# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| EMERSON REDEVELOPERS URBAN RENEWAL, LLC,<br><br>              Plaintiff,<br><br>      v.<br><br>THE BOROUGH OF EMERSON, NEW JERSEY, AND DANIELLE DIPAOLA,<br><br>              Defendants. | Civil Action No. 20-cv-4728-MCA-MAH |

---

## PLAINTIFF EMERSON REDEVELOPERS URBAN RENEWAL, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DANIELLE DIPAOLA'S MOTION TO DISMISS

---

**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, New Jersey 07102
Tel. (973) 643-7000
*Attorneys for Plaintiff Emerson*
*Redevelopers Urban Renewal, LLC*

Of Counsel and On the Brief:
Joseph B. Fiorenzo, Esq.
David W. Phillips, Esq.

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................... I

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 2

    a.    The Nature Of The Project ....................................................................... 2

    b.    The Low-to-Moderate Income Component Of The  Project Constituted A Court-Ordered Obligation Of Emerson, Which Resolved Litigation Against Emerson For Denying Residents Affordable Housing ........................... 3

    c.    Emerson, And Its Newly Elected Mayor DiPaola, Schemed To Defy The Fair-Housing Mandate, And Evade Compliance With The Fair-Share Judgment Against Emerson .................................................................. 7

LEGAL ARGUMENT ...................................................................................... 11

    a.    STANDARDS FOR A MOTION TO DISMISS UNDER R. 12(b)(6) ............... 11

    b.    THE COMPLAINT PROPERLY PLEADS A CLAIM FOR VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE BASED UPON THE DEFENDANTS' CONSCIENCE-SHOCKING VIOLATION OF THE COURT-ORERED PROJECT, IN AN ILLEGAL EFFORT TO DEPRIVE LOW-INCOME AND MINORITY CITIZENS OF AFFORDABLE HOUSING ........................................................................ 13

        1.    Plaintiffs Have a Fundamental Property Interest in the Project and its Rights Under the Redevelopment Agreement ................................... 14

        2.    Plaintiff Has Been Arbitrarily Deprived of Its Property Interest Through Acts That "Shock The Conscience" ........................................ 16

    c.    PLAINTIFF HAS ADEQUATELY PLEAD AN EQUAL PROTECTION CAUSE OF ACTION FOR HAVING BEEN TREATED DIFFERENTLY FROM THOSE SIMILARLY SITUATED AS A "CLASS OF ONE" .............. 25

    d.    MAYOR DIPAOLA IS LIABLE FOR CAUSING THE  BOROUGH TO BREACH ITS CONTRACTS WITH PLAINTIFF ........................................... 28

CONCLUSION................................................................................................. 28

## PRELIMINARY STATEMENT

Forty-five years after the New Jersey Supreme Court's historical desegregation decision in *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 67 N.J. 151 (1975), the Borough of Emerson still has not complied with the Supreme Court's directive. From 2016 through 2018, the administration of the Borough set out a course to reverse and remedy the Borough's discriminatory history. As part of that effort, the Borough designated plaintiff as the redeveloper of a dilapidated section of downtown, which is to include significant low income housing. The Borough entered a settlement with the Fair Share Housing Council, and then obtained Conditional Final Judgement of Compliance and Repose on the strength of the redeveloper's agreement and the settlement, thereby granting immunity from developer's remedy lawsuit that would impose a remedy.

Defendant/movant Danielle DiPaola, a long-time councilwoman and steadfast opponent of the progress being made by the Borough,[1] did not like what she saw. She ran for Mayor on an explicitly anti-development platform, promising to curtail the project, and its fair share housing. There can be no disguising her intent – she wants to prevent low income and racially diverse citizens from living in the Borough.

There is also no denying that she has been able to substantially harm the Project. Before she was sworn in, project was proceeding apace. After she was sworn in, following repeated statements that she would terminate the Project, nothing has moved forward – permits are delayed, frivolous conditions are imposed, requests are ignored – the Borough even refused to defend a *prerogative writ* lawsuit that sought to invalidate the project *in toto*.

Now, she comes before this court, blithely ignoring the illegality of what she has done,

---

[1] According to news reports she voted "no" to every resolution or ordinance necessary to advance the fair share housing compliance.

denying that she should have any liability for the clear and unequivocal civil rights violations she has caused.  As set forth below, the Complaint states a cause of action for substantive due process violations, for Equal Protection violations, and for her inducement of the Borough to breach its agreements with Plaintiff.

Plaintiff states a claim for violation of the substantive due process clause.  The Complaint pleads a fundamental and protected property interest in a plan for development of property it owns, an interest repeatedly recognized by the Third Circuit.  So, too, it pleads conscience-shocking conduct: Mayor DiPaola's campaign to use the land-use administrative process as a pretext to stop low-income and minority citizens from moving to Plaintiff's Project and obtaining the constitutional-right to fair housing—in violation of the New Jersey Supreme Court's *Mount Laurel* jurisprudence and a Court-Order directed to Emerson—is just the type of abuse of power remedied by a substantive due process claim.

Plaintiff further states a claim for violation of the equal protection clause.  Unlike similarly situated developers who did not propose affordable housing, the Complaint pleads that Plaintiff has suffered obstacles and delays concocted by Defendants that served no legitimate government interest and are, instead, wholly arbitrary.  Defendants' differential treatment of Plaintiff without any valid basis is sufficient to plead a violation.

Defendant DiPaola's Motion should be rejected.

## STATEMENT OF FACTS

**a.  The Nature Of The Project**

Emerson Redevelopers Urban Renewal, LLC ("ERUR" or "Plaintiff") is the designated redeveloper and the owner of certain property, and certain development rights, located at Block 419 on Kinderkamack Road in Emerson, New Jersey, upon which Plaintiff has received approval to construct a 147 Unit, four-story mixed use inclusionary development. The planned

development would add 29 Units of low and moderate-income housing, a critical component in satisfying Emerson's Fair Share Housing obligations (the "Project").   The Project has an estimated cost of approximately $48 million. Pursuant to the Redevelopment Agreement between Emerson and Plaintiff, Plaintiff has proceeded forward with the Project by expending substantial sums of money in professional, application, and development costs.  Compl. ¶ 1.

Plaintiff's years of effort at the Project was imperiled when, in January 2019, a new administration took control of Emerson's municipal government led by Defendant/Movant, Mayor Danielle DiPaola ("DiPaola"). Following her election, DiPaola embarked upon a course of action designed to interfere, impede and ultimately destroy Plaintiff's ability to complete the Project, and in particular the low-income component of the Project.  Compl. ¶ 2.

