Richard Malagiere
Leonard E. Seaman
THE LAW OFFICES OF RICHARD MALAGIERE
A PROFESSIONAL CORPORATION
250 Moonachie Road, Suite 300A
Moonachie, New Jersey 07074
Tel: (201) 440-0675
Attorneys for Defendant, Danielle DiPaola

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EMERSON REDEVELOPERS URBAN RENEWAL, LLC,** | Civil Action No.: 2:20-cv-04728 |
| Plaintiff, | **DECLARATION OF LEONARD E. SEAMAN** |
| v. | |
| **THE BOROUGH OF EMERSON, NEW JERSEY, AND DANIELLE DIPAOLA,** | |
| Defendants. | |

I, Leonard E. Seaman, hereby declare pursuant to 28 *U.S.C.* § 1746 as follows:

1.    I am an attorney at law of the State of New Jersey and am admitted to practice before the United States District Court for the District of New Jersey. I am Of Counsel with the Law Offices of Richard Malagiere, P.C., attorneys for Defendant, Danielle DiPaola in this matter. I am one of the attorneys responsible for the handling of this matter and am fully familiar with the facts set forth herein.

2.    I make this Certification in support of defendant's motion for summary judgment.

3.    Annexed as exhibits are true and accurate copies of the following documents known to me through their exchange during the course of discovery in this matter:

Exhibit:

A.    A condensed version of the transcript of Volume I of the deposition of defendant, Danielle DiPaola taken on April 26, 2023 in this matter without the accompanying word index.

B.    Portions of the written opinion of the Honorable Jonathan N. Harris, J.S.C. dated October 19, 2001 in the matter *Community Developers & Management, LLC v. Borough of Emerson, et al.*, Sup. Ct. N.J. Docket No. BER-L-2734-00.

C.    Redevelopment Agreement between ERUR and the Borough of Emerson.

D.    First Amendment to the Redevelopment Development Agreement dated October 4, 2016.

E.    Second Amendment to the Redevelopment Agreement dated November 20, 2017.

F.    Third Amendment to the Redevelopment Agreement dated December 31, 2018.

G.    Minutes of the January 2, 2019 Reorganization Meeting of the Mayor and Council of the Borough of Emerson.

H.    Plaintiff's Answers to Interrogatories, as amended as of July 11, 2023.

I.    Article published on the NorthJersery.com website on or about November 8, 2018 titled "Emerson elects first woman as mayor."

J.    Article published in the Pascack Press by John Snyder titled "DiPaola, Emerson's First Woman Mayor, Sweeps Lamatina's Team."

K.    Article published in the Pascack Press by John Snyder titled "Mayors' Meeting: Redevelopment, Capital Project Top Chamber Updates.

L.    Article published in the Pascack Press titled "MAYORS DISH: Emerson Governing Body Weathering Unwelcome Redevelopment."

M.    October 4, 2026 resolution of the Borough of Emerson authorizing the execution of a First Amendment to Redevelopment Agreement.

N.    Ordinance 1535-16 of the Borough of Emerson adopted December 20, 2016.

O.    July 18, 2017 resolution of the Borough of Emerson authorizing the execution of a Second Amendment to Redevelopment Agreement.

P.    December 18, 2018 resolution of the Borough of Emerson authorizing the execution of a Third Amendment to Redevelopment Agreement.

Q.    A condensed version of the transcript of the deposition of Yaakovi "Jack" Klugmann taken on April 25, 2023 in this matter without the accompanying word index.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

s/ Leonard E. Seaman
Leonard E. Seaman
THE LAW OFFICES OF RICHARD
MALAGIERE, PC
250 Moonachie Road, Suite 102
Moonachie, New Jersey 07074
(201) 440-0675
rm@malagierelaw.com
les@malagierelaw.com
Attorneys for Defendant, Danielle DiPaola
Dated: September 13, 2024

**EXHIBIT A**

Page 1

1              UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
2              CIVIL ACTION NO. 20-cv-4728-MCA-MAH

3

4   EMERSON REDEVELOPERS URBAN        )
    RENEWAL, LLC,                     )
5                                     )   DEPOSITION OF:
            Plaintiff,                )
6                                     ) DANIELLE DI PAOLA
         v.                           )
7                                     )
    THE BOROUGH OF EMERSON,           )
8   NEW JERSEY, AND DANIELLE          )
    DIPAOLA,                          )
9                                     )
            Defendants.               )
10  _____

11

12          TRANSCRIPT of the stenographic notes of

13  the proceedings in the above-entitled matter as taken

14  by and before MARY ANN ADAMS, a Certified Court

15  Reporter and Notary Public of the State of New Jersey,

16  held at the office of SILLS, CUMMIS & GROSS, P.C.,

17  The Legal Center, One Riverfront Plaza, Newark, New

18  Jersey, on Wednesday, April 26, 2023, commencing at

19  10:12 a.m.

20

21

22

23

24

25

EXHIBIT A

Page 2

```
1  A P P E A R A N C E S :
2    SILLS, CUMMIS & GROSS, P.C.
       BY:  JOSEPH B. FIORENZO, ESQ.
3        STEPHEN M. KLEIN, ESQ.
       The Legal Center
4      One Riverfront Plaza
       Newark, New Jersey  07102
5      (973) 643-7000
       jfiorenzo@sillscummis.com
6      sklein@sillscummis.com
       Attorneys for Plaintiff
7
8      BOTTA ANGELI, LLC
       BY:  CHRISTOPHER C. BOTTA, ESQ.
9      50 South Franklin Turnpike
       Ramsey, New Jersey  07446
10     (201) 818-6400
       ccb@bottalaw.com
11     Attorneys for Defendants
12
       THE LAW OFFICES OF RICHARD MALAGIERE, P.C.
13     BY:  LEONARD E. SEAMAN, ESQ.
       250 Moonachie Road, Suite 300A
14     Moonachie, New Jersey  07074
       (201) 440-0675
15     les@malagierelaw.com
       Attorneys for Mayor Danielle DiPaola
16
17  ALSO PRESENT:
18     JACK KLUGMANN
19     KEVIN COWAN
20
21
22
23
24
25
```

Page 3

```
1              INDEX
2                          PAGE
3  WITNESS:  DANIELLE DI PAOLA
4  EXAMINATION BY MR. FIORENZO................  5
5
6
7              EXHIBITS
8  NO.      DESCRIPTION            PAGE
9  DD-1  Judge Harris decision         21
10 DD-2  Redevelopment Plan            33
11 DD-3  Redevelopment Agreement       39
12 DD-4  Resolution No. 256-16         40
13 DD-5  Minutes of the Borough of Emerson  41
       Mayor and Council 6/14/2016
14
   DD-6  First Amendment to Redevelopment  48
15     Agreement
16 DD-7  Minutes of the Borough of Emerson  52
       Mayor and Council 12/20/2016
17
   DD-8  Notice of Adoption of Ordinance No.  60
18     1535-16
19 DD-9  Resolution No. 200-17         69
20 DD-10 Letter from DeCotiis law firm with  87
       attachments
21
   DD-11  11/21/2017 Settlement Agreement  93
22
   DD-12  Minutes of the Borough of Emerson  110
23     Mayor and Council 11/21/2017
24 DD-13  1/25/2019 Conditional Final Judgment  114
       of Compliance and Repose
25
```

Page 4

```
1          EXHIBITS (continued)
2  NO.      DESCRIPTION            PAGE
3  DD-14  Order to Settle the Litigation    114
4  DD-15  Housing Element and Third Round Fair  125
       Share Plan
5
   DD-16  Minutes of the Borough of Emerson    130
6      Mayor and Council 12/4/2018
7  DD-17  Newspaper article published on    141
       11/8/2018
8
   DD-18  Newspaper article           159
9
   DD-19  Memorandum from Ms. Bogart dated    172
10     12/10/2018
11 DD-20  Boswell Engineering report dated    174
       12/6/2018
12
   DD-21  Transcript of 12/10/2018 Land Use    178
13     Board proceedings
14 DD-22  Resolution of the Land Use Board of    191
       the Borough of Emerson
15
   DD-23  Newspaper article by John Snyder    209
16
   DD-24  Newspaper article by John Snyder    211
17
   DD-25  Newspaper article           241
18
   DD-26  Letter brief by Giblin & Gannaio    258
19
   DD-27  Special meeting minutes of the Land    268
20     Use Board 12/10/2018
21 DD-28  Minutes of the Borough of Emerson    288
       Mayor and Council 12/18/2018
22
   DD-29  Notes dated 3/14/2019         291
23
24 (Exhibits retained by counsel.)
25
```

Page 5

```
1  DANIELLE DI PAOLA, having been duly sworn by the
2  Notary Public, testified as follows:
3  EXAMINATION BY MR. FIORENZO:
4      Q.   Good morning, Ms. DiPaola.  As you know,
5  my name is Joe Fiorenzo, I'm with Sills, Cummis &
6  Gross, and I represent Accurate Builders and Emerson
7  Redevelopers in connection with a lawsuit that is
8  pending in the Federal District Court entitled
9  Emerson Redevelopers Urban Renewal, LLC versus
10 Emerson and you.  You're aware of the pendency of
11 that lawsuit.  Correct?
12     A.   Yes.
13     Q.   I know you've been deposed before 'cause
14 you were deposed in another matter and I gave you
15 instructions at that time.  Do you remember those
16 instructions?
17     A.   Yes.
18     Q.   Would you like me to -- you do.
19     A.   Yes, verbal answers.
20     Q.   Right.  So I'm going to give you an
21 instruction because it's important, 'cause we just
22 had an issue.  Let me fully complete my questions
23 before you speak.  We had a problem with that last
24 time, so I'm going to again reiterate my
25 instruction.  Please allow me to fully complete the
```

1 question, don't anticipate as we do sometimes in
2 normal conversation, and then once I've completed my
3 question, then give me an answer. Okay?
4    A.    Okay.
5    Q.    Okay. The reporter will have great
6 difficulty creating a clean record if we don't do
7 that. Okay?
8    A.    Okay.
9    Q.    Great. Have you done anything to
10 prepare for this deposition today?
11    A.    I read the transcripts.
12    Q.    Okay. Read the transcripts. So what
13 transcript -- did you read the transcript of your
14 deposition --
15    A.    Yes.
16    Q.    -- in the state case?
17    A.    Yes.
18    Q.    Okay. Other than reading the transcript
19 of your deposition in the state case, what other
20 transcript, if any, did you read?
21    A.    None.
22    Q.    Okay. Aside from reading the transcript
23 of your deposition, did you do anything else to
24 prepare?
25    A.    Conferred with my lawyers.

1    Q.    Okay. Putting aside any conversations
2 you had with your lawyers, did you review any other
3 documents of this mass of information that has been
4 produced in all these different litigation matters,
5 did you review anything?
6    A.    Not particularly.
7    Q.    I'm not sure what that means, not
8 particularly. So in preparing, did you review
9 anything at all, any of the many documents that
10 exist in the record?
11    A.    No.
12    Q.    Okay. Did you speak to anyone in
13 preparation for this deposition other than your
14 lawyers?
15    A.    No.
16    Q.    Okay. For example, did you speak to
17 your administrator, Mr. Hermansen?
18    A.    No.
19    Q.    Okay. As I understand it, you became a
20 member of the governing body of the Borough of
21 Emerson sometime in 2010, if memory serves me. Is
22 that correct?
23    A.    I believe so, yes.
24    Q.    And at that time, you became a
25 councilwoman?

1    A.    Yes.
2    Q.    Prior to that time, you had, as I recall
3 it, some role in local Emerson government. Is that
4 true?
5    A.    Yes.
6    Q.    You were on a board or two if I
7 remember?
8    A.    Yes.
9    Q.    What boards were you on prior to 2010?
10    A.    The Land Use Board and the Environmental
11 Commission.
12    Q.    Okay. So when did you begin your
13 service on the Land Use Board?
14    A.    I believe three years before that, three
15 and a half years.
16    Q.    So in 2007 or thereabouts?
17    A.    About then.
18    Q.    And the other was the Environmental
19 Board?
20    A.    Correct.
21    Q.    Is the Environmental Board --
22    A.    It's a commission.
23    Q.    Commission. Is that a commission whose
24 members are appointed by the mayor, the governing
25 body, who appoints to that?

1    A.    The mayor.
2    Q.    And how many members were there on the
3 Environmental Commission when you sat on it?
4    A.    I don't recall.
5    Q.    And when were you on the Environmental
6 Commission?
7    A.    I don't recall.
8    Q.    Prior to you being on the governing
9 body. Correct?
10    A.    Correct.
11    Q.    Was it before or after you were on the
12 Land Use Board?
13    A.    It ran simultaneously.
14    Q.    Okay. And what was the function of the
15 Environmental Commission?
16    A.    To make decisions as it related to the
17 environment for the betterment of Emerson.
18    Q.    Well, explain to me what that means.
19 Give me an example of the environmental decisions
20 that the local government would make for the
21 betterment of Emerson. Can you give me an example?
22    A.    We worked with the school and saved
23 plastic caps in order to recycle. We did cleanups.
24 We did a tour of the Emerson woods.
25    Q.    Okay. Anything else you can remember?

3 (Pages 6 - 9)

Page 10

1   A.   I don't recall anything else.
2   Q.   You're familiar that at the state level,
3 there is a Department of Environmental Protection
4 that exists. Correct?
5   A.   Yes.
6   Q.   So your local commission didn't perform
7 any of the functions of the DEP. Correct?
8       MR. SEAMAN: Objection to form. You can
9 answer.
10   A.   No.
11   Q.   No, you did not.
12   A.   No.
13   Q.   'Cause I asked if that was correct and
14 you said no. So it's a double negative. So I just
15 want the record to be clear. So they did not
16 perform any of the functions of the State Department
17 of Environmental Protection. Correct?
18   A.   No.
19   Q.   Meaning yes, they didn't?
20   A.   We did not.
21   Q.   Okay. Thank you.
22       What do you understand the NJDEP to be?
23   A.   New Jersey Environmental Protection
24 Agency.
25   Q.   What do you understand their function at

Page 11

1 the state level to be?
2   A.   Make sure the environment is okay in
3 New Jersey.
4   Q.   Do you have any knowledge or expertise
5 of the functions that the DEP performs?
6   A.   No.
7   Q.   Do you know whether the DEP has the
8 exclusive jurisdiction to deal with things like
9 environmental contamination in the state?
10   A.   I believe they do.
11   Q.   Okay. You understand then that the
12 issue of environmental contamination is a state
13 issue that's dealt with by the DEP, not a local
14 issue to be dealt with by Emerson. Correct?
15       MR. BOTTA: Objection to the form. You
16 can answer.
17   Q.   You can answer.
18   A.   I think that's slightly incorrect,
19 because I think the first people on the scene are
20 the local fire department, police, emergency
21 services, OEM, and then the DEP is called in if
22 there's a problem.
23   Q.   Well, okay. DEP deals with -- I'm
24 asking about environmental contamination. If
25 there's an environmental contamination issue, that

Page 12

1 is an issue that falls within the jurisdiction of
2 the DEP to deal with whether a cleanup is required
3 or not. Correct?
4       MR. BOTTA: Objection, calls for a legal
5 conclusion.
6   A.   I guess. I don't know.
7   Q.   To your knowledge --
8   A.   I don't know.
9   Q.   To your knowledge, as a member of the
10 governing body and as a mayor, did you understand
11 that the DEP had responsibility for dealing with
12 issues concerning whether there was an environmental
13 contamination and what would be done to remediate
14 it, do you understand it was their function to deal
15 with that?
16   A.   I don't know.
17   Q.   No idea.
18   A.   No.
19   Q.   So even when you were the mayor, you had
20 no knowledge of the interrelationship between the
21 DEP and the Borough of Emerson as to environmental
22 contamination, you had no knowledge of that? Is
23 that a no? You had no knowledge?
24       MR. BOTTA: Let her answer.
25       MR. FIORENZO: Yeah. She was shaking

Page 13

1 her head.
2   A.   I don't -- I don't know.
3   Q.   You don't know.
4   A.   I don't know the functions of the DEP
5 completely.
6   Q.   And you never communicated with the DEP?
7   A.   I don't recall.
8   Q.   Did you ever inquire of the DEP as to
9 the status on any environmental contamination at the
10 site by any of the properties in Emerson?
11       MR. BOTTA: Objection. What site?
12   Q.   Any site. Any property in Emerson.
13   A.   I don't recall.
14   Q.   Did Emerson, while you were the mayor,
15 and let me focus on the period from 2019 and I'll
16 take it through today, did Emerson have any sites
17 within the town that are the subject of an
18 environmental cleanup?
19   A.   Yes.
20   Q.   How many?
21   A.   Three or four that I know of, I believe.
22   Q.   Okay. And as to those sites, is the DEP
23 the agency responsible for overseeing and approving
24 any remediation of the sites to your knowledge?
25   A.   Yes.

4 (Pages 10 - 13)

Page 14

1    Q.   Okay. Not Emerson. Correct? Not the
2 local community. Correct?
3    A.   I don't really understand your question.
4    Q.   Well, the local community doesn't decide
5 what cleanup plan should be implemented. The DEP
6 does that. Correct?
7    A.   Yes.
8    Q.   And the local community doesn't decide
9 whether the property is clean or not, that's a
10 determination made by the DEP. Correct?
11    A.   As I understand it, yes.
12    Q.   In fact, Emerson doesn't even have an
13 environmental engineer who's employed by the town.
14 Correct?
15    A.   I don't recall.
16    Q.   Today, you don't have an environmental
17 engineer that's employed by the town. Correct?
18    A.   We employ an engineering firm and they
19 may have an environmental engineer on their staff
20 that the Borough has access to.
21    Q.   Right. That may well be true. I'm
22 asking whether the Borough has specifically employed
23 an environmental engineer for the purpose of
24 assisting them on an annual basis.
25    A.   No.

Page 15

1    Q.   Okay. On those sites where you say
2 there is cleanup activity, that's being overseen by
3 the DEP. Correct?
4    A.   Yes.
5    Q.   On those sites, do you keep yourself
6 apprised of the status of the cleanup activity?
7        MR. SEAMAN: Objection to form.
8    A.   Only if they contact us.
9    Q.   Only if who contacts you?
10    A.   The DEP.
11    Q.   Okay. So you basically let the DEP
12 handle that unless they contact you?
13    A.   I don't know how to answer your
14 question.
15    Q.   Well, you told me a moment ago that you
16 don't --
17        MR. FIORENZO: I'm sorry, read back that
18 last answer. I just want to make sure I have it
19 correctly.
20        (The record is read by the reporter.)
21    Q.   Well, you said only if the DEP
22 contacts you do you keep yourself apprised of the
23 status of the cleanup. Is that what you just told
24 us? Correct?
25    A.   I don't recall. I don't know.

Page 16

1    Q.   You said -- I asked you if you kept
2 yourself apprised. You said, I'm only apprised if
3 the DEP lets us know what's going on. That's what
4 you just told us. Correct?
5    A.   I did. However, there are times where
6 there are complaints that come into Borough Hall and
7 then we refer them to the DEP.
8    Q.   Sure. With that exception where a
9 complaint comes in and you refer it over, you don't
10 generally keep yourself apprised, you're only
11 apprised of the cleanup activity if the DEP lets you
12 know what's going on. Correct?
13    A.   No, I would follow up to see if
14 something was cleaned up and whether it was safe in
15 my town.
16    Q.   Oh, so you do monitor it then, you do
17 monitor the cleanup activities at the sites?
18        MR. SEAMAN: Objection to form.
19    A.   Not on a regular basis.
20    Q.   Well, on an irregular basis do you?
21    A.   If a problem arises, I like to see it
22 through to make sure that it is completed.
23    Q.   Well, if there is no problem, if there's
24 just a cleanup plan submitted to the DEP and the DEP
25 is overseeing it, would you keep yourself apprised

Page 17

1 of that or do you wait for the DEP to let you know
2 what's going on?
3    A.   It depends on the circumstance.
4    Q.   What circumstance would it depend on?
5    A.   On whether I know about it or whether I
6 don't know about it.
7    Q.   Well, I thought you told me you keep
8 yourself apprised of the cleanup sites in town.
9    A.   That I know of.
10        MR. SEAMAN: Objection to form.
11    Q.   So of the ones you know of, do you in
12 that instance keep yourself apprised of what's going
13 on at the site as to the cleanup activity or not?
14    A.   I attempt to stay apprised of what's
15 going on.
16    Q.   And how do you do that?
17    A.   I would generally ask the administrator
18 to make sure that something was taken care of.
19    Q.   Okay. And anything else you would do to
20 keep yourself apprised of what's going on other than
21 asking the administrator to -- to do what? I'm
22 sorry. What would you ask the administrator to do?
23    A.   Just to look into something to see if it
24 was satisfied, if it was complete.
25    Q.   And do you do that as a matter of

5 (Pages 14 - 17)

EXHIBIT A

Page 18

1 ordinary course?
2    A.    No.
3    Q.    Okay.  So, again, what's the criteria
4 that you would use to determine whether to do that
5 or not, whether to contact the business
6 administrator -- or the town administrator?
7    A.    Say your question again?
8    Q.    What are the criteria then you would use
9 to ask the administrator or not to monitor what's
10 going on and report back to you?
11        MR. SEAMAN:  Objection to form.
12    A.    I don't particularly have criteria.  If
13 somebody asks me about something, I will inquire for
14 the administrator to look into something.
15    Q.    So then only if someone asks you about
16 it will you inquire of the administrator?
17    A.    Or if there is an application before the
18 Land Use Board and a member of the public comes in
19 and says that they believe that there's an issue
20 with the property, we might have them look into it.
21    Q.    Okay.  Have you done that?
22    A.    I don't recall.
23    Q.    Have you been in front of the Land Use
24 Board where someone raised an issue regarding
25 environmental contamination?

Page 19

1    A.    I think so, yeah.
2    Q.    When?  When was the last time?
3    A.    I don't recall.
4    Q.    Did that happen with regard to the site
5 owned by Emerson Redevelopers?
6    A.    I believe it did.
7    Q.    And that was at the Planning Board?
8    A.    Yes.
9    Q.    Okay.  So someone came before the
10 Planning Board and raised an issue about
11 contamination?
12    A.    Yes.
13    Q.    Who was that?  Was that you?
14    A.    No, I believe it was Lorraine McQueeney.
15    Q.    Was it you as well?
16    A.    I don't recall.
17    Q.    When you appeared before that board when
18 they were --
19    A.    I don't --
20    Q.    Let me finish.
21    -- when they were considering the application,
22 did you raise an issue about environmental
23 contamination at the site?
24    A.    It was a long time ago.  I don't recall.
25    Q.    I might be able to help you with that in

Page 20

1 a minute or two.
2    Q.    Okay.  So you -- over a period of years, you
3 were asked to consider and vote on various
4 ordinances and resolutions that relate to the
5 subject property.  And when I say the subject
6 property, I'm referring to Block 419, I'll use as a
7 shorthand expression for the Emerson redevelopment
8 project.  So when I say that, that's what I'm
9 referring to.  Okay?
10    A.    Yes.
11    Q.    Okay.  So over the years, you were asked
12 to consider and vote upon various resolutions and
13 ordinances relating to the subject property.
14 Correct?
15    A.    Correct.
16    Q.    And when you considered those issues and
17 voted on those issues, were you aware at the time
18 that Emerson has been engaged in litigation for many
19 years over issues concerning affordable housing,
20 were you aware of that?
21    A.    I became aware.
22    Q.    Okay.  So when you were voting on those
23 various matters at that time, you were aware, were
24 you not?
25    A.    I don't recall.

Page 21

1    Q.    Were you aware that as far back as 2001,
2 there was a decision rendered by Judge Harris
3 relating to Emerson's noncompliance with its
4 constitutional obligations under Mount Laurel, were
5 you aware that Judge Harris rendered a decision?
6    A.    At what point was I aware?
7    Q.    Well, were you aware of it at the time
8 you were on the governing body?
9    A.    I don't recall.
10    Q.    Were you aware of it at the time you
11 were on the Land Use Board?
12    A.    I don't recall.
13        MR. FIORENZO:  Pull up the decision,
14 please.  Let's mark it.
15        MR. KLEIN:  DD-1.
16    Q.    DD-1.
17        MR. BOTTA:  DD-1?
18        MR. FIORENZO:  DD.
19        MR. BOTTA:  Got you.
20        MR. FIORENZO:  That's going to be our
21 markings for today.
22    Q.    So back in 2001, Judge Harris rendered a
23 49-page decision involving litigation brought
24 against Emerson for its failure to comply with its
25 constitutional obligation.  So when did you become

6 (Pages 18 - 21)

Page 22

1 aware of the Judge Harris decision?
2    A.    I don't recall.
3    Q.    No idea?
4    A.    I don't recall.
5    Q.    Okay.  Well, were you aware of it when
6 you voted on the redevelopment plan for the subject
7 site?
8    A.    I don't recall.
9    Q.    Okay.  So in his decision, Judge Harris
10 stated, "Emerson, New Jersey, persists as a bastion
11 of exclusionary zoning.  It has steadfastly resisted
12 taking affirmative steps to provide realistic
13 opportunities for affordable housing within its
14 borders.  It has further failed to enact the
15 necessary legislation to authorize the expenditure
16 of its considerable affordable housing trust funds
17 for regional and local housing needs."
18    Were you aware of that finding by Judge
19 Harris?
20         MR. SEAMAN:  Objection to form.
21    A.    I don't recall.
22    Q.    Well, do you remember on the Emerson
23 website that former Mayor Lou Lamatina had a series
24 of messages to the town that were posted which, in
25 fact, related to the members of the community the

Page 23

1 Judge Harris ruling, do you remember that?
2    A.    I recall telling you that I didn't read
3 them.
4    Q.    Well, yeah, in another deposition.  But
5 this is a new day and it's a new case, so I've got
6 to ask.  There may be some overlap and I apologize
7 for that because it's a different matter.
8    So your answer is that you didn't read them,
9 those postings by the mayor which were describing
10 the Mount Laurel history of Emerson.  Correct?
11    A.    Correct, I did not read them.
12    Q.    And you didn't read them because I think
13 you described them under oath as propaganda.  Right?
14    A.    I believe I said that.
15    Q.    Yeah.  And even though it was quoting
16 from various legal rulings to try to explain to the
17 public the circumstance Emerson found itself in, you
18 didn't take it upon yourself to even bother reading
19 it 'cause you couldn't believe anything Mr. Lamatina
20 wrote.  Correct?
21         MR. SEAMAN:  Objection to form.
22    A.    Correct.
23    Q.    Okay.  So you weren't aware that Judge
24 Harris ruled, again, in the first paragraph, "The
25 time has come to end this constitutional breakdown."

Page 24

1 The New Jersey constitution shall not be permitted
2 to merely remain a vague rumor in Emerson."  You
3 weren't aware that the judge made that finding
4 either.  Correct?
5         MR. SEAMAN:  Objection to form.
6    A.    I don't recall when I was aware of that.
7    Q.    Were you aware --
8         MR. FIORENZO:  Scroll over, Steve, to
9 the next page.  If you could just highlight.  Yeah,
10 right there.  Just blow it up.
11    Q.    So were you aware, however, that Judge
12 Harris says -- he ruled, "Although I conclude that
13 the builder's remedy is not warranted, Emerson shall
14 be required without delay to adopt all affirmative
15 measures, including meaningful legislation and
16 adequate appropriations, recommended or made
17 necessary by the Special Master, in order to fulfill
18 its constitutional obligation to provide shelter
19 opportunities for the beneficiary class of unhoused
20 poor."
21    So did you become aware at some point in time
22 that Judge Harris said the time had come for Emerson
23 to come forward without delay to do the things
24 needed to be done to fulfill its constitutional
25 obligation, were you aware of that at some point?

Page 25

1    A.    At some point.
2    Q.    Okay.  You just don't know when.
3    A.    I don't recall.
4    Q.    Okay.  I want to ask you again regarding
5 this ruling back in 2001.  Judge Harris on page 18
6 of this ruling also ordered Emerson to provide a
7 "compliant Housing Element and Fair Share Plan by
8 March 30, 2001.  As revealed during trial, it has
9 woefully failed to comply.  The planning document
10 that Emerson seeks to pass off as Mount Laurel II
11 compliant is riddled with regulatory deficiencies,
12 substantive errors, and rank speculation.
13 Accordingly, I conclude I must invoke the
14 exceptional affirmative remedies of the type
15 outlined in Mount Laurel II and require Emerson to
16 adopt specific amendments to its zoning ordinance
17 and other land use regulations as will enable it to
18 finally meet its Mount Laurel II obligations."
19    Were you aware that Judge Harris made such
20 findings?
21         MR. SEAMAN:  Objection to form.
22    A.    I don't recall.
23    Q.    Do you know what a housing element plan
24 is?
25    A.    Yes.

7 (Pages 22 - 25)

Page 26

1    Q.    What is it?
2    A.    It's a plan of the housing stock in
3  Emerson or in any municipality and a plan for the
4  future.
5    Q.    Do you know what a fair share plan is?
6    A.    It's a plan for fair share housing, for
7  affordable housing.
8    Okay.  And you understand every
9  municipality has to have one?
10   A.    Yes.
11   Q.    Okay.  And the judge is ordering Emerson
12 to move forward swiftly to satisfy these
13 constitutional deficiencies.  Correct?
14         MR. SEAMAN:  Objection to form.
15   A.    If you say so.
16   Q.    I'm asking you.  I don't say anything.
17 I'm asking questions.  Did you understand that the
18 judge was ordering Emerson to move forward to create
19 a compliant housing element and fair share plan by a
20 certain date?
21         MR. SEAMAN:  Objection to form.
22   A.    I don't recall.  I wasn't aware of that
23 in 2001.  I don't recall.
24   Q.    So you weren't aware that the -- I'm not
25 asking in 2001.  At some point in time were you

Page 27

1  aware of it when you got on the governing body, for
2  example, and there were issues of Mount Laurel that
3  were being discussed, were you aware of it then?
4    A.    I don't know when I became aware of it.
5    Q.    Okay.  But you were aware of it at some
6  point.  Correct?
7    A.    At some point, but I don't recall when.
8    Q.    Because ultimately Emerson filed a
9  lawsuit to try to get protection from further
10 builder's remedy lawsuits and to invoke the court to
11 help them get that protection.  Correct?
12   A.    Correct.
13   Q.    Okay.  So now, with this then as a
14 backdrop, did you understand the Court had appointed
15 a Special Master?
16   A.    I don't recall.
17   Q.    Do you know what a Special Master is?
18   A.    I think I have a brief understanding of
19 it.
20   Q.    Well, is there a Special Master that
21 exists as we sit here today relating to Emerson's
22 compliance with its Mount Laurel obligations?
23   A.    Yes.
24   Q.    Who is that?
25   A.    Mary Beth Lonergan.

Page 28

1    Q.    Right.  There has been a Special Master
2  now for a very long period of time since Judge
3  Harris entered his ruling.  Correct?
4    A.    I don't recall.
5    Q.    There was a Special Master back in 2010
6  when you became a member of the governing body.  You
7  were aware of that, weren't you?
8    A.    I don't recall.
9    Q.    Is there any way you wouldn't have been
10 aware of that as a member of the governing body who
11 had to deal --
12   A.    I don't recall.
13   Q.    Let me finish.
14   -- who had to deal with these issues?
15         MR. SEAMAN:  Objection to form.
16   A.    I don't recall.
17   Q.    That's something you would want to make
18 yourself aware of.  Correct?
19         MR. SEAMAN:  Objection to form.
20   Q.    What the constitutional Mount Laurel
21 obligations of your community were, you'd want to
22 know that, wouldn't you?
23         MR. SEAMAN:  Objection to form.
24   A.    I don't recall.
25   Q.    No, I just asked, that's something you

Page 29

1  would want to know, isn't it?
2    A.    I don't recall when I understood all of
3  that.
4    Q.    That's not my question though.  Is that
5  something you would want to know what obligations
6  your town had to fulfill its Mount Laurel
7  obligation, is that -- as a member of the governing
8  body is that something you would want to know?
9         MR. SEAMAN:  Objection to form.
10   A.    I can't tell you what I wanted to know
11 13 years ago.
12   Q.    Well, tell me today.  Do you want to
13 know it today?  Today.
14   A.    Do I want to know what?
15   Q.    What Emerson's constitutional affordable
16 housing obligations are, do you want to know about
17 that today?
18   A.    Of course.
19   Q.    Okay.  So you certainly would have
20 wanted to know about it back then when you got on
21 the governing body.  Correct?
22         MR. SEAMAN:  Objection to form.
23   A.    I don't recall if I --
24   Q.    Because you took an oath, didn't you?
25         MR. BOTTA:  You've got to let her

8 (Pages 26 - 29)

Page 30

1 finish. If she's going to let you finish your
2 question, she's got to finish her answer.
3     Q.    You took an oath. Right? When you were
4 sworn in?
5     A.    Yes.
6     Q.    And that oath was to uphold and defend
7 the constitution and laws of the state of
8 New Jersey. Right?
9     A.    Correct.
10    Q.    And if Emerson wasn't compliant with its
11 constitutional obligations, consistent with the oath
12 you took, you would want to know that, wouldn't you?
13        MR. SEAMAN: Objection to form.
14    A.    I believe you're asking me for what my
15 mindset was back when I took an oath and I don't
16 recall.
17    Q.    I'm asking you generally now. Forget
18 about -- that's something you would want to know,
19 isn't it?
20        MR. SEAMAN: Objection.
21    Q.    You would need to know as a member of
22 the governing body. Right?
23        MR. SEAMAN: Objection to form.
24    A.    I would rely on attorneys to explain to
25 me what I needed to know and what I didn't.

Page 31

1     Q.    Right. So let me make it simple. Do
2 you deny here today under oath that back in 2010
3 when you became a member of the governing body that
4 you didn't make yourself aware through whatever
5 means, reading, speaking to lawyers, or whatever, of
6 what Emerson's constitutional Mount Laurel
7 obligations were at that time, do you deny making
8 yourself aware of that at that time? Yes or no?
9        MR. SEAMAN: Objection to form.
10    A.    That's a long question. You'll have to
11 ask shorter ones.
12    Q.    Well, no. You don't tell me what I have
13 to do.
14    A.    I don't understand your question.
15    Q.    What don't you understand about it?
16    A.    I lost you at like the fifth word.
17    Q.    Okay. Let me have it repeated, and if
18 there's a deficiency, if there's something you don't
19 understand, I'm happy to rephrase it.
20    A.    I don't have a deficiency.
21    Q.    There's a deficiency in my question. If
22 you don't understand my question, tell me what in
23 there is confusing and I'll try to rephrase it.
24        MR. FIORENZO: Could you read it back to
25 her?

Page 32

1     Q.    I thought it was pretty clear.
2         (The record is read by the reporter.)
3     A.    I don't recall.
4     Q.    Did you care?
5     A.    I don't recall.
6     Q.    You don't recall if you cared?
7     A.    I can't tell you what my mindset was all
8 those years ago.
9     Q.    So the answer is you don't recall if you
10 cared what the constitutional obligation of Emerson
11 was, is that your answer?
12    A.    I don't recall.
13    Q.    You don't recall if you cared, 'cause
14 that's the only question, did you care, and you said
15 I don't remember. So you don't remember if you
16 cared?
17    A.    I don't remember.
18    Q.    Okay. So now, after this happens in
19 court and Emerson is being, my words, chastised by
20 the Court as a bastion --
21        MR. BOTTA: 2001?
22        MR. FIORENZO: Yeah, 2001, the decision.
23    Q.    -- a bastion of exclusionary zoning, do
24 you know what actions, if any, they took after that
25 to remediate these problems?

Page 33

1     A.    I don't remember.
2     Q.    Do you know what actions, if any, they
3 took when you got on in 2010 to address and
4 remediate these problems?
5     A.    I don't remember.
6     Q.    Do you recall that there was a
7 resolution adopted by the governing body in 2016 --
8 actually, withdraw that.
9        MR. KLEIN: DD-2.
10    Q.    Okay. So were you aware that in 2006,
11 Emerson prepared a redevelopment plan?
12        MR. SEAMAN: Objection to form. Was she
13 aware in 2006 or was she aware --
14        MR. FIORENZO: I'm sorry, we should mark
15 that.
16    A.    I was thinking the same thing. I don't
17 know when I became aware, but I'm aware of that
18 plan.
19        MR. FIORENZO: Just mark it as DD-2.
20    Q.    So you don't know when you became aware
21 of this, but at some point in time you did?
22    A.    Like I said, I don't remember when I
23 became aware, but I'm aware of the plan.
24    Q.    So when you got on the governing body in
25 2010, did you attempt to educate yourself on the

9 (Pages 30 - 33)

EXHIBIT A

Page 34

1 important issues relating to Emerson?
2      A.   I think after 2006 I was on the Land Use
3 Board and then I knew that there was a redevelopment
4 plan that was put in place.
5      Q.   Okay.  Great.  So you're familiar with
6 this plan?
7      A.   I have not reviewed it in a very --
8      Q.   Or were at the time way back when.
9      A.   I think I may have been aware of certain
10 segments of it but not the full plan.
11      Q.   And do you recall that this
12 redevelopment plan was prepared --
13         MR. SEAMAN:  Joe.
14         MR. BOTTA:  Please let her finish.
15 She's finishing and you're starting.
16         MR. FIORENZO:  Okay.  I thought she was
17 done.
18      Q.   Something else you want to say?
19      A.   No, you can continue.
20      Q.   Okay.
21         MR. BOTTA:  You're just overlapping and
22 that's not good for the record.
23         MR. FIORENZO:  Okay.
24         THE WITNESS:  Thank you.
25      Q.   Do you know if this was done in an

Page 35

1 effort to try to address the issues raised by Judge
2 Harris in his ruling?
3      A.   I don't recall.
4         MR. FIORENZO:  Pull up page 5, please.
5      Q.   So whenever you became aware of this,
6 either sitting on the Zoning Board or when you came
7 on the governing body, were you aware that this
8 redevelopment plan intended to create a provision
9 for affordable housing under the Fair Housing Act?
10      A.   I can read that.  That's what it says.
11      Q.   Were you aware of that when you reviewed
12 this?
13      A.   I don't recall what I was aware of back
14 then.
15      Q.   So did you ever become aware that the
16 redevelopment plan created by Emerson was intended
17 to address the issue of affordable housing, did you
18 ever know that?
19      A.   At some point, yes, I was aware.
20      Q.   Okay.  You sat on the Land Use Board.
21 Right?
22      A.   Correct.
23      Q.   Did that plan go before the Land Use
24 Board?
25      A.   I believe it did.

Page 36

1      Q.   Okay.  So you would have heard a
2 presentation from Mr. Burgis, Joe Burgis, the
3 planner, regarding this.  Correct?
4      A.   I guess.
5      Q.   And you were made aware at that time
6 that this redevelopment plan was created in part to
7 try to address the problems that were identified by
8 Judge Harris so that Emerson was in compliance with
9 its obligation.  You were aware of that from the
10 presentation that was made as you sat on the board.
11 Correct?
12      A.   I don't recall.
13      Q.   Okay.  You don't deny that though, do
14 you?
15         MR. SEAMAN:  Objection to form.
16      A.   I don't recall.
17      Q.   But you don't deny it.
18      A.   Deny what?
19      Q.   I understand you don't recall.  So that
20 means maybe yes, maybe no.  You don't deny that that
21 was the reason for this plan was to address, in
22 part, affordable housing.  Right?
23      A.   In part.
24      Q.   Okay.
25      A.   I believe a portion of it was

Page 37

1 regentrification of Emerson.
2      Q.   Sure.  And if you read the highlighted
3 provisions, it talks about all development within
4 the designated redevelopment area shall provide for
5 the appropriate number of affordable dwellings.  The
6 number of affordable dwellings shall be provided
7 pursuant to the State of New Jersey Council on
8 Affordable Housing third round rules that mandate a
9 minimum of one affordable housing unit for every
10 eight units of market rate housing and one
11 affordable housing unit for every twenty-five jobs
12 created.  The redevelopment plan encourages the use
13 of age-restricted housing, and then it goes on.
14         So this was the plan adopted by Emerson
15 sometime back in 2006.  Correct?
16      A.   Yes.
17      Q.   Are you -- do you know what the COAH
18 third round rules mean, do you know what that refers
19 to?
20      A.   The number of units that each
21 municipality has to build.
22      Q.   Right.  And COAH would determine that
23 based on their third round rules.  They had numbers
24 which they ascribed to each municipality.  Right?
25      A.   Yes.

10 (Pages 34 - 37)

1    Q.   Okay.  So Emerson now in adopting this
2  plan is recognizing their obligation to address
3  their affordable housing obligation.  True?
4    A.   I guess.
5    Q.   You guess?  Is there any doubt in your
6  mind?
7    A.   Like I said, I think it was also just to
8  redo the downtown so it would look nicer.
9    Q.   Well, may, but it certainly was
10 designed, in part, to address Emerson's affordable
11 housing obligation.
12    A.   Yes, in part.
13    Q.   Okay.  Did you vote on this -- approval
14 of this plan?
15    A.   I don't recall.
16    Q.   Did you support the plan as presented?
17    A.   I don't recall.
18    Q.   Ultimately the redevelopment plan was
19 adopted.  Correct?
20    A.   Yes.
21    Q.   And when it was adopted then, it now
22 presented an opportunity for Emerson to try to
23 address their affordable housing obligation through
24 the creation of these redevelopment areas.  Correct?
25    A.   Yes.

1    Q.   Okay.  And at some point did the Mayor
2  and Council approve a redevelopment agreement?
3    A.   I don't recall.
4       MR. FIORENZO:  Steve, pull up -- yeah.
5    A.   I mean, seventeen years ago?
6    Q.   No.  No.  I'll show it to you.  Let me
7  see if I can help you, make it easier?
8       MR. KLEIN:  DD-3.
9    A.   Oh, yes.
10    Q.   Okay.  So at some point there was a
11 redevelopment agreement created entered into by the
12 town between the Borough of Emerson and Emerson
13 Redevelopers Urban Renewal, LLC, and this agreement
14 DD-3 is dated June 27, '16.  Do you see that?
15    A.   Yes.
16    Q.   And you're aware of this agreement.
17 Correct?
18    A.   Yes.
19    Q.   This agreement was intended as it says
20 in the body of the document, I'm happy to show you
21 whatever you want, in part, to address a portion of
22 Emerson's affordable housing obligation.  Correct?
23    A.   I believe that was the intent.
24    Q.   Okay.  You voted against approval of
25 this redevelopment agreement.  Correct?

1    A.   Did I?
2    Q.   Did you?
3    A.   I don't recall.  Do you have the vote?
4    Q.   Well, you don't remember what your
5  position was regarding this?
6    A.   I don't recall if I abstained or if I
7  voted no.
8       MR. FIORENZO:  Okay.  Mark that, please.
9       MR. KLEIN:  This is DD-4.
10    Q.   Okay.  DD-4 is a resolution of the
11 Borough of Emerson, Resolution No. 256-16, and the
12 subject is "Authorizing" --
13       MR. KLEIN:  I'm sorry.
14       MR. FIORENZO:  That's okay.
15       MR. KLEIN:  DD-4.
16       MR. FIORENZO:  This will be DD-4, the
17 resolution.
18    Q.   So this redevelopment agreement which
19 was intended to try to address the affordable
20 housing obligation as you noted a moment ago, the
21 subject is "Authorizing the Execution of a First
22 Amendment" --
23       MR. FIORENZO:  Yeah, but I wanted the
24 original.  I'm sorry, we're doing it out of
25 sequence.  Go back to this one, E293.  That's the

1  First Amendment.  We skipped over the original.
2  Okay.
3       MR. KLEIN:  This will be DD-5.
4    Q.   All right.  DD-5 are minutes of the
5  Emerson Mayor and Council, June 14, 2016.
6       Could you go to that section where they vote
7  on this.  Okay.  Just pull it up.  So just make it a
8  little bigger.
9       So there's a motion made at that time to
10 approve the consent agenda item number 173-16,
11 approval of the execution of the redevelopment
12 agreement only was moved and seconded, and then it
13 shows with respect to this one you appeared to have
14 abstained.  Correct?
15    A.   Correct.  I told you I didn't remember.
16    Q.   So is there some reason why you didn't
17 vote in favor of it since it was intended to fulfill
18 the obligation of Emerson noted by the Court
19 concerning its affordable housing obligation?  What
20 was your reason for not voting in favor?
21       MR. SEAMAN:  Objection to form.
22       MR. BOTTA:  Objection to the form.  Can
23 you just ask her why she didn't vote in favor?
24       MR. FIORENZO:  No, I'll stay with my
25 question, thank you.

EXHIBIT A

Page 42

1    A.    Generally when I abstain, it's because I
2 need more information.
3    Q.    Well, I'm not asking generally.  Why
4 didn't you vote in favor of the redevelopment
5 agreement here?
6    A.    I don't remember.
7    Q.    Okay.  You told us a moment ago this
8 agreement was intended to address the affordable
9 housing problem that Emerson had.  Correct?
10    A.    Correct.
11    Q.    So as you sit here today, can you think
12 of any reason why you would not have voted in favor
13 of that?
14        MR. SEAMAN:  Objection to form.
15    A.    I already said I generally needed more
16 information if I abstain.
17    Q.    No, no, but I'm not asking generally
18 what you do.  I'm asking --
19    A.    I don't recall --
20    Q.    Let me finish.
21    A.    -- on that day why I abstained.
22    Q.    In this instance, as to this resolution,
23 can you tell us why you didn't vote to support it,
24 is there any reason you can think of?
25    A.    Can I see the full -- can you get rid of

Page 43

1 the box and can I see the full page?
2    Q.    Sure.
3    A.    I probably needed more information.
4        MR. SEAMAN:  Can we just confirm that's
5 the full consent agenda?  It doesn't --
6    A.    It's not.  Those are the items that were
7 pulled off.
8        MR. FIORENZO:  No, it's the minutes.
9        MR. SEAMAN:  I understand.
10        MR. FIORENZO:  It's not the consent
11 agenda.  They're the minutes of the actual
12 meeting --
13        MR. SEAMAN:  Yes.
14        MR. FIORENZO:  -- prepared by the clerk.
15        MR. SEAMAN:  And can we confirm that
16 that is the minutes of all the items that were on
17 the consent agenda on that page or does it continue
18 on the next page?  That's my question.
19        MR. FIORENZO:  It's the minutes.
20        MR. SEAMAN:  Is there a second page?  Is
21 there a page following this page?
22        MR. FIORENZO:  Steve, show him the whole
23 thing.
24    A.    That's the full consent.
25        You're laughing.  I don't recall making a

Page 44

1 joke.
2    Q.    Well, I'm just laughing at the comment
3 you just made loud enough for me to hear that you
4 can't believe I'm asking you these questions.
5    A.    That's not what I said.
6    Q.    Oh, okay.
7    A.    That's absolutely not what I said.
8    Q.    That's good.  I'm happy to hear that.
9        MR. SEAMAN:  Glad it was loud enough for
10 you to hear, Joe.
11        MR. FIORENZO:  Yeah, I'm getting old.
12    A.    That's not what I said.
13        MR. FIORENZO:  I'm getting old.  My
14 hearing's bad, I'll concede that.
15    Q.    Here's a copy, so we have that.
16        MR. SEAMAN:  That wasn't what she said.
17        MR. SEAMAN:  All right.
18        MR. SEAMAN:  Mayor, I'm going to ask you
19 to take your time and review the entire document and
20 let Mr. Fiorenzo know when you're ready.
21        MR. FIORENZO:  I don't have any other
22 questions on the document.  I'm done.  So, you know,
23 I'm just giving it to you because she was asking to
24 see the whole thing and I've given it.  But I have
25 my answer to the question.  So as far as I'm

Page 45

1 concerned, I'm ready to move on.
2        MR. SEAMAN:  Okay.  Then we can move on.
3    A.    Okay.
4        MR. FIORENZO:  Okay.  So let's go back,
5 Steve, to the resolution on the First Amendment.
6 That's the one we marked.  That was 4?
7        MR. KLEIN:  It was 4.
8    Q.    So then after the redevelopment
9 agreement gets executed by the Borough to address
10 affordable housing, there then was -- you're aware
11 there was a First Amendment to the redevelopment
12 agreement?
13    A.    Yes.
14    Q.    Okay.  And that was also voted on.
15 Correct?
16    A.    Yes.
17    Q.    And you voted against execution of the
18 First Amendment.  Correct?
19    A.    Correct.
20    Q.    Why?
21    A.    Because I was against it.
22    Q.    Why?
23    A.    I don't recall right this second.
24    Q.    Is there any reason why that you can
25 think of as you sit here today that you were against

12 (Pages 42 - 45)

EXHIBIT A

Page 46

1 the First Amendment? And maybe I can help you. Are
2 you able to answer the question, the pending
3 question?
4    A.   I don't recall why I voted no.
5    Q.   So in the Whereas clause, the fourth
6 Whereas clause, it says, "Whereas the Borough and
7 the redeveloper have agreed to enter into a First
8 Amendment to the redevelopment agreement with the
9 specific intention to amend and supplement the
10 property descriptions to be redeveloped, as set
11 forth and attached hereto in form and substance as
12 Exhibit A."
13    A.   They were including properties that
14 weren't there in the original agreement.
15    Q.   Okay. But it was within the
16 redevelopment zone. Correct?
17    A.   Yes.
18    Q.   Okay. And that's why you voted against
19 it?
20    A.   Correct.
21    Q.   Why? Why was that objectionable to you?
22        MR. BOTTA: Objection, asked and
23 answered.
24        MR. FIORENZO: No, it hasn't.
25        MR. BOTTA: She answered why she voted

Page 47

1 no.
2        MR. FIORENZO: No, I'm asking her
3 specifically now that I've shown her and she said --
4    A.   Because they were including more
5 properties.
6    Q.   Right. And what was it about the
7 inclusion of those properties that was objectionable
8 to you that led you to vote no?
9    A.   Because I believe our planner was saying
10 that these businesses were blighted and I did not
11 agree.
12    Q.   So that's a different issue. So you're
13 saying --
14    A.   But I think that's why they were
15 included in the next amendment.
16    Q.   So you're saying --
17    A.   In the First Amendment.
18    Q.   You're saying you voted no because
19 something the planner had concluded?
20    A.   I don't recall.
21    Q.   Okay. In any event, you voted no and
22 everybody else voted yes.
23    A.   Yeah.
24    Q.   All right. So the agreement was
25 amended.

Page 48

1        MR. FIORENZO: Pull the agreement up,
2 please.
3        MR. KLEIN: DD-6.
4    Q.   I'm glad you're having fun.
5    That's the First Amendment, ma'am, DD-6. You
6 saw the First Amendment before you voted no, I take
7 it. Correct?
8    A.   Yes.
9    Q.   So the redeveloper had submitted a
10 proposal to the town. Correct?
11    A.   Yes.
12    Q.   Was there an RFP?
13    A.   Yeah.
14    Q.   And a number of developers submitted
15 proposals --
16    A.   Yes.
17    Q.   -- and this developer was the one who
18 was selected. Correct?
19    A.   Not this developer. Joseph Forgione's
20 company was selected.
21    Q.   Well, ma'am, this is Joseph Forgione's
22 company right here. Right? In 2016, Emerson
23 Redevelopers Urban Renewal, LLC, was Mr. Forgione's
24 company, wasn't it?
25    A.   Yes.

Page 49

1    Q.   Okay. So this was the redeveloper
2 selected to develop the site. Right?
3    A.   Yes.
4    Q.   Okay. And it says, that second
5 Wherefore clause, "The parties are desirous of
6 amending and supplementing the redevelopment
7 agreement to reflect their mutual understanding with
8 respect to the implementation of the redeveloper's
9 proposal submitted to the Borough." Okay?
10    And let's scroll to the second page, please.
11 Stop there, please. Okay.
12    Paragraph 2 is the intent of the amendment to
13 supplement the description of the properties. So do
14 you know what the change to the description of the
15 properties was?
16    A.   I believe they were adding the corner
17 property.
18    Q.   When you say the corner property,
19 describe it.
20    A.   It was a restaurant.
21    Q.   What restaurant?
22    A.   I don't recall the name.
23        MR. FIORENZO: Go to the next paragraph,
24 Steve, just scroll down.
25    Q.   Is that the property?

13 (Pages 46 - 49)

Page 50

1     A.    I believe so.
2     Q.    Okay.  So Block 419, Lot 9 was added, is
3  that your understanding at the time?
4     A.    Was what my understanding?
5     Q.    That Block 419, Lot 9 was added to the
6  property and that was one of the reasons for the
7  amendment?
8     A.    I think that's the only reason, isn't
9  it?
10    Q.    Is it?
11    A.    I'd have to read the whole document.
12    Q.    Okay.  Well, then I don't know why you
13  said that then.  Is that one of the reasons though?
14    A.    Clearly.
15    Q.    Okay.  And Block 419, Lot 9, do you know
16  who owned that?
17    A.    I think it's the restaurant and I think
18  I know who owned it, yes.
19    Q.    Who do you think it was?
20    A.    I think it was a man by the name of
21  Lopata.
22    Q.    And you knew him.  Right?
23    A.    Vaguely.
24    Q.    You went to his restaurant.
25    A.    I don't think it was his restaurant.  I

Page 51

1  think he leased it.
2     Q.    Okay.  To whom?
3     A.    Several restaurants were there, that's
4  why I don't recall the name.
5     Q.    At this time do you know who was there?
6     A.    I don't recall.
7     Q.    And then if we continue down, go to
8  paragraph 5, it refers to the First Amendment
9  together with the proposal, the Land Use Board
10  resolutions, and any orders or directives of any
11  authorized official, it goes on and on, represent
12  the understanding of the Borough and the
13  redeveloper.  Do you see that?
14    A.    Yes.
15    Q.    Okay.  So, again, I just want to be
16  clear, the only reason you've given why you voted
17  against this was the addition of that piece of land?
18    A.    I --
19    Q.    Is that the reason, the only reason why
20  you voted no?
21    A.    I don't recall.
22    Q.    All right.  So after this First
23  Amendment, in 2016, were there any public meetings
24  that occurred concerning amendments to the
25  redevelopment plan, the one that I showed you

Page 52

1  earlier from back in 2006, do you know if there were
2  public meetings and hearings regarding an amendment
3  to that plan?
4     A.    At what point?
5     Q.    In 2016.  Shortly after this First
6  Amendment.
7     A.    I don't recall.
8          MR. FIORENZO:  Would you pull up E13,
9  please.
10         MR. KLEIN:  This will be DD-7.
11    Q.    So these are minutes of a meeting of the
12  Mayor and Council on December 20, 2016.  You were a
13  member -- you were a council member at that time.
14  Correct?
15    A.    Yes.
16    Q.    Okay.  And these -- and that's going to
17  be DD-7.  So these minutes --
18         MR. FIORENZO:  If you could, Steve, just
19  turn to here, page 5.
20         MR. BOTTA:  What are the dates of the
21  minutes?
22         MR. FIORENZO:  December 20, 2016.
23    Q.    So there's a long description of what
24  happened at this hearing, but I just want to ask you
25  a question about your participation in the meeting

Page 53

1  at that time.  Do you remember at the conclusion of
2  this, this proposal to amend the redevelopment plan,
3  that you opposed it, you voted no?
4     A.    I don't recall.
5     Q.    Okay.  In the minutes of the meeting,
6  there's a paragraph -- there's a -- next to last
7  paragraph from the bottom where it said,
8  Councilwoman DiPaola received.  It says,
9  "Councilwoman DiPaola received confirmation from
10  Mr. Doyle that it included all the blocks and lots
11  he read off.  She," referring to you, "said that
12  everyone was under the impression that the fourth
13  story would only be allowed for the JMF property.
14  But if it was for CBD-10, it represented a larger
15  parcel.  She said if this was approved, it would
16  allow a fourth story elsewhere, as well as decreased
17  parking and everything else.  Mr. Doyle said the
18  Borough had already allowed the height that JMF was
19  proposing to build in other locations to 40 feet.
20  He said they would now be making the east side the
21  same as the west side.  He stated that what the
22  governing body said was that this might be okay, but
23  on Kinderkamack Road and Lincoln Boulevard, the
24  50-foot building would be required to have a
25  five-foot setback on the top story."

14 (Pages 50 - 53)

Page 54

1    Now, do you remember having this discussion at
2 the time of this meeting?
3    A.   I don't recall.
4    Q.   Do you remember expressing concerns
5 about it being four stories as the minutes reflect?
6    A.   Absolutely.
7    Q.   Okay.  You didn't like that.  Correct?
8    A.   I was opposed to fourth story, yes.
9    Q.   Right, right.  And you made that clear
10 on the record.  Right?
11   A.   Yes.
12   Q.   Okay.  And go to the next page, please.
13   So there's a -- it says Mr. Esque.  Do you see
14 that?
15   A.   It's small.
16   Q.   Okay.  So apparently they had some
17 people who spoke in connection with this public
18 hearing.  Right?  And there's a Mr. Esque, and
19 underneath the heading for him -- well -- yeah,
20 yeah, yeah, continue down.  You've got to make it
21 tighter.  Yeah, right there.  That's it.
22   Okay.  So Mr. Esque speaks, and then -- I
23 won't get into his comments.  And then Mr. Doyle --
24 the minutes reflect that Mr. Doyle responded, "It
25 was not so much fear, either the governing body

Page 55

1 would do what was best for the community or the
2 Court would come in and follow the constitution and
3 do what needed to provide low and moderate income
4 housing."
5    So you were there when Mr. Doyle said that.
6 Correct?
7    A.   Correct.
8    Q.   So you understood that what was
9 happening here as to this amendment was trying to
10 address this affordable housing obligation so that
11 Emerson could control its own destiny rather than
12 the Court deciding it.  Correct?
13       MR. BOTTA:  Objection to the form.
14 You're mischaracterizing what the minutes say.  Let
15 her just read the minutes.
16   Q.   You can answer my question.  You need to
17 have it read back?
18   A.   Can you rephrase that?
19   Q.   Yeah.
20       MR. FIORENZO:  Could you just read it
21 back to the witness, please?
22   A.   I didn't say repeat, I said rephrase.
23   Q.   Well, unless -- what don't you
24 understand?
25   A.   Repeat and rephrase maybe.

Page 56

1        MR. FIORENZO:  Repeat the question for
2 her.
3    Q.   And then tell me if there's something
4 that was not understood by you.
5        (The record is read by the reporter.)
6        MR. SEAMAN:  Objection to form.
7    A.   I don't recall.
8    Q.   Yeah, I mean, Mr. Doyle was explaining
9 that the Court could come in and follow the
10 constitution and make the decision on affordable
11 housing.  You understood that was an option.  Right?
12   A.   I don't recall what I remembered at that
13 moment.
14   Q.   Well, don't you know that as you sit
15 here today --
16   A.   I don't recall.
17   Q.   -- that if the town doesn't deal with
18 the problem, the Court can then impose a solution
19 for affordable housing?  You know that, don't you?
20   A.   I know it's a possibility.
21   Q.   Yeah.  In fact, not only is it a
22 possibility, you went on and said, "Councilwoman
23 DiPaola asked if another judge could have another
24 decision."  So you were asking the attorney who's
25 telling you, well, the Court would come in and

Page 57

1 impose something, you then said, well, can we get
2 another judge?
3        MR. SEAMAN:  Objection to form.
4    Q.   In substance, that's what you asked.
5 Right?
6        MR. SEAMAN:  Objection to form.
7    A.   I don't recall and I don't think that's
8 what I was saying.
9    Q.   Well, when you said, "Councilwoman
10 DiPaola" -- first of all, do you deny making that
11 statement reflected in the minutes?
12   A.   I don't recall making that statement.
13   Q.   So let's assume the minutes are accurate
14 then, that you made that statement.  It says,
15 "Councilwoman DiPaola asked if another judge could
16 have another decision."  So by another judge, did
17 you mean some judge other than the one who was then
18 handling it?
19       MR. SEAMAN:  Objection to form.
20   A.   I think I was just asking the opinion of
21 this was one judge's opinion, could another judge
22 have had a different opinion on what our number was.
23   Q.   Okay.  And that's why you said could
24 another judge have another decision.  Correct?
25   A.   I wasn't asking for another judge to

15 (Pages 54 - 57)

EXHIBIT A

Page 58

1 make the decision, I was just inferring that this
2 was one judge's opinion and that perhaps another
3 judge may have made a different decision.
4    Q.    And you were asking that question in
5 response to Mr. Doyle saying that the Court would
6 come in and follow the constitution and do what they
7 needed to provide low and moderate income housing.
8 You were asking that question in response to that.
9 Correct?
10    A.    I don't know if anything was left out of
11 the minutes.  I don't -- I would have to listen to a
12 tape.
13    Q.    Do you deny the accuracy of the minutes?
14    A.    Minutes are not word for word.
15    Q.    Do you deny the accuracy of those
16 minutes in substance?
17    A.    They're not word for word, so I don't
18 know what was intended.
19    Q.    You vote on the minutes, don't you?
20    A.    Minutes are not word for word.
21    Q.    Ma'am, you vote and approve the minutes
22 of the prior meeting at your next meeting, don't
23 you?
24    A.    Yes.
25    Q.    And you voted to approve the minutes as

Page 59

1 being accurate, did you not?
2    A.    Yes, but you're asking me a question
3 that has to do with the whole meeting, and I don't
4 know in what context that the clerk put those
5 specific words into the minutes.
6    Q.    It doesn't matter, because when they --
7    A.    It matters to me to answer your
8 question.
9    Q.    -- when they present the minutes to you
10 and all the members of the governing body at the
11 next meeting, one of the first items on your agenda
12 was, do you -- is there a motion to approve the
13 minutes of the prior meeting.
14    A.    You're asking --
15    Q.    Let me finish.  And you voted yes.  You
16 approved the minutes.  Correct?
17    A.    You're asking me --
18    Q.    Is that true or not?
19    A.    You're asking me --
20    Q.    Stick with my question.
21    A.    -- a specific question about going back
22 to the original question.
23    Q.    I'm asking if you approved the minutes.
24 Did you vote yes on the minutes?
25    A.    I don't remember if I approved the

Page 60

1 minutes.
2    Q.    Okay.  Well, let me show you here -- do
3 you deny approving the minutes?
4    A.    I don't recall.
5        MR. FIORENZO:  Steve, pull that up where
6 it shows that.
7    Q.    So part of the minutes, up at the top
8 you see Agenda No. 27 approved for release and
9 content 1/17/17.  Do you remember that on January 7,
10 2017, there was a vote and the minutes were approved
11 to be released to the public?
12        MR. SEAMAN:  January 17th.  You said
13 January 7th.
14    Q.    January 17th, 2017.  You don't remember
15 that.  Right?
16    A.    No.
17    Q.    Okay.  In any event, you voted against
18 it.  Right?
19        MR. SEAMAN:  Objection to form.
20    A.    Voted against what?
21    Q.    You voted against the amendment to the
22 redevelopment plan.
23        MR. KLEIN:  This will be DD-8.
24    Q.    So this is -- DD-8 is a Notice of
25 Adoption of Ordinance No. 1535-16 adopted on

Page 61

1 December 20, 2016, an ordinance amending the central
2 business district redevelopment plan.  And it
3 provides that -- just let me run through it real
4 quickly.
5    There's a number of Whereas clauses.  The
6 second one says, "The board conducted the requested
7 investigation and held requisite hearings on July
8 29, August 19, which were all done on notice as to
9 whether the area met the statutory requirement as an
10 area in need of redevelopment."
11    So you're aware that happened.  Right?
12    A.    I don't recall.
13    Q.    And then on September 7, '04, there was
14 a resolution adopted by the Mayor and Council.  Were
15 you aware of that?
16    A.    I don't recall.
17    Q.    And on December 14, 2004, the Mayor and
18 Council adopted a resolution designating the area as
19 an area in need of redevelopment.  Were you aware of
20 that?
21    A.    I wasn't involved in 2004.
22    Q.    And you didn't become aware of it later
23 on, the history, you didn't understand the history
24 leading up to the different votes you took?
25    A.    I don't know if I specifically knew

16 (Pages 58 - 61)

EXHIBIT A

Page 62

1 about that specific instance.
2     Q.    This document was the one you voted on.
3 You voted no. So it was in the document you were
4 asked to consider and vote on. Correct?
5     A.    Then I guess my answer if I don't recall
6 would be accurate.
7     Q.    Did you review resolutions before you
8 voted on them --
9     A.    I don't recall.
10    Q.    -- so you could understand the content?
11    A.    I don't recall.
12    Q.    So would you ever vote on a resolution
13 that you didn't read?
14    A.    I don't know.
15        MR. SEAMAN: Objection to form.
16    Q.    So it's possible you would? You're
17 telling me it's possible you would vote on a
18 resolution you didn't read? It's not that hard.
19 Could you give me an answer?
20        MR. BOTTA: She did answer.
21    A.    I generally read everything that I vote
22 on.
23        MR. FIORENZO: Well, I'm waiting. I'm
24 waiting thirty seconds. She hasn't answered. How
25 much longer do you need?

Page 63

1        MR. BOTTA: The transcript doesn't say
2 that. She can answer whenever she wants.
3        MR. FIORENZO: She can. I'm waiting
4 thirty seconds for a response to that.
5     Q.    What's the answer?
6     A.    I said I generally read resolutions
7 before I vote on them.
8     Q.    Of course you do. It would be
9 irresponsible not to. Right?
10        MR. BOTTA: Objection.
11        MR. SEAMAN: Objection.
12    Q.    Would you agree it would be the height
13 of irresponsibility of a public official, council
14 person, mayor, to vote on a resolution that you
15 don't read?
16        MR. SEAMAN: Objection to form.
17    A.    Generally.
18    Q.    Okay. So having read all this, let me
19 refer over to -- just go to the vote part of it, not
20 that. Where it shows the vote, last page.
21     Before I get to that, Steve.
22     So this ordinance dealt specifically with the
23 issue of height. Are you aware of that?
24    A.    Can I see the whole document?
25    Q.    You can see whatever you want, sure.

Page 64

1        MR. FIORENZO: Can you get a hard copy
2 and give it to her? She wants to see it.
3     Q.    We'll give you a hard copy, that way you
4 can review it and make sure you're comfortable with
5 seeing it. Okay?
6     A.    Fabulous.
7     Q.    Great. We're just here to help any way
8 we can. Anything you need, you let us know.
9     A.    Thank you.
10    Q.    So I want -- as you're reading it, I
11 want you to take a look specifically at the section
12 that I've highlighted there, which is subparagraph
13 section 4(f). So this ordinance addresses --
14    A.    Sir, I'm reading.
15    Q.    What does that mean?
16    A.    It means I'm reading.
17    Q.    So? I'm going to ask you a question and
18 then your reading will be informed.
19    A.    I know, but I asked if I could see the
20 document and you're not letting me see it and read
21 it.
22    Q.    For what purpose? There's no question.
23    A.    You asked me a question. I asked to see
24 the document.
25        MR. BOTTA: Let her review it.

Page 65

1     Q.    I'm going to ask you a question right
2 now, and if you want to read it, read whatever you
3 want. But right now there's no purpose for reading
4 it until I ask the question.
5     So my question is, in the document, does this
6 document deal with amendment to the ordinance
7 concerning building height in the CBD-W zone
8 reflected in subparagraph (f)?
9        MR. SEAMAN: Danielle, please take any
10 time you need to review the document before you
11 answer his question.
12    A.    Can you ask your question again or
13 repeat it?
14    Q.    Yeah. Section (f) -- section 4(f), did
15 you understand that this ordinance dealt, in part,
16 with building height?
17    A.    Yes.
18    Q.    And it spoke about the CBD-W zone and it
19 addressed the issue of four stories. Correct?
20    A.    Correct.
21    Q.    Did you oppose that?
22    A.    I opposed it.
23    Q.    Why?
24    A.    'Cause it's too high.
25    Q.    Too high for what?

17 (Pages 62 - 65)

Page 66

1    A.    Our small downtown.
2    Q.    You previously testified at your last --
3 in another deposition that you understood that the
4 reason why the four-story amendment occurred was
5 because there was a certain level of density needed
6 in a Mount Laurel project. You understood that.
7 Correct? Do you remember that?
8    A.    I don't think I said that. I think what
9 I --
10   Q.    Oh, you did.
11   A.    There was a fourth story needed so that
12 the developer could make more money because he spent
13 more money acquiring the property, so they gave him
14 the fourth floor so that he would make more money on
15 the actual market rate units.
16   Q.    So that's your position today.
17   A.    I think that's always been my position.
18   Q.    Well, let's not, but that's okay.
19       MR. BOTTA:  How do you know her
20 position?
21       MR. FIORENZO:  Because it's in the
22 deposition.
23       MR. BOTTA:  Well, then fine.
24       MR. FIORENZO:  Yeah, so I know it's not.
25       MR. BOTTA:  So you represent that.

Page 67

1       MR. FIORENZO:  Yeah, yeah, yeah. No,
2 I'm just --
3       MR. BOTTA:  Let her present her
4 position. You don't need your position.
5    Q.    That's your position today, right, that
6 it was all just because of the money, not because it
7 was needed to create sufficient density to
8 accommodate affordable units. Correct?
9    A.    I don't believe I said that.
10   Q.    Okay. I'm just asking your position
11 today.
12   A.    And if I said that, I may not have
13 understood your question, because --
14   Q.    Well, of course.
15   A.    -- the reason for the fourth story was
16 clearly so that the developer could make more money
17 because he spent too much money on the project.
18   Q.    Right, that's your --
19   A.    So if I said something other than that,
20 I may have misspoke.
21   Q.    Well, the record's going to reflect what
22 you clearly said before, and so -- but your position
23 now is that it was all about the money. Right?
24       MR. SEAMAN:  Objection to form.
25   Q.    Correct?

Page 68

1    A.    On the developer's end, yes.
2    Q.    Well, on the town's end, did you
3 understand as a member of the governing body the
4 reason there was another floor was because there was
5 greater density required to accommodate the
6 affordable housing, did you understand that?
7       MR. SEAMAN:  Objection to form.
8    A.    The only reason for a fourth story was
9 to make more apartments which was in order to make
10 more money for the developer because he had to put
11 in the affordable housing, and he felt after
12 purchasing all of the properties that he spent too
13 much money on the properties and that he had a
14 higher per door, so the fourth floor was added so
15 that he could add more market rate units to make the
16 project feasible for him to do.
17   Q.    Okay. Fair enough. Got it.
18       So I show you the last page of the exhibit.
19 Again, you voted against this ordinance, this
20 resolution adopting an ordinance. Correct?
21   A.    I voted no on this ordinance.
22   Q.    And why did you vote no?
23   A.    Because I was against the fourth story.
24   Q.    Okay.
25       MR. FIORENZO:  Steve, pull up the next

Page 69

1 one.
2    A.    I believe Lamatina broke this tie.
3       MR. KLEIN:  This is DD-9.
4    Q.    DD-9 is a resolution of the Borough of
5 Emerson dated July 2017. Do you recall that there
6 was a second amendment to the redevelopment
7 agreement in 2017?
8    A.    Yes.
9    Q.    And do you know what the purpose of that
10 second amendment was?
11   A.    I'd have to see the document.
12   Q.    Again, you voted against this. Correct?
13   A.    I'd have to see.
14       MR. FIORENZO:  Turn to the last page,
15 please.
16   Q.    So, again, on the second amendment, you
17 voted no. True?
18   A.    Yes, that's what it says.
19   Q.    Okay. Well, you have to say -- you have
20 to say yes on the record, so.
21   A.    I did. I said yes, that's what it says.
22   Q.    And was the reason you voted no having
23 to do with four stories?
24   A.    I'd have to read the whole document
25 again.

18 (Pages 66 - 69)

Page 70

1    Q.    Is there any other reason?  You have the
2 whole document in front of you.
3    A.    I think I've told you in the last
4 deposition that my opposition to this development
5 was that it was too dense.
6    Q.    Yeah.
7    A.    And adding a fourth story was only going
8 to make it more dense.  However, I don't recall
9 specifically what the second amendment was.
10    Q.    Do you know how many affordable units
11 had to be accommodated at the site?
12    A.    Yes.
13    Q.    How many?
14    A.    I think 47.
15    Q.    And do you know whether the -- this plan
16 was reviewed by the Special Master?
17    A.    I think it's actually 27, but I'm
18 blanking.  I think that there was a component where
19 they needed to review it.
20    Q.    Yeah, the Master had to review it and
21 approve it.  Correct?
22    A.    I believe so.
23    Q.    And the Court had to review it and
24 approve it.  Correct?
25    A.    I don't know if we were at that point.

Page 71

1 I guess, yeah.
2    Q.    Well, later there was a hearing on this,
3 a fairness hearing.  Correct?
4    A.    Yes.
5    Q.    Okay.  So all of this stuff that was
6 proposed to be developed in order to address the
7 affordable housing units at the site were reviewed
8 and approved by the Court and a court-appointed
9 monitor.  Right?
10    A.    Yes.
11    Q.    And although both of them approved it,
12 you voted no.  Correct?
13        MR. SEAMAN:  Objection to form.
14    A.    I voted no on what?  On this?
15    Q.    Yes.
16    A.    I'd have to see that document.
17    Q.    No, on this.  You voted no.
18    A.    Yeah, but you're just showing me the
19 vote.  I don't know what it said.
20    Q.    It's in front of you.  That's the one
21 you were reading before.
22    A.    You said that's the resolution.  This is
23 the ordinance or this is the resolution?  This is an
24 ordinance that you gave me.  You said resolution.
25    Q.    You have in front of you what's up on

Page 72

1 the board.
2        MR. BOTTA:  So I think --
3        MR. SEAMAN:  The witness does not have
4 what's -- that's not what she has in front of her.
5    Q.    All right.  So what do you want, what do
6 you need?
7    A.    Whatever you're asking me what I voted
8 on.
9    Q.    All right.  You want to scroll back?
10        MR. FIORENZO:  Let's go back, Steve.
11 Pull it out and -- okay.  Give her a hard copy so
12 she's got that as well.
13    A.    I'm right.  Right?  This is an
14 ordinance, that's a resolution.
15    Q.    So let's -- funny, you're having a good
16 time?
17    A.    I think you're trying to trick me, like
18 I don't know the difference between an ordinance and
19 a resolution.  It clearly says resolution.
20    Q.    Do you know the difference?
21    A.    You're telling me there's something in
22 front of me and it says ordinance and I do know how
23 to read.
24    Q.    Do you know the difference between the
25 two?  Ma'am?  Do you know the difference?

Page 73

1        MR. BOTTA:  Objection.
2    A.    Yes, I do know the difference.
3        MR. BOTTA:  You're being argumentative
4 now.
5        MR. FIORENZO:  I'm not.  I'm following
6 up on her comment.
7    Q.    What is the difference?
8    A.    An ordinance is a law in the town and a
9 resolution is basically an agreement that generally
10 shows whether the governing body agrees with an
11 action or not.
12    Q.    Do you adopt an ordinance by a
13 resolution?
14    A.    What?
15    Q.    Do you adopt an ordinance by a
16 resolution?
17        MR. BOTTA:  It's a Title 40 test,
18 Danielle.
19    A.    Do you adopt -- yes.
20    Q.    Okay.  So the resolution is utilized for
21 the purpose of adopting ordinances or local law.
22 Right?
23        MR. BOTTA:  Objection, calls for a legal
24 conclusion.  Can we get back to the question on the
25 ordinance or the resolution or whatever you want to

19 (Pages 70 - 73)

EXHIBIT A

Page 74

1 know?
2      MR. FIORENZO:  We'll get back to it when
3 I'm ready to and I'm not ready to yet.
4      Q.   Are you reviewing something for the
5 purpose of answering my question?
6      A.   I am.
7      Q.   Okay.
8      A.   All costs --
9      MR. SEAMAN:  Danielle, read silently,
10 please.
11      MR. FIORENZO:  All right.  I'll withdraw
12 the pending question, that way we can move on.  The
13 witness has been reading the document for quite some
14 time.
15      MR. SEAMAN:  He doesn't want to ask
16 about that, so you can put that aside and answer his
17 questions.
18      Q.   Yeah.
19      MR. FIORENZO:  So, Steve, scroll back up
20 on this, please.  Scroll to the first paragraph.
21 Scroll down a little bit, please.  Okay.
22      Q.   So this is the second amendment.
23      MR. BOTTA:  Objection to form.
24      Q.   Oh, it's the resolution.  Yeah, the
25 resolution adopting -- or voting for the second

Page 75

1 amendment.
2      Turn to the second page, please.
3      It says in paragraph 2 that the purpose and
4 intent of the amendment is to amend and supplement
5 the affordable housing requirements.  So were you
6 aware of that at the time that you voted on it?
7      A.   I don't recall.
8      Q.   It goes on to amend certain provisions
9 in the redevelopment agreement, and in particular,
10 the definition of affordable housing requirements.
11 Do you see that?
12      A.   I see it.
13      Q.   What was the reason why you voted
14 against this?
15      A.   Because this included eminent domain.
16      Q.   Okay.  It also included a provision that
17 addressed the affordable housing obligations of
18 Emerson pursuant to the Court's prior rulings.
19 Correct?
20      A.   Correct.
21      Q.   And it provided that the affordable
22 housing could be addressed through the construction
23 of affordable units on site, or two, construct
24 affordable units elsewhere within the Borough
25 (off-site).  Do you see that?

Page 76

1      A.   I see it.
2      Q.   Do you recall the discussions that took
3 place at that time --
4      A.   I don't recall.
5      Q.   You've got to let me finish.
6      -- regarding the issue of the affordable units
7 being on-site versus off-site?
8      A.   I don't recall.
9      Q.   Was there a discussion at that time
10 about the number of units required to go off-site?
11      A.   I don't specifically recall right now.
12      MR. FIORENZO:  Scroll down, Steve,
13 please.  Highlight number 4, please.
14      Q.   Okay.  Section 4 point -- Article 4.01
15 of the agreement was also amended, and it makes
16 reference here to use of eminent domain to acquire
17 the property.  Do you see that?
18      A.   I see it.
19      Q.   And you know what eminent domain is.
20 Right?
21      A.   I do.
22      Q.   That's when the municipality or state
23 determines to condemn or take property by paying
24 just compensation to the property owner for some
25 public purpose.  Correct?

Page 77

1      A.   Correct.
2      Q.   Okay.  So you say that you voted against
3 this because of eminent domain.  Up to this date,
4 was there any provision in the redevelopment
5 agreement that obligated Emerson to use eminent
6 domain if needed to assemble the land in this
7 redevelopment zone?
8      A.   I don't recall, but I do know that once
9 a redevelopment plan is in place, eminent domain is
10 on the table.
11      Q.   Right.  It's on the table not only by
12 agreement but by statute.  Correct?
13      A.   Correct.
14      Q.   All right.  So to the extent that this
15 is now providing for an amendment to 4.01 and it
16 refers to the cost of acquisition, including eminent
17 domain, the issue of eminent domain had been on the
18 table and part of this since the time of the
19 adoption of the original redevelopment plan.
20 Correct?
21      A.   Yes, but now they were actually talking
22 about doing it and talking about putting it right
23 here when they didn't need to specifically put it in
24 a document because it was already in the law.
25      Q.   It was already in the document.

20 (Pages 74 - 77)

EXHIBIT A

Page 78

1    A.    So the fact that they were putting it in
2 here, they were drawing attention to the fact that
3 it may actually happen.
4    Q.    Well, wasn't it already in a document?
5    A.    I don't recall.
6    Q.    Didn't the original redevelopment
7 agreement provide specifically for eminent domain if
8 needed?
9    A.    I don't recall.
10    Q.    So you don't know if it's now put in
11 here for the first time or not.
12    A.    I don't recall.
13    Q.    Okay.  And you understood the reasons
14 for the -- there being a provision in law and in the
15 agreement for eminent domain.  Right?  You
16 understood why that was there.
17    A.    I do understand eminent domain, yes.
18    Q.    What did you understand the reason why
19 it was in the redevelopment agreement and in the
20 statute?
21    A.    To take away property for a public use.
22    Q.    Okay.  So if there's a determination
23 made that a property is now a redevelopment zone, an
24 area in need of redevelopment, there's a statutory
25 right to be able to condemn it 'cause that's a

Page 79

1 public purpose.  Correct?  As you understood it.
2    A.    Can you say that again?
3    Q.    Yes.  So if there's a provision in the
4 law that permits eminent domain, it would then be
5 there to permit the town to use it for the public
6 purpose of creating a redevelopment zone.  Correct?
7    A.    Yes, but I don't agree with eminent
8 domain.
9    Q.    I understand.  You may disagree with the
10 law, but that's the law.  Right?  You disagree with
11 it though.
12    A.    It's something that's permitted in the
13 law, yes.
14    Q.    And I think you've told me previously
15 you're philosophically opposed to that.  Right?
16    A.    Yes.
17    Q.    You think it's wrong.
18    A.    As used in this purpose, yes.
19    Q.    And you think it's unfair to property
20 owners.
21    A.    It was unfair in Emerson, yes.
22    Q.    Right.  And you felt very strongly about
23 that.  Right?
24    A.    Yes.
25    Q.    Because in your view, that would result

Page 80

1 in potentially if the -- well, withdrawn.
2    You understood the way the process would work
3 would be the following, that the developer --
4 redeveloper would initiate communications with the
5 property owner or tenant and try to negotiate an
6 amount to pay them.  That's step one.  Right?
7    A.    Yes.
8    Q.    And if they were unable to reach such an
9 agreement, they then had a right to come to the town
10 and say, I need you to initiate a condemnation
11 proceeding so I can take the property, and then the
12 redeveloper ultimately would have to pay whatever
13 was determined to be the fair market value.  Right?
14    A.    Yes.
15    Q.    Okay.  And you understood that if we
16 assume that the creation of this redevelopment zone
17 was for a public purpose as found by the governing
18 body, that this eminent domain was a necessary --
19 potentially necessary tool to be able to get the
20 property you needed to develop the site.  You
21 understood that.  Correct?
22    A.    Yes, but I didn't feel that site was the
23 necessary spot to fulfill affordable housing.
24    Q.    Right.  Well, I know that.
25    A.    I had no issue abiding by the judge's

Page 81

1 ruling that we had to have the affordable housing.
2 My argument was that it didn't have to be on that
3 site --
4    Q.    Well, I don't want to go over this
5 again.
6    A.    -- taking away all of the businesses
7 that were still open and working.  I think you
8 recall that from my last deposition.
9    Q.    I do.  You felt really badly, you had a
10 lot of friends there.
11    A.    I never said friends.
12    Q.    Well, you said Cork & --
13    A.    You said friends.
14    Q.    Cork & Keg, you used to go see them
15 every day you said or almost every day.  Right?
16    A.    I didn't say that.
17    Q.    You didn't say that?
18    A.    Are you putting words in my mouth again?
19    Q.    Are you saying you didn't say that?
20    A.    I think you're putting words in my
21 mouth.
22    Q.    Are you saying --
23    A.    I think in the last deposition you tried
24 to tell me they were my friends and I didn't tell
25 you they were my friends.

21 (Pages 78 - 81)

Page 82

1    Q.    No, no, no, no, no, no, no.
2         MR. BOTTA: Joe, move on.
3    Q.    No, no, no, no. Let's be real clear.
4    Do you deny that you went to Cork & Keg almost every
5    day?
6    A.    I bought cigarettes at Cork & Keg. I
7    don't know if it was every day.
8    Q.    And you had a social relationship with
9    those people?
10        MR. SEAMAN: Objection to form.
11   A.    I don't recall.
12   Q.    And you knew all of these people whose
13   businesses potentially would be taken. Correct?
14   A.    I generally know all of the business
15   owners in Emerson.
16   Q.    Yes. And so the answer to my question
17   would be yes, you knew them all. Correct?
18   A.    I knew them, yes.
19   Q.    Okay. And you felt badly, you said a
20   moment ago you felt that this project should have
21   been somewhere else, not here. Right?
22   A.    I don't recall what I said.
23   Q.    No, no. You just said it a moment ago.
24   You just told me --
25   A.    I said it could have been somewhere

Page 83

1    else.
2    Q.    Right, right, it could have been. And
3    you knew that someone undertook an analysis in
4    Emerson, a vacant land analysis to determine what
5    sites might be available for the affordable housing.
6    You knew that. Correct?
7    A.    Say that again?
8         MR. SEAMAN: At what point in time?
9    Q.    Did you know when you were on the
10   governing body that there had been an analysis of
11   the available land in Emerson to determine what the
12   appropriate sites would be to be able to site
13   affordable housing?
14   A.    The land wasn't available.
15   Q.    The determination of availability was to
16   be made here by the Special Master, wasn't it?
17   A.    I don't know.
18   Q.    The Special Master, in fact, was charged
19   with the responsibility of overseeing the siting of
20   this Mount Laurel housing. Are you aware of that?
21   A.    I don't remember.
22   Q.    And this site was the one that was
23   ultimately settled upon as the most likely to be
24   able to accommodate a substantial portion of
25   Emerson's affordable needs. Correct?

Page 84

1    A.    I honestly don't remember.
2    Q.    You don't know?
3    A.    I don't remember how this happened.
4    Q.    So in any event, you voted against the
5    second amendment.
6         MR. FIORENZO: Scroll down, Steve,
7    please. No, no, no, go back up to the next numbered
8    paragraph.
9    Q.    So just -- I'm going to ask you a
10   question generally. Tell me then, what were the
11   reasons why you voted against this second amendment
12   which was intended to address the affordable housing
13   requirements, why did you do that?
14   A.    I don't recall. I told you that I was
15   against eminent domain.
16   Q.    Yes.
17   A.    I don't recall why else.
18   Q.    Other than that, can you remember any
19   other reason?
20   A.    I was opposed to the density of the
21   project, which is why I voted no on the majority of
22   votes that came up.
23   Q.    Well, this doesn't -- the second
24   amendment didn't address density.
25   A.    Everything addresses the project.

Page 85

1    Q.    No, no, no, excuse me. Is there
2    anywhere in this agreement where they address
3    density? The second amendment.
4         MR. BOTTA: Well, doesn't it incorporate
5    the First Amendment and the redevelopment agreement?
6    Q.    You can answer.
7    A.    This is an addendum, this is a second --
8    what do you call it, a second --
9    Q.    Amendment.
10   A.    Amendment to a redevelopment
11   agreement --
12   Q.    Okay.
13   A.    -- which I opposed from the get-go.
14   Q.    Got it. Okay. So your position is the
15   density -- it was too much density.
16   A.    Yes.
17   Q.    You didn't like it because eminent
18   domain, number one, too much density, number two.
19   Anything else?
20   A.    It didn't fit into our downtown, it was
21   too big.
22   Q.    Too big, number three. Anything else?
23   A.    A fourth story.
24   Q.    Fourth story, number four. Anything
25   else?

22 (Pages 82 - 85)

Page 86

1    A.    It also speaks to density.
2    Q.    What?
3    A.    I believe it also speaks to density and
4 eminent domain --
5    Q.    We did that.
6    A.    -- that I was against.
7    Q.    We did that one already.  I guess the
8 height increases the density.  Right?
9    A.    Uh-hum.
10   Q.    Yes.  Anything else?  Anything else?
11   A.    No.
12   Q.    Okay.  And all of these issues that you
13 raised were considered by the Special Master when a
14 determination was made as to whether to recommend
15 this site to the Court.  Correct?
16   A.    I guess.
17   Q.    Okay.  Now, after the second
18 amendment --
19   A.    What time is it?
20   Q.    -- did you -- it's 11:45.
21   A.    Thank you.
22   Q.    You're welcome.  And by the way, so
23 we're in -- let's see, this is 7/18/17.  The date of
24 this is July 18th of '17.  So at this point when
25 this is going on, there is already pending the

Page 87

1 lawsuit filed by Emerson.  Correct?
2    A.    What do you mean?
3    Q.    Emerson filed a lawsuit in the Superior
4 Court of New Jersey seeking protection from
5 builder's remedy lawsuits.  Right?
6    A.    I think that was filed in '15.
7    Q.    Right.  So I'm going to show it to you
8 in a minute, but there was a suit that was
9 instituted by Emerson.  Correct?
10   A.    Yeah.
11         MR. FIORENZO:  Okay.  Would you pull
12 that up?
13         MR. KLEIN:  This will be DD-10.
14         MR. FIORENZO:  Yeah, whatever.  I'm
15 losing track.  DD-10, Steve?
16         MR. KLEIN:  Yes.
17         MR. FIORENZO:  Okay.
18   Q.    Okay.  DD-10 is a letter from the
19 DeCotiis law firm, July 9, 2005.  It encloses a
20 complaint, Order to Show Cause, and a variety of
21 other legal documents.
22         MR. FIORENZO:  Turn to the next page,
23 please.
24         MR. SEAMAN:  You meant 2015, Joe.
25 Right?

Page 88

1         MR. FIORENZO:  '15, yeah.  Thank you.
2 2015.
3         And turn to the first page of the
4 complaint.  There we go.
5    Q.    So this is the complaint filed by
6 Emerson in the matter of the application of the
7 Borough of Emerson, Bergen County, New Jersey, for a
8 declaratory judgment which was filed on or about
9 July 2015.  You were aware that a suit was filed.
10 Correct?
11   A.    Yeah.
12   Q.    You sat on the governing body when they
13 voted to authorize the suit.  Correct?
14   A.    Yes.
15   Q.    You participated in discussions relating
16 to that?
17   A.    I don't recall if I participated in
18 discussions.
19   Q.    Okay.  Did you vote in favor of the
20 institution of the suit?
21   A.    I don't recall how I voted.
22   Q.    Did you oppose the institution of the
23 suit?
24   A.    I don't recall.
25   Q.    So as you sit here today, you don't

Page 89

1 remember what your position was on this lawsuit?
2    A.    I don't recall.
3    Q.    Okay.  So you don't know your position.
4    A.    I don't recall at this time.
5    Q.    Well, did you think it was a good idea?
6    A.    I don't recall.
7    Q.    Did you think it was a good idea that
8 the town seek protection from builder's remedy
9 lawsuits?
10   A.    I don't recall.
11   Q.    Do you know what a builder's remedy
12 lawsuit is?
13   A.    Yes.
14   Q.    What is it?
15   A.    It's when a builder files a lawsuit
16 against a town because they want to build somewhere
17 that the town doesn't want them to build.
18   Q.    Because of Mount -- because of lack of
19 Mount Laurel compliance.  Right?
20   A.    Yes, correct.
21   Q.    And that was something -- you told me
22 last time we spoke, that was something that you
23 agreed the town should try to protect itself
24 against.  Would you agree with that?
25   A.    Yes.

23 (Pages 86 - 89)

Page 90

1    MR. BOTTA: Against builder's remedy
2  lawsuits?
3    MR. FIORENZO: Yeah, yeah, sure.
4    Q.  And that's, in part, what this did, it
5  sought repose, it sought protection from that.
6  Correct?  True?
7    (Jack Klugmann and Kevin Cowan enter the
8  room.)
9    Q.  True?
10   A.  Say your question again?
11    MR. BOTTA: Can you just put on the
12  record --
13    MR. FIORENZO: Can you read it back?
14    MR. BOTTA: -- who's here?
15    MR. FIORENZO: Yeah, Mr. Jack Klugmann
16  and the other gentleman.
17    MR. COWAN: First name is Kevin Cowan,
18  C-O-W-A-N.
19    MR. FIORENZO: Okay.  With my client.
20  They're representatives of my client.
21    MR. BOTTA: And he is who?
22    MR. FIORENZO: Mr. Cowan.
23    MR. BOTTA: Yeah, I know.  Who is he?
24    MR. FIORENZO: With Accurate.
25    MR. BOTTA: Okay.  The title, please?

Page 91

1    MR. FIORENZO: Why?  Why do you need to
2  know?
3    MR. BOTTA: Well, I don't know if he's a
4  member of the company or not.  He can't just show up
5  if he's not a member of the plaintiff.
6    MR. FIORENZO: He works for the company.
7    MR. BOTTA: Okay.  Put it on the record.
8    MR. FIORENZO: I just did.
9    MR. BOTTA: No, you didn't.
10    MR. FIORENZO: He works for the company.
11    MR. BOTTA: What's his title?
12    MR. FIORENZO: Don't know.  Okay?
13    MR. BOTTA: Can you put your title on
14  the record?
15    MR. FIORENZO: No, no, no, no, you don't
16  respond.  Don't respond to him.  You don't get to
17  question him.
18    MR. BOTTA: Then I want the record to
19  reflect who is here and what their titles are in
20  relation to the plaintiff.
21    MR. FIORENZO: And I just told you, and
22  as far as I'm concerned, that's all I'm going to
23  tell you about it.
24    MR. BOTTA: No, I want on the record who
25  he is and who he is at present and if he's a

Page 92

1  representative and what his title is so that it can
2  be checked.
3    MR. FIORENZO: Right.  And I'm declining
4  to do anything more than what I just did, which I
5  told you he works for the company.
6    MR. BOTTA: I want his name and address
7  on the record.
8    MR. FIORENZO: His name is on the
9  record.  I just gave it to you.
10    MR. BOTTA: Well, spell it.
11    MR. FIORENZO: Spell the name.  I don't
12  know how you --
13    MR. COWAN: C-O-W-A-N.
14    MR. FIORENZO: Thank you.
15    MR. BOTTA: First name?
16    MR. COWAN: First name is Kevin.
17    MR. FIORENZO: Thank you.
18    Q.  Okay.  Can we -- do you remember the
19  question?
20    A.  No.
21    MR. FIORENZO: Okay.  Let's go back.
22    (The record is read by the reporter.)
23    A.  Correct.
24    Q.  Okay.  So after this complaint was
25  filed, and I want to take you now back, we were in

Page 93

1  July of 2017 when you voted against the second
2  amendment, do you remember shortly thereafter the
3  lawsuit in the Superior Court was settled?
4    A.  I don't think it was settled until I
5  became mayor and we had to prove everything.  I
6  think there was a condition of settlement.
7    MR. FIORENZO: Pull it up, Steve.
8  November 21, '17.
9    MR. KLEIN: This will be DD-11.
10    Q.  This is a November 21, 2017, settlement
11  agreement addressed to Wendy Rubinstein.  She was
12  counsel for Emerson.  Correct?
13    A.  Correct.
14    Q.  And it's regarding In the Matter of the
15  Application of the Borough of Emerson, Docket No.
16  BER-L-6300-15.
17    So the first sentence says, The letter
18  memorializes the terms of an agreement reached
19  between the Borough of Emerson, the declaratory
20  judgment plaintiff, and Fair Share through
21  settlement.
22    So this is the settlement agreement reached
23  between the parties.  True?
24    A.  Yes.
25    Q.  Okay.  So within a couple months of the

24 (Pages 90 - 93)

EXHIBIT A

Page 94

1  vote on the second amendment to the redevelopment
2  agreement, this Mount Laurel case was settled, and
3  you were aware of that at the time.  Correct?
4      A.    I don't recall.
5      Q.    Well, this was presented to the
6  governing body, including you, to determine whether
7  Emerson was authorized to settle.  True?
8      A.    I don't recall.  It was a long time ago.
9      Q.    So do you deny that you voted on this?
10     A.    I just said I don't recall specifically
11 what you're saying.
12     Q.    Did you have any objections to the
13 proposed settlement?
14     A.    I don't recall.
15     Q.    Take a look at the agreement.
16          MR. FIORENZO:  Give her a hard copy if
17 you could, please.
18          MR. KLEIN:  Sure.
19     Q.    Here's a hard copy for you.
20          MR. FIORENZO:  By the way,
21 congratulations.
22          MR. KLUGMANN:  Thank you.
23     Q.    Okay.  So in the settlement agreement --
24          MR. FIORENZO:  What is it, Steve, DD-11?
25          MR. KLEIN:  Yes.

Page 95

1      Q.    DD-11, in the -- go back to the first
2  page if you would.  You're on the first page.
3  There's a section that says Background.  And it
4  says, "Emerson filed the above-captioned matter on
5  July 8, 2015, seeking a declaration of its
6  compliance with the Mount Laurel doctrine and the
7  Fair Housing Act," and I'll stop there.  "Through
8  declaratory judgment process, the Borough and FSHC
9  agreed to settle the litigation and to present the
10 settlement to the trial court with jurisdiction over
11 this matter to review, recognizing the settlement of
12 Mount Laurel litigation is favored because it avoids
13 delays and the expense of trial and results more
14 quickly in the construction of homes for
15 lower-income households."
16     So does that refresh your recollection that
17 this, in fact, was the settlement agreement reached
18 between Emerson and the Fair Housing in connection
19 with the pending litigation?
20     A.    I recall that this is the agreement.  I
21 don't recall how I voted.
22     Q.    Okay.  The last page, which is page 10
23 of the agreement before the exhibits, is signed on
24 behalf of Emerson.  Do you know who signed that?
25     A.    On page 10?

Page 96

1      Q.    Yeah, page 10.
2      A.    It looks like it says Lou Lamatina.
3      Q.    Okay.  In the settlement agreement --
4          MR. FIORENZO:  Go to paragraph 6,
5  please, Steve.
6      Q.    So paragraph 6 addresses certain parts
7  of Emerson's affordable housing obligations.  Were
8  you aware of the provisions of paragraph 6 --
9      A.    Yes.
10     Q.    -- at the time?
11     There's also --
12     A.    Actually, I don't know if I was at the
13 time.  I'm aware of them now.
14     Q.    Okay.  There's also a section 7.
15          MR. FIORENZO:  Steve, could you scroll
16 down to that.
17     Q.    So as part of the settlement, it
18 attempted to quantify what Emerson's affordable
19 housing needs were in what's described as the "prior
20 round."  Do you know what that means?
21     A.    Yes.
22     Q.    What?
23     A.    That means the amount of affordable
24 units that already satisfied the obligation.
25     Q.    Okay.  And in addition to the prior

Page 97

1  round, it then addressed -- it addressed the
2  prospective need, and I want to have you take a
3  look, please, at paragraph 8.
4     So paragraph 8 is the -- provides that Exhibit
5  A -- as reflected in Exhibit A, those properties
6  have a realistic development potential of 53 units
7  and the RDP will be satisfied as follows, as will be
8  more fully described in the Borough's Housing
9  Element and Fair Share Plan.
10    So did you understand that this settlement
11 agreement, among other things, settled and fixed the
12 number of affordable units, thereby eliminating the
13 potential of the court fixing a different amount?
14     A.    Yes.
15     Q.    Okay.  And it then listed the various
16 projects where the housing would be sited.  Correct?
17     A.    Yes.
18     Q.    And it shows the second line is Block
19 419 project, and that's the project in question.
20 True?  That's my client's property, Block 419.
21 True?
22     A.    Are you asking me or are you stating
23 that?
24     Q.    I'm always asking you, yeah.
25     A.    It sounded like a statement.

25 (Pages 94 - 97)

EXHIBIT A

Page 98

1    Q.    No.  True?
2    A.    Yes.
3    Q.    Okay.
4    A.    15 percent.
5    Q.    And it provides for 29 of the units of
6 the affordable housing of the 53 units were going to
7 be sited on the subject property.  Correct?  Yes?
8    A.    Yes.
9    Q.    So would you agree that Block 419
10 comprised really the single largest component part
11 of Emerson's affordable housing obligation,
12 fulfillment of that obligation.  Correct?
13    A.    As presented, yes.
14    Q.    Okay.  And then there's an asterisk
15 there down below, and it reflects that there's a
16 minimum of 15 percent set-aside, 22 units with an
17 option -- with an off-site provision for
18 payment-in-lieu -- or payment-in-lieu for the
19 remaining seven.  So did you understand when this
20 was settled, there were to be 29 affordable units --
21    A.    22.
22    Q.    -- 22 would be on-site and seven would
23 be off-site.  Correct?
24    A.    That there could be seven off-site.
25 There didn't have to be.  But they were supplying 29

Page 99

1 of the units.
2    Q.    Seven to be off-site at the election of
3 the developer.  Correct?
4    A.    With an option for off-site.
5    Q.    Yeah, yeah.  Okay.  And so that would be
6 the 29.  And it goes on to say, "If such option is
7 exercised, the Borough will show at the midpoint
8 review how it will provide a realistic opportunity
9 for the remaining seven units, in accordance with
10 the provisions of the agreement."
11         Now, did you engage in discussions with anyone
12 about those seven units?
13    A.    At what point?
14    Q.    At any point.  Well, let me -- at any
15 point up through the institution of the suit here.
16 Did you have discussions about the seven units with
17 anyone?
18    A.    Yes.
19    Q.    With whom?
20    A.    I think they presented a pseudo-plan to
21 the Borough that they wanted to put seven units on a
22 particular piece of land in the Borough.
23    Q.    When?  After the litigation or before?
24 When I say litigation, this litigation, this
25 lawsuit, before or after this suit.

Page 100

1    A.    I guess after.
2    Q.    Okay.  Prior to this suit, did you have
3 any discussions or communications with anyone
4 regarding the seven off-site units?
5    A.    Did I have conversations?
6    Q.    You, yes.
7    A.    No.
8    Q.    Okay.  Were you aware of -- were there
9 discussions about where those seven units would be
10 located prior to the institution of the suit in this
11 matter?
12    A.    Can we take a break?
13    Q.    Well, we're in the middle of a question.
14 We can take a break.  Just answer my question and we
15 can take a break.
16    A.    I think I'd like to take a break right
17 now.
18    Q.    Well, once you answer the question.
19    A.    I'm going to go to the ladies' room
20 right now.
21         MR. BOTTA:  We'll read it back.
22    Q.    You're walking out?
23         MR. FIORENZO:  Let the record reflect --
24    A.    I'm going to the ladies' room out of
25 necessity.

Page 101

1         MR. FIORENZO:  Let the record reflect I
2 asked the witness just to complete the answer to the
3 question --
4         MR. BOTTA:  Well, we've been going two
5 hours plus, so.
6         MR. FIORENZO:  -- and she just picked
7 up -- she just picked up and walked out, because she
8 is --
9         MR. BOTTA:  We've been going two hours
10 plus.
11         MR. FIORENZO:  -- controlling how we
12 proceed here apparently.
13         MR. BOTTA:  She needed to go to the
14 ladies' room.
15         MR. FIORENZO:  Oh, come on.  She could
16 have answered the question and that's the way it
17 works.
18         MR. BOTTA:  She had to go to the ladies'
19 room.
20         MR. FIORENZO:  She's supposed to answer
21 the question before she breaks.
22         MR. BOTTA:  I don't talk about your
23 bladder, don't talk about hers.
24         MR. FIORENZO:  In Federal Court, that's
25 how it works.  You don't walk out in the middle of a

26 (Pages 98 - 101)

EXHIBIT A

Page 102

1 question. But this is Danielle DiPaola, so.
2      Okay. We might as well take a break.
3      (A break was taken at 12:05 p.m.)
4      (Deposition resumes at 12:15 p.m.)
5      MR. FIORENZO: Back on the record.
6 BY MR. FIORENZO:
7   Q.   So we were discussing the 419 project,
8 and I just want to make sure the record is clear.
9 Do you recall any discussions at all at any meetings
10 of the governing body regarding the terms and
11 conditions of the settlement agreement?
12      MR. SEAMAN: At what point in time?
13      MR. FIORENZO: Prior to the execution of
14 the settlement agreement, which is in 2017.
15   A.   I don't recall.
16   Q.   Before the settlement agreement was
17 approved by the governing body back in 2017, did you
18 understand the terms and conditions of the
19 settlement?
20   A.   I don't recall.
21   Q.   You don't recall if you knew them?
22   A.   I don't recall if I understood them
23 fully.
24   Q.   Okay. Did you have an opportunity to
25 speak to anyone you wanted regarding the terms and

Page 103

1 conditions of the proposed settlement?
2   A.   I don't recall.
3   Q.   Was a presentation made by the attorney
4 for Emerson concerning the terms and conditions of
5 the settlement?
6   A.   I don't recall.
7   Q.   Did you have any objections to the terms
8 and conditions of the settlement agreement reached
9 by Emerson with Fair Housing in the Mount Laurel
10 case?
11   A.   I don't recall.
12   Q.   As you sit here today, do you have any
13 objections to the settlement agreement?
14   A.   I guess it was necessary.
15   Q.   Okay. So I guess then the answer to
16 that would be no, you don't have any objections
17 'cause it was necessary?
18   A.   At the point in time of this agreement,
19 I guess the governing body felt that it was
20 necessary.
21   Q.   Well, I asked you about today and you
22 just told me -- I asked if you had any objections as
23 of today, and you said, I guess it was necessary.
24 By that did you mean you don't have any objections
25 today because it was necessary to do?

Page 104

1   A.   I have the objection of including the 29
2 units only for the same reasons I've been saying all
3 morning.
4   Q.   Right. But they agreed to settle with
5 those 29 units related to Block 419. You understood
6 that. Correct?
7   A.   Yeah. I also agreed that 55 Emerson
8 Plaza West was part of the agreement, and it didn't
9 exist, they weren't deed-restricted until I became
10 mayor.
11   Q.   Okay. But I'm not asking about that.
12   A.   I know. But you're asking me to think
13 about what I did. I don't recall.
14   Q.   Okay. So did you have any objection --
15 or do you have any objections today as to the terms
16 and conditions of the settlement agreement?
17   A.   I don't know.
18   Q.   Well, take a look at it. It's in front
19 of you. This is my opportunity to ask you that
20 question.
21   A.   I guess I would say yes.
22   Q.   What are your objections --
23   A.   The fact that --
24   Q.   Let me finish. What are your objections
25 as to the settlement agreement, DD-11, today?

Page 105

1   A.   I think you knew that I objected to
2 Block 419 because of the density of the project for
3 the fourth story, so if I was going to have an
4 objection, I would say that we could have had a
5 better plan in order to put into the -- into this
6 agreement.
7   Q.   Okay. So you have -- today you have an
8 objection as to the settlement agreement to the
9 extent it includes Block 419 as one of the sites for
10 affordable housing. Is that correct?
11   A.   Because of its density and size.
12   Q.   I don't want to know because. Is that
13 correct?
14   A.   Because of the density and size.
15   Q.   I don't want to know why yet. I just
16 want you to confirm that you have an objection to
17 Block 419 being included, and then I'll get to the
18 reasons. Is that true?
19   A.   I don't know.
20   Q.   I thought you just told me that you had
21 an objection --
22   A.   I'm saying the reason is because of the
23 density. You've got to let me finish, please.
24   Q.   You've got to let me finish.
25   A.   Yeah, but I was answering you what you

27 (Pages 102 - 105)

Page 106

1 asked.
2    Q.    No, no, no, I was in the middle of a
3 question. Okay?
4    A.    Okay.
5    Q.    So as to the settlement agreement, do
6 you or do you not have an objection to inclusion of
7 Block 419 as a site for affordable housing in the
8 settlement agreement, yes or no?
9    A.    I guess I objected to it, but it's on
10 specific instances that I keep on saying and you
11 don't want to hear.
12    Q.    I don't know what that means. Do you
13 object to it as of today, including Block 419, or
14 not?
15    A.    I don't understand your question.
16    Q.    My question is, Block 419 is in the
17 agreement for 29 affordable units. Correct?
18    A.    Yes.
19    Q.    Do you object to the settlement
20 agreement because it included Block 419 for the 29
21 affordable units, yes or no?
22    A.    I don't really understand what you're
23 asking.
24    Q.    What don't you understand about that
25 simple question?

Page 107

1    A.    I just don't understand your question.
2    Q.    Do you object to Block 419 being in the
3 settlement agreement?
4    A.    I don't know.
5    Q.    Okay. You said a moment ago, I guess it
6 was necessary. Do you recall that testimony?
7    A.    I said I guess the governing body felt
8 it was necessary.
9    Q.    No, I think you said I guess it was
10 necessary. But did you believe it was necessary to
11 satisfy the 53 units?
12    A.    I think it was necessary to come up with
13 a plan to build affordable units in Emerson in order
14 to satisfy the agreement with the court.
15    Q.    But I didn't ask that, did I. I asked
16 whether Block 419 was necessary in order to satisfy
17 part of the 53 units?
18    A.    I think the majority of the governing
19 body felt that it was.
20    Q.    I didn't ask about them though. I asked
21 about you. Did you think it was necessary?
22    A.    No.
23    Q.    Okay. Did you offer or propose any
24 other site for the 29 units?
25    A.    I don't really think there was an option

Page 108

1 for that.
2    Q.    Okay. Did you have another site that
3 you proposed is the question, not whether there was
4 an option. Did you say to anyone, look, before we
5 settle this thing and before we include Block 419,
6 we should instead put it somewhere else, did you
7 give another alternate location?
8    A.    I don't know that I gave a specific, but
9 I think that I said that this wasn't the only way to
10 fulfill the obligation.
11    Q.    Right. I appreciate that. That wasn't
12 my question. Did you give another site in lieu of
13 that to site -- to provide for the 29 units that
14 would be lost if 419 was not part of the deal?
15    A.    I don't --
16    Q.    Did you give another site location?
17    A.    I don't think that I had the knowledge
18 of where there could be other sites.
19    Q.    So is the answer then no?
20    A.    Because as a single governing body
21 member, I couldn't have the engineers and the
22 planners work just for me to find another site.
23    Q.    So I take it then the answer to my
24 question is no, you didn't offer another site?
25    A.    I think I suggested that there could be

Page 109

1 other sites --
2    Q.    I know that.
3    A.    -- but nobody wanted to look into it.
4    MR. BOTTA: Let her finish.
5    Q.    We keep going around in circles. We're
6 wasting time. I know you said I kept suggesting.
7 I'm asking, did you ever propose a specific site in
8 lieu of Block 419, yes or no?
9    A.    I don't recall.
10    MR. BOTTA: Joe, now you're raising your
11 voice. Just talk normal.
12    MR. FIORENZO: I'm not. If I raise my
13 voice, believe me, you'll know. That's not it.
14 That's really not it.
15    MR. BOTTA: That is raising your voice.
16    MR. FIORENZO: Trust me, it's not.
17    Q.    Did you know of another site that could
18 house the 29 affordable units at the time this
19 settlement agreement was entered into?
20    A.    I don't recall.
21    Q.    Did you know what other sites were
22 considered by the Special Master appointed by the
23 Court?
24    A.    I don't recall.
25    Q.    Did the Special Master appointed by the

28 (Pages 106 - 109)

EXHIBIT A

Page 110

1 Court consider other locations?
2    A.   I don't remember.
3    Q.   You voted against the settlement, didn't
4 you?
5    A.   I don't recall.
6        MR. FIORENZO:  Pull that up, Steve.
7        MR. KLEIN:  This will be DD-12.
8        MR. FIORENZO:  Would you turn to section
9 17.
10    Q.   Okay.  Here we are.
11        MR. BOTTA:  What is this, please?
12        MR. FIORENZO:  Yeah, these are minutes
13 of -- what's the date again?
14        MR. KLEIN:  November 21, 2017.
15    Q.   So on November 21 of '17, there was a
16 resolution proposed and voted on.  The resolution
17 was to authorize the settlement, agreement, which is
18 the document we've been talking about, DD-11.  And
19 it appears from the record that everyone voted in
20 favor of settling the dispute except for you, you
21 voted no.  Right?
22    A.   Everyone always voted in favor of
23 everything that Lou Lamatina presented.
24    Q.   Great, but that wasn't my question
25 though, was it?

Page 111

1    A.   Except for me.
2    Q.   Thanks a lot, yeah, yeah.  Yeah, that's
3 great.  Now could you answer my question?  Everyone
4 voted in favor but you, you voted no.  Correct?
5    A.   Everyone that was present, correct.
6    Q.   You're the only no vote.  Right?
7    A.   Right, but there were only five
8 council --
9    Q.   Right.
10    A.   -- members present.
11    Q.   What was the reason why you voted
12 against settlement --
13        MR. SEAMAN:  Joe, let her finish her
14 answer before you ask another question.
15    Q.   What was the reason why you voted
16 against the settlement agreement, let me finish,
17 that was going to settle the litigation and provide
18 Emerson with a judgment of repose and protection
19 against builder's remedy?  Give me your reasons.
20 What was number one?
21    A.   I can only say that I objected to the
22 project at 419 because of its density and the fourth
23 story and everything else that I objected about it,
24 the eminent domain, everything.
25    Q.   Okay.  So the reason you voted against

Page 112

1 it is you knew 419 was included as a core component
2 part of the settlement.  Correct?
3        MR. SEAMAN:  Objection to form.
4    A.   I guess I knew that.
5    Q.   Okay.  And you felt that it was too
6 dense and you felt that you didn't like the fourth
7 story as you told me before.  Right?
8    A.   Right.
9    Q.   And so that was the reason you voted
10 against it?
11    A.   And I didn't like the component of
12 eminent domain.
13    Q.   Okay.  That's the third reason.
14    A.   Which looked like it was going to be
15 used.
16    Q.   Okay.  And those were the reasons why
17 you voted against the settlement agreement?
18    A.   They are probably some of them.  I don't
19 recall specifically --
20    Q.   Well, I want to know all of them.
21    A.   I don't recall specifically --
22    Q.   Okay.  So let me --
23    A.   -- why I voted no.
24        MR. BOTTA:  Joe, let her finish.
25        MR. FIORENZO:  She's not even trying.

Page 113

1        MR. BOTTA:  Objection.
2        MR. SEAMAN:  Objection.
3    Q.   Let's be clear.  Just so you understand,
4 this is your deposition, and it's my opportunity to
5 discover facts in the case.  So I need to know today
6 if you -- tell me what you remember.  Do you
7 remember any other reasons other than you objecting
8 to Block 419 for the reasons you stated, density,
9 four stories, eminent domain, any other reason why
10 you voted against the settlement agreement that you
11 can recall sitting here today?
12    A.   I don't recall.
13    Q.   Okay.  Did you understand that if the
14 matter wasn't settled, there would be a trial?
15    A.   I don't know if I knew that at the time.
16    Q.   Did you understand that if it wasn't
17 settled, fixing and limiting the numbers for
18 affordable units, that there was exposure to Emerson
19 of higher units imposed by the Court?
20    A.   I don't recall what I remembered at that
21 moment.
22    Q.   Do you know that as of today?
23    A.   I understand it today.
24    Q.   Okay.
25    A.   It's a long time ago, yeah.

29 (Pages 110 - 113)

1        MR. FIORENZO:  Pull up the conditional
2  compliance.
3        MR. KLEIN:  This will be DD-13.
4     Q.    So DD-13 is a January 25, 2019,
5  Conditional Final Judgment of Compliance and Repose.
6  Hold on one second.
7     So we're going to come back to DD-13 in a
8  moment, but I want to show you something else before
9  we discuss this.
10       MR. KLEIN:  This will be DD-14.
11    Q.    Okay.  So after the settlement agreement
12  was entered into signed on November 21, 2017,
13  between Emerson and Fair Housing to settle the
14  litigation, did you understand that there had to be
15  a hearing in front of the Court for the Court to
16  approve it?
17    A.    I don't know.
18    Q.    Because this was a Mount Laurel case
19  with affordable housing, did you understand that it
20  was required that the Court make a determination at
21  a "fairness hearing" as to whether the settlement
22  agreement was fair and reasonable and would allow
23  Emerson to fulfill its obligations, did you
24  understand that?
25    A.    I don't recall.

1     Q.    That was explained to you, was it not,
2  back at -- prior to June 29, 2018?
3     A.    I don't recall.
4     Q.    Do you remember telling me that you knew
5  there was going to be a hearing but they didn't tell
6  you the exact date when the hearing was going to be?
7     A.    Or where it was.
8     Q.    Or where it was.  Remember we went over
9  that previously?
10    A.    I remember that.
11    Q.    So you knew about there was going to be
12  a hearing, you just claimed that no one ever told
13  you the specifics of when and where it was so you
14  could go down to object if you wanted to.  Correct?
15  Remember telling me that?  Is that true?
16    A.    I don't recall.
17    Q.    Okay.  You don't remember that either?
18    A.    I don't recall.  There's been a lot of
19  time in between a lot of this.
20    Q.    Yeah, yeah.  In any event, the Court
21  conducted a fairness hearing, do you remember us
22  discussing that the last time we sat down together,
23  and that there were certain objectors who came down
24  and actually objected to the settlement agreement,
25  do you recall that, we talked about that?

1     A.    I don't recall.
2     Q.    Did you understand there was a fairness
3  hearing?
4     A.    I understand it now.
5     Q.    Okay.  And at the fairness hearing, did
6  you understand that there were objectors -- first of
7  all, there was a Special Master that was there
8  testifying, there were objectors, 214 Kinderkamack,
9  LLC, Dolores Della Volpe.  Do you know who she is?
10    A.    Yes.
11    Q.    Did you ever speak to Ms. Volpe?
12    A.    Yes.
13    Q.    Did she own a business?
14    A.    No.
15    Q.    Was she involved -- how was she involved
16  in any way with this project?
17    A.    She owned a property within the
18  redevelopment zone.
19    Q.    Okay.  She had a tenant on the site?
20    A.    She had a tenant.
21    Q.    Who was the tenant?
22    A.    Cork & Keg.
23    Q.    Okay.
24    A.    And the cleaners.
25    Q.    Those were the people that you used to

1  go --
2     A.    Cork & Keg and the cleaners, not just
3  Cork & Keg.
4     Q.    Cork & Keg were the people we talked
5  about, you used to see them all the time, you went
6  in the store, bought things, interacted.  Correct?
7     A.    Just like I saw Billy and Sue all the
8  time when I went into the cleaners.
9     Q.    Sure.  You knew everybody you told us.
10  Right?
11    A.    I do know all the businesses in town.
12    Q.    I'm sure you do.  So did you speak to
13  Ms. Volpe about trying to get her to come down to
14  the hearing to make an objection?
15    A.    No.
16    Q.    So you never spoke with her before this
17  fairness hearing?
18        MR. SEAMAN:  Objection to form.
19    A.    I think I've spoken to her before, but
20  not particularly about the fairness hearing, no.
21    Q.    Did you speak to her about objections to
22  the plan?
23    A.    I believe the only conversation I ever
24  had with -- well, I don't even know if it was
25  Dolores Volpe, I think it was the daughter.  I don't

EXHIBIT A

Page 118

1 know if Dolores was the daughter or the mother,
2 because the mother inherited the building from her
3 husband who passed, and the only conversation I
4 believe I only had with Dolores is when she called
5 to tell me that she had told Mayor Lamatina that she
6 would put a second story on the Cork & Keg cleaners
7 building, and he said, don't even try it, we're
8 taking your property.
9     Q.    Okay. So now that you've gotten that
10 out, did you speak with Dolores in any way about the
11 settlement agreement?
12    A.    No.
13    Q.    You didn't appear at the settlement --
14 at the fairness hearing. Correct?
15    A.    I don't think I understood at the time
16 that I could.
17    Q.    Right. I didn't ask the reason, but
18 you've now confirmed you weren't there. Correct?
19    A.    I was not there.
20        MR. FIORENZO: Scroll to the next page.
21    Q.    So did your town attorney when the case
22 was settled explain to the governing body as a whole
23 that there would then have to be approval of the
24 settlement agreement by the Court, did you know
25 that?

Page 119

1     A.    I guess.
2     Q.    Okay. And the Court had a hearing and
3 they, according to the order, heard and received
4 evidence, both documentary and witnesses, and
5 considered the challenges of the objectors to the
6 proposed settlement, including --
7        MR. FIORENZO: Steve, highlight that
8 last paragraph, please. Can you make that a little
9 bigger? Oh, never mind.
10    Q.    It says, "The Court having heard and
11 considered challenges argued by the objectors to the
12 proposed settlement agreement, including the
13 objectors' challenge to the realistic opportunity to
14 provide housing for persons of low and moderate
15 income, based on the objectors' contention that the
16 Borough may not acquire the objectors' property or
17 other properties within Block 419 for
18 redevelopment."
19        MR. FIORENZO: Continue on, please.
20 Stop there.
21    Q.    And having considered all that, the
22 Court ordered and found that, and then there's A, B,
23 it identified the present need obligation of Emerson
24 at twenty units. Do you see that?
25    A.    Yeah. I don't know where you're going

Page 120

1 with all of this.
2     Q.    Well, I'm asking, did you understand
3 that the Court then after this hearing made a final
4 determination fixing the amount of affordable
5 housing obligations, in other words, taking the
6 numbers that had been proposed, and then this
7 settlement reduced those numbers, did you understand
8 that it was reducing the numbers?
9     A.    I don't recall.
10    Q.    Don't you recall your counsel at a
11 hearing presenting and saying this is a good deal
12 for the town and here's why?
13    A.    I don't remember.
14    Q.    Was the settlement recommended by
15 counsel?
16    A.    I don't remember.
17    Q.    So you didn't understand that there was
18 now going to be a cap or limit on what the COAH
19 housing obligations were, you didn't know that?
20    A.    I don't remember.
21        MR. SEAMAN: Objection to form.
22    A.    I don't remember.
23    Q.    Well, do you know that now?
24    A.    I don't know. I think it's fair to say
25 that when a lot of this was going on, I didn't get a

Page 121

1 lot of one-on-one with our attorneys for
2 explanations.
3     Q.    I didn't ask that.
4     A.    I was only picking up as much as I could
5 and I voted the way I felt was the best interest of
6 the Borough.
7     Q.    I asked only did you know that now,
8 today, as you sit in this room, that one of the
9 things the Court-approved settlement did is it
10 limited, reduced the number of affordable units
11 Emerson would otherwise have to fulfill.
12    A.    Yes, I just read it.
13    Q.    Do you understand that now?
14    A.    Yes, I just read it.
15    Q.    Okay.
16        MR. FIORENZO: Continue scrolling down.
17 Go to H, please.
18    Q.    And it appears that the Court at the
19 hearing specifically considered Block 419, and they
20 found, "Upon the Special Master's report, testimony,
21 and recommendation, that the settlement is fair and
22 reasonable to low and moderate income persons, and
23 the properties located within Block 419
24 redevelopment project area are all 'necessary or
25 useful' to provide low and moderate income housing."

31 (Pages 118 - 121)

EXHIBIT A

Page 122

1    Did you understand that the Court made a
2 specific finding of fairness of the settlement
3 agreement, and specifically that Block 419 was
4 necessary or useful to satisfy the constitutional
5 obligation, did you know that?
6    A.    I understand reading that, that that was
7 the Judge's opinion, yes.
8    Q.    And that was the Judge's opinion back
9 then on --
10        MR. FIORENZO:  What's the date again
11 Steve, January?
12        MR. KLEIN:  June 29th, 2018.
13    Q.    June 29th, 2018, that was the Judge's
14 opinion back then.  Right?
15    A.    Yes.
16    Q.    Okay.  Now, after this occurred, after
17 the fairness hearing and now the settlement
18 agreement was approved by the Court, did you
19 understand that there were things that needed to be
20 done further by the town of Emerson in order to
21 fulfill its obligation with respect to affordable
22 housing, did you know that?
23    A.    I don't recall.
24    Q.    Well, you were on the governing body,
25 weren't you?

Page 123

1    A.    I don't recall.
2    Q.    Were you interested in monitoring what
3 was going on with regard to satisfying the
4 affordable housing obligations?
5    A.    I don't recall what I was thinking at
6 that time.
7    Q.    So you have no recollection of what you
8 knew and didn't know after the Court-approved
9 settlement agreement with respect to Mount Laurel,
10 you just have no recollection whatsoever?
11    A.    At this time I can't tell you
12 specifically what I thought after hearing about
13 this.
14    Q.    Okay.  Well, sitting here today, what
15 you know -- let's explore what you know today.  You
16 know today that after that settlement was approved,
17 there then had to be certain things done, one of
18 which was there had to be a Planning Board hearing
19 where the plan was presented to the Zoning Board for
20 approval of the Block 419 project.  You were aware
21 of that.  Correct?
22    A.    I guess.
23    Q.    'Cause you were there.  Right?
24    A.    I think so.
25    Q.    You attended that.

Page 124

1    A.    I think I did, yeah.
2    Q.    Is there any doubt you did?
3    A.    What date was it?  Was this the last
4 meeting in December?
5    Q.    December 2018, did you attend --
6    A.    Yes, I was there.
7    Q.    -- did you attend the Land Use Board
8 hearing at which the Block 419 project was presented
9 for approval?
10    A.    Yes.
11    Q.    Okay.  And did you understand that that
12 was being done to implement the terms of the
13 settlement agreement approved by the Court?
14    A.    I don't know if I knew that at the time.
15    Q.    Do you know that now --
16    A.    Yes.
17    Q.    -- that it was being done -- yeah.
18 Okay.  And, in fact, in addition to that, there were
19 other things the settlement agreement required to be
20 done, there had to be a Housing Element Plan
21 adopted.  Correct?
22    A.    I don't recall.
23    Q.    You don't remember anything.
24    A.    I don't recall the process.
25    Q.    Okay.

Page 125

1        MR. KLEIN:  DD-15.
2    Q.    DD-15 is a Housing Element and Third
3 Round Fair Share Plan.  Have you seen this report
4 before?
5    A.    Yes.
6    Q.    And it's prepared by Brigette Bogart.
7 Who was she?
8    A.    She was the planner for the Borough of
9 Emerson?
10    Q.    Okay.  Before you fired her?
11    A.    I fired her, yes, I did.
12    Q.    Right.  Yeah, I'm just trying to get a
13 time frame.  This was before she was fired by you
14 when you came on.
15    A.    She technically was not fired, she was
16 just not reappointed.
17    Q.    Fair enough.
18    A.    But I think what you're getting at is I
19 didn't agree with her work.  I did not.
20    Q.    I'm not getting at anything.  I'm asking
21 you a question.
22    A.    Well, you said fired.
23    Q.    I'm just asking you a question.  You
24 told me you didn't fire her.  She wasn't
25 reappointed.  Okay.  I'll accept that.

32 (Pages 122 - 125)

EXHIBIT A

Page 126

1    A.    You were a mayor.  You know I can't
2 single-handedly fire a professional, so don't put
3 words in my mouth.
4    Q.    Yeah, I know.  You didn't have any
5 control over the instruments of government in
6 Emerson at all, is that what you're saying?  You had
7 no influence over the instruments of government in
8 Emerson, is that what you're saying?
9    A.    I don't understand your question when
10 you say instruments.
11    Q.    You said, I couldn't do it.  Are you
12 saying that you, as the mayor, had no influence on
13 whether to hire or retain professionals once you
14 were elected mayor, is that your testimony here?
15    A.    I cannot fire a professional all on my
16 own, you know that.
17    Q.    No, but you could influence who gets
18 hired or not.  Right?
19         MR. SEAMAN:  Objection to form.
20    A.    Influence?
21    Q.    Yeah.
22    A.    I think that we have discussions
23 about --
24    Q.    Yeah.
25    A.    -- who should be hired and who shouldn't.

Page 127

1    Q.    Okay.  But in any event, you got rid of
2 Bogart.
3         MR. SEAMAN:  Objection.
4    Q.    Let's look at the report, DD-15.  Did
5 you review this report?
6    A.    Parts of it.
7         MR. FIORENZO:  Let's get the date,
8 Steve.  I can't see it at the top.
9         MR. BOTTA:  That's from the court stamp.
10         MR. FIORENZO:  Oh, yeah, yeah, yeah,
11 yeah.  Okay.  That's the court stamp.
12         MR. KLEIN:  December 6, 2018.
13         MR. FIORENZO:  Okay.  Right, on the
14 bottom.
15    Q.    Okay.  So on the front page of DD-15, it
16 indicates December 6 of '18.  Do you see that?
17    A.    I see it.
18    Q.    That is the Housing Element Plan Third
19 Amendment.  Was there a hearing and discussion about
20 this third amendment?
21    A.    I don't remember.
22    Q.    Did you participate in discussions
23 regarding it?
24    A.    I don't remember.
25    Q.    Did you understand that -- so this is

Page 128

1 page 22 of the -- Ms. Bogart's December 6 plan.  And
2 it provides, The development of Block 419 has a
3 minimum set-aside of 22 units with an option for
4 off-site provisions or a payment-in-lieu for the
5 remaining seven units.  If such option is exercised,
6 the Borough will show at the midpoint review how it
7 will provide a realistic opportunity for the
8 remaining seven units in accordance with the
9 agreement with Fair Share Housing.
10         Then it goes to state, "The Block 419 project
11 is an integral component of the Borough's Fair Share
12 Plan.  Did you understand that 419 was an integral
13 component of the Fair Share Plan?
14    A.    That's what she wrote.
15    Q.    Well, did you understand that to be the
16 case and why it was so?
17    A.    I understand it, but I didn't agree with
18 it.
19    Q.    But, again, I didn't ask if you agreed
20 with it, I just asked if you understood it.  Did you
21 understand that it was an integral component part by
22 providing 29 of the 53 affordable units in Emerson?
23    A.    That was Brigette's position.
24    Q.    Okay.  And you understood that that was
25 the Court's opinion as well based on the fact that

Page 129

1 they approved that site as necessary.  Correct?
2 Useful and necessary.  Right?
3         MR. SEAMAN:  Objection to form.
4    Q.    Did you understand the Court had so
5 concluded as well?
6    A.    I don't recall.
7    Q.    Well, do you remember I showed you that
8 the Judge said in his ruling, his order, which is --
9 has the force of law, it's a judicial order, that
10 419 was "both useful and necessary" to fulfill the
11 affordable housing obligation?
12    A.    Yes, but I think I answered --
13    Q.    Okay.
14    A.    -- that that was the Judge's opinion.
15    Q.    So it just wasn't Ms. Bogart's opinion,
16 it was also the Court's opinion and the Master's
17 opinion that it was an integral component part of
18 the Fair Share Plan.  Correct?
19    A.    I guess it's fair to say they all shared
20 the same opinion, yes.
21         MR. FIORENZO:  All right.  So that's a
22 good point, we'll stop for the lunch break, 'cause
23 it's about 12:45.  Let's go off the record.
24         (A luncheon recess was taken at 12:45
25 p.m.)

33 (Pages 126 - 129)

Page 130

1      AFTERNOON SESSION
2
3          (Deposition resumes at 1:25 p.m.)
4          MR. FIORENZO:  All right.  Let's go back
5   on the record.
6   EXAMINATION BY MR. FIORENZO:
7      Q.   So when we broke, we were discussing
8   some of the events that occurred towards the end of
9   2018.  I want to --
10         MR. FIORENZO:  Can you pull up E32,
11  Steve?
12         MR. KLEIN:  This will be DD-16.
13     Q.   So it appears on December 4, 2018, there
14  was an amendment introduced which -- in the meeting
15  of the Mayor and Council to dedicate Block 419, Lot
16  7 to Emerson Redevelopers and also -- yeah, Emerson
17  Redevelopers and also vacating Kenneth Avenue in
18  Emerson.  Do you remember that there was a meeting
19  at which this issue was being discussed?
20     A.   Is Block 7 the ambulance corps building?
21     Q.   419, Lot 7.  You tell me.  You're the
22  mayor.  I don't know.
23     A.   I don't have the blocks memorized in the
24  town.
25     Q.   So you don't know?

Page 131

1      A.   (Shakes head.)
2      Q.   Did you participate in this meeting?
3      A.   Yes.
4      Q.   Before voting on it, did you have a
5   discussion about the proposed ordinance?
6      A.   I don't recall.
7          MR. FIORENZO:  Turn to the highlighted
8   section, Steve.
9      Q.   So there was a note in the minutes that
10  you said to the governing body at the meeting that
11  the governing body was "tying the hands of any
12  future administration and said the process had been
13  accelerated because of the upcoming change in
14  government."  Did you make such a statement?
15     A.   Something to that effect, yes.
16     Q.   So what actions do you feel were being
17  taken at that meeting that would tie the hands of
18  the future administration?
19     A.   I don't remember specifically.  You
20  mentioned an ordinance that we introduced.
21     Q.   Were there any actions that were taken
22  in December of 2018 that you believe tied the hands
23  of future administration?
24     A.   Yes.
25     Q.   What actions were taken that tied the

Page 132

1   hands of future administration?
2      A.   The approval of the third amendment of
3   the redevelopment plan.
4      Q.   When was that approved?
5      A.   In December of 2018 after I was elected
6   mayor.
7      Q.   So you felt the approval of the third
8   amendment tied the hands of the future
9   administration?  How so?
10     A.   Because it was still a part of the
11  redevelopment and it was showing that the project
12  was going to move forward with an even larger piece
13  of property.
14     Q.   So the third amendment increased the
15  size of the project?
16     A.   I believe the third amendment is where
17  the -- oh, no, the third amendment was the decrease
18  in the amount of money for the infrastructure from
19  seven hundred to like three hundred and something
20  and the deadline for the ambulance corps.
21     Q.   Okay.  So you say the third amendment
22  tied the hands of your incoming -- about to be
23  incoming administration.  Correct?
24     A.   I think I was talking collectively of
25  everything that had happened since the election.

Page 133

1      Q.   Okay.  Well, I want to be more specific.
2   Okay?  When you said on December 4th, 2018, that the
3   governing body should hold up so as not to tie the
4   hands of the future administration, what were you
5   asking them to hold up doing?
6      A.   The approval of the redevelopment plan,
7   the site plan.
8      Q.   Well, that was before the Land Use
9   Board, not the governing body.  Correct?
10     A.   And all of the agreements that we were
11  voting on.
12     Q.   Well, what agreement was being voted on
13  that night?
14     A.   I believe it was the third amendment to
15  the redevelopment plan.
16     Q.   So you felt the third amendment
17  shouldn't be voted on.  Correct?
18     A.   I'd have to look at the whole agenda to
19  refresh my memory.
20     Q.   Well, okay.  Do you remember what it is
21  that you were saying would tie the hands of your
22  administration --
23     A.   I don't know what --
24     Q.   Let me finish.
25     -- when you made that statement at the meeting

34 (Pages 130 - 133)

EXHIBIT A

Page 134

1 on December 4, 2018?
2     A.    I don't recall at this time what I was
3 referring to.
4     Q.    So right then and there at that meeting
5 on the agenda were two different things; number one,
6 a resolution or an ordinance to vacate Kenneth
7 Avenue.  Do you remember that?
8     A.    Not specifically.
9     Q.    Do you know what the purpose of vacating
10 Kenneth Avenue was?
11     A.    Do I know what the purpose was?
12     Q.    Yeah.
13     A.    Yeah, they were giving the property to
14 Accurate Builders.
15     Q.    That was part of the Block 19
16 development approved by the Court and later on by --
17 and by the Special Master.  Correct?
18     A.    I guess.
19     Q.    And that was part of what was included
20 within the third amendment to the fair share plan.
21 Correct?
22     A.    I don't -- I don't recall.
23     Q.    Okay.  So other than the Kenneth
24 Avenue -- vacating Kenneth Avenue, was there
25 anything else that you were objecting to at that

Page 135

1 meeting?
2     A.    I don't recall specifically what I was
3 objecting to.  I was objecting in whole to all of
4 the acceleration of the process to push this through
5 before I took office.
6     Q.    Well, acceleration of what process?
7 What was being accelerated?
8     A.    Everything having to do with building
9 this building.
10     Q.    Well, let's identify what it is you
11 claim was being accelerated.  Give me a list.  What
12 are they?
13     A.    Particularly the plan going before the
14 Land Use Board.
15     Q.    Okay.  So the site plan approval process
16 before the Land Use Board.  Correct?  You wanted
17 that to be put on hold.  Correct?
18     A.    I think it would have been in the best
19 interest of the Borough to take it slow instead of
20 approve it in less than an hour.
21     Q.    Well, did you want it to be held until
22 your administration was in place?
23     A.    I think that probably would have been
24 appropriate.
25     Q.    Whether it would have or not, was that

Page 136

1 what you wanted to see happen, you wanted it to be
2 held --
3     A.    I think that would have been
4 appropriate.
5     Q.    Okay.  So is the answer to my question
6 yes, you wanted the Land Use Board not to act until
7 your administration was in place?  Yes?
8     A.    I think that was what was appropriate at
9 the time, yes.
10     Q.    So the answer is yes.  Okay.  We finally
11 got to yes.  And the answer is yes because you
12 thought it was appropriate.  Right?
13     A.    I think everybody thought it was
14 appropriate.
15     Q.    I'm not asking about everybody.  I'm
16 asking you, Danielle DiPaola, did you think it was
17 appropriate?
18     A.    I think the majority of the Borough of
19 Emerson thought it was appropriate.
20     Q.    I didn't ask about the majority of the
21 Borough, did I?  I asked about you.  Did you think
22 it was appropriate?
23     A.    My decisions are always made based on
24 what I feel is best for the Borough.
25     Q.    Again, I didn't ask that.

Page 137

1         MR. BOTTA:  Let her finish.
2     Q.    I asked whether you thought it was
3 appropriate.
4         MR. BOTTA:  If you don't like her
5 answer, just please let her finish.
6         MR. FIORENZO:  No, no, she's not even
7 trying.
8         MR. BOTTA:  If you let her finish --
9         MR. FIORENZO:  She's playing games.
10         MR. BOTTA:  All right.  Well, you've got
11 to let her finish her answer.
12     A.    I'm answering honestly.
13     Q.    No, no, I don't care what anybody else
14 wanted to happen.  I don't care about the town.  I
15 don't care about others.  I'm asking you personally.
16 Did you believe it was inappropriate to go ahead
17 with the Land Use Board application until your
18 administration was in place, yes or no?
19     A.    I don't recall.
20         MR. BOTTA:  Objection, asked and
21 answered.
22     Q.    You don't remember?
23     A.    I don't recall.
24     Q.    Okay.  Well, here you refer to tying the
25 hands and the process being accelerated because of

35 (Pages 134 - 137)

Page 138

1 the upcoming change. So the idea of the
2 acceleration you told me was, number one, the Land
3 Use Board, you thought the Land Use Board shouldn't
4 be proceeding until the new administration was in
5 place. Correct?
6    A.    Say that again?
7    Q.    You told me a moment ago, I asked you
8 about what were you concerned about accelerating and
9 you mentioned the Land Use Board.
10    A.    Yeah.
11    Q.    Okay. So you wanted the Land Use Board
12 hearing not to take place in December 'cause it was
13 being accelerated, instead you wanted it to wait
14 until your administration was in place. Correct?
15    A.    Yes.
16    Q.    Okay. Anything else other than the Land
17 Use Board application for site plan approval that
18 you felt was being accelerated?
19    A.    No, 'cause I didn't know about the
20 change in ownership until the next meeting.
21    Q.    Okay. All right. So --
22        MR. FIORENZO: Steve, can you just go
23 back to the earlier part where it shows what 15,
24 that ordinance is about.
25    Q.    So the ordinance that you voted no on as

Page 139

1 reflected in the minutes was the ordinance
2 dedicating Block 419, Lot 7. See that?
3    A.    Yeah.
4    Q.    Okay. So why did you vote no?
5    A.    I don't recall specifically what
6 property is Block 419, Lot 7. If you could tell me
7 whether it's Kenneth Avenue or whether it's the
8 ambulance building or the parking lots or the
9 commuter lot, I might be able to answer you better.
10    Q.    Do you know?
11    A.    I don't know what Block 7 is off the top
12 of my head, no, I do not.
13    Q.    So you don't know why you voted against
14 it?
15    A.    If you tell me what that Block 19 and 7
16 refers to.
17    Q.    Ma'am, I'm not in the business of
18 telling you anything --
19    A.    Then I don't know.
20    Q.    -- 'cause I just --
21    A.    My answer is I don't know.
22    Q.    I ask questions and I expect answers.
23 It's not my deposition. So I'm just finding out
24 what you know and what you don't know. So if you
25 don't know why it is you voted against this on

Page 140

1 December 4 of 2018, just state that.
2    A.    I don't know.
3    Q.    Okay. So by the way, around this time,
4 this is December 4, the election had occurred in
5 early November of 2018. Right?
6    A.    Uh-hum. Yes.
7    Q.    And that's the election where you were
8 elected as mayor. Correct?
9    A.    Yes.
10    Q.    And you were running a campaign
11 throughout a number of months in 2018 leading up to
12 it. Correct?
13    A.    Yes. We've done all this before.
14    Q.    Have we?
15    A.    Yeah.
16    Q.    In this case we've done it?
17    A.    I don't know. I feel like we talked
18 about this for two days already, but.
19    Q.    This is the first time you're being
20 deposed in this case.
21    A.    Oh, okay.
22    Q.    It's a different case.
23    A.    Okay.
24    Q.    Okay? This is the case --
25    A.    I know.

Page 141

1    Q.    -- brought by my client against you.
2 The other case had to do with a claim by the town.
3 Okay?
4        And in connection with that, I want to show
5 you a couple things.
6        MR. FIORENZO: Steve, could you pull up
7 E026.
8    Q.    So this is a newspaper article written
9 by Stephanie, I can't make that out, of North Jersey
10 published on November 8th, 2018.
11        MR. KLEIN: DD-17.
12    Q.    So it's an article reporting your
13 election as mayor. You saw that before. Right?
14    A.    Yes.
15    Q.    Ms. Noa --
16    A.    Noda.
17    Q.    Noda? She interviewed you after the
18 election. Correct?
19    A.    I guess. I don't remember.
20    Q.    You spoke with her?
21    A.    I don't remember if I spoke with her or
22 if she took comments from something that I could
23 have said.
24    Q.    Okay. Let me ask you about some of the
25 comments you made.

36 (Pages 138 - 141)

EXHIBIT A

Page 142

1        MR. FIORENZO: Could you make bigger
2 the -- yeah.
3        Q.    Just a couple comments. In the fourth
4 paragraph. So the newspaper article states, Since
5 2010, DiPaola has served the Borough as councilwoman
6 but said she decided to run for mayor because she
7 "didn't like the direction the town was going in,"
8 with particular concerns about overdevelopment in
9 the downtown. Did you make such a statement to the
10 reporter on that day?
11       A.    I don't know if I made it specifically
12 to the reporter, but it's in quotes, so I must have
13 said it.
14       Q.    Okay. You don't deny making the
15 statement in quotes, do you?
16       A.    I don't remember.
17       Q.    My question is, you don't deny it, do
18 you?
19       A.    I --
20       Q.    You don't recall, but you don't --
21 you're not denying that you made the statement, you
22 just don't remember one way or the other?
23       A.    I don't know if I said exactly that, but
24 it's in print.
25       Q.    Right. And that's why I'm asking the

Page 143

1 follow-up question. You said --
2        A.    I --
3        Q.    Listen to me. You don't remember, but I
4 take it from I don't remember you're saying you
5 don't remember if you said it or you didn't say it,
6 but you're not denying that you made the statement
7 to the reporter, you just don't remember. Correct?
8        A.    I'm saying that I don't know if that's
9 exactly what I said, but that I see it's in quotes,
10 and I don't remember when I said it, if I said it,
11 or who I said it to.
12       Q.    You still haven't answered my question
13 though. Do you deny making the statement to the
14 reporter, yes or no?
15       A.    I deny saying it to the reporter 'cause
16 I don't think I said it to a reporter.
17       Q.    I just need to know if I have to call
18 the reporter at the trial to tell us that you said
19 that. Are you denying you said that to her?
20       A.    I don't know when I said that.
21       Q.    Did you say it to her, what she put in
22 quote?
23       A.    I do not believe I said anything
24 specifically to the reporter. I do not think I
25 spoke with her. I don't recall.

Page 144

1        Q.    So you're now telling me you don't think
2 you spoke to the reporter? I'm confused. Are you
3 telling us now under oath you don't think you even
4 spoke to this reporter --
5        A.    I don't recall if I --
6        Q.    -- who quoted you?
7        A.    -- specifically spoke to that reporter
8 or if I said that at a meeting and she took my quote
9 from a meeting.
10       Q.    Do you deny making the statement --
11       A.    I don't --
12       Q.    Let me finish. You're interrupting.
13       Do you deny making the statement irrespective
14 of where or when it was said?
15       A.    I don't know. Can you tell me when I
16 said it?
17       Q.    Again, you don't get to ask me
18 questions, I get to ask you questions. Okay? I'm
19 simply asking you, at any time do you deny that you
20 made the statement in quotes that the reporter said
21 you made, do you deny that?
22       A.    I don't remember.
23       Q.    Okay. But you don't deny it.
24       A.    I don't remember.
25       Q.    Okay. But you don't deny it?

Page 145

1        MR. SEAMAN: Objection to form.
2        A.    I don't remember.
3        Q.    Okay. Are you saying it didn't
4 happen --
5        A.    I don't remember.
6        Q.    -- or you don't recall one way or the
7 other?
8        A.    I don't remember.
9        Q.    Well, I'm trying to find out what you
10 mean by that. When you say you don't remember, that
11 means it could have happened but you don't recall?
12       A.    I don't remember.
13       MR. SEAMAN: Objection to form.
14       Q.    Yeah, I know, but does that mean you
15 don't recall whether you did it or not?
16       A.    I don't remember.
17       Q.    You're not going to answer my question?
18       A.    I don't remember.
19       Q.    Are you intentionally not answering my
20 questions now?
21       A.    I do not remember.
22       Q.    Yeah, I know, but do you mean by that
23 that it might have happened, it might not, you just
24 don't recall?
25       A.    I don't remember.

37 (Pages 142 - 145)

1    Q.    Okay.  So we'll get the reporter in.
2 We'll go through that exercise since that's what you
3 want us to do.  You don't remember -- you don't even
4 remember speaking to her, do you?
5    A.    I don't remember if I spoke directly to
6 her.
7    Q.    So let's go down and see if you remember
8 anything else that you said to this reporter.
9    So did you ever say to anybody that you didn't
10 like the direction the town was going in?
11    A.    I don't remember.
12    Q.    Is that something that you believe, that
13 you didn't like the direction the town was going in?
14    A.    I don't remember what I felt at that
15 time.
16    Q.    Did you like the direction the town was
17 going --
18    A.    I don't --
19    Q.    Hold on, let me finish.  You keep
20 interrupting me.
21    A.    I know, but you're badgering --
22    Q.    Don't interrupt me, please.
23    A.    Okay.  Don't badger me.
24    Q.    Please don't interrupt me.  Okay?
25    Did you like the direction the town was going

1 in under Mayor Lamatina?
2    A.    I didn't like the way Lou Lamatina acted
3 as mayor.
4    Q.    Did you like the direction the town was
5 going in with respect to the development downtown or
6 the Block 419 project, did you like that?
7    A.    Not particularly.
8    Q.    Okay.  So to the extent the reporter
9 said you told her you didn't like the direction the
10 town was going in, that sounds like it was, in fact,
11 your position back then.  Correct?
12    A.    Say that again?
13    Q.    Was that, in fact, your position
14 generally back then, you didn't like the direction
15 of the town?
16    A.    I think that's why anyone runs.
17    Q.    Well, then why is it so hard for you to
18 say that?
19    MR. SEAMAN:  Objection.
20    Q.    It's obvious that that -- what the
21 answer is.  So you didn't like the direction the
22 town was going in, and in particular you didn't like
23 the overdevelopment of the downtown.  True?
24    A.    I didn't like the density of the
25 downtown.

1    Q.    Right.  Which had to do with your
2 concerns about overdevelopment.  Correct?
3    A.    As it related to the density and the
4 height of the buildings they were putting in.
5    Q.    So it sounds like she was accurately
6 reflecting what your position was back then.  Am I
7 wrong?
8    A.    You keep asking me if I told her that
9 and I've told you several times --
10    Q.    I didn't ask you that.
11    MR. SEAMAN:  Let her finish.
12    Q.    That's not the pending question.
13    A.    Now you're yelling at me.
14    Q.    I said -- well, you're not even trying
15 to answer.  You're making a mockery out of this,
16 honestly.  I'm asking you a simple question.  And
17 the simple question is, regardless of whether you
18 remember if you said that, it sounds from what you
19 described to me that that statement accurately
20 reflected generally your sentiments that you didn't
21 like the direction of the town because of
22 overdevelopment.  Correct?
23    A.    Because of the density that
24 overdevelopment was bringing with the height.
25    Q.    Yes?  Is that right?

1    A.    I don't really know what you're trying
2 to get me to agree to, 'cause you've asked me so
3 many different questions around that -- those
4 quotes.
5    Q.    I can't wait to when you're going to
6 have to answer questions.  This is ridiculous, but
7 okay.  You don't want to answer that question then.
8 Right?
9    MR. SEAMAN:  Objection.
10    MR. BOTTA:  She answered it.
11    A.    I answered it as best I could.
12    MR. FIORENZO:  She's not answering the
13 question.  You know it and you know it.  She's not
14 even trying at this point.
15    MR. BOTTA:  She answered the question.
16 Maybe you don't like how she answered it.
17    MR. FIORENZO:  Yeah.
18    MR. SEAMAN:  I disagree with your
19 characterization.  Please ask another question.
20    Q.    You want to play that game?
21    A.    Play what game?
22    Q.    The game you're playing right now where
23 I ask you questions and it takes five minutes and we
24 go around in circles and then you don't answer, is
25 that what you want to do here today?

38 (Pages 146 - 149)

Page 150

1      MR. BOTTA: Is that a question?
2      MR. FIORENZO: Yes, it is.
3      MR. SEAMAN: Objection.
4      MR. FIORENZO: It is a question.
5      MR. BOTTA: Objection.
6   Q.   Is that what you want to do?
7   A.   I'm answering to the best of my ability.
8   Q.   Yeah. Okay. Well, let's take a look at
9   what else you said.
10      MR. FIORENZO: Go to the next one.
11   Q.   The reporter goes on to report based on
12   a discussion she claims to have had with you, On a
13   larger scale, DiPaola, who served on the Borough's
14   Land Use Board in the past, would like to ensure
15   development in the downtown is done in a "reasonable
16   way that isn't four story buildings." Did you make
17   that statement to the reporter in words or
18   substance?
19   A.   Again, does it say somewhere in the
20   article that she interviewed me? Because I don't
21   know if I said that specifically to her.
22   Q.   Can you answer my question? I asked if
23   you said that to the reporter in words or in
24   substance.
25   A.   I could have. I don't remember.

Page 151

1   Q.   And the reason you could have is because
2   it accurately reflected your position at that time.
3   Correct?
4   A.   Right, which is why I don't know when I
5   could have said it. I don't know if it was in an
6   interview or not.
7   Q.   So was the answer to my question right,
8   it did accurately reflect your position at that
9   time?
10   A.   I don't know if I said that, but I would
11   say that it does seem to comply with what my
12   reasoning was at the time.
13   Q.   Okay. And, in fact, you told me earlier
14   that, you know, your objections many times in these
15   votes against the redevelopment plan and the
16   amendment was you had concerns about the four-story
17   building on the site. Correct?
18   A.   Yes, I was opposed to four-story
19   buildings.
20   Q.   And she specifically says -- she says
21   you told her that when she wrote the article.
22      MR. SEAMAN: Objection to form.
23   A.   I don't see anywhere where she says I
24   told her. That's what I'm really --
25   Q.   Do you know what quotations mean?

Page 152

1   A.   Yes, but --
2   Q.   What do quotations generally mean? What
3   do quotations generally mean?
4   A.   It means that somebody believes I said
5   something --
6   Q.   Right.
7   A.   -- but I have no proof that I said it or
8   when or to who.
9   Q.   Well, I guess the proof we have is the
10   reporter saying she spoke to you and then putting
11   your statement in quotes, and I'm simply asking if
12   you will confirm here on the record that you said
13   that to her or whether we've got to go through the
14   exercise of bringing the reporter in to say you told
15   her that.
16   A.   I don't see anywhere in the article that
17   I could see that it said I spoke to her and she
18   interviewed me.
19   Q.   Well, when she did a newspaper article
20   and quoted you, why did you think she was quoting
21   you?
22   A.   Oh, my God.
23      MR. SEAMAN: Objection to form.
24   A.   Reporters quote people all the time when
25   they say things at meetings and whatnot. You don't

Page 153

1   have to have an interview in order to be quoted.
2   Q.   Okay. Well, did you make that statement
3   either in an interview, in a public setting,
4   anywhere, that you didn't -- that you want to ensure
5   the development of the downtown is done in a
6   reasonable way that "isn't four-story buildings,"
7   have you ever made that statement in public?
8   A.   I don't --
9      MR. SEAMAN: Objection to form.
10   A.   I don't recall. I could have. I don't
11   recall.
12   Q.   Well, you could have because you've said
13   that here today. Right? It reflects your position
14   back at that time when you ran for mayor. Correct?
15   A.   I think I've stated that I was against
16   the four-story building.
17   Q.   And that was the position you ran on.
18   You told people that, didn't you?
19   A.   That I was against four stories.
20   Q.   You were against the overdevelopment in
21   downtown and it had to be reasonable and you didn't
22   think a four-story building was reasonable, that was
23   what you ran on, wasn't it?
24   A.   I don't think that a four-story building
25   was reasonable in the downtown.

39 (Pages 150 - 153)

EXHIBIT A

Page 154

1    Q.    I didn't ask that.  Did you run on that?
2 Did you tell people during your campaign that your
3 position was that the downtown was being
4 overdeveloped and Block 419, which had four stories,
5 was overdevelopment, that was your position.
6 Correct?
7    A.    I could have.  I ran on a lot of
8 different platforms.
9    Q.    You could have.  You did, didn't you?
10 Do you deny making that statement during your
11 campaign?
12    A.    I haven't read anything from that
13 campaign in years.
14    Q.    Do you deny making the statement during
15 your campaign that you were running on
16 overdevelopment and that 419 was the centerpiece of
17 that, do you deny that?
18    A.    No.
19        MR. FIORENZO:  Okay.  Pull up the next
20 one.
21    Q.    You're right, it is ridiculous.  I
22 haven't seen anything like this in a really long
23 time.  The good news is you can't do this stuff when
24 we get to trial.  Okay?  We'll have a day when
25 you're going to have to really answer these

Page 155

1 questions.
2        Okay.  The article goes on to have further
3 quotes, which say, "Everyone has this idea I'm
4 against development, but I'm not against it, said
5 DiPaola.  I'm against eminent domain.  I'd like to
6 move forward and bring positive change to the
7 downtown."
8        Did you tell the reporter you were against
9 eminent domain?
10    A.    I think I've told you several times I
11 don't know if I specifically spoke to the reporter.
12    Q.    Okay.  Whether you spoke to her directly
13 that day or spoke in some other context, your
14 position was, as you've told us today, you're
15 against eminent domain.  Right?
16    A.    Yes, I am against eminent domain in this
17 instance, correct.
18    Q.    Well, you say, I'm against eminent
19 domain.  You didn't say in any instance there.  You
20 just said you're generally -- in fact, you told me
21 philosophically you were opposed to eminent domain.
22 Remember that?
23    A.    At the time, maybe I was.
24    Q.    As a general principle, even unrelated
25 to this, you didn't like eminent domain

Page 156

1 philosophically.  It was against what your belief
2 system was.  Correct?
3        MR. SEAMAN:  Objection to form.
4    A.    As it related to Emerson, correct.
5    Q.    Then she quotes you saying, She would
6 like to move forward and bring positive change to
7 the town.  Was that also your position, you wanted
8 to bring "positive change to the downtown"?
9    A.    I don't recall exactly what my state of
10 mind was then, but --
11    Q.    Well, when you ran --
12        MR. SEAMAN:  Joe.
13    Q.    Remember when you ran?
14        MR. SEAMAN:  Joe, she said but, then you
15 interrupted her.  Please let her finish her answer.
16    Q.    Go ahead.
17    A.    But I believe change was needed in
18 Emerson, but I don't think that it needed the
19 density that was being brought forth with 419.
20    Q.    So when you talk about positive change
21 to downtown, did you want positive change to the
22 downtown area?
23    A.    Sure.
24    Q.    What did you want to have changed in the
25 downtown?

Page 157

1    A.    A smaller scale project.
2    Q.    Well, are you referring to 419?
3    A.    Any project that was smaller scale that
4 was able to satisfy the affordable housing.
5    Q.    There was only one downtown and that was
6 419.  Correct?
7    A.    Right.
8    Q.    So when you talk about positive change
9 and I asked you what did you want to have changed,
10 you wanted to change 419.  Correct?
11    A.    I think it also says that I'm not
12 against -- what did I say?
13    Q.    Ma'am, don't go off on things I'm not
14 asking you about.  I'm asking you when you refer to
15 change, the positive change in downtown, what you're
16 referring to is change to the Block 419 project.
17 Correct?
18    A.    I don't know if I was specifically
19 speaking to Block 419.
20    Q.    Well, there's no other project downtown
21 you told me other than 419 that was involved in
22 development at that time.
23    A.    There's a lot of changes that could
24 happen to Emerson in the downtown.
25    Q.    What was the change you were asking for

40 (Pages 154 - 157)

EXHIBIT A

Page 158

1  in the downtown when --
2      A.   I don't --
3      Q.   Let me finish.
4           When you ran and you went to all your
5  constituents and you talked to them about why you
6  wanted to be mayor, did you tell them that you
7  wanted to change the 419 project downtown in words
8  or substance?  Did you convey that to them?
9      A.   I don't think I did.
10     Q.   Are you sure you didn't or you don't
11 think you did?
12     A.   No, I think people asked me to stop it,
13 they didn't ask me to change it.  They asked me to
14 stop it.  They asked me --
15     Q.   Well, you wanted change.
16     A.   -- to bring down -- that's one quote.  I
17 don't know what I was referring to that moment.
18 There's also the opposite side of the street that I
19 could bring positive change to.
20     Q.   So let me finish with this.  So you're
21 telling us here under oath you don't know what was
22 meant when you said you wanted to bring positive
23 change to downtown, you don't know what you wanted
24 to change, is that your testimony under oath?
25     A.   You're trying to say that I wanted to

Page 159

1  change --
2      Q.   Just answer the question.
3      A.   -- the plan.
4      Q.   Just answer the question.
5      A.   I didn't say --
6      Q.   Just answer the question.
7      A.   Well, I can't answer --
8      Q.   Is that your testimony?
9      A.   -- unless you're going to let me speak.
10     Q.   No, no, no.  Is that your position, that
11 when you talked about change downtown, that you
12 don't remember what it was you wanted to change?
13     A.   No, those -- that box that you've
14 highlighted to me seems like I was speaking in a
15 generality.
16     Q.   Okay.
17          MR. KLEIN:  This is DD-18.
18     Q.   Okay.  So DD-18 is another news article,
19 this one 12/29/21.
20          MR. KLEIN:  That's when it was printed.
21     Q.   Oh, I'm sorry.  What's the date?  The
22 Pascack Press and Northern Valley Press.  Do you
23 know that newspaper?
24     A.   Do I know the newspaper?
25     Q.   Yeah, do you know of that newspaper?

Page 160

1      A.   Yeah.
2      Q.   And do they service the Emerson area?
3      A.   Yes.
4      Q.   Okay.  And have you spoken with
5  representatives of the press from that paper from
6  time to time?
7      A.   At times I have.
8      Q.   Do you know John Snyder?
9      A.   I know John Snyder.
10     Q.   Have you spoken to John Snyder from time
11 to time where he was asking you questions relating
12 to Emerson?
13     A.   Yeah, but I couldn't tell you
14 specifically when.
15     Q.   Okay.  Did you speak to John Snyder
16 after your election as mayor?
17     A.   I don't recall.
18     Q.   Do you deny you spoke to him?
19     A.   I don't recall.
20     Q.   Okay.  Did you -- according to
21 Mr. Snyder, he wrote a newspaper article here and he
22 said that --
23          MR. FIORENZO:  Well, go back to the
24 paragraph before that, please.
25     A.   Well, there it says, Told Pascack Press,

Page 161

1  so I would say yes, I spoke to him.
2      Q.   Okay.  Great.
3      A.   It didn't say that in the other article.
4      Q.   Fair enough.  So you spoke to him.
5  That's good.
6          MR. FIORENZO:  So let's go, Steve, to
7  where it says, A vocal critic.
8      Q.   In the article he writes, after
9  apparently speaking to you, he says, "A vocal critic
10 of elements of an ambitious mixed use redevelopment
11 plan taking shape under Lamatina" -- by the way,
12 that ambitious mixed use redevelopment plan, do you
13 know what he's referring to?
14     A.   I guess he's talking about 419.
15     Q.   You guess.  Is there any ambitious mixed
16 use redevelopment plan that was taking shape under
17 Lamatina other than the Block 419 development?
18     A.   I don't know.  There's a Valero that's
19 been under construction.
20     Q.   Is there any doubt in your mind what
21 he's referring to there?  'Cause he talked to you
22 about it when he interviewed you.  Right?
23     A.   I guess.
24     Q.   Okay.  You guess.  And he goes on to
25 say, She, meaning you, called your November 6

41 (Pages 158 - 161)

Page 162

1 election "a referendum on overdevelopment." So what
2 did you mean by that?
3    A.   I think what I was trying to invoke to
4 the reporter was that by me and my slate winning, we
5 were opposed to the fourth story, we were opposed to
6 the density, we were opposed to the eminent domain,
7 and that the sentiment in town was that this project
8 was overdevelopment, and that by winning, we were
9 sending a message to Lou Lamatina and his cohorts
10 that Emerson did not want overdevelopment.
11 Overdevelopment. Not didn't want -- not want
12 development, they didn't want overdevelopment.
13    Q.   So by overdevelopment, were you
14 referring to the 419 project?
15    A.   Any overdevelopment.
16    Q.   Were you referring to the 419 project?
17    A.   Any overdevelopment.
18    Q.   Were you referring to the 419 --
19    A.   Any overdevelopment.
20    Q.   Were you referring specifically to the
21 419 project, which was the ambitious mixed use
22 redevelopment plan taking shape under Lamatina?
23 That's what's being discussed in that sentence of
24 the article. Correct?
25    A.   I think it was a referendum on any

Page 163

1 overdevelopment that could happen under a Lamatina
2 administration --
3    Q.   Right.
4    A.   -- and that is why the people voted for
5 us in order to do more sensible decisions for our
6 downtown.
7    Q.   So what more sensible decision did you
8 want to do for the downtown --
9    A.   Eliminate four-story.
10    Q.   Let me finish. You keep interrupting me
11 time and time again.
12    A.   I thought you were finished.
13    Q.   Why?
14    A.   I thought you were finished.
15    Q.   Why?
16       MR. BOTTA:  Mutual combatants here on
17 interrupting.
18    Q.   Why is that?
19    A.   I thought you were finished.
20    Q.   You didn't think I was finished. I was
21 in the middle of a sentence. I speak pretty rapidly
22 and I don't pause, so you knew exactly what I was
23 doing. You cut me off. Please don't do that.
24 Okay? Would you agree not to cut me off?
25       MR. BOTTA:  That's not a deposition

Page 164

1 question. Move on.
2       MR. SEAMAN:  Please ask a valid
3 question.
4    Q.   So you won't agree not to cut me off?
5       MR. BOTTA:  Objection.
6    Q.   I'm giving you an instruction not to cut
7 me off as I did at the beginning of the deposition.
8 Will you comply with that request?
9    A.   I think you're trying to intimidate me
10 is what I think is going on.
11    Q.   Why is that? 'Cause I'm asking you not
12 to be so rude as to interrupt me?
13    A.   Well, now your voice is being raised,
14 so.
15    Q.   It's not being raised at all. That's an
16 utter fabrication. It's a lie. Why are you doing
17 that?
18       MR. BOTTA:  Okay. Let's just move on.
19    Q.   Why do you do these things?
20       MR. BOTTA:  Can you just -- Joe, can you
21 just ask questions.
22       MR. FIORENZO:  Yeah. That's what I'm
23 trying to do.
24       MR. BOTTA:  So ask questions and let her
25 answer.

Page 165

1       MR. FIORENZO:  If your client would let
2 me ask them without interrupting me and without
3 making false statements on the record about me
4 raising my voice or not raising my voice. Why do
5 you do these things, ma'am? I don't understand.
6       MR. BOTTA:  Okay.
7    Q.   Okay.
8       MR. SEAMAN:  All right, Joe. Please ask
9 a question.
10    Q.   Will you abide by my request not to cut
11 me off?
12       MR. SEAMAN:  And, Joe, will you abide by
13 our request not to cut her off in her answers?
14       MR. FIORENZO:  Of course, yeah. Sure.
15       MR. SEAMAN:  You haven't been doing a
16 hundred percent of that either.
17       MR. FIORENZO:  Oh, stop, will you, stop.
18 You know that's not true.
19       MR. SEAMAN:  I know it's absolutely
20 true.
21       MR. FIORENZO:  Well, you've objected
22 maybe two or three times, that's all I know. She's
23 cutting me off every time.
24    Q.   Okay. So you want to play that game,
25 we'll play that game. I know your game at this

42 (Pages 162 - 165)

Page 166

1 point.
2     So when these newspaper articles were written
3 then and you referred to a referendum on
4 overdevelopment, in fact, that was part of your
5 campaign pledge. Correct? That the town was being
6 overdeveloped. Correct? That's what you ran on.
7 Right?
8     A.    Yes.
9     Q.    And you ran specifically on the 419
10 project. You said, This project being -- taking
11 shape under Lamatina was bad for Emerson and it
12 constituted overdevelopment, as you told me today,
13 too high, too dense. That's what you told people as
14 your campaign. Correct?
15     A.    I didn't have to tell anybody that.
16     Q.    Did you tell them that?
17     A.    They told me that.
18     Q.    Did you tell them?
19     A.    I didn't have to tell people --
20     Q.    No, no, no. Did --
21     A.    -- it was overdevelopment.
22     Q.    Did you --
23     A.    They told me.
24     Q.    Did you ever tell people that?
25     A.    I didn't have to.

Page 167

1     Q.    So you never told anybody that, is that
2 it?
3     A.    I don't recall.
4     Q.    Okay. So you never told anybody Emerson
5 was being overdeveloped with 419, they told you, is
6 that your position?
7     A.    You're saying that I went door to door
8 telling people that Emerson was being overdeveloped.
9     Q.    No, I'm asking, did you tell people when
10 you campaigned, door to door, in campaign
11 literature, or otherwise, that Emerson was being
12 overdeveloped, and 419 was a perfect example, this
13 is Lamatina's creation, throw him out. That was
14 your position, wasn't it?
15     A.    Yes.
16     Q.    Okay. That wasn't hard.
17     Now, with respect to the rest of this article,
18 you go on to say --
19     MR. FIORENZO: Scroll down, Steve, to
20 here.
21     Q.    He's now referring -- in the article he
22 says, Later in the day, she added, "The people of
23 Emerson have spoken. It is apparent that the people
24 have serious concerns about the direction the town
25 was taking. I would ask the governing body, out of

Page 168

1 respect to the voters, take no further action on
2 redevelopment until January." He quotes you there.
3 Is that an accurate quote of your position?
4     A.    I would say it's an accurate sentiment.
5     Q.    Okay. So you wanted no further action
6 to be taken regarding the development of the 419
7 project until January when you came in office.
8 Right?
9     A.    Yes.
10     Q.    So when you ran -- by the way, did you
11 have campaign literature when you ran?
12     A.    Yes.
13     Q.    And does that campaign literature set
14 forth what you consider to be the issues in town?
15     A.    I haven't looked at the literature in
16 five or -- five years, six years.
17     Q.    What was the number one issue that you
18 were advocating as you campaigned?
19     A.    Getting rid of Lou Lamatina.
20     Q.    And why was that?
21     A.    Because he was a menace to the town.
22     Q.    Why was that?
23     A.    Have you ever met him?
24     Q.    Again, you don't get to ask me
25 questions. You should know that by now. You

Page 169

1 just -- you're here to answer them. Do you
2 understand that? I know you're a mayor and you
3 probably think that gives you special dispensation.
4 It really doesn't?
5     A.    No, I don't.
6     Q.    Good. So can you answer my question
7 now?
8     A.    There were a lot of things that Lou
9 Lamatina was doing that nobody in town agreed with.
10     Q.    Well, was one of them Block 419?
11     A.    One of them was the pushing through of
12 Block 419 to the cries of the people at the meetings
13 asking him not to go forward with it.
14     Q.    So you said he was pushing it through?
15 Right?
16     A.    Signing an agreement on December 31st
17 before you're out of office at midnight, I consider
18 that pushing it through.
19     Q.    So you consider Mr. Lamatina pushing
20 through the 419 development plan?
21     A.    Yes. He wanted it. It was his dream.
22     Q.    Oh, it was his dream. And do you know
23 why it was his dream?
24     MR. SEAMAN: Objection to form.
25     A.    I don't know what he was thinking.

43 (Pages 166 - 169)

Page 170

1     Q.    So you believe it was Lamatina's dream
2  to develop the downtown with Block 419, is that your
3  testimony? Dream?
4     A.    Maybe it was the wrong word dream.
5     Q.    Okay.
6     A.    I don't know.
7     Q.    So is it possible that the 419 project
8  went forward in the way it did because the town
9  settled their suit with Fair Housing, is that a
10  possibility?
11        MR. SEAMAN: Objection to form.
12     A.    I think I've already said that there
13  could have been other ways --
14     Q.    I didn't ask that.
15     A.    -- to settle that.
16     Q.    I didn't ask other ways. I'm asking
17  whether it's possible that the reason why this
18  project went forward was not because it was
19  Lamatina's dream, but because the town had a duty
20  and an obligation under the settlement agreement
21  approved by the Court, approved by the Master to
22  proceed forward with that project quickly under the
23  agreement. Is that possibly why this thing moved
24  fast?
25     A.    I don't know.

Page 171

1        MR. SEAMAN: Objection to form.
2     Q.    Okay. All right. So at some point
3  then, in order to move forward with the settlement
4  agreement, as we discussed, there was a hearing
5  before the -- a site plan application before the
6  Emerson -- is it the Land Use Board?
7     A.    Municipal Land Use Board.
8     Q.    Right. Were you a member of that board
9  at that time?
10     A.    At what time?
11     Q.    At the time this application came
12  forward in late 2018.
13     A.    No.
14     Q.    In advance of that, do you know if there
15  were professionals that reviewed the plan for the
16  Borough of Emerson?
17     A.    I believe there were.
18        MR. FIORENZO: Steve, pull this up,
19  please.
20     Q.    Who was the town engineer at that time?
21     A.    Gary Ascolese.
22     Q.    From Boswell Engineering?
23     A.    Correct.
24     Q.    Did you know Mr. Ascolese?
25     A.    I know Mr. Ascolese.

Page 172

1     Q.    Was he the engineer for any period of
2  time in town? For how long?
3     A.    I don't remember how long.
4     Q.    Did you consider him a good engineer?
5        MR. SEAMAN: Objection to form.
6     A.    In some cases.
7     Q.    Okay. And who is the town planner?
8     A.    Who is the town planner?
9     Q.    Who was the town planner in December of
10  2018?
11     A.    Brigette Bogart.
12        MR. FIORENZO: So let's mark this
13  document, please.
14        MR. KLEIN: DD-19.
15     Q.    So DD-19 is a memorandum from Ms. Bogart
16  dated December 10, 2018, and it was submitted to the
17  Emerson Land Use Board, Re: Emerson Station Site
18  Plan Application. Have you seen this document
19  before today?
20     A.    I don't remember.
21     Q.    Had you reviewed it at the time you
22  appeared before the Land Use Board?
23        MR. SEAMAN: Objection to form.
24     A.    No, I don't think I would have been
25  privy to that 'cause it was to the Land Use Board.

Page 173

1     Q.    Well, it's a public document, but -- and
2  I'm just asking, as of the time -- you appeared
3  before the Land Use Board. Correct?
4     A.    I attended the Land Use Board.
5     Q.    And you made certain statements on the
6  record.
7     A.    During public comment.
8     Q.    Yes. So --
9     A.    I didn't like present as a professional
10  or anything.
11     Q.    Okay. That's fine. You appeared and
12  made statements before the Land Use Board on
13  December -- right around this time, December 10 of
14  2018. Correct?
15     A.    About that time, yes.
16     Q.    And I'm simply asking, were you aware of
17  the planner's comments at the time you made your
18  statements?
19     A.    I don't remember.
20     Q.    Were you aware of whether, as of that
21  date, Mr. Ascolese of Boswell had also submitted a
22  report regarding the site plan?
23     A.    I don't remember.
24        MR. FIORENZO: Can you pull that,
25  please?

44 (Pages 170 - 173)

Page 174

1    A.    I think that would have been considered
2 work product until it was considered by the Land Use
3 Board. It says to the Land Use Board. It doesn't
4 say public document.
5    Q.    It's a public document when it gets
6 submitted to the Land Use Board, do you know that?
7    A.    No, I don't.
8    Q.    Okay.
9    A.    Because I think until they consider
10 it --
11    Q.    So why are you giving an opinion that
12 it's work product?
13    A.    Because I --
14    Q.    Are you a lawyer?
15    A.    No, but I think that until something is
16 considered as I've been told by attorneys --
17    Q.    So this is your legal opinion?
18    A.    -- that it -- no, I'm telling you as I
19 understand it, until something is considered to a
20 board, it's considered work product.
21    Q.    All right. So --
22        MR. KLEIN: DD-20.
23    A.    I can tell you -- let me rephrase. They
24 were not handed out at the meeting I should say.
25    Q.    I didn't ask that. Thank you for that

Page 175

1 information.
2        This is a report of Boswell Engineering,
3 December 6, 2018. Did you ever see this report or
4 review this report before you appeared before the
5 Land Use Board and made statements on the record?
6    A.    I don't believe so.
7    Q.    So there was a planner and an engineer
8 and other professionals who testified at the hearing
9 before the Land Use Board. Correct?
10    A.    There was a -- say that again?
11    Q.    There was a planner, Ms. Bogart,
12 Mr. Ascolese from Boswell, and other professionals
13 of the applicant who appeared at the Land Use Board
14 for the presentation of the site plan application.
15 Correct?
16    A.    Correct.
17    Q.    And you were there and you heard that
18 presentation. Correct?
19    A.    Correct.
20    Q.    You were there as an objector. Correct?
21    A.    I was there to hear what was going on.
22    Q.    But you also were more than that, you
23 objected to the plan publicly on the record.
24 Correct?
25    A.    Yes, after hearing the plan.

Page 176

1    Q.    Okay. I just wanted to confirm that.
2 That's what I thought.
3        So when you objected on the record to this
4 plan, you knew at that time that this site plan was
5 being submitted to implement the requirement under
6 the settlement agreement that Block 419 be developed
7 with affordable housing, you were aware of that when
8 this application was submitted. Correct?
9    A.    I don't remember if I was cognizant of
10 that.
11    Q.    Well, you voted when the settlement
12 agreement occurred to oppose it. Remember that?
13    A.    I don't think that was forefront in my
14 mind in opposing that.
15    Q.    But you knew there was a settlement
16 agreement when you appeared before the Land Use
17 Board that required Emerson to fulfill its
18 obligation with 419. Correct? You knew that,
19 didn't you?
20    A.    I guess.
21    Q.    Okay. And so when you opposed this, if
22 you were successful in convincing them not to
23 approve it, did you have a plan for how they would
24 bring themselves into compliance with the settlement
25 agreement?

Page 177

1    A.    I have said numerous times that I
2 objected to the fourth story and to the density, and
3 I surmised that what my feeling was was that they
4 would go back to the drawing board and redraw
5 something that was more fitting to our downtown.
6    Q.    Redraw it where? Where? Where were you
7 going to get the 29 units from? The Court had
8 reviewed it. The Master had reviewed it. They did
9 an analysis of land development. This was the
10 selected site. You were now opposing it. Assuming
11 you were able to convince someone that they should
12 not move forward, did you have an alternative plan
13 in mind as the incoming mayor as to how you were
14 going to now comply with the settlement agreement?
15 Did you have a plan in mind?
16    A.    I don't remember.
17    Q.    Did you understand that if it wasn't
18 approved, the Town of Emerson would be in breach of
19 the settlement agreement, which mandated that the
20 majority of its affordable housing be located at
21 that site, did you understand that when you made
22 your statements?
23        MR. SEAMAN: Objection to form.
24    A.    I don't know if I remember it or I was
25 cognizant of that.

45 (Pages 174 - 177)

Page 178

1  Q.  So you didn't even consider the
2 consequence, did you?
3      MR. SEAMAN:  Objection to form.
4  Q.  Of your objections, did you?
5  A.  I don't remember.
6  Q.  Okay.  So then ultimately you appeared
7 there.
8      MR. FIORENZO:  And let me pull up and
9 mark...
10      MR. KLEIN:  DD-21.
11  Q.  DD-21 is a transcript of the December
12 10th, 2018, proceedings and you attended.  Right,
13 ma'am?
14  A.  What was the date?
15  Q.  December 10, 2018.  Right there.  That's
16 the hearing you attended.  Right?
17  A.  I guess, yeah.  I don't remember the
18 date.
19  Q.  You guess?
20  A.  I don't remember the date.
21  Q.  Why are you -- is there any doubt you
22 appeared at the meeting on that date?  I thought you
23 told me you did appear there, you made statements in
24 opposition.  Why do we have to go over this again?
25  A.  Because I don't --

Page 179

1  Q.  You appeared there.  Right?
2  A.  I don't remember the exact date, and
3 you've stated wrong dates in reading some of these
4 documents --
5  Q.  Oh, okay.
6  A.  -- and our lawyers have corrected you.
7  Q.  Oh, that was nice of them.
8  A.  When I say I think so, it's because I'm
9 assuming that you're giving me the correct date.
10  Q.  Well, I thank you and them for
11 correcting me.  So do you want to correct me on this
12 one?
13  A.  I don't remember what date the meeting
14 was.
15  Q.  Yeah, let's take a look at what you had
16 to say, maybe that will help.  Okay?  Do you want to
17 do that?
18      MR. SEAMAN:  Objection.
19  Q.  Shall we do that together so we can
20 clear this thing up?
21      MR. SEAMAN:  Joe, why don't you ask a
22 question.
23  A.  As you keep saying, you're running the
24 deposition.
25  Q.  Yeah, yeah.

Page 180

1  A.  Why are you asking me?
2  Q.  So let's do that.  All right?  Yeah,
3 let's do that.  Let's see if we can clear it up.
4  A.  Yeah, let's have fun.
5  Q.  Okay.  So this is DD-21.
6      MR. FIORENZO:  Let's go to page 137,
7 please.  You got it?  Okay.  And go to, let's see,
8 137, line 12.  Could you start with that, Steve?
9 Just highlight that.  And then over to 138, 13.
10 Yeah, right about there, that's fine.
11  Q.  Okay.  So let's take a look -- well,
12 actually, let's go back.  It doesn't -- it doesn't
13 show who was actually the speaker.  Okay.  Yeah.  So
14 you spoke.  You were Mayor Elect DiPaola.  Right?
15  A.  Yes.
16  Q.  So can we now agree that you did appear
17 on December 10th, 2018, at the hearing of the Land
18 Use Board?
19  A.  Yes.
20  Q.  Okay.  So I want to look at line 8,
21 Mayor Elect DiPaola.  Here's what you say, and I'm
22 asking you to confirm.  This is a transcript, a
23 recorded stenographic transcript.
24      "Still too big.  It has a lot more character
25 than this box, but it reminds me of a building I

Page 181

1 used to hang in on 2nd Avenue in the City in the
2 '80s.  Look, I think the election of myself, Brian
3 Gordon, and Ken Hoffman was a one-issue election,
4 one issue you say, and it was a referendum on the
5 development of Block 419 in downtown.  That's what I
6 was asking about before.  Remember?
7  A.  Probably where she got the quote from.
8  Q.  Remember that?  We were talking about
9 whether you ran on that and if that was the issue,
10 the principal issue?  You state before the board
11 that it was a one-issue election and it was Block
12 419.  Was that an honest and truthful statement when
13 you made it?
14  A.  Was what an honest and truthful
15 statement?
16  Q.  What I just read, that when you and your
17 fellow members were elected, it was a "one-issue
18 election," and it was a referendum on the
19 development of Block 419 in our downtown.  Was that
20 an honest and truthful statement you made in public
21 to the Land Use Board in front of all the people in
22 your town?
23  A.  At that time, yes.
24  Q.  Okay.
25      MR. SEAMAN:  Objection to form and it's

46 (Pages 178 - 181)

Page 182

1 an expression of opinion, it's misstating a fact.
2     Q.    And then you go on to state -- and by
3 the way, when we talked earlier, a little bit
4 earlier, I was asking you about -- we showed the
5 newspaper article about overdevelopment, and I was
6 asking you what project, doesn't it really mean 419,
7 you said, I don't remember, I don't know.  There's
8 no doubt now that when you were talking about
9 overdevelopment, that was the one issue that you and
10 your mates ran on, which was the development of
11 Block 419 of the downtown area, isn't it.  Correct?
12     A.    There were other projects that were in
13 the hopper.
14     Q.    Well, that's what you said on the
15 record.  Correct?
16         MR. SEAMAN:  Objection to form.
17     A.    Is what what I said on the record?
18     Q.    That it was a one-issue election and it
19 was a referendum.  In other words, the vote for you
20 guys was a referendum on the development of Block
21 419.  That's what you told the board.  Right?
22     A.    Yes, it appears that I said that.
23     Q.    Yeah.  And that was honest when you said
24 it.  Right?  You wouldn't have lied about that,
25 would you?

Page 183

1     A.    I wouldn't lie about anything.
2     Q.    Perfect.
3     You go on to say, I would ask the board to
4 respect the wishes of the people of Emerson and
5 listen to them as far as making sure that a plan
6 that is going to be the centerpiece of our downtown
7 for possibly a hundred years or more until the next
8 governing body and the next Land Use Board decides
9 that it's not appropriate for town and needs to be
10 updated, that this is the plan that you really want
11 to see there for a hundred years, the generations
12 are going to have to live with.
13     So those were all statements you made at that
14 time.  Correct?
15     A.    Yes.
16     Q.    Okay.  And then you go on to say,
17 there's this paragraph beginning on line 6, This is
18 an existing building right now.  You're referring to
19 the fact that there was already a structure on the
20 site?  Ma'am?
21     A.    I don't -- I said that?
22     Q.    Yeah, you said that.
23     A.    What did I say before that?
24         MR. FIORENZO:  Run it back.
25     Q.    It's just a run-on from where we were

Page 184

1 before.  You're asking to -- you say, This is the
2 centerpiece of our downtown.  Okay?  And what I'm
3 focused on -- this is all you making these
4 statements.  I'm focused on the statement that you
5 make where you say -- yeah, right there.  You say,
6 This is an existing building, line 6, on the right,
7 right now.  So there was already a structure on the
8 site.  Correct?
9     A.    That's what I'm trying to put into --
10     Q.    Was there a structure on the site?  All
11 these people who had the businesses there?
12     A.    Yeah, but I don't --
13     Q.    There was a building.  Right?
14     A.    I'm trying to figure out what I was
15 referring to when I say, This is an existing
16 building.
17     Q.    Well, why don't you just listen to my
18 question and then try to answer the question.
19     So there was an existing building on the site.
20 Correct?
21     A.    There are a lot of existing buildings on
22 the site.
23     Q.    Yeah.  And you go on to say, How is this
24 good planning for the Borough of Emerson?  How does
25 this benefit the Borough of Emerson in any way other

Page 185

1 than satisfying our affordable housing obligation?
2     So let me stop you there.  That satisfaction
3 of the affordable housing obligation was a
4 significant benefit to Emerson, was it not?
5     A.    I think that is subjectional.
6     Q.    It's what?
7     A.    I think that's a subjective question.
8     Q.    Well, you say it's a benefit.  You say,
9 How does it benefit other than affordable housing?
10 So the affordable housing obligation, the
11 fulfillment of that --
12     A.    I guess I --
13     Q.    Let me finish.
14     A.    I know.
15     Q.    You're interrupting me again.
16     A.    I apologize.
17     Q.    And the protection against builder's
18 remedy lawsuits and the reduction of the number of
19 units that Emerson had to comply with all were
20 benefits of the settlement agreement.  We've been
21 over this.  Correct?
22     A.    Yeah.
23     Q.    Okay.  And so when you're asking these
24 rhetorical questions, how does the Borough benefit
25 in any other way, you knew the answer to that,

47 (Pages 182 - 185)

EXHIBIT A

Page 186

1 didn't you?
2    A.    I don't know how to answer your
3 questions, I really don't.
4    Q.    Well, you knew at that time when you
5 made the statement that under the settlement
6 agreement, in addition to satisfying 55 or
7 60 percent of the affordable obligations, it also
8 resulted in protection, a judgment of repose so that
9 Emerson could no longer be sued by a builder.
10 That's a benefit.  Right?  Is that a benefit?
11    A.    That the Borough can't be sued?
12    Q.    Yes.
13    A.    Yeah, that's a benefit.
14    Q.    And you also knew, as the settlement
15 agreement laid out, that there were numbers that had
16 been ascribed by COAH for affordable units to
17 Emerson that were a lot higher than the numbers
18 ultimately settled on.  That was also a benefit,
19 wasn't it?
20    A.    Say that again?  Than the numbers.
21    Q.    Yeah.  There were numbers of COAH units
22 that COAH had said Emerson had to satisfy, and it's
23 laid out in the agreement, that number of units that
24 Emerson had to satisfy based on COAH was higher than
25 what the settlement agreement ultimately required,

Page 187

1 in other words, it lowered --
2    A.    Yes.
3    Q.    -- the number.
4    A.    Yes.
5    Q.    Okay.  And that was also a benefit.
6 Correct?
7    A.    Yes.
8    Q.    Okay.  You go on to say, Because to me
9 does not look like it benefits Emerson.  That's what
10 you said in public.  Right?
11    A.    Yes, I said that.
12    Q.    Okay.  Now, when you appeared --
13    MR. FIORENZO:  Pull up, please, page
14 200, line 23.
15    Q.    So did you also raise questions at this
16 public hearing regarding environmental issues?
17    A.    I don't remember.
18    Q.    Let's see if I can help you.  Okay?
19 Okay.  So, again, this is at the Land Use
20 hearing.  You make the following statement:
21 "I just -- I need clarification.  When
22 somebody asked about whether or not the dry-cleaning
23 property was clean enough to put housing on for the
24 health and well-being of those future residents, you
25 don't know that, if we could build on that property

Page 188

1 yet?  And what if," and then there's a statement.
2    So you were raising an issue at this time
3 about whether there was environmental contamination
4 at the site?
5    A.    Yes.
6    Q.    And what was the basis for you raising
7 that question at the time?  Did you have any facts
8 to support that question?
9    A.    Because it was widely known in newspaper
10 articles that most dry-cleaners in the area of the
11 Pascack Valley had sites that needed to be
12 remediated because of the chloroacetyl localocamine
13 (ph.) that was being leached into the ground where
14 dry cleaners were.
15    Q.    Okay.  So you knew from being on the
16 Land Use Board, I'm sure, that ultimately when an
17 approval is given, there would be prepared a
18 resolution memorializing it?
19    A.    Uh-hum.
20    Q.    Yes?  And you know that one of the
21 things that is customary and standard in any such
22 resolution is that the applicant has to comply with
23 all other governmental entity requirements,
24 including the NJDEP.  You're aware of that.
25 Correct?

Page 189

1    A.    Yeah.
2    Q.    Okay.  In fact, who's Mr. Martin?
3    A.    He was the board attorney.
4    Q.    And when you raised that issue,
5 Mr. Martin chimed in on page 200, beginning on line
6 6, did he not?
7    MR. FIORENZO:  Can you highlight that,
8 Steve?  Thanks.
9    Q.    He says, May I be heard?  Ms. DiPaola,
10 you make an excellent point again like some other
11 people have made in that regard.  I think you know
12 the resolution's all contingent upon all state
13 approvals, local as well as state/county approvals,
14 and that would be subject to the DEP in terms of
15 whether or not -- whether the property is clean or
16 not.
17    So he told you at that time there would be a
18 condition of the resolution which would require DEP
19 compliance if that was required.  Correct?
20    A.    Correct.
21    Q.    So you raised this question about the
22 environmental stuff and Mr. Martin responded.
23 Right?
24    A.    Yes.
25    Q.    So as of that date, were you aware that

48 (Pages 186 - 189)

EXHIBIT A

Page 190

1 if there was any environmental issue, it would be
2 something that would be sorted out by the state
3 NJDEP?
4     A.    Say that again?
5     Q.    You're aware as of this date then if
6 there was any environmental issues at the site, it
7 wasn't the subject matter within the jurisdiction of
8 the local Planning Board, but those would all be
9 dealt with by the NJDEP, because this approval was
10 contingent upon the DEP giving a clean bill of
11 health.  Correct?
12     A.    I don't think there's anything wrong
13 with an elected official making sure that everything
14 was being done appropriately.
15     Q.    Yeah, again, I didn't ask that though.
16 Could you answer my question now?
17     A.    He told me that, so I guess I knew it at
18 that point.
19     Q.    Okay.  All right.
20         MR. BOTTA:  Joe, do you want to take
21 like a five-minute bathroom break post-lunch?
22         MR. FIORENZO:  Yeah, absolutely.  If you
23 guys would like, we can take a break now, sure.
24         (A break was taken at 2:25 p.m.)
25         (Deposition resumes at 2:35 p.m.)

Page 191

1         MR. FIORENZO:  All right.  Let's go back
2 on the record.
3         Pull up E42.  Okay.  So, Steve, could
4 you pull up E forty -- pull up the resolution.
5 BY MR. FIORENZO:
6     Q.    So I put up on the board what we're
7 going to mark as DD --
8         MR. KLEIN:  22.
9     Q.    -- 22, Resolution of the Land Use Board
10 of the Borough of Emerson.
11     Following the hearing, the board voted to
12 approve the site plan application.  Correct?
13     A.    Yes.
14     Q.    Did you review the resolution which
15 we've marked here around the time it was prepared?
16     A.    I don't believe so.
17     Q.    When did you see this resolution for the
18 first time, if at all?
19     A.    Probably after it was approved.
20     Q.    Well, again, probably is not competent.
21 Do you remember --
22     A.    I don't recall.
23     Q.    Let's start with the basics.  Have you
24 ever seen it before?
25     A.    Yes.

Page 192

1     Q.    Okay.  Do you remember the first time
2 you saw it?
3     A.    No.
4     Q.    Did you at some point in time see it
5 after you were the mayor?
6     A.    Yes.
7     Q.    What was the context in which you saw
8 it, why were you reviewing it at that time?
9     A.    To familiarize myself at the time of
10 what the stipulations were for the resolution.
11     Q.    Okay.  You say the stipulations.  There
12 were certain conditions in the resolution.  Is that
13 correct?
14     A.    Uh-hum.
15     Q.    Did you have discussions with any of
16 your professionals regarding the resolution of the
17 Land Use Board approving the site plan?
18     A.    I don't remember.
19     Q.    When you came into office, you had a
20 reorganization meeting around January 1st?
21     A.    Around January 1st, yeah.
22     Q.    And at that time, were there a series of
23 resolutions passed, including the appointment of
24 professionals?
25     A.    Yes.

Page 193

1     Q.    Did you change professionals at that
2 time?
3     A.    Yes.
4     Q.    Did you change the township engineer
5 from Boswell to someone else?
6     A.    Yes.
7     Q.    Who was the new township engineer?
8     A.    Neglia Engineering.
9     Q.    Why did you remove or not renew Boswell?
10     A.    The governing body voted in favor of
11 Neglia.  They reviewed all of them and they thought
12 that Neglia was the most qualified.
13     Q.    Did you know Neglia?
14     A.    No.
15     Q.    So prior to Neglia's appointment, had
16 you dealt with anyone from Neglia?
17     A.    No.  I only knew them on their
18 reputation.
19     Q.    Had they contributed any money to your
20 campaign?
21     A.    I don't remember.
22     Q.    You don't remember?
23     A.    I don't remember.
24     Q.    Is it possible they did?
25         MR. SEAMAN:  Objection to form.

49 (Pages 190 - 193)

Page 194

1   A.   I don't remember.
2   Q.   Yeah, I know that, but is it possible
3 that they did?
4       MR. SEAMAN:  Objection to form.
5   A.   I mean, it's possible pigs are going to
6 fly out of the sky.  I mean, is it possible?  I
7 don't remember.
8   Q.   You're not denying they contributed,
9 that's why I asked.  Does that mean there's a
10 possibility they did?
11      MR. SEAMAN:  Objection to form.
12  A.   I don't remember.
13  Q.   Did you ever solicit a contribution from
14 them?
15  A.   I don't remember.
16  Q.   Who is your point of contact at Neglia?
17      MR. SEAMAN:  Objection to form.
18  A.   Like today who is my point of contact?
19  Q.   No, back then when they were brought in?
20  A.   I don't think I had a point of contact.
21 I think they just sent an RFQ in.
22  Q.   Okay.  Other than the engineer, did you
23 also change the planner?
24  A.   Yes.
25  Q.   So you removed or did not reappoint

Page 195

1 Ms. Bogart?
2   A.   We did not reappoint Ms. Bogart.
3   Q.   And who did you replace her with?
4   A.   Statile Planners, Caroline Reiter.
5   Q.   Did you know Ms. Reiter before she was
6 appointed?
7   A.   No.
8   Q.   You never dealt with her at all?
9   A.   No.
10  Q.   Did you recommend Neglia?
11  A.   What do you mean by recommend?
12  Q.   Did you recommend, did you suggest to
13 the governing body that we bring in Neglia?
14  A.   I think I recommended that we not
15 reappoint Boswell, but I don't think I store them --
16 steered them into any particular direction.  I
17 don't --
18  Q.   Again, I asked if you recommended them.
19  A.   I don't remember.
20  Q.   Was there anyone else considered other
21 than Neglia?
22  A.   There may have been, yeah.
23  Q.   Well, I know.  That's why I'm asking.
24 Was there?
25  A.   I don't remember exactly who, but I

Page 196

1 would assume that more than two people responded to
2 an RFQ.
3   Q.   So other than Ms. Reiter and Mr. Neglia,
4 was there a new architect brought in?
5   A.   Yes.
6   Q.   Who was the prior architect under
7 Lamatina?  Axis?
8   A.   I believe so, yeah.
9   Q.   And who did you bring in?
10  A.   Kevin Settembrino.
11  Q.   Did you know Mr. Settembrino?
12  A.   Only because he had answered an RFQ
13 years before.
14  Q.   Had you done any business with him?
15  A.   No.
16  Q.   Had the town?
17  A.   I don't think so.
18  Q.   Did he contribute to your campaign?
19  A.   I don't remember.
20  Q.   So maybe he did, maybe he didn't, you
21 don't know.
22  A.   I don't remember.
23  Q.   You don't know.  You don't remember.
24 Could be he did, could be he didn't.
25  A.   Right.  I don't remember.

Page 197

1   Q.   Okay.  Now, were you unhappy with the
2 performance of your -- of the professional engineer
3 Boswell as of the time you took office?
4   A.   Yes.
5   Q.   What was it you were unhappy with?
6   A.   I was unhappy with his work.
7   Q.   What parts of his work were you unhappy
8 with?  We're now talking about Mr. Ascolese.  Right?
9   A.   Yeah.
10  Q.   What did he do that you didn't like?
11  A.   I felt he was too accommodating.
12  Q.   To whom?
13  A.   To the mayor.
14  Q.   And what facts are you aware of that led
15 you to conclude that he was too accommodating?
16  A.   Various projects over the years that he
17 contributed to for the Borough.
18  Q.   How about 419, did you believe he was
19 too accommodating to Mayor Lamatina regarding the
20 site plan approval process for 419?
21  A.   Yes.
22  Q.   Did you express that to anyone?
23  A.   I think I expressed it to him.
24  Q.   Okay.  Well, what did you say to him?
25  A.   I said it at the Land Use Board, so you

50 (Pages 194 - 197)

Page 198

1 probably have a transcript of it.
2    Q.    Well, I --
3    A.    I don't remember, but I do think I said
4 something to him and to Ms. Bogart.
5    Q.    But what, what was the tenor of the
6 statement?
7    A.    That I was unpleased with their
8 decision.
9    Q.    Whose decision?
10    A.    Their engineering and their planning of
11 the project.
12    Q.    Well, they didn't engineer it or plan
13 it, they reviewed it, didn't they?
14    A.    Well, the review of the plans of the
15 engineer.
16    Q.    So you were critical of their review of
17 the plans that were submitted pursuant to the
18 settlement agreement?
19    A.    To the settlement agreement?
20    Q.    Yeah, the plans that were submitted, the
21 site plan, was for -- was to implement the terms of
22 the settlement agreement. So I'm asking whether --
23 what were you critical about in their review of
24 those plans?
25    A.    That they thought that the height was

Page 199

1 acceptable for Emerson's downtown, and that the
2 change in the plans aesthetically that Ms. Bogart
3 agreed that were proper planning.
4    Q.    So you thought that their acceptance of
5 the height -- that the height was acceptable was a
6 problem for you. Correct?
7    A.    Uh-hum.
8    Q.    Yes?
9    A.    Yes.
10    Q.    Was the site plan submitted a conforming
11 site plan?
12    MR. SEAMAN: Objection to form.
13    Q.    Do you know what I mean by that?
14    A.    Yeah, I do know what you mean by it.
15 Yeah, I think it was.
16    Q.    So by conforming, that means it
17 conformed to the local ordinances, including use and
18 bulk requirements. Correct?
19    A.    Yes, because we changed the ordinances
20 so that it didn't have to require a variance.
21    Q.    Well, you understand then if the
22 engineer is reviewing it, he has to review it in
23 accordance with the existing ordinances, didn't you
24 know that?
25    A.    I do know that.

Page 200

1    Q.    So when Mr. Ascolese reviewed it with
2 respect to height and reached the conclusion that it
3 conformed, that wasn't his fault as an engineer, he
4 was simply reporting whether the plan conformed or
5 not. Correct?
6    A.    Yes.
7    Q.    So how could you complain to
8 Mr. Ascolese because of the height?
9    A.    Because I said it was all of his work as
10 a total. He was involved in the fourth-story issues
11 of height.
12    Q.    What do you mean he was involved?
13    A.    He was involved.
14    Q.    In what way?
15    A.    In helping to write the ordinance as to
16 what height levels were going to be acceptable in
17 the Borough.
18    Q.    Did he write that ordinance because it's
19 what he wanted or was he --
20    A.    No.
21    Q.    -- requested by his client to do so?
22    A.    He was requested by I believe Mayor
23 Lamatina to do it.
24    Q.    Again, as the engineer, if you're
25 working for the town and they've asked you to draft

Page 201

1 an ordinance, is it his function to say no?
2    MR. SEAMAN: Objection to form.
3    A.    I think that when you are a professional
4 for a borough, that you should do what's in the best
5 interest of the borough, not just what different
6 elected officials want.
7    Q.    So he should overrule the policy-making
8 decisions of the elected officials?
9    MR. SEAMAN: Objection to form.
10    Q.    Is that what you think the function of
11 an engineer is?
12    A.    My feeling is when you have a borough
13 professional, they should guide you accordingly on
14 what's appropriate for your town and not just please
15 the people that are voting for you.
16    Q.    So if you as the mayor tell your
17 engineer we want you to draft a particular ordinance
18 as a policy matter because we, as the governing
19 body, think this is good policy, you're saying that
20 the engineer should say no?
21    A.    I think that he should just have a
22 conversation with the governing body saying that he
23 doesn't think that it's appropriate.
24    Q.    Do you know what conversation he had
25 with the governing body --

51 (Pages 198 - 201)

Page 202

1    A.    No.
2    Q.    -- when he was asked to prepare an
3 ordinance?
4    A.    I don't think he had any conversation.
5    Q.    Well, do you know if he had a
6 conversation?
7    A.    I don't.
8    Q.    All right.  So you don't know what he
9 did or didn't do in connection with that ordinance.
10 Correct?  True or not?
11    A.    Do I know what he did with that
12 ordinance or not.
13    Q.    In connection with the preparation of
14 that ordinance.
15    A.    I'm pretty sure he prepared the
16 ordinance.
17    Q.    You're pretty sure.  Do you know?
18    A.    I don't know who else would have done
19 it.
20    Q.    Well, could the attorney have drafted an
21 ordinance?
22        MR. SEAMAN:  Objection to form.
23    A.    It wouldn't be the appropriate person to
24 do it.
25    Q.    You don't know who did it, that's the

Page 203

1 point.  Correct?
2    A.    I know that when an ordinance is
3 drafted, the different professionals that are
4 speaking to each subject matter prepare their
5 portion of it.  I don't think the attorney went out
6 and measured to see what were appropriate levels.
7    Q.    But you don't know who actually prepared
8 the ordinance as you sit here today.  Can you state
9 that with any certainty?
10    A.    Who prepared the ordinance?
11    Q.    Who prepared and drafted the ordinance?
12    A.    I have no idea.
13    Q.    And you don't know what discussions that
14 person who drafted it had with the policymakers as
15 to what they wanted him to do.  Correct?
16    A.    Well, I was one of the policymakers.  I
17 don't remember any discussions.
18    Q.    Well, were there any discussions at the
19 governing body level?
20    A.    I don't recall.
21    Q.    Okay.  So that's why you didn't like
22 Ascolese, because he didn't -- you thought the
23 height was not acceptable and he should have done
24 something about that.  Correct?
25    A.    I have a very different vision of what

Page 204

1 professionals do.
2    Q.    I didn't ask what -- I didn't ask that.
3 I asked you to confirm what I think you said, which
4 is that you didn't like the work Ascolese did
5 because you thought the height wasn't acceptable and
6 he should have done something about that.  That's
7 what you told me.  Correct?
8    A.    Yeah, but I think --
9    Q.    Yes?  Before you get to the but, just
10 answer the question first.
11    A.    I don't know how to answer your
12 question, because professionals have discussions and
13 make recommendations, and I don't know what --
14    Q.    You don't know what discussions they
15 had.
16    A.    And I don't know what recommendations
17 were his or weren't his.
18    Q.    I'm just asking your position.  You told
19 me that -- I said, why did you let Ascolese go, what
20 didn't you like about the work he did?  The one
21 thing you said to me is that you thought that the
22 height was not acceptable on the 419 project and he
23 should have done something about that.  Did you tell
24 me that a moment ago?
25    A.    Yes, I think he should have advised --

Page 205

1    Q.    Okay.  Yeah, good.  But at the board
2 level, he -- there was an existing ordinance, so
3 when he reviewed the plans, he had to determine if
4 it complied or not.  Correct?
5    A.    Yes.
6    Q.    And it did comply.  Correct?
7    A.    Yes, because we changed the ordinance so
8 that it would.
9    Q.    Right.  Because the governing body voted
10 to do that.  Right?
11    A.    Yeah.
12    Q.    It's a legislative decision by the
13 governing body.  Correct?
14    A.    Yes, which I disagreed with.
15    Q.    Of course.  You voted against it.  So --
16 but it became the law.  Right?  It was the law in
17 town, the ordinance.
18    A.    Yes.
19    Q.    And so therefore Ascolese, like any
20 other professional, has to follow the law, doesn't
21 he?
22    A.    Yes.
23    Q.    Okay.  And that's what he did.  Right?
24        MR. SEAMAN:  Objection to form.
25    Q.    He compared the plan to the existing

52 (Pages 202 - 205)

EXHIBIT A

Page 206

1  ordinances, the law in town, to determine whether it
2  deviated or not. That's what he did. Right?
3      A.    I guess.
4      Q.    Okay. So why else did you not renew?
5  What other things didn't you like about what he did,
6  other than the fact that you thought it was too high
7  and he should have done something about it, even
8  though that was the law in Emerson, what else did he
9  do?
10     A.    I don't recollect right now.
11     Q.    Okay. How about the planner, what, if
12 anything, did she do that you didn't like that led
13 you to conclude that she shouldn't be renewed?
14     A.    She made a lot of suggestions that
15 didn't make any sense for the Borough of Emerson.
16     Q.    So give me the top five.
17     A.    Thinking that it was okay to encapsulate
18 a two-story existing building with the project on
19 419 that Accurate Builders was building.
20     Q.    I'm sorry, so this is 419 again?
21     A.    Uh-hum.
22     Q.    What is it she recommended be done?
23     A.    She recommended that the buildings were
24 blighted. She recommended eminent domain. She
25 recommended that it was an appropriate look to

Page 207

1  encapsulate another building with another -- an
2  existing building with a new building on 419.
3  Pretty much everything she did I think I didn't
4  agree with.
5      Q.    What do you mean by encapsulate?
6      A.    If you've ever seen the plans of 419,
7  there's an existing building in the center of it and
8  it's encapsulated on three sides.
9      Q.    All right. So now, after the -- after
10 you came in office now and you brought in your own
11 team of professionals, did you have any -- any
12 meetings with them to discuss what your goals and
13 objectives were for the town?
14     A.    Yes.
15     Q.    Okay. And when did you do that?
16     A.    Shortly after I took office, I think.
17     Q.    Okay. Tell me when that happened.
18         MR. SEAMAN: Objection.
19     A.    I believe after they were appointed.
20     Q.    So did you then call everyone in and
21 have a meeting?
22     A.    No, not particularly. I think I just
23 met with two of the attorneys.
24     Q.    Who were the two attorneys you met?
25     A.    Maybe three. John McCann, Rich

Page 208

1  Malagiere, and Brian Giblin. Or maybe it was just
2  Malagiere and Giblin. I don't remember.
3      Q.    So other than the attorneys, did you
4  meet with any of the other professionals once you
5  took over to discuss what your agenda was?
6      A.    No.
7      Q.    Did you meet with the engineer?
8      A.    No.
9      Q.    So you didn't have any meetings with
10 Mr. Atkinson?
11     A.    No. I think I met him when he came to
12 the first meeting.
13     Q.    And how about the new planner, you
14 didn't meet -- and who was that again?
15     A.    Caroline Reiter.
16     Q.    Reiter. You didn't meet with her to go
17 over your agenda?
18     A.    I don't think so.
19     Q.    Okay.
20     A.    You keep saying agenda. I don't know
21 that I necessarily had an agenda.
22     Q.    Well, you ran on an agenda, didn't you?
23 Didn't you have -- when you tried to get people to
24 vote for you, didn't you tell them what your agenda
25 was?

Page 209

1      A.    I just don't like the word agenda.
2      Q.    Okay. Whether you like it or not, it's
3  a word. Did you have an agenda?
4      A.    Personally, no, I didn't have an agenda.
5      Q.    Did you have issues that you --
6      A.    I had issues --
7      Q.    -- knocked around?
8      A.    -- that I didn't like that were
9  happening in the town.
10     Q.    Again, you're talking over me. Okay?
11 You're talking over me again.
12         Did you have issues that you ran on that you
13 wanted to address for Emerson?
14     A.    Yes.
15     Q.    And did you review those issues with the
16 new professional staff that you hired?
17     A.    Only as it came up.
18         MR. FIORENZO: Okay. Steve, could you
19 pull up E53.
20     Q.    So this is another Pascack Press article
21 by John Snyder, who you confirm you've spoken with.
22 Correct?
23     A.    Correct.
24     Q.    Marked as D?
25         MR. KLEIN: DD-23.

53 (Pages 206 - 209)

EXHIBIT A

Page 210

1    Q.    DD-23.  So let's mark it.
2         MR. FIORENZO:  Could you pull up the
3 article, Steve?
4         MR. KLEIN:  Just one second.
5         MR. FIORENZO:  What happened to that
6 quick new software.
7    Q.    Oh, look at that.  All right.  So
8 there's a very nice photo of you.  Who are you with?
9    A.    Carlos Renda.
10    Q.    Who is he?
11    A.    The Mayor of Woodcliff Lake.
12    Q.    Got it.  You're quoted in here
13 predicting, "It's not going to be smooth but it's
14 going to be fun."  Did you make that statement to
15 the PAC group at the organization meeting?
16    A.    Yes.
17         MR. FIORENZO:  And scroll down, Steve,
18 to the last -- you know, the last paragraph dealing
19 with DiPaola, Gordon, and Hoffman.  Yeah.
20    Q.    Okay.  So the article states, DiPaola,
21 Gordon, and Hoffman (returned after two terms, 2005
22 through 2010) had campaigned hard on the issue of
23 what they called overdevelopment, taking aim at the
24 four-story Block 419 redevelopment project long
25 taking shape and just approved.  Is that true?

Page 211

1    A.    I'd say so, yeah.
2    Q.    Okay.  And the next paragraph goes on,
3 "With her rise, DiPaola, who often found herself the
4 lone no vote on Block 419 matters, might well find
5 herself presiding at the project's ribbon cutting."
6 Did you have that discussion with the reporter as
7 well?
8    A.    About cutting a ribbon, no.
9    Q.    So that's just the reporter.
10    A.    Yeah.
11    Q.    Now, after this article --
12         MR. FIORENZO:  Steve, could you pull
13 up --
14         MR. BOTTA:  By the way, do you want to
15 amend that part about being mayor is fun?  It's a
16 joke.  Off the record.
17         (Discussion off the record.)
18         MR. FIORENZO:  Okay.  Steve, pull up
19 E58.
20         MR. KLEIN:  DD-24.
21    Q.    So this is another one of the Passaic
22 Press and Northern Valley Press local newspaper,
23 Mr. Snyder wrote another article.
24         MR. FIORENZO:  Scroll down if you would.
25         MR. BOTTA:  Do you have a date on that,

Page 212

1 Steve?
2         MR. FIORENZO:  Yeah, it's small up here.
3 It's --
4         MR. KLEIN:  No, it's the date it was
5 printed.  It says 4/6 --
6         MR. FIORENZO:  4/6/20, but that's not
7 the date.
8         MR. KLEIN:  No.
9         THE WITNESS:  No.  The chamber meeting
10 is generally January or February.
11         MR. FIORENZO:  I have the date as
12 January 24th from some source, but maybe it's
13 further buried inside.
14    Q.    So at this time --
15         MR. FIORENZO:  Scroll back a little bit,
16 Steve.
17    Q.    At this point in January now, your new
18 administration is just beginning.  And was
19 affordable housing in Emerson the big ticket item
20 that you were concerned about?
21         MR. SEAMAN:  Objection to form.
22    A.    I'm sorry, could you say that again?
23    Q.    Was affordable housing as you took
24 office the big ticket item that you were concerned
25 about?

Page 213

1    A.    Was affordable housing?  No, that was
2 not my -- no.
3    Q.    That wasn't considered a big ticket item
4 to you?
5    A.    Affordable housing?
6    Q.    Affordable housing and development and
7 overdevelopment.
8    A.    Overdevelopment was, not --
9    Q.    Well, that would have included within
10 it -- the reason it gets overdeveloped and higher
11 density as we discussed is because of Mount Laurel
12 gives higher density, thereby creating potential
13 overdevelopment.  Correct?
14         MR. SEAMAN:  Objection to form.
15         MR. BOTTA:  Objection to the form.  You
16 can answer that if you understand it.
17    Q.    Right?
18    A.    You said a lot of words.  Can you just
19 ask me one question?
20    Q.    You understand, and I thought we'd gone
21 over this, that the issue of overdevelopment, which
22 equates to higher density than you otherwise might
23 have, is triggered by Mount Laurel housing because
24 there are, quote, density bonuses that the law says
25 that you get.  You understand that.  Right?

54 (Pages 210 - 213)

EXHIBIT A

Page 214

```
1      A.    Yeah, but I don't think it's the only
2  reason that things are dense --
3      Q.    No.
4      A.    -- or overdeveloped.
5      Q.    But that's a reason why the 419 project
6  is as dense as it is, 'cause if it didn't have the
7  Mount Laurel, there would be no way they would be
8  entitled to the number of units that they had.
9  Correct?
10         MR. SEAMAN:  Objection to form.
11     A.    I don't know how to answer the question.
12     Q.    Well, do you know the answer?  Well,
13 let's assume.  Pretend for a moment there was no
14 Mount Laurel at the Block 419 site.  Do you not
15 understand that if there was no Mount Laurel, there
16 would be lower density development at the site?
17         MR. SEAMAN:  Objection to form.
18     Q.    Do you understand that?
19         MR. SEAMAN:  Objection to form.
20     A.    I don't know if that's a fact.
21     Q.    And an application to build and develop
22 on that site without affordable housing yields less
23 units than with affordable housing.  Do you deny
24 that?
25         MR. SEAMAN:  Objection to form.
```

Page 215

```
1      A.    I don't know the answer to your
2  question.
3      Q.    You don't know?  You don't know.
4      A.    I don't know.
5      Q.    Okay.  So when you're talking about
6  density of development and overdevelopment, you
7  don't understand what impact Mount Laurel has on
8  overdevelopment?
9      A.    On this specific project?
10     Q.    Yes.
11     A.    Yes, I understand that.  You're saying
12 overall I thought.
13     Q.    Do you understand on this specific
14 project --
15     A.    Yes.
16     Q.    -- that the existence of Mount Laurel
17 and the Court's rulings in this case mandating
18 compliance had an effect on overdevelopment of the
19 site, did you understand that?
20     A.    I understand what you're saying, but I
21 still think it could have been built smaller and
22 still satisfied our affordable housing obligation.
23     Q.    Well, great.  You're not an expert on
24 that and I'd be happy for you to give us an expert
25 opinion to that effect.  Your intuitive belief on
```

Page 216

```
1  that, while interesting, is of no real moment.  My
2  point is that do you acknowledge that one of the
3  reasons why there's overdevelopment at the subject
4  site or there's higher density at the subject site
5  is because the Court-approved settlement gave
6  density bonuses as a reward to the developer for
7  building affordable housing.  You understood that.
8  Correct?
9      A.    I understand that.
10     Q.    Okay.  So when we talk about this issue
11 of overdevelopment at the site, overdevelopment at
12 the site and density at the site is linked to Mount
13 Laurel, which gives density bonuses.  Correct?
14         MR. SEAMAN:  Objection to form.
15     A.    I don't know about the bonuses.
16     Q.    You don't know that there's higher
17 density because of Mount Laurel from the settlement
18 agreement and everything else that you reviewed
19 while you were on the governing body, you don't know
20 that?
21     A.    Not the way you're describing it.  Maybe
22 it was described a different way.
23     Q.    Well, is there greater density that's
24 given to a developer who's willing to put Mount
25 Laurel housing on a site, do you know that?
```

Page 217

```
1      A.    Is there -- say that again?
2      Q.    Is there greater density permitted to a
3  developer who's willing to build Mount Laurel
4  housing on a site?
5      A.    Like in every occasion or in this
6  occasion?
7      Q.    In this occasion.
8      A.    Yes.
9      Q.    Okay.  In fact, that was part of the
10 settlement agreement.  Correct?
11         MR. SEAMAN:  Objection to form.
12     A.    What was part of the settlement
13 agreement?
14     Q.    The fact that there were bonuses,
15 greater density given to the developer because the
16 developer was willing to build affordable.
17     A.    I just don't remember the word "bonus"
18 being used.
19     Q.    Bonus, greater density, more units.
20 There were more units allowed to be built because
21 there was a Mount Laurel component that the
22 developer was willing to build.  You understood that
23 when all the -- when the settlement agreement was
24 being discussed.  Correct?
25     A.    Yes.
```

55 (Pages 214 - 217)

EXHIBIT A

Page 218

1    Q.    Okay.
2    A.    And I was against it.
3    Q.    Okay.  All right.  So in this article --
4 go to this.  First of all, that's a very nice
5 picture there.  You're in that photo?  Yes, you are.
6 Very nice.
7    A.    Glad it meets with your approval.
8    Q.    These were all people -- these were all
9 people with the -- yeah.  No, I'm very impressed, so
10 I just wanted to let you know that.  So, you know,
11 everybody there looks very good.  You look very
12 nice.  And my question is, this is the Chamber of
13 Commerce people?
14    A.    Those are the mayors with part of the
15 Greater Pascack Valley members.
16    Q.    Okay.  So these are all mayors.
17    A.    Or representatives from boroughs.
18    Q.    Got it.  Okay.  So in this article,
19 which I guess the reporter was reporting as a result
20 of this meeting of the mayors -- was the reporter at
21 that meeting?
22    A.    He usually is.  I don't remember if he
23 was at this one, per se.
24    Q.    Well, it says, Emerson Scaling Back.
25 Let's go to that.  Emerson's new mayor, Danielle

Page 219

1 DiPaola, made her first appearance at the breakfast,
2 where she appealed for help "from anyone in the
3 room" during this time of transition.  So did you
4 make the search for a new borough administrator.  So did you
5 make such a statement at the breakfast?
6    A.    Yes.
7    Q.    Okay.  And then she goes on -- he goes
8 on to say, "She said," referring to you, "affordable
9 housing and redevelopment were the big ticket items
10 she is carrying over."  Let me stop there.
11    So did you tell that to the assembled mayors
12 that in Emerson, that affordable housing and
13 redevelopment were the big ticket items consistent
14 with what I guess you said earlier, that that was
15 the number one issue, that's what you were elected
16 on.  So did you make that statement?
17    A.    Probably something like it.
18    Q.    Okay.
19        MR. FIORENZO:  So scroll down, Steve, to
20 the next paragraph.  She said, the third paragraph,
21 could you highlight that, please?
22    Q.    The article says, She said, "I think
23 we've gotten a little bit lost on trying to do big
24 projects.  We're going to continue with all of the
25 drainage projects we've started and we have a lot of

Page 220

1 grants for those."  Did you make that statement to
2 the reporter?
3    A.    I guess so.
4        MR. FIORENZO:  Continue down, Steve.
5 Scroll.  Okay.
6    Q.    The reporter reports, "In the meantime,
7 she said," referring to you again, "'We're trying to
8 scale this back and make it more of a reasonable
9 development that is friendlier to our small
10 downtown.'"  Did you make that statement to the
11 reporter?
12    A.    I guess I did.
13    Q.    Okay.  And when he quotes you as saying
14 we're, meaning the town, I presume.  Right?  The
15 "we're" is the town?  You were at the breakfast and
16 you're giving a speech.  We're meaning Emerson?
17    A.    I guess.
18    Q.    Okay.  Trying to scale this back.  So
19 scale back the 419 project you're discussing.
20 Correct?
21    A.    I think overdevelopment in general.
22    Q.    Well, you were specifically focused on
23 419, 'cause as you said to other reporters -- you
24 said to this reporter, that was the big ticket
25 issue.  Right?

Page 221

1        MR. SEAMAN:  Objection to form.
2    A.    Yeah, but I don't know when I said that
3 statement what I was referring to.
4    Q.    Well, what project were you trying to
5 scale back at that time?
6    A.    Did I say a specific project?
7    Q.    We're trying to scale this.  What's the
8 "this" that you're trying to scale back?
9    A.    I could have been talking about 419.
10    Q.    Okay.  Is there any other -- was there
11 any other large development project in town at that
12 time other than 419?
13    A.    There was also, I told you, a project
14 approved for the Valero that people thought was too
15 big.
16    Q.    Is that downtown?
17    A.    Uh-hum.
18    Q.    Where?
19    A.    Across the street from 419.
20    Q.    How big is that?
21    A.    It's a big gas station with a 7-Eleven
22 with --
23    Q.    Okay.
24    A.    -- residential on top.
25    Q.    You weren't talking about the Valero

56 (Pages 218 - 221)

Page 222

1  project before the mayors, were you?  You were
2  talking about 419.
3      A.    I don't recall.
4      Q.    Let me see if I can help you.  "Downtown
5  redevelopment is in the process of acquiring
6  properties, she said."
7          So the downtown redevelopment which was in the
8  process of acquiring properties was the 419 project.
9  Correct?
10     A.    Yes.
11     Q.    So in the following sentence then it
12  says, In the meantime, she said, we're trying to
13  scale this back, it appears to refer to the downtown
14  redevelopment project.
15     A.    Then I was talking about 419, yes.
16     Q.    Okay.  Great.  So when you told the
17  assembled mayors that you wanted to scale back the
18  419 project, what did you intend to do to scale it
19  back since it had Planning Board approval?  I'm
20  sorry, it had Land Use Board approval.
21     A.    I have no idea what I meant by that.  It
22  was probably the first time I was speaking in public
23  after I was elected mayor.
24     Q.    How could you scale it back if you
25  wanted to?  How could you do that?  What would you

Page 223

1  do?
2      A.    I think I wasn't able to, which is why
3  it didn't happen.
4      Q.    So you weren't able to, but you said,
5  we're trying to scale it back.  How were you -- what
6  were you doing to try to scale it back?  I mean,
7  again, you're making a public statement to the
8  mayors.  You were trying to be honest about what
9  your intentions were.  Correct?  Yes?
10     A.    Yes.  I also said it was probably the
11  first time I was speaking to such a large crowd of
12  people and may have said things that --
13     Q.    Well, you didn't lie to them, you didn't
14  say things that --
15     A.    No, I didn't lie to them.
16     Q.    Because you wouldn't do that, you've
17  told us.  So assuming you were telling the truth,
18  and I'm sure you were, when you told the mayors
19  under the topic of Emerson Scaling Back, that's the
20  heading of the article, when you talked about trying
21  to scale back 419, what efforts were underway at
22  this time to do that?
23     A.    I don't think there were any efforts.
24     Q.    Were there ways that you discussed with
25  anyone as to how you might scale back the project?

Page 224

1      A.    I don't remember.
2      Q.    Do you know as you sit here today of any
3  actions that were taken by Emerson to try to scale
4  back the project?
5      A.    I don't think we took any actions to try
6  to scale it back.
7      Q.    Did Emerson have a redevelopment
8  committee?
9      A.    Yes.
10     Q.    Did the redevelopment committee meet and
11  discuss ways to try to scale back the project?
12     A.    No.
13     Q.    Did you discuss with your professional
14  engineer ways to scale back the project?
15     A.    No.
16     Q.    Did you discuss with the engineer -- do
17  you know what the resolution compliance process is
18  all about?
19     A.    The what?
20     Q.    Resolution compliance, do you know what
21  that means?
22     A.    Yes.
23     Q.    What does it mean?
24     A.    That means that the project has to
25  comply with the resolution.

Page 225

1      Q.    What resolution?
2      A.    Any resolution for whichever project
3  it's written for.
4      Q.    And did you have discussions with
5  Mr. Atkinson at any time about that process?
6      A.    I don't think so.
7      Q.    You deny it?
8      A.    I don't think I did.
9      Q.    You don't think you did or you're sure
10  you didn't?
11     A.    I don't remember.
12     Q.    Okay.  Would the mayor, you, have a role
13  in the resolution compliance process or would that
14  normally be handled by the professionals?
15         MR. SEAMAN:  Objection to form.
16     A.    I don't know.
17     Q.    Well, in the history of your time as the
18  mayor, do you typically get involved in the
19  resolution compliance process after a zoning board
20  grants an approval with conditions?
21     A.    We don't have a zoning board.
22     Q.    Okay.  Whatever board.  Land Use Board.
23  Do you typically get involved in that process --
24     A.    When you --
25     Q.    -- of resolution compliance?

57 (Pages 222 - 225)

Page 226

1    A.    I don't understand what you mean when
2  you say involved.
3    Q.    Do you have any role at all?
4    A.    Well, there might be a time where we're
5  questioning whether someone is complying with the
6  resolution, we may look at it and ask a professional
7  in any given project if something that they've done
8  complies with the resolution.
9    Q.    Who's the "we"? You look at the
10 resolution to determine if it's compliant, is that
11 what you do as the mayor?
12   A.    No.
13   Q.    That's what I'm asking. You as the
14 mayor, Danielle DiPaola, since you've been elected,
15 is it your role to review resolutions of the Land
16 Use Board or any other board in town to determine
17 compliance with condition or do you have others who
18 do that?
19   A.    I don't really understand your question.
20 You mean while it's being written?
21   Q.    Do you review compliance with Zoning
22 Board resolutions to determine if someone has
23 complied or not, whether they've checked off all the
24 boxes and done all the things they're required to
25 do, do you as the mayor do that?

Page 227

1    A.    I think anyone can do that once they --
2    Q.    Do you as the mayor do that?
3    A.    As a role? No.
4    Q.    Yes, yes.
5    A.    No.
6    Q.    Okay.
7    A.    But I can certainly look at a
8  resolution.
9    Q.    Have you ever done it?
10   A.    Have I ever looked at a resolution and
11 questioned whether something complies?
12   Q.    Yes.
13   A.    Yes.
14   Q.    Okay. When was the last time you did
15 it?
16   A.    Oh, God, I have no idea.
17   Q.    Did you ever do it as to Block 419?
18   A.    I don't recall.
19   Q.    You hire professionals to do that. You
20 have engineers in line. Correct?
21   A.    Yes.
22   Q.    Isn't that their role?
23   A.    Yes.
24   Q.    You're not an engineer. Right?
25   A.    No.

Page 228

1    Q.    And you wouldn't be in a position really
2  to evaluate whether it's compliant or not. Correct?
3        MR. SEAMAN: Objection to form.
4    A.    I don't think it's beyond my scope or
5  anyone to question whether an item that's listed on
6  a resolution is being satisfied by the applicant.
7    Q.    Okay. And so let me be as specific as I
8  can as to Block 419. There was a Planning Board
9  resolution, which you said you reviewed it at some
10 time. You don't even remember when you reviewed it.
11 Correct?
12   A.    Correct.
13   Q.    Did you involve yourself in any way in
14 reviewing the conditions of the resolution to
15 determine whether the applicant had complied?
16   A.    At some point I may have.
17   Q.    Did you ask people to look at certain
18 things for you to determine whether my client had
19 complied with the resolution?
20   A.    I think the only thing that came up was
21 there was specifically some wording in the
22 resolution that asked for a cash escrow, and there
23 was just conversation as to why they thought it was
24 actual cash.
25   Q.    Okay. Other than that? Other than

Page 229

1  that, is there anything else?
2    A.    I don't think so.
3    Q.    Okay.
4    A.    That's the only thing I think that I
5  remember was from the resolution.
6    Q.    So you never met or conferred with
7  Mr. Atkinson and went over and asked him to do
8  certain things with respect to the conditions?
9    A.    I don't believe so, no.
10   Q.    'Cause that wouldn't be proper, would
11 it?
12       MR. SEAMAN: Objection to form.
13   Q.    If you did that. You're not supposed
14 to, as the mayor, inject yourself into the process
15 of telling the engineer what to do as to whether
16 somebody has complied or not with a resolution.
17       MR. SEAMAN: Objection to form.
18   Q.    You would agree that's not your
19 function. Correct?
20   A.    I'm not understanding what you're asking
21 me, because I think anyone can look at a resolution
22 and say, does this comply in your opinion, in your
23 professional opinion does this comply.
24   Q.    To who?
25   A.    What do you mean by insert myself?

58 (Pages 226 - 229)

EXHIBIT A

Page 230

1    Q.    But you, it's not your function as the
2  mayor to do that, is it?  Do you view it as your
3  function to review a resolution to determine if
4  they've complied with conditions?
5    A.    I think anyone can look at a resolution.
6    Q.    I didn't ask if anyone could.  Do you
7  view it as your function as the mayor to do it?
8    A.    I don't know how to answer the question.
9    Q.    As the mayor, did you do it in Emerson?
10   A.    Not to my knowledge, but I don't think
11 it's out of the realm for anyone to look at it.
12   Q.    I didn't ask if it's out of the realm.
13 I'm asking if you did it.
14   A.    I don't recall.
15   Q.    Do you remember after the approval was
16 given that efforts were being made by the developer
17 to meet with you?
18   A.    There were efforts by the developer to
19 meet with me?
20   Q.    Yeah.
21   A.    When?
22   Q.    Again, you're a stranger to these
23 proceedings.  You don't get to ask me questions.  I
24 get to ask them of you.
25         Did you at any time receive a request from the

Page 231

1  developer to try to meet with you after your
2  administration came on board?
3    A.    Yeah, he wanted to have lunch with me, I
4  think.
5    Q.    Okay.  And did you meet with
6  Mr. Klugmann?
7    A.    No.
8    Q.    Why not?
9    A.    Because the first time I met him, I felt
10 like he was hitting on me.
11   Q.    Okay.
12   A.    And he made me uncomfortable.
13   Q.    Really?
14   A.    Yes.
15   Q.    So let's explore that for a moment.
16 You're saying that when you met Mr. Klugmann, you
17 perceived he was, quote/unquote, hitting on you?
18   A.    I did.
19   Q.    What did he do to lead you to that
20 conclusion?
21   A.    Called me beautiful.
22   Q.    Okay.
23   A.    Said he wanted to get to know me.
24   Q.    Okay.
25   A.    Said he wanted to spend time with me.

Page 232

1    Q.    Really?
2    A.    Yeah.
3    Q.    Okay.  Where was that?
4    A.    I was sitting on the dais.  He came up
5  after the meeting, after the governing body approved
6  his 51 percent ownership in the project.
7    Q.    So that was before you --
8    A.    I mean, you saw the picture.  Right?
9    Q.    That was before you became mayor.  Saw
10 what picture?
11   A.    Of me.
12   Q.    What about it?
13   A.    I think I looked a little different back
14 then.  I don't think it's so inconceivable.
15   Q.    I'm sorry, you're saying --
16   A.    I'm making a joke about my looks, sir.
17 Sorry.
18   Q.    You're saying the way you looked in the
19 picture supports the contention that --
20   A.    I'm joking.
21   Q.    -- he would have hit on you 'cause
22 anyone would have, is that what you're saying?
23   A.    I was joking that I was attractive in
24 the photo, that's all.
25   Q.    Okay.  All right.  Which is why that

Page 233

1  would support your contention that Mr. Klugmann
2  would have made those statements.
3    A.    Not that it supports it, but he did,
4  it's a fact.
5    Q.    Okay.  And the picture is also some
6  additional evidence of that, I guess.
7    A.    I was making a joke, yes.
8    Q.    Were you?
9    A.    Well, you made such a comment about my
10 photo.  You studied it, stared at it, told me I
11 looked very nice.
12   Q.    Yeah.  Did you think I was hitting on
13 you, too?
14   A.    I was making a joke on the fact that you
15 were commenting on --
16   Q.    Do you think I was hitting on you when I
17 said you looked nice in the picture?
18   A.    I thought it was kind of odd the way you
19 stared at the photo, yeah.
20   Q.    You thought I was hitting on you, too.
21 Okay.  So not only did Mr. Klugmann hit on you, but
22 I hit on you as well?
23   A.    Well, it appeared that you were
24 evaluating me on my looks by staring at the photo
25 and that you were agreeable to my looks at the point

59 (Pages 230 - 233)

Page 234

1 in the photo, yeah, it made me uncomfortable.
2    Q.    That made you -- so you --
3       MR. BOTTA:  Maybe we can move on.
4    Q.    So I made you uncomfortable.  Well, no.
5 I mean, so Mr. Klugmann you say made you
6 uncomfortable because you thought he was hitting on
7 you.  And then just a moment ago when I looked at
8 your picture and I said you looked very nice, you
9 thought -- that made you uncomfortable that I was
10 hitting on you as well?
11    A.    I thought it was an odd statement to --
12    Q.    Did you think I was hitting on you?
13    A.    I thought it was an odd statement --
14    Q.    No, no, no, did you think I --
15    A.    -- to comment on my looks.
16    Q.    Did you think I was hitting on you?
17    A.    I think it was inappropriate --
18    Q.    Did you think I was hitting on you --
19    A.    -- to comment --
20    Q.    -- yes or no?
21    A.    -- on my looks.
22       MR. SEAMAN:  Please don't raise your
23 voice, Joe.
24    Q.    Did you think I was hitting on you?
25 Answer the question, please.

Page 235

1    A.    Can I leave?  'Cause he's being --
2    Q.    No, you can't leave.
3    A.    -- really inappropriate.
4    Q.    No, you're the one --
5    A.    He's making me very uncomfortable
6 talking about my looks.
7    Q.    You brought it up.
8    A.    He's the one that --
9       MR. BOTTA:  Joe, let's stop.
10    Q.    You brought it up.
11    A.    He's staring at my photo.
12    Q.    You brought it up.
13    A.    Commenting on my looks for an
14 inexorbitant amount of time --
15       MR. BOTTA:  Let's take a break.
16    A.    -- which I thought was odd and made me
17 uncomfortable.
18    Q.    You really think that I was hitting on
19 you, just like Mr. Klugmann.  Now I understand.
20    A.    I didn't say you were hitting on me.  I
21 said you made me --
22       MR. BOTTA:  She didn't say --
23    A.    -- uncomfortable the way you were
24 staring at my photograph and commenting on my looks
25 in the photo.

Page 236

1    Q.    Oh.
2       MR. SEAMAN:  Joe, we're going to take a
3 five-minute break.
4    Q.    So I -- do you think I was hitting on
5 you?
6       MR. SEAMAN:  Already asked and answered,
7 Joe.
8    Q.    Yes or no?  I need to know that.
9    A.    No, I don't think you were hitting on
10 me.
11    Q.    Oh, great.  Okay.
12    A.    But you were inappropriate staring at my
13 photograph.
14       MR. BOTTA:  We'll take five minutes.
15    Q.    You are a very funny lady to think that
16 I would have any interest in staring at your
17 photograph.
18    A.    You're a joke.
19    Q.    You're a very funny lady.
20    A.    Why did you do it?
21    Q.    Because it's evidence in the case.
22    A.    My photo?
23       MR. BOTTA:  We're off the record.
24    Q.    Yeah.  It's an exhibit.
25       (A break was taken at 3:21 p.m.)

Page 237

1       (Deposition resumes at 3:27 p.m.)
2       MR. FIORENZO:  Let's go back on the
3 record.
4 BY MR. FIORENZO:
5    Q.    So after you took over as the mayor, did
6 you oversee the actions that were being taken by
7 your staff and professionals regarding the Block 419
8 project?
9    A.    No.
10    Q.    What role, if any, did you have in
11 overseeing the progress of the Block 419 project?
12    A.    They only came to me if there was a
13 problem and just made me aware that there was an
14 issue.
15    Q.    Who is "they"?
16    A.    The administrator, the clerk.
17    Q.    Did they come to you with any problems?
18    A.    They didn't come to me with problems.
19 They made me aware of the problems.
20    Q.    What problems, if any, did they make you
21 aware of?
22    A.    Complaints that they were making.
23    Q.    Okay.  Complaints about what?
24    A.    That they weren't being issued permits.
25    Q.    So these were complaints that they told

60 (Pages 234 - 237)

Page 238

1  you were being made by the redeveloper that permits
2  were not being issued?
3      A.   Right.
4      Q.   Who told you that?
5      A.   I believe it was the administrator.
6      Q.   Mr. Hermansen?
7      A.   I believe so.  It could have been
8  Mr. Sheola.  He was before Mr. Hermansen.
9      Q.   Did you have a discussion with
10 Mr. Hermansen or anyone else as to why the permits
11 were not issued?
12     A.   Yes.
13     Q.   What were the discussions you had with
14 Hermansen about the permits?
15     A.   It was explained to me that the permits
16 either weren't applied for or that they weren't paid
17 for and that is the reason they weren't getting
18 them.
19     Q.   Who told you that?
20     A.   Probably Mr. Hermansen.  I don't
21 remember exactly.
22     Q.   Did he tell you anything else as to why
23 the permits were not issued?
24     A.   No.
25     Q.   Other than the issue of the complaint

Page 239

1  about the permits, are there any other things you
2  became involved with with regard to the Block 419
3  after your administration took over?
4      A.   No.
5      Q.   That was it.  Yes?
6      A.   I didn't get involved in anything.
7      Q.   Right.  So that was it, just that one
8  issue you've raised.  Correct?
9      A.   Or a property maintenance issue perhaps.
10     Q.   Well, perhaps.  Was there a property
11 maintenance issue or not?
12     A.   The gate kept opening into the street
13 and the black curtain was falling and the debris was
14 sitting there for months.  In fact, some of the
15 debris is still sitting there, has never been moved.
16     Q.   Okay.
17     A.   Just the general site that people were
18 complaining to me that live in town about the
19 looks -- of how atrocious it looked.  And then they
20 would complain to me and I would give the complaint
21 to Rob.
22     Q.   And Rob would then give it to someone
23 else?
24     A.   I guess.
25     Q.   Do you know who Ron Cenicola is?

Page 240

1      A.   Yeah.
2      Q.   Who is he?
3      A.   He works in our construction department.
4      Q.   Who hired him?
5      A.   I guess I did.  I don't really remember.
6      Q.   Did you know him?
7      A.   I know who he is now, but.
8      Q.   Did you know him before you hired him?
9      A.   No.
10     Q.   Okay.  So he works in the Building
11 Department?
12     A.   Yeah.
13     Q.   Who's his boss?
14     A.   Scott Wickersheim.
15     Q.   Did you communicate to the Building
16 Department that you wanted Mr. Cenicola to tag my
17 client's property?
18     A.   Not to my recollection, no.
19     Q.   Do you know what it means to tag it?
20     A.   No.
21     Q.   Did you ever ask anyone to issue any
22 violations --
23     A.   No.
24     Q.   -- to my client's property?
25     A.   No.

Page 241

1      Q.   Okay.  So now --
2           MR. FIORENZO:  Pull up E196, please.
3           MR. KLEIN:  DD-25.
4      Q.   This is an article -- DD-25 is an
5  article again in the Pascack Press.
6           MR. FIORENZO:  I'm trying to -- is there
7  a date on that?
8           MR. KLEIN:  I don't think so.
9      Q.   Okay.  I don't want to keep this up too
10 long for fear that I be accused of looking at your
11 photo, so let's see if we can move through it
12 quickly.
13          MR. BOTTA:  Objection.  Just move on,
14 Joe.
15          MR. FIORENZO:  Yeah, I am moving on.  I
16 am.
17     Q.   So this article, second paragraph -- the
18 article was written by --
19          MR. FIORENZO:  Who is the reporter, do
20 we have that, Steve?
21          MR. KLEIN:  It just says who the photo
22 is by.
23     Q.   It's a photo by Murray Bass.  Do you
24 know who Murray Bass is?
25     A.   No.

61 (Pages 238 - 241)

EXHIBIT A

Page 242

1    Q.    Okay.  The article says in the second
2  paragraph, "In order to get 29 affordable housing
3  units, Emerson 'lost seven businesses so far.  Two
4  others are still open and they're fighting for their
5  lives,' she said, at the Chamber's annual mayors'
6  breakfast at The Iron Horse Restaurant in Westwood."
7  Did you say that?
8    A.    Yes.
9    Q.    Okay.  And you were upset that the
10  businesses were lost.  Correct?
11    A.    You're saying I was upset.  That was a
12  fact.  That wasn't a feeling.
13    Q.    I'm asking if you were upset that
14  businesses were being lost.
15    A.    I thought it was sad that businesses
16  were being taken over, yeah.
17    Q.    Right.  And you weren't happy about
18  that.  Correct?
19    A.    No.
20    Q.    I'm sorry?
21    A.    No, I was not happy.
22    Q.    Okay.  That was my question.  And you
23  wanted to try to help those people if you could.
24  Correct?
25    A.    There was no way to help them.

Page 243

1    Q.    No?  There was no way to help them?
2    A.    Not really, not with only one vote.
3    Q.    Well, as of January 1, 2019, you didn't
4  just have one vote, you had the majority of the
5  council.  So did you want to help those businesses?
6    A.    There was no way to help them.
7    Q.    Did you explore whether there was a way
8  to help them?
9    A.    There was a contract in place.
10    Q.    Did you explore if there was any way to
11  help them is the question.
12    A.    There was no way to help them.
13    Q.    I didn't ask you that.
14    A.    A contract was in place before I took
15  office.
16    Q.    Did you explore whether there was any
17  way --
18    A.    Why would I explore something that would
19  have been futile.
20    Q.    Then that answers the question.  Right?
21  Then the answer is no, I didn't.  Did you explore
22  ways to try to help them?
23    A.    I don't think so.
24    Q.    Okay.  Did you speak with any of those
25  business owners as to whether there was any

Page 244

1  assistance that the town could give?
2    A.    I don't remember specifically.
3    Q.    Did you try to assist any of these
4  business owners in connection with maximizing value
5  in the condemnation for them, trying to get them as
6  much money as you could?
7    A.    No.
8    Q.    No, you didn't do that?
9    A.    I wouldn't know how to do that.
10    Q.    And that wouldn't have been proper for
11  you to do that anyway.  Right?
12      MR. SEAMAN:  Objection to form.
13    Q.    Did you say yes?  I didn't hear you.
14    A.    I didn't do it, so there's no reason to
15  answer any other questions.
16    Q.    No, there is a reason to answer 'cause I
17  asked it.  Okay?  You don't get to decide what
18  questions you answer or not.  Do you understand
19  that, Ms. DiPaola?  You're the mayor, but you don't
20  have any greater rights than any other litigant at a
21  deposition.  Do you understand that?
22    A.    Yes.
23    Q.    So could you now please answer my
24  question without telling me you don't have to answer
25  it.  Would you like to have it read back?

Page 245

1    A.    I didn't say I didn't have to answer.  I
2  said what was the use of answering it.
3    Q.    The use is -- well, I'm not going to
4  tell you what the use is.
5      MR. FIORENZO:  Could you read it back to
6  the witness?
7      (The record is read by the reporter.)
8    Q.    Can you answer the question now?
9    A.    Which question?
10    Q.    The question is, you wouldn't have done
11  that 'cause you knew it wouldn't have been
12  appropriate to do that.  Correct?
13      MR. SEAMAN:  Objection to form.
14    Q.    To try to help these people when there
15  was a contract with the redeveloper that the town
16  was going to assist with respect to the
17  condemnation.  You knew it wouldn't be appropriate
18  to do that.  Correct?
19    A.    I guess, yeah.
20    Q.    Okay.  All right.  Turn if you would,
21  please, to page 3.  So this is again this newspaper
22  article.  It states, Regarding the planned 29
23  affordable housing units, 22 will be incorporated
24  into the Emerson Station as three-, two-, and
25  one-bedroom units.  The remaining seven, DiPaola

62 (Pages 242 - 245)

Page 246

1 said, will comprise a stand-alone building across
2 from Dunkin' Donuts. Did you make those statements
3 at the meeting?
4    A.    I don't recall.
5    Q.    Is there a piece of property across from
6 the Dunkin' Donuts that was being discussed for the
7 siting of the off-site units as you appear to say
8 here?
9    A.    I think there were discussions, but no
10 decision was made.
11    Q.    Okay. There was a Block 610, Lot 1,
12 where you say there was a discussion but no decision
13 was made. So there was a discussion among whom
14 regarding using that site for the off-site units,
15 who was involved in that discussion?
16    A.    I don't remember. I think they might
17 have come to -- I don't remember.
18    Q.    Were you involved in those discussions?
19    A.    I don't remember.
20    Q.    Did you ever speak to anyone about the
21 location of the -- well, I mean, obviously you spoke
22 to someone because the reporter says you were
23 talking about it at this meeting. So you don't deny
24 that you discussed it at this meeting that he was
25 reporting on, do you?

Page 247

1    A.    I honestly don't remember.
2    Q.    I know, but you don't deny the accuracy
3 of the reporting, do you?
4    A.    I could have said it, I may not have
5 said it. I don't know. There's no quotes around
6 it.
7    Q.    So he says you talked about this. You
8 don't deny that. Right?
9    A.    I don't recall.
10        MR. SEAMAN: Objection to form.
11    Q.    By the way, those seven off-site units,
12 what is Emerson's position today about the seven
13 off-site units?
14        MR. SEAMAN: Objection to form.
15    A.    That's in front of a judge right now, I
16 think.
17    Q.    Yeah. No, I know it is. What is
18 Emerson's position today about the seven off-site
19 units?
20    A.    This is like a closed session matter.
21    Q.    No, it's not. I'm asking you questions.
22 You're the mayor of the town.
23    A.    We've only ever discussed it in closed
24 session.
25    Q.    I don't care where you discussed it.

Page 248

1 I'm asking you if you know what the town's position,
2 their public position is regarding the seven
3 off-site units that they've articulated publicly?
4        MR. BOTTA: If you have.
5    A.    I don't remember.
6    Q.    Oh, they have. I can show you the
7 positions they've taken in the litigation. Do you
8 know --
9    A.    Okay.
10    Q.    -- what the position is that --
11    A.    You can show me.
12    Q.    Do you know what the position is that
13 you took -- Emerson took regarding the seven
14 off-site units?
15    A.    If you have something, I'd like to see
16 it.
17    Q.    Do you know what the position of the
18 Town of Emerson is today regarding the seven
19 off-site affordable housing units as the mayor of
20 Emerson?
21    A.    You said you could show me and I am
22 agreeing --
23    Q.    No, no, no.
24    A.    -- that it would be okay for you to show
25 me.

Page 249

1    Q.    I'm not going to show you anything until
2 you answer my question. Do you know?
3    A.    I don't remember.
4    Q.    So you don't know -- even though we
5 argued this last week, you don't know what the
6 position of Emerson is on this topic?
7    A.    You argued what last week?
8    Q.    Is that your position? Again, you don't
9 get to ask me questions. You don't know what it is,
10 Emerson's position on the seven off-site units?
11    A.    We've only discussed it in closed
12 session.
13    Q.    Are you aware that that building across
14 from Dunkin' Donuts, Block 610, Lot 1, which you're
15 reporting on and the reporter reported on, is the
16 location that my client -- the tract of land that
17 they purchased for those seven off-site units, are
18 you aware of that?
19    A.    I know they own it.
20    Q.    Right.
21    A.    I don't know exactly what they were
22 doing.
23    Q.    Do you know when they bought it?
24    A.    No.
25    Q.    Okay. And having bought it, are you

63 (Pages 246 - 249)

Page 250

1 aware that they've made an application -- they made
2 an initial application to the Land Use Board to seek
3 approval of those seven units consistent with the
4 settlement agreement that was reached, are you aware
5 that that happened?
6     A.   I'm aware that they wrote a motion, I
7 think, to ask Judge Padovano to grant Judge Carroll
8 the permission to decide it, and that they told you
9 that it was out of his purview.
10    Q.   You're getting ahead of yourself.
11    A.   I don't --
12    Q.   So let's take it a step at a time.  I'll
13 get to that, 'cause you're right.
14         Are you aware that initially, my client went
15 to your Land Use Board and said, as to the seven
16 units we're required under the settlement agreement,
17 we need to make sure we provide for the affordables,
18 here's our application, we want you to approve these
19 seven off-site units on block 610, Lot 1, which is
20 the building across from Dunkin' Donuts.  Are you
21 aware that they made an application to the Land Use
22 Board?  That's question number one.
23    A.   I don't think they did make an
24 application.  I think they were told that they
25 should bring it to the governing body.

Page 251

1     Q.   Well, that's step two.  You're right.
2     A.   And there was no application.
3     Q.   You're right, that's step two.  They did
4 make an application, and then they were told, just
5 as you said, the Land Use Board wouldn't hear it,
6 that it had to go to the governing body, are you
7 aware of that?
8     A.   Yes.
9     Q.   Okay.  And the position taken was the
10 Land Use Board won't hear it, you've got to go to
11 the governing body, and we have to pass an ordinance
12 in order to allow it.  Do you remember that?
13    A.   I don't think that we said we had to do
14 it.  I think we had to consider whether we should do
15 that.
16    Q.   Well, my client -- the Land Use Board
17 wouldn't hear them because you told them they
18 couldn't hear the application.  Correct?
19    A.   Because it didn't conform to the
20 redevelopment plan --
21    Q.   No, I'm not interested in because.  Did
22 you tell --
23    A.   -- because there was no commercial on
24 the bottom level.
25    Q.   I'm not interested in the because.  I'm

Page 252

1 interested first in -- we'll get to the because.
2 First, they were told, you told them the Land Use
3 Board couldn't hear that application, they have to
4 come to the governing body.  Correct?
5         MR. SEAMAN:  You, Mayor DiPaola, told
6 them personally?
7     Q.   Yeah, you, Mayor DiPaola of Emerson, you
8 told them --
9         MR. SEAMAN:  Well --
10    Q.   You told the Land Use Board, don't hear
11 it, make them come to us.  Correct?
12    A.   No, I didn't say that.
13    Q.   But that's what happened.  Right?  You
14 just said a moment ago they were told they had to
15 come to the governing body.
16    A.   I think because it was a use variance,
17 we didn't hear it.
18    Q.   I don't care why.  It's not relevant.
19 I'm just asking you to confirm a basic fact, that my
20 client was told the Land Use Board won't hear it,
21 you must come to the governing body.  True or not?
22    A.   I think that happened that way, yeah.
23    Q.   Okay.  And then after that happened, my
24 client said, we're not required to come to the
25 governing body.  Do you remember that?  There was a

Page 253

1 dispute about that.
2     A.   I don't remember that.
3     Q.   And then ultimately my client then made
4 an application, as you said a moment ago, to the
5 Special Master.  I'm sorry, not the Special Master,
6 the implementation monitor appointed by Judge
7 Padovano to try to cut through the delay, and that
8 was Judge Carroll, and we went to Judge Carroll and
9 asked him to rule on it.  You're aware of that.
10 Right?
11    A.   Yes.
12    Q.   And then Judge Carroll determined that
13 it wasn't within the scope of the order granting him
14 implementation monitor authority, as a result of
15 which it went back to Judge Padovano.  Correct?
16    A.   Uh-hum.
17    Q.   Yes.  Okay.  So here we are now.  This
18 was two thousand and -- okay.  And then in
19 connection with that application before Judge
20 Carroll, which, by the way, was argued, orally
21 argued last week by me, okay, and your lawyers.  In
22 that argument and in the position they took, it was
23 Emerson's position that the site, that site you
24 referred to back at the meeting a couple years ago,
25 wasn't suitable and that it shouldn't be approved

64 (Pages 250 - 253)

Page 254

1  and it shouldn't be permitted.  Are you aware of
2  that?
3        MR. SEAMAN:  I'm going to give you an
4  instruction.  Anything you learned from your lawyers
5  or anything you learned in closed session is
6  privileged.
7     Q.  Well, I'm going to ask you, are you
8  aware that's the public position that Emerson has
9  taken?
10    A.  Everything that we've discussed about
11 these seven units has been in closed session.
12    Q.  Oh, yeah, but not everything Emerson has
13 said about it has been in closed session, 'cause
14 they were required to and did take a public position
15 on it, didn't they?
16        MR. SEAMAN:  Are you aware of them
17 taking a public position?
18    A.  Yeah, but I might not have read it.  I
19 don't remember.  And I don't want to say something
20 that's considered closed session.
21        MR. SEAMAN:  I'm going to give you a
22 direction right now not to disclose anything that
23 you learned in closed session, other than what may
24 be in the minutes of a closed session meeting, and
25 not to disclose anything that you learned solely

Page 255

1  through discussions with counsel involved in the
2  litigation unrelated to this case.
3        THE WITNESS:  Okay.
4        MR. SEAMAN:  If it came directly from
5  counsel, don't disclose it.
6        THE WITNESS:  Okay.
7     Q.  Okay.  So as of today then, this piece
8  of the Mount Laurel obligation, the seven units that
9  was spoken about years ago and reported on in the
10 press --
11        MR. SEAMAN:  In the undated article,
12 Joe?
13        MR. FIORENZO:  In the undated article.
14        MR. SEAMAN:  Thank you.
15    Q.  I mean, I'm sure there's a date for it,
16 but there was no date on the one we showed you.  As
17 of today, Emerson has not approved the seven
18 off-site units.  Is that true?
19    A.  There's been no approval for the seven
20 off-site units, correct.
21    Q.  And would you agree that the seven
22 off-site units were a part of the settlement
23 agreement that was reached that we went over back in
24 2017?
25        MR. SEAMAN:  Objection to form.  Calls

Page 256

1  for a legal conclusion.
2     A.  I'd have to go back and read the
3  contract again.
4     Q.  And would you agree that in addition to
5  the settlement agreement, the seven off-site units
6  were part of the Special Master's report to Judge
7  Padovano?
8        MR. SEAMAN:  Objection to form.
9     Q.  Would you agree with that?
10        MR. SEAMAN:  Calls for a legal
11 conclusion.
12    A.  Can you just ask me that again?
13    Q.  Yeah.  The seven off-site units were
14 also part of what was in the Special Master's report
15 to Judge Padovano.  Correct?
16        MR. SEAMAN:  Calls for a legal
17 conclusion.
18    A.  Yeah, but it was never written down
19 where they were going to be, only that there would
20 be seven off-site units.
21    Q.  Well, you knew where it was going to be
22 all the way back two years ago when you reported it
23 at the meeting that it was the property across from
24 the Dunkin' Donuts where the seven units were
25 supposed to go.  Right?

Page 257

1        MR. SEAMAN:  Objection to form.
2     Q.  Do you deny making that statement?  You
3  know exactly where it went, which is why
4  Mr. Klugmann went out and bought the property and
5  paid for it so he could satisfy that obligation to
6  the settlement agreement.  Are you aware of that?
7        MR. SEAMAN:  Objection to form.
8     Q.  Are you aware of that?
9     A.  I don't know.
10    Q.  And all this does -- all this does is
11 hold up the ability of this project to be completed,
12 'cause as long as you can string this out and as
13 long as you now take the position we don't think
14 that that site is suitable for the seven units, that
15 create delay.  You're aware of that.  Correct?
16        MR. SEAMAN:  Objection to form.
17    A.  I'm not going to agree to that
18 statement.
19    Q.  It doesn't?  So here we are two years
20 later, five years after the settlement agreement,
21 and my client is trying to place the off-site units,
22 and he can't get Emerson to cooperate at all, can
23 he?
24        MR. SEAMAN:  Objection to form.
25    Q.  In fact, Emerson has taken the position,

65 (Pages 254 - 257)

Page 258

1  no, we're not going to agree you can put it there.
2  Right?
3          MR. SEAMAN:  Objection to form.
4      Q.   Right?
5      A.   I'm not agreeing with anything you're
6  saying.
7      Q.   So the public position of Emerson as
8  staked out before the Court as the developer is
9  trying to get the other affordable units built,
10 let's take a look at what your public position is on
11 that.  Okay?
12     A.   I can tell you what our public position
13 is.
14     Q.   Oh, good, 'cause I asked you that and
15 you couldn't tell me before.  You want to tell me
16 now?
17     A.   The only part of the public opinion that
18 I understand is that it does not conform to the
19 redevelopment plan.
20     Q.   Okay.  Well, let's see what you stated
21 publicly, Emerson, formally to the Court in
22 connection with this request to compel.
23         MR. FIORENZO:  Could you put it up?
24         MR. KLEIN:  DD-26.
25         MR. FIORENZO:  Thank you.

Page 259

1      Q.   Giblin & Gannaio are your attorneys.
2  Right?
3      A.   Yes.
4      Q.   Okay.  And this is the letter brief they
5  submitted to the judge in connection with our
6  efforts to compel us to be able to move ahead to
7  construct the seven units.
8          MR. FIORENZO:  Highlight that, please.
9      Q.   So in the papers on behalf of Emerson,
10 they state the following:
11         "ERUR's entire motion is to enforce a
12 nonexisting agreement to allow seven units to be
13 built on 129 Kinderkamack Road.  The Court should
14 see this motion for what it truly is, a last minute
15 attempt by the redeveloper asking the Court to allow
16 them to cram seven units on a site that was not
17 contemplated, suitable, or agreed to, and that would
18 be detrimental to Emerson residents merely in order
19 to reduce its own costs and maximize profits."
20     Are you aware that's the public position that
21 Emerson has taken?
22         MR. SEAMAN:  Objection to the form.
23 Other than what was disclosed to you by counsel.
24 All right?
25     A.   I mean, it says that's a public

Page 260

1  document.  Right?
2      Q.   Right.  It is.  Yes.
3      A.   Okay.
4      Q.   So that's the public position of
5  Emerson, that the effort to try to build these seven
6  affordable units to comply with the settlement
7  agreement, comply with the Special Master report,
8  and to comply with Judge Padovano's order, that the
9  site is not "contemplated, suitable, or agreed to,
10 and would be detrimental to Emerson."  Right?
11 That's your position, meaning Emerson.  Right?
12         MR. SEAMAN:  Objection to form.
13     A.   Yes, that's what it says in the brief.
14     Q.   So, again, Emerson is seeking to block
15 the ability to move forward with the construction on
16 that site of the seven affordable units 'cause it's
17 not suitable for the site.  Correct?
18     A.   I don't think we're trying to block
19 anything.  I think they just need to build something
20 that conforms with our plan.
21     Q.   Did you read the papers filed on behalf
22 of Emerson?
23     A.   I probably perused them.
24     Q.   Did you understand that suitability was
25 the issue, they claimed that this property wasn't

Page 261

1  suitable for the seven units and therefore shouldn't
2  be used for that purpose?
3          MR. SEAMAN:  Objection to form.
4      Q.   Are you aware that that's the position?
5          MR. SEAMAN:  Objection to form, calls
6  for a legal conclusion.  You're asking her to
7  interpret the letter brief?
8      Q.   No, I'm asking if she's aware of that
9  being the position of Emerson as articulated in the
10 papers filed with the Court.
11     A.   In my opinion, they should have -- I
12 don't know what I should --
13     Q.   I'm not asking for your opinion.  I'm
14 asking if you're aware of the public position
15 Emerson has taken before the Court in response to
16 the application to compel Emerson to let us build
17 it.
18     A.   I think they should have known what
19 was -- the redevelopment plan was before they built
20 something --
21     Q.   I really don't care what you think on
22 that 'cause it's not relevant to the question.
23 Could you please answer my question now?
24         MR. FIORENZO:  Could you read it back to
25 the witness?  She made no effort to answer it.

66 (Pages 258 - 261)

Page 262

1          (The record is read by the reporter.)
2      A.    Yes, I just read it.
3      Q.    Okay.  Now, are you aware that the
4  Special Master, Ms. Lonergan, has submitted papers
5  to the Court saying this property is suitable for
6  the seven units and was contemplated to be part of
7  the development plan, are you aware of that?
8      A.    I don't recall.
9      Q.    Okay.  So would you agree with me that
10  the consequence of Emerson placing these roadblocks
11  in the way of having this application for the seven
12  units approved has resulted in delay to my client?
13          MR. SEAMAN:  Objection to form.
14      Q.    Would you agree?  I mean, it's obvious.
15  I'm just asking you to --
16          MR. BOTTA:  Objection to form.
17      Q.    -- confirm the obvious.
18          MR. SEAMAN:  You're making a statement.
19      A.    I don't know how to answer that
20  question, 'cause there were three statements in it
21  that you're asking me whether it's true or not that
22  you're feeding into my mouth.
23      Q.    This caused the delay, the fact that
24  Emerson wouldn't even hear the application before
25  the Land Use Board.  Right?

Page 263

1          MR. SEAMAN:  Objection to form.
2      A.    That's your statement.
3      Q.    I'm asking you to confirm --
4      A.    I don't know.
5      Q.    You don't know.  Well, let's see, if
6  they heard it, which was over a year ago, it would
7  have been heard a long time ago.  Right?
8          MR. SEAMAN:  Objection to form, calls
9  for speculation.
10      Q.    Do you remember when the application was
11  made to the Land Use Board to hear it?
12      A.    No.
13      Q.    Would it surprise you to learn it was
14  over a year ago?
15      A.    I don't think it was actually an
16  application.  I think that they contacted the
17  secretary to say that they were going to make an
18  application, they submitted it, but it was never
19  heard.
20      Q.    Right, they submitted it.  You're right.
21  Okay.  You don't want to call it an application.
22  They submitted to the Land Use Board to have them
23  hear their request to approve the construction of
24  the affordables, and then the Land Use Board was
25  told no, don't hear it.  Correct?

Page 264

1      A.    I believe so.
2      Q.    Okay.  And that happened well over a
3  year ago.  Are you aware of that?  So now all this
4  time is just further delay in the project.  Right?
5          MR. SEAMAN:  Objection to form.
6      A.    We're not doing anything to delay them.
7      Q.    As to seven units that everyone
8  acknowledged and agreed could be off-site.  Correct?
9      A.    Say that again?
10      Q.    As to seven units which were always
11  intended to be off-site.  Correct?
12      A.    There was always a component in the
13  agreement that there could be seven off-site --
14      Q.    Yeah.
15      A.    -- not that there had to be seven
16  off-site.
17      Q.    Okay.  Well, the plan that was approved
18  by your Planning -- your Zoning Board provided for
19  22 units on-site and seven units off-site.  Are you
20  aware of that?
21      A.    I think it said a little bit more than
22  that.  That's not all it said in the agreement.
23      Q.    Well, the plan for construction called
24  for a certain number of units.  It only had 22 units
25  in the plans that were approved by the Planning

Page 265

1  Board for affordables on-site.  Are you aware of
2  that?  The plans that were ultimately approved?
3      A.    Yes, but that didn't --
4      Q.    Okay.  And the seven --
5      A.    That doesn't mean that they had to put
6  the seven on-site.
7      Q.    Well, they couldn't put it on that site
8  'cause they had already gotten approval and have
9  commenced construction pursuant to an approved plan
10  for a building for 22 affordable units.  So they
11  can't be on-site, can they?
12          MR. SEAMAN:  Objection to form.
13      A.    They could be on site if they --
14      Q.    How?
15      A.    -- just configured the plans and had --
16      Q.    No, no, no, no, no.
17      A.    -- less market rate units which was
18  discussed --
19      Q.    No, the Planning --
20      A.    -- over two to three years ago in a
21  meeting with you.
22          MR. SEAMAN:  Joe, let the witness
23  answer.
24      Q.    The Planning Board approved plans that
25  called for 22 units of affordable on-site.  True?

67 (Pages 262 - 265)

Page 266

1    A.    The Planning Board was -- the
2 application that was presented and approved had 22
3 on-site.
4    Q.    Okay.  So now, that approval has been
5 given, and the developer has gone forward to
6 construct in accordance with the approved plans.
7 True?
8    A.    I guess.
9    Q.    You guess?  Do you see the construction?
10    A.    It's going slow.
11    Q.    Whether it's slow or fast, is there
12 construction going on?
13         MR. SEAMAN:  Objection to form.
14    A.    I guess so.
15    Q.    I wonder why it's going slow, yeah.
16 You're right, it's going slow.  But is the
17 construction going on in accordance with the
18 approved plans for 22 on-site units?
19         MR. SEAMAN:  Objection to form.
20    A.    I'm not an inspector.
21    Q.    You don't know?
22    A.    How do I know if it's going as approved.
23    Q.    You don't know that.
24    A.    I assume it is if the inspectors are
25 doing their job.  I don't go out and inspect the

Page 267

1 property.
2    Q.    So that means now -- let's assume that
3 they're building the project pursuant to the
4 Planning Board -- to the board resolution with 21
5 units on-site.  Now, there have to be seven more
6 affordable units pursuant to the settlement
7 agreement.  Right?  Correct?
8    A.    There has to -- they have to give us 29
9 units.
10    Q.    Right.  And so those seven units now
11 have to be placed somewhere.  Right?
12    A.    You keep saying they have to be.
13 Nothing has to be.  They could rework their plan and
14 accommodate the building on-site to include more
15 affordables.
16    Q.    Oh, I see.  So they should --
17    A.    There would just be less market rate.
18    Q.    So in other words, under the
19 construction activity that's already taken place and
20 the footprint that's been taken place and all the
21 building structure and the rooms that have taken
22 place, they should redo all that, is that what
23 you're saying?
24    A.    I don't even think they've gotten that
25 far, sir.

Page 268

1    Q.    Is that what you're suggesting, you're
2 suggesting they go back to the Planning Board
3 again -- excuse me, Land Use Board again to revise
4 the site plan?
5    A.    I don't -- I don't think it would have
6 to be changed that much.
7    Q.    Unbelievable.  Okay.
8         MR. FIORENZO:  Yeah, pull that back up.
9 This is silly, but.  Let's go to the epic.
10         MR. KLEIN:  This is DD-27.
11    Q.    DD-27 are special meeting minutes of the
12 board, December 10, 2018, of the Land Use Board.
13    So turn to 6, page 6.  These are minutes of
14 the meeting of the board.  It states, "Ms. Bogart
15 clarified the number of apartments required for the
16 affordable housing element.  She said there would be
17 22 apartments on-site and seven apartments off-site,
18 which was agreeable to the Court Master."
19    So you were at that meeting.  Do you remember
20 Ms. Bogart testifying there were specific requests
21 to identify where and how the affordable component
22 would be satisfied?
23    A.    I understand that, but we've had several
24 conversations with you included as to changing
25 the --

Page 269

1    Q.    Oh, you mean settlement discussions?
2    A.    Yes.
3    Q.    Yeah.  Well, we're not interested in
4 that and we can't speak about that 'cause it's
5 improper under the Rules of Evidence.
6    A.    Okay.
7    Q.    And I know we did have them and they
8 were an utter waste of time, I do recall that,
9 'Cause there's no -- forget it, I'm not going to go
10 there.
11    But she said there would be 22 apartments
12 on-site and seven off-site, which was agreeable to
13 the Court Master.  And, in fact, the resolution of
14 the Planning Board cites that and says you've got to
15 make sure you comply with that.
16    So does that help refresh your memory that the
17 Planning Board resolution consistent with the
18 Special Master report and the settlement agreement
19 requires seven on-site -- excuse me, 22 on-site and
20 seven off-site?
21         MR. SEAMAN:  Objection to form.
22    A.    I see that Ms. Bogart said that.
23    Q.    Yeah.  And at the Planning Board in the
24 resolution, they provide for 22 units on-site and
25 the remainder off-site.  Isn't that correct?

68 (Pages 266 - 269)

Page 270

1    A.    I guess.
2    Q.    And that's why in March or April of
3  2019, my client went out and bought the very
4  property that you discussed that was reported in the
5  press across from the Dunkin' Donuts which had been
6  selected as the site for those seven units.
7         MR. SEAMAN: Objection to form.
8    Q.    Are you aware of that?
9         MR. SEAMAN: Objection to form.
10   A.    I don't recall.
11   Q.    Are you aware that that site was
12 selected for the seven units even before you became
13 the mayor?
14   A.    No, I was not aware of that.
15   Q.    Were you involved in any of those
16 discussions?
17   A.    I don't think so. I don't recall.
18        MR. FIORENZO: Pull that up, too.
19   Q.    So here's the resolution. So after all
20 this testimony, there were questions at the hearing
21 about the affordable housing. Do you remember that
22 came up? At the meeting you attended and spoke at,
23 you spoke about affordable housing?
24   A.    I don't recall what was discussed at
25 that meeting.

Page 271

1    Q.    You don't remember?
2    A.    No.
3    Q.    Okay. Well, do you remember at that
4  time the board had asked for some specification as
5  to the affordable units and how that was going to be
6  satisfied to make sure -- to make sure that Emerson
7  would be protected under the settlement agreement,
8  do you remember that?
9    A.    I don't remember that, but.
10        MR. FIORENZO: Okay. Could you pull up
11 that paragraph, please.
12   Q.    DD-22.
13        MR. FIORENZO: What paragraph?
14        MR. KLEIN: G.
15        MR. FIORENZO: G. Turn to that. It's
16 not moving.
17        MR. KLEIN: There we go.
18        MR. FIORENZO: What happened to this new
19 software, it's supposed to be so good.
20   Q.    So one of the approval findings is that,
21 "The settlement agreement," you're aware that's the
22 settlement agreement we went over before. Right?
23   A.    Uh-hum.
24   Q.    The town settled the lawsuit?
25   A.    Yes.

Page 272

1    Q.    "Requires 29 COAH or affordable units,
2  seven of which may be provided off-site. The
3  project will have 147 residential units, including
4  22 COAH or affordable units, and applicant will
5  comply," will comply, "with the seven off-site
6  affordable housing requirements."
7         So the condition of the resolution was that
8  the applicant, my client, will comply with the seven
9  off-site affordables. And that's what it's been
10 trying to do for a couple of years now, with the
11 town taking the position, oh, no, that's not a
12 suitable site, you can't do it. True?
13        MR. SEAMAN: Objection to form.
14   A.    I guess they should have built -- bought
15 a piece of property that it was suitable to build.
16   Q.    Well, the Master said it was suitable.
17 The Court said it was suitable. Who says it's not,
18 you? Do you say it's not suitable?
19   A.    Our redevelopment plan, it doesn't
20 comply with it.
21   Q.    Your brief said it's not suitable, which
22 is why you're telling the Court that we shouldn't be
23 allowed to build those seven units. So the
24 position --
25   A.    Excuse me, can I ask my lawyer a

Page 273

1  question?
2    Q.    No, no, you can't. No, you can't.
3    A.    To form?
4    Q.    No.
5    A.    Am I here to litigate the seven -- it
6  sounds like we're litigating the seven off-site
7  units, which I didn't think I was here to do.
8    Q.    Well, it doesn't matter what you think.
9  You don't get to speak to them in the middle of my
10 examination. I'm asking you questions about the
11 actions of Emerson and you that had the effect of
12 impeding my client in its development and
13 construction. And my client --
14   A.    We are not trying to impede.
15   Q.    Yeah, I know that. And my client who's
16 been now waiting over two years to try to build
17 these seven other units has been met with resistance
18 at every step of the way, including two weeks ago
19 when Emerson said publicly the site isn't suitable,
20 even though it's required by the Planning Board,
21 even though the Court said it's required to be done,
22 and even though it's the only site that has ever
23 been identified by anyone to satisfy the seven
24 units. Are you aware of that?
25        MR. BOTTA: Was that your argument last

69 (Pages 270 - 273)

EXHIBIT A

Page 274

1  week? 'Cause that sounds like it.
2      Q.    Are you aware of that --
3          MR. BOTTA:  Objection to the form of the
4  question.
5      Q.    -- that Emerson has never, ever
6  identified another site for those seven units?
7          MR. SEAMAN:  Objection to the form.
8      A.    That's not true.
9      Q.    Oh, it is true, because it was true
10 during oral argument, the Judge asked about that,
11 and Emerson never identified a site.  There's
12 nothing that has ever occurred to identify a site
13 where those seven other units can go, and that's the
14 reason why prior to you coming on, there were
15 discussions, and there's written communications on
16 all of this, identifying Block 610, Lot 1 as the
17 site to put the seven units, and it's only after you
18 became mayor that now it's been blocked, after my
19 client spent hundreds of thousands of dollars to
20 acquire the site to meet that obligation.  Are you
21 aware of that?
22         MR. SEAMAN:  Objection to the form.
23     A.    I don't recall.
24     Q.    Do you think that's right that my client
25 has been strung out after he bought that property

Page 275

1  and reliance on the property having been identified,
2  only today to find you and the town saying, oh, no,
3  no, it shouldn't go on the site 'cause it's not
4  suitable.
5          MR. SEAMAN:  Objection to form.
6      Q.    Do you think that's fair?
7          MR. SEAMAN:  Objection to form.
8      Q.    Is that fair?
9          MR. BOTTA:  Objection to form.
10     A.    I don't know.  I'm not --
11     Q.    You don't know.  Okay.  I know.
12     A.    You're grandstanding.  You're giving a
13 lot of statements.
14     Q.    No, I'm --
15     A.    There's too many statements in there --
16     Q.    No, I'm asking you questions --
17     A.    -- and I'm not --
18     Q.    -- to see if you're able to answer them.
19     A.    -- not going to agree to is that fair
20 after you make five statements and you're
21 grandstanding.
22     Q.    I'm trying to find out if there's any
23 explanation for how this behavior can be explained,
24 because to me it seems inexplicable, and the Judge
25 raised some serious questions about it.

Page 276

1      So the bottom line is this.  As to those seven
2  off-site units, would you agree with me as of today,
3  you, as the mayor of Emerson, have never
4  communicated in writing anything to the redeveloper
5  saying, we don't want it in the property across from
6  the Dunkin' Donuts that I talked about two years
7  ago, put the seven units at this site, you've never
8  done that, have you?
9          MR. SEAMAN:  Objection to form.
10     A.    I don't know.
11     Q.    And Emerson has never submitted anything
12 in writing, including in connection with the motion
13 we just had saying to the Court, you know, this
14 isn't suitable, but here's something in this,
15 they've never done that.
16     A.    I don't know.
17     Q.    So if this isn't suitable, let's pretend
18 for a moment you're right, if this isn't suitable,
19 now you have 22 affordable units and the settlement
20 agreement requires 29.  And under the order of the
21 Judge, you, Emerson, were required to report to the
22 Judge --
23     A.    Can you just --
24     Q.    -- two years ago --
25     A.    He's screaming at me.

Page 277

1      Q.    -- whether and how you were going to
2  satisfy your affordable obligation.  So you haven't
3  come up with any other alternative at all, have you?
4          MR. SEAMAN:  Objection to form.
5      Q.    Have you?
6      A.    I don't know.
7      Q.    So as the Judge said, what I thought
8  was --
9      A.    I thought that we did.
10     Q.    I thought the most poignant --
11     A.    You're saying that we didn't.
12     Q.    I thought the most poignant question
13 was, well, if it's not going to be here at this
14 site, which appeared to have been vetted and agreed
15 upon --
16     A.    By who?
17     Q.    By Emerson and its representatives
18 before you.  Okay?  If not here, then where,
19 Emerson, should it go, because otherwise, Emerson,
20 you're in violation of the settlement agreement,
21 you're in violation of the conditional judgment of
22 repose, and maybe you're stripped, stripped of any
23 protection you have for noncompliance with your
24 Mount Laurel obligation.  Do you have an answer for
25 the Judge's question on that?

70 (Pages 274 - 277)

Page 278

1          MR. SEAMAN: Objection.
2     A.    Everything that --
3          MR. SEAMAN: Hold on, Danielle. You're
4 quoting the Judge. You don't have a copy of the
5 transcript.
6          MR. FIORENZO: So?
7          MR. SEAMAN: I don't think it's her
8 obligation to answer the Judge's question.
9          MR. FIORENZO: Well, you object to the
10 form, that's fine.
11          MR. SEAMAN: She asked --
12          MR. FIORENZO: You can object to the
13 form. That's perfectly fine.
14          MR. SEAMAN: I'm objecting to the form.
15          MR. FIORENZO: That's fine. I'm going
16 to stay with my question. I like it.
17          MR. SEAMAN: And to the extent that
18 anything that you would know to answer that question
19 would come from counsel and come from information
20 from counsel --
21          THE WITNESS: Correct.
22          MR. SEAMAN: -- I'm going to tell you
23 not to disclose anything that would come from
24 counsel or on advice of counsel.
25     Q.    I'm not asking for anything having to do

Page 279

1 with counsel. I'm asking for this witness to tell
2 me if she's able to answer this simple question, if
3 it is not at that location that was identified by
4 the prior administration, that my client bought and
5 paid for for that purpose, and if we pretend you're
6 right that it's not suitable, even though the Master
7 says, then Emerson would be out of compliance
8 with the settlement agreement. Do you understand
9 that?
10          MR. SEAMAN: Objection to the form,
11 calls for speculation, it's a hypothetical.
12     Q.    Do you understand that?
13          MR. SEAMAN: Same objection.
14     A.    I don't -- there's so many different
15 statements and questions intertwined --
16     Q.    Just answer the question, ma'am.
17     A.    -- with what you're saying.
18     Q.    Just answer the question.
19     A.    Which question?
20     Q.    You keep saying that to avoid answering
21 the question.
22          MR. SEAMAN: Objection.
23     A.    No, you just talk for like thirty
24 seconds and then say answer the question and I don't
25 know where the question is anymore.

Page 280

1     Q.    I'll have it read back to you. Listen
2 to it and then answer it, please.
3          (The record is read by the reporter.)
4          MR. SEAMAN: Objection to --
5     A.    There were two or three questions.
6          MR. SEAMAN: Hold on, hold on.
7 Objection to the form, that's a hypothetical, calls
8 for speculation, calls for a legal conclusion.
9          MR. FIORENZO: All right. That's fine.
10 I think it's a proper question.
11     Q.    You can answer.
12          MR. BOTTA: Are you asking where the
13 other site is or if she knows it's out of
14 compliance?
15     A.    Right.
16     Q.    No, I'm asking -- the question that I
17 asked stands.
18          MR. BOTTA: If you can understand it.
19     A.    I don't understand your question.
20     Q.    Okay. Well, if you don't -- if we
21 accept the Emerson position that the site is not
22 suitable that my client bought and now it can't go
23 there, do you understand that puts Emerson in a
24 position where it's in breach of the settlement
25 agreement?

Page 281

1          MR. SEAMAN: Objection to the form.
2     Q.    And you could be stripped of your
3 protection?
4          MR. SEAMAN: Objection to the form,
5 calls for a legal conclusion.
6     A.    I'd have to ask my attorney.
7     Q.    So you don't know?
8     A.    I don't know.
9     Q.    Okay. So this whole process on the
10 affordable, before Emerson took the position that it
11 did that -- and you reiterated it here today that
12 it's not suitable, that's your position, right, it's
13 not suitable?
14     A.    Well, that's what I read that you said.
15     Q.    Well, that's what the Court was told by
16 Emerson in their brief, yeah.
17     A.    Right, but I was also reading what you
18 put on the board that it said it wasn't suitable.
19     Q.    That was Emerson's position.
20     A.    Yes, and I was agreeing with it.
21     Q.    Yeah, yeah.
22     A.    I read it.
23     Q.    And you agree with that. Right?
24          MR. SEAMAN: Objection.
25     A.    Yeah, I agree with it.

71 (Pages 278 - 281)

Page 282

1    Q.    Okay.  Great.  So have you asked as the
2  mayor anyone to undertake an analysis, a land
3  analysis in Emerson to determine if there are any
4  other sites that meet the COAH criteria of
5  suitability and viability to propose an alternative
6  site for the seven units, have you asked anyone to
7  do that?
8    A.    Me personally?
9    Q.    Yes, you.
10    A.    Me personally, no.  The governing body
11  may have.
12    Q.    Did the governing -- anything could --
13  may have is meaningless.  Has the governing body
14  asked someone to do that analysis, to your
15  knowledge?
16    A.    It's closed session.
17    Q.    Don't give me that it's closed session.
18  Have you done it or not?  Did you do it in closed
19  session?
20        MR. SEAMAN:  Don't disclose anything in
21  closed session.
22    Q.    Okay.  Are you aware of whether the
23  governing body has ever requested someone to do that
24  analysis?
25    A.    It's in closed session.  I'd have to ask

Page 283

1  the attorney.
2    Q.    Has it been done?
3    A.    I'd have to ask our attorneys if I can
4  even answer that.
5    Q.    Well, how about in public session, has
6  it ever been done?
7    A.    I don't think we've taken a vote on
8  anything at a meeting.
9    Q.    Has the topic every come up in public
10  session?
11    A.    I don't think so.
12    Q.    Has anyone ever spoken to one of your
13  professionals to begin the process of undertaking
14  that analysis?
15    A.    I don't recall.
16    Q.    Why not?
17        MR. SEAMAN:  Objection.
18    Q.    If you claim it's not suitable, why
19  wouldn't you do that?
20        MR. SEAMAN:  Objection, calls for
21  speculation.
22    Q.    So you could try to comply with the
23  settlement agreement, why wouldn't you do it?
24    A.    I don't have an answer.
25    Q.    I didn't think you would.  Okay.

Page 284

1        MR. SEAMAN:  Objection, argumentative.
2    Q.    So after -- so are you aware that after
3  the approval was obtained -- well, actually, let me
4  withdraw that.
5        So during the course of your campaigning for
6  mayor, did you -- you spoke to a number of people in
7  town I take it?
8        MR. SEAMAN:  Can you fix the campaign,
9  first term or --
10        MR. FIORENZO:  Yeah, when she was
11  elected the mayor in 2018.
12        MR. SEAMAN:  Thank you.
13        MR. FIORENZO:  Prior to the election in
14  2018.
15    Q.    Were you -- did you speak to people in
16  town as you went about trying to campaign?
17    A.    Yeah, I speak to people every day.
18    Q.    And did you, for example, go door to
19  door knocking on doors to talk to people about
20  trying to support you?
21    A.    When?
22    Q.    Prior to your election in 2018.
23    A.    Yes.
24    Q.    And in doing so, did you -- during the
25  course of those engagements with the electorate, did

Page 285

1  you convey to anyone that this development project
2  shouldn't move forward, the 419 project, the one you
3  described as the centerpiece of your campaign, that
4  there should be -- this project shouldn't be
5  approved and that you had a concern about who would
6  be moving into town as a result of this development
7  approval, did you convey that to anyone?
8    A.    No.
9    Q.    Did you state to anyone that it may
10  bring in a certain element, including religious Jews
11  into town?
12    A.    Absolutely not.
13    Q.    Did you ever make a statement -- do you
14  know a Ken Dzikowski?
15    A.    Ken who?
16    Q.    Dzikowski?
17    A.    No, I don't.
18    Q.    Do you know --
19    A.    Can you spell that last name?
20    Q.    Yeah.  D-Z-I-K-O-W-S-K-I.
21  Who is Michael DeOrio?
22    A.    A resident of Emerson.
23    Q.    And did he run with you in this last
24  cycle?
25    A.    Run with me?  No.  He's a Democrat.

72 (Pages 282 - 285)

Page 286

1    Q.    Oh, okay.  Did you appear anywhere with
2  him?
3    A.    No.
4    Q.    Okay.  Did you ever have any
5  communications with him regarding the 419
6  development project?
7    A.    Not to my knowledge.
8    Q.    Do you know a Kate Stutzel?
9    A.    Yeah.
10    Q.    Who is she?
11    A.    Resident of Emerson.
12    Q.    Did she run for any office?
13    A.    She did.
14    Q.    What office was that?
15    A.    She ran for council I think two years
16  ago, three years ago maybe.
17    Q.    So not the past cycle, the one before
18  that?
19    A.    I think it was even the cycle before
20  that.
21    Q.    Okay.
22    A.    Well, there's this cycle, the last
23  cycle, it was the cycle before that.
24    Q.    Did you ever bring up the topic in these
25  campaign ventures that you went on about the

Page 287

1  possibility of the development resulting in Hasidic
2  Jews coming into town?
3    A.    Never.
4    Q.    You never mentioned Hasidic Jews at all?
5    A.    Never.
6    Q.    You never expressed to anyone that the
7  project was owned by Jewish individuals?
8    A.    Never.
9    Q.    So if someone said you did, they would
10  not be telling the truth?
11    A.    They would be lying.
12    Q.    Okay.  Do you know why someone would lie
13  about that?
14        MR. SEAMAN:  Objection to form, calls
15  for speculation.
16    A.    Do I answer it?
17    Q.    Yeah.
18        MR. SEAMAN:  To the best of your
19  ability.
20    A.    I have no idea why anyone would say
21  that, except to make me look bad.
22    Q.    Did you -- do you remember there came a
23  time when there was a condemnation that was
24  requested by the town for you to institute?
25    A.    There was a condemnation?

Page 288

1    Q.    Yeah.  The developer asked the town to
2  initiate a condemnation.  Do you recall that?  As to
3  one of the people that they couldn't negotiate an
4  agreement with?
5    A.    Vaguely.
6    Q.    Who was it?
7    A.    I think it was the cleaners and the
8  liquor store building.
9    Q.    Did you speak to them at all, the
10  cleaners or the liquor store or anyone affiliated
11  with them?
12    A.    Did I speak to them?
13    Q.    Yeah, did you speak to them about the
14  condemnation?
15    A.    I don't remember.
16    Q.    Did they ever contact you to see if you
17  could help them --
18    A.    I don't --
19    Q.    -- with respect to the condemnation?
20    A.    I don't remember.
21    Q.    So by I don't remember, you're not
22  denying it happened, you're saying you don't recall
23  either way?
24    A.    I don't recall.
25        MR. KLEIN:  This will be DD-28.

Page 289

1    Q.    Okay.  DD-28 is a regular meeting
2  December 18, 2018.
3        MR. FIORENZO:  Could you scroll to
4  the -- yeah, right there.
5    Q.    It states here in these minutes that,
6  Mr. Doyle updated the governing body on negotiations
7  which had taken place between JMF and the property
8  owners of Block 419.  Because they paid
9  significantly more for the properties than
10  originally planned, as well as the need to close
11  quickly, JMF had to bring in a partner.  The third
12  amendment to the redevelopment agreement would
13  provide Accurate Builders and Developers with a
14  51 percent partnership by JMF's 49 percent.
15    Mr. Doyle said that this amendment was not
16  unreasonable and that bringing in Accurate Builders
17  would enable the developers to close and allow
18  Emerson to comply with its commitment.  The
19  governing body requested an addendum to the third
20  amendment to the redevelopment agreement, require
21  the builders to meet and work with a subcommittee of
22  the governing body members, which included the
23  Mayor-Elect DiPaola, so it will look like what they
24  wanted for the Borough and what residents would be
25  pleased with.

73 (Pages 286 - 289)

Page 290

1    Jack Klugmann, Chaim Klugmann, and Joseph
2    Forgione's attorney Peter Flannery of Bisgaier Hoff
3    were invited into closed session to discuss, and
4    then Klugmann and others left and agreed to a
5    subcommittee to review and provide input for the
6    plan.
7       So do you remember that you brought up the
8    desire to create such a subcommittee?
9       A.   Yes.
10      Q.   And that when the third amendment was
11   being discussed, you said that you would accept and
12   agree to it if such a subcommittee was created.
13   Correct?
14         MR. SEAMAN:  Objection to form.
15      A.   I don't know that I said that I would
16   agree to it if the subcommittee was formed, but I
17   asked for the subcommittee because the plan looked
18   very different than what was originally proposed.
19      Q.   Right, the plan that was approved.
20      A.   Yeah.
21      Q.   And you didn't like the way it looked
22   aesthetically.
23      A.   Aesthetically, yeah.
24      Q.   So did you vote in favor or against the
25   third amendment?

Page 291

1          MR. SEAMAN:  Objection to form.
2       A.   I abstained.
3       Q.   So as a result of that, the third
4    amendment was approved.  Correct?
5       A.   The third amendment was approved, yeah.
6       Q.   Did you create the subcommittee?
7       A.   Yes.
8       Q.   When did you create the subcommittee?
9       A.   Probably after I took office or maybe
10   right there.  I don't recall.
11      Q.   So you don't know when you created it?
12      A.   I don't remember.  I don't think -- I
13   don't know if I created it.  I don't think I had the
14   power to create it until after I was mayor.  I don't
15   remember.
16      Q.   I show you what we're going to mark as
17   DD?
18         MR. KLEIN:  29.
19      Q.   29.  And these are notes.  3/14/19.
20   R-E-D-E-V, it looks like redevelopment abbreviation.
21      Q.   Can you make that larger if we're going
22   to read it?
23      Q.   So was this a -- was this -- these notes
24   of a meeting of your redevelopment committee?
25      A.   Mayor Gerry -- I don't know what they

Page 292

1    are.
2       Q.   Who's GF?
3       A.   I can only guess that it's Gerry
4    Falotico.
5       Q.   Okay.  R. Malagiere.  Who's JMC?
6          MR. SEAMAN:  Objection to the form.  Can
7    we have some foundation whether she even recognizes
8    the handwriting on this document?
9       A.   I don't know who wrote that.
10      Q.   Okay.
11         MR. FIORENZO:  Is this part of the
12   document?
13         MR. KLEIN:  Yes.
14      Q.   Okay.  This is part of the same exhibit.
15   It's a sign-in sheet.  So Gerald Falotico, Council
16   President, Rich Malagiere, you, Jack Klugmann, Jeff
17   Wieboldt, Accurate Builders, two attorneys from
18   Porzio Bromberg, Mr. McCann and Mr. Sheola.  Right?
19   So all these people were present at this meeting,
20   redevelopment meeting in Borough Hall.  Do you
21   remember the meeting?
22      A.   No.
23         MR. FIORENZO:  Go back to the notes.
24      Q.   So the developer -- redeveloper
25   Mr. Klugmann had been trying to set up a meeting for

Page 293

1    some time prior to March.  Are you aware of that?
2          MR. SEAMAN:  Objection to form.
3       A.   No.
4       Q.   I won't bore you with the details, but
5    there's a series of e-mail communications starting
6    in February, late January when he's trying to meet,
7    and eventually the town -- the town finally agreed
8    to meet by March 14, 2019.  Do you remember being
9    ill around that time?
10      A.   I couldn't remember being ill back then.
11      Q.   Okay.  In any event, this is a meeting,
12   and at the meeting there's several things being
13   discussed.  It first says, Mayor's subcommittee to
14   be appointed 3/19.  Developer will meet as soon as
15   possible with committee.  So when did you appoint
16   people to the subcommittee?
17      A.   I don't know.  I guess sometime after
18   3/19 according to that.
19      Q.   Did you appoint them by 3/19?
20      A.   I don't recall.
21      Q.   Who did you appoint to the subcommittee?
22      A.   I don't recall.
23      Q.   Were you on it?
24      A.   I generally sit on all committees.
25      Q.   Okay.  So the answer would be yes, you

74 (Pages 290 - 293)

Page 294

1 were on it?
2    A.    Yeah, I guess so.
3    Q.    Okay.  There's also notes regarding the
4 emergency building, Section 4.04.
5         MR. FIORENZO:  Could you pull that up?
6    Q.    So --
7    A.    Excuse me, do you know whose notes these
8 are?
9    Q.    I don't.  Are they yours?
10    A.    No.  I don't recognize the handwriting.
11    Q.    Well, we'll find out eventually, I
12 suppose.
13    So there's a note there and it says MC.  Is
14 that Mr. McCann?
15    A.    I don't even know who wrote these notes,
16 so I don't know.
17    Q.    I didn't ask that though.  Do you
18 believe that that relates to Mr. McCann?
19         MR. SEAMAN:  Objection to form.
20    A.    I think it could mean him, but I don't
21 know.
22    Q.    It would appear to be the only person on
23 the sign-in sheet who those initials relate to, so.
24    There's also an RS, which appears to relate to
25 the only person with those initials is Richard

Page 295

1 Sheola, the interim borough administrator.  Correct?
2         MR. SEAMAN:  Objection to form.
3    Q.    Right?  That's RS, Mr. Sheola?
4    A.    Do I agree with your assumption?
5    Q.    Yes.  Since he's the only one on the
6 sign-in sheet --
7    A.    It appears that you're correct.
8    Q.    Okay.  There was a discussion at that
9 meeting about the emergency building.  Do you see
10 that?
11    A.    I see emer -- I don't know what that
12 says.  Emerg, E-M-E-R-G, I don't know what that
13 says.
14    Q.    Was there a provision in Section 4.04(E)
15 of the agreement that dealt with the emergency
16 services building?
17    A.    Yes.
18    Q.    Okay.  And the notes here indicate,
19 Identify property.  Was there a discussion about the
20 need to identify the property?
21    A.    I don't recall what happened in 2018.
22    Q.    Okay.  So you have no recollection of
23 that being discussed at the meeting?
24    A.    I don't.
25    Q.    There's a note in here about plans.  Do

Page 296

1 you know what was discussed, if anything, about any
2 obligations to prepare plans?
3    A.    I don't have any recollection.
4    Q.    Again, I'm talking about at this
5 meeting.  You don't remember?
6    A.    I don't have any recollection.
7    Q.    So it would be fair to say you don't
8 remember what anybody said at this meeting, what you
9 said, they said?
10    A.    I don't even remember where this meeting
11 was or who --
12    Q.    I didn't ask where.  Do you remember
13 anything that anyone said at the meeting?
14    A.    I don't -- I don't know.
15    Q.    Well, what does that mean.  Do you
16 remember what anyone said at the meeting or not?
17    A.    I'm trying to figure out where the
18 meeting was so I can put myself in the room --
19    Q.    Okay.
20    A.    -- and remember if anyone said anything.
21    Q.    Well, take your time and try to put
22 yourself in the room.  Do you remember what anyone
23 said at the meeting?
24    A.    Can I look at the rest of the note?
25    Q.    That's it.

Page 297

1         MR. FIORENZO:  Oh, okay.  Well, go back,
2 she wants to look at it.  Go back to the earlier
3 part if she wants.
4    A.    I don't remember.  So what was the date
5 of this meeting?
6    Q.    3/14/19?
7    A.    3/14/19.  Can you make that a little
8 bigger?
9         MR. KLEIN:  Which part?
10    A.    Any of it.  I see -- is that Joe -- oh,
11 Pappas.
12    Q.    Paparo.
13    A.    Oh, Paparo.
14    Q.    He's an attorney from Porzio Bromberg.
15    There's a note there, closing all
16 simultaneous.  Do you remember there being
17 discussion there about how the developer was moving
18 forward to close and purchase property?
19    A.    I honestly don't remember this meeting.
20    Q.    Okay.  So going back to my question, you
21 don't remember anything being discussed at this
22 meeting?
23    A.    I don't remember the meeting.
24    Q.    Okay.  So as a result of that, would it
25 be accurate to say you do not recall anything that

75 (Pages 294 - 297)

EXHIBIT A

Page 298

1 may have been discussed at the meeting since you
2 don't recall the meeting at all?
3     A.    If you ask me a question about something
4 being discussed, it could jog my memory, but right
5 now, out of the blue, I don't recall anything
6 discussed at the meeting.
7     Q.    Well, I'm asking you if you can recall.
8 The notes are here.  You can look at those.
9     A.    I can't read the handwriting.
10     Q.    You can't read it?
11     A.    I can't.  I can see the word evac.
12     Q.    It says Cork & Keg, evac closing 3/22.
13 So let me read it for you.  These are all notes
14 someone took of the meeting.  JMMC, he talks about
15 the Cork & Keg case.  There's a comment,
16 Condemnation should not be part of the conversation.
17 Cork & Keg.  Evac closing 3/22.  Maybe others at the
18 last minute.  Borough asked for communication
19 through attorneys.  JK, Klugmann, as long as treated
20 fairly will work with others.  Works well with
21 others mayors -- with other mayors.  Evac by 6:30.
22 So does any of this refresh your memory about
23 anything discussed at the meeting?
24     A.    No, and everything you said to me
25 doesn't make any sense at all.  It sounds like

Page 299

1 gibberish.
2     Q.    Okay.  So whoever wrote the notes was
3 writing in gibberish, I guess.
4     A.    Didn't take good notes --
5     Q.    Yeah.
6     A.    -- because it doesn't mean anything to
7 me.
8     Q.    I mean, they're talking about different
9 topics.  Topics.
10     A.    Yeah, but I can't -- I can't -- I don't
11 know what the word is.  I don't know what they were
12 trying to say.  I see words, I don't see complete
13 thoughts.
14     Q.    Yeah, a lot of times that happens with
15 notes.  Right?
16     Okay.  So in any event, you don't remember
17 anything discussed at the meeting.  Correct?
18          MR. SEAMAN:  Objection to form.
19     Q.    Is that correct, yes or no?
20     A.    I don't remember anything.
21     Q.    Okay.
22          MR. FIORENZO:  All right.  Off the
23 record.
24          (Discussion off the record.)
25          (Deposition adjourned at 4:36 p.m.)

Page 300

1          J U R A T
2
3
4     I DO HEREBY CERTIFY that I have read
5 the foregoing transcript of my deposition testimony
6 and I certify that it is true and correct to the
7 best of my knowledge.
8
9
10
11 _____
12     DANIELLE DI PAOLA
13
14
15
16
17 SWORN AND SUBSCRIBED
18 BEFORE ME ON THIS _____
19 DAY OF _____2023
20 _____
   Notary Public of the State of
21
22
23
24
25

Page 301

1          CERTIFICATE
2
3     I, MARY ANN ADAMS, a Certified Court Reporter
4 and Notary Public of the State of New Jersey, License
5 No. X101026, do hereby certify that prior to the
6 commencement of the examination, DANIELLE DI PAOLA
7 was duly sworn by me to testify as to the truth, the
8 whole truth, and nothing but the truth.
9     I DO FURTHER CERTIFY that the foregoing is a
10 true and accurate transcript of the testimony as
11 taken stenographically by and before me at the time,
12 place, and on the date hereinbefore set forth.
13     I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17 and that I am not financially interested in the
18 action.
19
20
21
22 *Mary Ann Adams, C.C.R.*
   Notary Public of the State of New Jersey
23 My Commission expires August 10, 2024
24
25

76 (Pages 298 - 301)

EXHIBIT A

Page 302

1                    ERRATA SHEET
                VERITEXT/NEW YORK REPORTING, LLC
2
   CASE NAME: Emerson Redevelopers Urban Renewal, L.P.C. v. The Boro
   Of Emerson New Jersey, And Danielle Dipaola
3  DATE OF DEPOSITION: 4/26/2023
   WITNESSES' NAME: Danielle Dipaola
4
5  PAGE  LINE (S)    CHANGE         REASON

6       |       |                |

7       |       |                |

8       |       |                |

9       |       |                |

10      |       |                |

11      |       |                |

12      |       |                |

13      |       |                |

14      |       |                |

15      |       |                |

16      |       |                |

17      |       |                |

18      |       |                |

19      |       |                |

20
21              Danielle Dipaola
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS _____ DAY OF _____, 20__.
23
24
   _____
25 (NOTARY PUBLIC)          MY COMMISSION EXPIRES:

Veritext Legal Solutions
EXHIBIT A
800-227-8440                                                  973-410-4040

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT A

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT A

**EXHIBIT B**

D-04

JONATHAN N. HARRIS, J.S.C.

I. INTRODUCTION

Emerson, New Jersey persists as a bastion of exclusionary zoning. It has steadfastly resisted taking affirmative steps to provide realistic opportunities for affordable housing within its borders. It has further failed to enact the necessary legislation to authorize the expenditure of its considerable affordable housing trust funds for regional or local housing needs. The time has come to end this constitutional breakdown. The New Jersey Constitution shall not be permitted to merely remain a vague rumor in Emerson.

This case is a conventional builder's remedy _Mt. Laurel II_[1] action, which until October 19, 2001 had been consolidated with a garden-variety eminent domain proceeding related to lands referred to as Emerson Woods. The condemnation dispute was settled by the contesting parties with their acquiescence to an acquisition for $7,800,000. In the course of this opinion, for the sake of completeness, I will refer to certain facts related to the condemnation aspect of the case which were developed at the consolidated trial. As such, the details of the case involve several arcane points within the maze which sometimes seems to

Deposition Exhibit
4/26/2023
2:20-cv-04728 (DNJ)
DD-01

---

[1] So. Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158 (1983).

characterize the world of affordable housing[2]. Although I conclude

that the builder's remedy is not warranted, Emerson shall be

required without delay to adopt all affirmative measures—

including meaningful legislation and adequate appropriations—

recommended or made necessary by the Special Master, in order to

fulfill its constitutional obligation to provide shelter

opportunities for the beneficiary class of unhoused poor.

II. SUMMARY OF THE PARTIES' POSITIONS

Plaintiff Community Developers & Management, LLC (Community

Developers) owns an .83-acre now-vacant parcel of land in the

Borough of Emerson (Emerson) zoned for single-family development.

It proposes to build at least twelve multi-family units on the

site including two units devoted to low or moderate income

households. Emerson resists the offer on the dual grounds that

Community Developers has not acted in good faith because

Community Developers: 1) has used the *Mt. Laurel II* doctrine as a

bargaining chip and 2) has conducted itself in a manner that

would be violative of the New Jersey Fair Housing Act (NJFHA)[3].

United Properties Group, Inc. and Emerson Woods, LLC

(Emerson Woods) own or control a vacant parcel of 19.38 acres

that had been recently approved for 111 townhouse units. This

land was the object of Emerson's eminent domain activity, the

---

[2] See Home Properties of New York, L.P. v. Ocino, Inc., 341 N.J. Super. 604,
606 (App. Div. 2001).

[1] N.J.S.A. 52:27D-301 to -329.

purpose of which was to acquire and conserve the property for open space.

III. PROCEDURAL BACKGROUND

Community Developers commenced its builder's remedy *Mt. Laurel* II action on March 28, 2000. It not only sought vindication of its right to develop its property at a density greater than permitted by existing zoning regulations, but it also urged the court to require Emerson to comply with the constitutional mandate of *Mt. Laurel* II and its progeny. Emerson contested Community Developers' claims and sought to dismiss its builder's remedy assertion.

On June 9, 2000, I granted permission to Emerson Woods to intervene as a party-plaintiff pursuant to R. 4:33-2. The limited purpose of the intervention was to permit Emerson Woods to try to protect its development approvals, which included a substantial monetary contribution towards affordable housing. *Emerson Woods did not specifically seek a builder's remedy*. It already considered its property to be a contributory, albeit not inclusionary, *Mt. Laurel II* site.

On December 15, 2000, I entered an order declaring that Emerson's zoning ordinance was invalid and unconstitutional insofar as it failed to provide a realistic opportunity for the development of affordable housing. I further required Emerson to revise its Master Plan and zoning ordinances to effectuate

4

compliance with the New Jersey Constitution. To assist Emerson in this endeavor, I appointed professional planner David N. Kinsey, Ph.D. as Special Master and obliged Emerson to complete the necessary remedial administrative and legislative activities no later than March 30, 2001. Additionally, a conditional builder's remedy was granted in favor of Community Developers so that its land would be treated as an inclusionary site in Emerson's forthcoming compliance plan. I reserved for trial Emerson's defense of bad faith. At the time, Emerson had not seriously raised the specter of the possibility of a NJFHA violation being an issue in this case.

On February 16, 2001, I declared that land was a scarce resource in Emerson and I entered an order containing an interlocutory injunction restraining certain land development activities until a final determination could be made concerning Emerson's ability to comply with its *Mt. Laurel II* obligations. In supposed compliance with the order of December 15, 2000, the Emerson Planning Board prepared and adopted an amended Housing Element and Fair Share Plan and the governing body endorsed it by resolution on April 3, 2001.

During the pendency of the builder's remedy *Mt. Laurel II* action, Emerson embarked upon an attempt to acquire the land of Emerson Woods for public open space. On June 14, 2000, Emerson commenced an action to exercise its right of eminent domain in

the Chancery Division. The condemnees resisted the condemnation
action, claiming that Emerson was acting in bad faith and that
the acquisition would not serve a valid public purpose because it
would thwart Emerson's ability to comply with its *Mt. Laurel II*
obligations. On January 3, 2001, the eminent domain action was
transferred to the Law Division and ultimately consolidated with
the builder's remedy *Mt. Laurel* II action for trial. Emerson was
permitted to deposit its estimate of the fair market value of the
property with the court[4], but I stayed the filing of a declaration
of taking[5].

Trial commenced on September 24, 2001 and consumed four
days. At the opening of the trial, Emerson Woods announced that
if it received an incentive density bonus higher than the density
it already enjoyed with its vested site plan approval, it would
abandon this approval for 111 townhouses, and instead build an
inclusionary development with 20% of the units devoted to low and
moderate income households. This announcement confirmed a similar
offer made in a February 14, 2001 letter to the Special Master.
At the immediate conclusion of the trial, Emerson Woods again
offered to surrender its current development entitlement in
exchange for the right to become a *Mt. Laurel II* inclusionary
site at the density recommended by the Special Master so as to

---

[4] N.J.S.A. 20:3-18.
[5] See Borough of Tenafly v. Centex Homes Corp., 139 N.J.Super. 490 (Law Div.
1975).

6

yield approximately 187 units, of which 37 would be devoted to low and moderate income households.

On October 19, 2001 I was informed in open court that Emerson and Emerson Woods had reached a mutually-agreeable resolution of their dispute. Emerson Woods has withdrawn as an intervenor in the builder's remedy *Mt. Laurel II* action and Emerson has dismissed the eminent domain proceeding.

## IV. FINDINGS OF FACT

### Emerson, New Jersey
(See Map 1)

Emerson is located in central Bergen County, on the west bank of the Oradell Reservoir, approximately one mile east of the Garden State Parkway. It serves as the southern boundary of the Pascack Valley.



Map 1

7

Emerson's population in 2000 was 7,197, an increase of 3.8%
from the 1990 census. It is estimated that in 2000 there were
2,406 dwelling units, of which 96% were single-family detached
units on modestly sized lots. The total land area in the
municipality is approximately 1,600 acres (2.5 square miles).
Most of Emerson is designated as *Planning Area 1 — Metropolitan
Planning Area* in the State Development and Redevelopment Plan,
with the exception of watershed/reservoir lands adjacent to the
Oradell Reservoir, which are designated as *Planning Area 5 —
Environmentally Sensitive Planning Area*.

### Community Developers' site
(See Map 2)

The Community Developers' site is vacant; a single-family
dwelling was demolished in 1997 pursuant to a duly issued
municipal permit. The land is located at 43 Emerson Plaza West,
almost exactly in the center of the municipality, a stone's throw
from the railroad station, and adjacent to a variety of
residential and commercial uses. It is zoned R-10 Residential
Single Family, thereby permitting a density[6] under the Municipal
Land Use Law[7] (MLUL) of 4.3 units per acre.

The property occupies an area of 34,824 square feet in a
generally rectangular shape. Frontage of 40 feet exists at the

---

[6] "Density" means the permitted number of dwelling units per gross acre of land
to be developed. N.J.S.A. 40:55D-4.
[7] N.J.S.A. 40:55D-1 to -129.

EXHIBIT B

terminus of Emerson Plaza West. Single-family dwellings occupy
lands north and west of the site. South of the site are a mix of
residences, offices, retail and commercial uses, and multi-family
dwellings. Directly adjacent to and east of the site is a
railroad right of way used mainly by New Jersey Transit for
weekday commuter rail operations. East beyond the railroad are
commercial and retail uses, which comprise Emerson's downtown
business area.

Before its demolition, the single-family structure that
occupied the property was in a state of wholesale disrepair. The
building was grossly overgrown with shrubbery. Glass was missing
in many windows. Cracks appeared in the foundation and holes in
the wooden framework of the structure were apparent upon even the
most cursory observation. Standing water to a depth of over one
foot covered the basement. Many floors and interior walls tilted
out of alignment. Electric and water utilities were discontinued
in 1995. At the time a representative of Community Developers
first inspected the property during negotiations for its
acquisition in 1996, electricity was provided by an extension
cord, which ran to the building from an adjacent property. The
only electrical fixture that operated, powered by that extension
cord, appeared to be a porch light. The stairways had no
railings; mildew and fungus covered the walls where sheetrock had
not given way to numerous holes; and none of the toilet

9

facilities worked. In a word, at the time of its demolition, the dwelling was substandard[8] and had been so for many years. Indeed, it was uninhabitable as well, although there is some anecdotal evidence to suggest that someone had taken up residence in the dilapidated structure before it was torn down. The decision to demolish, rather than to rehabilitate, was well taken.

## Emerson Woods' site
### (See Map 2)

The Emerson Woods' site is vacant. It has been a battleground between environmentalists and proponents of development since the 1980s. The land is located on Main Street, approximately 700 feet from the Oradell Reservoir. Evidence presented to the Emerson Planning Board suggested that the property had been cleared for agricultural purposes in the 1890s and remained so until the 1950s when the natural vegetation grew back.

It is undisputed that the property had once been an integral part of the Hackensack Water Company's overall watershed lands, serving either as an unnecessary utility holding or as a protected reservoir buffer. In 1984, the land was removed from watershed designation as part of a much larger parcel. It became potentially developable under a zoning ordinance permitting a

---

[8] A substandard housing unit is defined as a unit with health and safety code violations that require the repair or replacement of a major system. A major system shall include weatherization, a roof, plumbing (including wells), heating, electricity, sanitary plumbing (including septic systems), and/or a load bearing structural system. N.J.A.C. 5:93-5.2.

EXHIBIT B

planned commercial development, and remained so for almost a decade. In 1993, as a fraction of a complicated settlement involving former watershed lands surrounding the Oradell Reservoir, the 19.38-acre Emerson Woods' parcel was remaindered when the much larger land of which it was a small part was returned to protected status under the auspices of the Board of Regulatory Commissioners. Today, what remains is zoned R-TH Townhouse, which permits multi-family use at a density of six units per acre.

The property occupies an area of 19.38 acres in an irregular shape. The parties agree that because of wetlands constraints, only 12.93 acres are actually developable. Frontage of approximately 1,900 feet exists along Main Street. Single-family dwellings occupy lands north and west of the site. South of the site are primarily watershed lands and some scattered residences. Directly adjacent to and east of the site are reservoir buffer lands and the Oradell Reservoir.

On December 17, 1998, the property obtained preliminary site plan approval from the Emerson Planning Board for a 116-unit townhouse condominium development. This reflected a density pursuant to the MLUL of six units per acre, which matched the maximum density under Emerson's zoning ordinance. Pursuant to that zoning ordinance, Emerson Woods was required to contribute "an appropriate amount, consistent with Council on Affordable

11

Housing regulations, to the Borough Affordable Housing Trust."
The Planning Board resolution approving the preliminary site plan
echoed the ordinance. Final site plan approval was granted by the
Planning Board on April 1, 1999. Again, Emerson Woods was
obligated to contribute to the "Housing Trust Fund as required
under the Fair Housing Act." Amended final site plan approval was
obtained on February 15, 2001, which resulted in an altered site
plan and a reduction in units from 116 units to 111 units. The
resolution granting amended final site plan approval required,
for the first time, a specific monetary contribution to "the
Borough's Housing Trust Fund as required under the Fair Housing
Act" of "$4,000 per unit for a total contribution of $444,000."
The parties agree that although the actual collection of
development fees would probably violate COAH regulations[9], the
amount was based upon the Council on Affordable Housing's
(COAH's) presumed cost of subsidizing a low or moderate income
unit at $20,000 per unit as reflected in COAH's regulations[10].
Thus, the parties agree that if a 20% set-aside were required of
Emerson's R-TH zone instead of a monetary contribution, Emerson
Woods would be required to provide 22.2 low and moderate housing

---

[9] N.J.A.C. 5:93-8.1 permits the imposition, collection, and expenditure of
development fees only through participation in COAH's substantive certification
process, which Emerson has unfailingly eschewed.
[10] In 1992, COAH clarified that $20,000 is the average internal subsidy for the
set-aside units in an inclusionary development. 24 *N.J.R.* 238 (Jan. 21, 1992).
That figure was also the minimum amount acceptable for a Regional Contribution
Agreement (RCA). N.J.A.C. 5:93-6.5. Effective January 2, 2001, the minimum
amount necessary to transfer an RCA was increased to $25,000 per unit.

12

units. Multiplying 22.2 units times $20,000 produces $444,000, or $4,000 per unit. Emerson Woods did not challenge the required contribution, and Emerson did not seek to increase the amount to reflect the current RCA transfer amount of $25,000.

<div align="center">

Marek Farm site
(See Map 2)

</div>

As part of the *Mt. Laurel* II builder's remedy action, Emerson had been ordered by me to prepare a realistic plan to satisfy its fair share obligation under the NJFHA. Emerson proposes to utilize property referred to as the Marek Farm as part of the compliance plan presented at trial. This property is located in the northeast corner of Emerson, on Old Hook Road, in the general vicinity of the Emerson Woods' site. It consists of 6.43 acres of active farmland including a farm stand and greenhouse complex known as Old Hook Farm. It suffers no known environmental constraints. The farm is directly adjacent to a recently completed Alterra Wynwood three-story assisted living facility with 106 beds in 96 units. Emerson presented no competent evidence to indicate whether the owner of the land intended to continue to devote it to farming, redevelop it for permitted uses in the zone, or actually build low and moderate income housing. Hearsay statements about the owner's children and their ambitions have no evidentiary significance.

<div align="center">

13

</div>



Map 2

## Pre-litigation Activities of Community Developers

Community Developers acquired its site in 1997. After

demolishing the residential structure, it immediately applied to

the Emerson Board of Adjustment for a use variance[11] to permit the

establishment and operation of a 16 unit multi-family use on the

property. None of the units were proposed for use by low or

---

[11] N.J.S.A. 40:55D-70(d)(1).

14

moderate income households. The application was withdrawn. In 1999, Community Developers applied anew for a use variance, this time trimming its request to 12 units (and no low or moderate income units whatsoever). The Board of Adjustment denied the application. Emerson claims that at the hearing before the Board of Adjustment on June 16, 1999, Joseph Burgis, Community Developers' expert planning witness, made veiled threats that if the variance were not granted, Emerson might suffer an involuntary builder's remedy, notwithstanding an adverse Board of Adjustment ruling.

Burgis's two references to *Mt. Laurel II* remedies, when read in context, clearly were neither threat-laden, nor capable of objectively being understood as threats. The first discussion of *Mt. Laurel II* came in Burgis's discussion of the deficiencies in Emerson's Master Plan and then-overdue periodic reexamination under the MLUL[12]. He modestly opined that a site so close to an operating commuter railroad station and a downtown area is appropriate for high-density residential development. He further urged the Board of Adjustment to "get the mayor and council to address that issue (compliance with the *Mt. Laurel II* obligation)" to avoid being left vulnerable to a builder's remedy action. At no time was the discussion about a builder's remedy connected to Community Developers' plans.

_____

[12] See N.J.S.A. 40:55D-89.

15

The second reference to *Mt. Laurel II* came in response to an inquiry from a Board of Adjustment member who questioned alternative uses for the Community Developers' site. A dialogue followed in which low and moderate income units, as well as senior housing units, were discussed as being appropriate alternate uses for the site. Burgis's responses to questions were direct and forthright, but were in no way suggestive of Community Developers *then* harboring a hidden agenda to use *Mt. Laurel II* as a threat to gain a density bonus. Ironically, if Community Developers had applied for the use variance as an inclusionary development with an affordable housing set-aside it would find its instant builder's remedy claim much stronger.

After the Board of Adjustment denied the application, Community Developers pursued an unusual and ill-fated strategy. Rather than litigate the denial, it hired John Schepisi as its advocate to "settle" the dispute. Since no appeal of the Board of Adjustment action had been filed, and nothing by way of a disputed rezoning proposal was being discussed, it is unclear what there was to be "settled." Under the guise of trying to resolve a dispute that apparently did not exist except in the minds of Community Developers' principals, Schepisi--a self-proclaimed political insider--investigated who was perceived as the primary power broker in Emerson. He ultimately concluded that the nucleus of political power in the municipality was Council

16

President Gina Calogero. He successfully arranged a meeting with her on February 15, 2000 to lobby for a high-density multi-family use on his client's site and discuss how this might help Emerson fulfill Emerson's *Mt. Laurel II* obligations. Schepisi and Calogero chatted about a variety of alternatives including low and moderate income multi-family housing, senior housing, three 2-family dwelling units, and Emerson's exercise of eminent domain to buy Community Developers' land to "make Community Developers whole." Schepisi indicated that litigation was an additional alternative, if Emerson would not negotiate a reasonable use of his client's land. Schepisi did not memorialize his discussions with Calogero in writing and he never communicated his client's proposals to the full governing body in writing. He relied upon Calogero to orally communicate his client's offers to the mayor and council.

On the very evening of her first and only meeting with Schepisi, Calogero reported the encounter to the full governing body. She advised the governing body of the many alternates proposed by Schepisi, including those that did, and those that did not, include a *Mt. Laurel II* component. The governing body decided to take no action on Schepisi's informal petition, and shortly thereafter, Community Developers filed its builder's remedy *Mt. Laurel II* action on March 28, 2000.

17

EXHIBIT B

## V. CONCLUSIONS OF LAW

The overriding issue in a *Mt. Laurel II* case is whether a municipality has created a realistic opportunity for the construction of its fair share of the region's needs for affordable housing[13]. In reviewing a municipality's response to its constitutional duty, the judiciary should conform its decisions wherever possible to COAH guidelines and policy[14]. This is to ensure that a uniform and predictable body of law emerges to educate the public and direct its representatives to comply with constitutional doctrine that is now over eighteen years old. The unruly teenager of *Mt. Laurel II* jurisprudence will only mature under the guidance of the rules and regulations of COAH and the occasional firm and steady hand of the judiciary.

In this case, I ordered Emerson to provide a compliant Housing Element and Fair Share Plan by March 30, 2001. As revealed during trial, it has woefully failed to comply. The planning document that Emerson seeks to pass off as *Mt. Laurel II*-compliant is riddled with regulatory deficiencies, substantive errors, and rank speculation. Accordingly, I conclude that the court must invoke the exceptional affirmative remedies of the type outlined in *Mt. Laurel II*[15] and require Emerson to adopt specific amendments to its zoning ordinance and other land use

---

[13] Mount Olive Complex v. Tp. of Mount Olive, 340 N.J. Super. 511, 525 (App. Div. 2001).
[14] Hills Dev. Co. v. Bernards Tp., 103 N.J. 1, 22 (1986).
[15] 92 N.J. at 285-286.

18

regulations as will enable it to finally meet its *Mt. Laurel II*
obligations.

### Emerson's Fair Share

The threshold step in determining Emerson's compliance with
*Mt. Laurel II* requires calculation of its fair share[16]. Emerson's
current cumulative affordable housing obligation as determined by
COAH is 74 units[17]. None of these units includes satisfaction of
an indigenous need, or rehabilitation component. Rather, the 74
units represent Emerson's pre-credited obligation of its region's
present and prospective need, or the so-called inclusionary or
new construction component.

COAH rules permit limited credits to be applied to the pre-
credited obligation. Credits include units of affordable housing
that have already been constructed in or funded by a municipality
and reductions for affordable housing opportunities that have
been created through zoning[18]. Emerson is not entitled to any such
credits because it has not demonstrated with any persuasive
evidence that there exists affordable housing within the
municipality. Vague references to a group home at 19 Spruce
Avenue with five beds operated by a nonprofit mental health
organization do not provide the required proof under COAH rules
to garner even a single credit. There was no competent evidence

---

[16] Allan-Deane Corp. v. Bedminster Tp., 205 N.J. Super. 87, 105 (Law Div.
1985).
[17] See N.J.A.C. 5:93-2.1 *et. seq.*
[18] N.J.A.C. 5:93-3.1 *et. seq.*

19

of the nature of the facility, the income levels of residents, or the scope of affordability controls, if any, that govern the facility. Thus, Emerson's fair share housing obligation remains 74 new low and moderate income units.

Under N.J.A.C. 5:93-4.1 and -4.2, a municipality may attempt to demonstrate that it does not have the physical capacity to address the housing obligation calculated by COAH. This process involves the identification of all appropriate vacant land in the municipality and the assignment thereto of dwelling unit densities, which produces what COAH calls the municipal realistic development potential (RDP)[19]. Another way of expressing this process is to recognize that a land-poor municipality is entitled to a vacant land adjustment or "adjustment due to available land capacity[20]." However, in order to obtain this adjustment, the municipality must perform an exhaustive planning analysis and convince COAH or the court, as the case may be, of its clear entitlement to a vacant land adjustment.

In this case, Emerson has not even remotely provided the data required by COAH rules[21], and as confirmed by the Special Master, the entire adjustment rationale consists of a scant two paragraphs in Emerson's 2001 Housing Element and Fair Share Plan. This failure of proof alone would be sufficient to deny Emerson

---

[19] N.J.A.C. 5:93-4.1(b).
[20] N.J.A.C. 5:93-4.2(a).
[21] N.J.A.C. 5:93-4.2(a); -4.2(b); -4.2(e).

EXHIBIT B

the right to claim an adjustment due to available land; however,
the parties agree that notwithstanding this municipal omission,
Emerson, in fact, is deficient in vacant land and is entitled to
a vacant land adjustment.

The focus of the RDP calculation in this case is on two
parcels of vacant land: Community Developers' site and the Marek
Farm site. The land of Emerson Woods is not a factor in the RDP
as a result of the settlement. Emerson Woods has withdrawn its
offer to construct an inclusionary development on the site.
Therefore, it is not appropriate to be included in the RDP
calculation because its vested rights earned under the MLUL
militate against it ever being realistically developable for an
inclusionary development.  Additionally, once the municipality
successfully completes its acquisition of the land, it would be
entitled to exclude the parkland from the RDP pursuant to
N.J.A.C. 5:93-4.2(e)(5).

The Special Master concluded that both sites presented
realistic opportunities for affordable housing development and
included them in Emerson's RDP. Emerson claims that the Community
Developers' site should not be included for RDP purposes due to
the demolition of the dwelling in 1997 that, according to
Emerson, would result in a violation of the NJFHA. The
municipality did not assert this position until well into the
litigation. In fact, this litigation strategy contradicts the

21

Planning Board's and governing body's adoption and endorsement of

the 2001 Housing Element and Fair Share Plan, which *included*

Community Developer's site in the RDP calculus. All parties

concur that Marek Farm should be included in the RDP computation,

but they disagree over the appropriate density to be assigned to

the site.

It is important to observe that the inclusion of a

particular property in the computation of the RDP does not

*require*, according to COAH rules, the municipality to include

that land in its ultimate compliance mechanism. N.J.A.C. 5:93-

4.2(g) states:

> (g) The municipality may address its RDP
> through any activity approved by the Council, pursuant
> to N.J.A.C. 5:93-5. The municipality need not
> incorporate into its housing element and fair share
> plan all sites used to calculate the RDP if the
> municipality can devise an acceptable means of
> addressing its RDP. The RDP shall not vary with the
> strategy and implementation techniques employed by the
> municipality.

One of the obvious reasons for this rule is the recognition that

a municipality, in the first instance, is generally entitled to

legislatively decide how to implement its affordable housing

obligation without undue interference by COAH or the court[22]. For

example, absent an obligation to honor a builder's remedy, a

municipality may elect to concentrate affordable housing on a

---

[22] See Eastampton Center, LLC v. Tp. of Eastampton, 155 F.Supp.2d 102, 119
(D.N.J. 2001) (unless done in a discriminatory manner, municipalities may
control residential growth to promote the public good).

22

limited number of sites or even a single site, rather than scatter the affordable housing throughout a multitude of locations. Unless there is either no response, or an inappropriate response, from the municipality regarding its compliance mechanism, it will remain entitled to chart its own course as to how to comply with *Mt. Laurel II* and where to implement it. Thus, even where the municipality has merely miscalculated its RDP, the municipality's compliance mechanism is invested with a presumption of validity that must be considered by the court.

The actual calculation of RDP is not subject to arithmetic perfection or mathematical precision. It is based upon an assessment of the competent evidence, both factual and expert, covered with the gloss of COAH rules, and ultimately distilled into a concrete number. It is neither alchemy, nor sleight-of-hand, that results in the RDP. Rather, it emerges from the overarching notion that whatever the development potential is calculated to be, it must perforce be based upon a foundation of realism. The question to be answered is, what is the *realistic* (not necessarily the maximal) development capacity of the land?

The process of computing the RDP is supposed to begin with the municipality creating a map showing all existing land uses[23]. Next, the municipality should prepare an inventory of all vacant

---

[23] N.J.A.C. 5:93-4.2(a).

23

parcels by block and lot[24]. Third, the municipality may exclude

certain vacant lands from the inventory based upon certain

objective conditions[25]. Fourth, the municipality must

presumptively include all other vacant lands and may include

underutilized, but not vacant, lands including certain golf uses,

nurseries and farms, and nonconforming uses[26]. In connection with

nonvacant land, COAH may request confirmation from the owner

indicating the site's availability for inclusionary development[27].

Fifth, land may be excluded from the inventory by the

municipality if it falls within any of the following categories:

> 1. Constrained agricultural lands.
> 2. Environmentally sensitive lands.
> 3. Historic and architecturally important sites.
> 4. Certain active recreational lands.
> 5. Certain conservation, parklands, and open space
> lands.
> 6. Other sites determined to be not suitable for low
> and moderate income housing.

The final step in the RDP recipe is to assign a density and

set-aside for each parcel that has survived the culling process.

The minimum presumptive density shall be six units per acre and

the maximum presumptive set-aside shall be 20 percent[28]. COAH (and

the court) shall "consider the character of the area surrounding

each site and the need to provide housing for low and moderate

income households in establishing densities and set-asides for

---

[24] N.J.A.C. 5:93-4.2(b).
[25] N.J.A.C. 5:93-4.2(c).
[26] N.J.A.C. 5:93-4.2(d).
[27] Id.
[28] N.J.A.C. 5:93-4.2(f).

24

each site."[29] COAH rules further provide a hypothetical example[30] of the calculation of RDP for illustrative purposes.

Before completing the computation of RDP, I must point out that the criteria for inclusion in RDP is not the same criteria used to determine the exclusion or inclusion of a site as part of an ultimate compliance mechanism. N.J.A.C. 5:93-5.3 provides guidance as to which sites are appropriate to be designated for inclusionary development. It includes the requirement that the site be "available, suitable, developable, and approvable, as defined in N.J.A.C. 5:93-1." These criteria do not apply when RDP is computed. Rather, they play a role when the municipality announces which sites it intends to devote to incentive inclusionary zoning or other site-specific affirmative measures to meet the RDP. Thus, the two relevant criteria for RDP purposes are 1)planning concerns and 2)affordable housing needs[31].

In this case, however, before computing the absolute number for RDP, I must first determine whether the Community Developers' site even belongs in the vacant land inventory. I conclude that it is required to be included for RDP computation.

<u>Community Developers' Site Should be Included in the RDP</u>

Emerson argues that even though it included the Community Developers' site in its court-ordered 2001 Housing Element and

---

[29] <u>Id</u>.
[30] <u>Id</u>.
[31] N.J.A.C. 5:93-4.2(f).

Fair Share Plan, this land should not now be included in the RDP

computation because to do so would be a violation of the NJFHA,

specifically, N.J.S.A. 52:27D-311.1 and -313.1. This statutory

scheme, commonly referred to as the Fanwood Bill, provides that a

municipality shall neither be compelled to include in its housing

element, nor forced to fulfill its fair share housing obligation

through permitting development on certain land where a

residential structure has been demolished or is proposed for

demolition. If a parcel of land is less than two acres, and its

residential structure has not been declared unfit, or was within

the previous three years negligently or willfully rendered unfit

for human occupancy or use, that parcel is not required to be

considered by the municipality for affordable housing purposes.

The idea of the legislation is to prevent COAH (and the court)

from requiring the demolition of a "perfectly decent residential

accommodation"[32] to achieve affordable housing objectives. It was

never the intent of the NJFHA to require municipalities to

demolish or suffer the demolition of existing structures in order

to build affordable housing.

Emerson argues that the demolition of the residential

structure on the Community Developers' site in 1997 in

anticipation of obtaining permission for a higher density

residential use, including affordable housing, triggers the

---

[32] Paramus Substantive Cert. No. 47, 249 N.J. Super. 1, 9 (App. Div. 1991)

26

Fanwood Bill principles. I conclude that the dilapidated structure that was demolished in this case was not the type of residential building that the legislation intended to preserve. The evidence adduced at trial firmly establishes that although the building had never received the municipal imprimatur of being unfit, it was wholly uninhabitable, an eyesore, and dangerous at the time of its demolition. The extensive damage and lack of essential services rendered the building utterly unusable. Furthermore, the evidence confirms that the condition of the building was of long standing and not negligently or willfully rendered unfit within the three years before the demolition. This micro-blighted area is outside the Fanwood Bill. There is no reason why this now-vacant land should be excluded from RDP purposes.

Thus, consistent with the findings of the Special Master, I conclude that the lands of Community Developers and Marek Farm shall be included in the calculation of Emerson's RDP. I adopt the ultimate rationale of the Special Master regarding the computation of Emerson's RDP and therefore conclude that his assignment of densities near the top of the range is rationally supported in the record. The contrary opinion of Emerson's expert is unreliable, incomplete, and inconsistent.

27

## Marek Farm's RDP

Marek Farm consists of 6.43 acres. It is located on an active four lane east-west roadway and lies adjacent to a new multi-family assisted living development. The land is remote from single-family uses, but is in the vicinity of protected watershed lands. Emerson itself recognized that the land could realistically be developed at 14.5 units per acre, but claims that density should only be used if Marek Farm is provided a species of incentive inclusionary zoning that encourages the development of rental units[33] and gives the municipality the benefit of a two for one credit against its RDP[34]. This would permit a higher density, but a lesser set-aside of only 15% low and moderate income units as permitted by COAH rules[35]. If development of rental units is not forthcoming, Emerson contends that the RDP density for Marek Farm should not exceed 10 units per acre.

Emerson's proffer is rejected because the nature of RDP determination contemplates realistic development, and does not turn on the nature of the zoning bells and whistles that emerge from the imagination and creativity of the municipality's planner. It is, of course, clear that a municipality may actually zone an inclusionary site with a density under the MLUL that is

---

[33] N.J.A.C. 5:93-5.15.
[34] N.J.A.C. 5:93-5.15(d)(1).
[35] N.J.A.C. 5:93-5.15(c)(5).

28

either greater or less than the COAH density used in RDP calculations. There need not be perfect symmetry between the RDP density and compliance density. However, there must be a sound planning basis to use a lesser density for RDP purposes if it is acknowledged that the site will be realistically developable at a higher density. If the site is realistically capable of supporting 14.5 units per acre in a real-world rental environment, it is certainly capable of supporting that density for RDP purposes. The ultimate preference of the municipality as to MLUL density, based upon a projected type of use, is not a relevant factor in calculating RDP. The key is the realistic development capacity of the land.

The Special Master adopted Emerson's higher density after carefully analyzing the site from a comprehensive planning perspective. He concluded that this site is fully capable and appropriate to support the upper limit of 14.5 units per acre and still blend with the character of the surrounding uses. I conclude that it is most appropriate to use a whole integer to compute the RDP, and 14 units per acre with a 20% set-aside is realistic for the Marek Farm site. This results in 90 units on the site, including 18 low and moderate income units. Under the MLUL, this is a density of 14 units per acre (90 units spread over 6.43 acres).

29

This density is further supported by the acute need for low and moderate income housing in Emerson. There is not a single unit of affordable housing in Emerson. Its record of compliance with *Mt. Laurel II* is ghastly, embarrassing, and sorely in need of remediation. Its very conduct throughout this litigation confirms the need for affirmative steps to remedy its almost two-decades effort to encourage poor people to live elsewhere. Emerson's 2001 Housing Element and Fair Share Plan was rightly criticized by the Special Master as incomplete and non-compliant with COAH regulations, and it is virtually uninformative. The meager attempt to comply with my Order of December 15, 2000 is emblematic of Emerson's lackluster affordable housing efforts over many years.

The limited opportunities for developing inclusionary affordable housing appear to have been squandered by the municipality at almost every step. Indeed, the recent approval for development of the land adjacent to Marek Farm as an assisted living facility without an inclusionary component is an example of this casual attitude in the face of land becoming a scarce resource. Emerson's 1999 Master Plan reexamination report noted, "a number of sites previously recommended for inclusionary development have since been developed without inclusionary components." Emerson's 2000 Housing Element and Fair Plan specifically noted the loss of the Town and Country parcel of 25

30

acres on Forest Avenue. This property was suggested in Emerson's 1992 Housing Element and Fair Share Plan to produce at least 12 units of affordable housing on site, and instead generated only conventional single family dwellings at a density of 2.4 units per acre, plus a substantial contribution to Emerson's phantom affordable housing trust fund. Emerson seems to have never missed an opportunity to miss an opportunity for affordable housing.

Although the municipality may be proud of its collection of a substantial principal sum in its affordable housing trust fund, it was conceded at trial that the fund does not comply with COAH regulations and none of that money has been used to build or subsidize even a stick of affordable housing. What has the municipality been waiting for? Why has Emerson not authorized the necessary actions to facilitate the use of even a portion of the $300,000 in the trust fund? When will there be affordable housing in Emerson? The need for low and moderate income units in Emerson is painfully obvious and critical. This situation is a significant factor in determining the RDP.

## Community Developers' RDP

The Community Developers' infill site is located in a transitional area, between single-family development and Emerson's downtown. It abuts a commuter railroad. It is in close proximity to other multi-family uses with densities exceeding the Special Master's recommendation. Keeping in mind the nature of

31

the diverse uses in the surrounding area and the keen need for
low and moderate income housing in Emerson, I conclude that the
appropriate density, even for this small site, is 14 units per
acre with a 20% set-aside. I believe that an even higher density,
approaching the density found in nearby multi-family development,
would likewise be realistic. However, I believe that the Special
Master's advice in this regard is compelling. This results in 11
units on the site, including two low and moderate income units.
Under the MLUL, this is a density of 14 units per acre (11 units
spread over .83 acres).

The following Table 1 completes the computation of RDP
according to COAH methodology and results in Emerson's RDP of 20
units of low and moderate income housing:

Table 1:
Summary of RDP Calculation

| Site | Unconstrained Area (In acres) | Units per Acre | Total Units | Set-Aside | RDP Units |
|------|-------------------------------|----------------|-------------|-----------|-----------|
| Marek Farm | 6.43 | 14.0 | 90 | 20% | 18 |
| Community Developers | .83 | 14.0 | 11 | 20% | 2 |
| | | | | | |
| TOTAL | | | 101 | | 20 |

Thus, it is Emerson's burden of proof to demonstrate that it
has provided a realistic mechanism through zoning and other
affirmative devices to satisfy this fair share of 20 units of low
and moderate income housing, together with the unmet need of an
additional 54 units under N.J.A.C. 5:93-4.2(h). A review of

32

Even if a developer satisfies these three prongs, it may still be disqualified from receiving a builder's remedy if it is found that the developer acted in bad faith or has used *Mt. Laurel II* as a bargaining chip:

> Care must be taken to make certain that Mount Laurel is not used as an unintended bargaining chip in a builder's negotiations with the municipality, and that the courts not be used as the enforcer for the builder's threat to bring Mount Laurel litigation if municipal approvals for projects containing no lower income housing are not forthcoming. Proof of such threats shall be sufficient to defeat Mount Laurel litigation by that developer.[38]

Additionally, a builder's remedy may not be forthcoming if the developer has failed—for good reason—in an attempt to secure a variance for non-*Mt. Laurel II* uses:

> Finally, we emphasize that our decision to expand builder's remedies should not be viewed as a license for unnecessary litigation when builders are unable, for good reason, to secure variances for their particular parcels (as Judge Muir suggested was true in the Chester Township case). Trial courts should guard the public interest carefully to be sure that plaintiff-developers do not abuse the Mt. Laurel doctrine.[39]

It has been suggested that there may be another way a plaintiff-developer may win the race only to be disqualified for a false start. *J.W. Field Company, Inc. v. Tp. of Franklin*[40] held,

---

[38] 92 N.J. at 280.
[39] 92 N.J. 280-81.
[40] 204 N.J. Super. 445, 461 (Law Div 1985).

34

EXHIBIT B

in *dicta*, that if a plaintiff-developer fails to attempt to obtain relief without litigation, it may be denied a builder's remedy. This notion is based upon the Supreme Court's summary statement in *Mt. Laurel II* that "[w]here the plaintiff has acted in good faith, *attempted to obtain relief without litigation*, and thereafter vindicates the constitutional obligation in Mount Laurel-type litigation, ordinarily a builder's remedy will be granted..."(emphasis supplied)[41]. As a result of *J.W. Fields*, municipalities, as here, sometimes defend builder's remedy litigation with the affirmative defense that the developer never made a written overture to the governing body seeking to negotiate an inclusionary development before instituting litigation.

The loss of a builder's remedy to an otherwise-qualifying plaintiff-developer is neither novel, nor shocking. The interests of the absent class—the unhoused poor—for which the litigation is prosecuted, will not be prejudiced as long as the municipality's compliance mechanism is capable of satisfying the ultimate RDP and unmet need. In other words, in some cases, the land of the disqualified plaintiff-developer will be included in the RDP, but it will not be given inclusionary status. Other land in the municipality that is identified as being realistically developable with affordable housing will absorb the disqualified

---

[41] 92 N.J. at 218.

35

plaintiff-developer's complement of low and moderate income housing.

In this case, Community Developers satisfies the initial three-prong test for entitlement to a builder's remedy. First, it successfully obtained summary judgment declaring Emerson's development regulations invalid, thereby necessitating rezoning and the appointment of the Special Master. Second, it has offered to provide a 20% set-aside for affordable housing units, which is a substantial contribution to Emerson's nonexistent stock of low and moderate income housing units. Third, the municipality has not demonstrated that because of environmental or other substantial planning concerns Community Developers' site is clearly contrary to sound land use planning, thereby establishing the suitability of the site for affordable housing.

However, the municipality has satisfied me that Community Developers has used the *Mt. Laurel II* doctrine as a bargaining chip in its negotiations with Emerson. Additionally, its failed application for non-inclusionary development at the Board of Adjustment further seals its fate.

Community Developers acquired its site in 1997 and immediately demolished the structure. Within three months of becoming the owner, Community Developers applied to the Emerson Board of Adjustment for a use variance[42] to develop the site for

---

[42] N.J.S.A. 40:55D-70(d)(1).

sixteen market-rate townhouses (and a zero percent set-aside) at a density of 19 units per acre. The application was withdrawn without prejudice. In March 1999, Community Developers reapplied for a use variance, now seeking only twelve market-rate garden apartments (and a zero percent set-aside) at a density of 14.45 units per acre. The Board of Adjustment denied the application and no appeal therefrom was prosecuted. In the absence of proof to the contrary, a Board of Adjustment's decision of denial is presumptively for good reason[43]. Greater judicial deference is ordinarily given to a use variance denial than to an approval[44].

The only mention of *Mt. Laurel II* during the Board of Adjustment proceedings was during the presentation of Community Developers' expert planner whose stray references to affordable housing were neither adopted, nor incorporated into the application by Community Developers. I have already determined that those passing comments could not have been objectively considered by anyone to be a threat of *Mt. Laurel II* litigation if the variance were to be denied. Unfortunately, the utter absence of an affordable housing component in its development plans--a strategic decision presumably based upon economic considerations--sinks Community Developers' entitlement to a builder's remedy here.

---

[43] See New Brunswick Cellular v. South Plainfield Bd. of Adj., 160 N.J. 1, 14, (1999); Victor Recchia Residential Const., Inc. v. Zoning Bd. of Adjustment of Tp. of Cedar Grove, 338 N.J. Super. 242, 253 (App. Div. 2001).
[44] Pierce Estates Corp., Inc. v. Bridgewater Tp. Zoning Bd. of Adjustment, 303 N.J.Super. 507, 515 (App. Div. 1997).

37

The primary purpose of this variance defense is to prevent the abuse of the *Mt. Laurel II* doctrine. The risk that this defense avoids--whether directly threatened with *Mt. Laurel II* litigation or not--is having a Board of Adjustment inappropriately grant a variance as the course of least resistance to an expensive, time-consuming, and far-reaching *Mt. Laurel II* action. Since Community Developers never sought *Mt. Laurel II*-type housing in its *two* variance applications, it cannot claim to have been chilled in its efforts to seek vindication of *Mt. Laurel II*'s constitutional mandate. Moreover, I conclude that Community Developers' settlement strategy, concocted only after it was denied a density-enhancing use variance, was to try to strong-arm Emerson into making Community Developers economically whole. This narrow desire for financial benefit, to be funded by the municipality through the exercise of the power of eminent domain or obtained by incentive zoning enacted by the municipality, is exactly the type of developer activity that *Mt. Laurel II* condemns and discourages. Community Developers' last-minute conversion to the cause of affordable housing is simply too fortuitous to warrant a finding of its good faith.

Community Developers is further disqualified from a builder's remedy because to grant it this extraordinary relief would render the judiciary the enforcer of a builder's threat.

38

EXHIBIT B

When Schepisi met with Calogero on February 15, 2000, Community

Developers' primary purpose was to gain a profit-motivated

advantage for itself. At worst, the idea was to enlist Emerson to

subsidize a break-even scenario for Community Developers. *Mt.*

*Laurel II* recognizes that economic advantages—-typically

substantial density bonuses——are the engines that drive the

construction of affordable housing. However, it is the chore of

the judiciary to ensure that *Mt. Laurel II* machinery does not run

amok. During his negotiations with Calogero, Schepisi never

limited his client's proposal to only *Mt. Laurel II*-type housing.

This obviously was because his client was seeking economic relief

by any available means. Instead, he engaged in a free-wheeling

discussion of a variety of non-*Mt. Laurel II* solutions to his

client's problems, that would——in his words——also be a "win-win"

for Emerson.

Calogero's subjective perception of Schepisi's overtures is

unimportant. The objective nature of those propositions, however,

is important. There was no dispute then pending between the

parties; therefore, there was nothing for Schepisi and Calogero

to settle. Clearly, the interchange unfittingly encouraged

Emerson to capitulate to Community Developers' demand for a

density bonus or other means to make it whole. The partial

satisfaction of Emerson's *Mt. Laurel II* obligations by Community

Developers was merely a convenient righteous cloak in which to wrap Community Developers' true motivation.

When Community Developers purchased the property it rationally could have had no reasonable assurance of development for any use other single-family use. It may not reap a windfall at the expense of the public under the guise of *Mt. Laurel II*, especially in light of its aborted attempts to build non-inclusionary housing, and its last-ditch insistence that it be made whole.

Additionally, Community Developers never wrote to the Emerson governing body about its plans for affordable housing. Its negotiation embodied an *ex parte* meeting with a single member of the governing body, designed to try to convince the Council President to exercise her considerable power and influence in favor of Community Developers' desire to be made whole. I conclude that the failure to engage in a pre-litigation letter-writing campaign with Emerson, *standing alone*, does not disqualify Community Developers from a builder's remedy. I do not believe that *Mt. Laurel II* imposed such a rigid lock-step procedure, and although a writing would likely have avoided the confrontationally conflicting remarks of Schepisi and Calogero at trial, I part company with the *dicta* in *J.W. Field*[45]. I find that in today's post-NJFHA/COAH world, a requirement of written pre-

---

[45] 204 N.J. Super. at 461.

EXHIBIT B

suit notification to a governing body is unnecessary and counterproductive. However, in this case, the lack of a memorializing instrument regarding Community Developers' supposed inclusionary intent contributes to my firm conviction that a builder's remedy is not appropriate.

## Estoppel

I have considered the argument that Emerson is estopped from asserting the affirmative defense of bad faith against Community Developers because Emerson and its Planning Board adopted and endorsed the 2001 Housing Element and Fair Share Plan and included the Community Developers' site for RDP and compliance purposes. It is a fair argument to suggest that Emerson is playing fast and loose with the court by changing its position regarding Community Developers. However, this conduct does not constitute judicial or other estoppel for the simple reason that Emerson was *required*—by my Order of December 15, 2000—to prepare a plan for *Mt. Laurel II* compliance that included the Community Developers' site. I had granted a conditional builder's remedy, *subject to the defense of bad faith*. Thus, estoppel is wholly inapposite. Indeed, had Emerson's 2001 Housing Element and Fair Share Plan *not* included Community Developers' site, its public officials would have courted contempt proceedings.

## Unclean Hands

41

I have further considered the doctrine of unclean hands on the part of Emerson as an independent basis to purge the bad faith defense. A trial court may, *sua sponte*, recognize and invoke the equitable doctrine of unclean hands in the interests of justice and public policy where justified by the circumstances[46]. The essence of that doctrine, which is "discretionary on the part of the court,"[47] is that "[a] suitor in equity must come into court with clean hands and he must keep them clean after his entry and throughout the proceedings."[48] In simple parlance, it merely gives expression to the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit[49].

It has been contended throughout this trial, by Community Developers as well as by Emerson Woods, that Emerson has not presented even a scrap of genuine government compliance with *Mt. Laurel II*, and that such inaction continues to the present. There is much to be said for these contentions. Just a cursory glance at the chronology of the development of *Mt. Laurel II* jurisprudence reveals the feebleness of Emerson's response to the rule of law.

---

[46] <u>Trautwein v. Bozzo</u>, 39 N.J. Super. 267, 268 (App.Div. 1956).
[47] <u>Heuer v. Heuer</u>, 152 N.J. 226, 238 (1998).
[48] <u>A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.</u>, 2 N.J. 235, 246 (1949).
[49] <u>Faustin v. Lewis</u>, 85 N.J. 507, 511 (1981)

42

EXHIBIT B

On March 24, 1975, the New Jersey Supreme Court proclaimed that the Constitution of New Jersey required certain municipalities to use their power to regulate the use of land to provide housing opportunities for the poor[50]. Eight years later, the Supreme Court acknowledged the sad fact that the vast majority of municipalities in the state had ignored the Court's constitutional mandate and continued to practice exclusionary zoning[51]. On July 2, 1985, the NJFHA was adopted; on February 20, 1986, the Supreme Court declared the NJFHA constitutional[52]. Thus, Emerson has been on notice since at least the middle 1980s that it is required to obey the constitutional mandate to provide realistic opportunities for the construction of low and moderate income housing. Although Emerson's 1992 Housing Element and Fair Share Plan recognized the need to rezone certain sites for inclusionary development, no practical efforts were taken to make the dream a reality. Emerson never sought substantive certification from COAH. It was apparently satisfied that its benign neglect would either go unnoticed, or market forces would impel non-inclusionary development to saturate the remaining developable parcels of land and thereby render compliance with *Mt. Laurel II* impossible or, at worst, impracticable. The

---

[50] So. Burlington Cty. N.A.A.C.P. v. Tp. of Mount Laurel, 67 N.J. 151 (1975).
[51] So. Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158 (1983).

[52] Hills Dev. Co. v. Bernards Tp., 103 N.J. 1, 22 (1986).

approval and development of the assisted living facility next to

Marek Farm is a recent example of this unspoken policy.

By 2000, Emerson had adopted a new version of a Housing

Element and Fair Share Plan. In it, Emerson acknowledged its

COAH-calculated fair share obligation to be 74 units, but claimed

five units as credits. It proposed to satisfy the net obligation

of 69 units with an RCA program of 12 units, inclusionary

development on the Marek Farm site yielding 13 units, and an

assortment of ambiguous, incomplete proposals for accessory

apartments, an age-restricted public facility, and a possible

overlay zone to account for unmet need. Nowhere in the 2000

Housing Element and Fair Share Plan is there any discussion of a

vacant land adjustment or RDP. Suffice it to say, as the

municipality seems to acknowledge, the 2000 Housing Element and

Fair Share Plan was rightly declared noncompliant with *Mt. Laurel*

*II* principles, as well as deviating from COAH regulations.

After I ordered Emerson to adopt amendments to its Master

Plan and land development ordinances to effectuate compliance

with the New Jersey Constitution and the laws of the State of New

Jersey, Emerson still balked. Emerson has not even proposed, much

less adopted, any legislation that is consonant with the order of

December 15, 2000. The 2001 Housing Element and Fair Share Plan

is riddled with incomplete data and is a wholly unsatisfactory

response to a conventional *Mt. Laurel II* court-ordered mandatory

EXHIBIT B

injunction. The Special Master has cataloged the deficiencies in

Emerson's response to the Court's direction. It is noteworthy

that at trial, Emerson did not dispute most of the Special

Master's observations. Those deficiencies include:

1. Failure to follow COAH's rules and regulations in computing RDP.
2. Failure to provide documentation and evidential support for taking a five-unit credit against fair share.
3. Miscalculation of RDP.
4. Illogical application of density and set-aside for Marek Farm.
5. Erroneous use of rental bonus for Marek Farm where there is no evidence of compliance with N.J.A.C. 5:93-5.15(b)(5) and (6) relating to an agreement with a developer to build rental units.
6. Incomplete demonstration, in accordance with COAH rules, of how inclusionary sites (Marek Farm and Community Developers) are "available, suitable, developable, and approvable."[53]
7. Failure to include a draft ordinance delineating the actual design parameters for development of inclusionary sites.
8. Incomplete and inadequate support for the feasibility of using accessory apartments to be used to address Emerson's affordable housing obligation.
9. Noncompliance with COAH regulations regarding Emerson's development fee Ordinance 1170 and Spending Plan[54].
10. Proffer of vague, conceptual, and largely speculative measures for meeting unmet need.

In analyzing the effect of Emerson's conduct throughout the

pertinent period (1983 to today), I am hard pressed to declare

its behavior as constituting *clean* hands. However, the test is

whether this municipal abdication is shockingly contrary to the

public interest so as to constitute *unclean* hands. Additionally,

for the doctrine of unclean hands to apply vis-à-vis the

[53] N.J.A.C. 5:93-5.3(b).
[54] N.J.A.C. 5:93-5.1(c)(1) to (6).

EXHIBIT B

builder's remedy analysis, some evidence of an unseemly effect upon Community Developers must be shown. A generalized negative consequence to the public interest is not sufficient in this analysis because Community Developers' loss of a builder's remedy does not automatically prejudice the public interest. Because the rights of the absent class of unhoused poor remain vindicated, the unclean hands doctrine does not outweigh the mischief of Community Developers. In addition, municipal delay in itself, while perhaps an appropriate basis for rejecting an affirmative claim pursuant to the laches doctrine, does not establish unclean hands for purposes of our jurisprudence[55]. After all is said and done, I conclude that the doctrine of unclean hands does not eliminate Emerson's affirmative defense of bad faith. Community Developers is not entitled to a builder's remedy.

## Interim Judgment and Mandatory Injunction

An interim judgment shall be entered dismissing Community Developers' claim seeking a builder's remedy, with prejudice. The interim judgment shall further declare that Emerson's land use regulations remain invalid and unconstitutional insofar as they continue past exclusionary practices. The Special Master shall prepare a comprehensive compliance plan (including an appropriate strategy to address the unmet need) for Emerson, together with

---

[55] See Borough of Princeton v. Board of Chosen Freeholders of County of Mercer, 169 N.J. 135, 158 (2001).

EXHIBIT B

zoning and planning legislation to satisfy the RDP and all applicable COAH regulations. He shall draft a meaningful Housing Element and Fair Share Plan, as well, together with a fee ordinance and spending plan that is consonant with COAH rules. He shall exercise planning discretion in deciding whether to employ a program of RCAs, accessory apartments, mobile homes, or any other incentive devices to meet the RDP. He shall further determine the most appropriate device to compensate for the lost opportunity to collect $444,000 which had been earmarked for affordable housing purposes in connection with the Emerson Woods development approval. This plan shall be completed and presented to Emerson's Planning Board and governing body no later than December 31, 2001.

COAH regulations regarding percentages of rental units, mix of bedrooms, array of affordability limits, and distribution of age-restricted units shall be followed where practicable. Height limits of up to sixty feet shall be permitted, except where a lesser height is appropriate in light of sound planning principles.

The Special Master shall regularly consult with designated representatives of Emerson and its Planning Board during the preparation of the compliance plan and he shall take into consideration their constructive criticism. Emerson and its Planning Board shall effectuate the Special Master's compliance

47

plan no later than February 15, 2002. In default thereof, all
development regulations in Emerson shall be permanently
invalidated. All land shall be treated as unzoned, not subject to
local site plan review, and developable at the will of the
developer, subject only to applicable state and federal law,
including, of course, the Uniform Construction Code[56]. If Emerson
complies, it will be entitled to a six-year judgment of repose.
Costs of suit shall be borne by the parties without reallocation.
A final judgment shall be entered on or after February 18, 2001.

VI. CONCLUSION

The facts of this case reveal a legacy of cavalier
inattention by a succession of Emerson governing bodies that
produced a pattern of land use strikingly unfriendly to poor
people. Spanning decades, the inaction of Emerson requires an
immediate and robust response. Since opportunity has not knocked,
it is time to build a door.

The stern result of the interim judgment is necessary so
that the character of our State, as reflected in our
Constitution, in fact imparts the ways in which we live together,
when our relations are touched by the law. Emerson is not immune
to that character and it must conform its behavior to the will of
all the people. That is the basic justification for *Mount Laurel
II*. When that clear obligation is breached, and instructions

---

[56] N.J.S.A. 52:27D-119 *et. seq.*

48

given for its satisfaction, the municipality must prove every element of compliance. It is not fair to require a poor man to prove you were wrong the second time you slam the door in his face.[57] Our Constitution needs to be more than a whisper to the poor. While Emerson may not have the ability to eliminate poverty, it cannot use that condition as the basis for imposing further disadvantages.

---

[57] 92 N.J. at 306.

49

**EXHIBIT C**

REDEVELOPMENT AGREEMENT


BY AND BETWEEN


THE BOROUGH OF EMERSON


AND


EMERSON REDEVELOPERS URBAN RENEWAL, LLC


Dated: June __14__, 2016


1

EXHIBIT C

**THIS REDEVELOPMENT AGREEMENT** (the "Agreement") made this ___ day of June 2016 by and between

**THE BOROUGH OF EMERSON**, Bergen County, New Jersey, a municipal corporation with offices located at 146 Linwood Avenue, Emerson, New Jersey 07630 (hereinafter referred to as "Borough");

AND

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**, a limited liability corporation of the State of New Jersey, having an office at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as the "EMRED" or "Redeveloper")

## WITNESSETH

**WHEREAS,** capitalized terms used herein shall have the meaning given to them above, below or in Section 1.01; and

**WHEREAS,** all Block and Lot references used in this Agreement shall refer to Blocks and Lots appearing on the official tax maps of the Borough; and

**WHEREAS,** the Borough Governing Body authorized the Planning Board to conduct a preliminary investigation pursuant to N.J.S.A. 40A:12A-6 of the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1, et seq., (the "Act") to determine whether certain parcels of land in the Borough and located in the Borough constituted areas in need of redevelopment; and

**WHEREAS,** the Planning Board undertook said investigation and conducted a public hearing, all in accordance with N.J.S.A. 40A:12A-6; and

**WHEREAS,** thereafter the Planning Board found that, among others, the property described in the attached **Exhibit A** (the "Property" or "Properties") satisfied certain statutory criteria and thus constituted an area in need of redevelopment in accordance with N.J.S.A 40A:12A-5 and N.J.S.A. 40A:12-6; and

**WHEREAS,** on September 7, 2004, the Borough Governing Body adopted Resolution No. 199-04, accepting the findings of the Planning Board and designating the Property as an area in need of redevelopment (the "Central Business District Redevelopment Area", as defined herein); and

2

EXHIBIT C

**WHEREAS,** on April 3, 2006, the Borough adopted Ordinance No. 1305-06, adopting a Redevelopment Plan for the Central Business District Redevelopment Area; and

**WHEREAS,** the Borough Council is the Redevelopment Entity for the Central Business District Redevelopment Area; and

**WHEREAS,** on January 8, 2016, the Borough solicited proposals from redeveloper's to redevelop the Central Business District Redevelopment Area;

**WHEREAS,** EMRED together with other redeveloper's responded and submitted proposals to redevelop the Central Business District Redevelopment Area;

**WHEREAS,** JMF Properties responded (and ultimately formed EMRED to be the redevelopment entity) and other potential redevelopers made presentations to the Mayor and Council (the designated Redevelopment Agency) over the course of several meetings and the Mayor and Council selected EMRED with whom to negotiate a potential Redeveloper's Agreement;

**WHEREAS,** EMRED proposes to design, develop, finance and construct the Project as defined herein on the Property; and

**WHEREAS,** the Redeveloper agrees that the Property was legally and lawfully designated as an area in need of redevelopment in accordance with N.J.S.A. 40A:12A-1 et. seq., and such designation is unappealable and that the Property meets the statutory criteria as an area in need of redevelopment; and

**WHEREAS,** in furtherance of the Redeveloper's agreement that the designation of the area in need of redevelopment is legally valid and enforceable, and Redeveloper's waiver of the aforementioned notice, the Redeveloper has submitted to the Borough the Borough's form of application and executed a Funding Agreement with the Borough to pay the Borough's application fee and reimburse the Borough for its professional fees, costs and expenses associated with reviewing and assisting the Borough in connection with the proposed development of the Property, including but not limited, fees for legal services (including but not limited to negotiating the Redevelopment Agreement), professional planning services, engineering services, and financial advisory services and the Borough has designated the Redeveloper as the redeveloper for purposes of redeveloping the Property in accordance with the proposed concept plan attached hereto as **Exhibit B**; and

**WHEREAS,** in order to implement the development, financing, construction, operation and management of the Project, the Borough has determined to enter into this redevelopment agreement with the Redeveloper (the "Redevelopment Agreement");

**WHEREAS,** JMF Properties has agreed to guaranty EMRED's financial obligations under this Redevelopment Agreement.

3

EXHIBIT C

**NOW, THEREFORE,** in consideration of the promises and mutual covenants herein contained, the parties hereto do hereby covenant and agree, each with the other, as follows:

## ARTICLE 1.

### DEFINITIONS

**1.01.   Definitions.** As used in this Agreement the following terms set forth in this Article shall have the meanings ascribed to such terms below. Terms listed below in the singular form shall include the plural and words listed in the plural shall include the singular. Whenever the context may require, any pronoun that is used in this Agreement shall include the corresponding masculine, feminine and neuter. Unless otherwise noted, the words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation". The words "agree," "agreements," "approval" and "consent" when used in this Agreement shall be deemed to be followed by the phrase "which shall not be unreasonably withheld or unduly delayed," except or unless the context may otherwise specify or dictate. All references to Sections, Articles or Exhibits shall refer to Sections, Articles or Exhibits in this Agreement.

"**Act**" shall mean the New Jersey Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-l *et seq.*

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling or controlled by, or under direct common Control with such Person. For purposes of this definition the term "Control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, operations and policies of such Person, whether through the ownership of voting securities or by contract.

"**Affordable Housing Requirements**" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The maximum obligation shall be 20% set aside and may be built on and/or offsite.

"**Borough**" shall mean the Borough of Emerson.

"**Borough Costs**" shall means the reasonable out of pocket expenses incurred by the Borough for the fees and costs of any outside professional consultant, attorney, contractor or vendor retained by the Borough in connection with the Project which are

<center>4</center>

<center>EXHIBIT C</center>

identified by the Funding Agreement executed by the Parties simultaneous to the execution of this Agreement.

**"Agreement"** shall mean this Redevelopment Agreement between the Borough and the Redeveloper.

**"Applicable Laws"** shall mean any and all federal, state and local laws, ordinances, approvals, rules, regulations and requirements including, but not limited to, the Act, the Municipal Land Use Law, the Redevelopment Plan, regulations promulgated by the Council on Affordable Housing, ("COAH"), construction codes including construction codes governing access for people with disabilities, fire codes, zoning codes, health or sanitary codes, pollution and environmental laws, rules and regulations applicable to the Project, Property and/or Project Plan or any aspect thereof.

**"Building Permit"** shall mean a building permit issued by or on behalf of the Borough pursuant to applicable Law.

**"Certificate of Completion"** shall mean a certificate from the Borough in recordable form issued, at the request of the Redeveloper, acknowledging that the Redeveloper has performed all of its duties and obligations under this Agreement, and has completed construction of the Project in accordance with the requirements of this Agreement.

**"Certificate of Occupancy"** shall mean the written certificate issued by the Borough of Emerson in accordance with N.J.S.A. 52:27D-133 relative to a unit of residential space constructed as part of the Project indicating that the subject unit of residential space has been completed in accordance with the construction permit, the Uniform Construction Code and all other Applicable Laws.

**"Commencement of Construction"** or **"Commence Construction"** shall mean the undertaking by the Redeveloper of any actual physical construction of any new structure, Improvements, Public Improvements and other infrastructure included as a component of any phase of the Project other than any activities related to the preparation of the site for such construction, or any activities related to the environmental remediation, mitigation or clean up of same.

**"Commencement Date"** shall mean the date on which the construction force and machinery is mobilized for construction on the Project as further set forth in Sections 5.04 and 5.09.

**"Completion Date"** or **"Completion of Construction"** shall mean the earlier of: (i) the date on which the Redeveloper receives a Certificate of Completion as provided for in Section 5.08 of this Agreement or 24 months from the Commencement Date, whichever is sooner.

5

EXHIBIT C

"**Construction Period**" shall mean the period beginning on the Commencement Date and ending on the Completion Date.

"**Construction Plan**" shall mean the architectural and engineering plans prepared by the Redeveloper in conformance with the approved Final Site Plan, which plans shall be prepared in accordance with Applicable Laws and are to be submitted to the Borough for review and approval prior to the issuance of the necessary permits for Commencement of Construction.

"**Control**" (also referred to as "**Controlled by**" and "**under common Control with**") shall be used with respect to any Person, and shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Days**" shall mean calendar days when such term is used to denote time.

"**Declaration of Restrictions**" shall be a recordable document which includes (a) the provisions of Sections 3.02 to 3.05 inclusive and (b) the prohibition against transfers as set forth in Article 6 and (c) the Borough's remedies as set forth in Article 8.

"**Deeds**" shall mean any deed of conveyance from the Borough or any third Party to the Redeveloper conveying any parcel(s) of property owned or acquired by the Borough or such third party, pursuant to the terms and conditions of this Agreement.

"**Effective Date**" shall mean the date this Agreement is last executed by either the authorized officer of the Borough or by the authorized representative of the Redeveloper.

"**Emergency Municipal Services Building Project**" shall mean the new building the Borough will develop to relocate the volunteer ambulance corp as well as the police department facilities

"**Escrow Account**" shall be as defined in Section 4.02 and include amounts deposited by Redeveloper to cover the Borough's Costs.

"**Event of Default**" shall be as set forth in Article 8 hereof.

"**Final Site Plan**" shall mean the plan submitted to the Planning Board for Final Site Plan approval in accordance with the Redevelopment Plan and Applicable Law.

"**Financial Institution**" shall mean a bank, savings bank, savings and loan association, mortgage lender or insurance company, pension fund, real estate investment trust, investment bank, mutual fund or similarly recognized reputable source of construction and permanent financing for the Project, chartered under the laws of the United States of America, or any State thereof.

6

EXHIBIT C

"**Force Majeure**" (also "**Event of Force Majeure**") as used throughout this Agreement this term applies to all time limitations and other obligations and shall mean any acts of God, fire, volcano, earthquake, hurricane, blizzard, infectious disease, technological disaster, catastrophe, large scale infestation of any type, tremors, flood, explosion, release of nuclear radiation, release of biotoxic or of biochemical agents, the elements, war, blockade, riots, mob violence or civil disturbance, any act or acts of terrorism or terroristic threat, an inability to procure goods or services or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes, walkouts, actions of labor unions, governmentally imposed moratoriums, court orders, laws, rules, regulations or other orders of governmental or public agencies, bodies and authorities or any other similar cause not within the reasonable control of the Parties including legal inability to comply resulting from a change of law including municipal laws regulating land use and construction, any legal requirements under any applicable environmental laws, as well as all known and unknown rules and regulations of the Federal Environmental Protection Agency and the NJDEP, clearances, approvals or permits typical of the development process, any legal proceedings, decisions or decrees that adversely affect the Parties' ability to reasonably perform the obligations of and/or benefit from the terms of this Agreement, any economic conditions that may adversely affect the real estate market or may affect the Redevelopment Area, the Project or any of the individual phase(s) of this Project as demonstrated by an independent market study prepared by a qualified financial consultant selected by the Party seeking the benefit of Force Majeure provided that the qualified financial consultant is approved by the non-benefiting party using its reasonable judgment, in advance of the preparation of the independent market study, or any unreasonable delay in the Redeveloper's receipt of any necessary Governmental Approvals not within the Redeveloper's control.

"**Funding Agreement**" shall mean that agreement required by Borough Ordinance which obligates the Redeveloper to fund and pay for any and all professional fees the Borough may incur in order to complete this Project, a copy of which is attached hereto as **Exhibit E**.

"**Governmental Agency**" shall mean any federal, state, county or municipal legislative, administrative, executive or governing body, office, agency, department, commission, authority, court, or tribunal and any successor thereto, exercising executive, legislative, judicial, advisory or administrative functions of or pertaining to government, including, without limitation, the Borough of Emerson, the County of Bergen, the State of New Jersey and/or the United States of America.

"**Governmental Applications**" shall mean any and all submissions, plans, drawings, diagrams, supporting documentation or other proofs or presentations that are transmitted to any Governmental Agency for the purpose of obtaining any and all Governmental Approvals required to complete the Project.

"**Governmental Approvals**" shall mean any and all authorizations, permits, licenses or certificates issued by any Governmental Agency or quasi-governmental entity

EXHIBIT C

(including outside agencies) as a result of the submission of a Governmental Application required in order to implement the Project or any aspect thereof in accordance with this Agreement and the Redevelopment Plan, for the construction of the Project including, without limitation: the Site Plan Approval with respect to the Building Permit; environmental approvals; sewerage capacity approvals and any and all other necessary permits, licenses, consents and approvals required for construction and operation of the Project under Applicable Law. No approval shall be final until the time for appeal shall have run without the filing of an appeal, or, in the event an appeal is filed, until such appeal is resolved fully in favor of Redeveloper and the time for further appeals shall have run without the filing of any further appeal. No Governmental Approval shall contain any condition which would materially and adversely affect the development, construction or operation of the Project or the finances thereof.

"**Governing Body**" shall mean the Borough Council of the Borough of Emerson, together with any successor(s) thereto.

"**Impositions**" shall mean all taxes, assessments (including, without limitation, all assessments for public improvements or benefits), water, sewer or other rents, rates and charges, license fees, permit fees, inspection fees and other authorization fees and charges, in each case, whether general or special, which are levied upon any portion of the Project or on any of the improvements constructed thereon.

"**Improvements**" shall mean all buildings, appurtenances, structures physically within or upon the Property, together with any work on site or off-site, reasonably on-site and, if any, off-site improvements, constructed on or installed in connection with the construction of the Project in accordance with the Concept Plans attached hereto as **Exhibit B**, including but not limited to grading site drainage, walkways, hook-ups and service laterals from buildings to curbs for water, sewer, storm water and other utilities, parking, lighting within parking areas, landscaping and fire hydrants, all constructed in accordance with the Redevelopment Plan, Governmental Approvals and Applicable Laws.

"**Mortgagee**" shall mean an Institution that holds a Mortgage on the Property.

"**Municipal Land Use Law**" or "**MLUL**" shall mean the Municipal Land Use Law *N.J.S.A.* 40:55D-1, *et seq.*

"**NJDEP**" shall mean the State of New Jersey Department of Environmental Protection, together with any successor(s) in interest thereto.

"**Offsite/OnSite Improvement Share**" shall mean the amount Redeveloper shall pay for the Offsite and Onsite improvements that the Borough or other third parties shall make which will benefit Redeveloper as well as on site improvements which will benefit other property owners, all as fully set forth in **Exhibit F**.

**Party/Parties:** Shall mean individually, the Borough, the Redeveloper or a

EXHIBIT C

Person as defined herein and shall mean collectively, the Borough and Redeveloper.

**"Person(s)"** shall mean any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company or corporation, trust, unincorporated association, institution, public or governmental body, or any other entity.

**"PILOT"** shall mean a long term exemption pursuant to N.J.S.A. 40A:20-1 et seq.

**"Planning Board"** shall mean the Land Use Board of the Borough, pursuant to *N.J.S.A.* 40:55D-23.

**"Project"** shall mean the development, design, financing and construction of the Improvements and the Public Improvements by Redeveloper on the Property.

**"Project Costs"** shall be as defined in Section 4.01.

**"Project Milestones"** shall mean the date(s) or deadline(s) established for Project tasks to be completed by the Redeveloper in a timely manner as set forth in the Redevelopment Project Schedule attached hereto as **Exhibit C**.

**"Project Schedule"** shall mean the schedules set forth in the Redevelopment Project Schedule attached hereto as **Exhibit C**, that contain the Project Milestones for the development, construction and completion of the Project, as applicable.

**"Property"** or **"Properties"** shall mean the Blocks and Lots as located on Borough tax maps, as listed in **Exhibit A**, subject to a subdivision of the land for the construction of the Facility as referenced in this Agreement.

**"Plan"** or **"Redevelopment Plan"** shall mean the Redevelopment Plan adopted by Borough Ordinance on April 3, 2006, or any subsequent Redevelopment Plan as same may be amended from time to time.

**"Project Plan"** shall mean the concept plan annexed hereto as **Exhibit B** for the Project.

**"Public Improvements"** shall include but not be limited to all such improvements that benefit the public, including by way of example, roadways, sanitary sewers, stormwater facilities, water mains, fire hydrants, utilities poles, piping and conduits (such as telephone, fiber optic, electric, and natural gas), curbs, sidewalks, retaining walls, conservation easement areas, and retention or detention basins but shall exclude parking decks, and other private improvements.

**"Redeveloper"** shall mean Emerson Redevelopers, LLC having its corporate offices at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981. The members of Redeveloper are listed in **Exhibit D**.

9

EXHIBIT C

"**Redevelopment Area**" shall mean the area designated by the Borough Council as the Central Business District Redevelopment Area pursuant to a Borough Resolution No. 199-04 adopted on September 7, 2004.

"**Redevelopment Project Schedule**" shall mean the Project Schedule and Reporting Requirements which sets forth the respective tasks and completion dates of various phase-related activities, which is attached hereto as **Exhibit C.**

"**State**" shall mean the State of New Jersey.

"**Survey**" shall mean the standard process by which a qualified land surveyor licensed to perform such services within the State of New Jersey prepares location measurements of a parcel or parcels of property in order to ascertain the size of same and its location and relationship to adjoining parcels and to locate all structures, improvements, easements, and restrictions on the properties.

"**Tolling Event**" shall mean: (i) an act or omission by one Party or a third Party that has a material and adverse effect on the other Party's ability to perform any obligation, requirement, commitment, or responsibility prescribed under this Agreement; or (ii) any extension granted by either Party to the other Party, to extend any proposed date to perform in this Agreement; or (iii) any reasonable request by one Party to the other to extend the time for performance of any obligation, requirement, commitment or responsibility arising pursuant to this Agreement.

"**Borough**" shall mean the Borough of Emerson, Bergen County, New Jersey.

"**Borough Council**" shall mean the governing body of the Borough of Emerson.

"**Transfers**" shall be as defined in Section 6.03.

"**Transferee**" shall mean any Third-Party (other than unit purchasers in the ordinary course of business) to whom an interest in the Project Premises, the Improvements or rights in or under this Agreement is conveyed, transferred, leased, encumbered, acquired or assigned, by sale, merger, consolidation, reorganization, foreclosure or otherwise, including a trustee in bankruptcy or assignee for the benefit of creditors.

EXHIBIT C

## ARTICLE 2.

## REPRESENTATIONS AND WARRANTIES

**2.01 Representations and Warranties by the Redeveloper.** The Redeveloper hereby makes the following representations and warranties to the Borough for the purpose of inducing the Borough to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true, to the best of its knowledge, as of the date hereof:

(1) Redeveloper has the legal capacity to enter into this Agreement and perform each of the undertakings set forth herein and in the Redevelopment Project Schedule as of the date of this Agreement.

(2) Redeveloper is duly organized and a validly existing legal entity under the laws of the State of New Jersey and all necessary consents have been duly adopted to authorize the execution and delivery of this Agreement and to authorize and direct the persons executing this Agreement to do so for and on the Redeveloper's behalf.

(3) Redeveloper represents that the Project will create economic development on blighted property, in the form of job creation, increased real estate tax ratables, improvements to the Property, and an increase in the quality of life of the surrounding properties through the implementation of the Improvements.

(4) Redeveloper represents that it has the technical and financial expertise and ability to complete the Project in accordance with the Project Schedule established in **Exhibit C**.

(5) No receiver, liquidator, custodian or trustee of Redeveloper shall have been appointed as of the effective Date, and no petition to reorganize Redeveloper pursuant to the United States Bankruptcy Code or any similar statute that is applicable to the Redeveloper shall have been filed as of the effective Date.

(6) No adjudication of Bankruptcy of the Redeveloper or a filing for voluntary bankruptcy by Redeveloper under the provisions of the United States Bankruptcy Code or any other similar statue that is applicable to the Redeveloper shall have been filed.

(7) No indictment has been returned against Redeveloper or any official, principal or member of Redeveloper.

(8) There is no action, proceeding or investigation now pending, nor any basis therefore, known or believed to exist which questions the authority of the Redeveloper to

EXHIBIT C

enter into the Agreement or any action or act taken or to be taken by the Redeveloper pursuant to this Agreement.

(9) Redeveloper's execution and delivery of this Agreement and its performance hereunder will not constitute a violation of any operating, partnership and/or stockholder agreement of Redeveloper or of any agreement, mortgage, indenture, instrument or judgment, to which Redeveloper is a party.

(10) Redeveloper shall make its good faith efforts to award contracts and/or subcontracts wherever reasonably feasible to local business enterprises, where competitive bids and prices are offered by such enterprises, which may have a limited record of such activity, but which, in the judgment of Redeveloper, can competently provide the goods and services required by redeveloper. Redeveloper shall further make its best efforts to utilize local employees on the Project, and shall ensure that contractors and subcontractors retained by the Redeveloper make similar efforts, including cooperation with the Borough as set forth in subsection (10) immediately below.

(11) Redeveloper shall cooperate fully with the Borough in efforts by the Borough or its designees to recruit, screen, train, and refer qualified local and/or minority employees and subcontractors to Redeveloper and its general contractor or contractors, including providing information to the Borough or its designee with respect to the disposition of applicants for employment or subcontracts referred by the Borough or its designee to Redeveloper.

(12) All materials and documentation submitted by the Redeveloper and its agents to the Borough and its agents were, at the time of submission, and as of the Effective Date, materially accurate, and the Redeveloper shall continue to inform the Borough of any material or adverse changes in the documentation submitted. The Redeveloper acknowledges that the facts and representations contained in the information submitted by the Redeveloper are a material factor in the decision of the Borough to enter into this Agreement.

(13) Redeveloper and the resources available to it through its principal are financially and technically capable of developing, designing, financing and constructing the Project.

(14) There is no pending, or to the best of the Redeveloper's knowledge, threatened litigation, action or proceeding that would (i) prevent or delay the Redeveloper from performing its duties and obligations hereunder and/or (ii) question the validity of this Agreement or any essential element upon which this Agreement depends.

(15) Redeveloper acknowledges that it has had the opportunity to review all official documents contained in the public record relating to the Borough's designation of the Property as "an area in need of redevelopment", and the Borough's selection of the Redeveloper to undertake the redevelopment of the Property, all in accordance with

EXHIBIT C

N.J.S.A. 40A:12A-1 et seq., (collectively the "Official Acts"). The Redeveloper hereby waives any and all causes of action it may have, or seek to prosecute against the Borough and the Borough Planning Board, in the event that the Redeveloper's rights as set forth in this Agreement are affected by any determination of a court of competent jurisdiction that one or more of the Official Acts, or any portion thereof, is invalid. Further, Redeveloper hereby waives any and all causes of action it may have to challenge the "Official Acts", including, by way of example and not limitation, any challenge Redeveloper may have regarding notice (pursuant to <u>Harrison Redevelopment Agency vs. De Rose</u>) and/or the Local Redevelopment and Housing Law. These waivers shall survive any termination of this agreement.

(16) Notwithstanding the foregoing, the Borough and Redeveloper may determine that it is in the interest of the Project to re-study the Central Business District Redevelopment Area or particular properties located within the Central Business District Redevelopment Area to confirm that they continue to be blighted and otherwise meet the criteria pursuant to <u>N.J.S.A.</u> 40A:12A-1 *et seq*. Redeveloper shall reimburse the Borough for such costs associated with this work as set forth in Section 4.01.

**2.02. Representations and Warranties by the Borough.** The Borough hereby makes the following representations and warranties for the purpose of inducing the Redeveloper to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true as of the date hereof:

(1)     The Borough has the legal power, right and authority to enter into this Redevelopment Agreement and the instruments and documents referenced herein to which the Borough is a party, to consummate the transactions contemplated hereby, to take any steps or actions contemplated hereby, and to perform its obligations hereunder.

(2)     With the exception of the items or tasks which shall be a condition precedent to the Effective Date of this Agreement, upon the approval by the Governing Body of this Agreement, all requisite action has been taken by the Borough and all requisite consents have been obtained in connection with the entering into this Redevelopment Agreement and the instruments and documents referenced herein to which the Borough is party, and the consummation of the transaction contemplated hereby, and to the best of the Borough's knowledge and belief are authorized by all Applicable Laws. To the best knowledge of the Borough there are no writs, injunctions, orders or decrees of any court or governmental body that would be violated by the Borough entering into or performing its obligations under this Redevelopment Agreement.

(3)     This Redevelopment Agreement is duly executed by the Borough, and is valid and legally binding upon the Borough and enforceable in accordance with its terms on the basis of laws presently in effect and the execution and delivery thereof shall not, with due notice or the passage of time, constitute a default under or violate the terms of any indenture, agreement or other instrument to which the Borough is a party.

EXHIBIT C

(4)    There is no action, proceeding or investigation now pending, nor any basis known or believed to exist which questions the validity of this Agreement or the authority of the Borough to enter into the Agreement or any action or act taken or to be taken by the Borough pursuant to this Agreement.

(5)    The Borough agrees to support any applications for Governmental Approvals that are consistent with the terms of the Redevelopment Plan and this Agreement, and to execute any documents required to obtain such approvals and otherwise to cooperate with the Redeveloper with respect to the Governmental Approvals, provided that nothing contained in this Article 2.02 of this Agreement shall be deemed: (i) to constitute an approval of all or any portion of the Project for which Governmental Applications have been submitted or are required or approval of any Governmental Application seeking a financial incentive including but not limited to, the PILOT, (ii) a waiver of the ability of the Planning Board, or any other governmental or administrative entity, from exercising its statutorily authorized responsibilities with respect to the Governmental Applications or Governmental Approvals. Notwithstanding the foregoing, this Agreement shall not be deemed to be in full force and effect until such time as Redeveloper receives an approved PILOT agreement, mutually satifisactory to both parties.

(6)    No official or employee of the Borough has any personal interest, direct or indirect, in this Agreement.

(7)    Nothing exists that would prevent Governmental Applications from being deemed complete. Including without limitation taxes.

**2.03. Mutual Representations.**

(1) The Borough and Redeveloper agree that the Project as defined herein does not constitute a "Public Works Contract" as defined in N.J.S.A. 10:5-31 and the completion of the  Project does not constitute a "Public Work" as defined in N.J.S.A. 34:11-56.26 (the "Prevailing Wage Law").

(2)    In the event that any contractual provisions that are required by Applicable Laws have been omitted, then the Borough and Redeveloper agree that this Agreement shall be deemed to incorporate all such clauses by reference and such requirements shall become a part of this Agreement.  If such incorporation occurs and results in a change in the obligations or benefits of one of the parties, the Borough and Redeveloper agree to act in good faith to mitigate such changes in position.

EXHIBIT C

## ARTICLE 3.

## COVENANTS AND RESTRICTIONS

**3.01. Covenants and Restrictions.** Redeveloper agrees to record the Declaration of Covenants and Restrictions on the Property in the office of the Bergen County Clerk within thirty (30) days of the fulfillment of all contingencies set forth in Article 12.

**3.02. Description of Covenants.** The Declaration of Covenants and Restrictions shall also state that the Redeveloper and its successors and assigns shall:

(a)     Devote the Property to the uses specified in the Redevelopment Plan and shall not devote the Property to any other uses without the approval of the Borough;

(b)     To the extent provided for by the Applicable Laws to not discriminate upon the basis of age, race, color, creed, religion, ancestry, national origin, sex or marital status in the sale, lease, use or occupancy of the Property or any Improvements, buildings or structures erected or to be erected thereon, or any portion thereof;

(c)     To the extent provided for by the Applicable Laws, in the sale, lease or occupancy of the Property or any portion thereof, not effectuate or execute any covenant, lease agreement, conveyance or other instrument whereby the land or any Improvement, building or structure erected or to be erected thereon is restricted upon the basis of age, race, color, creed, religion, ancestry, national origin, sex or marital status, and the Redeveloper, its successors and Transferee(s) shall comply with all State and local laws prohibiting discrimination or segregation by reason of age, race, color, creed, religion, ancestry, national origin, sex or marital status; and

(d)     That the Redeveloper and its Transferee(s) shall not sell, lease or otherwise Transfer the Property, or any portion thereof, without the written consent of the Borough not to be unreasonably withheld, as set forth in Article 6 hereof other than those Transfers deemed to be the Permitted Transfers pursuant to Article 6 hereof.

**3.03. Effect and Duration of Covenants.** It is intended and agreed that the agreements and covenants set forth in Section 3.02 shall be covenants running with the land and that they shall, in any event, and without regard to technical classification or designation, legal or otherwise, and except only as otherwise specifically provided in this Agreement, be binding, to the fullest extent permitted by law and equity, for the benefit and in favor of, and enforceable by, the Borough, its successors and assigns, against the Redeveloper, its successors and assigns and every successor in interest therein, and any party in possession or occupancy of the Project or any part thereof until a Certificate of Completion has been issued.  However, such agreements and covenants shall be binding on the Redeveloper itself, each successor in interest to the Redeveloper and each party in possession or occupancy, respectively, but only for such period as the Redeveloper or such successor or party shall be a lessee or be in possession or occupancy of the Property, the buildings and structures thereon or any part thereof.

EXHIBIT C

**3.04. Enforcement by the Parties.** Both Parties shall have the right, in the event of any breach of any of the aforesaid covenants or of any of the other terms and conditions of this Agreement, to exercise all the rights and remedies and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breach of agreement or covenant, to which they or any other beneficiaries of such agreement or covenant may be entitled. In the event a party is successful in enforcing any of its rights hereunder, such unsuccessful party shall pay and reimburse the successful party for all of its reasonable attorneys fees together with any costs and expense incurred by the successful party in enforcing its rights hereunder.

**3.05. Redevelopment Area Upon Completion.** Upon issuance of a Certificate of Completion, the conditions that were found and determined to exist at the time the Property was determined to be in need of redevelopment shall be deemed to no longer exist, the Property shall no longer be subject to eminent domain as a result of such determinations conditions and the requirements of N.J.S.A. 40A:12A-9 shall be deemed to have been satisfied with respect to the Property. The Borough shall release the recorded documents and designations on a Phase by Phase basis provided that the Redeveloper has subdivided the Property to facilitate the Phase by Phase release of same.

## ARTICLE 4.

### COSTS ASSOCIATED WITH THE PROJECT

**4.01. Project Costs.** All costs of implementing and Completing the Project, including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property, any Remediation costs (including the costs of operation, maintenance, reporting and monitoring that may be associated with any engineering controls and institutional controls), the cost of designing and constructing the Project (including the costs of any construction observation services) all Improvements, all financing costs, all marketing and leasing costs for the Project and the Borough Costs as limited by the Funding Agreement, (collectively, the "Project Costs") shall be borne by Redeveloper. Except if otherwise specifically set forth herein, the Borough shall not be responsible for any costs associated with the Project. The Project Costs are estimated to be Thirty Million Dollars ($30,000,000.00). Detailed breakdowns of the hard and soft cost of this Project shall be provided by the Redeveloper to the Borough no later than the issuance of a building permit for the Phase 1 Project.

**4.01.1 Offsite/Onsite Improvement Share.** Redeveloper shall pay for the Offsite and Onsite improvements that the Borough or other third parties shall construct or install which will benefit Redeveloper as well as on site improvements which will benefit other property owners, all as fully set forth in **Exhibit F**, which may be amended or adjusted from time to time based on the actual costs of construction and a final determination by the Borough Engineer of this Redeveloper's Offsite/Onsite Improvement Share.

16

EXHIBIT C

**4.02. Borough Costs and Application Fees.** Redeveloper has executed a Funding Agreement with the Borough that addresses the timing and payment of the Borough Costs which is attached hereto and incorporated herein as **Exhibit E.**

**4.03. Affordable Housing Requirement.** The Parties recognize and acknowledge that the Project will generate a fair share housing requirement for Redeveloper pursuant to the Affordable Housing Requirements established by the State of New Jersey and the Council on Affordable Housing. Redeveloper and the Borough agree that Redeveloper shall satisfy the affordable housing obligations resulting from Redeveloper's development of the Project in accordance with the State's Affordable Housing Requirements. The obligation shall be fixed as of the start of each of the Phases of the Project. The presumptive percentage of set aside units to be built shall be twenty percent (20%). However, the Redeveloper may request that the Borough seek a determination from either the courts or COAH to determine the definitive affordable housing set aside for the Project. If the Redeveloper elects to have the Borough seek a determination from either the courts or COAH, the Redeveloper shall pay for all of the Borough's professional fees associated with seeking such determination, including but not limited to legal fees (together with costs and expenses), as well as the fees, costs and expenses of planners, engineers, financial advisers, COAH experts, and any other professional or advisory services required to obtain the determination (collectively the "Professional Fees"). The payment or reimbursement for such Professional Fees shall be made pursuant to the Funding Agreement the Redeveloper has previously executed. The Escrow established pursuant to such Funding Agreement shall be replenished as necessary and as required pursuant to the terms of the Funding Agreement and the Funding Agreement is deemed amended and supplemented to include the provisions of this Section 4.03 as if fully set forth within the Funding Agreement.

**4.03.1 Alternate COAH Location.** The Redeveloper and the Borough shall explore alternative sites to accommodate all of the Low and Moderate Housing obligations associated with this Project at another location in the Borough, subject to any necessary court approval and such court approval to be funded by Redeveloper as set forth in **Section 4.03** hereinabove.

**4.04. Emergency Municipal Services Building.** The Borough has dedicated and shall transfer Block 419Lot 7 to Redeveloper for the Project ("Dedicated Lot") which is currently utilized by the Borough Ambulance Corp and has a fair market value of $500,000. In consideration therefore the Redeveloper shall construct at its sole cost and expense an Emergency Municipal Services Building as defined hereinabove. The Borough shall provide the Redeveloper the property as well as all of the site plans, architectural and engineering plans at the Borough's sole cost and expense and upon the completion of the building the Borough shall pay and reimburse Redeveloper all of the costs associated with the construction of the Emergency Municipal Services Building, less the direct and allocatable costs associated with Ambulance portion of the building as the parties may agree, which in no case shall exceed the fair market value of the Dedicated Lot. In the event the parties cannot agree on such reimbursable costs to the

17

EXHIBIT C

Redeveloper, the party's attorneys shall select a retired Judge from Bergen County to mediate and definitively determine such costs to be reimbursed to the Redeveloper and such costs for such mediator shall be shared by the parties equally.

## ARTICLE 5.

## THE PROJECT

**5.01. Property.** The Property is located in the Borough and presently identified in the Borough tax maps on the Blocks and Lots described in **Exhibit A**, subject to any necessary subdivision. The Project is depicted in the Concept Plan for the Project attached hereto as **Exhibit B** and shall be constructed in accordance with the Redevelopment Project Schedule set forth in **Exhibit C**. The Redeveloper and Borough each covenant and agree to perform the obligations set forth in the Redevelopment Project Schedule set forth in **Exhibit C**. The Redeveloper covenants and agrees that it will construct the Project in accordance with the Redevelopment Plan. All Improvements to be situated upon the Property (i.e., sidewalks, utilities and site lighting, off street parking, roadways, pilings, foundations, footings, open space, walkways, landscaping, etc.) and other construction identified as Improvements shall be installed by the Redeveloper at its sole cost and expense as the Project requires. The Redeveloper shall negotiate for the purchase of any properties set forth in **Exhibit A** that it does not currently own or control at its sole cost and expense. In the event the Redeveloper is not able to purchase any property set forth in **Exhibit A** the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c). The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties. The Borough shall adopt the necessary Ordinances to vacate Kenneth Avenue within sixty (60) days from the date the Redeveloper obtains Governmental Approvals.

**5.02. Governmental Approvals.** The Redeveloper shall make all Governmental Applications and receive all Governmental Approvals required under Applicable Laws in order to construct the Project in accordance with the Redevelopment Project Schedule. Issuance of a Building Permit shall be conclusively presumed to be in compliance with all Governmental Applications and Governmental Approvals that are perquisites to the issuance of such Building Permit.

**5.03. Site Work.** The Redeveloper at its sole expense shall install upon or in the Property all necessary site preparation, including pilings and , filling and all on-site infrastructure. Notwithstanding anything contained herein, the Borough shall not be responsible for any costs associated with any Improvements necessary for the development and construction of the Project. The costs of developing the Project and Facilities, and of constructing all Improvements thereon, including, but not limited to, all required Public Improvements, shall be borne entirely by the Redeveloper; provided, however, that Redeveloper's contributions for offsite improvements may be subject to pro-ration in accordance with Applicable Laws. Notwithstanding the foregoing, the Borough shall not be responsible for any costs associated with any Improvements necessary for the development and construction of the Project

EXHIBIT C

**5.04.    Commencement and Completion Schedule.**  The Redeveloper agrees to commence construction of the prooct within 120 days of Government Approvals and thereafter diligently prosecute the Project to completion in accordance with the Redevelopment Project Schedule set forth in **Exhibit C** and this Article but in no case later than 24 months from the Commencement Date. Redeveloper understands that the Borough will require strict compliance with the Project Milestones, deadlines and time periods for the various activities and actions to be taken by the Redeveloper hereunder, as set forth in **Exhibit C**, subject to the occurrence of a Force Majeure Event.  The Borough agrees to cooperate fully with Redeveloper regarding all Governmental Approvals. Redeveloper acknowledges that a failure to meet a Project Milestone shall be a material breach of this Agreement that will subject the Redeveloper to Termination of this Agreement as permitted in Articles 8 & 9.  The Parties acknowledge and agree that the Redeveloper may need to modify the Redevelopment Project Schedule.  The Borough shall, upon the written request of the Redeveloper, consider modifications of the dates set forth in the Redevelopment Project Schedule.  The Borough agrees to consider and render a decision with respect to any such modification, within a period of sixty (60) days following receipt of a written request by the Redeveloper.  Failure to diligently prosecute the Project to Completion may cause the Borough to notify the Redeveloper that it is in default of its obligations hereunder, and to pursue all lawful remedies against the Redeveloper.   Similarly, the Borough agrees to commence and diligently prosecute its obligations as set forth in the Redevelopment Project Schedule.

**5.05.    Progress Reports.**  For so long as this Redevelopment Agreement shall remain in effect, Redeveloper shall make quarterly reports to the Borough as to the actual progress of Redeveloper with respect to development, planning and construction of both the Project, and such other matters as the Borough shall reasonably request be addressed in such reports, including but not limited to the reporting requirements set forth in **Exhibit C**.

**5.06.    Public Improvements and Utility Relocation.**  The Borough and the Redeveloper hereby agree that the Redeveloper will make the Public Improvements consistent with the Plan which shall include, but shall not be limited to installation of concrete curbing, sidewalks, roadway base/surface, sewers, drainage, grading, street lighting, street furniture, signage, utilities, plantings and appropriate traffic control signals as may be required by the Governmental Approvals or Applicable Laws. Notwithstanding anything contained herein to the contrary, Borough shall not be responsible for any costs associated with any Public Improvements necessary for the development and construction of the Project.  The costs of developing the Project and all Public Improvements thereon, including, but not limited to, all required Public Improvements or utility relocations, shall be borne entirely by the Redeveloper.     In addition, Redeveloper shall install at its sole cost and expense the Storm Water Pipe as more fully described and set forth in **Exhibit G**.

19

EXHIBIT C

**5.07.  Performance Bond.** If the Planning Board does not require that the Redeveloper post a Bond for the Public Improvements as a condition of the site plan approval issued by the Planning Board, then prior to the Commencement of Construction, Redeveloper shall provide the Borough with a bond (the "Bond") the "Performance Guaranty"), in an amount equal to the cost of Public Improvements  The Bond must be issued by an insurance or surety company authorized to conduct business in the State of New Jersey, rated A+ or better by A.M. Best and listed in the most current U.S. Treasury Circular 570. The Bond must name the Borough as an obligee, and Redeveloper shall deliver a copy of the Bond to the Borough on or before the Commencement Date.  If an Event of Default occurs, the Borough will use the Performance Guaranty to complete construction of the Public Improvements or to remove any structure on the Property, in its sole discretion, subject to the right to cure of the mortgagee as set forth in Article 9.03. Redeveloper shall receive a credit against the Bond for any bond required to be posted in satisfaction of the requirements of the Land Use Law, in the event that the Bond required by the Planning Board does not completely encompass the Public Improvements contemplated by this Redevelopment Agreement.

**5.08.  Certificates of Occupancy and Certificate of Completion.**  Upon completion of construction in accordance with the Governmental Approvals and Applicable Laws, the Redeveloper shall apply to the appropriate governmental officer or body for a Certificate of Occupancy for the Project or a portion thereof. The Certificate of Occupancy, when issued, shall constitute evidence that Redeveloper has fully performed its obligations under Governmental Approvals as to the Project or a portion thereof. Following the issuance of the Certificate of Occupancy and the satisfaction of the terms and conditions of this Agreement, the Borough agrees to issue a Certificate of Completion, in proper form for recording, which shall acknowledge that the Redeveloper has performed all of its duties and obligations under this Agreement and has completed construction of the Project or a portion thereof in accordance with the requirements of this Agreement. The Certificate of Completion shall constitute a recordable, conclusive determination of the satisfaction and termination of the agreements and covenants in this Agreement and the Redevelopment Plan with respect to the obligations of the Redeveloper to construct the Project or a portion thereof within the dates for the completion of same. Within 30 days after written request by the Redeveloper, the Borough shall provide the Redeveloper with the Certificate of Completion or a written statement setting forth in detail the reasons why it believes that Redeveloper has failed to complete the Project or a portion thereof in accordance with the provisions of this Agreement or is otherwise in default under this or any other applicable agreement and what reasonable measures or acts will be necessary in the opinion of the Borough in order for the Redeveloper to be entitled to the Certificate of Completion.

**5.09 Project Schedule.**  With respect to the Project, Redeveloper shall meet the deadlines and timeframes for the completion set forth in the Redevelopment Project Schedule set forth in **Exhibit C**. Redeveloper shall construct the Project using all commercially reasonable methods to prosecute the uninterrupted construction of the Project. Failure to prosecute the uninterrupted construction of the Project shall constitute an Event of Default.  It shall be an Event of Default for Redeveloper to fail to complete

EXHIBIT C

Construction of the Project such that a Certificate of Completion is not issued by the Borough in accordance with the Redevelopment Project Schedule set forth in **Exhibit C.**

5.10    **Project Modifications.**    The Redeveloper hereby acknowledges and agrees that the development and construction of the Project shall be in accordance with the Project Schedule set forth in **Exhibit C.** The Redeveloper may not modify, alter or amend the approved Final Site Plan at any time without the express prior written approval of the Borough which shall not be unreasonably withheld, conditioned or delayed, subject to the provisions of the Applicable Laws; provided, however, that the Redeveloper may make those modifications, alterations and amendments to the Final Site Plan or Construction Plans, as the case may be, that are "minor" in nature.  The Borough reserves its right to contest any material modifications that may potentially arise in the course of the construction of the Project.

5.11 **Suspension of Construction.**    If the Redeveloper shall abandon or substantially suspend construction activities on the Project for a period of 120 consecutive days, the rights and remedies of the Parties shall be governed by the provisions of Article 8 of this Agreement.

5.12    **Insurance.**  The Redeveloper shall maintain or cause to be maintained at its own cost and expense, with responsible insurers, the following kinds and the following amounts of insurance with such variations as shall reasonably be required to conform to customary insurance practice and in no case less than the amounts indicated below and certificates, or full copies of policies must be furnished as noted below:

(a)    Builder's Risk Insurance for the benefit of the Redeveloper and the Borough, as its respective interests may appear, during the term of construction which will protect against loss or damage resulting from "ALL Risk" or "Special Form" f The limits of liability will be equal to One Hundred (100%) percent of the insurable replacement cost value of the Project (comments on this may follow), including items of labor and materials connected therewith, whether in or adjacent to the structure insured, and materials in place or to be used as part of the permanent construction. Is this meant so say replacement cost endorsement Is loss of use an issue for the borough?

(b) COMPREHENSIVE GENERAL LIABILITY LIMITS $1,000,000/2,000,000 combined single limit "CSL" covering Bodily injury, Property damage and Personal Injury -including explosion, collapse, underground utilities, contractual, independent contractors, and Products/Completed Operations coverage for all premises and work to be completed under the redevelopment agreement.

(c)    Worker's Compensation Insurance coverage in the amount of:
Coverage A - New Jersey Statutory
Coverage B – 500,000/500,000/500,000
the full statutory liability of the Redeveloper;

21
EXHIBIT C

(d)    ENVIRONMENTAL INSURANCE (Pollution Liability)- $5,000,000/$5,000,000-covering Bodily Injury, Property Damage, pollution or environmental harm including cleanup cost arising out of the work to be performed under this contract. The policy must contain a separation of insureds clause and include the Borough of Emerson as an **additional Named Insured**.

(e)    Requirement that contractor's sub-contractors hired by redeveloper maintain certain insurance and name the Borough as additional insured.

(f)    Railroad Protective-Insurance- Requirements Equal to that required by the Railroad if applicable.

(g)    Such other insurance, in such amounts and against such risks, as is customarily maintained by the Redeveloper with respect to other similar properties owned or leased by it, including automobile insurance.

**The before mentioned policies listed in B,C,D & E above shall name the Borough of Emerson**, it's elected officials, agents, employees, officers, affiliates, directors, members, partners, consultants, and subcontractors of each and any of all such as **additional insureds**, and the insurance afforded to these additional insureds shall be primary coverage and noncontributory for all claims covered thereby

The Redeveloper shall file with the Owner before commencing with the redevelopment work under this Agreement, original Certificates of Insurance, or policies where required, which certificates shall bear the following information:
1. Name and address of the insured.
2. Title and Location of the operations to which the insurance applies
3. The number of the policy and the type or types of insurance in force thereunder on the date borne by such Certificate.
4. The expiration date of policy and the limit or limits of liability thereunder on the date borne by such certificate.
5. A statement that the insurance of the type afforded by the policy applies to all of the operation on and at the site of the project which are undertaken by the insured during the performance of his contract.
6. Indication of Insured, additional insured and Co-insured Parties.
7. A statement as to the exclusions of the policy, if any.
8. A statement showing the method of cancellations provided for by the policy. If cancellations may be affected by the giving of notice to the insured by the insurer, the policy shall provide for the lapse of such number of days following the giving of such notice that in the ordinary course of transmission the insured will have actually received such notice at least thirty (30) days before the cancellation becomes effective. Notice of cancellation shall also be delivered to Owner not less than thirty (30) days prior to such lapse or termination.

22
EXHIBIT C

**5.13  Indemnification and Defense.** (a)  The  Redeveloper  agrees  to indemnify and hold harmless the Borough against, and the Redeveloper shall pay for, any and all liability, loss, cost, damage, claims, judgments, legal fees and costs or expenses, of any and all kinds or nature and however arising, imposed by law, which the Borough may sustain, be subject to or be caused to incur by reason of any claim, suit or action based upon personal injury, death, or damage to property, whether real, personal or mixed, resulting from the Redeveloper's activities in constructing the Project or the Redeveloper's actual breach of contracts entered into by the Redeveloper which directly relate to the construction of the Project, or resulting solely from the Redeveloper's ownership of the Property, or resulting from the acquisition, construction or installation of the Project. Further, said indemnification shall include but not be limited to any and all claims by workmen, employees and agents of the Redeveloper and unrelated third parties, which claims result from the construction of the Project, the maintenance and functioning of the Improvements and Public Improvements or any other activities of the Redeveloper within the Property during the construction of the Project. Neither the Borough or its Council Members, commissioners, officers, agents, servants or employees shall be liable in any event for any action performed under this Agreement, except for any claim or suit arising from negligent, intentional or willful acts of the Borough, its Council Members, commissioners, officers, agents, servants or employees.

(b)  The Redeveloper, at its own cost and expense, shall defend any and all such claims, suits and actions, as described in and for which indemnification is required by this Section 5.13, which may be brought or asserted against the Borough, its Council Members, commissioners, officers, agents, servants or employees; but this provision shall not be deemed to relieve any insurance company which has issued a policy of insurance as may be provided for in this Agreement from its obligation to defend the Redeveloper, the Borough and any other insured identified in such policy of insurance in connection with claims, suits or actions covered by such policy. Any cost for reasonable attorneys' fees in situations where it is necessary for the Borough to engage its own attorneys, reasonable experts' testimony costs and all reasonable costs to defend the Borough or any of its Council Members, commissioners, officers, agents, servants, or employees shall be reimbursed to it by the Redeveloper in connection with such indemnification claim. The Borough shall give the Redeveloper notice of any such claim for which indemnification under this Agreement is sought (together with copies of any documents received) within Fifteen (15) Days of the Borough's receipt of same.

**5.14  Project Signage.**  Redeveloper shall work with the Borough to place signage on the Property within 30 days of obtaining Governmental Approvals that contains a rendering or renderings of the finished Project, and indicates that the Project is made possible in the community as a result of the efforts of the Redeveloper and Borough.  The Borough will provide the Redeveloper with the exact specifications and locations for any signage produced in accordance with the Article.

**5.15  Project Renderings.** Redeveloper shall make renderings of the finished Project available to the Borough for use at public presentations, and to further market the Borough for economic development.

EXHIBIT C

## ARTICLE 6.

## PROHIBITIONS

**6.01. Prohibition Against Transfers of Interests in Redeveloper.** Prior to completion of the Project as evidenced by the issuance of a Certificate of Completion, and without the prior written approval of the Borough, which approval shall not be unreasonably withheld, Redeveloper agrees for itself and any successor in interest that:

(1) There shall be no transfer by any owner of any equity interest in Redeveloper, or by any successor in interest to such owner, of any interest in Redeveloper.

(2) Nor shall any such owner or successor in interest suffer any such transfer to be made, except due to death, but excluding transfers among existing members;

(3) Nor shall such owner or successor in interest make, or suffer to be made, any other change in the ownership of any equity interest in Redeveloper except as hereinabove provided, or with respect to the identity of the parties in control of Redeveloper or the relative degrees of their control, by any other method or means, whether by increased capitalization, merger with another corporate, partnership or limited liability entity, or otherwise. With respect to this provision, Redeveloper and the party(ies) signing the Agreement on behalf of Redeveloper represent that each party has authority of all its owners to agree to this provision on their behalf and to bind them with respect thereto. For the purpose of this Agreement, the term "owners" is defined to include the general partners of a partnership, the stockholders of a corporation or the members of a limited liability company.

(4) If approval of the Borough is sought for a transfer, Redeveloper will pay an administrative fee equivalent to One Thousand Dollars ($1,000.00), and shall pay in addition thereto, any Borough Costs associated obtaining the Borough's approval.

The following transfers of interests in the Redeveloper shall be deemed to be approved without any approval by the Borough: (a) assignments among the principals of Redeveloper and their immediate family members; and (b) assignments by the principals of Redeveloper for estate planning and tax purposes.

**6.02. Transfer of Redevelopment Agreement.** Redeveloper further agrees for itself, its successors and assigns, that prior to the completion of the Project or any portion thereof, as evidenced by the issuance of a Certificate of Completion it will not make or create, or suffer to be made or created, any sale, assignment, conveyance, lease or transfer in any other mode or form (collectively, the "Transfers") of its interests in the Project or its interest in this Agreement, without the prior written approval of the Borough, except as provided below, which consent shall not be unreasonably withheld.

24

EXHIBIT C

In the event that the Borough consents to a Transfer, the Transferor shall be released from the obligations of this Agreement only to the extent or limit of the authorized Transfer.

**6.03. Exemption from Prohibited Transfers.** Notwithstanding the foregoing, and with the consent of the Borough, it shall not constitute a prohibited transfer, for purposes of Section 6.02 if after Final Site Plan Approval has been obtained, Redeveloper assigns its rights under this Agreement upon the following conditions: (i) the assignee of Redeveloper must be an entity controlling, controlled by, or under common control of Redeveloper including but not limited to an urban renewal entity formed by Redeveloper pursuant to N.J.S.A. 40A:20-4; (ii) the assignee of Redeveloper shall assume all of the obligations of Redeveloper hereunder, but Redeveloper shall remain primarily liable for the performance of Redeveloper's obligations, (iii) a copy of the fully executed written assignment and assumption agreement shall be promptly delivered to the Borough, and (iv) such assignment does not violate any of the Government Approvals.

In addition, nothing contained in this Agreement shall prohibit, nor require the consent of the Borough, to transfer individual condominium units to the ultimate purchaser of such units.

**6.04. Consent to Permitted Transfers.** The Borough hereby consents, without the necessity of further approvals or payment of the administrative fee set forth in Section 6.01(4) from any entity, to the following Transfers: (i) a Mortgage or related security granted by Redeveloper to a Mortgagee for the purpose of obtaining the financing necessary to enable Redeveloper to perform its obligations under this Agreement with respect to Completion of the Project and any other purpose authorized by this Agreement and (ii) any Mortgage or Mortgages and other liens and encumbrances granted by Redeveloper to a Mortgagee for the purpose of financing costs associated with the development, construction, and marketing of the Project. With respect to any of the Transfers listed in this Section 6.04, Redeveloper shall provide to the Borough written notice of at least fifteen (15) days prior to such Transfer, including a description of the nature of such Transfer, and the name(s) and address(es) of the transferee and any parties, individuals and/or entities comprising such Transfers.

**6.05. Prohibition Against Speculative Development.** Because of the importance of the development of the Property to the general welfare of the community, Redeveloper represents and agrees that Redeveloper's undertakings pursuant to this Agreement are, and will be used, for the purpose of the redevelopment of the Property as provided herein and not for speculation in land holding.

**6.06 Conditions of Transfer.** In the event that the Redeveloper requests the Borough's prior written approval for a transfer of interest the Borough shall be entitled to require, as a condition of approval of any transfer that (i) the proposed Transferee will have qualifications and financial responsibility necessary and adequate to fulfill the obligations undertaken in this Agreement with respect to the transferred portion of the Project and other obligations pursuant to Governmental Approvals or any part of such obligations that may pertain to the transferred interest or the transferred portion of the

EXHIBIT C

Project, as determined from (1) Audited financial statements indicating (a) net worth or (b) unencumbered lines of credit; or evidence of loan commitments sufficient to carry out the relevant aspect of the Project; and (2) Submission of letters of recommendation from reputable Parties for whom the prospective transferee has undertaken a comparable development, stating that the proposed transferee of the relevant aspect of the Project possesses the competence and integrity to undertake same; and (ii) any proposed transferee, by instrument in writing reasonably acceptable to the Borough, will, for itself and its Transferees, and expressly for the benefit of the Borough, have expressly assumed all of the relevant obligations of the Redeveloper under this Agreement with respect to the Project and agrees to be subject to all the Covenants and Restrictions to which the Redeveloper is subject; and (iii) the Transferee will comply with such other reasonable conditions as the Borough may find necessary in order to achieve and safeguard the purposes of the Redevelopment Plan.

**6.07 Transfers in Violation of this Agreement.**  Any Transfer in violation of this Agreement shall be deemed to be an Event of Default and shall be null and void *ab initio*.  The occurrence of such Event of Default shall entitle the Borough to seek all available remedies under the terms of this Agreement, including the right to terminate this Agreement, and all other remedies available under the Applicable Law(s).

## ARTICLE 7.

### PROJECT AND MORTGAGE FINANCING

**7.00    Submission of Financial Package.**  In the event that the Redeveloper intends to seek financing for the Project the Redeveloper represents that it shall use its best efforts to obtain sufficient financing for all costs associated with the Project.  The Redeveloper represents that such financing may be a combination of debt financing, equity financing and an equity contribution of the Redeveloper and may be obtained in coordination with the phased development of the Project.  On or prior to the earlier to occur of (i) ninety (90) days after the Redeveloper has obtained all Governmental Approvals with respect to the applicable phase of the Project, or (ii) ninety (90) days prior to Commencement of Construction on such phase of the Project, the Redeveloper shall submit a financial package that the Redeveloper believes to be complete that describes the anticipated sources of funding for that phase of the Project, including, but not limited to, commitments to construction financing required for that Phase of the Project and a representation regarding any equity capital necessary for the Commencement of Construction of the relevant phase of the Project.

**7.01.    Mortgage.**  Except as to financing conducted through recognized chartered banks and/or licensed insurance lenders or by an Affiliate of the Redeveloper, the Redeveloper shall request authority from the Borough (which shall not be unreasonably withheld) in writing in advance of any proposed financing secured by a mortgage or other similar lien instrument, which it proposes to enter into with respect to the Project, or any part thereof, and in any event Redeveloper shall promptly notify the Borough of any encumbrance or lien that has been created on or attached to the Project in

EXHIBIT C

connection with any financing of the Project obtained by Redeveloper; or, by involuntary act of the Redeveloper or others, upon obtaining knowledge or notice of same.

**7.02.    Obligations of Mortgagee.**  Notwithstanding any of the provisions of this Agreement, including but not limited to those which are or are intended to be covenants running with the land, the holder of any mortgage authorized by this Agreement, including any such holder who obtains title to the Property or any part thereof as a result of foreclosure proceedings, or action in lieu thereof, but not including (a) any other party who thereafter obtains title to the Property or such part from or through any such holder or (b) any other purchaser at foreclosure sale (other than the holder of the mortgage itself) shall in no way be obligated by the provisions of this Agreement to construct or complete the Project or to guarantee such construction or completion; provided that nothing in this Article or any other Article or provision of this Agreement shall be deemed or construed to permit or authorize any such holder to devote the Property or any part thereof to any uses, or to construct any Project thereon, other than those uses provided or permitted under the Redevelopment Plan, Governmental Approvals and Applicable Law.

**7.03.    Notice of Default to Mortgagee and Right to Cure.**  Whenever the Borough shall deliver any notice or demand to the Redeveloper with respect to any breach or default by the Redeveloper under this Redevelopment Agreement, the Borough shall at the same time deliver to each lender (or equity participant in Redeveloper) a copy of such notice or demand, provided that the Redeveloper has delivered to the Borough a written notice of the name and address of such lender and equity participant. Each such lender shall (insofar as the rights of the Borough are concerned) have the right at its option within ninety (90) days after the receipt of such notice, to cure or remedy, or to commence to cure or remedy, any such default with respect to that portion of the Project which is being financed by such lender and which is subject to being cured and to add the cost thereof to the debt and the lien which it holds, or to the obligations of the lessees under any lease-back or of the guarantor under any other conveyance for financing.

Notwithstanding the foregoing, in the event of any breach or default with respect to the deadlines for commencement and completion of construction of the Project set forth in Section 5.08, the Borough agrees that any notice to a Mortgagee will not be served simultaneously with the notice to the Redeveloper, but instead will be served forty five (45) days after notice of breach or default to Redeveloper if Redeveloper has not cured the breach or default.

**7.04.    Estoppel Certificate.**  Within forty five (45) days following written request therefore by the Redeveloper, or of any lender, purchaser, tenant or other party having an interest in the Project, the Borough shall issue a signed estoppel certificate either stating this Redevelopment Agreement is in full force and effect and that there is no default or breach under this Redevelopment Agreement, or stating the nature of the default or breach or event, if any.  In the event the estoppel certificate discloses such a default, breach or event, it shall also state the manner in which such default, breach and/or event may be cured. No more than a reasonable number of estoppel certificates may be requested per year.

EXHIBIT C

## ARTICLE 8.

### EVENTS OF DEFAULT

**8.01.   Events of Default.** Any one or more of the following shall constitute an Event of Default hereunder, subject to Force Majeure and tolling as provided elsewhere in this Agreement:

(1)    Failure of Redeveloper or the Borough to observe and perform any covenant, condition, representation, warranty or agreement hereunder, and continuance of such failure for a period of thirty  (30) days, after receipt by the defaulting party of written notice from the non-defaulting party specifying the nature of such failure and requesting that such failure be remedied, unless such delay is the direct cause of a governmental entity relating to an issue over which the Redeveloper has no control, or is not otherwise responsible for such governmental entities actions concerning the default or delay.

(2)    (i) Redeveloper shall have applied for or consented to the appointment of a custodian, receiver, trustee or liquidator of all or a substantial part of its assets; (ii) a custodian shall have been legally appointed with or without consent of Redeveloper; (iii) Redeveloper, (A) has made a general assignment for the benefit of creditors, or (B) has filed a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or has taken advantage of any insolvency law; (iv) Redeveloper has filed an answer admitting the material allegations of a petition in any bankruptcy or insolvency proceeding; or (v) Redeveloper shall take any action for the purpose of effecting any of the foregoing; (vi) a petition in bankruptcy shall have been filed against Redeveloper, and shall not have been dismissed for a period of ninety (90) consecutive days; (vii) an Order for Relief shall have been entered with respect to or for the benefit of Redeveloper, under the Bankruptcy Code; (viii) an Order, judgment or decree shall have been entered, without the application, approval or consent of Redeveloper, by any court of competent jurisdiction appointing a receiver, trustee, custodian or liquidator of Redeveloper, or a substantial part of its assets and such order, judgment or decree shall have continued unstayed and in effect for any period of ninety (90) consecutive days; (ix) Redeveloper shall have suspended the transaction of its usual business.

(3)    Redeveloper shall default in or violate its obligations with respect to the construction of the Project in accordance with this Agreement, the Redevelopment Plan, the Redevelopment Project Schedule, Governmental Approvals or Applicable Laws or including but not limited to failure to comply with the Commencement of Construction and Completion of Construction, shall abandon or substantially suspend construction work and any such default, violation, abandonment or suspension shall not be cured, ended, or remedied within thirty (30) days after written demand by the Borough to do so (provided that it shall not be an event of default if Redeveloper is proceeding with due diligence to remedy the same as soon as practicable).

28
EXHIBIT C

(4)    The Project shall not be complete, as evidenced by the issuance of a Certificate of Completion on the Completion Date.

(5)    Redeveloper, its successor or assigns shall fail to pay any application or permit fees in furtherance of any Governmental Approvals, or connection fees resulting therefrom, or real estate taxes, assessments, or PILOTs (as defined herein) on the Property or any part thereof when due, shall fail to pay any payments required under this Agreement, or shall place on the Property any encumbrance or lien unauthorized by this Redevelopment Agreement, or shall suffer any levy or attachment to be made, or any materialmen's or mechanics' lien, or any other unauthorized encumbrance or lien to attach and such real estate taxes or assessments shall not have been paid, or the encumbrance or lien removed or discharged or provision satisfactory to the Borough made for such payment, removal, or discharge, within thirty (30) days after written demand by the Borough to do so..

(6)    There is, in violation of this Redevelopment Agreement, a transfer or assignment as prohibited in Article 6.

(7)    The Redeveloper fails to make a payment of any sums payable to the Borough, as same shall become due and payable, and such failure to pay shall have continued for a period of (30) days after Redeveloper's receipt of written notice specifying its failure to make such payment.

**8.02.    Remedies of Borough Upon Event of Default.**  Whenever any Event of Default of Redeveloper shall have occurred and be continuing after the expiration of any applicable cure period, the Borough may seek to terminate this Agreement.  Upon termination of this Agreement the Borough shall have the right to specific performance, injunction or any other remedy available at law or in equity and the right to use the Performance Bond to complete construction of any Public Improvements.    The Borough's remedies are not limited to those set forth in this Agreement; the Borough retains at all times its delegated governmental powers to undertake enforcement action to stop, abate and ameliorate any issue or circumstance affecting the public health, public safety and public welfare of its residents.

**8.03.    Remedies of Redeveloper Upon Event of Default.**  Whenever any Event of Default of the Borough shall have occurred and be continuing, the Redeveloper may seek specific performance, injunction or any other remedy available at law or in equity.

**8.04.    Restoration of Status.**    In case the Borough or Redeveloper, as applicable, shall have proceeded to enforce its rights under this Redevelopment Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Borough or Redeveloper, as applicable, then and in every such case, Redeveloper and the Borough shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and

powers of Redeveloper and the Borough shall continue as though no such proceedings had been taken.

**8.05. Failure or Delay by Either Party.** Except as otherwise expressly provided in this Redevelopment Agreement or the Project Milestones attached hereto as **Exhibit B**, any failure or delay by either party in asserting any of its rights or remedies as to any default, shall not operate as a waiver of any default, or any such rights or remedies, or deprive either such party of its right to institute and maintain any actions or proceedings which it may deem necessary to protect, assert or enforce any such rights or remedies.

**8.06. Remedies Cumulative.** No remedy conferred by any of the provisions of this Redevelopment Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**8.07 Certificate of No Default.** The Redeveloper shall deliver to the Borough on each anniversary of the Effective Date, a certificate signed by its authorized representative to the effect that (a) the Redeveloper is not aware of any condition, event or act which constitutes a violation of this Agreement or which would constitute an Event of Default, and (b) no condition, event or act exists which, with notice or lapse of time, or both, would constitute an Event of Default; or (c) if any such condition, event or act exists, specifying same.

## ARTICLE 9.

## TERMINATION RIGHTS

**9.01 Additional Termination Rights of Borough** In the event that the Redeveloper substantially abandons or suspends construction of the Project for a period in excess of One Hundred Eighty (180) Days as a result of a Tolling Event not caused by the act or omission of the Borough hereunder or a period in excess of One Hundred Twenty (120) Days not resulting from the occurrence of Event of Force Majeure or other Tolling Event, then, whether or not an Event of Default by the Redeveloper has been declared by the Borough, the Borough shall have the right to terminate this Agreement.

Nothing in this Section 9.01 shall prevent the Borough from declaring that an Event of Default by the Redeveloper hereunder has occurred or from pursuing any of its other remedies hereunder.

## ARTICLE 10.

## INTENTIONALLY OMITTED

EXHIBIT C

## ARTICLE 11.

## DELAYS

**11.01. Force Majeure.** For the purposes of any of the provisions of this Agreement, neither the Borough nor Redeveloper, as the case may be, nor any successor in interest, shall be considered in breach of, or in default with respect to its obligations hereunder because of any delay in the performance of such obligations arising from an Event of Force Majeure as defined herein. It is the purpose and intent of this provision that in the event of the occurrence of any such enforced delay, the time or times for performance of the obligations of the Borough or Redeveloper shall be extended for the period of the delay.

**11.02 Notice of Event of Force Majeure.** The Party who seeks the benefit of the above described modification/extension shall, within Thirty (30) Days after that Party's actual discovery of any such Event of Force Majeure or other Tolling Event, notify the other Party in writing of the Event of Force Majeure or the Tolling Event, and of the cause(s) thereof, and therein a modification/extension of the term and an extension for the period of the enforced delay. The performance or non-performance by the Parties or either of them of any obligation, requirement, commitment or responsibility set forth in this Agreement shall not be deemed to be the Event of Default pursuant to this Agreement where such performance, failure of performance or delay in performance is/are the result of an Event of Force Majeure or other Tolling Event; provided, however, that the Event of Force Majeure or other Tolling Event was not the result of any unlawful action or non-action of the Party relying on such Event of Force Majeure or other Tolling Event as justification for the non-performance, failure of performance or delay in performance of the subject obligation, requirement, commitment or responsibility. Where either Party alleges that as a result of an Event of Force Majeure or a Tolling Event the aggrieved Party is unable to perform or not perform any aspect of this Agreement, the aggrieved Party shall send proper written notice to the other identifying the Event of Force Majeure or Tolling Event alleged to have occurred.

## ARTICLE 12.

## CONTINGENCIES

**12.01 Governmental Approvals Contingency.** In addition to the terms and conditions concerning the Redeveloper's obligation to obtain Governmental Approvals:

(1)    Redeveloper agrees to proceed in good faith and at its own cost and expense to obtain all Governmental Approvals to develop and construct the Project in accordance with the Redevelopment Project Schedule. Redeveloper agrees that it shall not seek any use variances pursuant to N.J.S.A. 40:55D-70(d) in connection with its applications for the Governmental Approvals.

31

EXHIBIT C

(2) No Governmental Approval shall be deemed "final" until (i) the time for all appeals has run without the filing of an such appeal or (ii) in the event an appeal is filed, all such appeals have been resolved fully in favor of Redeveloper and the time for filling any further appeals has expired without the filling of any such appeals.

(3) In the Event that Redeveloper's application for any Governmental Approval is denied, Redeveloper shall have the option, in its sole discretion, to appeal that denial at Redeveloper's sole cost and expense.

(4) In the event that any application by Redeveloper for a Governmental Approval is denied and either (i) the time for appeal has expired without Redeveloper filing an appeal from such denial or (ii) Redeveloper has filed an appeal from such denial and said appeal has been resolved against Redeveloper, either party shall have the option to terminate this Agreement by providing notice to the other party to that effect.

(5) In the event the Borough is unable to purchase and/or acquire properties Redeveloper could not purchase, Redeveloper shall have the right to terminate this Agreement.

## ARTICLE 13.

## COOPERATION AND COMPLIANCE

**13.01. Implementation of Agreement and Redevelopment Plan.** The parties hereto agree to cooperate with each other and to provide all necessary and reasonable documentation, certificates and consents in order to satisfy the terms and conditions hereof and the terms and conditions of the Plan. The Borough further agrees to cooperate as may be reasonably requested by any mortgagee of the Redeveloper in connection with obtaining financing for the Project; provided, however, that all Borough Costs associated with such action shall be borne by the Redeveloper.

## ARTICLE 14.

## MISCELLANEOUS

**14.01. Conflict of Interest.** No member, official or employee of the Borough shall have any direct or indirect interest in this Redevelopment Agreement, nor participate in any decision relating to the Agreement that is prohibited by law.

**14.02. No Consideration For Agreement.** The Redeveloper warrants it has not paid or given, and will not pay or give, any third person any money or other consideration for obtaining this Redevelopment Agreement, other than normal costs of conducting business and costs of professional services such as architects, engineers, financial consultants and attorneys. The Redeveloper further warrants it has not paid or incurred

EXHIBIT C

any obligation to pay any officer or official of the Borough, any money or other consideration for or in connection with this Redevelopment Agreement.

**14.03. Non-Liability of Officials and Employees of the Borough.** No member, official or employee of the Borough shall be personally liable to the Redeveloper, or any successor in interest, in the event of any default or breach by the Borough, or for any amount which may become due to the Redeveloper or its successor, or on any obligation under the terms of this Redevelopment Agreement.

**14.04. Non-Liability of Officials and Employees of the Redeveloper.** No member, officer, shareholders, director, partner or employee of the Redeveloper, and no member, officer, shareholders, director, partner or employee of the members of the Redeveloper or the members of the Redeveloper shall be personally liable to the Borough, or any successor in interest, in the event of any default or breach by the Redeveloper or for any amount which may become due to the Borough, or their successors, on any obligation under the terms of this Redevelopment Agreement.

**14.05. Inspection of Books and Records.**

(1) The Borough shall have the right at all reasonable times to inspect the books and records of the Redeveloper pertinent to the purposes of this Redevelopment Agreement, including but not limited to construction contracts, books and records, leases, insurance policies, and agreements.

(2) The Redeveloper shall have the right at all reasonable times to inspect the books and records of the Borough pertinent to the purposes of this Redevelopment Agreement.

(3) Such inspections must be performed at a time and in a manner as to not unreasonably interfere with the business operations of the party whose books and records are being inspected and be for a legitimate business purpose affecting the material interest of the party seeking the inspection.

**14.06. Approvals by the Borough and the Redeveloper.** Wherever this Redevelopment Agreement requires the approval or consent of the Borough or the Redeveloper, or any officers, agents or employees of either the Borough or the Redeveloper, such approval shall not be unreasonably withheld or conditioned, and approval or disapproval shall be given within the time set forth in this Agreement, or, if no time is given, within fifteen (15) days, unless formal action of the Governing Body is required, in which case, within forty five (45) days.

**14.07. Modification of Agreement.** No modification, waiver, amendment, discharge, or change of this Redevelopment Agreement shall be valid unless the same is in writing, duly authorized, and signed by the Redeveloper and the Borough.

EXHIBIT C

**14.08. Notices and Demands.** A notice, demand or other communication under this Agreement by any party to the other shall be sufficiently given or delivered if dispatched by United States Registered or Certified Mail, postage prepaid and return receipt requested, or delivered by overnight courier or delivered personally (and receipt acknowledged) to the parties at their respective addresses set forth herein, or at such other address or addresses with respect to the parties or their counsel as any party may, from time to time, designate in writing and forward to the others as provided in this Section 14.08. Notice shall be effective upon the earlier of receipt or refusal.

**BOROUGH OF EMERSON AGENCY**
Robert Hoffmann, Borough Administrator
Municipal Building
146 Linwood Avenue
Emerson, New Jersey 07630

With a copy to:

Douglas F. Doyle
DeCotiis, Fitzpatrick, & Cole, LLP
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666
Facsimile Number 201-928-0588

And

Emerson Redevelopers, LLC and JMF Properties
c/o JMF Properties
80 S. Jefferson,
Whippany, NJ 07981

With a copy to:

Carl Kemph
6 Hampshire Court
Springfield, NJ 07081

**14.9   Title of Articles and Sections.** The titles of the several Articles and Sections of this Agreement, as set forth in the Table of Contents or at the heads of said Articles and Sections, are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of its provisions.

**1410. Severability.** The validity of any Articles, clause or provision of this Agreement shall not affect the validity of the remaining Articles, clauses or provisions hereof.

EXHIBIT C

**14.11. Successors Bound.** This Agreement shall be binding upon the respective parties hereto and their successors and assigns provided however, that this Agreement may not be assigned by either party during the Construction Period.

**14.12. Governing Law.** This Agreement shall be governed by and construed by the laws of the State of New Jersey. Any legal action filed in this matter shall be heard in Superior Court of New Jersey, Bergen County Vicinage.

**14.13. Borough Approvals.** All approvals or disapprovals required by the Borough shall, unless otherwise stated herein, be valid if given in writing by the Mayor or his designee.

**14.14. Counterparts.** This Agreement may be executed in counterparts. All such counterparts shall be deemed to be originals and together shall constitute but one and the same instrument.

**14.15. Exhibits.** Any and all Exhibits annexed to this Agreement are hereby made a part of this Agreement by this reference thereto.

**14.16. Reporting.** Notwithstanding anything contained herein to the contrary, Redeveloper's reporting requirement as to progress of construction shall be the reports required in **Exhibit C**.

**14.17. Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior oral and written agreements between the parties with respect to the subject matter hereof.

**14.18. Effective Date.** Anything herein contained to the contrary notwithstanding, the effective date of this Agreement shall be the date this Agreement has been last executed by either the Redeveloper or Borough whichever party shall execute last.

**14.19. Review by Counsel.** This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey without regard to or any presumption or other rule requiring construction against the party drawing or causing this Agreement to be drawn since counsel for both the Redeveloper and the Borough have combined in their review and approval of same.

**14.20. Eminent Domain** The Borough agrees that it will not exercise any powers of eminent domain against the Property that is owned or controlled by EMRED or its transferee, unless EMRED breaches this Agreement or is otherwise in default, in which case, EMRED waives its right to object to or challenge the Borough's right to acquire EMRED's property through eminent domain.

**14.21. First Source Employment.** Until the issuance of the Certificate of Completion Redeveloper shall make good faith efforts to employ, and shall provide in its

contracts with its General Contractors that they must make good faith efforts to employ qualified residents of the Borough in the construction of the Project. Redeveloper's good faith efforts will include without limitation cooperating with the Borough in job fairs and similar endeavors and giving adequate consideration to potential employees and businesses as referred by the Borough. In addition, consistent with market wages and to the extent it is commercially feasible, Redeveloper shall make good faith efforts that qualified residents of the Borough and businesses located in the Borough are afforded a fair opportunity to be employed in the operation of the Project. Inclusion of the requirements of this section in Redeveloper's general contract agreements shall fully satisfy this obligation of Redeveloper under this section. Redeveloper, in its sole discretion, shall determine if, and the extent to which, it shall employ qualified residents of, or businesses located in, the Borough, and the extent, if at all, to which Redeveloper shall use union labor for the construction of the Project.

**14.22. Equal Employment Opportunity.** The Redeveloper agrees that during the construction of the Improvements:

(a) To the extent required by Applicable Law, the Redeveloper will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Redeveloper will take affirmative action to insure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Redeveloper agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause and any such notices provided by the Borough which are consistent therewith.

(b) To the extent required by Applicable Law, the Redeveloper will, in all solicitations or advertisements for employees placed by or on behalf of the Redeveloper state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(c) To the extent required by Applicable Law, subcontractors and suppliers to the Project shall to the extent that it is commercially feasible include qualified and certified minority enterprises.

(d) To the extent required by the Applicable Law, the obligations in this Section shall be binding on all contractors and subcontractors to the extent that any work is done by any contractor or subcontractor, and any contract entered into by the Redeveloper shall so provide.

**14.23 Drafting Ambiguities; Interpretation.** In interpreting any provision of this Agreement, no weight shall be given to, nor shall any construction or interpretation be influenced by, the fact that counsel for one of the Parties drafted this Agreement, each

EXHIBIT C

Party acknowledging that it and its counsel have had an opportunity to review this Agreement and have contributed to the final form of same.

   14.24  **Withholding of Approvals.**  All approvals, consents and acceptances required to be given or made by any Person or party, shall not be unreasonably withheld or delayed.

   14.25  **Recitals Incorporated; Definitions Incorporated**. The Recitals to this Agreement and the Definitions contained in this Agreement are incorporated by reference into this Agreement, as if set forth at length herein.

   14.26  **Limitation on Liability.**  Notwithstanding anything to the contrary in this Agreement, any liability(ies), commitments, obligations and/or responsibility or responsibilities of any type or kind whatsoever (whether actual, contingent, consequential or otherwise) (hereinafter referred to collectively as "Liability") of the Redeveloper in, resulting from, or relating in any way to this Agreement shall be those of the Redeveloper only.  Nothing in this Agreement, arising out of, or related in any way to this Agreement or to the Project or any aspect thereof shall, in any way, give the Borough or any other Person recourse to, or be construed to impose, directly or indirectly, any Liability on any Person other than the Redeveloper.

   The foregoing limitation on Liability shall apply to, but is not limited to, (i) any Affiliate of the Redeveloper or of the Redeveloper's members, (ii) any member, shareholder, manager, officer, director, partner, managing member, vendor, venturer, trustee, employee, agent, and/or other representative (hereinafter collectively referred to as the "Agent") of the Redeveloper or of the Redeveloper's members, (iii) any Agent of any Affiliate of the Redeveloper or of the Redeveloper's members, (iv) any Affiliate of any Agent of the Redeveloper or of the Redeveloper's members, (v) any Agent of any Agent of the Redeveloper or of the Redeveloper's members, (vi) any Person directly or indirectly holding, controlling and/or owning any interest in the Redeveloper or in the Redeveloper's members, in any Agent or Affiliate of the Redeveloper or of the Redeveloper's members, in any Agent of any Affiliate of the Redeveloper or of the Redeveloper's members, and/or in any Affiliate of any Agent of the Redeveloper or of the Redeveloper's members, and/or (vii) any successors and/or assigns of any of the Parties referenced in subsections (i) through (vi), above unless the Parties have assumed an interest in the Project in accordance with a Permitted Transfer and Article 6 hereof.

   The Borough understands and acknowledges that its respective acceptance of the Limitation on Liability set forth in this Section is a condition precedent to the Redeveloper's execution of this Agreement and constitutes specifically bargained-for consideration.  The terms of this Section shall in no way limit the indemnification of the Borough as provided for in Article 5 hereof.

   14.27  **Borough's Limitation on Liability.**   Any liabilities, obligations or responsibilities of any type or kind (contingent or otherwise) herein are solely those of the Borough.  No member, director, employee, officer, representative or agent of the

Borough shall be liable to the Redeveloper or any other Person for any matter arising out of or related to the payment or performance of any such liabilities, obligations or responsibilities of the Borough in this Agreement.

**14.28   Limitation on Third Parties.**  Nothing in this Agreement is intended to nor shall create any rights for or confer any benefits on any third person or party.

**14.29   No Brokerage Commissions.**   The Borough and the Redeveloper each represent one to the other that no real estate broker initiated, assisted, negotiated or consummated this Agreement as broker, agent, or otherwise acting on behalf of either the Borough or the Redeveloper, and the Borough and the Redeveloper shall indemnify each other with respect to any claims made by any person, firm or organization claiming to have been so employed by the indemnifying party.

**14.30   Maintenance.** The Redeveloper shall be responsible for the maintenance and security of each parcel of property contained within the Property subject to the terms of this Agreement subsequent to its acquisition of title to each such parcel of property and until such time as the Redeveloper no longer owns or leases the Property or any portions thereof.

**14.31   Lender Changes.**  If the Redeveloper's Financial Institution(s) requires modifications of the terms of this Agreement, the Borough shall reasonably cooperate with the Redeveloper in approving such modifications, so long as such modifications, do not materially and substantially change the rights or obligations of the Borough as set forth in this Agreement and, in the reasonable opinion of the Borough, do not materially impair the objectives and interest of the Borough or render the completion of the Project or any Phase thereof in jeopardy.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be properly executed and their corporate seals affixed and attested as of the date first written above.

**BOROUGH OF EMERSON**

By: _____
     Name:  Louis Lamatina
     Title:   Mayor

**REDEVELOPER**
**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

By: _____
     Name:  Joseph Forgione
     Title:   Managing Member

38

EXHIBIT C

## EXHIBIT A
### Property Description

| Property Owner | Block | Lots | Property Address |
|---|---|---|---|
| Angelo and Jane Giambona | 419 | 1 | 19 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 2 | 15 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 3 | 9 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 4 | 214 Kinderkamack |
| Borough of Emerson | 419 | 7 | |
| Dolores, Della Volpe Trste | 419 | 6.01 | 190 Kinderkamack |
| Yaghoob Pousty | 419 | 6.02 | 184 Kinderkamack |
| 182 Emerson, LLC | 419 | 8 | 182 Kinderkamack |
| 182 Emerson, LLC | 419 | 10 | 78 Linwood |

39
EXHIBIT C

**Exhibit B**

**Concept Plan**

EXHIBIT C

EXHIBIT C



EXHIBIT C



EXHIBIT C

**Exhibit C**

**Project Schedule and Reporting Requirements**

**<u>Project Schedule</u>**

By Redeveloper - Attached

**<u>Reporting Requirements:</u>**
Based on the attached Project Schedule, in addition, on or before the first day of each month after the Commencement Date, redeveloper shall provide report for the prior month to date identifying the following:

1. Status of property acquisition (if still applicable).
2. Status of application to Land Use Board (if still applicable);
3. Status of posting bonds and schedule for Commencement Date (if applicable);
4. Public Improvements performed to date;
5. Other private improvements performed to date;
6. Schedule for Public Improvements and non-public work to be performed in the following month;
7. Anticipated Completion Date and any explanation of revisions to the Anticipated Completion date from previous Monthly Reports;

41

EXHIBIT C



# EMERSON MIXED USED DEVELOPMENT

KINDERKAMACK ROAD, EMERSON, NEW JERSEY

*PRELIMINARY CONSTRUCTION SCHEDULE*

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 1 | | | | |
| 2 | Issuance Of Permit | 1 day | Mon 3/13/17 | Mon 3/13/17 |
| 3 | CONSTRUCTION | 519 days | Tue 3/14/17 | Fri 3/8/19 |
| 4 | Demolition | 20 days | Tue 3/14/17 | Mon 4/10/17 |
| 5 | Sitework | 499 days | Tue 4/11/17 | Fri 3/8/19 |
| 6 | Concrete | 90 days | Mon 5/22/17 | Fri 9/22/17 |
| 8 | Parking Structure | 274 days | Mon 5/22/17 | Thu 6/7/18 |
| 9 | Rough Carpentry | 90 days | Mon 9/25/17 | Fri 1/26/18 |
| 7 | Masonry | 90 days | Mon 1/29/18 | Fri 6/1/18 |
| 12 | Roofing | 30 days | Mon 1/29/18 | Fri 3/9/18 |
| 14 | Doors | 30 days | Mon 1/29/18 | Fri 3/9/18 |
| 16 | Drywall | 110 days | Mon 1/29/18 | Fri 6/29/18 |
| 20 | Elevators | 60 days | Mon 1/29/18 | Fri 4/20/18 |
| 21 | Fire Protection | 290 days | Mon 1/29/18 | Fri 3/8/19 |
| 22 | Plumbing | 290 days | Mon 1/29/18 | Fri 3/8/19 |
| 23 | HVAC | 290 days | Mon 1/29/18 | Fri 3/8/19 |
| 24 | Electrical | 290 days | Mon 1/29/18 | Fri 3/8/19 |
| 10 | Millwork | 90 days | Mon 7/2/18 | Fri 11/2/18 |
| 11 | Finish Carpentry | 170 days | Mon 7/2/18 | Fri 2/22/19 |
| 13 | Metal Panels | 20 days | Mon 12/17/18 | Fri 1/11/19 |
| 15 | Windows and Glass | 60 days | Mon 12/17/18 | Fri 3/8/19 |
| 19 | Painting | 40 days | Mon 12/17/18 | Fri 2/8/19 |
| 17 | Ceramic Tile | 70 days | Mon 12/3/18 | Fri 3/8/19 |
| 18 | Flooring | 70 days | Mon 12/3/18 | Fri 3/8/19 |

| Project: Emerson Preliminary Schedule<br>Date: Thu 6/9/16 | Task | | Progress | | Summary | | External Tasks | | Deadline | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Split | | Milestone | ◇ | Project Summary | | External Milestone ◇ | | | |

EXHIBIT C

**Exhibit D**

**Members of Redeveloper**

| | |
|---|---|
| Giuseppe Forgione | 50% |
| Steven Kalafer | 50% |

EXHIBIT C

**Exhibit E**

**Funding Agreement**

EXHIBIT C

## FUNDING AGREEMENT

THIS FUNDING AGREEMENT is dated this 6 day of ~~April~~ May, 2016 among the BOROUGH OF EMERSON, a municipal corporation with offices at 146 Linwood Ave., Emerson, NJ 07630 (the "Borough") and EMERSON REDEVELOPERS, LLC, with offices located at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as "ERD");

### W-I-T-N-E-S-S-E-T-H:

WHEREAS, ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the ~~Township~~ Borough as Block 419 ; Lots 1,2,3,4,6.01, 6.02, 8, +10 (the "Property"); and

WHEREAS, the Borough wishes to designate a redeveloper for the Redevelopment Area encompassing the Property; and

WHEREAS, ERD proposes to design, develop, finance and construct 134 units and 13,000 square feet of retail space ("the Project") and accordingly has requested the Borough consider appointing ERD as redeveloper for the Property; and

WHEREAS, ERD has agreed to pay the Application Fee as set forth herein and bear the costs for the Borough's professionals to assist the Borough in reviewing, among other things, whether ERD should be designated redeveloper for the Property, and in connection therewith has agreed to establish an escrow fund with the Borough to provide for the payment of professional fees, costs and expenses related thereto incurred by the Borough (the "Interim Costs");

NOW, THEREFORE, for and in consideration of the mutual promises, representations, covenants and agreements contained herein and the undertakings of each Party to the other and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby and to bind its successors and assigns, do mutually promise, covenant and agree as follows:

1. __Payment of Interim Costs.__

Immediately upon the execution of this Funding Agreement, ERD shall pay Ten Thousand Dollars ($10,000) (the "Escrow") to the Borough and the Borough shall deposit such funds into an escrow account established by it for the payment of the Interim Costs. Prior to the Borough's withdrawal of funds from the Escrow for the payment of the Interim Costs, the Borough shall provide ERD with a copy of each invoice reflecting Interim Costs to be paid. Unless ERD promptly (within fifteen (15) days of its receipt of any such copy) provides a written objection to any invoiced item as not being an Interim Cost, the Borough shall be free to withdraw funds from the Escrow for the payment of such invoiced services. If, when and as

1908805

## EXHIBIT C

often as may occur that the Escrow is drawn down to or below Three Thousand Five Hundred Dollars $3,500 then ERD, upon the Borough's request, shall immediately provide to the Borough for deposit an additional amount sufficient to replenish the escrow to Ten Thousand Dollars ($10,000) for use in accordance with these terms.

Interim Costs, for the purposes of this Funding Agreement, shall include the reasonably incurred out-of-pocket fees, costs and expenses incurred by the Borough (both before and after execution hereof) in reviewing the proposed development of the Property, including, but not limited to, fees for legal, engineering, planning and financial advisory services, including subsequent investigations and studies as may be reasonably determined and agreed to by the parties.

2.    **Application Fee** – Prior to the execution of a formal Redeveloper's Agreement the Borough shall imposes a non-refundable fee in an amount to be determined based on the final concept plan, with any adjustment to the fee to be paid, if appropriate, when the Redevelopment Agreement is executed.

3.    **Notice.**  Any notice provided to the Borough hereunder shall be submitted in writing to:

Jane Dietsche, RMC, Borough Clerk
146 Linwood Ave.
Emerson, NJ 07630

with copies to:

Douglas F. Doyle
Decotiis, Fitzpatrick & Cole, LLP
Glenpointe Centre West
500 Frank W. Burr Blvd, Suite 31
Teaneck, NJ 07666

Notices to ERD shall be submitted in writing to:

Emerson ReDevelopers, LLC
Attn: Kevin X. Codey, Vice President of Land Acquisitions
80 South Jefferson Road, Suite 202
Whippany, NJ 07981

with copies to:

Carleton R. Kemph, Esq.
6 Hampshire Court
Springfield, NJ 07081

1908805

EXHIBIT C

4.      General.- This Funding Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings between the parties.   This Funding Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

IN WITNESS WHEREOF, the Parties hereto have caused this Funding Agreement to be executed, all as of the date first above written.

BOROUGH OF EMERSON

BY: _____
          Louis J. Lamatina, Mayor

Witness:

By: _____
          Jane Dietsche, RMC, Borough Clerk

AND

EMERSON REDEVELOPERS, LLC

BY: _____
Name: GIUSEPPI FORGIONE
Title: MANAGING MEMBER

1908805

EXHIBIT C

**Exhibit F**
**Offsite/Onsite Improvement Share**

44

EXHIBIT C

DEVELOPER ESTIMATE

BOROUGH OF EMERSON, KINDERKAMACK ROAD PROJECT

ROAD CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY BERGEN COUNTY

1. Cost share estimate items, # 1-25,  portion of the 30 % costs borne by Borough  = $13,200
2. Roadway widening & excavation, 3 feet wide X 900 feet frontage, 2,700 SF = 300 SY X $100/ SY
   = $30,000
3. Milling, centerline to existing curbline, 15 feet wide X 900 feet frontage, 13,500 SF / 9
   = 1,500 SQ X $4 SY =                                                      = $ 6,000
4. Paving, centerline to existing curbline, 15 feet wide X 900 feet frontage, 13,500 SF / 70
   = 195 Tons X $75 / Ton =                                                  = $14,625
5. Concrete curb with excavation, 900 LF X $25/ LF                           = $22,500
6. Concrete sidewalk with excavation. 4 FT X 900 LF= 3,600 SF = 400 SY X $60/ SY
   = $24,000
7. Drainage changes for road widening, 3 X $6,000                            = $18,000
8. Traffic control during construction, signs, barricades & police           = $33,000
9. Traffic Signs                                                             = $ 1,000
10. Pavement striping, markings and eradication                              = $10,000
11. Relocate traffic signal pole and foundation at Linwood Ave.              = $20,000
12. Topsoil and seeding, between curb and  sidewalk                          = $ 5,000
13. Linwood Ave railroad crossing contribution, ( portion of  $410,000 NJ Transit Estimate)
   = $61,500

|  | **Bergen County Total** | **=$258,825** |
|---|---|---|
|  | 10% Contingency | **Say $285,000** |

CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY EMERSON

1. 42 Inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF X $225/ LF    = $146,250
2. Lincoln Ave drainage work, upsize pipes                                    = $ 10,000
3. 3 New drainage chambers, 42 inch pipe, 3 X $7,000                          = $ 21,000

STREETSCAPE ITEMS

4. Expand Paver Sidewalks, 6 FT Add. X 900 FT = 5,400 SF= 600 SY X $120/ SY    = $ 72,000
5. Streetscape Lighting, 9 Lights and wiring at $7,000/ each                   = $ 63,000
6. Street trees, 5 X $ 500                                                    = $  2,500
7. Amenities, benches, trash receptacles                                      = $ 10,000

|  |  | **Emerson Total** | **= $ 324,750** |
|---|---|---|---|
|  |  | 10 % Contingency      Say | **$ 357,000** |

| **Total Estimate** | **$ 642,000** |
|---|---|

Soft Costs, including surveying, engineering, attorney fees, property acquisition, utility layout, test pits, etc.

|  | $  75,000 |
|---|---|
| **TOTAL** | **$ 717,000** |

EXHIBIT C

**Exhibit G**
**Storm Water Pipe**

1. 42 Inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF
2. Lincoln Ave drainage work, upsize pipes
3. 3 New drainage chambers, 42 inch pipe

EXHIBIT C

Agenda No. 13

**BOROUGH OF EMERSON**
**COUNTY OF BERGEN, NEW JERSEY**
**RESOLUTION**              No: 173-16

*Subject:* **Approval of Execution of Redevelopment Agreement**

**WHEREAS,** at the April 5, 2016 meeting of the Governing Body, Resolution 129-16 was unanimously approved, authorizing the Borough to enter into a Redevelopment Agreement with JMF Properties; and

**WHEREAS,** the Redevelopment Counsel designated Redevelopment Subcommittee and other appropriate officials including the Administrator and Engineer were authorized to negotiate the terms and conditions of a Redevelopment Agreement; and

**WHEREAS,** the Redevelopment Subcommittee recommends that the terms and conditions negotiated for the Redevelopment Agreement be approved by the Governing Body;

**NOW, THEREFORE BE IT RESOLVED,** that the Governing Body of the Borough of Emerson authorizes the Mayor to execute the Redeveloper Agreement in a form approved by the Borough's Redevelopment Counsel.

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN | |
|---|---|---|---|---|---|---|---|
| DiPaola | | | | | | X | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on June 14, 2016.* |
| Lazar | X | | X | | | | |
| Downing | | | X | | | | |
| Knoller | | X | X | | | | |
| Tripodi | | | | | X | | |
| Worthington | | | X | | | | |

*Attest:*

*Municipal Clerk*

EXHIBIT C

**EXHIBIT D**

## FIRST AMENDMENT TO REDVELOPMENT AGREEMENT

This **First Amendment to Redevelopment Agreement** is made this 4 day of October

2016 by and between the

        **BOROUGH OF EMERSON**
        146 Linwood Ave., Emerson, NJ 07630
        A municipal corporation of the State of New
        Jersey, located in the County of Bergen,
        (hereinafter referred to as "Borough")

**AND**

        **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
        A limited liability corporation of the State of New Jersey, having an office
        at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
        (hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement on

or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas

within the Central Business District Redevelopment Area; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and

supplementing the Redevelopment Agreement to reflect their mutual understanding with respect

to the implementation of the Redeveloper's proposal submitted to the Borough and the

Borough's Redevelopment Plan;

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the

Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

    1.    All terms not defined in this Amendment shall have the same meaning as set forth

in the Redevelopment Agreement.

<div align="center">EXHIBIT D</div>

2.    The purpose and intent of this Amendment is to amend and supplement the description of the properties to be redeveloped to reflect the Redeveloper's proposal submitted to the Borough and in accordance with the Borough's Redevelopment Plan.

3.    The property descriptions listed in Exhibit A of the Redevelopment Agreement, attached hereto as **Exhibit A**, is amended and supplemented to include the following additional information:

| Property Owner | Block | Lot | Property Address |
|---|---|---|---|
| 182 Emerson, LLC | 419 | 9 | 176 Kinderkamack |

3.    The Funding Agreement attached to the Redevelopment Agreement as Exhibit E, shall be amended and supplemented, attached hereto as **Exhibit B**, to include Block 419, Lots 7 and 9 as redevelopment properties and are made part of the first "WHEREAS" clause, which shall now be deemed amended to read as follows:

> **WHEREAS,** ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the Borough as Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10.

4.    In all other respects, the Redevelopment Agreement remains in full force and effect.

5.    This First Amendment together with the proposal, the Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this First Amendment and the Redevelopment Agreement. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

EXHIBIT D

6.     All the provisions of this First Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

**IN WITNESS WHEREOF,** Redeveloper has hereunto caused this First Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto.  The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed and Attested to:                    **BOROUGH OF EMERSON**

_____      By: _____
JANE DIETSCHE, Borough Clerk                LOUIS J. LAMATINA, Mayor

Attested to:              **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

                         By: _____
                                    Managing Member

1976744-1

EXHIBIT D

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY:

                  : SS

COUNTY OF BERGEN    :

    **I CERTIFY** that on _Oct. 6_ , 2016,

    **JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

    (a)    this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

    (b)    this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamatina, the Mayor of the Municipal Corporation;

    (c)    this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

    (d)    this person knows the proper seal of the corporation which was affixed to this document; and

    (e)    this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
_Oct. 6,_ 2016.

_____
Municipal Clerk

_____
Notary Public, State of New Jersey

**LORI A. WOODS**
NOTARY PUBLIC, State of New Jersey
No. 2453738
Qualified in Bergen County
Commission Expires Oct. 14, 2020

1976744-1

EXHIBIT D

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY    :
                       : ss
COUNTY OF BERGEN       :

BE IT REMEMBERED that on this ____ day of _____ 2016, before me, the subscriber, personally appeared _____, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

_____
                                                    Managing Member

Signed and sworn to before me on
_____2016.

_____
Notary Public, State of New Jersey

1976744-1

EXHIBIT D

**EXHIBIT A**

**Property Description**

| Property Owner | Block | Lot | Property Address |
|---|---|---|---|
| Angelo and Jane Giambona | 419 | 1 | 19 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 2 | 15 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 3 | 9  Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 4 | 214 Kinderkamack |
| Dolores, Della Volpe Trste | 419 | 6.01 | 190 Kinderkamack |
| Yaghoob Pousty | 419 | 6.02 | 184 Kinderkamack |
| Borough of Emerson | 419 | 7 | |
| 182 Emerson, LLC | 419 | 8 | 182 Kinderkamack |
| 182 Emerson, LLC | 419 | 9 | 176 Kinderkamack |
| 182 Emerson, LLC | 419 | 10 | 78 Linwood |

**EXHIBIT B**

**EXHIBIT D**

1976744-1

Amended and Supplemented Funding Agreement

## FUNDING AGREEMENT

**THIS FUNDING AGREEMENT** is dated this ⟶4⟵ day of ⟶Oct⟵, 2016 among the **BOROUGH OF EMERSON**, a municipal corporation with offices at 146 Linwood Ave., Emerson, NJ 07630 (the "Borough") and **EMERSON REDEVELOPERS, LLC**, with offices located at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as "ERD");

### W-I-T-N-E-S-S-E-T-H:

**WHEREAS**, ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the Borough as Block 419; Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10 (the "Property"); and

**WHEREAS**, the Borough wishes to designate a redeveloper for the Redevelopment Area encompassing the Property; and

**WHEREAS**, ERD proposes to design, develop, finance and construct 134 units and 13,000 square feet of retail space ("the Project") and accordingly has requested the Borough consider appointing ERD as redeveloper for the Property; and

**WHEREAS**, ERD has agreed to pay the Application Fee as set forth herein and bear the costs for the Borough's professionals to assist the Borough in reviewing, among other things, whether ERD should be designated redeveloper for the Property, and in connection therewith has agreed to establish an escrow fund with the Borough to provide for the payment of professional fees, costs and expenses related thereto incurred by the Borough (the "Interim Costs");

**NOW, THEREFORE**, for and in consideration of the mutual promises, representations, covenants and agreements contained herein and the undertakings of each Party to the other and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby and to bind its successors and assigns, do mutually promise, covenant and agree as follows:

1.   **Payment of Interim Costs.**

Immediately upon the execution of this Funding Agreement, ERD shall pay Ten Thousand Dollars ($10,000) (the "Escrow") to the Borough and the Borough shall deposit such funds into an escrow account established by it for the payment of the Interim Costs. Prior to the Borough's withdrawal of funds from the Escrow for the payment of the Interim Costs, the Borough shall provide ERD with a copy of each invoice reflecting Interim Costs to be paid. Unless ERD promptly (within fifteen (15) days of its receipt of any such copy) provides a written objection to any invoiced item as not being an Interim Cost, the Borough shall be free to withdraw funds from the Escrow for the payment of such invoiced services. If, when and as often as may occur that the Escrow is drawn down to or below Three Thousand Five Hundred Dollars $3,500 then ERD, upon the Borough's request, shall immediately provide to the Borough

EXHIBIT D

for deposit an additional amount sufficient to replenish the escrow to Ten Thousand Dollars ($10,000) for use in accordance with these terms.

Interim Costs, for the purposes of this Funding Agreement, shall include the reasonably incurred out-of-pocket fees, costs and expenses incurred by the Borough (both before and after execution hereof) in reviewing the proposed development of the Property, including, but not limited to, fees for legal, engineering, planning and financial advisory services, including subsequent investigations and studies as may be reasonably determined and agreed to by the parties.

2.    **Application Fee** – Prior to the execution of a formal Redeveloper's Agreement the Borough shall imposes a non-refundable fee in an amount to be determined based on the final concept plan, with any adjustment to the fee to be paid, if appropriate, when the Redevelopment Agreement is executed.

3.    **Notice**.   Any notice provided to the Borough hereunder shall be submitted in writing to:

Jane Dietsche, RMC, Borough Clerk
146 Linwood Ave.
Emerson, NJ 07630

with copies to:

Douglas F. Doyle
Decotiis, Fitzpatrick & Cole, LLP
Glenpointe Centre West
500 Frank W. Burr Blvd, Suite 31
Teaneck, NJ 07666

Notices to ERD shall be submitted in writing to:

Emerson ReDevelopers, LLC
Attn: Kevin X. Codey, Vice President of Land Acquisitions
80 South Jefferson Road, Suite 202
Whippany, NJ 07981

with copies to:

Carleton R. Kemph, Esq.
6 Hampshire Court
Springfield, NJ 07081

4.    **General**.- This Funding Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings between the parties.   This Funding Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

1976744-1                              EXHIBIT D

**IN WITNESS WHEREOF**, the Parties hereto have caused this Funding Agreement to be executed, all as of the date first above written.

**BOROUGH OF EMERSON**

BY: _____
Louis J. Lamatina, Mayor

Witness:

By: _____
Jane Dietsche, RMC, Borough Clerk

**AND**

**EMERSON REDEVELOPERS, LLC**

BY: _____
Name:
Title:

1976744-1                    EXHIBIT D

**EXHIBIT E**

## SECOND AMENDMENT TO REDVELOPMENT AGREEMENT

This **Second Amendment to Redevelopment Agreement** is made this $20$ day of

Nov, 2017 by and between the

> **BOROUGH OF EMERSON**
> 146 Linwood Ave., Emerson, NJ 07630
> a municipal corporation of the State of New
> Jersey, located in the County of Bergen,
> (hereinafter referred to as "Borough")

**AND**

> **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
> a limited liability corporation of the State of New Jersey, having an office
> at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
> (hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS,** the Borough and Redeveloper entered into a Redevelopment Agreement on

or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas

within the Central Business District Redevelopment Area, attached hereto as **Exhibit A**; and

**WHEREAS,** the Borough and the Redeveloper are desirous of amending and

supplementing the Redevelopment Agreement to reflect their mutual understanding with respect

to the implementation of the development and requirement of affordable housing units to be built

on-site;

**WHEREAS,** the Borough and Redeveloper have agreed to amend and supplement the

Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE,** for and in consideration of the promises and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

EXHIBIT E

1.    All terms not defined in this Amendment shall have the same meaning as set forth in the Redevelopment Agreement.

2.    The purpose and intent of this Amendment is to amend and supplement the affordable housing requirements.

3.    Article 1, Section 1.01 entitled "Definitions" is amended as follows:

"Affordable Housing Requirements" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The ~~maximum~~ obligation shall be at least 20% set aside **[in accordance with Borough Ordinance 290-13.D]** and of which no less than 15% ~~may~~ **[shall]** be built on **[site]** and the remainder **shall be provided for by any of the following options to: (i) construct affordable units on-site; or (2) construct the affordable units elsewhere within the Borough ("Off-site"); or (3) make a payment in lieu of constructing the affordable units; or (4) provide a combination of a payment in lieu and on-site or Off-site construction.** ~~and/or offsite~~

4.    Article 4.01 entitled Project Costs is amended as follows:

All costs of implementing and Completing the Project including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property **[including the use of eminent domain to acquire the property under any authorizing statutes and/or regulations]**, any Remediation costs . . .

5.    Article 4, Section 4.03.1 entitled "Alternate COAH Location" is deleted in its entirety and will be "intentionally left blank".

6.    Article 5.01 entitled "Property" shall be amended and supplemented as follows:

. . . In the event the Redeveloper is not able to purchase any property set forth in Exhibit A the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c) **[, N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws authorizing the Borough to acquire such properties.]** The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties . . .

EXHIBIT E

7.    In all other respects, the Redevelopment Agreement remains in full force and effect.

8.    This Second Amendment together with the First Amendment, any applicable Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this Second Amendment. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

9.    All the provisions of this Second Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

**IN WITNESS WHEREOF**, Redeveloper has hereunto caused this Second Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

EXHIBIT E

<div align="center">

**BOROUGH OF EMERSON**
**COUNTY OF BERGEN, NEW JERSEY**
**RESOLUTION**          No: 200-17

</div>

RE:  SECOND AMENDMENT TO REDEVELOPMENT AGREEMENT

This **Second Amendment to Redevelopment Agreement** is made this $\underline{18}$ day of July

2017 by and between the

> **BOROUGH OF EMERSON**
> 146 Linwood Ave., Emerson, NJ 07630
> a municipal corporation of the State of New
> Jersey, located in the County of Bergen,
> (hereinafter referred to as "Borough")

**AND**

> **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
> a limited liability corporation of the State of New Jersey, having an office
> at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
> (hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS,** the Borough and Redeveloper entered into a Redevelopment Agreement on

or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas

within the Central Business District Redevelopment Area, attached hereto as **Exhibit A**; and

**WHEREAS,** the Borough and the Redeveloper are desirous of amending and

supplementing the Redevelopment Agreement to reflect their mutual understanding with respect

to the implementation of the development and requirement of affordable housing units to be built

on-site;

**WHEREAS,** the Borough and Redeveloper have agreed to amend and supplement the

Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE,** for and in consideration of the promises and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

<div align="center">

EXHIBIT E

</div>

    1.     All terms not defined in this Amendment shall have the same meaning as set forth in the Redevelopment Agreement.

    2.     The purpose and intent of this Amendment is to amend and supplement the affordable housing requirements.

    3.     Article 1, Section 1.01 entitled "Definitions" is amended as follows:

        "Affordable Housing Requirements" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The ~~maximum~~ obligation shall be at least 20% set aside **[in accordance with Borough Ordinance 290-13.D]** and of which no less than 15% ~~may~~ **[shall]** be built on **[site] and the remainder shall be provided for by any of the following options to: (i) construct affordable units on-site; or (2) construct the affordable units elsewhere within the Borough ("Off-site"); or (3) make a payment in lieu of constructing the affordable units; or (4) provide a combination of a payment in lieu and on-site or Off-site construction.** ~~and/or offsite~~

    4.     Article 4.01 entitled Project Costs is amended as follows:

        All costs of implementing and Completing the Project including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property **[including the use of eminent domain to acquire the property under any authorizing statutes and/or regulations]**, any Remediation costs . . .

    5.     Article 4, Section 4.03.1 entitled "Alternate COAH Location" is deleted in its entirety and will be "intentionally left blank".

    6.     Article 5.01 entitled "Property" shall be amended and supplemented as follows:

    . . . In the event the Redeveloper is not able to purchase any property set forth in Exhibit A the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c) **[, N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws authorizing the Borough to acquire such properties.]** The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties . . .

EXHIBIT E

7.    In all other respects, the Redevelopment Agreement remains in full force and effect.

8.    This Second Amendment together with the First Amendment, any applicable Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this Second Amendment. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

9.    All the provisions of this Second Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

IN WITNESS WHEREOF, Redeveloper has hereunto caused this Second Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto.  The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

EXHIBIT E

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN | |
|---|---|---|---|---|---|---|---|
| | | | | | | | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on July 18, 2017.* |
| DiPaola | | | | X | | | |
| Falotico | | | X | | | | *Attest:* |
| Lazar | | | X | | | | |
| Knoller | | X | X | | | | |
| Downing | X | | X | | | | *Acting Deputy Clerk* |
| Worthington | | | X | | | | |

EXHIBIT E

Witnessed and Attested to:                    **BOROUGH OF EMERSON**

By: _____
JANE DIETSCHE, Borough Clerk            LOUIS J. LAMATINA, Mayor

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

By: _____
Joseph Forgione,   Managing Member

EXHIBIT E

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY :

                           : SS

COUNTY OF BERGEN      :

      **I CERTIFY** that on ___11/20___ , 2017,

      **JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

      (a)     this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

      (b)     this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamatina, the Mayor of the Municipal Corporation;

      (c)     this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

      (d)     this person knows the proper seal of the corporation which was affixed to this document; and

      (e)     this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
11/20/2017.

_____
Notary Public, State of New Jersey

_____
Municipal Clerk

COLEEN A. GODDEL
NOTARY PUBLIC - NEW JERSEY
COMMISSION # 50086730
MY COMMISSION EXPIRES AUGUST 23,2022

EXHIBIT E

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY    :
                       : ss
COUNTY OF BERGEN       :

BE IT REMEMBERED that on this __7__ day of _November_ 2017, before me, the subscriber, personally appeared _Joseph Forgione_, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

_____
Joseph Forgione, Managing Member

Signed and sworn to before me on
Nov. 7, 2017.

_____
Notary Public, State of New Jersey

DIANE M DE VITA-CHIRCO
NOTARY
PUBLIC
My Comm. Exp.
Mar 13, 2022
STATE OF NEW JERSEY

EXHIBIT E

# EXHIBIT A

### Redevelopment Agreement

EXHIBIT E

## FIRST AMENDMENT TO REDEVELOPMENT AGREEMENT

This First Amendment to Redevelopment Agreement is made this ⁴⁄ day of October

2016 by and between the

> **BOROUGH OF EMERSON**
> 146 Linwood Ave., Emerson, NJ 07630
> A municipal corporation of the State of New
> Jersey, located in the County of Bergen,
> (hereinafter referred to as "Borough")

> AND

> **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
> A limited liability corporation of the State of New Jersey, having an office
> at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
> (hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement on

or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas

within the Central Business District Redevelopment Area; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and

supplementing the Redevelopment Agreement to reflect their mutual understanding with respect

to the implementation of the Redeveloper's proposal submitted to the Borough and the

Borough's Redevelopment Plan;

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the

Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

1.    All terms not defined in this Amendment shall have the same meaning as set forth

in the Redevelopment Agreement.

EXHIBIT E

2.     The purpose and intent of this Amendment is to amend and supplement the description of the properties to be redeveloped to reflect the Redeveloper's proposal submitted to the Borough and in accordance with the Borough's Redevelopment Plan.

3.     The property descriptions listed in Exhibit A of the Redevelopment Agreement, attached hereto as **Exhibit A**, is amended and supplemented to include the following additional information:

| Property Owner | Block | Lot | Property Address |
|---|---|---|---|
| 182 Emerson, LLC | 419 | 9 | 176 Kinderkamack |

3.     The Funding Agreement attached to the Redevelopment Agreement as Exhibit E, shall be amended and supplemented, attached hereto as **Exhibit B**, to include Block 419, Lots 7 and 9 as redevelopment properties and are made part of the first "WHEREAS" clause, which shall now be deemed amended to read as follows:

> **WHEREAS,** ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the Borough as Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10.

4.     In all other respects, the Redevelopment Agreement remains in full force and effect.

5.     This First Amendment together with the proposal, the Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this First Amendment and the Redevelopment Agreement. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

1976744-1                                    EXHIBIT E

6.    All the provisions of this First Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

IN WITNESS WHEREOF, Redeveloper has hereunto caused this First Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto.  The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed and Attested to:                     **BOROUGH OF EMERSON**

JANE DIETSCHE, Borough Clerk          By: _____
                                                  LOUIS J. LAMATINA, Mayor

Attested to:                          **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

                                      By: _____
                                                       Managing Member

EXHIBIT E

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY:

                      : SS

COUNTY OF BERGEN    :

     I CERTIFY that on *Oct. 6*, 2016,

     **JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

     (a)    this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

     (b)    this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamatina, the Mayor of the Municipal Corporation;

     (c)    this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

     (d)    this person knows the proper seal of the corporation which was affixed to this document; and

     (e)    this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
*Oct 6*, 2016.

                              Municipal Clerk

Notary Public, State of New Jersey

LORI A. WOODS
NOTARY PUBLIC, State of New Jersey
No. 2453733
Qualified in Bergen County
Commission Expires Oct. 14, 2020

EXHIBIT E

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY   :
                              : ss

COUNTY OF BERGEN     :

BE IT REMEMBERED that on this ____ day of _____ 2016, before me, the subscriber, personally appeared _____, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

_____
                                  Managing Member

Signed and sworn to before me on
_____ 2016.

_____
Notary Public, State of New Jersey

                                  EXHIBIT E

**EXHIBIT F**

## THIRD AMENDMENT TO REDEVELOPMENT AGREEMENT

This **Third Amendment to Redevelopment Agreement** ("Third Amendment") is made this ³l day of Ðec , 2018, by and between

**THE BOROUGH OF EMERSON,**
a municipal corporation of the State of New Jersey,
located in the County of Bergen,
with an address at 146 Linwood Avenue, Emerson, New Jersey 07630
(hereinafter referred to as the "Borough")

**AND**

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC,**
a limited liability company of the State of new Jersey,
with an address at c/o Accurate Builders & Developers, 742 Ocean Avenue,
Lakewood, New Jersey 08701
(hereinafter referred to as "Redeveloper").

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement dated June 27, 2016, which was amended on October 4, 2016 and November 20, 2017 (collectively, the "Redevelopment Agreement"), for the redevelopment of certain areas (the "Property") within the Central Business District Redevelopment Area, which Redevelopment Agreement is attached hereto and made a part hereof as **Exhibit A**; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and supplementing the Redevelopment Agreement to reflect their mutual understanding with respect to the implementation of Redeveloper's proposed mixed-use inclusionary development on the Property; and

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borough and the Redeveloper agree as follows:

1.     All terms not defined in this Third Amendment shall have the meaning as set forth in the Redevelopment Agreement.

2.     The purpose and intent of this Third Amendment is to amend and supplement the Redevelopment Agreement with respect to Redeveloper's required contributions for certain onsite and offsite improvements, with respect to the current ownership interest in Redeveloper resulting from a Borough approved transfer, and with respect to Redeveloper's efforts to acquire those portions of the Property not owned or controlled by Redeveloper.

[J005-0020/482895/1]

1

4083378
4103439

EXHIBIT F

3.     Section 4.04 of the Redevelopment Agreement is hereby deleted in its entirety and replaced with the following language:

**Section 4.04.  Redeveloper Contribution for Emergency Municipal Services Building.**  The Borough has dedicated and shall transfer Block 419, Lot 7 to Redeveloper for the Project ("Dedicated Lot") which is currently utilized by the Borough Ambulance Corp. and has a fair market value of $500,000.  In consideration therefore, the Redeveloper shall serve as the general contractor pursuant to a separate general contractor's agreement to be negotiated by the parties, and shall construct an Emergency Municipal Services Building as defined hereinabove. The Borough shall, within one (1) year from the adoption of this Third Amendment, identify the property upon which the Emergency Municipal Services Building is to be constructed and the Borough shall, at its sole cost and expense, provide all necessary site plans, engineering materials and architectural plans and secure all necessary local, county and state approvals and permits, including building permits, from all agencies having jurisdiction over the project.  In the event that the Borough fails to deliver said plans, approvals and permits within said 1-year period, the Redeveloper shall be relieved from all obligations to construct the Emergency Municipal Services Building.

The Borough shall pay Redeveloper for all costs associated with the construction of the Emergency Municipal Services Building, less the costs associated directly with and specifically allocated to, the portion of the building utilized for ambulance services which, in no case, shall exceed the fair market value of the Dedicated Lot as set forth above.

4.     The Redeveloper Estimate/Share for Offsite/Onsite Improvements attached to the Redevelopment Agreement as Exhibit F, shall be amended, attached hereto and made a part hereof as **Exhibit B**, to more accurately reflect Redeveloper's required share of costs for the Kinderkamack Road Improvements.

5.     Further to Section 5.01, the Borough and Redeveloper acknowledge and agree that the obligations set forth in the Redevelopment Project Schedule, attached to the Redevelopment Agreement as Exhibit C, have been tolled due to litigation involving the Redeveloper's acquisition of those portions of the Property not owned or controlled by Redeveloper.

6.     In accordance with 6.01 of the Redevelopment Agreement, the Borough and Redeveloper acknowledge and agree that the ownership interest in the Redeveloper, resulting from a Borough approved transfer, is as follows:

| Name | Address | Percentage Ownership Interest |
|---|---|---|
| Yaakov Klugmann | Accurate Builders & Developers 742 Ocean Avenue Lakewood, NJ 08701 | 51% |

[J005-0020/482895/1]

2

4083378
4103439

EXHIBIT F

|  |  |  |
|---|---|---|
| Giuseppi Forgione | JMF Properties<br>80 S. Jefferson Road, Suite 202<br>Whippany, NJ 07981 | 49% |

7.    The "Members of Redeveloper" set forth in Exhibit D to the Redevelopment Agreement shall be amended, attached hereto and made a part hereof as **Exhibit C**, to reflect the change in ownership interest in the Redeveloper.

8.    The contact information for Redeveloper as set forth in Section 14.08 (Notices and Demands) of the Redevelopment Agreement shall be amended to reflect the change in ownership interest in the Redeveloper, as follows:

Emerson Redevelopers Urban Renewal, LLC
c/o Accurate Builders & Developers
724 Ocean Avenue
Lakewood, NJ 08701

With a copy to:

Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway, P.O. Box 1997
Morristown, NJ 07962-1997
Attn: Joseph A. Paparo, Esq.

9.    Redeveloper shall submit proposed final versions of the site plan and architectural plans (including elevations) for the Project to the Borough Clerk for review by a duly-formed subcommittee of the Borough Governing Body, acting in its capacity as the Borough's redevelopment agency under the Act.  This review shall be undertaken within thirty (30) days of receipt of the plans by the Borough Clerk and the sole purpose of this review shall be to confirm that the submitted plans are consistent with the Redevelopment Plan (as such Redevelopment Plan has been amended through the date of this Third Amendment).

10.    In all other respects, the Redevelopment Agreement remains in full force and effect and there has been no breach or default to date, by Redeveloper.

11.    This Third Amendment together with the proposal, the Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official, and the Redevelopment Agreement, represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this Third Amendment and the Redevelopment Agreement. No further change or modification shall be effective unless in writing and signed by the Borough and Redeveloper.

12.    All the provisions of this Third Amendment shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

[J005-0020/482895/1]

3

4083378
4103439

EXHIBIT F

IN WITNESS WHEREOF, Redeveloper has hereunto caused this Third Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested to by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed or Attested to:             BOROUGH OF EMERSON

JANE DIETSCHE, Borough Clerk     LOUIS J. LAMATINA, Mayor

Witnessed or Attested to:             EMERSON REDEVELOPERS URBAN
RENEWAL, LLC

By:_____
YAAKOV KLUGMANN, Managing Member

EXHIBIT F

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY   :
                       : SS
COUNTY OF BERGEN     :

I CERTIFTY that on _1/2_, 2019,

JANE DIETSCHE personally came before me, and this person acknowledged under oath, to my satisfaction, that:

(a) This person is the Municipal Clerk of the Borough of Emerson, the municipal corporation named in this document;

(b) This person is the attesting witness to the signing of this document by the proper corporate officer, who is Louis J. Lamatina, the Mayor of the Borough of Emerson;

(c) This document was signed and delivered by the Borough of Emerson as its voluntary act duly authorized by a proper resolution of its Municipal Council;

(d) This person knows the proper seal of the Borough of Emerson which was affixed to this document; and

(e) This person signed this proof to attest to the truth of these facts.

_____

Signed and sworn before me on

_1/2_, 2018

_____
Notary Public, State of New Jersey

COLEEN A. GODDEL
NOTARY PUBLIC - NEW JERSEY
COMMISSION # 50066730
MY COMMISSION EXPIRES AUGUST 23, 2022

[J005-0020/482895/1]

4083378
4103439

5

EXHIBIT F

## <u>REDEVELOPER ACKNOWLEDGMENT</u>

STATE OF NEW JERSEY    :
                           : SS
COUNTY OF Bergen    :

       BE IT REMEMBERED that on this ___31___ day of _Dec._ 2018, before me, the subscriber, personally appeared Yaakov Klugmann, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that he is named as the person named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC, a limited liability company named in the within instrument, and acknowledged that he signed and delivered the within instrument as the managing member of the Redeveloper.

YAAKOV KLUGMANN, Managing Member

Signed and sworn before me on

12/31 , 2018

Notary Public, State of New Jersey

JANE A. MUSS DIETSCHE
NOTARY PUBLIC - NEW JERSEY
COMMISSION #2370635
MY COMMISSION EXPIRES MARCH 6, 2023

[J005-0020/482895/1]

4083378
4103439

6

EXHIBIT F

**EXHIBIT A**
REDEVELOPMENT AGREEMENT, DATED JUNE 27, 2016,
AMENDED OCTOBER 4, 2016 AND NOVEMBER 20, 2017

[ATTACHED]

## EXHIBIT B
## REVISED EXHIBIT F (OFFSITE/ONSITE IMPROVEMENT SHARE) TO
## REDEVELOPMENT AGREEMENT

### DEVELOPER ESTIMATE

### BOROUGH OF EMERSON, KINDERKAMACK ROAD PROJECT

### CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY EMERSON

| | | |
|---|---|---|
| 1. | 42 Inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF x $225/LF | = $146,250 |
| 2. | Lincoln Ave drainage work, upsize pipes | = $ 10,000 |
| 3. | 3 New drainage chambers, 42 inch pipe, 3 X $7,000 | = $ 21,000 |
| | STREETSCAPE ITEMS | |
| 4. | Expand Paver Sidewalks, 6 FT Add. X 900 FT = 5,400 SF = 600 SY X $120/SY | = $ 72,000 |
| 5. | Streetscape Lighting, 9 Lights and wiring at $7,000/each | = $ 63,000 |
| 6. | Street trees, 5 X $500 | = $ 2,500 |
| 7. | Amenities, benches, trash receptacles | = $ 10,000 |

*Emerson Total* = *$ 324,750*

10% Contingency    Say    $ 357,000

*Total Estimate*    *$ 357,000*

Soft Costs, including surveying, engineering, attorney fees, property acquisition, utility layout, test pits, etc.

$ 41,000

*TOTAL*    *$ 398,000*

[J005-0020/482895/1]

8

4083378
4103439

EXHIBIT F

## EXHIBIT C
## MEMBERS OF REDEVELOPER

| | | |
|---|---|---|
| Yaakov Klugmann | Accurate Builders & Developers<br>742 Ocean Avenue<br>Lakewood, NJ 08701 | 51% |
| Giuseppi Forgione | JMF Properties<br>80 S. Jefferson Road, Suite 202<br>Whippany, NJ 07981 | 49% |

EXHIBIT F

**EXHIBIT G**



**AGENDA**
**BOROUGH OF EMERSON**
**MAYOR AND COUNCIL**
**REORGANIZATION**
**JANUARY 2, 2019**
**7:30 P.M.**
**Borough Hall-Council Chambers**
**Emerson, NJ 07630**



1. **CALL TO ORDER BY THE BOROUGH CLERK**

   Borough Clerk Jane Dietsche called the meeting to order at 7:42 p.m.

2. **BOROUGH CLERK ANNOUNCES THE RECEIPT OF THE CERTIFICATION OF THE 2018 GENERAL ELECTION RESULTS**

   Ms. Dietsche said she was in receipt of the Certification of the Election and announced that on this historic occasion, the Honorable Mayor Danielle DiPaola would be sworn into office by the Honorable Mayor Carlos A. Rendo of Woodcliff Lake. She added that Mayor Rendo was a very well-respected Mayor in the Pascack Valley as well as a dear friend of Mayor DiPaola.

3. **SWEARING-IN CEREMONY-OATH OF OFFICE:**

   **Swearing in of**
   **MAYOR DANIELLE DIPAOLA**
   **By Mayor Carlos A. Rendo**

   Mayor Rendo swore Mayor DiPaola into office in the presence of her family and congratulated her to a round of applause. Mayor Rendo said it was a great honor to swear in Mayor DiPaola and that she had made history. He said she was an extraordinary woman who represented Emerson; she worked non-stop for the Borough. He had known her for years and she would do a great job as Mayor.

   **Swearing in of**
   **COUNCILMAN BRIAN GORDON**
   **By Mayor Danielle DiPaola**

   Mayor DiPaola swore in Councilman Brian Gordon in the presence of his family and offered her congratulations.

   **Swearing in of**
   **COUNCILMAN KENNETH HOFFMAN**
   **By Mayor Danielle DiPaola**

   Mayor DiPaola swore in Councilman Kenneth Hoffman in the presence of his family and offered her congratulations.

4. **ROLL CALL OF CURRENT 2019 MAYOR AND COUNCIL**

   Mayor DiPaola asked Ms. Dietsche to call the roll of the current Governing Body.

   **PRESENT**: Mayor DiPaola, Councilman Bayley, Councilman Falotico, Councilman Gordon, Councilman Hoffman, Councilman Knoller

4

EXHIBIT G

Agenda No. 1        APPROVED FOR RELEASE & CONTENT 1-15-19

5. **APPOINTMENT TO FILL COUNCILMEMBER VACANCY**
   o   Nominations:
       1. Jill McGuire
       2. Don Pierro
       3. Michael Timmerman

Mayor DiPaola announced that the Borough Clerk had received an email from the Vice Chair of the Republican Committee which had presented the names of three individuals to fill the vacancy left by her resignation as Councilwoman. The three names were Jill McGuire, Don Pierro and Michael Timmerman.

☞**Motion** to nominate Jill McGuire as Councilwoman to fill the vacancy for the unexpired term ending 12/31/19 was **moved** by Councilman Hoffman, and **seconded** by Councilman Gordon.

☞**Motion** to postpone this appointment to the next meeting was moved by Councilman Knoller.

Councilman Hoffman called a Point of Order, stating that he had made the first motion which should therefore be the first acted upon. Ms. Rubinstein noted that a motion to postpone superseded a pending motion to appoint.

Mayor DiPaola stated she had a brief conversation with Councilman Knoller who had indicated that the 2019 Governing Body members were not prepared to nominate a new Governing Body member that evening. Councilman Knoller said he was not prepared to ask the nominees questions and was not sure who one of the candidates was. His hope was to postpone the appointment to the next meeting and have the opportunity to ask the nominees some questions and get to know them.

Councilman Hoffman said if that was the case, all appointments should be postponed to allow the full complement of councilmembers to vote on items such as choosing a Council President and Class III Land Use Board member. He added that it would be highly inappropriate to make those decisions and perhaps others without having the full Council present as the votes would not represent the entire Governing Body.

Mayor DiPaola said she was all about inclusiveness and open and honest government. She had spoken to each Councilmember about the standing committees and liaisons and would like to afford the opportunity to any new Governing Body member to also deliberate their thoughts on committee appointments as well as the Class III Land Use Board member. A vote on the Land Use Board Class III member should be conducted by the full 2019 Governing Body. Councilman Knoller agreed and said that it was an important decision that should be postponed.

☞**Motion** to postpone the appointment of a new Councilmember to the January 15th meeting was **moved** by Councilman Knoller; **seconded** by Councilman Falotico and carried by roll call vote of 4-1:
**YES: Knoller, Bayley, Falotico, Gordon**
**NO: Hoffman**

5

EXHIBIT G

6.   **ROLL CALL OF 2019 MAYOR AND COUNCIL**

7.   **Resolution No. 01-19 - ADOPTION OF GOVERNING BODY BY-LAWS HERETO ATTACHED SHALL BE THE BY-LAWS FOR THE CONDUCT OF BUSINESS OF THE MAYOR AND COUNCIL FOR THE BOROUGH OF EMERSON FOR THE YEAR BEGINNING JANUARY 1, 2019 AND ENDING DECEMBER 31, 2019 WITH VOTING AND SEATING ORDER**

The Governing Body discussed whether the Mayor or Councilmembers determined the voting and seating order. Ms. Rubinstein confirmed that this was addressed in the by-laws. Mayor DiPaola said that in order to make decisions and make a smooth transition of the Governing Body, they needed the extra member at the dais with voting privileges. In previous years, the Mayor had made the nominations and the Council had either approved or denied the nominations made. She thought she was being blindsided and was looking for cooperation from her colleagues to her right. She preferred a nice mix of new and old Governing Body members for the seating order on the dais. Councilman Hoffman agreed and said this had been the practice when he had served as a Councilman previously. He believed they should follow the by-laws but, in this case, it would be nice to work cooperatively and determine a seating plan that would work for everyone.

Mayor DiPaola said she had planned the seating arrangement to be Councilman Falotico, Councilman Bayley, Councilman Hoffman, whoever the Council President would be, Councilman Knoller or the as yet to be determined Councilmember and Councilman Gordon.

Councilman Falotico called a Point of Order noting that the by-laws indicated the seating order is determined by the Council members and not the Mayor.

☞**Motion** to adopt the voting and seating order as noted above was **moved** by Councilman Knoller; **seconded** by Councilman Gordon. No roll call was made as Ms. Dietsche asked about the seating arrangement order after the Council President was selected.

8.   **MAYOR'S ADDRESS TO THE ASSEMBLAGE**

**MAYOR DANIELLE DIPAOLA**

Mayor DiPaola thanked everyone for coming that evening especially Assemblywoman Holly Schepisi, Councilman Hector Olmo from Cresskill, former Dumont Mayor Don Winant, Emerson Chief of Police Michael Mazzeo, and Mayor Carlos Rendo of Woodcliff Lake. She was looking forward to working with everyone in a bipartisan way. She said the election was over and they needed to move forward and recognize that new ideas needed to be brought to the table. She hoped that moving forward that they would do everything in the best interests of the Borough and not political parties. They needed to be open and transparent, and in her opinion should have immediately appointed a new member to the Governing Body so that Emerson would have had a complete Governing Body to make decisions moving forward. She had lived in Emerson her whole life and was sure everyone at the dais had one or two ideas about something they wanted to see happen in town. The future in Emerson was bright and she was determined to help the Borough become a place of opportunity for all people, whether a family of four, a single person or a senior citizen who had lived here a long time. They wanted to see economic opportunities and would do that by making sound fiscal decisions. She said good government was made up of good people and the good people in Emerson included the hard-working employees, administrative staff, emergency services personnel and dedicated volunteers. Volunteers were very important as they ran most of the Boards and Commissions in town and without them, they did not get things like Town Day. Without volunteers, there would be no ambulances or fire engines arriving for emergencies or shade trees taken down or decisions by the Environmental Commission. The Board of Health did a lot of very important things. She thanked all volunteers. She closed by saying that it was historic being the first female Mayor. She hoped that she would not be judged on her gender but rather on the basis of her ideas and abilities.

6

EXHIBIT G

Agenda No. 1      APPROVED FOR RELEASE & CONTENT 1-15-19

**9.  NEW COUNCILMEMBERS' ADDRESS TO THE ASSEMBLAGE**

**COUNCILMAN BRIAN GORDON**

Councilman Gordon thanked everyone for electing him to the Council and said he would work hard for them. If anyone had any questions, he told them to feel free to ask and he would answer to the best of his abilities.

**COUNCILMAN KENNETH HOFFMAN**

Councilman Hoffman thanked everyone for supporting them in the recent election. The large turnout for both sides clearly showed that elections mattered and the people of Emerson deeply cared about what happened to their community. His philosophy about governing was and always had been pretty simple – that the job of elected officials was to serve the people. The members of the public were their bosses, not the other way around. At the national level the authority of the three branches of government was derived solely from the consent of the governed, as the crucial first three words of the Constitution 'We the People' made clear. The same was true at the local level. They served at the public's behest. That was why answering their questions and listening to their concerns should be considered a top priority, not an unwanted annoyance. That was why the governing process should always be transparent, with discussions and decisions made in public. Elected officials should never forget that what they were doing was the public's business. He expressed his sincere gratitude to the voters of Emerson and looked forward to working with the entire Governing Body to move Emerson in a positive direction and always according to the wishes of the people they served.

**10.  RESOLUTION No. 02-19 ELECTION OF PRESIDENT OF THE COUNCIL**
   a.  Motion to open the floor to nominations
   b.  Nominations accepted
   c.  Motion to close for nominations
   d.  Motion to appoint
   e.  Roll Call

☞**Motion** to open the floor to nominations for election of Council President was **moved** by Councilman Knoller, **seconded** by Councilman Falotico and carried.

☞**Motion** to nominate Councilman Falotico as Council President was **moved** by Councilman Knoller, **seconded** by Councilman Bayley. Mayor DiPaola asked if there were any other nominations. There were none.

Mayor DiPaola asked for a roll call vote on the selection of Councilman Falotico as Council President.
**Roll call:**
**YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

Mayor DiPaola announced that Councilman Gerry Falotico would be the Council President for the term ending 12/31/19 and congratulated him.

7

EXHIBIT G

Agenda No. 1        APPROVED FOR RELEASE & CONTENT 1-15-19

9.  **RESOLUTION No. 03-19 BOROUGH PROFESSIONAL APPOINTMENTS - Pursuant to N.J.S.A 19:44A-20.4 et seq. "Fair and Open"**
    **(Appointment by Mayor on Consent and Advice of Council)**

    Mayor DiPaola said the Borough had sent out Requests for Quotes for Professional Appointments prior to the election. After the election she had requested that they reopen the selection process. The Governing Body has not yet had the opportunity to review all the resumes. Further appointments would take place at their next meeting.

    - Resolution No. 3-19 Award Professional Services Contract for A Three-Year Cycle Using The "Fair and Open Process" In Accordance with the "New Jersey Local Unit Pay to Play" Law, N.J.S.A. 19:44a-20.4 Et Seq., For Municipal Judge for The Calendar Years January 1, 2019 Through December 31, 2021 – Judge Francis J. Leddy, Jr.

        ☛**Motion** to adopt Resolution No. 3-19 Awarding Professional Services Contract for A Three-Year Cycle Using The "Fair and Open Process" In Accordance with the "New Jersey Local Unit Pay to Play" Law, N.J.S.A. 19:44a-20.4 Et Seq., For Municipal Judge for The Calendar Years January 1, 2019 Through December 31, 2021 – Judge Francis J. Leddy, Jr. was **moved** by Council President Falotico, **seconded** by Councilman Knoller and carried by a roll call vote of 5-0:
        **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

    Mayor DiPaola swore in Judge Leddy as Municipal Court Judge and announced that 2019 would be his 31st year serving the Borough of Emerson.

10. **RESOLUTION No. 04-19 STANDING COMMITTEE COUNCIL APPOINTMENTS WITH FIRST NAMED COMMITTEE MEMBER AS CHAIR:**

    ☛**Motion** to adopt Resolution No. 4-19 Standing Committee Council Appointments with First Named Committee Member as Chair was **moved** by Councilman Hoffman, **seconded** by Councilman Knoller and carried by a roll call vote of 5-0:
    **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

    - Streets and Municipal Services             Gordon/Bayley
    - Finance, Tax & Revenue                      Knoller/Hoffman
    - Police, Auxiliary Police, Office of
      Emergency Management & Courts              Knoller/Gordon
    - Public Buildings, Grounds
      Parks & Utilities                          Hoffman/Falotico
    - Real Estate and Land Use                    Hoffman/Falotico
    - Fire Department                             Bayley/TBD
    - Personnel and Human Resources               TBD/Bayley
    - Technology                                  Falotico/TBD
    - EVAC                                        Falotico/Gordon

    **<u>Other Liaison List for the Calendar Year 2019</u>**

    - Board of Health                             Knoller
    - Environmental Commission                    Hoffman
    - Chamber of Commerce                         Bayley
    - Library Board of Trustees                   Falotico
    - Board of Education                          Gordon
    - Senior Citizens                             DiPaola
    - Recreation Commission                       TBD
    - Insurance Fund Commissioner                 Administrator/Bayley
    - Historic Preservation Committee             Gordon
    - Municipal Land Use Board                    TBD

8

EXHIBIT G

**11. RESOLUTION No. 05-19   COUNCIL APPOINTMENT OF CLASS III LAND USE BOARD MEMBER**

☛**Motion** to postpone Resolution No. 5-19 Council Appointment of Class III Land Use Board Member. was **moved** by Councilman Knoller, **seconded** by Council President Falotico and carried by a roll call vote of 5-0:
**YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

**12. INTRODUCTION OF EMERGENCY SERVICES OFFICERS**

Mayor DiPaola introduced the Emergency Services Officers for 2019. Those present were sworn in.

- **Emerson Volunteer Fire Department**
  Fire Chief Tom Carlos, Assistant Chief Anthony Sottile, Senior Captain Joe D. Mara., Junior Captain Richard Solimando, Senior Lieutenant – Ryan Doughty; Junior Lieutenant – James McDermott; President Joseph Solimando, Jr., Vice President Joseph D. Mara, Treasurer Ron Berg, Secretary Jim McDermott

- **Emerson Volunteer Ambulance Corps**
  President Janine Davis; Vice President Danielle Strathman; Treasurer Maureen Howlin; Secretary George Howlin; Captain Dave Mason; 1st Lt. Dan Ardalan, 2nd Lt. Tim Cariddi and 3rd Lt. Mike Davis

- **Emerson Auxiliary Police-One Year**
  Captain Daniel Clayton, Lieut. John Mahoney, Sgt. William Levine, Sgt. David Kogut, Sgt. Mark Bensen, Ptl. William Cileo, Ptl. Alan Bernstein, Ptl. Joseph Kalachian, Ptl. Alex Toroslar, Ptl. William Frank, Ptl. Kristin Malakas

- **School Crossing Guards- One Year**
  Bonnie Kompel, Joseph Cannone, Donna Block, William Levine, Sheri Jaeger, Maria Acosta-Carpenter, Kevin Mulvenna, Kevin Felici, Gail Kovacs-Felici, Leo Conwell, Victoria Potter

**13. RESOLUTION No. 06-19 ANNUAL APPOINTMENT OF OFFICERS AND EMPLOYEES WITH COUNCIL COMFIRMATION**

☛**Motion** to approve Resolution No. 6-19 Annual Appointment of Officers and Employees with Council Confirmation was **moved** by Council President Falotico, **seconded** by Councilman Knoller and carried by a roll call vote of 5-0:
**YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

| POSITION | TERM EXPIRES | NAME |
|---|---|---|
| Recycling Coordinator | 12/2019 | Liz Morris |
| Deputy Recycling Coordinator | 12/2019 | Perry Solimando |
| Sewer Operator | 12/2019 | Keith Durie |
| Zoning Official | 12/2019 | Nelson Fullam |
| Dep. OEM Coordinator | 12/2019 | Perry Solimando |
| Assessment Search Officer | 12/2019 | Jane Dietsche |
| Public Agency Compliance Officer (PACO) | 12/2019 | Borough Administrator |

9

EXHIBIT G

Agenda No. 1      APPROVED FOR RELEASE & CONTENT 1-15-19

## 14. MAYOR'S NOMINATIONS TO BOARDS AND COMMISSIONS with advice and consent of Council.

- **Library Board**
  - o Mayor's Representative for term ending 12/31/19          Ida Ennis
  - o Board of Education Representative for term ending 12/31/19          Kristen Vitale

  ☞**Motion** to appoint Ida Ennis as the Mayor's Representative for the term ending 12/31/19 and Kristen Vitale as the Board of Education Representative for the term ending 12/31/19 was **moved** by Councilman Bayley, **seconded** by Councilman Knoller and carried by a roll call vote of 5-0:
  **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

- **Recreation Commission**
  - o Regular member for the term ending 12/31/23          Anthony Gismondi

  ☞**Motion** to appoint Anthony Gismondi as a Regular Member for the term ending 12/31/23 was **moved** by Councilman Knoller, **seconded** by Council President Falotico and carried by a roll call vote of 5-0:
  **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

Those members who were present were sworn into office.

## COUNCIL APPOINTMENTS:

- **Board of Health**
  - o Regular member for the term ending 12/31/21          Cindy Bischoff
  - o Regular member for the term ending 12/31/21          Susan Gibbons
  - o Regular member for the unexpired term ending 12/31/20          VACANT

  ☞**Motion** to appoint Cindy Bischoff and Susan Gibbons as Regular Members for the terms ending 12/31/21 was **moved** by Councilman Hoffman, **seconded** by Councilman Bayley and carried by a roll call vote of 5-0:
  **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

## 16. MAYOR'S APPOINTMENTS

Mayor DiPaola announced the following appointments and swore in those who were present.

- **Land Use Board**
  - o Class II member for the term ending 12/31/19          Jill McGuire
  - o Class IV member for the term ending 12/31/22          Jeff Bischoff
  - o Class IV member for the term ending 12/31/22          Don Pierro
  - o Alternate II member for the term ending 12/31/20          Mike Myers
  - o Alternate III member for the term ending 12/31/20          Bill Loschiavo

- **Environmental Commission**
  - o Chairperson/Regular member
    for the term ending 12/31/19          Stephanie Clark
  - o Regular member for the term ending 12/31/19          Steve Frassa
  - o Regular member for the term ending 12/31/21          Kevin Leeds
  - o Regular member for the term ending 12/31/21          Michael Casey
  - o Alternate I member for the term ending 12/31/20          Michael Guarriello
  - o Student member for the term ending 12/31/19          Katherine Haight

10

EXHIBIT G

- **Historic Preservation Committee**
  - Class C Member for the term ending 12/31/22                Anthony Basile
  - Class C member for the term ending 12/31/22                Aldrin Cruz
  - Class C member for the unexpired term ending 12/31/20      TBD
  - Alternate I member for the term ending 12/31/20            Chris Wamsley
  - Alternate II member for the term ending 12/31/19           TBD

## 16. NEW BUSINESS:

- Resolution #07-19 Adoption of the Temporary 2019 Municipal Budget

☞**Motion** to approve Resolution No. 7-19 Adoption of the Temporary 2019 Municipal Budget was **moved** by Councilman Knoller, **seconded** by Council President Falotico and carried by a roll call vote of 5-0: **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

## 17. PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilman Hoffman, **seconded** by Councilman Bayley and carried at 8:52 p.m.

Assemblywoman Holly Schepisi said she had come to congratulate Mayor DiPaola, Councilman Gordon and Councilman Hoffmann and said their win was well deserved. They had worked exceptionally hard to be elected. The win showed that voters didn't care about Democrats or Republicans but that their concerns be listened to and their voices heard. She offered her office's assistance to everyone. She stated that Emerson would be losing an asset when Borough Administrator Bob Hoffmann departed and congratulated him on his new position in Chatham. She announced that her office would be holding an "Office on the Road" on Thursday, February 14th in the Borough and invited anyone who needed help to visit.

Jeff Bischoff, 86 Park Avenue thanked the outgoing Councilmembers for their time and service, stating that he knew it was a difficult job and took up much time and effort. He congratulated Mayor DiPaola, Councilman Gordon and Councilman Hoffman on their win and said he looked forward to working on the Land Use Board.

Gary Schwinder, 99 Linden Avenue wished everyone good luck and congratulated Mayor DiPaola and the new members of the Council. He thanked the outgoing members of the Governing Body for their service over the past years and looked forward to a great 2019.

Bill Price, 9 Emwood Drive said it was a wonderful experience and that he had been going through hell over projects in the Borough. He said that voters had saved the Emerson Woods and voted out the old Council; it was starting to happen again. He congratulated Mr. Hoffmann, wished him good luck in his new position and said he had done a good job.

Seeing no more hands, Mayor DiPaola asked for a motion to close the floor to comments from the public.

☞**Motion** to close the meeting to comments from the public was **moved** by Council President Falotico, **seconded** by Councilman Knoller and carried at 8:58 p.m.

11

EXHIBIT G

Agenda No. 1      APPROVED FOR RELEASE & CONTENT 1-15-19

### 18. RESOLUTION No. 08-19 CONSENT AGENDA

Council President Falotico requested that two resolutions be pulled for discussion and a separate vote: CA 42-19 Award Contract Extension for Information Technology Services for Ninety Day Period to DART Computer Services and CA 43-19 Authorize Public WIFI Access In Borough Hall

☞**Motion** to approve Consent Agenda Resolution No. 8-19 excluding CA 42-19 and CA 43-19 was **moved** by Council President Falotico, **seconded** by Councilman Knoller and carried by a roll call vote of 5-0: **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

Council President Falotico requested that CA 42-19 Award Contract Extension for Information Technology Services for Ninety Day Period to DART Computer Services be reduced to a 45 Day Period and inquired about security protocols for WIFI access.

☞**Motion** to approve Consent Agenda Resolution items CA 42-19 and CA 43-19 only was **moved** by Council President Falotico, **seconded** by Councilman Knoller and carried by a roll call vote of 5-0: **YES: Knoller, Bayley, Hoffman, Falotico, Gordon**

| | |
|---|---|
| CA 09-19 | Designate Official Newspapers – The Record and Ridgewood News |
| CA 10-19 | Approve Cash Management Plan |
| CA 11-19 | Approve Official Depositories |
| CA 12-19 | Approve Authorized Signatories |
| CA 13-19 | Approve Ratification of Public Official Bonds |
| CA 14-19 | Establishing Rate of Interest for Delinquent Taxes at 8% of the first $1,500.00 and 18% on any remaining balance |
| CA 15-19 | Approve Appointment of LOSAP Program Administrators Joseph D. Mara for the Emerson Volunteer Fire Department and George Howlin for the Emerson Volunteer Ambulance Corps |
| CA 16-19 | Approve Fee of $20.00 for Returned Checks for Insufficient Funds |
| CA 17-19 | Approve Bond, Treasurer of Library Board of Trustees |
| CA 18-19 | Re-establishment of Petty Cash Funds |
| CA 19-19 | Approve Volunteer Tuition Credit Program |
| CA 20-19 | Authorize CFO to pay certain obligations as needed |
| CA 21-19 | Mutual Aid – Pascack Valley Fire Departments |
| CA 22-19 | Approve Official Towers for the Borough of Emerson-Rich's Automotive, Bergen Brookside and Emerson Towing |
| CA 23-19 | Resolution Approving the Cancellation of Small Balances |
| CA 24-19 | Reimburse Residents for Property Damage Caused by Municipal Work |
| CA 25-19 | Approve BMED Fund Commissioner |
| CA 26-19 | Approve JIF Fund Commissioner |
| CA 27-19 | Appoint Liz Morris as Borough Recycling Coordinator and Perry Solimando as the Deputy Borough Recycling Coordinator |
| CA 28-19 | Appoint Keith Durie as Borough Sewer System Operator |
| CA 29-19 | Board, Commission & Committee Secretary Responsibilities |
| CA 30-19 | Authorize Shared Service Arrangement with the Borough of Glen Rock for Acting Municipal Court Administrator |
| CA 31-19 | Authorize Deputy Borough Clerk Coverage |
| CA 32-19 | Interlocal Services Agreement – Mutual Aid Plan & Rapid Deployment Force |
| CA 33-19 | Authorizing A Duplicate Coverage Opt Out Disbursement for Nonaffiliated Employees Who Voluntarily Decline to Participate in the Borough's Medical Benefits Coverage |
| CA 34-19 | Appoint Borough Administrator as a Municipal Housing Liaison |
| CA 35-19 | Authorize the Appointment a Records Custodian in the Emerson Police Department, Building Department and Board of Health for the Purposes of Open Public Records Requests |
| CA 36-19 | Appointment of Justin Schwarz as a Probationary Police Officer effective January 2, 2019 |
| CA 37-19 | Appoint Kasey Ciborowski as successor to Narita Maraj Inc. for Records Management Services |
| CA 38-19 | Approve Open Space Delegate & Alternate Representative for the period January 1, 2019 through June 30, 2019 |

12

EXHIBIT G

| CA 39-19 | Approve Community Development Delegate & Alternate for the period January 1, 2019 through June 30, 2019 |
| CA 40-19 | Award Ninety (90) Day Extension Municipal Building Cleaning Contract to Tropical Cleaning Through March 31, 2019 |
| CA 41-19 | Extension of Ace Tree Surgeons Contract for 90 days |
| CA 42-19 | Award Contract Extension for Information Technology Services for ~~Ninety (90)~~ Forty-five (45) Day Period to DART Computer Services |
| CA 43-19 | Authorize Public WIFI Access In Borough Hall |

Councilman Knoller called a Point of Order and congratulated Mayor DiPaola on her first meeting as Mayor. He looked forward to working with Councilman Gordon and Councilman Hoffman as well. He said there would be times they would agree or disagree but would always do so respectfully.

Council President Falotico congratulated Mayor DiPaola, Councilman Gordon and Councilman Hoffman and said he looked forward to working together with everyone. Mayor DiPaola concurred. Councilman Hoffman said he looked forward to working with the entire Governing Body and that Councilman Knoller was correct - they would agree or disagree but do so respectfully. He thanked the public for coming out that evening. He said they were there because of the public. Councilman Bayley wished everyone a Happy New Year, thanked them for coming and wished the newly elected officials all the best in this year and the years to come and looked forward to working for the people. Mr. Hoffmann wished everyone a Happy New Year and congratulated Mayor DiPaola, Councilman Gordon and Councilman Hoffman and wished them a good 2019.

Mayor DiPaola said that on a personal level, there were three people missing from the room – her father, her Uncle Danny and her Uncle Ralph but she knew they were watching her and were proud of her. She wished they were present but the rest of her family was there and together, united. They did a lot together and loved each other and were very close. She thanked everyone for coming, especially her family.

**21. ADJOURNMENT**

With no other business to address, at the request of Mayor DiPaola, a motion to adjourn was moved by Councilman Knoller, seconded by Council President Falotico and carried at 9:04 p.m.

Respectfully submitted,


Jane Dietsche, RMC
Borough Clerk

13

EXHIBIT G

Agenda No. 1        APPROVED FOR RELEASE & CONTENT 1-15-19

## BY-LAWS OF THE MAYOR AND COUNCIL
## OF THE BOROUGH OF EMERSON, NEW JERSEY

### January 2, 2019

**ARTICLE I**

<u>Section 1</u>        The Mayor shall take the Chair at the time appointed for meetings of the Council, and shall preside thereat.

<u>Section 2</u>         She/he shall be entitled to speak upon all questions, which are before the Council.

<u>Section 3</u>        She/he shall, on all occasions, preserve order and decorum and may cause the arrest or removal of all persons who interrupt or interfere with the orderly proceedings of the Council.

<u>Section 4</u>        When two or more members of the Council shall request recognition at the same time, she/he shall name the one entitled to the floor.

<u>Section 5</u>        She/he shall decide all questions of order without debate, subject to an appeal to the Council when moved by a member and duly seconded, and she/he may call for the sense of the Council upon any question of order and decorum.

<u>Section 6</u>        In the absence of the Mayor, the President of the Council shall preside and while so doing, she/he shall have the same rights and powers as the Mayor and shall retain her/his Council vote when so doing. In the absence of the Mayor and President of the Council, the members present shall appoint a Chairman Pro Tem, who shall then have the same power, and shall retain her/his vote.

<u>Section 7</u>        The Mayor shall not vote except to give the deciding vote in case of a tie.

**ARTICLE II**

<u>Section 1</u>        The Council, at the annual organization meeting shall elect a President of the Council.  The Council President shall hold office for one year and until the next organization meeting.  The Council President shall have the right to debate and vote on all questions before the Council and shall retain all her/his rights as a member of the Council.

<u>Section 2</u>        If the Mayor is absent from the Borough for a period of three days or, for any reason, is unable to act, the President of the Council shall perform all the duties of the Mayor during such absence or inability.  The Mayor, in case of her/his intended absence from the borough for more than three days at any one time, shall notify the President of such intended absence whereupon the President shall be and become Acting Mayor from the beginning of such absence and continue to act until the Mayor's return.

14

EXHIBIT G

Agenda No. 1      APPROVED FOR RELEASE & CONTENT 1-15-19

**ARTICLE III**

<u>Section 1</u>        The Borough Clerk shall perform such duties enjoined on her/him by the laws of the State of New Jersey, and by these by-laws and as may from time to time be directed by the Mayor and Council.

<u>Section 2</u>        She/he shall keep the Minutes and Ordinance books fully indexed and up-to-date, shall keep the Minutes of closed sessions in a secure location until such time as they are made public, shall periodically review the closed session Minutes and shall present them to the Council for vote at the appropriate time when they should be approved by the Council for content and again for release to the public and for inclusion in the Minute book, shall perform all the duties usually devolving upon such officer and such special services as the Mayor and Council may require.

She/he shall also keep the minutes of closed sessions with separate Minutes for each closed session topic.

<u>Section 3</u>        It shall not be necessary for the Borough Clerk to read Minutes of the previous meeting at length if the said Borough Clerk shall have submitted to each of the Council at least four days prior to the next Council meeting a copy of the official minutes.

**ARTICLE IV**

<u>Section 1</u>        Three members of the Council and the Mayor shall constitute a quorum for the transaction of business but a smaller number may meet and adjourn from time to time.

<u>Section 2</u>        In the absence of the Mayor, four members of the Council shall constitute a quorum.

**ARTICLE V:**

*Meetings*

<u>Section 1</u>        Types of Meetings.  There shall be two types of meetings of the governing body as follows and as defined herein below:

  <u>Regular Meetings</u>: Those meetings scheduled in the Annual Meeting Notice as required by law.
  <u>Special Meetings</u>: Those meetings not listed in the Annual Notice and scheduled by the Governing Body as needed and noticed as required by law.

All meetings of the Mayor and Council shall be called to order at 7:30 p.m. and adjourned no later than 11:00 p.m.

<u>Section 2</u>        <u>Reorganization</u>.  The date and time of the reorganization meeting shall generally be scheduled at the last meeting of the prior year in consultation with the members elect by vote of a majority of the Governing Body, those members whose terms will end December 31 shall not vote. The following business shall be conducted:  swearing in of newly elected officials, adoption of by-laws, adoption of a schedule of meetings for the coming year, election of President of the Council, appointment of professionals, appointment or election of commissioners, standing committees, council liaisons, and, if necessary, special committees, appointment of members of boards and commissions of the borough, appointment and/or re-appointment of employees and other employment matters, the presentation of new business, speeches and ceremonies as allowed by the Mayor, and any other business appropriate to these by-laws and State Statutes.

15

EXHIBIT G

Agenda No. 1        APPROVED FOR RELEASE & CONTENT 1-15-19

<u>Section 3</u>              Regular Meetings.  Regular Meetings shall generally be held on the first and third Tuesday of each month at the Municipal Building or such other location as published by the Mayor and Council.  All Regular Meetings shall follow the agenda, which may be suspended by majority vote of the Council.

1.  Call to Order
2.  Pledge of Allegiance
3.  Moment of Silence or prayer, led by the Mayor.
3.  Open Public Meeting Statement, led by the Mayor.
4.  Roll Call.  The Borough Clerk shall call the roll.
5.  Excused Absence of Governing Body member
6.  Proclamations and Citations
7.  Appointments/Resignations
8.  Approval of Minutes
9.  Presentation of correspondence, petitions, etc. and the reading thereof and referral   thereof to the proper committee ordering same filed.
10. Financial Business
11. Unfinished business and vote on any questions before the Council
12. Ordinance Introduction and Adoption
13. Final passage of ordinances
14. Discussion of New Matters.  Any matter may be placed on the agenda for discussion by any member of the Governing Body by presenting a request to the Borough Clerk by 4:00 p.m. on the Thursday prior to the regularly scheduled meeting. Notice to the Clerk is not required for matters relating to the reorganization of the Governing Body addressed at the Re-Organization Meeting.  A vote on matters presented under New Business shall be conducted after the public comment portion of the meeting
15. Reports of Committees, Liaisons, Officials, Mayor, Clerk, Administrator and Attorney.
16. Opening of the Meeting for public comment for the good and welfare of the Borough.
13. Consent Calendar as defined in Article VI, Section 5 below.
14.  Adjournment

<u>Section 4</u>           <u>Sine Die</u>.  Immediately preceding the Reorganization Meeting, the Mayor and Council shall convene a Sine Die Meeting for the purpose of winding up old business, delivering final reports and conducting any additional business related to the reorganization of the Governing Body all in accordance with the law.

16

EXHIBIT G

**ARTICLE VI**

*Order of Business and Definitions*

<u>Section 1</u>          Definitions.

"New Business":  Discussion of new matters to be placed on the Agenda for consideration or vote at a future meeting by a member of the governing body.

Unfinished Business":  Discussion of matters placed on the Agenda at prior meetings and carried to a subsequent meeting.

"Public Hearing" is that portion of the meeting during which the Mayor and Council accept comments from the public and also including the voting on any matters previously agreed to be presented to the Council for vote.

<u>Section 2</u>          All communications received for the Mayor or any Councilperson that should be properly addressed by the Mayor and Council shall be forwarded to the Mayor and all members of the Council by the Borough Clerk, and handled as official correspondence and listed on the Agenda following receipt of the correspondence.

<u>Section 3</u>          The regular order of business may be suspended at any time by a majority vote of the Council. In case of a tie vote, the Mayor shall cast the tie-breaking vote.

<u>Section 4</u>          Rules of Order.

(a)       No question or motion shall be put unless seconded, except referring to a report or a question put by the Mayor.

(b)       Every Council member or member of the public, when speaking, shall address the Chair and shall not occupy more time than is deemed necessary by the Mayor.

(c)       While a member of the public is speaking, no member shall entertain any private discourse or leave his/her seat.

(d)       No person not a member of the governing body shall be given the privileges of the floor except by permission of the Mayor or upon the demand of a member of the Council if supported by the votes of a majority of the members of the Council present, except, during the portion of a meeting which has been opened for remarks from the citizens, at which time all members of the public who conduct themselves with decorum shall be heard.  Members of the public may speak on any matter relevant to the Borough or other matters.  Any individual addressing the Mayor and Council shall be limited to five (5) minutes unless this time is extended by approval of a majority of those members of the Governing Body, including the Mayor, present at the meeting.

<u>Section 5</u>          A majority vote of those present and voting shall carry all questions, except when by any statutory provision a larger vote is required.

17

EXHIBIT G

Agenda No. 1        APPROVED FOR RELEASE & CONTENT 1-15-19

<u>Section 6</u>            All routine and non-controversial resolutions previously sent to Council Members prior to the meeting at which a vote on said resolution is anticipated and upon which no discussion is anticipated shall be included in a single resolution entitled, "Resolutions by Consent."

(a)        All resolutions listed on "Resolutions by Consent" shall be adopted by a single roll call vote and no discussion thereon shall be entertained at the time the Resolution by Consent is moved for adoption.

(b)        Any Council Member may remove any items listed for consent at any time prior to the adoption of the Resolution by Consent.

(c)        In order to provide an orderly method of preparing the Resolution by Consent, Council Members should notify the Borough Clerk by 3:00 p.m. on the day prior to the Council meeting at which the Resolution by Consent is to be adopted, of the matter to be removed from the Consent Calendar.

(d)        The Resolution by Consent shall not be utilized with respect to the adoption of ordinances, the awarding of contracts, the adoption of resolutions for Closed Sessions, or other matters as required by law.

## **ARTICLE VII**

### ***Standing Committees***

<u>Section 1</u>            By majority vote, the Council shall elect two members of the Council to each of the following Standing Committees.  The first named Council Member shall be the Chair of the committee.

(1)        Streets and Municipal Services
(2)        Finance, Tax and Revenue
(3)        Police, Auxiliary Police, Office of Emergency Management and Courts
(4)        Public Buildings, Grounds, Parks and Utilities
(5)        Real Estate and Land Use
(6)        Fire
(7)        Ambulance
(8)        Human Resources/Personnel
(9)        Technology

<u>Section 2</u>            Purpose, Authority and Duties of Standing Committees:

Standing committees are appointed to expedite and facilitate the work of the Council by supervising and overseeing the area of their purview; however, standing committees are not intended to supplant the authority of the full Council which is responsible for all operations of the borough government.

A standing committee shall:
1.  Act as a liaison to its respective department or commission, attend various meetings and review all areas under the purview of each department or board.
2.  Have no policy-making authority.
3.  Perform such acts as may be assigned to it by the Council.
4.  Report and make recommendations to the full Council for its consideration.

<u>Reports.</u> All standing committees shall report to the Mayor and Council on the principal activities and achievements of the committee.  The Committee shall also report at the Sine Die meeting a summary of the activities of the previous year.

<u>Section 4 - Other Liaisons to Boards and Commissions</u>

The Mayor may appoint members of the Council to act as liaison to other permanent Boards, Organizations, and Commissions of the Borough, such as the Senior Citizens Center, the Board of Education, etc.  Such appointments shall be subject to confirmation by a majority of the Council.  The members of the Council must receive the names of those being proposed for appointment forty-eight hours before the meeting when the vote will take place.

18

EXHIBIT G

Agenda No. 1        APPROVED FOR RELEASE & CONTENT 1-15-19

Section 5          Special Council Committees

Definition:        Special Committees are subcommittees of the Council not to exceed three in number, which are created to perform special duties which may overlap the duties of two or more standing committees or to perform a special or limited purpose other than those embraced in the duties of the standing committees. Special Committees that include citizens shall be considered Advisory Committees. All Special and Advisory Committees shall be established with the consent of the Council.

Creation:          The Mayor may create Special Committees as needed. All Special and Advisory Committees shall be established with the consent of the Council. The purpose, duration, size and duties of each Special Committee shall be deemed and set forth on the record at the time of its creation and shall be reviewed periodically. Each Special Committee shall automatically be dissolved at the end of the calendar year in which it was created unless said Committee is created by Ordinance which specifies a longer duration.

All Special Committees shall keep reasonable records of their activities and shall report their progress to the Council upon request and shall make all records available to the public under the Freedom of Information Act. No Special Committee shall be permitted to exclude members of the public from a meeting, which is held on public grounds.

**ARTICLE VIII**

*Ordinances*

Section 1          All ordinances shall be submitted in writing in proper legal form, at a meeting of the Council. The procedure for the passage of all ordinances shall conform to the procedure set forth under the laws of the State of New Jersey. After final passage or adoption of any ordinance, it shall be published as provided by law, together with date of passage or approval or both.

Section 2          No ordinance shall be read at any Council meeting until a copy thereof in its final form shall be delivered to the Mayor and each member of the Council prior to the first reading except for emergent matters.

**ARTICLE IX**

*Bills or Demands*

Section 1          All bills for payments are to be submitted on forms provided for by the Chief Financial Officer/Treasurer and all bills for payment shall be fully itemized, and all bills being submitted shall be sworn to by the claimant.

Section 2          Only those bills will be considered which shall have been presented in due form no later than the Friday preceding such Regular Meeting.

Section 3          All bills shall be reviewed by the Chief Financial Officer/Treasurer, submitted to the Commissioner and/or Committee person and then to the Finance Chair and/or Committee for approval, unless by unanimous consent they are considered by the Council without reference to be paid within a reasonable period of time.

**ARTICLE X**

19

EXHIBIT G

*Borough Seal*

<u>Section 1</u>        The Seal of the Borough shall be the seal adopted at the time of incorporation of the Borough, and shall be circular in form and shall contain beside a special device the following:

"The Borough of Emerson, New Jersey,
Incorporated April 8, 1903"

<u>Section 2</u>        The Seal shall be in the custody of the Borough Clerk, and shall be affixed upon instruments by her/him only, when ordered by the resolution of the Council, or as required by law.

## **ARTICLE XI**

### *Rules of Procedures*

<u>Section 1</u>        The yeas, nays and abstentions shall be taken and recorded upon the final passage of all ordinances, upon all resolutions and upon all questions involving expenditures of money.

<u>Section 2</u>        All motions and resolutions shall, when requested by the Mayor, be reduced to writing.  If required by a member, and when seconded and stated from the chair shall be open for discussion.  No motion or resolution can be withdrawn after it shall have been amended or decided, and no matter foreign to the subject under consideration shall be received under color of an amendment.

<u>Section 3</u>        Any member may call for a division of a question if two or more distinct propositions be involved therein either of which may be voted upon its own merits.

<u>Section 4</u>        Any motion to adjourn shall not be in order until all items on the agenda for the meeting have been discussed except that, if the meeting is unduly protracted wherein Section 1 of Article V shall prevail, it may be necessary to recess the meeting for a period not exceeding one week to finish the uncompleted items on the agenda.  The Mayor may, without the consent of Council, adjourn the meeting if it becomes disorderly or tumultuous.  However, a motion to recess, duly seconded, and carried by a majority of Council shall always be in order.

<u>Section 5</u>        These rules may be altered, amended or added to, at any Regular Meeting of the Council, by a majority vote of the entire Council provided, however, that a copy of the proposed amendment be submitted to each member of the governing body at the previous meeting.

<u>Section 6</u>        Whenever a question or order not covered in these by-laws shall arise, Roberts Rules of Order shall be the guide for determining all parliamentary questions not herein specifically provided for, a copy of which shall be kept by the Borough Clerk so as to be available for determining all disputed questions.

<u>Section 7</u>        The Council shall, at the Reorganization Meeting, assign the seating arrangement for respective Council Members, which shall be retained throughout the year.  The seating arrangement shall establish the voting procedure at said Reorganization Meeting.

## **SEATING AND VOTING SEQUENCE**

| Council Person | Council Person | Council Person | Mayor DiPaola | Council Person | Council Person | Council Person |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | | 4 | 5 | 6 |

20

EXHIBIT G

**EXHIBIT H**

Joseph B. Fiorenzo, Esq. (021421980)
**SILLS CUMMIS & GROSS P.C.**
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
*Attorneys for Plaintiff*

<div align="center">

**UNITED STATEST DISTRICT COURT
DISTRICT OF NEW JERSEY**

</div>

| | |
|---|---|
| **EMERSON REDEVELOPERS URBAN RENEWAL, LLC,** | |
| **Plaintiff,** | **Civil Action No. 20-cv-4728-MCA-MAH** |
| **v.** | **PLAINTIFF'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |
| **THE BOROUGH OF EMERSON, NEW JERSEY, AND DANIELLE DIPAOLA,** | |
| **Defendants.** | |

Plaintiff Emerson Redevelopers Urban Renewal, LLC ("Plaintiff"), by and through its attorneys, Sills Cummis & Gross P.C., hereby objects and responds to the First Set of Interrogatories (each individually an "Interrogatory" and collectively the "Interrogatories") propounded by Defendants as set forth herein.

<div align="center">

**GENERAL OBJECTIONS**

</div>

1.    Each of the general objections listed below is considered applicable to and is incorporated into each and every response by Plaintiff to the Interrogatories and into each and every amendment, supplement, and modification to these responses hereinafter provided to Defendant. Each and every response is made without waiving any of the general objections. The specific assertion of any of these general objections in response to the Interrogatories shall not be considered a waiver of the remaining general objections.

<div align="center">

EXHIBIT H

</div>

2.      Plaintiff objects to the Interrogatories on the grounds that they are overbroad, are unduly burdensome, and do not seek matter that is relevant and proportional to the needs of the case.

3.      Plaintiff objects to the Interrogatories to the extent that they seek disclosure of or can be construed to seek disclosure of information that is privileged under law, whether under the attorney-client privilege, work product doctrine, or other privilege or immunity.  Such information will not be disclosed.  In the event that any such information is disclosed, such disclosure is inadvertent and does not constitute a waiver of such privilege or immunity.

4.      Plaintiff objects to the Interrogatories to the extent that they seek from Plaintiff information that is solely in the possession, custody, or control of third parties or that Plaintiff was and is under no obligation to maintain.

5.      Insofar as Plaintiff has objected to the Interrogatories, Plaintiff reserves the right to maintain such objections, and such objections are not waived in any respect by the provision of responses.

6.      Plaintiff submits these responses to the Interrogatories without conceding the relevancy or materiality of the subject matter of the Interrogatories and without prejudice to Plaintiff's right to object to further discovery or to object to the admissibility of any such responses at the time of hearing or trial.

7.      Plaintiff objects to the Interrogatories to the extent that they contain incomplete or misleading descriptions of facts, persons, relationships, events, or pleadings in this matter. Disclosure of any information in response to the Interrogatories shall not constitute agreement with or acquiescence to any such descriptions.

- 2 -

EXHIBIT H

8.      Plaintiff objects to each of the Interrogatories that does not specify a time period for which information is sought as being overly broad, unreasonably vague, not susceptible to reasonable interpretation, lacking in specificity, and unduly burdensome.

9.      Plaintiff objects to each of the Interrogatories that is premature, conflicts with, or is duplicative of any schedule for disclosure of expert opinions provided for by the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey.

10.     Plaintiff objects to each of the Interrogatories to the extent that it would impose a duty on Plaintiff to undertake an unreasonable search for or an evaluation of information, documents, and things for which Defendant is equally able to search and that Defendant is equally able to evaluate.  In particular, Plaintiff objects to each of the Interrogatories to the extent that it seeks disclosure or production of information, documents, and things that are publicly available.

11.     Plaintiff objects to the Interrogatories to the extent that the definitions and instructions seek to impose obligations on Plaintiff beyond the scope of that which is required by the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey.

12.     Plaintiff objects to each of the Interrogatories that seeks the disclosure or production of information, documents, and things that are beyond the purview of an interrogatory pursuant to the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey.

13.     Plaintiff objects to each of the Interrogatories that seeks the production of documents for which the requesting party does not specify that the documents are to be produced

- 3 -

EXHIBIT H

at its expense in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey.

14.     Plaintiff objects to each of the Interrogatories that seeks disclosure or production of information, documents, and things that are not within the purview of its knowledge or the knowledge of its agents or attorneys.

15.     These objections and responses are based upon Plaintiff's present knowledge, information, and belief. These objections and responses are subject to amendment, in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey. Plaintiff reserves the right to rely upon any facts, documents, or other evidence that may hereafter develop or come to its attention.

## <u>RESPONSES TO INTERROGATORIES</u>

1.     Identify all documents that may relate to this action and attach copies of each such document.

**<u>RESPONSE:</u>**

Objection. Plaintiff objects on the grounds and to the extent that this Interrogatory is vague, ambiguous, and overbroad including but not limited to the fact that "relate to this action" is unclear, undefined, and requires the responding party to draw legal conclusions not permitted under Fed. R. Civ. P. 33. Moreover, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information, and production of documents containing information, that is protected by the attorney-client privilege and the work product doctrine. Furthermore, Plaintiff objects insofar as this Interrogatory requesting that Plaintiff "[i]dentify all documents that may relate to this action" does not seek matter that is relevant and proportional to the needs of the case. Plaintiff additionally objects because responding to this Interrogatory would impose a duty on Plaintiff to undertake an unreasonable search for and an evaluation of documents for which Defendant is equally able to search and that Defendant is equally able to evaluate. Plaintiff also objects because responding to this Interrogatory would impose on Plaintiff an undue burden in formulating a response in accordance with the definition of "identify" pertaining to documents provided by Defendant in the Interrogatories. Finally, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information and production of documents that are not in the possession, custody, or control of Plaintiff.

EXHIBIT H

Notwithstanding the foregoing, and subject to the objections above, see the pleadings, discovery responses, documents produced by any party or non-party to this action, or during the course of discovery, including during depositions in this action or pending before the Superior Court of New Jersey, *Emerson v. Emerson Redevelopers Urban Renewal, LLC*, BER-L-3359-20.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

2.    Identify any photographs, video recordings, audio recordings or other forms of electronic recording, sketches, reproductions, charts or maps were made with respect to anything that is relevant to the subject matter of the first amended complaint.

**RESPONSE:**

Objection. Plaintiff objects on the grounds and to the extent that this Interrogatory is vague, ambiguous, and overbroad, including but not limited to the fact that the phrase "anything that is relevant to the subject matter of the first amended complaint" is unclear, undefined, and requires the responding party to draw legal conclusions not permitted under Fed. R. Civ. P. 33.  Moreover, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information that is protected by the attorney-client privilege and the work product doctrine.  Furthermore, Plaintiff objects because responding to this Interrogatory would impose a duty on Plaintiff to undertake an unreasonable search for and an evaluation of matter for which Defendant is equally able to search and that Defendant is equally able to evaluate.  Plaintiff additionally objects because "identify" are undefined and given that their meanings are unclear.  Plaintiff also objects to the extent that this Interrogatory seeks disclosure of information that is not in the possession, custody, or control of Plaintiff.

Notwithstanding the foregoing, and subject to the objections above, see the pleadings, discovery responses, documents produced by any party or non-party to this action, or during the course of discovery, including during depositions in this action or pending before the Superior Court of New Jersey, *Emerson v. Emerson Redevelopers Urban Renewal, LLC*, BER-L-3359-20.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

3.    Identify any admissions as to the subject matter of this lawsuit, state by the party serving these interrogatories.

**RESPONSE:**

- 5 -

EXHIBIT H

Objection. Plaintiff objects on the grounds and to the extent that this Interrogatory is vague, ambiguous, and overbroad. Moreover, Plaintiff objects because "the subject matter of this lawsuit" is undefined and given that its meaning is unclear. Additionally, this interrogatory improperly requests the responding party to render a legal conclusion on whether a statement constitutes an "admission" pursuant to the Federal Rules of Evidence and Federal Rules of Civil Procedure. Furthermore, Plaintiff objects because responding to this Interrogatory would impose a duty on Plaintiff to undertake an unreasonable search for and an evaluation of documents for which Defendant is equally or more able to search and that Defendant is equally or more able to evaluate. Plaintiff additionally objects because responding to this Interrogatory would impose on Plaintiff an undue burden in formulating a response in accordance with the definition of "identify" pertaining to oral communications provided by Defendant in the Interrogatories. Plaintiff also objects to the extent that "identify," with respect to written communications, is undefined and given that its meaning is unclear. Finally, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information that is not in the possession, custody, or control of Plaintiff.

Notwithstanding the foregoing, and subject to the above objections, Plaintiff refers to any admissions reflected or identified in any pleadings, discovery responses, documents produced by any party or non-party to this action, or during the course of discovery, including during depositions.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

4. If you intend to rely on any statute, rule, regulation or ordinance state the exact section and title of each.

**RESPONSE:**

Objection. Plaintiff objects on the grounds and to the extent that this Interrogatory seeks disclosure of information protected by the attorney-client privilege and the work product doctrine. Additionally, Plaintiff objects on the ground that this interrogatory calls for the responding party to draw legal conclusions not permitted under Fed. R. Civ. P. 33.

Notwithstanding the foregoing, and subject to the objections above, Plaintiff refers to any statute, rule, regulation or ordinance identified or referred to in the pleadings, discovery responses, documents produced by any party or non-party to this action, or during the course of discovery, including during depositions in this action or pending before the Superior Court of New Jersey, *Emerson v. Emerson Redevelopers Urban Renewal, LLC*, BER-L-3359-20.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

EXHIBIT H

5.      Identify all communications regarding any matter relevant to the allegations in the

First Amended Complaint.

**<u>RESPONSE:</u>**

Objection. Plaintiff objects on the grounds and to the extent that this Interrogatory is vague, ambiguous, and overbroad, including but not limited to the fact that the terms "relevant to the allegations in the First Amended Complaint" is unclear, undefined, and calls for the responding party to draw a legal conclusion prohibited by Fed. R. Civ. P. 33.  Additionally, Defendants' request that Plaintiff identify "all communications" regarding "any matter" is involves communications too numerous to catalog in responses to interrogatories. Moreover, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information that is protected by the attorney-client privilege and the work product doctrine. Furthermore, Plaintiff objects because responding to this Interrogatory would impose a duty on Plaintiff to undertake an unreasonable search for and an evaluation of communications for which Defendant is equally able to search and that Defendant is equally able to evaluate.  Plaintiff additionally objects because responding to this Interrogatory would impose on Plaintiff an undue burden in formulating a response in accordance with the definition of "identify" pertaining to oral communications provided by Defendant in the Interrogatories.  Plaintiff also objects to the extent that "identify," with respect to written communications, is undefined and given that its meaning is unclear. Finally, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information that is not in the possession, custody, or control of Plaintiff.

Notwithstanding the foregoing, and subject to the objections above, Plaintiff responds as follows: any communications identified or referred to in the pleadings, discovery responses, documents produced by any party or non-party to this action, or during the course of discovery, including during depositions in this action or pending before the Superior Court of New Jersey, Emerson v. Emerson Redevelopers Urban Renewal, LLC, BER-L-3359-20.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

6.      Describe any investigation that was conducted concerning any of the allegations in

the First Amended Complaint.

**<u>RESPONSE:</u>**

Objection.  Plaintiff objects to the extent that this Interrogatory seeks disclosure of information protected by the attorney-client privilege and the work product doctrine, including but not limited to the fact that any investigation performed in developing the facts for the complaint was in anticipation of filing litigation and therefore protected from

EXHIBIT H

disclosure. Moreover, Plaintiff objects to the extent that "investigation" and "concerning" are undefined and given that their meanings are unclear.

7.    Identify all proposed expert witnesses who will testify at trial on your behalf. Attach true copies of all written reports provided to you by any such proposed expert witnesses, their most recent curriculum vitae.

**RESPONSE:**

Objection. Plaintiff objects on the grounds and to the extent that this Interrogatory seeks disclosure of information that is protected from disclosure by the attorney-client privilege and the work product doctrine. Moreover, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information in advance of the deadline set forth in the Federal Rules of Civil Procedure. If and when a testifying expert is retained, Plaintiff will supply Plaintiff's expert report(s) in accordance with the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey. Furthermore, Plaintiff objects to this Interrogatory to the extent that does not seek matter that is relevant and proportional to the needs of the case, in view of the definition of "identify" pertaining to natural persons provided by Defendant in the Interrogatories.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

Plaintiff identifies Art Bernard, P.P., of Art Bernard and Associates, LLC; Eric L. Keller, P.E., P.P., LEED AP, of Bowman Consulting Group, Ltd. (the "Keller Report")

Although Plaintiff contends the factual testimony below is not in the nature of an expert opinion based on "scientific, technical, or otherwise specialized knowledge" pursuant to F.R.E. 702 because it involved recitation of cost data found in business records, to the extent it is determined by the Court to be an expert opinion, in an abundance of caution, Plaintiffs identify David Cahn of ERUR and Accurate Builders & Developers. Cahn will testify that the lease of the site as of the anticipated completion in 2020 included 146 residential units with annual rental income of $3,989,100 and 20,360 square feet of retail space with annual rental income of $712,600. With residential vacancies of 5% and commercial vacancies of 7%, and expenses for advertising, electric, garbage, insurance, landscaping, among other things of $1,183,105 per year, the income less expenses equals $3,706,933 annually. Schedule A identifies a pro forma of rental income and expenses. After reviewing ERUR's bookkeeping software kept and maintained in the ordinary course of business, ERUR paid additional carrying costs of $351,913 in insurance, $3,848,753 in interest, $27,000 in escrow fees, and in $515,221.48 in real estate taxes, as a result of the delay in construction activities stated in the Keller Report. In reviewing the cost of labor and materials paid by Accurate Builders at the time of the projected completion of the Project in 2020 in arms' length transactions based on reasonable market prices, including those prices paid by Accurate Builders during construction The Crossings in Raritan, NJ,

EXHIBIT H

ERUR paid higher prices for labor and materials as a result of the delays in commencement of construction identified in the Keller Report. This includes an additional $2,492,441.31 costs ERUR paid for framing and lumber materials and labor, $3,320,094.54 in foundation work, among other things. Schedule B provides the cost of materials and labor paid by ERUR in 2020 versus the prices ERUR paid between 2021 and 2023 at the Emerson project.

8.    Describe with specificity all facts that form the basis for your allegation that defendants embarked upon a course of action designed to interfere, impede and ultimately destroy plaintiffs' ability to complete the Project.

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Moreover, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks information solely in the possession, custody, or control of Defendant and the Borough of Emerson, New Jersey ("Emerson" and, collectively with Defendant, "Defendants"), including but not limited to the fact that the full scope of Defendants' conduct and course of action is known by Defendants themselves; therefore, Plaintiff is unable to fully respond to the Interrogatory until Defendants comply with their discovery obligations. Moreover, Plaintiff objects to the extent that this Interrogatory seeks disclosure of information that is protected from disclosure by the attorney-client privilege and the work product doctrine.

Notwithstanding the foregoing, and subject to the objections above, see the pleadings, discovery responses, documents produced by any party or non-party to this action, or during the course of discovery, including during depositions in this action or pending before the Superior Court of New Jersey, *Emerson v. Emerson Redevelopers Urban Renewal, LLC*, BER-L-3359-20.

Additionally, among other things, and without limitation, the Courts, Special Masters, and Borough professionals identified a pattern of frustration of affordable housing in Emerson by public officials. Moreover, as to the Block 419 Project, the Borough, among other things:

- Sought to increase the cost and time necessary to construct the Project with knowledge that the private construction and operation of affordable housing requires efficiencies to control costs and minimize delays, with the intent that the increased costs and time to complete the project would render the project no longer economical and thereby avoid the construction of affordable housing.

- Repeatedly delayed or conditioned acceptance of an application or granting an application for demolition permits upon various unlawful asserted preconditions, including but not limited to demonstrating the properties had no environmental

EXHIBIT H

issues even though environmental actions are governed by the NJDEP; requiring approval of construction drawings prior to demolition; requiring demolition on any lot or portion of a lot be performed at the same time as all other lots in the Project; demanding information regarding demolition contractors without any basis in an ordinance or statute including but not limited to demanding the names of all employees of the asbestos contractors; delaying and obstructing cut and cap permits and utility disconnections needed for demolition until ERUR was able to proceed with construction on all lots; delayed vacating Lot 7 after repeated demands to vacate for purposes of demolition; persistently delayed issuance of fence permit needed for demolition, then, when the Zoning Officer issued the fence permit, Borough officials directed ERUR to desist from constructing the duly permitted fence and failed to respond when ERUR modified fence plan at Borough's request; as well as additional actions.

- Borough officials attempted to solicit an investigation by NJDEP of the site to stall or stop the Project.

- ERUR contacted the Borough for required meetings regarding the project and repeatedly received either no response or attempts to stall any meeting.

- Imposed a Developer Fee while refusing to justify its calculations.

- Failed and refused to institute condemnation proceedings, including but not limited to proceedings against Cork & Keg and Laurel Chinese Restaurant, for months after ERUR advised of its inability to settle through good faith negotiations and made demand for condemnation proceedings; assisted the tenants in resisting the Developer in violation of the Borough's cooperation covenant; advised residents that the project would not go forward or would be scaled back thereby frustrating efforts at good faith negotiations; and unlawfully delayed the Borough's obligation to proceed forward with condemnation.

- Failed to oppose prerogative writ action filed by owners/leasees in redevelopment area and failed to respond to a cease and desist letter by an attorney for Cork & Keg.

- Required physical signatures of police and fire department before moving forward with site plan when all that is required is notice to the police and fire department.

- Failed and delayed in giving consent to the request for consent to the Treatment Works Approval.

- Delayed forming the Redevelopment Subcommittee which was required for review of the construction plans and the commencement of construction.

- Obstructed the agreed-upon construction of seven units of affordable housing on Block 610, Lot 1 needed to satisfy the Redevelopment Agreement and the Borough's affordable housing obligations.

- Wrongfully conditioned issuance of construction permits upon full satisfaction of "resolution compliance," including invented conditions contained nowhere in the resolution of approval, conditions on items already resolved by the Land Use Board, and conditions that were to be completed at the conclusion of the project, even the Uniform Construction Code provided no basis to refuse the ministerial act of granting the construction permits, resulting in a delay in construction until after

EXHIBIT H

issuance of the Order in Aid of Litigants' Rights.

- Borough officials, including but not limited to Councilmember and Mayor Danielle DiPaola, expressed opposition to affordable housing, the Borough's declaratory judgment action, the settlement with Fair Share Housing Center, the completion of the Block 419 Project, by way of example only, and without limitation, expressing the aim of delaying, stopping, or scaling back the Project, in statements at meetings, to the press, to residents and representatives of Plaintiffs, and with respect to votes on pending ordinances and resolutions, as well as terminating Borough professionals who endorsed or failed to curtail affordable housing and the Block 419 Project, among other things.

9.    Define the term "minorities" as used in page 2, paragraph 1 of plaintiffs' Amended Complaint.

**RESPONSE:**

Objection. Plaintiff objects on the grounds and to the extent that the definition of a term calls for a legal conclusion by the responding party, which is prohibited by Fed. R. Civ. P. 33. Notwithstanding the foregoing, and subject to same, a minority includes a part of a population thought of as differing from the rest of the population in some characteristics.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

10.    Describe with specificity all facts that form the basis for your allegation that the Project would bring in racially diverse citizens into the City of Emerson.

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Moreover, Plaintiff objects on the grounds and to the extent that Defendant has mischaracterized Plaintiff's allegations, rendering it impossible to respond to Defendant's interrogatory.

Plaintiffs further object on the ground and to the extent that this Interrogatory seeks disclosure of expert information in advance of the deadline set forth in the Federal Rules of Civil Procedure and the Court's Scheduling Order.

11.    Describe with specificity all facts that form the basis for your allegation that alleged actions of defendants were undertaken to impede construction of the Project.

EXHIBIT H

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Moreover, Plaintiff objects on the grounds and to the extent that Defendant has mischaracterized Plaintiff's allegations, rendering it impossible to respond to Defendant's interrogatory. Additionally, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks information solely in the possession, custody, or control of Defendants. Also, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks disclosure of information that is protected from disclosure by the attorney-client privilege and the work product doctrine.

Notwithstanding the foregoing, and subject to those objections, Plaintiffs direct Defendants to the response to Interrogatory No. 8.

12.    Describe with specificity all facts that form the basis for your allegation that continuing actions taken by defendants under the color of law as defined in 42 U.S.C. § 1983 were intended to deprive plaintiffs of its property rights.

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Moreover, Plaintiff objects on the grounds and to the extent that Defendant has mischaracterized Plaintiff's allegations, rendering it impossible to respond to Defendant's interrogatory. Additionally, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks information solely in the possession, custody, or control of Defendants. Also, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks disclosure of information that is protected from disclosure by the attorney-client privilege and the work product doctrine. Moreover, Plaintiffs object on the grounds that this interrogatory seeks to have Plaintiffs offer a legal conclusion.

Notwithstanding the foregoing, and subject to those objections, Plaintiffs direct Defendants to the response to Interrogatory No. 8.

13.    Describe with specificity all the alleged "frivolous roadblocks" instituted by defendants to delay the Project.

**RESPONSE:**

EXHIBIT H

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Objection. Plaintiff objects on the grounds and to the extent that this Interrogatory seeks information solely in the possession, custody, or control of Defendants; therefore, Plaintiff is unable to fully respond to the Interrogatory until Defendants comply with their discovery obligations. Moreover, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks disclosure of information that is protected from disclosure by the attorney-client privilege and the work product doctrine.

Notwithstanding the foregoing, and subject to those objections, Plaintiffs direct Defendants to Plaintiffs' objections and response to Interrogatory No. 8.

14.    Set forth the amount of plaintiff's alleged "substantial loss and damages" as stated in page 5, paragraph 11 of plaintiffs' Amended Complaint.

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Additionally, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks disclosure of information that is protected by the attorney-client privilege and the work product doctrine. Moreover, Plaintiff objects to the extent that any calculation of damages is premature at this time, pursuant to the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of New Jersey. If and when a damages expert is retained, Plaintiff will supply Plaintiff's expert report(s) in accordance with the Federal Rules of Civil Procedure the Local Civil Rules of the United States District Court for the District of New Jersey.

Notwithstanding the foregoing, and subject to the above objections, Defendants caused Plaintiff substantial financial harm related to delay damages, loss of rental revenue, delay and unnecessary expenses incurred in undertaking actions demanded by Defendants without basis in the law, general damages, reputational damages, punitive damages, attorneys' fees, and costs of suit.

Plaintiff reserves the right to amend, supplement, and modify its objections and responses to this Interrogatory.

15.    Identify all "constraints" on the development of the property where the Project is located that existed prior to it being designated in the Redevelopment Agreement that assured that

EXHIBIT H

affordable housing could not be built.

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Additionally, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks information solely in the possession, custody, or control of Defendants; therefore, Plaintiff is unable to fully respond to the Interrogatory until Defendants comply with their discovery obligations. Moreover, Plaintiff objects because the terms "constraints on development" are undefined, unclear, and impossible to interpret to provide a response to this interrogatory.

Notwithstanding the foregoing, and subject to the objections above, see the objections and response to Interrogatory No. 16.

16.    Describe with specificity all facts that form the basis for your allegation that "as of 2020, Emerson's racial diversity was practically non-existent, and it had managed to prevent any affordable housing from entering its borders."

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Additionally, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks information to which Defendant has equal or increased access, as compared to Plaintiff, and to the extent that this Interrogatory seeks information that is publicly available. Moreover, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks disclosure of information that is protected from disclosure by the attorney-client privilege and the work product doctrine.

Plaintiffs further object on the ground and to the extent that this Interrogatory seeks disclosure of expert information in advance of the deadline set forth in the Federal Rules of Civil Procedure and the Court's Scheduling Order.

Notwithstanding the foregoing, and subject to the objections above, see the pleadings, discovery responses, documents produced by any party or non-party to this action, or during the course of discovery, including during depositions in this action or pending before the Superior Court of New Jersey, *Emerson v. Emerson Redevelopers Urban Renewal, LLC*, BER-L-3359-20. Additionally, by way of example only, and without limitation, Plaintiffs identify the documents, evidence, and holdings in *Community*

EXHIBIT H

*Developers and Management, LLC v. Borough of Emerson*, BER-L-2734-00 and *In re Declaratory Judgment of the Borough of Emerson*, BER-L-6500-15, and the Borough's Housing Element and Fair Share Plans, amendments, and supplements, and documents from Fair Share Housing Center.

17.    Describe with specificity all facts that form the basis for your allegation that on November 8, 2018, defendant DiPaola intended to obstruct and interfere with the Project to discriminate against minorities.

**RESPONSE:**

Plaintiff objects on the ground that this is a contention interrogatory seeking to determine the basis for legal contentions in the complaint and is therefore impermissibly premature pursuant to L. Civ. R. 33.1.

Additionally, Plaintiff objects on the grounds and to the extent that this Interrogatory seeks information solely in the possession, custody, or control of Defendants; therefore, Plaintiff is unable to fully respond to the Interrogatory until Defendants comply with their discovery obligations.

Notwithstanding the foregoing, and subject to those objections, Plaintiffs direct Defendants to Plaintiffs' objections and response to Interrogatory No. 8.


                              **SILLS CUMMIS & GROSS P.C.**
                              Attorneys for Plaintiff


                       By:   *s/Joseph B. Fiorenzo*
                              JOSEPH B. FIORENZO

Amended July 11, 2023


- 15 -
EXHIBIT H

**EXHIBIT I**

D-29

# Emerson elects first woman as mayor

**Stephanie Noda,** **NorthJersey**     Published 6:59 a.m. ET Nov. 8, 2018 | Updated 4:58 p.m. ET Nov. 8, 2018



*(Photo: Photo courtesy of Danielle DiPaola)*

EMERSON — Danielle DiPaola, a longtime Republican councilwoman, ousted the borough's Democratic mayor in Tuesday's election and will become the borough's first female mayor.

"I could not have done it without those who supported me over the years," said DiPaola. "I was proud to represent them for almost a decade as a councilwoman and I'm even prouder to serve them as their mayor."

According to Tuesday night's unofficial results, DiPaola received 1,652 votes, while Mayor Louis Lamatina received 1,409.

Since 2010, DiPaola has served the borough as a councilwoman, but said she decided to run for mayor because she "didn't like the direction the town was going in," with particular concerns about overdevelopment in the downtown.

DiPaola said she aims to bring more transparency to government, with plans for televised meetings and an official borough Facebook page. A new committee to handle decorations around town for the holidays may also be in the works, said DiPaola.

On a larger scale, DiPaola, who served on the borough's Land Use Board in the past, would like to ensure development in the downtown is done in a "reasonable" way "that isn't four-story buildings."

"Everyone has this idea that I'm against development, but I'm not against it," said DiPaola. "I'm against eminent domain. I would like to move forward and bring positive change to the downtown."

**DOWNTOWN:**  Lawsuits over Emerson downtown redevelopment settled (/story/news/bergen/emerson/2018/11/03/lawsuits-over-emerson-nj-downtown-redevelopment-settled/1858935002/)

**MORE:**  Election turnout surpasses 2014 midterm voting throughout North Jersey (/story/news/2018/11/07/nj-midterm-election-turnout-surpasses-2014-mid-term-voting-throughout-region/1915975002/)

DiPaola hopes young girls in the borough will gain encouragement from her upcoming term as mayor.

"I'm proud to be a role model and teach them that they can be anything they want," said DiPaola.

Deposition Exhibit

4/26/2023

2:20-cv-04728 (DNJ)

DD-17

Emerson NJ electBER-L-006300-15   06/24/2020 5:26:05 PM  Pg 3 of 36 Trans ID: LCV20201114789         Page 2 of 2

## Don't miss a thing



Download our apps and get alerts for local news, weather, traffic and
more. iPhone app (https://itunes.apple.com/us/app/northjersey.com-
latest-news/id446490632?mt=8) | iPad app
(https://itunes.apple.com/us/app/northjersey.com-latest-
news/id446490632?mt=8) | Android app
(https://play.google.com/store/apps/details?
id=com.northjersey.developer.northjerseylatestnews) | Sign up for our newsletter
(https://profile.northjersey.com/newsletters/manage/) | Subscribe
(http://offers.northjersey.com/specialoffer)| Find us on social media: Twitter
(https://twitter.com/northjersey) | Sports Twitter (https://twitter.com/TheRecordSports) |
Facebook (https://www.facebook.com/northjerseycom/) | Instagram
(https://www.instagram.com/northjerseynews/) | Food Instagram
(https://www.instagram.com/northjerseyeats/)

Read or Share this story: https://www.northjersey.com/story/news/bergen/emerson/2018/11/08/emerson-nj-elects-first-female-mayor/1924456002/

EXHIBIT I

**EXHIBIT J**

# DiPaola, Emerson's First Woman Mayor, Sweeps Lamatina's Team



[slideshow_deploy id='899']

Deposition Exhibit
4/26/2023
2:20-cv-04728 (DNJ)
DD-18

EXHIBIT J

12/29/21, 12:48 PM                    DiPaola, Emerson's First Woman Mayor, Sweeps Lamatina's Team — Pascack Press & Northern Valley Press

**BY JOHN SNYDER**
**OF PASCACK PRESS**

EMERSON, N.J.—The Borough Council has returned to Republican leadership, with Councilwoman Danielle DiPaola, soon the borough's first woman mayor, wresting the gavel from two-term Mayor Lou Lamatina.



MONTVALE HEALTH
SPORT + SPINE
www.MontvaleHealth.com
PAIN RELIEF
Open 6 Days A Week

DiPaola's running mates, Brian Gordon and Ken Hoffman, unseated Karen Wolf, who was seated in January to finish John Lazar's term, and Brian Downing, a retired county sheriff's sergeant who was making his first bid for re-election to the council.

DiPaola, 52, a lifelong borough resident who studied art history and theater at The University of Maryland at College Park, is a veteran of borough government   and owns Danielle's Baskets & Gifts.

A vocal critic of elements of an ambitious mixed-use redevelopment plan taking shape under Lamatina, she called her Nov. 6 election "a referendum on overdevelopment."

"We swept, all three of us. It was great. We won, but what really happened is that Emerson won," DiPaola told Pascack Press the morning of Nov. 7.

Later in the day, she added, "The people of Emerson have spoken. It is apparent that the people have serious concerns about the direction the town was taking. I would ask that the governing body, out of respect to the voters, take no further action [on redevelopment] until January."

DiPaola opposed borough tactics against holdout property  owners, questioned where additional affordable housing is expected to go, and has called for greater transparency of the deal.

Selected to fill a vacated seat on the council, DiPaola was elected to three-year terms on the dais in 2010, 2013, and 2016.

She's been liaison to Public Buildings and Grounds, Parks and Utilities, Streets and Municipal Services, Finance, Tax, and Revenue Committee, the Environmental Commission, the Historic Preservation Commission, the Board of Health, the Library Board of Trustees, and the Shade Tree Commission.

Her win also could breathe new life into the possibility that Borough Hall, which is eligible to apply for a spot on the State Register of Historic Places, might get what local historians call its due against a push to modernize municipal facilities, including police headquarters and the courtroom.

Campaigning, she told Pascack Press, "My opponents have said I'm against progress, but this couldn't be further from the truth. I've always supported and voted yes on projects that actually improve the borough while still being consistent with its small- town character."

EXHIBIT J

She cited her votes as vice chair of the Land Use Board and Class III member for over four years in favor of Oritani Bank, The Emerson Grand, Tool Chest, and renovations to ShopRite, The Emerson Hotel, and Liberty Subaru.

"These projects had excellent plans that were befitting of a small town," she said.

She also has said she would "bring government to the people of Emerson." She was on a committee looking into televising meetings.

## Lamatina, proud of record, wishes new team luck

Lamatina, 60, principal of the Law Office of Louis J. Lamatina, served as a councilman here from 1995 to 1997, was mayor 2007 to 2010, and was elected to the center seat again in 2015.

He also advises the Township of Washington Planning Board.

He graduated magna cum laude from Manhattan College with a double major in economics and history and from Hofstra law.

On Nov. 8 he told Pascack Press he is honored and privileged to have led the Borough of Emerson for the past four years.

"Our legacy will be the major accomplishments which have improved our way of life, including completion of the Kinderkamack Road Improvement Project, moving forward with the much needed revitalization to our downtown, stabilizing and actually reducing the Borough portion of our tax bills by increasing ratables through reasonable and rational development, increasing our surplus, closing the Just Pups puppy mill location in our downtown, and restoring civility to the Borough," he said.

He added, "My team has accomplished much, and I wish our new leaders all the luck in the world as they will hopefully continue with that progress."

He took evident delight in announcing recently that redeveloper JMF Properties had struck a deal with owners on Block 419 lots, 2, 3, 4, and 6.01, which include the Cinar Turkish Restaurant, Cork & Keg Liquor, and Ranch Cleaners, to acquire their properties, seen as in the way of new upscale shopping, 147 apartments, and a parking garage on Kinderkamack Road between Lincoln Boulevard and Linwood Avenue.

There would also be a set-aside for some of the borough's unmet need for affordable housing.

The attorney for the sellers told Pascack Press Oct. 29 that his clients "have had to live with a cloud of condemnation hanging over their properties for nearly three years. They have been forced to incur substantial legal fees in defending their properties in court over the last 18 months."

## Gordon, Hoffman ready to get to work

Celebrating their ticket's win on the council are DiPaola's running mates, Brian Gordon and Ken Hoffman.

Gordon, a millwright with Local 715, said he learned his work ethic from his father, "a longtime union man who expected nothing less than my best effort. And I have continued to practice that sense of self discipline in raising my family and in my profession. If I'm elected, the people of Emerson can expect that I'll bring that same work habit to my position on the council," he told Pascack Press.

Hoffman is a College of William and Mary–educated clerk who served as councilman for two terms, 2005–2010.

He told Pascack Press, "Unfortunately, we cannot undo the mistakes of the present governing body. But we can promise a future where thoughtless planning and foolish spending are things of the past."

[slideshow_deploy id='899']

**0 Comments**                                                                                          Sort by   Oldest

Add a comment…

Facebook Comments Plugin

EXHIBIT J

**EXHIBIT K**

# Mayors' Meeting: Redevelopment, Capital Projects Top Chamber Updates



BY JOHN SNYDER

OF PASCACK PRESS

Deposition Exhibit

4/26/2023

2:20-cv-04728 (DNJ)

DD-24

EXHIBIT K

WESTWOOD, N.J.—Over a sunny breakfast buffet at the Iron Horse Restaurant on Jan. 23, seven Pascack Valley mayors and one councilwoman reflected on their communities' challenges and opportunities heading into the new year.

According to co-host Skip Kelley, Greater Pascack Valley Chamber of Commerce vice president, the chamber's annual mayors breakfast is in approximately its 45th year.



MONTVALE HEALTH
S P O R T + S P I N E
www.MontvaleHealth.com

ACUTE & CHRONIC
PAIN RELIEF
No Surgery • Gentle Treatments

For their audience of business folks and a few residents, the leaders, including Oradell Mayor Dianne C. Didio, spoke for up to five minutes each on everything from affordable housing to capital projects to fighting hate in partnership with the schools. Here are the highlights:



Left to right: GPVCOC Secretary Ann Marie Feret, Marketing Chair Paul Wharton, President Robin Malley, Treasurer Sandra McCleod, local mayors Keith Misciagna, John Birkner Jr., John Ruocco, Peter Calamari, Michael Ghassali, Danielle DiPaola, Woodcliff Lake Councilwoman Nancy Gross, and Chamber Vice President Skip Kelley at the Iron Horse on Jan. 23. | MURRAY BASS PHOTO

## Westwood has eye on festivities

Mayor John Birkner Jr. spoke of the borough's recent conveyance of a plot to Habitat for Humanity of Bergen County, where veteran housing is planned, fulfilling the municipality's quota for new affordable housing into 2025.

The recent transformation of the former Ford property into luxury apartments and a storage center meant Westwood is fully built out, Birkner said, meaning officials could now focus more on municipal infrastructure (paving, sewer lines and such) and the social infrastructure (LGBTQ community inclusion and expanding senior services).

Case 2:20-cv-04728-MCA-MAH   Document 82-3   Filed 09/13/24   Page 271 of 335
BER-L-006300-15   06/24/2020 5:26:05 PM  Pg 28 of 36 Trans ID: LCV20201114789
Page ID: 1912

4/6/2020                 Mayors' Meeting: Redevelopment, Capital Projects Top Chamber Updates — Pascack Press & Northern Valley Press

"For seniors, the number one issue is transportation, and number two is taxes. I always tell them I'll get working on transportation right away," Birkner riffed.

Birkner also spoke enthusiastically of Westwood's 125th anniversary this year, which brings milestone celebrations for the borough, the library, and several other institutions.

He predicted "a very minimal tax increase, if at all," and noted the borough had filled out its Police Department table of organization.

## Woodcliff Lake as ever in transition

Woodcliff Lake Councilwoman Nancy Gross reported that the borough soon would demolish the former Galaxy Gardens site and seek bids for remediation.

Focus then will shift to remodeling, with grant funds, the Westervelt–Lydecker House, which will be used for public events.

Gross touched on the borough's settlement on affordable housing, saying construction was pending on the first 16 units it's committed to.

She reported the borough said "farewell for now" to "our beloved [Police] Chief [Anthony] Jannicelli, who had been with the department 41 years—18 as as chief.

Retiring Dec. 31, 2018, he was replaced by Police Chief John Burns.

Gross also said she was pleased with progress toward Unity in the Valley, an effort of the four towns of the Pascack Valley Regional High School District against hate and discrimination.

## A new approach in Hillsdale

Hillsdale Mayor John Ruocco praised his council's resolution to reach out to Waste Management for cooperation in its bid to redevelop its industrial zone, pointedly without recourse to eminent domain.

"Hopefully that will allow WM to extract value out of its property in our town without reliance on a permit, so we'll see where that goes," he said.

Hillsdale's affordable housing settlement is due for court approval in the next couple of months. "We don't expect to have material development in our town," the mayor said.

Ruocco reported with cheer that the Demarest Farms parking issue is solved.

"By next year Demarest Farms will not allow their patrons to park on residential streets. It's been successful in getting offsite parking for its customers," he said.

EXHIBIT K

Ruocco said the borough faces the need for capital investment: roads, DPW equipment, police, and fire. There's an additional challenge of perhaps upgrading the athletic fields. Officials are assessing the situation.

Ruocco also said he was disappointed that his council opted to spend $318,000 to replace the police dispatch desk rather than save money in the long term by shifting to a shared service to meet the need. He said more work remained in countering "fear of change" and local home rule.

He predicted "a difficult time with our budget this year," particularly exacerbated by the police budget after the state 2 percent interest arbitration cap expired.

## Smoother sailing in the Township of Washington

Township of Washington Mayor Peter Calamari noted that the Township is fully built out. Although there are two properties with affordable housing overlay zones, "We don't anticipate them changing hands in the near future, and our impact will be minimal."

He said driving through "the infamous Pascack/Washington intersection" will get easier after the county moves forward with a fix, which he said might be funded this year.

"I'm sure it affects a lot of your residents who drive through that intersection. We'd love to see it get improved so you don't have to spend 10 minutes just getting through the traffic light," he said.

The township is embarking on a new firehouse and ambulance building, and will have to replace fire apparatus and the DMF building. He said much would be paid out of "a decent surplus."

## Montvale is doing brisk business

Montvale Mayor Michael Ghassali started out saying, "So 2018, I'm happy to say, it's over."

He touched on affordable housing, the eruv settlement, the new firehouse, and a $4 million sports area.

"In the last week of the year we lost two residents: one very young, 16, to suicide, and one 77, to fire," Ghassali said somberly.

"They're both very personal because I think we could have avoided it if we were more involved, and that's my message: We were so busy doing all these things, very important things, but it took us away from paying attention tot he residents and what's happening in the community," he said.

Saying he looked forward to 2019, he explained his message to his council "and I think to my fellow mayors and to the region here is we have to be more flexible to businesses that are looking to move into our towns."

He said Montvale had lost a prospective global tenant over the color of their sign.

EXHIBIT K

"Give them red, give them pink, give them whatever they want. Why are we so rigid?" he said.

He said he has asked the Planning Board to reassess the Master Plan to include light manufacturing. "We lost a major company that was willing to do light manufacturing to take up a whole building, 200 to 300 employees, to come to town. They went somewhere else," he said

Since 2016, he said 110 business moved to Montvale.

Montvale made gains on affordable hosing last year, with major projects taking shape at the A&P, the former Sony site, and the former Mercedes site.

He lauded his colleagues on the borough council.

"My mission for this year, which is what I love to do, is go to more businesses, talk to the businesses, and work with the young and the seniors," he said.

## Emerson scaling back

Emerson's new mayor, Danielle DiPaola, made her first appearance at the breakfast, where she appealed for help "from anyone in the room" during this time of transition, including the search for a new borough administrator.

She said affordable housing and redevelopment were the big ticket items she is carrying over but said she wanted to renew outreach to senior citizens "and dealing with our community members and making sure that we really do represent our motto, The Family Town."

She added, "I think we've gotten a little bit lost on trying to do big projects. We're going to continue with all of the drainage projects that we've started and we have a lot of grants for those."

Downtown redevelopment is in the process of acquiring properties, she said.

In the meantime, she said, "We're trying to scale this back and make it more of a reasonable development that is friendlier to our small downtown."

She lauded the Emerson Chamber of Commerce and said assessing Borough Hall, police station, and municipal court needs would continue.

## Park Ridge fights on

Park Ridge Mayor Keith Misciagna said Park Ridge continues to object in court to housing density it's been asked to absorb.

"Park Ridge wants affordable housing—I'm probably going to need it in a few years myself—but we just don't want to be Hudson County, and that's what the residents of Park Ridge elected me to do and we are doing that," he said.

EXHIBIT K

He spoke to siting a large development downtown, 240 units, as "a nice center point for our downtown. I personally like it because it replaces a garbage waste transfer site that I grew up smelling—it was a disgusting thing to have in the center of town and I'm happy to see that go," he said.

He added,"The project's a little larger than we would have chosen but with having this litigation hanging over our head we had to make compromises."

He commended the Park Ridge Animal Hospital project, where bricks are going up.

"People were upset when that went up—it's not that large a project, it looked big when it was going up—but it looks like a nice addition to our downtown."

He noted that the borough was always more industrial than suburban—its motto was By Industry We Flourish—and said, "We're reinventing ourselves."

Park Ridge, as well, is celebrating 125 years this year, and activities are taking shape.

Also in the works: a downtown community center, paid for in large part with downtown redevelopment funds.

Misciagna also was pleased with its partnerships toward the reservoir pathway project, which he said "feels like it's going to happen this year." He said it would be "like Central Park in the Pascack Valley—the jewel of the Pascack Valley."

Peluso Constru

Ad  We Use Proven
Management Tools

Peluso Construction Inc.

Open

EXHIBIT K

Case 2:20-cv-04728-MCA-MAH   Document 82-3   Filed 09/13/24   Page 275 of 335
BER-L-006300-15   06/24/2020 5:26:05 PM Pg 32 of 36 Trans ID: LCV20201114789
PageID: 1918

4/6/2020                    Mayors' Meeting: Redevelopment, Capital Projects Top Chamber Updates — Pascack Press & Northern Valley Press

**1 Comment**                                      Sort by  **Top**

EXHIBIT K

**EXHIBIT L**

Case 2:20-cv-04728-MCA-MAH  Document 82-3  Filed 09/13/24  Page 277 of 335
PageID: 1930
BER-L-006300-15  06/24/2020 5:26:05 PM  Pg 34 of 36 Trans ID: LCV20201114789

4/6/2020                    MAYORS DISH: Emerson Governing Body Weathering Unwelcome Redevelopment — Pascack Press & Northern Valley Press

# MAYORS DISH: Emerson Governing Body Weathering Unwelcome Redevelopment



**Emerson Mayor Danielle DiPaola. | Photo by Murray Bass**

**Alvarez Roofing - Roof Repairs**

Ad  We Specialize in Roof Systems, Built-l

roofingbyalvarez.com

Learn more

EMERSON, N.J.—Mayor Danielle DiPaola, a Republican who inherited Democratic predecessor Louis Lamatina's agreements for a major mixed–use redevelopment project downtown, told the Greater Pascack Valley Chamber of Commerce on Jan. 29 that the borough has lost "seven of its thriving businesses due to redevelopment in the name of affordable housing."

In order to get 29 affordable housing units, Emerson "lost seven businesses so far. Two others are still open and they're fighting for their lives," she said at the chamber's annual mayors breakfast at The Iron Horse Restaurant in Westwood.



Deposition Exhibit
4/26/2023
2:20-cv-04728 (DNJ)

**DD-25**

EXHIBIT L

DiPaola said the borough is "desperately" looking for a place to help relocate Cork & Keg liquor store at 188 Kinderkamack Road after the borough's redevelopment partner exercised their right to condemn the store's lease.





**In Emerson, a Kinderkamack Road restaurant site was recently demolished to make way for Emerson Station, a mixed-use redevelopment project.**

She said the project, known locally as Block 419, was pitched such that it would result in something "similar to a Westwood Avenue" in Westwood.

"That's not what's happening," she said. She described 14,000 square feet of retail space, in addition to the majority of the first floor occupied by "a large gym for the people living in the building only. The project will have a five-story parking garage, and traffic is going to be a very big issue."

DiPaola also predicted a worsening of traffic on Linwood and Lincoln.

She said the borough hadn't seen many traffic benefits from the recent Kinderkamack Road corridor overhaul, saying the council is "reaching out to Bergen County and New Jersey Transit for meetings, asking them to come back and revisit this issue."

EXHIBIT L

Regarding the planned 29 affordable housing units, 22 will be incorporated into Emerson Station as three-, two-, and one-bedroom units. The remaining seven units, DiPaola said, will comprise a standalone building across from Dunkin' Donuts.

Alvarez Roofing - Roof Repairs

Ad   We Specialize in Roof Systems, Built-l

roofingbyalvarez.com

Learn more

**0 Comments**

Sort by   Oldest

EXHIBIT L

**EXHIBIT M**

Agenda No. 20

**BOROUGH OF EMERSON**
**COUNTY OF BERGEN, NEW JERSEY**
**RESOLUTION**        No: 256-16

...................................................................................................................................

**Subject: Authorizing the execution of a First Amendment to Redevelopment Agreement**

**WHEREAS,** Emerson Redevelopers Urban Renewal, LLC ("ERD" or "Redeveloper") was designated as Redeveloper of Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10 by the Borough of Emerson ("Borough"); and

**WHEREAS,** on June 14, 2016, by Resolution No. 17346, the Borough approved the execution of a Redevelopment Agreement between the Borough and the Redeveloper for the redevelopment of certain areas located within the Central Business District for a mixed use project; and

**WHEREAS,** per the Redeveloper's proposal to the Borough and the Borough's Redevelopment Plan, the areas to be redeveloped are Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10 on the Official Tax Map of the Borough; and

**WHEREAS,** the Borough and the Redeveloper have agreed to enter into a First Amendment to the Redevelopment Agreement with the specific intention to amend and supplement the property descriptions to be redeveloped, as set forth and attached hereto in form and substance as **Exhibit A**;

**NOW, THEREFORE, BE IT RESOLVED,** by the Mayor and Council of the Borough of Emerson, County of Bergen, State of New Jersey, that it hereby authorizes the Mayor to execute and the Borough Clerk to witness the execution of a First Amendment to Redevelopment Agreement between the Borough and Emerson Redevelopers Urban Renewal, LLC, attached hereto in form and substance as **Exhibit A**.

**BE IT FURTHER RESOLVED,** that this Resolution shall take immediate effect.

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN | |
|---|---|---|---|---|---|---|---|
| DiPaola | | | | X | | | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on October 4, 2016.* |
| Lazar | | | X | | | | |
| Downing | | X | X | | | | |
| Knoller | X | | X | | | | *Attest:* |
| Tripodi | X | | | | X | | _____ |
| Worthington | | | X | | | | *Municipal Clerk* |

Deposition Exhibit
4/26/2023
2:20-cv-04728 (DNJ)

**DD-04**

EXHIBIT M

**EXHIBIT N**

### BOROUGH OF EMERSON
### COUNTY OF BERGEN
### NOTICE OF ADOPTION

D-20

### ORDINANCE NO. 1535-16

**Introduced:** December 6, 2016
**Adopted:** December 20, 2016

### AN ORDINANCE OF THE MAYOR AND COUNCIL OF THE BOROUGH OF EMERSON AMENDING THE CENTRAL BUSINESS DISTRICT REDEVELOPMENT PLAN PURSUANT TO N.J.S.A. 40A:12A-7

· **NOTICE IS HEREBY GIVEN** that the following ordinance was adopted on the second reading after a Public Hearing at the Regular Meeting of the Borough Council of the Borough of Emerson on the 20th day of December, 2016. A copy of Ordinance 1535-16 is on file in the Borough Clerk's Office in the Municipal Building, 1 Municipal Pl., Emerson, NJ 07630.

**WHEREAS,** Pursuant to the Local Redevelopment and Housing Law, (N.J.S.A. 40A:12A-1 et seq.) (the "Redevelopment Law"), on February 3, 2004 the Mayor and Council of the Borough of Emerson ("Mayor and Council" or "Borough") authorized the Emerson Planning Board, now known as the Emerson Land Use Board, ("Board") to conduct a preliminary investigation and hold the requisite public hearing to determine whether a certain area located within the Central Business District, including Lots 1, 2, 3, 4 & 5 on Block 412; Lots 1, 2, 3, 4, 5, 6.01, 6.02, 7, 8, 9 & 10 on Block 419; Lots · 2 & 16 on Block 420; Lots 1,10,11,12,13,14,15,16,17 &18 on Block 422; Lots 2, 3, 4, 5, & 6 on Block 603; Lots 3 & 4 on Block 606; Lots 1, 2, 4, 5.01, 5.02, 6, 7, 8, 9.01, 9.02, & 10 on Block 610; Lots 1 & 2 on Block 613; Lot 1 on Block 615; Lots 1, 16, 17, 19, 20, 21, 22, 23 & 24 on Block 616; and Lot 1 on 617.01 on the Official Tax Assessment Map of the Borough of Emerson ("Area") met the statutory criteria to be designated as "an area in need of redevelopment" as defined by the Redevelopment Law; and

**WHEREAS,** The Board conducted the requested investigation and held the requisite hearings on July 29, 2004 and August 19, 2004, which were all done on proper notice, to determine whether the studied Area met the statutory criteria to be designated as "an area in need of redevelopment"; and

**WHEREAS,** On September 7, 2004, the Board adopted a Resolution, recommending that the Mayor and Council designate the studied Area as "an area in need of redevelopment"; and

**WHEREAS,** The Mayor and Council adopted Resolution No. 242-04 on December 14, 2004 designating the Area as "an area in need of redevelopment" as well as directing the Board to prepare a redevelopment plan and forward its recommendation to the Mayor and Council; and

**WHEREAS,** The Board prepared a proposed redevelopment plan ("Redevelopment Plan") and on April 6, 2006 adopted a Resolution recommending the adoption of the Redevelopment Plan to the Mayor and Council; and

**WHEREAS,** On July 11, 2006, the Governing Body adopted Ordinance No. 1305-06 adopting the Redevelopment Plan and were determined to implement said plan; and

2089996-1

Deposition Exhibit
4/26/2023
2:20-cv-04728 (DNJ)

**DD-08**

EXHIBIT N

**WHEREAS,** On May 4, 2010, the Governing Body adopted Ordinance No. 1394-10 adopting certain amendments and reaffirming the Redevelopment Plan for the Central Business District (the "2010 Redevelopment Plan"); and

**WHEREAS,** In furtherance of redeveloping the Central Business District Redevelopment Area, on August 16, 2016 the Mayor and Council adopted Resolution No. 222-16, directing that the Board prepare revisions and/or amendments to the 2010 Redevelopment Plan pursuant to N.J.S.A. 40A:12A-7(e) and N.J.S.A. 40A:12A-7(f); and

**WHEREAS,** On September 8, 2016, the Board held a public meeting where at the Board's retained planner, Brigette Bogart PP, AICP, CGW of Planning & Design Professionals LLC ("Planner") presented proposed amendments to the 2010 Redevelopment Plan; and

**WHEREAS,** On September 22, 2016, after review of the proposed amendments, the Board adopted a Resolution affirming and recommending amendments to the 2010 Redevelopment Plan to the Mayor and Council, which also contained its report with its findings and conclusions of facts; and

**WHEREAS,** On November 21, 2016, the Mayor and Council held a meeting whereby the Planner and designated redeveloper presented its comments and recommendations for additional amendments to the Redevelopment Plan; and

**WHEREAS,** the Mayor and Council has determined it to be in the Borough's best interests to further amend the 2010 Redevelopment Plan in order to effectuate redevelopment on certain parcels located within the Central Business District Area ("Proposed Amendments"); and

**WHEREAS,** concurrently with the introduction of this Ordinance, the Mayor and Council shall adopt a Resolution referring the Proposed Amendments to the Board in Accordance with N.J.S.A. 40A:12A-7(e) and N.J.S.A. 40A:12A-7 (f) for its report and recommendation after review of the Proposed Amendments; and

**WHEREAS,** prior to final adoption of this Ordinance, the Mayor and Council shall have reviewed the Board's report and recommendation or if the Board fails to transmit a recommendation within 45 days after referral, the Mayor and Council may act upon this Ordinance adopting the Proposed Amendments pursuant to N.J.S.A. 40A:12A-7(e).

2089996-1

**NOW THEREFORE, BE IT ORDAINED** by the Mayor and Council of the Borough of Emerson as follows:

**SECTION ONE:** **Permitted Uses.**

§ 290-68A. Principal Uses shall be deleted in its entirety and replaced with the following:

1. Retail stores.
2. Personal service businesses.
3. Eating and Drinking establishments (except drive ins)
4. Professional, financial and medical offices
5. Multi-family residential dwellings above at-grade, retail, commercial and other principal permitted uses.
6. Multi-family residential dwellings including buildings above at grade parking, only in areas where the building is behind a building that fronts on Kinderkamack Road.
7. Multi-family residential dwellings at grade only where they front on Lincoln Boulevard and only in areas where the building is behind a building that fronts on Kinderkamack Road.
8. Instructional studios spaces, including dance, artist, martial arts, music and other related studios.
9. Financial institutions
10. Childcare facilities and nursery schools.

2089996-1

**SECTION TWO: Area and Bulk Requirements.**

§ 290-69.  Table A shall be deleted in its entirety and replaced with the following:

**TABLE A: AREA AND BULK REQUIREMENTS CBD-10 AND CBD-15**

| Regulation | CBD-10 | CBD-15 |
|---|---|---|
| Minimum Lot Area | 10,000 square feet (a) | 15,000 square feet (a) |
| Minimum Lot Width | 75 feet | 120 feet |
| Minimum Lot Depth | 60 feet(1) | 75 feet (1) |
| Minimum Front Yard | | |
|     Kinderkamack | 17 feet (2) (4) | 15 feet (3) |
|     Other Streets | 0 feet | N/A |
| Maximum Front Yard | | |
|     Kinderkamack | 25 feet (2) | 50 feet (3) |
|     Other Streets | 15 feet | N/A |
| Minimum Side Yard one/both | 0/0 feet | 10/20 feet(1) |
| Minimum Rear Yard | 0 feet | 10 feet |
| Maximum Building Stories | Four | Three |
| Maximum Building Height | | |
|     Along Public Streets | 42 feet (5) | 40 feet (5) |
|     Along the Railroad ROW | 50 feet (5) | 40 feet (5) |
| Maximum Building Coverage | 85 percent | 85 percent |
| Maximum Impervious Coverage | 95 percent | 90 percent |

(1) Corner parcels with rights of way located on three sides may reduce the required depth by 55% & reduced side yards of 5 feet each yard.

(2) In accordance with the streetscape requirements set forth in Section 290-70B1 of the ordinance.

(3) In accordance with the streetscape requirements set forth in Section 290-70B2 of the ordinance.

(4) Measured to the curb line.

(5) Additional Height is permitted in accordance with Section 290-70A3 and shall only be permitted on development parcels which are two (2) acres or greater. Further the 50 foot building height will only be permitted setback from the front building facade by a minimum of 5 feet in depth on buildings facing Lincoln Boulevard and Kinderkamack Road.

(a) Provided that, where an entire block is to be redeveloped pursuant to the Redevelopment Plan, the minimum lot area shall coincide with the block as depicted on that map.

2089996-1

EXHIBIT N

## SECTION THREE: PARKING REQUIREMENTS

§ 290-71. Table C shall now include the footnote (a) below:

(a) If a project contains retail on the first floor with residential above, the parking requirement may be reduced to a maximum of up to 25% to account for shared parking, subject to and conditioned upon: (i) the receipt of testimony provided by the applicant's traffic/parking expert supporting such reduction: and, (ii) the Land Use Board retaining a traffic/parking consultant to support and confirm such determination, which shall be paid for by the applicant. If a development is constructed with the parking reduction then medical office space shall be a prohibited use. For the purpose of this section "medical office" shall include walk-in and urgent care clinics, other medical, dental, treatment and therapy related facilities.

## SECTION FOUR: DESIGN STANDARDS

§ 290-70A(3) Rooflines/building height shall be deleted in its entirety and replaced with the following:

(a) The top of all buildings must be capped by a cornice or sloping roof element other than structures utilized for parking.

(b) An additional five feet in height for ornamentation, such as parapets and cornices, is permitted. This additional height is only permitted along a maximum of 66% of the facade to encourage a varying roofline.

(c) In addition to Subsection A(3)(b) above, for each portion of a building that provides cornices and similar appurtenances for ornamental purposes, such elements may not be more than 25 feet in length each.

(d) All roof-mounted equipment shall be screened from public view by use of parapet walls.

(e) All lighting proposed on all buildings shall be designed to minimize any impact to the surrounding area. The lighting design should be consistent with the streetscape standards of the district and complimentary to the structure design.

(f) In the CBD-W zone district, 50% of a building may be four stories in height where the topography of land provides a minimum of an eight-foot change in elevation.

(g) Irrespective of other height restrictions, buildings in the area south of Ackerman Avenue may be developed with a maximum three residential stories above at-grade parking or above at-grade commercial, with a maximum height of 50 feet.

2089996-1

**SECTION FIVE:** **Purpose and Compliance with Statutory Requirements:**

A. Purpose. The purpose of the Redevelopment Plan is to improve areas designated as being in need of redevelopment; to achieve the goals and objectives of the Master Plan as described above, to enhance the downtown commercial area, to provide for affordable housing in an appropriate location within the Borough, to provide added development near mass transit, to create additional walkable areas and reduce auto dependency, to provide for appropriate land usage, to provide public improvements including public parking, plazas and recreation facilities and to otherwise promote the public health, safety and welfare.

B. Compliance with Statutory Requirements.

1) While it is not contemplated that implementation of the amendments to the Redevelopment Plan will require the relocation of businesses or persons, any relocation that may be required shall comply with the requirements of the New Jersey Relocation Assistance Law (N.J.S.A. 52:31(B)(1) et seq.) the Residential Eviction Law (N.J.S.A. 2A:18-61.1 et seq.) and any regulations adopted pursuant thereto.

2) The within Redevelopment Plan contemplates potential planned condemnation of properties, if required.

3) The within Redevelopment Plan does not require the removal of any affordable housing units.

4) The within Redevelopment Plan provides sufficiently complete information to establish compliance with the objectives of local zoning, redevelopment, building, land use, population density, traffic, transportation, recreation and public facilities.

5) The within Redevelopment Plan conforms to the New Jersey Development and Redevelopment Plan adopted pursuant to the State Planning Act and implements goals and objectives of the State Plan.

6) The within Redevelopment Plan complies with all provisions of the Municipal Land Use Law.

7) The within Plan further complies with the provisions of the Bergen County Draft Master Plan Report.

8) The Borough of Emerson hereby affirms that it and its designated agents will assert leadership within the community to ensure compliance with Title VI of the Civil Rights Act of 1964 and Title VII as amended in March of 1972, and with all the affirmative action requirements of the State of New Jersey, as well as regulations issued by the State of New Jersey and the Borough of Emerson.

9) No covenant, lease, conveyance, or other instrument shall be affected or executed by the Borough of Emerson or by a developer or any successor of an developer whereby the land within the Redevelopment District is restricted by the Borough or the developer on the basis of race, creed, color, or national origin in the sale lease, use or occupancy thereof. Appropriate covenants, running with the land, will prohibit such restrictions and shall be included in disposition instruments. There shall be no restrictions of occupancy or use of any part of the Redevelopment District on the basis of race, creed, color or national origin.

2089996-1

10) The provisions of this Redevelopment Plan and the requirements and restrictions contained herein shall be in effect for a period of thirty (30) years from the date of approval of this Ordinance by the Mayor and Council.

## SECTION SIX:  Additional Provisions.

A.  Deviation Requests.  The Borough may grant deviations from the regulations contained in the within Ordinance where permitted by the provisions of the Municipal Land Use Law.  Notwithstanding the above, any changes to the uses permitted in the within Redevelopment Plan Ordinance shall only be permitted by an amendment to this Ordinance by the Mayor and Council upon a finding that such deviation would be consistent with and in furtherance of the goals and objectives of this Ordinance.

B.  Implementation of the Plan.  The Mayor and Council are also authorized to enter into an agreement with a Redeveloper to implement the provisions of the within Redevelopment Plan Ordinance.  In the event the Borough does enter into such an agreement the Redeveloper shall be responsible to post sufficient escrows to cover any and all costs of the professional consultants retained by the Borough to review the proposed redevelopment project and any and all other aspects of the redevelopment process.  The Redeveloper, at the Redeveloper's sole cost and expense, shall also provide all necessary engineering studies in order to construct all on-site and/or off-site improvements, municipal infrastructure improvements, capacity enhancements or upgrades or other improvements required in connection with the provisions of water, sanitary sewer, stormwater sewer, electric and gas services to the project, and, in addition, all required tie-in or connection fees.  The Redeveloper shall also be responsible for providing, at the Redeveloper's sole cost and expense, all lighting, on-site and off-site traffic controls, road improvements, street trees, pavers, furniture, landscaping, and any and all other improvements required as a result of the proposed redevelopment.  Any Redevelopment Agreement between the Borough and the Redeveloper will contain the terms, conditions, specifications and description of required performance guarantees pertaining to the Redeveloper's obligation to provide all improvements.

C.  This Ordinance may be amended upon compliance with the requirements of State Law.  In the event a Redeveloper requests any amendment of the within Ordinance, said Redeveloper shall be required to post escrows in such amounts as shall be necessary to cover all costs of the Borough's professionals in connection with the required amendment, including, but not limited to the costs of an impact study prepared by a professional planner.

2089996-1

**BE IT FURTHER ORDAINED,** that the provisions of this Ordinance are hereby declared to be severable. Should any section, paragraph, subparagraph, provision, sentence, or part hereof be declared invalid or unconstitutional, said finding shall not affect any other section, paragraph, subparagraph, provision, sentence, or part thereof and the remainder of this Ordinance shall be deemed valid and effective.

**BE IT FURTHER ORDAINED,** This Ordinance shall take effect immediately following final passage, adoption and publication as provided by law.

| COUNCIL | M O V E D | S E C O N D E D | A Y E S | N A Y E S | A B S E N T | A B S T A I N | |
|---|---|---|---|---|---|---|---|
| DiPaola | | | | X | | | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on December 20, 2016.* |
| Lazar | X | | X | | | | |
| Downing | | | X | | | | Attest: _____ |
| Knoller | | X | X | | | | *Municipal Clerk* |
| Tripodi | | | | X | | | |
| Worthington | | | | X | | | |
| Mayor Lamatina | | | X | | | | |

Adopted: December 20, 2016          Approved: _____

LOUIS LAMATINA, Mayor

**ATTEST:**

JANE DIETSCHE, Borough Clerk

2089996-1

EXHIBIT N

**EXHIBIT O**

# BOROUGH OF EMERSON
## COUNTY OF BERGEN, NEW JERSEY
### RESOLUTION                No: 200-17

**RE: SECOND AMENDMENT TO REDEVELOPMENT AGIIBEMENT**

This **Second Amendment to Redevelopment Agreement** is made this _ day of July 2017 by and between the

**BOROUGH OF EMERSON**
146 Linwood Ave., Emerson, NJ 07630
a municipal corporation oftlle State of New
Jersey, located in the County of Bergen,
(hereinafter referred to as "Borough")

**AND**

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
a limited liability corporation of the State of New Jersey, having an office
at 80 S. Jefferson Road, Suite 202, Whippany, NJ  07981
(hereinafter refen·ed to as "EMRED" or "Redeveloper")

**WHEREAS,** the Borough and Redeveloper entered into a Redevelopment Agreement on or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopn1ent of certain areas within the Central Business District Redevelopment Area, attached hereto as **Exhibit A;** and

**WHEREAS,** the Borough and tlle Redeveloper are desirous of amending and s11pplementing the Redevelopment Agreement to reflect their mutual understanding with respect to the implementation of the development and requirement of affordable housing units to be built on-site;

**WHEREAS,** the Borough and Redeveloper have agreed to ainend and supplement the Redevelopment Agreement upon the tern1s and conditions set forth herein;

**NOW, THEREFORE,** for and in consideration of the promises and other good and valuable consideration, the receipt and sufficiency of which ai·e hereby acla1owledged, the parties hereto agre.e as follows:



Deposition Exhibit
4/26/2023
2:20-cv-04728 (DNJ)
**DD-09**
EXHIBIT O

2169563

1.    All terms not defined in this Amendment shall have the same meaning as set forth in the Redevelopment Agreement.

2.    The purpose and intent of this Amendment is to amend and supplement the affordable housing requirements.

3.    Article 1, Section 1.01 entitled "Definitions" is amended as follows:

"Affordable Housing Requirements" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The ~~maximum~~ obligation shall be at least 20% set aside **[in accordance with Borough Ordinance 290-13.D]** and of which no less than 15% ~~may~~ **[shall]** be built on **[site] and the remainder shall be provided for by any of the following options to: (i) construct affordable units on-site; or (2) construct the affordable units elsewhere within the Borough ("Off-site"); or (3) make a payment in lieu of constructing the affordable units; or (4) provide a combination of a payment in lieu and on-site or Off-site construction.** ~~and/or offsite~~

4.    Article 4.01 entitled Project Costs is amended as follows:

All costs of implementing and Completing the Project including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property **[including the use of eminent domain to acquire the property under any authorizing statutes and/or regulations]**, any Remediation costs . . .

5.    Article 4, Section 4.03.1 entitled "Alternate COAH Location" is deleted in its entirety and will be "intentionally left blank".

6.    Article 5.01 entitled "Property" shall be amended and supplemented as follows:

. . . In the event the Redeveloper is not able to purchase any property set forth in Exhibit A the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c) **[, N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws authorizing the Borough to acquire such properties.]** The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties . . .

7.  In all other respects, the Redevelopment Agreement remains in full force and effect.

8.  This Second Amendment together with the First Amendment, any applicable Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this Second Amendment. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

9.  All the provisions of this Second Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

**IN WITNESS WHEREOF**, Redeveloper has hereunto caused this Second Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto.  The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

2169563-1

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on July 18, 2017.* |
|---|---|---|---|---|---|---|---|
| DiPaola | | | | X | | | |
| Falotico | | | X | | | | *Attest:* |
| Lazar | | | X | | | | |
| Knoller | | X | X | | | | *Acting Deputy Clerk* |
| Downing | X | | X | | | | |
| Worthington | | | X | | | | |

2169563-1

Witnessed and Attested to:                    **BOROUGH OF EMERSON**


_____     By: _____
JANE DIETSCHE, Borough Clerk                LOUIS J. LAMATINA, Mayor


**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**


By: _____
        Joseph Forgione,   Managing Member

2169563-1

EXHIBIT O

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY :
                 : SS
COUNTY OF BERGEN    :

    **I CERTIFY** that on _____, 2017,

    **JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

    (a)    this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

    (b)    this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamantina, the Mayor of the Municipal Corporation;

    (c)    this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

    (d)    this person knows the proper seal of the corporation which was affixed to this document; and

    (e)    this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
_____ 2017.

                         _____

                                Municipal Clerk

_____
Notary Public, State of New Jersey

2169563-1

## <u>REDEVELOPER ACKNOWLEDGMENT</u>

STATE OF NEW JERSEY    :
                          : ss
COUNTY OF BERGEN      :

     BE IT REMEMBERED that on this _____ day of _____ 2017, before me, the subscriber, personally appeared _____, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.


                                _____

                                Joseph Forgione, Managing Member


Signed and sworn to before me on
_____2017.



_____
Notary Public, State of New Jersey

EXHIBIT O

# EXHIBIT A

## Redevelopment Agreement

**EXHIBIT P**

Agenda No. 21

**BOROUGH OF EMERSON**
**COUNTY OF BERGEN, NEW JERSEY**
**RESOLUTION            NO. 305-18**

---

**RE: AUTHORIZING THE EXECUTION OF THIRD AMENDMENT TO REDEVELOPMENT AGREEMENT BETWEEN THE BOROUGH OF EMERSON AND EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

      **WHEREAS,**    Emerson Redevelopers Urban Renewal, LLC ("ERD" or "Redeveloper") was designated as Redeveloper of Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10  by the Borough of Emerson ("Borough"); and

      **WHEREAS,** pursuant to the New Jersey Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 et seq., ("LRHL")  the Borough has the power to enter into an agreement with a redeveloper to implement and effectuate a redevelopment plan; and

      **WHEREAS,** on June 14, 2016, by Resolution No. 17346, the Borough approved the execution of a Redevelopment Agreement between the Borough and Redeveloper for the redevelopment of certain areas located within the Central Business District for a mixed use project; and

      **WHEREAS,** per the Redeveloper's proposal to the Borough and the Borough's Redevelopment Plan, the areas to be redeveloped are Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10 on the Official Tax Map of the Borough; and

      **WHEREAS,** the Borough and the Redeveloper entered into a First Amendment and a Second Amendment to the Redevelopment Agreement to amend and supplement the Redevelopment Agreement; and

      **WHEREAS,** the Borough and Redeveloper have mutually agreed to enter into a Third Amendment to the Redevelopment Agreement to amend and supplement the Redeveloper's required contributions for certain onsite and offsite improvements, and to modify the current ownership interest in Redeveloper which Borough approval of such transfer is required pursuant to N.J.S.A. 40A:12A-9, which modification arose from Redeveloper's efforts to acquire those portions of the Property not owned or controlled by Redeveloper, all as more fully and completely set forth in form and substance attached hereto as **Exhibit A;**

      **NOW, THEREFORE, BE IT RESOLVED,** by the Mayor and Council of the Borough of Emerson, County of Bergen, State of New Jersey, that it hereby authorizes the Mayor to execute and the Borough Clerk to witness the execution of a Third Amendment to the Redevelopment Agreement between the Borough and Emerson Redevelopers Urban Renewal, LLC, attached hereto in form and substance as **Exhibit A**.

      **BE IT FURTHER RESOLVED,** that this Resolution shall take immediate effect.

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN | |
|---|---|---|---|---|---|---|---|
| | | | | | | | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on December 18, 2018.* |
| DiPaola | | | | | | X | |
| Bayley | | X | X | | | | *Attest:* |
| Wolf | | | X | | | | |
| Knoller | X | | X | | | | *Municipal Clerk* |
| Falotico | | | | X | | | |
| Downing | | | X | | | | |

EXHIBIT P

**EXHIBIT Q**

```
                                                      Page 1

 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEW JERSEY

 3            CIVIL ACTION NO.:  20-cv-4728-MCA-MAH

 4

 5      EMERSON REDEVELOPERS URBAN

 6      RENEWAL, LLC,

 7                    Plaintiff,

 8

 9          vs.

10

11      THE BOROUGH OF EMERSON, NEW

12      JERSEY and DANIELLE DIPAOLA,

13                    Defendants.

14      ------------------------------------

15

16          DEPOSITION OF YAAKOVI "JACK" KLUGMANN

17                TUESDAY, APRIL 25, 2023

18

19          Deposition of YAAKOVI KLUGMANN in the

20      above-mentioned matter before Jomanna DeRosa, a

21      Certified Court Reporter (License No. 30XI00188500),

22      and Notary Public of the State of New Jersey, taken

23      at 250 Moonachie Road, Moonachie, New Jersey on

24      Tuesday, April 25, 2023, commencing at 10:06 a.m.

25      Job No. CS5877544
```

EXHIBIT Q

Page 2

1 A P P E A R A N C E S
2
3 THE LAW OFFICES OF RICHARD MALAGIERE
4 A PROFESSIONAL CORPORATION
5 BY:  LEONARD E. SEAMAN, ESQ.
6 250 Moonachie Road, Suite 102
7 Moonachie, New Jersey 07074
8 (201)440-0675
9 les@malagierelaw.com
10
11
12 SILLS CUMMIS & GROSS P.C.
13 BY:  JOSEPH B. FIORENZO, ESQ.
14     STEPHEN KLEIN, ESQ.
15 The Legal Center
16 One Riverfront Plaza
17 Newark, New Jersey 07102
18 (973)643-5499 JF
19 (973)643-4775 SK
20 jfiorenzo@sillscummis.com
21 sklein@sillscummis.com
22
23
24
25

Page 4

1          I N D E X
2
3 WITNESS      EXAMINATION BY          PAGE
4 Mr. Klugmann    Mr. Seaman          9
5
6
7
8          E X H I B I T S
9
10 NUMBER       DESCRIPTION          PAGE
11 FD-1       First Amended Complaint     31
12
13 (All exhibits are attached hereto.)
14
15
16          REQUESTS
17
18 PAGE LINE
19 47    5
20 66    4
21
22
23
24
25

Page 3

1 A P P E A R A N C E S (CONT'D)
2
3 BOTTA ANGELI, LLC
4 BY:  CHRISTOPHER C. BOTTA, ESQ.
5 50 South Franklin Turnpike
6 Ramsey, New Jersey 07446
7 (201)818-6400
8 ccb@bottalaw.com
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1          YAAKOVI KLUGMANN, residing at 32 Cross
2 Street, Suite 301, Lakewood, New Jersey 08701, having
3 first been duly affirmed by the Notary, then
4 testified as follows:
5
6          MR. FIORENZO:  Before we begin, I just
7 want to place something on the record.  Who is going
8 to be examining Mr. Klugmann today?
9          MR. SEAMAN:  I'm going to be taking the
10 lead.
11          MR. FIORENZO:  Okay.  Because you both
12 represent the same parties.  We're not going to let
13 Mr. Klugmann be examined by two attorneys
14 representing the same party.  There should be one
15 person examining him.
16          MR. SEAMAN:  Well, we don't represent
17 the same parties.  I only represent Mayor DiPaola.
18          MR. FIORENZO:  As does Mr. Botta.
19          MR. SEAMAN:  With regard to any
20 uninsured claims.
21          MR. FIORENZO:  You both represent Mayor
22 DiPaola.
23          MR. SEAMAN:  On different issues.
24          MR. FIORENZO:  Okay.  My position is
25 that two attorneys representing the same client do

2 (Pages 2 - 5)

EXHIBIT Q

Page 6

1 not have a right to conduct an examination of a
2 deponent.
3         MR. SEAMAN:  Do you have a rule to
4 support that position?
5         MR. FIORENZO:  I'll get you some
6 authority for that.  But at the moment, I'm not going
7 to cite anything off the top of my head.  But you
8 don't have a right to question the witness twice.
9 You can't have two attorneys examine the same witness
10 at a deposition if they're representing the same
11 party.
12         MR. SEAMAN:  Well --
13         MR. FIORENZO:  That's duplicative.
14         MR. SEAMAN:  Well, there will not be a
15 duplicative question.  I can guarantee you that.
16 Mr. Botta and I will certainly work to not be
17 duplicative of the questioning.
18         MR. SEAMAN:  Just so we're clear on
19 the record.  My position is that only one counsel
20 representing the DiPaola party -- you represent Mayor
21 DiPaola.
22         MR. SEAMAN:  I do.
23         MR. FIORENZO:  Mr. Botta does as well.
24 Only one attorney representing Mayor DiPaola should
25 have the right to examine the witness.  Whoever that

Page 7

1 is, I don't care.  But we're not going to have you
2 examine on behalf of Mayor DiPaola and Mr. Botta do
3 the same thing.  That's not appropriate.
4         MR. SEAMAN:  Well, Mr. Botta also
5 represents The Borough as an entity.
6         MR. FIORENZO:  Well, that's true.
7 That's true.  But, again, you're both representing
8 Mayor DiPaola.  So I'm not going to let two people
9 examine him.  So do you want Mr. Botta then, since he
10 represents both parties, you only represent one?  Let
11 him do the examination?
12         MR. BOTTA:  Well, you put it on the
13 record Mr. Fiorenzo, so very good.  Thank you.
14         MR. SEAMAN:  Okay.
15         MR. FIORENZO:  Okay.  Just so we're
16 clear, I'm not going to consent to a second attorney,
17 no offense to Mr. Botta.
18         MR. BOTTA:  Well, I would disagree with
19 that.
20         MR. FIORENZO:  Well, no, I mean, it's
21 nothing personal.  The position is two attorneys
22 representing the same party don't have the right to
23 examine the witness.  That's my position.  So, with
24 that said on the record --
25         MR. BOTTA:  So are you going to object

Page 8

1 if I ask questions and direct him not to answer?
2         MR. FIORENZO:  Yes, I'm going to direct
3 him not to answer questions from you.  If you do that
4 at the conclusion of his examination, yes.
5         MR. BOTTA:  Well, then I guess we're
6 going to have to get Judge Hammer on the phone.
7         MR. FIORENZO:  We may have to do that.
8 We may have to do that because I don't think it's
9 appropriate having two attorneys examine on behalf of
10 the same client.
11         MR. BOTTA:  All right.
12         MR. FIORENZO:  So I don't know if you
13 want to do that now or you want to do it later.  It's
14 up to you guys.  I just want to, you know, state my
15 position clearly up front so you can handle it any
16 way you want.  You want to start your examination
17 now, get the Judge on the phone, whatever works.
18         MR. SEAMAN:  All right.  Well, let's
19 take a break.  Chris and I will discuss it and we'll
20 get back and tell you which way we're going to go.
21         MR. FIORENZO:  That's fine.
22
23         (Whereupon, a brief recess was taken off
24 the record.)
25

Page 9

1         MR. FIORENZO:  Just do me a favor when
2 we start the deposition, just note the timing because
3 there's a seven-hour limit.
4         MR. SEAMAN:  Mr. Botta and I have
5 discussed this.  While we appreciate you putting your
6 position on the record, we don't agree.  It's your
7 position.  I've asked you for some authority, other
8 than you giving your position.  You haven't given
9 that to me yet to even evaluate what we think or to
10 determine whether we -- there's authority for your
11 position.  We're going to proceed right now.  But
12 Mr. Botta may ask questions later and we'll deal with
13 that with Judge Hammer at that time.  Okay?
14         MR. FIORENZO:  Fair enough.  Let's do
15 it.
16
17 DIRECT EXAMINATION
18 BY MR. SEAMAN:
19   Q.    Good morning, Mr. Klugmann.
20   A.    How are you?
21   Q.    My name is Leonard Seaman and my firm
22 represents Danielle DiPaola in this lawsuit that is
23 pending by Accurate Builders against Mayor DiPaola
24 and The Borough of Emerson -- not Accurate Builders
25 -- Emerson Redevelopers.  Correct?  You've been

3 (Pages 6 - 9)

EXHIBIT Q

Page 10

1 produced today as a witness for deposition in this
2 case. I know you were deposed previously last summer
3 in another suit related to the Emerson development.
4 Do you need me to go over any of the instructions
5 before we begin?
6        MR. FIORENZO: If you could, for the
7 benefit of him. I probably think it's a good idea.
8        THE WITNESS: It's a good idea.
9
10 BY MR. SEAMAN:
11     Q.   Okay. So everything being said in the
12 room today is being taken down by this lovely woman
13 here, the court reporter. She takes down all the
14 words that are said in the deposition. However, she
15 can't take down something like you nodding your head,
16 shrugging your shoulders, when people say "uh-huh"
17 for "yes" and "uh-uh" for "no"; it ends up looking
18 the same on paper. People get confused. It doesn't
19 make a clean record. So please try to answer my
20 questions verbally with words, as appropriate, as
21 they come about. It's also very difficult for her to
22 take down two people speaking at the same time.
23 Please wait for me to finish my question before you
24 provide an answer. I will of course try and show you
25 the same courtesy in terms of making sure you

Page 11

1 finished your answer before I ask another question.
2 If Mr. Fiorenzo should raise any sort of objection,
3 please let him place that objection on the record.
4 We may have some discussion, we may not. We may do
5 whatever. You'll probably be given an instruction
6 once that's done and you can follow his instruction
7 at that point.
8        Do you understand that?
9     A.   Yes.
10     Q.   I also ask you to listen to my complete
11 question because lawyers have a habit of starting a
12 question, the witness anticipates what the question
13 is, the witness starts to answer the question they
14 think the lawyer is going to ask. Then the lawyer
15 changes the question somehow at the last minute and
16 suddenly you're not answering the question that's
17 trying to be asked of you. That just creates a
18 situation where you haven't answered the question
19 being asked and we have to go back and start all over
20 again to make the record clean. So please wait for
21 me to finish my question before you provide any sort
22 of answer. I also want to make sure that you've
23 heard my complete question so we're sure you
24 understand the question. If I ask you a question
25 that's in any way confusing, I used a word you didn't

Page 12

1 understand, I mumbled, I went too fast, anything like
2 that, that is in any way confusing, you didn't hear
3 it, if you don't understand the question, stop and
4 let me know. Tell me you're confused. Explain to me
5 what the problem is. I will repeat, rephrase or
6 change my question in whatever way so we're sure that
7 you're answering the question that I'm asking.
8        Do you understand that?
9     A.   Yes.
10     Q.   Okay. The converse to that rule is that
11 if you provide an answer to a question today, if this
12 deposition is used later in terms of the court
13 proceedings, Judge Cox Arleo, potentially the jury in
14 this matter when it goes to trial in Newark will
15 assume that you're answering the question as it's
16 being asked.
17        Do you understand that?
18     A.   Yes.
19     Q.   Okay. This is not a memory contest.
20 Don't feel compelled to answer questions just because
21 I'm asking them. If you don't know or you don't
22 recall, that's perfectly acceptable. Please tell me
23 that and we'll move on. It's also not an endurance
24 contest. As your attorney mentioned, there's a
25 seven-hour limit under the -- Rules of Civil

Page 13

1 Procedure and we already know from people here, we're
2 probably not going to go that long today. That being
3 said, if you need to take a break at any time, please
4 let me know. I'll be happy to accommodate you. The
5 only condition I put on that is if there's a question
6 pending, I'm going to ask for your answer before we
7 take our break.
8        Do you understand that?
9     A.   Yes.
10     Q.   Lawyers often give witnesses instruction
11 at a deposition; don't guess, but you can estimate.
12 I find that to be a very confusing instruction and it
13 makes little sense, to me at least. So I'm going to
14 tell you what I mean by it. A guess is an
15 off-the-wall guess. If I were to ask you what the
16 winning numbers in next Saturday's Mega Millions
17 lottery were, you could give me an answer. It would
18 be a guess. It would do us no good; maybe, maybe
19 not. But it would be an off-the-wall guess. An
20 estimate is something that, while you cannot be
21 absolutely precise, and this often comes up with
22 dates, times, in certain cases distances, things like
23 that; you can't be absolutely precise to your answer,
24 but you can give a reasonable estimate and it will be
25 one that you would feel comfortable sitting in the

4 (Pages 10 - 13)

Page 14

1 federal courthouse in Newark and telling Judge Cox
2 Arleo and the jury in this case that it was the
3 truth, albeit an estimate.
4        Do you understand the difference between
5 those two?
6     A.    Yes.
7     Q.    Okay.  So if you're presented with a
8 question that you can't be absolutely precise and you
9 can't give an absolute precise answer, but you can
10 give a reasonable estimate within those parameters,
11 please give a reasonable estimate and let me know
12 you're estimating.  If it's anything less than that
13 in terms of your confidence in giving the answer,
14 it's just a guess and you can tell me that you would
15 be guessing and we'll leave it at that.
16        Do you understand that?
17    A.    Yes.
18    Q.    Did you have an opportunity to meet with
19 your counsel prior to the deposition today?
20    A.    Yes.
21    Q.    Do you need to speak with Mr. Fiorenzo
22 or Mr. Klein any further before we begin?
23    A.    No, we're ready to go.
24    Q.    Okay.  Other than your counsel, did you
25 discuss your deposition today with any other person?

Page 15

1     A.    No.
2     Q.    Did you review any documents in
3 preparation for your deposition today?
4     A.    Yes.
5     Q.    What documents did you review in
6 preparation for your deposition today?
7     A.    Just a summary of notes that I have that
8 my attorney gave to me.
9     Q.    Are those notes that you have taken on
10 this case?
11    A.    No.
12    Q.    Are those notes that were prepared by
13 your counsel?
14    A.    Yes.
15    Q.    And when did you review those notes?
16    A.    About ten minutes ago.
17        MR. SEAMAN:  Off the record.
18
19        (Whereupon, a brief discussion took
20 place off the record.)
21
22 BY MR. SEAMAN:
23    Q.    The plaintiff in this case is Emerson
24 Redevelopers Urban Renewal.  Correct?
25    A.    Yes.

Page 16

1     Q.    How are you affiliated with Emerson
2 Redevelopers Urban Renewal?
3     A.    I'm the managing member.
4     Q.    And is Emerson Redevelopers Urban
5 Renewal a single purpose entity meant to develop the
6 property in Emerson that's the subject of this
7 litigation?
8     A.    Yeah.
9     Q.    Okay.  And what -- you're also
10 affiliated with a company called Accurate Builders.
11 Is that correct?
12    A.    Yes.
13    Q.    And can you describe the business of
14 Accurate Builders?
15    A.    Accurate Builders is a
16 development/building company GC.
17    Q.    And how long has Accurate Builders been
18 active as a developer/building company GC?
19    A.    Over ten years.
20    Q.    At the present time, is all of the work
21 of Accurate Builders related to development,
22 building, and general contracting services for single
23 purpose entities similar to Emerson Redevelopers
24 Urban Renewal?
25        MR. FIORENZO:  Object to the form of the

Page 17

1 question.  You may answer it.
2        THE WITNESS:  I don't understand it.
3
4 BY MR. SEAMAN:
5     Q.    Let me ask it this way:  Accurate
6 Builders maintains a website?
7     A.    Yes.
8     Q.    Okay.  And what's the name of that
9 website, if you know?  You seem to be struggling with
10 it.
11    A.    Yeah.  Honestly, I don't know.
12        MR. FIORENZO:  The name of the website?
13        MR. SEAMAN:  The URL for the website.
14        THE WITNESS:  AccurateofNJ.com, maybe.
15 I don't know.  I don't really know the website.
16
17 BY MR. SEAMAN:
18    Q.    You don't know?  Okay.  When was the
19 last time you reviewed the website for Accurate
20 Builders?
21    A.    I don't know that I ever have.
22    Q.    Are you aware that the Accurate Builders
23 website contains a web page that talks about a
24 portfolio of properties?
25    A.    Yes.

5 (Pages 14 - 17)

EXHIBIT Q

Page 18

1    Q.    Okay.  And that portfolio of properties
2 relates to various types of construction that
3 Accurate Builders has engaged in over it's existence.
4 Is that fair to say?
5    A.    Yes.
6    Q.    And that portfolio of properties
7 includes some single family homes.  Correct?
8    A.    Yes.
9    Q.    It includes some commercial development
10 buildings?
11    A.    Yes.
12    Q.    Okay.  And it involves some multi-family
13 mixed use properties?
14    A.    Yes.
15    Q.    Are there any other types of properties
16 that Accurate Builders was involved in the
17 construction and development of -- or has been
18 involved in since this lawsuit began?
19    A.    We do warehousing and office space and
20 just residential apartment buildings.
21    Q.    And within those different categories of
22 properties, where does the Emerson project fall?
23 What category would you put that in?
24        MR. FIORENZO:  Object to the form.  You
25 may answer.

Page 19

1        THE WITNESS:  Mixed use.
2
3 BY MR. SEAMAN:
4    Q.    And the Emerson property, when it is
5 completed, it is contemplated to provide commercial
6 rental space?
7    A.    There's about 14,000 square feet of
8 retail space.
9    Q.    And also residential apartments?
10    A.    Yes.
11    Q.    How many residential apartments are
12 contemplated for the Emerson project?
13    A.    So there's two properties.  One is
14 147 units and one is 7 units.
15    Q.    And where are the 147 units located?
16    A.    On Kinderkamack Road in Emerson.
17    Q.    And where are the seven units to be
18 located?
19    A.    Also -- 129 Kinderkamack Road.
20    Q.    And a portion of those residential units
21 are designated as low to moderate income housing?
22    A.    Yes.
23    Q.    And how many of those units are low
24 income housing?
25    A.    There's 22 on-site affordable units and

Page 20

1 there's 7 off-site affordable units.
2    Q.    And of the affordable units, on-site or
3 off-site, is there a distinction between them being
4 low income housing or moderate income housing?
5    A.    I don't know what it is.
6    Q.    I want to understand your answer.  Are
7 you saying you don't know what low or moderate income
8 housing is?  Let me withdraw the question.  I need to
9 ask a better question.
10        Do you have an understanding of what is
11 considered low income housing in New Jersey?
12        MR. FIORENZO:  Under the COAH
13 regulations, you're referring to?
14        MR. SEAMAN:  Yes.
15        MR. FIORENZO:  Okay.
16        THE WITNESS:  Yes.
17
18 BY MR. SEAMAN:
19    Q.    What is your understanding of low income
20 housing under COAH?
21    A.    Depends what people are -- depends on
22 how much the income is for the county versus what
23 they're making and stuff like that.
24    Q.    And what is your understanding of what
25 moderate income housing is in Bergen County?

Page 21

1    A.    I don't know the numbers.
2    Q.    Are you aware of how many units in the
3 Emerson project are designated as low income versus
4 moderate income in Bergen County?
5    A.    No.
6    Q.    Are you aware if any of the units in the
7 Emerson project are designated as low income?
8    A.    I don't know this offhand.
9    Q.    From the website, I'll just indicate to
10 you I found it as www.accurate-re.com.  Does that
11 sound about right?
12    A.    Yes.
13    Q.    Google is great.  The portfolio for
14 mixed use properties on that website, you list a
15 number of different properties and I will ask you
16 about some of them.  Citizen at Linden, are you
17 familiar with that property?
18    A.    Yes.
19    Q.    Is it in construction or complete?
20    A.    It's 100 percent complete.
21    Q.    And is it leased?
22    A.    Yes.
23    Q.    How many units of residential housing
24 are in that development?
25    A.    234.

6 (Pages 18 - 21)

Page 22

1    Q.    And are any of those 234 units
2  designated as low or moderate income housing?
3    A.    No.
4    Q.    City Square in Newark is that -- are you
5  familiar with that project?
6    A.    Yes.
7    Q.    And is that project complete or under
8  construction?
9    A.    No, we're starting the construction.
10   Q.    Crossings By Citizen in Raritan, in
11 Raritan, New Jersey?
12   A.    Yes.
13   Q.    Are you familiar with that project?
14   A.    I am.
15   Q.    Okay.  Is it complete?
16   A.    It is.
17   Q.    And are units being offered for rental
18 in that project?
19   A.    As opposed to?
20   Q.    I'm sorry.  I'm just trying to reference
21 being complete and being rented?
22   A.    Oh, yes.  Yeah.
23   Q.    Okay.  How many units are in Crossings
24 By Citizen?
25   A.    276.

Page 23

1    Q.    Are any of those units low or moderate
2  income housing?
3    A.    There are 20 affordable units.  It's a
4  pretty nice website.  I should go on it every so
5  often.
6    Q.    Just for the record, you made a comment
7  to Mr. Fiorenzo.  I'm assuming he has your website
8  open and you looked.  I'm asking you for the
9  information that you know.  Obviously, if you would
10 prefer that website, I just want to know.  I'm not --
11       MR. FIORENZO:  Yeah, I haven't showed it
12 to him.
13       MR. SEAMAN:  No, I understand.  Joe, I
14 understand.  And it's not -- I'm just making sure
15 that the record is clear with what the witness knows.
16 That's all.
17       THE WITNESS:  I don't have an issue with
18 your question.
19       MR. SEAMAN:  No, I know.  I'm protecting
20 the record, from my standpoint.  I know there was
21 nothing that was improper there.
22       Off the record.
23
24       (Whereupon, a discussion takes place off
25 the record.)

Page 24

1
2  BY MR. SEAMAN:
3    Q.    Mr. Klugmann, of the -- are you aware of
4  whether the 20 affordable units in Crossings By
5  Citizen are leased at this time?
6    A.    I don't know the state of all of them.
7    Q.    Are you aware of the racial background
8  of any of the tenants in the affordable units at
9  Crossings By Citizen at Raritan?
10   A.    No.
11   Q.    Are you aware of the racial background
12 of any of the tenants at Citizen by Raritan?
13   A.    No, it's not important to me.
14   Q.    And Citizen Bayonne, is that project
15 completed?
16   A.    Parts of it.
17   Q.    Are parts of it being leased to tenants?
18   A.    Yes.
19   Q.    And how many units is that?
20   A.    It's a total of 651 units.
21   Q.    And how many, approximately, are
22 available to lease?
23   A.    I don't know.
24   Q.    Of the 651 total units, are there any
25 affordable housing units?

Page 25

1    A.    No.
2    Q.    Citizens in Little Falls, is that
3  project complete and leasing?
4    A.    It is 95 percent complete.  It is being
5  leased.
6    Q.    Have any of the tenants taken occupancy?
7    A.    No.
8    Q.    Are any of the units in Citizen Little
9  Falls affordable housing units?
10   A.    Yes.
11   Q.    And how many units total at Citizen
12 Little Falls?
13   A.    45.
14   Q.    And how many are affordable?
15   A.    Oh, it's 185 units and 45 of them are
16 affordable.  I thought that was your question.
17   Q.    Okay.  Thank you for clarifying.  Are
18 you aware of the racial background of any of the 45
19 -- the tenants of any of the 45 affordable units?
20       MR. FIORENZO:  Objection.  Form.  He's
21 already said it hasn't been rented yet, so how would
22 he know?
23
24 BY MR. SEAMAN:
25   Q.    Are you aware -- I want to clarify.  I

7 (Pages 22 - 25)

EXHIBIT Q

Page 26

1  may have misunderstood.
2          Are leases signed with any tenants or
3  has it not been rented at all?
4      A.    I'm really not involved in this on a
5  day-to-day basis, so I don't know.
6      Q.    You don't know.  Okay.  All right.  As
7  you sit here today, you don't know if anyone is
8  occupying a unit at Citizen Little Falls?
9      A.    No, I told you, no one is in there.
10     Q.    Okay.  I apologize, then I
11 misunderstood.
12     A.    No problem.
13     Q.    Citizen Bound Brook, is that completed
14 or under construction?
15     A.    Yes.  It's also 95 percent complete.
16     Q.    Are any of the units in Citizen Bound
17 Brook leased to tenants who are occupying units?
18     A.    Yes.
19     Q.    How many units total is Citizen Bound
20 Brook?
21     A.    105.
22     Q.    And does that include any affordable
23 housing units?
24     A.    Does not.
25     Q.    There's a project identified in your

Page 27

1  website simply as Basking Ridge?
2      A.    Yes.
3      Q.    Does that have a name that it goes by as
4  well?
5      A.    Nope, not yet.
6      Q.    Okay.  Is it completed or under
7  construction?
8      A.    No, it's under construction.
9      Q.    There's also a project identified as
10 Parsippany.  Is that complete or under construction?
11     A.    Under construction.
12     Q.    There's a project identified as Citizen
13 Clifton on your website.  Is that complete or under
14 construction?
15     A.    Under construction.
16     Q.    There's a project identified in your
17 website as Montclair.  Is that complete or under
18 construction?
19     A.    Under construction.
20     Q.    There's a project identified on your
21 website as New Brunswick.  Is that complete or under
22 construction?
23     A.    They're doing demo.
24     Q.    So it's obviously not even started
25 construction of the actual unit yet?

Page 28

1      A.    Correct.
2      Q.    Okay.  A project on your website
3  identified as Cedar Grove.  Is that complete or under
4  construction?
5      A.    It's under construction.
6      Q.    There's a project on your website
7  identified as Citizen Guttenberg.  Is that complete
8  or under construction?
9      A.    It just got approvals.
10     Q.    Okay.  There's a project on your website
11 referred to as Perth Amboy.  Is that complete or
12 under construction?
13     A.    Neither.
14     Q.    Okay.  What does that mean, just so I
15 can clarify?
16     A.    It means we're going through the
17 approval process.
18     Q.    Other than the projects that we've just
19 discussed, are there any other projects that Accurate
20 Builders has been involved in the construction of
21 that are completed and renting units to tenants in
22 the State of New Jersey?
23     A.    Sure.  My website has a lot of it.
24     Q.    Okay.  Maybe I can clarify it.  Are
25 there any others that are identified as multi-family

Page 29

1  units as opposed to a single family or townhome
2  units?
3          MR. FIORENZO:  Is the question whether
4  there are any other multi-family units that Accurate
5  has been involved in construction of, other than what
6  you've discussed with him?  Is that --
7          MR. SEAMAN:  Yes.
8          THE WITNESS:  That we've built?
9          MR. SEAMAN:  Yes?
10         THE WITNESS:  Yes.
11
12 BY MR. SEAMAN:
13     Q.    Are there any that you're still involved
14 in, in terms of the ownership and management of?
15     A.    I'm a little confused.
16     Q.    Okay.  What's confusing you about my
17 question?
18     A.    I don't understand what you're asking
19 me.  Are there things that are not on the website
20 that I'm involved in?  Are there things that I'm an
21 investor in?  Are there -- like, I don't understand
22 your question.
23     Q.    Okay.  Are there -- let me ask it this
24 way then:  Are there other projects that you have an
25 interest in involving mixed use -- no, let me ask a

Page 30

1 better question.
2        MR. FIORENZO:  Is this Accurate when you
3 say "you" now?  Object to the form.  Are you asking
4 about Accurate's involvement in these projects?
5        MR. SEAMAN:  Okay.  Fair enough, Joe.
6 Fair enough, Joe.  Yeah.  Yeah.  I'm using "you" in
7 the vocative sense, not the nominative sense in terms
8 of "you" as Accurate Builders.  And I apologize if
9 that was in any way confusing.
10
11 BY MR. SEAMAN:
12    Q.    So are there any other projects that
13 Accurate Builders has been involved in the
14 development of that include affordable housing rental
15 units, besides the ones we've talked about?
16    A.    I don't recall right now.
17    Q.    Have you ever reviewed the First Amended
18 Complaint that was filed by your attorneys in this
19 action?
20    A.    Have I ever reviewed -- I didn't hear
21 you.
22    Q.    Have you ever reviewed -- I apologize.
23 I'll re-ask it.
24        Have you ever reviewed the First Amended
25 Complaint that was filed by your attorneys in the

Page 31

1 lawsuit in this action in federal court in Newark?
2    A.    Yes, I have.
3    Q.    When was the last time you reviewed it?
4    A.    I don't remember.
5    Q.    Do you know if you reviewed it before or
6 after it was filed?
7    A.    I don't remember either.
8
9        (Whereupon, Exhibit FD-1 was marked for
10 identification.)
11
12 BY MR. SEAMAN:
13    Q.    Mr. Klugmann, I've given you a document
14 that I've marked as FD-1 for identification.  It's
15 the filed First Amended Complaint in the federal
16 court action.  Please take as much time as you need
17 to review it and let me know when you're ready to
18 answer some questions.
19    A.    Let's go through it.
20        MR. FIORENZO:  Take a minute just to
21 skim through it.
22        THE WITNESS:  You sure?
23        MR. FIORENZO:  Yeah.
24        THE WITNESS:  It's a lot of papers.
25        MR. FIORENZO:  It's all right.

Page 32

1        Okay, he's reviewed it.
2
3 BY MR. SEAMAN:
4    Q.    Mr. Klugmann, before I start asking you
5 about the complaint, obviously, Danielle DiPaola is
6 one of the defendants in this case.  When did you
7 first meet Mayor DiPaola?
8    A.    The end of 2018.
9    Q.    And what was the -- what were the
10 circumstances of you meeting her at the end of 2018?
11    A.    I was coming in to be the redeveloper.
12    Q.    So where did you meet Mayor DiPaola?
13    A.    Emerson town hall.
14    Q.    And given the time frame, she was not
15 yet mayor.  Is that correct?
16        MR. FIORENZO:  You mean when he first
17 met her, you're talking about?
18        MR. SEAMAN:  Yes.
19        THE WITNESS:  She was mayor-elect.
20
21 BY MR. SEAMAN:
22    Q.    When you say you were coming in to be
23 the redeveloper, I imagine that you're speaking about
24 the entity Emerson Redevelopers Urban Renewal LLC.
25 Is that fair to say?

Page 33

1    A.    Yes.
2    Q.    Okay.  And where did you -- was this a
3 public meeting or something of that nature that you
4 met Mayor DiPaola for the first time?
5    A.    Yeah.
6    Q.    Do you know what public body was
7 meeting?
8    A.    I don't remember which one it was.
9    Q.    Did you have any one-on-one interaction
10 with Mayor DiPaola at that time?
11    A.    Not that I recall.
12    Q.    You indicated that when you met Mayor
13 DiPaola she was mayor-elect, so the election had
14 already taken place.  Is that fair to say?
15    A.    Yes.
16    Q.    Did you follow the municipal election in
17 Emerson in any way?
18    A.    Not even a little bit.
19    Q.    Did you receive any flyers?
20    A.    No.
21    Q.    Didn't see any campaign information
22 anywhere?
23    A.    That I have no idea if I saw.
24    Q.    You don't have any recollection of
25 seeing any campaign information.  Is that fair to

9 (Pages 30 - 33)

Page 34

1  say?
2      A.    That's fair to say.
3      Q.    Did you speak to any of the citizens of
4  Emerson about that election and what they were --
5  what the issues were?
6      A.    No.
7      Q.    Do you recall if there were any votes
8  taken after the public meeting when you first met
9  Mayor DiPaola?
10     A.    I don't recall.
11     Q.    Do you recall Mayor DiPaola making any
12  statements from the dais during that meeting?
13     A.    I don't remember.  I don't recall.
14     Q.    Have you, at any time, received any
15  e-mail communications from Mayor DiPaola?
16     A.    I don't recall.
17     Q.    Have you received any text
18  communications from Mayor DiPaola?
19     A.    I want to say yes, but it's been so long
20  that I don't remember.  So I don't remember.
21     Q.    Any of those text communications from
22  Mayor DiPaola, did she ever convey anything that you
23  took to be inappropriate comments of a -- about
24  anyone's racial background?
25         MR. FIORENZO:  Objection.  Form.  Lack

Page 35

1  of foundation.  He said "I'd like to think I did",
2  but he did not say he did receive a text message.
3  There's no foundation that there was such a text
4  message.  You can answer it subject to that
5  objection, if you're able to.
6         THE WITNESS:  Can you repeat the
7  question, again?
8         MR. SEAMAN:  Can you read the question
9  back?
10
11         (Whereupon, the requested portion of the
12  record was read by the reporter.)
13
14         THE WITNESS:  I don't remember the text
15  message from DiPaola, so I can't answer the question.
16  I don't remember if I got a text message, if I texted
17  her, so I can't answer the question if I have text
18  messages from her that she said something about
19  racial background.
20
21  BY MR. SEAMAN:
22     Q.    Have you ever heard Mayor DiPaola make a
23  comment that you interpreted as inappropriate in
24  terms of someone's racial background?
25     A.    Can I talk to counsel?

Page 36

1         MR. FIORENZO:  No, no, hold on.  Object
2  to the form.  Are you asking about verbal statements
3  now?
4         MR. SEAMAN:  Yes.
5         MR. FIORENZO:  Okay.  Go ahead.  You can
6  answer, if you're able to answer it.
7         THE WITNESS:  Can I talk to you?  Can we
8  go off the record for a minute?  May I talk with --
9         MR. SEAMAN:  No, I have a question
10  pending.  I asked you a question.
11         MR. FIORENZO:  We're not going to do it
12  unless you guys say it's in consent.
13         MR. SEAMAN:  Yeah.
14         MR. FIORENZO:  He's asked if he wants to
15  confer with me.
16         MR. SEAMAN:  Would it have anything to
17  do with -- you're allowed to confer with Mr. Fiorenzo
18  if it relates to some sort of privilege or things of
19  that nature.
20         THE WITNESS:  That's what it is.  It is
21  conversations that we've had and I need to clarify
22  it.
23         MR. SEAMAN:  I'll ask you a few
24  questions before I consent to you conferring.  Hold
25  on.

Page 37

1         THE WITNESS:  Okay.
2
3  BY MR. SEAMAN:
4      Q.    Let me get some foundation here first.
5  How many times have you had face-to-face verbal
6  communications with Mayor DiPaola since meeting her?
7      A.    I don't know.
8      Q.    Can you estimate?
9      A.    No.
10     Q.    I'm trying to understand what about my
11  question implicates any sort of privilege.  Let me
12  make it very clear to you.  I'm not asking you to
13  convey to me anything that was told to you by
14  Mr. Fiorenzo or any other attorney with his firm or
15  any information that he gave you.  I'm asking for
16  your personal observations of Mayor DiPaola's
17  conduct, so I don't understand how that would impact
18  a privilege.  So I don't understand why you would
19  need to confer with your attorney?
20         MR. FIORENZO:  Well, why don't you ask
21  the question again so we can better understand and
22  then we'll value whether it has any such implication.
23
24  BY MR. SEAMAN:
25     Q.    In any of your direct interaction with

10 (Pages 34 - 37)

EXHIBIT Q

Page 38

1 Mayor DiPaola, either in person or perhaps over a
2 telephone or anything of that nature, can you point
3 to any statements that she has made that you took to
4 be racially inappropriate?
5        MR. FIORENZO: I'm going to object to
6 the form of the question in that the use of the term
7 "racially inappropriate" is vague and ambiguous. I
8 don't know what you mean by that. If you're able to
9 answer it subject to the objection, you may.
10       THE WITNESS: I can't answer it because
11 of needing to talk to you.
12       MR. FIORENZO: The witness has indicated
13 he needed --
14       THE WITNESS: I'd be happy to talk to
15 him and come back with a decision on that.
16       MR. SEAMAN: Well, I'm going to ask you
17 a couple more questions.
18       THE WITNESS: I'll try to be helpful.
19       MR. SEAMAN: I'll ask you -- I'm going
20 to ask you a few more questions.
21
22 BY MR. SEAMAN:
23    Q.    During any of your interactions with
24 Mayor DiPaola, either face-to-face or over telephone
25 or anything of that nature, had she made any comments

Page 39

1 to you that refer or relate to a person's racial
2 background?
3    A.    Yes.
4    Q.    How many times did she make comments to
5 you that refer or relate to a person's racial
6 background?
7    A.    I don't remember.
8    Q.    And what do you recall her saying to you
9 that related to a person's racial background?
10   A.    That comes back to me needing to talk to
11 Mr. Fiorenzo as well.
12   Q.    Is that because it is something that is
13 from a communication between you and Mr. Fiorenzo?
14   A.    Yes.
15   Q.    Well, I'm not asking for any
16 communications between you and Mr. Fiorenzo, I want
17 to make that clear.
18       So outside -- let me ask you this: Was
19 anyone else present with you when Mayor DiPaola made
20 comments about someone's racial background?
21   A.    I'm sure, because I've never been there
22 alone. I just don't remember who.
23   Q.    Okay. Were any of your attorneys
24 present?
25   A.    That I don't -- I don't know. I don't

Page 40

1 recall.
2    Q.    What person or group of people was Mayor
3 DiPaola referring to in her comments about any racial
4 background?
5    A.    Orthodox Jews.
6    Q.    And what do you recall Mayor DiPaola
7 saying about Orthodox Jews?
8    A.    A couple things; first one being that
9 we're -- that there's going to be a kosher breast
10 milk storage facility here.
11   Q.    I'm going to give you an instruction
12 that I neglected to give you when I began. The court
13 reporter here may interrupt you from time-to-time and
14 ask you to repeat what you said. She is literally
15 asking you to try and rewind and repeat what you
16 said. She's not asking you to expand. She's not
17 interested in asking you a better question than I
18 asked you, which she most likely could do. But she
19 is interested in getting what you said clearly on the
20 record, which helps us all. So if she does that,
21 just please try and repeat what you said the last
22 time.
23   A.    Understood.
24       MR. FIORENZO: Which I believe he just
25 did, at least on the one comment.

Page 41

1        MR. SEAMAN: Yes.
2
3 BY MR. SEAMAN:
4    Q.    So I understand there was some comment
5 about a kosher breast milk facility in the Emerson
6 project. Is that correct?
7    A.    Yeah. Yes.
8    Q.    And can you -- when did this comment
9 take place?
10   A.    I don't remember.
11   Q.    Was it before or after the federal
12 lawsuit was filed?
13   A.    Definitely before.
14   Q.    Was it before or after Mayor DiPaola was
15 installed as the mayor of Emerson?
16   A.    After.
17   Q.    Where did that -- where was she when
18 that comment was made?
19   A.    The Borough Hall.
20   Q.    And do you recall anyone else being
21 present when that comment was made?
22   A.    I don't remember.
23   Q.    And do you recall precisely what Mayor
24 DiPaola said at that time?
25       MR. FIORENZO: You mean other than what

11 (Pages 38 - 41)

Page 42

1  he's already testified to?
2       MR. SEAMAN:  Yes.
3       THE WITNESS:  No.
4
5  BY MR. SEAMAN:
6    Q.   Okay.  Was that comment made to you or
7  to someone else that was present at the time?
8    A.   Just to me.
9    Q.   Okay.  And was it a question to you
10 about whether the project would have a kosher breast
11 milk facility?
12   A.   They wanted to know who -- she wanted to
13 know who the tenants are going to be here in the
14 redevelopment.
15   Q.   So this comment related to the tenants
16 who would be occupying the retail commercial spaces
17 in the project.  Is that correct?
18   A.   Yes.
19   Q.   This comment did not have to do with the
20 tenants in any of the residential units?
21   A.   This particular comment, no.
22   Q.   Were you offended by her comment?
23   A.   Of course.
24   Q.   Did you express to Mayor DiPaola that
25 you were offended by her comment?

Page 43

1    A.   I don't remember what I did.
2    Q.   Okay.  Aside from that instance, are
3  there any other times that Mayor DiPaola made any
4  comments, in your presence, about any other person's
5  racial or ethnic background?
6    A.   In my presence?  I don't recall.
7    Q.   Did Mayor DiPaola ever make any
8  comments, in your presence, that related to the
9  racial or ethnic background of potential tenants in
10 the affordable housing units of the Emerson
11 development?
12   A.   I don't -- I don't remember.
13   Q.   Have you ever seen any written
14 communications of any sort, be it letters, texts,
15 e-mails, written statements attributed to the mayor
16 in the media, anything of that nature, that related
17 to the racial or ethnic background of the potential
18 tenants in the affordable units of the Emerson
19 development?
20       MR. FIORENZO:  I want an objection to
21 the form.  When you use the term "racial or ethnic
22 background", that is vague and ambiguous.  So I'll
23 note that objection.  You can answer if you're able,
24 subject to that objection.
25       THE WITNESS:  If you can -- if she can

Page 44

1  -- can you repeat the question?  Thank you.
2
3       (Whereupon, the requested portion of the
4  record was read by the reporter.)
5
6       THE WITNESS:  Yes.
7
8  BY MR. SEAMAN:
9    Q.   I just want to do this real quick.  What
10 have you seen?
11   A.   I've seen how her comments of "we don't
12 want the" -- I'm being clear I don't remember the
13 word she used.  I don't remember if it was Hasidics
14 or the Orthodox, which one it was, "to come in and
15 take over our town."
16   Q.   And, again, was this a verbal statement
17 from her or a written communication of some form?  Is
18 that what you're referring to?
19   A.   Yeah, I don't have any text messaging.
20 It was a verbal statement.
21   Q.   And do you recall where you saw that?
22   A.   No.
23   Q.   And whether it was Orthodox or Hasidic,
24 it related to people with a Jewish background taking
25 over the town, in terms -- that's a terrible

Page 45

1  question.  I'm going to ask a different one.
2       Did -- to your understanding, did that
3  comment have anything to do with the potential
4  tenants in affordable housing units in the Emerson
5  development?
6    A.   The answer is yes.  It's not just
7  affordable.  It's the entire project because she
8  knows that I'm an Orthodox Jew and that's what she's
9  trying to use as her propaganda.
10       MR. SEAMAN:  You want to take a break
11 now?
12       MR. FIORENZO:  Yeah, he's got to make
13 that call.  It's 11 o'clock.
14
15       (Whereupon, a brief recess was taken off
16 the record.)
17
18 BY MR. SEAMAN:
19   Q.   Mr. Klugmann, how is Mayor Dipaola using
20 your background as an Orthodox Jew as propaganda?
21   A.   So she ran on antidevelopment,
22 antidevelopment being specific to this site.
23   Q.   How do you know that she ran on
24 antidevelopment?
25   A.   A smart man told me the words "Google".

12 (Pages 42 - 45)

EXHIBIT Q

Page 46

1  Q.   So you Googled information on Mayor
2 Dipaola and looked at the results of the Google
3 search?
4  A.   Yeah.
5  Q.   What specific search terms did you put
6 into Google?
7  A.   I don't know.
8  Q.   When did you perform this Google search?
9  A.   2018, 2019.
10  Q.   Did you -- I'll ask that a little
11 different.
12      How many search results did you look at
13 from that Google search?
14  A.   I don't recall.
15  Q.   Did you keep copies of any of the web
16 pages that you were directed to as a result of that
17 Google search?
18  A.   Yes.
19  Q.   Which -- what pages did you keep copies
20 of as a result of that Google search?
21  A.   I don't remember right now while I'm
22 sitting here.
23  Q.   Do you still have those copies?
24  A.   That's a good question.  I don't know.
25 But I believe some of it is in my either affidavit or

Page 47

1 lawsuit.
2      MR. FIORENZO:  Yeah, we produced --
3      THE WITNESS:  I believe a lot of it is
4 in here.
5      MR. SEAMAN:  Okay.  Well, my request is
6 going to be Joe, to the extent that any of those have
7 not been produced, I would like you to produce them.
8
9      MR. FIORENZO:  Sure, if they haven't
10 been, but I believe they have.
11      MR. SEAMAN:  Fair enough.
12      MR. FIORENZO:  By the way, before we go
13 back, let's -- just to briefly address, you guys had
14 asked whether there was any authority for the
15 proposition that more than one attorney couldn't
16 examine on behalf of the same client.  So Steve, you
17 want to just give them.
18      MR. KLEIN:  So generally, in courts in
19 the third circuit, there's a rule that, according
20 from this case which is a 1999 decision of the
21 Eastern District of Pennsylvania In Re Diet Drugs
22 Product Liability litigation; it's a February 10th,
23 1999 decision.  At Page 15, it talks about how:
24 "Generally, unless there is notice and prior
25 agreement, no more than one attorney for each

Page 48

1 defendant separately represented shall have the right
2 to pose questions to the witness and make objections
3 in connection with each such noticed deposition."
4      MR. BOTTA:  So you would agree that
5 there's no court rule about it.  Right?
6      MR. KLEIN:  The Federal Rules of Civil
7 Procedure do not expressly state that multiple
8 attorneys can or cannot take questions of a witness.
9 However, the practice in this jurisdiction, as
10 reflected in this court case, is that when there's
11 one deponent and multiple parties or multiple
12 attorneys are representing a single witness or a
13 single party in that litigation, they can't both
14 question the witness, as reflected in this case.
15      MR. FIORENZO:  That's our position.
16      MR. BOTTA:  That's your position.
17      MR. SEAMAN:  Well, first of all -- first
18 of all, do you have the full citation to that?
19      MR. KLEIN:  Sure.  1999 U.S. Dist LEXIS
20 1797.
21      MR. SEAMAN:  Okay.  And that's out of
22 the Eastern District of Pennsylvania?
23      MR. KLEIN:  Correct.
24      MR. SEAMAN:  Okay.  So you don't have
25 any cases from the District of New Jersey?

Page 49

1      MR. KLEIN:  Those are the only ones that
2 have addressed it.  And those courts that have
3 addressed it had said if you have multiple attorneys
4 representing a single party, one gets to question the
5 witness.
6      MR. SEAMAN:  Okay.  I'm just clarifying.
7 You haven't cited a case yet from the District of New
8 Jersey.
9      MR. FIORENZO:  No, nor do we have to.
10 You can do your own research on it.  You asked for
11 some authority.  In the short period of time we've
12 been here, we've taken a quick look and given you
13 some.  There may be more.
14      MR. SEAMAN:  Okay.  Well -- okay.  I'm
15 just -- you found an unreported case from the Eastern
16 District of Pennsylvania.  Thank you.
17      MR. FIORENZO:  Yeah.  Yeah.  Yeah.
18      MR. SEAMAN:  Okay.  We'll take your
19 position under advisement.
20      MR. FIORENZO:  Okay.  And I want to
21 raise it early so you guys can plan accordingly.
22      MR. SEAMAN:  Okay.  Can you read the
23 last question and answer now?  I'm sorry.
24
25      (Whereupon, the requested portion of the

13 (Pages 46 - 49)

Page 50

1 record was read by the reporter.)
2
3 BY MR. SEAMAN:
4    Q.    In any of those Google search results,
5 did you find any specific comments by Mayor Dipaola
6 about Orthodox Jews or Hasidic Jews?
7    A.    I don't remember.
8    Q.    Do you have the FD-1 in front of you?
9    A.    Yeah.
10    Q.    Okay.  Looking at the Page 4,
11 Paragraph 10 of FD-1, that paragraph says:  "After
12 all these carefully -- agreements approved by the
13 Court and Special Master were swept away with the
14 November 28th Emerson elections that brought into
15 power defendant DiPaola and her slate of candidates,
16 who ran on a platform of stopping the project as
17 approved by the Court, Special Master plaintiff and
18 Emerson through the previous administration."
19        Did I read that correctly?
20    A.    Yeah.
21    Q.    What facts are you aware of that Mayor
22 Dipaola and her slate of candidates ran a platform of
23 stopping the project as approved by the Court?
24    A.    I think I answered that.  It's in --
25 it's in all of our documents and the affidavit, I

Page 51

1 think; in this lawsuit, it's in here.
2        MR. FIORENZO:  I'm sorry.  When you
3 refer to "an affidavit," what are you -- just so the
4 record's clear, what are you referring to?
5        MR. SEAMAN:  Yeah, I was going to get to
6 it.
7
8 BY MR. SEAMAN:
9    Q.    You mentioned an affidavit a couple of
10 times.  You haven't -- let's just --
11        MR. FIORENZO:  Do you mean your
12 certification?
13        THE WITNESS:  Yes, that's what I meant,
14 sorry.  Thank you.  I'm not so good at this.
15        MR. SEAMAN:  Okay.  I'm not -- Joe, you
16 can correct me if I'm wrong, but there are no
17 affidavits or certifications or declarations filed by
18 your client in this case in the federal action.
19        MR. FIORENZO:  No.  I could stand
20 corrected on that by Steve, but there are a number of
21 them in the state proceedings.  I think what he says
22 refers to his certification by reference; he's
23 referring to those, which, I think, detail in some
24 measure the extent of the communications on this
25 topic.

Page 52

1        MR. KLEIN:  Just to be clear, it's in
2 the underlying Mount Laurel action.  The 6300-15
3 action.
4        MR. FIORENZO:  Right.  Right.  Yeah, I
5 should be clear.  There are two state court
6 proceedings, as you know, the Mount Laurel action and
7 then there's a separate action that's brought by
8 Emerson against Accurate.  So in the Mount Laurel
9 action, there are a number of certifications.  I
10 think that's what Mr. Klugmann was referring to.
11
12 BY MR. SEAMAN:
13    Q.    Mr. Klugmann, you've heard your counsel
14 kind of describe the different landscape of
15 litigation here and where you may or may not have
16 provided sworn statements to the court.  Is that your
17 understanding of what you were referring to as well
18 is certifications or affidavits that may have been
19 provided in the context of some of the state court
20 litigation related to this project?
21    A.    What do you mean?
22    Q.    I'm just trying to understand what you
23 were referring to --
24        MR. FIORENZO:  He's asking when you
25 talked about the affidavit, were you referring to the

Page 53

1 certifications that you signed in the state court
2 action?
3        THE WITNESS:  Yes.  Yes.  Yes.
4        MR. FIORENZO:  Okay.
5
6 BY MR. SEAMAN:
7    Q.    Well, as you sit here today, can you
8 describe for me what your understanding of Mayor
9 Dipaola and her slate of candidates' platform was to
10 stop the project as approved?
11    A.    She ran on antidevelopment; that's how
12 she won.  She brought in or she had other people run
13 to come and be on the counsel with her.  And her
14 antidevelopment, which is everywhere, and everything
15 she has to say about it was something that she's not
16 shy about.  She doesn't like this project.  She
17 didn't want this project and she wishes it was never
18 here, even until today.
19    Q.    All right.  I direct you to Paragraph 12
20 of the First Amended Complaint.  That paragraph
21 reads:  "The ultimate goal of this course of action
22 is to prevent racially diverse minorities from moving
23 into Emerson, which defendants connect to Mount
24 Laurel low income housing."
25        Do you see that?

14 (Pages 50 - 53)

EXHIBIT Q

Page 54

1    A.   Yes.
2    Q.   Did I read that correctly?
3    A.   Yes, you did.
4    Q.   Okay.  So what facts are you aware of
5    that demonstrate that it was the ultimate goal of
6    Mayor Dipaola to prevent racially diverse minorities
7    from moving into Emerson?
8    A.   Yeah.  There's 29 affordable units here
9    on this project.  She wants to shut this project
10   down, which includes 29 affordable units.  We have
11   been able to move forward on 145 units, which has 22
12   affordable units -- move forward with the
13   construction of the 145 units in spite of her, due to
14   the good work of my attorneys and the court, who have
15   since put in place a court order monitor, Judge
16   Carroll, who, without him, we'd be nowhere; who The
17   Borough of Emerson is paying for, 100 percent of.  So
18   what she did is she tried to make the situation where
19   that will never happen.  Those affordable units will
20   never come into town, which is minorities and people
21   of lesser income.  And that's what she tried to stop.
22   That's what she's trying to stop still.
23   Q.   How do you know that minorities are
24   the -- well, before, I guess, you used the term
25   "minorities"; what does that mean to you?

Page 55

1    A.   She doesn't want the Jews there.
2    Q.   So when you used the phrase "minorities"
3    before, that was Jewish people?
4    A.   Part of it.
5    Q.   Any other groups fit within the
6    definition of minorities as you're using it?
7    A.   Anybody that's going to fit under the --
8    whoever is able to get affordable units.
9    Q.   Have you made any determination -- let
10   me ask it this way.
11        Are you aware of the racial background
12   of individuals who qualify for affordable units in
13   Bergen County?
14        MR. FIORENZO:  Generally, you're
15   referring to?
16        MR. SEAMAN:  Yes.
17        THE WITNESS:  No.
18
19   BY MR. SEAMAN:
20   Q.   Are you aware of the racial background
21   of any of the individuals who will potentially
22   qualify for affordable units in the Emerson project?
23        MR. FIORENZO:  You mean the project
24   that's not yet complete?
25        MR. SEAMAN:  Yes.

Page 56

1         THE WITNESS:  No.
2
3    BY MR. SEAMAN:
4    Q.   What facts are you aware of that
5    specifically connect Mayor DiPaola's proposition to
6    redevelopment?
7         MR. FIORENZO:  I'm going to object to
8    the form and that calls for a legal conclusion.  You
9    used the word "connect".  You're asking for him to
10   give opinions on causation.  I think that's improper.
11        MR. SEAMAN:  I'm not asking him for his
12   opinions on the causation.
13        MR. FIORENZO:  It sounded that way to
14   me.  I objected to form.  I didn't instruct him not
15   to answer.
16        MR. SEAMAN:  I didn't even finish my
17   question, Joe.
18        MR. FIORENZO:  Oh, I thought you did.
19        MR. SEAMAN:  No, I hadn't, so.
20        MR. FIORENZO:  Okay.  When you paused, I
21   thought you were done.
22        MR. SEAMAN:  I was not done.
23        MR. FIORENZO:  Okay.  Then why don't you
24   complete it and then I'll make my objection.
25

Page 57

1    BY MR. SEAMAN:
2    Q.   What facts are you aware of that support
3    the statement that the ultimate goal of Mayor
4    DiPaola's course of action is to prevent racially
5    diverse minorities from moving into Emerson?
6    A.   Her antidevelopment propaganda.
7    Q.   And that antidevelopment propaganda, are
8    there any instances you're aware of where any of that
9    propaganda references racial diversity?
10        MR. FIORENZO:  Objection to the form.
11   You may answer.
12        THE WITNESS:  Well, it comes back to the
13   fact that I know that she doesn't want Orthodox Jews
14   coming into her town, so when you put that together.
15
16   BY MR. SEAMAN:
17   Q.   And please start at the beginning and go
18   to the end, and tell me everything that you're aware
19   of that Mayor Dipaola has done that shows that she
20   doesn't want Orthodox Jews coming into The Borough of
21   Emerson?
22   A.   The first thing is she fought the
23   development, which includes fighting off the Mount
24   Laurel lawsuit, which is in place, which is part of
25   the settlement which allows for different, diverse

15 (Pages 54 - 57)

EXHIBIT Q

Page 58

1  type of people to come in here. That's the first
2  thing.
3          The second thing is, is the comments
4  that have been made, which I've expressed before, of
5  how she does not want this to become a town filled
6  with Orthodox Jews to come take over her town.
7      Q.    You've told me about the one comment
8  about a kosher breastfeeding facility. What other
9  comments are you aware of that Mayor Dipaola has made
10 that she doesn't want Orthodox Jews taking over the
11 town?
12     A.    When she ran the second term, she went
13 around to people's houses telling them this.
14     Q.    How are you aware that Mayor Dipaola
15 went around campaigning for a second term and telling
16 people this?
17     A.    Some of it, I can't say. And some of it
18 I can tell you that I got phone calls from local
19 people.
20     Q.    Why can't you say? Is there some sort
21 of privilege attached to it?
22     A.    Yes.
23     Q.    Is that some -- are you -- would that
24 delve into communications with your lawyer?
25         MR. FIORENZO: There are certain

Page 59

1  questions that we've had with him where we shared
2  information. I think that's what he's referring to.
3         THE WITNESS: Yes.
4
5  BY MR. SEAMAN:
6      Q.    Okay. All right. Aside from anything
7  that you would have learned from your lawyer, can you
8  please identify for me the basis for your
9  understanding that Mayor Dipaola campaigned for a
10 second term -- let me finish the question --
11 campaigned for a second term with intentions to keep
12 Orthodox Jews from taking over the town?
13     A.    Yeah. Yeah. But if I can, I'd like to
14 back it up a second. And that is that when she
15 became mayor, to me, I've done this in many
16 municipalities. It was a normal course of action for
17 me to have communication with the attorney -- with
18 the town, borough, city mayor, which is why I told
19 you before it could be there's text messages. I just
20 don't remember.
21         We sat down a few months after she
22 became mayor to have a meeting. She made it very
23 clear after she stopped picking up my phone calls or
24 text messages that nothing should be -- nothing
25 should come through -- I shouldn't call her anymore.

Page 60

1  Everything has to go through attorneys. There's no
2  lawsuits. There's no nothing. Then she started
3  firing everybody that worked in The Borough. And so
4  it took -- it didn't happen overnight, but one of
5  them was that they got rid of the existing borough
6  administrator or he left because he didn't like her.
7  I have no idea what it was, but either way, she then
8  brought in a new borough administrator who is a
9  notorious antisemitic. He was the borough
10 administrator in, I believe, it's Ramapo. His name
11 is Rob Hermansen. He got fired from there because
12 Ramapo had a massive lawsuit about an eruv. An eruv
13 is the string that allows --
14     Q.    I'm aware of what an eruv is.
15     A.    Yes.
16         MR. FIORENZO: Well, you can finish your
17 answer.
18         THE WITNESS: An eruv is basically
19 creating an area that allows us Orthodox Jews to
20 carry inside as opposed to walking on the streets on
21 the Sabbath and carrying stuff. I'm sure you can
22 Google it and see the history of everything that he
23 has done over there. So that was all part of the --
24 together with the history that she had of
25 antidevelopment and bringing in such type of people,

Page 61

1  together with the attorney that she brought in, John
2  McCann, who -- I'll put it as not a good person with
3  all of the stories and stuff online that get posted
4  by The Borough or by her on her Facebook page, and
5  then the comments that would be posted to her
6  Facebook page, to her post that she would put in
7  there about the development all led to the fact of
8  not only do we know that she doesn't want this
9  development, she doesn't want me, Jack Klugmann, in
10 her town. And me, Jack Klugmann, being an Orthodox
11 Jew; and that's how she promoted her propaganda. And
12 it continued. It continued until she had to go redo
13 her -- to go where she ran for re-election. I don't
14 know if I answered your question or not.
15     Q.    Well, I don't know -- do you feel you've
16 answered my question completely?
17     A.    I hope so.
18     Q.    Okay.
19         MR. SEAMAN: I'm going to ask the
20 reporter just to read the question back and then I'm
21 going to ask you again to make sure that you've
22 answered the question completely. Because I want
23 your complete answer.
24         THE WITNESS: Yeah.
25

16 (Pages 58 - 61)

Page 62

1    (Whereupon, the requested portion of the
2    record was read by the reporter.)
3
4    THE WITNESS: Yes, I answered it.
5
6    BY MR. SEAMAN:
7    Q.    Who is the previous borough
8    administrator?
9    A.    I forgot his name.
10    Q.    Do you know when he was fired?
11    A.    No.
12    Q.    Do you know when Mr. Hermansen was hired
13    as borough administrator?
14    A.    Estimate 2019.
15    Q.    Are there any other borough employees,
16    besides the previous borough administrator, that
17    you're aware of -- and you said she fired borough
18    employees. You mentioned the borough administrator.
19    Any other borough employees that you indicate were
20    fired by Mayor Dipaola because of her opposition to
21    your project?
22    A.    The attorney, their redevelopment
23    attorney, and their engineer, and I think their
24    planner.
25    Q.    And when you say these individuals were

Page 63

1    fired, do you know if they were actually --
2    withdrawn.
3    Have you been involved in interactions
4    with municipal governments when they've had a change
5    in control based on a political party?
6    A.    That's vague. I don't know -- I don't
7    know what you mean by that.
8    Q.    Okay. Have you ever been working with
9    any of the towns in terms of redevelopments or
10    project that you are engaged in where the political
11    party in control of the local government changed?
12    A.    Yes.
13    Q.    And in the instances where those
14    political parties changed, did you ever observe a
15    change in terms of the professionals who served the
16    municipality?
17    A.    No.
18    Q.    Can you identify, other than Emerson,
19    municipalities where you've been present and you've
20    observed a change in the control of a governing body?
21    A.    Raritan.
22    Q.    When did there -- when was there a
23    change in control of Raritan?
24    A.    Shortly after we started construction.
25    Q.    And what was the makeup of the governing

Page 64

1    body before that shift?
2    A.    Which party were they part of?
3    Q.    Yes.
4    A.    I don't know.
5    Q.    Which party took control?
6    A.    I don't know.
7    Q.    And when one party took control of the
8    other, they retained the same borough attorney?
9    A.    They did, yes.
10    Q.    They retained the same municipal
11    engineer?
12    A.    Yes.
13    Q.    And they retained the same planner?
14    A.    They did.
15    Q.    Any other instances where you've
16    observed towns with a change in control?
17    A.    Yeah, in Parsippany.
18    Q.    And when did the change in control in
19    Parsippany take place?
20    A.    Before I started construction.
21    Q.    And what was the shift between the
22    parties?
23    A.    I don't know.
24    Q.    And you observed them retain the same
25    attorney with that new control of the government?

Page 65

1    A.    I don't know.
2    Q.    Do you know if they retained the same
3    engineer?
4    A.    I don't.
5    Q.    Do you know if they retained the same
6    planner?
7    A.    I don't.
8    Q.    Did Raritan have a redevelopment
9    attorney at the time that there was a shift in
10    government?
11    A.    I don't remember. I don't remember.
12    Q.    Did Parsippany have a redevelopment
13    attorney?
14    A.    Yes.
15    Q.    Did they retain the same redevelopment
16    attorney?
17    A.    I don't remember because I got my
18    building permit.
19    Q.    You'd indicated previously that outside
20    of what you may have learned from your attorney, you
21    have heard that Mayor Dipaola made negative comments
22    about Orthodox or Hasidic Jewish people as part of
23    her re-election campaign. Do you recall that?
24    A.    Yes. Yes.
25    Q.    Who are the people who have told you

17 (Pages 62 - 65)

EXHIBIT Q

Page 66

1 that?
2    A.    I don't remember, but I could probably
3 find out.
4        MR. SEAMAN:  Well, I would ask you to
5 find out and we'll follow this up with a letter to
6 counsel, but I'm going to ask you to identify any
7 individuals who have provided that information to
8 you.
9        THE WITNESS:  Perfect.
10        MR. FIORENZO:  Send that and we'll
11 respond.
12        THE WITNESS:  Yes.
13
14 BY MR. SEAMAN:
15    Q.    And do you recall -- let me ask a little
16 bit about these people, if you know.  Are they
17 residents of Emerson?
18    A.    Yeah.
19    Q.    And do you generally recollect what they
20 told you they heard from Mayor Dipaola?
21    A.    The gist of it was how she doesn't want
22 it to turn into -- he's from Lakewood, he's an
23 Orthodox Jew, and she doesn't want it to turn into
24 Lakewood.
25        MR. FIORENZO:  Yeah, did you get that;

Page 67

1 he's from Lakewood, he's an Orthodox Jew, and we
2 don't want it to turn into Lakewood.
3        MR. BOTTA:  Make sure we get what he
4 said.
5        MR. SEAMAN:  We're going to get the
6 record.  That's all it is.
7
8        (Whereupon, the requested portion of the
9 record was read by the reporter.)
10
11        THE WITNESS:  No, let me add in the one
12 more thing.
13        MR. FIORENZO:  No, he also said he's an
14 Orthodox Jew.
15        THE WITNESS:  He's from Lakewood.  He's
16 an Orthodox Jew and we don't want it to turn into
17 that.
18
19 BY MR. SEAMAN:
20    Q.    Was it one person or more than one
21 person?
22    A.    More than one person.
23    Q.    Can you estimate the number of people
24 who told you words to that effect?
25    A.    I could.  I think it was three people,

Page 68

1 but I don't remember, because I don't remember which
2 ones told it to me offhand.
3    Q.    Did anyone, at any time, convey to you
4 statements by Mayor Dipaola about her opposition to
5 your project that referred or related to any minority
6 group other than Orthodox or Hasidic Jewish people?
7    A.    Well, I would include her negative
8 statements towards affordable housing.  I would
9 include that as a negative comment towards minorities
10 or -- yeah, so the answer is yes.
11    Q.    Okay.  So you equate any comments that
12 she made about affordable housing to minorities?
13    A.    Yes.
14    Q.    And why do you do that?
15    A.    Because that's what it is.
16    Q.    How do you -- what does the basis for
17 you saying that's what it is?
18    A.    It's people who are -- aren't making --
19 can you ask that question again?  Now I'm confused.
20        MR. SEAMAN:  Can you read the question
21 back please?
22
23        (Whereupon, the requested portion of the
24 record was read by the reporter.)
25

Page 69

1        THE WITNESS:  Oh, the one before that.
2
3        (Whereupon, the requested portion of the
4 record was read by the reporter.)
5
6        THE WITNESS:  Affordable housing is to
7 give housing to the people that can't afford the
8 regular -- the regular stuff, which is typically
9 people who make less money, people who just came into
10 the country and they just got work VISAs, and it's
11 all different types of people that come into the --
12 that can't get regular housing or can't afford
13 regular housing and that's what -- this is an
14 opportunity for them to have an affordable unit.
15    Q.    Have you seen any studies or empirical
16 data that indicate the percentage of minority groups
17 that occupy affordable housing in the State of New
18 Jersey?
19        MR. FIORENZO:  On a statewide basis?
20        MR. SEAMAN:  On a statewide basis for
21 now.
22        THE WITNESS:  No.
23
24 BY MR. SEAMAN:
25    Q.    Have you seen any data of that sort that

18 (Pages 66 - 69)

EXHIBIT Q

Page 70

1 identifies the makeup of affordable housing in Bergen
2 County?
3     A.    Yes.
4     Q.    And what empirical data have you seen on
5 that?
6     A.    I don't remember because it was back
7 when we were going for our approvals there, so I
8 don't remember.
9     Q.    In what context did you see that data?
10     A.    I wanted to understand what does it
11 meant to have 29 affordable units there and why was
12 the mayor so against it?
13     Q.    Can you describe for me what you -- what
14 you saw?
15     A.    I don't remember. I just remember that
16 there's a conception, I don't know if conception is
17 the right word, but there's a view out there that
18 people think that affordable units is Section 8
19 homes; and it's not. So I was reading up about
20 what's the difference, what does it mean there's
21 different levels of low or medium or different types
22 of income, and I was trying to understand what it is.
23     Q.    What is your understanding of Mayor
24 DiPaola's interpretation of affordable housing?
25           MR. FIORENZO: I'm going to object. How

Page 71

1 could he possibly know what Mayor DiPaola's
2 interpretation is unless he can view her mind and
3 then state what's in her mind? No one can do that.
4 It's not competent, I object to it. It's an improper
5 form of the question.
6           MR. SEAMAN: You can answer the
7 question.
8           THE WITNESS: I don't know. I know she
9 doesn't want affordable units.
10
11 BY MR. SEAMAN:
12     Q.    You know what?
13     A.    She doesn't want affordable units.
14     Q.    And how do you know she doesn't want
15 affordable units?
16     A.    Because she said it.
17     Q.    When did she say she didn't want
18 affordable units?
19     A.    When she said she doesn't want the
20 project.
21     Q.    When she said she doesn't want the
22 project, did she -- had she specifically mentioned
23 the affordable housing component of the project?
24     A.    Yeah, because there's another component
25 to this project of seven off-site units and she's

Page 72

1 fighting me about being able to build those without
2 trying to remedy the lawsuit which is in place, which
3 is actually a settlement, I should say, that's in
4 place for the Borough of Emerson. And if she really
5 cared about the people having affordable housing,
6 which most people do, and if she really understands,
7 you realize that they're good people. They just
8 can't afford certain units. Then you would try to
9 make sure -- you would do whatever you can. When
10 you're a leader of a municipality, you do whatever
11 you can to make sure that you can have affordable
12 units within reason. She's doing the -- she's having
13 the adverse effect in the sense that she doesn't want
14 it. She doesn't want affordable units here and the
15 history and the lawsuit and everything on Google
16 could back that up.
17     Q.    Are you aware of any other reason that
18 the Borough of Emerson objected to the seven off-site
19 units related to enforcement of the Borough zoning
20 laws or things of that nature?
21     A.    So I'm going to answer that question
22 with a little history here. The history is that
23 Mayor Dipaola has never done anything to help
24 anything with this project. Whenever she can find an
25 opportunity to do something to destroy it, she does

Page 73

1 it. So if she decides -- back to your question, and
2 all that stuff is in this complaint, the First
3 Amended Complaint and there's a lot of it, at least.
4 So when it comes to including to not wanting to give
5 me a fence permit, which is done for safety reasons,
6 including not giving us demo permits, and then
7 complaining that there's people living in the houses
8 when we asked for a demo permit so we could make the
9 properties safe and put up fences, she wouldn't do
10 it. And that's really her M-O because, instead of
11 just talking to me, she says everything had to go
12 through an attorney because she's just an
13 obstructionist. So if she found something that can
14 obstruct me trying to keep my word to the Borough of
15 Emerson, which is to build 145 units on one property
16 with 22 affordable and 7 off-site affordable, she
17 will do whatever she can, whether she has the right
18 to or not, to obstruct it, because that's what she's
19 doing.
20     Q.    Turning to Page 16 of the First Amended
21 Complaint and Paragraph 55. There are a number of
22 subparagraphs running across the following pages and
23 I want to direct your attention to those.
24     A.    Sure.
25     Q.    55A is captioned as "refusal to issue

19 (Pages 70 - 73)

Page 74

1  demolition permit". Do you see that?
2      A.   Yes.
3      Q.   What are you aware of that Mayor Dipaola
4  specifically did to result in the refusal to issue a
5  demolition permit?
6      A.   Everything goes through her. She runs
7  that Borough like a hawk, helicopter, whatever words
8  you want to use. She runs with an iron -- whatever
9  the word is.
10         MR. FIORENZO: Iron fist.
11         THE WITNESS: Iron fist, there you go.
12  But the hawk also. The hawk something --
13         MR. BOTTA: You were a mayor.
14         THE WITNESS: That's why I'm nervous
15  what I say in front of him about a mayor.
16         MR. SEAMAN: He was a mayor too.
17         THE WITNESS: Oh, really?
18         MR. FIORENZO: It's true.
19         THE WITNESS: Where was that? Where
20  were you? No pressure.
21         MR. BOTTA: I'm not being deposed.
22         MR. SEAMAN: Off the record.
23
24  BY MR. SEAMAN:
25      Q.   Are you aware of any -- let me ask you

Page 75

1  this way: Can you identify any specific actions,
2  that you're aware of, that Mayor Dipaola took that
3  resulted in the refusal to issue the demolition
4  permit as alleged in Paragraph 55A?
5      A.   Yes. We spoke to the building inspector
6  at the time and we asked him, "Where's our permits?"
7  And he told us, and I don't remember his name, and I
8  believe he's not there anymore, so if I find that
9  out -- he said that, "We were told to not issue you
10  permits here." And I said, "By who?" And he said,
11  "By the powers that be."
12      Q.   And did he tell you that he was told at
13  the time that Mayor Dipaola was the mayor?
14      A.   You want to know if he knew that Mayor
15  Dipaola?
16      Q.   I'm trying to set the time frame here.
17  I'm just trying to set the context here.
18      A.   She was definitely mayor then.
19      Q.   And you don't remember this individual's
20  name?
21      A.   No.
22      Q.   The next -- I'll just follow that up.
23  Other than that indication from the person whose name
24  you don't recall, are there any other specific acts
25  that you can point to that Mayor Dipaola was in with

Page 76

1  regard to refusal to issue a demolition permit as
2  alleged in Paragraph 55A?
3      A.   I don't remember offhand.
4      Q.   Looking at Paragraph 55B, the "refusal
5  to issue a fence permit". Can you identify what
6  specific acts you're aware of that Mayor Dipaola
7  undertook with regard to the refusal to issue that
8  fence permit?
9      A.   Yeah. We submitted to the -- we asked
10  for a -- if we could put up fences and we were told
11  no. We had to submit a zoning permit, which we did,
12  outlining with a color coded map of where -- exactly
13  where the fence was going to go. She said -- she
14  came out and said, I think even on record, but this
15  is a -- and I think that she's concerned about the
16  parking that's there for the existing stores or for
17  the commuters that are going to ride the trains and
18  which really was -- I'm going to jump to, if I may,
19  something which is not in here, but I'm going to talk
20  about how I know that she was involved with it. When
21  we took over, there was a tenant here called Cork &
22  Keg Liquor Store. She went ahead and -- we -- it was
23  -- they were a tenant on the property that we settled
24  with the owners to buy as part of us buying the
25  property. She worked with the tenant to make sure

Page 77

1  that they wouldn't move and to prolong me from doing
2  this development in order to try to, in my opinion,
3  bankrupt the project. And you may ask how do I know
4  this? Because I drove by the property and I saw her
5  there one day talking to the owners. We have e-mails
6  where the Borough is asking the state for questions
7  about how it works and what can be done. So, again,
8  she wanted to make sure that the stores could be
9  operating and she didn't care about the safety of the
10  site and that's why she held up the issue, made sure
11  that the fence permit was not issued. This is not a
12  counsel issue. It's not a mayor conversation even.
13  It should never be a mayor conversation. And I say
14  this in respect to the two mayors sitting here, this
15  is a zoning officer who goes by the law, the code,
16  and she got her nose -- and like everything else, she
17  stuck her nose into it.
18      Q.   All right. You mentioned the Cork & Keg
19  there. So when you observed Mayor Dipaola at the
20  Cork & Keg, were you able to hear what she was
21  saying?
22      A.   No.
23      Q.   Do you have any -- do you have any basis
24  to tell me what she was saying that time you observed
25  her at the Cork & Keg?

20 (Pages 74 - 77)

Page 78

1    A.    Yes.  Yes, because she said it on record
2    as well many times at the council meetings.  She
3    said, "These are my very good friends and I need to
4    make sure they're being taken care of."  And when it
5    came to another tenant that was there, which is in
6    here, which is K and L, she never -- when one tenant
7    we had that -- to try to -- when you read K and L, it
8    really describes it.
9        MR. FIORENZO:  You're referring to
10   letters K and L on Page 18 of FD-1?
11        THE WITNESS:  Yes, on Page 18, yes.
12
13   BY MR. SEAMAN:
14   Q.    So that's really into a failure to
15   respond to a cease and desist letter and a failure to
16   proceed with condemnation of Caiqui Zheng,
17   C-A-I-Q-U-I Z-H-E-N-G; that's what you're referring
18   to?
19   A.    Yes.
20   Q.    What specific acts did you observe Mayor
21   Dipaola undertake with regard to item K, the failure
22   to respond to the cease and desist letter?
23   A.    Exactly that.  She failed -- they didn't
24   do anything.  They didn't -- they have an obligation
25   under the Redeveloper's Agreement to make sure this

Page 79

1    project gets built and this would -- this would
2    destroy that because it would go straight to summary
3    judgment.  And they never responded.  I had to step
4    in, at the time, and have an attorney respond to
5    that.  And eventually we won it, but it had nothing
6    to do with the Borough.
7    Q.    Again, I asked you for specific acts
8    from the mayor that you're aware of.  Did you see her
9    say something?  Did you hear her say something?  Did
10   you see her do something?  Did you read something she
11   put in some sort of directive?
12        MR. FIORENZO:  I'm sorry, it's unclear
13   to me.  What are we specifically referring to now?
14   Which of these?
15        MR. SEAMAN:  Item K, the cease and
16   desist letter.
17        MR. FIORENZO:  K?  Okay.  Well, K --
18   okay, the cease and desist.
19        THE WITNESS:  No, I have nothing, not
20   that I can recall.
21
22   BY MR. SEAMAN:
23   Q.    Okay.  And as to Item L, the failure to
24   proceed with the condemnation of the person who is --
25   what specific acts did you observe Mayor Dipaola

Page 80

1    undertake to initiate that action?
2    A.    She took no action.
3    Q.    And did you personally observe any
4    directives that she gave or see anything in writing
5    of any sort of directive from her of that nature?
6    A.    No, I'm just a businessman.  I run a
7    business.  If somebody in my company does something
8    wrong, it's my fault.  So when you're the mayor, I
9    assume it's the same.
10   Q.    Are you familiar with the phrase "a fish
11   stinks from the head down"?
12   A.    No, but I like that.
13   Q.    Other than the mayor's position as the
14   chief executive officer or the governor or whoever it
15   may be, what other actions can you tell me that
16   involve her doing any act or making any direction
17   that relates to any of the items in Paragraph 55A
18   through L?
19        MR. FIORENZO:  Okay.  I'm going to
20   object to that.  It's overly broad.  I thought we
21   were talking about the Zheng condemnation.  You're
22   asking about anything in the complaint?  I think
23   that's unduly broad.
24        MR. SEAMAN:  No.  No, Joe, I wasn't
25   asking about anything from the complaint.  I was

Page 81

1    asking about Paragraph 55.
2        MR. FIORENZO:  Paragraph 55.  Yeah,
3    well, Paragraph 55 goes on for, I don't know, three
4    pages.
5        MR. SEAMAN:  Okay.  I'll withdraw --
6    Joe, Joe, I'll withdraw the question.
7        MR. FIORENZO:  It has A through L.
8        MR. SEAMAN:  Joe, I'll withdraw the
9    question.  Okay?
10       MR. FIORENZO:  Yeah.  Good.
11
12   BY MR. SEAMAN:
13   Q.    Again, so we're going to look at
14   Paragraph B, the fence permit.  What specific actions
15   or directives on the part of Mayor Dipaola are you
16   aware of that relate to the refusal to issue a fence
17   permit?
18       MR. FIORENZO:  Please take a look at it
19   before you answer.  Okay?
20       THE WITNESS:  Yeah.  We originally had
21   an agreement from the zoning officer about putting a
22   fence up.  Then we were told we're not going to get
23   it.  It has -- it's going to be discussed by council.
24   If you can look back at the YouTube, which I believe
25   they have all these council meetings, you'll find

21 (Pages 78 - 81)

EXHIBIT Q

Page 82

1  that it was then brought up as a public conversation,
2  which then the mayor said that, "We want to make sure
3  it doesn't hurt the parking of the tenants that are
4  there."
5
6  BY MR. SEAMAN:
7      Q.   Any other specific actions by the mayor?
8      A.   Not that I recall.
9      Q.   Okay.  Looking at Item C, "demand of
10 inappropriate information from asbestos contractor",
11 what specific actions are you aware of that Mayor
12 Dipaola undertook to relate to that item?
13          MR. FIORENZO:  Again, please review and
14 give an answer.
15          THE WITNESS:  Again, we were told by
16 that inspector that I was telling you about that we
17 were going to get our permits.  And then we were told
18 that he was -- that he was told to get all this
19 information, even though he's never had to request
20 this before.
21
22 BY MR. SEAMAN:
23     Q.   And did he tell you who told him to do
24 that?
25     A.   He referenced the mayor.

Page 83

1      Q.   And, again, this is the building
2  inspector whose name you don't recall?
3      A.   I don't, that's correct.
4      Q.   What specific actions are you aware of
5  that Mayor Dipaola was involved in with regard to
6  Item D, "denial of permits for utility
7  disconnections"?
8          MR. FIORENZO:  Again, please take a look
9  at it and then answer.
10         THE WITNESS:  Yeah.  I don't recall
11 anything like that one.
12
13 BY MR. SEAMAN:
14     Q.   Looking at the next page, Item E, "more
15 delay of demolition permits" is how it's captioned.
16 What specific actions are you aware of that Mayor
17 Dipaola undertook in connection with the purported
18 more delay of demolition permits?  And take your time
19 to look at the bullet point before you provide an
20 answer.
21         MR. FIORENZO:  Please.
22         THE WITNESS:  Same thing, the building
23 inspector referencing that he was told to cause us
24 these issues.
25

Page 84

1  BY MR. SEAMAN:
2      Q.   Same building inspector you referred to
3  previously?
4      A.   Yes.
5      Q.   Was this -- you've mentioned the
6  building inspector now with regard to a couple of
7  different ones.  Was this one interaction with the
8  building inspector or more than one interaction?
9      A.   Multiple.
10     Q.   With respect to each of these bullet
11 points you had a separate action; is that your
12 recollection?
13     A.   I don't remember.
14     Q.   "Refused to issue sewer and water
15 cutting and capping permits".  What information are
16 you aware of with regards to Mayor DiPaola's
17 directive or involvement in that point?
18     A.   I can't recall.
19     Q.   "Sign off by fire and police", under
20 Item G.  What specific action or involvement by Mayor
21 Dipaola are you aware of that relate to that bullet
22 point?
23     A.   That she wanted to make sure that fire
24 and police were satisfied with this project.
25     Q.   How do you know that she wanted to make

Page 85

1  sure the fire and police?
2      A.   Because she told us this.
3      Q.   She told you, personally?
4      A.   By one of our meetings that we had,
5  yeah.
6      Q.   What did she tell you?
7      A.   Exactly that.  That she wants to make
8  sure that fire and police sign off.  And we said, at
9  the time, "Never heard of something so -- there's no
10 code for this.  It's not necessary."  We even went to
11 the fire or police, I don't remember which one it
12 was, and they said, "What do you want from us?  Where
13 do we sign?  There's no signing here.  We don't
14 sign."
15     Q.   What's -- moving on to -- stop.
16         Other than that conversation with Mayor
17 Dipaola seeking the sign off by fire and police, are
18 there any other actions that you're aware of that she
19 undertook related to that bullet point?
20     A.   Not that I recall.
21     Q.   "Delay in issuance of resolution
22 compliance".  What actions of Mayor Dipaola are you
23 aware of that relate to that point?
24         MR. FIORENZO:  Take a look at the bullet
25 point, please.  Please read it.

22 (Pages 82 - 85)

Page 86

1          THE WITNESS: I read that, yeah. So
2   there's a history to that in the sense that we were
3   pretty much through resolution compliance. And I
4   don't recall the dates. And then she fired that
5   engineer who reviewed the plans, and brought in a new
6   engineer, who made up a bunch of stuff, like,
7   basically started over again, which is part of our
8   damages of what we're looking for of all the work we
9   re-had to do because of all the, like I write in
10  here, previously imposed conditions which have no
11  basis and there was no reason for them, except for
12  doing what she does, which is to just delay this
13  project or try to make it not happen at all.
14      Q.   And who was the engineer who was
15  originally engaged?
16      A.   I don't remember.
17      Q.   And who is the new engineer?
18      A.   I think, this is a guess, (phonetic)
19  Neglia.
20      Q.   Again, I gave you an instruction before
21  about guesses and estimates and I just want to
22  understand.
23      A.   And I followed it.
24          MR. FIORENZO: I mean, it's all in the
25  documents. It's in the documents. Show him.

Page 87

1          MR. SEAMAN: I understand.
2          THE WITNESS: But I followed the
3   instruction, also.
4          MR. FIORENZO: No, I'm not, you know,
5   I'm just saying it's -- I can tell you who it is, if
6   you want.
7          MR. SEAMAN: No. I appreciate that.
8   I'm just trying to keep him with the guesses, is all.
9   It's not a consequential statement one way or the
10  other.
11         MR. FIORENZO: Agreed.
12
13  BY MR. SEAMAN:
14      Q.   What is your understanding of Mayor
15  DiPaola's involvement in the replacement of that
16  borough engineer?
17      A.   I have no doubt it was all her.
18      Q.   Well, what things can you point to that
19  were done or said by her or others that leads you to
20  have no doubt it was her?
21      A.   She wanted to get rid of anybody that
22  had to do with Lou Lamatina and help building and who
23  was the prior mayor. And she wanted to bring in the
24  people that she felt would make sure that everything
25  is done perfect, so that if it's not done perfect,

Page 88

1   she can stop the project.
2       Q.   With regard to bullet point I, "refusal
3   to execute municipal consent for TWA, temporary works
4   approval, what are you aware of that Mayor Dipaola
5   did in connection with refusing to execute the
6   municipal consent for the TWA?
7       A.   Just a refusal to act.
8       Q.   Has a temporary works approval ever been
9   signed by the -- on behalf of the Borough?
10      A.   Yes, recently.
11      Q.   When was it signed?
12      A.   In 2023.
13      Q.   Who signed it?
14      A.   I don't know.
15      Q.   Do you know if Mayor Dipaola was
16  involved in the signing of that, in any way?
17      A.   I don't know.
18      Q.   Item J, "the failure to contest the
19  written lawsuit", and I ask you to review that and it
20  specifically indicates within this that something was
21  done at the direction of defendant DiPaola, near the
22  bottom of that paragraph. So please review that and
23  tell me everything that you're aware that was
24  directed by Mayor Dipaola to fail -- fail to answer
25  or otherwise respond to the product of written

Page 89

1   lawsuit?
2       A.   Before I get to that, I just want to
3   back up to I, just one last point. In my opinion,
4   the only reason I have the TWA permit today and the
5   only reason why we have building permits and
6   inspections and there's construction going on on-site
7   is 100 percent due to Judge Carroll that's in place.
8   He's the court ordered monitor by Judge Padovano.
9   He's been excellent all the way around, and if wasn't
10  for him, we wouldn't have permits, inspections. And
11  by the way, I want to put on the record that the
12  inspections that they're requesting are crazy. I
13  don't have this, third-party inspections they're
14  mandating that I don't do in any other municipality
15  anywhere. Not in any municipality, so I'm putting
16  that on the record that all the extra money they're
17  making me spend because that's what she wants me to
18  do.
19         Back to your question about J, I don't
20  remember that offhand.
21      Q.   Looking at Page 18 now of the First
22  Amended Complaint, Paragraph 57 that begins with a
23  sentence "Defendant DiPaola orchestrated the above
24  municipal actions." Do you see that?
25      A.   Yes.

23 (Pages 86 - 89)

Page 90

1    Q.   Is there anything that you're aware of,
2 other than what you've told me previously related to
3 Paragraph 55, that Mayor Dipaola did to orchestrate
4 those actions?
5    A.   I don't recall it right now.
6
7 BY MR. SEAMAN:
8    Q.   Looking at Paragraph 58, it begins:
9 "After her election as mayor, DiPaola issued a
10 directive to municipal government to suspend all
11 actions on redevelopment and affordable housing under
12 the final judgment."
13       Do you see that?
14    A.   Yes.
15    Q.   Is there a written directive of some
16 nature?
17    A.   I don't remember offhand.  It's been a
18 while.
19    Q.   Have you ever seen a directive of that
20 sort?
21    A.   I don't remember.
22    Q.   Looking at Paragraph 59 on Pages 18 and
23 19, the final paragraph of that -- or the final
24 sentence of that paragraph begins:  "At her
25 direction," and then continues, "officials concocted

Page 91

1 new requirements for a demolition fence and utility
2 permits to obstruct delay and increase plaintiff's
3 project, consistent with the representations that she
4 would stop the project from being built."
5       Do you see that?
6    A.   Yes.
7    Q.   What, if anything -- what is there, if
8 anything, in addition to what you've already told me
9 that constitutes a direction by Mayor Dipaola to
10 officials to concoct new requirements for demolition,
11 fence, and utility permits?
12    A.   I have nothing new.  I told you what
13 they told me already.
14    Q.   Okay.  That's the conversations, I
15 apologize.  That's the conversations that you had
16 with the building official whose name you can't
17 recall?
18    A.   Yeah.  And I want to think back to the
19 conversation I had with Rob Hermansen.  Yeah.  After
20 I had an issue with one of the guys with the
21 demolition permit, I went to him, and I asked him for
22 his help.  And he told me, "I'm trying to do
23 everything I can to help you, but this is what the
24 mayor and our attorney are telling me they want."
25 Which I found out later was you can't trust a word

Page 92

1 that Mr. Hermansen says.
2    Q.   When did you find out that you couldn't
3 trust a word that Mr. Hermansen says?
4    A.   When he made a recording of me.
5    Q.   As you sit here today, do you believe
6 Mr. Hermansen was being truthful when he made the
7 statement to you that you mention about doing
8 everything he could to help you get the demolition
9 permit?
10       MR. FIORENZO:  Except for being told by
11 the mayor and the attorney, you've only characterized
12 part of it.  Is that the question?
13       MR. SEAMAN:  Yes.
14       MR. FIORENZO:  Okay.  He's asking you if
15 you think he was being truthful when he told you what
16 you just said.
17       THE WITNESS:  As I sit here today, I
18 would say, yeah.  He was new.
19
20 BY MR. SEAMAN:
21    Q.   What, if anything, did Mr. Hermansen
22 tell you, at that time, that Mayor Dipaola was doing
23 to prevent him from helping you to get the demolition
24 permit?
25    A.   It was just, "You have these new items.

Page 93

1 Let's see what we can do and I'll try to help you."
2    Q.   Did he indicate any specific action or
3 directive that Mayor Dipaola had given him with
4 regard to assisting you with the project?
5       MR. FIORENZO:  Object to the form.  You
6 can answer.
7       THE WITNESS:  I don't remember that.
8
9 BY MR. SEAMAN:
10    Q.   Looking at Paragraph 60 of the
11 complaint, it references an article in the Pascack
12 Press.  Do you see that?
13    A.   Yes.
14    Q.   Have you read that article?
15    A.   I have.
16    Q.   And it references a quote from Mayor
17 Dipaola that the Borough has lost "seven of its
18 thriving businesses due to redevelopment in the name
19 of affordable housing."
20       Do you see that?
21    A.   Yes.
22    Q.   Did you hear Mayor Dipaola make that
23 statement?
24    A.   I've heard her make that statement,
25 yeah.

24 (Pages 90 - 93)

Page 94

1    Q.   Did you hear her make the statement
2 that's attributed to her in the Pascack Press?
3    A.   Oh, no.  You want to know if I knew when
4 they got that quote from her?  I have no idea when
5 they got that quote.  Maybe I was there.  I don't
6 know.
7    Q.   Okay.  All right.  Is it correct that
8 seven businesses within Emerson are no longer doing
9 business because of the redevelopment?
10   A.   No.
11   Q.   What is incorrect about that factual
12 statement?
13   A.   Cork & Keg is still open down the block.
14 I have no idea about the other businesses.  We paid
15 some money to one of the businesses to relocate.  So
16 I don't know all the facts about each business, but I
17 can tell you that it's not true.
18   Q.   Do you know if it was factually accurate
19 at the time that the statement attributed to Mayor
20 Dipaola was purportedly made, that there were seven
21 businesses that were not currently operating because
22 of the redevelopment?
23   A.   That's also incorrect because there was
24 never a moment where Cork & Keg was out of business,
25 never.

Page 95

1    Q.   Looking at Paragraph 62 of the
2 complaint.  The final sentence in that paragraph
3 relates to "governing body members, including
4 Defendant DiPaola, are laughing, chortling, and
5 tripping over each other to be the first to 'so move'
6 and 'second' before enthusiastically adopting the
7 motion."
8         Do you see that?
9    A.   Yes.  And I remember it.
10   Q.   Do you remember one instance or more
11 than one instance?
12   A.   No.  It was March 3rd.
13       MR. FIORENZO:  He's referring to a
14 specific instance.  You were asking about this one?
15       THE WITNESS:  Yeah.
16       MR. SEAMAN:  Yes, I guess I am.
17       THE WITNESS:  Yeah, I remember it.
18
19 BY MR. SEAMAN:
20   Q.   Did you observe Mayor Dipaola laughing
21 at that time?
22   A.   Yeah.
23   Q.   Do you know what she was laughing about?
24   A.   I watched it on YouTube, like I do watch
25 most of their council meetings, and it was just like

Page 96

1 a funny matter about, you know, them convincing their
2 people that live in their Borough that they're going
3 to spend all this money now.  They're going to go
4 after the big bad -- I forget how Mr. McCann
5 describes it -- but the big bad developer I think is
6 how he does it, to bring down this project, which is
7 their goal.
8    Q.   So you heard a statement by Mr. McCann
9 during that meeting when you watched that YouTube.
10 Did you -- well, my question to you was:  Did you
11 observe Mayor Dipaola laughing?
12   A.   Yeah.
13   Q.   Do you know what she was laughing about?
14   A.   I don't remember.
15   Q.   Did you observe her chortling?
16   A.   Yes.
17   Q.   And do you know what she was chortling
18 about?
19   A.   She was laughing, chortling, and
20 whatever else we wrote in here over the fact that
21 they were coming to sue us.
22   Q.   How do you know that?
23   A.   It's on YouTube.  You can watch it.
24   Q.   Looking at Paragraph 67 of the
25 complaint, the First Amended Complaint, the final

Page 97

1 paragraph reads:  "DiPaola's obstruction of the
2 project is motivated by racial ends in that it seeks
3 to stop the relocation of minority residents."
4         Do you see that?
5    A.   Yeah.
6    Q.   Start at the beginning and go all the
7 way to the end and tell me all of the facts that
8 you're aware of that Mayor DiPaola's obstruction of
9 the project is motivated by racial animus?
10       MR. FIORENZO:  I'm going to object
11 because you've asked him about this previously today.
12 You want him to go back over his testimony?  Because
13 you examined him about, you know, what Mount Laurel
14 means and how he equates that to being discriminatory
15 and what facts he knew.  He's already testified at
16 some length about a lot of the facts he relies upon.
17 Do you want him to go back over all that again?
18       MR. SEAMAN:  Sure.
19       MR. FIORENZO:  Well, I don't think
20 that's appropriate, so if there's anything new, you
21 can -- I'm going to object because it's been asked
22 and answered in a variety of different ways.
23       MR. SEAMAN:  That's an objection, but
24 it's not an objection to a deposition question.
25       MR. FIORENZO:  No, it is in fact an

25 (Pages 94 - 97)

Page 98

1 objection to a deposition question. I just made it.
2          MR. SEAMAN: I understand. It's not an
3 objection to the form of the question.
4          MR. FIORENZO: It is. All right.
5          THE WITNESS: I have nothing new to add.
6          MR. FIORENZO: I'm going to let you do
7 it again.
8          MR. SEAMAN: All right. You know what?
9 I'll appease Mr. Fiorenzo.
10
11 BY MR. SEAMAN:
12     Q.    Other than what you have told me about
13 today, start at the beginning and go all the way to
14 the end and tell me every other fact that you're
15 aware of that Mayor DiPaola's obstruction of the
16 project is motivated by racial animus?
17     A.    I mentioned it already to you.
18     Q.    Looking at Paragraph 69 of the First
19 Amended Complaint, it says that Mayor Dipaola -- it
20 says: "On information and belief DiPaola has used
21 her position as mayor to directly receive in the
22 approvals and permitting process with the project to
23 impede the project and slow the reaction of the
24 Borough to the project including through its
25 'resolution compliance' process."

Page 99

1          Do you see that?
2     A.    Yes.
3     Q.    Other than what you've told me about
4 already, are there any facts that you can identify
5 that support that position?
6     A.    No.
7          MR. FIORENZO: Off the record.
8
9          (Luncheon recess: 1:05 p.m.)
10
11 BY MR. SEAMAN:
12     Q.    All right. Mr. Klugmann, we're back on
13 the record. You're ready to proceed now?
14     A.    I am. Thank you. I'm ready to finish.
15     Q.    Okay. Again, by the way, I remarked
16 FD-1 for identification.
17     A.    So I'm going to give this to you and I'm
18 going to take this one.
19     Q.    So it has a proper marking on it.
20 Again, looking at Paragraph 67, which is on Page 20.
21     A.    20.
22     Q.    Again, other than what you've told me
23 about previously today, are there any facts that you
24 can identify to support the proposition that Mayor
25 Dipaola intended to convey that the potential of

Page 100

1 people with racial -- with diverse racial backgrounds
2 at the project have already destroyed existing
3 businesses or would cause some sort of harm?
4          MR. FIORENZO: Objection. Asked and
5 answered.
6          MR. SEAMAN: I said other than what he
7 said here today.
8          THE WITNESS: No, not that I recall.
9
10 BY MR. SEAMAN:
11     Q.    Are you familiar with the rulings that
12 Judge Padovano has issued in the state court action?
13     A.    For the most part.
14     Q.    Are there any rulings, as you sit here
15 today, that you're aware of, that Judge Padovano made
16 that you disagree with in terms of any of his
17 findings?
18          MR. FIORENZO: I'm going to object in
19 that it calls for a legal analysis and a legal
20 conclusion. He could only answer that if he
21 understood the legal analysis that was undertaken, so
22 I'm going to object to the form of the question.
23          MR. SEAMAN: Okay. You can still answer
24 the question.
25          THE WITNESS: Well, I love that he made

Page 101

1 Emerson write me a check for my legal fees. I love
2 the fact that Judge Carroll is in place. Is there
3 anything that I'm not happy with, any decision that
4 he made? No, not that I can think of. Judge Carroll
5 was a great decision.
6
7 BY MR. SEAMAN:
8     Q.    Okay. You're satisfied with Judge
9 Carroll as far as his services as well?
10     A.    Extremely. He's a nice person.
11     Q.    Would you agree with me that there are
12 legitimate reasons why someone could object to a
13 development project that are not racially motivated?
14     A.    Do I agree with you that people can
15 object to a project that's not racially --
16          MR. BOTTA: Why don't you have her read
17 back the question.
18          THE WITNESS: Yeah.
19          MR. BOTTA: Instead of you trying to
20 repeat it.
21          THE WITNESS: Yeah. I have to make sure
22 I understood that one.
23
24          (Whereupon, the requested portion of the
25 record was read by the reporter.)

26 (Pages 98 - 101)

EXHIBIT Q

Page 102

1
2          THE WITNESS:  Hypothetically, sure.
3
4  BY MR. SEAMAN:
5      Q.    Is it fair to say that someone could
6  object to a redevelopment project because they
7  believed it was too big?
8          MR. FIORENZO:  Objection.  Form.
9  Hypothetical.  You can answer.
10          THE WITNESS:  Are you talking in any
11  case or are you talking specific to Emerson?
12
13  BY MR. SEAMAN:
14      Q.    Well, in any case, first of all?
15      A.    People can object to whatever they want.
16      Q.    Have you heard anyone object to the
17  project in Emerson, expressing their reason for their
18  objection because they believed it was too big?
19          MR. FIORENZO:  Objection to form.  You
20  may answer the question.
21          THE WITNESS:  Yes.
22
23  BY MR. SEAMAN:
24      Q.    Who are those people?
25      A.    Mayor Dipaola.

Page 103

1      Q.    Anyone aside from Mayor Dipaola who used
2  "too big" as a reason?
3      A.    I don't know.  I wasn't so involved
4  then, at that point, so I can't really speak to it.
5      Q.    Okay.  Have you heard anyone express an
6  objection to the project in Emerson on the basis that
7  it was too dense?
8          MR. FIORENZO:  Objection to the form.
9  You may answer.
10          THE WITNESS:  Not that I recall, other
11  than Mayor Dipaola.
12
13  BY MR. SEAMAN:
14      Q.    Have you heard anyone object to the
15  Emerson project on the grounds that it required too
16  much parking?
17      A.    I don't know that at all.
18      Q.    Have you heard anyone object to the
19  Emerson project on the grounds that it would generate
20  too much traffic?
21      A.    Yeah.
22      Q.    Who are those people?
23      A.    I don't remember.  This is going back
24  four years ago.
25      Q.    Do you recall Mayor Dipaola raising

Page 104

1  traffic as an issue?
2      A.    Yeah.
3      Q.    Do you recall anyone other than Mayor
4  Dipaola raising traffic as an issue?
5      A.    No.
6      Q.    With the other projects in your
7  portfolio that we discussed this morning --
8      A.    Yes.
9      Q.    -- have there been objections to those
10  projects for reasons such as being too big, too
11  dense, too much parking, too much traffic?
12          MR. FIORENZO:  I'm going to object.
13  Irrelevant.  Immaterial.  Beyond the scope of
14  discovery.  It has nothing to do with this case.
15  Subject to my objection, I'm going to let him answer
16  the question.
17          THE WITNESS:  Well, I think, really,
18  it's important to answer that question because I want
19  to clarify.  A lot of the stuff that I heard from
20  Mayor Dipaola, including the stuff that I said that
21  she spoke out against, was after she was mayor, was
22  after she looked at me in the face and including the
23  previous mayor, this was right before the end of the
24  year, and she told us how she wanted to create a
25  subcommittee to review the plans.  And I said, "If I

Page 105

1  do it, are you going to go ahead with it?  Are you
2  going to do whatever needed to be done?  Are we done?
3  Are we finished?  We know you don't like it.  At the
4  end of the day, this is approved.  The site is
5  approved and you have to approve it."  And she looked
6  at me and she said, "Yes."  And then, when it came
7  out to vote, she abstained.  And then, from there,
8  she never really -- which is what happened -- you're
9  asking me, do people come out and dislike or speak
10  out against projects?  It happens all the time.  We
11  all know that.
12          But, once it's approved, you don't have
13  people, unless it's a direct neighbor, 99 percent of
14  the time, who's affected by the project.  You don't
15  have people come out that keep on going on and on
16  about the project.  And that's what she has done.
17  She has gone on and on about how she wants to destroy
18  the project, even after it's approved.  The project
19  was approved.  It was done.  It's not her -- the bed
20  was made by someone else.  That's it.  She has to
21  deal with it and move on.  She wants to stop
22  development going forward, that's up to her and her
23  council and her planning board.  At the end of the
24  day, this was approved before she was mayor.  And she
25  has spoken out before, after, and everything in

27 (Pages 102 - 105)

EXHIBIT Q

Page 106

1 between to do whatever she can to stop it.
2
3 BY MR. SEAMAN:
4    Q.   All right.  I just want to clarify the
5 time frame.  You said "before the end of the year".
6 Can you testify to which year that was?
7    A.   To which point?
8    Q.   You spoke with her about a subcommittee,
9 it was near the end of the year?
10    A.   That was 2018, I think.  Yeah.
11    Q.   Okay.  So was that while she was still a
12 member of the council before she became mayor?
13    A.   Yes.
14    Q.   That's your reference?  And the
15 reference to a vote when she was a member of the
16 council before she became mayor.  Is that correct?
17    A.   Correct.
18    Q.   Did she make any statements on the
19 record at the council as to the reason why she was
20 abstaining from her vote as opposed to voting for or
21 against the resolution?
22    A.   No.  But to me, it was cowardly because
23 you just made a deal with someone and looked at them
24 in the face and then the only answer she could have
25 come out to have given was yes.  She didn't give that

Page 107

1 answer.  So it was a coward move.  You shake
2 someone's hand, you follow through on what you say.
3 And she didn't do that, which is the story here.
4    Q.   Did her abstention from the vote on that
5 resolution prevent it from passing?
6    A.   No.
7    Q.   Who else was present during the pre-vote
8 conversation that you referred to?
9    A.   I had an attorney there and I had -- I
10 don't remember if the architect was there or the
11 engineer, but I had an attorney and I believe -- I
12 don't know, maybe my brother.  I don't remember.  I
13 don't remember everybody that was there.
14    Q.   Do you remember anyone that was there?
15    A.   Sure.  Lou Lamatina, who was the prior
16 mayor, the redevelopment attorney was there, Keith
17 Hoffman was there, I think that's his first name, he
18 was -- he went on with her to eventually join on the
19 council, so he was an elected official but wasn't in
20 yet.  She was there.  The room was packed.  It was a
21 back room and there was a bunch of people there, two
22 attorneys, town attorney, the redevelopment attorney,
23 I don't know.
24    Q.   I just want to understand the timeline
25 of this.

Page 108

1    A.   Yeah, that's fine.
2    Q.   No.  You had this meeting and these
3 statements you're attributing to Mayor Dipaola at the
4 time that she was still a council member were made.
5 Did the governing body then move directly to the dais
6 in open session or was there a closed session?
7    A.   This was closed session.  This was
8 closed session.  This wasn't done in open session.
9    Q.   And were you present for the entire
10 closed session meeting?
11    A.   No.
12    Q.   Okay.  So you were present for a portion
13 of the closed session meeting and there were
14 discussions taken during that closed session meeting
15 and then you and your colleagues were excused from
16 the closed session.  Is that fair to say?
17    A.   I don't remember how it ended.  But we
18 definitely stepped out to have our own private
19 conversation about what we wanted to do.
20    Q.   Is it your understanding that the
21 governing body continued to meet in closed session
22 for a period?
23    A.   I really don't remember.
24    Q.   And then subsequent to the closed
25 session, they returned to the dais?

Page 109

1    A.   To vote.
2    Q.   And they reopened the public meeting?
3    A.   Yes.
4    Q.   That was the time when the mayor cast
5 her vote as an abstention?
6    A.   Of the council, yeah.
7    Q.   Other than what you've told me
8 previously today, what facts can you point to that
9 show that the defendants' land use decisions in this
10 case were motivated by racial animus as opposed to a
11 mere reluctance to comply with state law?
12        MR. FIORENZO:  Objection to form.  You
13 may answer.
14        THE WITNESS:  I don't know if I have any
15 new fact -- any new thing that I haven't brought up.
16 No.  It's just, as the lawsuit says and as I've told
17 you, it's just her insistence of not having
18 affordable housing there.
19
20 MR. SEAMAN:
21    Q.   Okay.  Same question in terms of if
22 there are any facts other than what you've told me
23 about already today, that you're aware of that show
24 that the defendant's land use decisions were
25 motivated by racial animus as opposed to a general

28 (Pages 106 - 109)

EXHIBIT Q

Page 110

1 dislike of large residential buildings?
2      A.    There was no land use decisions made
3 here. I'm not sure I understand the question.
4      Q.    What facts, if any, other than what you
5 told me about today, are you aware of, that the
6 defendant's actions with regard to your development
7 were motivated by racial animus as opposed to a
8 general dislike of large residential buildings?
9           MR. FIORENZO: Objection. Asked and
10 answered now several times. Do you have something
11 else to add to what you've already told him?
12           THE WITNESS: No.
13
14 BY MR. SEAMAN:
15      Q.    Has Emerson Redevelopers Urban Renewal
16 been damaged as a result of the actions of the mayor
17 and the Borough that make up this action?
18      A.    I think significantly.
19      Q.    Can you start at the beginning and go
20 all the way to the end and tell me all the ways that
21 the plaintiff has been damaged by those actions?
22      A.    I can't tell you all --
23           MR. FIORENZO: Let me just note, he's
24 going to answer the question, but there will be
25 expert reports that will be submitted that address

Page 111

1 the particulars and the numbers and damages. He's
2 here, and you're welcome to ask him generally,
3 conceptually about it. He'll answer it to the best
4 of his abilities.
5           MR. SEAMAN: He's been doing a very good
6 job of it so far, so I'm sure he'll continue.
7           MR. FIORENZO: Okay, yeah. Thank you.
8           THE WITNESS: What was the question?
9           MR. FIORENZO: Have you suffered any
10 damages --
11           THE WITNESS: No, he was asking about
12 the Borough, I think.
13           MR. SEAMAN: I'll repeat the question,
14 just to be clear. Let's start at the beginning --
15           MR. BOTTA: You don't want to ask the
16 question, I think.
17           MR. FIORENZO: You want me to ask?
18           MR. BOTTA: No. Let the reporter read
19 it.
20           THE WITNESS: I'm happy to answer both
21 of them. That's why.
22           MR. BOTTA: That's how it should be
23 done. We don't want Joe to rephrase it for you.
24 Just have the reporter ask it again.
25           MR. FIORENZO: I'm just here to help.

Page 112

1 I'm just trying to help. I'm here to help. That's
2 all.
3           MR. SEAMAN: Oh, yeah.
4
5           (Whereupon, the requested portion of the
6 record was read by the reporter.)
7
8           MR. FIORENZO: Yeah, I just want to
9 object to the form. I don't know what start at the
10 beginning and going to the end means. But subject to
11 my objection, you can describe it as best you can.
12           THE WITNESS: I'm actually happy that I
13 asked to repeat it because I didn't hear the Urban
14 Renewal part. I only heard the Emerson part. So I
15 thought you were talking about the Borough as opposed
16 to me, but you're talking about me.
17
18 BY MR. SEAMAN:
19      Q.    No, I'm asking how you've been damaged.
20      A.    Yeah. So the first and foremost is the
21 delay in the project, the delay in the ability to
22 make money, to have an income from -- there's an
23 income producing property. So the fact that we
24 should have started building this within a short time
25 frame after we closed on it being that it had all the

Page 113

1 government approvals, you have taxes, insurance,
2 carry. It was so bad that when I finally got my demo
3 permits, the bank that I have in place says: "You're
4 not going to finish in the time frame of when this
5 loan is maturing. You have to redo the loan."
6 (Repeating for reporter) "You're not going to finish
7 the project by the time that the loan is going to
8 mature, even with your extension that you have in
9 place. You need to redo the loan. We're not going
10 to advance you the draws and do it; especially since
11 we know that the municipality is slow playing
12 everything." And then we also have the fact that the
13 cost of materials, construction, the higher interest
14 rates that are out there now, the lack of income that
15 was made for the management company that we have, and
16 the lack of just income that would have came in from
17 the property, the profits that could have been made
18 here are substantial. On top of that, her onslaught
19 of media press releases, postings under -- whatever
20 they do, their consistent council meetings that they
21 like to make, their -- pardon my French -- their BS
22 conversations that they make up and try to have and
23 do things, is just -- there's nothing short of
24 trying -- their indirect way of trying to destroy my
25 reputation as a developer in this state. It came up

29 (Pages 110 - 113)

EXHIBIT Q

Page 114

1  in other municipalities and you can do your homework
2  on it.  It happened in Clifton.  I still got my
3  approval there, but it's nothing short of stress,
4  anxiety, extra work, extra workers that have to do
5  stuff, starting over, starting again.  My lack of
6  ability, even on top of all this, to go -- I'm
7  sitting here today doing a deposition when I should
8  be going ahead and looking for new work and doing
9  more projects and going to other municipalities to
10 see how I can do new work.  So it's coming, the
11 hammer is coming.
12     Q.   What do you mean by "the hammer is
13 coming"?
14     A.   I want a lot of money; a lot of money.
15 Just on the record, we've offered her a million
16 times -- oh, I shouldn't say a million -- many times
17 to try to work out ways to settle this and her
18 misleading and misguiding attitude, I don't know if
19 that's the right way to put it, but I'll just say it
20 nicely, you know, she has no interest in settling.
21 She has no interest in doing what's right.  She has
22 no interest in doing anything.  And that's why we're
23 here for the -- until the finish line.  And our offer
24 to settle is not because we think we're wrong.  We
25 know we're 100 percent right.

Page 115

1     Q.   The management company that you
2  indicated is not earning the profits, is that
3  different in any way other than Emerson Redevelopers
4  Urban Renewal?
5     A.   It's called 21 Glen Management.
6     Q.   And do they serve as a management
7  company for your other projects in your portfolio?
8     A.   Yeah.  Yeah.
9     Q.   And it's your testimony that they've
10 lost money because they're not actively managing the
11 property at this point?
12     A.   1,000 percent.  Yes.
13     Q.   Are there any agreements in place from
14 Emerson Redevelopers Urban Renewal to pay 21 Glen
15 Management any amount of that loss?
16     A.   No.  They only make their money during
17 lease up and management.  They only make their money
18 when we're going through the lease up and management
19 process.
20     Q.   Would you agree with me that any of the
21 increased cost that you've described in terms of the
22 cost of developing this property will increase the
23 basis for the property for tax purposes?
24          MR. FIORENZO:  Object to the form.  I
25 don't know what you mean by "basis".  It has a legal

Page 116

1  tax term.  I don't know how you're using it.
2          THE WITNESS:  So I don't understand the
3  question.
4
5  BY MR. SEAMAN:
6     Q.   Are you familiar with the term "basis"
7  in terms of income tax implications?
8     A.   For income tax -- I'm confused by the
9  question.
10         MR. FIORENZO:  You're asking his opinion
11 as to whether something is going to increase the
12 basis?
13         MR. SEAMAN:  I'm asking him if he's
14 familiar with the term "basis".
15         MR. FIORENZO:  So you're asking him for
16 a legal conclusion.  How would he know?  He's not
17 here as an expert.
18         MR. SEAMAN:  I'm asking him a question.
19 Let him give an answer.  That's all.  It will be what
20 it is.
21
22 BY MR. SEAMAN:
23     Q.   Are you familiar with the term "basis"
24 in terms of use in taxation?
25         MR. FIORENZO:  Object to the form.

Page 117

1  Under the federal tax code?  Is that the question?
2          MR. SEAMAN:  Generally, is he familiar
3  with the term?
4          THE WITNESS:  Vaguely.
5
6  BY MR. SEAMAN:
7     Q.   Okay.  On the other properties that
8  you've developed that are within your portfolio that
9  are actively leasing to tenants currently, are you
10 aware of the use of a depreciation deduction to
11 offset the income those properties generate?
12     A.   Of course.
13     Q.   And are you aware of the fact that the
14 more you spend to develop the property, the greater
15 that depreciation value becomes?
16         MR. FIORENZO:  Objection.  Calls for a
17 legal/tax accounting conclusion.  He's not here as an
18 expert.  He's not qualified to give such opinions, so
19 I object to the form.
20
21 BY MR. SEAMAN:
22     Q.   Generally, are you familiar with that
23 concept?
24     A.   No.
25     Q.   Are there any projects that Accurate

30 (Pages 114 - 117)

EXHIBIT Q

Page 118

1 Builders has lost as a result of any of the issues
2 that you're having with the Emerson project?
3          MR. FIORENZO:  Object to the form.  What
4 do you mean by "lost"?
5          MR. SEAMAN:  Do you understand the
6 question?
7          MR. FIORENZO:  I don't.
8          THE WITNESS:  I can guess.
9          MR. SEAMAN:  Well, I don't want you to
10 guess.
11         THE WITNESS:  Then, no.
12
13 BY MR. SEAMAN:
14    Q.    Okay.  Are there any projects that
15 Accurate Builders has applied for to develop property
16 that have been denied because of the issues that
17 you're having with Emerson in this case?
18    A.    No.  But I can tell you that in my
19 Clifton case, I had to have a non-Jew represent me
20 because of Emerson, because one of the people on the
21 council in Clifton, we knew that she was going to --
22 she was friends with Mayor Dipaola and she was going
23 to reference it.  And if I would be the face of it,
24 she would say, "Look what's going on in Emerson.  Do
25 you want to be a part of that?"

Page 119

1    Q.    So who is this member of the Clifton
2 council who's --
3    A.    I don't remember her name.
4    Q.    You don't recall the person?
5    A.    No.
6    Q.    And when you say you had to have a
7 non-Jew represent you, did you have someone appear as
8 a representative of Accurate Builders?  Or are you
9 saying you had a non-Jewish attorney represent you?
10 I just want to understand what you mean be "represent
11 you"?
12    A.    I had someone else under his own entity
13 go and get the approval with his own attorney.
14    Q.    And who was that?
15    A.    Kevin Codey, C-O-D-E-Y.
16    Q.    And who was the attorney that
17 represented Mr. Codey in that?
18    A.    Joe something, I forget his last name.
19    Q.    And did you have some sort of
20 discussions with Mr. Codey about him going in to get
21 that approval and then transferring the development
22 rights over to Accurate Builders?
23    A.    Of course.
24    Q.    And was there anything in writing to
25 memorialize that?

Page 120

1    A.    Yes.
2    Q.    And what was in writing to memorialize
3 that?
4    A.    A contract.
5    Q.    And does that contract specifically
6 reference a desire to avoid Clifton being aware of
7 the fact that it was going to be a Jewish business
8 that would be doing the development?
9    A.    No.
10         MR. SEAMAN:  Can I take five minutes
11 just quickly, Joe?
12         MR. FIORENZO:  Sure, sure.
13
14         (Whereupon, a brief recess was taken.)
15
16         MR. SEAMAN:  Mr. Klugmann, I don't have
17 any further questions of you.  I thank you for your
18 time.
19         THE WITNESS:  Really?
20         MR. SEAMAN:  Yeah, I really don't, but I
21 appreciate your time.  I appreciate your testimony.
22         THE WITNESS:  You've been very nice.
23         MR. FIORENZO:  Thank you, appreciate it.
24         (Whereupon, the deposition was concluded
25 at 1:49 p.m.)

Page 121

1          CERTIFICATE
2
3
4          I, JOMANNA DEROSA, a Certified Court
5  Reporter and Notary Public of the State of New
6  Jersey, do hereby certify that the foregoing is a
7  true and accurate transcript of the testimony as
8  taken stenographically and digitally at the time,
9 place and on the date hereinbefore set forth, to the
10          best of my ability.
11
12
13          I DO FURTHER CERTIFY that I am neither a
14 relative nor employee nor attorney nor counsel of any
15 of the parties to this action, and that I am neither
16 a relative nor employee of such attorney or counsel,
17    and that I am not financially interested in the
18          action.
19
20
21          _Jomanna DeRosa_
22          JOMANNA DEROSA, C.C.R.
             License No. 30XI00188500
23           Notary Public of the
              State of New Jersey
24
25

31 (Pages 118 - 121)

EXHIBIT Q

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT Q

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT Q