## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **EMERSON REDEVELOPERS URBAN RENEWAL, LLC,** | Civil Action No. 20-cv-4728-MCA-MAH |
| **Plaintiff,** | Hon. Madeline Cox Arleo, U.S.D.J. |
| v. | |
| **THE BOROUGH OF EMERSON, NEW JERSEY, AND DANIELLE DIPAOLA,** | **ORAL ARGUMENT REQUESTED** |
| **Defendants.** | *Document Electronically Filed* |

---

**PLAINTIFF EMERSON REDEVELOPERS URBAN RENEWAL, LLC'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS DANIELLE DIPAOLA AND THE BOROUGH OF EMERSON'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

---

**SILLS CUMMIS & GROSS P.C.**
One Riverfront Plaza
Newark, New Jersey 07102
Tel. (973) 643-7000
Attorneys for Plaintiff Emerson
Redevelopers Urban Renewal, LLC

Of Counsel and On the Brief:
Joseph B. Fiorenzo, Esq.

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ............................................................................................... I

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

      a.      Courts Have Repeatedly Declared Emerson's Housing Policies Are Discriminatory ....................................................................................... 4

      b.      Emerson's Prior Administration Reached An Agreement With FSHC, So Ordered By The Court, To Have ERUR Construct Affordable Housing And Granted All Required Municipal Land Use Approvals So That Emerson Could Comply With Its Constitutional Obligations ................................ 7

      c.      In The Middle of the Approval Process, Candidate DiPaola Ousts The Prior Administration—Who Were Attempting To Implement Fifteen Years Of Planning For Policies To Remedy Discrimination—Succeeding On A Campaign Platform Of Stopping The Construction Of Affordable Housing, Sufficient To Infer Racial Animus .......................................... 9

      d.      Emerson, And Its Newly Elected Mayor DiPaola, Schemed To Defy The Fair-Housing Mandate, Obstruct The Project, And Evade Compliance With The Fair-Share Judgment Against Emerson ................................. 10

LEGAL ARGUMENT .................................................................................................. 13

I.      STANDARDS ON MOTION FOR SUMMARY JUDGMENT ..................................... 13

II.    THERE IS, AT MINIMUM, A DISPUTE OF FACT WHETHER EMERSON'S DEFIANCE OF THE COURT-ORDERED PROJECT WAS MOTIVATED BY AN ILLEGAL EFFORT TO DEPRIVE LOW-INCOME AND MINORITY CITIZENS OF AFFORDABLE HOUSING, IN VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS PROTECTIONS ....................................................... 14

    a.    Plaintiff Has Been Arbitrarily Deprived of Its Property Interest Through Acts That "Shock The Conscience" ................................................... 14

        1.    Plaintiff Has Adduced Sufficient Facts To Raise An Inference Of Race-Based Discrimination, Establishing A Genuine Issue For Trial ..................................................................................... 16

        2.    Plaintiff Has Adduced Facts Evidencing Corruption Sufficient To State A Genuine Dispute Of Fact As To Whether DiPaola's Defiance Of Court Orders To Intentionally Harm Plaintiff Shocked The Conscience.......................................................................... 23

        3.    Defendant Emerson Badly Conflates Violations Of Substantive Due Process—Alleged Here—With The Standard For Procedural Due Process, Which Is Wholly Inapplicable ........................................... 25

III.    EMERSON IS LIABLE BOTH FOR ITS OWN ACTIONS AND FOR THE ACTIONS TAKEN AT THE DIRECTION OF MAYOR DIPAOLA ........................... 26

CONCLUSION ................................................................................ 30

# TABLE OF AUTHORITIES

*Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)..........................................................................26

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996)...................................20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).........................................................13

*Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F. Supp. 2d 633, 655-56 (E.D.
    Pa. 2003)..................................................................................................................................16

*B.S. v. Somerset Cnty.*, 704 F.3d 250, 267-68 (3d Cir. 2013) .....................................................15

*Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017)..30

*Beard v. Borough of Duncansville*, 652 F. Supp. 2d 611, 625 (W.D. Pa. 2009)....................16, 24

*Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) .............................................................27

*Black v. Stephens*, 662 F.2d 181, 191 (3d Cir. 1981) ..................................................................29

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014) ....................................18, 20

*Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000).....................14

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).................................................15, 16, 23

*Cole v. Jersey City Med. Ctr.*, 215 N.J. 265, 268 (2013) .............................................................30

*Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ......................................................26

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 549 (3d Cir. 2011).........................17

*Ectone Farm LLC v. Ward*, 639 F. App'x 118, 126 (3d Cir. 2016) ............................................24

*Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 286 (3d Cir. 2004)........................................16, 17, 23

*Feibush v. Johnson*, 2015 U.S. Dist. LEXIS 193185 (E.D. Pa. Mar. 20, 2015) .........................25

*Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) ..................................................................14

*Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006)........................................26, 30

*In re N.J.A.C. 5:96 & 5:97*, 221 N.J. 1 (2015) ..............................................................................5

*Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 738 (1989) ............................................................27

*Langford v. Atl. City*, 235 F.3d 845, 848 (3d Cir. 2000) ...............................................29

*Largoza v. FKM Real Estate Holdings, Inc.*, 474 N.J. Super. 61, 84 (App. Div. 2022) ...............30

*Lonzetta Trucking & Excavating Co. v. Schan*, 144 F. App'x 206 (3d Cir. 2005) ......................25

*Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 415 (D.N.J. 2011) ........................................20

*MARJAC, LLC v. Trenk*, 380 F. App'x 142, 146-47 (3d Cir. 2010) ..............................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ...........................13

*McGreevy v. Stroup*, 413 F.3d 359, 367-68 (3d Cir. 2005)....................................................29, 30

*MFS, Inc. v. DiLazaro,* 2009 U.S. Dist. LEXIS 89125, at *57-58 (E.D. Pa. Sep. 25, 2009)........24

*Miller v. City of Phila.*, 174 F.3d 368, 375-76 (3d Cir. 1999).......................................................15

*Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978)...............27, 28, 29

*Newport v. Fact Concerts*, 453 U.S. 247, 251 (1981) ....................................................................28

*Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000)...............................................14, 24

*Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 209 (3d Cir. 2010) ....................................................30

*Owen v. City of Independence*, 445 U.S. 622 (1980) .....................................................................28

*Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982)........................................................................26

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986) ..................................................28, 29

*Rogers v. Lodge*, 458 U.S. 613, 625–26 (1982) ...........................................................................18

*Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 67 N.J. 151 (1975)...4, 5, 17, 24

*St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ..................................................................27, 29

*Thorpe v. Upper Makefield Twp.*, 758 F. App'x 258, 261 (3d Cir. 2018) .....................................17

*UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003)............................15

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977) ................17, 21

*Watrous v. Borner*, No. 3:10-CV-597 (JCH), 2013 U.S. Dist. LEXIS 102647, at *22 (D. Conn. July 23, 2013) ................................................................................................................25

*Williams v. Pennsylvania State Police*, 481 F. Supp. 2d 424, 429 (W.D. Pa. 2007).....................21

**Statutes**

42 U.S.C. § 1983 ................................................................................................................27

FED. R. CIV. P. 56(a) ..........................................................................................................13

FED. R. CIV. P. 56(c)(1)......................................................................................................13

N.J.S.A. § 52:27D-301 .........................................................................................................5

## PRELIMINARY STATEMENT

Fifty years after the New Jersey Supreme Court's desegregation decision in *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 67 N.J. 151 (1975), the Borough of Emerson still has not complied with the Supreme Court's mandate to address the ills of historical discrimination. From the time of the Superior Court's finding that Emerson worked "palpably invidious discrimination" by erecting barriers to low-income and minority housing, through 2018, numerous administrations set a course to reverse and remedy the Borough's discriminatory history. As part of that effort, the Borough designated Plaintiff as the redeveloper of a dilapidated section of downtown, for the creation of affordable housing, and thereby satisfying the majority of the Borough's constitutional obligations. The Borough entered a settlement with the Fair Share Housing Council, and then obtained Conditional Final Judgement of Compliance and Repose on the strength of the redeveloper's agreement and the settlement, thereby granting immunity from any developer's remedy lawsuit that would impose a remedy.

