Exhibit 1

# *Art Bernard and Associates, L.L.C.*

Housing and Land Use Planning

# IMPACT OF EXCLUSIONARY ZONING IN EMERSON

JUNE 2023

PREPARED FOR EMERSON REDEVELOPERS URBAN RENEWAL, LLC

PREPARED BY

ART BERNARD, P.P.

77 North Union Street, Lambertville, New Jersey 08530 Phone (609) 397-8070
E-mail: yuckygolfer@gmail.com

This report provides my professional opinion regarding the relationship between the municipal housing stock and the ability of the low and moderate income population to afford housing in the community. Since the low and moderate income population, in New Jersey, includes a disproportionate share of African-American and Hispanic Households, municipal exclusionary zoning practices have a disproportionate impact on these two minority populations. I have been retained by Emerson Redevelopers Urban Renewal LLC (ERUR) to prepare this report.

## *CREDENTIALS*

I am the managing member of my own firm. I have a Masters in City and Regional Planning (MCRP) from Rutgers University. I am a licensed professional planner with 45+ years of experience in land use planning and affordable housing. I served the New Jersey Council on Affordable Housing (COAH) from March of 1986 to October of 1994 as its Deputy and Executive Directors. During that time, I developed and supervised COAH's entire work program and was responsible for working directly with the COAH Board on all of its rules and motion decisions. I prepared the First and Second Round rules that have been upheld by the Appellate Division, which include, but are not limited to, the fair share methodology, COAH's vacant land adjustment process, COAH's durational adjustment process and municipal compliance issues.

Since leaving COAH in 1994, I have worked for 27 municipalities in various capacities. I have worked with private sector clients before local boards and in Superior Court. I have testified as an expert witness in most of the State's vicinages and I have served the Superior Court as a Special Master.

I have also consulted for the New Jersey Builders Association (NJBA) as to affordable housing matters and I wrote the expert reports that NJBA submitted in its successful appeals of COAH's 2004 and 2008 rule adoptions. Pursuant to the Appellate Division's 2010 order for COAH to develop third Round rules based on COAH's first and second Round methodologies, I developed 1999-2023 fair share calculations. I also wrote an

expert report for NJBA challenging COAH's 2014 rule proposal that the COAH Board failed to adopt.

I have served as an expert witness in the fair share trials in Middlesex and Mercer Counties. I have testified in many other court proceedings involving affordable housing issues.

Since the Supreme Court established the declaratory judgment process, I have participated in about 70 matters as a professional planner for municipalities and private sector clients as well as a Special Master for the court. These matters involve municipalities from all over the State. I have attached my curriculum vitae as Exhibit 1.

## *DOCUMENTS REVIEWED*

This report is based on the most recent data available, the 2017 - 2021 American Community Survey, published by the United Census Department.

## *BACKGROUND*

Segregation in the United States persists for a variety of reasons[1] not the least of which rests with land use controls, e.g. exclusionary zoning laws. Researchers examining the effect of exclusionary zoning on segregation have found correlations. Rolf Pendall (2000) looked at the affect of zoning practices using Census data and a mail survey of over 1,100 localities in the Nation's 25 largest metro areas. His findings indicate that low density zoning works to reduce rental housing supplies which in turn reduces the number of minority residents in an area, or stated in other words: higher density housing works toward providing greater options for lower income and minority families, "[a] healthy supply of multifamily housing is particularly important to minority residents because it tends to be rented, and when owner-occupied it tends to cost less than detached houses."[2]  Pendall concluded that "[f]our important housing market conditions promote inclusion of African

---

[1] The literature suggests numerous factors for segregations' persistence in the US including institutions discrimination, racial discrimination in real estate sales, household preferences, and predatory lending practices to name a few.

[2] Rolf Pendall.  "Local Land Use Regulation and the Chain of Exclusion"  *APA Journal.*  Spring 2000, Vol. 66, No. 2, p. 127.

Americans and Hispanics: new housing supply, multifamily housing supply, rental housing supply, and affordable rental housing."[3]

Similarly, a discussion paper prepared for the Brookings Institute (2002) on issues of land use policy and housing affordability concluded:

> In the end, both traditional zoning practices and growth management policies can increase home prices, but they do so in different ways. Traditional zoning and other planning and land use controls limit the supply and accessibility of affordable housing, thereby raising home prices by excluding lower income households. Evidence shows that certain growth control and land use policies actually reduce jurisdictions' housing supply and the affordability of their housing. Such policies, already widespread in the U.S., include requirements for low-density-only, minimum housing size, or bans against attached or cluster homes. Such policies are, in fact, specifically intended to make housing more expensive and thereby exclude lower income families, who are often people of color. This "chain of exclusion" is a powerful reality for limiting the affordability of housing in certain jurisdictions. [4]

The New Jersey Supreme Court has determined that New Jersey municipalities have a constitutional obligation to provide low and moderate income housing opportunities through use of the zoning power. The New Jersey Legislature established the Council on Affordable Housing (COAH) with the responsibility of quantifying each municipal low and moderate income housing obligation, establishing criteria for the review of municipal compliance plans and conducting a review of municipal compliance plans. COAH successfully adopted 1987-1999 regulations that included fair share calculations for each municipality. COAH allocated a 1987-1999 allocation of 74 units to Emerson.

In 2015, the Supreme Court found that COAH was no longer a functioning agency and determined that the New Jersey courts must provide some of COAH functions. The

---

[3] Rolf Pendall, "Local Land Use Regulation and the Chain of Exclusion." *APA Journal*. Spring 2000,Vol. 66, No. 2, P. 139.
[4] Arthur C. Nelson, Rolf Pendall, Casey J. Dawkins, and Gerrit J. Knaap, "A Discussion Paper Prepared for The Brookings Institution Center on Urban and Metropolitan Policy." February 2002.

Supreme Court directed the courts to utilize COAH's 1987 – 1999 housing allocations and prepare 1999 – 2015 housing allocations using, for the most part, COAH's prior round methodologies.[5]

COAH allocated Emerson a 1987 – 1999 housing allocation of 74 units.  There have been 1999 – 2025 fair share trials in Middlesex County (Judge Wolfson) and Mercer County (Judge Jacobson).  Neither decision is binding on this court; however, most parties and courts have gravitated to the Jacobson methodology based on her March 8, 2018 Decision. The methodology results in a 1999-2025 housing allocation of 238 units for Emerson Borough.  The results of the Jacobson methodology have generally been used, at least as a point of departure, for many court settlements between municipalities and Fair Share Housing Center (FSHC) throughout New Jersey.   Thus, Emerson Borough has a cumulative 1987 – 2025 housing obligation of 312 low and moderate income housing units. However, I understand that Emerson is subject to a Consent Judgment, based on a settlement with FSHC which provides for a realistic development potential (RDP) of fewer units, the majority of which is satisfied by affordable housing provided by ERUR's Bock 419 community.

In stark contrast, the "New Jersey Guide to Affordable Housing," updated by the New Jersey Department of Community Affairs in 2022, indicates that there are <u>no</u> deed-restricted affordable housing units in Emerson.

### THE IMPACT OF EXCLUSIONARY ZONING IN EMERSON

My review of the 2017 – 2021 ACS data reveals that Emerson has a very homogenous housing stock.  It is much less diverse than the housing stock for New Jersey.  I should emphasize that New Jersey's affordable housing obligation is a share of a regional obligation, In the case of Emerson, the share is based on a housing region, including: Bergen County, Hudson County, Passaic County and Sussex County.    Thus, only 13.1 percent of Emerson's housing stock involves some form of attached housing.  In contrast,

---

[5] The direction was less explicit regarding the 1999 – 2015 portion of the 1999 – 2025 housing allocation.

46.9 percent of the State's housing stock is in some form of attached housing and 62 percent of the Region's housing stock is in the form of attached housing.

| Units in Structure | | | |
|---|---|---|---|
| Housing Type | New Jersey | Housing Region 1 | Emerson |
| 1 unit, detached | 53.1% | 38.0% | 86.9% |
| 1 unit, attached | 9.7% | 5.6% | 0.0% |
| 2 units | 8.9% | 17.1% | 4.7% |
| 3 to 4 units | 6.3% | 8.8% | 3.6% |
| 5 to 9 units | 4.7% | 6.3% | 0.5% |
| 10 to 19 units | 4.8% | 5.1% | 1.1% |
| 20 to 49 units | 4.1% | 6.1% | 2.1% |
| 50 or more units | 7.5% | 12.7% | 1.1% |
| Mobile home | 0.9% | 0.3% | 0.0% |
| Boat, RV, van, etc. | 0.0% | 0.0% | 0.0% |
| | | | Source: 2017-2021 ACS |

Typically, single family homes are the most expensive type of housing and the least likely to be rented. Low and moderate income households require less expensive housing; and, since many cannot qualify for a mortgage or find it difficult to afford the taxes and long term expenses associated with home ownership, many low and moderate income households require rental housing.

Indeed, when one examines, the rentals available in Emerson, one finds that the percentage of rentals is approximately one-third to one-quarter the percentage of rentals available in New Jersey and the Housing Region respectively.

| Percentage of Housing Units by Tenure | | | |
|---|---|---|---|
| Tenure Type | New Jersey | Housing Region 1 | Emerson |
| Owner-Occupied | 64.9% | 52.9% | 87.2% |
| Renter-Occupied | 35.1% | 47.1% | 12.8% |
| | | | Source: 2017-2021 ACS |

As discussed earlier, the Housing Region includes Bergen, Passaic, Hudson and Sussex Counties. The data below indicates that the median income of Emerson is much higher than New Jersey's median income and the median incomes of any County within the Housing Region. I would expect Emerson, with an homogenous housing stock and very few rentals, to have a much higher median income than the State or any county within the Housing Region.

| Median Household Income by Geography | |
|---|---|
| New Jersey | $89,703 |
| Bergen County | $109,497 |
| Hudson County | $79,795 |
| Passaic County | $78,386 |
| Sussex County | $101,645 |
| Emerson | $135,396 |
| | Source: 2017-2021 ACS |

The impact of exclusionary zoning on low and moderate income households is apparent when one examines the percentage of households with lower incomes living in New Jersey,

the Housing Region and Emerson.    The precise income limits for very low, low and moderate income households vary by household size and housing region.  The Census publication of households by income does not neatly correspond to low and moderate income households by household size as calculated by HUD or the State of New Jersey. However, in reviewing the table below, it is useful to examine the percentage of households earning less than $75,000 per year.

The reason I point the court at the percentage of households earning less than $75,000 is that that it approximates the income of many low and moderate income two and three person households in various housing regions in New Jersey.  Since the median household size in New Jersey is roughly 2.6 people, it is my opinion, to a reasonable degree of certainty in the context of affordable housing planning, that the percentage of households earning $75,000 in various locations is useful in discussing the impact of exclusionary zoning on low and moderate income households.

| Percentage of Households by Income | | | |
|---|---|---|---|
| Income Level | New Jersey | Housing Region 1 | Emerson |
| Less than $25,000 | 13.7% | 13.9% | 5.0% |
| $25,000 - $49,999 | 14.9% | 14.6% | 8.9% |
| $50,000 - $74,999 | 13.9% | 13.2% | 8.3% |
| $75,000 - $99,999 | 12.1% | 11.5% | 13.5% |
| $100,000 - $149,999 | 17.9% | 17.7% | 23.5% |
| $150,000 or more | 27.4% | 29.0% | 40.8% |
| | | | Source: 2017-2021 ACS |

Low and moderate income households earn 80 percent of median income within the housing region.  Since median income means that half the households earn more and half the households earn less, one would expect that low and moderate income households represent approximately 40 percent (80 percent of 50 percent) of the State and Regional population.   Indeed, when one examines the percentage of households earing less than $75,000 in New Jersey, one finds that  42.5 percent of all households earned less than $75,000.   In the Housing Region, 41.7 percent of all households earned less than $75,000.

In Emerson, only 22.2 percent of households earned less than $75,000.  In Emerson, the
percentage of households earning less than $75,000 is approximately half the percentage
of the State and Housing Region.

Median household income varies by race/ethnicity.  The median income for the White and
Asian population is much higher than the median income for African-Americans and
Hispanics.

| Median Household Income by Race and Ethnicity | | | |
|---|---|---|---|
| Race/Ethnicity | New Jersey | Bergen County | Emerson |
| White | $100,584 | $110,654 | $132,008 |
| Black | $59,207 | $79,349 | Too few households[1] |
| Hispanic | $63,608 | $81,641 | $149,271 |
| Asian | $135,043 | $130,850 | $140,750 |
| | | | Source: 2017-2021 ACS |
| [1]The Census Bureau does not publicly provide data for median income by race when there are too few respondents of a particular race in a given geography. The Census Bureau does this for reasons of accuracy and privacy. | | | |

As a result, the African-American and Hispanic population rely more on rental housing
than Whites and Asians.  African-American and Hispanic households rent over twice as
often as white households.  For example, in New Jersey 23.5 percent of white households
rent; whereas, 60.8 percent of African-Americans and 61.3 percent of Hispanics.  In the
Housing Region, 32.2 percent of white's rent; while 68.4 percent of African-Americans
and 68.1 percent of Hispanics rent.

| Tenure by Race and Ethnicity | | | | | | |
|---|---|---|---|---|---|---|
| **Race and Ethnicity** | **New Jersey** | | **Housing Region 1** | | **Emerson** | |
| | **Owner-Occupied** | **Renter-Occupied** | **Owner-Occupied** | **Renter-Occupied** | **Owner-Occupied** | **Renter-Occupied** |
| White | 76.5% | 23.5% | 67.8% | 32.2% | 88.6% | 11.4% |
| Black | 39.2% | 60.8% | 31.6% | 68.4% | 47.8% | 52.2% |
| Hispanic | 38.7% | 61.3% | 31.9% | 68.1% | 76.1% | 23.9% |
| Asian | 63.6% | 36.4% | 52.6% | 47.4% | 85.2% | 14.8% |
| Other Race | 34.2% | 65.8% | 28.3% | 71.7% | 100.0% | 0.0% |
| Two or More Races | 48.4% | 51.6% | 37.6% | 62.4% | 100.0% | 0.0% |
| | | | | | | Source: 2017-2021 ACS |

As discussed above, Emerson is a municipality with a housing stock that is much more homogenous than found in New Jersey and other areas of the Emerson Housing Region. Emerson is a community with few rentals. As a result, Emerson is a community in which the residents that live in the Borough have much higher incomes than New Jersey and other parts of the Housing Region.

The data reveal that low and moderate income households represent approximately 40 percent of all households in New Jersey and the Housing Region; and Emerson has about half the households earning less than $75,000 than New Jersey and the Housing Region.

The data reveal that African-Americans and Hispanics have lower incomes than Whites and Asians and generally must rent more than Whites and Asians. Thus, it is not surprising that the percentage of African-Americans and Hispanics living in Emerson is much less than in New Jersey and the Housing Region.

| Percentage of Population by Race and Ethnicity | | | |
|---|---|---|---|
| Race or Ethnicity | New Jersey | Housing Region 1 | Emerson |
| White | 51.9% | 44.3% | 73.1% |
| Black | 12.4% | 7.5% | 1.5% |
| Hispanic | 21.6% | 31.3% | 13.0% |
| Asian | 10.2% | 13.4% | 9.7% |
| Other Race Alone | 0.9% | 1.0% | 0.3% |
| Two or More Races | 3.1% | 2.5% | 2.4% |
| | | | Source: 2017-2021 ACS |

In Emerson, 14.5 percent of the population is African-American or Hispanic.   In New Jersey, 34 percent  are African-American or Hispanic; and 38.8 percent of the Housing Region's population  is African-American or Hispanic.   The Emerson percentage is between one-half to one-third the equivalent percentage in the State and/or Housing Region.

It is clear, to a reasonable degree of certainty in the context of affordable housing planning, that African-Americans and Hispanics have been disproportionately impacted by Emerson's exclusionary zoning. The New Jersey Guide to Affordable Housing has no record of any affordable housing within the Borough.

## ERUR'S COMMUNITY

ERUR's contract with Emerson Borough requires ERUR to construct a community with 29 units of low and moderate income housing.  I understand that ERUR asserts that the Borough's current leadership has attempted to block this construction.  As discussed above, Emerson's exclusionary zoning has, in my opinion, to a reasonable degree of certainty in the field, had a disproportionate impact on African-American and Hispanic households; and delays in the construction of the 29 low and moderate income units, at issue in this matter, will continue the exclusionary status quo.

When Emerson does create some deed-restricted affordable housing including, as required by the Order within the Block 419 community, *as much of the State has long since done*, the housing will be affirmatively marketed throughout the housing region.  The affirmative marketing effort will include employment centers, houses of worship, various government agencies, non-profits etc.  The goal of that affirmative marketing effort will be to target those who have been excluded from Emerson and other communities in the past.   For the reasons set forth above, in my opinion, to a reasonable degree of certainty in the field,  the affordable housing, including the affordable housing contemplated in the Block 4l9 community, and its future Emerson residents will be much more diverse, in terms of race and ethnicity, than the Borough's current housing stock and population.  It is my opinion that, with a reasonable degree of certainty in the field of affordable housing planning, the percentage of African-Americans and Hispanics occupying the affordable units within the ERUR community will be much more representative of the percentage of these minority populations currently living in the housing region than the very low percentage of African-Americans and Hispanics currently living in Emerson.

Exhibit 2

# Bowman

July 11, 2023

**VIA EMAIL**

Joseph B. Fiorenzo, Esq.
SILLS CUMMIS & GROSS P.C.
One Riverfront Plz.
Newark, NJ 07102
Counsel for Plaintiffs

**Re:**    ***Emerson Redevelopers Urban Renewal, LLC v. The Borough of Emerson, et al.***
***2:20-cv-4728-MCA-MAH***


Dear Mr. Fiorenzo:

You have asked me to provide an opinion with respect to any delays in the issuance of permits by the Borough of Emerson ("Emerson") to Emerson Redevelopers Urban Renewal, LLC ("ERUR" or "Plaintiff") in connection with construction of a mixed-use development located on Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10, and Block 610, Lot 1 on the tax map of Emerson (the "Project").

I am a Vice President of Bowman Consulting Group Ltd. ("Bowman") with over forty (40) years' experience in land use planning and development. I am a licensed professional engineer in the state of New Jersey since 1987. Bowman is a national engineering and building services consulting firm, which offers engineering and planning services in site planning, construction administration, and land development. I have participated in countless mixed-use development projects in New Jersey. In reaching the opinions below, I have relied upon well-established principles in the field, as well as my decades of experience with land development and municipal permitting, and applied these principles to the facts and the case based on my review of, among other things, the deposition exhibits, pleadings, and discovery responses of the parties. This information, among other things, has provided me with sufficient reliable facts and data to render opinions concerning the process of development and permitting for the Project based on the applicable standards in the industry. Unless expressly stated otherwise, all opinions provided below are stated to a reasonable degree of certainty in the fields of land development and municipal permitting. This report is based upon information available to me on the date it is submitted and I reserve the right to modify or amend the report and its conclusions upon presentation of additional relevant materials.

## I.    BACKGROUND

Since before 2001, Emerson has been the subject of a variety of orders concerning the construction of affordable housing. On October 19, 2001, the Superior Court of New Jersey, Law Division, appointed a special master and implemented certain remedial measures to address what

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 2

the Superior Court called a "bastion of exclusionary zoning" in Emerson. DD-01.[1]  On March 21, 2002, the Court ordered certain revisions to Emerson's zoning ordinances. *Id.*  After adopting a Housing Element and Fair Share Plan and various ordinances concerning redevelopment and affordable housing, on September 8, 2015 Emerson filed a declaratory judgment action in the Law Division seeking a final judgment approving Emerson's fair share plan and entry of a judgment of repose for a period of ten years (the "Declaratory Judgment Action"). DD-10. During the pendency of the Declaratory Judgment Action, Emerson selected an area of land in the Central Business District for redevelopment, including with an affordable housing set-aside, as described below, which became the Block 419 Project.

In or about 2015, Emerson issued a request for proposal for development with respect to five lots on Block 419.  (Email dated 2/13/16). When no suitable proposals were submitted, the Emerson Municipal Council ("Council") issued a revised request for proposal on January 8, 2016 for an expanded project area consisting of nine lots. (Request issued 1/8/16). The request noted the "Redevelopment Affordable Housing Requirements." A number of developers submitted proposals, including JMF Property Group, LLC, Hornrock Properties, LLC (Email dated 2/26/16) Woodmont Properties, and Capodagli Property Co. (Email dated 2/26/16). After the developers presented their proposals and renderings to the Council over several meetings (Minutes of Meeting dated 3/15/16, Minutes of Meeting dated 4/5/16), Emerson adopted Resolution 129-16 on April 5, 2016, designating JMF Properties as redeveloper and seeking to negotiate the terms of a redevelopment agreement. *Id.* On June 14, 2016, the Council approved execution of a Redevelopment Agreement. DD-05. On June 27, 2016, Emerson executed a Redevelopment Agreement with Plaintiff ERUR, designated as an affiliate of JMF Properties. DD-03. Among other things, Section 2.02, "Representations and Warranties by the Borough," includes various provisions obligating the Borough to cooperate and execute approvals necessary for the development:

> (5) The Borough agrees to support any applications for Governmental Approvals that are consistent with the terms of the Redevelopment Plan and this Agreement and to execute any documents required to obtain such approvals and otherwise to cooperate with the Redeveloper with respect to the Governmental Approvals, provided that nothing contained in this Article 2.02 of this Agreement shall be deemed: (i) to constitute an approval of all or any portion of the Project for which Governmental Applications have been submitted or are required or approval of any Governmental Application seeking a financial incentive including but, not limited to, the PILOT (ii) a waiver of the ability of the Planning Board, or any other governmental or administrative entity, from exercising its statutorily authorized responsibilities with respect to the Governmental Applications or Governmental Approvals.

*Id.* The Redevelopment Agreement further provides:

> 5.04 The Borough agrees to cooperate fully with Redeveloper regarding all Governmental Approvals. . . The Borough shall, upon the written request of the Redeveloper, consider modifications of the dates set forth in the

---

[1] Where available, reference is made to deposition exhibits.

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 3

> Redevelopment Project Schedule. .. The Borough agrees to commence and
> diligently prosecute its obligations as set forth in the Redevelopment Project
> Schedule.
>
> ***
>
> 14.06 Approvals by the Borough and the Redeveloper. Wherever this
> Redevelopment Agreement requires the approval or consent of the Borough
> or the Redeveloper, or any  officers, agents or employees of either the
> Borough or the Redeveloper, such approval shall not be unreasonably
> withheld or conditioned; and approval or disapproval shall be given within
> the time set forth in this Agreement, or, if no time is given, within fifteen
> (15) days, unless formal action of the  Governing Body is required, in which
> case, within forty five ( 45) days.
>
> ***
>
> 14.13. Borough Approvals, All approvals or disapprovals required by the
> Borough shall, unless otherwise stated herein, be valid if given in writing
> by the Mayor or his designee.
>
> ***
>
> 14.24 Withholding of Approvals. All approvals, consents and acceptances
> required to be given or made by any person or party, shall not be
> unreasonably withheld or delayed.

*Id.* As to affordable housing, the Redevelopment Agreement provides:

> 4.03 Affordable Housing Requirement. The Parties recognize and
> acknowledge that the Project will generate a fair share housing requirement
> for the Redeveloper pursuant to the Affordable Housing Requirements
> established by the State of New Jersey and the Council on Affordable
> Housing. Redeveloper and the Borough agree that Redeveloper shall satisfy
> the affordable housing obligations resulting from Redeveloper's
> development of the Project in accordance with the State's Affordable
> Housing Requirements. The obligation shall be fixed as of the start of each
> of the Phases of the Project. The presumptive percentage of set aside units
> to be build shall be twenty percent (20%)

*Id.*  On October 4, 2016, the Redevelopment Agreement was amended to add Block 419 Lot 9 as
within the Project.  DD-06. A second amendment was executed on July 18, 2017, among other
things, amending the definition of the Affordable Housing Requirement to include 15% on-site
units and 5% off-site units and restating Emerson's obligation to utilize eminent domain. DD-09;
D-22.  It provides: "6. In the event the Redeveloper is not able to purchase any property set forth
in Exhibit A the Redeveloper shall request that the Borough assist it in purchasing such or
acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c) [N.J.S.A. 20:3-1 et al.,
N.J.S.A. 52:27D-301 et al. and/or any  other laws authorizing the Borough to acquire such

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 4

properties.]" On December 31, 2018, a third amendment was executed, adding Yaakov Klugmann as managing member of ERUR, among other things. D-35.

On November 21, 2017, a settlement agreement was executed with respect to the Declaratory Judgment Action, subject to review by the court and objections by interested parties, between Emerson and Fair Share Housing Center (the "Settlement Agreement"). DD-11. In it, Emerson relied upon the Project to meet its fair-housing obligations:

> 8. The municipality, as calculated in Exhibit A to this Agreement, has a realistic development potential (RDP) of 53 units. That RDP will be satisfied as follows, as will be more fully described In Borough's Housing Element and Fair Share Plan:... Block 419 Project. Credits 29...

> *The Block 419 Project has a minimum 15% set-aside, or 22 units, with an option for off-site provision or payment-in-lieu for the remaining 7 units. If such option is exercised, the Borough will show at the midpoint review how it will provide a realistic opportunity for the remaining 7 units, in accordance with the provisions of this Agreement.

> The Borough is providing a realistic opportunity for the Block 419 Project through its prior issuance of a Request for Proposals from redevelopers on January 8, 2016; publishing a ranking of the redeveloper respondents, and then executing, a Redevelopment Agreement, First Amendment to Redevelopment Agreement and Second Amendment to Redevelopment Agreement (hereinafter collectively referred to as 'Redevelopment Agreement' and attached hereto as Exhibit B) with Emerson Redevelopers Urban Renewal, LLC (Redeveloper), the selected redeveloper ranked the highest in the review by the Governing Body. The Redeveloper has been pursuing good faith negotiations with each of the property owners within the Block 419 Project area, and currently holds options for all but two of the properties. In the event the Redeveloper is not able to purchase one or more property(s) through good faith negotiations prior to the end of the first quarter of 2018, the Redeveloper shall request that the Borough assist It In purchasing such or acquiring such properties as permitted under N.J.S:A. 40A:12A-8(c) and N.J.S.A 20:3-1 et al., N.J.S.A: 52:27D-301 et al. and/or any other laws that grant the Borough the authority to acquire such properties. The Borough will expeditiously undertake good faith negotiations with any remaining property owners(s), and in the event that good faith negotiations are unsuccessful, the Borough is committed to moving to immediately acquire the property(ies) through eminent domain.

*Id.* Emerson adopted the Settlement Agreement by resolution. DD-12. On March 16, 2018, court appointed Special Master Mary Beth Lonergan recommended that the Court approve the Settlement Agreement. (Report dated 3/16/18). The Special Master's recommendation was based, in part, on the fact that "the 419 Redevelopment Inclusionary Housing . . . is producing the lion's share of the Borough's credits (29 affordable family rental units) towards the Third Round RDP." The Special Master also noted a realistic potential for the construction of affordable housing because, if negotiations were unsuccessful, under the Redevelopment Agreement as amended,

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 5

Emerson "is committed to acquiring the property through eminent domain as authorized under Local Redevelopment and Housing Law." After several days of fairness hearings considering objectors' objections, the Court entered an order on June 29, 2018, finding based on the Special Master's Report that the settlement agreement created "a realistic opportunity for the satisfaction of the Borough's Affordable Housing Obligation." DD-14. The matter was set for a final hearing on issuance of a judgment of compliance.

After the 2017 Settlement Agreement was executed in the Declaratory Judgment Action, ERUR applied for Preliminary & Final Site Plan Approval with respect to Block 419 (the "Application"). (Application dated 12/18/18). On December 6, 2018, Borough Engineer Gary Ascolese, P.E. of Boswell Engineering issued an Engineering Review Letter with respect to ERUR's land use application, Preliminary and Final Site Plans dated November 15, 2018, prepared by myself for Bowman Consulting, and Architectural Plans dated November 15, 2018, prepared by Devereaux & Associates, among other documents. DD-20. On December 10, 2018, Borough Planner Bridgette Bogart issued a Planning Review Letter regarding ERUR's submission for site plan approval. DD-19. On December 10, 2018, Emerson's combined Land Use Board held a public hearing on ERUR's Application for site plan approval. After hearing the ERUR's presentation and the testimony and statements of members of the community, the Board voted in favor of the application. DD-21. As discussed above, the Borough entered a third amendment to the Redevelopment Agreement providing for, among other things, Mr. Klugmann's management of the Project, on December 18, 2018. DD-28. The Borough counsel advised the Board with respect to the Third Amendment, noting the "amendment was not unreasonable and that bringing in Accurate Builders would enable the developers to close and allow Emerson to comply with its commitment" in the Declaratory Judgment Action. DD-28. On December 28, 2018, the Land Use Board issued a Resolution granting Preliminary and Final Major Site Plan Approval for the redevelopment on Block 419. DD-22. The Resolution set forth conditions of the approval and adopted some, but not all, of the comments in the Engineering and Planning Review Letters. On January 25, 2019, the Court in the Declaratory Judgment Action accepted Emerson's Housing Element and Fair Share Plan and entered a Conditional Final Judgment of Compliance and Repose. DD-13. The Court relied upon the Special Master's supplemental Report for a Mount Laurel Compliance Hearing, which again looked to the Block 419 Project to provide a realistic opportunity for the satisfaction of the Borough's affordable housing obligation. D-25. Emerson's counsel advised that "Emerson was safe from builder's remedy lawsuits." (Closed Meeting Minutes dated 2/19/19).

Shortly before the Land Use Board hearing on the Application, a municipal election was held in early November 2018. The previous administration, which had presided over negotiation of the Project, was not reelected. Danielle DiPaola ("Mayor DiPaola") became the mayor-elect. Several other members of the Council were also replaced. During and after the campaign, Mayor DiPaola made a variety of statements in opposition to the Project, the use of eminent domain, and the settlement agreement with Fair Share Housing Center. DD-07, (Meeting minutes dated 1/17/17), DD-17, DD-18, DD-21, DD-33. Mayor DiPaola was sworn in on January 2, 2019. Her administration elected not to retain the Borough architect, engineer, and counsel, who had overseen approvals for the Project.

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 6

## II.    RESOLUTION COMPLIANCE

We understand that Emerson asserted, for a period of over a year, that no construction permits for the Project would issue until all conditions of the Land Use Board Resolution had been met, what they termed "Resolution Compliance."  Following ERUR obtaining site plan approval, ERUR sent various requests to the new administration seeking a meeting with the Borough and its new professionals to discuss proceeding forward with the Project.  DD-33, DD-34, (Email dated 2/13/19), DD-35, DD-36, (Letter dated 3/4/19), DD-37, (Email dated 3/12/19), (Email dated 3/14/19). It appears that a meeting was not held until March 14, 2019. DD-29.  Thereafter, Emerson, through its professionals, issued six resolution compliance comment letters asserting a variety of pre-requisites, spanning from July 12, 2019, through July 2, 2020. *See* Comment Letters and Responses DD-20, DD-19, DA-05, (Letter dated 7/18/19), (Letter dated 11/14/19), Letter dated 11/22/19), (Letter dated 12/20/19), (Letter dated 12/20/19), DA-02, (Letter dated 3/6/20), (Letter dated 5/1/20), D-01, (Letter dated 7/6/20).

Among other things, Emerson imposed conditions upon the Project as part of Resolution Compliance that were not required by the Land Use Board's Resolution, DD-22. By way of one example, Emerson added 25 additional conditions that were not included in the Resolution under Section 5 "Technical Review Comment."  Additionally, the Resolution incorporates some, but not all, of the comments from the Borough's prior engineer's Engineering Review Letter, DD-20. Particularly, Condition 8 of the Resolution provides: "the Applicant shall comply with the following comments set forth in the Boswell Engineering review letter dated December 6, 2018 ("Engineering Review Letter") . . . A. Engineering Review Letter, Comments 7-16, 19-20, 22, 25-28, 34-38, 40-49."  Emerson conditioned Resolution Compliance upon comments that were not incorporated by the Board, DA-01 (requiring compliance with Engineering Comments 6, 17-18, 21, 23, 24, 29-33, 39). By way of a further example, the Land Use Board expressly considered whether the Project was within the height limitations of the zoning ordinance or required a height variance. Boswell's Engineering Review Letter sought testimony concerning whether the height complied with the Ordinance in Comment 23 of its Engineering Review Letter:

> The architectural plan shows a cut away section view A-A on the northwest comer of Kinderkamack Road and Linwood A venue with an overall height in excess of 50 feet. This is contrary to the maximum permitted building height for the redevelopment area. The Applicant shall explain this design feature, and if it complies with Chapter 290 -69 of the Zoning Code.

DD-20. At the Land Use Board hearing four days later, the Board heard extensive testimony as to how the height of the building complied with the Ordinance.  DD-21.  The Land Use Board granted approval without a variance, *id.*; omitted Engineering Comment 23 regarding height from the Resolution; and found in its Resolution that the application conformed to the height limitation of the ordinance, "[i]n reviewing the Application, documents, evidence and testimony, the Board concludes that the proposed uses comply with the municipal ordinances and the MLUL," DD-22. Despite express consideration and approval of the height of the Project as not requiring a variance, Emerson's new administration, through its recently appointed engineer, Neglia Engineering Associates (NEA), asserted in a Resolution Compliance letter that the Project did not comply with the Zoning Ordinance because the height listed in the plan required a variance:

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 7

> 2.1. In accordance with Table A (Area and Bulk Requirements for CBD-10 and CBD-15) within Chapter §290- 69, the maximum allowable building height (in feet) for the CBD-10 Zone is 42 feet along public rights-of-way and 50 feet along railroad rights-of-way. Furthermore, in accordance with note 5 provided under the aforementioned Table A, additional height is permitted in accordance with §290-70.A(3) and shall only be permitted on development parcels which are two (2) acres or greater. Further, the fifty (50) foot building height will only be permitted set back from the front building facade by a minimum of five (5) feet in depth on buildings facing Lincoln Boulevard and Kinderkamack Road. Based on the above, it is NEA interpretation that the maximum allowable building height along Lincoln Boulevard, Kinderkamack Road and the subject railroad right-of-way to the west, when incorporating the requirements established within the above-referenced note and §290-70.A(3), is 50 feet. Likewise, it appears that the maximum allowable height along Linwood Avenue is 47 feet. As per Chapter §290-6 (Definitions) of the Borough of Emerson Zoning Code, the building height is defined as the vertical distance measured from the curb level, as defined, to the extreme high point of the building, exclusive of a chimney, weather vane or similar structure. Furthermore, the curb level is defined as "the permanently established natural grade at the midpoint of the front building line." The Applicant has provided top of curb and top of roof profiles for the building facades fronting Lincoln Boulevard, Kinderkamack Road, and Linwood Avenue. These profile views shall be amended to illustrate the associated alignment midpoint to confirm the building heights along the same as they relate. to the maximum allowable building height. Furthermore, these profiles illustrate the top of roof elevation at 100 feet, whereas, the Architectural Plan Set illustrates the top of roof elevation at 95 feet (not exclusive of the building parapet). The Applicant shall clarify this discrepancy. Additionally, the Applicant shall revise the Site Plan Set to include an additional roof line profile along the rear railroad right-of-way. Irrespective of the above required plan revisions, it appears that the Applicant is proposing building height that exceeds 47 feet along Linwood Avenue. Therefore, based on the above definitions and requirements, it is NEA's opinion that the Applicant does not comply with the building height requirements of the CBD-10 Zone along Linwood Avenue. However, we defer to the Borough Land Use Board Planner and Attorney for confirmation with respect to the same.

DA-01.

By way of a further example, the Land Use Board discussed the calculations for the capacity of the stormwater drainage during the hearing on the application and asked "to see their [ERUR's] calculations." DD-21. The Resolution included, as Stipulation F, that "Applicant shall provide drainage calculations for the proposed development for the review and approval of the Board Engineer." Thereafter, the applicant provided capacity and drainage calculations. DA-06. Following submission of the calculations, Emerson's new administration demanded as part of Resolution Compliance: "Applicant shall submit an accompanying stormwater management report." DA-01. Emerson new administration further demanded for the first time in Resolution Compliance various certifications:

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 8

The Applicant shall provide a final certification memorandum, prepared, signed, and sealed by a licensed engineer in the State of New Jersey before a recommendation to issue a final certificate of occupancy can be made. This certification shall contain the following content at a minimum:
• A chronological log of site visits that include the date, time, weather and the nature of stormwater management related work
• Signed and sealed certification of a licensed professional in the State of New Jersey attesting to the following:

> o He/She was on-site and observed key phases of active construction;
> o He/She evaluated the as-built condition and that all aspects of the stormwater management system conforms to the approved plan or justify any exceptions thereto; and
> o He/She is of the professional opinion that the stormwater management system is expected to operate in accordance with the approved plan. This comment remains applicable and shall be addressed prior to issuance of a final certificate of occupancy.

DA-01. Emerson also demanded for the first time as part of Resolution Compliance a "Soil Evaluation Report":

A Soil Evaluation Report shall be prepared and submitted by a licensed professional engineer in the State of New Jersey, prior to any construction. This report shall include the following content at a minimum:
• Soil boring or test pit logs and location map;
• Detailed procedures and methods used to conduct any soil test;
• Weather conditions at the time of any testing, including time, temperature and the amount of precipitation within the preceding 48-hour period;
• Identification of the seasonal groundwater elevation;
• Field observations; data collected during any on-site test; derived/calculated infiltration rate(s), if applicable;
• A statement of certification signed and sealed by an appropriate professional attesting that the field conditions observed are either suitable or unsuitable for construction of the approved stormwater management system. If unsuitable conditions are encountered, the Applicant shall include a proposed revised storm water management plan. The revised plan must result in the equivalent runoff rate and volume as the originally approved plan; and
• NEA shall be notified 48 hours in advance of this testing so that a representative of our office may be present for this testing.
This comment has not been addressed. The required Soil Evaluation Report shall be provided prior to commencement of construction.

DA-01. It also required a meter study:

The Applicant shall perform a comprehensive thirty (30) day meter study for the existing sanitary sewers system within the Kinderkamack Road right-of-way, to ensure that adequate capacity is provided within the existing systems to service the proposed improvements. This comment has not been addressed.

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 9

DA-01.

By way of a further example, Emerson required that ERUR submit traffic analyses that were not required by the Board. Before the Land Use Board, ERUR's engineers testified to traffic counts for the proposed Project. DD-21 (Traffic Engineer Olivo testifying to 100 trips during the peak hour, which would "not be expected to significantly alter the patterns within the area"). The Board's Resolution credited this testimony. DD-22 ("traffic generation associated with the site is not expected to significantly alter the traffic patterns . . . With regard to trip generation, it is estimated that during peak hours, which are 7:00 a.m.-9:00 a.m. and 4:00 p.m. to 7:00 p.m. on weekdays and 11 :00 a.m. to 2:00 p.m. on Saturdays, there are just under 100 trips per hour."). As a condition of the Resolution, the Board required ERUR to submit a "traffic report to support the traffic testimony presented at the December 10, 2018 Land Use Board meeting," i.e. of just under 100 trips during peak hours. D-22, Condition 11hh. But when ERUR submitted the traffic report, Emerson's new administration demanded a variety of revisions and supplements to the traffic report not required by the Board.

It is a bedrock principle of land development that the municipal body charged with approving, rejecting, or conditioning applications for land use is the planning board or zoning board (or, as here, combined land use board). After approval, relief may be sought, in some circumstances, from the governing body, or from the superior court. After the appeal period has passed, the approval is final and cannot be modified, rescinded, or further conditioned by the municipality, even if the leadership of such municipality has changed. Likewise, the conditions set by the municipal land use board in the formal resolution are the only applicable land use conditions. They cannot be enlarged, expanded, or added to after the resolution is duly adopted and the appeal period has passed. Each of the additional conditions imposed by the new administration identified above could have been raised, considered, and decided upon by the body charged with implementing land use decisions. Indeed, some of them were directly considered and rejected. It violates well established principles of land development and permitting for the municipality, through its new administration, to impose new conditions upon a resolution which were never specified by the Land Use Board in its Resolution granting approval. For Emerson to hold up the Project, on that basis, delayed, and did not diligently prosecute, its obligations. Similarly, to the extent Emerson conditioned the issuance of demolition or construction permits upon full satisfaction of the duly adopted conditions set forth in the December 28, 2018 Resolution, is contrary to applicable principles of municipal permitting. Further, even many valid and binding conditions of a resolution may be complied with during or after construction. It is not proper under well-established principles of land development for a municipality to condition the grant of construction permits for a fully approved project upon "Resolution Compliance," unless such conditions of the resolution expressly pertain to pre-construction conditions. Rather, it is the role of the construction code official to compare the plans to the Uniform Construction Code and assess whether the plans are code compliant, and, if so, issue the construction permit; it is not to make zoning determinations concerning whether the conditions of the Resolution are met. To a reasonable degree of certainty in the field of land development and local government permitting, Emerson's imposition of these additional requirements, and position that construction permits would only be issued upon satisfaction of Resolution Compliance, caused a delay to the substantial completion of the Project. ERUR was unable to commence demolition and construction ninety days after the December 28, 2018 approval, and indeed, delays for Resolution Compliance continued after ERUR received an order on an application in aid of litigants' rights on March 16, 2021, DA-15.

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 10

## III.    DEMOLITION PERMITS

It is our understanding that Emerson conditioned the issuance of demolition permits for the Project upon  Resolution Compliance and upon ERUR obtaining a certification from DEP that there was no contamination on  the Project tract. We further understand there were additional periods where demolition was delayed due to the Borough's objections to erecting fencing.  It is our opinion to a reasonable degree of certainty in the field that these actions caused overlapping delays with Resolution Compliance, discussed above.

In or around May 2019, ERUR inquired as to the issuance of demolition permits for several (but not all) of the lots.  We understand that Emerson initially claimed that no demolition permit could be issued until all demolition was ready to commence with respect to all lots in the Project.  On July 9, 2019, ERUR sought Emerson's assistance in removing a water line for sprinklers prior to demolition.  Emerson's construction official responded that the building department would not approve demolition until ERUR had satisfied all land use conditions and approvals.  (Email dated 4/7/22).  On July 15, 2019, ERUR advised Emerson of its "frustration … regarding the Borough's consistent pattern of inaction regarding all aspects of this redevelopment project", and stated that it had the "absolute right to demolish structures on its property irrespective of the status of project approvals and construction." (Letter dated 7/15/19). Notes from a September 5, 2019 meeting between Emerson and ERUR reflect that ERUR sought to move forward with "demolition now" at "19 Lincoln, 214 K'mack, 184 K'mack, 176 K'mack, 78 & 76 Lincoln." (Notes dated 9/5/19).  The Borough requested ERUR erect a fence prior to demolition and ERUR sought and received a fence permit on September 17, 2019. (Permit issued 9/17/19). Days later, Emerson blocked ERUR from moving forward with the fence, asserting it would make commuter parking more difficult. (Email dated 9/17/19; Email dated 9/18/19). ERUR temporarily held off fencing and demolition, as demanded by Emerson, until Emerson could resolve the parking issue. (Email dated 9/20/19). On September 24, 2019, ERUR proposed a modified fence that allowed additional commuter spots, which plan was apparently accepted by Emerson.  (Email dated 9/24/19).  Over the next week, ERUR requested confirmation that it could move forward with the fence, repeatedly, receiving no response. *Id.*; (Email dated 9/24/19, Email dated 9/25/19, Email dated 9/27/19, Letter dated 10/3/19). Then, on October 2, 2019, Emerson complained that the buildings had not been secured, "Each building MUST be secured by whatever means necessary." (Email dated 10/2/19). It still did not confirm the fence layout. By letter dated October 7, 2019, ERUR's counsel observed:

As you know, Redeveloper has been attempting to secure and fence the vacated portions of the Property and prepare same for demolition for at least the last five (5) months. Redeveloper also informed you, Mayor DiPaola, Mr. McCann and many other Borough representatives at a meeting held on August 8, 2019, that Redeveloper needed to secure, fence off, and demolish the vacated portions of the Property as soon as possible for health and safety reasons. In response, Redeveloper experienced only delays in trying to secure the necessary utility shut-offs and fencing and demolition permits from the Borough… When Redeveloper finally obtained zoning permits to install fencing for the Property on September 17, 2019, the Borough requested that Redeveloper hold off on installing any fencing so that the parties could properly identify the location of the commuter parking spaces on the Property (which are to remain accessible to the public until December

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 11

1, 2019)... Redeveloper promptly prepared a revised fence map incorporating these additional commuter parking spaces and submitted it to the Borough the next morning. Despite daily followup, however, Redeveloper did not receive any confirmation from the Borough that the revised fence map was acceptable and that Redeveloper could move forward with the installation of the fencing. Finally, on September 27, 2019, we sent an e-mail to the Borough indicating that Redeveloper would proceed with the installation of the fencing based on the revised fence map unless the Borough notified us otherwise. After we received no response from the Borough other than an inquiry from the Borough Construction Official on September 30, 2019 as to when Redeveloper proposed to install the fencing, you sent an e-mail to Redeveloper - without copying me or anyone from my firm - at 9:33 p.m. on Tuesday, October 1, 2019. In your e-mail, you demanded that Redeveloper immediately install the fencing and secure the vacant buildings on the Property and gave Redeveloper less than twenty-four (24) hours ("by close of business Wednesday") to do so.

(Letter dated 10/7/19). We understand no response was received from Emerson confirming the fence layout. ERUR constructed the fence days later and made a November 5, 2019 request for demolition permits.

Demolition permits were further held in abeyance based on Emerson's assertion that, despite the absence of an ongoing NJDEP remediation, ERUR purportedly had to provide a certification that the Project was free from contamination. Initially, the December 28, 2019 Land Use Board Resolution stated, as a condition, "Applicant is responsible for any environmental clean-up and/or environmental conditions as to the site as required by federal, state, county and local governmental agencies and officials, which must be complied with to the satisfaction of each of the aforementioned agencies and officials." It did not state that the local municipality would play any role in evaluation of the site or remediation, if remediation was required by NJDEP. During the months preceding ERUR's request for demolition permits, Emerson Mayor DiPaola repeatedly contacted NJDEP and sought action with respect to the site. Following a June 2019 meeting with the Mayor, an NJDEP representative emailed on June 25, 2019 that the Project did not have an active cleanup and the one site subject to NJDEP review had received a No Further Action letter:

After discussing with our programs, I have some updated information about the issues we discussed in our meeting last week... attached is a No Further Action letter issued in July 1996 for "Bills Tire and Auto", 176 Kinderkamack Road. Bills Tire and Auto is an unrestricted cleanup, with no cap. Therefore there couldn't be any disturbance of a cap should construction occur on the adjacent property.

(Email dated 6/25/19). Mayor DiPaola, or her staff, followed up numerous times with NJDEP in the following six weeks apparently seeking to prompt NJDEP action with respect to a former dry cleaner at the Project. The Mayor also placed a call with the Director, Office of Local Government Assistance, expressing concerns regarding "planned residential housing on the former dry cleaner site and associated concerns (testing for contamination, concerns re: development, etc.)" NJDEP representatives responded that they had thoroughly researched the site and "DEP cannot require

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 12

environmental investigation due to a real estate transaction or redevelopment. To trigger DEP site
remediation regulations, a discharge must be reported to the DEP hotline, 1-877-WARN-DEP.
DEP has not received report of a discharge at 190 Kinderkamack Road, the former dry cleaner
site." Throughout July and August 2019, the new administration tried several additional requests
to NJDEP, claiming they believed there were AOCs or Areas of Concern, and seeking information
from other governmental units of "any records of any hazardous waste discharge . . . or "anyone
else here who might have knowledge if such an event had occurred." On August 6, 2019, NJDEP
advised for a final time that there was no basis for NJDEP to conduct an investigation, including
based on an Area of Concern, unless there was a "known discharge on site."

With no action by NJDEP forthcoming, Emerson demanded additional information from ERUR.
On September 3, 2019, in closed session, the Mayor and Council determined that ERUR "needed
to provide all DEP information. Governing Body consensus was to return to open session and
make a motion to demand all environmental information in the redeveloper's possession on the
Block 419 properties." (Closed Meeting Minutes dated 9/3/19). Emerson's counsel demanded "all
environmental documents … in your possession." ERUR's attorney advised: "It is not appropriate
to share the content of our confidential legal review. If and when our client is required to perform
environmental remediation, a New Jersey Licensed Site Remediation Professional (LSRP') will
be engaged. Any LSRP filings with the NJDEP, along with any/all existing 'public documentation'
and previous sampling documentation, already in the NJDEP records, will be available to the
Borough." (Email dated 9/21/19). On November 12, 2019, the Emerson Council discussed
"Potential Litigation - Emerson Redevelopers Urban Renewal LLC - Re: Environmental Issues."
(Closed Meeting Minutes 11/12/19). Similarly, Emerson sought, by way of Resolution
Compliance, a new condition, where it demanded "[a]ll documentation related to the
["environmental clean-up and/or environmental conditions"] shall be submitted for review as
required," DA-01, although never required in the Resolution. Emerson then withheld demolition
permits until ERUR produced a certification from DEP.

On November 27, 2019, ERUR representative emailed the code official regarding issuance
of demolition permits, stating:

> Can you please send me an email detailing the conversation we just had,
> explaining that we can't demo any properties until we clear up the situation
> with the past usage as a dry cleaners at 190 Kinderkamack, and any possible
> contamination that it may have caused.

(Email dated 11/27/19). The code official responded that permits would not be issued without
"verification from the DEP":

> I do not know if the site is contaminated or not. I need verification from the DEP that
> the site is ok. This should not be very difficult to do. This chemical is very dangerous
> and I need to find out.

*Id.*

There was no sound basis in land development or local government permitting to condition
the ministerial act of issuance of a demolition permit upon the land owner obtaining a certification

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 13

from the NJDEP, which had no open investigation, that the site was not contaminated. Environmental remediation is governed by state law, subject to the jurisdiction of the NJDEP, not by local government concerns about the appropriateness of the site for residential housing based on the assumed contamination of prior uses. Similarly, it is the obligation of the municipality, through its construction code official, to issue demolition permits upon disconnection of service connections, notice to adjoining landowners, and abatement of asbestos, if any. There is no sound principle of local government permitting that allows a municipality to withhold a ministerial issuance of a demolition permit upon satisfaction of all conditions of a resolution or the approval of construction plans. Indeed, a property owner may demolish a building on a single or multiple lots even without a plan for construction. Emerson's acts of imposing prerequisites to the application for demolition permits and additional conditions to the grant of such permits delayed initiation of demolition, and, therefore, substantial completion of the Project, from ERUR's July 2019 demand through issuance of demolition permits.

## IV.   CONDEMNATION OF LEASEHOLD INTERESTS

Block 419 Lot 6.01 included a tenant Scalco, Inc. d/b/a Cork & Keg, a liquor store, in the middle of the Project. Before the Land Use Board hearing on December 10, 2018, Emerson and ERUR, and their attorneys, had been engaged in negotiations with Cork & Keg's counsel in a good faith attempt to purchase Cork & Keg's interest to allow the Project to move forward. DD-21 ("I've been in contact with Mr. Massey. I've told Mr. Massey that he needs to present to us so that we in turn can present it to the developer the amount of money you think you'll need to relocate in town."). By April 12, 2019, ERUR had closed title to each of the lots within the Project, including the lot subject to the Cork & Keg lease. Over six months, the parties reached an impasse. On May 30, 2019, ERUR made a good faith offer for relocation expenses and an "offer in excess of $100,000 to settle the matter privately and avoid involving the municipality in a leasehold condemnation," but Cork & Keg "rejected the offer.... No counter offer of settlement was proposed." As described, the parties' good faith negotiations had been unsuccessful and were "at a standstill." (Email dated 6/3/19). ERUR's counsel wrote to the Borough's municipal counsel on June 3, 2019, invoking the Redevelopment Agreement and advising that "we will in fact require the filing of a leasehold condemnation action against Cork and Keg." *Id.* Emerson did not then move forward to condemn the leasehold interest. On July 15, 2029, ERUR again advised that if Cork & Keg continued to reject its good faith offers, the Borough would be required to "begin condemnation proceedings." (Letter dated 7/15/19). In response, Cork & Keg issued a cease and desist letter to the Borough, and demanded that Emerson refuse to issue demolition permits. ERUR asked the Borough to advise Cork & Keg "it has the power to condemn Cork & Keg's leasehold interest in the Property, in accordance with Section 5.01 of the Redevelopment Agreement." (Letter dated 7/29/19, Letter dated 8/2/19 to Richard De Angelis, Letter dated 8/2/19 to John McCann). The Borough never responded to Cork & Keg. It did not commence condemnation proceedings.

Another six months passed before the Borough considered the request concerning "Potential Litigation - Lease Condemnation." (Closed Meeting Minutes dated 12/3/19). On December 17, 2019, the Borough publicly announced it had authorized the commencement of condemnation proceedings after January 2, 2020. (Meeting Minutes dated 12/17/19). But when January 2, 2020 passed, the Council, in closed session, elected "not doing anything further regarding condemnation to see if the parties could come to an amicable agreement." (Closed

Joseph B. Fiorenzo, Esq.
July 11, 2023
Page 14

Meeting Minutes dated 1/2/20). Instead of moving forward with lease condemnation proceedings, by the end of January 2021, Emerson had only "written letters to Cork and Keg and the Redeveloper suggesting they consider participating in a one-day mediation with a retired judge." (Closed Meeting Minutes dated 1/21/20).  Consistent with the Redevelopment Agreement and the Local Redevelopment and Housing Law, N.J.S.A. § 40A:12A-1, et seq., upon being advised by ERUR that its good faith negotiations with Cork & Keg had failed and that initiation of condemnation proceedings were required, well established principles of land use compelled Emerson to move forward with initiation of condemnation for this centrally located lot, with no way to work around it during construction. By failing to promptly commence and prosecute such proceedings, Emerson caused a postponement of substantial completion of construction between ERUR's demand for initiation of condemnation and Emerson's meeting at the end of January 2020, because ERUR could not reasonably move forward with construction if use of a component parcel of the Project was uncertain.


Sincerely,
BOWMAN CONSULTING GROUP, LTD.


Eric L. Keller, P.E., P.P., LEED AP
Vice President
ekeller@bowman.com

Exhibit 3

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE COMMITTEE ON OPINIONS

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: BERGEN COUNTY
DOCKET NO. BER-L-2734-00

COMMUNITY DEVELOPERS & MANAGEMENT,
LLC,

        Plaintiffs,

   v.

BOROUGH OF EMERSON AND THE
PLANNING BOARD OF THE BOROUGH OF
EMERSON,

        Defendants.

---

Decided: October 19, 2001

Nylema Nabbie, Esq., (Schepisi & McLaughlin, attorneys)
tried the cause for Plaintiff Community Developers &
Management, LLC.

Gary T. Hall, Esq., (McCarter & English, attorneys) and
Christine Farrington, Esq., tried the cause for Defendants
Borough of Emerson and the Planning Board of the Borough of
Emerson (Docket No. L-2734-00)

## Outline of Opinion

| | | |
|---|---|---:|
| I. | INTRODUCTION | 2 |
| II. | SUMMARY OF THE PARTIES' POSITIONS | 3 |
| III. | PROCEDURAL BACKGROUND | 4 |
| IV. | FINDINGS OF FACT | 7 |
| | Emerson, New Jersey | 7 |
| |     Map 1 | 7 |
| | Community Developers' Site | 8 |
| | Emerson Woods' Site | 10 |
| | Marek Farm Site | 13 |
| |     Map 2 | 14 |
| | Pre-litigation Activities of Community Developers | 14 |
| V. | CONCLUSIONS OF LAW | 18 |
| | Emerson's Fair Share | 19 |
| |     Community Developer's Site Should | |
| |         Be Included in the RDP | 25 |
| |     Marek Farm's RDP | 28 |
| |     Community Developers' RDP | 31 |
| |     Table 1: Summary of RDP | 32 |
| |     Community Developers is Not Entitled to a | |
| |         Builder's Remedy | 33 |
| |     Estoppel | 41 |
| |     Unclean Hands | 42 |
| |     Interim Judgment and Mandatory Injunction | 46 |
| VI. | CONCLUSION | 48 |

P011586

JONATHAN N. HARRIS, J.S.C.

I. INTRODUCTION

Emerson, New Jersey persists as a bastion of exclusionary zoning. It has steadfastly resisted taking affirmative steps to provide realistic opportunities for affordable housing within its borders. It has further failed to enact the necessary legislation to authorize the expenditure of its considerable affordable housing trust funds for regional or local housing needs. The time has come to end this constitutional breakdown. The New Jersey Constitution shall not be permitted to merely remain a vague rumor in Emerson.

This case is a conventional builder's remedy *Mt. Laurel II*[1] action, which until October 19, 2001 had been consolidated with a garden-variety eminent domain proceeding related to lands referred to as Emerson Woods. The condemnation dispute was settled by the contesting parties with their acquiescence to an acquisition for $7,800,000. In the course of this opinion, for the sake of completeness, I will refer to certain facts related to the condemnation aspect of the case which were developed at the consolidated trial. As such, the details of the case involve several arcane points within the maze which sometimes seems to

[1] So. Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158 (1983).

characterize the world of affordable housing[2]. Although I conclude
that the builder's remedy is not warranted, Emerson shall be
required without delay to adopt all affirmative measures—
including meaningful legislation and adequate appropriations—
recommended or made necessary by the Special Master, in order to
fulfill its constitutional obligation to provide shelter
opportunities for the beneficiary class of unhoused poor.

II. SUMMARY OF THE PARTIES' POSITIONS

    Plaintiff Community Developers & Management, LLC (Community
Developers) owns an .83-acre now-vacant parcel of land in the
Borough of Emerson (Emerson) zoned for single-family development.
It proposes to build at least twelve multi-family units on the
site including two units devoted to low or moderate income
households. Emerson resists the offer on the dual grounds that
Community Developers has not acted in good faith because
Community Developers: 1) has used the *Mt. Laurel II* doctrine as a
bargaining chip and 2) has conducted itself in a manner that
would be violative of the New Jersey Fair Housing Act (NJFHA)[3].

    United Properties Group, Inc. and Emerson Woods, LLC
(Emerson Woods) own or control a vacant parcel of 19.38 acres
that had been recently approved for 111 townhouse units. This
land was the object of Emerson's eminent domain activity, the

---

[2] See Home Properties of New York, L.P. v. Ocino, Inc., 341 N.J. Super. 604,
606 (App. Div. 2001).

[3] N.J.S.A. 52:27D-301 to -329.

3

P011588

purpose of which was to acquire and conserve the property for open space.

III. PROCEDURAL BACKGROUND

Community Developers commenced its builder's remedy *Mt. Laurel* II action on March 28, 2000. It not only sought vindication of its right to develop its property at a density greater than permitted by existing zoning regulations, but it also urged the court to require Emerson to comply with the constitutional mandate of *Mt. Laurel* II and its progeny. Emerson contested Community Developers' claims and sought to dismiss its builder's remedy assertion.

On June 9, 2000, I granted permission to Emerson Woods to intervene as a party-plaintiff pursuant to R. 4:33-2. The limited purpose of the intervention was to permit Emerson Woods to try to protect its development approvals, which included a substantial monetary contribution towards affordable housing. *Emerson Woods did not specifically seek a builder's remedy*. It already considered its property to be a contributory, albeit not inclusionary, *Mt. Laurel II* site.

On December 15, 2000, I entered an order declaring that Emerson's zoning ordinance was invalid and unconstitutional insofar as it failed to provide a realistic opportunity for the development of affordable housing. I further required Emerson to revise its Master Plan and zoning ordinances to effectuate

4

compliance with the New Jersey Constitution. To assist Emerson in this endeavor, I appointed professional planner David N. Kinsey, Ph.D. as Special Master and obliged Emerson to complete the necessary remedial administrative and legislative activities no later than March 30, 2001. Additionally, a conditional builder's remedy was granted in favor of Community Developers so that its land would be treated as an inclusionary site in Emerson's forthcoming compliance plan. I reserved for trial Emerson's defense of bad faith. At the time, Emerson had not seriously raised the specter of the possibility of a NJFHA violation being an issue in this case.

On February 16, 2001, I declared that land was a scarce resource in Emerson and I entered an order containing an interlocutory injunction restraining certain land development activities until a final determination could be made concerning Emerson's ability to comply with its *Mt. Laurel II* obligations. In supposed compliance with the order of December 15, 2000, the Emerson Planning Board prepared and adopted an amended Housing Element and Fair Share Plan and the governing body endorsed it by resolution on April 3, 2001.

During the pendency of the builder's remedy *Mt. Laurel II* action, Emerson embarked upon an attempt to acquire the land of Emerson Woods for public open space. On June 14, 2000, Emerson commenced an action to exercise its right of eminent domain in

5

P011590

the Chancery Division. The condemnees resisted the condemnation action, claiming that Emerson was acting in bad faith and that the acquisition would not serve a valid public purpose because it would thwart Emerson's ability to comply with its *Mt. Laurel II* obligations. On January 3, 2001, the eminent domain action was transferred to the Law Division and ultimately consolidated with the builder's remedy *Mt. Laurel* II action for trial. Emerson was permitted to deposit its estimate of the fair market value of the property with the court[4], but I stayed the filing of a declaration of taking[5].

Trial commenced on September 24, 2001 and consumed four days. At the opening of the trial, Emerson Woods announced that if it received an incentive density bonus higher than the density it already enjoyed with its vested site plan approval, it would abandon this approval for 111 townhouses, and instead build an inclusionary development with 20% of the units devoted to low and moderate income households. This announcement confirmed a similar offer made in a February 14, 2001 letter to the Special Master. At the immediate conclusion of the trial, Emerson Woods again offered to surrender its current development entitlement in exchange for the right to become a *Mt. Laurel II* inclusionary site at the density recommended by the Special Master so as to

---

[4] N.J.S.A. 20:3-18.
[5] See Borough of Tenafly v. Centex Homes Corp., 139 N.J.Super. 490 (Law Div. 1975).

6

yield approximately 187 units, of which 37 would be devoted to low and moderate income households.

On October 19, 2001 I was informed in open court that Emerson and Emerson Woods had reached a mutually-agreeable resolution of their dispute. Emerson Woods has withdrawn as an intervenor in the builder's remedy *Mt. Laurel II* action and Emerson has dismissed the eminent domain proceeding.

IV. FINDINGS OF FACT

### Emerson, New Jersey
(See Map 1)

Emerson is located in central Bergen County, on the west bank of the Oradell Reservoir, approximately one mile east of the Garden State Parkway. It serves as the southern boundary of the Pascack Valley.



Map 1

7

Emerson's population in 2000 was 7,197, an increase of 3.8% from the 1990 census. It is estimated that in 2000 there were 2,406 dwelling units, of which 96% were single-family detached units on modestly sized lots. The total land area in the municipality is approximately 1,600 acres (2.5 square miles). Most of Emerson is designated as *Planning Area 1 — Metropolitan Planning Area* in the State Development and Redevelopment Plan, with the exception of watershed/reservoir lands adjacent to the Oradell Reservoir, which are designated as *Planning Area 5 — Environmentally Sensitive Planning Area*.

### Community Developers' site
(See Map 2)

The Community Developers' site is vacant; a single-family dwelling was demolished in 1997 pursuant to a duly issued municipal permit. The land is located at 43 Emerson Plaza West, almost exactly in the center of the municipality, a stone's throw from the railroad station, and adjacent to a variety of residential and commercial uses. It is zoned R-10 Residential Single Family, thereby permitting a density[6] under the Municipal Land Use Law[7] (MLUL) of 4.3 units per acre.

The property occupies an area of 34,824 square feet in a generally rectangular shape. Frontage of 40 feet exists at the

---

[6] "Density" means the permitted number of dwelling units per gross acre of land to be developed. N.J.S.A. 40:55D-4.
[7] N.J.S.A. 40:55D-1 to -129.

8

P011593

terminus of Emerson Plaza West. Single-family dwellings occupy
lands north and west of the site. South of the site are a mix of
residences, offices, retail and commercial uses, and multi-family
dwellings. Directly adjacent to and east of the site is a
railroad right of way used mainly by New Jersey Transit for
weekday commuter rail operations. East beyond the railroad are
commercial and retail uses, which comprise Emerson's downtown
business area.

Before its demolition, the single-family structure that
occupied the property was in a state of wholesale disrepair. The
building was grossly overgrown with shrubbery. Glass was missing
in many windows. Cracks appeared in the foundation and holes in
the wooden framework of the structure were apparent upon even the
most cursory observation. Standing water to a depth of over one
foot covered the basement. Many floors and interior walls tilted
out of alignment. Electric and water utilities were discontinued
in 1995. At the time a representative of Community Developers
first inspected the property during negotiations for its
acquisition in 1996, electricity was provided by an extension
cord, which ran to the building from an adjacent property. The
only electrical fixture that operated, powered by that extension
cord, appeared to be a porch light. The stairways had no
railings; mildew and fungus covered the walls where sheetrock had
not given way to numerous holes; and none of the toilet

9

P011594

facilities worked. In a word, at the time of its demolition, the
dwelling was substandard[8] and had been so for many years. Indeed,
it was uninhabitable as well, although there is some anecdotal
evidence to suggest that someone had taken up residence in the
dilapidated structure before it was torn down. The decision to
demolish, rather than to rehabilitate, was well taken.

### Emerson Woods' site
#### (See Map 2)

The Emerson Woods' site is vacant. It has been a
battleground between environmentalists and proponents of
development since the 1980s. The land is located on Main Street,
approximately 700 feet from the Oradell Reservoir. Evidence
presented to the Emerson Planning Board suggested that the
property had been cleared for agricultural purposes in the 1890s
and remained so until the 1950s when the natural vegetation grew
back.

It is undisputed that the property had once been an integral
part of the Hackensack Water Company's overall watershed lands,
serving either as an unnecessary utility holding or as a
protected reservoir buffer. In 1984, the land was removed from
watershed designation as part of a much larger parcel. It became
potentially developable under a zoning ordinance permitting a

---

[8] A substandard housing unit is defined as a unit with health and safety code
violations that require the repair or replacement of a major system. A major
system shall include weatherization, a roof, plumbing (including wells),
heating, electricity, sanitary plumbing (including septic systems), and/or a
load bearing structural system. N.J.A.C. 5:93-5.2.

P011595

planned commercial development, and remained so for almost a decade. In 1993, as a fraction of a complicated settlement involving former watershed lands surrounding the Oradell Reservoir, the 19.38-acre Emerson Woods' parcel was remaindered when the much larger land of which it was a small part was returned to protected status under the auspices of the Board of Regulatory Commissioners. Today, what remains is zoned R-TH Townhouse, which permits multi-family use at a density of six units per acre.

The property occupies an area of 19.38 acres in an irregular shape. The parties agree that because of wetlands constraints, only 12.93 acres are actually developable. Frontage of approximately 1,900 feet exists along Main Street. Single-family dwellings occupy lands north and west of the site. South of the site are primarily watershed lands and some scattered residences. Directly adjacent to and east of the site are reservoir buffer lands and the Oradell Reservoir.

On December 17, 1998, the property obtained preliminary site plan approval from the Emerson Planning Board for a 116-unit townhouse condominium development. This reflected a density pursuant to the MLUL of six units per acre, which matched the maximum density under Emerson's zoning ordinance. Pursuant to that zoning ordinance, Emerson Woods was required to contribute "an appropriate amount, consistent with Council on Affordable

11

P011596

Housing regulations, to the Borough Affordable Housing Trust."
The Planning Board resolution approving the preliminary site plan
echoed the ordinance. Final site plan approval was granted by the
Planning Board on April 1, 1999. Again, Emerson Woods was
obligated to contribute to the "Housing Trust Fund as required
under the Fair Housing Act." Amended final site plan approval was
obtained on February 15, 2001, which resulted in an altered site
plan and a reduction in units from 116 units to 111 units. The
resolution granting amended final site plan approval required,
for the first time, a specific monetary contribution to "the
Borough's Housing Trust Fund as required under the Fair Housing
Act" of "$4,000 per unit for a total contribution of $444,000."
The parties agree that although the actual collection of
development fees would probably violate COAH regulations[9], the
amount was based upon the Council on Affordable Housing's
(COAH's) presumed cost of subsidizing a low or moderate income
unit at $20,000 per unit as reflected in COAH's regulations[10].
Thus, the parties agree that if a 20% set-aside were required of
Emerson's R-TH zone instead of a monetary contribution, Emerson
Woods would be required to provide 22.2 low and moderate housing

---

[9] N.J.A.C. 5:93-8.1 permits the imposition, collection, and expenditure of
development fees only through participation in COAH's substantive certification
process, which Emerson has unfailingly eschewed.
[10] In 1992, COAH clarified that $20,000 is the average internal subsidy for the
set-aside units in an inclusionary development. 24 N.J.R. 238 (Jan. 21, 1992).
That figure was also the minimum amount acceptable for a Regional Contribution
Agreement (RCA). N.J.A.C. 5:93-6.5. Effective January 2, 2001, the minimum
amount necessary to transfer an RCA was increased to $25,000 per unit.

P011597

units. Multiplying 22.2 units times $20,000 produces $444,000, or
$4,000 per unit. Emerson Woods did not challenge the required
contribution, and Emerson did not seek to increase the amount to
reflect the current RCA transfer amount of $25,000.

<u>Marek Farm site</u>
(See Map 2)

As part of the *Mt. Laurel* II builder's remedy action,
Emerson had been ordered by me to prepare a realistic plan to
satisfy its fair share obligation under the NJFHA. Emerson
proposes to utilize property referred to as the Marek Farm as
part of the compliance plan presented at trial. This property is
located in the northeast corner of Emerson, on Old Hook Road, in
the general vicinity of the Emerson Woods' site. It consists of
6.43 acres of active farmland including a farm stand and
greenhouse complex known as Old Hook Farm. It suffers no known
environmental constraints. The farm is directly adjacent to a
recently completed Alterra Wynwood three-story assisted living
facility with 106 beds in 96 units. Emerson presented no
competent evidence to indicate whether the owner of the land
intended to continue to devote it to farming, redevelop it for
permitted uses in the zone, or actually build low and moderate
income housing. Hearsay statements about the owner's children and
their ambitions have no evidentiary significance.

13

P011598



Map 2

## Pre-litigation Activities of Community Developers

Community Developers acquired its site in 1997. After demolishing the residential structure, it immediately applied to the Emerson Board of Adjustment for a use variance[11] to permit the establishment and operation of a 16 unit multi-family use on the property. None of the units were proposed for use by low or

---

[1] N.J.S.A. 40:55D-70(d)(1).

14

P011599

moderate income households. The application was withdrawn. In 1999, Community Developers applied anew for a use variance, this time trimming its request to 12 units (and no low or moderate income units whatsoever). The Board of Adjustment denied the application. Emerson claims that at the hearing before the Board of Adjustment on June 16, 1999, Joseph Burgis, Community Developers' expert planning witness, made veiled threats that if the variance were not granted, Emerson might suffer an involuntary builder's remedy, notwithstanding an adverse Board of Adjustment ruling.

Burgis's two references to *Mt. Laurel II* remedies, when read in context, clearly were neither threat-laden, nor capable of objectively being understood as threats. The first discussion of *Mt. Laurel II* came in Burgis's discussion of the deficiencies in Emerson's Master Plan and then-overdue periodic reexamination under the MLUL[12]. He modestly opined that a site so close to an operating commuter railroad station and a downtown area is appropriate for high-density residential development. He further urged the Board of Adjustment to "get the mayor and council to address that issue (compliance with the *Mt. Laurel II* obligation)" to avoid being left vulnerable to a builder's remedy action. At no time was the discussion about a builder's remedy connected to Community Developers' plans.

---

[12] See N.J.S.A. 40:55D-89.

15

The second reference to *Mt. Laurel II* came in response to an inquiry from a Board of Adjustment member who questioned alternative uses for the Community Developers' site. A dialogue followed in which low and moderate income units, as well as senior housing units, were discussed as being appropriate alternate uses for the site. Burgis's responses to questions were direct and forthright, but were in no way suggestive of Community Developers *then* harboring a hidden agenda to use *Mt. Laurel II* as a threat to gain a density bonus. Ironically, if Community Developers had applied for the use variance as an inclusionary development with an affordable housing set-aside it would find its instant builder's remedy claim much stronger.

After the Board of Adjustment denied the application, Community Developers pursued an unusual and ill-fated strategy. Rather than litigate the denial, it hired John Schepisi as its advocate to "settle" the dispute. Since no appeal of the Board of Adjustment action had been filed, and nothing by way of a disputed rezoning proposal was being discussed, it is unclear what there was to be "settled." Under the guise of trying to resolve a dispute that apparently did not exist except in the minds of Community Developers' principals, Schepisi—a self-proclaimed political insider—investigated who was perceived as the primary power broker in Emerson. He ultimately concluded that the nucleus of political power in the municipality was Council

16

President Gina Calogero. He successfully arranged a meeting with her on February 15, 2000 to lobby for a high-density multi-family use on his client's site and discuss how this might help Emerson fulfill Emerson's *Mt. Laurel II* obligations. Schepisi and Calogero chatted about a variety of alternatives including low and moderate income multi-family housing, senior housing, three 2-family dwelling units, and Emerson's exercise of eminent domain to buy Community Developers' land to "make Community Developers whole." Schepisi indicated that litigation was an additional alternative, if Emerson would not negotiate a reasonable use of his client's land. Schepisi did not memorialize his discussions with Calogero in writing and he never communicated his client's proposals to the full governing body in writing. He relied upon Calogero to orally communicate his client's offers to the mayor and council.

On the very evening of her first and only meeting with Schepisi, Calogero reported the encounter to the full governing body. She advised the governing body of the many alternates proposed by Schepisi, including those that did, and those that did not, include a *Mt. Laurel II* component. The governing body decided to take no action on Schepisi's informal petition, and shortly thereafter, Community Developers filed its builder's remedy *Mt. Laurel II* action on March 28, 2000.

P011602

V. CONCLUSIONS OF LAW

The overriding issue in a *Mt. Laurel II* case is whether a municipality has created a realistic opportunity for the construction of its fair share of the region's needs for affordable housing[13]. In reviewing a municipality's response to its constitutional duty, the judiciary should conform its decisions wherever possible to COAH guidelines and policy[14]. This is to ensure that a uniform and predictable body of law emerges to educate the public and direct its representatives to comply with constitutional doctrine that is now over eighteen years old. The unruly teenager of *Mt. Laurel II* jurisprudence will only mature under the guidance of the rules and regulations of COAH and the occasional firm and steady hand of the judiciary.

In this case, I ordered Emerson to provide a compliant Housing Element and Fair Share Plan by March 30, 2001. As revealed during trial, it has woefully failed to comply. The planning document that Emerson seeks to pass off as *Mt. Laurel II*-compliant is riddled with regulatory deficiencies, substantive errors, and rank speculation. Accordingly, I conclude that the court must invoke the exceptional affirmative remedies of the type outlined in *Mt. Laurel II*[15] and require Emerson to adopt specific amendments to its zoning ordinance and other land use

---

[13] Mount Olive Complex v. Tp. of Mount Olive, 340 N.J. Super. 511, 525 (App. Div. 2001).
[14] Hills Dev. Co. v. Bernards Tp., 103 N.J. 1, 22 (1986).
[15] 92 N.J. at 285-286.

18

P011603

regulations as will enable it to finally meet its *Mt. Laurel II* obligations.

### Emerson's Fair Share

The threshold step in determining Emerson's compliance with *Mt. Laurel II* requires calculation of its fair share[16]. Emerson's current cumulative affordable housing obligation as determined by COAH is 74 units[17]. None of these units includes satisfaction of an indigenous need, or rehabilitation component. Rather, the 74 units represent Emerson's pre-credited obligation of its region's present and prospective need, or the so-called inclusionary or new construction component.

COAH rules permit limited credits to be applied to the pre-credited obligation. Credits include units of affordable housing that have already been constructed in or funded by a municipality and reductions for affordable housing opportunities that have been created through zoning[18]. Emerson is not entitled to any such credits because it has not demonstrated with any persuasive evidence that there exists affordable housing within the municipality. Vague references to a group home at 19 Spruce Avenue with five beds operated by a nonprofit mental health organization do not provide the required proof under COAH rules to garner even a single credit. There was no competent evidence

---

[16] <u>Allan-Deane Corp. v. Bedminster Tp.</u>, 205 N.J. Super. 87, 105 (Law Div. 1985).
[17] See N.J.A.C. 5:93-2.1 *et. seq.*
[18] N.J.A.C. 5:93-3.1 *et. seq.*

P011604

of the nature of the facility, the income levels of residents, or the scope of affordability controls, if any, that govern the facility. Thus, Emerson's fair share housing obligation remains 74 new low and moderate income units.

Under N.J.A.C. 5:93-4.1 and -4.2, a municipality may attempt to demonstrate that it does not have the physical capacity to address the housing obligation calculated by COAH. This process involves the identification of all appropriate vacant land in the municipality and the assignment thereto of dwelling unit densities, which produces what COAH calls the municipal realistic development potential (RDP)[19]. Another way of expressing this process is to recognize that a land-poor municipality is entitled to a vacant land adjustment or "adjustment due to available land capacity[20]." However, in order to obtain this adjustment, the municipality must perform an exhaustive planning analysis and convince COAH or the court, as the case may be, of its clear entitlement to a vacant land adjustment.

In this case, Emerson has not even remotely provided the data required by COAH rules[21], and as confirmed by the Special Master, the entire adjustment rationale consists of a scant two paragraphs in Emerson's 2001 Housing Element and Fair Share Plan. This failure of proof alone would be sufficient to deny Emerson

---

[19] N.J.A.C. 5:93-4.1(b).
[20] N.J.A.C. 5:93-4.2(a).
[21] N.J.A.C. 5:93-4.2(a); -4.2(b); -4.2(e).

20

the right to claim an adjustment due to available land; however,
the parties agree that notwithstanding this municipal omission,
Emerson, in fact, is deficient in vacant land and is entitled to
a vacant land adjustment.

The focus of the RDP calculation in this case is on two
parcels of vacant land: Community Developers' site and the Marek
Farm site. The land of Emerson Woods is not a factor in the RDP
as a result of the settlement. Emerson Woods has withdrawn its
offer to construct an inclusionary development on the site.
Therefore, it is not appropriate to be included in the RDP
calculation because its vested rights earned under the MLUL
militate against it ever being realistically developable for an
inclusionary development.  Additionally, once the municipality
successfully completes its acquisition of the land, it would be
entitled to exclude the parkland from the RDP pursuant to
N.J.A.C. 5:93-4.2(e)(5).

The Special Master concluded that both sites presented
realistic opportunities for affordable housing development and
included them in Emerson's RDP. Emerson claims that the Community
Developers' site should not be included for RDP purposes due to
the demolition of the dwelling in 1997 that, according to
Emerson, would result in a violation of the NJFHA. The
municipality did not assert this position until well into the
litigation. In fact, this litigation strategy contradicts the

21

Planning Board's and governing body's adoption and endorsement of
the 2001 Housing Element and Fair Share Plan, which *included*
Community Developer's site in the RDP calculus. All parties
concur that Marek Farm should be included in the RDP computation,
but they disagree over the appropriate density to be assigned to
the site.

It is important to observe that the inclusion of a
particular property in the computation of the RDP does not
*require*, according to COAH rules, the municipality to include
that land in its ultimate compliance mechanism. N.J.A.C. 5:93-
4.2(g) states:

> (g) The municipality may address its RDP
> through any activity approved by the Council, pursuant
> to N.J.A.C. 5:93-5. The municipality need not
> incorporate into its housing element and fair share
> plan all sites used to calculate the RDP if the
> municipality can devise an acceptable means of
> addressing its RDP. The RDP shall not vary with the
> strategy and implementation techniques employed by the
> municipality.

One of the obvious reasons for this rule is the recognition that
a municipality, in the first instance, is generally entitled to
legislatively decide how to implement its affordable housing
obligation without undue interference by COAH or the court[22]. For
example, absent an obligation to honor a builder's remedy, a
municipality may elect to concentrate affordable housing on a

_____

[22] See Eastampton Center, LLC v. Tp. of Eastampton, 155 F.Supp.2d 102, 119
(D.N.J. 2001) (unless done in a discriminatory manner, municipalities may
control residential growth to promote the public good).

22

limited number of sites or even a single site, rather than scatter the affordable housing throughout a multitude of locations. Unless there is either no response, or an inappropriate response, from the municipality regarding its compliance mechanism, it will remain entitled to chart its own course as to how to comply with *Mt. Laurel II* and where to implement it. Thus, even where the municipality has merely miscalculated its RDP, the municipality's compliance mechanism is invested with a presumption of validity that must be considered by the court.

The actual calculation of RDP is not subject to arithmetic perfection or mathematical precision. It is based upon an assessment of the competent evidence, both factual and expert, covered with the gloss of COAH rules, and ultimately distilled into a concrete number. It is neither alchemy, nor sleight-of-hand, that results in the RDP. Rather, it emerges from the overarching notion that whatever the development potential is calculated to be, it must perforce be based upon a foundation of realism. The question to be answered is, what is the *realistic* (not necessarily the maximal) development capacity of the land?

The process of computing the RDP is supposed to begin with the municipality creating a map showing all existing land uses[23]. Next, the municipality should prepare an inventory of all vacant

---

[23] N.J.A.C. 5:93-4.2(a).

23

parcels by block and lot[24]. Third, the municipality may exclude certain vacant lands from the inventory based upon certain objective conditions[25]. Fourth, the municipality must presumptively include all other vacant lands and may include underutilized, but not vacant, lands including certain golf uses, nurseries and farms, and nonconforming uses[26]. In connection with nonvacant land, COAH may request confirmation from the owner indicating the site's availability for inclusionary development[27]. Fifth, land may be excluded from the inventory by the municipality if it falls within any of the following categories:

> 1. Constrained agricultural lands.
> 2. Environmentally sensitive lands.
> 3. Historic and architecturally important sites.
> 4. Certain active recreational lands.
> 5. Certain conservation, parklands, and open space lands.
> 6. Other sites determined to be not suitable for low and moderate income housing.

The final step in the RDP recipe is to assign a density and set-aside for each parcel that has survived the culling process. The minimum presumptive density shall be six units per acre and the maximum presumptive set-aside shall be 20 percent[28]. COAH (and the court) shall "consider the character of the area surrounding each site and the need to provide housing for low and moderate income households in establishing densities and set-asides for

---

[24] N.J.A.C. 5:93-4.2(b).
[25] N.J.A.C. 5:93-4.2(c).
[26] N.J.A.C. 5:93-4.2(d).
[27] Id.
[28] N.J.A.C. 5:93-4.2(f).

24

each site."[29] COAH rules further provide a hypothetical example[30] of the calculation of RDP for illustrative purposes.

Before completing the computation of RDP, I must point out that the criteria for inclusion in RDP is not the same criteria used to determine the exclusion or inclusion of a site as part of an ultimate compliance mechanism. N.J.A.C. 5:93-5.3 provides guidance as to which sites are appropriate to be designated for inclusionary development. It includes the requirement that the site be "available, suitable, developable, and approvable, as defined in N.J.A.C. 5:93-1." These criteria do not apply when RDP is computed. Rather, they play a role when the municipality announces which sites it intends to devote to incentive inclusionary zoning or other site-specific affirmative measures to meet the RDP. Thus, the two relevant criteria for RDP purposes are 1)planning concerns and 2)affordable housing needs[31].

In this case, however, before computing the absolute number for RDP, I must first determine whether the Community Developers' site even belongs in the vacant land inventory. I conclude that it is required to be included for RDP computation.

Community Developers' Site Should be Included in the RDP

Emerson argues that even though it included the Community Developers' site in its court-ordered 2001 Housing Element and

---

[29] Id.
[30] Id.
[31] N.J.A.C. 5:93-4.2(f).

P011610

Fair Share Plan, this land should not now be included in the RDP
computation because to do so would be a violation of the NJFHA,
specifically, N.J.S.A. 52:27D-311.1 and -313.1. This statutory
scheme, commonly referred to as the Fanwood Bill, provides that a
municipality shall neither be compelled to include in its housing
element, nor forced to fulfill its fair share housing obligation
through permitting development on certain land where a
residential structure has been demolished or is proposed for
demolition. If a parcel of land is less than two acres, and its
residential structure has not been declared unfit, or was within
the previous three years negligently or willfully rendered unfit
for human occupancy or use, that parcel is not required to be
considered by the municipality for affordable housing purposes.
The idea of the legislation is to prevent COAH (and the court)
from requiring the demolition of a "perfectly decent residential
accommodation"[32] to achieve affordable housing objectives. It was
never the intent of the NJFHA to require municipalities to
demolish or suffer the demolition of existing structures in order
to build affordable housing.

Emerson argues that the demolition of the residential
structure on the Community Developers' site in 1997 in
anticipation of obtaining permission for a higher density
residential use, including affordable housing, triggers the

---

[32] Paramus Substantive Cert. No. 47, 249 N.J. Super. 1, 9 (App. Div. 1991)

26

P011611

Fanwood Bill principles. I conclude that the dilapidated structure that was demolished in this case was not the type of residential building that the legislation intended to preserve. The evidence adduced at trial firmly establishes that although the building had never received the municipal imprimatur of being unfit, it was wholly uninhabitable, an eyesore, and dangerous at the time of its demolition. The extensive damage and lack of essential services rendered the building utterly unusable. Furthermore, the evidence confirms that the condition of the building was of long standing and not negligently or willfully rendered unfit within the three years before the demolition. This micro-blighted area is outside the Fanwood Bill. There is no reason why this now-vacant land should be excluded from RDP purposes.

Thus, consistent with the findings of the Special Master, I conclude that the lands of Community Developers and Marek Farm shall be included in the calculation of Emerson's RDP. I adopt the ultimate rationale of the Special Master regarding the computation of Emerson's RDP and therefore conclude that his assignment of densities near the top of the range is rationally supported in the record. The contrary opinion of Emerson's expert is unreliable, incomplete, and inconsistent.

27

P011612

### Marek Farm's RDP

Marek Farm consists of 6.43 acres. It is located on an active four lane east-west roadway and lies adjacent to a new multi-family assisted living development. The land is remote from single-family uses, but is in the vicinity of protected watershed lands. Emerson itself recognized that the land could realistically be developed at 14.5 units per acre, but claims that density should only be used if Marek Farm is provided a species of incentive inclusionary zoning that encourages the development of rental units[33] and gives the municipality the benefit of a two for one credit against its RDP[34]. This would permit a higher density, but a lesser set-aside of only 15% low and moderate income units as permitted by COAH rules[35]. If development of rental units is not forthcoming, Emerson contends that the RDP density for Marek Farm should not exceed 10 units per acre.

Emerson's proffer is rejected because the nature of RDP determination contemplates realistic development, and does not turn on the nature of the zoning bells and whistles that emerge from the imagination and creativity of the municipality's planner. It is, of course, clear that a municipality may actually zone an inclusionary site with a density under the MLUL that is

---

[33] N.J.A.C. 5:93-5.15.
[34] N.J.A.C. 5:93-5.15(d)(1).
[35] N.J.A.C. 5:93-5.15(c)(5).

28

P011613

either greater or less than the COAH density used in RDP
calculations. There need not be perfect symmetry between the RDP
density and compliance density. However, there must be a sound
planning basis to use a lesser density for RDP purposes if it is
acknowledged that the site will be realistically developable at a
higher density. If the site is realistically capable of
supporting 14.5 units per acre in a real-world rental
environment, it is certainly capable of supporting that density
for RDP purposes. The ultimate preference of the municipality as
to MLUL density, based upon a projected type of use, is not a
relevant factor in calculating RDP. The key is the realistic
development capacity of the land.

    The Special Master adopted Emerson's higher density after
carefully analyzing the site from a comprehensive planning
perspective. He concluded that this site is fully capable and
appropriate to support the upper limit of 14.5 units per acre and
still blend with the character of the surrounding uses. I
conclude that it is most appropriate to use a whole integer to
compute the RDP, and 14 units per acre with a 20% set-aside is
realistic for the Marek Farm site. This results in 90 units on
the site, including 18 low and moderate income units. Under the
MLUL, this is a density of 14 units per acre (90 units spread
over 6.43 acres).

<div align="center">29</div>

This density is further supported by the acute need for low and moderate income housing in Emerson. There is not a single unit of affordable housing in Emerson. Its record of compliance with *Mt. Laurel II* is ghastly, embarrassing, and sorely in need of remediation. Its very conduct throughout this litigation confirms the need for affirmative steps to remedy its almost two-decades effort to encourage poor people to live elsewhere. Emerson's 2001 Housing Element and Fair Share Plan was rightly criticized by the Special Master as incomplete and non-compliant with COAH regulations, and it is virtually uninformative. The meager attempt to comply with my Order of December 15, 2000 is emblematic of Emerson's lackluster affordable housing efforts over many years.

The limited opportunities for developing inclusionary affordable housing appear to have been squandered by the municipality at almost every step. Indeed, the recent approval for development of the land adjacent to Marek Farm as an assisted living facility without an inclusionary component is an example of this casual attitude in the face of land becoming a scarce resource. Emerson's 1999 Master Plan reexamination report noted, "a number of sites previously recommended for inclusionary development have since been developed without inclusionary components." Emerson's 2000 Housing Element and Fair Plan specifically noted the loss of the Town and Country parcel of 25

30

P011615

acres on Forest Avenue. This property was suggested in Emerson's
1992 Housing Element and Fair Share Plan to produce at least 12
units of affordable housing on site, and instead generated only
conventional single family dwellings at a density of 2.4 units
per acre, plus a substantial contribution to Emerson's phantom
affordable housing trust fund. Emerson seems to have never missed
an opportunity to miss an opportunity for affordable housing.

Although the municipality may be proud of its collection of
a substantial principal sum in its affordable housing trust fund,
it was conceded at trial that the fund does not comply with COAH
regulations and none of that money has been used to build or
subsidize even a stick of affordable housing. What has the
municipality been waiting for? Why has Emerson not authorized the
necessary actions to facilitate the use of even a portion of the
$300,000 in the trust fund? When will there be affordable housing
in Emerson? The need for low and moderate income units in Emerson
is painfully obvious and critical. This situation is a
significant factor in determining the RDP.

### Community Developers' RDP

The Community Developers' infill site is located in a
transitional area, between single-family development and
Emerson's downtown. It abuts a commuter railroad. It is in close
proximity to other multi-family uses with densities exceeding the
Special Master's recommendation. Keeping in mind the nature of

31

P011616

the diverse uses in the surrounding area and the keen need for low and moderate income housing in Emerson, I conclude that the appropriate density, even for this small site, is 14 units per acre with a 20% set-aside. I believe that an even higher density, approaching the density found in nearby multi-family development, would likewise be realistic. However, I believe that the Special Master's advice in this regard is compelling. This results in 11 units on the site, including two low and moderate income units. Under the MLUL, this is a density of 14 units per acre (11 units spread over .83 acres).

The following Table 1 completes the computation of RDP according to COAH methodology and results in Emerson's RDP of 20 units of low and moderate income housing:

**Table 1:**
**Summary of RDP Calculation**

| Site | Unconstrained Area (In acres) | Units per Acre | Total Units | Set-Aside | RDP Units |
|---|---|---|---|---|---|
| Marek Farm | 6.43 | 14.0 | 90 | 20% | 18 |
| Community Developers | .83 | 14.0 | 11 | 20% | 2 |
| | | | | | |
| TOTAL | | | 101 | | 20 |

Thus, it is Emerson's burden of proof to demonstrate that it has provided a realistic mechanism through zoning and other affirmative devices to satisfy this fair share of 20 units of low and moderate income housing, together with the unmet need of an additional 54 units under N.J.A.C. 5:93-4.2(h). A review of

32

P011617

Even if a developer satisfies these three prongs, it may

still be disqualified from receiving a builder's remedy if it is

found that the developer acted in bad faith or has used *Mt.*

*Laurel II* as a bargaining chip:

> Care must be taken to make certain that
> Mount Laurel is not used as an unintended
> bargaining chip in a builder's negotiations
> with the municipality, and that the courts
> not be used as the enforcer for the builder's
> threat to bring Mount Laurel litigation if
> municipal approvals for projects containing
> no lower income housing are not forthcoming.
> Proof of such threats shall be sufficient to
> defeat Mount Laurel litigation by that
> developer.[38]

Additionally, a builder's remedy may not be forthcoming if the

developer has failed—for good reason—in an attempt to secure a

variance for non-*Mt. Laurel II* uses:

> Finally, we emphasize that our decision
> to expand builder's remedies should not be
> viewed as a license for unnecessary
> litigation when builders are unable, for good
> reason, to secure variances for their
> particular parcels (as Judge Muir suggested
> was true in the Chester Township case). Trial
> courts should guard the public interest
> carefully to be sure that plaintiff-
> developers do not abuse the Mt. Laurel
> doctrine.[39]

It has been suggested that there may be another way a

plaintiff-developer may win the race only to be disqualified for

a false start. *J.W. Field Company, Inc. v. Tp. of Franklin*[40] held,

---

[38] 92 N.J. at 280.
[39] 92 N.J. 280-81.
[40] 204 N.J. Super. 445, 461 (Law Div 1985).

34

P011618

in *dicta*, that if a plaintiff-developer fails to attempt to obtain relief without litigation, it may be denied a builder's remedy. This notion is based upon the Supreme Court's summary statement in *Mt. Laurel II* that "[w]here the plaintiff has acted in good faith, *attempted to obtain relief without litigation*, and thereafter vindicates the constitutional obligation in Mount Laurel-type litigation, ordinarily a builder's remedy will be granted..."(emphasis supplied)[41]. As a result of *J.W. Fields*, municipalities, as here, sometimes defend builder's remedy litigation with the affirmative defense that the developer never made a written overture to the governing body seeking to negotiate an inclusionary development before instituting litigation.

The loss of a builder's remedy to an otherwise-qualifying plaintiff-developer is neither novel, nor shocking. The interests of the absent class—the unhoused poor—for which the litigation is prosecuted, will not be prejudiced as long as the municipality's compliance mechanism is capable of satisfying the ultimate RDP and unmet need. In other words, in some cases, the land of the disqualified plaintiff-developer will be included in the RDP, but it will not be given inclusionary status. Other land in the municipality that is identified as being realistically developable with affordable housing will absorb the disqualified

---

[41] 92 N.J. at 218.

35

P011619

plaintiff-developer's complement of low and moderate income housing.

In this case, Community Developers satisfies the initial three-prong test for entitlement to a builder's remedy. First, it successfully obtained summary judgment declaring Emerson's development regulations invalid, thereby necessitating rezoning and the appointment of the Special Master. Second, it has offered to provide a 20% set-aside for affordable housing units, which is a substantial contribution to Emerson's nonexistent stock of low and moderate income housing units. Third, the municipality has not demonstrated that because of environmental or other substantial planning concerns Community Developers' site is clearly contrary to sound land use planning, thereby establishing the suitability of the site for affordable housing.

However, the municipality has satisfied me that Community Developers has used the *Mt. Laurel II* doctrine as a bargaining chip in its negotiations with Emerson. Additionally, its failed application for non-inclusionary development at the Board of Adjustment further seals its fate.

Community Developers acquired its site in 1997 and immediately demolished the structure. Within three months of becoming the owner, Community Developers applied to the Emerson Board of Adjustment for a use variance[42] to develop the site for

---

[42] N.J.S.A. 40:55D-70(d)(1).

36

P011620

sixteen market-rate townhouses (and a zero percent set-aside) at

a density of 19 units per acre. The application was withdrawn

without prejudice. In March 1999, Community Developers reapplied

for a use variance, now seeking only twelve market-rate garden

apartments (and a zero percent set-aside) at a density of 14.45

units per acre. The Board of Adjustment denied the application

and no appeal therefrom was prosecuted. In the absence of proof

to the contrary, a Board of Adjustment's decision of denial is

presumptively for good reason[43]. Greater judicial deference is

ordinarily given to a use variance denial than to an approval[44].

The only mention of *Mt. Laurel II* during the Board of

Adjustment proceedings was during the presentation of Community

Developers' expert planner whose stray references to affordable

housing were neither adopted, nor incorporated into the

application by Community Developers. I have already determined

that those passing comments could not have been objectively

considered by anyone to be a threat of *Mt. Laurel II* litigation

if the variance were to be denied. Unfortunately, the utter

absence of an affordable housing component in its development

plans—a strategic decision presumably based upon economic

considerations—sinks Community Developers' entitlement to a

builder's remedy here.

[43] See New Brunswick Cellular v. South Plainfield Bd. of Adj., 160 N.J. 1, 14,
(1999); Victor Recchia Residential Const., Inc. v. Zoning Bd. of Adjustment of
Tp. of Cedar Grove, 338 N.J. Super. 242, 253 (App. Div. 2001).
[44] Pierce Estates Corp., Inc. v. Bridgewater Tp. Zoning Bd. of Adjustment, 303
N.J.Super. 507, 515 (App. Div. 1997).

P011621

The primary purpose of this variance defense is to prevent the abuse of the *Mt. Laurel II* doctrine. The risk that this defense avoids--whether directly threatened with *Mt. Laurel II* litigation or not--is having a Board of Adjustment inappropriately grant a variance as the course of least resistance to an expensive, time-consuming, and far-reaching *Mt. Laurel II* action. Since Community Developers never sought *Mt. Laurel II*-type housing in its *two* variance applications, it cannot claim to have been chilled in its efforts to seek vindication of *Mt. Laurel II*'s constitutional mandate. Moreover, I conclude that Community Developers' settlement strategy, concocted only after it was denied a density-enhancing use variance, was to try to strong-arm Emerson into making Community Developers economically whole. This narrow desire for financial benefit, to be funded by the municipality through the exercise of the power of eminent domain or obtained by incentive zoning enacted by the municipality, is exactly the type of developer activity that *Mt. Laurel II* condemns and discourages. Community Developers' last-minute conversion to the cause of affordable housing is simply too fortuitous to warrant a finding of its good faith.

Community Developers is further disqualified from a builder's remedy because to grant it this extraordinary relief would render the judiciary the enforcer of a builder's threat.

38

When Schepisi met with Calogero on February 15, 2000, Community
Developers' primary purpose was to gain a profit-motivated
advantage for itself. At worst, the idea was to enlist Emerson to
subsidize a break-even scenario for Community Developers. *Mt.
Laurel II* recognizes that economic advantages—typically
substantial density bonuses—are the engines that drive the
construction of affordable housing. However, it is the chore of
the judiciary to ensure that *Mt. Laurel II* machinery does not run
amok. During his negotiations with Calogero, Schepisi never
limited his client's proposal to only *Mt. Laurel II*-type housing.
This obviously was because his client was seeking economic relief
by any available means. Instead, he engaged in a free-wheeling
discussion of a variety of non-*Mt. Laurel II* solutions to his
client's problems, that would—in his words—also be a "win-win"
for Emerson.

Calogero's subjective perception of Schepisi's overtures is
unimportant. The objective nature of those propositions, however,
is important. There was no dispute then pending between the
parties; therefore, there was nothing for Schepisi and Calogero
to settle. Clearly, the interchange unfittingly encouraged
Emerson to capitulate to Community Developers' demand for a
density bonus or other means to make it whole. The partial
satisfaction of Emerson's *Mt. Laurel II* obligations by Community

39

P011623

Developers was merely a convenient righteous cloak in which to wrap Community Developers' true motivation.

When Community Developers purchased the property it rationally could have had no reasonable assurance of development for any use other single-family use. It may not reap a windfall at the expense of the public under the guise of *Mt. Laurel II*, especially in light of its aborted attempts to build non-inclusionary housing, and its last-ditch insistence that it be made whole.

Additionally, Community Developers never wrote to the Emerson governing body about its plans for affordable housing. Its negotiation embodied an *ex parte* meeting with a single member of the governing body, designed to try to convince the Council President to exercise her considerable power and influence in favor of Community Developers' desire to be made whole. I conclude that the failure to engage in a pre-litigation letter-writing campaign with Emerson, *standing alone*, does not disqualify Community Developers from a builder's remedy. I do not believe that *Mt. Laurel II* imposed such a rigid lock-step procedure, and although a writing would likely have avoided the confrontationally conflicting remarks of Schepisi and Calogero at trial, I part company with the *dicta* in *J.W. Field*[45]. I find that in today's post-NJFHA/COAH world, a requirement of written pre-

---

[45] 204 N.J. Super. at 461.

P011624

suit notification to a governing body is unnecessary and counterproductive. However, in this case, the lack of a memorializing instrument regarding Community Developers' supposed inclusionary intent contributes to my firm conviction that a builder's remedy is not appropriate.

### Estoppel

I have considered the argument that Emerson is estopped from asserting the affirmative defense of bad faith against Community Developers because Emerson and its Planning Board adopted and endorsed the 2001 Housing Element and Fair Share Plan and included the Community Developers' site for RDP and compliance purposes. It is a fair argument to suggest that Emerson is playing fast and loose with the court by changing its position regarding Community Developers. However, this conduct does not constitute judicial or other estoppel for the simple reason that Emerson was *required*—by my Order of December 15, 2000—to prepare a plan for *Mt. Laurel II* compliance that included the Community Developers' site. I had granted a conditional builder's remedy, *subject to the defense of bad faith*. Thus, estoppel is wholly inapposite. Indeed, had Emerson's 2001 Housing Element and Fair Share Plan *not* included Community Developers' site, its public officials would have courted contempt proceedings.

### Unclean Hands

41

I have further considered the doctrine of unclean hands on
the part of Emerson as an independent basis to purge the bad
faith defense. A trial court may, *sua sponte*, recognize and
invoke the equitable doctrine of unclean hands in the interests
of justice and public policy where justified by the
circumstances[46]. The essence of that doctrine, which is
"discretionary on the part of the court,"[47] is that "[a] suitor in
equity must come into court with clean hands and he must keep
them clean after his entry and throughout the proceedings."[48] In
simple parlance, it merely gives expression to the equitable
principle that a court should not grant relief to one who is a
wrongdoer with respect to the subject matter in suit[49].

It has been contended throughout this trial, by Community
Developers as well as by Emerson Woods, that Emerson has not
presented even a scrap of genuine government compliance with *Mt.
Laurel II*, and that such inaction continues to the present. There
is much to be said for these contentions. Just a cursory glance
at the chronology of the development of *Mt. Laurel II*
jurisprudence reveals the feebleness of Emerson's response to the
rule of law.

---

[46] Trautwein v. Bozzo, 39 N.J. Super. 267, 268 (App.Div. 1956).
[47] Heuer v. Heuer, 152 N.J. 226, 238 (1998).
[48] A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 246 (1949).
[49] Faustin v. Lewis, 85 N.J. 507, 511 (1981)

42

On March 24, 1975, the New Jersey Supreme Court proclaimed
that the Constitution of New Jersey required certain
municipalities to use their power to regulate the use of land to
provide housing opportunities for the poor[50]. Eight years later,
the Supreme Court acknowledged the sad fact that the vast
majority of municipalities in the state had ignored the Court's
constitutional mandate and continued to practice exclusionary
zoning[51]. On July 2, 1985, the NJFHA was adopted; on February 20,
1986, the Supreme Court declared the NJFHA constitutional[52]. Thus,
Emerson has been on notice since at least the middle 1980s that
it is required to obey the constitutional mandate to provide
realistic opportunities for the construction of low and moderate
income housing. Although Emerson's 1992 Housing Element and Fair
Share Plan recognized the need to rezone certain sites for
inclusionary development, no practical efforts were taken to make
the dream a reality. Emerson never sought substantive
certification from COAH. It was apparently satisfied that its
benign neglect would either go unnoticed, or market forces would
impel non-inclusionary development to saturate the remaining
developable parcels of land and thereby render compliance with
*Mt. Laurel II* impossible or, at worst, impracticable. The

---

[50] So. Burlington Cty. N.A.A.C.P. v. Tp. of Mount Laurel, 67 N.J. 151 (1975);
[51] So. Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 92 N.J. 158 (1983).

[52] Hills Dev. Co. v. Bernards Tp., 103 N.J. 1, 22 (1986).

P011627

approval and development of the assisted living facility next to
Marek Farm is a recent example of this unspoken policy.

By 2000, Emerson had adopted a new version of a Housing
Element and Fair Share Plan. In it, Emerson acknowledged its
COAH-calculated fair share obligation to be 74 units, but claimed
five units as credits. It proposed to satisfy the net obligation
of 69 units with an RCA program of 12 units, inclusionary
development on the Marek Farm site yielding 13 units, and an
assortment of ambiguous, incomplete proposals for accessory
apartments, an age-restricted public facility, and a possible
overlay zone to account for unmet need. Nowhere in the 2000
Housing Element and Fair Share Plan is there any discussion of a
vacant land adjustment or RDP. Suffice it to say, as the
municipality seems to acknowledge, the 2000 Housing Element and
Fair Share Plan was rightly declared noncompliant with *Mt. Laurel
II* principles, as well as deviating from COAH regulations.

After I ordered Emerson to adopt amendments to its Master
Plan and land development ordinances to effectuate compliance
with the New Jersey Constitution and the laws of the State of New
Jersey, Emerson still balked. Emerson has not even proposed, much
less adopted, any legislation that is consonant with the order of
December 15, 2000. The 2001 Housing Element and Fair Share Plan
is riddled with incomplete data and is a wholly unsatisfactory
response to a conventional *Mt. Laurel II* court-ordered mandatory

44

P011628

injunction. The Special Master has cataloged the deficiencies in

Emerson's response to the Court's direction. It is noteworthy

that at trial, Emerson did not dispute most of the Special

Master's observations. Those deficiencies include:

1. Failure to follow COAH's rules and regulations in
   computing RDP.
2. Failure to provide documentation and evidential support
   for taking a five-unit credit against fair share.
3. Miscalculation of RDP.
4. Illogical application of density and set-aside for Marek
   Farm.
5. Erroneous use of rental bonus for Marek Farm where there
   is no evidence of compliance with N.J.A.C. 5:93-
   5.15(b)(5) and (6) relating to an agreement with a
   developer to build rental units.
6. Incomplete demonstration, in accordance with COAH rules,
   of how inclusionary sites (Marek Farm and Community
   Developers) are "available, suitable, developable, and
   approvable."[53]
7. Failure to include a draft ordinance delineating the
   actual design parameters for development of inclusionary
   sites.
8. Incomplete and inadequate support for the feasibility of
   using accessory apartments to be used to address
   Emerson's affordable housing obligation.
9. Noncompliance with COAH regulations regarding Emerson's
   development fee Ordinance 1170 and Spending Plan[54].
10. Proffer of vague, conceptual, and largely speculative
    measures for meeting unmet need.

In analyzing the effect of Emerson's conduct throughout the

pertinent period (1983 to today), I am hard pressed to declare

its behavior as constituting *clean* hands. However, the test is

whether this municipal abdication is shockingly contrary to the

public interest so as to constitute *unclean* hands. Additionally,

for the doctrine of unclean hands to apply vis-à-vis the

---

[53] N.J.A.C. 5:93-5.3(b).
[54] N.J.A.C. 5:93-5.1(c)(1) to (6).

45

P011629

builder's remedy analysis, some evidence of an unseemly effect
upon Community Developers must be shown. A generalized negative
consequence to the public interest is not sufficient in this
analysis because Community Developers' loss of a builder's remedy
does not automatically prejudice the public interest. Because the
rights of the absent class of unhoused poor remain vindicated,
the unclean hands doctrine does not outweigh the mischief of
Community Developers. In addition, municipal delay in itself,
while perhaps an appropriate basis for rejecting an affirmative
claim pursuant to the laches doctrine, does not establish unclean
hands for purposes of our jurisprudence[55]. After all is said and
done, I conclude that the doctrine of unclean hands does not
eliminate Emerson's affirmative defense of bad faith. Community
Developers is not entitled to a builder's remedy.

### Interim Judgment and Mandatory Injunction

An interim judgment shall be entered dismissing Community
Developers' claim seeking a builder's remedy, with prejudice. The
interim judgment shall further declare that Emerson's land use
regulations remain invalid and unconstitutional insofar as they
continue past exclusionary practices. The Special Master shall
prepare a comprehensive compliance plan (including an appropriate
strategy to address the unmet need) for Emerson, together with

---

[55] See Borough of Princeton v. Board of Chosen Freeholders of County of Mercer,
169 N.J. 135, 158 (2001).

46

P011630

zoning and planning legislation to satisfy the RDP and all
applicable COAH regulations. He shall draft a meaningful Housing
Element and Fair Share Plan, as well, together with a fee
ordinance and spending plan that is consonant with COAH rules. He
shall exercise planning discretion in deciding whether to employ
a program of RCAs, accessory apartments, mobile homes, or any
other incentive devices to meet the RDP. He shall further
determine the most appropriate device to compensate for the lost
opportunity to collect $444,000 which had been earmarked for
affordable housing purposes in connection with the Emerson Woods
development approval. This plan shall be completed and presented
to Emerson's Planning Board and governing body no later than
December 31, 2001.

COAH regulations regarding percentages of rental units, mix
of bedrooms, array of affordability limits, and distribution of
age-restricted units shall be followed where practicable. Height
limits of up to sixty feet shall be permitted, except where a
lesser height is appropriate in light of sound planning
principles.

The Special Master shall regularly consult with designated
representatives of Emerson and its Planning Board during the
preparation of the compliance plan and he shall take into
consideration their constructive criticism. Emerson and its
Planning Board shall effectuate the Special Master's compliance

47

P011631

plan no later than February 15, 2002. In default thereof, all
development regulations in Emerson shall be permanently
invalidated. All land shall be treated as unzoned, not subject to
local site plan review, and developable at the will of the
developer, subject only to applicable state and federal law,
including, of course, the Uniform Construction Code[56]. If Emerson
complies, it will be entitled to a six-year judgment of repose.
Costs of suit shall be borne by the parties without reallocation.
A final judgment shall be entered on or after February 18, 2001.

VI. CONCLUSION

The facts of this case reveal a legacy of cavalier
inattention by a succession of Emerson governing bodies that
produced a pattern of land use strikingly unfriendly to poor
people. Spanning decades, the inaction of Emerson requires an
immediate and robust response. Since opportunity has not knocked,
it is time to build a door.

The stern result of the interim judgment is necessary so
that the character of our State, as reflected in our
Constitution, in fact imparts the ways in which we live together,
when our relations are touched by the law. Emerson is not immune
to that character and it must conform its behavior to the will of
all the people. That is the basic justification for *Mount Laurel
II*. When that clear obligation is breached, and instructions

---

[56] N.J.S.A. 52:27D-119 *et. seq.*

48

given for its satisfaction, the municipality must prove every element of compliance. It is not fair to require a poor man to prove you were wrong the second time you slam the door in his face.[57] Our Constitution needs to be more than a whisper to the poor. While Emerson may not have the ability to eliminate poverty, it cannot use that condition as the basis for imposing further disadvantages.

---

[57] 92 N.J. at 306.

49

P011633

Exhibit 4

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 1

```
                              SUPERIOR COURT OF NEW JERSEY
                              BERGEN COUNTY
                              LAW DIVISION, CIVIL PART
                              DOCKET NO. L-268-01
                              APP. DIV. NO. _____

     COMMUNITY DEVELOPERS,)
                          )
         Plaintiff,       )        TRANSCRIPT
                          )            of
         vs.              )        DECISION
                          )
     BOROUGH OF EMERSON,   )
                          )
         Defendant.        )

                              Place: Bergen County Courthouse
                                     10 Main Street
                                     Hackensack, NJ 07601

                              Date:  March 21, 2002
         BEFORE:

         HONORABLE JONATHAN HARRIS, J.S.C.

     TRANSCRIPT ORDERED BY:

         CHRISTINE FARRINGTON, ESQ.,
         294 Union St., Hackensack, NJ 07601

     APPEARANCES:

         NYLEMA NABBIE, ESQ., (Schepisi & McLaughlin)
         Attorney for the Plaintiff

         GARY P. HALL, ESQ., (McCarter & English)
         Attorney for the Defendant

         DR. DAVID KINSEY,
         Special Master

                              Kathryn Murray
                              ELITE TRANSCRIPTS, INC.
                              28 Catherine Street
                              Bloomingdale, NJ  07403
                              (973) 283-0196
                              Audio Recorded
                              Operator, _____
```

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196   (973) 492-2927-FAX

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**



SHEET 2

2

I N D E X

Page

THE COURT                                    3

---

                        Court - Decision            3
1           THE COURT:   This is COMMUNITY DEVELOPERS AND
2    MANAGEMENT VS. BOROUGH OF EMERSON.  Docket number L-
3    2734-00.   May I have the appearances of counsel.
4           MS. NABBIE:   Good afternoon, Your Honor,
5    Nylema Nabbie, Schepisi & McLaughlin, appearing on
6    behalf of the plaintiff.
7           MR. HALL:  Gary Hall, McCarter & English, for
8    defendant, Borough of Emerson.
9           THE COURT:   And the appearance of the Special
10   Master.
11          MR. KINSEY:  David Kinsey, Your Honor.
12          THE COURT:  Good afternoon to all counsel and
13   Special Master.  Welcome.  I make the following
14   findings of fact and conclusions of law.
15          The determinations I am about to make relate
16   to the remediation proposal of the Municipality, as
17   dictated by the Special Master pursuant to the interim
18   judgment in this action, dated November 2nd, 2001,
19   which is based upon my written opinion of October 19,
20   2001.
21          In this Mount Laurel II exclusionary zoning
22   and builders remedy action I have already determined
23   that Emerson officials have relentlessly preserved and
24   exacerbated economic and class segregation throughout
25   the Borough.   There appeared to me to be a remarkably

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196   (973) 492-2927-FAX

P011650

**COMMUNITY DEVELOPERS v b BORO OF EMERSON - March 21, 2002**

SHEET 3

Cowurt - Decision                                                    4

 1   consistent and extreme : pattern of exclusionary efforts
 2   characterized by what a appears to be developing again.
 3   That is, concentrated nnative opposition to affordable
 4   housing in certain areæas of the Borough, and
 5   acquiescence in that oppposition by Borough officials.
 6          In my Octobenr, 2001 opinion I catalogued a
 7   variety of missed oppoortunities, failure of will and
 8   lack of resolve by goveernmental actors spanning decades
 9   regarding the Borough'ss obligation to provide a
10   realistic opportunity f for low and moderate income
11   housing.
12          I remain dumbibfounded, that notwithstanding
13   all of the accumulated l history of this State's
14   exclusionary zoning littigation and the perils attendant
15   thereto, that Emerson aappears to have overlooked its
16   lessons, and is consignned to repeat the costly blunders
17   of the past.
18          Emerson's entitrenchment is again on display in
19   this proceeding, where : although it correctly points out
20   the technical errors obf the Special Master's compliance
21   plan, it neglects-to pprovide a meaningful alternative
22   to the affordable houssing crisis within its borders.
23          Once the Law / Division has issued a valid
24   order to remedy the effffects of a prior specific
25   Constitutional violatioon, as here, elected officials

Cowurt - Decision                                                    5

 1   are expected to act witth dispatch to remedy the wrong.
 2   At this point the Consttitutional itself imposes an
 3   overriding definition oof the public good. And public
 4   officials sworn to uphoould the Constitution may not
 5   avoid a Constitutional . duty by bowing to the political
 6   effects of prejudice annd self-interest. Defiance at
 7   this stage results, in : essence, in a perpetuation of
 8   the very Constitutionabl violation at which the remedy
 9   is aimed.
10          At the concluusion of the trial I was
11   convinced that it wouldd be a vain and futile act to
12   commit this Constitutioonal remedy to the very
13   intractable officials wwho appeared to be incapable of
14   taking meaningful actioon. Had I done that, given the
15   limited presentation byy the Municipality, I believe
16   that we would probably / be in the same posture that we
17   are today. That is, peerhaps deciding whether a two-
18   site compliance plan coonsisting only of the community
19   developers land and thee Marrick (phonetic) farm
20   presents a pragmatic soolution for affordable housing
21   needs within the six-yeear compliance period.
22          Such a plan wwould not pass Constitutional
23   muster, and in this sceenario the Special Master would
24   have been ordered to taake over to devise a plan for the
25   Municipality. Here, itt's exactly the opposite. The

**ELITE TRAANSCRIPTS, INC.**
28 Catherine Street,st. Bloomingdale, NJ  07403
(973) 283-0196 6   (973) 492-2927-FAX

P011651

**COMMUNITY DEVELOPERS v BORO OF EMERSON – March 21, 2002**

SHEET 4

                              Court – Decision                    6
1    Special Master has crafted an imperfect compliance
2    plan, and the Municipality now is entitled,
3    notwithstanding my expressed reservations, to give it a
4    shot.
5               The main problem in this case is that the
6    governing body has not yet suggested a viable
7    alternative to the Kinsey compliance plan, and has not
8    countered the factual predicate upon which it was
9    built.
10              To be sure, Emerson challenges Dr. Kinsey's
11   plan on distinct legal grounds, some of which are
12   persuasive and some of which are not.  But I am left
13   adrift again by a Municipality that has been content to
14   dispatch New Jersey Constitution to serve as mere
15   background noise in Emerson.
16              On the other hand, my effort to expedite
17   structural reform in the Land Use Practices of Emerson
18   has not paid dividends.  The Special Master has done
19   the initial work, albeit imperfectly, and my choices
20   are limited.
21   —          I could approve the Special Master's plan by
22   granting a waiver under COA regulations.  I decline to
23   do that.
24              I could continue the Master to come up with a
25   more finely crafted plan or I could give the governing

                              Court – Decision                    7
1    body what it is clamoring for, and that is an
2    independent opportunity to right the Constitutional
3    wrong.  I should warn the governing body, as I warn
4    most litigants, one must be careful what one wishes for
5    because you might just get it.
6               I had intended to employ the Special Master
7    as the remediation vehicle in order to swiftly remove
8    the condition that threatens Constitutional values.
9    The Supreme Court has explained that in institutional
10   litigation the appointment of a Special Master is not
11   to be regarded as a victory for either side.  And that
12   the Special Master's value lies in assisting all
13   parties to resolve their differences.  While the
14   appointment of a Special Master is discretionary, such
15   appointment is desirable where the Court orders the
16   revision of land use regulations, especially if the
17   revision is substantial and the Municipality's
18   historical posture has been resistant.
19              A Special Master is an expert, a negotiator,
20   a mediator and a catalyst.  A person who is designed to
21   help the Municipality select from innumerable
22   combinations of actions that which could satisfy the
23   Constitutional obligation.  The appointment of the
24   Special Master is not viewed as punitive in the least.
25   It is not designed to settle scores with recalcitrant

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196   (973) 492-2927-FAX

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 3

Court - Decision                                    8

1   Municipalities.
2               Dr. Kinsey has been a particularly apt and
3   able Special Master in trying to remain balanced amidst
4   the awful cross-currents of this case.  I do not view
5   his work following the interim judgment as a failure,
6   even though it did not achieve the desired result.
7               Perhaps it was I who was too ambitious and
8   too overly sanguine that the Special Master could
9   propose something that would likely satisfy and work
10  for all interested parties.  Having not achieved that
11  goal, I hereby restore the Municipality to the front
12  line of making land use value judgments, but the
13  Special Master will remain Emerson's conscience.
14              By returning to Emerson its zoning authority,
15  I in no way intend to abdicate my responsibility under
16  Mount Laurel II to insure compliance with the New
17  Jersey Constitution.
18              If this effort fails, I will have no choice
19  but to permanently invalidate Emerson's land use
20  regulations or consider the imposition of a stay of all
21  development applications, from the smallest to the
22  largest, until compliance is achieved.
23              Either coercive incentive will be difficult
24  to swallow.  But the former has the elegant simplicity
25  of immediately providing a realistic opportunity for

Court - Decision                                    9

1   the construction of low and moderate income units,
2   while the forme will likely only parade a public clamor
3   that may impel government to achieve Constitutional
4   compliance.
5               That's a summary of my conclusions in this
6   case.  The specific facts upon which I base that
7   conclusion consist of the following:
8               I, basically, have rendered my opinion
9   backwards.  Normally I make my fact finding first and
10  then my conclusions.  Here, I've done it the opposite.
11              Dr. Kinsey was invested with extraordinary
12  powers to devise a compliance plan for Emerson. Dr.
13  Kinsey himself has described that investment as almost
14  unique.  He pointed out only one other case that he was
15  aware of in which the Judiciary had made that
16  determination.  And that, ultimately, did not result in
17  the Master performing what Dr. Kinsey did here.
18              It is a very uncomfortable position for any
19  single individual, any single unelected individual to
20  be placed in, given New Jersey's long tradition of Home
21  Rule, especially as to land use regulations.
22              Under the bright light of the New Jersey
23  Constitution, however, it seemed to me to be
24  appropriate given the bankruptcy of action by the
25  Emerson governing bodies over the years.

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196    (973) 492-2927-FAX

P011653

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 6

Court - Decision                    10

1       My rationale for investing the Special Master
2   stemmed from the long-standing litany of inaction and
3   the palpably invidious discrimination that it worked.
4   I took my cue from the variety of institutional
5   litigation case, primarily in Federal Court, including
6   School v. Segregation cases, prison reform cases,
7   mental health provision cases and the like.
8       I was fortified in my decision by the lapse
9   of time that has passed since the New Jersey Supreme
10  Court decided MOUNT LAUREL II. And what I mean from
11  that is I acted deliberately recognizing that the New
12  Jersey Supreme Court did not project or promote the
13  remedy that I created. And, in fact, more
14  traditionally, granted a Municipality, in the first
15  instance, the opportunity to remediate a problem. I
16  viewed the passage of time, from 1983 until the year
17  2001 as sufficient time to wait for the Municipality to
18  act.
19      I also was moved, as I've already indicated,
20  by the facts, the particular facts in this case, and
21  the recognition that it is the rare case that a
22  Municipality need be compelled to act at all. I say
23  that because the vast majority of MOUNT LAUREL II
24  litigation is ultimately resolved.
25      Dr. Kinsey was charged to do an independent

Court - Decision                    11

1   assessment, to consult with Municipal Officials,
2   members of the Governing Body, members of the Planning
3   Board, the various advocates in this Court. He
4   conducted one or more informal meetings. He reached
5   out for other resources in the Municipality. Here I'm
6   referring to the United Jersey Representatives who
7   ultimately made available approximately 1.5 acres of
8   land on Palisade Avenue. And he constructed what he
9   believed was a COA and Constitutional compliant plan.
10      I had already determined that the obligation
11  of Emerson, after a full trial on full proofs, was 20
12  units based upon Emerson's realistic development
13  potential. I granted Emerson's request for a lack of
14  land adjustment. One that is countenanced both by
15  Statute and by regulation.
16      For those 20 units that were intended, under
17  MOUNT LAUREL II, to be likely to be constructed within
18  the six-year period of repose that would follow from
19  the conclusion of this case, were the following:
20      A five-unit, age restricted, rental housing
21  development on the property still owned, as I
22  understand it, by Plaintiff, Community Developers.
23  Those five units would be entitled to generate one
24  virtual unit, a credit, an additional unit without
25  actual construction, based upon COA regulations. That

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ 07403
(973) 283-0196    (973) 492-2927-FAX

P011654

## COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002

SHEET 7

### Court - Decision    12

1   component, therefore, was a five-unit development
2   yielding six units towards the realistic development
3   potential.
4       The second component of the plan was an
5   amendment to the Emerson development regulations
6   permitting inclusionary zoning on this newly discovered
7   1.5 acre parcel on Palisade Avenue to be developed with
8   18 units yielding 4 units of low and moderate income
9   housing.
10      The third component was a regional
11  contribution agreement for ten units.  The three
12  components adding up to the 20-unit R.D.P.
13      The compliance plan was much more extensive
14  than what I've indicated, but these are the key
15  ingredients that are challenged, or some of them.  When
16  I say there are more elements to the compliance plan,
17  I'm not fleshing out the overlay zone, the proviso for
18  unmet need, the spending plan, the tweaking and
19  amendments to the Affordable Housing Trust Fund and the
20  escrow provisions for that.  All of which were provided
21  in the compliance plan and none of which have been the
22  target of much, if any, dispute.
23      The Municipality argues that the fatal flaw
24  in Dr. Kinsey's compliance plan, not the only one, but
25  the fatal flaw is that it fails to include the Marrick

### Court - Decision    13

1   Farm property which was the source of a substantial
2   number of units in the computation of the realistic
3   development potential.
4       On Page 32 of my October 19 opinion, that's a
5   Table One, I had assigned 18 R.D.P. units to Marrick
6   Farm and two R.D.P. units to Community Developers.
7   It's important to remember that the Municipality itself
8   had projected and promoted the Marrick Farm site as an
9   element in the R.D.P., albeit not at the ultimate
10  density that I determine.  But there never was a
11  dispute, until this proceeding, as to whether Marrick
12  Farm should be an R.D.P.  And the Municipality's
13  position now is since Dr. Kinsey did not include it,
14  and I'll explain why he didn't include it in a moment,
15  then Emerson should be relieved of 18 units of R.D.P.,
16  otherwise it would not be obtaining the statutory and
17  administrative remedy of a lack of land adjustment.
18      I do not subscribe and I do not agree with
19  the Municipality's position that the elimination of
20  Marrick Farm was a flaw.  I think and I conclude that
21  it is a correct determination.  It is supported by the
22  facts.  The Municipality presented no contrary facts to
23  those of Dr. Kinsey.  And it is supported
24  philosophically, in my view, under the Statute, meaning
25  the Fair Housing Act and under the regulations.  I'll

P011655

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 8

Court - Decision                                        14

1   come back to that later.
2                Another flaw the Municipality points out is
3   that the total cost of the compliance plan approaches
4   $600,000, and the Fair Housing Act bars the forced, the
5   involuntary use of Municipal revenue in meeting a
6   compliance order or a COA order.
7                As it turns out, substantially less than the
8   total projected cost is Municipal money.  Most of this
9   money is held in trust by the Municipality.  It's
10  somebody else's money.  I couldn't help but being
11  struck by the Municipality having no qualms about
12  spending 7.8 million dollars of other people's money,
13  and yet balking at spending upwards of $160,000 to
14  $200,000 to meet Dr. Kinsey's compliance plan.
15  Nevertheless, the Statute does seem to prohibit a Court
16  from specifically requiring the use of what are called
17  Municipal revenues.
18               There's something to be said for the
19  Municipal position.  The Municipality has pointed out
20  the case of WARREN COUNTY COMMUNITY COLLEGE -- might
21  truly be  WARREN COUNTY COMMUNITY COLLEGE AGENCY VS.
22  WARREN COUNTY, as the thought that no court can force a
23  legislator to appropriate or spend money.
24               I'm pausing because I want to choose my words
25  carefully.  That case, I believe, expressly recognized


Court - Decision                                        15

1   that it was not dealing with a Constitutional issue.
2   It was dealing in a dimension of the much more mundane,
3   although it was dealing with Separation of Powers and
4   the equitable extent of the authority of the Court.
5                I have my doubts whether a Court would be
6   hamstrung ala WARREN COUNTY COMMUNITY COLLEGE but I
7   don't ignore a case that was cited SPILLONE (phonetic)
8   VS UNITED STATES, 493 U.S. 265, dealing, not with
9   ordering a Municipality to spend money, but ordering
10  individual governing body members to do something in
11  that regard, and a course of incentive regarding that.
12               This is a very difficult area.--It's an
13  admittedly sensitive area, and it is one for which,
14  while the ironies abound in Emerson, I cannot and will
15  not ignore the proviso in the Fair Housing Act
16  regarding the expenditure of funds as being an order by
17  a Court.
18               The Municipality further points out that, and
19  I hope I've read the argument correctly and I think I
20  have, that the use of Palisades Avenue site is arguably
21  barred by a provision of the Fair Housing Act, N.J.S.A.
22  52:27D-310.1 which prohibits the use of land -- what I
23  should better say is which prohibits the forced use of
24  land that was excluded from R.D.P. for a compliance
25  plan.

P011656

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 9

Court - Decision                                              16

```
 1              I don't believe that that has any
 2   applicability here because the 1.5 acres was never
 3   excluded.  It just wasn't included.  And there's a big
 4   difference because there is, under the COA regulations,
 5   an exclusion process for which this property was never
 6   originally involved.  So I don't find that that is a
 7   defect.
 8              And finally, there is a claim that the use of
 9   the age-restricted rental housing as a vehicle to
10   produce six units, five real, one virtual, is barred
11   under N.J.A.C. 5:93-6.1b.  That and N.J.A.C. 5:93-5.14b
12   limit the number of age-restricted units where a
13   Municipality gets a vacant land adjustment as here, and
14   where it is electing, and I should put that in quotes
15   for this case, to send some units outside the Municipal
16   boundaries through a regional contribution agreement.
17              The formula permits no more than 25 percent
18   of the net of R.D.P. minus regional contribution
19   agreement units.  In this case, that would be 20, which
20   is the R.D.P., minus ten, which is the R.C.A. which
21   leaves a net of 10.  Twenty-five percent of that is two
22   and a half.  Therefore, the maximum would be two age-
23   restricted units yielding two, four, if you round it
24   up, three age-restricted units yielding four, but not
25   enough to satisfy the total R.D.P.
```

Court - Decision                                              17

```
 1              And the Municipality is correct that this is
 2   a flaw.  It was suggested, and I strongly considered
 3   that N.J.A.C. 5:93-15.1, that is the waiver provision
 4   of the COA regulations, might save the day.  That
 5   regulation permits the Council, and by inference the
 6   Court, to grant waivers if it is determined will foster
 7   the production of low and moderate income housing or
 8   that such a waiver fosters the intent of, if not the
 9   letter of its rules, or where the strict application of
10   the Rule would create an unnecessary hardship.
11              Arguably, the waiver might foster the
12   production of low and moderate income housing, but
13   given other concerns of the Municipality, I think, as a
14   first effort, a waiver would not be employed.
15              Now, let me go back to Marrick Farm and why
16   that is not appropriate for inclusionary zoning.
17   Better said, why it is not an appropriate element or
18   component of the housing element of the COA rules.
19              It is well recognized, in my view, and pretty
20   clear from the COA commentary and regulations as well,
21   that the computation of the realistic development
22   potential and the manner in which that is satisfied,
23   are two separate and distinct computations.
24              We ought not fool ourselves into thinking
25   that there is anything perfect, anything obtaining
```

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ 07403
(973) 283-0196   (973) 492-2927-FAX

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 10

Court - Decision                    18

1  mathematical accuracy in computing the fair share
2  obligation of a Municipality.  The arcane and
3  convoluted methodology of COA in coming to its first
4  level of pre-credited need is enough to suggest that
5  it's more of an art than a science.
6          The vacant land adjustment is no more precise
7  than that.  And the R.D.P., as an adjunct of a vacant
8  land adjustment, doesn't get any more amorphous.  But
9  it retains this discretionary, yet linked to objective
10 standards flavor.
11         The R.D.P. is a function of how a site fits
12 into a neighborhood and how acute the need is for low
13 and moderate income housing.  The R.D.P., once it is
14 computed, is fixed.  I daresay it's inviolate, although
15 that may be going a bit too far.  It's certainly
16 challengeable on appeal, and I don't suggest otherwise.
17         Once the R.D.P. is set, the compliance
18 through a housing element can use a variety of
19 techniques to meet that R.D.P.  A Municipality can
20 decide to put all of its obligation on one site, for
21 example, and not use a myriad of sites.  Or a
22 Municipality, up to a limit, can decide to put those
23 sites out of town using a regional contribution
24 agreement.  And most towns do that at some level.  The
25 limitation, of course, is 50 percent of the R.D.P.

Court - Decision                    19

1          There are provisions for accessory apartments
2  as a means of achieving R.D.P.  And COA encourages many
3  innovative devices.  All of that is confirmatory that
4  there need not be an identity of use between R.D.P.
5  sites and housing element sites.  And a key ingredient
6  is to get over the threshold of N.J.A.C. 5:93-5.3b
7  which requires the familiar developable, approvable,
8  available and suitable criteria to be demonstrated.
9          In this case Dr. Kinsey has demonstrated that
10 this property is not developable within the meaning of
11 the regulation.  And it is probably not available
12 within the meaning of the regulation.  That does not
13 mean, and the COA rules fairly recognize this, that the
14 property is then removed from R.D.P.  There's just no
15 mechanism for that.
16         As to the developability achilles heel, that
17 is, the property has limited or no access to
18 infrastructure.  The Municipality claims that may be
19 true, but then it's entitled to a durational adjustment
20 under the COA regulations.  I reject that.  I reject
21 that where there appears to be, although I can't say
22 with any ultimate supreme certainty, a variety of other
23 available techniques, at little or no cost to the
24 Municipality, none of which have been even remotely
25 presented by the Municipality, but fairly drip out of

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196    (973) 492-2927-FAX

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 11

Court - Decision                          20

1   the COA regulations in the COA Handbook, to meet an
2   R.D.P.
3              And so I find, from the facts, that Marrick
4   Farm presently is not developable and is not likely to
5   develop within the six-year period of repose.  And a
6   durational adjustment is not appropriate, given all of
7   the prior history.  It would be the height of inequity
8   to permit such a durational adjustment, given the
9   history that has elapsed.
10             And I will say this; I, both as a believer in
11  precedent, as well as philosophically, believe that the
12  Court must be guided by the principles of the Fair
13  Housing Act.  It's not just because the Supreme Court
14  says so; it makes eminent sense.
15             Having said that, and I think I have strayed
16  from the -- I have deliberately strayed from the Fair
17  Housing Act, maybe once in 15 cases.  And I'm not even
18  sure that that's accurate.  There is an equitable
19  reservoir of Constitutional power that permits the
20  Court to go outside the Fair Housing Act and, in my
21  view, and when I say Fair Housing Act I'm really
22  talking about the regulations thereunder because
23  there's nothing in the Act, specifically, on this, I am
24  satisfied that a durational adjustment in terms of
25  compliance for 20 units, and that's what we're talking

Court - Decision                          21

1   about, we're not talking about 100; we're not talking
2   about 1,000; we're not talking about any substantial
3   number, would be to further the Constitutional injured.
4              I find that there is a substantial question
5   as to whether Marrick Farm is available.  Now, the
6   availability component has to do with title and
7   encumbrances.  And while there was no evidence of
8   traditional encumbrances, there is hearsay evidence
9   that the property is not intended or likely to be used,
10  and this comes from Dr. Kinsey's conversations with the
11  representative of Marrick Farm.  Now, I held in my
12  October 19th opinion that either stray or hearsay
13  comments -- here it is.
14             "Hearsay statements about the owner's
15  children and their ambitions have no evidentiary
16  significance."  That's on Page 13 of the opinion.  That
17  was a different issue than what Dr. Kinsey made an
18  inquiry of, and I think it would be grossly
19  inconsistent for me to elevate Dr. Kinsey's
20  conversations, hearsay conversations with Mr. Marrick
21  above that which was sought to be demonstrated during
22  the trial.
23             But that hearsay transformed by an expert's
24  opinion allows the Court to rely upon, to some extent,
25  the expert's opinion.  Experts generally can only

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196    (973) 492-2927-FAX

**COMMUNITY DEVELOPERS v BBORO OF EMERSON - March 21, 2002**

SHEET 12

Courrt - Decision                                22

1  create their opinion relying upon hearsay information.
2  Of course, that hearsay information is generally that
3  which is usually and reliably relied upon by experts.
4  And speaking to property owners is the raw material of
5  planners on an every day basis.
6            And so I don't want there to be any
7  misunderstanding here.   I'm adopting the opinion of Dr.
8  Kinsey regarding the availability without elevating the
9  hearsay to any conclusive effect.
10           Besides that,  if the hearsay is reliable,
11  that's another reason why Marrick Farm is _inappropriate_
12  for including in the housing element from an equitable
13  standpoint.
14           It's important to note, again, because this
15  may be a species of judicial estoppel, that the
16  Municipality has always said, or at least I should say
17  at the time of trial and through various situations
18  prior to trial, that Marrick Farm should be included
19  for R.D.P. purposes.  And if it's position now is it
20  shouldn't be because we've now learned some information
21  by which it shouldn't be in R.D.P. which I don't agree
22  with, but even if you were, then shame on the
23  Municipality.  It's judicially estopped from now
24  claiming that it ought to get a credit -- I shouldn't
25  say a credit -- an exclusion.  It can't have it both

Courrt - Decision                                23

1  ways.
2            And I believe : that Marrick Farm, at the
3  present time and for thee foreseeable period of the
4  repose, remains unavailable and may not be, unless
5  there be changed circumstances, a component of the
6  housing element.
7            With all of that said, this matter will be
8  remanded to the governing body, as I've already
9  indicated.  The Municipality will be given an
10  opportunity to come up with its own plan.  It can deal
11  with 20 units in any way that is appropriate.  The
12  Special Master will remain available and _will be_
13  consulted and kept abreast of what is happening.  I'll
14  give you time frames and specific parameters in a
15  minute.
16           I would expect, although I am not ordering
17  today, the Municipality ' to make meaningful use of other
18  people's money, both thee trust fund and the variety,
19  although the sources may have dried up significantly,
20  of other funds through grants and loans that would
21  assist the Municipality ' in providing low and affordable
22  housing.
23           I don't begrudge for one second the fund
24  raising the Municipality developed to save Emerson
25  Woods.  But what I'd like is that same talent and

**ELITE TRANSSCRIPTS, INC.**
28 Catherine Street, B Bloomingdale, NJ  07403
(973) 283-0196  ·  (973) 492-2927-FAX

P011660

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 13

                    Court - Decision                    24

1   energy to go into satisfying this Constitutional
2   obligation.  I don't think that's too much to ask of
3   anyone.
4           Throughout the period of the six years Dr.
5   Kinsey has estimated there's going to be 390,000
6   available.  Now he may be right or he may be wrong, but
7   we know this, or at least the Municipality has
8   encountered this, there's $306,000, and there probably
9   should be some more from missing interest, in the fund
10  right now.
11          So the Municipality will work out its R.D.P.
12  using some or all of those funds, some additional funds
13  that the Municipality may wish to use.  It will concoct
14  a plan without Marrick Farm, and it will concoct a plan
15  without accessory apartments.  Nowhere in this case did
16  the Municipality ever take the position that its
17  housing stock was appropriate for accessory apartments,
18  other than a glib reference in one of the housing
19  elements.
20          Dr. Kinsey's recalcitrance to use accessory
21  apartments, given the sad experience throughout the
22  State, having nothing to do with Emerson, coupled with
23  the failure of the Municipality to come forth it's
24  strongly suggested that accessory apartments are not
25  appropriate.

                    Court - Decision                    25

1           Now, having said that, that may be too
2   extreme.  It may very well be appropriate for some
3   measure of accessory apartments as a supplement.  When
4   I say supplement, meaning real tangible likelihood of
5   development of low and moderate income housing, and
6   maybe one or two, and that's just by illustration --
7   that's not written in stone -- accessory apartments.
8           Because we know that the Municipality is not
9   expected to guarantee that low and moderate income
10  housing is built.  It just has to show there's
11  realistic opportunity for it.  And I may have been
12  precipitous in suggesting no accessory apartments.
13  There may be a place for a small number of them here.
14  Dr. Kinsey may disagree completely, and when we come
15  back here, and we will come back here, I will listen
16  carefully to him.  That is if, and only if, the
17  Municipality decides to employ that device.
18          Now, I wrote out a number of possibilities,
19  and I recognize that I have no monopoly on imagination
20  and creativity in this regard, and as I indicated
21  before, there is numerable combinations that can arise.
22  But it seemed to me that there was some obvious
23  possibilities.  And that's all that they are,
24  possibilities.
25          There could be a change on the so-called

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196   (973) 492-2927-FAX

P011661

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 14

Court - Decision                         26

1  Community Developer's site changing from, say age
2  restricted rentals to family rentals.  A change in the
3  density.  I suppose the Municipality wouldn't have to
4  purchase the property.  The Municipality could just
5  give the zoning incentive to the property,
6  notwithstanding all the hubbub of the builder's remedy.
7  Sometimes a party may want to change its mind.
8         The Municipality can change the R.C.A. mix.
9  Once again, I'm not suggesting the Municipality has to
10 send any units out of town.  I suppose I should be
11 gratified that this is a Municipality that didn't want
12 to send -- didn't want to export the poor.  But that's
13 an option.
14        The Municipality may want to adjust the
15 density on Palisades Avenue site.  It can eliminate
16 Palisades Avenue if you can come up with units
17 elsewhere.  But maybe 18 units on that site is too much
18 and maybe I'll pick an arbitrary number, maybe 10 units
19 works.
20        Maybe there's other land lurking about, as a
21 result of all this controversy.  Maybe somebody can
22 twist United Water for more land.
23        And in all of this if money is the root of
24 some or all of the Municipality's concern, and I've
25 already expressed my views regarding the Emerson Woods

Court - Decision                         27

1  grant and the pittance of Municipal funds that would
2  have to fund Dr. Kinsey's plan, I can't help but be
3  continued to be struck by the loss of over $400,000 in
4  money that would have accrued if Emerson Woods had
5  developed.
6         Now there are trade-offs there, to be sure,
7  and the governing body made a value judgment.  It's not
8  for me to second guess that value judgment.  Open space
9  is a salutary purpose, preservation of open space, the
10 promotion of affordable housing is as well.  And I've
11 always viewed that contribution that would have come
12 from Emerson Woods as a loss to the protected class
13 which has not been directly compensated for.
14        Now where that ultimately comes out at the
15 end of this I'm not exactly sure.  But I couldn't
16 resist reminding the parties of my concern in that
17 respect.
18        The Municipality, having had since October
19 19th or 20th to start to think about this, and now
20 having an authoritative desicion regarding Marrick
21 Farms, will not be entitled to the full 90 days of
22 repose.  But it also will not have to adopt ordinances,
23 as it would otherwise have to do.  And let me tell you
24 what the Municipality will do.
25        It will consult with Dr. Kinsey and all other

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196    (973) 492-2927-FAX

P011662

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 15

Court - Decision                                                                28

1    interested parties.  That includes the public, that
2    includes the plaintiff, that includes any public
3    interest groups who may have been in contact with the
4    Municipality, and will prepare a housing element and
5    fair share plan and submit it to the Court no later
6    than April 30th, 2002.
7              As of that date, the Planning Board will have
8    adopted the housing element and fair share plan.  The
9    Municipality will have introduced the necessary
10   ordinances, but it need not adopt them until after a
11   hearing, and I'm going to give you the date of the
12   hearing.  You'll be able to fit these things in.
13             The date of the hearing, the next Court event
14   at which time this plan will be presented in open
15   court, will be May 10th, that is a motion Friday
16   afternoon, at 1:30.
17             The Municipality shall provide copies of the
18   ordinance and housing element to the Master and to the
19   Court no later than May 1st.  And the Master will
20   provide his report and recommendations no later than
21   May 8th.  That way, if it is approvable, the next order
22   will be to grant a conditional judgment of repose
23   conditioned upon the actual adoption of the ordinance,
24   and I'll certainly take into account the additional
25   work that any plan would need to have done in order to

Court - Decision                                                                29

1    fulfil it.  That is, submitting certain things to COA,
2    if that's the way the plan works out or otherwise.
3              - No order is necessary to be submitted as a
4    result of today's proceeding.  Essentially, what I'm
5    doing is I am continuing the compliance hearing with
6    these parameters.
7              Dr. Kinsey remains as the Special Master.
8    All other terms and conditions not inconsistent with my
9    decision today of the interim judgment, and of the
10   opinion, remain in full force and effect.  Does anybody
11   have any questions?
12             MS. NABBIE:  No, Your Honor.
13             MR. HALL:  Judge, one clarification, just so
14   I'm clear.  The Planning Board action by April 30 on
15   the housing element, that's as we did before, is a
16   formal master plan amendment.
17             THE COURT:  That's correct.
18             MR. HALL:  Okay.
19             THE COURT:  Okay?  Mr. Hall, do you have any
20   other questions?
21             MR. HALL:  No, thank you.  No, I'm sorry,
22   Judge, no.
23             THE COURT:  I may have said something that
24   was contradictory.  I said that the plan had to be
25   prepared and submitted to the Court by April 3th, and

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ 07403
(973) 283-0196    (973) 492-2927-FAX

**COMMUNITY DEVELOPERS v BORO OF EMERSON - March 21, 2002**

SHEET 16

Court - Decision                                              30

1   then I think I may have said something about May 1st.
2              MS. NABBIE:  You did.  I believe you said the
3   Municipality has to submit the plan to the Special
4   Master.
5              THE COURT:  Okay.  That's got to be April
6   30th.  I want it to be consistent.  Everything -- the
7   first submission, so to speak, is April 30th.  The
8   Master's response is as I indicated.  I would keep the
9   lines of communication open.  It may very well be that
10  the Master will have very little objection.  I don't
11  know whether Ms. Nabbie's client will have any
12  objections, but we'll have a hearing beginning on the
13  10th of May, and we'll see how this alternative works
14  out.
15             Dr. Kinsey, do you have any questions.
16             MR. KINSEY:  No, Your Honor.
17             THE COURT:  Okay.  That concludes this
18  proceeding.  Thank you for your patience.  I'll see you
19  on May 10th.  Good luck.
20             MR. HALL:  Thank you, Judge.
21             MS. NABBIE:  Thank you, Judge.
22                  (Proceedings Concluded)

Court - Decision                                              31

Certification

        I, Kathryn Murray, the assigned transcriber,

do hereby certify that the foregoing transcript of

proceedings in the Bergen County, Civil Part, on March

13, 2002, Tape No. 98-02, index number from 4480 to

7275, Tape No. 99-02, index number from 0001 to 1605,

is prepared in full compliance with the current tran-

script format for judicial proceedings, and is a true

and accurate compressed transcript of the proceedings

as recorded.

Kathryn Murray  AOC#460      March 27, 2002
ELITE TRANSCRIPTS, INC.
Bloomingdale, New Jersey 07403

**ELITE TRANSCRIPTS, INC.**
28 Catherine Street, Bloomingdale, NJ  07403
(973) 283-0196    (973) 492-2927-FAX

P011664

Exhibit 5



# 2006 REDEVELOPMENT PLAN

## BOROUGH OF EMERSON
## BERGEN COUNTY, NEW JERSEY

**PREPARED FOR BOROUGH OF EMERSON PLANNING BOARD**
**BA # 1486.07**

The original document was appropriately signed and sealed on March 31, 2006 in accordance with Chapter 41 of Title 13 of the State Board of Professional Planners

Joseph H. Burgis, P.P., A.I.C.P.
Professional Planner # 2450

Brigette Bogart P.P., A.I.C.P.
Professional Planner # 5679

Borough of Emerson, New Jersey

## BOROUGH OF EMERSON MAYOR AND COUNCIL

Mayor Steve Setteducati
Mr. Brian Todd, Council President
Mr. Carlo Camporeale, Council Member
Ms. Carole Costantin, Council Member
Mr. Chris Heyer, Council Member
Mr. Kenneth Hoffman, Council Member
Mr. Francis P. Milone, Jr., Council Member

### PLANNING BOARD MEMBERS

Mr. Steven L. Bair, Chairman
Mr. Robert Adams, Vice Chairman
Mayor Steve Setteducati
Mr. Brian Todd, Council member
Mr. Owen Cassidy
Ms. Marcia DeSalvo
Mr. Gary Goursky
Mr. Fred Madura
Mr. Mark Orecchio

### COUNCIL LIASIONS

Mr. Brian Todd
Mr. Christopher Heyer

### PLANNING BOARD TECHNICAL ADVISORS

Ms. Barbara Looney - Planning Board Secretary
Mark Madaio, Esq. - Board Attorney
Kenneth Job, PE - Borough Engineer
Joseph Burgis, P.P., A.I.C.P - Planning Consultant

The Redevelopment Plan                                                                    Borough of Emerson, New Jersey

# TABLE OF CONTENTS

1.0   INTRODUCTION ......................................................................................................................1

2.0   BACKGROUND INFORMATION ..........................................................................................2

    2.1 AREA DESIGNATED AS AN AREA IN NEED OF REDEVELOPMENT..............................2
    2.2 EXISTING LAND USES ............................................................................................2
    2.3 EXISTING DEVELOPMENT .......................................................................................2

3.0 GOALS  &  OBJECTIVES .......................................................................................................3

    3.1 GENERAL ..............................................................................................................3
    3.2 CBD DESIGN .......................................................................................................3
    3.3 PARKING AND VEHICLE CIRCULATION...................................................................3
    3.4 PEDESTRIAN SAFETY AND CIRCULATION ...............................................................4
    3.5 ARCHITECTURE OF BUILDINGS ..............................................................................4
    3.6 SIGNAGE ..............................................................................................................4
    3.7 STREETSCAPE DESIGN ..........................................................................................4

4.0   Required Components of the Redevelopment  Plan.......................................................5

5.0   Redevelopment Plan Strategy/ Overview of the Process ............................................5

6.0   The Redevelopment Plan ...............................................................................................6

    6.1   OVERVIEW OF DESIGN CONCEPT .........................................................................6
    6.2   RELATIONSHIP TO LOCAL OBJECTIVES ...............................................................11
    6.3   PROPOSED LAND USE AND BUILDING REQUIREMENTS .........................................14
    6.4   PROVISIONS FOR RELOCATION.............................................................................25
    6.5   IDENTIFICATION OF PROPERTY TO BE ACQUIRED .................................................25
    6.6   RELATIONSHIP OF MASTER PLANS........................................................................26
    6.7   RELATIONSHIP TO PERTINENT MUNICIPAL REGULATIONS.....................................28

7.0    Sample Concept Designs ............................................................................................29

*The Redevelopment Plan*

*Borough of Emerson, New Jersey*

# 1.0 INTRODUCTION

The Borough of Emerson Redevelopment Plan for the community's central business district represents a follow-up to the borough's recent adoption of an "area in need of redevelopment" study for the borough's Kinderkamack Road business corridor. This redevelopment plan is the next step in the redevelopment process. It is designed to incorporate the philosophy and policies of the state's smart growth initiatives, envisioning the creation of a business district that promotes a pedestrian-friendly mix of local retail establishments and residential units above these stores. As detailed herein, the plan is designed to revitalize the commercial core of the community by enhancing the local shopping experience, improve vehicular and pedestrian circulation, increase parking, and improve the aesthetic character of the area.

Before a municipality, or designated redevelopment entity, may utilize their powers granted under the Local Redevelopment and Housing Law (LRHL) a redevelopment plan must be adopted. The statute requires the redevelopment plan include an outline for planning, development, redevelopment, or rehabilitation sufficient to indicate the plan's relationship to definite local objectives as to a variety of specific planning indices, land use and building requirements, the manner in which residential relocation issues are to be addressed, identification of any sites to be acquired, and any significant relationship of the plan to County and State Plans, contiguous municipal master plans and local development regulations. The redevelopment plan as set forth herein addresses all of these statutory requirements.



THE REDEVELOPMENT PROCESS

**Governing body** adopts a resolution directing the Planning Board to undertake a preliminary investigation of an area for redevelopment criteria and conduct a public hearing.

**Planning Board** prepares a map showing the boundaries of the proposed redevelopment area and the location of parcels to be included with an appended statement setting forth the basis for the investigation.

**Planning Board** sets a date for a public hearing and gives public notice describing the boundaries of the area, and the location of the map for public inspection.

Notice is published once per week for two consecutive weeks with the last notice not less than ten days prior to the hearing date. Notice is also sent to owners of all parcels in the proposed area at least ten days prior to.

**Planning Board** completes public hearing and makes recommendations to governing body on whether or not to designate all or part of a proposed area as being in need of redevelopment.

**Governing body** adopts a binding resolution designating all or part of a proposed area as a Redevelopment area.

**Governing body** authorizes preparation of a Redevelopment Plan which may be delegated to the planning board.

**Planning Board** either reviews Redevelopment Plan for consistency with Master Plan within 45 days of referral by governing body or causes the preparation of a Redevelopment Plan and submits to governing body for action

**Governing body** adopts, by o r d i n a n c e, the Redevelopment Plan, after introduction of the ordinance and a public hearing.

The Redevelopment Plan

Borough of Emerson, New Jersey

## 2.0 BACKGROUND INFORMATION

### 2.1 AREA DESIGNATED AS AN AREA IN NEED OF REDEVELOPMENT.

The map to the right identifies the area that the Borough of Emerson, during the designation phase, determined met the criteria as an "area in need of redevelopment". The map illustrates the boundaries of the area and the tax blocks and lots. The area includes 59 tax lots and approximately 19.7 acres of land, excluding rights of way. The district's boundary primarily includes lots fronting on Kinderkamack Road between Lozier Avenue to the north and the municipal border with the Borough of Oradell to the south. On an east-west axis, the district extends along the rear property lines of lots fronting on Kinderkamack Road, Emerson Plaza East and Emerson Plaza West. The boundaries were established through an examination of the distribution of commercial land uses along Kinderkamack Road and its side streets.

### 2.2 EXISTING LAND USES

Approximately 33 percent of the 19.7 acres of land located in the study area is currently developed with commercial retail uses. Automotive, office, vacant land and restaurants comprise the bulk of the uses occupying the remaining land in the district. A small portion of the district is currently used for detached residential, apartments, industrial, public and vacant buildings.

### 2.3 EXISTING DEVELOPMENT

The majority of the lots are developed with one-story buildings, with a few two-story buildings dispersed throughout the study area. These buildings yield approximately 236,000 square feet of floor space, with 756 off-street parking spaces serving them. This results in an overall parking deficit of 285 parking spaces for the district when utilizing general planning parking standards.



# 3.0 GOALS & OBJECTIVES

## 3.1 CBD DESIGN

1. Encourage new developments that utilizes architectural and other site design elements that will establish a distinctive neo-traditional developed character to replace the district's current strip commercial sprawl imagery;
2. Encourage mixed-use developments and reduced setback lines to foster a continuous frontage of buildings and unify the streetscape;
3. Discourage the creation of front yard parking areas;
4. Encourage lot consolidation to enhance opportunities for infill and redevelopment where appropriate;
5. Support developments that are pedestrian-scaled and reinforce retail activity in the district;
6. Support a modest increase in intensity of use in the district to promote and sustain the revitalization of the district;
7. Enhance the physical appearance of the business district through comprehensive and integrated streetscape improvements, building renovations, and related physical improvements.

## 3.2 PARKING AND VEHICLE CIRCULATION

1. Work with New Jersey Transit to improve access to mass transit and relocate the train stop to eliminate the blockage of Kinderkamack Road;
2. Review and establish alternative areas and programs for commuter parking;
3. Encourage shared parking design, common access and circulation features between adjoining properties to maximize parking arrangements and a greater utilization of existing parking areas;
4. Improve the design and accessibility of off-street parking arrangements to encourage the use of rear parking areas;
5. Work with County officials to create on-street parking areas along Kinderkamack Road;
6. Support roadway improvement programs that balance the need for circulation and roadway improvements while reinforcing a pedestrian-friendly environment, and at the same time enhancing the district's livability;
7. Support roadway improvement programs that utilize pedestrian-friendly techniques and smart growth concepts;
8. Support the addition of a dedicated turning lane on Kinderkamack Road at its intersection with Linwood Avenue, Ackerman Avenue and Lincoln Boulevard;
9. Support the installation of traffic lights at Kinderkamack Road and Ackerman Street.

## 3.3 PEDESTRIAN SAFETY AND CIRCULATION

1. Create an enhanced pedestrian connection between the business district and activity centers (Borough Hall, School facilities, Hilliard Park, Senior Center, and other places of gathering);
2. Establish landscaping to buffer the sidewalks from the vehicles traveling on Kinderkamack Road;
3. Create a physical setting for pedestrian activity that is comfortable, convenient, visually interesting, and secure.

## 3.4 ARCHITECTURE OF BUILDINGS

1. Identify appropriate design controls and standards that will promote the rehabilitation of the buildings utilizing a diversity of architectural styles and materials, while also encouraging the use of selected common thematic elements that will unify the district with a particular visual theme;

2. Encourage architectural features that create a visual impact on the corridor and contributes to the character of the area, specifically variation in building articulation such as size and shape of windows, roofs and cornices, recessed building entries, and building materials;

3. Encourage corner buildings with enhanced design elements including, but not limited to, varying building heights, changes in façade articulation and plans, awnings and canopies, pedestrian entrances that develop and contribute to active intersections;

4. Encourage creative storefront designs that enhances the overall character and attractiveness of the CBD.

## 3.5 SIGNAGE

1. Encourage store signage to be an integral building element that is in scale with the storefronts they serve;

2. Encourage signage styles that reflects the character of the individual buildings they are placed on, as well as taking into consideration the surrounding buildings and signage n their immediate vicinity;

3. Establish a comprehensive signage program to promote consistency and complimentary designs throughout the CBD;

4. Establish an identifiable cohesive district image through signage and other unifying elements.

## 3.6 STREETSCAPE DESIGN

1. Enhance the intersection of Linwood Avenue and Kinderkamack Road as a key focal point in the district;

2. Create a sense of pedestrian scale through the use of street furniture and landscaping;

3. Establish streetscape elements that will further enhance the visual character of the district;

4. Ensure that parking areas incorporate a comprehensive landscape design to enhance the site's visual impression;

5. Prepare a comprehensive streetscape improvement plan connecting the business district with the adjoining civic institutions.

## 4.0 REQUIRED COMPONENTS OF THE REDEVELOPMENT PLAN

Section 40A:12A-7 of the New Jersey Local Redevelopment and Housing Law (LRHL) requires that the redevelopment plan shall consist of an outline for the planning, development, redevelopment, or rehabilitation of the project area which designates the following:

1. Its relationship to definite local objectives as to appropriate land use, density of population and improved traffic and public transportation, public utilities, recreational and community facilities and other public improvements.

2. Proposed land uses and building requirements in the project area.

3. Adequate provisions for the temporary and permanent relocation, as necessary for residents in the project area, including an estimate of the extent of which decent, safe, and sanitary dwelling units affordable to displace residents will be available to them in the existing local housing market.

4. An identification of any property with the redevelopment area which is proposed to be acquired in accordance with the redevelopment plan.

5. Any significant relationship of the redevelopment plan to (a) the master plans of contiguous municipalities (b) the master plan of the county in which the municipality is located and (c) the State Development and Redevelopment Plan adopted pursuant to the "State Planning Act" P.L. 1985,c.398 (C.52:18A-196 et al.).

6. Its relationship to pertinent municipal development regulations as defined in the "Municipal Land Use Law" (MLUL).

In addition, the redevelopment plan shall include the provision of affordable housing in accordance with the "Fair Housing Act". All development within the designated redevelopment area shall provide for the appropriate number of affordable dwellings. The number of affordable units shall be provided pursuant to the State of New Jersey Council On Affordable Housing third round rules that mandate a minimum of one affordable housing unit for every eight units of market rate housing and one affordable housing unit for every twenty-five jobs created. The redevelopment plan encourages the use of age-restricted housing, to the extent feasible and in accordance with COAH rules, to address the borough's affordable obligation.

## 5.0 REDEVELOPMENT PLAN STRATEGY/OVERVIEW OF PROCESS

The Borough of Emerson Redevelopment Plan for the Kinderkamack Road corridor calls for the physical redevelopment of the existing structures, the area's redevelopment with a variety of retail and service commercial uses and residential uses, the redesign of the existing circulation and parking designs and the provision of new streetscape elements. The plan provides for a two-fold approach for the redevelopment of the district. In one instance, it sets forth a plan that provides for a comprehensive design for the entire corridor that enables redevelopment, and in some cases redevelopment that is coupled with expansion of existing development where it is warranted. It provides for phasing to allow for the relocation of businesses within the central business district. In the second instance, it also provides an opportunity to enable a more comprehensive redevelopment of the entire district that is to be imposed where existing conditions are not to be retained. Both approaches include the required components of a redevelopment plan as set forth in the LRHL. The borough's adopted 2003 Central Business District Plan was utilized as a basis for many of the redevelopment plan's design principles, because it provides for efficient circulation patterns, new streetscape designs and more appropriately scaled structures for the entire area, in contrast to the area's existing conditions. The following sections of this report illustrate the proposed planning for the entire area that was designated as the area in need of redevelopment. It further details specific sample plans for different blocks in the area.

# 6.0 THE REDEVELOPMENT PLAN

In order to implement the redevelopment plan, new zone districts must be established. These new zones, identified as numbered Central Business District Zones, are detailed below.

In accordance with Section 40A:12A-7f of the redevelopment statute, which permits the governing body to amend or revise any portion of the proposed redevelopment plan by an affirmative vote of the majority of its full authorized membership, this plan hereby requires that it be reviewed once a year, to reevaluate its applicability to the area in need. During the review of the plan and ordinance, the governing body may remove properties from the area designated "in need of redevelopment" if the properties have been redeveloped and the redevelopment has been undertaken in a manner that meets the purposes and intent of the Central Business District Ordinance and its regulatory controls. It should be noted that while the designation may be removed, the subject properties should remain in the Central Business Districts for zoning purposes. Components of the plan may also be revised at that time, pursuant to the applicable statutory provisions.

## 6.1 OVERVIEW OF DESIGN CONCEPT

The first design concept is based on the redevelopment of selected properties and blocks in the district that will not only revitalize the mix of retail uses and the image of the district, but also improve the way the district physically functions. In order to accomplish these goals, the plan includes an improved parking and vehicular circulation design for the entire corridor, and identifies appropriate locations for multi-level buildings that include additional retail and office space and/or residential units on the upper floors. The plan also calls for a comprehensive streetscape design that will unify

*The Redevelopment Plan*

*Borough of Emerson, New Jersey*

the commercial corridor through appropriate design elements and create a more pedestrian-friendly and aesthetically pleasing environment. The second design concept maintains the same overall goals with respect to improving the physical character of the district, but enables a more substantive and comprehensive approach to redevelopment.

## CIRCULATION IMPROVEMENTS

The redevelopment plan includes recommendations for circulation and parking improvements along Kinderkamack Road and in adjacent parking areas. The proposal incorporates recommendations from Bergen County's Preliminary Roadway Plan and from the community stakeholders that include residents, property owners, the governing body, and merchants. The plan includes many of the recommendations for roadway improvements that were presented in the borough's adopted Central Business District Plan. These include the provision of a new traffic light at Ackerman Avenue, construction of dedicated turning lanes, the potential relocation of the train stop, the elimination of several existing curb cuts, and the creation of on-street parking. Without these improvements the corridor does not operate as efficiently as it could, and therefore these improvements are an integral part of the redevelopment of the corridor. The accompanying maps detail the two circulation concepts.

## SCALE OF STRUCTURES AND BUILDING DESIGN

The redevelopment plan is designed to encourage and accommodate a unified, compact commercial area focused around shops, restaurants, and residential development. The scale and design of the buildings proposed for the redevelopment area seek to create a critical mass of development that includes dwellings. In this regard, the plan calls for the development of multi-family residences above retail establishments, and in some cases, where lots are farthest from the central portion of the cbd, residential development without at-grade retail may also be allowed. The redevelopment plan permits 2 and 3 story buildings, and in some cases 4 stories, that may be occupied by residential and/or office uses. This will provide additional support for the local stores. The specific scale and the design of the buildings permitted in the redevelopment area are established by the area and bulk regulations set forth below.



The Redevelopment Plan

Borough of Emerson, New Jersey

## STREETSCAPE SYSTEM

The redevelopment plan calls for a new streetscape design for Kinderkamack Road. The design includes new lighting fixtures, sidewalk paving, new crosswalks, banners, wayfinding signage, landscaping and street furniture. These streetscape improvements are designed to create a unified character for the entire central business district, improve the appearance of the district, and enhance the safety of the area.

The map on this page details the extent and the planned location of proposed streetscape improvements. The next two pages illustrate the paving designs suggested for the sidewalks. In addition to the paver design for the sidewalks, the crosswalk design should be enhanced with textured materials delineating critical pedestrian areas to promote pedestrian safety throughout the Central Business District, thereby serving to improve the general appearance of the street.

## PEDESTRIAN LIGHTING

Installation of pedestrian-oriented decorative lighting fixtures is recommended for the area along Kinderkamack Road, Emerson Plaza West, and Emerson Plaza East. The fixtures should not be mounted higher than 12 feet. The light poles should contain mounting brackets for wayfinding signage and seasonal decorative display and information.

## WAYFINDING SIGNAGE







MIN. 4' AND LESS THAN 6'
LOCATE LIGHT FIXTURE IN CENTER OF CIRCULAR PATTERN TO MAINTAIN 18" FROM BASE COVER OF POLE TO CURB FACE FOOTING NOTCHED TO PROVIDE EXTENSION OF PAVERS OVER FOOTING TO BASE (SEE DETAIL)
OLDE VILLAGE PAVER - MEDIUM RECTANGLE EDGING BY UNILOCK
ADJACENT TURF AREA/ASPHALT RESTORATION WHERE APPLICABLE
CIRCULAR PATTERN OLDE VILLAGE PAVER PAVING FIELD, FLASHED COLOR
EDGING COURSE AT PAVEMENT WIDTH TRANSITIONS FROM LESS THAN 5' TO MORE THAN 6' OF PAVEMENT
- MEDIUM RECTANGLE
- SQUARE
- SMALL RECTANGLE
- SQUARE
- MEDIUM RECTANGLE
EDGING COURSE AT CURB
- MEDIUM RECTANGLE
- SQUARE
- SMALL RECTANGLE
- SQUARE
- SMALL RECTANGLE
- SQUARE
MEDIUM RECTANGLE
R4'
R2.7'
1.33'
TREE WELL - PROPOSED TREES
OLDE VILLAGE PAVER - MEDIUM RECTANGLE EDGING BY UNILOCK
STREET
THREE BANDS EDGING RADIAL COURSE OF OLDE VILLAGE PAVERS BY UNILOCK
CONCRETE CURB
CONCRETE PAVEMENT 90 DEG ANGLE 3' SCORING GRID SCORED WITH A ONE INCH SCORING EDGER
R1.70'
LOCATE LIGHT FIXTURE IN CENTER OF CIRCULAR PATTERN TO MAINTAIN 18" FROM BASE COVER OF POLE TO CURB FACE FOOTING NOTCHED TO PROVIDE EXTENSION OF PAVERS OVER FOOTING TO BASE (SEE DETAIL)
CONCRETE PAVEMENT EXPANSION JOINT EVERY 9' WITHIN SCORING PATTERN
COORDINATE DECORATIVE PAVEMENT AT STOREFRONT ENTRANCES WITH BUSINESS OWNERS. DESIGN WILL BE ADJUSTED AS NEEDED ON A CASE BY CASE BASIS
EXISTING STORE FRONT
VARIES - 6' MIN.
SIDEWALK PAVEMENT DETAIL #1
BOROUGH OF EMERSON
NOT TO SCALE

MIN. 4' AND LESS THAN 6'
LOCATE LIGHT FIXTURE IN CENTER OF CIRCULAR PATTERN TO MAINTAIN 18" FROM BASE COVER OF POLE TO CURB FACE FOOTING NOTCHED TO PROVIDE EXTENSION OF PAVERS OVER FOOTING TO BASE (SEE DETAIL)
OLDE VILLAGE PAVER - MEDIUM RECTANGLE EDGING BY UNILOCK
ADJACENT TURF AREA/ASPHALT RESTORATION WHERE APPLICABLE
RUNNING BOND OLDE VILLAGE SQUARE PAVING FIELD, FLASHED COLOR
EDGING COURSE AT PAVEMENT WIDTH TRANSITIONS FROM LESS THAN 5' TO MORE THAN 6' OF PAVEMENT
- MEDIUM RECTANGLE
- SQUARE
- SMALL RECTANGLE
- SQUARE
- MEDIUM RECTANGLE
EDGING COURSE AT CURB
- MEDIUM RECTANGLE
- SQUARE
- SMALL RECTANGLE
- SQUARE
- SMALL RECTANGLE
- SQUARE
MEDIUM RECTANGLE
R4'
R2.7'
1.5'
TREE WELL - PROPOSED TREES
OLDE VILLAGE PAVER - MEDIUM RECTANGLE EDGING BY UNILOCK
STREET
THREE BANDS EDGING RADIAL COURSE OF OLDE VILLAGE PAVERS BY UNILOCK
CONCRETE CURB
CONCRETE PAVEMENT 90 DEG ANGLE 3' SCORING GRID SCORED WITH A ONE INCH SCORING EDGER
R1.70'
LOCATE LIGHT FIXTURE IN CENTER OF CIRCULAR PATTERN TO MAINTAIN 18" FROM BASE COVER OF POLE TO CURB FACE FOOTING NOTCHED TO PROVIDE EXTENSION OF PAVERS OVER FOOTING TO BASE (SEE DETAIL)
CONCRETE PAVEMENT EXPANSION JOINT EVERY 9' WITHIN SCORING PATTERN
COORDINATE DECORATIVE PAVEMENT AT STOREFRONT ENTRANCES WITH BUSINESS OWNERS. DESIGN WILL BE ADJUSTED AS NEEDED ON A CASE BY CASE BASIS
EXISTING STORE FRONT
VARIES - 6' MIN.
2.67'
SIDEWALK PAVEMENT DETAIL #1
BOROUGH OF EMERSON
NOT TO SCALE

The Redevelopment Plan

Borough of Emerson, New Jersey

Prepared by Burgis Associates

March 2006

10

A wayfinding signage program is recommended for the district. The signage is designed to be color-coded to identify points of interests, direct people to parking, etc. This signage can be located on existing and proposed light poles. The design uses color-coding for different areas of the borough, thereby allowing the program to be extended to other commercial areas and side streets in the borough.

## 6.2 RELATIONSHIP TO LOCAL OBJECTIVES

One of the required components of a redevelopment plan is to provide information regarding its relationship with local objectives as to appropriate land uses, density of population and improved traffic and public transportation, public utilities, recreational and community facilities and other public improvements.

### BOROUGH OF EMERSON'S MASTER PLAN DOCUMENTS

The proposed redevelopment plan is consistent with the borough's master plan documents and the recommendations in those plans that pertain to the business district. The 1999 master plan reexamination report recommended that the borough consider the preparation of a Downtown Plan to address the need to enhance the area adjacent to the rail station on Kinderkamack Road. At that time New Jersey Transit was planning to alter the station area, and the 1999 plan encouraged the borough to become actively involved in those planning efforts. The borough recognized that the possibility existed for the relocation of the platform to the southerly side of Linwood Avenue so that Kinderkamack Road would not be blocked during the times when passengers are entering or existing the train. A Central Business District Plan was subsequently adopted in 2003. The goals and objectives of the Redevelopment Plan reflect the goals set forth in the 2003 Central Business District Plan. These goals are detailed in Section 3.0 of this document.

The 1999 Reexamination Report also states the need to examine the land use designations and zoning for properties in close proximity to the station to determine whether or not changes are required. The 2003 Central Business District Plan also determined that changes are required, and detailed specific zoning recommendations to implement change. The proposed land use and building requirements detailed in Section 5.3 include those zoning recommendations, with refinements and modifications based on further analysis and assessment of site conditions.

It is noted that the reexamination report further states that "the borough may also wish to consider the use of the Local Redevelopment and Housing Law to create a redevelopment plan for all or part of the Downtown area to upgrade the appearance and efficiency of the Downtown. The Local Redevelopment and Housing Law provides for the establishment of a redevelopment agency which can condemn and assemble parcels to "jump start" the redevelopment process. (Or) public/private partnerships can be entered which can provide the borough with a far greater degree of control over the timing and quality of any development." This 2005 redevelopment plan was created in furtherance of the recommendations set forth in the 1999 mater plan reexamination report.

### BOROUGH OF EMERSON'S ZONING ORDINANCE

The "area in need of redevelopment" encompasses four zoning districts, including the RC Retail Commercial District, the LBE Limited Business East District, the LBW Limited Business West, and the IM Industrial Manufacturing District. The redevelopment plan refines the provisions of these zones to facilitate a uniform and integrated development pattern. It recommends that the entire area be rezoned to create two new CBD Central Business District zones that encompass the entire redevelopment area. The maps on the previous pages detail the existing zone districts and the proposed Central Business Districts.





*The Redevelopment Plan*     *Borough of Emerson, New Jersey*

**6.3 PROPOSED LAND USE AND BUILDING REQUIREMENTS**
The LRHL requires that the redevelopment plan sets forth the proposed land uses and building requirements in the project area. The following recommended zoning regulations set forth the permitted uses and the area and bulk regulations for the proposed central business districts.

A. **Purpose.** The intent and purpose of the Central Business District East (CBD-E) and Central Business District West (CBD-W) is to:

1. Provide standards and guidelines to implement the goals of the Redevelopment Plan.
2. Recognizing the fact that that a majority of the lots within the Central Business District are small, allow for mixed-use development of single lots within the district that will utilize the land more efficiently by promoting shared parking and circulation.
3. Encourage a comprehensive design that can be completed in phases, but when completed creates a strong sense of place and a unified streetscape design.
4. Establish regulations that promotes the revitalization of the district, create a desirable visual environment and reestablishes a safe and efficient circulation design for vehicular and pedestrian traffic.
5. Ensure that all developments are planned on the basis of an integrated, comprehensive design with respect to the location and relationship of buildings, parking, landscape and buffer amenities, architectural elements, walkways, and pedestrian and vehicular traffic movement.
6. Establish standards and requirements that are applicable to any project requiring subdivision approval, site plan approval, or zoning permit approval within the CBD District as defined on the Borough of Emerson Zoning Map.
7. Affirm the goals and objectives set forth in Section 3.0 above.

**§ 290-65 Permitted Uses.**

A. **Principal Uses.**
1. Retail stores.
2. Personal service businesses.
3. Eating and drinking establishments (except drive-ins)
4. Professional, financial and medical offices.
5. Multi-family residential dwellings above at-grade retail commercial and other principal permitted uses.
6. Multi-family residential dwellings including buildings above at-grade parking, only in areas (a) north of Lincoln Blvd where the multi-family building is behind a building that fronts on Kinderkemack Rd, and (b) south of Ackerman Avenue.
7. Instructional studio spaces including dance, artist, martial art, music and other related studios.
8. Financial institutions.
9. Child care facilities and nursery schools.

B. **Accessory Uses.**
1. Off-street parking designed in accordance with Section 290-69B of the ordinance and 290-13 of the general zoning ordinance
2. Outdoor eating areas designed in accordance with Section 290-67C of the ordinance.
3. Fences and walls in accordance with Section 290-40 of the ordinance
4. Landscaped plazas, courtyards, alleys and other similar public amenities designed in accordance with the area and bulk regulations set forth for the CBD districts.

5. Signs in accordance with section 290-67A5 of the ordinance.
6. Uses that are customarily and normally incidental to the permitted uses.

C **Prohibited Uses.** Any use or structure other than those uses or structures permitted in subsection A, B or C above are prohibited. In addition, and not withstanding the above, the following uses shall be specifically prohibited:
1. Automotive service stations, auto body and repair shops.
2. Car washes of any type.
3. Drive-up or through windows serving restaurants.
4. Automotive and motorcycle sales and service businesses.
5. Contractor supply and storage yards.
6. Industrial, warehousing, and manufacturing use.
7. Exterior storage of goods.

**§290-66 Area and Bulk Requirements.** The following bulk and lot regulations shall apply to all uses permitted within the CBD zone district:

**TABLE A: AREA AND BULK REQUIREMENTS, CBD-E AND CBD-W**

| Regulation | CBD-East of Railroad Line | CBD-West of Railroad Line |
|---|---|---|
| Minimum Lot Area (sf.) | 10,000 (a) | 15,000 (a) |
| Minimum Lot Width (ft.) | 75 | 120 |
| Minimum Lot Depth (ft.) | 60 | $75^1$ |
| Minimum Front Yard (ft.): Kinderkamack Road / Other Streets | $10^2$ / 5 | $20^3$ / - |
| Maximum Front Yard (ft.): Kinderkamack Road / Other Streets | $25^2$ / 15 | $50^3$ |
| Minimum Side Yard – one/both (ft.) | 0/0 | $10/20^1$ |
| Minimum Rear Yard | 30 | 20 |
| Maximum Building Height (stories/feet) | 3 sty/40 feet $^4$ | 3 sty/40 feet $^4$ |
| Maximum Building Coverage (percent) | 70 | 70 |
| Maximum Impervious coverage (percent) | 85 | 85 |

a.    Provided that, where an entire block is to be redeveloped pursuant to the redevelopment plan located at the end of this report, the minimum lot area shall coincide with the block as depicted on that map.

1    Corner Parcels with rights of way located on three sides may reduce the required depth by 55% & reduced side yards of 5 feet for each yard.

2    In accordance with the streetscape requirements set forth in  Section 290-67 B1 of the ordinance.
3    In accordance with the streetscape requirements set forth in Section 290-67B2 of the ordinance.
4    Additional height is permitted in accordance with section 290-67A3 of the ordinance.

## § 290-67 Design Standards

### A.    Architectural Guidelines

#### 1.  *Façade Design*

*a.    Horizontal articulation between floors.*  Each façade should be designed to have a  delineated floor line between  street level  and upper floors. This delineation can be in the form of a masonry belt course, a concrete lintel or a cornice line delineated by wood detailing.

*b.    Vertical articulation.*  Each building façade facing a public right of way must have elements of vertical articulation comprised of columns, piers, recessed windows or entry designs, overhangs, ornamental projection of the molding, or recessed portions of the main surface of the wall itself. The vertical articulations shall be designed in accordance with the following:

i.    Each vertical articulation must be a maximum of thirty (30) feet apart.

ii.    Each vertical articulation must be a minimum of one (1) foot deep.

iii.   Each projection, excluding projections of the main wall surface that are not designed as overhangs, may extend into the required front yard a maximum of  2 feet in depth.

iv.    Each projection of the main wall surface that is not designed as an overhang, may extend into the required front yard a maximum of one (1) foot

v.    The total length of the building façade projections, identified in Section 290-67A1a and 290-67A1b above, may not exceed sixty percent (60%) of the total façade length.

#### c.  *Fenestration*

i.    At least thirty (30) percent of the first floor primary building frontage shall be clear window glass permitting a view of the buildings' interior.  This percentage shall be calculated within the area of the building façade that is located between three feet and ten feet above sidewalk level.

ii.   Doors and windows should cover a minimum of 50% of the building frontage on the street level.

iii.   A minimum of 40% of the front door shall consist of glass in order to maximize the visibility of the store interior.

iv.   Recessed entries are encouraged to create additional pedestrian environs, provide shelter for sidewalk patrons and enlarged windows in the district.

#### 2.    *Materials.*    Exterior building materials shall be classified as either primary, secondary or accent materials.  The façade must be designed in accordance with the following:

i.    The primary material shall cover at least sixty percent (60%) of the façade of the building.

ii.   Secondary materials shall cover not more than forty percent (40%) of the façade.

iii.  Accent materials may include door and window frames, lintels, cornices and other elements and may cover no more than ten percent (10%) of the façade.

3. **Roof Lines/Building Height**

a. The top of all buildings must be capped by a cornice or sloping roof element.

b. An additional five (5) feet in height for ornamentation such as parapets and cornices is permitted. This additional height is only permitted along a maximum of sixty percent (66%) of the façade to encourage a varying roof line.

c. In addition to 3ii above, each portion of a building that provides cornices and similar appurtenances for ornamental purposes, such elements may not be more than 25 feet in length each.

d. All roof mounted equipment shall be screened from public view by use of parapet walls.

e. In the CBD-w zone district 50% of a building may be 4 stories in height where the topography of land provides a minimum of a 8 foot change in elevation.

f. Irrespective of other height restrictions, (a) buildings in the area north of Lincoln Blvd that are placed behind a building fronting Kinderkamack Rd may be a maximum 4 stories/50 feet in height and developed solely with three residential floors above at-grade parking or solely for parking; and (b) buildings in the area south of Ackerman Avenue may be developed with a maximum three residential stories above at-grade parking or above at-grade commercial, with a maximum height of 50 feet.

4. **Awnings and Canopies**

a. Canopies and awnings are encouraged at the ground floor level.

b. Buildings with multiple storefronts all awnings or canopies shall be designed of compatible material and shall be uniform in color, shape and design.

c. Awnings and cornices shall be designed with a minimum vertical clearance of 7 feet and shall not extend more than 5 feet from the face of the building.

d. A maximum number of four colors, inclusive of black and white, are permitted.

e. The lettering on the canopy shall be limited to the name of the occupant only, which shall be included in determining the color and other sign calculations. The lettering shall have a maximum letter size of 9 inches and occupy a maximum of 70 percent of the valence area.

f. No awning shall be erected or maintained so as to obstruct access to any fire escape, window or door.

g. Awnings and canopies are permitted to encroach within the front yard setback.

5. **Signage.**

a. Roof signs are prohibited in the district.

b. For multi-tenanted buildings the signs shall be designed with uniform area and height.

c. Except as required above, all signage shall meet the regulations of Chapter 232. Any proposed sign that does not meet the requirements set forth by this chapter shall require variance relief. In the event that these new standards conflict with existing standards set forth in the Borough of Emerson Signs and Awnings Ordinance, this section of design standards supersedes.

*The Redevelopment Plan*

*Borough of Emerson, New Jersey*

B. **Streetscape Design Requirements.**

1. All parcels along Kinderkamack Road that are located in the CBD-E zone district must comply with the following requirements.

   a. Buildings setback between ten (10) and twelve (12) feet from the curb line shall have a minimum sidewalk width of 5 feet and a landscape planter with a minimum width of five (5) feet.

   b. Buildings setback between twelve (12) and twenty (20) feet from the curb line shall have a minimum sidewalk width of 12 feet inclusive of a 4 foot minimum landscaped planter separating two 4 foot wide sidewalks, one of which is adjacent to the building and the other adjacent to the curb.

   c. Landscaped planters must be at least two hundred and fifty (250) square feet in area.

   d. A combination of perennials and shrubs and similar material is required in proposed planters.

   e. Streetscape amenities such as benches shall be incorporated as part of the planter design.

2. All parcels along Kinderkamack Road that are located in the CBD-W zone district must comply with the following requirements.

   a. All buildings must be setback a minimum of twenty (20) feet and a maximum of 50 feet from Kinderkamack Road.

   b. There shall be no parking located between the building and Kinderkamack Road.

   c. The area between the building and Kinderkamack Road must be landscaped in accordance with section 4 below.

   d. Landscaped frontage buffer areas shall be provided for all sites located in the CBD-W district that front on Kinderkamack Road.

   e. Frontage buffers shall be designed in accordance with the following:

      i. Shall be planted with a mixture of deciduous and evergreen trees, shrubs, grasses and perennials, and incorporated with berms, mounds, rock formations or combinations thereof.



STREET RIGHT OF WAY

**CBD-E STREETSCAPE REQUIREMENTS**

*Sites located in the CBD-E district with a front yard setback between 10 and 12 feet.*

*Sites located in the CBD-E district with a front yard setback between 12 and 20 feet.*



**CBD-W STREETSCAPE REQUIREMENTS**

*Sites located in the CBD-W district*

The Redevelopment Plan

Borough of Emerson, New Jersey

    ii. Frontage buffers shall be equal to the street setback requirement and shall be shown on the landscape plan.

    iii. In addition to the required street trees, frontage buffers shall require a minimum of 10 shrubs for every 30 feet of frontage.

    iv. No building, structure or accessory structure, parking, or loading areas shall be permitted in the front buffer area

3. Street trees shall be provided along all public right of ways in accordance with the following standards:

    a. Streets trees should be located at a distance of fort (40) feet on center. The exact spacing and planting location shall be evaluated on a site-specific basis and adjusted to reflect the location of buildings to minimize potential obstruction and visibility impacts on wall business signage.

    b. Trees shall have a minimum caliper size of three (3) inches at time of planting.

**C. Pedestrian Circulation Design: Outdoor cafes and plazas**

1. Outdoor Cafés

    a. Outdoor café shall be located on sidewalks, plazas, and courtyards immediately adjacent to any eating and food establishment. Such facilities shall be provided in a manner that pedestrian circulation or access to store entrances is not impaired.

    b. A minimum of six (6) feet of unobstructed sidewalk area must be available for pedestrian circulation.

    c. No outdoor loudspeaker, radio, or similar device shall be utilized.

    d. The area occupied by the café must be separated from the public walkway by a structure such as planters, posts, ropes and/or other removable enclosures.

    e. Outdoor establishments shall not be entitled to additional signage.

    f. No tables, chairs, or other equipment shall be attached, chained, or in any manner affixed to any tree, post, sign, curb or sidewalk.

    g. All outdoor equipment must be removed from the sidewalk at the end of each business day.

    h. The applicant shall be responsible for keeping the area of the outdoor café and the adjacent walks and streets free and clear of any debris or litter.

    i. No outdoor cafe shall be open for business prior to 7:30 a.m. nor remain open for business after 11:00 p.m. All persons occupying the



Minimum sidewalk dimensions for street tree plantings



Minimum sidewalk dimensions for sidewalk café locations

outdoor cafe shall vacate the same no later than 11:30 p.m.

1. Outdoor cafes shall be permitted to operate from April 1 to November 30 in any calendar year. The permit, when issued, shall be valid for one season.

2. Pedestrian walkways and plazas

    a. Where redevelopment, lot consolidation or other means of land assemblage occurs within the central business district, alleyways must be incorporated into the site plan and designed in accordance with section c below.

    b. Where the redevelopment of a site includes more than 300 feet in frontage on Kinderkamack Road an alleyway designed in accordance with the section c shall be provided.

    c. When the development only includes a single tax lot, and provides a mid-block alleyway that conforms to the design standards detailed below, the parking requirement shall be reduced by 10%.
       i. The alleyway must extend from the parking area to the front sidewalk along Kinderkamack Road.
       ii. The design should include features such as decorative lamp posts or lighting bollards that comply with the lighting standards set forth in section 290-67D of the ordinance
       iii. Pedestrian alleyways shall be minimally 12 feet in width.
       iv. Low-lying vegetation, designed in accordance with the detail below shall be provided along the walkway.
       v. The walkway surface should be compatible in style, materials, colors, and details with other site improvements and or the public sidewalks. Brick pavers, textured or stamped sidewalk are encouraged.

    d. Plazas or courtyards adjacent to parking lots shall utilize decorative, landscaped and effective protective devices to prevent injury from vehicles that inadvertently enter into the pedestrian area

D.  Landscaping Requirements

    1. General.

        a. A landscape design plan shall be required for each site. Each design shall incorporate three or more of the following: trees, shrubs, hedges, ground covers and/or grasses as part of the overall landscape plan.

        b. Automatic irrigations systems are mandatory components of said plan.

        c. Perennial and annual flower beds shall be incorporated into the plan.

    2. Parking Area Landscaping.

        a. Parking areas with less than 10 spaces shall be screened from the street with landscaping but no interior parking lot landscaping is required. The street screening shall comply with the general requirements in section 1 above.

        b. Parking areas with 10 or greater parking spaces shall be screened from the street with landscaping and interior lot landscaping shall be required in accordance with the following:
           i. Each parking row shall include a curbed landscaped island with at least one shade tree and shrub plantings.
           ii. A minimum of one shrub for every two parking spaces shall be planted along the perimeter of the parking spaces.
           iii. One shade tree shall be provided for every ten (10) parking spaces.

iv Street trees shall be provided along all right of ways at a distance of 40 feet on center.

3. Recommended Plant Material:

## SHADE TREES

| BOTANICAL NAME | COMMON NAME |
|---|---|
| Acer Rubrum 'Var' | Red Maple Varieties |
| Carpinus betulus | European Hornbeam |
| Fraxinus pennsylvanica 'lanceolata' | Green Ash (seedless) |
| Gleditsia triacanthos 'inermis' | Thornless Honeylocust |
| Koelreuteria paniculata | Golden Rain Tree |
| Platanus x acerifolia | London Plane |
| Quercus rubra variety | Red Oak |
| Sophora japonica 'Regent' | Regent Scholartree |
| Tilia cordata 'Greenspire' | Greenspire Littleleaf Linden |
| Zelkova serrata 'Green Vase', 'Village Green' | Green Vase Japanese Zelkova |

## ORNAMENTAL TREES

| BOTANICAL NAME | COMMON NAME |
|---|---|
| Acer ginnala 'Flame' | Amur Maple |
| Acer griseum | Paperbark Maple |
| Amelanchier x grandiflora 'Autumn Brilliance' | Serviceberry |
| Cercis Canadensis | Eastern Redbud |
| Cornus kousa 'Chinensis' | Chinese Kousa Dogwood |
| Malus 'Var' | Crab Apple Varieties |
| Prunus 'Newport' | Newport Plum |
| Prunus serrulata 'Amanogawa' | Amanogawa Cherry |
| Prunus x yedoensis | Yoshino Cherry |
| Pyrus calleryana 'Aristocrat', 'Chanticleer', 'Whitehouse' | Pear Varieties |

## SHRUBS AND GROUND COVERS

| BOTANICAL NAME | COMMON NAME |
|---|---|
| Abelia sp. | Glossy Abelia |
| Clethra | Summersweet |
| Cotoneaster | Cotoneaster |
| Fothergilla forsythea sp. | Fothergilla |
| Juniperous 'Var' | Juniper Varieties |
| Ilex Crenata | Japanese Holly |
| Ilex Glabra | Inkberry Holly |
| Pinus Mugo | Mugho Pine |
| Potentilla Fruticosa | Dwarf Potentilla |
| Prunus Laurocerasus | Cherry Laurel |
| Spirea sp. | Spirea |



| | |
|---|---|
| *Syringa* | *Lilac* |
| *Taxus sp.* | *Yew* |
| *Thuja occidentalis Emerald Sentinel 'Spiralis'* | *Spiralis Eastern Arborvitae* |

## D. Lighting

1. General Site Lighting Requirements.

   a. The borough standard lighting fixture shall be utilized in all pedestrian areas such as walkways and plazas.  In addition this fixture shall be utilized along the Kinderkamack road right of way.

   b. All outdoor lights shall be decorative fixtures not exceeding (12) feet in height.

   c. The maximum lighting intensity (footcandle) at any point on the subject property line shall not exceed five tenths (0.5) footcandle.

   d. All lights shall utilize color corrected lamps. The use of high pressure sodium lights, fluorescent, or mercury vapor lighting is prohibited. Use of minimum wattage metal halide is encouraged.

   e. Maximum permitted wattage of fixtures is limited to 250 watts.

2. Lighting Standards.

   The required lighting levels (in footcandles) for properties in the district shall be as determined in the table below:

**Table B**

| Requirement | Minimum footcandles | Average footcandles | Uniformity Ratio |
|---|---|---|---|
| Parking Areas | 0.5 | 1.0 | 4:1 |
| Pedestrian Areas | 1.0 | 1.5 | 4:1 |
| Access Driveways | 1.0 | 2.0 | |

2. Storefront and Facade Lighting.

   a. Lighting should be directed toward the storefront, and should be shielded and recessed to prevent spillage.

   b. Wall mounted lights shall not be located higher than the second floor.

   c. No lighting is permitted on the roof structure of a building.

   d. Use of floodlights is prohibited.

*The Redevelopment Plan*                                                        *Borough of Emerson, New Jersey*

## 290-69 Off-Street Parking Requirements.

### A. Number of Parking Spaces.
The minimum number of off-street parking spaces required shall be as shown on Table B:

**Table C**

| Land Use | Requirement |
|---|---|
| Retail stores and shops | 1 space per 250 square feet of gross floor area |
| Banks | 1 space per 500 square feet of gross floor area |
| Business and professional offices | 1 space per 350 square feet of gross floor area |
| Medical and dental clinics or offices | 2.5 spaces per each examining room or dental chair or like, plus 1 space for each employee |
| Restaurants | 1 space for each 3 seats |
| Residence in mixed-use buildings<br>1 Bedroom<br>2 Bedroom | 1.8 spaces per unit<br>2.0 spaces per unit |
| Personal Service Establishments | 1 space per 300 square feet of gross floor area |
| Dance, martial arts, and related studios | 1 space per 500 square feet of gross floor area |
| Galleries | 1 space per 500 square feet of gross floor area |
| Child Care Centers & Nursery Schools | 1 space per employee plus 1 space for every ten children |

### B. Parking Area Design.

1. Location. Front yard parking shall be prohibited. Off-street parking spaces shall be limited to side and rear yards.

2. Setback. Parking spaces shall be setback minimally 5 feet from side and rear lot lines, provided that all designs must include a provision for drive connections between adjoining lots for shared parking arrangements. Where parking abuts a single-family residential zone, the minimum setback shall be 10 feet. A landscape buffer shall be provided adjacent to the property line shared with the single-family residential zone.

3. Dimension. Parking stalls shall be nine by eighteen (9x18) feet in dimension.

4. Loading and unloading facilities shall not take place in the public right of way.

5. All such parking lots, driveways and loading areas shall be hard-surfaced with asphalt or concrete pavement or brick pavers as approved by the Borough Engineer.

6. Parking Area Landscaping Details. See Section 290-69G.

7. Shared Parking. Where there is a mixed use facility consisting of residential and non-residential uses, an applicant shall be permitted to reduce the amount of required parking by 25% from standards that would otherwise apply to the individual properties.

8. Driveways and access aisles dimensions shall be designed in accordance with §290-30B(2).

## 6.4 Provisions For Relocation

As detailed in the LRHL the redevelopment plan must include adequate provisions for the temporary and permanent relocation, as necessary, for residents in the project area, including an estimate of the extent of which decent, safe, and sanitary dwelling units affordable to displace residents will be available to them in the existing local housing market.

The redevelopment plan was designed to reduce the amount of relocation that was necessary by including one plan approach that respects the existing lot lines to allow individual lots to be redeveloped in accordance with the area and bulk regulations created. It is noted that, while the LRHL does not require a relocation plan for commercial tenants, a redevelopment phasing plan detailed below would allow for the relocation of existing commercial tenants within the central business district under that one scenario.

The principal area for which a relocation/phasing plan is provided is within Blocks 419 and Block 422. The plans call the expansion of several of the existing commercial buildings. The permitted expansions were designed to allow existing commercial tenants to operate during construction. This is most evident in the designs for Block 419. Therefore it is most appropriate to begin the first phase of redevelopment on this block, specifically with the



lots that front on Kinderkamack. Once the expansions are constructed several of the tenants from other lots that do not front on Kinderkamack Road can occupy the new building spaces while the remainder of the parking area in the rear is constructed.

Lastly, the third phase of the plan can be constructed, while the existing commercial tenants can occupy some of the new floor area located on Block 419, the redevelopment of Block 422 can occur. This phasing is illustrated on the map to the right. Regarding the displacement of residential tenants, the plans calls for the removal of 2 residential structures located on block 419 in order to construct public parking. These 2 residential structures house 3 dwelling units which need to be relocated.

If the residents in these structures are displaced, this plan calls for an agreement between the borough and the property owners to ensure adequate provision for their temporary and/or permanent relocation, including an estimate of the extent of which decent, safe, and sanitary dwelling units affordable to the displaced residents will be available to them in the existing local housing market. And the cost of the relocation of the owners/tenants of the property. The borough shall work with the Bergen County Housing Authority (if it is determined that the residents meet the BCHA requirements) to relocate these residents, or work with local realtors to determine the location of existing safe affordable housing for any

displaced residents.

### 6.5 Identification of Property to be Acquired

The first plan approach is developed around the phasing plan in order to reduce the number of properties that would have to be acquired in order to implement the plan. However the two residential parcels noted above may need to be acquired in order to complete the redevelopment plan. These structures are located on Block 419 Lots 1 & 2. In addition, Block 419 Lot 10 is needed to be acquired for access to the proposed parking area called for on Block 419 in the plan. This lot currently is occupied by a commercial structure. Additionally, Block 422 Lots 1, 12, and 13-18 are also identified as sites that may be acquired if, within a period of one year from the date of the approval of the redevelopment plan, the property owners do not come forward with a plan for the effective redevelopment of these lots pursuant to the provisions of this plan. In the implementation of the second alternative plan approach, the plan calls for the entire area to be identified as property to be acquired.

### 6.6 RELATIONSHIP OF MASTER PLANS

#### A. MASTERPLANS OF CONTIGUOUS MUNICIPALITIES

1. BOROUGH OF WESTWOOD

Westwood is adjacent to much of the northern boundary of the Borough of Emerson. Although the Redevelopment area does not border directly with the Borough of Westwood, it has been included in this section of the Redevelopment Plan because of its extensive border with the Borough of Emerson. A reexamination report was prepared in May of 1999 and the latest master plan was adopted in 1993. Westwood is currently updating its Master Plan and will likely adopt a reexamination report in 2005. The 1993 Master Plan included a Central Business District Plan and the new reexamination report will contain an additional study of the Westwood CBD, currently there are no CBD redevelopment plans or studies that have been undertaken by the borough. According to the Westwood Land Use Plan the areas in Westwood that are located west of Broadway, bordering Emerson include "low density residential". Westwood lands bordering Emerson east of Broadway include a mix of "commercial," "medium density residential", "cemetery," and "light manufacturing uses". The Westwood 1993 Master Plan and 1999 Reexamination Report do not make any findings which address the compatibility of the current zoning and land use in Westwood with Emerson. The 1992 Emerson Master Plan Reexamination Report concludes however that "land uses remain generally compatible" between Emerson and its eight (8) surrounding municipalities. Furthermore, after a review and comparison of the land uses within Westwood and Emerson was conducted it is concluded that the Emerson Redevelopment Plan is not inconsistent with the uses that are well established within Westwood.

2. BOROUGH OF ORADELL

Oradell abuts the southern portion of the study area. The Borough of Oradell adopted a Land Use Plan in 1988 and amended this Plan in 1993. In addition, a Master Plan Reexamination Report was adopted on October 14, 1997. The Borough is currently updating its Master Plan and will adopt a Reexamination Report in 2005. The Oradell/Emerson municipal border forms the southern boundary of the study area. It is important to note that sections of the redevelopment area south of Louis Avenue that border Oradell are commercial properties. The Oradell Land Use Map classifies areas in Oradell directly south of the redevelopment area as "business and professional office". A suburban style office park is located directly south and adjacent to the study area. Any redevelopment in Emerson directly adjacent to this site should take into account the nature of this office use. Appropriate buffering and/or landscaping may be required. West of Kinderkamack Road single-family uses predominate in Oradell. In addition, the Emerson Golf Course is east of the

railroad right-of-way and south of the study area. Land uses west of Kinderkamack Road are classified as "low density residential" and uses east of the railroad right-of-way are displayed as "recreation" in the Oradell Land Use Plan.

The 1999 and 1992 Emerson Master Plan Reexamination Reports do not specify any areas of land use incompatibility with Oradell. The existing land use pattern in Oradell is consistent with and compatible with this Redevelopment Plan and with the adjacent land uses in Emerson. The current zoning and land uses in Oradell are not inconsistent with the proposed uses set forth in this document. It is important to note that in the 1997 Oradell Reexamination Report there are policies and goals discussed that are similar to and echo the improvements proposed in this Redevelopment Plan. For example, the 1997 Oradell Report calls for an improvement plan serving the Kinderkamack Road business corridor that "would enhance the physical character of the area, reinforce the corridor as an attractive place to shop, and thereby encourage an upgrading of the type and character of shops which may locate into the district". Furthermore, the 1997 Report states, regarding the Kinderkamack corridor, that "consideration should be given to design features which enhance the physical character of the community, and encourage the integration of building, parking, landscaping and signage elements into a comprehensive unified framework." This specific recommendation or goal is an integral and important aspect of the Emerson Redevelopment Plan.

## B. BERGEN COUNTY MASTER PLAN

Bergen County's last *Master Plan* was written and formally adopted on December 10, 1962 and amended March 14, 1966. Since this time the county has studied and developed recommendations on the present and future needs for basic County facilities under the *County Comprehensive Plan* program. These studies resulted in 26 reports that were published from 1969 (Report 1, Physical Characteristics) to 1975 (Report 26, Open Space and Recreation Inventory). However, since 1975 the only documents that are somewhat related to county master planning, have been several Cross Acceptance reports to the State Planning Commission written in 1989 and 1998. These reports were required as part of the *New Jersey State Development and Redevelopment Plan*.

*Currently the Bergen County Department of Planning and Economic development has a Division of Master Planning* whose primary intent is to develop and create a new Master Plan for the County of Bergen. The division will pursue intergovernmental coordination with all 70 municipalities to ensure that the County Master Plan as well as each municipality's master plan is generally consistent with each other. Moreover, the County Master Plan will provide municipalities with a regional framework for their local planning process. The development of the County Master Plan will also include an extensive public outreach component (for example, public meetings and hearings) to ensure that there is sufficient public discussion and feedback. Lastly, the County Master Plan will be fully in accordance with the New Jersey Municipal Land Use Law as well as consistent with the goals and objectives of the New Jersey State Development and Redevelopment Plan. Once this process begins the Borough of Emerson should work with the County to ensure this Redevelopment Plan is consistent with the Bergen County Master Plan.

## C. THE STATE DEVELOPMENT AND REDEVELOPMENT PLAN

### Goal #1: Revitalize the State's Cities and Towns

**Strategy**

Protect, preserve and develop the valuable human and economic assets in cities, towns and other urban areas. Plan to improve their livability and sustainability by investing public resources in accordance with current plans which are consistent with the provisions of the State Plan. Leverage private investments in jobs and housing; provide comprehensive public services at lower costs and higher quality; and improve the natural and built environment. Incorporate ecological design through mechanisms such as solar access for heating and power generation. Level the playing field in such areas as financing services, infrastructure and regulation. Reduce the barriers which limit mobility and access of city residents, particularly the poor and minorities, to jobs, housing, services and open space within the region. Build on the assets of cities and towns such as their labor force, available land and buildings, strategic location and diverse populations.

**STATEWIDE POLICIES** The Borough's redevelopment efforts and resultant plan are consistent with two of the statewide policies set forth in the state plan. These policies are detailed below:

1. Community Design. Include in all revitalization efforts community design guidelines that:

- promote mixed-use and public open space in redevelopment projects so that these areas are both attractive and functional for residents and businesses;
- establish design criteria to improve and enhance waterfront areas, corridors, neighborhoods and gateways;
- design and redesign buildings and neighborhoods to both improve public safety and facilitate community interaction;
- encourage compact, mixed-use redevelopment projects through master plans, zoning and other development regulations where they are compatible with the general character of surrounding areas;
- provide and maintain appropriate lighting that improves pedestrian movement and public safety;
- establish compatible design criteria for commercial facades, setbacks and streetscapes;
- encourage the creation of design facilitation teams drawn from public agencies and private groups to consult on development and redevelopment projects; and
- facilitate the inclusion of art work and quality aesthetics in all construction projects.

2. LAND USE REGULATIONS. Modify land-use regulations to maximize the effectiveness of revitalization efforts.

## 6.7 RELATIONSHIP TO PERTINENT MUNICIPAL DEVELOPMENT REGULATIONS As detailed in Section 6.2of this plan The "Area in Need of Redevelopment" encompasses four existing zone districts, including the RC retail commercial District, the LBE Limited Business East District, the LBW Limited Business West, and the IM Industrial Manufacturing District. This plan recommends that this entire area be rezoned and two new CBD Central Business District zones be created to encompass the entire redevelopment area. The maps on the following page detail the existing zone districts

## 7.0 SAMPLE CONCEPT DESIGNS

### COMPREHENSIVE REDEVELOPMENT PLAN:

The following concept design for the Kinderkamack corridor illustrates the opportunities and goals established in the redevelopment plan. The following three pages provide a detailed view of different areas of the corridor concept plan. These sketches depict concept plans where the area is redeveloped with infill development that enables expansions of some of the existing buildings in the area. The concept plan shown at the very end of this report depicts a more comprehensive conceptual redevelopment of the area, as referenced in previous sections of this report.





The Redevelopment Plan

SECTION ONE: THE northern most section of the Redevelopment Area

The plan permits mixed use buildings that are slightly setback from the street right of way to allow for a generous sidewalk area. In addition this area permits outdoor cafés and landscaped areas adjacent to the sidewalks within the front yard setbacks.

Borough of Emerson, New Jersey

Prepared by Burgis Associates

30

March 2006

The Redevelopment Plan

Borough of Emerson, New Jersey

SECTION TWO: THE central core of the Redevelopment Area

The central core of the redevelopment plan revolves around the relocation of the train station. While modifications to the building area and bulk regulations are not as significant in this area as in others, the plan does focus on the redesign of parking areas and the addition of landscaping on all parcels and public right of ways.



The Redevelopment Plan

SECTION THREE:  The southern most section of the Redevelopment Area

The plan permits mixed use buildings that are slightly setback from the street right of way to allow for a generous sidewalk area.  In addition this area permits out-door cafés and landscaped areas adjacent to the sidewalks within the front yard setbacks.



Railroad

Avenue

Kinderkamack Road

Polisade  Ave.

Prepared by Burgis Associates

31

March 2006

Borough of Emerson, New Jersey

The Redevelopment Plan

## 7.0 COMPREHENSIVE REDEVELOPMENT DESIGN

Borough of Emerson, New Jersey



### LEGEND - COMPREHENSIVE REDEVELOPMENT DESIGN

| BLOCK # | BLK ID # | USE | # DWELLING UNITS | COMMERCIAL S.F. |
|---|---|---|---|---|
| 1 | 1A | MAX 3 STORY RESIDENTIAL ABOVE RETAIL ALONG KINDERKAMACK ROAD & 3 STORY RESIDENTIAL ABOVE PARKING GEAR BUILDING | 80 | 20,000 S.F. |
| 2 | 1B | MAX 3 STORY RESIDENTIAL ABOVE RETAIL | 53 | 33,000 S.F. |
| 3 | 1C | MAX 3 STORY RESIDENTIAL ABOVE RETAIL | 6 | 6,000 S.F. |
| 4 | 1D | MAX 3 STORY RESIDENTIAL ABOVE RETAIL | 12 | 8,000 S.F. |
| 5 | 1E | MAX 3 STORY RESIDENTIAL ABOVE RETAIL | 15 | 20,000 S.F. |
| 6 | 1F | MAX 3 STORY RESIDENTIAL ABOVE RETAIL | 12 | 25,000 S.F. |
| 7 | 1G | MAX 3 STORY RESIDENTIAL ABOVE RETAIL | 30 | 9,000 S.F. |
| 8 | 1H | MAX 3 STORY RESIDENTIAL ABOVE PARKING | 65 | |
| 9 | 1I | MAX 3 STORY RESIDENTIAL ABOVE PARKING | 65 | |
| 10 | 1J | MAX 3 STORY RESIDENTIAL ABOVE PARKING | 10 | |
| 11 | 1K | MAX 3 STORY RESIDENTIAL ABOVE PARKING | 36 | |
| 12 | 1L | MAX 3 STORY RESIDENTIAL ABOVE PARKING | 95 | |
| | 2 | EMERSON HOTEL | | |
| | 3 | SURFACE PARKING | | |
| | 4 | PARKING DECKS | | |
| | 5 | RESTORED TRAIN STATION FOR COMMERCIAL USE | | |
| | | RELOCATED TRAIN STATION WITH APPROXIMATELY 120 COMMUTER PARKING SPACES IN ADJACENT DECK | | |

SCALE 1" = 300'

Exhibit 6

Exhibit 7

# D-28



— LAW OFFICES —
**DECOTIIS**
DeCotiis, FitzPatrick & Cole, LLP

NEW YORK
NEW JERSEY

GLENPOINTE CENTRE WEST
500 FRANK W. BURR BOULEVARD, SUITE 31
TEANECK, NEW JERSEY 07666

EDWARD J. BOCCHER, ESQ.
EBOCCHER@DECOTIISLAW.COM
201.907.5275

TELEPHONE: (201) 928-1100
TELEFAX:     (201) 928-0588
WWW.DECOTIISLAW.COM



RECEIVED

JUL 09 2015

BOROUGH OF EMERSON

July 8, 2015

**VIA HAND DELIVERY**
Clerk, Superior Court of New Jersey
Bergen County Courthouse, Law Division
10 Main St.
Hackensack, NJ 07601

> **Re:    In the Matter of the Application of the Borough of Emerson, Bergen
> County, New Jersey, for a Declaratory Judgment**

Dear Sir/Madam:

This Firm represents Petitioner, the Borough of Emerson, in the above-referenced matter which is brought pursuant to the requirements of the Supreme Court in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 6 (2015).

Enclosed for filing please find an original and two (2) copies of the following documents:

(1)    Verified Complaint for Declaratory Judgment and Injunctive Relief

(2)    Order to Show Cause for Temporary Immunity

(3)    Brief in Support of Order to Show Cause

(4)    Case Information Statement.

Kindly file these documents, and return a stamped "filed" copy to us in the self-addressed, stamped envelope provided herein.  Please charge our Superior Court Depository Account, account number 141020, with any applicable filing fees.

Please do not hesitate to contact us if you have any questions or comments regarding this matter.

Thank you for your consideration.



**DECOTIIS**

July 8, 2015

PAGE 2

Respectfully submitted,

DeCotiis, FitzPatrick & Cole, LLP

By:_____

Edward J. Boccher, Esq.

EJB/kh
Encl.

cc:     Lou Lamatina, Mayor
        Robert Hoffmann, Borough Administrator

1802630-1

P009242

Edward J. Boccher, Esq.
Attorney I.D. # 020501980
**DeCOTIIS, FITZPATRICK & COLE, LLP**
Glenpointe Centre West
500 Frank W. Burr Blvd., Suite 31
Teaneck, NJ 07666
Tel: (201) 928-1100
eboccher@decotiislaw.com
*Attorneys for Petitioner,*
*Borough of Emerson*

|  |  |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY, FOR A DECLARATORY JUDGMENT,<br><br>Petitioner. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION:BERGEN COUNTY<br><br>DOCKET NO.:<br><br>CIVIL ACTION<br>*Mount Laurel* Action<br><br>**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF** |

Petitioner Borough of Emerson, County of Bergen, New Jersey, by way of Verified

Complaint for Declaratory Judgment and for Injunctive Relief says:

1.     Petitioner, Borough of Emerson ("Emerson" or "the Borough"), a Municipal

Corporation of the State of New Jersey, located at 1 Municipal Place, Emerson, New Jersey

07630, by way of a Complaint for Declaratory Judgment says:

## BACKGROUND

**The *Mt. Laurel Doctrine***

2.     Forty years ago, in 1975, the New Jersey Supreme Court declared that the

discriminatory use of zoning powers was illegal and provided, as a matter of constitutional law,

- 1 -

P009243

that each developing municipality "must, by its land use regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who may desire to live there, of course including those of low and moderate income." In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 6 (2015), citing S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (*Mount Laurel I*), 67 N.J. 151, 179, 187, appeal dismissed and cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L. Ed. 2d 28 (1975)

3.    Thereafter, in 1983, the New Jersey Supreme Court reaffirmed the constitutional obligation that towns must provide "a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing." In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 6 (2015), citing S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (*Mount Laurel II*), 92 N.J. 158, 205 (1983) (citing Mount Laurel I, supra, 67 N.J. at 174), (together with *Mount Laurel I*, the *Mount Laurel Doctrine*).

4.    Deterring exclusionary zoning practices and encouraging the development of affordable housing where it is needed are the goals of the *Mount Laurel Doctrine*. In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 215 N.J. 578, 610 (2013).

**The Fair Housing Act and COAH**

5.    The Legislature codified the *Mount Laurel Doctrine* in enacting the Fair Housing Act, N.J.S.A. 52:27D-301, et seq. and established the Council on Affordable Housing ("COAH") as the entity charged with implementing and administering the legislative mandates of the Act.

6.    COAH initially adopted substantive rules, governing the period from 1987 to

1807099-1

P009244

1993, ("The First Round Rules"), N.J.A.C. 5:92-1.1 to -18.20. It thereafter adopted substantive rules governing the period from 1987 to 1999, ("The Second Round Rules"), N.J.A.C. 5:93-1.1 to -15.1.

    7.    COAH has not promulgated valid, effective rules since the Second Round Rules expired in 1999.

    8.    The New Jersey Supreme Court, in the matter of In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015), ("the Supreme Court Decision"), held that "There is no question that COAH failed to comply with this Court's March 2014 Order that was designed to achieve the promulgation of Third Round Rules and the maintenance of a functioning COAH," such that "the administrative forum is not capable of functioning as intended by the [Fair Housing Act] due to the lack of lawful Third Round Rules assigning constitutional obligations to municipalities," and, consequently "the courts may resume their role as the forum of first instance for evaluating municipal compliance with Mount Laurel obligations."

    9.    The Supreme Court Decision has accordingly provided for a judicial mechanism for municipalities to seek a declaratory judgment that the municipality has complied with the *Mount Laurel Doctrine* and is entitled to immunity from exclusionary zoning lawsuits.

    10.    The process developed in the Supreme Court Decision is intended to track the process established under the Fair Housing Act.

    11.    The judicial mechanism devised by the Supreme Court Decision contemplates that municipalities be afforded an initial opportunity to craft housing plans to address their affordable housing obligation consistent with the *Mount Laurel Doctrine*.

    12.    Participating municipalities are afforded five months to submit a housing element and fair share plan under the Supreme Court Decision.

- 3 -

1807099-1

P009245

13.    Participating municipalities may obtain immunity from exclusionary zoning actions pending the development of a housing element and fair share plan under the Supreme Court Decision.

14.    Upon submission of a municipal housing element and fair share plan, courts are to conduct an individualized assessment of such submission based on the court's determination of present and prospective regional need for affordable housing applicable to the municipality.

**The Township is a Participant in the *Mount Laurel* Process**

15.    Emerson has engaged in a comprehensive land-use planning and zoning process to, among other things, guides the appropriate use or development of lands in compliance with the *Mount Laurel Doctrine*.

16.    The Borough, by an Interim Judgment Dismissing with Prejudice Plaintiff's Builder Remedy Claim and Directing Remedial Action by Special Master entered November 2, 2001, and modified by a bench opinion issued March 13, 2002 in Community Developers & Management, L.L.C. v. Borough of Emerson et al., Docket No. BER-L-2734-00 was directed to prepare a Housing Element and Fair Share Plan (the "2002 FSP").

17.    On June 4, 2002, the court conditionally approved the 2002 FSP.

18.    The 2002 FSP included several compliance mechanisms to create a realistic opportunity to address the Borough's affordable housing obligation including an Affordable Housing Regulations Ordinance to establish standards and procedures on eligibility, marketing, and affordability controls for the affordable housing that is created.

19.    Additionally, as a result of the creation of the 2002 FSP, the Borough created an affordable housing overlay zone, by Ord. No 1203, on May 21, 2002, which provides for 100% affordable housing for low and moderate income persons in order to address a portion of the fair share obligation of the Borough, §290.17.2 of the 1966 Code of the Borough of Emerson.

- 4 -

1807099-1

20.     On June 4, 2002, the court approved the Borough's Development Fee Ordinance as established by Ordinance No. 1170 adopted on April 3, 2001 and amended by Ordinance No. 1192 adopted on February 5, 2002.

21.     The court approved the Borough's spending plan on June 4, 2002, establishing standards for the expenditure of development fees pursuant to the then existing COAH regulations.

22.     On December 31, 2008, Emerson petitioned COAH for "Third Round" substantive certification of its Housing Element and Fair Share Plan (the "2008 FSP") under the Fair Housing Act, addressing its entire 1987-2018 affordable housing obligation. The Borough's 2008 FSP was based on the then-valid COAH third round substantive rules, N.J.A.C. 5:97-1.1 et seq. (the "Third Round Rules").

23.     As part of its December 31, 2008 petition for Third Round Substantive certification, the Borough submitted a proposed Development Fee Ordinance, Spending Plan, Ordinance and Governing Body Resolution Creating a Position of Municipal Housing Liaison, and Affirmative Marketing Ordinance.

24.     The Borough's petition remains pending with COAH which has taken no action upon it.

25.     It is the Borough's intent to continue to responsibly and comprehensively address its affordable housing obligation to meet the needs of its residents and its fair share of its region's need for affordable housing.

26.     Notwithstanding COAH's failure to act on the Borough's petition for substantive certification, the Borough has aggressively acted to actually implement its pending 2008 FSP to provide for affordable housing by, among other things, creating, updating, and implementing

- 5 -

P009247

zoning and Affordable Housing Regulations to capture development opportunities to produce affordable housing.

27.    The Borough adopted a new Development Fee Ordinance on September 1, 2009, by Ord. No. 1383 for consistency with COAH regulations.

28.    The Borough created the position of a Municipal Housing Liaison to oversee and administer the affordable housing program for Emerson, and an Administrative Agent to ensure that the restricted units under administration are affirmatively marketed and sold or rented, as applicable, only to low- and moderate-income households, by Ord. No 1384, on September 1, 2009.

29.    To meet its third round obligation, as well as a 74 unit unmet need due to a requested vacant land adjustment from the prior round, the Borough's 2008 FSP proposed certain projects, mechanisms and funding sources.

30.    The Borough's 2008 FSP proposed applying 5 units of credits towards its obligation from a COAH approved Regional Contribution Agreement ("RCA") with the Borough of Ridgefield.

31.    The Borough sought 10 units of credit for group home known as the New Concepts for Living (Block 412, Lots 2 & 3), which has been completed.

32.    The Borough's 2008 FSP also identified an area for an affordable housing overlay zone which could potentially provide an inclusionary development of 41 units, including 10 affordable units and 10 units of credit, which the Borough has implemented.

33.    On October 8, 2010, the Appellate Division invalidated substantial parts of COAH's Third Round Rules. In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 416 N.J. Super. 462 (App. Div. 2010).

34.    On September 26, 2013 the Supreme Court affirmed in part and modified in part

- 6 -

P009248

the Appellate Division's decision invalidating COAH's Third Round Rules in <u>In Re Adoption of</u>
<u>N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing</u>, 215 <u>N.J.</u> 578 (2013).

35.    Because the 2008 FSP was predicated, in part, upon the invalidated Third Round
Growth Share Rules, aspects of the plan must be updated to take into account current governing
law with respect to the calculation of affordable housing obligations and to also revise, amend
and supplement the mechanism the borough will employ to address that obligation.

## COUNT ONE

### (Declaratory Judgment and for Injunctive Relief)

36.    Petitioner repeats and incorporates herein as if restated at length each and every
allegation of paragraphs 1-35 of the Verified Complaint as if fully set forth herein.

37.    Accordingly, the Borough has actively addressed its affordable housing obligation
and, since at least December 31, 2008, Emerson has been within the jurisdiction of the Council
on Affordable Housing and the Borough has been a "participating" municipality before that
agency.

38.    Because the Borough was a "participating" municipality in the administrative
process before COAH it is entitled to the protections afforded such municipalities under the
Supreme Court Decision.

39.    The Borough is entitled to a period of five months to prepare and submit a
housing element and fair share plan.

**WHEREFORE,** Emerson demands judgment in the form of a declaratory judgment and
temporary, preliminary and permanent injunctive relief ordering:

P009249

A.    The Borough was a "participating" municipality in the administrative process before COAH and is entitled to the protections afforded such municipalities under the Supreme Court Decision.

B.    The Borough is awarded temporary immunity and entitled to a minimum period of five months to prepare, update, revise and submit to the court a housing element and fair share plan.

C.    For such other relief as the court deems just.

## COUNT TWO

### (Declaratory Judgment of Compliance and Judgment for Repose)

40.    Petitioner repeats and incorporates herein as if restated at length each and every allegation of paragraphs 1- 39 of the Verified Complaint as if fully set forth herein.

41.    Upon submission of its fair share plan, the Borough requests that the court conduct an individualized assessment of its plan based on the court's determination of present and prospective regional need for affordable housing applicable to the Borough and upon a consideration of those lands which are available, suitable and developable for affordable housing.

42.    The Borough requests that the court determine and declare that its fair share plan is in compliance with the requirements of the *Mt. Laurel Doctrine* and issue a judgment of repose insulating the Borough from exclusionary zoning lawsuits for a period of ten (10) years.

**WHEREFORE,** the Borough demands judgment in the form of a declaratory judgment and temporary injunctive relief:

P009250

A.    Approving the Borough's fair share plan as in compliance with the municipal obligation under the *Mt. Laurel Doctrine* and issuing a judgment of repose for a period of ten (10) years.

B.    For such other relief as the court deems just.

## COUNT THREE

### (Spending Plan/Trust Fund Approval)

43.    Petitioner repeats and incorporates herein as if restated at length each and every allegation of paragraphs 1- 42 of the Verified Complaint as if fully set forth herein.

44.    The Fair Housing Act was amended effective July 17, 2008 ("the 2008 Amendments") to provide, among other things, that a municipality which has petitioned COAH for a substantive certification of its Fair Share Plan may be authorized by the Council to adopt a Development Fee Ordinance to impose and collect development fees. N.J.S.A. 52:27D-329.2a.

45.    The 2008 Amendments also provided that a municipality may not spend or "commit to spend" any affordable housing development fees without first obtaining COAH's approval of the expenditure. Ibid.

46.    The 2008 Amendments further required that the Council promulgate regulations regarding the establishment, the administration and the enforcement of the expenditure of affordable housing development fees by municipalities. Ibid.

47.    Pursuant to the 2008 Amendments, COAH was to establish a time by which all development fees collected within a calendar year are to be expended at that, in any event, all fees shall be committed for expenditure within four years from the date of collection. N.J.S.A. 52:27D-329.2d.

48.    Under the 2008 Amendments, if a municipality "fails to commit to expend the

- 9 -

P009251

balance required in the development fee trust fund by the time set forth" under the Act it "shall be required by the [C]ouncil to transfer the remaining unspent balance at the end of the four year period to the New Jersey Affordable Housing Trust Fund. Ibid.

49.     Substantially similar provisions of the 2008 Amendments govern trust funds collected as payments in lieu of construction, except that the deadline for expenditure of such funds within four years of collection may expressly extended by COAH upon a showing of prescribed conditions. N.J.S.A. 52:27D-329.3b.

50.     COAH has not promulgated regulations, with respect to either development fees or payments in lieu of construction, which establish how such amounts are to be "committed for expenditure" within four years of collection or which set forth a time by which all development fees collected within a calendar year are to be expended.

51.     Because COAH has failed to establish valid procedures respecting the commitment and forfeiture of municipal trust funds, the Superior Court-Appellate Division has enjoined COAH or any other part of the executive branch from engaging in any attempt to seize affordable housing trust funds and provided that the use and disposition of those funds will be decided, in the first instance, by Mount Laurel-designated trial judges. In re Failure of the Council on Affordable Housing to Adopt Trust Fund Commitment Regulations, 440 N.J. Super. 220 (App. Div. 2015).

52.     Accordingly, Emerson has long maintained a development fee ordinance, and affordable housing trust fund, approved by the court and COAH, authorizing the imposition, collection and expenditure of affordable housing trust funds.

53.     Emerson currently maintains an affordable housing trust fund balance.

54.     Emerson has adopted resolutions and ordinances and has otherwise timely "committed for expenditure" all amounts held within its affordable housing trust fund, which is

- 10 -

P009252

to be so committed, as required, if at all, by the 2008 Amendments.

55.     The Borough will further undertake to commit for expenditure trust funds consistent with a fair share plan and spending plan to be approved by the court.

**WHEREFORE,** Emerson demands judgment in the form of a declaratory judgment and temporary injunctive relief:

A.     Determining that the Borough has timely "committed for expenditure" all funds held within its affordable housing trust fund as required, if at all, by the 2008 Amendments.

B.     To the extent the Borough has not has timely "committed for expenditure" all funds held within its affordable housing trust fund as required, if at all, by the 2008 Amendments, it could not do so because no standards or regulations providing how such funds may be committed for expenditure have been promulgated by COAH as required by the 2008 Amendments.

C.     Temporarily, preliminarily and permanently enjoining COAH or any other instrumentality of the State from directing the Borough to transfer, or otherwise seeking to transfer, any trust funds held by the Borough to the New Jersey Affordable Housing Trust Fund or other State-maintained account.

D.     Approving the Borough's spending plan, upon its completion, for disposition of all or part of its trust fund.

DECOTIIS, FITZPATRICK & COLE, LLP

By: _____
        Edward J. Boecher, Esq.

Dated: July 8, 2015

- 11 -

P009253

## CERTIFICATION AS TO OTHER PROCEEDINGS

I hereby certify, pursuant to R. 4:5-1, that this matter is not the subject of any other action pending in any Court or any pending arbitration. I further certify that I am unaware of any non-party who should be joined in this action pursuant to R. 4:28, or who is subject to joinder pursuant to R. 4:29-1(b) because of potential liability to any party based on the same transactional facts except that the Supreme Court in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) has identified parties who are to receive notice of declaratory judgment actions filed pursuant to the process set forth by the Court in that decision.

Dated: July 8, 2015

Edward J. Boccher, Esq.

1807099-1

- 12 -

## DESIGNATION OF TRIAL COUNSEL

Edward J. Boccher, Esq. is hereby designated as trial counsel.

DECOTIIS, FITZPATRICK & COLE, LLP

Dated: July 8, 2015

By: _____
Edward J. Boccher, Esq.

- 13 -

1807099-1

P009255

## VERIFICATION

1.    I, Robert S. Hoffmann, am the Administrator for the Borough of Emerson.

2.    I have reviewed the contents of the above Verified Complaint for Declaratory Judgment and Preliminary Injunctive Relief and certify that the allegations contained therein are true to the best of my knowledge, information and belief.

3.    I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

_____
Robert S. Hoffmann, Borough Administrator

Dated:   7/7/2015

- 14 -

1807099-1

Edward J. Boccher, Esq.
Attorney I.D. # 020501980
**DECOTIIS, FITZPATRICK & COLE, LLP**
Glenpointe Center West
500 Frank W. Burr Blvd.
Teaneck, New Jersey 07666
Tel: (201) 928-1100
eboccher@decotiislaw.com
*Attorneys for Petitioner,*
*Borough of Emerson*

| | |
|---|---|
| IN RE PETITION OF THE BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY,<br><br>Petitioner. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>BERGEN COUNTY<br><br>DOCKET NO.:<br><br><br>CIVIL ACTION<br><br>**ORDER TO SHOW CAUSE FOR**<br>**TEMPORARY IMMUNITY** |

**THIS MATTER** having been opened to the Court on the application of DeCotiis, FitzPatrick & Cole, LLP, attorneys for Petitioner, Borough of Emerson (the "Borough" or "Emerson"), seeking the entry of an Order granting temporary immunity against constitutional compliance, exclusionary zoning or builders' remedy litigation as provided under the Supreme Court's determination in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) ("the Supreme Court Decision") and pursuant to the Fair Housing Act, N.J.S.A. 52:27D-301, et seq., and

The Court, having reviewed the Verified Complaint and brief filed in support of the Borough's application; and

All Parties designated in the Supreme Court Decision ("the Supreme Court Parties")

1806003-1

1

having received notice of this application; and

For the reasons placed on the record and for good cause shown;

**IT IS** this on this _____ day of _____, 2015:

**ORDERED** that Petitioner is hereby granted temporary immunity from any constitutional compliance, exclusionary zoning or builders' remedy litigation ("Immunity Order") as provided under the Supreme Court Decision, pending the return date of this Order to Show Cause, at which time the Court will consider extending the Immunity Order for such time as it may determine to afford the Petitioner time to prepare a fair share plan for consideration by the Court; and

**IT IS FURTHER ORDERED** that a copy of this Order to Show Cause, Verified Complaint and brief be served upon all Supreme Court Parties within _____ days of the date of this Order, by overnight mail with guaranteed one-day delivery or by personal delivery; and

**IT IS FURTHER ORDERED** that, to the extent any of the Supreme Court Parties seek to be heard upon the application of Petitioner to extend the Immunity Order, they shall file and serve their answering affidavits, briefs, or any other papers in opposition to this application upon all parties and the Court at least _____ days before the return date, in default of which this action may proceed *ex parte* and the relief requested may be granted by default; and

**IT IS FURTHER ORDERED** that the Court will hear Petitioner's request for an extension of the Immunity Order to afford the Petitioner time to prepare a fair share plan for consideration by the Court before the Hon. Menelaos W. Toskos, J.S.C., of the Superior Court of New Jersey, Bergen County, Law Division, at 10 Main Street, Hackensack, New Jersey, on the _____ day of _____, 2015, at 9:00 a.m., or as soon thereafter as counsel can be heard; and

P009258

**IT IS FURTHER ORDERED** that Petitioner file with the Court its proof of service of these pleadings on the Supreme Court Parties no later than three (3) days before the return date of this Order to Show Cause; and

**IT IS FURTHER ORDERED** that Petitioner may file and serve reply papers no later than _____ days before the return date.

_____
HON. MENELAOS W. TOSCOS, J.S.C.

P009259

IN THE MATTER OF THE APPLICATION
OF THE BOROUGH OF EMERSONT,
BERGEN COUNTY, NEW JERSEY

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:BERGEN COUNTY
DOCKET NO:

CIVIL ACTION

*Mount Laurel* **Action**

---

## BRIEF IN SUPPORT OF ORDER TO SHOW CAUSE

---

**Edward J. Boccher, Esq.**
**Attorney I.D. # 020501980**
**Wendy Rubinstein, Esq.**
**Attorney I.D. # 029772002**
DeCotiis, Fitzpatrick & Cole, LLP
Glenpointe Center West
500 Frank W. Burr Blvd.
Teaneck, New Jersey 07666
*Attorneys for Petitioner,*
   *Borough of Emerson*

Of Counsel and
On the Brief:

Edward J. Boccher, Esq.
Wendy Rubinstein, Esq.

P009260

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ............................................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................................... 1

PROCEDURAL HISTORY .............................................................................................................. 2

ARGUMENT

THE BOROUGH IS ENTITLED TO TEMPORARY IMMUNITY
AS IT RECRAFTS A FAIR SHARE PLAN ................................................................................. 4

    A.    The Supreme Court's *Mount Laurel* Process ................................................................ 4

    B.    The Borough is a "Participating" Municipality and
        Entitled to Temporary Immunity .............................................................................. 10

CONCLUSION .............................................................................................................................. 13

i

1807359-1

P009261

## TABLE OF AUTHORITIES

Page(s)

### Cases

In re Adoption of N.J.A.C. 5:94 and 5:95,
390 N.J. Super. 1 (App. Div. 2007) ......................................................................................... 5, 10

In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing,
416 N.J. Super. 462 (App. Div. 2010) .................................................................................. 3, 6, 11

In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing,
215 N.J. 578 (2013) ............................................................................................................... 3, 6, 11

In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing,
221 N.J. 1 (2015) ............................................................................................................. 1, 3, 4, 6, 7

In Re Six Month Extension of N.J.A.C. 5:91 et seq.,
372 N.J. Super 61 (2004) .............................................................................................................. 5

S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel II),
92 N.J. 158 (1983) ......................................................................................................................... 4

S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount,
Laurel I), 67 N.J. 151 (1975) ........................................................................................................ 4

Six Month Extension of N.J.A.C. 5:91 et seq.,
372 N.J. Super. 61 (App. Div. 2004) ............................................................................................ 5

### Statutes

N.J.S.A. 52:27D-301, et seq. ..................................................................................................... 1, 5
N.J.S.A. 52:27D-313............................................................................................................... 2, 5, 8

### Regulations

N.J.A.C. 5:92-1.1 to 18.20, Appendices A to F................................................................................ 5
N.J.A.C. 5:93-1.1 to -15.1, Appendices A to H................................................................................ 5
N.J.A.C. 5:96 and 5:97................................................................................................................... 6
N.J.A.C. 5:96-15.2(c)2.................................................................................................................... 3
N.J.A.C. 5:96-3.5 ........................................................................................................................... 2
N.J.A.C. 5:96-6.2(b) ....................................................................................................................... 3
N.J.A.C. 5:97-1.1 et seq............................................................................................................ 2, 11

1807359-1

P009262

## PRELIMINARY STATEMENT

This is a Declaratory Judgment action brought by the Borough of Emerson pursuant to the Fair Housing Act, N.J.S.A. 52:27D-301, et seq. and the Supreme Court's decision in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 20 (2015). By way of order to show cause, the Borough seeks for the Court to enter an Order affording Emerson temporary immunity from "builders' remedy" or "constitutional compliance" litigation while the Borough develops a fair share plan for review and approval by the Court.

Because Emerson has steadfastly pursued administrative approval of its housing plan, received substantive certification from Council on Affordable Housing (COAH) under the now invalidated COAH Third Round Rules, and seeks to further advance its obligation under the *Mount Laurel* Doctrine it respectfully requests that the Court grant it temporary immunity.

1

P009263

**PROCEDURAL HISTORY**

The Borough has long addressed its affordable housing obligation under the *Mount Laurel Doctrine* since the Borough, by an Interim Judgment Dismissing with Prejudice Plaintiff's Builder Remedy Claim and Directing Remedial Action by Special Master entered November 2, 2001, and modified by a bench opinion issued March 13, 2002 in Community Developers & Management, L.L.C. v. Borough of Emerson et al., Docket No. BER-L-2734-00, was directed to prepare a Housing Element and Fair Share Plan (the "2002 FSP"). (Verified Complaint ("Complt.") ¶16). The Borough received conditional approval for the 2002 FSP from the court on June 4, 2002. (Complt. ¶17).

The Borough's 2002 FSP included several compliance mechanisms to create an opportunity address the Borough's affordable housing obligation including, but not limited to, an Affordable Housing Regulations Ordinance to establish procedures on eligibility, marketing, and affordability controls for affordable housing. (Complt. ¶18). For example, as a result of the creation of the 2002 FSP, the Borough created an affordable housing overlay zone, by Ord. No 1203, on May 21, 2002, which provides for 100% affordable housing for low and moderate income persons in order to address a portion of the fair share obligation of the Borough, §290.17.2 of the 1966 Code of the Borough of Emerson. . (Complt. ¶19).

The Borough's Development Fee Ordinance as established by Ordinance No. 1170 adopted on April 3, 2001 and amended by Ordinance No. 1192 adopted on February 5, 2002, and spending plan establishing standards for the expenditure of development fees pursuant to the then existing COAH regulations were also approved by the court on June 4, 2002. (Complt. ¶20-21).

2

1807359-1

P009264

On December 31, 2008, Emerson petitioned COAH for "Third Round" substantive certification of its Housing Element and Fair Share Plan ("the 2008 FSP") under the Fair Housing Act. The Borough's 2008 FSP was based on the then-valid COAH third round substantive rules, N.J.A.C. 5:97-1.1 et seq. (the "Third Round Rules"). (Complt. ¶22). As part of its December 31, 2008 petition for Third Round Substantive certification, the Borough submitted a proposed Development Fee Ordinance, Spending Plan, Ordinance and Governing Body Resolution Creating a Position of Municipal Housing Liaison, and Affirmative Marketing Ordinance. (Complt. ¶23). The Borough's petition remains pending with COAH. (Complt. ¶24).

On October 8, 2010, the Appellate Division had invalidated substantial parts of COAH's Third Round Rules. In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 416 N.J. Super. 462 (App. Div. 2010).

On September 26, 2013 the Supreme Court affirmed in part and modified in part the Appellate Division's decision invalidating COAH's Third Round Rules in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 215 N.J. 578 (2013). Thus the "growth share" methodology was discarded and the agency was directed by the Supreme Court to promulgate new rules. It has failed to do so.

The Supreme Court's decision, providng for the judiciary to resume its role in *Mount Laurel* matters, followed. In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 10 (2015).

Consequently, this Verified Complaint for a Declaratory Judgment, and application for an order to show cause is submitted.

3

P009265

## ARGUMENT

### THE BOROUGH IS ENTITLED TO TEMPORARY IMMUNITY AS IT RECRAFTS A FAIR SHARE PLAN

A.    The Supreme Court's *Mount Laurel* Process

**The *Mount Laurel Doctrine***

The New Jersey Supreme Court prohibited the discriminatory use of zoning powers and mandated that each developing municipality "must, by its land use regulations, make realistically possible the opportunity for an appropriate variety and choice of housing for all categories of people who may desire to live there, of course including those of low and moderate income," S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel I), 67 N.J. 151, 179, 187, appeal dismissed and cert. denied, 423 U.S. 808, 96 S. Ct. 18, 46 L. Ed. 2d 28 (1975)

Thereafter, in 1983, the New Jersey Supreme Court reaffirmed the constitutional obligation that towns provide "a realistic opportunity for the construction of [their] fair share of the present and prospective regional need for low and moderate income housing." S. Burlington Cnty. NAACP v. Twp. of Mount Laurel (Mount Laurel II), 92 N.J. 158, 205 (1983) (citing Mount Laurel I, supra, 67 N.J. at 174), (together with Mount Laurel I, the *Mount Laurel Doctrine*).

"The *Mount Laurel* series of cases recognized that the power to zone carries a constitutional obligation to do so in a manner that creates a realistic opportunity for producing a fair share of the regional present and prospective need for housing low- and moderate-income families." In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 3-4 (2015); (footnote omitted).

4

P009266

It is the intent and purpose of the *Mount Laurel Doctrine* to prohibit the discriminatory use of zoning powers and zoning practices which have the exclusionary effect of making housing unavailable to persons of low and moderate income and to provide remedies to address such practices when they are proven to exist.

**The Council on Affordable Housing and 3rd Round Rules**

The Legislature codified the *Mount Laurel Doctrine* in the Fair Housing Act ("the Act"), N.J.S.A. 52:27D-301, et seq. and further established COAH as the administrative agency charged with implementing and administering the Act.

Under the Act, COAH is empowered, through its procedural and substantive rules to establish municipal affordable housing obligations, and review and approve housing plans submitted to it by granting "substantive certification" if they create a realistic opportunity for the creation of affordable housing. N.J.S.A. 52:27D-313. Under a grant of substantive certification, a municipality is insulated to a substantial extent from exclusionary zoning litigation for a period of ten years[1]. Ibid.

---

[1] COAH initially adopted substantive rules, governing the period from 1987 to 1993, ("The First Round Rules"), N.J.A.C. 5:92-1.1 to -18.20, Appendices A to F. It thereafter adopted substantive rules governing the period from 1987 to 1999, ("The Second Round Rules"), N.J.A.C. 5:93-1.1 to -15.1, Appendices A to H. After a lengthy period of study and review ultimately characterized by the New Jersey Superior Court - Appellate Division as "dramatic and inexplicable," In re Six Month Extension of N.J.A.C. 5:91 et seq., 372 N.J. Super. 61, 95-96 (App. Div. 2004), certif. denied, 182 N.J. 630 (2005), COAH proposed Initial Third Round Rules on October 6, 2003.

Upon receipt of voluminous comments, COAH re-proposed Third Round Rules which were adopted on December 20, 2004. 36 N.J.R. 5895(a). These Initial Third Round Rules, which contained a "growth share" approach, were designed to address a cumulative municipal affordable housing obligation beginning 1987 and ending 2014.

The Initial Third Round Rules were invalidated in a significant number of respects, and the matter remanded to COAH, by the Superior Court - Appellate Division on January 25, 2007. In Re Adoption of N.J.A.C. 5:94 & 5:95, 390 N.J. Super. 1, (App. Div. 2007), certif. den. 192 N.J. 71 (2007).

1807359-1

P009267

On October 20, 2008, COAH adopted Third Round Rules intended to assess municipal affordable housing obligations for the period from 1999 to 2018 utilizing a "growth share" methodology. N.J.A.C. 5:96 and 5:97. The revised Third Round Rules were initially invalidated by the Appellate Division on October 8, 2010, in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 416 N.J. Super. 462 (App. Div. 2010). That ruling was ultimately affirmed and modified by the Supreme Court on September 26, 2013, In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 215 N.J. 578 (2013), and COAH was ordered to promulgate new rules, utilizing a First and Second Round methodology, within five months of that decision. Upon COAH's requests, the Court extended the time for adoption under an Order entered on March 14, 2014. Ultimately, however, COAH failed to adopt regulations in a stale-mated 3-3 vote. In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 10 (2015).

Consequently, an application was made to the Supreme Court by the Fair Share Housing Center (FSHC), (a party which had challenged COAH's rules), to enforce litigants' rights under Rule 1:10-3. On March 10, 2015, in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015), the Court granted FSHC's application, finding that "There is no question that COAH failed to comply with this Court's March 2014 Order that was designed to achieve the promulgation of Third Round Rules and the maintenance of a functioning COAH," such that "the administrative forum is not capable of functioning as intended by the [Fair Housing Act] due to the lack of lawful Third Round Rules assigning constitutional obligations to municipalities," and, accordingly, "the courts may resume their role as the forum of first instance for evaluating municipal compliance with *Mount Laurel* obligations. . . " Id. at 19 – 20.

6

P009268

**The Judicial Process**

The Supreme Court thus reinstituted a judicial mechanism to address municipal *Mount Laurel* obligations. Under that system, municipalities that have complied with the *Mount Laurel Doctrine* may initially seek a declaratory judgment, and are entitled to immunity from exclusionary zoning lawsuits, before being subject to challenges by developers and interest groups: "We establish a transitional process before allowing exclusionary zoning actions against towns that had sought to use the [Fair Housing Act] mechanisms in recognition of the various stages of municipal preparation that exist as a result of the long period of uncertainty attributable to COAH's failure to promulgate Third Round Rules." In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1, 20 (2015).

The process developed by the Supreme Court seeks to track the process established under the Fair Housing Act:

> Our goal is to establish an avenue by which towns can demonstrate their constitutional compliance to the courts through submission of a housing plan and use of processes, where appropriate, that are similar to those which would have been available through COAH for the achievement of substantive certification. Those processes include conciliation, mediation, and the use, when necessary, of special masters. The end result of the processes employed by the courts is to achieve adoption of a municipal housing element and implementing ordinances deemed to be presumptively valid if thereafter subjected to challenge by third parties. Our approach in this transition is to have courts provide a substitute for the substantive certification process that COAH would have provided for towns that had sought its protective jurisdiction. And as part of the court's review, we also authorize, as more fully set forth hereinafter, a court to provide a town whose plan is under review immunity from subsequently filed challenges during the court's review proceedings, even if supplementation of the plan is required during the proceedings.

> Id. at 23-24.

Hence, the process devised by the Supreme Court plainly directs that only municipal declaratory judgment actions will be received by the courts for consideration during a transitional period:

7

1807359-1

During the first thirty days following the effective date of our implementing order, the only actions that will be entertained by the courts will be declaratory judgment actions filed by any town that either (1) had achieved substantive certification from COAH under prior iterations of Third Round Rules before they were invalidated, or (2) had "participating" status before COAH.

Id. at 5-6.

Only upon the expiration of the thirty day period may a party institute a "constitutional compliance" action against a municipality: *"After that thirty-day period expires,* a challenge to a town's constitutional compliance may be filed against a municipality by FSHC or any other interested party." Id. at 27; (emphasis supplied). Even then, no "builder's remedy" action may proceed until a court ultimately finds that a municipality's plan does not adequately meet its affordable housing obligation. Only after a court has had the opportunity to fully address constitutional compliance and has found constitutional compliance wanting shall it permit exclusionary zoning actions and any builder's remedy to proceed. Id. at 29.

Temporary Immunity

The Court directed that moving forward, the process developed is meant "to track the progress provided for in the [Fair Housing Act]." Id. at 29. Drawing from the Fair Housing Act, the Court directed that "participating" municipalities "coming before the courts seeking to obtain approval of an affordable housing plan should receive like treatment to that which was afforded by the [Fair Housing Act] to towns that had their exclusionary zoning cases transferred to COAH when the Act was passed." Id. at 27. Just as those towns received protection due to COAH's jurisdiction so long as they "prepared and filed a housing element and fair share plan within five months," so to shall towns with "participating" status "that now seek to obtain a court declaration that their affordable housing plans are presumptively valid should have no more than five months to submit their supplemental housing element and affordable housing plan" to a reviewing court. Id. at 27.

8

P009270

Importantly, "During that period, the court may provide initial immunity preventing any exclusionary zoning actions from proceeding." Id. at 27-28. The Court directed that ". . . as part of the [trial] court's review, we also authorize, as more fully set forth hereinafter, a court to provide a town whose plan is under review immunity from subsequently filed challenges during the court's review proceedings, even if supplementation of the plan is required during the proceedings." Id. at 24.

In determining whether to grant immunity to a "participating" town, the Court directs the trial court to look more favorably on a town that "devised a housing element and took actions in furtherance of its plan" than a "town that merely submitted a resolution of participation and took few or perhaps no further steps toward preparation of a formal plan demonstrating constitutional compliance." Id. at 27. "Participating" towns that did not have well-developed plans to submit to the court initially, are still given an opportunity to request immunity and prepare and file a housing element and fair share plan within five months. Id.

The Court directs that the trial court reviewing the submission of a "participating" town must "render an individualized assessment of the town's housing element and affordable housing plan based on the court's determination of present and prospective regional need for affordable housing applicable to that municipality." Id. at 28-29. The trial court must therefore assess the "good faith and legitimacy of the town's plan, as proposed and as supplemented during the process authorized under the [Fair Housing Act]" which include "conciliation, mediation, and use of special masters" and will be employed at the court's discretion. Id. at 29. The Court further provides that "[o]nly after a court has had the opportunity to fully address constitutional compliance and has found constitutional compliance wanting shall it permit exclusionary zoning actions and any builder's remedy to proceed." Id.

9

P009271

As such, the Court has identified a two-prong approach for determining whether to grant immunity to a "participating" town. The trial courts must consider the level of participation of the "participating" town and the good faith and legitimacy of the town's plan. Emerson satisfies both prongs and is entitled to temporary immunity.

<u>Determination of Need and Review of Housing Plans</u>

Finally, upon submission of a municipal housing element and fair share plan, courts are to conduct an individualized assessment of the submission based on the court's determination of present and prospective regional need for affordable housing as allocated to the municipality using mechanisms outlined in the Act and the assistance of "interested parties." <u>Id.</u> at 29-30.

**The Judicial Process is Preemptive**

Accordingly, the Supreme Court has established a detailed, and preemptive, process for the judiciary's consideration of *Mount Laurel* matters. It provides for a series of steps for judicial consideration of *Mount Laurel* following an initial period reserved for municipalities to trigger court jurisdiction. Those steps likewise proceed from municipal applications for immunity for lawsuits and the development of municipal fair share plans. Thus, where a municipality has availed itself of the procedural mechanism crafted by the Supreme Court, that mechanism is exclusive and no other actions or related efforts to circumvent the process should be tolerated.

B.    <u>The Borough is a "Participating" Municipality and Entitled to Temporary Immunity</u>

On December 31, 2008, Emerson petitioned COAH for substantive certification of its 2008 FSP. The 2008 FSP was based on the then-existing COAH third "growth share" substantive rules, <u>N.J.A.C.</u> 5:97-1.1 <u>et seq.</u> (the "Third Round Rules"). (Complt. ¶22). These rules had been promulgated and adopted in 2008 in response to <u>In re Adoption of N.J.A.C. 5:94 and 5:95</u>, 390 <u>N.J. Super.</u> 1 (App. Div. 2007), which vacated COAH's first version of third round rules.

10

P009272

On October 8, 2010, the Appellate Division invalidated substantial parts of COAH's Third Round Rules. In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 416 N.J. Super. 462 (App. Div. 2010). On September 26, 2013 the Supreme Court affirmed in part and modified in part the Appellate Division's decision invalidating COAH's Third Round Rules in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 215 N.J. 578 (2013).

Emerson has actively been engaged in the judicial and administrative process established under the Fair Housing Act to address its affordable housing obligation and has made significant efforts to actually implement its 2008 FSP to provide for affordable housing by, among other things, creating, updating, and implementing zoning and Affordable Housing Regulations to capture development opportunities to provide for housing, in spite of COAH's failure to consider the Borough's petition for substantive certification from December 31, 2008. (Complt. ¶26).

For example, The Borough adopted a new Development Fee Ordinance on September 1, 2009, by Ord. No 1383 for consistency with COAH regulations. (Complt. ¶27). Additionally, the Borough created the position of a Municipal Housing Liaison to oversee and administer the affordable housing program for Emerson, and an Administrative Agent to ensure that the restricted units under administration are affirmatively marketed and sold or rented, as applicable, only to low- and moderate-income households, by Ord. No 1384, on September 1, 2009. (Complt. ¶28).

To meet its third round obligation, as well as a 74 unit unmet need due to a requested vacant land adjustment from the prior round, the Borough's 200 FSP proposed certain projects, mechanisms and funding sources. (Complt. ¶29).

Emerson's 2008 FSP includes, but is not limited to:

11

P009273

- 5 units of credit from a COAH approved Regional Contribution Agreement with the Borough of Ridgefield.

- 10 units of credit from a group home known as the New Concepts for Living (Block 412, Lots 2 & 3), which has been completed.

- Identification and implementation of an affordable housing overlay zone which could potentially provide an inclusionary development of 41 units, including 10 affordable units and 10 units of credit.

(Complt. ¶30-23).

Accordingly, Emerson, a "participating" municipality, has undertaken substantial efforts to actively address its affordable housing obligation. Emerson has satisfied the Supreme Court's two-prong approach for determining whether to grant immunity to a "participating" town. The Borough was a "participating" municipality in the administrative process before COAH and it has steadfastly addressed the need for affordable housing. Thus, the Borough has historically actively participated in the affordable housing process before COAH and the Court and has in good faith prosecuted its plan to provide for affordable housing.

Because the 2008 FSP was based, in part, upon invalidated Third Round Rules, aspects of the plan must be updated to take into account current governing law respecting the calculation of affordable housing obligations and to also revise, amend and supplement the mechanism the Borough will employ to address that obligation.

Therefore, the Borough respectfully requests that the Court enter an Order granting Emerson temporary immunity as it proceeds to develop its fair share plan.

12

P009274

## CONCLUSION

Therefore, for the reasons expressed herein, the Borough of Emerson respectfully request that the Court enter an order granting the Borough temporary immunity as it prepares an updated Housing Element and Fair Share Plan.

**DECOTIIS, FITZPATRICK & COLE, LLP**
Attorneys for Petitioner Borough of Emerson

By: _____
        Edward J. Boccher, Esq.

Dated: July 8, 2015

13

1807359-1

P009275

Appendix XII-B1

## CIVIL CASE INFORMATION STATEMENT
### (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed

| FOR USE BY CLERK'S OFFICE ONLY |
| --- |
| PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
| --- | --- | --- |
| Edward J. Boccher | (201) 928-1100 | Bergen |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
| --- | --- |
| DeCotiis, FitzPatrick & Cole, LLP | |

| OFFICE ADDRESS | DOCUMENT TYPE |
| --- | --- |
| Glenpointe Centre West | Verified Complaint |
| 500 Frank W. Burr Blvd., Suite 31 | |
| Teaneck, NJ 07666 | JURY DEMAND   ☐ YES   ■ NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
| --- | --- |
| Borough of Emerson | IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY FOR A DECLARATORY JUDGMENT |

| CASE TYPE NUMBER (See reverse side for listing) 303 | HURRICANE SANDY RELATED? ☐ YES ■ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ■ NO |
| --- | --- | --- |
| | | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? ☐ Yes ■ No | IF YES, LIST DOCKET NUMBERS |
| --- | --- |

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? ☐ Yes ■ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)   ■ NONE   ☐ UNKNOWN |
| --- | --- |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ☐ Yes ■ No | IF YES, IS THAT RELATIONSHIP: ☐ EMPLOYER/EMPLOYEE ☐ FAMILIAL | ☐ FRIEND/NEIGHBOR ☐ BUSINESS | ☐ OTHER (explain) |
| --- | --- | --- | --- |

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ☐ YES   ■ No |
| --- |

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ Yes ■ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
| --- | --- |
| WILL AN INTERPRETER BE NEEDED? ☐ Yes ■ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:

Effective 05-04-2015, CN 10517-English

page 1 of 2



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
- 151 NAME CHANGE
- 175 FORFEITURE
- 302 TENANCY
- 399 REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
- 502 BOOK ACCOUNT (debt collection matters only)
- 505 OTHER INSURANCE CLAIM (including declaratory judgment actions)
- 506 PIP COVERAGE
- 510 UM or UIM CLAIM (coverage issues only)
- 511 ACTION ON NEGOTIABLE INSTRUMENT
- 512 LEMON LAW
- 801 SUMMARY ACTION
- 802 OPEN PUBLIC RECORDS ACT (summary action)
- 999 OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
- 305 CONSTRUCTION
- 509 EMPLOYMENT (other than CEPA or LAD)
- 599 CONTRACT/COMMERCIAL TRANSACTION
- 603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
- 603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
- 605 PERSONAL INJURY
- 610 AUTO NEGLIGENCE – PROPERTY DAMAGE
- 621 UM or UIM CLAIM (includes bodily injury)
- 699 TORT – OTHER

**Track III - 450 days' discovery**
- 005 CIVIL RIGHTS
- 301 CONDEMNATION
- 602 ASSAULT AND BATTERY
- 604 MEDICAL MALPRACTICE
- 606 PRODUCT LIABILITY
- 607 PROFESSIONAL MALPRACTICE
- 608 TOXIC TORT
- 609 DEFAMATION
- 616 WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
- 617 INVERSE CONDEMNATION
- 618 LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
- 156 ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
- 303 MT. LAUREL
- 508 COMPLEX COMMERCIAL
- 513 COMPLEX CONSTRUCTION
- 514 INSURANCE FRAUD
- 620 FALSE CLAIMS ACT
- 701 ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 271 | ACCUTANE/ISOTRETINOIN | 289 | REGLAN |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 278 | ZOMETA/AREDIA | 291 | PELVIC MESH/GYNECARE |
| 279 | GADOLINIUM | 292 | PELVIC MESH/BARD |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 282 | FOSAMAX | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 296 | STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 286 | LEVAQUIN | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 287 | YAZ/YASMIN/OCELLA | 601 | ASBESTOS |
| 288 | PRUDENTIAL TORT LITIGATION | 623 | PROPECIA |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

**Please check off each applicable category**    ☐ **Putative Class Action**    ■ **Title 59**

P009277

Exhibit 8

MIN No. 13 APPROVED FOR RELEASE & CONTENT 6-28-16



**MINUTES**
**BOROUGH OF EMERSON**
**MAYOR AND COUNCIL**
**June 14, 2016**
**7:30 P.M.**
**Borough Hall-Council Chambers**
**Emerson, NJ 07630**



**D-16**



A meeting of the Mayor and Council of the Borough of Emerson, held in the Borough Hall, Municipal Place, Emerson, NJ on June 14, 2016 at 7:34 p.m.

Please turn off your cell phone ring tones. In case of a fire, follow the Fire Exit signs above the doors to your right and left in the Council Chambers and exit calmly.

## I. CALL TO ORDER

Mayor Lamatina called the meeting to order at 7:37 p.m. and identified the emergency exits.

## II. ROLL CALL

Mayor Lamatina asked Ms. Dietsche to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilwoman DiPaola, Councilman Downing, Council President Knoller, Councilman Lazar

**Absent**: Councilman Tripodi

Also present were Borough Administrator Robert S. Hoffmann, Borough Attorney Wendy Rubinstein and Borough Clerk Jane Dietsche.

## III. EXCUSED ABSENCE OF GOVERNING BODY MEMBER

- Councilman Downing and Councilman Worthington for their absence from the Regular Meeting of May 17, 2016.

   ☞**Motion** to excuse Councilman Downing and Councilman Worthington for their absence from the Regular Meeting of May 17, 2016 was **moved** by Councilwoman DiPaola, **seconded** by Councilman Lazar and carried unanimously.

## IV. PROCLAMATIONS & CITATIONS

- Honoring Joshua Salles on achieving the rank of Eagle Scout
- Honoring the Emerson/Park Ridge Bowling Team
- Honoring the Emerson Jr./Sr. High School Girls' Softball Team
- Honoring the Emerson Jr./Sr. High School Boys' Baseball Team
- Honoring the Emerson Jr./Sr. High School Boy's Track Team

MIN No. 13 APPROVED FOR RELEASE & CONTENT 6-28-16

V.  APPOINTMENTS/RESIGNATIONS

- Resolution No. 175-16 Appointment of Perry Solimando as Department of Public Works Superintendent effective Wednesday, June 15, 2016

  ☛**Motion** to approve Resolution No. 175-16 Appointment of Perry Solimando as Department of Public Works Superintendent effective Wednesday, June 15, 2016 was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried by roll call vote of 5-0.
  **RC: Council members:**
  **YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

- Resignation of Ed Bueti as a member of the Emerson Shade Tree Commission effective May 16, 2016

  ☛**Motion** to accept the resignation of Ed Bueti as a member of the Emerson Shade Tree Commission effective May 16, 2016 was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried unanimously.

VI.  MINUTES FOR APPROVAL

- Regular Meeting Minutes of May 17, 2016
- Closed Session Meeting Minutes of May 17, 2016

  ☛**Motion** to approve the Regular and Closed Session Meeting Minutes of May 17th, 2016 was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried unanimously.

VII.  FINANCIAL BUSINESS

- Resolution No. 155-16 Bill List

  ☛**Motion** to approve Resolution No. 155-16 Bill List was **moved** by Councilman Worthington, **seconded** by Councilman Downing and carried by a roll call vote of 5-0.
  **RC: Council members:**
  **YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

- Resolution No. 156-16 Corrective Action Plan - Audit ending December 31, 2015

  ☛**Motion** to approve Resolution No. 156-16 Corrective Action Plan - Audit ending December 31, 2015 was **moved** by Councilman Downing, **seconded** by Councilman Worthington and carried by a roll call vote of 5-0.
  **RC: Council members:**
  **YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

- Resolution No. 157-16 Certification of Governing Body of the Annual Audit - Group Affidavit form

  ☛**Motion** to approve Resolution No. 157-16 Certification of Governing Body of the Annual Audit - Group Affidavit form was **moved** by Councilwoman DiPaola, **seconded** by Councilman Worthington and carried by a roll call vote of 5-0.
  **RC: Council members:**
  **YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

VIII.   UNFINISHED BUSINESS

Mayor Lamatina announced that there was no unfinished business.

IX.   NEW BUSINESS

- Request to propose an addition to Chapter 252 and ask that the matter be remanded to the Land Use Board for investigation and recommendation as to the proposed Chapter for the Governing Body's consideration – Mr. Hoffmann explained that Borough Engineer Gary Ascolese had advised there had been a gap in the Borough Code for decades related to Chapter 252 Subdivisions. A resolution was on the Consent Agenda to request that the Land Use Board work with Mr. Ascolese to consider this matter and recommend standard specifications and requirements for this chapter.

- Just Pups license application for 2016/2017 – Mayor Lamatina announced that this item was being pulled from the agenda because the Borough had not yet received an application for a new license from Just Pups.

X.   INTRODUCTION OF ORDINANCES

Mayor Lamatina announced that Ms. Dietsche would read the following ordinances by title and they would be further considered at a Public Hearing to be held on June 28th, 2016 at 7:30 p.m. in the Council Chambers of the Borough Hall, Municipal Place, Emerson, N.J. and published by title in the June 17th, 2016 edition of the Ridgewood News.  He added that these ordinances were on file in the Clerk's Office and posted on the official bulletin board of the Municipal Building where copies would be available to the General Public at no charge.

**First Reading:**

**1525-16** AN ORDINANCE TO REPEAL AND REPLACE CHAPTER 248, ENTITLED "EXCAVATIONS IN STREETS" OF THE REVISED GENERAL ORDINANCES OF THE BOROUGH OF EMERSON

☞**Motion** to introduce Ordinance #1525-16 on first reading was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

**1526-16** AN ORDINANCE TO FIX THE SALARIES, WAGES, COMPENSATION AND OTHER TERMS OF EMPLOYMENT OF CERTAIN EMPLOYEES OF THE BOROUGH OF EMERSON FOR THE CALENDAR YEAR 2016

Councilwoman DiPaola requested discussion going forward on the two new positions in the salary ordinance – Recreation Director and Part-Time Deputy Court Clerk/Floater. Mr. Hoffmann concurred.

☞**Motion** to introduce Ordinance #1526-16 on first reading was **moved** by Councilman Lazar, **seconded** by Councilman Worthington and carried by roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

**1527-16** BOND ORDINANCE TO AUTHORIZE THE MAKING OF VARIOUS PUBLIC IMPROVEMENTS AND THE ACQUISITION OF NEW ADDITIONAL OR REPLACEMENT EQUIPMENT AND MACHINERY, NEW INFORMATION TECHNOLOGY EQUIPMENT, NEW COMMUNICATION AND SIGNAL SYSTEMS EQUIPMENT, NEW ADDITIONAL FURNISHINGS AND NEW AUTOMOTIVE VEHICLES, INCLUDING ORIGINAL APPARATUS AND EQUIPMENT, IN, BY AND FOR THE BOROUGH OF EMERSON, IN THE COUNTY OF BERGEN, STATE OF NEW JERSEY, TO APPROPRIATE THE SUM OF $1,822,900 TO PAY THE COST THEREOF, TO MAKE A DOWN PAYMENT, TO AUTHORIZE THE ISSUANCE OF BONDS TO FINANCE SUCH APPROPRIATION AND TO PROVIDE FOR THE ISSUANCE OF BOND ANTICIPATION NOTES IN ANTICIPATION OF THE ISSUANCE OF SUCH BONDS.

☞**Motion** to introduce Ordinance #1527-16 on first reading was **moved** by Councilman Worthington, **seconded** by Council President Knoller and carried by roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

XI.    ADOPTION OF ORDINANCES

**Second Reading & Public Hearing:**

**1524-16** AN ORDINANCE AMENDING AND SUPPLEMENTING CHAPTER140, ARTICLE I "DOGS AND KENNELS" OF THE CODE OF THE BOROUGH OF EMERSON, TO BAN THE SALE OF DOGS BRED IN PUPPY MILLS IN THE BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY

☞**Motion** to open the meeting to comments from the public on Ordinance #1524-16 only was **moved** by Councilwoman DiPaola, **seconded** by Council President Knoller and carried at 8:35 p.m.

Robert Obernauer, 161 Kinderkamack Road asked how the ordinance would affect a new application for Just Pups.

Gina Calogero, 3 South Dorchester Road was in support of the ordinance. She asked if the kennel license application required the applicant to certify that they would not purchase puppies from puppy mills. She also suggested amending the application so an applicant could certify that they would not purchase from or sell to puppy mills.

Vincent LoSacco, 112 Ackerman Avenue said he was in favor of the adoption of this ordinance and commended the Governing Body for proposing and drafting it.

Ken Hoffman, 61 Emwood Drive asked about the definition of puppy mills and who determined the definition of the health of a dog.

Robike Noll, Westwood was in favor of the passage of this ordinance.  She responded to Mr. LoSacco's statement and said that the definition of a commercial breeding facility was a puppy mill.

Robert Obernauer, 161 Kinderkamack Road asked about fines if the ordinance was violated.

Councilwoman DiPaola said she was happy the ordinance was passing that evening and noted that it was a first step. Going forward, she hoped a stricter ordinance would be adopted.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on this ordinance only.

☞**Motion** to close the meeting to comments from the public on Ordinance #1524-16 only was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried at 8:42 p.m.

☞**Motion** to adopt Ordinance #1524-16 on second reading was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried by roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

XII.   REPORTS

- Borough Administrator Robert Hoffmann reported on the following:
    - On June 3rd the Borough had closed on the property at 64 Locust Avenue. The closing for 58 Locust Avenue was scheduled for June 16th.
    - A draft of the Architectural Request for Proposals had been sent to three architects with a request for feedback by June 30th. He said he would meet with residents on Jefferson Avenue at that time.
    - Mr. Hoffmann, Mayor Lamatina, Mr. Solimando and Councilman Lazar had met with Oradell officials to explore joint garbage, recycling and disposal collection opportunities. Oradell's Governing Body was meeting that evening, and was planning to extend their contract until the end of the year so their contract dates would coincide with Emerson. He thought this was a positive opportunity and would be sending out a memo about next steps.
    - He wished the Volunteer Ambulance Corps a Happy 60th Anniversary.
    - He thanked the Governing Body for introducing the streets and sidewalks ordinance. He said it would enhance road construction practices and set a standard for restoring roads after work was performed. It would also increase permit fees.
    - He was preparing a revised draft of the COAH letter for review by the Governing Body. It would be placed on the website and perhaps in a future newsletter. He noted that at the end of July, the Borough would lose the protection of the courts. He said the Fair Share Housing numbers had inched up from 354 to 428 and this would impact the Borough for the next 100 years.

XIII.   PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman DiPaola, **seconded** by Council President Knoller and carried at 8:50 p.m.

Dave Rector, Recreation Commission Chair, 36 Jefferson Avenue said he wanted to publicly thank everyone for their contributions to the 7th Summer Kickoff, picnic and fireworks event of June 12th. He thanked the Governing Body, Chief Rossi, Captain Mazzeo and the Police Department, Mark Brackenbury and the Fire Department, Perry Solimando and the Department of Public Works, Dave Mason and the Volunteer Ambulance Corps, Recreation Secretary Peggy DiLello, Emerson Schools Superintendent Brian Gatens and Business Administrator Phil Nisonoff, Councilman and Recreation Liaison Brian Downing and Council President Chris Knoller, Fire Official Tom Monahan, Ken Benkovic and the Junior Baseball Board and Friends of Junior Baseball, Bob Quinones and the Soccer Board, members of the Recreation Commission including Afrim Hoxha, Willie Ortiz, Mike Graham, Dave Cannici, Gerry Falotico, Steve Carmosino, Anthony Gismondi, Borough Administrator Robert Hoffmann, Borough Clerk Jane Dietsche, Noah Weiss, Joshua Weiss Gabe Cannici and Mayor Lou Lamatina.

Councilman Downing said he was amazed at everything that went into the Summer Kickoff and noted that Mr. Rector put it all together flawlessly. He said it went off seamlessly even though it had to be moved from Saturday to Sunday due to the weather and still had a tremendous turnout.

Council President Knoller said Mr. Rector committed countless hours as a volunteer for all the residents and should be commended for doing a great job.

Mayor Lamatina agreed and said he appreciated all the great work by everyone.

Paul Hulbert, 55 Jefferson Avenue reported that a tree was in bad condition at 58 Locust Avenue. He also said a fence was broken and weeds were high. He noted that he was not made aware in advance when Jefferson Avenue was closed for construction.

Robike Noll, Westwood said the fireworks were awesome and thanked the Governing Body for their work on the kennel ordinance. She also stated that summonses had finally been issued to Just Pups and urged the Governing Body to not renew their license based on their past record.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public.

☞**Motion** to close the meeting to comments from the public was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried at 9:06 p.m.

XIV.   RESOLUTIONS ON CONSENT AGENDA NO. 158-16

Councilwoman DiPaola requested that three items be removed from the Consent Agenda for separate votes: Ca 163-16, Ca 164-16 and Ca 173-16.

☞**Motion** to approve Consent Agenda No. 158-16 with the removal of Ca 163-16, Ca 164-16 and Ca 173-16 for separate votes was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried by a roll call vote of 4-0.
**RC: Council members:**
**YES:  Lazar, Downing, Knoller, Worthington**
**Abstain: DiPaola**

☞**Motion** to approve Consent Agenda item No. 163-16 Authorize 2016-2018 Snow Plowing Agreement with County of Bergen only was **moved** by Councilman Lazar, **seconded** by Councilman Downing and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

☞**Motion** to approve Consent Agenda item No. 164-16 Emergency Resolution – Down Payment on Improvements only was **moved** by Councilman Downing, **seconded** by Councilman Lazar and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

☞**Motion** to approve Consent Agenda item No. 173-16 Approval of Execution of Redevelopment Agreement only was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried by a roll call vote of 4-0.
**RC: Council members:**
**YES:  Lazar, Downing, Knoller, Worthington**
**Abstain: DiPaola**

| Ca 159-16 | Award co-op road paving contract to D&L in the amount of $325,000.00 |
| Ca 160-16 | Resolution requesting approval of items of revenue and appropriation NJS 40a:4-87 - in the sum of $17,332.18, Fiscal Year 2016, State of New Jersey, Division of Environmental Protection, Clean Communities Grant |
| Ca 161-16 | Tax Deduction Adjustments |
| Ca 162-16 | Specialty Award - Sidewalk Safety |
| Ca 163-16 | Authorize 2016-2018 Snow Plowing Agreement with County of Bergen |
| Ca 164-16 | Emergency Resolution – Down Payment on Improvements |
| Ca 165-16 | Approve Cancellation of Capital Balances |
| Ca 166-16 | Appoint Open Space Representatives |
| Ca 167-16 | Approve Community Development Delegate & Alternate |
| Ca 168-16 | 2015 BC Open Space Trust Fund Municipal Program Centennial Park Community Garden Grant Award of $20,000 - Grantee Authorizing Resolution |
| Ca 169-16 | State Tax Appeal Refund - 100 Kinderkamack Rd, Block 607, Lot 1 2014 Refund Amount: $82,734.91; 2015 Refund Amount: $84,524.85 |
| Ca 170-16 | Request that Land Use Board review and recommend updates to Chapter 252 Subdivisions |
| Ca 171-16 | COAH – Municipal Consortium Participation |
| Ca 172-16 | Assumption Church – Permission to hold carnival |
| Ca 173-16 | Approval of Execution of Redevelopment Agreement |

XV.  CLOSED EXECUTIVE SESSION - Resolution No. 174-16

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 174-16 was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried by roll call vote of 5-0 at 9:15 p.m.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

#16-06/14-13    Update on Status of Potential Litigation – Fire Dept.        N.J.S.A. 10:4-7

XVI.  RECONVENE

☞**Motion** to reconvene was **moved** by Council President Knoller, **seconded** by Councilwoman DiPaola and carried at 10:04 p.m.

XVII.  ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried at 10:04 p.m.

Respectfully submitted,

_____

Jane Dietsche, RMC
Borough Clerk

Exhibit 9

D-15

REDEVELOPMENT AGREEMENT

BY AND BETWEEN

THE BOROUGH OF EMERSON

AND

EMERSON REDEVELOPERS URBAN RENEWAL, LLC

Dated: June 27, 2016

**THIS REDEVELOPMENT AGREEMENT** (the "Agreement") made this __ day of June 2016 by and between

**THE BOROUGH OF EMERSON**, Bergen County, New Jersey, a municipal corporation with offices located at 146 Linwood Avenue, Emerson, New Jersey 07630 (hereinafter referred to as "Borough");

AND

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**, a limited liability corporation of the State of New Jersey, having an office at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as the "EMRED" or "Redeveloper")

**WITNESSETH**

**WHEREAS,** capitalized terms used herein shall have the meaning given to them above, below or in Section 1.01; and

**WHEREAS,** all Block and Lot references used in this Agreement shall refer to Blocks and Lots appearing on the official tax maps of the Borough; and

**WHEREAS,** the Borough Governing Body authorized the Planning Board to conduct a preliminary investigation pursuant to N.J.S.A. 40A:12A-6 of the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1, et seq., (the "Act") to determine whether certain parcels of land in the Borough and located in the Borough constituted areas in need of redevelopment; and

**WHEREAS,** the Planning Board undertook said investigation and conducted a public hearing, all in accordance with N.J.S.A. 40A:12A-6; and

**WHEREAS,** thereafter the Planning Board found that, among others, the property described in the attached **Exhibit A** (the "Property" or "Properties") satisfied certain statutory criteria and thus constituted an area in need of redevelopment in accordance with N.J.S.A 40A:12A-5 and N.J.S.A. 40A:12-6; and

**WHEREAS,** on September 7, 2004, the Borough Governing Body adopted Resolution No. 199-04, accepting the findings of the Planning Board and designating the Property as an area in need of redevelopment (the "Central Business District Redevelopment Area ", as defined herein); and

2

**WHEREAS,** on April 3, 2006, the Borough adopted Ordinance No. 1305-06, adopting a Redevelopment Plan for the Central Business District Redevelopment Area; and

**WHEREAS,** the Borough Council is the Redevelopment Entity for the Central Business District Redevelopment Area; and

**WHEREAS,** on January 8, 2016, the Borough solicited proposals from redeveloper's to redevelop the Central Business District Redevelopment Area;

**WHEREAS,** EMRED together with other redeveloper's responded and submitted proposals to redevelop the Central Business District Redevelopment Area;

**WHEREAS,** JMF Properties responded  (and ultimately formed EMRED to be the redevelopment entity) and other potential redevelopers made presentations to the Mayor and Council (the designated Redevelopment Agency) over the course of several meetings and the Mayor and Council selected EMRED with whom to negotiate a potential Redeveloper's Agreement;

**WHEREAS,** EMRED proposes to design, develop, finance and construct the Project as defined herein on the Property; and

**WHEREAS,** the Redeveloper agrees that the Property was legally and lawfully designated as an area in need of redevelopment in accordance with N.J.S.A. 40A:12A-1 et. seq., and such designation is unappealable and that the Property meets the statutory criteria as an area in need of redevelopment; and

**WHEREAS,** in furtherance of the Redeveloper's agreement that the designation of the area in need of redevelopment is legally valid and enforceable, and Redeveloper's waiver of the aforementioned notice, the Redeveloper has submitted to the Borough the Borough's form of  application and executed a Funding Agreement with the Borough to pay the Borough's application fee and reimburse the Borough for its professional fees, costs and expenses associated with reviewing and assisting the Borough in connection with the proposed development of the Property, including but not limited, fees for legal services (including but not limited to negotiating the Redevelopment Agreement), professional planning services, engineering services, and financial advisory services and the Borough has designated the Redeveloper as the redeveloper for purposes of redeveloping the Property in accordance with the proposed concept plan attached hereto as **Exhibit B;** and

**WHEREAS,** in order to implement the development, financing, construction, operation and management of the Project, the Borough has determined to enter into this redevelopment agreement with the Redeveloper (the "Redevelopment Agreement");

~~**WHEREAS,** JMF  Properties  has  agreed  to  guaranty  EMRED's  financial~~ obligations under this Redevelopment Agreement.

3

NOW, **THEREFORE,** in consideration of the promises and mutual covenants herein contained, the parties hereto do hereby covenant and agree, each with the other, as follows:

## ARTICLE 1.

## DEFINITIONS

**1.01. Definitions.** As used in this Agreement the following terms set forth in this Article shall have the meanings ascribed to such terms below. Terms listed below in the singular form shall include the plural and words listed in the plural shall include the singular. Whenever the context may require, any pronoun that is used in this Agreement shall include the corresponding masculine, feminine and neuter. Unless otherwise noted, the words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation". The words "agree," "agreements," "approval" and "consent" when used in this Agreement shall be deemed to be followed by the phrase "which shall not be unreasonably withheld or unduly delayed," except or unless the context may otherwise specify or dictate. All references to Sections, Articles or Exhibits shall refer to Sections, Articles or Exhibits in this Agreement.

"**Act**" shall mean the New Jersey Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-I *et seq.*

"**Affiliate**" shall mean, with respect to any Person, any other Person directly or indirectly controlling or controlled by, or under direct common Control with such Person. For purposes of this definition the term "Control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, operations and policies of such Person, whether through the ownership of voting securities or by contract.

"**Affordable Housing Requirements**" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The maximum obligation shall be 20% set aside and may be built on and/or offsite.

"**Borough**" shall mean the Borough of Emerson.

"**Borough Costs**" shall means the reasonable out of pocket expenses incurred by the Borough for the fees and costs of any outside professional consultant, attorney, contractor or vendor retained by the Borough in connection with the Project which are

4

identified by the Funding Agreement executed by the Parties simultaneous to the execution of this Agreement.

"**Agreement**" shall mean this Redevelopment Agreement between the Borough and the Redeveloper.

"**Applicable Laws**" shall mean any and all federal, state and local laws, ordinances, approvals, rules, regulations and requirements including, but not limited to, the Act, the Municipal Land Use Law, the Redevelopment Plan, regulations promulgated by the Council on Affordable Housing, ("COAH"), construction codes including construction codes governing access for people with disabilities, fire codes, zoning codes, health or sanitary codes, pollution and environmental laws, rules and regulations applicable to the Project, Property and/or Project Plan or any aspect thereof.

"**Building Permit**" shall mean a building permit issued by or on behalf of the Borough pursuant to applicable Law.

"**Certificate of Completion**" shall mean a certificate from the Borough in recordable form issued, at the request of the Redeveloper, acknowledging that the Redeveloper has performed all of its duties and obligations under this Agreement, and has completed construction of the Project in accordance with the requirements of this Agreement.

"**Certificate of Occupancy**" shall mean the written certificate issued by the Borough of Emerson in accordance with N.J.S.A. 52:27D-133 relative to a unit of residential space constructed as part of the Project indicating that the subject unit of residential space has been completed in accordance with the construction permit, the Uniform Construction Code and all other Applicable Laws.

"**Commencement of Construction**" or "**Commence Construction**" shall mean the undertaking by the Redeveloper of any actual physical construction of any new structure, Improvements, Public Improvements and other infrastructure included as a component of any phase of the Project other than any activities related to the preparation of the site for such construction, or any activities related to the environmental remediation, mitigation or clean up of same.

"**Commencement Date**" shall mean the date on which the construction force and machinery is mobilized for construction on the Project as further set forth in Sections 5.04 and 5.09.

"**Completion Date**" or "**Completion of Construction**" shall mean the earlier of: (i) the date on which the Redeveloper receives a Certificate of Completion as provided for in Section 5.08 of this Agreement or 24 months from the Commencement Date, whichever is sooner.

"**Construction Period**" shall mean the period beginning on the Commencement Date and ending on the Completion Date.

"**Construction Plan**" shall mean the architectural and engineering plans prepared by the Redeveloper in conformance with the approved Final Site Plan, which plans shall be prepared in accordance with Applicable Laws and are to be submitted to the Borough for review and approval prior to the issuance of the necessary permits for Commencement of Construction.

"**Control**" (also referred to as "**Controlled by**" and "**under common Control with**") shall be used with respect to any Person, and shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Days**" shall mean calendar days when such term is used to denote time.

"**Declaration of Restrictions**" shall be a recordable document which includes (a) the provisions of Sections 3.02 to 3.05 inclusive and (b) the prohibition against transfers as set forth in Article 6 and (c) the Borough's remedies as set forth in Article 8.

"**Deeds**" shall mean any deed of conveyance from the Borough or any third Party to the Redeveloper conveying any parcel(s) of property owned or acquired by the Borough or such third party, pursuant to the terms and conditions of this Agreement.

"**Effective Date**" shall mean the date this Agreement is last executed by either the authorized officer of the Borough or by the authorized representative of the Redeveloper.

"**Emergency Municipal Services Building Project**" shall mean the new building the Borough will develop to relocate the volunteer ambulance corp as well as the police department facilities

"**Escrow Account**" shall be as defined in Section 4.02 and include amounts deposited by Redeveloper to cover the Borough's Costs.

"**Event of Default**" shall be as set forth in Article 8 hereof.

"**Final Site Plan**" shall mean the plan submitted to the Planning Board for Final Site Plan approval in accordance with the Redevelopment Plan and Applicable Law.

"**Financial Institution**" shall mean a bank, savings bank, savings and loan association, mortgage lender or insurance company, pension fund, real estate investment trust, investment bank, mutual fund or similarly recognized reputable source of construction and permanent financing for the Project, chartered under the laws of the United States of America, or any State thereof.

6

"Force Majeure" (also "Event of Force Majeure") as used throughout this Agreement this term applies to all time limitations and other obligations and shall mean any acts of God, fire, volcano, earthquake, hurricane, blizzard, infectious disease, technological disaster, catastrophe, large scale infestation of any type, tremors, flood, explosion, release of nuclear radiation, release of biotoxic or of biochemical agents, the elements, war, blockade, riots, mob violence or civil disturbance, any act or acts of terrorism or terroristic threat, an inability to procure goods or services or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes, walkouts, actions of labor unions, governmentally imposed moratoriums, court orders, laws, rules, regulations or other orders of governmental or public agencies, bodies and authorities or any other similar cause not within the reasonable control of the Parties including legal inability to comply resulting from a change of law including municipal laws regulating land use and construction, any legal requirements under any applicable environmental laws, as well as all known and unknown rules and regulations of the Federal Environmental Protection Agency and the NJDEP, clearances, approvals or permits typical of the development process, any legal proceedings, decisions or decrees that adversely affect the Parties' ability to reasonably perform the obligations of and/or benefit from the terms of this Agreement, any economic conditions that may adversely affect the real estate market or may affect the Redevelopment Area, the Project or any of the individual phase(s) of this Project as demonstrated by an independent market study prepared by a qualified financial consultant selected by the Party seeking the benefit of Force Majeure provided that the qualified financial consultant is approved by the non-benefiting party using its reasonable judgment, in advance of the preparation of the independent market study, or any unreasonable delay in the Redeveloper's receipt of any necessary Governmental Approvals not within the Redeveloper's control.

"Funding Agreement" shall mean that agreement required by Borough Ordinance which obligates the Redeveloper to fund and pay for any and all professional fees the Borough may incur in order to complete this Project, a copy of which is attached hereto as **Exhibit E.**

"Governmental Agency" shall mean any federal, state, county or municipal legislative, administrative, executive or governing body, office, agency, department, commission, authority, court, or tribunal and any successor thereto, exercising executive, legislative, judicial, advisory or administrative functions of or pertaining to government, including, without limitation, the Borough of Emerson, the County of Bergen, the State of New Jersey and/or the United States of America.

"Governmental Applications" shall mean any and all submissions, plans, drawings, diagrams, supporting documentation or other proofs or presentations that are transmitted to any Governmental Agency for the purpose of obtaining any and all Governmental Approvals required to complete the Project.

"Governmental Approvals" shall mean any and all authorizations, permits, licenses or certificates issued by any Governmental Agency or quasi–governmental entity

7

(including outside agencies) as a result of the submission of a Governmental Application required in order to implement the Project or any aspect thereof in accordance with this Agreement and the Redevelopment Plan, for the construction of the Project including, without limitation: the Site Plan Approval with respect to the Building Permit; environmental approvals; sewerage capacity approvals and any and all other necessary permits, licenses, consents and approvals required for construction and operation of the Project under Applicable Law. No approval shall be final until the time for appeal shall have run without the filing of an appeal, or, in the event an appeal is filed, until such appeal is resolved fully in favor of Redeveloper and the time for further appeals shall have run without the filing of any further appeal. No Governmental Approval shall contain any condition which would materially and adversely affect the development, construction or operation of the Project or the finances thereof.

"**Governing Body**" shall mean the Borough Council of the Borough of Emerson, together with any successor(s) thereto.

"**Impositions**" shall mean all taxes, assessments (including, without limitation, all assessments for public improvements or benefits), water, sewer or other rents, rates and charges, license fees, permit fees, inspection fees and other authorization fees and charges, in each case, whether general or special, which are levied upon any portion of the Project or on any of the improvements constructed thereon.

"**Improvements**" shall mean all buildings, appurtenances, structures physically within or upon the Property, together with any work on site or off-site, reasonably on-site and, if any, off-site improvements, constructed on or installed in connection with the construction of the Project in accordance with the Concept Plans attached hereto as **Exhibit B**, including but not limited to grading site drainage, walkways, hook-ups and service laterals from buildings to curbs for water, sewer, storm water and other utilities, parking, lighting within parking areas, landscaping and fire hydrants, all constructed in accordance with the Redevelopment Plan, Governmental Approvals and Applicable Laws.

"**Mortgagee**" shall mean an Institution that holds a Mortgage on the Property.

"**Municipal Land Use Law**" or "**MLUL**" shall mean the Municipal Land Use Law *N.J.S.A.* 40:55D-1, *et seq.*

"**NJDEP**" shall mean the State of New Jersey Department of Environmental Protection, together with any successor(s) in interest thereto.

"**Offsite/OnSite Improvement Share**" shall mean the amount Redeveloper shall pay for the Offsite and Onsite improvements that the Borough or other third parties shall make which will benefit Redeveloper as well as on site improvements which will benefit other property owners, all as fully set forth in **Exhibit F**.

**Party/Parties:**    Shall mean individually, the Borough, the Redeveloper or a

8

Person as defined herein and shall mean collectively, the Borough and Redeveloper.

"**Person(s)**"   shall mean any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company or corporation, trust, unincorporated association, institution, public or governmental body, or any other entity.

"**PILOT**" shall mean a long term exemption pursuant to N.J.S.A. 40A:20-1 et seq.

"**Planning Board**" shall mean the Land Use Board of the Borough, pursuant to *N.J.S.A.* 40:55D-23.

"**Project**" shall mean the development, design, financing and construction of the Improvements and the Public Improvements by Redeveloper on the Property.

"**Project Costs**" shall be as defined in Section 4.01.

"**Project Milestones**"   shall mean the date(s) or deadline(s) established for Project tasks to be completed by the Redeveloper in a timely manner as set forth in the Redevelopment Project Schedule attached hereto as **Exhibit C.**

"**Project Schedule**" shall mean the schedules set forth in the Redevelopment Project Schedule attached hereto as **Exhibit C,** that contain the Project Milestones for the development, construction and completion of the Project, as applicable.

"**Property**" or "**Properties**" shall mean the Blocks and Lots as located on Borough tax maps, as listed in **Exhibit A,** subject to a subdivision of the land for the construction of the Facility as referenced in this Agreement.

"**Plan**" or "**Redevelopment Plan**" shall mean the Redevelopment Plan adopted by Borough Ordinance on April 3, 2006, or any subsequent Redevelopment Plan as same may be amended from time to time.

"**Project Plan**" shall mean the concept plan annexed hereto as **Exhibit B** for the Project.

"**Public Improvements**" shall include but not be limited to all such improvements that benefit the public, including by way of example, roadways, sanitary sewers, stormwater facilities, water mains, fire hydrants, utilities poles, piping and conduits (such as telephone, fiber optic, electric, and natural gas), curbs, sidewalks, retaining walls, conservation easement areas, and retention or detention basins but shall exclude parking decks, and other private improvements.

"**Redeveloper**" shall mean Emerson Redevelopers, LLC having its corporate offices at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981. The members of Redeveloper are listed in **Exhibit D.**

9

"**Redevelopment Area**" shall mean the area designated by the Borough Council as the Central Business District Redevelopment Area pursuant to a Borough Resolution No. 199-04 adopted on September 7, 2004.

"**Redevelopment Project Schedule**" shall mean the Project Schedule and Reporting Requirements which sets forth the respective tasks and completion dates of various phase-related activities, which is attached hereto as **Exhibit C**.

"**State**" shall mean the State of New Jersey.

"**Survey**" shall mean the standard process by which a qualified land surveyor licensed to perform such services within the State of New Jersey prepares location measurements of a parcel or parcels of property in order to ascertain the size of same and its location and relationship to adjoining parcels and to locate all structures, improvements, easements, and restrictions on the properties.

"**Tolling Event**" shall mean: (i) an act or omission by one Party or a third Party that has a material and adverse effect on the other Party's ability to perform any obligation, requirement, commitment, or responsibility prescribed under this Agreement; or (ii) any extension granted by either Party to the other Party, to extend any proposed date to perform in this Agreement; or (iii) any reasonable request by one Party to the other to extend the time for performance of any obligation, requirement, commitment or responsibility arising pursuant to this Agreement.

"**Borough**" shall mean the Borough of Emerson, Bergen County, New Jersey.

"**Borough Council**" shall mean the governing body of the Borough of Emerson.

"**Transfers**" shall be as defined in Section 6.03.

"**Transferee**" shall mean any Third-Party (other than unit purchasers in the ordinary course of business) to whom an interest in the Project Premises, the Improvements or rights in or under this Agreement is conveyed, transferred, leased, encumbered, acquired or assigned, by sale, merger, consolidation, reorganization, foreclosure or otherwise, including a trustee in bankruptcy or assignee for the benefit of creditors.

## ARTICLE 2.

## REPRESENTATIONS AND WARRANTIES

**2.01 Representations and Warranties by the Redeveloper.** The Redeveloper hereby makes the following representations and warranties to the Borough for the purpose of inducing the Borough to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true, to the best of its knowledge, as of the date hereof:

(1) Redeveloper has the legal capacity to enter into this Agreement and perform each of the undertakings set forth herein and in the Redevelopment Project Schedule as of the date of this Agreement.

(2) Redeveloper is duly organized and a validly existing legal entity under the laws of the State of New Jersey and all necessary consents have been duly adopted to authorize the execution and delivery of this Agreement and to authorize and direct the persons executing this Agreement to do so for and on the Redeveloper's behalf.

(3) Redeveloper represents that the Project will create economic development on blighted property, in the form of job creation, increased real estate tax ratables, improvements to the Property, and an increase in the quality of life of the surrounding properties through the implementation of the Improvements.

(4) Redeveloper represents that it has the technical and financial expertise and ability to complete the Project in accordance with the Project Schedule established in **Exhibit C.**

(5) No receiver, liquidator, custodian or trustee of Redeveloper shall have been appointed as of the effective Date, and no petition to reorganize Redeveloper pursuant to the United States Bankruptcy Code or any similar statute that is applicable to the Redeveloper shall have been filed as of the effective Date.

(6) No adjudication of Bankruptcy of the Redeveloper or a filing for voluntary bankruptcy by Redeveloper under the provisions of the United States Bankruptcy Code or any other similar statue that is applicable to the Redeveloper shall have been filed.

(7) No indictment has been returned against Redeveloper or any official, principal or member of Redeveloper.

(8) There is no action, proceeding or investigation now pending, nor any basis therefore, known or believed to exist which questions the authority of the Redeveloper to

11

enter into the Agreement or any action or act taken or to be taken by the Redeveloper pursuant to this Agreement.

(9) Redeveloper's execution and delivery of this Agreement and its performance hereunder will not constitute a violation of any operating, partnership and/or stockholder agreement of Redeveloper or of any agreement, mortgage, indenture, instrument or judgment, to which Redeveloper is a party.

(10)  Redeveloper shall make its good faith  efforts to award contracts and/or subcontracts wherever reasonably feasible to local business enterprises, where competitive bids and prices are offered by such enterprises, which may have a limited record of such activity, but which, in the judgment of Redeveloper, can competently provide the goods and services required by redeveloper.  Redeveloper shall further make its best efforts to utilize local employees on the Project, and shall ensure that contractors and  subcontractors  retained  by  the  Redeveloper  make  similar  efforts,  including cooperation with the Borough as set forth in subsection (10) immediately below.

(11)  Redeveloper shall cooperate fully with the Borough in efforts by the Borough or its designees to recruit, screen, train, and refer qualified local and/or minority employees and subcontractors to Redeveloper and its general contractor or contractors, including providing information to the Borough or its designee with respect to the disposition of applicants for employment or subcontracts referred by the Borough or its designee to Redeveloper.

(12)  All materials and documentation submitted by the Redeveloper and its agents to the Borough and its agents were, at the time of submission, and as of the Effective Date, materially accurate, and the Redeveloper shall continue to inform the Borough of any material or adverse changes in the documentation submitted.  The Redeveloper acknowledges that the facts and representations contained in the information submitted by the Redeveloper are a material factor in the decision of the Borough to enter into this Agreement.

(13)  Redeveloper and the resources available to it through its principal are financially and technically capable of developing, designing, financing and constructing the Project.

(14)  There is no pending, or to the best of the Redeveloper's knowledge, threatened litigation, action or proceeding that would (i) prevent or delay the Redeveloper from performing its duties and obligations hereunder and/or (ii) question the validity of this Agreement or any essential element upon which this Agreement depends.

(15) Redeveloper acknowledges that it has had the opportunity to review all official documents contained in the public record relating to the Borough's designation of the Property as "an area in need of redevelopment", and the Borough's selection of the Redeveloper to undertake the redevelopment of the Property, all in accordance with

12

N.J.S.A. 40A:12A-1 et seq., (collectively the "Official Acts"). The Redeveloper hereby waives any and all causes of action it may have, or seek to prosecute against the Borough and the Borough Planning Board, in the event that the Redeveloper's rights as set forth in this Agreement are affected by any determination of a court of competent jurisdiction that one or more of the Official Acts, or any portion thereof, is invalid. Further, Redeveloper hereby waives any and all causes of action it may have to challenge the "Official Acts", including, by way of example and not limitation, any challenge Redeveloper may have regarding notice (pursuant to Harrison Redevelopment Agency vs. De Rose) and/or the Local Redevelopment and Housing Law. These waivers shall survive any termination of this agreement.

(16) Notwithstanding the foregoing, the Borough and Redeveloper may determine that it is in the interest of the Project to re-study the Central Business District Redevelopment Area or particular properties located within the Central Business District Redevelopment Area to confirm that they continue to be blighted and otherwise meet the criteria pursuant to N.J.S.A. 40A:12A-1 et seq. Redeveloper shall reimburse the Borough for such costs associated with this work as set forth in Section 4.01.

2.02. **Representations and Warranties by the Borough.** The Borough hereby makes the following representations and warranties for the purpose of inducing the Redeveloper to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true as of the date hereof:

(1)   The Borough has the legal power, right and authority to enter into this Redevelopment Agreement and the instruments and documents referenced herein to which the Borough is a party, to consummate the transactions contemplated hereby, to take any steps or actions contemplated hereby, and to perform its obligations hereunder.

(2)   With the exception of the items or tasks which shall be a condition precedent to the Effective Date of this Agreement, upon the approval by the Governing Body of this Agreement, all requisite action has been taken by the Borough and all requisite consents have been obtained in connection with the entering into this Redevelopment Agreement and the instruments and documents referenced herein to which the Borough is party, and the consummation of the transaction contemplated hereby, and to the best of the Borough's knowledge and belief are authorized by all Applicable Laws. To the best knowledge of the Borough there are no writs, injunctions, orders or decrees of any court or governmental body that would be violated by the Borough entering into or performing its obligations under this Redevelopment Agreement.

(3)   This Redevelopment Agreement is duly executed by the Borough, and is valid and legally binding upon the Borough and enforceable in accordance with its terms on the basis of laws presently in effect and the execution and delivery thereof shall not, with due notice or the passage of time, constitute a default under or violate the terms of any indenture, agreement or other instrument to which the Borough is a party.

13

(4)      There is no action, proceeding or investigation now pending, nor any basis known or believed to exist which questions the validity of this Agreement or the authority of the Borough to enter into the Agreement or any action or act taken or to be taken by the Borough pursuant to this Agreement.

(5)      The Borough agrees to support any applications for Governmental Approvals that are consistent with the terms of the Redevelopment Plan and this Agreement, and to execute any documents required to obtain such approvals and otherwise to cooperate with the Redeveloper with respect to the Governmental Approvals, provided that nothing contained in this Article 2.02 of this Agreement shall be deemed: (i) to constitute an approval of all or any portion of the Project for which Governmental Applications have been submitted or are required or approval of any Governmental Application seeking a financial incentive including but not limited to, the PILOT, (ii) a waiver of the ability of the Planning Board, or any other governmental or administrative entity, from exercising its statutorily authorized responsibilities with respect to the Governmental Applications or Governmental Approvals. Notwithstanding the foregoing, this Agreement shall not be deemed to be in full force and effect until such time as Redeveloper receives an approved PILOT agreement, mutually satifisfactory to both parties.

(6)   No official or employee of the Borough has any personal interest, direct or indirect, in this Agreement.

(7)      Nothing exists that would prevent Governmental Applications from being deemed complete. Including without limitation taxes.

**2.03. Mutual Representations.**

(1) The Borough and Redeveloper agree that the Project as defined herein does not constitute a "Public Works Contract" as defined in N.J.S.A. 10:5-31 and the completion of the Project does not constitute a "Public Work" as defined in N.J.S.A. 34:11-56.26 (the "Prevailing Wage Law").

(2) In the event that any contractual provisions that are required by Applicable Laws have been omitted, then the Borough and Redeveloper agree that this Agreement shall be deemed to incorporate all such clauses by reference and such requirements shall become a part of this Agreement. If such incorporation occurs and results in a change in the obligations or benefits of one of the parties, the Borough and Redeveloper agree to act in good faith to mitigate such changes in position.

14

## ARTICLE 3.

### COVENANTS AND RESTRICTIONS

**3.01. Covenants and Restrictions.** Redeveloper agrees to record the Declaration of Covenants and Restrictions on the Property in the office of the Bergen County Clerk within thirty (30) days of the fulfillment of all contingencies set forth in Article 12.

**3.02. Description of Covenants.** The Declaration of Covenants and Restrictions shall also state that the Redeveloper and its successors and assigns shall:

(a)   Devote the Property to the uses specified in the Redevelopment Plan and shall not devote the Property to any other uses without the approval of the Borough;

(b)   To the extent provided for by the Applicable Laws to not discriminate upon the basis of age, race, color, creed, religion, ancestry, national origin, sex or marital status in the sale, lease, use or occupancy of the Property or any Improvements, buildings or structures erected or to be erected thereon, or any portion thereof;

(c)   To the extent provided for by the Applicable Laws, in the sale, lease or occupancy of the Property or any portion thereof, not effectuate or execute any covenant, lease agreement, conveyance or other instrument whereby the land or any Improvement, building or structure erected or to be erected thereon is restricted upon the basis of age, race, color, creed, religion, ancestry, national origin, sex or marital status, and the Redeveloper, its successors and Transferee(s) shall comply with all State and local laws prohibiting discrimination or segregation by reason of age, race, color, creed, religion, ancestry, national origin, sex or marital status; and

(d)   That the Redeveloper and its Transferee(s) shall not sell, lease or otherwise Transfer the Property, or any portion thereof, without the written consent of the Borough not to be unreasonably withheld, as set forth in Article 6 hereof other than those Transfers deemed to be the Permitted Transfers pursuant to Article 6 hereof.

**3.03. Effect and Duration of Covenants.** It is intended and agreed that the agreements and covenants set forth in Section 3.02 shall be covenants running with the land and that they shall, in any event, and without regard to technical classification or designation, legal or otherwise, and except only as otherwise specifically provided in this Agreement, be binding, to the fullest extent permitted by law and equity, for the benefit and in favor of, and enforceable by, the Borough, its successors and assigns, against the Redeveloper, its successors and assigns and every successor in interest therein, and any party in possession or occupancy of the Project or any part thereof until a Certificate of Completion has been issued.  However, such agreements and covenants shall be binding on the Redeveloper itself, each successor in interest to the Redeveloper and each party in possession or occupancy, respectively, but only for such period as the Redeveloper or such successor or party shall be a lessee or be in possession or occupancy of the Property, the buildings and structures thereon or any part thereof.

15

**3.04. Enforcement by the Parties.** Both Parties shall have the right, in the event of any breach of any of the aforesaid covenants or of any of the other terms and conditions of this Agreement, to exercise all the rights and remedies and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breach of agreement or covenant, to which they or any other beneficiaries of such agreement or covenant may be entitled. In the event a party is successful in enforcing any of its rights hereunder, such unsuccessful party shall pay and reimburse the successful party for all of its reasonable attorneys fees together with any costs and expense incurred by the successful party in enforcing its rights hereunder.

**3.05. Redevelopment Area Upon Completion.** Upon issuance of a Certificate of Completion, the conditions that were found and determined to exist at the time the Property was determined to be in need of redevelopment shall be deemed to no longer exist, the Property shall no longer be subject to eminent domain as a result of such determinations conditions and the requirements of N.J.S.A. 40A:12A-9 shall be deemed to have been satisfied with respect to the Property. The Borough shall release the recorded documents and designations on a Phase by Phase basis provided that the Redeveloper has subdivided the Property to facilitate the Phase by Phase release of same.

## ARTICLE 4.

## COSTS ASSOCIATED WITH THE PROJECT

**4.01. Project Costs.** All costs of implementing and Completing the Project, including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property, any Remediation costs (including the costs of operation, maintenance, reporting and monitoring that may be associated with any engineering controls and institutional controls), the cost of designing and constructing the Project (including the costs of any construction observation services) all Improvements, all financing costs, all marketing and leasing costs for the Project and the Borough Costs as limited by the Funding Agreement, (collectively, the "Project Costs") shall be borne by Redeveloper. Except if otherwise specifically set forth herein, the Borough shall not be responsible for any costs associated with the Project. The Project Costs are estimated to be Thirty Million Dollars ($30,000,000.00). Detailed breakdowns of the hard and soft cost of this Project shall be provided by the Redeveloper to the Borough no later than the issuance of a building permit for the Phase 1 Project.

**4.01.1 Offsite/Onsite Improvement Share.** Redeveloper shall pay for the Offsite and Onsite improvements that the Borough or other third parties shall construct or install which will benefit Redeveloper as well as on site improvements which will benefit other property owners, all as fully set forth in **Exhibit F**, which may be amended or adjusted from time to time based on the actual costs of construction and a final determination by the Borough Engineer of this Redeveloper's Offsite/Onsite Improvement Share.

16

**4.02. Borough Costs and Application Fees.** Redeveloper has executed a Funding Agreement with the Borough that addresses the timing and payment of the Borough Costs which is attached hereto and incorporated herein as **Exhibit E.**

**4.03. Affordable Housing Requirement.** The Parties recognize and acknowledge that the Project will generate a fair share housing requirement for Redeveloper pursuant to the Affordable Housing Requirements established by the State of New Jersey and the Council on Affordable Housing. Redeveloper and the Borough agree that Redeveloper shall satisfy the affordable housing obligations resulting from Redeveloper's development of the Project in accordance with the State's Affordable Housing Requirements. The obligation shall be fixed as of the start of each of the Phases of the Project. The presumptive percentage of set aside units to be built shall be twenty percent (20%). However, the Redeveloper may request that the Borough seek a determination from either the courts or COAH to determine the definitive affordable housing set aside for the Project. If the Redeveloper elects to have the Borough seek a determination from either the courts or COAH, the Redeveloper shall pay for all of the Borough's professional fees associated with seeking such determination, including but not limited to legal fees (together with costs and expenses), as well as the fees, costs and expenses of planners, engineers, financial advisers, COAH experts, and any other professional or advisory services required to obtain the determination (collectively the "Professional Fees"). The payment or reimbursement for such Professional Fees shall be made pursuant to the Funding Agreement the Redeveloper has previously executed. The Escrow established pursuant to such Funding Agreement shall be replenished as necessary and as required pursuant to the terms of the Funding Agreement and the Funding Agreement is deemed amended and supplemented to include the provisions of this Section 4.03 as if fully set forth within the Funding Agreement.

**4.03.1 Alternate COAH Location.** The Redeveloper and the Borough shall explore alternative sites to accommodate all of the Low and Moderate Housing obligations associated with this Project at another location in the Borough, subject to any necessary court approval and such court approval to be funded by Redeveloper as set forth in **Section 4.03** hereinabove.

**4.04. Emergency Municipal Services Building.** The Borough has dedicated and shall transfer Block 419 Lot 7 to Redeveloper for the Project ("Dedicated Lot") which is currently utilized by the Borough Ambulance Corp and has a fair market value of $500,000. In consideration therefore the Redeveloper shall construct at its sole cost and expense an Emergency Municipal Services Building as defined hereinabove. The Borough shall provide the Redeveloper the property as well as all of the site plans, architectural and engineering plans at the Borough's sole cost and expense and upon the completion of the building the Borough shall pay and reimburse Redeveloper all of the costs associated with the construction of the Emergency Municipal Services Building, less the direct and allocatable costs associated with Ambulance portion of the building as the parties may agree, which in no case shall exceed the fair market value of the Dedicated Lot. In the event the parties cannot agree on such reimbursable costs to the

17

Redeveloper, the party's attorneys shall select a retired Judge from Bergen County to mediate and definitively determine such costs to be reimbursed to the Redeveloper and such costs for such mediator shall be shared by the parties equally.

## ARTICLE 5.

## THE PROJECT

**5.01. Property.** The Property is located in the Borough and presently identified in the Borough tax maps on the Blocks and Lots described in **Exhibit A**, subject to any necessary subdivision. The Project is depicted in the Concept Plan for the Project attached hereto as **Exhibit B** and shall be constructed in accordance with the Redevelopment Project Schedule set forth in **Exhibit C**. The Redeveloper and Borough each covenant and agree to perform the obligations set forth in the Redevelopment Project Schedule set forth in **Exhibit C**. The Redeveloper covenants and agrees that it will construct the Project in accordance with the Redevelopment Plan. All Improvements to be situated upon the Property (i.e., sidewalks, utilities and site lighting, off street parking, roadways, pilings, foundations, footings, open space, walkways, landscaping, etc.) and other construction identified as Improvements shall be installed by the Redeveloper at its sole cost and expense as the Project requires. The Redeveloper shall negotiate for the purchase of any properties set forth in **Exhibit A** that it does not currently own or control at its sole cost and expense. In the event the Redeveloper is not able to purchase any property set forth in **Exhibit A** the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c). The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties. The Borough shall adopt the necessary Ordinances to vacate Kenneth Avenue within sixty (60) days from the date the Redeveloper obtains Governmental Approvals.

**5.02. Governmental Approvals.** The Redeveloper shall make all Governmental Applications and receive all Governmental Approvals required under Applicable Laws in order to construct the Project in accordance with the Redevelopment Project Schedule. Issuance of a Building Permit shall be conclusively presumed to be in compliance with all Governmental Applications and Governmental Approvals that are perquisites to the issuance of such Building Permit.

**5.03. Site Work.** The Redeveloper at its sole expense shall install upon or in the Property all necessary site preparation, including pilings and , filling and all on-site infrastructure. Notwithstanding anything contained herein, the Borough shall not be responsible for any costs associated with any Improvements necessary for the development and construction of the Project. The costs of developing the Project and Facilities, and of constructing all Improvements thereon, including, but not limited to, all required Public Improvements, shall be borne entirely by the Redeveloper; provided, however, that Redeveloper's contributions for offsite improvements may be subject to pro-ration in accordance with Applicable Laws. Notwithstanding the foregoing, the Borough shall not be responsible for any costs associated with any Improvements necessary for the development and construction of the Project

18

**5.04. Commencement and Completion Schedule.** The Redeveloper agrees to commence construction of the proocet within 120 days of Government Approvals and thereafter diligently prosecute the Project to completion in accordance with the Redevelopment Project Schedule set forth in **Exhibit C** and this Article but in no case later than 24 months from the Commencement Date. Redeveloper understands that the Borough will require strict compliance with the Project Milestones, deadlines and time periods for the various activities and actions to be taken by the Redeveloper hereunder, as set forth in **Exhibit C**, subject to the occurrence of a Force Majeure Event. The Borough agrees to cooperate fully with Redeveloper regarding all Governmental Approvals. Redeveloper acknowledges that a failure to meet a Project Milestone shall be a material breach of this Agreement that will subject the Redeveloper to Termination of this Agreement as permitted in Articles 8 & 9. The Parties acknowledge and agree that the Redeveloper may need to modify the Redevelopment Project Schedule. The Borough shall, upon the written request of the Redeveloper, consider modifications of the dates set forth in the Redevelopment Project Schedule. The Borough agrees to consider and render a decision with respect to any such modification, within a period of sixty (60) days following receipt of a written request by the Redeveloper. Failure to diligently prosecute the Project to Completion may cause the Borough to notify the Redeveloper that it is in default of its obligations hereunder, and to pursue all lawful remedies against the Redeveloper. Similarly, the Borough agrees to commence and diligently prosecute its obligations as set forth in the Redevelopment Project Schedule.

**5.05. Progress Reports.** For so long as this Redevelopment Agreement shall remain in effect, Redeveloper shall make quarterly reports to the Borough as to the actual progress of Redeveloper with respect to development, planning and construction of both the Project, and such other matters as the Borough shall reasonably request be addressed in such reports, including but not limited to the reporting requirements set forth in **Exhibit C.**

**5.06. Public Improvements and Utility Relocation.** The Borough and the Redeveloper hereby agree that the Redeveloper will make the Public Improvements consistent with the Plan which shall include, but shall not be limited to installation of concrete curbing, sidewalks, roadway base/surface, sewers, drainage, grading, street lighting, street furniture, signage, utilities, plantings and appropriate traffic control signals as may be required by the Governmental Approvals or Applicable Laws. Notwithstanding anything contained herein to the contrary, Borough shall not be responsible for any costs associated with any Public Improvements necessary for the development and construction of the Project. The costs of developing the Project and all Public Improvements thereon, including, but not limited to, all required Public Improvements or utility relocations, shall be borne entirely by the Redeveloper. In addition, Redeveloper shall install at its sole cost and expense the Storm Water Pipe as more fully described and set forth in **Exhibit G.**

**5.07.   Performance Bond.** If the Planning Board does not require that the Redeveloper post a Bond for the Public Improvements as a condition of the site plan approval issued by the Planning Board, then prior to the Commencement of Construction, Redeveloper shall provide the Borough with a bond (the "Bond") (the "Performance Guaranty"), in an amount equal to the cost of Public Improvements  The Bond must be issued by an insurance or surety company authorized to conduct business in the State of New Jersey, rated A+ or better by A.M. Best and listed in the most current U.S. Treasury Circular 570. The Bond must name the Borough as an obligee, and Redeveloper shall deliver a copy of the Bond to the Borough on or before the Commencement Date.  If an Event of Default occurs, the Borough will use the Performance Guaranty to complete construction of the Public Improvements or to remove any structure on the Property, in its sole discretion, subject to the right to cure of the mortgagee as set forth in Article 9.03. Redeveloper shall receive a credit against the Bond for any bond required to be posted in satisfaction of the requirements of the Land Use Law, in the event that the Bond required by the Planning Board does not completely encompass the Public Improvements contemplated by this Redevelopment Agreement.

**5.08.   Certificates of Occupancy and Certificate of Completion.**  Upon completion of construction in accordance with the Governmental Approvals and Applicable Laws, the Redeveloper shall apply to the appropriate governmental officer or body for a Certificate of Occupancy for the Project or a portion thereof. The Certificate of Occupancy, when issued, shall constitute evidence that Redeveloper has fully performed its obligations under Governmental Approvals as to the Project or a portion thereof. Following the issuance of the Certificate of Occupancy and the satisfaction of the terms and conditions of this Agreement, the Borough agrees to issue a Certificate of Completion, in proper form for recording, which shall acknowledge that the Redeveloper has performed all of its duties and obligations under this Agreement and has completed construction of the Project or a portion thereof in accordance with the requirements of this Agreement. The Certificate of Completion shall constitute a recordable, conclusive determination of the satisfaction and termination of the agreements and covenants in this Agreement and the Redevelopment Plan with respect to the obligations of the Redeveloper to construct the Project or a portion thereof within the dates for the completion of same. Within 30 days after written request by the Redeveloper, the Borough shall provide the Redeveloper with the Certificate of Completion or a written statement setting forth in detail the reasons why it believes that Redeveloper has failed to complete the Project or a portion thereof in accordance with the provisions of this Agreement or is otherwise in default under this or any other applicable agreement and what reasonable measures or acts will be necessary in the opinion of the Borough in order for the Redeveloper to be entitled to the Certificate of Completion.

**5.09 Project Schedule.**  With respect to the Project, Redeveloper shall meet the deadlines and timeframes for the completion set forth in the Redevelopment Project Schedule set forth in **Exhibit C.** Redeveloper shall construct the Project using all commercially reasonable methods to prosecute the uninterrupted construction of the Project. Failure to prosecute the uninterrupted construction of the Project shall constitute an Event of Default.  It shall be an Event of Default for Redeveloper to fail to complete

20

Construction of the Project such that a Certificate of Completion is not issued by the Borough in accordance with the Redevelopment Project Schedule set forth in **Exhibit C.**

**5.10   Project Modifications.**   The Redeveloper hereby acknowledges and agrees that the development and construction of the Project shall be in accordance with the Project Schedule set forth in **Exhibit C.** The Redeveloper may not modify, alter or amend the approved Final Site Plan at any time without the express prior written approval of the Borough which shall not be unreasonably withheld, conditioned or delayed, subject to the provisions of the Applicable Laws; provided, however, that the Redeveloper may make those modifications, alterations and amendments to the Final Site Plan or Construction Plans, as the case may be, that are "minor" in nature. The Borough reserves its right to contest any material modifications that may potentially arise in the course of the construction of the Project.

**5.11   Suspension of Construction.**   If the Redeveloper shall abandon or substantially suspend construction activities on the Project for a period of 120 consecutive days, the rights and remedies of the Parties shall be governed by the provisions of Article 8 of this Agreement.

**5.12   Insurance.** The Redeveloper shall maintain or cause to be maintained at its own cost and expense, with responsible insurers, the following kinds and the following amounts of insurance with such variations as shall reasonably be required to conform to customary insurance practice and in no case less than the amounts indicated below and certificates, or full copies of policies must be furnished as noted below:

(a)     Builder's Risk Insurance for the benefit of the Redeveloper and the Borough, as its respective interests may appear, during the term of construction which will protect against loss or damage resulting from "ALL Risk" or "Special Form" f The limits of liability will be equal to One Hundred (100%) percent of the insurable replacement cost value of the Project (comments on this may follow), including items of labor and materials connected therewith, whether in or adjacent to the structure insured, and materials in place or to be used as part of the permanent construction. Is this meant so say replacement cost endorsement Is loss of use an issue for the borough?

(b) COMPREHENSIVE GENERAL LIABILITY LIMITS $1,000,000/2,000,000 combined single limit "CSL" covering Bodily injury, Property damage and Personal Injury -including explosion, collapse, underground utilities, contractual, independent contractors, and Products/Completed Operations coverage for all premises and work to be completed under the redevelopment agreement.

(c)     Worker's Compensation Insurance coverage in the amount of:
Coverage A - New Jersey Statutory
Coverage B – 500,000/500,000/500,000
the full statutory liability of the Redeveloper;

(d)    ENVIRONMENTAL INSURANCE (Pollution Liability)- $5,000,000/$5,000,000-covering Bodily Injury, Property Damage, pollution or environmental harm including cleanup cost arising out of the work to be performed under this contract. The policy must contain a separation of insureds clause and include the Borough of Emerson as an **additional Named Insured.**

(e)    Requirement that contractor's sub-contractors hired by redeveloper maintain certain insurance and name the Borough as additional insured.

(f)    Railroad Protective-Insurance- Requirements Equal to that required by the Railroad if applicable.

(g)    Such other insurance, in such amounts and against such risks, as is customarily maintained by the Redeveloper with respect to other similar properties owned or leased by it, including automobile insurance.

**The before mentioned policies listed in B,C,D & E above shall name the Borough of Emerson, it's elected officials, agents, employees, officers, affiliates, directors, members, partners, consultants, and subcontractors of each and any of all such as additional insureds, and the insurance afforded to these additional insureds shall be primary coverage and noncontributory for all claims covered thereby**

The Redeveloper shall file with the Owner before commencing with the redevelopment work under this Agreement, original Certificates of Insurance, or policies where required, which certificates shall bear the following information:

1. Name and address of the insured.
2. Title and Location of the operations to which the insurance applies
3. The number of the policy and the type or types of insurance in force thereunder on the date borne by such Certificate.
4. The expiration date of policy and the limit or limits of liability thereunder on the date borne by such certificate.
5. A statement that the insurance of the type afforded by the policy applies to all of the operation on and at the site of the project which are undertaken by the insured during the performance of his contract.
6. Indication of Insured, additional insured and Co-insured Parties.
7. A statement as to the exclusions of the policy, if any.
8. A statement showing the method of cancellations provided for by the policy. If cancellations may be affected by the giving of notice to the insured by the insurer, the policy shall provide for the lapse of such number of days following the giving of such notice that in the ordinary course of transmission the insured will have actually received such notice at least thirty (30) days before the cancellation becomes effective. Notice of cancellation shall also be delivered to Owner not less than thirty (30) days prior to such lapse or termination.

22

**5.13  Indemnification and Defense.** (a)  The  Redeveloper  agrees  to indemnify and hold harmless the Borough against, and the Redeveloper shall pay for, any and all liability, loss, cost, damage, claims, judgments, legal fees and costs or expenses, of any and all kinds or nature and however arising, imposed by law, which the Borough may sustain, be subject to or be caused to incur by reason of any claim, suit or action based upon personal injury, death, or damage to property, whether real, personal or mixed, resulting from the Redeveloper's activities in constructing the Project or the Redeveloper's actual breach of contracts entered into by the Redeveloper which directly relate to the construction of the Project, or resulting solely from the Redeveloper's ownership of the Property, or resulting from the acquisition, construction or installation of the Project. Further, said indemnification shall include but not be limited to any and all claims by workmen, employees and agents of the Redeveloper and unrelated third parties, which claims result from the construction of the Project, the maintenance and functioning of the Improvements and Public Improvements or any other activities of the Redeveloper within the Property during the construction of the Project. Neither the Borough or its Council Members, commissioners, officers, agents, servants or employees shall be liable in any event for any action performed under this Agreement, except for any claim or suit arising from negligent, intentional or willful acts of the Borough, its Council Members, commissioners, officers, agents, servants or employees.

(b)  The Redeveloper, at its own cost and expense, shall defend any and all such claims, suits and actions, as described in and for which indemnification is required by this Section 5.13, which may be brought or asserted against the Borough, its Council Members, commissioners, officers, agents, servants or employees; but this provision shall not be deemed to relieve any insurance company which has issued a policy of insurance as may be provided for in this Agreement from its obligation to defend the Redeveloper, the Borough and any other insured identified in such policy of insurance in connection with claims, suits or actions covered by such policy. Any cost for reasonable attorneys' fees in situations where it is necessary for the Borough to engage its own attorneys, reasonable experts' testimony costs and all reasonable costs to defend the Borough or any of its Council Members, commissioners, officers, agents, servants, or employees shall be reimbursed to it by the Redeveloper in connection with such indemnification claim. The Borough shall give the Redeveloper notice of any such claim for which indemnification under this Agreement is sought (together with copies of any documents received) within Fifteen (15) Days of the Borough's receipt of same.

**5.14  Project Signage.**  Redeveloper shall work with the Borough to place signage on the Property within 30 days of obtaining Governmental Approvals that contains a rendering or renderings of the finished Project, and indicates that the Project is made possible in the community as a result of the efforts of the Redeveloper and Borough. The Borough will provide the Redeveloper with the exact specifications and locations for any signage produced in accordance with the Article.

**5.15  Project Renderings.** Redeveloper shall make renderings of the finished Project available to the Borough for use at public presentations, and to further market the Borough for economic development.

## ARTICLE 6.

## PROHIBITIONS

6.01.    **Prohibition Against Transfers of Interests in Redeveloper.** Prior to completion of the Project as evidenced by the issuance of a Certificate of Completion, and without the prior written approval of the Borough, which approval shall not be unreasonably withheld, Redeveloper agrees for itself and any successor in interest that:

(1)  There shall be no transfer by any owner of any equity interest in Redeveloper, or by any successor in interest to such owner, of any interest in Redeveloper.

(2)  Nor shall any such owner or successor in interest suffer any such transfer to be made, except due to death, but excluding transfers among existing members;

(3)  Nor shall such owner or successor in interest make, or suffer to be made, any other change in the ownership of any equity interest in Redeveloper except as hereinabove provided, or with respect to the identity of the parties in control of Redeveloper or the relative degrees of their control, by any other method or means, whether by increased capitalization, merger with another corporate, partnership or limited liability entity, or otherwise. With respect to this provision, Redeveloper and the party(ies) signing the Agreement on behalf of Redeveloper represent that each party has authority of all its owners to agree to this provision on their behalf and to bind them with respect thereto. For the purpose of this Agreement, the term "owners" is defined to include the general partners of a partnership, the stockholders of a corporation or the members of a limited liability company.

(4)  If approval of the Borough is sought for a transfer, Redeveloper will pay an administrative fee equivalent to One Thousand Dollars ($1,000.00), and shall pay in addition thereto, any Borough Costs associated obtaining the Borough's approval.

The following transfers of interests in the Redeveloper shall be deemed to be approved without any approval by the Borough: (a) assignments among the principals of Redeveloper and their immediate family members; and (b) assignments by the principals of Redeveloper for estate planning and tax purposes.

6.02.    **Transfer of Redevelopment Agreement.** Redeveloper further agrees for itself, its successors and assigns, that prior to the completion of the Project or any portion thereof, as evidenced by the issuance of a Certificate of Completion it will not make or create, or suffer to be made or created, any sale, assignment, conveyance, lease or transfer in any other mode or form (collectively, the "Transfers") of its interests in the Project or its interest in this Agreement, without the prior written approval of the Borough, except as provided below, which consent shall not be unreasonably withheld.

24

In the event that the Borough consents to a Transfer, the Transferor shall be released from the obligations of this Agreement only to the extent or limit of the authorized Transfer.

**6.03. Exemption from Prohibited Transfers.** Notwithstanding the foregoing, and with the consent of the Borough, it shall not constitute a prohibited transfer, for purposes of Section 6.02 if after Final Site Plan Approval has been obtained, Redeveloper assigns its rights under this Agreement upon the following conditions: (i) the assignee of Redeveloper must be an entity controlling, controlled by, or under common control of Redeveloper including but not limited to an urban renewal entity formed by Redeveloper pursuant to N.J.S.A. 40A:20-4;  (ii) the assignee of Redeveloper shall assume all of the obligations of Redeveloper hereunder, but Redeveloper shall remain primarily liable for the performance of Redeveloper's obligations, (iii) a copy of the fully executed written assignment and assumption agreement shall be promptly delivered to the Borough, and (iv) such assignment does not violate any of the Government Approvals.

In addition, nothing contained in this Agreement shall prohibit, nor require the consent of the Borough, to transfer individual condominium units to the ultimate purchaser of such units.

**6.04. Consent to Permitted Transfers.** The Borough hereby consents, without the necessity of further approvals or payment of the administrative fee set forth in Section 6.01(4) from any entity, to the following Transfers: (i) a Mortgage or related security granted by Redeveloper to a Mortgagee for the purpose of obtaining the financing necessary to enable Redeveloper to perform its obligations under this Agreement with respect to Completion of the Project and any other purpose authorized by this Agreement and (ii) any Mortgage or Mortgages and other liens and encumbrances granted by Redeveloper to a Mortgagee for the purpose of financing costs associated with the development, construction, and marketing of the Project. With respect to any of the Transfers listed in this Section 6.04, Redeveloper shall provide to the Borough written notice of at least fifteen (15) days prior to such Transfer, including a description of the nature of such Transfer, and the name(s) and address(es) of the transferee and any parties, individuals and/or entities comprising such Transfers.

**6.05. Prohibition Against Speculative Development.** Because of the importance of the development of the Property to the general welfare of the community, Redeveloper represents and agrees that Redeveloper's undertakings pursuant to this Agreement are, and will be used, for the purpose of the redevelopment of the Property as provided herein and not for speculation in land holding.

**6.06 Conditions of Transfer.** In the event that the Redeveloper requests the Borough's prior written approval for a transfer of interest the Borough shall be entitled to require, as a condition of approval of any transfer that (i)  the proposed Transferee will have qualifications and financial responsibility necessary and adequate to fulfill the obligations undertaken in this Agreement with respect to the transferred portion of the Project and other obligations pursuant to Governmental Approvals or any part of such obligations that may pertain to the transferred interest or the transferred portion of the

Project, as determined from (1) Audited financial statements indicating (a) net worth or (b) unencumbered lines of credit; or evidence of loan commitments sufficient to carry out the relevant aspect of the Project; and (2) Submission of letters of recommendation from reputable Parties for whom the prospective transferee has undertaken a comparable development, stating that the proposed transferee of the relevant aspect of the Project possesses the competence and integrity to undertake same; and (ii) any proposed transferee, by instrument in writing reasonably acceptable to the Borough, will, for itself and its Transferees, and expressly for the benefit of the Borough, have expressly assumed all of the relevant obligations of the Redeveloper under this Agreement with respect to the Project and agrees to be subject to all the Covenants and Restrictions to which the Redeveloper is subject; and (iii) the Transferee will comply with such other reasonable conditions as the Borough may find necessary in order to achieve and safeguard the purposes of the Redevelopment Plan.

6.07 **Transfers in Violation of this Agreement.** Any Transfer in violation of this Agreement shall be deemed to be an Event of Default and shall be null and void *ab initio*. The occurrence of such Event of Default shall entitle the Borough to seek all available remedies under the terms of this Agreement, including the right to terminate this Agreement, and all other remedies available under the Applicable Law(s).

## ARTICLE 7.

## PROJECT AND MORTGAGE FINANCING

7.00 **Submission of Financial Package.** In the event that the Redeveloper intends to seek financing for the Project the Redeveloper represents that it shall use its best efforts to obtain sufficient financing for all costs associated with the Project. The Redeveloper represents that such financing may be a combination of debt financing, equity financing and an equity contribution of the Redeveloper and may be obtained in coordination with the phased development of the Project. On or prior to the earlier to occur of (i) ninety (90) days after the Redeveloper has obtained all Governmental Approvals with respect to the applicable phase of the Project, or (ii) ninety (90) days prior to Commencement of Construction on such phase of the Project, the Redeveloper shall submit a financial package that the Redeveloper believes to be complete that describes the anticipated sources of funding for that phase of the Project, including, but not limited to, commitments to construction financing required for that Phase of the Project and a representation regarding any equity capital necessary for the Commencement of Construction of the relevant phase of the Project.

7.01. **Mortgage.** Except as to financing conducted through recognized chartered banks and/or licensed insurance lenders or by an Affiliate of the Redeveloper, the Redeveloper shall request authority from the Borough (which shall not be unreasonably withheld) in writing in advance of any proposed financing secured by a mortgage or other similar lien instrument, which it proposes to enter into with respect to the Project, or any part thereof, and in any event Redeveloper shall promptly notify the Borough of any encumbrance or lien that has been created on or attached to the Project in

connection with any financing of the Project obtained by Redeveloper; or, by involuntary act of the Redeveloper or others, upon obtaining knowledge or notice of same.

**7.02. Obligations of Mortgagee.** Notwithstanding any of the provisions of this Agreement, including but not limited to those which are or are intended to be covenants running with the land, the holder of any mortgage authorized by this Agreement, including any such holder who obtains title to the Property or any part thereof as a result of foreclosure proceedings, or action in lieu thereof, but not including (a) any other party who thereafter obtains title to the Property or such part from or through any such holder or (b) any other purchaser at foreclosure sale (other than the holder of the mortgage itself) shall in no way be obligated by the provisions of this Agreement to construct or complete the Project or to guarantee such construction or completion; provided that nothing in this Article or any other Article or provision of this Agreement shall be deemed or construed to permit or authorize any such holder to devote the Property or any part thereof to any uses, or to construct any Project thereon, other than those uses provided or permitted under the Redevelopment Plan, Governmental Approvals and Applicable Law.

**7.03. Notice of Default to Mortgagee and Right to Cure.** Whenever the Borough shall deliver any notice or demand to the Redeveloper with respect to any breach or default by the Redeveloper under this Redevelopment Agreement, the Borough shall at the same time deliver to each lender (or equity participant in Redeveloper) a copy of such notice or demand, provided that the Redeveloper has delivered to the Borough a written notice of the name and address of such lender and equity participant. Each such lender shall (insofar as the rights of the Borough are concerned) have the right at its option within ninety (90) days after the receipt of such notice, to cure or remedy, or to commence to cure or remedy, any such default with respect to that portion of the Project which is being financed by such lender and which is subject to being cured and to add the cost thereof to the debt and the lien which it holds, or to the obligations of the lessees under any lease-back or of the guarantor under any other conveyance for financing.

Notwithstanding the foregoing, in the event of any breach or default with respect to the deadlines for commencement and completion of construction of the Project set forth in Section 5.08, the Borough agrees that any notice to a Mortgagee will not be served simultaneously with the notice to the Redeveloper, but instead will be served forty five (45) days after notice of breach or default to Redeveloper if Redeveloper has not cured the breach or default.

**7.04. Estoppel Certificate.** Within forty five (45) days following written request therefore by the Redeveloper, or of any lender, purchaser, tenant or other party having an interest in the Project, the Borough shall issue a signed estoppel certificate either stating this Redevelopment Agreement is in full force and effect and that there is no default or breach under this Redevelopment Agreement, or stating the nature of the default or breach or event, if any. In the event the estoppel certificate discloses such a default, breach or event, it shall also state the manner in which such default, breach and/or event may be cured. No more than a reasonable number of estoppel certificates may be requested per year.

## ARTICLE 8.

## EVENTS OF DEFAULT

8.01.   **Events of Default.** Any one or more of the following shall constitute an Event of Default hereunder, subject to Force Majeure and tolling as provided elsewhere in this Agreement:

(1)   Failure of Redeveloper or the Borough to observe and perform any covenant, condition, representation, warranty or agreement hereunder, and continuance of such failure for a period of thirty (30) days, after receipt by the defaulting party of written notice from the non-defaulting party specifying the nature of such failure and requesting that such failure be remedied, unless such delay is the direct cause of a governmental entity relating to an issue over which the Redeveloper has no control, or is not otherwise responsible for such governmental entities actions concerning the default or delay.

(2)   (i) Redeveloper shall have applied for or consented to the appointment of a custodian, receiver, trustee or liquidator of all or a substantial part of its assets; (ii) a custodian shall have been legally appointed with or without consent of Redeveloper; (iii) Redeveloper, (A) has made a general assignment for the benefit of creditors, or (B) has filed a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or has taken advantage of any insolvency law; (iv) Redeveloper has filed an answer admitting the material allegations of a petition in any bankruptcy or insolvency proceeding; or (v) Redeveloper shall take any action for the purpose of effecting any of the foregoing; (vi) a petition in bankruptcy shall have been filed against Redeveloper, and shall not have been dismissed for a period of ninety (90) consecutive days; (vii) an Order for Relief shall have been entered with respect to or for the benefit of Redeveloper, under the Bankruptcy Code; (viii) an Order, judgment or decree shall have been entered, without the application, approval or consent of Redeveloper, by any court of competent jurisdiction appointing a receiver, trustee, custodian or liquidator of Redeveloper, or a substantial part of its assets and such order, judgment or decree shall have continued unstayed and in effect for any period of ninety (90) consecutive days; (ix) Redeveloper shall have suspended the transaction of its usual business.

(3)   Redeveloper shall default in or violate its obligations with respect to the construction of the Project in accordance with this Agreement, the Redevelopment Plan, the Redevelopment Project Schedule, Governmental Approvals or Applicable Laws or including but not limited to failure to comply with the Commencement of Construction and Completion of Construction, shall abandon or substantially suspend construction work and any such default, violation, abandonment or suspension shall not be cured, ended, or remedied within thirty (30) days after written demand by the Borough to do so (provided that it shall not be an event of default if Redeveloper is proceeding with due diligence to remedy the same as soon as practicable).

28

(4)     The Project shall not be complete, as evidenced by the issuance of a Certificate of Completion on the Completion Date.

(5)     Redeveloper, its successor or assigns shall fail to pay any application or permit fees in furtherance of any Governmental Approvals, or connection fees resulting therefrom, or real estate taxes, assessments, or PILOTs (as defined herein) on the Property or any part thereof when due, shall fail to pay any payments required under this Agreement, or shall place on the Property any encumbrance or lien unauthorized by this Redevelopment Agreement, or shall suffer any levy or attachment to be made, or any materialmen's or mechanics' lien, or any other unauthorized encumbrance or lien to attach and such real estate taxes or assessments shall not have been paid, or the encumbrance or lien removed or discharged or provision satisfactory to the Borough made for such payment, removal, or discharge, within thirty (30) days after written demand by the Borough to do so.

(6)     There is, in violation of this Redevelopment Agreement, a transfer or assignment as prohibited in Article 6.

(7)     The Redeveloper fails to make a payment of any sums payable to the Borough, as same shall become due and payable, and such failure to pay shall have continued for a period of (30) days after Redeveloper's receipt of written notice specifying its failure to make such payment.

**8.02.   Remedies of Borough Upon Event of Default.** Whenever any Event of Default of Redeveloper shall have occurred and be continuing after the expiration of any applicable cure period, the Borough may seek to terminate this Agreement. Upon termination of this Agreement the Borough shall have the right to specific performance, injunction or any other remedy available at law or in equity and the right to use the Performance Bond to complete construction of any Public Improvements. The Borough's remedies are not limited to those set forth in this Agreement; the Borough retains at all times its delegated governmental powers to undertake enforcement action to stop, abate and ameliorate any issue or circumstance affecting the public health, public safety and public welfare of its residents.

**8.03.   Remedies of Redeveloper Upon Event of Default.** Whenever any Event of Default of the Borough shall have occurred and be continuing, the Redeveloper may seek specific performance, injunction or any other remedy available at law or in equity.

**8.04.   Restoration of Status.** In case the Borough or Redeveloper, as applicable, shall have proceeded to enforce its rights under this Redevelopment Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Borough or Redeveloper, as applicable, then and in every such case, Redeveloper and the Borough shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and

powers of Redeveloper and the Borough shall continue as though no such proceedings had been taken.

**8.05.  Failure or Delay by Either Party.**  Except as otherwise expressly provided in this Redevelopment Agreement or the Project Milestones attached hereto as **Exhibit B**, any failure or delay by either party in asserting any of its rights or remedies as to any default, shall not operate as a waiver of any default, or any such rights or remedies, or deprive either such party of its right to institute and maintain any actions or proceedings which it may deem necessary to protect, assert or enforce any such rights or remedies.

**8.06.  Remedies Cumulative.**  No remedy conferred by any of the provisions of this Redevelopment Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**8.07  Certificate of No Default.**  The Redeveloper shall deliver to the Borough on each anniversary of the Effective Date, a certificate signed by its authorized representative to the effect that (a) the Redeveloper is not aware of any condition, event or act which constitutes a violation of this Agreement or which would constitute an Event of Default, and (b) no condition, event or act exists which, with notice or lapse of time, or both, would constitute an Event of Default; or (c) if any such condition, event or act exists, specifying same.

## ARTICLE 9.

## TERMINATION RIGHTS

**9.01  Additional Termination Rights of Borough**  In the event that the Redeveloper substantially abandons or suspends construction of the Project for a period in excess of One Hundred Eighty (180) Days as a result of a Tolling Event not caused by the act or omission of the Borough hereunder or a period in excess of One Hundred Twenty (120) Days not resulting from the occurrence of Event of Force Majeure or other Tolling Event, then, whether or not an Event of Default by the Redeveloper has been declared by the Borough, the Borough shall have the right to terminate this Agreement.

Nothing in this Section 9.01 shall prevent the Borough from declaring that an Event of Default by the Redeveloper hereunder has occurred or from pursuing any of its other remedies hereunder.

## ARTICLE 10.

## ~~INTENTIONALLY OMITTED~~

## ARTICLE 11.

### DELAYS

**11.01. Force Majeure.** For the purposes of any of the provisions of this Agreement, neither the Borough nor Redeveloper, as the case may be, nor any successor in interest, shall be considered in breach of, or in default with respect to its obligations hereunder because of any delay in the performance of such obligations arising from an Event of Force Majeure as defined herein. It is the purpose and intent of this provision that in the event of the occurrence of any such enforced delay, the time or times for performance of the obligations of the Borough or Redeveloper shall be extended for the period of the delay.

**11.02 Notice of Event of Force Majeure.** The Party who seeks the benefit of the above described modification/extension shall, within Thirty (30) Days after that Party's actual discovery of any such Event of Force Majeure or other Tolling Event, notify the other Party in writing of the Event of Force Majeure or the Tolling Event, and of the cause(s) thereof, and therein a modification/extension of the term and an extension for the period of the enforced delay. The performance or non-performance by the Parties or either of them of any obligation, requirement, commitment or responsibility set forth in this Agreement shall not be deemed to be the Event of Default pursuant to this Agreement where such performance, failure of performance or delay in performance is/are the result of an Event of Force Majeure or other Tolling Event; provided, however, that the Event of Force Majeure or other Tolling Event was not the result of any unlawful action or non-action of the Party relying on such Event of Force Majeure or other Tolling Event as justification for the non-performance, failure of performance or delay in performance of the subject obligation, requirement, commitment or responsibility. Where either Party alleges that as a result of an Event of Force Majeure or a Tolling Event the aggrieved Party is unable to perform or not perform any aspect of this Agreement, the aggrieved Party shall send proper written notice to the other identifying the Event of Force Majeure or Tolling Event alleged to have occurred.

## ARTICLE 12.

### CONTINGENCIES

**12.01 Governmental Approvals Contingency.** In addition to the terms and conditions concerning the Redeveloper's obligation to obtain Governmental Approvals:

(1) Redeveloper agrees to proceed in good faith and at its own cost and expense to obtain all Governmental Approvals to develop and construct the Project in accordance with the Redevelopment Project Schedule. Redeveloper agrees that it shall not seek any use variances pursuant to N.J.S.A. 40:55D-70(d) in connection with its applications for the Governmental Approvals.

31

(2) No Governmental Approval shall be deemed "final" until (i) the time for all appeals has run without the filing of an such appeal or (ii) in the event an appeal is filed, all such appeals have been resolved fully in favor of Redeveloper and the time for filling any further appeals has expired without the filling of any such appeals.

(3) In the Event that Redeveloper's application for any Governmental Approval is denied, Redeveloper shall have the option, in its sole discretion, to appeal that denial at Redeveloper's sole cost and expense.

(4) In the event that any application by Redeveloper for a Governmental Approval is denied and either (i) the time for appeal has expired without Redeveloper filing an appeal from such denial or (ii) Redeveloper has filed an appeal from such denial and said appeal has been resolved against Redeveloper, either party shall have the option to terminate this Agreement by providing notice to the other party to that effect.

(5) In the event the Borough is unable to purchase and/or acquire properties Redeveloper could not purchase, Redeveloper shall have the right to terminate this Agreement.

## ARTICLE 13.

## COOPERATION AND COMPLIANCE

**13.01. Implementation of Agreement and Redevelopment Plan.** The parties hereto agree to cooperate with each other and to provide all necessary and reasonable documentation, certificates and consents in order to satisfy the terms and conditions hereof and the terms and conditions of the Plan. The Borough further agrees to cooperate as may be reasonably requested by any mortgagee of the Redeveloper in connection with obtaining financing for the Project; provided, however, that all Borough Costs associated with such action shall be borne by the Redeveloper.

## ARTICLE 14.

## MISCELLANEOUS

**14.01. Conflict of Interest.** No member, official or employee of the Borough shall have any direct or indirect interest in this Redevelopment Agreement, nor participate in any decision relating to the Agreement that is prohibited by law.

**14.02. No Consideration For Agreement.** The Redeveloper warrants it has not paid or given, and will not pay or give, any third person any money or other consideration for obtaining this Redevelopment Agreement, other than normal costs of conducting business and costs of professional services such as architects, engineers, financial consultants and attorneys. The Redeveloper further warrants it has not paid or incurred

any obligation to pay any officer or official of the Borough, any money or other consideration for or in connection with this Redevelopment Agreement.

**14.03. Non-Liability of Officials and Employees of the Borough.** No member, official or employee of the Borough shall be personally liable to the Redeveloper, or any successor in interest, in the event of any default or breach by the Borough, or for any amount which may become due to the Redeveloper or its successor, or on any obligation under the terms of this Redevelopment Agreement.

**14.04. Non-Liability of Officials and Employees of the Redeveloper.** No member, officer, shareholders, director, partner or employee of the Redeveloper, and no member, officer, shareholders, director, partner or employee of the members of the Redeveloper or the members of the Redeveloper shall be personally liable to the Borough, or any successor in interest, in the event of any default or breach by the Redeveloper or for any amount which may become due to the Borough, or their successors, on any obligation under the terms of this Redevelopment Agreement.

**14.05. Inspection of Books and Records.**

(1) The Borough shall have the right at all reasonable times to inspect the books and records of the Redeveloper pertinent to the purposes of this Redevelopment Agreement, including but not limited to construction contracts, books and records, leases, insurance policies, and agreements.

(2) The Redeveloper shall have the right at all reasonable times to inspect the books and records of the Borough pertinent to the purposes of this Redevelopment Agreement.

(3) Such inspections must be performed at a time and in a manner as to not unreasonably interfere with the business operations of the party whose books and records are being inspected and be for a legitimate business purpose affecting the material interest of the party seeking the inspection.

**14.06. Approvals by the Borough and the Redeveloper.** Wherever this Redevelopment Agreement requires the approval or consent of the Borough or the Redeveloper, or any officers, agents or employees of either the Borough or the Redeveloper, such approval shall not be unreasonably withheld or conditioned, and approval or disapproval shall be given within the time set forth in this Agreement, or, if no time is given, within fifteen (15) days, unless formal action of the Governing Body is required, in which case, within forty five (45) days.

**14.07. Modification of Agreement.** No modification, waiver, amendment, discharge, or change of this Redevelopment Agreement shall be valid unless the same is in writing, duly authorized, and signed by the Redeveloper and the Borough.

14.08.  Notices and Demands.  A notice, demand or other communication under this Agreement by any party to the other shall be sufficiently given or delivered if dispatched by United States Registered or Certified Mail, postage prepaid and return receipt requested, or delivered by overnight courier or delivered personally (and receipt acknowledged) to the parties at their respective addresses set forth herein, or at such other address or addresses with respect to the parties or their counsel as any party may, from time to time, designate in writing and forward to the others as provided in this Section 14.08. Notice shall be effective upon the earlier of receipt or refusal.

**BOROUGH OF EMERSON AGENCY**
Robert Hoffmann, Borough Administrator
Municipal Building
146 Linwood Avenue
Emerson, New Jersey 07630

With a copy to:

Douglas F. Doyle
DeCotiis, Fitzpatrick, & Cole, LLP
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666
Facsimile Number 201-928-0588

And

Emerson Redevelopers, LLC and JMF Properties
c/o JMF Properties
80 S. Jefferson,
Whippany, NJ 07981

With a copy to:

Carl Kemph
6 Hampshire Court
Springfield, NJ 07081

14.9   Title of Articles and Sections.  The titles of the several Articles and Sections of this Agreement, as set forth in the Table of Contents or at the heads of said Articles and Sections, are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of its provisions.

14.10.  Severability.  The validity of any Articles, clause or provision of this Agreement shall not affect the validity of the remaining Articles, clauses or provisions hereof.

34

**14.11.  Successors Bound.**  This Agreement shall be binding upon the respective parties hereto and their successors and assigns provided however, that this Agreement may not be assigned by either party during the Construction Period.

**14.12.  Governing Law.**  This Agreement shall be governed by and construed by the laws of the State of New Jersey. Any legal action filed in this matter shall be heard in Superior Court of New Jersey, Bergen County Vicinage.

**14.13.  Borough Approvals.**   All approvals or disapprovals required by the Borough shall, unless otherwise stated herein, be valid if given in writing by the Mayor or his designee.

**14.14.  Counterparts.**   This Agreement may be executed in counterparts. All such counterparts shall be deemed to be originals and together shall constitute but one and the same instrument.

**14.15.  Exhibits.**   Any and all Exhibits annexed to this Agreement are hereby made a part of this Agreement by this reference thereto.

**14.16.  Reporting.**  Notwithstanding anything contained herein to the contrary, Redeveloper's reporting requirement as to progress of construction shall be the reports required in **Exhibit C.**

**14.17.  Entire Agreement.**   This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior oral and written agreements between the parties with respect to the subject matter hereof.

**14.18.  Effective  Date.**     Anything herein contained to the contrary notwithstanding, the effective date of this Agreement shall be the date this Agreement has been last executed by either the Redeveloper or Borough whichever party shall execute last.

**14.19.  Review by Counsel.**  This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey without regard to or any presumption or other rule requiring construction against the party drawing or causing this Agreement to be drawn since counsel for both the Redeveloper and the Borough have combined in their review and approval of same.

**14.20.  Eminent Domain**  The Borough agrees that it will not exercise any powers of eminent domain against the Property that is owned or controlled by EMRED or its transferee, unless EMRED breaches this Agreement or is otherwise in default, in which case, EMRED waives its right to object to or challenge the Borough's right to acquire EMRED's property through eminent domain.

**14.21.  First Source Employment.**   Until the issuance of the Certificate of Completion Redeveloper shall make good faith efforts to employ, and shall provide in its

35

contracts with its General Contractors that they must make good faith efforts to employ qualified residents of the Borough in the construction of the Project. Redeveloper's good faith efforts will include without limitation cooperating with the Borough in job fairs and similar endeavors and giving adequate consideration to potential employees and businesses as referred by the Borough. In addition, consistent with market wages and to the extent it is commercially feasible, Redeveloper shall make good faith efforts that qualified residents of the Borough and businesses located in the Borough are afforded a fair opportunity to be employed in the operation of the Project. Inclusion of the requirements of this section in Redeveloper's general contract agreements shall fully satisfy this obligation of Redeveloper under this section. Redeveloper, in its sole discretion, shall determine if, and the extent to which, it shall employ qualified residents of, or businesses located in, the Borough, and the extent, if at all, to which Redeveloper shall use union labor for the construction of the Project.

**14.22. Equal Employment Opportunity.** The Redeveloper agrees that during the construction of the Improvements:

(a)     To the extent required by Applicable Law, the Redeveloper will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Redeveloper will take affirmative action to insure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Redeveloper agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause and any such notices provided by the Borough which are consistent therewith.

(b)     To the extent required by Applicable Law, the Redeveloper will, in all solicitations or advertisements for employees placed by or on behalf of the Redeveloper state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(c)     To the extent required by Applicable Law, subcontractors and suppliers to the Project shall to the extent that it is commercially feasible include qualified and certified minority enterprises.

(d)     To the extent required by the Applicable Law, the obligations in this Section shall be binding on all contractors and subcontractors to the extent that any work is done by any contractor or subcontractor, and any contract entered into by the Redeveloper shall so provide.

**14.23 Drafting Ambiguities; Interpretation.** In interpreting any provision of this Agreement, no weight shall be given to, nor shall any construction or interpretation be influenced by, the fact that counsel for one of the Parties drafted this Agreement, each

36

Party acknowledging that it and its counsel have had an opportunity to review this Agreement and have contributed to the final form of same.

**14.24  Withholding of Approvals.** All approvals, consents and acceptances required to be given or made by any Person or party, shall not be unreasonably withheld or delayed.

**14.25  Recitals Incorporated; Definitions Incorporated.** The Recitals to this Agreement and the Definitions contained in this Agreement are incorporated by reference into this Agreement, as if set forth at length herein.

**14.26  Limitation on Liability.** Notwithstanding anything to the contrary in this Agreement, any liability(ies), commitments, obligations and/or responsibility or responsibilities of any type or kind whatsoever (whether actual, contingent, consequential or otherwise) (hereinafter referred to collectively as "Liability") of the Redeveloper in, resulting from, or relating in any way to this Agreement shall be those of the Redeveloper only. Nothing in this Agreement, arising out of, or related in any way to this Agreement or to the Project or any aspect thereof shall, in any way, give the Borough or any other Person recourse to, or be construed to impose, directly or indirectly, any Liability on any Person other than the Redeveloper.

The foregoing limitation on Liability shall apply to, but is not limited to, (i) any Affiliate of the Redeveloper or of the Redeveloper's members, (ii) any member, shareholder, manager, officer, director, partner, managing member, vendor, venturer, trustee, employee, agent, and/or other representative (hereinafter collectively referred to as the "Agent") of the Redeveloper or of the Redeveloper's members, (iii) any Agent of any Affiliate of the Redeveloper or of the Redeveloper's members, (iv) any Affiliate of any Agent of the Redeveloper or of the Redeveloper's members, (v) any Agent of any Agent of the Redeveloper or of the Redeveloper's members, (vi) any Person directly or indirectly holding, controlling and/or owning any interest in the Redeveloper or in the Redeveloper's members, in any Agent or Affiliate of the Redeveloper or of the Redeveloper's members, in any Agent of any Affiliate of the Redeveloper or of the Redeveloper's members, and/or in any Affiliate of any Agent of the Redeveloper or of the Redeveloper's members, and/or (vii) any successors and/or assigns of any of the Parties referenced in subsections (i) through (vi), above unless the Parties have assumed an interest in the Project in accordance with a Permitted Transfer and Article 6 hereof.

The Borough understands and acknowledges that its respective acceptance of the Limitation on Liability set forth in this Section is a condition precedent to the Redeveloper's execution of this Agreement and constitutes specifically bargained-for consideration. The terms of this Section shall in no way limit the indemnification of the Borough as provided for in Article 5 hereof.

**14.27  Borough's Limitation on Liability.** Any liabilities, obligations or responsibilities of any type or kind (contingent or otherwise) herein are solely those of the Borough. No member, director, employee, officer, representative or agent of the

37

Borough shall be liable to the Redeveloper or any other Person for any matter arising out of or related to the payment or performance of any such liabilities, obligations or responsibilities of the Borough in this Agreement.

**14.28 Limitation on Third Parties.** Nothing in this Agreement is intended to nor shall create any rights for or confer any benefits on any third person or party.

**14.29 No Brokerage Commissions.** The Borough and the Redeveloper each represent one to the other that no real estate broker initiated, assisted, negotiated or consummated this Agreement as broker, agent, or otherwise acting on behalf of either the Borough or the Redeveloper, and the Borough and the Redeveloper shall indemnify each other with respect to any claims made by any person, firm or organization claiming to have been so employed by the indemnifying party.

**14.30 Maintenance.** The Redeveloper shall be responsible for the maintenance and security of each parcel of property contained within the Property subject to the terms of this Agreement subsequent to its acquisition of title to each such parcel of property and until such time as the Redeveloper no longer owns or leases the Property or any portions thereof.

**14.31 Lender Changes.** If the Redeveloper's Financial Institution(s) requires modifications of the terms of this Agreement, the Borough shall reasonably cooperate with the Redeveloper in approving such modifications, so long as such modifications do not materially and substantially change the rights or obligations of the Borough as set forth in this Agreement and, in the reasonable opinion of the Borough, do not materially impair the objectives and interest of the Borough or render the completion of the Project or any Phase thereof in jeopardy.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be properly executed and their corporate seals affixed and attested as of the date first written above.

**BOROUGH OF EMERSON**

By: _____
Name: Louis Lamatina
Title: Mayor

**REDEVELOPER**
**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

By: _____
Name: Joseph Forgione
Title: Managing Member

38

## EXHIBIT A
### Property Description

| Property Owner | Block | Lots | Property Address |
|---|---|---|---|
| Angelo and Jane Giambona | 419 | 1 | 19 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 2 | 15 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 3 | 9 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 4 | 214 Kinderkamack |
| Borough of Emerson | 419 | 7 | |
| Dolores, Della Volpe Trste | 419 | 6.01 | 190 Kinderkamack |
| Yaghoob Pousty | 419 | 6.02 | 184 Kinderkamack |
| 182 Emerson, LLC | 419 | 8 | 182 Kinderkamack |
| 182 Emerson, LLC | 419 | 10 | 78 Linwood |

Exhibit B

Concept Plan







**Exhibit C**

**Project Schedule and Reporting Requirements**

**Project Schedule**

By Redeveloper - Attached

**Reporting Requirements:**

Based on the attached Project Schedule, in addition, on or before the first day of each month after the Commencement Date, redeveloper shall provide report for the prior month to date identifying the following:

1. Status of property acquisition (if still applicable).
2. Status of application to Land Use Board (if still applicable);
3. Status of posting bonds and schedule for Commencement Date (if applicable);
4. Public Improvements performed to date;
5. Other private improvements performed to date;
6. Schedule for Public Improvements and non-public work to be performed in the following month;
7. Anticipated Completion Date and any explanation of revisions to the Anticipated Completion date from previous Monthly Reports;



EMERSON MIXED USED DEVELOPMENT
KINDERKAMACK ROAD, EMERSON, NEW JERSEY
PRELIMINARY CONSTRUCTION SCHEDULE

Exhibit E

Funding Agreement

## FUNDING AGREEMENT

**THIS FUNDING AGREEMENT** is dated this 6 day of ~~April~~ *May* 2016 among the **BOROUGH OF EMERSON**, a municipal corporation with offices at 146 Linwood Ave., Emerson, NJ 07630 (the "Borough") and **EMERSON REDEVELOPERS, LLC**, with offices located at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as "ERD");

### W-I-T-N-E-S-S-E-T-H:

**WHEREAS**, ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the ~~Township~~ *Borough* as Block ___419___; Lots 1,2,3,4,6.01, 6.02, 8, + 10 (the "Property"); and

**WHEREAS**, the Borough wishes to designate a redeveloper for the Redevelopment Area encompassing the Property; and

**WHEREAS**, ERD proposes to design, develop, finance and construct 134 units and 13,000 square feet of retail space ("the Project") and accordingly has requested the Borough consider appointing ERD as redeveloper for the Property; and

**WHEREAS**, ERD has agreed to pay the Application Fee as set forth herein and bear the costs for the Borough's professionals to assist the Borough in reviewing, among other things, whether ERD should be designated redeveloper for the Property, and in connection therewith has agreed to establish an escrow fund with the Borough to provide for the payment of professional fees, costs and expenses related thereto incurred by the Borough (the "Interim Costs");

**NOW, THEREFORE**, for and in consideration of the mutual promises, representations, covenants and agreements contained herein and the undertakings of each Party to the other and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby and to bind its successors and assigns, do mutually promise, covenant and agree as follows:

1. **Payment of Interim Costs.**

   Immediately upon the execution of this Funding Agreement, ERD shall pay Ten Thousand Dollars ($10,000) (the "Escrow") to the Borough and the Borough shall deposit such funds into an escrow account established by it for the payment of the Interim Costs. Prior to the Borough's withdrawal of funds from the Escrow for the payment of the Interim Costs, the Borough shall provide ERD with a copy of each invoice reflecting Interim Costs to be paid. Unless ERD promptly (within fifteen (15) days of its receipt of any such copy) provides a written objection to any invoiced item as not being an Interim Cost, the Borough shall be free to withdraw funds from the Escrow for the payment of such invoiced services. If, when and as

1908805

often as may occur that the Escrow is drawn down to or below Three Thousand Five Hundred Dollars $3,500 then ERD, upon the Borough's request, shall immediately provide to the Borough for deposit an additional amount sufficient to replenish the escrow to Ten Thousand Dollars ($10,000) for use in accordance with these terms.

Interim Costs, for the purposes of this Funding Agreement, shall include the reasonably incurred out-of-pocket fees, costs and expenses incurred by the Borough (both before and after execution hereof) in reviewing the proposed development of the Property, including, but not limited to, fees for legal, engineering, planning and financial advisory services, including subsequent investigations and studies as may be reasonably determined and agreed to by the parties.

2.    Application Fee -- Prior to the execution of a formal Redeveloper's Agreement the Borough shall imposes a non-refundable fee in an amount to be determined based on the final concept plan, with any adjustment to the fee to be paid, if appropriate, when the Redevelopment Agreement is executed.

3.    Notice. Any notice provided to the Borough hereunder shall be submitted in writing to:

    Jane Dietsche, RMC, Borough Clerk
    146 Linwood Ave.
    Emerson, NJ 07630

    with copies to:

    Douglas F. Doyle
    Decotiis, Fitzpatrick & Cole, LLP
    Glenpointe Centre West
    500 Frank W. Burr Blvd, Suite 31
    Teaneck, NJ 07666

Notices to ERD shall be submitted in writing to:

    Emerson ReDevelopers, LLC
    Attn: Kevin X. Codey, Vice President of Land Acquisitions
    80 South Jefferson Road, Suite 202
    Whippany, NJ 07981

    with copies to:

    Carleton R. Kemph, Esq.
    6 Hampshire Court
    Springfield, NJ 07081

1908805

4.     General. - This Funding Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings between the parties.  This Funding Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

IN WITNESS WHEREOF, the Parties hereto have caused this Funding Agreement to be executed, all as of the date first above written.

BOROUGH OF EMERSON

BY: _____
        Louis J. Lanatina, Mayor

Witness:

By: _____
        Jane Dietsche, RMC, Borough Clerk

AND

EMERSON REDEVELOPERS, LLC

BY: _____
Name: GIUSEPPI FORGIONE
Title: MANAGING MEMBER

1908805

**Exhibit F**
**Offsite/Onsite Improvement Share**

DEVELOPER ESTIMATE

BOROUGH OF EMERSON, KINDERKAMACK ROAD PROJECT

ROAD CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY BERGEN COUNTY

1. Cost share estimate items, # 1-25, portion of the 30 % costs borne by Borough   = $13,200
2. Roadway widening & excavation, 3 feet wide X 900 feet frontage, 2,700 SF = 300 SY X $100/ SY
   = $30,000
3. Milling, centerline to existing curbline, 15 feet wide X 900 feet frontage, 13,500 SF / 9
   = 1,500 SQ X $4 SY =   = $ 6,000
4. Paving, centerline to existing curbline, 15 feet wide X 900 feet frontage, 13,500 SF / 70
   = 195 Tons X $75 / Ton =   = $14,625
5. Concrete curb with excavation, 900 LF X $25/ LF   = $22,500
6. Concrete sidewalk with excavation, 4 FT X 900 LF= 3,600 SF = 400 SY X $60/ SY
   = $24,000
7. Drainage changes for road widening, 3 X $6,000   = $18,000
8. Traffic control during construction, signs, barricades & police   = $33,000
9. Traffic Signs   = $ 1,000
10. Pavement striping, markings and eradication   = $10,000
11. Relocate traffic signal pole and foundation at Linwood Ave.   = $20,000
12. Topsoil and seeding, between curb and sidewalk   = $ 5,000
13. Linwood Ave railroad crossing contribution, ( portion of $410,000 NJ Transit Estimate)
   = $61,500

   *Bergen County Total*   =$258,825

   10% Contingency   *Say $285,000*

CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY EMERSON

1. 42 inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF X $225/ LF   = $146,250
2. Lincoln Ave drainage work, upsize pipes   = $ 10,000
3. 3 New drainage chambers, 42 inch pipe, 3 X $7,000   = $ 21,000

STREETSCAPE ITEMS

4. Expand Paver Sidewalks, 6 FT Add. X 900 FT = 5,400 SF= 600 SY X $120/ SY   = $ 72,000
5. Streetscape Lighting, 9 Lights and wiring at $7,000/ each   = $ 63,000
6. Street trees, 5 X $ 500   = $  2,500
7. Amenities, benches, trash receptacles   = $ 10,000

   *Emerson Total*   = $ 324,750
   10 % Contingency   Say   $ 357,000

   *Total Estimate*   $ 642,000

Soft Costs, including surveying, engineering, attorney fees, property acquisition, utility layout, test pits, etc.
   $  75,000
   *TOTAL*   $ 717,000

**Exhibit G**
**Storm Water Pipe**

1. 42 Inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF
2. Lincoln Ave drainage work, upsize pipes
3. 3 New drainage chambers, 42 inch pipe

*Prepared by Affordable Housing Professionals of New Jersey (AHPNJ) - August 2017*

## 2017 AFFORDABLE HOUSING REGIONAL INCOME LIMITS BY HOUSEHOLD SIZE

Income limits not officially adopted by the State of New Jersey. Contact your municipality to see if applicable in your jurisdiction. Additional information about AHPNJ income limits is posted on AHPNJ.org

| Region | | 1 Person | 1.5 Person | 2 Person | 3 Person | 4 Person | 4.5 Person | 5 Person | 6 Person | 7 Person | 8+ Person | Max Increase Rents** | Max Increase Sales*** | Regional Asset Limit**** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Region 1** | Median | $60,271 | $64,576 | $68,882 | $77,492 | $86,102 | $89,546 | $92,990 | $99,878 | $106,766 | $113,655 | | | $266,493 |
| Bergen, Hudson, | Moderate | $48,217 | $51,661 | $55,105 | $61,993 | $68,882 | $71,637 | $74,392 | $79,903 | $85,413 | $90,924 | 1.7% | 1.99% | |
| Passaic and Sussex | Low | $30,136 | $32,288 | $34,441 | $38,746 | $43,051 | $44,773 | $46,495 | $49,938 | $53,383 | $56,827 | | | |
| | Very Low | $18,081 | $19,373 | $20,664 | $23,248 | $25,831 | $26,864 | $27,897 | $29,963 | $32,030 | $34,096 | | | |
| **Region 2** | Median | $65,953 | $70,668 | $75,374 | $84,796 | $94,218 | $97,987 | $101,755 | $109,293 | $116,830 | $124,368 | | | $280,756 |
| Essex, Morris, | Moderate | $52,762 | $56,531 | $60,299 | $67,837 | $75,374 | $78,389 | $81,404 | $87,434 | $93,464 | $99,494 | 1.7% | 3.25% | |
| Union and Warren | Low | $32,976 | $35,332 | $37,687 | $42,398 | $47,109 | $48,993 | $50,878 | $54,646 | $58,415 | $62,184 | | | |
| | Very Low | $19,786 | $21,199 | $22,612 | $25,439 | $28,265 | $29,395 | $30,527 | $32,788 | $35,049 | $37,310 | | | |
| **Region 3** | Median | $73,780 | $79,050 | $84,320 | $94,860 | $105,400 | $109,615 | $113,832 | $122,264 | $130,696 | $139,128 | | | $200,698 |
| Hunterdon, | Moderate | $59,024 | $63,240 | $67,456 | $75,888 | $84,320 | $87,693 | $91,066 | $97,811 | $104,557 | $111,302 | 1.7% | 0.38% | |
| Middlesex and | Low | $36,890 | $39,525 | $42,160 | $47,430 | $52,700 | $54,808 | $56,916 | $61,132 | $65,348 | $69,564 | | | |
| Somerset | Very Low | $22,134 | $23,715 | $25,296 | $28,458 | $31,620 | $32,885 | $34,150 | $36,679 | $39,209 | $41,738 | | | |
| **Region 4** | Median | $66,022 | $70,738 | $75,454 | $84,885 | $94,317 | $98,090 | $101,862 | $109,408 | $116,953 | $124,498 | | | $377,413 |
| Mercer, | Moderate | $52,817 | $56,590 | $60,363 | $67,908 | $75,454 | $78,472 | $81,490 | $87,526 | $93,562 | $99,599 | 1.7% | 1.53% | |
| Monmouth and | Low | $33,011 | $35,369 | $37,727 | $42,443 | $47,158 | $49,045 | $50,931 | $54,704 | $58,476 | $62,249 | | | |
| Ocean | Very Low | $19,807 | $21,221 | $22,636 | $25,456 | $28,295 | $29,427 | $30,559 | $32,822 | $35,086 | $37,349 | | | |
| **Region 5** | Median | $58,240 | $62,400 | $66,560 | $74,880 | $83,200 | $86,528 | $89,856 | $96,512 | $103,168 | $109,824 | | | $154,194 |
| Burlington, | Moderate | $46,592 | $49,920 | $53,248 | $59,904 | $66,560 | $69,222 | $71,885 | $77,210 | $82,534 | $87,859 | 1.7% | 2.09% | |
| Camden and | Low | $29,120 | $31,200 | $33,280 | $37,440 | $41,600 | $43,264 | $44,928 | $48,256 | $51,584 | $54,912 | | | |
| Gloucester | Very Low | $17,472 | $18,720 | $19,968 | $22,464 | $24,960 | $25,958 | $26,957 | $28,954 | $30,950 | $32,947 | | | |
| **Region 6** | Median | $51,085 | $54,734 | $58,383 | $65,681 | $72,979 | $75,898 | $78,817 | $84,655 | $90,494 | $96,332 | | | $236,680 |
| Atlantic, Cape | Moderate | $40,868 | $43,787 | $46,706 | $52,545 | $58,383 | $60,718 | $63,054 | $67,724 | $72,395 | $77,066 | 1.7% | 0.02% | |
| May, Cumberland | Low | $25,543 | $27,367 | $29,192 | $32,840 | $36,489 | $37,949 | $39,409 | $42,328 | $45,247 | $48,166 | | | |
| and Salem | Very Low | $15,326 | $16,420 | $17,515 | $19,704 | $21,894 | $22,769 | $23,645 | $25,397 | $27,148 | $28,900 | | | |

Moderate income is between 80 and 50 percent of the median income. Low income is 50 percent or less of median income. Very low income is 30 percent or less of median income.

* These columns are for calculating the pricing for one, two and three bedroom sale and rental units as per N.J.A.C. 5:80-26.4(a).

** This column is used for calculating the pricing for rent increase for units as per N.J.A.C. 5:97-9.3. The increase for 2015 was 2.3%, the increase for 2016 was 1.1% and the increase for 2017 is 1.7% (Consumer price Index for All Urban Consumers (CPI-U); Regions by expenditure category and commodity and service group). Landlords who did not increase rents in 2015 or 2016 may increase rent by up to the applicable combined percentage from their last rental increase for that unit. In no case can rent for any particular apartment be increased more than one time per year.

*** This column is used for calculating the pricing for resale increases for units as per N.J.A.C. 5:97-9.3 /As per 5:97-9.3(b). The price of owner-occupied low and moderate income units may increase annually based on the percentage increase in the regional median income limit for each housing region. In no event shall the maximum resale price established by the administrative agent be lower than that last recorded purchase price.

Low income tax credit developments may increase based on the low income tax credit regulations.

**** The Regional Asset Limit is used in determining an applicant's eligibility for affordable housing pursuant to N.J.A.C. 5:80-26.16(b)3.

Note: Since the Regional Income Limits for Region 6 in 2016 were higher than the 2017 calculations, the 2016 income limits will remain in force for 2017. See N.J.A.C. 5:97-9.2(e).

**EXHIBIT C: 2017 INCOME LIMITS**

*November 27, 2017*
*Page 13*

Exhibit 10

D-18

## FIRST AMENDMENT TO REDEVELOPMENT AGREEMENT

This First Amendment to Redevelopment Agreement is made this ⎵4⎵ day of October

2016 by and between the

        **BOROUGH OF EMERSON**
        146 Linwood Ave., Emerson, NJ 07630
        A municipal corporation of the State of New
        Jersey, located in the County of Bergen,
        (hereinafter referred to as "Borough")

**AND**

        **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
        A limited liability corporation of the State of New Jersey, having an office
        at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
        (hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement on

or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas

within the Central Business District Redevelopment Area; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and

supplementing the Redevelopment Agreement to reflect their mutual understanding with respect

to the implementation of the Redeveloper's proposal submitted to the Borough and the

Borough's Redevelopment Plan;

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the

Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

1.     All terms not defined in this Amendment shall have the same meaning as set forth

in the Redevelopment Agreement.

2.     The purpose and intent of this Amendment is to amend and supplement the description of the properties to be redeveloped to reflect the Redeveloper's proposal submitted to the Borough and in accordance with the Borough's Redevelopment Plan.

3.     The property descriptions listed in Exhibit A of the Redevelopment Agreement, attached hereto as **Exhibit A**, is amended and supplemented to include the following additional information:

| Property Owner | Block | Lot | Property Address |
|---|---|---|---|
| 182 Emerson, LLC | 419 | 9 | 176 Kinderkamack |

3.     The Funding Agreement attached to the Redevelopment Agreement as Exhibit E, shall be amended and supplemented, attached hereto as **Exhibit B**, to include Block 419, Lots 7 and 9 as redevelopment properties and are made part of the first "WHEREAS" clause, which shall now be deemed amended to read as follows:

WHEREAS, ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the Borough as Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10.

4.     In all other respects, the Redevelopment Agreement remains in full force and effect.

5.   This First Amendment together with the proposal, the Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this First Amendment and the Redevelopment Agreement. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

1976744-1

6.      All the provisions of this First Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

IN WITNESS WHEREOF, Redeveloper has hereunto caused this First Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed and Attested to:                    BOROUGH OF EMERSON


JANE DIETSCHE, Borough Clerk        By: _____
                                                LOUIS J. LAMATINA, Mayor

Attested to:                    EMERSON REDEVELOPERS URBAN RENEWAL, LLC


                                By: _____
                                                Managing Member


1976744-1

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY:
                                    : SS
COUNTY OF BERGEN        :

    I CERTIFY that on *Oct. 6* , 2016,

    JANE DIETSCHE personally came before me, and this person acknowledged under oath, to my satisfaction, that:

    (a)   this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

    (b)   this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamatina, the Mayor of the Municipal Corporation;

    (c)   this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

    (d)   this person knows the proper seal of the corporation which was affixed to this document; and

    (e)   this person signed this proof to attest to the truth of these facts.


Signed and sworn to before me on
*Oct. 6*, 2016.                                          _____
                                                                          Municipal Clerk


_____
Notary Public, State of New Jersey

**LORI A. WOODS**
NOTARY PUBLIC, State of New Jersey
No. 2453735
Qualified in Bergen County
Commission Expires Oct. 14, 2020


1976744-1

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY   :
                      : ss
COUNTY OF BERGEN      :

BE IT REMEMBERED that on this _____ day of _____ 2016,  before me, the subscriber, personally appeared _____, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

_____
                    Managing Member

Signed and sworn to before me on
_____ 2016.

_____
Notary Public, State of New Jersey

1976744-1

## EXHIBIT A

### Property Description

| Property Owner | Block | Lot | Property Address |
|---|---|---|---|
| Angelo and Jane Giambona | 419 | 1 | 19 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 2 | 15 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 3 | 9 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 4 | 214 Kinderkamack |
| Dolores, Della Volpe Trste | 419 | 6.01 | 190 Kinderkamack |
| Yaghoob Pousty | 419 | 6.02 | 184 Kinderkamack |
| Borough of Emerson | 419 | 7 | |
| 182 Emerson, LLC | 419 | 8 | 182 Kinderkamack |
| 182 Emerson, LLC | 419 | 9 | 176 Kinderkamack |
| 182 Emerson, LLC | 419 | 10 | 78 Linwood |

## EXHIBIT B

1976744-1

Exhibit 11

Agenda No. 20

**BOROUGH OF EMERSON**
**COUNTY OF BERGEN, NEW JERSEY**
**RESOLUTION**        No: 256-16

..........................................................................................................................................................................

**Subject: Authorizing the execution of a First Amendment to Redevelopment Agreement**

    **WHEREAS,** Emerson Redevelopers Urban Renewal, LLC ("ERD" or "Redeveloper") was designated as Redeveloper of Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10 by the Borough of Emerson ("Borough"); and

    **WHEREAS,** on June 14, 2016, by Resolution No. 17346, the Borough approved the execution of a Redevelopment Agreement between the Borough and the Redeveloper for the redevelopment of certain areas located within the Central Business District for a mixed use project; and

    **WHEREAS,** per the Redeveloper's proposal to the Borough and the Borough's Redevelopment Plan, the areas to be redeveloped are Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10 on the Official Tax Map of the Borough; and

    **WHEREAS,** the Borough and the Redeveloper have agreed to enter into a First Amendment to the Redevelopment Agreement with the specific intention to amend and supplement the property descriptions to be redeveloped, as set forth and attached hereto in form and substance as **Exhibit A**;

    **NOW, THEREFORE, BE IT RESOLVED,** by the Mayor and Council of the Borough of Emerson, County of Bergen, State of New Jersey, that it hereby authorizes the Mayor to execute and the Borough Clerk to witness the execution of a First Amendment to Redevelopment Agreement between the Borough and Emerson Redevelopers Urban Renewal, LLC, attached hereto in form and substance as **Exhibit A**.

    **BE IT FURTHER RESOLVED,** that this Resolution shall take immediate effect.

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on October 4, 2016.* |
|---|---|---|---|---|---|---|---|
| DiPaola | | | | X | | | |
| Lazar | | | X | | | | |
| Downing | | X | X | | | | *Attest:* _____ |
| Knoller | X | | X | | | | *Municipal Clerk* |
| Tripodi | | | | | X | | |
| Worthington | | | X | | | | |