Exhibit 12

D-17

MIN No. 20 APPROVED FOR RELEASE & CONTENT 10-18-16



**AGENDA**
**BOROUGH OF EMERSON**
**MAYOR AND COUNCIL**
October 4, 2016
7:30 P.M.
**Borough Hall-Council Chambers**
**Emerson, NJ 07630**



I.   CALL TO ORDER

Mayor Lamatina called the meeting to order at 7:30 p.m. and identified the emergency exits.

II.   ROLL CALL

Mayor Lamatina asked Ms. Dietsche to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilwoman DiPaola, Councilman Downing, Council President Knoller, Councilman Lazar, Councilman Worthington

**Absent**: Councilman Tripodi

Also present were Borough Administrator Robert S. Hoffmann, Borough Attorney Wendy Rubinstein and Borough Clerk Jane Dietsche.

III.   EXCUSED ABSENCE OF GOVERNING BODY MEMBER

Mayor Lamatina announced that all Governing Body members were present at the last meeting.

IV.   PROCLAMATIONS & CITATIONS

- Honoring Eagle Scout Franklin Praschil

V.   APPOINTMENTS/RESIGNATIONS

Mayor Lamatina announced that there were no appointments or resignations.

VI.   MINUTES FOR APPROVAL

- Regular Meeting Minutes of September 20, 2016
- Closed Session Meeting Minutes of September 20, 2016

Councilwoman DiPaola asked that the minutes be reviewed to ensure that she had abstained from voting on the Bill List of September 20th and that the September 20th minutes related to the Borough's Social Media policy reflect that the Mayor asked people in the Borough newsletter to friend him on Facebook in order to keep up on Borough issues.

☞**Motion** to approve the Regular and Closed Session Meeting Minutes of September 20, 2016 as amended was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried unanimously.

VII.   FINANCIAL BUSINESS

- Resolution No. 246-16 Bill List

  ☞**Motion** to approve Resolution No. 246-16 Bill List was **moved** by Councilman Worthington, **seconded** by Councilwoman DiPaola and carried by a roll call vote of 5-0.
  **RC: Council members:**
  **YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

VIII.   UNFINISHED BUSINESS

- Public Hearing – 2016 Bergen County Open Space Trust Fund Municipal Park Program Improvement Grant Application - Resolution to apply for funds to replace shade trees in parks and clean up the Broadway nature path.

  ☞**Motion** to open the meeting to comments from the public on the 2016 Bergen County Open Space Trust Fund Municipal Park Program Improvement Grant Application - Resolution to apply for funds to replace shade trees in parks and clean up the Broadway nature path was **moved** by Councilwoman DiPaola, **seconded** by Councilman Worthington and carried at 7:37 p.m.

  Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on this topic.

  ☞**Motion** to close the meeting to comments from the public on the 2016 Bergen County Open Space Trust Fund Municipal Park Program Improvement Grant Application - Resolution to apply for funds to replace shade trees in parks and clean up the Broadway nature path was **moved** by Councilman Worthington, **seconded** by Council President Knoller and carried at 7:38 p.m.

  Mr. Hoffmann explained that the application was due by October 13th and one of the criteria required was to advertise and hold a public hearing. He planned to proceed with the application.

- Kinderkamack Road lighting streetscape decision – Mr. Hoffmann had met with Borough Engineer Gary Ascolese and proposed another model of lighting to New Prince Concrete Construction Company. Both models used bolt holes in the bottom. They would evaluate the options and make a decision within 60 days.

IX.   NEW BUSINESS

- Bill List Policy – Mr. Hoffmann said Councilwoman DiPaola, the Finance Chair, had discussed this topic previously and was recommending returning to a bill review/payment process that had been utilized in the past. Bills were paid at the second meeting of each month allowing more time to review vouchers. Mr. Hoffmann explained that they were considering reverting to this procedure with some exceptions. He discussed the Prompt Payment Law and noted that construction funds were required to be appropriated within 60 days.

- Best Practices Checklist – Mr. Hoffmann said the checklist was due back to the State by October 21st. It had been reviewed and if the two resolutions on the Consent Agenda were adopted, the Borough would receive a score of 90%. If the score was 85% or less, the State could review and withhold State aid. The State would be reviewing all submissions to verify accurate responses and would take action if there were inaccuracies. The Council discussed the requirement that an individual be designated to monitor PILOT agreements and emphasized the need to ensure that the appropriate PILOT funds were collected in a timely manner going forward and for past due payments as well. Mr. Hoffmann assured the Governing Body that the appropriate procedures could be implemented and payments due would be followed up on. He also addressed the audit findings related to the Recreation Commission. This finding could possibly be rectified by allowing the Recreation Commission to use a check scanner and having a part time Recreation Director be present on weekends to collect funds during sports sign ups.

X.   INTRODUCTION OF ORDINANCES

Mayor Lamatina announced that Ordinances 1534-16 and 1535-16 were being pulled from the agenda. Ms. Rubinstein explained that Ordinance 1534-16 was being pulled at the request of the Appropriate Authority. Mr. Hoffmann explained that Ordinance 1535-16 was being pulled because Borough Planner Brigette Bogart was not able to attend the meeting to make a presentation or answer questions. Councilwoman DiPaola requested more advance notice of changes to the agenda.

**First Reading:**

~~**1534-16** AN ORDINANCE AMENDING CHAPTER 77 POLICE DEPARTMENT, SECTION 8 "PROMOTIONS"~~ **PULLED**

~~**1535-16** AN ORDINANCE OF THE MAYOR AND COUNCIL OF THE BOROUGH OF EMERSON AMENDING THE CENTRAL BUSINESS DISTRICT REDEVELOPMENT PLAN PURSUANT TO N.J.S.A. 40A:12A-7~~ **PULLED**

XI.   ADOPTION OF ORDINANCES

**Second Reading & Public Hearing:**

~~**1530-16** AN ORDINANCE AMENDING CHAPTER 208, PEDDLING AND SOLICITING, OF THE CODE OF THE BOROUGH OF EMERSON~~ - **TABLED**

☞**Motion** to open the meeting to comments from the public on Ordinance #1530-16 only was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried at 8:07 p.m.

Bill Price, 9 Emwood Drive asked for information about the ordinance.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on this ordinance only.

☞**Motion** to close the meeting to comments from the public on Ordinance #1530-16 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried at 8:09 p.m.

Councilwoman DiPaola asked if the ordinance applied to door to door campaigning and was told by Ms. Rubinstein that it did not. Council President Knoller asked to table the ordinance for further investigation.

☞**Motion** to table Ordinance #1530-16 was **moved** by Council President Knoller, **seconded** by Councilwoman DiPaola and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES: DiPaola, Lazar, Downing, Knoller, Worthington**

~~**1531-16** AN ORDINANCE REPEALING AND REPLACING CHAPTER 104 OF THE CODE OF THE BOROUGH OF EMERSON ENTITLED, "ALARM SYSTEMS" –~~ **TABLED**

Council President Knoller requested that this ordinance be tabled to allow for further discussion of the fee structure, cyber security issues and concerns from the Fire Official.

☞**Motion** to table Ordinance #1531-16 was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES: DiPaola, Lazar, Downing, Knoller, Worthington**

XII.   REPORTS

- Borough Administrator Robert Hoffmann reported on the following:
  - o The Borough had received eight proposals for architectural services in response to the Request for Proposals. A total of twenty four architects had requested proposals. The responses would be reviewed, ranked and sent to the Governing Body.
  - o There was a resolution on the agenda to move forward with a contract for a new voice mail and telephone system. The payback would total one year and eight months.
  - o There was a resolution on the agenda to authorize Mr. Hoffmann to submit a grant application for $200,000 for drainage improvements and paving on Pine Drive.

XIII.   PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman DiPaola, **seconded** by Councilman Lazar and carried at 8:18 p.m.

Corey Melillo, 18 Vivian Avenue asked about redevelopment and a recent article in The Record. She was opposed to four story development downtown.

Gloria Wilson, 53 George Road expressed concerns about four story development downtown.

Mike Esqueu, 276 Kinderkamack Road expressed concerns related to four story development downtown.

Kathy Viola, 39 Linwood Avenue asked questions about redevelopment and affordable housing.

Bill Price, 9 Emwood Drive asked questions about redevelopment and affordable housing and was opposed to four story development.
Dot Haight, 84 Lincoln Boulevard asked whether affordable housing would be available to Emerson residents before being available to non-residents.

Gloria Wilson, 53 George Road asked if veterans' housing counted towards affordable housing obligations.

Ken Hoffmann, 61 Emwood Drive inquired about the redevelopment project and the total units permitted.

Ed Bueti, 91 Chestnut Street expressed concerns about four story development in the Borough.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public.

☞**Motion** to close the meeting to comments from the public was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried at 8:58 p.m.

XIV.    RESOLUTIONS ON CONSENT AGENDA NO. 247-16

Councilwoman DiPaola requested that CA 256-16 - Approval of First Amendment to Execution of Redevelopment Agreement be pulled for a separate vote.

☞**Motion** to approve Consent Agenda No. 247-16 without CA 256-16 - Approval of first amendment to execution of Redevelopment Agreement was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

☞**Motion** to approve CA 256-16 only - Approval of first amendment to execution of Redevelopment Agreement was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Lazar, Downing, Knoller, Worthington**
**NO: DiPaola**

| | |
|---|---|
| Ca 248-16 | Personnel Manual Update – per Best Practices & JIF |
| Ca 249-16 | Refund of Tax Overpayments (3rd Quarter 2016) |
| Ca 250-16 | Authorize new voice mail and telephone system for the Borough |
| Ca 251-16 | Resolution Requesting Approval of Items of Revenue And Appropriation NJS 40a:4-87 - in the sum of $6,281.57 - Drunk Driving Enforcement Fund Grant |
| Ca 252-16 | Approve Cancellation of Completed Funded Capital Improvement Authorizations |
| Ca 253-16 | Resolution Requesting Approval of Items of Revenue And Appropriation NJS 40a:4-87 - 2015 Bergen County Open Space Trust Fund – Municipal Program in the amount of $20,000. |
| Ca 254-16 | Approve Block Party Application – Orchard Avenue between Kinderkamack Road and Linda Place – Sat., October 22nd |
| Ca 255-16 | Accept 2016-2017 Senior Citizen Activity Grant from Bergen County in the amount of $3,530 |
| Ca 256-16 | Approval of first amendment to execution of Redevelopment Agreement |
| Ca 257-16 | Authorize Borough Administrator to apply for grant funding for drainage and paving on Pine Drive |
| Ca 258-17 | Award Main Street/Linwood Avenue Section 3 to AJM Contractors, Clifton, NJ in an amount not to exceed $158,982.50 Pending TTF Allocation |
| Ca 259-16 | Designate Borough Administrator to Monitor Pilot Agreements per NJSA 40A:20-1 |

XV.    CLOSED EXECUTIVE SESSION - Resolution No. 260-16

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 260-16 was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Worthington**

#16-10/04-31    Update on status of potential litigation – Fire Dept.        N.J.S.A. 10:4-7
#16-10/04-32    Update on labor negotiations – DPW                          N.J.S.A. 10:4-4
#16-10/04-33    Update on status of litigation – Just Pups                  N.J.S.A. 10:4-7

XVI.    RECONVENE

☞**Motion** to reconvene was **moved** by Councilwoman DiPaola, **seconded** by Council President Knoller and carried at 9:21 p.m.

XVII.    ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried at 9:22 p.m.


Respectfully submitted,


_____
Jane Dietsche, RMC
Borough Clerk

Exhibit 13

Agenda No. 27APPROVED FOR RELEASE & CONTENT 1-17-17



**MINUTES
BOROUGH OF EMERSON
MAYOR AND COUNCIL**
December 20, 2016
7:30 P.M.
**Borough Hall-Council Chambers**
Emerson, NJ 07630



D-19

## I. CALL TO ORDER

Mayor Lamatina called the meeting to order at 7:36 p.m. and identified the emergency exits.

## II. ROLL CALL

Mayor Lamatina asked Ms. Dietsche to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilwoman DiPaola, Councilman Downing, Council President Knoller, Councilman Lazar, Councilman Tripodi, Councilman Worthington, Councilman-elect Falotico

Also present were Borough Administrator Robert S. Hoffmann, Borough Attorney Wendy Rubinstein, Special Counsel Douglas Doyle and Borough Clerk Jane Dietsche.

## III. EXCUSED ABSENCE OF GOVERNING BODY MEMBER

Mayor Lamatina announced that no members of the Governing Body were absent from the December 6th Regular or Special Meetings.

## IV. PROCLAMATIONS & CITATIONS
- Swearing in Ceremony of Captain Michael McDermott
- Recognition of Volunteers who contributed to the Memory Garden project of Eagle Scout Franklin Praschil

## V. APPOINTMENTS/RESIGNATIONS

Mayor Lamatina announced that he was accepting the following resignation and making the following appointments to the Land Use Board:

- Land Use Board
  - Resignation of Germaine Ortiz as a Class IV member effective immediately
  - Appointment of Norm Rieger to Class IV member effective immediately for the unexpired term ending 12/31/17
  - Appointment of Michael DeOrio as Alternate I member effective immediately for the unexpired term ending 12/31/17
  - Appointment of Doug McKendry as the Alternate II member effective immediately for the unexpired term ending 12/31/16
  - Appointment of Evan Kutzin as the Alternate III member effective immediately for the unexpired term ending 12/31/16
  - Appointment of Trudy Grimaldi as the Alternate IV member effective immediately for the unexpired term ending 12/31/17

Agenda No. 27APPROVED FOR RELEASE & CONTENT 1-17-17

- Recreation Commission
  - Appointment of Paul Coombes as the Alternate II member of the Recreation Commission effective immediately for the unexpired term ending 12/31/17

    ☞**Motion** to appoint Paul Coombes as the Alternate II member of the Recreation Commission effective immediately for the unexpired term ending 12/31/17 was **moved** by Councilman Tripodi, **seconded** by Councilman Lazar and carried unanimously.

VI.   MINUTES FOR APPROVAL
- Special & Closed Session Meeting Minutes of December 6, 2016

    ☞**Motion** to approve the Regular and Closed Session Meeting Minutes of December 6, 2016 was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried unanimously.

- Regular Meeting Minutes of December 6, 2016

    Councilman Lazar requested that the Regular Meeting Minutes of December 6, 2016 be tabled.

    ☞**Motion** to table the Regular Meeting Minutes of December 6, 2016 was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried unanimously.

- Amend Regular Meeting Minutes of May 17, 2016

    ☞**Motion** to accept the Regular Meeting Minutes of May 17, 2016 as amended was **moved** by Councilman Downing, **seconded** by Councilman Lazar and carried by a roll call vote of 5-1.
    **RC: Council members:**
    **YES:  Lazar, Downing, Knoller, Tripodi, Worthington**
    **NO: DiPaola**

VII.   CORRESPONDENCE

Mayor Lamatina announced that copies of the correspondence were available in the Office of the Municipal Clerk.

- Letter dated November 17, 2016 from Commissioner Richard Hammer, NJDOT; Re: Applications for NJDOT FY 2017 State Aid Programs
- Letter dated November 18, 2016 from Commissioner Bob Martin, NJDEP; Re: Applications  for Green Acres funding
- Email dated December 4, 2016 from Jill McGuire; Re: Opposing four story development in the downtown corridor
- Letter dated December 2, 2016 from PERMA Risk Management Services; Re: Public Hearing 2017 Adopted Budgets
- Email dated December 4, 2016 from Jill McGuire: Re: Requesting Land Use Board audio, minutes and transcript of meeting of Thursday, December 8, 2016
- Email dated December 9, 2016 from Alisha Wallace; Re: Township Façade Improvements
- Email dated December 13, 2016 from Jill McGuire; Re: Request postponement of Governing Body vote on condemnation until Land Use Board materials are available
- Email dated December 12, 2016 from County Executive Jim Tedesco III: Re: 2016 Kwanza Ceremony

- Email dated December 12, 2016 from Mark Schriecks; Re: Bergen County Ceremonial Swearing in of Sheriff/Surrogate/Clerk and Freeholders
- Letter dated December 19, 2016 from Oritani Bank Senior Vice President Phillip Wyks; Re: Redevelopment

Mr. Doyle asked that an item on the correspondence list- "Letter dated December 19, 2016 from Oritani Bank Senior Vice President Phillip Wyks; Re: Redevelopment" be sent to Borough Planner Brigette Bogart for her recommendation based on their request.

☞**Motion** to ask the Borough Clerk to send a copy of the letter dated December 19, 2016 from Oritani Bank Senior Vice President Phillip Wyks; Re: Redevelopment to Ms. Bogart for her recommendation based on their request was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried unanimously.

VIII.   FINANCIAL BUSINESS
- Resolution No. 283-16 Bill List

☞**Motion** to approve Resolution No. 283-16 Bill List was **moved** by Councilman Downing, **seconded** by Councilman Worthington and carried by a roll call vote of 6-0. **RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Tripodi, Worthington**

IX.   UNFINISHED BUSINESS

Mayor Lamatina announced that there was no unfinished business.

X.   NEW BUSINESS

Mayor Lamatina announced that there was no new business.

XI.   INTRODUCTION OF ORDINANCES

Mayor Lamatina announced that no ordinances were being introduced.

XII.   ADOPTION OF ORDINANCES

**Second Reading & Public Hearing:**

**1535-16** AN ORDINANCE OF THE MAYOR AND COUNCIL OF THE BOROUGH OF EMERSON AMENDING THE CENTRAL BUSINESS DISTRICT REDEVELOPMENT PLAN PURSUANT TO N.J.S.A. 40A:12A-7

☞**Motion** to open the meeting to comments from the public on Ordinance #1535-16 only was **moved** by Council President Knoller, **seconded** by Councilwoman DiPaola and carried at 8:12 p.m.

Redevelopment Counsel Mr. Doyle explained that the ordinance amended a couple sections of the Central Business District Redevelopment Plan. He said the Mayor and Council originally received their recommendations from the Board. The Governing Body then sent back some additional proposed changes to the Land Use Board. Ultimately the Land Use Board met again on December 8th to consider the revisions. They met again earlier that evening (December 20th) to memorialize the resolution. He noted that this was required under the statutes and the Board had accepted the recommendations made by the Governing Body. The only two changes were the five foot in depth set back on the front façade of the fourth floor for buildings facing Kinderkamack Road and Lincoln Boulevard. In addition the Land Use Board had recommended that if an applicant who was going to build in the redevelopment area sought to reduce the parking requirements otherwise required, they would have to hire their own expert. Also, an expert would be hired by the Land Use Board at the expense of the applicant in order to be able to determine whether it should confirm or reject the findings of the applicant's traffic/parking consultant.

Mr. Doyle also confirmed that this was the entire redevelopment plan for CBD-10. A request for clarification of the subject area was made by members of the Governing Body. Mr. Doyle read the blocks and lots into the record: Lots 1, 2, 3, 4, 5 on Block 412; Lots 1, 2, 3, 4,5 , 6.01, 6.02, 7, 8, 9,10 on Block 419; Lots 2 and 16 on Block 420; Lots 1, 10, 11, 12, 13, 14, 15, 16, 17 and 18 on Block 422; Lots 2, 3, 4, 5, and 6 on Block 603; Lots 3 and 4 on Block 606; Lots 1, 2, 4, 5.01, 5.02, 6, 7, 8, 9.01, 9.02 and 10 on Block 610; Lots 1 and 2 on Block 613; Lot 1 on Block 615; Lots 1, 16, 17, 19, 20, 21, 22, 23 and 24 on Block 616; Lot 1 on 617.01. He noted that the plan only amended the area involving CBD-10.

Mr. Doyle said that CBD-10 and CBD-15 comprised the entire area of the lots and blocks he referenced. The changes that were recommended by the Board comprised this ordinance. The additional changes requested had to do with the request from the Governing Body that the fourth story be stepped back to five feet in width. The Governing Body also referred to the Land Use Board the request that a parking expert 'shall' be retained rather than 'may' be retained. The Land Use Board agreed but said that the requirement would be at the expense of the applicant. He said that CBD-10 and CBD-15 comprised the entire area but CBD-15 was not being changed. They were replacing the entire chart which included the other lots and blocks. He said the ordinance talked about replacing the area and bulk requirements for CBD-10 and CBD-15. They weren't making any changes to CBD-15, only to CBD-10.

Councilwoman DiPaola received confirmation from Mr. Doyle that it included all the blocks and lots he read off. She said that everyone was under the impression that the fourth story would only be allowed for the JMF property. But if it was for CBD-10, it represented a larger parcel. She said if this was approved, it would allow a fourth story elsewhere as well as decreased parking and everything else. Mr. Doyle said the Borough already allowed the height that JMF was proposing to build in other locations – to forty feet. He said that they would now be making the east side the same as the west side. He stated that what the Governing Body said was that this might be okay but on Kinderkamack Road and Lincoln Boulevard, the fifty foot building would be required to have a five foot setback on the top story.

Mayor Lamatina noted that the fifty foot height was allowed where the elevation was lower. Mayor Lamatina asked and Mr. Doyle confirmed that this was not the redesignation, but rather changing the zone to accommodate a project that JMF had proposed. Mr. Doyle added that it was not only a project accommodation, but a project that would satisfy part of the municipality's COAH obligations. Mr. Doyle said that it would enhance the value of the properties, but also as he understood Ms. Bogart's testimony, it would not be inconsistent with heights in other areas of Emerson. He said there were other buildings in the Borough that were fifty foot in height.

Agenda No. 27APPROVED FOR RELEASE & CONTENT 1-17-17

Jill McGuire, 154 Linwood Avenue shared photos of a four story building in Westfield with a setback and said it still looked like four stories. She was opposed to four story buildings. She read and submitted a petition she had initiated which was signed by approximately 240 individuals also opposed to four story development and eminent domain. She requested that the Governing Body prioritize the best interests of Emerson residents over the redeveloper JMF.

Corey Melillo, 18 Vivian Avenue stated that at JMF's April presentation before the Governing Body, the Ranchero Cantina property was not part of the original proposal.

Michael Esque, 276 Kinderkamack Road asked if the rendering presented by JMF would look like the actual building and whether Emerson was acting out of fear that JMF might pull out of the project and someone else might build a six or seven story building.

Mr. Doyle responded that it was not so much fear - either the Governing Body would do what was best for the community or the Court would come in and follow the constitution and do what they needed to provide low and moderate income housing. Councilwoman DiPaola asked if another judge could have another decision. Ms. Rubinstein said that the number that was Emerson's obligation was the same number no matter who the judge was.

Mr. Esque asked that they lower their profit a bit. Mr. Doyle said that the Borough demanded that JMF come up with $717,000 in a contribution for improvements to Kinderkamack Road, infrastructure upgrades including a large drainage pipe, and the 20% set aside which helped with the prospective affordable housing need. JMF would also be building a state of the art emergency service facility. He said that they were already trying to get as much as they could from the developer and get the Borough's low and moderate income obligations met and get improvements for the Kinderkamack Road project. Council President Knoller said that they had bonded for those improvements so they were already budgeted for. Governing Body consensus was that this was something to look into.

Councilwoman DiPaola said they had bonded almost a million dollars to purchase two properties across the street. She proposed that the $717,000 the Borough was asking JMF to contribute could instead come from the Governing Body. Councilman Tripodi asked if the funds could be used to eliminate the fourth floor. Mr. Doyle confirmed that it would reduce the number of affordable units and some could go at another location.

Dan O'Brien, 17 A,B,C Palisade Avenue said that at the recent Land Use Board meeting, they only discussed the construction on Block 419 and that presently the vote was on a bigger parcel.

Mr. Doyle explained that the Land Use Board had held a hearing on whether Block 419 and all the lots should continue to be designated as an area in need of redevelopment and at the end of the meeting the Board heard and made comments with respect to the redevelopment plan for the entire area – CBD-10 and CBD-15. He said the Land Use Board had not adopted their resolution recommending that Block 419 and all the lots continue to be designated as an area in need of redevelopment.

He clarified that the only thing that the Governing Body was considering that evening was whether it should adopt the ordinance which amended the redevelopment plan for CBD-10 and CBD-15. In response to Mayor Lamatina's question as to why everyone in the zone had received a letter, Mr. Doyle said that in 2004 the Governing Body designated all of the properties read off at the beginning of the meeting as an area in need of redevelopment. That meant that immediately upon the Governing Body's adoption of the resolution, they could have condemned the properties. In the last three to four years, the Legislature decided to have two types of redevelopment – redevelopment condemnation and redevelopment without condemnation. Upon counsel's advice and because they were before the courts with respect to low and moderate income obligations, they re-noticed the entire area so they could accurately report to the courts that they were looking to redevelop the downtown area and meet their prospective need. If certain properties met that requirement of the redevelopment area, the Governing Body could potentially consider acquiring them in order to build. They hoped that this would not have been necessary and that the properties would get redeveloped on their own. Despite this fact they had to notify all the property owners because they were beginning to reconfirm that the downtown area continued to be an area in need of redevelopment. They only took up Block 419 because there was currently a developer who had entered into an agreement with the Borough to build in the downtown area and redevelop part of the area and provide low and moderate income housing. When and if the Governing Body was ready to move forward on other areas in the redevelopment area, everyone would receive notice all over again indicating that there would be a hearing on those additional blocks and lots.

Mr. O'Brien continued with his comments. Since his property was in the condemnation zone, he asked why he would want to make any improvements. Mr. Doyle explained that Mr. O'Brien's property had been in a condemnation area since 2004 – it just didn't have the word condemnation in it. It was now required term by law, indicating whether there was an intention to use condemnation powers or not. The Borough was doing the exact same thing they did in 2004 which did not require the term condemnation. Condemnation was useful as a last resort tool if people were holding out and trying to leverage the town and taxpayers. Councilwoman DiPaola asked if they had to put it in legally at that point or if it could just have been designated as an area in need of redevelopment. Mr. Doyle said that it was his recommendation that they needed to have it continue to have it designated as they did previously which was an area that allowed condemnation. Council President Knoller asked Mr. Doyle if a property owner rehabilitated their property, if they could apply to be removed from the zone. Mr. Doyle agreed.

Mr. O'Brien asked if that was a guarantee. Mr. Doyle said it was not. Mr. O'Brien asked why he would do that financially. Mr. Doyle said it would have to be improved in accordance with the redevelopment plan.

Mr. O'Brien also reviewed property maintenance records for the past two years for Block 419, Lots 1-10 including 6.01 and 6.02 obtained through an OPRA request. He said that he had heard that these properties were run down and horrible at the Land Use Board meeting, but the records did not indicate that the properties were in disrepair.

Kathy Hornyak, 123 Palisade Avenue said that the area was unsightly and that something needed to be done but shared concerns about the PILOT program and its impact on the schools. She said that increased units would increase the number of students in schools.

Agenda No. 27APPROVED FOR RELEASE & CONTENT 1-17-17

Mr. Doyle said that in transit oriented developments, historically the data indicated that they did not get school aged children – instead it was empty nesters and college graduates. Mr. Doyle said nothing prevented the Governing Body from taking some of the PILOT payments and contributing them to the Board of Education if the project generated more children than anticipated. Ms. Rubinstein said that there were also retail components to this development. That would be based on whether revenue increased. However there was a bottom portion that they were guaranteed to have to pay and it could only go up.

Councilman Lazar said that when the development was done, the value of the property would go up. The money that you would normally pay for the property would still go to the school and the town and the county. Mayor Lamatina clarified the comment and said it was the property assessment. The Mayor said that there were two aspects to the tax bill, land and building. The land aspect would continue to be paid as normal – 30% to the Borough, 60% to the schools and 10% to the County. That would continue. It was only the improvements that would only be paid 95% to the Borough. Councilman Lazar clarified that there would still be more money going to the town and schools through the land value. The extra money for the improvements would now be given to the municipality and the County.

Dot Haight, 84 Lincoln Boulevard asked for clarifications about the PILOT and tax payments. She said they needed more understanding on the PILOT program. Mayor Lamatina said there had been a public hearing to answer questions. Mr. Doyle said that if the Governing Body would like, they could put it on an agenda for a January meeting. Mr. Karrenberg would return to allow for further discussion on what the PILOT meant. The Governing Body agreed. Mayor Lamatina said there were four items on the website explaining PILOT agreements generally and specifically for Emerson.

Michael Casey, Linwood Avenue asked whether the project would be scrapped if a business did not sell.

Mr. Doyle said the project would either be retooled or potentially scrapped – it would be up to the developer.

Ken Hoffmann, 61 Emwood Drive shared concerns about the height allowance of the downtown development and asked that the Governing Body make a decision that was in the best interest of the public. He suggested that decisions on the use of eminent domain and the height of the buildings be put to a referendum vote.

Mike Myers, 38 Allison Way said he was reiterating Mr. Hoffman's comments and asked that the Governing Body listen to the public's concerns and not just focus on the project.

William Price, 9 Emwood Drive said the proposed redevelopment was too big, would bring in too many people and put a burden on municipal services. He asked that the Governing Body wait to see how the Kinderkamack Road improvement project worked out before thinking about redevelopment.

Debbie Agnello, 188 Kinderkamack Road commented on eminent domain and Mayor Lamatina's quotes in the Pascack Press. She asked if the Governing Body had spoken to existing businesses about how productive their businesses were.

Mr. Doyle said it would not be appropriate because they had performed an appraisal on the properties and they had not sat down to negotiate in good faith. She also asked about the process of appealing the designation and when the 45 day appeal period started.

<u>Toni Plantamura, Dairy Queen owner, 13 Kinderkamack Road</u>, discussed how her family had been affected by eminent development twice since the 1950's and how business was down by 20-30% due to Kinderkamack Road improvements. She commented on the PILOT program and said that redevelopment would lead to more congestion and more taxes to cover police, fire and schools. She asked how to get off the redevelopment list.

Mr. Doyle explained that she should write a letter to the Governing Body asking whether it could be removed from the list and they would take it up at the appropriate time. Mr. Doyle said they could give her some guidance.

<u>Robert Petrow, 21, 23, 33 and 50 Chestnut Street</u> discussed his two buildings and said he wanted his properties taken out of the redevelopment zone. He said that in 2008 he had sent six or eight letters to Borough Counsel formally asking to be taken out of the redevelopment zone and never received a response.

Mayor Lamatina asked that Mr. Petrow send copies to redevelopment counsel and said there was a procedure in the redevelopment law for properties to be taken out of the zone if they had been developed in accordance with the plan.

Mr. Petrow also asked if there was fire equipment and manpower to handle four story buildings.

<u>Laura Litchult, Cradles to Crayons, 300 Kinderkamack Road</u> asked about enforcement of the noise ordinance and how it would relate to rooftop facilities in the redevelopment zone.

<u>Kathy Viola, 139 Linwood Avenue</u> asked if a paid Fire Department would be necessary with additional development in town. Councilman Lazar said that the building would be safer than a private home due to fire regulations.

<u>Todd Bradbury, 24 Chestnut Street</u> asked about the ordinance up for adoption and expressed concerns about redevelopment and flooding on Chestnut Street. He discussed a letter he received in 2008 saying that he was not included in the redevelopment zone but had received a letter in November indicating that he was in the zone.

Ms. Rubinstein said that his letter had been forwarded to the Borough Planner to start the process to have him removed. Mr. Hoffmann said he would follow up the next day.

<u>Jody Fortino, employee of Mr. Bradbury at 24 Chestnut Street</u> said she was speaking on behalf of Mr. Bradbury who had purchased his property in 2008 and made improvements. She said it would be financially and mentally crippling to him personally and to his business if his property was seized. She asked that eminent domain be stopped.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on this ordinance only.

☞**Motion** to close the meeting to comments from the public on Ordinance #1535-16 only was **moved** by Councilman Lazar, **seconded** by Councilwoman DiPaola and carried.

Mr. Doyle stated that this process had been going on since August 16, 2016 when the Governing Body adopted Resolution #221-16 directing the Land Use Board to review certain amendments. On September 8th, the Land Use Board held a Public Hearing and heard all the testimony. On September 22nd the Board adopted a resolution with its report. On December 6th the Mayor and Council heard about the findings and adopted a resolution and ultimately referred it back down because there were a couple changes and on December 8th the Land Use Board met and ultimately recommended the resolution the Governing Body had before them that evening. He noted that this was a process that had been going on since August. If the Governing Body did not adopt the ordinance or it was tabled it would have to be reintroduced again in January and then referred back to the Land Use Board. They would have to wait for the Land Use Board to adopt the resolution once again which would take two meetings to do. It would then be referred back to the Mayor and Council for a second reading and hearing. He said there was a developer's agreement in place and certain obligations; he strongly recommended that the Mayor and Council consider adopting the ordinance that evening if they found the proposed changes, which were minimal by the Land Use Board, to be acceptable.

☞**Motion** to adopt Ordinance 1535-16 on second reading was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried by a roll call vote of 4-3.

Before announcing his vote, Councilman Tripodi said he had concerns with how large the area was that was being affected by the amendment. He thought it was going to be Block 419 and did not realize how many people were going to be affected. His second concern was that he thought they should go back and look at JMF's contribution to the Kinderkamack Road project to see if there was any way they could get rid of the fourth story and potentially have the Borough take on some of that work. He then voted no.

Councilman Worthington said he was in complete agreement with Councilman Tripodi and that they should go back and take a look at this. He then voted no.

**RC: Council members:**
**YES: Lazar, Downing, Knoller, Mayor Lamatina**
**NO: DiPaola, Tripodi, Worthington**

XIII.   REPORTS
- Mayor and Council

    Councilwoman DiPaola held her report until January.

    Councilman Lazar said the Department of Public Works had cleaned up leaves in the parks and playgrounds, recycled metal, prepared brine and conducted preventative maintenance. They were doing an exceptional job during snow storms. Injuries were down 75% in 2016 compared to 2015 which he attributed to online training on safety topics.

    Mayor Lamatina said Ms. Viola had reported a pothole on the corner of Linwood Avenue and Kinderkamack Road and DPW Superintendent Perry Solimando had it fixed the next day. He added that Construction Official Mike Sartori had sent an email to the builder of Starbucks because the temporary patch had come out and if it was not repaired by the following day, the job would be shut down. Councilman Lazar also praised Mr. Sartori for following up within minutes after he reported that the builder had not cleaned up snow on the sidewalk after the recent storm which led to icy conditions. He wished everyone a Merry Christmas and Happy Chanukah.

Agenda No. 27 APPROVED FOR RELEASE & CONTENT 1-17-17

Councilman Downing gave the November report of the Volunteer Ambulance Corps. He thanked the Fire Department for their outstanding job hosting Santa and the movie at the high school. He said a couple people shared concerns about why Santa and the Fire Department were no longer driving around at night and explained that the change was made for safety reasons.

Council President Knoller discussed the Special Meeting held earlier that evening and announced that conditional offers of employment were offered to three people. Two officers would start on January 1, 2017 and the third would start in March. He thanked the Governing Body for their support. He congratulated Captain McDermott and his family and was happy that they were able to accommodate his family so that they were all able to participate in his swearing in. He wished everyone a Merry Christmas, Happy Chanukah and a Happy and Healthy New Year.

Mayor Lamatina thanked Council President Knoller and Councilman Tripodi who served on the Police Committee, as well as Mr. Hoffmann and everyone else on the committee. At the Mayor's request, Council President Knoller detailed the process that led to the hiring of the three officers.

Councilman Tripodi congratulated Captain McDermott and said they were glad to accommodate him so that his son who lived in South Carolina could be present for his swearing in. He detailed the police hiring process and thanked Council President Knoller for all the time he invested in the process. He wished everyone a Happy Holiday and a Happy and Healthy New Year.

Councilman Worthington wished everyone a Happy Holiday.

Mayor Lamatina said that the County had placed seventy trees at Van Saun Park for the Winter Wonderland event. County Executive Jim Tedesco had invited each town to decorate their tree. Mayor Lamatina said he was making arrangements for residents to provide decorations in the theme of the Family Town and decorate Emerson's tree on December 23rd.

- Borough Administrator Robert Hoffmann wished everyone a Merry Christmas, Happy Chanukah and a Happy and Healthy New Year. He thanked the Governing Body for all they accomplished during the year and wished everyone the best of success in 2017.

- Borough Clerk Jane Dietsche wished everyone a Happy Holiday.

- Borough Attorney Wendy Rubinstein said she had attended a case management conference with the COAH judge. Based on the study for redesignation on affordable housing and the proposed project by JMF, they were thrilled that the Borough could put 20% on site. They were negotiating with Fair Share Housing to see if they could lower their number that was up around 400. The judge had requested giving the Borough sixty days to get a preliminary housing plan together at which time they would go back for another case management conference with Fair Share Housing Center and Special Master to see if they could get some kind of reduction – maybe into the upper 200's instead of the lower 400's. She said they were doing their best to reduce that and noted that Fair Share was recognizing that the Borough was taking a proactive approach.

XIV.  PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman DiPaola, **seconded** by Councilman Tripodi and carried at 10:45 p.m.

Dan O'Brien, 17 A,B,C Palisade Avenue asked questions about  property values and assessments and read quotes from an article in the December 19th issue of the Pascack Press. He said that eminent domain was when a municipality purchased property for public purposes. He questioned how the Borough was using eminent domain to buy property for a redeveloper to make money.

Jim Sabino, 23 Pavonia Avenue spoke about ongoing flooding issues which resulted in property damage, expense and inconvenience to his family. He detailed remediation efforts which had resulted in only a temporary solution. Mr. Hoffmann said he would follow up on this.

Alyssa (inaudible), Cradles to Crayons, 300 Kinderkamack Road read a statement and said that members of the audience had worked hard for their small businesses, made sacrifices for their families and worked hard to build the community. She was disgusted and disappointed in some of the elected officials who so casually threw their votes around.  She challenged everyone to do better in 2017.

Laura Litchult, owner of Cradles to Crayons, 300 Kinderkamack Road said she had grown her business and was passionate about working with children. She added she would be heartbroken to see it come to an end and did not feel that members of the public were being heard. She asked that the Governing Body communicate with business owners and families to come up with a collective solution to make this work for everyone.

Jill McGuire, 159 Linwood Avenue asked that the Governing Body listen to Councilman Tripodi's comments and step back to think about alternate funding to eliminate the need for a fourth story. She requested empathy for property owners.

Kathleen Viola, 139 Linwood Avenue asked about traffic patterns on Linwood Avenue and Kinderkamack Road.

☞**Motion** to extend the meeting curfew to no later than midnight was **moved** by Council President Knoller, **seconded** by Councilman Tripodi and carried unanimously.

Todd Bradbury, 24 Chestnut Street commented on Ms. Bogart's plan and said it did not address the use level of the properties.

Pat Gillespie, owner of Shop Rite Shopping Center, Old Hook Road said he had received feedback from tenants that business was down because of the Kinderkamack Road improvement project and asked for a meeting with the County to explore ways to mitigate traffic congestion and disruption.

William Price, 9 Emwood Drive thanked members of the Governing Body for their no vote and said they needed to step back and listen to the people. He said he disliked the traffic on Linwood Avenue.

Mike Myers, 38 Allison Way asked how retail could be accessed in the JMF development area and requested a better mix of retail chains and mom and pop businesses.

Ed Bueti, 91 Chestnut Street asked about the cost per square foot for JMF's retail locations.

Robert Petrow, 21, 23, 33 and 50 Chestnut Street asked if the project would definitely happen and if the current tenants would be relocated and/or compensated. He also requested that his properties be taken out of the redevelopment zone.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public.

☞**Motion** to close the meeting to comments from the public was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried at 11:47 p.m.

XV.    RESOLUTIONS ON CONSENT AGENDA NO. 284-16

☞**Motion** to approve Consent Agenda No. 284-16 was **moved** by Councilman Lazar, **seconded** by Council President Knoller and carried by a roll call vote of 6-0.
**RC: Council members:**
**YES:  DiPaola, Lazar, Downing, Knoller, Tripodi, Worthington**

| | |
|---|---|
| Ca 285-16 | Authorize renewal of Shared Service Agreement with the County of Bergen for TV Inspection Services for CY 2017 and 2018 |
| Ca 286-16 | Authorize Cancellation of Small Balances |
| Ca 287-16 | Authorize hiring of Susan Monaghan as F/T Technical Assistant for the Construction Office |
| Ca 288-16 | Mayor and Council - 2017 Holiday Dates |
| Ca 289-16 | Mayor and Council - 2017 Meeting Dates |
| Ca 290-16 | Authorizing Disposal of Surplus Property |
| Ca 291-16 | Authorize Drug and Alcohol Testing Agreement for 2017 |
| Ca 292-16 | Authorize the hiring of Jim Howells as DPW Road Department member effective January 1, 2017 |
| Ca 293-16 | Authorize Action to Ensure Continuity of Services |
| Ca 294-16 | Authorize Borough Administrator to issue RFQ's for Grant Writing Services for 2017, 2018 and 2019 |
| Ca 295-16 | DOT and Green Acres Grant Applications |

Councilwoman DiPaola departed the Council Chambers before Closed Session due to illness.

XVI.   CLOSED EXECUTIVE SESSION - Resolution No. 296-16

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 296-16 was **moved** by Council President Knoller, **seconded** by Councilman Tripodi and carried by a roll call vote of 6-0 at 11:48 p.m.
**RC: Council members:**
**YES:  ~~DiPaola~~, Lazar, Downing, Knoller, Tripodi, Worthington**

| | | |
|---|---|---|
| #16-12/06-41 | Personnel – Rice Notice – Construction Office | N.J.S.A. 10:4-8 |
| #16-12/06-42 | Contract Negotiations - DPW | N.J.S.A. 10:4-7 |

XVII.  RECONVENE

The Borough of Emerson reserves the right to return to Open Session and, if appropriate, take formal action.

~~Councilwoman DiPaola departed the Council Chambers at the conclusion of Closed Session due to illness.~~

Agenda No. 27APPROVED FOR RELEASE & CONTENT 1-17-17

☞**Motion** to reconvene was **moved** by Councilman Worthington, **seconded** by Councilman Downing and carried.

☞**Motion** to extend the curfew for five additional minutes was **moved** by Councilman Worthington, **seconded** by Councilman Downing and carried unanimously.

- Resolution No. 297-16 Construction Official Compensation Adjustment & Acceptance of Resignation

    ☞**Motion** to approve Resolution No. 297-16 Construction Official Compensation Adjustment & Acceptance of Resignation was **moved** by Councilman Tripodi, **seconded** by Councilman Downing and carried by a roll call vote of 5-0.
    **RC: Council members:**
    **YES:  Lazar, Downing, Knoller, Tripodi, Worthington**

XVIII.   ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Councilman Lazar, **seconded** by Councilman Downing and carried at 12:03 a.m.

Respectfully submitted,

Jane Dietsche, RMC
Borough Clerk

Exhibit 14

### BOROUGH OF EMERSON
### COUNTY OF BERGEN
### NOTICE OF ADOPTION

D-20

## ORDINANCE NO. 1535-16

**Introduced:** December 6, 2016
**Adopted:** December 20, 2016

### AN ORDINANCE OF THE MAYOR AND COUNCIL OF THE BOROUGH OF EMERSON AMENDING THE CENTRAL BUSINESS DISTRICT REDEVELOPMENT PLAN PURSUANT TO N.J.S.A. 40A:12A-7

· **NOTICE IS HEREBY GIVEN** that the following ordinance was adopted on the second reading after a Public Hearing at the Regular Meeting of the Borough Council of the Borough of Emerson on the 20th day of December, 2016. A copy of Ordinance 1535-16 is on file in the Borough Clerk's Office in the Municipal Building, 1 Municipal Pl., Emerson, NJ 07630.

**WHEREAS,** Pursuant to the Local Redevelopment and Housing Law, (N.J.S.A. 40A:12A-1 et seq.) (the "Redevelopment Law"), on February 3, 2004 the Mayor and Council of the Borough of Emerson ("Mayor and Council" or "Borough") authorized the Emerson Planning Board, now known as the Emerson Land Use Board, ("Board") to conduct a preliminary investigation and hold the requisite public hearing to determine whether a certain area located within the Central Business District, including Lots 1, 2, 3, 4 & 5 on Block 412; Lots 1, 2, 3, 4, 5, 6.01, 6.02, 7, 8, 9 & 10 on Block 419; Lots · 2 & 16 on Block 420; Lots 1,10,11,12,13,14,15,16,17 &18 on Block 422; Lots 2, 3, 4, 5, & 6 on Block 603; Lots 3 & 4 on Block 606; Lots 1, 2, 4, 5.01, 5.02, 6, 7, 8, 9.01, 9.02, & 10 on Block 610; Lots 1 & 2 on Block 613; Lot 1 on Block 615; Lots 1, 16, 17, 19, 20, 21, 22, 23 & 24 on Block 616; and Lot 1 on 617.01 on the Official Tax Assessment Map of the Borough of Emerson ("Area") met the statutory criteria to be designated as "an area in need of redevelopment" as defined by the Redevelopment Law; and

**WHEREAS,** The Board conducted the requested investigation and held the requisite hearings on July 29, 2004 and August 19, 2004, which were all done on proper notice, to determine whether the studied Area met the statutory criteria to be designated as "an area in need of redevelopment"; and

**WHEREAS,** On September 7, 2004, the Board adopted a Resolution, recommending that the Mayor and Council designate the studied Area as "an area in need of redevelopment"; and

**WHEREAS,** The Mayor and Council adopted Resolution No. 242-04 on December 14, 2004 designating the Area as "an area in need of redevelopment" as well as directing the Board to prepare a redevelopment plan and forward its recommendation to the Mayor and Council; and

**WHEREAS,** The Board prepared a proposed redevelopment plan ("Redevelopment Plan") and on April 6, 2006 adopted a Resolution recommending the adoption of the Redevelopment Plan to the Mayor and Council; and

**WHEREAS,** On July 11, 2006, the Governing Body adopted Ordinance No. 1305-06 adopting the Redevelopment Plan and were determined to implement said plan; and

2089996-1

**WHEREAS,** On May 4, 2010, the Governing Body adopted Ordinance No. 1394-10 adopting certain amendments and reaffirming the Redevelopment Plan for the Central Business District (the "2010 Redevelopment Plan"); and

**WHEREAS,** In furtherance of redeveloping the Central Business District Redevelopment Area, on August 16, 2016 the Mayor and Council adopted Resolution No. 222-16, directing that the Board prepare revisions and/or amendments to the 2010 Redevelopment Plan pursuant to N.J.S.A. 40A:12A-7(e) and N.J.S.A. 40A:12A-7(f); and

**WHEREAS,** On September 8, 2016, the Board held a public meeting where at the Board's retained planner, Brigette Bogart PP, AICP, CGW of Planning & Design Professionals LLC ("Planner") presented proposed amendments to the 2010 Redevelopment Plan; and

**WHEREAS,** On September 22, 2016, after review of the proposed amendments, the Board adopted a Resolution affirming and recommending amendments to the 2010 Redevelopment Plan to the Mayor and Council, which also contained its report with its findings and conclusions of facts; and

**WHEREAS,** On November 21, 2016, the Mayor and Council held a meeting whereby the Planner and designated redeveloper presented its comments and recommendations for additional amendments to the Redevelopment Plan; and

**WHEREAS,** the Mayor and Council has determined it to be in the Borough's best interests to further amend the 2010 Redevelopment Plan in order to effectuate redevelopment on certain parcels located within the Central Business District Area ("Proposed Amendments"); and

**WHEREAS,** concurrently with the introduction of this Ordinance, the Mayor and Council shall adopt a Resolution referring the Proposed Amendments to the Board in Accordance with N.J.S.A. 40A:12A-7(e) and N.J.S.A. 40A:12A-7 (f) for its report and recommendation after review of the Proposed Amendments; and

**WHEREAS,** prior to final adoption of this Ordinance, the Mayor and Council shall have reviewed the Board's report and recommendation or if the Board fails to transmit a recommendation within 45 days after referral, the Mayor and Council may act upon this Ordinance adopting the Proposed Amendments pursuant to N.J.S.A. 40A:12A-7(e).

2089996-1

NOW THEREFORE, BE IT ORDAINED by the Mayor and Council of the Borough of Emerson as follows:

### SECTION ONE:  Permitted Uses.

§ 290-68A.  Principal Uses shall be deleted in its entirety and replaced with the following:

1. Retail stores.
2. Personal service businesses.
3. Eating and Drinking establishments (except drive ins)
4. Professional, financial and medical offices
5. Multi-family residential dwellings above at-grade, retail, commercial and other principal permitted uses.
6. Multi-family residential dwellings including buildings above at grade parking, only in areas where the building is behind a building that fronts on Kinderkamack Road.
7. Multi-family residential dwellings at grade only where they front on Lincoln Boulevard and only in areas where the building is behind a building that fronts on Kinderkamack Road.
8. Instructional studios spaces, including dance, artist, martial arts, music and other related studios.
9. Financial institutions
10. Childcare facilities and nursery schools.

**SECTION TWO:** Area and Bulk Requirements.

§ 290-69. Table A shall be deleted in its entirety and replaced with the following:

**TABLE A: AREA AND BULK REQUIREMENTS CBD-10 AND CBD-15**

| Regulation | CBD-10 | CBD-15 |
|---|---|---|
| Minimum Lot Area | 10,000 square feet (a) | 15,000 square feet (a) |
| Minimum Lot Width | 75 feet | 120 feet |
| Minimum Lot Depth | 60 feet(1) | 75 feet (1) |
| Minimum Front Yard | | |
| Kinderkamack | 17 feet (2) (4) | 15 feet (3) |
| Other Streets | 0 feet | N/A |
| Maximum Front Yard | | |
| Kinderkamack | 25 feet (2) | 50 feet (3) |
| Other Streets | 15 feet | N/A |
| Minimum Side Yard one/both | 0/0 feet | 10/20 feet(1) |
| Minimum Rear Yard | 0 feet | 10 feet |
| Maximum Building Stories | Four | Three |
| Maximum Building Height | | |
| Along Public Streets | 42 feet (5) | 40 feet (5) |
| Along the Railroad ROW | 50 feet (5) | 40 feet (5) |
| Maximum Building Coverage | 85 percent | 85 percent |
| Maximum Impervious Coverage | 95 percent | 90 percent |

(1) Corner parcels with rights of way located on three sides may reduce the required depth by 55% & reduced side yards of 5 feet each yard.

(2) In accordance with the streetscape requirements set forth in Section 290-70B1 of the ordinance.

(3) In accordance with the streetscape requirements set forth in Section 290-70B2 of the ordinance.

(4) Measured to the curb line.

(5) Additional Height is permitted in accordance with Section 290-70A3 and shall only be permitted on development parcels which are two (2) acres or greater. Further the 50 foot building height will only be permitted setback from the front building facade by a minimum of 5 feet in depth on buildings facing Lincoln Boulevard and Kinderkamack Road.

(a) Provided that, where an entire block is to be redeveloped pursuant to the Redevelopment Plan, the minimum lot area shall coincide with the block as depicted on that map.

2089996-1

## SECTION THREE: PARKING REQUIREMENTS

§ 290-71. Table C shall now include the footnote (a) below:

(a) If a project contains retail on the first floor with residential above, the parking requirement may be reduced to a maximum of up to 25% to account for shared parking, subject to and conditioned upon: (i) the receipt of testimony provided by the applicant's traffic/parking expert supporting such reduction: and, (ii) the Land Use Board retaining a traffic/parking consultant to support and confirm such determination, which shall be paid for by the applicant. If a development is constructed with the parking reduction then medical office space shall be a prohibited use. For the purpose of this section "medical office" shall include walk-in and urgent care clinics, other medical, dental, treatment and therapy related facilities.

## SECTION FOUR: DESIGN STANDARDS

§ 290-70A(3) Rooflines/building height shall be deleted in its entirety and replaced with the following:

(a) The top of all buildings must be capped by a cornice or sloping roof element other than structures utilized for parking.

(b) An additional five feet in height for ornamentation, such as parapets and cornices, is permitted. This additional height is only permitted along a maximum of 66% of the facade to encourage a varying roofline.

(c) In addition to Subsection A(3)(b) above, for each portion of a building that provides cornices and similar appurtenances for ornamental purposes, such elements may not be more than 25 feet in length each.

(d) All roof-mounted equipment shall be screened from public view by use of parapet walls.

(e) All lighting proposed on all buildings shall be designed to minimize any impact to the surrounding area. The lighting design should be consistent with the streetscape standards of the district and complimentary to the structure design.

(f) In the CBD-W zone district, 50% of a building may be four stories in height where the topography of land provides a minimum of an eight-foot change in elevation.

(g) Irrespective of other height restrictions, buildings in the area south of Ackerman Avenue may be developed with a maximum three residential stories above at-grade parking or above at-grade commercial, with a maximum height of 50 feet.

**SECTION FIVE: Purpose and Compliance with Statutory Requirements:**

      A. Purpose. The purpose of the Redevelopment Plan is to improve areas designated as being in need of redevelopment; to achieve the goals and objectives of the Master Plan as described above, to enhance the downtown commercial area, to provide for affordable housing in an appropriate location within the Borough, to provide added development near mass transit, to create additional walkable areas and reduce auto dependency, to provide for appropriate land usage, to provide public improvements including public parking, plazas and recreation facilities and to otherwise promote the public health, safety and welfare.

      B. Compliance with Statutory Requirements.

1) While it is not contemplated that implementation of the amendments to the Redevelopment Plan will require the relocation of businesses or persons, any relocation that may be required shall comply with the requirements of the New Jersey Relocation Assistance Law (N.J.S.A. 52:31(B)(1) et seq.) the Residential Eviction Law (N.J.S.A. 2A:18-61.1 et seq.) and any regulations adopted pursuant thereto.
2) The within Redevelopment Plan contemplates potential planned condemnation of properties, if required.
3) The within Redevelopment Plan does not require the removal of any affordable housing units.
4) The within Redevelopment Plan provides sufficiently complete information to establish compliance with the objectives of local zoning, redevelopment, building, land use, population density, traffic, transportation, recreation and public facilities.
5) The within Redevelopment Plan conforms to the New Jersey Development and Redevelopment Plan adopted pursuant to the State Planning Act and implements goals and objectives of the State Plan.
6) The within Redevelopment Plan complies with all provisions of the Municipal Land Use Law.
7) The within Plan further complies with the provisions of the Bergen County Draft Master Plan Report.
8) The Borough of Emerson hereby affirms that it and its designated agents will assert leadership within the community to ensure compliance with Title VI of the Civil Rights Act of 1964 and Title VII as amended in March of 1972, and with all the affirmative action requirements of the State of New Jersey, as well as regulations issued by the State of New Jersey and the Borough of Emerson.
9) No covenant, lease, conveyance, or other instrument shall be affected or executed by the Borough of Emerson or by a developer or any successor of an developer whereby the land within the Redevelopment District is restricted by the Borough or the developer on the basis of race, creed, color, or national origin in the sale lease, use or occupancy thereof. Appropriate covenants, running with the land, will prohibit such restrictions and shall be included in disposition instruments. There shall be no restrictions of occupancy or use of any part of the Redevelopment District on the basis of race, creed, color or national origin.

10) The provisions of this Redevelopment Plan and the requirements and restrictions contained herein shall be in effect for a period of thirty (30) years from the date of approval of this Ordinance by the Mayor and Council.

## SECTION SIX:  Additional Provisions.

A.  Deviation Requests.  The Borough may grant deviations from the regulations contained in the within Ordinance where permitted by the provisions of the Municipal Land Use Law.  Notwithstanding the above, any changes to the uses permitted in the within Redevelopment Plan Ordinance shall only be permitted by an amendment to this Ordinance by the Mayor and Council upon a finding that such deviation would be consistent with and in furtherance of the goals and objectives of this Ordinance.

B.  Implementation of the Plan.  The Mayor and Council are also authorized to enter into an agreement with a Redeveloper to implement the provisions of the within Redevelopment Plan Ordinance.  In the event the Borough does enter into such an agreement the Redeveloper shall be responsible to post sufficient escrows to cover any and all costs of the professional consultants retained by the Borough to review the proposed redevelopment project and any and all other aspects of the redevelopment process.  The Redeveloper, at the Redeveloper's sole cost and expense, shall also provide all necessary engineering studies in order to construct all on-site and/or off-site improvements, municipal infrastructure improvements, capacity enhancements or upgrades or other improvements required in connection with the provisions of water, sanitary sewer, stormwater sewer, electric and gas services to the project, and, in addition, all required tie-in or connection fees.  The Redeveloper shall also be responsible for providing, at the Redeveloper's sole cost and expense, all lighting, on-site and off-site traffic controls, road improvements, street trees, pavers, furniture, landscaping, and any and all other improvements required as a result of the proposed redevelopment.  Any Redevelopment Agreement between the Borough and the Redeveloper will contain the terms, conditions, specifications and description of required performance guarantees pertaining to the Redeveloper's obligation to provide all improvements.

C.  This Ordinance may be amended upon compliance with the requirements of State Law.  In the event a Redeveloper requests any amendment of the within Ordinance, said Redeveloper shall be required to post escrows in such amounts as shall be necessary to cover all costs of the Borough's professionals in connection with the required amendment, including, but not limited to the costs of an impact study prepared by a professional planner.

**BE IT FURTHER ORDAINED,** that the provisions of this Ordinance are hereby declared to be severable. Should any section, paragraph, subparagraph, provision, sentence, or part hereof be declared invalid or unconstitutional, said finding shall not affect any other section, paragraph, subparagraph, provision, sentence, or part thereof and the remainder of this Ordinance shall be deemed valid and effective.

**BE IT FURTHER ORDAINED,** This Ordinance shall take effect immediately following final passage, adoption and publication as provided by law.

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN |
|---|---|---|---|---|---|---|
| DiPaola | | | | X | | |
| Lazar | X | | X | | | |
| Downing | | | X | | | |
| Knoller | | X | X | | | |
| Tripodi | | | | X | | |
| Worthington | | | | X | | |
| Mayor Lamatina | | | X | | | |

*I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on December 20, 2016.*

Attest: _____
                    *Municipal Clerk*

Adopted: December 20, 2016          Approved: _____

_____
LOUIS LAMATINA, Mayor

**ATTEST:**

_____
JANE DIETSCHE, Borough Clerk

2089996-1

Exhibit 15

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17





**MINUTES**
**BOROUGH OF EMERSON**
**MAYOR AND COUNCIL**
**January 17, 2017**
**7:30 P.M.**
**Borough Hall-Council Chambers**
**Emerson, NJ 07630**

I.  CALL TO ORDER

Mayor Lamatina called the meeting to order at 7:30 p.m. and identified the emergency exits.

Mayor Lamatina announced that in order to accommodate the public, the Governing Body had consented to allow two additional opportunities for specific public comment. The first was under 'Financial Business' so that questions concerning the PILOT agreement could be asked and answered. The second was under 'Unfinished Business' to accept comments on the redesignation of Block 419 as an area in need of redevelopment.

II.  ROLL CALL

Mayor Lamatina asked Ms. Dietsche to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilwoman DiPaola, Councilman Downing, Councilman Falotico, Council President Knoller, Councilman Lazar

**Absent**: Councilman Worthington

Also present were Assemblywoman Holly Schepisi, Borough Administrator Robert S. Hoffmann, Special Counsel Douglas Doyle, substituting for Borough Attorney Wendy Rubinstein, and Borough Clerk Jane Dietsche.

Ms. Schepisi said she represented 23 municipalities and was attempting to visit a Council meeting in each community. She said local municipalities were facing a host of issues related to affordable housing and school funding. She was available to work with everyone to provide clarification on affordable housing obligations as well as try to get more fair school funding. She said her office was in Westwood and asked everyone to reach out to her. She offered legislative help for anything impacting the community.

Mr. Hoffmann thanked Assemblywoman Schepisi for her help with the Pascack Valley Shared Service group. He also thanked members of her staff, Senator Cardinale and Assemblyman Auth since they have provided timely assistance on some perplexing issues.

III.  EXCUSED ABSENCE OF GOVERNING BODY MEMBER
   •  Absence of Councilwoman  DiPaola from Special Meeting of December 20, 2016

   ☞**Motion** to excise the absence of Councilwoman DiPaola from the Special Meeting of December 20, 2016 was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried unanimously.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

IV.  PROCLAMATIONS & CITATIONS
   • Swearing in of Probationary Patrol Officers Connor Murphy and Trace McDermott

V.  RESOLUTION NO. 48-17 - BOROUGH PROFESSIONAL APPOINTMENTS –
    Non-Fair and Open Contract Pursuant to the Provisions of N.J.S.A. 19:44a-20.4

    Councilwoman DiPaola requested that each resolution be voted on separately.

| PROFESSIONAL | | TERM | NAME |
|---|---|---|---|
| 49-17 | Borough Attorney | 1 Year | DeCotiis, Fitzpatrick, Cole & Giblin |
| | | | Wendy Rubinstein, Esq. |
| 50-17 | Land Use Board Attorney | 1 Year | Morrison Mahoney LLP |
| | | | Christopher Martin, Esq. |
| 51-17 | Labor Attorney | 1 Year | Ruderman Horn & Esmerado |
| | | | Mark Ruderman, Esq. |
| 52-17 | Borough Engineer | 1 Year | Boswell Engineering |
| | | | Gary Ascolese |
| 53-17 | Borough Planner | 1 Year | Brigette Bogart Planning & Design Professionals |
| 54-17 | Borough Prosecutor | 1 Year | Arthur Balsamo, Esq. |
| 55-17 | Alternate Prosecutor | 1 Year | Christopher Martin, Esq. |
| 56-17 | Public Defender | 1 Year | Jeffrey Carney, Esq. |

☛**Motion** to approve Resolution No. 49-17 Appointment of Borough Attorney Wendy Rubinstein, Esq., DeCotiis Fitzpatrick, Cole & Giblin for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO: DiPaola**

☛**Motion** to approve Resolution No. 50-17 Appointment of Land Use Board Attorney Chris Martin, Esq., Morrison Mahoney LLP for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

☛**Motion** to approve Resolution No. 51-17 Appointment of Labor Attorney Mark Ruderman, Esq., Ruderman, Horn & Esmerado for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

☛**Motion** to approve Resolution No. 52-17 Appointment of Borough Engineer Gary Ascolese, P.E., and Boswell Engineering for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

☞**Motion** to approve Resolution No. 53-17 Appointment of Borough Planner Brigette Bogart, Bogart Planning & Design Professionals for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO: DiPaola**

☞**Motion** to approve Resolution No. 54-17 Appointment of Borough Prosecutor Art Balsamo, Esq. for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO: DiPaola**

☞**Motion** to approve Resolution No. 55-17 Appointment of Alternate Prosecutor Chris Martin, Esq. for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

☞**Motion** to approve Resolution No. 56-17 Appointment of Public Defender Jeff Carney, Esq. for Calendar Year 2017 was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

VI.  MINUTES FOR APPROVAL
- Regular Meeting Minutes of December 20, 2016
- Closed Session Regular Meeting Minutes of December 20, 2016

   ☞**Motion** to approve the Regular Meeting Minutes of December 20, 2016 as amended and the Closed Session Regular Meeting Minutes of December 20, 2016 was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried unanimously.

- Sine Die/Reorganization Meeting Minutes of January 3, 2017

   ☞**Motion** to approve the Sine Die/Reorganization Meeting Minutes of January 3, 2017 as amended was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried unanimously.

VII.  CORRESPONDENCE
Mayor Lamatina announced that copies of the correspondence were available in the Office of the Municipal Clerk.

- Letter dated December 21, 2016 from Dan O'Brien; Re: Procedure to remove property located at 17 A-C Palisade Avenue from Redevelopment Zone
- Letter dated November 16, 2016 from Pam Their, Compliance Inspector, NJDEP; Green Acres Program Compliance Approval
- Letter/Petition received December 20, 2016 from Jill McGuire et.al.; Re: Limit building height to three stories in Redevelopment Zone
- Email received December 19, 2016 from Ann Arnold; Re: Anti BDS Resolution
- Resolution dated December 20th from City of Hackensack; Re: Mutual Aid

- Letter dated December 16, 2016 from Beth Ravit, Co-Director, Rutgers University Center for Urban Environmental Stability; Re: Master Plan for Bergen County Parks System
- Email dated January 2, 2017 from Jill McGuire; Re: PILOTS, historic significance of Borough Hall, Land Use Board transcript of 12/20/16
- Email dated January 4, 2017 from Jim and Kara Sabino; Re: Flooding on Pavonia Avenue
- Email dated January 7, 2017 from Jill McGuire; Re: Borough Hall murals
- Resolutions from Bergenfield, Westwood, Teaneck, Northvale, et. al., Re: Mutual Aid Plan & Rapid Deployment Force – Interlocal Service Agreement
- Email dated January 13, 2017 from Alexandria Acosta; Re: Bergen County Parks Master Plan Community Information Sessions
- Emails dated January 14, 2017 from Jill McGuire; Re: Request for clarification of Ordinance 1566-17; Request for tabling of repeal and replace Ordinances 1566-17 and 1567-17
- Email dated January 17, 2017 from Lorraine McQueeney; Re: Mount Laurel obligations

VIII.   FINANCIAL BUSINESS
- Resolution No. 57-17 Bill List

    ☞**Motion** to approve Resolution No. 57-17 Bill List was **moved** by Councilman Lazar, **seconded** by Councilman Falotico and carried by a roll call vote of 5-0.
    **RC: Council members:**
    **YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

- Address questions related to PILOT agreement

    Special Counsel Matt Karrenberg, Esq. of DeCotiis, Fitzpatrick, Cole & Giblin was present to answer questions related to payments in lieu of taxes, better known as PILOT agreements.

- Public Comment on PILOT agreement only

    ☞**Motion** to open the meeting to comments from the public on the PILOT agreement only was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried at 8:16 p.m.

    Mr. Karrenberg said he was present to discuss the financial and PILOT agreements with JMF Properties. He noted that he had given a financial presentation in August regarding the terms of the financial agreement. At that time, the agreement was approved pursuant to Ordinance at the public hearing. He was aware of additional questions from the public which the Borough addressed through a memorandum in August. He added that the math was a little bit off in one or two items in the original memo and a new memo had been prepared and posted which was easier to explain to the public.

    He stated that the land was not exempt from taxation – the land was assessed and taxed the same way all other properties in the Borough were taxed. The PILOT was based upon a calculation as a percentage of the annual gross revenue – which was basically the rent – and initially that was 10%. He provided a detailed explanation of the calculation process.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

Councilman Lazar asked if the property values would increase when the development was done and if so, whether the taxes on the property would increase. Mr. Karrenberg confirmed that this was the case and estimated the value of the land would likely jump from $5.7 - $6 million today to approximately $9 million. Mayor Lamatina noted that the value of the land would range from approximately $2,775,000 to $2,800,000 and the improvements would be around $2,900,000, for a total value of approximately $5,775,000.

Councilwoman DiPaola said she thought the number of students that would come out of 147 or possibly more apartments was low. What residents could not wrap their heads around was the amount of money going to go to the school because they felt there would be more students coming out of the development than the money that was going to be allocated from land taxes to the school.

Mr. Karrenberg explained how the number of school children was calculated and said a much lower number of school children would be anticipated when the property was considered a transit oriented development.

Councilman Lazar asked what would happen if there were more school age children generated from the development than anticipated and the school needed more money. If that was the case, he asked if some of the money be redirected from the PILOT to the school to compensate them if the Governing Body chose to do that. Mr. Karrenberg said it was a trickier question than it sounded. All governments in New Jersey could only do what they were statutorily authorized to do. There was no express statutory authorization to take PILOT money from the Borough's budget and give it to the school. But he added there were probably ways it could be done. He did point out that at the end of the day it was a net neutral issue.

Councilwoman DiPaola asked if Mr. Karrenberg had a hand in the terms of the thirty year PILOT or if he thought it was beneficial. Mr. Karrenberg said all deals were negotiated and it was statutorily permitted so it was part of the negotiations. He said that while Emerson was a much nicer town than where a lot of these types of developments occurred, it was an untested market. JMF would be building something downtown that did not exist and had not existed. It came with some risk and was a tough site assemblage with a lot of risk in trying to acquire multiple properties as opposed to having one property where negotiations were easier. He noted that the deal was not what JMF originally requested which was thirty years at a flat ten percent.

Mr. Karrenberg reviewed the PILOT agreement's financial details. He said that the total tax collected from the properties in 2015 was about $146,000. The Borough received about $45,000, the school received about $88,000 and the County received about $15,000. Assuming the development was completed based on the analysis, the land tax itself would be $236,000. The Borough would receive the same percentage it received today which would be about $72,000, the school would receive $142,000 and the County would receive about $23,000. When those numbers were added to the 95/5 split of the remaining PILOT, the Borough under the remaining PILOT would receive $115,000 and the County would receive about $6,000. The school would not receive any of the remaining PILOT amounts pursuant to the long term tax exemption. The total amount would become $187,000 for the Borough, $142,000 for the school and about $29,000 for the County equaling $358,000. Each entity would do better under the development than they did under the current years. He projected it out over a thirty year period and the analysis indicated that the development would pay collectively in PILOT and land taxes approximately $16 million over the thirty year period. Under the current use, assuming no additional new improvements or new developments, but also increasing the current taxes by 2%, it would result in about $6 million, a $10 million increase.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

Councilwoman DiPaola said the numbers sounded great but questioned what would happen if the development turned into a big white elephant and they were not getting the anticipated revenue or could not sustain the rents they anticipated. She asked what would happen if more affordable housing had to be made available just to make ends meet and then there were more children. She said that in that case, Emerson would be stuck in a 30 year agreement with a redeveloper and the Borough would be bleeding because funds had to be given to the school system to sustain the children. Mr. Karrenberg responded that it depended how big the white elephant was. He said his studies indicated that the rents seemed relatively in-line with about 25 properties in surrounding municipalities. To the extent the revenues were lower, the PILOT would be lower; to the extent they were higher, the PILOT would be higher.  He explained that in the agreement and in accordance with law, there was a minimum annual service charge. Under law it could not be lower than what it was today - $146,000. If the development was completely built, his expectation was that the land tax, even if the rents were terrible, would be more than $146,000.

Councilwoman DiPaola asked if the Borough was locked into this agreement for residents' clarification. Mr. Doyle explained that the Governing Body had authorized this after a first reading and second reading and a full hearing that took place during the summer. She said she just wanted everyone to know that there was no going back and that the presentation was just for education and information. Mr. Doyle and Mr. Karrenberg agree.

Dot Haight, 84 Lincoln Boulevard asked Mr. Karrenberg questions related to the PILOT agreement and differences between the original and revised memo.

Mr. Doyle stated that the decision to approve the financial agreement was not based on the erroneous data. Mr. Karrenberg said that the $358,000 was the estimated scenario for the total amount and more than likely, the developer was holding back because they did not want people to think they were going to make too much money. Therefore, this led them to be generally conservative in their application. It did not mean it would be true in the future but to the extent the rents went up, the $358,000 would go up. The Borough had the right to audit annually so they could not hide money. In addition, the Borough also had the right under the long term tax exemption law to limit the amount of profit they could make. If a developer received a tax abatement and made over 12% profit, that amount had to be disgorged back to the town.

Council President Knoller thanked Mr. Karrenberg for redoing the document and said the original had been confusing. He said the current version was much easier to follow. He hoped it answered Ms. Haight's questions and apologized for the delay in responding to her.

Ms. Haight asked if the developer could appeal the land value if they could not fill their units and possibly pay less in land tax. Mr. Karrenberg noted that they could after the first year and under statute the developer had the right after the first year and any time thereafter to terminate the PILOT.

Councilman Lazar noted that the Emerson Grand had all the apartments rented out before it was even finished and had a waiting list. He said that because of the convenient mass transportation options into New York City for professionals, it was a very desirable location. He found it hard to believe that they couldn't fill it up 110% based on past experience in the area. He found the nay saying about whether they could fill the units very disconcerting.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

Mr. Gonzalez, Maepaul Drive asked if the apartments above the stores on Kinderkamack Road were occupied and said they were looking to add more apartments when there were vacancies in town.

Toni Plantamura, owner of Dairy Queen, 13 Kinderkamack Road inquired about appealing taxes in a PILOT agreement.

Ernest Van Der Heuvel, 32 Lake Road, Congers, NY asked about taxpayer appeals in a PILOT agreement.

Jim Tabacchi, 378 Hardenburg Avenue, Demarest said he represented the owners of Cork and Keg at 188 Kinderkamack Road and asked about their lease. Mayor Lamatina explained that this open session was only for comments related to the PILOT agreement.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on the PILOT agreement only.

☛**Motion** to close the meeting to comments from the public on the PILOT agreement only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

Mr. Karrenberg departed the Council Chambers.

IX.  UNFINISHED BUSINESS
- **Discussion of Resolution No. 58-17** - RESOLUTION OF THE BOROUGH COUNCIL OF THE BOROUGH OF EMERSON, COUNTY OF BERGEN, STATE OF NEW JERSEY DETERMINING THAT BLOCK 419, LOTS 1, 2, 3, 4, 5, 6.01, 6.02, 7, 8, 9 AND 10, ON THE OFFICIAL TAX ASSESSMENT MAP OF THE BOROUGH OF EMERSON QUALIFY AS AN AREA IN NEED OF REDEVELOPMENT, SPECIFICALLY A CONDEMNATION REDEVELOPMENT AREA, PURSUANT TO THE PROVISIONS OF THE LOCAL REDEVELOPMENT AND HOUSING LAW (N.J.S.A. 40A:12A-1 ET SEQ.) AND SHALL CONTINUE TO BE PART OF THE CENTRAL BUSINESS DISTRICT REDEVELOPMENT AREA:
  **Addressing Land Use Board's Recommendation to Redesignate As An Area in Need of Redevelopment of Block 419 of the Redevelopment Zone**

  Mayor Lamatina said the Governing Body was willing to hear any comments the public might have on the redesignation of Block 419. He noted that the resolution only affected Block 419 which encompassed the area from Linwood Avenue north to Lincoln Boulevard on the west side of Kinderkamack Road with the western border of the railroad tracks. He added that the Governing Body would only accept comments from the public on that area.

- Public Comment on Resolution No. 58-17 only

  ☛**Motion** to open the meeting to comments from the public on Resolution No. 58-17 only was **moved** by Councilwoman DiPaola, **seconded** by Councilman Falotico and carried at 8:35 p.m.

  Mayor Lamatina recognized Borough Planner Brigette Bogart who was also present to answer questions.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

Mr. Doyle stated that this was not an opportunity for a hearing or expanding the record. The Municipal Land Use Law and the Legislature had made it very clear how to designate an area in need of redevelopment. The Governing Body had done that and done it correctly. The Land Use Board had proceeded in accordance with the law. Several months ago, the Governing Body had directed that the Land Use Board undertake a study of the existing redevelopment area for the Central Business District. In 2004 the Governing Body had requested that the Land Use Board at that time perform that study which they did. They made a recommendation back to the Mayor and Council. The Mayor and Council adopted a resolution in 2004 designating all these properties that they recommended be considered as an area in need of redevelopment.

This year the Governing Body again asked the Land Use Board to restudy the area. When he and Ms. Bogart looked at the volume and work that needed to be done, it was determined that they should probably put them in order of priority, that priority being that they had a developer who was willing to move forward with respect to Block 419 and the lots therein. At a point in the future, the Land Use Board would take up the remaining blocks and lots in the Central Business District, but before they did that they would re-notice all property owners indicating when a hearing would take place. He said that no further hearings would take place on any other lots within the Central Business District unless and until those individual property owners receive notice in the same notice that they received notice before.

He said there had been some concern about the notices indicated that they were for a condemnation redevelopment area.   He explained that in the first study in 2004 and determination in need of redevelopment, the Governing Body had authorized to proceed with condemnation with limited success. Between 2004 and the new notices, the legislature said it was necessary to indicate if there was a potential use of power of eminent domain. At this evening's meeting, the Governing Body could accept and/or reject the findings of the Land Use Board as it related to Block 419. No other properties were being considered. In addition, he noted that Ms. Bogart was present to answer procedural questions only and not give further testimony.

Richard DeAngelis, Esq. representing the owner of 214 Kinderkamack Road was opposed to the vote to designate the properties as a condemnation zone and requested that the Governing Body reject the resolution. He said that once it passed, he would be filing a lawsuit in Bergen County Superior Court and noted that the process was procedurally flawed in 2004. He asked that if the Governing Body did not reject the resolution, that it be remanded and sent back to the Land Use Board for further hearings. He further commented that the area was not blighted.

Phyllis Rooney, 5 Oakland Avenue stated that Emerson would become Pottersville instead of the Family Town. She asked that the lives of business owners be considered since they cared about the town. She discussed vacancies in garden apartments in the area and asked the Governing Body to reconsider their decision.

Ken Hoffman, 61 Emwood Drive discussed the rights of property owners and said the Governing Body should heed Mr. DeAngelis' warning. He questioned the designation of blight and whether it affected the health, safety and welfare of the community. He said a court case would be expensive, lengthy and ultimately unsuccessful.

Dan O'Brien, 17A Palisade Avenue commented on quotes in the Pascack Press by Mayor Lamatina. He said misinformation was being put out to the public. He was opposed to the blight designation of properties in the redevelopment zone and said the Governing Body was not protecting the residents. He noted that if there was blight in town, it was due to the Governing Body not enforcing property maintenance ordinances.

Bill Price, 9 Emwood Drive said information had not been communicated well at the December Land Use Board meeting. He also discussed traffic congestion in the downtown area and said that additional apartments would make it worse.

Ernest Van Der Heuvel, 32 Lake Road, Congers, NY thanked Councilwoman DiPaola for caring about the taxpayers. He asked Ms. Bogart about her Oath of Office. He requested that the Governing Body table the deal because they were not listening to taxpayers.

Stan Woods, 56 Maepaul Drive asked the Governing Body to be very careful about their decision because he did not think things were going in the right direction.

Paul Hulbert, 55 Jefferson Avenue asked if the resolution only applied to Block 419. He suggested holding landowners accountable for the condition of their properties and thought they would make a good faith effort to redevelop their properties on their own.

Dominic Scala, owner of Cork and Keg, 188 Kinderkamack Road said that not all business owners were able to attend the meeting but they did care. He asked for details about having his business relocated.

Jack Pousty, 184 Kinderkamack Road said he did not know when meetings took place and was very disappointed with the negotiations. He disapproved of the project.

Steve Paino, 51 Colonial Road inquired about the property assessments of Block 419. He requested that Kinderkamack Road improvements be finished and allow property owners to redevelop on their own.

Bob Petrow, 21, 23, 33, 50 Chestnut Street said that the property owners in the room all stood in solidarity with the owners of Block 419 properties. He said that if Block 419 went, others would be next and he did not want Emerson to turn into a city.

☞**Motion** to close the meeting to comments from the public on Resolution No. 58-17 only was **moved** by Councilman Lazar, **seconded** by Councilman Falotico and carried at 9:55 p.m.

☞**Motion** to approve Resolution No. 58-17 - RESOLUTION OF THE BOROUGH COUNCIL OF THE BOROUGH OF EMERSON, COUNTY OF BERGEN, STATE OF NEW JERSEY DETERMINING THAT BLOCK 419, LOTS 1, 2, 3, 4, 5, 6.01, 6.02, 7, 8, 9 AND 10, ON THE OFFICIAL TAX ASSESSMENT MAP OF THE BOROUGH OF EMERSON QUALIFY AS AN AREA IN NEED OF REDEVELOPMENT, SPECIFICALLY A CONDEMNATION REDEVELOPMENT AREA, PURSUANT TO THE PROVISIONS OF THE LOCAL REDEVELOPMENT AND HOUSING LAW (N.J.S.A. 40A:12A-1 ET SEQ.) AND SHALL CONTINUE TO BE PART OF THE CENTRAL BUSINESS DISTRICT REDEVELOPMENT AREA was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO: DiPaola**

- Discussion of Selection of Architect – Mr. Hoffmann said the original eight architects who had submitted Requests for Proposals had been whittled down to four finalists. He asked the Governing Body to make a first and second choice so the Borough could move forward with needed work at the Department of Public Works facility, as well as relocate the Ambulance Corps and improve Borough Hall. The Governing Body discussed the length of the contract and what projects should be worked on first and agreed to a limit of three years instead of five. Council consensus was that their first choice was Joseph Cecco of Axis Architectural Group and their second choice was Arcari and Iovino Architects. Mr. Hoffmann said the resolution was included in the Consent Agenda and the term would be reduced from five to three years.

X.  NEW BUSINESS
- PSEG Road Opening – Randolph Avenue – Mr. Hoffmann said he would be sending the Governing Body a memo related to a meeting with PSE&G. They wanted to replace gas lines at three locations as part of the Energy Strong Program on Randolph Avenue. PSE&G did not want to pay for repaving the entire road. He stated that the Borough had passed an ordinance requiring that if a road was opened, it had to be repaved. He would keep the Governing Body informed.

- Borough Hall WPA Designation - Policy Decision – Mr. Hoffmann noted that it was necessary to make improvements to Borough Hall but there was no need to rush the process. He also mentioned the WPA artwork and other interest about the designation of Borough Hall. He said there was not a need to rush into this and that work should be done with the architect, the Historic Preservation Commission and Borough staff to determine the best course of action. The Governing Body consensus was to preserve the Borough's history.

XI.  INTRODUCTION OF ORDINANCES

Mayor Lamatina announced that Ms. Dietsche would read the following ordinances by title and they would be further considered at a Public Hearing to be held on February 7th, 2017 at 7:30 p.m. in the Council Chambers of the Borough Hall, Municipal Place, Emerson, N.J. and published by title in the January 20, 2017 edition of the Ridgewood News.  He added that these ordinances were on file in the Clerk's Office and posted on the official bulletin board of the Municipal Building where copies would be available to the General Public at no charge.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

**First Reading:**

__1536-17__ AN ORDINANCE REPEALING AND REPLACING CHAPTER 163 HISTORIC PRESERVATION, ARTICLE I HISTORIC PRESERVATION COMMITTEE, OF THE CODE OF THE BOROUGH OF EMERSON

☞**Motion** to introduce Ordinance #1536-17 on first reading was **moved** by Councilman Falotico, **seconded** by Councilman Lazar and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO: DiPaola**

__1537-17__ AN ORDINANCE TO AMEND CHAPTER 27. ENVIRONMENTAL COMMISSION.  REPEAL CHAPTER 89. SHADE TREE COMMISSION AND AMEND CHAPTER 266 TREES AND SHRUBBERY OF THE CODE OF THE BOROUGH OF EMERSON

☞**Motion** to introduce Ordinance #1537-17 on first reading was **moved** by Councilman Lazar, **seconded** by Councilman Falotico and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO: DiPaola**

XII.   ADOPTION OF ORDINANCES

Mayor Lamatina announced that no ordinances were being adopted that evening.

XIII.   REPORTS
- Mayor and Council

Councilwoman DiPaola commented on the moment of silence for former Tax Collector Joseph McQueeney who had served the Borough from 1976-1996. He was a great guy and had continued to help the town after retiring when the new Tax Collector was ill. She stated that he had been a hero for another Emersonian.

She had attended the Library Board of Trustees meeting and noted that a number of outdoor lights were out, reducing visibility. Mr. Hoffmann said they would follow up on this item. The library was displaying model airplanes from the Hackensack Valley Flyer Model Airplane Club. She thanked Library Director Camille Valentino for facilitating this display. In addition, an artist would be coming in to paint and repurpose tables so they would not need to purchase new ones. Their water bill had increased by 200% since the Memory Garden was installed and she said the water should be hooked in to the Department of Public Works or the Borough should reimburse the Library.

Councilman Falotico said he had attended his first Land Use Board meeting, the Reorganization meeting where new members were sworn in. Discussion had centered on redevelopment and the area designated as the Redevelopment Zone. He attended a New Jersey State League of Municipalities orientation for newly elected officials on Saturday, January 7th.

Councilman Lazar gave the December report for the Department of Public Works. They were in the process of chipping Christmas trees and had recycled 14,200 pounds of metal. The department had been reimbursed $1,440 for plowing County roads. The men's and women's restrooms at their facility had been updated. He noted that they were doing a fine job and keeping costs way down by doing a lot of the work themselves.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

He stated that the owner of 23 Pavonia Avenue had brought flooding issues to his attention. He and DPW Superintendent Perry Solimando had investigated the area and used a camera to view the storm drain and found a collapsed clay pipe which was causing all the problems. They were working on ways to resolve this and were currently getting quotes. A discussion with the Borough Engineer was also planned.  He wanted to make sure the property owners on Pavonia Avenue would not be subject to flooding.

Council President Knoller congratulated the new Police Officers Murphy and McDermott and said they were two fine young men. He had recently met in person with nine residents and two additional residents on the phone to listen to their concerns about redevelopment. He told them he would bring their concerns to the Council. He said that condemnation was a big concern and the Governing Body did not really want condemnation. It was not an easy process and he hoped the developer would be able to come to amicable agreements with all the property owners in the designated area. The group had agreed that the area needed to be redeveloped but had expressed concerns about the PILOT program. He said new information would be posted to the Borough website. There was discussion about a potential increase in the number of students that might enroll at the schools but at this point they did not see that happening. He said that if something changed, they would have a discussion with the school.

Council President Knoller also said the group had asked why the area was a condemnation redevelopment zone. Mr. Doyle explained that it had always been a condemnation zone. In 2004 and 2006 the area was studied by the Land Use Board as recommended by the Governing Body at that time. The study was to determine whether the area was in need of redevelopment. Once confirmed, the Governing Body automatically at that time under the law had the authority to acquire property. Since that time the Legislature sought fit to say that if you want to continue to be able to acquire property, you now needed to include that in your notice as well as the letters sent to everyone and what was published in the paper. He added that the Governing Body always had that authority going back to the first time they designated it as an area in need of redevelopment. When the notices were sent out again, they were sent as they were required to be sent presently. They did not have to say it before, but now they did.

Council President Knoller said another topic discussed was that the Governing Body needed to do a better job of communicating to the public. He said that overall, the discussion was cordial and enlightening. He appreciated that they asked him to be there and hoped to continue to have discussions with the public in a neutral setting where everyone had the ability to voice their opinion. There was a lot of respect and everyone listened to each other. They may not have agreed with his opinion but they were very respectful and he really appreciated that. He acknowledged some people's anger and frustration with what was going on but his intention was not to create that. He understood that when things were changing, some of the changes were happening so quickly that they could bring frustration and apprehension and uncertainty.

He stated he was only looking at Block 419 and hoped that the property owners across the street would take care of their properties on their own. He hoped it would never come to condemnation or eminent domain. He thought that property owners did have a responsibility to maintain their properties. He wanted to keep the Family Town atmosphere but also move Emerson forward. He noted that there was a COAH obligation that would enable some of the requirements to be addressed by this particular project. But the ultimate goal was to clean up and improve the downtown to attract people to come to Emerson to live and open businesses and have adequate parking and walkways.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

He had attended the Chamber of Commerce meeting the previous week and they had asked about redevelopment. He said he had no intention of going beyond Block 419. That was not the focus and not what he was looking to do or what needed to be done. But moving forward on Block 419 was the right decision to provide some tax stabilization. He hoped agreements would be made amicably between the developer and the property owners and that it did not come down to a condemnation effort. He said that this process was not simple; rather it was long and drawn out and time consuming.

Mayor Lamatina said he shared Council President Knoller's thoughts on redevelopment and ceded his report time to allow Ms. Bogart to explain the interaction between the redevelopment zone and affordable housing.

Council President Knoller said that if the ordinance passed on second reading, the Historical Preservation Commission would become the Historic Preservation Committee and suggested that Ms. McGuire become one of the first residents to be asked to be on the committee. She had done a tremendous amount of work on her own time, including historic fact finding about Borough Hall and mentioned her Facebook page, Preserve Emerson Borough Hall, where she posted pictures of the WPA paintings in the basement.

Councilman Downing had attended the Fire Department Installation Dinner and was amazed to see generations of families who were committed to volunteering in town. It showed the dedication of Emerson's residents and was what the town was all about. He added that the new police officers were great guys and would also be a great addition to the town.

He also reported on the recent Environmental Commission meeting and said they were moving forward with the Centennial Park project and community garden. They were discussing walking paths and using grants to install porous rubber walkways that would be environmentally sound and sustainable as well as ADA accessible for wheelchairs as well as strollers. It would also include lighting and deer fencing for the vegetable gardens. He praised the volunteerism of the Environmental Commission.

He addressed condemnation and redevelopment and explained the reasons he voted the way he did. He did not believe the project was going to move forward and it was going to fall apart like all the other ones. He said they needed to move forward – they were focusing on one little area. He did not want to take anyone's property and wanted everyone to get what they deserved. If someone did not want to be involved in the project, then they should come out. He was not happy to hear that JMF wasn't being fair but he hoped the attorney would address that. He stated that if it was not being done fairly or properly, then maybe they should renegotiate with JMF and find a new developer because they were voiding their agreement with the Borough. He added that part of their agreement was to do fair market values. He said that all the buildings were in the condemnation zone since 2002. It was nothing new; people had bought property in the redevelopment zone. They were not looking at anything else; they were trying to do one piece of the town and try to make it better.

Mayor Lamatina stated that the Borough needed to make affordable housing a realistic and reasonable opportunity. He asked the Ms. Bogart to explain how affordable housing related to redevelopment. They had to provide a draft plan to the Court to address Emerson's affordable housing obligation and make it a reasonable opportunity for houses to built.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

Ms. Bogart said they had recently promised the Court that they would come up with a draft plan in the next month or so trying to address the Borough's affordable housing obligation. Otherwise, the Borough would be subject to builders' remedy lawsuits. She said the Borough had been sued before for builders' remedy lawsuits. As a result of that lawsuit, the town had a 20% overlay for the whole municipality; any development over six units was required to include 20% set aside for affordable housing units. The Land Use Board would be obligated to review and consider it in accordance with that ordinance. That overlay made development more difficult in any parcel in the Borough, not only in the downtown area. It created an opportunity for developers to go in throughout the rest of the municipality and build multi-family or affordable housing where they may not want it in nice little family neighborhoods.

She said that as part of the draft plan, they were trying to get the overlay for the whole municipality lifted and concentrate the affordable housing where it should be, in the downtown area. The location would be near mass transit so that people who might not have access to a vehicle would be able to get to work.  By having the Redevelopment Zone, the Borough was telling the Court that this was where they had planned for it for over 15 years. The good thing about the redevelopment statute was that the Borough would get a bonus for every rental unit provided for affordable housing, an additional unit credit. But in a redevelopment district, you would receive 1.33 credits for every unit. So any units provided downtown would receive additional credits up to 25% of Emerson's obligation. It was a benefit to the municipality because it would reduce our obligation.

Mayor Lamatina asked how Ms. Bogart's plan would be affected if the Governing Body decided to abolish the Redevelopment Zone. She said the plan would be affected significantly; bonus credits would be gone. If a Court accepted Emerson's plan and relied on it and then the redevelopment district was abolished, the Courts would say that Emerson did not abide by its plan and had not committed to the constitutional obligation to provide affordable housing.

Ms. Bogart said the prior round obligation was to provide 74 units. The Borough went through a vacant land adjustment so it was reduced previously and wound up with an overlay over the entire municipality. EConsult, the Borough's consultant hired to come up with the number, estimated the number to be about affordable 237 units, which was inclusive of the 74 units. This would mean the Borough would have to provide over 1000 units. Fair Share Housing has suggested the Borough would have to come up with 408 affordable units but said they would reduce their obligation by 30% if the Borough was willing to settle with them. That would represent about 290 units they would want to see built in Emerson. Mayor Lamatina said that was the quota - the Borough did not have to build them; they had to make it a reasonable possibility. The way to do that was to have enhanced or multi-family zoning. She noted that JMF's project would represent about 47 credits. Mr. Doyle said that would immediately reduce Emerson's obligation if the project could get accomplished.

Councilwoman DiPaola said that while they were talking about affordable housing, the Borough was also spending a lot of money to fight in the Courts to bring the number down. She asked how much had been spent on Borough Attorney fees to prepare Court documents to reduce the number. Mr. Hoffmann said he would research this and let her know. She noted they were discussing affordable housing they had to do yet they were spending a lot of tax dollars to go to Court.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

Mr. Doyle said that it was not tax dollars, but COAH dollars. He explained that the Borough was allowed to use its COAH fund to defend COAH actions – the money collected from developers to build their COAH units could be used and did not go against the taxpayers. She asked how much money was in the account and whether that money was also to be used to build units. Mr. Doyle said it was for all the Borough's COAH obligations. He explained that one of the things they were allowed to do with that money was to defend these kinds of claims. Councilwoman DiPaola responded that they could also be building affordable housing somewhere with the money and asked if that wasn't what it was really for – the developer puts the money aside for the Borough to build it – but instead it was being spent on litigation. Mr. Doyle responded that currently Fair Share wanted to say that Emerson's obligation was 400 units. That would require 1600 units to be built in town if they just fell on the sword and not challenge it.

Mayor Lamatina asked if she was suggesting that it not be challenged. Councilwoman DiPaola said she thought it was ridiculous that anyone was going to make the town of Emerson build 1600 affordable units – there was no space for it and the Court was wrong. Mr. Doyle asked who would tell them that they were wrong. Councilwoman DiPaola said that apparently the Borough would have to tell them they were wrong but the municipality was spending a lot of money to do it. She said she was just bringing out the point that as much as this number is being discussed, the Borough was trying to get it lowered. So maybe there was not so much need for redevelopment.

Mr. Doyle said the experts said the number was 237; that was a little less than half of what they say. But if the town did nothing and did not challenge it, then the Borough would have to account for 1600 units in town. He said a developer would come in and put property together or find other property and the Court would potentially allow them to build. He said that you could see it in Franklin Lakes and Park Ridge.

Councilwoman DiPaola said she did not think it could happen in Emerson – the roads were not wide enough to accommodate the kind of buildings that they were being scared into thinking they were going to come in and build. She said experts were wrong and there was probably another expert who would negate that. Mr. Doyle said the only way to prove the experts wrong was by retaining competent counsel, a good planner, and experts like EConsult to say there was no way Emerson could build 400 units. He added that the alternative was to simply not defend it. The Court would say no one had challenged it and the town would have to build 1600 units and provide an overlay zone to get to 1600 units.

Ms. Bogart said they were not just trying to reduce the number because they knew the experts had said 237; what they were really trying to do was say if you say it is 237, this is where it was going to be zoned and planned for as opposed to a developer coming in and saying they would do 400 units for the Borough. If Emerson just sat back and said 400, then the developer would be permitted to come in and take any property in town and build affordable housing.

Councilman Downing said he thought they were trying to be proactive by attempting to show the Courts that Emerson was willing to try to do this and move forward and not stick their heads in the sand and think it would never happen and then get 400 units shoved down their throats wherever there was open space. If Emerson steered its own destiny, it was better than having someone else drive the bus. The Land Use Board and Council might not have control over what would be built because Fair Share Housing may say a developer could put 400 units somewhere.

Councilwoman DiPaola said she understood why Councilman Downing believed it but she did not believe it and did not think being proactive was putting businesses and landowners in a condemnation zone. Councilwoman Downing said towns were going through this all over. Councilwoman DiPaola said a lot of professionals were making a lot of money off of it – a lot of professionals were making a lot of money off of it.

- Borough Administrator Robert Hoffmann said that due to the late hour he was holding his report to the next meeting.

- Borough Clerk Jane Dietsche had no report.

- Special Counsel Douglas Doyle said there was a letter prepared by Mr. DeAngelis and he recommended that the Governing Body authorize him to prepare a response. Mr. Hoffmann said that discussion would take place during Closed Session.

☞**Motion** to extend the curfew to 11:15 p.m. was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried at 10:55 p.m.

XIV.    PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried at 10:55 p.m.

Bill Wassmann, Historic Preservation Commission Chairman, 27 Sullivan Drive said it was the Governing Body's fault that the commission did not do anything because they had no legal authority. He said that an historic element needed to be included in the Master Plan.

Jill McGuire, 154 Linwood Avenue read a report on the history of Borough Hall and said the murals met the criteria for historic designation.

☞**Motion** to extend the curfew to 11:45 p.m. was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried.

Todd Bradbury, 28 Chestnut Street asked about the status of the letter he received in 2008 stating he was out of the Redevelopment Zone. Mr. Doyle confirmed that he was not currently in the zone. Mr. Bradbury said that eminent domain would have a massive impact on Emerson and asked that it not carry from the Oradell to the Westwood borders.

Ed Bueti, 91 Chestnut Street inquired about the difference between a Historic Preservation Commission and Historic Preservation Committee and asked how condemnation would affect tenants or business owners. He also thanked Council President Knoller for participating in the meeting with residents and Councilman Lazar for his work to resolve flooding issues on Pavonia Avenue.

Corey Melillo, 18 Vivian Avenue asked questions about affordable housing.

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

<u>Robert Petrow, 21, 23, 33, 50 Chestnut Street</u> asked if his properties were included in the Redevelopment Zone. Mr. Doyle said his properties were in an area that was going to be studied; he was not in - he had been identified as in an area that was potentially going to be in, he had received a notice; he could disregard the notice until he received further notice from the Borough. In addition, they were taking a harder, closer look preliminarily at some specific properties to figure out if they should be immediately recommended to the Land Use Board to no longer be considered. For example, those who had made improvements to their property by complying with the CBD redevelopment plan. He said that Mr. Petrow might be off the hook, to use his words, sooner rather than later. If it was determined that his properties should still be in the area, he would get a new notice in the paper and the opportunity to appear at a hearing before the Land Use Board with his planner, with a lawyer to challenge whether in fact he should be in the area.

Mr. Doyle concluded by saying that Mr. Petrow was not in but he was right now going to potentially be considered to be designated as in an area in need of redevelopment. Mr. Petrow said he had sent a letter to Borough Hall and wanted to know if he would receive a response. Mr. Doyle said that they were going to see if there was a way, with respect to certain properties, whether the Planner could recommend that they streamline some of the properties which clearly did not need to be considered anymore. He said that they were going to take a look at everyone's property but because Mr. Petrow asked for it, they would make sure they took a look at his.

<u>Rich Palumbo, owner of Plaza Auto Repair, 9 Emerson Plaza East</u> said he had concerns about the letter he received stating his property was in the Redevelopment Condemnation Zone. He was disgusted by what he heard from Cork and Keg about being blown off. Mayor Lamatina said he had only heard one side and there was another side to the story. Mr. Palumbo stated he thought the Mayor and Council cared about property owners and would do the right thing. It needed to be handled properly by the developer. If the property owners did not want to sell, maybe the deal needed to be sweetened. Mayor Lamatina said they were all looking to sell, except according to Mr. DeAngelis, Ranchero Cantina – and that could change the next day. Mr. Palumbo said there would be moving, relocation fees that should be taken care of and it was up to the Governing Body to oversee things and make sure that happened.

<u>Jim Sabino, 23 Pavonia Avenue</u> said he had received a detailed report and thanked Councilman Lazar for investigating the flooding issues at his property. He asked about a timeline for repairs and inquired about recourse for the expenses he incurred from property damage. Mr. Doyle said he should check with his homeowner's insurance policy. Mr. Sabino said he hoped this would be resolved sooner rather than later. Councilman Lazar said they would move along with the repairs but by law they had to get estimates before they could perform the repairs.

☞**Motion** to extend the curfew to 12:00 midnight was **moved** by Council President Knoller, **seconded** by Councilwoman DiPaola and carried.

<u>Bill Price, 9 Pine Emwood Drive</u> thanked Councilman Lazar for helping to resolve the flooding issues on Pavonia Avenue. He said he was disappointed with the vote on redevelopment and thought the town was too small for this.

<u>Todd Bradbury, 28 Chestnut Street</u> asked that his property not be studied.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public.

☞**Motion** to close the meeting to comments from the public was **moved** by Councilman Lazar, **seconded** by Councilwoman DiPaola and carried at 11:48 p.m.

XV.    RESOLUTIONS ON CONSENT AGENDA NO. 59-17

☞**Motion** to approve Consent Agenda No. 59-17 was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

| | |
|---|---|
| CA 60-17 | Authorize the Borough of Emerson to Enter Into an Agreement for Architectural Services with Axis Architectural Services for a ~~Five~~ Three Year Period |
| CA 61-17 | Tax Refunds/Appeals |
| CA 62-17 | Approval to submit a grant application and execute a grant contract with the New Jersey Department of Transportation for the Main Street - Linwood Avenue Road Resurfacing Phase IV |
| CA 63-17 | Tax Lien Redemption – 50 Palisade Avenue |
| CA 64-17 | Authorize extension of Tree Service contract for CY 2017 |
| CA 65-17 | Authorize extension of Cleaning Contract for CY 2017 |
| CA 66-17 | Authorize Hiring of DPW employee on a full time temporary basis for three months to cover military service leave |
| CA 67-17 | Amending 2017 Council Liaison Appointments due to conflicts |
| CA 68-17 | Formation of the Redevelopment Subcommittee: Mayor Lamatina, Councilman Falotico and Councilman Lazar |

☞**Motion** to extend the curfew to no later than 12:15 a.m. as the last extension was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried at 11:58 p.m.

XVI.    CLOSED EXECUTIVE SESSION - Resolution No. 69-17

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 69-17 was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

| | | |
|---|---|---|
| #17-01/17-01 | Real Estate – Potential Litigation | N.J.S.A. 10:4-5 |
| #17-01/17-02 | Potential Litigation - Redevelopment | N.J.S.A. 10:4-7 |

XVII.    RECONVENE

The Borough of Emerson reserves the right to return to Open Session and, if appropriate, take formal action.

☞**Motion** to reconvene was **moved** by Councilwoman DiPaola, **seconded** by Council President Knoller and carried at 12:13 a.m.

☞**Motion** to authorize Special Counsel Doug Doyle to respond to the December 29th letter from Richard DeAngelis, Esq. was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

MIN No. 2 APPROVED FOR RELEASE & CONTENT 3-7-17

☞**Motion** to authorize Special Counsel Doug Doyle to undertake the discussions with Borough Planner Brigette Bogart and have Ms. Bogart prepare a report as was discussed in Closed Session for the next regularly scheduled meeting of the Governing Body was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 4-0.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**ABSTAIN: DiPaola**

XVIII.    ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried at 12:15 a.m.

Respectfully submitted,

_____

Jane Dietsche, RMC
Borough Clerk

Exhibit 16

| | |
|---|---|
| **From:** | Brigette Bogart <bbogart@bogartplanning.com> |
| **Sent:** | Monday, February 13, 2017 10:05 AM |
| **To:** | Robert Hoffmann <rhoffmann@emersonnj.org> |
| **Subject:** | Block 419 pictures |
| **Attach:** | 120816report.pdf; Untitled attachment.htm; IMG_1305.JPG; Untitled attachment.htm; IMG_1309.JPG; Untitled attachment.htm; IMG_1313.JPG; Untitled attachment.htm; IMG_1316.JPG; Untitled attachment.htm |

Good morning,

These pics will come in several emails due to file size. I am also attaching the report so you can see which lots each pic is for.



**Brigette Bogart**
Planning & Design Professionals LLC

Wyckoff Office (for mailing only):
366 Harvey Court Wyckoff, NJ 07481
201-485-8845

Midland Park Office:
638 Godwin Avenue, Suite 2 Midland Park, NJ 07432
201-485-5365

# Determination of Area in need of Redevelopment

## EMERSON REDEVELOPMENT AREA
## BOROUGH OF EMERSON, NEW JERSEY

Completed in accordance with the Local Redevelopment & Housing Law
(N.J.S.A. 40A:12A-1 et seq.)

The original document was appropriately signed and sealed on December 8, 2016 in accordance with Chapter 41 of Title 13 of the State Board of Professional Planners.

*Brigette Bogart*

**Brigette Bogart, P.P., AICP, CGW**
**Professional Planner #5679**

**TABLE OF CONTENTS**

I. Introduction ........................................................................................................................ 2

II. Criteria for Determination of An Area In Need of Redevelopment ..................................... 3

III. The Statutory Criteria (a more detailed narrative) .......................................................... 4

IV. Study Area Description ..................................................................................................... 9

V. Background Information .................................................................................................... 2
   A. Police Records ............................................................................................................ 12
   B. Master Plan Recommendations ................................................................................. 13
   C. 2003 Central Business District Plan ........................................................................... 14
   D. Zoning Ordinance ...................................................................................................... 14

VI. Subject Properties Evaluation for Compliance with Redevelopment Area ..................... 17
   Area A: BLOCK 419 ......................................................................................................... 18

        Block 419 Lot 1 ................................................................................ 19
        Block 419 Lot 2 ................................................................................ 21
        Block 419 Lots 3 & 4 ........................................................................ 23
        Block 419 Lot 5 ................................................................................ 25
        Block 419 Lot 6.01 ........................................................................... 27
        Block 419 Lot 6.02 ........................................................................... 30
        Block 419 Lot 7 ................................................................................ 32
        Block 419 Lot 8 ................................................................................ 34
        Block 419 Lot 9 ................................................................................ 37
        Block 419 Lot 10 .............................................................................. 40

VII. Conclusion ..................................................................................................................... 42
VIII. Recommendation .......................................................................................................... 42
Appendices .......................................................................................................................... 43

P014718

## I. Introduction

The purpose of this report is to determine if the said properties located in the Borough of Emerson qualify as Area in Need of Redevelopment as defined by the Local Redevelopment and Housing Law (N.J.S.A. 40:12A-1 et seq, hereafter referred to as LRHL). This analysis has been conducted pursuant to the LRHL, which specifies the conditions that must be met within the delineated areas and the process to be undertaken by the Planning Board during the investigation.

This report is written pursuant to 40A:12A-6 section of the LRHL, which states the following:

*No area of municipality shall be determined a redevelopment area unless the governing body of the municipality shall by resolution authorize the planning board to undertake a preliminary investigation to determine whether the proposed area is a redevelopment area according to the criteria set forth in section 5 of P.L.1992, c.79 (C.40A:12A-5). Such determination shall be made after public notice and public hearing as provided in subsection b. of this section. The governing body of a municipality shall assign the conduct of the investigation and hearing to the planning board of the municipality.*

*After completing its hearing on this matter, the planning board shall recommend that the delineated area, or any part thereof, be determined, or not be determined, by the municipal governing body to be a redevelopment area. After receiving the recommendation of the planning board, the municipal governing body may adopt a resolution determining that the delineated area, or any part thereof, is a redevelopment area.*

The Borough Mayor and Council adopted a Resolution No. 221-16 on August 16, 2016 to authorize the Professional Planner to undertake a preliminary investigation to determine whether the properties in question are in need of redevelopment. This Area was previously designated as an Area in Need in 2004. This report was prepared to update and reaffirm the fact that this area still meets the criteria set forth in the Local Redevelopment and Housing Law and updated through recent case law.

The applicable LHRL statute also requires the Planning Board to hold a public hearing on this matter prior to recommending that the delineated area, or any part thereof, be determined or not determined a redevelopment area by the governing body. After obtaining the Planning Board's recommendation, the governing body may adopt a resolution determining that the delineated area or any part thereof is a redevelopment area. This report is a study to determine whether the properties in question are to be determined or not determined as "area in need of redevelopment", as required under the LRHL.

A redevelopment plan may supersede the zoning of an area or serve as an overlay, should specify the following:

1.  The plan's relationship to definite local objective as to appropriate land uses, density of population, improved traffic and public transportation, public utilities, recreational and community facilities and other public improvements.
2.  Proposed Land uses and building requirements in the project area.
3.  Adequate provision for temporary and permanent relocation, as necessary, of residents in the project area, including an estimate of the extent to which decent, safe and sanitary dwelling units affordable to displaced residents will be available to them in the existing local housing market.
4.  An identification of any property within the redevelopment area which is proposed to be acquired in accordance with the redevelopment plan.
5.  (a) Any significant relationship of the redevelopment plan to master plans of contiguous municipalities,
    (b) The master plan of the county in which the municipality is located and (c) the State Development and Redevelopment Plan adopted pursuant to the "State Planning Act".

P014719

This report and investigation are aimed only at determining whether properties in question meet the statutory criteria to be identified as an Area in Need of Redevelopment and therefore does not contain any of the specific planning regulations contained in a redevelopment area. If the Borough of Emerson determines that they agree with the recommendations set forth in this report, this area can be designated as an "Area in Need of Redevelopment". The Emerson Borough Council would then have the authority to declare this area an "Area in Need of Redevelopment", and authorize the Borough of Emerson to use all those powers provided by the Legislature for use in a redevelopment area, including the power of eminent domain ("Condemnation Redevelopment Area").

## II. Criteria for Determination of An Area In Need of Redevelopment

Per LHRL 40A:12A-5 an area may be determined to be in Need of Redevelopment if after investigation, notice and hearing, the governing body of the municipality concludes by resolution that any of the following conditions exists:

A. The generality of buildings are substandard, unsafe, unsanitary, dilapidated or obsolescent, or possess any of such characteristics or are so lacking in light, air or space as to be conducive to unwholesome living or working conditions.

B. The discontinuance of the use of buildings previously used for commercial, manufacturing, or industrial purposes; the abandonment of such buildings; or the same being allowed to fall into so great a state of disrepair as to be untenantable.

C. Land that is owned by the municipality, the county, a local housing authority, redevelopment agency or redevelopment entity or redevelopment entity, or unimproved vacant land that has remained so for a period of ten years prior to adoption of the resolution, and that by reason of its location, remoteness, lack of means of access to developed sections or developed through the instrumentality of private capital.

D. Areas with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangements or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious and use or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals or welfare of the community.

E. A growing lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real property therein or other conditions, which impede land assemblage or discourage the undertaking of improvements, resulting in a stagnant and not fully productive condition of land potentially useful and valuable for contributing to and serving the public health, safety and welfare., which condition is presumed to be having a negative social or economic impact or otherwise detrimental to the safety health, morals, or welfare of the surrounding area or the community in general.

F. Areas, in excess of five contiguous acres, whereon buildings or improvements have been destroyed, consumed by fire, demolished or altered by the action of storm, fire, cyclone, tornado, earthquake or other casualty in such a way that the aggregate assessed value of the area has been materially depreciated.

G. In any municipality in which an enterprise has been designated pursuant to the "New Jersey Urban Enterprise Zones Act", P.L.1983, c.303 (C.52: 27H-60 et seq.) the execution of the actions prescribed in the act for the adoption by the municipality and approval by the New Jersey Urban Enterprise Zone Authority of the zone development plan for the area of the enterprise zone shall be considered sufficient for the determination that the area is in need of redevelopment pursuant to sections 5 and 6 of the P.L.1992, c.79 (C.40A: 12A-5 and 40A: 12A-6) for the purpose of granting tax exemptions within the enterprise zone district to the provisions P.L.1991, c431 (C.40A: 20-1 et seq.) or the adoption of a tax abatement and exemption ordinance pursuant to the provisions of P.L.1991, c 441 (C.40A:21 -1  et seq.). The municipality shall not utilize any other redevelopment

P014720

powers within the urban enterprise zone unless the municipal governing body and planning board have also taken the actions and fulfilled the requirements prescribed in P.L.1992, c79 (C.40A:12A-1 et al) for determining that the area is in need of redevelopment or in need of rehabilitation and the municipal governing body has adopted a redevelopment plan ordinance including the area of the enterprise zone.

H.  The designation of the delineated area is consistent with smart growth planning principles adopted pursuant to law or regulation. In addition to the above criteria, Section 3 of the LRHL (N.J.S.A 40A:12A-3) allows the inclusion of parcels necessary for the effective redevelopment of the area, by stating "a redevelopment area may include land, buildings, or improvements, which of themselves are not detrimental to the health, safety or welfare, but the inclusion of which is found necessary, with or without change in their condition, for the effective redevelopment of the area in which they are a part."

## III. The Statutory Criteria (a more detailed narrative)

The following section provides additional detail on the eight statutory criteria that qualify an area being in need of redevelopment and the planning analysis and evidence necessary that indicate the criteria could be met. Generally, properties located within an area in need of redevelopment will meet more than one of the criteria. However, only one of the eight need be found for a delineated area to be determined in need of redevelopment. The eight criteria are commonly identified by the letter corresponding to the paragraphs in Section 5 of the LRHL (N.J.S.A. 40A:12A-5).

### The "a" Criteria – Deterioration

For an area to qualify as being in need of redevelopment pursuant to the "a" criteria, the planning board must find that the buildings in the area have deteriorated or fallen into such a state of disrepair that they constitute a threat to the people who live or work in them, or are a danger to public safety. Consequently, when analyzing the applicability of the "a" criteria, the planning board should focus on the physical conditions within the study area. This compels the preliminary investigation (this document) to include photographic documentation of the deterioration of the structures, documentation of site inspections, and a visual assessment of the physical conditions of the structures. Since buildings that have been neglected for long periods of time are frequently subject to numerous local code enforcement actions, the site inspection documentation is combined with a review of building, housing and property maintenance records, as detailed in this report. There are a couple of lots which appear to meet Criteria "a".

### The "b" Criteria- Abandoned Commercial and Industrial Buildings

Criteria "b" allows for a site that is being studied to qualify as being in need of redevelopment if it includes buildings previously used for commercial, manufacturing, or industrial purposes that have been vacated or abandoned. Vacant buildings that have been allowed to fall into a great state of disrepair have historically been associated with "blighted" areas or areas in need of redevelopment.

Similar to criteria "a", site inspections and photographic documentation are important to assess how a structure potentially meets criteria "b" of the statute. The existence of these abandoned buildings are typically what triggers this type of investigation and should be readily apparent. It is important to note that the "b" criteria is only applicable to commercial and industrial buildings and not to residential buildings. However, the nonresidential component of mixed-use buildings, which contains both residential and commercial uses, can meet the "b" criteria. While there are buildings in the Study area which are currently vacant this criteria was not relied upon for this investigation.

P014721

**The "c" Criteria- Public and Vacant Land**

Property owned by a public entity, such as a municipality, county, housing authority, or redevelopment entity may be designated in need of redevelopment pursuant to the "c" criteria. A court decision has determined that the public ownership alone is not a sufficient reason for such designation. The investigation should specify in its findings why the development potential of a property may be limited, such as its location, remoteness, lack of access, topography, or soil conditions.

The "c" criteria enables municipalities to use the redevelopment process to generate private development interest in surplus public lands and get them back on tax rolls. By designating these publically owned parcels in need of redevelopment, the municipality is able to convey the parcel to a redeveloper without having to go through the public bidding process. The redeveloper is then required by a redeveloper agreement to redevelop them in accordance with a redevelopment plan. This study area does include a public right of way, a publicly owned surface parking area and a publicly owned parcel currently developed with the ambulance core building. All three of these parcels of land would be more appropriately developed with private developments since they are located in the middle of the Borough's central business district.

Additionally, inherent in criteria "c", privately owned land that has remained unimproved or vacant for at least 10 years may also be designated in need of redevelopment. As with publically owned land, it also must be shown that a vacant parcel is not likely to be developed through private investment because of development constraints resulting from its location, remoteness from other developed areas of the community, lack of access, topography, or soil conditions.

**The "d" Criteria- Obsolete layout and design**

While the "a" and "b" criteria focus on the condition of the buildings on a property, the "d" criteria focuses on the site design itself. In order to analyze how a property meets criteria "d", other site improvements such as accessory structures, parking areas, on site circulation, land uses, and adjacent off site circulation impacts need to be reviewed.

Some of the considerations to be reviewed in analyzing a study area for the applicability of the "d" criteria focus on important land use planning standards, such as the location and relationship of buildings, accessory structures and other site improvements, onsite circulation and parking, land use conflicts as well as lot and building coverages within the study area. When analyzing parcels to see if they potentially meet criteria "d", the investigation should include information on how the site's design, circulation and parking dimensions compare to modern planning objectives. If it is found that a parcel does not comply with modern planning objectives or standards, this investigation should also go a step further and review how these "deficiencies" on site affect adjacent sites and public rights of way. These deficiencies are detailed lot by lot in this document.

Given the flexible nature of the "d" criteria, it often is used with other criteria, typically the "e" criteria, where deterioration and abandonment are not issues. A good portion of the Study Area falls both within the meets both Criteria 'd" and "e" as detailed on a lot by lot basis.

**The "e" Criteria: Underutilization**

Criteria "e" is applicable where there is a growing lack or total lack of proper utilization of areas caused by the condition of the title, diverse ownership of the real properties therein or other similar conditions which are presumed to be having a negative social or economic impact or otherwise being detrimental to the safety, health, morals, or welfare of the surrounding area or the community in general. The "e" criteria is applicable in circumstances where there is a quantifiable economic "underutilization" or "lack of proper utilization" of properties in a study area.

However, with the criteria noted above, the New Jersey Supreme Court in the Gallenthin Realty Development, Inc. v Borough of Paulsboro, 191 N.J. 344 (2007), stated that the New Jersey Constitution authorizes government redevelopment of only "blighted areas," and concluded that the Legislature did not intend N.J.S.A. 40A:12A---5(e) to apply in circumstances where the sole basis for redevelopment is that the property is "not fully productive." It further held that this criteria set forth N.J.S.A. 40A:12A---5(e) applies only to property that has become stagnant and unproductive because of issues of title, diversity of ownership, or other conditions of the same kind.

Given the recent Gallenthin Realty Development, Inc. v Borough of Paulsboro, 191 N.J. 344 (2007) decision, if an investigation determines that a site meets criteria "e", it should be analyzed to confirm that the parcels at issue are preventing the proper development of the surrounding properties because of the fact that they reached a stage of stagnation and unproductiveness. In order to determine this, the site maybe reviewed in the context of the "d" criteria, exhibiting poor design and arrangement and not developed in a manner consistent with the objectives of a municipality's zoning and master plan. It is important to note that a property may not be "economically underutilized", but may exhibit a lack of "proper utilization" in relation to a municipality's overall land use goals and objectives. Thus, the property would still meet the "e" criteria, but the analysis would focus on broader land use planning issues and concerns. There are a number of properties which exhibit a lack of "proper utilization" based on the Borough of Emerson's Master Plan goals and objectives that have been in place for over a decade.

One of the indicators used to measure the economic productivity of a property is the ratio of the assessed value of the improvements on the property to the value of land. Developed properties in areas that are economically viable typically have improvement to land ratios of 2:1 or greater. Ratios of less than 2:1 may offer evidence of underutilization. As indicated above, a low improvement to land ratio in itself is not absolute proof that a property is in need of redevelopment. Improvement to land ratios should be analyzed in connection with other evidence such as the physical condition of the property or site layout to determine the applicability of the statutory criteria. It may be necessary to compare ratios within the study area to those in surrounding areas or on the other parts of the community. For example, the property values and tax revenue generated from two comparable blocks, one within the study area and one within an area considered economically stable, should be evaluated to determine the appropriate threshold in identifying underutilization.

Of the entire study area, only 10 of the 82 properties have an improvement to land value ratio of 2:1 or greater. That is only 12.5 percent of the entire study area that meets the standard. This is compared to the fact that the remaining commercial properties within the Borough have a ratio of 2.11. This fact combined with the fact that a majority of the study area exhibits poor design and arrangement are indicators that the study area is not being properly utilized and exhibits economic underutilization. The table below provides the assessment values for the study area.

| Block | Lot | Land Area (sf) | Improved Value | Land Value | Total Value | Improvement Ratio |
|-------|------|----------------|----------------|------------|-------------|-------------------|
|       | 1    | 6,500          | 96,100         | 263,900    | 360,000     | 0.36              |
|       | 2    | 5,500          | 61,700         | 253,300    | 315,000     | 0.24              |
| 213   | 3    | 5,500          | 319,500        | 260,500    | 580,000     | 1.23              |
|       | 4    | 8,260          | 134,900        | 279,300    | 414,200     | 0.48              |
|       | 5    | 8,850          | 318,800        | 289,300    | 608,100     | 1.10              |
|       | 6    | 28,000         | 587,600        | 425,000    | 1,012,600   | 1.38              |
|       | 1.02 | 14,162         | 303,500        | 356,500    | 660,000     | 0.85              |
|       | 5.02 | 10,600         | 457,800        | 342,200    | 800,000     | 1.34              |
| 214   | 6    | 18,750         | 70,200         | 340,900    | 411,100     | 0.21              |
|       | 7    | 11,250         | 151,100        | 341,300    | 492,400     | 0.44              |
|       | 8.01 | 20,000         | 605,000        | 385,000    | 990,000     | 1.57              |
|       | 8.02 | 20,000         | 715,000        | 385,000    | 1,100,000   | 1.86              |
|       | 9    | 16,200         | 725,100        | 366,200    | 1,091,300   | 1.98              |

P014723

| Block | Lot | Land Area (sf) | Improved Value | Land Value | Total Value | Improvement Ratio |
|---|---|---|---|---|---|---|
| 405 | 1 | 13,625 | 408,100 | 356,900 | 765,000 | 1.14 |
| | 2 | 8,250 | 68,600 | 282,600 | 351,200 | 0.24 |
| | 3.01 | 8,250 | 333,900 | 298,700 | 632,600 | 1.12 |
| | 3.02 | 6,600 | 134,600 | 265,400 | 400,000 | 0.51 |
| | 4 | 6,120 | 125,400 | 185,100 | 310,500 | 0.68 |
| | 12 | 33,196 | 102,200 | 494,100 | 596,300 | 0.21 |
| | 13 | 4,361 | 285,100 | 235,900 | 521,000 | 1.21 |
| | 14 | 117,612 | **1,338,000** | 1,104,000 | **2,442,000** | 1.21 |
| 412 | 1 | 74,052 | 542,800 | 1,106,800 | 1,649,600 | 0.49 |
| | 2 | 9,750 | **397,600** | 324,100 | **721,700** | 1.23 |
| | 3 | 15,372 | **161,100** | 396,500 | **557,600** | 0.41 |
| | 4 | 10,168 | 39,200 | **335,800** | 375,000 | 0.12 |
| | 5 | 15,376 | **884,500** | 365,500 | **1,250,000** | 2.42 |
| 419 | 1 | **4,389** | 197,700 | 228,900 | 426,600 | 0.86 |
| | 2 | 40,000 | 0 | 224,900 | 224,900 | 0.00 |
| | 3 | | 10,600 | 238,200 | 248,800 | 0.04 |
| | 4 | 16,600 | 1,257,500 | 506,400 | 1,763,900 | 2.48 |
| | 5 | 10,000 | **578,100** | 342,600 | **920,700** | 1.69 |
| | 6.01 | 16,400 | 482,700 | 392,300 | 875,000 | 1.23 |
| | 6.02 | 6,612 | 238,700 | 304,400 | 543,100 | 0.78 |
| | 7 | 15,000 | 85,600 | 314,700 | 400,300 | 0.27 |
| | 8 | 7,350 | 457,600 | 303,200 | 760,800 | 1.51 |
| | 9 | 9,600 | 161,700 | 333,300 | 495,000 | 0.49 |
| | 10 | 3,500 | 159,800 | 244,200 | 404,000 | 0.65 |
| 420 | 2 | 17,900 | 490,100 | 430,700 | 920,800 | 1.14 |
| | 16 | 13,067 | 447,500 | 371,800 | 819,300 | 1.20 |
| 422 | 1 | 2,862 | 27,300 | 262,700 | 290,000 | 0.10 |
| | 10, 11 | 15,760 | 425,500 | 424,500 | 850,000 | 1.00 |
| | 12 | 3,700 | 16,100 | 258,900 | 275,000 | 0.06 |
| | 13 | 8,496 | 115,600 | 317,300 | 432,900 | 0.36 |
| | 14 | 3,078 | 107,400 | 87,600 | 195,000 | 1.23 |
| | 15 | 2,505 | 114,300 | 80,700 | 195,000 | 1.42 |
| | 16 | 2,460 | 119,900 | 80,100 | 200,000 | 1.50 |
| | 17 | 3,220 | 183,500 | 89,300 | 272,800 | 2.05 |
| | 18 | 1,470 | 141,800 | 68,200 | 210,000 | 2.08 |
| 603 | 2 | 6,660 | 522,500 | 336,800 | 859,300 | 1.55 |
| | 3 | 6,840 | 658,300 | 301,700 | 960,000 | 2.18 |
| | 4 | 7,620 | 493,300 | 307,700 | 801,000 | 1.60 |
| | 5 | 10,480 | **764,800** | 318,100 | **1,082,900** | 2.40 |
| | 6 | 4,160 | 0 | 252,100 | 252,100 | 0.00 |

P014724

| Block | Lot | Land Area (sf) | Improved Value | Land Value | Total Value | Improvement Ratio |
|---|---|---|---|---|---|---|
| 606 | 3 | 12,200 | 292,200 | 344,600 | 636,800 | 0.85 |
| | 4 | 13,608 | 201,000 | 359,200 | 560,200 | 0.56 |
| 610 | 1 | 11,957 | 210,600 | 290,400 | 501,000 | 0.73 |
| | 2 | 12,319 | 271,300 | 328,700 | 600,000 | 0.83 |
| | 4 | 19,272 | 889,700 | 428,100 | 1,317,800 | 2.08 |
| | 5.01 | 16,536 | 557,200 | 367,800 | 925,000 | 1.51 |
| | 5.02 | 15,092 | 336,100 | 413,900 | 750,000 | 0.81 |
| | 6 | 15,900 | 353,900 | 368,000 | 721,900 | 0.96 |
| | 7 | 111,121 | 2,481,500 | 1,548,500 | 4,030,000 | 1.60 |
| | 8 | 12,500 | 61,600 | 333,200 | 394,800 | 0.18 |
| | 9.01 | 10,650 | 0 | 453,000 | 453,000 | 0.00 |
| | 9.02 | 18,687 | 1,354,900 | 395,100 | 1,750,000 | 3.43 |
| | 10 | no longer exists | | | | |
| 613 | 1 | 21,452 | 285,600 | 474,400 | 760,000 | 0.60 |
| | 2 | 5,232 | 0 | 817,000 | 817,000 | 0.00 |
| 615 | 1 | 10,001 | 58,900 | 279,800 | 338,700 | 0.21 |
| 616 | 1 | 12,000 | 152,500 | 536,200 | 688,700 | 0.28 |
| | 2 | 15,000 | 123,300 | 213,800 | 337,100 | 0.58 |
| | 16 | 25,650 | 3,225,000 | 517,700 | 3,742,700 | 6.23 |
| | 17 | 89,670 | 901,500 | 374,300 | 1,275,800 | 2.41 |
| | 19 | 25,350 | 778,700 | 539,300 | 1,318,000 | 1.44 |
| | 20 | 7,650 | 251,900 | 306,800 | 558,700 | 0.82 |
| | 21 | 11,100 | 236,700 | 348,200 | 584,900 | 0.68 |
| | 22 | 11,100 | 331,600 | 350,000 | 681,600 | 0.95 |
| | 23 | 12,000 | 188,100 | 359,800 | 547,900 | 0.52 |
| | 24 | 9,150 | 350,200 | 324,800 | 675,000 | 1.08 |
| 617.01 | 1 | 55,000 | 1,438,100 | 629,600 | 2,067,700 | 2.28 |
| | 2.02 | 52,000 | 427,400 | 553,900 | 981,300 | 0.77 |
| | 8 | 76,274 | 1,017,100 | 756,400 | 1,773,500 | 1.34 |
| | 9 | 82,764 | 0 | 101,200 | 101,200 | 0.00 |

\* Block 610 lot 10, part of the original study area, no longer exists

P014725

In this investigation, the analysis for criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development.

**The "f" Criteria – Fire and Natural disaster.**

The "f" criteria is intended to permit the redevelopment of a large area in a community that has been destroyed or where the property values have been materially reduced by a sudden natural disaster. It was first added to the old urban renewal statues after a catastrophic fire in Passaic destroyed several city blocks. When the State's redevelopment laws were updated in 1992, the "f" criteria was retained, but the minimum tract area that could qualify for designation was reduced from ten to five contiguous acres. This investigation does not rely on this criterion.

**The "g" Criteria – Urban Enterprise Zones**

The Urban Enterprise Zone Act added criteria "g" to the redevelopment statute. Under the "g" criteria, urban enterprise zones (UEZs) designated by the New Jersey Urban Enterprise Zone Authority automatically qualify as areas in need of redevelopment for the purposes of granting long and short-term tax abatements and exemptions. However, if municipality wants to exercise any other redevelopment powers within the UEZ, including the power of eminent domain, it must prove that the area meets one or more of other statutory criteria and formally designate the area in need of redevelopment pursuant to the procedures in the LRHL. A redevelopment plan for the area also must be adopted. This investigation does not rely on this criterion.

**The "h" Criteria – Smart Growth**

The "h" criteria requires that the delineated area be consistent with smart growth planning principles adopted pursuant to law or regulation. Uniquely, this criteria may be applied to the overall study area rather than individual parcels therein. As such, it is possible for a Study Area to qualify even if certain individual lots do not meet criteria "a" through "g", thereby preventing certain lots within a larger area from obstructing the redevelopment of a larger area. Specifically, Section 3 of the LRHL (N.J.S.A 40A:12A-3) allows the inclusion of parcels in the area "which of themselves are not detrimental to the health, safety or welfare, but the inclusion of which is found necessary, with or without change in their condition, for the effective redevelopment of the area in which they are a part." As noted above, it has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development.

**IV. Study Area Description**

The following analysis reviews eighty-three (83) properties within fourteen (14) blocks located along the central portion of the Borough. The plan area totals approximately thirty-four (34) acres not including rights-of-way. The properties in question are generally along the Kinderkamack Road corridor between Hartland Avenue to the north and the municipal boundary with Oradell to the south. Additional lots along the NJ Transit rail line are also included, effectively creating a bow-tie shaped plan area.

P014726



P014727



Brigette Bogart Planning & Design Professionals, LLC
648 Godwin Ave, Suite #2 Midland Park, NJ
(201)485-3365    www.bogartplanning.com

**Borough of Emerson**
Redevelopment Area - November 2016

## V. Background Information

A. **Police Records.** As noted above, the Study area includes approximately 34 acres of land, where the entire municipality is approximately 1,535 acres. This translates into the study area encompassing 2.2% of the Borough's total land area as identified on the map on t4eh following page. The police provided a report of all arrests and Computer Aided Dispatch (CAD) incidents along Kinderkamack Road (approximately the Study area) as compared to the remainder of the Borough. While it is noted that Kinderkamack Road is one of the only commercial thoroughfares in the Borough, it is noteworthy to consider the fact that it is the location for 32% of all the Police incidents in the Borough over the last five years as follows:

| | Incident | Kinderkamack Road | Other | Total | % on Kinderkamack |
|---|---|---|---|---|---|
| Computer Aided Dispatch | Alarm | 313 | 1419 | 1732 | 0.18 |
| | Animal Incident | 133 | 1225 | 1358 | 0.10 |
| | Assist Residence | 36 | 416 | 452 | 0.08 |
| | Dispute | 36 | 434 | 470 | 0.08 |
| | Disabled MV | 180 | 429 | 609 | 0.30 |
| | DPW Assist | 43 | 157 | 200 | 0.22 |
| | Fire Depart Request | 88 | 590 | 678 | 0.13 |
| | Funeral Escort | 13 | 30 | 43 | 0.30 |
| | Group Moved | 193 | 99 | 292 | 0.66 |
| | Intoxicated Party | 23 | 41 | 64 | 0.36 |
| | Lock out | 53 | 178 | 231 | 0.23 |
| | Medical Request | 261 | 2201 | 2462 | 0.11 |
| | Missing Persons | 5 | 57 | 62 | 0.08 |
| | MV Complaint | 153 | 481 | 634 | 0.24 |
| | MV Stop | 5918 | 6580 | 12498 | 0.47 |
| | Noise Complaints | 39 | 390 | 429 | 0.09 |
| | Propety Lost/Found | 71 | 364 | 435 | 0.16 |
| | Suspicious Incident | 45 | 243 | 288 | 0.16 |
| | Suspicious Persons | 241 | 628 | 869 | 0.28 |
| | Suspicious Vehicle | 309 | 1035 | 1344 | 0.23 |
| | Domestic Violence | 15 | 140 | 155 | 0.10 |
| Arrests | Aggravated Assault | 5 | 7 | 12 | 0.42 |
| | Simple Assault | 8 | 30 | 38 | 0.21 |
| | Burglary | 3 | 2 | 5 | 0.60 |
| | Borough Ordinance Violation | 8 | 80 | 88 | 0.09 |
| | CDS Offenses | 50 | 78 | 128 | 0.39 |
| | Contempt | 2 | 8 | 10 | 0.20 |
| | Criminal Mischief | 2 | 5 | 7 | 0.29 |
| | Disorderly Conduct | 1 | 3 | 4 | 0.25 |
| | DUI | 41 | 46 | 87 | 0.47 |
| | Harassment | 1 | 8 | 9 | 0.11 |
| | Lewdness | 1 | 0 | 1 | 1.00 |
| | Sex Assault | 0 | 2 | 2 | 0.00 |
| | Theft | 5 | 8 | 13 | 0.38 |
| | Vehicular Homocide | 0 | 1 | 1 | 0.00 |
| | Terroristic Threats | 1 | 4 | 5 | 0.20 |
| | Stalking | 1 | 1 | 2 | 0.50 |
| | Warrant | 59 | 124 | 183 | 0.32 |
| | Shoplifting | 16 | 8 | 24 | 0.67 |
| | all other offenses | 6 | 15 | 21 | 0.29 |
| | Total | 8378 | 17567 | 25945 | 0.32 |

P014729

**B. Master Plan Recommendation**

The Borough of Emerson has adopted a number of master plans/reexamination reports over the past twenty-five years. The last Master Plan was adopted in 1978 with multiple amendment and reexamination reports adopted since that time, most recently in 2015. The Master Plan has numerous goals and objectives, including a number of which are applicable to the subject study area.

In 1999, over 16 years ago, the Borough's Master Plan Reexamination Report indicated that the Borough should consider the preparation of a Downtown Plan to address the area adjacent to the New Jersey Transit Rail Station. It further states that the "Borough may also wish to consider the use of the Local Redevelopment and Housing Law to create a Redevelopment Plan for all or part of the Downtown area to upgrade the appearance and efficiency of Downtown." That plan was prepared in 2003 and the goals and objectives set forth in that plan are detailed below.

Subsequently, in 2004 the Borough undertook a redevelopment design study and prepared a redevelopment plan to assist in the implementations of the Central Business District Plan. Since 2004, over 12 years ago, there have only been two developments in the Central Business District and the Comprehensive Redevelopment Plan itself has not been implemented.

In the 2007 Reexamination Report set forth the following Five (5) goals for Commercial Development in the Borough, all of which are important and applicable while analyzing the study area.

**Goal #1:** To uphold the comprehensive long-range plan set forth by the Central Business District Plan. The general goals of the plan encourage redevelopment as well as renovations and rehabilitation of selected existing buildings and storefronts, and the general improvement of buildings, parking lots, storefronts, sidewalks and other public areas. Application of the plan ought too provide a stimulus to the area, improve the physical appearance of the district and promote pedestrian activity and vitality in a district with active ground floor uses and upper level residential units. In addition, the plan updates and maintains modern codes and ordinances to ensure adequate development controls.

**Goal #2:** To encourage the coordination of all building renovations and the construction of al new buildings in the commercial district through the utilization of complimentary building materials, colors and streetscape elements.

**Goal #3** To establish a strong, distinct image for the commercial area through unified signage and streetscape design elements. The borough seeks to encourage a unified design character through a system of streetscape improvements. These improvements include design elements for buildings, lighting, sidewalk paving, banners, way finding signage, landscaping and street furniture.

**Goal #4**: To promote increased pedestrian safety and enhanced aesthetics in the commercial district, the borough encourages landscaping and streetscape elements that should be dispersed throughout parking areas and along pedestrian walkways. The borough recognizes that the integration of landscaping into a site design not only increase the aesthetics of the development but can also contribute to pedestrian safety.

**Goal #5:** To preserve the aesthetics enhancements of the commercial areas of the municipality by encouraging the general maintenance of all buildings, parking areas, storefronts, sidewalks and other public areas. The borough seeks to encourage the ongoing maintenance of all commercial properties and seeks to enforce the building maintenance regulations set forth in the borough code.

P014730

## C. 2003 Central Business District Plan

A Central Business District (CBD) Master Plan was adopted in 2003. All lots within the CBD area are also included in this Study Area, making the Master Plan and its vision wholly applicable. The Plan addresses the development of the Study Area in several ways. The Plan notes that the Area faces the challenge of being a linear district with disconnected storefronts, interrupted development and an uncomfortable pedestrian environment. Fortunately, the district also has great potential for redevelopment that could revitalize and activate the area with a cohesive identity and community asset.

Goals and objectives include:
- Prepare a comprehensive and coordinated long-range plan;
- Update and maintain modern codes and ordinances to ensure adequate development controls in the future;
- Promote pedestrian activity and vitality in the district with active ground floor uses, visually interesting storefronts, window display, canopies, and signage;
- Encourage mixed-use developments and reduced setback lines to foster a continuous frontage of buildings and unify the streetscape;
- Encourage lot consolidation to enhance opportunities for infill and redevelopment where appropriate;
- Support a modest increase in intensity of use in the district to promote and sustain the revitalization of the district;
- Identify regulations and standards that will promote the rehabilitation of the buildings in the district and a diversity of architectural materials and styles;

Additionally, the Plan provides revitalization, road improvement, façade, and streetscape concepts to further the aesthetic and functional vision for the area.

## C. Zoning Ordinance

The zoning map dated October 2014 for the Borough of Emerson identifies that the area is located in a number of zone districts. That portion of the area between the railroad right-of-way and Kinderkamack road, from the Oradell border north to Ackerman Street is zoned CBD-15 (Central Business District). Properties east of the rail line are zoned OSC (Open Space Conservation), LB (Limited Business), and CBD-10 (Central Business District). North of Lozier Street, properties are zoned IM, R-7.5 (Single-Family Residential), and RC (Retail Commercial). On the following page is a portion of the borough's zoning map with the study area outlined in red. Additionally the chart details the permitted uses in each zone district.

P014731



**Zoning Districts**

| | |
|---|---|
| R-22.5 | Residential Single-Family |
| R-10 | Residential Single-Family |
| R-7.5 | Residential Single-Family |
| LB | Limited Business |
| RB | Residential, Single-Family and Two-Family |
| RC | Retail Commercial |
| IM | Industrial and Manufacturing |
| OSC | Open Space Conservation |
| ML-10 | Single-Family |
| MS-AHO | Municipally-Sponsored Affordable Housing Overlay Zone-1 |
| AHO | Affordable Housing Overlay Zone (entire Borough) |
| R-2/ARC | Age Restricted Community Residence Zone |
| CBD-10 | Central Business District - 10 |
| CBD-15 | Central Business District - 15 |

P014732

## zones & permitted uses

| | | | |
|---|---|---|---|
| **CBD-15**<br>**CBD-10** | Retail stores; Personal service businesses; Eating and drinking establishments (except drive-ins); Professional, financial and medical offices; Multifamily residential dwellings above at-grade retail commercial and other principal permitted uses; Multifamily residential dwellings including buildings above at-grade parking, only in areas: a) north of Lincoln Boulevard where the multifamily building is behind a building that fronts on Kinderkamack Road; and b) south of Demarest Road, south of Block 610 Lot 6; Instructional | **OSC** | Agriculture; country clubs; golf courses (not including driving ranges); Government offices; reservoirs; ice skating rinks; swimming pools; tennis courts; parks or passive recreation; environmental centers; public and private schools; hospitals; single-family detached dwelling |
| **LB** | Professional business and governmental offices; Medical and dental clinics; banks and other financial institutions; funeral homes; nursing homes; hospitals and schools | **RC** | Appliance Sales; automotive spare parts; banks; bakeries; barbershops and beauty parlors; book, card & stationery Stores; bowling alleys; business & professional offices; candy & cigar stores; drug, dry goods & variety stores; dry cleaners, laundries & laundromats; eating and drinking places (excluding drive-thrus); florists; food stores; garden supplies; gasoline service stations; hardware stores; locksmiths; newsstands; package liquor stores; pet stores; photographic supplies and services; radio, elevations & appliance services; shoe sales & repair services; soda fountains; tailors and dressmakers; telephone exchange buildings; wearing apparel stores |
| **R-7.5** | Single-family detached dwellings. | | |
| **IM** | Electrical, Plumbing; Sales; essential services; furniture repair; industrial & manufacturing; printing & publishing; upholstery; wholesale sales; woodworking | | |

P014733

## VI. Subject Properties Evaluation for Compliance with Redevelopment Area

An analysis of the subject properties existing land uses, site layout and physical characteristics was conducted utilizing tax maps/records, physical inspection of the area, review of GIS data, maps and aerial photographs, Master Plan studies and Zoning Ordinance review. The Study area includes approximately 34 acres of land, where the entire municipality is approximately 1,535 acres. This translates into the study area encompassing 2.2% of the Borough's total land area. Given the diverse nature of the area from planning, circulation, use, access and location perspective, the following analysis has been divided into 6 sections as follows:



Brigette Bogart Planning & Design Professionals, LLC
648 Godwin Ave, Suite #2 Midland Park, NJ
(201)485-3365    www.bogartplanning.com

**Borough of Emerson**
Redevelopment Area - November 2016

P014734

The following details the findings and observations of this analysis by tax lot for Section A. The remaining sections will be further reviewed in a subsequent report.

SECTION A: BLOCK 419

Located east of the railroad right-of-way (and Kenneth Avenue) and west of Kinderkamack Road, between Lincoln Boulevard and Linwood Avenue. This block contains a variety of uses including retail and service commercial uses, a restaurant, and detached dwellings. Generally, the circulation in this area makes pedestrian activity unsafe and unattractive.



*Figure 1: Study Area parcels within Block 419 Aerial taken from Bing Maps*

P014735

**BLOCK 419 LOT 1**



**Description:** Residential
**Zone:** CBD-10
**Address:** 19 Lincoln Blvd.
**Site Inspection Observations:**  Currently, on this site is a two-story residence.  The building is situated on an undersized lot without parking.  The building is in a substandard, unsafe and deteriorated condition as can be seen in the photographs below.  The roof has holes in it and is caving in, the siding has numerous holes, the windows are deteriorating exhibiting water damage, and the gutters are falling down.  The building is in a state of disrepair.
**Environmental Issues:** None
**Violations:** 2006-2011, property maintenance, weeds, and litter violations; 2008, building and fire code violations;

P014736

**Photographs:** The following photographs are from a site inspection on November 14, 2016

  

 

**Evaluation:** Site is considered blighted for the following reasons:

1.  Deterioration. The dwelling is in a dilapidated condition as it has a crumbling roof and siding, holes in the walls, damaged gutters, deteriorated porch floor and crumbling windows, which is unsafe and substandard for occupancy. Therefore, this property is consistent with Criteria "a".
2.  Faulty arrangement. The residence is the only home located on the block, adjacent to the railroad tracks with no parking on site and little area for outdoor storage, which evinces a faulty arrangement detrimental to the safety and welfare of the community as well as creating a greater demand for on street parking, thereby have a negative impact o the surrounding properties. Therefore, this property is consistent with Statutory Criteria "d".
3.  Underutilization. The site has a improvement to land value of only .86 wherein the standard is 2.0. This is an indicator that the site is underutilized. Therefore, this property is consistent with Statutory Criteria "e".

The property exhibits conditions consistent with Statutory Criteria "a", "d" and "e". This is confirmed through site inspections, as can be seen in the photographs above. In addition, this property is necessary for the effective redevelopment of the entire area.

P014737

**BLOCK 419 LOT 2**



**Description:** Vacant Lot was Residential
**Zone:** CBD-10
**Address:** 15 Lincoln Blvd.
**Site Inspection Observations:** was a one-story residence without parking and now it is an empty lot
**Environmental Issues:** None
**Violations:** previously in 2011, exterior building maintenance violations

P014738

**Photographs:** The following photographs are from a site inspection on November 14, 2016





**Evaluation**: Site is considered substandard for the following reasons: It was a nonconforming residential land use that was demolished. This site is currently vacant and has been for several years. Its improvement to land value ratio is only 0.045 wherein the standard for property utilization of land is a ratio of 2.0. As such it represents a significantly underutilized property in the heart of the Borough's Central Business District and Redevelopment Area. It is not developed, nor has it ever been developed consistent with the goals and objectives of the Master Plan and Central Business District Plans as detailed in this report. The property exhibits conditions consistent with Statutory Criteria "e". This was confirmed through site inspections, as can be seen in the photographs above. In this investigation, the analysis for criteria "e" has focused both on the underutilization of the stagnant area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development. In addition, given its location, this property is necessary to the effective redevelopment of the entire area.

P014739

## BLOCK 419 LOTS 3 & 4



**Description:** Restaurant (lot 4) with adjacent surface parking lot (lot 3)
**Zone:** CBD-10
**Address:** 9 Lincoln Blvd. / 214 Kinderkamack Rd.
**Site Inspection Observations:** one-story restaurant with excess lot coverage, insufficient surface parking and unsafe vehicular circulation. The building was recently renovated, however the site itself still remains inefficient.
**Environmental Issues:** None
**Violations:** 2006, health department issues with grease on sidewalk; 2006, illegal signs; 2007, illegal parking and selling of vehicles on site; 2008, building maintenance; 2009, signage and lighting issues; 2009-2011, litter and weeds; 2009, failure to shovel snow; 2010, property to be boarded up and secured; 2014, signage; 2014, hazardous sidewalk; 2014, tall weeds/grass.

P014740

**Photographs:** The following photographs are from a site inspection on November 14, 2016.






**Evaluation**: Site is considered substandard for the following reasons: The site exhibits faulty arrangement that is characteristic of meeting Statutory Criteria "d". This is due to the fact that the site was developed as one lot and not as a comprehensive plan. The faulty arrangement is due to the size and use of the building on site. This creates a site with an inefficient layout and lack of parking which creates a greater demand for on-street parking, thereby having a negative impact on surrounding properties and the area. In this investigation, the analysis has focused on the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development. Further, Section 3 of the LRHL (N.J.S.A 40A:12A-3) allows the inclusion of parcels necessary for the effective redevelopment of the area, by stating "a redevelopment area may include land, buildings or improvements, which of themselves are not detrimental to the health, safety, or welfare, but the inclusion of which is found necessary, with or without change in their conditions, for the effective redevelopment of the area in which they are a part. The property exhibits some conditions consistent with Statutory Criteria "d". which creates a greater demand for on-street parking, thereby having a negative impact on surrounding properties.

P014741

**BLOCK 419 LOT 5**



**Description:** Mixed –Use building

**Zone:** CBD-10

**Address:** 200 Kinderkamack Rd.

**Site Inspection Observations:** This site was previously an abandoned one-story structure, in deteriorating condition with roof and façade repairs needed and site maintenance lacking with weeds and debris.  It has since been redeveloped.

**Environmental Issues:** on 2008 list of known contaminated sites in the State. It is still an active NJMES site, site ID # 452277 with ground water contamination. The report and map from the NJDEP is located in the appendix.

**Violations:** 2006-2013, tall grass and weeds, illegal parking; 2006, building maintenance issues; 2010-2012, building maintenance issues; 2015, signage

**Photographs:**  The following photographs are from a site inspection on November 14, 2016

P014742



**Evaluation**: Site is considered substandard for the following reasons:

1.  The site exhibits faulty arrangement that is characteristic of meeting Criteria "d". However this is due to the fact that the site was redeveloped as one lot and not as a comprehensive plan. The faulty arrangement is due to the size and location of the building on site. This creates a site with an inefficient layout, however there is an opportunity to improve the circulation on and off site and improve the parking design. This can be done by cross circulation easements to adjacent parcels and with keeping all the improvements in tact and in a manner consistent with the redevelopment plan goals and objectives.
2.  The site's land to improvement value ratio is 1.68, lower than the standards of 2.0. This is an indicator that the site is being underlined. While a majority of the lots in the study area do not meet the 2.0 standard, the average ratio for commercial lots outside the study area is 2.11. In this investigation, the analysis for criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development.

Further, Section 3 of the LRHL (N.J.S.A. 40A:12A-3) allows the inclusion of parcels necessary for the effective redevelopment of the area, by stating "a redevelopment area may include land, buildings or improvements, which of themselves are not detrimental to the health, safety, or welfare, but the inclusion of which is found necessary, with or without change in their conditions, for the effective redevelopment of the area in which they are a part. The property exhibits some conditions consistent with Statutory Criteria "d" and "e". However, while the lot is necessary to effectuate the redevelopment plan, it is not necessary to remove the newly developed building.

P014743

**BLOCK 419 LOT 6.01**



**Description:** Commercial

**Zone:** CBD-10

**Address:** 190 Kinderkamack Rd.

**Site Inspection Observations:** one-story structure with liquor store and cleaner. The site is not undersized for the zone, however the current building/uses create the need for outdoor storage of materials adjacent to vehicle circulation aisles. The site in general has unsafe vehicular circulation resulting from undefined curb cut, and parking spaces that allow a vehicle to back directly onto Kinderkamack Road, excess signage, unmaintained parking lot with potholes

**Environmental Issues:** It is still an active NJMES site, site ID # 12270. The report and map from the NJDEP is located in the appendix.

**Violations:** 2010, property maintenance; 2011, tall grass/weeds; 2013, signage

**Photographs:** The following photographs are from a site inspection on November 14, 2016

P014744






P014745



**Evaluation**: Site is considered substandard for the following reasons:

1. The site exhibits faulty arrangement that is characteristic of meeting Statutory Criteria "d". The Faulty arrangement is due to the size and location of the building on site. This creates a site with an inefficient layout with no opportunities to improve. Given the uses and building size, there is a need for outdoor storage and display as can bee seen from the photographs. The lack of a curb cut is of typical of modern planning standards.

2. The site's land to improvement value ratio is 1.23, clearly lower than the standards of 2.0. This is an indicator that the site is being underlined. While a majority of the lots in the study area do not meet the 2.0 standard, the average ratio for commercial lots outside the study area is 2.11. In this investigation, the analysis for Statutory Criteria "e" has focused both on the underutilization of the area and the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development. In addition, given the lot's location, this property is necessary for the effective redevelopment of the entire area.

The property exhibits conditions consistent with Statutory Criteria "d" and "e". This confirmed through site inspections, as can be seen in the photographs above.

**Block 419 Lot 6.02**



**Description:** Mixed use Commercial/Multi-family residential

**Zone:** CBD-10

**Address:** 184 Kinderkamack Rd.

**Site Inspection Observations:** two-story structure on an undersized lot with ground floor commercial and five residential units above with on-site surface parking. Parking and sidewalk appears to be poorly maintained with un-delineated parking spaces, unpaved areas and potholes, weeds growing through the asphalt and a light pole in the middle of the lot impeding movement. The deteriorating façade has holes in the siding, and boarded up windows. All the windows are covered, with and deteriorating panes. The guardrail adjacent to the circulation aisle is deteriorated to the point it is falling apart.

**Environmental Issues:** None

**Violations:** 2007, dumpster to be enclosed; 2007-2008 derelict and abandoned vehicles; 2008, potholes on site; 2008-2011, property maintenance issues; 2010-2013, weeds and tall grass; 2012, dumpster enclosure to be repaired; 2013, potholes on site

P014747

**Photographs:** The following photographs are from a site inspection on November 14, 2016

  

 

**Evaluation:** Site is considered substandard for the following reasons:

1. Deterioration. The building is dilapidated as evidenced by crumbling siding, holes in the walls, damaged gutters, deteriorated crumbling and boarded up windows. Moreover, the building appears to have not been properly maintained as illustrated in the photographs above. Additionally, the deteriorated and unsafe sidewalk and parking area have negative impacts on the public and surrounding properties by creating a greater demand for on-street parking. As such, Statutory Criteria "a" is met.

2. Underutilization. The site has a improvement to land value of only .78 wherein the standard is 2.0. This is an indicator that the site is underutilized. Statutory Criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development. While the concept of mixed use is contemplated by the plan, the buildings deterioration creates a property that has become stagnant and unproductive because of issues with [title/diversity of ownership/or other conditions]. Therefore, no improvement can occur without redevelopment and given the lot's location, this property is necessary for the redevelopment of the entire area.

The property exhibits conditions consistent with Statutory Criteria "a" and "e" This confirmed through site inspections, as can be seen in the photographs above.

P014748

**BLOCK 419 LOT 7**



**Description:** Public parking and ambulance Corps building
**Zone:** CBD-10
**Address:** 9 Kenneth Ave.
**Site Inspection Observations:** The lot has been the site of the Borough's commuter parking area and the Ambulance corps building for years as seen in the photographs below.
**Environmental Issues:** None
**Photographs:** The following photographs are from a site inspection on November 14, 2016.

P014749

 

**Evaluation:** Site is considered substandard for the following reasons: This site is currently utilized for surface parking area. The improvement to land value is only 0.27 where a standard of 2.0 is considered appropriate for land. As such it represents an underutilized property in the heart of the Borough's Central Business District and Redevelopment Area. It is not developed, nor was it ever developed consistent with the goals and objectives of the Master Plan and Central Business District Plans as detailed in this report. The property exhibits conditions consistent with Statutory Criteria "e". This confirmed through site inspections, as can be seen in the photographs above. In this investigation, the analysis for criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development.

P014750

**Block 419 Lot 8**



**Description:** Restaurant commercial

**Zone:** CBD-10

**Address:** 182 Kinderkamack Rd.

**Site Inspection Observations:** one-story multi-tenant commercial building with on-site parking that is poorly controlled with a wide curb cut and excess lot coverage. While the front of the building appears to be in adequate condition, the rear of the building is deteriorating.

**Environmental Issues:** None

**Violations:** 2007 property maintenance issues; 2008 potholes on site; 2009 dumpster to be enclosed; 2010, litter and tall grass/weeds, dumpster enclosure; 2011, remove drum and debris; 2011, improper use (dine-in); 2011, signage; 2013, signage; 2013, repair dumpster enclosure; 2015, signage

**Police Activity:**

**Photographs:** The following photographs are from a site inspection on November 14, 2016

P014751













P014752

**Evaluation**: Site is considered substandard for the following reasons:

1. Deterioration. The building is dilapidated as evidence by crumbling concrete, holes in the walls, damaged gutters, and deteriorated crumbling windows. The building appears to have not been properly maintained as illustrated in the photographs above. Additional the deteriorated parking area, and sidewalk have negative impacts on the public. Therefore, Statutory Criteria "a" is met.

2. Improper layout. The front of the site has an undefined curb cut, which allows for vehicles to back into Kinderkamack Road. Further the rear of the site has a faulty arrangement due to lacks parking and the proper drive aisles. If the parking spaces are utilized a vehicle has to back out onto the adjacent lot to exit the site thus, creating a negative impact to the adjacent property. Therefore, Statutory Criteria "d" is met.

3. Underutilization. The site has an improvement to land value of only 1.5 wherein the standard is 2.0. This is an indicator that the site is underutilized. Criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development. While the concept of mixed use is contemplated by the plan, the buildings deterioration creates a negative impact on the area.

The property exhibits conditions consistent with Statutory Criteria "a", "d" and "e" This confirmed through site inspections, as can be seen in the photographs above.

P014753

**BLOCK 419 LOT 9**



**Description:** Restaurant commercial
**Zone:** CBD-10
**Address:** 176 Kinderkamack Rd.
**Site Inspection Observations:** one-story multi-tenant commercial building with excess coverage and on-site parking that is poorly controlled with a wide curb cut and stacked parking. Weed overgrowth.
**Environmental Issues:** on 2008 list of known contaminated sites in the State. It is still an active NJMES site, Id # 42778 with ground water contamination. The report and map from the DEP is located in the appendix.
**Violations:** 2006-2008, repeat signage violations; 2006-2008 weeds and tall grass violations; 2010, property maintenance, outdoor seating appeared; 2010, failure to shovel; 2011, signage; 2016, failure to shovel; 2016, signage.

P014754

**Photographs:** The following photographs are from a site inspection on November 14, 2016

 

 

**Evaluation**: Site is considered substandard for the following reasons:

1. Deterioration. The building is dilapidated as evidenced by crumbling concrete, holes in the walls, damaged gutters, and deteriorated crumbling windows. The building appears to have not been properly maintained as illustrated in the photographs above. Additional the deteriorated parking area and sidewalk which have negative impacts on the public. Therefore, Statutory Criteria "a" is met.

2. Improper layout. The front of the site has an undefined curb cut, which allows for vehicles to back into Kinderkamack Road. Further there exists faulty arrangement in the rear of the site and lacks parking and the proper drive aisles. If the parking spaces are utilized a vehicle has to back out onto the adjacent lot to exit the site. Therefore, Statutory Criteria "d" is met.

P014755

3.  Underutilization.  The site has an improvement to land value of only 0.48 wherein the standard is 2.0.  This is an indicator that the site is underutilized.  Criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development.  While the concept of mixed use is contemplated by the plan, the building's deterioration creates a property. which is stagnant and unproductive. Given its location, this property is necessary for the effective redevelopment of the entire area. Therefore, Statutory Criteria "d" is met.

The property exhibits conditions consistent with Statutory Criteria "a'', "d'' and "e" This confirmed through site inspections, as can be seen in the photographs above.

P014756

**BLOCK 419 LOT 10**



**Description:** commercial
**Zone:** CBD-10
**Address:** 78 Linwood Ave.
**Site Inspection Observations:** Currently on the lot is a one-story multi-tenant commercial building on an undersized lot with insufficient on-site parking
**Environmental Issues:** None
**Violations:** 2007, weeds and tall grass; 2009, signage; 2009, dumpster enclosure; 2010, property maintenance; 2014, signage
**Photographs:** The following photographs are from a site inspection on November 14, 2016.




P014757

**Evaluation**: Site is considered substandard for the following reasons:

1. The site exhibits faulty arrangement that is characteristic of meeting Criteria "d". The Faulty arrangement is due to the size and location of the building on site. This creates a site with an inefficient layout with no opportunities to improve. Given the uses and building size, there is a need for outdoor storage and display. The lack of a curb cut is of typical of modern planning standards. Therefore, Statutory Criteria "d" is met.

2. Underutilization. The site has an improvement to land value of only 0.65 wherein the standard is 2.0. This is an indicator that the site is underutilized. Criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development. While the concept of mixed use is contemplated by the plan, the buildings deterioration creates a property. Moreover, given the lots location it is necessary for the effective redevelopment of the entire area. Therefore, Statutory Criteria "e" is met.

The property exhibits conditions consistent with Statutory Criteria "d" and "e" This confirmed through site inspections, as can be seen in the photographs above.

P014758

VII. Conclusion

This preliminary investigation reveals several key findings that indicate and verify that the proposed redevelopment area meets the statutory criteria found in N.J.S.A.40A:12A-5 of the Local Redevelopment Law.  In general, the properties have a deleterious impact on the surrounding areas.

A majority of the Study Area exhibits faulty arrangement that is characteristic of meeting Criteria "d". The faulty arrangement is due to the size and location of the buildings, lack of parking and improper circulation aisles.  This creates a site with an inefficient layout with no opportunities to improve.  Given the uses and building sizes on a number of lots, there is a need for outdoor storage and display. Further the lack of a curbing along Kinderkamack Road creates safety issues with un-channeled vehicles exiting and entering the sites and/or backing out onto Kinderkamack Road.

Of the entire study area, only 10 of the 82 properties have an improvement to land value ratio of 2:1 or greater. That is only 12.5 percent of the entire study area that meets the standard. This is compared to the fact that the remaining commercial properties within the Borough have a ratio of 2.11. This fact combined with the fact that a majority of the study area exhibits poor design and arrangement are indicators that the study area is not being properly utilized and exhibits economic underutilization.  This is an indicator that the area as whole is underutilized. Criteria "e" has focused both on the underutilization of the area but also the broader land use and planning goals of the municipality. It has concluded that the area as a whole is not developing in a manner that furthers or is consistent with the Borough's land use plan and the proximity to the train station which offers excellent opportunities for smart growth and transit-oriented development.  Lastly, when analyzing the entire area, it is concluded that these parcels are necessary for the effective redevelopment of the entire area as a whole.

The proposed designation of the above-mentioned area as "Area In Need of Redevelopment" would allow for the creation of a Redevelopment Plan for the area that can encourage creative design, require streetscape improvements, and permit uses that will be compatible with the area's proximity to the train station. These changes would be compatible to the vision of the Master Plan and in keeping with the Smart Growth principles of the State Plan.

VIII. Recommendation

Based on the findings of this preliminary investigation, the recommendation to the Borough of Emerson Planning Board is to forward these findings and recommendations to the Municipal Council. All the properties within the proposed area clearly meet the statutory criteria needed to establish a redevelopment area. Therefore, the Municipal Council of the Borough of Emerson has the authority to reconfirm this area as an "Area in Need of Redevelopment", and to authorize the Borough to use all those powers provided by the Legislature for use in a redevelopment area, including the power of eminent domain ("Condemnation Redevelopment Area").

Once the area designation is formally reconfirmed, the Council should authorize a process by which the Planning Board, the public and municipal professionals establish a redevelopment plan for the area. A resolution will be needed authorizing Planning Board to develop such a plan.

P014759

## Appendices

1. Governing Resolution
2. Police Records
3. NJDEP Environmental Reports and Map

P014760

P014761



P014763



P014765



P014767



Sincerely,

Brigette Bogart PP, AICP, CGW
**Planning & Design Professionals LLC**
www.BogartPlanning.com

Wyckoff Office (for mailing only)
366 Harvey Court
Wyckoff, New Jersey, 07481
(Ph) 201.485.8455

Midland Park Office:
648 Godwin Avenue, Suite #2
Midland Park, New Jersey, 07432
(Ph) 201.485.3365

P014769

Exhibit 17

Agenda No. 5

## BOROUGH OF EMERSON
## COUNTY OF BERGEN, NEW JERSEY
### RESOLUTION           No: 92-17

RE: Resolution of the Borough Council of the Borough of Emerson, County of Bergen, State of New Jersey Authorizing Certain Properties Previously Designated As An Area In Need Of Redevelopment Be Removed from the Redevelopment Area

WHEREAS, the New Jersey Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 et seq. ("LRHL"), authorizes municipalities to determine whether certain properties meet the statutory criteria to be designated an area "in need of redevelopment"; and

WHEREAS, on February 3, 2004, the Borough Council of the Borough of Emerson ("Borough Council") adopted Resolution No. 50-04, authorizing the Emerson Planning Board, now known as the Emerson Land Use Board ("Board"), to conduct a preliminary investigation as to whether the following blocks or portions thereof: 412, 419, 420, 422, 603, 610, 613, 615, 616, and 617.01, on the official tax assessment map of the Borough and located in the area more commonly known as the Central Business District ("CBD"), met the statutory criteria to be designated as "an area in need of redevelopment" pursuant to the LRHL; and

WHEREAS, the Board conducted the requested analysis and held the requisite hearings on July 29, 2004 and August 19, 2004, which were all properly noticed, to determine whether the studied properties met the statutory criteria to be designated as "an area in need of redevelopment"; and

WHEREAS, the Board adopted a resolution on September 7, 2004 recommending that the Borough Council designate the studied properties as "an area in need of redevelopment" pursuant to the LRHL; and

WHEREAS, the Borough Council adopted Resolution No. 199-04 on September 7, 2004 (the "2004 Resolution") designating the following properties as an area "in need of redevelopment" ("Designated Area"):

2116252-1

EMERSON   -200-

Agenda No. 5

| Block | Lot(s) |
|-------|--------|
| 412 | 1, 2, 3, 4 & 5 |
| 419 | 1, 2, 3, 4, 5, 6.01, 6.02, 7, 8, 9 & 10 |
| 420 | 2 & 16 |
| 422 | 1, 10, 11, 12, 13, 14, 15, 16, 17 & 18 |
| 603 | 2, 3, 4, 5 & 6 |
| 606 | 3 & 4 |
| 610 | 1, 2, 4, 5.01, 5.02, 6, 7, 8, 9.01, 9.02 & 10 |
| 613 | 1 & 2 |
| 615 | 1 |
| 616 | 1, 16, 17, 19, 20, 21, 22, 23 & 24 |
| 617.01 | 1 |

**WHEREAS**, on February 7, 2017, at the regularly scheduled Borough Council meeting, the Borough Planner Brigette Bogart PP, AICP, CGW of Planning & Design Professionals, LLC ("Planner Bogart"), presented and recommended to the Borough Council that certain properties previously designated as an "area in need or redevelopment" should be removed from the redevelopment area based on no longer meeting the statutory criteria under the LRHL and on the Borough Planner's site inspections and review of the Borough's tax records; and

**WHEREAS**, the Borough Council has determined that certain properties should be removed from the designated redevelopment area because it no longer meets the statutory criteria under the LRHL and should no longer be subject to the Borough's Redevelopment Plan and the LRHL;

**NOW, THEREFORE BE IT RESOLVED**, that the Borough Council of the Borough of Emerson hereby declares that the following blocks and lots, previously designated by the Borough Council by way of Resolution No. 50-04, are hereby removed from the redevelopment area ("De-Designation"):

| Block | Lot(s) |
|-------|--------|
| 412 | 1 & 2 |
| 603 | 2, 3, 4, 5 & 6 |
| 606 | 3 & 4 |
| 610 | 4, 5.01, 5.02, 6, 7, 8, 9.01, 9.02 & 10 |
| 613 | 1 & 2 |
| 615 | 1 |
| 616 | 16, 17, & 19 |

**BE IT FURTHER RESOLVED**, that the Council's De-Designation of the above listed properties shall also exempt these properties from being subject to the Borough's Redevelopment Plan; and

2116252-1

Agenda No. 5

BE IT FURTHER RESOLVED, that these properties are located within the CBD and are thus, subject to any and all applicable zoning ordinances; and

BE IT FURTHER RESOLVED, the Council hereby directs that the Board shall not be required to investigate these properties as previously directed by Resolution No. 221-16 and shall not be required to determine if these properties continue to be designated as an "area in need of redevelopment" pursuant to the LRHL; and

BE IT FURTHER RESOLVED, that the Borough hereby reserves all other authority and powers granted to it under the LRHL; and

BE IT FURTHER RESOLVED, this Resolution shall take effect immediately.

| COUNCIL | MOVED | SECONDED | AYES | NAYES | ABSENT | ABSTAIN | |
|---|---|---|---|---|---|---|---|
| DiPaola | | | X | | | | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on February 21, 2017.* |
| Falotico | X | | X | | | | |
| Lazar | | | X | | | | Attest: |
| Knoller | | X | X | | | | |
| Downing | | | X | | | | *Municipal Clerk* |
| Worthington | | | X | | | | |

2116252-1

EMERSON  -202-

Exhibit 18

**BOROUGH OF EMERSON**
**COUNTY OF BERGEN, NEW JERSEY**
**RESOLUTION**          **No: 200-17**

..................................................................................................................................................

RE:  SECOND AMENDMENT TO REDEVELOPMENT AGREEMENT

This **Second Amendment to Redevelopment Agreement** is made this ____ day of July

2017 by and between the

>    **BOROUGH OF EMERSON**
>    146 Linwood Ave., Emerson, NJ 07630
>    a municipal corporation of the State of New
>    Jersey, located in the County of Bergen,
>    (hereinafter referred to as "Borough")

**AND**

>    **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
>    a limited liability corporation of the State of New Jersey, having an office
>    at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
>    (hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement on

or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas

within the Central Business District Redevelopment Area, attached hereto as **Exhibit A**; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and

supplementing the Redevelopment Agreement to reflect their mutual understanding with respect

to the implementation of the development and requirement of affordable housing units to be built

on-site;

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the

Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

2169563

1.      All terms not defined in this Amendment shall have the same meaning as set forth

in the Redevelopment Agreement.

2.      The purpose and intent of this Amendment is to amend and supplement the

affordable housing requirements.

3.      Article 1, Section 1.01 entitled "Definitions" is amended as follows:

"Affordable Housing Requirements" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The ~~maximum~~ obligation shall be at least 20% set aside **[in accordance with Borough Ordinance 290-13.D]** and of which no less than 15% ~~may~~ **[shall]** be built on **[site] and the remainder shall be provided for by any of the following options to: (i) construct affordable units on-site; or (2) construct the affordable units elsewhere within the Borough ("Off-site"); or (3) make a payment in lieu of constructing the affordable units; or (4) provide a combination of a payment in lieu and on-site or Off-site construction.** ~~and/or offsite~~

4.      Article 4.01 entitled Project Costs is amended as follows:

All costs of implementing and Completing the Project including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property **[including the use of eminent domain to acquire the property under any authorizing statutes and/or regulations]**, any Remediation costs . . .

5.      Article 4, Section 4.03.1 entitled "Alternate COAH Location" is deleted in its

entirety and will be "intentionally left blank".

6.      Article 5.01 entitled "Property" shall be amended and supplemented as follows:

. . . In the event the Redeveloper is not able to purchase any property set forth in Exhibit A the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c) **[, N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws authorizing the Borough to acquire such properties.]** The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties . . .

7. In all other respects, the Redevelopment Agreement remains in full force and effect.

8. This Second Amendment together with the First Amendment, any applicable Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this Second Amendment. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

9. All the provisions of this Second Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

**IN WITNESS WHEREOF**, Redeveloper has hereunto caused this Second Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

2169563-1

| COUNCIL | M O V E D | S E C O N D E D | A Y E S | N A Y E S | A B S E N T | A B S T A I N | *I hereby certify that the above Resolution was duly adopted by the Borough of Emerson at a meeting held on July 18, 2017.* |
|---|---|---|---|---|---|---|---|
| DiPaola | | | | X | | | |
| Falotico | | | X | | | | *Attest:* |
| Lazar | | | X | | | | |
| Knoller | | X | X | | | | *Acting Deputy Clerk* |
| Downing | X | | X | | | | |
| Worthington | | | X | | | | |

2169563-1

Witnessed and Attested to:                    **BOROUGH OF EMERSON**


_____    By: _____
JANE DIETSCHE, Borough Clerk                    LOUIS J. LAMATINA, Mayor


**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**


                                By: _____
                                    Joseph Forgione,   Managing Member

2169563-1

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY :

                : SS

COUNTY OF BERGEN    :

    **I CERTIFY** that on _____, 2017,

    **JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

    (a)    this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

    (b)    this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamantina, the Mayor of the Municipal Corporation;

    (c)    this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

    (d)    this person knows the proper seal of the corporation which was affixed to this document; and

    (e)    this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on

_____ 2017.

                    _____

                            Municipal Clerk

_____

Notary Public, State of New Jersey

2169563-1

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY    :
                       : ss
COUNTY OF BERGEN       :

    BE IT REMEMBERED that on this _____ day of _____ 2017, before me, the subscriber, personally appeared _____, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

 

_____
Joseph Forgione, Managing Member

Signed and sworn to before me on
_____2017.

_____
Notary Public, State of New Jersey

# EXHIBIT A

## Redevelopment Agreement

Exhibit 19

MIN No. 15 APPROVED FOR RELEASE & CONTENT 8-15-17




D-21

**MINUTES
BOROUGH OF EMERSON
MAYOR AND COUNCIL**
July 18, 2017
7:30 P.M.
**Borough Hall-Council Chambers**
Emerson, NJ 07630

....................................................................................................................................

I.  Mayor Lamatina called the meeting to order at 7:30 p.m. and identified the emergency exits.

II.  ROLL CALL

Mayor Lamatina asked Mr. Hoffmann to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilwoman DiPaola Councilman Downing, Councilman Falotico, Council President Knoller, Councilman Lazar, Councilman Worthington

Also present were Borough Attorney Wendy Rubinstein and Borough Administrator Robert Hoffmann substituting as Deputy Clerk in the absence of Borough Clerk Jane Dietsche.

III.  EXCUSED ABSENCE OF GOVERNING BODY MEMBER
• Absence of Councilwoman DiPaola and Councilman Worthington from the Regular Meeting of June 27, 2017

☞**Motion** to excuse the absence of Councilwoman DiPaola and Councilman Worthington from the Regular Meeting of June 27, 2017 was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried. Councilwoman DiPaola and Councilman Worthington abstained.

IV.  PROCLAMATIONS & CITATIONS
• Congratulating Emerson Baseball Team
• Congratulating Katie Falotico for Softball Achievements
• Congratulating Eran Peci for Pole Vaulting Achievements
• Congratulating Sophia Castronovo for Track Achievements
• Congratulating Adrianna Gobin for Pole Vaulting Achievements

V.  APPOINTMENTS/RESIGNATIONS
• Resolution No. 194-17 Permanent Appointment of Officer Sean Croal to the Emerson Police Department

☞**Motion** to approve Resolution No. 194-17 Permanent Appointment of Officer Sean Croal to the Emerson Police Department was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 6-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

- Resolution No. 195-17 Permanent Appointment of Officer George Featherstone to the Emerson Police Department

  ☞**Motion** to approve Resolution No. 195-17 Permanent Appointment of Officer George Featherstone to the Emerson Police Department was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 6-0.
  **RC: Council members:**
  **YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

VI.   MINUTES FOR APPROVAL
- Regular and Closed Session Meeting Minutes of June 27, 2017

  ☞**Motion** to approve the Regular and Closed Session Regular Meeting Minutes of June 27, 2017 with corrections was **moved** by Council President Knoller, **seconded** by Councilman Lazar and carried unanimously.

VII.   CORRESPONDENCE

Mayor Lamatina stated that copies of the correspondence were available in the Office of the Municipal Clerk.

- Letter dated June 20, 2017 from Kimberli Craft, P.E., NJ Society of Municipal Engineers; Re: 2017 Municipal Engineering Project of the Year Awards
- Letter from Borough of Harrington Park dated June 29, 2017; Re: Notice of Public Hearing
- Email dated June 30, 2017 from New Jersey Municipal Clerks' Association; Re: Affordable Housing and Police and Fire Contracts

VIII.   FINANCIAL BUSINESS
- Resolution No. 196-17 Bill List

  ☞**Motion** to approve Resolution No. 196-17 Bill List was **moved** by Councilman Worthington, **seconded** by Councilman Falotico and carried by a roll call vote of 6-0.
  **RC: Council members:**
  **YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

- Resolution No. 197-17 Capital Budget Amendment Resolution

  ☞**Motion** to approve Resolution No. 197-17 Capital Budget Amendment was **moved** by Councilman Lazar, **seconded** by Councilman Downing and carried by a roll call vote of 6-0.
  **RC: Council members:**
  **YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

IX.   UNFINISHED BUSINESS
- Appraisal – 156 Palisade Avenue – Mr. Hoffmann explained that this item had been placed on the agenda to discuss the feasibility of selling the property and putting it back on the tax rolls. The Governing Body discussed the monetary value in the latest appraisal as well as whether there was value in putting it back on the tax rolls. This discussion was tabled to the August 15th meeting.

- Resolution No. 198-17 of the Borough Council of the Borough of Emerson, County of Bergen, State of New Jersey, Confirming Certain Properties Previously Designated as An Area in Need of Redevelopment Be Removed from the Redevelopment Area

  ☞**Motion** to approve Resolution No. 198-17 of the Borough Council of the Borough of Emerson, County of Bergen, State of New Jersey, Confirming Certain Properties Previously Designated as An Area in Need of Redevelopment Be Removed from the Redevelopment Area was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 6-0.
  **RC: Council members:**
  **YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

X.  NEW BUSINESS

- Resolution No. 199-17 Urging the State Legislature to Extend the 2% Cap on Police and Fire Arbitration Contract Awards

  Councilman Falotico was opposed to this resolution, explaining that it put undue restrictions on two professions in the State and that this goal could be accomplished through collective bargaining. Council President Knoller and Councilman Lazar concurred with Councilman Falotico's remarks and said it was unfair.

  Mayor Lamatina asked for a motion to approve Resolution No. 199-17 Urging the State Legislature to Extend the 2% Cap on Police and Fire Arbitration Contract Awards. No motion was made and the resolution failed.

- Resolution No. 200-17 Authorizing the Execution of a Second Amendment to the Redevelopment Agreement

  Ms. Rubinstein explained that this resolution provided further clarification on the Borough's affordable housing obligation for the Redevelopment area. It specifically set forth that 15% must be onsite and 5% could be onsite, off site or payment in lieu of taxes. She noted that the original redeveloper's agreement only provided the onus of a 20% set aside but did not specify that 15% had to be placed on site. The Special Master was very much in favor of the 15% on site as was the Fair Share Housing Center. Another amendment was to clarify costs if eminent domain was used.

  ☞**Motion** to approve Resolution No. 200-17 Authorizing the Execution of a Second Amendment to the Redevelopment Agreement was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by a roll call vote of 5-1.
  **RC: Council members:**
  **YES:  Falotico, Lazar, Knoller, Downing, Worthington**
  **NO: DiPaola**

MIN No. 15 APPROVED FOR RELEASE & CONTENT 8-15-17

XI.   INTRODUCTION OF ORDINANCES

**First Reading:**

Mayor Lamatina announced that Mr. Hoffmann would read the following ordinance by title and it would be further considered at a Public Hearing to be held on August 15, 2017 at 7:30 p.m. in the Council Chambers of the Borough Hall, Municipal Place, Emerson, N.J. and published in the July 21st, 2017 edition of the Ridgewood News.  He added that the ordinance was on file in the Clerk's Office and posted on the official bulletin board of the Municipal Building where copies would be available to the General Public at no charge.

**1543-17** CAPITAL ORDINANCE OF THE BOROUGH OF EMERSON, IN THE COUNTY OF BERGEN, NEW JERSEY AUTHORIZING THE ACQUISITION OF EASEMENTS IN REAL PROPERTY FOR THE KINDERKAMACK ROAD IMPROVEMENT PROJECT IN, BY AND FOR THE BOROUGH, APPROPRIATING THEREFOR THE SUM OF $25,000 AND PROVIDING THAT SUCH SUM SO APPROPRIATED SHALL BE RAISED FROM THE BOROUGH'S CAPITAL IMPROVEMENT FUND.

☛**Motion** to introduce Capital Ordinance No. 1543-17 on first reading was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by a roll call vote of 6-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

XII.   ADOPTION OF ORDINANCES

Mayor Lamatina stated that no ordinances were being adopted this evening.

XIII.   REPORTS
   • Mayor and Council

Councilwoman DiPaola had no report.

Councilman Falotico said he had attended a Land Use Board meeting on June 15th. He had been in contact with Assemblyman Auth's office to schedule a meeting with New Jersey Transit to discuss where the train stopped and how it could be positioned to avoid blocking Kinderkamack Road. He was happy to report that Assemblyman Auth and Jack Fornaro a legislative aide to Senator Cardinale, had been great and that a meeting would take place shortly. He would report back when he had more information.

Councilman Lazar gave the June report for the Building Department. He said that Property Maintenance Inspectors and other personnel were out there doing their job. They were writing up any infractions that did not comply with Borough ordinances, but giving residents and business owners time to correct any issues. It made the Borough a better place. He also reported on the Department of Public Works for the month of June. They were doing a great job and saving taxpayers money by eliminating the need to go out and hire professionals. They were keeping up with all their training and doing a lot more than in the past, which was showing in their performance and safety record. They were cleaning catch basins and streams which eliminated a lot of the backups and flooding which occurred in the past.

MIN No. 15 APPROVED FOR RELEASE & CONTENT 8-15-17

Council President Knoller gave the Police Department report for June and part of July. He also discussed the upcoming opening of the Veteran's Housing for disabled veterans and said that the organization Making-It-Home was accepting donations to furnish the homes. He and Mayor Lamatina were planning to visit some businesses to obtain sponsorships for the veterans. He commended Unity Bank for donating $1,400 to Making-It-Home. Councilman Downing was also reaching out to organizations for sponsorships and donations as well. He said that it was a great thing for the town and said that whatever they could do to help, they would do. He hoped to get these homes fully furnished for veterans who gave more than their fair share for us.

Councilman Downing said that Summer Recreation Camp was going very well and the Community Garden at Centennial Park was fully stocked, with all plots taken.

Councilman Worthington had no report.

Mayor Lamatina discussed the July Pascack Valley Mayors' meeting where the invited guest was Captain Bill Sheehan, the River Keeper. He had been talking to Mr. Sheehan about access to the Oradell reservoir. The property was owned by Suez Water which would have to okay it but his goal was to have kayaking and a sailing school out of the reservoir. Mayor Lamatina said the Pascack Mayors agreed to propose a resolution at their September meeting. County Freeholders Ganz and Amoroso were very excited by the idea and said it played well with the County's recent park survey. He said they were looking to make nature available and usable and would report back in August or September.

Mayor Lamatina also discussed the installation of the light at the intersection of Lincoln Boulevard and Kinderkamack Road. He said people need to be courteous coming south on Kinderkamack Road and be aware that there was a feeder road coming in. He also discussed installing a stop line before Jefferson Avenue on the southbound side and noted that the situation would be monitored.

Council President Knoller thanked the family of Jim Wagner for their generous donation of $2,500 in honor of the 10th anniversary of Jim Wagner's passing.

- Borough Administrator Robert Hoffmann reported on the following:
    o A cantilever had been installed for one of the New Jersey Transit signals at the Kinderkamack Road railroad crossing. Another cantilever was scheduled to be installed and then they will be changing out the gate.
    o All but one telephone pole had been installed.
    o This morning the traffic signal at Lincoln Boulevard was activated. The voice activated signals for the crosswalk were programmed and working well.
    o Milling and paving was scheduled to take place in August.
    o A resolution was on the agenda about new bus stops. They had been agreed to back in 2013 or earlier. The County had designed the Kinderkamack Road project with these bus stops in mind. The Emerson Plaza West stop was currently at a temporary location and would be moved when the Central Business District project was complete.
    o The County had been unable to strike the tax rate for the Borough due to the increase in school district aid. This increase in state aid was disclosed after the late adoption of the State budget. The Borough found out about this on Friday, July 14th. He anticipated that tax bills would go out within the next two weeks. He explained that the deadline for paying taxes is 25 days from the date of mailing and there would be an extension for tax payments.

MIN No. 15 APPROVED FOR RELEASE & CONTENT 8-15-17

- Borough Clerk Jane Dietsche was absent.

- Borough Attorney Wendy Rubinstein said there had been a case management conference with the judge on the affordable housing action the previous week. The judge had extended the immunity to August 31st. All parties were in agreement that the Borough was moving forward. There would be an update in mid-August.

XIV.  PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman DiPaola, **seconded** by Council President Knoller and carried.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public.

☞**Motion** to close the meeting to comments from the public was **moved** by Councilman Lazar, **seconded** by Councilman Falotico and carried.

XV.  RESOLUTIONS ON CONSENT AGENDA NO. 201-17

☞**Motion** to approve Consent Agenda No. 201-17 was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 6-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

.

| CA 202-17 | Borough of Emerson Bergen County Proposed Bus Stop – Emerson Plaza West |
| CA 203-17 | Approve Cancellation of Completed Funded Capital Improvement Authorizations |

XVI.  CLOSED EXECUTIVE SESSION - Resolution No. 204-17

Mayor Lamatina announced that item #17-07/18-41 Personnel – Salary Ordinance was being pulled from Closed Session.

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 204-17 with item #17-07/18-41 Personnel – Salary Ordinance removed was **moved** by Councilman Lazar, **seconded** by Councilman Falotico and carried by a roll call vote of 6-0 at 8:51 p.m.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

| #17-07/18-40 | PBA Negotiations – Memorandum of Understanding | N.J.S.A. 10:4-4 |
| ~~#17-07/18-41~~ | ~~Personnel – Salary Ordinance~~ | ~~N.J.S.A. 10:4-8~~ |

MIN No. 15 APPROVED FOR RELEASE & CONTENT 8-15-17

XVII.    RECONVENE

The Borough of Emerson reserves the right to return to Open Session and, if appropriate, take formal action.

☞**Motion** to reconvene was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried at 9:15 p.m.

~~**First Reading:**~~

~~**1541-17** AN ORDINANCE TO FIX THE SALARIES, WAGES, COMPENSATION AND OTHER TERMS OF EMPLOYMENT OF CERTAIN EMPLOYEES OF THE BOROUGH OF EMERSON FOR THE CALENDAR YEAR 2017~~

☞**Motion** to authorize Mayor Lamatina and a member of the Appropriate Authority to execute the Memorandum of Agreement with the Emerson Police Benevolent Association as approved by the Labor Counsel after it is signed by the PBA representatives was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 6-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing, Worthington**

XVIII.    ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Councilman Lazar, **seconded** by Councilman Falotico and carried at 9:17 p.m.

Respectfully submitted,

_____

Jane Dietsche, RMC
Borough Clerk

Exhibit 20

*Exh. B*

D-22

## SECOND AMENDMENT TO REDEVELOPMENT AGREEMENT

This Second Amendment to Redevelopment Agreement is made this *20* day of *Nov*, 2017 by and between the

**BOROUGH OF EMERSON**
146 Linwood Ave., Emerson, NJ 07630
a municipal corporation of the State of New
Jersey, located in the County of Bergen,
(hereinafter referred to as "Borough")

**AND**

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
a limited liability corporation of the State of New Jersey, having an office
at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
(hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement on or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas within the Central Business District Redevelopment Area, attached hereto as **Exhibit A**; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and supplementing the Redevelopment Agreement to reflect their mutual understanding with respect to the implementation of the development and requirement of affordable housing units to be built on-site;

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      All terms not defined in this Amendment shall have the same meaning as set forth in the Redevelopment Agreement.

2.      The purpose and intent of this Amendment is to amend and supplement the affordable housing requirements.

3.      Article 1, Section 1.01 entitled "Definitions" is amended as follows:

"Affordable Housing Requirements" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The ~~maximum~~ obligation shall be at least 20% set aside **[in accordance with Borough Ordinance 290-13.D]** and of which no less than 15% ~~may~~ **[shall]** be built on ~~[site]~~ **and the remainder shall be provided for by any of the following options to: (i) construct affordable units on-site; or (2) construct the affordable units elsewhere within the Borough ("Off-site"); or (3) make a payment in lieu of constructing the affordable units; or (4) provide a combination of a payment in lieu and on-site or Off-site construction.** ~~and/or offsite~~

4.      Article 4.01 entitled Project Costs is amended as follows:

All costs of implementing and Completing the Project including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property **[including the use of eminent domain to acquire the property under any authorizing statutes and/or regulations]**, any Remediation costs . . .

5.      Article 4, Section 4.03.1 entitled "Alternate COAH Location" is deleted in its entirety and will be "intentionally left blank".

6.      Article 5.01 entitled "Property" shall be amended and supplemented as follows:

. . . In the event the Redeveloper is not able to purchase any property set forth in Exhibit A the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c) **[, N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws authorizing the Borough to acquire such properties.]** The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties . . .

7.    In all other respects, the Redevelopment Agreement remains in full force and effect.

8.    This Second Amendment together with the First Amendment, any applicable Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this Second Amendment. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

9.    All the provisions of this Second Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

**IN WITNESS WHEREOF**, Redeveloper has hereunto caused this Second Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed and Attested to:                    **BOROUGH OF EMERSON**

By: _____
JANE DIETSCHE, Borough Clerk          LOUIS J. LAMATINA, Mayor


**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

By: _____
Joseph Forgione,   Managing Member

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY :

: SS

COUNTY OF BERGEN :

**I CERTIFY** that on _11/20_ , 2017,

**JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

(a)   this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

(b)   this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamatina, the Mayor of the Municipal Corporation;

(c)   this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

(d)   this person knows the proper seal of the corporation which was affixed to this document; and

(e)   this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
_11/20/_2017.

_____
Municipal Clerk

_____
Notary Public, State of New Jersey

COLEEN A. GODDEL
NOTARY PUBLIC – NEW JERSEY
COMMISSION # 50086730
MY COMMISSION EXPIRES AUGUST 23, 2022

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY  :

: ss

COUNTY OF BERGEN  :

BE IT REMEMBERED that on this _7_ day of _November_ 2017, before me, the subscriber, personally appeared _Joseph Forgione_, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

_____
Joseph Forgione, Managing Member

Signed and sworn to before me on
Nov. 7, 2017.

_____
Notary Public, State of New Jersey

DIANE M DE VITA-CHIRCO
NOTARY
PUBLIC
My Comm. Exp.
Mar 13, 2022
STATE OF NEW JERSEY

Exhibit 21



Peter J. O'Connor, Esq.
Kevin D. Walsh, Esq.
Adam M. Gordon, Esq.
Laura Smith-Denker, Esq.
David T. Rammler, Esq.
Joshua D. Bauers, Esq.

November 21, 2017

D-24

Wendy Rubinstein
DeCotiis, FitzPatrick, Cole & Giblin, LLP
Glenpointe Center West
500 Frank W. Burr Blvd., Ste. 31
Teaneck, New Jersey 07666

         **Re:**   **In the Matter of the Application of the Borough of Emerson, County of Bergen,** Docket No. BER-L-6300-15

Dear Ms. Rubinstein:

This letter memorializes the terms of an agreement reached between the Borough of Emerson (the Borough or "Emerson"), the declaratory judgment plaintiff, and Fair Share Housing Center (FSHC), a Supreme Court-designated interested party in this matter in accordance with In re N.J.A.C. 5:96 and 5:97, 221 N.J. 1, 30 (2015)(Mount Laurel IV) and, through this settlement, a defendant in this proceeding.

**Background**

Emerson filed the above-captioned matter on July 8, 2015 seeking a declaration of its compliance with the Mount Laurel doctrine and Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq. in accordance with In re N.J.A.C. 5:96 and 5:97, supra. Through the declaratory judgment process, the Borough and FSHC agreed to settle the litigation and to present that settlement to the trial court with jurisdiction over this matter to review, recognizing that the settlement of Mount Laurel litigation is favored because it avoids delays and the expense of trial and results more quickly in the construction of homes for lower-income households.

**Settlement terms**

The Borough and FSHC hereby agree to the following terms:

1. FSHC agrees that the Borough, through the adoption of a Housing Element and Fair Share Plan conforming with the terms of this Agreement (hereafter "the Plan") and through the implementation of the Plan and this Agreement, satisfies its obligations under the Mount Laurel doctrine and Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq., for the Prior Round (1987-1999) and Third Round (1999-2025).

2. At this time and at this particular point in the process resulting from the Supreme Court's Mount Laurel IV decision, when Third Round fair share obligations have yet to be definitively determined, it is appropriate for the parties to arrive at a settlement regarding a municipality's Third Round present and prospective need instead of doing so through plenary adjudication of the present and prospective need.

3. FSHC and the Borough hereby agree that Emerson's affordable housing obligations are as follows:

| Rehabilitation Share (per Kinsey Report[1]) | 20 |
| Prior Round Obligation (pursuant to N.J.A.C. 5:93) | 74 |
| Third Round (1999-2025) Prospective Need (per Kinsey Report, as adjusted through this Agreement) | 234 |

4. For purposes of this Agreement, the Third Round Prospective Need shall be deemed to include the Gap Period Present Need, which is a measure of households formed from 1999-2015 that need affordable housing, that was recognized by the Supreme Court in In re Declaratory Judgment Actions Filed By Various Municipalities, 227 N.J. 508 (2017).

5. FSHC and the Borough agree that Emerson does not accept the basis of the methodology or calculation proffered by FSHC's consultant, David N. Kinsey, PhD, P.P., F.A.I.C.P. The Parties agree to the terms in this agreement solely for purposes of settlement of this action. Although the Borough does not accept the basis of the methodology or calculations proffered by FSHC's consultant, FSHC contends and is free to take the position before the Court that the 234 Third Round obligation should be accepted by the Court because it is based on the Prior Round methodology and reflects a reduction from Dr. Kinsey's May 2016 calculation of the Borough's Third Round prospective need.

6. The Borough's efforts to meet its present need include the following: Upon approval of this Settlement Agreement by the Court, the Borough will reserve at least $200,000 ($10,000 per unit hard costs) of its affordable housing trust fund account to complete up to 20 rehabilitations through the Affordable Critical Home Repair Program Agreement between the Borough and Habitat for Humanity of Bergen County, Inc. which shall include an experienced affordable housing rehabilitation program administrative agent. This is sufficient to satisfy the Borough's present need obligation of 20 units.

7. As noted above, the Borough has a Prior Round prospective need of 74 units. The Borough received a Prior Round vacant land adjustment with a RDP of 20, leaving a remaining unmet need of 54 units. The Borough has met its Prior Round RDP of 20 through the following compliance mechanisms:

| Project | Senior | Rental | Street Address | Block and Lot | Credits |
|---|---|---|---|---|---|
| RCA with Ridgefield | | | | | 5 |
| New Concepts (Group Home / ALA) | | X | 43 Emerson Plaza West | Block 417, Lots 2 & 3 | 10 |
| Rental Bonus Credits | | | | | 5 |
| | | | | **Total Prior Round Credits** | **20** |

[1] David N. Kinsey, PhD, PP, FAICP, NEW JERSEY LOW AND MODERATE INCOME HOUSING OBLIGATIONS FOR 1999-2025 CALCULATED USING THE NJ COAH PRIOR ROUND (1987-1999) METHODOLOGY, May 2016.

8. The municipality, as calculated in Exhibit A to this Agreement, has a realistic development potential (RDP) of 53 units. That RDP will be satisfied as follows, as will be more fully described in Borough's Housing Element and Fair Share Plan:

| Project | Senior | Rental | Street Address | Block and Lot | Credits |
|---|---|---|---|---|---|
| Veterans Housing (Group Home / ALA) | | X | 324 Main St | Block 304, Lot 3 | 14 |
| Block 419 Project* | | X | | Block 419 | 29 |
| Advancing Opportunities (Group Home / ALA) | | X | 5 Pine Drive | Block 313, Lot 17 | 3 |
| Center for Hope and Safety (Group Home / ALA) | | X | | | 7 |
| Emerson Grand | | X | 55 Emerson Plaza East | Block 616, Lot 16 | 4 |
| Rental Bonus Credits | | | | | 14 |
| **Total Third Round Credits** | | | | | 71 |

* The Block 419 Project has a minimum 15% set-aside, or 22 units, with an option for off-site provision or payment-in-lieu for the remaining 7 units. If such option is exercised, the Borough will show at the midpoint review how it will provide a realistic opportunity for the remaining 7 units, in accordance with the provisions of this Agreement.

9. The Borough is providing a realistic opportunity for the Block 419 Project through its prior issuance of a Request for Proposals from redevelopers on January 8, 2016; publishing a ranking of the redeveloper respondents, and then executing a Redevelopment Agreement, First Amendment to Redevelopment Agreement and Second Amendment to Redevelopment Agreement (hereinafter collectively referred to as "Redevelopment Agreement" and attached hereto as Exhibit B) with Emerson Redevelopers Urban Renewal, LLC (Redeveloper), the selected redeveloper ranked the highest in the review by the Governing Body. The Redeveloper has been pursuing good faith negotiations with each of the property owners within the Block 419 Project area, and currently holds options for all but two of the properties. In the event the Redeveloper is not able to purchase one or more property(s) through good faith negotiations prior to the end of the first quarter of 2018, the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c), N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws that grant the Borough the authority to acquire such properties. The Borough will expeditiously undertake good faith negotiations with any remaining property owner(s), and in the event that good faith negotiations are unsuccessful, the Borough is committed to moving to immediately acquire the property(ies) through eminent domain.

10. The Third Round RDP of 53, subtracted from the Third Round obligation of 234 units, plus the prior Round RDP of 20, subtracted from the Prior Round obligation of 74, results in an unmet need of 235 (181-unit Third Round unmet need plus a 54-unit Prior Round unmet need) which shall be addressed through the following mechanisms, as will be more fully described in the Borough's Housing Element and Fair Share Plan:

a.  17 surplus credits from the above Third Round mechanisms;

b.  The adoption of the Multi-Family Residential Affordable Housing Overlay Zone District North ("MFRAH North") inclusionary zoning district, on the following sites: Block 214, Lots 6, 7, 8.01, 8.02, and 9; Block 213, Lots 1-6; Block 405, Lots 1, 2, 3.01, 3.02, 4-14. The MFRAH North District will allow for a maximum gross density of 64 dwelling units per acre and will require a minimum of 15% of the multi-family housing constructed for rental purposes and a minimum of 20% of the multi-family housing constructed for sale purposes be set aside for affordable housing deed restricted units;

c.  The adoption of the Multi-Family Residential Affordable Housing Overlay Zone District South ("MFRAH South") inclusionary zoning district on the following sites: Block 616, Lots 1, 2, 16, 17, 19-24; and Block 617.01, Lots 2.01, 2.02 and 8. The MFRAH South District will allow for a maximum gross density of 43 dwelling units per acre and will require a minimum of 15% of the multi-family housing constructed for rental purposes and a minimum of 20% of the multi-family housing constructed for sale purposes be set aside for affordable housing deed restricted units;

d.  As an additional mechanism to address unmet need, the Borough will adopt a mandatory set-aside ordinance in a form satisfactory to FSHC and the Special Master, so as to establish zoning standards that provide for an inclusionary zoning requirement on future multifamily residential development at a density of at least six (6) units per acre, yielding at least five (5) new dwelling units in the Borough that become permissible through planning board approval, zoning board approval, or a new or amended redevelopment or rehabilitation plan. The Borough will require a set-aside of at least 15 percent of all units in rental developments as affordable, and 20 percent of all units in for-sale developments as affordable, with at least 50 percent of the units in each development being affordable to low-income households including 13 percent in rental developments affordable to very-low-income households, with all such affordable units including the required bedroom distribution, be governed by controls on affordability and affirmatively marketed in conformance with the Uniform Housing Affordability Controls ("UHAC"), N.J.A.C. 5:80-26.1 et. seq. or any successor regulation, and all other applicable law. Language shall be included in the Ordinance to explicitly address that developers cannot, for example, subdivide a project into two lots and then make each of them a number of units just below the threshold. This ordinance does not give any developer the right to any such rezoning, variance or other relief, or establish any obligation on the part of the Borough to grant such rezoning, variance, or other relief.

11. The Borough agrees to require 13% of all units referenced in this Agreement, excepting those units that were constructed or granted preliminary or final site plan approval prior to July 1, 2008, to be very-low-income units, with half of the very-low-income units being available to families. Based upon the agreed Third Round RDP of 53, there is a requirement for 8 units to be reserved for very-low-income households. The Borough will comply with those requirements as follows:

   a.  At least three (3) units at the JMF Redevelopment will provide for very-low income family housing. If all 29 affordable units will be built on-site, then four (4) will be very-low income units.

   b.  The three (3) beds at Advancing Opportunities provide very-low-income housing.

   c.  The seven (7) bedrooms at the Center for Hope and Safety provide very-low income housing;

   d. 13% very low income set-aside of the total affordable units would be imposed on each development within the MFRAH North and the MFRAH South and resulting from the mandatory set-aside ordinance.

12. The Borough shall meet its Third Round Prospective Need in accordance with the following standards as agreed to by the Parties and reflected in the table in paragraph 8 above:

   a. Third Round bonuses will be applied in accordance with N.J.A.C. 5:93-5.15(d).
   b. At least 50% of the units addressing the Third Round Prospective Need shall be affordable to very-low-income and low-income households with the remainder affordable to moderate-income households.
   c. At least 25% of the Third Round Prospective Need shall be met through rental units, including at least half in rental units available to families.
   d. At least half of the units addressing the Third Round Prospective Need in total must be available to families.
   e. The Borough agrees to comply with an age-restricted cap of 25% and to not request a waiver of that requirement. This shall be understood to mean that in no circumstance may the municipality claim credit toward its fair share obligation for age-restricted units that exceed 25% of all units developed or planned to meet its cumulative prior round and third round fair share obligation.

13. The Borough shall add to the list of community and regional organizations in its affirmative marketing plan, pursuant to N.J.A.C. 5:80-26.15(f)(5), Fair Share Housing Center, the New Jersey State Conference of the NAACP, the Latino Action Network, the Bergen County Chapter of the NAACP, and Bergen County Urban League, and shall, as part of its regional affirmative marketing strategies during its implementation of the affirmative marketing plan, provide notice to those organizations of all available affordable housing units. The Borough also agrees to require any other entities, including developers or persons or companies retained to do affirmative marketing, to comply with this paragraph.

14. All units shall include the required bedroom distribution, be governed by controls on affordability and affirmatively marketed in conformance with the Uniform Housing Affordability Controls, N.J.A.C. 5:80-26.1 et. seq. or any successor regulation, with the exception that in lieu of 10 percent of affordable units in rental projects being required to be at 35 percent of median income, 13 percent of affordable units in such projects shall be required to be at 30 percent of median income, and all other applicable law. The Borough as part of its HEFSP shall adopt and/or update appropriate implementing ordinances in conformance with standard ordinances and guidelines developed by COAH to ensure that this provision is satisfied. Income limits for all units that are part of the Plan required by this Agreement and for which income limits are not already established through a federal program exempted from the Uniform Housing Affordability Controls pursuant to N.J.A.C. 5:80-26.1 shall be updated by the Borough annually within 30 days of the publication of determinations of median income by HUD as follows:

   a. Regional income limits shall be established for the region that the Borough is located within (i.e. Region 1) based on the median income by household size, which shall be established by a regional weighted average of the uncapped Section 8 income limits published by HUD. To compute this regional income limit, the HUD determination of median county income for a family of four is multiplied

by the estimated households within the county according to the most recent decennial Census. The resulting product for each county within the housing region is summed. The sum is divided by the estimated total households from the most recent decennial Census in the Borough's housing region. This quotient represents the regional weighted average of median income for a household of four. The income limit for a moderate-income unit for a household of four shall be 80 percent of the regional weighted average median income for a family of four. The income limit for a low-income unit for a household of four shall be 50 percent of the HUD determination of the regional weighted average median income for a family of four. The income limit for a very low income unit for a household of four shall be 30 percent of the regional weighted average median income for a family of four. These income limits shall be adjusted by household size based on multipliers used by HUD to adjust median income by household size. In no event shall the income limits be less than those for the previous year.

b. The income limits attached hereto as Exhibit Care the result of applying the percentages set forth in paragraph (a) above to HUD's determination of median income for FY 2017, and shall be utilized until the Borough updates the income limits after HUD has published revised determinations of median income for the next fiscal year.

c. The Regional Asset Limit used in determining an applicant's eligibility for affordable housing pursuant to N.J.A.C. 5:80-26.16(b)3 shall be calculated by the Borough annually by taking the percentage increase of the income limits calculated pursuant to paragraph (a) above over the previous year's income limits, and applying the same percentage increase to the Regional Asset Limit from the prior year. In no event shall the Regional Asset Limit be less than that for the previous year.

d. The parties agree to request the Court prior to or at the fairness hearing in this matter to enter an order implementing this paragraph of this Agreement.

15. All new construction units shall be adaptable in conformance with P.L.2005, c.350/N.J.S.A. 52:27D-311a and -311b and all other applicable law.

16. As an essential term of this Agreement, within one hundred and twenty (120) days of Court's approval of this Agreement, the Borough shall introduce an ordinance or ordinances providing for the amendment of the Borough's Affordable Housing Ordinance and Zoning Ordinance to implement the terms of this Agreement and the zoning contemplated herein and adopt a Housing Element and Fair Share Plan and Spending Plan in conformance with the terms of this Agreement.

17. The parties agree that if a decision of a court of competent jurisdiction in Bergen County, or a determination by an administrative agency responsible for implementing the Fair Housing Act, or an action by the New Jersey Legislature, would result in a calculation of an obligation for the Borough for the period 1999-2025 that would be lower by more than ten (10%) percent than the total prospective Third Round need obligation established in this Agreement, and if that calculation is memorialized in an unappealable final judgment, the Borough may seek to amend the judgment in this matter to reduce its fair share obligation accordingly. Notwithstanding any such reduction, the Borough shall be obligated to adopt a Housing Element and Fair Share Plan that conforms to the terms of this Agreement and to implement all compliance mechanisms included in this Agreement, including by adopting or leaving in place any site specific zoning adopted or relied upon in connection with the Plan adopted pursuant to this Agreement; taking all

steps necessary to support the development of any 100% affordable developments referenced herein; maintaining all mechanisms to address unmet need; and otherwise fulfilling fully the fair share obligations as established herein. The reduction of the Borough's obligation below that established in this Agreement does not provide a basis for seeking leave to amend this Agreement or seeking leave to amend an order or judgment pursuant to R. 4:50-1. If the Borough prevails in reducing its prospective need for the Third Round, the Borough may carry over any resulting extra credits to future rounds in conformance with the then-applicable law.

18. The Borough shall prepare a Spending Plan within the period referenced above, subject to the review of FSHC and approval of the Court, and reserves the right to seek approval from the Court that the expenditures of funds contemplated under the Spending Plan constitute "commitment" for expenditure pursuant to N.J.S.A. 52:27D-329.2 and -329.3, with the four-year time period for expenditure designated pursuant to those provisions beginning to run with the entry of a final judgment approving this settlement in accordance with the provisions of In re Tp. Of Monroe, 442 N.J. Super. 565 (Law Div. 2015) (aff'd 442 N.J. Super. 563). On the first anniversary of the granting of a Final Judgment of Compliance and Repose or judicial equivalent to substantive certification and on every anniversary of that date thereafter through the end of the period of protection from litigation referenced in this Agreement, the Borough agrees to provide annual reporting of trust fund activity to the New Jersey Department of Community Affairs, or other entity designated by the State of New Jersey, with a copy provided to Fair Share Housing Center and posted on the municipal website, using forms developed for this purpose by the New Jersey Department of Community Affairs. The reporting shall include an accounting of all housing trust fund activity, including the source and amount of funds collected and the amount and purpose for which any funds have been expended. Such forms shall be provided to the Borough prior to the compliance hearing.

19. On the first anniversary of the granting of a Final Judgment of Compliance and Repose or judicial equivalent of substantive certification, and every anniversary thereafter through the end of this Agreement, the Borough agrees to provide annual reporting of the status of all affordable housing activity within the municipality through posting on the municipal website with a copy of such posting provided to Fair Share Housing Center, using forms previously developed for this purpose by the Council on Affordable Housing or any other forms endorsed by the Special Master and FSHC. Such forms shall be provided to the Borough prior to the compliance hearing.

20. The Fair Housing Act includes two provisions regarding action to be taken by the Borough during the ten-year period of protection provided in this Agreement. The Borough agrees to comply with those provisions as follows:
    a. For the midpoint realistic opportunity review due on July 1, 2020, as required pursuant to N.J.S.A. 52:27D-313, the Borough will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its implementation of the Plan and an analysis of whether any unbuilt sites or unfulfilled mechanisms continue to present a realistic opportunity and whether any mechanisms to meet unmet need should be revised or supplemented. Such posting shall invite any interested party to submit comments to the municipality, with a copy to Fair Share Housing Center, regarding whether any sites no longer present a realistic opportunity and should be replaced and whether any mechanisms to meet unmet need should be revised or supplemented.

    b. For the review of very low income housing requirements required by N.J.S.A. 52:27D-329.1, within 30 days of the third anniversary of a Final Judgment of Compliance and Repose or judicial equivalent of substantive certification,, and every third year thereafter, the Borough will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its satisfaction of its very low income requirements, including the family very low income requirements referenced herein. Such posting shall invite any interested party to submit comments to the municipality and Fair Share Housing Center on the issue of whether the municipality has complied with its very low income housing obligation under the terms of this settlement.

21. FSHC is hereby deemed to have party status in this matter and to have intervened in this matter as a defendant without the need to file a motion to intervene or an answer or other pleading. The parties to this Agreement agree to request the Court to enter an order declaring FSHC is an intervenor, but the absence of such an order shall not impact FSHC's rights.

22. This Agreement must be approved by the Court following a fairness hearing as required by Morris Cty. Fair Hous. Council v. Boonton Twp., 197 N.J. Super. 359, 367-69 (Law Div. 1984), aff'd o.b., 209 N.J. Super. 108 (App. Div. 1986); East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311, 328-29 (App. Div. 1996). The Borough shall present its planner as a witness at this hearing. FSHC agrees to support this Agreement at the fairness hearing. In the event the Court approves this proposed settlement, the parties agree the Borough will receive a Judgment of Compliance and Repose or "the judicial equivalent of substantive certification and accompanying protection as provided under the FHA," as addressed in the Supreme Court's decision in In re N.J.A.C. 5:96 & 5:97, 221 N.J. 1, 36 (2015), which shall be determined by the trial judge and both parties agree not to appeal the decision of the trial judge as to whether the Borough receives a Judgment of Compliance and Repose or the judicial equivalent of substantive certification. The "accompanying protection" shall remain in effect through July 1, 2025. If this Agreement is rejected by the Court at a fairness hearing it shall be null and void.

23. The Borough agrees to pay FSHC's attorneys fees and costs in the amount of $7,500within thirty (30) days of the Court's approval of this Agreement pursuant to a duly-noticed fairness hearing.

24. If an appeal is filed of the Court's approval or rejection of this Agreement, the Parties agree to defend the Agreement on appeal, including in proceedings before the Superior Court, Appellate Division and New Jersey Supreme Court, and to continue to implement the terms of this Agreement if the Agreement is approved before the trial court unless and until an appeal of the trial court's approval is successful, at which point the Parties reserve their right to rescind any action taken in anticipation of the trial court's approval. All Parties shall have an obligation to fulfill the intent and purpose of this Agreement.

25. This Agreement may be enforced through a motion to enforce litigant's rights or a separate action filed in Superior Court, Bergen County. A prevailing movant or plaintiff in such a motion or separate action shall be entitled to reasonable attorney's fees.

26. Unless otherwise specified, it is intended that the provisions of this Agreement are to be severable. The validity of any article, section, clause or provision of this Agreement shall not affect the validity of the remaining articles, sections, clauses or provisions hereof. If

any section of this Agreement shall be adjudged by a court to be invalid, illegal, or unenforceable in any respect, such determination shall not affect the remaining sections.

27. This Agreement shall be governed by and construed by the laws of the State of New Jersey.

28. This Agreement may not be modified, amended or altered in any way except by a writing signed by each of the Parties.

29. This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute but one and the same Agreement.

30. The Parties acknowledge that each has entered into this Agreement on its own volition without coercion or duress after consulting with its counsel, that each party is the proper person and possess the authority to sign the Agreement, that this Agreement contains the entire understanding of the Parties and that there are no representations, warranties, covenants or undertakings other than those expressly set forth herein.

31. Each of the Parties hereto acknowledges that this Agreement was not drafted by any one of the Parties, but was drafted, negotiated and reviewed by all Parties and, therefore, the presumption of resolving ambiguities against the drafter shall not apply. Each of the Parties expressly represents to the other Parties that: (i) it has been represented by counsel in connection with negotiating the terms of this Agreement; and (ii) it has conferred due authority for execution of this Agreement upon the persons executing it.

32. Any and all Exhibits and Schedules annexed to this Agreement are hereby made a part of this Agreement by this reference thereto. Any and all Exhibits and Schedules now and/or in the future are hereby made or will be made a part of this Agreement with prior written approval of both Parties.

33. This Agreement constitutes the entire Agreement between the Parties hereto and supersedes all prior oral and written agreements between the Parties with respect to the subject matter hereof except as otherwise provided herein.

34. No member, official or employee of the Borough shall have any direct or indirect interest in this Agreement, nor participate in any decision relating to the Agreement which is prohibited by law, absent the need to invoke the rule of necessity.

35. Anything herein contained to the contrary notwithstanding, the effective date of this Agreement shall be the date upon which all of the Parties hereto have executed and delivered this Agreement.

36. All notices required under this Agreement ("Notice[s]") shall be written and shall be served upon the respective Parties by certified mail, return receipt requested, or by a recognized overnight or by a personal carrier. In addition, where feasible (for example, transmittals of less than fifty pages) shall be served by facsimile or e-mail. All Notices shall be deemed received upon the date of delivery. Delivery shall be affected as follows, subject to change as to the person(s) to be notified and/or their respective addresses upon ten (10) days notice as provided herein:

November 21, 2017
Page 10

**TO FSHC:**

Adam M. Gordon Esq.
Fair Share Housing Center
510 Park Boulevard
Cherry Hill, NJ 08002
Phone: (856) 665-5444
Telecopier: (856) 663-8182
E-mail: adamgordon@fairsharehousing.org

**TO THE BOROUGH:**

Wendy Rubinstein
DeCotiis, FitzPatrick, Cole & Giblin, LLP
Glenpointe Center West
500 Frank W. Burr Blvd., Ste. 31
Teaneck, New Jersey 07666
Phone: (201) 928-1100
Telecopier: (201) 928-0588
Email: wrubinstein@decotiislaw.com

**WITH A COPY TO THE
MUNICIPAL CLERK:**

Jane Dietsche
1 Municipal Place
Emerson, NJ 07630
Phone: (201) 262-6086
Telecopier: (201) 262-0938
Email: clerk@emersonnj.org

Please sign below if these terms are acceptable.

Sincerely,

Adam M. Gordon, Esq.
Counsel for Intervenor/Interested Party
Fair Share Housing Center

On behalf of the Borough of Emerson, with the authorization
of the governing body:

Dated:

## EXHIBIT A: THIRD ROUND VACANT LAND ADJUSTMENT

## BOROUGH OF EMERSON: RDP DETERMINATION - NOVEMBER 21, 2017

| Block | Lot | Street Address/Development | Total Area | Unconstrained Area | Estimated Development Potential: Density | Total Units | Number of Affordable Units with 20% Set-Aside |
|---|---|---|---|---|---|---|---|
| **PRIOR ROUND RDP** | | | | | | | |
| 1201 | 1 | 550 Old Hook Road / Marek Farm | 6.71 | 6.71 | 14 DU / AC * | 90 | 18 |
| 417 | 2,3 | 43 Emerson Plaza West / New Concepts | 0.83 | 0.83 | 14 DU / AC * | 12 | 2 |
| \* PER COURT ORDER FROM PRIOR ROUND | | | | | **PRIOR ROUND RDP** | | 20 |
| **THIRD ROUND RDP** | | | | | | | |
| **BURNS AND RICE GROUP SITE** | | | | | | | |
| 610 | 9.01 | 2 Lois Avenue | 0.53 | 0.47 | | | |
| 613 | 2 | 7 Lois Avenue | 1.09 | 0.97 | | | |
| | | | *Subtotal* | 1.44 | 8 DU / AC | 12 | 2 |
| **EMERSON GOLF CLUB PARCELS** | | | | | | | |
| 617.01 | 7.01 | 99 Palisades | 5.13 | 5.13 | | | |
| 617.01 | 7.03 | 99 Palisades | 1.87 | 1.87 | | | |
| | | | *Subtotal* | 7.00 | 8 DU / AC | 56 | 11 |
| **OTHER DEVELOPMENT** | | | | | | | |
| 616 | 16 | 55 Emerson Plaza East / Emerson Grand | 0.59 | — | 34 DU/AC | 20 | 4 |
| 609 | 3 | R2-ARC Contributory Site | ~0.9 | — | 36 DU/AC | 36 | 7 |
| **REDEVELOPMENT** | | | | | | | |
| | 1 | 19 Lincoln Blvd | | | | | |
| | 2 | 15 Lincoln Blvd | | | | | |
| | 3 | 3 Lincoln Blvd | | | | | |
| | 4 | 214 Kinderkamack Road | | | | | |
| | 5 | 200 Kinderkamack Road | | | | | |
| 419 | 6.01 | 190 Kinderkamack | | | 64 DU / AC | 147 | 29 |
| | 6.02 | 184 Kinderkamack Road | | | | | |
| | 7 | 9 Kenneth Ave | | | | | |
| | 8 | 182 Kinderkamack Road | | | | | |
| | 9 | 176 Kinderkamack Road | | | | | |
| | 10 | 78 Linwood Ave | | | | | |
| | | | | | **THIRD ROUND RDP** | | 53 |

## EXHIBIT B: REDEVELOPMENT AGREEMENT

*Exh. B*

## SECOND AMENDMENT TO REDVELOPMENT AGREEMENT

This Second Amendment to Redevelopment Agreement is made this $\underline{20}$ day of $\underline{Nov}$, 2017 by and between the

**BOROUGH OF EMERSON**
146 Linwood Ave., Emerson, NJ 07630
a municipal corporation of the State of New
Jersey, located in the County of Bergen,
(hereinafter referred to as "Borough")

**AND**

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
a limited liability corporation of the State of New Jersey, having an office
at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
(hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement on or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas within the Central Business District Redevelopment Area, attached hereto as **Exhibit A**; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and supplementing the Redevelopment Agreement to reflect their mutual understanding with respect to the implementation of the development and requirement of affordable housing units to be built on-site;

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      All terms not defined in this Amendment shall have the same meaning as set forth in the Redevelopment Agreement.

2.      The purpose and intent of this Amendment is to amend and supplement the affordable housing requirements.

3.      Article 1, Section 1.01 entitled "Definitions" is amended as follows:

"Affordable Housing Requirements" shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The ~~maximum~~ obligation shall be at least 20% set aside [in accordance with Borough Ordinance 290-13.D] and of which no less than 15% may [shall] be built on [site] and the remainder shall be provided for by any of the following options to: (i) construct affordable units on-site; or (2) construct the affordable units elsewhere within the Borough ("Off-site"); or (3) make a payment in lieu of constructing the affordable units; or (4) provide a combination of a payment in lieu and on-site or Off-site construction. ~~and/or offsite~~

4.      Article 4.01 entitled Project Costs is amended as follows:

All costs of implementing and Completing the Project including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property [including the use of eminent domain to acquire the property under any authorizing statutes and/or regulations], any Remediation costs . . .

5.      Article 4, Section 4.03.1 entitled "Alternate COAH Location" is deleted in its entirety and will be "intentionally left blank".

6.      Article 5.01 entitled "Property" shall be amended and supplemented as follows:

. . . In the event the Redeveloper is not able to purchase any property set forth in Exhibit A the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c) [, N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws authorizing the Borough to acquire such properties.] The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties . . .

7.     In all other respects, the Redevelopment Agreement remains in full force and effect.

8.     This Second Amendment together with the First Amendment, any applicable Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this Second Amendment. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

9.     All the provisions of this Second Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

**IN WITNESS WHEREOF**, Redeveloper has hereunto caused this Second Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed and Attested to:                    **BOROUGH OF EMERSON**

By: _____

JANE DIETSCHE, Borough Clerk          LOUIS J. LAMATINA, Mayor


**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

By: _____

Joseph Forgione,    Managing Member

# MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY :

                 : SS

COUNTY OF BERGEN   :

    **I CERTIFY** that on ___11/20___ , 2017,

    **JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

    (a)   this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

    (b)   this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamatina, the Mayor of the Municipal Corporation;

    (c)   this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

    (d)   this person knows the proper seal of the corporation which was affixed to this document; and

    (e)   this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
11/20/2017.

Municipal Clerk

Notary Public, State of New Jersey

COLEEN A. GODDEL
NOTARY PUBLIC - NEW JERSEY
COMMISSION # 50086730
MY COMMISSION EXPIRES AUGUST 23, 2022

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY    :

                          : ss

COUNTY OF BERGEN    :

BE IT REMEMBERED that on this _7_ day of _November_ 2017, before me, the subscriber, personally appeared _Joseph Forgione_, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

_____
Joseph Forgione, Managing Member

Signed and sworn to before me on
Nov. 7, 2017.

_____
Notary Public, State of New Jersey

DIANE M DE VITA-GHIRCO
NOTARY
PUBLIC
My Comm. Exp.
Mar 13, 2022
STATE OF NEW JERSEY

# EXHIBIT A

## Redevelopment Agreement

<u>FIRST AMENDMENT TO REDVELOPMENT AGREEMENT</u>

This **First Amendment to Redevelopment Agreement** is made this ⌐⌐ day of October

2016 by and between the

> **BOROUGH OF EMERSON**
> 146 Linwood Ave., Emerson, NJ 07630
> A municipal corporation of the State of New
> Jersey, located in the County of Bergen,
> (hereinafter referred to as "Borough")

**AND**

> **EMERSON REDEVELOPERS URBAN RENEWAL, LLC**
> A limited liability corporation of the State of New Jersey, having an office
> at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981
> (hereinafter referred to as "EMRED" or "Redeveloper")

**WHEREAS**, the Borough and Redeveloper entered into a Redevelopment Agreement on

or about June 14, 2016 (the "Redevelopment Agreement") for the redevelopment of certain areas

within the Central Business District Redevelopment Area; and

**WHEREAS**, the Borough and the Redeveloper are desirous of amending and

supplementing the Redevelopment Agreement to reflect their mutual understanding with respect

to the implementation of the Redeveloper's proposal submitted to the Borough and the

Borough's Redevelopment Plan;

**WHEREAS**, the Borough and Redeveloper have agreed to amend and supplement the

Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE**, for and in consideration of the promises and other good and

valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties

hereto agree as follows:

1.    All terms not defined in this Amendment shall have the same meaning as set forth

in the Redevelopment Agreement.

2.    The purpose and intent of this Amendment is to amend and supplement the description of the properties to be redeveloped to reflect the Redeveloper's proposal submitted to the Borough and in accordance with the Borough's Redevelopment Plan.

3.    The property descriptions listed in Exhibit A of the Redevelopment Agreement, attached hereto as **Exhibit A**, is amended and supplemented to include the following additional information:

| Property Owner | Block | Lot | Property Address |
|---|---|---|---|
| 182 Emerson, LLC | 419 | 9 | 176 Kinderkamack |

3.    The Funding Agreement attached to the Redevelopment Agreement as Exhibit B, shall be amended and supplemented, attached hereto as **Exhibit B**, to include Block 419, Lots 7 and 9 as redevelopment properties and are made part of the first "WHEREAS" clause, which shall now be deemed amended to read as follows:

WHEREAS, ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the Borough as Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, **9**, and 10.

4.    In all other respects, the Redevelopment Agreement remains in full force and effect.

5.    This First Amendment together with the proposal, the Land Use Board Resolution(s), any Orders or Directives of any authorized Borough Official and the Redevelopment Agreement represents the entire understanding of the Borough and Redeveloper with respect to the subject matter of this First Amendment and the Redevelopment Agreement. No further change or modification shall be effective unless in writing and signed by the Borough and the Redeveloper.

1976744-1

6.    All the provisions of this First Amendment to Redevelopment Agreement shall survive and shall remain in full force and effect, despite the expiration or completion of any other provisions of the Redevelopment Agreement or any other extinguishing or superseding event or document.

IN WITNESS WHEREOF, Redeveloper has hereunto caused this First Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed and Attested to:                    BOROUGH OF EMERSON


JANE DIETSCHE, Borough Clerk        By: _____
                                            LOUIS J. LAMATINA, Mayor

Attested to:                    EMERSON REDEVELOPERS URBAN RENEWAL, LLC


                                    By: _____
                                                    Managing Member

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY:

                  : SS

COUNTY OF BERGEN   :

    I CERTIFY that on *Oct. 6*, 2016,

    JANE DIETSCHE personally came before me, and this person acknowledged under oath, to my satisfaction, that:

    (a)   this person is the Municipal Clerk of the Borough of Emerson, the Municipal Corporation named in this document;

    (b)   this person is the attesting witness to the signing of this document by the proper Corporate Officer who is Louis J. Lamatina, the Mayor of the Municipal Corporation;

    (c)   this document was signed and delivered by the Municipal Corporation as its voluntary act duly authorized by a proper Resolution of its Municipal Council;

    (d)   this person knows the proper seal of the corporation which was affixed to this document; and

    (e)   this person signed this proof to attest to the truth of these facts.

Signed and sworn to before me on
*Oct 6*, 2016.

_____
                     Municipal Clerk

_____
Notary Public, State of New Jersey

LORI A. WOODS
NOTARY PUBLIC, State of New Jersey
No. 2453735
Qualified in Bergen County
Commission Expires Oct. 14, 2020

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY   :
                      : ss
COUNTY OF BERGEN      :

BE IT REMEMBERED that on this ____ day of _____ 2016, before me, the subscriber, personally appeared _____, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that they are named as the persons named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC a Limited Liability Company named in the within instrument, and acknowledged that he signed and delivered the within instrument the managing member of the Redeveloper.

_____
                Managing Member

Signed and sworn to before me on
_____ 2016.

_____
Notary Public, State of New Jersey

1976744-1

## EXHIBIT A

### Property Description

| Property Owner | Block | Lot | Property Address |
|---|---|---|---|
| Angelo and Jane Giambona | 419 | 1 | 19 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 2 | 15 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 3 | 9 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 4 | 214 Kinderkamack |
| Dolores, Della Volpe Trste | 419 | 6.01 | 190 Kinderkamack |
| Yaghoob Pousty | 419 | 6.02 | 184 Kinderkamack |
| Borough of Emerson | 419 | 7 | |
| 182 Emerson, LLC | 419 | 8 | 182 Kinderkamack |
| 182 Emerson, LLC | 419 | 9 | 176 Kinderkamack |
| 182 Emerson, LLC | 419 | 10 | 78 Linwood |

## EXHIBIT B

Amended and Supplemented Funding Agreement

## FUNDING AGREEMENT

THIS FUNDING AGREEMENT is dated this 4 day of Oct , 2016 among the **BOROUGH OF EMERSON**, a municipal corporation with offices at 146 Linwood Ave., Emerson, NJ 07630 (the "Borough") and **EMERSON REDEVELOPERS, LLC**, with offices located at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as "ERD");

## W-I-T-N-E-S-S-E-T-H:

**WHEREAS**, ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the Borough as Block 419; Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9, and 10 (the "Property"); and

**WHEREAS**, the Borough wishes to designate a redeveloper for the Redevelopment Area encompassing the Property; and

**WHEREAS**, ERD proposes to design, develop, finance and construct 134 units and 13,000 square feet of retail space ("the Project") and accordingly has requested the Borough consider appointing ERD as redeveloper for the Property; and

**WHEREAS**, ERD has agreed to pay the Application Fee as set forth herein and bear the costs for the Borough's professionals to assist the Borough in reviewing, among other things, whether ERD should be designated redeveloper for the Property, and in connection therewith has agreed to establish an escrow fund with the Borough to provide for the payment of professional fees, costs and expenses related thereto incurred by the Borough (the "Interim Costs");

**NOW, THEREFORE**, for and in consideration of the mutual promises, representations, covenants and agreements contained herein and the undertakings of each Party to the other and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby and to bind its successors and assigns, do mutually promise, covenant and agree as follows:

1. <u>Payment of Interim Costs</u>.

Immediately upon the execution of this Funding Agreement, ERD shall pay Ten Thousand Dollars ($10,000) (the "Escrow") to the Borough and the Borough shall deposit such funds into an escrow account established by it for the payment of the Interim Costs. Prior to the Borough's withdrawal of funds from the Escrow for the payment of the Interim Costs, the Borough shall provide ERD with a copy of each invoice reflecting Interim Costs to be paid. Unless ERD promptly (within fifteen (15) days of its receipt of any such copy) provides a written objection to any invoiced item as not being an Interim Cost, the Borough shall be free to withdraw funds from the Escrow for the payment of such invoiced services. If, when and as often as may occur that the Escrow is drawn down to or below Three Thousand Five Hundred Dollars $3,500 then ERD, upon the Borough's request, shall immediately provide to the Borough

for deposit an additional amount sufficient to replenish the escrow to Ten Thousand Dollars ($10,000) for use in accordance with these terms.

Interim Costs, for the purposes of this Funding Agreement, shall include the reasonably incurred out-of-pocket fees, costs and expenses incurred by the Borough (both before and after execution hereof) in reviewing the proposed development of the Property, including, but not limited to, fees for legal, engineering, planning and financial advisory services, including subsequent investigations and studies as may be reasonably determined and agreed to by the parties.

2.    Application Fee -- Prior to the execution of a formal Redeveloper's Agreement the Borough shall imposes a non-refundable fee in an amount to be determined based on the final concept plan, with any adjustment to the fee to be paid, if appropriate, when the Redevelopment Agreement is executed.

3.    Notice.  Any notice provided to the Borough hereunder shall be submitted in writing to:

Jane Dietsche, RMC, Borough Clerk
146 Linwood Ave.
Emerson, NJ 07630

with copies to:

Douglas F. Doyle
Decotiis, Fitzpatrick & Cole, LLP
Glenpointe Centre West
500 Frank W. Burr Blvd, Suite 31
Teaneck, NJ 07666

Notices to ERD shall be submitted in writing to:

Emerson ReDevelopers, LLC
Attn: Kevin X. Codey, Vice President of Land Acquisitions
80 South Jefferson Road, Suite 202
Whippany, NJ 07981

with copies to:

Carleton R. Kemph, Esq.
6 Hampshire Court
Springfield, NJ 07081

4.    General.- This Funding Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings between the parties.  This Funding Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

1976744-1

**IN WITNESS WHEREOF,** the Parties hereto have caused this Funding Agreement to be executed, all as of the date first above written.

BOROUGH OF EMERSON

BY:
Louis J. Lamatina, Mayor

Witness:

By:
Jane Dietsche, RMC, Borough Clerk

AND

EMERSON REDEVELOPERS, LLC

BY:
Name:
Title:

1976744-1

REDEVELOPMENT AGREEMENT

BY AND BETWEEN

THE BOROUGH OF EMERSON

AND

EMERSON REDEVELOPERS URBAN RENEWAL, LLC

Dated: June _27_, 2016

THIS REDEVELOPMENT AGREEMENT (the "Agreement") made this ___ day of June 2016 by and between

THE BOROUGH OF EMERSON, Bergen County, New Jersey, a municipal corporation with offices located at 146 Linwood Avenue, Emerson, New Jersey 07630 (hereinafter referred to as "Borough");

AND

EMERSON REDEVELOPERS URBAN RENEWAL, LLC, a limited liability corporation of the State of New Jersey, having an office at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as the "EMRED" or "Redeveloper")

WITNESSETH

WHEREAS, capitalized terms used herein shall have the meaning given to them above, below or in Section 1.01; and

WHEREAS, all Block and Lot references used in this Agreement shall refer to Blocks and Lots appearing on the official tax maps of the Borough; and

WHEREAS, the Borough Governing Body authorized the Planning Board to conduct a preliminary investigation pursuant to N.J.S.A. 40A:12A-6 of the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1, et seq., (the "Act") to determine whether certain parcels of land in the Borough and located in the Borough constituted areas in need of redevelopment; and

WHEREAS, the Planning Board undertook said investigation and conducted a public hearing, all in accordance with N.J.S.A. 40A:12A-6; and

WHEREAS, thereafter the Planning Board found that, among others, the property described in the attached Exhibit A (the "Property" or "Properties") satisfied certain statutory criteria and thus constituted an area in need of redevelopment in accordance with N.J.S.A 40A:12A-5 and N.J.S.A. 40A:12-6; and

WHEREAS, on September 7, 2004, the Borough Governing Body adopted Resolution No. 199-04, accepting the findings of the Planning Board and designating the Property as an area in need of redevelopment (the "Central Business District Redevelopment Area", as defined herein); and

2

**WHEREAS,** on April 3, 2006, the Borough adopted Ordinance No. 1305-06, adopting a Redevelopment Plan for the Central Business District Redevelopment Area; and

**WHEREAS,** the Borough Council is the Redevelopment Entity for the Central Business District Redevelopment Area; and

**WHEREAS,** on January 8, 2016, the Borough solicited proposals from redeveloper's to redevelop the Central Business District Redevelopment Area;

**WHEREAS,** EMRED together with other redeveloper's responded and submitted proposals to redevelop the Central Business District Redevelopment Area;

**WHEREAS,** JMF Properties responded (and ultimately formed EMRED to be the redevelopment entity) and other potential redevelopers made presentations to the Mayor and Council (the designated Redevelopment Agency) over the course of several meetings and the Mayor and Council selected EMRED with whom to negotiate a potential Redeveloper's Agreement;

**WHEREAS,** EMRED proposes to design, develop, finance and construct the Project as defined herein on the Property; and

**WHEREAS,** the Redeveloper agrees that the Property was legally and lawfully designated as an area in need of redevelopment in accordance with N.J.S.A. 40A:12A-1 et. seq., and such designation is unappealable and that the Property meets the statutory criteria as an area in need of redevelopment; and

**WHEREAS,** in furtherance of the Redeveloper's agreement that the designation of the area in need of redevelopment is legally valid and enforceable, and Redeveloper's waiver of the aforementioned notice, the Redeveloper has submitted to the Borough the Borough's form of application and executed a Funding Agreement with the Borough to pay the Borough's application fee and reimburse the Borough for its professional fees, costs and expenses associated with reviewing and assisting the Borough in connection with the proposed development of the Property, including but not limited, fees for legal services (including but not limited to negotiating the Redevelopment Agreement), professional planning services, engineering services, and financial advisory services and the Borough has designated the Redeveloper as the redeveloper for purposes of redeveloping the Property in accordance with the proposed concept plan attached hereto as **Exhibit B**; and

**WHEREAS,** in order to implement the development, financing, construction, operation and management of the Project, the Borough has determined to enter into this redevelopment agreement with the Redeveloper (the "Redevelopment Agreement");

~~**WHEREAS,** JMF Properties has agreed to guaranty EMRED's financial~~ obligations under this Redevelopment Agreement.

3

**NOW, THEREFORE,** in consideration of the promises and mutual covenants herein contained, the parties hereto do hereby covenant and agree, each with the other, as follows:

## ARTICLE 1.

## DEFINITIONS

**1.01. Definitions.** As used in this Agreement the following terms set forth in this Article shall have the meanings ascribed to such terms below. Terms listed below in the singular form shall include the plural and words listed in the plural shall include the singular. Whenever the context may require, any pronoun that is used in this Agreement shall include the corresponding masculine, feminine and neuter. Unless otherwise noted, the words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation". The words "agree," "agreements," "approval" and "consent" when used in this Agreement shall be deemed to be followed by the phrase "which shall not be unreasonably withheld or unduly delayed," except or unless the context may otherwise specify or dictate. All references to Sections, Articles or Exhibits shall refer to Sections, Articles or Exhibits in this Agreement.

**"Act"** shall mean the New Jersey Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 *et seq.*

**"Affiliate"** shall mean, with respect to any Person, any other Person directly or indirectly controlling or controlled by, or under direct common Control with such Person. For purposes of this definition the term "Control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, operations and policies of such Person, whether through the ownership of voting securities or by contract.

**"Affordable Housing Requirements"** shall mean the fair share housing requirement for the Project as established pursuant to the requirements of the Fair Housing Act (N.J.S.A. 52:27D-301 et seq.) and all other applicable laws, and regulations promulgated by the Council on Affordable Housing and local ordinances that may be applicable to the Project. The maximum obligation shall be 20% set aside and may be built on and/or offsite.

**"Borough"** shall mean the Borough of Emerson.

**"Borough Costs"** shall means the reasonable out of pocket expenses incurred by the Borough for the fees and costs of any outside professional consultant, attorney, contractor or vendor retained by the Borough in connection with the Project which are

4

identified by the Funding Agreement executed by the Parties simultaneous to the execution of this Agreement.

"**Agreement**" shall mean this Redevelopment Agreement between the Borough and the Redeveloper.

"**Applicable Laws**" shall mean any and all federal, state and local laws, ordinances, approvals, rules, regulations and requirements including, but not limited to, the Act, the Municipal Land Use Law, the Redevelopment Plan, regulations promulgated by the Council on Affordable Housing, ("COAH"), construction codes including construction codes governing access for people with disabilities, fire codes, zoning codes, health or sanitary codes, pollution and environmental laws, rules and regulations applicable to the Project, Property and/or Project Plan or any aspect thereof.

"**Building Permit**" shall mean a building permit issued by or on behalf of the Borough pursuant to applicable Law.

"**Certificate of Completion**" shall mean a certificate from the Borough in recordable form issued, at the request of the Redeveloper, acknowledging that the Redeveloper has performed all of its duties and obligations under this Agreement, and has completed construction of the Project in accordance with the requirements of this Agreement.

"**Certificate of Occupancy**" shall mean the written certificate issued by the Borough of Emerson in accordance with N.J.S.A. 52:27D-133 relative to a unit of residential space constructed as part of the Project indicating that the subject unit of residential space has been completed in accordance with the construction permit, the Uniform Construction Code and all other Applicable Laws.

"**Commencement of Construction**" or "**Commence Construction**" shall mean the undertaking by the Redeveloper of any actual physical construction of any new structure, Improvements, Public Improvements and other infrastructure included as a component of any phase of the Project other than any activities related to the preparation of the site for such construction, or any activities related to the environmental remediation, mitigation or clean up of same.

"**Commencement Date**" shall mean the date on which the construction force and machinery is mobilized for construction on the Project as further set forth in Sections 5.04 and 5.09.

"**Completion Date**" or "**Completion of Construction**" shall mean the earlier of: (i) the date on which the Redeveloper receives a Certificate of Completion as provided for in Section 5.08 of this Agreement or 24 months from the Commencement Date, whichever is sooner.

5

"**Construction Period**" shall mean the period beginning on the Commencement Date and ending on the Completion Date.

"**Construction Plan**" shall mean the architectural and engineering plans prepared by the Redeveloper in conformance with the approved Final Site Plan, which plans shall be prepared in accordance with Applicable Laws and are to be submitted to the Borough for review and approval prior to the issuance of the necessary permits for Commencement of Construction.

"**Control**" (also referred to as "**Controlled by**" and "**under common Control with**") shall be used with respect to any Person, and shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Days**" shall mean calendar days when such term is used to denote time.

"**Declaration of Restrictions**" shall be a recordable document which includes (a) the provisions of Sections 3.02 to 3.05 inclusive and (b) the prohibition against transfers as set forth in Article 6 and (c) the Borough's remedies as set forth in Article 8.

"**Deeds**" shall mean any deed of conveyance from the Borough or any third Party to the Redeveloper conveying any parcel(s) of property owned or acquired by the Borough or such third party, pursuant to the terms and conditions of this Agreement.

"**Effective Date**" shall mean the date this Agreement is last executed by either the authorized officer of the Borough or by the authorized representative of the Redeveloper.

"**Emergency Municipal Services Building Project**" shall mean the new building the Borough will develop to relocate the volunteer ambulance corp as well as the police department facilities

"**Escrow Account**" shall be as defined in Section 4.02 and include amounts deposited by Redeveloper to cover the Borough's Costs.

"**Event of Default**" shall be as set forth in Article 8 hereof.

"**Final Site Plan**" shall mean the plan submitted to the Planning Board for Final Site Plan approval in accordance with the Redevelopment Plan and Applicable Law.

"**Financial Institution**" shall mean a bank, savings bank, savings and loan association, mortgage lender or insurance company, pension fund, real estate investment trust, investment bank, mutual fund or similarly recognized reputable source of construction and permanent financing for the Project, chartered under the laws of the United States of America, or any State thereof.

6

"**Force Majeure**" (also "**Event of Force Majeure**") as used throughout this Agreement this term applies to all time limitations and other obligations and shall mean any acts of God, fire, volcano, earthquake, hurricane, blizzard, infectious disease, technological disaster, catastrophe, large scale infestation of any type, tremors, flood, explosion, release of nuclear radiation, release of biotoxic or of biochemical agents, the elements, war, blockade, riots, mob violence or civil disturbance, any act or acts of terrorism or terroristic threat, an inability to procure goods or services or a general shortage of labor, equipment, facilities, energy, materials or supplies in the open market, failure of transportation, strikes, walkouts, actions of labor unions, governmentally imposed moratoriums, court orders, laws, rules, regulations or other orders of governmental or public agencies, bodies and authorities or any other similar cause not within the reasonable control of the Parties including legal inability to comply resulting from a change of law including municipal laws regulating land use and construction, any legal requirements under any applicable environmental laws, as well as all known and unknown rules and regulations of the Federal Environmental Protection Agency and the NJDEP, clearances, approvals or permits typical of the development process, any legal proceedings, decisions or decrees that adversely affect the Parties' ability to reasonably perform the obligations of and/or benefit from the terms of this Agreement, any economic conditions that may adversely affect the real estate market or may affect the Redevelopment Area, the Project or any of the individual phase(s) of this Project as demonstrated by an independent market study prepared by a qualified financial consultant selected by the Party seeking the benefit of Force Majeure provided that the qualified financial consultant is approved by the non-benefiting party using its reasonable judgment, in advance of the preparation of the independent market study, or any unreasonable delay in the Redeveloper's receipt of any necessary Governmental Approvals not within the Redeveloper's control.

"**Funding Agreement**" shall mean that agreement required by Borough Ordinance which obligates the Redeveloper to fund and pay for any and all professional fees the Borough may incur in order to complete this Project, a copy of which is attached hereto as **Exhibit E**.

"**Governmental Agency**" shall mean any federal, state, county or municipal legislative, administrative, executive or governing body, office, agency, department, commission, authority, court, or tribunal and any successor thereto, exercising executive, legislative, judicial, advisory or administrative functions of or pertaining to government, including, without limitation, the Borough of Emerson, the County of Bergen, the State of New Jersey and/or the United States of America.

"**Governmental Applications**" shall mean any and all submissions, plans, drawings, diagrams, supporting documentation or other proofs or presentations that are transmitted to any Governmental Agency for the purpose of obtaining any and all Governmental Approvals required to complete the Project.

"**Governmental Approvals**" shall mean any and all authorizations, permits, licenses or certificates issued by any Governmental Agency or quasi-governmental entity

7

(including outside agencies) as a result of the submission of a Governmental Application required in order to implement the Project or any aspect thereof in accordance with this Agreement and the Redevelopment Plan, for the construction of the Project including, without limitation: the Site Plan Approval with respect to the Building Permit; environmental approvals; sewerage capacity approvals and any and all other necessary permits, licenses, consents and approvals required for construction and operation of the Project under Applicable Law. No approval shall be final until the time for appeal shall have run without the filing of an appeal, or, in the event an appeal is filed, until such appeal is resolved fully in favor of Redeveloper and the time for further appeals shall have run without the filing of any further appeal. No Governmental Approval shall contain any condition which would materially and adversely affect the development, construction or operation of the Project or the finances thereof.

"**Governing Body**" shall mean the Borough Council of the Borough of Emerson, together with any successor(s) thereto.

"**Impositions**" shall mean all taxes, assessments (including, without limitation, all assessments for public improvements or benefits), water, sewer or other rents, rates and charges, license fees, permit fees, inspection fees and other authorization fees and charges, in each case, whether general or special, which are levied upon any portion of the Project or on any of the improvements constructed thereon.

"**Improvements**" shall mean all buildings, appurtenances, structures physically within or upon the Property, together with any work on site or off-site, reasonably on-site and, if any, off-site improvements, constructed on or installed in connection with the construction of the Project in accordance with the Concept Plans attached hereto as **Exhibit B**, including but not limited to grading site drainage, walkways, hook-ups and service laterals from buildings to curbs for water, sewer, storm water and other utilities, parking, lighting within parking areas, landscaping and fire hydrants, all constructed in accordance with the Redevelopment Plan, Governmental Approvals and Applicable Laws.

"**Mortgagee**" shall mean an Institution that holds a Mortgage on the Property.

"**Municipal Land Use Law**" or "**MLUL**" shall mean the Municipal Land Use Law *N.J.S.A.*40:55D-1, *et seq.*

"**NJDEP**" shall mean the State of New Jersey Department of Environmental Protection, together with any successor(s) in interest thereto.

"**Offsite/OnSite Improvement Share**" shall mean the amount Redeveloper shall pay for the Offsite and Onsite improvements that the Borough or other third parties shall make which will benefit Redeveloper as well as on site improvements which will benefit other property owners, all as fully set forth in **Exhibit F**.

**Party/Parties:**    Shall mean individually, the Borough, the Redeveloper or a

8

Person as defined herein and shall mean collectively, the Borough and Redeveloper.

"**Person(s)**" shall mean any individual, sole proprietorship, corporation, partnership, joint venture, limited liability company or corporation, trust, unincorporated association, institution, public or governmental body, or any other entity.

"**PILOT**" shall mean a long term exemption pursuant to N.J.S.A. 40A:20-1 et seq.

"**Planning Board**" shall mean the Land Use Board of the Borough, pursuant to *N.J.S.A.* 40:55D-23.

"**Project**" shall mean the development, design, financing and construction of the Improvements and the Public Improvements by Redeveloper on the Property.

"**Project Costs**" shall be as defined in Section 4.01.

"**Project Milestones**" shall mean the date(s) or deadline(s) established for Project tasks to be completed by the Redeveloper in a timely manner as set forth in the Redevelopment Project Schedule attached hereto as **Exhibit C.**

"**Project Schedule**" shall mean the schedules set forth in the Redevelopment Project Schedule attached hereto as **Exhibit C,** that contain the Project Milestones for the development, construction and completion of the Project, as applicable.

"**Property**" or "**Properties**" shall mean the Blocks and Lots as located on Borough tax maps, as listed in **Exhibit A,** subject to a subdivision of the land for the construction of the Facility as referenced in this Agreement.

"**Plan**" or "**Redevelopment Plan**" shall mean the Redevelopment Plan adopted by Borough Ordinance on April 3, 2006, or any subsequent Redevelopment Plan as same may be amended from time to time.

"**Project Plan**" shall mean the concept plan annexed hereto as **Exhibit B** for the Project.

"**Public Improvements**" shall include but not be limited to all such improvements that benefit the public, including by way of example, roadways, sanitary sewers, stormwater facilities, water mains, fire hydrants, utilities poles, piping and conduits (such as telephone, fiber optic, electric, and natural gas), curbs, sidewalks, retaining walls, conservation easement areas, and retention or detention basins but shall exclude parking decks, and other private improvements.

"**Redeveloper**" shall mean Emerson Redevelopers, LLC having its corporate offices at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981. The members of Redeveloper are listed in **Exhibit D.**

9

"**Redevelopment Area**" shall mean the area designated by the Borough Council as the Central Business District Redevelopment Area pursuant to a Borough Resolution No. 199-04 adopted on September 7, 2004.

"**Redevelopment Project Schedule**" shall mean the Project Schedule and Reporting Requirements which sets forth the respective tasks and completion dates of various phase-related activities, which is attached hereto as **Exhibit C**.

"**State**" shall mean the State of New Jersey.

"**Survey**" shall mean the standard process by which a qualified land surveyor licensed to perform such services within the State of New Jersey prepares location measurements of a parcel or parcels of property in order to ascertain the size of same and its location and relationship to adjoining parcels and to locate all structures, improvements, easements, and restrictions on the properties.

"**Tolling Event**" shall mean: (i) an act or omission by one Party or a third Party that has a material and adverse effect on the other Party's ability to perform any obligation, requirement, commitment, or responsibility prescribed under this Agreement; or (ii) any extension granted by either Party to the other Party, to extend any proposed date to perform in this Agreement; or (iii) any reasonable request by one Party to the other to extend the time for performance of any obligation, requirement, commitment or responsibility arising pursuant to this Agreement.

"**Borough**" shall mean the Borough of Emerson, Bergen County, New Jersey.

"**Borough Council**" shall mean the governing body of the Borough of Emerson.

"**Transfers**" shall be as defined in Section 6.03.

"**Transferee**" shall mean any Third-Party (other than unit purchasers in the ordinary course of business) to whom an interest in the Project Premises, the Improvements or rights in or under this Agreement is conveyed, transferred, leased, encumbered, acquired or assigned, by sale, merger, consolidation, reorganization, foreclosure or otherwise, including a trustee in bankruptcy or assignee for the benefit of creditors.

ARTICLE 2.

REPRESENTATIONS AND WARRANTIES

**2.01 Representations and Warranties by the Redeveloper.** The Redeveloper hereby makes the following representations and warranties to the Borough for the purpose of inducing the Borough to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true, to the best of its knowledge, as of the date hereof:

(1) Redeveloper has the legal capacity to enter into this Agreement and perform each of the undertakings set forth herein and in the Redevelopment Project Schedule as of the date of this Agreement.

(2) Redeveloper is duly organized and a validly existing legal entity under the laws of the State of New Jersey and all necessary consents have been duly adopted to authorize the execution and delivery of this Agreement and to authorize and direct the persons executing this Agreement to do so for and on the Redeveloper's behalf.

(3) Redeveloper represents that the Project will create economic development on blighted property, in the form of job creation, increased real estate tax ratables, improvements to the Property, and an increase in the quality of life of the surrounding properties through the implementation of the Improvements.

(4) Redeveloper represents that it has the technical and financial expertise and ability to complete the Project in accordance with the Project Schedule established in **Exhibit C.**

(5) No receiver, liquidator, custodian or trustee of Redeveloper shall have been appointed as of the effective Date, and no petition to reorganize Redeveloper pursuant to the United States Bankruptcy Code or any similar statute that is applicable to the Redeveloper shall have been filed as of the effective Date.

(6) No adjudication of Bankruptcy of the Redeveloper or a filing for voluntary bankruptcy by Redeveloper under the provisions of the United States Bankruptcy Code or any other similar statue that is applicable to the Redeveloper shall have been filed.

(7) No indictment has been returned against Redeveloper or any official, principal or member of Redeveloper.

(8) There is no action, proceeding or investigation now pending, nor any basis therefore, known or believed to exist which questions the authority of the Redeveloper to

enter into the Agreement or any action or act taken or to be taken by the Redeveloper pursuant to this Agreement.

(9) Redeveloper's execution and delivery of this Agreement and its performance hereunder will not constitute a violation of any operating, partnership and/or stockholder agreement of Redeveloper or of any agreement, mortgage, indenture, instrument or judgment, to which Redeveloper is a party.

(10) Redeveloper shall make its good faith efforts to award contracts and/or subcontracts wherever reasonably feasible to local business enterprises, where competitive bids and prices are offered by such enterprises, which may have a limited record of such activity, but which, in the judgment of Redeveloper, can competently provide the goods and services required by redeveloper. Redeveloper shall further make its best efforts to utilize local employees on the Project, and shall ensure that contractors and subcontractors retained by the Redeveloper make similar efforts, including cooperation with the Borough as set forth in subsection (10) immediately below.

(11) Redeveloper shall cooperate fully with the Borough in efforts by the Borough or its designees to recruit, screen, train, and refer qualified local and/or minority employees and subcontractors to Redeveloper and its general contractor or contractors, including providing information to the Borough or its designee with respect to the disposition of applicants for employment or subcontracts referred by the Borough or its designee to Redeveloper.

(12) All materials and documentation submitted by the Redeveloper and its agents to the Borough and its agents were, at the time of submission, and as of the Effective Date, materially accurate, and the Redeveloper shall continue to inform the Borough of any material or adverse changes in the documentation submitted. The Redeveloper acknowledges that the facts and representations contained in the information submitted by the Redeveloper are a material factor in the decision of the Borough to enter into this Agreement.

(13) Redeveloper and the resources available to it through its principal are financially and technically capable of developing, designing, financing and constructing the Project.

(14) There is no pending, or to the best of the Redeveloper's knowledge, threatened litigation, action or proceeding that would (i) prevent or delay the Redeveloper from performing its duties and obligations hereunder and/or (ii) question the validity of this Agreement or any essential element upon which this Agreement depends.

(15) Redeveloper acknowledges that it has had the opportunity to review all official documents contained in the public record relating to the Borough's designation of the Property as "an area in need of redevelopment", and the Borough's selection of the Redeveloper to undertake the redevelopment of the Property, all in accordance with

12

N.J.S.A. 40A:12A-1 et seq., (collectively the "Official Acts"). The Redeveloper hereby waives any and all causes of action it may have, or seek to prosecute against the Borough and the Borough Planning Board, in the event that the Redeveloper's rights as set forth in this Agreement are affected by any determination of a court of competent jurisdiction that one or more of the Official Acts, or any portion thereof, is invalid. Further, Redeveloper hereby waives any and all causes of action it may have to challenge the "Official Acts", including, by way of example and not limitation, any challenge Redeveloper may have regarding notice (pursuant to Harrison Redevelopment Agency vs. De Rose) and/or the Local Redevelopment and Housing Law. These waivers shall survive any termination of this agreement.

(16) Notwithstanding the foregoing, the Borough and Redeveloper may determine that it is in the interest of the Project to re-study the Central Business District Redevelopment Area or particular properties located within the Central Business District Redevelopment Area to confirm that they continue to be blighted and otherwise meet the criteria pursuant to N.J.S.A. 40A:12A-1 et seq. Redeveloper shall reimburse the Borough for such costs associated with this work as set forth in Section 4.01.

**2.02. Representations and Warranties by the Borough.** The Borough hereby makes the following representations and warranties for the purpose of inducing the Redeveloper to enter into this Agreement and to consummate the transactions contemplated hereby, all of which shall be true as of the date hereof:

(1)     The Borough has the legal power, right and authority to enter into this Redevelopment Agreement and the instruments and documents referenced herein to which the Borough is a party, to consummate the transactions contemplated hereby, to take any steps or actions contemplated hereby, and to perform its obligations hereunder.

(2)     With the exception of the items or tasks which shall be a condition precedent to the Effective Date of this Agreement, upon the approval by the Governing Body of this Agreement, all requisite action has been taken by the Borough and all requisite consents have been obtained in connection with the entering into this Redevelopment Agreement and the instruments and documents referenced herein to which the Borough is party, and the consummation of the transaction contemplated hereby, and to the best of the Borough's knowledge and belief are authorized by all Applicable Laws. To the best knowledge of the Borough there are no writs, injunctions, orders or decrees of any court or governmental body that would be violated by the Borough entering into or performing its obligations under this Redevelopment Agreement.

(3)     This Redevelopment Agreement is duly executed by the Borough, and is valid and legally binding upon the Borough and enforceable in accordance with its terms on the basis of laws presently in effect and the execution and delivery thereof shall not, with due notice or the passage of time, constitute a default under or violate the terms of any indenture, agreement or other instrument to which the Borough is a party.

(4)    There is no action, proceeding or investigation now pending, nor any basis known or believed to exist which questions the validity of this Agreement or the authority of the Borough to enter into the Agreement or any action or act taken or to be taken by the Borough pursuant to this Agreement.

(5)    The Borough agrees to support any applications for Governmental Approvals that are consistent with the terms of the Redevelopment Plan and this Agreement, and to execute any documents required to obtain such approvals and otherwise to cooperate with the Redeveloper with respect to the Governmental Approvals, provided that nothing contained in this Article 2.02 of this Agreement shall be deemed: (i) to constitute an approval of all or any portion of the Project for which Governmental Applications have been submitted or are required or approval of any Governmental Application seeking a financial incentive including but not limited to, the PILOT, (ii) a waiver of the ability of the Planning Board, or any other governmental or administrative entity, from exercising its statutorily authorized responsibilities with respect to the Governmental Applications or Governmental Approvals. Notwithstanding the foregoing, this Agreement shall not be deemed to be in full force and effect until such time as Redeveloper receives an approved PILOT agreement, mutually satifisfactory to both parties.

(6)    No official or employee of the Borough has any personal interest, direct or indirect, in this Agreement.

(7)    Nothing exists that would prevent Governmental Applications from being deemed complete. Including without limitation taxes.

**2.03. Mutual Representations.**

(1) The Borough and Redeveloper agree that the Project as defined herein does not constitute a "Public Works Contract" as defined in N.J.S.A. 10:5-31 and the completion of the Project does not constitute a "Public Work" as defined in N.J.S.A. 34:11-56.26 (the "Prevailing Wage Law").

(2) In the event that any contractual provisions that are required by Applicable Laws have been omitted, then the Borough and Redeveloper agree that this Agreement shall be deemed to incorporate all such clauses by reference and such requirements shall become a part of this Agreement. If such incorporation occurs and results in a change in the obligations or benefits of one of the parties, the Borough and Redeveloper agree to act in good faith to mitigate such changes in position.

14

## ARTICLE 3.

### COVENANTS AND RESTRICTIONS

**3.01. Covenants and Restrictions.** Redeveloper agrees to record the Declaration of Covenants and Restrictions on the Property in the office of the Bergen County Clerk within thirty (30) days of the fulfillment of all contingencies set forth in Article 12.

**3.02. Description of Covenants.** The Declaration of Covenants and Restrictions shall also state that the Redeveloper and its successors and assigns shall:

(a)    Devote the Property to the uses specified in the Redevelopment Plan and shall not devote the Property to any other uses without the approval of the Borough;

(b)    To the extent provided for by the Applicable Laws to not discriminate upon the basis of age, race, color, creed, religion, ancestry, national origin, sex or marital status in the sale, lease, use or occupancy of the Property or any Improvements, buildings or structures erected or to be erected thereon, or any portion thereof;

(c)    To the extent provided for by the Applicable Laws, in the sale, lease or occupancy of the Property or any portion thereof, not effectuate or execute any covenant, lease agreement, conveyance or other instrument whereby the land or any Improvement, building or structure erected or to be erected thereon is restricted upon the basis of age, race, color, creed, religion, ancestry, national origin, sex or marital status, and the Redeveloper, its successors and Transferee(s) shall comply with all State and local laws prohibiting discrimination or segregation by reason of age, race, color, creed, religion, ancestry, national origin, sex or marital status; and

(d)    That the Redeveloper and its Transferee(s) shall not sell, lease or otherwise Transfer the Property, or any portion thereof, without the written consent of the Borough not to be unreasonably withheld, as set forth in Article 6 hereof other than those Transfers deemed to be the Permitted Transfers pursuant to Article 6 hereof.

**3.03. Effect and Duration of Covenants.** It is intended and agreed that the agreements and covenants set forth in Section 3.02 shall be covenants running with the land and that they shall, in any event, and without regard to technical classification or designation, legal or otherwise, and except only as otherwise specifically provided in this Agreement, be binding, to the fullest extent permitted by law and equity, for the benefit and in favor of, and enforceable by, the Borough, its successors and assigns, against the Redeveloper, its successors and assigns and every successor in interest therein, and any party in possession or occupancy of the Project or any part thereof until a Certificate of Completion has been issued. However, such agreements and covenants shall be binding on the Redeveloper itself, each successor in interest to the Redeveloper and each party in possession or occupancy, respectively, but only for such period as the Redeveloper or such successor or party shall be a lessee or be in possession or occupancy of the Property, the buildings and structures thereon or any part thereof.

**3.04. Enforcement by the Parties.** Both Parties shall have the right, in the event of any breach of any of the aforesaid covenants or of any of the other terms and conditions of this Agreement, to exercise all the rights and remedies and to maintain any actions or suits at law or in equity or other proper proceedings to enforce the curing of such breach of agreement or covenant, to which they or any other beneficiaries of such agreement or covenant may be entitled. In the event a party is successful in enforcing any of its rights hereunder, such unsuccessful party shall pay and reimburse the successful party for all of its reasonable attorneys fees together with any costs and expense incurred by the successful party in enforcing its rights hereunder.

**3.05. Redevelopment Area Upon Completion.** Upon issuance of a Certificate of Completion, the conditions that were found and determined to exist at the time the Property was determined to be in need of redevelopment shall be deemed to no longer exist, the Property shall no longer be subject to eminent domain as a result of such determinations conditions and the requirements of N.J.S.A. 40A:12A-9 shall be deemed to have been satisfied with respect to the Property. The Borough shall release the recorded documents and designations on a Phase by Phase basis provided that the Redeveloper has subdivided the Property to facilitate the Phase by Phase release of same.

## ARTICLE 4.

## COSTS ASSOCIATED WITH THE PROJECT

**4.01. Project Costs.** All costs of implementing and Completing the Project, including but not limited to the cost of obtaining all Governmental Approvals, the cost of the acquisition of the Property, any Remediation costs (including the costs of operation, maintenance, reporting and monitoring that may be associated with any engineering controls and institutional controls), the cost of designing and constructing the Project (including the costs of any construction observation services) all Improvements, all financing costs, all marketing and leasing costs for the Project and the Borough Costs as limited by the Funding Agreement, (collectively, the "Project Costs") shall be borne by Redeveloper. Except if otherwise specifically set forth herein, the Borough shall not be responsible for any costs associated with the Project. The Project Costs are estimated to be Thirty Million Dollars ($30,000,000.00). Detailed breakdowns of the hard and soft cost of this Project shall be provided by the Redeveloper to the Borough no later than the issuance of a building permit for the Phase 1 Project.

**4.01.1 Offsite/Onsite Improvement Share.** Redeveloper shall pay for the Offsite and Onsite improvements that the Borough or other third parties shall construct or install which will benefit Redeveloper as well as on site improvements which will benefit other property owners, all as fully set forth in **Exhibit F**, which may be amended or adjusted from time to time based on the actual costs of construction and a final determination by the Borough Engineer of this Redeveloper's Offsite/Onsite Improvement Share.

16

**4.02. Borough Costs and Application Fees.** Redeveloper has executed a Funding Agreement with the Borough that addresses the timing and payment of the Borough Costs which is attached hereto and incorporated herein as **Exhibit E.**

**4.03. Affordable Housing Requirement.** The Parties recognize and acknowledge that the Project will generate a fair share housing requirement for Redeveloper pursuant to the Affordable Housing Requirements established by the State of New Jersey and the Council on Affordable Housing. Redeveloper and the Borough agree that Redeveloper shall satisfy the affordable housing obligations resulting from Redeveloper's development of the Project in accordance with the State's Affordable Housing Requirements. The obligation shall be fixed as of the start of each of the Phases of the Project. The presumptive percentage of set aside units to be built shall be twenty percent (20%). However, the Redeveloper may request that the Borough seek a determination from either the courts or COAH to determine the definitive affordable housing set aside for the Project. If the Redeveloper elects to have the Borough seek a determination from either the courts or COAH, the Redeveloper shall pay for all of the Borough's professional fees associated with seeking such determination, including but not limited to legal fees (together with costs and expenses), as well as the fees, costs and expenses of planners, engineers, financial advisers, COAH experts, and any other professional or advisory services required to obtain the determination (collectively the "Professional Fees"). The payment or reimbursement for such Professional Fees shall be made pursuant to the Funding Agreement the Redeveloper has previously executed. The Escrow established pursuant to such Funding Agreement shall be replenished as necessary and as required pursuant to the terms of the Funding Agreement and the Funding Agreement is deemed amended and supplemented to include the provisions of this Section 4.03 as if fully set forth within the Funding Agreement.

**4.03.1 Alternate COAH Location.** The Redeveloper and the Borough shall explore alternative sites to accommodate all of the Low and Moderate Housing obligations associated with this Project at another location in the Borough, subject to any necessary court approval and such court approval to be funded by Redeveloper as set forth in **Section 4.03** hereinabove.

**4.04. Emergency Municipal Services Building.** The Borough has dedicated and shall transfer Block 419Lot 7 to Redeveloper for the Project ("Dedicated Lot") which is currently utilized by the Borough Ambulance Corp and has a fair market value of $500,000. In consideration therefore the Redeveloper shall construct at its sole cost and expense an Emergency Municipal Services Building as defined hereinabove. The Borough shall provide the Redeveloper the property as well as all of the site plans, architectural and engineering plans at the Borough's sole cost and expense and upon the completion of the building the Borough shall pay and reimburse Redeveloper all of the costs associated with the construction of the Emergency Municipal Services Building, less the direct and allocatable costs associated with Ambulance portion of the building as the parties may agree, which in no case shall exceed the fair market value of the Dedicated Lot. In the event the parties cannot agree on such reimbursable costs to the

17

Redeveloper, the party's attorneys shall select a retired Judge from Bergen County to mediate and definitively determine such costs to be reimbursed to the Redeveloper and such costs for such mediator shall be shared by the parties equally.

## ARTICLE 5.

### THE PROJECT

**5.01. Property.** The Property is located in the Borough and presently identified in the Borough tax maps on the Blocks and Lots described in **Exhibit A**, subject to any necessary subdivision. The Project is depicted in the Concept Plan for the Project attached hereto as **Exhibit B** and shall be constructed in accordance with the Redevelopment Project Schedule set forth in **Exhibit C**. The Redeveloper and Borough each covenant and agree to perform the obligations set forth in the Redevelopment Project Schedule set forth in **Exhibit C**. The Redeveloper covenants and agrees that it will construct the Project in accordance with the Redevelopment Plan. All Improvements to be situated upon the Property (i.e., sidewalks, utilities and site lighting, off street parking, roadways, pilings, foundations, footings, open space, walkways, landscaping, etc.) and other construction identified as Improvements shall be installed by the Redeveloper at its sole cost and expense as the Project requires. The Redeveloper shall negotiate for the purchase of any properties set forth in **Exhibit A** that it does not currently own or control at its sole cost and expense. In the event the Redeveloper is not able to purchase any property set forth in **Exhibit A** the Redeveloper shall request that the Borough assist it in purchasing such or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c). The Redeveloper shall pay and reimburse the Borough for any and all costs it may incur in assisting the Redeveloper in purchasing or acquiring such properties. The Borough shall adopt the necessary Ordinances to vacate Kenneth Avenue within sixty (60) days from the date the Redeveloper obtains Governmental Approvals.

**5.02. Governmental Approvals.** The Redeveloper shall make all Governmental Applications and receive all Governmental Approvals required under Applicable Laws in order to construct the Project in accordance with the Redevelopment Project Schedule. Issuance of a Building Permit shall be conclusively presumed to be in compliance with all Governmental Applications and Governmental Approvals that are perquisites to the issuance of such Building Permit.

**5.03. Site Work.** The Redeveloper at its sole expense shall install upon or in the Property all necessary site preparation, including pilings and , filling and all on-site infrastructure. Notwithstanding anything contained herein, the Borough shall not be responsible for any costs associated with any Improvements necessary for the development and construction of the Project. The costs of developing the Project and Facilities, and of constructing all Improvements thereon, including, but not limited to, all required Public Improvements, shall be borne entirely by the Redeveloper; provided, however, that Redeveloper's contributions for offsite improvements may be subject to pro-ration in accordance with Applicable Laws. Notwithstanding the foregoing, the Borough shall not be responsible for any costs associated with any Improvements necessary for the development and construction of the Project

18

**5.04.   Commencement and Completion Schedule.**  The Redeveloper agrees to commence construction of the proeect within 120 days of Government Approvals and thereafter diligently prosecute the Project to completion in accordance with the Redevelopment Project Schedule set forth in **Exhibit C** and this Article but in no case later than 24 months from the Commencement Date. Redeveloper understands that the Borough will require strict compliance with the Project Milestones, deadlines and time periods for the various activities and actions to be taken by the Redeveloper hereunder, as set forth in **Exhibit C**, subject to the occurrence of a Force Majeure Event. The Borough agrees to cooperate fully with Redeveloper regarding all Governmental Approvals. Redeveloper acknowledges that a failure to meet a Project Milestone shall be a material breach of this Agreement that will subject the Redeveloper to Termination of this Agreement as permitted in Articles 8 & 9. The Parties acknowledge and agree that the Redeveloper may need to modify the Redevelopment Project Schedule. The Borough shall, upon the written request of the Redeveloper, consider modifications of the dates set forth in the Redevelopment Project Schedule. The Borough agrees to consider and render a decision with respect to any such modification, within a period of sixty (60) days following receipt of a written request by the Redeveloper. Failure to diligently prosecute the Project to Completion may cause the Borough to notify the Redeveloper that it is in default of its obligations hereunder, and to pursue all lawful remedies against the Redeveloper. Similarly, the Borough agrees to commence and diligently prosecute its obligations as set forth in the Redevelopment Project Schedule.

**5.05.   Progress Reports.**  For so long as this Redevelopment Agreement shall remain in effect, Redeveloper shall make quarterly reports to the Borough as to the actual progress of Redeveloper with respect to development, planning and construction of both the Project, and such other matters as the Borough shall reasonably request be addressed in such reports, including but not limited to the reporting requirements set forth in **Exhibit C.**

**5.06.   Public Improvements and Utility Relocation.**  The Borough and the Redeveloper hereby agree that the Redeveloper will make the Public Improvements consistent with the Plan which shall include, but shall not be limited to installation of concrete curbing, sidewalks, roadway base/surface, sewers, drainage, grading, street lighting, street furniture, signage, utilities, plantings and appropriate traffic control signals as may be required by the Governmental Approvals or Applicable Laws. Notwithstanding anything contained herein to the contrary, Borough shall not be responsible for any costs associated with any Public Improvements necessary for the development and construction of the Project. The costs of developing the Project and all Public Improvements thereon, including, but not limited to, all required Public Improvements or utility relocations, shall be borne entirely by the Redeveloper.    In addition, Redeveloper shall install at its sole cost and expense the Storm Water Pipe as more fully described and set forth in **Exhibit G.**

**5.07. Performance Bond.** If the Planning Board does not require that the Redeveloper post a Bond for the Public Improvements as a condition of the site plan approval issued by the Planning Board, then prior to the Commencement of Construction, Redeveloper shall provide the Borough with a bond (the "Bond") the "Performance Guaranty"), in an amount equal to the cost of Public Improvements  The Bond must be issued by an insurance or surety company authorized to conduct business in the State of New Jersey, rated A+ or better by A.M. Best and listed in the most current U.S. Treasury Circular 570. The Bond must name the Borough as an obligee, and Redeveloper shall deliver a copy of the Bond to the Borough on or before the Commencement Date.  If an Event of Default occurs, the Borough will use the Performance Guaranty to complete construction of the Public Improvements or to remove any structure on the Property, in its sole discretion, subject to the right to cure of the mortgagee as set forth in Article 9.03. Redeveloper shall receive a credit against the Bond for any bond required to be posted in satisfaction of the requirements of the Land Use Law, in the event that the Bond required by the Planning Board does not completely encompass the Public Improvements contemplated by this Redevelopment Agreement.

**5.08.  Certificates of Occupancy and Certificate of Completion.**  Upon completion of construction in accordance with the Governmental Approvals and Applicable Laws, the Redeveloper shall apply to the appropriate governmental officer or body for a Certificate of Occupancy for the Project or a portion thereof. The Certificate of Occupancy, when issued, shall constitute evidence that Redeveloper has fully performed its obligations under Governmental Approvals as to the Project or a portion thereof. Following the issuance of the Certificate of Occupancy and the satisfaction of the terms and conditions of this Agreement, the Borough agrees to issue a Certificate of Completion, in proper form for recording, which shall acknowledge that the Redeveloper has performed all of its duties and obligations under this Agreement and has completed construction of the Project or a portion thereof in accordance with the requirements of this Agreement. The Certificate of Completion shall constitute a recordable, conclusive determination of the satisfaction and termination of the agreements and covenants in this Agreement and the Redevelopment Plan with respect to the obligations of the Redeveloper to construct the Project or a portion thereof within the dates for the completion of same. Within 30 days after written request by the Redeveloper, the Borough shall provide the Redeveloper with the Certificate of Completion or a written statement setting forth in detail the reasons why it believes that Redeveloper has failed to complete the Project or a portion thereof in accordance with the provisions of this Agreement or is otherwise in default under this or any other applicable agreement and what reasonable measures or acts will be necessary in the opinion of the Borough in order for the Redeveloper to be entitled to the Certificate of Completion.

**5.09 Project Schedule.** With respect to the Project, Redeveloper shall meet the deadlines and timeframes for the completion set forth in the Redevelopment Project Schedule set forth in **Exhibit C.** Redeveloper shall construct the Project using all commercially reasonable methods to prosecute the uninterrupted construction of the Project. Failure to prosecute the uninterrupted construction of the Project shall constitute an Event of Default. It shall be an Event of Default for Redeveloper to fail to complete

20

Construction of the Project such that a Certificate of Completion is not issued by the Borough in accordance with the Redevelopment Project Schedule set forth in **Exhibit C.**

    **5.10    Project Modifications.**    The Redeveloper hereby acknowledges and agrees that the development and construction of the Project shall be in accordance with the Project Schedule set forth in **Exhibit C.** The Redeveloper may not modify, alter or amend the approved Final Site Plan at any time without the express prior written approval of the Borough which shall not be unreasonably withheld, conditioned or delayed, subject to the provisions of the Applicable Laws; provided, however, that the Redeveloper may make those modifications, alterations and amendments to the Final Site Plan or Construction Plans, as the case may be, that are "minor" in nature. The Borough reserves its right to contest any material modifications that may potentially arise in the course of the construction of the Project.

    **5.11  Suspension of Construction.**    If the Redeveloper shall abandon or substantially suspend construction activities on the Project for a period of 120 consecutive days, the rights and remedies of the Parties shall be governed by the provisions of Article 8 of this Agreement.

    **5.12   Insurance.** The Redeveloper shall maintain or cause to be maintained at its own cost and expense, with responsible insurers, the following kinds and the following amounts of insurance with such variations as shall reasonably be required to conform to customary insurance practice and in no case less than the amounts indicated below and certificates, or full copies of policies must be furnished as noted below:

    (a)    Builder's Risk Insurance for the benefit of the Redeveloper and the Borough, as its respective interests may appear, during the term of construction which will protect against loss or damage resulting from "ALL Risk" or "Special Form" f The limits of liability will be equal to One Hundred (100%) percent of the insurable replacement cost value of the Project (comments on this may follow), including items of labor and materials connected therewith, whether in or adjacent to the structure insured, and materials in place or to be used as part of the permanent construction. Is this meant so say replacement cost endorsement Is loss of use an issue for the borough?

    (b) COMPREHENSIVE GENERAL LIABILITY LIMITS $1,000,000/2,000,000 combined single limit "CSL" covering Bodily injury, Property damage and Personal Injury -including explosion, collapse, underground utilities, contractual, independent contractors, and Products/Completed Operations coverage for all premises and work to be completed under the redevelopment agreement.

    (c)    Worker's Compensation Insurance coverage in the amount of:
                Coverage A - New Jersey Statutory
                Coverage B -- 500,000/500,000/500,000
the full statutory liability of the Redeveloper;

-21

(d)    ENVIRONMENTAL INSURANCE (Pollution Liability)- $5,000,000/$5,000,000-covering Bodily Injury, Property Damage, pollution or environmental harm including cleanup cost arising out of the work to be performed under this contract. The policy must contain a separation of insureds clause and include the Borough of Emerson as an **additional Named Insured.**

(e)    Requirement that contractor's sub-contractors hired by redeveloper maintain certain insurance and name the Borough as additional insured.

(f)    Railroad Protective-Insurance- Requirements Equal to that required by the Railroad if applicable.

(g)    Such other insurance, in such amounts and against such risks, as is customarily maintained by the Redeveloper with respect to other similar properties owned or leased by it, including automobile insurance.

**The before mentioned policies listed in B,C,D & E above shall name the Borough of Emerson,** it's elected officials, agents, employees, officers, affiliates, directors, members, partners, consultants, and subcontractors of each and any of all such as **additional insureds,** and the insurance afforded to these additional insureds shall be primary coverage and noncontributory for all claims covered thereby .

The Redeveloper shall file with the Owner before commencing with the redevelopment work under this Agreement, original Certificates of Insurance, or policies where required, which certificates shall bear the following information:

1. Name and address of the insured.
2. Title and Location of the operations to which the insurance applies
3. The number of the policy and the type or types of insurance in force thereunder on the date borne by such Certificate.
4. The expiration date of policy and the limit or limits of liability thereunder on the date borne by such certificate.
5. A statement that the insurance of the type afforded by the policy applies to all of the operation on and at the site of the project which are undertaken by the insured during the performance of his contract.
6. Indication of Insured, additional insured and Co-insured Parties.
7. A statement as to the exclusions of the policy, if any.
8. A statement showing the method of cancellations provided for by the policy. If cancellations may be affected by the giving of notice to the insured by the insurer, the policy shall provide for the lapse of such number of days following the giving of such notice that in the ordinary course of transmission the insured will have actually received such notice at least thirty (30) days before the cancellation becomes effective. Notice of cancellation shall also be delivered to Owner not less than thirty (30) days prior to such lapse or termination.

5.13 **Indemnification and Defense.** (a)  The  Redeveloper  agrees  to indemnify and hold harmless the Borough against, and the Redeveloper shall pay for, any and all liability, loss, cost, damage, claims, judgments, legal fees and costs or expenses, of any and all kinds or nature and however arising, imposed by law, which the Borough may sustain, be subject to or be caused to incur by reason of any claim, suit or action based upon personal injury, death, or damage to property, whether real, personal or mixed, resulting from the Redeveloper's activities in constructing the Project or the Redeveloper's actual breach of contracts entered into by the Redeveloper which directly relate to the construction of the Project, or resulting solely from the Redeveloper's ownership of the Property, or resulting from the acquisition, construction or installation of the Project. Further, said indemnification shall include but not be limited to any and all claims by workmen, employees and agents of the Redeveloper and unrelated third parties, which claims result from the construction of the Project, the maintenance and functioning of the Improvements and Public Improvements or any other activities of the Redeveloper within the Property during the construction of the Project. Neither the Borough or its Council Members, commissioners, officers, agents, servants or employees shall be liable in any event for any action performed under this Agreement, except for any claim or suit arising from negligent, intentional or willful acts of the Borough, its Council Members, commissioners, officers, agents, servants or employees.

(b)  The Redeveloper, at its own cost and expense, shall defend any and all such claims, suits and actions, as described in and for which indemnification is required by this Section 5.13, which may be brought or asserted against the Borough, its Council Members, commissioners, officers, agents, servants or employees; but this provision shall not be deemed to relieve any insurance company which has issued a policy of insurance as may be provided for in this Agreement from its obligation to defend the Redeveloper, the Borough and any other insured identified in such policy of insurance in connection with claims, suits or actions covered by such policy. Any cost for reasonable attorneys' fees in situations where it is necessary for the Borough to engage its own attorneys, reasonable experts' testimony costs and all reasonable costs to defend the Borough or any of its Council Members, commissioners, officers, agents, servants, or employees shall be reimbursed to it by the Redeveloper in connection with such indemnification claim. The Borough shall give the Redeveloper notice of any such claim for which indemnification under this Agreement is sought (together with copies of any documents received) within Fifteen (15) Days of the Borough's receipt of same.

5.14 **Project Signage.** Redeveloper shall work with the Borough to place signage on the Property within 30 days of obtaining Governmental Approvals that contains a rendering or renderings of the finished Project, and indicates that the Project is made possible in the community as a result of the efforts of the Redeveloper and Borough. The Borough will provide the Redeveloper with the exact specifications and locations for any signage produced in accordance with the Article.

5.15 **Project Renderings.** Redeveloper shall make renderings of the finished Project available to the Borough for use at public presentations, and to further market the Borough for economic development.

23

## ARTICLE 6.

## PROHIBITIONS

**6.01.  Prohibition Against Transfers of Interests in Redeveloper.** Prior to completion of the Project as evidenced by the issuance of a Certificate of Completion, and without the prior written approval of the Borough, which approval shall not be unreasonably withheld, Redeveloper agrees for itself and any successor in interest that:

(1) There shall be no transfer by any owner of any equity interest in Redeveloper, or by any successor in interest to such owner, of any interest in Redeveloper.

(2) Nor shall any such owner or successor in interest suffer any such transfer to be made, except due to death, but excluding transfers among existing members;

(3) Nor shall such owner or successor in interest make, or suffer to be made, any other change in the ownership of any equity interest in Redeveloper except as hereinabove provided, or with respect to the identity of the parties in control of Redeveloper or the relative degrees of their control, by any other method or means, whether by increased capitalization, merger with another corporate, partnership or limited liability entity, or otherwise. With respect to this provision, Redeveloper and the party(ies) signing the Agreement on behalf of Redeveloper represent that each party has authority of all its owners to agree to this provision on their behalf and to bind them with respect thereto. For the purpose of this Agreement, the term "owners" is defined to include the general partners of a partnership, the stockholders of a corporation or the members of a limited liability company.

(4) If approval of the Borough is sought for a transfer, Redeveloper will pay an administrative fee equivalent to One Thousand Dollars ($1,000.00), and shall pay in addition thereto, any Borough Costs associated obtaining the Borough's approval.

The following transfers of interests in the Redeveloper shall be deemed to be approved without any approval by the Borough: (a) assignments among the principals of Redeveloper and their immediate family members; and (b) assignments by the principals of Redeveloper for estate planning and tax purposes.

**6.02.  Transfer of Redevelopment Agreement.** Redeveloper further agrees for itself, its successors and assigns, that prior to the completion of the Project or any portion thereof, as evidenced by the issuance of a Certificate of Completion it will not make or create, or suffer to be made or created, any sale, assignment, conveyance, lease or transfer in any other mode or form (collectively, the "Transfers") of its interests in the Project or its interest in this Agreement, without the prior written approval of the Borough, except as provided below, which consent shall not be unreasonably withheld.

In the event that the Borough consents to a Transfer, the Transferor shall be released from the obligations of this Agreement only to the extent or limit of the authorized Transfer.

**6.03. Exemption from Prohibited Transfers.** Notwithstanding the foregoing, and with the consent of the Borough, it shall not constitute a prohibited transfer, for purposes of Section 6.02 if after Final Site Plan Approval has been obtained, Redeveloper assigns its rights under this Agreement upon the following conditions: (i) the assignee of Redeveloper must be an entity controlling, controlled by, or under common control of Redeveloper including but not limited to an urban renewal entity formed by Redeveloper pursuant to N.J.S.A. 40A:20-4; (ii) the assignee of Redeveloper shall assume all of the obligations of Redeveloper hereunder, but Redeveloper shall remain primarily liable for the performance of Redeveloper's obligations, (iii) a copy of the fully executed written assignment and assumption agreement shall be promptly delivered to the Borough, and (iv) such assignment does not violate any of the Government Approvals.

In addition, nothing contained in this Agreement shall prohibit, nor require the consent of the Borough, to transfer individual condominium units to the ultimate purchaser of such units.

**6.04. Consent to Permitted Transfers.** The Borough hereby consents, without the necessity of further approvals or payment of the administrative fee set forth in Section 6.01(4) from any entity, to the following Transfers: (i) a Mortgage or related security granted by Redeveloper to a Mortgagee for the purpose of obtaining the financing necessary to enable Redeveloper to perform its obligations under this Agreement with respect to Completion of the Project and any other purpose authorized by this Agreement and (ii) any Mortgage or Mortgages and other liens and encumbrances granted by Redeveloper to a Mortgagee for the purpose of financing costs associated with the development, construction, and marketing of the Project. With respect to any of the Transfers listed in this Section 6.04, Redeveloper shall provide to the Borough written notice of at least fifteen (15) days prior to such Transfer, including a description of the nature of such Transfer, and the name(s) and address(es) of the transferee and any parties, individuals and/or entities comprising such Transfers.

**6.05. Prohibition Against Speculative Development.** Because of the importance of the development of the Property to the general welfare of the community, Redeveloper represents and agrees that Redeveloper's undertakings pursuant to this Agreement are, and will be used, for the purpose of the redevelopment of the Property as provided herein and not for speculation in land holding.

**6.06 Conditions of Transfer.** In the event that the Redeveloper requests the Borough's prior written approval for a transfer of interest the Borough shall be entitled to require, as a condition of approval of any transfer that (i) the proposed Transferee will have qualifications and financial responsibility necessary and adequate to fulfill the obligations undertaken in this Agreement with respect to the transferred portion of the Project and other obligations pursuant to Governmental Approvals or any part of such obligations that may pertain to the transferred interest or the transferred portion of the

25

Project, as determined from (1) Audited financial statements indicating (a) net worth or (b) unencumbered lines of credit; or evidence of loan commitments sufficient to carry out the relevant aspect of the Project; and (2) Submission of letters of recommendation from reputable Parties for whom the prospective transferee has undertaken a comparable development, stating that the proposed transferee of the relevant aspect of the Project possesses the competence and integrity to undertake same; and (ii) any proposed transferee, by instrument in writing reasonably acceptable to the Borough, will, for itself and its Transferees, and expressly for the benefit of the Borough, have expressly assumed all of the relevant obligations of the Redeveloper under this Agreement with respect to the Project and agrees to be subject to all the Covenants and Restrictions to which the Redeveloper is subject; and (iii) the Transferee will comply with such other reasonable conditions as the Borough may find necessary in order to achieve and safeguard the purposes of the Redevelopment Plan.

**6.07 Transfers in Violation of this Agreement.** Any Transfer in violation of this Agreement shall be deemed to be an Event of Default and shall be null and void *ab initio*. The occurrence of such Event of Default shall entitle the Borough to seek all available remedies under the terms of this Agreement, including the right to terminate this Agreement, and all other remedies available under the Applicable Law(s).

## ARTICLE 7.

## PROJECT AND MORTGAGE FINANCING

**7.00 Submission of Financial Package.** In the event that the Redeveloper intends to seek financing for the Project the Redeveloper represents that it shall use its best efforts to obtain sufficient financing for all costs associated with the Project. The Redeveloper represents that such financing may be a combination of debt financing, equity financing and an equity contribution of the Redeveloper and may be obtained in coordination with the phased development of the Project. On or prior to the earlier to occur of (i) ninety (90) days after the Redeveloper has obtained all Governmental Approvals with respect to the applicable phase of the Project, or (ii) ninety (90) days prior to Commencement of Construction on such phase of the Project, the Redeveloper shall submit a financial package that the Redeveloper believes to be complete that describes the anticipated sources of funding for that phase of the Project, including, but not limited to, commitments to construction financing required for that Phase of the Project and a representation regarding any equity capital necessary for the Commencement of Construction of the relevant phase of the Project.

**7.01. Mortgage.** Except as to financing conducted through recognized chartered banks and/or licensed insurance lenders or by an Affiliate of the Redeveloper, the Redeveloper shall request authority from the Borough (which shall not be unreasonably withheld) in writing in advance of any proposed financing secured by a mortgage or other similar lien instrument, which it proposes to enter into with respect to the Project, or any part thereof, and in any event Redeveloper shall promptly notify the Borough of any encumbrance or lien that has been created on or attached to the Project in

26

connection with any financing of the Project obtained by Redeveloper; or, by involuntary act of the Redeveloper or others, upon obtaining knowledge or notice of same.

7.02. **Obligations of Mortgagee.** Notwithstanding any of the provisions of this Agreement, including but not limited to those which are or are intended to be covenants running with the land, the holder of any mortgage authorized by this Agreement, including any such holder who obtains title to the Property or any part thereof as a result of foreclosure proceedings, or action in lieu thereof, but not including (a) any other party who thereafter obtains title to the Property or such part from or through any such holder or (b) any other purchaser at foreclosure sale (other than the holder of the mortgage itself) shall in no way be obligated by the provisions of this Agreement to construct or complete the Project or to guarantee such construction or completion; provided that nothing in this Article or any other Article or provision of this Agreement shall be deemed or construed to permit or authorize any such holder to devote the Property or any part thereof to any uses, or to construct any Project thereon, other than those uses provided or permitted under the Redevelopment Plan, Governmental Approvals and Applicable Law.

7.03. **Notice of Default to Mortgagee and Right to Cure.** Whenever the Borough shall deliver any notice or demand to the Redeveloper with respect to any breach or default by the Redeveloper under this Redevelopment Agreement, the Borough shall at the same time deliver to each lender (or equity participant in Redeveloper) a copy of such notice or demand, provided that the Redeveloper has delivered to the Borough a written notice of the name and address of such lender and equity participant. Each such lender shall (insofar as the rights of the Borough are concerned) have the right at its option within ninety (90) days after the receipt of such notice, to cure or remedy, or to commence to cure or remedy, any such default with respect to that portion of the Project which is being financed by such lender and which is subject to being cured and to add the cost thereof to the debt and the lien which it holds, or to the obligations of the lessees under any lease-back or of the guarantor under any other conveyance for financing.

Notwithstanding the foregoing, in the event of any breach or default with respect to the deadlines for commencement and completion of construction of the Project set forth in Section 5.08, the Borough agrees that any notice to a Mortgagee will not be served simultaneously with the notice to the Redeveloper, but instead will be served forty five (45) days after notice of breach or default to Redeveloper if Redeveloper has not cured the breach or default.

7.04. **Estoppel Certificate.** Within forty five (45) days following written request therefore by the Redeveloper, or of any lender, purchaser, tenant or other party having an interest in the Project, the Borough shall issue a signed estoppel certificate either stating this Redevelopment Agreement is in full force and effect and that there is no default or breach under this Redevelopment Agreement, or stating the nature of the default or breach or event, if any. In the event the estoppel certificate discloses such a default, breach or event, it shall also state the manner in which such default, breach and/or event may be cured. No more than a reasonable number of estoppel certificates may be requested per year.

27

## ARTICLE 8.

### EVENTS OF DEFAULT

**8.01. Events of Default.** Any one or more of the following shall constitute an Event of Default hereunder, subject to Force Majeure and tolling as provided elsewhere in this Agreement:

(1)    Failure of Redeveloper or the Borough to observe and perform any covenant, condition, representation, warranty or agreement hereunder, and continuance of such failure for a period of thirty (30) days, after receipt by the defaulting party of written notice from the non-defaulting party specifying the nature of such failure and requesting that such failure be remedied, unless such delay is the direct cause of a governmental entity relating to an issue over which the Redeveloper has no control, or is not otherwise responsible for such governmental entities actions concerning the default or delay.

(2)    (i) Redeveloper shall have applied for or consented to the appointment of a custodian, receiver, trustee or liquidator of all or a substantial part of its assets; (ii) a custodian shall have been legally appointed with or without consent of Redeveloper; (iii) Redeveloper, (A) has made a general assignment for the benefit of creditors, or (B) has filed a voluntary petition in bankruptcy or a petition or an answer seeking an arrangement with creditors or has taken advantage of any insolvency law; (iv) Redeveloper has filed an answer admitting the material allegations of a petition in any bankruptcy or insolvency proceeding; or (v) Redeveloper shall take any action for the purpose of effecting any of the foregoing; (vi) a petition in bankruptcy shall have been filed against Redeveloper, and shall not have been dismissed for a period of ninety (90) consecutive days; (vii) an Order for Relief shall have been entered with respect to or for the benefit of Redeveloper, under the Bankruptcy Code; (viii) an Order, judgment or decree shall have been entered, without the application, approval or consent of Redeveloper, by any court of competent jurisdiction appointing a receiver, trustee, custodian or liquidator of Redeveloper, or a substantial part of its assets and such order, judgment or decree shall have continued unstayed and in effect for any period of ninety (90) consecutive days; (ix) Redeveloper shall have suspended the transaction of its usual business.

(3)    Redeveloper shall default in or violate its obligations with respect to the construction of the Project in accordance with this Agreement, the Redevelopment Plan, the Redevelopment Project Schedule, Governmental Approvals or Applicable Laws or including but not limited to failure to comply with the Commencement of Construction and Completion of Construction, shall abandon or substantially suspend construction work and any such default, violation, abandonment or suspension shall not be cured, ended, or remedied within thirty (30) days after written demand by the Borough to do so (provided that it shall not be an event of default if Redeveloper is proceeding with due diligence to remedy the same as soon as practicable).

28

(4)    The Project shall not be complete, as evidenced by the issuance of a Certificate of Completion on the Completion Date.

(5)    Redeveloper, its successor or assigns shall fail to pay any application or permit fees in furtherance of any Governmental Approvals, or connection fees resulting therefrom, or real estate taxes, assessments, or PILOTs (as defined herein) on the Property or any part thereof when due, shall fail to pay any payments required under this Agreement, or shall place on the Property any encumbrance or lien unauthorized by this Redevelopment Agreement, or shall suffer any levy or attachment to be made, or any materialmen's or mechanics' lien, or any other unauthorized encumbrance or lien to attach and such real estate taxes or assessments shall not have been paid, or the encumbrance or lien removed or discharged or provision satisfactory to the Borough made for such payment, removal, or discharge, within thirty (30) days after written demand by the Borough to do so..

(6)    There is, in violation of this Redevelopment Agreement, a transfer or assignment as prohibited in Article 6.

(7)    The Redeveloper fails to make a payment of any sums payable to the Borough, as same shall become due and payable, and such failure to pay shall have continued for a period of (30) days after Redeveloper's receipt of written notice specifying its failure to make such payment.

**8.02.   Remedies of Borough Upon Event of Default.** Whenever any Event of Default of Redeveloper shall have occurred and be continuing after the expiration of any applicable cure period, the Borough may seek to terminate this Agreement. Upon termination of this Agreement the Borough shall have the right to specific performance, injunction or any other remedy available at law or in equity and the right to use the Performance Bond to complete construction of any Public Improvements. The Borough's remedies are not limited to those set forth in this Agreement; the Borough retains at all times its delegated governmental powers to undertake enforcement action to stop, abate and ameliorate any issue or circumstance affecting the public health, public safety and public welfare of its residents.

**8.03.   Remedies of Redeveloper Upon Event of Default.** Whenever any Event of Default of the Borough shall have occurred and be continuing, the Redeveloper may seek specific performance, injunction or any other remedy available at law or in equity.

**8.04.   Restoration of Status.** In case the Borough or Redeveloper, as applicable, shall have proceeded to enforce its rights under this Redevelopment Agreement and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Borough or Redeveloper, as applicable, then and in every such case, Redeveloper and the Borough shall be restored respectively to their several positions and rights hereunder, and all rights, remedies and

29

powers of Redeveloper and the Borough shall continue as though no such proceedings had been taken.

**8.05. Failure or Delay by Either Party.** Except as otherwise expressly provided in this Redevelopment Agreement or the Project Milestones attached hereto as **Exhibit B**, any failure or delay by either party in asserting any of its rights or remedies as to any default, shall not operate as a waiver of any default, or any such rights or remedies, or deprive either such party of its right to institute and maintain any actions or proceedings which it may deem necessary to protect, assert or enforce any such rights or remedies.

**8.06. Remedies Cumulative.** No remedy conferred by any of the provisions of this Redevelopment Agreement is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies shall not constitute a waiver of the right to pursue other available remedies.

**8.07 Certificate of No Default.** The Redeveloper shall deliver to the Borough on each anniversary of the Effective Date, a certificate signed by its authorized representative to the effect that (a) the Redeveloper is not aware of any condition, event or act which constitutes a violation of this Agreement or which would constitute an Event of Default, and (b) no condition, event or act exists which, with notice or lapse of time, or both, would constitute an Event of Default; or (c) if any such condition, event or act exists, specifying same.

## ARTICLE 9.

## TERMINATION RIGHTS

**9.01 Additional Termination Rights of Borough** In the event that the Redeveloper substantially abandons or suspends construction of the Project for a period in excess of One Hundred Eighty (180) Days as a result of a Tolling Event not caused by the act or omission of the Borough hereunder or a period in excess of One Hundred Twenty (120) Days not resulting from the occurrence of Event of Force Majeure or other Tolling Event, then, whether or not an Event of Default by the Redeveloper has been declared by the Borough, the Borough shall have the right to terminate this Agreement.

Nothing in this Section 9.01 shall prevent the Borough from declaring that an Event of Default by the Redeveloper hereunder has occurred or from pursuing any of its other remedies hereunder.

## . ARTICLE 10.

## INTENTIONALLY OMITTED

## ARTICLE 11.

## DELAYS

**11.01. Force Majeure.** For the purposes of any of the provisions of this Agreement, neither the Borough nor Redeveloper, as the case may be, nor any successor in interest, shall be considered in breach of, or in default with respect to its obligations hereunder because of any delay in the performance of such obligations arising from an Event of Force Majeure as defined herein. It is the purpose and intent of this provision that in the event of the occurrence of any such enforced delay, the time or times for performance of the obligations of the Borough or Redeveloper shall be extended for the period of the delay.

**11.02 Notice of Event of Force Majeure.** The Party who seeks the benefit of the above described modification/extension shall, within Thirty (30) Days after that Party's actual discovery of any such Event of Force Majeure or other Tolling Event, notify the other Party in writing of the Event of Force Majeure or the Tolling Event, and of the cause(s) thereof, and therein a modification/extension of the term and an extension for the period of the enforced delay. The performance or non-performance by the Parties or either of them of any obligation, requirement, commitment or responsibility set forth in this Agreement shall not be deemed to be the Event of Default pursuant to this Agreement where such performance, failure of performance or delay in performance is/are the result of an Event of Force Majeure or other Tolling Event; provided, however, that the Event of Force Majeure or other Tolling Event was not the result of any unlawful action or non-action of the Party relying on such Event of Force Majeure or other Tolling Event as justification for the non-performance, failure of performance or delay in performance of the subject obligation, requirement, commitment or responsibility. Where either Party alleges that as a result of an Event of Force Majeure or a Tolling Event the aggrieved Party is unable to perform or not perform any aspect of this Agreement, the aggrieved Party shall send proper written notice to the other identifying the Event of Force Majeure or Tolling Event alleged to have occurred.

## ARTICLE 12.

## CONTINGENCIES

**12.01 Governmental Approvals Contingency.** In addition to the terms and conditions concerning the Redeveloper's obligation to obtain Governmental Approvals:

(1)    Redeveloper agrees to proceed in good faith and at its own cost and expense to obtain all Governmental Approvals to develop and construct the Project in accordance with the Redevelopment Project Schedule. Redeveloper agrees that it shall not seek any use variances pursuant to N.J.S.A. 40:55D-70(d) in connection with its applications for the Governmental Approvals.

31

(2) No Governmental Approval shall be deemed "final" until (i) the time for all appeals has run without the filing of an such appeal or (ii) in the event an appeal is filed, all such appeals have been resolved fully in favor of Redeveloper and the time for filling any further appeals has expired without the filling of any such appeals.

(3) In the Event that Redeveloper's application for any Governmental Approval is denied, Redeveloper shall have the option, in its sole discretion, to appeal that denial at Redeveloper's sole cost and expense.

(4) In the event that any application by Redeveloper for a Governmental Approval is denied and either (i) the time for appeal has expired without Redeveloper filing an appeal from such denial or (ii) Redeveloper has filed an appeal from such denial and said appeal has been resolved against Redeveloper, either party shall have the option to terminate this Agreement by providing notice to the other party to that effect.

(5) In the event the Borough is unable to purchase and/or acquire properties Redeveloper could not purchase, Redeveloper shall have the right to terminate this Agreement.

## ARTICLE 13.

## COOPERATION AND COMPLIANCE

**13.01. Implementation of Agreement and Redevelopment Plan.** The parties hereto agree to cooperate with each other and to provide all necessary and reasonable documentation, certificates and consents in order to satisfy the terms and conditions hereof and the terms and conditions of the Plan. The Borough further agrees to cooperate as may be reasonably requested by any mortgagee of the Redeveloper in connection with obtaining financing for the Project; provided, however, that all Borough Costs associated with such action shall be borne by the Redeveloper.

## ARTICLE 14.

## MISCELLANEOUS

**14.01. Conflict of Interest.** No member, official or employee of the Borough shall have any direct or indirect interest in this Redevelopment Agreement, nor participate in any decision relating to the Agreement that is prohibited by law.

**14.02. No Consideration For Agreement.** The Redeveloper warrants it has not paid or given, and will not pay or give, any third person any money or other consideration for obtaining this Redevelopment Agreement, other than normal costs of conducting business and costs of professional services such as architects, engineers, financial consultants and attorneys. The Redeveloper further warrants it has not paid or incurred

32

any obligation to pay any officer or official of the Borough, any money or other consideration for or in connection with this Redevelopment Agreement.

**14.03. Non-Liability of Officials and Employees of the Borough.** No member, official or employee of the Borough shall be personally liable to the Redeveloper, or any successor in interest, in the event of any default or breach by the Borough, or for any amount which may become due to the Redeveloper or its successor, or on any obligation under the terms of this Redevelopment Agreement.

**14.04. Non-Liability of Officials and Employees of the Redeveloper.** No member, officer, shareholders, director, partner or employee of the Redeveloper, and no member, officer, shareholders, director, partner or employee of the members of the Redeveloper or the members of the Redeveloper shall be personally liable to the Borough, or any successor in interest, in the event of any default or breach by the Redeveloper or for any amount which may become due to the Borough, or their successors, on any obligation under the terms of this Redevelopment Agreement.

**14.05. Inspection of Books and Records.**

(1) The Borough shall have the right at all reasonable times to inspect the books and records of the Redeveloper pertinent to the purposes of this Redevelopment Agreement, including but not limited to construction contracts, books and records, leases, insurance policies, and agreements.

(2) The Redeveloper shall have the right at all reasonable times to inspect the books and records of the Borough pertinent to the purposes of this Redevelopment Agreement.

(3) Such inspections must be performed at a time and in a manner as to not unreasonably interfere with the business operations of the party whose books and records are being inspected and be for a legitimate business purpose affecting the material interest of the party seeking the inspection.

**14.06. Approvals by the Borough and the Redeveloper.** Wherever this Redevelopment Agreement requires the approval or consent of the Borough or the Redeveloper, or any officers, agents or employees of either the Borough or the Redeveloper, such approval shall not be unreasonably withheld or conditioned, and approval or disapproval shall be given within the time set forth in this Agreement, or, if no time is given, within fifteen (15) days, unless formal action of the Governing Body is required, in which case, within forty five (45) days.

**14.07. Modification of Agreement.** No modification, waiver, amendment, discharge, or change of this Redevelopment Agreement shall be valid unless the same is in writing, duly authorized, and signed by the Redeveloper and the Borough.

**14.08. Notices and Demands.** A notice, demand or other communication under this Agreement by any party to the other shall be sufficiently given or delivered if dispatched by United States Registered or Certified Mail, postage prepaid and return receipt requested, or delivered by overnight courier or delivered personally (and receipt acknowledged) to the parties at their respective addresses set forth herein, or at such other address or addresses with respect to the parties or their counsel as any party may, from time to time, designate in writing and forward to the others as provided in this Section 14.08. Notice shall be effective upon the earlier of receipt or refusal.

**BOROUGH OF EMERSON AGENCY**
Robert Hoffmann, Borough Administrator
Municipal Building
146 Linwood Avenue
Emerson, New Jersey 07630

With a copy to:

Douglas F. Doyle
DeCotiis, Fitzpatrick, & Cole, LLP
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666
Facsimile Number 201-928-0588

And

Emerson Redevelopers, LLC and JMF Properties
c/o JMF Properties
80 S. Jefferson,
Whippany, NJ 07981

With a copy to:

Carl Kemph
6 Hampshire Court
Springfield, NJ 07081

**14.9    Title of Articles and Sections.** The titles of the several Articles and Sections of this Agreement, as set forth in the Table of Contents or at the heads of said Articles and Sections, are inserted for convenience of reference only and shall be disregarded in construing or interpreting any of its provisions.

**1410. Severability.** The validity of any Articles, clause or provision of this Agreement shall not affect the validity of the remaining Articles, clauses or provisions hereof.

**14.11. Successors Bound.** This Agreement shall be binding upon the respective parties hereto and their successors and assigns provided however, that this Agreement may not be assigned by either party during the Construction Period.

**14.12. Governing Law.** This Agreement shall be governed by and construed by the laws of the State of New Jersey. Any legal action filed in this matter shall be heard in Superior Court of New Jersey, Bergen County Vicinage.

**14.13. Borough Approvals.** All approvals or disapprovals required by the Borough shall, unless otherwise stated herein, be valid if given in writing by the Mayor or his designee.

**14.14. Counterparts.** This Agreement may be executed in counterparts. All such counterparts shall be deemed to be originals and together shall constitute but one and the same instrument.

**14.15. Exhibits.** Any and all Exhibits annexed to this Agreement are hereby made a part of this Agreement by this reference thereto.

**14.16. Reporting.** Notwithstanding anything contained herein to the contrary, Redeveloper's reporting requirement as to progress of construction shall be the reports required in **Exhibit C.**

**14.17. Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior oral and written agreements between the parties with respect to the subject matter hereof.

**14.18. Effective Date.** Anything herein contained to the contrary notwithstanding, the effective date of this Agreement shall be the date this Agreement has been last executed by either the Redeveloper or Borough whichever party shall execute last.

**14.19. Review by Counsel.** This Agreement shall be construed and enforced in accordance with the laws of the State of New Jersey without regard to or any presumption or other rule requiring construction against the party drawing or causing this Agreement to be drawn since counsel for both the Redeveloper and the Borough have combined in their review and approval of same.

**14.20. Eminent Domain** The Borough agrees that it will not exercise any powers of eminent domain against the Property that is owned or controlled by EMRED or its transferee, unless EMRED breaches this Agreement or is otherwise in default, in which case, EMRED waives its right to object to or challenge the Borough's right to acquire EMRED's property through eminent domain.

**14.21. First Source Employment.** Until the issuance of the Certificate of Completion Redeveloper shall make good faith efforts to employ, and shall provide in its

contracts with its General Contractors that they must make good faith efforts to employ qualified residents of the Borough in the construction of the Project. Redeveloper's good faith efforts will include without limitation cooperating with the Borough in job fairs and similar endeavors and giving adequate consideration to potential employees and businesses as referred by the Borough. In addition, consistent with market wages and to the extent it is commercially feasible, Redeveloper shall make good faith efforts that qualified residents of the Borough and businesses located in the Borough are afforded a fair opportunity to be employed in the operation of the Project. Inclusion of the requirements of this section in Redeveloper's general contract agreements shall fully satisfy this obligation of Redeveloper under this section. Redeveloper, in its sole discretion, shall determine if, and the extent to which, it shall employ qualified residents of, or businesses located in, the Borough, and the extent, if at all, to which Redeveloper shall use union labor for the construction of the Project.

**14.22. Equal Employment Opportunity.** The Redeveloper agrees that during the construction of the Improvements:

(a)    To the extent required by Applicable Law, the Redeveloper will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The Redeveloper will take affirmative action to insure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to, the following: employment, upgrading, demotion, or transfer, recruitment or recruitment advertising, layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The Redeveloper agrees to post in conspicuous places, available to employees and applicants for employment, notices setting forth the provisions of this nondiscrimination clause and any such notices provided by the Borough which are consistent therewith.

(b)    To the extent required by Applicable Law, the Redeveloper will, in all solicitations or advertisements for employees placed by or on behalf of the Redeveloper state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(c)    To the extent required by Applicable Law, subcontractors and suppliers to the Project shall to the extent that it is commercially feasible include qualified and certified minority enterprises.

(d)    To the extent required by the Applicable Law, the obligations in this Section shall be binding on all contractors and subcontractors to the extent that any work is done by any contractor or subcontractor, and any contract entered into by the Redeveloper shall so provide.

**14.23 Drafting Ambiguities; Interpretation.** In interpreting any provision of this Agreement, no weight shall be given to, nor shall any construction or interpretation be influenced by, the fact that counsel for one of the Parties drafted this Agreement, each

Party acknowledging that it and its counsel have had an opportunity to review this Agreement and have contributed to the final form of same.

**14.24  Withholding of Approvals.**  All approvals, consents and acceptances required to be given or made by any Person or party, shall not be unreasonably withheld or delayed.

**14.25  Recitals Incorporated; Definitions Incorporated.** The Recitals to this Agreement and the Definitions contained in this Agreement are incorporated by reference into this Agreement, as if set forth at length herein.

**14.26  Limitation on Liability.** Notwithstanding anything to the contrary in this Agreement, any liability(ies), commitments, obligations and/or responsibility or responsibilities of any type or kind whatsoever (whether actual, contingent, consequential or otherwise) (hereinafter referred to collectively as "Liability") of the Redeveloper in, resulting from, or relating in any way to this Agreement shall be those of the Redeveloper only. Nothing in this Agreement, arising out of, or related in any way to this Agreement or to the Project or any aspect thereof shall, in any way, give the Borough or any other Person recourse to, or be construed to impose, directly or indirectly, any Liability on any Person other than the Redeveloper.

The foregoing limitation on Liability shall apply to, but is not limited to, (i) any Affiliate of the Redeveloper or of the Redeveloper's members, (ii) any member, shareholder, manager, officer, director, partner, managing member, vendor, venturer, trustee, employee, agent, and/or other representative (hereinafter collectively referred to as the "Agent") of the Redeveloper or of the Redeveloper's members, (iii) any Agent of any Affiliate of the Redeveloper or of the Redeveloper's members, (iv) any Affiliate of any Agent of the Redeveloper or of the Redeveloper's members, (v) any Agent of any Agent of the Redeveloper or of the Redeveloper's members, (vi) any Person directly or indirectly holding, controlling and/or owning any interest in the Redeveloper or in the Redeveloper's members, in any Agent or Affiliate of the Redeveloper or of the Redeveloper's members, in any Agent of any Affiliate of the Redeveloper or of the Redeveloper's members, and/or in any Affiliate of any Agent of the Redeveloper or of the Redeveloper's members, and/or (vii) any successors and/or assigns of any of the Parties referenced in subsections (i) through (vi), above unless the Parties have assumed an interest in the Project in accordance with a Permitted Transfer and Article 6 hereof.

The Borough understands and acknowledges that its respective acceptance of the Limitation on Liability set forth in this Section is a condition precedent to the Redeveloper's execution of this Agreement and constitutes specifically bargained-for consideration. The terms of this Section shall in no way limit the indemnification of the Borough as provided for in Article 5 hereof.

**14.27  Borough's Limitation on Liability.**  Any liabilities, obligations or responsibilities of any type or kind (contingent or otherwise) herein are solely those of the Borough. No member, director, employee, officer, representative or agent of the

Borough shall be liable to the Redeveloper or any other Person for any matter arising out of or related to the payment or performance of any such liabilities, obligations or responsibilities of the Borough in this Agreement.

**14.28  Limitation on Third Parties.** Nothing in this Agreement is intended to nor shall create any rights for or confer any benefits on any third person or party.

**14.29 No Brokerage Commissions.** The Borough and the Redeveloper each represent one to the other that no real estate broker initiated, assisted, negotiated or consummated this Agreement as broker, agent, or otherwise acting on behalf of either the Borough or the Redeveloper, and the Borough and the Redeveloper shall indemnify each other with respect to any claims made by any person, firm or organization claiming to have been so employed by the indemnifying party.

**14.30 Maintenance.** The Redeveloper shall be responsible for the maintenance and security of each parcel of property contained within the Property subject to the terms of this Agreement subsequent to its acquisition of title to each such parcel of property and until such time as the Redeveloper no longer owns or leases the Property or any portions thereof.

**14.31 Lender Changes.** If the Redeveloper's Financial Institution(s) requires modifications of the terms of this Agreement, the Borough shall reasonably cooperate with the Redeveloper in approving such modifications, so long as such modifications, do not materially and substantially change the rights or obligations of the Borough as set forth in this Agreement and, in the reasonable opinion of the Borough, do not materially impair the objectives and interest of the Borough or render the completion of the Project or any Phase thereof in jeopardy.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be properly executed and their corporate seals affixed and attested as of the date first written above.

**BOROUGH OF EMERSON**

By: _____
    Name: Louis Lamatina
    Title:  Mayor

**REDEVELOPER**
**EMERSON REDEVELOPERS URBAN RENEWAL, LLC**

By: _____
    Name: Joseph Forgione
    Title:  Managing Member

## EXHIBIT A
### Property Description

| Property Owner | Block | Lots | Property Address |
|---|---|---|---|
| Angelo and Jane Giambona | 419 | 1 | 19 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 2 | 15 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 3 | 9 Lincoln Blvd. |
| 214 Kinderkamack, LLC | 419 | 4 | 214 Kinderkamack |
| Borough of Emerson | 419 | 7 | |
| Dolores, Della Volpe Trste | 419 | 6.01 | 190 Kinderkamack |
| Yaghoob Pousty | 419 | 6.02 | 184 Kinderkamack |
| 182 Emerson, LLC | 419 | 8 | 182 Kinderkamack |
| 182 Emerson, LLC | 419 | 10 | 78 Linwood |

**Exhibit B**

**Concept Plan**





Exhibit C

Project Schedule and Reporting Requirements

**Project Schedule**

By Redeveloper - Attached

**Reporting Requirements:**

Based on the attached Project Schedule, in addition, on or before the first day of each month after the Commencement Date, redeveloper shall provide report for the prior month to date identifying the following:

1. Status of property acquisition (if still applicable).
2. Status of application to Land Use Board (if still applicable);
3. Status of posting bonds and schedule for Commencement Date (if applicable);
4. Public Improvements performed to date;
5. Other private improvements performed to date;
6. Schedule for Public Improvements and non-public work to be performed in the following month;
7. Anticipated Completion Date and any explanation of revisions to the Anticipated Completion date from previous Monthly Reports;

# EMERSON MIXED USED DEVELOPMENT
## KINDERKAMACK ROAD, EMERSON, NEW JERSEY
### PRELIMINARY CONSTRUCTION SCHEDULE

| ID | Task Name | Duration | Start | Finish |
|---|---|---|---|---|
| 1 | Issuance Of Permit | 1 day | Mon 3/13/17 | Mon 3/13/17 |
| 2 | CONSTRUCTION | 519 days | Tue 3/14/17 | Fri 3/8/19 |
| 3 | Demolition | 20 days | Tue 3/14/17 | Mon 4/10/17 |
| 4 | Sitework | 489 days | Tue 4/11/17 | Fri 3/8/19 |
| 5 | Concrete | 90 days | Mon 5/22/17 | Fri 5/22/17 |
| 6 | Parking Structure | 274 days | Mon 5/22/17 | Thu 6/7/18 |
| 7 | Rough Carpentry | 90 days | Mon 6/25/17 | Fri 12/8/17 |
| 8 | Masonry | 90 days | Mon 1/29/18 | Fri 6/1/18 |
| 9 | Roofing | 90 days | Mon 1/29/18 | Fri 3/9/18 |
| 12 | Doors | 30 days | Mon 1/29/18 | Fri 3/9/18 |
| 14 | Drywall | 110 days | Mon 1/29/18 | Fri 6/29/18 |
| 15 | Elevators | 60 days | Mon 1/29/18 | Fri 4/20/18 |
| 16 | Fire Protection | 250 days | Mon 1/29/18 | Fri 3/9/19 |
| 21 | Plumbing | 250 days | Mon 1/29/18 | Fri 3/9/19 |
| 22 | HVAC | 250 days | Mon 1/29/18 | Fri 3/9/19 |
| 23 | Electrical | 250 days | Mon 1/29/18 | Fri 3/9/19 |
| 24 | Millwork | 90 days | Mon 1/29/18 | Fri 11/2/18 |
| 10 | Finish Carpentry | 170 days | Mon 7/2/18 | Fri 2/22/19 |
| 11 | Metal Panels | 20 days | Mon 7/2/18 | Fri 1/11/19 |
| 13 | Windows and Glass | 60 days | Mon 12/17/18 | Fri 3/8/19 |
| 15 | Painting | 40 days | Mon 12/17/18 | Fri 2/8/19 |
| 19 | Ceramic Tile | 70 days | Mon 12/3/18 | Fri 3/8/19 |
| 18 | Flooring | 70 days | Mon 12/3/18 | Fri 3/8/19 |



| Project: Emerson Preliminary Schedule | Task | Milestone | Summary | External Tasks | Deadline |
|---|---|---|---|---|---|
| Date: Thu 03/6/15 | Split | Progress | Project Summary | External Milestone | |

Page 1

Exhibit E

Funding Agreement

FUNDING AGREEMENT

THIS FUNDING AGREEMENT is dated this _6_ day of ~~April~~ *May* 2016 among the BOROUGH OF EMERSON, a municipal corporation with offices at 146 Linwood Ave., Emerson, NJ 07630 (the "Borough") and EMERSON REDEVELOPERS, LLC, with offices located at 80 S. Jefferson Road, Suite 202, Whippany, NJ 07981 (hereinafter referred to as "ERD");

W-I-T-N-E-S-S-E-T-H:

WHEREAS, ERD seeks to redevelop the following property located in the Borough of Emerson identified on the Tax Maps of the ~~Township~~ *Borough* as Block _419_ ; Lots 1,2,3,4,6.01, 6.02, 8, +10 (the "Property"); and

WHEREAS, the Borough wishes to designate a redeveloper for the Redevelopment Area encompassing the Property; and

WHEREAS, ERD proposes to design, develop, finance and construct 134 units and 13,000 square feet of retail space ("the Project") and accordingly has requested the Borough consider appointing ERD as redeveloper for the Property; and

WHEREAS, ERD has agreed to pay the Application Fee as set forth herein and bear the costs for the Borough's professionals to assist the Borough in reviewing, among other things, whether ERD should be designated redeveloper for the Property, and in connection therewith has agreed to establish an escrow fund with the Borough to provide for the payment of professional fees, costs and expenses related thereto incurred by the Borough (the "Interim Costs");

NOW, THEREFORE, for and in consideration of the mutual promises, representations, covenants and agreements contained herein and the undertakings of each Party to the other and such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby and to bind its successors and assigns, do mutually promise, covenant and agree as follows:

1.    **Payment of Interim Costs.**

Immediately upon the execution of this Funding Agreement, ERD shall pay Ten Thousand Dollars ($10,000) (the "Escrow") to the Borough and the Borough shall deposit such funds into an escrow account established by it for the payment of the Interim Costs. Prior to the Borough's withdrawal of funds from the Escrow for the payment of the Interim Costs, the Borough shall provide ERD with a copy of each invoice reflecting Interim Costs to be paid. Unless ERD promptly (within fifteen (15) days of its receipt of any such copy) provides a written objection to any invoiced item as not being an Interim Cost, the Borough shall be free to withdraw funds from the Escrow for the payment of such invoiced services. If, when and as

1908805

often as may occur that the Escrow is drawn down to or below Three Thousand Five Hundred Dollars $3,500 then ERD, upon the Borough's request, shall immediately provide to the Borough for deposit an additional amount sufficient to replenish the escrow to Ten Thousand Dollars ($10,000) for use in accordance with these terms.

Interim Costs, for the purposes of this Funding Agreement, shall include the reasonably incurred out-of-pocket fees, costs and expenses incurred by the Borough (both before and after execution hereof) in reviewing the proposed development of the Property, including, but not limited to, fees for legal, engineering, planning and financial advisory services, including subsequent investigations and studies as may be reasonably determined and agreed to by the parties.

2.    Application Fee -- Prior to the execution of a formal Redeveloper's Agreement the Borough shall imposes a non-refundable fee in an amount to be determined based on the final concept plan, with any adjustment to the fee to be paid, if appropriate, when the Redevelopment Agreement is executed.

3.    Notice. Any notice provided to the Borough hereunder shall be submitted in writing to:

Jane Dietsche, RMC, Borough Clerk
146 Linwood Ave.
Emerson, NJ 07630

with copies to:

Douglas F. Doyle
Decotiis, Fitzpatrick & Cole, LLP
Glenpointe Centre West
500 Frank W. Burr Blvd, Suite 31
Teaneck, NJ 07666

Notices to ERD shall be submitted in writing to:

Emerson ReDevelopers, LLC
Attn: Kevin X. Codey, Vice President of Land Acquisitions
80 South Jefferson Road, Suite 202
Whippany, NJ 07981

with copies to:

Carleton R. Kemph, Esq.
6 Hampshire Court
Springfield, NJ 07081

1908805

4.    General.- This Funding Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings between the parties. This Funding Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

IN WITNESS WHEREOF, the Parties hereto have caused this Funding Agreement to be executed, all as of the date first above written.

BOROUGH OF EMERSON

BY: _____
Louis J. Lamatina, Mayor

Witness:

By: _____
Jane Dietsche, RMC, Borough Clerk

AND

EMERSON REDEVELOPERS, LLC

BY: _____
Name: GIUSEPPI FORGIONE
Title: MANAGING MEMBER

1908805

**Exhibit F**
**Offsite/Onsite Improvement Share**

DEVELOPER ESTIMATE

BOROUGH OF EMERSON, KINDERKAMACK ROAD PROJECT

ROAD CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY BERGEN COUNTY

1. Cost share estimate items, # 1-25,  portion of the 30 % costs borne by Borough  =  $13,200
2. Roadway widening & excavation, 3 feet wide X 900 feet frontage, 2,700 SF = 300 SY X $100/ SY
   = $30,000
3. Milling, centerline to existing curbline, 15 feet wide X 900 feet frontage, 13,500 SF / 9
   = 1,500 SQ X $4 SY =        = $ 6,000
4. Paving, centerline to existing curbline, 15 feet wide X 900 feet frontage, 13,500 SF / 70
   = 195 Tons X $75 / Ton =        = $14,625
5. Concrete curb with excavation, 900 LF X $25/ LF        = $22,500
6. Concrete sidewalk with excavation, 4 FT X 900 LF= 3,600 SF = 400 SY X $60/ SY
   = $24,000
7. Drainage changes for road widening, 3 X $6,000        = $18,000
8. Traffic control during construction, signs, barricades & police        = $33,000
9. Traffic Signs        = $ 1,000
10. Pavement striping, markings and eradication        = $10,000
11. Relocate traffic signal pole and foundation at Linwood Ave.        = $20,000
12. Topsoil and seeding, between curb and  sidewalk        = $ 5,000
13. Linwood Ave railroad crossing contribution, ( portion of  $410,000 NJ Transit Estimate)
   = $61,500

                           *Bergen County Total*        *=$258,825*

                           10% Contingency        <u>Say $285,000</u>

CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY EMERSON

1. 42 inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF X $225/ LF        = $146,250
2. Lincoln Ave drainage work, upsize pipes        = $ 10,000
3. 3 New drainage chambers, 42 inch pipe, 3 X $7,000        = $ 21,000
   STREETSCAPE ITEMS
4. Expand Paver Sidewalks, 6 FT Add. X 900 FT = 5,400 SF= 600 SY X $120/ SY        = $ 72,000
5. Streetscape Lighting, 9 Lights and wiring at $7,000/ each        = $ 63,000
6. Street trees, 5 X $ 500        = $  2,500
7. Amenities, benches, trash receptacles        = $ 10,000
                           *Emerson Total*        *= $ 324,750*
                           10 % Contingency        Say    $ 357,000

                           _____
                           *Total Estimate*        $ 642,000

Soft Costs, including surveying, engineering, attorney fees, property acquisition, utility layout, test pits, etc.
                                           $  75,000
                           *TOTAL*        $ 717,000

**Exhibit G**
**Storm Water Pipe**

1. 42 Inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF
2. Lincoln Ave drainage work, upsize pipes
3. 3 New drainage chambers, 42 inch pipe

November 27, 2017
Page 13

EXHIBIT C: 2017 INCOME LIMITS

*Prepared by Affordable Housing Professionals of New Jersey (AHPNJ) - August 2017*

### 2017 AFFORDABLE HOUSING REGIONAL INCOME LIMITS BY HOUSEHOLD SIZE

Income limits not officially adopted by the State of New Jersey. Contact your municipality to see if applicable in your jurisdiction. Additional information about AHPNJ income limits is posted on AHPNJ.org

| | | 1 Person | *1.5 Person | 2 Person | *3 Person | 4 Person | *4.5 Person | 5 Person | 6 Person | 7 Person | 8+ Person | Max Increase Rents** | Max Increase Sales*** | Regional Asset Limit**** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Region 1** Bergen, Hudson, Passaic and Sussex | Median | $60,271 | $64,576 | $68,882 | $77,492 | $86,102 | $89,546 | $92,990 | $99,878 | $106,766 | $113,655 | | | |
| | Moderate | $48,217 | $51,661 | $55,105 | $61,993 | $68,882 | $71,637 | $74,392 | $79,903 | $85,413 | $90,924 | 1.7% | 1.99% | $166,493 |
| | Low | $30,136 | $32,288 | $34,441 | $38,746 | $43,051 | $44,773 | $46,495 | $49,939 | $53,383 | $56,827 | | | |
| | Very Low | $18,081 | $19,373 | $20,664 | $23,248 | $25,831 | $26,864 | $27,897 | $29,963 | $32,030 | $34,096 | | | |
| **Region 2** Essex, Morris, Union and Warren | Median | $65,953 | $70,663 | $75,374 | $84,796 | $94,218 | $97,987 | $101,755 | $109,298 | $116,830 | $124,368 | | | |
| | Moderate | $52,762 | $56,531 | $60,299 | $67,837 | $75,374 | $78,389 | $81,404 | $87,434 | $93,464 | $99,494 | 1.7% | 3.25% | $180,756 |
| | Low | $32,976 | $35,332 | $37,687 | $42,398 | $47,109 | $48,993 | $50,878 | $54,646 | $58,415 | $62,184 | | | |
| | Very Low | $19,786 | $21,199 | $22,612 | $25,439 | $28,265 | $29,396 | $30,527 | $32,788 | $35,049 | $37,310 | | | |
| **Region 3** Hunterdon, Middlesex and Somerset | Median | $73,780 | $79,050 | $84,320 | $94,860 | $105,400 | $109,616 | $113,832 | $122,264 | $130,696 | $139,128 | | | |
| | Moderate | $59,024 | $63,240 | $67,456 | $75,888 | $84,320 | $87,693 | $91,066 | $97,811 | $104,557 | $111,302 | 1.7% | 0.38% | $200,698 |
| | Low | $36,890 | $39,525 | $42,160 | $47,430 | $52,700 | $54,808 | $56,916 | $61,132 | $65,348 | $69,564 | | | |
| | Very Low | $22,134 | $23,715 | $25,296 | $28,458 | $31,620 | $32,885 | $34,150 | $36,679 | $39,209 | $41,738 | | | |
| **Region 4** Mercer, Monmouth and Ocean | Median | $66,022 | $70,738 | $75,454 | $84,885 | $94,317 | $98,090 | $101,862 | $109,408 | $116,953 | $124,498 | | | |
| | Moderate | $52,817 | $56,590 | $60,363 | $67,908 | $75,454 | $78,472 | $81,490 | $87,526 | $93,562 | $99,599 | 1.7% | 1.53% | $177,413 |
| | Low | $33,011 | $35,369 | $37,727 | $42,443 | $47,158 | $49,045 | $50,931 | $54,704 | $58,476 | $62,249 | | | |
| | Very Low | $19,807 | $21,221 | $22,636 | $25,466 | $28,295 | $29,427 | $30,559 | $32,822 | $35,086 | $37,349 | | | |
| **Region 5** Burlington, Camden and Gloucester | Median | $58,240 | $62,400 | $66,560 | $74,880 | $83,200 | $86,528 | $89,856 | $96,512 | $103,168 | $109,824 | | | |
| | Moderate | $46,592 | $49,920 | $53,248 | $59,904 | $66,560 | $69,222 | $71,885 | $77,210 | $82,534 | $87,859 | 1.7% | 2.09% | $154,194 |
| | Low | $29,120 | $31,200 | $33,280 | $37,440 | $41,600 | $43,264 | $44,928 | $48,256 | $51,584 | $54,912 | | | |
| | Very Low | $17,472 | $18,720 | $19,968 | $22,464 | $24,960 | $25,958 | $26,957 | $28,954 | $30,950 | $32,947 | | | |
| **Region 6** Atlantic, Cape May, Cumberland, and Salem | Median | $51,085 | $54,734 | $58,383 | $65,681 | $72,979 | $75,898 | $78,817 | $84,655 | $90,494 | $96,332 | | | |
| | Moderate | $40,868 | $43,787 | $46,706 | $52,545 | $58,383 | $60,718 | $63,054 | $67,724 | $72,395 | $77,066 | 1.7% | 0.00% | $136,880 |
| | Low | $25,543 | $27,367 | $29,192 | $32,840 | $36,489 | $37,949 | $39,409 | $42,328 | $45,247 | $48,166 | | | |
| | Very Low | $15,326 | $16,420 | $17,515 | $19,704 | $21,894 | $22,769 | $23,645 | $25,397 | $27,148 | $28,900 | | | |

Moderate income is between 80 and 50 percent of the median income. Low income is 50 percent or less of median income. Very low income is 30 percent or less of median income.

\* These columns are for calculating the pricing for one, two and three bedroom sale and rental units as per N.J.A.C. 5:80-26.4(a).

\*\*This column is used for calculating the pricing for rent increases for units as per N.J.A.C. 5:97-9.3. The increase for 2015 was 2.3%, the increase for 2016 was 1.1% and the increase for 2017 is 1.7% (Consumer Price Index for All Urban Consumers (CPI-U): Regions by expenditure category and commodity and service group). Landlords who did not increase rents in 2015 or 2016 may increase rent by up to the applicable combined percentage from their last rental increase for that unit. In no case can rent for any particular apartment be increased more than one time per year.

\*\*\* This column is used for calculating the pricing for resale increases for units as per N.J.A.C. 5:97-9.3. As per 5:97-9.3,(b), The price of owner-occupied low and moderate income units may increase annually based on the percentage increase in the regional median income limit for each housing region. In no event shall the maximum resale price established by the administive agent be lower than the last recorded purchase price.

Low income tax credit developments may increase based on the low income tax credit regulations.

\*\*\*\* The Regional Asset Limit is used in determining an applicant's eligibility for affordable housing pursuant to N.J.A.C. 5:80-26.16(b)3.

Note: Since the Regional Income Limits for Region 6 in 2016 were higher than the 2017 calculations, the 2016 income limits will remain in force for 2017. See N.J.A.C. 5:97-9.2(c).

Exhibit 22

MIN No. 22 APPROVED FOR RELEASE & CONTENT 12-5-17

D-23



**MINUTES
BOROUGH OF EMERSON
MAYOR AND COUNCIL**
November 21, 2017
7:30 P.M.
**Borough Hall-Council Chambers**
Emerson, NJ 07630



I.  Mayor Lamatina called the meeting to order at 7:30 p.m. and identified the emergency exits.

II.  ROLL CALL

Mayor Lamatina asked Ms. Dietsche to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilwoman DiPaola, Councilman Downing, Councilman Falotico, Council President Knoller, Councilman Lazar

**Absent**: Councilman Worthington

Also present were Councilman-Elect Jim Bayley, Borough Administrator Robert Hoffmann, Borough Attorney Wendy Rubinstein and Borough Clerk Jane Dietsche and representatives from the Axis Architectural Group: Architects Joseph Cecco, Piero Gabucci and Steve Lazarus, and Planner Ken Shier.

III.  EXCUSED ABSENCE OF GOVERNING BODY MEMBER
- Excuse the absence of Council President Knoller and Councilman Falotico from the Regular Meeting of October 17, 2017

   ☞**Motion** to excuse the absence of Council President Knoller and Councilman Falotico from the Regular Meeting of October 17, 2017 was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried unanimously.

IV.  PROCLAMATIONS & CITATIONS
- 100th Birthday Proclamation – Evelyn Aronson

V.  APPOINTMENTS/RESIGNATIONS
- Emerson Volunteer Fire Department
   o  Appointment of Ryan Smith as a Cadet Member

      ☞**Motion** to appoint Ryan Smith as a Cadet Member of the Emerson Fire Department was **moved** by Councilman Downing, **seconded** by Councilman Lazar and carried unanimously.

   o  Appointment of Zachary Miros as a Probationary Member

      ☞**Motion** to appoint Zachary Miros as a Probationary Member of the Emerson Volunteer Fire Department was **moved** by Councilman Falotico, **seconded** by Councilman Downing and carried unanimously.

MIN No. 22 APPROVED FOR RELEASE & CONTENT 12-5-17

o   Appointment of Timothy Murphy as a Probationary Member

☞**Motion** to appoint Timothy Murphy as a Probationary Member of the Emerson Volunteer Fire Department was **moved** by Councilman Falotico, **seconded** by Councilman Lazar and carried unanimously.

VI.   MINUTES FOR APPROVAL
- Regular and Closed Session Meeting Minutes of October 17, 2017

☞**Motion** to approve the Regular and Closed Session Meeting Minutes of October 17, 2017 was **moved** by Councilman Downing, **seconded** by Councilman Lazar and carried unanimously.

VII.   CORRESPONDENCE

Mayor Lamatina announced that copies of the correspondence were available in the Office of the Municipal Clerk.

- Letter dated October 6, 2017 from Williams, Re: Notification of Flood Hazard Area Individual Permit will be submitted to NJDEP for RSTM Uprate Project.
- Resolution from Bergenfield; Re: Opposition to the New Rules Regarding Employee Compensation Disclosure Proposed by the Local Finance Board
- Letter dated October 19, 2017 from NJ Bankers; Re: Listing of foreclosure properties service
- Letter dated October 19, 2017 from Board of Chosen Freeholders; Re: Bus Stop relocation on Kinderkamack Road
- NJ Transit Public Hearing Notice received October 25, 2017; Re: Programs developed pursuant to the Senior Citizen and Disabled Resident Transportation Assistance Program.
- Letter dated October 23, 2017 from PERMA Risk Management Services; Re: 2017 Dividend
- Letter dated October 25, 2017 from PERMA Risk Management Services; Re: Public Hearing – 2018 Proposed Budgets
- Public Hearing Notice received November 3, 2017 from BCUA; Re: Proposed Amendment to the Bergen County District Solid Waste Management Program.
- Letter dated October 25, 2017 from the NJ Housing and Mortgage Finance Agency; Re: Request for continued Municipal support of the Special Needs Housing Partnership Loan Program.
- Letter dated November 1, 2017 from the County Executive; Re: Application approval of funding from the Bergen County Division of Community Development.
- Emailed received on November 13, 2017 from Dr. Frank P. Varney; Re: Borough Hall preservation.
- Resolution from Borough of Allendale; Re: Widening of George Washington Bridge's sidewalks.
- Emailed received November 14, 2017 from NJ Transit; Re: Repairs at Penn Station

VIII.   FINANCIAL BUSINESS
- Resolution No. 260-17 Bill List

    ☞**Motion** to approve Resolution No. 260-17 Bill List was **moved** by Councilman Falotico, **seconded** by Councilman Lazar and carried by a roll call vote of 5-0.
    **RC: Council members:**
    **YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

IX.   UNFINISHED BUSINESS
- Presentation by Architects – DPW, Ambulance Corps, Fire Department 7:45 – 8:15 p.m.

    Architects Joseph Cecco, Piero Gabucci and Steve Lazarus, and Planner Ken Shier of Axis Architectural Group gave a preliminary presentation which outlined structural conditions at the Department of Public Works and Fire Department. They also proposed relocating both emergency service facilities, the Ambulance Corps and the Fire Department, to the Department of Public Works property. They suggested repurposing the Fire Department property on Thomas Avenue to address COAH requirements. Their cost projections for new Firehouse and Ambulance Corps structures totaled $3,565,500. The programming and cost projections for a new Department of Public Works facility totaled $2,420,000. Governing Body consensus was to address structural repair where possible due to the need to allocate funds for higher priority projects. The Axis Group was scheduled to return in February to address the second part of their study related to Borough Hall and drilling down on concept plans, priorities and recommendations.

X.   NEW BUSINESS
- Resolution No. 261-17 Authorize RFQ for Housing Administrative Agent

    ☞**Motion** to approve Resolution No. 261-17 Authorize RFQ for Housing Administrative Agent was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 5-0.
    **RC: Council members:**
    **YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

- Emerson Chamber of Commerce Presentation - President Frank DiDolci of Unity Bank and Vice-President Laura Litchult of Cradles to Crayons gave a presentation highlighting their mission and vision to revitalize the Emerson Chamber of Commerce. They also emphasized their goal to gain a stronger presence for businesses and the entire community. They asked for Governing Body input and support and hoped to create an open dialogue. Among their short term goals were upgrading their website and social media presence. Long term goals included participating in fundraisers and being a part of annual Borough events. The Governing Body was supportive of their plans and appreciative of their willingness to take the lead.

MIN No. 22 APPROVED FOR RELEASE & CONTENT 12-5-17

XI.   INTRODUCTION OF ORDINANCES

**First Reading:**

Mayor Lamatina announced that Ms. Dietsche would read the following ordinance by title and it would be further considered at a Public Hearing to be held on December 5, 2017 at 7:30 p.m. in the Council Chambers of the Borough Hall, Municipal Place, Emerson, N.J. and published in the November 24th, 2017 edition of the Ridgewood News.  He added that this ordinance was on file in the Clerk's Office and posted on the official bulletin board of the Municipal Building where copies would be available to the General Public at no charge.

**1548-17** AN ORDINANCE AMENDING THE ZONING ORDINANCE OF THE BOROUGH OF EMERSON TO INCORPORATE TWO OF THE REZONING RECOMMENDATIONS SET FORTH IN THE 2017 MASTER PLAN REEXAMINATION REPORT

☞Motion to introduce Ordinance No. 1548-17 on first reading was moved by Councilman Falotico, seconded by Council President Knoller and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO: DiPaola**

XII.   ADOPTION OF ORDINANCES

Mayor Lamatina announced that no ordinances were being adopted that evening.

XIII.   REPORTS
• Mayor and Council

Councilwoman DiPaola followed up on her discussion of televising Council meetings and requested that the Governing Body schedule a brief Special Meeting to allow Mr. Besink to outline his services. Governing Body consensus was to agree to hold a short special meeting. She would follow up to get some dates from Mr. Besink.

Councilman Falotico said he had attending the ribbon cutting ceremony for the Veteran's Housing where he, Council President Knoller, and Councilman Downing were approached by a resident requesting a fence on the property line. He was planning to meet them the following day to discuss their concern. He and Councilman Downing had attended a Board of Chosen Freeholders work session on October 18th where they had discussed the purchase of the Emerson Golf Course. He said they attended to make sure that the purchase was in the best interests of the residents and Borough. He reviewed the Environmental Protection application for the Transcontinental Gas Pipeline which passes through the Borough, mostly along the Oradell Reservoir. They proposed upgrades to increase the amount of pressure. The plans were not yet finalized and he would continue to monitor this to ensure the least impact on the Borough and its residents. He and Councilwoman DiPaola had met with the Axis Architectural Group several times before the evening's presentation. He had been approached by the Emerson Recreation Baseball program. They were looking for funding to upgrade and maintain Hillman Field including putting grass in the infield.

MIN No. 22 APPROVED FOR RELEASE & CONTENT 12-5-17

He and Mayor Lamatina had met with New Jersey Transit, the Department of Transportation, the Bergen County Engineer and the Borough Engineer on numerous occasions to discuss the timing of the light sequences on Kinderkamack Road and the preemption of the railroad safety gates. Speed indicators were supposed to be installed but had been done yet because the Westwood Station was too close to Emerson. However, after discussions, they would be installed, possibly by the end of November but first the timing of the lights and the preemption time for the gates needed to be adjusted to reduce traffic backups on Linwood Avenue, Ackerman Avenue and Kinderkamack Road. He noted that they had seen some progress and were planning to do some trial runs with a Borough fire truck to test the timing for tractor trailer sized vehicles. He had helped the Environmental Commission on their recent cleanup at Emerson Woods along Main Street, the high school and Centennial Park. Even though there were a limited number of volunteers, they had collected eight large bags of debris. He thanked members of the Emerson Key Club for their assistance including Alexa DeSantis, Tori Elek, Brianna Galaezza and Radhika Thakkar. He noted that there was landscape debris being dumped in Emerson Woods from a new home being constructed across the street as well as litter. He noted that there was a need for garbage receptacles and well as better enforcement options go curtail dumping in the woods. They were planning an analysis of the bus stops along Kinderkamack Road and hoped that the stop at Highland Avenue could be eliminated. The life expectancy of the storm and sewer drains on the vacant property on Jordan Road were being monitored with Borough Engineer Gary Ascolese to see if anything needed to be done. He congratulated Council President Knoller and Councilman-Elect Jim Bayley for winning the General Election and thanked residents for putting their faith in them. In conclusion, he noted that he had attended the New Jersey League of Municipalities convention and had taken classes to further his knowledge to assist the Borough. He had also met with numerous vendors to network and might be of assistance to the Borough in the future.

Councilman Lazar gave the October report of the Building Department and reported that the Department of Public Works had recycling metal which generated over $1,000 in funds for the Borough. Construction of the first floor Building Department was nearly complete. Leaf bag distribution had ended. On October 24th a storm caused a power outage resulting in traffic lights to go out on Kinderkamack Road, Ackerman Avenue and Linwood Avenue. Since then, they have looked into purchasing a second portable generator so that if this problem happened again, they would be able to restore the traffic signals. Street signs which had been stolen were being replaced throughout town. The DPW was getting ready for winter by preparing their snow equipment and were waiting for deliver of a smaller snow blower for clearing sidewalks which would also work as a lawnmower.

At the conclusion of Councilman Lazar's report, Councilman Falotico stated that he wanted to update the mandatory background check ordinance to close loopholes and cover all functions within the Borough rather than just Borough sponsored functions.

MIN No. 22 APPROVED FOR RELEASE & CONTENT 12-5-17

<u>Council President Knoller</u> said that the October Police Department report would be delayed. The last Community Policing event had taken place for the year – the Pasta Dinner for the Borough's senior citizens. He thanked Councilman Falotico and Councilman Downing for attending the NJSLOM convention and said they had met with many vendors and made new contacts for items pertaining to the Borough. A vendor which provided cold patch would be sending samples to test out to see if it worked better than traditional cold patch. When he and Councilman-Elect Bayley had walked through town one of the biggest issues brought to their attention was speeding. They had met a vendor who offered solar powered signs which flashed the speed limit and asked if they could be purchased with grant funding. He requested more crossing and speed alerts on Ackerman Avenue, Lincoln Boulevard and Palisade Avenue. He wished everyone a Happy Thanksgiving and hoped that they would enjoy time with family.

<u>Councilman Downing</u> congratulated Council President Knoller on his reelection and Councilman-Elect Bayley on his election to the Council. He announced that Emerson's Winter Wonderland would take place from December 6th through December 9th and would include ice skating, outdoor shops, pictures with Santa and a gift-wrapping service. The funds would be used to help Project Graduation. He hoped that the event could continue every year and that eventually there would be sufficient funds to help the Recreation Commission as well. He invited everyone to come down and enjoy the event. He said that he had made many contacts at the NJSLOM convention and gathered information about potential grant opportunities. He concluded by wishing everyone a Happy Thanksgiving.

Mayor Lamatina announced that since Councilman Worthington was absent, he had received a request from Council President Knoller to have Historic Preservation Chair Jill McGuire report on her committee.

Historic Preservation Committee Chair Jill McGuire reported that William Newman, a Rutherford historian, historic preservationist and board member of Preservation New Jersey, was a special guest speaker at their November meeting. He spoke on matters related to historic preservation in New Jersey, the significance of WPA architecture and the possibility for grant monies to preserve structures in the community. She said he was a lively speaker and all members found the information he shared very important. They were discussing moving forward with a plan to write a book on Historic Emerson to be published by Arcadia Publishers. She asked what they would need to do to move forward with this project. Ms. Rubinstein said that they might need to request funding based on the cost of publishing the book which might require approval of the Mayor and Council. Ms. McGuire also mentioned vacancies on the committee for 2018 and inquired as to how to assist to ensure that the goal of ensuring that a historic element was included in the Master Plan was reached in the near future. Emerson resident and Vietnam War veteran Jim Tobin had spoken about his war experiences during a recent meeting of the Senior Citizen Club and he was very eloquent and did a phenomenal job. She was so proud and very grateful to him. Mr. Tobin was also helping with the upcoming World War I Centennial event scheduled to take place at the Emerson Library on November 30th and suggested that he would be a great member of the committee. Councilman Lazar thanked Ms. McGuire for all her hard work after taking over the committee and doing such a great job.

MIN No. 22 APPROVED FOR RELEASE & CONTENT 12-5-17

<u>Mayor Lamatina</u> congratulated Council President Knoller on his reelection and Councilman-Elect Jim Bayley on his election to the Council. He had visited the new Veteran's Housing on Veteran's Day and informed residents what the Borough was able to do to assist them. He thanked Councilman Downing and his family for helping to decorate the Borough tree for the Winter Wonderland at Van Saun Park. Councilman Downing said the Girl Scouts asked to be included in this event in the future. The Christmas tree lighting would take place at Van Saun Park on November 25th during the event.

- Borough Administrator Robert Hoffmann reported on the following:
    - Three bids were received for garbage/recycling/yard waste services in the Borough. Eighteen packets had been sent out and the bids received would be reviewed and analyzed over the next week or so to provide a recommendation for next year.
    - An unprogrammed funds grant resolution was on the Consent Agenda. Mayor Lamatina had been made aware of it and the Borough acted quickly to apply for funds for drainage work in the Continental Woods neighborhood. Another resolution on the Consent Agenda was for Phase 3 of the grant application for drainage for $60,000.
    - He was working on a grant application for senior programs and said that the Borough was fortunate to have a wonderful group of seniors. The Community Development program had changed the requirements for the grant since last year. He had met with President Ken Roman and Joseph Giordano to look at potential programs to apply for over the next seven years. They focused on six different stages of wellness and development for seniors. They were wonderful to work with and were able to turn this around on short notice.
    - The following Tuesday, the Borough was scheduled to open bids for tree services and cleaning services. Bids for information technology services would be opened on Wednesday, December 6th.
    - He would be speaking with Councilman Lazar about 23 to 27 parks and municipal easements owned by the Borough. He and DPW Superintendent Perry Solimando had been researching using Clean Communities funds to have different groups take care of some of these sites. It would help beautify areas of town and free up additional manhours for the DPW to work on other projects.
    - He thanked Council President Knoller on his reelection and Councilman-Elect Bayley on his election to the Governing Body. He also thanked Michael Meyers for running and appreciated his willingness to participate in public service. He concluded by wishing everyone a Happy Thanksgiving.

- Borough Clerk Jane Dietsche wished everyone a Happy Thanksgiving.

- Borough Attorney Wendy Rubinstein said her report would be discussed during Closed Session.

XIV.   PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman DiPaola, **seconded** by Councilman Falotico and carried at 9:35 p.m.

<u>Gary Schwinder, 99 Linden Boulevard</u> spoke about the maintenance of lights in front of businesses and asked who was responsible for the maintenance of the grass along Forest Avenue. He wished everyone a Happy Thanksgiving.

☞**Motion** to close the meeting to comments from the public was **moved** by Councilman Downing, **seconded** by Councilman Falotico and carried at 9:39 p.m.

XV.   RESOLUTIONS ON CONSENT AGENDA NO. 262-17

Councilwoman DiPaola requested that CA 271-17 Confirming Resolution Permitting the Sale of Christmas Trees in the Stop and Shop parking lot be pulled for a separate vote.

☞**Motion** to approve Consent Agenda No. 262-17 without CA 271-17 Confirming Resolution Permitting the Sale of Christmas Trees in the Stop and Shop parking lot was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

☞**Motion** to approve Consent Agenda item CA 271-17 Confirming Resolution Permitting the Sale of Christmas Trees in the Stop and Shop parking lot only was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 4-0.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**ABSTAIN: DiPaola**

CA 263-17        Confirming Resolution Authorizing Cybersecurity Threat Analysis Study – Palendrome Technologies
CA 264-17        Refund of Tax Overpayments (4th Quarter 2017)
CA 265-17        Resolution Requesting Approval of Items of Revenue and Appropriation NJS 40a:4-87 - Community Development Block Grant - Senior Activities in the amount of $3,338.00
CA 266-17        Authorize Borough Administrator to Apply for Grant Funding for Drainage and Paving Improvements in A Low/Moderate Income Benefit Area Known as Continental Woods in the amount of $100,000
CA 267-17        Authorize Borough Administrator to Apply for Grant Funding for Drainage and Paving Improvements in A Low/Moderate Income Benefit Area Known as Continental Woods in the amount of $60,000
CA 268-17        Approve Cancellation of Completed Funded Capital Improvement Authorizations
CA 269-17        Authorizing Disposal of Surplus Property
CA 270-17        Change Order #1 NJDOT Main Street Linwood Avenue Improvements, Section 3
CA 271-17        Confirming Resolution Permitting the Sale of Christmas Trees in the Stop and Shop parking lot
CA 272-17        Authorize submission of grant application for Senior Citizen Activities in the amount of $6,000.00

MIN No. 22 APPROVED FOR RELEASE & CONTENT 12-5-17

XVI.   CLOSED EXECUTIVE SESSION - Resolution No. 273-17

Mayor Lamatina announced that #17-11/21-52 Tax Appeal Settlements was being pulled from the agenda and would be rescheduled to the December 5, 2017 Council meeting.

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 273-17 with the removal of #17-11/21-52 was **moved** by Councilman Falotico, **seconded** by Councilman Lazar and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES:  DiPaola, Falotico, Lazar, Knoller, Downing**

| #17-11/21-52 | ~~Tax Appeal Settlements~~ | ~~N.J.S.A. 10:4-7~~ |
|---|---|---|
| #17-11/21-53 | Fire Department Personnel | N.J.S.A. 10:4-8 |
| #17-11/21-54 | Affordable Housing Update | N.J.S.A. 10:4-5 |

XVII.   RECONVENE

The Borough of Emerson reserves the right to return to Open Session and, if appropriate, take formal action.

☞**Motion** to reconvene was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried at 10:50 p.m.

- Consideration of Resolution authorizing settlement of affordable housing litigation

RESOLUTION NO. 274-17 A RESOLUTION AUTHORIZING A SETTLEMENT AGREEMENT BY AND AMONG THE BOROUGH OF EMERSON AND FAIR SHARE HOUSING CENTER TO RESOLVE THE AFFORDABLE HOUSING ISSUES RAISED IN THE BOROUGH'S DECLARATORY JUDGMENT ACTION

☞**Motion** to approve Resolution No. 274-17 Authorizing a settlement agreement by and among the Borough of Emerson and Fair Share Housing Center to resolve the Affordable Housing issues raised in the Borough's Declaratory Judgment Action was **moved** by Council President Knoller, seconded by Councilman Falotico and carried by a roll call vote of 4-1.
**RC: Council members:**
**YES:  Falotico, Lazar, Knoller, Downing**
**NO:   DiPaola**

XVIII.   ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Councilwoman DiPaola, **seconded** by Council President Knoller and carried at 10:52 p.m.

Respectfully submitted,

Jane Dietsche, RMC
Borough Clerk

Exhibit 23

# MASTER'S REPORT ON A SETTLEMENT AGREEMENT AND PRELIMINARY COMPLIANCE DETERMINATION FOR THE *MOUNT LAUREL* FAIRNESS HEARING BOROUGH OF EMERSON BERGEN COUNTY, NEW JERSEY

*IMO Application of the Borough of Emerson*
*Docket No. BER-L-6300-15*

**March 16, 2018**

*Prepared for*:

**The Honorable Gregg A. Padovano, J.S.C.**
**Superior Court of New Jersey**
**Bergen County Justice Center**
**10 Main Street**
**Hackensack, NJ 07601**

*Prepared By:*

———————————————
Mary Beth Lonergan, PP, AICP
New Jersey Professional Planning License No. 4288

———————————————
Jessica Bodnar, PP, AICP
New Jersey Professional Planning License No. 6360

**Clarke Caton Hintz**   

100 Barrack Street
Trenton, New Jersey 08608

# Table of Contents

1.0  INTRODUCTION .............................................................................................. 1

2.0  BACKGROUND .............................................................................................. 2

3.0  THE CONTEXT FOR REVIEW ........................................................................ 4

4.0  THE SETTLEMENT AGREEMENT ................................................................. 6

5.0  PRELIMINARY COMPLIANCE DETERMINATION ...................................... 12

6.0  COMMENTS/OBJECTIONS ......................................................................... 21

7.0  THE FAIRNESS ANALYSIS .......................................................................... 26

8.0  CONCLUSION & RECOMMENDATIONS ................................................... 31

## 1.0   INTRODUCTION

This report addresses a Settlement Agreement that is proposed to resolve <u>Mount Laurel</u> litigation through the establishment of a Third Round fair share obligation for the Borough of Emerson, Bergen County ("Borough" or "Emerson") in the case entitled <u>In the Matter of the Application of the Borough of Emerson, Docket No. BER-L-6300-15</u>. In addition, the report reviews Emerson's preliminary compliance summary as reflected in the terms of the Settlement Agreement ("Agreement"). This report has been prepared in light of the upcoming Fairness Hearing initially scheduled on January 24, 2018 and subsequently adjourned and rescheduled before the Honorable Gregg A. Padovano, J.S.C., on March 23, 2018.

The purpose of the Fairness Hearing is for the Court to determine whether the terms of the contemplated Agreement between the Borough of Emerson and Fair Share Housing Center ("FSHC") are fair and reasonable to the interests of low- and moderate-income households within the region. I am writing in my capacity as Special Master appointed by the Honorable Menelaos W. Toskos, J.S.C., in the above-captioned matter per Court Order of September 4, 2015.

Emerson filed a Complaint for Declaratory Judgment on July 8, 2015 seeking a declaration of its compliance with the <u>Mount Laurel</u> doctrine and the Fair Housing Act, <u>N.J.S.A.</u> 52:27D-301 <u>et seq.</u>, in accordance with the New Jersey Supreme Court's March 10, 2015 decision <u>In re N.J.A.C. 5:96 and 5:97</u>, 221 N.J. 1, (2015). As a <u>Mount Laurel</u> Trial Judge for Bergen County, Your Honor directed Bergen County municipalities and FSHC to attempt to settle Third Round fair share obligations. Following a series of case management conferences, Emerson's attorney, Wendy Rubinstein, Esq., and Joshua D. Bauers, Esq. and Adam M. Gordon, Esq. from FSHC engaged in settlement discussions that resulted in an agreement which established the Borough's fair share obligation including a Third Round Rehabilitation Share of 20 units, a 74-unit Prior Round (1987-1999) obligation, and a 234-unit Third Round (1999-2025) Gap and Prospective Need obligation. As discussed in more detail below, the Borough has limited vacant developable land and, as such, continues to be eligible for a vacant land adjustment. The Borough's 74-unit Prior Round obligation is reduced to a 20-unit Prior Round realistic development potential ("RDP") and the 234-unit Third Round obligation is reduced to a 53-unit Third Round RDP, resulting in a combined Prior Round and Third Round unmet need of 235 units. Settling the Borough's Third Round fair share obligation is clearly a preferable approach to resolving affordable housing disputes thereby minimizing the time and expense of a Court action.

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 2*

Public notice of the Borough's fairness hearing was published in accordance with established <u>Mount Laurel</u> case law. The notice properly summarized the salient points of the Agreement, directed any interested members of the public to the Borough Clerk's office where they could review the Agreement, described the purpose of the Court hearing that was to be held on January 24th and subsequently adjourned by the court to March 23rd, and invited written comments on the Agreement to be filed no later than January 9, 2018.

In response to the public notice, the Borough received objections in a letter, dated January 8, 2018, from Richard P. De Angelis, Esq., the attorney representing 214 Kinderkamack, LLC ("214 Kinderkamack") and Delores Della Volpe, Trustee ("Della Volpe"), property owners in the Borough whose properties are located in a designated Redevelopment Area, which is included in the Borough's proposed preliminary compliance plan as a means to address its Third Round obligation. Della Volpe and 214 Kinderkamack are currently challenging the Borough's Redevelopment Area designation and potential proposed use of eminent domain in separate matters before the Court and also object to the inclusion of this redevelopment site in the Borough's Agreement with FSHC and, thus, as part of the Borough's proposed compliance plan, as not providing a realistic opportunity for the production of affordable housing. Both the Borough's counsel team (Wendy Rubinstein, Esq., Doug Doyle, Esq. and John Stone, Esq.) and Adam Gordon, Esq. of FSHC have filed responses to the objections.  The objections and the responses will be specifically addressed in Section 6 of this report.

As discussed in detail below, this report recommends approval of the Settlement Agreement between FSHC and Emerson to the Court and recommends preliminary approval of the Borough's proposed fair share compliance measures.

## 2.0    BACKGROUND

During the First Round (1987 to 1993), Emerson did not petition the Council on Affordable Housing ("COAH") for substantive certification. Emerson was subsequently involved in a <u>Mount Laurel</u> lawsuit during the Second Round. In March 2000, an entity known as Community Developers and Management, L.L.C. ("Community Developers") filed litigation requesting builder's remedy relief.[1] On November 2, 2001, the Court issued an Interim Judgment that dismissed the case with prejudice and

---

[1] <u>Community Developers and Management, L.L.C. v. Borough of Emerson et al., Docket No. BER-L-2734-00</u>

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 3*

directed the Special Master, Dr. David N. Kinsey, to prepare a compliance plan for the Borough. The November 2001 Interim Judgment also approved a vacant land adjustment, which resulted in an adjusted Prior Round fair share obligation of 20 units based on a realistic development potential ("RDP") of 2 units for the Community Developers site and 18 units for a site known as Marek Farm.

On March 13, 2002, the Court ultimately declined to approve the Special Master's compliance plan and directed Emerson to prepare a Housing Element and Fair Share Plan. The Court conditionally approved the Borough's Plan on June 4, 2002. The Borough's 2002 Plan addressed the 20-unit RDP with a five-unit regional contribution agreement ("RCA") with Ridgefield Borough, a 10-bedroom group home, and five (5) associated rental bonuses. Additional compliance mechanisms implemented by the Borough included an Affordable Housing Regulations Ordinance, a Borough-wide overlay zone requiring a 20% affordable housing set-aside for any residential development with five (5) or more units, adoption of a Development Fee Ordinance, and adoption of a Spending Plan. The Development Fee Ordinance and Spending Plan were both approved by the Court. On April 16, 2004, the Court issued a Judgment of Compliance and Repose for a period of six (6) years from August 6, 2003.

On December 31, 2008, the Borough petitioned the Council on Affordable Housing ("COAH") for Third Round Substantive Certification. The Borough's 2008 Housing Element and Fair Share Plan proposed that the Borough's Prior Round (1987-1999) obligation of 74 units be reduced to zero (0) units by virtue of an updated vacant land adjustment. The Borough proposed to update their Development Fee ordinance and Spending Plan, along with creating Municipal Housing Liaison and Administrative Agent positions for the Borough and adopting an Affirmative Marketing Ordinance. The Ordinances updating the Development Fee Ordinance and creating the new positions were adopted on September 1, 2009. However, the Borough did not receive Third Round substantive certification prior to the invalidation of COAH's 2008 growth share approach by Judge Skillman's October 2010 Appellate Division decision, which was upheld by the New Jersey Supreme Court's September 2013 decision.

On March 10, 2015, the New Jersey Supreme Court issued a ruling on the Motion In Aid of Litigant's Rights (In re Adoption of N.J.A.C. 5:96 & 5:97 by N.J. Council on Affordable Housing, 221 N.J. 578 (2015)) filed by FSHC. Providing a new direction for New Jersey municipalities in their effort to comply with the constitutional requirement to provide their fair share of affordable housing, the Court transferred responsibility to review and approve housing elements and fair share plans from COAH to designated Mount Laurel trial judges. In adherence with the process laid out by the Supreme Court and the Superior Court, Emerson filed a Declaratory Judgment Motion on July 8, 2015 and a Plan Summary on December 2, 2015 with the Superior Court. The Borough was granted immunity by the Court from

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 4*

exclusionary zoning lawsuits while it was negotiating the terms of the Settlement Agreement. The immunity remains in effect.

## 3.0    THE CONTEXT FOR REVIEW

Before addressing the Settlement Agreement, I would like to acknowledge the parties' efforts in achieving settlement of the Borough's Third Round fair share obligation. Settlement of Mount Laurel litigation including the establishment of the Borough's fair share – so long as it meets the appropriate standards for judicial approval – is clearly preferable to the adjudication of a builder's remedy dispute or other Mount Laurel dispute.

Among the most prominent advantages to settlement is that it creates a more civil atmosphere for the further interactions between the parties, such as the ongoing monitoring of the municipal means to address its fair share obligations. Cooperative working relationships increase the likelihood that FSHC and Emerson will be able to resolve differences during the monitoring period without resorting to Court action. In this way, settlements typically facilitate the local compliance process and thereby expedite the delivery of affordable housing.

The Agreement must be evaluated according to guidelines established by the Court in two principal cases: Morris County Fair Housing Council v. Boonton Twp. 197 N.J. Super. 359, 369-71 (Law Div. 1984) and East/West Venture v. Borough of Fort Lee 286 N.J. Super. 311 (App. Div. 1996). These cases require agreements in Mount Laurel litigation to be subject to a "Fairness Hearing." The scope of the Fairness Hearing was determined by the Appellate Division in a decision that upheld the hearing process conducted by then-Assignment Judge Peter Ciolino in East/West Venture, a case in which Philip Caton, PP, FAICP, served as Special Master. In its 1996 decision, the Appellate Court ruled that a settlement between a builder Plaintiff and municipal defendant in a Mount Laurel case may be approved by the Trial Court after a hearing which established that the settlement "adequately protects the interest of lower-income persons on whose behalf the affordable units proposed by the settlement are to be built" 286 N.J. Super. 311, 329 (App. Div. 1996). The Appellate Court provided specific factors for Trial Courts to consider in making fairness determinations. These factors, as modified for relevance in a case with a settlement between an intervener (FSHC) and a municipality, will be detailed in a subsequent section of this report.

Notwithstanding the continued uncertainty in the statewide affordable housing realm, I have endeavored to utilize the Second Round regulations of COAH to the greatest extent practicable in the course of this review for the Court. This approach will encourage uniformity in the interpretation of the <u>Mount Laurel</u> doctrine and is consistent with both legislative and judicial directives. The Fair Housing Act (P.L. 1985, c. 222) states,

> *"The interest of all citizens, including low and moderate income families in need of affordable housing, would be best served by a comprehensive planning and implementation response to this constitutional obligation." (<u>N.J.S.A.</u> 52:27D-302(c))*

Furthermore, the New Jersey Supreme Court, in its decision in <u>The Hills Development Co. v. Town of Bernards</u>, 103 N.J. 1 (1986) (commonly known as <u>Mount Laurel III</u>) upheld the constitutionality of the Fair Housing Act, and stated,

> *"Instead of varying and potentially inconsistent definitions of total need, regions, regional need, and fair share that can result from the case-by-case determinations of courts involved in isolated litigation, an overall plan for the entire state is envisioned, with definitions and standards that will have the kind of consistency that can result only when full responsibility and power are given to a single entity." (103 N.J. at 25)*

Lastly, in the decision, the Supreme Court also stated that to the extent that <u>Mount Laurel</u> cases remained before the courts,

> *"...any such proceedings before a court should conform whenever possible to the decisions, criteria and guidelines of the Council." (103 N.J. at 63)*

On March 10, 2015, the New Jersey Supreme Court delivered a unanimous decision <u>In re Adoption of N.J.A.C. 5:96 & 5:97 by N.J. Council on Affordable Housing</u>. This decision acknowledged COAH's inability or unwillingness to adopt administrative rules for the so-called "Third Round" of municipal affordable housing compliance. In the absence of regulatory guidance from COAH (or Legislative action), the decision instructs the Trial Courts to once again serve as the first resort for evaluating the constitutionality of municipal fair share plans.

While the Court has invalidated COAH's last two attempts to promulgate Third Round rules, the Second Round rules (<u>N.J.A.C.</u> 5:93) are still largely intact. In fact, these rules have been relied upon by the Trial Courts in numerous compliance and fairness hearings to evaluate the settlement agreements before the Court in order to promote the uniformity of approach which is evident in the Court's decision. I have

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 235 of 579
PageID: 1774

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*    *March 16, 2018*
*for the Borough of Emerson, Bergen County*    *Page 6*

been guided by these principals of uniformity and consistency in the review of this Settlement Agreement.

## 4.0    THE SETTLEMENT AGREEMENT

I have reviewed the proposed Settlement Agreement between FSHC and the Borough of Emerson in the context of the required "Fairness" analysis. The Agreement was fully executed on November 28, 2017 by Mayor Louis J. Lamatina for the Borough and by Mr. Gordon for FSHC and was submitted to the Court and placed on file in the Borough Clerk's office for public review.

Under the Settlement Agreement, FSHC and Emerson agree that the Borough's fair share affordable housing obligation for the period from 1987 to July 1, 2025 is as follows:

- Present Need (Rehabilitation Share)(per Kinsey Report)[2]:    20 units

- Prior Round (1987-1999) Obligation (pursuant to <u>N.J.A.C.</u> 5:93):    74 units

- Third Round (1999-2025) Obligation (per Kinsey Report)
  as adjusted per the Settlement Agreement[3]:    234 units

The Settlement Agreement specifically acknowledges that the Borough's Third Round obligation includes the "gap period present need," which is the measure of need based on low- and moderate-income households formed from 1999-2015 that was recognized by the New Jersey Supreme Court in its January 2017 decision <u>In Re Declaratory Judgment Actions Filed By Various Municipalities</u>, 227 N.J. 508 (2017).

Emerson and FSHC both agree that the Borough does not accept the methodology or calculations proffered by FSHC's consultant, David Kinsey, PhD, PP, FACIP, but agree to the above obligation for the purposes of settlement. I would note that the 74-unit Prior Round obligation was previously established by COAH. The 234-unit Third Round obligation represents a 30% reduction of Dr. Kinsey's May 2016 calculation of the Borough's Third Round obligation. However, the Agreement provides that Emerson

---

[2] David N. Kinsey, PhD, PP, FAICP, "New Jersey Fair Share Housing Obligations for 1999-2025 (Third Round) Under <u>Mount Laurel IV</u>," May 17, 2016.

[3] The Third Round fair share obligation of 234 units represents a 30% reduction from the 334-unit Third Round gap period present need and prospective need obligation (1999-2025) determined by Dr. Kinsey for FSHC in the May 2016 report noted above.

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 236 of 579
PageID: 1775
*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*        *March 16, 2018*
*for the Borough of Emerson, Bergen County*        *Page 7*

may seek to amend its Third Round obligation should a forthcoming and binding legal determination result in the calculation of a Third Round obligation more than 10% less than the 234-unit total obligation established in the Agreement. Should this reduction occur, the Borough is still obligated to implement its Fair Share Plan via all of the mechanisms set forth in the Settlement Agreement.

Emerson is essentially entirely developed and the availability of vacant land is extremely limited. As a result, the Borough remains entitled to adjust its fair share obligation in accordance with the vacant land adjustment procedure set forth in COAH's Second Round rules (N.J.A.C. 5:93-4.2). COAH's rules provide adjustments of municipal fair share allocations to reflect a municipality's RDP in response to a lack of vacant land and/or water and sewer infrastructure. With respect to Emerson, the municipal adjustment was made only in response to the lack of vacant land.

Pursuant to the Settlement Agreement, Emerson has a Prior Round RDP of 20 units and a Third Round RDP of 53 units, as well as a total unmet need of 235 units (54-unit Prior Round unmet need and 181-unit Third Round unmet need).

The Prior Round 20-unit RDP was approved by the Court in the November 2001 Interim Judgment and was based on the development potential of two (2) sites, the Marek Farm site and the Community Developer's site, the latter of which was the subject of the 2000 builder's remedy lawsuit. To reflect the increase in development potential as a result of land use conditions and approved inclusionary and affordable housing developments, the Borough prepared an updated vacant land analysis for the Third Round. The Borough's updated vacant land analysis, dated November 21, 2017, considered all vacant and Borough-owned land in Emerson, as well as any sites that have been or are likely to be redeveloped with housing during the Third Round. The table below provides summary information of all sites contributing to the Borough's 20-unit Prior Round and 53-unit Third Round RDP.

**2001 COURT-APPROVED PRIOR ROUND RDP & PROPOSED THIRD ROUND RDP**

| Block | Lot(s) | Street Address / Development | Developable Acreage | Density (du/acre) | Total Units | Affordable Units (20% Set-Aside) |
|-------|--------|------------------------------|---------------------|-------------------|-------------|----------------------------------|
| **PRIOR ROUND RDP** | | | | | | |
| 1201 | 1 | 650 Old Hook Road / Marek Farm | 6.71 | 14* | 90 | 18 |
| 417 | 2,3 | 43 Emerson Plaza West / New Concepts | 0.83 | 14* | 12 | 2 |
| | | | | **PRIOR ROUND RDP** | | **20** |
| **THIRD ROUND RDP** | | | | | | |
| *Burns and Row Group Site (vacant parcels)* | | | | | | |
| 610 | 9.01 | 2 Lois Avenue | 0.47 | | | |
| 613 | 2 | 7 Lois Avenue | 0.97 | | | |

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 237 of 579
PageID: 1776

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 8*

| Block | Lot(s) | Street Address / Development | Developable Acreage | Density (du/acre) | Total Units | Affordable Units (20% Set-Aside) |
|---|---|---|---|---|---|---|
| | | *Subtotal* | 1.44 | 8 | 12 | 2 |
| *Emerson Golf Club Parcels (vacant parcels)* | | | | | | |
| 617 | 7.01 | 99 Palisades | 5.13 | | | |
| 617 | 7.03 | 99 Palisades | 1.87 | | | |
| | | *Subtotal* | 7.00 | 8 | 56 | 11 |
| *Multi-Family Residential Development Completed during the Third Round* | | | | | | |
| 616 | 16 | 55 Emerson Plaza East / Emerson Grand | -- | 34 | 20 | 4 |
| 609 | 3 | R2-ARC Contributory Site | -- | 36 | 36 | 7 |
| *Designated Redevelopment Area* | | | | | | |
| 419 | 1-5, 6.01, 6.02, & 7-10 | Lincoln Boulevard, Kinderkamack Road, Kenneth Avenue, and Linwood Avenue | -- | 64 | 147 | 29 |
| | | | | **THIRD ROUND RDP** | | 53 |

☆ per the Court's 2001 written opinion and Interim Judgment.

Per COAH's rules at <u>N.J.A.C.</u> 5:93-4.2(g), a "municipality may address its RDP through any activity approved by [COAH], pursuant to <u>N.J.A.C.</u> 5:93-5. The municipality need not incorporate into its housing element and fair share plan all sites used to calculate the RDP if the municipality can devise an acceptable means of addressing its RDP. The RDP shall not vary with the strategy and implementation techniques employed by the municipality."

Emerson has fully satisfied its 20-unit Prior Round RDP pursuant to the Borough's Court-approved 2002 Housing Element and Fair Share Plan with the following compliance mechanisms:

- A five-unit RCA with the Borough of Ridgefield.

- A completed group home/alternative living arrangement owned and operated by New Concepts comprised of five (5) units and 10 total bedrooms (credit by the bedroom).

- Maximum of five (5) prior round rental bonus credits generated by the New Concepts 10-bedroom group home/alternative living arrangement.

Emerson agrees to satisfy its 53-unit Third Round RDP with 71 credits as follows:

- Four (4) affordable family rental units completed as part of the Emerson Grand inclusionary development.

- 24 bedrooms in three (3) separate group homes/alternative living arrangements.

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 238 of 579
PageID: 1777
*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*    *March 16, 2018*
*for the Borough of Emerson, Bergen County*    *Page 9*

- 29 family affordable rental units to be provided as part of the Block 419 Redevelopment Area and pursuant to an executed Redeveloper's Agreement.

- Maximum of 14 third round rental bonus credits.

Through its vacant land adjustment, Emerson has reduced its 74-unit Prior Round obligation to a Prior Round RDP of 20 units and reduced its 234-unit Third Round obligation to a Third Round RDP of 53 units, resulting in a combined Prior Round and Third Round unmet need of 235 units. [See aerial map below for the Borough's sites to address RDP and its unmet need overlay zones.] N.J.A.C. 5:93-4.2(h) states that in addressing unmet need, COAH "may require at least any combination of the following in an effort to address the housing obligation:

✓ Zoning amendments that permit apartments or accessory apartments;

✓ Overlay zoning requiring inclusionary development or the imposition of a development fee consistent with N.J.A.C. 5:93-8. In approving an overlay zone, [COAH] may allow the existing use to continue and expand as a conforming use, but provide that where the prior use on the site is changed, the site shall produce low- and moderate-income housing or a development fee; or

✓ Zoning amendments that impose a development fee consistent with N.J.A.C. 5:93-8."

As noted above, Emerson was previously required by the Court to adopt mechanisms to help in addressing its Prior Round unmet need including a Borough-wide overlay zone requiring a 20% affordable housing set-aside for any residential development with five (5) or more units, adoption of a development fee ordinance, and adoption of a spending plan. For the Third Round, the Borough has agreed to provide other means that may continue to help address the remaining combined 235-unit unmet need through the following compliance mechanisms:

- 18 surplus credits from the compliance mechanisms addressing the Third Round RDP;[4]

- The adoption of the Multi-Family Residential Affordable Housing Overlay District North permitting inclusionary housing development at a density of 64 dwelling units per acre on Block 214, Lots 6, 7, 8.01, 8.02, and 9; Block 213, Lots 1 through 6; and Block 405, Lots 1, 2, 3.01, 3.02, and 4 through 14 in the Borough's downtown.

---

[4] It should be noted that paragraph 10a of the Settlement Agreement incorrectly indicates that the Borough has 17 surplus Third Round credits to address any Unmet Need. The Borough has 18 surplus credits (71 Third Round credits – 53-unit Third Round RDP = 18 surplus credits).



Affordable Housing Sites
(RDP & Unmet Need)

LOCATION
Emerson Borough, Bergen County, NJ

DATE
January 2018

Legend

Affordable Housing Sites Addressing the RDP

Inclusionary Overlay Zoning Sites Addressing Unmet Need

Emerson Grand

New Concepts

Block 419 Redevelopment

MFRAH South Inclusionary Overlay District

MFRAH North Inclusionary Overlay District

Advancing Opportunities

Veterans Housing

Clarke Caton Hintz
Architecture
Planning
Landscape Architecture

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 240 of 579
PageID: 1779

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*    *March 16, 2018*
*for the Borough of Emerson, Bergen County*    *Page 11*

- The adoption of the Multi-Family Residential Affordable Housing Overlay District South permitting inclusionary housing development at a density of 43 dwelling units per acre on Block 616, Lots 1, 2, 16, 17, and 19 through 24 and Block 617.01, Lots 2.01, 2.02, and 8, also in the Borough's downtown.

- The adoption of a Borough-wide mandatory affordable housing set-aside to be required for future multi-family residential development at a density of at least six (6) units per acre and yielding at least five (5) new dwelling units in the Borough that become permissible through planning board approval, zoning board approval, or a new or amended redevelopment or rehabilitation plan.

The required affordable housing set-aside Borough-wide and within the two (2) proposed overlay zoning districts is to be 15% for rental housing developments and 20% for for-sale developments. The Borough has agreed to introduce the overlay zoning ordinance(s) and the Borough-wide mandatory affordable housing set-aside ordinance within 120 days of the entry of a Court Order approving this Settlement Agreement.

Pursuant to the Settlement Agreement, Emerson has a Third Round Rehabilitation Share of 20 units. To address this obligation, the Borough proposes to reserve at least $200,000 of Affordable Housing Trust Funds to complete up to 20 rehabilitations through the Affordable Critical Home Report Program Agreement between the Borough and Habitat for Humanity of Bergen County, Inc. ("Habitat). The program shall have an experienced affordable housing rehabilitation program administrator.

The Settlement Agreement also includes a variety of housing compliance mechanisms and requirements that are intended to ensure that affordable housing developed to address the Borough's fair share obligation conforms to COAH rules, the Fair Housing Act ("FHA"), and the Uniform Housing Affordability Controls ("UHAC") (N.J.A.C. 5:80-26.1 et seq.). These mechanisms are detailed in a subsequent section of this report on the fairness analysis.

Finally, within 120 days of entry of an Order approving the Settlement Agreement, the Borough shall adopt a final Housing Element and Fair Share Plan, including an updated Spending Plan, and introduce ordinances necessary to implement the terms of the Agreement including amendments to the Borough's zoning provisions and affordable housing standards.

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 241 of 579
PageID: 1780

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*                          *March 16, 2018*
*for the Borough of Emerson, Bergen County*                                                                                 *Page 12*

## 5.0    PRELIMINARY COMPLIANCE DETERMINATION

As noted above, the Borough's Third Round fair share obligation consists of:

- Third Round Rehabilitation Share:           20 units

- Prior Round (1987-1999) Obligation:        74 units

- Third Round (1999-2025) Obligation:        234 units

As previously detailed, the Borough is entitled to adjust its fair share obligation as a result of limited vacant and developable land. Emerson has a 20-unit Prior Round RDP and a 53-unit Third Round RDP, as well as a total combined unmet need of 235 units (54-unit Prior Round and 181-unit Third Round unmet need).

**Rehabilitation Share –** Pursuant to the Settlement Agreement, Emerson proposes to address its 20-unit Rehabilitation Share through completing up to 20 rehabilitations through the Affordable Critical Home Report Program Agreement between the Borough and Habitat. The Borough proposes to fund these rehabilitations by reserving at least $200,000 of Affordable Housing Trust Funds for the program. This reservation of Affordable Housing Trust Funds must be reflected in the Borough's updated Spending Plan, as will be discussed below. The program shall have an experienced affordable housing rehabilitation program administrator. As part of the compliance phase of this matter, the Borough must provide the program agreement between Emerson and Habitat as well as an executed contract with an experienced rehabilitation program administrator **[Condition 1]**. The Borough must also indicate whether the rehabilitation program will be available to rental units to satisfy the rental component of the Present Need obligation. Additionally, the Borough must provide an operating manual for the proposed housing rehabilitation program that ensures compliance with COAH's requirements including an average expenditure of $10,000 in hard costs per unit, the repair or replacement of at least one major system in each housing unit, and the establishment of 10-year affordability controls **[Condition 2]**.

**Prior Round RDP –** the Borough has fully satisfied its 20-unit Prior Round RDP with a completed RCA with the Borough of Ridgefield and an existing 10-bedroom alternative living arrangement and its associated rental bonus credits. The following provides a preliminary compliance review of these mechanisms:

- A five-unit RCA between Emerson and the Borough of Ridgefield was executed on February 4, 2003, which provided for the transfer of $125,000, or $25,000 per unit, from Emerson to

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 242 of 579
PageID: 1781

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*     *March 16, 2018*
*for the Borough of Emerson, Bergen County*     *Page 13*

Ridgefield for the implementation of a scattered site housing rehabilitation program. COAH recommended the Court approve the executed RCA by resolution of August 6, 2003. On April 16, 2004, the Court approved the RCA as part of the Borough's Judgment of Compliance and Repose. According to the Borough, the $125,000 RCA payment has been transferred and was funded through a bond ordinance passed by the governing body in 2003.

- New Concepts for Living ("New Concepts") owns and operates a 10-bedroom group home/alternative living arrangement located on Emerson Plaza West. This group home was previously approved by the Court as a Prior Round compliance mechanism. Specifically, by Order of June 4, 2002, the Court approved a development agreement and project schedule for the proposed group home. The New Concepts group home has subsequently been constructed and is now in operation. Emerson is claiming 10 credits (credit by the bedroom) and five (5) associated rental bonuses for the New Concepts group home to assist in addressing the 20-unit Prior Round RDP. The Borough is eligible to claim up to a maximum of five (5) Prior Round rental bonuses (25% x 20 = 5).

  To confirm the credit-eligibility of this group home, the Borough must submit a completed DCA Supportive and Special Needs Housing Survey form that verifies information including, but not limited to, the date the facility was established, the number of bedrooms, and the terms of the affordability controls. Additionally, the Borough must provide a copy of the facility's most recent operating license **[Condition 3 – survey and license]**. To be eligible for rental bonus credits, the affordability controls must be in effect for at least 30 years. Alternatively, group homes that receive funding through the Department of Human Services, Division of Developmental Disabilities that requires a 20-year renewable operational restriction are also eligible for rental bonus credits.

**Third Round RDP –** the Borough proposes to address its 53-unit Third Round RDP with a completed inclusionary family rental housing development, three (3) group homes/alternative living arrangements, a family inclusionary housing development proposed as part of a Redevelopment Plan, and rental bonus credits. The following provides a preliminary compliance review of these mechanisms:

- Emerson Grand is a multi-family inclusionary family rental housing development located at 55 Emerson Plaza East in the Borough's downtown. This development includes a total of four (4) units affordable to low- and moderate-income households. As such, the Borough is claiming four (4) credits for this development to address the 53-unit Third Round RDP. To verify the credit-eligibility of these units, the Borough must provide evidence of 30-year affordability controls such as a deed restriction, submit documentation confirming

compliance with UHAC including the income split by unit and bedroom distribution, and provide the date the development was approved and subsequently received a certificate of occupancy **[Condition 4]**.

- The Borough is claiming 14 credits for a group home/alternative living arrangement on Main Street that provides housing for veterans. To confirm the credit-eligibility of this veterans housing, the Borough must submit a completed Supportive and Special Needs Housing Survey form that verifies information including the date the facility was established, the number of bedrooms, and the terms of the affordability controls. Additionally, the Borough must provide a copy of the facility's current operating license **[Condition 5 – survey and license]**.

- Advancing Opportunities owns and operates a group home located on Pine Drive in the Borough. The Borough is claiming three (3) credits for the Advancing Opportunities group home. To confirm the credit-eligibility of this group home, the Borough must submit a completed Supportive and Special Needs Housing Survey form that verifies the date the facility was established, the number of bedrooms, and the terms of the affordability controls. Additionally, the Borough must provide a copy of the facility's most recent operating license **[Condition 6 – survey and license]**.

- Center for Hope and Safety provides transitional housing in a group home for victims of domestic violence. According to a recently completed Supportive and Special Needs Housing Survey, the group home is comprised of seven (7) bedrooms that serve very low-income clients. The group home receives funding through the Department of Housing and Urban Development's ("HUD") Continuum of Care program, which is an annual renewable operating subsidy. The facility received its Certificate of Occupancy on August 18, 2003. The Borough is claiming seven (7) Third Round credits for the seven (7) bedrooms at this group home, which has been in operation for more than 15 years. As the Borough has already provided a completed survey, the Borough should just provide a copy of the facility's most recent license **[Condition 7]**.

- Emerson is proposing to redevelop the entirety of Block 419 (Lots 1-5, 6.01, 6.02, and 7-10) in the Borough's downtown with a mixed-use multi-family inclusionary rental development. Block 419 is part of an area in need of redevelopment designated by the Borough in September 2004. In April 2006, the Borough adopted a Redevelopment Plan for the area known as the Central Business District Redevelopment Area, which permits the development of multi-family residential dwelling units including mixed-use development. The first phase

of the Redevelopment Plan was identified as Block 419. On January 8, 2016, the Borough solicited proposals from redevelopers interested in redeveloping Block 419. Emerson Redevelopers Urban Renewal, LLC ("EMRED") was ultimately selected as the Redeveloper and the Borough and EMRED executed a Redevelopment Agreement on June 27, 2016. Subsequently, the Redevelopment Agreement has been twice amended. The June 2016 Redevelopment Agreement and the subsequent amendments are included as Exhibit B of the Settlement Agreement. By resolution of January 17, 2017, the Borough Council accepted the findings of a December 2016 Planning Board report that determined Block 419 continued to qualify as an area in need of redevelopment and designated Block 419 as a Condemnation Redevelopment Area. On February 6, 2018, the Borough adopted an ordinance authorizing the acquisition of properties including those of the Objectors (discussed below) by purchase or condemnation.

Although the Borough will fully detail and confirm the realistic opportunity of the site in its future housing element and fair share plan, Emerson has supplied information per the Second Round rules at N.J.A.C. 5:93-5.3 which requires municipalities to "designate sites that are available, suitable, developable, and approvable, as defined in N.J.A.C. 5:93-1." This site meets each of these criteria, as follows:

- Available: Availability means that a site has clear title, and is free of encumbrances which preclude development for low- and moderate-income housing. Based on the February 6th Borough Ordinance authorizing the acquisition of properties including those of the Objectors by purchase or condemnation, ultimately, the entirety of the site is to be owned by the Redeveloper and we are not aware of any encumbrances that would obstruct the creation of affordable housing (see discussion of the objections that raise a legal question as to whether the Borough has a right through the FHA to condemn the objectors' properties for an inclusionary redevelopment developed by a for-profit redeveloper in Section 6 below).

- Suitable: Suitability means that a site is adjacent to compatible land uses, has access to appropriate streets, and is consistent with the environmental policies which would be applied in determining a site's realistic development potential. Block 419 is approximately 2.2 acres and is located in the heart of the Borough's downtown, immediately across Linwood Avenue from the Borough's NJ Transit Pascack Valley Line Rail Station which provides mass transit service from Spring Valley, NY to Hoboken, NJ. The site is generally bounded by Lincoln Avenue, Kinderkamack Road, Linwood Avenue and the NJ Transit commuter rail tracks. Surrounding land uses include retail, commercial,

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 245 of 579
PageID: 1784
*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*        *March 16, 2018*
*for the Borough of Emerson, Bergen County*        *Page 16*

restaurants, and offices. Directly across the rail line from the site is one of the Borough's affordable housing sites – New Concepts – along Emerson Plaza West as well as other residential uses. The site is also outside of the flood hazard area and has no wetlands or environmentally sensitive constraints. As with the remainder of the Borough, the site is in the Metropolitan Planning Area (Planning Area 1) where redevelopment is encouraged and affordable housing is preferred.

- Developable: Developability is measured by a site's access to water and sewer infrastructure, its consistency with the applicable areawide water quality management plan (including the wastewater management plan) or is included in an amendment to the areawide water quality management plan submitted to and under review by the DEP. We understand that the site is within the Borough's sewer service area and has current connections to the existing infrastructure with sufficient capacity to serve the proposed redevelopment.

- Approvable: A site is approvable if it may be developed in a manner consistent with the rules/regulations of all agencies with jurisdiction over the site. A site may be approvable even if it is not consistent with the underlying zoning. The site is outside of the flood hazard area and does not contain any known wetlands or other constraints which would require special approval from DEP.

The proposed redevelopment of Block 419 includes 147 total units, retail/non-residential uses and a structured parking garage as depicted on the Redevelopers' concept plan. As it is not expressly stated in the Redevelopment Agreement, during the compliance phase of this matter, the Borough must provide evidence that the proposed development is to be comprised of family rental units, including the affordable units **[Condition 8]**. Pursuant to the Redevelopment Agreement, the development shall be subject to a 20% affordable housing set-aside. EMRED must provide no less than a 15% on-site affordable housing set-aside, or 22 on-site affordable housing units. The remaining 5% obligation, or seven (7) affordable units, may be provided for by on-site construction, off-site construction, a payment-in-lieu of construction, or a combination of a payment-in-lieu and off-site construction. Pursuant to the Settlement Agreement, the Borough must indicate how it will provide for the realistic opportunity of the seven (7) remaining units (including one very-low income unit) at the time of the required midpoint review by July 1, 2020.

Pursuant to the Settlement Agreement, the parties agree that the Borough is providing for the realistic opportunity for the Block 419 redevelopment project through its executed Redevelopment Agreement with EMRED. This redeveloper currently holds options to

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 246 of 579
PageID: 1785

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*    *March 16, 2018*
*for the Borough of Emerson, Bergen County*    *Page 17*

purchase all but two (2) of the properties (multiple lots) in Block 419. In the event the Redeveloper is not able to purchase one or more of the properties by the end of the first quarter of 2018, the Redeveloper shall request the assistance of the Borough to undertake good faith negotiations. Should these negotiations be unsuccessful, the Borough is committed to acquiring the property through eminent domain as authorized under Local Redevelopment and Housing Law ("LRHL") and/or the Fair Housing Act ("FHA").

As part of the Borough's updated Housing Element and Fair Share Plan, Emerson should provide additional details discussing how the Block 419 development intends to comply with UHAC including at least 30-year affordability controls and the income targeting bedroom distribution requirements.**[Condition 9]** With respect to very low-income units, pursuant to the Settlement Agreement, the Borough will require at least three (3) of the 22 total affordable units required on-site to be available to very low-income households. Should all 29 affordable housing units ultimately be provided on-site, four (4) very low-income units will be provided. The Borough should also indicate the entity that will be responsible for administering the affordable units. **[Condition 10]**

- The Borough is applying 14 rental bonuses to address its 53-unit Third Round RDP. Pursuant to N.J.A.C. 5:93-5.15, this is the maximum permitted to address the Third Round RDP (53 x 25% = 13.25, rounded up to 14).

It should also be noted that since all units addressing the Borough's 53-unit Third Round RDP are special needs and family rentals, the Borough has satisfied its Third Round rental requirement and is not exceeding the Third Round age-restricted cap.

**Prior Round and Third Round Unmet Need** – The Borough has a combined Prior Round and Third Round unmet need of 235 units. The Borough has an existing development fee ordinance as means to address unmet need. Additionally, pursuant to COAH's Second Round rules at N.J.A.C. 5:93-4.2, overlay zoning requiring inclusionary development is also an approved mechanism to address unmet need and specifically states "that where the prior use on the site is changed, the site shall produce low and moderate income housing." Consistent with this provision, the Borough will implement inclusionary overlay zoning on select sites in its downtown. Additionally, unmet need will be addressed through surplus credits from the compliance mechanisms addressing the Borough's Third Round RDP and through a mandatory Borough-wide affordable housing set-aside.

- The Borough is proposing to address its 53-unit Third Round RDP with 71 credits, resulting in a surplus of 18 credits. These 18 surplus credits will be used to address a portion of the Borough's 235-unit Unmet Need.

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 18*

- The Borough will adopt the Multi-Family Residential Affordable Housing Overlay District North ("MFRAH North") inclusionary zoning district on Block 214, Lots 6, 7, 8.01, 8.02, and 9; Block 213, Lots 1 through 6; and Block 405, Lots 1, 2, 3.01, 3.02, and 4 through 14. This area is located one block north of the Block 419 redevelopment site in the Borough's downtown area. The MFRAH North district is characterized with a mix of commercial and industrial uses located in the Industrial and Manufacturing zoning district, with the exception of Lots 5 through 11 in Block 405. These lots appear to all be improved with single-family residences and are located in the R-7.5 Single-Family Residential zoning district. The Borough should ensure that it intends to include these lots in the MFRAH North inclusionary overlay zoning district. The proposed inclusionary overlay zoning district is adjacent to commercial and retail uses to the north and south and single-family residential neighborhoods to the east and west. The proposed area is bounded to the west by active railroad tracks serving NJ Transit commuter rail. Given the surrounding uses and the close proximity to the downtown, transit, and the proposed Block 419 multi-family mixed-use inclusionary redevelopment, this area appears to be appropriate for inclusionary multi-family residential development.

   The Industrial Manufacturing zoning district does not permit residential uses and the R-7.5 zoning district permits single-family residential uses at approximately six (6) dwelling units per acre. The proposed MFRAH North inclusionary overlay zoning district would permit this area to be redeveloped with multi-family residential at a density of 64 dwelling units per acre subject to a mandatory affordable housing set-aside of 20% for for-sale units and 15% for rentals. Since the provisions of the proposed overlay district would permit for new residential development at a substantial increase in density, the change in use and density from the underlying zoning districts presents a viable compensatory benefit and opportunity to accommodate additional affordable housing development to assist the Borough in addressing its unmet need in the future.

- The Borough will adopt the Multi-Family Residential Affordable Housing Overlay District South ("MFRAH South") inclusionary zoning district on Block 616, Lots 1, 2, 16, 17, and 19 through 24 and Block 617.01, Lots 2.01, 2.02, and 8.

   With respect to Block 616, all lots listed, with the exception of Lot 2, were part of the Central Business District Redevelopment Area designated in 2004 and subject to the 2006 Redevelopment Plan. Lot 2 is located in the RB Residential zoning district and appears to be currently improved with a vacant single-family residence. By resolution of February 21, 2017, the Borough removed Lots 16, 17, and 19 from the designated redevelopment area. Lot 16 was recently redeveloped and is the site of the Emerson Grand mixed-use inclusionary

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 248 of 579
PageID: 1787

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*    *March 16, 2018*
*for the Borough of Emerson, Bergen County*    *Page 19*

development. The structures on Lot 17 and 19 also appear to be more recently redeveloped or renovated and are both multi-story commercial buildings. Therefore, these lots may not be suitable for inclusion in the MFRAH South inclusionary overlay district. The remainder of this area of Block 616 is largely characterized with a mix of one-story commercial and retail uses. However, these remaining lots are already included in the Borough's Central Business District Redevelopment Area, which permits multi-family and mixed-use residential development. Therefore, as part of the Borough's Housing Element and Fair Share Plan, Emerson should reevaluate the inclusion of all parcels listed in Block 616 and must provide a discussion of the compensatory benefit to be provided to offset the imposition of an affordable housing set-aside in this portion of the MFRAH South inclusionary zoning district.

**[Condition 11]**

With respect to Block 617.01, all three (3) lots are located in the LB Limited Zoning District, which does not permit residential uses. Lot 8 is currently owned by the Borough and is utilized by Emerson's Department of Public Work and Lot 2.02 is similarly improved with single-story commercial buildings. Block 2.01 is improved with a single-family residence. It should be noted that the adjacent Lot 1 in Block 617.01 remains part of the Central Business District Redevelopment Area where multi-family residential development is currently permitted although it is developed with a single-story commercial facility. Other surrounding land uses include a single-family residential neighborhood to the east, Emerson Golf Club property to the south, and Block 616 as discussed above to the north. As is similar to the MFRAH North district, this area is in close proximity to the downtown and public transit and has compatible surrounding land uses. Therefore, this area of the proposed MFRAH South appears to be appropriate for inclusionary multi-family residential development.

The proposed overlay district would permit this area of Block 617.01 to be redeveloped with multi-family residential at a density of 43 dwelling units per acre with a mandatory affordable housing set-aside of 20% for for-sale units and 15% for rentals. The provisions of the proposed overlay district would permit for multi-family residential development on Block 617.01 where such use was not previously permitted. Therefore, the change in use presents a viable compensatory benefit and opportunity to accommodate additional future affordable housing development in this portion of the proposed MFRAH South inclusionary zoning district.

- As required in the proposed FSHC settlements in virtually all vacant land adjustment communities in Bergen County as well as across the State, the Borough will adopt an ordinance establishing a mandatory, municipal-wide affordable housing set-aside of 15 or

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 20*

20% (for rental or for sale units, respectively) for all new multi-family residential developments at a density of at least six (6) dwelling units per acre and yielding at least five (5) units that become permissible through Planning Board approval, Zoning Board approval, or a new or amended redevelopment or rehabilitation plan.[5] At least 50% of the units must be affordable to low-income households, including the required 13% very low-income units in rental developments, and all affordable units must include the required bedroom distribution, be governed by control on affordability, and be affirmatively marketed in conformance with UHAC. The Borough shall include language in the ordinance that explicitly provides that no subdivision shall be permitted or approved for the purpose of avoiding compliance with this requirement. The ordinance will not give any developer the right to any such rezoning, variance, or other relief, or establish any obligation on the part of the Borough to grant such rezoning, variance, or other relief. In addition to Planning Board approval, Zoning Board approval, or a new or amended redevelopment or rehabilitation plan, the Borough should also list 'municipal rezoning' triggering an affordable housing setaside in the mandatory setaside ordinance. **[Condition 12]**

As part of the future compliance process in the matter, the Borough must submit the draft zoning ordinance creating the inclusionary residential overlay districts and the draft ordinance establishing a mandatory, municipal-wide affordable housing set-aside **[Condition 13]**. Adoption of these ordinances will either be a future condition of compliance or will be adopted prior to the Borough's future compliance hearing.

**Trust Fund/Spending Plan –** Pursuant to the Settlement Agreement, Emerson will prepare a Spending Plan as part of the updated Housing Element and Fair Share Plan. Additionally, pursuant to the Agreement, the Borough has agreed to reserve at least $200,000 for the rehabilitation of up to 20 housing units based on an average hard cost of $10,000 per unit. The Borough must account for the proposed expenditure in its revised Spending Plan and should include the associated administration cost for the rehabilitation program as well **[Condition 14]**.

The Spending Plan will be reviewed as part of the compliance phase of this matter and approved during a future Compliance Hearing. Upon approval of the Spending Plan, the Agreement acknowledges that any funds deemed committed by the Court must be expended within four (4) years of the Court's entry of a final judgment approving the Borough's compliance plan.

---

[5] The Borough's existing overlay zoning shall be repealed.

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 21*

**Fair Share Ordinance/Affirmative Marketing** – The Borough shall provide a draft updated Affordable Housing Ordinance, which Emerson must submit as part of the Borough's updated Housing Element and Fair Share Plan. Although not covered in the Agreement, the parties should agree as part of the fairness hearing whether the Borough will adopt the required implementing ordinances prior to the compliance hearing or if the adoption of the ordinance will be a future condition of compliance.

The Borough must adopt a revised Affirmative Marketing Plan, specifically including the additional groups to be noticed of affordable housing unit availability required through the Settlement Agreement, and submit such revised Affirmative Marketing Plan as part of the Borough's updated Housing Element and Fair Share Plan **[Condition 15]**. Additionally, the Borough must submit an adopted resolution appointing an existing municipal employee as Emerson's municipal housing liaison **[Condition 16]**. The Borough must submit contract(s) for an experienced affordable housing administrative agent for all existing and proposed affordable units **[Condition 17]**.

## 6.0    COMMENTS/OBJECTIONS

As previously indicated, the Borough received one objection letter, dated January 8, 2018, from Richard P. De Angelis, Esq., the attorney representing 214 Kinderkamack and Della Volpe, property owners in the Borough whose properties are located on Block 419 of the designated Redevelopment Area.[6] Specifically, 214 Kinderkamack is the owner of Block 419, Lots 2 through 4 and Della Volpe is the owner of Block 419, Lot 6.01. [See aerial map of 419 tract area and the objectors' sites below] These properties are part of the Borough's Block 419 redevelopment project proposed to address the Borough's Third Round RDP, as well as the Third Round rental, family rental and very-low income family rental requirements set forth in the Settlement Agreement.

As will be discussed below, FSHC and the Borough filed responses to the De Angelis objections and the Borough filed a motion to compel the intervention of the objectors in order to ensure that any court decision in the Borough's DJ matter would also be binding in the other matter challenging the Borough's LIRHL procedures or future legal challenges.

---

[6] Additional filings were submitted by Mr. De Angelis to the Court including letters dated January 12, 2018, January 17, 2018, January 22, 2018, March 5, 2018 and opposition dated February 22, 2018 to the Borough's motion.

**214 KINDERKAMACK, LLC**

LINCOLN BLVD

L1 L2 L3

L4

KINDERKAMACK RD

New Concepts

L7

L5

PASCACK VALLEY LINE

BL 419

L 6.01

**DELLA VOLPE**

LOCUST AVE

L 6.02

L8

L10 L9

503 COUNTY

L1

EMERSON PLZ

**Emerson Train Station**

BL 615

LINWOOD AVE



0 — 100 Ft

**Clarke Caton Hintz** ● ● ■
Architecture
Planning
Landscape Architecture

## 419 Redevelopment Area

214 Kinderkamack, LLC - Block 419 / Lots 2-4 (0.58 Acres)
Della Volpe - Brook 419 / Lot 6.02 (0.35 Acres)

LOCATION:
Emerson Borough, Bergen County, NJ

DATE:
March 2018

Mr. De Angelis stated that the property owners objected "to the inclusion of the Block 419 project in the proposed Settlement Agreement as it may not be considered a 'realistic opportunity' toward achieving the Borough's affordable housing obligations." The objection received is largely with respect to contesting the Borough's potential proposed use of eminent domain to acquire the above-listed properties as authorized by the LRHL and/or the Fair Housing Act. The acquisition of these properties is necessary to implement the proposed Block 419 redevelopment project. Della Volpe and 214 Kinderkamack are currently challenging the Borough's Redevelopment Area designation and proposed use of eminent domain through the LRHL in separate matters before the Court. Due to this pending litigation before the Court, the objectors argue that the Block 419 redevelopment project should not be included in the Borough's Settlement Agreement and proposed compliance plan. With respect to the objections regarding the LRHL, this is an existing legal challenge that will be litigated and resolved in those respective separate matters.

In order to provide perspective on the impact of the objections on the required fairness analysis of the Borough's Agreement with FSHC and the use of the properties to not only generate a large portion of the Borough's RDP but also to address a portion of the Borough's fair share affordable housing obligations, I have proceeded to review the Borough's proposed preliminary compliance measures including the Block 419 redevelopment project. In this report, I am making an assumption that the Court will find that the Borough has a right through the FHA to condemn the objectors' properties for an inclusionary redevelopment developed by a for-profit redeveloper. This is not an opinion as to how the court should rule on the Borough's condemnation right. To fulfill the East/West Ventures fairness analysis requirements, the legal objection as to realistic opportunity of the 419 Redevelopment Area based on the objectors' claims that the FHA does not provide authorization for condemnation and, if it did, the FHA only authorizes condemnation for a 100% affordable housing development by a non-profit developer. Outside of the legal question raised regarding the reliance on the FHA for eminent domain, there is no evidence at this time to suggest that the project does not present a realistic opportunity for the construction of affordable housing. Should the Court's decision on the objections ultimately call into question the realistic opportunity of the Block 419 redevelopment project, the Borough and Redeveloper will be faced with either scaling back the proposed inclusionary affordable housing site or completely eliminating it from its preliminary compliance measures. In such case, the Borough may be eligible for a reduced third round RDP as over 50% of the RDP is based on the current proposal for the 419 Redevelopment site. However, the Borough would most likely have to amend its preliminary compliance plan as well as its Agreement with FSHC as it would have to replace some number of lost family affordable rental units and family very-low income units in order to address the settlement terms in the Borough's Agreement with FSHC.

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 24*

The objectors acknowledge that the FHA does provide the Borough with authority to acquire these properties through condemnation as referenced in paragraph 9 of the Settlement Agreement as the FHA does permit the use of eminent domain as a technique for a municipality to provide affordable housing. Specifically, <u>N.J.S.A.</u> 52:27D-311.a(5) permits the "donation or use of municipally owned land or land condemned by the municipality for purposes of providing low and moderate income housing." Further, <u>N.J.S.A.</u> 52:27D-325, Municipal Powers, states:

> *"Notwithstanding any other law to the contrary, a municipality may purchase, lease or acquire*
> *by gift or through the exercise of eminent domain, real property and any estate or interest*
> *therein, which the municipal governing body determines necessary or useful for the construction*
> *or rehabilitation of low and moderate income housing or conversion to low and moderate*
> *income housing."*

However, the objectors assert that the sale or lease of a housing unit or units acquired through condemnation is limited to a non-profit entity or a low- or moderate-income household as also provided in <u>N.J.S.A.</u> 52:27D-325 as follows:

> *"Notwithstanding the provisions of any other law regarding the conveyance, sale or lease of real*
> *property by municipalities, the municipal governing body may, by resolution, authorize the*
> *private sale and conveyance or lease of a housing unit or units acquired or constructed pursuant*
> *to this section, where the sale, conveyance or lease is to a low or moderate income household or*
> *nonprofit entity and contains a contractual guarantee that the housing unit will remain*
> *available to low and moderate income households for a period of at least 30 years."*

This provision is strictly referring to the sale, lease, or conveyance of housing units. Pursuant to the Redeveloper's Agreement, the affordable units to be provided at the Block 419 redevelopment project will be leased to low- and moderate-income households.

Contrary to the objectors' arguments, the Block 419 redevelopment project should be considered an inclusionary affordable housing site (majority market-rate units and typically up to 20% affordable housing units as upheld for decades in <u>Mount Laurel</u> matters either before the Courts or COAH) and the proposed development is instrumental in assisting in the fulfillment of the Borough's affordable housing obligations. I have been involved as either a municipal affordable housing planner, an assigned special affordable housing master or assisting other special masters at Clarke Caton Hintz in countless cases where municipalities use redevelopment sites to provide inclusionary affordable housing, not just 100% affordable housing developments. Further, the use of inclusionary zoning and inclusionary developments through redevelopment to provide low- and moderate-income housing has been prevalent in many of the

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 25*

at least 180 current municipal settlement agreements with FSHC throughout the State. Also, in my experience, the vast majority of affordable housing, including both inclusionary and 100% affordable developments, is provided by for-profit developers. Lastly, New Jersey's Housing and Mortgage Finance Agency's administration of the federal Low Income Housing Tax Credit Program ("LIHTC") which provides for the vast majority of funding for the construction of 100% family, senior or special needs affordable housing in the State is open to both for-profit and non-profit developers.

On behalf of FSHC, Adam Gordon, Esq., filed a series of responses to the objections including letters to the Court dated January 12, 2018, January 17, 2018, January 23, 2018 and March 14, 2018. In summary, Mr. Gordon finds that "the sole issue raised by Objectors that FSHC agrees may be a germane issue to the fairness hearing is the Borough's authority pursuant to the Fair Housing Act to pursue condemnation...." He states that the vast majority of objections raised remain more appropriately addressed as part of the Objectors' legal challenges on the Borough's redevelopment procedures which is part of a separate legal matter, not the Borough's DJ matter. Although Mr. Gordon doesn't believe the Objectors' legal arguments are correct, Mr. Gordon believes that based on the <u>Southampton</u> decision, the Court is required to address the Objectors' FHA claims as that does call into question the realistic opportunity of the site to address the Borough's fair share affordable housing obligations. Specifically, he states "limit the scope of [the Objectors'] legal arguments to be addressed in this [DJ matter] to legal argument #2, on the Borough's authority to take under the FHA, while making it clear that Objectors are not prejudiced from pursuing their currently pending litigation or any claims they may have on the issue of good faith;" Mr. Gordon relies on <u>Saratoga</u> for the point that COAH's substantive certification "does not preclude a challenge to the validity of zoning ordinances. If the COAH process, and now this court's process, were not final until any possible challenges to all implementing ordinances and related actions were adjudicated, it would be impossible to reach a final decision." In his January 17th letter, Mr. Gordon states "FSHC joins in the Borough's request for a binding determination in this matter on whether Objectors' interpretation of the condemnation powers under the FHA is correct..." Also, "FSHC agrees with the Borough that Objectors could still raise any procedural issues that arise with any condemnation action the Borough may pursue." Finally, FSHC finds that the Objectors can't have it both ways by filing objections in this DJ matter and then "claiming they should not be required to participate in proceedings or be bound by the Court's determination is simply untenable. The Court and Special Master have a responsibility to evaluate the objections received and rule on them in order to find the Settlement Agreement fair. To then allow Objectors to relitigate the same objections in a future case would violate basic principles of collateral estoppel and waste judicial resources."

Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 255 of 579
PageID: 1794
*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*    *March 16, 2018*
*for the Borough of Emerson, Bergen County*    *Page 26*

The Borough's counsel also filed a number of responses to the objections including letters dated January 11, 2018, January 16, 2018 from Doug Doyle, Esq. and Brief dated February 26, 2108 and letter dated March 9, 2018 from John Stone, Esq. to the Court. Borough's counsel also finds the objectors' legal arguments as incorrect regarding the claims against the utilization of the FHA for authority for the Borough to condemn/acquire by purchase or eminent domain the objectors' properties. As noted above, the Borough also filed a motion to compel intervention by the objectors to ensure that any decisions by the court regarding the FHA issues would be applicable to the objectors' other matters and the objectors would be bound by the judicial determination. As Mr. Stone stated "binding consideration at a Fairness Hearing of [Objectors] objections will not impair consideration of their opposition to redevelopment; it will expedite that determination, while not leaving the Borough's affordable housing plan in limbo, vulnerable to subsequent attack."

## 7.0    THE FAIRNESS ANALYSIS

The Borough's Settlement Agreement with FSHC must be subjected to the fairness analysis embodied in the East/West Venture case referenced above. Before doing so, it is worth noting, as the Court did in Morris County Fair Housing Council v. Boonton Township 197 N.J. Super, that "...it may be assumed that generally a public interest organization will only approve a settlement which it conceives to be in the best interest of the people it represents." FSHC was involved in all aspects of this case including the determination of the Borough's fair share allocation, RDP, and unmet need mechanisms. FSHC is a public interest advocacy organization in New Jersey devoted to promoting the production of housing affordable to low- and moderate-income households. Consequently, FSHC's endorsement of the Settlement Agreement is a compelling indication that it believes the Agreement to be fair and reasonable.

Under the East/West Venture case, the Court established criteria for evaluating the fairness of settlements between municipalities and builder plaintiffs in exclusionary zoning cases. By contrast, this settlement involves a municipality and a public interest organization. Consequently, the East/West Venture fairness criteria must be adapted to serve the instant matter.

The first step under the East/West Venture case is to evaluate the number and rationale for the affordable housing units to be provided by the developer(s). However, the fairness of the Settlement Agreement between Emerson and FSHC must be viewed from a Borough-wide perspective.

**First, the number and rationale for the affordable housing units to be provided must be considered by evaluating the Borough's fair share allocation under alternative methodologies.** As previously mentioned, FSHC commissioned Dr. Kinsey to prepare a fair share methodology that would calculate the regional need for the 1999-2025 period and allocate that housing need to the constituent municipalities in each housing region. As part of this effort, Dr. Kinsey authored a number of reports with variations to his methodology that have been submitted to various Superior Courts. Dr. Kinsey's report released in May 2016 allocated Emerson a Present Need (Rehabilitation Share) of 20 units, a Prior Round Obligations of 74 units and a Third Round need of 334 units, comprised of a "gap period" (1999-2015) obligation of 89 units and a Prospective Need (2015-2025) of 244 units. Therefore, while Dr. Kinsey's May 2016 calculations were released prior to the January 2017 NJ Supreme Court 'gap' decision, the Third Round obligation in Kinsey's May 2016 report includes a gap period calculation for the 1999-2015 period. Subsequently, Dr. Kinsey revised the gap period calculation in April 2017 pursuant to the Court's gap decision; Emerson's gap period obligation was recalculated to be 114 units. As agreed to by FSHC, the Settlement Agreement relies on the May 2016 report prepared by Dr. Kinsey as modified for the settlement for determining the Borough's fair share obligation.

As the Court is aware, a consortium of 288 municipalities retained Econsult Solutions, Inc. ("Econsult") to prepare a fair share methodology. Econsult also produced a series of expert reports and included an allocation mechanism for each municipality. According to Econsult's most recent report released in April 2017 in response to the Court's gap decision, Emerson was allocated a Present Need of 56 units, a Prior Round of 74 units, and a total Third Round need of 176 consisting of a 68-unit Gap Period obligation (1999-2015), and a 108-unit Third Round Prospective Need (2015-2025) obligation.

In the absence of any consensus on the methodology and in light of the considerable spread in the calculations presented by the experts, I find the fair share resolution set forth in the Settlement Agreement to be fair and reasonable to the region's low- and moderate-income households. This opinion is supported by the following:

- Both the Borough and FSHC accept the Rehabilitation Share of 20 units. The Present Need calculated by Dr. Kinsey is 36 units less than the 56-unit Present Need calculated by Econsult.

- Both the Borough and FSHC accept COAH's Prior Round obligation of 74 units; this is in accordance with <u>Mount Laurel IV</u>, which required prior housing obligations to be addressed <u>In Re Adoption of N.J.A.C. 5:96</u>, 221 N.J. 1, 30 (2015).

- The 234-unit Third Round obligation represents a 30% reduction of Dr. Kinsey's May 2016 calculation. This method is consistent with the approach utilized to adjust the fair share

obligation in the majority of other Third Round settlements approved by the Court and is reasonably balanced between the allocations advanced by both experts. Additionally, this Third Round obligation reflects that which was calculated for the 1999 to 2025 period by FSHC including a gap obligation.

- The absolute fair share number is of lesser import than the municipal compliance plan's prospects for successfully delivering affordable housing in fully-developed municipalities like Emerson which are entitled to a significant fair share adjustment due to a lack of vacant land.

**Second, under the fairness analysis, any other contributions made by the municipality or FSHC must be considered.** Through the settlement, Emerson and FSHC are able to avoid delays and the expense of a trial, which results in the Borough's focus on satisfying its fair share obligation.

As stipulated in the Settlement Agreement, Emerson has fully addressed its Prior Round RDP with two (2) compliance mechanisms previously approved by the Court. These include an RCA with Ridgefield, a completed group home and rental bonuses. The Borough proposes to address its Third Round RDP with group homes/alternative living arrangements, a completed inclusionary housing development, and a proposed mixed-use, inclusionary housing redevelopment site. Again, my finding that the 419 Redevelopment Inclusionary Housing site which is producing the lion's share of the Borough's credits (29 affordable family rental units) towards the Third Round RDP assumes the Court will find that the Borough has a right under the FHA to condemn the objectors' properties for an inclusionary redevelopment developed by a for-profit redeveloper. Further, the Borough agrees to provide opportunities to address its combined Prior Round and Third Round unmet need with proposed inclusionary overlay zoning on select sites and with a mandatory municipal-wide affordable housing set-aside requirement encouraging the future production of affordable housing generally through downtown redevelopment.

**Lastly, the Court is to consider any other components of the Agreement that contribute to the municipality's satisfaction of its <u>Mount Laurel</u> obligation.** The Agreement includes a number of provisions which facilitate the Borough's satisfaction of its fair share housing responsibilities, now and into the future. These provisions are as follows:

- Within 120 days of the Court's approval of this Agreement, the Borough must adopt a final Housing Element and Fair Share Plan and introduce any amendments to the Borough's Affordable Housing Ordinance and Zoning Ordinance that are necessary to implement the terms of this Agreement. The Borough shall also adopt a spending plan within 120 days of

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*
*for the Borough of Emerson, Bergen County*

*March 16, 2018*
*Page 29*

the Court's approval of this Agreement. The Spending Plan will be reviewed as part of the compliance phase of this matter and acted on during the future compliance hearing.

- The Borough shall update its affirmative marketing plan to include FSHC and other organizations in its list of community and regional organizations, and both the Borough and any other developers or administrative agencies conducting affirmative marketing must provide notice to those organizations of any available affordable units.

- The Borough agrees to require 13% of all affordable units referenced in its compliance plan (approved and constructed after July 1, 2008) to be affordable to households earning 30% or less of the regional median income, with at least half of the very-low income units being available to families. Pursuant to the Settlement Agreement, the Borough will comply with this requirement by providing at least three (3) very low-income family rental units at the Block 419 redevelopment site (and possibly one (1) very low-income family rental unit off-site), three (3) very low-income bedrooms at the Advancing Opportunities group homes, and seven (7) very low-income bedrooms at the Center for Hope and Safety and by requiring that 13% of all affordable units developed in the MFRAH North and South inclusionary overlay zoning districts be very low-income units.

- At least half of all units addressing the Borough's Third Round obligation (RDP and unmet need) will be made affordable to low-income households (which include the 13% requirement for very low-income units); the remainder will be made affordable to moderate-income households.

- At least 25% of the Borough's Third Round obligation (RDP and unmet need) shall be met through rental units, at least half of which will be available to families.

- At least half of the units addressing the Borough's Third Round obligation (RDP and unmet need) must be available to families.

- No more than 25% of units addressing the Prior Round RDP, Third Round RDP or combined unmet need shall be age-restricted.

- Rental bonuses shall be calculated in accordance with COAH's Second Round rules <u>N.J.A.C.</u> 5:93 – 5.15 (d) and shall not exceed the rental obligation.

- All affordable housing units created pursuant to the Settlement Agreement will comply with UHAC rules, with the exception of the third bullet point in which UHAC rules have been superseded by an amendment to the Fair Housing Act.

- Income limits for all affordable units that are part of the Borough's compliance plan and for which income limits are not already established through a federal program exempted from UHAC shall be updated by the Borough annually within 30 days of the publication of determinations of median income by HUD using the methodology set forth in the Settlement Agreement.

- On the first anniversary of the granting of a Final Judgment of Compliance and Repose, and every anniversary thereafter through the end of the period of protection, the Borough agrees to provide a report of trust fund activity and report of the status of all affordable housing activity within the municipality. The reporting is to be posted on the Borough's municipal website with a copy to FSHC.

- Within 30 days of the third anniversary of the Final Judgment of Compliance and Repose, and every three years thereafter through the end of the period of protection, the Borough will publish on its website and submit to FSHC a status report regarding its satisfaction of the very low-income requirement pursuant to N.J.S.A. 52:27D-329.1.

- For the midpoint realistic opportunity review due on July 1, 2020 as required pursuant to N.J.S.A. 52:27D-313, the Borough will post on its municipal website, with a copy provided to FSHC, a status report as to the implementation of its HEFSP. This midpoint review permits any interested party, such as FSHC, to request by motion a Court hearing regarding whether any sites in the Borough's compliance plan no longer present a realistic opportunity for affordable housing development and should be replaced. As mentioned above, during the review, the Borough must indicate how it will provide for the realistic opportunity of the possible seven-unit obligation (29 – 22 required on-site affordable housing units = 7) from the Block 419 redevelopment project if the balance of the seven (7) affordable units are not to be built on-site.

These provisions are affirmative actions on the part of the Borough and FSHC that facilitate the viability that Emerson will foster affordable housing development in accordance with all regulatory and statutory requirements, thereby contributing to the satisfaction of the Borough's Mount Laurel obligation on a continuing basis.

For the reasons cited above, I find that the Settlement Agreement between Emerson and FSHC is fundamentally fair to the interests of low- and moderate-income persons.

*Master's Report on the Settlement Agreement/Preliminary Compliance Determination*    *March 16, 2018*
*for the Borough of Emerson, Bergen County*    *Page 31*

## 8.0    CONCLUSION & RECOMMENDATIONS

Based on my review above, I find that the Settlement Agreement between FSHC and the Borough of Emerson is fundamentally fair to the interests of low- and moderate-income persons. As such, I would recommend that Your Honor approve the Agreement. As noted above in Section 6, my recommendation assumes that the Court will find that the Borough has a right through the FHA to condemn the objectors' properties for an inclusionary redevelopment developed by a for-profit redeveloper.

In addition, notwithstanding the required additional documentation for inclusion in the Borough's subsequent final compliance plan as contemplated by the Agreement, I would recommend that Your Honor approve the Borough's RDP determinations as well as the Borough's preliminary compliance efforts addressing the Prior Round RDP and Third Round RDP and the combined unmet need mechanisms. The Court may wish to enumerate the conditions noted herein in a Third Round Order approving the Settlement Agreement and preliminary compliance efforts.

I would be happy to answer any questions that Your Honor or the parties may have either prior to or at the Fairness and Preliminary Compliance Hearing.

Exhibit 24

D-27

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY, FOR A DECLARATORY JUDGMENT, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:BERGEN COUNTY<br><br>DOCKET NO.: BER-L-6300-15 |
| Petitioner. | CIVIL ACTION *Mount Laurel* Action<br><br>**F I L E D**<br>JUN 29 2018<br>**ORDER**  GREGG A. PADOVANO, J.S.C. |

**THIS MATTER** comes before the court upon the Declaratory Judgment Complaint of Petitioner Borough of Emerson ("Borough" or "Petitioner"), seeking a determination that the Borough has complied with its Mount Laurel Obligation, in accordance with the procedures set forth in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) (Mount Laurel IV), and

**THE COURT HAVING**   conducted a Fairness Hearing, in accordance with the requirements of Morris County Fair Housing Council v. Boonton Township, 197 N.J. Super. 359, 364 (Law Div.1984), aff'd o.b., 209 N.J. Super. 108 (App. Div. 1986) and East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311, 328 (App. Div. 1996),  upon the Borough's proposed plan to provide for affordable housing, Ronald H. Gordon, Esq. of DeCotiis FitzPatrick Cole & Giblin, LLP appearing on behalf of Petitioner, Adam Gordon, Esq. appearing on behalf of Intervenor Fair Share Housing Center ("Intervenor" or "FSHC"), Special Master Mary Beth Lonergan, AICP, PP ("Special Master") appearing, and Richard P. DeAngelis, Esq. appearing on behalf of Objectors, 214 Kinderkamack, LLC ("214") and Dolores Della Volpe, Trustee ("Della Volpe") (hereinafter, collectively "Objectors"); and

**THE COURT HAVING** received the testimony of Petitioner's planner, Brigette Bogart, PP, AICP having been qualified as an expert witness, as well as the testimony of the Special Master, Mary Beth Lonergan, AICP, PP; and

**THE COURT HAVING** received into evidence the following documents offered by Petitioner:

P-1    Affidavit of Service dated January 19, 2018.

P-2    Affidavit of Publication – The Ridgewood News dated December 8, 2017.

P-3    Affidavit of Publication – Bergen Record dated December 8, 2017.

P-4    Settlement Agreement between Fair Share Housing Center and Borough of Emerson dated November 21, 2017 ("Settlement Agreement").

SM-1    Special Master Mary Beth Lonergan Report and Recommendations dated March 16, 2018 ("Report"); and

**THE COURT HAVING** received into evidence the Report of the Special Master, dated March 16, 2018 which was identified as Exhibit SM-1 ("the Report"), evaluating the fairness of the Agreement and the Special Master having concluded in her Report that the Agreement is fair and reasonable to the region's low and moderate income households and having further recommended in her Report that the court approve the Settlement; and

**THE COURT HAVING** heard and considered the challenge(s) argued by Objectors to the proposed Settlement Agreement with FSHC, including Objectors' challenge to the realistic opportunity to provide housing for persons of low and moderate income, based on Objectors' contention that the Borough may not acquire the Objectors' property or other properties within Block 419 for a redevelopment project (the "419 Redevelopment Project"); and

**THE COURT HAVING** previously determined and ordered that Objectors "be bound by the court's finding at the Fairness Hearing is GRANTED to the extent that all non-parties and members of the public are so bound" pursuant to an order dated May 21, 2018; and

**THIS COURT** being designated and assigned to decide all issues related to affordable housing pursuant to the FHA, including a determination of whether Objectors' challenges would prevent the proposed Settlement Agreement from providing a realistic opportunity for the construction of low and moderate income housing in the Borough and the court having determined, for the reasons set forth on the record, that the Borough has demonstrated its voluntary and good faith efforts to comply with its fair share obligation and for good cause

**IT IS ON THIS 29th DAY OF JUNE 2018 ORDERED:**

1.    Petitioner properly afforded notice of the Fairness Hearing in accordance with governing law.

2.    The court determines and finds, upon the testimony presented, and arguments of counsel and upon a consideration of the Settlement Agreement admitted into evidence, (collectively, "the Settlement"), and the Special Master's Report, and in accordance with the requirements of <u>Morris County Fair Housing Council v. Boonton Township</u>, 197 N.J. Super. 359, 364 (Law Div.1984), <u>aff'd o.b.</u>, 209 <u>N.J.Super.</u> 108 (App. Div. 1986) and <u>East/West Venture v. Borough of Fort Lee</u>, 286 <u>N.J. Super.</u> 311, 328 (App. Div. 1996), that:

      a.    The Present Need Obligation, as agreed upon by the Parties based upon implementing the directives of <u>Mount Laurel IV</u> is 20 housing units;

      b.    The Prior Round Obligation, as originally determined by COAH in 1994 for the period 1987-1999 is 74 housing units;

c.      The Prospective Need Obligation, including the "GAP Period" obligation for the period of 1999-2025, based upon a compromise reached among the Parties in view of the uncertainty of litigation and in accordance with the directives of <u>Mount Laurel IV</u>, and upon the recommendation of the Special Master, is 234 housing units;

d.      The Borough has prepared a Vacant Land Adjustment (VLA) which, upon the Special Master's recommendation, is accepted by the court. The Special Master has recommended, the Parties have accepted, and the court accepts, a Realistic Development Potential (RDP) of 20 units from the Prior Round Obligation, and an RDP of 53 units for the Prospective Need Obligation for a total RDP of 73 units arising from the VLA. When the RDP of 20 units is subtracted from the Prior Round Obligation of 74 units, an Unmet Need of 54 units results. When the RDP of 53 units is subtracted from the Prospective Need Obligation of 234 units an Unmet Need of 181 units results. The total Unmet Need is 235 units;

e.      The Present Need Obligation, Prior Round Obligation and Prospective Need Obligation are collectively referred to as the Borough's Affordable Housing Obligation;

f.      The Settlement sets forth and otherwise incorporates mechanisms to address the Affordable Housing Obligation. The court finds, upon the Special Master's, Report, testimony and recommendation, that the Borough's Affordable Housing Obligation, including the Unmet Need, is adequately and sufficiently addressed by the mechanisms provided for in the Settlement Agreement;

g.      The court finds, upon the Special Master's Report, testimony and recommendation, that the Settlement creates a realistic opportunity for the satisfaction of the Borough's Affordable Housing Obligation;

h.      The court finds, upon the Special Master's Report, testimony and recommendation, that the Settlement is fair and reasonable to low and moderate income persons and that the properties located within Block 419 Redevelopment Project area are all "necessary or useful" to provide low and moderate income housing;

3.    Entry of a Final Judgment of Compliance and Repose is subject to the Borough complying with the following conditions:

a.    The Borough shall comply with the recommendations of the Special Master as set forth in her Report including, but not limited to, undertaking any amendments to the Borough's Housing Element and Fair Share Plan and Spending Plan;

b.    The Borough shall adopt a revised Spending Plan upon the Special Master's review and comment, such that the court may determine at a final hearing that the proposed expenditure of amounts from the affordable housing trust fund in the Spending Plan is consistent with and authorized by the Fair Housing Act, N.J.S.A. 52:27D-301, et seq., and such funds are timely "committed for expenditure" as required, if at all, by N.J.S.A. 52:27D-329.2, -329.3;

4.    The objection presented to the court filed by 214 and Della Volpe by correspondence dated January 8, 2018 and the court's order dated May 21, 2018 on the motion brought by the Borough of Emerson to have 214 and Della Volpe bound by the court's determination at the Fairness Hearing resulted in the following:

a.    The court held that "any party or non-party may challenge an action taken to implement a housing plan approved under a fairness hearing (citations omitted);"

b.    The court found that "this challenge must actually occur as a part of the fairness hearing;"

c.    The court found that "any ruling made as a part of the scheduled fairness hearing will be binding upon any and all non-parties;"

By letter dated June 15, 2018, counsel for 214 and Della Volpe advised the court that "aside from this letter and the previous letters and certifications submitted on behalf of the Owners on January 8, 2018, the Owners do not intend to make any other written submissions or call any witnesses in connection with the Fairness Hearing."

**IT IS FURTHER ORDERED**, that 214 and Della Volpe's properties (as well as all other properties located within Block 419) are "necessary or useful" to the Borough of Emerson in meeting its Affordable Housing obligations as agreed to in the Settlement Agreement with Fair Share Housing Center and as recommended in the Special Master's Report, testimony and recommendation; and

**IT IS FURTHER ORDERED** that the court shall conduct a Final Hearing to consider entering a Final Judgment of Compliance and Repose on August 23, 2018 at 2:00 p.m.. Petitioner shall provide public notice of the Final Hearing; and

**IT IS FURTHER ORDERED** that the Borough is entitled to continued immunity and the accompanying protection from Mount Laurel exclusionary zoning and/or builders' remedy lawsuits as provided under the FHA and in accordance with Mount Laurel IV and this court's order until the court's determination following the Final Compliance Hearing; and

**IT IS FURTHER ORDERED** that a copy of this order shall be served upon all parties within seven (7) days from counsel for the Borough's receipt; and

**IT IS FURTHER ORDERED** that a copy of this order shall be available for inspection by any interested party.

HON. GREGG A. PADOVANO, J.S.C.

Exhibit 25

Emerson NJ elec BER-L-006300-15   06/24/2020 5:26:05 PM  Pg 2 of 36 Trans ID: LCV20201114789   Page 1 of 2
Case 2:20-cv-04728-MCA-MAH     Document 84-3     Filed 10/28/24     Page 269 of 579
PageID: 1808

D-29

# Emerson elects first woman as mayor

**Stephanie Noda**, NorthJersey    Published 6:59 a.m. ET Nov. 8, 2018 | **Updated 4:58 p.m. ET Nov. 8, 2018**



*(Photo: Photo courtesy of Danielle DiPaola)*

EMERSON — Danielle DiPaola, a longtime Republican councilwoman, ousted the borough's Democratic mayor in Tuesday's election and will become the borough's first female mayor.

"I could not have done it without those who supported me over the years," said DiPaola. "I was proud to represent them for almost a decade as a councilwoman and I'm even prouder to serve them as their mayor."

According to Tuesday night's unofficial results, DiPaola received 1,652 votes, while Mayor Louis Lamatina received 1,409.

Since 2010, DiPaola has served the borough as a councilwoman, but said she decided to run for mayor because she "didn't like the direction the town was going in," with particular concerns about overdevelopment in the downtown.

DiPaola said she aims to bring more transparency to government, with plans for televised meetings and an official borough Facebook page. A new committee to handle decorations around town for the holidays may also be in the works, said DiPaola.

On a larger scale, DiPaola, who served on the borough's Land Use Board in the past, would like to ensure development in the downtown is done in a "reasonable" way "that isn't four-story buildings."

"Everyone has this idea that I'm against development, but I'm not against it," said DiPaola. "I'm against eminent domain. I would like to move forward and bring positive change to the downtown."

**DOWNTOWN:**  Lawsuits over Emerson downtown redevelopment settled (/story/news/bergen/emerson/2018/11/03/lawsuits-over-emerson-nj-downtown-redevelopment-settled/1858935002/)

**MORE:**  Election turnout surpasses 2014 midterm voting throughout North Jersey (/story/news/2018/11/07/nj-midterm-election-turnout-surpasses-2014-mid-term-voting-throughout-region/1915975002/)

DiPaola hopes young girls in the borough will gain encouragement from her upcoming term as mayor.

"I'm proud to be a role model and teach them that they can be anything they want," said DiPaola.

Emerson NJ elec BER-L-006300-15   06/24/2020 5:26:05 PM  Pg 3 of 36 Trans ID: LCV20201114789   Page 2 of 2
Case 2:20-cv-04728-MCA-MAH      Document 84-3     Filed 10/28/24    Page 270 of 579
PageID: 1809

**Don't miss a thing**



Download our apps and get alerts for local news, weather, traffic and more. iPhone app (https://itunes.apple.com/us/app/northjersey.com-latest-news/id446490632?mt=8) | iPad app (https://itunes.apple.com/us/app/northjersey.com-latest-news/id446490632?mt=8) | Android app (https://play.google.com/store/apps/details?id=com.northjersey.developer.northjerseylatestnews) | Sign up for our newsletter (https://profile.northjersey.com/newsletters/manage/) | Subscribe (http://offers.northjersey.com/specialoffer) | Find us on social media: Twitter (https://twitter.com/northjersey) | Sports Twitter (https://twitter.com/TheRecordSports) | Facebook (https://www.facebook.com/northjerseycom/) | Instagram (https://www.instagram.com/northjerseynews/) | Food Instagram (https://www.instagram.com/northjerseyeats/)

Read or Share this story: https://www.northjersey.com/story/news/bergen/emerson/2018/11/08/emerson-nj-elects-first-female-mayor/1924456002/

Exhibit 26

Case 2:20-cv-04728-MCA-MAH Document 84-3 Filed 10/28/24 Page 272 of 579 PageID: 1811

# DiPaola, Emerson's First Woman Mayor, Sweeps Lamatina's Team



[slideshow_deploy id='899']

BY JOHN SNYDER
OF PASCACK PRESS

EMERSON, N.J.—The Borough Council has returned to Republican leadership, with Councilwoman Danielle DiPaola, soon the borough's first woman mayor, wresting the gavel from two-term Mayor Lou Lamatina.



DiPaola's running mates, Brian Gordon and Ken Hoffman, unseated Karen Wolf, who was seated in January to finish John Lazar's term, and Brian Downing, a retired county sheriff's sergeant who was making his first bid for re-election to the council.

DiPaola, 52, a lifelong borough resident who studied art history and theater at The University of Maryland at College Park, is a veteran of borough government   and owns Danielle's Baskets & Gifts.

A vocal critic of elements of an ambitious mixed-use redevelopment plan taking shape under Lamatina, she called her Nov. 6 election "a referendum on overdevelopment."

"We swept, all three of us. It was great. We won, but what really happened is that Emerson won," DiPaola told Pascack Press the morning of Nov. 7.

Later in the day, she added, "The people of Emerson have spoken. It is apparent that the people have serious concerns about the direction the town was taking. I would ask that the governing body, out of respect to the voters, take no further action [on redevelopment] until January."

DiPaola opposed borough tactics against holdout property  owners, questioned where additional affordable housing is expected to go, and has called for greater transparency of the deal.

Selected to fill a vacated seat on the council, DiPaola was elected to three-year terms on the dais in 2010, 2013, and 2016.

She's been liaison to Public Buildings and Grounds, Parks and Utilities, Streets and Municipal Services, Finance, Tax, and Revenue Committee, the Environmental Commission, the Historic Preservation Commission, the Board of Health, the Library Board of Trustees, and the Shade Tree Commission.

Her win also could breathe new life into the possibility that Borough Hall, which is eligible to apply for a spot on the State Register of Historic Places, might get what local historians call its due against a push to modernize municipal facilities, including police headquarters and the courtroom.

Campaigning, she told Pascack Press, "My opponents have said I'm against progress, but this couldn't be further from the truth. I've always supported and voted yes on projects that actually improve the borough while still being consistent with its small- town character."

She cited her votes as vice chair of the Land Use Board and Class III member for over four years in favor of Oritani Bank, The Emerson Grand, Tool Chest, and renovations to ShopRite, The Emerson Hotel, and Liberty Subaru.

"These projects had excellent plans that were befitting of a small town," she said.

She also has said she would "bring government to the people of Emerson." She was on a committee looking into televising meetings.

## Lamatina, proud of record, wishes new team luck

Lamatina, 60, principal of the Law Office of Louis J. Lamatina, served as a councilman here from 1995 to 1997, was mayor 2007 to 2010, and was elected to the center seat again in 2015.

He also advises the Township of Washington Planning Board.

He graduated magna cum laude from Manhattan College with a double major in economics and history and from Hofstra law.

On Nov. 8 he told Pascack Press he is honored and privileged to have led the Borough of Emerson for the past four years.

"Our legacy will be the major accomplishments which have improved our way of life, including completion of the Kinderkamack Road Improvement Project, moving forward with the much needed revitalization to our downtown, stabilizing and actually reducing the Borough portion of our tax bills by increasing ratables through reasonable and rational development, increasing our surplus, closing the Just Pups puppy mill location in our downtown, and restoring civility to the Borough," he said.

He added, "My team has accomplished much, and I wish our new leaders all the luck in the world as they will hopefully continue with that progress."

He took evident delight in announcing recently that redeveloper JMF Properties had struck a deal with owners on Block 419 lots, 2, 3, 4, and 6.01, which include the Cinar Turkish Restaurant, Cork & Keg Liquor, and Ranch Cleaners, to acquire their properties, seen as in the way of new upscale shopping, 147 apartments, and a parking garage on Kinderkamack Road between Lincoln Boulevard and Linwood Avenue.

There would also be a set-aside for some of the borough's unmet need for affordable housing.

The attorney for the sellers told Pascack Press Oct. 29 that his clients "have had to live with a cloud of condemnation hanging over their properties for nearly three years. They have been forced to incur substantial legal fees in defending their properties in court over the last 18 months."

## Gordon, Hoffman ready to get to work

Celebrating their ticket's win on the council are DiPaola's running mates, Brian Gordon and Ken Hoffman.

Gordon, a millwright with Local 715, said he learned his work ethic from his father, "a longtime union man who expected nothing less than my best effort. And I have continued to practice that sense of self discipline in raising my family and in my profession. If I'm elected, the people of Emerson can expect that I'll bring that same work habit to my position on the council," he told Pascack Press.

Hoffman is a College of William and Mary-educated clerk who served as councilman for two terms, 2005–2010.

He told Pascack Press, "Unfortunately, we cannot undo the mistakes of the present governing body. But we can promise a future where thoughtless planning and foolish spending are things of the past."

[slideshow_deploy id='899']

**0 Comments**

Add a comment…

Sort by    Oldest

Facebook Comments Plugin

Exhibit 27

MIN No. 20APPROVED FOR RELEASE & CONTENT 12-18-18



**MINUTES**
**BOROUGH OF EMERSON**
**MAYOR AND COUNCIL**
December 4, 2018
7:30 P.M.
**Borough Hall-Council Chambers**
Emerson, NJ 07630



I. CALL TO ORDER
Mayor Lamatina called the meeting to order at 7:30 p.m. and identified the emergency exits.

II. ROLL CALL

Mayor Lamatina asked Ms. Dietsche to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilman Bayley, Councilwoman/Mayor-elect DiPaola, Councilman Downing, Councilman Falotico, Council President Knoller, Councilwoman Wolf

Also present were Councilman-elect Hoffman, Borough Administrator Robert Hoffmann, Borough Attorney Wendy Rubinstein and Borough Clerk Jane Dietsche.

III. EXCUSED ABSENCE OF GOVERNING BODY MEMBER
• Absence of Mayor Lamatina from the Special Meeting of November 19, 2018

☞**Motion** to excuse the absence of Mayor Lamatina from the Special Meeting of November 19, 2018 was **moved** by Council President Knoller, seconded by Councilwoman Wolf and carried unanimously.

IV. PROCLAMATIONS & CITATIONS

Mayor Lamatina stated that there were no proclamations or citations that evening.

V. APPOINTMENTS/RESIGNATIONS
• Emerson Volunteer Ambulance Corps
    o Appointment of Brandon Izzo as a Probationary Member effective immediately

☞**Motion** to appoint Brandon Izzo as a Probationary Member of the Emerson Volunteer Ambulance Corps effective immediately was **moved** by Councilman Downing, seconded by Councilman Falotico and carried unanimously.

• Emerson Volunteer Fire Department
    o Appointment of Daniel Dominguez as a Probationary Member effective immediately

☞**Motion** to appoint Daniel Dominguez as a Probationary Member of the Emerson Volunteer Fire Department effective immediately was **moved** by Councilwoman Wolf, seconded by Councilman Downing and carried unanimously.

MIN No. 20APPROVED FOR RELEASE & CONTENT 12-18-18

## VI. MINUTES FOR APPROVAL
- Special and Closed Session Special Meeting Minutes of November 19, 2018

  ☞**Motion** to approve the Special and Closed Session Meeting Minutes of November 19, 2018 was **moved** by Council President Knoller, seconded by Councilman Falotico and carried unanimously.

- Regular and Closed Session Meeting Minutes of November 20, 2018

  ☞**Motion** to approve the Regular Meeting Minutes as amended and the Closed Session Meeting Minutes of November 20, 2018 was **moved** by Council President Knoller, seconded by Councilman Falotico and carried unanimously.

## VII. UNFINISHED BUSINESS
- Presentation by Borough Planner on updates to Sign Ordinance – Ms. Bogart noted that the Land Use Board had been working on this item for two and a half years and outlined the major changes. The biggest change was removing items originally in Chapter 232 Sign and Awning and adding them to the Chapter 290 Zoning. She explained that the goal of the Land Use Board was to consolidate and simplify the regulations and give new businesses the opportunity to design their own signage by relaxing the current stringent regulations. Ms. Bogart discussed definitions which were added and specific items which were amended. Those items addressed animated signage and current technology, temporary signs, exemptions for charitable and religious institutions and relaxing the code related to colors on signs to allow businesses to have flexibility in marketing. Councilwoman/Mayor-elect DiPaola requested that the ordinance limit the number of colors allowed on signs to keep the look of downtown Emerson cohesive and provide a small-town feel. However, there was a concern that this would limit specific brand standards and would require a variance. Governing Body consensus was to introduce the ordinance with the stipulation that no sign consist of more than four colors, inclusive of black and white in place of the verbiage on page 8 Letter B which stated 'there are no restrictions on the number of colors permitted on one sign' and to add the word 'electronically' before the word 'animated' on page 9 in Section H. Further amendments could be addressed in the future.

- Discussion of changing weekly recycling dates from Wednesday to Monday – Mr. Hoffmann followed up on a discussion that had taken place at the November 20th Council meeting. He stated that if the Borough changed the date of recycling pickup from Wednesday to Monday, only one Monday over the next four years, in 2022, would be considered a holiday by Interstate Waste and postpone their pickup to Wednesday. Interstate Waste offered to give the Borough 200 free totes and would be willing to provide additional containers at cost. Gaeta Recycling would continue to pick up yard waste on Mondays and Interstate Waste would pick up all recycling on Monday. Garbage collection would continue on Tuesdays and Fridays.

  ☞**Motion** to allow Interstate Waste Services to change the date of recycling pickup from Wednesdays to Mondays beginning in 2019 for the remainder of their contract was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 6-0:
  **RC: Council members:**
  **YES: DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

MIN No. 20 APPROVED FOR RELEASE & CONTENT 12-18-18

VIII.  NEW BUSINESS
- Permit Training Unlimited to hold training class on March 21st in Borough Hall – benefit to Borough - CEU's at no cost to Borough employee – The Governing Body and Mr. Hoffmann discussed allowing Training Unlimited to hold a training class in Borough Hall on March 21, 2019. The class would allow one Borough employee to obtain CEU's at no cost. Other organizations also scheduled training classes periodically in Borough facilities. Governing Body consensus was to have a formal procedure whereby all such requests went through the Borough Administrator in the future.

  ☞**Motion** to permit Training Unlimited to hold a training class in Borough Hall on March 21, 2019 was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried by a roll call vote of 6-0:
  **RC: Council members:**
  **YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

- Crossing Guards – Calendar Year Appointment – New Jersey State Law Sick Leave – Mr. Hoffmann noted that New Jersey had passed a law on October 29th which required employers to provide paid sick time for part time employees. He was expecting more information from the State which would help guide the Borough in conforming with these new regulations.

IX.  INTRODUCTION OF ORDINANCES

**First Reading:**

Mayor Lamatina announced that Ms. Dietsche would read the following ordinances by title and they would be further considered at a Public Hearing to be held on December 18th, 2018 at 7:30 p.m. in the Council Chambers of the Borough Hall, Municipal Place, Emerson, N.J. and published in the December 7, 2018 edition of The Ridgewood News.  He added that these ordinances were on file in the Clerk's Office and posted on the official bulletin board of the Municipal Building where copies would be available to the General Public at no charge.

**1569-18** AN ORDINANCE TO AMEND THE CODE OF EMERSON CHAPTER 77 THEREOF, TITLED POLICE DEPARTMENT TO AMEND ARTICLE II ENTITLED OUTSIDE EMPLOYMENT, SECTION §77-15 ENTITLED E THEREOF, ENTITLED ACCOUNTING OF HOURS; PAYMENT OF HOURS PROVIDING FOR HOURLY FEE FOR PRIVATE EMPLOYMENT OF POLICE OFFICERS

☞**Motion** to introduce Ordinance No. 1569-18 on first reading was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

**1571-18** "AN ORDINANCE OF THE BOROUGH OF EMERSON AMENDING CHAPTER 138, "DEVELOPMENT FEES" OF THE BOROUGH CODE

☞**Motion** to introduce Ordinance No. 1571-18 on first reading was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

MIN No. 20APPROVED FOR RELEASE & CONTENT 12-18-18

<u>1572-18</u> AN ORDINANCE OF THE BOROUGH OF EMERSON AMENDING CHAPTER 290, ARTICLE IV SECTION 13D "AHO AFFORDABLE HOUSING OVERLAY SET-ASIDE REQUIRMENTS" OF THE BOROUGH CODE

☞**Motion** to introduce Ordinance No. 1572-18 on first reading was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

<u>1573-18</u> AN ORDINANCE AMENDING CHAPTER 200-8 HOURS; PERMIT REQUIRED FOR ORGANIZED ACTIVITIES OF THE CODE OF THE BOROUGH OF EMERSON

☞**Motion** to introduce Ordinance No. 1573-18 on first reading was **moved** by Councilman Falotico, **seconded** by Councilman Downing and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

<u>1574-18</u> AN ORDINANCE AMENDING CHAPTER 101, ZONING, OF THE CODE OF THE BOROUGH OF EMERSON, TO ADDRESS ALL EXISTING SIGNAGE REGULATIONS AND IMPLEMENT A NEW COMPREHENSIVE SIGN CODE

☞**Motion** to introduce Ordinance No. 1574-18 as amended on first reading was **moved** by Council President Knoller, **seconded** by Councilman Falotico and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

<u>1575-18</u> AN ORDINANCE DEDICATING BLOCK 419, LOT 7 IN THE BOROUGH OF EMERSON, COUNTY OF BERGEN, STATE OF NEW JERSEY AND CONVEYING SUCH LAND TO EMERSON REDEVELOPER'S URBAN RENEWAL, LLC

Councilwoman/Mayor-elect DiPaola requested that Ordinance 1575-18 and 1576-18 be opened to the public so that their voices could be heard on these items.

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1575-18 and Ordinance No. 1575-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Downing and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

<u>Jan Blau, 77 Hasbrouck Avenue</u> said the Volunteer Ambulance Corps property belonged to Emerson and that there was no consideration for this conveyance of property. He discussed traffic concerns and opined that an independent traffic safety expert should sign off on the redevelopment project.

<u>Bill Price, 9 Emwood Drive</u> said Emerson Woods was beautiful and opined that he was against a monstrous building in the downtown area. He expressed his concerns about traffic and opined that it would be worse with redevelopment. He loved Councilman Downing's compassion and said that he did a good job and would always be his friend.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1575-18 and Ordinance No. 1575-18 was **moved** by Councilman Falotico, **seconded** by Councilman Bayley and carried unanimously.

MIN No. 20APPROVED FOR RELEASE & CONTENT 12-18-18

Councilwoman/Mayor-elect DiPaola said the Governing Body was tying the hands of any future administration and said the process had been accelerated because of the upcoming change in government.

☞**Motion** to introduce Ordinance No. 1575-18 on first reading was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 5-1:
**RC: Council members:**
**YES: Bayley, Wolf, Knoller, Falotico, Downing**
**NO: DiPaola**

<u>1576-18</u> AN ORDINANCE VACATING KENNETH AVENUE IN THE BOROUGH OF EMERSON, COUNTY OF BERGEN, STATE OF NEW JERSEY AND CONVEYING SUCH VACATED LANDS TO EMERSON REDEVELOPER'S URBAN RENEWAL, LLC

☞**Motion** to introduce Ordinance No. 1576-18 on first reading was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 4-1:
**RC: Council members:**
**YES: Bayley, Wolf, Knoller, Falotico**
NO: DiPaola
ABSTAIN: **Downing**

<u>1577-18</u> AN ORDINANCE AMENDING AND SUPPLEMENTING CHAPTER 274, VEHICLES AND TRAFFIC; ARTICLE VII, SCHEDULES, OF THE REVISED GENERAL ORDINANCES OF THE BOROUGH OF EMERSON

☞**Motion** to introduce Ordinance No. 1577-18 on first reading was **moved** by Councilman Downing, **seconded** by Councilwoman/Mayor-elect DiPaola and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

<u>1578-18</u> AN ORDINANCE AMENDING CHAPTER 77 POLICE DEPARTMENT, SECTION IV COMPOSITION

☞**Motion** to introduce Ordinance No. 1578-18 on first reading was **moved** by Councilman Bayley, **seconded** by Councilman Downing and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

<u>1579-18</u> AN ORDINANCE AMENDING CHAPTER 187: MUNICIPAL FACILITIES USE OF THE CODE OF THE BOROUGH OF EMERSON

☞**Motion** to introduce Ordinance No. 1579-18 on first reading was **moved** by Councilman Falotico, **seconded** by Councilman Downing and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

X.    ADOPTION OF ORDINANCES

**<u>Second Reading & Public Hearing:</u>**

<u>1570-18</u> AN ORDINANCE AMENDING CHAPTER 61-10 ENTITLED PARKS, PLAYGROUNDS AND RECREATION, 'FEE SCHEDULE' OF THE BOROUGH OF EMERSON, COUNTY OF BERGEN AND STATE OF NEW JERSEY, ESTABLISHING FEES FOR PARTICIPATION IN RECREATIONAL ACTIVITIES

MIN No. 20 APPROVED FOR RELEASE & CONTENT 12-18-18

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1570-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried at 8:54 p.m.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1570-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1570-18 only was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried.

☞**Motion** to adopt Ordinance No. 1570-18 on second reading was **moved** by Councilman Falotico, **seconded** by Councilman Downing and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

☞**Motion** to add Borough Administrator Robert Hoffmann's report to the agenda was **moved** by Council President Knoller, **seconded** by Councilwoman/Mayor-elect DiPaola and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

XI.  REPORTS
- Borough Administrator Robert Hoffmann reported on the following:
  - He thanked Office of Emergency Management Coordinator/Police Lieutenant Mark Savino and Deputy OEM Coordinator/DPW Superintendent Perry Solimando for helping the Borough receive a reimbursement of $80,098.44 from the Federal Emergency Management Agency. They had submitted all the necessary paperwork to be reimbursed for expenses related to the March 7, 2018 snowstorm which deposited 26 inches of snow in Bergen County. The Borough would benefit from their professionalism, perseverance and willingness to go the extra mile on behalf of Emerson.
  - He wished everyone a Happy Chanukah.
  - On Friday, December 7th at 7:00 p.m. the Annual Christmas Tree Lighting would take place at Borough Hall. Father Paul of Assumption Church and Pastor Arturo of the Emerson Bible Church would take part in the event and the Emerson Junior/Senior High School Choir would perform. Santa was scheduled to arrive on the fire truck and lead everyone to the Fire House for hot cocoa and merriment.
  - He discussed the passing of former President George Bush and said that he had touched a lot of people. Wednesday, December 5th would be a National Day of Mourning to pay tribute and honor the good deeds he did for the country. He added that President Bush valued public service and shared a story about meeting him on three occasions when he served as Vice President. He said that on January 10, 1985 he was offered a job as an advance man for Vice President Bush but said he could only accept the position if he was able to be in the United States on Saturday, June 22nd, 1985 for his wedding. He was told that it was not possible to guarantee that, so he declined the job offer. As it turned out, on June 22, 1985, Vice President Bush was in Europe attempting to negotiate an extension to the SALT II treaty and he would have been in Europe instead of getting married. He closed by saying that Vice President Bush had written a note and sent a picture to his future in-laws saying he had made the right decision to marry their daughter. He noted that former President Bush was a genuinely nice man who touched a lot of people.

MIN No. 20 APPROVED FOR RELEASE & CONTENT 12-18-18

## XII. PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried at 9:01 p.m.

<u>Laura Litchult, 300 Kinderkamack Road, President of the Emerson Chamber of Commerce</u> said the Veterans' Breakfast they hosted on November 12th had been well received and thanked business owners and residents for their assistance. She hoped to continue the event in the future. She also requested to be notified in advance of upcoming events in the Borough so the Chamber of Commerce could participate.

☞**Motion** to close the meeting to comments from the public was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried at 9:08 p.m.

## XIII. RESOLUTIONS ON CONSENT AGENDA NO. 283-18

☞**Motion** to approve Resolution No. 283-18 Consent Agenda was **moved** by Councilman Falotico, **seconded** by Council President Knoller and carried by a roll call vote of 6-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

| | |
|---|---|
| CA 284-18 | Transfer of Funds |
| CA 285-18 | Confirm Endorsement of Community Development Grant for $6,000.00 for Cognitive Training and Intellectual Wellness |
| CA 286-18 | Confirm Endorsement of Community Development Grant for $200,000.00 for drainage improvements in Continental Woods Section 4 |
| CA 287-18 | Authorizing Retroactive Five-Year Agreement with New Jersey Transit through May 31, 2022 for Commuter Parking Spaces on Emerson Plaza East License #L0237-1944-01 |
| CA 288-18 | Authorizing Retroactive Five-Year Agreement with New Jersey Transit through May 31, 2022 for Commuter Parking Spaces at Emerson Train Station License #L0237-1964-01 |
| CA 289-18 | Authorize Renewal of Shared Service Agreement with the Northwest Bergen County Utilities Authority for Licensed Operator Services for the period January 1, 2019 through December 31, 2020 |
| CA 290-18 | Amending Resolution 221-18 Not to Exceed Amount for Specialty/Hybrid Services Contract – Joe Amaral and Sons Landscaping Inc. |
| CA 291-18 | Authorize Borough Attorney to begin the process of taking in-rem foreclosure proceedings on a property with unpaid taxes |

## XIV. CLOSED EXECUTIVE SESSION - Resolution No. 292-18

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 292-18 was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Bayley and carried by a roll call vote of 6-0.
**RC: Council members:**
**YES: DiPaola, Wolf, Bayley, Knoller, Falotico, Downing**

| | | |
|---|---|---|
| #18-12/04-31 | Potential Litigation – New Concepts for Living | N.J.S.A. 10:4-7 |
| #18-12/04-32 | Personnel – Police Department -SRO | N.J.S.A. 10:4-7 |
| #18-12/04-33 | Potential Litigation – Land Use Statutes, Variances | N.J.S.A. 10:4-7 |

MIN No. 20APPROVED FOR RELEASE & CONTENT 12-18-18

XV.  RECONVENE

The Borough of Emerson reserves the right to return to Open Session and, if appropriate, take formal action.

☞**Motion** to reconvene was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried at 10:30 p.m.

- Resolution No 293-18 Resolution for Municipalities to Confirm Endorsement of Community Development Projects – New Concepts for Living

  ☞**Motion** to approve Resolution No. 293-18 Resolution for Municipalities to Confirm Endorsement of Community Development Projects – New Concepts for Living was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Falotico and carried by a roll call vote of 6-0:
  **RC: Council members:**
  **YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

- Resolution No 294-18 Authorize the Hiring of One Full Time Probationary Patrol Officer for the Emerson Police Department

  ☞**Motion** to approve Resolution No. 293-18 Authorize the Hiring of One Full Time Probationary Patrol Officer for the Emerson Police Department as a conditional offer of employment to a potential police officer pending completion of the required background, etc. testing as well as pending the ability to hire an extra officer if the Borough Ordinance is enacted to hire officers up to 22 on the force was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 6-0:
  **RC: Council members:**
  **YES:  DiPaola, Bayley, Wolf, Knoller, Falotico, Downing**

XVI.  ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried at 10:43 p.m.

Respectfully submitted,


Jane Dietsche, RMC
Borough Clerk

Exhibit 28

# Brigette Bogart

Planning  & Design Professionals LLC

South Franklin Turnpike Ramsey, New Jersey 07446
Phone: 201-485-8455 / 201-485-3365
BogartPlanning.com

# HOUSING ELEMENT AND THIRD ROUND FAIR SHARE PLAN

## BOROUGH OF EMERSON
## BERGEN COUNTY, NEW JERSEY

The original document was appropriately signed and sealed on December 6, 2018 in accordance with Chapter 41 of Title 13 of the State Board of Professional Planners.

**Brigette Bogart, P.P., AICP, CGW**
**Professional Planner #5679**

## TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................................................... **5**

**SECTION I: HOUSING ELEMENT** ........................................................................................ **5**

   A. Community Overview ......................................................................................................... 11

   B. Inventory of Municipal Housing Stock ........................................................................... 11

   C. Projection of Municipal Housing Stock .......................................................................... 11

   D. Population Analysis ............................................................................................................ 11

   E. Employment Analysis ........................................................................................................ 12

**SECTION II: FAIR SHARE PLAN** ....................................................................................... **14**

   A. Introduction ....................................................................................................................... **14**

   B. Prior Round History ........................................................................................................... 14

   C. Prior Round Compliance .................................................................................................. 15

   D. Third Round Obligation .................................................................................................... 16

   E. Third Round Plan ............................................................................................................... 17

   F. Distribution Compliance ................................................................................................... 22

LIST OF TABLES

| TABLE # | TITLE | PAGE |
|---|---|---|
| 1 | Exiting Land Uses | 6 |
| 2 | Dwelling Units | 7 |
| 3 | Units in Structure | 7 |
| 4 | # of Bedrooms in Housing Unit | 7 |
| 5 | Year Structure was Built | 8 |
| 6 | Occupants per Room | 8 |
| 7 | Equipment and Plumbing Facilities | 9 |
| 8 | Gross Rent of Renter Occupied Housing Units | 9 |
| 9 | Value of Owner Occupied Housing Units | 9 |
| 10 | Housing Units authorized by Building Permit | 10 |
| 11 | Population Growth | 10 |
| 12 | Age Characteristics | 11 |
| 13 | Average Household Size | 11 |
| 14 | Household Income | 11 |
| 15 | Employment Status | 12 |
| 16 | Employed Residents age 16 and Over by Occupation | 12 |
| 17 | Employed Residents age 16 and Over by Industry | 12 |
| 18 | The Borough of Emerson 3rd Round Obligation | 13 |
| 19 | Summary of Compliance Plan for Adjusted Housing Obligation | 15 |
| 20 | Borough of Emerson Total Affordable Housing Obligation | 16 |
| 21 | Vacant Land Analysis | 17 |
| 22 | Realistic Development Potential Calculation | 18 |
| 23 | Remaining Unmet Need | 19 |
| 24 | Third Round Plan | 19 |
| 25 | Third Round Mechanisms details | 19 |
| 26 | Distribution Compliance | 22 |

APPENDIX

| A-1 | Sites Map |
|---|---|
| A-2 | Redevelopment Documents |
| A-3 | Vacant Land Analysis |
| A-4 | Fair Share Ordinance |
| A-5 | Spending Plan |
| A-6 | Development Fee Ordinance |
| A-7 | Affirmative Marketing Plan |
| A-8 | Rehabilitation Manual |
| A-9 | Draft Resolution: Intent to Bond |
| A-10 | Resolution appointing a Municipal Housing Liaison |
| A-11 | Group Home Surveys |
| A-12 | Deed restrictions |
| A-13 | SWAN Agreement |
| A-14 | FSHC Agreement |

## INTRODUCTION

### Affordable Housing History

In 1975 the New Jersey Supreme Court decided, in <u>So. Burlington Cty. NAACP v. Township of Mount Laurel</u>, that every developing municipality in New Jersey had an affirmative obligation to provide for its fair share of affordable housing.   In a subsequent decision in 1983, the Court acknowledged that the vast majority of municipalities in the State had ignored their constitutional obligation and called for the State Legislature to enact legislation that would save municipalities from the burden of having the courts determine their affordable housing needs.  The result was the establishment of the New Jersey Council on Affordable Housing (COAH), the State agency responsible for overseeing the manner in which municipalities address their low- and moderate-income housing needs.

COAH initially adopted a "fair share" methodology to determine the State's low and moderate income housing needs in 1986.  Their adopted combined first and second round housing-need numbers for Emerson, published in 1994, called for the Borough to provide a total of 74 affordable housing units.

In December 2004, COAH adopted new substantive (<u>N.J.A.C.</u> 5:94) and procedural (<u>N.J.A.C.</u> 5:95) rules for the period beginning December 20, 2004.  At the same time, COAH re-adjusted all municipal first and second round housing-need new construction numbers and rehabilitation numbers. At that time, COAH's re-adjusted 'new construction' obligation for Emerson went back to 74 units and the rehabilitation share was set at zero units.  The Borough's new construction obligation was ultimately reduced to 20 units through a vacant land adjustment with a 54-unit unmet need.  This vacant land adjustment was previously approved by the Superior Court.

These new third round rules also implemented a new "growth share" approach to affordable housing and thus represents a significant departure from the Council's first and second round rules in that the new rules link the production of affordable housing with actual development and projected growth within the community.

As a result of Judge Cuff's 2007 Appellate Division ruling, COAH's substantive and procedural rules were revised again on June 2, 2008 (now <u>N.J.A.C.</u> 5:97 and <u>N.J.A.C.</u> 5:96, respectively). In 2010 Judge Skillman's' Appellate Decision invalidated the second iteration of the Third Round Rules, wherein he indicated that the procedures must involve a methodology similar to the methodologies utilized in the First and Second Rounds and use more current data. The NJ Supreme Court in their 2013 decision upheld this decision.  As a result of a failure by COAH to adopt revised Third Round regulations ( <u>N.J.A.C. 5:96</u> and <u>5:97</u>, 221 <u>N.J.</u> 1,30 (2015) (Mount Laurel IV) after order to by the NJ Supreme Court in 2013 a 2015 Supreme Court decision was issued.

In March of 2015 the New Jersey Supreme Court indicated that prior methodologies employed in the First and Second Round Rules should be used to establish present and prospective statewide and regional housing needs. The municipalities should establish to the court, computations of housing need and municipal obligation based on those methodologies. As a result of the March 2015 ruling, municipalities were required to individually petition the Superior Court for approval of their housing plans, which proceedings are known as declaratory judgment actions.

Current Affordable Housing Standards

This document is designed to address the Borough of Emerson's housing obligation, inclusive of a determination of the community's Third Round Obligation and the plan to achieve this obligation. A municipality's Fair Share obligation is comprised of its Present Need, Prior Round (1987-1999), the Gap Prior (1999-2015); and the Third Round Prospective Need (2015-2025) obligations. The Supreme Court has directed municipalities to rely on the 1987-199 Prior Round Obligation estimates listed in N.J.A.C. 5:93 to determine Fair Share obligations.

Pursuant to In re N.J.A.C. 5:96 and 5:97, 221 N.J. 1, 30 (2015)(Mount Laurel IV), the Borough of Emerson filed a declaratory judgment action on July 8, 2015, In the Matter of the application of the Borough of Emerson, County of Bergen, Docket No. BER-L-6300-15, seeking a declaration of its compliance with the Mount Laurel doctrine and Fair Housing Act of 1985, N.J.S.A. 52:27D-301 et seq. in accordance with In re N.J.A.C. 5:96 and 5:97, supra. The Court in Mount Laurel IV, however did not provide estimates for the Present Need, Gap Period, or Third Round Prospective Need obligations. As such, it is appropriate for the parties to the declaratory judgment action to arrive at a settlement regarding a municipality's Third Round present and prospective need instead of doing so through plenary adjudication of the present and prospective need.

The Borough of Emerson has therefore negotiated a settlement with Fair Share Housing Center (FSHC), a Supreme Court-designated interested party in the declaratory judgment action, for the Borough's Third Round present, Gap period and prospective need instead of doing so through plenary adjudication of the present and prospective need.

FSHC and the Borough agree that Emerson does not accept the basis of the methodology or calculation proffered by FSHC's consultant, David N. Kinsey, PhD, P.P., F.A.I.C.P., NEW JERSEY LOW AND MODERATE INCOME HOUSING OBLIGATIONS FOR 1999-2025 CALCULATED USING THE NJ COAH PRIOR ROUND (1987-1999) METHODOLOGY, dated May 2016. The Borough arrived at such settlement on the basis that the negotiated Third Round obligation is based on the Prior Round methodology and reflects a reduction from Dr. Kinsey's May 2016 calculation of the Borough's Third Round prospective need.

This Document contains the Borough's proposed Housing Element and Fair Share Plan. It has been prepared pursuant to the provisions of the Municipal Land Use Law (MLUL) and the applicable regulations of the Council on Affordable Housing governing the provision of affordable housing within the community for the period between 1987 and 2025.

This document is organized into three sections.

1. The first part, the Housing Element, contains background data on the Borough's housing characteristics and population as required by COAH.
2. The second section identifies the Borough's historical housing activity and how the Prior Round obligation was met.
3. The final section contains the Borough's Fair Share Plan for meeting its third Round affordable housing obligation.

**SECTION I: HOUSING ELEMENT**

A.  **COMMUNITY OVERVIEW**

The Borough of Emerson is located in the north central portion of Bergen County.  The borough occupies an area of 2.4 square miles. It is contiguous with eight (8) municipalities, including Washington to the west, Westwood and River Vale to the north, Harrington Park, Closter and Haworth to the east and Oradell and Paramus to the south.

The borough is essentially a fully developed municipality with approximately 99 percent of its land area developed or set aside as permanent recreation/open space.  The borough is generally characterized by mature residential neighborhoods and a central commercial district, which extends in a north/south direction along Kinderkamack Road and the NJ Transit Railroad Right of Way.

The table below provides additional information regarding the Borough's current land use distribution.

**Table 1: Existing Land Use**
**Emerson, New Jersey**

| Existing Land Use Distribution | | |
|---|---|---|
| Residential | 527 | 34.1 |
| Open Space and Recreation | 413 | 204 |
| Railroad and R.O.W. | 204 | 13.2 |
| Commercial | 195 | 12.6 |
| Cemetery | 83 | 5.4 |
| Public Schools | 53 | 3.4 |
| Public | 35 | 2.3 |
| Quasi-Public | 17 | 1.1 |
| Vacant | 11 | 0.7 |
| Farm | 7 | 0.4 |
| Industrial | 1 | 0.1 |
| Total | 1,546 | 100.00 |

*Source: Borough of Emerson 2007 Master Plan Reexamination*

B.  **INVENTORY OF MUNICIPAL HOUSING STOCK**

The Borough of Emerson occupies an area of 2.4 square miles within the Pascack Valley region of Bergen County. The borough is located in COAH's Region I housing region which consists of Bergen, Hudson, Passaic and Sussex Counties. Emerson is primarily a single-family residential suburban community.

This section of the plan includes data from the U.S. Census, as well as the American Community Survey which identifies housing characteristics including occupancy, value, and age, as required by the Municipal Land Use Law.  The inventory details housing characteristics such as age, condition, purchase/rental value and occupancy.

1.  The Borough had 2,398 dwelling units in 2000, which represents an increase of 6.2 percent over the number of units identified in 1990.  In 1990 there were 2,257 units.  In 2010 the number of housing units increase slightly more to 2,572 units with the most significant increase in renter occupied units. From 165 to 201 the number of renter occupied units increased from 165 to 450 units, a 172% increase. The following table provides additional details regarding the tenure and occupancy of the borough's

housing stock.  As shown below, over 91 percent of the borough's housing stock in 2000 was owner-occupied.  There were 25 vacant units in 2000, representing 1.0 percent of the housing stock in the community. In 2010 this number rose to 162 units representing 6.3 percent of the housing stock.

**Table 2: Dwelling Units (1990, 2000, 2010 and 2015 Estimate)**
**Emerson, New Jersey**

| Category | 1990 | | 2000 | | 2010 | | 2015 Estimate | |
|---|---|---|---|---|---|---|---|---|
| | No. of Units | Percent | No. of Units | Percent | No. of Units | Percent | Number of Units | Percent |
| Owner-Occupied Units | 2,052 | 90.0 | 2,191 | 91.3 | 1,960 | 76.2 | 1,960 | 81.3 |
| Renter-Occupied Units | 165 | 7.3 | 182 | 7.7 | 450 | 17.5 | 450 | 18.6 |
| Vacant Units | 40 | 1.8 | 25 | 1.0 | 162 | 6.3 | 0 | 0.0 |
| Total Units | 2,257 | 100.00 | 2,398 | 100.00 | 2,572 | 100.00 | 2,410 | 100.00 |

*Source: U.S. Census 1990, 2000 & 2010 and American Community Survey 2015*

2. <u>Housing Characteristics</u>.  The following tables provide additional information on the characteristics of the borough's housing stock, including data on the number of units in the structure and the number of bedrooms.  As shown below, the housing stock is predominantly characterized by single-family detached dwellings, which represented approximately 93 percent of all dwelling units in 2000, but only 86.7 % of the housing stock in 2010.

**Table 3: Units in Structure (1990, 2000, 2010 and 2015 Estimate)**
**Emerson, New Jersey**

| Units in Structure | 1990 | | 2000 | | 2010 | | 2015 Estimate | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Single Family, detached | 2076 | 92.0 | 2,228 | 92.9 | 2,229 | 86.7 | 2,080 | 86.3 % |
| Single Family, attached | 39 | 1.7 | 40 | 1.7 | 53 | 2.1 | 41 | 1.7% |
| 2 units | 2013 | 4.6 | 97 | 4.0 | 110 | 4.3 | 111 | 4.6% |
| 3 or 4 Units | 12 | 0.5 | 18 | 0.8 | 42 | 1.6 | 41 | 1.7% |
| 5 to 9 Units | 5 | 0.2 | 15 | 0.6 | 17 | 0.7 | 17 | 0.7% |
| 10 or More Units | 11 | 0.5 | 0 | 0 | 100 | 3.5 | 89 | 3.7% |
| Other | 11 | 0.5 | 0 | 0 | 31 | 1.2 | 31 | 1.3% |
| Total | 2,257 | 100.00 | 2,398 | 100.00 | 2,572 | 100.00 | 2,410 | 100% |

*Source: U.S. Census 1990, 2000 & 2010 and American Community Survey 2015*

**Table 4: Number of Bedrooms in Housing Units (2000, 2010 and 2015 Estimate)**
**Emerson, New Jersey**

| Number of Bedrooms | 2000 | | 2010 | | 2015 Estimate | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Zero | 15 | 0.6 | 14 | 0.5 | 14 | 0.6% |
| One | 44 | 1.8 | 52 | 2.0 | 53 | 2.2% |
| Two | 211 | 8.8 | 358 | 13.9 | 1,528 | 63.4% |
| Three | 1,190 | 49.6 | 1,270 | 49.4 | | |
| Four | 745 | 31.1 | 633 | 24.6 | 817 | 33.9% |
| Five or More | 193 | 8.1 | 245 | 9.5 | | |
| Total | 2,398 | 100.0 | 2,572 | 100.00 | 2,410 | 100.0% |

*Source: U.S. Census, 2000 and 2010 and American Community Survey 2015*

3. <u>Housing Age.</u>  The majority  (85 percent) of the borough's housing units wee constructed in the years prior to 1970.  The median year for the construction of the borough's dwelling units is 1956.  The following table details the age of the borough's housing stock.

As shown on the following table the majority (approximately 81.9 percent) of the Borough's housing units were constructed prior to 1960.

**Table 5: Year Structure Built (2000 and 2015 Estimate)**
**Emerson, New Jersey**

| Year Units Built | 2000 | | 2015 Estimate | |
|---|---|---|---|---|
| | Number of Units | Percent | Number of Units | Percent |
| 2014 or later | - | - | 0 | 0 |
| 2010 to 2013 | - | - | 72 | 3.0% |
| 1999 to 2009* | 14 | 0.6 | 104 | 4.3% |
| 1990 to 1998 | 81 | 3.4 | 282 | 11.7% |
| 1980 to 1989 | 105 | 4.4 | | |
| 1970 to 1979 | 171 | 7.1 | 598 | 24.8% |
| 1960 to 1969 | 449 | 18.7 | | |
| 1950 to 1959 | 1,075 | 44.8 | 1,070 | 44.4% |
| 1940 to 1949 | 231 | 9.7 | | |
| 1939 or earlier | 272 | 11.3 | 287 | 11.9% |
| Total | 2,398 | 100.00 | 2,410 | 100.00 |

*Source: U. S. Census 2000 and American Community Survey 2015      * This data is from 2000-2009*

4.  Housing Conditions.   The following table identifies the extent of overcrowding in the borough represented by housing units with more than one occupant per room.  In 2000 there were 23 housing units found to be overcrowded according to this standard, representing 1.0 percent of the housing stock.  However in 2010 there were zero.

**Table 6: Occupants per Room (2000 and 2010)**
**Emerson, New Jersey**

| Occupants per Room | 2000 | | 2010 | |
|---|---|---|---|---|
| | Number of Units | Percent | Number of Units | Percent |

| 1.00 or less | 2,350 | 99.0 | 2,410 | 100.00 |
| 1.01 to 1.5 | 23 | 1.0 | 0 | 0 |
| 1.51 or more | 0 | 0 | 0 | 0 |
| **Total** | **2,373** | **100.00** | **2,410** | **100.0** |

*Source: U. S. Census 2000 and 2010*

The table below presents information pertaining to housing conditions such as the presence of complete plumbing and kitchen facilities and the type of heating equipment used. In all the census data years, there were no housing units found to be lacking in complete kitchen or plumbing facilities or lacking in heat.

**Table 7: Equipment and Plumbing Facilities (2000, 2010 and 2015 Estimate)**
**Emerson, New Jersey**

| Facilities | 2000 | | 2010 | | 2015 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Kitchen | | | | | | |
| Lacking Complete Facilities | 0 | 0 | 0 | 0 | 0 | 0 |
| With Complete Facilities | 2,373 | 100.0 | 2,410 | 100.00 | 2,410 | 100.00 |
| Plumbing | | | | | | |
| Lacking Complete Facilities | 0 | 0 | 0 | 0 | 0 | 0 |
| With Complete Facilities | 2,373 | 100.0 | 2,410 | 100.00 | 2,410 | 100.00 |
| Heating Equipment | | | | | | |
| Standard Heating Facilities | 2,373 | 100.00 | 2,410 | 100.00 | 2,410 | 100.00 |
| Other Means | 0 | 0 | 0 | 0 | 0 | 0 |
| No Fuel Used | 0 | 0 | 0 | 0 | 0 | 0 |
| No Phone Service | - | - | 10 | 0.4% | | |

*Source: U.S. Census 2000 & 2010 and American Community Survey 2015*

5.  Purchase and Rental Values.  As shown in following tables, the borough has seen a rise in both owner-occupied and rental prices between 1990 and 2010.  The median gross rent for the borough's rental for the borough's rental housing stock increased by roughly 9.5 percent, from $1,001 in 1990 to $1,096 in 2000 to $2000 in 2010. For a renter-occupied housing, an affordable monthly rent for a three-person household is estimated to be  $1,400.  According to the 2010 US Census approximately 38% of the borough's rental units had a gross rent less than $1,400. According to census data the Borough has seen a rise in rental prices for housing between 2000 and 2010.  This reflects general regional increases in rents as well.  As shown in Table 3, the median gross rent for the Borough's rental housing stock increased by roughly 100 percent between 2000 and 2010, from $1,096 to $2,000.

**Table 8: Gross Rent of Renter-Occupied Housing Units (1990, 2000 and 2010)**
**Emerson, New Jersey**

| Rent | 1990 | | 2000 | | 2010 | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Less than $250 | 0 | 0 | 10 | 5.5 | 0 | 0 |
| $250 to $499 | 0 | 0 | 0 | 0 | 50 | 27.3 |
| $500 to $749 | 42 | 25.5 | 16 | 8.8 | 14 | 7.7 |
| $750 to $999 | 31 | 18.8 | 43 | 23.8 | 23 | 12.6 |
| $1,000 or more | 84 | 50.9 | 105 | 58.0 | 96 | 52.5 |
| No Cash Rent | 8 | 4.8 | 7 | 3.9 | 17 | NA |
| Total | 165 | 100 | 181 | 100 | **288** | **100** |
| Median Gross Rent | $1,001 | - | $1,096 | - | **$2,000** | ~ |

*Source: U.S. Census 1990, 2000and 2010*

Table 9 illustrates that the median value of owner-occupied housing units dramatically increased between 2000

and 2010, rising from $260,000 to $505,300. It is noted that the overall region has seen a marked decrease in housing values since the 2010 Census. According to the American Community Survey of 2010-2014, the median value of housing has decreased to $455,200.

**Table 9: Value of Owner-Occupied Housing Units (2000 and 2010)**
**Emerson, New Jersey**

| Value Range | 2000 | | 2010 | |
|---|---|---|---|---|
| | Units | % | Units | % |
| Less than $100,000 | 20 | 1.0 | 8 | 0.3 |
| $100,000 to $149,999 | 11 | 0.5 | 0 | 0 |
| $150,000 to $199,999 | 337 | 15.9 | 23 | 1.6 |
| $200,000 to $299,999 | 1,102 | 52.2 | 40 | 1.8 |
| $300,000 to $499,999 | 610 | 28.9 | 990 | 45.7 |
| $500,000 to $999,999 | 33 | 1.6 | 1,103 | 50.6 |
| $1,000,000 or more | 0 | 0 | 0 | 0 |
| **Total** | 2,113 | 100% | 2,164 | 100 |
| **Median Value** | $ 260,000 | | $ 505,300 | |

*Source: U.S. Census 2000 and 2010;*

Based on the most current COAH regional income limits (from 2014), the median household income for a three-person household in Region 1 (which is Emerson's housing region) is $75,980. A three- person moderate-income household, established at no more than 80 percent of the median income would have an income not exceeding $60,784.

An affordable sales price for a three-person moderate-income household earning 80 percent of the median income is estimated to be approximately no more than $160,000. However actual moderate-income sales prices are capped at a typical household making 70% of the regional median income and rents are capped at 60% of the regional median income.  This estimate is based on the UHAC affordability controls outline in N.J.A.C. 5:80-26.6.

C.   PROJECTION OF MUNICIPALITY'S HOUSING STOCK

The number of housing units constructed over the past fifteen years peaked during the years from 2001 to 2006. The economic downturn in 2008 is evidenced in the fact that only ten (10) dwelling units were constructed between 2007 and 2009. Since 2010 there have been 20 multi-family dwelling units constructed, as well as three (3) units in mixed use buildings, and twenty-eight (28) single family units. Table 10 provides the number of building permits issued between 2000 and 2015.

**Table 10: Housing Units Authorized by Building Permits for New Construction**
**Emerson, New Jersey**

| Year | One and Two Units | Multi-Family | Mixed Use | Total |
|------|------|------|------|------|
| 2015 | 14 | 0 | 0 | 14 |
| 2014 | 5 | 2 | 0 | 7 |
| 2013 | 2 | 0 | 0 | 2 |
| 2012 | 1 | 0 | 0 | 1 |
| 2011 | 2 | 0 | 3 | 5 |
| 2010 | 4 | 18 | 0 | 22 |
| 2009 | 1 | 0 | 0 | 1 |
| 2008 | 2 | 0 | 0 | 2 |
| 2007 | 8 | 0 | 0 | 8 |
| 2006 | 7 | 36 | 0 | 43 |
| 2005 | 8 | 0 | 0 | 8 |
| 2004 | 36 | 0 | 0 | 36 |
| 2003 | NA | NA | NA | 20 |
| 2002 | NA | NA | NA | 15 |
| 2001 | NA | NA | NA | 16 |
| 2000 | NA | NA | NA | 6 |
| **Total** | NA | NA | NA | 206 |

*Source: New Jersey Department of Community Affairs*
*NA – information provided is not broken down by housing type for years 2000-2003*

## D. POPULATION ANALYSIS

The Borough of Emerson has experienced an increase in population from 1990 until 2010. The 2010 population of 7,401 identified in the 2010 US Census represents a 2.8 percent increase over the 2000 Census figure.

**Table 11: Population Growth (1930 to 2010 and 2015 Estimate)**
**Emerson, New Jersey**

| Year | Population | Population Change | Percent Change |
|------|------|------|------|
| 1930 | 1,394 | ~ | ~ |
| 1940 | 1,487 | 93 | 6.7 |
| 1950 | 1,744 | 257 | 17.3 |
| 1960 | 6,849 | 5,105 | 292.7 |
| 1970 | 8,428 | 1,579 | 23.1 |
| 1980 | 7,793 | -635 | -7.5 |
| 1990 | 6,930 | -863 | -11.1 |
| 2000 | 7,197 | 267 | 3.9 |
| 2010 | 7,401 | 204 | 2.8 |
| 2015 Estimate | 7,616 | 215 | 2.9 |

*Source: U.S. Census, Tabulated by Bergen County Department of Planning and Economic Development, 2011*
*And American Community Survey 2015*

The Borough's age characteristics are outlined in the table below. The age characteristics of the Borough's population have remained relatively unchanged in the last ten years. The median age in 2010 was 45.7 in Emerson, as compared to 41.1 in 2000. The median age in Bergen County in 2010 was 42.5.

**Table 12: Age Characteristics (2000, 2010 and 2015 Estimate)**
Emerson, New Jersey

| Age | 2000 | | 2010 | | 2015 Estimate | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Under 5 years | 500 | 6.9 | 395 | 5.3 | 396 | 5.2 |
| 5 to 19 years | 1,289 | 17.9 | 1,493 | 20.2 | 1,577 | 20.7 |
| 20 to 24 years | 278 | 3.9 | 326 | 4.4 | 343 | 4.5 |
| 25 to 34 years | 784 | 10.9 | 572 | 7.7 | 731 | 9.6 |
| 35 to 44 years | 1,192 | 16.6 | 1,003 | 13.6 | 1,028 | 13.5 |
| 45 to 54 years | 1,038 | 14.4 | 1,253 | 17.0 | 1,439 | 18.9 |
| 55 to 64 years | 765 | 10.6 | 890 | 12.0 | 845 | 11.1 |
| 65 to 84 years | 1,089 | 15.1 | 1,109 | 14.9 | 975 | 12.8 |
| 85 years and over | 262 | 3.6 | 360 | 4.9 | 267 | 3.5 |
| **Total** | **7,197** | **100%** | **7,401** | **100%** | 7,616 | 100% |

*Source: U.S. Census, 2000 & 2010 and American Community Survey 2015*

The average household size in 2010 was 2.89 persons per household, a decrease in size that is consistent with the pattern over the last thirty years. However it 2015 to was estimated to rise again to 3.06.

**Table 13: Average Household Size (1980 to 2010 and 2015 Estimate)**
Emerson, New Jersey

| Year | Total Population | Average Household Size |
|---|---|---|
| 1980 | 7,793 | 3.39 |
| 1990 | 6,930 | 3.01 |
| 2000 | 7,197 | 2.91 |
| 2010 | 7,401 | 2.89 |
| 2015 Estimate | 7,616 | 3.06 |

*Sources: U.S. Census 2000 and 2010 and American Community Survey 2015*

Table 14 illustrates the median household income for Emerson households for 2000 and 2010 and the 2015 estimate from the American Community Survey. The income increased by approximately forty-five (45) percent between 2000 and 2010, from $74,556 to $108,295.  There was a significant increase in the percent of households with income greater than $150,000, jumping from 13.5 percent of households in 2000 to 27.7 percent in 2010.

**Table 14: Household Income (2000 to 2010 and 2015 Estimate)**
Emerson, New Jersey

| Income Category | 2000 | | 2010 | | 2015 Estimate | |
|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent |
| Less than $10,000 | 47 | 2.0 | 29 | 1.2 | 70 | 2.9 |
| $10,000 to $14,999 | 69 | 2.9 | 62 | 2.6 | 24 | 1.0 |
| $15,000 to $24,999 | 154 | 6.4 | 74 | 3.1 | 133 | 5.5 |
| $25,000 to $34,999 | 123 | 5.1 | 154 | 6.5 | 119 | 4.9 |
| $35,000 to $49,999 | 303 | 12.7 | 215 | 9.1 | 258 | 10.7 |
| $50,000 to $74,999 | 507 | 21.2 | 356 | 15.1 | 362 | 15.0 |
| $75,000 to $99,999 | 385 | 16.1 | 307 | 13.0 | 176 | 7.3 |
| $100,000 to $149,999 | 480 | 20.1 | 513 | 21.7 | 692 | 28.7 |

| | | | | | |
|---|---|---|---|---|---|
| $150,000 or more | 322 | 13.5 | 654 | 27.7 | - | - |
| $150,000 to $199,999 | - | - | - | - | 340 | 14.1 |
| $200,00 or more | - | - | - | - | 236 | 9.8 |
| **Total** | 2,390 | 100.0 % | 2,364 | 100.0 % | 2,410 | 100.0% |
| **Median Household Income** | $74,556 | | $108,295 | | $102,500 | |

*Source: U.S. Census, 2000 & 2010 and American Community Survey 2015*

E.  **EMPLOYMENT ANALYSIS**

Table 15 provides information on the employment status of Borough residents age 16 and over.  In 2000, approximately 98.9 percent of the Borough's population over the age of 16 was employed, with only 1.1percent unemployed.  This was below the Bergen County unemployment rate of 2.3 percent.  The unemployment numbers increased in 2010 with only 93.7% of the Borough's population over the age of 16 employed with 6.3 percent unemployed.  In 2015 the estimated unemployment rate increased an approximate 1.6 times from 2010 level according to the American Community Survey.

**Table 15: Employment Status 2000, 2010 and 2015 Estimate**
**Emerson, New Jersey**

| Employment Status | 2000 | 2010 | 2015 Estimate |
|---|---|---|---|
| In civilian labor force | 3,413 | 3,813 | 4,460 |
| Employed | 3,350 | 3,434 | 4,042 |
| Unemployed | 63 | 379 | 410 |
| **Unemployment Rate** | **1.1** | **6.3** | **10.1** |
| **Total Population 16 and Over** | **5,719** | **5,990** | **6,706** |

*Source: U.S. Census 2000 and American Community Survey 2010 & 2015*

The following two tables detail information on the employment characteristics of employed Emerson residents. Table 16 details occupation characteristics, while Table 12 details industry characteristics.

**Table 16: Employed Residents Age 16 and Over, By Occupation 2000 and 2010)**
**Emerson, New Jersey**

| Occupation | 2000 | | 2010 | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| Management, Business, Science and Arts Occupations | 1,598 | 47.7 | 1,798 | 52.3 |
| Sales & Administrative Support Occupations | 1,031 | 30.8 | 896 | 26.0 |
| Service Occupations | 395 | 11.8 | 415 | 12.1 |
| Natural resources, construction and maintenance occupations | 174 | 5.2 | 140 | 4.2 |
| Production, transportation and material moving occupations | 152 | 4.5 | 185 | 5.4 |
| **Total** | **3,350** | **100** | **3,434** | **100** |

*Source: U.S. Census, 2000 and 2010*

**Table 17: Employed Residents Age 16 and Over, By Industry (2000 and 2010)**
**Emerson, New Jersey**

| Industry | 2000 | | 2010 | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| Agriculture, Forestry, Fishing and Hunting & Mining | 0 | 0 | 0 | 0 |
| Construction | 165 | 4.9 | 103 | 3.0 |
| Manufacturing | 344 | 10.2 | 173 | 5.0 |
| Transportation, Communication & Other Public Utilities | 80 | 2.4 | 151 | 4.4 |
| Wholesale Trade | 146 | 4.4 | 301 | 8.8 |
| Retail Trade | 421 | 12.6 | 224 | 6.5 |
| Information | 163 | 4.9 | 256 | 7.6 |
| Finance, Insurance, & Real Estate | 402 | 12.0 | 301 | 8.8 |
| Professional, scientific and management and administrative and waste management services | 447 | 13.3 | 369 | 10.7 |
| Educational services and health care and social assistance | 679 | 20.3 | 994 | 29.0 |
| Arts, entertainment, and recreation and accommodation and food services | 163 | 4.9 | 337 | 9.8 |
| Other services except public administration | 195 | 5.8 | 103 | 2.8 |
| Public Administration | 145 | 4.3 | 122 | 3.6 |
| **Total** | **3,350** | **100** | **3,434** | **100** |

*Source: U.S. Census, 2000 and 2010*

## FAIR SHARE PLAN

### INTRODUCTION

A municipality's Fair Share obligation is comprised of its present need, prior round (1987-1999) Gap Period (1999-2015) and Third Round Prospective Need (2015-2025) obligations. The Supreme Court directed municipalities to rely on the 1987-1999 Prior Round obligation estimate listed in N.J.A.C. 5:93 to determine the Fair Share obligations.  However, the court did not provide estimates for the Present Need, Gap Period or Third Round Prospective Need obligations. The table below summarizes the Borough of Emerson's affordable housing obligation as agreed to by Fair Share Housing.

**Table 18: The Borough of Emerson's Third Round Obligation**

| Round/Component | Obligation |
|---|---|
| Present Need (Rehabilitation Requirement per Kinsey Report) | 20 |
| Prior Round (1987-1999 requirement pursuant to N.J.A.C. 5:93) | 74 |
| Third Round (1999-2025) Prospective Need (per Kinsey Report, as adjusted through this Agreement)* | 234 |

* For Purposes of this plan (that is based on the Agreement memorialized in a letter dated November 21, 2017 executed by Fair Share Housing Center and the Borough of Emerson) the Third Round Prospective Need shall be deemed to include the GAP Period Present Need, which is a measure of households formed from 1999-2015 that need affordable housing, that was recognized by the Supreme Court in the Declaratory Judgment Actions Filed by Various Municipalities, 227 N.J. 508 (2017)

This plan has been prepared to address the Borough's obligation as set forth above and in the Agreement dated November 21, 2017. This plan memorializes an agreement reached between the Borough of Emerson, the declaratory judgment plaintiff, and Fair Share Housing Center (FSHC).  The plan details the projects, mechanisms and funding sources which will be used to meet the borough's affordable housing obligation.   It is organized into three sections.

1. **Prior Round:** History and final Compliance Plan
2. **Third Round Obligation and Planning**: Vacant Land Analysis and Historical Housing activity.  This section details all the housing activity and planning for affordable housing that the Borough has completed or is currently undergoing to address the affordable housing needs.  This documentation details projects that have been planned, approved and/or are under construction since the last housing plan was prepared for the Second Round.
3. **Mechanisms for meeting the Borough's Third Round Obligation**. The final section contains a summary of how the estimated obligation for the Borough compares to the housing activity and planning that the Borough has been undertaking.

### PRIOR ROUND HISTORY

The Borough of Emerson Planning Board adopted a Housing Element and Fair Share Plan in April 2001 as a formal amendment to the Master Plan (The April 2001 Compliance Plan).  This action occurred with the context of consolidated pending litigation entitled "Community Developers & Management, LLC v. Borough of Emerson, et all,." (Docket No. BER-L-2734-00) and "Borough of Emerson v. United Water New Jersey, et al.," (Docket No. Ber-L-268-01).  At that time there were significant open issues having major impacts on the required components of the Plan. It was believed at the time that after the Court ruled on these major issues Emerson would have the opportunity to revise and refine the compliance plan.

Trial proceedings were conducted in the Superior Court in September 2001, resulting in issuance of a written opinion dated October 19, 2001 ("the Decision"), which invalidated the April 2001 Compliance Plan. The Decision was implemented by an Interim Judgment entered by the Court on November 2, 2001. The Decision did not require inclusion of Emerson Woods Parcel in RDP. The principal holdings in the Decision and the Interim Judgment were as follows:

1. Community Developers was not entitled to a builder's remedy, but inclusion of the Community Developer's site in RDP was not precluded by the Fanwood Amendment. The site was determined to have a RDP of 2 rather than 1 unit as set forth in the April 2001 plan.
2. The Marek Farm site was determined to have a RDP of 18 units, rather than 12 units.
3. The total RDP was determined to be 20 units, rather than 13 units.
4. The April 2001 Plan was held to be inadequate to address Emerson's adjusted fair share obligation of 20 units.
5. *The Court did not allow Emerson to prepare a revised compliance plan based on the judicially determined RDP of 20 units, but instead directed the special master to prepare a compliance plan for Emerson.*

In accordance with the Decision and Interim Judgment, the special master prepared a compliance plan for Emerson as set for the in a report dated December 31, 2001. The Special Master Compliance Plan provided for Judicially-determined RDP of 20 units to be addressed by the following measures:

1. A regional contribution agreement for 5 units at a cost of $25,000 per unit, resulting in a total funding requirement of $125,000. This was approved by COAH August 6, 2003.
2. The municipal-sponsored construction of 5 units of age-restricted rental housing on the Community Developers site at a projected cost of $615,000, which might be offset in part by a potential $315,000 grant. This project was indicated to include a rental bonus credit of 1 unit, resulting in a total credit of 6 units.
3. Rezoning for inclusionary development at a density of 12 units per acre of a 1.5 -acre portion of the Emerson Golf club property. The 20% set-aside requirement would produce 4 affordable units.
4. The Special Master's Compliance Plan also included administrative provisions and regulations, modifications of the developer's fee ordinance and an overlay zone directed at the unmeet need.

The Special Master Compliance Plan was adopted under protest by the Planning Board and Borough Council. On March 13, 2002, the Court issues a bench opinion that rejected certain objections, but nevertheless declined to approve the Special Master's Compliance Plan and instead directed Emerson to prepare a new compliance plan subject to various restrictions

PRIOR ROUND COMPLIANCE PLAN

As stated previously, the Borough of Emerson has a total "pre-credited need" fair share housing obligation for 1987-1999 of 74 units of new construction. The Borough had no rehabilitation component. The Superior Court has determined that Emerson has a adjusted fair share housing obligation of 20 units, based on the realistic development potential ("RPD") of two vacant parcels if zoned for inclusionary development at a gross density of 14.00 units/acre with a 20% set-aside of affordable as follows:

(a) The 6.4 acre Marek Farm on Old Hook Road for a yield of 18 affordable units and
(b) The 0.83 acre Community Developers parcel at Emerson Plaza West for a theoretical yield of 2 affordable units.
(c) With the remaining 54 units being the Borough's unmet need.

The Borough addressed its prior Round Obligation with the following components.

1. <u>Emerson Plaza West Site (Block 417 Lots 2 & 3)</u>

This 0.83–acre site at the northern end of Emerson Plaza West is owned by Community Developers and Management, the plaintiff in the Mt. Laurel litigation. It previously contained a single-family residence that was demolished by Community Developers. The Court decision held that a builder's remedy was barred by the prior improper use of the threat of Mt. Laurel litigation, but rejected Emerson's statutory claim. The decision also held that this site has an RDP of 2 units that must be addressed by the Borough of Emerson, though the use of this site is optional.

The site was subsequently rezoned for a municipally sponsored project that resulted in 10 units that were developed by New Concepts for group housing for the developmentally- disabled persons. All 10 of the units are very low-income units. The Borough also received 5-rental bonus credit for this site, resulting in a total of 15 credits. The Building had a Certificate of Occupancy on May 8, 2007 with 30 years of control and has a current license date of May 31, 2017.

2. <u>Regional Contribution Agreement</u>

The Special Master's Compliance Plan originally provided for the Borough of Emerson to enter into a regional contribution agreement ("RCA") with the Borough of Ridgefield, Bergen County to transfer 10 units of Emerson's Fair Share obligation to a cost of Emerson of $25,000 per unit transferred, for a total of $250,000. Two equal payments would be made over the period of a year. Ridgefield would use the funds for a scattered site housing rehabilitation program.

The judicial ruling identified that given the limitations on the use of inclusionary zoning; it would have been difficult to address the 20 fair share obligation with using an RCA. To that extent that an alternative living arrangement project could provide a credit in excess of 10 units, a corresponding reduction in the number of RCA units would be possible. That would allow for a reduction in the RCA cost and the cost savings would be applied to the cost of the alternative living arrangement housing project. The final determination was that the total number of units for the RCA would be 5 of the Emerson's adjusted housing obligation of 20 units was consistent with the 50% cap in the prior round COAH regulations.

**Table 19: Summary of Compliance Plan for Adjusted Housing Obligation**

| Compliance Mechanism | Location | Affordable Units | Bonus Credits | Total Credits |
|---|---|---|---|---|
| Municipally Sponsored Housing | Bock 417 Lots 2 & 3 | 10 | 5 | 15 |
| RCA with Ridgefield | | | | 5 |
| Total | | | | 20 |

The Borough approved the 5 unit RCA with Ridgefield in a Resolution No. 114-02 dated April 23, 2002 and was approved by COAH on August 6, 2003.

3. <u>Inclusionary Overlay Zone</u>

This plan recommended a zoning ordinance amendment to establish a Borough- wide inclusionary overlay, which was intended to capture affordable housing opportunities, if and when residential development of five or more units is approved by requiring a 20% set-aside of any such development. This was added to the Borough Code by Ordinance No. 1203 on May 21, 2002. This overlay zone was the Borough's original response to addressing its 54-unit unmet need from the prior round.

This overlay zone will be replaced with several overlay ordinances for the Central Business District as

discussed in the Third Round section of the plan for the mechanism covering the unmet need. Additionally, the Borough adopted a new inclusionary overlay for the entire municipality, which requires any development with five (5) or more dwelling units to include a required set-aside of at least 15% of all units in rental developments as affordable and 20% of all units in for sale developments to be deed restricted as affordable units.

4. <u>Development Fees and Spending Plan</u>

At the time of the preparation of the Prior Round plan the Borough had collected $310,000 in development fees and interest in its Housing Trust Fund. Most of this money was collected from Town and Country Developers of Block 905 Lot 3. This was a 25- acre parcel located on Forest Avenue. The property was rezoned from 60,000 square foot lots to ML-10 Single-family housing with an affordable housing contribution.

In April 2001, the Borough adopted a Development Fee Ordinance that established a Housing Trust Fund in accordance with COAH regulations and was projected to produce $80,000 in additional funds during 2002-2008. That ordinance was amended by Ordinance No 1383, which was adopted in 2009. A draft spending plan and updated ordinance is included in the appendix of this document. It is the intention of the Borough to adopt the spending plan after this plan is approved.

**THIRD ROUND OBLIGATION**

TABLE 20: BOROUGH OF EMERSON'S TOTAL AFFORDABLE HOUSING OBLIGATION

| Round/Component | Obligation |
|---|---|
| Present Need (Rehabilitation Requirement per Kinsey Report) | 20 |
| Prior Round (1987-1999 requirement pursuant to N.J.A.C. 5:93) | 74 |
| Third Round (1999-2025) Prospective Need (per Kinsey Report, as adjusted through this Agreement) | 234 |

**THIRD ROUND PLAN**

<u>Present Need</u>

The Borough of Emerson has a 20 unit Present Need obligation. Present Need is an estimate of existing deficient housing currently occupied by Low and Moderate Income (LMI) households. In order to address this the Borough has entered into an agreement with Habitat for Humanity of Bergen County, Inc.

Habitat offers a rehabilitation program for owner-occupied dwelling units, located in Emerson, that meet the income restrictions established by the U.S. Department of Housing and Urban Development (HUD). The Rehab Program is designed to assist low and moderate-income homeowners to correct interior and exterior code violations or rehabilitate other interior and/or exterior issues in or about their homes.

Emerson has agreed to reserve at least $200,000 ($10,000 per unit hard costs) of its affordable housing trust fund account to complete up to 20 rehabilitations through the Affordable Critical Home Repair Program Agreement between the Borough and the Habitat for Humanity of Bergen County, Inc. The Borough will provide the funding to pay for the necessary improvements. The Program will assist low- and moderate income homeowners to address immediate and critical housing rehabilitation problems to ensure the safe and continued occupancy of the property.

Emerson has adopted resolution 228-18 dated August 14, 2018, which authorizes the Borough attorney to prepare a contact and awards a contract to Community Action Services to provide the borough with the services of an Affordable Housing Administrative Agent. The Borough will enter into an agreement with a governmental agency or private consultant to administer the administrative aspects of the program. Emerson will provide the consultant's credentials to administer the program as well as the procedures manual. The draft agreement is in the appendix of this document.

<u>Vacant Land Adjustment</u>

COAH then required that an inventory of vacant land and other data to determine future growth be provided in accordance with NJAC 5:93-4.2 (c) and (d), which permits municipalities to request an adjustment due to available land capacity. Municipalities that request an adjustment due to available land capacity shall submit an inventory of vacant parcels by lot and block that includes the acreage and owner of each lot. This information is included in the appendix of this document.

The inventory of vacant land includes all privately- and municipally owned parcels in Emerson that are classified on the Borough's tax records as vacant. These parcels are categorized as either residential or non-residential based on the Borough's existing zoning regulations. These sites also included properties that were developed since 2002 when the Borough last received certification. These two sites are detailed below in table 21. In accordance with NJAC 5:93-4.2(e)2 parcels were determined to exhibit no potential for development if they contain environmentally sensitive features, are designated for active or passive recreation, or are too small or constrained to accommodate at least one housing unit. In addition, sites that have already been approved for development were eliminated from the inventory.

This process started with 80 parcels that were identified in the Borough tax records as vacant. That list is located in the Appendix of this document. This list was then culled down to all sites that would generate a minimum of 5 housing units to ensure that they can accommodate at least one affordable unit. Additionally this analysis took into consideration redevelopment opportunities. All the lots that are currently owned by the Suez water were also removed, as it is a public utility and protected under the SWAN Agreement. The modified list included only 10 parcels.

The remaining 10 parcels were then individually reviewed for lot characteristics, including location, size, depth, environmental constraints and potential development constraints. The list of the 10 parcels and their characteristics is detailed below.

TABLE 21: VACANT LOT ANALYSIS

| Site Number | Block | Lot | Street Address | Land Area | Characteristics |
|---|---|---|---|---|---|
| 1 | 610 | 9.01 | 2 l Louis Ave | 142X75 | |
| 2 | 613 | 2 | 7 Louis Avenue | 1.09 | |
| 3 | 617.01 | 10 | 50 Mae Paul Drive | 8.0AC | Constrained with C1 stream and wetlands |
| 4 | 617.01 | 9 | 70 West Mae Paul Drive | 1.9AC | Constrained with C1 stream and wetlands |
| 5 | 617.01 | 7.01 | 99 Palisades | 5.13 AC | |
| 6 | 617.01 | 7.03 | 99 Palisades | 1.87 | |
| 7 | 738 | 9.01 | 51 Auricchio Ave | 3.328 AC | Constrained with C1 stream and wetlands |
| 8 | 738 | 9.02 | 55 Aurricchio Ave | 20.416 AC | Constrained with C1 stream and wetlands |

| 9 | 901.01 | 1 | 175 Forest Ave | 9.52AC | Wetlands |
| 10 | 901.02 | 9 | 70 Patrick Ave | 148X155 | Wetlands |

The parcels in yellow are constrained in some manner as to limit or totally prohibit development or a portion of the lots are located in another municipality and therefor have been removed from the Realistic Development Potential (RDP) calculation. With the determination that the six (6) parcels noted above are not realistically developable for affordable housing, there are now 4 parcels remaining in the calculation for the Borough's RDP. An estimated density based on location, size and shape of the lots was applied to the 6 remaining parcels to determine their development potential.

The following table provides for the total calculation of the Borough's Realistic Development Potential (RDP) calculation.  This calculation includes the four (4) vacant parcels detailed above, as well as three other sites that either has been developed with affordable housing, or there is an agreement in place to provide affordable housing.

**Table 22: Realistic Development Potential Calculations**

| Block | Lot | Street Address / Development | Total Area | Unconstrained Area | Estimated Development Potential | | Number of Affordable Units with 20% Set-Aside |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Density | Total Units | |
| **BURNS AND ROE GROUP SITE** | | | | | | | |
| 610 | 9.01 | 2 Lois Avenue | 0.53 | 0.47 | | | |
| 613 | 2 | 7 Lois Avenue | 1.09 | 0.97 | | | |
| | | *Subtotal* | | 1.44 | 8 DU / AC | 12 | 2 |
| **EMERSON GOLF CLUB PARCELS** | | | | | | | |
| 617.01 | 7.01 | 99 Palisades | 5.13 | 5.13 | | | |
| 617.01 | 7.03 | 99 Palisades | 1.87 | 1.87 | | | |
| | | *Subtotal* | | 7.00 | 8 DU / AC | 56 | 11 |
| **OTHER DEVELOPMENT** | | | | | | | |
| 616 | 16 | 55 Emerson Plaza East / Emerson Grand | 0.59 | ~ | 34 DU/AC | 20 | 4 |
| 609 | 3 | R2-ARC Contributory Site | ~0.9 | ~ | 36 DU/AC | 36 | 7 |
| **REDEVELOPMENT** | | | | | | | |
| 419 | 1 | 19 Lincoln Blvd | ~ | ~ | 64 DU / AC | 147 | 29 |
| | 2 | 15 Lincoln Blvd | ~ | ~ | | | |
| | 3 | 3 Lincoln Blvd | ~ | ~ | | | |
| | 4 | 214 Kinderkamack Road | ~ | ~ | | | |
| | 5 | 200 Kinderkamack Road | ~ | ~ | | | |
| | 6.01 | 190 Kinderkamack | ~ | ~ | | | |
| | 6.02 | 184 Kinderkamack Road | ~ | ~ | | | |
| | 7 | 9 Kenneth Ave | ~ | ~ | | | |
| | 8 | 182 Kinderkamack Road | ~ | ~ | | | |
| | 9 | 176 Kinderkamack Road | ~ | ~ | | | |
| | 10 | 78 Linwood Ave | ~ | ~ | | | |
| | | | | | **THIRD ROUND RDP** | | 53 |

The Vacant Land Analysis resulted in the determination that the Borough has Realistic Development Potential of 53 units. The total third Round Obligation was determined to be 234 affordable dwelling units leaving 181 dwelling units as Unmeet Need. The next section of this document provides the plan to address the RDP as well as the remaining unmet need for both the Prior Round and the Third Round.

The vacant land analysis for both rounds have left the Borough with an Unmeet Need of 235 for both the Prior Round and the Third Round as calculated below.

#### TABLE 23: REMAINING UNMEET NEED CALCULATION

|  | OBLIGATION | RDP | REMAINING UNMEET NEED |
|---|---|---|---|
| Prior Round | 74 | 20 | 54 |
| Third Round | 234 | 53 | 181 |
|  |  | Total | 235 |

### COMPLIANCE MECHANISMS

The Borough plans to address the Third Round Realistic Development Potential of 53 units with the mechanisms set forth in the table below.

#### TABLE 24: THIRD ROUND PLAN

| Compliance Mechanism | Street Address | Block and Lot | # Of Credits |
|---|---|---|---|
| Veterans Housing (Group Home- rental) | 324 Main Street | Block 304 Lot 3 | 14 |
| Block 419* (rental) |  | Block 419 | 29 |
| Advanced Opportunities (Group Home-rental) | 5 Pine Drive | Block 313 Lot 17 | 3 |
| Center for Hope and Safety (Group Home- rental) |  |  | 7 |
| Emerson Grand (rental) | 55 Emerson Plaza East | Block 616 Lot 16 | 4 |
| Rental Bonus Credits |  |  | 14 |
| **Total Credits** |  |  | 71 |

* The development of Block 419 has minimum set-aside of 22 units with an option for off-site provisions or a payment in lieu for the remaining 7 units. If such option is exercised, the Borough will show at the midpoint review how it will provide a realistic opportunity for the remaining 7 units in accordance with the Agreement with Fair Share Housing.

The Block 419 Project is an integral component of the Borough's Fair Share Plan. This project is necessary and useful for the construction of 29 low and moderate income family rental housing units in a centrally located portion of town, with easy access to both bus and train lines for commuters. To accomplish this Project, the Borough of Emerson issued a Request for Proposals from redevelopers on January 8, 2016; publishing a ranking of the redeveloper respondents, and then executing a Redevelopment Agreement, First Amendment to Redevelopment Agreement and Second Amendment to Redevelopment Agreement (hereinafter collectively referred to as "Redevelopment Agreement" with Emerson Redevelopers Urban Renewal, LLC (Redeveloper). The selected redeveloper ranked the highest in the review by the Governing Body. The Redeveloper has been pursuing negotiations with each of the property owners within the Block 419 project area and has requested the Borough's assistance in purchasing certain properties that are not otherwise under options or acquiring such properties as permitted under N.J.S.A. 40A:12A-8(c), N.J.S.A. 20:3-1 et al., N.J.S.A. 52:27D-301 et al. and/or any other laws that

grant the Borough the authority to acquire such properties.

The Borough will undertake good faith negotiations with any remaining property owner(s) for such properties not otherwise under option for purchase by the Redeveloper, and in the event that good faith negotiations are unsuccessful, the Borough is committed to acquiring the property (ies) through eminent domain.

The proposed mechanisms to address the Third Round obligations are all sites which already have been developed, except for the redevelopment project of Block 419.  Given the fact that a redevelopment designation and plan are already in place for this site, this site is to be developed for low and moderate income housing in a manner consistent with the rules or regulations of all agencies with jurisdiction over the site.  This site also has access to appropriate water and sewer infrastructure, and is consistent with the applicable areawide water quality management plan (including the wastewater management plan) or is included in an amendment to the areawide water quality management plan submitted to and under review by DEP. Most importantly this site is adjacent to compatible land uses and has access to appropriate streets and is consistent with the environmental policies delineated in N.J.A.C. 5:93-4.  Therefore, in accordance with N.J.A.C. 5:92-9.1(a) the site is "available, suitable, developable and approvable" as defined in N.J.A.C. 5:92-1.3.

**COMPLIANCE N.J.S.A 52:27D-310F**

Per the Fair Housing Act at N.J.S.A 52:27D-310F there were no other sites offered by developers for the production of affordable housing since the last Housing Element and Fair Share Plan. And therefore there were no offers to provide low and moderate income housing to consider as the time of presenting the proposed plan at the Fairness Hearing on June 20, 2018.

**AFFIRMATIVE MARKETING OF UNITS**

All units developed in accordance with this plan will be affirmatively marketed in accordance with 5:93-11.1.  This provides the following:

(a)     The affirmative marketing plan is a regional marketing strategy designed to attract buyers and/or renters of all majority and minority groups, regardless of sex, age or number of children, to housing units which are being marketed by a developer or sponsor of affordable housing. It is a continuing program and covers the period of deed restriction.

(b)     The affirmative marketing plan shall provide the following information:

1.     The name and address of the project;
2.     The number of units, including the number of sales and rental units;
3.     The price of sales and/or rental units;
4.     The name of the rental manager and/or sales agent;
5.     A description of outreach efforts to groups that are not readily reached by commercial media efforts (See 5:93-11.3 for advertising program details); and
6.     A description of the random selection method that will be used to select occupants of low and moderate income housing.

A draft affirmative marketing plan is included in the appendix of this plan and will be adopted by the Borough once this plan is approved.

**UNMET NEED**

The Borough intends to address the Unmet Need of 235, with the mechanisms set forth below:

1. **Surplus Credits.**  The RDP was calculated for the Third Round as 53 units, while the mechanism above include 71 credits, leaving 18 surplus to be applied to the Unmeet Need.

2. **Multi-family Residential Affordable Housing Overlay Zone District North (MFRAH North).**  The Borough recently adopted a zoning ordinance that created an inclusionary zone district that permits a density of 64 dwelling units per acre and requires 15% set-aside for housing constructed for rental purposes and a 20% set-aside for housing constructed for sale purposes.  The required set-aside units will be deed-restricted units for affordable housing.  This designation is applicable to Block 214 Lots 6, 7, 8.01, 8.02, and 9; Block 213 Lots 1-6;Block 405 Lots 1, 2, 3.01, 3.02, 4-14. The recently adopted ordinance provide for a increase in residential density as compared to what was originally permitted in this area.  The adopted ordinance is in the appendix of this document.



3. **Multi-family Residential Affordable Housing Overlay Zone District South (MFRAH South).** The Borough recently adopted a zoning ordinance that created an inclusionary zone district that permits a density of 43 dwelling units per acre and requires 15% set-aside for housing constructed for rental purposes and a 20% set-aside for housing constructed for sale purposes.  The required set-aside units will be deed-restricted

units for affordable housing.  This designation is applicable to Block 616 Lots 1, 2,16, 17, 19-24 and Block 617.01 Lots 1, 2.01, 2.02 and 8.  The recently adopted ordinance provide for an increase in residential density as compared to what was originally permitted in this area and will also allow for multi-family residential uses on the first floor which was previously not allowed by the underlying zoning.  The adopted ordinance is in the appendix of this document.



4.  <u>Mandatory Set-Aside Ordinance.</u>  The Borough will adopt a mandatory set-aside ordinance in the form satisfactory to FSHC and the Special Master so as to establish zoning standards that provide for an inclusionary zoning requirement for future multi-family residential development at a density of at least six (6) units per acre, yielding at least five (5) new dwelling units in the Borough that become permissible through the Land Use Board approval, or a new or amended redevelopment or rehabilitation plan or rezoning.  The Borough will require a set-aside of at least 15% of all units in rental developments as affordable and 20% of all units in for sale developments to be deed restricted as affordable units.  Additionally, at least 50% of the units in each development that are deed restricted as affordable will be affordable to low income households, including 13% in rental developments affordable to very low income households with all such affordable units including the required bedroom distribution, be governed by controls on affordability and affirmatively marketed in conformance with the Uniform Housing

Affordability Controls ("UHAC") N.J.A.C. 5:80-26.1 et. Seq. or any successor regulations and all other applicable law.

## DISTRIBUTION COMPLIANCE

The Borough will ensure that the number of units comply with the UHAC standards as follows:

TABLE 26: DISTRIBUTION COMPLIANCE

|  |  | Required / Permitted | Provided |
|---|---|---|---|
| Maximum Rental Bonus Credits | [ 0.25 (RDP) = 0.25 (53) = 13.25 | 14 | 14 |
| Minimum Rental Units | [ 0.25 (RDP) = 0.25 (53) = 13.25 | 14 | 57 |
| Maximum Age-Restricted Units | [ 0.25 (RDP) = 0.25 (53) = 13.25, (round down to 13] | 13 | 0 |
| Minimum Family Rental Units | [ 0.5 (Third Round Rental Obligation) = 0.5 (14) = 7 | 7 | 33 |
| Minimum Very Low-Income Units | [ 0.13 (Units Built Post 7/2008) = 0.13 ( 57) = 7.41, round up to 8] | 8 | 4 |
| Minimum Very Low-Income Family Units | [ 0.5 (Very Low-Income Requirement) = 0.5 (8) = 4 ] | 4 | 4 |

The four very low income units are provided in the group homes that are already constructed. The remaining four very low income units will be provide in the redevelopment project located on Block 419

## MONITORING OF AFFORDABLE HOUSING ACTIVITY

On the first anniversary of the granting of a Final Judgment of Compliance and Repose or judicial equivalent of substantive certification, and every anniversary thereafter through the end of the Settlement Agreement, the Borough has agreed to provide annual reporting of the status of all affordable housing activity within the municipality through posting on the municipal website with a copy of such posting provided to Fair Share Housing Center, using forms previously developed for this purpose by the Council on Affordable Housing or any other forms endorsed by the Special Master and FSHC. Such forms shall be provided to the Borough prior to the compliance hearing.

The Fair Housing Act includes two provisions regarding action to be taken by the Borough during the ten-year period of protection provided in the Settlement Agreement. The Borough agrees to comply with those provisions as follows:
    a.  For the midpoint realistic opportunity review due on July 1, 2020, as required pursuant to N.J.S.A. 52:27D-313, the Borough will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its implementation of the Plan and an analysis of whether any unbuilt sites or unfulfilled mechanisms continue to present a realistic opportunity and whether any mechanisms to meet unmet need should be revised or supplemented. Such posting shall invite any interested party to submit comments to the municipality, with a copy to Fair Share Housing Center, regarding whether any sites no longer present a realistic opportunity and should be replaced and whether any mechanisms to meet unmet need should be revised or supplemented.

b.  For the review of very low income housing requirements required by <u>N.J.S.A.</u> 52:27D-329.1, within 30 days of the third anniversary of a Final Judgment of Compliance and Repose or judicial equivalent of substantive certification,, and every third year thereafter, the Borough will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its satisfaction of its very low income requirements, including the family very low income requirements referenced herein.  Such posting shall invite any interested party to submit comments to the municipality and Fair Share Housing Center on the issue of whether the municipality has complied with its very low income housing obligation under the terms of this settlement.

APPENDIX

A-1          SITES MAP
A-2          REDEVELOPMENT DOCUMENTS
A-3          VACANT LAND ANALYSIS
A-4          FAIR SHARE ORDINANCE
A-5          SPENDING PLAN
A-6          DEVELOPMENT FEE ORDINANCE
A-7          AFFIRMATIVE MARKETING PLAN
A-8          REHABILITATION MANUAL
A-9          DRAFT RESOLUTION: INTENT TO BOND
A-10         RESOLUTION APPOINTING A MUNICIPAL HOUSING LIAISON
A-11         GROUP HOME SURVEYS
A-12         DEED RESTRICTIONS
A-13         SWAN AGREEMENT
A-14         FSHC AGREEMENT

Exhibit 29

# D-32

## In The Matter Of:

*Emerson Redevelopers Urban Renewal*

---

*Transcript of Proceedings*
*December 10, 2018*

---



66 W. Mt. Pleasant Avenue
Livingston, NJ  07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

---

Page 1

```
 1              BOROUGH OF EMERSON
                LAND USE BOARD
 2

 3  - - - - - - - - - - - - x
    SPECIAL MEETING       :    STENOGRAPHIC
 4  Application of        :    TRANSCRIPT
    EMERSON REDEVELOPERS URBAN :      OF
 5  RENEWAL, LLC;         :    PUBLIC HEARING
    Block 419, Lots 1, 2, 3, :
 6  4, 6.01-6.02, 7, 8, 9 & 10 :
 7  - - - - - - - - - - - - x
                 Municipal Building
 8               146 Linwood Avenue
                 Emerson, New Jersey
 9               Monday, December 10, 2018
                 Commencing 7:25 p.m.
10

11  B E F O R E :
         MR. GARY SCHWINDER, Chairperson
12       MR. LOUIS J. LAMATINA, Mayor
         MR. GERALD FALOTICO, Councilman
13       MR. STEVEN MALONE, Member
         MR. MICHAEL DeORIO, Member
14       MR. MICHAEL CIMINO, Member
         MR. DOUG McKENDRY, Member
15       MR. NORM REIGER, Member
         MR. ALBAN BRESA, Member
16       MR. THOMAS SUDANO, Member

17

18  ALSO IN ATTENDANCE:
         MS. M. MARIE SHUST, Secretary
18       MR. GARY M. ASCOLESE, PE, Engineer
19       MS. BRIGETTE BOGART, PP, AICP CGW, Planner

20

21  A P P E A R A N C E S :

22       MORRISON MAHONEY, LLP
         BY:  CHRISTOPHER E. MARTIN, ESQ.
23       Attorney for the Board

24       BISGAIER, HOFF, LLC
         BY:  PETER M. FLANNERY, ESQ.
25       Attorneys for Applicant
```

---

Page 2

```
 1              I N D E X
    WITNESS          EXAMINATION  DIRECT  CROSS
 2  QUESTIONING

 3  WAYNE A. CORSEY, PE, PP

 4       By Mr. Martin      12
         By Mr. Flannery         13
 5       By the Board                    97

 6  CHARLES OLIVO, PE

 7       By Mr. Martin      41
         By Mr. Flannery         44
 8       By the Board                    60

 9  ANGELA KOSTELECKY, RA

10       By Mr. Martin      66
         By Mr. Flannery         82
11       By the Board                    83

12  WILLIAM J. DEVEREAUX, JR., RA

13       By Mr. Martin      68
         By Mr. Flannery         70
14       By the Board                   109

15  BY THE PUBLIC:
         Mayor-Elect Danielle DiPaolo   136,199
16       Jeff Bischoff                  140
         Mike Meyers                    150,171
17       Corey Melillo                  153,175
         Loraine McQueeney              156
18       Joseph Polvere                 159
         Councilman-Elect Kenneth Hoffman 161
19       Billy Price             164,193,206
         Michael Esqueu                 167
20       Don Pierro on behalf of Phyllis Rooney 168
         Paul Hulbert                   173
21       Michael Casey                  174
         Kathleen Viola                 176
22       Laura Litchult                 180
         Jill McGuire                   183
23       Lina Ballas                    186
         Bob Petrow                     188
24       Annette Scala                  195
         Doug Doyle, Esq.               196
25       Jack Klugman                   202
```

---

Page 3

```
 1                 E X H I B I T S
    EXHIBIT        DESCRIPTION              PAGE
 2  A-1  Affidavit of Service              7

 3  A-2  Rendering of Aerial photograph   14

 4  A-3  Colorized rendering of           19
         Landscape Plan
 5

 6  A-4  Revised Sheet A-1.10, revision   70
         date 12/10/18
 7

 8  A-5  Revised Sheet A-1.20, revision   71
         dated 12/10/18
 9
    A-6  Sheet A-2.10 dated 11/15/18      76
10
    A-7  Colorized rendering of           78
11       Kinderkamack Road elevation

12  A-8  Color Sample Board, Exterior     81
         Finishes
13
```

---

Page 4

1    CHAIRPERSON SCHWINDER: Good

2  evening.  The meeting is starting at 7:25.  This

3  meeting of the Emerson Municipal Land Use Board

4  is being held in compliance with the Open Public

5  Meetings Act.  The Borough clerk has notified The

6  Record and The Ridgewood News of this meeting and

7  notice has been posted in the Municipal office.

8    In the unlikely event of fire or

9  emergency, follow the fire exit signs above the

10  council chamber doors to your right or left and

11  please exit calmly.

12    This meeting is a judicial

13  proceeding.  Any questions or comments must be

14  limited to issues that are relevant to what the

15  board may legally consider in reaching a

16  decision, and decorum appropriate to a judicial

17  hearing must be maintained at all times.

18    Mr. Bresa, pledge, please.

19    (Pledge of Allegiance taken.)

20    CHAIRPERSON SCHWINDER: Roll call.

21    SECRETARY SHUST: Okay.  Mr. Bresa?

22    MR. BRESA: Present.

23    SECRETARY SHUST: Mr. Adams?

24    MR. ADAMS: Here.

25    SECRETARY SHUST: Mr. Carlos?

Page 5

1  Mr. Cimino?
2  MR. CIMINO: Here.
3  SECRETARY SHUST: Mr. DeOrio?
4  MR. DeORIO: Here.
5  SECRETARY SHUST: Mr. Goursky?
6  Mr. Kutzin?
7  Mr. Malone?
8  MR. MALONE: Here.
9  SECRETARY SHUST: Mr. Mc Kendry?
10  MR. McKENDRY: Present.
11  SECRETARY SHUST: Mr. Reiger?
12  MR. REIGER: Here.
13  SECRETARY SHUST: Mr. Sudano?
14  MR. SUDANO: Here.
15  SECRETARY SHUST: Councilman
16  Falotico?
17  COUNCILMAN FALOTICO: Here.
18  SECRETARY SHUST: Mayor Lamatina?
19  MAYOR LAMATINA: Here.
20  SECRETARY SHUST: Mr. Ascolese?
21  MR. ASCOLESE: Here.
22  SECRETARY SHUST: Ms. Bogart?
23  MS. BOGART: Here.
24  SECRETARY SHUST: Mr. Martin?
25  MR. MARTIN: Here.

Page 6

1  SECRETARY SHUST: Chairman
2  Schwinder?
3  CHAIRPERSON SCHWINDER: Here.
4  Okay.  We'll get right into it.  We
5  have an application by Emerson Redevelopers Urban
6  Renewal, LLC.  Please step forward.
7  MR. FLANNERY: Yes, good evening,
8  Mr. Chairman, members of the board.
9  MR. MARTIN: Mr. Flannery.  Mayor
10  Lamatina and Councilman Falotico, please step
11  down.
12  COUNCILMAN FALOTICO: Sure.
13  (Whereupon Mayor Lamatina and
14  Councilman Falotico exit the meeting room at this
15  time.)
16  MR. MARTIN: Sorry.
17  MR. FLANNERY: Thank you, Mr.
18  Martin.  For the Record, my name is Peter
19  Flannery, the law firm of Bisgaier Hoff, here on
20  behalf of the applicant, Emerson Redevelopers
21  Urban Renewal, LLC.  Proper legal notice was
22  provided of this hearing and I ask that the board
23  accept jurisdiction of the application.
24  MR. MARTIN: Mr. Flannery, I'm going
25  to mark your Affidavit of Service, I appreciate

Page 7

1  it, it's A-1.  Okay.
2  MR. FLANNERY: Thank you, Mr.
3  Martin.
4  (Exhibit A-1 is received and marked
5  for identification at this time.)
6  MR. FLANNERY: So this application
7  is for a property well known in town in the
8  central business district on Kinderkamack Road
9  between Lincoln Boulevard and Linwood Avenue,
10  also known as the Block 419 project, Lots 1
11  through 4, 6.01-6.02, 7 to 10.  It's about 2.2
12  acres in area.  It's located in the central
13  business district redevelopment area, also known
14  as the CBD10 zoning district.
15  Just to give a brief background
16  regarding the project for the benefit of the
17  public and the board, the Borough council first
18  designated this property as an area in need of
19  redevelopment versing local redevelopment housing
20  law back in 2004.  In 2006 there was a -- the
21  first redevelopment plan was adopted, it was
22  subsequently amended.
23  In 2016, the Borough endeavored to
24  create a competitive public bidding process, an
25  RFP, requests for proposals, for various

Page 8

1  developers to bid on a project to see which
2  redeveloper had a project which was best suited
3  for the borough.  Among several redevelopers, the
4  applicant through its affiliate JM Properties was
5  the successful redeveloper, was designated by the
6  Borough as a redeveloper and entered into a
7  redevelopment agreement with the Borough on June
8  27th, 2016.  That was subsequently amended.
9  In August of 2016, a financial
10  agreement providing for a pilot for the project
11  was approved and executed.  And on November 28th,
12  2017, the Borough entered into a settlement
13  agreement with the Fair Share Housing Center, a
14  leading affordable housing advocate in the state,
15  to settle a declaratory judgment action, which
16  had been instituted in 2015 for the Borough's Mt.
17  Laurel affordable housing requirements, a
18  constitutionally mandated requirement to provide
19  a realistic opportunity for the provision of
20  housing affordable to low and moderate income
21  households.
22  As part of that settlement agreement
23  with Fair Share Housing Center, this project was
24  a real key component.  It was responsible in
25  terms of providing affordable housing that was

Page 9

1 almost half of the credits for the third round
2 obligation, obligation for a certain time period
3 for which the Borough was to produce a certain
4 amount of affordable housing.
5    So the project is really integral to
6 the settlement of the declaratory judgment action
7 and for the satisfaction of the Borough's
8 affordable housing obligation.
9    The applicant has spent the last two
10 years attempting to acquire all the property
11 necessary for the project and has done so through
12 private means.
13    Tonight, the applicant is before the
14 board to present this application for a really
15 wonderful transit-oriented redevelopment project
16 on the property. It's preliminary and final site
17 plan approval to demolish the existing
18 improvements on the property and to construct a
19 four-story 147-unit inclusionary residential
20 development with parking, a parking garage,
21 ground floor retail, service parking and other
22 great amenities, right near the Emerson train
23 station. Also seeking a major soil permit in
24 accordance with Chapter 244 of the Emerson
25 Borough Code.

Page 10

1    No variances are requested as part of
2 this application, and there are some temporary
3 checklist waivers the applicant requires, which
4 would be a condition of any approval, essentially
5 items that you typically have with a separate
6 final approval.
7    I have three witnesses here tonight.
8 Wayne Corsey of Bowman Consulting, our
9 professional engineer; Charles Olivo, Stonefield,
10 professional traffic engineer; and I have
11 Devereaux and Associates, Bill Devereaux and
12 Angela Kostelecky, who are registered architects.
13    So without further adieu I would like
14 to present my first witness, Mr. Wayne Corsey, a
15 professional engineer.
16    MAYOR-ELECT DiPAOLO: A point of
17 order real quick, chairman.
18    CHAIRPERSON SCHWINDER: Yes.
19    MAYOR-ELECT DiPAOLO: Why did you
20 ask members of the governing body to step down?
21 Why are they conflicted out?
22    MR. MARTIN: I asked them to step
23 down. Councilwoman DiPaolo because there is a
24 agreement, a litigation agreement I believe that
25 they're involved with that effects this

Page 11

1 application.
2    MAYOR-ELECT DiPAOLO: So you think
3 that's a conflict?
4    MR. MARTIN: I think that there's a
5 issue in terms of the governing body, including
6 yourself, looking at the resolution of property
7 issues involving this application.
8    MAYOR-ELECT DiPAOLO: So is your
9 opinion that no governing body member should be
10 here or just ones that would be making some kind
11 of a decision on the application?
12    MR. MARTIN: Well, I hope see you
13 next year up here. However, you are not on the
14 dais. So you can be in the room, of course. My
15 opinion is no governing body sits on this
16 application.
17    MAYOR-ELECT DiPAOLO: That was my
18 question. Okay.
19    MR. MARTIN: Mr. Flannery, while Mr.
20 Corsey is set I'll swear him in and I'll walk him
21 through to --
22    THE WITNESS: Is this the right
23 spot, spot for the stand there?
24    CHAIRPERSON SCHWINDER: Have it
25 slanted a little bit more so some of the public

Page 12

Corsey, PE, PP, Wayne A. - examination - Mr. Martin

1 can see as well. Thank you.
2    MR. MARTIN: Mr. Corsey, you can
3 either come up or stay there, whatever you're
4 comfortable with.
5    MR. CORSEY: I'll just stand right
6 here. That's fine.
7    MR. MARTIN: All right. Whenever
8 you're ready. Raise your right hand. You swear
9 to tell the truth, the whole truth and nothing
10 but the truth, so help you God?
11    MR. CORSEY: I do.
12    MR. MARTIN: And for the Record,
13 your full name, your professional license and
14 your business address.
15    THE WITNESS: My name is Wayne
16 Corsey, C-o-r-s-e-y. I'm an employee of Bowman
17 Consulting, formerly Bowman Engineering, for the
18 past 25 years. I have a license in --
19 professional license in engineering in two --
20 1998, a professional license in planning in 2002.
21    MR. MARTIN: And where is Bowman?
22    THE WITNESS: It's in Cedar Knolls,
23 New Jersey.
24    MR. MARTIN: And --
25    THE WITNESS: And I -- excuse me.

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 13

1  And I have testified before Montvale, Oradell,
2  Hackensack, Morristown, Cedar Knolls and multiple
3  other towns.
4      MR. MARTIN: And are you licensed
5  anywhere else besides New Jersey?
6      THE WITNESS: Just New Jersey.
7      MR. MARTIN: And is your license in
8  good standing now?
9      THE WITNESS: It is, yes.
10     MR. MARTIN: And has it ever been
11 revoked for any reason or suspended?
12     THE WITNESS: No.
13     MR. MARTIN: And you're being
14 offered tonight as a professional engineer?
15     MR. FLANNERY: Yes, site civil.
16     MR. MARTIN: And in terms of civil
17 engineering, you're qualified tonight as the
18 same. Okay. Thank you.
19     MR. FLANNERY: Thank you.
20     THE WITNESS: Thank you, Mr. Martin.
21
22     DIRECT EXAMINATION BY MR. FLANNERY:
23 Q.  Mr. Corsey, I just want to go
24 through the existing conditions of the property.
25 A.  Okay. What we have before you

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 14

1  tonight is a aerial rendering of the site, site
2  being located in the central portion. This is
3  taken from the New Jersey N-J -- NJIN database.
4  So it's an aerial photograph. The one thing I
5  will note right off the bat is that it doesn't
6  include the most recent improvements on
7  Kinderkamack, Linwood, because to my knowledge
8  there's not a aerial available up to date.
9      MR. MARTIN: I'll mark that A-2.
10     MR. FLANNERY: A-2. Thank you.
11     (Exhibit A-2 is received and marked
12 for identification at this time.)
13 A.  So the property as we discussed, as
14 our attorney has discussed is a conglomerate of
15 multiple lots from Block 419 Lots 1 through 10
16 with the exception of Lots 5, which is the center
17 portion. So again the site is located in the
18 central portion of the site, has frontage on
19 Kinderkamack Road, has 432 feet of frontage along
20 Kinderkamack Road with the exception of 87 feet
21 for Lot 5. It has 294 feet of frontage on
22 Lincoln Boulevard and it has 105 feet of frontage
23 on Linwood Avenue. Additionally, it has 550 feet
24 of frontage along the Conrail/New Jersey Transit
25 right-of-way.

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 15

1      The site is, consists of a mix of
2  uses from restaurants, office, retail and
3  single-family residence. There's a single-family
4  residence here, restaurant here. Lot 5 is a
5  two-story masonry building that is not part of
6  this application.
7      Additionally, there's a liquor store
8  here, a hair weaving store, and a second-story
9  retail and a restaurant there as well.
10     The site is predominantly, as you
11 can see from the aerial, the site predominantly
12 either covered by buildings or blacktop parking
13 spaces. There's a small area in the north,
14 northwest corner that is actually part of the
15 single-family residential. One thing I did
16 neglect to mention is there is also the Kennedy
17 Avenue right-of-way is in this upper right corner
18 adjacent to the railroad tracks. That's a
19 Borough right-of-way.
20     The uses around the site are across
21 the street there's an office building on, on
22 Lincoln Boulevard. There is a commercial
23 contractor yard over here. There's the church is
24 over here. A retail mixed use here, another
25 mixed retail use here. Boston market's on the

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 16

1  corner. The train station is across Linwood
2  Avenue and then there's residential and
3  commercial properties to the rear of the
4  property. There's also a first aid squad, which
5  is located in the central portion of the site.
6      This site additionally has a commuter
7  parking lot, which I believe includes the portion
8  of Kennedy Boulevard or Kennedy Avenue and also
9  the --
10     CHAIRPERSON SCHWINDER: Kenneth,
11 Kenneth.
12     MR. FLANNERY: Kenneth Avenue.
13     THE WITNESS: I'm sorry, my
14 apologies.
15 A.  Kenneth, and then the first aid
16 squad is located in the center portion there.
17     The property, the high point of the
18 property is this intersection over here where the
19 restaurant is, and it slopes down towards Lincoln
20 Boulevard to the west and along Kinderkamack to
21 the south at Linwood.
22     The site drains. There is some
23 onsite drainage on the site, small inlets that
24 will collect stormwater on-site and discharge to
25 the railroad, come down the railroad and connect

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 17

1  to the Linwood storm system.
2      There's -- this site has been part
3  of, as I mentioned earlier, it has been part of a
4  major undertaking by the County and the Borough
5  to improve Kinderkamack Road to improve traffic
6  patterns throughout with the inclusion of
7  widening of the road, some signalized
8  intersection changes and striping turn lanes as
9  such.
10     There is also sanitary sewer, which
11  goes along the frontage of the site and other
12  utilities, electric, cable, telephone, and the
13  electric lines along the front, just I've said.
14  And I believe that's it for existing conditions.
15  Q.  And a lot of, in terms of access to
16  the property, Kinderkamack Road has a lot of
17  access points?
18  A.  All right.  So we have, one thing I
19  neglected to mention, there are two driveway
20  accesses on Lincoln Boulevard from the site, one
21  from the parking lot for the restaurant, the
22  other one, like I said, for Kennedy Boulevard or
23  Kenneth.
24      CHAIRPERSON SCHWINDER: Kenneth.
25      THE WITNESS: I'm sorry.

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 18

1  A.  And there is multiple access along
2  Kinderkamack Road.  A lot of them consist of,
3  there's a driveway access for the restaurant.
4  Additionally, there's certain curb cuts for
5  parking in front of these businesses here, and
6  then there's one access off of Linwood Avenue to
7  there.
8      The other thing I will note is that
9  the intersection of Linwood Avenue, unlike this
10  aerial photograph shows, is now one way going
11  westbound and that's part of the County
12  improvements to the road.
13     THE WITNESS: Now, did you want me
14  to mark this A-1 on the Board as well?
15     MR. MARTIN: A-2.
16     MR. FLANNERY: A-2.
17     THE WITNESS: A-2.
18  A.  Now, the second rendering I'm going
19  to show you tonight is the same existing aerial
20  rendering.
21     MR. FLANNERY: Just really briefly,
22  so that would be A-3 site plan rendering.
23     MR. MARTIN: We'll just call it site
24  plan rendering, or are there going to be a number
25  of them here?

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 19

1      MR. FLANNERY: I believe this is
2  the --
3      THE WITNESS: It's a colorized
4  rendering of the landscaping plan, which is part
5  of --
6      MR. FLANNERY: Do you have another
7  board also titled site plan rendering --
8      THE WITNESS: No, not --
9      MR. FLANNERY: -- or something
10  similar?
11     THE WITNESS: No, that's it.
12     MR. FLANNERY: That's fine.
13     MR. MARTIN: So this will be
14  colorized site plan rendering of the landscape
15  plan?
16     THE WITNESS: Yes, correct.
17     (Exhibit A-3 is received and marked
18  for identification at this time.)
19  A.  Okay.  Similar to the existing
20  conditions plan aerial that I had presented
21  previously, this one also has an aerial
22  photograph with the site superimposed with a
23  colorized version of the landscaping plan, which
24  is part of the site plan set.
25     The proposed building consists of a

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery                    Page 20

1  four-story building and the architect will get
2  into more detail of the building.  I'm just going
3  to gloss over the site features in terms of
4  access.  So we'll have a building which is going
5  front on all three roads from Lincoln Boulevard
6  around Kinderkamack Road and to the corner of
7  Linwood Avenue.
8      Additionally, there will be a
9  proposed driveway and surface parking lot here,
10  and then a four-story parking garage located
11  here, which is in the northeast corner -- or
12  northwest corner.  I'm sorry.  There will be
13  driveway access that will go through the site
14  from Lincoln Boulevard through to Linwood Avenue.
15  It will be two-way traffic.
16     This will be a garage-door-type
17  access, where it will be covered access with the
18  building on the second floor.  This will be
19  unencumbered with any building above it.
20     CHAIRPERSON SCHWINDER: What do you
21  mean by "a garage-door-type access"?
22     THE WITNESS: Well, the building is
23  going to be built over this, so it's going to be
24  like driving through a garage in terms of a
25  cover.

1    CHAIRPERSON SCHWINDER: Okay.
2    THE WITNESS: And, again, the
3  architect --
4    CHAIRPERSON SCHWINDER: It's through
5  traffic?
6    THE WITNESS: It's through, exactly,
7  sir, through traffic.
8    CHAIRPERSON SCHWINDER: In two
9  directions?
10    THE WITNESS: Correct, exactly.
11 A.  So we have frontage along the three
12  sides.  The town -- the Borough in its
13  redevelopment has also developed a streetscape
14  standard.  As part of that streetscape standard,
15  they have requirements for sidewalk and
16  landscaping along the street frontage to improve
17  the esthetic of the property as well as providing
18  functional space for pedestrians.
19    So what we have along this frontage
20  is, we have as you can see here, this green area
21  would be landscaping and landscape beds along the
22  sidewalk.  The streetscape standard basically
23  requires that you have a 4 foot sidewalk adjacent
24  to the curb line of Kinderkamack Road, a
25  landscape bed and then another 4 foot sidewalk to

1  the building.  The landscape bed will be a
2  variable width.
3    As part of our plan, what we did
4  because of the grade differential is we provided
5  a wider sidewalk adjacent to the building to
6  account for door swing, so pedestrians could
7  cross without obstructing a door swing, and
8  additionally, they provide an access for
9  handicapped.  So there's certain door locations
10  are handicapped access ramps as well to get
11  access to the building.
12    So the proposed parking for the site
13  is a total of 308 spaces.  We have 73 surface
14  spaces, which would be in this location here.
15  And we have an additional 235 spaces that would
16  be located in the garage, the parking garage
17  itself.  The parking garage will have a surface
18  area equal in level to this surface parking and
19  then it will have three stories above that.
20    There will be 10 handicapped spots,
21  2 surface spots here and then 2 per floor in the
22  parking garage.
23    The drive aisle to, through the
24  structure, the site, would be 23 feet wide, and
25  there are no proposed changes to the wide -- the

1  widths of the surrounding roadways.
2    As part of this project, this is a
3  mixed use project.  It will have 147 residential
4  units including 22 COAH or Affordable units in
5  the mix.  And it will also have 14,700 square
6  feet of retail space.  The retail space will be
7  located in the lower southwest corner --
8  southeast corner of the site and also on the
9  south southern side of this building.
10    The residential access will be on the
11  northwest corner -- northeast corner of the site
12  at the intersection of Kinderkamack and Lincoln
13  Boulevard.  The residential units will be on the
14  ground floor along Lincoln Boulevard.  They will
15  also be on the ground floor in the rear parking
16  lot.  And then the residential units will be
17  above that on the second, third and fourth
18  floors.
19    MR. BRESA: Sorry, quick question
20  for you.  On the Lincoln Boulevard corner, so
21  that street will not be widened whatsoever?
22    THE WITNESS: No, there's no
23  changes.
24    MR. ASCOLESE: Mr. Chairman, if I
25  can make a comment, though?

1    THE WITNESS: Sure.
2    MR. ASCOLESE: I believe your plan
3  shows the southerly curb line of Lincoln
4  Boulevard as a street curb, which is not the way
5  it was built today.
6    THE WITNESS: Right.
7    MR. ASCOLESE: There is a transition
8  of about 3 feet.
9    THE WITNESS: Correct.
10    MR. ASCOLESE: So there would be
11  what, a correction along the westerly --
12    THE WITNESS: Yes.
13    MR. ASCOLESE: -- the southerly curb
14  line of Lincoln Boulevard?
15    THE WITNESS: Yes.
16    MR. BRESA: Okay, that's it.
17    MR. McKENDRY: And, Gary, what's the
18  purpose of that correction?
19    MR. ASCOLESE: There were property
20  issues with the County project.  There was PSE&G
21  issues with the pole locations with the power
22  drops.  The County had the preference to put the
23  two catch basins setback for future widening, but
24  they did not widen Lincoln Boulevard south side
25  all the way to the tracks for those reasons.

1    MR. BRESA: So would that be
2  relocated, the poling and the light on that
3  corner?
4    MR. ASCOLESE: I believe that's
5  going to be contemplated to do that, yes, now
6  that the power pole, the power drop I think
7  that's on that pole would be eliminated because
8  it doesn't serve any purpose.
9    MR. BRESA: So that will open up
10  that curve.
11    MR. ASCOLESE: Yes.
12    MR. BRESA: Thank you.
13  A.  So the two location access points
14  will be the retail here, there's retail here.
15  There's also what they call plaza area, which is
16  in conformance with the streetscape standards.
17  And what that will be is it will be the open area
18  on the first floor on the ground floor area of
19  the building that will be for outdoor dining
20  depending on the type of restaurant or
21  facilities, the business retail space, there's an
22  option for that type of line, and the street --
23  the redevelopment ordinance allows for that type
24  of use as well.
25    There's also an access hallway here

1  for the residential.  So we have three access
2  point -- primary access points at the corners and
3  then one in this rear area here.
4    The proposed signage for the, the
5  site will be building-mounted signage.  As you
6  can tell from this layout is there's not much
7  room for the surface area.  So the building
8  will -- proposed signs we're building on it and
9  it will be in conformance with the ordinance.
10    The site grading, as I said before,
11  the high point in the site is on this corner over
12  here at Lincoln Boulevard and Kinderkamack Road.
13  Because of the topography sloping down
14  Kinderkamack and sloping down Lincoln Boulevard,
15  the ground floors of the units will equally be
16  stepped across to accommodate the grades and the
17  topography of the street and meet the street
18  grades.
19    Stormwater management for the site
20  will consist of, as I said before, there's a
21  small collection of stormwater inlets on-site as
22  it exists.  They will all be removed as well as
23  all the site improvements, buildings and the
24  Kenneth's right-of-way will be vacated as well.
25    The stormwater management of the

1  site, the County imparted as part of their
2  improvements to the Lincoln Boulevard, and
3  Kinderkamack and Linwood, they installed storm
4  structures in the northwest corner over here and
5  also in the north -- the southwest corner over
6  there on the left-hand side for the future
7  connection of that storm system as part of this
8  development.  So as part of this development what
9  we're going to do is we're going to install 42
10  inch RCP, reinforced concrete pipe, from the
11  existing inlets in Lincoln Boulevard to the
12  existing inlets in Linwood Avenue, and that will
13  provide more capacity in the storm pipe to
14  alleviate any potential flooding at that
15  intersection of Lincoln Boulevard.
16    Additionally, we will be tying, we
17  are going to have a collection of stormwater
18  inlets in this back surface parking lot as well
19  as roof leader collectors and collectors for that
20  parking garage that will connect into that 42
21  inch proposed 42 inch pipe.
22    As part of the Borough's stormwater
23  management ordinance, they consider anything with
24  a acre of disturbance of land or a quarter acre
25  of increase of impervious as what they call a

1  "major" development.  As part of a major
2  development, there is criteria for stormwater
3  management on the site.  Our site, although our
4  site will disturb more than an acre of land, the
5  site area is 2.29 acres.  There is a net
6  reduction of about .01 acres of impervious
7  surface, so a net reduction in impervious
8  surface.
9    Therefore, there will be a net
10  reduction in stormwater management for stormwater
11  runoff on the site based on this development.
12  And as I said, all this, the collection of the
13  stormwater management system will tie into that
14  42 inch pipe, and that 42 inch pipe ties into
15  Linwood Avenue and goes out to the south towards
16  the train station.
17    Other utilities on the site would be
18  the connection, a sanitary connection, two
19  sanitary connections along Kinderkamack Road, one
20  for this portion of the building and one for this
21  portion of the building for the sanitary sewer
22  laterals.  Additionally, we will have water, gas,
23  electric, cable, all those walls so they're
24  connected up to Kinderkamack Road.
25    As I mentioned before, as part of

---

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 29

1  the Borough streetscape standard was a collection
2  of streetscape being pavers and scored concrete,
3  striped concrete along the sidewalk area.
4  Additionally, there is a landscaped area as well.
5  Being that this driveway or, excuse me, the
6  sidewalk along the site's frontage of the
7  variable width starts out at very narrow widths
8  of like 5 to 8 feet here on Linwood Avenue and
9  wraps all the way around the frontage and goes
10 back down to 5 to 10 feet on Lincoln Boulevard.
11     However, along the site's frontage
12 there is a wider width.  So we have as part of
13 the streetscape, compliance with the streetscape
14 standard we are providing these landscape beds
15 within the middle of this sidewalk area.
16     Now, this sidewalk -- this landscape
17 bed consists of a collection of shade trees and
18 various shrubs, all as outlined in the Borough's
19 streetscape standard and redevelopment ordinance.
20     By adding these landscaped areas to
21 the site, it will give a more esthetic feel as
22 you walk down Kinderkamack Avenue or Road as well
23 as it will provide green space for stormwater
24 runoff and the like to infiltrate back into the
25 ground.

---

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 30

1      In addition to the streetscape
2  standard is the Borough also has a streetscape
3  fixture, light fixture that will be placed along
4  the site frontages and that is a Hadco Colonial
5  fixture.  It's got a mounting height of 12 feet.
6  It's an LED fixture, roughly 80 watts of, of
7  light.  So we'll have -- so we have 14
8  streetscape fixtures that will go around the
9  perimeter of the frontage.  Additionally, we have
10 a -- let me just take, take a step back.
11     The Colonial fixtures and uplights, a
12 decorative fixture you -- I'm sure you all seen
13 along Kinderkamack Road.  In order to control
14 light in the rear portion of the site, part of
15 the Borough ordinance is to control light
16 spillage onto adjacent properties.
17     So what we've done here is we've
18 put -- we've selected a different fixture, a down
19 light that projects the light down in this.  So
20 we have 4 building-mounted lights and then we
21 have 7 pole-mounted lights along here, all --
22 they'll all be mounted at a 12 foot mounting
23 height.
24     As Mr. Ascolese says, there
25 are -- Kinderkamack Road, Linwood and Lincoln

---

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 31

1  have all been improved.  However, there are some
2  anomalies in the improvements based on the
3  ownerships.  So what we were doing as part of
4  this project is we're cleaning out -- we're
5  creating a straight line to improve the curb
6  return on Lincoln Boulevard and tying it into
7  this corner intersection to a wider radius around
8  the intersection of Kinderkamack Road and Lincoln
9  Boulevard.  And I believe that's it.
10 Q.  Just a few more questions.
11 A.  Okay.
12 Q.  In terms of the lighting it will
13 comply with all the ordinances light standards,
14 correct?
15 A.  Yes, correct.
16 Q.  You alluded to that.  I just wanted
17 to confirm.
18 A.  Correct.
19 Q.  There were some details perhaps
20 missing from the plans we submitted, but --
21 A.  Yeah, I believe the town asked for
22 -- I'm sorry.
23     So I believe the town asked for what
24 we call a point-by-point display which goes --
25 shows intensities at a grid and we'll provide

---

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 32

1  that to the town.
2      CHAIRPERSON SCHWINDER: It's all LED
3  lighting?
4      THE WITNESS: It's all LED lighting,
5  yes.  I don't think they really make much other
6  than LED lighting today.
7  Q.  There's also a comment regarding the
8  sidewalk requirement set forth in the ordinance,
9  Section 70.B.1B?
10 A.  Right.
11 Q.  We'll comply with that?
12 A.  That's correct, yeah.
13 Q.  And also as a condition of approval
14 in addition to the plan revisions there would be
15 obtaining any other necessary governmental
16 approvals, planning boards, soil conservation
17 districts?
18 A.  Yeah.  So, so, I'm sorry, I didn't
19 hit it.  So as part of the outside agencies that
20 require, obviously the Borough Planning Board
21 would be a requirement, the police, fire and
22 department of public works for the sewer
23 connection.  We also have Bergen County Planning
24 Board, which we'll be submitting to shortly.  We
25 have the Bergen County Soil Conservation

---

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery          Page 33

1    District, which we'll be submitting to as well.
2       The BCUA will have to approve our
3    sewer permit that we have to submit to the DEP,
4    and SUEZ will have to approve the water
5    connection permits. As far as DEP permits we
6    have what they call a TWA permit, treatment works
7    approval, which is for the sanitary sewer, if you
8    are over a certain gallonage you have to go to
9    the DEP and they approve, and in conjunction to
10   your Borough, DPW and the BCUA.
11      Additionally, for water they have a
12   water extension permit, which would go to if,
13   again, we trigger the amounts, which I believe we
14   will, you'll have to go to the DEP and get a
15   permit in addition to getting sign-off from SUEZ.
16      MR. FLANNERY: Thank you, Mr.
17   Corsey. Those are all the direct questions I
18   have at this time for Mr. Corsey.
19      CHAIRPERSON SCHWINDER: Yes, Mr.
20   Ascolese.
21      MR. ASCOLESE: A clarification. How
22   many square feet of retail did you say we were
23   going to have?
24      THE WITNESS: It's 14,700. So the,
25   just a clarification, our plan I guess there was

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery          Page 34

1    a little mixup between us and the architect.
2    There's -- it's actually if you look in the
3    architecture plan it's 14,700 square feet.
4       MR. ASCOLESE: 14,700.
5       MR. FLANNERY: And we'll provide
6    additional testimony on that issue --
7       THE WITNESS: Right.
8       MR. FLANNERY: -- with the
9    architect.
10      THE WITNESS: Correct.
11      MR. ASCOLESE: Okay. Your parking
12   then, you said is five stories or four?
13      THE WITNESS: Four stories.
14      MR. ASCOLESE: It's four stories.
15      THE WITNESS: Again, the architect
16   will provide more information.
17      MR. FLANNERY: We also have a
18   traffic engineer, who will address some of the
19   parking and site circulation issues.
20      MR. ASCOLESE: Just one other thing
21   relating to the parking garage. The opening for
22   that garage, is it going to be 14 like feet high
23   so an emergency vehicle can go through it?
24   What's the height of the opening of the --
25      THE WITNESS: I'll defer to the

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery          Page 35

1    architect.
2       MR. FLANNERY: We'll have the
3    architect answer that. We'll just hold that
4    question, Mr. Ascolese.
5       MR. ASCOLESE: We'll hold that
6    question, okay.
7       MR. MARTIN: Just one question I
8    have for Mr. Ascolese, this witness. On this
9    application, are there any engineering variances
10   that you see? Mr. Flannery was nice enough to
11   announce that it's a variance-free application.
12   And he's very good at what he does, but I want to
13   make sure that you say that, too.
14      MR. ASCOLESE: The only
15   clarification I need, and I guess I'm going to
16   get it from the architect, is the building height
17   because it's a 50 foot limit and I just need an
18   explanation of why the building appears to be
19   higher than 50 feet.
20      MR. MARTIN: Okay.
21      MR. ASCOLESE: From an engineering
22   standpoint, I can find no variances that were
23   required based on the redevelopment portion of
24   the code.
25      MR. MARTIN: Thank you, Mr.

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery          Page 36

1    Ascolese.
2       MR. FLANNERY: And we'll address
3    that question with the architect. We believe we
4    conform.
5       CHAIRPERSON SCHWINDER: Miss Bogart,
6    any questions?
7       MS. BOGART: I just have three
8    questions. The handicap ramps along -- near
9    Linwood?
10      THE WITNESS: Yes.
11      MS. BOGART: Is there an opportunity
12   to modify their location, their size based upon
13   the streetscape?
14      THE WITNESS: Yes, we can. We can.
15   I mean, obviously Linwood and Kinderkamack that,
16   the grade starts to get -- between the building
17   and it starts to get tight and the space does get
18   tight, but, yeah, we can modify it to accommodate
19   that.
20      MS. BOGART: I just have some
21   questions with regard to how the sidewalk is
22   going to layout, so I would like to --
23      THE WITNESS: Yeah, we can work --
24      MS. BOGART: Okay.
25      THE WITNESS: We can work with you

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 37

1    on that, yeah.
2        MS. BOGART: Do you know the height
3    of the ceiling in the plaza area?  Is that going
4    to be 12, 14 feet?
5        THE WITNESS: I'll defer to the
6    architect on that.
7        MS. BOGART: And my only other
8    question or comment is, make sure you just
9    include the lighting for the parking structure
10   when you do the lighting --
11       THE WITNESS: Yes.
12       MS. BOGART: -- the formal lighting
13   plans.
14       THE WITNESS: Yes.
15       MS. BOGART: Thank you.
16       CHAIRPERSON SCHWINDER: Any
17   questions from board members?
18       MR. CIMINO: I have one.  The
19   drainage on the leaders coming down, are they
20   going to be piped directly on the ground or are
21   they going to spill out onto sidewalks?
22       THE WITNESS: No, they'll definitely
23   be piped in the ground, yeah.
24       CHAIRPERSON SCHWINDER: And then
25   they go into the new main?

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 38

1        THE WITNESS: Correct.  The roof
2    leaders will pipe.  I'm not sure exactly.  I'm
3    sure the architect hasn't designed them to any
4    great detail at this point, but they will be
5    designed and connected.  There's a collection of
6    storm inlets along this back.  They won't go
7    directly into the pipe because that's considered
8    a blind connection and it's not a standard we
9    like to practice.  We would prefer they go into a
10   storm inlet.  So there's, I believe there's four
11   inlets on this back parking lot that they will
12   connect to.
13       CHAIRPERSON SCHWINDER: Okay.
14       MR. MARTIN: Mr. Ascolese, is there
15   sufficient capacity for that?
16       MR. ASCOLESE: The 42 inch storm
17   drain that the County and the Town put in took
18   into consideration the historical flooding on
19   Lincoln Boulevard, and the pipe size was
20   increased substantially to the effect that the
21   runoff from this site as well as the runoff from
22   Lincoln Boulevard should be accommodated in I
23   believe it was a 10-year design storm.
24       MR. MARTIN: And if there's any
25   off-tract improvements the proper nexus of

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 39

1    percentage would be addressed by the developer,
2    correct?
3        MR. FLANNERY: Correct.
4        CHAIRPERSON SCHWINDER: Go ahead.
5        MR. BRESA: With regards to the
6    parking lot light, now is that going to follow a
7    schedule from sunset to sunrise?  Or is that
8    going to be eliminated throughout the night?  Or
9    is there a shutoff time that you guys had planned
10   for that, the building lights and the parking lot
11   lights?
12       THE WITNESS: Well, I think for
13   security reasons, just like all parking lot
14   lights, this is a residential community.  If it
15   was a off-peak where it went down, but because
16   there's residents in the community I think it has
17   to be maintained at all times.
18       MR. BRESA: Okay.
19       THE WITNESS: But it will, I will
20   say it's cast down so there's not going to be a
21   up-glow.
22       MR. BRESA: And are there any
23   lighting -- I'm sorry -- fixtures on the frontage
24   of the building on Kinderkamack, you know, on the
25   facade of the building?

Corsey, PE, PP, Wayne A. - direct - Mr. Flannery    Page 40

1        THE WITNESS: I'll defer to the
2    architect.
3        MR. BRESA: All right, no problem.
4        THE WITNESS: I think that the
5    fixtures in the light on the facade will be
6    decorative fixtures.
7        MR. BRESA: Okay.
8        CHAIRPERSON SCHWINDER: Anything
9    else for this witness?
10       MR. SUDANO: Could you repeat the
11   breakdown of the parking between the deck --
12       THE WITNESS: Yes.
13       MR. SUDANO: -- and the onsite?
14       THE WITNESS: Sure.
15       MR. SUDANO: I know you said 308.  I
16   just, I missed it.
17       THE WITNESS: That's another
18   clarification, if I could, is on our site plan,
19   another mixup between us and the architect, on
20   our site plan we have 301 spaces.  However,
21   there, based on the architect's plan there's 47
22   spaces for the level of the deck and then 72
23   surface spaces.  So that gives you 308.  And then
24   we have 235 garage spaces and 73 surface spaces.
25       MR. SUDANO: Thank you.

---

Olivo, PE, Charles - examination - Mr. Martin                    Page 41

1    THE WITNESS: You're welcome.
2    CHAIRPERSON SCHWINDER: Anything
3  else?
4    Okay.  Next witness.
5    MR. FLANNERY: Thank you.
6    THE WITNESS: Thank you.
7    MR. FLANNERY: Next witness I have
8  Mr. Charles Olivo, Stonefield, our traffic
9  engineer.  Have Mr. Olivo sworn in, please.
10    MR. MARTIN: Sir, raise your right
11  hand.  Do you swear to tell the truth, the whole
12  truth, and nothing but the truth so help you God?
13    THE WITNESS: I do.
14    MR. MARTIN: And please give us your
15  full name and your full business address and your
16  professional degrees.
17    THE WITNESS: Certainly.  Good
18  evening, Mr. Chairman, members of the board,
19  members of the public.  My name is Charles Olivo,
20  O-l-i-v, as in Victor, -o, Stonefield Engineering
21  and Design located at 92 Park Avenue, Rutherford,
22  New Jersey.
23    I have a bachelor of science in the
24  field of civil engineering from the University of
25  Notre Dame.  I'm a licensed professional engineer

---

Olivo, PE, Charles - examination - Mr. Martin                    Page 42

1  in the state of New Jersey.  I hold licensure
2  throughout the East coast from Maine to Florida,
3  where I've been involved in the preparation of
4  over 300 traffic impact studies.  I've been
5  qualified as an expert in the field of civil
6  engineering and traffic engineering before over
7  120 municipalities in the state of New Jersey.
8  I've served as a consultant to the New Jersey
9  Department of Transportation, and I'm also a
10  Certified Professional Traffic Operations
11  Engineer certified by the Institute of
12  Transportation Engineers.
13    MR. MARTIN: Are you a licensed
14  professional engineer in New Jersey and New York?
15    THE WITNESS: Yes.
16    MR. MARTIN: Any other states?
17    THE WITNESS: Maine, Florida, New
18  Hampshire, Connecticut, essentially up and down
19  the Eastern seaboard and the Midwest as well.
20    MR. MARTIN: And all, all in good
21  standing, correct?
22    THE WITNESS: All in good standing,
23  yes.
24    MR. MARTIN: And how long have you
25  been licensed in New Jersey?

---

Olivo, PE, Charles - examination - Mr. Martin                    Page 43

1    THE WITNESS: I've been licensed now
2  12 years.
3    MR. MARTIN: So you're a
4  professional engineer.  You're so qualified
5  tonight.  I believe you're being proffered as a
6  traffic -- on behalf of the applicant as a
7  traffic engineer?
8    THE WITNESS: That is correct,
9  traffic engineer, yes.
10    MR. MARTIN: So you're not a traffic
11  consultant.  You're actually an engineer, a
12  traffic engineer.  You worked as a consultant for
13  the DEP -- I'm sorry, the New Jersey DOT?
14    THE WITNESS: DOT, I served as a
15  consultant on projects that involved
16  transportation engineering design for the
17  Department of Transportation.
18    MR. MARTIN: And was that as a
19  traffic engineer or some other profession?
20    THE WITNESS: Yes, it was traffic
21  engineer.
22    MR. MARTIN: And, specifically, Mr.
23  Flannery you want him qualified as a traffic
24  engineer or professional engineer?  I know that
25  he's a professional engineer, but --

---

Olivo, PE, Charles - direct - Mr. Flannery                    Page 44

1    MR. FLANNERY: Right.
2    MR. MARTIN: -- is he here for
3  traffic or anything else?
4    MR. FLANNERY: He's both, but he's
5  really here for traffic.
6    MR. MARTIN: So traffic only.
7    MR. FLANNERY: He's not really
8  discussing any civil engineering.
9    MR. MARTIN: So qualified as a
10  traffic engineer tonight.  Thank you.  Go ahead,
11  Mr. Olivo.
12    MR. FLANNERY: Thank you.
13    THE WITNESS: Thank you.
14    DIRECT EXAMINATION BY MR. FLANNERY:
15    THE WITNESS: Our firm assessed the
16  traffic and the parking associated with the
17  project that you have here, which is a
18  redevelopment site in close proximity to the
19  existing matched mass transit, public transit
20  that you have within the Borough.  The Department
21  of Transportation, as well as other agencies,
22  certainly Redevelopment agencies would classify
23  this as a Transit-Oriented Development.  I'm sure
24  the Board has heard the term before, but a TOD
25  project.

---

1     And the goal of a transit-oriented
2   development project is to take advantage of the
3   excellent public transit, the walkability that
4   you have within the borough here.  And so the
5   goal of redevelopment of this nature where you
6   have ground floor retail, residential above and
7   also residential essentially on the ground floor
8   as well, in close proximity to walkability,
9   sidewalk areas, as well as you have the 165 bus
10   line.  You have Rockland coach lines as well that
11   run in close proximity to the site, as well as
12   the train station, which is located just to the
13   south on the exhibit which was previously marked
14   by Mr. Corsey.
15     So in terms of traffic engineering
16   and the goals of reducing traffic generation and
17   parking demand or the reliance on parking
18   ownership and single-occupancy vehicles being
19   driven through our roadway networks, this is the
20   exact type of project that municipalities are
21   looking for, and, quite frankly, that the
22   Department of Transportation as a state-wide
23   initiative is recommending throughout communities
24   in New Jersey.
25     Traffic assessment starts with an

1   inventory of the existing street network that we
2   have around us.  I believe Mr. Corsey did an
3   excellent job of going through the location of
4   the site, which is effectively found by Lincoln
5   Boulevard to the north and Linwood Avenue to the
6   south with Kinderkamack Road running along the
7   bottom portion of the exhibit board, which is
8   your north/south artery in this area and
9   throughout the county, quite frankly.
10     There's some significant
11   improvements that are coming about as a result of
12   this redevelopment plan.  Mr. Corsey touched on
13   this.  But with the exception of Lot 5, what we
14   are doing is creating a continuous street wall,
15   which is exactly what you look for in walkable
16   environments in terms of design guidelines of how
17   you create a sense of place and buildings that
18   thrive in communities such as this.  So the four
19   access points.
20     And you can see some more antiquated
21   access along Kinderkamack Road today, where you
22   literally have parked cars that back up onto a
23   County arterial roadway.
24     The four curb cuts that exist within
25   the subject property along Kinderkamack Road,

1   which is your main artery, are being removed
2   entirely.  So there's no vehicular access to and
3   from Kinderkamack Road.  Two-way access would be
4   provided near Linwood Avenue and also Lincoln
5   Boulevard to parking that would be shared by
6   commuters, retail users and the residential
7   tenants within the building.
8     So shared parking principles as well,
9   which, again, is something that is being promoted
10   as part of excellent downtown planning in
11   guidelines for transit-oriented development
12   projects.  Rather than simply building parking
13   that would likely go unused during most times of
14   day, it can be shared by the complementary use of
15   commuters, retail, restaurants, in addition to
16   the residential that are being proposed here.
17     Now, in terms of the parking supply
18   you've heard that there will be 308 parking
19   stalls provided on the site.  73 that are located
20   within the rear portion of the site in the
21   surface or the uncovered parking area at the
22   first level of the, we'll call it the garage
23   portion of the site, the northerly portion of the
24   site, you have 47 stalls at ground level.  So
25   that gives you a total at the ground level of 120

1   parking stalls, and those can be used by
2   commuters or retail and can be accessed via
3   Lincoln or via Linwood.
4     Above that, you would have 188
5   stalls.  So the 120 and the 188 gets you to the
6   308 total parking stalls on the site.  Now based
7   on the redevelopment plan, we look at the RSIS
8   requirement for parking, which is 1.8 for
9   one-bedrooms.
10     MR. McKENDRY: W-R-I-S, what was
11   that?
12     THE WITNESS: Residential Site
13   Improvement Standards.
14     MR. McKENDRY: Thank you.
15     THE WITNESS: Which is the
16   state-wide manual that essentially guides
17   residential projects in the state.
18   A.  Now there is a section within RSIS
19   4.14 (c), which specifically says that
20   alternative parking standards can be utilized in
21   areas such as this, well served by mass transit,
22   downtown living, walkability and other features
23   that marry well with downtown areas and
24   neighborhoods.
25     So effectively what we look at is

1  the RSIS standard, 1.8 for one bedroom, 2.0 for
2  two bedroom. This project is more heavily
3  weighted towards one-bedroom units. You have 120
4  one-bedrooms and 27 two-bedrooms. We have retail
5  parking guidelines, which are at 1 per 250 or 4
6  per thousand. And within the redevelopment plan
7  it states when you have this ability to share
8  parking, which we do here, you can take a 25
9  percent credit from that parking supply. And so
10 that's what allows us to say that we are above
11 and beyond. The requirement here is 254 parking
12 stalls, and we are at 308 parking stalls.
13     Now, just breaking that down into
14 some, some numbers that tell us about the, the
15 residential portion of the site. If we were to
16 dedicate that entire ground level, as I
17 mentioned, to commuter and retail, leaving us
18 with the 188 parking stalls, what that would
19 equate to is 1.28 stalls per unit. And because
20 of the bedroom count here, we could also look at
21 this in terms of the total bedrooms being
22 provided and we would actually have 1.08. So
23 more than one to one for every bedroom. That
24 means you could rent every stall to a bedroom,
25 and you would still have leftover parking stalls.

1      A lot of times we just focus on the
2  units. But you can see here that that type of
3  parking supply would be more than adequate to
4  accommodate the demand.
5      Our firm has studied a number of
6  transit-oriented development projects built
7  throughout the state of New Jersey after they're
8  built and after they're occupied. And what we've
9  found is that the typical parking ratios that you
10 see within transit areas, and a number of those
11 projects are farther from transit than this
12 project is, they're typically parking on average
13 around .94 per unit so just under that one-to-one
14 threshold.
15     We're well above the one-to-one
16 threshold. We're actually above the one-to-one
17 one bedroom as well. So you have an excellent
18 opportunity here to park commuters, share that
19 parking with visitors, retail and then you have
20 more than adequate parking for the residential
21 itself.
22     In terms of just circulation,
23 maneuverability, trip generation in terms of
24 talking about the traffic related to a project
25 like this, based on the ITE trip generation

1  projections for 147 units and this amount of
2  retail, we'd be looking at -- we're I believe at
3  just under 15,000 square feet of retail -- we
4  would be below the threshold that we would
5  typically call a significant increase in traffic.
6      The trip generation associated with
7  the residential units with no credit taken for
8  public transit access, and if you look at the
9  census data in the borough, about 28 percent of
10 your constituents now are using a means other
11 than a single-occupancy car, meaning driving
12 themselves. About 28 percent are using something
13 else, mass transit, car pooling, walking,
14 telecommuting.
15     And so with a project built right on
16 the train line and near the 165 and other buses
17 running into New York City and other outlying
18 areas, you have the ability to capture that type
19 of reduced traffic demand and reduce parking
20 demand as well. But, be that as it may, we meet
21 the parking requirement with the amount of
22 parking supply that we have here.
23     The retail of this type of downtown
24 retail typically sees more pass-by traffic in
25 addition to lesser traffic demand levels. And

1  that's why I say that, that threshold of a
2  hundred trips or more during the peak hour, we
3  would be below that threshold based on the
4  projections we have here, looking at pass-by and
5  looking at potential public transit credit.
6      So from a traffic perspective, the
7  unit density, the scaling, the mass, you'll hear
8  from the architect, is all contemplated within
9  the redevelopment plan. This is a permitted use
10 within this redevelopment zone, and as a result,
11 the traffic associated with it is conceived to be
12 part of the roadway network when a redevelopment
13 plan is approved and essentially promoted in that
14 nature.
15     So the traffic generation associated
16 with the site would not be expected to
17 significantly alter the patterns within the area.
18 And from a parking perspective, we have more than
19 adequate parking to accommodate the expected
20 demands here.
21     And just to wrap up, site
22 circulation, and we've spoken about parking
23 supply, but in terms of the circulation aisles,
24 the parking stall dimensions, all in accordance
25 with typically held industry standards for

Emerson Redevelopers Urban Renewal

---

1  design. These are our stalls that would be in
2  terms of the dwell time of a vehicle for
3  residential and for commuters. You can imagine
4  that vehicles will be there for a longer course
5  of time. Commuters during the day, residential
6  during the overnight period. And so when we look
7  at the dimensions that are provided as part of
8  the architectural plan and the site plan, those
9  would be in accordance with industry standards
10 for safe and effective access to and from the
11 part and within the parking areas.
12 Q. There was also comment about
13 queueing on Lincoln Boulevard?
14 A. Yes. The proposal at the ground
15 level on Lincoln Boulevard would be to be able to
16 pull into the ground level. And then as you're
17 accessing the parking that would be located
18 above, there may be a barrier arm-type gate that
19 could be used with either a key FOB or a
20 ticketing system. But there is room for
21 approximately two vehicles before you enter into
22 the parking field that is proposed proximate to
23 Lincoln Boulevard, and by virtue of that, I do
24 not see reason why queueing would be an issue on
25 Lincoln Boulevard coming into or leaving the

---

1  garage.
2      MR. FLANNERY: Thank you. And on
3  the gate system I think we'll have a little more
4  testimony from the architect on that. There was
5  a comment or two about that as well.
6      That's all I have of direct questions
7  for Mr. Olivo at this time.
8      CHAIRPERSON SCHWINDER: The gate
9  would be at the base of the ramp?
10     THE WITNESS: I believe the
11 architect can provide a little more detail what
12 the developer's intent is there, but that is
13 certainly something that we see as part projects
14 like this. It can be located in the area, yes.
15     CHAIRPERSON SCHWINDER: Right. So
16 it's like if it was closer to entry activity from
17 Lincoln Boulevard, I can see some queueing there.
18     THE WITNESS: Yes.
19     CHAIRPERSON SCHWINDER: Mr.
20 Ascolese.
21     MR. MARTIN: Just a second. Gary,
22 raise your right hand. Do you swear to tell the
23 truth, the whole truth and nothing but the truth
24 so help you God?
25     MR. ASCOLESE: I do.

---

1      MR. MARTIN: Mr. Flannery, you
2  stipulate to his credentials as a professional
3  engineer?
4      MR. FLANNERY: I do.
5      MR. MARTIN: And a subspecialty in
6  traffic engineering which he actually has.
7      MR. FLANNERY: Yes, of course.
8      MR. MARTIN: Okay. And would you
9  raise your right hand? Do you swear to tell the
10 truth, the whole truth and nothing but the truth
11 so help you God?
12     MS. BOGART: I do.
13     MR. MARTIN: Do you stipulate to
14 Ms. Bogart's qualifications as a professional
15 planner?
16     MR. FLANNERY: Yes, of course.
17     MR. MARTIN: Okay. And everything
18 you both have stated earlier on the record is
19 true and the best of your abilities in terms of
20 your professions, yes?
21     MR. ASCOLESE: Yes.
22     MR. MARTIN: Yes?
23     MS. BOGART: Yes.
24     MR. MARTIN: Okay. Gary, I could
25 cross-examine Mr. Olivo --

---

1      THE WITNESS: Olivo.
2      MR. MARTIN: Olivo. Los Olivos is a
3  very good place in California, by the way.
4      -- however, you're the specialist.
5  Why don't you ask him a few questions?
6      MR. ASCOLESE: Thank you, Mr.
7  Chairman, Counselor.
8      Mr. Olivo, you had mentioned
9  approximately a hundred trips per hour during the
10 morning and evening peak hours was -- is --
11 that's what you inferred, as part of the
12 development of the 147 units adjusting 14,700
13 square feet of retail?
14     THE WITNESS: It depend -- I believe
15 that we would be below that based on the transit
16 oriented use of a site like this. If you apply
17 the trip generation standards for, we'll call it
18 a mid-rise apartment project, you would arrive
19 during the highest peak at 65 peak vehicles
20 during a 60-minute window.
21     Now, obviously, from 6 to 9 a.m.
22 which you would typically find to be your
23 commuter rush period is when the majority of
24 vehicles would be existing the site, and 4 to 7
25 p.m. would be their return into the site.

---

Olivo, PE, Charles - direct - Mr. Flannery                Page 57

1  And when we look at with no credit
2  for public transportation or this connectivity
3  that we're speaking about, you would be at
4  approximately 65 trips during the peak 60-minute
5  window.
6  In terms of retail, there's a number
7  of different ways to look at retail, whether it
8  be specialty retail or shopping center. I
9  believe with the smaller units that are
10 contemplated, understanding that they do total
11 just under 15,000 square feet, this wouldn't be a
12 big box retailer that's coming in here in more of
13 your anchor centers that you see along State
14 highways.
15 This is meant to be neighborhood
16 retail, which I believe would create more of your
17 pass-by traffic, neighborhood traffic that
18 potentially would be within the roadway network
19 already under existing conditions.
20 So I believe when you apply those
21 types of credits to shared parking as well as
22 public transportation usage, that we would be
23 just under that 100-trip threshold, but we could
24 certainly provide more information about that.
25 MR. ASCOLESE: My next question is,

Olivo, PE, Charles - direct - Mr. Flannery                Page 58

1  have you been out at this location during the
2  morning or evening peak hours?
3  THE WITNESS: I have.
4  UNIDENTIFIED FEMALE: No, you
5  haven't.
6  MR. ASCOLESE: The County and the
7  Municipality has spent a substantial amount of
8  money.
9  THE WITNESS: Yes.
10 MR. ASCOLESE: And right now with
11 all the safety features that are built-in to keep
12 people from stopping on the crossing, it takes
13 sometimes several minutes, 6, 7, 8 minutes at
14 times to recover after a train comes through --
15 THE WITNESS: Yes.
16 MR. ASCOLESE: -- whether it be
17 local, express -- or express. What do you feel
18 the impacts would be if this development were
19 approved, what would the impacts be to the
20 intersections that are controlled by that
21 railroad re-entry system?
22 THE WITNESS: Based on what I'll
23 call the insignificant amount of traffic. And I
24 know what this area is like. I know what areas
25 are like when the train barriers come down and

Olivo, PE, Charles - direct - Mr. Flannery                Page 59

1  how vehicles backup within the system, and that's
2  essentially in downtown areas that are served by
3  the train. That is the sacrifice that we make
4  for taking those cars off the roadway and putting
5  people in trains. We're changing modes of
6  transportation right here, which means that
7  during the time that that train comes into
8  station, the people that are within cars have to
9  wait and so the levels of service during those
10 times are constrained. I don't deny that at all,
11 but that is what is part of a multimodal system
12 of transportation. You are converting passenger
13 cars into riders of the train, which takes
14 vehicles off of your regional roadway network.
15 Having conducted hundreds of traffic
16 impact studies in downtown areas, our firm has
17 worked on over 30 transit-oriented development
18 projects throughout the state of New Jersey.
19 There are times when there are significant
20 constraints within the roadway system. There are
21 times where you will wait through multiple cycles
22 of a traffic signal to get through between the
23 hours of 7 a.m. and 9 a.m. and 4 p.m. and 7 p.m.,
24 and that is why this site is located where it is
25 and is considered to be a transit-oriented

Olivo, PE, Charles - cross - The Board                Page 60

1  development project, and has been placed in the
2  redevelopment area and in a redevelopment plan to
3  take and mitigate the traffic, the vehicles that
4  are associated with projects that are built away
5  from train stations and away from bus lines.
6  So, in and of itself, the location
7  is a mitigation factor. If you pick this project
8  up and take it out Route 78 to western New Jersey
9  and drop it just off a state highway, it would
10 need more parking. It would need more roadway
11 infrastructure, and it would not be connected to
12 an already existing downtown area. So that, from
13 a traffic perspective, it's much more wholistic.
14 It's bigger picture than simply, what is the
15 impact during the worst time of day.
16 And so from a traffic generation
17 perspective, this project would not be expected
18 to significantly alter what is happening under
19 existing conditions. And, in my opinion, it's a
20 step in the right direction.
21 UNIDENTIFIED MALE: Impossible.
22 MR. ASCOLESE: I just have one last
23 question. Do you have a statement prepared that
24 we can review or put in our files --
25 THE WITNESS: I don't.

Olivo, PE, Charles - cross - The Board                                    Page 61

1    MR. ASCOLESE: -- containing your
2  testimony?
3    THE WITNESS: Just my notes and
4  testimony.
5    MR. ASCOLESE: Thank you.
6    CHAIRPERSON SCHWINDER: Thank you.
7  Brigette.
8    MS. BOGART: Just one question with
9  regard to the ADA compliance, is that for you or
10  for the architect?
11    UNIDENTIFIED FEMALE: Can't hear.
12    THE WITNESS: Either the
13  architect --
14    CHAIRPERSON SCHWINDER: Will you let
15  her --
16    THE WITNESS: -- or the site
17  engineer. I believe we're ADA compliant.
18    CHAIRPERSON SCHWINDER: Will you let
19  her repeat the question?
20    MR. FLANNERY: Yes. I think the
21  architect may address some of this.
22    CHAIRPERSON SCHWINDER: Repeat the
23  question please.
24    MS. BOGART: My question was with
25  regard to ADA compliant for parking spaces, the

Olivo, PE, Charles - cross - The Board                                    Page 62

1  van-accessible spaces. Is that going to be
2  addressed by you or the architect?
3    THE WITNESS: I believe the
4  architect can touch on that.
5    MR. FLANNERY: Yes.
6    CHAIRPERSON SCHWINDER: Any board
7  members have any question of this witness?
8    MR. MALONE: Just to confirm that
9  the upper levels of the garage are only
10  residential use? No transient parking in there,
11  no commuter parking? Just for residents?
12    THE WITNESS: No, the commuter
13  parking is proposed to be at ground level.
14    MR. MARTIN: Same with the retail?
15    THE WITNESS: Yes. Most accessible,
16  most convenient, easiest to use and get to the
17  street.
18    MR. ASCOLESE: Another question, Mr.
19  Chairman. From what I understood, on the
20  original concept plan from 2016, there were 55
21  spaces reserved for commuters. That number does
22  not appear in the legal agreement nor on the
23  latest concept plan.
24    Can you touch on where the 55
25  commuter stalls are going to be designated?

Olivo, PE, Charles - cross - The Board                                    Page 63

1    THE WITNESS: We would propose to
2  allocate 55 of the 73 parking stalls located in
3  the service parking for that purpose.
4    What we would also do, similar to
5  what you have today, if you look at the signs in
6  a commuter area: Permit parking only from 7 a.m.
7  to 6 p.m. -- and we've had this done in other
8  redevelopment projects as well -- is after 6 p.m.
9  when the commuter demand leaves that area, it's
10  an excellent way to share parking with your
11  restaurant uses, your retail uses that may peak
12  after that time. Rather than just letting them
13  sit vacant, and you're essentially wasting that
14  space for no purpose. So that would be the goal
15  is to have a similar type of parking enforcement
16  after the commuter period.
17    MR. ASCOLESE: And who would address
18  the operation of the parking garage? Is that for
19  the architect? The question I have, is it going
20  to be -- is there going to be a fee? Is it going
21  to be a gate operation?
22    MR. FLANNERY: Right, the architect
23  can address those issues.
24    MR. ASCOLESE: Okay. One last thing
25  was the trash.

Olivo, PE, Charles - cross - The Board                                    Page 64

1    MR. MARTIN: I'm sorry about that.
2    MR. ASCOLESE: Excuse me. The
3  architect is going to address that as well.
4    MR. ASCOLESE: He's got a long night
5  then.
6    MR. FLANNERY: That's right. Yes,
7  they do.
8    MR. MARTIN: Mr., Mr. Olivo, the
9  about approximately just under a hundred trips
10  per hour at peak hours, is that your testimony?
11    THE WITNESS: It is, yes.
12    MR. MARTIN: And would that be as
13  you framed it from 7 to 9 and 4 to 7; is that
14  fair?
15    THE WITNESS: Those would be the
16  peak weekday hours. The Saturday peak, which is
17  generally a one-hour window between 11 a.m. to 2
18  p.m., I have the same expectation of similar
19  volumes of traffic.
20    Now, the commuter traffic does add an
21  element of vehicles in and out, but associated
22  with the project, 147 units and the 14,700 square
23  feet of neighborhood retail, my expectation would
24  be approximately a hundred or less vehicles, yes.
25    MR. MARTIN: So it would be 7 to 9

| Olivo, PE, Charles - cross - The Board | Page 65 |
|---|---|

1 a.m. and 4 to 7 p.m. weekdays, 11 to 2 on
2 Saturdays.  Any other time during the weekend?
3    THE WITNESS: Those would be the
4 peaks.  No, I would -- I frame those as the peak
5 periods and the peak hour being a 60-minute
6 window within those periods.
7    MR. MARTIN: Thank you.
8    THE WITNESS: You're welcome.
9    CHAIRPERSON SCHWINDER: Anybody
10 else?
11    Okay.  Thank you.
12    Next witness?
13    THE WITNESS: Thank you.
14    MR. FLANNERY: My next witness is,
15 I'm actually doing something a little strange
16 here.  With the permission of the Board, I'm
17 actually going to have two architects come up,
18 both registered architects in the state of New
19 Jersey, but they collaborated on preparing these
20 plans, and one will speak on certain aspects and
21 another will speak on other aspects.
22    MR. MARTIN: All right.  Let's take
23 witness number three, ladies before gentlemen.
24 Raise your right hand.  You swear to tell the
25 truth, the whole truth and nothing but the truth

| RA, Kostelecky, Angela - examination - Mr. Martin | Page 66 |
|---|---|

1 so help you God?
2    MS. KOSTELECKY: Yes.
3    MR. MARTIN: Yes?  And what is your
4 name?
5    MS. KOSTELECKY: Angela Kostelecky,
6 K-o-s-t-e-l-e-c-k-y.
7    MR. MARTIN: A-n-g-e-l-a?
8    MS. KOSTELECKY: Yes.
9    MR. MARTIN: All right, and your
10 business address.
11    MS. KOSTELECKY: 1477 Chain Bridge
12 Road.
13    MR. MARTIN: Montville?
14    MS. KOSTELECKY: McClean, Virginia.
15    MR. MARTIN: Ah, oh.
16    MR. FLANNERY: Close.
17    MR. MARTIN: And what's the name of
18 your business?
19    MS. KOSTELECKY: Devereaux and
20 Associates.
21    MR. MARTIN: Spell that.
22    MS. KOSTELECKY: D-e-v-e-r-e-a-u-x.
23    MR. MARTIN: All right.  And you're
24 a AIA?
25    MS. KOSTELECKY: Yes.

| RA, Kostelecky, Angela - examination - Mr. Martin | Page 67 |
|---|---|

1    MR. MARTIN: And how long have you
2 been a, a licensed architect?
3    MS. KOSTELECKY: Oh, gosh, 25 years.
4    MR. MARTIN: And you are licensed in
5 Virginia?
6    MS. KOSTELECKY: Virginia, Maryland,
7 Pennsylvania, New York, New Jersey,
8 Massachusetts.
9    MR. MARTIN: License in good
10 standing in all those jurisdictions?
11    MS. KOSTELECKY: Yes.
12    MR. MARTIN: And tonight you're here
13 to testify as to licensed architect issues
14 involving this particular project, correct?
15    MS. KOSTELECKY: Yes.
16    MR. MARTIN: Have you testified and
17 been qualified at other courts or boards before?
18    MS. KOSTELECKY: Yes, Plainfield,
19 Raritan, Cherry Hill.
20    MR. MARTIN: And so qualified
21 tonight.
22    Witness number four, raise your right
23 hand, sir.  You swear to tell the truth, the
24 whole truth and nothing but the truth, so help
25 you God?

| RA, Devereaux, Jr., William J. - examination - Mr. Martin | Page 68 |
|---|---|

1    MR. DEVEREAUX, JR.: Yes.
2    MR. MARTIN: And your name?
3    MR. DEVEREAUX, JR.: William J.
4 Devereaux, Jr.
5    MR. MARTIN: Of Devereaux and
6 Associates?
7    MR. DEVEREAUX, JR.: Right.
8    MR. MARTIN: All right.  Mr.
9 Devereaux, where is it, same address down in
10 McLean?
11    MR. DEVEREAUX, JR.: Yes.
12    MR. MARTIN: And you are a licensed
13 architect, AIA?
14    MR. DEVEREAUX, JR.: I am not AIA.
15    MR. MARTIN: RA?
16    MR.  DEVEREAUX, JR.: I'm a licensed
17 architect in New Jersey.
18    MR. MARTIN: Registered architect,
19 is it?
20    MR. DEVEREAUX, JR.: Oh, yeah,
21 Registered Architect.
22    MR. MARTIN: Okay.
23    MR. DEVEREAUX, JR.: You don't have
24 to be a member of the AIA.
25    MR. MARTIN: I understood.  You are,

RA, Devereaux, Jr., William J. - examination - Mr. Martin          Page 69

1  though?
2    MS. KOSTELECKY: I am.
3    MR. MARTIN: Okay.  And you are
4  licensed in New Jersey and Virginia.  Any other
5  places?
6    MR. DEVEREAUX, JR.: Virginia,
7  Maryland, North Carolina, West Virginia,
8  Pennsylvania, Massachusetts, Connecticut,
9  probably still Connecticut.
10   MR. MARTIN: License in good
11 standing, not --
12   MR. DEVEREAUX, JR.: Yes.
13   MR. MARTIN: No issues with that?
14   MR. DEVEREAUX, JR.: Yes.
15   MR. MARTIN: You've been qualified
16 before different boards, the same as your
17 protégé?
18   MR. DEVEREAUX, JR.: Yes, but they
19 pulled me out of retirement.  So I've been in
20 front of the board for a long time, so, but I've
21 done many.  I've worked in New Jersey for 35
22 years and done boards all over the state.
23   MR. MARTIN: Okay, and you're -- you
24 are qualified as a registered architect tonight.
25 Thank you.  Go ahead.

RA, Devereaux, Jr., William J. - direct - Mr. Flannery          Page 70

1    MR. FLANNERY: Thank you.
2    DIRECT EXAMINATION BY MR. FLANNERY:
3    MR. FLANNERY: If you could, please,
4  I think you have some exhibits to present
5  tonight?
6    MR. DEVEREAUX, JR.: Yes, we do.
7    MR. FLANNERY: We can start at
8  those.  I think we're on A-4, Exhibit A-4.
9    MR. MARTIN: Yes, we are.
10   (Exhibits A-4 is received and marked
11 for identification at this time.)
12   MR. DEVEREAUX, JR.: Well, I would
13 like to point out that we've made a slight
14 modification in the building since when you saw
15 it last, but we have not modified the perimeter
16 of the building, as you can see.  We've kept that
17 pretty much the same.  What we've done is we've
18 made it into basically a single building.
19   MR. FLANNERY: Just one moment, just
20 a point of order.
21   MR. DEVEREAUX, JR.: Yeah.
22   MR. FLANNERY: This is a, this is a
23 rendered version of his revised sheet A 1.10.
24   MS. KOSTELECKY: A 1.10.
25   MR. DEVEREAUX, JR.: Right.

RA, Devereaux, Jr., William J. - direct - Mr. Flannery          Page 71

1    MR. FLANNERY: Is this different
2  than what was submitted in the application
3  packet --
4    MS. KOSTELECKY: Yes.
5    MR. FLANNERY: Or is this the same?
6  Okay.
7    MR. MARTIN: And what's the date of
8  the revision?
9    MR. DEVEREAUX, JR.: It's oriented
10 the same way.
11   MR. FLANNERY: Date of the revision?
12   MS. KOSTELECKY: Date of the
13 revision is 12/10/18.
14   MR. FLANNERY: Okay.  Thank you.
15 Go ahead.
16   MR. DEVEREAUX, JR.: Okay.  Well,
17 what we did again was again, a minor change,
18 which we think improved the building a lot.  And
19 what we've done is we've created so we have a
20 single building.  You'll see in the next drawing;
21 and why don't we put the next one up for one
22 second?
23   MR. MARTIN: Exhibit A-5.
24   (Exhibit A-5 is received and marked
25 for identification at this time.)

RA, Devereaux, Jr., William J. - direct - Mr. Flannery          Page 72

1    MR. DEVEREAUX, JR.: A-5, this is.
2    MR. FLANNERY: This is a similar
3  revised December 10th, 2018 rendered version of
4  Sheet A-1.20?
5    MR. DEVEREAUX, JR.: Right.
6    MS. KOSTELECKY: Yes, 1.20.
7    MR. DEVEREAUX, JR.: And, again, it
8  may seem like a detail, but what we have done is
9  create a single building.  We felt that if you're
10 going to wake up at 2 in the morning and you
11 happen to want to go exercise at your amenity
12 center, you don't need to go outside or walk
13 across the parking garage.
14   So we've connected it and we've,
15 we've kept, like I said, the same perimeter, as
16 you saw before, kept that pretty much the same in
17 the front and we changed where our parking is as
18 you saw on the plan with the, with the
19 engineering.
20   But this allows us to have a single
21 amenity center, a single lobby, and the building
22 works much better.  It becomes a community within
23 this community.  And if we put the other drawing
24 back on, if you don't mind.  Appreciate it.
25   What we're showing is our lobby and

RA, Devereaux, Jr., William J. - direct - Mr. Flannery    Page 73

1  fitness center right here because that's part of
2  the activity of the street.  I mean, this fitness
3  center, it's not going to be gigantic, but it's
4  like I think we're showing about 5,000 feet,
5  maybe 5300 feet here, but we're looking at that
6  as like something that has the lights on at
7  night.  It's a fitness center.  It's activity,
8  bring -- we want to bring activity to the street.
9  Not that you don't have activity.  You do have
10  activity.  We were out there tonight, there's a
11  lot of activity, but we want a lot of pedestrian
12  activity and that's what we're trying to get
13  here.
14      Our entry would right in this
15  location, our lobby elevator here, put an
16  elevator here for our, kind-of a back door, but
17  everybody would be able to walk through the
18  building and get -- within the building and get
19  to their amenity center, to their lobby, to their
20  mail, to all the stuff you normally would do in a
21  single building, and it works great, we think, on
22  the site.  So we don't think we lost anything.
23  As long as we kept the look that we know you like
24  and we think we have.
25      We've kept the breezeway through that

RA, Devereaux, Jr., William J. - direct - Mr. Flannery    Page 74

1  allows people to park here and come to get to the
2  retail.  This is the majority of our retail is
3  right in here.  So they're coming right through
4  getting out to the street and getting to the
5  retailers you see at this point.
6      We also thought that this was a real
7  important corner.  Not that this isn't an
8  important corner, but there is a lot of activity
9  going on here, and we wanted to add more of that,
10  and we think this can be a real special place.
11      I mean, in the warm months we see
12  umbrellas and people having coffee on their way
13  running to catch the commuter train or whatever,
14  or just the activity of the street and maybe the
15  shopping that goes along here.
16      So we think this could be a really
17  exciting type of a corner.  We have the rounded
18  edge, as you see there, which you saw in the
19  original drawings.  We have the rounded edges you
20  see here on the original drawings.
21      We've also added activity to Lincoln
22  over this way, and what we've done is we have
23  direct access to these units off the sidewalk off
24  the street.
25      Now, they, to go against what I just

RA, Devereaux, Jr., William J. - direct - Mr. Flannery    Page 75

1  told you, they would have to go out to get to the
2  amenity center and then to the lobby, but it's
3  only I think, what?  Seven units or something in
4  there.
5      So the majority of the building
6  would all be self-contained except for its access
7  to the street.  We want to get people and we want
8  to get the experience of the street, so that's
9  what we were looking for.
10      I'd like to -- let's go to the other
11  drawing of the floor plan.  And, again, you can
12  see how the hallway works as it gets around here
13  and off the elevator core here and the elevator
14  core here.  So we feel pretty confident that
15  that's going to work really nicely and feel good
16  for the residents.
17      And I'd like to show a floor plan,
18  too.  I know you're not interested in the floor
19  plans, but when we design a building we like to
20  design the whole building, and we get pretty
21  excited about the things we do, and the floor
22  plans are important to us.  We think we're going
23  to get renters that, ah, we may get a lot of
24  young people, we may get a lot of --
25      MR. MARTIN: Let's call that A-6?

RA, Devereaux, Jr., William J. - direct - Mr. Flannery    Page 76

1      MR. FLANNERY: A-6, right.
2      MS. KOSTELECKY: Ah, yes, A-6.
3      MR. DEVEREAUX, JR.: Okay.
4      MR. MARTIN: Any change in that
5  sheet?
6      MS. KOSTELECKY: No.
7      MR. MARTIN: And what sheet is that?
8      MS. KOSTELECKY: A-2.10.
9      MR. MARTIN: And for the Record,
10  what's the date of it?
11      MS. KOSTELECKY: This one is dated
12  11/15/18.
13      MR. MARTIN: Thank you.
14      (Exhibit A-6 is received and marked
15  for identification at this time.)
16      MR. DEVEREAUX, JR.: Now, what we're
17  trying to do is to create excitement within the
18  building also.  We know the most important thing
19  is the outside and how it feels with the
20  community and how it works with the community,
21  but we want our residents to enjoy the building
22  also, and we think we have with our floor plans.
23      If we start with like even the
24  two-bedroom, maybe that, maybe that rents to a
25  young professional couple, maybe two people

1  renting, maybe a young couple with a baby
2  kind-of-thing, who knows, or it might even be an
3  empty nester.  We have a one-bedroom also.  We
4  have two different variations of it that you come
5  in.  This one has a small den, which can be an
6  office type-of-space and this one just has a
7  larger master bedroom suite.
8      But all these units, when you walk in
9  the homes, when you walk in the door you look out
10  through the glass and you look out through a
11  balcony.  And every room you walk into you're
12  walking into glass.  We try to have the door open
13  into their apartment and into their home and all
14  of a sudden they're looking out, and that to us
15  is very important.
16      And you see even in our corner unit,
17  you saw the corner down by the, by the transit
18  station this is one of the units that would be
19  the one I would take with the rounded glass, and
20  the living room, dining room, kitchen looking out
21  through that with an island.  And in this case
22  two-bedrooms next to each other a lot of times
23  we'll do two separate bedrooms, and a pretty
24  exciting space as you come into the, in the unit.
25      With that, we'd like to walk you

1  through the elevation a little bit.  And
2  originally you saw a couple of perspectives of
3  the building, and we've tried to maintain that as
4  much as we can.  And this will show you the
5  entire stretch of the building.  And Angela will
6  also have some drawings we can hand out that
7  probably show the colors and even maybe bring out
8  the color board.
9      MR. FLANNERY: So that would be A-7,
10  I believe?
11      MS. KOSTELECKY: Yes.
12      MR. FLANNERY: Kinderkamack Road
13  elevation of the property.  Do you want me to
14  hold that?
15      MS. KOSTELECKY: Okay.  A-7.  It's
16  not going to work.  Okay.
17      (Exhibit A-7 is received and marked
18  for identification at this time.)
19      MR. MARTIN: It looks very nice.
20      MR. CIMINO: The price is right
21  there.
22      MALE VOICE: There we go.
23      MS. KOSTELECKY: Thank you.
24      MR. MARTIN: Peter?  Peter, could
25  you just face it a little bit towards the

1  audience?
2      MR. FLANNERY: Sure.
3      MS. KOSTELECKY: Thank you.
4      MALE VOICE: That looks better.
5      MS. KOSTELECKY: Absolutely.  Thank
6  you.
7      MR. DEVEREAUX, JR.: Well, the
8  perspectives that you saw originally were looking
9  at this corner, Linwood, and this corner,
10  Lincoln, down here.  And you can see how we have
11  kept the verticals, as you saw in the original.
12  We've kept the curb, as you've seen in the
13  original.  We have stacked balconies to get a
14  vertical feel in here.  We've kept the horizontal
15  line as the ordinance calls for separation
16  somewhere in the elevation between the range of
17  the streetscape and the upper level.
18      This is the 5 foot setback up here
19  up along the street here, which we anticipate
20  that being a balcony for the upper level units.
21  So they'll be like terrace units up there.
22      We handed out some drawings to you,
23  which we'll give also to, some for the audience
24  to look at, that probably is a little bit better
25  depiction of the brick colors that we're

1  anticipating.  Sometimes when you get something
2  mounted it's a little bit more magenta than we
3  probably would do.  But you'll see in what we're
4  showing you that this is, this is a better
5  rendition of what is on our color board.  But
6  that gives you a good example of how the building
7  will look, and how it steps back, and the top
8  floor basically kind of fades back and away.
9      Obviously, we're looking at as much
10  glass and as much activity as we can get on the
11  street.  And you can see here the umbrellas and
12  the seating.  Hopefully, we'll get a cafe or
13  coffee shop or what have you come in there.  We
14  don't know who is going to come in, but there's a
15  lot of opportunity for glass and activity and a
16  walkability of the streetscape.
17      So with that we're quite happy.  We
18  hope everybody else is, but we're quite happy
19  that we've definitely provided something that
20  will get some activity to the streetscape, and
21  bring our residents out into the community, and
22  get the community into our particular building.
23      So with that, Angela has the color
24  board here for everybody to look at, also, and...
25      MS. KOSTELECKY: A-8.

RA, Devereaux, Jr., William J. - direct - Mr. Flannery    Page 81

1    MR. MARTIN: Exterior finishes?
2    MR. DEVEREAUX, JR.: Yes.
3    MS. KOSTELECKY: Yes.
4    MR. DEVEREAUX, JR.: Our sample
5    board.
6    (Exhibit A-8 is received and marked
7    for identification at this time.)
8    CHAIRPERSON SCHWINDER: Question,
9    the last, the left end of that illustration, is
10   that the last portion that is going to be facing
11   Kinderkamack Road and there's another facade on
12   Linwood Avenue?
13   MR. DEVEREAUX, JR.: Yes. Right
14   here is kind of the end of Kinderkamack Road.
15   Then it turns and curves around, which is
16   difficult to see on an elevation, but it curves
17   around. Then its parallel again with
18   Kinderkamack Road and then it goes back on
19   Linwood.
20   CHAIRPERSON SCHWINDER: So we don't
21   see anything that has the southern elevation
22   here?
23   MR. DEVEREAUX, JR.: You probably
24   don't.
25   CHAIRPERSON SCHWINDER: Okay.

RA, Devereaux, Jr., William J. - direct - Mr. Flannery    Page 82

1    MR. FLANNERY: But with those
2    elevations, both on the southern end and the
3    northern end be similar to what we're seeing
4    right now?
5    MS. KOSTELECKY: Yes.
6    MR. DEVEREAUX, JR.: Yes, in
7    character, yes.
8    MR. FLANNERY: Same articulation,
9    colors, materials?
10   MR. DEVEREAUX, JR.: Yes. I think
11   that those are the questions, I think we're --
12   MR. FLANNERY: Just really quickly,
13   there were some comments I just want to address.
14   Trash collection.
15   MS. KOSTELECKY: Yes.
16   MR. FLANNERY: I don't know if you
17   want to refer it back to the site plan or one of
18   your architectural plan exhibits.
19   All right. So we're looking again at
20   A-1.10?
21   MS. KOSTELECKY: "A dash," yes, 1.1.
22   Trash collection is all handled internal to the
23   building. We have a trash room located here with
24   a service drive. The intent is there will be a
25   porter that is managing trash of the building.

RA, Kostelecky, Angela - cross - The Board    Page 83

1    There are trash shoots that connect every
2    residential floor with the trash room down below.
3    Trash pickup will be private and
4    scheduled so as not to conflict with, with
5    business hours and things like that. So there
6    are no dumpsters on the site. Everything is
7    internal to the building.
8    CHAIRPERSON SCHWINDER: Would you
9    please just point to the pass-through first on
10   the existing exhibit that's on the front?
11   MS. KOSTELECKY: Right here.
12   CHAIRPERSON SCHWINDER: That's the
13   pass-through.
14   MS. KOSTELECKY: And right here.
15   CHAIRPERSON SCHWINDER: That's where
16   I want.
17   MS. KOSTELECKY: Yeah.
18   CHAIRPERSON SCHWINDER: So there are
19   be apartments above the pass through?
20   MS. KOSTELECKY: Yes, there are.
21   CHAIRPERSON SCHWINDER: So it's a
22   covered area?
23   MS. KOSTELECKY: Yeah.
24   CHAIRPERSON SCHWINDER: So if
25   somebody was walking from the back --

RA, Kostelecky, Angela - cross - The Board    Page 84

1    MS. KOSTELECKY: Exactly.
2    CHAIRPERSON SCHWINDER: -- it's a
3    covered area to get in?
4    MS. KOSTELECKY: It's a covered area
5    through here, and it's this area right here.
6    MR. FLANNERY: And it's a private
7    trash hauler, correct?
8    MS. KOSTELECKY: Private trash
9    hauler.
10   MR. FLANNERY: There was a question
11   about building height --
12   MS. KOSTELECKY: Yes.
13   MR. FLANNERY: -- and whether it
14   conformed to the ordinance?
15   MS. KOSTELECKY: I wanted to refer
16   you to the 2016 ordinance 1535-16 and on Page --
17   I don't see a page, but Section 4, design
18   standards, 290-7A, item B, it says, "An
19   additional 5 feet in height for ornamentation
20   such as parapets and cornices is permitted."
21   MR. DEVEREAUX, JR.: In total.
22   MS. KOSTELECKY: This additional
23   height is only permitted along a maximum of 66
24   percent of the facade to encourage a varying
25   ridge line. So we have 50 feet to the, to

RA, Kostelecky, Angela - cross - The Board                    Page 85

1  the -- is the building height and then we've
2  added an additional 5 in certain locations for
3  the par -- the ornamental parapet.
4        MR. ASCOLESE: Mr. Chairman, if I
5  can raise a question?
6        CHAIRPERSON SCHWINDER: Yes, please.
7        MR. ASCOLESE: Kinderkamack Road
8  experiences an 8 foot drop from Lincoln Boulevard
9  down to Linwood Avenue.
10        MS. KOSTELECKY: Yes.
11        MR. ASCOLESE: Where are we
12  measuring that 50 feet from?
13        MS. KOSTELECKY: We are measuring
14  that from Linwood.
15        MR. ASCOLESE: Why just Linwood?
16        MS. KOSTELECKY: Well, that's the
17  lowest point of the site.
18        MR. ASCOLESE: So then the northern
19  portion of the building would be higher?
20        MS. KOSTELECKY: The building does
21  not step up, no, it's the same consistent height
22  all the way across.
23        MR. ASCOLESE: All right. So the
24  Lincoln Boulevard section is --
25        MS. KOSTELECKY: The Lincoln

RA, Kostelecky, Angela - cross - The Board                    Page 86

1  Boulevard --
2        MR. ASCOLESE: -- going to be
3  depressed or grade?
4        MS. KOSTELECKY: Yes, it is. And we
5  have bollards along that area. There was a
6  comment about cars --
7        MR. ASCOLESE: Correct.
8        MS. KOSTELECKY: -- potentially. So
9  we've added bollards along there to protect the
10  staircase.
11        MR. ASCOLESE: So we're talking 50
12  feet measured from the top of the curb --
13        MS. KOSTELECKY: Yes.
14        MR. ASCOLESE: -- at the
15  intersection of Kinderkamack Road and Linwood.
16        MS. KOSTELECKY: Yes.
17        MR. ASCOLESE: And that brings us to
18  where on this elevation?
19        MS. KOSTELECKY: That brings you to
20  approximately in this location in here, and then
21  we've added another 5 feet for the ornamental
22  parapet.
23        MR. ASCOLESE: Just the additional 5
24  feet.
25        MS. KOSTELECKY: Um-hum.

RA, Kostelecky, Angela - cross - The Board                    Page 87

1        MR. ASCOLESE: And the Code also
2  requires no more than 66 percent of the building
3  facade to be in excess of the 5 feet?
4        MS. KOSTELECKY: Yes, and we will --
5  we're committed to making sure that we follow the
6  ordinance. We've stepped the building down.
7        MR. ASCOLESE: And then you have the
8  out parcel?
9        MS. KOSTELECKY: And then it will
10  step again. Yes, this is the out parcel right
11  here.
12        MR. ASCOLESE: Out parcel, Lot 5.
13        MS. KOSTELECKY: Um-hum.
14        MR. ASCOLESE: Let's go back to the
15  trash pick up.
16        MS. KOSTELECKY: Yes.
17        MR. ASCOLESE: You had mentioned
18  that it's going to be privately collected?
19        MS. KOSTELECKY: Yes.
20        MR. ASCOLESE: You measured -- you
21  mentioned that there's going to be a porter doing
22  the collection. How does this guy get 147 units
23  of trash into the truck?
24        MS. KOSTELECKY: Well, it's a
25  private trash hauler.

RA, Kostelecky, Angela - cross - The Board                    Page 88

1        MR. ASCOLESE: Okay.
2        MS. KOSTELECKY: So it's a private
3  company that's going to be coming and taking the
4  trash from this trash room out to the truck.
5        MR. ASCOLESE: And it's not in a
6  dumpster?
7        MS. KOSTELECKY: It's going to be in
8  a -- there's going to be trash -- a trash
9  compactor --
10        MR. ASCOLESE: Okay.
11        MS. KOSTELECKY: -- in system, and
12  containers, trash containers within the trash
13  room.
14        MR. ASCOLESE: And what size vehicle
15  is going to be making this maneuver? Because I'd
16  like an explanation how a vehicle is going to
17  make the swing --
18        MR. DEVEREAUX, JR.: Well --
19        MR. ASCOLESE: -- into that trash
20  area.
21        MR. DEVEREAUX, JR.: -- you can do
22  that. You answered.
23        MS. KOSTELECKY: Well, we're
24  assuming that the private trash hauler is not
25  going to be driving a typical, you know, public

---

RA, Kostelecky, Angela - cross - The Board                    Page 89

1  trash truck.
2     MR. ASCOLESE: Something with
3  elevator forks in the front, correct?
4     MS. KOSTELECKY: Well, there's going
5  to be -- everything in this room is going to be
6  wheeled out to the street --
7     MR. ASCOLESE: But not in a --
8     MS. KOSTELECKY: -- to meet the
9  trash truck.
10    MR. ASCOLESE: But it won't be in a
11  dumpster?
12    MS. KOSTELECKY: They're in waste
13  containers.  Yes, compacted waste containers.
14    MR. DEVEREAUX, JR.: But what we
15  have here, we have for -- correct me if I'm
16  wrong -- we have a 14 foot ceiling height in
17  here.
18    MS. KOSTELECKY: We do.  We have a
19  14 foot ceiling height
20    MR. DEVEREAUX, JR.: So, I mean, you
21  can get a lot of fire trucks through there
22  including some trash trucks.
23    MS. KOSTELECKY: So this drive under
24  the garage here, and through the garage is at a
25  14 foot ceiling height.

---

RA, Kostelecky, Angela - cross - The Board                    Page 90

1     MR. ASCOLESE: And it's fully opened
2  all the time?
3     MS. KOSTELECKY: Yes, it is.
4     MR. ASCOLESE: It's not gated?
5     MR. DEVEREAUX, JR.: No.
6     MS. KOSTELECKY: We are gated right
7  here at the ramp that goes up to the residential
8  levels.
9     MR. ASCOLESE: All right.  So
10  commuters as well as --
11    MS. KOSTELECKY: Yes, free passage
12  through here.
13    MR. ASCOLESE: -- retail as well as
14  patrons will have full access to the use.
15    MS. KOSTELECKY: Yes, full access.
16    MR. ASCOLESE: I would like to see
17  eventually a sketch showing the wheel base, the
18  turning radius for trucks coming in and out of
19  the those driveways.
20    MS. KOSTELECKY: Okay.
21    MR. ASCOLESE: And you had mentioned
22  the materials are going to be wheeled out, so the
23  truck is not going to make any turns in that
24  aisle?
25    MS. KOSTELECKY: It can.

---

RA, Kostelecky, Angela - cross - The Board                    Page 91

1     MR. ASCOLESE: Is it going to stop?
2     MS. KOSTELECKY: There is a service
3  drive right here.  It could back into the service
4  drive.
5     MR. ASCOLESE: I would like to see
6  it.
7     MS. KOSTELECKY: We will definitely
8  show wheel turning radius.
9     MR. FLANNERY: And we'll provide
10  those as a condition of any approvals.
11    MS. KOSTELECKY: Um-hum.
12    MR. BRESA: So it would be safe to
13  say that the waste trucks coming into this site
14  would be smaller than the existing trucks that --
15    MS. KOSTELECKY: Yes.
16    MR. BRESA: -- come take dumpsters
17  from those areas now that are outside.
18    MR. DEVEREAUX, JR.: But it's not a
19  pickup truck.
20    MR. BRESA: Correct.
21    MS. KOSTELECKY: Yeah.
22    MR. DEVEREAUX, JR.: It's a 14 foot
23  ceiling height, so we're okay.
24    MR. BRESA: Yeah, I understand now.
25    MR. ASCOLESE: There was another

---

RA, Kostelecky, Angela - cross - The Board                    Page 92

1  issue.  We had an incident now at the
2  intersection of Kinderkamack and Lincoln
3  Boulevard at the corner radius.  It was built
4  relatively tight so that we didn't have to take
5  the building down, but now that the building is
6  going to be coming down the Bergen County
7  planning board as well as the Borough might want
8  to see that enlarged slightly.  What effect is
9  that going to have on your overall design scheme
10  about this?  Because right now I believe you have
11  about a 15 foot radius on that corner.
12    MR. ADAMS: Yeah.  The building
13  will, is set back far enough that it would
14  accommodate a larger radius there at that impact
15  in the sidewalk.
16    MR. ASCOLESE: All right.  And the
17  set of stairs, I think it's about 3 1/2 feet of
18  steps vertically?
19    MR. ADAMS: Yes.
20    MR. ASCOLESE: And you said you had
21  bollards?
22    MS. KOSTELECKY: Yes.
23    MR. ASCOLESE: And the bollards are
24  mounted how far away from the curb line?
25    MS. KOSTELECKY: They are --

---

RA, Kostelecky, Angela - cross - The Board                    Page 93

1    MR. ASCOLESE: Approximately.
2    MS. KOSTELECKY: Oh, I'd have to --
3    MR. ASCOLESE: Would that be 17
4    feet?
5    MS. KOSTELECKY: Well, this is 17.
6    Yes, it would be 17.
7    MR. ASCOLESE: Okay.
8    MS. KOSTELECKY: Because this
9    dimension is 17 right here.
10   MR. ADAMS: 17 feet.
11   MS. KOSTELECKY: Thank you.
12   MR. ADAMS: One hand.
13   MS. KOSTELECKY: Yup.
14   MR. ASCOLESE: Approximately 17
15   feet.
16   MS. KOSTELECKY: Yes.
17   MR. ASCOLESE: We talked also on a
18   previous, previous meeting we had some flooding
19   conditions on Lincoln Boulevard in May of 2015.
20   That road had been 3 feet of water on it.
21   MR. DEVEREAUX, JR.: I read that.
22   MR. ASCOLESE: I would strongly
23   recommend your site engineer review the drainage
24   calculations, because I think the first floor
25   elevation is only a foot higher than the catch

---

RA, Kostelecky, Angela - cross - The Board                    Page 94

1    basins on Lincoln Boulevard.  And I just wanted
2    to double-check the first floor heights there to
3    make sure that we don't have a repeat of what we
4    had three years ago.
5    MR. FLANNERY: We'll check on that.
6    MR. MARTIN: Well, Gary, there's got
7    to be zero runoff, correct?
8    MR. ASCOLESE: Correct, but by the
9    same token if you have a storm that exceeds like
10   a 10-year frequency, and you have all that water
11   coming down Lincoln Boulevard, even though they
12   have the 42 inch pipe in there and we have some
13   bigger collection facilities, there may be a risk
14   that that water might still collect temporarily
15   and come up high enough.  I'm sure they don't the
16   want the water in their, in their units.
17   MR. MARTIN: If they give you the
18   information are you able to decide whether that's
19   appropriate or not?
20   MR. ASCOLESE: Well, I want to see
21   their calculations of what they figure their
22   design elevation should be and that's mentioned
23   in my report.
24   MR. MARTIN: And, Peter, if it's not
25   consistent, the board engineer's requirements

---

RA, Kostelecky, Angela - cross - The Board                    Page 95

1    will control, correct?
2    MR. FLANNERY: Correct.
3    MR. ASCOLESE: I'm all out of whack
4    here.  Did you have any comments?  I want to go
5    through my notes.
6    MS. BOGART: What about the refuse
7    collection for the retail spaces?
8    MS. KOSTELECKY: We have a service
9    corridor that runs connecting the retail spaces
10   to the trash area.
11   MS. BOGART: What about the one all
12   the way --
13   MS. KOSTELECKY: We have another
14   service drive here, and we were anticipating
15   possibly putting another trash room interior to
16   the building over here --
17   MS. BOGART: So that the --
18   MS. KOSTELECKY: -- for that retail
19   space.
20   MS. BOGART: Secondary retail space
21   to the north of that will have to go all the way
22   to the trash enclosure garbage structure?
23   MS. KOSTELECKY: Yes.
24   MS. BOGART: Do you want go back?
25   MR. ASCOLESE: Yes.  How many stores

---

RA, Kostelecky, Angela - cross - The Board                    Page 96

1    do you contemplate having in this entire complex?
2    Have you decided on --
3    MS. KOSTELECKY: Four.
4    MR. ASCOLESE: Four, five, eight?
5    MR. FLANNERY: Well, I --
6    MR. DEVEREAUX, JR.: I'm not sure we
7    know.
8    MR. FLANNERY: I don't know if
9    that's been finally determined.
10   MR. DEVEREAUX, JR.: Yeah, I don't
11   think we -- I mean, we can tell you all kinds of
12   square footage numbers that retail stores are
13   looking for, but we don't know whether they're
14   looking at here yet.
15   MR. ASCOLESE: Oh, we don't know the
16   uses.
17   MR. DEVEREAUX, JR.: Yes.  We do
18   not.
19   MR. ASCOLESE: And, again, a 25
20   percent reduction does not permit medical offices
21   of any type --
22   MR. DEVEREAUX, JR.: Correct.
23   MR. ASCOLESE: -- you recognize
24   that?
25   The commuter lot for people who come

---

---

1  in, the 55 or so commuters that use that surface
2  lot, are you contemplating any connection to the
3  existing railroad platform that exists there?  Or
4  do these people have to walk either through the
5  garage or down to Linwood to gain access to the
6  platform, the so-called platform?
7      MS. KOSTELECKY: I would ask Bowman
8  about that question about the existing platform.
9      MR. CORSEY: Right now it's at
10 at-grade.  The existing train station is an
11 at-grade intersection.  I don't know if there's
12 anticipated to be any improvements to that at
13 this point.
14     MR. ASCOLESE: If we were to review
15 that with, say, New Jersey Transit, because we've
16 been trying to get them to move the crossway
17 station a little bit further north to unload at
18 Kinderkamack Road crossing.  Can an accommodation
19 be made perhaps of placing a stairwell from your
20 lot upwards to that platform?
21     MR. MARTIN: Mr. Corsey, do me a
22 favor, step up.  Somebody may be listening.
23     MR. CORSEY: Okay.  We could look
24 into it.  As you know, we're always are at the
25 mercy of New Jersey Transit as to what they will

---

1  and will not allow.  We can inquire with them to
2  see if they would be amenable to allowing an
3  access there.
4      Typically, they don't like access on
5  a private property.  They prefer to have it on a
6  public property, such as where it is, on Emerson
7  way in that location there and Linwood.  So I
8  don't know that.
9      All I can say at this point is I can,
10 we can inquire about it and see if they would be
11 amenable to having some sort of access.
12     MR. ASCOLESE: Will you work with
13 the Borough of Emerson, if we can get them to
14 move the crossing or the station further north
15 and somehow make an accommodation for the
16 pedestrians either coming from the unit, the
17 units themselves --
18     THE WITNESS: Right.
19     MR. ASCOLESE: -- or from that lot.
20 That maybe in line with the breezeway you had
21 mentioned that the frontage along the railroad --
22     MR. CORSEY: Yes.
23     MR. ASCOLESE: -- is over 500 feet.
24     THE WITNESS: Yes.
25     MR. ASCOLESE: Rather than somebody

---

1  having to run to the end to catch a train that
2  they can come up a stairwell, work in conjunction
3  with New Jersey Transit and the Borough have some
4  type of access somewhere by the northern portion
5  of their platform, I think that would work out
6  well.
7      Do you just want to follow up now?
8      MS. BOGART: Sure.
9      Do you want to go through your table
10 with the COAH?  You had said the breakdown into
11 number of bedrooms.  I think there was a
12 discrepancy.
13     MS. KOSTELECKY: We have modified
14 that on Sheet A point 1.10.  So at 15 percent
15 total of 147 units, that gives us 22 COAH units.
16 Of those 22, we have four one-bedroom studio or
17 studios, 13 two-bedrooms and five three-bedroom
18 units.
19     MS. BOGART: The revised breakdown
20 is on the plan?
21     MS. KOSTELECKY: Yes, um-hum.
22     MS. BOGART: What I just mentioned
23 to the architect is that it is required that they
24 do three-bedroom units, and the engineering
25 plans, the part with calculations don't have

---

1  three-bedroom units on there.
2      MS. KOSTELECKY: Right.
3      MS. BOGART: And I didn't see any
4  three-bedroom units on your floor plan.
5      MS. KOSTELECKY: We've shown those.
6  I have them in the upper floor plan.
7      MR. MARTIN: That's A-6, right?
8      MS. KOSTELECKY: That is A-5.
9      MR. MARTIN: Can you show us A-6?  I
10 just want to -- that's the floor plan.
11     MR. ASCOLESE: I think that's A-6,
12 yeah.
13     MS. KOSTELECKY: This is A-6 with
14 the enlarged unit plans.
15     MR. DEVEREAUX, JR.: A three-bedroom
16 here and then one here, so we end up with six of
17 those.  So one will be market --
18     CHAIRPERSON SCHWINDER: Was there a
19 three-bedroom on that?
20     MS. KOSTELECKY: No, there is not.
21     CHAIRPERSON SCHWINDER: So you did
22 not plan --
23     MR. DEVEREAUX, JR.: We haven't, no.
24 We haven't drawn all the plans yet.
25     CHAIRPERSON SCHWINDER: Once again,

---

1  Ms. Bogart --
2      MR. DEVEREAUX, JR.: So we were
3  showing you the character.
4      CHAIRPERSON SCHWINDER: -- what is
5  the requirement for three-bedroom?
6      MR. DEVEREAUX, JR.: Yes.
7      CHAIRPERSON SCHWINDER: No, I was
8  asking Ms. Bogart as per COAH.
9      MS. BOGART: They would need six
10  three-bedroom units just editing per COAH, and
11  that would slightly change the parking
12  requirements.  And as part of the settlement
13  agreement the Court Master requirements that we
14  meet the COAH standards for bedroom distribution
15  as well as income distribution.
16      So as a condition of approval, if
17  this project were approved, we would need the
18  breakdown of all the income levels, all the
19  bedroom distribution and just to insure we comply
20  with the settlement agreement.
21      CHAIRPERSON SCHWINDER: Did you hear
22  what our planner had to say about that?
23      MR. FLANNERY: Yeah.  We would
24  comply with all those requirements, UAC
25  requirements, the redevelopment agreement

1  requirements.
2      CHAIRPERSON SCHWINDER: Any other
3  questions, Ms. Bogart?
4      MS. BOGART: You want to address the
5  ADA compliance?
6      MS. KOSTELECKY: The parking?
7      MS. BOGART: Yes.
8      MS. KOSTELECKY: We have a total of
9  10 accessible parking spaces and two van
10  accessible spaces, and they're shown.  There's
11  some in this location here and the balance are
12  all in the garage on every level of the garage.
13      MS. BOGART: I didn't see the van
14  spaces located anywhere on the plans.
15      MS. KOSTELECKY: I think this one is
16  a van accessible space.
17      MR. ADAMS: Right here, there's a
18  van here, there's a van here.
19      MR. MARTIN: So it's 10 plus, plus
20  2?
21      MS. KOSTELECKY: 10 plus 2, yes.
22      MR. ADAMS: They only have it on the
23  ramp there.
24      MS. BOGART: They only need two.
25      CHAIRPERSON SCHWINDER: Ms. Bogart,

1  anything else?
2      MS. BOGART: Yes.  With regard to
3  the architectural design standards that are
4  required, there are certain dimensional lengths
5  and widths that are associated with what
6  represents a plan.
7      MS. KOSTELECKY: Yes.
8      MS. BOGART: We did not receive
9  dimensions, elevations, and that would be needed
10  to be provided to insure the compliance of the
11  plan itself.
12      MS. KOSTELECKY: We agree to that.
13      MS. BOGART: Including the
14  dimensions of the parapets to insure that you
15  meet that feature.
16      MS. KOSTELECKY: Yes.
17      MS. BOGART: I just need the
18  dimensions to insure that this plan complies with
19  the Borough code, otherwise we'll have to talk
20  about the variation per code of the redevelopment
21  plan so they said they would be providing that.
22      CHAIRPERSON SCHWINDER: Okay.  Thank
23  you.  Anything else?
24      MS. BOGART: One last thing,
25  building equipment, HVAC, and also if you need

1  exhaust fans for any restaurant-type-of-use,
2  where would they be located and where would they
3  be vented to?
4      MS. KOSTELECKY: All of the
5  mechanical units are on the roof screened from
6  the streets, the flat roof building.  As for
7  exhaust systems, we don't really know at this
8  point either where they would be located or if we
9  would have restaurant spaces.
10      CHAIRPERSON SCHWINDER: Is there a
11  process where you would build some units that
12  were suitable to be a restaurant and incorporate
13  the appropriate venting in the systems in the
14  anticipation of some day having a restaurant
15  occupy that space?
16      MS. KOSTELECKY: That would be
17  agreeable.
18      CHAIRPERSON SCHWINDER: I think
19  that's very important.
20      MS. BOGART: I think it's very
21  important because it could have not only noise
22  impact --
23      MS. KOSTELECKY: Right.
24      MS. BOGART: -- but visual impact.
25      CHAIRPERSON SCHWINDER: Right.  So

RA, Kostelecky, Angela - cross - The Board          Page 105

1  that would definitely be required.
2      MS. KOSTELECKY: Yeah.
3      MR. FLANNERY: Yeah, we'd agree to
4  that.
5      MS. BOGART: My last question, I
6  don't know if this is for you, is there going to
7  be any signage identifying the development as a
8  whole?  What it would be for Emerson station?
9      MS. KOSTELECKY: There will be.  We
10  haven't gotten into that design.
11     MS. BOGART: Okay.
12     MS. KOSTELECKY: But we will be, you
13  know, using all the sign ordinances for Emerson.
14     MS. BOGART: Okay.
15     MR. FLANNERY: And any signage would
16  be fully in compliance with the ordinance.
17     MS. KOSTELECKY: Fully in
18  compliance.
19     MS. BOGART: Okay.  Thank you.
20     CHAIRPERSON SCHWINDER: Are you
21  planning a sign for an overall sign for the
22  development for -- I mean, there, there are signs
23  for the retail, but is there going to be a sign
24  for, let's call it Emerson station village or
25  whatever?

RA, Kostelecky, Angela - cross - The Board          Page 106

1      MR. DEVEREAUX, JR.: There probably
2  would, yes.
3      MS. KOSTELECKY: Most definitely,
4  yes.
5      MR. FLANNERY: Yeah.
6      MR. DEVEREAUX, JR.: I mean, it's
7  going to be a nice sign.
8      CHAIRPERSON SCHWINDER: I would hope
9  so.
10     MS. KOSTELECKY: And we will abide
11  by all the sign ordinances.
12     MS. BOGART: And in that same vein,
13  you probably need directional signage on this
14  site now shows where the commuter spaces are,
15  where the resident spaces are, guide you to the
16  retail, that has to be submitted as the design
17  package as a whole.
18     CHAIRPERSON SCHWINDER: Anything
19  else, Ms. Bogart?
20     Mr. Ascolese.
21     MR. ASCOLESE: I have another
22  question.  I guess this is for the site engineer,
23  Mr. Corsey.  Right now, Lot 5 is an out parcel
24  and the County and Municipal project did not
25  include any brick pavers or any lighting in front

RA, Kostelecky, Angela - cross - The Board          Page 107

1  of Lot 5.
2      Do we have your cooperation to run
3  your street amenities across the front of Lot 5,
4  Lot 5 so that we have an overall matching
5  pattern, color, alignment, grade, things like
6  that?
7      MR. CORSEY: Yes, as long as it
8  doesn't create any encumbrances on Lot 5
9  itself --
10     MR. ASCOLESE: Fine.
11     MR. CORSEY: -- any operation on
12  that lot.
13     MR. ASCOLESE: In addition to that,
14  it might -- whether we noted that there were some
15  monitoring wells that are out there today.
16     MR. CORSEY: Yes.
17     MR. ASCOLESE: And just want you to
18  recognize that and treat them the way they needed
19  to be treated as far as the E.P.A. is concerned.
20     MR. McKENDRY: Mike, could you
21  explain what a monitoring well is?  I saw that in
22  the paperwork.
23     MR. ASCOLESE: The gas stations have
24  or perhaps had some leaking facilities on-site.
25  So the DEP required them to sink monitoring wells

RA, Kostelecky, Angela - cross - The Board          Page 108

1  where people come out periodically to test water
2  samples in those wells.  You really can't touch
3  those wells unless you go through a procedure,
4  and I believe there were three of them on the
5  Block 419.  So I just want those to appear on the
6  plan so that the developer can take into
7  consideration how they have to be treated as part
8  of this, this project.
9      MR. McKENDRY: Thank you.
10     MR. ASCOLESE: That's all I have,
11  Mr. Chairman.
12     CHAIRPERSON SCHWINDER: I have a
13  question with regard to retail deliveries.  I
14  know where the retail stores are pictured in your
15  diagram.  Are there rear doors for deliveries of
16  merchandise?
17     MS. KOSTELECKY: Yes.
18     CHAIRPERSON SCHWINDER: And if the
19  storeowner wanted to, to have a rear entrance
20  from the parking lot?
21     MR. DEVEREAUX, JR.: We do, we have
22  a service area here.  We have ability to have
23  doors along here.  We're probably anticipating
24  some glass and maybe some store frontage and
25  still going through the breezeway.  This area has

---

RA, Kostelecky, Angela - cross - The Board                Page 109

1  entrances and access.
2      CHAIRPERSON SCHWINDER: I'm most
3  concerned with making sure that we're not having
4  any deliveries from Kinderkamack Road. You know,
5  all service vehicles should be going through the
6  rear and have the ability to deliver goods
7  through a rear door to the retail units.
8      MR. DEVEREAUX, JR.: Right, and I
9  think that's what we have to think about here.
10     CHAIRPERSON SCHWINDER: So that
11 would be accommodated based on how the unit is
12 broken up.
13     Okay. Any questions from the board
14 members? Yes, Mr. DeOrio.
15     MR. DeORIO: The resident parking
16 deck, is it open or it's covered?
17     MS. KOSTELECKY: It's opened.
18     MR. DeORIO: It's open. So what
19 about snow removal? How would you take that out?
20     MS. KOSTELECKY: That would be done
21 privately.
22     MR. DeORIO: But what is it going to
23 do? Is it going to be plowed into two or three
24 spots and that's going to be taken away? How is
25 it going to be removed from the site?

---

RA, Kostelecky, Angela - cross - The Board                Page 110

1      MR. DEVEREAUX, JR.: That would
2  probably be up to the operator. I don't know.
3      MS. KOSTELECKY: Yeah.
4      CHAIRPERSON SCHWINDER: Because with
5  a heavy snow storm that's a lot fewer parking
6  spaces without a -- I -- we didn't hear -- that
7  was a good point. We didn't hear anything about
8  a designated snow storage area.
9      MR. BRESA: Just out of curiosity,
10 the surface area of the parking now as compared
11 to what currently exists, how much differential
12 is there, approximately? If they're removing
13 snow currently at that, it's about the same
14 surface area, how are they doing it? I'm
15 assuming they would be doing it the same way? I
16 mean, the snow removal doesn't pose a problem
17 currently, I'm thinking?
18     MR. DEVEREAUX, JR.: I can't answer
19 that question.
20     MR. BRESA: No, I understand.
21     MR. DEVEREAUX, JR.: I haven't done
22 the calculations to know what to be prepared for.
23     CHAIRPERSON SCHWINDER: Mr.
24 Ascolese, we, we required Starbucks that for the
25 snowstorm of a certain number of inches, that

---

RA, Kostelecky, Angela - cross - The Board                Page 111

1  they were required to remove the snow from the
2  premises; is that correct?
3      MR. ASCOLESE: Yes, I believe it was
4  6 inches or more of snow, they had to cart it off
5  the property.
6      CHAIRPERSON SCHWINDER: Right. So
7  would the applicant be amenable to something like
8  that? Who is speaking on behalf of the
9  applicant?
10     MR. FLANNERY: Yes, we'll be
11 amenable to that. Thank you.
12     CHAIRPERSON SCHWINDER: Thank you.
13 Any other? Does that answer your question?
14     MR. DeORIO: The only thing is, I
15 don't know if it was 6 inches or if it was less?
16     CHAIRPERSON SCHWINDER: Use the
17 microphone.
18     MR. DeORIO: When we spoke about
19 Starbucks, I don't know if it was 6 inches or
20 less. I believe it was less than 6 inches. I
21 thought it was about 4 inches.
22     CHAIRPERSON SCHWINDER: Whatever it
23 is, but they're willing to -- we'll take a look
24 at that, but they're willing to address that.
25     MR. DeORIO: That's fine.

---

RA, Kostelecky, Angela - cross - The Board                Page 112

1      CHAIRPERSON SCHWINDER: And we will
2  check to see, what. Mr. Ascolese, you can take a
3  look at that.
4      MR. MARTIN: Yeah. The standard is
5  2 usually inches, but, Gary, whatever's
6  satisfactory to you I'm sure it will be complied
7  with.
8      CHAIRPERSON SCHWINDER: Mr. Adams,
9  did you have a question?
10     MR. ADAMS: I had a question about
11 the frontage. The code says you're allowed to go
12 40 feet, and you spoke before about a 5 foot
13 allowance. How does that apply?
14     MS. KOSTELECKY: The ordinance says
15 50 feet.
16     MR. ADAMS: 50 feet was with the 5
17 foot setback.
18     MS. KOSTELECKY: 5 foot setback. We
19 are 50 at the --
20     MR. ADAMS: But the front of the
21 building should only 40 feet.
22     MS. KOSTELECKY: We are 50 at the 5
23 foot setback.
24     MR. ADAMS: Right, but at the front
25 of the building code says 40 feet and you're

---

RA, Kostelecky, Angela - cross - The Board                    Page 113

1    above 40 feet now.
2        MR. ASCOLESE: Where are we?
3        MS. KOSTELECKY: I'm looking at the
4    ordinance, 42 feet. Ordinance 1535-16, along
5    public streets 42 feet.
6        MR. FLANNERY: There is an
7    additional height permitted for tracts that are
8    larger than 2 acres.
9        MS. KOSTELECKY: That was the 50
10   foot to the setback.
11       MR. DEVEREAUX, JR.: Right.
12       MS. KOSTELECKY: And we are 50 at
13   the setback.
14       MR. ADAMS: At the setback.
15       MS. KOSTELECKY: Um-hum.
16       MR. ADAMS: I believe that the --
17       MR. DEVEREAUX, JR.: These say it's
18   42 over here.
19       MR. ADAMS: -- the front is showing
20   it can only be 40 feet.
21       MS. KOSTELECKY: Two
22       MR. DEVEREAUX, JR.: It's 42.
23       MR. ADAMS: You're 42.4.
24       MS. KOSTELECKY: We will lower it 4
25   inches and make sure we're at 40 or less.

RA, Kostelecky, Angela - cross - The Board                    Page 114

1        MR. ADAMS: I don't know if you're
2    going to have enough height for your retainer for
3    that wall then. Safety standpoint, I don't know
4    what that has to be.
5        MS. KOSTELECKY: The retainer for
6    which wall?
7        MR. ADAMS: Well, right now you have
8    a 3 foot 6 wall from where somebody is standing.
9        MS. KOSTELECKY: That is parapet
10   wall, yes.
11       MR. ADAMS: Can you go to 3 foot 2?
12   Is that legal?
13       MR. DEVEREAUX, JR.: These we're
14   lowering over here.
15       MS. KOSTELECKY: We're lowering at
16   the floor level of the building.
17       MR. DEVEREAUX, JR.: We're lowering
18   the floor. You want the floor lower. You lower
19   the floor.
20       MR. ADAMS: Can you lower the floor?
21       MS. KOSTELECKY: Yes.
22       MR. DEVEREAUX, JR.: It takes 1 inch
23   out of everybody's room downstairs, but you can
24   do it.
25       MR. ADAMS: Is it 42 feet, Brigette,

RA, Kostelecky, Angela - cross - The Board                    Page 115

1    or 40 feet? Our planner is going to check out.
2    I read this morning it was 40 feet.
3        MR. DEVEREAUX, JR.: 40 feet here,
4    40 feet here.
5        MR. ADAMS: Well, from here and here
6    that's 42.4.
7        MS. BOGART: This is 42.
8        MS. KOSTELECKY: Is that -- oh, yes,
9    so --
10       MS. BOGART: Usually this would be
11   the 15. 42.
12       MS. KOSTELECKY: We are under 40, I
13   believe --
14       MR. ADAMS: It should be 10.
15       MS. KOSTELECKY: -- to the roof
16   height.
17       MS. BOGART: 42.
18       MS. KOSTELECKY: And that's
19   decorative cornice.
20       MR. ADAMS: I'm seeing it here.
21       MS. KOSTELECKY: We're under 40.
22       MR. DEVEREAUX, JR.: Yeah, we're
23   already at --
24       MS. KOSTELECKY: To the top.
25       MR. DEVEREAUX, JR.: Oh, okay.

RA, Kostelecky, Angela - cross - The Board                    Page 116

1        MS. BOGART: That's right.
2        MR. ADAMS: Okay. I stand
3    corrected. It's 42. You -- according to my
4    calculations, you're at 42.4.
5        MS. KOSTELECKY: That's to the top
6    of that parapet wall.
7        MR. ADAMS: Yes. You're only
8    allowed 42.
9        MS. KOSTELECKY: For a building
10   height we are less than 40 --
11       MR. DEVEREAUX, JR.: To the parapet.
12       MS. KOSTELECKY: -- to the structure
13   of the building.
14       MR. DEVEREAUX, JR.: Right. The
15   parapet is a separate issue.
16       MR. ASCOLESE: You're saying --
17       MS. KOSTELECKY: The way I read it.
18       MR. ASCOLESE: -- it excludes this
19   from, doesn't include this. It's 40, maximum 42
20   here, be about here, add to this.
21       MR. ADAMS: Just have that checked
22   as to this here.
23       MS. BOGART: Well, and that's why I
24   asked them to dimension the entire elevation.
25       MR. ADAMS: Let me know. Now the

1 other question I had is, the gentleman before was
2 talking about a four-level garage. The way I
3 count it's five levels.
4     MS. KOSTELECKY: For parking on the
5 rooftop of the garage.
6     MR. ADAMS: That's not considered a
7 level?
8     MS. KOSTELECKY: It is, it is a --
9     MR. DEVEREAUX, JR.: It doesn't
10 violate the height.
11     MS. KOSTELECKY: It doesn't violate
12 the height and it's under the roof line of the
13 residential portion of the building, so.
14     MR. ADAMS: Measurement from the
15 curb at, on Lincoln on the westerly part of
16 Lincoln with a five-story building, what's our
17 elevation? I didn't see any side elevations.
18     MR. DEVEREAUX, JR.: It's four-story
19 and a roof.
20     MR. ADAMS: Because you're parking
21 on the roof there, that in itself has no roof to
22 it.
23     MR. DEVEREAUX, JR.: The roof.
24     MR. ADAMS: What's the elevation of
25 the wall there, from the curb?

1     MS. KOSTELECKY: That fourth level
2 is the roof.
3     MR. DEVEREAUX, JR.: Is the roof.
4     MS. KOSTELECKY: Roof deck.
5     MR. ASCOLESE: So it's five levels,
6 but the top level is the roof?
7     MS. KOSTELECKY: Yes.
8     MR. DEVEREAUX, JR.: Yes.
9     MR. ASCOLESE: Okay, and you said
10 it's the same level as the apartments?
11     MS. KOSTELECKY: Yes.
12     MR. ASCOLESE: Which are only four
13 stories or four floors?
14     MR. DEVEREAUX, JR.: But the roof
15 is -- .
16     MS. KOSTELECKY: The roof is at 50.
17     MR. DEVEREAUX, JR.: -- the roof of
18 the garage is the same grade as the roof.
19     MR. ASCOLESE: Okay.
20     MR. DEVEREAUX, JR.: Now when it goes down
21 the slope on Lincoln, now we're going to be
22 greater or possibly greater than the 50 feet at
23 that point, and actually only 42 feet is allowed,
24 if I'm not -- 42 feet on Lincoln?
25     MS. BOGART: Yes

1     MR. DEVEREAUX, JR.: The wall or you
2 want the top of the roof?
3     MR. ADAMS: Top, top of the parapet.
4 You don't recall it?
5     MS. KOSTELECKY: The levels of the
6 garage are all lining up with the floor levels of
7 the building. So it would be at --
8     MR. DEVEREAUX, JR.: It's just the
9 same as the building.
10     MS. KOSTELECKY: It's the exact same
11 height as the building.
12     MR. DEVEREAUX, JR.: As the parapet.
13     MS. KOSTELECKY: Because we're
14 lining all the levels of the garage up with the
15 building in the drawings.
16     MR. DEVEREAUX, JR.: So the garage
17 doesn't go beyond the building.
18     MR. ASCOLESE: If I can?
19     CHAIRPERSON SCHWINDER: Sure.
20     MR. ASCOLESE: The chart, at least
21 the previous chart that you submitted from the
22 parking count you have a surface lot, you have a
23 ground floor, you have a first floor, second
24 floor, third floor and fourth floor. So the
25 parking deck is five levels.

1     MR. ADAMS: It would be greater than
2 42 feet. Without seeing the side elevation I
3 might be a little confused, but I see here a
4 grade of 42 feet.
5     MR. DEVEREAUX, JR.: You're saying
6 when you get down here.
7     MR. ADAMS: That slopes down, right.
8     MR. DEVEREAUX, JR.: You're saying
9 it's a slope of 42 here.
10     MR. ADAMS: Correct.
11     MR. DEVEREAUX, JR.: We'd have to
12 check, check.
13     MS. KOSTELECKY: Yeah, we can check.
14     MR. DEVEREAUX, JR.: We can find out
15 what the grade is --
16     MS. KOSTELECKY: The grade there,
17 about 47.
18     MR. DEVEREAUX, JR.: We think that
19 our worst, lowest condition's here.
20     MS. KOSTELECKY: The lowest is about
21 the same actually. We're at just above 47 here,
22 47 here. Like 47.5 here. Okay.
23     MR. ADAMS: Were there any
24 elevations up in here?
25     MR. ASCOLESE: On the site plans,

RA, Kostelecky, Angela - cross - The Board                  Page 121

1    yes, there is.
2        MR. ADAMS: While they're looking
3    that up, another question I had on drawing
4    A-2.20, you have --
5        MS. KOSTELECKY: That plan.
6        MR. ADAMS: -- you have a sketch.
7        MS. KOSTELECKY: Yes.
8        MR. ADAMS: A layout of apartment D,
9    like in David.
10       MR. DEVEREAUX, JR.: What's that?
11       MS. KOSTELECKY: D as in David.
12       MR. ADAMS: I don't have the revised
13   set of drawings. I have the ones that were dated
14   11/15/18.
15       MS. KOSTELECKY: And there's a D
16   unit, yes.
17       MR. ADAMS: A D unit. It says,
18   "entrance to a parking garage," but when I look
19   on the other drawing there is no entrance to a
20   parking garage. The entrance is off onto
21   Lincoln.
22       MR. DEVEREAUX, JR.: Well, at one
23   point we were thinking, and I'm not sure we
24   didn't decide whether we're going to have a back
25   door to these units. We don't need it. There's

RA, Kostelecky, Angela - cross - The Board                  Page 122

1    no code requirements for it. This has always
2    been our point and always will be our point.
3        Now we thought maybe for convenience
4    they might want a doorway to the parking garage,
5    but we're -- we haven't decided yet and I don't
6    know that.
7        MR. ADAMS: Now the drawings show
8    the door on both sides of the apartment.
9        MR. DEVEREAUX, JR.: Yes.
10       MR. ADAMS: The drawing is not
11   correct.
12       MR. DEVEREAUX, JR.: The drawing
13   might be correct. We don't know whether we're
14   putting it in the back. That's not fair, not
15   fair. We're not sure. We're not sure whether
16   we're going to add that back door here. We don't
17   have to. There's no requirement for it.
18       MR. ADAMS: Okay.
19       MR. DEVEREAUX, JR.: That is always
20   the front door, but it might be nice to have a
21   back door to get to the cars right there.
22       MR. ADAMS: Okay.
23       MR. DEVEREAUX, JR.: But we haven't
24   decided. You know, we're not that far enough
25   along.

RA, Kostelecky, Angela - cross - The Board                  Page 123

1        MR. ADAMS: Okay. Now it didn't
2    show it here, so I was confused.
3        CHAIRPERSON SCHWINDER: Anything
4    else, Mr. Adams?
5        MR. ASCOLESE: I just have a
6    clarification. Mr. Adams asked that the
7    elevation difference between the corner of
8    Kinderkamack and Lincoln and the, say, the
9    manhole at Lincoln and Kenneth, there's a 7 -- a
10   6 foot difference.
11       MR. ADAMS: 6 foot.
12       MR. ASCOLESE: 6 foot elevation
13   difference from the corner of Kinderkamack and
14   Lincoln Boulevard and the storm manhole that's at
15   Kenneth, Kenneth Place -- Kenneth Street.
16       MR. ADAMS: But we have to compare
17   that.
18       MR. ASCOLESE: Sure.
19       MR. ADAMS: We have to compare that.
20       MR. ADAMS: Right, and it's an 8
21   foot to here.
22       MR. ADAMS: Difference.
23       MR. ASCOLESE: That's an 8 foot
24   difference.
25       MR. ADAMS: From here?

RA, Kostelecky, Angela - cross - The Board                  Page 124

1        MR. ASCOLESE: It's an 8 foot
2    difference from Kinderkamack Road at Lincoln and
3    Kinderkamack and Linwood. And it's a 6 foot
4    difference from Kinderkamack and Lincoln to
5    Kenneth.
6        MR. ADAMS: Well, what's the
7    difference from here to here?
8        MR. ASCOLESE: 2 feet.
9        MR. ADAMS: That's all?
10       MR. ASCOLESE: That's what the
11   elevations show, yes.
12       MR. ADAMS: So this is 2 foot lower?
13       MR. ASCOLESE: That's 2 foot higher
14   than this point.
15       MR. ADAMS: Is that right?
16       MR. ASCOLESE: Based on the topo
17   that is provided as part of the site plans, yes.
18       MR. ADAMS: I wouldn't have guessed
19   that from driving it.
20       MR. ASCOLESE: Well, that's the
21   information that was provided.
22       MR. ADAMS: If it's 2 foot higher
23   we're in good shape.
24       CHAIRPERSON SCHWINDER: The front
25   door entrances to the units on Lincoln Boulevard

1  ground floor, how many steps up or how many
2  inches off the grade is the ground floor of those
3  units?
4      I think it's very important to take
5  into consideration if you're, if you're on
6  Lincoln Boulevard you'll see there is a scale on
7  the street that talks about how many feet of
8  flooding they had before the improvement.
9      So I just want to make sure that as
10  Mr. Ascolese pointed out, we have one of those
11  10-or 25-year rain storms that there's enough
12  height in the ground floor so that those
13  apartments are not severely effected by flooding.
14      MR. DEVEREAUX, JR.: I guess they
15  would be the same floor height as this, but.
16      MS. KOSTELECKY: But we're stepping
17  the entrances along the grade.
18      MR. DEVEREAUX, JR.: Stepping
19  down --
20      MS. KOSTELECKY: Yes.
21      MR. DEVEREAUX, JR.: -- here. So
22  we're following, we're basically following the
23  street.
24      CHAIRPERSON SCHWINDER: Because the
25  storm drains are approximately -- well, those

1  storm drains I believe are in front of 12 Lincoln
2  Boulevard, which is probably right in the middle
3  of your --
4      MR. DEVEREAUX, JR.: In here.
5      CHAIRPERSON SCHWINDER: Right around
6  there, and that's where --
7      MR. DEVEREAUX, JR.: The dip, yeah,
8  there's a dip, there's no doubt about it.
9      CHAIRPERSON SCHWINDER: That's where
10  the dip is --
11      MR. DEVEREAUX, JR.: Yeah.
12      CHAIRPERSON SCHWINDER: -- from the
13  railroad tracks --
14      MR. DEVEREAUX, JR.: Yeah.
15      CHAIRPERSON SCHWINDER: -- down and
16  from Lincoln -- from Kinderkamack Road. So all
17  I'm saying is that I want to make sure that you
18  take into account the history in that area.
19      MS. KOSTELECKY: Yes.
20      CHAIRPERSON SCHWINDER: And that you
21  consider how far off the grade your ground floor
22  is to those units.
23      MR. CORSEY: If I may add, let me
24  just get back to my site rendering again.
25      MR. FLANNERY: A-3.

1      MR. CORSEY: Okay. So what we're
2  talking about here is there's an existing set of
3  double inlets --
4      CHAIRPERSON SCHWINDER: Right.
5      MS. BOGART: -- roughly around where
6  the B is in Boulevard in this rendering. And
7  what Mr. Ascolese is talking about I guess
8  during a storm event in the past there was
9  roughly around 3 feet of water in that
10  intersection, which he showed me a picture of it,
11  documented as such with a BMW half-filled with
12  water.
13      So what we have here is with the
14  drainage improvements that we're proposing for
15  that inlet there, right now, there's a small
16  24-inch pipe that connects this system at a
17  15-inch pipe, an 18 pipe. There's a succession
18  of small pipes here currently.
19      As part of our proposed improvement,
20  this 42-inch pipe is going to be a conduit that's
21  going to direct a lot of that stormwater through
22  this site to Linwood Avenue, and for all intents
23  and purposes, alleviate the majority of the storm
24  now.
25      These flash floods, like Mr. Ascolese

1  is talking about, we get these high intensity
2  storms for a short period of time, you can't
3  design stormwater systems to handle that without
4  making them monstrous for that one storm. The
5  intent is you -- as Mr. Ascolese is saying, is
6  that we have to design a finished floor elevation
7  that's appreciable so he's higher, there's a
8  resident, or these residents are higher than
9  that.
10      What we've done as part of our
11  design is that the access road on Lincoln
12  Boulevard slopes down, goes to the low point and
13  then it starts to work its way back up towards
14  the train tracks.
15      The design intent here was that we
16  were going to step these units down the slope and
17  make them at an at-grade inter -- at-grade access
18  to the units for ADA accessibility.
19      What we're going to have to do with
20  in relation to what Mr. Ascolese is saying is
21  that those units in close proximity to that inlet
22  will have to be elevated now. So we'll probably
23  have to do elevated internal -- we'll have to
24  have internal stepping or something like that.
25      The sidewalk in this location is only

RA, Kostelecky, Angela - cross - The Board    Page 129

1  around 10 feet wide.  The -- in order to put the
2  steps outside of the building that would require
3  stoops and stairs within the right-of-way, which
4  I don't believe is acceptable by the Borough
5  standards.  So we need to internalize those
6  things.  So we'll work with the project
7  architects to make that, to facilitate that to
8  make sure the units are high enough to
9  accommodate that flood elevation.
10    CHAIRPERSON SCHWINDER: Is there a
11 maximum height for a curb, Mr. Ascolese?
12    MR. ASCOLESE: The County standard
13 is an 8 inch face.  The Kinderkamack Road project
14 was built a 6 inch face.
15    CHAIRPERSON SCHWINDER: Would you
16 think that it would be wise to have an 8 inch
17 face on Lincoln Boulevard?
18    MR. ASCOLESE: I would leave that to
19 them to --
20    CHAIRPERSON SCHWINDER: "Them"
21 being?
22    MR. ASCOLESE: The developer.
23 Again, everything else in this project is built
24 for 6 inches because of the door sills and things
25 like that.  6 inches would be the minimum.  If

RA, Kostelecky, Angela - cross - The Board    Page 130

1  they can go higher it just then it gets to the
2  point where it, can people of age step up to 10
3  inches.
4     CHAIRPERSON SCHWINDER: I
5  understand.  This town has a long history on that
6  street of seeing severe flooding, and I know that
7  you're going to be putting in a larger pipe and
8  to get rid of that water --
9     MR. CORSEY: Right.
10    CHAIRPERSON SCHWINDER: -- faster
11 than before, but with that in mind, just remember
12 that that flash flooding storm could be
13 devastating --
14    MR. CORSEY: Sure.
15    CHAIRPERSON SCHWINDER: -- to the
16 first floor --
17    MR. CORSEY: Right.
18    CHAIRPERSON SCHWINDER: --
19 apartments.
20    MR. CORSEY: Yes, I do understand.
21    CHAIRPERSON SCHWINDER: So I would
22 want to make sure that you take that into account
23 in your plan.
24    MR. CORSEY: Yes, sir.
25    CHAIRPERSON SCHWINDER: If you have

RA, Kostelecky, Angela - cross - The Board    Page 131

1  to did it in your face level A then take it up to
2  level B.
3     MR. CORSEY: Right.
4     CHAIRPERSON SCHWINDER: Just to be
5  safe.
6     MR. CORSEY: So we'll work with Mr.
7  Ascolese's office to get the information that the
8  Town has on the upgrading, or the upgradient
9  system that ties into this to make sure those get
10 taken into account.
11    CHAIRPERSON SCHWINDER: Thank you.
12 Any other questions from the board?
13    MR. FLANNERY: That's all I have,
14 Mr. Chairman.
15    CHAIRPERSON SCHWINDER: Okay.  If
16 there are no other questions?
17    MR. SUDANO: Can I?
18    CHAIRPERSON SCHWINDER: Yes.
19    MR. SUDANO: You would anticipate
20 even if you rented to a restaurant, a restaurant
21 moved, in using that trash room even for a
22 restaurant, no dumpsters?
23    MS. KOSTELECKY: We do have -- we
24 have other areas where we can add trash rooms if
25 a restaurant were to move in.

RA, Kostelecky, Angela - cross - The Board    Page 132

1     MR. SUDANO: So you keep everything?
2     MS. KOSTELECKY: Yes.
3     MR. SUDANO: Your intention is to
4  keep everything in.
5     MS. KOSTELECKY: Yes.
6     MR. MALONE: Do you have enough
7  space for recycling?
8     MS. KOSTELECKY: Yes, it's trash and
9  recycling.
10    CHAIRPERSON SCHWINDER: Mr. Sudano
11 or our architect, is there a different
12 requirement for a trash removal from a restaurant
13 than there is from other types of business?
14    MR. SUDANO: It has to be picked up.
15 It's picked up more often than twice a week at a
16 minimum I believe.
17    CHAIRPERSON SCHWINDER: Picked up
18 more.
19    MR. SUDANO: I believe, yeah.
20    CHAIRPERSON SCHWINDER: And what
21 about food waste, be able to accommodate that?
22    MR. SUDANO: That's a restaurant
23 waste usually considered like slop and
24 everything, everything goes in together, believe
25 it or not.

RA, Kostelecky, Angela - cross - The Board                Page 133

1      MR. MARTIN: They would have to
2  comply with whatever the standards are.
3      MR. SUDANO: Yeah.
4      MR. MARTIN: Okay.
5      MS. KOSTELECKY: And also since it's
6  private hauling that you have the opportunity to
7  have pickups more often, if need be.
8      MR. MARTIN: Mr. Flannery, do you
9  have any more evidence?
10     MR. FLANNERY: No, that's all I have
11  for now.
12     MS. BOGART: Mr. Chairman, I just
13  have one more question. And I don't know who to
14  direct this to, but the housing agreement
15  actually requires 50 percent set aside for a
16  total of 29 affordable units, seven of which
17  could be provided off-site. I just, no one has
18  addressed the off-site units or how that's going
19  to be handled.
20     MR. FLANNERY: We will comply with
21  that requirement. It is an off-site requirement.
22  It's not a part of this application tonight, but
23  we are in discussions and we have property under
24  control for that off-site affordable housing
25  development and we will have to comply with that

RA, Kostelecky, Angela - cross - The Board                Page 134

1  provision, yes.
2      MR. MARTIN: Is that in terms of
3  the proposed court settlement?
4      MS. BOGART: The settlement
5  agreement says that they could be provided
6  off-site. They also could be provided on-site.
7  So they're suggesting, I guess, it's going to be
8  provide off-site. There would have to be a
9  condition of any approval on that.
10     MR. MARTIN: Right. So 29 is the
11  total, 22 is proposed for site.
12     MR. FLANNERY: Correct, and seven to
13  be offsite.
14     MR. MARTIN: In the distribution
15  that's required you already stipulate to that?
16     MR. FLANNERY: As to that, yes.
17     MR. MARTIN: And the other seven you
18  would have to show evidence that you properly
19  complied. I think the Special Master has
20  approved that, right?
21     MS. BOGART: Correct.
22     MR. MARTIN: Okay. All right.
23     MR. FLANNERY: We will comply.
24     MR. MARTIN: Any other evidence?
25     MR. FLANNERY: No, not at this

RA, Devereaux, Jr., William J. - cross - The Public       Page 135

1  time.
2      MR. MARTIN: And you'll stipulate to
3  any requirements of the fire department, police
4  emergency service assistance?
5      MR. FLANNERY: Yes.
6      MR. MARTIN: All right.
7      CHAIRPERSON SCHWINDER: No other
8  questions from board members, then I'd like to
9  entertain a motion to open to the public.
10     MR. McKENDRY: I'll make a motion.
11     (Discussion off the Record.)
12     CHAIRPERSON SCHWINDER: Okay.
13  There's been a request for a break, so I'll agree
14  to that. Let's take like three to four, do a
15  four-minute break.
16     (Recess is taken.)
17     CHAIRPERSON SCHWINDER: Okay. We
18  are now -- we will now continue the proceedings.
19  Please take your seat. Okay. I am going to ask
20  for a motion to open to the public.
21     There are a lot of people here. I
22  assume there will be a lot of questions. We want
23  to give as many people a chance to speak as
24  possible. So we're going to give 3 minutes per
25  turn.

cross - by the Public                                      Page 136

1      AUDIENCE: What?
2      MR. BRESA: Can I make that motion,
3  Gary?
4      MR. DeORIO: Make a motion.
5      CHAIRPERSON SCHWINDER: And if you
6  need more time you'll speak after somebody else
7  gets their turn, but, anyway, I'll entertain a
8  motion to open to the public.
9      MR. BRESA: I'll make a motion.
10     CHAIRPERSON SCHWINDER: 3 minutes
11  per turn.
12     MR. DeORIO: Second.
13     CHAIRPERSON SCHWINDER: Second. All
14  in favor?
15     (All Board members stated "Aye.")
16     CHAIRPERSON SCHWINDER: Opposed?
17     Okay. We are open to the public.
18  Ms. DiPaolo.
19     MR. MARTIN: Councilwoman.
20     CHAIRPERSON SCHWINDER: Councilwoman
21  DiPaolo, sorry. Mayor-elect DiPaolo.
22     AUDIENCE: Mayor-elect DiPaolo.
23     UNIDENTIFIED MALE: Now we're
24  getting it.
25     AUDIENCE MEMBER: Time's up.

cross - by the Public                                        Page 137

1    MAYOR-ELECT DiPAOLO: I guess I'm
2  going to show it to you guys and then I'm going
3  to show it to them.  When the governing body
4  chose them as a developer, this the rendition,
5  not this.  Very different.  This has a lot more
6  character.
7    UNIDENTIFIED FEMALE: Still too big.
8    MAYOR-ELECT DiPAOLO: Still too big.
9  It has a lot more character than this box.  But
10 it reminds me of a building I used to hang in on
11 2nd Avenue in the City in the eighties.
12   Look, I think that the election of
13 myself, Brian Gordon and Ken Hoffman was a
14 one-issue election, and it was a referendum on
15 the development of Block 419 in our downtown.
16   And I would ask that this Board
17 respect the wishes of the people of Emerson, and
18 listen to them as far as making sure that a plan
19 that is going to be the centerpiece of our
20 downtown for possibly a hundred years or more
21 until the next governing body and the next Land
22 Use Board decides that it's not appropriate for
23 town and needs to be updated, that this is the
24 plan that you really want to see down there for a
25 hundred years the generations are going to have

cross - by the Public                                        Page 138

1  to live with.
2    And I do, I have a question for our
3  planner.  You can't see it right now because of
4  the way they have that clipped, but if we move
5  that board away, can we do that?
6    This is an existing building right
7  now.  How is this good planning for the borough
8  of Emerson?  How does this benefit the borough of
9  Emerson in any way other than satisfying our
10 affordable housing obligation?  Because this, to
11 me, does not look like it benefits Emerson.
12   Is this proper planing to put a
13 building right in the center and it's going stay
14 like that for a hundred years?
15   MS. BOGART: That building was
16 approved when I wasn't the board planner.
17   MAYOR-ELECT DiPAOLO: I understand
18 that, but to engulf it with the rest of this, is
19 that --
20   MS. BOGART: Well, at the time --
21   MAYOR ELECT-DiPAOLO: Is that
22 appropriate planning in your opinion as the
23 Borough's planner?
24   MS. BOGART: At the time of that
25 building design that was the redevelopment plan

cross - by the Public                                        Page 139

1  criteria, and it was approved in accordance with
2  the redevelopment plan.  And, unfortunately,
3  since it was redeveloped it no longer meets the
4  redevelopment criteria so it couldn't be included
5  in the redevelopment plan.
6    MAYOR-ELECT DiPAOLO: I understand
7  that, but to engulf this little building, which
8  is now -- which really isn't a little building.
9  It's an appropriate size building for our
10 neighborhood of our downtown, does this look good
11 to you as a planner?
12   MS. BOGART: Unfortunately, because
13 of the timeline of what has occurred there's
14 nothing we can do about it.  It's no longer
15 designated as redevelopment.
16   MAYOR-ELECT DiPAOLO: You didn't
17 answer my question.  Does this look good in your
18 opinion as a planner?
19   MS. BOGART: I think that it's
20 definitely out of scale.  It's basically an
21 existing building.  You can't tell on the
22 elevation, but I think it does break up the
23 facade that will help the building.
24   MAYOR-ELECT DiPAOLO: Is that my
25 three?

cross - by the Public                                        Page 140

1    CHAIRPERSON SCHWINDER: That's your
2  three.
3    MAYOR-ELECT DiPAOLO: Thank you.
4    MR. BRESA: Thanks.
5    CHAIRPERSON SCHWINDER: Mr.
6  Bischoff.
7    MR. BISCHOFF: Good evening, guys.
8  Jeff Bischoff, 86 Park Avenue, Emerson, New
9  Jersey.
10   I'd like to -- I heard some testimony
11 tonight about on their side from a -- I guess
12 he's a traffic engineer, he doesn't seem -- but I
13 -- did the Borough do an official traffic study
14 yet on this or --
15   CHAIRPERSON SCHWINDER: Not yet.
16   MR. BISCHOFF: There hasn't been
17 anything on this?
18   CHAIRPERSON SCHWINDER: No.
19   MR. BISCHOFF: So the Borough has
20 done nothing on as far as traffic study?
21   CHAIRPERSON SCHWINDER: As far as
22 traffic.
23   MR. BISCHOFF: No engineering study,
24 no traffic engineer on our part or anybody yet?
25   CHAIRPERSON SCHWINDER: The only

cross - by the Public                                                      Page 141

1  engineer that has reviewed the plan is Mr.
2  Ascolese but there was no --
3      MR. BISCHOFF: But we haven't done
4  our individual traffic study yet?
5      CHAIRPERSON SCHWINDER: Not a
6  traffic study.
7      MR. BISCHOFF: Okay, that's correct,
8  so we have no traffic study yet.  And everybody
9  knows we have quite a bit of traffic here in
10  Emerson; isn't that correct, Mr. Schwinder?
11      CHAIRPERSON SCHWINDER: That is
12  correct.
13      MR. BISCHOFF: Okay.  So we probably
14  shouldn't even be here tonight without a traffic
15  study.  And we asked for a lot of stuff here.
16  I've seen an application that we're asking for a
17  lot of waivers here tonight.
18      I've done some development myself and
19  actually sat on the Land Use Board at one time.
20      CHAIRPERSON SCHWINDER: I do
21  remember that correctly.
22      MR. BISCHOFF: I've never seen an
23  application get to the board with actually so
24  many waivers here that were missing tonight, you
25  know what I mean?  Is we have no, no input from

cross - by the Public                                                      Page 142

1  all these other --
2      (Applause.)
3      MR. BISCHOFF: Also, Mr. Schwinder,
4  the water problem.  I remember when you were on
5  the board.  There was two things you were
6  concerned about when I was starting on the board,
7  and that was water and parking.
8      Okay.  We all know we have a problem
9  on Lincoln Avenue, and we had an existing problem
10  for years and years and years on Plaza East;
11  isn't that correct, sir?  Right in front of the
12  now vape shop over there we had a very -- lot of
13  flooding over there for years.
14      CHAIRPERSON SCHWINDER: Yeah, I
15  remember.
16      MR. BISCHOFF: Okay.  So now we're
17  going to take all the water from Lincoln and dump
18  it on Plaza East; is that correct, sir?
19      CHAIRPERSON SCHWINDER: Well, that I
20  would refer to the engineer to ask him.
21      MR. BISCHOFF: That's just a
22  question.
23      CHAIRPERSON SCHWINDER: Ask him how
24  we can carry it away.
25      MR. BISCHOFF: Is that a yes or no?

cross - by the Public                                                      Page 143

1      MR. ASCOLESE: If I can, Mr.
2  Chairman.
3      CHAIRPERSON SCHWINDER: Yes.
4      MR. ASCOLESE: The County and the
5  Borough upgraded all of the drainage facilities.
6      MR. BISCHOFF: The only question I'm
7  asking, sir, is are we dumping all the water from
8  Lincoln Avenue onto Plaza East; is that correct,
9  sir?
10      MR. ASCOLESE: In an enlarged pipe,
11  yes.
12      MR. BISCHOFF: That's what we're
13  doing?
14      MR. ASCOLESE: Yes, correct.
15      MR. BISCHOFF: Okay.  Thank you.
16  The other point I want to make is, I heard
17  some -- again, going back to the traffic study
18  and the parking and all that other stuff, now
19  we're assuming, I heard from testimony from the
20  developer that -- because we're asking for a 25
21  percent reduction in parking, which is a major,
22  major reduction in parking.  25 percent is not a
23  little bit.  It's quite a bit.
24      And we're also assuming that
25  everybody's going to leave that development and

cross - by the Public                                                      Page 144

1  get in their cars and go out in the, in the
2  morning and then that's not going to happen.
3      You're going to get people that are
4  jumping on trains.  You're going to get people
5  who are taking Ubers to work.  You're going to
6  get people that are carpooling to work.
7      So a 25 percent reduction in parking
8  is just off the hook, you know.  That's where
9  we're coming into our density problem, because
10  without the 25 percent reduction you are not
11  going to get that fourth floor in there.  It's
12  not going to happen a hundred percent.  Okay.  I
13  would think a reduction is proper, but more like
14  10 percent or 5 percent.
15      And I remember with you on the board
16  with me, we were always going back and forth with
17  the parking, celebrity salons, all that area down
18  there, remember.
19      CHAIRPERSON SCHWINDER: Yeah.
20      MR. BISCHOFF: And we had shared
21  parking throughout the Borough, okay, which was
22  all done on all that other stuff.
23      Now we get to the parking garage that
24  Mr. Adams was talking about, everything else, and
25  they say the -- it's online for the residential,

| cross - by the Public | Page 145 |
|---|---|

1  with residential floors. That's incorrect.
2  That's not correct. And because the first floor
3  is all retail here. And the first floor of the
4  parking garage is on the first floor, right?
5     So it doesn't align with the, with
6  the thing because you're going to be -- the first
7  floor is going to be the second floor of
8  residential; is that correct, sir?
9     CHAIRPERSON SCHWINDER: That I would
10  ask the architect.
11     MR. BISCHOFF: That's correct.
12  Okay.
13     CHAIRPERSON SCHWINDER: You don't
14  want to hear from the expert that?
15     MR. BISCHOFF: Well, I did hear it,
16  but I'm -- I got a little drawing for you. It
17  shows you right here. It shows retail on the
18  bottom and that's the first floor. And then the
19  first floor of the apartments would be the second
20  floor of the parking garage; isn't that correct?
21  Because it's actually not. The parking garage is
22  going to be over in height, too. You're correct
23  on that, too, sir.
24     And you were talking about the
25  flooding on Lincoln and everything else, and I

| cross - by the Public | Page 146 |
|---|---|

1  believe that was a great point and because it is,
2  it floods like crazy over there.
3     But the reduction in the parking and
4  the no traffic study, it seems like we're here a
5  little premature honestly, you know. And to hold
6  special meetings because we're here premature, I
7  don't know what's going on.
8     The election was a one-issue
9  election. I don't know if everybody knows how it
10  works here in town, but I'll give you a quick
11  lesson. I only got three minutes, I know.
12     MR. MARTIN: Only actually until the
13  next guy.
14     MR. BISCHOFF: Yeah, I'm just going
15  to get out of here quick. One more point and
16  I'll be done.
17     MAYOR-ELECT DiPAOLO: We don't mind.
18     MR. MARTIN: Jeff, just real quick,
19  too, and this doesn't come out of your time.
20  That's what the judges tell me, it doesn't come
21  out of your time.
22     Just to get the Record straight, you
23  specified that the parking reduction issue that
24  he met raised a good issue, what he seeks.
25     MR. BISCHOFF: Well, we're running

| cross - by the Public | Page 147 |
|---|---|

1  the parking at a 25 percent. That's the max you
2  could get for shared parking, that's max, max,
3  max, max, that's --
4     CHAIRPERSON SCHWINDER: For a mixed
5  use development.
6     MR. BISCHOFF: For what?
7     MR. MARTIN: Excuse me?
8     MR. BISCHOFF: That's max. So, I
9  mean, we've had so much problem in parking down
10  here as it is and now we're going to go to that.
11     MR. MARTIN: You're suggesting 10
12  percent?
13     MR. BISCHOFF: I would think 10
14  percent would be the more of a fairer number for
15  that as far as that goes, not taking it to the
16  max. We already have a parking problem here. We
17  already have a traffic problem here. We've done
18  no traffic study. Now you threw me off my other
19  point. I forget what I was going to say.
20     MR. MARTIN: One, one minute, go
21  ahead, as they say.
22     MR. BISCHOFF: Yeah, okay. The
23  other thing is I think we're here a little
24  prematurely without any of that stuff done.
25     Back to the election, all right, just

| cross - by the Public | Page 148 |
|---|---|

1  so everyone knows here what's going to happen
2  here is that the mayor and council is going to
3  change greatly. Not only the balance of power is
4  going change, and what I don't know if everybody
5  in the room realizes here, I believe there's
6  seven seats up on this Planning Board, is that
7  correct? Does anybody acknowledge that?
8     FEMALE AUDIENCE MEMBER: Yes.
9     MR. BISCHOFF: There is seven seats
10  up, five regulars and two alternates from . So I
11  think there may be changes in the board.
12  Everything else, I can't believe this application
13  is 100 percent variance free. It's unbelievable
14  that this is 100 percent variance free. I've
15  never, I've never seen an application that's been
16  100 percent variance free, so.
17     Now I don't know if it's because
18  we're not having everything in yet. And I see we
19  ask out of 10 requirements we're asking for eight
20  waivers on finals. So I don't see how you can --
21  that other -- how are you going to get final
22  approval without all these other -- with
23  everything they're asking for a waiver on?
24     And then the other agencies don't
25  agree, or that's just not public knowledge at

cross - by the Public                                      Page 149

1 that point. Because without it here in front of
2 the board, and the testimony given on it or
3 reports from the Bergen County Soils or the
4 County engineers, I guess if you're going to
5 approve it, but then none of that testimony is
6 open to the public?
7 FEMALE AUDIENCE MEMBER: Right.
8 MR. BISCHOFF: Or any other, any
9 other reports coming back at that point?
10 CHAIRPERSON SCHWINDER: Every --
11 MR. BISCHOFF: How would that work?
12 CHAIRPERSON SCHWINDER: Every
13 meeting here is open to the public.
14 MR. BISCHOFF: You're not --
15 CHAIRPERSON SCHWINDER: Okay, and
16 when the County reviews the plan, the soil
17 movement is reviewed. That's all reviewed.
18 Everything is subject to them approving it before
19 we can move forward, so and we --
20 MR. BISCHOFF: So then why we would
21 we be asking for final?
22 CHAIRPERSON SCHWINDER: -- we --
23 MR. BISCHOFF: Why would we be
24 asking for final with this application right now
25 then, if everything is subject to all that other

cross - by the Public                                      Page 150

1 stuff and not just asking for preliminary
2 approval?
3 CHAIRPERSON SCHWINDER: As our Board
4 engineer pointed out, this is a variance-free
5 application. Okay, and there is nothing that
6 would prevent us from voting on this application.
7 FEMALE AUDIENCE MEMBER: What?
8 Really.
9 CHAIRPERSON SCHWINDER: So it could
10 be a positive vote, a negative vote.
11 MR. BISCHOFF: I understand that.
12 CHAIRPERSON SCHWINDER: But there is
13 nothing that would prevent us from voting, unless
14 there was a severe deficiency in a request for a
15 variance and it's variance free.
16 MR. BISCHOFF: Yeah. Okay, sir,
17 thank you for your time.
18 CHAIRPERSON SCHWINDER: Thank you.
19 (Applause.)
20 MR. MEYERS: Thank you. Mike
21 Meyers, 38 Allison Way in Emerson.
22 So building upon what Mr. Bischoff
23 just said in terms of the traffic, let's dispel
24 with some of the TOD mumbo-jumbo here. Because
25 if I understand what Mr. Olivo said was that the

cross - by the Public                                      Page 151

1 purpose of a transit-oriented development is to
2 take traffic off the street, but we have 55
3 commuter spots, which means there's going to be
4 55 additional cars on the street coming here in
5 addition to whoever may live in this development,
6 who is going to be using transit. So that just
7 doesn't make sense right there. We're not
8 reducing traffic. We're increasing traffic.
9 With the 55 commuter spots, that
10 leaves only 18 spots for retail. I think we have
11 more than 18 spots for retail right now, and this
12 drawing here with these beautiful new stores are
13 going to require a lot more than 18 spots for
14 parking.
15 The concept that commuters and
16 shoppers are going to share parking is kind of
17 ridiculous, because the commuters are going to be
18 parked there all day long.
19 Anybody who believes there's only
20 going to be one car per household shouldn't be
21 making a decision tonight because that's patently
22 absurd. There's going to be at least two cars
23 for most of the households.
24 And even if somebody is totally
25 commuter oriented, they're not going to take the

cross - by the Public                                      Page 152

1 bus up to Stop and Shop to get groceries.
2 They're going to need a car. And now they're
3 going to need a car to go to the dry cleaners
4 because the most convenient dry cleaner's going
5 to be put out of business.
6 Speaking about putting people out of
7 business, Mr. Devereaux said they're going to
8 have a fitness center there. Well, what does
9 that do to the anomaly here, which is basically a
10 fitness center, how is that going to impact his
11 business? We don't know. That's a lot of
12 questions that we don't know.
13 How many times was the answer, "I
14 don't know," given tonight? And if you guys have
15 the conscious to vote on something tonight with
16 all these "I don't knows," then I don't know what
17 your qualifications are. I used to do site
18 selection research for a $4 billion retailer, and
19 if I came into a presentation as unprepared as
20 these guys are I would have been fired.
21 Now, speaking about being unprepared,
22 what retail is actually going to go there?
23 Nobody knows. What are we going to get? Are we
24 going to get five more pizza places? Are we
25 going to get five more banks? What are we going

1   to get that's going to benefit us. So far
2   everything we've heard benefits them and nothing
3   we've heard benefits us.
4       (Applause.)
5       I know you guys are experienced. I
6   know you've been doing this for a while, but you
7   really gotta look at your conscious and really
8   think: Is this the right thing to do? Is this
9   vote tonight the right thing to do? I don't
10  think it is, and I don't think these folks think
11  it is either. Thank you.
12      (Applause.)
13      MS. MELILLO: Cory Melillo, 18
14  Vivian Avenue.
15      MR. MARTIN: Can you just spell your
16  last name?
17      MS. MELILLO: M-e-l-i-l-l-o. I know
18  that the term, "bait and switch," isn't recepted
19  (sic) well, but when the ordinance was passed two
20  years ago it was stated in the Mayor's message
21  that it was being approved to go to the four
22  stories for JMF, the 20 percent of the affordable
23  housing here. That's not being done now, so I do
24  believe that's a bait and switch.
25      My question is also on the

1   one-document presentation board. Is there any
2   retail that's going to be north of the Lot 5 plus
3   unit building or is that all their gym? And is
4   that gym only for their residents or are you
5   going to be taking people from our community and
6   giving us something?
7       My other question is, and I'm just
8   sorry I'm just asking them since there's only a
9   certain amount of time, what is happening for the
10  parking for the residents of Lot 5 now? Are they
11  going to have to park in the back and walk
12  around?
13      CHAIRPERSON SCHWINDER: They have
14  their same lot. Their lot is --
15      MS. MELILLO: Their lot is not being
16  taken away?
17      CHAIRPERSON SCHWINDER: It's not
18  being touched.
19      MS. MELILLO: All right. It doesn't
20  look like that from the pictures.
21      CHAIRPERSON SCHWINDER: Not being
22  touched.
23      MS. MELILLO: So --
24      MR. SUDANO: That's behind it.
25      MS. MELLILO: It's the --

1       MR. SUDANO: Yeah.
2       MS. MELILLO: It's, oh, behind.
3       MR. SUDANO: I believe what you're
4   looking out, if I may, I think you're looking at
5   the building below the building behind.
6       MS. MELILLO: Yes.
7       MR. SUDANO: The building behind.
8       MS. MELILLO: That's what I saw
9   online yesterday.
10      MR. SUDANO: But the parking lot and
11  everything I believe is --
12      MS. MELILLO: So there'll be an
13  entrance then going -- walk in through
14  Kinderkamack to get in? How are they getting in?
15      CHAIRPERSON SCHWINDER: That curb
16  cut is going to be the only curb cut.
17      MS. MELILLO: Okay, because they
18  said before there was no curb cut. I didn't
19  realize if that was with existing.
20      CHAIRPERSON SCHWINDER: No curb cut
21  in the new project.
22      MS. MELILLO: But that curb cut --
23      CHAIRPERSON SCHWINDER: But the only
24  curb cut that remains is the one for that
25  building.

1       MS. MELILLO: Okay. So they'll
2   still have a dumpster for their trash, for their
3   trash?
4       CHAIRPERSON SCHWINDER: Right. It
5   has -- their property has nothing to do with this
6   project.
7       MS. MELILLO: Okay. Thank you.
8       CHAIRPERSON SCHWINDER: Thank you.
9       Anybody else? Yes, the hand in the
10  back.
11      MS. McQUEENEY: Good evening, ladies
12  and gentlemen. Happy holidays.
13      MALE VOICE: Thanks.
14      MS. McQUEENEY: Lorraine McQueeney,
15  115 Grand Boulevard, Emerson, New Jersey.
16      CHAIRPERSON SCHWINDER: I'm sorry?
17      MS. McQUEENEY: Lorraine M-c capital
18  Q-u-e-e-n-e-y.
19      CHAIRPERSON SCHWINDER: Thank you.
20      MS. McQUEENEY: 115 Grand Boulevard
21  Emerson, New Jersey since 1964. We've gotten so
22  far into the weeds I think we need a little bit
23  of a chronology with this debacle, and I'm going
24  present this in a bit of a unique way tonight.
25      "How the Grinch almost stole downtown

1  Emerson.  Most folks here in Emerson like its
2  quaint downtown a lot, but the Grinch north of
3  Kinderkamack Road, he did not.  The fluster cup
4  just down on Linwood falls just shy of treason,
5  now please don't ask why for we all know the
6  reason.  Four stories downtown?  That just
7  wouldn't be right.  Added traffic, all those
8  people, these thoughts give us a fright.  And I
9  think the most likely reason of all is because
10  the lot for this project is two stories too small.
11      Staring down from his yard with a
12  sour Grinchy frown at the small business owners
13  below in the town.  They won't sell their
14  buildings he snarled with a sneer.  If they won't
15  do so willingly they'll do so with fear.  I must
16  find a way, some loophole to use, so the
17  developer can make them an offer they just can't
18  refuse.  And while the Grinch said, This ship had
19  already sailed, by early November he knew that he
20  failed.
21      For the more townspeople thought
22  about what four stories would bring, the more
23  they thought we must stop this whole thing.
24  Although for 50-plus years downtown has needed
25  replacing, two stories too tall instead of

1  refacing?  We must rethink this whole thing, with
2  JMF call a truce.  Forget eminent domain and
3  highest and best use.
4      The people in Block 419 need to stay
5  in their home.  Cork and Keg and Ranch Cleaners,
6  leave these merchants alone.  We can restore our
7  downtown without dread or fearing that affordable
8  housing it brings social engineering.  Emerson is
9  the town that we are for a reason and there is no
10  better time than this Christmas season to
11  mitigate, not litigate.  It's not about lost or
12  won.  It's about damage to good people, which
13  must be undone.
14      What is an agreement without mutual
15  assent?  No meeting of minds when it comes to
16  intent.  No arm's-length transactions, no good
17  faith or fair dealing.  Papers signed under
18  duress means successful appealing.
19      No need to take matters too far, put
20  this town through the worst.  Let's make that a
21  thing of the past and agree to a first.  Without
22  fanfare or lawsuits, this very next day, I appeal
23  to the developer to just walk away.
24      Maybe downtown perhaps means so very
25  much more than three flights of apartments with a

1  row planned for stores.  Start with that holdover
2  tenant and without much adieu take the agreement
3  they signed and rip it in two.  Let the rest
4  follow quietly, and let it be time to go into
5  Ranch cleaners and take down that new sign."
6      Thank you very much.
7      (Applause.)
8      MALE VOICE: She should be on Ed
9  Sullivan, at least she's having more fun.
10      MS. McQUEENEY: I'm going to --
11      MR. POLVERE: I'm not going to rhyme
12  because I don't think I could equal that, but.
13      CHAIRPERSON SCHWINDER: Your name?
14      MR. POLVERE: Joseph Polvere, 124
15  Linden Avenue.
16      CHAIRPERSON SCHWINDER: Joseph?
17      MR. MARTIN: Polvere, P-o-l-v-e-r-e.
18  You know, first of all, I did -- I do want to say
19  I came to tonight thinking that redevelopment's a
20  good thing.  I still think redevelopment's a good
21  thing.  And I really think that the nature of the
22  previous administration, I don't think it was as
23  corrupt as some would suggest.  And I think the
24  incoming administration certainly deserves to
25  have a chance in their say in things as well.

1      And I know you, as a planning board,
2  I'm sure have sat through meeting after meeting
3  about this and I know you're looking at it very
4  closely, but I can only make a judgment based
5  upon the presentations tonight, and I have to
6  agree with some of the comments that have been
7  made tonight.  There are a lot of "I don't knows"
8  and a lot of questions being asked.  And even as
9  someone who feels that our downtown needs a lot
10  of work, there were too many questionable
11  responses from the developer tonight.  There were
12  too many questionable responses all across the
13  board.
14      I've been an educator for 18 years,
15  and even when I presented Back to School Night, I
16  feel if I presented in front of parents and
17  didn't necessarily explain my curriculum well,
18  however good my intention would be, that that
19  wouldn't leave them in any -- with any confidence
20  in what I'm doing for the school year.
21      I think what tonight shows, and even
22  though I thank you for what you've done in terms
23  of what you're trying to do for redevelopment,
24  even though I think it needs to get done in this
25  town, I do think that from what I've seen tonight

1   I have to change my opinion coming in tonight,
2   which was that I though this should happen now.
3      Instead, I think we need to take time
4   out. We need to draw up a plan where more
5   questions can be answered. And I think that the
6   residents that are here have spoken about that
7   tonight, so I hope you'll take that into
8   consideration. Thank you.
9      (Applause.)
10     CHAIRPERSON SCHWINDER: Anyone else?
11  Mr. Hoffman -- councilman-elect Hoffman.
12     COUNCILMAN-ELECT HOFFMAN: Kenneth
13  Hoffman, 61 Emwood Drive.
14     What I would say in general is that
15  we are here tonight only because a handful of
16  people decided they knew what was best for
17  downtown Emerson instead of listening to the
18  majority of the people.
19     Our outgoing mayor said the people
20  who were opposed to this four-story monstrosity
21  were a vocal minority. And on November 6th I
22  think it was proven that they were in the
23  majority.
24     (Applause.)
25     So it's a shame when you have a

1   governing body that doesn't listen to the will of
2   the people. That's not democracy. We have not
3   seen democracy here in Emerson moving forward,
4   but I think we will definitely see that happen.
5   Unfortunately, we are stuck here tonight.
6      One of the questions I had tonight,
7   this is regard to the traffic expert, Mr. Olivo,
8   Olivo. I'm not sure of the pronunciation. He
9   used the term, "mitigation." And in my right
10  mind I'm trying to figure out how the hell what
11  you're putting in here is going to mitigate the
12  problem on Kinderkamack Road in the downtown. So
13  I'm wondering if he can somehow answer that?
14     MR. MARTIN: Mr. Hoffman, I remember
15  that. That was when he said that there's a bus
16  line, a train line, and that would mitigate if
17  you dropped it off a Route 78 in the woods
18  somewhere and that you would have to expand more
19  parking and available roadways.
20     MR. OLIVO: That was the context,
21  yes.
22     MR. MARTIN: Yes.
23     MR. OLIVO: It reduces the reliance
24  on passenger cars, single-occupancy vehicles.
25  That is mitigation location.

1      COUNCILMAN-ELECT HOFFMAN: It's
2   ridiculous, number one, to assume that
3   everybody's taking the train. It's ridiculous to
4   think when they come home, like Mr. Meyer said,
5   they're going to be taking the bus to ShopRite or
6   Stop and Shop. You're going to have a definite
7   adverse impact upon roadways that are already in
8   horrible shape. So I think the comments of
9   mitigation is, is kind of funny.
10     I also heard about the spaces per
11  unit or bedroom unit. And you were kind of
12  bragging about how many you were going to
13  provide. But as Mr. Meyers also pointed out or
14  someone else pointed out, where you have a couple
15  you're going to have two cars. You're not going
16  to have one car. You're going to have two cars.
17  So you're going to have to provide a lot more
18  spaces where you have a couple coming in.
19     I thought that the presentation on
20  traffic was very disingenuous and does not give a
21  good sense of the really horrible impact this
22  development is going to have in our downtown
23  forever.
24     (Applause.)
25     CHAIRPERSON SCHWINDER: Anyone else?

1      Yes, sir.
2      MR. PRICE: Billy Price, 9 Emwood
3   Drive, Emerson, New Jersey, peoples town.
4      This thing is, I looked at that
5   picture. It is like a sardine can and we're
6   trying to put whales into it. I, I didn't come
7   prepared. I didn't have  a -- make up a poem or
8   anything like that. I leave it to the people who
9   can handle it. I'm just an ordinary grunt. I'm
10  not a doctor or a lawyer, an Indian chief. I'm
11  just me. I love this town dearly. I grew up in
12  River Edge, I didn't go far. Two years in the
13  Army I was away. But what I want to say is --
14     AUDIENCE: Thank you.
15     (Applause.)
16     CHAIRPERSON SCHWINDER: Thank you
17  for your service.
18     MR. PRICE: You're welcome.
19  Everybody up here, you have to be listening to
20  what people are saying. This is what I'm trying
21  to say is, like, listen to what -- don't go by
22  what anybody else wants. Don't go by the chief.
23  Don't fall in behind everybody and go down to the
24  slaughterhouse. Stand up for your rights and
25  listen to what these people are saying. They're

cross - by the Public                                                      Page 165

1    not here because there's nothing on TV. They're
2    here because this is a big thing. It means a lot
3    to us.
4        I'll tell you one quick story. I'm
5    over by the high school. It took me for -- to go
6    to my chiropractor up on Forest 14 minutes to get
7    from there up to there. That's a long time for a
8    mile ride, 14 minutes. This thing is not -- I'm
9    all for it like everybody else said. We're all
10   for improvement, but not four stories. That's
11   for Englewood and Teaneck down there on Route 4.
12   You see what those things look like? It's a city
13   down there, an absolute city. Englewood doesn't
14   even -- it's city. We don't want that here. Do
15   we?
16       AUDIENCE: No.
17       MR. PRICE: No, we don't. And,
18   again, I'm going to throw out that the election,
19   I -- 20 years ago -- I said this the last time I
20   was here -- Emerson Woods, 129 condominiums down
21   there behind ShopRite all the way up around the
22   bend. It was republicans beating republicans and
23   they wiped out the whole crew, brought a whole
24   new crew in and straightened that thing out and
25   we still have those woods, and I'm damn proud

cross - by the Public                                                      Page 166

1    that I was part of it.
2        (Applause.)
3        So the best thing, it's like, please,
4    you don't -- don't be loyal to anybody. Be loyal
5    to you and be loyal to these people that took the
6    time to come here. I could be watching the
7    Ranger game or something, but I'm not. I'm here
8    because I care. And I want to see people keep
9    your jobs, but you gotta do the right thing.
10   This is wrong. This is way, way too big. We
11   can't move in here. 14 minutes to go from here
12   to frigging Soldier Hill Road, that's ridiculous.
13       And Emerson is probably, I think
14   Montvale also, where the railroad tracks cross
15   over the road, we don't have to be afraid of New
16   Jersey Transit. We're Emerson, New Jersey. We
17   gotta get these people down here and get this
18   thing fixed. The right people are in place now.
19   All we gotta do is get to them. That, that could
20   be fixed.
21       When they first started coming up
22   with this thing, I said, if you're going to do
23   this the train has to stop north of Linwood. It
24   has to stop north so traffic can move still, some
25   of it. That's not happening. We gotta get that

cross - by the Public                                                      Page 167

1    done and. I told them they should have done that
2    when the first planned it. Please, I beg you,
3    don't let this happen. Thank you.
4        (Applause.)
5        MR. ESQUEU: Hi, good evening.
6    Michael Esqueu, 276 Kinderkamack Road.
7    E-s-q-u-e-u.
8        I've been a resident here since 1972.
9    My parents came here from Grand Concourse in the
10   Bronx, and that's why they left to come see
11   the trees and the hills and the nice Emerson
12   town, and that's going backwards in my opinion.
13       The second thing, when JMF started
14   they said they were going to help out. I may be
15   wrong, but I thought I heard them say they were
16   going to help out the local businesses. Has
17   anybody heard anything about that? Are they
18   helping out relocate Ranch cleaners, relocate the
19   liquor store, anybody? Has anybody heard
20   anything like that?
21       MS. BOGART: They have to come up
22   with a relocation plan, that's required.
23       MR. ESQUEU: Who has to? JMF?
24       MS. BOGART: Yes.
25       MR. ESQUEU: So we don't even know

cross - by the Public                                                      Page 168

1    what that plan is and you guys want to vote
2    tonight? We don't even know what that is.
3        (Applause.)
4        MR. ESQUEU: The second thing is, I
5    heard the residents are not allowed to park on
6    the first floor, yet they're thinking about
7    putting back doors on the first floor apartments.
8    Who from New Jersey is not going to park as close
9    as they can to their apartment with a back door
10   to get in?
11       CHAIRPERSON SCHWINDER: They left
12   that undecided.
13       MR. ESQUEU: Another thing
14   undecided.
15       CHAIRPERSON SCHWINDER: They said
16   they could or they don't have to.
17       MR. ESQUEU: Yeah, all right,
18   whatever. So that's it. Thank you very much.
19       CHAIRPERSON SCHWINDER: Thank you,
20   thank you.
21       (Applause.)
22       CHAIRPERSON SCHWINDER: Next up.
23       MR. PIERRO: Don Pierro, 70 Eagle
24   Drive. P, like Peter, i-e-r-r-o.
25       The statement I'd like to read from

cross - by the Public                                    Page 169

1  one of our senior citizens who couldn't be here
2  tonight because she's not feeling well.  Her name
3  is Phyllis Rooney.  She knows I'm --
4      SECRETARY SHUST: Can you speak up,
5  please?  I'm sorry.
6      MR. PIERRO: Yeah, can I -- can I --
7  I'm sorry.
8      MR. MARTIN: Don, that's, that's
9  fine.  What, just the street address, again?
10     MR. PIERRO: Oakland.
11     MR. MARTIN: What number?
12     MR. PIERRO: I don't know the number
13  she lives at.
14     MR. MARTIN: No, I'm sorry, not her.
15  You?
16     MR. PIERRO: I live at 70, 70 Eagle.
17     MR. MARTIN: 70 Eagle, thanks.
18     MR. PIERRO: And her name is
19  Phyllis Rooney.  She couldn't be here tonight
20  because she's not feeling well.  So this is what
21  she wants me to speak:
22     "My name is Phyllis Rooney.  I regret
23  I cannot be here tonight, but I would like to
24  state my disgust with the plans for our town.  A
25  four-story apartment building with a five-story

cross - by the Public                                    Page 170

1  parking garage will turn our town into a big city
2  like the Bronx.  I'm ashamed of the individuals
3  who put us into this horrible situation.
4      I know I speak for many, which the
5  election proved, who are devastated by what you
6  people have created.  I hope it's not too late to
7  stop this insanity."  And that's by Phyllis
8  Rooney.  She wanted me to get that point across.
9      The point I would like to make is,
10  which nobody has mentioned, that the residents of
11  this town are funding a big portion of the tax
12  rebate.  I think it's in excess of half a million
13  dollars a year.  It's something that we should
14  consider when making these decisions that we
15  shouldn't be hasty of any votes because everyone
16  back here is funding a good half million bucks a
17  year to have this monstrosity.
18     I appreciate everybody's time and
19  effort.  And, Mr. Schwinder, I know you're very
20  comprehensive when you've spoken and I know
21  you're very thorough, so I hope you do the right
22  thing.  Thanks.
23     (Applause.)
24     CHAIRPERSON SCHWINDER: Anyone else?
25  Seeing no hands I -- oh.  Mr. Meyers?

cross - by the Public                                    Page 171

1      MR. MEYERS: Thank you.  I thought
2  of something.
3      CHAIRPERSON SCHWINDER: Wait until
4  you get to the microphone, please.
5      MR. MEYERS: Mike Meyers, redux, 38
6  Allison Way, Emerson.  So I thought of something
7  while people were talking, and I know there's a
8  lot of emotional appeals that are going on, and
9  you guys really can't base a decision on
10  emotional appeals, even though you get the
11  sentiment that the town is against this.
12     So let's talk about some factual
13  things.  And we talked about the back doors that
14  the res -- that the retail could possibly have
15  and that there would be deliveries there.  So I'm
16  looking here, and wherever these delivery trucks
17  are going to be I can see it impeding the egress
18  and exit of the driveway.  So I'm not really sure
19  how that's going to work because, your -- you
20  know, deliveries are going to be sporadic
21  throughout the day, ups® comes one time, Fedex
22  comes another time, and so on and so forth.
23     And then given, if you just look up
24  and down Kinderkamack Road and look at the
25  retail, we're probably going to have like five

cross - by the Public                                    Page 172

1  pizza places in here.  And we talked about the
2  147 apartment units that are going to have a
3  rollout trash and a mini trash van coming in
4  here, but even if you only had one restaurant,
5  which is one of the talking points that we had.
6  The cafe on the corner with the umbrellas where
7  people are going to breathe in bus fumes while
8  they sip their lattes, or whatever restaurant.
9  You know, we have three restaurants, four or five
10  restaurants there, right?  We got the Turkish
11  fast place.  We got the catering place, the
12  Japanese place, the Chinese place and Cinar.
13     So even if you have one restaurant,
14  restaurants generate a lot of trash and they're
15  going to have a dumpster.  I mean,
16  there's no way around that.  They're going to
17  need, what is it?  Grease traps or grease --
18  whatever that thing is, and it's just not built
19  in there.  So that alone should raise factual
20  doubt in your minds.
21     I mean, yeah, the traffic, I mean.  I
22  mean, if you guys really think that you're going
23  to put 10 pounds of traffic in a 5 pound bag,
24  you're wrong, you just are wrong.
25     But the traffic and the delivery and

cross - by the Public                                      Page 173

1  the trash situation for how ever many restaurants
2  we get, it just doesn't make sense. So I implore
3  you to use that approach as opposed to any other
4  approach. Thank you.
5    (Applause.)
6    CHAIRPERSON SCHWINDER: Thank you.
7  Anyone else? Yes, sir.
8    MR. HULBURT: Paul Hulburt,
9  H-u-l-b-u-r-t, 55 Jefferson Avenue.
10  I listened, I listened carefully. I
11  think we're here prematurely. I've seen this
12  board turn people away two and three times trying
13  to put a sign on their building, and here we are
14  with this. And it sounds to me like we're
15  pleading for our life here. I think we're here
16  prematurely. There are too many things not in
17  place with this plan. There are too many
18  problems with the deliveries. There are too many
19  problems with the parking spaces. There are too
20  many unaddressed issues that we really need to
21  have more clarity on before we even think about
22  voting.
23  I think as the chairman you need to
24  tell them to go back home, get their pencils back
25  out, put it all back together, and come here with

cross - by the Public                                      Page 174

1  a complete plan. They're not ready. Thank you.
2    (Applause.)
3    CHAIRPERSON SCHWINDER: Thank you.
4    MR. MARTIN: Thank you.
5    CHAIRPERSON SCHWINDER: Anyone else?
6  Yes.
7    MR. CASEY: Michael Casey, 60
8  Linwood.
9    MR. MARTIN: Sorry, what Linwood?
10    MR. CASEY: 60 Linwood.
11  I just want to start by saying, I
12  live right behind where that's going to be. I
13  don't think I will ever see the sun again if that
14  goes up. I live right by apartments right there,
15  more than just my family, too. There's other
16  houses there. When that goes up, it will block
17  us. It will be the same amount of traffic. It's
18  going to completely change our way of life over
19  there.
20  And I just want to go off by saying,
21  I think it's completely inappropriate 90 percent
22  of the questions on here were answered by, I
23  don't know or I don't have that. And I think
24  it's more inappropriate that you guys are doing
25  this right before, two weeks before the entire

cross - by the Public                                      Page 175

1  council is about to change and the entire Land
2  Use Board is about to change.
3    (Applause.)
4    CHAIRPERSON SCHWINDER: Yes, ma'am.
5    MS. MELILLO: Corey Melillo,
6  M-e-l-i-l-l-o, 18 Vivian Avenue.
7  I'm sorry, I know I kind of asked all
8  my questions at once, but I would like to have an
9  answer of why it was stated that they were going
10  put 20 percent of the affordable housing, because
11  I believe when the ordinance passed to raise it
12  to four stories that was the condition of why it
13  was raised to four stories.
14    UNIDENTIFIED MALE: Yeah.
15    MS. MELILLO: So I don't see why we
16  have to have four stories if 20 percent of
17  affordable housing isn't going in.
18    UNIDENTIFIED MALE: Good, good
19  point.
20    UNIDENTIFIED FEMALE: Good question.
21    (Applause.)
22    MS. BOGART: The reason it dropped
23  from 20 percent to 15 percent is that when we
24  went through the litigation process in the court,
25  the court master agreed to allow for all projects

cross - by the Public                                      Page 176

1  in the borough to be 15 percent set aside when
2  they're rental units or 20 percent for sale
3  units, and so that was the change. It was
4  directed by the court master.
5    MS. MELILLO: It should go back down
6  to three stories instead of four stories.
7    (Applause.)
8    CHAIRPERSON SCHWINDER: Yes, ma'am.
9    MS. VIOLA: Hi. Kathleen Viola,
10  V-i-o-l-a, 139 Linwood Avenue.
11  You mentioned there's only going to
12  be the one cutout on Kinderkamack Road. For the
13  last man standing over there, where is the
14  traffic, where are the vehicles going to enter
15  and exit from this facility? Are they going to
16  go in and out through Lincoln?
17    CHAIRPERSON SCHWINDER: Lincoln
18  Boulevard and --
19    MS. VIOLA: Where people try to turn
20  left into Cinar right now?
21    CHAIRPERSON SCHWINDER: No.
22    MS. VIOLA: Because they have to
23  pass two traffic lanes.
24    CHAIRPERSON SCHWINDER: It's going
25  to be next to the railroad tracks where Kenneth

Emerson Redevelopers Urban Renewal

---

cross - by the Public                                  Page 177

1  Avenue is now.
2     MS. VIOLA: But there's still going
3  to be in direct traffic where going are going up
4  and down Lincoln.
5     CHAIRPERSON SCHWINDER: Lincoln
6  Boulevard will be perpendicular to the entryway
7  of the development on the north side. Linwood
8  Avenue would be perpendicular to the entry and
9  exit from the development from the south side.
10 The, that, that two-way street there will be
11 parking up against the railroad track and then
12 the two-way road is --
13    MS. VIOLA: In the back.
14    CHAIRPERSON SCHWINDER: -- just
15 behind the cars that are parked nose into the
16 railroad track.
17    MS. VIOLA: Okay, and I live on
18 Linwood and to get to Ackerman, no joke, I cut
19 across Thomas make a left on Lozier, make a right
20 on Kinderkamack and a left on Lincoln just to get
21 back to Ackerman because of Linwood as it is
22 right now.
23    The only saving grace I find is that
24 they stopped the train from stopping on Lincoln.
25 Will that be something they will keep or that had

---

cross - by the Public                                  Page 178

1  something to do with New Jersey Transit.
2     CHAIRPERSON SCHWINDER: That has to
3  do with New Jersey Transit and --
4     MS. VIOLA: Will they open that?
5  With the building going there, will they reopen
6  that stop?
7     CHAIRPERSON SCHWINDER: New Jersey
8  Transit is not the easiest organization to deal
9  with. I believe Mr. Ascolese has experience with
10 New Jersey Transit. The fact that we got the
11 northbound trains to stop just beyond
12 Kinderkamack Road crossing so that the gates can
13 go up was a major accomplishment, but Mr.
14 Ascolese, for some reason New Jersey Transit has
15 fought the concept of moving the train.
16    Right now, when the train is going
17 south the engine is on the Kinderkamack Road
18 crossing and we haven't gotten them to make that
19 switch.
20    Mr. Ascolese, tell me a little bit
21 about some of the negotiations.
22    MR. ASCOLESE: We have asked them
23 more than once to pave maybe an additional 300
24 feet of the railroad platform brining it up to
25 Lincoln Boulevard and they said they had no

---

cross - by the Public                                  Page 179

1  money. If they made any physical improvements
2  all of the new ADA standard requirements would
3  kick in and it would cost them several million
4  dollars to build the appropriate platform for
5  Emerson to meet these current standards.
6     We asked if there was any way that
7  they could do something on a temporary basis,
8  like they did in downtown Westwood where they
9  built a series of ramps out of wood to service
10 one or two cars. They indicated that was out of
11 the question.
12    So we're still trying to get them to
13 come in do something with where the train,
14 especially the northbound trains, where they call
15 it the westbound trains, stop to unload or to
16 clear the rail crossings. We've had
17 conversations with them.
18    The Borough of Emerson is still not
19 satisfied on how these traffic signals are
20 working in conjunction with New Jersey Transit.
21 We're still looking to do some type of
22 adjustments in the timing to, to lessen the
23 recovery time necessary once a train comes in to
24 clear Kinderkamack Road on Linwood Avenue. We've
25 been asking for additional green time on Linwood

---

cross - by the Public                                  Page 180

1  Avenue in the off-peak hours to help service
2  those things.
3     So even though the construction has
4  stopped, we're still trying to get them back in
5  to make some adjustments with the operations of
6  the systems that are there.
7     But, again, as far as the railroad
8  crossing or the station is concerned, there have
9  been many discussions to try to get them to move
10 it northbound to unload the Linwood Avenue or at
11 least the Kinderkamack Road crossing in both
12 eastbound and westbound trains.
13    MS. VIOLA: Okay. Thank you.
14    MR. ASCOLESE: Again, we haven't
15 been, we haven't been too successful so far in
16 getting them to do that.
17    MS. VIOLA: Thank you.
18    CHAIRPERSON SCHWINDER: Thank you.
19 Yes.
20    MS. LITCHULT: Laura Litchult, 300
21 Kinderkamack Road, L-i-c-t-h-u-l-t.
22    I have a very basic question. I was
23 at a council meeting last week, and I understood
24 that the land off of Kenneth, Kenneth Avenue or
25 Drive, Kenneth, the ambulance corps building and

---

cross - by the Public                                          Page 181

1  19 Lincoln was needed to be given to JMF in order
2  for them to secure funding to purchase the land.
3      We're here talking about this tonight
4  and my basic question is, do they own these
5  properties yet?
6      CHAIRPERSON SCHWINDER: I believe
7  all the properties are under contract.
8      MR. FLANNERY: They're all under
9  contract other than the municipal piece, which is
10 per the redevelopment agreement to be acquired by
11 JMF.
12     MS. LITCHULT: So they don't own
13 them yet, they're under contract?
14     MR. FLANNERY: That's a typical
15 process. We're not going to close title on a
16 property until we have all the approvals and the
17 other entitlements in place.
18     MR. MARTIN: It's a condition.
19     MS. LITCHULT: I just wanted to make
20 sure. Because normally going in front of a
21 Planning or Land Use Board you would do what you
22 would do to the property that you own. That
23 would be like me saying, hey, I think want to --
24 I'm under contract and then if I'm drilling or if
25 they find -- if the DEP finds any issues with the

cross - by the Public                                          Page 182

1  drilling at Ranch cleaners or what have you, that
2  I'm sure is a condition of the sale.
3      MR. MARTIN: That's an excellent
4  point. That's exactly what's going on. The
5  gentleman over here, I remember you from -- yeah,
6  I remember you from the Kuiken Brothers
7  applications, too.
8      UNIDENTIFIED MALE: Yeah.
9      MR. MARTIN: It was litigation
10 involving two properties in this zone. The
11 litigation has resolved subject to this
12 application being approved. That's why I would
13 assume, I'm not sure, I didn't speak with them,
14 but those two owners are not here.
15     In addition to that, the municipal
16 piece or the one you just described.
17     MS. LITCHULT: There's two.
18     MR. MARTIN: Not that one. The one
19 you just described here, where you just answered
20 the question, that's also a condition and that's
21 the reason why I asked the governing body
22 members, any governing body members that would be
23 sitting on this board to step down, because
24 technically their part, it's not a personal
25 issue, it's a body politic where they're part of

cross - by the Public                                          Page 183

1  the agreement in terms of the sale and transfer
2  of the property, so I don't think that should be
3  involved in their decision-making process on
4  this. That's why I told them to step off.
5      MS. LITCHULT: I understand.
6      MR. MARTIN: But, anyhow, they're
7  all conditions. And the DEP I often have
8  applications that come before other boards and
9  this board for the last twelve years for me
10 subject to DEP approval, County approval. All of
11 it would have to be subject. I would put that in
12 the approval. If it was to be approved, I would
13 put that it. So your questions are excellent and
14 that's answer to them.
15     Now, I have a simple question. I
16 thought I was only missing one individual
17 tonight, but I completely blew yourfour address.
18     MS. LITCHULT: 300 Kinderkamack
19 Road.
20     MR. MARTIN: Thank you.
21     MS. LITCHULT: Thank you.
22     CHAIRPERSON SCHWINDER: Yes,
23 Ms. McGuire.
24     MS. McGUIRE: Jill McGuire, 154
25 Linwood Avenue.

cross - by the Public                                          Page 184

1      Earlier this year in the RB zone on
2  Linwood Avenue, there was an applicant who asked
3  for a variance request for a 10, 10-family house
4  and it was denied because of traffic conditions.
5  There was a lot of concerns expressed.
6      Subsequent to that, there was an
7  applicant on Linwood and Kinderkamack that a 10,
8  10-unit project is now approved and it hasn't
9  been constructed yet. There was no traffic study
10 done at that time, but I just wanted to bring it
11 to your attention that I think a traffic study
12 should be done. We're talking about this, these
13 units plus the upcoming project that's going on
14 Linwood and Kinderkamack. So that's two projects
15 that are going to be going forward at the same
16 time. And how could you in good faith move
17 forward with approving this applicant when no
18 traffic study has been conducted?
19     I really feel that you have to ask
20 them to do a traffic study between the two
21 different projects that are going to be taking
22 place in the near future.
23     And one more quick question. That
24 project on Kinderkamack and Linwood, it's not
25 memorialized yet. And I really want to know, is

cross - by the Public                                    Page 185

1   there a deadline for memorializing, like getting
2   a resolution memorialized? Because that was
3   approved in August. It was supposed to be
4   memorialized in September, and it has never been
5   rescheduled and we're in December.
6         MR. MARTIN: That's true.
7         MS. McGUIRE: It is true. What's
8   going on?
9         MR. MARTIN: We're only here for the
10  other application.
11        MS. McGUIRE: Oh, sorry.
12        MR. MARTIN: No, no. I'm fine. I'm
13  waiting for the applicant's information and
14  that's okay. They're entitled to address
15  whatever they want to address and present back.
16        MS. McGUIRE: Is there a deadline
17  for a memorialization?
18        MR. MARTIN: It has not occurred
19  yet. It's within a year.
20        MS. McGUIRE: Within a year. Okay.
21  Thank you. I really respectfully request that
22  you ask for a traffic study. I think it would be
23  wrong if you do not. I asked for that for the
24  project on Linwood and Kinderkamack and it was
25  not done. I'm asking again. Thank you.

cross - by the Public                                    Page 186

1         (Applause.)
2         MS. BALLAS: Hello, my name is Lina
3   Ballas, B-a-l-l-a-s, 101 Patrick Avenue.
4         I agree with the prior speaker that a
5   traffic study needs to be done because all the
6   years I've been living in Emerson, about nine,
7   the traffic is getting worse and worse and worse.
8   So this project is going to make the traffic
9   worse, and you're idling ten minutes here when
10  the train comes in. Ten minutes here is taking
11  out too much time every day.
12        Also, I'd like clarification
13  regarding the 42-inch pipe that's going to be
14  draining off Lincoln as to where it's going to
15  drain to. I think it's on Lincoln, but it's
16  going to drain someplace else.
17        CHAIRPERSON SCHWINDER: Mr.
18  Ascolese?
19        MR. ASCOLESE: They're as part of
20  the Municipal and County project. There was a
21  42-inch pipe with a large chamber that was
22  constructed in front of vape store. That chamber
23  is about 6 feet wide, maybe 8 feet long, probably
24  6 to 8 feet deep. The County actually
25  constructed a sleeve on the north side of that

cross - by the Public                                    Page 187

1   chamber to accept this anticipated 42-inch pipe.
2         The County also increased the
3   drainage system from a point south of the front
4   of the vape store all the way down to the
5   drainage ditch down by the DPW yard. So they
6   installed not only a 42-inch pipe on
7   Emerson -- near Emerson Plaza West as well as
8   Linwood Avenue. They also put in twin 30-inch
9   pipes underneath Kinderkamack Road because they
10  couldn't fit the 42-inch pipe, but they wanted to
11  keep the same capacity.
12        So the structure, the infrastructure
13  for increasing the drainage to be connected to
14  Lincoln Boulevard has been installed as part of
15  the County/Municipal project. And this developer
16  is required as part of this approval, if they get
17  the approval, to extend that 42-inch pipe up to
18  Lincoln Boulevard to help cure the issues that we
19  have with flooding on Lincoln Boulevard.
20        So all of this water is going to to
21  run south in that ditch right past the DPW yard
22  and into the wetlands south of the DPW yard.
23        MS. BALLAS: Okay. Thank you. I
24  think everybody should really consider this issue
25  and not rush to get this through in a quick

cross - by the Public                                    Page 188

1   order. It should take time and multiple meetings
2   to sort it out. Thank you.
3         (Applause.)
4         CHAIRPERSON SCHWINDER: Thank you.
5   Yes, sir.
6         MR. PETROW: Good evening.
7         CHAIRPERSON SCHWINDER: Good
8   evening.
9         MR. PETROW: It's been a while, Bob
10  Petrow, P-e-t-r-o-w, 21, 23, 33, 50 Chestnut
11  Street, Emerson, New Jersey.
12        I have a couple of questions. Mr.
13  Martin, it may be addressed to you possibly.
14        MR. MARTIN: Mr. Petrow, good to see
15  you outside of church.
16        MR. PETROW: There are monitoring
17  wells on the old gas station property, is that
18  correct?
19        MR. MARTIN: That's the engineer's
20  question.
21        MR. ASCOLESE: Yes.
22        MR. PETROW: Sorry. Wrong guy.
23        MR. ASCOLESE: Yes.
24        MR. PETROW: I didn't see you in
25  church though.

1    MR. PETROW: Have there been phase
2  1, 2, 3 reports on those wells?
3    MR. ASCOLESE: I have no idea. I
4  asked for the developer to include it on the plan
5  and take it into consideration. I know our
6  department has done an environmental statement
7  for two of the properties. I don't know the
8  status of the monitoring well reviews, how much
9  longer they have to stay under operation.
10    MR. PETROW: It should be ten years
11  I think.
12    MR. ASCOLESE: I don't know. I
13  don't know how long they're there.
14    UNIDENTIFIED MALE: It's ten years.
15    MR. PETROW: Well, is it fair to say
16  that, that if we don't know what's down there,
17  how can you vote on this? And if I, if I would
18  go further with it, the cleaners, what was done
19  at the cleaners? How do you we know that, that
20  there's no pollution in the aquifer?
21    MR. ASCOLESE: Our department
22  prepared two reports for the Borough of Emerson
23  for two of the properties, the restaurant
24  property and the Cork and Keg and cleaner
25  property. Those texts are about 200 something

1  pages. I'm not intimately familiar with them.
2  Our environmental staff is. I don't know what
3  the status of it is.
4    All I have indicated to you and to
5  the Board is that whatever needs to be done to
6  abandon those wells has to follow the EPA
7  protocol, DEP protocol.
8    MR. PETROW: Well, would it be fair
9  to say then that, that how can you vote on this
10  if you don't know what's under that ground?
11    MR. ASCOLESE: I believe, again,
12  those reports have been prepared for the Borough,
13  have been supplied to the developer. And as part
14  of this approval were it to go forward, any and
15  all requirements to satisfy the DEP regarding
16  those wells needs to be accommodated.
17    MR. MARTIN: And also in terms of
18  any kind of laundry cleanup or anything like that
19  would have, it would have to be satisfied.
20    MR. ASCOLESE: Yes.
21    MR. MARTIN: It all would have to be
22  satisfied. So if there is a Board approval as to
23  site plan, Bob, the DEP would have to say that
24  the site is used to be -- is allowed to be built
25  upon, if it's not.

1    MR. PETROW: All right. Well, if I
2  may expand a little bit more, there are contracts
3  in place on these properties? Yes? No?
4    MR. MARTIN: That's my
5  understanding. That's why I asked the governing
6  body representatives to step down, but I was not
7  involved in those.
8    MR. PETROW: Okay. I may be a
9  little rusty on this, but isn't it a fact that
10  before the property is transferred, isn't it,
11  isn't it a State law that the property has to
12  have a clean bill of health?
13    MR. MARTIN: I don't know about
14  that, but it would be -- I would put it into my
15  contracts that it would have to comply with.
16    MR. PETROW: In other words, can it
17  be transferred, with a questionable bill of
18  health?
19    MR. MARTIN: If there was a hazard,
20  I wouldn't want anything like that, so I would
21  hope that's included in the agreement.
22    MR. PETROW: You know, I thought
23  that was a requirement of the State that the
24  property cannot be transferred unless it had a
25  clean bill of health.

1    MR. MARTIN: I started at the
2  Attorney General's office in the environmental
3  section. I know if the property is transferred
4  they can go back after the prior owners. You
5  might have heard of that, too.
6    MR. PETROW: So you're saying it's,
7  you're saying that it is appropriate then to sell
8  it with a questionable bill of health?
9    MR. MARTIN: I would -- if I was
10  purchasing a property I would want to make sure
11  that it's got an Environmental Impact Statement.
12  I don't know. Mr. Flannery, were there any
13  environmental impact statements done on the
14  property?
15    MR. FLANNERY: I don't know. I
16  can't comment on it.
17    MR. PETROW: Another "I don't know."
18    MR. FLANNERY: And it's irrelevant.
19    (Applause.)
20    MR. PETROW: I rest my case. Thank
21  you. He don't know.
22    MR. MARTIN: Well, it would have to
23  satisfy all environmental requirements.
24    UNIDENTIFIED MALE: You can sell it
25  as is.

1  CHAIRPERSON SCHWINDER: Any other
2  hands?
3  MR. PRICE: There was a first time.
4  I'm going to try again. Billy Price again, 9
5  Emwood Drive.
6  They made a point about out something
7  being put on Linwood Avenue. Is that next to the
8  gas station?
9  CHAIRPERSON SCHWINDER: Yes, but
10  that's not the subject of tonight's meeting.
11  MR. PRICE: I can't talk about
12  that?
13  AUDIENCE: No.
14  CHAIRPERSON SCHWINDER: No, you
15  cannot talk about that tonight.
16  MR. PRICE: Can I talk about how
17  it's going to effect traffic on Linwood Avenue?
18  CHAIRPERSON SCHWINDER: The only
19  subject that we're discussion tonight is Block
20  419.
21  MR. PRICE: All right. I won't ask
22  anybody any questions. We already know there's
23  something going there and like the lady said, we
24  need a traffic study. We know we need a traffic
25  study. I go that way every day and depending

1  upon where the train is depends on what time I
2  go. So how do I, you know, like how do I make my
3  appointments? 15 minutes, 20 minutes ahead of
4  time. I get there half an hour ahead of time.
5  Ridiculous, but that, to put something over there
6  next to that gas station, it's absurd, it's like
7  we can't even get out. I, one Sunday --
8  CHAIRPERSON SCHWINDER: Mr. Price.
9  MR. PRICE: -- one Sunday --
10  CHAIRPERSON SCHWINDER: Mr. Price,
11  please.
12  MR. PRICE: What?
13  CHAIRPERSON SCHWINDER: We are not
14  discussing Linwood Avenue Kinderkamack Road at
15  the Valero station.
16  MR. PRICE: I've been disgusted
17  there because of the traffic.
18  CHAIRPERSON SCHWINDER: We are
19  discussing 419, Block 419.
20  MR. PRICE: We were at the light on
21  Sunday and we stopped at the light and the train
22  came and we were there for five minutes waiting,
23  nothing, nothing going either way left or right,
24  but yous got stuck there for 5 minutes and there
25  was nothing happening, Sunday afternoon.

1  CHAIRPERSON SCHWINDER: We live in a
2  town with a railroad passing through it.
3  MR. PRICE: Yeah.
4  CHAIRPERSON SCHWINDER: Thank you.
5  Any other comments? Yes.
6  MRS. SCALA: My name is Annette
7  Scala. My husband owns Cork and Keg on Block 419
8  and I heard a question asked here tonight.
9  What would be a --
10  MR. MARTIN: What's your address?
11  MRS. SCALA: Sorry?
12  MR. MARTIN: What's your address?
13  UNIDENTIFIED MALE: 188.
14  MRS. SCALA: My address?
15  MR. MARTIN: Your home address.
16  What's your address?
17  MRS. SCALA: Home address, 400
18  Adolphus Avenue in Cliffside Park.
19  MR. MARTIN: Thank you.
20  MRS. SCALA: You're welcome. The
21  question was, what was JMF going to do to help
22  the business relocate or help us get through the
23  situation with us being taken down? How do I
24  find that answer? What happens in the meantime?
25  What goes on with my family? Can anybody tell me

1  that?
2  CHAIRPERSON SCHWINDER: Ms. Bogart,
3  would you please answer what the requirement is
4  of the redevelopment?
5  MR. DOYLE: Actually, why don't I do
6  that? Since I'm the redevelopment counsel for
7  the City.
8  CHAIRPERSON SCHWINDER: Please,
9  introduce --
10  MR. DOYLE: My name -- sure. My
11  name is Doug Doyle.
12  CHAIRPERSON SCHWINDER: Mr. Doyle,
13  step up to the microphone.
14  MR. DOYLE: My name is Doug Doyle.
15  I'm the redevelopment attorney for the Borough of
16  Emerson. Good evening, everybody. Good evening,
17  members of the public. The governing body
18  adopted what's known as a relocation assistance
19  work plan that guarantees that businesses like
20  yourself will be given the appropriate
21  opportunities to relocate within the municipality
22  and be given the funds to relocate within the
23  municipality.
24  In fact, I believe you're represented
25  by Sean Massey. I've been in contact with Mr.

cross - by the Public                                    Page 197

1  Massey.  I've told Mr. Massey that he needs to
2  present to us so that we in turn can present it
3  to the developer the amount of money you think
4  you'll need to relocate in town.
5     For the last several months, I've
6  been urging Mr. Massey to go and find a location
7  in town so that I can get it before the governing
8  body, so that we can either move to amend the
9  zoning ordinances, if necessary, to make sure
10 that you can relocate in the town because you're
11 a town institution, we want to make sure you're
12 here.
13    So I'm going renew my request.
14 Please have Sean get in touch with me so we can
15 help relocate you and we can minimize any expense
16 associated with making sure that we keep you here
17 in town.
18    MRS. SCALA: Can I ask what happens
19 if there is no place for us to go in town?
20    MR. MARTIN: Well, why don't -- Mr.
21 Doyle, she's represented by counsel.  Can you
22 just give Mrs. Scala your number so --
23    MR. DOYLE: Sure, absolutely, I'd
24 be happy to.
25    MR. MARTIN: -- to ask Mr. Massy.

cross - by the Public                                    Page 198

1     If you've reached out and now you've
2  represented by and know that you did, I hope he
3  would contact you and at least give an answer to
4  his client.
5     MR. DOYLE: Sure, absolutely.  I'm
6  sure he would.
7     MR. MARTIN: Thank you.
8     MRS. SCALA: Thank you.
9     CHAIRPERSON SCHWINDER: Mr. Doyle?
10    MR. DOYLE: Yes.
11    CHAIRPERSON SCHWINDER: There is
12 another business owner I see in the back of the
13 room.
14    MR. DOYLE: I'll make sure they get
15 my number.
16    CHAIRPERSON SCHWINDER: The owner of
17 the Cozy Corner Cafe.
18    MR. DOYLE: Okay.
19    CHAIRPERSON SCHWINDER: Raise your
20 hand, please?
21    Thank you.
22    MR. DOYLE: I'll make sure they both
23 get the number, Mr. Chairman.
24    CHAIRPERSON SCHWINDER: Thank you.
25    MR. DOYLE: Thank you.

cross - by the Public                                    Page 199

1     CHAIRPERSON SCHWINDER: Anyone else,
2  please?  Mayor-elect DiPaolo.
3     MAYOR-ELECT DiPAOLO: I just, I need
4  clarification.  When somebody asked about whether
5  or not the dry cleaning property was clean enough
6  to put housing on for the health and well-being
7  of those future residents, you don't know that,
8  if we could build on that property yet?  And what
9  if --
10    MR. FLANNERY: We'll likely be able
11 to.  That's going to --
12    MAYOR-ELECT DiPAOLO: I have a
13 second question, wait, let me.  And if you can't
14 build on that property, it's contaminated, what
15 happens?  The whole plan is contingent on that
16 property, right?
17    MR. FLANNERY: Correct, right.
18    MAYOR-ELECT DiPAOLO: So at what
19 point --
20    MR. FLANNERY: It has nothing to do
21 with this approval.
22    MAYOR-ELECT DiPAOLO: At what point
23 will you know that's so?
24    MR. FLANNERY: At some point down
25 the development line, but not right now.  It's

cross - by the Public                                    Page 200

1  not something --
2     MAYOR-ELECT DiPAOLO: Do you have a
3  time frame on that?  I mean, what if they start
4  building and then they realize that the ground is
5  contaminated from the dry cleaning and --
6     MR. MARTIN: May I be heard?
7     Miss Di Paolo, you make an excellent
8  point, again, like some other people have made in
9  that regard.  I think you know the resolution's
10 all contingent upon all State approvals local as
11 well as State/County approvals and that would be
12 subject to the DEP in terms of whether the
13 property is clean or not.
14    I have no reason to think it's not,
15 but I didn't do any investigation on it.  The
16 redevelopment counsel might know.  Mr. Flannery
17 might now.  I do not know.
18    However, I can tell you one thing,
19 and you're familiar with my resolutions, it would
20 be contingent upon that being satisfactory to the
21 State and County.  If it's not, the development
22 can't go forward.
23    MAYOR-ELECT DiPAOLO: So there's no
24 shovels in the ground, there's no demolition
25 until that property has a clean bill of health?

cross - by the Public                                    Page 201

1      MR. MARTIN: Well, is there a need
2  for an environmental impact statement or not?
3  They have to answer that question, and if there
4  is, they better get somebody in pre approval.
5  And if they don't and something comes up, the
6  engineers will stop the project and it will be
7  cleaned up.
8      MR. FLANNERY: We're in the process
9  of doing due diligence. We're investigating
10  environmental condition of the property, but we
11  just don't have answers yet. And that's
12  something that it's going to be conditioned on
13  any approval.
14      MAYOR-ELECT DiPAOLO: When maybe
15  you'll have an answer?
16      MR. FLANNERY: The next few months
17  probably, right?
18      MAYOR-ELECT DiPAOLO: So what is
19  the timeline for you to put bulldozers, I guess,
20  not shovels in the ground?
21      MR. FLANNERY: It's all about
22  obtaining all of the necessary agency approvals,
23  that runs all the conditions of any approval,
24  including our due diligence, lining up financing,
25  closing the property. There are lots of steps

cross - by the Public                                    Page 202

1  that need to be taken before any development
2  begins.
3      MAYOR-ELECT DiPAOLO: What is the
4  soonest you think that the project would begin?
5      MR. FLANNERY: Probably about six
6  months.
7      MAYOR-ELECT DiPAOLO: Six months?
8      MR. FLANNERY: The soonest.
9      MAYOR-ELECT DiPAOLO: And the
10  latest?
11      MR. FLANNERY: The latest, I don't
12  know.
13      MAYOR-ELECT DiPAOLO: How long will
14  you be waiting for --
15      MR. KLUGMAN: If there's
16  contamination on the property it can take who
17  knows how many years.
18      MAYOR-ELECT DiPAOLO: That's my
19  question, if there's contamination how long could
20  it take?
21      MR. KLUGMAN: Until we clean it up.
22  There's no answer for that.
23      MAYOR-ELECT DiPAOLO: And how long
24  does it take to usually clean up the
25  environmental --

cross - by the Public                                    Page 203

1      (Identification request for the
2  Record.)
3      MR. KLUGMAN: Jack Klugman. It
4  depends how bad it is. It depends on how bad the
5  contamination is.
6      MAYOR-ELECT DiPAOLO: So I, from
7  what I understand there's something called, and
8  correct me if I'm wrong, perca?
9      MR. KLUGMAN: Perc, the dry cleaning
10  sanitizer.
11      MAYOR-ELECT DiPAOLO: Perc, but
12  there's a long -- how long does it usually take
13  to clean that up, do you know, from future --
14  from past experience?
15      MR. KLUGMAN: That I --
16      MR. FLANNERY: Mr. Klugman is not an
17  environmental expert and really can't comment on
18  that at this time.
19      MAYOR-ELECT DiPAOLO: Okay. All
20  right. Thank you.
21      CHAIRPERSON SCHWINDER: Thank you.
22      MR. MARTIN: If the site's
23  contaminated they can't do anything.
24      MR. BRESA: It has to be remedied
25  ultimately.

cross - by the Public                                    Page 204

1      MR. MARTIN: It should be.
2      MR. BRESA: Right, or based on
3  standards.
4      MR. MARTIN: And, quite frankly, if
5  they do transactions on the site the other
6  agreements might be have to be involved, too.
7      MR. BRESA: Yeah, oh, yeah.
8      MR. MARTIN: Well, I said that
9  already.
10      CHAIRPERSON SCHWINDER: Any other
11  hands?
12      Seeing no hands. I'll entertain a
13  motion to close to the public.
14      MR. BRESA: A motion.
15      CHAIRPERSON SCHWINDER: Second?
16      MR. DeORIO: Second.
17      CHAIRPERSON SCHWINDER: All in, all
18  in favor?
19      (All Board members stated "Aye.")
20      CHAIRPERSON SCHWINDER: Opposed?
21      Okay. I would just like to make one
22  comment in response to some things that people
23  have said. I've been on this board for six, six
24  years, maybe more. I've worked with a variety of
25  Emerson residents who are committed to this town,

1  who love this town, who have raised their
2  families in this town, and they are serving the
3  community to the best of their abilities and with
4  their heart in the right place.
5      Not all of us agree. You have
6  friends. We have friends. We talk. We don't
7  meet. We don't socialize. We come here and meet
8  and discuss the facts and the issues. This
9  happens to be one that has been under discussion
10  for years and years.
11     We all want to see this town look
12  better. I know there are some people who said or
13  somebody said, I've been living in Emerson for
14  six or seven years and traffic keeps getting
15  worse. Has there been a big development in
16  Emerson that has caused traffic to get worse?
17  No. It's coming from people on, crossing through
18  Emerson on one of the busiest roads in the
19  county. Do we have to stop our progress while
20  other communities are building?
21     Take a look on, in River Edge. Look
22  at what they're building right on Kinderkamack
23  Road. I just want to share this because we all
24  have different views. We talk to people in town
25  as well. They may not agree with you. They're

1  not here. I can't -- and I understand there was
2  a recent vote and things are going to change
3  politically in town. Things are going change on
4  this board, but we are a dedicated board and we
5  are committed to this community to do what we
6  think is right.
7      And tonight I'm going to ask this
8  board if we are going to vote on this project and
9  I will ask for either a yea or a nay as to
10  somebody who is going make a motion, and we do it
11  with the best that we can think of for this town.
12  And, like I said, we're dedicated to this town
13  and we love it as much as you do.
14     MR. PRICE: No, you're not. That
15  building is two stories high in River Edge, two
16  stories high.
17     CHAIRPERSON SCHWINDER: Excuse me.
18     MR. PRICE: And it's not intrusive
19  at all.
20     CHAIRPERSON SCHWINDER: Excuse me,
21  the public portion is over.
22     MR. PRICE: You're wrong. You're
23  wrong about that one. I'm leaving. Don't worry
24  about it.
25     (Applause.)

1      CHAIRPERSON SCHWINDER: Anyway, are
2  there any other comments, questions of our board
3  members on this project? Any other discussion?
4      MR. BRESA: No.
5      MR. CIMINO: No.
6      CHAIRPERSON SCHWINDER: Okay.
7      MR. BRESA: They satisfied my
8  questions for tonight.
9      CHAIRPERSON SCHWINDER: Okay. Then
10  I will entertain a motion on this particular
11  issue, on this application.
12     MR. BRESA: I'll make that motion.
13     CHAIRPERSON SCHWINDER: Make a
14  motion to?
15     MR. BRESA: To vote for this
16  applicant to move put on this application.
17     CHAIRPERSON SCHWINDER: In favor of
18  this application?
19     MR. BRESA: In favor of this
20  application.
21     CHAIRPERSON SCHWINDER: Do I have a
22  second?
23     MR. McKENDRY: I'll second it.
24     CHAIRPERSON SCHWINDER: We have a
25  second. Okay. Roll call, please.

1      SECRETARY SHUST: Mr. Adams?
2      MR. ADAMS: Abstain.
3      SECRETARY SCHUST: Mr. Bresa?
4      MR. BRESA: Yes.
5      SECRETARY SHUST: Mr. Cimino?
6      MR. CIMINO: No.
7      SECRETARY SHUST: Mr. DeOrio?
8      MR. DeORIO: Yes.
9      SECRETARY SHUST: Mr. Malone?
10     MR. MALONE: Yes.
11     SECRETARY SHUST: Mr. McKendry?
12     MR. McKENDRY: Yes.
13     SECRETARY SHUTS: Mr. Reiger?
14     MR. REIGER: Yes.
15     SECRETARY SHUST: Mr. Sudano?
16     MR. SUDANO: No.
17     SECRETARY SHUST: Mr. -- Chairman
18  Schwinder?
19     CHAIRPERSON SCHWINDER: Yes.
20     SECRETARY SHUST: I have six yeses
21  and two nos.
22     CHAIRPERSON SCHWINDER: Six yeses
23  and two nos.
24     SECRETARY SHUST: And one abstain.
25     MR. MARTIN: And one abstain.

cross - by the Public                                    Page 209

1      CHAIRPERSON SCHWINDER: And one
2  abstention.  So the applicant -- the application
3  passes.
4      MR. FLANNERY: Thank you very much.
5      CHAIRPERSON SCHWINDER: I would
6  caution the applicant to take into account what's
7  been said tonight.  There were a lot of important
8  issues raised by the public regarding many
9  different aspects of this project.
10     MR. FLANNERY: Yes.
11     CHAIRPERSON SCHWINDER: And I would
12  hope that you would address all of them.
13     MR. FLANNERY: Yes.
14     CHAIRPERSON SCHWINDER: And that's
15  all I can say right now.
16     FEMALE VOICE: You should be ashamed
17  of yourselves.
18     CHAIRPERSON SCHWINDER: Any board
19  member?  For the welfare, I'll entertain a motion
20  adjourn.  Second?
21     MR. BRESA: I'll second.
22     CHAIRPERSON SCHWINDER: All in
23  favor?
24     (All Board members stated "Aye.")
25     CHAIRPERSON SCHWINDER: Opposed?

---

cross - by the Public                                    Page 210

1      We are adjourned at 10:45 p.m.
2      (Meeting ended.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 211

1              C E R T I F I C A T E
2
3          I CERTIFY that the foregoing is a
4  true and accurate transcript of the testimony as
5  taken by and before me stenographically at the
6  time and place aforementioned.
7          I FURTHER CERTIFY that I am neither
8  attorney for nor counsel to any of the parties;
9  parties of any of the attorneys in this action;
10  and that I am not financially interested in the
11  outcome of this case.
12
13
14
15
16          RENEE RUSSO, CCR, CRCR, RPR, CRR
17          Certificate No. XI00143700
18
19
20
21
22
23
24
25

**$**

**$4 (1)**
152:18

**A**

**A-1 (3)**
7:1,4;18:14
**A-1.10 (1)**
82:20
**A-1.20 (1)**
72:4
**A-2 (6)**
14:9,10,11;18:15,
16,17
**A-2.10 (1)**
76:8
**A-2.20 (1)**
121:4
**A-3 (3)**
18:22;19:17;126:25
**A-4 (3)**
70:8,8,10
**A-5 (4)**
71:23,24;72:1;
100:8
**A-6 (8)**
75:25;76:1,2,14;
100:7,9,11,13
**A-7 (3)**
78:9,15,17
**A-8 (2)**
80:25;81:6
**abandon (1)**
190:6
**abide (1)**
106:10
**abilities (2)**
55:19;205:3
**ability (4)**
49:7;51:18;108:22;
109:6
**able (5)**
53:15;73:17;94:18;
132:21;199:10
**above (13)**
4:9;20:19;22:19;
23:17;45:6;48:4;
49:10;50:15,16;
53:18;83:19;113:1;
120:21
**absolute (1)**
165:13
**Absolutely (3)**
79:5;197:23;198:5
**Abstain (3)**
208:2,24,25
**abstention (1)**
209:2
**absurd (2)**
151:22;194:6

**accept (2)**
6:23;187:1
**acceptable (1)**
129:4
**access (36)**
17:15,17;18:1,3,6;
20:4,13,17,17,21;
22:8,10,11;23:10;
25:13,25;26:1,2;
46:19,21;47:2,3;51:8;
53:10;74:23;75:6;
90:14,15;97:5;98:3,4,
11;99:4;109:1;
128:11,17
**accessed (1)**
48:2
**accesses (1)**
17:20
**accessibility (1)**
128:18
**accessible (4)**
62:15;102:9,10,16
**accessing (1)**
53:17
**accommodate (7)**
26:16;36:18;50:4;
52:19;92:14;129:9;
132:21
**accommodated (3)**
38:22;109:11;
190:16
**accommodation (2)**
97:18;98:15
**accomplishment (1)**
178:13
**accordance (4)**
9:24;52:24;53:9;
139:1
**according (1)**
116:3
**account (5)**
22:6;126:18;
130:22;131:10;209:6
**Ackerman (2)**
177:18,21
**acknowledge (1)**
148:7
**acquire (1)**
9:10
**acquired (1)**
181:10
**acre (3)**
27:24,24;28:4
**acres (4)**
7:12;28:5,6;113:8
**across (9)**
15:20;16:1;26:16;
72:13;85:22;107:3;
160:12;170:8;177:19
**Act (1)**
4:5
**action (2)**
8:15;9:6

**activity (14)**
54:16;73:2,7,8,9,10,
11,12;74:8,14,21;
80:10,15,20
**actually (18)**
15:14;34:2;43:11;
49:22;50:16;55:6;
65:15,17;119:23;
120:21;133:15;
141:19,23;145:21;
146:12;152:22;
186:24;196:5
**ADA (6)**
61:9,17,25;102:5;
128:18;179:2
**Adams (65)**
4:23,24;92:12,19;
93:10,12;102:17,22;
112:8,10,16,20,24;
113:14,16,19,23;
114:1,7,11,20,25;
115:5,14,20;116:2,7,
21,25;117:6,14,20,24;
118:3;119:20;120:1,
7,10,23;121:2,6,8,12,
17;122:7,10,18,22;
123:1,4,6,11,16,19,22,
25;124:6,9,12,15,18,
22;144:24;208:1,2
**add (6)**
64:20;74:9;116:20;
122:16;126:23;
131:24
**added (5)**
74:21;85:2;86:9,21;
157:7
**adding (1)**
29:20
**addition (8)**
30:1;32:14;33:15;
47:15;51:25;107:13;
151:5;182:15
**additional (10)**
22:15;34:6;84:19,
22;85:2;86:23;113:7;
151:4;178:23;179:25
**Additionally (11)**
14:23;15:7;16:6;
18:4;20:8;22:8;27:16;
28:22;29:4;30:9;
33:11
**address (24)**
12:14;34:18;36:2;
41:15;61:21;63:17,
23;64:3;66:10;68:9;
82:13;102:4;111:24;
169:9;183:17;185:14,
15;195:10,12,14,15,
16,17;209:12
**addressed (4)**
39:1;62:2;133:18;
188:13
**adequate (3)**

**activity** — continued
50:3,20;52:19
**adieu (2)**
10:13;159:2
**adjacent (4)**
15:18;21:23;22:5;
30:16
**adjourn (1)**
209:20
**adjourned (1)**
210:1
**adjusting (1)**
56:12
**adjustments (2)**
179:22;180:5
**administration (2)**
159:22,24
**Adolphus (1)**
195:18
**adopted (2)**
7:21;196:18
**advantage (1)**
45:2
**adverse (1)**
163:7
**advocate (1)**
8:14
**aerial (8)**
14:1,4,8;15:11;
18:10,19;19:20,21
**Affidavit (1)**
6:25
**affiliate (1)**
8:4
**affordable (14)**
8:14,17,20,25;9:4,
8;23:4;133:16,24;
138:10;153:22;158:7;
175:10,17
**afraid (1)**
166:15
**afternoon (1)**
194:25
**again (27)**
14:17;21:2;33:13;
34:15;47:9;71:17,17;
72:7;75:11;81:17;
82:19;87:10;96:19;
100:25;126:24;
129:23;143:17;
165:18;169:9;174:13;
180:7,14;185:25;
190:11;193:4,4;200:8
**against (3)**
74:25;171:11;
177:11
**age (1)**
130:2
**agencies (4)**
32:19;44:21,22;
148:24
**agency (1)**
201:22
**ago (3)**

**ago** — continued
94:4;153:20;165:19
**agree (9)**
103:12;105:3;
135:13;148:25;
158:21;160:6;186:4;
205:5,25
**agreeable (1)**
104:17
**agreed (1)**
175:25
**agreement (17)**
8:7,10,13,22;10:24,
24;62:22;101:13,20,
25;133:14;134:5;
158:14;159:2;181:10;
183:1;191:21
**agreements (1)**
204:6
**Ah (3)**
66:15;75:23;76:2
**ahead (7)**
39:4;44:10;69:25;
71:15;147:21;194:3,4
**AIA (3)**
66:24;68:13,14,24
**aid (2)**
16:4,15
**aisle (2)**
22:23;90:24
**aisles (1)**
52:23
**align (1)**
145:5
**alignment (1)**
107:5
**Allegiance (1)**
4:19
**alleviate (2)**
27:14;127:23
**Allison (2)**
150:21;171:6
**allocate (1)**
63:2
**allow (2)**
98:1;175:25
**allowance (1)**
112:13
**allowed (5)**
112:11;116:8;
119:23;168:5;190:24
**allowing (1)**
98:2
**allows (4)**
25:23;49:10;72:20;
74:1
**alluded (1)**
31:16
**almost (2)**
9:1;156:25
**alone (2)**
158:6;172:19
**along (35)**
14:19,24;16:20;

**anticipating (3)**
80:1;95:14;108:23
**anticipation (1)**
104:14
**antiquated (1)**
46:20
**apartment (7)**
56:18;77:13;121:8;
122:8;168:9;169:25;
172:2
**apartments (8)**
83:19;119:10;
125:13;130:19;
145:19;158:25;168:7;
174:14
**apologies (1)**
16:14
**appeal (1)**
158:22
**appealing (1)**
158:18
**appeals (2)**
171:8,10
**appear (2)**
62:22;108:5
**appears (1)**
35:18
**Applause (23)**
142:2;150:19;
153:4,12;159:7;
161:9,24;163:24;
164:15;166:2;167:4;
168:3,21;170:23;
173:5;174:2;175:3,
21;176:7;186:1;
188:3;192:19;206:25
**applicant (14)**
6:20;8:4;9:9,13;
10:3;43:6;111:7,9;
184:2,7,17;207:16;
209:2,6
**applicant's (1)**
185:13
**application (28)**
6:5,23;7:6;9:14;
10:2;11:1,7,11,16;
15:6;35:9,11;71:2;
133:22;141:16,23;
148:12,15;149:24;
150:5,6;182:12;
185:10;207:11,16,18,
20;209:2
**applications (2)**
182:7;183:8
**apply (3)**
56:16;57:20;112:13
**appointments (1)**
194:3
**appreciable (1)**
128:7
**appreciate (3)**
6:25;72:24;170:18
**approach (2)**

173:3,4
**appropriate (9)**
4:16;94:19;104:13;
137:22;138:22;139:9;
179:4;192:7;196:20
**approval (20)**
9:17;10:4,6;32:13;
33:7;101:16;134:9;
148:22;150:2;183:10,
10,12;187:16,17;
190:14,22;199:21;
201:4,13,23
**approvals (6)**
32:16;91:10;
181:16;200:10,11;
201:22
**approve (4)**
33:2,4,9;149:5
**approved (12)**
8:11;52:13;58:19;
101:17;134:20;
138:16;139:1;153:21;
182:12;183:12;184:8;
185:3
**approving (2)**
149:18;184:17
**approximately (10)**
53:21;56:9;57:4;
64:9,24;86:20;93:1,
14;110:12;125:25
**aquifer (1)**
189:20
**architect (34)**
20:1;21:3;34:1,9,
15;35:1,3,16;36:3;
37:6;38:3;40:2,19;
52:8;54:4,11;61:10,
13,21;62:2,4;63:19,
22;64:3;67:2,13;
68:13,17,18,21;69:24;
99:23;132:11;145:10
**architects (4)**
10:12;65:17,18;
129:7
**architect's (1)**
40:21
**architectural (3)**
53:8;82:18;103:3
**architecture (1)**
34:3
**area (39)**
7:12,13,18;15:13;
21:20;22:18;25:15,
17,18;26:3,7;28:5;
29:3,4,15;37:3;46:8;
47:21;52:17;54:14;
58:24;60:2,12;63:6,9;
83:22;84:3,4,5;86:5;
88:20;95:10;108:22,
25;110:8,10,14;
126:18;144:17
**areas (12)**
29:20;45:9;48:21,

23;50:10;51:18;
53:11;58:24;59:2,16;
91:17;131:24
**arm's-length (1)**
158:16
**arm-type (1)**
53:18
**Army (1)**
164:13
**around (17)**
15:20;20:6;29:9;
30:8;31:7;46:2;50:13;
75:12;81:15,17;
126:5;127:5,9;129:1;
154:12;165:21;
172:16
**arrive (1)**
56:18
**arterial (1)**
46:23
**artery (2)**
46:8;47:1
**articulation (1)**
82:8
**Ascolese (158)**
5:20,21;23:24;24:2,
7,10,13,19;25:4,11;
30:24;33:20,21;34:4,
11,14,20;35:4,5,8,14,
21;36:1;38:14,16;
54:20,25;55:21;56:6;
57:25;58:6,10,16;
60:22;61:1,5;62:18;
63:17,24;64:2,4;85:4,
7,11,15,18,23;86:2,7,
11,14,17,23;87:1,7,
12,14,17,20;88:1,5,
10,14,19;89:2,7,10;
90:1,4,9,13,16,21;
91:1,5,25;92:16,20,
23;93:1,3,7,14,17,22;
94:8,20;95:3,25;96:4,
15,19,23;97:14;98:12,
19,23,25;100:11;
106:20,21;107:10,13,
17,23;108:10;110:24;
111:3;112:2;113:2;
116:16,18;118:18,20;
119:5,9,12,19;120:25;
123:5,12,18,20,23;
124:1,8,10,13,16,20;
125:10;127:7,25;
128:5,20;129:11,12,
18,22;141:2;143:1,4,
10,14;178:9,14,20,22;
180:14;186:18,19;
188:21,23;189:3,12,
21;190:11,20
**Ascolese's (1)**
131:7
**ashamed (2)**
170:2;209:16
**aside (2)**

23;50:10;51:18;
53:11;58:24;59:2,16;
91:17;131:24
**aspects (3)**
65:20,21;209:9
**assent (1)**
158:15
**assessed (1)**
44:15
**assessment (1)**
45:25
**assistance (2)**
135:4;196:18
**associated (8)**
44:16;51:6;52:11,
15;60:4;64:21;103:5;
197:16
**Associates (3)**
10:11;66:20;68:6
**assume (3)**
135:22;163:2;
182:13
**assuming (4)**
88:24;110:15;
143:19,24
**at-grade (4)**
97:10,11;128:17,17
**attempting (1)**
9:10
**attention (1)**
184:11
**attorney (3)**
14:14;192:2;196:15
**audience (11)**
79:1,23;136:1,22,
25;148:8;149:7;
150:7;164:14;165:16;
193:13
**August (2)**
8:9;185:3
**available (2)**
14:8;162:19
**Avenue (43)**
7:9;14:23;15:17;
16:2,8,12;18:6,9;20:7,
14;27:12;28:15;29:8,
22;41:21;46:5;47:4;
81:12;85:9;127:22;
137:11;140:8;142:9;
143:8;153:14;159:15;
173:9;175:6;176:10;
177:1,8;179:24;
180:1,10,24;183:25;
184:2;186:3;187:8;
193:7,17;194:14;
195:18
**average (4)**
50:12
**away (11)**
60:4,5;80:8;92:24;
109:24;138:5;142:24;
154:16;158:23;
164:13;173:12
**Aye (3)**
136:15;204:19;

173:3,4

---

17:11,13;18:1;21:11,
16,19,21;23:14;
24:11;28:19;29:3,6,
11;30:3,13,21;36:8;
38:6;46:6,21,25;
57:13;74:15;79:19;
84:23;86:5,9;98:21;
108:23;113:4;122:25;
125:17
**alter (2)**
52:17;60:18
**alternates (1)**
148:10
**alternative (1)**
48:20
**although (2)**
28:3;157:24
**always (5)**
97:24;122:1,2,19;
144:16
**ambulance (1)**
180:25
**amenable (4)**
98:2,11;111:7,11
**amend (1)**
197:8
**amended (2)**
7:22;8:8
**amenities (2)**
9:22;107:3
**amenity (4)**
72:11,21;73:19;
75:2
**Among (1)**
8:3
**amount (8)**
9:4;51:1,21;58:7,
23;154:9;174:17;
197:3
**amounts (1)**
33:13
**anchor (1)**
57:13
**Angela (4)**
10:12;66:5;78:5;
80:23
**A-n-g-e-l-a (1)**
66:7
**Annette (1)**
195:6
**announce (1)**
35:11
**anomalies (1)**
31:2
**anomaly (1)**
152:9
**answered (4)**
88:22;161:5;
174:22;182:19
**anticipate (2)**
79:19;131:19
**anticipated (2)**
97:12;187:1

209:24

**B**

**baby (1)**
77:1
**bachelor (1)**
41:23
**back (46)**
7:20;27:18;29:10,
24;30:10;38:6,11;
46:22;72:24;73:16;
80:7,8;81:18;82:17;
83:25;87:14;91:3;
92:13;95:24;121:24;
122:14,16,21;126:24;
128:13;143:17;
144:16;147:25;149:9;
154:11;156:10;
160:15;168:7,9;
170:16;171:13;
173:24,24,25;176:5;
177:13,21;180:4;
185:15;192:4;198:12
**background (1)**
7:15
**backup (1)**
59:1
**backwards (1)**
167:12
**bad (2)**
203:4,4
**bag (1)**
172:23
**bait (2)**
153:18,24
**balance (2)**
102:11;148:3
**balconies (1)**
79:13
**balcony (2)**
77:11;79:20
**BALLAS (3)**
186:2,3;187:23
**B-a-l-l-a-s (1)**
186:3
**banks (1)**
152:25
**barrier (1)**
53:18
**barriers (1)**
58:25
**base (3)**
54:9;90:17;171:9
**based (14)**
28:11;31:2;35:23;
36:12;40:21;48:6;
50:25;52:3;56:15;
58:22;109:11;124:16;
160:4;204:2
**basic (2)**
180:22;181:4
**basically (6)**

21:22;70:18;80:8;
125:22;139:20;152:9
**basins (2)**
24:23;94:1
**basis (1)**
179:7
**bat (1)**
14:5
**BCUA (2)**
33:2,10
**beating (1)**
165:22
**beautiful (1)**
151:12
**becomes (1)**
72:22
**bed (3)**
21:25;22:1;29:17
**bedroom (10)**
49:1,2,20,23,24;
50:17;77:7;101:14,
19;163:11
**bedrooms (3)**
49:21;77:23;99:11
**beds (2)**
21:21;29:14
**beg (1)**
167:2
**begin (1)**
202:4
**begins (1)**
202:2
**behalf (1)**
6:20;43:6;111:8
**behind (8)**
154:24;155:2,5,7;
164:23;165:21;
174:12;177:15
**believes (1)**
151:19
**below (6)**
51:4;52:3;56:15;
83:2;155:5;157:13
**bend (1)**
165:22
**benefit (1)**
7:16;138:8;153:1
**benefits (3)**
138:11;153:2,3
**Bergen (4)**
32:23,25;92:6;
149:3
**besides (1)**
13:5
**best (7)**
8:2;55:19;158:3;
161:16;166:3;205:3;
206:11
**better (7)**
72:22;79:4,24;80:4;
158:10;201:4;205:12
**beyond (1)**
49:11;118:17;

178:11
**bid (1)**
8:1
**bidding (1)**
7:24
**big (8)**
57:12;137:7,8;
165:2;166:10;170:1,
11;205:15
**bigger (2)**
60:14;94:13
**Bill (6)**
10:11;191:12,17,
25;192:8;200:25
**billion (1)**
152:18
**Billy (2)**
164:2;193:4
**Bischoff (35)**
140:6,7,8,16,19,23;
141:3,7,13,22;142:3,
16,21,25;143:6,12,15;
146:14,25;147:6,8,13,
22;148:9;149:8,11,14,
20,23;150:11,16,22
**Bisgaier (1)**
6:19
**bit (13)**
11:25;78:1,25;
79:24;80:2;97:17;
141:9;143:23,23;
156:22,24;178:20;
191:2
**blacktop (1)**
15:12
**blew (1)**
183:17
**blind (1)**
38:8
**Block (9)**
7:10;14:15;108:5;
137:15;158:4;174:16;
193:19;194:19;195:7
**BMW (1)**
127:11
**Board (58)**
4:3,15;6:8,22;7:17;
9:14;18:14;19:7;
32:20,24;37:17;
41:18;44:24;46:7;
62:6;65:16;69:20;
78:8;80:5,24;81:5;
92:7;94:25;109:13;
131:12;135:8;136:15;
137:16,22;138:5,16;
141:19,23;142:5,6;
144:15;148:6,11;
149:2;150:3;154:1;
160:1,13;173:12;
175:2;181:21;182:23;
183:9;190:5,22;
204:19,23;206:4,4,8;

207:2;209:18,24
**boards (5)**
32:16;67:17;69:16,
22;183:8
**Bob (2)**
188:9;190:23
**body (13)**
10:20;11:5,9,15;
137:3,21;162:1;
182:21,22,25;191:6;
196:17;197:8
**Bogart (65)**
5:22,23;36:5,7,11,
20,24;37:2,7,12,15;
55:12,23;61:8,24;
95:6,11,17,20,24;
99:8,19,22;100:3;
101:1,8,9;102:3,4,7,
13,24,25;103:2,8,13,
17,24;104:20,24;
105:5,11,14,19;
106:12,19;115:7,10,
17;116:1,23;119:25;
127:5;133:12;134:4,
21;138:15,20,24;
139:12,19;167:21,24;
175:22;196:2
**Bogart's (1)**
55:14
**bollards (4)**
86:5,9;92:21,23
**Borough (36)**
4:5;7:17,23;8:3,6,7,
12;9:3,25;15:19;17:4;
21:11;29:1;30:2,15;
32:20;33:10;44:20;
45:4;51:9;92:7;98:13;
99:3;103:19;129:4;
138:7,8;140:13,19;
143:5;144:21;176:1;
179:18;189:22;
190:12;196:15
**Borough's (5)**
8:16;9:7;27:22;
29:18;138:23
**Boston (1)**
15:25
**both (7)**
44:4;55:18;65:18;
82:2;122:8;180:11;
198:22
**bottom (2)**
46:7;145:18
**Boulevard (54)**
7:9;14:22;15:22;
16:8,20;17:20,22;
20:5,14;23:13,14,20;
24:4,14,24;26:12,14;
27:2,11,15;29:10;
31:6,9;38:19,22;46:5;
47:5;53:13,15,23,25;
54:17;85:8,24;86:1;
92:3;93:19;94:1,11;

123:14;124:25;125:6;
126:2;127:6;128:12;
129:17;156:15,20;
176:18;177:6;178:25;
187:14,18,19
**Bowman (5)**
10:8;12:16,17,21;
97:7
**box (2)**
57:12;137:9
**bragging (1)**
163:12
**break (3)**
135:13,15;139:22
**breakdown (4)**
40:11;99:10,19;
101:18
**breaking (1)**
49:13
**breathe (1)**
172:7
**breezeway (3)**
73:25;98:20;108:5
**Bresa (34)**
4:18,21,22;23:19;
24:16;25:1,9,12;39:5,
18,22;40:3,7;91:12,
16,20,24;110:9,20;
136:2,9;140:4;
203:24;204:2,7,14;
207:4,7,12,15,19;
208:3,4;209:21
**Brian (1)**
137:13
**brick (2)**
79:25;106:25
**Bridge (1)**
66:11
**brief (1)**
7:15
**briefly (1)**
18:21
**Brigette (2)**
61:7;114:25
**bring (6)**
73:8,8;78:7;80:21;
157:22;184:10
**brings (3)**
86:17,19;158:8
**brining (1)**
178:24
**broken (1)**
109:12
**Bronx (2)**
167:10;170:2
**Brothers (1)**
182:6
**brought (1)**
165:23
**bucks (1)**
170:16
**build (4)**
104:11;179:4;

199:8,14
**building (97)**
15:5,21;19:25;20:1,
2,4,18,19,22;22:1,5,
11;23:9;25:19;26:7,8;
28:20,21;35:16,18;
36:16;39:10,24,25;
47:7,12;70:14,16,18;
71:18,20;72:9,21;
73:18,18,21;75:5,19,
20;76:18,21;78:3,5;
80:6,22;82:23,25;
83:7;84:11;85:1,19,
20;87:2,6;92:5,5,12;
95:16;103:25;104:6;
112:21,25;114:16;
116:9,13;117:13,16;
118:7,9,11,15,17;
129:2;137:10;138:6,
13,15,25;139:7,8,9,
21,23;150:22;154:3;
155:5,5,7,25;169:25;
173:13;178:5;180:25;
200:4;205:20,22;
206:15
**building-mounted (2)**
26:5;30:20
**buildings (4)**
15:12;26:23;46:17;
157:14
**built (12)**
20:23;24:5;50:6,8;
51:15;60:4;92:3;
129:14,23;172:18;
179:9;190:24
**built-in (1)**
58:11
**bulldozers (1)**
201:19
**bus (6)**
45:9;60:5;152:1;
162:15;163:5;172:7
**buses (1)**
51:16
**busiest (1)**
205:18
**business (15)**
7:8,13;12:14;25:21;
41:15;66:10,18;83:5;
132:13;152:5,7,11;
157:12;195:22;
198:12
**businesses (3)**
18:5;167:16;196:19

**C**

**cable (2)**
17:12;28:23
**cafe (3)**
80:12;172:6;198:17
**calculations (5)**
93:24;94:21;99:25;

110:22;116:4
**California (1)**
56:3
**call (15)**
4:20;18:23;25:15;
27:25;31:24;33:6;
47:22;51:5;56:17;
58:23;75:25;105:24;
158:2;179:14;207:25
**called (1)**
203:7
**calls (1)**
79:15
**calmly (1)**
4:11
**came (4)**
152:19;159:19;
167:9;194:22
**can (106)**
11:14;12:1,2;15:11;
21:20;23:25;26:6;
34:23;35:22;36:14,
14,18,23,25;46:20;
47:14;48:1,2,20;49:8;
50:2;53:3;54:11,14,
17;60:24;62:4,24;
63:23;70:7,16;74:10;
75:11;77:5;78:4,6;
79:10;80:10,11;85:5;
88:21;89:21;90:25;
96:11;97:18;98:1,9,9,
10,13;99:2;100:9;
108:6;112:2;113:20;
114:11,20,23;118:18;
120:13,14;130:1,2;
131:17,24;136:2;
138:5;139:14;142:24;
143:1;148:20;149:19;
153:15;157:17;158:6;
160:4;161:5;162:13;
164:5,9;166:24;
168:9;169:4,6,6;
171:17;178:12;
189:17;190:9;191:16;
192:4,24;193:16;
195:25;197:2,7,8,10,
14,15,18,21;200:18;
202:16;206:11;
209:15
**capacity (3)**
27:13;38:15;187:11
**capital (1)**
156:17
**capture (1)**
51:18
**car (6)**
51:11,13;151:20;
152:2,3;163:16
**care (1)**
166:8
**carefully (1)**
173:10
**Carlos (1)**

4:25
**Carolina (1)**
69:7
**carpooling (1)**
144:6
**carry (1)**
142:24
**cars (14)**
46:22;59:4,8,13;
86:6;122:21;144:1;
151:4,22;162:24;
163:15,16;177:15;
179:10
**cart (1)**
111:4
**case (2)**
77:21;192:20
**CASEY (3)**
174:7,7,10
**cast (1)**
39:20
**catch (4)**
24:23;74:13;93:25;
99:1
**catering (1)**
172:11
**caused (1)**
205:16
**caution (1)**
209:6
**CBD10 (1)**
7:14
**Cedar (2)**
12:22;13:2
**ceiling (5)**
37:3;89:16,19,25;
91:23
**celebrity (1)**
144:17
**census (1)**
51:9
**Center (15)**
8:13,23;14:16;
16:16;57:8;72:12,21;
73:1,3,7,19;75:2;
138:13;152:8,10
**centerpiece (1)**
137:19
**centers (1)**
57:13
**central (5)**
7:8,12;14:2,18;16:5
**certain (10)**
9:2,3;18:4;22:9;
33:8;65:20;85:2;
103:4;110:25;154:9
**Certainly (5)**
41:17;44:22;54:13;
57:24;159:24
**Certified (2)**
42:10,11
**Chain (1)**
66:11

**CHAIPERSON (1)**
176:21
**Chairman (15)**
6:1,8;10:17;23:24;
41:18;56:7;62:19;
85:4;108:11;131:14;
133:12;143:2;173:23;
198:23;208:17
**CHAIRPERSON (206)**
4:1,20;6:3;10:18;
11:24;16:10;17:24;
20:20;21:1,4,8;32:2;
33:19;36:5;37:16,24;
38:13;39:4;40:8;41:2;
54:8,15,19;61:6,14,
18,22;62:6;65:9;81:8,
20,25;83:8,12,15,18,
21,24;84:2;85:6;
100:18,21,25;101:4,7,
21;102:2,25;103:22;
104:10,18,25;105:20;
106:8,18;108:12,18;
109:2,10;110:4,23;
111:6,12,16,22;112:1,
8;118:19;123:3;
124:24;125:24;126:5,
9,12,15,20;127:4;
129:10,15,20;130:4,
10,15,18,21,25;131:4,
11,15,18;132:10,17,
20;135:7,12,17;136:5,
10,13,16,20;140:1,5,
15,18,21,25;141:5,11,
20;142:14,19,23;
143:3;144:19;145:9,
13;147:4;149:10,12,
15,22;150:3,9,12,18;
154:13,17,21;155:15,
20,23;156:4,8,16,19;
159:13,16;161:10;
163:25;164:16;
168:11,15,19,22;
170:24;171:3;173:6;
174:3,5;175:4;176:8,
17,24;177:5,14;178:2,
7;180:18;181:6;
183:22;186:17;188:4,
7;193:1,9,14,18;
194:8,10,13,18;195:1,
4;196:2,8,12;198:9,
11,16,19,24;199:1;
203:21;204:10,15,17,
20;206:17,20;207:1,6,
9,13,17,21,24;208:19,
22;209:1,5,11,14,18,
22,25
**chamber (4)**
4:10;186:21,22;
187:1
**chance (2)**
135:23;159:25
**change (12)**
71:17;76:4;101:11;

148:3,4;161:1;
174:18;175:1,2;
176:3;206:2,3
**changed (1)**
72:17
**changes (4)**
17:8;22:25;23:23;
148:11
**changing (1)**
59:5
**Chapter (1)**
9:24
**character (4)**
82:7;101:3;137:6,9
**Charles (3)**
10:9;41:8,19
**chart (2)**
118:20,21
**check (6)**
94:5;112:2;115:1;
120:12,12,13
**checked (1)**
116:21
**checklist (1)**
10:3
**Cherry (1)**
67:19
**Chestnut (1)**
188:10
**chief (2)**
164:10,22
**Chinese (1)**
172:12
**chiropractor (1)**
165:6
**chose (1)**
137:4
**Christmas (1)**
158:10
**chronology (1)**
156:23
**church (3)**
15:23;188:15,25
**Cimino (7)**
5:1,2;37:18;78:20;
207:5;208:5,6
**Cinar (2)**
172:12;176:20
**circulation (4)**
34:19;50:22;52:22,
23
**citizens (1)**
169:1
**City (7)**
51:17;137:11;
165:12,13,14;170:1;
196:7
**civil (5)**
13:15,16;41:24;
42:5;44:8
**clarification (7)**
33:21,25;35:15;
40:18;123:6;186:12;

199:4
**clarity (1)**
173:21
**classify (1)**
44:22
**clean (8)**
191:12,25;199:5;
200:13,25;202:21,24;
203:13
**cleaned (1)**
201:7
**cleaner (1)**
189:24
**cleaners (7)**
152:3;158:5;159:5;
167:18;182:1;189:18,
19
**cleaner's (1)**
152:4
**cleaning (4)**
31:4;199:5;200:5;
203:9
**cleanup (1)**
190:18
**clear (2)**
179:16,24
**clerk (1)**
4:5
**client (1)**
198:4
**Cliffside (1)**
195:18
**clipped (1)**
138:4
**close (8)**
44:18;45:8,11;
66:16;128:21;168:8;
181:15;204:13
**closely (1)**
160:4
**closer (1)**
54:16
**closing (1)**
201:25
**coach (1)**
45:10
**COAH (6)**
23:4;99:10,15;
101:8,10,14
**coast (1)**
42:2
**Code (8)**
9:25;35:24;87:1;
103:19,20;112:11,25;
122:1
**coffee (2)**
74:12;80:13
**collaborated (1)**
65:19
**collect (2)**
16:24;94:14
**collected (1)**
87:18

**collection (11)**
26:21;27:17;28:12;
29:1,17;38:5;82:14,
22;87:22;94:13;95:7
**collectors (2)**
27:19,19
**Colonial (2)**
30:4,11
**color (4)**
78:8;80:5,23;107:5
**colorized (1)**
19:3,14,23
**colors (3)**
78:7;79:25;82:9
**comfortable (1)**
12:4
**coming (19)**
37:19;46:11;53:25;
57:12;74:3;88:3;
90:18;91:13;92:6;
94:11;98:16;144:9;
149:9;151:4;161:1;
163:18;166:21;172:3;
205:17
**comment (9)**
23:25;32:7;37:8;
53:12;54:5;86:6;
192:16;203:17;
204:22
**comments (7)**
4:13;82:13;95:4;
160:6;163:8;195:5;
207:2
**commercial (2)**
15:22;16:3
**committed (3)**
87:5;204:25;206:5
**communities (3)**
45:23;46:18;205:20
**community (11)**
39:14,16;72:22,23;
76:20,20;80:21,22;
154:5;205:3;206:5
**commuter (16)**
16:6;49:17;56:23;
62:11,12,25;63:6,9,
16;64:20;74:13;
96:25;106:14;151:3,
9,25
**commuters (11)**
47:6,15;48:2;50:18;
53:3,5;62:21;90:10;
97:1;151:15,17
**compacted (1)**
89:13
**compactor (1)**
88:9
**company (1)**
88:3
**compare (2)**
123:16,19
**compared (1)**
110:10

**competitive (1)**
7:24
**complementary (1)**
47:14
**complete (1)**
174:1
**completely (3)**
174:18,21;183:17
**complex (1)**
96:1
**compliance (7)**
4:4;29:13;61:9;
102:5;103:10;105:16,
18
**compliant (2)**
61:17;25
**complied (2)**
112:6;134:19
**complies (1)**
103:18
**comply (9)**
31:13;32:11;
101:19,24;133:2,20,
25;134:23;191:15
**component (1)**
8:24
**comprehensive (1)**
170:20
**conceived (1)**
52:11
**concept (4)**
62:20,23;151:15;
178:15
**concerned (4)**
107:19;109:3;
142:6;180:8
**concerns (1)**
184:5
**Concourse (1)**
167:9
**concrete (3)**
27:10;29:2,3
**condition (10)**
10:4;32:13;91:10;
101:16;134:9;175:12;
181:18;182:2,20;
201:10
**conditioned (1)**
201:12
**conditions (9)**
13:24;17:14;19:20;
57:19;60:19;93:19;
183:7;184:4;201:23
**condition's (1)**
120:19
**condominiums (1)**
165:20
**conducted (2)**
59:15;184:18
**conduit (1)**
127:20
**confidence (1)**
160:19

**confident (1)**
75:14
**confirm (2)**
31:17;62:8
**conflict (2)**
11:3;83:4
**conflicted (1)**
10:21
**conform (1)**
36:4
**conformance (2)**
25:16;26:9
**conformed (1)**
84:14
**confused (2)**
120:3;123:2
**conglomerate (1)**
14:14
**conjunction (3)**
33:9;99:2;179:20
**connect (4)**
16:25;27:20;38:12;
83:1
**connected (5)**
28:24;38:5;60:11;
72:14;187:13
**Connecticut (3)**
42:18;69:8,9
**connecting (1)**
95:9
**connection (7)**
27:7;28:18,18;
32:23;33:5;38:8;97:2
**connections (1)**
28:19
**connectivity (1)**
57:2
**connects (1)**
127:16
**Conrail/New (1)**
14:24
**conscious (2)**
152:15;153:7
**conservation (2)**
32:16,25
**consider (5)**
4:15;27:23;126:21;
170:14;187:24
**consideration (5)**
38:18;108:7;125:5;
161:8;189:5
**considered (4)**
38:7;59:25;117:6;
132:23
**consist (2)**
18:2;26:20
**consistent (2)**
85:21;94:25
**consists (3)**
15:1;19:25;29:17
**constituents (1)**
51:10
**constitutionally (1)**

8:18
**constrained (1)**
59:10
**constraints (1)**
59:20
**construct (1)**
9:18
**constructed (3)**
184:9;186:22,25
**construction (1)**
180:3
**consultant (4)**
42:8;43:11,12,15
**Consulting (2)**
10:8;12:17
**contact (2)**
196:25;198:3
**containers (4)**
88:12,12;89:13,13
**containing (1)**
61:1
**contaminated (3)**
199:14;200:5;
203:23
**contamination (3)**
202:16,19;203:5
**contemplate (1)**
96:1
**contemplated (3)**
25:5;52:8;57:10
**contemplating (1)**
97:2
**context (1)**
162:20
**contingent (3)**
199:15;200:10,20
**continue (1)**
135:18
**continuous (1)**
46:14
**contract (4)**
181:7,9,13,24
**contractor (1)**
15:23
**contracts (2)**
191:2,15
**control (4)**
30:13,15;95:1;
133:24
**controlled (1)**
58:20
**convenience (1)**
122:3
**convenient (2)**
62:16;152:4
**conversations (1)**
179:17
**converting (1)**
59:12
**cooperation (1)**
107:2
**core (2)**
75:13,14

**Corey (1)**
175:5
**Cork (3)**
158:5;189:24;195:7
**corner (29)**
15:14,17;16:1;20:6,
11,12;23:7,8,11,11,
20;25:3;26:11;27:4,5;
31:7;74:7,8,17;77:16,
17;79:9,9;92:3,11;
123:7,13;172:6;
198:17
**corners (1)**
26:2
**cornice (1)**
115:19
**cornices (1)**
84:20
**corps (1)**
180:25
**corrected (1)**
116:3
**correction (2)**
24:11,18
**correctly (1)**
141:21
**corridor (1)**
95:9
**corrupt (1)**
159:23
**Corsey (30)**
10:8,14;11:20;12:2,
5,11,16;13:23;33:17,
18;45:14;46:2,12;
97:9,21,23;98:22;
106:23;107:7,11,16;
126:23;127:1;130:9,
14,17,20,24;131:3,6
**C-o-r-s-e-y (1)**
12:16
**Cory (1)**
153:13
**cost (1)**
179:3
**council (5)**
4:10;7:17;148:2;
175:1;180:23
**Councilman (5)**
5:15,17;6:10,12,14
**councilman-elect (3)**
161:11,12;163:1
**Councilwoman (3)**
10:23;136:19,20
**counsel (3)**
196:6;197:21;
200:16
**Counselor (1)**
56:7
**count (3)**
49:20;117:3;118:22
**County (24)**
17:4;18:11;24:20,
22;27:1;32:23,25;

38:17;46:9,23;58:6;
92:6;106:24;129:12;
143:4;149:3,4,16;
183:10;186:20,24;
187:2;200:21;205:19
**County/Municipal (1)**
187:15
**couple (6)**
76:25;77:1;78:2;
163:14,18;188:12
**course (4)**
11:14;53:4;55:7,16
**Court (5)**
101:13;134:3;
175:24,25;176:4
**courts (1)**
67:17
**cover (1)**
20:25
**covered (6)**
15:12;20:17;83:22;
84:3,4;109:16
**Cozy (1)**
198:17
**crazy (1)**
146:2
**create (6)**
7:24;46:17;57:16;
72:9;76:17;107:8
**created (2)**
71:19;170:6
**creating (2)**
31:5;46:14
**credentials (1)**
55:2
**credit (4)**
49:9;51:7;52:5;
57:1
**credits (2)**
9:1;57:21
**crew (2)**
165:23,24
**criteria (3)**
28:2;139:1,4
**cross (2)**
22:7;166:14
**cross-examine (1)**
55:25
**crossing (8)**
58:12;97:18;98:14;
178:12,18;180:8,11;
205:17
**crossings (1)**
179:16
**crossway (1)**
97:16
**cup (1)**
157:3
**curb (19)**
18:4;21:24;24:3,4,
13;31:5;46:24;79:12;
86:12;92:24;117:15,
25;129:11;155:15,16,

18,20,22,24
**cure (1)**
187:18
**curiosity (1)**
110:9
**current (1)**
179:5
**currently (4)**
110:11,13,17;
127:18
**curriculum (1)**
160:17
**curve (1)**
25:10
**curves (2)**
81:15,16
**cut (7)**
155:16,18,20,22,
24;177:18
**cutout (1)**
176:12
**cuts (2)**
18:4;46:24
**cycles (1)**
59:21

## D

**dais (1)**
11:14
**damage (1)**
158:12
**Dame (1)**
41:25
**damn (1)**
165:25
**dash (1)**
82:21
**data (1)**
51:9
**database (1)**
14:3
**date (5)**
14:8;71:7,11,12;
76:10
**dated (2)**
76:11;121:13
**David (2)**
121:9,11
**day (9)**
47:14;53:5;60:15;
104:14;151:18;
158:22;171:21;
186:11;193:25
**deadline (2)**
185:1,16
**deal (1)**
178:8
**dealing (1)**
158:17
**dearly (1)**
164:11
**debacle (1)**

156:23
**December (2)**
72:3;185:5
**decide (2)**
94:18;121:24
**decided (4)**
96:2;122:5,24;
161:16
**decides (1)**
137:22
**decision (4)**
4:16;11:11;151:21;
171:9
**decision-making (1)**
183:3
**decisions (1)**
170:14
**deck (5)**
40:11,22;109:16;
118:25;119:4
**declaratory (2)**
8:15;9:6
**decorative (1)**
30:12;40:6;115:19
**decorum (1)**
4:16
**dedicate (1)**
49:16
**dedicated (2)**
206:4,12
**deep (1)**
186:24
**defer (3)**
34:25;37:5;40:1
**deficiency (1)**
150:14
**definite (1)**
163:6
**definitely (7)**
37:22;80:19;91:7;
105:1;106:3;139:20;
162:4
**degrees (1)**
41:16
**deliver (1)**
109:6
**deliveries (6)**
108:13,15;109:4;
171:15,20;173:18
**delivery (2)**
171:16;172:25
**demand (6)**
45:17;50:4;51:19,
20,25;63:9
**demands (1)**
52:20
**democracy (2)**
162:2,3
**demolish (1)**
9:17
**demolition (1)**
200:24
**den (1)**

77:5
**denied (1)**
184:4
**density (2)**
52:7;144:9
**deny (1)**
59:10
**DeOrio (14)**
5:3,4;109:14,15,18,
22;111:14,18,25;
136:4,12;204:16;
208:7,8
**DEP (13)**
33:3,5,9,14;43:13;
107:25;181:25;183:7,
10;190:7,15,23;
200:12
**department (8)**
32:22;42:9;43:17;
44:20;45:22;135:3;
189:6,21
**depend (1)**
56:14
**depending (2)**
25:20;193:25
**depends (3)**
194:1;203:4,4
**depiction (1)**
79:25
**depressed (1)**
86:3
**described (2)**
182:16,19
**deserves (1)**
159:24
**design (18)**
38:23;41:21;43:16;
46:16;53:1;75:19,20;
84:17;92:9;94:22;
103:3;105:10;106:16;
128:3,6,11,15;138:25
**designated (5)**
7:18;8:5;62:25;
110:8;139:15
**designed (2)**
38:3,5
**detail (4)**
20:2;38:4;54:11;
72:8
**details (1)**
31:19
**determined (1)**
96:9
**devastated (1)**
170:5
**devastating (1)**
130:13
**developed (1)**
21:13
**developer (12)**
39:1;108:6;129:22;
137:4;143:20;157:17;
158:23;160:11;

187:15;189:4;190:13;
197:3
**developers (1)**
8:1
**developer's (1)**
54:12
**development (30)**
9:20;27:8,8;28:1,2,
11;44:23;45:2;47:11;
50:6;56:12;58:18;
59:17;60:1;105:7,22;
133:25;137:15;
141:18;143:25;147:5;
151:1,5;163:22;
177:7,9;199:25;
200:21;202:1;205:15
**Devereaux (100)**
10:11,11;66:19;
68:1,3,4,5,7,9,11,14,
16,20,23;69:6,12,14,
18;70:6,12,21,25;
71:9,16;72:1,5,7;76:3,
16;79:7;81:2,4,13,23;
82:6,10;84:21;88:18,
21;89:14,20;90:5;
91:18,22;93:21;96:6,
10,17,22;100:15,23;
101:2,6;106:1,6;
108:21;109:8;110:1,
18,21;113:11,17,22;
114:13,17,22;115:3,
22,25;116:11,14;
117:9,18,23;118:1,8,
12,16;119:3,8,14,17;
120:5,8,11,14,18;
121:10,22;122:9,12,
23;125:14,18,21;
126:4,7,11,14;152:7
**D-e-v-e-r-e-a-u-x (1)**
66:22
**DEVEREAUXJR (1)**
122:19
**Di (1)**
200:7
**diagram (1)**
108:15
**difference (8)**
123:7,10,13,22,24;
124:2,4,7
**different (10)**
30:18;57:7;69:16;
71:1;77:4;132:11;
137:5;184:21;205:24;
209:9
**differential (2)**
22:4;110:11
**difficult (1)**
81:16
**diligence (2)**
201:9,24
**dimension (2)**
93:9;116:24
**dimensional (1)**

103:4
**dimensions (5)**
52:24;53:7;103:9,
14,18
**dining (2)**
25:19;77:20
**dip (3)**
126:7,8,10
**DiPAOLO (36)**
10:16,19,23;11:2,8,
17;136:18,21,21,22;
137:1,8;138:17;
139:6,16,24;140:3;
146:17;199:2,3,12,18,
22;200:2,23;201:14,
18;202:3,7,9,13,18,
23;203:6,11,19
**DIRECT (9)**
13:22;33:17;44:14;
54:6;70:2;74:23;
127:21;133:14;177:3
**directed (1)**
176:4
**direction (1)**
60:20
**directional (1)**
106:13
**directions (1)**
21:9
**directly (2)**
37:20;38:7
**discharge (1)**
16:24
**discrepancy (1)**
99:12
**discuss (1)**
205:8
**discussed (2)**
14:13,14
**discussing (3)**
44:8;194:14,19
**Discussion (4)**
135:11;193:19;
205:9;207:3
**discussions (2)**
133:23;180:9
**disgust (1)**
169:24
**disgusted (1)**
194:16
**disingenuous (1)**
163:20
**dispel (1)**
150:23
**display (1)**
31:24
**distribution (4)**
101:14,15,19;
134:14
**district (4)**
7:8,13,14;33:1
**districts (1)**
32:17

**disturb (1)**
28:4
**disturbance (1)**
27:24
**ditch (2)**
187:5,21
**doctor (1)**
164:10
**documented (1)**
127:11
**dollars (2)**
170:13;179:4
**domain (1)**
158:2
**Don (2)**
168:23;169:8
**done (32)**
9:11;30:17;63:7;
69:21,22;70:17;
71:19;72:8;74:22;
109:20;110:21;
128:10;140:20;141:3,
18;144:22;146:16;
147:17,24;153:23;
160:22,24;167:1,1;
184:10,12;185:25;
186:5;189:6,18;
190:5;192:13
**door (15)**
22:6,7,9;73:16;
77:9,12;109:7;
121:25;122:8,16,20,
21;124:25;129:24;
168:9
**doors (5)**
4:10;108:15,23;
168:7;171:13
**doorway (1)**
122:4
**DOT (2)**
43:13,14
**double (1)**
127:3
**double-check (1)**
94:2
**doubt (2)**
126:8;172:20
**Doug (2)**
196:11,14
**down (55)**
6:11;10:20,23;
16:19,25;26:13,14;
29:10,22;30:18,19;
37:19;39:15,20;
42:18;49:13;58:25;
68:9;77:17;79:10;
83:2;85:9;87:6;92:5,
6;94:11;97:5;119:20;
120:6,7;125:19;
126:15;128:12,16;
137:24;144:17;147:9;
157:4,11;159:5;
164:23;165:11,13,20;

166:17;171:24;176:5;
177:4;182:23;187:4,
5;189:16;191:6;
195:23;199:24
**downstairs (1)**
114:23
**downtown (21)**
47:10;48:22,23;
51:23;59:2,16;60:12;
137:15,20;139:10;
156:25;157:2,6,24;
158:7,24;160:9;
161:17;162:12;
163:22;179:8
**DOYLE (15)**
196:5,10,11,12,14,
14;197:21,23;198:5,9,
10,14,18,22,25
**DPW (4)**
33:10;187:5,21,22
**drain (3)**
38:17;186:15,16
**drainage (8)**
16:23;37:19;93:23;
127:14;143:5;187:3,
5,13
**draining (1)**
186:14
**drains (3)**
16:22;125:25;126:1
**draw (1)**
161:4
**drawing (9)**
71:20;72:23;75:11;
121:3,19;122:10,12;
145:16;151:12
**drawings (7)**
74:19,20;78:6;
79:22;118:15;121:13;
122:7
**drawn (1)**
100:24
**dread (1)**
158:7
**drilling (2)**
181:24;182:1
**drive (11)**
22:23;82:24;89:23;
91:3,4;95:14;161:13;
164:3;168:24;180:25;
193:5
**driven (1)**
45:19
**driveway (6)**
17:19;18:3;20:9,13;
29:5;171:18
**driveways (1)**
90:19
**driving (4)**
20:24;51:11;88:25;
124:19
**drop (3)**
25:6;60:9;85:8

**dropped (2)**
162:17;175:22
**drops (1)**
24:22
**dry (5)**
152:3,4;199:5;
200:5;203:9
**due (2)**
201:9,24
**dump (1)**
142:17
**dumping (1)**
143:7
**dumpster (4)**
88:6;89:11;156:2;
172:15
**dumpsters (3)**
83:6;91:16;131:22
**duress (1)**
158:18
**during (14)**
47:13;52:2;53:5,6;
56:9,19,20;57:4;58:1;
59:7,9;60:15;65:2;
127:8
**dwell (1)**
53:2

## E

**Eagle (3)**
168:23;169:16,17
**earlier (3)**
17:3;55:18;184:1
**early (1)**
157:19
**easiest (2)**
62:16;178:8
**East (4)**
42:2;142:10,18;
143:8
**eastbound (1)**
180:12
**Eastern (1)**
42:19
**Ed (1)**
159:8
**edge (4)**
74:18;164:12;
205:21;206:15
**edges (1)**
74:19
**editing (1)**
101:10
**educator (1)**
160:14
**effect (3)**
38:20;92:8;193:17
**effected (1)**
125:13
**effective (1)**
53:10
**effectively (2)**

46:4;48:25
**effects (1)**
10:25
**effort (1)**
170:19
**egress (1)**
171:17
**eight (2)**
96:4;148:19
**eighties (1)**
137:11
**either (11)**
12:3;15:12;53:19;
61:12;97:4;98:16;
104:8;153:11;194:23;
197:8;206:9
**ELECT-DiPAOLO (1)**
138:21
**election (7)**
137:12,14;146:8,9;
147:25;165:18;170:5
**electric (3)**
17:12,13;28:23
**element (1)**
64:21
**elevated (2)**
128:22,23
**elevation (17)**
78:1,13;79:16;
81:16,21;86:18;
93:25;94:22;116:24;
117:17,24;120:2;
123:7,12;128:6;
129:9;139:22
**elevations (5)**
82:2;103:9;117:17;
120:24;124:11
**elevator (5)**
73:15,16;75:13,13;
89:3
**eliminated (2)**
25:7;39:8
**else (27)**
13:5;40:9;41:3;
44:3;51:13;65:10;
80:18;103:1,23;
106:19;123:4;129:23;
136:6;144:24;145:25;
148:12;156:9;161:10;
163:14,25;164:22;
165:9;170:24;173:7;
174:5;186:16;199:1
**emergency (3)**
4:9;34:23;135:4
**Emerson (42)**
4:3;6:5,20;9:22,24;
98:6,13;105:8,13,24;
137:17;138:8,9,11;
140:8;141:10;150:21;
156:15,21;157:1,1;
158:8;161:17;162:3;
164:3;165:20;166:13,
16;167:11;171:6;

179:5,18;186:6;
187:7,7;188:11;
189:22;196:16;
204:25;205:13,16,18
**eminent (1)**
158:2
**emotional (2)**
171:8,10
**employee (1)**
12:16
**empty (1)**
77:3
**Emwood (3)**
161:13;164:2;193:5
**enclosure (1)**
95:22
**encourage (1)**
84:24
**encumbrances (1)**
107:8
**end (6)**
81:9,14;82:2,3;
99:1;100:16
**endeavored (1)**
7:23
**ended (1)**
210:2
**enforcement (1)**
63:15
**engine (1)**
178:17
**engineer (29)**
10:9,10,15;13:14;
34:18;41:9,25;42:11,
14;43:4,7,9,11,12,19,
21,24,24,25;44:10;
55:3;61:17;93:23;
106:22;140:12,24;
141:1;142:20;150:4
**Engineering (17)**
12:17,19;13:17;
35:9,21;41:20,24;
42:6,6;43:16;44:8;
45:15;55:6;72:19;
99:24;140:23;158:8
**Engineers (3)**
42:12;149:4;201:6
**engineer's (2)**
94:25;188:19
**Englewood (2)**
165:11,13
**engulf (2)**
138:18;139:7
**enjoy (1)**
76:21
**enlarged (3)**
92:8;100:14;143:10
**enough (9)**
35:10;92:13;94:15;
114:2;122:24;125:11;
129:8;132:6;199:5
**enter (2)**
53:21;176:14

entered (2)
8:6,12
**entertain (5)**
135:9;136:7;
204:12;207:10;
209:19
**entire (6)**
49:16;78:5;96:1;
116:24;174:25;175:1
**entirely (1)**
47:2
**entitled (1)**
185:14
**entitlements (1)**
181:17
**entrance (5)**
108:19;121:18,19,
20;155:13
**entrances (3)**
109:1;124:25;
125:17
**entry (3)**
54:16;73:14;177:8
**entryway (1)**
177:6
**environmental (10)**
189:6;190:2;192:2,
11,13,23;201:2,10;
202:25;203:17
**environments (1)**
46:16
**EPA (2)**
107:19;190:6
**equal (2)**
22:18;159:12
**equally (1)**
26:15
**equate (1)**
49:19
**equipment (1)**
103:25
**especially (1)**
179:14
**ESQUEU (7)**
167:5,6,23,25;
168:4,13,17
**E-s-q-u-e-u (1)**
167:7
**essentially (7)**
10:4;42:18;45:7;
48:16;52:13;59:2;
63:13
**esthetic (2)**
21:17;29:21
**even (22)**
76:23;77:2,16;78:7;
94:11;131:20,21;
141:14;151:24;160:8,
15,21,24;165:14;
167:25;168:2;171:10;
172:4,13;173:21;
180:3;194:7
**evening (12)**

4:2;6:7;41:18;
56:10;58:2;140:7;
156:11;167:5;188:6,
8;196:16,16
**event (2)**
4:8;127:8
**eventually (1)**
90:17
**everybody (11)**
73:17;80:18,24;
141:8;146:9;148:4;
164:19,23;165:9;
187:24;196:16
**everybody's (4)**
114:23;143:25;
163:3;170:18
**everyone (2)**
148:1;170:15
**evidence (3)**
133:9;134:18,24
**exact (2)**
45:20;118:10
**exactly (6)**
21:6,10;38:2;46:15;
84:1;182:4
**EXAMINATION (3)**
13:22;44:14;70:2
**example (1)**
80:6
**exceeds (1)**
94:9
**excellent (8)**
45:3;46:3;47:10;
50:17;63:10;182:3;
183:13;200:7
**except (1)**
75:6
**exception (3)**
14:16,20;46:13
**excess (2)**
87:3;170:12
**excited (1)**
75:21
**excitement (1)**
76:17
**exciting (2)**
74:17;77:24
**excludes (1)**
116:18
**excuse (6)**
12:25;29:5;64:2;
147:7;206:17,20
**executed (1)**
8:11
**exercise (1)**
72:11
**exhaust (2)**
104:1,7
**Exhibit (12)**
7:4;14:11;19:17;
45:13;46:7;70:8;
71:23,24;76:14;
78:17;81:6;83:10

**exhibits (3)**
70:4,10;82:18
**exist (1)**
46:24
**existing (23)**
9:17;13:24;17:14;
18:19;19:19;27:11,
12;44:19;46:1;56:24;
57:19;60:12,19;
83:10;91:14;97:3,8,
10;127:2;138:6;
139:21;142:9;155:19
**exists (3)**
26:22;97:3;110:11
**exit (6)**
4:9,11;6:14;171:18;
176:15;177:9
**expand (2)**
162:18;191:2
**expectation (2)**
64:18,23
**expected (3)**
52:16,19;60:17
**expense (1)**
197:15
**experience (3)**
75:8;178:9;203:14
**experienced (1)**
153:5
**experiences (1)**
85:8
**expert (4)**
42:5;145:14;162:7;
203:17
**explain (2)**
107:21;160:17
**explanation (2)**
35:18;88:16
**express (2)**
58:17,17
**expressed (1)**
184:5
**extend (1)**
187:17
**extension (1)**
33:12
**Exterior (1)**
81:1

**F**

**facade (6)**
39:25;40:5;81:11;
84:24;87:3;139:23
**face (5)**
78:25;129:13,14,
17;131:1
**facilitate (1)**
129:7
**facilities (4)**
25:21;94:13;
107:24;143:5
**facility (1)**

176:15
**facing (1)**
81:10
**fact (3)**
178:10;191:9;
196:24
**factor (1)**
60:7
**facts (1)**
205:8
**factual (2)**
171:12;172:19
**fades (1)**
80:8
**failed (1)**
157:20
**Fair (8)**
8:13,23;64:14;
122:14,15;158:17;
189:15;190:8
**fairer (1)**
147:14
**faith (2)**
158:17;184:16
**fall (1)**
164:23
**falls (1)**
157:4
**Falotico (5)**
5:16,17;6:10,12,14
**familiar (2)**
190:1;200:19
**families (1)**
205:2
**family (2)**
174:15;195:25
**fanfare (1)**
158:22
**fans (1)**
104:1
**far (16)**
33:5;92:13,24;
107:19;122:24;
126:21;137:18;
140:20,21;147:15;
153:1;156:22;158:19;
164:12;180:7,15
**farther (1)**
50:11
**fast (1)**
172:11
**faster (1)**
130:10
**favor (6)**
97:22;136:14;
204:18;207:17,19;
209:23
**fear (1)**
157:15
**fearing (1)**
158:7
**feature (1)**
103:15

**features (3)**
20:3;48:22;58:11
**Fedex (1)**
171:21
**fee (1)**
63:20
**feel (7)**
29:21;58:17;75:14,
15;79:14;160:16;
184:19
**feeling (2)**
169:2,20
**feels (2)**
76:19;160:9
**feet (62)**
14:19,20,21,22,23;
22:24;23:6;24:8;29:8,
10;30:5;33:22;34:3,
22;35:19;37:4;51:3;
56:13;57:11;64:23;
73:4,5;84:19,25;
85:12;86:12,21,24;
87:3;92:17;93:4,10,
15,20;98:23;112:12,
15,16,21,25;113:1,4,
5,20;114:25;115:1,2,
3,4;119:22,23,24;
120:2,4;124:8;125:7;
127:9;129:1;178:24;
186:23,23,24
**felt (1)**
72:9
**FEMALE (8)**
58:4;61:11;137:7;
148:8;149:7;150:7;
175:20;209:16
**few (3)**
31:10;56:5;201:16
**fewer (1)**
110:5
**field (3)**
41:24;42:5;53:22
**figure (2)**
94:21;162:10
**files (1)**
60:24
**final (5)**
9:16;10:6;148:21;
149:21,24
**finally (1)**
96:9
**finals (1)**
148:20
**financial (1)**
8:9
**financing (1)**
201:24
**find (8)**
35:22;56:22;
120:14;157:16;
177:23;181:25;
195:24;197:6
**finds (1)**

181:25
**fine (6)**
12:6;19:12;107:10;
111:25;169:9;185:12
**finished (1)**
128:6
**finishes (1)**
81:1
**fire (5)**
4:8,9;32:21;89:21;
135:3
**fired (1)**
152:20
**firm (4)**
6:19;44:15;50:5;
59:16
**first (25)**
7:17,21;10:14;16:4,
15;25:18;47:22;83:9;
93:24;94:2;118:23;
130:16;145:2,3,4,6,
18,19;158:21;159:18;
166:21;167:2;168:6,
7;193:3
**fit (1)**
187:10
**fitness (5)**
73:1,2,7;152:8,10
**five (12)**
34:12;96:4;99:17;
117:3;118:25;119:5;
148:10;152:24,25;
171:25;172:9;194:22
**five-story (2)**
117:16;169:25
**fixed (2)**
166:18,20
**fixture (6)**
30:3,3,5,6,12,18
**fixtures (5)**
30:8,11;39:23;40:5,
6
**FLANNERY (109)**
6:7,9,17,19,24;7:2,
6;11:19;13:15,19,22;
14:10;16:12;18:16,
21;19:1,6,9,12;33:16;
34:5,8,17;35:2,10;
36:2;39:3;41:5,7;
43:23;44:1,4,7,12,14;
54:2;55:1,4,7,16;
61:20;62:5;63:22;
64:6;65:14;66:16;
70:1,2,3,7,19,22;71:1,
5,11,14;72:2;76:1;
78:9,12;79:2;82:1,8,
12,16;84:6,10,13;
91:9;94:5;95:2;96:5,
8;101:23;105:3,15;
106:5;111:10;113:6;
126:25;131:13;133:8,
10,20;134:12,16,23,
25;135:5;181:8,14;

192:12,15,18;199:10,
17,20,24;200:16;
201:8,16,21;202:5,8,
11;203:16;209:4,10,
13
**flash (2)**
127:25;130:12
**flat (1)**
104:6
**flights (1)**
158:25
**flood (1)**
129:9
**flooding (10)**
27:14;38:18;93:18;
125:8,13;130:6,12;
142:13;145:25;
187:19
**floods (2)**
127:25;146:2
**floor (50)**
9:21;20:18;22:21;
23:14,15;25:18,18;
45:6,7;75:11,17,18,
21;76:22;80:8;83:2;
93:24;94:2;100:4,6,
10;114:16,18,18,19,
20;118:6,23,23,24,24,
24;125:1,2,12,15;
126:21;128:6;130:16;
144:11;145:2,3,4,7,7,
18,19,20;168:6,7
**floors (4)**
23:18;26:15;
119:13;145:1
**Florida (2)**
42:2,17
**fluster (1)**
157:3
**FOB (1)**
53:19
**focus (1)**
50:1
**folks (2)**
153:10;157:1
**follow (6)**
4:9;39:6;87:5;99:7;
159:4;190:6
**following (2)**
125:22,22
**food (1)**
132:21
**foot (29)**
21:23,25;30:22;
35:17;79:18;85:8;
89:16,19,25;91:22;
92:11;93:25;112:12,
17,18,23;113:10;
114:8,11;123:10,11,
12,21,23;124:1,3,12,
13,22
**footage (1)**
96:12

**Forest (1)**
165:6
**forever (1)**
163:23
**forget (2)**
147:19;158:2
**forks (1)**
89:3
**formal (1)**
37:12
**formerly (1)**
12:17
**forth (3)**
32:8;144:16;171:22
**forward (7)**
6:6;149:19;162:3;
184:15,17;190:14;
200:22
**fought (1)**
178:15
**found (2)**
46:4;50:9
**four (22)**
34:12,13,14;38:10;
46:18,24;67:22;96:3,
4;99:16;119:12,13;
135:14;153:21;157:6,
22;165:10;172:9;
175:12,13,16;176:6
**four-level (1)**
117:2
**four-minute (1)**
135:15
**four-story (6)**
9:19;20:1,10;
117:18;161:20;
169:25
**fourth (4)**
23:17;118:24;
119:1;144:11
**frame (2)**
65:4;200:3
**framed (1)**
64:13
**frankly (3)**
45:21;46:9;204:4
**free (5)**
90:11;148:13,14,
16;150:15
**frequency (1)**
94:10
**friends (2)**
205:6,6
**frigging (1)**
166:12
**fright (1)**
157:8
**front (21)**
17:13;18:5;20:5;
69:20;72:17;83:10;
89:3;106:25;107:3;
112:20,24;113:19;
122:20;124:24;126:1;

142:11;149:1;160:16;
181:20;186:22;187:3
**frontage (17)**
14:18,19,21,22,24;
17:11;21:11,16,19;
29:6,9,11;30:9;39:23;
98:21;108:24;112:11
**frontages (1)**
30:4
**frown (1)**
157:12
**full (5)**
12:13;41:15,15;
90:14,15
**fully (3)**
90:1;105:16,17
**fumes (1)**
172:7
**fun (1)**
159:9
**functional (1)**
21:18
**funding (3)**
170:11,16;181:2
**funds (1)**
196:22
**funny (1)**
163:9
**further (4)**
10:13;97:17;98:14;
189:18
**future (5)**
24:23;27:6;184:22;
199:7;203:13

**G**

**gain (1)**
97:5
**gallonage (1)**
33:8
**game (1)**
166:7
**garage (35)**
9:20;20:10,24;
22:16,16,17,22;27:20;
34:21,22;40:24;
47:22;54:1;62:9;
63:18;72:13;89:24,
24;97:5;102:12,12;
117:2,5;118:6,14,16;
119:18;121:18,20;
122:4;144:23;145:4,
20,21;170:1
**garage-door-type (2)**
20:16,21
**garbage (1)**
95:22
**Gary (6)**
24:17;54:21;55:24;
94:6;112:5;136:3
**gas (5)**
28:22;107:23;

188:17;193:8;194:6
**gate (4)**
53:18;54:3,8;63:21
**gated (2)**
90:4,6
**gates (1)**
178:12
**general (1)**
161:14
**generally (1)**
64:17
**General's (1)**
192:2
**generate (1)**
172:14
**generation (7)**
45:16;50:23,25;
51:6;52:15;56:17;
60:16
**generations (1)**
137:25
**gentleman (2)**
117:1;182:5
**gentlemen (2)**
65:23;156:12
**gets (4)**
48:5;75:12;130:1;
136:7
**gigantic (1)**
73:3
**given (6)**
149:2;152:14;
171:23;181:1;196:20,
22
**gives (4)**
40:23;47:25;80:6;
99:15
**giving (1)**
154:6
**glass (6)**
77:10,12,19;80:10,
15;108:24
**gloss (1)**
20:3
**goal (3)**
45:1,5;63:14
**goals (1)**
45:16
**God (6)**
12:10;41:12;54:24;
55:11;66:1;67:25
**goes (14)**
17:11;28:15;29:9;
31:24;74:15;81:18;
90:7;119:20;128:12;
132:24;147:15;
174:14,16;195:25
**Good (37)**
4:1;6:7;13:8;35:12;
41:17;42:20,22;56:3;
67:9;69:10;75:15;
80:6;110:7;124:23;
138:7;139:10,17;

140:7;146:24;156:11;
158:12,16;159:20,20;
160:18;163:21;167:5;
170:16;175:18,18,20;
184:16;188:6,7,14;
196:16,16
**goods (1)**
109:6
**Gordon (1)**
137:13
**gosh (1)**
67:3
**gotta (5)**
153:7;166:9,17,19,
25
**Goursky (1)**
5:5
**governing (12)**
10:20;11:5,9,15;
137:3,21;162:1;
182:21,22;191:5;
196:17;197:7
**governmental (1)**
32:15
**grace (1)**
177:23
**grade (11)**
22:4;36:16;86:3;
107:5;119:18;120:4,
15,16;125:2,17;
126:21
**grades (2)**
26:16,18
**grading (1)**
26:10
**Grand (3)**
156:15,20;167:9
**Grease (2)**
172:17,17
**great (4)**
9:22;38:4;73:21;
146:1
**greater (3)**
119:22,22;120:1
**greatly (1)**
148:3
**green (3)**
21:20;29:23;179:25
**grew (1)**
164:11
**grid (1)**
31:25
**Grinch (3)**
156:25;157:2,18
**Grinchy (1)**
157:12
**groceries (1)**
152:1
**ground (25)**
9:21;23:14,15;
25:18;26:15;29:25;
37:20,23;45:6,7;
47:24,25;49:16;

53:14,16;62:13;
118:23;125:1,2,12;
126:21;190:10;200:4,
24;201:20
**grunt (1)**
164:9
**guarantees (1)**
196:19
**guess (10)**
33:25;35:15;
106:22;125:14;127:7;
134:7;137:1;140:11;
149:4;201:19
**guessed (1)**
124:18
**guide (1)**
106:15
**guidelines (3)**
46:16;47:11;49:5
**guides (1)**
48:16
**guy (3)**
87:22;146:13;
188:22
**guys (10)**
39:9;137:2;140:7;
152:14,20;153:5;
168:1;171:9;172:22;
174:24
**gym (2)**
154:3,4

**H**

**Hackensack (1)**
13:2
**Hadco (1)**
30:4
**hair (1)**
15:8
**half (4)**
9:1;170:12,16;
194:4
**half-filled (1)**
127:11
**hallway (2)**
25:25;75:12
**Hampshire (1)**
42:18
**hand (10)**
12:8;41:11;54:22;
55:9;65:24;67:23;
78:6;93:12;156:9;
198:20
**handed (1)**
79:22
**handful (1)**
161:15
**handicap (1)**
36:8
**handicapped (3)**
22:9,10,20
**handle (2)**

128:3;164:9
**handled (2)**
82:22;133:19
**hands (4)**
170:25;193:2;
204:11,12
**hang (1)**
137:10
**happen (7)**
72:11;144:2,12;
148:1;161:2;162:4;
167:3
**happening (4)**
60:18;154:9;
166:25;194:25
**happens (4)**
195:24;197:18;
199:15;205:9
**happy (4)**
80:17,18;156:12;
197:24
**hasty (1)**
170:15
**hauler (4)**
84:7,9;87:25;88:24
**hauling (1)**
133:6
**hazard (1)**
191:19
**health (6)**
191:12,18,25;
192:8;199:6;200:25
**hear (7)**
52:7;61:11;101:21;
110:6,7;145:14,15
**heard (15)**
44:24;47:18;
140:10;143:16,19;
153:2,3;163:10;
167:15,17,19;168:5;
192:5;195:8;200:6
**hearing (2)**
4:17;6:22
**heart (1)**
205:4
**heavily (1)**
49:2
**heavy (1)**
110:5
**height (25)**
30:5,23;34:24;
35:16;37:2;84:11,19,
23;85:1,21;89:16,19,
25;91:23;113:7;
114:2;115:16;116:10;
117:10,12;118:11;
125:12,15;129:11;
145:22
**heights (1)**
94:2
**held (2)**
4:4;52:25
**hell (1)**

162:10
**Hello (1)**
  186:2
**help (14)**
  12:10;41:12;54:24;
  55:11;66:1;67:24;
  139:23;167:14,16;
  180:1;187:18;195:21,
  22;197:15
**helping (1)**
  167:18
**hey (1)**
  181:23
**Hi (2)**
  167:5;176:9
**high (9)**
  16:17;26:11;34:22;
  94:15;128:1;129:8;
  165:5;206:15,16
**higher (8)**
  35:19;85:19;93:25;
  124:13,22;128:7,8;
  130:1
**highest (2)**
  56:19;158:3
**highway (1)**
  60:9
**highways (1)**
  57:14
**Hill (2)**
  67:19;166:12
**hills (1)**
  167:11
**historical (1)**
  38:18
**history (2)**
  126:18;130:5
**hit (1)**
  32:19
**Hoff (1)**
  6:19
**Hoffman (7)**
  137:13;161:11,11,
  12,13;162:14;163:1
**hold (5)**
  35:3,5;42:1;78:14;
  146:5
**holdover (1)**
  159:1
**holidays (1)**
  156:12
**home (6)**
  77:13;158:5;163:4;
  173:24;195:15,17
**homes (1)**
  77:9
**honestly (1)**
  146:5
**hook (1)**
  144:8
**hope (9)**
  11:12;80:18;106:8;
  161:7;170:6,21;

191:21;198:2;209:12
**Hopefully (1)**
  80:12
**horizontal (1)**
  79:14
**horrible (3)**
  163:8,21;170:3
**hour (5)**
  52:2;56:9;64:10;
  65:5;194:4
**hours (7)**
  56:10;58:2;59:23;
  64:10,16;83:5;180:1
**house (1)**
  184:3
**household (1)**
  151:20
**households (2)**
  8:21;151:23
**houses (1)**
  174:16
**housing (17)**
  7:19;8:13,14,17,20,
  23,25;9:4,8;133:14,
  24;138:10;153:23;
  158:8;175:10,17;
  199:6
**HULBURT (2)**
  173:8,8
**H-u-l-b-u-r-t (1)**
  173:9
**hundred (8)**
  52:2;56:9;64:9,24;
  137:20,25;138:14;
  144:12
**hundreds (1)**
  59:15
**husband (1)**
  195:7
**HVAC (1)**
  103:25

**I**

**idea (1)**
  189:3
**identification (9)**
  7:5;14:12;19:18;
  70:11;71:25;76:15;
  78:18;81:7;203:1
**identifying (1)**
  105:7
**idling (1)**
  186:9
**i-e-r-r-o (1)**
  168:24
**illustration (1)**
  81:9
**imagine (1)**
  53:3
**impact (12)**
  42:4;59:16;60:15;
  92:14;104:22,24;

152:10;163:7,21;
  192:11,13;201:2
**impacts (2)**
  58:18,19
**imparted (1)**
  27:1
**impeding (1)**
  171:17
**impervious (3)**
  27:25;28:6,7
**implore (1)**
  173:2
**important (9)**
  74:7,8;75:22;76:18;
  77:15;104:19,21;
  125:4;209:7
**Impossible (1)**
  60:21
**improve (4)**
  17:5,5;21:16;31:5
**improved (2)**
  31:1;71:18
**Improvement (4)**
  48:13;125:8;
  127:19;165:10
**improvements (7)**
  9:18;14:6;18:12;
  26:23;27:2;31:2;
  38:25;46:11;97:12;
  127:14;179:1
**inappropriate (2)**
  174:21,24
**inch (11)**
  27:10,21,21;28:14,
  14;38:16;94:12;
  114:22;129:13,14,16
**inches (12)**
  110:25;111:4,15,
  19,20,21;112:5;
  113:25;125:2;129:24,
  25;130:3
**incident (1)**
  92:1
**include (5)**
  14:6;37:9;106:25;
  116:19;189:4
**included (2)**
  139:4;191:21
**includes (1)**
  16:7
**including (5)**
  11:5;23:4;89:22;
  103:13;201:24
**inclusion (1)**
  17:6
**inclusionary (1)**
  9:19
**income (3)**
  8:20;101:15,18
**incoming (1)**
  159:24
**incorporate (1)**
  104:12

**incorrect (1)**
  145:1
**increase (2)**
  27:25;51:5
**increased (2)**
  38:20;187:2
**increasing (2)**
  151:8;187:13
**Indian (1)**
  164:10
**indicated (2)**
  179:10;190:4
**individual (2)**
  141:4;183:16
**individuals (1)**
  170:2
**industry (2)**
  52:25;53:9
**inferred (1)**
  56:11
**infiltrate (1)**
  29:24
**information (6)**
  34:16;57:24;94:18;
  124:21;131:7;185:13
**infrastructure (2)**
  60:11;187:12
**initiative (1)**
  45:23
**inlet (3)**
  38:10;127:15;
  128:21
**inlets (8)**
  16:23;26:21;27:11,
  12,18;38:6,11;127:3
**input (1)**
  141:25
**inquire (2)**
  98:1,10
**insanity (1)**
  170:7
**insignificant (1)**
  58:23
**install (1)**
  27:9
**installed (3)**
  27:3;187:6,14
**instead (4)**
  157:25;161:3,17;
  176:6
**Institute (1)**
  42:11
**instituted (1)**
  8:16
**institution (1)**
  197:11
**insure (4)**
  101:19;103:10,14,
  18
**integral (1)**
  9:5
**intensities (1)**
  31:25

**intensity (1)**
  128:1
**intent (5)**
  54:12;82:24;128:5,
  15;158:16
**intention (2)**
  132:3;160:18
**intents (1)**
  127:22
**inter (1)**
  128:17
**interested (1)**
  75:18
**interior (1)**
  95:15
**internal (4)**
  82:22;83:7;128:23,
  24
**internalize (1)**
  129:5
**intersection (11)**
  16:18;17:8;18:9;
  23:12;27:15;31:7,8;
  86:15;92:2;97:11;
  127:10
**intersections (1)**
  58:20
**intimately (1)**
  190:1
**into (57)**
  6:4;8:6,12;20:2;
  27:20;28:13,14;
  29:24;31:6;37:25;
  38:7,9,18;49:13;
  51:17;53:16,21,25;
  56:25;59:7,13;70:18;
  77:11,12,13,13,24;
  80:21,22;87:23;
  88:19;91:3,13;97:24;
  99:10;105:10;108:6;
  109:23;125:5;126:18;
  130:22;131:9,10;
  144:9;152:19;156:22;
  159:4;161:7;164:6;
  170:1,3;176:20;
  177:15;187:22;189:5;
  191:14;209:6
**introduce (1)**
  196:9
**intrusive (1)**
  206:18
**inventory (1)**
  46:1
**investigating (1)**
  201:9
**investigation (1)**
  200:15
**involved (6)**
  10:25;42:3;43:15;
  183:3;191:7;204:6
**involving (3)**
  11:7;67:14;182:10
**irrelevant (1)**

192:18
**island (1)**
  77:21
**issue (10)**
  11:5;34:6;53:24;
  92:1;116:15;146:23,
  24;182:25;187:24;
  207:11
**issues (13)**
  4:14;11:7;24:20,21;
  34:19;63:23;67:13;
  69:13;173:20;181:25;
  187:18;205:8;209:8
**ITE (1)**
  50:25
**item (1)**
  84:18
**items (1)**
  10:5

**J**

**Jack (1)**
  203:3
**Japanese (1)**
  172:12
**Jeff (2)**
  140:8;146:18
**Jefferson (1)**
  173:9
**Jersey (38)**
  12:23;13:5,6;14:3,
  24;41:22;42:1,7,8,14,
  25;43:13;45:24;50:7;
  59:18;60:8;65:19;
  67:7;68:17;69:4,21;
  97:15,25;99:3;140:9;
  156:15,21;164:3;
  166:16,16;168:8;
  178:1,3,7,10,14;
  179:20;188:11
**Jill (1)**
  183:24
**JM (1)**
  8:4
**JMF (7)**
  153:22;158:2;
  167:13,23;181:1,11;
  195:21
**job (1)**
  46:3
**jobs (1)**
  166:9
**joke (1)**
  177:18
**Joseph (2)**
  159:14,16
**JR (94)**
  68:1,3,4,7,11,14,16,
  20,23;69:6,12,14,18;
  70:6,12,21,25;71:9,
  16;72:1,5,7;76:3,16;
  79:7;81:2,4,13,23;

82:6,10;84:21;88:18,
21;89:14,20;90:5;
91:18,22;93:21;96:6,
10,17,22;100:15,23;
101:2,6;106:1,6;
108:21;109:8;110:1,
18,21;113:11,17,22;
114:13,17,22;115:3,
22,25;116:11,14;
117:9,18,23;118:1,8,
12,16;119:3,8,14,17;
120:5,8,11,14,18;
121:10,22;122:9,12,
23;125:14,18,21;
126:4,7,11,14
**judges (1)**
  146:20
**judgment (2)**
  8:15;9:6;160:4
**judicial (2)**
  4:12,16
**jumping (1)**
  144:4
**June (1)**
  8:7
**jurisdiction (1)**
  6:23
**jurisdictions (1)**
  67:10

**K**

**Kathleen (1)**
  176:9
**keep (7)**
  58:11;132:1,4;
  166:8;177:25;187:11;
  197:16
**keeps (1)**
  205:14
**Keg (3)**
  158:5;189:24;195:7
**Ken (1)**
  137:13
**Kendry (1)**
  5:9
**Kennedy (4)**
  15:16;16:8,8;17:22
**Kenneth (16)**
  16:10,11,12,15;
  17:23,24;123:9,15,15,
  15;124:5;161:12;
  176:25;180:24,24,25
**Kenneth's (1)**
  26:24
**kept (8)**
  70:16;72:15,16;
  73:23,25;79:11,12,14
**key (2)**
  8:24;53:19
**kick (1)**
  179:3
**kind (8)**

11:10;80:8;81:14;
151:16;163:9,11;
175:7;190:18
**Kinderkamack (62)**
  7:8;14:7,19,20;
  16:20;17:5,16;18:2;
  20:6;21:24;23:12;
  26:12,14;27:3;28:19,
  24;29:22;30:13,25;
  31:8;36:15;39:24;
  46:6,21,25;47:3;
  78:12;81:11,14,18;
  85:7;86:15;92:2;
  97:18;109:4;123:8,
  13;124:2,3,4;126:16;
  129:13;155:14;157:3;
  162:12;167:6;171:24;
  176:12;177:20;
  178:12,17;179:24;
  180:11,21;183:18;
  184:7,14,24;185:24;
  187:9;194:14;205:22
**kind-of (1)**
  73:16
**kind-of-thing (1)**
  77:2
**kinds (1)**
  96:11
**kitchen (1)**
  77:20
**KLUGMAN (7)**
  202:15,21;203:3,3,
  9,15,16
**knew (2)**
  157:19;161:16
**Knolls (2)**
  12:22;13:2
**knowledge (2)**
  14:7;148:25
**known (4)**
  7:7,10,13;196:18
**knows (9)**
  77:2;141:9;146:9;
  148:1;152:16,23;
  160:7;169:3;202:17
**Kostelecky (172)**
  10:12;66:2,5,5,8,11,
  14,19,22,25;67:3,6,
  11,15,18;69:2;70:24;
  71:4,12;72:6;76:2,6,8,
  11;78:11,15,23;79:3,
  5;80:25;81:3;82:5,15,
  21;83:11,14,17,20,23;
  85:10,13,16,20,25;
  86:4,8,13,16,19,25;
  87:4,9,13,16,19,24;
  88:2,7,11,23;89:4,8,
  12,18,23;90:3,6,11,
  15,20,25;91:2,7,11,
  15,21;92:22,25;93:2,
  5,8,11,13,16;95:8,13,
  18,23;96:3;97:7;

99:13,21;100:2,5,8,
13,20;102:6,8,15,21;
103:7,12,16;104:4,16,
23;105:2,9,12,17;
106:3,10;108:17;
109:17,20;110:3;
112:14,18,22;113:3,9,
12,15,21,24;114:5,9,
15,21;115:8,12,15,18,
21,24;116:5,9,12,17;
117:4,8,11;118:5,10,
13;119:1,4,7,11,16;
120:13,16,20;121:5,7,
11,15;125:16,20;
126:19;131:23;132:2,
5,8;133:5
**K-o-s-t-e-l-e-c-k-y (1)**
  66:6
**Kuiken (1)**
  182:6
**Kutzin (1)**
  5:6

**L**

**ladies (2)**
  65:23;156:11
**lady (1)**
  193:23
**Lamatina (4)**
  5:18,19;6:10,13
**Land (9)**
  4:3;27:24;28:4;
  137:21;141:19;175:1;
  180:24;181:2,21
**landscape (6)**
  19:14;21:21,25;
  22:1;29:14,16
**landscaped (2)**
  29:4,20
**landscaping (4)**
  19:4,23;21:16,21
**lanes (2)**
  17:8;176:23
**large (1)**
  186:21
**larger (4)**
  77:7;92:14;113:8;
  130:7
**last (14)**
  9:9;60:22;63:24;
  70:15;81:9,10;
  103:24;105:5;153:16;
  165:19;176:13;
  180:23;183:9;197:5
**late (1)**
  170:6
**laterals (1)**
  28:22
**latest (3)**
  62:23;202:10,11
**lattes (1)**
  172:8

**laundry (1)**
  190:18
**Laura (1)**
  180:20
**Laurel (1)**
  8:17
**law (3)**
  6:19;7:20;191:11
**lawsuits (1)**
  158:22
**lawyer (1)**
  164:10
**layout (3)**
  26:6;36:22;121:8
**leader (1)**
  27:19
**leaders (2)**
  37:19;38:2
**leading (1)**
  8:14
**leaking (1)**
  107:24
**least (5)**
  118:20;151:22;
  159:9;180:11;198:3
**leave (5)**
  129:18;143:25;
  158:6;160:19;164:8
**leaves (2)**
  63:9;151:10
**leaving (3)**
  49:17;53:25;206:23
**LED (4)**
  30:6;32:2,4,6
**left (8)**
  4:10;81:9;167:10;
  168:11;176:20;
  177:19,20;194:23
**left-hand (1)**
  27:6
**leftover (1)**
  49:25
**legal (3)**
  6:21;62:22;114:12
**legally (1)**
  4:15
**lengths (1)**
  103:4
**less (6)**
  64:24;111:15,20,
  20;113:25;116:10
**lessen (1)**
  179:22
**lesser (1)**
  51:25
**lesson (1)**
  146:11
**letting (1)**
  63:12
**level (19)**
  22:18;40:22;47:22,
  24,25;49:16;53:15,
  16;62:13;79:17,20;

102:12;114:16;117:7;
119:1,6,10;131:1,2
**levels (11)**
51:25;59:9;62:9;
90:8;101:18;117:3;
118:5,6,14,25;119:5
**license (7)**
12:13,18,19,20;
13:7;67:9;69:10
**licensed (11)**
13:4;41:25;42:13,
25;43:1;67:2,4,13;
68:12,16;69:4
**licensure (1)**
42:1
**L-i-c-t-h-u-l-t (1)**
180:21
**life (2)**
173:15;174:18
**light (12)**
25:2;30:3,7,14,15,
19,19;31:13;39:6;
40:5;194:20,21
**lighting (9)**
31:12;32:3,4,6;
37:9,10,12;39:23;
106:25
**lights (6)**
30:20,21;39:10,11,
14;73:6
**likely (3)**
47:13;157:9;199:10
**limit (1)**
35:17
**limited (1)**
4:14
**Lina (1)**
186:2
**Lincoln (74)**
7:9;14:22;15:22;
16:19;17:20;20:5,14;
23:12,14,20;24:3,14,
24;26:12,14;27:2,11,
15;29:10;30:25;31:6,
8;38:19,22;46:4;47:4;
48:3;53:13,15,23,25;
54:17;74:21;79:10;
85:8,24,25;92:2;
93:19;94:1,11;
117:15,16;119:21,24;
121:21;123:8,9,14;
124:2,4,25;125:6;
126:1,16;128:11;
129:17;142:9,17;
143:8;145:25;176:16,
17;177:4,5,20,24;
178:25;181:1;186:14,
15;187:14,18,19
**Linden (1)**
159:15
**line (15)**
21:24;24:3,14;
25:22;31:5;45:10;

51:16;79:15;84:25;
92:24;98:20;117:12;
162:16,16;199:25
**lines (3)**
17:13;45:10;60:5
**lining (3)**
118:6,14;201:24
**Linwood (53)**
7:9;14:7,23;16:1,
21;17:1;18:6,9;20:7,
14;27:3,12;28:15;
29:8;30:25;36:9,15;
46:5;47:4;48:3;79:9;
81:12,19;85:9,14,15;
86:15;97:5;98:7;
124:3;127:22;157:4;
166:23;174:8,9,10;
176:10;177:7,18,21;
179:24,25;180:10;
183:25;184:2,7,14,24;
185:24;187:8;193:7,
17;194:14
**liquor (2)**
15:7;167:19
**listen (4)**
137:18;162:1;
164:21,25
**listened (2)**
173:10,10
**listening (3)**
97:22;161:17;
164:19
**LITCHULT (8)**
180:20,20;181:12,
19;182:17;183:5,18,
21
**literally (1)**
46:22
**litigate (1)**
158:11
**litigation (4)**
10:24;175:24;
182:9,11
**little (21)**
11:25;34:1;54:3,11;
65:15;78:1,25;79:24;
80:2;97:17;120:3;
139:7,8;143:23;
145:16;146:5;147:23;
156:22;178:20;191:2,
9
**live (7)**
138:1;151:5;
169:16;174:12,14;
177:17;195:1
**lives (1)**
169:13
**living (4)**
48:22;77:20;186:6;
205:13
**LLC (2)**
6:6,21
**lobby (5)**

72:21,25;73:15,19;
75:2
**local (4)**
7:19;58:17;167:16;
200:10
**located (19)**
7:12;14:2,17;16:5,
16;20:10;22:16;23:7;
41:21;45:12;47:19;
53:17;54:14;59:24;
63:2;82:23;102:14;
104:2,8
**location (13)**
22:14;25:13;36:12;
46:3;58:1;60:6;73:15;
86:20;98:7;102:11;
128:25;162:25;197:6
**locations (3)**
22:9;24:21;85:2
**long (16)**
42:24;64:4;67:1;
69:20;73:23;107:7;
130:5;151:18;165:7;
186:23;189:13;
202:13,19,23;203:12,
12
**longer (4)**
53:4;139:3,14;
189:9
**look (32)**
34:2;46:15;48:7,25;
49:20;51:8;53:6;57:1,
7;63:5;73:23;77:9,10;
79:24;80:7,24;97:23;
111:23;112:3;121:18;
137:12;138:11;
139:10,17;153:7;
154:20;165:12;
171:23,24;205:11,21,
21
**looked (1)**
164:4
**looking (21)**
11:6;45:21;51:2;
52:4,5;73:5;75:9;
77:14,20;79:8;80:9;
82:19;96:13,14;
113:3;121:2;155:4,4;
160:3;171:16;179:21
**looks (2)**
78:19;79:4
**loophole (1)**
157:16
**Lorraine (2)**
156:14,17
**Los (1)**
56:2
**lost (2)**
73:22;158:11
**Lot (66)**
14:21;15:4;16:7;
17:15,16,21;18:2;
20:9;23:16;27:18;

38:11;39:6,10,13;
46:13;50:1;71:18;
73:11,11;74:8;75:23,
24;77:22;80:15;
87:12;89:21;96:25;
97:2,20;98:19;
106:23;107:1,3,4,8,
12;108:20;110:5;
118:22;127:21;
135:21,22;137:5,9;
141:15,17;142:12;
151:13;152:11;154:2,
10,14,14,15;155:10;
157:2,10;160:7,8,9;
163:17;165:2;171:8;
172:14;184:5;209:7
**Lots (5)**
7:10;14:15,15,16;
201:25
**love (3)**
164:11;205:1;
206:13
**low (2)**
8:20;128:12
**lower (6)**
23:7;113:24;
114:18,18,20;124:12
**lowering (3)**
114:14,15,17
**lowest (3)**
85:17;120:19,20
**loyal (3)**
166:4,4,5
**Lozier (1)**
177:19

**M**

**ma'am (2)**
175:4;176:8
**magenta (1)**
80:2
**mail (1)**
73:20
**main (2)**
37:25;47:1
**Maine (2)**
42:2,17
**maintain (1)**
78:3
**maintained (2)**
4:17;39:17
**major (7)**
9:23;17:4;28:1,1;
143:21,22;178:13
**majority (6)**
56:23;74:2;75:5;
127:23;161:18,23
**making (9)**
11:10;87:5;88:15;
109:3;128:4;137:18;
151:21;170:14;
197:16

**MALE (12)**
60:21;78:22;79:4;
136:23;156:13;159:8;
175:14,18;182:8;
189:14;192:24;
195:13
**Malone (6)**
5:7,8;62:8;132:6;
208:9,10
**man (1)**
176:13
**management (6)**
26:19,25;27:23;
28:3,10,13
**managing (1)**
82:25
**mandated (1)**
8:18
**maneuver (1)**
88:15
**maneuverability (1)**
50:23
**manhole (2)**
123:9,14
**manual (1)**
48:16
**many (21)**
33:22;69:21;95:25;
125:1,1,7;135:23;
141:24;152:13;
160:10,12;163:12;
170:4;173:1,16,17,18,
20;180:9;202:17;
209:8
**mark (1)**
6:25;14:9;18:14
**marked (9)**
7:4;14:11;19:17;
45:13;70:10;71:24;
76:14;78:17;81:6
**market (1)**
100:17
**market's (1)**
15:25
**marry (1)**
48:23
**Martin (168)**
5:24,25;6:9,16,18,
24;7:3;10:22;11:4,12,
19;12:2,7,12,21,24;
13:4,7,10,13,16,20;
14:9;18:15,23;19:13;
35:7,20,25;38:14,24;
41:10,14;42:13,16,20,
24;43:3,10,18,22;
44:2,6,9;54:21;55:1,5,
8,13,17,22,24;56:2;
62:14;64:1,8,12,25;
65:7,22;66:3,7,9,13,
15,17,21,23;67:1,4,9,
12,16,20;68:2,5,8,12,
15,18,22,25;69:3,10,
13,15,23;70:9;71:7,

23;75:25;76:4,7,9,13;
78:19,24;81:1;94:6,
17,24;97:21;100:7,9;
102:19;112:4;133:1,
4,8;134:2,10,14,17,
22,24;135:2,6;
136:19;146:12,18;
147:7,11,20;153:15;
159:17;162:14,22;
169:8,11,14,17;174:4,
9;181:18;182:3,9,18;
183:6,20;185:6,9,12,
18;188:13,14,19;
190:17,21;191:4,13,
19;192:1,9,22;195:10,
12,15,19;197:20,25;
198:7;200:6;201:1;
203:22;204:1,4,8;
208:25

**Maryland (2)**
67:6;69:7

**masonry (1)**
15:5

**mass (4)**
44:19;48:21;51:13;
52:7

**Massachusetts (2)**
67:8;69:8

**Massey (4)**
196:25;197:1,1,6

**Massy (1)**
197:25

**master (5)**
77:7;101:13;
134:19;175:25;176:4

**matched (1)**
44:19

**matching (1)**
107:4

**materials (2)**
82:9;90:22

**matters (1)**
158:19

**max (7)**
147:1,2,2,3,3,8,16

**maximum (3)**
84:23;116:19;
129:11

**may (21)**
4:15;51:20;53:18;
61:21;63:11;72:8;
75:23,24;93:19;
94:13;97:22;126:23;
148:11;151:5;155:4;
167:14;188:13;191:2,
8;200:6;205:25

**maybe (15)**
73:5;74:14;76:24,
24,25;77:1;78:7;
98:20;108:24;122:3;
158:24;178:23;
186:23;201:14;
204:24

**Mayor (7)**
5:18,19;6:9,13;
138:21;148:2;161:19

**MAYOR-ELECT (33)**
10:16,19;11:2,8,17;
136:21,22;137:1,8;
138:17;139:6,16,24;
140:3;146:17;199:2,
3,12,18,22;200:2,23;
201:14,18;202:3,7,9,
13,18,23;203:6,11,19

**Mayor's (1)**
153:20

**Mc (1)**
5:9

**M-c (1)**
156:17

**McClean (1)**
66:14

**McGuire (7)**
183:23,24,24;
185:7,11,16,20

**McKENDRY (10)**
5:10;24:17;48:10,
14;107:20;108:9;
135:10;207:23;
208:11,12

**McLean (1)**
68:10

**McQUEENEY (6)**
156:11,14,14,17,20;
159:10

**mean (16)**
20:21;36:15;73:2;
74:11;89:20;96:11;
105:22;106:6;110:16;
141:25;147:9;172:15,
21,21,22;200:3

**meaning (1)**
51:11

**means (8)**
9:12;49:24;51:10;
59:6;151:3;158:18,
24;165:2

**meant (1)**
57:15

**meantime (1)**
195:24

**measured (2)**
86:12;87:20

**Measurement (1)**
117:14

**measuring (2)**
85:12,13

**mechanical (1)**
104:5

**medical (1)**
96:20

**meet (8)**
26:17;51:20;89:8;
101:14;103:15;179:5;
205:7,7

**meeting (13)**

4:2,3,6,12;6:14;
93:18;149:13;158:15;
160:2,2;180:23;
193:10;210:2

**Meetings (3)**
4:5;146:6;188:1

**meets (1)**
139:3

**MELILLO (18)**
153:13,13,17;
154:15,19,23;155:2,6,
8,12,17,22;156:1,7;
175:5,5,15;176:5

**M-e-l-i-l-l-o (2)**
153:17;175:6

**MELLILO (1)**
154:25

**member (7)**
11:9;68:24;136:25;
148:8;149:7;150:7;
209:19

**members (15)**
6:8;10:20;37:17;
41:18,19;62:7;
109:14;135:8;136:15;
182:22,22;196:17;
204:19;207:3;209:24

**memorialization (1)**
185:17

**memorialized (3)**
184:25;185:2,4

**memorializing (1)**
185:1

**mention (2)**
15:16;17:19

**mentioned (12)**
17:3;28:25;49:17;
56:8;87:17,21;90:21;
94:22;98:21;99:22;
170:10;176:11

**merchandise (1)**
108:16

**merchants (1)**
158:6

**mercy (1)**
97:25

**message (1)**
153:20

**met (1)**
146:24

**Meyer (1)**
163:4

**MEYERS (7)**
150:20,21;163:13;
170:25;171:1,5,5

**Michael (2)**
167:6;174:7

**microphone (3)**
111:17;171:4;
196:13

**middle (2)**
29:15;126:2

**mid-rise (1)**

56:18

**Midwest (1)**
42:19

**might (12)**
77:2;92:7;94:14;
107:14;120:3;122:4,
13,20;192:5;200:16,
17;204:6

**Mike (3)**
107:20;150:20;
171:5

**mile (1)**
165:8

**million (3)**
170:12,16;179:3

**mind (4)**
72:24;130:11;
146:17;162:10

**minds (2)**
158:15;172:20

**mini (1)**
172:3

**minimize (1)**
197:15

**minimum (2)**
129:25;132:16

**minor (1)**
71:17

**minority (1)**
161:21

**minute (1)**
147:20

**minutes (14)**
58:13,13;135:24;
136:10;146:11;165:6,
8;166:11;186:9,10;
194:3,3,22,24

**Miss (2)**
36:5;200:7

**missed (1)**
40:16

**missing (3)**
31:20;141:24;
183:16

**mitigate (4)**
60:3;158:11;
162:11,16

**mitigation (4)**
60:7;162:9,25;
163:9

**mix (2)**
15:1;23:5

**mixed (4)**
15:24,25;23:3;
147:4

**mixup (2)**
34:1;40:19

**moderate (1)**
8:20

**modes (1)**
59:5

**modification (1)**
70:14

**modified (2)**
70:15;99:13

**modify (2)**
36:12,18

**moment (1)**
70:19

**money (3)**
58:8;179:1;197:3

**monitoring (5)**
107:15,21,25;
188:16;189:8

**monstrosity (2)**
161:20;170:17

**monstrous (1)**
128:4

**months (5)**
74:11;197:5;
201:16;202:6,7

**Montvale (2)**
13:1;166:14

**Montville (1)**
66:13

**more (57)**
11:25;20:2;27:13;
28:4;29:21;31:10;
34:16;46:20;49:2,23;
50:3,20;51:24;52:2,
18;54:3,11;57:12,16,
24;60:10,10,13;74:9;
80:2;87:2;111:4;
132:15,18;133:7,9,13;
136:6;137:5,9,20;
144:13;146:15;
147:14;151:11,13;
152:24,25;157:21,22;
158:25;159:9;161:4;
162:18;163:17;
173:21;174:15,24;
178:23;184:23;191:2;
204:24

**morning (3)**
56:10;58:2;72:10;
115:2;144:2

**Morristown (1)**
13:2

**most (11)**
14:6;47:13;62:15,
16;76:18;106:3;
109:2;151:23;152:4;
157:1,9

**motion (14)**
135:9,10,20;136:2,
4,8,9;204:13,14;
206:10;207:10,12,14;
209:19

**mounted (3)**
30:22;80:2;92:24

**mounting (2)**
30:5,22

**move (11)**
97:16;98:14;
131:25;138:4;149:19;
166:11,24;180:9;

184:16;197:8;207:16
**moved (1)**
    131:21
**movement (1)**
    149:17
**moving (2)**
    162:3;178:15
**MRS (8)**
    195:6,11,14,17,20;
    197:18,22;198:8
**Mt (1)**
    8:16
**much (19)**
    26:6;32:5;60:13;
    70:17;72:16,22;78:4;
    80:9,10;110:11;
    147:9;158:25;159:2,
    6;168:18;186:11;
    189:8;206:13;209:4
**multimodal (1)**
    59:11
**multiple (5)**
    13:2;14:15;18:1;
    59:21;188:1
**mumbo-jumbo (1)**
    150:24
**Municipal (6)**
    4:3,7;106:24;181:9;
    182:15;186:20
**municipalities (2)**
    42:7;45:20
**Municipality (3)**
    58:7;196:21,23
**must (6)**
    4:13,17;157:15,23;
    158:1,13
**mutual (1)**
    158:14
**myself (2)**
    137:13;141:18

### N

**name (18)**
    6:18;12:13,15;
    41:15,19;66:4,17;
    68:2;153:16;159:13;
    169:2,18,22;186:2;
    195:6;196:10,11,14
**narrow (1)**
    29:7
**nature (3)**
    45:5;52:14;159:21
**nay (1)**
    206:9
**near (6)**
    9:22;36:8;47:4;
    51:16;184:22;187:7
**necessarily (1)**
    160:17
**necessary (5)**
    9:11;32:15;179:23;
    197:9;201:22

**need (32)**
    7:18;35:15,17;
    60:10,10;72:12;
    101:9,17;102:24;
    103:17,25;106:13;
    121:25;129:5;133:7;
    136:6;152:2,3;
    156:22;158:4,19;
    161:3,4;172:17;
    173:20,23;193:24,24;
    197:4;199:3;201:1;
    202:1
**needed (4)**
    103:9;107:18;
    157:24;181:1
**needs (7)**
    137:23;160:9,24;
    186:5;190:5,16;197:1
**negative (1)**
    150:10
**neglect (1)**
    15:16
**neglected (1)**
    17:19
**negotiations (1)**
    178:21
**neighborhood (4)**
    57:15,17;64:23;
    139:10
**neighborhoods (1)**
    48:24
**nester (1)**
    77:3
**net (3)**
    28:5,7,9
**network (4)**
    46:1;52:12;57:18;
    59:14
**networks (1)**
    45:19
**New (47)**
    12:23;13:5,6;14:3;
    37:25;41:22;42:1,7,8,
    14,14,17,25;43:13;
    45:24;50:7;51:17;
    59:18;60:8;65:18;
    67:7,7;68:17;69:4,21;
    97:15,25;99:3;140:8;
    151:12;155:21;
    156:15,21;159:5;
    164:3;165:24;166:15,
    16;168:8;178:1,3,7,
    10,14;179:2,20;
    188:11
**News (1)**
    4:6
**next (18)**
    11:13;41:4,7;57:25;
    65:12,14;71:20,21;
    77:22;137:21,21;
    146:13;158:22;
    168:22;176:25;193:7;
    194:6;201:16

**nexus (1)**
    38:25
**nice (5)**
    35:10;78:19;106:7;
    122:20;167:11
**nicely (1)**
    75:15
**night (4)**
    39:8;64:4;73:7;
    160:15
**nine (1)**
    186:6
**N-J (1)**
    14:3
**NJIN (1)**
    14:3
**Nobody (2)**
    152:23;170:10
**noise (1)**
    104:21
**none (1)**
    149:5
**nor (1)**
    62:22
**normally (2)**
    73:20;181:20
**north (13)**
    15:13;27:5;46:5;
    69:7;95:21;97:17;
    98:14;154:2;157:2;
    166:23,24;177:7;
    186:25
**north/south (1)**
    46:8
**northbound (3)**
    178:11;179:14;
    180:10
**northeast (2)**
    20:11;23:11
**northerly (1)**
    47:23
**northern (3)**
    82:3;85:18;99:4
**northwest (4)**
    15:14;20:12;23:11;
    27:4
**nos (2)**
    208:21,23
**nose (1)**
    177:15
**note (2)**
    14:5;18:8
**noted (1)**
    107:14
**notes (2)**
    61:3;95:5
**notice (2)**
    4:7;6:21
**notified (1)**
    4:5
**Notre (1)**
    41:25
**November (3)**

8:11;157:19;161:21
**number (16)**
    18:24;50:5,10;57:6;
    62:21;65:23;67:22;
    99:11;110:25;147:14;
    163:2;169:11,12;
    197:22;198:15,23
**numbers (2)**
    49:14;96:12

### O

**Oakland (1)**
    169:10
**obligation (4)**
    9:2,2,8;138:10
**obstructing (1)**
    22:7
**obtaining (2)**
    32:15;201:22
**obviously (4)**
    32:20;36:15;56:21;
    80:9
**occupied (1)**
    50:8
**occupy (1)**
    104:15
**occurred (2)**
    139:13;185:18
**off (21)**
    14:5;18:6;59:4,14;
    60:9;74:23,23;75:13;
    111:4;121:20;125:2;
    126:21;135:11;144:8;
    147:18;151:2;162:17;
    174:20;180:24;183:4;
    186:14
**offer (1)**
    157:17
**offered (1)**
    13:14
**office (6)**
    4:7;15:2,21;77:6;
    131:7;192:2
**offices (1)**
    96:20
**official (1)**
    140:13
**off-peak (2)**
    39:15;180:1
**offsite (1)**
    134:13
**off-site (6)**
    133:17,18,21,24;
    134:6,8
**off-tract (1)**
    38:25
**often (3)**
    132:15;133:7;183:7
**old (1)**
    188:17
**O-l-i-v (1)**
    41:20

**Olivo (16)**
    10:9;41:8,9,19;
    44:11;54:7;55:25;
    56:1,2,8;64:8;150:25;
    162:7,8,20,23
**Olivos (1)**
    56:2
**Once (2)**
    100:25;175:8;
    178:23;179:23
**one (74)**
    14:4;15:15;17:18,
    20,22;18:6,10;19:21;
    26:3;28:19,20;34:20;
    35:7;37:18;49:1,23,
    23;50:17;60:22;61:8;
    63:24;65:20;70:19;
    71:21,21;76:11;77:5,
    6,18,19;82:17;93:12;
    95:11;100:16,17;
    102:15;103:24;
    121:22;125:10;128:4;
    133:13,17;141:19;
    146:15;147:20,20;
    151:20;155:24;162:6;
    163:2,16;165:4;
    169:1;171:21;172:4,
    5,13;176:12;179:10;
    182:16,18,18;183:16;
    184:23;194:7,9;
    200:18;204:21;205:9,
    18;206:23;208:24,25;
    209:1
**one-bedroom (3)**
    49:3;77:3;99:16
**one-bedrooms (2)**
    48:9;49:4
**one-document (1)**
    154:1
**one-hour (1)**
    64:17
**one-issue (2)**
    137:14;146:8
**ones (2)**
    11:10;121:13
**one-to-one (3)**
    50:13,15,16
**online (2)**
    144:25;155:9
**only (38)**
    35:14;37:7;44:6;
    62:9;63:6;75:3;84:23;
    93:25;102:22,24;
    104:21;111:14;
    112:21;113:20;116:7;
    119:12,23;128:25;
    140:25;143:6;146:11,
    12;148:3;151:10,19;
    154:4,8;155:16,23;
    160:4;161:15;172:4;
    176:11;177:23;
    183:16;185:9;187:6;
    193:18

**onsite (2)**
16:23;40:13

**on-site (4)**
16:24;26:21;
107:24;134:6

**onto (5)**
30:16;37:21;46:22;
121:20;143:8

**Open (13)**
4:4;25:9,17;77:12;
109:16,18;135:9,20;
136:8,17;149:6,13;
178:4

**opened (2)**
90:1;109:17

**opening (2)**
34:21,24

**operation (4)**
63:18,21;107:11;
189:9

**Operations (2)**
42:10;180:5

**operator (1)**
110:2

**opinion (7)**
11:9,15;60:19;
138:22;139:18;161:1;
167:12

**opportunities (1)**
196:21

**opportunity (5)**
8:19;36:11;50:18;
80:15;133:6

**Opposed (5)**
136:16;161:20;
173:3;204:20;209:25

**option (1)**
25:22

**Oradell (1)**
13:1

**order (6)**
10:17;30:13;70:20;
129:1;181:1;188:1

**ordinance (16)**
25:23;26:9;27:23;
29:19;30:15;32:8;
79:15;84:14,16;87:6;
105:16;112:14;113:4,
4;153:19;175:11

**ordinances (4)**
31:13;105:13;
106:11;197:9

**ordinary (1)**
164:9

**organization (1)**
178:8

**oriented (3)**
56:16;71:9;151:25

**original (5)**
62:20;74:19,20;
79:11,13

**originally (2)**
78:2;79:8

**ornamental (2)**
85:3;86:21

**ornamentation (1)**
84:19

**otherwise (1)**
103:19

**out (68)**
10:21;28:15;29:7;
31:4;37:21;58:1;60:8;
64:21;69:19;70:13;
73:10;74:4;75:1;77:9,
10,14,20;78:6,7;
79:22;80:21;87:8,10,
12;88:4;89:6;90:18,
22;95:3;99:5;106:23;
107:15;108:1;109:19;
110:9;114:23;115:1;
120:14;125:10;
139:20;144:1;146:15,
19,21;148:19;150:4;
152:5,6;155:4;161:4;
162:10;163:13,14;
165:18,23,24;167:14,
16,18;173:25;176:16;
179:9,10;186:11;
188:2;193:6;194:7;
198:1

**outdoor (1)**
25:19

**outgoing (1)**
161:19

**outlined (1)**
29:18

**outlying (1)**
51:17

**outside (6)**
32:19;72:12;76:19;
91:17;129:2;188:15

**over (29)**
15:23,24;16:18;
20:3,23;26:11;27:4,5;
33:8;42:4,6;59:17;
69:22;74:22;95:16;
98:23;113:18;114:14;
142:12,13;145:22;
146:2;165:5;166:15;
174:18;176:13;182:5;
194:5;206:21

**overall (3)**
92:9;105:21;107:4

**overnight (1)**
53:6

**own (3)**
181:4,12,22

**owner (2)**
198:12,16

**owners (3)**
157:12;182:14;
192:4

**ownership (1)**
45:18

**ownerships (1)**
31:3

**owns (1)**
195:7

## P

**package (1)**
106:17

**packet (1)**
71:3

**Page (2)**
84:16,17

**pages (1)**
190:1

**Paolo (1)**
200:7

**Papers (1)**
158:17

**paperwork (1)**
107:22

**par (1)**
85:3

**parallel (1)**
81:17

**parapet (8)**
85:3;86:22;114:9;
116:6,11,15;118:3,12

**parapets (2)**
84:20;103:14

**parcel (4)**
87:8,10,12;106:23

**parents (2)**
160:16;167:9

**Park (8)**
41:21;50:18;74:1;
140:8;154:11;168:5,
8;195:18

**parked (3)**
46:22;151:18;
177:15

**parking (114)**
9:20,20,21;15:12;
16:7;17:21;18:5;20:9,
10;22:12,16,17,18,22;
23:15;27:18,20;
34:11,19,21;37:9;
38:11;39:6,10,13;
40:11;44:16;45:17,
17;47:5,8,12,17,18,
21;48:1,6,8,20;49:5,8,
9,11,12,18,25;50:3,9,
12,19,20;51:19,21,22;
52:18,19,22,24;53:11,
17,22;57:21;60:10;
61:25;62:10,11,13;
63:2,3,6,10,15,18;
72:13,17;101:11;
102:6,9;108:20;
109:15;110:5,10;
117:4,20;118:22,25;
121:18,20;122:4;
142:7;143:18,21,22;
144:7,17,21,23;145:4,
20,21;146:3,23;147:1,

**part (46)**
8:22;10:1;15:5,14;
17:2,3;18:11;19:4,24;
21:14;22:3;23:2;27:1,
7,8,22;28:1,25;29:12;
30:14;31:3;32:19;
47:10;52:12;53:7,11;
54:13;56:11;59:11;
73:1;99:25;101:12;
108:7;117:15;124:17;
127:19;128:10;
133:22;140:24;166:1;
182:24,25;186:19;
187:14,16;190:13

**particular (3)**
67:14;80:22;207:10

**pass (2)**
83:19;176:23

**passage (1)**
90:11

**pass-by (3)**
51:24;52:4;57:17

**passed (2)**
153:19;175:11

**passenger (2)**
59:12;162:24

**passes (1)**
209:3

**passing (1)**
195:2

**pass-through (2)**
83:9,13

**past (5)**
12:18;127:8;
158:21;187:21;
203:14

**patently (1)**
151:21

**Patrick (1)**
186:3

**patrons (1)**
90:14

**pattern (1)**
107:5

**patterns (2)**
17:6;52:17

**Paul (1)**
173:8

**pave (1)**
178:23

**pavers (2)**
29:2;106:25

**peak (12)**
52:2;56:10,19,19;
57:4;58:2;63:11;
64:10,16,16;65:4,5

**peaks (1)**
65:4

**pedestrian (1)**

**2,9,16;151:14,16;**
154:10;155:10;
162:19;170:1;173:19;
177:11

**pedestrians (3)**
21:18;22:6;98:16

**pencils (1)**
173:24

**Pennsylvania (2)**
67:7;69:8

**people (44)**
58:12;59:5,8;74:1,
12;75:7,24;76:25;
96:25;97:4;108:1;
130:2;135:21,23;
137:17;144:3,4,6;
152:6;154:5;157:8;
158:4,12;161:16,18,
19;162:2;164:8,20,
25;166:5,8,17,18;
170:6;171:7;172:7;
173:12;176:19;200:8;
204:22;205:12,17,24

**peoples (1)**
164:3

**per (15)**
22:21;49:5,6,19;
50:13;56:9;64:10;
101:8,10;103:20;
135:24;136:11;
151:20;163:10;
181:10

**Perc (2)**
203:9,11

**perca (1)**
203:8

**percent (29)**
49:9;51:9,12;84:24;
87:2;96:20;99:14;
133:15;143:21,22;
144:7,10,12,14,14;
147:1,12,14;148:13,
14,16;153:22;174:21;
175:10,16,23,23;
176:1,2

**percentage (1)**
39:1

**perhaps (4)**
31:19;97:19;
107:24;158:24

**perimeter (3)**
30:9;70:15;72:15

**period (5)**
9:2;53:6;56:23;
63:16;128:2

**periodically (1)**
108:1

**periods (2)**
65:5,6

**permission (1)**
65:16

**permit (7)**
9:23;33:3,6,12,15;
63:6;96:20

**permits (2)**
33:5,5

**permitted (4)**
52:9;84:20,23;
113:7
**perpendicular (2)**
177:6,8
**personal (1)**
182:24
**perspective (4)**
52:6,18;60:13,17
**perspectives (2)**
78:2;79:8
**Peter (5)**
6:18;78:24,24;
94:24;168:24
**PETROW (18)**
188:6,9,10,14,16,
22,24;189:1,10,15;
190:8;191:1,8,16,22;
192:6,17,20
**P-e-t-r-o-w (1)**
188:10
**phase (1)**
189:1
**photograph (3)**
14:4;18:10;19:22
**Phyllis (4)**
169:3,19,22;170:7
**physical (1)**
179:1
**pick (2)**
60:7;87:15
**picked (3)**
132:14,15,17
**pickup (2)**
83:3;91:19
**pickups (1)**
133:7
**picture (3)**
60:14;127:10;164:5
**pictured (1)**
108:14
**pictures (1)**
154:20
**piece (2)**
181:9;182:16
**PIERRO (7)**
168:23,23;169:6,
10,12,16,18
**pilot (1)**
8:10
**pipe (21)**
27:10,13,21;28:14,
14;38:2,7,19;94:12;
127:16,17,17,20;
130:7;143:10;186:13,
21;187:1,6,10,17
**piped (2)**
37:20,23
**pipes (2)**
127:18;187:9
**pizza (2)**
152:24;172:1
**place (15)**

46:17;56:3;74:10;
123:15;166:18;
172:11,11,12,12;
173:17;181:17;
184:22;191:3;197:19;
205:4
**placed (2)**
30:3;60:1
**places (3)**
69:5;152:24;172:1
**placing (1)**
97:19
**Plainfield (1)**
67:18
**plan (62)**
7:21;9:17;18:22,24;
19:4,7,14,15,20,23,
24;22:3;24:2;32:14;
33:25;34:3;40:18,20,
21;46:12;48:7;49:6;
52:9,13;53:8,8;60:2;
62:20,23;72:18;
75:11,17;82:17,18;
99:20;100:4,6,10,22;
103:6,11,18,21;108:6;
121:5;130:23;137:18,
24;138:25;139:2,5;
141:1;149:16;161:4;
167:22;168:1;173:17;
174:1;189:4;190:23;
196:19;199:15
**planing (1)**
138:12
**planned (3)**
39:9;159:1;167:2
**planner (8)**
55:15;101:22;
115:1;138:3,16,23;
139:11,18
**planning (12)**
12:20;32:16,20,23;
47:10;92:7;105:21;
138:7,22;148:6;
160:1;181:21
**plans (13)**
31:20;37:13;65:20;
75:19,22;76:22;
99:25;100:14,24;
102:14;120:25;
124:17;169:24
**platform (8)**
97:3,6,6,8,20;99:5;
178:24;179:4
**plaza (6)**
25:15;37:3;142:10,
18;143:8;187:7
**pleading (1)**
173:15
**please (23)**
4:11,18;6:6,10;
41:9,14;61:23;70:3;
83:9;85:6;135:19;
157:5;166:3;167:2;

169:5;171:4;194:11;
196:3,8;197:14;
198:20;199:2;207:25
**pledge (2)**
4:18,19
**plowed (1)**
109:23
**plus (5)**
102:19,19,21;
154:2;184:13
**pm (8)**
56:25;59:23,23;
63:7,8;64:18;65:1;
210:1
**poem (1)**
164:7
**point (38)**
10:16;16:17;26:2,
11;38:4;70:13,20;
74:5;83:9;85:17;
97:13;98:9;99:14;
104:8;110:7;119:23;
121:23;122:2,2;
124:14;128:12;130:2;
143:16;146:1,15;
147:19;149:1,9;
170:8,9;175:19;
182:4;187:3;193:6;
199:19,22,24;200:8
**point-by-point (1)**
31:24
**pointed (4)**
125:10;150:4;
163:13,14
**points (5)**
17:17;25:13;26:2;
46:19;172:5
**pole (3)**
24:21;25:6,7
**pole-mounted (1)**
30:21
**police (2)**
32:21;135:3
**poling (1)**
25:2
**politic (1)**
182:25
**politically (1)**
206:3
**pollution (1)**
189:20
**POLVERE (4)**
159:11,14,14,17
**P-o-l-v-e-r-e (1)**
159:17
**pooling (1)**
51:13
**porter (2)**
82:25;87:21
**portion (21)**
14:2,17,18;16:5,7,
16;28:20,21;30:14;
35:23;46:7;47:20,23,

23;49:15;81:10;
85:19;99:4;117:13;
170:11;206:21
**pose (1)**
110:16
**positive (1)**
150:10
**possible (1)**
135:24
**possibly (5)**
95:15;119:22;
137:20;171:14;
188:13
**posted (1)**
4:7
**potential (2)**
27:14;52:5
**potentially (2)**
57:18;86:8
**pound (1)**
172:23
**pounds (1)**
172:23
**power (4)**
24:21;25:6,6;148:3
**practice (1)**
38:9
**pre (1)**
201:4
**predominantly (2)**
15:10,11
**prefer (2)**
38:9;98:5
**preference (1)**
24:22
**preliminary (2)**
9:16;150:1
**premature (2)**
146:5,6
**prematurely (3)**
147:24;173:11,16
**premises (1)**
111:2
**preparation (1)**
42:3
**prepared (5)**
60:23;110:22;
164:7;189:22;190:12
**preparing (1)**
65:19
**Present (9)**
4:22;5:10;9:14;
10:14;70:4;156:24;
185:15;197:2,2
**presentation (3)**
152:19;154:1;
163:19
**presentations (1)**
160:5
**presented (3)**
19:20;160:15,16
**pretty (5)**
70:17;72:16;75:14,

23;49:15;81:10;
85:19;99:4;117:13;
170:11;206:21
**pose (1)**

20;77:23
**prevent (2)**
150:6,13
**previous (4)**
93:18,18;118:21;
159:22
**previously (2)**
19:21;45:13
**price (20)**
78:20;164:2,2,18;
165:17;193:3,4,11,16,
21;194:8,9,10,12,16,
20;195:3;206:14,18,
22
**primary (1)**
26:2
**principles (1)**
47:8
**prior (2)**
186:4;192:4
**private (9)**
9:12;83:3;84:6,8;
87:25;88:2,24;98:5;
133:6
**privately (2)**
87:18;109:21
**probably (17)**
69:9;78:7;79:24;
80:3;81:23;106:1,13;
108:23;110:2;126:2;
128:22;141:13;
166:13;171:25;
186:23;201:17;202:5
**problem (10)**
40:3;110:16;142:4,
8,9;144:9;147:9,16,
17;162:12
**problems (2)**
173:18,19
**procedure (1)**
108:3
**proceeding (1)**
4:13
**proceedings (1)**
135:18
**process (6)**
7:24;104:11;
175:24;181:15;183:3;
201:8
**produce (1)**
9:3
**profession (1)**
43:19
**professional (17)**
10:9,10,15;12:13,
19,20;13:14;41:16,
25;42:10,14;43:4,24,
25;55:2,14;76:25
**professions (1)**
55:20
**proffered (1)**
43:5
**progress (1)**

205:19
**project (48)**
7:10,16;8:1,2,10,
23;9:5,11,15;23:2,3;
24:20;31:4;44:17,25;
45:2,20;49:2;50:12,
24;51:15;56:18;60:1,
7,17;64:22;67:14;
101:17;106:24;108:8;
129:6,13,23;155:21;
156:6;157:10;184:8,
13,24;185:24;186:8,
20;187:15;201:6;
202:4;206:8;207:3;
209:9
**projections (2)**
51:1;52:4
**projects (13)**
30:19;43:15;47:12;
48:17;50:6,11;54:13;
59:18;60:4;63:8;
175:25;184:14,21
**promoted (2)**
47:9;52:13
**pronunciation (1)**
162:8
**Proper (4)**
6:21;38:25;138:12;
144:13
**properly (1)**
134:18
**Properties (9)**
8:4;16:3;30:16;
181:5,7;182:10;
189:7,23;191:3
**property (42)**
7:7,18;9:10,16,18;
11:6;13:24;14:13;
16:4,17,18;17:16;
21:17;24:19;46:25;
78:13;98:5,6;111:5;
133:23;156:5;181:16,
22;183:2;188:17;
189:24,25;191:10,11,
24;192:3,10,14;199:5,
8,14,16;200:13,25;
201:10,25;202:16
**proposal (1)**
53:14
**proposals (1)**
7:25
**propose (1)**
63:1
**proposed (13)**
19:25;20:9;22:12,
25;26:4,8;27:21;
47:16;53:22;62:13;
127:19;134:3,11
**proposing (1)**
127:14
**protect (1)**
86:9
**protégé (1)**

69:17
**protocol (2)**
190:7,7
**proud (1)**
165:25
**proved (1)**
170:5
**proven (1)**
161:22
**provide (13)**
8:18;22:8;27:13;
29:23;31:25;34:5,16;
54:11;57:24;91:9;
134:8;163:13,17
**provided (13)**
6:22;22:4;47:4,19;
49:22;53:7;80:19;
103:10;124:17,21;
133:17;134:5,6
**providing (5)**
8:10,25;21:17;
29:14;103:21
**provision (2)**
8:19;134:1
**proximate (1)**
53:22
**proximity (4)**
44:18;45:8,11;
128:21
**PSE&G (1)**
24:20
**Public (26)**
4:4;7:17,24;11:25;
32:22;41:19;44:19;
45:3;51:8;52:5;57:2,
22;88:25;98:6;113:5;
135:9,20;136:8,17;
148:25;149:6,13;
196:17;204:13;
206:21;209:8
**pull (1)**
53:16
**pulled (1)**
69:19
**purchase (1)**
181:2
**purchasing (1)**
192:10
**purpose (5)**
24:18;25:8;63:3,14;
151:1
**purposes (1)**
127:23
**put (26)**
24:22;30:18;38:17;
60:24;71:21;72:23;
73:15;129:1;138:12;
152:5;158:19;164:6;
170:3;172:23;173:13,
25;175:10;183:11,13;
187:8;191:14;193:7;
194:5;199:6;201:19;
207:16

**putting (7)**
59:4;95:15;122:14;
130:7;152:6;162:11;
168:7

**Q**

**quaint (1)**
157:2
**qualifications (2)**
55:14;152:17
**qualified (9)**
13:17;42:5;43:4,23;
44:9;67:17,20;69:15,
24
**quarter (1)**
27:24
**Q-u-e-e-n-e-y (1)**
156:18
**questionable (4)**
160:10,12;191:17;
192:8
**queueing (3)**
53:13,24;54:17
**quick (8)**
10:17;23:19;
146:10,15,18;165:4;
184:23;187:25
**quickly (1)**
82:12
**quietly (1)**
159:4
**quite (7)**
45:21;46:9;80:17,
18;141:9;143:23;
204:4

**R**

**RA (1)**
68:15
**radius (6)**
31:7;90:18;91:8;
92:3,11,14
**rail (1)**
179:16
**railroad (14)**
15:18;16:25,25;
58:21;97:3;98:21;
126:13;166:14;
176:25;177:11,16;
178:24;180:7;195:2
**rain (1)**
125:11
**Raise (10)**
12:8;41:10;54:22;
55:9;65:24;67:22;
85:5;172:19;175:11;
198:19
**raised (4)**
146:24;175:13;
205:1;209:8
**ramp (3)**

54:9;90:7;102:23
**ramps (3)**
22:10;36:8;179:9
**Ranch (4)**
158:5;159:5;
167:18;182:1
**range (1)**
79:16
**Ranger (1)**
166:7
**Raritan (1)**
67:19
**Rather (3)**
47:12;63:12;98:25
**ratios (1)**
50:9
**RB (1)**
184:1
**RCP (1)**
27:10
**reached (1)**
198:1
**reaching (1)**
4:15
**read (4)**
93:21;115:2;
116:17;168:25
**ready (2)**
12:8;174:1
**real (5)**
8:24;10:17;74:6,10;
146:18
**realistic (1)**
8:19
**realize (2)**
155:19;200:4
**realizes (1)**
148:5
**really (27)**
9:5,14;18:21;32:5;
44:5,7;74:16;75:15;
82:12;104:7;108:2;
137:24;139:8;150:8;
153:7,7;159:21;
163:21;171:9,18;
172:22;173:20;
184:19,25;185:21;
187:24;203:17
**rear (9)**
16:3;23:15;26:3;
30:14;47:20;108:15,
19;109:6,7
**reason (9)**
13:11;53:24;157:6,
9;158:9;175:22;
178:14;182:21;
200:14
**reasons (2)**
24:25;39:13
**rebate (1)**
170:12
**recall (1)**
118:4

**receive (1)**
103:8
**received (8)**
7:4;14:11;19:17;
70:10;71:24;76:14;
78:17;81:6
**recent (2)**
14:6;206:2
**recepted (1)**
153:18
**Recess (1)**
135:16
**recognize (2)**
96:23;107:18
**recommend (1)**
93:23
**recommending (1)**
45:23
**Record (8)**
4:6;6:18;12:12;
55:18;76:9;135:11;
146:22;203:2
**recover (1)**
58:14
**recovery (1)**
179:23
**recycling (2)**
132:7,9
**redeveloped (1)**
139:3
**redeveloper (3)**
8:2,5,6
**Redevelopers (3)**
6:5,20;8:3
**redevelopment (35)**
7:13,19,19,21;8:7;
9:15;21:13;25:23;
29:19;35:23;44:18,
22;45:5;46:12;48:7;
49:6;52:9,10,12;60:2,
2;63:8;101:25;
103:20;138:25;139:2,
4,5,15;160:23;
181:10;196:4,6,15;
200:16
**redevelopment's (2)**
159:19,20
**reduce (1)**
51:19
**reduced (1)**
51:19
**reduces (1)**
162:23
**reducing (2)**
45:16;151:8
**reduction (11)**
28:6,7,10;96:20;
143:21,22;144:7,10,
13;146:3,23
**redux (1)**
171:5
**re-entry (1)**
58:21

**refacing (1)**
158:1
**refer (3)**
82:17;84:15;142:20
**referendum (1)**
137:14
**refuse (2)**
95:6;157:18
**regard (7)**
36:21;61:9,25;
103:2;108:13;162:7;
200:9
**regarding (5)**
7:16;32:7;186:13;
190:15;209:8
**regards (1)**
39:5
**regional (1)**
59:14
**registered (5)**
10:12;65:18;68:18,
21;69:24
**regret (1)**
169:22
**regulars (1)**
148:10
**Reiger (4)**
5:11,12;208:13,14
**reinforced (1)**
27:10
**related (1)**
50:24
**relating (1)**
34:21
**relation (1)**
128:20
**relatively (1)**
92:4
**relevant (1)**
4:14
**reliance (2)**
45:17;162:23
**relocate (8)**
167:18,18;195:22;
196:21,22;197:4,10,
15
**relocated (1)**
25:2
**relocation (2)**
167:22;196:18
**remains (1)**
155:24
**remedied (1)**
203:24
**remember (9)**
130:11;141:21;
142:4,15;144:15,18;
162:14;182:5,6
**reminds (1)**
137:10
**removal (3)**
109:19;110:16;
132:12

**remove (1)**
111:1
**removed (3)**
26:22;47:1;109:25
**removing (1)**
110:12
**rendered (2)**
70:23;72:3
**rendering (10)**
14:1;18:18,20,22,
24;19:4,7,14;126:24;
127:6
**rendition (2)**
80:5;137:4
**renew (1)**
197:13
**Renewal (2)**
6:6,21
**rent (1)**
49:24
**rental (1)**
176:2
**rented (1)**
131:20
**renters (1)**
75:23
**renting (1)**
77:1
**rents (1)**
76:24
**reopen (1)**
178:5
**repeat (4)**
40:10;61:19,22;
94:3
**replacing (1)**
157:25
**report (1)**
94:23
**reports (5)**
149:3,9;189:2,22;
190:12
**representatives (1)**
191:6
**represented (3)**
196:24;197:21;
198:2
**represents (1)**
103:6
**republicans (2)**
165:22,22
**request (6)**
135:13;150:14;
184:3;185:21;197:13;
203:1
**requested (1)**
10:1
**requests (1)**
7:25
**require (3)**
32:20;129:2;151:13
**required (10)**
35:23;99:23;103:4;

105:1;107:25;110:24;
111:1;134:15;167:22;
187:16
**requirement (13)**
8:18;32:8,21;48:8;
49:11;51:21;101:5;
122:17;132:12;
133:21,21;191:23;
196:3
**requirements (14)**
8:17;21:15;94:25;
101:12,13,24,25;
102:1;122:1;135:3;
148:19;179:2;190:15;
192:23
**requires (4)**
10:3;21:23;87:2;
133:15
**res (1)**
171:14
**rescheduled (1)**
185:5
**research (1)**
152:18
**reserved (1)**
62:21
**residence (2)**
15:3,4
**resident (4)**
106:15;109:15;
128:8;167:8
**residential (27)**
9:19;15:15;16:2;
23:3,10,13,16;26:1;
39:14;45:6,7;47:6,16;
48:12,17;49:15;
50:20;51:7;53:3,5;
62:10;83:2;90:7;
117:13;144:25;145:1,
8
**residents (13)**
39:16;62:11;75:16;
76:21;80:21;128:8;
154:4,10;161:6;
168:5;170:10;199:7;
204:25
**resolution (2)**
11:6;185:2
**resolutions (1)**
200:19
**resolution's (1)**
200:9
**resolved (1)**
182:11
**respect (1)**
137:17
**respectfully (1)**
185:21
**response (1)**
204:22
**responses (2)**
160:11,12
**responsible (1)**

8:24
**rest (3)**
138:18;159:3;
192:20
**restaurant (20)**
15:4,9;16:19;17:21;
18:3;25:20;63:11;
104:9,12,14;131:20,
20,22,25;132:12,22;
172:4,8,13;189:23
**restaurants (6)**
15:2;47:15;172:9,
10,14;173:1
**restaurant-type-of-use (1)**
104:1
**restore (1)**
158:6
**result (2)**
46:11;52:10
**retail (51)**
9:21;15:2,9,24,25;
23:6,6;25:14,14,21;
33:22;45:6;47:6,15;
48:2;49:4,17;50:19;
51:2,3,23,24;56:13;
57:6,7,8,16;62:14;
63:11;64:23;74:2,2;
90:13;95:7,9,18,20;
96:12;105:23;106:16;
108:13,14;109:7;
145:3,17;151:10,11;
152:22;154:2;171:14,
25
**retailer (2)**
57:12;152:18
**retailers (1)**
74:5
**retainer (2)**
114:2,5
**rethink (1)**
158:1
**retirement (1)**
69:19
**return (2)**
31:6;56:25
**review (3)**
60:24;93:23;97:14
**reviewed (3)**
141:1;149:17,17
**reviews (2)**
149:16;189:8
**revised (4)**
70:23;72:3;99:19;
121:12
**revision (3)**
71:8,11,13
**revisions (1)**
32:14
**revoked (1)**
13:11
**RFP (1)**
7:25
**rhyme (1)**

159:11
**rid (1)**
130:8
**ride (1)**
165:8
**riders (1)**
59:13
**ridge (1)**
84:25
**Ridgewood (1)**
4:6
**ridiculous (5)**
151:17;163:2,3;
166:12;194:5
**right (128)**
4:10;6:4;9:22;
11:22;12:5,7,8;14:5;
15:17;17:18;24:6;
32:10;34:7;40:3;
41:10;44:1;51:15;
54:15,22;55:9;58:10;
59:6;60:20;63:22;
64:6;65:22,24;66:9,
23;67:22;68:7,8;
70:25;72:5;73:1,14;
74:3,3;76:1;78:20;
81:13;82:4,19;83:11,
14;84:5;85:23;87:10;
90:6,9;91:3;92:10,16;
93:9;97:9;98:18;
100:2,7;102:17;
104:23,25;106:23;
109:8;111:6;112:24;
113:11;114:7;116:1,
14;120:7;122:21;
123:20;124:15;126:2,
5;127:4,15;130:9,17;
131:3;134:10,20,22;
135:6;138:3,6,13;
142:11;145:4,17;
147:25;149:7,24;
151:7,11;153:8,9;
154:19;156:4;157:7;
162:9;166:9,18;
168:17;170:21;
172:10;174:12,14,14,
25;176:20;177:19,22;
178:16;187:21;191:1;
193:21;194:23;
199:16,17,25;201:17;
203:20;204:2;205:4,
22;206:6;209:15
**right-of-way (5)**
14:25;15:17,19;
26:24;129:3
**rights (1)**
164:24
**rip (1)**
159:3
**risk (1)**
94:13
**River (3)**
164:12;205:21;

206:15
**Road (52)**
7:8;14:19,20;17:5,
7,16;18:2,12;20:6;
21:24;26:12;28:19,
24;29:22;30:13,25;
31:8;46:6,21,25;47:3;
66:12;78:12;81:11,
14,18;85:7;86:15;
93:20;97:18;109:4;
124:2;126:16;128:11;
129:13;157:3;162:12;
166:12,15;167:6;
171:24;176:12;
177:12;178:12,17;
179:24;180:11,21;
183:19;187:9;194:14;
205:23
**roads (2)**
20:5;205:18
**roadway (8)**
45:19;46:23;52:12;
57:18;59:4,14,20;
60:10
**roadways (3)**
23:1;162:19;163:7
**Rockland (1)**
45:10
**Roll (2)**
4:20;207:25
**rollout (1)**
172:3
**roof (19)**
27:19;38:1;104:5,6;
115:15;117:12,19,21,
21,23;118:2;119:2,3,
4,6,14,16,17,18
**rooftop (1)**
117:5
**room (17)**
6:14;11:14;26:7;
53:20;77:11,20,20;
82:23;83:2;88:4,13;
89:5;95:15;114:23;
131:21;148:5;198:13
**rooms (1)**
131:24
**Rooney (4)**
169:3,19,22;170:8
**roughly (3)**
30:6;127:5,9
**round (1)**
9:1
**rounded (3)**
74:17,19;77:19
**Route (3)**
60:8;162:17;165:11
**row (1)**
159:1
**RSIS (3)**
48:7,18;49:1
**run (4)**
45:11;99:1;107:2;

187:21
**running (4)**
46:6;51:17;74:13;
146:25
**runoff (5)**
28:11;29:24;38:21,
21;94:7
**runs (2)**
95:9;201:23
**rush (2)**
56:23;187:25
**rusty (1)**
191:9
**Rutherford (1)**
41:21

## S

**sacrifice (1)**
59:3
**safe (3)**
53:10;91:12;131:5
**safety (2)**
58:11;114:3
**sailed (1)**
157:19
**sale (3)**
176:2;182:2;183:1
**salons (1)**
144:17
**same (27)**
13:18;18:19;62:14;
64:18;68:9;69:16;
70:17;71:5,10;72:15,
16;82:8;85:21;94:9;
106:12;110:13,15;
118:9,10;119:10,18;
120:21;125:15;
154:14;174:17;
184:15;187:11
**sample (1)**
81:4
**samples (1)**
108:2
**sanitary (5)**
17:10;28:18,19,21;
33:7
**sanitizer (1)**
203:10
**sardine (1)**
164:5
**sat (2)**
141:19;160:2
**satisfaction (1)**
9:7
**satisfactory (2)**
112:6;200:20
**satisfied (4)**
179:19;190:19,22;
207:7
**satisfy (2)**
190:15;192:23
**satisfying (1)**

138:9
**Saturday (1)**
64:16
**Saturdays (1)**
65:2
**saving (1)**
177:23
**saw (10)**
70:14;72:16,18;
74:18;77:17;78:2;
79:8,11;107:21;155:8
**saying (13)**
116:16;120:5,8;
126:17;128:5,20;
164:20,25;174:11,20;
181:23;192:6,7
**SCALA (9)**
195:6,7,11,14,17,
20;197:18,22;198:8
**scale (2)**
125:6;139:20
**scaling (1)**
52:7
**schedule (1)**
39:7
**scheduled (1)**
83:4
**scheme (1)**
92:9
**School (3)**
160:15,20;165:5
**SCHUST (1)**
208:3
**SCHWINDER (212)**
4:1,20;6:2,3;10:18;
11:24;16:10;17:24;
20:20;21:1,4,8;32:2;
33:19;36:5;37:16,24;
38:13;39:4;40:8;41:2;
54:8,15,19;61:6,14,
18,22;62:6;65:9;81:8,
20,25;83:8,12,15,18,
21,24;84:2;85:6;
100:18,21,25;101:4,7,
21;102:2,25;103:22;
104:10,18,25;105:20;
106:8,18;108:12,18;
109:2,10;110:4,23;
111:6,12,16,22;112:1,
8;118:19;123:3;
124:24;125:24;126:5,
9,12,15,20;127:4;
129:10,15,20;130:4,
10,15,18,21,25;131:4,
11,15,18;132:10,17,
20;135:7,12,17;136:5,
10,13,16,20;140:1,5,
15,18,21,25;141:5,10,
11,20;142:3,14,19,23;
143:3;144:19;145:9,
13;147:4;149:10,12,
15,22;150:3,9,12,18;
154:13,17,21;155:15,

20,23;156:4,8,16,19;
159:13,16;161:10;
163:25;164:16;
168:11,15,19,22;
170:19,24;171:3;
173:6;174:3,5;175:4;
176:8,17,21,24;177:5,
14;178:2,7;180:18;
181:6;183:22;186:17;
188:4,7;193:1,9,14,
18;194:8,10,13,18;
195:1,4;196:2,8,12;
198:9,11,16,19,24;
199:1;203:21;204:10,
15,17,20;206:17,20;
207:1,6,9,13,17,21,
24;208:18,19,22;
209:1,5,11,14,18,22,
25
**science (1)**
41:23
**scored (1)**
29:2
**screened (1)**
104:5
**seaboard (1)**
42:19
**Sean (2)**
196:25;197:14
**season (1)**
158:10
**seat (1)**
135:19
**seating (1)**
80:12
**seats (2)**
148:6,9
**second (20)**
18:18;20:18;23:17;
54:21;71:22;118:23;
136:12,13;145:7,19;
167:13;168:4;199:13;
204:15,16;207:22,23,
25;209:20,21
**Secondary (1)**
95:20
**second-story (1)**
15:8
**SECRETARY (26)**
4:21,23,25;5:3,5,9,
11,13,15,18,20,22,24;
6:1;169:4;208:1,3,5,7,
9,11,13,15,17,20,24
**Section (5)**
32:9;48:18;84:17;
85:24;192:3
**secure (1)**
181:2
**security (1)**
39:13
**seeing (6)**
82:3;115:20;120:2;
130:6;170:25;204:12

**seeking (1)**
9:23
**seeks (1)**
146:24
**seem (2)**
72:8;140:12
**seems (1)**
146:4
**sees (1)**
51:24
**selected (1)**
30:18
**selection (1)**
152:18
**self-contained (1)**
75:6
**sell (3)**
157:13;192:7,24
**senior (1)**
169:1
**sense (4)**
46:17;151:7;
163:21;173:2
**sentiment (1)**
171:11
**separate (3)**
10:5;77:23;116:15
**separation (1)**
79:15
**September (1)**
185:4
**series (1)**
179:9
**serve (1)**
25:8
**served (4)**
42:8;43:14;48:21;
59:2
**Service (15)**
6:25;9:21;59:9;
63:3;82:24;91:2,3;
95:8,14;108:22;
109:5;135:4;164:17;
179:9;180:1
**serving (1)**
205:2
**set (9)**
11:20;19:24;32:8;
92:13,17;121:13;
127:2;133:15;176:1
**setback (8)**
24:23;79:18;
112:17,18,23;113:10,
13,14
**settle (1)**
8:15
**settlement (7)**
8:12,22;9:6;101:12,
20;134:3,4
**Seven (7)**
75:3;133:16;
134:12,17;148:6,9;
205:14

**several (4)**
8:3;58:13;179:3;
197:5
**severe (2)**
130:6;150:14
**severely (1)**
125:13
**sewer (5)**
17:10;28:21;32:22;
33:3,7
**shade (1)**
29:17
**shame (1)**
161:25
**shape (2)**
124:23;163:8
**Share (7)**
8:13,23;49:7;50:18;
63:10;151:16;205:23
**shared (6)**
47:5,8,14;57:21;
144:20;147:2
**sheet (5)**
70:23;72:4;76:5,7;
99:14
**ship (1)**
157:18
**shoots (1)**
83:1
**shop (4)**
80:13;142:12;
152:1;163:6
**shoppers (1)**
151:16
**shopping (2)**
57:8;74:15
**ShopRite (2)**
163:5;165:21
**short (1)**
128:2
**shortly (1)**
32:24
**shovels (2)**
200:24;201:20
**show (12)**
18:19;75:17;78:4,7;
91:8;100:9;122:7;
123:2;124:11;134:18;
137:2,3
**showed (1)**
127:10
**showing (6)**
72:25;73:4;80:4;
90:17;101:3;113:19
**shown (2)**
100:5;102:10
**shows (7)**
18:10;24:3;31:25;
106:14;145:17,17;
160:21
**shrubs (1)**
29:18
**SHUST (24)**

4:21,23,25;5:3,5,9,
11,13,15,18,20,22,24;
6:1;169:4;208:1,5,7,9,
11,15,17,20,24
**shutoff (1)**
39:9
**SHUTS (1)**
208:13
**shy (1)**
157:4
**sic (1)**
153:19
**side (9)**
23:9;24:24;27:6;
117:17;120:2;140:11;
177:7,9;186:25
**sides (2)**
21:12;122:8
**sidewalk (15)**
21:15,22,23,25;
22:5;29:3,6,15,16;
32:8;36:21;45:9;
74:23;92:15;128:25
**sidewalks (1)**
37:21
**sign (8)**
105:13,21,21,23;
106:7,11;159:5;
173:13
**signage (5)**
26:4,5;105:7,15;
106:13
**signal (1)**
59:22
**signalized (1)**
17:7
**signals (1)**
179:19
**signed (2)**
158:17;159:3
**significant (3)**
46:10;51:5;59:19
**significantly (2)**
52:17;60:18
**sign-off (1)**
33:15
**signs (4)**
4:9;26:8;63:5;
105:22
**sills (1)**
129:24
**similar (7)**
19:10,19;63:4,15;
64:18;72:2;82:3
**simple (1)**
183:15
**simply (2)**
47:12;60:14
**single (6)**
70:18;71:20;72:9,
20,21;73:21
**single-family (3)**
15:3,3,15

**single-occupancy (3)**
45:18;51:11;162:24
**sink (1)**
107:25
**sip (1)**
172:8
**sit (1)**
63:13
**site (84)**
9:16;13:15;14:1,1,
17,18;15:1,10,11,20;
16:5,6,22,23;17:2,11,
20;18:22,23;19:7,14,
22,24;20:3,13;22:12,
24;23:8,11;26:5,10,
11,19,23;27:1;28:3,3,
4,5,11,17;29:21;30:4,
14;34:19;38:21;
40:18,20;44:18;
45:11;46:4;47:19,20,
23,24;48:6,12;49:15;
52:16,21;53:8;56:16,
24,25;59:24;61:16;
73:22;82:17;83:6;
85:17;91:13;93:23;
106:14,22;109:25;
120:25;124:17;
126:24;127:22;
134:11;152:17;
190:23,24;204:5
**site's (3)**
29:6,11;203:22
**sits (1)**
11:15
**sitting (1)**
182:23
**situation (3)**
170:3;173:1;195:23
**six (9)**
100:16;101:9;
202:5,7;204:23,23;
205:14;208:20,22
**size (4)**
36:12;38:19;88:14;
139:9
**sizes (1)**
157:10
**sketch (2)**
90:17;121:6
**slanted (1)**
11:25
**slaughterhouse (1)**
164:24
**sleeve (1)**
186:25
**slight (1)**
70:13
**slightly (2)**
92:8;101:11
**slop (1)**
132:23
**slope (3)**
119:21;120:9;

128:16
**slopes (3)**
16:19;120:7;128:12
**sloping (2)**
26:13,14
**small (8)**
15:13;16:23;26:21;
77:5;127:15,18;
157:10,12
**smaller (2)**
57:9;91:14
**snarled (1)**
157:14
**sneer (1)**
157:14
**snow (7)**
109:19;110:5,8,13,
16;111:1,4
**snowstorm (1)**
110:25
**so-called (1)**
97:6
**social (1)**
158:8
**socialize (1)**
205:7
**soil (7)**
9:23;32:16,25;
149:16
**Soils (1)**
149:3
**Soldier (1)**
166:12
**somebody (10)**
83:25;97:22;98:25;
114:8;136:6;151:24;
199:4;201:4;205:13;
206:10
**somehow (2)**
98:15;162:13
**someone (2)**
160:9;163:14
**someplace (1)**
186:16
**sometimes (2)**
58:13;80:1
**somewhere (3)**
79:16;99:4;162:18
**soonest (2)**
202:4,8
**Sorry (21)**
6:16;16:13;17:25;
20:12;23:19;31:22;
32:18;39:23;43:13;
64:1;136:21;154:8;
156:16;169:5,7,14;
174:9;175:7;185:11;
188:22;195:11
**sort (2)**
98:11;188:2
**sounds (1)**
173:14
**sour (1)**

157:12
**south (11)**
16:21;23:9;24:24;
28:15;45:13;46:6;
177:9;178:17;187:3,
21,22
**southeast (1)**
23:8
**southerly (2)**
24:3,13
**southern (3)**
23:9;81:21;82:2
**southwest (2)**
23:7;27:5
**space (13)**
21:18;23:6,6;25:21;
29:23;36:17;63:14;
77:24;95:19,20;
102:16;104:15;132:7
**spaces (24)**
15:13;22:13,14,15;
40:20,22,23,24,24;
61:25;62:1,21;95:7,9;
102:9,10,14;104:9;
106:14,15;110:6;
163:10,18;173:19
**speak (8)**
65:20,21;135:23;
136:6;169:4,21;
170:4;182:13
**speaker (1)**
186:4
**speaking (4)**
57:3;111:8;152:6,
21
**special (2)**
74:10;134:19;146:6
**specialist (1)**
56:4
**specialty (1)**
57:8
**specifically (2)**
43:22;48:19
**specified (1)**
146:23
**Spell (2)**
66:21;153:15
**spent (2)**
9:9;58:7
**spill (1)**
37:21
**spillage (1)**
30:16
**spoke (2)**
111:18;112:12
**spoken (3)**
52:22;161:6;170:20
**sporadic (1)**
171:20
**spot (2)**
11:23,23
**spots (8)**
22:20,21;109:24;

151:3,9,10,11,13
**squad (2)**
16:4,16
**square (8)**
23:5;33:22;34:3;
51:3;56:13;57:11;
64:22;96:12
**stacked (1)**
79:13
**staff (1)**
190:2
**staircase (1)**
86:10
**stairs (2)**
92:17;129:3
**stairwell (2)**
97:19;99:2
**stall (2)**
49:24;52:24
**stalls (13)**
47:19,24;48:1,5,6;
49:12,12,18,19,25;
53:1;62:25;63:2
**stand (4)**
11:23;12:5;116:2;
164:24
**standard (12)**
21:14,14,22;29:1,
14,19;30:2;38:8;49:1;
112:4;129:12;179:2
**standards (14)**
25:16;31:13;48:13,
20;52:25;53:9;56:17;
84:18;101:14;103:3;
129:5;133:2;179:5;
204:3
**standing (7)**
13:8;42:21,22;
67:10;69:11;114:8;
176:13
**standpoint (2)**
35:22;114:3
**Starbucks (2)**
110:24;111:19
**Staring (1)**
157:11
**start (5)**
70:7;76:23;159:1;
174:11;200:3
**started (3)**
166:21;167:13;
192:1
**starting (2)**
4:2;142:6
**starts (5)**
29:7;36:16,17;
45:25;128:13
**state (15)**
8:14;42:1,7;48:17;
50:7;57:13;59:18;
60:9;65:18;69:22;
169:24;191:11,23;
200:10,21

**State/County (1)**
200:11
**stated (6)**
55:18;136:15;
153:20;175:9;204:19;
209:24
**statement (5)**
60:23;168:25;
189:6;192:11;201:2
**statements (1)**
192:13
**states (2)**
42:16;49:7
**state-wide (2)**
45:22;48:16
**station (16)**
9:23;16:1;28:16;
45:12;59:8;77:18;
97:10,17;98:14;
105:8,24;180:8;
188:17;193:8;194:6,
15
**stations (2)**
60:5;107:23
**status (2)**
189:8;190:3
**stay (4)**
12:3;138:13;158:4;
189:9
**step (15)**
6:6,10;10:20,22;
30:10;60:20;85:21;
87:10;97:22;128:16;
130:2;182:23;183:4;
191:6;196:13
**stepped (2)**
26:16;87:6
**stepping (3)**
125:16,18;128:24
**steps (5)**
80:7;92:18;125:1;
129:2;201:25
**still (15)**
49:25;69:9;94:14;
108:25;137:7,8;
156:2;159:20;165:25;
166:24;177:2;179:12,
18,21;180:4
**stipulate (4)**
55:2,13;134:15;
135:2
**stole (1)**
156:25
**Stonefield (3)**
10:9;41:8,20
**stoops (1)**
129:3
**stop (12)**
91:1;152:1;157:23;
163:6;166:23,24;
170:7;178:6,11;
179:15;201:6;205:19
**stopped (3)**

177:24;180:4;
194:21
**stopping (2)**
58:12;177:24
**storage (1)**
110:8
**store (6)**
15:7,8;108:24;
167:19;186:22;187:4
**storeowner (1)**
108:19
**stores (5)**
95:25;96:12;
108:14;151:12;159:1
**stories (17)**
22:19;34:12,13,14;
119:13;153:22;157:6,
22,25;165:10;175:12,
13,16;176:6,6;206:15,
16
**storm (17)**
17:1;27:3,7,13;
38:6,10,16,23;94:9;
110:5;123:14;125:25;
126:1;127:8,23;
128:4;130:12
**storms (2)**
125:11;128:2
**stormwater (13)**
16:24;26:19,21,25;
27:17,22;28:2,10,10,
13;29:23;127:21;
128:3
**story (1)**
165:4
**straight (2)**
31:5;146:22
**straightened (1)**
165:24
**strange (1)**
65:15
**street (30)**
15:21;21:16;23:21;
24:4;25:22;26:17,17;
46:1,14;62:17;73:2,8;
74:4,14,24;75:7,8;
79:19;80:11;89:6;
107:3;123:15;125:7,
23;130:6;151:2,4;
169:9;177:10;188:11
**streets (2)**
104:6;113:5
**streetscape (16)**
21:13,14,22;25:16;
29:1,2,13,13,19;30:1,
2,8;36:13;79:17;
80:16,20
**stretch (1)**
78:5
**striped (1)**
29:3
**striping (1)**
17:8

**strongly (1)**
93:22
**structure (5)**
22:24;37:9;95:22;
116:12;187:12
**structures (1)**
27:4
**stuck (2)**
162:5;194:24
**studied (1)**
50:5
**studies (2)**
42:4;59:16
**studio (1)**
99:16
**studios (1)**
99:17
**study (18)**
140:13,20,23;
141:4,6,8,15;143:17;
146:4;147:18;184:9,
11,18,20;185:22;
186:5;193:24,25
**stuff (6)**
73:20;141:15;
143:18;144:22;
147:24;150:1
**subject (9)**
46:25;149:18,25;
182:11;183:10,11;
193:10,19;200:12
**submit (1)**
33:3
**submitted (4)**
31:20;71:2;106:16;
118:21
**submitting (2)**
32:24;33:1
**Subsequent (1)**
184:6
**subsequently (2)**
7:22;8:8
**subspecialty (1)**
55:5
**substantial (1)**
58:7
**substantially (1)**
38:20
**successful (3)**
8:5;158:18;180:15
**succession (1)**
127:17
**Sudano (22)**
5:13,14;40:10,13,
15,25;131:17,19;
132:1,3,10,14,19,22;
133:3;154:24;155:1,
3,7,10;208:15,16
**sudden (1)**
77:14
**SUEZ (2)**
33:4,15
**sufficient (1)**

38:15
**suggest (1)**
159:23
**suggesting (2)**
134:7;147:11
**suitable (1)**
104:12
**suite (1)**
77:7
**suited (1)**
8:2
**Sullivan (1)**
159:9
**sun (1)**
174:13
**Sunday (4)**
194:7,9,21,25
**sunrise (1)**
39:7
**sunset (1)**
39:7
**superimposed (1)**
19:22
**supplied (1)**
190:13
**supply (5)**
47:17;49:9;50:3;
51:22;52:23
**supposed (1)**
185:3
**Sure (46)**
6:12;24:1;30:12;
35:13;37:8;38:2,3;
40:14;44:23;79:2;
87:5;94:3,15;96:6;
99:8;109:3;112:6;
113:25;118:19;
121:23;122:15,15;
123:18;125:9;126:17;
129:8;130:14,22;
131:9;137:18;160:2;
162:8;171:18;181:20;
182:2,13;192:10;
196:10;197:9,11,16,
23;198:5,6,14,22
**surface (16)**
20:9;22:13,17,18,
21;26:7;27:18;28:7,8;
40:23,24;47:21;97:1;
110:10,14;118:22
**surrounding (1)**
23:1
**suspended (1)**
13:11
**swear (7)**
11:20;12:8;41:11;
54:22;55:9;65:24;
67:23
**swing (3)**
22:6,7;88:17
**switch (3)**
153:18,24;178:19
**sworn (1)**

41:9
**system (13)**
17:1;27:7;28:13;
53:20;54:3;58:21;
59:1,11,20;88:11;
127:16;131:9;187:3
**systems (4)**
104:7,13;128:3;
180:6

## T

**table (1)**
99:9
**talk (7)**
103:19;171:12;
193:11,15,16;205:6,
24
**talked (3)**
93:17;171:13;172:1
**talking (12)**
50:24;86:11;117:2;
127:2,7;128:1;
144:24;145:24;171:7;
172:5;181:3;184:12
**talks (1)**
125:7
**tall (1)**
157:25
**tax (1)**
170:11
**Teaneck (1)**
165:11
**technically (1)**
182:24
**telecommuting (1)**
51:14
**telephone (1)**
17:12
**temporarily (1)**
94:14
**temporary (2)**
10:2;179:7
**ten (4)**
186:9,10;189:10,14
**tenant (1)**
159:2
**tenants (1)**
47:7
**term (3)**
44:24;153:18;162:9
**terms (23)**
8:25;11:5;13:16;
17:15;20:3,24;31:12;
45:15;46:16;47:17;
49:21;50:22,23;
52:23;53:2;55:19;
57:6;134:2;150:23;
160:22;183:1;190:17;
200:12
**terrace (1)**
79:21
**test (1)**

108:1
**testified (2)**
13:1;67:16
**testify (1)**
67:13
**testimony (9)**
34:6;54:4;61:2,4;
64:10;140:10;143:19;
149:2,5
**texts (1)**
189:25
**Thanks (4)**
140:4;156:13;
169:17;170:22
**Therefore (1)**
28:9
**there'll (1)**
155:12
**thinking (4)**
110:17;121:23;
159:19;168:6
**third (3)**
9:1;23:17;118:24
**Thomas (1)**
177:19
**thorough (1)**
170:21
**though (9)**
23:25;69:1;94:11;
160:22,24;161:2;
171:10;180:3;188:25
**thought (11)**
74:6;111:21;122:3;
157:21,23;163:19;
167:15;171:1,6;
183:16;191:22
**thoughts (1)**
157:8
**thousand (1)**
49:6
**three (18)**
10:7;20:5;21:11;
22:19;26:1;36:7;
65:23;94:4;108:4;
109:23;135:14;
139:25;140:2;146:11;
158:25;172:9;173:12;
176:6
**three-bedroom (8)**
99:17,24;100:1,4,
15,19;101:5,10
**threshold (6)**
50:14,16;51:4;52:1,
3;57:23
**threw (1)**
147:18
**thrive (1)**
46:18
**throughout (9)**
17:6;39:8;42:2;
45:23;46:9;50:7;
59:18;144:21;171:21
**throw (1)**

165:18
**ticketing (1)**
53:20
**tie (1)**
28:13
**ties (2)**
28:14;131:9
**tight (3)**
36:17,18;92:4
**timeline (2)**
139:13;201:19
**times (11)**
4:17;39:17;47:13;
50:1;58:14;59:10,19,
21;77:22;152:13;
173:12
**Time's (1)**
136:25
**timing (1)**
179:22
**title (1)**
181:15
**titled (1)**
19:7
**TOD (2)**
44:24;150:24
**today (5)**
24:5;32:6;46:21;
63:5;107:15
**together (2)**
132:24;173:25
**token (1)**
94:9
**told (4)**
75:1;167:1;183:4;
197:1
**Tonight (46)**
9:13;10:7;13:14,17;
14:1;18:19;43:5;
44:10;67:12,21;
69:24;70:5;73:10;
133:22;140:11;
141:14,17,24;151:21;
152:14,15;153:9;
156:24;159:19;160:5,
7,11,21,25;161:1,7,
15;162:5,6;168:2;
169:2,19,23;181:3;
183:17;193:15,19;
195:8;206:7;207:8;
209:7
**tonight's (1)**
193:10
**took (3)**
38:17;165:5;166:5
**top (8)**
80:7;86:12;115:24;
116:5;118:2,3,3;
119:6
**topo (1)**
124:16
**topography (2)**
26:13,17

**total (10)**
22:13;47:25;48:6;
49:21;57:10;84:21;
99:15;102:8;133:16;
134:11
**totally (1)**
151:24
**touch (5)**
62:4,24;108:2;
197:14
**touched (3)**
46:12;154:18,22
**towards (5)**
16:19;28:15;49:3;
78:25;128:13
**town (36)**
7:7;21:12;31:21,23;
32:1;38:17;130:5;
131:8;137:23;146:10;
157:13;158:9,20;
160:25;164:3,11;
167:12;169:24;170:1,
11;171:11;195:2;
197:4,7,10,11,17,19;
204:25;205:1,2,11,24;
206:3,11,12
**towns (1)**
13:3
**townspeople (1)**
157:21
**track (2)**
177:11,16
**tracks (6)**
15:18;24:25;
126:13;128:14;
166:14;176:25
**tracts (1)**
113:7
**traffic (90)**
10:10;17:5;20:15;
21:5,7;34:18;41:8;
42:4,6,10;43:6,7,9,10,
12,19,20,23;44:3,5,6,
10,16;45:15,16,25;
50:24;51:5,19,24,25;
52:6,11,15;55:6;
57:17,17;58:23;
59:15,22;60:3,13,16;
64:19,20;140:12,13,
20,22,24;141:4,6,8,9,
14;143:17;146:4;
147:17,18;150:23;
151:2,8,8;157:7;
162:7;163:20;166:24;
172:21,23,25;174:17;
176:14,23;177:3;
179:19;184:4,9,11,18,
20;185:22;186:5,7,8;
193:17,24,24;194:17;
205:14,16
**train (26)**
9:22;16:1;28:16;
45:12;51:16;58:14,

25;59:3,7,13;60:5;
74:13;97:10;99:1;
128:14;162:16;163:3;
166:23;177:24;
178:15,16;179:13,23;
186:10;194:1,21
**trains (6)**
59:5;144:4;178:11;
179:14,15;180:12
**transactions (2)**
158:16;204:5
**transfer (1)**
183:1
**transferred (4)**
191:10,17,24;192:3
**transient (1)**
62:10
**Transit (23)**
14:24;44:19,19;
45:3;48:21;50:10,11;
51:8,13;52:5;56:15;
77:17;97:15,25;99:3;
151:6;166:16;178:1,
3,8,10,14;179:20
**transition (1)**
24:7
**transit-oriented (8)**
9:15;44:23;45:1;
47:11;50:6;59:17,25;
151:1
**Transportation (10)**
42:9,12;43:16,17;
44:21;45:22;57:2,22;
59:6,12
**traps (1)**
172:17
**trash (37)**
63:25;82:14,22,23,
25;83:1,2,3;84:7,8;
87:15,23,25;88:4,4,8,
8,12,12,19,24;89:1,9,
22;95:10,15,22;
131:21,24;132:8,12;
156:2,3;172:3,3,14;
173:1
**treason (1)**
157:4
**treat (1)**
107:18
**treated (2)**
107:19;108:7
**treatment (1)**
33:6
**trees (2)**
29:17;167:11
**tried (1)**
78:3
**trigger (1)**
33:13
**trip (4)**
50:23,25;51:6;
56:17
**trips (4)**

52:2;56:9;57:4;
64:9
**truce (1)**
158:2
**truck (6)**
87:23;88:4;89:1,9;
90:23;91:19
**trucks (6)**
89:21,22;90:18;
91:13,14;171:16
**true (3)**
55:19;185:6,7
**truth (18)**
12:9,9,10;41:11,12,
12;54:23,23,23;55:10,
10,10;65:25,25,25;
67:23,24,24
**try (4)**
77:12;176:19;
180:9;193:4
**trying (10)**
73:12;76:17;97:16;
160:23;162:10;164:6,
20;173:12;179:12;
180:4
**Turkish (1)**
172:10
**turn (8)**
17:8;135:25;136:7,
11;170:1;173:12;
176:19;197:2
**turning (2)**
90:18;91:8
**turns (2)**
81:15;90:23
**TV (1)**
165:1
**TWA (1)**
33:6
**twelve (1)**
183:9
**twice (1)**
132:15
**twin (1)**
187:8
**two (44)**
9:9;12:19;17:19;
21:8;24:23;25:13;
28:18;49:2;53:21;
54:5;65:17;76:25;
77:4,23;102:9,24;
109:23;113:21;142:5;
148:10;151:22;
153:19;157:10,25;
159:3;163:15,16;
164:12;173:12;
174:25;176:23;
179:10;182:10,14,17;
184:14,20;189:7,22,
23;206:15,15;208:21,
23
**two-bedroom (1)**
76:24

**two-bedrooms (3)**
49:4;77:22;99:17
**two-story (1)**
15:5
**two-way (4)**
20:15;47:3;177:10,
12
**tying (2)**
27:16;31:6
**type (12)**
25:20,22,23;45:20;
50:2;51:18,23;63:15;
74:17;96:21;99:4;
179:21
**type-of-space (1)**
77:6
**types (2)**
57:21;132:13
**typical (3)**
50:9;88:25;181:14
**typically (7)**
10:5;50:12;51:5,24;
52:25;56:22;98:4

### U

**UAC (1)**
101:24
**Ubers (1)**
144:5
**ultimately (1)**
203:25
**umbrellas (3)**
74:12;80:11;172:6
**Um-hum (5)**
86:25;87:13;91:11;
99:21;113:15
**unaddressed (1)**
173:20
**unbelievable (1)**
148:13
**uncovered (1)**
47:21
**undecided (2)**
168:12,14
**under (20)**
50:13;51:3;57:11,
19,23;60:18;64:9;
89:23;115:12,21;
117:12;133:23;
158:17;181:7,8,13,24;
189:9;190:10;205:9
**underneath (1)**
187:9
**understood (3)**
62:19;68:25;180:23
**undertaking (1)**
17:4
**undone (1)**
158:13
**unencumbered (1)**
20:19
**unfortunately (3)**

139:2,12;162:5
**UNIDENTIFIED (12)**
58:4;60:21;61:11;
136:23;137:7;175:14,
18,20;182:8;189:14;
192:24;195:13
**unique (1)**
156:24
**unit (13)**
49:19;50:13;52:7;
77:16,24;98:16;
100:14;109:11;
121:16,17;154:3;
163:11,11
**units (45)**
23:4,4,13,16;26:15;
49:3;50:2;51:1,7;
56:12;57:9;64:22;
74:23;75:3;77:8,18;
79:20,21;87:22;
94:16;98:17;99:15,
15,18,24;100:1,4;
101:10;104:5,11;
109:7;121:25;124:25;
125:3;126:22;128:16,
18,21;129:8;133:16,
18;172:2;176:2,3;
184:13
**University (1)**
41:24
**unless (3)**
108:3;150:13;
191:24
**unlike (1)**
18:9
**unlikely (1)**
4:8
**unload (3)**
97:17;179:15;
180:10
**unprepared (2)**
152:19,21
**unused (1)**
47:13
**up (68)**
11:13;12:3;14:8;
25:9;28:24;42:18;
46:22;52:21;60:8;
65:17;71:21;72:10;
79:18,19,21;85:21;
87:15;90:7;94:15;
97:22;99:2,7;100:16;
109:12;110:2;118:6,
14;120:24;121:3;
125:1;128:13;130:2;
131:1;132:14,15,17;
136:25;139:22;148:6,
10;152:1;161:4;
164:7,11,19,24;165:6,
7,21;166:21;167:21;
168:22;169:4;171:23;
174:14,16;177:3,11;
178:13,24;187:17;

196:13;201:5,7,24;
202:21,24;203:13
**upcoming (1)**
184:13
**updated (1)**
137:23
**up-glow (1)**
39:21
**upgraded (1)**
143:5
**upgradient (1)**
131:8
**upgrading (1)**
131:8
**uplights (1)**
30:11
**upon (8)**
36:12;150:22;
160:5;163:7;190:25;
194:1;200:10,20
**upper (5)**
15:17;62:9;79:17,
20;100:6
**ups® (1)**
171:21
**upwards (1)**
97:20
**Urban (2)**
6:5,21
**urging (1)**
197:6
**usage (1)**
57:22
**Use (21)**
4:3;15:24,25;23:3;
25:24;47:14;52:9;
56:16;62:10,16;
90:14;97:1;111:16;
137:22;141:19;147:5;
157:16;158:3;173:3;
175:2;181:21
**used (6)**
48:1;53:19;137:10;
152:17;162:9;190:24
**users (1)**
47:6
**uses (5)**
15:2,20;63:11,11;
96:16
**using (5)**
51:10,12;105:13;
131:21;151:6
**usually (5)**
112:5;115:10;
132:23;202:24;
203:12
**utilities (2)**
17:12;28:17
**utilized (1)**
48:20

### V

**vacant (1)**
63:13
**vacated (1)**
26:24
**Valero (1)**
194:15
**van (6)**
102:9,13,16,18,18;
172:3
**van-accessible (1)**
62:1
**vape (3)**
142:12;186:22;
187:4
**variable (2)**
22:2;29:7
**variance (6)**
148:13,14,16;
150:15,15;184:3
**variance-free (2)**
35:11;150:4
**variances (3)**
10:1;35:9,22
**variation (1)**
103:20
**variations (1)**
77:4
**variety (1)**
204:24
**various (2)**
7:25;29:18
**varying (1)**
84:24
**vehicle (4)**
34:23;53:2;88:14,
16
**vehicles (13)**
45:18;53:4,21;
56:19,24;59:1,14;
60:3;64:21,24;109:5;
162:24;176:14
**vehicular (1)**
47:2
**vein (1)**
106:12
**vented (1)**
104:3
**venting (1)**
104:13
**versing (1)**
7:19
**version (3)**
19:23;70:23;72:3
**vertical (1)**
79:14
**vertically (1)**
92:18
**verticals (1)**
79:11
**via (2)**
48:2,3
**Victor (1)**
41:20

**views (1)**
205:24
**village (1)**
105:24
**VIOLA (10)**
176:9,9,19,22;
177:2,13,17;178:4;
180:13,17
**V-i-o-l-a (1)**
176:10
**violate (2)**
117:10,11
**Virginia (6)**
66:14;67:5,6;69:4,
6,7
**virtue (1)**
53:23
**visitors (1)**
50:19
**visual (1)**
104:24
**Vivian (2)**
153:14;175:6
**vocal (1)**
161:21
**VOICE (5)**
78:22;79:4;156:13;
159:8;209:16
**volumes (1)**
64:19
**vote (10)**
150:10,10;152:15;
153:9;168:1;189:17;
190:9;206:2,8;207:15
**votes (1)**
170:15
**voting (3)**
150:6,13;173:22

## W

**wait (4)**
59:9,21;171:3;
199:13
**waiting (3)**
185:13;194:22;
202:14
**waiver (1)**
148:23
**waivers (4)**
10:3;141:17,24;
148:20
**wake (1)**
72:10
**walk (12)**
11:20;29:22;72:12;
73:17;77:8,9,11,25;
97:4;154:11;155:13;
158:23
**walkability (4)**
45:3,8;48:22;80:16
**walkable (1)**
46:15

**walking (3)**
51:13;77:12;83:25
**wall (8)**
46:14;114:3,6,8,10;
116:6;117:25;118:1
**walls (1)**
28:23
**wants (2)**
164:22;169:21
**warm (1)**
74:11
**waste (5)**
89:12,13;91:13;
132:21,23
**wasting (1)**
63:13
**watching (1)**
166:6
**water (17)**
28:22;33:4,11,12;
93:20;94:10,14,16;
108:1;127:9,12;
130:8;142:4,7,17;
143:7;187:20
**watts (1)**
30:6
**way (33)**
18:10;24:4,25;29:9;
56:3;63:10;71:10;
74:12,22;85:22;
95:12,21;98:7;
107:18;110:15;
116:17;117:2;128:13;
138:4,9;150:21;
156:24;157:16;
165:21;166:10,10;
171:6;172:16;174:18;
179:6;187:4;193:25;
194:23
**Wayne (3)**
10:8,14;12:15
**ways (1)**
57:7
**weaving (1)**
15:8
**weeds (1)**
156:22
**week (2)**
132:15;180:23
**weekday (1)**
64:16
**weekdays (1)**
65:1
**weekend (1)**
65:2
**weeks (1)**
174:25
**weighted (1)**
49:3
**welcome (4)**
41:1;65:8;164:18;
195:20
**welfare (1)**

209:19
**well-being (1)**
199:6
**wells (8)**
107:15,25;108:2,3;
188:17;189:2;190:6,
16
**west (3)**
16:20;69:7;187:7
**westbound (3)**
18:11;179:15;
180:12
**westerly (2)**
24:11;117:15
**western (1)**
60:8
**Westwood (1)**
179:8
**wetlands (1)**
187:22
**whack (1)**
95:3
**whales (1)**
164:6
**whatever's (1)**
112:5
**what's (20)**
24:17;34:24;66:17;
71:7;76:10;117:16,
24;121:10;124:6;
146:7;148:1;182:4;
185:7;189:16;190:10;
195:10,12,16;196:18;
209:6
**whatsoever (1)**
23:21
**wheel (2)**
90:17;91:8
**wheeled (2)**
89:6;90:22
**Whenever (1)**
12:7
**Whereupon (1)**
6:13
**wherever (1)**
171:16
**whole (14)**
12:9;41:11;54:23;
55:10;65:25;67:24;
75:20;105:8;106:17;
157:23;158:1;165:23,
23;199:15
**wholistic (1)**
60:13
**wide (4)**
22:24,25;129:1;
186:23
**widen (1)**
24:24
**widened (1)**
23:21
**widening (2)**
17:7;24:23

**wider (3)**
22:5;29:12;31:7
**width (3)**
22:2;29:7,12
**widths (3)**
23:1;29:7;103:5
**William (1)**
68:3
**willing (2)**
111:23,24
**willingly (1)**
157:15
**window (4)**
56:20;57:5;64:17;
65:6
**wiped (1)**
165:23
**wise (1)**
129:16
**wishes (1)**
137:17
**within (27)**
29:15;44:20;45:4;
46:24;47:7,20;48:18;
49:6;50:10;52:8,10,
17;53:11;57:18;59:1,
8,20;65:6;72:22;
73:18;76:17;88:12;
129:3;185:19,20;
196:21,22
**without (14)**
10:13;22:7;110:6;
120:2;128:3;141:14;
144:10;147:24;
148:22;149:1;158:7,
14,21;159:2
**witness (97)**
10:14;11:22;12:15,
22,25;13:6,9,12,20;
16:13;17:25;18:13,
17;19:3,8,11,16;
20:22;21:2,6,10;
23:22;24:1,6,9,12,15;
32:4;33:24;34:7,10,
13,15,25;35:8;36:10,
14,23,25;37:5,11,14,
22;38:1;39:12,19;
40:1,4,9,12,14,17;
41:1,4,6,7,13,17;
42:15,17,22;43:1,8,
14,20;44:13,15;48:12,
15;54:10,18;56:1,14;
58:3,9,15,22;60:25;
61:3,12,16;62:3,7,12,
15;63:1;64:11,15;
65:3,8,12,13,14,23;
67:22;98:18,24
**witnesses (1)**
10:7
**won (1)**
158:12
**wonderful (1)**
9:15

**wondering (1)**
162:13
**wood (1)**
179:9
**woods (3)**
162:17;165:20,25
**words (1)**
191:16
**work (16)**
36:23,25;75:15;
78:16;98:12;99:2,5;
128:13;129:6;131:6;
144:5,6;149:11;
160:10;171:19;
196:19
**worked (4)**
43:12;59:17;69:21;
204:24
**working (1)**
179:20
**works (7)**
32:22;33:6;72:22;
73:21;75:12;76:20;
146:10
**worry (1)**
206:23
**worse (6)**
186:7,7,7,9;205:15,
16
**worst (3)**
60:15;120:19;
158:20
**wrap (1)**
52:21
**wraps (1)**
29:9
**W-R-I-S (1)**
48:10
**wrong (10)**
89:16;166:10;
167:15;172:24,24;
185:23;188:22;203:8;
206:22,23

## Y

**yard (5)**
15:23;157:11;
187:5,21,22
**yea (1)**
206:9
**year (7)**
11:13;160:20;
170:13,17;184:1;
185:19,20
**years (27)**
9:10;12:18;43:2;
67:3;69:22;94:4;
137:20,25;138:14;
142:10,10,10,13;
153:20;157:24;
160:14;164:12;
165:19;183:9;186:6;

189:10,14;202:17;
204:24;205:10,10,14
**yeses (2)**
208:20,22
**yesterday (1)**
155:9
**York (3)**
42:14;51:17;67:7
**young (3)**
75:24;76:25;77:1
**yourfour (1)**
183:17
**yous (1)**
194:24
**Yup (1)**
93:13

## Z

**zero (1)**
94:7
**zone (3)**
52:10;182:10;184:1
**zoning (2)**
7:14;197:9

## 0

**01 (1)**
28:6

## 1

**1 (5)**
7:10;14:15;49:5;
114:22;189:2
**1.08 (1)**
49:22
**1.1 (1)**
82:21
**1.10 (3)**
70:23,24;99:14
**1.20 (1)**
72:6
**1.28 (1)**
49:19
**1.8 (2)**
48:8;49:1
**1/2 (1)**
92:17
**10 (17)**
7:11;14:15;22:20;
29:10;102:9,19,21;
115:14;129:1;130:2;
144:14;147:11,13;
148:19;172:23;184:3,
7
**10:45 (1)**
210:1
**100 (3)**
148:13,14,16
**100-trip (1)**
57:23

**101 (1)**
186:3
**105 (1)**
14:22
**10-family (1)**
184:3
**10-or (1)**
125:11
**10th (1)**
72:3
**10-unit (1)**
184:8
**10-year (2)**
38:23;94:10
**11 (2)**
64:17;65:1
**11/15/18 (2)**
76:12;121:14
**115 (2)**
156:15,20
**12 (5)**
30:5,22;37:4;43:2;
126:1
**12/10/18 (1)**
71:13
**120 (4)**
42:7;47:25;48:5;
49:3
**124 (1)**
159:14
**129 (1)**
165:20
**13 (1)**
99:17
**139 (1)**
176:10
**14 (10)**
30:7;34:22;37:4;
89:16,19,25;91:22;
165:6,8;166:11
**14,700 (6)**
23:5;33:24;34:3,4;
56:12;64:22
**147 (7)**
23:3;51:1;56:12;
64:22;87:22;99:15;
172:2
**1477 (1)**
66:11
**147-unit (1)**
9:19
**15 (6)**
92:11;99:14;
115:11;175:23;176:1;
194:3
**15,000 (2)**
51:3;57:11
**1535-16 (2)**
84:16;113:4
**154 (1)**
183:24
**15-inch (1)**
127:17

**165 (2)**
45:9;51:16
**17 (6)**
93:3,5,6,9,10,14
**18 (7)**
127:17;151:10,11,
13;153:13;160:14;
175:6
**188 (4)**
48:4,5;49:18;
195:13
**19 (1)**
181:1
**1964 (1)**
156:21
**1972 (1)**
167:8
**1998 (1)**
12:20

## 2

**2 (15)**
22:21,21;64:17;
65:1;72:10;102:20,
21;112:5;113:8;
114:11;124:8,12,13,
22;189:2
**2.0 (1)**
49:1
**2.2 (1)**
7:11
**2.29 (1)**
28:5
**20 (7)**
153:22;165:19;
175:10,16,23;176:2;
194:3
**200 (1)**
189:25
**2002 (1)**
12:20
**2004 (1)**
7:20
**2006 (1)**
7:20
**2015 (2)**
8:16;93:19
**2016 (5)**
7:23;8:8,9;62:20;
84:16
**2017 (1)**
8:12
**2018 (1)**
72:3
**21 (1)**
188:10
**22 (4)**
23:4;99:15,16;
134:11
**23 (2)**
22:24;188:10
**235 (2)**

22:15;40:24
**244 (1)**
9:24
**24-inch (1)**
127:16
**25 (9)**
12:18;49:8;67:3;
96:19;143:20,22;
144:7,10;147:1
**250 (1)**
49:5
**254 (1)**
49:11
**25-year (1)**
125:11
**27 (1)**
49:4
**276 (1)**
167:6
**27th (1)**
8:8
**28 (2)**
51:9,12
**28th (1)**
8:11
**29 (2)**
133:16;134:10
**290-7A (1)**
84:18
**294 (1)**
14:21
**2nd (1)**
137:11

## 3

**3 (9)**
24:8;92:17;93:20;
114:8,11;127:9;
135:24;136:10;189:2
**30 (1)**
59:17
**300 (4)**
42:4;178:23;
180:20;183:18
**301 (1)**
40:20
**308 (6)**
22:13;40:15,23;
47:18;48:6;49:12
**30-inch (1)**
187:8
**33 (1)**
188:10
**35 (1)**
69:21
**38 (2)**
150:21;171:5

## 4

**4 (13)**
7:11;21:23,25;

30:20;49:5;56:24;
59:23;64:13;65:1;
84:17;111:21;113:24;
165:11
**4.14 (1)**
48:19
**40 (14)**
112:12,21,25;
113:1,20,25;115:1,2,
3,4,12,21;116:10,19
**400 (1)**
195:17
**419 (9)**
7:10;14:15;108:5;
137:15;158:4;193:20;
194:19,19;195:7
**42 (23)**
27:9,20,21;28:14,
14;38:16;94:12;
113:4,5,18,22;114:25;
115:7,11,17;116:3,8,
19;119:23,24;120:2,4,
9
**42.4 (3)**
113:23;115:6;116:4
**42-inch (7)**
127:20;186:13,21;
187:1,6,10,17
**432 (1)**
14:19
**47 (5)**
40:21;47:24;
120:17,21,22
**47.5 (1)**
120:22

## 5

**5 (27)**
14:16,21;15:4;29:8,
10;46:13;79:18;
84:19;85:2;86:21,23;
87:3,12;106:23;
107:1,3,4,8;112:12,
16,18,22;144:14;
154:2,10;172:23;
194:24
**5,000 (1)**
73:4
**50 (15)**
35:17,19;84:25;
85:12;86:11;112:15,
16,19,22;113:9,12;
119:16,22;133:15;
188:10
**500 (1)**
98:23
**50-plus (1)**
157:24
**5300 (1)**
73:5
**55 (8)**
62:20,24;63:2;97:1;

151:2,4,9;173:9
**550 (1)**
14:23

**6**

**6 (18)**
56:21;58:13;63:7,8;
111:4,15,19,20;114:8;
123:10,11,12;124:3;
129:14,24,25;186:23,
24
**6.01-6.02 (1)**
7:11
**60 (2)**
174:7,10
**60-minute (3)**
56:20;57:4;65:5
**61 (1)**
161:13
**65 (2)**
56:19;57:4
**66 (2)**
84:23;87:2
**6th (1)**
161:21

**7**

**7 (12)**
7:11;30:21;56:24;
58:13;59:23,23;63:6;
64:13,13,25;65:1;
123:9
**7:25 (1)**
4:2
**70 (4)**
168:23;169:16,16,
17
**70B1B (1)**
32:9
**72 (1)**
40:22
**73 (4)**
22:13;40:24;47:19;
63:2
**78 (2)**
60:8;162:17

**8**

**8 (10)**
29:8;58:13;85:8;
123:20,23;124:1;
129:13,16;186:23,24
**80 (1)**
30:6
**86 (1)**
140:8
**87 (1)**
14:20

**9**

**9 (6)**
56:21;59:23;64:13,
25;164:2;193:4
**90 (1)**
174:21
**92 (1)**
41:21
**94 (1)**
50:13

Exhibit 30

D-25

# MASTER'S REPORT
# FOR A *MOUNT LAUREL* COMPLIANCE HEARING
# BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY

*IMO Application of the Borough of Emerson*
*Docket No. BER-L-6300-15*

December 14, 2018

*Prepared for:*

**The Honorable Gregg A. Padovano, J.S.C.**
**Superior Court of New Jersey**
**Bergen County Justice Center**
**10 Main Street**
**Hackensack, NJ 07601**

*Prepared by:*

Mary Beth Lonergan, PP, AICP
New Jersey Professional Planning License No. 3288

Austin Maitland, AICP Candidate

Clarke Caton Hintz 
100 Barrack Street
Trenton, New Jersey 08608

## TABLE OF CONTENTS

PAGE

1.0   INTRODUCTION ..................................................................................................... 3

2.0   THE SETTLEMENT AGREEMENT AND FAIRNESS ........................................... 3

3.0   EMERSON BOROUGH'S HOUSING ELEMENT AND FAIR SHARE PLAN ....................... 4

4.0   ZONING AMENDMENTS ........................................................................................ 12

5.0   CONCLUSION ........................................................................................................ 12

## 1.0   INTRODUCTION

This report has been prepared in light of the upcoming Compliance Hearing before the Hon. Gregg A. Padovano, J.S.C. on December 21, 2018 In the Matter of the Application of the Borough of Emerson, County of Bergen, Docket No. BER-L-6300-15. This report reviews the compliance of Emerson Borough's (hereinafter "Borough" or "Emerson") 2018 Third Round Housing Element and Fair Share Plan ("HEFSP", "the Plan", or "Third Round Plan") with the substantive rules of the Council on Affordable Housing (hereinafter "COAH") (N.J.A.C. 5:93, or the "Second Round rules"). It also reviews the Borough's compliance with the Settlement Agreement, dated November 21, 2017 and fully executed on November 28, 2017, between the Borough of Emerson and Fair Share Housing Center (hereinafter "FSHC"). I am submitting this report in my capacity as Special Master appointed by the Honorable Menelaos W. Toskos, J.S.C. (now retired) by Order of September 4, 2015 to assist the Court in the above-captioned litigation.

As discussed in detail below, this report acknowledges progress Emerson has made and recommends that Emerson Borough be granted a Third Round Judgment of Compliance and Repose, subject to the fulfillment of certain terms and conditions, including the submission of supplementary material needed to verify credit eligibility and/or to implement the Plan.

## 2.0   THE SETTLEMENT AGREEMENT AND FAIRNESS

Emerson filed a Complaint for Declaratory Judgment on July 8, 2015 seeking a declaration of its compliance with the *Mount Laurel* doctrine and in accordance with the NJ Supreme Court's March 10, 2015 decision In re N.J.A.C. 5:96 and 5:97, 221 N.J. 1, (2015; a.k.a. "*Mount Laurel IV*"). Emerson and FSHC settled on the following fair share need allocations:

- 20-unit Third Round Present Need (rehabilitation share)
- 74-unit Prior Round obligation (1987-1999)
- 234-unit Third Round Gap and Prospective Need obligation (1999-2025)

The Settlement Agreement was fully executed by Louis J. Lamatina, Mayor, for the Borough and Adam M. Gordon, Esq. for FSHC on November 28, 2017. The 74-unit Prior Round obligation was previously established by COAH. The 234-unit Third Round obligation represents a 30% reduction of Dr. Kinsey's May 2016 calculation of the Borough's Third Round obligation.

Emerson is essentially entirely developed and the availability of vacant land is extremely limited. As a result, the Borough remains entitled to adjust its fair share obligation in accordance with the vacant land adjustment procedure set forth in COAH's Second Round rules (N.J.A.C. 5:93-4.2). Pursuant to the Settlement Agreement, Emerson's 74-unit Prior Round was previously adjusted by the Court as a Prior Round realistic development potential ("RDP") of 20 units and the 234-unit Third Round is adjusted to an RDP of 53 units. The combined 73-unit RDP results in a total unmet need of 235 units (54-unit Prior Round unmet need and 181-unit Third Round unmet need).

Public notice of the Borough's January 24, 2018 fairness hearing (subsequently adjourned to March 23, 2018 and then to May 21, 2018) was published in accordance with established Mount Laurel case law. In response to the public notice, the Borough received objections in a letter, dated January 8, 2018, from Richard P. De Angelis, Esq. on behalf of 214 Kinderkamack, LLC ("214 Kinderkamack" or "objector") and Delores Della Volpe, Trustee ("Della Volpe" or "objector"), property owners in the Borough whose properties are located in the Block 419 redevelopment area which contributes significantly to the Borough's RDP. FSHC and the Borough filed responses to the De Angelis objections and the Borough filed a motion to compel the intervention of the objectors to ensure that any court decision in the Borough's declaratory judgment matter would also be binding in the other matter challenging the Borough's local redevelopment and housing law ("LRHL") procedures or future legal challenges.

On March 16, 2018, I submitted a *Fairness Report* in which I recommended that the Court approve the Settlement Agreement and grant the Borough 120 days to comply with the requirements of that Agreement and the recommendations of my report. My recommendation was contingent on the Court finding that the Borough has a right, through the NJ Fair Housing Act ("FHA"), to condemn the objectors' properties for an inclusionary development by a for-profit redeveloper.

In a May 21, 2018 order, the Court denied the Borough's motion to compel intervention by 214 Kinderkamack and Della Volpe but granted the Borough's motion to deem that the objectors are on notice of the fairness hearing and granted the Borough's motion to "deem that 214 and Della Volpe be bound by the Court's findings at the Fairness Hearing...to the extent that all non-parties and members of the public are so bound."

On June 15, 2018, the objectors submitted a letter continuing to object to the realistic opportunity of the Block 419 redevelopment site in the Borough's Plan and requesting the full adjudication of the redevelopment dispute prior to a final judgment of compliance and repose. On June 20, 2018, the Court held the continuation of the Borough's Fairness Hearing. On June 29, 2018, the Court issued an order declaring that "the Settlement is fair and reasonable to low and moderate income persons and that the properties located within Block 419 Redevelopment Project area are all 'necessary or useful' to provide low and moderate income housing" (see attached June 29, 2018 order).

Subsequently, the Borough provided appropriate notice for a Compliance Hearing to be held on August 23, 2018 which was adjourned to December 10, 2018 and ultimately to December 21, 2018. We are not aware of any comments or filed objections filed regarding the Borough's compliance plan.

### 3.0    EMERSON BOROUGH'S HOUSING ELEMENT AND FAIR SHARE PLAN

This report and the upcoming Compliance Hearing focus on the Borough's Third Round Plan and its compliance with the rules and guidelines set forth in COAH's Second Round rules, the FHA, the Uniform Housing Affordability Controls ("UHAC"), and the Borough's Settlement Agreement with FSHC.

The FHA and COAH's rules prescribe the components of the municipal Housing Element of the Master Plan. The Borough's Third Round Plan meets the basic requirements of these standards, but requires additional documentation for full compliance.

The Borough plans to address its fair share obligation as follows:

**Present Need: Rehabilitation Component: 20 units**

The Borough will address its Present Need/Rehabilitation obligation by reserving at least $200,000 (at least $10,000 in hard costs per unit) of its affordable housing trust fund to complete up to 20 rehabilitations through the Affordable Critical Home Repair Program Agreement between the Borough and Habitat for Humanity of Bergen County ("Habitat"). ***The Agreement between the Borough and Habitat should be provided (Condition 1).*** As discussed below, Habitat will utilize Community Action Services, an experienced rehabilitation administrative agent to operate the Borough's rehabilitation program.

The Borough is required by N.J.A.C. 5:93-5.2 to provide a rehabilitation program manual and copies of any contracts executed with an administrative agent responsible for the municipal rehabilitation program. The Borough has provided a copy of Resolution 228-18, adopted August 14, 2018, which awards the contract for affordable housing administrative agent and rehabilitation administrator to Community Action Services. Community Action Services will be responsible for administering the Habitat rehabilitation program within the Borough. The HEFSP includes a model rehabilitation manual which has been partially adapted for the Borough. ***The Borough must submit a detailed rehabilitation manual, geared toward Emerson Borough, with guidelines for rehabilitating homeowner-occupied housing and renter-occupied housing, and indicate whether the rehabilitation program will be available to rental units to satisfy the rental component of the Present Need obligation. The Borough must also submit a signed agreement between the Borough and Community Action Services (Condition 2).***

**Prior Round Obligation: 74 units (20-unit Prior Round RDP and 54-unit Prior Round unmet need)**

The Borough proposes to satisfy its 20-unit Prior Round RDP, per a Court-approved vacant land adjustment included in the Borough's 2002 HEFSP, with a 5-credit Regional Contribution Agreement ("RCA") with Ridgefield (approved by COAH on August 6, 2003), 10 credits from the New Concepts group home, and five (5) credits from Prior Round rental bonuses. ***The Borough must indicate the date of payment and amount paid to Ridgefield as part of the RCA (Condition 3).***

The Borough has provided a Supportive and Special Needs Housing Survey and affordability controls for the New Concepts group home. The survey includes the date of the facility's current license. The deed includes a reversion that establishes 30-year affordability controls and ensures that the title of the property will revert to the Borough if New Concepts ceases to operate the group home. This documentation is sufficient for establishing compliance.

As discussed below, the Borough has provided various unmet need compliance measures to assist the Borough in addressing the 54-unit Prior Round portion of the total 235-unit unmet need.

**Third Round Obligation: 234 units (53-unit Third Round RDP and 181-unit Third Round unmet need)**

BER-L-006300-15   06/24/2020 5:26:05 PM  Pg 153 of 167 Trans ID: LCV20201114789
Case 2:20-cv-04728-MCA-MAH    Document 84-3    Filed 10/28/24    Page 401 of 579
PageID: 1940

For the Third Round, the Borough prepared an updated vacant land analysis ("VLA") to reflect an increase in development potential as a result of land use conditions and approved inclusionary and affordable housing developments. The VLA, dated November 21, 2017, considered all vacant and Borough-owned land in Emerson, as well as any sites that have been or are likely to be redeveloped with housing during the Third Round. The updated VLA produced a 53-unit Third Round RDP.

The Borough's HEFSP proposes to fully satisfy the 53-unit Third Round RDP with 33 inclusionary rental units, 24 group home credits, and 14 Third Round rental bonuses. This Third Round compliance plan totals 57 units and 14 rental bonuses, resulting in a total of 71 credits, including 18 surplus credits that will go towards addressing the combined Prior Round and Third Round unmet need. The Third Round compliance mechanisms are outlined in the table below:

| Project Name | Affordable Units/Credits | Year Approved or Constructed |
|---|---|---|
| Veterans' Housing (Group Home – rental) | 14 | - |
| Block 419 Redevelopment (rental) | 29 | Proposed |
| Advanced Opportunities (Group Home – rental) | 3 | 5/10/12 |
| Center for Hope and Safety (Group Home – rental) | 7 | 8/18/03 |
| Emerson Grand (rental) | 4 | - |
| Rental Bonus Credits | 14 | - |
| **TOTAL** | **71** | - |

**Veteran's Housing**

The Borough is claiming 14 credits for a group home/alternative living arrangement on Main Street that provides housing for veterans. The Borough has provided a loan agreement (dated March 18, 2016) and deed restriction between the New Jersey Housing and Mortgage Finance Agency ("HMFA") and Emerson Affordable Housing, LLC. The loan agreement stipulates a 30-year period of affordability and that all 14 group home units be reserved for low-income households in conformance with the HEFSP.



**Affordable Housing Sites**
(RDP & Unmet Need)

**Legend**

- Affordable Housing Sites Addressing the RDP
- Inclusionary Overlay Zoning Sites Addressing Unmet Need

Emerson Grand

New Concepts

Block 419 Redevelopment

MFRAH South Inclusionary Overlay District

MFRAH North Inclusionary Overlay District

Advancing Opportunities

Veterans Housing

Clarke Caton Hintz
Architecture
Planning
Landscape Architecture

LOCATION:
Emerson Borough, Bergen County, NJ

DATE
January 2018

## Block 419 Redevelopment

Emerson is proposing to redevelop the entirety of Block 419 (Lots 1-5, 6.01, 6.02, and 7-10) in the Borough's downtown with a mixed-use multi-family inclusionary rental development. The Borough has provided a redeveloper's agreement, dated June 27, 2016, and two (2) amendments, dated October 4, 2016 and November 20, 2017, for Block 419. The second amendment of the redeveloper's agreement includes an affordable set-aside requirement of 20%, and a requirement that at least 15% of all units be affordable and provided on-site. The remaining units may be provided at another location in the Borough, through a payment-in-lieu of construction ("PIL"), or a combination of off-site units and a PIL. Pursuant to the Settlement Agreement, the redeveloper will provide 29 affordable units, including 22 on-site affordable units and seven (7) affordable units through an off-site mechanism and/or a PIL as established in the redeveloper's agreement. The Settlement Agreement also stipulates that the Borough will show, at the July 2020 midpoint review, how it will provide a realistic opportunity for the affordable units provided off-site or through a PIL. The agreement and amendments do not expressly identify age-restrictions or status as rental or for-sale with regard to the affordable units provided as part of the redevelopment. ***The Borough must provide evidence that the proposed Block 419 development is to be comprised of family rental units, including the affordable units. The Township should also clarify whether or not the affordable units at the 419 Redevelopment site will be administered by Community Action Services (Condition 4).***

The Borough has submitted signed copies of two (2) separate memoranda of agreement ("MOA"), both dated October 27, 2018, between the Borough, Emerson Redevelopers Urban Renewal, LLC ("ERUR") and 214 Kinderkamack, an objector to the redevelopment of Block 419, as well as a separate MOA between the Borough, ERUR, and Della Volpe. The objectors had challenged, through an action in lieu of prerogative writ ("PW litigation"), the 2004 and 2017 designations of Block 419 under LRHL as well as the Borough's authority to take the properties by condemnation. The Borough intends to use the Block 419 redevelopment to fulfill its obligation of low and moderate income housing pursuant to the Settlement Agreement and claimed authority under the FHA to acquire the property via condemnation.

Subsequent to the filing of the PW litigation and the Court's approval of the Settlement Agreement, the Borough, ERUR, and objectors negotiated the sale of the properties from 214 Kinderkamack and Della Volpe to ERUR. The parties agreed to resolve the PW litigation and avoid any future condemnation action under either the LRHL or FHA. Separately, 214 Kinderkamack and Della Volpe entered into a Real Estate Purchase and Sale Agreement ("PSA") with ERUR contemporaneous with the execution of the MOA. The execution of the PSA is conditioned upon the objectors voluntarily dismissing the pending PW litigation, signing any consent necessary for applications required for the Block 419 redevelopment, refraining from objecting to the Block 419 redevelopment and refraining from taking a position adverse to the Borough in the declaratory judgment litigation. Therefore, the objection to the Block 419 redevelopment has been addressed. The redevelopment received site plan approval from the Emerson Land Use Board at a special meeting on December 10, 2018.

## Advancing Opportunities

Advancing Opportunities owns and operates a group home located on Pine Drive in the Borough. The Borough is claiming three (3) credits for the Advancing Opportunities group home. The Borough has

provided a Supportive and Special Needs Survey for the Advancing Opportunities group home. The survey indicates five-year controls on affordability beginning May 10, 2012. According to the survey, the group home's current license is dated June 13, 2017. ***The Borough must clarify the status of affordability controls and provide deed restrictions for the Advancing Opportunities group home (Condition 5).***

## Center for Hope and Safety

Center for Hope and Safety provides transitional housing in a group home for victims of domestic violence. The Borough has provided a Supportive and Special Needs Survey and deed for the Center for Hope and Safety group home. The deed includes a reversion that establishes 10-year affordability controls and ensures that all U.S. Department of Housing and Urban Development ("HUD") funds will be returned to HUD in the event that the home ceases to be operated as a group home. No license has been submitted for this group home. ***The Borough should confirm whether a license is or isn't required for the Center for Hope and Safety group home (Condition 6).***

## Emerson Grand

Emerson Grand is a multi-family inclusionary family rental housing development located at 55 Emerson Plaza East in the Borough's downtown. The Borough is claiming four (4) credits at the Emerson Grand inclusionary development located on Block 616, Lot 16 at 55 Emerson Plaza East for four (4) family rental units. ***The Borough must provide full documentation for these affordable units including, but not limited to, compliance with UHAC, such as a deed restriction, affirmative marketing efforts, proof of an experienced administrative agent, the number of bedrooms per unit, the low/moderate-income breakdown, the certificate of occupancy date, and date of approval, to confirm the eligibility of affordable units at the Emerson Grand inclusionary development (Condition 7).***

## Unmet Need

Through its VLA, Emerson has reduced its 74-unit Prior Round obligation to a Prior Round RDP of 20 units and reduced its 234-unit Third Round obligation to a Third Round RDP of 53 units, resulting in a combined Prior Round and Third Round unmet need of 235 units. The Borough's HEFSP provides the following compliance mechanisms to help address the combined 235-unit unmet need through future possible affordable housing production:

- 18 surplus credits from the compliance mechanisms addressing the Third Round RDP;

- The adoption of Ordinance No. 1548-17 (adopted December 5, 2017) which established the Multi-Family Residential Affordable Housing Overlay District North ("MFRAH North") and Multi-Family Residential Affordable Housing Overlay District South ("MFRAH South"). The Borough has provided a copy of the adopted ordinance. MFRAH North permits inclusionary housing development at a density of 64 dwelling units per acre on Block 214, lots 6, 7, 8.01, 8.02, and 9; Block 213, lots 1 through 6; and Block 405, lots 1, 2, 3.01, 3.02, and 4 through 14 near the Borough's downtown. MFRAH North provides a compensatory benefit by permitting inclusionary residential development in an area currently zoned for only industrial and commercial uses. MFRAH South permits inclusionary housing development at a density of 43 dwelling units per acre on Block 616,

lots 1, 2, 16, 17, 19-24; and Block 617.01, lots 1, 2.01, 2.02, and 8 also near the Borough's downtown. MFRAH South provides a compensatory benefit of permitting first-floor residential uses in age-restricted inclusionary developments. The existing zoning does not permit residential use on the ground floor; and

- The adoption of a Borough-wide mandatory affordable housing set-aside ordinance applicable to all multi-family housing developments containing five (5) or more units at a density of at least six (6) units per acre. A draft set-aside ordinance has been provided. The required set-aside is 15% for rental units and 20% for for-sale units. The ordinance includes language calling for an affordable housing set-aside in the case of a municipal rezoning to allow multi-family housing. However, the ordinance does not include language requiring a minimum density of six (6) dwelling units per acre. ***The Borough must revise and adopt the mandatory affordable set-aside ordinance (Condition 8)***; and

- The amendment of the Borough's 2009 development fee ordinance (No. 1383) to replace references to COAH and N.J.A.C. 5:97 with references to the NJ Superior Court and N.J.A.C. 5:93. On December 4, 2018, the Borough Council passed Ordinance No. 1571-18 amending Ordinance No. 1383. I find the development fee ordinance amendment to be acceptable as adopted.

**Very Low-Income Requirements**

Pursuant to the 2008 amendments to the FHA, P.L. 2008, c. 46 (codified as N.J.S.A. 52:27D-329.1), municipalities must provide very low-income units equal to 13% of all affordable units approved and constructed after July 17, 2008 at 30% of the regional median income instead of the UHAC standard of 10% at 35% of the regional median income. The HEFSP indicates that the Borough is required to provide eight (8) very low-income units (0.13 x 57 = 7.41, round up); however, only four (4) very low-income units have been provided as part of the existing group homes. The Plan indicates that the remaining four (4) very low-income units will be provided as part of the Block 419 redevelopment. ***Documentation must be submitted confirming compliance with the very low-income requirements at the Block 419 redevelopment (Condition 9).***

**Rental and Age-Restricted Housing Requirements**

Pursuant to the Settlement Agreement, the Borough's fair share plan must comply with the rental housing minimum and rental bonus caps established by COAH's second round rules. According to these rules, the Borough's Prior Round minimum rental housing requirement (which equals the Borough's maximum rental bonus allowance) is equal to 25% of the 20-unit Prior Round RDP which is five (5) units. The minimum Third Round rental requirement is 14 units (25% x 53 = 13.25, rounded up). The Borough complies with these requirements, having a plan comprised of 10 Prior Round rental units, 57 Third Round rental units, and five (5) Prior Round and 14 Third Round rental bonus credits.

The Settlement Agreement between the Parties prohibits the Borough from receiving credit for age-restricted housing units exceeding 25% of all units developed or planned to meet its fair share obligation. The Third Round Plan does not include any age-restricted units at this time.

**Additional Conditions:**

The Settlement Agreement and March 16, 2018 Master's Report established a number of additional requirements including the following:

- The Borough shall prepare a revised Spending Plan following the Court's approval of the Settlement Agreement. The Agreement acknowledges that any funds deemed committed by the Court must be expended within four (4) years of the Court's entry of a final judgment approving the settlement. ***The Borough has submitted a draft Spending Plan. We will work with the Borough and the Borough's attorney to revise and finalize the Spending Plan which will be adopted and submitted at a later date (Condition 10).***

- At least half of all housing units addressing the Third Round Fair Share shall be affordable to low- and very low-income households, with 13% of the affordable housing units being reserved for very-low income households. The remainder of the affordable units may be affordable to moderate-income households. ***The Borough has complied with this requirement.***

- At least half of the units addressing the Third Round Fair Share must be available to families. ***The Borough has complied with this requirement.***

- All affordable housing units created pursuant to the Settlement Agreement shall comply with UHAC rules, with the exception of the subject of the very low-income requirement in which case those rules have been superseded by an amendment to the FHA as discussed above. ***The Borough has complied with this requirement.***

- The Borough shall update its affirmative marketing plan to include FSHC and other named organizations in its list of community and regional organizations, and both the Borough and any other developers or administrative agencies conducting affirmative marketing shall provide notice to those organizations of any available affordable units. ***The Borough has complied with this requirement.***

- The Borough must submit an adopted resolution appointing an existing municipal employee as Emerson's municipal housing liaison. ***The Borough has complied with this requirement.***

The Agreement also established the following requirements for the Borough to meet between now and July 2025 – the period of Third Round Repose:

- On the first anniversary of the granting of a Final Judgment of Compliance and Repose, and every anniversary thereafter through the end of the Agreement, the Borough agrees to provide annual reporting of trust fund activity. The reporting shall include an accounting of all housing trust fund activity, including the source and amount of funds collected and the amount and purpose for which any funds have been expended.

- On the first anniversary of the execution of a Final Judgment of Compliance and Repose, and every anniversary thereafter through the end of the Agreement, the Borough agrees to provide a status report of all affordable housing activity (including rehabilitation) within the municipality.

- The Borough shall submit its midpoint realistic opportunity review on or before July 1, 2020, as required pursuant to N.J.S.A. 52:27D-313. This midpoint review permits any interested party, such as FSHC, to request by motion a Court hearing regarding whether any sites in the Borough's compliance plan no longer present a realistic opportunity for affordable housing development and should be replaced.

- Within 30 days of every third anniversary of a Final Judgment of Compliance and Repose, the Borough will publish on its website and submit to FSHC a status report regarding its satisfaction of the very low-income requirement pursuant to N.J.S.A. 52:27D – 329.1.

## 4.0   ZONING AMENDMENTS

As required by the Settlement Agreement, the Borough has submitted the following ordinances:

- Ordinance 1571-18: The Borough adopted Ordinance 1571-18 to amend the development fee chapter of the Borough code. The ordinance replaces references to COAH and N.J.A.C. 5:97 with references to the Court and N.J.A.C. 5:93. The ordinance also updates language regarding the handling of the affordable housing trust fund. This ordinance is acceptable as adopted.

- Ordinance 1565-18: The Borough adopted Ordinance 1565-18 to repeal and replace Chapter 290 "Zoning", Article XII "Affordable Housing Regulations" of the revised general ordinances, and to ensure compliance with all applicable COAH, FHA, and UHAC regulations. This ordinance is acceptable as adopted.

- Ordinance 1548-17: The Borough adopted Ordinance 1548-17 to amend the zoning ordinance to incorporate the MFRAH North and MFRAH South affordable housing overlay districts. This ordinance is acceptable as adopted.

- Set-aside Ordinance: The Borough has provided a draft ordinance requiring an affordable set-aside for all new multi-family residential developments with five (5) or more units. The ordinance will need revision before being adopted (see Condition 8).

## 5.0   CONCLUSION

This report has been prepared in light of the upcoming Compliance Hearing before Your Honor on December 21, 2018. This report reviews Emerson Borough's 2018 HEFSP and draft Spending Plan prepared by Brigette Bogart, PP, AICP, CGW, and related documents. The Borough is seeking a Final Judgment of Compliance and Repose for its Third Round Plan. The Borough's Fair Share Plan is generally consistent with the Court-approved Settlement Agreement, the Fair Housing Act, and COAH's Second Round rules with the exceptions noted herein.

I find the Borough's 2018 HEFSP to be consistent with the *Mount Laurel* doctrine and the *Mount Laurel IV* decision. I recommend that Your Honor grant the Borough a Judgment of Compliance and Repose, subject to the Borough fulfilling the conditions contained herein. I would recommend that the Borough be provided 120 days from the entry of the Court's order of repose to address the conditions. Your Honor may wish to have the Borough submit a certification as to how each condition has been addressed with any required supporting documentation. Once the Borough has satisfied all conditions, I will notify Your Honor and copy all parties, at which point the issuance of a final Judgment of Compliance and Repose would be warranted. I don't believe an additional court hearing would be required. In the meantime, I recommend that immunity remain in effect.

**Condition 1:**     The Agreement between the Borough and Habitat for Humanity should be provided.

**Condition 2:**     The Borough must submit a detailed rehabilitation manual, geared toward Emerson Borough, with guidelines for rehabilitating homeowner-occupied housing and renter-occupied housing, and indicate whether the rehabilitation program will be available to rental units to satisfy the rental component of the Present Need obligation. The Borough must also submit a signed agreement between the Borough and Community Action Services.

**Condition 3:**     The Borough must indicate the date of payment and amount paid to Ridgefield as part of the RCA.

**Condition 4:**     The Borough must provide evidence that the proposed Block 419 development is to be comprised of family rental units, including the affordable units. The Township should also clarify whether or not the affordable units at the 419 Redevelopment site will be administered by Community Action Services.

**Condition 5:**     The Borough must clarify the status of affordability controls and provide deed restrictions for the Advancing Opportunities group home.

**Condition 6:**     The Borough should confirm whether a license is or isn't required for the Center for Hope and Safety group home.

**Condition 7:**     The Borough must provide full documentation for these affordable units including, but not limited to, compliance with UHAC, such as a deed restriction, affirmative marketing efforts, proof of an experienced administrative agent, the number of bedrooms per unit, the low/moderate-income breakdown, the certificate of occupancy date, and date of approval, to confirm the eligibility of affordable units at the Emerson Grand inclusionary development.

**Condition 8:**     The Borough must revise and adopt the mandatory affordable set-aside ordinance.

**Condition 9:**     Documentation must be submitted confirming compliance with the very low-income requirements at the Block 419 redevelopment.

**Condition 10:**     The Borough has submitted a draft Spending Plan. We will work with the Borough and the Borough's attorney to revise and finalize the Spending Plan which will be adopted and submitted at a later date.

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY, FOR A DECLARATORY JUDGMENT,<br><br>Petitioner. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION:BERGEN COUNTY<br><br>DOCKET NO.: BER-L-6300-15<br><br>CIVIL ACTION<br>*Mount Laurel* Action<br><br>ORDER |

F I L E D
JUN 29 2018
GREGG A. PADOVANO, J.S.C.

**THIS MATTER** comes before the court upon the Declaratory Judgment Complaint of Petitioner Borough of Emerson ("Borough" or "Petitioner"), seeking a determination that the Borough has complied with its Mount Laurel Obligation, in accordance with the procedures set forth in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable Housing, 221 N.J. 1 (2015) (Mount Laurel IV), and

**THE COURT HAVING** conducted a Fairness Hearing, in accordance with the requirements of Morris County Fair Housing Council v. Boonton Township, 197 N.J. Super. 359, 364 (Law Div.1984), aff'd o.b., 209 N.J. Super. 108 (App. Div. 1986) and East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311, 328 (App. Div. 1996), upon the Borough's proposed plan to provide for affordable housing, Ronald H. Gordon, Esq. of DeCotiis FitzPatrick Cole & Giblin, LLP appearing on behalf of Petitioner, Adam Gordon, Esq. appearing on behalf of Intervenor Fair Share Housing Center ("Intervenor" or "FSHC"), Special Master Mary Beth Lonergan, AICP, PP ("Special Master") appearing, and Richard P. DeAngelis, Esq. appearing on behalf of Objectors, 214 Kinderkamack, LLC ("214") and Dolores Della Volpe, Trustee ("Della Volpe") (hereinafter, collectively "Objectors"); and

**THE COURT HAVING** received the testimony of Petitioner's planner, Brigette Bogart, PP, AICP having been qualified as an expert witness, as well as the testimony of the Special Master, Mary Beth Lonergan, AICP, PP; and

**THE COURT HAVING** received into evidence the following documents offered by Petitioner:

P-1    Affidavit of Service dated January 19, 2018.

P-2    Affidavit of Publication – The Ridgewood News dated December 8, 2017.

P-3    Affidavit of Publication – Bergen Record dated December 8, 2017.

P-4    Settlement Agreement between Fair Share Housing Center and Borough of Emerson dated November 21, 2017 ("Settlement Agreement").

SM-1   Special Master Mary Beth Lonergan Report and Recommendations dated March 16, 2018 ("Report"); and

**THE COURT HAVING** received into evidence the Report of the Special Master, dated March 16, 2018 which was identified as Exhibit SM-1 ("the Report"), evaluating the fairness of the Agreement and the Special Master having concluded in her Report that the Agreement is fair and reasonable to the region's low and moderate income households and having further recommended in her Report that the court approve the Settlement; and

**THE COURT HAVING** heard and considered the challenge(s) argued by Objectors to the proposed Settlement Agreement with FSHC, including Objectors' challenge to the realistic opportunity to provide housing for persons of low and moderate income, based on Objectors' contention that the Borough may not acquire the Objectors' property or other properties within Block 419 for a redevelopment project (the "419 Redevelopment Project"); and

**THE COURT HAVING** previously determined and ordered that Objectors "be bound by the court's finding at the Fairness Hearing is GRANTED to the extent that all non-parties and members of the public are so bound" pursuant to an order dated May 21, 2018; and

**THIS COURT** being designated and assigned to decide all issues related to affordable housing pursuant to the FHA, including a determination of whether Objectors' challenges would prevent the proposed Settlement Agreement from providing a realistic opportunity for the construction of low and moderate income housing in the Borough and the court having determined, for the reasons set forth on the record, that the Borough has demonstrated its voluntary and good faith efforts to comply with its fair share obligation and for good cause

**IT IS ON THIS 29th DAY OF JUNE 2018 ORDERED:**

1.      Petitioner properly afforded notice of the Fairness Hearing in accordance with governing law.

2.      The court determines and finds, upon the testimony presented, and arguments of counsel and upon a consideration of the Settlement Agreement admitted into evidence, (collectively, "the Settlement"), and the Special Master's Report, and in accordance with the requirements of Morris County Fair Housing Council v. Boonton Township, 197 N.J. Super. 359, 364 (Law Div.1984), aff'd o.b., 209 N.J.Super. 108 (App. Div. 1986) and East/West Venture v. Borough of Fort Lee, 286 N.J.Super. 311, 328 (App. Div. 1996), that:

   a.      The Present Need Obligation, as agreed upon by the Parties based upon implementing the directives of Mount Laurel IV is 20 housing units;

   b.      The Prior Round Obligation, as originally determined by COAH in 1994 for the period 1987-1999 is 74 housing units;

c.      The Prospective Need Obligation, including the "GAP Period" obligation for the period of 1999-2025, based upon a compromise reached among the Parties in view of the uncertainty of litigation and in accordance with the directives of <u>Mount Laurel IV</u>, and upon the recommendation of the Special Master, is 234 housing units;

d.      The Borough has prepared a Vacant Land Adjustment (VLA) which, upon the Special Master's recommendation, is accepted by the court. The Special Master has recommended, the Parties have accepted, and the court accepts, a Realistic Development Potential (RDP) of 20 units from the Prior Round Obligation, and an RDP of 53 units for the Prospective Need Obligation for a total RDP of 73 units arising from the VLA. When the RDP of 20 units is subtracted from the Prior Round Obligation of 74 units, an Unmet Need of 54 units results. When the RDP of 53 units is subtracted from the Prospective Need Obligation of 234 units an Unmet Need of 181 units results. The total Unmet Need is 235 units;

e.      The Present Need Obligation, Prior Round Obligation and Prospective Need Obligation are collectively referred to as the Borough's Affordable Housing Obligation;

f.      The Settlement sets forth and otherwise incorporates mechanisms to address the Affordable Housing Obligation. The court finds, upon the Special Master's, Report, testimony and recommendation, that the Borough's Affordable Housing Obligation, including the Unmet Need, is adequately and sufficiently addressed by the mechanisms provided for in the Settlement Agreement;

g.      The court finds, upon the Special Master's Report, testimony and recommendation, that the Settlement creates a realistic opportunity for the satisfaction of the Borough's Affordable Housing Obligation;

h.      The court finds, upon the Special Master's Report, testimony and recommendation, that the Settlement is fair and reasonable to low and moderate income persons and that the properties located within Block 419 Redevelopment Project area are all "necessary or useful" to provide low and moderate income housing;

3.     Entry of a Final Judgment of Compliance and Repose is subject to the Borough complying with the following conditions:

    a.     The Borough shall comply with the recommendations of the Special Master as set forth in her Report including, but not limited to, undertaking any amendments to the Borough's Housing Element and Fair Share Plan and Spending Plan;

    b.     The Borough shall adopt a revised Spending Plan upon the Special Master's review and comment, such that the court may determine at a final hearing that the proposed expenditure of amounts from the affordable housing trust fund in the Spending Plan is consistent with and authorized by the Fair Housing Act, N.J.S.A. 52:27D-301, et seq., and such funds are timely "committed for expenditure" as required, if at all, by N.J.S.A. 52:27D-329.2, -329.3;

4.     The objection presented to the court filed by 214 and Della Volpe by correspondence dated January 8, 2018 and the court's order dated May 21, 2018 on the motion brought by the Borough of Emerson to have 214 and Della Volpe bound by the court's determination at the Fairness Hearing resulted in the following:

    a.     The court held that "any party or non-party may challenge an action taken to implement a housing plan approved under a fairness hearing (citations omitted);"

    b.     The court found that "this challenge must actually occur as a part of the fairness hearing;"

    c.     The court found that "any ruling made as a part of the scheduled fairness hearing will be binding upon any and all non-parties;"

By letter dated June 15, 2018, counsel for 214 and Della Volpe advised the court that "aside from this letter and the previous letters and certifications submitted on behalf of the Owners on January 8, 2018, the Owners do not intend to make any other written submissions or call any witnesses in connection with the Fairness Hearing."

**IT IS FURTHER ORDERED**, that 214 and Della Volpe's properties (as well as all other properties located within Block 419) are "necessary or useful" to the Borough of Emerson in meeting its Affordable Housing obligations as agreed to in the Settlement Agreement with Fair Share Housing Center and as recommended in the Special Master's Report, testimony and recommendation; and

**IT IS FURTHER ORDERED** that the court shall conduct a Final Hearing to consider entering a Final Judgment of Compliance and Repose on August 23, 2018 at 2:00 p.m.. Petitioner shall provide public notice of the Final Hearing; and

**IT IS FURTHER ORDERED** that the Borough is entitled to continued immunity and the accompanying protection from Mount Laurel exclusionary zoning and/or builders' remedy lawsuits as provided under the FHA and in accordance with Mount Laurel IV and this court's order until the court's determination following the Final Compliance Hearing; and

**IT IS FURTHER ORDERED** that a copy of this order shall be served upon all parties within seven (7) days from counsel for the Borough's receipt; and

**IT IS FURTHER ORDERED** that a copy of this order shall be available for inspection by any interested party.

_____
HON. GREGG A. PADOVANO, J.S.C.

Exhibit 31

# Did Emerson Land Use Board Do Enough? '419' Project Passes

D-33



**Kevin Cody of JMF Properties is pictured at a 2016 Emerson governing body meeting alongside renderings of the proposed block 419 redevelopment. | File photo**

BY JOHN SNYDER
OF PASCACK PRESS

EMERSON, N.J.—Many residents are calling for change on the Land Use Board after redevelopment on Kinderkamack Road between Lincoln Boulevard and Linwood Avenue passed in a single session where important questions were seen as not raised— or raised but left unanswered.

Following a presentation from Emerson Redevelopers Urban Renewal, an affiliate of JMF Properties, the board voted Dec. 10 to grant preliminary and final approval for a four-story mixed use project on Block 419, complete with 147 apartments from studios to three-bedrooms, 14,700 square feet of retail space, and a garage offering "four floors and rooftop" parking.



Commuter and retail parking are at ground level. The number of spaces—308 total, with some 120 for commuters and shoppers to share with residents—is subject to change.

The project, contracted for with the borough in 2016, will yield 29 affordable units, seven of which JMF is to site elsewhere—that's to be determined—and a new emergency services building for Emerson.

ERUR, established equally in 2016 by Giuseppe Forgione and Steven Kalafer, also won a long-term tax exemption for the project, agreeing to payments in lieu of taxes, which encourages the development of property in blighted or distressed areas.



**Mayor-elect Danielle DiPaola and Boswell Engineering's Gary Ascolese review a rendering of Emerson Station, the mixed-use redevelopment project on Block 419, which the Land Use Board approved over resident pleas Dec. 10. | John Snyder photo**

The vote was 6-2, with one abstention. Work is to commence within 120 days of getting government approval.

Tentatively dubbed Emerson Station, the project, a 50-foot-tall "continuous street wall" as measured by its rising and falling parapets, links together inside to give renters access to a lobby, club, and fitness center.

Their apartments—the top floor units are set back five feet—will offer abundant glass through which to take in the streetscape below.

There will be no Dumpsters. Trash will be compacted and wheeled out to a private hauler. Curb cuts will be removed, except for the one serving Lot 5, which the project flows around and which the borough planner said she agrees is out of scale with its proposed surroundings.

At the standing-room-only hearing, ERUR attorney Peter M. Flannery introduced witnesses on parking, engineering, and architecture, all of whom spoke of the project in glowing terms.

Board attorney Chris Martin led questioning, often deferring to Gary Ascolese of Boswell Engineering.

Charles Olivo, principal of Stonefield Engineering and Design, lauded the project as an exemplar of transit oriented development.

"This is the exact type of project municipalities are looking for," he said.

He added there would be "more than adequate parking" for commuters, residents, and shoppers, who he suggested would flip spaces as one group leaves and another arrives.

"We're below the threshold of what we would call a significant increase in traffic," he said.

When it was pointed out to him that local motorists even now struggle with multi-cycle delays after a train passes by, Olivo urged residents to take the long view.

"That is the sacrifice we make when we take cars off the roadway. The people that are within cars have to wait. You're part of a multimodal system. Public transportation…takes vehicles off the regional roadway network," he said.

# 'All the I-don't-knows…'

Residents at the public microphone, including Mayor-elect Danielle DiPaola, said they were shocked by the hearing's lack of feasibility studies and site appraisals—particularly for traffic and the environment—and knocked assumptions to do with parking, trash removal, and flood mitigation.

DiPaola reminded the board she and her ticket swept in on the issue of overdevelopment. She derided the proposal's rendering as too big and boxy, particularly compared to the first pitch rendering, which she held up for comparison.

She asked the board whether the new design was "really what you want to see in the downtown for the next 100 years."

Resident Jill McGuire pleaded with the board to consider the project's impacts alongside others pending.

"How can you in good faith move forward without a traffic study?" she said.

Resident Mike Myers asked the board, "What are we going to get, five more pizza places? Five more banks? What are we going to get that benefits us?"

Later he questioned whether retail deliveries would worsen traffic—then mocked a hypothetical "cafe on the corner where people are going to breathe in bus fumes while they sip their lattes."

There was a dispute as to whether parking on five floors constitutes a five- or four-level garage.

There are three monitoring wells and an underground oil tank on Block 419, and a dry cleaner and former gas station. Asked if there had been any environmental impact studies under his company's new acquisitions, Flannery said, "I don't know."

As the crowd laughed, he added, "It's irrelevant."

The resolution depends on county and state approval, including from the state DEP. A waiver for preliminary Bergen County Planning Board approval was granted.

Flannery's associate Jack Klugman said ERUR is conducting due diligence, including lining up financing and closing on properties, and would know more "in the next few months, probably."

Voting yes were members Alban Bresa, Michael DeOrio, Steven Malone, Doug McKendry, Norman Rieger, and Chairman Gary Schwinder.

Voting no were Thomas Sudano and Mike Cimino.

Robert Adams abstained.

Mayor Louis J. Lamatina and Councilman Gerald Falotico stepped off the dais and out of the room at the start of proceedings at Martin's recommendation.

With the results noted, and a resident then shouting out, "You should be ashamed of yourselves!" Schwinder said, "I caution the applicant to take into account what has been said tonight. There were a lot of questions raised."

## Schwinder says board is dedicated

In calling for the vote, Schwinder noted he has served on the LUB for six or seven years and was sure the board was dedicated to serving "to the best of their abilities and with their heart in the right place."



**ERUR attorney Peter M. Flannery, at right, looks on as Land Use Board Chairman Gary Schwinder, center, and ERUR associate Jack Klugman discuss outstanding items following the vote Dec. 10. Klugman and Flannery told Schwinder they would respect residents' concerns. "We're easy to work with," Flannery said. | John Snyder photo**

He said redevelopment has been under discussion "for years and years. We all want to see this town look better."

Of borough traffic worsening under his watch, he said, "Has there been a big development in Emerson that has caused traffic to get worse? No. It's coming from people crossing through Emerson on one of the busiest roads in the county."

Then he asked, "Do we have to stop our progress while other communities are building?"

He told Pascack Press later that the redevelopment protects the borough against a builder's remedy lawsuit.

Schwinder also said that the four developers brought in to look at the site said they would need a certain density to make their investment profitable.

"You can't go any further beyond 419. The only way to go was up, and that's why there's a fourth floor," he said.

Reached for comment Dec. 13, Lamatina said he was pleased with the vote, saying it "fulfills a vision of the governing body dating back to 2006, where the entire business district was designated as a redevelopment zone by Borough Ordinance 1305-06, unanimously enacted by that Council."

He singled out Councilman-elect Ken Hoffman, who he said "should also take some comfort in this historic vote, as he was one of the six councilpersons who adopted that massive plan in July 2006."

That said, it was Lamatina who broke a 3-3 council vote in December 2016 to allow four-story development in the borough's redevelopment area.

He campaigned for re-election on the promise of four-story downtown redevelopment as a partial consequence of the borough's affordable housing settlement and said eminent domain threats against holdout property owners (who sued the borough) was sound and justified.

He lost re-election in a Republican sweep.



**A rendering of JMF Properties' initial proposed three-story redevelopment project in Emerson. | File**

Exhibit 32

D-34

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

 

**MINUTES**
**BOROUGH OF EMERSON**
**MAYOR AND COUNCIL**
December 18, 2018
7:30 P.M.
Borough Hall-Council Chambers
Emerson, NJ 07630

..................................................................................................................................

I.  CALL TO ORDER
Mayor Lamatina called the meeting to order at 7:30 p.m. and identified the emergency exits.

II.  ROLL CALL

Mayor Lamatina asked Ms. Dietsche to call the roll of the Governing Body.

**Present**: Mayor Lamatina, Councilman Bayley, Councilwoman/Mayor-elect DiPaola, Councilman Downing, Council President Knoller, Councilwoman Wolf

**Absent**: Councilman Falotico

Also present were Councilman-elect Ken Hoffman, Borough Administrator Robert Hoffmann, Borough Attorney Wendy Rubinstein, Special Counsel Doug Doyle and Borough Clerk Jane Dietsche.

III.  EXCUSED ABSENCE OF GOVERNING BODY MEMBER

Mayor Lamatina stated that no members of the Governing Body were absent from the December 4, 2018 meeting.

IV.  PROCLAMATIONS & CITATIONS
• Honoring Peter Jacullo's 100th Birthday – Hometown Hero

V.  APPOINTMENTS/RESIGNATIONS
• Swearing in of Sergeant Randy Velez
• Emerson Volunteer Fire Department
  o Appointment of Martin R. Mahon as a Probationary Member effective immediately

   ☞**Motion** to appoint Martin R. Mahon as a Probationary Member of the Emerson Volunteer Fire Department effective immediately was **moved** by Councilwoman Wolf, seconded by Councilman Bayley and carried unanimously.

• Environmental Commission
  o Resignation of Chairman Tom Browne as a regular member effective immediately
  o Resignation of Jeanine Lamatina as a regular member effective immediately

   Mayor Lamatina announced that he accepted the resignation of Chairman Tom Browne and regular member Jeanine Lamatina effective immediately.

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

- Land Use Board
  - o  Resignation of Norm Rieger as a Class IV member effective immediately
  - o  Appointment of Evan Kutzin as a Class IV member for the unexpired term ending 12/31/21

  Mayor Lamatina announced that he accepted the resignation of Norm Rieger as a Class IV member of the Land Use Board effective immediately. He also announced that he was appointing Evan Kutzin as a Class IV member for the unexpired term ending 12/31/21.

VI.  MINUTES FOR APPROVAL
- Regular and Closed Session Meeting Minutes of December 4, 2018

  ☞**Motion** to approve the Regular and Closed Session Meeting Minutes of December 4, 2018 was **moved** by Council President Knoller, seconded by Councilman Bayley and carried unanimously.

VII.  CORRESPONDENCE

Mayor Lamatina stated that copies of the correspondence were available in the office of the Municipal Clerk.

- Email dated December 2, 2018 from Tom Brown; Re: Resignation – Environmental Commission.
- Email dated December 5, 2018 from Kerry Pflugh; Re: DEP: Solar Siting Analysis Guide for Communities.
- Resolution dated December 11, 2018 from Bergen County League of Municipalities; Re: Opposing Power Plant
- Public Notice from Bergen County Utilities Authority; Re: Proposed 2019 Wastewater Service Charges and 2019 Solid Waste Service Charges.
- Public Meeting Notice form Bergen County Municipal Joint Insurance Fund; Re: Reorganization Meeting
- Email from Norm Rieger dated December 17, 2018: Re: Resignation from Land Use Board
- Email from Jeanine Lamatina dated December 17, 2018; Re: Resignation from Environmental Commission
- Emails from Evan Kutzin dated Monday, December 17th and December 18th; Re: Resignation and amending resignation from Land Use Board to fill vacated seat

VIII.  FINANCIAL BUSINESS
- Resolution No. 295-18 Bill List

  ☞**Motion** to approve Resolution No. 295-18 Bill List was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 5-0:
  **RC: Council members:**
  **YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

IX.  UNFINISHED BUSINESS
- Part time Employees - 20 hours or less per week – Update related to New Jersey sick leave law – Mr. Hoffmann explained that he had no update because he had not yet received any information from the State.

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

X.  NEW BUSINESS

Mayor Lamatina announced that there was no new business.

XI.  INTRODUCTION OF ORDINANCES

**First Reading:**

Mayor Lamatina announced that no ordinances were being introduced.

XII.  ADOPTION OF ORDINANCES

**Second Reading & Public Hearing:**

**1569-18** AN ORDINANCE TO AMEND THE CODE OF EMERSON CHAPTER 77 THEREOF, TITLED POLICE DEPARTMENT TO AMEND ARTICLE II ENTITLED OUTSIDE EMPLOYMENT, SECTION §77-15 ENTITLED E THEREOF, ENTITLED ACCOUNTING OF HOURS; PAYMENT OF HOURS PROVIDING FOR HOURLY FEE FOR PRIVATE EMPLOYMENT OF POLICE OFFICERS

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1569-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried at 7:53 p.m.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1569-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1569-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

☞**Motion** to adopt Ordinance No. 1569-18 on second reading was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by a roll call vote of 5-0: **RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

**1571-18** "AN ORDINANCE OF THE BOROUGH OF EMERSON AMENDING CHAPTER 138, "DEVELOPMENT FEES" OF THE BOROUGH CODE

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1571-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1571-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1571-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

☞**Motion** to adopt Ordinance No. 1571-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilwoman Wolf and carried by a roll call vote of 5-0: **RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

**1572-18** AN ORDINANCE OF THE BOROUGH OF EMERSON AMENDING CHAPTER 290, ARTICLE IV SECTION 13D "AHO AFFORDABLE HOUSING OVERLAY SET-ASIDE REQUIRMENTS" OF THE BOROUGH CODE

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1572-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1572-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1572-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilwoman Wolf and carried.

☞**Motion** to adopt Ordinance No. 1572-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

**1573-18** AN ORDINANCE AMENDING CHAPTER 200-8 HOURS; PERMIT REQUIRED FOR ORGANIZED ACTIVITIES OF THE CODE OF THE BOROUGH OF EMERSON

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1573-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1573-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1573-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

☞**Motion** to adopt Ordinance No. 1573-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

**1574-18** AN ORDINANCE AMENDING CHAPTER ~~101~~ 290, ZONING, OF THE CODE OF THE BOROUGH OF EMERSON, TO ADDRESS ALL EXISTING SIGNAGE REGULATIONS AND IMPLEMENT A NEW COMPREHENSIVE SIGN CODE

Mayor Lamatina noted that there had been a typographic error in the title of the ordinance submitted by the Borough Planner. The chapter being amended was Chapter 290 as detailed in the body of the ordinance, not Chapter 101.

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1574-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Downing and carried at 8:54 p.m.

MIN No. 21 APPROVED FOR RELEASE & CONTENT 1-2-19

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1574-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1574-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

☞**Motion** to adopt Ordinance No. 1574-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

**1575-18** AN ORDINANCE DEDICATING BLOCK 419, LOT 7 IN THE BOROUGH OF EMERSON, COUNTY OF BERGEN, STATE OF NEW JERSEY AND CONVEYING SUCH LAND TO EMERSON REDEVELOPER'S URBAN RENEWAL, LLC

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1575-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Downing and carried at 7:57 p.m.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1575-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1575-18 only was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried.

☞**Motion** to adopt Ordinance No. 1575-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 4-1:
**RC: Council members:**
**YES:  Bayley, Wolf, Knoller, Downing**
**NO: DiPaola**

**1576-18** AN ORDINANCE VACATING KENNETH AVENUE IN THE BOROUGH OF EMERSON, COUNTY OF BERGEN, STATE OF NEW JERSEY AND CONVEYING SUCH VACATED LANDS TO EMERSON REDEVELOPER'S URBAN RENEWAL, LLC

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1576-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Downing and carried.

Jill McGuire, 154 Linwood Avenue said she was speaking as a private citizen and noted that the Volunteer Ambulance Corps building was constructed with bricks from the original firehouse. She requested that when the building was demolished that some of the bricks be salvaged for posterity and be repurposed for future projects.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1576-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1576-18 only was **moved** by Council President Knoller, **seconded** by Councilwoman Wolf and carried.

☞**Motion** to adopt Ordinance No. 1576-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 4-1:
**RC: Council members:**
**YES:  Bayley, Wolf, Knoller, Downing**
**NO: DiPaola**

<u>**1577-18**</u> AN ORDINANCE AMENDING AND SUPPLEMENTING CHAPTER 274, VEHICLES AND TRAFFIC; ARTICLE VII, SCHEDULES, OF THE REVISED GENERAL ORDINANCES OF THE BOROUGH OF EMERSON

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1577-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Bayley and carried.

<u>Mike Myers, 38 Allison Way</u> inquired about the planning and studies that went into the preparation of this ordinance. He opined that no thought had been involved in planning for the traffic impact this ordinance and the resolution to be voted on by the Land Use Board at their Special Meeting on December 28th would create.

Seeing no more hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1577-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1577-18 only was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried.

☞**Motion** to adopt Ordinance No. 1577-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilman Downing and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

<u>**1578-18**</u> AN ORDINANCE AMENDING CHAPTER 77 POLICE DEPARTMENT, SECTION IV COMPOSITION

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1578-18 only was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Downing and carried.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1578-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1578-18 only was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried.

☞**Motion** to adopt Ordinance No. 1578-18 on second reading was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

<u>1579-18</u> AN ORDINANCE AMENDING CHAPTER 187: MUNICIPAL FACILITIES USE OF THE CODE OF THE BOROUGH OF EMERSON

☞**Motion** to open the meeting to comments from the public on Ordinance No. 1579-18 only was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried.

Seeing no hands, Mayor Lamatina asked for a motion to close the meeting to comments from the public on Ordinance No. 1579-18 only.

☞**Motion** to close the meeting to comments from the public on Ordinance No. 1579-18 only was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried.

☞**Motion** to adopt Ordinance No. 1579-18 on second reading was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES:  DiPaola, Bayley, Wolf, Knoller, Downing**

XIII.    REPORTS
   • Mayor and Council

   <u>Councilwoman/Mayor-elect DiPaola</u> said she had no report but wished everyone a Merry Christmas and a Happy New Year and hoped that everyone had a Happy Hanukkah. She said it had been her privilege to have served as Councilwoman in the Borough of Emerson and looked forward to serving as Mayor. She thanked Mayor Lamatina for his service to the Borough as well as Councilwoman Wolf and Councilman Downing.

   <u>Councilman Bayley</u> thanked Tom Browne, former Chair of the Environmental Commission, for his dedicated service over the years and said he had led them well. He gave the monthly report for the Department of Public Works and commended DPW Superintendent Perry Solimando and Foreman Tom Carlos for spending nine hours repairing a pump on Cindy Lane. He said their work had saved the neighborhood from disaster. He thanked the Volunteer Fire Department, Santa Claus and the entire crew for bringing smiles to the Borough and wished everyone a happy holiday. He also thanked Mayor Lamatina, Councilwoman Wolf and Councilman Downing for their service to the Borough and their support of the Bayley family through the years.

   <u>Councilwoman Wolf</u> thanked the Fire Department for the Santa's Christmas visit. The department had two new members and others had expressed interest in volunteering. She said that it had been a pleasure to work with them and that they do a lot of hard work for the community. The Board of Health had renewed contracts with Tyco Animal Control and Northwest Bergen Regional Health Commission to continue Borough services and approved their 2019 calendar. She had been unable to attend the Historic Preservation Committee meeting but said that they had hosted Ms. Elaine Gold from the Bergen County Office of Historic Preservation. Ms. Gold stated that there per Borough ordinance, it was the responsibility of the committee to conduct a review and update the historic survey every other year to identify what historic structures or sites existed. Ms. Gold gave a presentation and offered to assist with this project. She thanked the Historic Preservation Committee, said it was fun to work with them and wished them good luck. She concluded her report by saying that it had been fun to work with her colleagues on the Council and wished them good luck.

MIN No. 21 APPROVED FOR RELEASE & CONTENT 1-2-19

Council President Knoller had led the December 7th Christmas Tree Lighting. There had been a nice turnout with a lot of happy faces in the crowd. He thanked the Fire Department for hosting everyone for hot chocolate and donuts. He thanked everyone involved for making it a great evening. He provided an update on recent finance meetings where they had discussed goals and priorities and said it was very productive. He thanked Borough Administrator Robert Hoffmann and CFO Lauren Roehrer and Mayor-elect DiPaola for their time and input. He congratulated Sergeant Randy Velez on his promotion. As a member of the Volunteer Ambulance Corps, he had observed Sergeant Velez, who was of the highest character and would assist the members. He was very proud of Sergeant Velez and thought he would be a tremendous asset to the Borough. He thanked Mayor Lamatina, Councilwoman Wolf and Councilman Downing, noting that it had been terrific working with them. He said that public service took a lot of hard work and takes up a lot of time; they tried to do the right thing for the right reasons. He said that people may not agree and that was okay. His goal was to see things finished up and see them through. He wished everyone a Merry Christmas, Happy Chanukah and a Happy and Healthy New Year.

Councilman Downing congratulated Sergeant Velez and said he knew him personally. He was a great guy and would be a great Sergeant. He had attended the Christmas Tree Lighting and said that Council President Knoller did a great job. The Recreation Commission and Volunteer Fire Department made the evening special and did a great job. He thanked everyone for their service and said it had been an honor to represent the Borough he had grown up in. He enjoyed public service and thanked everyone for their support including Mayor Lamatina, Councilwoman Wolf and wished Mayor-elect DiPaola, Councilman-elect Gordon and Councilman-elect Hoffman the best of luck. He closed by wishing everyone a Merry Christmas.

Mayor Lamatina had attended a meeting to make sure Governor Murphy and his staff to make sure they were aware of Emerson's issues with New Jersey Transit. He asked the local liaison Rob Field to work on getting the train to stop further north on the tracks so that Kinderkamack Road could stay open when the train was in the station going towards New York. Mr. Field assured him that he would follow up. He asked that Councilmembers stay on top of this to get the train to stop further north which would solve many traffic problems in the center of town. The Borough would continue to work with New Jersey Transit and the Department of Transportation on this issue. He congratulated Sergeant Velez and said he was a great officer, one of many who do a great job. He also thanked the Governing Body for this years' work and the four years of work since he had been Mayor and wished Mayor-elect DiPaola, Councilman-elect Hoffman and Councilman-elect Gordon. He wished them well and wished everyone Happy Holidays.

- Borough Administrator Robert Hoffmann reported on the following:
  o He thanked the Department of Public Works for fixing a broken pump on Cindy Lane. Two inches of rain were predicted for Sunday and everything had been repaired by Saturday afternoon. He asked residents not to flush gloves or wipes as they clog the pumps and cause backups.
  o Emerson had received a $25,000 matching grant for the shade pavilion at Hillman Field. The County would vote on it at their January 7, 2019 meeting. He said that this was another example of teamwork and thanked the Public Library, the Recreation Commission, the Emerson Seniors, the Summer Camp Director, the Mayor and Council and the grant writers for their contribution to this project.

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

- o He congratulated Sergeant Randy Velez on his promotion and said he would be a great Sergeant and bring a lot to his new assignment.
- o The Borough had received 89 RFQ responses which would be sent electronically to the Governing Body.
- o During the weeks of Christmas and New Year's Day, there would only be one garbage collection on Friday of each week due to the holidays falling on Tuesdays. The information would be posted on the Borough website and residents would be noticed through electronic communication as well.
- o Recycling collection would be moved from Wednesdays to Mondays effective January 7, 2019.
- o He thanked Mayor Lamatina, Councilman Downing and Councilwoman Wolf for their service to Emerson. He said that public service as an Elected Official was a noble calling and they needed a thick skin. He wished them the best of health, happiness and success. He wishes everyone a Merry Christmas and a Happy New Year.

- Borough Clerk Jane Dietsche said it had been an honor and pleasure to work with Mayor Lamatina, Councilman Downing and Councilwoman Wolf and thanked them for their service. She said she looked forward to continuing to work with Councilwoman-Mayor—elect DiPaola and Councilman-elect Hoffman and working with Councilman-elect Gordon next year.

- Borough Attorney Wendy Rubinstein said the Special Master's report had been received in advance of the hearing scheduled for Friday, December 22nd. The report was favorable in recommending a conditional order of compliance.

## XIV. PUBLIC COMMENT

☞**Motion** to open the meeting to comments from the public was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Councilman Bayley and carried at 8:22 p.m.

Corey Melillo, 18 Vivian Avenue thanked Mayor Lamatina, Councilman Downing and Councilwoman Wolf for their service and suggested that a Nixle message be sent out to alert residents not to flush wipes. She also asked for an update on her request at the previous meeting to post a crossing guard at High Street and Locust Avenue no later than 7:45 a.m. She wished everyone a Merry Christmas and a Happy New Year.

Jill McGuire, 154 Linwood Avenue asked about an item on Closed Session related to contract negotiations with Emerson Redevelopers Urban Renewal, LLC. She opined that she was not happy with the Land Use Board's upcoming Special Meeting scheduled for December 28th. She requested that negotiations be postponed until the incoming administration was in place. She congratulated the incoming administration and thanked those who had served.

Mike Myer, 38 Allison Way asked what was being done about anti-Semitic attacks that had occurred that day at the public schools. He also asked about a malfunction of the railroad crossing gates and opined that the Governing Body should draft a resolution or encourage the Land Use Board not to confirm the resolution that had been passed at their last meeting. He opined that it had been it had been snuck in under the wire after so many residents had expressed their displeasure with what was going on.

Pat Hulburt, 55 Jefferson Avenue said she was bothered by redevelopment and opined that there was a huge difference between the plans originally submitted and the current plans. She did not see any benefit to the residents.

MIN No. 21 APPROVED FOR RELEASE & CONTENT 1-2-19

Corey Melillo, 18 Vivian Avenue commented on the redevelopment and said there was nothing for children and families. She asked that they rethink the plans.

Peter Flannery, of Bisgaier Hoff, LLC, Attorney for Joseph Forgione of JMF said that the redevelopers were open to having a restaurant in the plans. They were still negotiating with tenants.

Jack Klugmann, CEO of Accurate Builders and Developers said the original plans called for a restaurant on each corner of the project but the ceilings were too low because of height restrictions.

Bill Price, 9 Emwood Drive wished everyone a Happy Holiday. He was not pleased with the redevelopment plans. He said that the election showed that they should listen to the people and opined that the process was underhanded.

Don Piero, 70 Eagle Drive asked about amendments to the redevelopment agreement, the number of three-bedroom units and the number of affordable housing units. He asked if there were any plans related to where the offsite affordable housing units would be located.

Joe Polvere, 124 Linden Avenue wished everyone a Happy Holiday. He said he was not against redevelopment; the downtown needed to be improved and that it was important to meet housing requirements. He asked that the Governing Body take a step back and look more closely at the project as there was so much division in the Borough. He opined that people cared about the town and that everyone should work together to build confidence in the project.

Paul Hulburt, 55 Jefferson Avenue opined that if the Mayor's term was not up that this project would not have been approved so quickly. He opined that the redeveloper did not have answers to questions related to site elevation, storm drainage or traffic studies. He opined that they were completely unprepared and unprofessional and that the project had been jammed down their throat.

Corey Melillo, 18 Vivian Avenue thanked Councilwoman/Mayor-elect DiPaola for voting no on four stories. She said the Mayor's Message noted that he had broken the tie on this decision and that JMF was going to put 20% affordable housing on site. She opined that she spoke for a majority of residents who did not have a problem with redoing the downtown, but rather with the scale of the redevelopment. They did not want a fast food restaurant but rather the local businesses such as Cork and Keg, Ranch Cleaners and Cozy Café.

Bill Price, 9 Emwood Drive opined that greed did bad things to people and that the redevelopment should be two stories. He added that he was glad that the vote turned out the way it did.

Jill McGuire, 154 Linwood Avenue asked whether there would be a Public Comment opportunity before there was a vote on the amendment being discussed in Closed Session. She opined that the vote should be postponed until 2019 but if not, then residents should have a chance to voice their comments.

☛**Motion** to close the meeting to comments from the public was **moved, seconded** and carried.

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

☞**Motion** to provide for Public Comment after reconvening from Closed Session was **moved** by Councilwoman DiPaola, **seconded** by Councilman Downing and carried by a roll call vote of 4-1:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Downing**
**NO: Knoller**

XV.   RESOLUTIONS ON CONSENT AGENDA NO. 296-18

☞**Motion** to approve Resolution No. 296-18 Consent Agenda was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Downing**

| | |
|---|---|
| CA 297-18 | Cancelling Current Fund Unexpended Appropriation |
| CA 298-18 | Authorize Drug & Alcohol Testing Agreement for CY 2019 |
| CA 299-18 | Drive Sober or Get Pulled Over 2018 Year End Holiday Crackdown |
| CA 300-18 | Mayor and Council Regular Meeting Dates for 2019/Sine Die & Reorganization 2020 |
| CA 301-18 | 2019 Borough Closings in Observance of Legal Holidays |
| CA 302-18 | Endorsing the Amended 2018 Housing Element and Fair Share Plan and Included Spending Plan |
| CA 303-18 | Resolution of Intent to Bond in the Event that there is a Shortfall in Funding to Effectuate Certain Affordable Housing Mechanisms |

XVI.   CLOSED EXECUTIVE SESSION – Resolution No. 304-18

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 304-18 was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES: DiPaola, Wolf, Bayley, Knoller, Downing**

| | | |
|---|---|---|
| #18-12/18-34 | Contract Negotiations – Police Dept. SRO | N.J.S.A. 10:4-7 |
| #18-12/18-35 | Potential Litigation – Action in lieu of prerogative writ – Ord #1513-16 | N.J.S.A. 10:4-7 |
| #18-12/18-36 | Contract Negotiations – Emerson Redevelopers Urban Renewal, LLC | N.J.S.A. 10:4-7 |

XVII.   RECONVENE

The Borough of Emerson reserves the right to return to Open Session and, if appropriate, take formal action.

☞**Motion** to reconvene was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried at 10:59 p.m.

☞**Motion** to extend the curfew until 11:15 p.m. was **moved** by Councilman Downing, **seconded** by Council President Knoller and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Downing**

MIN No. 21APPROVED FOR RELEASE & CONTENT 1-2-19

Mr. Doyle said he had received a proposed Third Amendment to the Redevelopment Agreement which had arisen from circumstances related to Emerson's ultimate settlement with certain property owners. This had allowed the Governing Body to avoid the use of eminent domain. As a result of those negotiations and the payment of monies which were in excess of the funds originally contemplated by the developer, the developer had asked for certain concessions:

- The developer had a duty to make certain that off site and onsite improvements that were originally set out in Schedule F in the amount of $750,000.00. The developer was looking for a reduction in the commitment to make those improvements which would now total approximately $400,000.00.
- The developer continued to agree to provide the general contractor services at no cost to the Borough in an amount up to $500,000.00, the approximate market value of the Ambulance Corps building. But in order for the developer to enjoy the benefits of this negotiated provision which was to have the general contractor be both the contractor for the redevelopment site as well as the municipal site, they were looking for the Governing Body to provide them with plans and access to the site within one year of the adoption of the third amendment.
- The developer had made the commitment and Emerson had agreed to assist with was for them to be able to close before the end of the year. Since traditional financing was no longer available to the developer, Joseph Forgione, sought out another developer who could come in and share the risk and participate with him in this project. Information was presented to the Governing Body that indicated the developer was well suited financially and in terms of experience to build the project, as was JMF. There would be two developers at the table and 51% of Emerson Redevelopers Urban Renewal would be transferred to an entity known as Accurate Builders and Developers. The remaining 49% would continue to be retained by JMF, the original developer.

Mr. Doyle added that as a result of discussions in Closed Session, one of the concerns of the Governing Body which had been expressed by Councilwoman/Mayor-elect DiPaola, Councilman-elect Hoffman and other members of the Governing Body was that the plans provided to the Land Use Board did not appear to be consistent aesthetically with the concept plan that was prepared by JMF. Therefore, the developer had agreed that they would meet with a subcommittee of the Governing Body, currently the Redevelopment Subcommittee either before the Sine Die meeting or sometime soon thereafter. If after the Sine Die meeting, then Mayor DiPaola would form a subcommittee which would meet with the redeveloper to review detailed concept plans in order to confirm that the concept plans, the aesthetic look of the building, and the materials used were consistent with the redevelopment ordinances and the redevelopment plan. He said those were essentially the amendments that were included in the Third Amendment to the Redevelopers Agreement.

Mayor Lamatina asked if there was a motion to adopt the Third Amendment to the Redevelopers Agreement. Council President Knoller made the motion and Councilman Bayley seconded it. The Mayor then asked for a motion to open the meeting to comments from the public.

☞**Motion** to open the meeting to comments from the public on the Third Amendment to the Redevelopment Agreement was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Downing**

MIN No. 21 APPROVED FOR RELEASE & CONTENT 1-2-19

Mike Myers, 38 Allison Way opined that there was a last-minute switcheroo and could not see how the Governing Body could accept this in good conscience.

Jill McGuire, 154 Linwood Avenue inquired about the reduction in the cash contribution that the redeveloper would pay towards the relocation of the Volunteer Ambulance Corps structure.

Don Piero, 70 Eagle Drive asked about the one-year time frame for relocating the Volunteer Ambulance Corps structure and whether that included relocating the Police Department.

Paul Hulburt, 55 Jefferson Avenue asked where the emergency services building would be constructed and whether it was supposed to be part of the Borough Hall project. He opined that there should be a referendum for the Borough Hall project.

☞**Motion** to close the meeting to comments from the public on the Third Amendment to the Redevelopment Agreement was **moved** by Council President Knoller, **seconded** by Councilwoman Wolf and carried by a roll call vote of 5-0:
**RC: Council members:**
**YES: DiPaola, Bayley, Wolf, Knoller, Downing**

- Resolution No. 305-18 Adopt Resolution Permitting the Third Amendment to the Redevelopment Agreement

☞**Motion** to approve Resolution No. 305-18 Adopt Resolution Authorizing the Third Amendment to the Redevelopment Agreement was **moved** by Council President Knoller, **seconded** by Councilman Bayley and carried by a roll call vote of 4-1:
**RC: Council members:**
**YES: Bayley, Wolf, Knoller, Downing**
**ABSTAIN: DiPaola**

XVIII.  ADJOURNMENT

With no other business to address, at the request of Mayor Lamatina, a motion to adjourn was **moved** by Council President Knoller, **seconded** by Councilwoman Wolf and carried at 11:15 p.m.

Respectfully submitted,


Jane Dietsche, RMC
Borough Clerk

Exhibit 33

CONFIDENTIAL

**REGULAR MEETING OF DECEMBER 18, 2018**
**CLOSED EXECUTIVE SESSION MEETING MINUTES**

I. CLOSED EXECUTIVE SESSION – Resolution No. 304-18

**FMotion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 304-18 was **moved** by Councilwoman/Mayor-elect DiPaola, **seconded** by Council President Knoller and carried by a roll call vote of 5-0.
**RC: Council members:**
**YES: DiPaola, Wolf, Bayley, Knoller, Downing**

| | | |
|---|---|---|
| #18-12/18-34 | Contract Negotiations – Police Dept. SRO | N.J.S.A. 10:4-7 |
| #18-12/18-35 | Potential Litigation – Action in lieu of prerogative writ – Ord #1513-16 | N.J.S.A. 10:4-7 |
| #18-12/18-36 | Contract Negotiations – Emerson Redevelopers Urban Renewal, LLC | N.J.S.A. 10:4-7 |

Also present were Councilman-elect Hoffman, Borough Administrator Robert Hoffmann, Borough Attorney Wendy Rubinstein, Special Counsel Doug Doyle and Borough Clerk Jane Dietsche.

**#18-12/18-34    Contract Negotiations – Police Dept. SRO    N.J.S.A. 10:4-7**

Mr. Hoffmann provided the Governing Body with an update of a conversation with Emerson Schools Superintendent Brian Gatens. The Board of Education had agreed to a five-year agreement for a Schools Resource Officer. Governing Body consensus was to agree to move forward with this process.

**#18-12/18-35    Potential Litigation – Action in lieu of**
**prerogative writ – Ord #1513-16    N.J.S.A. 10:4-7**

Ms. Rubinstein said that the Borough was being threatened with litigation because a 200-foot notice had not been mailed out. She explained that it was not required but recommended that the Governing Body pass a new ordinance in January as it would be cheaper than litigating. Governing Body consensus was to address this next year by introducing an ordinance in January and providing surround municipalities a certified notice of the public hearing.

**#18-12/18-36    Contract Negotiations – Emerson Redevelopers**
**Urban Renewal, LLC    N.J.S.A. 10:4-7**

Mr. Doyle updated the Governing Body on negotiations which had taken place between JMF and the property owners of Block 419. Because they paid significantly more for the properties than originally planned as well as the need to close quickly, JMF had to bring in a partner. The Third Amendment to the Redevelopment Agreement would provide Accurate Builders and Developers with a 51% partnership to JMF's 49%. Mr. Doyle said that this amendment was not unreasonable and that bringing in Accurate Builders would enable the developers to close and allow Emerson to comply with its commitment. The Governing Body requested an addendum to the Third Amendment to the Redevelopment Agreement – require the builders to meet and work with a subcommittee of Governing Body members which included Mayor-elect DiPaola so it will look like what they wanted for the Borough and what residents would be pleased with.

CONFIDENTIAL

Jack Klugmann, Chaim Klugmann and Joseph Forgione's attorney, Peter Flannery of Bisgaier
Hoff, LLCF, were invited into Closed Session to discuss this condition. Mr. Jack Klugmanm,
Mr. Chaim Klugmann and Mr. Flannery left the Closed Session on two occasions to discuss
and upon returning, agreed to a subcommittee to review and provide input for the plan.



P000929

Exhibit 34

**RESOLUTION OF THE LAND USE BOARD**

**THE BOROUGH OF EMERSON**

**In the matter of the Application of:**

**Emerson Redevelopers Urban Renewal, LLC**

**For Preliminary and Final Major Site Plan**

**Approval as to Kinderkamack Road between**

**Lincoln Boulevard and Linwood Avenue**

**Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9 & 10**

      **WHEREAS, Emerson Redevelopers Urban Renewal, LLC** ("Applicant") has made

application (the "Application") to the Land Use Board of the Borough of Emerson (the "Board")

for preliminary and final site plan approval and a major soil moving permit to demolish the existing

improvements on the property and redevelop the Property as a 4-story, 147-unit inclusionary

residential development with parking garage, ground floor retail, amenities and other site

improvements, including twenty two (22) affordable housing units on site and an additional seven

(7) credits off site within the Borough, this will provide the Borough with a total of twenty-nine

(29) affordable housing credits, located on Kinderkamack Road between Lincoln Boulevard and

Linwood Avenue, and also known as Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9 & 10 on the Tax

Assessment Map of the Borough of Emerson (the "Property"), in the CBD-10 Zoning district, in

accordance with the Borough's Redevelopment Plan for the Central Business District

Redevelopment Area; and

      **WHEREAS,** Applicant also applied for a Major Soil moving Permit in accordance with

Chapter 244 of the Borough of Emerson Municipal Code as part of the Application; and

1

**WHEREAS,** the Applicant has filed application materials in connection with the Application; and

**WHEREAS**, the Applicant has presented satisfactory proof to the Board that legal notice of the Application was published and served in accordance with the Municipal Land Use Law of the State of New Jersey, N.J.S.A. 40:55D-1 et seq. ("MLUL"); and

**WHEREAS**, the Board reviewed this matter at a public hearing (Special Meeting) on December 10, 2018; and

**WHEREAS,** after consideration and deliberation at the aforementioned hearing, the Board did vote in favor of the Application and did instruct the Board Attorney to prepare a resolution memorializing the vote taken; and

**WHEREAS**, pursuant to N.J.S.A. 40:55D-10g, a decision must be reduced to writing and shall include findings of fact, based upon the evidence presented at its public hearings; and

**WHEREAS**, the Land Use Board of the Borough of Emerson makes the following factual findings and conclusions:

1)     The Applicant is the contract purchaser of the Property located at Kinderkamack Road between Lincoln Boulevard and Linwood Avenue, Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9 & 10, in the CBD-10 zoning district and filed the Application in order to demolish the existing structures on the Property and construct thereon a 4-story, 147-unit inclusionary multifamily rental residential development with surface parking, parking garage, approximately 14,700 square-foot of ground floor retail, amenities, and other site improvements.  Approximately twenty two (22) of the proposed on site residential units will be affordable housing units.

2

2)     The proposed development is contemplated by, and subject to, both the Redevelopment Agreement between the Borough and the Applicant dated June 14, 2016, as amended, including but not limited to the Third Amendment to Redevelopment Agreement ("Redevelopment Agreement"), as well as the Settlement Agreement between the Borough and the Fair Share Housing Center, dated November 21, 2017 ("Settlement Agreement").   The Redevelopment Agreement and the Settlement Agreement, among other things, require the Applicant to provide for a total of twenty nine (29) affordable housing units.   Applicant will provide twenty-two (22) affordable housing units on site as part of the proposed development, and will provide seven (7) off-site affordable housing credits, all in accordance with the Uniform Housing Affordability Controls, N.J.A.C. 5:80-26.1 et seq. ("UHAC").  Four (4) of the affordable housing units shall be very low income housing units (as defined by UHAC).

3)     The Application is subject to several "temporary" checklist waivers.   The Application does not require any variances and is an "as-of-right" site plan application.

4)     The Applicant was represented by Peter M. Flannery, Esq.   Testimony of the following individuals was presented in support of the Application:

(a)     Wayne A. Corsey, P.E., P.P., Bowman Consulting, Civil Engineering.

(b)     Charles Olivo, P.E., P.P., P.T.O.E., Stonefield, Traffic Engineering.

(c)     William Devereaux, R.A., and Angela Kostelecky, R.A., Devereaux & Associates, Architecture.

5)     All witnesses were sworn and duly qualified as experts in their respective fields, and they testified as to how the proposed use will be developed consistent with the Borough's

3

Central Business District Redevelopment Plan, codified as the CBD-10 Zoning District in Chapter 290 of the Borough Code ("Redevelopment Plan").

6)      The Applicant presented the following exhibits in support of the Application:

Exhibit A-1:  Affidavit of Service.

Exhibit A-2:  Rendering of Aerial Photograph, prepared by Bowman Consulting, dated December 10, 2018.

Exhibit A-3:  Colorized Rendering of Landscape Plan, prepared by Bowman Consulting, dated December 10, 2018.

Exhibit A-4:  Revised Sheet A-1.10, dated December 10, 2018, prepared by Devereaux & Associates.

Exhibit A-5:  Revised Sheet A-1.20, dated December 10, 2018, prepared by Devereaux & Associates.

Exhibit A-6:  Revised Sheet A-2.10, dated November 15, 2018, prepared by Devereaux & Associates.

Exhibit A-7:  Colorized Rendering of Kinderkamack Road Elevation, dated December 10, 2018, prepared by Devereaux & Associates.

Exhibit A-8:  Color Sample Board – Exterior Finishes, dated December 10, 2018, prepared by Devereaux & Associates.

4

1177669

## TESTIMONY

7)      Based upon the sworn and qualified testimony of Applicant's professional engineer, Wayne A. Corsey, P.E., P.P., of Bowman Engineering, the Board made the following findings of fact:

a.      Mr. Corsey described the existing condition of the Property and the proposed development. The site consists of a mix of uses, from restaurants, office, retail and single-family residence. Lot 5 is a two-story masonry building that is not part of this application. The site is predominantly either covered by buildings or blacktop parking spaces.

b.      The site has frontage on Kinderkamack Road, Lincoln Boulevard and Linwood Avenue. It also has 550 feet of frontage along the Conrail/New Jersey Transit right-of-way. The Kenneth Street right-of-way which is a Borough right-of-way, is adjacent to the railroad tracks.

c.      The property slopes downward toward Lincoln Boulevard to the west and along Kinderkamack to the south at Linwood Avenue. There is currently some on-site drainage that will be removed. This on-site drainage collects stormwater and discharges into the Linwood storm system. Applicant will install 42 inch reinforced concrete pipe (RCP), from the existing inlets in Lincoln Boulevard to the existing inlets in Linwood Avenue, which will provide more capacity in the storm pipe to alleviate any potential flooding at the intersection of Lincoln Boulevard. There will also be stormwater inlets in the back surface parking lot as well as roof leader collectors and collectors for the parking garage that will connect into the proposed 42 inch RCP. There will be a net reduction in stormwater management for stormwater runoff on the site. The ground floors of the units will be stepped down to accommodate the grades and topography.

5

d.      The proposed building will front on all three roads and there will be a parking lot and parking garage located in the northwest corner. There will be two-way driveway access that will go through the site from Lincoln Boulevard to Linwood Avenue.

e.      The proposed parking for the site is a total of 308 spaces, with 73 surface spaces and an additional 235 spaces located in the parking garage. There will be 10 handicapped persons spots.

f.      Applicant will comply with the streetscape standard required by the Borough for the redevelopment area, and work with the Borough to modify the design to accommodate areas for outdoor dining.

g.      The Settlement Agreement requires twenty-nine (29) COAH or affordable units, seven (7) of which may be provided off-site. The project will have 147 residential units including twenty-two (22) COAH or Affordable units and Applicant will comply with the seven (7) off-site affordable housing requirements. The residential units will only be on the ground floor along Lincoln Boulevard. There will be residential units above that on the second, third and fourth floors. There are three access points: primary access points at the corner and one in the rear area. There will also be 14,700 square feet of retail space.

h.      There will be building mounted signs which will comply with Ordinance requirements. Additionally, the complex will have main signage identifying the building name and directional signage.

i.      The proposed development will provide adequate grading and utilities, stormwater controls, sanitary sewer, lighting, landscaping and site circulation. He also confirmed that the site lighting will conform to Borough requirements.

6

1177669

8)      Based upon the sworn and qualified testimony of Applicant's professional traffic engineer, Charles Olivo, P.E., P.P., P.T.O.E., of Stonefield Engineering and Design, the Board made the following findings of fact:

a.      Mr. Olivo testified that the proposed project is a Transit-Oriented Development ("TOD"), the goal of which is to take advantage of public transit and walkability that exists in the Borough.  Based on his own analysis as well as traffic studies his firm has completed for similar developments, this project will have no significant traffic impact on the surrounding area.

b.      Mr. Olivo testified that there are significant improvements that will result from this project, including the creation of a street wall, which encourages a walkable environment and shared parking which will be used by commuters, retail, restaurants and residential uses.  In addition, the parking that is being supplied exceeds the Residential Site Improvement Standards ("RSIS") which requires 254 parking spaces, while 308 spaces are being provided:  55 parking spaces dedicated for commuters to the adjacent New Jersey Transit train station, 188 parking spaces in the parking garage dedicated for the residents, and 65 parking spaces for the retail, as well as for additional resident parking.  In his opinion, the proposed parking is more than adequate for the proposed development.

c.      From a traffic perspective, the unit density, the scaling and the mass all comply with the redevelopment plan.  The proposed uses are permitted uses in the zone and the traffic associated with it is conceived to be part of the roadway network when a redevelopment plan is approved.  Accordingly, traffic generation associated with the site is not expected to significantly alter the traffic patterns.

7

d.      He also testified as to adequate site circulation and site access for the proposed development, with all existing Kinderkamack Road access points on the Property being eliminated, subject to any exception at the sole discretion of the Borough, in favor of Linwood and Lincoln access points as far away from Kinderkamack Road as possible.  Mr. Olivo also confirmed that the internal, fob-operated gate used for access to the 188 dedicated residential spaces in the parking garage will not interfere with site access from Lincoln Boulevard, and the location or locations are to be determined with the Borough's approval.

e.      With regard to trip generation, it is estimated that during peak hours, which are 7:00 a.m.-9:00 a.m. and 4:00 p.m. to 7:00 p.m. on weekdays and 11:00 a.m. to 2:00 p.m. on Saturdays, there are just under 100 trips per hour.

9)      Based upon the sworn and qualified testimony of Applicant's registered architects, William Devereaux, R.A., and Angela Kostelecky, R.A., of Devereaux & Associates, Architecture, the Board made the following findings of fact:

a.      Mr. Devereaux and Ms. Kostelecky testified regarding the architectural plans, including the latest revision made on December 10, 2018, which created a single building, with a single amenity center and a single lobby, which they opined encourages a "community within a community."  The majority of the building is self-contained except for its access to the street.  The intention is to encourage activity on the street with for example, a café or coffee shop, and outdoor seating.

b.      Mr. Devereaux and Ms. Kostelecky testified regarding the architectural elevations and floor plans for the proposed development, including the proposed setbacks, building

8

components, colors and materials. They also confirmed that the proposed development conforms to the building height requirements and the design standards set forth in the Redevelopment Plan.

c.     Ms. Kostelecky described the trash collection for the proposed development, which will be undertaken by private trash haulers and will utilize a system of trash rooms and interior corridors for the collection of trash and recycling from the retail spaces and the residential development.

d.     Ms. Kostelecky also testified regarding the addition of bollards at the corner of Kinderkamack and Lincoln to provide protection for the stairs leading to the ground floor, and she described the fob-controlled gate access for the 188 dedicated resident parking spaces in the parking garage.

e.     Applicant agrees to work with the Borough of Emerson to engage in discussions with New Jersey Transit to move the crossway station further north to unload at the Kinderkamack Road crossing and to potentially place a stairwell from the site toward the platform.

f.     With regard to the affordable housing component, Ms. Kostelecky testified as to the revised bedroom distribution for the affordable housing units and confirmed that the proposed development would comply with all the applicable legal requirements for the affordable housing units. Specifically, there are a total of twenty nine (29) COAH units required, and twenty two (22) COAH units will be provided on-site. Of those 22 units, there are 4 one-bedroom, 13 two-bedrooms and 5 three-bedrooms.

g.     All signage on the building will be in compliance with the Borough's sign ordinance and Applicant will submit a design package regarding all signs, including directional,

9

1177669

parking, etc., to the satisfaction of the Board Engineer, Planner, and the Governing Body and Land Use Board subcommittee.

**PUBLIC COMMENT**

10)     The following members of the public spoke with regard to the application:  Mayor-Elect Danielle DiPaola, Jeff Bischoff, Mike Meyers, Corey Melillo, Lorraine McQueeney, Joseph Polvere, Councilman-elect Kenneth Hoffman, Billy Price, Michael Esqueu, Don Pierro on behalf of Phyllis Rooney, Paul Hulbert, Michael Casey, Kathleen Viola, Laura Litchult, Jill McGuire, Lina Ballas, Bob Petrow, Annette Scala, Douglas Doyle, Esq. as Redevelopment Counsel for Emerson,  and Jack Klugman, as part of the Applicant's team.  Public spoke in opposition to the Application, and expressed concerns regarding: the height, scale and appearance of the proposed development; the number of parking spaces provided as part of the proposed development; the traffic impacts of the proposed development; stormwater controls; and the environmental condition of the Property.  No expert testimony was offered in support of the public comments.

11)     The Board Engineer and the Board Planner commented on the evidence presented by the Applicant following review of the same, sought clarification of certain items, and required supplemental information and stipulations from Applicant with regard to same as set forth herein.

**STIPULATIONS MADE BY APPLICANT**

A.     Applicant shall comply with all landscaping comments regarding the Application, which are to be submitted by the Board Engineer's office or the Board Planner's office, one or the other which shall be completed to the satisfaction of the Board Engineer and/or Board Planner.

1177669

B.      Applicant will meet with the Land Use Board's Planner and a subcommittee of the Governing Body for the Borough and the Land Use Board to discuss and address the Board's and Borough's concerns and comments regarding the final architectural design and details of the project and all other aspects of the project.  Applicant agrees to use all good faith efforts to satisfactorily address the Board's and Governing Body's concerns and comments through the subcommittee.  The sample materials that were submitted as hearing evidence shall be the ones utilized during construction unless otherwise approved by the Borough.

C.      Applicant shall dedicate at least 55 of the 73 surface parking spaces on the Property for the exclusive use by New Jersey Transit (Emerson Borough) train station users during the hours of 7:00 a.m. and 6:00 p.m., Monday through Friday.  The signage and permitting for these 55 commuter spaces shall be agreed upon between the Borough and the Applicant.

D.      Insofar as the proposed development is constructed with the parking reduction set forth in Section 290-71A(a) of the Borough Code: medical office space – which shall include walk-in and urgent-care clinics and other medical, dental, treatment and therapy-related facilities – shall be a prohibited use in the proposed development.

E.      Applicant shall provide turning templates for garbage trucks and emergency vehicles accessing the Property, for the review and approval of the Board Engineer and/or Board Planner.

F.      Applicant shall provide drainage calculations for the proposed development for the review and approval of the Board Engineer.

G.      The Applicant shall provide any off-tract improvements required by the Application consistent with the MLUL and the Redevelopment Agreement,

11

1177669

H.      There shall be a review after six (6) months to address any lighting concerns, and adjustments are to be made at the direction and approval of the Board Engineer;

I.      Deliveries shall not be made from Kinderkamack Road and shall only be made in the rear of the building(s) of the proposed development.

J       Applicant will reasonably assist Borough efforts to create pedestrian connections to and from the Property and the Borough's New Jersey Transit train station.

K.      All standing snow of 2 inches or more, from one or multiple snow events, shall be removed from the Property by the Applicant at Applicant's sole cost and expense.

L.      Subject to obtaining the permission of the owner of Block 419, Lot 5 ("Lot 5"), and provided same does not encroach onto Lot 5, the Applicant shall continue the streetscape for the proposed development across the frontage of Lot 5.

M.      Applicant shall revise the architectural plans to be to scale and to provide dimensions to confirm compliance with all Borough Code requirements, including, but not limited to, the design standards set forth in the Redevelopment Plan, and the Applicant shall provide elevations of all four sides of the proposed development for review and approval by the Board Engineer and/or the Board Planner.

N.      Applicant shall comply with all applicable requirements of the Redevelopment Agreement, the Settlement Agreement and UHAC with respect to the affordable housing proposed as part of the development.

1177669

O.    Applicant shall design the HVAC units to be shielded from public view and shall provide some HVAC and vents for units suitable for future restaurant uses within the development to the approval of the Board Engineer.

P.    Application shall provide a point-by-point lighting plan for the review and approval of the Board Engineer.

Q.    Applicant shall submit a directional sign package for the review and approval of the Board Engineer and/or Board Planner.

12)    Based upon the aforementioned facts and law, the Application conforms to the requirements of the Borough in terms of public safety, health and general welfare and will not deter the efforts of the Borough to effectuate the general purpose of municipal planning.

**NOW, THEREFORE, BE IT RESOLVED** by the Land Use Board of the Borough of Emerson that the Application of Emerson Redevelopers Urban Renewal, LLC with respect to the Property requesting preliminary and final site approval and a major soil permit be and is hereby APPROVED subject to the terms and conditions hereinafter set forth:

1)    The foregoing findings of fact and conclusions of law are incorporated herein as if set forth at length;

2)    The Applicant seeks site plan approval pursuant to N.J.S.A. 40:55D-50 in conformance with the municipal ordinances;

3)    In reviewing the Application, documents, evidence and testimony, the Board concludes that the proposed uses comply with the municipal ordinances and the MLUL;

13

1177669

## CONDITIONS SPECIFIC TO THIS APPLICATION

1)      Applicant shall abide by all of the Stipulations set forth at length above.

2)      The Applicant shall submit revised site plan and architectural plan sets incorporating any and all applicable conditions set forth herein, and conditions of all engineering reports and reports of the Land Use Board's professionals, and the subcommittee of the Board and the Governing Body, for the review and approval of the Board Engineer and Borough Engineer and/or Board Planner and Borough Planner.

3)      The Applicant shall obtain the appropriate approvals, permits and/or letters for the Application from all applicable local, county, state and federal bodies and agencies, including, but not limited to, the following:

A.      Bergen County Planning Board;

B.      Bergen County Soil Conservation District;

C.      Borough of Emerson Police Department;

D.      Borough of Emerson Fire Department; and

E.      New Jersey Department of Environmental Protection.

4)      If any material changes to the site plan as approved by this Resolution of the Board are required by any other governmental body or agency, said changes are to be brought by the Applicant on a forthwith basis before the Board, which retains jurisdiction over the Application;

5)      The Applicant shall at all times comply with all applicable rules, regulations, ordinances and statutes of the Borough of Emerson, County of Bergen, State of New Jersey and

14

1177669

the federal government with regard to the development, including, but not limited to, the Americans with Disabilities Act;

6)      The Applicant agrees that the work to be performed consistent with this Resolution will be consistent with Emerson's Redevelopment Plan;

7)      Nothing herein grants the Applicant an approval of any material changes to this application as set forth in detail in this Resolution.  Any such changes or amendments will require amended site plan and/or variance approval from this Board, as applicable;

8)      The Applicant shall comply with the following comments set forth in the Boswell Engineering review letter dated December 6, 2018 ("Engineering Review Letter") and the Brigette Bogart Planning & Design Professionals LLC review letter dated December 10, 2018 ("Planning Review Letter") (the Engineering Review Letter and the Planning Review Letter are attached hereto and made a part hereof):

A.      Engineering Review Letter, Comments 7-16, 19-20, 22, 25-28, 34-38, 40-49.

B.      Planning Review Letter, Comments C.1 – C.13.

9)      The Applicant shall comply with the following final site plan checklist items:

A.      *Final Site Plan Checklist Item 2.*  Original tracings with signature lines.

B.      *Final Site Plan Checklist Item 3.*  Proof of execution of developer's agreement.

C.      *Final Site Plan Checklist Item 4.*   Proof of posting of performance and/or maintenance bonds.

15

1177669

D.     *Final Site Plan Checklist Item 5.*  Copies of recorded easements, rights-of-way or conveyances of open space or public easements, if required.

E.     *Final Site Plan Checklist Item 6.*  Deposit of escrow funds for engineering inspections, and any other items required by the Borough.

F.     *Final Site Plan Checklist Item 7.*  Bergen County Planning Board approval.

G.     *Final Site Plan Checklist Item 9.*  Bergen County Soil Erosion and Sediment Control Plan approval, where required.

10)     The Settlement Agreement requires 29 affordable units, seven of which may be provided off-site.  The project will have 147 residential units including 22 COAH or Affordable units on site and Applicant will comply with the requirement of seven (7) off-site affordable units. The residential units will be on the ground floor along Lincoln Boulevard and on the ground floor in the rear parking lot.   There will be residential units above that on the second, third and fourth floors.   There are three access points: primary access points at the corner and one in the rear area. There will also be 14,700 square feet of retail space.

11)     The following construction drawings and site plan items are required to be submitted and approved by the subcommittee review team of the Emerson Land Use Board and Governing Body, the Board Planner and Borough Planner, and the Board Engineer and Borough Engineer:

A.     Provide building elevation drawings for all four side of the redevelopment area with dimensions for each floor, balconies, reliefs, overhangs, parapets, cornices, and any other requested items.

B.     Provide building elevation grades for highest points for each facade section.

16

C.    Provide building elevation views for the side of the complex to face the existing building on Lot 5.

D.    Provide datum elevations and locations from where all height measurements will be made for field verification.

E.    The low point along Lincoln Boulevard may be the same as the Final First Floor Elevation on the northeast corner of the building. Design area to drain properly to reduce possible flooding of recessed stair entrance on the northeast corner of the building.

F.    Provide top of curb profile of Lincoln Boulevard and roof profile.

G.    Provide top of curb profile of Kinderkamack Road and roof profile.

H.    Provide top of curb profile of Linwood Avenue and roof profile.

I.    Provide typical construction details for all curbs, parking lots, sidewalks, drainage, sanitary sewers, electrical connections, and any other items requested.

J.    Provide construction staging concepts, where work will commence, and construction staging schedules.

K.    Provide plan and details of fences along the railroad property.

L.    Provide the location of the PSE&G 230 KV underground electrical line located along the west side of the redevelopment property.

M.    Provide cross - sections, slopes and access controls for parking garage operation.

N.    Provide inverts and slopes for proposed drainage system throughout the site.

O.    Provide a grading plan for site, with spot grades plotted every 50 feet.

P.    Provide a soil erosion and sediment control plan with details.

Q.    Provide a site lighting plan with intensities plotted throughout site.

1177669

R.      Provide a streetscape lighting electrical plan to match county project lighting recently completed.

S.      Provide a construction plan and cross - sections for new curb line along Lincoln Boulevard.

T.      Provide demolition plans and stone mat requirements for trucking operations.

U.      Provide quantity receipts for all recycled asphalt, concrete, contaminated soil, and steel removed from the site and presented to the Borough Superintendent of Public Works for municipal recycling credits.

V.      Provide traffic control plans for construction phases that will interfere with traffic flow on Kinderkamack Road, Lincoln Boulevard, and Linwood Avenue, to the satisfaction of the Borough Chief of Police.

W.      Provide documentation that all NJDEP requirements regarding the underground monitoring wells on the site have been satisfied for the redevelopment.

X.      Supply, relocate and modify the traffic signal equipment on the southwest corner of the Kinderkamack Road and Lincoln Boulevard intersection to the satisfaction of the Bergen County.

Y.      Review and upsize the existing drainage line, as needed, along the south side of Lincoln Boulevard to provide additional flow capacity once reviewed.

Z.      Provide information and the location of loading zones onsite for deliveries to the back of the proposed stores.

AA.     Provide the locations, parking signs, and pavement markings for the commuter parking and retail parking spaces for the site on the construction plans.

BB.     Provide a minimum of a 9'6" streetscape sidewalk design around the perimeter of the redevelopment zone, including along Linwood Avenue and Lincoln Boulevard.

CC.     Provide all necessary road widening easements, with parcel descriptions and parcel maps, to the County of Bergen and Borough of Emerson.

DD.     Provide a cost estimate for all curbing, sidewalk, drainage, paving, streetscape lighting, traffic signs, pavement markings, traffic signal relocation, regulatory and warning signs, and utility relocation. This estimate will be submitted for review and be the basis for the performance bond requirements.

EE.     Provide the date when the commuter parking spaces are required to be vacated for the start of construction.

FF.     Provide truck turning radii on a plan showing how a truck will access the trash areas for service.

GG.     Provide a note on the plans indicating where snow would be stockpiled during heavy snow events, with snow to be removed from the site for snow events over 2 inches in depth.

HH.     Provide a written traffic report to support the traffic testimony presented at the December 10, 2018 Land Use Board meeting.

II.     Provide an ADA compliance letter from a licensed New Jersey Professional Engineer to verify all ADA requirements have been installed in accordance with current requirements.

JJ.     Developer to agree to a 6-month lookback regarding site lighting to resolve any and all complaints regarding non-compliant site lighting.

KK.     Developer to abide by the noise ordinances for the Borough of Emerson.

LL.     Developer to abide by all New Jersey Transit and Federal Railroad Administration requirements regarding construction techniques and operations near the New Jersey Transit rail lines and crossings.

MM.   Developer to abide by all New Jersey Department of Transportation and County of Bergen construction materials and methods of construction for work within the public right of way.

NN.   Developer to abide by all Bergen County Planning Board requirements.

OO.   Developer to abide by all Bergen County Soil Conservation District requirements.

12.   Applicant shall have a pre-construction meeting with the Board Engineer, Borough Engineer & Board Planner prior to construction.

13.   The parking garage structure shall not exceed the height requirement in the CBD-10 zone and the levels and ramps of the garage are to be spaced at a height that is consistent with the requirements in the zone and to the satisfaction of the Board and the Borough Engineer.

14.   Applicant shall enter into an appropriate Developer's Agreement with the Borough and Land Use Board and shall post all necessary fees, escrows, and performance guarantees and payment for off-site improvements in the future.  The Developer's Agreement shall be drawn by the applicant and submitted to the Borough and Planning Board Attorneys for review and approval.

## II.   <u>GENERAL CONDITIONS</u>

1.   Applicant shall adhere to the Borough of Emerson's storm water management requirements with regard to ground water recharge for a major development as required in by the Borough Ordinance.

2.   Applicant or any successor in interest shall address all recommendations and requirements of the Borough Police Department, Fire Department and Department of Public Works.

3.   No certificate of occupancy will be granted unless all conditions imposed by this Land Use Board, the Land Use Board's professionals, Board Attorney, Planner, Engineer and the Borough's Attorney, Engineer and Planner have been satisfied in full.

1177669

4.     Applicant shall be responsible for obtaining any other approvals or permits from other governmental agencies as may be required by law, including, but not limited to, the Bergen County Soil Conservation District, and the New Jersey Department of Environmental Protection and Applicant shall comply with any requirements or conditions for such approvals or permits.

5.     Applicant is responsible for any environmental clean-up and/or environmental conditions as to the site as required by federal, state, county and local governmental agencies and officials, which must be complied with to the satisfaction of each of the aforementioned agencies and officials.

6.     Applicant agrees to comply with any and all conditions and requirements of the Borough Engineer and/or Board Engineer with regard to Soil Movement, including but not limited to truck routes and hours of operation, and will comply with the Borough Engineer's requirements as to any and all soil movement, in conjunction with the Emerson Police Department.

7.     Applicant shall submit revised plans, as necessary, with correct revision dates on all sheets.

8.     Applicant will comply with any and all requirements of the Property's Water Company.

9.     All construction shall be completed in accordance with all ordinances and building requirements of the Borough of Emerson, the Uniform Construction Code of the State of New Jersey and in accordance with the instructions of the Construction Official of the Borough of Emerson, the Borough Engineer and in accordance with the requirements of all other departments of the Borough.

21

1177669

10.   Applicant is required to obtain a building permit, post all necessary fees and costs with the Borough of Emerson prior to any construction.  This approval is subject to Applicant obtaining a building permit and any other State, County or Borough approvals if required.

11.   Applicant shall pay all fees, costs, bonds and escrows when due or becoming due and shall post all performance guarantees in connection with the review of this application prior and subsequent to the approval of this application.  Any monies are to be paid within twenty (20) days of said request by the Borough's Chief Financial Officer.

12.   If an application before the Bergen County Planning Board is required and any material or substantial changes are required by the Bergen County Planning Board to the site plan as approved by this Resolution, then the Emerson Land Use Board retains jurisdiction over this application and reserves its right to amend or withdraw its approval of this application.

13.   Applicant shall file, as applicable, a deed restriction regarding any and all affordable units constructed pursuant to the approval granted herein, as same is required by N.J.A.C. 5:93-9.2(e).

14.   Applicant shall comply with all affordable housing requirements of the Borough of Emerson Code as well as the Uniform Housing Affordability Control Rules, N.J.A.C. 5:80-26.1 et seq., including, but not limited to, administration of units, marketing, rent pricing and stratification, qualification and selection of households, and any other items.  Documentation demonstrating such compliance is required as an ongoing condition of this approval.

15.   All representations and stipulations made by Applicant or its agents shall be deemed conditions of this approval and any misrepresentations by Applicant contrary to the representations and stipulations made before the Land Use Board shall be deemed a violation of this approval.

1177669

16.    The action of the Land Use Board in approving this application shall not relieve Applicant of responsibility for any damages caused by this project, nor does the Land Use Board of the Borough of Emerson, or its reviewing professionals and agencies, accept any responsibility for design of the proposed improvement or for any damages that may be caused by this development.

17.    Any and all conditions imposed upon Applicant in connection with the approval granted herein shall apply to any successor in interest to Applicant.

18.    All easements, deeds, subdivision maps and deed restrictions as may be required hereunder must be reviewed and approved by the Borough of Emerson and recorded by Applicant before any permit is issued by the Borough.

## III.    **SOIL MOVING PERMIT**

A Major Soil Moving Permit in accordance with the requirements of Chapter 244 of the Borough of Emerson Municipal Code for a soil movement is GRANTED without substantial detriment to the public safety, health and general welfare and will not deter the efforts of the Borough to effectuate the general purpose of municipal planning.  The granting of the permit is subject to the following conditions:

1.    Prior to the commencement of any soil operations (fill or cut), Applicant agrees to develop trucking routes for the hauling of soil to the site which shall be submitted to the Borough for review and approval.   The review will include the Borough's Police Department and Engineering professionals.

2.    Applicant agrees to comply with any and all conditions and requirements rendered by the Borough Engineer and/or Board Engineer with regard to the Soil Movement, including but not limited to truck routes and hours of operation.

1177669

3.     Applicant will provide motor vehicle and general liability insurance for all necessary vehicles and parties involved in the soil movement in sums and form deemed appropriate by the Borough Attorney.

4.     The Applicant agrees to comply with Borough Police Department Traffic Control Officers in order to provide a safe means for moving the soil as deemed required by the Borough Engineer or his designees.

5.     The Applicant shall comply with any and all other applicable Borough regulations, Ordinances and directives pertaining to soil movement.

6.     The Applicant shall obtain all other necessary governmental approvals and permits, and shall perform all acts of compliance which may be required under the applicable federal, state, county and local statutes, regulations and ordinances.  The Applicant shall submit to the Board copies of all permits or approvals or, in the alternative, written verification that no permits or approvals are required.

7.     The Board reserves the right to require further review of this permit request in the event that another governmental entity requires "Substantial modifications or revisions" to the plan as approved.

**BE IT FURTHER RESOLVED** that this Resolution does not constitute approval or recommendation for approval for site plan or any variance not herein referenced or any exception or permit not requested by the Applicant, nor any site plan, variance or exception or permit which may not be expressly or specifically created by this Resolution.

**NOW THEREFORE, BE IT RESOLVED** that the Chairman and Secretary of the Board are hereby authorized to affix their signatures to this Resolution granting the requested application, to advertise the action taken, by way of Resolution, in the local newspaper, and furthermore to

24

send certified copies to the Construction Code Enforcement Official and/or Building Sub-Code official, the Zoning Official, the Applicant and/or the Applicant's attorney, the subject property Owner if other than the Applicant, and to the Borough Attorney and Redevelopment Attorney.

The undersigned certifies that the within Resolution was adopted by the Board and memorialized herein pursuant to <u>N.J.S.A.</u> 40:55D-10(g) on December _28th_____, 2018.

Dated: _12/28/18_

_____
Gary Schwinder, Chairman

Dated: _12/28/18_

_____
Marie Shust, Secretary

OFFERED BY: _Mr Mc Kendry_

SECONDED BY: _Mr Bresa_

VOTE: Ayes:      5

    Nays:      0

    Abstain: 0

25

1177669

Exhibit 35

# D-35

## THIRD AMENDMENT TO REDEVELOPMENT AGREEMENT

This **Third Amendment to Redevelopment Agreement ("Third Amendment")** is made this 31 day of Dec , 2018, by and between

**THE BOROUGH OF EMERSON,**
a municipal corporation of the State of New Jersey,
located in the County of Bergen,
with an address at 146 Linwood Avenue, Emerson, New Jersey 07630
(hereinafter referred to as the "Borough")

**AND**

**EMERSON REDEVELOPERS URBAN RENEWAL, LLC,**
a limited liability company of the State of new Jersey,
with an address at c/o Accurate Builders & Developers, 742 Ocean Avenue,
Lakewood, New Jersey 08701
(hereinafter referred to as "Redeveloper").

**WHEREAS,** the Borough and Redeveloper entered into a Redevelopment Agreement dated June 27, 2016, which was amended on October 4, 2016 and November 20, 2017 (collectively, the "Redevelopment Agreement"), for the redevelopment of certain areas (the "Property") within the Central Business District Redevelopment Area, which Redevelopment Agreement is attached hereto and made a part hereof as **Exhibit A**; and

**WHEREAS,** the Borough and the Redeveloper are desirous of amending and supplementing the Redevelopment Agreement to reflect their mutual understanding with respect to the implementation of Redeveloper's proposed mixed-use inclusionary development on the Property; and

**WHEREAS,** the Borough and Redeveloper have agreed to amend and supplement the Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE,** for and in consideration of the promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borough and the Redeveloper agree as follows:

1.     All terms not defined in this Third Amendment shall have the meaning as set forth in the Redevelopment Agreement.

2.     The purpose and intent of this Third Amendment is to amend and supplement the Redevelopment Agreement with respect to Redeveloper's required contributions for certain onsite and offsite improvements, with respect to the current ownership interest in Redeveloper resulting from a Borough approved transfer, and with respect to Redeveloper's efforts to acquire those portions of the Property not owned or controlled by Redeveloper.

[J005-0020/482895/1]

1

## THIRD AMENDMENT TO REDEVELOPMENT AGREEMENT

This **Third Amendment to Redevelopment Agreement ("Third Amendment")** is made this 31 day of Dec , 2018, by and between

> **THE BOROUGH OF EMERSON,**
> a municipal corporation of the State of New Jersey,
> located in the County of Bergen,
> with an address at 146 Linwood Avenue, Emerson, New Jersey 07630
> (hereinafter referred to as the "Borough")

**AND**

> **EMERSON REDEVELOPERS URBAN RENEWAL, LLC,**
> a limited liability company of the State of new Jersey,
> with an address at c/o Accurate Builders & Developers, 742 Ocean Avenue,
> Lakewood, New Jersey 08701
> (hereinafter referred to as "Redeveloper").

**WHEREAS,** the Borough and Redeveloper entered into a Redevelopment Agreement dated June 27, 2016, which was amended on October 4, 2016 and November 20, 2017 (collectively, the "Redevelopment Agreement"), for the redevelopment of certain areas (the "Property") within the Central Business District Redevelopment Area, which Redevelopment Agreement is attached hereto and made a part hereof as **Exhibit A**; and

**WHEREAS,** the Borough and the Redeveloper are desirous of amending and supplementing the Redevelopment Agreement to reflect their mutual understanding with respect to the implementation of Redeveloper's proposed mixed-use inclusionary development on the Property; and

**WHEREAS,** the Borough and Redeveloper have agreed to amend and supplement the Redevelopment Agreement upon the terms and conditions set forth herein;

**NOW, THEREFORE,** for and in consideration of the promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borough and the Redeveloper agree as follows:

1.      All terms not defined in this Third Amendment shall have the meaning as set forth in the Redevelopment Agreement.

2.      The purpose and intent of this Third Amendment is to amend and supplement the Redevelopment Agreement with respect to Redeveloper's required contributions for certain onsite and offsite improvements, with respect to the current ownership interest in Redeveloper resulting from a Borough approved transfer, and with respect to Redeveloper's efforts to acquire those portions of the Property not owned or controlled by Redeveloper.

[J005-0020/482895/1]

4083378
4103439

3.       Section 4.04 of the Redevelopment Agreement is hereby deleted in its entirety and replaced with the following language:

**Section 4.04. Redeveloper Contribution for Emergency Municipal Services Building**. The Borough has dedicated and shall transfer Block 419, Lot 7 to Redeveloper for the Project ("Dedicated Lot") which is currently utilized by the Borough Ambulance Corp. and has a fair market value of $500,000. In consideration therefore, the Redeveloper shall serve as the general contractor pursuant to a separate general contractor's agreement to be negotiated by the parties, and shall construct an Emergency Municipal Services Building as defined hereinabove. The Borough shall, within one (1) year from the adoption of this Third Amendment, identify the property upon which the Emergency Municipal Services Building is to be constructed and the Borough shall, at its sole cost and expense, provide all necessary site plans, engineering materials and architectural plans and secure all necessary local, county and state approvals and permits, including building permits, from all agencies having jurisdiction over the project. In the event that the Borough fails to deliver said plans, approvals and permits within said 1-year period, the Redeveloper shall be relieved from all obligations to construct the Emergency Municipal Services Building.

The Borough shall pay Redeveloper for all costs associated with the construction of the Emergency Municipal Services Building, less the costs associated directly with and specifically allocated to, the portion of the building utilized for ambulance services which, in no case, shall exceed the fair market value of the Dedicated Lot as set forth above.

4.       The Redeveloper Estimate/Share for Offsite/Onsite Improvements attached to the Redevelopment Agreement as Exhibit F, shall be amended, attached hereto and made a part hereof as **Exhibit B**, to more accurately reflect Redeveloper's required share of costs for the Kinderkamack Road Improvements.

5. ·     Further to Section 5.01, the Borough and Redeveloper acknowledge and agree that the obligations set forth in the Redevelopment Project Schedule, attached to the Redevelopment Agreement as Exhibit C, have been tolled due to litigation involving the Redeveloper's acquisition of those portions of the Property not owned or controlled by Redeveloper.

6.       In accordance with 6.01 of the Redevelopment Agreement, the Borough and Redeveloper acknowledge and agree that the ownership interest in the Redeveloper, resulting from a Borough approved transfer, is as follows:

| Name | Address | Percentage Ownership Interest |
|------|---------|-------------------------------|
| Yaakov Klugmann | Accurate Builders & Developers 742 Ocean Avenue Lakewood, NJ 08701 | 51% |

[J005-0020/482895/1]

2

4083378
4103439

Giuseppi Forgione    JMF Properties                49%
                     80 S. Jefferson Road, Suite 202
                     Whippany, NJ 07981

7.    The "Members of Redeveloper" set forth in Exhibit D to the Redevelopment
Agreement shall be amended, attached hereto and made a part hereof as **Exhibit C**, to reflect the
change in ownership interest in the Redeveloper.

8.    The contact information for Redeveloper as set forth in Section 14.08 (Notices
and Demands) of the Redevelopment Agreement shall be amended to reflect the change in
ownership interest in the Redeveloper, as follows:

Emerson Redevelopers Urban Renewal, LLC
c/o Accurate Builders & Developers
724 Ocean Avenue
Lakewood, NJ 08701

With a copy to:

Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway, P.O. Box 1997
Morristown, NJ 07962-1997
Attn: Joseph A. Paparo, Esq.

9.    Redeveloper shall submit proposed final versions of the site plan and architectural
plans (including elevations) for the Project to the Borough Clerk for review by a duly-formed
subcommittee of the Borough Governing Body, acting in its capacity as the Borough's
redevelopment agency under the Act. This review shall be undertaken within thirty (30) days of
receipt of the plans by the Borough Clerk and the sole purpose of this review shall be to confirm
that the submitted plans are consistent with the Redevelopment Plan (as such Redevelopment
Plan has been amended through the date of this Third Amendment).

10.   In all other respects, the Redevelopment Agreement remains in full force and
effect and there has been no breach or default to date, by Redeveloper.

11.   This Third Amendment together with the proposal, the Land Use Board
Resolution(s), any Orders or Directives of any authorized Borough Official, and the
Redevelopment Agreement, represents the entire understanding of the Borough and Redeveloper
with respect to the subject matter of this Third Amendment and the Redevelopment Agreement.
No further change or modification shall be effective unless in writing and signed by the Borough
and Redeveloper.

12.   All the provisions of this Third Amendment shall survive and shall remain in full
force and effect, despite the expiration or completion of any other provisions of the
Redevelopment Agreement or any other extinguishing or superseding event or document.

[3005-0020/482895/1]

3

4083378
4103439

**IN WITNESS WHEREOF**, Redeveloper has hereunto caused this Third Amendment to Redevelopment Agreement to be signed by its proper authorized parties and has caused its proper seals, if any, to be affixed hereto. The Borough of Emerson has caused this instrument to be signed by its Mayor and attested to by its Borough Clerk and does cause its proper corporate seal to be affixed as of the date and year first above written.

Witnessed or Attested to:                              BOROUGH OF EMERSON

JANE DIETSCHE, Borough Clerk                     LOUIS J. LAMATINA, Mayor

Witnessed or Attested to:                              EMERSON REDEVELOPERS URBAN
                                                                    RENEWAL, LLC

                                                                    By: _____
                                                                    YAAKOV KLUGMANN, Managing Member

[J005-0020/482895/1]

4

4083378
4103439

## MUNICIPAL ACKNOWLEDGMENT

STATE OF NEW JERSEY   :
                      : SS
COUNTY OF BERGEN      :

      **I CERTIFTY** that on 1/2 , 2018,

      **JANE DIETSCHE** personally came before me, and this person acknowledged under oath, to my satisfaction, that:

(a) This person is the Municipal Clerk of the Borough of Emerson, the municipal corporation named in this document;

(b) This person is the attesting witness to the signing of this document by the proper corporate officer, who is Louis J. Lamatina, the Mayor of the Borough of Emerson;

(c) This document was signed and delivered by the Borough of Emerson as its voluntary act duly authorized by a proper resolution of its Municipal Council;

(d) This person knows the proper seal of the Borough of Emerson which was affixed to this document; and

(e) This person signed this proof to attest to the truth of these facts.

Signed and sworn before me on

1/2 , 2018

Notary Public, State of New Jersey

      COLEEN A. GODDEL
    NOTARY PUBLIC - NEW JERSEY
     COMMISSION # 50086730
MY COMMISSION EXPIRES AUGUST 23,2022

[J005-0020/482895/1]

5

4083378
4103439

## REDEVELOPER ACKNOWLEDGMENT

STATE OF NEW JERSEY    :
                       : SS
COUNTY OF Bergen    :

      BE IT REMEMBERED that on this ___31___ day of ___Dec.___ 2018, before me, the subscriber, personally appeared Yaakov Klugmann, who, being by me duly sworn on his oath, deposed and made proof to my satisfaction that he is named as the person named as the Managing Member of Emerson Redevelopers Urban Renewal, LLC, a limited liability company named in the within instrument, and acknowledged that he signed and delivered the within instrument as the managing member of the Redeveloper.

      YAAKOV KLUGMANN, Managing Member

Signed and sworn before me on

12|31___ , 2018

Notary Public, State of New Jersey

**JANE A. MUSS DIETSCHE
NOTARY PUBLIC - NEW JERSEY
COMMISSION #2370635
MY COMMISSION EXPIRES MARCH 6, 2023**

[J005-0020/482895/1]

6

4083378
4103439

**EXHIBIT A**
**REDEVELOPMENT AGREEMENT, DATED JUNE 27, 2016,**
**AMENDED OCTOBER 4, 2016 AND NOVEMBER 20, 2017**

[ATTACHED]

[J005-0020/482895/1]

7

4083378
4103439

## EXHIBIT B
## REVISED EXHIBIT F (OFFSITE/ONSITE IMPROVEMENT SHARE) TO REDEVELOPMENT AGREEMENT

### DEVELOPER ESTIMATE

### BOROUGH OF EMERSON, KINDERKAMACK ROAD PROJECT

### CONSTRUCTION COSTS ON NORTHWEST CORNER, REQUIRED BY EMERSON

| | | | |
|---|---|---|---|
| 1. | 42 Inch drainage line from Linwood Ave to Lincoln Blvd, 650 LF x $225/LF | | = $146,250 |
| 2. | Lincoln Ave drainage work, upsize pipes | | = $ 10,000 |
| 3. | 3 New drainage chambers, 42 inch pipe, 3 X $7,000 | | = $ 21,000 |
| | STREETSCAPE ITEMS | | |
| 4. | Expand Paver Sidewalks, 6 FT Add. X 900 FT = 5,400 SF = 600 SY X $120/SY | | = $ 72,000 |
| 5. | Streetscape Lighting, 9 Lights and wiring at $7,000/each | | = $ 63,000 |
| 6. | Street trees, 5 X $500 | | = $ 2,500 |
| 7. | Amenities, benches, trash receptacles | | = $ 10,000 |
| | | *Emerson Total* | = *$ 324,750* |
| | | 10% Contingency   Say | $ 357,000 |

*Total Estimate*          $ 357,000

Soft Costs, including surveying, engineering, attorney fees, property acquisition, utility layout, test pits, etc.
$  41,000

*TOTAL*          $ 398,000

## EXHIBIT C
## MEMBERS OF REDEVELOPER

Yaakov Klugmann    Accurate Builders & Developers    51%
742 Ocean Avenue
Lakewood, NJ 08701

Giuseppi Forgione    JMF Properties    49%
80 S. Jefferson Road, Suite 202
Whippany, NJ 07981

[J005-0020/482895/1]

9

4083378
4103439

Exhibit 36

# Historic Rise: DiPaola Takes the Reins in Emerson



BY JOHN SNYDER
OF PASCACK PRESS



**Mayor Danielle DiPaola, sworn in Jan. 2 by Woodcliff Lake Mayor Carlos Rendo, above, has asked that she be judged not on her gender but rather, alongside the council, by her ideas and actions. | John Snyder photo**

EMERSON, N.J.—Predicting "It's not going to be smooth but it's going to be fun," Mayor Danielle DiPaola took the reins of government at a packed council reorganization meeting Jan. 2, becoming the first woman mayor in borough history.

She was joined at the dais by her Republican running mates, councilmen Brian Gordon and Kenneth Hoffman, and said she looked forward to working with everyone on council "in a bipartisan way."



Noting her historic win, she said, "I hope you don't judge me on my gender but all of us on our ideas and actions."

DiPaola, Gordon and Hoffman (returned after two terms, 2005 through 2010) had campaigned hard on the issue of what they called overdevelopment, taking aim at the four-story Block 419 redevelopment project long taking shape and just approved.

With her rise, DiPaola, who often found herself the lone no vote on Block 419 matters, might well find herself presiding at the project's ribbon cutting.

After the meeting, DiPaola told Pascack Press she had spoken that day with Accurate Builders and Developers owner and CEO Jack Klugmann, who assured her that he looks forward to working with the borough on residents' concerns on the project—including items to do with the environment, traffic, and fire safety.

Joined by more than a score of relatives, and sworn in by Woodcliff Lake Mayor Carlos Rendo, DiPaola took her vows and promised an open and transparent administration and said "The future here in Emerson is bright."

Also attending were state Assemblywoman Holly Schepisi, Cresskill Councilman Hector Olmo, former Dumont mayor Don Wyman, and Police Chief Michael Mazzeo.

Former Council President Chris Knoller interrupted DiPaola as she was bringing forth resident Jill Manell McGuire for a vote to the unexpired term of the sixth council seat, the one she vacated to become mayor.

He moved to table the vote until the next meeting, Tuesday, Jan. 15 at 7:30 p.m., saying he hadn't had time to interview McGuire, Don Pierro, and Michael Timmerman, all of whom were nominated by the town Republican Committee.

Knoller, who nominated Gerald Falotico to succeed him as council president, further pointed out a bylaw complicating DiPaola's preferred seating chart, leading the mayor to complain, "I'm getting blindsided, quite frankly; I thought we were going to have a smooth transition. I'm looking for a little cooperation from my colleagues to the right."

That said, Knoller, who has two years to go on the council, congratulated his new colleagues and anticipated "Agreeing, disagreeing, but always doing so respectfully."

DiPaola had her way in naming the new Land Use Board. McGuire, formerly chair of the Historic Preservation Committee, is LUB Class II member for the term ending Dec. 31. Jeff Bischoff and Don Pierro are Class IV members for the term ending Dec. 31, 2022. Mike Myers and Bill Loschiavo are Alternate II and III members, respectively, for the term ending Dec. 31, 2020.

Francis J. Leddy Jr. was sworn in for his 31st year as municipal judge.

With few exceptions, standing committee council appointments and liaisons were named, several of the emergency services officers agreed to were sworn in, and most other posts were filled.

The temporary 2019 municipal budget was adopted.

In its *sine die* meeting, the 2018 council presented a plaque marking its appreciation of service to Councilman Brian Downing.

Mayor Louis Lamatina, and Councilwoman Karen Wolf did not attend the meeting, but they too were to receive plaques for their service.

The governing body accepted the resignation of Borough Administrator Robert S. Hoffmann, effective Jan. 25. He leaves to take on a new job as township administrator for the Township of Chatham.

A party followed at the Emerson Hotel.



**Mayor Danielle DiPaola with Woodcliff Lake Mayor Carlos Rendo and members of her family Jan. 2 at Borough Hall. She made a point of thanking the borough's volunteers for all they do for the community. | John Snyder photo**

Exhibit 37

# Mayors' Meeting: Redevelopment, Capital Projects Top Chamber Updates



BY JOHN SNYDER

OF PASCACK PRESS

BER-L-006300-15   06/24/2020 5:26:05 PM   Pg 27 of 36 Trans ID: LCV20201114789
Case 2:20-cv-04728-MCA-MAH   Document 84-3   Filed 10/28/24   Page 484 of 579
PageID: 2023

WESTWOOD, N.J.—Over a sunny breakfast buffet at the Iron Horse Restaurant on Jan. 23, seven Pascack Valley mayors and one councilwoman reflected on their communities' challenges and opportunities heading into the new year.

According to co-host Skip Kelley, Greater Pascack Valley Chamber of Commerce vice president, the chamber's annual mayors breakfast is in approximately its 45th year.



MONTVALE HEALTH
SPORT + SPINE
www.MontvaleHealth.com

ACUTE & CHRONIC
PAIN RELIEF
No Surgery • Gentle Treatments

For their audience of business folks and a few residents, the leaders, including Oradell Mayor Dianne C. Didio, spoke for up to five minutes each on everything from affordable housing to capital projects to fighting hate in partnership with the schools. Here are the highlights:



Left to right: GPVCOC Secretary Ann Marie Feret, Marketing Chair Paul Wharton, President Robin Malley, Treasurer Sandra McCleod, local mayors Keith Misciagna, John Birkner Jr., John Ruocco, Peter Calamari, Michael Ghassali, Danielle DiPaola, Woodcliff Lake Councilwoman Nancy Gross, and Chamber Vice President Skip Kelley at the Iron Horse on Jan. 23. | MURRAY BASS PHOTO

## Westwood has eye on festivities

Mayor John Birkner Jr. spoke of the borough's recent conveyance of a plot to Habitat for Humanity of Bergen County, where veteran housing is planned, fulfilling the municipality's quota for new affordable housing into 2025.

The recent transformation of the former Ford property into luxury apartments and a storage center meant Westwood is fully built out, Birkner said, meaning officials could now focus more on municipal infrastructure (paving, sewer lines and such) and the social infrastructure (LGBTQ community inclusion and expanding senior services).

BER-L-006300-15   06/24/2020 5:26:05 PM   Pg 28 of 36 Trans ID: LCV20201114789
Case 2:20-cv-04728-MCA-MAH   Document 84   Filed 10/28/24   Page 485 of 579
PageID: 2024

"For seniors, the number one issue is transportation, and number two is taxes. I always tell them I'll get working on transportation right away," Birkner riffed.

Birkner also spoke enthusiastically of Westwood's 125th anniversary this year, which brings milestone celebrations for the borough, the library, and several other institutions.

He predicted "a very minimal tax increase, if at all," and noted the borough had filled out its Police Department table of organization.

## Woodcliff Lake as ever in transition

Woodcliff Lake Councilwoman Nancy Gross reported that the borough soon would demolish the former Galaxy Gardens site and seek bids for remediation.

Focus then will shift to remodeling, with grant funds, the Westervelt−Lydecker House, which will be used for public events.

Gross touched on the borough's settlement on affordable housing, saying construction was pending on the first 16 units it's committed to.

She reported the borough said "farewell for now" to "our beloved [Police] Chief [Anthony] Jannicelli, who had been with the department 41 years—18 as as chief.

Retiring Dec. 31, 2018, he was replaced by Police Chief John Burns.

Gross also said she was pleased with progress toward Unity in the Valley, an effort of the four towns of the Pascack Valley Regional High School District against hate and discrimination.

## A new approach in Hillsdale

Hillsdale Mayor John Ruocco praised his council's resolution to reach out to Waste Management for cooperation in its bid to redevelop its industrial zone, pointedly without recourse to eminent domain.

"Hopefully that will allow WM to extract value out of its property in our town without reliance on a permit, so we'll see where that goes," he said.

Hillsdale's affordable housing settlement is due for court approval in the next couple of months. "We don't expect to have material development in our town," the mayor said.

Ruocco reported with cheer that the Demarest Farms parking issue is solved.

"By next year Demarest Farms will not allow their patrons to park on residential streets. It's been successful in getting offsite parking for its customers," he said.

4/6/2020
BER-L-006300-15   06/24/2020 5:26:05 PM   Pg 29 of 36 Trans ID: LCV20201114789
Case 2:20-cv-04728-MCA-MAH   Document 84-4   Filed 10/28/24   Page 486 of 579
Mayors Meeting Redevelopment, Capital projects top Chamber updates | Pascack Press & Northern Valley Press
PageID: 2025

Ruocco said the borough faces the need for capital investment: roads, DPW equipment, police, and fire. There's an additional challenge of perhaps upgrading the athletic fields. Officials are assessing the situation.

Ruocco also said he was disappointed that his council opted to spend $318,000 to replace the police dispatch desk rather than save money in the long term by shifting to a shared service to meet the need. He said more work remained in countering "fear of change" and local home rule.

He predicted "a difficult time with our budget this year," particularly exacerbated by the police budget after the state 2 percent interest arbitration cap expired.

## Smoother sailing in the Township of Washington

Township of Washington Mayor Peter Calamari noted that the Township is fully built out. Although there are two properties with affordable housing overlay zones, "We don't anticipate them changing hands in the near future, and our impact will be minimal."

He said driving through "the infamous Pascack/Washington intersection" will get easier after the county moves forward with a fix, which he said might be funded this year.

"I'm sure it affects a lot of your residents who drive through that intersection. We'd love to see it get improved so you don't have to spend 10 minutes just getting through the traffic light," he said.

The township is embarking on a new firehouse and ambulance building, and will have to replace fire apparatus and the DMF building. He said much would be paid out of "a decent surplus."

## Montvale is doing brisk business

Montvale Mayor Michael Ghassali started out saying, "So 2018, I'm happy to say, it's over."

He touched on affordable housing, the eruv settlement, the new firehouse, and a $4 million sports area.

"In the last week of the year we lost two residents: one very young, 16, to suicide, and one 77, to fire," Ghassali said somberly.

"They're both very personal because I think we could have avoided it if we were more involved, and that's my message: We were so busy doing all these things, very important things, but it took us away from paying attention tot he residents and what's happening in the community," he said.

Saying he looked forward to 2019, he explained his message to his council "and I think to my fellow mayors and to the region here is we have to be more flexible to businesses that are looking to move into our towns."

He said Montvale had lost a prospective global tenant over the color of their sign.

4/6/2020　　Mayors' Meeting: Redevelopment, Capital Projects Top Chamber Updates | Pascack Press & Northern Valley Press

BER-L-006300-15   06/24/2020 5:26:05 PM   Pg 30 of 36 Trans ID: LCV20201114789
Case 2:20-cv-04728-MCA-MAH   Document 94   Filed 10/28/24   Page 487 of 579
PageID: 2026

"Give them red, give them pink, give them whatever they want. Why are we so rigid?" he said.

He said he has asked the Planning Board to reassess the Master Plan to include light manufacturing. "We lost a major company that was willing to do light manufacturing to take up a whole building, 200 to 300 employees, to come to town. They went somewhere else," he said

Since 2016, he said 110 business moved to Montvale.

Montvale made gains on affordable hosing last year, with major projects taking shape at the A&P, the former Sony site, and the former Mercedes site.

He lauded his colleagues on the borough council.

"My mission for this year, which is what I love to do, is go to more businesses, talk to the businesses, and work with the young and the seniors," he said.

## Emerson scaling back

Emerson's new mayor, Danielle DiPaola, made her first appearance at the breakfast, where she appealed for help "from anyone in the room" during this time of transition, including the search for a new borough administrator.

She said affordable housing and redevelopment were the big ticket items she is carrying over but said she wanted to renew outreach to senior citizens "and dealing with our community members and making sure that we really do represent our motto, The Family Town."

She added, "I think we've gotten a little bit lost on trying to do big projects. We're going to continue with all of the drainage projects that we've started and we have a lot of grants for those."

Downtown redevelopment is in the process of acquiring properties, she said.

In the meantime, she said, "We're trying to scale this back and make it more of a reasonable development that is friendlier to our small downtown."

She lauded the Emerson Chamber of Commerce and said assessing Borough Hall, police station, and municipal court needs would continue.

## Park Ridge fights on

Park Ridge Mayor Keith Misciagna said Park Ridge continues to object in court to housing density it's been asked to absorb.

"Park Ridge wants affordable housing—I'm probably going to need it in a few years myself—but we just don't want to be Hudson County, and that's what the residents of Park Ridge elected me to do and we are doing that," he said.

BER-L-006300-15   06/24/2020 5:26:05 PM   Pg 31 of 36 Trans ID: LCV20201114789
Case 2:20-cv-04728-MCA-MAH   Document 84   Filed 10/28/24   Page 488 of 579
PageID: 2027

He spoke to siting a large development downtown, 240 units, as "a nice center point for our downtown. I personally like it because it replaces a garbage waste transfer site that I grew up smelling—it was a disgusting thing to have in the center of town and I'm happy to see that go," he said.

He added,"The project's a little larger than we would have chosen but with having this litigation hanging over our head we had to make compromises."

He commended the Park Ridge Animal Hospital project, where bricks are going up.

"People were upset when that went up—it's not that large a project, it looked big when it was going up—but it looks like a nice addition to our downtown."

He noted that the borough was always more industrial than suburban—its motto was By Industry We Flourish—and said, "We're reinventing ourselves."

Park Ridge, as well, is celebrating 125 years this year, and activities are taking shape.

Also in the works: a downtown community center, paid for in large part with downtown redevelopment funds.

Misciagna also was pleased with its partnerships toward the reservoir pathway project, which he said "feels like it's going to happen this year." He said it would be "like Central Park in the Pascack Valley—the jewel of the Pascack Valley."

Peluso Constru...

Ad   We Use Proven
Management Tools

Peluso Construction Inc.

Open

Mayor's Meeting: Redevelopment, Capital Projects Top Chamber Updates - Passaic Press Agent | Valley Press

**1 Comment**                                                    Sort by   Top

Exhibit 38

**Ronald H. Gordon, Esq.**
Attorney I.D. # 001941979
**Wendy Rubinstein, Esq.**
Attorney I.D. # 029772002
**DeCOTIIS, FITZPATRICK, COLE & GIBLIN, LLP**
Glenpointe Centre West
500 Frank W. Burr Blvd., Suite 31
Teaneck, NJ 07666
Tel: (201) 928-1100
rgordon@decotiislaw.com
wrubinstein@decotiislaw.com
*Attorneys for Petitioner,*
*Borough of Emerson*

FILED

JAN 2 5 2019

GREGG A. PADOVANO, J.S.C.

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF EMERSON, BERGEN COUNTY, NEW JERSEY, FOR A DECLARATORY JUDGMENT,<br><br>Petitioner. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:BERGEN COUNTY<br><br>DOCKET NO.: BER-L-6300-15<br><br>CIVIL ACTION<br>*Mount Laurel* Action<br><br>**CONDITIONAL FINAL JUDGMENT OF COMPLIANCE AND REPOSE** |

**THIS MATTER** comes before the Court upon the Declaratory Judgment Complaint of

Petitioner Borough of Emerson ("Borough" or "Petitioner"), seeking a determination that the

Borough has complied with its *Mount Laurel Obligation*, in accordance with the procedures set

forth in In Re Adoption of N.J.A.C. 5:96 and 5:97 by the New Jersey Council on Affordable

Housing, 221 N.J. 1 (2015) (*Mount Laurel IV*), and

**THE COURT HAVING** conducted a Final Hearing on December 21, 2018, in

accordance with the requirements of Morris County Fair Housing Council v. Boonton Township,

197 N.J. Super. 359, 364 (Law Div.1984), aff'd o.b., 209 N.J.Super. 108 (App. Div. 1986) and

East/West Venture v. Borough of Fort Lee, 286 N.J. Super. 311, 328 (App. Div. 1996), upon the

1

Borough's proposed plan to provide for affordable housing, Wendy Rubinstein, Esq. of DeCotiis

FitzPatrick Cole & Giblin, LLP appearing on behalf of Petitioner, Adam Gordon, Esq. appearing

on behalf of Intervenor Fair Share Housing Center ("Intervenor"), and Special Master Mary Beth

Lonergan, AICP, PP ("Special Master") appearing; and

     **THE COURT HAVING** received the testimony of the Special Master, Mary Beth

Lonergan, AICP, PP; and

     **THE COURT HAVING** received into evidence the Report of the Special Master, dated

December 14, 2018 and marked **Exhibit SM-1,** ("the Report") evaluating the compliance of

Petitioner's 2018 Third Round Housing Element and Fair Share Plan and compliance with the

Court's June 29, 2018 order and the recommendations noted in the Special Master's March 16,

2018 Report, and the Special Master having recommended in her Report that the Borough be

granted a Third Round Judgment of Compliance and Repose, subject to certain terms and

conditions, including the submission of supplementary material to verify credit eligibility and/or

to implement the Plan.

     **IT IS** on this 25th day of January 2019 **HEREBY ORDERED AND ADJUDGED:**

     1.    Petitioner properly afforded notice of the Compliance Hearing in accordance with

governing law.

     2.    The Court hereby accepts the Housing Element and Fair Share Plan and finds that

it creates a realistic opportunity for satisfaction of the Borough of Emerson's Fair Share of low

and moderate-income housing.

     3.    The Court hereby grants a Conditional Final Judgment of Compliance and Repose

and declares that Petitioner is entitled to protection from Mount Laurel/Constitutional

2

Compliance litigation for the period concluding on <u>July 1</u>, 2025, subject to the conditions set forth herein.

4. As set forth in the Settlement Agreement between Fair Share Housing Center and Borough of Emerson dated November 21, 2017 and established at the June 20,2018 Fairness Hearing, the Borough's cumulative 1987-2025 third round <u>Mount Laurel</u> affordable housing obligation is comprised of:

        a. A Present Need Obligation of 20 housing units;

        b. A Prior Round Obligation of 74 housing units;

        c. A Third Round Prospective Need Obligation of 234 housing units; and

        d. The Borough has prepared a Vacant Land Adjustment (VLA) which has been accepted by the Court and yields a Realistic Development Potential (RDP) of 20 units from the Prior Round Obligation, and an RDP of 53 units for the Prospective Need Obligation for a total RDP of 73 units and a total Unmet Need of 235 units.

5. Having reviewed the Borough's Housing Element and Fair Share Plan and implementing ordinances, the Court finds and declares that the Borough has demonstrated that it has a plan in place to meet its cumulative RDP of 73 units. As such, subject to the conditions set forth in this Conditional Final Judgment of Compliance and Repose, the Court finds that the Borough's Plan and implementing ordinances are constitutionally compliant and satisfy the Borough's cumulative third round <u>Mount Laurel</u> affordable housing obligations and are therefore approved.

6. The findings, conclusions and grant of Judgment set forth herein are conditioned upon the satisfaction of the following requirements:

a.     The Borough shall, within 120 days of entry of this Judgment, submit to the Special Master the following supplementary material needed to verify credit eligibility:

i.     The Agreement between the Borough and Habitat for Humanity;

ii.     The rehabilitation manual, with guidelines for rehabilitating owner-occupied housing and renter-occupied housing, and confirm whether the program will be available to rental units to satisfy the rental component of the Present Need obligation;

iii.     The executed agreement between the Borough and Community Action Services;

iv.     Provide the date of payment and amount paid to Ridgefield as part of the Prior Round Regional Contribution Agreement (RCA);

v.     Supporting documentation indicating that the proposed Block 419 redevelopment is to be comprised of family rental units, including the affordable units, and clarify who will be administering those affordable units, as well as confirm compliance with the very low-income requirements;

vi.     Clarify the status of affordability controls and provide deed restrictions for the Advancing Opportunities group home;

vii.     Confirm whether a license is required for the Center for Hope and Safety group home; and

viii.     For the Emerson Grand inclusionary development, provide full documentation for these affordable units including, but not limited to,

4

compliance with UHAC, such as a deed restriction, affirmative marketing efforts, proof of an experienced administrative agent, the number of bedrooms per unit, the low/moderate-income breakdown, the certificate of occupancy date, and date of approval to confirm the eligibility of these affordable units.

b.     The Borough shall, within 120 days of entry of this Judgment, submit to the Special Master the mandatory affordable set-aside ordinance introduced on December 2, 2018 and adopted on December 18, 2018; and

c.     The Borough Attorney and Special Master will coordinate to revise and finalize the Spending Plan to be adopted within 120 days of entry of this Judgment.

7.     On the first anniversary of the entry of this Order, and every anniversary thereafter through the end of the Repose period, the Borough shall provide annual reporting of trust fund activity to the New Jersey Department of Community Affairs, Council on Affordable Housing, or Local Government Services, or other entity designated by the State of New Jersey. The reporting shall include an accounting of all housing trust fund activity, including the source and amount of funds collected and the amount and purpose for which any funds have been expended.

8.     On the first anniversary of the entry of this Final judgment of Compliance and Repose or judicial equivalent of substantive certification, and every anniversary thereafter through the end of the Repose period , the Borough shall  provide annual reporting of the status of all affordable housing activity within the municipality through posting on the municipal website with a copy of such posting provided to Fair Share Housing Center, using forms previously developed for this purpose by the Council on Affordable Housing or any other forms

5

endorsed by the Special Master and FSHC. Such forms shall be provided to the Borough by the Special Master and/or FSHC.

9.    The Fair Housing Act includes two provisions regarding action to be taken by the Borough during the Repose period provided in this Order. The Borough shall comply with those provisions as follows:

a. For the midpoint realistic opportunity review due on July 1, 2020, as required pursuant to N.J.S.A. 52:27D-313, the Borough will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its implementation of its Plan and an analysis of whether any unbuilt sites or unfulfilled mechanisms continue to present a realistic opportunity and whether any mechanisms to meet unmet need should be revised or supplemented. Such posting shall invite any interested party to submit comments to the municipality, with a copy to Fair Share Housing Center, regarding whether any sites no longer present a realistic opportunity and should be replaced and whether any mechanisms to meet unmet need should be revised or supplemented.

b. For the review of very low income housing requirements required by N.J.S.A. 52:27D-329.1, within 30 days of the third anniversary of this Judgment of Compliance and Repose or judicial equivalent of substantive certification, and every third year thereafter, the Borough will post on its municipal website, with a copy provided to Fair Share Housing Center, a status report as to its satisfaction of its very low income requirements, including the family very low income requirements referenced herein. Such posting shall invite any interested party to submit comments to the municipality and Fair Share Housing Center on the issue of whether the municipality has complied with its very low-income housing obligation under the terms of this judgment.

6

10.    The Borough is authorized and directed to use the regional income limits as set forth in the "2018 Affordable Housing Regional Income Limits by Household Size" summary chart prepared by the Affordable Housing Professionals of New Jersey (AHPNJ) dated April 2018, and the methodology developed thereto by AHPNJ that replicates COAH's procedures for annually updating and establishing said income limits, for use in establishing annual eligibility and qualification levels and the maximum rental levels and sales prices for affordable housing units.

11.    Subject to the conditions set forth herein, the Borough is entitled to this Judgment of Compliance and Repose and immunity from exclusionary zoning lawsuits, including, but not limited to "builder's remedy" lawsuits for its third round <u>Mount Laurel</u> affordable housing obligations, including unmet need, for a period of ten (10) years, retroactive to July 1, 2015, with said protections extending through and expiring on July 1, 2025. Once the above conditions called for to be addressed within 120 days of entry of this order have been met, the Borough will be granted final repose and immunity form exclusionary zoning through July 1, 2025. The Special Master shall report to the Court on the Borough's compliance with the 120-day conditions.

12.    A copy of this Order shall be served on the Special Master, all counsel of record, and the official service list within seven days of receipt by counsel for Petitioner

HON. GREGG A. PADOVANO, J.S.C.

Exhibit 39

**Jane Dietsche**

| | |
|---|---|
| **From:** | Coleen Goddel <deputyclerk@emersonnj.org> |
| **Sent:** | Friday, February 15, 2019 12:03 PM |
| **To:** | Danielle DiPaola (mayor@emersonnj.org); Gerald Falotico; James Bayley; Brian Gordon; Ken Hoffman; Chris Knoller; Jill McGuire; John McCann; rm@malagierelaw.com |
| **Cc:** | Jane Dietsche |
| **Subject:** | Notice of Motion to for Leave to File an Appeal - In the matter of the application of Emerson Redeveloper's Urban Renewal LLC |
| **Attachments:** | Tanveer Hassan 178 Kinderkamack Road Appeal 2-14-19.pdf |

Good afternoon all,

Attached please find a copy of a notice that was received at the Borough Clerk's office yesterday.  Have a great weekend!

Thank you,
Coleen Goddel , RMC
Deputy Borough Clerk
Borough of Emerson
201-262-6086 X1201

1

# TANVEER A. HASSAN

178 Kinderkamack Road, Emerson, New Jersey 07630 • 201-776-5665 • sendal@njsushi.com

February 12, 2019

Court Clerk (Via USPS Priority Mail)
Superior Court of New Jersey
Bergen County
Law Division
10 Main Street
Hackensack, New Jersey 07601

> **RECEIVED**
>
> FEB 14 2019
>
> **BOROUGH OF EMERSON**

Re: In the Matter of the Application of:
   Emerson Redevelopers Urban Renewal, LLC

Dear Sir/Madam,

Enclosed, please find an original and three copies of a Motion for Leave to File an Appeal. Please return any copies marked "filed" in the self-addressed postage paid envelope provided.

Copies of the enclosed papers have been served upon the Borough of Emerson at the address listed below, and a copy has been forwarded to the court at the address listed below.

I have enclosed a money order in the amount of $100 for the applicable filing fee for this motion.

Thank you for your consideration in this matter.

Respectfully submitted,

Tanveer A. Hassan

Cc:   Borough Administrator (Via USPS Priority Mail)
      Borough of Emerson
      1 Municipal Place
      Emerson, NJ 07630

      Ozturk Bren (Via USPS Priority Mail)
      Cozy Café & Grill
      176 Kinderkamack Road
      Emerson, New Jersey 07630

      Ryan C. Parks (Via USPS Priority Mail)
      Parke5 Catering
      180 Kinderkamack Road
      Emerson, New Jersey 07630

Caiqui Zheng (Via USPS Priority
Mail) Laurel Chinese Restaurant II
LLC 182 Kinderkamack Road
Emerson, New Jersey 07630

TANVEER A. HASSAN
178 KINDERKAMACK ROAD
EMERSON, NEW JERSEY 07630
201-776-5665
sendai@njsushi.com

| | |
|---|---|
| TANVEER A. HASSAN; OZTURK EREN; RYAN C. PARKES; and CAIQUI ZHENG, | SUPERIOR COURT OF NEW JERSEY BERGEN COUNTY LAW DIVISION |
| Appellants, | CIVIL ACTION |
| v. | **NOTICE OF MOTION FOR LEAVE TO FILE APPEAL** |
| BOROUGH OF EMERSON; JOHN and JANE DOES, 1-100, | |
| Respondent(s). | |

**PLEASE TAKE NOTICE** as soon as may be heard, Appellants TANVEER A. HASSAN; OZTURK EREN; RYAN C. PARKES; and CAIQUI ZHENG, shall make a plea before the above-named court, in the Superior Court of New Jersey, Law Division, at the Bergen County Courthouse, Hackensack, New Jersey, for an Order as follows:

1.    Permitting the Parties to file an appeal of the Borough's resolution of the land use board regarding the Matter of Emerson Redevelopers Urban Renewal, LLC with regard to Block 419; and

2.    Awarding such other further relief deemed equitable and just.

**PLEASE TAKE FURTHER NOTICE** that the undersigned shall rely upon the accompanying Certification in support of the within Notice of Motion, and such further pleadings may be deemed appropriate to file.

**PLEASE TAKE FURTHER NOTICE** that Oral Argument is waived unless scheduled by the Court.

TANVEER A. HASSAN
On behalf of OZTURK EREN;
RYAN C. PARKES; CAIQUI ZHENG

DATED: February 12, 2019

**NOTICE TO LITIGANTS: IF YOU WANT TO RESPOND TO THIS CROSS MOTION, YOU MUST DO SO IN WRITING.** This written response shall be by Affidavit or Certification. (Affidavits and Certifications are documents filed with the Court. In either document the person signing it swears to its truth and acknowledges that he or she is aware that he or she can be punished for not filing a true statement with the Court. Affidavits are notarized, and Certifications are not.) If you would also like to submit your own separate requests in a Motion to the Judge, you can do so by filing a Cross-Motion. Your response and/or Cross-Motion may ask for oral argument. That means you can ask to appear before the Court to explain your position. However, you must submit a written response even if you request oral argument. Any papers you send to the Court must be sent to the opposing side, either to the attorney if the opposing party is represented by one, or to the other party if he or she represents himself or herself. Two copies of all motions, cross-motions, certifications and briefs shall be sent to the opposing side.

The response and/or Cross-Motion must be submitted to the Court by a certain date. All Motions must be filed on the Tuesday 24 days before the return date. A response and/or Cross-Motion must be filed 15 days (Thursday) before the return date. Answers or responses to any opposing affidavits and cross-motions shall be served and filed not later than 8 days (Thursday) before the return date. No other response is permitted without permission of the court. If you mail in your papers, you must add three days to the above time periods.

Responses to Motion papers sent to the Court are to be sent to the following address: Superior Court of New Jersey, Bergen County Courthouse, Hackensack, New Jersey 07601. Call the Law Division Manager's office at 201-221-0700 if you have any questions on how to file a Motion, Cross-Motion, or any response papers. Please note that the Law Division Manager's office cannot give you legal advice.

**CERTIFICATION OF MAILING**

On February 12, 2019, I transmitted copies of the within Notice of Motion, Certification, and proposed form of Order, to the Parties listed below, via USPS Priority Mail.

Borough Administrator
Borough of Emerson
1 Municipal Place
Emerson, NJ 07630

Ozturk Eren
Cozy Café & Grill
176 Kinderkamack Road
Emerson, New Jersey 07630

Ryan C. Parks
Parke5 Catering
180 Kinderkamack Road
Emerson, New Jersey 07630

Caqui Zheng
Laurel Chinese Restaurant II LLC
182 Kinderkamack Road
Emerson, New Jersey 07630

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

TANVEER A. HASSAN
On behalf of OZTURK EREN;
RYAN C. PARKES; CAIQUI ZHENG

DATED: February 12, 2019

TANVEER A. HASSAN
178 KINDERKAMACK ROAD
EMERSON, NEW JERSEY 07630
201-776-5665
sendai@njsushi.com

| | | |
|---|---|---|
| TANVEER A. HASSAN; OZTURK EREN; RYAN C. PARKES; and CAIQUI ZHENG, | : | SUPERIOR COURT OF NEW JERSEY BERGEN COUNTY LAW DIVISION |
| Appellants, | : | CIVIL ACTION |
| v. | : | **CERTIFICATION IN SUPPORT OF MOTION FOR LEAVE TO FILE APPEAL** |
| BOROUGH OF EMERSON; JOHN and JANE DOES, 1-100, | : | |
| Respondent(s). | : | |

I, TANVEER A. HASSAN, and on behalf of OZTURK EREN; RYAN C. PARKES; CAIQUI

ZHENG, upon my oath, duly certify as follows:

1.      I am one of the Parties in this matter with regard to Lot 419 in the Borough of

Emerson, the subject of the Borough of Emerson's Resolution of the Land Use Board in the Matter

of Emerson Redevelopers Urban Renewal, LLC. As such, I have personal knowledge of the facts

set forth herein.

2.      I am the owner of the business known as Sendai Japanese Restaurant and Grill

located on Lot 419 in the Borough of Emerson; my co-Appellants are OZTURK EREN, owner

of Cozy Café & Grill; RYAN C. PARKES, owner of Parke5 Catering; and CAIQUI ZHENG,

owner of Laurel Chinese Restaurant II, LLC.

3.      On December 28, 2018, the Land Use Board of the Borough of Emerson adopted a

resolution to "demolish the existing improvements on the property and redevelop the Property as

a 4-story, 147-unit inclusionary residential development with parking garage, ground floor retail,

amenities and other site improvements, including twenty two (22) affordable housing units on site

and an additional seven (7) credits off site within the Borough, this will provide the Borough with

a total of twenty-nine (29) affordable housing credits, located on Kinderkamack Road between

Lincoln Boulevard and Linwood Avenue, and also known as Block 419, Lots 1, 2, 3, 4, 6.01, 6.02,

7, 8, 9 & 10 on the Tax Assessment Map of the Borough of Emerson (the "Property"), in the CBD-

10 Zoning district, in accordance with the Borough's Redevelopment Plan for the Central Business

District Redevelopment Area…". (Exhibit A).

    4.    It is our contention and understanding that New Jersey's Local Redevelopment and

Housing Law ("LRHL") authorizes the governing body of a municipality to declare an area in need

of redevelopment. The process begins by the municipality authorizing the local planning board to

investigate whether a proposed area qualifies for redevelopment. The planning board must hold a

public hearing and give notice of that hearing to persons who would be affected by a

redevelopment determination. A copy of the notice is required to be published, as well as mailed

to the owner of each parcel of property within the delineated area. The statute provides, however,

that failure to mail any such notice does <u>not</u> invalidate the investigation or redevelopment

determination. After completion of the public hearing, the planning board decides based on

"substantial credible evidence" whether to recommend that the governing body declare the

delineated area to be in need of redevelopment. The eight enumerated criteria in the LHRL

supporting a redevelopment designation are broad, and include the four following criteria:

    (1) the buildings are substandard, unsafe, unsanitary, dilapidated, or obsolete;
    (2) the buildings are in such a state of disrepair as to be untenantable;
    (3) there is a lack of proper utilization of the land rendering it stagnant or not fully productive; and
    (4) designation of the area is consistent with smart growth planning principles adopted pursuant to law or regulation.

    5.    Recently, the New Jersey Supreme Court overturned a redevelopment designation

based on the "stagnant or not fully productive" criteria contained in <u>N.J.S.A.</u> 40A:12A section 5(e)

of the LHRL. In the case of <u>Gallenthin Realty Development v. Borough of Paulsboro</u>, the Court

held that because the New Jersey Constitution authorizes the taking only of "blighted areas" for

redevelopment, the Legislature did not intend for N.J.S.A. 40A:12A section 5(e) to apply in circumstances where the sole basis for redevelopment is that the property is "not fully productive." The Supreme Court observed that under the town's interpretation, any property that is unimproved or operated in less than an optimal manner could be taken for redevelopment. Instead, the Supreme Court concluded that subsection 5(e) applies only to property that has become stagnant because of issues of title, diversity of ownership, or other similar conditions. The decision in Gallenthin certainly limits the power of the LHRL.

6.      It is respectfully asserted that there is just cause for the Court to allow the Parties to file the appeal in this matter, as it is within a reasonable amount of time, that the Resolution of the Land Use Board of the Borough of Emerson is misguided and was a misuse of the application of N.J.S.A. 40A:12A section 5(e) and was nothing more than an egregious act of profiteering of developers...and would be a manifest injustice to allow our adversary to proceed at this time.

7.      Given the above reasons, and, in the interest of fairness and justice, it is respectfully requested that this Court grant this application to file an appeal of the Resolution of the Land Use Board of the Borough of Emerson as it relates to the Matter of Emerson Redevelopers Urban Renewal, LLC and Lot 419.

I HEREBY CERTIFY that the foregoing statements made by me are true to the best of my knowledge. I am aware that if any of the foregoing statements made by me are false, I am subject to punishment.

Dated: February 12, 2019

TANVEER A. HASSAN
On behalf of OZTURK EREN;
RYAN C. PARKES; CAIQUI ZHENG

TANVEER A. HASSAN
178 KINDERKAMACK ROAD
EMERSON, NEW JERSEY 07630
201-776-5665
sendai@njsushi.com

| | | |
|---|---|---|
| TANVEER A. HASSAN; OZTURK EREN; RYAN C. PARKES; and CAIQUI ZHENG, | : | SUPERIOR COURT OF NEW JERSEY BERGEN COUNTY LAW DIVISION |
| Appellants, | : | CIVIL ACTION |
| v. | : | **ORDER** |
| BOROUGH OF EMERSON; JOHN and JANE DOES, 1-100, | : | |
| Respondent(s). | : | |

**THIS MATTER** having been brought before the Court by TANVEER A. HASSAN; OZTURK EREN; RYAN C. PARKES; CAIQUI ZHENG; upon notice to BOROUGH OF EMERSON; and the Court having read and reviewed the application filed by the Parties and any opposition thereto; and good cause therefore appearing for the entry of this Order;

**IT IS ON** this _____ day of _____ 2019 **ORDERED** as follows:

1. The Court grants the request of TANVEER A. HASSAN; OZTURK EREN; RYAN C. PARKES; and CAIQUI ZHENG to file an appeal as within time.

_____
J.S.C.

DATED:

_____ Opposed

_____ Unopposed

# EXHIBIT A

RESOLUTION OF THE LAND USE BOARD

THE BOROUGH OF EMERSON

In the matter of the Application of:

Emerson Redevelopers Urban Renewal, LLC

For Preliminary and Final Major Site Plan

Approval as to Kinderkamack Road between

Lincoln Boulevard and Linwood Avenue

Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9 & 10

**WHEREAS**, Emerson Redevelopers Urban Renewal, LLC ("Applicant") has made application (the "Application") to the Land Use Board of the Borough of Emerson (the "Board") for preliminary and final site plan approval and a major soil moving permit to demolish the existing improvements on the property and redevelop the Property as a 4-story, 147-unit inclusionary residential development with parking garage, ground floor retail, amenities and other site improvements, including twenty two (22) affordable housing units on site and an additional seven (7) credits off site within the Borough, this will provide the Borough with a total of twenty-nine (29) affordable housing credits, located on Kinderkamack Road between Lincoln Boulevard and Linwood Avenue, and also known as Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9 & 10 on the Tax Assessment Map of the Borough of Emerson (the "Property"), in the CBD-10 Zoning district, in accordance with the Borough's Redevelopment Plan for the Central Business District Redevelopment Area; and

**WHEREAS**, Applicant also applied for a Major Soil moving Permit in accordance with Chapter 244 of the Borough of Emerson Municipal Code as part of the Application; and

1

1177669

WHEREAS, the Applicant has filed application materials in connection with the Application; and

WHEREAS, the Applicant has presented satisfactory proof to the Board that legal notice of the Application was published and served in accordance with the Municipal Land Use Law of the State of New Jersey, N.J.S.A. 40:55D-1 et seq. ("MLUL"); and

WHEREAS, the Board reviewed this matter at a public hearing (Special Meeting) on December 10, 2018; and

WHEREAS, after consideration and deliberation at the aforementioned hearing, the Board did vote in favor of the Application and did instruct the Board Attorney to prepare a resolution memorializing the vote taken; and

WHEREAS, pursuant to N.J.S.A. 40:55D-10g, a decision must be reduced to writing and shall include findings of fact, based upon the evidence presented at its public hearings; and

WHEREAS, the Land Use Board of the Borough of Emerson makes the following factual findings and conclusions:

1)    The Applicant is the contract purchaser of the Property located at Kinderkamack Road between Lincoln Boulevard and Linwood Avenue, Block 419, Lots 1, 2, 3, 4, 6.01, 6.02, 7, 8, 9 & 10, in the CBD-10 zoning district and filed the Application in order to demolish the existing structures on the Property and construct thereon a 4-story, 147-unit inclusionary multifamily rental residential development with surface parking, parking garage, approximately 14,700 square-foot of ground floor retail, amenities, and other site improvements. Approximately twenty two (22) of the proposed on site residential units will be affordable housing units.

1177669

2)    The proposed development is contemplated by, and subject to, both the Redevelopment Agreement between the Borough and the Applicant dated June 14, 2016, as amended, including but not limited to the Third Amendment to Redevelopment Agreement ("Redevelopment Agreement"), as well as the Settlement Agreement between the Borough and the Fair Share Housing Center, dated November 21, 2017 ("Settlement Agreement"). The Redevelopment Agreement and the Settlement Agreement, among other things, require the Applicant to provide for a total of twenty nine (29) affordable housing units. Applicant will provide twenty-two (22) affordable housing units on site as part of the proposed development, and will provide seven (7) off-site affordable housing credits, all in accordance with the Uniform Housing Affordability Controls, N.J.A.C. 5:80-26.1 et seq. ("UHAC"). Four (4) of the affordable housing units shall be very low income housing units (as defined by UHAC).

3)    The Application is subject to several "temporary" checklist waivers. The Application does not require any variances and is an "as-of-right" site plan application.

4)    The Applicant was represented by Peter M. Flannery, Esq. Testimony of the following individuals was presented in support of the Application:

    (a)    Wayne A. Corsey, P.E., P.P., Bowman Consulting, Civil Engineering.

    (b)    Charles Olivo, P.E., P.P., P.T.O.E., Stonefield, Traffic Engineering.

    (c)    William Devereaux, R.A., and Angela Kostelecky, R.A., Devereaux & Associates, Architecture.

5)    All witnesses were sworn and duly qualified as experts in their respective fields, and they testified as to how the proposed use will be developed consistent with the Borough's

3

1177669

Central Business District Redevelopment Plan, codified as the CBD-10 Zoning District in Chapter 290 of the Borough Code ("Redevelopment Plan").

      6)     The Applicant presented the following exhibits in support of the Application:

      Exhibit A-1:  Affidavit of Service.

      Exhibit A-2:  Rendering of Aerial Photograph, prepared by Bowman Consulting, dated December 10, 2018.

      Exhibit A-3:  Colorized Rendering of Landscape Plan, prepared by Bowman Consulting, dated December 10, 2018.

      Exhibit A-4:  Revised Sheet A-1.10, dated December 10, 2018, prepared by Devereaux & Associates.

      Exhibit A-5:  Revised Sheet A-1.20, dated December 10, 2018, prepared by Devereaux & Associates.

      Exhibit A-6:  Revised Sheet A-2.10, dated November 15, 2018, prepared by Devereaux & Associates.

      Exhibit A-7:  Colorized Rendering of Kinderkamack Road Elevation, dated December 10, 2018, prepared by Devereaux & Associates.

      Exhibit A-8:  Color Sample Board – Exterior Finishes, dated December 10, 2018, prepared by Devereaux & Associates.

4

## TESTIMONY

7)   Based upon the sworn and qualified testimony of Applicant's professional engineer, Wayne A. Corsey, P.E., P.P., of Bowman Engineering, the Board made the following findings of fact:

a.   Mr. Corsey described the existing condition of the Property and the proposed development. The site consists of a mix of uses, from restaurants, office, retail and single-family residence. Lot 5 is a two-story masonry building that is not part of this application. The site is predominantly either covered by buildings or blacktop parking spaces.

b.   The site has frontage on Kinderkamack Road, Lincoln Boulevard and Linwood Avenue. It also has 550 feet of frontage along the Conrail/New Jersey Transit right-of-way. The Kenneth Street right-of-way which is a Borough right-of-way, is adjacent to the railroad tracks.

c.   The property slopes downward toward Lincoln Boulevard to the west and along Kinderkamack to the south at Linwood Avenue. There is currently some on-site drainage that will be removed. This on-site drainage collects stormwater and discharges into the Linwood storm system. Applicant will install 42 inch reinforced concrete pipe (RCP), from the existing inlets in Lincoln Boulevard to the existing inlets in Linwood Avenue, which will provide more capacity in the storm pipe to alleviate any potential flooding at the intersection of Lincoln Boulevard. There will also be stormwater inlets in the back surface parking lot as well as roof leader collectors and collectors for the parking garage that will connect into the proposed 42 inch RCP. There will be a net reduction in stormwater management for stormwater runoff on the site. The ground floors of the units will be stepped down to accommodate the grades and topography.

5

d.    The proposed building will front on all three roads and there will be a parking lot and parking garage located in the northwest corner. There will be two-way driveway access that will go through the site from Lincoln Boulevard to Linwood Avenue.

e.    The proposed parking for the site is a total of 308 spaces, with 73 surface spaces and an additional 235 spaces located in the parking garage. There will be 10 handicapped persons spots.

f.    Applicant will comply with the streetscape standard required by the Borough for the redevelopment area, and work with the Borough to modify the design to accommodate areas for outdoor dining.

g.    The Settlement Agreement requires twenty-nine (29) COAH or affordable units, seven (7) of which may be provided off-site. The project will have 147 residential units including twenty-two (22) COAH or Affordable units and Applicant will comply with the seven (7) off-site affordable housing requirements. The residential units will only be on the ground floor along Lincoln Boulevard. There will be residential units above that on the second, third and fourth floors. There are three access points: primary access points at the corner and one in the rear area. There will also be 14,700 square feet of retail space.

h.    There will be building mounted signs which will comply with Ordinance requirements. Additionally, the complex will have main signage identifying the building name and directional signage.

i.    The proposed development will provide adequate grading and utilities, stormwater controls, sanitary sewer, lighting, landscaping and site circulation. He also confirmed that the site lighting will conform to Borough requirements.

6

1177669

8)      Based upon the sworn and qualified testimony of Applicant's professional traffic engineer, Charles Olivo, P.E., P.P., P.T.O.E., of Stonefield Engineering and Design, the Board made the following findings of fact:

a.      Mr. Olivo testified that the proposed project is a Transit-Oriented Development ("TOD"), the goal of which is to take advantage of public transit and walkability that exists in the Borough. Based on his own analysis as well as traffic studies his firm has completed for similar developments, this project will have no significant traffic impact on the surrounding area.

b.      Mr. Olivo testified that there are significant improvements that will result from this project, including the creation of a street wall, which encourages a walkable environment and shared parking which will be used by commuters, retail, restaurants and residential uses.  In addition, the parking that is being supplied exceeds the Residential Site Improvement Standards ("RSIS") which requires 254 parking spaces, while 308 spaces are being provided:  55 parking spaces dedicated for commuters to the adjacent New Jersey Transit train station, 188 parking spaces in the parking garage dedicated for the residents, and 65 parking spaces for the retail, as well as for additional resident parking. In his opinion, the proposed parking is more than adequate for the proposed development.

c.      From a traffic perspective, the unit density, the scaling and the mass all comply with the redevelopment plan.  The proposed uses are permitted uses in the zone and the traffic associated with it is conceived to be part of the roadway network when a redevelopment plan is approved.  Accordingly, traffic generation associated with the site is not expected to significantly alter the traffic patterns.

7

1177669

d.    He also testified as to adequate site circulation and site access for the proposed development, with all existing Kinderkamack Road access points on the Property being eliminated, subject to any exception at the sole discretion of the Borough, in favor of Linwood and Lincoln access points as far away from Kinderkamack Road as possible. Mr. Olivo also confirmed that the internal, fob-operated gate used for access to the 188 dedicated residential spaces in the parking garage will not interfere with site access from Lincoln Boulevard, and the location or locations are to be determined with the Borough's approval.

e.    With regard to trip generation, it is estimated that during peak hours, which are 7:00 a.m.-9:00 a.m. and 4:00 p.m. to 7:00 p.m. on weekdays and 11:00 a.m. to 2:00 p.m. on Saturdays, there are just under 100 trips per hour.

9)    Based upon the sworn and qualified testimony of Applicant's registered architects, William Devereaux, R.A., and Angela Kostelecky, R.A., of Devereaux & Associates, Architecture, the Board made the following findings of fact:

a.    Mr. Devereaux and Ms. Kostelecky testified regarding the architectural plans, including the latest revision made on December 10, 2018, which created a single building, with a single amenity center and a single lobby, which they opined encourages a "community within a community." The majority of the building is self-contained except for its access to the street. The intention is to encourage activity on the street with for example, a café or coffee shop, and outdoor seating.

b.    Mr. Devereaux and Ms. Kostelecky testified regarding the architectural elevations and floor plans for the proposed development, including the proposed setbacks, building

8

components, colors and materials. They also confirmed that the proposed development conforms to the building height requirements and the design standards set forth in the Redevelopment Plan.

c.    Ms. Kostelecky described the trash collection for the proposed development, which will be undertaken by private trash haulers and will utilize a system of trash rooms and interior corridors for the collection of trash and recycling from the retail spaces and the residential development.

d.    Ms. Kostelecky also testified regarding the addition of bollards at the corner of Kinderkamack and Lincoln to provide protection for the stairs leading to the ground floor, and she described the fob-controlled gate access for the 188 dedicated resident parking spaces in the parking garage.

e.    Applicant agrees to work with the Borough of Emerson to engage in discussions with New Jersey Transit to move the crossway station further north to unload at the Kinderkamack Road crossing and to potentially place a stairwell from the site toward the platform.

f.    With regard to the affordable housing component, Ms. Kostelecky testified as to the revised bedroom distribution for the affordable housing units and confirmed that the proposed development would comply with all the applicable legal requirements for the affordable housing units. Specifically, there are a total of twenty nine (29) COAH units required, and twenty two (22) COAH units will be provided on-site. Of those 22 units, there are 4 one-bedroom, 13 two-bedrooms and 5 three-bedrooms.

g.    All signage on the building will be in compliance with the Borough's sign ordinance and Applicant will submit a design package regarding all signs, including directional,

9

1177669

parking, etc., to the satisfaction of the Board Engineer, Planner, and the Governing Body and Land Use Board subcommittee.

### PUBLIC COMMENT

10)    The following members of the public spoke with regard to the application: Mayor-Elect Danielle DiPaola, Jeff Bischoff, Mike Meyers, Corey Melillo, Lorraine McQueeney, Joseph Polvere, Councilman-elect Kenneth Hoffman, Billy Price, Michael Esqueu, Don Pierro on behalf of Phyllis Rooney, Paul Hulbert, Michael Casey, Kathleen Viola, Laura Litchult, Jill McGuire, Lina Ballas, Bob Petrow, Annette Scala, Douglas Doyle, Esq. as Redevelopment Counsel for Emerson, and Jack Klugman, as part of the Applicant's team. Public spoke in opposition to the Application, and expressed concerns regarding: the height, scale and appearance of the proposed development; the number of parking spaces provided as part of the proposed development; the traffic impacts of the proposed development; stormwater controls; and the environmental condition of the Property. No expert testimony was offered in support of the public comments.

11)    The Board Engineer and the Board Planner commented on the evidence presented by the Applicant following review of the same, sought clarification of certain items, and required supplemental information and stipulations from Applicant with regard to same as set forth herein.

### STIPULATIONS MADE BY APPLICANT

A.    Applicant shall comply with all landscaping comments regarding the Application, which are to be submitted by the Board Engineer's office or the Board Planner's office, one or the other which shall be completed to the satisfaction of the Board Engineer and/or Board Planner.

10

1177669

B.      Applicant will meet with the Land Use Board's Planner and a subcommittee of the Governing Body for the Borough and the Land Use Board to discuss and address the Board's and Borough's concerns and comments regarding the final architectural design and details of the project and all other aspects of the project. Applicant agrees to use all good faith efforts to satisfactorily address the Board's and Governing Body's concerns and comments through the subcommittee. The sample materials that were submitted as hearing evidence shall be the ones utilized during construction unless otherwise approved by the Borough.

C.      Applicant shall dedicate at least 55 of the 73 surface parking spaces on the Property for the exclusive use by New Jersey Transit (Emerson Borough) train station users during the hours of 7:00 a.m. and 6:00 p.m., Monday through Friday. The signage and permitting for these 55 commuter spaces shall be agreed upon between the Borough and the Applicant.

D.      Insofar as the proposed development is constructed with the parking reduction set forth in Section 290-71A(a) of the Borough Code: medical office space – which shall include walk-in and urgent-care clinics and other medical, dental, treatment and therapy-related facilities – shall be a prohibited use in the proposed development.

E.      Applicant shall provide turning templates for garbage trucks and emergency vehicles accessing the Property, for the review and approval of the Board Engineer and/or Board Planner.

F.      Applicant shall provide drainage calculations for the proposed development for the review and approval of the Board Engineer.

G.      The Applicant shall provide any off-tract improvements required by the Application consistent with the MLUL and the Redevelopment Agreement.

11

1177669

H.      There shall be a review after six (6) months to address any lighting concerns, and adjustments are to be made at the direction and approval of the Board Engineer;

I.      Deliveries shall not be made from Kinderkamack Road and shall only be made in the rear of the building(s) of the proposed development.

J       Applicant will reasonably assist Borough efforts to create pedestrian connections to and from the Property and the Borough's New Jersey Transit train station.

K.      All standing snow of 2 inches or more, from one or multiple snow events, shall be removed from the Property by the Applicant at Applicant's sole cost and expense.

L.      Subject to obtaining the permission of the owner of Block 419, Lot 5 ("Lot 5"), and provided same does not encroach onto Lot 5, the Applicant shall continue the streetscape for the proposed development across the frontage of Lot 5.

M.      Applicant shall revise the architectural plans to be to scale and to provide dimensions to confirm compliance with all Borough Code requirements, including, but not limited to, the design standards set forth in the Redevelopment Plan, and the Applicant shall provide elevations of all four sides of the proposed development for review and approval by the Board Engineer and/or the Board Planner.

N.      Applicant shall comply with all applicable requirements of the Redevelopment Agreement, the Settlement Agreement and UHAC with respect to the affordable housing proposed as part of the development.

12

O.    Applicant shall design the HVAC units to be shielded from public view and shall provide some HVAC and vents for units suitable for future restaurant uses within the development to the approval of the Board Engineer.

P.    Application shall provide a point-by-point lighting plan for the review and approval of the Board Engineer.

Q.    Applicant shall submit a directional sign package for the review and approval of the Board Engineer and/or Board Planner.

12)    Based upon the aforementioned facts and law, the Application conforms to the requirements of the Borough in terms of public safety, health and general welfare and will not deter the efforts of the Borough to effectuate the general purpose of municipal planning.

NOW, THEREFORE, BE IT RESOLVED by the Land Use Board of the Borough of Emerson that the Application of Emerson Redevelopers Urban Renewal, LLC with respect to the Property requesting preliminary and final site approval and a major soil permit be and is hereby APPROVED subject to the terms and conditions hereinafter set forth:

1)    The foregoing findings of fact and conclusions of law are incorporated herein as if set forth at length;

2)    The Applicant seeks site plan approval pursuant to N.J.S.A. 40:55D-50 in conformance with the municipal ordinances;

3)    In reviewing the Application, documents, evidence and testimony, the Board concludes that the proposed uses comply with the municipal ordinances and the MLUL;

13

1177669

**CONDITIONS SPECIFIC TO THIS APPLICATION**

1)      Applicant shall abide by all of the Stipulations set forth at length above.

2)      The Applicant shall submit revised site plan and architectural plan sets incorporating any and all applicable conditions set forth herein, and conditions of all engineering reports and reports of the Land Use Board's professionals, and the subcommittee of the Board and the Governing Body, for the review and approval of the Board Engineer and Borough Engineer and/or Board Planner and Borough Planner.

3)      The Applicant shall obtain the appropriate approvals, permits and/or letters for the Application from all applicable local, county, state and federal bodies and agencies, including, but not limited to, the following:

A.      Bergen County Planning Board;

B.      Bergen County Soil Conservation District;

C.      Borough of Emerson Police Department;

D.      Borough of Emerson Fire Department; and

E.      New Jersey Department of Environmental Protection.

4)      If any material changes to the site plan as approved by this Resolution of the Board are required by any other governmental body or agency, said changes are to be brought by the Applicant on a forthwith basis before the Board, which retains jurisdiction over the Application;

5)      The Applicant shall at all times comply with all applicable rules, regulations, ordinances and statutes of the Borough of Emerson, County of Bergen, State of New Jersey and

14

1177669

the federal government with regard to the development, including, but not limited to, the Americans with Disabilities Act;

6)    The Applicant agrees that the work to be performed consistent with this Resolution will be consistent with Emerson's Redevelopment Plan;

7)    Nothing herein grants the Applicant an approval of any material changes to this application as set forth in detail in this Resolution. Any such changes or amendments will require amended site plan and/or variance approval from this Board, as applicable;

8)    The Applicant shall comply with the following comments set forth in the Boswell Engineering review letter dated December 6, 2018 ("Engineering Review Letter") and the Brigette Bogart Planning & Design Professionals LLC review letter dated December 10, 2018 ("Planning Review Letter") (the Engineering Review Letter and the Planning Review Letter are attached hereto and made a part hereof):

A.    Engineering Review Letter, Comments 7-16, 19-20, 22, 25-28, 34-38, 40-49.

B.    Planning Review Letter, Comments C.1 – C.13.

9)    The Applicant shall comply with the following final site plan checklist items:

A.    *Final Site Plan Checklist Item 2.* Original tracings with signature lines.

B.    *Final Site Plan Checklist Item 3.* Proof of execution of developer's agreement.

C.    *Final Site Plan Checklist Item 4.* Proof of posting of performance and/or maintenance bonds.

15

1177669

D.    *Final Site Plan Checklist Item 5.* Copies of recorded easements, rights-of-way or conveyances of open space or public easements, if required.

E.    *Final Site Plan Checklist Item 6.* Deposit of escrow funds for engineering inspections, and any other items required by the Borough.

F.    *Final Site Plan Checklist Item 7.* Bergen County Planning Board approval.

G.    *Final Site Plan Checklist Item 9.* Bergen County Soil Erosion and Sediment Control Plan approval, where required.

10)    The Settlement Agreement requires 29 affordable units, seven of which may be provided off-site. The project will have 147 residential units including 22 COAH or Affordable units on site and Applicant will comply with the requirement of seven (7) off-site affordable units. The residential units will be on the ground floor along Lincoln Boulevard and on the ground floor in the rear parking lot. There will be residential units above that on the second, third and fourth floors. There are three access points; primary access points at the corner and one in the rear area. There will also be 14,700 square feet of retail space.

11)    The following construction drawings and site plan items are required to be submitted and approved by the subcommittee review team of the Emerson Land Use Board and Governing Body, the Board Planner and Borough Planner, and the Board Engineer and Borough Engineer:

A.    Provide building elevation drawings for all four side of the redevelopment area with dimensions for each floor, balconies, reliefs, overhangs, parapets, cornices, and any other requested items.

B.    Provide building elevation grades for highest points for each facade section.

16

C.    Provide building elevation views for the side of the complex to face the existing building on Lot 5,

D.    Provide datum elevations and locations from where all height measurements will be made for field verification.

E.    The low point along Lincoln Boulevard may be the same as the Final First Floor Elevation on the northeast corner of the building. Design area to drain properly to reduce possible flooding of recessed stair entrance on the northeast corner of the building.

F.    Provide top of curb profile of Lincoln Boulevard and roof profile.

G.    Provide top of curb profile of Kinderkamack Road and roof profile.

H.    Provide top of curb profile of Linwood Avenue and roof profile.

I.    Provide typical construction details for all curbs, parking lots, sidewalks, drainage, sanitary sewers, electrical connections, and any other items requested.

J.    Provide construction staging concepts, where work will commence, and construction staging schedules.

K.    Provide plan and details of fences along the railroad property.

L.    Provide the location of the PSE&G 230 KV underground electrical line located along the west side of the redevelopment property.

M.    Provide cross – sections, slopes and access controls for parking garage operation.

N.    Provide inverts and slopes for proposed drainage system throughout the site.

O.    Provide a grading plan for site, with spot grades plotted every 50 feet.

P.    Provide a soil erosion and sediment control plan with details.

Q.    Provide a site lighting plan with intensities plotted throughout site.

17

1177669

R.      Provide a streetscape lighting electrical plan to match county project lighting recently completed.

S.      Provide a construction plan and cross - sections for new curb line along Lincoln Boulevard.

T.      Provide demolition plans and stone mat requirements for trucking operations.

U.      Provide quantity receipts for all recycled asphalt, concrete, contaminated soil, and steel removed from the site and presented to the Borough Superintendent of Public Works for municipal recycling credits.

V.      Provide traffic control plans for construction phases that will interfere with traffic flow on Kinderkamack Road, Lincoln Boulevard, and Linwood Avenue, to the satisfaction of the Borough Chief of Police.

W.      Provide documentation that all NJDEP requirements regarding the underground monitoring wells on the site have been satisfied for the redevelopment.

X.      Supply, relocate and modify the traffic signal equipment on the southwest corner of the Kinderkamack Road and Lincoln Boulevard intersection to the satisfaction of the Bergen County.

Y.      Review and upsize the existing drainage line, as needed, along the south side of Lincoln Boulevard to provide additional flow capacity once reviewed.

Z.      Provide information and the location of loading zones onsite for deliveries to the back of the proposed stores.

AA.     Provide the locations, parking signs, and pavement markings for the commuter parking and retail parking spaces for the site on the construction plans.

BB.     Provide a minimum of a 9'6" streetscape sidewalk design around the perimeter of the redevelopment zone, including along Linwood Avenue and Lincoln Boulevard.

18

1177669

CC.    Provide all necessary road widening easements, with parcel descriptions and parcel maps, to the County of Bergen and Borough of Emerson.

DD.    Provide a cost estimate for all curbing, sidewalk, drainage, paving, streetscape lighting, traffic signs, pavement markings, traffic signal relocation, regulatory and warning signs, and utility relocation. This estimate will be submitted for review and be the basis for the performance bond requirements.

EE.    Provide the date when the commuter parking spaces are required to be vacated for the start of construction.

FF.    Provide truck turning radii on a plan showing how a truck will access the trash areas for service.

GG.    Provide a note on the plans indicating where snow would be stockpiled during heavy snow events, with snow to be removed from the site for snow events over 2 inches in depth.

HH.    Provide a written traffic report to support the traffic testimony presented at the December 10, 2018 Land Use Board meeting.

II.    Provide an ADA compliance letter from a licensed New Jersey Professional Engineer to verify all ADA requirements have been installed in accordance with current requirements.

JJ.    Developer to agree to a 6-month lookback regarding site lighting to resolve any and all complaints regarding non-compliant site lighting.

KK.    Developer to abide by the noise ordinances for the Borough of Emerson.

LL.    Developer to abide by all New Jersey Transit and Federal Railroad Administration requirements regarding construction techniques and operations near the New Jersey Transit rail lines and crossings.

1177669

MM.    Developer to abide by all New Jersey Department of Transportation and County of Bergen construction materials and methods of construction for work within the public right of way.

NN.    Developer to abide by all Bergen County Planning Board requirements.

OO.    Developer to abide by all Bergen County Soil Conservation District requirements.

12.    Applicant shall have a pre-construction meeting with the Board Engineer, Borough Engineer & Board Planner prior to construction.

13.    The parking garage structure shall not exceed the height requirement in the CBD-10 zone and the levels and ramps of the garage are to be spaced at a height that is consistent with the requirements in the zone and to the satisfaction of the Board and the Borough Engineer.

14.    Applicant shall enter into an appropriate Developer's Agreement with the Borough and Land Use Board and shall post all necessary fees, escrows, and performance guarantees and payment for off-site improvements in the future. The Developer's Agreement shall be drawn by the applicant and submitted to the Borough and Planning Board Attorneys for review and approval.

II.    **GENERAL CONDITIONS**

1.    Applicant shall adhere to the Borough of Emerson's storm water management requirements with regard to ground water recharge for a major development as required in by the Borough Ordinance.

2.    Applicant or any successor in interest shall address all recommendations and requirements of the Borough Police Department, Fire Department and Department of Public Works.

3.    No certificate of occupancy will be granted unless all conditions imposed by this Land Use Board, the Land Use Board's professionals, Board Attorney, Planner, Engineer and the Borough's Attorney, Engineer and Planner have been satisfied in full.

1177669

4.    Applicant shall be responsible for obtaining any other approvals or permits from other governmental agencies as may be required by law, including, but not limited to, the Bergen County Soil Conservation District, and the New Jersey Department of Environmental Protection and Applicant shall comply with any requirements or conditions for such approvals or permits.

5.    Applicant is responsible for any environmental clean-up and/or environmental conditions as to the site as required by federal, state, county and local governmental agencies and officials, which must be complied with to the satisfaction of each of the aforementioned agencies and officials.

6.    Applicant agrees to comply with any and all conditions and requirements of the Borough Engineer and/or Board Engineer with regard to Soil Movement, including but not limited to truck routes and hours of operation, and will comply with the Borough Engineer's requirements as to any and all soil movement, in conjunction with the Emerson Police Department.

7.    Applicant shall submit revised plans, as necessary, with correct revision dates on all sheets.

8.    Applicant will comply with any and all requirements of the Property's Water Company.

9.    All construction shall be completed in accordance with all ordinances and building requirements of the Borough of Emerson, the Uniform Construction Code of the State of New Jersey and in accordance with the instructions of the Construction Official of the Borough of Emerson, the Borough Engineer and in accordance with the requirements of all other departments of the Borough.

1177669

10.    Applicant is required to obtain a building permit, post all necessary fees and costs with the Borough of Emerson prior to any construction. This approval is subject to Applicant obtaining a building permit and any other State, County or Borough approvals if required.

11.    Applicant shall pay all fees, costs, bonds and escrows when due or becoming due and shall post all performance guarantees in connection with the review of this application prior and subsequent to the approval of this application. Any monies are to be paid within twenty (20) days of said request by the Borough's Chief Financial Officer.

12.    If an application before the Bergen County Planning Board is required and any material or substantial changes are required by the Bergen County Planning Board to the site plan as approved by this Resolution, then the Emerson Land Use Board retains jurisdiction over this application and reserves its right to amend or withdraw its approval of this application.

13.    Applicant shall file, as applicable, a deed restriction regarding any and all affordable units constructed pursuant to the approval granted herein, as same is required by N.J.A.C. 5:93-9.2(e).

14.    Applicant shall comply with all affordable housing requirements of the Borough of Emerson Code as well as the Uniform Housing Affordability Control Rules, N.J.A.C. 5:80-26.1 et seq., including, but not limited to, administration of units, marketing, rent pricing and stratification, qualification and selection of households, and any other items. Documentation demonstrating such compliance is required as an ongoing condition of this approval.

15.    All representations and stipulations made by Applicant or its agents shall be deemed conditions of this approval and any misrepresentations by Applicant contrary to the representations and stipulations made before the Land Use Board shall be deemed a violation of this approval.

22

1177669

16.    The action of the Land Use Board in approving this application shall not relieve Applicant of responsibility for any damages caused by this project, nor does the Land Use Board of the Borough of Emerson, or its reviewing professionals and agencies, accept any responsibility for design of the proposed improvement or for any damages that may be caused by this development.

17.    Any and all conditions imposed upon Applicant in connection with the approval granted herein shall apply to any successor in interest to Applicant.

18.    All easements, deeds, subdivision maps and deed restrictions as may be required hereunder must be reviewed and approved by the Borough of Emerson and recorded by Applicant before any permit is issued by the Borough.

### III.    SOIL MOVING PERMIT

A Major Soil Moving Permit in accordance with the requirements of Chapter 244 of the Borough of Emerson Municipal Code for a soil movement is GRANTED without substantial detriment to the public safety, health and general welfare and will not deter the efforts of the Borough to effectuate the general purpose of municipal planning. The granting of the permit is subject to the following conditions:

1.    Prior to the commencement of any soil operations (fill or cut), Applicant agrees to develop trucking routes for the hauling of soil to the site which shall be submitted to the Borough for review and approval. The review will include the Borough's Police Department and Engineering professionals.

2.    Applicant agrees to comply with any and all conditions and requirements rendered by the Borough Engineer and/or Board Engineer with regard to the Soil Movement, including but not limited to truck routes and hours of operation.

23

1177669

3.    Applicant will provide motor vehicle and general liability insurance for all necessary vehicles and parties involved in the soil movement in sums and form deemed appropriate by the Borough Attorney.

4.    The Applicant agrees to comply with Borough Police Department Traffic Control Officers in order to provide a safe means for moving the soil as deemed required by the Borough Engineer or his designees.

5.    The Applicant shall comply with any and all other applicable Borough regulations, Ordinances and directives pertaining to soil movement.

6.    The Applicant shall obtain all other necessary governmental approvals and permits, and shall perform all acts of compliance which may be required under the applicable federal, state, county and local statutes, regulations and ordinances.  The Applicant shall submit to the Board copies of all permits or approvals or, in the alternative, written verification that no permits or approvals are required.

7.    The Board reserves the right to require further review of this permit request in the event that another governmental entity requires "Substantial modifications or revisions" to the plan as approved.

BE IT FURTHER RESOLVED that this Resolution does not constitute approval or recommendation for approval for site plan or any variance not herein referenced or any exception or permit not requested by the Applicant, nor any site plan, variance or exception or permit which may not be expressly or specifically created by this Resolution.

NOW THEREFORE, BE IT RESOLVED that the Chairman and Secretary of the Board are hereby authorized to affix their signatures to this Resolution granting the requested application, to advertise the action taken, by way of Resolution, in the local newspaper, and furthermore to

24

1177669

send certified copies to the Construction Code Enforcement Official and/or Building Sub-Code official, the Zoning Official, the Applicant and/or the Applicant's attorney, the subject property Owner if other than the Applicant, and to the Borough Attorney and Redevelopment Attorney.

The undersigned certifies that the within Resolution was adopted by the Board and memorialized herein pursuant to N.J.S.A. 40:55D-10(g) on December _28th_____, 2018.

Dated: _12/28/18_

_____
Gary Schwinder, Chairman

Dated: _12/28/18_

_____
Marie Shust, Secretary

OFFERED BY: _Mr Mc Kearney_

SECONDED BY: _Mr Bresa_

VOTE: Ayes: _5_

    Nays: _0_

    Abstain: _0_

25

1177669

Exhibit 40

CONFIDENTIAL

**REGULAR MEETING OF FEBRUARY 19, 2019**
**CLOSED EXECUTIVE SESSION MEETING MINUTES**

CLOSED EXECUTIVE SESSION - Resolution No. 95-19

☞**Motion** to go into an executive session to discuss matters exempt from the public as duly noticed by Resolution No. 95-19 was **moved** by Councilman Hoffman, **seconded** by Council President Falotico and carried by a roll call vote of 6-0:
**YES: Bayley, Hoffman, McGuire, Falotico, Knoller, Gordon**

| 19-2/19-08 | Personnel – Rice Notice: Dept. of Public Works | N.J.S.A. 10:4-8 |
| 19-2/19-09 | Potential Litigation – Redevelopment | N.J.S.A. 10:4-7 |
| 19-2/19-10 | Litigation Update – Affordable Housing | N.J.S.A. 10:4-7 |

Also present were Borough Attorney John McCann and Borough Clerk Jane Dietsche.

**19-2/19-08      Personnel – Rice Notice: Dept. of Public Works       N.J.S.A. 10:4-8**

Mr. Omar Hernandez, a member of the Department of Public Works, had been Rice Noticed and had requested that the discussion be held in Closed Session and that he would not attend. The Governing Body discussed the fact that Mr. Hernandez had been called to active duty for a two-year period beginning March 1, 2019 and the laws related to military deployment for employees.

**19-2/19-09      Potential Litigation – Redevelopment       N.J.S.A. 10:4-7**

Mr. McCann said that an objection to redevelopment had been filed by several business owners but in his opinion, it was legally defective. He said he would update the Governing Body in the future but that he planned to file a motion to dismiss.

**19-2/19-10      Litigation Update – Affordable Housing       N.J.S.A. 10:4-7**

The Borough's Special Counsel on Affordable Housing, Brian Giblin, Esq., was present for this discussion. He provided an overview of the COAH process and noted that Emerson was safe from builder's remedy lawsuits. He discussed a 120 day period in which information had to be supplied to the Court and explained that he was in the process of reviewing his files and obtaining all necessary information.

Exhibit 41



**PORZIO**
BROMBERG&NEWMAN P.C.

ATTORNEYS AT LAW          MORRISTOWN NJ • NEW YORK NY • PRINCETON NJ • WASHINGTON DC • WESTBOROUGH MA

JOSEPH A. PAPARO
MEMBER, NJ AND NY BARS
DIRECT DIAL NO.: 973-889-4042
E-MAIL ADDRESS: JAPAPARO@PBNLAW.COM

February 25, 2019

**VIA EMAIL &
CERTIFIED MAIL/RRR**

The Law Office of John McCann
13 Ponds Way
Oakland, NJ 07436

       Re:     *Emerson Redevelopers Urban Renewal, LLC*
               *Kinderkamack Road (Block 419) Redevelopment*

       Our File No.:     021331.012610

Dear Mr. McCann:

      It was a pleasure meeting you at the Borough Council meeting last week and congratulations on your position as the new Borough Attorney for Emerson. As discussed, this office represents the Redeveloper in connection with the above referenced redevelopment project which was approved by the Emerson Land Use Board on December 10, 2018 and a resolution memorializing that approval was adopted by the Board on December 28, 2018.

      While it is understandable that you and Mr. Gilson may not yet be fully up to speed on this project, it is critical that a meeting be scheduled with my client and the Borough as soon as possible so that we can provide the Borough with an update concerning the project, in general, and specifically, the status of closing on the parcels and tenant-related issues. Over the passing weeks, my client and I have made multiple requests to Borough officials and consultants for such a meeting with no success.

      As you are certainly aware, the Redevelopment Agreement between the Borough and the Redeveloper requires the Borough to cooperate fully with the Redeveloper in furtherance of the project regardless of how unpopular the project may be with the new administration. The Borough's obligations concerning this project also flow from the affordable housing settlement as this project was a key element to that settlement. My client is committed to this project and eager to move it forward as quickly as possible but in order to do so, there must be cooperation and collaboration with the Borough and its consultants. The Redeveloper is proceeding diligently and honoring its obligations under the Redevelopment Agreement and it expects the Borough to do likewise.

100 SOUTHGATE PARKWAY, P.O. BOX 1997
MORRISTOWN, NJ 07962-1997
TELEPHONE (973) 538-4006
FAX (973) 538-5146
www.pbnlaw.com

4152944


**BROMBERG&NEWMAN P.C.**

John McCann, Es
February 25, 201.
Page 2

ATTORNEYS AT LAW

It is my understanding that you are currently on vacation. Upon your return next week, I would ask that you make this matter a priority and advise as to when we can meet to discuss this project. Thank you for your assistance.

Regards,

Joseph A. Paparo

cc: Mayor Danielle DiPaola (email only)
Richard Sheola, Interim Borough Administrator (email & certified/RRR )
Matthew Gilson, Esq. – redevelopment counsel (email only)
Michael Jovishoff, PP -- Borough planner (email only)
Accurate Builders – Jack Klugmann
JMF Properties – Joe Forgione

4152944



**ATTORNEYS AT LAW**

John McCann, Es
February 25, 201.
Page 2

It is my understanding that you are currently on vacation. Upon your return next week, I would ask that you make this matter a priority and advise as to when we can meet to discuss this project. Thank you for your assistance.

Regards,

Joseph A. Paparo

cc: Mayor Danielle DiPaola (email only)
Richard Sheola, Interim Borough Administrator (email & certified/RRR )
Matthew Gilson, Esq. – redevelopment counsel (email only)
Michael Jovishoff, PP -- Borough planner (email only)
Accurate Builders – Jack Klugmann
JMF Properties – Joe Forgione

4152944

Exhibit 42



**PORZIO**
BROMBERG&NEWMAN P.C.

ATTORNEYS AT LAW    MORRISTOWN NJ • NEW YORK NY • PRINCETON NJ • WASHINGTON DC • WESTBOROUGH MA

JOSEPH A. PAPARO
MEMBER, NJ AND NY BARS
DIRECT DIAL NO.: 973-889-4042
E-MAIL ADDRESS: JAPAPARO@PBNLAW.COM

March 4, 2019

VIA EMAIL

Adam Gordon
Fair Share Housing Center
510 Park Blvd
Cherry Hill, NJ 08002

Re:    *Emerson Redevelopers Urban Renewal, LLC*
       *Kinderkamack Road (Block 419) Redevelopment*
       Our File No.:        021331.012610

Dear Mr. Gordon:

For your information, I enclose a copy of my letter of even date sent to John McCann, Esq. Please call at your convenience so that I may bring you up to date as to where we are with this project. We are waiting for the Borough of Emerson to provides us with a date and time for a meeting. Once we have this we will share this information with you and welcome your participation.

Regards,

Joseph A. Paparo

JAP/jc
Enclosure

cc:    Special Master Mary Beth Lonergan, PP, AICP (email only)
       John McCann, Esq. (email & certified mail/RRR)
       Mayor Danielle DiPaola (email only)
       Richard Sheola, Interim Borough Administrator (email & certified/RRR )
       Matthew Gilson, Esq. – redevelopment counsel (email only)
       Michael Jovishoff, PP – Borough planner (email only)
       Accurate Builders – Jack Klugmann
       JMF Properties – Joe Forgione

100 SOUTHGATE PARKWAY, P.O. BOX 1997
MORRISTOWN, NJ 07962-1997
TELEPHONE (973) 538-4006
FAX (973) 538-5146
www.pbnlaw.com

4158923

Exhibit 43



**PORZIO**
BROMBERG&NEWMAN P.C.

ATTORNEYS AT LAW          MORRISTOWN NJ • NEW YORK NY • PRINCETON NJ • WASHINGTON DC • WESTBOROUGH MA

JOSEPH A. PAPARO
MEMBER, NJ AND NY BARS
DIRECT DIAL NO.: 973-889-4042
E-MAIL ADDRESS: JAPAPARO@PBNLAW.COM

March 4, 2019

**VIA EMAIL &**
**CERTIFIED MAIL/RRR**

The Law Office of John McCann
13 Ponds Way
Oakland, NJ 07436

Re:   *Emerson Redevelopers Urban Renewal, LLC*
      *Kinderkamack Road (Block 419) Redevelopment*

Our File No.:     021331.012610

Dear Mr. McCann:

Having received no response to my February 25, 2019 letter, I am, again, writing to request that a meeting be scheduled with the Borough to discuss the status of closing on the parcels and the tenant-related issues that require the Borough's direct involvement and participation.  It is extremely frustrating and disappointing that no one, on behalf of the Borough, has responded to our prior requests.  My client is an experienced real estate developer that has worked with many municipalities on similar redevelopment projects and, frankly, neither my client nor I have ever encountered such a lack of cooperation as we are encountering here.

I reiterate the points in my previous letter regarding the Borough's obligations under the Redevelopment Agreement <u>and</u> the affordable housing settlement and must emphasize that we intend on holding the Borough to its obligations under those agreements.  We expect the Borough to cooperate, however, if the Borough fails to cooperate, we will be forced to obtain that cooperation through other avenues.  I am hopeful that such actions will not be necessary and that the Borough will work with the redeveloper as mandated by the Redevelopment Agreement in furtherance of the project.

To that end, my client is requesting that a meeting be scheduled no later than <u>March 15, 2019</u>.  We look forward to a response.  Thank you.

100 SOUTHGATE PARKWAY, P.O. BOX 1997
MORRISTOWN, NJ 07962-1997
TELEPHONE (973) 538-4006
FAX (973) 538-5146
www.pbnlaw.com

4157991

John McCann, Esq.
March 4, 2019
Page 2



**PORZIO**
BROMBERG & NEWMAN P.C.
ATTORNEYS AT LAW

Regards,

Joseph A. Paparo

cc: Mayor Danielle DiPaola (email only)
    Richard Sheola, Interim Borough Administrator (email & certified/RRR )
    Matthew Gilson, Esq. – redevelopment counsel (email only)
    Michael Jovishoff, PP – Borough planner (email only)
    Accurate Builders – Jack Klugmann
    JMF Properties – Joe Forgione

4157991

Exhibit 44

**Jane Dietsche**

| | |
|---|---|
| **From:** | John McCann <johnjmccann@optonline.net> |
| **Sent:** | Tuesday, March 12, 2019 3:54 PM |
| **To:** | Mayor |
| **Subject:** | Fwd: Business Owners Sue Emerson Over Redevelopment Tactics – News from Pascack Press & Northern Valley Press |

JM

Begin forwarded message:

> **From:** "Paparo, Joseph A." <JAPaparo@pbnlaw.com>
> **Date:** March 12, 2019 at 1:41:21 PM EDT
> **To:** "'Martin, Christopher'" <CMartin@morrisonmahoney.com>, 'John McCann'
> <johnjmccann@optonline.net>
> **Cc:** "Corriston, Lina" <LCorriston@morrisonmahoney.com>
> **Subject: RE: Business Owners Sue Emerson Over Redevelopment Tactics – News from Pascack Press & Northern Valley Press**
>
> John,
> This Thursday is perfect.  Morning preferably but we will make ourselves anytime that works for you and the Borough.  Thanks.
> Joe.
>
>
> **From:** Martin, Christopher [mailto:CMartin@morrisonmahoney.com]
> **Sent:** Tuesday, March 12, 2019 1:20 PM
> **To:** 'John McCann'; Paparo, Joseph A.
> **Cc:** Corriston, Lina
> **Subject:** RE: Business Owners Sue Emerson Over Redevelopment Tactics – News from Pascack Press & Northern Valley Press
>
>
> **EXTERNAL MESSAGE**
>
> _____
>
> Thanks John.
>
> Joe- FYI
>
>
> **Christopher E. Martin**
> Partner
>
> MORRISON MAHONEY LLP
> Waterview Plaza
> 2001 US Highway 46
> Suite 200, Parsippany, NJ  07054

1

T (862) 286-6116 | F (973) 257-3527
CMartin@morrisonmahoney.com | www.morrisonmahoney.com

Connecticut | Massachusetts | New Hampshire | New Jersey | New York | Rhode Island | United Kingdom

The information transmitted, including attachments, is intended only for the person(s) or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy any copies of this information.

**From:** John McCann [mailto:johnjmccann@optonline.net]
**Sent:** Tuesday, March 12, 2019 12:36 PM
**To:** Martin, Christopher <CMartin@morrisonmahoney.com>
**Subject:** Re: Business Owners Sue Emerson Over Redevelopment Tactics – News from Pascack Press & Northern Valley Press

**\*\*External Email\*\***
Joe how is Thursday for a meeting?

JM

On Mar 8, 2019, at 10:30 AM, Martin, Christopher <CMartin@morrisonmahoney.com> wrote:

Thanks John.


Christopher E. Martin
Partner

MORRISON MAHONEY LLP
Waterview Plaza
2001 US Highway 46
Suite 200, Parsippany, NJ 07054
T (862) 286-6116 | F (973) 257-3527
CMartin@morrisonmahoney.com | www.morrisonmahoney.com

Connecticut | Massachusetts | New Hampshire | New Jersey | New York | Rhode Island | United Kingdom


The information transmitted, including attachments, is intended only for the person(s) or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmissions, dissemination or other use of, or taking of any action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and destroy any copies of this information.

**From:** John McCann [mailto:johnjmccann@optonline.net]
**Sent:** Friday, March 08, 2019 10:13 AM
**To:** Joe A. Paparo <JAPaparo@pbnlaw.com>
**Cc:** Martin, Christopher <CMartin@morrisonmahoney.com>
**Subject:** Re: Business Owners Sue Emerson Over Redevelopment Tactics – News from Pascack Press & Northern Valley Press

**\*\*External Email\*\***
No such appeal has been filed with Borough Council.

JM

On Mar 8, 2019, at 9:22 AM, Paparo, Joseph A.
<JAPaparo@pbnlaw.com> wrote:

Chris,
Below is a link to the recent newspaper article that I mentioned.
The article references a lawsuit/appeal of my client's approval from
the Land Use Board. You advised that you are not aware of any
such appeal being filed with the Superior Court. As I mentioned,
the Borough Code does include a section dealing with appeals of
Board decisions directly to the Borough Council (see attached).
John, please confirm that no such appeal of my client's Land Use
Board approval has been filed with or is pending before the
Borough Council. Also John, you will note that the Mayor is
quoted in the article as saying that she's working on scheduling a
meeting with the redeveloper. Let's please set this meeting.
Thanks.
Joe.


-----Original Message-----
From: Andrade, Carmen
Sent: Thursday, March 07, 2019 4:38 PM
To: Paparo, Joseph A.
Subject: Business Owners Sue Emerson Over Redevelopment
Tactics – News from Pascack Press & Northern Valley Press

https://thepressgroup.net/business-owners-sue-emerson-over-
redevelopment-tactics/

**Joseph A. Paparo, Esq.**
**PORZIO, BROMBERG & NEWMAN, P.C.**
**100 Southgate Parkway, P.O. Box 1997 | Morristown, NJ 07962-1997**

**P: 973.889.4042 | M: 908.377.9328 | F: 973.538.5146 | vCard | CV**
**japaparo@pbnlaw.com | www.pbnlaw.com**

This electronic communication, including any authorized attachments, contains information from the
law firm of Porzio, Bromberg & Newman, P.C., that may be legally privileged, confidential, and exempt
from disclosure under applicable law. This communication also may include content that was not
originally generated by the firm. If you are not the intended recipient, any use or dissemination of this
communication is strictly prohibited. If you have received this communication in error, please notify the
sender immediately and delete it from all computers on which it may be stored. In addition, if you are
not currently a client of the firm, this communication is not to be construed as establishing an attorney-
client relationship.
<DOC_20190308090535.PDF>

Exhibit 45

**Jane Dietsche**

| | |
|---|---|
| **From:** | Gerald Falotico <gfalotico@emersonnj.org> |
| **Sent:** | Thursday, March 14, 2019 11:06 AM |
| **To:** | Danielle DiPaola |
| **Subject:** | Fwd: Re: Block 419 |

FYI

*Gerald Falotico, Councilman*
*Borough of Emerson*
*P:201-262-6086; 1524*
*F:201-262-0938*
*gfalotico@emersonnj.org*
*www.emersonnj.org*

-------- Original message --------
From: John McCann <johnjmccann@optonline.net>
Date: 3/13/19 15:46 (GMT-05:00)
To: Gerald Falotico <gfalotico@emersonnj.org>
Cc: Rich Sheola <rsheola@emersonnj.org>
Subject: Re: Block 419

Can you you pass it along. Meeting tomorrow at 11 at borough hall.

JM

On Mar 13, 2019, at 1:19 PM, Gerald Falotico <gfalotico@emersonnj.org> wrote:

Good afternoon,

Just checking, any update on block 419?

Gerry

*Gerald Falotico, Councilman*
*Borough of Emerson*
*P:201-262-6086; 1524*
*F:201-262-0938*
*gfalotico@emersonnj.org*
*www.emersonnj.org*

-------- Original message --------
From: Rich Sheola <rsheola@emersonnj.org>
Date: 3/11/19 13:24 (GMT-05:00)
To: Gerald Falotico <gfalotico@emersonnj.org>, John McCann <johnjmccann@optonline.net>
Subject: RE: Block 419

Hi Gerry

Not that I am aware of but I believe John is taking point.

Rich

*Richard J. Sheola*

Interim Borough Administrator

**From:** Gerald Falotico <gfalotico@emersonnj.org>
**Sent:** Monday, March 11, 2019 1:16 PM
**To:** John McCann <johnjmccann@optonline.net>
**Cc:** Rich Sheola <rsheola@emersonnj.org>
**Subject:** Re: Block 419

Good afternoon,

Just checking to see if the Borough has a meeting set up with the redeveloper for block 419 this week?

Thanks,

Gerry

*Gerald Falotico, Councilman*

*Borough of Emerson*

*P:201-262-6086; 1524*
*F:201-262-0938*
*gfalotico@emersonnj.org*
*www.emersonnj.org*

-------- Original message --------

From: John McCann <johnjmccann@optonline.net>

Date: 3/5/19 09:42 (GMT-05:00)

To: Gerald Falotico <gfalotico@emersonnj.org>

Cc: Rich Sheola <rsheola@emersonnj.org>

Subject: Re: Block 419

Not getting a run around. I told them I will get in touch with them on Thursday to set up a meeting

JM

On Mar 5, 2019, at 7:18 AM, Gerald Falotico <gfalotico@emersonnj.org> wrote:

> Rich/John,

> Can you let the governing body know where we stand with the redevelopment of block 419?

█████████████████████████████████████████████████

> Hopefully, we can prevent legal action with this matter. Thanks

> Sincerely,

> Gerry

> *Gerald Falotico, Councilman*

> *Borough of Emerson*

> *P:201-262-6086; 1524*
> *F:201-262-0938*
> *gfalotico@emersonnj.org*
> *www.emersonnj.org*

3

Exhibit 46

LAW OFFICES

## GIBLIN & GANNAIO

BRIAN T. GIBLIN**
MICHAEL A. GANNAIO*

BRIAN T. GIBLIN, JR.*

OF COUNSEL
LOUIS M. FLORA

* MEMBER N.J. & N.Y. BAR
** MEMBER N.J. & FLA. BAR
* MEMBER N.J. & WI BAR

2 FOREST AVENUE
SUITE 200
ORADELL, N.J. 07649
PHONE: (201) 262-9500
FAX: (201) 262-8107
INFO@GIBLINANDGANNAIO.COM

May 8, 2019

### Via E-Courts and Regular Mail

Hon. Gregg A. Padovano, J.S.C.
Superior Court of New Jersey
Bergen County Justice Center
10 Main Street
Hackensack, NJ 07601

> *RE:* *In the Matter of the Application of*
> *Emerson, Bergen County, New Jersey*
> *For a Declaratory Judgment*
> *Docket No.: BER-L-6300-15*

Dear Judge Padovano:

As Your Honor may be aware, this firm substituted in as counsel for the Petitioner, the Borough of Emerson ("Emerson"), in February of this year.

Kindly allow this letter to serve as a status update to the Borough's actions to comply with Your Honor's Conditional Final Judgment of Compliance and Repose dated January 25, 2019, as well as a request for a 120-day extension of the original date of compliance with all conditions set forth therein of May 25, 2019.

Pursuant to Your Honor's Order, numerous items and information are to be provided to the Special Master, Ms. Mary Beth Lonergan. I have been in communication with Ms. Lonergan and am pleased to report the Borough has begun to diligently accumulate the items and information needed for compliance.

The Borough respectfully requests a 120-day extension, in short, because due to recent changes in Borough professionals, including the Borough Planner, Borough Administrator, Borough Attorney, and Borough Engineer, there has been some delay in locating and obtaining certain documents and information from prior individuals representing the Borough throughout its Petition.

In addition, a key element of the Borough's compliance with its low and moderate income housing obligation pursuant to Your Honor's Order involves the "Block 419 Redevelopment." This Property is to be developed and provide the Borough with twenty-nine 29 units of affordable housing. The Developer of the project has not yet finished acquiring all of the lots required, although it appears this will be completed in the next sixty (60) to ninety days (90). It is not until the Developer has acquired these lots that the Borough will be able to satisfy all of the items contained within Your Honors January 25, 2019 Order.

The Borough believes that a 120-day extension to September 25, 2019, will allow for all the conditions to be satisfied and bring the Borough into compliance. This request is being made with the consent of Ms. Lonergan.

Your consideration of this request is greatly appreciated.

Very truly yours,

Brian T. Giblin, Sr.

BTG/mag
cc:     Mary Beth Lonergan, Special Master
        Richard Sheola, Borough Administrator
        John McCann, Esq.
        Honorable Mayor and Council

Exhibit 47

**Jane Dietsche**

| | |
|---|---|
| **From:** | Jane Dietsche <clerk@emersonnj.org> |
| **Sent:** | Monday, June 3, 2019 4:25 PM |
| **To:** | Danielle DiPaola (mayor@emersonnj.org); Gerald Falotico; James Bayley; Brian Gordon; Ken Hoffman; Chris Knoller; Jill McGuire |
| **Cc:** | Rich Sheola; Coleen Goddel; John McCann |
| **Subject:** | FW: Cork and Keg |

Dear Governing Body,

Please see email below for your information.

Best regards,

Jane

**From:** John McCann <johnjmccann@optonline.net>
**Sent:** Monday, June 3, 2019 4:15 PM
**To:** Jane Dietsche <clerk@emersonnj.org>
**Subject:** Fwd: Cork and Keg

Please circulate.

JM

Begin forwarded message:

> **From:** "Andrade, Carmen" <CAndrade@pbnlaw.com>
> **Date:** June 3, 2019 at 3:30:16 PM EDT
> **To:** "'johnjmccann@optonline.net'" <johnjmccann@optonline.net>
> **Cc:** "Andrade, Carmen" <CAndrade@pbnlaw.com>, "Paparo, Joseph A." <JAPaparo@pbnlaw.com>, Jack Klugmann <jack@accuratebuildersnj.com>
> **Subject: Cork and Keg**

John,
Reaching out to update you on where we are with the Cork and Keg.
Following our second meeting, we received a number of invoices from the cork and keg to substantiate their moving expenses. The invoices totaled about $190,000.
Of those, we believe that $20,000 is not recoverable.
Our client offered the cork and keg a good faith offer in excess of $100,000 to settle the matter privately and avoid involving the municipality in an leasehold condemnation.

Unfortunately, last Thursday, their counsel, Sean McGowan, rejected the offer on behalf of the cork and keg. No counter offer of settlement was proposed. Our client's offer required them to move out by July 31, 2019.

It seems that we are now at a standstill.

Our client feels strongly that a private settlement requires sacrifice on both sides. That is the very essence of a settlement. Our client feels that it is unreasonable for the cork and keg to expect to get 100 cents on the dollar by way of a private settlement. Cork and keg needs to compromise and they seem unwilling to do so. Accordingly, we ask that you please notify whomever you need to at the Borough that we will in fact require the filing of a leasehold condemnation action against the Cork and Keg.

We should set up a call in the next week or so to discuss next steps. Our client can't afford to delay this project any longer. Our client negotiated in good faith with the Cork and Keg and now feels that he has been mislead.

Please provide your availability for a call in the next week to discuss the filing of the action.

Thanks for your time and attention to this matter.

**Carmen Andrade, Esq.**
**PORZIO, BROMBERG & NEWMAN, P.C.**
100 Southgate Parkway, P.O. Box 1997 | Morristown, NJ 07962-1997

P: 973.889.4128 | F: 973.538.5146 | vCard | CV
candrade@pbnlaw.com | www.pbnlaw.com

This electronic communication, including any authorized attachments, contains information from the law firm of Porzio, Bromberg & Newman, P.C., that may be legally privileged, confidential, and exempt from disclosure under applicable law. This communication also may include content that was not originally generated by the firm. If you are not the intended recipient, any use or dissemination of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately and delete it from all computers on which it may be stored. In addition, if you are not currently a client of the firm, this communication is not to be construed as establishing an attorney- client relationship.

Exhibit 48



STANLEY T. OMLAND, PE, PP, LEED AP
ERIC L. KELLER, PE, PP, LEED AP
WILLIAM H. HAMILTON, PP, AICP, LLA, LEED AP
GEOFFREY R. LANZA, PE, PP, LEED AP, CFM
SEAN A. DELANY, PE, PP
JAMES GIURINTANO, PE, PP, CME
MARTIN F. TIRELLA, PLS
THEODORE D. CASSERA, PE, PP
KEVIN P. BOLLINGER, PLS
WAYNE A. CORSEY, PE, PP
ANTHONY J. DILODOVICO, MS
DAVID B. DIXON, PLS, PP
ANTHONY FACCHINO, PE, PP, PLS
R. MICHAEL MCKENNA, PE, PP
JARYD MORAN, LLA
MARC L. OLMEDA, PLS
MICHAEL J. ROTH, PE
JAMES M. WARD, PE
PAUL J. WINTERS, PE, CME
JAMES R. WOODS, PE

June 19, 2019

***VIA Courier***

Ms. Marie Shust
Land Use Board Secretary
Emerson Borough
146 Linwood Ave.
Emerson, NJ 07630
Ph: 201-262-6086

                    **RE:   Emerson Station**
                    **Site Plan Application**
                    Block 419, Lots 1-4,6.01,6.02, & 7-10
                    Borough of Emerson
                    Bergen County, NJ
                    Project# 080642-C2-001

Dear Ms. Shust:

Attached please find the following revised plans and additional information in response outstanding items contained in the Approval Resolution for the above referenced project.

- 4 sets of the revised Preliminary & Final Site Plans (24" x 36"), Sheets. 1 - 17, last revised 6/19/19.
- 4 copies of an exhibit titled "Truck Turning Exhibits" (24" x36"), Sheets 1-2, dated 3/29/19.
- 4 copies of the Traffic and Parking Assessment Report dated 3/22/19.
- 4 copies of the Soil Movement Plan (24" x 36"), dated 3/29/19.
- 4 copies of drainage calculations

The following are our itemized responses to required items in the Approval Resolution:

Below are the itemized responses to the Stipulations using the same numbering format as the Resolution (Item 12):

   A. The Applicant will comply with all landscaping comments when received.
   B. The Applicant will dedicate 55 surface parking spaces for exclusive use by New Jersey Transit train station users during the specified hours.  Signage has been added to the Site Plan.

Ms. Marie Shust
**Emerson Station**
BCG #. 080642-C2-001
June 19, 2019
Page 2 of 7

   C. A note has been added to Sheet 2 of the plans noting such.

   D. A truck turning movement exhibit is included with this submission for review and approval of the Board Engineer and/or Board Planner.

   E. Drainage Calculations are included with this submission for review and approval of the Board Engineer.

   F. The Applicant will provide the off-tract improvements as required by the Application.

   G. A note has been added to Sheet 2 of the plans noting such.

   H. A note has been added to Sheet 2 of the plans noting such.

   I. The applicant will assist Borough efforts to create pedestrian connections to and from the Property and the Borough's New Jersey Transit train station.

   J. Based on previous discussions with Borough Staff, a note has been added to Sheet 2 of the plans noting that all standing snow of 4-6 inches or more, from one or multiple snow events, shall be removed from the Property by the Applicant at the Applicant's sole cost and expense.

   K. The Applicant will commit to extending the streetscape across Block 419, Lot 5, subject to the Borough obtaining permission from the owner of said lot.

   L. The Architect has provided revised plans (Sheets 1-3) to scale with dimensions which are, to the best of their knowledge, in compliance with all Borough code requirements including the Redevelopment Plan (See Addendum A).  The Architect has also provided elevations (Sheets 4-6) on all sides of the proposed development.

   M. Noted.

   N. Noted

   O. The lighting plan has been revised as requested.

   P. Signage has been added to the Site Plan where required.

Below are the itemized responses to the Specific Conditions using the numbering format of the Resolution:

   1. The Applicant will abide by all of the Stipulations set forth.

   2. The attached plans have been revised in accordance with the conditions of this approval.

   3. Noted

   4. Responses to review letters from the previous Borough Planner, Brigette Bogart, and previous Board Engineer, Gary Ascolese, are addressed in this letter.  Plans have been submitted to the Bergen County Planning Board and the Bergen County Soil Conservation District for review and approval.  Plans will be submitted to the Borough Fire Department, Police Department, and Department of Public Works for approval prior to construction.



Ms. Marie Shust
**Emerson Station**
BCG #. 080642-C2-001
June 19, 2019
Page 3 of 7

5. Noted

6. Any changes required by other governmental bodies or agencies will be brought to the Board for approval.

7. Noted.

8. Noted.

9. Noted.

10. Responses to both the Boswell Engineering review letter dated December 6, 2018 and the Brigette Bogart Planning & Design Professionals LLC review letter dated December 10, 2018 are included in this letter.

11. The applicant will provide the following final site plan checklist items prior to final approval:

   A. Original tracings with signature lines.

   B. Proof of execution of the developer's agreement.

   C. Proof of posting of performance and/or maintenance bonds.

   D. Copies of recorded easements, rights-of-way or conveyances of open space or public easements.

   E. Deposit of escrow funds for engineering inspections or any other items required by the Borough.

   F. An application has been submitted to the Bergen County Planning Board for approval.

   G. An application will be submitted to the Bergen County Soil Erosion and Sediment Control District for approval.

12. Previously addressed

The following are our itemized responses to the review memorandum from Boswell Engineering (Borough Engineer) dated December 6, 2018:

1. No response required.
2. No response required.
3. The retail space has been reduced to 14,700 square feet. All other portions of the project remain the same.
4. No response required.
5. The parking tabulation has been updated per the reduction in retail space. The remainder of the zoning table is unchanged.
6. The lots will be consolidated into a single lot with one owner. Addressing will be coordinated with the United States Post Office.
7. This information is now shown on Sheet 3 of the plan set.
8. The Zoning for Block 419, Lot 5 has been added to Sheet 3 of the plan set.



Ms. Marie Shust
**Emerson Station**
BCG #. 080642-C2-001
June 19, 2019
Page 4 of 7

9. This information has been added to Sheet 3 of the plan set.

10. This information has been added to Sheet 9 of the plan set.

11. The curbline datum at Kinderkamack and Linwood is shown on Elevation Sheets 4-6.  The height is listed from this datum to the roof deck of the main portion of the building and to the highest parapet

12. The existing monitoring wells are now shown on the site plan.

13. The 42" storm system and other improvements in this area were designed by the Borough and the County to alleviate flooding concerns in this area.  Finish Floor elevations adjacent to this area have been set at 6" above curb line.

14. See Drainage Calculations enclosed

15. The corner radius at the southwest corner of Kinderkamack Road and Lincoln Boulevard is shown as being widened to a 30-foot radius on the site plan at the request of Bergen County.

16. Noted.

17. A parking control arm is located at the base of the ramp leading from the first to second levels to control access to all upper levels (2 thru 5) for residential use only

18. The applicant will assist Borough efforts to create pedestrian connections to and from the Property and the Borough's New Jersey Transit train station.

19. Plans will be submitted to the Fire Department and the plans will be revised per their requirements and recommendations.

20. Noted

21. Residential trash and recycling will be managed within the building.  Trash rooms will be located on each floor with a chute discharging into a compactor room on the first floor adjacent to the garage.  Porters will manage the trash and compactor rooms, and wheel trash containers to the service area for trash pickup.   A screened location for two 8-yard dumpsters for retail use are also located adjacent to this service area.  A scheduled private hauler will be retained by the Owner to pick up trash and recycling during non-peak hours of operation and at a schedule to accommodate the retail and residential so that trash does not accumulate on site for any great length of time.

22. Please see Elevation Sheets 4 thru 6.  In addition, Addendum A details compliance with the Chapter 290 Article XIII, CBD 10 – Central Business District Zones.

23. Ordinance 1535-16, 290-70A(3)(b) states that, "An additional five feet in height for ornamentation such as parapets and cornices is permitted.  This additional height is only permitted along a maximum of 66% of the facade to encourage a varying roofline."   Further, 290-70(A)(3)(c) states that, "for each portion of a building that provides cornices and similar appurtenance for ornamental purposes, such elements may not be more than 25 feet in length each."



Ms. Marie Shust
**Emerson Station**
BCG #. 080642-C2-001
June 19, 2019
Page 5 of 7

24. The Applicant has added bollards as shown on Sheet 1 to provide pedestrian protection
25. Noted, please see Sheet 1 of Architectural Plans
26. Noted, please see Sheet 1
27. Noted
28. No response necessary
29. A total of 55 surface parking spaces will be reserved for commuter parking from 7:00 a.m. to 6:00 p.m. Monday through Friday.  Signage has been added to the plans.
30. Testimony was provided.  Traffic report enclosed
31. Testimony was provided.  Traffic report enclosed
32. Testimony was provided.  Traffic report enclosed
33. Testimony was provided.  Traffic report enclosed. The drive aisle from Lincoln provides direct access to the surface lot without going through a gate.  The clearance at the Lincoln Boulevard entry is approximately 12'-10" in height
34. The parking space striping detail on Sheet 13 of the plan set has been revised to show hairpin striping.
35. A note has been added to Sheet 2 of the plan set.
36. The site plan shows a 42" RCP pipe to be installed through the proposed parking area which will provide a connection between the drainage systems in Lincoln Boulevard and Linwood Avenue.  This is being shown and will be installed at the request/direction of the Borough Engineer.  The proposed catch basins will connect to this proposed 42" RCP pipe.  The site is graded so that runoff will be collected by the proposed catch basins.
37. A note has been added to Sheet 2 of the plan set.
38. The site lighting is now shown on Sheet 10 of the plan set.
39. Testimony was provided regarding site lighting and conformance with Borough standards.
40. A note has been added to Sheet 2 of the plan set stating that the lighting shall be evaluated after 6 months.
41. A Soil Movement Plan and calculations are included with this submittal.  A Soil Moving Permit application will be applied for.
42. Noted.
43. Landscape review comments have not yet been received.
44. Noted.
45. Noted.
46. Additional detail and a standard cross section have been added to the plans. Testimony was provided stating that this requirement has been satisfied.
47. Construction Plans will be submitted for review and approval.



Ms. Marie Shust
**Emerson Station**
BCG #. 080642-C2-001
June 19, 2019
Page 6 of 7

48. An ADA compliance Construction Certification will be submitted once construction is complete.
49. All necessary approvals will be obtained.

The following are our itemized responses to the review memorandum from Brigette Bogart Planning & Design Professionals, LLC (Borough Planner) dated December 10, 2018:

Section C

1. The total proposed parking is 308 spaces as shown on Sheet 1 of the Architectural plans.

   | | |
   |---|---|
   | RESIDENTAIL: | |
   | 120 One bedroom @ 1.8 | 216 |
   | 21 Two bedroom @ 2.0 | 42 |
   | 6 Three bedroom @ 2.5* | 15 |
   | RETAIL: | |
   | 14,700sf @ 1/250 | 59 |
   | TOTAL | 332 |
   | **25% REDUCTION** | **249** |
   | **TOTAL PROPOSED** | **308** |

   *2.5 assumed – no parking requirement is listed

   Of the 120 surface spaces proposed – 55 are to be reserved for transit commuter usage. All of the 188 garage spaces on levels 2 thru 5 are to be reserved for residential use only.

2. Please see Sheet 1. All units will be family rental units. Income levels are to be determined by UHAC requirements. 15% of the total unit count are to be COAH units for a total of 22. Of this, 20% (4) are 1 bedroom/studios, 60% (13) are 2 bedrooms, and 20% (5) are three-bedroom units.

3. As stated, two ADA accessible spaces will be located within the surface parking lot with another 10 ADA accessible spaces located within the parking structure. The two ADA accessible spaces in the surface parking lot are Van Accessible.

4. Please see Sheet 2. The 5'-0" minimum setback is noted. This area will be outdoor terrace space for the units on the fourth floor.

5. Benches have been added to the plans in the breezeway area.

6. Please see Sheets 4 thru 6 and Addendum A which details compliance with 290-70 of the Zoning Code. The breezeway will be used for access through the site to the parking and will provide retail shopping.

7. Irrigation will be provided for all planting beds.



Ms. Marie Shust
**Emerson Station**
BCG #. 080642-C2-001
June 19, 2019
Page 7 of 7

8. In testimony on 12.10.18, the Architect provided a material and color board for the project. A copy has been provided with this submittal. Please also see Sheets 4 thru 6 and Addendum A.

9. Noted. The Applicant will provide signage details before the start of construction

10. A truck turning movement exhibit is included with this submission for review and approval of the Board Engineer and/or Board Planner.

11. The lighting plan has been revised to include lighting levels throughout the site.

12. A screened location for two 8-yard dumpsters for retail use are located adjacent to the service area/trash room for the residential usage. The screen will be opaque and constructed out of maintenance free materials at a height of 8'-0".

We believe that the revised plans and additional information address all conditions of the Compliance Report, approval resolution and Borough professional's review comments and the site plans should be ready for signatures. Should you have any questions, please call our office.

Very truly yours,

BOWMAN CONSULTING GROUP, LLC

William H. Hamilton, PP, AICP, LLA, LEED AP
Principal
*whamilton@bowmanconsulting.com*

Enclosures

Cc:     Joseph A. Paparo, Esq.
         Steve Aisenstark



Exhibit 49

**Jane Dietsche**

| | |
|---|---|
| **From:** | Jane Dietsche |
| **Sent:** | Tuesday, June 25, 2019 9:31 AM |
| **To:** | 'David R. Atkinson' |
| **Subject:** | RE: Emerson Station (Block 419) Revised Site Plans |

Hi Dave,

Per our conversation, please see link to 'Redevelopment' page on our website:
https://www.emersonnj.org/index.asp?Type=B_BASIC&SEC={FEAF0541-AF53-48FD-857E-1962E73E71E3}

Jane

**From:** David R. Atkinson <datkinson@negliaengineering.com>
**Sent:** Monday, June 24, 2019 4:45 PM
**To:** Jane Dietsche <clerk@emersonnj.org>
**Subject:** RE: Emerson Station (Block 419) Revised Site Plans

Jane,

I was wondering if you could provide me with a copy of the redevelopment plan for the property or direct me to where I could find said document.

Thanks,
David R. Atkinson, P.E., P.P., C.M.E.
NEGLIA ENGINEERING ASSOCIATES
1119 Raritan Road, Suite 2
Clark, New Jersey 07066
Office: (201) 939-8805 Ext. 173
Mobile: (201) 953-4409
Fax: (732) 943-7249
Email: datkinson@negliaengineering.com

Engineering ● Traffic ● Surveying ● GIS ● Construction Management ● Planning ● Landscape Architecture

**From:** Jane Dietsche <clerk@emersonnj.org>
**Sent:** Monday, June 24, 2019 12:46 PM
**To:** Mike Sartori <constructionofficial@emersonnj.org>; David R. Atkinson <datkinson@negliaengineering.com>; Christopher Statile, P.E. <cpstatile@aol.com>
**Cc:** Danielle DiPaola (mayor@emersonnj.org) <mayor@emersonnj.org>; Rich Sheola <rsheola@emersonnj.org>; Coleen Goddel <deputyclerk@emersonnj.org>
**Subject:** Emerson Station (Block 419) Revised Site Plans

Good afternoon Mike, Dave, Caroline,

Kindly note that the revised site plans for Emerson Station, Block 419 were delivered this morning.

Mike, your copy is in your office. Neglia Engineering will be picking up their copy this afternoon. Caroline, what is the easiest way to get a copy to you?

1

Best regards,

Jane

Exhibit 50

**Jane Dietsche**

| | |
|---|---|
| **From:** | McLeod, Allison <Allison.McLeod@dep.nj.gov> on behalf of Pflugh, Kerry <Kerry.Pflugh@dep.nj.gov> |
| **Sent:** | Tuesday, June 25, 2019 11:25 AM |
| **To:** | mayor@emersonnj.org |
| **Cc:** | Jane Dietsche; Rich Sheola; Snyder, Maude |
| **Subject:** | RE: DEP Visit Follow Up |
| **Attachments:** | 20190621110024501.pdf; S3682.PDF; 3682_S1 statement.PDF |

Good morning Mayor DiPaola,

I hope this finds you well. After discussing with our programs, I have some updated information about the issues we discussed in our meeting last week.

Attached to this email is the latest reprint of the Site Remediation Reform Act. (Please note there might be a more current version that had not been posted online at the time I spoke with our Legislative Liaison). The statement from the last committee hearing is also attached for your reference.

I also spoke with my colleagues at Green Acres. Typically, Green Acres encourages trail development; however, it is possible parkland may have limitations against certain kinds of trails. The acquisition for Emerson Woods Preserve was funded with an Environmental Incentive Grant, which requires a more careful project review for environmental impacts. For the program to make a determination about the trail, more information would be needed. Copied here is Maude Snyder of the Green Acres program. Maude will be able to help you determine if a bike path is permittable in the Emerson Woods Preserve.

Also attached is a No Further Action letter issued in July 1996 for "Bills Tire and Auto", 176 Kinderkamack Road. Bills Tire and Auto is an unrestricted cleanup, with no cap. Therefore there couldn't be any disturbance of a cap should construction occur on the adjacent property. The Site Remediation program also mentioned a property at 200 Kinderkamack Road, Emerson Auto Repair, which is an active case. If you would like information about that site as well, please let me know.

If you would like to discuss these or any other issues further, please do not hesitate to contact me.

Regards,

Kerry Kirk Pflugh
Director
Office of Local Government Assistance
New Jersey Department of Environmental Protection
401 E. State Street
P.O. Box 402
Trenton, NJ 08625-0402
Office: 609-633-7700
Cell: 609-575-3806
Email: kerry.pflugh@dep.nj.gov

http://www.nj.gov/dep/lga/

NOTE: This E-mail is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521. This E-Mail and its contents may be Privileged & Confidential due to the Attorney -Client Privilege, Attorney Work Product, Deliberative Process or under the New Jersey Open Public Records Act.   If you are not the intended recipient of this e-mail, please notify the sender, delete it and do not read, act upon, print, disclose, copy, retain or redistribute it.

**From:** McLeod, Allison **On Behalf Of** Pflugh, Kerry
**Sent:** Thursday, June 20, 2019 1:00 PM
**To:** mayor@emersonnj.org
**Cc:** clerk@emersonnj.org; administrator@emersonnj.org
**Subject:** DEP Visit Follow Up

Good afternoon Mayor DiPaola,

It was lovely meeting you on Wednesday. I very much enjoyed our discussion about our experiences in government.

I have reached out to our Site Remediation Program and requested the NFA and additional information for the site we discussed. We also touched base with Green Acres about the Emerson Woods Preserve.

When I have more information and a copy of the proposed amendments to the Site Remediation Reform Act, I will be in touch. In the meantime, if you have any additional questions please don't hesitate to reach out to my office. I look forward to working with you in the future.

Regards,

Kerry Kirk Pflugh
Director
Office of Local Government Assistance
New Jersey Department of Environmental Protection
401 E. State Street
P.O. Box 402
Trenton, NJ 08625-0402
Office: 609-633-7700
Cell: 609-575-3806
Email: kerry.pflugh@dep.nj.gov

http://www.nj.gov/dep/lga/

NOTE: This E-mail is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521. This E-Mail and its contents may be Privileged & Confidential due to the Attorney -Client Privilege, Attorney Work Product, Deliberative Process or under the New Jersey Open Public Records Act.   If you are not the intended recipient of this e-mail, please notify the sender, delete it and do not read, act upon, print, disclose, copy, retain or redistribute it.



## State of New Jersey

Christine Todd Whitman
*Governor*

Department of Environmental Protection
Bureau of Underground Storage Tanks
CN-433
401 East State Street
Trenton, NJ 08625

Robert C. Shinn, Jr.
*Commissioner*

Mr. William Ramagli
Ramagli Brothers, Inc.
95 Ackerman Avenue
Emerson, New Jersey 07630

JUL 3 1 1996

Re:     Ramagli Brothers, Inc. (A.K.A. Bill's Tire and Auto)
        176 Kinderkamack Road
        Emerson, Bergen, County
        Case Number 90-05-30-1540     UST #0036984

Dear Mr. Ramagli:

On June 3, 1996, and June 21, 1996, the New Jersey Department of Environmental Protection (Department) received reports from Ramagli Brothers, Inc. (Ramagli's). This report documents the remedial investigation and/or remedial action undertaken in response to the discharge from Ramagli's underground storage tank system.

Based on a review of the information submitted, the Department finds that Ramagli has complied with the existing requirements regarding the remedial investigation and remedial action for the underground storage tank systems. Therefore, no further action will be required at this time.

Please be advised that this approval only addresses the listed discharges and tank systems. This approval makes no representation regarding the environmental conditions of any other areas for the referenced property.

Because levels of contaminants remain above the Ground Water Quality Standards (GWQS), N.J.A.C. 7:9-6 et seq., a Classification Exception Area (CEA) and Well Restriction Area (WRA) are required at this time. When contamination remains on site above an applicable remediation standard, institutional controls are required pursuant to P.L. 1993, c.139. The Department may establish a CEA and WRA for the impacted area to accomplish the institutional control when no receptors are currently at risk. Pursuant to 7:9-6.6, a CEA may be established when the Department determines that the GWQS will not be met in a localized area due to pollution within a contaminated site. Due to this pollution, designated uses, for example, use of ground water as a potable water supply, may not be possible without the proper precautions. The Department is obligated to establish a WRA in conjunction with the CEA where contaminant levels exceed Primary Drinking Water Standards in an aquifer classification which includes potable use. A CEA and WRA are appropriate for this site since the data indicate that all sources of contamination (e.g., an UST system and any contaminated soil)

have been addressed, no receptors are at risk, and ground water contamination remains above standards, but at a level where the residual contaminant plume will not migrate beyond the designated boundary identified below.

The regulatory program overseeing the implementation of the CEA for this site is the Underground Storage of Hazardous Substances Act, N.J.S.A. 58:10A, and its implementing regulation, N.J.A.C. 7:14B-1 - 13 and 15.  This CEA and WRA are based, in part, on the aquifer and contaminant data and evaluations provided in the June 3, 1996, report.  The CEA and WRA are the area identified on the enclosed map.  Any special conditions or restrictions for water use within the WRA will be administered by the Department's Bureau of Water Allocation.

The CEA and WRA apply to benzene only.  All other constituent standards apply within the CEA.  All constituent standards (N.J.A.C. 7:9-6) apply at the designated boundary.  All designated ground water uses within this area are suspended for the duration of the CEA.  Pursuant to N.J.A.C. 7:9-6.4, "designated use" means a present or potential use of ground water within a ground water classification area as determined by 7:9-6.5.  Pursuant to 7:9-6.5, this area is presently designated as Class II-A.  The primary designated use for Class II-A ground water is potable water; secondary uses include agricultural and industrial water.

The duration of the CEA and WRA are set at 12 years years.  This is equal to the maximum predicted duration for contaminant degradation in the June 3, 1996, report.  The GWQS for benzene is 1 ppb. Should concentrations of benzene reach it's respective criterion prior to the CEA and WRA expiration date as demonstrated through ground water sampling, it may be requested that the CEA and WRA be terminated.  However, the expiration of the 12 year period prior to contaminant concentrations reaching the GWQS would not constitute approval to utilize the ground water for its designated purposes.  Compliance may be determined by Ramagli at the termination of the CEA and WRA or sooner, but can only be terminated by demonstrating that the GWQS have been met for the referenced constituent(s) through ground water sampling from monitoring wells MW-1 and MW-4.  Please note that Ramagli has the option of maintaining these wells for sampling purposes or sealing these wells and utilizing an acceptable method of ground water sampling to demonstrate compliance with the GWQS.  The Department's evaluation of the ground water sampling results, to determine compliance with the GWQS, would be through a Memorandum of Agreement (enclosed) executed between Ramagli and the Department.

In addition, Ramagli is required to properly seal all abandoned wells. Therefore, all monitoring wells installed as part of the remedial investigation and/or remedial action at Ramagli's facility that will no longer be used for ground water monitoring shall be sealed properly in accordance with the requirements of N.J.A.C. 7:9-9.1 et seq. by a licensed well driller certified to seal wells. The well abandonment forms shall be completed and submitted to the Bureau of Water Allocation. Please call (609) 984-6831 for forms and information.

Thank you for your cooperation in this matter.

Sincerely,

Wayne C. Howitz, Assistant Director
Industrial Site Evaluation Element

enclosure:
    CEA Map

cc:    Paul Bauer, Case Manager
       Jayne Warne, Matrix Environmental Management
       Bergen County Department of Health Services
       Mayor/Clerk, City of Emerson
       Bergen County Planning Board
       NJDEP-Bureau of Water Allocation
       NJDEP-Office of Environmental Planning
       NJDEP-Environmental Claims Administration

Exhibit 51

**Jane Dietsche**

| | |
|---|---|
| **From:** | Jane Dietsche |
| **Sent:** | Thursday, July 11, 2019 10:59 AM |
| **To:** | Danielle DiPaola (mayor@emersonnj.org) |
| **Cc:** | Richard Sheola (administrator@emersonnj.org) |
| **Subject:** | FW: Questions on Block 419 Plans |

FYI

**From:** Christopher Statile, P.E. <cpstatile@aol.com>
**Sent:** Thursday, July 11, 2019 10:55 AM
**To:** Jane Dietsche <clerk@emersonnj.org>
**Subject:** Re: Questions on Block 419 Plans

You read my mind, that was my follow up question!

These exhibits should be reviewed by the Redevelopment committee, as Rich said, the Borough only has one chance to do this.

Thanks again,
Caroline

**Christopher P. Statile, P.A.**
Professional Engineers & Planners
3 Fir Court Oakland, NJ 07436
201-337-7470 office
201-337-7599 fax


-----Original Message-----
From: Jane Dietsche <clerk@emersonnj.org>
To: Christopher Statile, P.E. <cpstatile@aol.com>
Cc: mayor@emersonnj.org <mayor@emersonnj.org>; Rich Sheola <rsheola@emersonnj.org>; Coleen Goddel <deputyclerk@emersonnj.org>
Sent: Thu, Jul 11, 2019 10:50 am
Subject: RE: Questions on Block 419 Plans

Hi Caroline,

Just an FYI – the materials displayed on the board (size is 18"x18") are identical to the page in your packet titled 'Emerson Station Proposed Colors & Materials Board'. The only differences are that the precast is a 3-D piece of casting material about 3"x3" in size and the aluminum sample is a flat piece of metal.

Best regards,

Jane

**From:** Jane Dietsche
**Sent:** Wednesday, July 10, 2019 4:25 PM
**To:** Christopher Statile, P.E. <cpstatile@aol.com>
**Cc:** mayor@emersonnj.org; Rich Sheola <rsheola@emersonnj.org>; Coleen Goddel <deputyclerk@emersonnj.org>
**Subject:** RE: Questions on Block 419 Plans

1

Hi Caroline,

I don't have a quick answer on #1 or #2 but for #3 there is a board with sample materials that I have brought to my office. You can stop in – I am usually here from about 8:00 to 4:30. Let me know if that works for you.

To my knowledge the Redevelopment Subcommittee has not met yet, but they may be involved in reviewing the samples. I would defer to the Mayor and Rich on that one.

Best regards,

Jane

**From:** Christopher Statile, P.E. <cpstatile@aol.com>
**Sent:** Wednesday, July 10, 2019 3:59 PM
**To:** Jane Dietsche <clerk@emersonnj.org>; Coleen Goddel <deputyclerk@emersonnj.org>; Rich Sheola <rsheola@emersonnj.org>
**Cc:** mayor@emersonnj.org
**Subject:** Questions on Block 419 Plans

Hi Jane, Mayor, Rich --

We have a few outstanding questions on the submitted materials  and approving resolution and are looking for clarification.

1.  Page 12, Item J of the resolution - "Applicant will reasonably assist Borough efforts to create pedestrian connections to and from the Property and the Borough's train station." - Question:  What efforts have the Borough made, and has the applicant assisted with them?

2.  Page 12, Item K of the resolution - "All standing snow of 2 inches or more, from one or multiple snow events, shall be removed from the property by the applicant at the applicant's sole cost and expense."   Per the Bowman cover letter, the snow amount has been revised to 4-6 inches based on discussions with Borough Staff.  How can we confirm the Borough staff involved and whether the 4-6 inch amount was agreed to by those staff members?

3.  Page 11, Item B of the resolution - References sample materials that were submitted during the hearing.  Who has those//how can I see them?   Did the Borough wish to utilize those sample materials or make changes?

Thank you,

Caroline


**Christopher P. Statile, P.A.**
Professional Engineers & Planners
3 Fir Court Oakland, NJ 07436
201-337-7470 office
201-337-7599 fax