Page 1

1                UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
2                CIVIL ACTION NO. 20-cv-4728-MCA-MAH
3
4    EMERSON REDEVELOPERS URBAN        )
     RENEWAL, LLC,                     )
5                                      )   DEPOSITION OF:
             Plaintiff,                )
6                                      ) DANIELLE DI PAOLA
         v.                            )
7                                      )
     THE BOROUGH OF EMERSON,           )
8    NEW JERSEY, AND DANIELLE          )
     DIPAOLA,                          )
9                                      )
             Defendants.               )
10   _____
11
12           TRANSCRIPT of the stenographic notes of
13   the proceedings in the above-entitled matter as taken
14   by and before MARY ANN ADAMS, a Certified Court
15   Reporter and Notary Public of the State of New Jersey,
16   held at the office of SILLS, CUMMIS & GROSS, P.C.,
17   The Legal Center, One Riverfront Plaza, Newark, New
18   Jersey, on Wednesday, April 26, 2023, commencing at
19   10:12 a.m.
20
21
22
23
24
25

```
                                                    Page 2

 1   A P P E A R A N C E S :
 2        SILLS, CUMMIS & GROSS, P.C.
          BY:  JOSEPH B. FIORENZO, ESQ.
 3             STEPHEN M. KLEIN, ESQ.
          The Legal Center
 4        One Riverfront Plaza
          Newark, New Jersey  07102
 5        (973) 643-7000
          jfiorenzo@sillscummis.com
 6        sklein@sillscummis.com
          Attorneys for Plaintiff
 7
 8        BOTTA ANGELI, LLC
          BY:  CHRISTOPHER C. BOTTA, ESQ.
 9        50 South Franklin Turnpike
          Ramsey, New Jersey  07446
10        (201) 818-6400
          ccb@bottalawcom
11        Attorneys for Defendants
12
          THE LAW OFFICES OF RICHARD MALAGIERE, P.C.
13        BY:  LEONARD E. SEAMAN, ESQ.
          250 Moonachie Road, Suite 300A
14        Moonachie, New Jersey  07074
          (201) 440-0675
15        les@malagierelaw.com
          Attorneys for Mayor Danielle DiPaola
16
17   ALSO PRESENT:
18        JACK KLUGMANN
19        KEVIN COWAN
20
21
22
23
24
25
```

Page 3

1                           INDEX
2                                                    PAGE
3    WITNESS:  DANIELLE DI PAOLA
4    EXAMINATION BY MR. FIORENZO................    5
5
6
7                          EXHIBITS
8    NO.      DESCRIPTION                          PAGE

9     DD-1    Judge Harris decision                 21
10    DD-2    Redevelopment Plan                    33
11    DD-3    Redevelopment Agreement               39
12    DD-4    Resolution No. 256-16                 40
13    DD-5    Minutes of the Borough of Emerson     41
              Mayor and Council 6/14/2016
14
      DD-6    First Amendment to Redevelopment      48
15            Agreement
16    DD-7    Minutes of the Borough of Emerson     52
              Mayor and Council 12/20/2016
17
      DD-8    Notice of Adoption of Ordinance No.   60
18            1535-16
19    DD-9    Resolution No. 200-17                 69
20    DD-10   Letter from DeCotiis law firm with    87
              attachments
21
      DD-11   11/21/2017 Settlement Agreement       93
22
      DD-12   Minutes of the Borough of Emerson     110
23            Mayor and Council 11/21/2017
24    DD-13   1/25/2019 Conditional Final Judgment  114
              of Compliance and Repose
25

Page 4

EXHIBITS (continued)

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| DD-14 | Order to Settle the Litigation | 114 |
| DD-15 | Housing Element and Third Round Fair Share Plan | 125 |
| DD-16 | Minutes of the Borough of Emerson Mayor and Council 12/4/2018 | 130 |
| DD-17 | Newspaper article published on 11/8/2018 | 141 |
| DD-18 | Newspaper article | 159 |
| DD-19 | Memorandum from Ms. Bogart dated 12/10/2018 | 172 |
| DD-20 | Boswell Engineering report dated 12/6/2018 | 174 |
| DD-21 | Transcript of 12/10/2018 Land Use Board proceedings | 178 |
| DD-22 | Resolution of the Land Use Board of the Borough of Emerson | 191 |
| DD-23 | Newspaper article by John Snyder | 209 |
| DD-24 | Newspaper article by John Snyder | 211 |
| DD-25 | Newspaper article | 241 |
| DD-26 | Letter brief by Giblin & Gannaio | 258 |
| DD-27 | Special meeting minutes of the Land Use Board 12/10/2018 | 268 |
| DD-28 | Minutes of the Borough of Emerson Mayor and Council 12/18/2018 | 288 |
| DD-29 | Notes dated 3/14/2019 | 291 |

(Exhibits retained by counsel.)

1    DANIELLE DI PAOLA, having been duly sworn by the

2    Notary Public, testified as follows:

3    EXAMINATION BY MR. FIORENZO:

4         Q.    Good morning, Ms. DiPaola.  As you know,

5    my name is Joe Fiorenzo, I'm with Sills, Cummis &

6    Gross, and I represent Accurate Builders and Emerson

7    Redevelopers in connection with a lawsuit that is

8    pending in the Federal District Court entitled

9    Emerson Redevelopers Urban Renewal, LLC versus

10   Emerson and you.  You're aware of the pendency of

11   that lawsuit.  Correct?

12        A.    Yes.

13        Q.    I know you've been deposed before 'cause

14   you were deposed in another matter and I gave you

15   instructions at that time.  Do you remember those

16   instructions?

17        A.    Yes.

18        Q.    Would you like me to -- you do.

19        A.    Yes, verbal answers.

20        Q.    Right.  So I'm going to give you an

21   instruction because it's important, 'cause we just

22   had an issue.  Let me fully complete my questions

23   before you speak.  We had a problem with that last

24   time, so I'm going to again reiterate my

25   instruction.  Please allow me to fully complete the

Page 6

1    question, don't anticipate as we do sometimes in

2    normal conversation, and then once I've completed my

3    question, then give me an answer.  Okay?

4           A.    Okay.

5           Q.    Okay.  The reporter will have great

6    difficulty creating a clean record if we don't do

7    that.  Okay?

8           A.    Okay.

9           Q.    Great.  Have you done anything to

10   prepare for this deposition today?

11          A.    I read the transcripts.

12          Q.    Okay.  Read the transcripts.  So what

13   transcript -- did you read the transcript of your

14   deposition --

15          A.    Yes.

16          Q.    -- in the state case?

17          A.    Yes.

18          Q.    Okay.  Other than reading the transcript

19   of your deposition in the state case, what other

20   transcript, if any, did you read?

21          A.    None.

22          Q.    Okay.  Aside from reading the transcript

23   of your deposition, did you do anything else to

24   prepare?

25          A.    Conferred with my lawyers.

Page 7

1      Q.    Okay.  Putting aside any conversations
2   you had with your lawyers, did you review any other
3   documents of this mass of information that has been
4   produced in all these different litigation matters,
5   did you review anything?
6      A.    Not particularly.
7      Q.    I'm not sure what that means, not
8   particularly.  So in preparing, did you review
9   anything at all, any of the many documents that
10  exist in the record?
11     A.    No.
12     Q.    Okay.  Did you speak to anyone in
13  preparation for this deposition other than your
14  lawyers?
15     A.    No.
16     Q.    Okay.  For example, did you speak to
17  your administrator, Mr. Hermansen?
18     A.    No.
19     Q.    Okay.  As I understand it, you became a
20  member of the governing body of the Borough of
21  Emerson sometime in 2010, if memory serves me.  Is
22  that correct?
23     A.    I believe so, yes.
24     Q.    And at that time, you became a
25  councilwoman?

Page 8

1        A.      Yes.

2        Q.      Prior to that time, you had, as I recall

3   it, some role in local Emerson government.  Is that

4   true?

5        A.      Yes.

6        Q.      You were on a board or two if I

7   remember?

8        A.      Yes.

9        Q.      What boards were you on prior to 2010?

10       A.      The Land Use Board and the Environmental

11  Commission.

12       Q.      Okay.  So when did you begin your

13  service on the Land Use Board?

14       A.      I believe three years before that, three

15  and a half years.

16       Q.      So in 2007 or thereabouts?

17       A.      About then.

18       Q.      And the other was the Environmental

19  Board?

20       A.      Correct.

21       Q.      Is the Environmental Board --

22       A.      It's a commission.

23       Q.      Commission.  Is that a commission whose

24  members are appointed by the mayor, the governing

25  body, who appoints to that?

Page 9

1          A.      The mayor.

2          Q.      And how many members were there on the

3    Environmental Commission when you sat on it?

4          A.      I don't recall.

5          Q.      And when were you on the Environmental

6    Commission?

7          A.      I don't recall.

8          Q.      Prior to you being on the governing

9    body.  Correct?

10         A.      Correct.

11         Q.      Was it before or after you were on the

12   Land Use Board?

13         A.      It ran simultaneously.

14         Q.      Okay.  And what was the function of the

15   Environmental Commission?

16         A.      To make decisions as it related to the

17   environment for the betterment of Emerson.

18         Q.      Well, explain to me what that means.

19   Give me an example of the environmental decisions

20   that the local government would make for the

21   betterment of Emerson.  Can you give me an example?

22         A.      We worked with the school and saved

23   plastic caps in order to recycle.  We did cleanups.

24   We did a tour of the Emerson woods.

25         Q.      Okay.  Anything else you can remember?

Page 10

1          A.      I don't recall anything else.

2          Q.      You're familiar that at the state level,

3   there is a Department of Environmental Protection

4   that exists.  Correct?

5          A.      Yes.

6          Q.      So your local commission didn't perform

7   any of the functions of the DEP.  Correct?

8                  MR. SEAMAN:  Objection to form.  You can

9   answer.

10         A.      No.

11         Q.      No, you did not.

12         A.      No.

13         Q.      'Cause I asked if that was correct and

14  you said no.  So it's a double negative.  So I just

15  want the record to be clear.  So they did not

16  perform any of the functions of the State Department

17  of Environmental Protection.  Correct?

18         A.      No.

19         Q.      Meaning yes, they didn't?

20         A.      We did not.

21         Q.      Okay.  Thank you.

22         What do you understand the NJDEP to be?

23         A.      New Jersey Environmental Protection

24  Agency.

25         Q.      What do you understand their function at

Page 11

1    the state level to be?

2         A.    Make sure the environment is okay in

3    New Jersey.

4         Q.    Do you have any knowledge or expertise

5    of the functions that the DEP performs?

6         A.    No.

7         Q.    Do you know whether the DEP has the

8    exclusive jurisdiction to deal with things like

9    environmental contamination in the state?

10        A.    I believe they do.

11        Q.    Okay.  You understand then that the

12   issue of environmental contamination is a state

13   issue that's dealt with by the DEP, not a local

14   issue to be dealt with by Emerson.  Correct?

15             MR. BOTTA:  Objection to the form.  You

16   can answer.

17        Q.    You can answer.

18        A.    I think that's slightly incorrect,

19   because I think the first people on the scene are

20   the local fire department, police, emergency

21   services, OEM, and then the DEP is called in if

22   there's a problem.

23        Q.    Well, okay.  DEP deals with -- I'm

24   asking about environmental contamination.  If

25   there's an environmental contamination issue, that

Page 12

```
 1   is an issue that falls within the jurisdiction of

 2   the DEP to deal with whether a cleanup is required

 3   or not.  Correct?

 4             MR. BOTTA:  Objection, calls for a legal

 5   conclusion.

 6        A.    I guess.  I don't know.

 7        Q.    To your knowledge --

 8        A.    I don't know.

 9        Q.    To your knowledge, as a member of the

10   governing body and as a mayor, did you understand

11   that the DEP had responsibility for dealing with

12   issues concerning whether there was an environmental

13   contamination and what would be done to remediate

14   it, do you understand it was their function to deal

15   with that?

16        A.    I don't know.

17        Q.    No idea.

18        A.    No.

19        Q.    So even when you were the mayor, you had

20   no knowledge of the interrelationship between the

21   DEP and the Borough of Emerson as to environmental

22   contamination, you had no knowledge of that?  Is

23   that a no?  You had no knowledge?

24             MR. BOTTA:  Let her answer.

25             MR. FIORENZO:  Yeah.  She was shaking
```

Page 13

1    her head.

2         A.    I don't -- I don't know.

3         Q.    You don't know.

4         A.    I don't know the functions of the DEP

5    completely.

6         Q.    And you never communicated with the DEP?

7         A.    I don't recall.

8         Q.    Did you ever inquire of the DEP as to

9    the status on any environmental contamination at the

10   site by any of the properties in Emerson?

11             MR. BOTTA:  Objection.  What site?

12        Q.    Any site.  Any property in Emerson.

13        A.    I don't recall.

14        Q.    Did Emerson, while you were the mayor,

15   and let me focus on the period from 2019 and I'll

16   take it through today, did Emerson have any sites

17   within the town that are the subject of an

18   environmental cleanup?

19        A.    Yes.

20        Q.    How many?

21        A.    Three or four that I know of, I believe.

22        Q.    Okay.  And as to those sites, is the DEP

23   the agency responsible for overseeing and approving

24   any remediation of the sites to your knowledge?

25        A.    Yes.

Page 14

1        Q.      Okay.  Not Emerson.  Correct?  Not the

2   local community.  Correct?

3        A.      I don't really understand your question.

4        Q.      Well, the local community doesn't decide

5   what cleanup plan should be implemented.  The DEP

6   does that.  Correct?

7        A.      Yes.

8        Q.      And the local community doesn't decide

9   whether the property is clean or not, that's a

10  determination made by the DEP.  Correct?

11       A.      As I understand it, yes.

12       Q.      In fact, Emerson doesn't even have an

13  environmental engineer who's employed by the town.

14  Correct?

15       A.      I don't recall.

16       Q.      Today, you don't have an environmental

17  engineer that's employed by the town.  Correct?

18       A.      We employ an engineering firm and they

19  may have an environmental engineer on their staff

20  that the Borough has access to.

21       Q.      Right.  That may well be true.  I'm

22  asking whether the Borough has specifically employed

23  an environmental engineer for the purpose of

24  assisting them on an annual basis.

25       A.      No.

Page 15

1          Q.    Okay.  On those sites where you say

2     there is cleanup activity, that's being overseen by

3     the DEP.  Correct?

4          A.    Yes.

5          Q.    On those sites, do you keep yourself

6     apprised of the status of the cleanup activity?

7                MR. SEAMAN:  Objection to form.

8          A.    Only if they contact us.

9          Q.    Only if who contacts you?

10         A.    The DEP.

11         Q.    Okay.  So you basically let the DEP

12    handle that unless they contact you?

13         A.    I don't know how to answer your

14    question.

15         Q.    Well, you told me a moment ago that you

16    don't --

17                MR. FIORENZO:  I'm sorry, read back that

18    last answer.  I just want to make sure I have it

19    correctly.

20                (The record is read by the reporter.)

21         Q.    And then you said only if the DEP

22    contacts you do you keep yourself apprised of the

23    status of the cleanup.  Is that what you just told

24    us?  Correct?

25         A.    I don't recall.  I don't know.

Page 16

1          Q.     You said -- I asked you if you kept

2    yourself apprised.  You said, I'm only apprised if

3    the DEP lets us know what's going on.  That's what

4    you just told us.  Correct?

5          A.     I did.  However, there are times where

6    there are complaints that come into Borough Hall and

7    then we refer them to the DEP.

8          Q.     Sure.  With that exception where a

9    complaint comes in and you refer it over, you don't

10   generally keep yourself apprised, you're only

11   apprised of the cleanup activity if the DEP lets you

12   know what's going on.  Correct?

13         A.     No, I would follow up to see if

14   something was cleaned up and whether it was safe in

15   my town.

16         Q.     Oh, so you do monitor it then, you do

17   monitor the cleanup activities at the sites?

18                MR. SEAMAN:  Objection to form.

19         A.     Not on a regular basis.

20         Q.     Well, on an irregular basis do you?

21         A.     If a problem arises, I like to see it

22   through to make sure that it is completed.

23         Q.     Well, if there is no problem, if there's

24   just a cleanup plan submitted to the DEP and the DEP

25   is overseeing it, would you keep yourself apprised

Page 17

1    of that or do you wait for the DEP to let you know

2    what's going on?

3           A.     It depends on the circumstance.

4           Q.     What circumstance would it depend on?

5           A.     On whether I know about it or whether I

6    don't know about it.

7           Q.     Well, I thought you told me you keep

8    yourself apprised of the cleanup sites in town.

9           A.     That I know of.

10          MR. SEAMAN:  Objection to form.

11          Q.     So of the ones you know of, do you in

12   that instance keep yourself apprised of what's going

13   on at the site as to the cleanup activity or not?

14          A.     I attempt to stay apprised of what's

15   going on.

16          Q.     And how do you do that?

17          A.     I would generally ask the administrator

18   to make sure that something was taken care of.

19          Q.     Okay.  And anything else you would do to

20   keep yourself apprised of what's going on other than

21   asking the administrator to -- to do what?  I'm

22   sorry.  What would you ask the administrator to do?

23          A.     Just to look into something to see if it

24   was satisfied, if it was complete.

25          Q.     And do you do that as a matter of

Page 18

1  ordinary course?

2          A.      No.

3          Q.      Okay.  So, again, what's the criteria

4  that you would use to determine whether to do that

5  or not, whether to contact the business

6  administrator -- or the town administrator?

7          A.      Say your question again?

8          Q.      What are the criteria then you would use

9  to ask the administrator or not to monitor what's

10  going on and report back to you?

11              MR. SEAMAN:  Objection to form.

12          A.      I don't particularly have criteria.  If

13  somebody asks me about something, I will inquire for

14  the administrator to look into something.

15          Q.      So then only if someone asks you about

16  it will you inquire of the administrator?

17          A.      Or if there is an application before the

18  Land Use Board and a member of the public comes in

19  and says that they believe that there's an issue

20  with the property, we might have them look into it.

21          Q.      Okay.  Have you done that?

22          A.      I don't recall.

23          Q.      Have you been in front of the Land Use

24  Board where someone raised an issue regarding

25  environmental contamination?

Page 19

```
 1          A.      I think so, yeah.

 2          Q.      When?  When was the last time?

 3          A.      I don't recall.

 4          Q.      Did that happen with regard to the site

 5    owned by Emerson Redevelopers?

 6          A.      I believe it did.

 7          Q.      And that was at the Planning Board?

 8          A.      Yes.

 9          Q.      Okay.  So someone came before the

10    Planning Board and raised an issue about

11    contamination?

12          A.      Yes.

13          Q.      Who was that?  Was that you?

14          A.      No, I believe it was Lorraine McQueeney.

15          Q.      Was it you as well?

16          A.      I don't recall.

17          Q.      When you appeared before that board when

18    they were --

19          A.      I don't --

20          Q.      Let me finish.

21          -- when they were considering the application,

22    did you raise an issue about environmental

23    contamination at the site?

24          A.      It was a long time ago.  I don't recall.

25          Q.      I might be able to help you with that in
```

Page 20

1  a minute or two.

2       Okay.  So you -- over a period of years, you

3  were asked to consider and vote on various

4  ordinances and resolutions that relate to the

5  subject property.  And when I say the subject

6  property, I'm referring to Block 419, I'll use as a

7  shorthand expression for the Emerson redevelopment

8  project.  So when I say that, that's what I'm

9  referring to.  Okay?

10      A.     Yes.

11      Q.     Okay.  So over the years, you were asked

12 to consider and vote upon various resolutions and

13 ordinances relating to the subject property.

14 Correct?

15      A.     Correct.

16      Q.     And when you considered those issues and

17 voted on those issues, were you aware at the time

18 that Emerson had been engaged in litigation for many

19 years over issues concerning affordable housing,

20 were you aware of that?

21      A.     I became aware.

22      Q.     Okay.  So when you were voting on those

23 various matters at that time, you were aware, were

24 you not?

25      A.     I don't recall.

Page 21

1        Q.      Were you aware that as far back as 2001,

2    there was a decision rendered by Judge Harris

3    relating to Emerson's noncompliance with its

4    constitutional obligations under Mount Laurel, were

5    you aware that Judge Harris rendered a decision?

6        A.      At what point was I aware?

7        Q.      Well, were you aware of it at the time

8    you were on the governing body?

9        A.      I don't recall.

10       Q.      Were you aware of it at the time you

11   were on the Land Use Board?

12       A.      I don't recall.

13               MR. FIORENZO:  Pull up the decision,

14   please.  Let's mark it.

15               MR. KLEIN:  DD-1.

16       Q.      DD-1.

17               MR. BOTTA:  DD-1?

18               MR. FIORENZO:  DD.

19               MR. BOTTA:  Got you.

20               MR. FIORENZO:  That's going to be our

21   markings for today.

22       Q.      So back in 2001, Judge Harris rendered a

23   49-page decision involving litigation brought

24   against Emerson for its failure to comply with its

25   constitutional obligation.  So when did you become

Page 22

1    aware of the Judge Harris decision?

2         A.    I don't recall.

3         Q.    No idea?

4         A.    I don't recall.

5         Q.    Okay.  Well, were you aware of it when

6    you voted on the redevelopment plan for the subject

7    site?

8         A.    I don't recall.

9         Q.    Okay.  So in his decision, Judge Harris

10   stated, "Emerson, New Jersey, persists as a bastion

11   of exclusionary zoning.  It has steadfastly resisted

12   taking affirmative steps to provide realistic

13   opportunities for affordable housing within its

14   borders.  It has further failed to enact the

15   necessary legislation to authorize the expenditure

16   of its considerable affordable housing trust funds

17   for regional and local housing needs."

18        Were you aware of that finding by Judge

19   Harris?

20             MR. SEAMAN:  Objection to form.

21        A.    I don't recall.

22        Q.    Well, do you remember on the Emerson

23   website that former Mayor Lou Lamatina had a series

24   of messages to the town that were posted which, in

25   fact, related to the members of the community the

Page 23

1    Judge Harris ruling, do you remember that?

2         A.    I recall telling you that I didn't read

3    them.

4         Q.    Well, yeah, in another deposition.  But

5    this is a new day and it's a new case, so I've got

6    to ask.  There may be some overlap and I apologize

7    for that because it's a different matter.

8         So your answer is that you didn't read them,

9    those postings by the mayor which were describing

10   the Mount Laurel history of Emerson.  Correct?

11        A.    Correct, I did not read them.

12        Q.    And you didn't read them because I think

13   you described them under oath as propaganda.  Right?

14        A.    I believe I said that.

15        Q.    Yeah.  And even though it was quoting

16   from various legal rulings to try to explain to the

17   public the circumstance Emerson found itself in, you

18   didn't take it upon yourself to even bother reading

19   it 'cause you couldn't believe anything Mr. Lamatina

20   wrote.  Correct?

21             MR. SEAMAN:  Objection to form.

22        A.    Correct.

23        Q.    Okay.  So you weren't aware that Judge

24   Harris ruled, again, in the first paragraph, "The

25   time has come to end this constitutional breakdown.

Page 24

1    The New Jersey constitution shall not be permitted

2    to merely remain a vague rumor in Emerson."  You

3    weren't aware that the judge made that finding

4    either.  Correct?

5                    MR. SEAMAN:  Objection to form.

6         A.    I don't recall when I was aware of that.

7         Q.    Were you aware --

8                    MR. FIORENZO:  Scroll over, Steve, to

9    the next page.  If you could just highlight.  Yeah,

10   right there.  Just blow it up.

11        Q.    So were you aware, however, that Judge

12   Harris says -- he ruled, "Although I conclude that

13   the builder's remedy is not warranted, Emerson shall

14   be required without delay to adopt all affirmative

15   measures, including meaningful legislation and

16   adequate appropriations, recommended or made

17   necessary by the Special Master, in order to fulfill

18   its constitutional obligation to provide shelter

19   opportunities for the beneficiary class of unhoused

20   poor."

21        So did you become aware at some point in time

22   that Judge Harris said the time had come for Emerson

23   to come forward without delay to do the things

24   needed to be done to fulfill its constitutional

25   obligation, were you aware of that at some point?

Page 25

1        A.      At some point.

2        Q.      Okay.  You just don't know when.

3        A.      I don't recall.

4        Q.      Okay.  I want to ask you again regarding

5    this ruling back in 2001.  Judge Harris on page 18

6    of this ruling also ordered Emerson to provide a

7    "compliant Housing Element and Fair Share Plan by

8    March 30, 2001.  As revealed during trial, it has

9    woefully failed to comply.  The planning document

10   that Emerson seeks to pass off as Mount Laurel II

11   compliant is riddled with regulatory deficiencies,

12   substantive errors, and rank speculation.

13   Accordingly, I conclude I must invoke the

14   exceptional affirmative remedies of the type

15   outlined in Mount Laurel II and require Emerson to

16   adopt specific amendments to its zoning ordinance

17   and other land use regulations as will enable it to

18   finally meet its Mount Laurel II obligations."

19        Were you aware that Judge Harris made such

20   findings?

21              MR. SEAMAN:  Objection to form.

22        A.      I don't recall.

23        Q.      Do you know what a housing element plan

24   is?

25        A.      Yes.

Page 26

1      Q.    What is it?

2      A.    It's a plan of the housing stock in

3   Emerson or in any municipality and a plan for the

4   future.

5      Q.    Do you know what a fair share plan is?

6      A.    It's a plan for fair share housing, for

7   affordable housing.

8      Q.    Okay.  And you understand every

9   municipality has to have one?

10     A.    Yes.

11     Q.    Okay.  And the judge is ordering Emerson

12  to move forward swiftly to satisfy these

13  constitutional deficiencies.  Correct?

14            MR. SEAMAN:  Objection to form.

15     A.    If you say so.

16     Q.    I'm asking you.  I don't say anything.

17  I'm asking questions.  Did you understand that the

18  judge was ordering Emerson to move forward to create

19  a compliant housing element and fair share plan by a

20  certain date?

21            MR. SEAMAN:  Objection to form.

22     A.    I don't recall.  I wasn't aware of that

23  in 2001.  I don't recall.

24     Q.    So you weren't aware that the -- I'm not

25  asking in 2001.  At some point in time were you

Page 27

1   aware of it when you got on the governing body, for

2   example, and there were issues of Mount Laurel that

3   were being discussed, were you aware of it then?

4          A.     I don't know when I became aware of it.

5          Q.     Okay.  But you were aware of it at some

6   point.  Correct?

7          A.     At some point, but I don't recall when.

8          Q.     Because ultimately Emerson filed a

9   lawsuit to try to get protection from further

10  builder's remedy lawsuits and to invoke the court to

11  help them get that protection.  Correct?

12         A.     Correct.

13         Q.     Okay.  So now, with this then as a

14  backdrop, did you understand the Court had appointed

15  a Special Master?

16         A.     I don't recall.

17         Q.     Do you know what a Special Master is?

18         A.     I think I have a brief understanding of

19  it.

20         Q.     Well, is there a Special Master that

21  exists as we sit here today relating to Emerson's

22  compliance with its Mount Laurel obligations?

23         A.     Yes.

24         Q.     Who is that?

25         A.     Mary Beth Lonergan.

Page 28

1          Q.     Right.   There has been a Special Master

2     now for a very long period of time since Judge

3     Harris entered his ruling.   Correct?

4          A.     I don't recall.

5          Q.     There was a Special Master back in 2010

6     when you became a member of the governing body.   You

7     were aware of that, weren't you?

8          A.     I don't recall.

9          Q.     Is there any way you wouldn't have been

10    aware of that as a member of the governing body who

11    had to deal --

12         A.     I don't recall.

13         Q.     Let me finish.

14         -- who had to deal with these issues?

15              MR. SEAMAN:  Objection to form.

16         A.     I don't recall.

17         Q.     That's something you would want to make

18    yourself aware of.   Correct?

19              MR. SEAMAN:  Objection to form.

20         Q.     What the constitutional Mount Laurel

21    obligations of your community were, you'd want to

22    know that, wouldn't you?

23              MR. SEAMAN:  Objection to form.

24         A.     I don't recall.

25         Q.     No, I just asked, that's something you

Page 29

1    would want to know, isn't it?

2        A.    I don't recall when I understood all of

3    that.

4        Q.    That's not my question though.  Is that

5    something you would want to know what obligations

6    your town had to fulfill its Mount Laurel

7    obligation, is that -- as a member of the governing

8    body is that something you would want to know?

9            MR. SEAMAN:  Objection to form.

10       A.    I can't tell you what I wanted to know

11   13 years ago.

12       Q.    Well, tell me today.  Do you want to

13   know it today?  Today.

14       A.    Do I want to know what?

15       Q.    What Emerson's constitutional affordable

16   housing obligations are, do you want to know about

17   that today?

18       A.    Of course.

19       Q.    Okay.  So you certainly would have

20   wanted to know about it back then when you got on

21   the governing body.  Correct?

22           MR. SEAMAN:  Objection to form.

23       A.    I don't recall if I --

24       Q.    Because you took an oath, didn't you?

25           MR. BOTTA:  You've got to let her

Page 30

```
 1   finish.  If she's going to let you finish your
 2   question, she's got to finish her answer.
 3         Q.    You took an oath.  Right?  When you were
 4   sworn in?
 5         A.    Yes.
 6         Q.    And that oath was to uphold and defend
 7   the constitution and laws of the state of
 8   New Jersey.  Right?
 9         A.    Correct.
10         Q.    And if Emerson wasn't compliant with its
11   constitutional obligations, consistent with the oath
12   you took, you would want to know that, wouldn't you?
13               MR. SEAMAN:  Objection to form.
14         A.    I believe you're asking me for what my
15   mindset was back when I took an oath and I don't
16   recall.
17         Q.    I'm asking you generally now.  Forget
18   about -- that's something you would want to know,
19   isn't it?
20               MR. SEAMAN:  Objection.
21         Q.    You would need to know as a member of
22   the governing body.  Right?
23               MR. SEAMAN:  Objection to form.
24         A.    I would rely on attorneys to explain to
25   me what I needed to know and what I didn't.
```

Page 31

1          Q.      Right.  So let me make it simple.  Do

2     you deny here today under oath that back in 2010

3     when you became a member of the governing body that

4     you didn't make yourself aware through whatever

5     means, reading, speaking to lawyers, or whatever, of

6     what Emerson's constitutional Mount Laurel

7     obligations were at that time, do you deny making

8     yourself aware of that at that time?  Yes or no?

9                  MR. SEAMAN:  Objection to form.

10         A.      That's a long question.  You'll have to

11    ask shorter ones.

12         Q.      Well, no.  You don't tell me what I have

13    to do.

14         A.      I don't understand your question.

15         Q.      What don't you understand about it?

16         A.      I lost you at like the fifth word.

17         Q.      Okay.  Let me have it repeated, and if

18    there's a deficiency, if there's something you don't

19    understand, I'm happy to rephrase it.

20         A.      I don't have a deficiency.

21         Q.      There's a deficiency in my question.  If

22    you don't understand my question, tell me what in

23    there is confusing and I'll try to rephrase it.

24                 MR. FIORENZO:  Could you read it back to

25    her?

Page 32

1      Q.     I thought it was pretty clear.

2             (The record is read by the reporter.)

3      A.     I don't recall.

4      Q.     Did you care?

5      A.     I don't recall.

6      Q.     You don't recall if you cared?

7      A.     I can't tell you what my mindset was all

8  those years ago.

9      Q.     So the answer is you don't recall if you

10  cared what the constitutional obligation of Emerson

11  was, is that your answer?

12     A.     I don't recall.

13     Q.     You don't recall if you cared, 'cause

14  that's the only question, did you care, and you said

15  I don't remember.  So you don't remember if you

16  cared?

17     A.     I don't remember.

18     Q.     Okay.  So now, after this happens in

19  court and Emerson is being, my words, chastised by

20  the Court as a bastion --

21            MR. BOTTA:  2001?

22            MR. FIORENZO:  Yeah, 2001, the decision.

23     Q.     -- a bastion of exclusionary zoning, do

24  you know what actions, if any, they took after that

25  to remediate these problems?

Page 33

1          A.     I don't remember.

2          Q.     Do you know what actions, if any, they

3     took when you got on in 2010 to address and

4     remediate these problems?

5          A.     I don't remember.

6          Q.     Do you recall that there was a

7     resolution adopted by the governing body in 2016 --

8     actually, withdraw that.

9               MR. KLEIN:  DD-2.

10         Q.     Okay.  So were you aware that in 2006,

11    Emerson prepared a redevelopment plan?

12              MR. SEAMAN:  Objection to form.  Was she

13    aware in 2006 or was she aware --

14              MR. FIORENZO:  I'm sorry, we should mark

15    that.

16         A.     I was thinking the same thing.  I don't

17    know when I became aware, but I'm aware of that

18    plan.

19              MR. FIORENZO:  Just mark it as DD-2.

20         Q.     So you don't know when you became aware

21    of this, but at some point in time you did?

22         A.     Like I said, I don't remember when I

23    became aware, but I'm aware of the plan.

24         Q.     So when you got on the governing body in

25    2010, did you attempt to educate yourself on the

Page 34

1    important issues relating to Emerson?

2         A.    I think after 2006 I was on the Land Use

3    Board and then I knew that there was a redevelopment

4    plan that was put in place.

5         Q.    Okay.  Great.  So you're familiar with

6    this plan?

7         A.    I have not reviewed it in a very --

8         Q.    Or were at the time way back when.

9         A.    I think I may have been aware of certain

10   segments of it but not the full plan.

11        Q.    And do you recall that this

12   redevelopment plan was prepared --

13              MR. SEAMAN:  Joe.

14              MR. BOTTA:  Please let her finish.

15   She's finishing and you're starting.

16              MR. FIORENZO:  Okay.  I thought she was

17   done.

18        Q.    Something else you want to say?

19        A.    No, you can continue.

20        Q.    Okay.

21              MR. BOTTA:  You're just overlapping and

22   that's not good for the record.

23              MR. FIORENZO:  Okay.

24              THE WITNESS:  Thank you.

25        Q.    Do you know if this was done in an

Page 35

1    effort to try to address the issues raised by Judge

2    Harris in his ruling?

3            A.    I don't recall.

4                  MR. FIORENZO:  Pull up page 5, please.

5            Q.    So whenever you became aware of this,

6    either sitting on the Zoning Board or when you came

7    on the governing body, were you aware that this

8    redevelopment plan intended to create a provision

9    for affordable housing under the Fair Housing Act?

10           A.    I can read that.  That's what it says.

11           Q.    Were you aware of that when you reviewed

12   this?

13           A.    I don't recall what I was aware of back

14   then.

15           Q.    So did you ever become aware that the

16   redevelopment plan created by Emerson was intended

17   to address the issue of affordable housing, did you

18   ever know that?

19           A.    At some point, yes, I was aware.

20           Q.    Okay.  You sat on the Land Use Board.

21   Right?

22           A.    Correct.

23           Q.    Did that plan go before the Land Use

24   Board?

25           A.    I believe it did.

Page 36

1          Q.     Okay.  So you would have heard a

2     presentation from Mr. Burgis, Joe Burgis, the

3     planner, regarding this.  Correct?

4          A.     I guess.

5          Q.     And you were made aware at that time

6     that this redevelopment plan was created in part to

7     try to address the problems that were identified by

8     Judge Harris so that Emerson was in compliance with

9     its obligation.  You were aware of that from the

10    presentation that was made as you sat on the board.

11    Correct?

12         A.     I don't recall.

13         Q.     Okay.  You don't deny that though, do

14    you?

15                MR. SEAMAN:  Objection to form.

16         A.     I don't recall.

17         Q.     But you don't deny it.

18         A.     Deny what?

19         Q.     I understand you don't recall.  So that

20    means maybe yes, maybe no.  You don't deny that that

21    was the reason for this plan was to address, in

22    part, affordable housing.  Right?

23         A.     In part.

24         Q.     Okay.

25         A.     I believe a portion of it was

Page 37

1    regentrification of Emerson.

2        Q.    Sure.  And if you read the highlighted

3    provisions, it talks about all development within

4    the designated redevelopment area shall provide for

5    the appropriate number of affordable dwellings.  The

6    number of affordable dwellings shall be provided

7    pursuant to the State of New Jersey Council on

8    Affordable Housing third round rules that mandate a

9    minimum of one affordable housing unit for every

10   eight units of market rate housing and one

11   affordable housing unit for every twenty-five jobs

12   created.  The redevelopment plan encourages the use

13   of age-restricted housing, and then it goes on.

14        So this was the plan adopted by Emerson

15   sometime back in 2006.  Correct?

16        A.    Yes.

17        Q.    Are you -- do you know what the COAH

18   third round rules mean, do you know what that refers

19   to?

20        A.    The number of units that each

21   municipality has to build.

22        Q.    Right.  And COAH would determine that

23   based on their third round rules.  They had numbers

24   which they ascribed to each municipality.  Right?

25        A.    Yes.

Page 38

1      Q.      Okay.  So Emerson now in adopting this

2   plan is recognizing their obligation to address

3   their affordable housing obligation.  True?

4      A.      I guess.

5      Q.      You guess?  Is there any doubt in your

6   mind?

7      A.      Like I said, I think it was also just to

8   redo the downtown so it would look nicer.

9      Q.      Well, may, but it certainly was

10  designed, in part, to address Emerson's affordable

11  housing obligation.

12     A.      Yes, in part.

13     Q.      Okay.  Did you vote on this -- approval

14  of this plan?

15     A.      I don't recall.

16     Q.      Did you support the plan as presented?

17     A.      I don't recall.

18     Q.      Ultimately the redevelopment plan was

19  adopted.  Correct?

20     A.      Yes.

21     Q.      And when it was adopted then, it now

22  presented an opportunity for Emerson to try to

23  address their affordable housing obligation through

24  the creation of these redevelopment areas.  Correct?

25     A.      Yes.

Page 39

1          Q.    Okay.  And at some point did the Mayor

2    and Council approve a redevelopment agreement?

3          A.    I don't recall.

4                MR. FIORENZO:  Steve, pull up -- yeah.

5          A.    I mean, seventeen years ago?

6          Q.    No.  No.  I'll show it to you.  Let me

7    see if I can help you, make it easier?

8                MR. KLEIN:  DD-3.

9          A.    Oh, yes.

10         Q.    Okay.  So at some point there was a

11   redevelopment agreement created entered into by the

12   town between the Borough of Emerson and Emerson

13   Redevelopers Urban Renewal, LLC, and this agreement

14   DD-3 is dated June 27, '16.  Do you see that?

15         A.    Yes.

16         Q.    And you're aware of this agreement.

17   Correct?

18         A.    Yes.

19         Q.    This agreement was intended as it says

20   in the body of the document, I'm happy to show you

21   whatever you want, in part, to address a portion of

22   Emerson's affordable housing obligation.  Correct?

23         A.    I believe that was the intent.

24         Q.    Okay.  You voted against approval of

25   this redevelopment agreement.  Correct?

Page 40

1        A.      Did I?

2        Q.      Did you?

3        A.      I don't recall.  Do you have the vote?

4        Q.      Well, you don't remember what your

5    position was regarding this?

6        A.      I don't recall if I abstained or if I

7    voted no.

8               MR. FIORENZO:  Okay.  Mark that, please.

9               MR. KLEIN:  This is DD-4.

10       Q.      Okay.  DD-4 is a resolution of the

11   Borough of Emerson, Resolution No. 256-16, and the

12   subject is "Authorizing" --

13              MR. KLEIN:  I'm sorry.

14              MR. FIORENZO:  That's okay.

15              MR. KLEIN:  DD-4.

16              MR. FIORENZO:  This will be DD-4, the

17   resolution.

18       Q.      So this redevelopment agreement which

19   was intended to try to address the affordable

20   housing obligation as you noted a moment ago, the

21   subject is "Authorizing the Execution of a First

22   Amendment" --

23              MR. FIORENZO:  Yeah, but I wanted the

24   original.  I'm sorry, we're doing it out of

25   sequence.  Go back to this one, E293.  That's the

Page 41

1    First Amendment.  We skipped over the original.

2    Okay.

3              MR. KLEIN:  This will be DD-5.

4        Q.    All right.  DD-5 are minutes of the

5    Emerson Mayor and Council, June 14, 2016.

6        Could you go to that section where they vote

7    on this.  Okay.  Just pull it up.  So just make it a

8    little bigger.

9        So there's a motion made at that time to

10   approve the consent agenda item number 173-16,

11   approval of the execution of the redevelopment

12   agreement only was moved and seconded, and then it

13   shows with respect to this one you appeared to have

14   abstained.  Correct?

15       A.    Correct.  I told you I didn't remember.

16       Q.    So is there some reason why you didn't

17   vote in favor of it since it was intended to fulfill

18   the obligation of Emerson noted by the Court

19   concerning its affordable housing obligation?  What

20   was your reason for not voting in favor?

21             MR. SEAMAN:  Objection to form.

22             MR. BOTTA:  Objection to the form.  Can

23   you just ask her why she didn't vote in favor?

24             MR. FIORENZO:  No, I'll stay with my

25   question, thank you.

Page 42

1          A.      Generally when I abstain, it's because I

2    need more information.

3          Q.      Well, I'm not asking generally.  Why

4    didn't you vote in favor of the redevelopment

5    agreement here?

6          A.      I don't remember.

7          Q.      Okay.  You told us a moment ago this

8    agreement was intended to address the affordable

9    housing problem that Emerson had.  Correct?

10         A.      Correct.

11         Q.      So as you sit here today, can you think

12   of any reason why you would not have voted in favor

13   of that?

14                 MR. SEAMAN:  Objection to form.

15         A.      I already said I generally needed more

16   information if I abstain.

17         Q.      No, no, but I'm not asking generally

18   what you do.  I'm asking --

19         A.      I don't recall --

20         Q.      Let me finish.

21         A.      -- on that day why I abstained.

22         Q.      In this instance, as to this resolution,

23   can you tell us why you didn't vote to support it,

24   is there any reason you can think of?

25         A.      Can I see the full -- can you get rid of

Page 43

1    the box and can I see the full page?

2         Q.    Sure.

3         A.    I probably needed more information.

4              MR. SEAMAN:  Can we just confirm that's

5    the full consent agenda?  It doesn't --

6         A.    It's not.  Those are the items that were

7    pulled off.

8              MR. FIORENZO:  No, it's the minutes.

9              MR. SEAMAN:  I understand.

10             MR. FIORENZO:  It's not the consent

11   agenda.  They're the minutes of the actual

12   meeting --

13             MR. SEAMAN:  Yes.

14             MR. FIORENZO:  -- prepared by the clerk.

15             MR. SEAMAN:  And can we confirm that

16   that is the minutes of all the items that were on

17   the consent agenda on that page or does it continue

18   on the next page?  That's my question.

19             MR. FIORENZO:  It's the minutes.

20             MR. SEAMAN:  Is there a second page?  Is

21   there a page following this page?

22             MR. FIORENZO:  Steve, show him the whole

23   thing.

24        A.    That's the full consent.

25             You're laughing.  I don't recall making a

Page 44

1    joke.

2         Q.     Well, I'm just laughing at the comment

3    you just made loud enough for me to hear that you

4    can't believe I'm asking you these questions.

5         A.     That's not what I said.

6         Q.     Oh, okay.

7         A.     That's absolutely not what I said.

8         Q.     That's good.  I'm happy to hear that.

9                MR. SEAMAN:  Glad it was loud enough for

10   you to hear, Joe.

11               MR. FIORENZO:  Yeah, I'm getting old.

12        A.     That's not what I said.

13               MR. FIORENZO:  I'm getting old.  My

14   hearing's bad, I'll concede that.

15        Q.     Here's a copy, so we have that.

16               MR. SEAMAN:  That wasn't what she said.

17               MR. FIORENZO:  All right.

18               MR. SEAMAN:  Mayor, I'm going to ask you

19   to take your time and review the entire document and

20   let Mr. Fiorenzo know when you're ready.

21               MR. FIORENZO:  I don't have any other

22   questions on the document.  I'm done.  So, you know,

23   I'm just giving it to you because she was asking to

24   see the whole thing and I've given it.  But I have

25   my answer to the question.  So as far as I'm

Page 45

1    concerned, I'm ready to move on.

2              MR. SEAMAN:  Okay.  Then we can move on.

3         A.    Okay.

4              MR. FIORENZO:  Okay.  So let's go back,

5    Steve, to the resolution on the First Amendment.

6    That's the one we marked.  That was 4?

7              MR. KLEIN:  It was 4.

8         Q.    So then after the redevelopment

9    agreement gets executed by the Borough to address

10   affordable housing, there then was -- you're aware

11   there was a First Amendment to the redevelopment

12   agreement?

13        A.    Yes.

14        Q.    Okay.  And that was also voted on.

15   Correct?

16        A.    Yes.

17        Q.    And you voted against execution of the

18   First Amendment.  Correct?

19        A.    Correct.

20        Q.    Why?

21        A.    Because I was against it.

22        Q.    Why?

23        A.    I don't recall right this second.

24        Q.    Is there any reason why that you can

25   think of as you sit here today that you were against

Page 46

1    the First Amendment?  And maybe I can help you.  Are

2    you able to answer the question, the pending

3    question?

4            A.     I don't recall why I voted no.

5            Q.     So in the Whereas clause, the fourth

6    Whereas clause, it says, "Whereas the Borough and

7    the redeveloper have agreed to enter into a First

8    Amendment to the redevelopment agreement with the

9    specific intention to amend and supplement the

10   property descriptions to be redeveloped, as set

11   forth and attached hereto in form and substance as

12   Exhibit A."

13           A.     They were including properties that

14   weren't there in the original agreement.

15           Q.     Okay.  But it was within the

16   redevelopment zone.  Correct?

17           A.     Yes.

18           Q.     Okay.  And that's why you voted against

19   it?

20           A.     Correct.

21           Q.     Why?  Why was that objectionable to you?

22                  MR. BOTTA:  Objection, asked and

23   answered.

24                  MR. FIORENZO:  No, it hasn't.

25                  MR. BOTTA:  She answered why she voted

Page 47

1    no.

2                MR. FIORENZO:  No, I'm asking her

3    specifically now that I've shown her and she said --

4        A.     Because they were including more

5    properties.

6        Q.     Right.  And what was it about the

7    inclusion of those properties that was objectionable

8    to you that led you to vote no?

9        A.     Because I believe our planner was saying

10   that these businesses were blighted and I did not

11   agree.

12       Q.     So that's a different issue.  So you're

13   saying --

14       A.     But I think that's why they were

15   included in the next amendment.

16       Q.     So you're saying --

17       A.     In the First Amendment.

18       Q.     You're saying you voted no because

19   something the planner had concluded?

20       A.     I don't recall.

21       Q.     Okay.  In any event, you voted no and

22   everybody else voted yes.

23       A.     Yeah.

24       Q.     All right.  So the agreement was

25   amended.

Page 48

1              MR. FIORENZO:  Pull the agreement up,

2     please.

3              MR. KLEIN:  DD-6.

4        Q.    I'm glad you're having fun.

5        That's the First Amendment, ma'am, DD-6.  You

6     saw the First Amendment before you voted no, I take

7     it.  Correct?

8        A.    Yes.

9        Q.    So the redeveloper had submitted a

10    proposal to the town.  Correct?

11       A.    Yes.

12       Q.    Was there an RFP?

13       A.    Yeah.

14       Q.    And a number of developers submitted

15    proposals --

16       A.    Yes.

17       Q.    -- and this developer was the one who

18    was selected.  Correct?

19       A.    Not this developer.  Joseph Forgione's

20    company was selected.

21       Q.    Well, ma'am, this is Joseph Forgione's

22    company right here.  Right?  In 2016, Emerson

23    Redevelopers Urban Renewal, LLC, was Mr. Forgione's

24    company, wasn't it?

25       A.    Yes.

Page 49

 1        Q.    Okay.  So this was the redeveloper

 2   selected to develop the site.  Right?

 3        A.    Yes.

 4        Q.    Okay.  And it says, that second

 5   Wherefore clause, "The parties are desirous of

 6   amending and supplementing the redevelopment

 7   agreement to reflect their mutual understanding with

 8   respect to the implementation of the redeveloper's

 9   proposal submitted to the Borough."  Okay?

10        And let's scroll to the second page, please.

11   Stop there, please.  Okay.

12        Paragraph 2 is the intent of the amendment to

13   supplement the description of the properties.  So do

14   you know what the change to the description of the

15   properties was?

16        A.    I believe they were adding the corner

17   property.

18        Q.    When you say the corner property,

19   describe it.

20        A.    It was a restaurant.

21        Q.    What restaurant?

22        A.    I don't recall the name.

23             MR. FIORENZO:  Go to the next paragraph,

24   Steve, just scroll down.

25        Q.    Is that the property?

Page 50

1          A.     I believe so.

2          Q.     Okay.  So Block 419, Lot 9 was added, is

3     that your understanding at the time?

4          A.     Was what my understanding?

5          Q.     That Block 419, Lot 9 was added to the

6     property and that was one of the reasons for the

7     amendment?

8          A.     I think that's the only reason, isn't

9     it?

10         Q.     Is it?

11         A.     I'd have to read the whole document.

12         Q.     Okay.  Well, then I don't know why you

13    said that then.  Is that one of the reasons though?

14         A.     Clearly.

15         Q.     Okay.  And Block 419, Lot 9, do you know

16    who owned that?

17         A.     I think it's the restaurant and I think

18    I know who owned it, yes.

19         Q.     Who do you think it was?

20         A.     I think it was a man by the name of

21    Lopata.

22         Q.     And you knew him.  Right?

23         A.     Vaguely.

24         Q.     You went to his restaurant.

25         A.     I don't think it was his restaurant.  I

Page 51

1    think he leased it.

2          Q.     Okay.  To whom?

3          A.     Several restaurants were there, that's

4    why I don't recall the name.

5          Q.     At this time do you know who was there?

6          A.     I don't recall.

7          Q.     And then if we continue down, go to

8    paragraph 5, it refers to the First Amendment

9    together with the proposal, the Land Use Board

10   resolutions, and any orders or directives of any

11   authorized official, it goes on and on, represent

12   the understanding of the Borough and the

13   redeveloper.  Do you see that?

14         A.     Yes.

15         Q.     Okay.  So, again, I just want to be

16   clear, the only reason you've given why you voted

17   against this was the addition of that piece of land?

18         A.     I --

19         Q.     Is that the reason, the only reason why

20   you voted no?

21         A.     I don't recall.

22         Q.     All right.  So after this First

23   Amendment, in 2016, were there any public meetings

24   that occurred concerning amendments to the

25   redevelopment plan, the one that I showed you

Page 52

1    earlier from back in 2006, do you know if there were

2    public meetings and hearings regarding an amendment

3    to that plan?

4            A.     At what point?

5            Q.     In 2016.  Shortly after this First

6    Amendment.

7            A.     I don't recall.

8                   MR. FIORENZO:  Would you pull up E13,

9    please.

10                  MR. KLEIN:  This will be DD-7.

11           Q.     So these are minutes of a meeting of the

12   Mayor and Council on December 20, 2016.  You were a

13   member -- you were a council member at that time.

14   Correct?

15           A.     Yes.

16           Q.     Okay.  And these -- and that's going to

17   be DD-7.  So these minutes --

18                  MR. FIORENZO:  If you could, Steve, just

19   turn to here, page 5.

20                  MR. BOTTA:  What are the dates of the

21   minutes?

22                  MR. FIORENZO:  December 20, 2016.

23           Q.     So there's a long description of what

24   happened at this hearing, but I just want to ask you

25   a question about your participation in the meeting

Page 53

1   at that time.  Do you remember at the conclusion of

2   this, this proposal to amend the redevelopment plan,

3   that you opposed it, you voted no?

4          A.     I don't recall.

5          Q.     Okay.  In the minutes of the meeting,

6   there's a paragraph -- there's a -- next to last

7   paragraph from the bottom where it said,

8   Councilwoman DiPaola received.  It says,

9   "Councilwoman DiPaola received confirmation from

10  Mr. Doyle that it included all the blocks and lots

11  he read off.  She," referring to you, "said that

12  everyone was under the impression that the fourth

13  story would only be allowed for the JMF property.

14  But if it was for CBD-10, it represented a larger

15  parcel.  She said if this was approved, it would

16  allow a fourth story elsewhere, as well as decreased

17  parking and everything else.  Mr. Doyle said the

18  Borough had already allowed the height that JMF was

19  proposing to build in other locations to 40 feet.

20  He said they would now be making the east side the

21  same as the west side.  He stated that what the

22  governing body said was that this might be okay, but

23  on Kinderkamack Road and Lincoln Boulevard, the

24  50-foot building would be required to have a

25  five-foot setback on the top story."

Page 54

```
 1        Now, do you remember having this discussion at
 2   the time of this meeting?
 3        A.    I don't recall.
 4        Q.    Do you remember expressing concerns
 5   about it being four stories as the minutes reflect?
 6        A.    Absolutely.
 7        Q.    Okay.  You didn't like that.  Correct?
 8        A.    I was opposed to fourth story, yes.
 9        Q.    Right, right.  And you made that clear
10   on the record.  Right?
11        A.    Yes.
12        Q.    Okay.  And go to the next page, please.
13        So there's a -- it says Mr. Esque.  Do you see
14   that?
15        A.    It's small.
16        Q.    Okay.  So apparently they had some
17   people who spoke in connection with this public
18   hearing.  Right?  And there's a Mr. Esque, and
19   underneath the heading for him -- well -- yeah,
20   yeah, yeah, continue down.  You've got to make it
21   tighter.  Yeah, right there.  That's it.
22        Okay.  So Mr. Esque speaks, and then -- I
23   won't get into his comments.  And then Mr. Doyle --
24   the minutes reflect that Mr. Doyle responded, "It
25   was not so much fear, either the governing body
```

Page 55

1    would do what was best for the community or the

2    Court would come in and follow the constitution and

3    do what needed to provide low and moderate income

4    housing."

5         So you were there when Mr. Doyle said that.

6    Correct?

7         A.    Correct.

8         Q.    So you understood that what was

9    happening here as to this amendment was trying to

10   address this affordable housing obligation so that

11   Emerson could control its own destiny rather than

12   the Court deciding it.  Correct?

13             MR. BOTTA:  Objection to the form.

14   You're mischaracterizing what the minutes say.  Let

15   her just read the minutes.

16        Q.    You can answer my question.  You need to

17   have it read back?

18        A.    Can you rephrase that?

19        Q.    Yeah.

20             MR. FIORENZO:  Could you just read it

21   back to the witness, please?

22        A.    I didn't say repeat, I said rephrase.

23        Q.    Well, unless -- what don't you

24   understand?

25        A.    Repeat and rephrase maybe.

Page 56

1          MR. FIORENZO:  Repeat the question for

2    her.

3          Q.    And then tell me if there's something

4    that was not understood by you.

5                (The record is read by the reporter.)

6          MR. SEAMAN:  Objection to form.

7          A.    I don't recall.

8          Q.    Yeah, I mean, Mr. Doyle was explaining

9    that the Court could come in and follow the

10   constitution and make the decision on affordable

11   housing.  You understood that was an option.  Right?

12         A.    I don't recall what I remembered at that

13   moment.

14         Q.    Well, don't you know that as you sit

15   here today --

16         A.    I don't recall.

17         Q.    -- that if the town doesn't deal with

18   the problem, the Court can then impose a solution

19   for affordable housing?  You know that, don't you?

20         A.    I know it's a possibility.

21         Q.    Yeah.  In fact, not only is it a

22   possibility, you went on and said, "Councilwoman

23   DiPaola asked if another judge could have another

24   decision."  So you were asking the attorney who's

25   telling you, well, the Court would come in and

Page 57

1    impose something, you then said, well, can we get

2    another judge?

3              MR. SEAMAN:  Objection to form.

4        Q.    In substance, that's what you asked.

5    Right?

6              MR. SEAMAN:  Objection to form.

7        A.    I don't recall and I don't think that's

8    what I was saying.

9        Q.    Well, when you said, "Councilwoman

10   DiPaola" -- first of all, do you deny making that

11   statement reflected in the minutes?

12       A.    I don't recall making that statement.

13       Q.    So let's assume the minutes are accurate

14   then, that you made that statement.  It says,

15   "Councilwoman DiPaola asked if another judge could

16   have another decision."  So by another judge, did

17   you mean some judge other than the one who was then

18   handling it?

19             MR. SEAMAN:  Objection to form.

20       A.    I think I was just asking the opinion of

21   this was one judge's opinion, could another judge

22   have had a different opinion on what our number was.

23       Q.    Okay.  And that's why you said could

24   another judge have another decision.  Correct?

25       A.    I wasn't asking for another judge to

Page 58

1    make the decision, I was just inferring that this

2    was one judge's opinion and that perhaps another

3    judge may have made a different decision.

4         Q.    And you were asking that question in

5    response to Mr. Doyle saying that the Court would

6    come in and follow the constitution and do what they

7    needed to provide low and moderate income housing.

8    You were asking that question in response to that.

9    Correct?

10        A.    I don't know if anything was left out of

11   the minutes.  I don't -- I would have to listen to a

12   tape.

13        Q.    Do you deny the accuracy of the minutes?

14        A.    Minutes are not word for word.

15        Q.    Do you deny the accuracy of those

16   minutes in substance?

17        A.    They're not word for word, so I don't

18   know what was intended.

19        Q.    You vote on the minutes, don't you?

20        A.    Minutes are not word for word.

21        Q.    Ma'am, you vote and approve the minutes

22   of the prior meeting at your next meeting, don't

23   you?

24        A.    Yes.

25        Q.    And you voted to approve the minutes as

Page 59

1    being accurate, did you not?

2         A.    Yes, but you're asking me a question

3    that has to do with the whole meeting, and I don't

4    know in what context that the clerk put those

5    specific words into the minutes.

6         Q.    It doesn't matter, because when they --

7         A.    It matters to me to answer your

8    question.

9         Q.    -- when they present the minutes to you

10   and all the members of the governing body at the

11   next meeting, one of the first items on your agenda

12   was, do you -- is there a motion to approve the

13   minutes of the prior meeting.

14        A.    You're asking --

15        Q.    Let me finish.  And you voted yes.  You

16   approved the minutes.  Correct?

17        A.    You're asking me --

18        Q.    Is that true or not?

19        A.    You're asking me --

20        Q.    Stick with my question.

21        A.    -- a specific question about going back

22   to the original question.

23        Q.    I'm asking if you approved the minutes.

24   Did you vote yes on the minutes?

25        A.    I don't remember if I approved the

Page 60

1  minutes.

2       Q.     Okay.  Well, let me show you here -- do

3  you deny approving the minutes?

4       A.     I don't recall.

5            MR. FIORENZO:  Steve, pull that up where

6  it shows that.

7       Q.     So part of the minutes, up at the top

8  you see Agenda No. 27 approved for release and

9  content 1/17/17.  Do you remember that on January 7,

10  2017, there was a vote and the minutes were approved

11  to be released to the public?

12            MR. SEAMAN:  January 17th.  You said

13  January 7th.

14       Q.     January 17th, 2017.  You don't remember

15  that.  Right?

16       A.     No.

17       Q.     Okay.  In any event, you voted against

18  it.  Right?

19            MR. SEAMAN:  Objection to form.

20       A.     Voted against what?

21       Q.     You voted against the amendment to the

22  redevelopment plan.

23            MR. KLEIN:  This will be DD-8.

24       Q.     So this is -- DD-8 is a Notice of

25  Adoption of Ordinance No. 1535-16 adopted on

Page 61

1    December 20, 2016, an ordinance amending the central

2    business district redevelopment plan.  And it

3    provides that -- just let me run through it real

4    quickly.

5         There's a number of Whereas clauses.  The

6    second one says, "The board conducted the requested

7    investigation and held requisite hearings on July

8    29, August 19, which were all done on notice as to

9    whether the area met the statutory requirement as an

10   area in need of redevelopment."

11        So you're aware that happened.  Right?

12        A.    I don't recall.

13        Q.    And then on September 7, '04, there was

14   a resolution adopted by the Mayor and Council.  Were

15   you aware of that?

16        A.    I don't recall.

17        Q.    And on December 14, 2004, the Mayor and

18   Council adopted a resolution designating the area as

19   an area in need of redevelopment.  Were you aware of

20   that?

21        A.    I wasn't involved in 2004.

22        Q.    And you didn't become aware of it later

23   on, the history, you didn't understand the history

24   leading up to the different votes you took?

25        A.    I don't know if I specifically knew

Page 62

1   about that specific instance.

2        Q.     This document was the one you voted on.

3   You voted no.  So it was in the document you were

4   asked to consider and vote on.  Correct?

5        A.     Then I guess my answer if I don't recall

6   would be accurate.

7        Q.     Did you review resolutions before you

8   voted on them --

9        A.     I don't recall.

10       Q.     -- so you could understand the content?

11       A.     I don't recall.

12       Q.     So would you ever vote on a resolution

13  that you didn't read?

14       A.     I don't know.

15              MR. SEAMAN:  Objection to form.

16       Q.     So it's possible you would?  You're

17  telling me it's possible you would vote on a

18  resolution you didn't read?  It's not that hard.

19  Could you give me an answer?

20              MR. BOTTA:  She did answer.

21       A.     I generally read everything that I vote

22  on.

23              MR. FIORENZO:  Well, I'm waiting.  I'm

24  waiting thirty seconds.  She hasn't answered.  How

25  much longer do you need?

Page 63

1          MR. BOTTA:  The transcript doesn't say

2     that.  She can answer whenever she wants.

3          MR. FIORENZO:  She can.  I'm waiting

4     thirty seconds for a response to that.

5          Q.    What's the answer?

6          A.    I said I generally read resolutions

7     before I vote on them.

8          Q.    Of course you do.  It would be

9     irresponsible not to.  Right?

10         MR. BOTTA:  Objection.

11         MR. SEAMAN:  Objection.

12         Q.    Would you agree it would be the height

13    of irresponsibility of a public official, council

14    person, mayor, to vote on a resolution that you

15    don't read?

16         MR. SEAMAN:  Objection to form.

17         A.    Generally.

18         Q.    Okay.  So having read all this, let me

19    refer over to -- just go to the vote part of it, not

20    that.  Where it shows the vote, last page.

21         Before I get to that, Steve.

22         So this ordinance dealt specifically with the

23    issue of height.  Are you aware of that?

24         A.    Can I see the whole document?

25         Q.    You can see whatever you want, sure.

Page 64

1          MR. FIORENZO:  Can you get a hard copy

2     and give it to her?  She wants to see it.

3          Q.    We'll give you a hard copy, that way you

4     can review it and make sure you're comfortable with

5     seeing it.  Okay?

6          A.    Fabulous.

7          Q.    Great.  We're just here to help any way

8     we can.  Anything you need, you let us know.

9          A.    Thank you.

10         Q.    So I want -- as you're reading it, I

11    want you to take a look specifically at the section

12    that I've highlighted there, which is subparagraph

13    section 4(f).  So this ordinance addresses --

14         A.    Sir, I'm reading.

15         Q.    What does that mean?

16         A.    It means I'm reading.

17         Q.    So?  I'm going to ask you a question and

18    then your reading will be informed.

19         A.    I know, but I asked if I could see the

20    document and you're not letting me see it and read

21    it.

22         Q.    For what purpose?  There's no question.

23         A.    You asked me a question.  I asked to see

24    the document.

25              MR. BOTTA:  Let her review it.

Page 65

1      Q.    I'm going to ask you a question right

2  now, and if you want to read it, read whatever you

3  want.  But right now there's no purpose for reading

4  it until I ask the question.

5      So my question is, in the document, does this

6  document deal with amendment to the ordinance

7  concerning building height in the CBD-W zone

8  reflected in subparagraph (f)?

9          MR. SEAMAN:  Danielle, please take any

10 time you need to review the document before you

11 answer his question.

12     A.    Can you ask your question again or

13 repeat it?

14     Q.    Yeah.  Section (f) -- section 4(f), did

15 you understand that this ordinance dealt, in part,

16 with building height?

17     A.    Yes.

18     Q.    And it spoke about the CBD-W zone and it

19 addressed the issue of four stories.  Correct?

20     A.    Correct.

21     Q.    Did you oppose that?

22     A.    I opposed it.

23     Q.    Why?

24     A.    'Cause it's too high.

25     Q.    Too high for what?

Page 66

1        A.      Our small downtown.

2        Q.      You previously testified at your last --

3   in another deposition that you understood that the

4   reason why the four-story amendment occurred was

5   because there was a certain level of density needed

6   in a Mount Laurel project.  You understood that.

7   Correct?  Do you remember that?

8        A.      I don't think I said that.  I think what

9   I --

10       Q.      Oh, you did.

11       A.      There was a fourth story needed so that

12  the developer could make more money because he spent

13  more money acquiring the property, so they gave him

14  the fourth floor so that he would make more money on

15  the actual market rate units.

16       Q.      So that's your position today.

17       A.      I think that's always been my position.

18       Q.      Well, it's not, but that's okay.

19               MR. BOTTA:  How do you know her

20  position?

21               MR. FIORENZO:  Because it's in the

22  deposition.

23               MR. BOTTA:  Well, then fine.

24               MR. FIORENZO:  Yeah, so I know it's not.

25               MR. BOTTA:  So you represent that.

Page 67

1              MR. FIORENZO:  Yeah, yeah, yeah.  No,

2      I'm just --

3              MR. BOTTA:  Let her present her

4      position.  You don't need your position.

5          Q.     That's your position today, right, that

6      it was all just because of the money, not because it

7      was needed to create sufficient density to

8      accommodate affordable units.  Correct?

9          A.     I don't believe I said that.

10         Q.     Okay.  I'm just asking your position

11     today.

12         A.     And if I said that, I may not have

13     understood your question, because --

14         Q.     Well, of course.

15         A.     -- the reason for the fourth story was

16     clearly so that the developer could make more money

17     because he spent too much money on the project.

18         Q.     Right, that's your --

19         A.     So if I said something other than that,

20     I may have misspoke.

21         Q.     Well, the record's going to reflect what

22     you clearly said before, and so -- but your position

23     now is that it was all about the money.  Right?

24             MR. SEAMAN:  Objection to form.

25         Q.     Correct?

Page 68

1     A.     On the developer's end, yes.

2     Q.     Well, on the town's end, did you

3  understand as a member of the governing body the

4  reason there was another floor was because there was

5  greater density required to accommodate the

6  affordable housing, did you understand that?

7              MR. SEAMAN:  Objection to form.

8     A.     The only reason for a fourth story was

9  to make more apartments which was in order to make

10  more money for the developer because he had to put

11  in the affordable housing, and he felt after

12  purchasing all of the properties that he spent too

13  much money on the properties and that he had a

14  higher per door, so the fourth floor was added so

15  that he could add more market rate units to make the

16  project feasible for him to do.

17     Q.     Okay.  Fair enough.  Got it.

18  So I show you the last page of the exhibit.

19  Again, you voted against this ordinance, this

20  resolution adopting an ordinance.  Correct?

21     A.     I voted no on this ordinance.

22     Q.     And why did you vote no?

23     A.     Because I was against the fourth story.

24     Q.     Okay.

25              MR. FIORENZO:  Steve, pull up the next

Page 69

1    one.

2         A.    I believe Lamatina broke this tie.

3              MR. KLEIN:  This is DD-9.

4         Q.    DD-9 is a resolution of the Borough of

5    Emerson dated July 2017.  Do you recall that there

6    was a second amendment to the redevelopment

7    agreement in 2017?

8         A.    Yes.

9         Q.    And do you know what the purpose of that

10   second amendment was?

11        A.    I'd have to see the document.

12        Q.    Again, you voted against this.  Correct?

13        A.    I'd have to see.

14              MR. FIORENZO:  Turn to the last page,

15   please.

16        Q.    So, again, on the second amendment, you

17   voted no.  True?

18        A.    Yes, that's what it says.

19        Q.    Okay.  Well, you have to say -- you have

20   to say yes on the record, so.

21        A.    I did.  I said yes, that's what it says.

22        Q.    And was the reason you voted no having

23   to do with four stories?

24        A.    I'd have to read the whole document

25   again.

Page 70

```
 1        Q.    Is there any other reason?  You have the
 2  whole document in front of you.
 3        A.    I think I've told you in the last
 4  deposition that my opposition to this development
 5  was that it was too dense.
 6        Q.    Yeah.
 7        A.    And adding a fourth story was only going
 8  to make it more dense.  However, I don't recall
 9  specifically what the second amendment was.
10        Q.    Do you know how many affordable units
11  had to be accommodated at the site?
12        A.    Yes.
13        Q.    How many?
14        A.    I think 47.
15        Q.    And do you know whether the -- this plan
16  was reviewed by the Special Master?
17        A.    I think it's actually 27, but I'm
18  blanking.  I think that there was a component where
19  they needed to review it.
20        Q.    Yeah, the Master had to review it and
21  approve it.  Correct?
22        A.    I believe so.
23        Q.    And the Court had to review it and
24  approve it.  Correct?
25        A.    I don't know if we were at that point.
```

Page 71

1    I guess, yeah.

2         Q.    Well, later there was a hearing on this,

3    a fairness hearing.  Correct?

4         A.    Yes.

5         Q.    Okay.  So all of this stuff that was

6    proposed to be developed in order to address the

7    affordable housing units at the site were reviewed

8    and approved by the Court and a court-appointed

9    monitor.  Right?

10        A.    Yes.

11        Q.    And although both of them approved it,

12   you voted no.  Correct?

13             MR. SEAMAN:  Objection to form.

14        A.    I voted no on what?  On this?

15        Q.    Yes.

16        A.    I'd have to see that document.

17        Q.    No, on this.  You voted no.

18        A.    Yeah, but you're just showing me the

19   vote.  I don't know what it said.

20        Q.    It's in front of you.  That's the one

21   you were reading before.

22        A.    You said that's the resolution.  This is

23   the ordinance or this is the resolution?  This is an

24   ordinance that you gave me.  You said resolution.

25        Q.    You have in front of you what's up on

Page 72

1    the board.

2              MR. BOTTA:  So I think --

3              MR. SEAMAN:  The witness does not have

4    what's -- that's not what she has in front of her.

5         Q.    All right.  So what do you want, what do

6    you need?

7         A.    Whatever you're asking me what I voted

8    on.

9         Q.    All right.  You want to scroll back?

10             MR. FIORENZO:  Let's go back, Steve.

11   Pull it out and -- okay.  Give her a hard copy so

12   she's got that as well.

13        A.    I'm right.  Right?  This is an

14   ordinance, that's a resolution.

15        Q.    So let's -- funny, you're having a good

16   time?

17        A.    I think you're trying to trick me, like

18   I don't know the difference between an ordinance and

19   a resolution.  It clearly says resolution.

20        Q.    Do you know the difference?

21        A.    You're telling me there's something in

22   front of me and it says ordinance and I do know how

23   to read.

24        Q.    Do you know the difference between the

25   two?  Ma'am?  Do you know the difference?

Page 73

1              MR. BOTTA:  Objection.

2       A.     Yes, I do know the difference.

3              MR. BOTTA:  You're being argumentative

4    now.

5              MR. FIORENZO:  I'm not.  I'm following

6    up on her comment.

7       Q.     What is the difference?

8       A.     An ordinance is a law in the town and a

9    resolution is basically an agreement that generally

10   shows whether the governing body agrees with an

11   action or not.

12      Q.     Do you adopt an ordinance by a

13   resolution?

14      A.     What?

15      Q.     Do you adopt an ordinance by a

16   resolution?

17             MR. BOTTA:  It's a Title 40 test,

18   Danielle.

19      A.     Do you adopt -- yes.

20      Q.     Okay.  So the resolution is utilized for

21   the purpose of adopting ordinances or local law.

22   Right?

23             MR. BOTTA:  Objection, calls for a legal

24   conclusion.  Can we get back to the question on the

25   ordinance or the resolution or whatever you want to

Page 74

1    know?

2            MR. FIORENZO:  We'll get back to it when

3    I'm ready to and I'm not ready to yet.

4        Q.    Are you reviewing something for the

5    purpose of answering my question?

6        A.    I am.

7        Q.    Okay.

8        A.    All costs --

9            MR. SEAMAN:  Danielle, read silently,

10   please.

11           MR. FIORENZO:  All right.  I'll withdraw

12   the pending question, that way we can move on.  The

13   witness has been reading the document for quite some

14   time.

15           MR. SEAMAN:  He doesn't want to ask

16   about that, so you can put that aside and answer his

17   questions.

18       Q.    Yeah.

19           MR. FIORENZO:  So, Steve, scroll back up

20   on this, please.  Scroll to the first paragraph.

21   Scroll down a little bit, please.  Okay.

22       Q.    So this is the second amendment.

23           MR. BOTTA:  Objection to form.

24       Q.    Oh, it's the resolution.  Yeah, the

25   resolution adopting -- or voting for the second

Page 75

1    amendment.

2          Turn to the second page, please.

3          It says in paragraph 2 that the purpose and

4    intent of the amendment is to amend and supplement

5    the affordable housing requirements.  So were you

6    aware of that at the time that you voted on it?

7          A.    I don't recall.

8          Q.    It goes on to amend certain provisions

9    in the redevelopment agreement, and in particular,

10   the definition of affordable housing requirements.

11   Do you see that?

12         A.    I see it.

13         Q.    What was the reason why you voted

14   against this?

15         A.    Because this included eminent domain.

16         Q.    Okay.  It also included a provision that

17   addressed the affordable housing obligations of

18   Emerson pursuant to the Court's prior rulings.

19   Correct?

20         A.    Correct.

21         Q.    And it provided that the affordable

22   housing could be addressed through the construction

23   of affordable units on site, or two, construct

24   affordable units elsewhere within the Borough

25   (off-site).  Do you see that?

Page 76

1        A.      I see it.

2        Q.      Do you recall the discussions that took

3    place at that time --

4        A.      I don't recall.

5        Q.      You've got to let me finish.

6        -- regarding the issue of the affordable units

7    being on-site versus off-site?

8        A.      I don't recall.

9        Q.      Was there a discussion at that time

10   about the number of units required to go off-site?

11       A.      I don't specifically recall right now.

12               MR. FIORENZO:  Scroll down, Steve,

13   please.  Highlight number 4, please.

14       Q.      Okay.  Section 4 point -- Article 4.01

15   of the agreement was also amended, and it makes

16   reference here to use of eminent domain to acquire

17   the property.  Do you see that?

18       A.      I see it.

19       Q.      And you know what eminent domain is.

20   Right?

21       A.      I do.

22       Q.      That's when the municipality or state

23   determines to condemn or take property by paying

24   just compensation to the property owner for some

25   public purpose.  Correct?

Page 77

1          A.      Correct.

2          Q.      Okay.  So you say that you voted against

3     this because of eminent domain.  Up to this date,

4     was there any provision in the redevelopment

5     agreement that obligated Emerson to use eminent

6     domain if needed to assemble the land in this

7     redevelopment zone?

8          A.      I don't recall, but I do know that once

9     a redevelopment plan is in place, eminent domain is

10    on the table.

11         Q.      Right.  It's on the table not only by

12    agreement but by statute.  Correct?

13         A.      Correct.

14         Q.      All right.  So to the extent that this

15    is now providing for an amendment to 4.01 and it

16    refers to the cost of acquisition, including eminent

17    domain, the issue of eminent domain had been on the

18    table and part of this since the time of the

19    adoption of the original redevelopment plan.

20    Correct?

21         A.      Yes, but now they were actually talking

22    about doing it and talking about putting it right

23    here when they didn't need to specifically put it in

24    a document because it was already in the law.

25         Q.      It was already in the document.

Page 78

1         A.     So the fact that they were putting it in

2    here, they were drawing attention to the fact that

3    it may actually happen.

4         Q.     Well, wasn't it already in a document?

5         A.     I don't recall.

6         Q.     Didn't the original redevelopment

7    agreement provide specifically for eminent domain if

8    needed?

9         A.     I don't recall.

10        Q.     So you don't know if it's now put in

11   here for the first time or not.

12        A.     I don't recall.

13        Q.     Okay.  And you understood the reasons

14   for the -- there being a provision in law and in the

15   agreement for eminent domain.  Right?  You

16   understood why that was there.

17        A.     I do understand eminent domain, yes.

18        Q.     What did you understand the reason why

19   it was in the redevelopment agreement and in the

20   statute?

21        A.     To take away property for a public use.

22        Q.     Okay.  So if there's a determination

23   made that a property is now a redevelopment zone, an

24   area in need of redevelopment, there's a statutory

25   right to be able to condemn it 'cause that's a

Page 79

1    public purpose.  Correct?  As you understood it.

2          A.    Can you say that again?

3          Q.    Yes.  So if there's a provision in the

4    law that permits eminent domain, it would then be

5    there to permit the town to use it for the public

6    purpose of creating a redevelopment zone.  Correct?

7          A.    Yes, but I don't agree with eminent

8    domain.

9          Q.    I understand.  You may disagree with the

10   law, but that's the law.  Right?  You disagree with

11   it though.

12         A.    It's something that's permitted in the

13   law, yes.

14         Q.    And I think you've told me previously

15   you're philosophically opposed to that.  Right?

16         A.    Yes.

17         Q.    You think it's wrong.

18         A.    As used in this purpose, yes.

19         Q.    And you think it's unfair to property

20   owners.

21         A.    It was unfair in Emerson, yes.

22         Q.    Right.  And you felt very strongly about

23   that.  Right?

24         A.    Yes.

25         Q.    Because in your view, that would result

Page 80

1    in potentially if the -- well, withdrawn.

2         You understood the way the process would work

3    would be the following, that the developer --

4    redeveloper would initiate communications with the

5    property owner or tenant and try to negotiate an

6    amount to pay them.  That's step one.  Right?

7         A.    Yes.

8         Q.    And if they were unable to reach such an

9    agreement, they then had a right to come to the town

10   and say, I need you to initiate a condemnation

11   proceeding so I can take the property, and then the

12   redeveloper ultimately would have to pay whatever

13   was determined to be the fair market value.  Right?

14        A.    Yes.

15        Q.    Okay.  And you understood that if we

16   assume that the creation of this redevelopment zone

17   was for a public purpose as found by the governing

18   body, that this eminent domain was a necessary --

19   potentially necessary tool to be able to get the

20   property you needed to develop the site.  You

21   understood that.  Correct?

22        A.    Yes, but I didn't feel that site was the

23   necessary spot to fulfill affordable housing.

24        Q.    Right.  Well, I know that.

25        A.    I had no issue abiding by the judge's

Page 81

1    ruling that we had to have the affordable housing.

2    My argument was that it didn't have to be on that

3    site --

4        Q.    Well, I don't want to go over this

5    again.

6        A.    -- taking away all of the businesses

7    that were still open and working.  I think you

8    recall that from my last deposition.

9        Q.    I do.  You felt really badly, you had a

10   lot of friends there.

11       A.    I never said friends.

12       Q.    Well, you said Cork & --

13       A.    You said friends.

14       Q.    Cork & Keg, you used to go see them

15   every day you said or almost every day.  Right?

16       A.    I didn't say that.

17       Q.    You didn't say that?

18       A.    Are you putting words in my mouth again?

19       Q.    Are you saying you didn't say that?

20       A.    I think you're putting words in my

21   mouth.

22       Q.    Are you saying --

23       A.    I think in the last deposition you tried

24   to tell me they were my friends and I didn't tell

25   you they were my friends.

Page 82

1          Q.      No, no, no, no, no, no, no.

2                  MR. BOTTA:  Joe, move on.

3          Q.      No, no, no, no.  Let's be real clear.

4    Do you deny that you went to Cork & Keg almost every

5    day?

6          A.      I bought cigarettes at Cork & Keg.  I

7    don't know if it was every day.

8          Q.      And you had a social relationship with

9    those people?

10                 MR. SEAMAN:  Objection to form.

11         A.      I don't recall.

12         Q.      And you knew all of these people whose

13   businesses potentially would be taken.  Correct?

14         A.      I generally know all of the business

15   owners in Emerson.

16         Q.      Yes.  And so the answer to my question

17   would be yes, you knew them all.  Correct?

18         A.      I knew them, yes.

19         Q.      Okay.  And you felt badly, you said a

20   moment ago you felt that this project should have

21   been somewhere else, not here.  Right?

22         A.      I don't recall what I said.

23         Q.      No, no.  You just said it a moment ago.

24   You just told me --

25         A.      I said it could have been somewhere

                                                    Page 83

1    else.

2         Q.      Right, right, it could have been.  And

3    you knew that someone undertook an analysis in

4    Emerson, a vacant land analysis to determine what

5    sites might be available for the affordable housing.

6    You knew that.  Correct?

7         A.      Say that again?

8              MR. SEAMAN:  At what point in time?

9         Q.      Did you know when you were on the

10   governing body that there had been an analysis of

11   the available land in Emerson to determine what the

12   appropriate sites would be to be able to site

13   affordable housing?

14        A.      The land wasn't available.

15        Q.      The determination of availability was to

16   be made here by the Special Master, wasn't it?

17        A.      I don't know.

18        Q.      The Special Master, in fact, was charged

19   with the responsibility of overseeing the siting of

20   this Mount Laurel housing.  Are you aware of that?

21        A.      I don't remember.

22        Q.      And this site was the one that was

23   ultimately settled upon as the most likely to be

24   able to accommodate a substantial portion of

25   Emerson's affordable needs.  Correct?

Page 84

1        A.      I honestly don't remember.

2        Q.      You don't know?

3        A.      I don't remember how this happened.

4        Q.      So in any event, you voted against the

5   second amendment.

6                MR. FIORENZO:   Scroll down, Steve,

7   please.  No, no, no, go back up to the next numbered

8   paragraph.

9        Q.      So just -- I'm going to ask you a

10  question generally.  Tell me then, what were the

11  reasons why you voted against this second amendment

12  which was intended to address the affordable housing

13  requirements, why did you do that?

14       A.      I don't recall.  I told you that I was

15  against eminent domain.

16       Q.      Yes.

17       A.      I don't recall why else.

18       Q.      Other than that, can you remember any

19  other reason?

20       A.      I was opposed to the density of the

21  project, which is why I voted no on the majority of

22  votes that came up.

23       Q.      Well, this doesn't -- the second

24  amendment didn't address density.

25       A.      Everything addresses the project.

Page 85

1          Q.    No, no, no, excuse me.  Is there
2    anywhere in this agreement where they address
3    density?  The second amendment.
4                MR. BOTTA:  Well, doesn't it incorporate
5    the First Amendment and the redevelopment agreement?
6          Q.    You can answer.
7          A.    This is an addendum, this is a second --
8    what do you call it, a second --
9          Q.    Amendment.
10         A.    Amendment to a redevelopment
11   agreement --
12         Q.    Okay.
13         A.    -- which I opposed from the get-go.
14         Q.    Got it.  Okay.  So your position is the
15   density -- it was too much density.
16         A.    Yes.
17         Q.    You didn't like it because eminent
18   domain, number one, too much density, number two.
19   Anything else?
20         A.    It didn't fit into our downtown, it was
21   too big.
22         Q.    Too big, number three.  Anything else?
23         A.    A fourth story.
24         Q.    Fourth story, number four.  Anything
25   else?

Page 86

1        A.      It also speaks to density.

2        Q.      What?

3        A.      I believe it also speaks to density and

4    eminent domain --

5        Q.      We did that.

6        A.      -- that I was against.

7        Q.      We did that one already.  I guess the

8    height increases the density.  Right?

9        A.      Uh-hum.

10       Q.      Yes.  Anything else?  Anything else?

11       A.      No.

12       Q.      Okay.  And all of these issues that you

13   raised were considered by the Special Master when a

14   determination was made as to whether to recommend

15   this site to the Court.  Correct?

16       A.      I guess.

17       Q.      Okay.  Now, after the second

18   amendment --

19       A.      What time is it?

20       Q.      -- did you -- it's 11:45.

21       A.      Thank you.

22       Q.      You're welcome.  And by the way, so

23   we're in -- let's see, this is 7/18/17.  The date of

24   this is July 18th of '17.  So at this point when

25   this is going on, there is already pending the

Page 87

1    lawsuit filed by Emerson.  Correct?

2          A.      What do you mean?

3          Q.      Emerson filed a lawsuit in the Superior

4    Court of New Jersey seeking protection from

5    builder's remedy lawsuits.  Right?

6          A.      I think that was filed in '15.

7          Q.      Right.  So I'm going to show it to you

8    in a minute, but there was a suit that was

9    instituted by Emerson.  Correct?

10          A.      Yeah.

11                MR. FIORENZO:  Okay.  Would you pull

12    that up?

13                MR. KLEIN:  This will be DD-10.

14                MR. FIORENZO:  Yeah, whatever.  I'm

15    losing track.  DD-10, Steve?

16                MR. KLEIN:  Yes.

17                MR. FIORENZO:  Okay.

18          Q.      Okay.  DD-10 is a letter from the

19    DeCotiis law firm, July 9, 2005.  It encloses a

20    complaint, Order to Show Cause, and a variety of

21    other legal documents.

22                MR. FIORENZO:  Turn to the next page,

23    please.

24                MR. SEAMAN:  You meant 2015, Joe.

25    Right?

Page 88

1              MR. FIORENZO:   '15, yeah.  Thank you.

2      2015.

3              And turn to the first page of the

4      complaint.  There we go.

5              Q.    So this is the complaint filed by

6      Emerson in the matter of the application of the

7      Borough of Emerson, Bergen County, New Jersey, for a

8      declaratory judgment which was filed on or about

9      July 2015.  You were aware that a suit was filed.

10     Correct?

11             A.    Yeah.

12             Q.    You sat on the governing body when they

13     voted to authorize the suit.  Correct?

14             A.    Yes.

15             Q.    You participated in discussions relating

16     to that?

17             A.    I don't recall if I participated in

18     discussions.

19             Q.    Okay.  Did you vote in favor of the

20     institution of the suit?

21             A.    I don't recall how I voted.

22             Q.    Did you oppose the institution of the

23     suit?

24             A.    I don't recall.

25             Q.    So as you sit here today, you don't

Page 89

1    remember what your position was on this lawsuit?

2          A.     I don't recall.

3          Q.     Okay.  So you don't know your position.

4          A.     I don't recall at this time.

5          Q.     Well, did you think it was a good idea?

6          A.     I don't recall.

7          Q.     Did you think it was a good idea that

8    the town seek protection from builder's remedy

9    lawsuits?

10         A.     I don't recall.

11         Q.     Do you know what a builder's remedy

12   lawsuit is?

13         A.     Yes.

14         Q.     What is it?

15         A.     It's when a builder files a lawsuit

16   against a town because they want to build somewhere

17   that the town doesn't want them to build.

18         Q.     Because of Mount -- because of lack of

19   Mount Laurel compliance.  Right?

20         A.     Yes, correct.

21         Q.     And that was something -- you told me

22   last time we spoke, that was something that you

23   agreed the town should try to protect itself

24   against.  Would you agree with that?

25         A.     Yes.

Page 90

1           MR. BOTTA:  Against builder's remedy

2      lawsuits?

3           MR. FIORENZO:  Yeah, yeah, sure.

4      Q.    And that's, in part, what this did, it

5      sought repose, it sought protection from that.

6      Correct?  True?

7           (Jack Klugmann and Kevin Cowan enter the

8      room.)

9      Q.    True?

10     A.    Say your question again?

11          MR. BOTTA:  Can you just put on the

12     record --

13          MR. FIORENZO:  Can you read it back?

14          MR. BOTTA:  -- who's here?

15          MR. FIORENZO:  Yeah, Mr. Jack Klugmann

16     and the other gentleman.

17          MR. COWAN:  First name is Kevin Cowan,

18     C-O-W-A-N.

19          MR. FIORENZO:  Okay.  With my client.

20     They're representatives of my client.

21          MR. BOTTA:  And he is who?

22          MR. FIORENZO:  Mr. Cowan.

23          MR. BOTTA:  Yeah, I know.  Who is he?

24          MR. FIORENZO:  With Accurate.

25          MR. BOTTA:  Okay.  The title, please?

Page 91

1            MR. FIORENZO:  Why?  Why do you need to

2     know?

3            MR. BOTTA:  Well, I don't know if he's a

4     member of the company or not.  He can't just show up

5     if he's not a member of the plaintiff.

6            MR. FIORENZO:  He works for the company.

7            MR. BOTTA:  Okay.  Put it on the record.

8            MR. FIORENZO:  I just did.

9            MR. BOTTA:  No, you didn't.

10            MR. FIORENZO:  He works for the company.

11            MR. BOTTA:  What's his title?

12            MR. FIORENZO:  Don't know.  Okay?

13            MR. BOTTA:  Can you put your title on

14     the record?

15            MR. FIORENZO:  No, no, no, no, you don't

16     respond.  Don't respond to him.  You don't get to

17     question him.

18            MR. BOTTA:  Then I want the record to

19     reflect who is here and what their titles are in

20     relation to the plaintiff.

21            MR. FIORENZO:  And I just told you, and

22     as far as I'm concerned, that's all I'm going to

23     tell you about it.

24            MR. BOTTA:  No, I want on the record who

25     he is and who he is at present and if he's a

Page 92

1   representative and what his title is so that it can

2   be checked.

3                    MR. FIORENZO:  Right.  And I'm declining

4   to do anything more than what I just did, which I

5   told you he works for the company.

6                    MR. BOTTA:  I want his name and address

7   on the record.

8                    MR. FIORENZO:  His name is on the

9   record.  I just gave it to you.

10                   MR. BOTTA:  Well, spell it.

11                   MR. FIORENZO:  Spell the name.  I don't

12  know how you --

13                   MR. COWAN:  C-O-W-A-N.

14                   MR. FIORENZO:  Thank you.

15                   MR. BOTTA:  First name?

16                   MR. COWAN:  First name is Kevin.

17                   MR. FIORENZO:  Thank you.

18       Q.    Okay.  Can we -- do you remember the

19  question?

20       A.    No.

21                   MR. FIORENZO:  Okay.  Let's go back.

22                   (The record is read by the reporter.)

23       A.    Correct.

24       Q.    Okay.  So after this complaint was

25  filed, and I want to take you now back, we were in

Page 93

1   July of 2017 when you voted against the second

2   amendment, do you remember shortly thereafter the

3   lawsuit in the Superior Court was settled?

4        A.    I don't think it was settled until I

5   became mayor and we had to prove everything.  I

6   think there was a condition of settlement.

7             MR. FIORENZO:  Pull it up, Steve.

8   November 21, '17.

9             MR. KLEIN:  This will be DD-11.

10       Q.    This is a November 21, 2017, settlement

11   agreement addressed to Wendy Rubinstein.  She was

12   counsel for Emerson.  Correct?

13       A.    Correct.

14       Q.    And it's regarding In the Matter of the

15   Application of the Borough of Emerson, Docket No.

16   BER-L-6300-15.

17       So the first sentence says, The letter

18   memorializes the terms of an agreement reached

19   between the Borough of Emerson, the declaratory

20   judgment plaintiff, and Fair Share through

21   settlement.

22       So this is the settlement agreement reached

23   between the parties.  True?

24       A.    Yes.

25       Q.    Okay.  So within a couple months of the

Page 94

1  vote on the second amendment to the redevelopment

2  agreement, this Mount Laurel case was settled, and

3  you were aware of that at the time.  Correct?

4       A.    I don't recall.

5       Q.    Well, this was presented to the

6  governing body, including you, to determine whether

7  Emerson was authorized to settle.  True?

8       A.    I don't recall.  It was a long time ago.

9       Q.    So do you deny that you voted on this?

10      A.    I just said I don't recall specifically

11  what you're saying.

12      Q.    Did you have any objections to the

13  proposed settlement?

14      A.    I don't recall.

15      Q.    Take a look at the agreement.

16            MR. FIORENZO:  Give her a hard copy if

17  you could, please.

18            MR. KLEIN:  Sure.

19      Q.    Here's a hard copy for you.

20            MR. FIORENZO:  By the way,

21  congratulations.

22            MR. KLUGMANN:  Thank you.

23      Q.    Okay.  So in the settlement agreement --

24            MR. FIORENZO:  What is it, Steve, DD-11?

25            MR. KLEIN:  Yes.

Page 95

1      Q.    DD-11, in the -- go back to the first

2  page if you would.  You're on the first page.

3  There's a section that says Background.  And it

4  says, "Emerson filed the above-captioned matter on

5  July 8, 2015, seeking a declaration of its

6  compliance with the Mount Laurel doctrine and the

7  Fair Housing Act," and I'll stop there.  "Through

8  declaratory judgment process, the Borough and FSHC

9  agreed to settle the litigation and to present the

10  settlement to the trial court with jurisdiction over

11  this matter to review, recognizing the settlement of

12  Mount Laurel litigation is favored because it avoids

13  delays and the expense of trial and results more

14  quickly in the construction of homes for

15  lower-income households."

16      So does that refresh your recollection that

17  this, in fact, was the settlement agreement reached

18  between Emerson and the Fair Housing in connection

19  with the pending litigation?

20      A.    I recall that this is the agreement.  I

21  don't recall how I voted.

22      Q.    Okay.  The last page, which is page 10

23  of the agreement before the exhibits, is signed on

24  behalf of Emerson.  Do you know who signed that?

25      A.    On page 10?

Page 96

1      Q.    Yeah, page 10.

2      A.    It looks like it says Lou Lamatina.

3      Q.    Okay.  In the settlement agreement --

4            MR. FIORENZO:  Go to paragraph 6,

5      please, Steve.

6      Q.    So paragraph 6 addresses certain parts

7      of Emerson's affordable housing obligations.  Were

8      you aware of the provisions of paragraph 6 --

9      A.    Yes.

10     Q.    -- at the time?

11     There's also --

12     A.    Actually, I don't know if I was at the

13     time.  I'm aware of them now.

14     Q.    Okay.  There's also a section 7.

15           MR. FIORENZO:  Steve, could you scroll

16     down to that.

17     Q.    So as part of the settlement, it

18     attempted to quantify what Emerson's affordable

19     housing needs were in what's described as the "prior

20     round."  Do you know what that means?

21     A.    Yes.

22     Q.    What?

23     A.    That means the amount of affordable

24     units that already satisfied the obligation.

25     Q.    Okay.  And in addition to the prior

Page 97

1  round, it then addressed -- it addressed the

2  prospective need, and I want to have you take a

3  look, please, at paragraph 8.

4         So paragraph 8 is the -- provides that Exhibit

5  A -- as reflected in Exhibit A, those properties

6  have a realistic development potential of 53 units

7  and the RDP will be satisfied as follows, as will be

8  more fully described in the Borough's Housing

9  Element and Fair Share Plan.

10         So did you understand that this settlement

11  agreement, among other things, settled and fixed the

12  number of affordable units, thereby eliminating the

13  potential of the court fixing a different amount?

14         A.    Yes.

15         Q.    Okay.  And it then listed the various

16  projects where the housing would be sited.  Correct?

17         A.    Yes.

18         Q.    And it shows the second line is Block

19  419 project, and that's the project in question.

20  True?  That's my client's property, Block 419.

21  True?

22         A.    Are you asking me or are you stating

23  that?

24         Q.    I'm always asking you, yeah.

25         A.    It sounded like a statement.

Page 98

1      Q.     No.  True?

2      A.     Yes.

3      Q.     Okay.

4      A.     15 percent.

5      Q.     And it provides for 29 of the units of

6   the affordable housing of the 53 units were going to

7   be sited on the subject property.  Correct?  Yes?

8      A.     Yes.

9      Q.     So would you agree that Block 419

10  comprised really the single largest component part

11  of Emerson's affordable housing obligation,

12  fulfillment of that obligation.  Correct?

13     A.     As presented, yes.

14     Q.     Okay.  And then there's an asterisk

15  there down below, and it reflects that there's a

16  minimum of 15 percent set-aside, 22 units with an

17  option -- with an off-site provision for

18  payment-in-lieu -- or payment-in-lieu for the

19  remaining seven.  So did you understand when this

20  was settled, there were to be 29 affordable units --

21     A.     22.

22     Q.     -- 22 would be on-site and seven would

23  be off-site.  Correct?

24     A.     That there could be seven off-site.

25  There didn't have to be.  But they were supplying 29

Page 99

1    of the units.

2        Q.    Seven to be off-site at the election of

3    the developer.  Correct?

4        A.    With an option for off-site.

5        Q.    Yeah, yeah.  Okay.  And so that would be

6    the 29.  And it goes on to say, "If such option is

7    exercised, the Borough will show at the midpoint

8    review how it will provide a realistic opportunity

9    for the remaining seven units, in accordance with

10   the provisions of the agreement."

11       Now, did you engage in discussions with anyone

12   about those seven units?

13       A.    At what point?

14       Q.    At any point.  Well, let me -- at any

15   point up through the institution of the suit here.

16   Did you have discussions about the seven units with

17   anyone?

18       A.    Yes.

19       Q.    With whom?

20       A.    I think they presented a pseudo-plan to

21   the Borough that they wanted to put seven units on a

22   particular piece of land in the Borough.

23       Q.    When?  After the litigation or before?

24   When I say litigation, this litigation, this

25   lawsuit, before or after this suit.

Page 100

1          A.     I guess after.

2          Q.     Okay.  Prior to this suit, did you have

3    any discussions or communications with anyone

4    regarding the seven off-site units?

5          A.     Did I have conversations?

6          Q.     You, yes.

7          A.     No.

8          Q.     Okay.  Were you aware of -- were there

9    discussions about where those seven units would be

10   located prior to the institution of the suit in this

11   matter?

12         A.     Can we take a break?

13         Q.     Well, we're in the middle of a question.

14   We can take a break.  Just answer my question and we

15   can take a break.

16         A.     I think I'd like to take a break right

17   now.

18         Q.     Well, once you answer the question.

19         A.     I'm going to go to the ladies' room

20   right now.

21                MR. BOTTA:  We'll read it back.

22         Q.     You're walking out?

23                MR. FIORENZO:  Let the record reflect --

24         A.     I'm going to the ladies' room out of

25   necessity.

Page 101

 1              MR. FIORENZO:  Let the record reflect I

 2    asked the witness just to complete the answer to the

 3    question --

 4              MR. BOTTA:  Well, we've been going two

 5    hours plus, so.

 6              MR. FIORENZO:  -- and she just picked

 7    up -- she just picked up and walked out, because she

 8    is --

 9              MR. BOTTA:  We've been going two hours

10    plus.

11              MR. FIORENZO:  -- controlling how we

12    proceed here apparently.

13              MR. BOTTA:  She needed to go to the

14    ladies' room.

15              MR. FIORENZO:  Oh, come on.  She could

16    have answered the question and that's the way it

17    works.

18              MR. BOTTA:  She had to go to the ladies'

19    room.

20              MR. FIORENZO:  She's supposed to answer

21    the question before she breaks.

22              MR. BOTTA:  I don't talk about your

23    bladder, don't talk about hers.

24              MR. FIORENZO:  In Federal Court, that's

25    how it works.  You don't walk out in the middle of a

Page 102

1    question.  But this is Danielle DiPaola, so.

2                    Okay.  We might as well take a break.

3                    (A break was taken at 12:05 p.m.)

4                    (Deposition resumes at 12:15 p.m.)

5                    MR. FIORENZO:  Back on the record.

6    BY MR. FIORENZO:

7        Q.    So we were discussing the 419 project,

8    and I just want to make sure the record is clear.

9    Do you recall any discussions at all at any meetings

10   of the governing body regarding the terms and

11   conditions of the settlement agreement?

12                   MR. SEAMAN:  At what point in time?

13                   MR. FIORENZO:  Prior to the execution of

14   the settlement agreement, which is in 2017.

15       A.    I don't recall.

16       Q.    Before the settlement agreement was

17   approved by the governing body back in 2017, did you

18   understand the terms and conditions of the

19   settlement?

20       A.    I don't recall.

21       Q.    You don't recall if you knew them?

22       A.    I don't recall if I understood them

23   fully.

24       Q.    Okay.  Did you have an opportunity to

25   speak to anyone you wanted regarding the terms and

Page 103

1    conditions of the proposed settlement?

2        A.    I don't recall.

3        Q.    Was a presentation made by the attorney

4    for Emerson concerning the terms and conditions of

5    the settlement?

6        A.    I don't recall.

7        Q.    Did you have any objections to the terms

8    and conditions of the settlement agreement reached

9    by Emerson with Fair Housing in the Mount Laurel

10   case?

11       A.    I don't recall.

12       Q.    As you sit here today, do you have any

13   objections to the settlement agreement?

14       A.    I guess it was necessary.

15       Q.    Okay.  So I guess then the answer to

16   that would be no, you don't have any objections

17   'cause it was necessary?

18       A.    At the point in time of this agreement,

19   I guess the governing body felt that it was

20   necessary.

21       Q.    Well, I asked you about today and you

22   just told me -- I asked if you had any objections as

23   of today, and you said, I guess it was necessary.

24   By that did you mean you don't have any objections

25   today because it was necessary to do?

Page 104

1      A.     I have the objection of including the 29

2   units only for the same reasons I've been saying all

3   morning.

4      Q.     Right.  But they agreed to settle with

5   those 29 units related to Block 419.  You understood

6   that.  Correct?

7      A.     Yeah.  I also agreed that 55 Emerson

8   Plaza West was part of the agreement, and it didn't

9   exist, they weren't deed-restricted until I became

10  mayor.

11     Q.     Okay.  But I'm not asking about that.

12     A.     I know.  But you're asking me to think

13  about what I did.  I don't recall.

14     Q.     Okay.  So did you have any objection --

15  or do you have any objections today as to the terms

16  and conditions of the settlement agreement?

17     A.     I don't know.

18     Q.     Well, take a look at it.  It's in front

19  of you.  This is my opportunity to ask you that

20  question.

21     A.     I guess I would say yes.

22     Q.     What are your objections --

23     A.     The fact that --

24     Q.     Let me finish.  What are your objections

25  as to the settlement agreement, DD-11, today?

Page 105

1          A.     I think you knew that I objected to

2     Block 419 because of the density of the project for

3     the fourth story, so if I was going to have an

4     objection, I would say that we could have had a

5     better plan in order to put into the -- into this

6     agreement.

7          Q.     Okay.  So you have -- today you have an

8     objection as to the settlement agreement to the

9     extent it includes Block 419 as one of the sites for

10    affordable housing.  Is that correct?

11         A.     Because of its density and size.

12         Q.     I don't want to know because.  Is that

13    correct?

14         A.     Because of the density and size.

15         Q.     I don't want to know why yet.  I just

16    want you to confirm that you have an objection to

17    Block 419 being included, and then I'll get to the

18    reasons.  Is that true?

19         A.     I don't know.

20         Q.     I thought you just told me that you had

21    an objection --

22         A.     I'm saying the reason is because of the

23    density.

24         Q.     You've got to let me finish, please.

25         A.     Yeah, but I was answering you what you

Page 106

1    asked.

2         Q.    No, no, no, I was in the middle of a

3    question.  Okay?

4         A.    Okay.

5         Q.    So as to the settlement agreement, do

6    you or do you not have an objection to inclusion of

7    Block 419 as a site for affordable housing in the

8    settlement agreement, yes or no?

9         A.    I guess I objected to it, but it's on

10   specific instances that I keep on saying and you

11   don't want to hear.

12        Q.    I don't know what that means.  Do you

13   object to it as of today, including Block 419, or

14   not?

15        A.    I don't understand your question.

16        Q.    My question is, Block 419 is in the

17   agreement for 29 affordable units.  Correct?

18        A.    Yes.

19        Q.    Do you object to the settlement

20   agreement because it included Block 419 for the 29

21   affordable units, yes or no?

22        A.    I don't really understand what you're

23   asking.

24        Q.    What don't you understand about that

25   simple question?

Page 107

1        A.      I just don't understand your question.

2        Q.      Do you object to Block 419 being in the

3    settlement agreement?

4        A.      I don't know.

5        Q.      Okay.  You said a moment ago, I guess it

6    was necessary.  Do you recall that testimony?

7        A.      I said I guess the governing body felt

8    it was necessary.

9        Q.      No, I think you said I guess it was

10   necessary.  But did you believe it was necessary to

11   satisfy the 53 units?

12       A.      I think it was necessary to come up with

13   a plan to build affordable units in Emerson in order

14   to satisfy the agreement with the court.

15       Q.      But I didn't ask that, did I.  I asked

16   whether Block 419 was necessary in order to satisfy

17   part of the 53 units.

18       A.      I think the majority of the governing

19   body felt that it was.

20       Q.      I didn't ask about them though.  I asked

21   about you.  Did you think it was necessary?

22       A.      No.

23       Q.      Okay.  Did you offer or propose any

24   other site for the 29 units?

25       A.      I don't really think there was an option

Page 108

1    for that.

2         Q.     Okay.  Did you have another site that

3    you proposed is the question, not whether there was

4    an option.  Did you say to anyone, look, before we

5    settle this thing and before we include Block 419,

6    we should instead put it somewhere else, did you

7    give another alternate location?

8         A.     I don't know that I gave a specific, but

9    I think that I said that this wasn't the only way to

10   fulfill the obligation.

11        Q.     Right.  I appreciate that.  That wasn't

12   my question.  Did you give another site in lieu of

13   that to site -- to provide for the 29 units that

14   would be lost if 419 was not part of the deal?

15        A.     I don't --

16        Q.     Did you give another site location?

17        A.     I don't think that I had the knowledge

18   of where there could be other sites.

19        Q.     So is the answer then no?

20        A.     Because as a single governing body

21   member, I couldn't have the engineers and the

22   planners work just for me to find another site.

23        Q.     So I take it then the answer to my

24   question is no, you didn't offer another site?

25        A.     I think I suggested that there could be

Page 109

1    other sites --

2          Q.     I know that.

3          A.     -- but nobody wanted to look into it.

4                 MR. BOTTA:  Let her finish.

5          Q.     We keep going around in circles.  We're

6    wasting time.  I know you said I kept suggesting.

7    I'm asking, did you ever propose a specific site in

8    lieu of Block 419, yes or no?

9          A.     I don't recall.

10                MR. BOTTA:  Joe, now you're raising your

11   voice.  Just talk normal.

12                MR. FIORENZO:  I'm not.  If I raise my

13   voice, believe me, you'll know.  That's not it.

14   That's really not it.

15                MR. BOTTA:  That is raising your voice.

16                MR. FIORENZO:  Trust me, it's not.

17         Q.     Did you know of another site that could

18   house the 29 affordable units at the time this

19   settlement agreement was entered into?

20         A.     I don't recall.

21         Q.     Did you know what other sites were

22   considered by the Special Master appointed by the

23   Court?

24         A.     I don't recall.

25         Q.     Did the Special Master appointed by the

Page 110

1    Court consider other locations?

2         A.    I don't remember.

3         Q.    You voted against the settlement, didn't

4    you?

5         A.    I don't recall.

6               MR. FIORENZO:  Pull that up, Steve.

7               MR. KLEIN:  This will be DD-12.

8               MR. FIORENZO:  Would you turn to section

9    17.

10        Q.    Okay.  Here we are.

11              MR. BOTTA:  What is this, please?

12              MR. FIORENZO:  Yeah, these are minutes

13   of -- what's the date again?

14              MR. KLEIN:  November 21, 2017.

15        Q.    So on November 21 of '17, there was a

16   resolution proposed and voted on.  The resolution

17   was to authorize the settlement, agreement, which is

18   the document we've been talking about, DD-11.  And

19   it appears from the record that everyone voted in

20   favor of settling the dispute except for you, you

21   voted no.  Right?

22        A.    Everyone always voted in favor of

23   everything that Lou Lamatina presented.

24        Q.    Great, but that wasn't my question

25   though, was it?

Page 111

1         A.      Except for me.

2         Q.      Thanks a lot, yeah, yeah.  Yeah, that's

3    great.  Now could you answer my question?  Everyone

4    voted in favor but you, you voted no.  Correct?

5         A.      Everyone that was present, correct.

6         Q.      You're the only no vote.  Right?

7         A.      Right, but there were only five

8    council --

9         Q.      Right.

10        A.      -- members present.

11        Q.      What was the reason why you voted

12   against settlement --

13               MR. SEAMAN:  Joe, let her finish her

14   answer before you ask another question.

15        Q.      What was the reason why you voted

16   against the settlement agreement, let me finish,

17   that was going to settle the litigation and provide

18   Emerson with a judgment of repose and protection

19   against builder's remedy?  Give me your reasons.

20   What was number one?

21        A.      I can only say that I objected to the

22   project at 419 because of its density and the fourth

23   story and everything else that I objected about it,

24   the eminent domain, everything.

25        Q.      Okay.  So the reason you voted against

Page 112

1  it is you knew 419 was included as a core component

2  part of the settlement.  Correct?

3           MR. SEAMAN:  Objection to form.

4      A.    I guess I knew that.

5      Q.    Okay.  And you felt that it was too

6  dense and you felt that you didn't like the fourth

7  story as you told me before.  Right?

8      A.    Right.

9      Q.    And so that was the reason you voted

10  against it?

11      A.    And I didn't like the component of

12  eminent domain.

13      Q.    Okay.  That's the third reason.

14      A.    Which looked like it was going to be

15  used.

16      Q.    Okay.  And those were the reasons why

17  you voted against the settlement agreement?

18      A.    They are probably some of them.  I don't

19  recall specifically --

20      Q.    Well, I want to know all of them.

21      A.    I don't recall specifically --

22      Q.    Okay.  So let me --

23      A.    -- why I voted no.

24           MR. BOTTA:  Joe, let her finish.

25           MR. FIORENZO:  She's not even trying.

Page 113

1              MR. BOTTA:  Objection.

2              MR. SEAMAN:  Objection.

3         Q.    Let's be clear.  Just so you understand,

4    this is your deposition, and it's my opportunity to

5    discover facts in the case.  So I need to know today

6    if you -- tell me what you remember.  Do you

7    remember any other reasons other than you objecting

8    to Block 419 for the reasons you stated, density,

9    four stories, eminent domain, any other reason why

10   you voted against the settlement agreement that you

11   can recall sitting here today?

12        A.    I don't recall.

13        Q.    Okay.  Did you understand that if the

14   matter wasn't settled, there would be a trial?

15        A.    I don't know if I knew that at the time.

16        Q.    Did you understand that if it wasn't

17   settled, fixing and limiting the numbers for

18   affordable units, that there was exposure to Emerson

19   of higher units imposed by the Court?

20        A.    I don't recall what I remembered at that

21   moment.

22        Q.    Do you know that as of today?

23        A.    I understand it today.

24        Q.    Okay.

25        A.    It's a long time ago, yeah.

Page 114

1           MR. FIORENZO:  Pull up the conditional

2     compliance.

3           MR. KLEIN:  This will be DD-13.

4           Q.    So DD-13 is a January 25, 2019,

5     Conditional Final Judgment of Compliance and Repose.

6     Hold on one second.

7           So we're going to come back to DD-13 in a

8     moment, but I want to show you something else before

9     we discuss this.

10          MR. KLEIN:  This will be DD-14.

11          Q.    Okay.  So after the settlement agreement

12    was entered into signed on November 21, 2017,

13    between Emerson and Fair Housing to settle the

14    litigation, did you understand that there had to be

15    a hearing in front of the Court for the Court to

16    approve it?

17          A.    I don't know.

18          Q.    Because this was a Mount Laurel case

19    with affordable housing, did you understand that it

20    was required that the Court make a determination at

21    a "fairness hearing" as to whether the settlement

22    agreement was fair and reasonable and would allow

23    Emerson to fulfill its obligations, did you

24    understand that?

25          A.    I don't recall.

Page 115

1          Q.    That was explained to you, was it not,

2    back at -- prior to June 29, 2018?

3          A.    I don't recall.

4          Q.    Do you remember telling me that you knew

5    there was going to be a hearing but they didn't tell

6    you the exact date when the hearing was going to be?

7          A.    Or where it was.

8          Q.    Or where it was.  Remember we went over

9    that previously?

10         A.    I remember that.

11         Q.    So you knew about there was going to be

12   a hearing, you just claimed that no one ever told

13   you the specifics of when and where it was so you

14   could go down to object if you wanted to.  Correct?

15   Remember telling me that?  Is that true?

16         A.    I don't recall.

17         Q.    Okay.  You don't remember that either?

18         A.    I don't recall.  There's been a lot of

19   time in between a lot of this.

20         Q.    Yeah, yeah.  In any event, the Court

21   conducted a fairness hearing, do you remember us

22   discussing that the last time we sat down together,

23   and that there were certain objectors who came down

24   and actually objected to the settlement agreement,

25   do you recall that, we talked about that?

Page 116

1          A.     I don't recall.

2          Q.     Did you understand there was a fairness

3    hearing?

4          A.     I understand it now.

5          Q.     Okay.  And at the fairness hearing, did

6    you understand that there were objectors -- first of

7    all, there was a Special Master that was there

8    testifying, there were objectors, 214 Kinderkamack,

9    LLC, Dolores Della Volpe.  Do you know who she is?

10         A.     Yes.

11         Q.     Did you ever speak to Ms. Volpe?

12         A.     Yes.

13         Q.     Did she own a business?

14         A.     No.

15         Q.     Was she involved -- how was she involved

16   in any way with this project?

17         A.     She owned a property within the

18   redevelopment zone.

19         Q.     Okay.  She had a tenant on the site?

20         A.     She had a tenant.

21         Q.     Who was the tenant?

22         A.     Cork & Keg.

23         Q.     Okay.

24         A.     And the cleaners.

25         Q.     Those were the people that you used to

Page 117

1  go --

2       A.    Cork & Keg and the cleaners, not just

3  Cork & Keg.

4       Q.    Cork & Keg were the people we talked

5  about, you used to see them all the time, you went

6  in the store, bought things, interacted.  Correct?

7       A.    Just like I saw Billy and Sue all the

8  time when I went into the cleaners.

9       Q.    Sure.  You knew everybody you told us.

10  Right?

11       A.    I do know all the businesses in town.

12       Q.    I'm sure you do.  So did you speak to

13  Ms. Volpe about trying to get her to come down to

14  the hearing to make an objection?

15       A.    No.

16       Q.    So you never spoke with her before this

17  fairness hearing?

18            MR. SEAMAN:  Objection to form.

19       A.    I think I've spoken to her before, but

20  not particularly about the fairness hearing, no.

21       Q.    Did you speak to her about objections to

22  the plan?

23       A.    I believe the only conversation I ever

24  had with -- well, I don't even know if it was

25  Dolores Volpe, I think it was the daughter.  I don't

Page 118

1    know if Dolores was the daughter or the mother,

2    because the mother inherited the building from her

3    husband who passed, and the only conversation I

4    believe I only had with Dolores is when she called

5    to tell me that she had told Mayor Lamatina that she

6    would put a second story on the Cork & Keg cleaners

7    building, and he said, don't even try it, we're

8    taking your property.

9         Q.    Okay.  So now that you've gotten that

10   out, did you speak with Dolores in any way about the

11   settlement agreement?

12        A.    No.

13        Q.    You didn't appear at the settlement --

14   at the fairness hearing.  Correct?

15        A.    I don't think I understood at the time

16   that I could.

17        Q.    Right.  I didn't ask the reason, but

18   you've now confirmed you weren't there.  Correct?

19        A.    I was not there.

20             MR. FIORENZO:  Scroll to the next page.

21        Q.    So did your town attorney when the case

22   was settled explain to the governing body as a whole

23   that there would then have to be approval of the

24   settlement agreement by the Court, did you know

25   that?

Page 119

1          A.      I guess.

2          Q.      Okay.  And the Court had a hearing and

3     they, according to the order, heard and received

4     evidence, both documentary and witnesses, and

5     considered the challenges of the objectors to the

6     proposed settlement, including --

7                  MR. FIORENZO:  Steve, highlight that

8     last paragraph, please.  Can you make that a little

9     bigger?  Oh, never mind.

10         Q.      It says, "The Court having heard and

11    considered challenges argued by the objectors to the

12    proposed settlement agreement, including the

13    objectors' challenge to the realistic opportunity to

14    provide housing for persons of low and moderate

15    income, based on the objectors' contention that the

16    Borough may not acquire the objectors' property or

17    other properties within Block 419 for

18    redevelopment."

19                 MR. FIORENZO:  Continue on, please.

20    Stop there.

21         Q.      And having considered all that, the

22    Court ordered and found that, and then there's A, B,

23    it identified the present need obligation of Emerson

24    at twenty units.  Do you see that?

25         A.      Yeah.  I don't know where you're going

Page 120

1    with all of this.

2        Q.    Well, I'm asking, did you understand

3    that the Court then after this hearing made a final

4    determination fixing the amount of affordable

5    housing obligations, in other words, taking the

6    numbers that had been proposed, and then this

7    settlement reduced those numbers, did you understand

8    that it was reducing the numbers?

9        A.    I don't recall.

10       Q.    Don't you recall your counsel at a

11   hearing presenting and saying this is a good deal

12   for the town and here's why?

13       A.    I don't remember.

14       Q.    Was the settlement recommended by

15   counsel?

16       A.    I don't remember.

17       Q.    So you didn't understand that there was

18   now going to be a cap or limit on what the COAH

19   housing obligations were, you didn't know that?

20       A.    I don't remember.

21             MR. SEAMAN:  Objection to form.

22       A.    I don't remember.

23       Q.    Well, do you know that now?

24       A.    I don't know.  I think it's fair to say

25   that when a lot of this was going on, I didn't get a

Page 121

1    lot of one-on-one with our attorneys for

2    explanations.

3         Q.    I didn't ask that.

4         A.    I was only picking up as much as I could

5    and I voted the way I felt was the best interest of

6    the Borough.

7         Q.    I asked only did you know that now,

8    today, as you sit in this room, that one of the

9    things the Court-approved settlement did is it

10   limited, reduced the number of affordable units

11   Emerson would otherwise have to fulfill.

12        A.    Yes, I just read it.

13        Q.    Do you understand that now?

14        A.    Yes, I just read it.

15        Q.    Okay.

16             MR. FIORENZO:  Continue scrolling down.

17   Go to H, please.

18        Q.    And it appears that the Court at the

19   hearing specifically considered Block 419, and they

20   found, "Upon the Special Master's report, testimony,

21   and recommendation, that the settlement is fair and

22   reasonable to low and moderate income persons, and

23   the properties located within Block 419

24   redevelopment project area are all 'necessary or

25   useful' to provide low and moderate income housing."

Page 122

1          Did you understand that the Court made a

2     specific finding of fairness of the settlement

3     agreement, and specifically that Block 419 was

4     necessary or useful to satisfy the constitutional

5     obligation, did you know that?

6          A.     I understand reading that, that that was

7     the Judge's opinion, yes.

8          Q.     And that was the Judge's opinion back

9     then on --

10               MR. FIORENZO:  What's the date again

11    Steve, January?

12               MR. KLEIN:  June 29th, 2018.

13         Q.     June 29th, 2018, that was the Judge's

14    opinion back then.  Right?

15         A.     Yes.

16         Q.     Okay.  Now, after this occurred, after

17    the fairness hearing and now the settlement

18    agreement was approved by the Court, did you

19    understand that there were things that needed to be

20    done further by the town of Emerson in order to

21    fulfill its obligation with respect to affordable

22    housing, did you know that?

23         A.     I don't recall.

24         Q.     Well, you were on the governing body,

25    weren't you?

Page 123

1         A.      I don't recall.

2         Q.      Were you interested in monitoring what
3    was going on with regard to satisfying the
4    affordable housing obligations?

5         A.      I don't recall what I was thinking at
6    that time.

7         Q.      So you have no recollection of what you
8    knew and didn't know after the Court-approved
9    settlement agreement with respect to Mount Laurel,
10   you just have no recollection whatsoever?

11        A.      At this time I can't tell you
12   specifically what I thought after hearing about
13   this.

14        Q.      Okay.  Well, sitting here today, what
15   you know -- let's explore what you know today.  You
16   know today that after that settlement was approved,
17   there then had to be certain things done, one of
18   which was there had to be a Planning Board hearing
19   where the plan was presented to the Zoning Board for
20   approval of the Block 419 project.  You were aware
21   of that.  Correct?

22        A.      I guess.

23        Q.      'Cause you were there.  Right?

24        A.      I think so.

25        Q.      You attended that.

Page 124

1          A.      I think I did, yeah.

2          Q.      Is there any doubt you did?

3          A.      What date was it?  Was this the last

4     meeting in December?

5          Q.      December 2018, did you attend --

6          A.      Yes, I was there.

7          Q.      -- did you attend the Land Use Board

8     hearing at which the Block 419 project was presented

9     for approval?

10         A.      Yes.

11         Q.      Okay.  And did you understand that that

12    was being done to implement the terms of the

13    settlement agreement approved by the Court?

14         A.      I don't know if I knew that at the time.

15         Q.      Do you know that now --

16         A.      Yes.

17         Q.      -- that it was being done -- yeah.

18    Okay.  And, in fact, in addition to that, there were

19    other things the settlement agreement required to be

20    done, there had to be a Housing Element Plan

21    adopted.  Correct?

22         A.      I don't recall.

23         Q.      You don't remember anything.

24         A.      I don't recall the process.

25         Q.      Okay.

Page 125

1          MR. KLEIN:  DD-15.

2     Q.    DD-15 is a Housing Element and Third

3 Round Fair Share Plan.  Have you seen this report

4 before?

5     A.    Yes.

6     Q.    And it's prepared by Brigette Bogart.

7 Who was she?

8     A.    She was the planner for the Borough of

9 Emerson?

10     Q.    Okay.  Before you fired her?

11     A.    I fired her, yes, I did.

12     Q.    Right.  Yeah, I'm just trying to get a

13 time frame.  This was before she was fired by you

14 when you came on.

15     A.    She technically was not fired, she was

16 just not reappointed.

17     Q.    Fair enough.

18     A.    But I think what you're getting at is I

19 didn't agree with her work.  I did not.

20     Q.    I'm not getting at anything.  I'm asking

21 you a question.

22     A.    Well, you said fired.

23     Q.    I'm just asking you a question.  You

24 told me you didn't fire her.  She wasn't

25 reappointed.  Okay.  I'll accept that.

Page 126

1      A.     You were a mayor.  You know I can't

2  single-handedly fire a professional, so don't put

3  words in my mouth.

4      Q.     Yeah, I know.  You didn't have any

5  control over the instruments of government in

6  Emerson at all, is that what you're saying?  You had

7  no influence over the instruments of government in

8  Emerson, is that what you're saying?

9      A.     I don't understand your question when

10  you say instruments.

11      Q.     You said, I couldn't do it.  Are you

12  saying that you, as the mayor, had no influence on

13  whether to hire or retain professionals once you

14  were elected mayor, is that your testimony here?

15      A.     I cannot fire a professional all on my

16  own, you know that.

17      Q.     No, but you could influence who gets

18  hired or not.  Right?

19                MR. SEAMAN:  Objection to form.

20      A.     Influence?

21      Q.     Yeah.

22      A.     I think that we have discussions

23  about --

24      Q.     Yeah.

25      A.     -- who should be hired and who shouldn't.

Page 127

1      Q.    Okay.  But in any event, you got rid of

2   Bogart.

3             MR. SEAMAN:  Objection.

4      Q.    Let's look at the report, DD-15.  Did

5   you review this report?

6      A.    Parts of it.

7             MR. FIORENZO:  Let's get the date,

8   Steve.  I can't see it at the top.

9             MR. BOTTA:  That's from the court stamp.

10            MR. FIORENZO:  Oh, yeah, yeah, yeah,

11   yeah.  Okay.  That's the court stamp.

12            MR. KLEIN:  December 6, 2018.

13            MR. FIORENZO:  Okay.  Right, on the

14   bottom.

15      Q.    Okay.  So on the front page of DD-15, it

16   indicates December 6 of '18.  Do you see that?

17      A.    I see it.

18      Q.    That is the Housing Element Plan Third

19   Amendment.  Was there a hearing and discussion about

20   this third amendment?

21      A.    I don't remember.

22      Q.    Did you participate in discussions

23   regarding it?

24      A.    I don't remember.

25      Q.    Did you understand that -- so this is

Page 128

1  page 22 of the -- Ms. Bogart's December 6 plan.  And

2  it provides, The development of Block 419 has a

3  minimum set-aside of 22 units with an option for

4  off-site provisions or a payment-in-lieu for the

5  remaining seven units.  If such option is exercised,

6  the Borough will show at the midpoint review how it

7  will provide a realistic opportunity for the

8  remaining seven units in accordance with the

9  agreement with Fair Share Housing.

10         Then it goes to state, "The Block 419 project

11  is an integral component of the Borough's Fair Share

12  Plan.  Did you understand that 419 was an integral

13  component of the Fair Share Plan?

14         A.    That's what she wrote.

15         Q.    Well, did you understand that to be the

16  case and why it was so?

17         A.    I understand it, but I didn't agree with

18  it.

19         Q.    But, again, I didn't ask if you agreed

20  with it, I just asked if you understood it.  Did you

21  understand that it was an integral component part by

22  providing 29 of the 53 affordable units in Emerson?

23         A.    That was Brigette's position.

24         Q.    Okay.  And you understood that that was

25  the Court's opinion as well based on the fact that

Page 129

1    they approved that site as necessary.  Correct?

2    Useful and necessary.  Right?

3              MR. SEAMAN:  Objection to form.

4         Q.    Did you understand the Court had so

5    concluded as well?

6         A.    I don't recall.

7         Q.    Well, do you remember I showed you that

8    the Judge said in his ruling, his order, which is --

9    has the force of law, it's a judicial order, that

10   419 was "both useful and necessary" to fulfill the

11   affordable housing obligation?

12        A.    Yes, but I think I answered --

13        Q.    Okay.

14        A.    -- that that was the Judge's opinion.

15        Q.    So it just wasn't Ms. Bogart's opinion,

16   it was also the Court's opinion and the Master's

17   opinion that it was an integral component part of

18   the Fair Share Plan.  Correct?

19        A.    I guess it's fair to say they all shared

20   the same opinion, yes.

21              MR. FIORENZO:  All right.  So that's a

22   good point, we'll stop for the lunch break, 'cause

23   it's about 12:45.  Let's go off the record.

24              (A luncheon recess was taken at 12:45

25   p.m.)

Page 130

1                    AFTERNOON SESSION

2

3              (Deposition resumes at 1:25 p.m.)

4              MR. FIORENZO:  All right.  Let's go back

5      on the record.

6      EXAMINATION BY MR. FIORENZO:

7         Q.    So when we broke, we were discussing

8      some of the events that occurred towards the end of

9      2018.  I want to --

10             MR. FIORENZO:  Can you pull up E32,

11     Steve?

12             MR. KLEIN:  This will be DD-16.

13        Q.    So it appears on December 4, 2018, there

14     was an ordinance introduced which -- in the meeting

15     of the Mayor and Council to dedicate Block 419, Lot

16     7 to Emerson Redevelopers and also -- yeah, Emerson

17     Redevelopers and also vacating Kenneth Avenue in

18     Emerson.  Do you remember that there was a meeting

19     at which this issue was being discussed?

20        A.    Is Block 7 the ambulance corps building?

21        Q.    419, Lot 7.  You tell me.  You're the

22     mayor.  I don't know.

23        A.    I don't have the blocks memorized in the

24     town.

25        Q.    So you don't know?

Page 131

1          A.      (Shakes head.)

2          Q.      Did you participate in this meeting?

3          A.      Yes.

4          Q.      Before voting on it, did you have a

5     discussion about the proposed ordinance?

6          A.      I don't recall.

7                  MR. FIORENZO:   Turn to the highlighted

8     section, Steve.

9          Q.      So there was a note in the minutes that

10    you said to the governing body at the meeting that

11    the governing body was "tying the hands of any

12    future administration and said the process had been

13    accelerated because of the upcoming change in

14    government."  Did you make such a statement?

15         A.      Something to that effect, yes.

16         Q.      So what actions do you feel were being

17    taken at that meeting that would tie the hands of

18    the future administration?

19         A.      I don't remember specifically.  You

20    mentioned an ordinance that we introduced.

21         Q.      Were there any actions that were taken

22    in December of 2018 that you believe tied the hands

23    of future administration?

24         A.      Yes.

25         Q.      What actions were taken that tied the

Page 132

1    hands of future administration?

2         A.    The approval of the third amendment of

3    the redevelopment plan.

4         Q.    When was that approved?

5         A.    In December of 2018 after I was elected

6    mayor.

7         Q.    So you felt the approval of the third

8    amendment tied the hands of the future

9    administration?  How so?

10        A.    Because it was still a part of the

11   redevelopment and it was showing that the project

12   was going to move forward with an even larger piece

13   of property.

14        Q.    So the third amendment increased the

15   size of the project?

16        A.    I believe the third amendment is where

17   the -- oh, no, the third amendment was the decrease

18   in the amount of money for the infrastructure from

19   seven hundred to like three hundred and something

20   and the deadline for the ambulance corps.

21        Q.    Okay.  So you say the third amendment

22   tied the hands of your incoming -- about to be

23   incoming administration.  Correct?

24        A.    I think I was talking collectively of

25   everything that had happened since the election.

Page 133

1          Q.      Okay.  Well, I want to be more specific.

2    Okay?  When you said on December 4th, 2018, that the

3    governing body should hold up so as not to tie the

4    hands of the future administration, what were you

5    asking them to hold up doing?

6          A.      The approval of the redevelopment plan,

7    the site plan.

8          Q.      Well, that was before the Land Use

9    Board, not the governing body.  Correct?

10         A.      And all of the agreements that we were

11   voting on.

12         Q.      Well, what agreement was being voted on

13   that night?

14         A.      I believe it was the third amendment to

15   the redevelopment plan.

16         Q.      So you felt the third amendment

17   shouldn't be voted on.  Correct?

18         A.      I'd have to look at the whole agenda to

19   refresh my memory.

20         Q.      Well, okay.  Do you remember what it is

21   that you were saying would tie the hands of your

22   administration --

23         A.      I don't know what --

24         Q.      Let me finish.

25         -- when you made that statement at the meeting

Page 134

1    on December 4, 2018?

2        A.    I don't recall at this time what I was

3    referring to.

4        Q.    So right then and there at that meeting

5    on the agenda were two different things; number one,

6    a resolution or an ordinance to vacate Kenneth

7    Avenue.  Do you remember that?

8        A.    Not specifically.

9        Q.    Do you know what the purpose of vacating

10   Kenneth Avenue was?

11       A.    Do I know what the purpose was?

12       Q.    Yeah.

13       A.    Yeah, they were giving the property to

14   Accurate Builders.

15       Q.    That was part of the Block 19

16   development approved by the Court and later on by --

17   and by the Special Master.  Correct?

18       A.    I guess.

19       Q.    And that was part of what was included

20   within the third amendment to the fair share plan.

21   Correct?

22       A.    I don't -- I don't recall.

23       Q.    Okay.  So other than the Kenneth

24   Avenue -- vacating Kenneth Avenue, was there

25   anything else that you were objecting to at that

Page 135

1    meeting?

2          A.    I don't recall specifically what I was

3    objecting to.  I was objecting in whole to all of

4    the acceleration of the process to push this through

5    before I took office.

6          Q.    Well, acceleration of what process?

7    What was being accelerated?

8          A.    Everything having to do with building

9    this building.

10         Q.    Well, let's identify what it is you

11   claim was being accelerated.  Give me a list.  What

12   are they?

13         A.    Particularly the plan going before the

14   Land Use Board.

15         Q.    Okay.  So the site plan approval process

16   before the Land Use Board.  Correct?  You wanted

17   that to be put on hold.  Correct?

18         A.    I think it would have been in the best

19   interest of the Borough to take it slow instead of

20   approve it in less than an hour.

21         Q.    Well, did you want it to be held until

22   your administration was in place?

23         A.    I think that probably would have been

24   appropriate.

25         Q.    Whether it would have or not, was that

Page 136

1    what you wanted to see happen, you wanted it to be

2    held --

3         A.    I think that would have been

4    appropriate.

5         Q.    Okay.  So is the answer to my question

6    yes, you wanted the Land Use Board not to act until

7    your administration was in place?  Yes?

8         A.    I think that was what was appropriate at

9    the time, yes.

10        Q.    So the answer is yes.  Okay.  We finally

11   got to yes.  And the answer is yes because you

12   thought it was appropriate.  Right?

13        A.    I think everybody thought it was

14   appropriate.

15        Q.    I'm not asking about everybody.  I'm

16   asking you, Danielle DiPaola, did you think it was

17   appropriate?

18        A.    I think the majority of the Borough of

19   Emerson thought it was appropriate.

20        Q.    I didn't ask about the majority of the

21   Borough, did I?  I asked about you.  Did you think

22   it was appropriate?

23        A.    My decisions are always made based on

24   what I feel is best for the Borough.

25        Q.    Again, I didn't ask that.

Page 137

1          MR. BOTTA:  Let her finish.

2      Q.    I asked whether you thought it was

3  appropriate.

4          MR. BOTTA:  If you don't like her

5  answer, just please let her finish.

6          MR. FIORENZO:  No, no, she's not even

7  trying.

8          MR. BOTTA:  If you let her finish --

9          MR. FIORENZO:  She's playing games.

10          MR. BOTTA:  All right.  Well, you've got

11  to let her finish her answer.

12      A.    I'm answering honestly.

13      Q.    No, no, I don't care what anybody else

14  wanted to happen.  I don't care about the town.  I

15  don't care about others.  I'm asking you personally.

16  Did you believe it was inappropriate to go ahead

17  with the Land Use Board application until your

18  administration was in place, yes or no?

19      A.    I don't recall.

20          MR. BOTTA:  Objection, asked and

21  answered.

22      Q.    You don't remember?

23      A.    I don't recall.

24      Q.    Okay.  Well, here you refer to tying the

25  hands and the process being accelerated because of

Page 138

1   the upcoming change.  So the idea of the

2   acceleration you told me was, number one, the Land

3   Use Board, you thought the Land Use Board shouldn't

4   be proceeding until the new administration was in

5   place.  Correct?

6        A.    Say that again?

7        Q.    You told me a moment ago, I asked you

8   about what were you concerned about accelerating and

9   you mentioned the Land Use Board.

10       A.    Yeah.

11       Q.    Okay.  So you wanted the Land Use Board

12  hearing not to take place in December 'cause it was

13  being accelerated, instead you wanted it to wait

14  until your administration was in place.  Correct?

15       A.    Yes.

16       Q.    Okay.  Anything else other than the Land

17  Use Board application for site plan approval that

18  you felt was being accelerated?

19       A.    No, 'cause I didn't know about the

20  change in ownership until the next meeting.

21       Q.    Okay.  All right.  So --

22             MR. FIORENZO:  Steve, can you just go

23  back to the earlier part where it shows what 15,

24  that ordinance is about.

25       Q.    So the ordinance that you voted no on as

Page 139

1    reflected in the minutes was the ordinance

2    dedicating Block 419, Lot 7.  See that?

3         A.    Yeah.

4         Q.    Okay.  So why did you vote no?

5         A.    I don't recall specifically what

6    property is Block 419, Lot 7.  If you could tell me

7    whether it's Kenneth Avenue or whether it's the

8    ambulance building or the parking lots or the

9    commuter lot, I might be able to answer you better.

10        Q.    Do you know?

11        A.    I don't know what Block 7 is off the top

12   of my head, no, I do not.

13        Q.    So you don't know why you voted against

14   it?

15        A.    If you tell me what that Block 19 and 7

16   refers to.

17        Q.    Ma'am, I'm not in the business of

18   telling you anything --

19        A.    Then I don't know.

20        Q.    -- 'cause I just --

21        A.    My answer is I don't know.

22        Q.    I ask questions and I expect answers.

23   It's not my deposition.  So I'm just finding out

24   what you know and what you don't know.  So if you

25   don't know why it is you voted against this on

Page 140

1   December 4 of 2018, just state that.

2          A.     I don't know.

3          Q.     Okay.  So by the way, around this time,

4   this is December 4, the election had occurred in

5   early November of 2018.  Right?

6          A.     Uh-hum.  Yes.

7          Q.     And that's the election where you were

8   elected as mayor.  Correct?

9          A.     Yes.

10         Q.     And you were running a campaign

11  throughout a number of months in 2018 leading up to

12  it.  Correct?

13         A.     Yes.  We've done all this before.

14         Q.     Have we?

15         A.     Yeah.

16         Q.     In this case we've done it?

17         A.     I don't know.  I feel like we talked

18  about this for two days already, but.

19         Q.     This is the first time you're being

20  deposed in this case.

21         A.     Oh, okay.

22         Q.     It's a different case.

23         A.     Okay.

24         Q.     Okay?  This is the case --

25         A.     I know.

Page 141

1       Q.      -- brought by my client against you.
2  The other case had to do with a claim by the town.
3  Okay?
4       And in connection with that, I want to show
5  you a couple things.
6              MR. FIORENZO:  Steve, could you pull up
7  E026.
8       Q.      So this is a newspaper article written
9  by Stephanie, I can't make that out, of North Jersey
10 published on November 8th, 2018.
11             MR. KLEIN:  DD-17.
12      Q.      So it's an article reporting your
13 election as mayor.  You saw that before.  Right?
14      A.      Yes.
15      Q.      Ms. Noa --
16      A.      Noda.
17      Q.      Noda?  She interviewed you after the
18 election.  Correct?
19      A.      I guess.  I don't remember.
20      Q.      You spoke with her?
21      A.      I don't remember if I spoke with her or
22 if she took comments from something that I could
23 have said.
24      Q.      Okay.  Let me ask you about some of the
25 comments you made.

Page 142

1           MR. FIORENZO:  Could you make bigger

2      the -- yeah.

3           Q.    Just a couple comments.  In the fourth

4      paragraph.  So the newspaper article states, Since

5      2010, DiPaola has served the Borough as councilwoman

6      but said she decided to run for mayor because she

7      "didn't like the direction the town was going in,"

8      with particular concerns about overdevelopment in

9      the downtown.  Did you make such a statement to the

10     reporter on that day?

11          A.    I don't know if I made it specifically

12     to the reporter, but it's in quotes, so I must have

13     said it.

14          Q.    Okay.  You don't deny making the

15     statement in quotes, do you?

16          A.    I don't remember.

17          Q.    My question is, you don't deny it, do

18     you?

19          A.    I --

20          Q.    You don't recall, but you don't --

21     you're not denying that you made the statement, you

22     just don't remember one way or the other?

23          A.    I don't know if I said exactly that, but

24     it's in print.

25          Q.    Right.  And that's why I'm asking the

Page 143

1    follow-up question.  You said --

2         A.    I --

3         Q.    Listen to me.  You don't remember, but I

4    take it from I don't remember you're saying you

5    don't remember if you said it or you didn't say it,

6    but you're not denying that you made the statement

7    to the reporter, you just don't remember.  Correct?

8         A.    I'm saying that I don't know if that's

9    exactly what I said, but that I see it's in quotes,

10   and I don't remember when I said it, if I said it,

11   or who I said it to.

12        Q.    You still haven't answered my question

13   though.  Do you deny making the statement to the

14   reporter, yes or no?

15        A.    I deny saying it to the reporter 'cause

16   I don't think I said it to a reporter.

17        Q.    I just need to know if I have to call

18   the reporter at the trial to tell us that you said

19   that.  Are you denying you said that to her?

20        A.    I don't know when I said that.

21        Q.    Did you say it to her, what she put in

22   quote?

23        A.    I do not believe I said anything

24   specifically to the reporter.  I do not think I

25   spoke with her.  I don't recall.

Page 144

1          Q.     So you're now telling me you don't think

2    you spoke to the reporter?  I'm confused.  Are you

3    telling us now under oath you don't think you even

4    spoke to this reporter --

5          A.     I don't recall if I --

6          Q.     -- who quoted you?

7          A.     -- specifically spoke to that reporter

8    or if I said that at a meeting and she took my quote

9    from a meeting.

10         Q.     Do you deny making the statement --

11         A.     I don't --

12         Q.     Let me finish.  You're interrupting.

13    Do you deny making the statement irrespective

14    of where or when it was said?

15         A.     I don't know.  Can you tell me when I

16    said it?

17         Q.     Again, you don't get to ask me

18    questions, I get to ask you questions.  Okay?  I'm

19    simply asking you, at any time do you deny that you

20    made the statement in quotes that the reporter said

21    you made, do you deny that?

22         A.     I don't remember.

23         Q.     Okay.  But you don't deny it.

24         A.     I don't remember.

25         Q.     Okay.  But you don't deny it?

Page 145

1              MR. SEAMAN:  Objection to form.

2         A.    I don't remember.

3         Q.    Okay.  Are you saying it didn't

4    happen --

5         A.    I don't remember.

6         Q.    -- or you don't recall one way or the

7    other?

8         A.    I don't remember.

9         Q.    Well, I'm trying to find out what you

10   mean by that.  When you say you don't remember, that

11   means it could have happened but you don't recall?

12        A.    I don't remember.

13             MR. SEAMAN:  Objection to form.

14        Q.    Yeah, I know, but does that mean you

15   don't recall whether you did it or not?

16        A.    I don't remember.

17        Q.    You're not going to answer my question?

18        A.    I don't remember.

19        Q.    Are you intentionally not answering my

20   questions now?

21        A.    I do not remember.

22        Q.    Yeah, I know, but do you mean by that

23   that it might have happened, it might not, you just

24   don't recall?

25        A.    I don't remember.

Page 146

1          Q.    Okay.  So we'll get the reporter in.

2   We'll go through that exercise since that's what you

3   want us to do.  You don't remember -- you don't even

4   remember speaking to her, do you?

5          A.    I don't remember if I spoke directly to

6   her.

7          Q.    So let's go down and see if you remember

8   anything else that you said to this reporter.

9          So did you ever say to anybody that you didn't

10  like the direction the town was going in?

11         A.    I don't remember.

12         Q.    Is that something that you believe, that

13  you didn't like the direction the town was going in?

14         A.    I don't remember what I felt at that

15  time.

16         Q.    Did you like the direction the town was

17  going --

18         A.    I don't --

19         Q.    Hold on, let me finish.  You keep

20  interrupting me.

21         A.    I know, but you're badgering --

22         Q.    Don't interrupt me, please.

23         A.    Okay.  Don't badger me.

24         Q.    Please don't interrupt me.  Okay?

25         Did you like the direction the town was going

Page 147

1    in under Mayor Lamatina?

2         A.    I didn't like the way Lou Lamatina acted

3    as mayor.

4         Q.    Did you like the direction the town was

5    going in with respect to the development downtown or

6    the Block 419 project, did you like that?

7         A.    Not particularly.

8         Q.    Okay.  So to the extent the reporter

9    said you told her you didn't like the direction the

10   town was going in, that sounds like it was, in fact,

11   your position back then.  Correct?

12        A.    Say that again?

13        Q.    Was that, in fact, your position

14   generally back then, you didn't like the direction

15   of the town?

16        A.    I think that's why anyone runs.

17        Q.    Well, then why is it so hard for you to

18   say that?

19             MR. SEAMAN:  Objection.

20        Q.    It's obvious that that -- what the

21   answer is.  So you didn't like the direction the

22   town was going in, and in particular you didn't like

23   the overdevelopment of the downtown.  True?

24        A.    I didn't like the density of the

25   downtown.

Page 148

1      Q.      Right.  Which had to do with your

2   concerns about overdevelopment.  Correct?

3      A.      As it related to the density and the

4   height of the buildings they were putting in.

5      Q.      So it sounds like she was accurately

6   reflecting what your position was back then.  Am I

7   wrong?

8      A.      You keep asking me if I told her that

9   and I've told you several times --

10     Q.      I didn't ask you that.

11             MR. SEAMAN:  Let her finish.

12     Q.      That's not the pending question.

13     A.      Now you're yelling at me.

14     Q.      I said -- well, you're not even trying

15   to answer.  You're making a mockery out of this,

16   honestly.  I'm asking you a simple question.  And

17   the simple question is, regardless of whether you

18   remember if you said that, it sounds from what you

19   described to me that that statement accurately

20   reflected generally your sentiments that you didn't

21   like the direction of the town because of

22   overdevelopment.  Correct?

23     A.      Because of the density that

24   overdevelopment was bringing with the height.

25     Q.      Yes?  Is that right?

Page 149

1      A.    I don't really know what you're trying

2  to get me to agree to, 'cause you've asked me so

3  many different questions around that -- those

4  quotes.

5      Q.    I can't wait to when you're going to

6  have to answer questions.  This is ridiculous, but

7  okay.  You don't want to answer that question then.

8  Right?

9             MR. SEAMAN:  Objection.

10            MR. BOTTA:  She answered it.

11      A.    I answered it as best I could.

12            MR. FIORENZO:  She's not answering the

13  question.  You know it and you know it.  She's not

14  even trying at this point.

15            MR. BOTTA:  She answered the question.

16  Maybe you don't like how she answered it.

17            MR. FIORENZO:  Yeah.

18            MR. SEAMAN:  I disagree with your

19  characterization.  Please ask another question.

20      Q.    You want to play that game?

21      A.    Play what game?

22      Q.    The game you're playing right now where

23  I ask you questions and it takes five minutes and we

24  go around in circles and then you don't answer, is

25  that what you want to do here today?

Page 150

1           MR. BOTTA:  Is that a question?

2           MR. FIORENZO:  Yes, it is.

3           MR. SEAMAN:  Objection.

4           MR. FIORENZO:  It is a question.

5           MR. BOTTA:  Objection.

6     Q.    Is that what you want to do?

7     A.    I'm answering to the best of my ability.

8     Q.    Yeah.  Okay.  Well, let's take a look at

9  what else you said.

10          MR. FIORENZO:  Go to the next one.

11    Q.    The reporter goes on to report based on

12  a discussion she claims to have had with you, On a

13  larger scale, DiPaola, who served on the Borough's

14  Land Use Board in the past, would like to ensure

15  development in the downtown is done in a "reasonable

16  way that isn't four story buildings."  Did you make

17  that statement to the reporter in words or

18  substance?

19    A.    Again, does it say somewhere in the

20  article that she interviewed me?  Because I don't

21  know if I said that specifically to her.

22    Q.    Can you answer my question?  I asked if

23  you said that to the reporter in words or in

24  substance.

25    A.    I could have.  I don't remember.

Page 151

1      Q.     And the reason you could have is because

2    it accurately reflected your position at that time.

3    Correct?

4      A.     Right, which is why I don't know when I

5    could have said it.  I don't know if it was in an

6    interview or not.

7      Q.     So was the answer to my question right,

8    it did accurately reflect your position at that

9    time?

10     A.     I don't know if I said that, but I would

11   say that it does seem to comply with what my

12   reasoning was at the time.

13     Q.     Okay.  And, in fact, you told me earlier

14   that, you know, your objections many times in these

15   votes against the redevelopment plan and the

16   amendment was you had concerns about the four-story

17   building on the site.  Correct?

18     A.     Yes, I was opposed to four-story

19   buildings.

20     Q.     And she specifically says -- she says

21   you told her that when she wrote the article.

22              MR. SEAMAN:  Objection to form.

23     A.     I don't see anywhere where she says I

24   told her.  That's what I'm really --

25     Q.     Do you know what quotations mean?

Page 152

1          A.      Yes, but --

2          Q.      What do quotations generally mean?  What

3     do quotations generally mean?

4          A.      It means that somebody believes I said

5     something --

6          Q.      Right.

7          A.      -- but I have no proof that I said it or

8     when or to who.

9          Q.      Well, I guess the proof we have is the

10    reporter saying she spoke to you and then putting

11    your statement in quotes, and I'm simply asking if

12    you will confirm here on the record that you said

13    that to her or whether we've got to go through the

14    exercise of bringing the reporter in to say you told

15    her that.

16         A.      I don't see anywhere in the article that

17    I could see that it said I spoke to her and she

18    interviewed me.

19         Q.      Well, when she did a newspaper article

20    and quoted you, why did you think she was quoting

21    you?

22         A.      Oh, my God.

23                 MR. SEAMAN:  Objection to form.

24         A.      Reporters quote people all the time when

25    they say things at meetings and whatnot.  You don't

Page 153

1    have to have an interview in order to be quoted.

2         Q.    Okay.  Well, did you make that statement

3    either in an interview, in a public setting,

4    anywhere, that you didn't -- that you want to ensure

5    the development of the downtown is done in a

6    reasonable way that "isn't four-story buildings,"

7    have you ever made that statement in public?

8         A.    I don't --

9              MR. SEAMAN:  Objection to form.

10        A.    I don't recall.  I could have.  I don't

11   recall.

12        Q.    Well, you could have because you've said

13   that here today.  Right?  It reflects your position

14   back at that time when you ran for mayor.  Correct?

15        A.    I think I've stated that I was against

16   the four-story building.

17        Q.    And that was the position you ran on.

18   You told people that, didn't you?

19        A.    That I was against four stories.

20        Q.    You were against the overdevelopment in

21   downtown and it had to be reasonable and you didn't

22   think a four-story building was reasonable, that was

23   what you ran on, wasn't it?

24        A.    I don't think that a four-story building

25   was reasonable in the downtown.

Page 154

1        Q.     I didn't ask that.  Did you run on that?
2    Did you tell people during your campaign that your
3    position was that the downtown was being
4    overdeveloped and Block 419, which had four stories,
5    was overdevelopment, that was your position.
6    Correct?
7        A.     I could have.  I ran on a lot of
8    different platforms.
9        Q.     You could have.  You did, didn't you?
10   Do you deny making that statement during your
11   campaign?
12       A.     I haven't read anything from that
13   campaign in years.
14       Q.     Do you deny making the statement during
15   your campaign that you were running on
16   overdevelopment and that 419 was the centerpiece of
17   that, do you deny that?
18       A.     No.
19              MR. FIORENZO:  Okay.  Pull up the next
20   one.
21       Q.     You're right, it is ridiculous.  I
22   haven't seen anything like this in a really long
23   time.  The good news is you can't do this stuff when
24   we get to trial.  Okay?  We'll have a day when
25   you're going to have to really answer these

Page 155

1    questions.

2        Okay.  The article goes on to have further

3    quotes, which say, "Everyone has this idea I'm

4    against development, but I'm not against it, said

5    DiPaola.  I'm against eminent domain.  I'd like to

6    move forward and bring positive change to the

7    downtown."

8        Did you tell the reporter you were against

9    eminent domain?

10       A.    I think I've told you several times I

11   don't know if I specifically spoke to the reporter.

12       Q.    Okay.  Whether you spoke to her directly

13   that day or spoke in some other context, your

14   position was, as you've told us today, you're

15   against eminent domain.  Right?

16       A.    Yes, I am against eminent domain in this

17   instance, correct.

18       Q.    Well, you say, I'm against eminent

19   domain.  You didn't say in any instance there.  You

20   just said you're generally -- in fact, you told me

21   philosophically you were opposed to eminent domain.

22   Remember that?

23       A.    At the time, maybe I was.

24       Q.    As a general principle, even unrelated

25   to this, you didn't like eminent domain

Page 156

1    philosophically.  It was against what your belief

2    system was.  Correct?

3                MR. SEAMAN:  Objection to form.

4        A.    As it related to Emerson, correct.

5        Q.    Then she quotes you saying, She would

6    like to move forward and bring positive change to

7    the town.  Was that also your position, you wanted

8    to bring "positive change to the downtown"?

9        A.    I don't recall exactly what my state of

10   mind was then, but --

11       Q.    Well, when you ran --

12               MR. SEAMAN:  Joe.

13       Q.    Remember when you ran?

14               MR. SEAMAN:  Joe, she said but, then you

15   interrupted her.  Please let her finish her answer.

16       Q.    Go ahead.

17       A.    But I believe change was needed in

18   Emerson, but I don't think that it needed the

19   density that was being brought forth with 419.

20       Q.    So when you talk about positive change

21   to downtown, did you want positive change to the

22   downtown area?

23       A.    Sure.

24       Q.    What did you want to have changed in the

25   downtown?

Page 157

1          A.    A smaller scale project.

2          Q.    Well, are you referring to 419?

3          A.    Any project that was smaller scale that

4    was able to satisfy the affordable housing.

5          Q.    There was only one downtown and that was

6    419.  Correct?

7          A.    Right.

8          Q.    So when you talk about positive change

9    and I asked you what did you want to have changed,

10   you wanted to change 419.  Correct?

11         A.    I think it also says that I'm not

12   against -- what did I say?

13         Q.    Ma'am, don't go off on things I'm not

14   asking you about.  I'm asking you when you refer to

15   change, the positive change in downtown, what you're

16   referring to is change to the Block 419 project.

17   Correct?

18         A.    I don't know if I was specifically

19   speaking to Block 419.

20         Q.    Well, there's no other project downtown

21   you told me other than 419 that was involved in

22   development at that time.

23         A.    There's a lot of changes that could

24   happen to Emerson in the downtown.

25         Q.    What was the change you were asking for

Page 158

1    in the downtown when --

2         A.    I don't --

3         Q.    Let me finish.

4         When you ran and you went to all your

5    constituents and you talked to them about why you

6    wanted to be mayor, did you tell them that you

7    wanted to change the 419 project downtown in words

8    or substance?  Did you convey that to them?

9         A.    I don't think I did.

10        Q.    Are you sure you didn't or you don't

11   think you did?

12        A.    No, I think people asked me to stop it,

13   they didn't ask me to change it.  They asked me to

14   stop it.  They asked me --

15        Q.    Well, you wanted change.

16        A.    -- to bring down -- that's one quote.  I

17   don't know what I was referring to that moment.

18   There's also the opposite side of the street that I

19   could bring positive change to.

20        Q.    So let me finish with this.  So you're

21   telling us here under oath you don't know what was

22   meant when you said you wanted to bring positive

23   change to downtown, you don't know what you wanted

24   to change, is that your testimony under oath?

25        A.    You're trying to say that I wanted to

Page 159

1   change --

2        Q.    Just answer the question.

3        A.    -- the plan.

4        Q.    Just answer the question.

5        A.    I didn't say --

6        Q.    Just answer the question.

7        A.    Well, I can't answer --

8        Q.    Is that your testimony?

9        A.    -- unless you're going to let me speak.

10       Q.    No, no, no.  Is that your position, that

11   when you talked about change downtown, that you

12   don't remember what it was you wanted to change?

13       A.    No, those -- that box that you've

14   highlighted to me seems like I was speaking in a

15   generality.

16       Q.    Okay.

17             MR. KLEIN:  This is DD-18.

18       Q.    Okay.  So DD-18 is another news article,

19   this one 12/29/21.

20             MR. KLEIN:  That's when it was printed.

21       Q.    Oh, I'm sorry.  What's the date?  The

22   Pascack Press and Northern Valley Press.  Do you

23   know that newspaper?

24       A.    Do I know the newspaper?

25       Q.    Yeah, do you know of that newspaper?

Page 160

1          A.     Yeah.

2          Q.     And do they service the Emerson area?

3          A.     Yes.

4          Q.     Okay.  And have you spoken with

5     representatives of the press from that paper from

6     time to time?

7          A.     At times I have.

8          Q.     Do you know John Snyder?

9          A.     I know John Snyder.

10          Q.     Have you spoken to John Snyder from time

11     to time where he was asking you questions relating

12     to Emerson?

13          A.     Yeah, but I couldn't tell you

14     specifically when.

15          Q.     Okay.  Did you speak to John Snyder

16     after your election as mayor?

17          A.     I don't recall.

18          Q.     Do you deny you spoke to him?

19          A.     I don't recall.

20          Q.     Okay.  Did you -- according to

21     Mr. Snyder, he wrote a newspaper article here and he

22     said that --

23               MR. FIORENZO:  Well, go back to the

24     paragraph before that, please.

25          A.     Well, there it says, Told Pascack Press,

Page 161

1    so I would say yes, I spoke to him.

2         Q.    Okay.  Great.

3         A.    It didn't say that in the other article.

4         Q.    Fair enough.  So you spoke to him.

5    That's good.

6              MR. FIORENZO:  So let's go, Steve, to

7    where it says, A vocal critic.

8         Q.    In the article he writes, after

9    apparently speaking to you, he says, "A vocal critic

10   of elements of an ambitious mixed use redevelopment

11   plan taking shape under Lamatina" -- by the way,

12   that ambitious mixed use redevelopment plan, do you

13   know what he's referring to?

14        A.    I guess he's talking about 419.

15        Q.    You guess.  Is there any ambitious mixed

16   use redevelopment plan that was taking shape under

17   Lamatina other than the Block 419 development?

18        A.    I don't know.  There's a Valero that's

19   been under construction.

20        Q.    Is there any doubt in your mind what

21   he's referring to there?  'Cause he talked to you

22   about it when he interviewed you.  Right?

23        A.    I guess.

24        Q.    Okay.  You guess.  And he goes on to

25   say, She, meaning you, called your November 6

Page 162

1    election "a referendum on overdevelopment."  So what

2    did you mean by that?

3         A.    I think what I was trying to invoke to

4    the reporter was that by me and my slate winning, we

5    were opposed to the fourth story, we were opposed to

6    the density, we were opposed to the eminent domain,

7    and that the sentiment in town was that this project

8    was overdevelopment, and that by winning, we were

9    sending a message to Lou Lamatina and his cohorts

10   that Emerson did not want overdevelopment.

11   Overdevelopment.  Not didn't want -- not want

12   development, they didn't want overdevelopment.

13        Q.    So by overdevelopment, were you

14   referring to the 419 project?

15        A.    Any overdevelopment.

16        Q.    Were you referring to the 419 project?

17        A.    Any overdevelopment.

18        Q.    Were you referring to the 419 --

19        A.    Any overdevelopment.

20        Q.    Were you referring specifically to the

21   419 project, which was the ambitious mixed use

22   redevelopment plan taking shape under Lamatina?

23   That's what's being discussed in that sentence of

24   the article.  Correct?

25        A.    I think it was a referendum on any

                                                        Page 163

1    overdevelopment that could happen under a Lamatina

2    administration --

3           Q.     Right.

4           A.     -- and that is why the people voted for

5    us in order to do more sensible decisions for our

6    downtown.

7           Q.     So what more sensible decision did you

8    want to do for the downtown --

9           A.     Eliminate four-story.

10          Q.     Let me finish.  You keep interrupting me

11   time and time again.

12          A.     I thought you were finished.

13          Q.     Why?

14          A.     I thought you were finished.

15          Q.     Why?

16          MR. BOTTA:  Mutual combatants here on

17   interrupting.

18          Q.     Why is that?

19          A.     I thought you were finished.

20          Q.     You didn't think I was finished.  I was

21   in the middle of a sentence.  I speak pretty rapidly

22   and I don't pause, so you knew exactly what I was

23   doing.  You cut me off.  Please don't do that.

24   Okay?  Would you agree not to cut me off?

25          MR. BOTTA:  That's not a deposition

Page 164

1   question.  Move on.

2              MR. SEAMAN:  Please ask a valid

3   question.

4        Q.    So you won't agree not to cut me off?

5              MR. BOTTA:  Objection.

6        Q.    I'm giving you an instruction not to cut

7   me off as I did at the beginning of the deposition.

8   Will you comply with that request?

9        A.    I think you're trying to intimidate me

10  is what I think is going on.

11       Q.    Why is that?  'Cause I'm asking you not

12  to be so rude as to interrupt me?

13       A.    Well, now your voice is being raised,

14  so.

15       Q.    It's not being raised at all.  That's an

16  utter fabrication.  It's a lie.  Why are you doing

17  that?

18             MR. BOTTA:  Okay.  Let's just move on.

19       Q.    Why do you do these things?

20             MR. BOTTA:  Can you just -- Joe, can you

21  just ask questions.

22             MR. FIORENZO:  Yeah.  That's what I'm

23  trying to do.

24             MR. BOTTA:  So ask questions and let her

25  answer.

Page 165

1           MR. FIORENZO:  If your client would let

2    me ask them without interrupting me and without

3    making false statements on the record about me

4    raising my voice or not raising my voice.  Why do

5    you do these things, ma'am?  I don't understand.

6           MR. BOTTA:  Okay.

7       Q.    Okay.

8           MR. SEAMAN:  All right, Joe.  Please ask

9    a question.

10      Q.    Will you abide by my request not to cut

11   me off?

12          MR. SEAMAN:  And, Joe, will you abide by

13   our request not to cut her off in her answers?

14          MR. FIORENZO:  Of course, yeah.  Sure.

15          MR. SEAMAN:  You haven't been doing a

16   hundred percent of that either.

17          MR. FIORENZO:  Oh, stop, will you, stop.

18   You know that's not true.

19          MR. SEAMAN:  I know it's absolutely

20   true.

21          MR. FIORENZO:  Well, you've objected

22   maybe two or three times, that's all I know.  She's

23   cutting me off every time.

24      Q.    Okay.  So you want to play that game,

25   we'll play that game.  I know your game at this

Page 166

1    point.

2        So when these newspaper articles were written

3    then and you referred to a referendum on

4    overdevelopment, in fact, that was part of your

5    campaign pledge.  Correct?  That the town was being

6    overdeveloped.  Correct?  That's what you ran on.

7    Right?

8        A.    Yes.

9        Q.    And you ran specifically on the 419

10   project.  You said, This project being -- taking

11   shape under Lamatina was bad for Emerson and it

12   constituted overdevelopment, as you told me today,

13   too high, too dense.  That's what you told people as

14   your campaign.  Correct?

15       A.    I didn't have to tell anybody that.

16       Q.    Did you tell them that?

17       A.    They told me that.

18       Q.    Did you tell them?

19       A.    I didn't have to tell people --

20       Q.    No, no, no.  Did --

21       A.    -- it was overdevelopment.

22       Q.    Did you --

23       A.    They told me.

24       Q.    Did you ever tell people that?

25       A.    I didn't have to.

Page 167

1      Q.    So you never told anybody that, is that

2   it?

3      A.    I don't recall.

4      Q.    Okay.  So you never told anybody Emerson

5   was being overdeveloped with 419, they told you, is

6   that your position?

7      A.    You're saying that I went door to door

8   telling people that Emerson was being overdeveloped.

9      Q.    No, I'm asking, did you tell people when

10  you campaigned, door to door, in campaign

11  literature, or otherwise, that Emerson was being

12  overdeveloped, and 419 was a perfect example, this

13  is Lamatina's creation, throw him out.  That was

14  your position, wasn't it?

15     A.    Yes.

16     Q.    Okay.  That wasn't hard.

17        Now, with respect to the rest of this article,

18  you go on to say --

19           MR. FIORENZO:  Scroll down, Steve, to

20  here.

21     Q.    He's now referring -- in the article he

22  says, Later in the day, she added, "The people of

23  Emerson have spoken.  It is apparent that the people

24  have serious concerns about the direction the town

25  was taking.  I would ask the governing body, out of

Page 168

1    respect to the voters, take no further action on

2    redevelopment until January."  He quotes you there.

3    Is that an accurate quote of your position?

4            A.      I would say it's an accurate sentiment.

5            Q.      Okay.  So you wanted no further action

6    to be taken regarding the development of the 419

7    project until January when you came in office.

8    Right?

9            A.      Yes.

10           Q.      So when you ran -- by the way, did you

11   have campaign literature when you ran?

12           A.      Yes.

13           Q.      And does that campaign literature set

14   forth what you consider to be the issues in town?

15           A.      I haven't looked at the literature in

16   five or -- five years, six years.

17           Q.      What was the number one issue that you

18   were advocating as you campaigned?

19           A.      Getting rid of Lou Lamatina.

20           Q.      And why was that?

21           A.      Because he was a menace to the town.

22           Q.      Why was that?

23           A.      Have you ever met him?

24           Q.      Again, you don't get to ask me

25   questions.  You should know that by now.  You

Page 169

1   just -- you're here to answer them.  Do you

2   understand that?  I know you're a mayor and you

3   probably think that gives you special dispensation.

4   It really doesn't?

5        A.    No, I don't.

6        Q.    Good.  So can you answer my question

7   now?

8        A.    There were a lot of things that Lou

9   Lamatina was doing that nobody in town agreed with.

10       Q.    Well, was one of them Block 419?

11       A.    One of them was the pushing through of

12   Block 419 to the cries of the people at the meetings

13   asking him not to go forward with it.

14       Q.    So you said he was pushing it through?

15   Right?

16       A.    Signing an agreement on December 31st

17   before you're out of office at midnight, I consider

18   that pushing it through.

19       Q.    So you consider Mr. Lamatina pushing

20   through the 419 development plan?

21       A.    Yes.  He wanted it.  It was his dream.

22       Q.    Oh, it was his dream.  And do you know

23   why it was his dream?

24             MR. SEAMAN:  Objection to form.

25       A.    I don't know what he was thinking.

Page 170

1      Q.      So you believe it was Lamatina's dream

2   to develop the downtown with Block 419, is that your

3   testimony?  Dream?

4      A.      Maybe it was the wrong word dream.

5      Q.      Okay.

6      A.      I don't know.

7      Q.      So is it possible that the 419 project

8   went forward in the way it did because the town

9   settled their suit with Fair Housing, is that a

10  possibility?

11              MR. SEAMAN:  Objection to form.

12     A.      I think I've already said that there

13  could have been other ways --

14     Q.      I didn't ask that.

15     A.      -- to settle that.

16     Q.      I didn't ask other ways.  I'm asking

17  whether it's possible that the reason why this

18  project went forward was not because it was

19  Lamatina's dream, but because the town had a duty

20  and an obligation under the settlement agreement

21  approved by the Court, approved by the Master to

22  proceed forward with that project quickly under the

23  agreement.  Is that possibly why this thing moved

24  fast?

25     A.      I don't know.

Page 171

1                    MR. SEAMAN:  Objection to form.

2          Q.     Okay.  All right.  So at some point

3    then, in order to move forward with the settlement

4    agreement, as we discussed, there was a hearing

5    before the -- a site plan application before the

6    Emerson -- is it the Land Use Board?

7          A.     Municipal Land Use Board.

8          Q.     Right.  Were you a member of that board

9    at that time?

10         A.     At what time?

11         Q.     At the time this application came

12   forward in late 2018.

13         A.     No.

14         Q.     In advance of that, do you know if there

15   were professionals that reviewed the plan for the

16   Borough of Emerson?

17         A.     I believe there were.

18                MR. FIORENZO:  Steve, pull this up,

19   please.

20         Q.     Who was the town engineer at that time?

21         A.     Gary Ascolese.

22         Q.     From Boswell Engineering?

23         A.     Correct.

24         Q.     Did you know Mr. Ascolese?

25         A.     I know Mr. Ascolese.

Page 172

1      Q.      Was he the engineer for any period of

2   time in town?  For how long?

3      A.      I don't remember how long.

4      Q.      Did you consider him a good engineer?

5              MR. SEAMAN:  Objection to form.

6      A.      In some cases.

7      Q.      Okay.  And who is the town planner?

8      A.      Who is the town planner?

9      Q.      Who was the town planner in December of

10  2018?

11     A.      Brigette Bogart.

12             MR. FIORENZO:  So let's mark this

13  document, please.

14             MR. KLEIN:  DD-19.

15     Q.      So DD-19 is a memorandum from Ms. Bogart

16  dated December 10, 2018, and it was submitted to the

17  Emerson Land Use Board, Re: Emerson Station Site

18  Plan Application.  Have you seen this document

19  before today?

20     A.      I don't remember.

21     Q.      Had you reviewed it at the time you

22  appeared before the Land Use Board?

23             MR. SEAMAN:  Objection to form.

24     A.      No, I don't think I would have been

25  privy to that 'cause it was to the Land Use Board.

Page 173

1          Q.     Well, it's a public document, but -- and

2     I'm just asking, as of the time -- you appeared

3     before the Land Use Board.  Correct?

4          A.     I attended the Land Use Board.

5          Q.     And you made certain statements on the

6     record.

7          A.     During public comment.

8          Q.     Yes.  So --

9          A.     I didn't like present as a professional

10    or anything.

11         Q.     Okay.  That's fine.  You appeared and

12    made statements before the Land Use Board on

13    December -- right around this time, December 10 of

14    2018.  Correct?

15         A.     About that time, yes.

16         Q.     And I'm simply asking, were you aware of

17    the planner's comments at the time you made your

18    statements?

19         A.     I don't remember.

20         Q.     Were you aware of whether, as of that

21    date, Mr. Ascolese of Boswell had also submitted a

22    report regarding the site plan?

23         A.     I don't remember.

24                MR. FIORENZO:  Can you pull that,

25    please?

Page 174

1          A.    I think that would have been considered

2    work product until it was considered by the Land Use

3    Board.  It says to the Land Use Board.  It doesn't

4    say public document.

5          Q.    It's a public document when it gets

6    submitted to the Land Use Board, do you know that?

7          A.    No, I don't.

8          Q.    Okay.

9          A.    Because I think until they consider

10   it --

11         Q.    So why are you giving an opinion that

12   it's work product?

13         A.    Because I --

14         Q.    Are you a lawyer?

15         A.    No, but I think that until something is

16   considered as I've been told by attorneys --

17         Q.    So this is your legal opinion?

18         A.    -- that it -- no, I'm telling you as I

19   understand it, until something is considered to a

20   board, it's considered work product.

21         Q.    All right.  So --

22               MR. KLEIN:  DD-20.

23         A.    I can tell you -- let me rephrase.  They

24   were not handed out at the meeting I should say.

25         Q.    I didn't ask that.  Thank you for that

Page 175

1      information.

2           This is a report of Boswell Engineering,

3      December 6, 2018.  Did you ever see this report or

4      review this report before you appeared before the

5      Land Use Board and made statements on the record?

6           A.     I don't believe so.

7           Q.     So there was a planner and an engineer

8      and other professionals who testified at the hearing

9      before the Land Use Board.  Correct?

10          A.     There was a -- say that again?

11          Q.     There was a planner, Ms. Bogart,

12     Mr. Ascolese from Boswell, and other professionals

13     of the applicant who appeared at the Land Use Board

14     for the presentation of the site plan application.

15     Correct?

16          A.     Correct.

17          Q.     And you were there and you heard that

18     presentation.  Correct?

19          A.     Correct.

20          Q.     You were there as an objector.  Correct?

21          A.     I was there to hear what was going on.

22          Q.     But you also were more than that, you

23     objected to the plan publicly on the record.

24     Correct?

25          A.     Yes, after hearing the plan.

Page 176

1      Q.    Okay.  I just wanted to confirm that.

2   That's what I thought.

3      So when you objected on the record to this

4   plan, you knew at that time that this site plan was

5   being submitted to implement the requirement under

6   the settlement agreement that Block 419 be developed

7   with affordable housing, you were aware of that when

8   this application was submitted.  Correct?

9      A.    I don't remember if I was cognizant of

10  that.

11     Q.    Well, you voted when the settlement

12  agreement occurred to oppose it.  Remember that?

13     A.    I don't think that was forefront in my

14  mind in opposing that.

15     Q.    But you knew there was a settlement

16  agreement when you appeared before the Land Use

17  Board that required Emerson to fulfill its

18  obligation with 419.  Correct?  You knew that,

19  didn't you?

20     A.    I guess.

21     Q.    Okay.  And so when you opposed this, if

22  you were successful in convincing them not to

23  approve it, did you have a plan for how they would

24  bring themselves into compliance with the settlement

25  agreement?

Page 177

1          A.      I have said numerous times that I

2    objected to the fourth story and to the density, and

3    I surmised that what my feeling was was that they

4    would go back to the drawing board and redraw

5    something that was more fitting to our downtown.

6          Q.      Redraw it where?  Where?  Where were you

7    going to get the 29 units from?  The Court had

8    reviewed it.  The Master had reviewed it.  They did

9    an analysis of land development.  This was the

10   selected site.  You were now opposing it.  Assuming

11   you were able to convince someone that they should

12   not move forward, did you have an alternative plan

13   in mind as the incoming mayor as to how you were

14   going to now comply with the settlement agreement?

15   Did you have a plan in mind?

16         A.      I don't remember.

17         Q.      Did you understand that if it wasn't

18   approved, the Town of Emerson would be in breach of

19   the settlement agreement, which mandated that the

20   majority of its affordable housing be located at

21   that site, did you understand that when you made

22   your statements?

23              MR. SEAMAN:  Objection to form.

24         A.      I don't know if I remember it or I was

25   cognizant of that.

Page 178

1      Q.    So you didn't even consider the

2    consequence, did you?

3                MR. SEAMAN:   Objection to form.

4      Q.    Of your objections, did you?

5      A.    I don't remember.

6      Q.    Okay.  So then ultimately you appeared

7    there.

8                MR. FIORENZO:   And let me pull up and

9    mark...

10                MR. KLEIN:   DD-21.

11      Q.    DD-21 is a transcript of the December

12    10th, 2018, proceedings and you attended.  Right,

13    ma'am?

14      A.    What was the date?

15      Q.    December 10, 2018.  Right there.  That's

16    the hearing you attended.  Right?

17      A.    I guess, yeah.  I don't remember the

18    date.

19      Q.    You guess?

20      A.    I don't remember the date.

21      Q.    Why are you -- is there any doubt you

22    appeared at the meeting on that date?  I thought you

23    told me you did appear there, you made statements in

24    opposition.  Why do we have to go over this again?

25      A.    Because I don't --

Page 179

1          Q.     You appeared there.  Right?

2          A.     I don't remember the exact date, and

3     you've stated wrong dates in reading some of these

4     documents --

5          Q.     Oh, okay.

6          A.     -- and our lawyers have corrected you.

7          Q.     Oh, that was nice of them.

8          A.     When I say I think so, it's because I'm

9     assuming that you're giving me the correct date.

10         Q.     Well, I thank you and them for

11    correcting me.  So do you want to correct me on this

12    one?

13         A.     I don't remember what date the meeting

14    was.

15         Q.     Yeah, let's take a look at what you had

16    to say, maybe that will help.  Okay?  Do you want to

17    do that?

18                MR. SEAMAN:  Objection.

19         Q.     Shall we do that together so we can

20    clear this thing up?

21                MR. SEAMAN:  Joe, why don't you ask a

22    question.

23         A.     As you keep saying, you're running the

24    deposition.

25         Q.     Yeah, yeah.

Page 180

1          A.      Why are you asking me?

2          Q.      So let's do that.  All right?  Yeah,

3     let's do that.  Let's see if we can clear it up.

4          A.      Yeah, let's have fun.

5          Q.      Okay.  So this is DD-21.

6                  MR. FIORENZO:  Let's go to page 137,

7     please.  You got it?  Okay.  And go to, let's see,

8     137, line 12.  Could you start with that, Steve?

9     Just highlight that.  And then over to 138, 13.

10    Yeah, right about there, that's fine.

11         Q.      Okay.  So let's take a look -- well,

12    actually, let's go back.  It doesn't -- it doesn't

13    show who was actually the speaker.  Okay.  Yeah.  So

14    you spoke.  You were Mayor Elect DiPaola.  Right?

15         A.      Yes.

16         Q.      So can we now agree that you did appear

17    on December 10th, 2018, at the hearing of the Land

18    Use Board?

19         A.      Yes.

20         Q.      Okay.  So I want to look at line 8,

21    Mayor Elect DiPaola.  Here's what you say, and I'm

22    asking you to confirm.  This is a transcript, a

23    recorded stenographic transcript.

24              "Still too big.  It has a lot more character

25    than this box, but it reminds me of a building I

Page 181

1    used to hang in on 2nd Avenue in the City in the

2    '80s.  Look, I think the election of myself, Brian

3    Gordon, and Ken Hoffman was a one-issue election,

4    one issue you say, and it was a referendum on the

5    development of Block 419 in downtown.  That's what I

6    was asking about before.  Remember?

7         A.    Probably where she got the quote from.

8         Q.    Remember that?  We were talking about

9    whether you ran on that and if that was the issue,

10   the principal issue?  You state before the board

11   that it was a one-issue election and it was Block

12   419.  Was that an honest and truthful statement when

13   you made it?

14        A.    Was what an honest and truthful

15   statement?

16        Q.    What I just read, that when you and your

17   fellow members were elected, it was a "one-issue

18   election," and it was a referendum on the

19   development of Block 419 in our downtown.  Was that

20   an honest and truthful statement you made in public

21   to the Land Use Board in front of all the people in

22   your town?

23        A.    At that time, yes.

24        Q.    Okay.

25              MR. SEAMAN:  Objection to form and it's

Page 182

1     an expression of opinion, it's misstating a fact.

2          Q.    And then you go on to state -- and by

3     the way, when we talked earlier, a little bit

4     earlier, I was asking you about -- we showed the

5     newspaper article about overdevelopment, and I was

6     asking you what project, doesn't it really mean 419,

7     you said, I don't remember, I don't know.  There's

8     no doubt now that when you were talking about

9     overdevelopment, that was the one issue that you and

10    your mates ran on, which was the development of

11    Block 419 of the downtown and that was it.  Correct?

12         A.    There were other projects that were in

13    the hopper.

14         Q.    Well, that's what you said on the

15    record.  Correct?

16              MR. SEAMAN:  Objection to form.

17         A.    Is what what I said on the record?

18         Q.    That it was a one-issue election and it

19    was a referendum.  In other words, the vote for you

20    guys was a referendum on the development of Block

21    419.  That's what you told the board.  Right?

22         A.    Yes, it appears that I said that.

23         Q.    Yeah.  And that was honest when you said

24    it.  Right?  You wouldn't have lied about that,

25    would you?

Page 183

1        A.      I wouldn't lie about anything.

2        Q.      Perfect.

3        You go on to say, I would ask the board to

4    respect the wishes of the people of Emerson and

5    listen to them as far as making sure that a plan

6    that is going to be the centerpiece of our downtown

7    for possibly a hundred years or more until the next

8    governing body and the next Land Use Board decides

9    that it's not appropriate for town and needs to be

10   updated, that this is the plan that you really want

11   to see there for a hundred years, the generations

12   are going to have to live with.

13       So those were all statements you made at that

14   time.  Correct?

15       A.      Yes.

16       Q.      Okay.  And then you go on to say,

17   there's this paragraph beginning on line 6, This is

18   an existing building right now.  You're referring to

19   the fact that there was already a structure on the

20   site?  Ma'am?

21       A.      I don't -- I said that?

22       Q.      Yeah, you said that.

23       A.      What did I say before that?

24               MR. FIORENZO:  Run it back.

25       Q.      It's just a run-on from where we were

Page 184

1    before.  You're asking to -- you say, This is the

2    centerpiece of our downtown.  Okay?  And what I'm

3    focused on -- this is all you making these

4    statements.  I'm focused on the statement that you

5    make where you say -- yeah, right there.  You say,

6    This is an existing building, line 6, on the right,

7    right now.  So there was already a structure on the

8    site.  Correct?

9         A.    That's what I'm trying to put into --

10        Q.    Was there a structure on the site?  All

11   these people who had the businesses there?

12        A.    Yeah, but I don't --

13        Q.    There was a building.  Right?

14        A.    I'm trying to figure out what I was

15   referring to when I say, This is an existing

16   building.

17        Q.    Well, why don't you just listen to my

18   question and then try to answer the question.

19        So there was an existing building on the site.

20   Correct?

21        A.    There are a lot of existing buildings on

22   the site.

23        Q.    Yeah.  And you go on to say, How is this

24   good planning for the Borough of Emerson?  How does

25   this benefit the Borough of Emerson in any way other

Page 185

1    than satisfying our affordable housing obligation?

2          So let me stop you there.  That satisfaction

3    of the affordable housing obligation was a

4    significant benefit to Emerson, was it not?

5          A.    I think that is subjectional.

6          Q.    It's what?

7          A.    I think that's a subjective question.

8          Q.    Well, you say it's a benefit.  You say,

9    How does it benefit other than affordable housing?

10   So the affordable housing obligation, the

11   fulfillment of that --

12         A.    I guess I --

13         Q.    Let me finish.

14         A.    I know.

15         Q.    You're interrupting me again.

16         A.    I apologize.

17         Q.    And the protection against builder's

18   remedy lawsuits and the reduction of the number of

19   units that Emerson had to comply with all were

20   benefits of the settlement agreement.  We've been

21   over this.  Correct?

22         A.    Yeah.

23         Q.    Okay.  And so when you're asking these

24   rhetorical questions, how does the Borough benefit

25   in any other way, you knew the answer to that,

Page 186

1    didn't you?

2          A.      I don't know how to answer your

3    questions, I really don't.

4          Q.      Well, you knew at that time when you

5    made the statement that under the settlement

6    agreement, in addition to satisfying 55 or

7    60 percent of the affordable obligations, it also

8    resulted in protection, a judgment of repose so that

9    Emerson could no longer be sued by a builder.

10   That's a benefit.  Right?  Is that a benefit?

11         A.      That the Borough can't be sued?

12         Q.      Yes.

13         A.      Yeah, that's a benefit.

14         Q.      And you also knew, as the settlement

15   agreement laid out, that there were numbers that had

16   been ascribed by COAH for affordable units to

17   Emerson that were a lot higher than the numbers

18   ultimately settled on.  That was also a benefit,

19   wasn't it?

20         A.      Say that again?  Than the numbers.

21         Q.      Yeah.  There were numbers of COAH units

22   that COAH had said Emerson had to satisfy, and it's

23   laid out in the agreement, that number of units that

24   Emerson had to satisfy based on COAH was higher than

25   what the settlement agreement ultimately required,

Page 187

1    in other words, it lowered --

2          A.     Yes.

3          Q.     -- the number.

4          A.     Yes.

5          Q.     Okay.  And that was also a benefit.

6    Correct?

7          A.     Yes.

8          Q.     Okay.  You go on to say, Because to me

9    does not look like it benefits Emerson.  That's what

10   you said in public.  Right?

11         A.     Yes, I said that.

12         Q.     Okay.  Now, when you appeared --

13                MR. FIORENZO:  Pull up, please, page

14   200, line 23.

15         Q.     So did you also raise questions at this

16   public hearing regarding environmental issues?

17         A.     I don't remember.

18         Q.     Let's see if I can help you.  Okay?

19         Okay.  So, again, this is at the Land Use

20   hearing.  You make the following statement:

21         "I just -- I need clarification.  When

22   somebody asked about whether or not the dry-cleaning

23   property was clean enough to put housing on for the

24   health and well-being of those future residents, you

25   don't know that, if we could build on that property

Page 188

1    yet?  And what if," and then there's a statement.

2         So you were raising an issue at this time

3    about whether there was environmental contamination

4    at the site?

5         A.    Yes.

6         Q.    And what was the basis for you raising

7    that question at the time?  Did you have any facts

8    to support that question?

9         A.    Because it was widely known in newspaper

10   articles that most dry-cleaners in the area of the

11   Pascack Valley had sites that needed to be

12   remediated because of the chloroacetyl localocamine

13   (ph.) that was being leached into the ground where

14   dry cleaners were.

15        Q.    Okay.  So you knew from being on the

16   Land Use Board, I'm sure, that ultimately when an

17   approval is given, there would be prepared a

18   resolution memorializing it?

19        A.    Uh-hum.

20        Q.    Yes?  And you know that one of the

21   things that is customary and standard in any such

22   resolution is that the applicant has to comply with

23   all other governmental entity requirements,

24   including the NJDEP.  You're aware of that.

25   Correct?

Page 189

1          A.      Yeah.

2          Q.      Okay.  In fact, who's Mr. Martin?

3          A.      He was the board attorney.

4          Q.      And when you raised that issue,

5    Mr. Martin chimed in on page 200, beginning on line

6    6, did he not?

7                  MR. FIORENZO:  Can you highlight that,

8    Steve?  Thanks.

9          Q.      He says, May I be heard?  Ms. DiPaola,

10   you make an excellent point again like some other

11   people have made in that regard.  I think you know

12   the resolution's all contingent upon all state

13   approvals, local as well as state/county approvals,

14   and that would be subject to the DEP in terms of

15   whether or not -- whether the property is clean or

16   not.

17         So he told you at that time there would be a

18   condition of the resolution which would require DEP

19   compliance if that was required.  Correct?

20         A.      Correct.

21         Q.      So you raised this question about the

22   environmental stuff and Mr. Martin responded.

23   Right?

24         A.      Yes.

25         Q.      So as of that date, were you aware that

Page 190

1    if there was any environmental issue, it would be

2    something that would be sorted out by the state

3    NJDEP?

4        A.    Say that again?

5        Q.    You're aware as of this date then if

6    there was any environmental issues at the site, it

7    wasn't the subject matter within the jurisdiction of

8    the local Planning Board, but those would all be

9    dealt with by the NJDEP, because this approval was

10   contingent upon the DEP giving a clean bill of

11   health.  Correct?

12       A.    I don't think there's anything wrong

13   with an elected official making sure that everything

14   was being done appropriately.

15       Q.    Yeah, again, I didn't ask that though.

16   Could you answer my question now?

17       A.    He told me that, so I guess I knew it at

18   that point.

19       Q.    Okay.  All right.

20            MR. BOTTA:  Joe, do you want to take

21   like a five-minute bathroom break post-lunch?

22            MR. FIORENZO:  Yeah, absolutely.  If you

23   guys would like, we can take a break now, sure.

24            (A break was taken at 2:25 p.m.)

25            (Deposition resumes at 2:35 p.m.)

Page 191

1              MR. FIORENZO:  All right.  Let's go back

2      on the record.

3              Pull up E42.  Okay.  So, Steve, could

4      you pull up E forty -- pull up the resolution.

5      BY MR. FIORENZO:

6          Q.    So I put up on the board what we're

7      going to mark as DD --

8              MR. KLEIN:  22.

9          Q.    -- 22, Resolution of the Land Use Board

10     of the Borough of Emerson.

11         Following the hearing, the board voted to

12     approve the site plan application.  Correct?

13         A.    Yes.

14         Q.    Did you review the resolution which

15     we've marked here around the time it was prepared?

16         A.    I don't believe so.

17         Q.    When did you see this resolution for the

18     first time, if at all?

19         A.    Probably after it was approved.

20         Q.    Well, again, probably is not competent.

21     Do you remember --

22         A.    I don't recall.

23         Q.    Let's start with the basics.  Have you

24     ever seen it before?

25         A.    Yes.

Page 192

1      Q.     Okay.  Do you remember the first time

2  you saw it?

3      A.     No.

4      Q.     Did you at some point in time see it

5  after you were the mayor?

6      A.     Yes.

7      Q.     What was the context in which you saw

8  it, why were you reviewing it at that time?

9      A.     To familiarize myself at the time of

10  what the stipulations were for the resolution.

11     Q.     Okay.  You say the stipulations.  There

12  were certain conditions in the resolution.  Is that

13  correct?

14     A.     Uh-hum.

15     Q.     Did you have discussions with any of

16  your professionals regarding the resolution of the

17  Land Use Board approving the site plan?

18     A.     I don't remember.

19     Q.     When you came into office, you had a

20  reorganization meeting around January 1st?

21     A.     Around January 1st, yeah.

22     Q.     And at that time, were there a series of

23  resolutions passed, including the appointment of

24  professionals?

25     A.     Yes.

Page 193

1      Q.    Did you change professionals at that

2   time?

3      A.    Yes.

4      Q.    Did you change the township engineer

5   from Boswell to someone else?

6      A.    Yes.

7      Q.    Who was the new township engineer?

8      A.    Neglia Engineering.

9      Q.    Why did you remove or not renew Boswell?

10      A.    The governing body voted in favor of

11   Neglia.  They reviewed all of them and they thought

12   that Neglia was the most qualified.

13      Q.    Did you know Neglia?

14      A.    No.

15      Q.    So prior to Neglia's appointment, had

16   you dealt with anyone from Neglia?

17      A.    No.  I only knew them on their

18   reputation.

19      Q.    Had they contributed any money to your

20   campaign?

21      A.    I don't remember.

22      Q.    You don't remember?

23      A.    I don't remember.

24      Q.    Is it possible they did?

25            MR. SEAMAN:  Objection to form.

Page 194

1          A.     I don't remember.

2          Q.     Yeah, I know that, but is it possible

3    that they did?

4                 MR. SEAMAN:  Objection to form.

5          A.     I mean, it's possible pigs are going to

6    fly out of the sky.  I mean, is it possible?  I

7    don't remember.

8          Q.     You're not denying they contributed,

9    that's why I asked.  Does that mean there's a

10   possibility they did?

11                MR. SEAMAN:  Objection to form.

12         A.     I don't remember.

13         Q.     Did you ever solicit a contribution from

14   them?

15         A.     I don't remember.

16         Q.     Who is your point of contact at Neglia?

17                MR. SEAMAN:  Objection to form.

18         A.     Like today who is my point of contact?

19         Q.     No, back then when they were brought in?

20         A.     I don't think I had a point of contact.

21   I think they just sent an RFQ in.

22         Q.     Okay.  Other than the engineer, did you

23   also change the planner?

24         A.     Yes.

25         Q.     So you removed or did not reappoint

Page 195

1    Ms. Bogart?

2          A.    We did not reappoint Ms. Bogart.

3          Q.    And who did you replace her with?

4          A.    Statile Planners, Caroline Reiter.

5          Q.    Did you know Ms. Reiter before she was

6    appointed?

7          A.    No.

8          Q.    You never dealt with her at all?

9          A.    No.

10         Q.    Did you recommend Neglia?

11         A.    What do you mean by recommend?

12         Q.    Did you recommend, did you suggest to

13   the governing body that we bring in Neglia?

14         A.    I think I recommended that we not

15   reappoint Boswell, but I don't think I store them --

16   steered them into any particular direction.  I

17   don't --

18         Q.    Again, I asked if you recommended them.

19         A.    I don't remember.

20         Q.    Was there anyone else considered other

21   than Neglia?

22         A.    There may have been, yeah.

23         Q.    Well, I know.  That's why I'm asking.

24   Was there?

25         A.    I don't remember exactly who, but I

Page 196

1    would assume that more than two people responded to

2    an RFQ.

3         Q.    So other than Ms. Reiter and Mr. Neglia,

4    was there a new architect brought in?

5         A.    Yes.

6         Q.    Who was the prior architect under

7    Lamatina?  Axis?

8         A.    I believe so, yeah.

9         Q.    And who did you bring in?

10        A.    Kevin Settembrino.

11        Q.    Did you know Mr. Settembrino?

12        A.    Only because he had answered an RFQ

13   years before.

14        Q.    Had you done any business with him?

15        A.    No.

16        Q.    Had the town?

17        A.    I don't think so.

18        Q.    Did he contribute to your campaign?

19        A.    I don't remember.

20        Q.    So maybe he did, maybe he didn't, you

21   don't know.

22        A.    I don't remember.

23        Q.    You don't know.  You don't remember.

24   Could be he did, could be he didn't.

25        A.    Right.  I don't remember.

Page 197

1        Q.     Okay.  Now, were you unhappy with the

2    performance of your -- of the professional engineer

3    Boswell as of the time you took office?

4        A.     Yes.

5        Q.     What was it you were unhappy with?

6        A.     I was unhappy with his work.

7        Q.     What parts of his work were you unhappy

8    with?  We're now talking about Mr. Ascolese.  Right?

9        A.     Yeah.

10       Q.     What did he do that you didn't like?

11       A.     I felt he was too accommodating.

12       Q.     To whom?

13       A.     To the mayor.

14       Q.     And what facts are you aware of that led

15   you to conclude that he was too accommodating?

16       A.     Various projects over the years that he

17   contributed to for the Borough.

18       Q.     How about 419, did you believe he was

19   too accommodating to Mayor Lamatina regarding the

20   site plan approval process for 419?

21       A.     Yes.

22       Q.     Did you express that to anyone?

23       A.     I think I expressed it to him.

24       Q.     Okay.  Well, what did you say to him?

25       A.     I said it at the Land Use Board, so you

Page 198

1    probably have a transcript of it.

2         Q.    Well, I --

3         A.    I don't remember, but I do think I said

4    something to him and to Ms. Bogart.

5         Q.    But what, what was the tenor of the

6    statement?

7         A.    That I was unpleased with their

8    decision.

9         Q.    Whose decision?

10        A.    Their engineering and their planning of

11   the project.

12        Q.    Well, they didn't engineer it or plan

13   it, they reviewed it, didn't they?

14        A.    Well, the review of the plans of the

15   engineer.

16        Q.    So you were critical of their review of

17   the plans that were submitted pursuant to the

18   settlement agreement?

19        A.    To the settlement agreement?

20        Q.    Yeah, the plans that were submitted, the

21   site plan, was for -- was to implement the terms of

22   the settlement agreement.  So I'm asking whether --

23   what were you critical about in their review of

24   those plans?

25        A.    That they thought that the height was

Page 199

1    acceptable for Emerson's downtown, and that the

2    change in the plans aesthetically that Ms. Bogart

3    agreed that were proper planning.

4         Q.    So you thought that their acceptance of

5    the height -- that the height was acceptable was a

6    problem for you.  Correct?

7         A.    Uh-hum.

8         Q.    Yes?

9         A.    Yes.

10        Q.    Was the site plan submitted a conforming

11   site plan?

12              MR. SEAMAN:  Objection to form.

13        Q.    Do you know what I mean by that?

14        A.    Yeah, I do know what you mean by it.

15   Yeah, I think it was.

16        Q.    So by conforming, that means it

17   conformed to the local ordinances, including use and

18   bulk requirements.  Correct?

19        A.    Yes, because we changed the ordinances

20   so that it didn't have to require a variance.

21        Q.    Well, you understand then if the

22   engineer is reviewing it, he has to review it in

23   accordance with the existing ordinances, didn't you

24   know that?

25        A.    I do know that.

Page 200

1          Q.     So when Mr. Ascolese reviewed it with

2    respect to height and reached the conclusion that it

3    conformed, that wasn't his fault as an engineer, he

4    was simply reporting whether the plan conformed or

5    not.  Correct?

6          A.     Yes.

7          Q.     So how could you complain to

8    Mr. Ascolese because of the height?

9          A.     Because I said it was all of his work as

10   a total.  He was involved in the fourth-story issues

11   of height.

12         Q.     What do you mean he was involved?

13         A.     He was involved.

14         Q.     In what way?

15         A.     In helping to write the ordinance as to

16   what height levels were going to be acceptable in

17   the Borough.

18         Q.     Did he write that ordinance because it's

19   what he wanted or was he --

20         A.     No.

21         Q.     -- requested by his client to do so?

22         A.     He was requested by I believe Mayor

23   Lamatina to do it.

24         Q.     Again, as the engineer, if you're

25   working for the town and they've asked you to draft

Page 201

1    an ordinance, is it his function to say no?

2              MR. SEAMAN:  Objection to form.

3         A.    I think that when you are a professional

4    for a borough, that you should do what's in the best

5    interest of the borough, not just what different

6    elected officials want.

7         Q.    So he should overrule the policy-making

8    decisions of the elected officials?

9              MR. SEAMAN:  Objection to form.

10        Q.    Is that what you think the function of

11   an engineer is?

12        A.    My feeling is when you have a borough

13   professional, they should guide you accordingly on

14   what's appropriate for your town and not just please

15   the people that are voting for you.

16        Q.    So if you as the mayor tell your

17   engineer we want you to draft a particular ordinance

18   as a policy matter because we, as the governing

19   body, think this is good policy, you're saying that

20   the engineer should say no?

21        A.    I think that he should just have a

22   conversation with the governing body saying that he

23   doesn't think that it's appropriate.

24        Q.    Do you know what conversation he had

25   with the governing body --

1        A.    No.

2        Q.    -- when he was asked to prepare an

3    ordinance?

4        A.    I don't think he had any conversation.

5        Q.    Well, do you know if he had a

6    conversation?

7        A.    I don't.

8        Q.    All right.  So you don't know what he

9    did or didn't do in connection with that ordinance.

10   Correct?  True or not?

11       A.    Do I know what he did with that

12   ordinance or not.

13       Q.    In connection with the preparation of

14   that ordinance.

15       A.    I'm pretty sure he prepared the

16   ordinance.

17       Q.    You're pretty sure.  Do you know?

18       A.    I don't know who else would have done

19   it.

20       Q.    Well, could the attorney have drafted an

21   ordinance?

22             MR. SEAMAN:  Objection to form.

23       A.    It wouldn't be the appropriate person to

24   do it.

25       Q.    You don't know who did it, that's the

Page 203

1   point.  Correct?

2          A.     I know that when an ordinance is

3   drafted, the different professionals that are

4   speaking to each subject matter prepare their

5   portion of it.  I don't think the attorney went out

6   and measured to see what were appropriate levels.

7          Q.     But you don't know who actually prepared

8   the ordinance as you sit here today.  Can you state

9   that with any certainty?

10         A.     Who prepared the ordinance?

11         Q.     Who prepared and drafted the ordinance?

12         A.     I have no idea.

13         Q.     And you don't know what discussions that

14  person who drafted it had with the policymakers as

15  to what they wanted him to do.  Correct?

16         A.     Well, I was one of the policymakers.  I

17  don't remember any discussions.

18         Q.     Well, were there any discussions at the

19  governing body level?

20         A.     I don't recall.

21         Q.     Okay.  So that's why you didn't like

22  Ascolese, because he didn't -- you thought the

23  height was not acceptable and he should have done

24  something about that.  Correct?

25         A.     I have a very different vision of what

Page 204

1    professionals do.

2         Q.    I didn't ask what -- I didn't ask that.

3    I asked you to confirm what I think you said, which

4    is that you didn't like the work Ascolese did

5    because you thought the height wasn't acceptable and

6    he should have done something about that.  That's

7    what you told me.  Correct?

8         A.    Yeah, but I think --

9         Q.    Yes?  Before you get to the but, just

10   answer the question first.

11        A.    I don't know how to answer your

12   question, because professionals have discussions and

13   make recommendations, and I don't know what --

14        Q.    You don't know what discussions they

15   had.

16        A.    And I don't know what recommendations

17   were his or weren't his.

18        Q.    I'm just asking your position.  You told

19   me that -- I said, why did you let Ascolese go, what

20   didn't you like about the work he did?  The one

21   thing you said to me is that you thought that the

22   height was not acceptable on the 419 project and he

23   should have done something about that.  Did you tell

24   me that a moment ago?

25        A.    Yes, I think he should have advised --

Page 205

1          Q.     Okay.  Yeah, good.  But at the board

2     level, he -- there was an existing ordinance, so

3     when he reviewed the plans, he had to determine if

4     it complied or not.  Correct?

5          A.     Yes.

6          Q.     And it did comply.  Correct?

7          A.     Yes, because we changed the ordinance so

8     that it would.

9          Q.     Right.  Because the governing body voted

10    to do that.  Right?

11         A.     Yeah.

12         Q.     It's a legislative decision by the

13    governing body.  Correct?

14         A.     Yes, which I disagreed with.

15         Q.     Of course.  You voted against it.  So --

16    but it became the law.  Right?  It was the law in

17    town, the ordinance.

18         A.     Yes.

19         Q.     And so therefore Ascolese, like any

20    other professional, has to follow the law, doesn't

21    he?

22         A.     Yes.

23         Q.     Okay.  And that's what he did.  Right?

24               MR. SEAMAN:  Objection to form.

25         Q.     He compared the plan to the existing

Page 206

1    ordinances, the law in town, to determine whether it

2    deviated or not.  That's what he did.  Right?

3         A.    I guess.

4         Q.    Okay.  So why else did you not renew?

5    What other things didn't you like about what he did,

6    other than the fact that you thought it was too high

7    and he should have done something about it, even

8    though that was the law in Emerson, what else did he

9    do?

10        A.    I don't recollect right now.

11        Q.    Okay.  How about the planner, what, if

12   anything, did she do that you didn't like that led

13   you to conclude that she shouldn't be renewed?

14        A.    She made a lot of suggestions that

15   didn't make any sense for the Borough of Emerson.

16        Q.    So give me the top five.

17        A.    Thinking that it was okay to encapsulate

18   a two-story existing building with the project on

19   419 that Accurate Builders was building.

20        Q.    I'm sorry, so this is 419 again?

21        A.    Uh-hum.

22        Q.    What is it she recommended be done?

23        A.    She recommended that the buildings were

24   blighted.  She recommended eminent domain.  She

25   recommended that it was an appropriate look to

Page 207

1    encapsulate another building with another -- an

2    existing building with a new building on 419.

3    Pretty much everything she did I think I didn't

4    agree with.

5           Q.    What do you mean by encapsulate?

6           A.    If you've ever seen the plans of 419,

7    there's an existing building in the center of it and

8    it's encapsulated on three sides.

9           Q.    All right.  So now, after the -- after

10   you came in office now and you brought in your own

11   team of professionals, did you have any -- any

12   meetings with them to discuss what your goals and

13   objectives were for the town?

14          A.    Yes.

15          Q.    Okay.  And when did you do that?

16          A.    Shortly after I took office, I think.

17          Q.    Okay.  Tell me when that happened.

18                MR. SEAMAN:  Objection.

19          A.    I believe after they were appointed.

20          Q.    So did you then call everyone in and

21   have a meeting?

22          A.    No, not particularly.  I think I just

23   met with two of the attorneys.

24          Q.    Who were the two attorneys you met?

25          A.    Maybe three.  John McCann, Rich

Page 208

1    Malagiere, and Brian Giblin.  Or maybe it was just

2    Malagiere and Giblin.  I don't remember.

3         Q.    So other than the attorneys, did you

4    meet with any of the other professionals once you

5    took over to discuss what your agenda was?

6         A.    No.

7         Q.    Did you meet with the engineer?

8         A.    No.

9         Q.    So you didn't have any meetings with

10   Mr. Atkinson?

11        A.    No.  I think I met him when he came to

12   the first meeting.

13        Q.    And how about the new planner, you

14   didn't meet -- and who was that again?

15        A.    Caroline Reiter.

16        Q.    Reiter.  You didn't meet with her to go

17   over your agenda?

18        A.    I don't think so.

19        Q.    Okay.

20        A.    You keep saying agenda.  I don't know

21   that I necessarily had an agenda.

22        Q.    Well, you ran on an agenda, didn't you?

23   Didn't you have -- when you tried to get people to

24   vote for you, didn't you tell them what your agenda

25   was?

Page 209

1      A.    I just don't like the word agenda.

2      Q.    Okay.  Whether you like it or not, it's

3   a word.  Did you have an agenda?

4      A.    Personally, no, I didn't have an agenda.

5      Q.    Did you have issues that you --

6      A.    I had issues --

7      Q.    -- knocked around?

8      A.    -- that I didn't like that were

9   happening in the town.

10      Q.    Again, you're talking over me.  Okay?

11   You're talking over me again.

12      Did you have issues that you ran on that you

13   wanted to address for Emerson?

14      A.    Yes.

15      Q.    And did you review those issues with the

16   new professional staff that you hired?

17      A.    Only as it came up.

18            MR. FIORENZO:  Okay.  Steve, could you

19   pull up E53.

20      Q.    So this is another Pascack Press article

21   by John Snyder, who you confirm you've spoken with.

22   Correct?

23      A.    Correct.

24      Q.    Marked as D?

25            MR. KLEIN:  DD-23.

Page 210

1          Q.     DD-23.  So let's mark it.

2               MR. FIORENZO:  Could you pull up the

3     article, Steve?

4               MR. KLEIN:  Just one second.

5               MR. FIORENZO:  What happened to that

6     quick new software.

7          Q.     Oh, look at that.  All right.  So

8     there's a very nice photo of you.  Who are you with?

9          A.     Carlos Renda.

10         Q.     Who is he?

11         A.     The Mayor of Woodcliff Lake.

12         Q.     Got it.  You're quoted in here

13    predicting, "It's not going to be smooth but it's

14    going to be fun."  Did you make that statement to

15    the PAC group at the organization meeting?

16         A.     Yes.

17               MR. FIORENZO:  And scroll down, Steve,

18    to the last -- you know, the last paragraph dealing

19    with DiPaola, Gordon, and Hoffman.  Yeah.

20         Q.     Okay.  So the article states, DiPaola,

21    Gordon, and Hoffman (returned after two terms, 2005

22    through 2010) had campaigned hard on the issue of

23    what they called overdevelopment, taking aim at the

24    four-story Block 419 redevelopment project long

25    taking shape and just approved.  Is that true?

Page 211

1          A.      I'd say so, yeah.

2          Q.      Okay.  And the next paragraph goes on,

3    "With her rise, DiPaola, who often found herself the

4    lone no vote on Block 419 matters, might well find

5    herself presiding at the project's ribbon cutting."

6    Did you have that discussion with the reporter as

7    well?

8          A.      About cutting a ribbon, no.

9          Q.      So that's just the reporter.

10         A.      Yeah.

11         Q.      Now, after this article --

12                 MR. FIORENZO:  Steve, could you pull

13   up --

14                 MR. BOTTA:  By the way, do you want to

15   amend that part about being mayor is fun?  It's a

16   joke.  Off the record.

17                 (Discussion off the record.)

18                 MR. FIORENZO:  Okay.  Steve, pull up

19   E58.

20                 MR. KLEIN:  DD-24.

21         Q.      So this is another one of the Passaic

22   Press and Northern Valley Press local newspaper,

23   Mr. Snyder wrote another article.

24                 MR. FIORENZO:  Scroll down if you would.

25                 MR. BOTTA:  Do you have a date on that,

Page 212

1    Steve?

2                   MR. FIORENZO:  Yeah, it's small up here.

3    It's --

4                   MR. KLEIN:  No, it's the date it was

5    printed.  It says 4/6 --

6                   MR. FIORENZO:  4/6/20, but that's not

7    the date.

8                   MR. KLEIN:  No.

9                   THE WITNESS:  No.  The chamber meeting

10   is generally January or February.

11                  MR. FIORENZO:  I have the date as

12   January 24th from some source, but maybe it's

13   further buried inside.

14        Q.     So at this time --

15                  MR. FIORENZO:  Scroll back a little bit,

16   Steve.

17        Q.     At this point in January now, your new

18   administration is just beginning.  And was

19   affordable housing in Emerson the big ticket item

20   that you were concerned about?

21                  MR. SEAMAN:  Objection to form.

22        A.     I'm sorry, could you say that again?

23        Q.     Was affordable housing as you took

24   office the big ticket item that you were concerned

25   about?

Page 213

1        A.    Was affordable housing?  No, that was

2    not my -- no.

3        Q.    That wasn't considered a big ticket item

4    to you?

5        A.    Affordable housing?

6        Q.    Affordable housing and development and

7    overdevelopment.

8        A.    Overdevelopment was, not --

9        Q.    Well, that would have included within

10   it -- the reason it gets overdeveloped and higher

11   density as we discussed is because of Mount Laurel

12   gives higher density, thereby creating potential

13   overdevelopment.  Correct?

14            MR. SEAMAN:  Objection to form.

15            MR. BOTTA:  Objection to the form.  You

16   can answer that if you understand it.

17       Q.    Right?

18       A.    You said a lot of words.  Can you just

19   ask me one question?

20       Q.    You understand, and I thought we'd gone

21   over this, that the issue of overdevelopment, which

22   equates to higher density than you otherwise might

23   have, is triggered by Mount Laurel housing because

24   there are, quote, density bonuses that the law says

25   that you get.  You understand that.  Right?

Page 214

1        A.      Yeah, but I don't think it's the only

2    reason that things are dense --

3        Q.      No.

4        A.      -- or overdeveloped.

5        Q.      But that's a reason why the 419 project

6    is as dense as it is, 'cause if it didn't have the

7    Mount Laurel, there would be no way they would be

8    entitled to the number of units that they had.

9    Correct?

10               MR. SEAMAN:  Objection to form.

11       A.      I don't know how to answer the question.

12       Q.      Well, do you know the answer?  Well,

13   let's assume.  Pretend for a moment there was no

14   Mount Laurel at the Block 419 site.  Do you not

15   understand that if there was no Mount Laurel, there

16   would be lower density development at the site?

17               MR. SEAMAN:  Objection to form.

18       Q.      Do you understand that?

19               MR. SEAMAN:  Objection to form.

20       A.      I don't know if that's a fact.

21       Q.      And an application to build and develop

22   on that site without affordable housing yields less

23   units than with affordable housing.  Do you deny

24   that?

25               MR. SEAMAN:  Objection to form.

Page 215

1        A.      I don't know the answer to your

2    question.

3        Q.      You don't know?  You don't know.

4        A.      I don't know.

5        Q.      Okay.  So when you're talking about

6    density of development and overdevelopment, you

7    don't understand what impact Mount Laurel has on

8    overdevelopment?

9        A.      On this specific project?

10       Q.      Yes.

11       A.      Yes, I understand that.  You're saying

12   overall I thought.

13       Q.      Do you understand on this specific

14   project --

15       A.      Yes.

16       Q.      -- that the existence of Mount Laurel

17   and the Court's rulings in this case mandating

18   compliance had an effect on overdevelopment of the

19   site, did you understand that?

20       A.      I understand what you're saying, but I

21   still think it could have been built smaller and

22   still satisfied our affordable housing obligation.

23       Q.      Well, great.  You're not an expert on

24   that and I'd be happy for you to give us an expert

25   opinion to that effect.  Your intuitive belief on

Page 216

1    that, while interesting, is of no real moment.  My

2    point is that do you acknowledge that one of the

3    reasons why there's overdevelopment at the subject

4    site or there's higher density at the subject site

5    is because the Court-approved settlement gave

6    density bonuses as a reward to the developer for

7    building affordable housing.  You understood that.

8    Correct?

9         A.    I understand that.

10        Q.    Okay.  So when we talk about this issue

11   of overdevelopment at the site, overdevelopment at

12   the site and density at the site is linked to Mount

13   Laurel, which gives density bonuses.  Correct?

14             MR. SEAMAN:  Objection to form.

15        A.    I don't know about the bonuses.

16        Q.    You don't know that there's higher

17   density because of Mount Laurel from the settlement

18   agreement and everything else that you reviewed

19   while you were on the governing body, you don't know

20   that?

21        A.    Not the way you're describing it.  Maybe

22   it was described a different way.

23        Q.    Well, is there greater density that's

24   given to a developer who's willing to put Mount

25   Laurel housing on a site, do you know that?

Page 217

1        A.    Is there -- say that again?

2        Q.    Is there greater density permitted to a

3   developer who's willing to build Mount Laurel

4   housing on a site?

5        A.    Like in every occasion or in this

6   occasion?

7        Q.    In this occasion.

8        A.    Yes.

9        Q.    Okay.  In fact, that was part of the

10  settlement agreement.  Correct?

11            MR. SEAMAN:  Objection to form.

12       A.    What was part of the settlement

13  agreement?

14       Q.    The fact that there were bonuses,

15  greater density given to the developer because the

16  developer was willing to build affordable.

17       A.    I just don't remember the word "bonus"

18  being used.

19       Q.    Bonus, greater density, more units.

20  There were more units allowed to be built because

21  there was a Mount Laurel component that the

22  developer was willing to build.  You understood that

23  when all the -- when the settlement agreement was

24  being discussed.  Correct?

25       A.    Yes.

Page 218

1      Q.     Okay.

2      A.     And I was against it.

3      Q.     Okay.  All right.  So in this article --

4  go to this.  First of all, that's a very nice

5  picture there.  You're in that photo?  Yes, you are.

6  Very nice.

7      A.     Glad it meets with your approval.

8      Q.     These were all people -- these were all

9  people with the -- yeah.  No, I'm very impressed, so

10 I just wanted to let you know that.  So, you know,

11 everybody there looks very good.  You look very

12 nice.  And my question is, this is the Chamber of

13 Commerce people?

14     A.     Those are the mayors with part of the

15 Greater Pascack Valley members.

16     Q.     Okay.  So these are all mayors.

17     A.     Or representatives from boroughs.

18     Q.     Got it.  Okay.  So in this article,

19 which I guess the reporter was reporting as a result

20 of this meeting of the mayors -- was the reporter at

21 that meeting?

22     A.     He usually is.  I don't remember if he

23 was at this one, per se.

24     Q.     Well, it says, Emerson Scaling Back.

25 Let's go to that.  Emerson's new mayor, Danielle

Page 219

1    DiPaola, made her first appearance at the breakfast,

2    where she appealed for help "from anyone in the

3    room" during this time of transition, including the

4    search for a new borough administrator.  So did you

5    make such a statement at the breakfast?

6         A.    Yes.

7         Q.    Okay.  And then she goes on -- he goes

8    on to say, "She said," referring to you, "affordable

9    housing and redevelopment were the big ticket items

10   she is carrying over."  Let me stop there.

11        So did you tell that to the assembled mayors

12   that in Emerson, that affordable housing and

13   redevelopment were the big ticket items consistent

14   with what I guess you said earlier, that that was

15   the number one issue, that's what you were elected

16   on.  So did you make that statement?

17        A.    Probably something like it.

18        Q.    Okay.

19             MR. FIORENZO:  So scroll down, Steve, to

20   the next paragraph.  She said, the third paragraph,

21   could you highlight that, please?

22        Q.    The article says, She said, "I think

23   we've gotten a little bit lost on trying to do big

24   projects.  We're going to continue with all of the

25   drainage projects we've started and we have a lot of

Page 220

1    grants for those."  Did you make that statement to

2    the reporter?

3              A.     I guess so.

4              MR. FIORENZO:  Continue down, Steve.

5    Scroll.  Okay.

6              Q.     The reporter reports, "In the meantime,

7    she said," referring to you again, "'We're trying to

8    scale this back and make it more of a reasonable

9    development that is friendlier to our small

10   downtown.'"  Did you make that statement to the

11   reporter?

12             A.     I guess I did.

13             Q.     Okay.  And when he quotes you as saying

14   we're, meaning the town, I presume.  Right?  The

15   "we're" is the town?  You were at the breakfast and

16   you're giving a speech.  We're meaning Emerson?

17             A.     I guess.

18             Q.     Okay.  Trying to scale this back.  So

19   scale back the 419 project you're discussing.

20   Correct?

21             A.     I think overdevelopment in general.

22             Q.     Well, you were specifically focused on

23   419, 'cause as you said to other reporters -- you

24   said to this reporter, that was the big ticket

25   issue.  Right?

Page 221

1            MR. SEAMAN:  Objection to form.

2        A.    Yeah, but I don't know when I said that

3    statement what I was referring to.

4        Q.    Well, what project were you trying to

5    scale back at that time?

6        A.    Did I say a specific project?

7        Q.    We're trying to scale this.  What's the

8    "this" that you're trying to scale back?

9        A.    I could have been talking about 419.

10       Q.    Okay.  Is there any other -- was there

11   any other large development project in town at that

12   time other than 419?

13       A.    There was also, I told you, a project

14   approved for the Valero that people thought was too

15   big.

16       Q.    Is that downtown?

17       A.    Uh-hum.

18       Q.    Where?

19       A.    Across the street from 419.

20       Q.    How big is that?

21       A.    It's a big gas station with a 7-Eleven

22   with --

23       Q.    Okay.

24       A.    -- residential on top.

25       Q.    You weren't talking about the Valero

Page 222

1  project before the mayors, were you?  You were

2  talking about 419.

3       A.    I don't recall.

4       Q.    Let me see if I can help you.  "Downtown

5  redevelopment is in the process of acquiring

6  properties, she said."

7       So the downtown redevelopment which was in the

8  process of acquiring properties was the 419 project.

9  Correct?

10      A.    Yes.

11      Q.    So in the following sentence then it

12  says, In the meantime, she said, we're trying to

13  scale this back, it appears to refer to the downtown

14  redevelopment project.

15      A.    Then I was talking about 419, yes.

16      Q.    Okay.  Great.  So when you told the

17  assembled mayors that you wanted to scale back the

18  419 project, what did you intend to do to scale it

19  back since it had Planning Board approval?  I'm

20  sorry, it had Land Use Board approval.

21      A.    I have no idea what I meant by that.  It

22  was probably the first time I was speaking in public

23  after I was elected mayor.

24      Q.    How could you scale it back if you

25  wanted to?  How could you do that?  What would you

Page 223

1    do?

2          A.      I think I wasn't able to, which is why

3    it didn't happen.

4          Q.      So you weren't able to, but you said,

5    we're trying to scale it back.  How were you -- what

6    were you doing to try to scale it back?  I mean,

7    again, you're making a public statement to the

8    mayors.  You were trying to be honest about what

9    your intentions were.  Correct?  Yes?

10         A.      Yes.  I also said it was probably the

11   first time I was speaking to such a large crowd of

12   people and may have said things that --

13         Q.      Well, you didn't lie to them, you didn't

14   say things that --

15         A.      No, I didn't lie to them.

16         Q.      Because you wouldn't do that, you've

17   told us.  So assuming you were telling the truth,

18   and I'm sure you were, when you told the mayors

19   under the topic of Emerson Scaling Back, that's the

20   heading of the article, when you talked about trying

21   to scale back 419, what efforts were underway at

22   this time to do that?

23         A.      I don't think there were any efforts.

24         Q.      Were there ways that you discussed with

25   anyone as to how you might scale back the project?

Page 224

1          A.      I don't remember.

2          Q.      Do you know as you sit here today of any

3     actions that were taken by Emerson to try to scale

4     back the project?

5          A.      I don't think we took any actions to try

6     to scale it back.

7          Q.      Did Emerson have a redevelopment

8     committee?

9          A.      Yes.

10         Q.      Did the redevelopment committee meet and

11    discuss ways to try to scale back the project?

12         A.      No.

13         Q.      Did you discuss with your professional

14    engineer ways to scale back the project?

15         A.      No.

16         Q.      Did you discuss with the engineer -- do

17    you know what the resolution compliance process is

18    all about?

19         A.      The what?

20         Q.      Resolution compliance, do you know what

21    that means?

22         A.      Yes.

23         Q.      What does it mean?

24         A.      That means that the project has to

25    comply with the resolution.

Page 225

1        Q.      What resolution?

2        A.      Any resolution for whichever project

3   it's written for.

4        Q.      And did you have discussions with

5   Mr. Atkinson at any time about that process?

6        A.      I don't think so.

7        Q.      You deny it?

8        A.      I don't think I did.

9        Q.      You don't think you did or you're sure

10  you didn't?

11       A.      I don't remember.

12       Q.      Okay.  Would the mayor, you, have a role

13  in the resolution compliance process or would that

14  normally be handled by the professionals?

15              MR. SEAMAN:  Objection to form.

16       A.      I don't know.

17       Q.      Well, in the history of your time as the

18  mayor, do you typically get involved in the

19  resolution compliance process after a zoning board

20  grants an approval with conditions?

21       A.      We don't have a zoning board.

22       Q.      Okay.  Whatever board.  Land Use Board.

23  Do you typically get involved in that process --

24       A.      When you --

25       Q.      -- of resolution compliance?

Page 226

1          A.      I don't understand what you mean when

2     you say involved.

3          Q.      Do you have any role at all?

4          A.      Well, there might be a time where we're

5     questioning whether someone is complying with the

6     resolution, we may look at it and ask a professional

7     in any given project if something that they've done

8     complies with the resolution.

9          Q.      Who's the "we"?  You look at the

10    resolution to determine if it's compliant, is that

11    what you do as the mayor?

12         A.      No.

13         Q.      That's what I'm asking.  You as the

14    mayor, Danielle DiPaola, since you've been elected,

15    is it your role to review resolutions of the Land

16    Use Board or any other board in town to determine

17    compliance with condition or do you have others who

18    do that?

19         A.      I don't really understand your question.

20    You mean while it's being written?

21         Q.      Do you review compliance with Zoning

22    Board resolutions to determine if someone has

23    complied or not, whether they've checked off all the

24    boxes and done all the things they're required to

25    do, do you as the mayor do that?

Page 227

```
1        A.    I think anyone can do that once they --

2        Q.    Do you as the mayor do that?

3        A.    As a role?  No.

4        Q.    Yes, yes.

5        A.    No.

6        Q.    Okay.

7        A.    But I can certainly look at a

8   resolution.

9        Q.    Have you ever done it?

10       A.    Have I ever looked at a resolution and

11  questioned whether something complies?

12       Q.    Yes.

13       A.    Yes.

14       Q.    Okay.  When was the last time you did

15  it?

16       A.    Oh, God, I have no idea.

17       Q.    Did you ever do it as to Block 419?

18       A.    I don't recall.

19       Q.    You hire professionals to do that.  You

20  have engineers in line.  Correct?

21       A.    Yes.

22       Q.    Isn't that their role?

23       A.    Yes.

24       Q.    You're not an engineer.  Right?

25       A.    No.
```

Page 228

1      Q.      And you wouldn't be in a position really

2  to evaluate whether it's compliant or not.  Correct?

3              MR. SEAMAN:  Objection to form.

4      A.      I don't think it's beyond my scope or

5  anyone to question whether an item that's listed on

6  a resolution is being satisfied by the applicant.

7      Q.      Okay.  And so let me be as specific as I

8  can as to Block 419.  There was a Planning Board

9  resolution, which you said you reviewed it at some

10  time.  You don't even remember when you reviewed it.

11  Correct?

12      A.      Correct.

13      Q.      Did you involve yourself in any way in

14  reviewing the conditions of the resolution to

15  determine whether the applicant had complied?

16      A.      At some point I may have.

17      Q.      Did you ask people to look at certain

18  things for you to determine whether my client had

19  complied with the resolution?

20      A.      I think the only thing that came up was

21  there was specifically some wording in the

22  resolution that asked for a cash escrow, and there

23  was just conversation as to why they thought it was

24  actual cash.

25      Q.      Okay.  Other than that?  Other than

Page 229

1    that, is there anything else?

2          A.    I don't think so.

3          Q.    Okay.

4          A.    That's the only thing I think that I

5    remember was from the resolution.

6          Q.    So you never met or conferred with

7    Mr. Atkinson and went over and asked him to do

8    certain things with respect to the conditions?

9          A.    I don't believe so, no.

10          Q.    'Cause that wouldn't be proper, would

11    it?

12                MR. SEAMAN:  Objection to form.

13          Q.    If you did that.  You're not supposed

14    to, as the mayor, inject yourself into the process

15    of telling the engineer what to do as to whether

16    somebody has complied or not with a resolution.

17                MR. SEAMAN:  Objection to form.

18          Q.    You would agree that's not your

19    function.  Correct?

20          A.    I'm not understanding what you're asking

21    me, because I think anyone can look at a resolution

22    and say, does this comply in your opinion, in your

23    professional opinion does this comply.

24          Q.    To who?

25          A.    What do you mean by insert myself?

Page 230

1          Q.     But you, it's not your function as the

2     mayor to do that, is it?  Do you view it as your

3     function to review a resolution to determine if

4     they've complied with conditions?

5          A.     I think anyone can look at a resolution.

6          Q.     I didn't ask if anyone could.  Do you

7     view it as your function as the mayor to do it?

8          A.     I don't know how to answer the question.

9          Q.     As the mayor, did you do it in Emerson?

10         A.     Not to my knowledge, but I don't think

11    it's out of the realm for anyone to look at it.

12         Q.     I didn't ask if it's out of the realm.

13    I'm asking if you did it.

14         A.     I don't recall.

15         Q.     Do you remember after the approval was

16    given that efforts were being made by the developer

17    to meet with you?

18         A.     There were efforts by the developer to

19    meet with me?

20         Q.     Yeah.

21         A.     When?

22         Q.     Again, you're a stranger to these

23    proceedings.  You don't get to ask me questions.  I

24    get to ask them of you.

25              Did you at any time receive a request from the

Page 231

1    developer to try to meet with you after your

2    administration came on board?

3         A.    Yeah, he wanted to have lunch with me, I

4    think.

5         Q.    Okay.  And did you meet with

6    Mr. Klugmann?

7         A.    No.

8         Q.    Why not?

9         A.    Because the first time I met him, I felt

10   like he was hitting on me.

11        Q.    Okay.

12        A.    And he made me uncomfortable.

13        Q.    Really?

14        A.    Yes.

15        Q.    So let's explore that for a moment.

16   You're saying that when you met Mr. Klugmann, you

17   perceived he was, quote/unquote, hitting on you?

18        A.    I did.

19        Q.    What did he do to lead you to that

20   conclusion?

21        A.    Called me beautiful.

22        Q.    Okay.

23        A.    Said he wanted to get to know me.

24        Q.    Okay.

25        A.    Said he wanted to spend time with me.

Page 232

1    Q.    Really?

2    A.    Yeah.

3    Q.    Okay.  Where was that?

4    A.    I was sitting on the dais.  He came up

5    after the meeting, after the governing body approved

6    his 51 percent ownership in the project.

7    Q.    So that was before you --

8    A.    I mean, you saw the picture.  Right?

9    Q.    That was before you became mayor.  Saw

10   what picture?

11   A.    Of me.

12   Q.    What about it?

13   A.    I think I looked a little different back

14   then.  I don't think it's so inconceivable.

15   Q.    I'm sorry, you're saying --

16   A.    I'm making a joke about my looks, sir.

17   Sorry.

18   Q.    You're saying the way you looked in the

19   picture supports the contention that --

20   A.    I'm joking.

21   Q.    -- he would have hit on you 'cause

22   anyone would have, is that what you're saying?

23   A.    I was joking that I was attractive in

24   the photo, that's all.

25   Q.    Okay.  All right.  Which is why that

Page 233

1    would support your contention that Mr. Klugmann

2    would have made those statements.

3         A.    Not that it supports it, but he did,

4    it's a fact.

5         Q.    Okay.  And the picture is also some

6    additional evidence of that, I guess.

7         A.    I was making a joke, yes.

8         Q.    Were you?

9         A.    Well, you made such a comment about my

10   photo.  You studied it, stared at it, told me I

11   looked very nice.

12        Q.    Yeah.  Did you think I was hitting on

13   you, too?

14        A.    I was making a joke on the fact that you

15   were commenting on --

16        Q.    Do you think I was hitting on you when I

17   said you looked nice in the picture?

18        A.    I thought it was kind of odd the way you

19   stared at the photo, yeah.

20        Q.    You thought I was hitting on you, too.

21   Okay.  So not only did Mr. Klugmann hit on you, but

22   I hit on you as well?

23        A.    Well, it appeared that you were

24   evaluating me on my looks by staring at the photo

25   and that you were agreeable to my looks at the point

Page 234

1    in the photo, yeah, it made me uncomfortable.

2            Q.    That made you -- so you --

3                  MR. BOTTA:  Maybe we can move on.

4            Q.    So I made you uncomfortable.  Well, no.

5    I mean, so Mr. Klugmann you say made you

6    uncomfortable because you thought he was hitting on

7    you.  And then just a moment ago when I looked at

8    your picture and I said you looked very nice, you

9    thought -- that made you uncomfortable that I was

10   hitting on you as well?

11           A.    I thought it was an odd statement to --

12           Q.    Did you think I was hitting on you?

13           A.    I thought it was an odd statement --

14           Q.    No, no, no, did you think I --

15           A.    -- to comment on my looks.

16           Q.    Did you think I was hitting on you?

17           A.    I think it was inappropriate --

18           Q.    Did you think I was hitting on you --

19           A.    -- to comment --

20           Q.    -- yes or no?

21           A.    -- on my looks.

22                 MR. SEAMAN:  Please don't raise your

23   voice, Joe.

24           Q.    Did you think I was hitting on you?

25   Answer the question, please.

Page 235

```
 1        A.    Can I leave?  'Cause he's being --

 2        Q.    No, you can't leave.

 3        A.    -- really inappropriate.

 4        Q.    No, you're the one --

 5        A.    He's making me very uncomfortable

 6   talking about my looks.

 7        Q.    You brought it up.

 8        A.    He's the one that --

 9              MR. BOTTA:  Joe, let's stop.

10        Q.    You brought it up.

11        A.    He's staring at my photo.

12        Q.    You brought it up.

13        A.    Commenting on my looks for an

14   inexorbitant amount of time --

15              MR. BOTTA:  Let's take a break.

16        A.    -- which I thought was odd and made me

17   uncomfortable.

18        Q.    You really think that I was hitting on

19   you, just like Mr. Klugmann.  Now I understand.

20        A.    I didn't say you were hitting on me.  I

21   said you made me --

22              MR. BOTTA:  She didn't say --

23        A.    -- uncomfortable the way you were

24   staring at my photograph and commenting on my looks

25   in the photo.
```

Page 236

1          Q.      Oh.

2                  MR. SEAMAN:  Joe, we're going to take a

3     five-minute break.

4          Q.      So I -- do you think I was hitting on

5     you?

6                  MR. SEAMAN:  Already asked and answered,

7     Joe.

8          Q.      Yes or no?  I need to know that.

9          A.      No, I don't think you were hitting on

10    me.

11         Q.      Oh, great.  Okay.

12         A.      But you were inappropriate staring at my

13    photograph.

14                 MR. BOTTA:  We'll take five minutes.

15         Q.      You are a very funny lady to think that

16    I would have any interest in staring at your

17    photograph.

18         A.      You're a joke.

19         Q.      You're a very funny lady.

20         A.      Why did you do it?

21         Q.      Because it's evidence in the case.

22         A.      My photo?

23                 MR. BOTTA:  We're off the record.

24         Q.      Yeah.  It's an exhibit.

25                 (A break was taken at 3:21 p.m.)

Page 237

1          (Deposition resumes at 3:27 p.m.)

2          MR. FIORENZO:  Let's go back on the

3    record.

4    BY MR. FIORENZO:

5          Q.    So after you took over as the mayor, did

6    you oversee the actions that were being taken by

7    your staff and professionals regarding the Block 419

8    project?

9          A.    No.

10         Q.    What role, if any, did you have in

11   overseeing the progress of the Block 419 project?

12         A.    They only came to me if there was a

13   problem and just made me aware that there was an

14   issue.

15         Q.    Who is "they"?

16         A.    The administrator, the clerk.

17         Q.    Did they come to you with any problems?

18         A.    They didn't come to me with problems.

19   They made me aware of the problems.

20         Q.    What problems, if any, did they make you

21   aware of?

22         A.    Complaints that they were making.

23         Q.    Okay.  Complaints about what?

24         A.    That they weren't being issued permits.

25         Q.    So these were complaints that they told

Page 238

1    you were being made by the redeveloper that permits

2    were not being issued?

3          A.      Right.

4          Q.      Who told you that?

5          A.      I believe it was the administrator.

6          Q.      Mr. Hermansen?

7          A.      I believe so.  It could have been

8    Mr. Sheola.  He was before Mr. Hermansen.

9          Q.      Did you have a discussion with

10   Mr. Hermansen or anyone else as to why the permits

11   were not issued?

12         A.      Yes.

13         Q.      What were the discussions you had with

14   Hermansen about the permits?

15         A.      It was explained to me that the permits

16   either weren't applied for or that they weren't paid

17   for and that is the reason they weren't getting

18   them.

19         Q.      Who told you that?

20         A.      Probably Mr. Hermansen.  I don't

21   remember exactly.

22         Q.      Did he tell you anything else as to why

23   the permits were not issued?

24         A.      No.

25         Q.      Other than the issue of the complaint

Page 239

1  about the permits, are there any other things you

2  became involved with with regard to the Block 419

3  after your administration took over?

4          A.      No.

5          Q.      That was it.  Yes?

6          A.      I didn't get involved in anything.

7          Q.      Right.  So that was it, just that one

8  issue you've raised.  Correct?

9          A.      Or a property maintenance issue perhaps.

10         Q.      Well, perhaps.  Was there a property

11 maintenance issue or not?

12         A.      The gate kept opening into the street

13 and the black curtain was falling and the debris was

14 sitting there for months.  In fact, some of the

15 debris is still sitting there, has never been moved.

16         Q.      Okay.

17         A.      Just the general site that people were

18 complaining to me that live in town about the

19 looks -- of how atrocious it looked.  And then they

20 would complain to me and I would give the complaint

21 to Rob.

22         Q.      And Rob would then give it to someone

23 else?

24         A.      I guess.

25         Q.      Do you know who Ron Cenicola is?

Page 240

1     A.     Yeah.

2     Q.     Who is he?

3     A.     He works in our construction department.

4     Q.     Who hired him?

5     A.     I guess I did.  I don't really remember.

6     Q.     Did you know him?

7     A.     I know who he is now, but.

8     Q.     Did you know him before you hired him?

9     A.     No.

10    Q.     Okay.  So he works in the Building

11    Department?

12    A.     Yeah.

13    Q.     Who's his boss?

14    A.     Scott Wickersheim.

15    Q.     Did you communicate to the Building

16    Department that you wanted Mr. Cenicola to tag my

17    client's property?

18    A.     Not to my recollection, no.

19    Q.     Do you know what it means to tag it?

20    A.     No.

21    Q.     Did you ever ask anyone to issue any

22    violations --

23    A.     No.

24    Q.     -- to my client's property?

25    A.     No.

Page 241

1          Q.    Okay.  So now --

2                MR. FIORENZO:  Pull up E196, please.

3                MR. KLEIN:  DD-25.

4          Q.    This is an article -- DD-25 is an

5    article again in the Pascack Press.

6                MR. FIORENZO:  I'm trying to -- is there

7    a date on that?

8                MR. KLEIN:  I don't think so.

9          Q.    Okay.  I don't want to keep this up too

10   long for fear that I be accused of looking at your

11   photo, so let's see if we can move through it

12   quickly.

13               MR. BOTTA:  Objection.  Just move on,

14   Joe.

15               MR. FIORENZO:  Yeah, I am moving on.  I

16   am.

17         Q.    So this article, second paragraph -- the

18   article was written by --

19               MR. FIORENZO:  Who is the reporter, do

20   we have that, Steve?

21               MR. KLEIN:  It just says who the photo

22   is by.

23         Q.    It's a photo by Murray Bass.  Do you

24   know who Murray Bass is?

25         A.    No.

Page 242

```
 1          Q.     Okay.  The article says in the second
 2    paragraph, "In order to get 29 affordable housing
 3    units, Emerson 'lost seven businesses so far.  Two
 4    others are still open and they're fighting for their
 5    lives,' she said, at the Chamber's annual mayors'
 6    breakfast at The Iron Horse Restaurant in Westwood."
 7    Did you say that?
 8          A.     Yes.
 9          Q.     Okay.  And you were upset that the
10    businesses were lost.  Correct?
11          A.     You're saying I was upset.  That was a
12    fact.  That wasn't a feeling.
13          Q.     I'm asking if you were upset that
14    businesses were being lost.
15          A.     I thought it was sad that businesses
16    were being taken over, yeah.
17          Q.     Right.  And you weren't happy about
18    that.  Correct?
19          A.     No.
20          Q.     I'm sorry?
21          A.     No, I was not happy.
22          Q.     Okay.  That was my question.  And you
23    wanted to try to help those people if you could.
24    Correct?
25          A.     There was no way to help them.
```

Page 243

1      Q.     No?  There was no way to help them?

2      A.     Not really, not with only one vote.

3      Q.     Well, as of January 1, 2019, you didn't

4   just have one vote, you had the majority of the

5   council.  So did you want to help those businesses?

6      A.     There was no way to help them.

7      Q.     Did you explore whether there was a way

8   to help them?

9      A.     There was a contract in place.

10     Q.     Did you explore if there was any way to

11  help them is the question.

12     A.     There was no way to help them.

13     Q.     I didn't ask you that.

14     A.     A contract was in place before I took

15  office.

16     Q.     Did you explore whether there was any

17  way --

18     A.     Why would I explore something that would

19  have been futile.

20     Q.     Then that answers the question.  Right?

21  Then the answer is no, I didn't.  Did you explore

22  ways to try to help them?

23     A.     I don't think so.

24     Q.     Okay.  Did you speak with any of those

25  business owners as to whether there was any

Page 244

1    assistance that the town could give?

2         A.    I don't remember specifically.

3         Q.    Did you try to assist any of these

4    business owners in connection with maximizing value

5    in the condemnation for them, trying to get them as

6    much money as you could?

7         A.    No.

8         Q.    No, you didn't do that?

9         A.    I wouldn't know how to do that.

10        Q.    And that wouldn't have been proper for

11   you to do that anyway.  Right?

12              MR. SEAMAN:  Objection to form.

13        Q.    Did you say yes?  I didn't hear you.

14        A.    I didn't do it, so there's no reason to

15   answer any other questions.

16        Q.    No, there is a reason to answer 'cause I

17   asked it.  Okay?  You don't get to decide what

18   questions you answer or not.  Do you understand

19   that, Ms. DiPaola?  You're the mayor, but you don't

20   have any greater rights than any other litigant at a

21   deposition.  Do you understand that?

22        A.    Yes.

23        Q.    So could you now please answer my

24   question without telling me you don't have to answer

25   it.  Would you like to have it read back?

Page 245

1          A.     I didn't say I didn't have to answer.  I
2     said what was the use of answering it.
3          Q.     The use is -- well, I'm not going to
4     tell you what the use is.
5                  MR. FIORENZO:  Could you read it back to
6     the witness?
7                  (The record is read by the reporter.)
8          Q.     Can you answer the question now?
9          A.     Which question?
10         Q.     The question is, you wouldn't have done
11    that 'cause you knew it wouldn't have been
12    appropriate to do that.  Correct?
13                 MR. SEAMAN:  Objection to form.
14         Q.     To try to help these people when there
15    was a contract with the redeveloper that the town
16    was going to assist with respect to the
17    condemnation.  You knew it wouldn't be appropriate
18    to do that.  Correct?
19         A.     I guess, yeah.
20         Q.     Okay.  All right.  Turn if you would,
21    please, to page 3.  So this is again this newspaper
22    article.  It states, Regarding the planned 29
23    affordable housing units, 22 will be incorporated
24    into the Emerson Station as three-, two-, and
25    one-bedroom units.  The remaining seven, DiPaola

Page 246

1  said, will comprise a stand-alone building across

2  from Dunkin' Donuts.  Did you make those statements

3  at the meeting?

4       A.    I don't recall.

5       Q.    Is there a piece of property across from

6  the Dunkin' Donuts that was being discussed for the

7  siting of the off-site units as you appear to say

8  here?

9       A.    I think there were discussions, but no

10  decision was made.

11       Q.    Okay.  There was a Block 610, Lot 1,

12  where you say there was a discussion but no decision

13  was made.  So there was a discussion among whom

14  regarding using that site for the off-site units,

15  who was involved in that discussion?

16       A.    I don't remember.  I think they might

17  have come to -- I don't remember.

18       Q.    Were you involved in those discussions?

19       A.    I don't remember.

20       Q.    Did you ever speak to anyone about the

21  location of the -- well, I mean, obviously you spoke

22  to someone because the reporter says you were

23  talking about it at this meeting.  So you don't deny

24  that you discussed it at this meeting that he was

25  reporting on, do you?

Page 247

```
 1        A.     I honestly don't remember.
 2        Q.     I know, but you don't deny the accuracy
 3   of the reporting, do you?
 4        A.     I could have said it, I may not have
 5   said it.  I don't know.  There's no quotes around
 6   it.
 7        Q.     So he says you talked about this.  You
 8   don't deny that.  Right?
 9        A.     I don't recall.
10               MR. SEAMAN:  Objection to form.
11        Q.     By the way, those seven off-site units,
12   what is Emerson's position today about the seven
13   off-site units?
14               MR. SEAMAN:  Objection to form.
15        A.     That's in front of a judge right now, I
16   think.
17        Q.     Yeah.  No, I know it is.  What is
18   Emerson's position today about the seven off-site
19   units?
20        A.     This is like a closed session matter.
21        Q.     No, it's not.  I'm asking you questions.
22   You're the mayor of the town.
23        A.     We've only ever discussed it in closed
24   session.
25        Q.     I don't care where you discussed it.
```

Page 248

1    I'm asking you if you know what the town's position,

2    their public position is regarding the seven

3    off-site units that they've articulated publicly?

4              MR. BOTTA:  If you have.

5         A.    I don't remember.

6         Q.    Oh, they have.  I can show you the

7    positions they've taken in the litigation.  Do you

8    know --

9         A.    Okay.

10        Q.    -- what the position is that --

11        A.    You can show me.

12        Q.    Do you know what the position is that

13   you took -- Emerson took regarding the seven

14   off-site units?

15        A.    If you have something, I'd like to see

16   it.

17        Q.    Do you know what the position of the

18   Town of Emerson is today regarding the seven

19   off-site affordable housing units as the mayor of

20   Emerson?

21        A.    You said you could show me and I am

22   agreeing --

23        Q.    No, no, no.

24        A.    -- that it would be okay for you to show

25   me.

Page 249

1          Q.    I'm not going to show you anything until
2    you answer my question.  Do you know?
3          A.    I don't remember.
4          Q.    So you don't know -- even though we
5    argued this last week, you don't know what the
6    position of Emerson is on this topic?
7          A.    You argued what last week?
8          Q.    Is that your position?  Again, you don't
9    get to ask me questions.  You don't know what it is,
10   Emerson's position on the seven off-site units?
11         A.    We've only discussed it in closed
12   session.
13         Q.    Are you aware that that building across
14   from Dunkin' Donuts, Block 610, Lot 1, which you're
15   reporting on and the reporter reported on, is the
16   location that my client -- the tract of land that
17   they purchased for those seven off-site units, are
18   you aware of that?
19         A.    I know they own it.
20         Q.    Right.
21         A.    I don't know exactly what they were
22   doing.
23         Q.    Do you know when they bought it?
24         A.    No.
25         Q.    Okay.  And having bought it, are you

Page 250

1   aware that they've made an application -- they made

2   an initial application to the Land Use Board to seek

3   approval of those seven units consistent with the

4   settlement agreement that was reached, are you aware

5   that that happened?

6       A.      I'm aware that they wrote a motion, I

7   think, to ask Judge Padovano to grant Judge Carroll

8   the permission to decide it, and that they told you

9   that it was out of his purview.

10      Q.      You're getting ahead of yourself.

11      A.      I don't --

12      Q.      So let's take it a step at a time.  I'll

13  get to that, 'cause you're right.

14      Are you aware that initially, my client went

15  to your Land Use Board and said, as to the seven

16  units we're required under the settlement agreement,

17  we need to make sure we provide for the affordables,

18  here's our application, we want you to approve these

19  seven off-site units on block 610, Lot 1, which is

20  the building across from Dunkin' Donuts.  Are you

21  aware that they made an application to the Land Use

22  Board?  That's question number one.

23      A.      I don't think they did make an

24  application.  I think they were told that they

25  should bring it to the governing body.

Page 251

1          Q.      Well, that's step two.  You're right.

2          A.      And there was no application.

3          Q.      You're right, that's step two.  They did

4    make an application, and then they were told, just

5    as you said, the Land Use Board wouldn't hear it,

6    that it had to go to the governing body, are you

7    aware of that?

8          A.      Yes.

9          Q.      Okay.  And the position taken was the

10   Land Use Board won't hear it, you've got to go to

11   the governing body, and we have to pass an ordinance

12   in order to allow it.  Do you remember that?

13         A.      I don't think that we said we had to do

14   it.  I think we had to consider whether we should do

15   that.

16         Q.      Well, my client -- the Land Use Board

17   wouldn't hear them because you told them they

18   couldn't hear the application.  Correct?

19         A.      Because it didn't conform to the

20   redevelopment plan --

21         Q.      No, I'm not interested in because.  Did

22   you tell --

23         A.      -- because there was no commercial on

24   the bottom level.

25         Q.      I'm not interested in the because.  I'm

Page 252

1    interested first in -- we'll get to the because.

2    First, they were told, you told them the Land Use

3    Board couldn't hear that application, they have to

4    come to the governing body.  Correct?

5                    MR. SEAMAN:  You, Mayor DiPaola, told

6    them personally?

7         Q.     Yeah, you, Mayor DiPaola of Emerson, you

8    told them --

9                    MR. SEAMAN:  Well --

10        Q.     You told the Land Use Board, don't hear

11   it, make them come to us.  Correct?

12        A.     No, I didn't say that.

13        Q.     But that's what happened.  Right?  You

14   just said a moment ago they were told they had to

15   come to the governing body.

16        A.     I think because it was a use variance,

17   we didn't hear it.

18        Q.     I don't care why.  It's not relevant.

19   I'm just asking you to confirm a basic fact, that my

20   client was told the Land Use Board won't hear it,

21   you must come to the governing body.  True or not?

22        A.     I think that happened that way, yeah.

23        Q.     Okay.  And then after that happened, my

24   client said, we're not required to come to the

25   governing body.  Do you remember that?  There was a

Page 253

1    dispute about that.

2         A.    I don't remember that.

3         Q.    And then ultimately my client then made

4    an application, as you said a moment ago, to the

5    Special Master.  I'm sorry, not the Special Master,

6    the implementation monitor appointed by Judge

7    Padovano to try to cut through the delay, and that

8    was Judge Carroll, and we went to Judge Carroll and

9    asked him to rule on it.  You're aware of that.

10   Right?

11        A.    Yes.

12        Q.    And then Judge Carroll determined that

13   it wasn't within the scope of the order granting him

14   implementation monitor authority, as a result of

15   which it went back to Judge Padovano.  Correct?

16        A.    Uh-hum.

17        Q.    Yes.  Okay.  So here we are now.  This

18   was two thousand and -- okay.  And then in

19   connection with that application before Judge

20   Carroll, which, by the way, was argued, orally

21   argued last week by me, okay, and your lawyers.  In

22   that argument and in the position they took, it was

23   Emerson's position that the site, that site you

24   referred to back at the meeting a couple years ago,

25   wasn't suitable and that it shouldn't be approved

Page 254

1    and it shouldn't be permitted.  Are you aware of

2    that?

3              MR. SEAMAN:  I'm going to give you an

4    instruction.  Anything you learned from your lawyers

5    or anything you learned in closed session is

6    privileged.

7         Q.    Well, I'm going to ask you, are you

8    aware that's the public position that Emerson has

9    taken?

10        A.    Everything that we've discussed about

11   these seven units has been in closed session.

12        Q.    Oh, yeah, but not everything Emerson has

13   said about it has been in closed session, 'cause

14   they were required to and did take a public position

15   on it, didn't they?

16             MR. SEAMAN:  Are you aware of them

17   taking a public position?

18        A.    Yeah, but I might not have read it.  I

19   don't remember.  And I don't want to say something

20   that's considered closed session.

21             MR. SEAMAN:  I'm going to give you a

22   direction right now not to disclose anything that

23   you learned in closed session, other than what may

24   be in the minutes of a closed session meeting, and

25   not to disclose anything that you learned solely

Page 255

1    through discussions with counsel involved in the

2    litigation unrelated to this case.

3                    THE WITNESS:  Okay.

4                    MR. SEAMAN:  If it came directly from

5    counsel, don't disclose it.

6                    THE WITNESS:  Okay.

7         Q.    Okay.  So as of today then, this piece

8    of the Mount Laurel obligation, the seven units that

9    was spoken about years ago and reported on in the

10   press --

11                   MR. SEAMAN:  In the undated article,

12   Joe?

13                   MR. FIORENZO:  In the undated article.

14                   MR. SEAMAN:  Thank you.

15        Q.    I mean, I'm sure there's a date for it,

16   but there was no date on the one we showed you.  As

17   of today, Emerson has not approved the seven

18   off-site units.  Is that true?

19        A.    There's been no approval for the seven

20   off-site units, correct.

21        Q.    And would you agree that the seven

22   off-site units were a part of the settlement

23   agreement that was reached that we went over back in

24   2017?

25                   MR. SEAMAN:  Objection to form.  Calls

Page 256

1    for a legal conclusion.

2         A.    I'd have to go back and read the

3    contract again.

4         Q.    And would you agree that in addition to

5    the settlement agreement, the seven off-site units

6    were part of the Special Master's report to Judge

7    Padovano?

8              MR. SEAMAN:  Objection to form.

9         Q.    Would you agree with that?

10             MR. SEAMAN:  Calls for a legal

11   conclusion.

12        A.    Can you just ask me that again?

13        Q.    Yeah.  The seven off-site units were

14   also part of what was in the Special Master's report

15   to Judge Padovano.  Correct?

16             MR. SEAMAN:  Calls for a legal

17   conclusion.

18        A.    Yeah, but it was never written down

19   where they were going to be, only that there would

20   be seven off-site units.

21        Q.    Well, you knew where it was going to be

22   all the way back two years ago when you reported it

23   at the meeting that it was the property across from

24   the Dunkin' Donuts where the seven units were

25   supposed to go.  Right?

Page 257

1          MR. SEAMAN:  Objection to form.

2     Q.    Do you deny making that statement?  You

3  know exactly where it went, which is why

4  Mr. Klugmann went out and bought the property and

5  paid for it so he could satisfy that obligation to

6  the settlement agreement.  Are you aware of that?

7          MR. SEAMAN:  Objection to form.

8     Q.    Are you aware of that?

9     A.    I don't know.

10     Q.    And all this does -- all this does is

11  hold up the ability of this project to be completed,

12  'cause as long as you can string this out and as

13  long as you now take the position we don't think

14  that that site is suitable for the seven units, that

15  create delay.  You're aware of that.  Correct?

16          MR. SEAMAN:  Objection to form.

17     A.    I'm not going to agree to that

18  statement.

19     Q.    It doesn't?  So here we are two years

20  later, five years after the settlement agreement,

21  and my client is trying to place the off-site units,

22  and he can't get Emerson to cooperate at all, can

23  he?

24          MR. SEAMAN:  Objection to form.

25     Q.    In fact, Emerson has taken the position,

Page 258

1   no, we're not going to agree you can put it there.

2   Right?

3              MR. SEAMAN:   Objection to form.

4        Q.    Right?

5        A.    I'm not agreeing with anything you're

6   saying.

7        Q.    So the public position of Emerson as

8   staked out before the Court as the developer is

9   trying to get the other affordable units built,

10  let's take a look at what your public position is on

11  that.  Okay?

12       A.    I can tell you what our public position

13  is.

14       Q.    Oh, good, 'cause I asked you that and

15  you couldn't tell me before.  You want to tell me

16  now?

17       A.    The only part of the public opinion that

18  I understand is that it does not conform to the

19  redevelopment plan.

20       Q.    Okay.  Well, let's see what you stated

21  publicly, Emerson, formally to the Court in

22  connection with this request to compel.

23             MR. FIORENZO:  Could you put it up?

24             MR. KLEIN:  DD-26.

25             MR. FIORENZO:  Thank you.

Page 259

1          Q.     Giblin & Gannaio are your attorneys.

2     Right?

3          A.     Yes.

4          Q.     Okay.  And this is the letter brief they

5     submitted to the judge in connection with our

6     efforts to compel us to be able to move ahead to

7     construct the seven units.

8                 MR. FIORENZO:  Highlight that, please.

9          Q.     So in the papers on behalf of Emerson,

10    they state the following:

11         "ERUR's entire motion is to enforce a

12    nonexisting agreement to allow seven units to be

13    built on 129 Kinderkamack Road.  The Court should

14    see this motion for what it truly is, a last minute

15    attempt by the redeveloper asking the Court to allow

16    them to cram seven units on a site that was not

17    contemplated, suitable, or agreed to, and that would

18    be detrimental to Emerson residents merely in order

19    to reduce its own costs and maximize profits."

20         Are you aware that's the public position that

21    Emerson has taken?

22                 MR. SEAMAN:  Objection to the form.

23    Other than what was disclosed to you by counsel.

24    All right?

25         A.     I mean, it says that's a public

Page 260

1    document.  Right?

2           Q.     Right.  It is.  Yes.

3           A.     Okay.

4           Q.     So that's the public position of

5    Emerson, that the effort to try to build these seven

6    affordable units to comply with the settlement

7    agreement, comply with the Special Master report,

8    and to comply with Judge Padovano's order, that the

9    site is not "contemplated, suitable, or agreed to,

10   and would be detrimental to Emerson."  Right?

11   That's your position, meaning Emerson.  Right?

12                 MR. SEAMAN:  Objection to form.

13          A.     Yes, that's what it says in the brief.

14          Q.     So, again, Emerson is seeking to block

15   the ability to move forward with the construction on

16   that site of the seven affordable units 'cause it's

17   not suitable for the site.  Correct?

18          A.     I don't think we're trying to block

19   anything.  I think they just need to build something

20   that conforms with our plan.

21          Q.     Did you read the papers filed on behalf

22   of Emerson?

23          A.     I probably perused them.

24          Q.     Did you understand that suitability was

25   the issue, they claimed that this property wasn't

Page 261

```
 1   suitable for the seven units and therefore shouldn't
 2   be used for that purpose?
 3               MR. SEAMAN:  Objection to form.
 4        Q.    Are you aware that that's the position?
 5               MR. SEAMAN:  Objection to form, calls
 6   for a legal conclusion.  You're asking her to
 7   interpret the letter brief?
 8        Q.    No, I'm asking if she's aware of that
 9   being the position of Emerson as articulated in the
10   papers filed with the Court.
11        A.    In my opinion, they should have -- I
12   don't know what I should --
13        Q.    I'm not asking for your opinion.  I'm
14   asking if you're aware of the public position
15   Emerson has taken before the Court in response to
16   the application to compel Emerson to let us build
17   it.
18        A.    I think they should have known what
19   was -- the redevelopment plan was before they built
20   something --
21        Q.    I really don't care what you think on
22   that 'cause it's not relevant to the question.
23   Could you please answer my question now?
24               MR. FIORENZO:  Could you read it back to
25   the witness?  She made no effort to answer it.
```

Page 262

1                    (The record is read by the reporter.)

2         A.      Yes, I just read it.

3         Q.      Okay.  Now, are you aware that the

4    Special Master, Ms. Lonergan, has submitted papers

5    to the Court saying this property is suitable for

6    the seven units and was contemplated to be part of

7    the development plan, are you aware of that?

8         A.      I don't recall.

9         Q.      Okay.  So would you agree with me that

10   the consequence of Emerson placing these roadblocks

11   in the way of having this application for the seven

12   units approved has resulted in delay to my client?

13                    MR. SEAMAN:  Objection to form.

14        Q.      Would you agree?  I mean, it's obvious.

15   I'm just asking you to --

16                    MR. BOTTA:  Objection to form.

17        Q.      -- confirm the obvious.

18                    MR. BOTTA:  You're making a statement.

19        A.      I don't know how to answer that

20   question, 'cause there were three statements in it

21   that you're asking me whether it's true or not that

22   you're feeding into my mouth.

23        Q.      This caused the delay, the fact that

24   Emerson wouldn't even hear the application before

25   the Land Use Board.  Right?

Page 263

1            MR. SEAMAN:  Objection to form.

2       A.    That's your statement.

3       Q.    I'm asking you to confirm --

4       A.    I don't know.

5       Q.    You don't know.  Well, let's see, if

6  they heard it, which was over a year ago, it would

7  have been heard a long time ago.  Right?

8            MR. SEAMAN:  Objection to form, calls

9  for speculation.

10      Q.    Do you remember when the application was

11 made to the Land Use Board to hear it?

12      A.    No.

13      Q.    Would it surprise you to learn it was

14 over a year ago?

15      A.    I don't think it was actually an

16 application.  I think that they contacted the

17 secretary to say that they were going to make an

18 application, they submitted it, but it was never

19 heard.

20      Q.    Right, they submitted it.  You're right.

21 Okay.  You don't want to call it an application.

22 They submitted to the Land Use Board to have them

23 hear their request to approve the construction of

24 the affordables, and then the Land Use Board was

25 told no, don't hear it.  Correct?

Page 264

1          A.      I believe so.

2          Q.      Okay.  And that happened well over a

3   year ago.  Are you aware of that?  So now all this

4   time is just further delay in the project.  Right?

5                  MR. SEAMAN:  Objection to form.

6          A.      We're not doing anything to delay them.

7          Q.      As to seven units that everyone

8   acknowledged and agreed could be off-site.  Correct?

9          A.      Say that again?

10         Q.      As to seven units which were always

11  intended to be off-site.  Correct?

12         A.      There was always a component in the

13  agreement that there could be seven off-site --

14         Q.      Yeah.

15         A.      -- not that there had to be seven

16  off-site.

17         Q.      Okay.  Well, the plan that was approved

18  by your Planning -- your Zoning Board provided for

19  22 units on-site and seven units off-site.  Are you

20  aware of that?

21         A.      I think it said a little bit more than

22  that.  That's not all it said in the agreement.

23         Q.      Well, the plan for construction called

24  for a certain number of units.  It only had 22 units

25  in the plans that were approved by the Planning

Page 265

1    Board for affordables on-site.  Are you aware of

2    that?  The plans that were ultimately approved?

3          A.    Yes, but that didn't --

4          Q.    Okay.  And the seven --

5          A.    That doesn't mean that they had to put

6    the seven on-site.

7          Q.    Well, they couldn't put it on that site

8    'cause they had already gotten approval and have

9    commenced construction pursuant to an approved plan

10   for a building for 22 affordable units.  So they

11   can't be on-site, can they?

12                MR. SEAMAN:  Objection to form.

13         A.    They could be on site if they --

14         Q.    How?

15         A.    -- just configured the plans and had --

16         Q.    No, no, no, no, no.

17         A.    -- less market rate units which was

18   discussed --

19         Q.    No, the Planning --

20         A.    -- over two to three years ago in a

21   meeting with you.

22                MR. SEAMAN:  Joe, let the witness

23   answer.

24         Q.    The Planning Board approved plans that

25   called for 22 units of affordable on-site.  True?

Page 266

1        A.      The Planning Board was -- the

2   application that was presented and approved had 22

3   on-site.

4        Q.      Okay.  So now, that approval has been

5   given, and the developer has gone forward to

6   construct in accordance with the approved plans.

7   True?

8        A.      I guess.

9        Q.      You guess?  Do you see the construction?

10       A.      It's going slow.

11       Q.      Whether it's slow or fast, is there

12  construction going on?

13              MR. SEAMAN:  Objection to form.

14       A.      I guess so.

15       Q.      I wonder why it's going slow, yeah.

16  You're right, it's going slow.  But is the

17  construction going on in accordance with the

18  approved plans for 22 on-site units?

19              MR. SEAMAN:  Objection to form.

20       A.      I'm not an inspector.

21       Q.      You don't know?

22       A.      How do I know if it's going as approved.

23       Q.      You don't know that.

24       A.      I assume it is if the inspectors are

25  doing their job.  I don't go out and inspect the

Page 267

1    property.

2         Q.    So that means now -- let's assume that

3    they're building the project pursuant to the

4    Planning Board -- to the board resolution with 21

5    units on-site.  Now, there have to be seven more

6    affordable units pursuant to the settlement

7    agreement.  Right?  Correct?

8         A.    There has to -- they have to give us 29

9    units.

10        Q.    Right.  And so those seven units now

11   have to be placed somewhere.  Right?

12        A.    You keep saying they have to be.

13   Nothing has to be.  They could rework their plan and

14   accommodate the building on-site to include more

15   affordables.

16        Q.    Oh, I see.  So they should --

17        A.    There would just be less market rate.

18        Q.    So in other words, under the

19   construction activity that's already taken place and

20   the footprint that's been taken place and all the

21   building structure and the rooms that have taken

22   place, they should redo all that, is that what

23   you're saying?

24        A.    I don't even think they've gotten that

25   far, sir.

Page 268

1      Q.     Is that what you're suggesting, you're

2   suggesting they go back to the Planning Board

3   again -- excuse me, Land Use Board again to revise

4   the site plan?

5      A.     I don't -- I don't think it would have

6   to be changed that much.

7      Q.     Unbelievable.  Okay.

8          MR. FIORENZO:  Yeah, pull that back up.

9   This is silly, but.  Let's go to the epic.

10          MR. KLEIN:  This is DD-27.

11     Q.     DD-27 are special meeting minutes of the

12   board, December 10, 2018, of the Land Use Board.

13          So turn to 6, page 6.  These are minutes of

14   the meeting of the board.  It states, "Ms. Bogart

15   clarified the number of apartments required for the

16   affordable housing element.  She said there would be

17   22 apartments on-site and seven apartments off-site,

18   which was agreeable to the Court Master."

19          So you were at that meeting.  Do you remember

20   Ms. Bogart testifying there were specific requests

21   to identify where and how the affordable component

22   would be satisfied?

23     A.     I understand that, but we've had several

24   conversations with you included as to changing

25   the --

Page 269

1        Q.     Oh, you mean settlement discussions?

2        A.     Yes.

3        Q.     Yeah.  Well, we're not interested in

4    that and we can't speak about that 'cause it's

5    improper under the Rules of Evidence.

6        A.     Okay.

7        Q.     And I know we did have them and they

8    were an utter waste of time, I do recall that,

9    'Cause there's no -- forget it, I'm not going to go

10   there.

11       But she said there would be 22 apartments

12   on-site and seven off-site, which was agreeable to

13   the Court Master.  And, in fact, the resolution of

14   the Planning Board cites that and says you've got to

15   make sure you comply with that.

16       So does that help refresh your memory that the

17   Planning Board resolution consistent with the

18   Special Master report and the settlement agreement

19   requires seven on-site -- excuse me, 22 on-site and

20   seven off-site?

21            MR. SEAMAN:  Objection to form.

22       A.     I see that Ms. Bogart said that.

23       Q.     Yeah.  And at the Planning Board in the

24   resolution, they provide for 22 units on-site and

25   the remainder off-site.  Isn't that correct?

Page 270

1          A.     I guess.

2          Q.     And that's why in March or April of

3     2019, my client went out and bought the very

4     property that you discussed that was reported in the

5     press across from the Dunkin' Donuts which had been

6     selected as the site for those seven units.

7                 MR. SEAMAN:  Objection to form.

8          Q.     Are you aware of that?

9                 MR. SEAMAN:  Objection to form.

10         A.     I don't recall.

11         Q.     Are you aware that that site was

12    selected for the seven units even before you became

13    the mayor?

14         A.     No, I was not aware of that.

15         Q.     Were you involved in any of those

16    discussions?

17         A.     I don't think so.  I don't recall.

18                MR. FIORENZO:  Pull that up, too.

19         Q.     So here's the resolution.  So after all

20    this testimony, there were questions at the hearing

21    about the affordable housing.  Do you remember that

22    came up?  At the meeting you attended and spoke at,

23    you spoke about affordable housing?

24         A.     I don't recall what was discussed at

25    that meeting.

Page 271

1          Q.     You don't remember?

2          A.     No.

3          Q.     Okay.  Well, do you remember at that

4    time the board had asked for some specification as

5    to the affordable units and how that was going to be

6    satisfied to make sure -- to make sure that Emerson

7    would be protected under the settlement agreement,

8    do you remember that?

9          A.     I don't remember that, but.

10              MR. FIORENZO:  Okay.  Could you pull up

11   that paragraph, please.

12         Q.     DD-22.

13              MR. FIORENZO:  What paragraph?

14              MR. KLEIN:  G.

15              MR. FIORENZO:  G.  Turn to that.  It's

16   not moving.

17              MR. KLEIN:  There we go.

18              MR. FIORENZO:  What happened to this new

19   software, it's supposed to be so good.

20         Q.     So one of the approval findings is that,

21   "The settlement agreement," you're aware that's the

22   settlement agreement we went over before.  Right?

23         A.     Uh-hum.

24         Q.     The town settled the lawsuit?

25         A.     Yes.

Page 272

1      Q.      "Requires 29 COAH or affordable units,

2    seven of which may be provided off-site.  The

3    project will have 147 residential units, including

4    22 COAH or affordable units, and applicant will

5    comply," will comply, "with the seven off-site

6    affordable housing requirements."

7          So the condition of the resolution was that

8    the applicant, my client, will comply with the seven

9    off-site affordables.  And that's what it's been

10   trying to do for a couple of years now, with the

11   town taking the position, oh, no, that's not a

12   suitable site, you can't do it.  True?

13            MR. SEAMAN:  Objection to form.

14     A.      I guess they should have built -- bought

15   a piece of property that it was suitable to build.

16     Q.      Well, the Master said it was suitable.

17   The Court said it was suitable.  Who says it's not,

18   you?  Do you say it's not suitable?

19     A.      Our redevelopment plan, it doesn't

20   comply with it.

21     Q.      Your brief said it's not suitable, which

22   is why you're telling the Court that we shouldn't be

23   allowed to build those seven units.  So the

24   position --

25     A.      Excuse me, can I ask my lawyer a

Page 273

1    question?

2         Q.    No, no, you can't.  No, you can't.

3         A.    To form?

4         Q.    No.

5         A.    Am I here to litigate the seven -- it

6    sounds like we're litigating the seven off-site

7    units, which I didn't think I was here to do.

8         Q.    Well, it doesn't matter what you think.

9    You don't get to speak to them in the middle of my

10   examination.  I'm asking you questions about the

11   actions of Emerson and you that had the effect of

12   impeding my client in its development and

13   construction.  And my client --

14        A.    We are not trying to impede.

15        Q.    Yeah, I know that.  And my client who's

16   been now waiting over two years to try to build

17   these seven other units has been met with resistance

18   at every step of the way, including two weeks ago

19   when Emerson said publicly the site isn't suitable,

20   even though it's required by the Planning Board,

21   even though the Court said it's required to be done,

22   and even though it's the only site that has ever

23   been identified by anyone to satisfy the seven

24   units.  Are you aware of that?

25              MR. BOTTA:  Was that your argument last

Page 274

1    week?  'Cause that sounds like it.

2         Q.    Are you aware of that --

3              MR. BOTTA:  Objection to the form of the

4    question.

5         Q.    -- that Emerson has never, ever

6    identified another site for those seven units?

7              MR. SEAMAN:  Objection to the form.

8         A.    That's not true.

9         Q.    Oh, it is true, because it was true

10   during oral argument, the Judge asked about that,

11   and Emerson never identified a site.  There's

12   nothing that has ever occurred to identify a site

13   where those seven other units can go, and that's the

14   reason why prior to you coming on, there were

15   discussions, and there's written communications on

16   all of this, identifying Block 610, Lot 1 as the

17   site to put the seven units, and it's only after you

18   became mayor that now it's been blocked, after my

19   client spent hundreds of thousands of dollars to

20   acquire the site to meet that obligation.  Are you

21   aware of that?

22             MR. SEAMAN:  Objection to the form.

23        A.    I don't recall.

24        Q.    Do you think that's right that my client

25   has been strung out after he bought that property

Page 275

1    and reliance on the property having been identified,

2    only today to find you and the town saying, oh, no,

3    no, it shouldn't go on the site 'cause it's not

4    suitable.

5              MR. SEAMAN:  Objection to form.

6        Q.    Do you think that's fair?

7              MR. SEAMAN:  Objection to form.

8        Q.    Is that fair?

9              MR. BOTTA:  Objection to form.

10       A.    I don't know.  I'm not --

11       Q.    You don't know.  Okay.  I know.

12       A.    You're grandstanding.  You're giving a

13   lot of statements.

14       Q.    No, I'm --

15       A.    There's too many statements in there --

16       Q.    No, I'm asking you questions --

17       A.    -- and I'm not --

18       Q.    -- to see if you're able to answer them.

19       A.    -- not going to agree to is that fair

20   after you make five statements and you're

21   grandstanding.

22       Q.    I'm trying to find out if there's any

23   explanation for how this behavior can be explained,

24   because to me it seems inexplicable, and the Judge

25   raised some serious questions about it.

Page 276

1      So the bottom line is this.  As to those seven

2   off-site units, would you agree with me as of today,

3   you, as the mayor of Emerson, have never

4   communicated in writing anything to the redeveloper

5   saying, we don't want it in the property across from

6   the Dunkin' Donuts that I talked about two years

7   ago, put the seven units at this site, you've never

8   done that, have you?

9              MR. SEAMAN:  Objection to form.

10      A.    I don't know.

11      Q.    And Emerson has never submitted anything

12   in writing, including in connection with the motion

13   we just had saying to the Court, you know, this

14   isn't suitable, but here's something in this,

15   they've never done that.

16      A.    I don't know.

17      Q.    So if this isn't suitable, let's pretend

18   for a moment you're right, if this isn't suitable,

19   now you have 22 affordable units and the settlement

20   agreement requires 29.  And under the order of the

21   Judge, you, Emerson, were required to report to the

22   Judge --

23      A.    Can you just --

24      Q.    -- two years ago --

25      A.    He's screaming at me.

Page 277

```
 1        Q.     -- whether and how you were going to
 2   satisfy your affordable obligation.  So you haven't
 3   come up with any other alternative at all, have you?
 4                MR. SEAMAN:  Objection to form.
 5        Q.     Have you?
 6        A.     I don't know.
 7        Q.     So as the Judge said, what I thought
 8   was --
 9        A.     I thought that we did.
10        Q.     I thought the most poignant --
11        A.     You're saying that we didn't.
12        Q.     I thought the most poignant question
13   was, well, if it's not going to be here at this
14   site, which appeared to have been vetted and agreed
15   upon --
16        A.     By who?
17        Q.     By Emerson and its representatives
18   before you.  Okay?  If not here, then where,
19   Emerson, should it go, because otherwise, Emerson,
20   you're in violation of the settlement agreement,
21   you're in violation of the conditional judgment of
22   repose, and maybe you're stripped, stripped of any
23   protection you have for noncompliance with your
24   Mount Laurel obligation.  Do you have an answer for
25   the Judge's question on that?
```

Page 278

```
 1              MR. SEAMAN:  Objection.
 2      A.      Everything that --
 3              MR. SEAMAN:  Hold on, Danielle.  You're
 4    quoting the Judge.  You don't have a copy of the
 5    transcript.
 6              MR. FIORENZO:  So?
 7              MR. SEAMAN:  I don't think it's her
 8    obligation to answer the Judge's question.
 9              MR. FIORENZO:  Well, you object to the
10    form, that's fine.
11              MR. SEAMAN:  She asked --
12              MR. FIORENZO:  You can object to the
13    form.  That's perfectly fine.
14              MR. SEAMAN:  I'm objecting to the form.
15              MR. FIORENZO:  That's fine.  I'm going
16    to stay with my question.  I like it.
17              MR. SEAMAN:  And to the extent that
18    anything that you would know to answer that question
19    would come from counsel and come from information
20    from counsel --
21              THE WITNESS:  Correct.
22              MR. SEAMAN:  -- I'm going to tell you
23    not to disclose anything that would come from
24    counsel or on advice of counsel.
25      Q.      I'm not asking for anything having to do
```

Page 279

1    with counsel.  I'm asking for this witness to tell

2    me if she's able to answer this simple question, if

3    it is not at that location that was identified by

4    the prior administration, that my client bought and

5    paid for for that purpose, and if we pretend you're

6    right that it's not suitable, even though the Master

7    says it, then Emerson would be out of compliance

8    with the settlement agreement.  Do you understand

9    that?

10               MR. SEAMAN:  Objection to the form,

11   calls for speculation, it's a hypothetical.

12        Q.    Do you understand that?

13               MR. SEAMAN:  Same objection.

14        A.    I don't -- there's so many different

15   statements and questions intertwined --

16        Q.    Just answer the question, ma'am.

17        A.    -- with what you're saying.

18        Q.    Just answer the question.

19        A.    Which question?

20        Q.    You keep saying that to avoid answering

21   the question.

22               MR. SEAMAN:  Objection.

23        A.    No, you just talk for like thirty

24   seconds and then say answer the question and I don't

25   know where the question is anymore.

Page 280

1        Q.    I'll have it read back to you.  Listen

2    to it and then answer it, please.

3              (The record is read by the reporter.)

4              MR. SEAMAN:  Objection to --

5        A.    There were two or three questions.

6              MR. SEAMAN:  Hold on, hold on.

7    Objection to the form, that's a hypothetical, calls

8    for speculation, calls for a legal conclusion.

9              MR. FIORENZO:  All right.  That's fine.

10   I think it's a proper question.

11       Q.    You can answer.

12             MR. BOTTA:  Are you asking where the

13   other site is or if she knows it's out of

14   compliance?

15       A.    Right.

16       Q.    No, I'm asking -- the question that I

17   asked stands.

18             MR. BOTTA:  If you can understand it.

19       A.    I don't understand your question.

20       Q.    Okay.  Well, if you don't -- if we

21   accept the Emerson position that the site is not

22   suitable that my client bought and now it can't go

23   there, do you understand that puts Emerson in a

24   position where it's in breach of the settlement

25   agreement?

Page 281

1          MR. SEAMAN:  Objection to the form.

2      Q.     And you could be stripped of your

3  protection?

4          MR. SEAMAN:  Objection to the form,

5  calls for a legal conclusion.

6      A.     I'd have to ask my attorney.

7      Q.     So you don't know?

8      A.     I don't know.

9      Q.     Okay.  So this whole process on the

10  affordable, before Emerson took the position that it

11  did that -- and you reiterated it here today that

12  it's not suitable, that's your position, right, it's

13  not suitable?

14     A.     Well, that's what I read that you said.

15     Q.     Well, that's what the Court was told by

16  Emerson in their brief, yeah.

17     A.     Right, but I was also reading what you

18  put on the board that it said it wasn't suitable.

19     Q.     That was Emerson's position.

20     A.     Yes, and I was agreeing with it.

21     Q.     Yeah, yeah.

22     A.     I read it.

23     Q.     And you agree with that.  Right?

24         MR. SEAMAN:  Objection.

25     A.     Yeah, I agree with it.

Page 282

1          Q.    Okay.  Great.  So have you asked as the

2     mayor anyone to undertake an analysis, a land

3     analysis in Emerson to determine if there are any

4     other sites that meet the COAH criteria of

5     suitability and viability to propose an alternative

6     site for the seven units, have you asked anyone to

7     do that?

8          A.    Me personally?

9          Q.    Yes, you.

10         A.    Me personally, no.  The governing body

11    may have.

12         Q.    Did the governing -- anything could --

13    may have is meaningless.  Has the governing body

14    asked someone to do that analysis, to your

15    knowledge?

16         A.    It's closed session.

17         Q.    Don't give me that it's closed session.

18    Have you done it or not?  Did you do it in closed

19    session?

20              MR. SEAMAN:  Don't disclose anything in

21    closed session.

22         Q.    Okay.  Are you aware of whether the

23    governing body has ever requested someone to do that

24    analysis?

25         A.    It's in closed session.  I'd have to ask

Page 283

1    the attorney.

2         Q.    Has it been done?

3         A.    I'd have to ask our attorneys if I can

4    even answer that.

5         Q.    Well, how about in public session, has

6    it ever been done?

7         A.    I don't think we've taken a vote on

8    anything at a meeting.

9         Q.    Has the topic every come up in public

10   session?

11        A.    I don't think so.

12        Q.    Has anyone ever spoken to one of your

13   professionals to begin the process of undertaking

14   that analysis?

15        A.    I don't recall.

16        Q.    Why not?

17             MR. SEAMAN:  Objection.

18        Q.    If you claim it's not suitable, why

19   wouldn't you do that?

20             MR. SEAMAN:  Objection, calls for

21   speculation.

22        Q.    So you could try to comply with the

23   settlement agreement, why wouldn't you do it?

24        A.    I don't have an answer.

25        Q.    I didn't think you would.  Okay.

Page 284

1          MR. SEAMAN:  Objection, argumentative.

2     Q.    So after -- so are you aware that after

3  the approval was obtained -- well, actually, let me

4  withdraw that.

5     So during the course of your campaigning for

6  mayor, did you -- you spoke to a number of people in

7  town I take it?

8          MR. SEAMAN:  Can you fix the campaign,

9  first term or --

10          MR. FIORENZO:  Yeah, when she was

11  elected the mayor in 2018.

12          MR. SEAMAN:  Thank you.

13          MR. FIORENZO:  Prior to the election in

14  2018.

15     Q.    Were you -- did you speak to people in

16  town as you went about trying to campaign?

17     A.    Yeah, I speak to people every day.

18     Q.    And did you, for example, go door to

19  door knocking on doors to talk to people about

20  trying to support you?

21     A.    When?

22     Q.    Prior to your election in 2018.

23     A.    Yes.

24     Q.    And in doing so, did you -- during the

25  course of those engagements with the electorate, did

Page 285

1    you convey to anyone that this development project

2    shouldn't move forward, the 419 project, the one you

3    described as the centerpiece of your campaign, that

4    there should be -- this project shouldn't be

5    approved and that you had a concern about who would

6    be moving into town as a result of this development

7    approval, did you convey that to anyone?

8            A.    No.

9            Q.    Did you state to anyone that it may

10   bring in a certain element, including religious Jews

11   into town?

12           A.    Absolutely not.

13           Q.    Did you ever make a statement -- do you

14   know a Ken Dzikowski?

15           A.    Ken who?

16           Q.    Dzikowski?

17           A.    No, I don't.

18           Q.    Do you know --

19           A.    Can you spell that last name?

20           Q.    Yeah.   D-Z-I-K-O-W-S-K-I.

21           Who is Michael DeOrio?

22           A.    A resident of Emerson.

23           Q.    And did he run with you in this last

24   cycle?

25           A.    Run with me?  No.  He's a Democrat.

Page 286

1          Q.     Oh, okay.  Did you appear anywhere with

2     him?

3          A.     No.

4          Q.     Okay.  Did you ever have any

5     communications with him regarding the 419

6     development project?

7          A.     Not to my knowledge.

8          Q.     Do you know a Kate Stutzel?

9          A.     Yeah.

10         Q.     Who is she?

11         A.     Resident of Emerson.

12         Q.     Did she run for any office?

13         A.     She did.

14         Q.     What office was that?

15         A.     She ran for council I think two years

16    ago, three years ago maybe.

17         Q.     So not the past cycle, the one before

18    that?

19         A.     I think it was even the cycle before

20    that.

21         Q.     Okay.

22         A.     Well, there's this cycle, the last

23    cycle, it was the cycle before that.

24         Q.     Did you ever bring up the topic in these

25    campaign ventures that you went on about the

Page 287

1   possibility of the development resulting in Hasidic

2   Jews coming into town?

3        A.     Never.

4        Q.     You never mentioned Hasidic Jews at all?

5        A.     Never.

6        Q.     You never expressed to anyone that the

7   project was owned by Jewish individuals?

8        A.     Never.

9        Q.     So if someone said you did, they would

10  not be telling the truth?

11       A.     They would be lying.

12       Q.     Okay.  Do you know why someone would lie

13  about that?

14              MR. SEAMAN:  Objection to form, calls

15  for speculation.

16       A.     Do I answer it?

17       Q.     Yeah.

18              MR. SEAMAN:  To the best of your

19  ability.

20       A.     I have no idea why anyone would say

21  that, except to make me look bad.

22       Q.     Did you -- do you remember there came a

23  time when there was a condemnation that was

24  requested by the town for you to institute?

25       A.     There was a condemnation?

Page 288

1      Q.     Yeah.  The developer asked the town to

2    initiate a condemnation.  Do you recall that?  As to

3    one of the people that they couldn't negotiate an

4    agreement with?

5      A.     Vaguely.

6      Q.     Who was it?

7      A.     I think it was the cleaners and the

8    liquor store building.

9      Q.     Did you speak to them at all, the

10   cleaners or the liquor store or anyone affiliated

11   with them?

12     A.     Did I speak to them?

13     Q.     Yeah, did you speak to them about the

14   condemnation?

15     A.     I don't remember.

16     Q.     Did they ever contact you to see if you

17   could help them --

18     A.     I don't --

19     Q.     -- with respect to the condemnation?

20     A.     I don't remember.

21     Q.     So by I don't remember, you're not

22   denying it happened, you're saying you don't recall

23   either way?

24     A.     I don't recall.

25            MR. KLEIN:  This will be DD-28.

Page 289

1        Q.    Okay.  DD-28 is a regular meeting

2    December 18, 2018.

3               MR. FIORENZO:  Could you scroll to

4    the -- yeah, right there.

5        Q.     It states here in these minutes that,

6    Mr. Doyle updated the governing body on negotiations

7    which had taken place between JMF and the property

8    owners of Block 419.  Because they paid

9    significantly more for the properties than

10   originally planned, as well as the need to close

11   quickly, JMF had to bring in a partner.  The third

12   amendment to the redevelopment agreement would

13   provide Accurate Builders and Developers with a

14   51 percent partnership to JMF's 49 percent.

15       Mr. Doyle said that this amendment was not

16   unreasonable and that bringing in Accurate Builders

17   would enable the developers to close and allow

18   Emerson to comply with its commitment.  The

19   governing body requested an addendum to the third

20   amendment to the redevelopment agreement, require

21   the builders to meet and work with a subcommittee of

22   the governing body members, which included the

23   Mayor-Elect DiPaola, so it will look like what they

24   wanted for the Borough and what residents would be

25   pleased with.

Page 290

1      Jack Klugmann, Chaim Klugmann, and Joseph

2   Forgione's attorney Peter Flannery of Bisgaier Hoff

3   were invited into closed session to discuss, and

4   then Klugmann and others left and agreed to a

5   subcommittee to review and provide input for the

6   plan.

7      So do you remember that you brought up the

8   desire to create such a subcommittee?

9      A.    Yes.

10     Q.    And that when the third amendment was

11  being discussed, you said that you would accept and

12  agree to it if such a subcommittee was created.

13  Correct?

14         MR. SEAMAN:  Objection to form.

15     A.    I don't know that I said that I would

16  agree to it if the subcommittee was formed, but I

17  asked for the subcommittee because the plan looked

18  very different than what was originally proposed.

19     Q.    Right, the plan that was approved.

20     A.    Yeah.

21     Q.    And you didn't like the way it looked

22  aesthetically.

23     A.    Aesthetically, yeah.

24     Q.    So did you vote in favor or against the

25  third amendment?

Page 291

1          MR. SEAMAN:  Objection to form.

2      A.     I abstained.

3      Q.     So as a result of that, the third

4  amendment was approved.  Correct?

5      A.     The third amendment was approved, yeah.

6      Q.     Did you create the subcommittee?

7      A.     Yes.

8      Q.     When did you create the subcommittee?

9      A.     Probably after I took office or maybe

10  right there.  I don't recall.

11      Q.     So you don't know when you created it?

12      A.     I don't remember.  I don't think -- I

13  don't know if I created it.  I don't think I had the

14  power to create it until after I was mayor.  I don't

15  remember.

16      Q.     I show you what we're going to mark as

17  DD?

18          MR. KLEIN:  29.

19      Q.     29.  And these are notes.  3/14/19.

20  R-E-D-E-V, it looks like redevelopment abbreviation.

21      A.     Can you make that larger if we're going

22  to read it?

23      Q.     So was this a -- was this -- these notes

24  of a meeting of your redevelopment committee?

25      A.     Mayor Gerry -- I don't know what they

Page 292

1    are.

2          Q.    Who's GF?

3          A.    I can only guess that it's Gerry

4    Falotico.

5          Q.    Okay.  R. Malagiere.  Who's JMC?

6                MR. SEAMAN:  Objection to the form.  Can

7    we have some foundation whether she even recognizes

8    the handwriting on this document?

9          A.    I don't know who wrote that.

10         Q.    Okay.

11               MR. FIORENZO:  Is this part of the

12   document?

13               MR. KLEIN:  Yes.

14         Q.    Okay.  This is part of the same exhibit.

15   It's a sign-in sheet.  So Gerald Falotico, Council

16   President, Rich Malagiere, you, Jack Klugmann, Jeff

17   Wieboldt, Accurate Builders, two attorneys from

18   Porzio Bromberg, Mr. McCann and Mr. Sheola.  Right?

19   So all these people were present at this meeting,

20   redevelopment meeting in Borough Hall.  Do you

21   remember the meeting?

22         A.    No.

23               MR. FIORENZO:  Go back to the notes.

24         Q.    So the developer -- redeveloper

25   Mr. Klugmann had been trying to set up a meeting for

Page 293

1    some time prior to March.  Are you aware of that?

2                    MR. SEAMAN:  Objection to form.

3          A.      No.

4          Q.      I won't bore you with the details, but

5    there's a series of e-mail communications starting

6    in February, late January when he's trying to meet,

7    and eventually the town -- the town finally agreed

8    to meet by March 14, 2019.  Do you remember being

9    ill around that time?

10         A.      I couldn't remember being ill back then.

11         Q.      Okay.  In any event, this is a meeting,

12   and at the meeting there's several things being

13   discussed.  It first says, Mayor's subcommittee to

14   be appointed 3/19.  Developer will meet as soon as

15   possible with committee.  So when did you appoint

16   people to the subcommittee?

17         A.      I don't know.  I guess sometime after

18   3/19 according to that.

19         Q.      Did you appoint them by 3/19?

20         A.      I don't recall.

21         Q.      Who did you appoint to the subcommittee?

22         A.      I don't recall.

23         Q.      Were you on it?

24         A.      I generally sit on all committees.

25         Q.      Okay.  So the answer would be yes, you

Page 294

1    were on it?

2         A.    Yeah, I guess so.

3         Q.    Okay.  There's also notes regarding the

4    emergency building, Section 4.04.

5              MR. FIORENZO:  Could you pull that up?

6         Q.    So --

7         A.    Excuse me, do you know whose notes these

8    are?

9         Q.    I don't.  Are they yours?

10        A.    No.  I don't recognize the handwriting.

11        Q.    Well, we'll find out eventually, I

12   suppose.

13        So there's a note there and it says MC.  Is

14   that Mr. McCann?

15        A.    I don't even know who wrote these notes,

16   so I don't know.

17        Q.    I didn't ask that though.  Do you

18   believe that that relates to Mr. McCann?

19             MR. SEAMAN:  Objection to form.

20        A.    I think it could mean him, but I don't

21   know.

22        Q.    It would appear to be the only person on

23   the sign-in sheet who those initials relate to, so.

24        There's also an RS, which appears to relate to

25   the only person with those initials is Richard

Page 295

1   Sheola, the interim borough administrator.  Correct?

2              MR. SEAMAN:  Objection to form.

3        Q.    Right?  That's RS, Mr. Sheola?

4        A.    Do I agree with your assumption?

5        Q.    Yes.  Since he's the only one on the

6   sign-in sheet --

7        A.    It appears that you're correct.

8        Q.    Okay.  There was a discussion at that

9   meeting about the emergency building.  Do you see

10  that?

11       A.    I see emer -- I don't know what that

12  says.  Emerg, E-M-E-R-G, I don't know what that

13  says.

14       Q.    Was there a provision in Section 4.04(E)

15  of the agreement that dealt with the emergency

16  services building?

17       A.    Yes.

18       Q.    Okay.  And the notes here indicate,

19  Identify property.  Was there a discussion about the

20  need to identify the property?

21       A.    I don't recall what happened in 2018.

22       Q.    Okay.  So you have no recollection of

23  that being discussed at the meeting?

24       A.    I don't.

25       Q.    There's a note in here about plans.  Do

Page 296

1    you know what was discussed, if anything, about any

2    obligations to prepare plans?

3         A.    I don't have any recollection.

4         Q.    Again, I'm talking about at this

5    meeting.  You don't remember?

6         A.    I don't have any recollection.

7         Q.    So it would be fair to say you don't

8    remember what anybody said at this meeting, what you

9    said, they said?

10         A.    I don't even remember where this meeting

11    was or who --

12         Q.    I didn't ask where.  Do you remember

13    anything that anyone said at the meeting?

14         A.    I don't -- I don't know.

15         Q.    Well, what does that mean.  Do you

16    remember what anyone said at the meeting or not?

17         A.    I'm trying to figure out where the

18    meeting was so I can put myself in the room --

19         Q.    Okay.

20         A.    -- and remember if anyone said anything.

21         Q.    Well, take your time and try to put

22    yourself in the room.  Do you remember what anyone

23    said at the meeting?

24         A.    Can I look at the rest of the note?

25         Q.    That's it.

Page 297

1          MR. FIORENZO:  Oh, okay.  Well, go back,

2    she wants to look at it.  Go back to the earlier

3    part if she wants.

4          A.    I don't remember.  So what was the date

5    of this meeting?

6          Q.    3/14/19?

7          A.    3/14/19.  Can you make that a little

8    bigger?

9          MR. KLEIN:  Which part?

10          A.    Any of it.  I see -- is that Joe -- oh,

11    Pappas.

12          Q.    Paparo.

13          A.    Oh, Paparo.

14          Q.    He's an attorney from Porzio Bromberg.

15          There's a note there, closing all

16    simultaneous.  Do you remember there being

17    discussion there about how the developer was moving

18    forward to close and purchase property?

19          A.    I honestly don't remember this meeting.

20          Q.    Okay.  So going back to my question, you

21    don't remember anything being discussed at this

22    meeting?

23          A.    I don't remember the meeting.

24          Q.    Okay.  So as a result of that, would it

25    be accurate to say you do not recall anything that

Page 298

1    may have been discussed at the meeting since you

2    don't recall the meeting at all?

3        A.    If you ask me a question about something

4    being discussed, it could jog my memory, but right

5    now, out of the blue, I don't recall anything

6    discussed at the meeting.

7        Q.    Well, I'm asking you if you can recall.

8    The notes are here.  You can look at those.

9        A.    I can't read the handwriting.

10       Q.    You can't read it?

11       A.    I can't.  I can see the word evac.

12       Q.    It says Cork & Keg, evac closing 3/22.

13   So let me read it for you.  These are all notes

14   someone took of the meeting.  JMMC, he talks about

15   the Cork & Keg case.  There's a comment,

16   Condemnation should not be part of the conversation.

17   Cork & Keg.  Evac closing 3/22.  Maybe others at the

18   last minute.  Borough asked for communication

19   through attorneys.  JK, Klugmann, as long as treated

20   fairly will work with others.  Works well with

21   others mayors -- with other mayors.  Evac by 6:30.

22   So does any of this refresh your memory about

23   anything discussed at the meeting?

24       A.    No, and everything you said to me

25   doesn't make any sense at all.  It sounds like

Page 299

1  gibberish.

2       Q.    Okay.  So whoever wrote the notes was

3  writing in gibberish, I guess.

4       A.    Didn't take good notes --

5       Q.    Yeah.

6       A.    -- because it doesn't mean anything to

7  me.

8       Q.    I mean, they're talking about different

9  topics.  Topics.

10      A.    Yeah, but I can't -- I can't -- I don't

11 know what the word is.  I don't know what they were

12 trying to say.  I see words, I don't see complete

13 thoughts.

14      Q.    Yeah, a lot of times that happens with

15 notes.  Right?

16      Okay.  So in any event, you don't remember

17 anything discussed at the meeting.  Correct?

18           MR. SEAMAN:  Objection to form.

19      Q.    Is that correct, yes or no?

20      A.    I don't remember anything.

21      Q.    Okay.

22           MR. FIORENZO:  All right.  Off the

23 record.

24           (Discussion off the record.)

25           (Deposition adjourned at 4:36 p.m.)

Page 300

1                          J U R A T

2

3

4          I DO HEREBY CERTIFY that I have read

5     the foregoing transcript of my deposition testimony

6     and I certify that it is true and correct to the

7     best of my knowledge.

8

9

10

11     _____

12               DANIELLE DI PAOLA

13

14

15

16

17     SWORN AND SUBSCRIBED

18     BEFORE ME ON THIS _____

19     DAY OF _____2023

20     _____

       Notary Public of the State of

21

22

23

24

25

Page 301

```
 1                        CERTIFICATE

 2

 3          I, MARY ANN ADAMS, a Certified Court Reporter

 4     and Notary Public of the State of New Jersey, License

 5     No. X101026, do hereby certify that prior to the

 6     commencement of the examination, DANIELLE DI PAOLA

 7     was duly sworn by me to testify as to the truth, the

 8     whole truth, and nothing but the truth.

 9          I DO FURTHER CERTIFY that the foregoing is a

10     true and accurate transcript of the testimony as

11     taken stenographically by and before me at the time,

12     place, and on the date hereinbefore set forth.

13          I DO FURTHER CERTIFY that I am neither a

14     relative nor employee nor attorney nor counsel of any

15     of the parties to this action, and that I am neither

16     a relative nor employee of such attorney or counsel,

17     and that I am not financially interested in the

18     action.

19

20

21     Mary Ann Adams, C.C.R.

22

       Notary Public of the State of New Jersey

23     My Commission expires August 10, 2024

24

25
```

Page 302

1                          ERRATA SHEET
                 VERITEXT/NEW YORK REPORTING, LLC
2
      CASE NAME: Emerson Redevelopers Urban Renewal, L.P.C. v. The Boro
   Of Emerson New Jersey, And Danielle Dipaola
3     DATE OF DEPOSITION: 4/26/2023
      WITNESSES' NAME: Danielle Dipaola
4
5     PAGE   LINE (S)        CHANGE              REASON
      ____|_____|_____|_____
6
      ____|_____|_____|_____
7
      ____|_____|_____|_____
8
      ____|_____|_____|_____
9
      ____|_____|_____|_____
10
      ____|_____|_____|_____
11
      ____|_____|_____|_____
12
      ____|_____|_____|_____
13
      ____|_____|_____|_____
14
      ____|_____|_____|_____
15
      ____|_____|_____|_____
16
      ____|_____|_____|_____
17
      ____|_____|_____|_____
18
      ____|_____|_____|_____
19
      ____|_____|_____|_____
20
21                                  _____
                                    Danielle Dipaola
22    SUBSCRIBED AND SWORN TO BEFORE ME
      THIS _____ DAY OF _____, 20___.
23
24
      _____           _____
25    (NOTARY PUBLIC)                MY COMMISSION EXPIRES:

| & | | | |
|---|---|---|---|
| **&** 1:16 2:2 4:18 5:5 81:12,14 82:4,6 116:22 117:2,3,4 118:6 259:1 298:12,15,17 | **11/8/2018** 4:7<br>**110** 3:22<br>**114** 3:24 4:3<br>**11:45** 86:20<br>**12** 3:22 110:7 180:8<br>**12/10/2018** 4:10,12,20<br>**12/18/2018** 4:21 | **1535-16** 3:18 60:25<br>**159** 4:8<br>**16** 4:5 39:14 130:12<br>**17** 4:7 86:24 93:8 110:9,15 141:11<br>**172** 4:9 | **2004** 61:17,21<br>**2005** 87:19 210:21<br>**2006** 33:10,13 34:2 37:15 52:1<br>**2007** 8:16<br>**201** 2:10,14<br>**2010** 7:21 8:9 |

**0**

**04** 61:13
**07074** 2:14
**07102** 2:4
**07446** 2:9

**1**

**1** 3:9 21:15,16 21:17 243:3 246:11 249:14 250:19 274:16
**1/17/17** 60:9
**1/25/2019** 3:24
**10** 3:20 53:14 87:13,15,18 95:22,25 96:1 172:16 173:13 178:15 268:12 301:23
**10:12** 1:19
**10th** 178:12 180:17
**11** 3:21 93:9 94:24 95:1 104:25 110:18
**11/21/2017** 3:21,23

**12/20/2016** 3:16
**12/29/21** 159:19
**12/4/2018** 4:6
**12/6/2018** 4:11
**125** 4:4
**129** 259:13
**12:05** 102:3
**12:15** 102:4
**13** 3:24 29:11 114:3,4,7 180:9
**130** 4:5
**137** 180:6,8
**138** 180:9
**14** 4:3 41:5 61:17 114:10 293:8
**141** 4:7
**147** 272:3
**15** 4:4 87:6 88:1 98:4,16 125:1,2 127:4 127:15 138:23

**173-16** 41:10
**174** 4:11
**178** 4:12
**17th** 60:12,14
**18** 4:8 25:5 127:16 159:17 159:18 289:2
**18th** 86:24
**19** 4:9 61:8 134:15 139:15 172:14,15
**191** 4:14
**1:25** 130:3
**1st** 192:20,21

**2**

**2** 3:10 33:9,19 49:12 75:3
**20** 1:2 4:11 52:12,22 61:1 174:22 302:22
**200** 187:14 189:5
**200-17** 3:19
**2001** 21:1,22 25:5,8 26:23 26:25 32:21,22

**2015** 87:24 88:2,9 95:5
**2016** 33:7 41:5 48:22 51:23 52:5,12,22 61:1
**2017** 60:10,14 69:5,7 93:1,10 102:14,17 110:14 114:12 255:24
**2018** 115:2 122:12,13 124:5 127:12 130:9,13 131:22 132:5 133:2 134:1 140:1,5,11 141:10 171:12 172:10,16 173:14 175:3 178:12,15 180:17 268:12

**[2018 - 419]**                                                                    Page 2

284:11,14,22
289:2 295:21
**2019**   13:15
114:4 243:3
270:3 293:8
**2023**   1:18
300:19
**2024**   301:23
**209**   4:15
**21**   3:9 4:12
93:8,10 110:14
110:15 114:12
178:10,11
180:5 267:4
**211**   4:16
**214**   116:8
**22**   4:14 98:16
98:21,22 128:1
128:3 191:8,9
245:23 264:19
264:24 265:10
265:25 266:2
266:18 268:17
269:11,19,24
271:12 272:4
276:19
**23**   4:15 187:14
209:25 210:1
**24**   4:16 211:20
**241**   4:17
**24th**   212:12
**25**   4:17 114:4
241:3,4
**250**   2:13

**256-16**   3:12
40:11
**258**   4:18
**26**   1:18 4:18
258:24
**268**   4:19
**27**   4:19 39:14
60:8 70:17
268:10,11
**28**   4:21 288:25
289:1
**288**   4:21
**29**   4:22 61:8
98:5,20,25
99:6 104:1,5
106:17,20
107:24 108:13
109:18 115:2
128:22 177:7
242:2 245:22
267:8 272:1
276:20 291:18
291:19
**291**   4:22
**29th**   122:12,13
**2:25**   190:24
**2:35**   190:25
**2nd**   181:1

**3**

**3**   3:11 39:8,14
245:21
**3/14/19**   291:19
297:6,7
**3/14/2019**   4:22

**3/19**   293:14,18
293:19
**3/22**   298:12,17
**30**   25:8
**300a**   2:13
**31st**   169:16
**33**   3:10
**39**   3:11
**3:21**   236:25
**3:27**   237:1

**4**

**4**   3:12 40:9,10
40:15,16 45:6
45:7 64:13
65:14 76:13,14
130:13 134:1
140:1,4
**4.01**   76:14
77:15
**4.04**   295:14
**4.04.**   294:4
**4/26/2023**
302:3
**4/6**   212:5
**4/6/20**   212:6
**40**   3:12 53:19
73:17
**41**   3:13
**419**   20:6 50:2,5
50:15 97:19,20
98:9 102:7
104:5 105:2,9
105:17 106:7
106:13,16,20
107:2,16 108:5

108:14 109:8
111:22 112:1
113:8 119:17
121:19,23
122:3 123:20
124:8 128:2,10
128:12 129:10
130:15,21
139:2,6 147:6
154:4,16
156:19 157:2,6
157:10,16,19
157:21 158:7
161:14,17
162:14,16,18
162:21 166:9
167:5,12 168:6
169:10,12,20
170:2,7 176:6
176:18 181:5
181:12,19
182:6,11,21
197:18,20
204:22 206:19
206:20 207:2,6
210:24 211:4
214:5,14
220:19,23
221:9,12,19
222:2,8,15,18
223:21 227:17
228:8 237:7,11
239:2 285:2
286:5 289:8

**440-0675**  2:14
**47**  70:14
**4728**  1:2
**48**  3:14
**49**  21:23
  289:14
**4:36**  299:25
**4th**  133:2

**5**

**5**  3:4,13 35:4
  41:3,4 51:8
  52:19
**50**  2:9 53:24
**51**  232:6
  289:14
**52**  3:16
**53**  97:6 98:6
  107:11,17
  128:22
**55**  104:7 186:6

**6**

**6**  3:14 48:3,5
  96:4,6,8
  127:12,16
  128:1 161:25
  175:3 183:17
  184:6 189:6
  268:13,13
**6/14/2016**  3:13
**60**  3:17 186:7
**610**  246:11
  249:14 250:19
  274:16

**6300-15**  93:16
**643-7000**  2:5
**69**  3:19
**6:30**  298:21

**7**

**7**  3:16 52:10,17
  60:9 61:13
  96:14 130:16
  130:20,21
  139:2,6,11,15
  221:21
**7/18/17**  86:23
**7th**  60:13

**8**

**8**  3:17 60:23,24
  95:5 97:3,4
  180:20
**8097**  301:22
**80s**  181:2
**818-6400**  2:10
**87**  3:20
**8th**  141:10

**9**

**9**  3:19 50:2,5
  50:15 69:3,4
  87:19
**93**  3:21
**973**  2:5

**a**

**a.m.**  1:19
**abbreviation**
  291:20
**abide**  165:10
  165:12

**abiding**  80:25
**ability**  150:7
  257:11 260:15
  287:19
**able**  19:25 46:2
  78:25 80:19
  83:12,24 139:9
  157:4 177:11
  223:2,4 259:6
  275:18 279:2
**above**  1:13
  95:4
**absolutely**  44:7
  54:6 165:19
  190:22 285:12
**abstain**  42:1,16
**abstained**  40:6
  41:14 42:21
  291:2
**accelerated**
  131:13 135:7
  135:11 137:25
  138:13,18
**accelerating**
  138:8
**acceleration**
  135:4,6 138:2
**accept**  125:25
  280:21 290:11
**acceptable**
  199:1,5 200:16
  203:23 204:5
  204:22
**acceptance**
  199:4

**access**  14:20
**accommodate**
  67:8 68:5
  83:24 267:14
**accommodated**
  70:11
**accommodati...**
  197:11,15,19
**accordance**
  99:9 128:8
  199:23 266:6
  266:17
**accuracy**  58:13
  58:15 247:2
**accurate**  5:6
  57:13 59:1
  62:6 90:24
  134:14 168:3,4
  206:19 289:13
  289:16 292:17
  297:25 301:10
**accurately**
  148:5,19 151:2
  151:8
**accused**  241:10
**acknowledge**
  216:2
**acknowledged**
  264:8
**acquire**  76:16
  119:16 274:20
**acquiring**
  66:13 222:5,8
**acquisition**
  77:16

**[act - affordables]**                                                                          Page 4

| | | | |
|---|---|---|---|
| **act** 35:9 95:7 136:6 | **additional** 233:6 | **adopt** 24:14 25:16 73:12,15 73:19 | 68:6,11 70:10 71:7 75:5,10 75:17,21,23,24 |
| **acted** 147:2 | **address** 33:3 35:1,17 36:7 | **adopted** 33:7 37:14 38:19,21 | 76:6 80:23 81:1 83:5,13 |
| **action** 1:2 73:11 168:1,5 301:15,18 | 36:21 38:2,10 38:23 39:21 40:19 42:8 | 60:25 61:14,18 124:21 | 83:25 84:12 96:7,18,23 |
| **actions** 32:24 33:2 131:16,21 131:25 224:3,5 237:6 273:11 | 45:9 55:10 71:6 84:12,24 85:2 92:6 209:13 | **adopting** 38:1 68:20 73:21 74:25 | 97:12 98:6,11 98:20 105:10 106:7,17,21 |
| **activities** 16:17 | **addressed** 65:19 75:17,22 | **adoption** 3:17 60:25 77:19 | 107:13 109:18 113:18 114:19 |
| **activity** 15:2,6 16:11 17:13 267:19 | 93:11 97:1,1 | **advance** 171:14 | 120:4 121:10 122:21 123:4 |
| **actual** 43:11 66:15 228:24 | **addresses** 64:13 84:25 96:6 | **advice** 278:24 | 128:22 129:11 157:4 176:7 |
| **actually** 33:8 70:17 77:21 78:3 96:12 115:24 180:12 180:13 203:7 263:15 284:3 | **adequate** 24:16 | **advised** 204:25 | 177:20 185:1,3 |
| | **adjourned** 299:25 | **advocating** 168:18 | 185:9,10 186:7 186:16 212:19 |
| | **administration** 131:12,18,23 132:1,9,23 133:4,22 135:22 136:7 137:18 138:4 138:14 163:2 212:18 231:2 239:3 279:4 | **aesthetically** 199:2 290:22 290:23 | 212:23 213:1,5 213:6 214:22 |
| | | **affiliated** 288:10 | 214:23 215:22 216:7 217:16 |
| **adams** 1:14 301:3 | | **affirmative** 22:12 24:14 25:14 | 219:8,12 242:2 245:23 248:19 |
| **add** 68:15 | | | 258:9 260:6,16 |
| **added** 50:2,5 68:14 167:22 | | **affordable** 20:19 22:13,16 26:7 29:15 35:9,17 36:22 37:5,6,8,9,11 38:3,10,23 39:22 40:19 41:19 42:8 45:10 55:10 56:10,19 67:8 | 265:10,25 267:6 268:16 268:21 270:21 270:23 271:5 272:1,4,6 276:19 277:2 281:10 |
| **addendum** 85:7 289:19 | | | |
| **adding** 49:16 70:7 | | | |
| **addition** 51:17 96:25 124:18 186:6 256:4 | **administrator** 7:17 17:17,21 17:22 18:6,6,9 18:14,16 219:4 237:16 238:5 295:1 | | **affordables** 250:17 263:24 |

**[affordables - amending]** Page 5

| | | | |
|---|---|---|---|
| 265:1 267:15 | 255:21 256:4,9 | 96:3 97:11 | 283:23 288:4 |
| 272:9 | 257:17 258:1 | 99:10 102:11 | 289:12,20 |
| **afternoon** | 262:9,14 | 102:14,16 | 295:15 |
| 130:1 | 275:19 276:2 | 103:8,13,18 | **agreements** |
| **age** 37:13 | 281:23,25 | 104:8,16,25 | 133:10 |
| **agency** 10:24 | 290:12,16 | 105:6,8 106:5 | **agrees** 73:10 |
| 13:23 | 295:4 | 106:8,17,20 | **ahead** 137:16 |
| **agenda** 41:10 | **agreeable** | 107:3,14 | 156:16 250:10 |
| 43:5,11,17 | 233:25 268:18 | 109:19 110:17 | 259:6 |
| 59:11 60:8 | 269:12 | 111:16 112:17 | **aim** 210:23 |
| 133:18 134:5 | **agreed** 46:7 | 113:10 114:11 | **allow** 5:25 |
| 208:5,17,20,21 | 89:23 95:9 | 114:22 115:24 | 53:16 114:22 |
| 208:22,24 | 104:4,7 128:19 | 118:11,24 | 251:12 259:12 |
| 209:1,3,4 | 169:9 199:3 | 119:12 122:3 | 259:15 289:17 |
| **ago** 15:15 | 259:17 260:9 | 122:18 123:9 | **allowed** 53:13 |
| 19:24 29:11 | 264:8 277:14 | 124:13,19 | 53:18 217:20 |
| 32:8 39:5 | 290:4 293:7 | 128:9 133:12 | 272:23 |
| 40:20 42:7 | **agreeing** | 169:16 170:20 | **alternate** 108:7 |
| 82:20,23 94:8 | 248:22 258:5 | 170:23 171:4 | **alternative** |
| 107:5 113:25 | 281:20 | 176:6,12,16,25 | 177:12 277:3 |
| 138:7 204:24 | **agreement** 3:11 | 177:14,19 | 282:5 |
| 234:7 252:14 | 3:15,21 39:2 | 185:20 186:6 | **ambitious** |
| 253:4,24 255:9 | 39:11,13,16,19 | 186:15,23,25 | 161:10,12,15 |
| 256:22 263:6,7 | 39:25 40:18 | 198:18,19,22 | 162:21 |
| 263:14 264:3 | 41:12 42:5,8 | 216:18 217:10 | **ambulance** |
| 265:20 273:18 | 45:9,12 46:8 | 217:13,23 | 130:20 132:20 |
| 276:7,24 | 46:14 47:24 | 250:4,16 | 139:8 |
| 286:16,16 | 48:1 49:7 69:7 | 255:23 256:5 | **amend** 46:9 |
| **agree** 47:11 | 73:9 75:9 | 257:6,20 | 53:2 75:4,8 |
| 63:12 79:7 | 76:15 77:5,12 | 259:12 260:7 | 211:15 |
| 89:24 98:9 | 78:7,15,19 | 264:13,22 | **amended** 47:25 |
| 125:19 128:17 | 80:9 85:2,5,11 | 267:7 269:18 | 76:15 |
| 149:2 163:24 | 93:11,18,22 | 271:7,21,22 | **amending** 49:6 |
| 164:4 180:16 | 94:2,15,23 | 276:20 277:20 | 61:1 |
| 207:4 229:18 | 95:17,20,23 | 279:8 280:25 | |

[amendment - application]                                    Page 6

**amendment**
3:14 40:22
41:1 45:5,11
45:18 46:1,8
47:15,17 48:5
48:6 49:12
50:7 51:8,23
52:2,6 55:9
60:21 65:6
66:4 69:6,10
69:16 70:9
74:22 75:1,4
77:15 84:5,11
84:24 85:3,5,9
85:10 86:18
93:2 94:1
127:19,20
132:2,8,14,16
132:17,21
133:14,16
134:20 151:16
289:12,15,20
290:10,25
291:4,5
**amendments**
25:16 51:24
**amount** 80:6
96:23 97:13
120:4 132:18
235:14
**analysis** 83:3,4
83:10 177:9
282:2,3,14,24
283:14

**angeli** 2:8
**ann** 1:14 301:3
**annual** 14:24
242:5
**answer** 6:3
10:9 11:16,17
12:24 15:13,18
23:8 30:2 32:9
32:11 44:25
46:2 55:16
59:7 62:5,19
62:20 63:2,5
65:11 74:16
82:16 85:6
100:14,18
101:2,20
103:15 108:19
108:23 111:3
111:14 136:5
136:10,11
137:5,11 139:9
139:21 145:17
147:21 148:15
149:6,7,24
150:22 151:7
154:25 156:15
159:2,4,6,7
164:25 169:1,6
184:18 185:25
186:2 190:16
204:10,11
213:16 214:11
214:12 215:1
230:8 234:25
243:21 244:15

244:16,18,23
244:24 245:1,8
249:2 261:23
261:25 262:19
265:23 275:18
277:24 278:8
278:18 279:2
279:16,18,24
280:2,11 283:4
283:24 287:16
293:25
**answered**
46:23,25 62:24
101:16 129:12
137:21 143:12
149:10,11,15
149:16 196:12
236:6
**answering** 74:5
105:25 137:12
145:19 149:12
150:7 245:2
279:20
**answers** 5:19
139:22 165:13
243:20
**anticipate** 6:1
**anybody**
137:13 146:9
166:15 167:1,4
296:8
**anymore**
279:25
**anyway** 244:11

**apartments**
68:9 268:15,17
268:17 269:11
**apologize** 23:6
185:16
**apparent**
167:23
**apparently**
54:16 101:12
161:9
**appealed** 219:2
**appear** 118:13
178:23 180:16
246:7 286:1
294:22
**appearance**
219:1
**appeared** 19:17
41:13 172:22
173:2,11 175:4
175:13 176:16
178:6,22 179:1
187:12 233:23
277:14
**appears** 110:19
121:18 130:13
182:22 222:13
294:24 295:7
**applicant**
175:13 188:22
228:6,15 272:4
272:8
**application**
18:17 19:21
88:6 93:15

[application - asked]                                                    Page 7

137:17 138:17
171:5,11
172:18 175:14
176:8 191:12
214:21 250:1,2
250:18,21,24
251:2,4,18
252:3 253:4,19
261:16 262:11
262:24 263:10
263:16,18,21
266:2
**applied** 238:16
**appoint** 293:15
293:19,21
**appointed** 8:24
27:14 71:8
109:22,25
195:6 207:19
253:6 293:14
**appointment**
192:23 193:15
**appoints** 8:25
**appreciate**
108:11
**apprised** 15:6
15:22 16:2,2
16:10,11,25
17:8,12,14,20
**appropriate**
37:5 83:12
135:24 136:4,8
136:12,14,17
136:19,22
137:3 183:9

201:14,23
202:23 203:6
206:25 245:12
245:17
**appropriately**
190:14
**appropriations**
24:16
**approval** 38:13
39:24 41:11
118:23 123:20
124:9 132:2,7
133:6 135:15
138:17 188:17
190:9 197:20
218:7 222:19
222:20 225:20
230:15 250:3
255:19 265:8
266:4 271:20
284:3 285:7
**approvals**
189:13,13
**approve** 39:2
41:10 58:21,25
59:12 70:21,24
114:16 135:20
176:23 191:12
250:18 263:23
**approved**
53:15 59:16,23
59:25 60:8,10
71:8,11 102:17
121:9 122:18
123:8,16

124:13 129:1
132:4 134:16
170:21,21
177:18 191:19
210:25 216:5
221:14 232:5
253:25 255:17
262:12 264:17
264:25 265:2,9
265:24 266:2,6
266:18,22
285:5 290:19
291:4,5
**approving**
13:23 60:3
192:17
**april** 1:18
270:2
**architect** 196:4
196:6
**area** 37:4 61:9
61:10,18,19
78:24 121:24
156:22 160:2
188:10
**areas** 38:24
**argued** 119:11
249:5,7 253:20
253:21
**argument** 81:2
253:22 273:25
274:10
**argumentative**
73:3 284:1

**arises** 16:21
**article** 4:7,8,15
4:16,17 76:14
141:8,12 142:4
150:20 151:21
152:16,19
155:2 159:18
160:21 161:3,8
162:24 167:17
167:21 182:5
209:20 210:3
210:20 211:11
211:23 218:3
218:18 219:22
223:20 241:4,5
241:17,18
242:1 245:22
255:11,13
**articles** 166:2
188:10
**articulated**
248:3 261:9
**ascolese** 171:21
171:24,25
173:21 175:12
197:8 200:1,8
203:22 204:4
204:19 205:19
**ascribed** 37:24
186:16
**aside** 6:22 7:1
74:16 98:16
128:3
**asked** 10:13
16:1 20:3,11

| | | | |
|---|---|---|---|
| 28:25 46:22 | 106:23 109:7 | **assisting** 14:24 | 301:16 |
| 56:23 57:4,15 | 120:2 125:20 | **assume** 57:13 | **attorneys** 2:6 |
| 62:4 64:19,23 | 125:23 133:5 | 80:16 196:1 | 2:11,15 30:24 |
| 64:23 101:2 | 136:15,16 | 214:13 266:24 | 121:1 174:16 |
| 103:21,22 | 137:15 142:25 | 267:2 | 207:23,24 |
| 106:1 107:15 | 144:19 148:8 | **assuming** | 208:3 259:1 |
| 107:20 121:7 | 148:16 152:11 | 177:10 179:9 | 283:3 292:17 |
| 128:20 136:21 | 157:14,14,25 | 223:17 | 298:19 |
| 137:2,20 138:7 | 160:11 164:11 | **assumption** | **attractive** |
| 149:2 150:22 | 167:9 169:13 | 295:4 | 232:23 |
| 157:9 158:12 | 170:16 173:2 | **asterisk** 98:14 | **august** 61:8 |
| 158:13,14 | 173:16 180:1 | **atkinson** | 301:23 |
| 187:22 194:9 | 180:22 181:6 | 208:10 225:5 | **authority** |
| 195:18 200:25 | 182:4,6 184:1 | 229:7 | 253:14 |
| 202:2 204:3 | 185:23 195:23 | **atrocious** | **authorize** |
| 228:22 229:7 | 198:22 204:18 | 239:19 | 22:15 88:13 |
| 236:6 244:17 | 226:13 229:20 | **attached** 46:11 | 110:17 |
| 253:9 258:14 | 230:13 242:13 | **attachments** | **authorized** |
| 271:4 274:10 | 247:21 248:1 | 3:20 | 51:11 94:7 |
| 278:11 280:17 | 252:19 259:15 | **attempt** 17:14 | **authorizing** |
| 282:1,6,14 | 261:6,8,13,14 | 33:25 259:15 | 40:12,21 |
| 288:1 290:17 | 262:15,21 | **attempted** | **availability** |
| 298:18 | 263:3 273:10 | 96:18 | 83:15 |
| **asking** 11:24 | 275:16 278:25 | **attend** 124:5,7 | **available** 83:5 |
| 14:22 17:21 | 279:1 280:12 | **attended** | 83:11,14 |
| 26:16,17,25 | 280:16 298:7 | 123:25 173:4 | **avenue** 130:17 |
| 30:14,17 42:3 | **asks** 18:13,15 | 178:12,16 | 134:7,10,24,24 |
| 42:17,18 44:4 | **assemble** 77:6 | 270:22 | 139:7 181:1 |
| 44:23 47:2 | **assembled** | **attention** 78:2 | **avoid** 279:20 |
| 56:24 57:20,25 | 219:11 222:17 | **attorney** 56:24 | **avoids** 95:12 |
| 58:4,8 59:2,14 | **assist** 244:3 | 103:3 118:21 | **aware** 5:10 |
| 59:17,19,23 | 245:16 | 189:3 202:20 | 20:17,20,21,23 |
| 67:10 72:7 | **assistance** | 203:5 281:6 | 21:1,5,6,7,10 |
| 97:22,24 | 244:1 | 283:1 290:2 | 22:1,5,18 |
| 104:11,12 | | 297:14 301:14 | 23:23 24:3,6,7 |

**[aware - benefit]**                    Page 9

| | **b** | 268:2,8 280:1 | 189:5 212:18 |
|---|---|---|---|

24:11,21,25
25:19 26:22,24
27:1,3,4,5 28:7
28:10,18 31:4
31:8 33:10,13
33:13,17,17,20
33:23,23 34:9
35:5,7,11,13,15
35:19 36:5,9
39:16 45:10
61:11,15,19,22
63:23 75:6
83:20 88:9
94:3 96:8,13
100:8 123:20
173:16,20
176:7 188:24
189:25 190:5
197:14 237:13
237:19,21
249:13,18
250:1,4,6,14,21
251:7 253:9
254:1,8,16
257:6,8,15
259:20 261:4,8
261:14 262:3,7
264:3,20 265:1
270:8,11,14
271:21 273:24
274:2,21
282:22 284:2
293:1
**axis** 196:7

**b** 2:2 119:22
**back** 15:17
18:10 21:1,22
25:5 28:5
29:20 30:15
31:2,24 34:8
35:13 37:15
40:25 45:4
52:1 55:17,21
59:21 72:9,10
73:24 74:2,19
84:7 90:13
92:21,25 95:1
100:21 102:5
102:17 114:7
115:2 122:8,14
130:4 138:23
147:11,14
148:6 153:14
160:23 177:4
180:12 183:24
191:1 194:19
212:15 218:24
220:8,18,19
221:5,8 222:13
222:17,19,24
223:5,6,19,21
223:25 224:4,6
224:11,14
232:13 237:2
244:25 245:5
253:15,24
255:23 256:2
256:22 261:24

268:2,8 280:1
292:23 293:10
297:1,2,20
**backdrop**
27:14
**background**
95:3
**bad** 44:14
166:11 287:21
**badger** 146:23
**badgering**
146:21
**badly** 81:9
82:19
**based** 37:23
119:15 128:25
136:23 150:11
186:24
**basic** 252:19
**basically** 15:11
73:9
**basics** 191:23
**basis** 14:24
16:19,20 188:6
**bass** 241:23,24
**bastion** 22:10
32:20,23
**bathroom**
190:21
**beautiful**
231:21
**bedroom**
245:25
**beginning**
164:7 183:17

189:5 212:18
**behalf** 95:24
259:9 260:21
**behavior**
275:23
**belief** 156:1
215:25
**believe** 7:23
8:14 11:10
13:21 18:19
19:6,14 23:14
23:19 30:14
35:25 36:25
39:23 44:4
47:9 49:16
50:1 67:9 69:2
70:22 86:3
107:10 109:13
117:23 118:4
131:22 132:16
133:14 137:16
143:23 146:12
156:17 170:1
171:17 175:6
191:16 196:8
197:18 200:22
207:19 229:9
238:5,7 264:1
294:18
**believes** 152:4
**beneficiary**
24:19
**benefit** 184:25
185:4,8,9,24
186:10,10,13

[benefit - body]                                                          Page 10

| | | | |
|---|---|---|---|
| 186:18 187:5 | **blighted** 47:10 | **blow** 24:10 | 252:3,10,20 |
| **benefits** 185:20 | 206:24 | **blue** 298:5 | 262:25 263:11 |
| 187:9 | **block** 20:6 50:2 | **board** 4:13,14 | 263:22,24 |
| **ber** 93:16 | 50:5,15 97:18 | 4:20 8:6,10,13 | 264:18 265:1 |
| **bergen** 88:7 | 97:20 98:9 | 8:19,21 9:12 | 265:24 266:1 |
| **best** 55:1 121:5 | 104:5 105:2,9 | 18:18,24 19:7 | 267:4,4 268:2 |
| 135:18 136:24 | 105:17 106:7 | 19:10,17 21:11 | 268:3,12,12,14 |
| 149:11 150:7 | 106:13,16,20 | 34:3 35:6,20 | 269:14,17,23 |
| 201:4 287:18 | 107:2,16 108:5 | 35:24 36:10 | 271:4 273:20 |
| 300:7 | 109:8 113:8 | 51:9 61:6 72:1 | 281:18 |
| **beth** 27:25 | 119:17 121:19 | 123:18,19 | **boards** 8:9 |
| **better** 105:5 | 121:23 122:3 | 124:7 133:9 | **body** 7:20 8:25 |
| 139:9 | 123:20 124:8 | 135:14,16 | 9:9 12:10 21:8 |
| **betterment** | 128:2,10 | 136:6 137:17 | 27:1 28:6,10 |
| 9:17,21 | 130:15,20 | 138:3,3,9,11,17 | 29:8,21 30:22 |
| **beyond** 228:4 | 134:15 139:2,6 | 150:14 171:6,7 | 31:3 33:7,24 |
| **big** 85:21,22 | 139:11,15 | 171:8 172:17 | 35:7 39:20 |
| 180:24 212:19 | 147:6 154:4 | 172:22,25 | 53:22 54:25 |
| 212:24 213:3 | 157:16,19 | 173:3,4,12 | 59:10 68:3 |
| 219:9,13,23 | 161:17 169:10 | 174:3,3,6,20 | 73:10 80:18 |
| 220:24 221:15 | 169:12 170:2 | 175:5,9,13 | 83:10 88:12 |
| 221:20,21 | 176:6 181:5,11 | 176:17 177:4 | 94:6 102:10,17 |
| **bigger** 41:8 | 181:19 182:11 | 180:18 181:10 | 103:19 107:7 |
| 119:9 142:1 | 182:20 210:24 | 181:21 182:21 | 107:19 108:20 |
| 297:8 | 211:4 214:14 | 183:3,8 188:16 | 118:22 122:24 |
| **bill** 190:10 | 227:17 228:8 | 189:3 190:8 | 131:10,11 |
| **billy** 117:7 | 237:7,11 239:2 | 191:6,9,11 | 133:3,9 167:25 |
| **bisgaier** 290:2 | 246:11 249:14 | 192:17 197:25 | 183:8 193:10 |
| **bit** 74:21 182:3 | 250:19 260:14 | 205:1 222:19 | 195:13 201:19 |
| 212:15 219:23 | 260:18 274:16 | 222:20 225:19 | 201:22,25 |
| 264:21 | 289:8 | 225:21,22,22 | 203:19 205:9 |
| **black** 239:13 | **blocked** 274:18 | 226:16,16,22 | 205:13 216:19 |
| **bladder** 101:23 | **blocks** 53:10 | 228:8 231:2 | 232:5 250:25 |
| **blanking** 70:18 | 130:23 | 250:2,15,22 | 251:6,11 252:4 |
| | | 251:5,10,16 | 252:15,21,25 |

**[body - bring]** Page 11

282:10,13,23
289:6,19,22
**bogart** 4:9
125:6 127:2
172:11,15
175:11 195:1,2
198:4 199:2
268:14,20
269:22
**bogart's** 128:1
129:15
**bonus** 217:17
217:19
**bonuses** 213:24
216:6,13,15
217:14
**borders** 22:14
**bore** 293:4
**boro** 302:2
**borough** 1:7
3:13,16,22 4:5
4:14,21 7:20
12:21 14:20,22
16:6 39:12
40:11 45:9
46:6 49:9
51:12 53:18
69:4 75:24
88:7 93:15,19
95:8 99:7,21
99:22 119:16
121:6 125:8
128:6 135:19
136:18,21,24
142:5 171:16

184:24,25
185:24 186:11
191:10 197:17
200:17 201:4,5
201:12 206:15
219:4 289:24
292:20 295:1
298:18
**borough's** 97:8
128:11 150:13
**boroughs**
218:17
**boss** 240:13
**boswell** 4:11
171:22 173:21
175:2,12 193:5
193:9 195:15
197:3
**bother** 23:18
**botta** 2:8,8
11:15 12:4,24
13:11 21:17,19
29:25 32:21
34:14,21 41:22
46:22,25 52:20
55:13 62:20
63:1,10 64:25
66:19,23,25
67:3 72:2 73:1
73:3,17,23
74:23 82:2
85:4 90:1,11
90:14,21,23,25
91:3,7,9,11,13
91:18,24 92:6

92:10,15
100:21 101:4,9
101:13,18,22
109:4,10,15
110:11 112:24
113:1 127:9
137:1,4,8,10,20
149:10,15
150:1,5 163:16
163:25 164:5
164:18,20,24
165:6 190:20
211:14,25
213:15 234:3
235:9,15,22
236:14,23
241:13 248:4
262:16,18
273:25 274:3
275:9 280:12
280:18
**bottalawcom**
2:10
**bottom** 53:7
127:14 251:24
276:1
**bought** 82:6
117:6 249:23
249:25 257:4
270:3 272:14
274:25 279:4
280:22
**boulevard**
53:23

**box** 43:1
159:13 180:25
**boxes** 226:24
**breach** 177:18
280:24
**break** 100:12
100:14,15,16
102:2,3 129:22
190:21,23,24
235:15 236:3
236:25
**breakdown**
23:25
**breakfast**
219:1,5 220:15
242:6
**breaks** 101:21
**brian** 181:2
208:1
**brief** 4:18
27:18 259:4
260:13 261:7
272:21 281:16
**brigette** 125:6
172:11
**brigette's**
128:23
**bring** 155:6
156:6,8 158:16
158:19,22
176:24 195:13
196:9 250:25
285:10 286:24
289:11

**bringing**
148:24 152:14
289:16
**broke** 69:2
130:7
**bromberg**
292:18 297:14
**brought** 21:23
141:1 156:19
194:19 196:4
207:10 235:7
235:10,12
290:7
**build** 37:21
53:19 89:16,17
107:13 187:25
214:21 217:3
217:16,22
260:5,19
261:16 272:15
272:23 273:16
**builder** 89:15
186:9
**builder's** 24:13
27:10 87:5
89:8,11 90:1
111:19 185:17
**builders** 5:6
134:14 206:19
289:13,16,21
292:17
**building** 53:24
65:7,16 118:2
118:7 130:20
135:8,9 139:8

151:17 153:16
153:22,24
180:25 183:18
184:6,13,16,19
206:18,19
207:1,2,2,7
216:7 240:10
240:15 246:1
249:13 250:20
265:10 267:3
267:14,21
288:8 294:4
295:9,16
**buildings** 148:4
150:16 151:19
153:6 184:21
206:23
**built** 215:21
217:20 258:9
259:13 261:19
272:14
**bulk** 199:18
**burgis** 36:2,2
**buried** 212:13
**business** 18:5
61:2 82:14
116:13 139:17
196:14 243:25
244:4
**businesses**
47:10 81:6
82:13 117:11
184:11 242:3
242:10,14,15
243:5

## c

**c** 2:1,8 90:18
92:13
**call** 85:8
143:17 207:20
263:21
**called** 11:21
118:4 161:25
210:23 231:21
264:23 265:25
**calls** 12:4 73:23
255:25 256:10
256:16 261:5
263:8 279:11
280:7,8 281:5
283:20 287:14
**campaign**
140:10 154:2
154:11,13,15
166:5,14
167:10 168:11
168:13 193:20
196:18 284:8
284:16 285:3
286:25
**campaigned**
167:10 168:18
210:22
**campaigning**
284:5
**cap** 120:18
**caps** 9:23
**captioned** 95:4
**care** 17:18 32:4
32:14 137:13

137:14,15
247:25 252:18
261:21
**cared** 32:6,10
32:13,16
**carlos** 210:9
**caroline** 195:4
208:15
**carroll** 250:7
253:8,8,12,20
**carrying**
219:10
**case** 6:16,19
23:5 94:2
103:10 113:5
114:18 118:21
128:16 140:16
140:20,22,24
141:2 215:17
236:21 255:2
298:15 302:2
**cases** 172:6
**cash** 228:22,24
**cause** 5:13,21
10:13 23:19
32:13 65:24
78:25 87:20
103:17 123:23
129:22 138:12
138:19 139:20
143:15 149:2
161:21 164:11
172:25 214:6
220:23 229:10
232:21 235:1

[cause - closed]                                                    Page 13

244:16 245:11
250:13 254:13
257:12 258:14
260:16 261:22
262:20 265:8
269:4,9 274:1
275:3
**caused** 262:23
**cbd** 53:14 65:7
65:18
**ccb** 2:10
**cenicola** 239:25
240:16
**center** 1:17 2:3
207:7
**centerpiece**
154:16 183:6
184:2 285:3
**central** 61:1
**certain** 26:20
34:9 66:5 75:8
96:6 115:23
123:17 173:5
192:12 228:17
229:8 264:24
285:10
**certainly** 29:19
38:9 227:7
**certainty** 203:9
**certificate**
301:1
**certified** 1:14
301:3
**certify** 300:4,6
301:5,9,13

**chaim** 290:1
**challenge**
119:13
**challenges**
119:5,11
**chamber** 212:9
218:12
**chamber's**
242:5
**change** 49:14
131:13 138:1
138:20 155:6
156:6,8,17,20
156:21 157:8
157:10,15,15
157:16,25
158:7,13,15,19
158:23,24
159:1,11,12
193:1,4 194:23
199:2 302:5
**changed**
156:24 157:9
199:19 205:7
268:6
**changes** 157:23
**changing**
268:24
**character**
180:24
**characterizati...**
149:19
**charged** 83:18
**chastised** 32:19

**checked** 92:2
226:23
**chimed** 189:5
**chloroacetyl**
188:12
**christopher** 2:8
**cigarettes** 82:6
**circles** 109:5
149:24
**circumstance**
17:3,4 23:17
**cites** 269:14
**city** 181:1
**civil** 1:2
**claim** 135:11
141:2 283:18
**claimed** 115:12
260:25
**claims** 150:12
**clarification**
187:21
**clarified**
268:15
**class** 24:19
**clause** 46:5,6
49:5
**clauses** 61:5
**clean** 6:6 14:9
187:23 189:15
190:10
**cleaned** 16:14
**cleaners** 116:24
117:2,8 118:6
188:10,14
288:7,10

**cleaning**
187:22
**cleanup** 12:2
13:18 14:5
15:2,6,23
16:11,17,24
17:8,13
**cleanups** 9:23
**clear** 10:15
32:1 51:16
54:9 82:3
102:8 113:3
179:20 180:3
**clearly** 50:14
67:16,22 72:19
**clerk** 43:14
59:4 237:16
**client** 90:19,20
141:1 165:1
200:21 228:18
249:16 250:14
251:16 252:20
252:24 253:3
257:21 262:12
270:3 272:8
273:12,13,15
274:19,24
279:4 280:22
**client's** 97:20
240:17,24
**close** 289:10,17
297:18
**closed** 247:20
247:23 249:11
254:5,11,13,20

**[closed - comply]**                                                                 Page 14

254:23,24
282:16,17,18
282:21,25
290:3
**closing**  297:15
298:12,17
**coah**  37:17,22
120:18 186:16
186:21,22,24
272:1,4 282:4
**cognizant**
176:9 177:25
**cohorts**  162:9
**collectively**
132:24
**combatants**
163:16
**come**  16:6
23:25 24:22,23
55:2 56:9,25
58:6 80:9
101:15 107:12
114:7 117:13
237:17,18
246:17 252:4
252:11,15,21
252:24 277:3
278:19,19,23
283:9
**comes**  16:9
18:18
**comfortable**
64:4
**coming**  274:14
287:2

**commenced**
265:9
**commencem...**
301:6
**commencing**
1:18
**comment**  44:2
73:6 173:7
233:9 234:15
234:19 298:15
**commenting**
233:15 235:13
235:24
**comments**
54:23 141:22
141:25 142:3
173:17
**commerce**
218:13
**commercial**
251:23
**commission**
8:11,22,23,23
9:3,6,15 10:6
301:23 302:25
**commitment**
289:18
**committee**
224:8,10
291:24 293:15
**committees**
293:24
**communicate**
240:15

**communicated**
13:6 276:4
**communication**
298:18
**communicati...**
80:4 100:3
274:15 286:5
293:5
**community**
14:2,4,8 22:25
28:21 55:1
**commuter**
139:9
**company**  48:20
48:22,24 91:4
91:6,10 92:5
**compared**
205:25
**compel**  258:22
259:6 261:16
**compensation**
76:24
**competent**
191:20
**complain**  200:7
239:20
**complaining**
239:18
**complaint**  16:9
87:20 88:4,5
92:24 238:25
239:20
**complaints**
16:6 237:22,23
237:25

**complete**  5:22
5:25 17:24
101:2 299:12
**completed**  6:2
16:22 257:11
**completely**
13:5
**compliance**
3:24 27:22
36:8 89:19
95:6 114:2,5
176:24 189:19
215:18 224:17
224:20 225:13
225:19,25
226:17,21
279:7 280:14
**compliant**  25:7
25:11 26:19
30:10 226:10
228:2
**complied**  205:4
226:23 228:15
228:19 229:16
230:4
**complies**  226:8
227:11
**comply**  21:24
25:9 151:11
164:8 177:14
185:19 188:22
205:6 224:25
229:22,23
260:6,7,8
269:15 272:5,5

[comply - contact]                                                    Page 15

272:8,20
283:22 289:18
**complying**
226:5
**component**
70:18 98:10
112:1,11
128:11,13,21
129:17 217:21
264:12 268:21
**comprise** 246:1
**comprised**
98:10
**concede** 44:14
**concern** 285:5
**concerned** 45:1
91:22 138:8
212:20,24
**concerning**
12:12 20:19
41:19 51:24
65:7 103:4
**concerns** 54:4
142:8 148:2
151:16 167:24
**conclude** 24:12
25:13 197:15
206:13
**concluded**
47:19 129:5
**conclusion** 12:5
53:1 73:24
200:2 231:20
256:1,11,17
261:6 280:8

281:5
**condemn** 76:23
78:25
**condemnation**
80:10 244:5
245:17 287:23
287:25 288:2
288:14,19
298:16
**condition** 93:6
189:18 226:17
272:7
**conditional**
3:24 114:1,5
277:21
**conditions**
102:11,18
103:1,4,8
104:16 192:12
225:20 228:14
229:8 230:4
**conducted** 61:6
115:21
**conferred** 6:25
229:6
**configured**
265:15
**confirm** 43:4
43:15 105:16
152:12 176:1
180:22 204:3
209:21 252:19
262:17 263:3
**confirmation**
53:9

**confirmed**
118:18
**conform**
251:19 258:18
**conformed**
199:17 200:3,4
**conforming**
199:10,16
**conforms**
260:20
**confused** 144:2
**confusing**
31:23
**congratulations**
94:21
**connection** 5:7
54:17 95:18
141:4 202:9,13
244:4 253:19
258:22 259:5
276:12
**consent** 41:10
43:5,10,17,24
**consequence**
178:2 262:10
**consider** 20:3
20:12 62:4
110:1 168:14
169:17,19
172:4 174:9
178:1 251:14
**considerable**
22:16
**considered**
20:16 86:13

109:22 119:5
119:11,21
121:19 174:1,2
174:16,19,20
195:20 213:3
254:20
**considering**
19:21
**consistent**
30:11 219:13
250:3 269:17
**constituents**
158:5
**constituted**
166:12
**constitution**
24:1 30:7 55:2
56:10 58:6
**constitutional**
21:4,25 23:25
24:18,24 26:13
28:20 29:15
30:11 31:6
32:10 122:4
**construct** 75:23
259:7 266:6
**construction**
75:22 95:14
161:19 240:3
260:15 263:23
264:23 265:9
266:9,12,17
267:19 273:13
**contact** 15:8,12
18:5 194:16,18

194:20 288:16
**contacted**
263:16
**contacts** 15:9
15:22
**contamination**
11:9,12,24,25
12:13,22 13:9
18:25 19:11,23
188:3
**contemplated**
259:17 260:9
262:6
**content** 60:9
62:10
**contention**
119:15 232:19
233:1
**context** 59:4
155:13 192:7
**contingent**
189:12 190:10
**continue** 34:19
43:17 51:7
54:20 119:19
121:16 219:24
220:4
**continued** 4:1
**contract** 243:9
243:14 245:15
256:3
**contribute**
196:18
**contributed**
193:19 194:8

197:17
**contribution**
194:13
**control** 55:11
126:5
**controlling**
101:11
**conversation**
6:2 117:23
118:3 201:22
201:24 202:4,6
228:23 298:16
**conversations**
7:1 100:5
268:24
**convey** 158:8
285:1,7
**convince**
177:11
**convincing**
176:22
**cooperate**
257:22
**copy** 44:15
64:1,3 72:11
94:16,19 278:4
**core** 112:1
**cork** 81:12,14
82:4,6 116:22
117:2,3,4
118:6 298:12
298:15,17
**corner** 49:16
49:18

**corps** 130:20
132:20
**correct** 5:11
7:22 8:20 9:9
9:10 10:4,7,13
10:17 11:14
12:3 14:1,2,6
14:10,14,17
15:3,24 16:4
16:12 20:14,15
23:10,11,20,22
24:4 26:13
27:6,11,12
28:3,18 29:21
30:9 35:22
36:3,11 37:15
38:19,24 39:17
39:22,25 41:14
41:15 42:9,10
45:15,18,19
46:16,20 48:7
48:10,18 52:14
54:7 55:6,7,12
57:24 58:9
59:16 62:4
65:19,20 66:7
67:8,25 68:20
69:12 70:21,24
71:3,12 75:19
75:20 76:25
77:1,12,13,20
79:1,6 80:21
82:13,17 83:6
83:25 86:15
87:1,9 88:10

88:13 89:20
90:6 92:23
93:12,13 94:3
97:16 98:7,12
98:23 99:3
104:6 105:10
105:13 106:17
111:4,5 112:2
115:14 117:6
118:14,18
123:21 124:21
129:1,18
132:23 133:9
133:17 134:17
134:21 135:16
135:17 138:5
138:14 140:8
140:12 141:18
143:7 147:11
148:2,22 151:3
151:17 153:14
154:6 155:17
156:2,4 157:6
157:10,17
162:24 166:5,6
166:14 171:23
173:3,14 175:9
175:15,16,18
175:19,20,24
176:8,18 179:9
179:11 182:11
182:15 183:14
184:8,20
185:21 187:6
188:25 189:19

[correct - danielle]                                                    Page 17

189:20 190:11
191:12 192:13
199:6,18 200:5
202:10 203:1
203:15,24
204:7 205:4,6
205:13 209:22
209:23 213:13
214:9 216:8,13
217:10,24
220:20 222:9
223:9 227:20
228:2,11,12
229:19 239:8
242:10,18,24
245:12,18
251:18 252:4
252:11 253:15
255:20 256:15
257:15 260:17
263:25 264:8
264:11 267:7
269:25 278:21
290:13 291:4
295:1,7 299:17
299:19 300:6
**corrected** 179:6
**correcting**
179:11
**correctly** 15:19
**cost** 77:16
**costs** 74:8
259:19
**council** 3:13,16
3:23 4:6,21

37:7 39:2 41:5
52:12,13 61:14
61:18 63:13
111:8 130:15
243:5 286:15
292:15
**councilwoman**
7:25 53:8,9
56:22 57:9,15
142:5
**counsel** 4:24
93:12 120:10
120:15 255:1,5
259:23 278:19
278:20,24,24
279:1 301:14
301:16
**county** 88:7
189:13
**couple** 93:25
141:5 142:3
253:24 272:10
**course** 18:1
29:18 63:8
67:14 165:14
205:15 284:5
284:25
**court** 1:1,14
5:8 27:10,14
32:19,20 41:18
55:2,12 56:9
56:18,25 58:5
70:23 71:8,8
86:15 87:4
93:3 95:10

97:13 101:24
107:14 109:23
110:1 113:19
114:15,15,20
115:20 118:24
119:2,10,22
120:3 121:9,18
122:1,18 123:8
124:13 127:9
127:11 129:4
134:16 170:21
177:7 216:5
258:8,21
259:13,15
261:10,15
262:5 268:18
269:13 272:17
272:22 273:21
276:13 281:15
301:3
**court's** 75:18
128:25 129:16
215:17
**cowan** 2:19
90:7,17,17,22
92:13,16
**cram** 259:16
**create** 26:18
35:8 67:7
257:15 290:8
291:6,8,14
**created** 35:16
36:6 37:12
39:11 290:12
291:11,13

**creating** 6:6
79:6 213:12
**creation** 38:24
80:16 167:13
**cries** 169:12
**criteria** 18:3,8
18:12 282:4
**critic** 161:7,9
**critical** 198:16
198:23
**crowd** 223:11
**cummis** 1:16
2:2 5:5
**curtain** 239:13
**customary**
188:21
**cut** 163:23,24
164:4,6 165:10
165:13 253:7
**cutting** 165:23
211:5,8
**cv** 1:2
**cycle** 285:24
286:17,19,22
286:23,23

**d**

**d** 209:24
285:20 291:20
**dais** 232:4
**danielle** 1:6,8
2:15 3:3 5:1
65:9 73:18
74:9 102:1
136:16 218:25
226:14 278:3

300:12 301:6
302:2,3,21
**date** 26:20 77:3
86:23 110:13
115:6 122:10
124:3 127:7
159:21 173:21
178:14,18,20
178:22 179:2,9
179:13 189:25
190:5 211:25
212:4,7,11
241:7 255:15
255:16 297:4
301:12 302:3
**dated** 4:9,11,22
39:14 69:5
172:16
**dates** 52:20
179:3
**daughter**
117:25 118:1
**day** 23:5 42:21
81:15,15 82:5
82:7 142:10
154:24 155:13
167:22 284:17
300:19 302:22
**days** 140:18
**dd** 3:9,10,11,12
3:13,14,16,17
3:19,20,21,22
3:24 4:3,4,5,7,8
4:9,11,12,14,15
4:16,17,18,19

4:21,22 21:15
21:16,17,18
33:9,19 39:8
39:14 40:9,10
40:15,16 41:3
41:4 48:3,5
52:10,17 60:23
60:24 69:3,4
87:13,15,18
93:9 94:24
95:1 104:25
110:7,18 114:3
114:4,7,10
125:1,2 127:4
127:15 130:12
141:11 159:17
159:18 172:14
172:15 174:22
178:10,11
180:5 191:7
209:25 210:1
211:20 241:3,4
258:24 268:10
268:11 271:12
288:25 289:1
291:17
**deadline**
132:20
**deal** 11:8 12:2
12:14 28:11,14
56:17 65:6
108:14 120:11
**dealing** 12:11
210:18

**deals** 11:23
**dealt** 11:13,14
63:22 65:15
190:9 193:16
195:8 295:15
**debris** 239:13
239:15
**december**
52:12,22 61:1
61:17 124:4,5
127:12,16
128:1 130:13
131:22 132:5
133:2 134:1
138:12 140:1,4
169:16 172:9
172:16 173:13
173:13 175:3
178:11,15
180:17 268:12
289:2
**decide** 14:4,8
244:17 250:8
**decided** 142:6
**decides** 183:8
**deciding** 55:12
**decision** 3:9
21:2,5,13,23
22:1,9 32:22
56:10,24 57:16
57:24 58:1,3
163:7 198:8,9
205:12 246:10
246:12

**decisions** 9:16
9:19 136:23
163:5 201:8
**declaration**
95:5
**declaratory**
88:8 93:19
95:8
**declining** 92:3
**decotiis** 3:20
87:19
**decrease**
132:17
**decreased**
53:16
**dedicate**
130:15
**dedicating**
139:2
**deed** 104:9
**defend** 30:6
**defendants** 1:9
2:11
**deficiencies**
25:11 26:13
**deficiency**
31:18,20,21
**definition**
75:10
**delay** 24:14,23
253:7 257:15
262:12,23
264:4,6
**delays** 95:13

| | | | |
|---|---|---|---|
| **della** 116:9 | **denying** 142:21 | 216:22 285:3 | **develop** 49:2 |
| **democrat** | 143:6,19 194:8 | **describing** 23:9 | 80:20 170:2 |
| 285:25 | 288:22 | 216:21 | 214:21 |
| **dense** 70:5,8 | **deorio** 285:21 | **description** 3:8 | **developed** 71:6 |
| 112:6 166:13 | **dep** 10:7 11:5,7 | 4:2 49:13,14 | 176:6 |
| 214:2,6 | 11:13,21,23 | 52:23 | **developer** |
| **density** 66:5 | 12:2,11,21 | **descriptions** | 48:17,19 66:12 |
| 67:7 68:5 | 13:4,6,8,22 | 46:10 | 67:16 68:10 |
| 84:20,24 85:3 | 14:5,10 15:3 | **designated** | 80:3 99:3 |
| 85:15,15,18 | 15:10,11,21 | 37:4 | 216:6,24 217:3 |
| 86:1,3,8 105:2 | 16:3,7,11,24,24 | **designating** | 217:15,16,22 |
| 105:11,14,23 | 17:1 189:14,18 | 61:18 | 230:16,18 |
| 111:22 113:8 | 190:10 | **designed** 38:10 | 231:1 258:8 |
| 147:24 148:3 | **department** | **desire** 290:8 | 266:5 288:1 |
| 148:23 156:19 | 10:3,16 11:20 | **desirous** 49:5 | 292:24 293:14 |
| 162:6 177:2 | 240:3,11,16 | **destiny** 55:11 | 297:17 |
| 213:11,12,22 | **depend** 17:4 | **details** 293:4 | **developer's** |
| 213:24 214:16 | **depends** 17:3 | **determination** | 68:1 |
| 215:6 216:4,6 | **deposed** 5:13 | 14:10 78:22 | **developers** |
| 216:12,13,17 | 5:14 140:20 | 83:15 86:14 | 48:14 289:13 |
| 216:23 217:2 | **deposition** 1:5 | 114:20 120:4 | 289:17 |
| 217:15,19 | 6:10,14,19,23 | **determine** 18:4 | **development** |
| **deny** 31:2,7 | 7:13 23:4 66:3 | 37:22 83:4,11 | 37:3 70:4 97:6 |
| 36:13,17,18,20 | 66:22 70:4 | 94:6 205:3 | 128:2 134:16 |
| 57:10 58:13,15 | 81:8,23 102:4 | 206:1 226:10 | 147:5 150:15 |
| 60:3 82:4 94:9 | 113:4 130:3 | 226:16,22 | 153:5 155:4 |
| 142:14,17 | 139:23 163:25 | 228:15,18 | 157:22 161:17 |
| 143:13,15 | 164:7 179:24 | 230:3 282:3 | 162:12 168:6 |
| 144:10,13,19 | 190:25 237:1 | **determined** | 169:20 177:9 |
| 144:21,23,25 | 244:21 299:25 | 80:13 253:12 | 181:5,19 |
| 154:10,14,17 | 300:5 302:3 | **determines** | 182:10,20 |
| 160:18 214:23 | **describe** 49:19 | 76:23 | 213:6 214:16 |
| 225:7 246:23 | **described** | **detrimental** | 215:6 220:9 |
| 247:2,8 257:2 | 23:13 96:19 | 259:18 260:10 | 221:11 262:7 |
| | 97:8 148:19 | | 273:12 285:1,6 |

[development - donuts]                                          Page 20

286:6 287:1
**deviated**  206:2
**di**  1:6 3:3 5:1
 300:12 301:6
**difference**
 72:18,20,24,25
 73:2,7
**different**  7:4
 23:7 47:12
 57:22 58:3
 61:24 97:13
 134:5 140:22
 149:3 154:8
 201:5 203:3,25
 216:22 232:13
 279:14 290:18
 299:8
**difficulty**  6:6
**dipaola**  1:8
 2:15 5:4 53:8,9
 56:23 57:10,15
 102:1 136:16
 142:5 150:13
 155:5 180:14
 180:21 189:9
 210:19,20
 211:3 219:1
 226:14 244:19
 245:25 252:5,7
 289:23 302:2,3
 302:21
**direction**  142:7
 146:10,13,16
 146:25 147:4,9
 147:14,21

148:21 167:24
195:16 254:22
**directives**
 51:10
**directly**  146:5
 155:12 255:4
**disagree**  79:9
 79:10 149:18
**disagreed**
 205:14
**disclose**  254:22
 254:25 255:5
 278:23 282:20
**disclosed**
 259:23
**discover**  113:5
**discuss**  114:9
 207:12 208:5
 224:11,13,16
 290:3
**discussed**  27:3
 130:19 162:23
 171:4 213:11
 217:24 223:24
 246:6,24
 247:23,25
 249:11 254:10
 265:18 270:4
 270:24 290:11
 293:13 295:23
 296:1 297:21
 298:1,4,6,23
 299:17
**discussing**
 102:7 115:22

130:7 220:19
**discussion**  54:1
 76:9 127:19
 131:5 150:12
 211:6,17 238:9
 246:12,13,15
 295:8,19
 297:17 299:24
**discussions**
 76:2 88:15,18
 99:11,16 100:3
 100:9 102:9
 126:22 127:22
 192:15 203:13
 203:17,18
 204:12,14
 225:4 238:13
 246:9,18 255:1
 269:1 270:16
 274:15
**dispensation**
 169:3
**dispute**  110:20
 253:1
**district**  1:1,1
 5:8 61:2
**docket**  93:15
**doctrine**  95:6
**document**  25:9
 39:20 44:19,22
 50:11 62:2,3
 63:24 64:20,24
 65:5,6,10
 69:11,24 70:2
 71:16 74:13

77:24,25 78:4
110:18 172:13
172:18 173:1
174:4,5 260:1
292:8,12
**documentary**
 119:4
**documents**  7:3
 7:9 87:21
 179:4
**doing**  40:24
 77:22 133:5
 163:23 164:16
 165:15 169:9
 223:6 249:22
 264:6 266:25
 284:24
**dollars**  274:19
**dolores**  116:9
 117:25 118:1,4
 118:10
**domain**  75:15
 76:16,19 77:3
 77:6,9,17,17
 78:7,15,17
 79:4,8 80:18
 84:15 85:18
 86:4 111:24
 112:12 113:9
 155:5,9,15,16
 155:19,21,25
 162:6 206:24
**donuts**  246:2,6
 249:14 250:20
 256:24 270:5

**[donuts - emerson]**                                                                Page 21

276:6
**door**  68:14
  167:7,7,10,10
  284:18,19
**doors**  284:19
**double**  10:14
**doubt**  38:5
  124:2 161:20
  178:21 182:8
**downtown**  38:8
  66:1 85:20
  142:9 147:5,23
  147:25 150:15
  153:5,21,25
  154:3 155:7
  156:8,21,22,25
  157:5,15,20,24
  158:1,7,23
  159:11 163:6,8
  170:2 177:5
  181:5,19
  182:11 183:6
  184:2 199:1
  220:10 221:16
  222:4,7,13
**doyle**  53:10,17
  54:23,24 55:5
  56:8 58:5
  289:6,15
**draft**  200:25
  201:17
**drafted**  202:20
  203:3,11,14
**drainage**
  219:25

**drawing**  78:2
  177:4
**dream**  169:21
  169:22,23
  170:1,3,4,19
**dry**  187:22
  188:10,14
**duly**  5:1 301:7
**dunkin**  246:2,6
  249:14 250:20
  256:24 270:5
  276:6
**duty**  170:19
**dwellings**  37:5
  37:6
**dzikowski**
  285:14,16

| e |
|---|

**e**  2:1,1,13 191:4
  291:20,20
  293:5 295:12
  295:12,14
**e026**  141:7
**e13**  52:8
**e196**  241:2
**e293**  40:25
**e32**  130:10
**e42**  191:3
**e53**  209:19
**e58**  211:19
**earlier**  52:1
  138:23 151:13
  182:3,4 219:14
  297:2

**early**  140:5
**easier**  39:7
**east**  53:20
**educate**  33:25
**effect**  131:15
  215:18,25
  273:11
**effort**  35:1
  260:5 261:25
**efforts**  223:21
  223:23 230:16
  230:18 259:6
**eight**  37:10
**either**  24:4 35:6
  54:25 115:17
  153:3 165:16
  238:16 288:23
**elect**  180:14,21
  289:23
**elected**  126:14
  132:5 140:8
  181:17 190:13
  201:6,8 219:15
  222:23 226:14
  284:11
**election**  99:2
  132:25 140:4,7
  141:13,18
  160:16 162:1
  181:2,3,11,18
  182:18 284:13
  284:22
**electorate**
  284:25

**element**  4:4
  25:7,23 26:19
  97:9 124:20
  125:2 127:18
  268:16 285:10
**elements**
  161:10
**eleven**  221:21
**eliminate**  163:9
**eliminating**
  97:12
**emer**  295:11
**emerg**  295:12
**emergency**
  11:20 294:4
  295:9,15
**emerson**  1:4,7
  3:13,16,22 4:5
  4:14,21 5:6,9
  5:10 7:21 8:3
  9:17,21,24
  11:14 12:21
  13:10,12,14,16
  14:1,12 19:5
  20:7,18 21:24
  22:10,22 23:10
  23:17 24:2,13
  24:22 25:6,10
  25:15 26:3,11
  26:18 27:8
  30:10 32:10,19
  33:11 34:1
  35:16 36:8
  37:1,14 38:1
  38:22 39:12,12

| | | | |
|---|---|---|---|
| 40:11 41:5,18 | 242:3 245:24 | 79:4,7 80:18 | 201:17,20 |
| 42:9 48:22 | 248:13,18,20 | 84:15 85:17 | 208:7 224:14 |
| 55:11 69:5 | 249:6 252:7 | 86:4 111:24 | 224:16 227:24 |
| 75:18 77:5 | 254:8,12 | 112:12 113:9 | 229:15 |
| 79:21 82:15 | 255:17 257:22 | 155:5,9,15,16 | **engineering** |
| 83:4,11 87:1,3 | 257:25 258:7 | 155:18,21,25 | 4:11 14:18 |
| 87:9 88:6,7 | 258:21 259:9 | 162:6 206:24 | 171:22 175:2 |
| 93:12,15,19 | 259:18,21 | **employ** 14:18 | 193:8 198:10 |
| 94:7 95:4,18 | 260:5,10,11,14 | **employed** | **engineers** |
| 95:24 103:4,9 | 260:22 261:9 | 14:13,17,22 | 108:21 227:20 |
| 104:7 107:13 | 261:15,16 | **employee** | **ensure** 150:14 |
| 111:18 113:18 | 262:10,24 | 301:14,16 | 153:4 |
| 114:13,23 | 271:6 273:11 | **enable** 25:17 | **enter** 46:7 90:7 |
| 119:23 121:11 | 273:19 274:5 | 289:17 | **entered** 28:3 |
| 122:20 125:9 | 274:11 276:3 | **enact** 22:14 | 39:11 109:19 |
| 126:6,8 128:22 | 276:11,21 | **encapsulate** | 114:12 |
| 130:16,16,18 | 277:17,19,19 | 206:17 207:1,5 | **entire** 44:19 |
| 136:19 156:4 | 279:7 280:21 | **encapsulated** | 259:11 |
| 156:18 157:24 | 280:23 281:10 | 207:8 | **entitled** 1:13 |
| 160:2,12 | 281:16 282:3 | **encloses** 87:19 | 5:8 214:8 |
| 162:10 166:11 | 285:22 286:11 | **encourages** | **entity** 188:23 |
| 167:4,8,11,23 | 289:18 302:2,2 | 37:12 | **environment** |
| 171:6,16 | **emerson's** 21:3 | **enforce** 259:11 | 9:17 11:2 |
| 172:17,17 | 27:21 29:15 | **engage** 99:11 | **environmental** |
| 176:17 177:18 | 31:6 38:10 | **engaged** 20:18 | 8:10,18,21 9:3 |
| 183:4 184:24 | 39:22 83:25 | **engagements** | 9:5,15,19 10:3 |
| 184:25 185:4 | 96:7,18 98:11 | 284:25 | 10:17,23 11:9 |
| 185:19 186:9 | 199:1 218:25 | **engineer** 14:13 | 11:12,24,25 |
| 186:17,22,24 | 247:12,18 | 14:17,19,23 | 12:12,21 13:9 |
| 187:9 191:10 | 249:10 253:23 | 171:20 172:1,4 | 13:18 14:13,16 |
| 206:8,15 | 281:19 | 175:7 193:4,7 | 14:19,23 18:25 |
| 209:13 212:19 | **eminent** 75:15 | 194:22 197:2 | 19:22 187:16 |
| 218:24 219:12 | 76:16,19 77:3 | 198:12,15 | 188:3 189:22 |
| 220:16 223:19 | 77:5,9,16,17 | 199:22 200:3 | 190:1,6 |
| 224:3,7 230:9 | 78:7,15,17 | 200:24 201:11 | |

[epic - failure]    Page 23

| | | | |
|---|---|---|---|
| epic 268:9 | examination | existing 183:18 | expressed |
| equates 213:22 | 3:4 5:3 130:6 | 184:6,15,19,21 | 197:23 287:6 |
| errata 302:1 | 273:10 301:6 | 199:23 205:2 | expressing 54:4 |
| errors 25:12 | example 7:16 | 205:25 206:18 | expression 20:7 |
| erur's 259:11 | 9:19,21 27:2 | 207:2,7 | 182:1 |
| escrow 228:22 | 167:12 284:18 | exists 10:4 | extent 77:14 |
| esq 2:2,3,8,13 | excellent | 27:21 | 105:9 147:8 |
| esque 54:13,18 | 189:10 | expect 139:22 | 278:17 |
| 54:22 | except 110:20 | expenditure | f |
| evac 298:11,12 | 111:1 287:21 | 22:15 | f 64:13 65:8,14 |
| 298:17,21 | exception 16:8 | expense 95:13 | 65:14 |
| evaluate 228:2 | exceptional | expert 215:23 | fabrication |
| evaluating | 25:14 | 215:24 | 164:16 |
| 233:24 | exclusionary | expertise 11:4 | fabulous 64:6 |
| event 47:21 | 22:11 32:23 | expires 301:23 | fact 14:12 |
| 60:17 84:4 | exclusive 11:8 | 302:25 | 22:25 56:21 |
| 115:20 127:1 | excuse 85:1 | explain 9:18 | 78:1,2 83:18 |
| 293:11 299:16 | 268:3 269:19 | 23:16 30:24 | 95:17 104:23 |
| events 130:8 | 272:25 294:7 | 118:22 | 124:18 128:25 |
| eventually | executed 45:9 | explained | 147:10,13 |
| 293:7 294:11 | execution | 115:1 238:15 | 151:13 155:20 |
| everybody | 40:21 41:11 | 275:23 | 166:4 182:1 |
| 47:22 117:9 | 45:17 102:13 | explaining 56:8 | 183:19 189:2 |
| 136:13,15 | exercise 146:2 | explanation | 206:6 214:20 |
| 218:11 | 152:14 | 275:23 | 217:9,14 233:4 |
| evidence 119:4 | exercised 99:7 | explanations | 233:14 239:14 |
| 233:6 236:21 | 128:5 | 121:2 | 242:12 252:19 |
| 269:5 | exhibit 46:12 | explore 123:15 | 257:25 262:23 |
| exact 115:6 | 68:18 97:4,5 | 231:15 243:7 | 269:13 |
| 179:2 | 236:24 292:14 | 243:10,16,18 | facts 113:5 |
| exactly 142:23 | exhibits 3:7 4:1 | 243:21 | 188:7 197:14 |
| 143:9 156:9 | 4:24 95:23 | exposure | failed 22:14 |
| 163:22 195:25 | exist 7:10 104:9 | 113:18 | 25:9 |
| 238:21 249:21 | existence | express 197:22 | failure 21:24 |
| 257:3 | 215:16 | | |

**fair** 4:4 25:7
26:5,6,19 35:9
68:17 80:13
93:20 95:7,18
97:9 103:9
114:13,22
120:24 121:21
125:3,17 128:9
128:11,13
129:18,19
134:20 161:4
170:9 275:6,8
275:19 296:7
**fairly** 298:20
**fairness** 71:3
114:21 115:21
116:2,5 117:17
117:20 118:14
122:2,17
**falling** 239:13
**falls** 12:1
**falotico** 292:4
292:15
**false** 165:3
**familiar** 10:2
34:5
**familiarize**
192:9
**far** 21:1 44:25
91:22 183:5
242:3 267:25
**fast** 170:24
266:11
**fault** 200:3

**favor** 41:17,20
41:23 42:4,12
88:19 110:20
110:22 111:4
193:10 290:24
**favored** 95:12
**fear** 54:25
241:10
**feasible** 68:16
**february**
212:10 293:6
**federal** 5:8
101:24
**feeding** 262:22
**feel** 80:22
131:16 136:24
140:17
**feeling** 177:3
201:12 242:12
**feet** 53:19
**fellow** 181:17
**felt** 68:11 79:22
81:9 82:19,20
103:19 107:7
107:19 112:5,6
121:5 132:7
133:16 138:18
146:14 197:11
231:9
**fifth** 31:16
**fighting** 242:4
**figure** 184:14
296:17
**filed** 27:8 87:1
87:3,6 88:5,8,9

92:25 95:4
260:21 261:10
**files** 89:15
**final** 3:24 114:5
120:3
**finally** 25:18
136:10 293:7
**financially**
301:17
**find** 108:22
145:9 211:4
275:2,22
294:11
**finding** 22:18
24:3 122:2
139:23
**findings** 25:20
271:20
**fine** 66:23
173:11 180:10
278:10,13,15
280:9
**finish** 19:20
28:13 30:1,1,2
34:14 42:20
59:15 76:5
104:24 105:24
109:4 111:13
111:16 112:24
133:24 137:1,5
137:8,11
144:12 146:19
148:11 156:15
158:3,20
163:10 185:13

**finished** 163:12
163:14,19,20
**finishing** 34:15
**fiorenzo** 2:2 3:4
5:3,5 12:25
15:17 21:13,18
21:20 24:8
31:24 32:22
33:14,19 34:16
34:23 35:4
39:4 40:8,14
40:16,23 41:24
43:8,10,14,19
43:22 44:11,13
44:17,20,21
45:4 46:24
47:2 48:1
49:23 52:8,18
52:22 55:20
56:1 60:5
62:23 63:3
64:1 66:21,24
67:1 68:25
69:14 72:10
73:5 74:2,11
74:19 76:12
84:6 87:11,14
87:17,22 88:1
90:3,13,15,19
90:22,24 91:1
91:6,8,10,12,15
91:21 92:3,8
92:11,14,17,21
93:7 94:16,20
94:24 96:4,15

**[fiorenzo - form]**                                                    Page 25

| | | | |
|---|---|---|---|
| 100:23 101:1,6 | 271:10,13,15 | **fitting** 177:5 | **foregoing** |
| 101:11,15,20 | 271:18 278:6,9 | **five** 37:11 | 300:5 301:9 |
| 101:24 102:5,6 | 278:12,15 | 53:25 111:7 | **forget** 30:17 |
| 102:13 109:12 | 280:9 284:10 | 149:23 168:16 | 269:9 |
| 109:16 110:6,8 | 284:13 289:3 | 168:16 190:21 | **forgione's** |
| 110:12 112:25 | 292:11,23 | 206:16 236:3 | 48:19,21,23 |
| 114:1 118:20 | 294:5 297:1 | 236:14 257:20 | 290:2 |
| 119:7,19 | 299:22 | 275:20 | **form** 10:8 |
| 121:16 122:10 | **fire** 11:20 | **fix** 284:8 | 11:15 15:7 |
| 127:7,10,13 | 125:24 126:2 | **fixed** 97:11 | 16:18 17:10 |
| 129:21 130:4,6 | 126:15 | **fixing** 97:13 | 18:11 22:20 |
| 130:10 131:7 | **fired** 125:10,11 | 113:17 120:4 | 23:21 24:5 |
| 137:6,9 138:22 | 125:13,15,22 | **flannery** 290:2 | 25:21 26:14,21 |
| 141:6 142:1 | **firm** 3:20 14:18 | **floor** 66:14 | 28:15,19,23 |
| 149:12,17 | 87:19 | 68:4,14 | 29:9,22 30:13 |
| 150:2,4,10 | **first** 3:14 11:19 | **fly** 194:6 | 30:23 31:9 |
| 154:19 160:23 | 23:24 40:21 | **focus** 13:15 | 33:12 36:15 |
| 161:6 164:22 | 41:1 45:5,11 | **focused** 184:3,4 | 41:21,22 42:14 |
| 165:1,14,17,21 | 45:18 46:1,7 | 220:22 | 46:11 55:13 |
| 167:19 171:18 | 47:17 48:5,6 | **follow** 16:13 | 56:6 57:3,6,19 |
| 172:12 173:24 | 51:8,22 52:5 | 55:2 56:9 58:6 | 60:19 62:15 |
| 178:8 180:6 | 57:10 59:11 | 143:1 205:20 | 63:16 67:24 |
| 183:24 187:13 | 74:20 78:11 | **following** 43:21 | 68:7 71:13 |
| 189:7 190:22 | 85:5 88:3 | 73:5 80:3 | 74:23 82:10 |
| 191:1,5 209:18 | 90:17 92:15,16 | 187:20 191:11 | 112:3 117:18 |
| 210:2,5,17 | 93:17 95:1,2 | 222:11 259:10 | 120:21 126:19 |
| 211:12,18,24 | 116:6 140:19 | **follows** 5:2 | 129:3 145:1,13 |
| 212:2,6,11,15 | 191:18 192:1 | 97:7 | 151:22 152:23 |
| 219:19 220:4 | 204:10 208:12 | **foot** 53:24,25 | 153:9 156:3 |
| 237:2,4 241:2 | 218:4 219:1 | **footprint** | 169:24 170:11 |
| 241:6,15,19 | 222:22 223:11 | 267:20 | 171:1 172:5,23 |
| 245:5 255:13 | 231:9 252:1,2 | **force** 129:9 | 177:23 178:3 |
| 258:23,25 | 284:9 293:13 | **forefront** | 181:25 182:16 |
| 259:8 261:24 | **fit** 85:20 | 176:13 | 193:25 194:4 |
| 268:8 270:18 | | | 194:11,17 |

[form - generally]                                                    Page 26

| | | | |
|---|---|---|---|
| 199:12 201:2,9 | **former** 22:23 | 200:10 | **funds** 22:16 |
| 202:22 205:24 | **forth** 46:11 | **frame** 125:13 | **funny** 72:15 |
| 212:21 213:14 | 156:19 168:14 | **franklin** 2:9 | 236:15,19 |
| 213:15 214:10 | 301:12 | **friendlier** | **further** 22:14 |
| 214:17,19,25 | **forty** 191:4 | 220:9 | 27:9 122:20 |
| 216:14 217:11 | **forward** 24:23 | **friends** 81:10 | 155:2 168:1,5 |
| 221:1 225:15 | 26:12,18 | 81:11,13,24,25 | 212:13 264:4 |
| 228:3 229:12 | 132:12 155:6 | **front** 18:23 | 301:9,13 |
| 229:17 244:12 | 156:6 169:13 | 70:2 71:20,25 | **futile** 243:19 |
| 245:13 247:10 | 170:8,18,22 | 72:4,22 104:18 | **future** 26:4 |
| 247:14 255:25 | 171:3,12 | 114:15 127:15 | 131:12,18,23 |
| 256:8 257:1,7 | 177:12 260:15 | 181:21 247:15 | 132:1,8 133:4 |
| 257:16,24 | 266:5 285:2 | **fshc** 95:8 | 187:24 |
| 258:3 259:22 | 297:18 | **fulfill** 24:17,24 | |
| 260:12 261:3,5 | **found** 23:17 | 29:6 41:17 | **g** |
| 262:13,16 | 80:17 119:22 | 80:23 108:10 | **g** 271:14,15 |
| 263:1,8 264:5 | 121:20 211:3 | 114:23 121:11 | 295:12 |
| 265:12 266:13 | **foundation** | 122:21 129:10 | **game** 149:20,21 |
| 266:19 269:21 | 292:7 | 176:17 | 149:22 165:24 |
| 270:7,9 272:13 | **four** 13:21 54:5 | **fulfillment** | 165:25,25 |
| 273:3 274:3,7 | 65:19 66:4 | 98:12 185:11 | **games** 137:9 |
| 274:22 275:5,7 | 69:23 85:24 | **full** 34:10 42:25 | **gannaio** 4:18 |
| 275:9 276:9 | 113:9 150:16 | 43:1,5,24 | 259:1 |
| 277:4 278:10 | 151:16,18 | **fully** 5:22,25 | **gary** 171:21 |
| 278:13,14 | 153:6,16,19,22 | 97:8 102:23 | **gas** 221:21 |
| 279:10 280:7 | 153:24 154:4 | **fun** 48:4 180:4 | **gate** 239:12 |
| 281:1,4 287:14 | 163:9 210:24 | 210:14 211:15 | **general** 155:24 |
| 290:14 291:1 | **fourth** 46:5 | **function** 9:14 | 220:21 239:17 |
| 292:6 293:2 | 53:12,16 54:8 | 10:25 12:14 | **generality** |
| 294:19 295:2 | 66:11,14 67:15 | 201:1,10 | 159:15 |
| 299:18 | 68:8,14,23 | 229:19 230:1,3 | **generally** 16:10 |
| **formally** | 70:7 85:23,24 | 230:7 | 17:17 30:17 |
| 258:21 | 105:3 111:22 | **functions** 10:7 | 42:1,3,15,17 |
| **formed** 290:16 | 112:6 142:3 | 10:16 11:5 | 62:21 63:6,17 |
| | 162:5 177:2 | 13:4 | 73:9 82:14 |
| | | | 84:10 147:14 |

148:20 152:2,3
155:20 212:10
293:24

**generations**
183:11

**gentleman**
90:16

**gerald** 292:15

**gerry** 291:25
292:3

**getting** 44:11
44:13 125:18
125:20 168:19
238:17 250:10

**gf** 292:2

**gibberish** 299:1
299:3

**giblin** 4:18
208:1,2 259:1

**give** 5:20 6:3
9:19,21 62:19
64:2,3 72:11
94:16 108:7,12
108:16 111:19
135:11 206:16
215:24 239:20
239:22 244:1
254:3,21 267:8
282:17

**given** 44:24
51:16 188:17
216:24 217:15
226:7 230:16
266:5

**gives** 169:3
213:12 216:13

**giving** 44:23
134:13 164:6
174:11 179:9
190:10 220:16
275:12

**glad** 44:9 48:4
218:7

**go** 35:23 40:25
41:6 45:4
49:23 51:7
54:12 63:19
72:10 76:10
81:4,14 84:7
85:13 88:4
92:21 95:1
96:4 100:19
101:13,18
115:14 117:1
121:17 129:23
130:4 137:16
138:22 146:2,7
149:24 150:10
152:13 156:16
157:13 160:23
161:6 167:18
169:13 177:4
178:24 180:6,7
180:12 182:2
183:3,16
184:23 187:8
191:1 204:19
208:16 218:4
218:25 237:2

251:6,10 256:2
256:25 266:25
268:2,9 269:9
271:17 274:13
275:3 277:19
280:22 284:18
292:23 297:1,2

**goals** 207:12

**god** 152:22
227:16

**goes** 37:13
51:11 75:8
99:6 128:10
150:11 155:2
161:24 211:2
219:7,7

**going** 5:20,24
16:3,12 17:2
17:12,15,20
18:10 21:20
30:1 44:18
52:16 59:21
64:17 65:1
67:21 70:7
84:9 86:25
87:7 91:22
98:6 100:19,24
101:4,9 105:3
109:5 111:17
112:14 114:7
115:5,6,11
119:25 120:18
120:25 123:3
132:12 135:13
142:7 145:17

146:10,13,17
146:25 147:5
147:10,22
149:5 154:25
159:9 164:10
175:21 177:7
177:14 183:6
183:12 191:7
194:5 200:16
210:13,14
219:24 236:2
245:3,16 249:1
254:3,7,21
256:19,21
257:17 258:1
263:17 266:10
266:12,15,16
266:17,22
269:9 271:5
275:19 277:1
277:13 278:15
278:22 291:16
291:21 297:20

**good** 5:4 34:22
44:8 72:15
89:5,7 120:11
129:22 154:23
161:5 169:6
172:4 184:24
201:19 205:1
218:11 258:14
271:19 299:4

**gordon** 181:3
210:19,21

[gotten - health]                                                      Page 28

**gotten** 118:9
219:23 265:8
267:24
**governing** 7:20
8:24 9:8 12:10
21:8 27:1 28:6
28:10 29:7,21
30:22 31:3
33:7,24 35:7
53:22 54:25
59:10 68:3
73:10 80:17
83:10 88:12
94:6 102:10,17
103:19 107:7
107:18 108:20
118:22 122:24
131:10,11
133:3,9 167:25
183:8 193:10
195:13 201:18
201:22,25
203:19 205:9
205:13 216:19
232:5 250:25
251:6,11 252:4
252:15,21,25
282:10,12,13
282:23 289:6
289:19,22
**government**
8:3 9:20 126:5
126:7 131:14
**governmental**
188:23

**grandstanding**
275:12,21
**grant** 250:7
**granting**
253:13
**grants** 220:1
225:20
**great** 6:5,9 34:5
64:7 110:24
111:3 161:2
215:23 222:16
236:11 282:1
**greater** 68:5
216:23 217:2
217:15,19
218:15 244:20
**gross** 1:16 2:2
5:6
**ground** 188:13
**group** 210:15
**guess** 12:6 36:4
38:4,5 62:5
71:1 86:7,16
100:1 103:14
103:15,19,23
104:21 106:9
107:5,7,9
112:4 119:1
123:22 129:19
134:18 141:19
152:9 161:14
161:15,23,24
176:20 178:17
178:19 185:12
190:17 206:3

218:19 219:14
220:3,12,17
233:6 239:24
240:5 245:19
266:8,9,14
270:1 272:14
292:3 293:17
294:2 299:3
**guide** 201:13
**guys** 182:20
190:23

## h

**h** 121:17
**half** 8:15
**hall** 16:6
292:20
**handed** 174:24
**handedly** 126:2
**handle** 15:12
**handled** 225:14
**handling** 57:18
**hands** 131:11
131:17,22
132:1,8,22
133:4,21
137:25
**handwriting**
292:8 294:10
298:9
**hang** 181:1
**happen** 19:4
78:3 136:1
137:14 145:4
157:24 163:1
223:3

**happened**
52:24 61:11
84:3 132:25
145:11,23
207:17 210:5
250:5 252:13
252:22,23
264:2 271:18
288:22 295:21
**happening** 55:9
209:9
**happens** 32:18
299:14
**happy** 31:19
39:20 44:8
215:24 242:17
242:21
**hard** 62:18
64:1,3 72:11
94:16,19
147:17 167:16
210:22
**harris** 3:9 21:2
21:5,22 22:1,9
22:19 23:1,24
24:12,22 25:5
25:19 28:3
35:2 36:8
**hasidic** 287:1,4
**head** 13:1
131:1 139:12
**heading** 54:19
223:20
**health** 187:24
190:11

| | | | |
|---|---|---|---|
| **hear** 44:3,8,10 | 200:2,8,11,16 | 131:7 159:14 | **hours** 101:5,9 |
| 106:11 175:21 | 203:23 204:5 | **hire** 126:13 | **house** 109:18 |
| 244:13 251:5 | 204:22 | 227:19 | **households** |
| 251:10,17,18 | **held** 1:16 61:7 | **hired** 126:18,25 | 95:15 |
| 252:3,10,17,20 | 135:21 136:2 | 209:16 240:4,8 | **housing** 4:4 |
| 262:24 263:11 | **help** 19:25 | **history** 23:10 | 20:19 22:13,16 |
| 263:23,25 | 27:11 39:7 | 61:23,23 | 22:17 25:7,23 |
| **heard** 36:1 | 46:1 64:7 | 225:17 | 26:2,6,7,19 |
| 119:3,10 | 179:16 187:18 | **hit** 232:21 | 29:16 35:9,9 |
| 175:17 189:9 | 219:2 222:4 | 233:21,22 | 35:17 36:22 |
| 263:6,7,19 | 242:23,25 | **hitting** 231:10 | 37:8,9,10,11,13 |
| **hearing** 52:24 | 243:1,5,6,8,11 | 231:17 233:12 | 38:3,11,23 |
| 54:18 71:2,3 | 243:12,22 | 233:16,20 | 39:22 40:20 |
| 114:15,21 | 245:14 269:16 | 234:6,10,12,16 | 41:19 42:9 |
| 115:5,6,12,21 | 288:17 | 234:18,24 | 45:10 55:4,10 |
| 116:3,5 117:14 | **helping** 200:15 | 235:18,20 | 56:11,19 58:7 |
| 117:17,20 | **hereinbefore** | 236:4,9 | 68:6,11 71:7 |
| 118:14 119:2 | 301:12 | **hoff** 290:2 | 75:5,10,17,22 |
| 120:3,11 | **hereto** 46:11 | **hoffman** 181:3 | 80:23 81:1 |
| 121:19 122:17 | **hermansen** | 210:19,21 | 83:5,13,20 |
| 123:12,18 | 7:17 238:6,8 | **hold** 114:6 | 84:12 95:7,18 |
| 124:8 127:19 | 238:10,14,20 | 133:3,5 135:17 | 96:7,19 97:8 |
| 138:12 171:4 | **high** 65:24,25 | 146:19 257:11 | 97:16 98:6,11 |
| 175:8,25 | 166:13 206:6 | 278:3 280:6,6 | 103:9 105:10 |
| 178:16 180:17 | **higher** 68:14 | **homes** 95:14 | 106:7 114:13 |
| 187:16,20 | 113:19 186:17 | **honest** 181:12 | 114:19 119:14 |
| 191:11 270:20 | 186:24 213:10 | 181:14,20 | 120:5,19 |
| **hearing's** 44:14 | 213:12,22 | 182:23 223:8 | 121:25 122:22 |
| **hearings** 52:2 | 216:4,16 | **honestly** 84:1 | 123:4 124:20 |
| 61:7 | **highlight** 24:9 | 137:12 148:16 | 125:2 127:18 |
| **height** 53:18 | 76:13 119:7 | 247:1 297:19 | 128:9 129:11 |
| 63:12,23 65:7 | 180:9 189:7 | **hopper** 182:13 | 157:4 170:9 |
| 65:16 86:8 | 219:21 259:8 | **horse** 242:6 | 176:7 177:20 |
| 148:4,24 | **highlighted** | **hour** 135:20 | 185:1,3,9,10 |
| 198:25 199:5,5 | 37:2 64:12 | | 187:23 212:19 |

**[housing - inspectors]**                                                    Page 30

212:23 213:1,5
213:6,23
214:22,23
215:22 216:7
216:25 217:4
219:9,12 242:2
245:23 248:19
268:16 270:21
270:23 272:6
**hum** 86:9 140:6
188:19 192:14
199:7 206:21
221:17 253:16
271:23
**hundred**
132:19,19
165:16 183:7
183:11
**hundreds**
274:19
**husband** 118:3
**hypothetical**
279:11 280:7

**i**

**idea** 12:17 22:3
89:5,7 138:1
155:3 203:12
222:21 227:16
287:20
**identified** 36:7
119:23 273:23
274:6,11 275:1
279:3
**identify** 135:10
268:21 274:12

295:19,20
**identifying**
274:16
**ii** 25:10,15,18
**impact** 215:7
**impede** 273:14
**impeding**
273:12
**implement**
124:12 176:5
198:21
**implementati...**
49:8 253:6,14
**implemented**
14:5
**important** 5:21
34:1
**impose** 56:18
57:1
**imposed**
113:19
**impressed**
218:9
**impression**
53:12
**improper** 269:5
**inappropriate**
137:16 234:17
235:3 236:12
**include** 108:5
267:14
**included** 47:15
53:10 75:15,16
105:17 106:20
112:1 134:19

213:9 268:24
289:22
**includes** 105:9
**including** 24:15
46:13 47:4
77:16 94:6
104:1 106:13
119:6,12
188:24 192:23
199:17 219:3
272:3 273:18
276:12 285:10
**inclusion** 47:7
106:6
**income** 55:3
58:7 95:15
119:15 121:22
121:25
**incoming**
132:22,23
177:13
**inconceivable**
232:14
**incorporate**
85:4
**incorporated**
245:23
**incorrect** 11:18
**increased**
132:14
**increases** 86:8
**index** 3:1
**indicate** 295:18
**indicates**
127:16

**individuals**
287:7
**inexorbitant**
235:14
**inexplicable**
275:24
**inferring** 58:1
**influence** 126:7
126:12,17,20
**information**
7:3 42:2,16
43:3 175:1
278:19
**informed** 64:18
**infrastructure**
132:18
**inherited** 118:2
**initial** 250:2
**initially** 250:14
**initials** 294:23
294:25
**initiate** 80:4,10
288:2
**inject** 229:14
**input** 290:5
**inquire** 13:8
18:13,16
**insert** 229:25
**inside** 212:13
**inspect** 266:25
**inspector**
266:20
**inspectors**
266:24

**instance**  17:12
42:22 62:1
155:17,19
**instances**
106:10
**institute**  287:24
**instituted**  87:9
**institution**
88:20,22 99:15
100:10
**instruction**
5:21,25 164:6
254:4
**instructions**
5:15,16
**instruments**
126:5,7,10
**integral**  128:11
128:12,21
129:17
**intend**  222:18
**intended**  35:8
35:16 39:19
40:19 41:17
42:8 58:18
84:12 264:11
**intent**  39:23
49:12 75:4
**intention**  46:9
**intentionally**
145:19
**intentions**
223:9
**interacted**
117:6

**interest**  121:5
135:19 201:5
236:16
**interested**
123:2 251:21
251:25 252:1
269:3 301:17
**interesting**
216:1
**interim**  295:1
**interpret**  261:7
**interrelations...**
12:20
**interrupt**
146:22,24
164:12
**interrupted**
156:15
**interrupting**
144:12 146:20
163:10,17
165:2 185:15
**intertwined**
279:15
**interview**  151:6
153:1,3
**interviewed**
141:17 150:20
152:18 161:22
**intimidate**
164:9
**introduced**
130:14 131:20
**intuitive**
215:25

**investigation**
61:7
**invited**  290:3
**invoke**  25:13
27:10 162:3
**involve**  228:13
**involved**  61:21
116:15,15
157:21 200:10
200:12,13
225:18,23
226:2 239:2,6
246:15,18
255:1 270:15
**involving**  21:23
**iron**  242:6
**irregular**  16:20
**irrespective**
144:13
**irresponsibility**
63:13
**irresponsible**
63:9
**issue**  5:22
11:12,13,14,25
12:1 18:19,24
19:10,22 35:17
47:12 63:23
65:19 76:6
77:17 80:25
130:19 168:17
181:3,4,9,10,11
181:17 182:9
182:18 188:2
189:4 190:1

210:22 213:21
216:10 219:15
220:25 237:14
238:25 239:8,9
239:11 240:21
260:25
**issued**  237:24
238:2,11,23
**issues**  12:12
20:16,17,19
27:2 28:14
34:1 35:1
86:12 168:14
187:16 190:6
200:10 209:5,6
209:12,15
**item**  41:10
212:19,24
213:3 228:5
**items**  43:6,16
59:11 219:9,13

**j**

**j**  300:1
**jack**  2:18 90:7
90:15 290:1
292:16
**january**  60:9
60:12,13,14
114:4 122:11
168:2,7 192:20
192:21 212:10
212:12,17
243:3 293:6
**jeff**  292:16

[jersey - klugmann]

**jersey** 1:1,8,15
  1:18 2:4,9,14
  10:23 11:3
  22:10 24:1
  30:8 37:7 87:4
  88:7 141:9
  301:4,22 302:2
**jewish** 287:7
**jews** 285:10
  287:2,4
**jfiorenzo** 2:5
**jk** 298:19
**jmc** 292:5
**jmf** 53:13,18
  289:7,11
**jmf's** 289:14
**jmmc** 298:14
**job** 266:25
**jobs** 37:11
**joe** 5:5 34:13
  36:2 44:10
  82:2 87:24
  109:10 111:13
  112:24 156:12
  156:14 164:20
  165:8,12
  179:21 190:20
  234:23 235:9
  236:2,7 241:14
  255:12 265:22
  297:10
**jog** 298:4
**john** 4:15,16
  160:8,9,10,15
  207:25 209:21

**joke** 44:1
  211:16 232:16
  233:7,14
  236:18
**joking** 232:20
  232:23
**joseph** 2:2
  48:19,21 290:1
**judge** 3:9 21:2
  21:5,22 22:1,9
  22:18 23:1,23
  24:3,11,22
  25:5,19 26:11
  26:18 28:2
  35:1 36:8
  56:23 57:2,15
  57:16,17,21,24
  57:25 58:3
  129:8 247:15
  250:7,7 253:6
  253:8,8,12,15
  253:19 256:6
  256:15 259:5
  260:8 274:10
  275:24 276:21
  276:22 277:7
  278:4
**judge's** 57:21
  58:2 80:25
  122:7,8,13
  129:14 277:25
  278:8
**judgment** 3:24
  88:8 93:20
  95:8 111:18

  114:5 186:8
  277:21
**judicial** 129:9
**july** 61:7 69:5
  86:24 87:19
  88:9 93:1 95:5
**june** 39:14 41:5
  115:2 122:12
  122:13
**jurisdiction**
  11:8 12:1
  95:10 190:7

## k

**k** 285:20,20
**kate** 286:8
**keep** 15:5,22
  16:10,25 17:7
  17:12,20
  106:10 109:5
  146:19 148:8
  163:10 179:23
  208:20 241:9
  267:12 279:20
**keg** 81:14 82:4
  82:6 116:22
  117:2,3,4
  118:6 298:12
  298:15,17
**ken** 181:3
  285:14,15
**kenneth** 130:17
  134:6,10,23,24
  139:7
**kept** 16:1 109:6
  239:12

**kevin** 2:19 90:7
  90:17 92:16
  196:10
**kind** 233:18
**kinderkamack**
  53:23 116:8
  259:13
**klein** 2:3 21:15
  33:9 39:8 40:9
  40:13,15 41:3
  45:7 48:3
  52:10 60:23
  69:3 87:13,16
  93:9 94:18,25
  110:7,14 114:3
  114:10 122:12
  125:1 127:12
  130:12 141:11
  159:17,20
  172:14 174:22
  178:10 191:8
  209:25 210:4
  211:20 212:4,8
  241:3,8,21
  258:24 268:10
  271:14,17
  288:25 291:18
  292:13 297:9
**klugmann** 2:18
  90:7,15 94:22
  231:6,16 233:1
  233:21 234:5
  235:19 257:4
  290:1,1,4
  292:16,25

| | | | |
|---|---|---|---|
| 298:19 | 51:5 52:1 | 133:23 134:9 | 204:11,13,14 |
| **knew** 34:3 | 56:14,19,20 | 134:11 138:19 | 204:16 208:20 |
| 50:22 61:25 | 58:10,18 59:4 | 139:10,11,13 | 210:18 214:11 |
| 82:12,17,18 | 61:25 62:14 | 139:19,21,24 | 214:12,20 |
| 83:3,6 102:21 | 64:8,19 66:19 | 139:24,25 | 215:1,3,3,4 |
| 105:1 112:1,4 | 66:24 69:9 | 140:2,17,25 | 216:15,16,19 |
| 113:15 115:4 | 70:10,15,25 | 142:11,23 | 216:25 218:10 |
| 115:11 117:9 | 71:19 72:18,20 | 143:8,17,20 | 218:10 221:2 |
| 123:8 124:14 | 72:22,24,25 | 144:15 145:14 | 224:2,17,20 |
| 163:22 176:4 | 73:2 74:1 | 145:22 146:21 | 225:16 230:8 |
| 176:15,18 | 76:19 77:8 | 149:1,13,13 | 231:23 236:8 |
| 185:25 186:4 | 78:10 80:24 | 150:21 151:4,5 | 239:25 240:6,7 |
| 186:14 188:15 | 82:7,14 83:9 | 151:10,14,25 | 240:8,19 |
| 190:17 193:17 | 83:17 84:2 | 155:11 157:18 | 241:24 244:9 |
| 245:11,17 | 89:3,11 90:23 | 158:17,21,23 | 247:2,5,17 |
| 256:21 | 91:2,3,12 | 159:23,24,25 | 248:1,8,12,17 |
| **knocked** 209:7 | 92:12 95:24 | 160:8,9 161:13 | 249:2,4,5,9,19 |
| **knocking** | 96:12,20 | 161:18 165:18 | 249:21,23 |
| 284:19 | 104:12,17 | 165:19,22,25 | 257:3,9 261:12 |
| **know** 5:4,13 | 105:12,15,19 | 168:25 169:2 | 262:19 263:4,5 |
| 11:7 12:6,8,16 | 106:12 107:4 | 169:22,25 | 266:21,22,23 |
| 13:2,3,4,21 | 108:8 109:2,6 | 170:6,25 | 269:7 273:15 |
| 15:13,25 16:3 | 109:13,17,21 | 171:14,24,25 | 275:10,11,11 |
| 16:12 17:1,5,6 | 112:20 113:5 | 174:6 177:24 | 276:10,13,16 |
| 17:9,11 25:2 | 113:15,22 | 182:7 185:14 | 277:6 278:18 |
| 25:23 26:5 | 114:17 116:9 | 186:2 187:25 | 279:25 281:7,8 |
| 27:4,17 28:22 | 117:11,24 | 188:20 189:11 | 285:14,18 |
| 29:1,5,8,10,13 | 118:1,24 | 193:13 194:2 | 286:8 287:12 |
| 29:14,16,20 | 119:25 120:19 | 195:5,23 | 290:15 291:11 |
| 30:12,18,21,25 | 120:23,24 | 196:11,21,23 | 291:13,25 |
| 32:24 33:2,17 | 121:7 122:5,22 | 199:13,14,24 | 292:9 293:17 |
| 33:20 34:25 | 123:8,15,15,16 | 199:25 201:24 | 294:7,15,16,21 |
| 35:18 37:17,18 | 124:14,15 | 202:5,8,11,17 | 295:11,12 |
| 44:20,22 49:14 | 126:1,4,16 | 202:18,25 | 296:1,14 |
| 50:12,15,18 | 130:22,25 | 203:2,7,13 | 299:11,11 |

[knowledge - level]                                                    Page 34

| | | | |
|---|---|---|---|
| **knowledge** | 35:20,23 51:9 | **laughing** 43:25 | **lawyers** 6:25 |
| 11:4 12:7,9,20 | 51:17 77:6 | 44:2 | 7:2,14 31:5 |
| 12:22,23 13:24 | 83:4,11,14 | **laurel** 21:4 | 179:6 253:21 |
| 108:17 230:10 | 99:22 124:7 | 23:10 25:10,15 | 254:4 |
| 282:15 286:7 | 133:8 135:14 | 25:18 27:2,22 | **leached** 188:13 |
| 300:7 | 135:16 136:6 | 28:20 29:6 | **lead** 231:19 |
| **known** 188:9 | 137:17 138:2,3 | 31:6 66:6 | **leading** 61:24 |
| 261:18 | 138:9,11,16 | 83:20 89:19 | 140:11 |
| **knows** 280:13 | 150:14 171:6,7 | 94:2 95:6,12 | **learn** 263:13 |

**l**

| | | | |
|---|---|---|---|
| | 172:17,22,25 | 103:9 114:18 | **learned** 254:4,5 |
| **l** 93:16 | 173:3,4,12 | 123:9 213:11 | 254:23,25 |
| **l.p.c.** 302:2 | 174:2,3,6 | 213:23 214:7 | **leased** 51:1 |
| **lack** 89:18 | 175:5,9,13 | 214:14,15 | **leave** 235:1,2 |
| **ladies** 100:19 | 176:16 177:9 | 215:7,16 | **led** 47:8 197:14 |
| 100:24 101:14 | 180:17 181:21 | 216:13,17,25 | 206:12 |
| 101:18 | 183:8 187:19 | 217:3,21 255:8 | **left** 58:10 290:4 |
| **lady** 236:15,19 | 188:16 191:9 | 277:24 | **legal** 1:17 2:3 |
| **laid** 186:15,23 | 192:17 197:25 | **law** 2:12 3:20 | 12:4 23:16 |
| **lake** 210:11 | 222:20 225:22 | 73:8,21 77:24 | 73:23 87:21 |
| **lamatina** 22:23 | 226:15 249:16 | 78:14 79:4,10 | 174:17 256:1 |
| 23:19 69:2 | 250:2,15,21 | 79:10,13 87:19 | 256:10,16 |
| 96:2 110:23 | 251:5,10,16 | 129:9 205:16 | 261:6 280:8 |
| 118:5 147:1,2 | 252:2,10,20 | 205:16,20 | 281:5 |
| 161:11,17 | 262:25 263:11 | 206:1,8 213:24 | **legislation** |
| 162:9,22 163:1 | 263:22,24 | **laws** 30:7 | 22:15 24:15 |
| 166:11 168:19 | 268:3,12 282:2 | **lawsuit** 5:7,11 | **legislative** |
| 169:9,19 196:7 | **large** 221:11 | 27:9 87:1,3 | 205:12 |
| 197:19 200:23 | 223:11 | 89:1,12,15 | **leonard** 2:13 |
| **lamatina's** | **larger** 53:14 | 93:3 99:25 | **les** 2:15 |
| 167:13 170:1 | 132:12 150:13 | 271:24 | **letter** 3:20 4:18 |
| 170:19 | 291:21 | **lawsuits** 27:10 | 87:18 93:17 |
| **land** 4:12,14,19 | **largest** 98:10 | 87:5 89:9 90:2 | 259:4 261:7 |
| 8:10,13 9:12 | **late** 171:12 | 185:18 | **letting** 64:20 |
| 18:18,23 21:11 | 293:6 | **lawyer** 174:14 | **level** 10:2 11:1 |
| 25:17 34:2 | | 272:25 | 66:5 203:19 |

205:2 251:24
**levels** 200:16
  203:6
**license** 301:4
**lie** 164:16
  183:1 223:13
  223:15 287:12
**lied** 182:24
**lieu** 98:18,18
  108:12 109:8
  128:4
**likely** 83:23
**limit** 120:18
**limited** 121:10
**limiting** 113:17
**lincoln** 53:23
**line** 97:18
  180:8,20
  183:17 184:6
  187:14 189:5
  227:20 276:1
  302:5
**linked** 216:12
**liquor** 288:8,10
**list** 135:11
**listed** 97:15
  228:5
**listen** 58:11
  143:3 183:5
  184:17 280:1
**literature**
  167:11 168:11
  168:13,15
**litigant** 244:20

**litigate** 273:5
**litigating** 273:6
**litigation** 4:3
  7:4 20:18
  21:23 95:9,12
  95:19 99:23,24
  99:24 111:17
  114:14 248:7
  255:2
**little** 41:8 74:21
  119:8 182:3
  212:15 219:23
  232:13 264:21
  297:7
**live** 183:12
  239:18
**lives** 242:5
**llc** 1:4 2:8 5:9
  39:13 48:23
  116:9 302:1
**local** 8:3 9:20
  10:6 11:13,20
  14:2,4,8 22:17
  73:21 189:13
  190:8 199:17
  211:22
**localocamine**
  188:12
**located** 100:10
  121:23 177:20
**location** 108:7
  108:16 246:21
  249:16 279:3
**locations** 53:19
  110:1

**lone** 211:4
**lonergan** 27:25
  262:4
**long** 19:24 28:2
  31:10 52:23
  94:8 113:25
  154:22 172:2,3
  210:24 241:10
  257:12,13
  263:7 298:19
**longer** 62:25
  186:9
**look** 17:23
  18:14,20 38:8
  64:11 94:15
  97:3 104:18
  108:4 109:3
  127:4 133:18
  150:8 179:15
  180:11,20
  181:2 187:9
  206:25 210:7
  218:11 226:6,9
  227:7 228:17
  229:21 230:5
  230:11 258:10
  287:21 289:23
  296:24 297:2
  298:8
**looked** 112:14
  168:15 227:10
  232:13,18
  233:11,17
  234:7,8 239:19
  290:17,21

**looking** 241:10
**looks** 96:2
  218:11 232:16
  233:24,25
  234:15,21
  235:6,13,24
  239:19 291:20
**lopata** 50:21
**lorraine** 19:14
**losing** 87:15
**lost** 31:16
  108:14 219:23
  242:3,10,14
**lot** 50:2,5,15
  81:10 111:2
  115:18,19
  120:25 121:1
  130:15,21
  139:2,6,9
  154:7 157:23
  169:8 180:24
  184:21 186:17
  206:14 213:18
  219:25 246:11
  249:14 250:19
  274:16 275:13
  299:14
**lots** 53:10
  139:8
**lou** 22:23 96:2
  110:23 147:2
  162:9 168:19
  169:8
**loud** 44:3,9

**low** 55:3 58:7
  119:14 121:22
  121:25
**lower** 95:15
  214:16
**lowered** 187:1
**lunch** 129:22
  190:21 231:3
**luncheon**
  129:24
**lying** 287:11

**m**

**m** 2:3 295:12
**ma'am** 48:5,21
  58:21 72:25
  139:17 157:13
  165:5 178:13
  183:20 279:16
**made** 14:10
  24:3,16 25:19
  36:5,10 41:9
  44:3 54:9
  57:14 58:3
  78:23 83:16
  86:14 103:3
  120:3 122:1
  133:25 136:23
  141:25 142:11
  142:21 143:6
  144:20,21
  153:7 173:5,12
  173:17 175:5
  177:21 178:23
  181:13,20
  183:13 186:5

189:11 206:14
  219:1 230:16
  231:12 233:2,9
  234:1,2,4,5,9
  235:16,21
  237:13,19
  238:1 246:10
  246:13 250:1,1
  250:21 253:3
  261:25 263:11
**mah** 1:2
**mail** 293:5
**maintenance**
  239:9,11
**majority** 84:21
  107:18 136:18
  136:20 177:20
  243:4
**make** 9:16,20
  11:2 15:18
  16:22 17:18
  28:17 31:1,4
  39:7 41:7
  54:20 56:10
  58:1 64:4
  66:12,14 67:16
  68:9,9,15 70:8
  102:8 114:20
  117:14 119:8
  131:14 141:9
  142:1,9 150:16
  153:2 184:5
  187:20 189:10
  204:13 206:15
  210:14 219:5

219:16 220:1,8
  220:10 237:20
  246:2 250:17
  250:23 251:4
  252:11 263:17
  269:15 271:6,6
  275:20 285:13
  287:21 291:21
  297:7 298:25
**makes** 76:15
**making** 31:7
  43:25 53:20
  57:10,12
  142:14 143:13
  144:10,13
  148:15 154:10
  154:14 165:3
  183:5 184:3
  190:13 201:7
  223:7 232:16
  233:7,14 235:5
  237:22 257:2
  262:18
**malagiere** 2:12
  208:1,2 292:5
  292:16
**malagierelaw...**
  2:15
**man** 50:20
**mandate** 37:8
**mandated**
  177:19
**mandating**
  215:17

**march** 25:8
  270:2 293:1,8
**mark** 21:14
  33:14,19 40:8
  172:12 178:9
  191:7 210:1
  291:16
**marked** 45:6
  191:15 209:24
**market** 37:10
  66:15 68:15
  80:13 265:17
  267:17
**markings** 21:21
**martin** 189:2,5
  189:22
**mary** 1:14
  27:25 301:3
**mass** 7:3
**master** 24:17
  27:15,17,20
  28:1,5 70:16
  70:20 83:16,18
  86:13 109:22
  109:25 116:7
  134:17 170:21
  177:8 253:5,5
  260:7 262:4
  268:18 269:13
  269:18 272:16
  279:6
**master's**
  121:20 129:16
  256:6,14

**[mates - meeting]** Page 37

**mates** 182:10
**matter** 1:13
  5:14 17:25
  23:7 59:6 88:6
  93:14 95:4,11
  100:11 113:14
  190:7 201:18
  203:4 247:20
  273:8
**matters** 7:4
  20:23 59:7
  211:4
**maximize**
  259:19
**maximizing**
  244:4
**mayor** 2:15
  3:13,16,23 4:6
  4:21 8:24 9:1
  12:10,19 13:14
  22:23 23:9
  39:1 41:5
  44:18 52:12
  61:14,17 63:14
  93:5 104:10
  118:5 126:1,12
  126:14 130:15
  130:22 132:6
  140:8 141:13
  142:6 147:1,3
  153:14 158:6
  160:16 169:2
  177:13 180:14
  180:21 192:5
  197:13,19

200:22 201:16
210:11 211:15
218:25 222:23
225:12,18
226:11,14,25
227:2 229:14
230:2,7,9
232:9 237:5
244:19 247:22
248:19 252:5,7
270:13 274:18
276:3 282:2
284:6,11
289:23 291:14
291:25
**mayor's** 293:13
**mayors** 218:14
  218:16,20
  219:11 222:1
  222:17 223:8
  223:18 242:5
  298:21,21
**mc** 294:13
**mca** 1:2
**mccann** 207:25
  292:18 294:14
  294:18
**mcqueeney**
  19:14
**mean** 37:18
  39:5 56:8
  57:17 64:15
  87:2 103:24
  145:10,14,22
  151:25 152:2,3

162:2 182:6
194:5,6,9
195:11 199:13
199:14 200:12
207:5 223:6
224:23 226:1
226:20 229:25
232:8 234:5
246:21 255:15
259:25 262:14
265:5 269:1
294:20 296:15
299:6,8
**meaning** 10:19
  161:25 220:14
  220:16 260:11
**meaningful**
  24:15
**meaningless**
  282:13
**means** 7:7 9:18
  31:5 36:20
  64:16 96:20,23
  106:12 145:11
  152:4 199:16
  224:21,24
  240:19 267:2
**meant** 87:24
  158:22 222:21
**measured**
  203:6
**measures** 24:15
**meet** 25:18
  208:4,7,14,16
  224:10 230:17

230:19 231:1,5
274:20 282:4
289:21 293:6,8
293:14
**meeting** 4:19
  43:12 52:11,25
  53:5 54:2
  58:22,22 59:3
  59:11,13 124:4
  130:14,18
  131:2,10,17
  133:25 134:4
  135:1 138:20
  144:8,9 174:24
  178:22 179:13
  192:20 207:21
  208:12 210:15
  212:9 218:20
  218:21 232:5
  246:3,23,24
  253:24 254:24
  256:23 265:21
  268:11,14,19
  270:22,25
  283:8 289:1
  291:24 292:19
  292:20,21,25
  293:11,12
  295:9,23 296:5
  296:8,10,13,16
  296:18,23
  297:5,19,22,23
  298:1,2,6,14,23
  299:17

[meetings - mount]                                                    Page 38

| | | | |
|---|---|---|---|
| **meetings** 51:23 | **message** 162:9 | 58:14,16,19,20 | 68:10,13 |
| 52:2 102:9 | **messages** 22:24 | 58:21,25 59:5 | 132:18 193:19 |
| 152:25 169:12 | **met** 61:9 | 59:9,13,16,23 | 244:6 |
| 207:12 208:9 | 168:23 207:23 | 59:24 60:1,3,7 | **monitor** 16:16 |
| **meets** 218:7 | 207:24 208:11 | 60:10 110:12 | 16:17 18:9 |
| **member** 7:20 | 229:6 231:9,16 | 131:9 139:1 | 71:9 253:6,14 |
| 12:9 18:18 | 273:17 | 149:23 236:14 | **monitoring** |
| 28:6,10 29:7 | **michael** 285:21 | 254:24 268:11 | 123:2 |
| 30:21 31:3 | **middle** 100:13 | 268:13 289:5 | **months** 93:25 |
| 52:13,13 68:3 | 101:25 106:2 | **mischaracteri...** | 140:11 239:14 |
| 91:4,5 108:21 | 163:21 273:9 | 55:14 | **moonachie** |
| 171:8 | **midnight** | **misspoke** 67:20 | 2:13,14 |
| **members** 8:24 | 169:17 | **misstating** | **morning** 5:4 |
| 9:2 22:25 | **midpoint** 99:7 | 182:1 | 104:3 |
| 59:10 111:10 | 128:6 | **mixed** 161:10 | **mother** 118:1,2 |
| 181:17 218:15 | **mind** 38:6 | 161:12,15 | **motion** 41:9 |
| 289:22 | 119:9 156:10 | 162:21 | 59:12 250:6 |
| **memorandum** | 161:20 176:14 | **mockery** | 259:11,14 |
| 4:9 172:15 | 177:13,15 | 148:15 | 276:12 |
| **memorializes** | **mindset** 30:15 | **moderate** 55:3 | **mount** 21:4 |
| 93:18 | 32:7 | 58:7 119:14 | 23:10 25:10,15 |
| **memorializing** | **minimum** 37:9 | 121:22,25 | 25:18 27:2,22 |
| 188:18 | 98:16 128:3 | **moment** 15:15 | 28:20 29:6 |
| **memorized** | **minute** 20:1 | 40:20 42:7 | 31:6 66:6 |
| 130:23 | 87:8 190:21 | 56:13 82:20,23 | 83:20 89:18,19 |
| **memory** 7:21 | 236:3 259:14 | 107:5 113:21 | 94:2 95:6,12 |
| 133:19 269:16 | 298:18 | 114:8 138:7 | 103:9 114:18 |
| 298:4,22 | **minutes** 3:13 | 158:17 204:24 | 123:9 213:11 |
| **menace** 168:21 | 3:16,22 4:5,19 | 214:13 216:1 | 213:23 214:7 |
| **mentioned** | 4:21 41:4 43:8 | 231:15 234:7 | 214:14,15 |
| 131:20 138:9 | 43:11,16,19 | 252:14 253:4 | 215:7,16 |
| 287:4 | 52:11,17,21 | 276:18 | 216:12,17,24 |
| **merely** 24:2 | 53:5 54:5,24 | **money** 66:12 | 217:3,21 255:8 |
| 259:18 | 55:14,15 57:11 | 66:13,14 67:6 | 277:24 |
| | 57:13 58:11,13 | 67:16,17,23 | |

**mouth** 81:18,21
126:3 262:22
**move** 26:12,18
45:1,2 74:12
82:2 132:12
155:6 156:6
164:1,18 171:3
177:12 234:3
241:11,13
259:6 260:15
285:2
**moved** 41:12
170:23 239:15
**moving** 241:15
271:16 285:6
297:17
**municipal**
171:7
**municipality**
26:3,9 37:21
37:24 76:22
**murray** 241:23
241:24
**mutual** 49:7
163:16

**n**

**n** 2:1 90:18
92:13
**name** 5:5 49:22
50:20 51:4
90:17 92:6,8
92:11,15,16
285:19 302:2,3
**necessarily**
208:21

**necessary**
22:15 24:17
80:18,19,23
103:14,17,20
103:23,25
107:6,8,10,10
107:12,16,21
121:24 122:4
129:1,2,10
**necessity**
100:25
**need** 30:21 42:2
55:16 61:10,19
62:25 64:8
65:10 67:4
72:6 77:23
78:24 80:10
91:1 97:2
113:5 119:23
143:17 187:21
236:8 250:17
260:19 289:10
295:20
**needed** 24:24
30:25 42:15
43:3 55:3 58:7
66:5,11 67:7
70:19 77:6
78:8 80:20
101:13 122:19
156:17,18
188:11
**needs** 22:17
83:25 96:19
183:9

**negative** 10:14
**neglia** 193:8,11
193:12,13,16
194:16 195:10
195:13,21
196:3
**neglia's** 193:15
**negotiate** 80:5
288:3
**negotiations**
289:6
**neither** 301:13
301:15
**never** 13:6
81:11 117:16
119:9 167:1,4
195:8 229:6
239:15 256:18
263:18 274:5
274:11 276:3,7
276:11,15
287:3,4,5,6,8
**new** 1:1,8,15,17
2:4,9,14 10:23
11:3 22:10
23:5,5 24:1
30:8 37:7 87:4
88:7 138:4
193:7 196:4
207:2 208:13
209:16 210:6
212:17 218:25
219:4 271:18
301:4,22 302:1
302:2

**newark** 1:17
2:4
**news** 154:23
159:18
**newspaper** 4:7
4:8,15,16,17
141:8 142:4
152:19 159:23
159:24,25
160:21 166:2
182:5 188:9
211:22 245:21
**nice** 179:7
210:8 218:4,6
218:12 233:11
233:17 234:8
**nicer** 38:8
**night** 133:13
**njdep** 10:22
188:24 190:3,9
**noa** 141:15
**noda** 141:16,17
**noncompliance**
21:3 277:23
**nonexisting**
259:12
**normal** 6:2
109:11
**normally**
225:14
**north** 141:9
**northern**
159:22 211:22
**notary** 1:15 5:2
300:20 301:4

301:22 302:25

**note**   131:9
294:13 295:25
296:24 297:15

**noted**   40:20
41:18

**notes**   1:12 4:22
291:19,23
292:23 294:3,7
294:15 295:18
298:8,13 299:2
299:4,15

**notice**   3:17
60:24 61:8

**november**   93:8
93:10 110:14
110:15 114:12
140:5 141:10
161:25

**number**   37:5,6
37:20 41:10
48:14 57:22
61:5 76:10,13
85:18,18,22,24
97:12 111:20
121:10 134:5
138:2 140:11
168:17 185:18
186:23 187:3
214:8 219:15
250:22 264:24
268:15 284:6

**numbered**   84:7

**numbers**   37:23
113:17 120:6,7

120:8 186:15
186:17,20,21

**numerous**
177:1

**o**

**o**   90:18 92:13
285:20

**oath**   23:13
29:24 30:3,6
30:11,15 31:2
144:3 158:21
158:24

**object**   106:13
106:19 107:2
115:14 278:9
278:12

**objected**   105:1
106:9 111:21
111:23 115:24
165:21 175:23
176:3 177:2

**objecting**   113:7
134:25 135:3,3
278:14

**objection**   10:8
11:15 12:4
13:11 15:7
16:18 17:10
18:11 22:20
23:21 24:5
25:21 26:14,21
28:15,19,23
29:9,22 30:13
30:20,23 31:9
33:12 36:15

41:21,22 42:14
46:22 55:13
56:6 57:3,6,19
60:19 62:15
63:10,11,16
67:24 68:7
71:13 73:1,23
74:23 82:10
104:1,14 105:4
105:8,16,21
106:6 112:3
113:1,2 117:14
117:18 120:21
126:19 127:3
129:3 137:20
145:1,13
147:19 149:9
150:3,5 151:22
152:23 153:9
156:3 164:5
169:24 170:11
171:1 172:5,23
177:23 178:3
179:18 181:25
182:16 193:25
194:4,11,17
199:12 201:2,9
202:22 205:24
207:18 212:21
213:14,15
214:10,17,19
214:25 216:14
217:11 221:1
225:15 228:3
229:12,17

241:13 244:12
245:13 247:10
247:14 255:25
256:8 257:1,7
257:16,24
258:3 259:22
260:12 261:3,5
262:13,16
263:1,8 264:5
265:12 266:13
266:19 269:21
270:7,9 272:13
274:3,7,22
275:5,7,9
276:9 277:4
278:1 279:10
279:13,22
280:4,7 281:1
281:4,24
283:17,20
284:1 287:14
290:14 291:1
292:6 293:2
294:19 295:2
299:18

**objectionable**
46:21 47:7

**objections**
94:12 103:7,13
103:16,22,24
104:15,22,24
117:21 151:14
178:4

**objectives**
207:13

**objector**
  175:20
**objectors**
  115:23 116:6,8
  119:5,11,13,15
  119:16
**obligated**  77:5
**obligation**
  21:25 24:18,25
  29:7 32:10
  36:9 38:2,3,11
  38:23 39:22
  40:20 41:18,19
  55:10 96:24
  98:11,12
  108:10 119:23
  122:5,21
  129:11 170:20
  176:18 185:1,3
  185:10 215:22
  255:8 257:5
  274:20 277:2
  277:24 278:8
**obligations**
  21:4 25:18
  27:22 28:21
  29:5,16 30:11
  31:7 75:17
  96:7 114:23
  120:5,19 123:4
  186:7 296:2
**obtained**  284:3
**obvious**  147:20
  262:14,17

**obviously**
  246:21
**occasion**  217:5
  217:6,7
**occurred**  51:24
  66:4 122:16
  130:8 140:4
  176:12 274:12
**odd**  233:18
  234:11,13
  235:16
**oem**  11:21
**offer**  107:23
  108:24
**office**  1:16
  135:5 168:7
  169:17 192:19
  197:3 207:10
  207:16 212:24
  243:15 286:12
  286:14 291:9
**offices**  2:12
**official**  51:11
  63:13 190:13
**officials**  201:6
  201:8
**oh**  16:16 39:9
  44:6 66:10
  74:24 101:15
  119:9 127:10
  132:17 140:21
  152:22 159:21
  165:17 169:22
  179:5,7 210:7
  227:16 236:1

236:11 248:6
254:12 258:14
267:16 269:1
272:11 274:9
275:2 286:1
297:1,10,13
**okay**  6:3,4,5,7
  6:8,12,18,22
  7:1,12,16,19
  8:12 9:14,25
  10:21 11:2,11
  11:23 13:22
  14:1 15:1,11
  17:19 18:3,21
  19:9 20:2,9,11
  20:22 22:5,9
  23:23 25:2,4
  26:8,11 27:5
  27:13 29:19
  31:17 32:18
  33:10 34:5,16
  34:20,23 35:20
  36:1,13,24
  38:1,13 39:1
  39:10,24 40:8
  40:10,14 41:2
  41:7 42:7 44:6
  45:2,3,4,14
  46:15,18 47:21
  49:1,4,9,11
  50:2,12,15
  51:2,15 52:16
  53:5,22 54:7
  54:12,16,22
  57:23 60:2,17

63:18 64:5
66:18 67:10
68:17,24 69:19
71:5 72:11
73:20 74:7,21
75:16 76:14
77:2 78:13,22
80:15 82:19
85:12,14 86:12
86:17 87:11,17
87:18 88:19
89:3 90:19,25
91:7,12 92:18
92:21,24 93:25
94:23 95:22
96:3,14,25
97:15 98:3,14
99:5 100:2,8
102:2,24
103:15 104:11
104:14 105:7
106:3,4 107:5
107:23 108:2
110:10 111:25
112:5,13,16,22
113:13,24
114:11 115:17
116:5,19,23
118:9 119:2
121:15 122:16
123:14 124:11
124:18,25
125:10,25
127:1,11,13,15
128:24 129:13

[okay - order]                                                    Page 42

| | | | |
|---|---|---|---|
| 132:21 133:1,2 | 197:24 203:21 | 269:6 271:3,10 | **opportunity** |
| 133:20 134:23 | 205:1,23 206:4 | 275:11 277:18 | 38:22 99:8 |
| 135:15 136:5 | 206:11,17 | 280:20 281:9 | 102:24 104:19 |
| 136:10 137:24 | 207:15,17 | 282:1,22 | 113:4 119:13 |
| 138:11,16,21 | 208:19 209:2 | 283:25 286:1,4 | 128:7 |
| 139:4 140:3,21 | 209:10,18 | 286:21 287:12 | **oppose** 65:21 |
| 140:23,24 | 210:20 211:2 | 289:1 292:5,10 | 88:22 176:12 |
| 141:3,24 | 211:18 215:5 | 292:14 293:11 | **opposed** 53:3 |
| 142:14 144:18 | 216:10 217:9 | 293:25 294:3 | 54:8 65:22 |
| 144:23,25 | 218:1,3,16,18 | 295:8,18,22 | 79:15 84:20 |
| 145:3 146:1,23 | 219:7,18 220:5 | 296:19 297:1 | 85:13 151:18 |
| 146:24 147:8 | 220:13,18 | 297:20,24 | 155:21 162:5,5 |
| 149:7 150:8 | 221:10,23 | 299:2,16,21 | 162:6 176:21 |
| 151:13 153:2 | 222:16 225:12 | **old** 44:11,13 | **opposing** |
| 154:19,24 | 225:22 227:6 | **once** 6:2 77:8 | 176:14 177:10 |
| 155:2,12 | 227:14 228:7 | 100:18 126:13 | **opposite** |
| 159:16,18 | 228:25 229:3 | 208:4 227:1 | 158:18 |
| 160:4,15,20 | 231:5,11,22,24 | **ones** 17:11 | **opposition** 70:4 |
| 161:2,24 | 232:3,25 233:5 | 31:11 | 178:24 |
| 163:24 164:18 | 233:21 236:11 | **open** 81:7 | **option** 56:11 |
| 165:6,7,24 | 237:23 239:16 | 242:4 | 98:17 99:4,6 |
| 167:4,16 168:5 | 240:10 241:1,9 | **opening** 239:12 | 107:25 108:4 |
| 170:5 171:2 | 242:1,9,22 | **opinion** 57:20 | 128:3,5 |
| 172:7 173:11 | 243:24 244:17 | 57:21,22 58:2 | **oral** 274:10 |
| 174:8 176:1,21 | 245:20 246:11 | 122:7,8,14 | **orally** 253:20 |
| 178:6 179:5,16 | 248:9,24 | 128:25 129:14 | **order** 4:3 9:23 |
| 180:5,7,11,13 | 249:25 251:9 | 129:15,16,17 | 24:17 68:9 |
| 180:20 181:24 | 252:23 253:17 | 129:20 174:11 | 71:6 87:20 |
| 183:16 184:2 | 253:18,21 | 174:17 182:1 | 105:5 107:13 |
| 185:23 187:5,8 | 255:3,6,7 | 215:25 229:22 | 107:16 119:3 |
| 187:12,18,19 | 258:11,20 | 229:23 258:17 | 122:20 129:8,9 |
| 188:15 189:2 | 259:4 260:3 | 261:11,13 | 153:1 163:5 |
| 190:19 191:3 | 262:3,9 263:21 | **opportunities** | 171:3 242:2 |
| 192:1,11 | 264:2,17 265:4 | 22:13 24:19 | 251:12 253:13 |
| 194:22 197:1 | 266:4 268:7 | | 259:18 260:8 |

[order - part]                                                    Page 43

| | | | |
|---|---|---|---|
| 276:20 | 78:6 | 259:19 | 96:1 118:20 |
| **ordered** 25:6 | **originally** | **owned** 19:5 | 127:15 128:1 |
| 119:22 | 289:10 290:18 | 50:16,18 | 180:6 187:13 |
| **ordering** 26:11 | **outlined** 25:15 | 116:17 287:7 | 189:5 245:21 |
| 26:18 | **overall** 215:12 | **owner** 76:24 | 268:13 302:5 |
| **orders** 51:10 | **overdeveloped** | 80:5 | **paid** 238:16 |
| **ordinance** 3:17 | 154:4 166:6 | **owners** 79:20 | 257:5 279:5 |
| 25:16 60:25 | 167:5,8,12 | 82:15 243:25 | 289:8 |
| 61:1 63:22 | 213:10 214:4 | 244:4 289:8 | **paola** 1:6 3:3 |
| 64:13 65:6,15 | **overdevelop...** | **ownership** | 5:1 300:12 |
| 68:19,20,21 | 142:8 147:23 | 138:20 232:6 | 301:6 |
| 71:23,24 72:14 | 148:2,22,24 | | **paparo** 297:12 |
| 72:18,22 73:8 | 153:20 154:5 | **p** | 297:13 |
| 73:12,15,25 | 154:16 162:1,8 | **p** 2:1,1 | **paper** 160:5 |
| 130:14 131:5 | 162:10,11,12 | **p.c.** 1:16 2:2,12 | **papers** 259:9 |
| 131:20 134:6 | 162:13,15,17 | **p.m.** 102:3,4 | 260:21 261:10 |
| 138:24,25 | 162:19 163:1 | 129:25 130:3 | 262:4 |
| 139:1 200:15 | 166:4,12,21 | 190:24,25 | **pappas** 297:11 |
| 200:18 201:1 | 182:5,9 210:23 | 236:25 237:1 | **paragraph** |
| 201:17 202:3,9 | 213:7,8,13,21 | 299:25 | 23:24 49:12,23 |
| 202:12,14,16 | 215:6,8,18 | **pac** 210:15 | 51:8 53:6,7 |
| 202:21 203:2,8 | 216:3,11,11 | **padovano** | 74:20 75:3 |
| 203:10,11 | 220:21 | 250:7 253:7,15 | 84:8 96:4,6,8 |
| 205:2,7,17 | **overlap** 23:6 | 256:7,15 | 97:3,4 119:8 |
| 251:11 | **overlapping** | **padovano's** | 142:4 160:24 |
| **ordinances** | 34:21 | 260:8 | 183:17 210:18 |
| 20:4,13 73:21 | **overrule** 201:7 | **page** 3:2,8 4:2 | 211:2 219:20 |
| 199:17,19,23 | **oversee** 237:6 | 21:23 24:9 | 219:20 241:17 |
| 206:1 | **overseeing** | 25:5 35:4 43:1 | 242:2 271:11 |
| **ordinary** 18:1 | 13:23 16:25 | 43:17,18,20,21 | 271:13 |
| **organization** | 83:19 237:11 | 43:21 49:10 | **parcel** 53:15 |
| 210:15 | **overseen** 15:2 | 52:19 54:12 | **parking** 53:17 |
| **original** 40:24 | **own** 55:11 | 63:20 68:18 | 139:8 |
| 41:1 46:14 | 116:13 126:16 | 69:14 75:2 | **part** 36:6,22,23 |
| 59:22 77:19 | 207:10 249:19 | 87:22 88:3 | 38:10,12 39:21 |
| | | 95:2,2,22,22,25 | |

**[part - pigs]**                                                                                 Page 44

| | | | |
|---|---|---|---|
| 60:7 63:19 | **parts** 96:6 | 218:8,9,13 | **persists** 22:10 |
| 65:15 77:18 | 127:6 197:7 | 221:14 223:12 | **person** 63:14 |
| 90:4 96:17 | **pascack** 159:22 | 228:17 239:17 | 202:23 203:14 |
| 98:10 104:8 | 160:25 188:11 | 242:23 245:14 | 294:22,25 |
| 107:17 108:14 | 209:20 218:15 | 284:6,15,17,19 | **personally** |
| 112:2 128:21 | 241:5 | 288:3 292:19 | 137:15 209:4 |
| 129:17 132:10 | **pass** 25:10 | 293:16 | 252:6 282:8,10 |
| 134:15,19 | 251:11 | **perceived** | **persons** 119:14 |
| 138:23 166:4 | **passaic** 211:21 | 231:17 | 121:22 |
| 211:15 217:9 | **passed** 118:3 | **percent** 98:4,16 | **perused** 260:23 |
| 217:12 218:14 | 192:23 | 165:16 186:7 | **peter** 290:2 |
| 255:22 256:6 | **past** 150:14 | 232:6 289:14 | **ph** 188:13 |
| 256:14 258:17 | 286:17 | 289:14 | **philosophically** |
| 262:6 292:11 | **pause** 163:22 | **perfect** 167:12 | 79:15 155:21 |
| 292:14 297:3,9 | **pay** 80:6,12 | 183:2 | 156:1 |
| 298:16 | **paying** 76:23 | **perfectly** | **photo** 210:8 |
| **participate** | **payment** 98:18 | 278:13 | 218:5 232:24 |
| 127:22 131:2 | 98:18 128:4 | **perform** 10:6 | 233:10,19,24 |
| **participated** | **pendency** 5:10 | 10:16 | 234:1 235:11 |
| 88:15,17 | **pending** 5:8 | **performance** | 235:25 236:22 |
| **participation** | 46:2 74:12 | 197:2 | 241:11,21,23 |
| 52:25 | 86:25 95:19 | **performs** 11:5 | **photograph** |
| **particular** 75:9 | 148:12 | **period** 13:15 | 235:24 236:13 |
| 99:22 142:8 | **people** 11:19 | 20:2 28:2 | 236:17 |
| 147:22 195:16 | 54:17 82:9,12 | 172:1 | **picked** 101:6,7 |
| 201:17 | 116:25 117:4 | **permission** | **picking** 121:4 |
| **particularly** | 152:24 153:18 | 250:8 | **picture** 218:5 |
| 7:6,8 18:12 | 154:2 158:12 | **permit** 79:5 | 232:8,10,19 |
| 117:20 135:13 | 163:4 166:13 | **permits** 79:4 | 233:5,17 234:8 |
| 147:7 207:22 | 166:19,24 | 237:24 238:1 | **piece** 51:17 |
| **parties** 49:5 | 167:8,9,22,23 | 238:10,14,15 | 99:22 132:12 |
| 93:23 301:15 | 169:12 181:21 | 238:23 239:1 | 246:5 255:7 |
| **partner** 289:11 | 183:4 184:11 | **permitted** 24:1 | 272:15 |
| **partnership** | 189:11 196:1 | 79:12 217:2 | **pigs** 194:5 |
| 289:14 | 201:15 208:23 | 254:1 | |

**[place - point]**                                                   Page 45

| | | | |
|---|---|---|---|
| **place**   34:4 76:3 | 151:15 159:3 | 190:8 198:10 | 105:24 110:11 |
| 77:9 135:22 | 161:11,12,16 | 199:3 222:19 | 119:8,19 |
| 136:7 137:18 | 162:22 169:20 | 228:8 264:18 | 121:17 137:5 |
| 138:5,12,14 | 171:5,15 | 264:25 265:19 | 146:22,24 |
| 243:9,14 | 172:18 173:22 | 265:24 266:1 | 149:19 156:15 |
| 257:21 267:19 | 175:14,23,25 | 267:4 268:2 | 160:24 163:23 |
| 267:20,22 | 176:4,4,23 | 269:14,17,23 | 164:2 165:8 |
| 289:7 301:12 | 177:12,15 | 273:20 | 171:19 172:13 |
| **placed**   267:11 | 183:5,10 | **plans**   198:14 | 173:25 180:7 |
| **placing**   262:10 | 191:12 192:17 | 198:17,20,24 | 187:13 201:14 |
| **plaintiff**   1:5 2:6 | 197:20 198:12 | 199:2 205:3 | 219:21 234:22 |
| 91:5,20 93:20 | 198:21 199:10 | 207:6 264:25 | 234:25 241:2 |
| **plan**   3:10 4:4 | 199:11 200:4 | 265:2,15,24 | 244:23 245:21 |
| 14:5 16:24 | 205:25 251:20 | 266:6,18 | 259:8 261:23 |
| 22:6 25:7,23 | 258:19 260:20 | 295:25 296:2 | 271:11 280:2 |
| 26:2,3,5,6,19 | 261:19 262:7 | **plastic**   9:23 | **pleased**   289:25 |
| 33:11,18,23 | 264:17,23 | **platforms** | **pledge**   166:5 |
| 34:4,6,10,12 | 265:9 267:13 | 154:8 | **plus**   101:5,10 |
| 35:8,16,23 | 268:4 272:19 | **play**   149:20,21 | **poignant** |
| 36:6,21 37:12 | 290:6,17,19 | 165:24,25 | 277:10,12 |
| 37:14 38:2,14 | **planned**   245:22 | **playing**   137:9 | **point**   21:6 |
| 38:16,18 51:25 | 289:10 | 149:22 | 24:21,25 25:1 |
| 52:3 53:2 | **planner**   36:3 | **plaza**   1:17 2:4 | 26:25 27:6,7 |
| 60:22 61:2 | 47:9,19 125:8 | 104:8 | 33:21 35:19 |
| 70:15 77:9,19 | 172:7,8,9 | **please**   5:25 | 39:1,10 52:4 |
| 97:9 99:20 | 175:7,11 | 21:14 34:14 | 70:25 76:14 |
| 105:5 107:13 | 194:23 206:11 | 35:4 40:8 48:2 | 83:8 86:24 |
| 117:22 123:19 | 208:13 | 49:10,11 52:9 | 99:13,14,15 |
| 124:20 125:3 | **planner's** | 54:12 55:21 | 102:12 103:18 |
| 127:18 128:1 | 173:17 | 65:9 69:15 | 129:22 149:14 |
| 128:12,13 | **planners** | 74:10,20,21 | 166:1 171:2 |
| 129:18 132:3 | 108:22 195:4 | 75:2 76:13,13 | 189:10 190:18 |
| 133:6,7,15 | **planning**   19:7 | 84:7 87:23 | 192:4 194:16 |
| 134:20 135:13 | 19:10 25:9 | 90:25 94:17 | 194:18,20 |
| 135:15 138:17 | 123:18 184:24 | 96:5 97:3 | 203:1 212:17 |

**[point - problem]**                                            Page 46

216:2 228:16
233:25
**police**  11:20
**policy**  201:7,18
201:19
**policymakers**
203:14,16
**poor**  24:20
**portion**  36:25
39:21 83:24
203:5
**porzio**  292:18
297:14
**position**  40:5
66:16,17,20
67:4,4,5,10,22
85:14 89:1,3
128:23 147:11
147:13 148:6
151:2,8 153:13
153:17 154:3,5
155:14 156:7
159:10 167:6
167:14 168:3
204:18 228:1
247:12,18
248:1,2,10,12
248:17 249:6,8
249:10 251:9
253:22,23
254:8,14,17
257:13,25
258:7,10,12
259:20 260:4
260:11 261:4,9

261:14 272:11
272:24 280:21
280:24 281:10
281:12,19
**positions**  248:7
**positive**  155:6
156:6,8,20,21
157:8,15
158:19,22
**possibility**
56:20,22
170:10 194:10
287:1
**possible**  62:16
62:17 170:7,17
193:24 194:2,5
194:6 293:15
**possibly**  170:23
183:7
**post**  190:21
**posted**  22:24
**postings**  23:9
**potential**  97:6
97:13 213:12
**potentially**
80:1,19 82:13
**power**  291:14
**predicting**
210:13
**preparation**
7:13 202:13
**prepare**  6:10
6:24 202:2
203:4 296:2

**prepared**  33:11
34:12 43:14
125:6 188:17
191:15 202:15
203:7,10,11
**preparing**  7:8
**present**  2:17
59:9 67:3
91:25 95:9
111:5,10
119:23 173:9
292:19
**presentation**
36:2,10 103:3
175:14,18
**presented**
38:16,22 94:5
98:13 99:20
110:23 123:19
124:8 266:2
**presenting**
120:11
**president**
292:16
**presiding**  211:5
**press**  159:22,22
160:5,25
209:20 211:22
211:22 241:5
255:10 270:5
**presume**
220:14
**pretend**  214:13
276:17 279:5

**pretty**  32:1
163:21 202:15
202:17 207:3
**previously**  66:2
79:14 115:9
**principal**
181:10
**principle**
155:24
**print**  142:24
**printed**  159:20
212:5
**prior**  8:2,9 9:8
58:22 59:13
75:18 96:19,25
100:2,10
102:13 115:2
193:15 196:6
274:14 279:4
284:13,22
293:1 301:5
**privileged**
254:6
**privy**  172:25
**probably**  43:3
112:18 135:23
169:3 181:7
191:19,20
198:1 219:17
222:22 223:10
238:20 260:23
291:9
**problem**  5:23
11:22 16:21,23
42:9 56:18

**[problem - prove]**                                          Page 47

199:6 237:13
**problems**  32:25
  33:4 36:7
  237:17,18,19
  237:20
**proceed**  101:12
  170:22
**proceeding**
  80:11 138:4
**proceedings**
  1:13 4:13
  178:12 230:23
**process**  80:2
  95:8 124:24
  131:12 135:4,6
  135:15 137:25
  197:20 222:5,8
  224:17 225:5
  225:13,19,23
  229:14 281:9
  283:13
**produced**  7:4
**product**  174:2
  174:12,20
**professional**
  126:2,15 173:9
  197:2 201:3,13
  205:20 209:16
  224:13 226:6
  229:23
**professionals**
  126:13 171:15
  175:8,12
  192:16,24
  193:1 203:3

204:1,12
207:11 208:4
225:14 227:19
237:7 283:13
**profits**  259:19
**progress**
  237:11
**project**  20:8
  66:6 67:17
  68:16 82:20
  84:21,25 97:19
  97:19 102:7
  105:2 111:22
  116:16 121:24
  123:20 124:8
  128:10 132:11
  132:15 147:6
  157:1,3,16,20
  158:7 162:7,14
  162:16,21
  166:10,10
  168:7 170:7,18
  170:22 182:6
  198:11 204:22
  206:18 210:24
  214:5 215:9,14
  220:19 221:4,6
  221:11,13
  222:1,8,14,18
  223:25 224:4
  224:11,14,24
  225:2 226:7
  232:6 237:8,11
  257:11 264:4
  267:3 272:3

285:1,2,4
286:6 287:7
**project's**  211:5
**projects**  97:16
  182:12 197:16
  219:24,25
**proof**  152:7,9
**propaganda**
  23:13
**proper**  199:3
  229:10 244:10
  280:10
**properties**
  13:10 46:13
  47:5,7 49:13
  49:15 68:12,13
  97:5 119:17
  121:23 222:6,8
  289:9
**property**  13:12
  14:9 18:20
  20:5,6,13
  46:10 49:17,18
  49:25 50:6
  53:13 66:13
  76:17,23,24
  78:21,23 79:19
  80:5,11,20
  97:20 98:7
  116:17 118:8
  119:16 132:13
  134:13 139:6
  187:23,25
  189:15 239:9
  239:10 240:17

240:24 246:5
256:23 257:4
260:25 262:5
267:1 270:4
272:15 274:25
275:1 276:5
289:7 295:19
295:20 297:18
**proposal**  48:10
  49:9 51:9 53:2
**proposals**
  48:15
**propose**  107:23
  109:7 282:5
**proposed**  71:6
  94:13 103:1
  108:3 110:16
  119:6,12 120:6
  131:5 290:18
**proposing**
  53:19
**prospective**
  97:2
**protect**  89:23
**protected**
  271:7
**protection**  10:3
  10:17,23 27:9
  27:11 87:4
  89:8 90:5
  111:18 185:17
  186:8 277:23
  281:3
**prove**  93:5

**provide** 22:12
24:18 25:6
37:4 55:3 58:7
78:7 99:8
108:13 111:17
119:14 121:25
128:7 250:17
269:24 289:13
290:5
**provided** 37:6
75:21 264:18
272:2
**provides** 61:3
97:4 98:5
128:2
**providing**
77:15 128:22
**provision** 35:8
75:16 77:4
78:14 79:3
98:17 295:14
**provisions** 37:3
75:8 96:8
99:10 128:4
**pseudo** 99:20
**public** 1:15 5:2
18:18 23:17
51:23 52:2
54:17 60:11
63:13 76:25
78:21 79:1,5
80:17 153:3,7
173:1,7 174:4
174:5 181:20
187:10,16

222:22 223:7
248:2 254:8,14
254:17 258:7
258:10,12,17
259:20,25
260:4 261:14
283:5,9 300:20
301:4,22
302:25
**publicly** 175:23
248:3 258:21
273:19
**published** 4:7
141:10
**pull** 21:13 35:4
39:4 41:7 48:1
52:8 60:5
68:25 72:11
87:11 93:7
110:6 114:1
130:10 141:6
154:19 171:18
173:24 178:8
187:13 191:3,4
191:4 209:19
210:2 211:12
211:18 241:2
268:8 270:18
271:10 294:5
**pulled** 43:7
**purchase**
297:18
**purchased**
249:17

**purchasing**
68:12
**purpose** 14:23
64:22 65:3
69:9 73:21
74:5 75:3
76:25 79:1,6
79:18 80:17
134:9,11 261:2
279:5
**pursuant** 37:7
75:18 198:17
265:9 267:3,6
**purview** 250:9
**push** 135:4
**pushing** 169:11
169:14,18,19
**put** 34:4 59:4
68:10 74:16
77:23 78:10
90:11 91:7,13
99:21 105:5
108:6 118:6
126:2 135:17
143:21 184:9
187:23 191:6
216:24 258:1
258:23 265:5,7
274:17 276:7
281:18 296:18
296:21
**puts** 280:23
**putting** 7:1
77:22 78:1
81:18,20 148:4

152:10

**q**

**qualified**
193:12
**quantify** 96:18
**question** 6:1,3
14:3 15:14
18:7 29:4 30:2
31:10,14,21,22
32:14 41:25
43:18 44:25
46:2,3 52:25
55:16 56:1
58:4,8 59:2,8
59:20,21,22
64:17,22,23
65:1,4,5,11,12
67:13 73:24
74:5,12 82:16
84:10 90:10
91:17 92:19
97:19 100:13
100:14,18
101:3,16,21
102:1 104:20
106:3,15,16,25
107:1 108:3,12
108:24 110:24
111:3,14
125:21,23
126:9 136:5
142:17 143:1
143:12 145:17
148:12,16,17
149:7,13,15,19

150:1,4,22
151:7 159:2,4
159:6 164:1,3
165:9 169:6
179:22 184:18
184:18 185:7
188:7,8 189:21
190:16 204:10
204:12 213:19
214:11 215:2
218:12 226:19
228:5 230:8
234:25 242:22
243:11,20
244:24 245:8,9
245:10 249:2
250:22 261:22
261:23 262:20
273:1 274:4
277:12,25
278:8,16,18
279:2,16,18,19
279:21,24,25
280:10,16,19
297:20 298:3
**questioned**
227:11
**questioning**
226:5
**questions** 5:22
26:17 44:4,22
74:17 139:22
144:18,18
145:20 149:3,6
149:23 155:1

160:11 164:21
164:24 168:25
185:24 186:3
187:15 230:23
244:15,18
247:21 249:9
270:20 273:10
275:16,25
279:15 280:5
**quick** 210:6
**quickly** 61:4
95:14 170:22
241:12 289:11
**quite** 74:13
**quotations**
151:25 152:2,3
**quote** 143:22
144:8 152:24
158:16 168:3
181:7 213:24
231:17
**quoted** 144:6
152:20 153:1
210:12
**quotes** 142:12
142:15 143:9
144:20 149:4
152:11 155:3
156:5 168:2
220:13 247:5
**quoting** 23:15
152:20 278:4

**r**

**r** 2:1 291:20
292:5 295:12
300:1
**raise** 19:22
109:12 187:15
234:22
**raised** 18:24
19:10 35:1
86:13 164:13
164:15 189:4
189:21 239:8
275:25
**raising** 109:10
109:15 165:4,4
188:2,6
**ramsey** 2:9
**ran** 9:13
153:14,17,23
154:7 156:11
156:13 158:4
166:6,9 168:10
168:11 181:9
182:10 208:22
209:12 286:15
**rank** 25:12
**rapidly** 163:21
**rate** 37:10
66:15 68:15
265:17 267:17
**rather** 55:11
**rdp** 97:7
**reach** 80:8
**reached** 93:18
93:22 95:17

103:8 200:2
250:4 255:23
**read** 6:11,12,13
6:20 15:17,20
23:2,8,11,12
31:24 32:2
35:10 37:2
50:11 53:11
55:15,17,20
56:5 62:13,18
62:21 63:6,15
63:18 64:20
65:2,2 69:24
72:23 74:9
90:13 92:22
100:21 121:12
121:14 154:12
181:16 244:25
245:5,7 254:18
256:2 260:21
261:24 262:1,2
280:1,3 281:14
281:22 291:22
298:9,10,13
300:4
**reading** 6:18,22
23:18 31:5
64:10,14,16,18
65:3 71:21
74:13 122:6
179:3 281:17
**ready** 44:20
45:1 74:3,3
**real** 61:3 82:3
216:1

**[realistic - recommendation]**                                                    Page 50

| | | | |
|---|---|---|---|
| **realistic** 22:12 | 244:14,16 | 51:21 52:7 | 160:19 167:3 |
| 97:6 99:8 | 274:14 302:5 | 53:4 54:3 56:7 | 191:22 203:20 |
| 119:13 128:7 | **reasonable** | 56:12,16 57:7 | 222:3 227:18 |
| **really** 14:3 81:9 | 114:22 121:22 | 57:12 60:4 | 230:14 246:4 |
| 98:10 106:22 | 150:15 153:6 | 61:12,16 62:5 | 247:9 262:8 |
| 107:25 109:14 | 153:21,22,25 | 62:9,11 69:5 | 269:8 270:10 |
| 149:1 151:24 | 220:8 | 70:8 75:7 76:2 | 270:17,24 |
| 154:22,25 | **reasoning** | 76:4,8,11 77:8 | 274:23 283:15 |
| 169:4 182:6 | 151:12 | 78:5,9,12 81:8 | 288:2,22,24 |
| 183:10 186:3 | **reasons** 50:6,13 | 82:11,22 84:14 | 291:10 293:20 |
| 226:19 228:1 | 78:13 84:11 | 84:17 88:17,21 | 293:22 295:21 |
| 231:13 232:1 | 104:2 105:18 | 88:24 89:2,4,6 | 297:25 298:2,5 |
| 235:3,18 240:5 | 111:19 112:16 | 89:10 94:4,8 | 298:7 |
| 243:2 261:21 | 113:7,8 216:3 | 94:10,14 95:20 | **receive** 230:25 |
| **realm** 230:11 | **recall** 8:2 9:4,7 | 95:21 102:9,15 | **received** 53:8,9 |
| 230:12 | 10:1 13:7,13 | 102:20,21,22 | 119:3 |
| **reappoint** | 14:15 15:25 | 103:2,6,11 | **recess** 129:24 |
| 194:25 195:2 | 18:22 19:3,16 | 104:13 107:6 | **recognize** |
| 195:15 | 19:24 20:25 | 109:9,20,24 | 294:10 |
| **reappointed** | 21:9,12 22:2,4 | 110:5 112:19 | **recognizes** |
| 125:16,25 | 22:8,21 23:2 | 112:21 113:11 | 292:7 |
| **reason** 36:21 | 24:6 25:3,22 | 113:12,20 | **recognizing** |
| 41:16,20 42:12 | 26:22,23 27:7 | 114:25 115:3 | 38:2 95:11 |
| 42:24 45:24 | 27:16 28:4,8 | 115:16,18,25 | **recollect** |
| 50:8 51:16,19 | 28:12,16,24 | 116:1 120:9,10 | 206:10 |
| 51:19 66:4 | 29:2,23 30:16 | 122:23 123:1,5 | **recollection** |
| 67:15 68:4,8 | 32:3,5,6,9,12 | 124:22,24 | 95:16 123:7,10 |
| 69:22 70:1 | 32:13 33:6 | 129:6 131:6 | 240:18 295:22 |
| 75:13 78:18 | 34:11 35:3,13 | 134:2,22 135:2 | 296:3,6 |
| 84:19 105:22 | 36:12,16,19 | 137:19,23 | **recommend** |
| 111:11,15,25 | 38:15,17 39:3 | 139:5 142:20 | 86:14 195:10 |
| 112:9,13 113:9 | 40:3,6 42:19 | 143:25 144:5 | 195:11,12 |
| 118:17 151:1 | 43:25 45:23 | 145:6,11,15,24 | **recommendat...** |
| 170:17 213:10 | 46:4 47:20 | 153:10,11 | 121:21 |
| 214:2,5 238:17 | 49:22 51:4,6 | 156:9 160:17 | |

**recommendat...**
204:13,16
**recommended**
24:16 120:14
195:14,18
206:22,23,24
206:25
**record** 6:6 7:10
10:15 15:20
32:2 34:22
54:10 56:5
69:20 90:12
91:7,14,18,24
92:7,9,22
100:23 101:1
102:5,8 110:19
129:23 130:5
152:12 165:3
173:6 175:5,23
176:3 182:15
182:17 191:2
211:16,17
236:23 237:3
245:7 262:1
280:3 299:23
299:24
**record's** 67:21
**recorded**
180:23
**recycle** 9:23
**redeveloped**
46:10
**redeveloper**
46:7 48:9 49:1
51:13 80:4,12

238:1 245:15
259:15 276:4
292:24
**redeveloper's**
49:8
**redevelopers**
1:4 5:7,9 19:5
39:13 48:23
130:16,17
302:2
**redevelopment**
3:10,11,14
20:7 22:6
33:11 34:3,12
35:8,16 36:6
37:4,12 38:18
38:24 39:2,11
39:25 40:18
41:11 42:4
45:8,11 46:8
46:16 49:6
51:25 53:2
60:22 61:2,10
61:19 69:6
75:9 77:4,7,9
77:19 78:6,19
78:23,24 79:6
80:16 85:5,10
94:1 116:18
119:18 121:24
132:3,11 133:6
133:15 151:15
161:10,12,16
162:22 168:2
210:24 219:9

219:13 222:5,7
222:14 224:7
224:10 251:20
258:19 261:19
272:19 289:12
289:20 291:20
291:24 292:20
**redo** 38:8
267:22
**redraw** 177:4,6
**reduce** 259:19
**reduced** 120:7
121:10
**reducing** 120:8
**reduction**
185:18
**refer** 16:7,9
63:19 137:24
157:14 222:13
**reference** 76:16
**referendum**
162:1,25 166:3
181:4,18
182:19,20
**referred** 166:3
253:24
**referring** 20:6
20:9 53:11
134:3 157:2,16
158:17 161:13
161:21 162:14
162:16,18,20
167:21 183:18
184:15 219:8
220:7 221:3

**refers** 37:18
51:8 77:16
139:16
**reflect** 49:7
54:5,24 67:21
91:19 100:23
101:1 151:8
**reflected** 57:11
65:8 97:5
139:1 148:20
151:2
**reflecting**
148:6
**reflects** 98:15
153:13
**refresh** 95:16
133:19 269:16
298:22
**regard** 19:4
123:3 189:11
239:2
**regarding**
18:24 25:4
36:3 40:5 52:2
76:6 93:14
100:4 102:10
102:25 127:23
168:6 173:22
187:16 192:16
197:19 237:7
245:22 246:14
248:2,13,18
286:5 294:3
**regardless**
148:17

**regentrification**
37:1

**regional**  22:17

**regular**  16:19
289:1

**regulations**
25:17

**regulatory**
25:11

**reiter**  195:4,5
196:3 208:15
208:16

**reiterate**  5:24

**reiterated**
281:11

**relate**  20:4
294:23,24

**related**  9:16
22:25 104:5
148:3 156:4

**relates**  294:18

**relating**  20:13
21:3 27:21
34:1 88:15
160:11

**relation**  91:20

**relationship**
82:8

**relative**  301:14
301:16

**release**  60:8

**released**  60:11

**relevant**  252:18
261:22

**reliance**  275:1

**religious**
285:10

**rely**  30:24

**remain**  24:2

**remainder**
269:25

**remaining**
98:19 99:9
128:5,8 245:25

**remediate**
12:13 32:25
33:4

**remediated**
188:12

**remediation**
13:24

**remedies**  25:14

**remedy**  24:13
27:10 87:5
89:8,11 90:1
111:19 185:18

**remember**  5:15
8:7 9:25 22:22
23:1 32:15,15
32:17 33:1,5
33:22 40:4
41:15 42:6
53:1 54:1,4
59:25 60:9,14
66:7 83:21
84:1,3,18 89:1
92:18 93:2
110:2 113:6,7
115:4,8,10,15

115:17,21
120:13,16,20
120:22 124:23
127:21,24
129:7 130:18
131:19 133:20
134:7 137:22
141:19,21
142:16,22
143:3,4,5,7,10
144:22,24
145:2,5,8,10,12
145:16,18,21
145:25 146:3,4
146:5,7,11,14
148:18 150:25
155:22 156:13
159:12 172:3
172:20 173:19
173:23 176:9
176:12 177:16
177:24 178:5
178:17,20
179:2,13 181:6
181:8 182:7
187:17 191:21
192:1,18
193:21,22,23
194:1,7,12,15
195:19,25
196:19,22,23
196:25 198:3
203:17 208:2
217:17 218:22
224:1 225:11

228:10 229:5
230:15 238:21
240:5 244:2
246:16,17,19
247:1 248:5
249:3 251:12
252:25 253:2
254:19 263:10
268:19 270:21
271:1,3,8,9
287:22 288:15
288:20,21
290:7 291:12
291:15 292:21
293:8,10 296:5
296:8,10,12,16
296:20,22
297:4,16,19,21
297:23 299:16
299:20

**remembered**
56:12 113:20

**reminds**  180:25

**remove**  193:9

**removed**
194:25

**renda**  210:9

**rendered**  21:2
21:5,22

**renew**  193:9
206:4

**renewal**  1:4 5:9
39:13 48:23
302:2

**renewed**
206:13
**reorganization**
192:20
**repeat** 55:22,25
56:1 65:13
**repeated** 31:17
**rephrase** 31:19
31:23 55:18,22
55:25 174:23
**replace** 195:3
**report** 4:11
18:10 121:20
125:3 127:4,5
150:11 173:22
175:2,3,4
256:6,14 260:7
269:18 276:21
**reported**
249:15 255:9
256:22 270:4
**reporter** 1:15
6:5 15:20 32:2
56:5 92:22
142:10,12
143:7,14,15,16
143:18,24
144:2,4,7,20
146:1,8 147:8
150:11,17,23
152:10,14
155:8,11 162:4
211:6,9 218:19
218:20 220:2,6
220:11,24

241:19 245:7
246:22 249:15
262:1 280:3
301:3
**reporters**
152:24 220:23
**reporting**
141:12 200:4
218:19 246:25
247:3 249:15
302:1
**reports** 220:6
**repose** 3:24
90:5 111:18
114:5 186:8
277:22
**represent** 5:6
51:11 66:25
**representative**
92:1
**representatives**
90:20 160:5
218:17 277:17
**represented**
53:14
**reputation**
193:18
**request** 164:8
165:10,13
230:25 258:22
263:23
**requested** 61:6
200:21,22
282:23 287:24
289:19

**requests**
268:20
**require** 25:15
189:18 199:20
289:20
**required** 12:2
24:14 53:24
68:5 76:10
114:20 124:19
176:17 186:25
189:19 226:24
250:16 252:24
254:14 268:15
273:20,21
276:21
**requirement**
61:9 176:5
**requirements**
75:5,10 84:13
188:23 199:18
272:6
**requires**
269:19 272:1
276:20
**requisite** 61:7
**resident** 285:22
286:11
**residential**
221:24 272:3
**residents**
187:24 259:18
289:24
**resistance**
273:17

**resisted** 22:11
**resolution** 3:12
3:19 4:14 33:7
40:10,11,17
42:22 45:5
61:14,18 62:12
62:18 63:14
68:20 69:4
71:22,23,24
72:14,19,19
73:9,13,16,20
73:25 74:24,25
110:16,16
134:6 188:18
188:22 189:18
191:4,9,14,17
192:10,12,16
224:17,20,25
225:1,2,13,19
225:25 226:6,8
226:10 227:8
227:10 228:6,9
228:14,19,22
229:5,16,21
230:3,5 267:4
269:13,17,24
270:19 272:7
**resolution's**
189:12
**resolutions**
20:4,12 51:10
62:7 63:6
192:23 226:15
226:22

| respect 41:13 | results 95:13 | rfp 48:12 | 79:15,22,23 |
|---|---|---|---|
| 49:8 122:21 | resumes 102:4 | rfq 194:21 | 80:6,9,13,24 |
| 123:9 147:5 | 130:3 190:25 | 196:2,12 | 81:15 82:21 |
| 167:17 168:1 | 237:1 | rhetorical | 83:2,2 86:8 |
| 183:4 200:2 | retain 126:13 | 185:24 | 87:5,7,25 |
| 229:8 245:16 | retained 4:24 | ribbon 211:5,8 | 89:19 92:3 |
| 288:19 | returned | rich 207:25 | 100:16,20 |
| respond 91:16 | 210:21 | 292:16 | 104:4 108:11 |
| 91:16 | revealed 25:8 | richard 2:12 | 110:21 111:6,7 |
| responded | review 7:2,5,8 | 294:25 | 111:9 112:7,8 |
| 54:24 189:22 | 44:19 62:7 | rid 42:25 127:1 | 117:10 118:17 |
| 196:1 | 64:4,25 65:10 | 168:19 | 122:14 123:23 |
| response 58:5,8 | 70:19,20,23 | riddled 25:11 | 125:12 126:18 |
| 63:4 261:15 | 95:11 99:8 | ridiculous | 127:13 129:2 |
| responsibility | 127:5 128:6 | 149:6 154:21 | 129:21 130:4 |
| 12:11 83:19 | 175:4 191:14 | right 5:20 | 134:4 136:12 |
| responsible | 198:14,16,23 | 14:21 23:13 | 137:10 138:21 |
| 13:23 | 199:22 209:15 | 24:10 28:1 | 140:5 141:13 |
| rest 167:17 | 226:15,21 | 30:3,8,22 31:1 | 142:25 148:1 |
| 296:24 | 230:3 290:5 | 35:21 36:22 | 148:25 149:8 |
| restaurant | reviewed 34:7 | 37:22,24 41:4 | 149:22 151:4,7 |
| 49:20,21 50:17 | 35:11 70:16 | 44:17 45:23 | 152:6 153:13 |
| 50:24,25 242:6 | 71:7 171:15 | 47:6,24 48:22 | 154:21 155:15 |
| restaurants | 172:21 177:8,8 | 48:22 49:2 | 157:7 161:22 |
| 51:3 | 193:11 198:13 | 50:22 51:22 | 163:3 165:8 |
| restricted | 200:1 205:3 | 54:9,9,10,18,21 | 166:7 168:8 |
| 37:13 104:9 | 216:18 228:9 | 56:11 57:5 | 169:15 171:2,8 |
| result 79:25 | 228:10 | 60:15,18 61:11 | 173:13 174:21 |
| 218:19 253:14 | reviewing 74:4 | 63:9 65:1,3 | 178:12,15,16 |
| 285:6 291:3 | 192:8 199:22 | 67:5,18,23 | 179:1 180:2,10 |
| 297:24 | 228:14 | 71:9 72:5,9,13 | 180:14 182:21 |
| resulted 186:8 | revise 268:3 | 72:13 73:22 | 182:24 183:18 |
| 262:12 | reward 216:6 | 74:11 76:11,20 | 184:5,6,7,13 |
| resulting 287:1 | rework 267:13 | 77:11,14,22 | 186:10 187:10 |
| | | 78:15,25 79:10 | 189:23 190:19 |

[right - says]                                                    Page 55

191:1 196:25
197:8 202:8
205:9,10,16,23
206:2,10 207:9
210:7 213:17
213:25 218:3
220:14,25
227:24 232:8
232:25 238:3
239:7 242:17
243:20 244:11
245:20 247:8
247:15 249:20
250:13 251:1,3
252:13 253:10
254:22 256:25
258:2,4 259:2
259:24 260:1,2
260:10,11
262:25 263:7
263:20,20
264:4 266:16
267:7,10,11
271:22 274:24
276:18 279:6
280:9,15
281:12,17,23
289:4 290:19
291:10 292:18
295:3 298:4
299:15,22
**rights** 244:20
**rise** 211:3
**riverfront** 1:17
2:4

**road** 2:13
53:23 259:13
**roadblocks**
262:10
**rob** 239:21,22
**role** 8:3 225:12
226:3,15 227:3
227:22 237:10
**ron** 239:25
**room** 90:8
100:19,24
101:14,19
121:8 219:3
296:18,22
**rooms** 267:21
**round** 4:4 37:8
37:18,23 96:20
97:1 125:3
**rs** 294:24 295:3
**rubinstein**
93:11
**rude** 164:12
**rule** 253:9
**ruled** 23:24
24:12
**rules** 37:8,18
37:23 269:5
**ruling** 23:1
25:5,6 28:3
35:2 81:1
129:8
**rulings** 23:16
75:18 215:17
**rumor** 24:2

**run** 61:3 142:6
154:1 183:24
183:25 285:23
285:25 286:12
**running** 140:10
154:15 179:23
**runs** 147:16

**s**

**s** 2:1 285:20
302:5
**sad** 242:15
**safe** 16:14
**sat** 9:3 35:20
36:10 88:12
115:22
**satisfaction**
185:2
**satisfied** 17:24
96:24 97:7
215:22 228:6
268:22 271:6
**satisfy** 26:12
107:11,14,16
122:4 157:4
186:22,24
257:5 273:23
277:2
**satisfying**
123:3 185:1
186:6
**saved** 9:22
**saw** 48:6 117:7
141:13 192:2,7
232:8,9

**saying** 47:9,13
47:16,18 57:8
58:5 81:19,22
94:11 104:2
105:22 106:10
120:11 126:6,8
126:12 133:21
143:4,8,15
145:3 152:10
156:5 167:7
179:23 201:19
201:22 208:20
215:11,20
220:13 231:16
232:15,18,22
242:11 258:6
262:5 267:12
267:23 275:2
276:5,13
277:11 279:17
279:20 288:22
**says** 18:19
24:12 35:10
39:19 46:6
49:4 53:8
54:13 57:14
61:6 69:18,21
72:19,22 75:3
93:17 95:3,4
96:2 119:10
151:20,20,23
157:11 160:25
161:7,9 167:22
174:3 189:9
212:5 213:24

| | | | |
|---|---|---|---|
| 218:24 219:22 | **scrolling** | 165:8,12,15,19 | 278:22 279:10 |
| 222:12 241:21 | 121:16 | 169:24 170:11 | 279:13,22 |
| 242:1 246:22 | **se** 218:23 | 171:1 172:5,23 | 280:4,6 281:1 |
| 247:7 259:25 | **seaman** 2:13 | 177:23 178:3 | 281:4,24 |
| 260:13 269:14 | 10:8 15:7 | 179:18,21 | 282:20 283:17 |
| 272:17 279:7 | 16:18 17:10 | 181:25 182:16 | 283:20 284:1,8 |
| 293:13 294:13 | 18:11 22:20 | 193:25 194:4 | 284:12 287:14 |
| 295:12,13 | 23:21 24:5 | 194:11,17 | 287:18 290:14 |
| 298:12 | 25:21 26:14,21 | 199:12 201:2,9 | 291:1 292:6 |
| **scale** 150:13 | 28:15,19,23 | 202:22 205:24 | 293:2 294:19 |
| 157:1,3 220:8 | 29:9,22 30:13 | 207:18 212:21 | 295:2 299:18 |
| 220:18,19 | 30:20,23 31:9 | 213:14 214:10 | **search** 219:4 |
| 221:5,7,8 | 33:12 34:13 | 214:17,19,25 | **second** 43:20 |
| 222:13,17,18 | 36:15 41:21 | 216:14 217:11 | 45:23 49:4,10 |
| 222:24 223:5,6 | 42:14 43:4,9 | 221:1 225:15 | 61:6 69:6,10 |
| 223:21,25 | 43:13,15,20 | 228:3 229:12 | 69:16 70:9 |
| 224:3,6,11,14 | 44:9,16,18 | 229:17 234:22 | 74:22,25 75:2 |
| **scaling** 218:24 | 45:2 56:6 57:3 | 236:2,6 244:12 | 84:5,11,23 |
| 223:19 | 57:6,19 60:12 | 245:13 247:10 | 85:3,7,8 86:17 |
| **scene** 11:19 | 60:19 62:15 | 247:14 252:5,9 | 93:1 94:1 |
| **school** 9:22 | 63:11,16 65:9 | 254:3,16,21 | 97:18 114:6 |
| **scope** 228:4 | 67:24 68:7 | 255:4,11,14,25 | 118:6 210:4 |
| 253:13 | 71:13 72:3 | 256:8,10,16 | 241:17 242:1 |
| **scott** 240:14 | 74:9,15 82:10 | 257:1,7,16,24 | **seconded** 41:12 |
| **screaming** | 83:8 87:24 | 258:3 259:22 | **seconds** 62:24 |
| 276:25 | 102:12 111:13 | 260:12 261:3,5 | 63:4 279:24 |
| **scroll** 24:8 | 112:3 113:2 | 262:13 263:1,8 | **secretary** |
| 49:10,24 72:9 | 117:18 120:21 | 264:5 265:12 | 263:17 |
| 74:19,20,21 | 126:19 127:3 | 265:22 266:13 | **section** 41:6 |
| 76:12 84:6 | 129:3 145:1,13 | 266:19 269:21 | 64:11,13 65:14 |
| 96:15 118:20 | 147:19 148:11 | 270:7,9 272:13 | 65:14 76:14 |
| 167:19 210:17 | 149:9,18 150:3 | 274:7,22 275:5 | 95:3 96:14 |
| 211:24 212:15 | 151:22 152:23 | 275:7 276:9 | 110:8 131:8 |
| 219:19 220:5 | 153:9 156:3,12 | 277:4 278:1,3 | 294:4 295:14 |
| 289:3 | 156:14 164:2 | 278:7,11,14,17 | |

**[see - settlement]**

| | | | |
|---|---|---|---|
| **see**  16:13,21 | **seem**  151:11 | **service**  8:13 | 102:19 103:1,5 |
| 17:23 39:7,14 | **seems**  159:14 | 160:2 | 103:8,13 |
| 42:25 43:1 | 275:24 | **services**  11:21 | 104:16,25 |
| 44:24 51:13 | **seen**  125:3 | 295:16 | 105:8 106:5,8 |
| 54:13 60:8 | 154:22 172:18 | **session**  130:1 | 106:19 107:3 |
| 63:24,25 64:2 | 191:24 207:6 | 247:20,24 | 109:19 110:3 |
| 64:19,20,23 | **segments**  34:10 | 249:12 254:5 | 110:17 111:12 |
| 69:11,13 71:16 | **selected**  48:18 | 254:11,13,20 | 111:16 112:2 |
| 75:11,12,25 | 48:20 49:2 | 254:23,24 | 112:17 113:10 |
| 76:1,17,18 | 177:10 270:6 | 282:16,17,19 | 114:11,21 |
| 81:14 86:23 | 270:12 | 282:21,25 | 115:24 118:11 |
| 117:5 119:24 | **sending**  162:9 | 283:5,10 290:3 | 118:13,24 |
| 127:8,16,17 | **sense**  206:15 | **set**  46:10 98:16 | 119:6,12 120:7 |
| 136:1 139:2 | 298:25 | 128:3 168:13 | 120:14 121:9 |
| 143:9 146:7 | **sensible**  163:5 | 292:25 301:12 | 121:21 122:2 |
| 151:23 152:16 | 163:7 | **setback**  53:25 | 122:17 123:9 |
| 152:17 175:3 | **sent**  194:21 | **settembrino** | 123:16 124:13 |
| 180:3,7 183:11 | **sentence**  93:17 | 196:10,11 | 124:19 170:20 |
| 187:18 191:17 | 162:23 163:21 | **setting**  153:3 | 171:3 176:6,11 |
| 192:4 203:6 | 222:11 | **settle**  4:3 94:7 | 176:15,24 |
| 222:4 241:11 | **sentiment** | 95:9 104:4 | 177:14,19 |
| 248:15 258:20 | 162:7 168:4 | 108:5 111:17 | 185:20 186:5 |
| 259:14 263:5 | **sentiments** | 114:13 170:15 | 186:14,25 |
| 266:9 267:16 | 148:20 | **settled**  83:23 | 198:18,19,22 |
| 269:22 275:18 | **september** | 93:3,4 94:2 | 216:5,17 |
| 288:16 295:9 | 61:13 | 97:11 98:20 | 217:10,12,23 |
| 295:11 297:10 | **sequence**  40:25 | 113:14,17 | 250:4,16 |
| 298:11 299:12 | **series**  22:23 | 118:22 170:9 | 255:22 256:5 |
| 299:12 | 192:22 293:5 | 186:18 271:24 | 257:6,20 260:6 |
| **seeing**  64:5 | **serious**  167:24 | **settlement**  3:21 | 267:6 269:1,18 |
| **seek**  89:8 250:2 | 275:25 | 93:6,10,21,22 | 271:7,21,22 |
| **seeking**  87:4 | **served**  142:5 | 94:13,23 95:10 | 276:19 277:20 |
| 95:5 260:14 | 150:13 | 95:11,17 96:3 | 279:8 280:24 |
| **seeks**  25:10 | **serves**  7:21 | 96:17 97:10 | 283:23 |
| | | 102:11,14,16 | |

**settling** 110:20
**seven** 98:19,22
  98:24 99:2,9
  99:12,16,21
  100:4,9 128:5
  128:8 132:19
  242:3 245:25
  247:11,12,18
  248:2,13,18
  249:10,17
  250:3,15,19
  254:11 255:8
  255:17,19,21
  256:5,13,20,24
  257:14 259:7
  259:12,16
  260:5,16 261:1
  262:6,11 264:7
  264:10,13,15
  264:19 265:4,6
  267:5,10
  268:17 269:12
  269:19,20
  270:6,12 272:2
  272:5,8,23
  273:5,6,17,23
  274:6,13,17
  276:1,7 282:6
**seventeen** 39:5
**several** 51:3
  148:9 155:10
  268:23 293:12
**shakes** 131:1
**shaking** 12:25

**shape** 161:11
  161:16 162:22
  166:11 210:25
**share** 4:4 25:7
  26:5,6,19
  93:20 97:9
  125:3 128:9,11
  128:13 129:18
  134:20
**shared** 129:19
**sheet** 292:15
  294:23 295:6
  302:1
**shelter** 24:18
**sheola** 238:8
  292:18 295:1,3
**shorter** 31:11
**shorthand** 20:7
**shortly** 52:5
  93:2 207:16
**show** 39:6,20
  43:22 60:2
  68:18 87:7,20
  91:4 99:7
  114:8 128:6
  141:4 180:13
  248:6,11,21,24
  249:1 291:16
**showed** 51:25
  129:7 182:4
  255:16
**showing** 71:18
  132:11
**shown** 47:3

**shows** 41:13
  60:6 63:20
  73:10 97:18
  138:23
**side** 53:20,21
  158:18
**sides** 207:8
**sign** 292:15
  294:23 295:6
**signature**
  301:22
**signed** 95:23,24
  114:12
**significant**
  185:4
**significantly**
  289:9
**signing** 169:16
**silently** 74:9
**sills** 1:16 2:2
  5:5
**sillscummis.c...**
  2:5,6
**silly** 268:9
**simple** 31:1
  106:25 148:16
  148:17 279:2
**simply** 144:19
  152:11 173:16
  200:4
**simultaneous**
  297:16
**simultaneously**
  9:13

**single** 98:10
  108:20 126:2
**sir** 64:14
  232:16 267:25
**sit** 27:21 42:11
  45:25 56:14
  88:25 103:12
  121:8 203:8
  224:2 293:24
**site** 13:10,11,12
  17:13 19:4,23
  22:7 49:2
  70:11 71:7
  75:23,25 76:7
  76:7,10 80:20
  80:22 81:3
  83:12,22 86:15
  98:17,22,23,24
  99:2,4 100:4
  106:7 107:24
  108:2,12,13,16
  108:22,24
  109:7,17
  116:19 128:4
  129:1 133:7
  135:15 138:17
  151:17 171:5
  172:17 173:22
  175:14 176:4
  177:10,21
  183:20 184:8
  184:10,19,22
  188:4 190:6
  191:12 192:17
  197:20 198:21

[site - specifically]                                                    Page 59

| | | | |
|---|---|---|---|
| 199:10,11 | **sited** 97:16 | 211:23 | 288:12,13 |
| 214:14,16,22 | 98:7 | **social** 82:8 | **speaker** 180:13 |
| 215:19 216:4,4 | **sites** 13:16,22 | **software** 210:6 | **speaking** 31:5 |
| 216:11,12,12 | 13:24 15:1,5 | 271:19 | 146:4 157:19 |
| 216:25 217:4 | 16:17 17:8 | **solely** 254:25 | 159:14 161:9 |
| 239:17 246:7 | 83:5,12 105:9 | **solicit** 194:13 | 203:4 222:22 |
| 246:14,14 | 108:18 109:1 | **solution** 56:18 | 223:11 |
| 247:11,13,18 | 109:21 188:11 | **somebody** | **speaks** 54:22 |
| 248:3,14,19 | 282:4 | 18:13 152:4 | 86:1,3 |
| 249:10,17 | **siting** 83:19 | 187:22 229:16 | **special** 4:19 |
| 250:19 253:23 | 246:7 | **soon** 293:14 | 24:17 27:15,17 |
| 253:23 255:18 | **sitting** 35:6 | **sorry** 15:17 | 27:20 28:1,5 |
| 255:20,22 | 113:11 123:14 | 17:22 33:14 | 70:16 83:16,18 |
| 256:5,13,20 | 232:4 239:14 | 40:13,24 | 86:13 109:22 |
| 257:14,21 | 239:15 | 159:21 206:20 | 109:25 116:7 |
| 259:16 260:9 | **six** 168:16 | 212:22 222:20 | 121:20 134:17 |
| 260:16,17 | **size** 105:11,14 | 232:15,17 | 169:3 253:5,5 |
| 264:8,11,13,16 | 132:15 | 242:20 253:5 | 256:6,14 260:7 |
| 264:19,19 | **skipped** 41:1 | **sorted** 190:2 | 262:4 268:11 |
| 265:1,6,7,11,13 | **sklein** 2:6 | **sought** 90:5,5 | 269:18 |
| 265:25 266:3 | **sky** 194:6 | **sounded** 97:25 | **specific** 25:16 |
| 266:18 267:5 | **slate** 162:4 | **sounds** 147:10 | 46:9 59:5,21 |
| 267:14 268:4 | **slightly** 11:18 | 148:5,18 273:6 | 62:1 106:10 |
| 268:17,17 | **slow** 135:19 | 274:1 298:25 | 108:8 109:7 |
| 269:12,12,19 | 266:10,11,15 | **source** 212:12 | 122:2 133:1 |
| 269:19,20,24 | 266:16 | **south** 2:9 | 215:9,13 221:6 |
| 269:25 270:6 | **small** 54:15 | **speak** 5:23 7:12 | 228:7 268:20 |
| 270:11 272:2,5 | 66:1 212:2 | 7:16 102:25 | **specifically** |
| 272:9,12 273:6 | 220:9 | 116:11 117:12 | 14:22 47:3 |
| 273:19,22 | **smaller** 157:1,3 | 117:21 118:10 | 61:25 63:22 |
| 274:6,11,12,17 | 215:21 | 159:9 160:15 | 64:11 70:9 |
| 274:20 275:3 | **smooth** 210:13 | 163:21 243:24 | 76:11 77:23 |
| 276:2,7 277:14 | **snyder** 4:15,16 | 246:20 269:4 | 78:7 94:10 |
| 280:13,21 | 160:8,9,10,15 | 273:9 284:15 | 112:19,21 |
| 282:6 | 160:21 209:21 | 284:17 288:9 | 121:19 122:3 |

**[specifically - steve]**                              Page 60

123:12 131:19
134:8 135:2
139:5 142:11
143:24 144:7
150:21 151:20
155:11 157:18
160:14 162:20
166:9 220:22
228:21 244:2
**specification**
271:4
**specifics**
115:13
**speculation**
25:12 263:9
279:11 280:8
283:21 287:15
**speech** 220:16
**spell** 92:10,11
285:19
**spend** 231:25
**spent** 66:12
67:17 68:12
274:19
**spoke** 54:17
65:18 89:22
117:16 141:20
141:21 143:25
144:2,4,7
146:5 152:10
152:17 155:11
155:12,13
160:18 161:1,4
180:14 246:21
270:22,23

284:6
**spoken** 117:19
160:4,10
167:23 209:21
255:9 283:12
**spot** 80:23
**staff** 14:19
209:16 237:7
**staked** 258:8
**stamp** 127:9,11
**stand** 246:1
**standard**
188:21
**stands** 280:17
**stared** 233:10
233:19
**staring** 233:24
235:11,24
236:12,16
**start** 180:8
191:23
**started** 219:25
**starting** 34:15
293:5
**state** 1:15 6:16
6:19 10:2,16
11:1,9,12 30:7
37:7 76:22
128:10 140:1
156:9 181:10
182:2 189:12
189:13 190:2
203:8 259:10
285:9 300:20
301:4,22

**stated** 22:10
53:21 113:8
153:15 179:3
258:20
**statement**
57:11,12,14
97:25 131:14
133:25 142:9
142:15,21
143:6,13
144:10,13,20
148:19 150:17
152:11 153:2,7
154:10,14
181:12,15,20
184:4 186:5
187:20 188:1
198:6 210:14
219:5,16 220:1
220:10 221:3
223:7 234:11
234:13 257:2
257:18 262:18
263:2 285:13
**statements**
165:3 173:5,12
173:18 175:5
177:22 178:23
183:13 184:4
233:2 246:2
262:20 275:13
275:15,20
279:15
**states** 1:1 142:4
210:20 245:22

268:14 289:5
**statile** 195:4
**stating** 97:22
**station** 172:17
221:21 245:24
**status** 13:9
15:6,23
**statute** 77:12
78:20
**statutory** 61:9
78:24
**stay** 17:14
41:24 278:16
**steadfastly**
22:11
**steered** 195:16
**stenographic**
1:12 180:23
**stenographic...**
301:11
**step** 80:6
250:12 251:1,3
273:18
**stephanie**
141:9
**stephen** 2:3
**steps** 22:12
**steve** 24:8 39:4
43:22 45:5
49:24 52:18
60:5 63:21
68:25 72:10
74:19 76:12
84:6 87:15
93:7 94:24

**[steve - supports]** Page 61

96:5,15 110:6
119:7 122:11
127:8 130:11
131:8 138:22
141:6 161:6
167:19 171:18
180:8 189:8
191:3 209:18
210:3,17
211:12,18
212:1,16
219:19 220:4
241:20
**stick** 59:20
**stipulations**
192:10,11
**stock** 26:2
**stop** 49:11 95:7
119:20 129:22
158:12,14
165:17,17
185:2 219:10
235:9
**store** 117:6
195:15 288:8
288:10
**stories** 54:5
65:19 69:23
113:9 153:19
154:4
**story** 53:13,16
53:25 54:8
66:4,11 67:15
68:8,23 70:7
85:23,24 105:3

111:23 112:7
118:6 150:16
151:16,18
153:6,16,22,24
162:5 163:9
177:2 200:10
206:18 210:24
**stranger**
230:22
**street** 158:18
221:19 239:12
**string** 257:12
**stripped**
277:22,22
281:2
**strongly** 79:22
**structure**
183:19 184:7
184:10 267:21
**strung** 274:25
**studied** 233:10
**stuff** 71:5
154:23 189:22
**stutzel** 286:8
**subcommittee**
289:21 290:5,8
290:12,16,17
291:6,8 293:13
293:16,21
**subject** 13:17
20:5,5,13 22:6
40:12,21 98:7
189:14 190:7
203:4 216:3,4

**subjectional**
185:5
**subjective**
185:7
**submitted**
16:24 48:9,14
49:9 172:16
173:21 174:6
176:5,8 198:17
198:20 199:10
259:5 262:4
263:18,20,22
276:11
**subparagraph**
64:12 65:8
**subscribed**
300:17 302:22
**substance**
46:11 57:4
58:16 150:18
150:24 158:8
**substantial**
83:24
**substantive**
25:12
**successful**
176:22
**sue** 117:7
**sued** 186:9,11
**sufficient** 67:7
**suggest** 195:12
**suggested**
108:25
**suggesting**
109:6 268:1,2

**suggestions**
206:14
**suit** 87:8 88:9
88:13,20,23
99:15,25 100:2
100:10 170:9
**suitability**
260:24 282:5
**suitable** 253:25
257:14 259:17
260:9,17 261:1
262:5 272:12
272:15,16,17
272:18,21
273:19 275:4
276:14,17,18
279:6 280:22
281:12,13,18
283:18
**suite** 2:13
**superior** 87:3
93:3
**supplement**
46:9 49:13
75:4
**supplementing**
49:6
**supplying**
98:25
**support** 38:16
42:23 188:8
233:1 284:20
**supports**
232:19 233:3

suppose   294:12
supposed
  101:20 229:13
  256:25 271:19
sure   7:7 11:2
  15:18 16:8,22
  17:18 37:2
  43:2 63:25
  64:4 90:3
  94:18 102:8
  117:9,12
  156:23 158:10
  165:14 183:5
  188:16 190:13
  190:23 202:15
  202:17 223:18
  225:9 250:17
  255:15 269:15
  271:6,6
surmised   177:3
surprise   263:13
swiftly   26:12
sworn   5:1 30:4
  300:17 301:7
  302:22
system   156:2

**t**

t   300:1
table   77:10,11
  77:18
tag   240:16,19
take   13:16
  23:18 44:19
  48:6 64:11
  65:9 76:23

78:21 80:11
92:25 94:15
97:2 100:12,14
100:15,16
102:2 104:18
108:23 135:19
138:12 143:4
150:8 168:1
179:15 180:11
190:20,23
235:15 236:2
236:14 250:12
254:14 257:13
258:10 284:7
296:21 299:4
taken   1:13
  17:18 82:13
  102:3 129:24
  131:17,21,25
  168:6 190:24
  224:3 236:25
  237:6 242:16
  248:7 251:9
  254:9 257:25
  259:21 261:15
  267:19,20,21
  283:7 289:7
  301:11
takes   149:23
talk   101:22,23
  109:11 156:20
  157:8 216:10
  279:23 284:19
talked   115:25
  117:4 140:17

158:5 159:11
161:21 182:3
223:20 247:7
276:6
talking   77:21
  77:22 110:18
  132:24 161:14
  181:8 182:8
  197:8 209:10
  209:11 215:5
  221:9,25 222:2
  222:15 235:6
  246:23 296:4
  299:8
talks   37:3
  298:14
tape   58:12
team   207:11
technically
  125:15
tell   29:10,12
  31:12,22 32:7
  42:23 56:3
  81:24,24 84:10
  91:23 113:6
  115:5 118:5
  123:11 130:21
  139:6,15
  143:18 144:15
  154:2 155:8
  158:6 160:13
  166:15,16,18
  166:19,24
  167:9 174:23
  201:16 204:23

207:17 208:24
219:11 238:22
245:4 251:22
258:12,15,15
278:22 279:1
telling   23:2
  56:25 62:17
  72:21 115:4,15
  139:18 144:1,3
  158:21 167:8
  174:18 223:17
  229:15 244:24
  272:22 287:10
tenant   80:5
  116:19,20,21
tenor   198:5
term   284:9
terms   93:18
  102:10,18,25
  103:4,7 104:15
  124:12 189:14
  198:21 210:21
test   73:17
testified   5:2
  66:2 175:8
testify   301:7
testifying   116:8
  268:20
testimony
  107:6 121:20
  126:14 158:24
  159:8 170:3
  270:20 300:5
  301:10

| | | | |
|---|---|---|---|
| **thank** 10:21 | 50:20,25 51:1 | 189:11 190:12 | 274:24 275:6 |
| 34:24 41:25 | 57:7,20 66:8,8 | 194:20,21 | 278:7 280:10 |
| 64:9 86:21 | 66:17 70:3,14 | 195:14,15 | 283:7,11,25 |
| 88:1 92:14,17 | 70:17,18 72:2 | 196:17 197:23 | 286:15,19 |
| 94:22 174:25 | 72:17 79:14,17 | 198:3 199:15 | 288:7 291:12 |
| 179:10 255:14 | 79:19 81:7,20 | 201:3,10,19,21 | 291:13 294:20 |
| 258:25 284:12 | 81:23 87:6 | 201:23 202:4 | **thinking** 33:16 |
| **thanks** 111:2 | 89:5,7 93:4,6 | 203:5 204:3,8 | 123:5 169:25 |
| 189:8 | 99:20 100:16 | 204:25 207:3 | 206:17 |
| **thereabouts** | 104:12 105:1 | 207:16,22 | **third** 4:4 37:8 |
| 8:16 | 107:9,12,18,21 | 208:11,18 | 37:18,23 |
| **thing** 33:16 | 107:25 108:9 | 214:1 215:21 | 112:13 125:2 |
| 43:23 44:24 | 108:17,25 | 219:22 220:21 | 127:18,20 |
| 108:5 170:23 | 117:19,25 | 223:2,23 224:5 | 132:2,7,14,16 |
| 179:20 204:21 | 118:15 120:24 | 225:6,8,9 | 132:17,21 |
| 228:20 229:4 | 123:24 124:1 | 227:1 228:4,20 | 133:14,16 |
| **things** 11:8 | 125:18 126:22 | 229:2,4,21 | 134:20 219:20 |
| 24:23 97:11 | 129:12 132:24 | 230:5,10 231:4 | 289:11,19 |
| 117:6 121:9 | 135:18,23 | 232:13,14 | 290:10,25 |
| 122:19 123:17 | 136:3,8,13,16 | 233:12,16 | 291:3,5 |
| 124:19 134:5 | 136:18,21 | 234:12,14,16 | **thirty** 62:24 |
| 141:5 152:25 | 143:16,24 | 234:17,18,24 | 63:4 279:23 |
| 157:13 164:19 | 144:1,3 147:16 | 235:18 236:4,9 | **thought** 17:7 |
| 165:5 169:8 | 152:20 153:15 | 236:15 241:8 | 32:1 34:16 |
| 188:21 206:5 | 153:22,24 | 243:23 246:9 | 105:20 123:12 |
| 214:2 223:12 | 155:10 156:18 | 246:16 247:16 | 136:12,13,19 |
| 223:14 226:24 | 157:11 158:9 | 250:7,23,24 | 137:2 138:3 |
| 228:18 229:8 | 158:11,12 | 251:13,14 | 163:12,14,19 |
| 239:1 293:12 | 162:3,25 | 252:16,22 | 176:2 178:22 |
| **think** 11:18,19 | 163:20 164:9 | 257:13 260:18 | 193:11 198:25 |
| 19:1 23:12 | 164:10 169:3 | 260:19 261:18 | 199:4 203:22 |
| 27:18 34:2,9 | 170:12 172:24 | 261:21 263:15 | 204:5,21 206:6 |
| 38:7 42:11,24 | 174:1,9,15 | 263:16 264:21 | 213:20 215:12 |
| 45:25 47:14 | 176:13 179:8 | 267:24 268:5 | 221:14 228:23 |
| 50:8,17,17,19 | 181:2 185:5,7 | 270:17 273:7,8 | 233:18,20 |

| | | | |
|---|---|---|---|
| 234:6,9,11,13 | 51:5 52:13 | 221:5,12 | 149:25 153:13 |
| 235:16 242:15 | 53:1 54:2 | 222:22 223:11 | 155:14 166:12 |
| 277:7,9,10,12 | 65:10 72:16 | 223:22 225:5 | 172:19 194:18 |
| **thoughts** | 74:14 75:6 | 225:17 226:4 | 203:8 224:2 |
| 299:13 | 76:3,9 77:18 | 227:14 228:10 | 247:12,18 |
| **thousand** | 78:11 83:8 | 230:25 231:9 | 248:18 255:7 |
| 253:18 | 86:19 89:4,22 | 231:25 235:14 | 255:17 275:2 |
| **thousands** | 94:3,8 96:10 | 250:12 263:7 | 276:2 281:11 |
| 274:19 | 96:13 102:12 | 264:4 269:8 | **together** 51:9 |
| **three** 8:14,14 | 103:18 109:6 | 271:4 287:23 | 115:22 179:19 |
| 13:21 85:22 | 109:18 113:15 | 293:1,9 296:21 | **told** 15:15,23 |
| 132:19 165:22 | 113:25 115:19 | 301:11 | 16:4 17:7 |
| 207:8,25 | 115:22 117:5,8 | **times** 16:5 | 41:15 42:7 |
| 245:24 262:20 | 118:15 123:6 | 148:9 151:14 | 70:3 79:14 |
| 265:20 280:5 | 123:11 124:14 | 155:10 160:7 | 82:24 84:14 |
| 286:16 | 125:13 134:2 | 165:22 177:1 | 89:21 91:21 |
| **throw** 167:13 | 136:9 140:3,19 | 299:14 | 92:5 103:22 |
| **ticket** 212:19 | 144:19 146:15 | **title** 73:17 | 105:20 112:7 |
| 212:24 213:3 | 151:2,9,12 | 90:25 91:11,13 | 115:12 117:9 |
| 219:9,13 | 152:24 153:14 | 92:1 | 118:5 125:24 |
| 220:24 | 154:23 155:23 | **titles** 91:19 | 138:2,7 147:9 |
| **tie** 69:2 131:17 | 157:22 160:6,6 | **today** 6:10 | 148:8,9 151:13 |
| 133:3,21 | 160:10,11 | 13:16 14:16 | 151:21,24 |
| **tied** 131:22,25 | 163:11,11 | 21:21 27:21 | 152:14 153:18 |
| 132:8,22 | 165:23 171:9 | 29:12,13,13,17 | 155:10,14,20 |
| **tighter** 54:21 | 171:10,11,20 | 31:2 42:11 | 157:21 160:25 |
| **time** 5:15,24 | 172:2,21 173:2 | 45:25 56:15 | 166:12,13,17 |
| 7:24 8:2 19:2 | 173:13,15,17 | 66:16 67:5,11 | 166:23 167:1,4 |
| 19:24 20:17,23 | 176:4 181:23 | 88:25 103:12 | 167:5 174:16 |
| 21:7,10 23:25 | 183:14 186:4 | 103:21,23,25 | 178:23 182:21 |
| 24:21,22 26:25 | 188:2,7 189:17 | 104:15,25 | 189:17 190:17 |
| 28:2 31:7,8 | 191:15,18 | 105:7 106:13 | 204:7,18 |
| 33:21 34:8 | 192:1,4,8,9,22 | 113:5,11,22,23 | 221:13 222:16 |
| 36:5 41:9 | 193:2 197:3 | 121:8 123:14 | 223:17,18 |
| 44:19 50:3 | 212:14 219:3 | 123:15,16 | 233:10 237:25 |

**[told - trying]**                                                    Page 65

238:4,19 250:8
250:24 251:4
251:17 252:2,2
252:5,8,10,14
252:20 263:25
281:15
**took** 29:24 30:3
30:12,15 32:24
33:3 61:24
76:2 135:5
141:22 144:8
197:3 207:16
208:5 212:23
224:5 237:5
239:3 243:14
248:13,13
253:22 281:10
291:9 298:14
**tool** 80:19
**top** 53:25 60:7
127:8 139:11
206:16 221:24
**topic** 223:19
249:6 283:9
286:24
**topics** 299:9,9
**total** 200:10
**tour** 9:24
**towards** 130:8
**town** 13:17
14:13,17 16:15
17:8 18:6
22:24 29:6
39:12 48:10
56:17 73:8

79:5 80:9 89:8
89:16,17,23
117:11 118:21
120:12 122:20
130:24 137:14
141:2 142:7
146:10,13,16
146:25 147:4
147:10,15,22
148:21 156:7
162:7 166:5
167:24 168:14
168:21 169:9
170:8,19
171:20 172:2,7
172:8,9 177:18
181:22 183:9
196:16 200:25
201:14 205:17
206:1 207:13
209:9 220:14
220:15 221:11
226:16 239:18
244:1 245:15
247:22 248:18
271:24 272:11
275:2 284:7,16
285:6,11 287:2
287:24 288:1
293:7,7
**town's** 68:2
248:1
**township** 193:4
193:7

**track** 87:15
**tract** 249:16
**transcript** 1:12
4:12 6:13,13
6:18,20,22
63:1 178:11
180:22,23
198:1 278:5
300:5 301:10
**transcripts**
6:11,12
**transition**
219:3
**treated** 298:19
**trial** 25:8 95:10
95:13 113:14
143:18 154:24
**trick** 72:17
**tried** 81:23
208:23
**triggered**
213:23
**true** 8:4 14:21
38:3 59:18
69:17 90:6,9
93:23 94:7
97:20,21 98:1
105:18 115:15
147:23 165:18
165:20 202:10
210:25 252:21
255:18 262:21
265:25 266:7
272:12 274:8,9
274:9 300:6

301:10
**truly** 259:14
**trust** 22:16
109:16
**truth** 223:17
287:10 301:7,8
301:8
**truthful** 181:12
181:14,20
**try** 23:16 27:9
31:23 35:1
36:7 38:22
40:19 80:5
89:23 118:7
184:18 223:6
224:3,5,11
231:1 242:23
243:22 244:3
245:14 253:7
260:5 273:16
283:22 296:21
**trying** 55:9
72:17 112:25
117:13 125:12
137:7 145:9
148:14 149:1
149:14 158:25
162:3 164:9,23
184:9,14
219:23 220:7
220:18 221:4,7
221:8 222:12
223:5,8,20
241:6 244:5
257:21 258:9

**[trying - units]**                                                    Page 66

| | u | underneath | 244:21 258:18 |
|---|---|---|---|
| 260:18 272:10 | | 54:19 | 260:24 268:23 |
| 273:14 275:22 | **u**  300:1 | **understand** | 279:8,12 |
| 284:16,20 | **uh**  86:9 140:6 | 7:19 10:22,25 | 280:18,19,23 |
| 292:25 293:6 | 188:19 192:14 | 11:11 12:10,14 | **understanding** |
| 296:17 299:12 | 199:7 206:21 | 14:3,11 26:8 | 27:18 49:7 |
| **turn**  52:19 | 221:17 253:16 | 26:17 27:14 | 50:3,4 51:12 |
| 69:14 75:2 | 271:23 | 31:14,15,19,22 | 229:20 |
| 87:22 88:3 | **ultimately**  27:8 | 36:19 43:9 | **understood** |
| 110:8 131:7 | 38:18 80:12 | 55:24 61:23 | 29:2 55:8 56:4 |
| 245:20 268:13 | 83:23 178:6 | 62:10 65:15 | 56:11 66:3,6 |
| 271:15 | 186:18,25 | 68:3,6 78:17 | 67:13 78:13,16 |
| **turnpike**  2:9 | 188:16 253:3 | 78:18 79:9 | 79:1 80:2,15 |
| **twenty**  37:11 | 265:2 | 97:10 98:19 | 80:21 102:22 |
| 119:24 | **unable**  80:8 | 102:18 106:15 | 104:5 118:15 |
| **two**  8:6 20:1 | **unbelievable** | 106:22,24 | 128:20,24 |
| 72:25 75:23 | 268:7 | 107:1 113:3,13 | 216:7 217:22 |
| 85:18 101:4,9 | **uncomfortable** | 113:16,23 | **undertake** |
| 134:5 140:18 | 231:12 234:1,4 | 114:14,19,24 | 282:2 |
| 165:22 196:1 | 234:6,9 235:5 | 116:2,4,6 | **undertaking** |
| 206:18 207:23 | 235:17,23 | 120:2,7,17 | 283:13 |
| 207:24 210:21 | **undated**  255:11 | 121:13 122:1,6 | **undertook**  83:3 |
| 242:3 245:24 | 255:13 | 122:19 124:11 | **underway** |
| 251:1,3 253:18 | **under**  21:4 | 126:9 127:25 | 223:21 |
| 256:22 257:19 | 23:13 31:2 | 128:12,15,17 | **unfair**  79:19,21 |
| 265:20 273:16 | 35:9 53:12 | 128:21 129:4 | **unhappy**  197:1 |
| 273:18 276:6 | 144:3 147:1 | 165:5 169:2 | 197:5,6,7 |
| 276:24 280:5 | 158:21,24 | 174:19 177:17 | **unhoused** |
| 286:15 292:17 | 161:11,16,19 | 177:21 199:21 | 24:19 |
| **tying**  131:11 | 162:22 163:1 | 213:16,20,25 | **unit**  37:9,11 |
| 137:24 | 166:11 170:20 | 214:15,18 | **united**  1:1 |
| **type**  25:14 | 170:22 176:5 | 215:7,11,13,19 | **units**  37:10,20 |
| **typically** | 186:5 196:6 | 215:20 216:9 | 66:15 67:8 |
| 225:18,23 | 223:19 250:16 | 226:1,19 | 68:15 70:10 |
| | 267:18 269:5 | 235:19 244:18 | 71:7 75:23,24 |
| | 271:7 276:20 | | |

**[units - viability]**

76:6,10 96:24
97:6,12 98:5,6
98:16,20 99:1
99:9,12,16,21
100:4,9 104:2
104:5 106:17
106:21 107:11
107:13,17,24
108:13 109:18
113:18,19
119:24 121:10
128:3,5,8,22
177:7 185:19
186:16,21,23
214:8,23
217:19,20
242:3 245:23
245:25 246:7
246:14 247:11
247:13,19
248:3,14,19
249:10,17
250:3,16,19
254:11 255:8
255:18,20,22
256:5,13,20,24
257:14,21
258:9 259:7,12
259:16 260:6
260:16 261:1
262:6,12 264:7
264:10,19,19
264:24,24
265:10,17,25
266:18 267:5,6

267:9,10
269:24 270:6
270:12 271:5
272:1,3,4,23
273:7,17,24
274:6,13,17
276:2,7,19
282:6
**unpleased**
198:7
**unquote**  231:17
**unreasonable**
289:16
**unrelated**
155:24 255:2
**upcoming**
131:13 138:1
**updated**  183:10
289:6
**uphold**  30:6
**upset**  242:9,11
242:13
**urban**  1:4 5:9
39:13 48:23
302:2
**use**  4:12,14,20
8:10,13 9:12
18:4,8,18,23
20:6 21:11
25:17 34:2
35:20,23 37:12
51:9 76:16
77:5 78:21
79:5 124:7
133:8 135:14

135:16 136:6
137:17 138:3,3
138:9,11,17
150:14 161:10
161:12,16
162:21 171:6,7
172:17,22,25
173:3,4,12
174:2,3,6
175:5,9,13
176:16 180:18
181:21 183:8
187:19 188:16
191:9 192:17
197:25 199:17
222:20 225:22
226:16 245:2,3
245:4 250:2,15
250:21 251:5
251:10,16
252:2,10,16,20
262:25 263:11
263:22,24
268:3,12
**used**  79:18
81:14 112:15
116:25 117:5
181:1 217:18
261:2
**useful**  121:25
122:4 129:2,10
**using**  246:14
**usually**  218:22
**utilized**  73:20

**utter**  164:16
269:8

**v**

**v**  1:6 291:20
302:2
**vacant**  83:4
**vacate**  134:6
**vacating**
130:17 134:9
134:24
**vague**  24:2
**vaguely**  50:23
288:5
**valero**  161:18
221:14,25
**valid**  164:2
**valley**  159:22
188:11 211:22
218:15
**value**  80:13
244:4
**variance**
199:20 252:16
**variety**  87:20
**various**  20:3,12
20:23 23:16
97:15 197:16
**ventures**
286:25
**verbal**  5:19
**veritext**  302:1
**versus**  5:9 76:7
**vetted**  277:14
**viability**  282:5

**[view - way]**                                                     Page 68

| | | | |
|---|---|---|---|
| **view**  79:25 | 60:17,20,21 | **walk**  101:25 | 276:5 |
| 230:2,7 | 62:2,3,8 68:19 | **walked**  101:7 | **wanted**  29:10 |
| **violation** | 68:21 69:12,17 | **walking**  100:22 | 29:20 40:23 |
| 277:20,21 | 69:22 71:12,14 | **want**  10:15 | 99:21 102:25 |
| **violations** | 71:17 72:7 | 15:18 25:4 | 109:3 115:14 |
| 240:22 | 75:6,13 77:2 | 28:17,21 29:1 | 135:16 136:1,1 |
| **vision**  203:25 | 84:4,11,21 | 29:5,8,12,14,16 | 136:6 137:14 |
| **vocal**  161:7,9 | 88:13,21 93:1 | 30:12,18 34:18 | 138:11,13 |
| **voice**  109:11,13 | 94:9 95:21 | 39:21 51:15 | 156:7 157:10 |
| 109:15 164:13 | 110:3,16,19,21 | 52:24 63:25 | 158:6,7,15,22 |
| 165:4,4 234:23 | 110:22 111:4,4 | 64:10,11 65:2 | 158:23,25 |
| **volpe**  116:9,11 | 111:11,15,25 | 65:3 72:5,9 | 159:12 168:5 |
| 117:13,25 | 112:9,17,23 | 73:25 74:15 | 169:21 176:1 |
| **vote**  20:3,12 | 113:10 121:5 | 81:4 89:16,17 | 200:19 203:15 |
| 38:13 40:3 | 133:12,17 | 91:18,24 92:6 | 209:13 218:10 |
| 41:6,17,23 | 138:25 139:13 | 92:25 97:2 | 222:17,25 |
| 42:4,23 47:8 | 139:25 163:4 | 102:8 105:12 | 231:3,23,25 |
| 58:19,21 59:24 | 176:11 191:11 | 105:15,16 | 240:16 242:23 |
| 60:10 62:4,12 | 193:10 205:9 | 106:11 112:20 | 289:24 |
| 62:17,21 63:7 | 205:15 | 114:8 130:9 | **wants**  63:2 |
| 63:14,19,20 | **voters**  168:1 | 133:1 135:21 | 64:2 297:2,3 |
| 68:22 71:19 | **votes**  61:24 | 141:4 146:3 | **warranted** |
| 88:19 94:1 | 84:22 151:15 | 149:7,20,25 | 24:13 |
| 111:6 139:4 | **voting**  20:22 | 150:6 153:4 | **waste**  269:8 |
| 182:19 208:24 | 41:20 74:25 | 156:21,24 | **wasting**  109:6 |
| 211:4 243:2,4 | 131:4 133:11 | 157:9 162:10 | **way**  28:9 34:8 |
| 283:7 290:24 | 201:15 | 162:11,11,12 | 64:3,7 74:12 |
| **voted**  20:17 | | 163:8 165:24 | 80:2 86:22 |
| 22:6 39:24 | **w** | 179:11,16 | 94:20 101:16 |
| 40:7 42:12 | | 180:20 183:10 | 108:9 116:16 |
| 45:14,17 46:4 | **w**  65:7,18 90:18 | 190:20 201:6 | 118:10 121:5 |
| 46:18,25 47:18 | 92:13 285:20 | 201:17 211:14 | 140:3 142:22 |
| 47:21,22 48:6 | **wait**  17:1 | 241:9 243:5 | 145:6 147:2 |
| 51:16,20 53:3 | 138:13 149:5 | 250:18 254:19 | 150:16 153:6 |
| 58:25 59:15 | **waiting**  62:23 | 258:15 263:21 | 161:11 168:10 |
| | 62:24 63:3 | | |
| | 273:16 | | |

170:8 182:3
184:25 185:25
200:14 211:14
214:7 216:21
216:22 228:13
232:18 233:18
235:23 242:25
243:1,6,7,10,12
243:17 247:11
252:22 253:20
256:22 262:11
273:18 288:23
290:21
**ways** 170:13,16
223:24 224:11
224:14 243:22
**we've** 101:4,9
110:18 140:13
140:16 152:13
185:20 191:15
219:23,25
247:23 249:11
254:10 268:23
283:7
**website** 22:23
**wednesday**
1:18
**week** 249:5,7
253:21 274:1
**weeks** 273:18
**welcome** 86:22
**wendy** 93:11
**went** 50:24
56:22 82:4
115:8 117:5,8

158:4 167:7
170:8,18 203:5
229:7 250:14
253:8,15
255:23 257:3,4
270:3 271:22
284:16 286:25
**west** 53:21
104:8
**westwood**
242:6
**whatnot** 152:25
**whatsoever**
123:10
**wherefore** 49:5
**whichever**
225:2
**wickersheim**
240:14
**widely** 188:9
**wieboldt**
292:17
**willing** 216:24
217:3,16,22
**winning** 162:4
162:8
**wishes** 183:4
**withdraw** 33:8
74:11 284:4
**withdrawn**
80:1
**witness** 3:3
34:24 55:21
72:3 74:13
101:2 212:9

245:6 255:3,6
261:25 265:22
278:21 279:1
**witnesses** 119:4
**witnesses'**
302:3
**woefully** 25:9
**wonder** 266:15
**woodcliff**
210:11
**woods** 9:24
**word** 31:16
58:14,14,17,17
58:20,20 170:4
209:1,3 217:17
298:11 299:11
**wording**
228:21
**words** 32:19
59:5 81:18,20
120:5 126:3
150:17,23
158:7 182:19
187:1 213:18
267:18 299:12
**work** 80:2
108:22 125:19
174:2,12,20
197:6,7 200:9
204:4,20
289:21 298:20
**worked** 9:22
**working** 81:7
200:25

**works** 91:6,10
92:5 101:17,25
240:3,10
298:20
**write** 200:15,18
**writes** 161:8
**writing** 276:4
276:12 299:3
**written** 141:8
166:2 225:3
226:20 241:18
256:18 274:15
**wrong** 79:17
148:7 170:4
179:3 190:12
**wrote** 23:20
128:14 151:21
160:21 211:23
250:6 292:9
294:15 299:2

| **x** |
| --- |

**x101026** 301:5

| **y** |
| --- |

**yeah** 12:25
19:1 23:4,15
24:9 32:22
39:4 40:23
44:11 47:23
48:13 54:19,20
54:20,21 55:19
56:8,21 65:14
66:24 67:1,1,1
70:6,20 71:1
71:18 74:18,24

87:10,14 88:1
88:11 90:3,3
90:15,23 96:1
97:24 99:5,5
104:7 105:25
110:12 111:2,2
111:2 113:25
115:20,20
119:25 124:1
124:17 125:12
126:4,21,24
127:10,10,10
127:11 130:16
134:12,13
138:10 139:3
140:15 142:2
145:14,22
149:17 150:8
159:25 160:1
160:13 164:22
165:14 178:17
179:15,25,25
180:2,4,10,13
182:23 183:22
184:5,12,23
185:22 186:13
186:21 189:1
190:15,22
192:21 194:2
195:22 196:8
197:9 198:20
199:14,15
204:8 205:1,11
210:19 211:1
211:10 212:2

214:1 218:9
221:2 230:20
231:3 232:2
233:12,19
234:1 236:24
240:1,12
241:15 242:16
245:19 247:17
252:7,22
254:12,18
256:13,18
264:14 266:15
268:8 269:3,23
273:15 281:16
281:21,21,25
284:10,17
285:20 286:9
287:17 288:1
288:13 289:4
290:20,23
291:5 294:2
299:5,10,14
**year**  263:6,14
264:3
**years**  8:14,15
20:2,11,19
29:11 32:8
39:5 154:13
168:16,16
183:7,11
196:13 197:16
253:24 255:9
256:22 257:19
257:20 265:20
272:10 273:16

276:6,24
286:15,16
**yelling**  148:13
**yields**  214:22
**york**  302:1

**z**

**z**  285:20
**zone**  46:16 65:7
65:18 77:7
78:23 79:6
80:16 116:18
**zoning**  22:11
25:16 32:23
35:6 123:19
225:19,21
226:21 264:18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.