**b.   The Low-to-Moderate Income Component Of The   Project Constituted A Court-Ordered Obligation Of Emerson, Which Resolved Litigation Against Emerson For Denying Residents Affordable Housing**

Every municipality in New Jersey has an obligation to provide its fair share of lower income housing, as first enunciated in *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 67 N.J. 151 (1975).  In *Mount Laurel I*, the New Jersey Supreme Court recognized that local municipalities' land-use policies, which led to the exclusion of low-income residents, was inherently driven by racial discrimination.   Compl. ¶ 18.   The Court observed that the historical "exclusionary zoning practices [were] also often motivated by fear of and prejudices against other social, economic, and racial groups."  *Mount Laurel I*, at 736.  Thus, following in the footsteps of desegregation cases such as *Brown v. Board of Education*, the *Mount Laurel* Doctrine aimed to correct endemic segregation and discrimination in New Jersey housing. Compl. ¶ 21.

Resistance was immediate and organized, and recalcitrant municipalities devised many methods for avoiding the decision and opening their communities. In *Mount Laurel II*, the New

Jersey Supreme Court reiterated its holding and found that there was "widespread non-compliance with the constitutional mandate of our original opinion in this case." The Court specifically sought legislative action to implement the constitutional imperative expressed in the *Mount Laurel* Doctrine.  Thus, in 1985, New Jersey passed the Fair Housing Act, N.J.S.A. § 52:27D-301, et seq.  Compl. ¶ 23.  In 2015, in an effort to address continuing recalcitrance, in *In re N.J.A.C. 5:96 & 5:97*, 221 N.J. 1 (2015), the Court reinstated the ability of developers to sue recalcitrant municipalities in Superior Court—but gave the recalcitrant municipalities one last chance—a 30 day window to file a declaratory judgment action seeking a judicial determination of their fair share. Compl. ¶ 3.

Emerson is one of those recalcitrant municipalities. For years, it made no efforts to fulfill its constitutional duty of providing its fair share of affordable housing in its community.  Compl. ¶ 25. It filed just such a declaratory judgment action in Superior Court in an action entitled *In the Matter Of Application of the Borough of Emerson, Bergen County, New Jersey, for a Declaratory Judgment*, Superior Court of New Jersey, Bergen County, Docket No. BER-L-6300-15 (the "Mt. Laurel Litigation").  Compl. ¶ 4.

To avoid builder's remedy lawsuits, Emerson convinced the Court that it had accepted in good faith a plan realistically calculated to meet its fair share of affordable housing, based largely on the planned development by Plaintiff.  It issued a Request for Proposals from developers for redevelopment of Block 419, to which Plaintiff responded, and ultimately was selected as the Designated Redeveloper.  Comp. ¶ 29. On June 27, 2016, Plaintiff entered into a Redevelopment Agreement with Defendant Emerson, setting forth the terms and conditions pursuant to which the Project would be developed on Block 419 by Plaintiff (the "Redevelopment Agreement").  Consistent with the Redevelopment Agreement, on December

- 4 -

20, 2016, Emerson amended its Redevelopment Plan by Ordinance No. 1535-16 (the "Redevelopment Plan Ordinance") to authorize the Project.   Compl. ¶¶ 28-31. Among other things, the Redevelopment Agreement was intended to articulate Emerson's obligation of "cooperat[ion]" to assist Plaintiff in building the Project, including its fair-housing component, thus demonstrating to the Court Emerson's purported seriousness and good faith in promptly satisfying its constitutional obligation. Compl. ¶ 33. To induce the Court to accept its proposal, Emerson promulgated its "Third Round Plan," which expressly admitted the central role the Project played in causing Emerson to meet its obligations: "The Block 419 Project is an integral component of the Borough's Fair Share Plan. This project is necessary and useful for the construction of 29 low and moderate income family rental housing units in a centrally located portion of town, with easy access to both bus and train lines for commuters." Compl. ¶ 36. Plaintiff was granted Site Plan Approval by Emerson's Land Use Board on December 10, 2018. Compl. ¶ 37.

The Redevelopment Agreement with Plaintiff, which required affordable units at the Project, gave Emerson the evidence of an intent to pursue a concrete plan for fair housing required to obtain a declaratory judgment, which was entered on January 25, 2019, entitled Conditional Final Judgment of Compliance and Repose (the "Fair Share Judgment").   The affordable-housing units Plaintiff proposed to build was a critical component to satisfying Emerson's constitutionally-mandated fair share of low and moderate-income housing and avoiding builders' remedy lawsuits. Compl. ¶ 5. Particularly, pursuant to the Fair Share Judgment, rigorously reviewed and approved by a Special Master, Emerson was required to have an additional 53 low to moderate income units.   Of these, 22 units are to be the low income/moderate income units built by Plaintiff in the Project, and another 7 units are to be built

by Plaintiff at another site to be determined.  Compl. ¶ 7.   This provided the basis for the Court-appointed Special Master, Mary Beth Lonergan, to approve Emerson's plan based on Plaintiff's Project.   On December 14, 2018, the Special Master filed a "Master's Report For A Mount Laurel Compliance Hearing Borough of Emerson, Bergen County, *IMO Application of the Borough of Emerson*, Docket No. BER-L-6300-15," (the "Special Master's Report"). Compl. ¶ 34-39. The Special Master's Report observed that the Project included "an affordable set-aside requirement of 20%, and a requirement that at least 15% of all units be affordable and provided on-site . . . Plaintiff will provide 29 affordable units, including 22 on-site affordable units and seven (7) affordable units through an off-site mechanism and/or a PIL as established in Plaintiff's agreement." It concluded with the recommendation that the Court enter a Conditional Final Judgment of Compliance and Repose.  Compl. ¶ 39.  The Court accepted Emerson's fair-housing plan, based on the report of the Special Master, and on January 25, 2019, a "Conditional Final Judgement of Compliance and Repose" was entered. The Fair Share Judgment the incorporated recommendations of the Special Master, and ordered Emerson to proceed forward with Plaintiff's Project which would result in the construction of 29 units of affordable housing, comprising 55% of the total affordable housing obligation of Defendant Emerson.  Compl. ¶ 41.

In other words, Emerson represented to the Court it would achieve compliance with its constitutional fair-housing obligations through Plaintiff's project, which was accepted by the Court and embodied in an Order. Without Plaintiff's affordable-housing units, Emerson is in violation of both the Fair-Share Judgment and the New Jersey Supreme Court's fair-housing mandate.  Emerson did not accede to the construction of affordable housing willingly: it was driven to adopt the Redevelopment Agreement with Plaintiff to demonstrate it had a realistic plan, without any impediments, to satisfy the Court and Special Master, and avoid a glut of

lawsuits by developers. Compl. ¶ 35. It is without discretion to modify, restrict, or abandon Plaintiff's Project.