But the fall of 2018, Danielle DiPaola, a long-time councilwoman and steadfast opponent of the housing progress being made by the Borough, campaigned for Mayor on an explicitly anti-affordable-housing platform—and won. In thinly disguised comments about how the residents of affordable housing would destroy businesses and schools, "bleeding" resources from true residents, Emerson manifested a discriminatory intent. There is also no denying that since January 2019, the Project has been substantially obstructed by Emerson. Before Mayor DiPaola was sworn in, the Project was proceeding apace and obtained all required governmental approvals. After, her administration raised procedural hurdles at every turn, imposing new conditions on the resolution of approval and demanding proof from NJDEP that the site was not contaminated without any jurisdiction, all as a pretext to raise the costs and delay affordable

housing in the hope the developer would grow frustrated and abandon it entirely. Emerson and DiPaola now move for partial summary judgment on Plaintiff's constitutional claims. Their arguments are without merit.

Defendants argue that discovery contained no "bigoted" email by DiPaola explicitly imposing barriers on the Project based on race. The Third Circuit has recognized that those who commit discriminatory acts "cover their tracks," and allows for a variety of indirect methods of proof that a decision was at least partially taken because the action would benefit or burden a particular group. The record is replete with such evidence, here, that raises an inference of a discriminatory motive. There is a history of the Borough's Court-recognized "palpably invidious discrimination" and efforts to evade desegregation measures. There is the bizarre procedural actions without jurisdiction, such as DiPaola's administration attempting to add conditions to Plaintiff's previously issued land-use board resolution of approval that was final and non-appealable. There is DiPaola's use of coded language about how Emerson had lost "seven of its thriving businesses due to redevelopment in the name of affordable housing" and that the "Borough would be bleeding because funds had to be given to the school system to sustain the children" from residents of affordable housing. And there is the racially discriminatory impact, as stated by Plaintiff's expert and the author of the First and Second Round Mount Laurel regulations, who opines that Emerson's delays have disproportionately impacted African-American and Hispanic communities most likely to rent such affordable spaces at the Project. All these give rise to the inference of discriminatory intent, at least sufficient to raise a genuine dispute of fact.

Defendants next argue a that "adequate post-deprivation remedies" are available. Emerson conflates the requirements of a claim not asserted by Plaintiff, for procedural due

process—that Plaintiff availed itself of the available state-law procedures—with the requirements for the substantive due process claim actually asserted by Plaintiff. A substantive due process claim is actionable if the Defendant's conduct "shocks the conscience," regardless of the procedure available. Plaintiff alleges that Emerson illegally circumvented a Court Judgment to construct Plaintiff's affordable housing Project by raising pretextual barriers for the discriminatory reason that Emerson officials did not want low-income and minority residents to move to Plaintiff's Project.

Emerson also seeks judgment for the municipality by arguing Plaintiff purportedly failed to identify an unconstitutional "policy" under *Monell.* But Plaintiff is not asserting Emerson is liable pursuant to a theory of *respondeat superior* addressed in *Monell*, i.e. that Emerson is vicariously liable for the misconduct of low-level employees not sanctioned by the Borough. Rather, as this Court already held was actionable, Plaintiff argues that Emerson acted directly, enacting a municipal decision to stall, obstruct, and deny Plaintiff the needed approvals, actions for which Emerson is directly (not vicariously) liable.  Defendants' Motions should be denied.

## STATEMENT OF FACTS

Emerson Redevelopers Urban Renewal, LLC ("ERUR" or the "Redeveloper") is the designated redeveloper of Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9 and 10, on the tax map of Emerson, New Jersey, ("Emerson Station" or the "Project"), which consists of a four-story, 147-unit, mixed use inclusionary development for property located on Kinderkamack Road with Borough of Emerson. Through the end of 2018, Emerson's elected representatives were required to confront Emerson's longstanding deficient affordable housing obligations pursuant to the *Mount Laurel* doctrine. Fiorenzo Cert. Exs. 7 (Declaratory Judgment filed by Emerson), 3 (Opinion in *Community Developers* finding exclusionary zoning), 4 (same). Emerson developed

a plan to build affordable housing with ERUR, Fiorenzo Cert. Ex. 9 (Redevelopment Agreement), reached a settlement with Fair Share Housing Center ("FSHC"), Fiorenzo Cert. Ex. 21, a Supreme Court-designated interested party in affordable housing litigation, and obtained a judgment of compliance under *Mount Laurel*, Fiorenzo Cert. Ex. 38. But as of January 1, 2019, a new administration was elected, led by Mayor Danielle DiPaola, ("DiPaola") who ran on an anti-affordable housing platform, vowing publicly to stop the Emerson Station project. In thinly veiled coded language, implied the people affordable housing would bring to Emerson— including minorities—would drive away Emerson's businesses and harm schools. Capitalizing on perceived racial and economic animus, DiPaola erected every imaginable roadblock to stop a fully approved Project with an existing land use resolution from moving forward for nearly two years. Emerson's malfeasance continued until the Superior Court of New Jersey appointed an Implementation Monitor, Hon. Harry Carroll, J.A.D., to ensure the construction without delay, with the power to circumvent the municipality by issuing permits, if needed.

a.  **Courts Have Repeatedly Declared Emerson's Housing Policies Are Discriminatory**

Every municipality in New Jersey has an obligation to provide its fair share of lower income housing, as first enunciated in *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 67 N.J. 151 (1975) (*Mount Laurel I*) This "*Mount Laurel* doctrine" thus requires municipalities enact policies to ensure "a realistic opportunity for producing a fair share of the regional present and prospective need for housing low- and moderate-income families." *In re Adoption of N.J.A.C. 5:96 & 5:97 ex rel. N.J. Council on Affordable Housing*, 221 N.J. 1, 3 (2015) (citing *Mount Laurel I*, 67 N.J. 151 (1975)). In *Mount Laurel I*, the New Jersey Supreme Court recognized that local municipalities' land-use policies, which led to "discrimination [having] the poor have been deprived of adequate housing and the opportunity to secure the construction of subsidized housing," was inherently driven by racial discrimination.   Notably, "exclusionary

zoning practices [were] also often motivated by fear of and prejudices against other social, economic, and racial groups." *Mount Laurel I*, 67 N.J. at 196 (Mountain, J., concurring). Thus, following in the footsteps of desegregation cases such as *Brown v. Board of Education*, the *Mount Laurel* Doctrine aimed to correct endemic segregation and discrimination in New Jersey housing.