**c.   Emerson, And Its Newly Elected Mayor DiPaola, Schemed To Defy The Fair-Housing Mandate, And Evade Compliance With The Fair-Share Judgment Against Emerson**

These carefully orchestrated agreements to comply with Emerson's constitutional obligations, approved by the Court and Special Master, were swept away with the November 2018 elections. Defendant DiPaola and her slate of candidates ran on a platform of stopping the Project, as approved by the Court, Special Master, Plaintiff and Emerson through its previous administration. Compl. ¶ 8. Since January, 2019, when Defendant DiPaola and her affiliates took control of the levers of power in Emerson, at the direction of Defendant DiPaola, Defendant Emerson intentionally obstructed the construction of Plaintiff's affordable-housing Project, through a continuing stream of frivolous roadblocks and impediments to development, and with the goal of so delaying and harming the Project so as to make it not economically viable. Compl. ¶ 9.

Defendant DiPaola expressly campaigned for Mayor on a stated platform of obstruction and interference with Plaintiff's Project particularly, and, more generally, with affordable housing intended to benefit the poor and minorities. Compl. ¶ 44. She called her election "a referendum on overdevelopment" in Emerson, with the Project at Block 419 as its centerpiece, proclaiming that the "people of Emerson have spoken" on the issue. Compl. ¶¶ 46, 48. After the election Defendant DiPaola called upon town officials to take no further action to fulfill Emerson's obligation under the Fair Share Judgment until January when she would be sworn in as Mayor. *Id.* When she assumed office, she derided Plaintiff's Project, asking whether it was "really what you want to see in the downtown for the next 100 years." Compl. ¶ 47. She vowed to "scale back," and later, terminate, the Project. Compl. ¶¶ 47, 49.  Defendant DiPaola was well

aware that since the Project required below-market affordable housing, it could only be economically viable at the size and scope contained in the Fair Share Judgment and understood that to "scale back" the Project would render it not economically viable and, thus, kill the Project: her stated intention.  Compl. ¶ 50. She complained that the Borough had purportedly lost "seven of its thriving businesses due to redevelopment in the name of affordable housing," and vowed to stop what she claimed were policies unfriendly to businesses. Compl. ¶ 55.

True to her word, Defendant DiPaola, under color of law using the instruments of the government in Emerson, engaged in a series of actions designed to accomplish her goal of terminating the Project.  Compl. ¶ 51. DiPaola orchestrated a scheme to obstruct construction that included the following:

     a.  **Refusal to issue demolition permit.**  The Defendants arbitrarily refused to issue demolition permits by frivolously taking the position that Plaintiff had to first show full resolution compliance and obtain all outside agency approvals.  There existed no legal basis whatsoever for these frivolous demands and they were made solely to interfere with the ability to move forward with construction.  Eventually, after considerable delay, and knowing that their position was defenseless, they were forced to relent and issue the demolition permit.

     b.  **Refusal to issue fence permit.**  After applications for fence permits were submitted in the form and manner sought by Emerson, and in compliance with the site plan application, at last minute, Emerson demanded to conduct a new review of the area to be fenced, and withheld approval of the permit.  Incredibly, at the same time, Emerson asserted that Plaintiff was not securing the Project sufficiently and that there were squatters in the vacant buildings.  These arbitrary actions were a transparent attempt to delay construction, cause economic harm to the Project, which Defendants hoped would make the Project not economically viable.

     c.  **Demand for inappropriate information from asbestos contractor.**  When asbestos removal began, the Borough demanded that the asbestos removal contractor file for a Borough permit, as well as provide the names of all their workers and insurance information.  These demands were arbitrary, capricious and without any legal basis, and were designed to delay and impede Plaintiff's ability to move forward with construction. Ultimately, because its demands were frivolous, the improper request was withdrawn, but only after significant harm and damage to the Project.

d. **Denial of permits for utility disconnections.**  Defendants arbitrarily and capriciously denied Plaintiff's application for permits by frivolously demanding that Plaintiff obtain documentation from the NJDEP concerning the alleged monitoring wells.  Defendants had no right to attempt to impose such precondition and they knew that the monitoring wells had been decommissioned years ago and were no longer in use, despite these demands which caused further delay.

e. **More delay of demolition permits.**  The Borough still further delayed the demolition permits by insisting that all the demolition permits, for every lot in the Project, had to be completed and submitted at once.  This also had no basis in law, or good construction (or demolition) practices, and caused further delay and effort.

f. **Refuse to issue sewer and water cutting and capping permits.**  The Borough unnecessarily refused to process and issue permits for the cutting and capping of the sewer and water lines until all the demolition was complete for all of the lots.  This again caused delay and expense.

g. **Signoff by fire and police.**  Defendants imposed the frivolous requirement that the Fire and Police officials physically sign an acknowledgement that any concerns of theirs are being addressed despite the fact that there was an approved Site Plan.

h. **Delay in issuance of resolution compliance.**  Defendants have frivolously imposed conditions through a "Resolution of Compliance" which have no basis in law, or fact, and which have had the effect of unduly delaying the Project's construction.  After substantial delay, when the Borough Engineer issued a Resolution Compliance letter, it contained myriad demands, contrary to the law and contrary to the approved Site Plan.  All of this had the intended effect of causing substantial delay and damage to Plaintiff.

i. **Refusal to execute municipal consent for TWA.**  Currently, the Borough has refused to issue its consent for the Treatment Works Approval ("TWA").  In fact, the Borough has missed its deadline under law to consent or object to the issuance of the TWA to Redeveloper, so Plaintiff can proceed without the Borough's consent.  However, the Borough's refusal to act on the request caused additional substantial delay in the Project.

j. **Failure to contest prerogative writ lawsuit.**  A prerogative writ action was filed challenging the Borough's December 28, 2018, Resolution memorializing site plan approvals for the Project, as well as the entire Redevelopment Plan put in place in 2006, *Hassan v. Borough of Emerson*, Superior Court of New Jersey, Bergen County, Docket No. BER-L-002577-19.  Although the Complaint was filed well after the 45 day

deadline of R. 4:69 to challenge the Resolution, and despite several communications from Redeveloper and its counsel, the Borough failed to answer or otherwise respond to the lawsuit, in an obvious attempt to have a default judgment entered invalidating the Site Plan approval. Defendant Emerson, at the direction of Defendant DiPaola, failed to answer or otherwise respond to the lawsuit, in violation of its duty to cooperate and the covenant of good faith.   This jeopardized not just the Project, but Emerson's fair share housing settlement and the Court's Judgment of repose and compliance in this action.   Redeveloper was forced to intervene in the lawsuit and move for dismissal, which was granted with prejudice. The Defendants never filed an answer to the lawsuit in the hope that it would terminate the Project.

k.   **Failure to respond to cease & desist letter.**   After the Settlement Agreement, the Conditional Final Judgment, and the dismissal of the *Hassan* prerogative writ suit, counsel for Cork & Keg purported to demand that the Borough "cease and desist" from redeveloping Block 419 with the Project, and demanded that the Borough refuse to issue demolition permits.   Incredibly, the Borough again made no response to this demand, and left it to Plaintiff to respond to counsel.

l.   **Failure to proceed with condemnation of Caiqui Zheng.**   Defendants were informed that Plaintiff was unable to purchase the leasehold interest on the property of Caiqui Zheng and, as a result, condemnation proceedings must be initiated as required by the Settlement Agreement.   In an effort to further delay the Project and drive up its costs, Defendants unjustifiably delayed in initiating the condemnation which was necessary for development of the Project.