Resistance was immediate and organized, and recalcitrant municipalities devised many methods for avoiding the decision and opening their communities. In *Mount Laurel II*, the New Jersey Supreme Court reiterated its holding and found that there was "widespread non-compliance with the constitutional mandate of our original opinion in this case." The Court specifically sought legislative action to implement the constitutional imperative expressed in the *Mount Laurel* Doctrine. Thus, in 1985, New Jersey passed the Fair Housing Act, N.J.S.A. § 52:27D-301, et seq. In 2015, in an effort to address continuing recalcitrance, in *In re N.J.A.C. 5:96 & 5:97*, 221 N.J. 1 (2015), the Court reinstated the ability of developers to sue recalcitrant municipalities in Superior Court. Emerson is one of those recalcitrant municipalities. On October 19, 2001, the Hon. Jonathan N. Harris, J.S.C., delivered an opinion striking down Emerson's zoning ordinances and requiring it to implement a new zoning scheme to provide affordable housing, because of its unconstitutional exclusionary zoning. The court held:

> Emerson, New Jersey persists as a bastion of exclusionary zoning. It has steadfastly resisted taking affirmative steps to provide realistic opportunities for affordable housing within its borders. It has further failed to enact the necessary legislation to authorize the expenditure of its considerable affordable housing trust funds for regional or local housing needs. The time has come to end this constitutional breakdown. The New Jersey Constitution shall not be permitted to merely remain a vague rumor in Emerson.

Fiorenzo Cert. Ex. 3. The Court had held that "Emerson's zoning ordinance was invalid and unconstitutional insofar as it failed to provide a realistic opportunity for the development of affordable housing," and, as a remedy, imposed an "interlocutory injunction restraining certain

land development activities until a final determination could be made concerning Emerson's ability to comply with its Mt. Laurel II obligations." *Id*.  After a trial, the Court found Emerson "has woefully failed to comply" and imposed "the exceptional affirmative remedies of the type outlined in *Mt. Laurel II* and require Emerson to adopt specific amendments to its zoning ordinance and other land use regulations as will enable to finally meet its *Mt. Laurel II* obligations." It noted there, "is not a single unit of affordable housing in Emerson. Its record of compliance with Mt. Laurel II is ghastly, embarrassing, and sorely in need of remediation. Its very conduct throughout this litigation confirms the need for affirmative steps to remedy its almost two decades effort to encourage poor people to live elsewhere." *Id*. Indeed, the Court observed, the "limited opportunities for developing inclusionary affordable housing appear to have been squandered by the municipality at almost every step. . .  Emerson seems to have never missed an opportunity to miss an opportunity for affordable housing." *Id*. The Court noted contemplated remedies:

> all development regulations in Emerson shall be permanently invalidated. All land shall be treated as unzoned, not subject to local site plan review, and developable at the will of the developer, subject only to applicable state and federal law, including, of course, the Uniform Construction Code. . .  The facts of this case reveal a legacy of cavalier inattention by a succession of Emerson governing bodies that produced a pattern of land use strikingly unfriendly to poor people. Spanning decades, the inaction of Emerson requires an immediate and robust response. Since opportunity has not knocked, it is time to build a door.

*Id*.  In assessing compliance the following year, the Court itemized Emerson's willful attempts to perpetuate segregation "spanning decades" involving "invidious discrimination":

> I have already determined that Emerson officials have relentlessly preserved and exacerbated economic and class segregation throughout the Borough. There appeared to me to be a remarkably consistent and extreme pattern of exclusionary efforts characterized by what appears to be developing again. That is, concentrated native opposition to affordable housing in certain areas of the Borough and

> acquiescence in that opposition by Borough officials. In my October 2021 opinion I catalogued a variety of missed opportunities, failures of will and lack of resolve by governmental actors spanning decades regarding the Borough's obligation to provide a realistic opportunity for low and moderate income housing. I remain dumbfounded, that notwithstanding all of the accumulated history of this State's exclusionary zoning litigation and the perils attendant thereto, that Emerson appears to have overlooked its lessons, and is consigned to repeat the costly blunders of the past.

Fiorenzo Cert. Ex. 4. Judge Harris found a "bankruptcy of action by the Emerson governing bodies over the years. . . stemm[ing] from the long-standing litany of inaction and the **palpably invidious discrimination** that it worked." *Ibid*. (emphasis added) When Emerson criticized the Special Master's proposal, without offering any realistic alternative to meet its obligations, the Court faulted Emerson for its obstruction:

> Emerson's entrenchment is again on display in this proceeding… At this point the Constitution itself imposes an overriding definition of the public good. And public officials sworn to uphold the Constitution may not avoid a constitutional duty by bowing to the political effects of prejudice and self-interest. Defiance at this stage results, in essence, in a perpetuation of the very Constitutional violation at which the remedy is aimed. At the conclusion of the trial I was convinced that it would be a vain and futile act to commit this Constitutional remedy to the very intractable officials who appeared to be incapable of taking meaningful action... I am left adrift again by a Municipality that has been content to dispatch New Jersey Constitution to serve as mere background noise in Emerson...

*Ibid*.

**b. Emerson's Prior Administration Reached An Agreement With FSHC, So Ordered By The Court, To Have ERUR Construct Affordable Housing And Granted All Required Municipal Land Use Approvals So That Emerson Could Comply With Its Constitutional Obligations**

Following the ruling, Emerson's prior administrations began taking steps to secure compliance. On February 3, 2004, the Council authorized an investigation to declare the blocks containing Emerson Station and the Off-site Property, Block 419 and Block 610, among others, as areas in need of redevelopment and on September 7, 2004, declared a need for redevelopment.

Fiorenzo Cert. Ex. 14. By 2006, Emerson developed a Redevelopment Plan to provide affordable

housing, Fiorenzo Cert. Ex. 5, and adopted the plan on July 11, 2006, Fiorenzo Cert. Ex. 14.

Emerson's "goal" of the redevelopment plan, among other things, was to "[r]educe the barriers

which limit mobility and access of city residents, particularly the poor and minorities, to jobs,

housing, services and open space within the region." Fiorenzo Cert. Ex. 5, at 27.  On July 8,

2015, upon forming a plan to meet its obligations, Emerson filed an action by verified complaint

seeking a declaratory judgment to "declare that its fair share plan is in compliance with the

requirements of the *Mt. Laurel* Doctrine and issue a judgment of repose insulating the Borough

from exclusionary zoning lawsuits . . . ."  Fiorenzo Cert. Ex. 7.

On June 26, 2016, ERUR and Emerson entered a Redevelopment Agreement by and

between the Borough of Emerson and Emerson Redevelopers Urban Renewal, LLC

("Redevelopment Agreement"). Fiorenzo Cert. Ex. 9. It addressed how the Borough would

utilize ERUR's development to satisfy the Borough's affordable housing requirements.

> 4.03 Affordable Housing Requirement. The Parties recognize and
> acknowledge that the Project will generate a fair share housing
> requirement for Redeveloper pursuant to the Affordable Housing
> Requirements established by the State of New Jersey and the
> Council on Affordable Housing. . .

With a plan in place for realizing the construction of affordable housing and a willing

partner to build it, ERUR, on November 21, 2017, Emerson and FSHC entered a Settlement

Agreement (the "Settlement Agreement"), Fiorenzo Cert. Ex. 21, with a corresponding

obligation to provide twenty-nine units. After conducting a fairness hearing, on June 29, 2018,

the Court entered an order accepting the Settlement Agreement based on Emerson's commitment

to fulfil its constitutional obligation through the Project, and subject to further recommendations

by Special Master Mary Beth Lonergan, PP, AICP, and a further fairness hearing. Fiorenzo Cert.

Ex. 24.  On December 14, 2018, Special Master Mary Beth Lonergan filed a Master's Report for

a Mount Laurel Compliance Hearing, Borough of Emerson ("Special Master's Report"). It advised the Court that there is a realistic probability of Emerson fulfilling its affordable housing needs, including because Emerson and ERUR have agreed to build Emerson Station. Fiorenzo Cert. Ex. 30. On December 28, 2018, the land use board issued all approvals in resolution approving Emerson Station.