Compl. ¶ 52.

Consistent with the promises made by Defendant DiPaola, when she ran for Mayor, the Defendants have engaged in every technique they could muster to interfere with and delay the Project in order to stop the construction of affordable housing by driving up the cost of the Project to such an extent that the Project is no longer economically viable, thus, effectively terminating the Project.  Compl. ¶ 53.

In a demonstration of the willful and intentional obstruction of Plaintiff's project, knowingly in violation of the Court's Order, Defendant DiPaola, on March 3, 2020, caused a Resolution to be adopted authorizing Emerson's counsel to file a lawsuit against the Plaintiff

relating to the Project, understanding that this further interfered with Plaintiff's rights under the Redevelopment Agreement to construct affordable housing.  In the video of that meeting, it shows the Board taking a break to go into closed session to discuss the filing of a lawsuit against Plaintiff, and when they returned, the Mayor asked for a motion to authorize the filing of the suit. The governing body members, including Defendant DiPaola, are laughing, chortling and tripping over each other to be the first to "so move" and "second" before enthusiastically adopting the motion.  Compl. ¶ 56.

Mayor DiPaola has made every effort to obstruct Plaintiff's Project so that affordable housing will not be built.

## **LEGAL ARGUMENT**

### a.    **STANDARDS FOR A MOTION TO DISMISS UNDER R. 12(b)(6)**

The Supreme Court has held that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[2] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  The complaint need not include "detailed factual allegations," and all well-pleaded allegations are accepted as true.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (citing *Twombly*, 550 U.S. at 555)).  A complaint containing well-pleaded facts from which a plausible claim for relief can be inferred is not subject to dismissal on a motion under Federal Rule of Civil Procedure 12(b)(6).  *Id.* at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citing *Twombly*, 550 U.S. at 570)).   Rule 8(a) does not impose a

---

[2] "[T]he Supreme Court's emphasis on Rule 8's requirement of a 'showing' is new," but does not impose any additional requirements beyond that the pleading contain a "a short and plain statement of the claim and its grounds." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citing *Twombly*, 550 U.S. at 555 n.3).

"probability requirement" on the plaintiff, but merely requires that the complaint plead more than "a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

The Third Circuit has cautioned that the plausibility standard set forth in *Twombly* and *Iqbal* "does not impose a heightened pleading requirement, and that Federal Rule of Civil Procedure 8(a) continues to require only a 'showing' that the pleader is entitled to relief." *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (citing *Phillips*, 515 F.3d at 233-34). Indeed, the *Twombly* Court expressly disavowed a heightened standard that would require the pleading of specific facts showing an entitlement to relief. *Twombly*, 550 U.S. at 569-70. "Implicit in the notion that a plaintiff need not plead 'specific facts' to survive a motion to dismiss is that courts cannot inject evidentiary issues into the plausibility determination." *Schuchardt*, 839 F.3d at 347 (citing *Twombly*, 550 U.S. at 556). Permitting a court to do so "would confuse the principles applicable to a motion to dismiss with those governing a motion for summary judgment." *Id.* at 348 (citations omitted).

The trial court's analysis of whether a complaint states a plausible claim for relief is "a context-specific task" that requires the "court to draw on its judicial experience and common sense." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786-87 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The Third Circuit has observed that the pleading standards set forth in *Twombly* and *Iqbal* require a three-step analysis. *Connelly*, 809 F.3d at 787. First, the court "must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.'" *Connelly*, 809 F.3d at 787 (quoting

*Iqbal*, 556 U.S. at 675).  Next, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679).  Third, the court must assume the truth of the remaining well-pleaded factual allegations and "then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Plaintiff's detailed Complaint more than satisfies these standards for well-pleaded, non-conclusory allegations of plausible claims for the relief asserted, and therefore satisfies the pleading standards established in *Twombly* and *Iqbal*.

**b.  THE COMPLAINT PROPERLY PLEADS A CLAIM FOR VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE BASED UPON THE DEFENDANTS' CONSCIENCE-SHOCKING VIOLATION OF THE COURT-ORERED PROJECT, IN AN ILLEGAL EFFORT TO DEPRIVE LOW-INCOME AND MINORITY CITIZENS OF AFFORDABLE HOUSING**

Ignoring any of the substance of the actual allegations of the Complaint, Defendant DiPaola wrongly argues this is just a "garden variety contract dispute" over permits, DiPaola Br. 1, and that Plaintiff purportedly has no constitutional "right, contractual or otherwise, to construction permits, approvals of the Project." DiPaola Br. 8.  By any reasonable reading of the Complaint—much less taking the allegations as true and giving Plaintiff the benefit of all favorable inferences, as required—Plaintiff does not merely contest its entitlement to permits. Rather, Plaintiff pleads that Defendant DiPaola, seeking to avoid low-income and minority residents that she baselessly feared would harm Emerson's businesses, used her position as Mayor to erect procedural obstacles to Plaintiff's Court-ordered redevelopment project to frustrate those protected classes from moving to Plaintiff's property. Far from alleging, as Defendant contends, "non-existent constitutional rights," DiPaola Br. 1, Plaintiff asserts the well-established "[property developer's] right to be free of arbitrary or irrational zoning actions." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977).

The "substantive component of the Due Process Clause limits what governments may do regardless of the fairness of the procedures that it employs." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000).  To state a substantive due process claim, a plaintiff must plead: (1) "the property interest being deprived is fundamental under the Constitution"; and (2) that there was an "arbitrary or irrational deprivation, regardless of the adequacy of procedures used." *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000).