> The Redevelopment Agreement and the Settlement Agreement, among other things, require the Applicant to provide for a total of twenty nine (29) affordable housing units. The project will have 147 residential units including 22 COAH or Affordable units on site and Applicant will comply with the requirement of seven (7) off-site affordable units.

Fiorenzo Cert. Ex. 34 ¶ (g). On January 25, 2019, the Superior Court entered the Conditional Final Judgment:

> The Court hereby accepts the Housing Element and Fair Share Plan and finds that it creates a realistic opportunity for satisfaction of the Borough of Emerson's Fair Share of low and moderate-income housing...The Court hereby accepts the Housing Element and Fair Share Plan and finds that it creates a realistic opportunity for satisfaction of the Borough of Emerson's Fair Share of low and moderate-income housing.

Fiorenzo Cert. Ex. 38.

**c.   In The Middle of the Approval Process, Candidate DiPaola Ousts The Prior Administration—Who Were Attempting To Implement Fifteen Years Of Planning For Policies To Remedy Discrimination—Succeeding On A Campaign Platform Of Stopping The Construction Of Affordable Housing, Sufficient To Infer Racial Animus**

During DiPaola's campaign for Mayor, she ran on a platform of obstructing and interfering with Redeveloper's development rights and construction of affordable housing intending to primarily benefit the poor and minorities. She called her election "a referendum on overdevelopment," publicly demanded that "the governing body, out of respect to the voters, take no further action [on redevelopment] until January," and "questioned where additional affordable housing is expected to go." Fiorenzo Cert. Ex. 26. She consistently emphasized her opposition to the Borough's mechanism for satisfying affordable housing, Emerson Station,

questioning whether this was "really what you want to see in the downtown for the next 100 years." Fiorenzo Cert. Ex. 31. She told business leaders with reference to the affordable-housing Project, "We're trying to scale this back." Fiorenzo Cert. Ex. 37.

Critically, DiPaola told the public that her opposition was specifically to affordable housing, claiming that the Borough has lost "seven of its thriving businesses due to redevelopment in the name of affordable housing." Fiorenzo Cert. Ex. 96. In order to get 29 affordable housing units, Emerson "lost seven businesses so far." *Ibid.* At a public meeting, she urged the prior administration to stop the Project, stating:

> [This was] a one-issue election, and it was a referendum on the development of Block 419 in our downtown. And I would ask that this Board respect the wishes of the people of Emerson, and listen to them as far as making sure that a plan . . . that it's not appropriate for town

Fiorenzo Cert. Ex. 29, 137:12-138:13. She also opposed affordable housing on the claimed ground that the children of those who rent affordable housing will "bleed[]" funds from the true residents of Emerson:

> DiPaola] asked what would happen if more affordable housing had to be made available just to make ends meet and then there were more children. She said that in that case, Emerson would be stuck in a 30 year agreement with a redeveloper and the Borough would be bleeding because funds had to be given to the school system to sustain the children.

Fiorenzo Cert. Ex. 15.

### d. **Emerson, And Its Newly Elected Mayor DiPaola, Schemed To Defy The Fair-Housing Mandate, Obstruct The Project, And Evade Compliance With The Fair-Share Judgment Against Emerson**

True to her word, after she took office on January 2, 2019, DiPaola and her administration immediately interfered with the construction of Emerson Station, despite its final, non-appealable receipt of site plan approvals. The Borough refused to issue demolition permits for any lot, Fiorenzo Cert. Ex. 109, Klugmann Cert. ¶ 18; repeatedly conditioned building

permits upon nonexistent and unreasonable demands, *id.* ¶ 25-30; and imposed new conditions on approvals that were never part of the final, non-appealable resolution issued by the land use board, *id.*, ¶ 16. Defendant DiPaola was well aware that, since the Project required below-market affordable housing, it could only be economically viable at the size and scope contained in the Fair Share Judgment and understood that to "scale back" the Project would render it not economically viable and, thus, kill the Project, her clear intention.

While not central to this Motion related solely to the proofs of discrimination, Plaintiff has amassed a substantial factual record that Emerson, at DiPaola's insistence, frustrated the fully approved Project. Some of those facts are included below:

a. **Refusal to issue permits**. The Defendants arbitrarily refused to issue demolition permits by taking the position that Plaintiff had to first show full resolution compliance and obtain all outside agency approvals. They were made solely to interfere with the ability to move forward with construction. Eventually, after considerable delay, and knowing that their position was defenseless, they were forced to relent and issue the demolition permit. Fiorenzo Cert. Ex. 109, Klugman Cert. ¶¶ 17a, 25-30; Fiorenzo Cert. Exs. 53, 54, 57, 65, 66, 68, 69-87, 91, 93.

b. **Refusal to issue fence permit**. After applications for fence permits were submitted in the form and manner sought by Emerson, and in compliance with the site plan application, at the last minute, Emerson demanded to conduct a new review of the area to be fenced, and withheld approval of the permit. Incredibly, at the same time, Emerson asserted that Plaintiff was not securing the Project sufficiently and that there were squatters in the vacant buildings. These arbitrary actions were a transparent attempt to delay construction, and cause economic harm to the Project, which Defendants hoped would make the Project not economically viable. Fiorenzo Cert. Ex. 109, Klugman Cert. ¶ 17b; Fiorenzo Cert. 85.

c. **Demand for inappropriate information from asbestos contractor**. When asbestos removal began, the Borough demanded that the asbestos removal contractor file for a Borough permit, as well as provide the names of all their workers and insurance information. These demands were designed to delay and impede Plaintiff's ability to move forward with construction. Ultimately, because its demands were frivolous, the improper request was withdrawn, but only after significant harm and damage to the Project. Fiorenzo Cert. Ex. 109, Klugman Cert. ¶ 17i.

    d.  **Denial of permits for DEP Review.**  Defendants arbitrarily and capriciously denied Plaintiff's application for permits by frivolously demanding that Plaintiff obtain documentation from the NJDEP concerning the alleged monitoring wells.  Defendants had no right to attempt to impose such preconditions outside their jurisdiction. Fiorenzo Cert. Ex. 109, Klugman Cert. ¶ 17e; Fiorenzo Cert. Exs. 29, 50, 60-65, 86, 88, 92.

    e.  **Delay in issuance of resolution compliance.**  Defendants have frivolously imposed conditions through a "Resolution of Compliance" which have no basis in law, or fact, and which have had the effect of unduly delaying the Project's construction.  After substantial delay, when the Borough Engineer issued a Resolution Compliance letter, it contained myriad demands, contrary to the law and contrary to the approved Site Plan.  All of this had the intended effect of causing substantial delay and damage to Plaintiff. Fiorenzo Cert. Ex. 2, Expert Report of Keller; Fiorenzo Cert. Exs. 11, 14, 18, 34, 48, 49, 52, 55, 56, 57, 89,  90, 97, 100, 102, 103, 104, 107.

ERUR filed an application in aid of litigants' rights for Emerson's violations of the

Conditional Judgment and, on March 16, 2021, the Superior Court granted in part, appointing a

"Mt. Laurel Implementation Monitor" and compelling that "all applications for building permits,

or for other governmental approvals, sought by [ERUR] from the Borough of Emerson shall be

reviewed . . . on an expedited basis." Fiorenzo Cert. Ex. 105.  The Superior Court noted it was,

> concerned by the apparent failure of the timely development of affordable housing in the Borough and is more concerned that the development was directly approved and ordered by the court. The undisputed facts now presented reveal that the Borough has failed to provide evidence of final satisfaction of all conditions identified and referenced under the court's January 25, 2019 order of conditional final judgment of compliance and repose. Over two years have passed since the entry of the court's January 25, 2019 order... However, [] the record reveals that the Borough has failed to provide evidence of final compliance and failed to request further extension for timely compliance. Redeveloper and FHSC have provided sufficient information revealing that the Borough has not adequately proceeded with fulfillment of the terms and obligations under the approved Settlement Agreement.