    1.  <u>Plaintiffs Have a Fundamental Property Interest in the Project and its Rights Under the Redevelopment Agreement</u>

Defendant DiPaola first baselessly claims that the Plaintiff property owner somehow failed to allege that it has been deprived of a property interest protected by the Fourteenth Amendment.[3]  The Third Circuit has found as a matter of law that a planned development by a landowner, such as Plaintiff, in connection with "real property ownership" is a fundamental interest protected by substantive due process. *Nicholas*, 227 F.3d at 141 ("[L]and ownership is a property interest worthy of substantive due process protection") (internal alterations omitted). Similarly, decisions which "impinge[] upon a landowner's use and enjoyment of property" constitute protected fundamental interests. *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 600 (3d Cir. 1995) *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392 (3d Cir. 2003)). Moreover, "governmental permission required for some intended use of land owned by the plaintiffs implicate[s] the kind of property interest protected by substantive due process." *Woodwind Estates Ltd. v. Gretkowski*, 205 F.3d 118, 123 (3d Cir. 2000); *Indep. Enters. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179 n.12 (3d Cir. 1997) ("[Z]oning decisions, building permits, or other governmental permission required for some intended use of land owned by the plaintiffs, [are] matters which were recognized in

---

[3] *See* DiPaola Br. 8 ("It has no right contractual or otherwise, to construction permits, approvals of the Project . . . , or the Borough's defense to legal claims brought by others. . . .  In the absence of any such property rights, the due process claim must be dismissed.").

*DeBlasio* as implicating the 'fundamental' property interest in the ownership of land."). Defendants' impairment, obstruction, and delay of Plaintiff's property interest in constructing the inclusive development is plainly set forth in the Complaint and includes deprivation of its rights in the real property it owns on which the Project is to be built, deprivation of its development rights under the Redevelopment Agreement and the potential loss of its investment in the Project.

Next, Mayor DiPaola apparently seeks to have this Court resolve a factual issue at the motion-to-dismiss stage, asserting that Mayor DiPaola, herself, "has not taken any steps to deprive ERUR of any real property interest." DiPaola Br. 8. In the context of this motion, Ms. DiPaola's factual denials of her actions are meaningless, and should not be given any weight. The Complaint plainly and expressly pleads how "Defendants Emerson and DiPaola have sought to derail and destroy the Project through a course of delay and obstruction." Compl. ¶ 61. It articulates how Mayor DiPaola used her power and influence to delay and obstruct her own administration's issuance of the government approvals necessary to start construction of Plaintiff's Project. By way of example only, the Complaint pleads that after her election she "announced to the press her intention to obstruct and terminate," Compl. ¶ 48. She urged her subordinates, "town officials to take no further action to fulfill Emerson's obligation under the Settlement Agreement," Compl. ¶ 46. "She derided the [plaintiff's] proposal[]" for an inclusive housing project, asking whether that was "really what you want to see in the downtown," Compl. ¶ 47, and promising "[w]e're "trying to scale this back . . . that is friendlier to our small downtown." Compl. ¶ 49. As "orchestrated by Defendant DiPaola," Compl. ¶ 56, she presided over a campaign by her administration to block the Project, or in the alternative, make the administrative burden so costly to Plaintiff that it was no longer economically possible to build the Project. Unsurprisingly, the town's departments delayed and rejected Plaintiff's applications,

consistent with exactly what DiPaola had promised.  The Complaint pleads that her purpose was to "impede the construction of affordable housing," Compl. ¶ 52, particularly so as to avoid the relocation of "poor and minorities" to Emerson. Compl. ¶ 44.  This discriminatory purpose was further confirmed when Mayor DiPaola explained the delays in approving Plaintiff's Project as related to her believe that "affordable housing," was the cause of Emerson "los[ing] seven of its thriving businesses due to redevelopment in the name of affordable housing," Compl. ¶ 54. In other words, the Complaint pleads that Mayor DiPaola attributed the loss of businesses to Plaintiff's planned redevelopment and confirmed that she was using influence over the township's land development and construction offices to obstruct Plaintiff's development because of the perceived impact on businesses if poor and minority residents moved to downtown Emerson.  As pled, DiPaola's direct involvement in the discriminatory obstruction of Plaintiff's Project and impairment of Plaintiff's property rights could not be clearer and her factual protestations have no place in a motion at the pleading stage.

2. <u>Plaintiff Has Been Arbitrarily Deprived of Its Property Interest Through Acts That "Shock The Conscience"</u>

i. *Defendants' Conduct Is Subject to the Highest Level of Scrutiny*

To establish a substantive due process violation, "a plaintiff . . . must demonstrate that the official's conduct 'shocks the conscience' *in the particular setting* in which that conduct occurred." *Nicini v. Morra*, 212 F.3d 798, 810 (3d Cir. 2000) (emphasis added).  The Third Circuit has explained that whether conduct shocks the conscience is an adaptive standard, as "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case, because a 'higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks.'"  *B.S. v. Somerset Cnty.,* 704 F.3d 250, 267-68 (3d Cir. 2013) (quoting *Miller*, 174 F.3d at 375-76).  The standard has been described as a sliding scale based

- 16 -

on varying levels of urgency and duty: where the situation is "hyper-pressurized," the official's conduct will have to rise to a higher level of wrongdoing (i.e., be "more conscience-shocking" or approach acting with purpose of causing harm) to impose liability.  *See*, *e.g.*, *Leamer v. Fauver*, 288 F.3d 532, 546 (3d Cir. 2002) (noting that a prison medical official's indifference is conscience-shocking in cases of inmate welfare because of protracted timeframe and obligation to inmate care); *Miller v. City of Philadelphia*, 174 F.3d 368, 375-76 (3d Cir. 1999) (noting that social worker is operating under less urgency than a prison riot or high-speed chase and so "in order for liability to attach, . . . need not have acted with the 'purpose to cause harm,' but the standard of culpability . . . must exceed both negligence and deliberate indifference, and reach a [conscience-shocking] level of gross negligence or arbitrariness.").

Defendants' discriminatory conduct warrants the highest level of scrutiny: they had the luxury of an unhurried decision-making process concerning a commercial (and non-life threatening) matter.  There has been no assertion that Mayor DiPaola was reacting to an emergent development that risked life or property, and her motives and outlook have been displayed for the public in the articles quoted in the Complaint.  Indeed, she made her outlook – and intentions – her campaign platform – stopping the Project and fair share housing in Emerson at any cost.  This was not just an unhurried decision, it was an intentional, calculated, thought out position, clearly driven by animus toward fair share housing and all that it stands for, including racial integration.  *See Beard v. Borough of Duncansville*, 652 F. Supp. 2d 611, 625 (W.D. Pa. 2009) (holding borough's action with respect to redevelopment "had the 'luxury of proceeding in a deliberate fashion' and, as such, providing evidence of deliberate indifference to the rights of [plaintiff] would be the proper approach to evaluating the 'shocks the conscience' standard.").  Accordingly, context dictates that the decision here was made in a calculated and deliberative

manner that would more easily "shock the conscience" than under more urgent circumstances.