Fiorenzo Cert. Ex. 105. On April 22, 2021, the trial court again found that "Emerson has not

proceeded to fulfill the terms and obligations of the approved Settlement Agreement," and

appointed the Hon. Harry G. Carroll, J.A.D. (Ret.), as an implementation monitor "for the purpose of ensuring that the Settlement Agreement and Conditional Final Judgment are fully complied with and that the Mt. Laurel housing necessary for Emerson to fulfill its constitutional obligation be constructed on an expedited basis as contemplated by the Settlement Agreement and Conditional Final Judgment." Fiorenzo Cert. Ex. 106.

Consistent with the promises made by Defendant DiPaola when she ran for Mayor, DiPaola and Emerson have engaged in every technique they could muster to interfere with and delay the Project in order to stop the construction of affordable housing by driving up the cost of the Project to such an extent that the Project is no longer economically viable, thus, effectively terminating the Project.

**LEGAL ARGUMENT**

**I.** **STANDARDS ON MOTION FOR SUMMARY JUDGMENT**

Summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" for purposes of a summary judgment motion only if a dispute over that fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" dispute is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* But "some metaphysical doubt as to the material facts" does not constitute a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).Both parties must support their assertions by citing to "particular parts of materials in the record" such as depositions or affidavits, or by showing that an adverse party "cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).  When such facts are set forth in the evidentiary record, the "court must view the evidence in the light most favorable to the non-moving party and give that

party the benefit of all reasonable inferences that can be drawn from the evidence." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). At "the summary judgment stage of proceedings, courts do not weigh the evidence or make credibility determinations, but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment." *Id.* (internal quotation marks omitted).

## II. THERE IS, AT MINIMUM, A DISPUTE OF FACT WHETHER EMERSON'S DEFIANCE OF THE COURT-ORDERED PROJECT WAS MOTIVATED BY AN ILLEGAL EFFORT TO DEPRIVE LOW-INCOME AND MINORITY CITIZENS OF AFFORDABLE HOUSING, IN VIOLATION OF PLAINTIFF'S SUBSTANTIVE DUE PROCESS PROTECTIONS

The "substantive component of the Due Process Clause limits what governments may do regardless of the fairness of the procedures that it employs." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000). To prove a substantive due process claim, a plaintiff must adduce facts: (1) "the property interest being deprived is fundamental under the Constitution"; and (2) that there was an "arbitrary or irrational deprivation, regardless of the adequacy of procedures used."[1] *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 142 (3d Cir. 2000).

### a. Plaintiff Has Been Arbitrarily Deprived of Its Property Interest Through Acts That "Shock The Conscience"

Emerson rests its argument for dismissal exclusively on the element of substantive due process that the municipality's conduct is "conscience-shocking." But Emerson cannot meet its burden on this summary judgment record to demonstrate an absence of dispute of fact and entitlement to judgment as a matter of law. Plaintiff has adduced substantial factual evidence that Emerson corruptly circumvented a Court-ordered imperative directed at Emerson to build

---

[1] Defendants do not contest that Plaintiff has been deprived of a property interest protected by the Fourteenth Amendment. *See* DiPaola Br. 15 ("DiPaola does not contest whether ERUR has a fundamental property interest").

Plaintiffs' low-income affordable housing Project, in defiance of the New Jersey Supreme Court's command to create fair housing to address discrimination. As set forth below, Emerson engaged in the clear types of intentional harm to Plaintiff's rights, corrupt conduct, and class-based discrimination, which are well established in this Circuit to "shock the conscience," sufficient to adequately state a substantive due process claim.

Pleading "a substantive due process claim requires 'decision-making . . . that is so clearly arbitrary . . . [that it] can properly be said to "shock the conscience." *B.S. v. Somerset Cnty.*, 704 F.3d 250, 267-68 (3d Cir. 2013). This standard is "intended to prevent government officials from abusing their power, or employing it as an instrument of oppression." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (internal quotation marks and alterations omitted). "[T]he measure of what is conscience-shocking is no calibrated yard stick." *Lewis*, 523 U.S. at 847. Rather, it "varies depending on the factual context." *UA Theatre Circuit v. Twp. of Warrington*, 316 F.3d 392, 400 (3d Cir. 2003). "The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case, because a 'higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks.'" *B.S.*, 704 F.3d at 267-68 (quoting *Miller v. City of Phila.*, 174 F.3d 368, 375-76 (3d Cir. 1999)). On the other hand, ample time for deliberation by the government actor results in a more exacting analysis, wherein "deliberate indifference" to plaintiff's rights may establish conscience-shocking conduct. *See id.* ("Deliberate indifference that shocks in one environment may not be so patently egregious in another."). As a threshold matter, Defendants' discriminatory conduct warrants the highest level of scrutiny: Emerson had the luxury of an unhurried decision-making process concerning a commercial (and non-life threatening) matter, analyzed over the course of years, and vetted in great detail before

the Courts and a special master. *See Beard v. Borough of Duncansville*, 652 F. Supp. 2d 611, 625 (W.D. Pa. 2009) (holding city's action on redevelopment "had the 'luxury of proceeding in a deliberate fashion' and, as such, providing evidence of deliberate indifference to the rights of [plaintiff] would be the proper approach to evaluating the 'shocks the conscience' standard.").

After determining the context of the government action, courts analyze whether the conduct is conscience-shocking for that particular context. Several categories of wrongs are well established bases for substantive due process liability. First, government "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. Second, a municipality seeking to "hamper development" in furtherance of "corruption or **self-dealing**" may rise to the level of conscience-shocking conduct. *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 286 (3d Cir. 2004) (emphasis added). Third, "interfere[nce] with otherwise constitutionally protected activity at the project site, or . . . **some bias against an ethnic group**," will rise to the level of conscience-shocking conduct for substantive due process purposes. *Id.* (emphasis added) (citing *Assocs. in Obstetrics & Gynecology v. Upper Merion Twp.*, 270 F. Supp. 2d 633, 655-56 (E.D. Pa. 2003) (denying dismissal where plaintiffs alleged that Township enforced zoning laws to interfere with constitutional rights)). Here, the facts in the record fall squarely within these established parameters for a substantive due process claim, and, in any event, the facts in their totality state a claim for conscience-shocking conduct.

1. Plaintiff Has Adduced Sufficient Facts To Raise An Inference Of Race-Based Discrimination, Establishing A Genuine Issue For Trial

Plaintiff has adduced sufficient facts to give rise to an inference of racial discriminatory interference with a constitutionally protected right, which is sufficient—alone—to meet this element. *See Eichenlaub,* 385 F.3d 274, 286 (3d Cir. 2004). A property developer, itself, has a

protected right to seek to build housing free from class-based discrimination. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977) (holding developer seeking to build inclusive housing had "right to be free of arbitrary or irrational zoning actions," particularly if motivated by a "racially discriminatory" purpose). So, too, a developer has a substantive due process right to construct housing benefiting low-income residents without obstruction by a municipality for the purpose of excluding a class of people. *See Mt. Laurel I*, *Southern Burlington County N.A.A.C.P. v. Mount Laurel Township*, 67 N.J. 151 (1975). Unsurprisingly, Courts in this circuit following *Eichenlaub* have repeatedly found that facts giving rise to the inference of discriminatory development decisions create a genuine issue for trial on a substantive due process clause claim. *See MARJAC, LLC v. Trenk*, 380 F. App'x 142, 146-47 (3d Cir. 2010) (reversing summary judgment granted to township, holding nightclub developer stated substantive due process claim related to town's issuance of stop work orders and revocation of permits based on "antipathy toward [plaintiff's] Italian heritage" and discriminatory statements about purported "mafia" connections, because the allegations stated a claim for "selective enforcement motivated by ethnic bias . . . arbitrary conduct capable of shocking the conscience"); *Thorpe v. Upper Makefield Twp.*, 758 F. App'x 258, 261 (3d Cir. 2018) ("Race-based discriminatory enforcement of zoning ordinances would certainly constitute conscience shocking behavior.")