> ii.    *Plaintiff's Complaint Meets The Conscience-Shocking Standard As Obstructing A Constitutional Right, Invidious Discrimination, Or Corruption*

Yet again misconstruing Plaintiff's complaint as mere disputes of state law over entitlement to "permits," Mayor DiPaola wrongly claims that none of the allegations "rise to the of [sic] self-dealing or corruption that shocks the conscious [sic]." DiPaola Br. 1. Not only is DiPaola incorrect, but she entirely ignores that Plaintiff's Complaint also pleads the well-established conscience-shocking behavior of class-based discrimination and interference with a protected right to housing. As expressly pled in the Complaint, Mayor DiPaola's "purpose was to obstruct and interfere with Plaintiff's development . . . of affordable housing intended to primarily benefit the poor and minorities." Compl. ¶ 44.   By artificially and irrationally constraining the scope of Plaintiff's pleadings to a mere dispute regarding permits, Defendant does not even submit argument regarding a key allegation: that Emerson and Mayor DiPaola constructed new onerous roadblocks as a pretext to obstruct low income and minority residents from moving to Plaintiff's redeveloped Property in Emerson—due to the perceived impact on business of complying with the constitutional obligation to provide housing for such residents— even after having been ordered by the New Jersey Supreme Court, the Superior Court, and the Special Master to cease its discriminatory housing policies.   This most certainly states conscience-shocking behavior at the pleading stage.

In the land-use context, one means for a complaint to state conscience-shocking conduct is to allege interference with constitutionally protected rights or class-based discrimination. Land-use or property decision that impact constitutional rights will qualify as "shocking the conscience."  *See Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F. Supp. 2d 633, 655 (E.D. Pa. 2003) (abortion rights). Similarly, land-use decisions which are intended to

harm a protected class are also conscience-shocking. *See MARJAC, Ltd. Liab. Co. v. Trenk*, 380

F. App'x 142, 147-48 (3d Cir. 2010) ("Township Attorney's selective enforcement of municipal

zoning laws was motivated by antipathy toward Italians - conduct which may shock the

conscience - creates a genuine issue of material fact sufficient to survive summary judgment.");

*Eichenlaub*, 385 F.3d at 286 (noting that conscience-shocking conduct includes attempts "to

interfere with otherwise constitutionally protected activity at the project site, or because of some

bias against an ethnic group," or "differences in treatment stem[ming] from racial or other

invidious forms of discrimination."); *Adhi Parasakthi Charitable v. Twp. of W. Pikeland*, 721

F.Supp. 2d 261 (E.D.Pa. 2010) (if a conditional use permit was denied "due to a bias against

Hindus…this would constitute conscience shocking behavior.").

Notably, *Eichenlaub* clearly stands for the proposition that land uses that "implicate a

separately protected constitutional right are analyzed differently than uses that do not implicate a

separately protected constitutional right."  385 F.3d at 285.  The Third Circuit explained through

a hypothetical:

> By way of example, a zoning decision that effectively prevented an owner from
> publishing a political newspaper would be analyzed under a framework that took
> into account the fact that such a use was separately protected by the First
> Amendment, while a zoning decision that effectively prevented an owner from
> manufacturing playing cards would be analyzed differently, as there is no separate
> constitutional protection for manufacturing playing cards. Both uses can serve as
> the basis for a substantive due process claim, however, the "shocks the
> conscience" standard will be applied differently to the two, as one involves a
> separately protected constitutional activity and the other does not.

*Tucker Indus. Liquid Coatings, Inc. v. Borough of E. Berlin*, 656 F. App'x 1, 6 (3d Cir. 2016).

The analysis concerning impairment of constitutional rights was applied in *Assocs. in*

*Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F.Supp.2d 633 (E.D.Pa 2003), where the

District Court found that the town's selective enforcement of zoning laws was solely based on

the fact that plaintiff was an abortion provider.   There, the Court found that the selective enforcing of zoning laws was intended to "eliminate the provision of abortion services in the Township" and that such motive does not further a "valid state interest."   *Id*. at 656.   To put another way, the court stated that enforcing zoning regulations "with the intent to harm Plaintiffs' business interests and to restrict their practice of lawful medical procedures states a claim that shocks the conscience."   *Id.*   (*citing County of Sacramento v. Lewis*, 523 U.S. 833 (1998)).

In *MARJAC, LLC v. Trenk*, 380 Fed. Appx. 142 (3d. Cir. 2010), the Third Circuit vacated the District Court's judgment dismissing the plaintiff's substantive due process claim.   The plaintiff sought to develop a largescale restaurant, nightclub and bar in West Orange, New Jersey.   By the time construction was 90% complete, the Township issued the first of numerous Stop Work Orders, citing variances from the approved plans.   Plaintiffs claimed that the Township, particularly the Town Attorney, harbored "personal animus" towards them, and antipathy toward their Italian heritage, claiming that the project was underwritten by "Mafia Money."   As such, the plaintiffs filed a ten-count complaint in state court alleging violations of Section 1983 and state law.   The district court dismissed their section 1983 claims, but the Third Circuit reversed, holding that plaintiffs "properly allege[d] a violation of substantive due process" because of their claim that the Attorney selectively enforced ordinances by motivation of his antipathy toward Italians.   The court expressly stated that "[d]epending on the gravity, context and surrounding circumstances, selective enforcement motivated by ethnic bias may constitute arbitrary conduct capable of shocking the conscience."   *See also Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 861 F.Supp.2d 470 (M.D. Pa. 2012) (allegation that the defendants harassed a business based on the race of its patrons sufficiently alleged conscience-shocking

behavior); *Hayward v. Borough of Sharon Hill*, 2013 U.S. Dist. LEXIS 153355 (E.D.Pa. Oct. 25, 2013) (allegation that the plaintiff was deprived of the use of his property because of his race stated substantive due process claim).

Similarly, in *Neiderhiser v. Berwick*, 840 F.2d 213 (3d Cir. 1988), the Court of Appeals reversed the district court's dismissal and upheld plaintiff's section 1983 substantive due process claim against the Borough of Berwick.  Plaintiff in *Berwick* leased premises on a property to establish a video rental store, that also included the rental of adult videos.  Plaintiff's intended use did not fall within those permitted by the area zoning plan.  Plaintiff's application for an exemption was denied, despite the property being operated on a commercial basis for the past 30 years, based on the Board Members' concerns at the hearing regarding the adult movies.  While the parties attempted to negotiate a settlement thereafter, the defendant also passed an ordinance which prohibited the sale of adult material or the establishment of adult book stores within the borough.  The Third Circuit, overturning the district court's dismissal, noted that the defendants' denial of plaintiff's exemption application was based on an "improper reason…which deprived [plaintiff] of its right to free expression and due process."