A discriminatory purpose is where conduct is "at least partially [taken] because the action would benefit or burden a particular group." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 549 (3d Cir. 2011). Racial animus, or a discriminatory purpose in part, typically must be inferred from conduct or coded language because individuals rarely state bigoted beliefs directly. *See Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Blunt v.*

*Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014) ("[I]ndividuals who violate the law based on discriminatory motives sometimes do not leave a trail of direct evidence, but instead 'cover their tracks' by providing alternate explanations for their actions, we have found that a plaintiff may establish a prima facie factual foundation of discrimination by drawing reasonable inferences from certain objective facts that are generally not in dispute."). Accordingly, discriminatory intent may be inferred "from the totality of the relevant facts." *Id.* at 266. Although the existence of racially disparate impact alone is not dispositive of discriminatory intent, it is still a relevant factor that provides an "important starting point." *Id.* at 265 (internal quotations and citation omitted). Other factors include the "historical background of the decision;" the "specific sequence of events leading up to the challenged decision;" and departures from "the normal procedural sequence . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Id.* at 266–68. The legislative or administrative history may also be considered, "especially where there are contemporary statements by members of the decisionmaking body." *Id.* Discriminatory purpose may be inferred where there is evidence of historical discrimination, such as when "discriminatory practices were commonly utilized, . . . abandoned when enjoined by courts or made illegal by civil rights legislation, and . . . replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Rogers v. Lodge*, 458 U.S. 613, 625–26 (1982) (considering past laws intended to disenfranchise African-Americans as evidence of intent that an at-large election system was adopted with discriminatory purpose). A community's "depressed socio-economic status" may also carry weight, as may a government's pattern of unresponsiveness and insensitivity to the community's needs. *Rogers*, 458 U.S. at 625–26 (considering "the overtly discriminatory pattern of paving county roads" and in "the

reluctance of the county to remedy black complaints").

At minimum, these factors demonstrate a genuine dispute of fact. Plaintiff has adduced facts of past historical discrimination. Judge Harris held Emerson "persists as a bastion of exclusionary zoning," Fiorenzo Cert. Ex. 3, at 2; "steadfastly resisted taking affirmative steps to provide realistic opportunities for affordable housing, *id.*; that "Emerson officials have relentlessly preserved and exacerbated economic and class segregation throughout the Borough," Ex. 4, at 3; created an "extreme pattern of exclusionary efforts," *id.*; "concentrated native opposition to affordable housing in certain areas of the Borough and acquiescence in that opposition by Borough officials," *id.*; "public officials sworn to uphold the Constitution [who have] avoid[ed] a constitutional duty by bowing to the political effects of prejudice and self-interest," *id.*; "intractable officials who appeared to be incapable of taking meaningful action. .. I am left adrift again by a Municipality that has been content to dispatch New Jersey Constitution to serve as mere background noise in Emerson," *id.* Judge Harris characterized the Borough's actions as "palpably invidious discrimination." Tellingly, since that decision and up through the filing of this lawsuit, Emerson admitted that "no affordable units have been physically rehabilitated or constructed within the Borough." Fiorenzo Cert. Ex. 61. "[M]aintain[ing] the status quo" after a Court finds "discriminatory practices," is an indicator of discriminatory intent. *Rogers*, 458 U.S. at 625–26.

DiPaloa also set forth her intent. As with nearly every racial animus case, DiPaloa never told Plaintiff directly or publicly stated that she was acting to stop African-American or Hispanic communities from living in Emerson, she did employ coded language that relied upon prejudiced tropes. Specifically, she repeatedly stoked the fear that affordable housing would generate an undesirable population that would harm businesses and schools and "bleed[]" funds from the

purportedly real residents to "sustain [their] children."  Fiorenzo Cert. Ex. 96 (DiPaola claiming Emerson "has lost 'seven of its thriving businesses due to redevelopment in the name of affordable housing.' In order to get 29 affordable housing units, Emerson "lost seven businesses so far. Two others are still open and they're fighting for their lives.'"); Ex. 15 ("[DiPaola] asked what would happen if more affordable housing had to be made available just to make ends meet and then there were more children. She said that in that case, Emerson would be stuck in a 30 year agreement with a redeveloper and the Borough would be bleeding because funds had to be given to the school system to sustain the children.") Defendants argue that Plaintiff cannot prove any action at "least partially [taken] because the action would benefit or burden a particular group" because discovery uncovered "no embarrassing 'hot mike' incidents" or facially "bigoted comments" in an email. DiPaola Br. 18. But that ignores that direct evidence is rare and unnecessary, and it is well settled that indirect evidence, such as coded terms, can be used as circumstantial evidence of racial animus. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 275 (3d Cir. 2014) (acknowledging the reality that those with discriminatory motives "cover their tracks," and requiring only "reasonable inferences" to "establish a prima facie factual foundation of discrimination"); *Major Tours, Inc. v. Colorel*, 799 F. Supp. 2d 376, 415 (D.N.J. 2011) ("To the extent the Garage Defendants are arguing that a jury is not permitted to make inferences about intent based on discriminatory conduct and circumstantial evidence without direct evidence of that racist intent . . . they are simply incorrect as a matter of law.") DiPaola's use of thinly disguised language, and attempts to stoke racial fears to suggest a class of people will harm businesses or deprive schools of resources is, at minimum, conduct that gives rise to a genuine dispute concerning Defendants' intent.  *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) (reversing judgment and holding 'use of "code words" can, under

circumstances . . . [lead jury to] conclude that the intent to discriminate is implicit" in Title VII

case); *Williams v. Pennsylvania State Police*, 481 F. Supp. 2d 424, 429 (W.D. Pa. 2007)

("[T]here are no 'talismanic expressions' needed to advance a racial harassment claim and 'code

words' and symbols may convey a clear message of racial intimidation based on the environment

in which they appear and the context in which they are used.")

Courts further consider as indirect evidence of racial motivations the presence of

substantial "departures from "the normal procedural sequence" in the decision-maker issuing a

decision. *Arlington Heights*, 429 U.S. at 266. The expert report of Eric Keller, Fiorenzo Cert. Ex.

1, details how, after the Land Use Board granted a Resolution of final, non-appealable

development approvals to Plaintiff for the construction of the Project on December 28, 2018,

Fiorenzo Cert. Ex. 28, the DiPaola administration attempted to "add[] 25 additional conditions

that were not included in the Resolution." Ex. 1, at 6-10 (noting, among other things, that

DiPaola insisted upon a traffic report, engineering certification, soil evaluation report, which

were not conditions of the Resolution granting approval). DiPaloa also included a variety of

limitations and objections that were expressly considered by the Land Use Board and rejected.