Here, the Complaint clearly pleads that Defendants' course of conduct of delay, obstruction, and pretextual denials was designed in its purpose to frustrate "affordable housing" for "poor and minorit[y]" citizens who would otherwise be able to move to Emerson absent Defendants' wrongful conduct, depriving citizens of a constitutional right to fair housing. Compl. ¶ 44.  Plaintiff expressly pleads both interference with a protected right and class-based discrimination on the basis of race and income, either of which are sufficient to state a claim. The *Mt. Laurel* line of cases from the New Jersey Supreme Court are intended to address invidious discrimination in housing in New Jersey, propagated by, and continued by, government

action.  Indeed, *Mt. Laurel I*, *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 67 N.J. 151 (1975), generally heralded as one of the great civil rights decisions,[4] was brought by the NAACP of Burlington County, due to the Borough of Mt. Laurel's refusal to permit low income housing that would have permitted minority families to live in Mt. Laurel.  Forty-five years later, after *Mount Laurel II, III* and *IV* have come and gone, Emerson has yet to fulfill its obligations to provide fair share housing. As set out in the Complaint, Emerson has attempted to appear as though it intended to satisfy these obligations,  resulting in passage of the December 31, 2018, resolution approving the Project.  However, Mayor DiPaola was sworn into office 3 days later on a platform of repealing those same measures designed to bring Emerson into constitutional compliance.

Mayor DiPaola ran for office on an "anti-development" platform, purportedly seeking to preserve the character of Emerson.  She was against the Project as being too big for Emerson, and promised to stop the Project.  Her code words – "overdevelopment in downtown", having "serious concerns about the direction the town is taking", wanting development that is "friendlier", and bemoaning the loss of a business "in the name of affordable housing" – clearly conveyed her animus to the low income, diverse, inclusionary housing to be built in the Project, and the sort of residents that might move into her community from surrounding areas.

To effectuate this discriminatory intent, as alleged in the Complaint, she "engaged in a series of actions designed to accomplish her goal of terminating the Project," and/or led her town in actions designed to accomplish her goal, including:

- ■ Refusal to issue demolition permits;

---

[4] "The New Jersey Supreme Court's 1983 ruling in the *Mount Laurel* fair-housing case is rightly regarded as one of the most important civil rights decisions of modern times.  The ruling, which greatly influenced fair-housing policy across the nation, limited the use of exclusionary zoning as a means of preventing the construction of affordable housing in wealthy communities."  "*The Mount Laurel Doctrine*," New York Times, Editorial page, January 28, 2013.

- Refusal to issue fence permits;

- Harassing an asbestos contractor with improper demands for personal information;

- Delaying utility disconnections

- Delaying the Project by a "resolution compliance" scam;

- Refusal to enter the Treatment Works Approval;

- Failure to contest a prerogative writ lawsuit that would have invalidated the Project, which was facially beyond the statute of limitations, and was summarily dismissed this basis on motion of the Plaintiff as intervenor;

- Failure to proceed with condemnation of a leasehold necessary for the Project.

As pled, Mayor DiPaola intended to—and did—prevent the exercise of the constitutional rights to low income housing. It also constitutes class-based discimination.  It is without doubt that this effort to suppress and deny key constitutional rights, and continue Emerson's deep-seated and undeniable discrimination against minorities and low-income citizens, "shocks the conscience," particularly after 45 years of *Mt. Laurel* litigation and Court Orders directed expressly against Emerson to cease this conduct.

Moreover, a complaint also states the element of "conscience-shocking" conduct if it the well-pled allegations support the inference of "arbitrary action of government . . .  in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *Lewis*, 523 U.S. at 845-46. Particularly, it shocks the conscience where a state official "deliberately and arbitrarily abused [the government's] power," *Nicholas*, 227 F.3d at 139. Thus, in addition to discrimination against a protected class and intrusion into a constitutional right, it is also conscience-shocking in the land-use context where there are allegations of "corruption or self-dealing." *Eichenlaub,* 385 F.3d 274, 286. Courts in the Third

Circuit have repeatedly held that the abuse of power for the corrupt ends of intentionally harming the plaintiff constitutes conscience-shocking conduct. *See New Horizon Inv. Corp. v. Mayor & Mun. Council of Belleville*, No. 2005 U.S. Dist. LEXIS 21665, at *24 (D.N.J. Sep. 9, 2005) (Hayden, J.) ("[Allegations that defendant] deliberately acted to cheat the plaintiffs out of all economically beneficial use of their properties, *after* affirmatively promising the plaintiffs they could actively develop these parcels . . . pleaded substantive due process sufficiently to withstand a motion to dismiss.") (emphasis in original); *see also Feibush v. Johnson*, 2015 U.S. Dist. LEXIS 193185 (E.D. Pa. Mar. 20, 2015) (denying motion to dismiss substantive due process claim where city "notified [plaintiff] that he had been selected as the developer for the site, and, in reliance on this communication, [plaintiff] purchased private lots on the same block and incurred development costs. . . [but] Councilman Johnson unilaterally stopped the sale") (internal quotation marks omitted); *Beard*, 652 F. Supp. 2d at 625 (denying summary judgment where reasonable jury could find conscience-shocking behavior where city took easement over portions of plaintiff's property even after being advised that it did not have statutory authority to support action because "Plaintiffs produced sufficient evidence for a reasonable jury to conclude that the Defendant Borough acted with deliberate indifference towards the property rights of the Plaintiffs, thus shocking the conscience."); *MFS, Inc. v. DiLazaro,* 2009 U.S. Dist. LEXIS 89125, at *57-58 (E.D. Pa. Sep. 25, 2009) ("There is also a genuine issue of material fact as to whether Defendants knew that their actions in blocking the issuance of the Title V permit were wrong and/or in violation of their authority . . . [and] a genuine and material dispute here as to whether Defendants were acting in the public interest or whether they were arbitrarily attempting to close the plant.  If the latter is proved at trial, an inference can be drawn that Defendants' conduct shocks the conscience.").

Here, taking the allegations in the Complaint as true and giving Plaintiff the benefit of all favorable inferences, Plaintiff pleads that Mayor DiPaola corruptly and intentionally sought to exercise her power to harm Plaintiff and undermine the Court Order mandating the construction of affordable housing.  This abuse of power by Mayor DiPaola, in defiance of a valid Court Order, and calculated to cater to the whims of a portion of the electorate who wished to disobey the judicial process, is nothing less than conscience-shocking.