*Id.* (noting how Land Use Board discussed and approved the height and did not include the

contemplated height restriction from the engineering department in the Resolution as a

Condition, but DiPaola's administration nevertheless attempted to limit height). DiPaola further

held the issuance of demolition and building permits unless and until the Department of

Environmental Protection provided her a verification stating there was no environmental

concerns at the property. *Id.* 9-13. DiPaola then contacted NJDEP and attempted to initiate an

investigation, which DEP declined.  Fiorenzo Cert. Exs. 29, 50, 60-65, 86, 88, 92. Local

government has no jurisdiction to condition permits upon something in the jurisdiction of the

NJDEP, which in any event, does not issue certifications to municipalities. Fiorenzo Cert. Ex. 2, at 13. The Keller report notes the bizarre deviation from the normal procedural sequence:

> It is a bedrock principle of land development that the municipal body charged with approving, rejecting, or conditioning applications for land use is the planning board or zoning board (or, as here, combined land use board). After approval, relief may be sought, in some circumstances, from the governing body, or from the superior court. After the appeal period has passed, the approval is final and cannot be modified, rescinded, or further conditioned by the municipality, even if the leadership of such municipality has changed. Likewise, the conditions set by the municipal land use board in the formal resolution are the only applicable land use conditions. They cannot be enlarged, expanded, or added to after the resolution is duly adopted and the appeal period has passed. Each of the additional conditions imposed by the new administration identified above could have been raised, considered, and decided upon by the body charged with implementing land use decisions. Indeed, some of them were directly considered and rejected. It violates well established principles of land development and permitting for the municipality, through its new administration, to impose new conditions upon a resolution which were never specified by the Land Use Board in its Resolution granting approval.

*Id.* at 9. Of course, not every violation of state law creates an actionable federal claim, but the drastic departure from the ordinary procedure of non-appealable land use approval contains facts from which to reasonably infer a pretextual motivation.

Moreover, the Bernard Report provides facts and data indicating that the Borough's conduct caused a disproportionate racial impact. The Bernard Report opines that that African-American and Hispanic households rely on rental stock a significant percentage more than white households. Fiorenzo Cert. Ex. 1, at 8. That Emerson has a homogenous housing stock with comparatively few rental units and many single-family homes. *id.* at 9. Unsurprisingly, then, the percentage of African-American or Hispanic families living in Emerson is significantly less than the larger community, comprised of Housing Region 1. *Id*. at 10. Despite demand from minority communities, since Round III began, Emerson had not built a new unit of affordable housing. *Id*. Indeed, as of the filing of this suit, Emerson admitted that "no affordable units have been

physically rehabilitated or constructed within the Borough." Fiorenzo Cert. Ex. 61. To the extent Plaintiff proves, as above, that the Project was delayed by Emerson, the expert opines that such delay "had a disproportionate impact on African-American and Hispanic households; and delays in the construction of the 29 low and moderate income units, at issue in this matter, will continue the exclusionary status quo." Fiorenzo Cert. Ex. 1, at 10.  The expert concludes that, based on the available data, if the 29 units required were built, demand from "African-Americans and Hispanics [that would be] occupying the affordable units within the ERUR community will be much more representative of the percentage of these minority populations currently living in the housing region." On the other hand, Emerson's obstruction of the 29 units has resulted in "very low percentage of African-Americans and Hispanics currently living in Emerson," constituting a disproportionate discriminatory impact. Fiorenzo Cert. Ex. 1, at 11.

Alone or in combination, these factors give rise to a reasonable inference that Defendants' conduct, at least in part, was motivated by race-based discrimination against those persons whom Defendants believed were likely to inhabit affordable housing.

2. <u>Plaintiff Has Adduced Facts Evidencing Corruption Sufficient To State A Genuine Dispute Of Fact As To Whether DiPaola's Defiance Of Court Orders To Intentionally Harm Plaintiff Shocked The Conscience</u>

Separately and independently, Plaintiff set forth "conscience-shocking" conduct related to Emerson's corrupt and "arbitrary action . . .  in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Lewis*, 523 U.S. at 845-46. Indeed, such "corruption or self-dealing" may support a claim for violation of the substantive due process clause. *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004).

Emerson's transparent attempts to evade an unambiguous Court Judgment, compelling it to allow Plaintiff to build its affordable housing development, is actionably corrupt in that Emerson "deliberately and arbitrarily abused [the government's] power," *Nicholas*, 227 F.3d at

139.  Particularly, Emerson officials were well aware of their obligations pursuant to the New Jersey Supreme Court's *Mount Laurel* decision, and had litigated a declaratory judgment action resulting in a Judgment requiring that Emerson build Plaintiff's development. But Emerson's newly-elected officials, who seized power on the promise of stopping the affordable-housing project, would have none of it, placing their personal political benefit over the law. The specific purpose of obstructing Plaintiff's Project and its affordable housing obligations under the Judgment was the Emerson officials' own political gain. This intentional interference by Emerson against known rights "depict[]s corruption and repeated abuse of government power with the deliberate aim of harming someone," and is actionable substantive due process conduct. *Ectone Farm LLC v. Ward*, 639 F. App'x 118, 126 (3d Cir. 2016) (applying *Eichenlaub,* and holding government engineer and town committee member "conspiring to use their government positions to harass them repeatedly and obstruct full enjoyment of their land" constituted "conscience-shocking" allegations).

Indeed, as here, a municipality's obstruction of development of affordable housing in violation of a clear legal directive supports the allegation of conscience-shocking behavior. *See Beard v. Borough of Ducansville*, 652 F. Supp. 2d at 611, 625 (W.D. Pa. 2009) (denying summary judgment where reasonable jury could find conscience-shocking behavior where city took easement over portions of plaintiff's property even after being advised that it did not have statutory authority to support action); *MFS, Inc. v. DiLazaro,* 2009 U.S. Dist. LEXIS 89125, at *57-58 (E.D. Pa. Sep. 25, 2009) ("There is also a genuine issue of material fact as to whether Defendants knew that their actions in blocking the issuance of the Title V permit were wrong and/or in violation of their authority . . . [and] a genuine and material dispute here as to whether Defendants were acting in the public interest or whether they were arbitrarily attempting to close

- 24 -

the plant.  If the latter is proved at trial, an inference can be drawn that Defendants' conduct shocks the conscience."); *Watrous v. Borner*, No. 3:10-CV-597 (JCH), 2013 U.S. Dist. LEXIS 102647, at *22 (D. Conn. July 23, 2013) ("[A]n action of a governmental body, taken without jurisdiction, is sufficient to make out a substantive due process violation if such actions were taken because of indefensible reasons such as impermissible political animus.").

Moreover, courts have held that the government granting plaintiff development rights, and then obstructing those rights with the intent to harm the plaintiff, deprives the plaintiff of substantive due process rights. *See Lonzetta Trucking & Excavating Co. v. Schan*, 144 F. App'x 206 (3d Cir. 2005) (holding that plaintiff's claim the board "was arbitrarily trying to close [plaintiff's] quarry" resulting from the influence of a political pressure group was "more than just disagreement about conventional zoning or planning rules" and, if proved, may shock the conscience); *see also Feibush v. Johnson*, 2015 U.S. Dist. LEXIS 193185 (E.D. Pa. Mar. 20, 2015) (holding prima facie substantive due process claim where city "notified [plaintiff] that he had been selected as the developer for the site, and, in reliance on this communication, [plaintiff] purchased private lots on the same block and incurred development costs. . . [but] Councilman Johnson unilaterally stopped the sale") (internal quotation marks omitted).