**c.**  **PLAINTIFF HAS ADEQUATELY PLEAD AN EQUAL PROTECTION CAUSE OF ACTION FOR HAVING BEEN TREATED DIFFERENTLY FROM THOSE SIMILARLY SITUATED AS A "CLASS OF ONE"**

Equal protection suits under a "class of one" theory are appropriate where "it appears that an individual is being singled out by the government such that the specter of arbitrary classification is fairly raised."  *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 602 (2008). Plaintiffs have made out the required elements of this claim in that:  "(1) the defendant[s] treated [Plaintiffs] differently from others similarly situated, (2) the defendant[s] did so intentionally, and (3) there was no rational basis for the difference in treatment."  *Hill v. Borough of Kutztown*, 455 F.3d 225 at 239 (3rd Cir., 2006).

At the pleadings stage, Plaintiffs are not required to identify with specificity the similarly situated parties or how they have been treated differently.  *See Phillips*, 515 F.3d at 244 ("[Supreme Court precedent] does not establish a requirement that a plaintiff identify in the complaint specific instances where others have been treated differently for the purposes of equal protection"); *M.G. v. Crisfield*, 2009 U.S. Dist. LEXIS 83419, at *14 (D.N.J. Sept. 11, 2009) ("The Third Circuit has held that a plaintiff is not required to specifically identify the similarly situated persons.").  Once discovery starts, of course, Plaintiff will be able to seek information on the Borough's and the Mayor's actions towards other builders and contractors.

As to the second element, Plaintiffs have surpassed the minimum requirement of generally alleging intent to treat parties differently.  *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Thomas v. Coopersmith*, 2012 U.S. Dist. LEXIS 118747, at *14 (E.D. Pa. Aug. 20, 2012) (finding intent was sufficiently pled where the plaintiff alleged that the disparate treatment by police was motivated by their friendship with his neighbor (with whom he was in a dispute)).  Plaintiff has met this requirement by setting forth detailed allegations of intent in identifying the Mayor's animus toward the Project and fair share housing, which reveal her contemptuous and intentionally unfair treatment of Plaintiff that are contrary to the public's well-documented interest in development of inclusive, low income housing.

As to the third element, Plaintiff has pled a lack of rational basis for the disparate treatment.  Indeed, the continued resistance to *Mt. Laurel* fair share housing is not just morally and constitutional repulsive, but has no possible legitimate benefit to the Borough.  In fact, DiPaola's resistance and animus has exposed the Borough not just to litigation with Plaintiff, but to the real possibility that the Superior Court will authorize builder's remedy lawsuits against Emerson to force fair share housing.  This is legally sufficient for pleading purposes.  *See Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1176 (3d Cir. 1986) (reversing dismissal of news agency's claim that government permitted access to information only "to those favorably disposed to it while denying access to those whom it considers unfriendly"); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir. 2000) (holding that there is no rational basis for differential treatment based on "reasons of a personal nature unrelated to the duties of the defendant's position").  Here, the Mayor's decision to target Plaintiff and the Project based on her animus to development of fair share housing is wholly arbitrary and not rationally linked to

- 26 -

legitimate governmental objectives. *See Versaggi v. Twp. of Gloucester*, 2005 U.S. Dist. LEXIS 30241 (D.N.J. Nov. 28, 2005) (denying motion to dismiss when plaintiff alleged different treatment based upon nepotism); *Hankin Family P'ship*, 2012 U.S. Dist. LEXIS 1471, at *63 (denying summary judgment where evidence showed plaintiff property owner was denied variance because zoning board wanted a golf course at that location); *Thomas v. Coopersmith*, 2012 U.S. Dist. LEXIS 118747, at *14 (difference in treatment due to another's friendly relationship with decision-maker); *Jannuzzi v. Borough of Edwardsville*, 2009 U.S. Dist. LEXIS 106166, at *9 (M.D. Pa. Nov. 13, 2009) (denying a motion to dismiss where the plaintiffs alleged they were treated differently because of "personal animus"); *see also Cordeco Dev. Corp. v. Vasquez*, 539 F.2d 256, 260 (1st Cir. 1976) (finding an equal protection violation where a plaintiff's sand extraction permit application was treated differently because "plaintiff's application was opposed by the politically influential Abreu family which owned the five adjacent parcels [compared to] [Plaintiff] Cordero's own lack of political influence."). In fact, it is abjectly unconstitutional. Thus, Plaintiff's allegations satisfy the notice pleading standard.

The Mayor's response is that the Borough has a right to deny or delay permits, or otherwise delay the project. Not only is this completely wrong, particularly in the context of the Project and the Borough's constitutional fair share housing obligations, but it is a defense to an Equal Protection cause of action, and not a reason to find a failure to state a cause of action.

Further, the Mayor's reliance on *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120 (3rd Cir., 2006), is misplaced. *Congregation Kol Ami* specifically concerned "an equal protection challenge to a zoning ordinance." That type of equal protection claim is not present there – the official zoning is done, there is no challenge being made to the ordinance. In fact, this is about the Mayor's direction to the Borough to refuse to enforce the existing ordinances and resolutions

and agreements and Judgments that were entered by and which bind the Borough, equally with other developers, contractors and homeowners that deal with the Borough.  Rather, this is, as stated above, a "class of one" equal protection cause of action, and Plaintiff has pled a cause of action sufficient to escape this motion to dismiss.

**d.   MAYOR DIPAOLA IS LIABLE FOR CAUSING THE  BOROUGH TO BREACH ITS CONTRACTS WITH PLAINTIFF**

"Unquestionably, one who willfully induces or improperly causes a party to a contract to break its contract with another party is liable to that other party for damages caused by the breach."  *Norwood Easthill Assocs. v. Norwood Easthill Watch*, 222 N.J. Super. 378 (App. Div., 1988).  The Complaint clearly and unequivocally alleges that DiPaola caused, induced, even affirmatively sought to have the Borough breach its contract with Plaintiff.  Thus, she is liable for the damages caused by the breach.

**CONCLUSION**

As set forth in Plaintiffs' Complaint and for the foregoing reasons, Defendant Danielle DiPaola's motion to dismiss should be denied in its entirety.

**SILLS CUMMIS & GROSS P.C.**

By:  *s/ Joseph B. Fiorenzo*
Joseph B. Fiorenzo, Esq.
David W. Phillips, Esq.
One Riverfront Plaza
Newark, New Jersey 07102
Tel. (973) 643-7000
*Attorneys for Plaintiff Emerson Redeveloper Urban Renewal, LLC*

DATED:        August 3, 2020