3. <u>Defendant Emerson Badly Conflates Violations Of Substantive Due Process—Alleged Here—With The Standard For Procedural Due Process, Which Is Wholly Inapplicable</u>

Next, Emerson confuses fundamentally distinct claims under the due process clause. Emerson repeatedly argues that it has not deprived Plaintiff of "procedural due process," or that "adequate post-deprivation remedies were clearly available." Emerson Br. 23. It further asserts Plaintiff's due process claim should not be entertained because, it claims, a prerogative writ cause of action is "an adequate remedy." Emerson Br. 23.   Plaintiff has brought a *substantive* due process claim, not a *procedural* due process claim. The availability of state law remedies is

irrelevant to a substantive due process claim under Section 1983. *See Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982) ("[W]e conclude that exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983."). Substantive due process "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (internal quotations omitted). Plaintiff is not seeking an additional procedural hearing; rather, Plaintiff asserts that regardless of the procedures available, it is unconstitutionally conscience-shocking for Emerson to obstruct Plaintiff's Court-ordered affordable housing project for its own transparent political gain associated with stopping minorities and individuals of lower socioeconomic status from living in Emerson.[2]

## III.   EMERSON IS LIABLE BOTH FOR ITS OWN ACTIONS AND FOR THE ACTIONS TAKEN AT THE DIRECTION OF MAYOR DIPAOLA

Emerson complains that Plaintiff is somehow trying to hold it liable to the Plaintiff on a "theory of *respondeat superior* or *vicarious liability*." Emerson Br. 25 (emphasis in original). From this straw man, Emerson makes the baseless argument that there is no policy that could be interpreted as encouraging unconstitutional behavior. Emerson misapprehends the *Monell* doctrine and ignores this Court's prior holding. Plaintiff does not seek to hold Emerson vicariously liable for the wayward acts of a low-level government employee. Instead, it pleads

---

[2] Unlike a substantive due process claim, an element of a procedural due process claim is that "the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (citation omitted). In such a *procedural* claim, the "plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate. A state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). This standard would have applied if Plaintiff brought a procedural due process claim—but it did not.

that Emerson acted directly—by rejecting, obstructing, and failing to act on Plaintiff's Court-ordered development—and through its Mayor, a high-level final decision-maker for whom the City bears ultimate responsibility. This Court, in its November 22, 2021 decision, already squarely held that "plaintiff may pursue a Section 1983 claim against a municipality arising from, among other things, an official act of the city, *Langford v. City of Atlantic City*, 235 F.3d 845, 850 (3d Cir. 2000), or a decision by an official with 'final policymaking authority' in the relevant area, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)." ECF No. 36, Op. at 5.

Plaintiff asserts both an individual capacity claim under Section 1983 against Mayor DiPaola and an official capacity claim against the municipality. *Monell* holds only that a "local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). Section 1983 requires the municipality must itself be the actor that "*subject[s], or causes to be subjected*, any citizen . . . to the deprivation of any rights" protected by federal law. *Id.* at 692 (quoting 42 U.S.C. § 1983) (emphasis in original). The municipality—as opposed to an individual in their personal capacity—cannot be held liable for the "isolated acts by government officials and employees," as in the doctrine of *respondeat superior. St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *see Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 738 (1989) (adopting *Praprotnik* plurality opinion as majority). Instead, to assert a claim against the municipality "the government unit itself [must have] supported a violation of constitutional rights." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action . . . executes a . . . decision officially adopted and promulgated by that body's

officers." *Monell*, 436 U.S. at 690. It is similarly liable for a "policy statement, ordinance, regulation" with unconstitutional effects. *Id.* Together, direct municipal decisions and the adoption of rules are called the municipality's "official policy." *Id.* (Municipalities are also responsible for certain "custom[s] even though such a custom has not received formal approval . . . [if] persistent and widespread." *Id.*). The requirement of "'official policy' was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986).

Where a municipality acts *directly*, rather than through one of its employees, the official-capacity claim against the municipality remains actionable. Thus, *Monell* poses no barrier to relief when the municipality, itself, issues the challenged "decision," rather than an employee taking isolated action. *Monell*, 436 U.S. at 690. "[A]cts 'of the municipality' [include] acts which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 480. Thus, a single decision issued by a municipal agency is sufficient to claim liability under *Monell:*

> No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body -- whether or not that body had taken similar action in the past or intended to do so in the future -- because even a single decision by such a body unquestionably constitutes an act of official government policy.

*Pembaur*, 475 U.S. at 480. For example, where, as here, a municipality delays, obstructs, or effectively terminates an agreement, this decision subjects the municipality to potential damages under § 1983. *See Newport v. Fact Concerts*, 453 U.S. 247, 251 (1981) (holding decision by the mayor and city council to "cancel the contract" with a service provider constituted municipal action to which *Monell* liability attached); *Owen v. City of Independence*, 445 U.S. 622 (1980) (finding municipal liability where City Council decided to terminate plaintiff's agreement);

*Langford v. Atl. City*, 235 F.3d 845, 848 (3d Cir. 2000) (holding municipality's decision to "eliminate[] the jobs of political opponents of the incumbent mayor" constituted action by the municipality itself). The Borough of Emerson acted directly – rejecting, delaying, or refusing to consider Plaintiff's construction efforts. There is no claim that relies upon a theory of *respondeat superior*, rather, the Complaint pleads direct action by the Borough's Council.

Separately and independently, a municipality is properly held accountable under *Monell* for "a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Praprotnik*, 485 U.S. at 123. Municipalities designate certain "officials whose acts or edicts may fairly be said to represent official policy, and whose decisions therefore may give rise to municipal liability under § 1983." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) (internal citations and quotation marks omitted). "[A]n official with policymaking authority can create official policy, even by rendering a single decision." *McGreevy v. Stroup*, 413 F.3d 359, 367-68 (3d Cir. 2005). "[W]here a government's authorized decision maker adopts a particular course of action, the government may be responsible for that policy . . . ." *Id.* (quoting *Pembaur*, 475 U.S. at 481). A decision by a "final policy-maker" occurs where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. For example, in *Pembaur*, 475 U.S. at 481-82, the Supreme Court held that the county prosecutor who directed a warrantless search of plaintiff's property was a final policy-maker because he set forth law enforcement search and seizure policy. The Third Circuit has found "final authority" for decisions vested in various officials, including a chief of police, *Black v. Stephens*, 662 F.2d 181, 191 (3d Cir. 1981) (holding chief charged with "establishing policies and procedures" was "final authority"), a

school superintendent, *McGreevy v. Stroup*, 413 F.3d 359, 369 (3d Cir. 2005), and mayors, *Hill v. Borough of Kutztown*, 455 F.3d 225, 246 (3d Cir. 2006) ("[T]here was no one 'above' the Mayor who had the power to curtail his conduct").  The facts in the record demonstrate that Mayor DiPaola are sufficient to at least create a genuine dispute of material fact that she acted and directed Emerson officials as final decision-maker for the Borough and thereby attribute such policy to the municipality.[3]

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions for Summary Judgment should be rejected.

**SILLS CUMMIS & GROSS P.C.**

By:  *s/ Joseph B. Fiorenzo*
Joseph B. Fiorenzo, Esq.

DATED:      October 28, 2024

---

[3] In passing, Defendants reference—but not submit argument—that there is a forum selection clause naming New Jersey Superior Court, Bergen County. Courts "consistently refuse[] to consider ill-developed arguments or those not properly raised and discussed." *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 (3d Cir. 2017). Regardless, in the four years this matter has been pending, Defendants have never previously sought to invoke any forum selection clause, for the first time raising it after discovery and on summary judgment. A party waives a forum selection clause taking action "inconsistent with its right," including participating in litigation over years and filing motions with the Court. *Largoza v. FKM Real Estate Holdings, Inc.*, 474 N.J. Super. 61, 84 (App. Div. 2022) (quoting *Cole v. Jersey City Med. Ctr.*, 215 N.J. 265, 268 (2013)); *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 209 (3d Cir. 2010) (holding in arbitration context that after five years of litigating in federal court, defendant, "through its litigation conduct, waived its right to compel arbitration of Nino's claims").