Page 302

1                UNITED STATES DISTRICT COURT
                   DISTRICT OF NEW JERSEY

2

3    EMERSON REDEVELOPERS URBAN        )
     RENEWAL, LLC                      )
4                                      ) CIVIL ACTION
                    Plaintiff,         ) NO.:20-cv-4728-MCA-MAH
5                                      )
        -vs-                           )
6                                      )
     THE BOROUGH OF EMERSON, NEW       )
7    JERSEY and DANIELLE DiPAOLA,      )
                                       )
8                    Defendants.       )
     _____

9

10

11                  (VOLUME II)

12           SWORN DEPOSITION TESTIMONY

13                    OF:

14          MAYOR DANIELLE DiPAOLA

15

16

17

18

19

20

21

22

23

24

25

Page 303

1

2              TRANSCRIPT of the stenographic notes of

3      the proceedings in the above-entitled matter, as

4      taken by and before LYDIA F. McDONNELL, a Certified

5      Shorthand Reporter and Notary Public of the State of

6      New Jersey, held at the office of SILLS, CUMMIS &

7      GROSS, P.C., The Legal Center, One Riverfront Plaza,

8      Floor 13, Newark, New Jersey, on Monday, May 15,

9      2023, commencing at 10:14 a.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 304

```
 1   A P P E A R A N C E S:
 2    SILLS, CUMMIS & GROSS, P.C.
      BY:  JOSEPH B. FIORENZO, ESQ.
 3            -and-
           STEPHEN M. KLEIN, ESQ.
 4    The Legal Center
      One Riverfront Plaza, 13th Floor
 5    Newark, New Jersey 07102
      973-643-7000
 6    jfiorenzo@sillscummis.com
      sklein@sillscummis.com
 7    Attorneys for the Plaintiff
 8
      BOTTA ANGELI, LLC
 9    BY:  CHRISTOPHER C. BOTTA, ESQ.
      50 South Franklin Turnpike
10    Ramsey, New Jersey 07446
      201-818-6400
11    ccb@bottalaw.com
      Attorneys for the Defendants,
12    The Borough of Emerson and Mayor Danielle DiPaola
13
      THE LAW OFFICES OF RICHARD MALAGIERE, APC
14    BY:  LEONARD E. SEAMAN, ESQ.
      250 Moonachie Road, Suite 300A
15    Moonachie, New Jersey 07074
      201-440-0675
16    les@malagierelaw.com
      Attorneys for the Defendant,
17    Mayor Danielle DiPaola
18
19
20
21
22
23
24
25
```

Page 305

1                         I N D E X
2
3    WITNESS:   MAYOR DANIELLE DiPAOLA
4
                    DIRECT    CROSS    REDIRECT    RECROSS
5
     MR. FIORENZO      307
6
7                     E X H I B I T S
8
     NUMBER             DESCRIPTION              PAGE
9
     DD-1       Decision of Judge Harris in 2001...  307
10
     DD-30      Transcript of decision of
11              Judge Harris on 3/21/02............  308
12   DD-31      Minutes of the Mayor & Council
                Meeting of 1/15/19.................  334
13
     DD-32      1/19 email from Ms. Dietsche to
14              Mr. Scala.........................  338
15   DD-13      January 25 Judgment entered by
                Judge Padovano....................  341
16
     DD-33      2/5/19 email from Mr. Klugmann
17              to Ms. DiPaola....................  343
18   DD-34      2/11/15 email from Ms. DiPaola
                to Mr. Sheola.....................  346
19
     DD-35      Series of emails between
20              Mr. Klugmann and Mr. Sheola........  350
21   DD-36      Letter dated 2/25/19 from the
                Porzio law firm to Mr. McCann......  351
22
     DD-37      Letter dated 3/4/19 from
23              Mr. Paparo........................  357
24   DD-38      Email from Mr. Statile to
                Mr. Sheola........................  361
25

1                          E X H I B I T S

2

  NUMBER                    DESCRIPTION                    PAGE

3

  DD-39        Email from Ms. Roehrer to

4             Mr. Sheola........................  380

5  DD-40        Letter dated 7/12/19 from

             Mr. Atkinson.....................  383

6

  DD-41        3/14/19 email marked Ms. Rider

7             to Ms. Dietsche..................  396

8  (Exhibits marked and retained by Mr. Klein.)

9

                     SPECIAL REQUESTS

10

                  (No special requests)

11

12                   MOVE TO STRIKE

13              Page 372, Line 4 -13

14

15

16

17

18

19

20

21

22

23

24

25

1          M A Y O R   D A N I E L L E   D i P A O L A,

2     having been duly sworn by the Notary Public,

3     testified as follows:

4     CONTINUED DIRECT EXAMINATION BY MR. FIORENZO:

5          Q.     Good morning.  I had previously given

6     you instructions for the deposition.  I'm not going

7     to repeat those unless you feel the need for me to do

8     that?

9          A.     No.

10         Q.     No.  Okay.  All your answers -- you just

11    nodded your head -- has to be verbal.  The only

12    instruction I'll remind you of is please allow me to

13    complete my questions before you try to speak.

14    Otherwise, it will be difficult for the reporter

15    taking us both speaking at the same time.

16              When we were here last, I had shown you

17    and read to you a portion of a decision by Judge

18    Harris, which we marked as --

19              MR. FIORENZO:  What is it?

20              MR. KLEIN:  DD-1.

21              MR. FIORENZO:  Pull that up.  Just the

22    first page.

23         Q.     So DD-1 was a decision of Judge Harris

24    back in 2001, which we discussed, where it makes

25    reference to Emerson as the bastion in exclusionary

Page 308

1    zoning.  Remember going over that last time?

2         A.    I guess.

3         Q.    You do recall, and of course you're

4    aware, that at some point in time the court was

5    critical of Emerson's lack of compliance with its

6    Constitutional obligation.  You were aware of that,

7    correct?

8         A.    Yes.

9         Q.    Okay.  And after this decision rendered

10   by Judge Harris, are you aware of any subsequent

11   rulings that Judge Harris made criticizing Emerson

12   for its noncompliance with its Constitutional

13   obligations?

14        A.    Criticizing us?

15        Q.    Yeah.  Yeah.  A decision in which he was

16   critical of Emerson's lack of willingness to fulfill

17   its Constitutional obligation after this initial

18   decision.

19        A.    None that I can think of.

20        Q.    Okay.

21              MR. FIORENZO:  Steve, could you pull

22   up....

23              MR. KLEIN:  That will be DD-30.

24        Q.    So DD-30 is a transcript of a decision

25   of Judge Harris on March 21, 2002, and it -- the

Page 309

1   first question:  Have you seen this transcript

2   before?

3        A.    I don't believe so.

4        Q.    Were you made aware of this subsequent

5   decision that was rendered by Judge Harris regarding

6   Emerson's lack of compliance with Mount Laurel?

7        A.    I don't recall.

8             MR. FIORENZO:  Go to the second page,

9   please, of this exhibit.

10        Q.    There are numbered pages here, and when

11   I say "the second page," it's the second page of the

12   exhibit, but it has two different pages on it.  So

13   there's a page number 3 of the transcript, and in

14   that, the Judge says, last paragraph at the bottom,

15   quote, In this Mount Laurel II exclusionary zoning

16   and builder's remedy action, I have already

17   determined that Emerson officials have relentlessly

18   preserved and exacerbated economic and class

19   segregation throughout the Borough.  There appeared

20   to me to be a remarkably consistent and extreme

21   pattern in exclusionary zoning -- exclusionary

22   efforts characterized by what appears to be

23   developing again.  That is, concentrated negative

24   opposition to affordable housing in certain areas of

25   the Borough, and acquiescence in that opposition --

Page 310

1   opposition by Borough officials.

2            Now, were you aware that Judge Harris

3   had made that subsequent ruling criticizing Emerson

4   and suggesting that its actions have exacerbated --

5   that -- that it has, quote, relentlessly preserved

6   and exacerbated economic and class segregation?  Are

7   you aware that he made that ruling?

8        A.    I don't think I've ever seen that

9   document before.

10       Q.    So you didn't know that he had made this

11  ruling against Emerson?

12            MR. SEAMAN:  Objection to form.

13       A.    I don't know.  I've -- I've never seen

14  that document.

15       Q.    No.  I know that.  But whether you saw

16  it or not, were you nonetheless aware that the Judge

17  made this second ruling, which suggested that Emerson

18  had engaged in -- in -- engaged in this pattern of

19  conduct -- pattern of exclusionary -- exclusionary

20  efforts?

21       A.    Not aware.

22       Q.    Okay.  So when you got on the council,

23  you didn't become aware of that?

24       A.    I don't recall.

25       Q.    Just refresh me:  When -- when did you

Page 311

1   get on the council?

2           A.      2008, '9, '10.  Something like that.

3           Q.      Okay.  So when you got on, you were not

4   aware and didn't look into the background of this

5   exclusionary zoning problem -- problem that --

6           A.      No.

7           Q.      -- Emerson -- you gotta let me finish.

8   You're answering before I finish.

9                   The exclusionary zoning problem that

10  Emerson had, you didn't look into it?

11          A.      I was not made aware of it.

12          Q.      I didn't ask that.  Did you -- did you

13  affirmatively, as a new member of the governing body

14  look into it, delve into it, so you could understand

15  the problem facing the community so you, as a

16  governing body member, could intelligently address

17  it?

18          A.      I don't believe it being a topic.

19          Q.      It wasn't a topic?

20          A.      I don't --

21          Q.      So you didn't --

22          A.      -- recall.

23          Q.      -- look into it at all.

24          A.      How could I if I didn't know it was a

25  topic?

Page 312

1          Q.     Okay.  So then the answer is you didn't
2     look into it, correct?  'Cause you didn't know it was
3     a topic, right?
4          A.     I don't know.
5          Q.     Oh.  I thought you said how could you
6     because you didn't know about it.  It wasn't even a
7     topic.  By that, did you mean because it wasn't a
8     topic, you did not explore and examine the background
9     of Emerson's noncompliance with Mount Laurel?  Is
10    that true?
11         A.     I -- I don't recall.
12         Q.     Okay.  So the Judge goes on.  He says,
13    In -- quote, In my October 2001 opinion, I cataloged
14    a variety of missed opportunities, failure of will
15    and lack of resolve by governmental actors spanning
16    decades regarding the Borough's obligation to provide
17    a realistic opportunity for low and moderate income
18    housing.
19               So again, I don't want to -- I don't
20    want to repeat this.  You -- you didn't know anything
21    about these statements that the Judge had made at
22    that time, right?
23         A.     I -- what year is this document?
24         Q.     This is 2001.
25         A.     I wasn't involved in the Borough at that

Page 313

1    time.

2         Q.    Oh.  Excuse me.  2002.

3         A.    I wasn't involved at that time.

4         Q.    Right.  And you didn't come to learn

5    about them later on when you either became a member

6    of the council or when you became the mayor of the

7    community, correct?

8         A.    I've never seen this document before.

9         Q.    Right.  I know that.  But you didn't

10   become aware, generally, of these decisions whether

11   you actually read the document.

12        A.    I don't recall.

13        Q.    Did you become aware from any source,

14   whether you read this document or not, that the

15   courts had been critical of Emerson?

16        A.    Only of Judge Harris's initial opinion

17   with the word "bastion."

18        Q.    Right.

19        A.    I've heard that.

20        Q.    Okay.  And did you -- and -- and I know

21   that we talked a little bit about how Former Mayor

22   Lamatina put on the website a history of the Mount

23   Laurel where he cited to different things, but you

24   never read any of that, as you told me, because you

25   couldn't believe a word he said, right?

Page 314

1        A.      Correct.

2        Q.      Okay.  So you don't know whether in

3   those communications with the -- the members of the

4   public he attempted to give an explanation for why

5   Emerson had to move forward with fulfilling this

6   Mount Laurel obligation.  You don't know if he did

7   that or not, correct?

8        A.      I -- I don't understand your question.

9        Q.      Well, since you didn't read what he

10  wrote, you don't know if he was telling the public

11  why Emerson had to do the things they were doing to

12  comply with Mount Laurel, correct?

13       A.      I don't think a lot of people wrote what

14  he post- -- read what he posted.

15       Q.      I didn't ask that, though, did I?  I

16  asked whether you -- because you didn't read what he

17  wrote, understanding you gave me the reasons why, you

18  were not aware of some of the history he tried to

19  explain, correct?

20       A.      I -- I don't know.

21       Q.      Did you care about the history of the

22  Mount Laurel obligation?

23              MR. SEAMAN:  Objection to form.

24       A.      I don't know.

25       Q.      Did you care when you became a member of

Page 315

1    the governing body whether -- whether Emerson was in

2    compliance with its Constitutional obligations that

3    were identified by Judge Harris?

4                    MR. SEAMAN:   Objection to form.

5        A.     I don't know how to answer.

6        Q.     Why?  I just asked whether you cared.

7        A.     Because this wasn't the only topic that

8    I had to learn being a new councilperson.

9        Q.     Oh, of course it wasn't.  But I'm asking

10   on this topic, did you care --

11       A.     I --

12       Q.     -- about this topic?

13       A.     I don't remember at the time if I cared

14   or not.

15       Q.     Okay.  So you don't remember if this was

16   an important topic at that time?

17       A.     I don't.

18       Q.     Did it become an important topic at any

19   time?

20       A.     Only when Lamatina was trying to push

21   through the 419 development.

22       Q.     And Lamatina was trying to push through

23   the 419 development as part of the settlement of the

24   Mount Laurel litigation, right?

25                    MR. SEAMAN:   Objection to form.

Page 316

1      A.      So he claims.

2      Q.      Well, do you deny that?  Do you deny

3  that 419 -- when you say he tried to "push it

4  through," that Block 419 was a part -- a central part

5  of the Settlement Agreement that gave Emerson all

6  those benefits that we discussed the last time?  Do

7  you deny that?

8      A.      I know that.

9      Q.      Okay.  So when you say he was trying to

10  "push it through," given that the courts had found

11  Emerson to be a bastion of exclusionary zoning, that

12  it engaged in a consistent and extreme pattern of

13  exclusionary efforts which had the effect of

14  exacerbating economic and class segregation, did you

15  think it was in the interest of Emerson when you

16  became a member of the governing body to now address

17  those problems that were recognized by the courts?

18      A.      I've never --

19          MR. SEAMAN:  Objection to form.

20      A.      -- heard the statement that you just

21  read.

22      Q.      No.  I know that.  But I'm asking, did

23  you think it was important as a member of the

24  governing body to address the problems that were

25  created by the prior Harris ruling?

Page 317

1          A.     I don't know.

2                 MR. SEAMAN:  Objection to form.

3          Q.     You don't know if you thought it was

4     important?

5          A.     I -- when you're first a councilperson,

6     you don't know what's important when you're first

7     learning --

8          Q.     Well, that's why you try to --

9          A.     -- what the issues are.

10         Q.     That's why you try to educate yourself,

11    right?

12         A.     I can't educate myself on stuff that I

13    wasn't made aware of.

14         Q.     Well, no, of course.  When you're a

15    member of the governing body -- and at some point in

16    time the Settlement Agreement was being discussed and

17    you voted on it, right?

18         A.     That was a long time --

19         Q.     Well --

20         A.     -- into it.

21         Q.     Okay.  But you -- you made yourself

22    aware of the issue by then, correct?

23         A.     Our lawyers explained to us --

24         Q.     Right.

25         A.     -- what was going on.

Page 318

1          Q.      Did you make yourself knowledgeable

2    about the history of the Mount Laurel noncompliance

3    at the time the Settlement Agreement was proposed to

4    the governing body?

5          A.      I don't know how to quantify what you

6    think was -- did I make myself knowledgeable.

7          Q.      Well, did you read about it?  Did you

8    investigate it?  Did you ask anybody for information

9    about it?  Did you do anything to make yourself

10   knowledgeable?

11         A.      Yes.

12         Q.      Okay.  What did you do?

13         A.      I asked our attorneys a lot of

14   questions.

15         Q.      Okay.  And did they provide you with

16   answers?

17         A.      Some.

18         Q.      Okay.  And did you understand that as a

19   result of the prior issues that arose going all the

20   way back to 2001 that Emerson really was kind of

21   between a rock and a hard place?

22               MR. SEAMAN:  Objection to form.

23         A.      I -- I don't know that I was cognizant

24   of that.

25         Q.      Did you know that Emerson didn't have

Page 319

1    many options?

2          A.    I don't know.

3          Q.    What options did Emerson have other than

4    entering into the Settlement Agreement as you

5    understood it?

6          A.    I -- I don't know.

7          Q.    Judge Harris went on on March 21, 2002

8    to state, quote, I remain dumbfounded that, not

9    withstanding all the accumulative history of this

10   State's exclusionary zoning litigation and the perils

11   attended thereto, that Emerson appears to have

12   overlooked its lessons, and is consigned to repeat

13   the costly blunders of the past, end quote.

14                So you weren't aware that the Court said

15   that either, right?

16         A.    No.

17         Q.    And so none of this -- the decision that

18   we just marked here wasn't part of the facts that

19   informed your decision whether to approve or not

20   approve the Settlement Agreement?

21         A.    Can you say that again?

22         Q.    Yeah.  When the Settlement Agreement

23   vote came that we talked about last time, you're

24   saying you didn't know anything about this decision,

25   right?

Page 320

1          A.     This document?  No.

2          Q.     No.  Not the document.  Either the

3    actual document or no one related to you the

4    substance of this subsequent decision, you didn't

5    know about --

6          A.     I don't know that I'm --

7          Q.     -- correct?

8          A.     Excuse me.  I don't understand what

9    you're getting at.

10         Q.     I'm trying to find out if when you voted

11   on this if you knew that Judge Harris had made a

12   second ruling in which he made these --

13         A.     No.

14         Q.     -- highly critical comments about

15   Emerson's exclusionary zoning trying to segregate --

16   engage in segregation.  Did you know any of this?

17         A.     I don't recall.  I don't recall these

18   being brought to my attention, no.

19         Q.     Uh-huh.  Now, when -- when you became

20   the mayor, one of the first things you did was to

21   clean house, right?

22         A.     No.

23         Q.     You got rid of old professionals and you

24   brought in new, correct?

25                MR. SEAMAN:  Objection to form.

Page 321

1      A.    I -- I don't know that I got rid of

2  everyone.

3      Q.    Okay.  Well, did you get rid of the

4  engineer?

5      A.    Yes.

6      Q.    The architect?

7      A.    Yes.

8      Q.    The planner?

9      A.    Yes.

10     Q.    The attorney?

11     A.    Yes.

12     Q.    Who didn't you get rid of?

13           MR. SEAMAN:  Objection to form.

14     A.    There were a lot of at-will employees

15  that we didn't get rid of --

16     Q.    No.  No.

17     A.    -- that were there.

18     Q.    I'm sorry.  Let me be clear.  Forget

19  about the at-will; I'm talking about the

20  discretionary appointments.  You -- you changed all

21  of the discretionary employees, correct?

22     A.    As is customary when a new

23  administration comes in.

24     Q.    You brought in your people, correct?

25           MR. SEAMAN:  Objection to form.

Page 322

1          A.      I don't know that they were my people.

2          Q.      Well, they're your people in the sense

3     that --

4          A.      They were people that I felt were

5     qualified.

6          Q.      Sure.

7          A.      And I thought that some of the people, I

8     believe I told you before, were not qualified to hold

9     the positions that they held.

10         Q.      So who -- who were the people you got

11    rid of that weren't qualified?  Who wasn't qualified?

12         A.      To start, Bridgette.

13         Q.      Bridgette?  She was the planner?

14         A.      Uh-huh.  Yes.

15         Q.      Yes?

16                 Who else?  Anybody else not qualified,

17    in your opinion?

18         A.      I don't know.  I don't know that he

19    wasn't qualified, but I didn't agree with things that

20    he was doing.  This Gary Ascolese.

21         Q.      Well, I'm asking you whether --

22    Mr. Ascolese was certainly qualified, wasn't he?

23         A.      I didn't agree with his decisions, so I

24    don't know how to quantify --

25         Q.      Yeah.  I didn't ask you that, though.

Page 323

1          A.     -- whether he was qualified or not.

2          Q.     And I didn't ask that, did I?

3          A.     How would I know that if an engineer is

4    qualified or not other than whether or not they

5    have a --

6          Q.     Well, I agree.  You said a moment ago

7    some of the people weren't qualified.  Your words.

8          A.     I would specifically say --

9          Q.     So -- so --

10         A.     Bridgett, in my opinion, was not

11   qualified.

12         Q.     Was Mr. Ascolese qualified?

13         A.     I don't know how to answer that.

14         Q.     I mean, he acted as an engineer for many

15   municipalities in Bergen County and other surrounding

16   counties.  You're aware of that, correct?

17         A.     I am.

18         Q.     Okay.

19         A.     He was a very nice man.

20         Q.     Okay.  And he was certainly qualified

21   whether you -- you agree with every decision he made

22   or not, correct?

23         A.     Correct.

24         Q.     Okay.  Anyone else that was unqualified

25   other than Bridgette?

Page 324

1       A.      Maybe the word "unqualified" is the

2   wrong word.

3       Q.      I'm sorry.  It was your word.  That's

4   why I was using it.

5       A.      I apologize.  Maybe I misspoke.

6       Q.      Okay.  Was she qualified?

7       A.      Bridgette, I don't believe, was

8   qualified.

9       Q.      When you say "not qualified," what do

10  you mean?  She didn't have --

11      A.      I don't --

12      Q.      -- the requisite skill or competence in

13  her chosen field?

14      A.      I -- I don't think that she was

15  competent, no.  Not for the decisions that she'd

16  made.

17      Q.      And -- and are you a -- do you have a

18  planning background?

19      A.      No.

20      Q.      So how do you know she's not qualified?

21      A.      It's my opinion.

22      Q.      Based on what?

23      A.      Based on her decisions.

24      Q.      What decision led you to conclude she

25  wasn't qualified?

Page 325

1          A.     Many decisions.

2          Q.     Name one.

3          A.     The fact that she thought that the

4     building was appropriate for Emerson --

5          Q.     Okay.

6          A.     -- in terms of planning.

7          Q.     Okay.  That it?  Any others?

8                 Well, let me ask you about that, though.

9     You said the fact that she thought the building was

10    appropriate.  You mean the size of the building?

11         A.     I've stated from the beginning that I

12    always thought that the building was too large for

13    our small downtown.

14         Q.     Well, I -- I understand that, except the

15    Court ordered ultimately that that was the project to

16    be built given the long history of Emerson's

17    exclusionary zoning and noncompliance.  Are you aware

18    of that?

19         A.     I'm not sure that that statement's

20    completely true.

21         Q.     Are you aware that the matter was

22    settled with Fair Housing limiting the exposure of

23    Emerson?  We went over this before.  You knew that,

24    right?

25         A.     I don't know how to answer you.

Page 326

1      Q.    Did you know that the matter was settled

2   with Fair Housing?  That Fair Housing said there were

3   a lot more affordable units that had to be built and

4   Emerson said we don't want to build all those units

5   and then there was a compromise reached?  Did you

6   know that?

7      A.    I know that this development was a tool

8   in order to satisfy our obligation and put us in

9   compliance with Fair Share and the Court.

10     Q.    There you go.  And part of that was this

11  building which was larger than it might otherwise be

12  because it had a Mount -- it had a -- a large Mount

13  Laurel component, correct?

14            MR. SEAMAN:  Objection to form.

15     A.    What's "large"?

16     Q.    Well, I'm using your word again.  You

17  said it was too large for the downtown area, yet that

18  was the building -- that was the size agreed upon in

19  the Settlement Agreement, wasn't it?

20            MR. SEAMAN:  Objection to form.

21     Q.    Wasn't it the size that was agreed upon

22  in the Settlement Agreement?

23     A.    The size?

24     Q.    Yes.  You said it was too big, and you

25  criticized Bridgette because she allowed this

Page 327

1    building or recommended a building too big.  That was

2    the building -- the size that was needed in order to

3    accommodate the 27 affordable units, correct?

4         A.    I -- I think the units were needed,

5    not --

6         Q.    Okay.

7         A.    -- necessarily the size.

8         Q.    Well, are you a planner, ma'am?

9         A.    It could have been less -- there could

10   have been less market-rate units, and the building

11   could have been smaller --

12        Q.    Are you a Mount Laurel expert?

13        A.    -- in order -- in order to satisfy.

14        Q.    Oh, you know that.  So you -- you

15   actually investigated whether there were alternatives

16   to that?

17        A.    I don't recall.

18        Q.    In fact, you don't know anything about

19   Mount Laurel, do you?

20             MR. SEAMAN:  Objection to form.

21        Q.    Do you, ma'am?  Are you knowledgeable of

22   Mount Laurel?

23        A.    I know what the lawyers have told me.

24        Q.    Are you knowledgeable of the Mount

25   Laurel doctrine?

Page 328

1        A.      I don't know how to answer your

2    question.

3        Q.      Are you knowledgeable of the COAH

4    regulations and what they require?

5        A.      I know what the lawyers have told me.

6        Q.      Well, you said a moment ago it could be

7    done a different way.  How do you know that unless

8    you are skilled and knowledgeable in this technical

9    area of Mount Laurel compliance.  How would you know

10   that?

11              MR. BOTTA:  Objection to form.  You're

12   asking her questions; she's answering them.

13       Q.      How would you know that?

14       A.      (No response.)

15       Q.      I'm waiting.

16       A.      Ask your question again from the

17   beginning without, like, all of your....  Can you ask

18   the question again, please?

19              MR. FIORENZO:  Can you read it back to

20   the witness, please.

21              (Reporter read back.)

22              "QUESTION:  Well, you said a moment ago

23   it could be done a different way.  How do you know

24   that unless you are skilled and knowledgeable in this

25   technical area of Mount Laurel compliance.  How would

Page 329

1    you know that?

2          A.      Common sense.

3                  MR. SEAMAN:   Objection to form.

4          Q.      Okay.  So your common sense allows you

5    to express the opinion here that Mount Laurel

6    compliance could have been achieved in another way.

7    Is that right?

8                  THE WITNESS:   Can you repeat that

9    question again?

10                 (Reporter read back.)

11                 "QUESTION:   Well, you said a moment ago

12   it could be done a different way.  How do you know

13   that unless you are skilled and knowledgeable in this

14   technical area of Mount Laurel compliance.  How would

15   you know that?

16         A.      Oh.  Common sense.

17                 MR. FIORENZO:   No.  And there was

18   subsequent question I asked.

19                 (Reporter read back.)

20                 "QUESTION:   Are you knowledgeable of the

21   COAH regulations and what they require?"

22                 "QUESTION:   Okay.  So your common sense

23   allows you to express the opinion here that Mount

24   Laurel compliance could have been achieved in another

25   way.  Is that right?"

Page 330

1        A.     I don't know where the question is to

2   answer.  I use my common sense when I make any

3   decisions that the governing body is faced with.

4        Q.     Well, is there common sense -- you --

5   you said there were other ways it could have been

6   done.  Are you telling me here today under oath that

7   you looked at this project and you evaluated it when

8   it was settled and you determined that there were

9   alternative ways of satisfying the Mount Laurel

10  obligation?  Did you do that at that time?

11       A.     Did I sit down and formulate a plan?

12  No.

13       Q.     Did you have any opinions at that time

14  when the case was settled that there was another way

15  to achieve Mount Laurel compliance other than the one

16  in the Settlement Agreement approved by the Court?

17       A.     I was of the opinion that this was the

18  path that was being taken, and I disagreed with it.

19       Q.     Yeah.  But I didn't ask that.  Did you

20  have an alternative solution?  It's easy to disagree,

21  but did you have some other solution that you had

22  evaluated at that point?

23       A.     I think I explained to you before that I

24  was one vote, and I could not ask our engineers and

25  give them work to do on my loan opposition to the

Page 331

1    size of the project.

2        Q.    Right.  But I didn't ask that.  Again, I

3    asked whether you had an alternative way of

4    satisfying the Mount Laurel obligation when the

5    matter was settled other than what was in the

6    Settlement Agreement?

7        A.    Yes.  I --

8        Q.    You did?

9        A.    Yes.  I said there could be more

10   market-less units -- I mean, less market-rate units

11   and that the building could have been smaller.

12       Q.    Less market-rate units?  Well, do you

13   know whether if there were less market-rate units

14   that would have yielded the necessary number of

15   affordable units?

16            MR. SEAMAN:  Objection to form.

17       A.    I don't know.

18       Q.    Do you know whether under Mount Laurel

19   there's a correlation between the market-rate units

20   and affordable units?

21       A.    Yes.

22       Q.    Okay.  So that if there are fewer

23   market-rate units, that would then mean there would

24   be less affordable units required.  True?

25       A.    I disagreed with the density of this

Page 332

1    plan.

2          Q.    No.  I know that.  But you're not

3    answering my question again.  Could you now answer

4    the pending question:  If there were fewer

5    market-rate units, would that then, under the COAH

6    regulations, yield a higher or lower amount of

7    affordable units; do you know?

8          A.    The number of market rate -- the number

9    of affordable units is based on how many market

10   rates.  I understand that.

11         Q.    Okay.  So you said they should reduce

12   the size of the building, reduce the market-rate

13   units.  And what would that do to the affordable

14   units?

15         A.    It would make the number go down.

16         Q.    Okay.  And did you have a plan for how

17   you were gonna satisfy that deficiency in the

18   affordable units?

19         A.    I already told you that I didn't have

20   professionals that were working with me --

21         Q.    Right.

22         A.    -- and solely me to come up with a

23   different plan.

24         Q.    So I take it, from that, you didn't have

25   an alternative plan.  Is that correct?

Page 333

1        A.    My -- I had ideas, but they were not

2    explored because I did not have the engineers and the

3    planners at my disposal.

4        Q.    Okay.  So you did not present and did

5    not have an alternative plan, correct, for the reason

6    you just said.

7        A.    I -- I think that I made suggestions,

8    and they were not listened to.

9        Q.    Okay.  Identify for me each and every

10   suggestion you made that were not --

11       A.    I don't recall exactly.

12       Q.    Do you remember any suggestion that you

13   made that was not listened to?

14       A.    That the building --

15       Q.    Give me one.

16       A.    -- should be smaller.

17       Q.    Okay.

18       A.    That the building didn't have to be one

19   full building.

20       Q.    Okay.

21       A.    It could have been separated.

22       Q.    Any others?

23       A.    That's what I recall.

24       Q.    Okay.  And you never contacted

25   professionals on your own to get any input or advice.

Page 334

1          A.     I think I said it at council meetings.

2          Q.     No.  No.  Independent.  Did you contact

3    someone you knew, like the planner or the architect

4    or engineer that you brought in, and try to get some

5    input from somebody else on this?

6          A.     I didn't really have relationships with

7    them.

8          Q.     Okay.  So you become mayor, and then you

9    make these various appointments.

10                MR. FIORENZO:  Could you pull up,

11   please, E53D.  We're gonna mark this as a new exhibit

12   number.  We're gonna mark that DD-31.

13         Q.     So DD-31 are Minutes of the Mayor &

14   Council meeting of January 15, 2019.  That was a

15   couple of weeks after you were sworn in as mayor,

16   correct, ma'am?

17         A.     It was a couple of weeks after I --

18         Q.     After you were --

19         A.     Yes.

20         Q.     -- sworn in.

21         A.     Yes.

22         Q.     You -- you became mayor effective

23   January 1 of '19, right?

24         A.     Yeah.  I don't remember when I was sworn

25   in.

Page 335

1    Q.    Whatever.  But your -- your term was

2  supposed to begin on January 1 --

3    A.    Correct.

4    Q.    -- correct?

5          Okay.  So this is like 15 days later in

6  that meeting.  Let's turn to the third page under

7  Appointments and Resignations.

8          So on the bottom there is a -- there was

9  a resolution adopted -- well, actually, those present

10  were sworn into office by Mayor DiPaola.  So you

11  swore in all these people on that day according to

12  the minutes.  Is that correct?

13    A.    It says, The present were sworn in to

14  office by mayor.  Yes.

15    Q.    Okay.  And about halfway down that list

16  it says Resolution No. 5319, Borough Engineer,

17  Michael J. Neglia, Neglia Engineering, correct?

18    A.    Yes.

19    Q.    So that was the new engineer you brought

20  on, correct?

21    A.    Correct.

22    Q.    There is a --

23          MR. FIORENZO:  Turn to the next page,

24  please.

25    A.    Boswell also stayed on.

Page 336

1      Q.    Well, Boswell wasn't your Borough

2  engineer; they worked for three special projects

3  noted in the resolution, correct?

4      A.    Correct.

5      Q.    So Boswell was no longer the Borough

6  engineer; Neglia was, correct?

7      A.    Correct.  But I didn't clean house as

8  you said.

9      Q.    Okay.  We'll let somebody else decide

10  whether you cleaned house.  That will be for a jury

11  to decide.

12            MR. FIORENZO:  Go to the next-to-last

13  bullet point.

14      Q.    Resolution 6319, Architect:  Kevin

15  Settembrino, Settembrino Architects.  You brought him

16  on board.  Is that correct?

17      A.    We did.

18      Q.    And then you also brought on a planner,

19  Christopher Statile, correct?

20      A.    Correct.

21      Q.    So all of those were new appointments,

22  right?

23      A.    Correct.

24      Q.    And when you then took over, do you

25  recall -- of course when you took over, you knew

Page 337

1    about the ERUR project.  You were well aware of that

2    project, correct?

3         A.    Yes.

4         Q.    Okay.  And after you were sworn in, did

5    the developer, ERUR, undertake an effort to meet with

6    you?

7         A.    Say that again?

8         Q.    Yeah.  Did the developer -- the

9    redeveloper undertake efforts to try to meet with you

10   once you got on board as mayor?

11        A.    I believe we did meet with them.

12        Q.    Okay.  So who was -- who was the clerk

13   during the period of time in 2019?

14        A.    Jane Dietsche.

15        Q.    How do you pronounce that, De-che?

16        A.    De-che.

17        Q.    Okay.  So in January of 2019, then, I

18   wanted to just ask you about a couple of things that

19   occurred around that time.  We went over it last

20   time, but just to refresh you.

21              MR. FIORENZO:  Steve, could you pull

22   that up?

23        Q.    We went over it last time.  There was

24   this newspaper article in which you were quoted as

25   saying, We're trying to scale this back and make it a

Page 338

1    more reasonable development.

2                   Remember me going over this last time?

3         A.    Yes.

4         Q.    Okay.  So that was January 24 of 2019.

5    Were you in communication and contact with any of the

6    tenants who were at the site that was proposed to

7    be -- to be redeveloped in January, 2019?

8         A.    I don't recall.

9                   MR. KLEIN:  This will be DD-32.

10        Q.    Do you recall Ms. Dietsche discussing

11   with you an inquiry from Dominick Scala --

12        A.    I don't recall.

13        Q.    -- in January of 2019?

14                  You -- you knew Mr. Scala you told me

15   last time, right?

16        A.    I know Mr. Scala.

17        Q.    According to Ms. Dietsche's email, she

18   says, Good morning Dominick, Per your request, please

19   find the attached information you were seeking

20   regarding Block 419.  If you need anything further,

21   please let me know.

22                  What -- why were you providing that

23   information to Mr. Scala at that time?

24        A.    I have no idea.  I don't know what he

25   asked for.

Page 339

1      Q.    So you weren't aware of this

2   communication?

3      A.    I don't recall.

4      Q.    Did Ms. Dietsche tell you in January

5   that Mr. Scala was seeking information regarding the

6   development?

7      A.    I don't recall.

8      Q.    The --

9      A.    This document doesn't contain his

10  request.

11          MR. FIORENZO:  Scroll down.  Scroll to

12  that.  Yeah.

13     Q.    There's a string of emails here.  The

14  one at the bottom, he's asking for information.  You

15  see that?

16     A.    Yes.

17     Q.    And then there's a response to that on

18  January 23rd, and Jane says, Hi Dominick.  I love

19  your email address!  I was gonna ask you which

20  property you wanted square footage of, but Mayor

21  DiPaola just walked in --

22     A.    Okay.

23     Q.    -- and said she thought you wanted the

24  square footage for all of Block 419.

25          How would you know that?

Page 340

1    A.    I don't -- I don't recall how I would
2    know that back then.
3    Q.    The only way you would --
4    A.    But clearly I said it because she
5    wouldn't lie.
6    Q.    Yeah.  But the only way it would seem
7    you would know that is you must have had some
8    conversation with Mr. Scala about that, correct?
9    A.    I don't recall.
10   Q.    Did you have any conversation with
11   Mr. Scala shortly after you became the mayor where
12   you indicated to him you would try to do what you
13   could to help him?
14   A.    I don't recall.  I don't think so.
15   Q.    You don't think you said to him in words
16   or substance you'd do whatever you could as the mayor
17   to try to help him?
18   A.    I don't recall.
19   Q.    You were against condemnation.  We went
20   over this last time, right?
21   A.    Yes.
22   Q.    And so you were very much opposed to him
23   being forcibly pushed out of that location, correct?
24   A.    By eminent domain, yes.
25   Q.    Right.  Right.  And he was someone who

Page 341

1   you frequented that store from time to time, as you

2   told us, correct?

3          A.    To buy cigarettes, yes.

4          Q.    Yes.  And so you knew him, correct?

5          A.    Yes.

6          Q.    Yeah.  Okay.  So when -- other than --

7   other than this communication in January, did you --

8   do you recall any other contacts or communications

9   you had with Mr. Scala in January of 2019 regarding

10  the concept of eminent domain?

11         A.    I don't recall.

12         Q.    Do you remember January 25 the Court

13  entered the conditional final judgment of repose in

14  this case?

15         A.    I know it came in January.

16         Q.    Right.  So let me pull that up.  We

17  marked this as DD-13 just for context.

18               So on January 25, Judge Padovano entered

19  this judgment, and you were -- as the mayor, of

20  course, you became aware of this around that time,

21  correct?

22         A.    Correct.

23         Q.    Okay.  And did you have an understanding

24  of what that judgment meant?

25         A.    As explained to me by the attorneys,

Page 342

1    yes.

2          Q.    Did you read the judgment?

3          A.    Yes.

4          Q.    Okay.  Did you know what the word

5    "repose" meant?

6          A.    I think it was explained by the

7    attorneys.

8          Q.    Well, what did you understand "repose"

9    to mean?

10         A.    I -- I don't know.

11         Q.    You don't know?

12         A.    I don't think I could tell you right now

13    what re- -- that means.

14         Q.    Did you ever know?

15         A.    It was explained at some point by our

16    attorneys, but we haven't discussed it in a long

17    time.

18         Q.    Well, did you understand it when it was

19    explained to you?

20         A.    I don't recall.

21         Q.    You don't recall if you understood what

22    the term "repose" meant?

23         A.    I don't recall.

24         Q.    Okay.  Well, as the mayor of the

25    community, I'm -- I'm sure it was important to you to

Page 343

1   understand what your legal duties and obligations

2   were under that judgment, correct?

3        A.    Yes.

4        Q.    Okay.  And did you understand that this

5   judgment was, quote, conditional as it says under

6   civil action?

7        A.    Yes.

8        Q.    It was conditioned on a number of

9   things?

10       A.    Yes.

11       Q.    Including Emerson's compliance with the

12  Settlement Agreement that was reached, correct?

13       A.    Yes.

14       Q.    Okay.  So after this happens --

15  actually, shortly after that, do you remember

16  Mr. Klugmann reaching out to you and your

17  representatives to meet with you?

18       A.    I don't recall.

19       Q.    Okay.

20            MR. KLEIN:  This will be DD-33.

21       Q.    So -- so it looks like on February

22  11th -- actually, even before that.

23            MR. FIORENZO:  Can you scroll down,

24  Steve.  Is there an email below that?

25            The earlier one, February 5.

Page 344

1          Q.    Okay.  So it looks like on February --

2     as early as February 5, 2019, there was an email sent

3     to you by Joseph Paparo, who was the attorney for

4     Mr. Klugmann.

5               Did you understand who Mr. Paparo was?

6          A.    It says he was cc'ed.

7               MR. SEAMAN:  I think you're mis- --

8          Q.    You're right.  You're right.  It was

9     from Mr. Klugmann -- excuse me -- to you, copied to

10    Mr. Paparo.  And he says, Hi.  Thank you for taking

11    my call.  Please let me know when works for you and

12    your team to meet.

13              So he -- he wanted to sit down and meet

14    with you about the project, correct?

15         A.    I guess.

16         Q.    Remember speaking to him?

17         A.    I don't.

18         Q.    Remember anything you discussed in that

19    phone call?

20         A.    I don't recall specifically.

21         Q.    Okay.  Well, again, just so the record

22    is clear, when you say you "don't recall

23    specifically," when I asked if you can remember the

24    conversation, I mean do you remember the actual words

25    spoken or the substance of the phone call in any way?

Page 345

1          A.    I don't remember the conversation.  I

2     don't remember the phone call.  I don't remember

3     anything.  It was at least four years ago if not

4     more.

5          Q.    That's fine.  All right.

6               MR. FIORENZO:  Scroll up to February 11,

7     please.

8          Q.    It looks like Mr. Klugmann again writes

9     on February 11, six days later, Just following up if

10    there's been any movement.  Please let me know.

11               Did you receive that?

12         A.    I guess I received it.  I don't know.

13         Q.    Okay.  And then you respond to that

14    advising Mr. Klugmann you haven't been feeling well.

15    What's your availability next week?

16               You asked Mr. Klugmann, right?

17         A.    "This week" it says.

18         Q.    "This week," right.  So did you meet

19    with him that week?

20         A.    I don't recall.

21         Q.    Do you remember when you finally got

22    around to meeting with him?

23         A.    Not specifically, no.

24         Q.    Okay.  Did....

25               MR. FIORENZO:  Is that it?

Page 346

1              MR. KLEIN:  Yeah.  This will be DD-34.

2        Q.    Okay.  Were you --

3              MR. FIORENZO:  Go to -- Steve, I don't

4    think that's what I'm looking for.  That's 2021.

5              MR. KLEIN:  Okay.

6              MR. FIORENZO:  That's the wrong

7    document.  It's February 11.

8              THE WITNESS:  Excuse me.

9        Q.    Okay.  We're --

10             MR. FIORENZO:  Can you mark that,

11   please.

12             MR. KLEIN:  Yes.  This will be DD-34.

13       Q.    So there's an email from you on February

14   11, 2015 to Richard Sheola.  He was the administrator

15   at that time, correct?

16       A.    Part-time.

17       Q.    Part-time.  Together with a number of

18   others.  And in this email, you say -- the subject is

19   the Ambulance Corps.  I did not add this to the next

20   agenda or even March 5th.  I feel there are other

21   issues as well as multiple other projects that need

22   to be dealt with more quickly.

23             Was -- was one of those projects that

24   had to be dealt with the ERUR project?

25       A.    Can I just read this whole --

Page 347

1          Q.     Yeah.

2          A.     -- page before....

3          Q.     Yeah.

4                 MR. SEAMAN:  Steve, is that the complete

5     email chain that's up there or is that --

6                 MR. KLEIN:  Just the one.

7                 MR. SEAMAN:  Could she look at the whole

8     document then.

9          A.     (Witness reviewing exhibit.)

10         Q.     You're welcome to read whatever you

11    want, but I'm -- what I'm focusing on in the moment

12    is the -- the email that refers to the 19th of March.

13         A.     I'm trying to put this in context.

14         Q.     Go ahead.

15         A.     (Witness reviewing exhibit.)

16                Okay.

17         Q.     Okay.  So my question was what are --

18    what are the -- February 11th you've been mayor for a

19    little over a month, and you make reference to -- you

20    say, Contact needs to be made with the developer to

21    understand exactly what's going on with the 419

22    project and what the timetable is, and it goes on.

23                My question to you is, what were the

24    multiple other projects that needed to be dealt with

25    more quickly that you were referring to?

Page 348

1          A.      I don't recall.

2          Q.      Do you remember any of the projects that

3    had to be dealt with quickly?

4          A.      I think you're reading this email out of

5    context.

6          Q.      Well, I'm reading where it says "other

7    projects had to be dealt with more quickly."  That's

8    what I'm reading.  That's what it says.

9          A.      Right.

10         Q.      Were there other projects?

11         A.      And I'm referring to the movement of the

12   Ambulance Corps out of the Ambulance Corps building,

13   not the project -- not the 419 project.

14         Q.      Well, you do refer to 419 specifically.

15         A.      Yeah.  But I'm not specifically talking

16   about the project.  When I say that there are other

17   products (sic) that need to be dealt with more

18   quickly, my -- what -- you're taking it completely

19   out of context.

20         Q.      What are the multiple other projects you

21   were referring to?

22         A.      It -- it doesn't matter what the other

23   projects were.

24         Q.      Well, whether it matters or not, that's

25   what I want to know.

Page 349

1      A.    What I was referring to was moving EVAC

2  out of the building.

3      Q.    I --

4      A.    That's what I was referring to when I

5  said "other projects."

6      Q.    I know that, okay.  So just now answer

7  my question.  When you said, I feel there are other

8  issues as well as multiple other projects that need

9  to be dealt with more quickly, more quickly than

10  what?

11      A.    More quickly than getting EVAC out of

12  their building --

13      Q.    Okay.

14      A.    -- and displacing them.

15      Q.    Good.  So what were the other

16  projects --

17      A.    That, I don't recall.

18      Q.    -- that needed to be dealt with more

19  quickly?

20      A.    That, I don't recall.

21      Q.    Okay.  You don't remember any of them?

22      A.    No.

23      Q.    Okay.  Now, when -- when you were

24  communicating at this point, did there come a time

25  that you asked Mr. Sheola to set up a meeting with

Page 350

1    Mr. Klugmann?

2         A.    I don't recall.

3              MR. KLEIN:  DD-35.

4         Q.    Do you recognize DD-35?

5         A.    (Witness reviewing exhibit.)

6         Q.    It's a series of emails between

7    Mr. Klugmann and Mr. Sheola.

8         A.    I see it, but I don't recall it.

9         Q.    He's asking to meet on March 4.

10   Mr. Klugmann.  You see that?

11        A.    Correct.  Yes.

12        Q.    And Mr. Sheola is responding.  He -- he

13   writes to Mr. Klugmann up top, and he says -- he

14   says, I haven't been brought up to speed on the

15   project and that will occur sometime next week.  I

16   request holding off the March 4th meeting until

17   possibly later that week to the following.

18              Did he discuss this with you?

19        A.    I don't recall.

20        Q.    Sheola, I mean.

21        A.    I don't recall.

22        Q.    Did you ask Mr. Sheola to put off the

23   meeting?

24        A.    I don't recall.

25        Q.    Did you know why Mr. Klugmann wanted to

Page 351

1   meet?

2        A.    No.  Mr. Sheola was part-time, so he may

3   have needed more time.  I don't know.

4        Q.    But you don't know.  Are you guessing?

5        A.    He says he hasn't been up to speed on

6   the project, and that will occur sometime next week.

7        Q.    Okay.

8             MR. FIORENZO:  Pull up the next one,

9   please.

10        A.    So that was on a Friday, so he was

11   asking that when he came back to work on Monday that

12   he would be brought up to speed.

13        Q.    Uh-huh.

14        A.    I'm just reading.  I'm not remembering.

15        Q.    Do you recall shortly thereafter on

16   February 25th, 2019, a letter was sent by

17   Mr. Klugmann's attorneys at Porzio, DD-36.

18        A.    I don't remember, but I see it.

19        Q.    Okay.  Who is Mr. McCann?

20        A.    Borough attorney.

21        Q.    Okay.  In the second paragraph of the

22   letter, Mr. Paparo, writing to your town attorney

23   says, quote, It is critical that a meeting be

24   scheduled with my client and the Borough as soon as

25   possible so we can provide the Borough with an update

Page 352

1    concerning the project in general, and specifically

2    the status of closing on the parcels and

3    tenant-related issues.  Over the passing weeks, my

4    client and I have made multiple requests to Borough

5    officials and consultants for such a meeting with no

6    success.

7            Did you see this letter around that

8    time?

9        A.    I don't recall.

10       Q.    Did you have a discussion with anyone

11   within Emerson regarding the developer's position

12   that he'd been trying to meet without success over

13   the last several weeks?

14       A.    I don't recall.  Is there a second page

15   to this letter?

16       Q.    No.  But it shows you were copied on it.

17       A.    Okay.

18       Q.    So you did receive it, right?

19       A.    It says that I did.

20       Q.    So you were aware that the developer was

21   expressing a concern about trying to set up a meeting

22   over several weeks, right?

23       A.    I don't think Matthew Gilson was ever

24   our attorney, though.

25       Q.    I didn't ask about Matthew Gilson,

Page 353

1    though, did I?

2         A.    I know.  Well --

3         Q.    Did I ask about Matthew Gilson?

4         A.    I'm reading this, and you're asking --

5         Q.    Did I ask about Matthew Gilson?

6         A.    You're asking me --

7         Q.    I asked -- I asked whether you received

8    this.

9         A.    You're asking me about the legitimacy --

10        Q.    No.  No.  I'm asking --

11        A.    -- of asking questions about a

12   document --

13        Q.    I'm not asking you about Matthew Gilson.

14        A.    -- and I'm reading it, and it doesn't

15   make sense to me.

16        Q.    I'm not asking you about Matthew Gilson;

17   I'm asking whether when you received this letter you

18   were aware that there was a concern being expressed

19   that the redeveloper was trying to set up this

20   meeting for several weeks.

21        A.    I don't --

22        Q.    Were you aware of that?

23        A.    I don't recall.

24        Q.    Okay.

25             MR. FIORENZO:  Let's just go back up.

Page 354

1    Let's go back up to the letter again, the third

2    paragraph.  Could you make that bigger?

3           Q.     He goes on to say, As you are certainly

4    aware, the Redevelopment Agreement between the

5    Borough and the Redeveloper requires the Borough to

6    cooperate fully with the redeveloper in furtherance

7    of the project regardless of how unpopular the

8    project may be with the new Administration.  The

9    Borough's obligations concerning the project also

10   flow from the Affordable Housing Settlement as the

11   project was the key -- key element to the settlement.

12           So you're aware at that time that

13   Mr. Paparo was reminding you, among others, of the

14   Borough's obligation to cooperate under the

15   Redevelopment Agreement?

16           MR. SEAMAN:  Objection to form.

17       A.     We always cooperated.

18       Q.     Someone will decide that, but were you

19   aware that you had a duty to cooperate?

20       A.     Yes, I was.

21       Q.     And that -- that duty to cooperate was

22   contained in the Redevelopment Agreement in writing,

23   was it not?

24       A.     Yes, it was.

25       Q.     Okay.  It also required, among other

Page 355

1    things, for the town to respond quickly to requests

2    of the redeveloper --

3          A.    I believe --

4          Q.    -- correct?

5          A.    I believe we did.

6          Q.    Okay.  Well, I'm not asking whether you

7    did; I'm asking whether you understood it required

8    you to do so, right?

9          A.    I guess.

10         Q.    Okay.  Whether you did or didn't, that

11   will be the subject of some discussion.

12         A.    I guess.

13         Q.    Yeah.  Yeah.  Okay.  Did you ever

14   complain about the provisions in the Redevelopment

15   Agreement that obligated the town to cooperate and

16   give consent to the project of the redeveloper?

17         A.    I don't recall.

18         Q.    Is it possible you did that?

19         A.    I don't recall.

20               MR. SEAMAN:  Objection to form.

21         Q.    I know that.  Since you don't remember,

22   does that mean maybe you did and maybe you didn't --

23         A.    I don't recall.

24         Q.    -- you just don't remember?

25               No.  I know that.

Page 356

1           MR. SEAMAN:  Objection to form.
2      Q.    I'm trying to hone down on what your
3  statement "I don't recall" means.
4      A.    "I don't recall" --
5      Q.    That -- that could --
6      A.    -- means I don't recall.
7      Q.    Well, I know -- I know you don't recall,
8  so that means maybe it happened and maybe it didn't;
9  you just don't remember, doesn't it?
10     A.    I don't recall.
11     Q.    Right.  Is that what it means?
12     A.    I don't recall.
13     Q.    Right.  Does that mean it might have
14  happened?
15          MR. SEAMAN:  Objection to form.
16     Q.    Can you answer my question?
17     A.    I did answer.  I said I don't recall.
18     Q.    Does that mean maybe it happened and
19  maybe it didn't; you just don't remember?
20     A.    I don't recall.
21     Q.    Right.  You don't remember whether if it
22  did or didn't, right?
23     A.    I don't recall.
24     Q.    You don't remember if it did or it
25  didn't, right?  Can you answer my question?

Page 357

1      A.    I --

2      Q.    It's really simple.  You don't remember

3  if it did or didn't, right?

4      A.    I don't recall.

5      Q.    Either way.

6            Can you answer the question?  You're

7  still not answering it.

8      A.    I -- you're putting words in my mouth,

9  and I don't recall.

10      Q.    Well, that's what we do when we ask

11  questions.  I'm asking you to just confirm what is

12  meant when you say you don't remember.  That means

13  maybe it happened, maybe it didn't; you just don't

14  remember.

15      A.    I guess.

16      Q.    Okay.

17      A.    I don't recall what happened.

18      Q.    Now -- so after this communication from

19  counsel for the developer, did you receive further

20  communications from Mr. Klugmann trying to set up a

21  meeting?

22      A.    I don't recall.

23            MR. KLEIN:  DD-37.

24      Q.    Okay.  Thirty-seven is a letter dated

25  March 4th, 2019, and it's, again, from Mr. Paparo.

Page 358

1    He says in the first paragraph, quote -- it's to

2    Mr. McCann, your -- your attorney, correct?

3            It says, Having received no response to

4    my February 25, 2019 letter, I'm again writing to

5    request that a meeting be scheduled with the Borough

6    to discuss the status of closing on parcels and

7    tenant-related issues that require the Borough's

8    direct involvement and participation.  It is

9    extremely frustrating and disappointing that no one

10   on behalf of the Borough has responded to our prior

11   requests.  My client is an experienced real estate

12   developer and has worked with many municipalities on

13   similar redevelopment projects, and frankly, neither

14   my client nor I have ever encountered such a lack of

15   cooperation as we are encountering here, end quote.

16           You were copied on this letter, correct?

17       A.    I don't know.

18           MR. FIORENZO:  Scroll down, please.

19       Q.    A copy was sent to you.

20       A.    It says I was.

21       Q.    Yeah.  So you received this, correct?

22       A.    I guess.

23       Q.    Okay.  And when -- when you read -- you

24   read the letter when you received it?

25       A.    I -- I don't recall.

Page 359

1          Q.     So were you aware that the redeveloper

2    was expressing frustration and concern with the delay

3    and the need to meet with the municipality to deal

4    with certain issues?

5          A.     I don't recall.

6          Q.     Did you instruct your staff not to meet

7    with the redeveloper?

8          A.     I didn't -- no.  I did not instruct

9    anyone not to meet.

10         Q.     Well, do you have any explanation for

11   why no one was responding to the redeveloper?

12         A.     You'd have to ask Mr. McCann.

13         Q.     No.  I'm asking you --

14         A.     I don't know.

15         Q.     -- because you're under oath.  Do you

16   know of any reason?

17         A.     No.

18         Q.     You.

19                Okay.  Did you think it was unreasonable

20   for the redeveloper to express the concern that no

21   one was responding to him?  Did you think that was an

22   unreasonable position --

23         A.     I --

24         Q.     -- he was taking?

25         A.     I don't recall --

Page 360

1          MR. SEAMAN:  Objection to form.

2     A.     -- what was going on at this time.  I

3  don't -- I don't know.

4     Q.     Were you focused on the 419 project?

5     A.     I don't recall.

6          MR. FIORENZO:  Could you give me....

7  before you get to that.  Before you get --

8     Q.     Did -- around this time, did -- did you

9  have any conversations with Mr. Statile, one of the

10  new professionals that you had hired regarding the

11  419 project?

12     A.     I don't recall.  No.  I don't recall

13  ever speaking to Mr. Statile.

14     Q.     Do you know Caroline Rider?

15     A.     Yes.

16     Q.     Okay.  Did you have any communication

17  with Caroline Rider around this time --

18     A.     I don't recall.

19     Q.     -- regarding 419?

20     A.     I don't recall.

21     Q.     Did you ever express to Caroline Rider

22  what it was that you wanted to accomplish this year

23  with regard to the 419 project?

24     A.     I don't recall.

25     Q.     Okay.

Page 361

1          MR. FIORENZO:  You can pull it up.

2          MR. KLEIN:  DD-38.

3     Q.    So this is from Chris Statile to Rich

4  Sheola.  And he says, Hi Rich.

5          Rich was, at the time, your

6  administrator, correct?

7     A.    Yeah.  But I'd like to make a

8  clarification.  That is Caroline's email.  That is

9  not Chris Statile's.  Every email from Caroline came

10 from Chris Statile.

11    Q.    Okay.  So this -- this email then --

12 Mr. Sheola was your administrator at this time,

13 correct?

14    A.    Part-time, yes.

15    Q.    Okay.  What -- describe what you mean by

16 "part-time"?

17    A.    He worked part-time.

18    Q.    How many hours a week?

19    A.    I don't remember.

20    Q.    And why was he part-time and not

21 full-time?

22    A.    Because we were seeking a full-time

23 administrator, and he was retired --

24    Q.    Uh-huh.

25    A.    -- and only available to work part-time

Page 362

1    per his pension.

2         Q.     Okay.  So in the email he -- he writes:

3    Hi Rich -- she writes.  Let's assume you're correct

4    this is Ms. Rider, okay.  Ms. Rider writes -- in

5    fact, it says, "Best, Caroline."  So that would

6    confirm that.

7              Ms. Rider writes:  Pleasure speaking

8    with you today.  My contact info is below.  Please

9    keep me posted on a meeting with the redeveloper.

10             So why -- do you know why she wanted to

11   be posted on the meeting with the redeveloper?

12        A.     No.

13        Q.     Did you ask to make sure that she was

14   present at any meeting?

15        A.     I don't recall.

16        Q.     She goes on to say, quote, It was -- it

17   also -- it also may also make sense for us to meet,

18   and the Mayor if she's available, to discuss what the

19   Borough wants to achieve this year, end quote.

20             Did you ever meet with her --

21        A.     I don't --

22        Q.     -- concerning what you wanted to achieve

23   this year?

24        A.     Again, that's a separate sentence.  I

25   don't think it has anything to do with the

Page 363

1    redevelopment.

2         Q.    Could you now answer my question?  Did

3    you ever meet with her or discuss with her what you

4    wanted to achieve this year?

5         A.    I don't recall.

6         Q.    Had you set a goal of what you wanted to

7    achieve this year for Block 419?

8         A.    That line I don't think refers to Block

9    419.

10        Q.    I didn't ask you that, though.  I'm

11   asking you whether you had set any goals or agenda as

12   to what you wanted to achieve for Block 419 this

13   year?

14        A.    There was a signed contract.  There was

15   nothing to achieve.  It is what it is.

16        Q.    Well, you had --

17        A.    It was what it was.

18        Q.    You had told the press you wanted to try

19   to scale it back.  Is that one of the things you

20   wanted to achieve?

21        A.    I think when I first became mayor I may

22   have asked one question as to whether or not that was

23   a possibility, and I was told emphatically no, and

24   that we would move on with the project as it was

25   written in the contract.

Page 364

1      Q.     Who told you that?

2      A.     Probably my attorneys.

3      Q.     Probably?  Do you know who told you --

4      A.     I don't --

5      Q.     -- or are you guessing?

6      A.     -- recall specifically.

7      Q.     You -- you don't know.  You don't know

8  who told you that?

9      A.     I -- I don't know.

10     Q.     You think someone told you that you had

11 to go ahead with the project?

12            THE WITNESS:  If the lawyers told me

13 something I asked them, is that attorney-client

14 privilege --

15     Q.     Well, you said you didn't know --

16            THE WITNESS:  -- or do I have to answer

17 it?

18     Q.     -- what the lawyers told you.

19     A.     I said I don't recall.

20     Q.     You don't recall who told you.

21            MR. SEAMAN:  Could we have a minute to

22 discuss privilege?  That's what she's asking for.

23            MR. FIORENZO:  Yeah.  She said she

24 didn't know who told her.

25            MR. SEAMAN:  Okay.

Page 365

1                    MR. FIORENZO:  Might have been this,

2      might have that.  She doesn't know.

3                    MR. SEAMAN:  Can we take five minutes,

4      please?

5                    MR. FIORENZO:  Go ahead.

6                    (Break:  11:20 a.m.)

7                    (Resume:  11:25 a.m.)

8                    MR. FIORENZO:  You all set?

9                    MR. SEAMAN:  Yup.

10                   MR. FIORENZO:  Okay.  Could you read

11     back the last question if you would, please.

12                   (Reporter read back.)

13                   "QUESTION:  You don't recall who told

14     you."

15                   MR. FIORENZO:  Go back one more, please.

16                   (Reporter read back.)

17                   "QUESTION:  You think someone told you

18     that you had to go ahead with the project?"

19                   MR. FIORENZO:  You know what, I'll pick

20     it up from there.  I'll just reask the question.

21     BY MR. FIORENZO:

22          Q.    You said that someone told you that you

23     had to go ahead and -- and comply with the

24     Redevelopment Agreement.  Is that right?

25          A.    Yes.

Page 366

1        Q.    Who was it that told you that?

2        A.    I --

3              MR. SEAMAN:  Objection to form.  It

4    calls for an attorney-client communications, but you

5    can answer the question.

6        Q.    Do you remember?

7        A.    I don't.  All I recall is that I had a

8    complete understanding that the Borough had to

9    completely comply with the Redevelopment Agreement.

10       Q.    The Borough had to completely comply

11   with it, right?

12       A.    (Witness nods head.)

13       Q.    How about the Settlement Agreement?  Did

14   you have an understanding about whether you had to

15   comply with that?

16       A.    You mean for the affordable housing

17   units?

18       Q.    The Settlement Agreement.

19       A.    With the Court.

20       Q.    The settlement of the lawsuit with the

21   Court between Fair Housing and Emerson that settled

22   the litigation.  Do you have an understanding that

23   you had to comply with the Settlement Agreement?

24       A.    I don't specifically remember asking

25   about it.

Page 367

1      Q.     Did you have understanding that you had

2   to comply with Judge Padovano's January 2019

3   conditional judgment of repose?

4      A.     I -- I think I had an understanding that

5   the Judge made an order and that we had to comply.

6      Q.     Right.  And that order that he entered

7   was in the lawsuit that was filed by Emerson,

8   correct?

9      A.     Say that again?

10     Q.     The order he entered, the judgment was

11  in the lawsuit filed by Emerson, correct?

12     A.     Before I was mayor, yes.

13     Q.     Well, the lawsuit was instituted before

14  you were mayor.

15     A.     In 2006.

16     Q.     While you were on the governing body.

17     A.     I don't think so.

18     Q.     Okay.  You don't think so?

19     A.     He --

20     Q.     Didn't you vote on whether or not to

21  pursue the litigation?

22     A.     Which lawsuit are you talking about?

23     Q.     The only lawsuit --

24     A.     Are you talking about the affordable

25  housing?

Page 368

1          Q.     The only lawsuit I've being talking
2    about is the one where Emerson filed suit to seek
3    protection in the matter of the application of the
4    Borough of Emerson, Bergen County for a declaratory
5    judgment which led Judge Padovano ultimately to enter
6    his judgment of repose after the Settlement Agreement
7    was reached.  That's the lawsuit I am referring to.
8          A.     What's the date of the lawsuit?
9          Q.     Okay.  I don't have it off the top of my
10   head, but I'll get it for you if you -- if you need
11   it.  We went over this before.  Okay.
12                Okay.  July 8th, 2015.  You were a
13   member of the governing body --
14         A.     Oh.
15         Q.     -- then?
16         A.     Yes.
17         Q.     So the lawsuit was instituted, as we've
18   talked about previously, because it was voted on when
19   you were at the council, correct?
20         A.     Yes.
21         Q.     All right.  So this lawsuit then was
22   settled with a Settlement Agreement and then
23   ultimately following a Fairness Hearing, which we
24   went over last time, the judge entered his
25   conditional judgment of repose.  Recall we went over

Page 369

1    this?

2        A.    I guess.

3        Q.    Okay.  And that was in January of 2019.

4    So my question is, did you understand that you had an

5    obligation to comply not only with the Redevelopment

6    Agreement, but with also the Court's conditional

7    judgment of repose settling conclusively the lawsuit?

8        A.    I guess.

9        Q.    Okay.  And so here we are now in 2019

10   after you are the mayor.  Did you at any time meet or

11   speak to any of the professionals about things that

12   you believed that they should be doing to slow down

13   the project?

14       A.    Never.

15       Q.    Did you ever speak with Caroline Rider

16   about things you believed that she should do with

17   respect to the project?

18       A.    No.

19       Q.    You never met with her concerning 419?

20       A.    I don't recall.

21       Q.    Uh-huh.

22       A.    The only thing that was ever discussed

23   about the project once I was told that we had to

24   comply was the look of the project, which was

25   discussed in that meeting that we would have a

Page 370

1  subcommittee to discuss what -- that it looked like

2  it fit in our downtown.

3       Q.    Again, that has nothing to do with my

4  question?

5       A.    Well....

6       Q.    I mean, you're giving me information

7  that's totally unresponsive.

8             My question:  Did you speak with

9  Caroline Rider in 2019, 2020 about what, if anything,

10  she should be doing concerning the 419 project?

11       A.    I don't recall.

12       Q.    Okay.  How about the engineer at Neglia,

13  Mr. Atkinson?  Did you speak with him?

14       A.    No.  No.  I don't think --

15       Q.    You never met with either of them

16  regarding the 419 project?

17       A.    I don't think so.

18       Q.    She's indicating that it might be

19  helpful to meet with you to discuss what you wanted

20  to achieve this year.  You're saying you never met

21  with her?

22       A.    That had nothing to do with 419.

23       Q.    Did you ever meet with her is the

24  only --

25       A.    We met just to -- to familiarize --

Page 371

1          Q.      Okay.

2          A.      Like to have a ladies' lunch.

3          Q.      Okay.

4          A.      To work together.

5          Q.      So you met with her.

6          A.      We had lunch.

7          Q.      Okay.  You -- which means you met with

8    her, correct?

9          A.      Yes.

10         Q.      Other than having a ladies' lunch, did

11   you ever meet with her on any other occasion?

12         A.      I don't recall.

13         Q.      Did you ever meet with her in town hall

14   with others present?

15         A.      I don't think so.

16         Q.      Did you ever meet with her at -- at any

17   meeting in which you discussed the Block 419 project?

18         A.      Maybe only as it related to the color of

19   the building.

20         Q.      Okay.  So your testimony is to the

21   extent there were discussions between you and

22   Ms. Rider regarding the 419 project, you only spoke

23   about the color?  Is that right?

24         A.      I -- I don't recall.

25         Q.      Okay.  So maybe you spoke about other

Page 372

1   things.

2          A.      No.  I don't -- I....

3          Q.      I thought you said you didn't remember.

4          A.      I think I -- I have already told you

5   that when they came in and they approved it at the

6   Land Use board meeting that I didn't like the look of

7   the building, the way it was being built.  And I

8   think the only thing that Mr. Klugmann agreed was to

9   build something that we thought would like nice in

10  our --

11         Q.      Yeah.  I'm gonna move to strike all

12  this.

13         A.      -- downtown.

14         Q.      None of this has anything to do with the

15  pending question.

16         A.      I don't understand your question then.

17         Q.      None of it.  Okay.  Could you please

18  listen to my question.  I'm asking about your

19  conversations with Ms. Rider.  You had a ladies'

20  lunch with her.

21         A.      Yes.

22         Q.      Is it your position that you never spoke

23  with her about the project --

24         A.      I never --

25         Q.      Let me finish.  -- other than discussion

Page 373

1    of the color of the building?  Is that your position?

2         A.    Yes.

3         Q.    Okay.  How about Mr. Atkinson?  Did you

4    ever meet with him in 2019 or 2020?

5         A.    I don't recall, no.

6         Q.    Did you ever meet with him to discuss in

7    any way the Block 419 project?

8         A.    No.

9         Q.    Okay.  So at no time did you ever have

10   any direct communications with Mr. Atkinson regarding

11   the Block 419 project?

12        A.    I don't --

13        Q.    Is that -- is that your testimony?

14        A.    I don't think I ever had a direct

15   conversation with him other than for him to clarify

16   something that I might have read in his email.

17        Q.    Did you ask him to do an examination of

18   the height of the building?

19        A.    I -- I don't recall.

20        Q.    Okay.  So again, possible you did,

21   possible you didn't; you don't remember, correct?

22        A.    I don't remember.

23        Q.    Right.  Which means maybe you did and

24   maybe you didn't, right?

25        A.    Oh, here we go again.

Page 374

1          Q.     Well, that's right.  I'm asking you a

2     question to clarify your response.

3          A.     I don't recall.

4          Q.     You say I don't know.  I believe that

5     means, if you don't recall, maybe it happened, maybe

6     it didn't.  Is that what you mean when you say "I

7     don't recall"?  'Cause you can't remember yes or no.

8          A.     I don't know.

9          Q.     So you don't know either way.

10          A.     I don't know the answer to your

11     question, did I --

12          Q.     Right.

13          A.     -- or didn't I.  I don't know.

14          Q.     And the reason you don't know the answer

15     is because you don't remember, right?

16          A.     I -- I said I don't remember --

17          Q.     Okay.

18          A.     -- and I don't recall.

19          Q.     Right.  And -- and so maybe you did.

20     Maybe you did speak to him.

21               MR. SEAMAN:  Objection to form.

22          Q.     Right?

23          A.     I don't recall.

24          Q.     Okay.  But it's possible you did?

25               MR. SEAMAN:  Objection to form.

Page 375

1         A.      I don't recall.

2         Q.      Is it possible that you did?

3                 MR. SEAMAN:  Objection to form.

4         A.      I mean, it's possible pigs are gonna

5    fall out of the sky.

6         Q.      Sure.  Sure.

7         A.      I don't know.

8         Q.      Okay.  Yeah.  So that means it would

9    also be possible you may have spoken to Mr. Atkinson.

10        A.      I --

11                MR. SEAMAN:  Objection to form.

12        A.      I don't know.

13        Q.      Okay.  When -- did there come a time

14   when your engineer undertook an analysis of -- well,

15   withdrawn.

16                Did -- did you become aware at some

17   point in time your engineer wrote to the developer

18   concerning additional requirements that the developer

19   had to fulfill before permits would be issued?

20        A.      I don't recall.

21        Q.      Were you aware at some point in time

22   that the developer sought the issuance of permits?

23        A.      I don't recall.

24        Q.      Well, you're aware that they -- they

25   sought permits, correct?

Page 376

1      A.      For what?

2      Q.      Demolition --

3      A.      Any permit?

4              Yes.

5      Q.      -- let's start with that.

6      A.      Yes.

7      Q.      Okay.  And you understood that -- in

8  order to get a demolition permit, what do you

9  understand had to happen?

10     A.      They had to pay for it.

11     Q.      Okay.  Other than paying for it, what

12  did they have to do, as you understood it?

13     A.      I don't know.

14     Q.      Well, who --

15     A.      But I know -- I know they didn't pay for

16  it for a very long time.

17     Q.      Okay.  Great.  Other than paying for it,

18  were there any other requirements for issuing a

19  demolition permit?

20     A.      I don't know.

21     Q.      Well, who else knows in the Borough, if

22  not you?

23     A.      The Construction Department would know.

24     Q.      That's within their bailiwick?

25     A.      Permits are applied for through the

Page 377

1   Construction Department, yes.

2        Q.    So that would be Mr. Sheola -- not

3   Sheola.

4             MR. FIORENZO:  Silvio, is it?

5             MR. KLEIN:  Silva.

6             MR. FIORENZO:  Silva.

7        Q.    Sylvia.  Mr. Silva was the Construction

8   Code official in 2019, correct?

9        A.    I -- I don't recall.

10       Q.    Okay.  He was the Construction Code

11  official at some point, correct?

12       A.    At some point.

13       Q.    Okay.  So your testimony is the issue of

14  the -- the permits is a function of your staff and

15  the Construction Code department determining whether

16  the permit should be issued or not, correct?

17       A.    The Construction Department gives out

18  the permits.

19       Q.    Right.  So it's their determination

20  whether the permit should be issued or not, correct?

21       A.    Yes.  They have to make sure

22  everything's satisfied in order to issue the permit.

23       Q.    Right.  And do you know what the

24  criteria are that they have to look at in determining

25  whether a permit issues?

Page 378

1          A.      The only thing that I know about

2    permitting is that they need to be paid for, and that

3    the -- that a permit was not paid for --

4          Q.      I got that.

5          A.      -- for a very long time.

6          Q.      You told me that three or four times.

7                  Other than paying money --

8          A.      I don't know.

9          Q.      Let me finish.  Please, don't interrupt

10   me.  You always do it.  I don't know why.  Can you

11   wait till I ask a question, ma'am?  Will you try to

12   do that?

13         A.      I'll try.

14         Q.      Good.  Okay.  Other than the payment of

15   money, do you know what the other criteria are that

16   your Construction Department has to use in

17   determining whether to issue a permit?

18         A.      No.

19         Q.      So you -- you don't have expertise on

20   that?

21         A.      No.

22         Q.      Okay.  Did you ever speak to Mr. Silva

23   at any time regarding the Block 419 project?

24         A.      Yes.

25         Q.      Okay.  When was the first time you spoke

Page 379

1    to him?

2         A.    I don't recall.

3         Q.    Where was it you spoke to him?

4         A.    Inside Borough Hall.

5         Q.    Okay.  Did you ask him to come see you?

6         A.    No.  I probably just saw him when he was

7    passing through.

8         Q.    Okay.  So what discussions did you have

9    with him regarding the Block 419 project when you

10   spoke with him?

11        A.    The only time I ever recall speaking to

12   Mr. Silva was regarding the deplorable condition that

13   the building was in, that I was getting complaints,

14   and for them to clean it up.

15        Q.    Okay.  That's the only time?

16        A.    That, and the fact that they didn't pay

17   the permits.

18        Q.    That's it?

19        A.    To the best of my recollection, that's

20   what I recall.

21        Q.    Did you ask Mr. Silva to cite ERUR for a

22   summons?

23        A.    I didn't ask him to cite it.  I said,

24   I'm getting complaints.  Would you take a look at it.

25        Q.    Did you ask him to tag it?

Page 380

1     A.    Never.

2     Q.    Do you know what "tag it" means?

3     A.    I -- I think it means to give them a

4  yellow tag, a warning.

5           MR. KLEIN:  DD-39.

6     Q.    Who's Ron Cenicola?

7     A.    He works in the Construction Department.

8     Q.    He works with Mr. Silva.

9     A.    He did.

10    Q.    Uh-huh.  Did you ask him to go outside

11  and tag my client's property?

12    A.    Tag it?  I -- I don't -- no.  I wouldn't

13  necessarily use that word.

14    Q.    Well, we just discussed what it meant.

15  Did you ask him to go out and issue a summons or

16  something to that effect?  Tag it?  Whatever the term

17  was you might have used?

18    A.    I -- I don't recall.

19    Q.    Right.

20          MR. KLEIN:  DD-39.

21    Q.    This is an email, DD-39, from Lauren

22  Roehrer.  Who is she?

23    A.    The CFO.

24    Q.    To Rich Sheola.  Subject, 184

25  Kinderkamack.  She says, Hi Rich, In case -- quote,

Page 381

1    In case I forget tomorrow, Ron Cenica -- it's

2    supposed to be Cenicola, I believe.

3         A.      Uh-huh.

4         Q.      -- the property maintenance officer was

5    looking for the owner above -- owner above -- above

6    the above property as the Mayor -- presumably you --

7    wants him to tag it.

8              So would you agree with me that you

9    specifically had conversations, either directly or

10   with one of your staff, to direct the Building

11   Department to tag it or to issue a summons with

12   regard to the property?

13        A.     I don't recall.

14        Q.     Do you deny the accuracy of that

15   statement?

16        A.     I -- I don't think I ever told anyone to

17   tag anything.  It's not my lingo.

18        Q.     Well, whether you said tag it or issue a

19   summons --

20        A.     I --

21        Q.     -- or take action, do you deny the gist

22   of Ms. Roehrer's email that the mayor wanted you

23   to -- she says "tag it," but do something, right?

24        A.     The only thing I ever asked anyone was

25   when I had a complaint for them to look at it.

Page 382

1      Q.    Well, she said you had a complaint and

2    asked somebody to tag it.  Do you deny that?

3      A.    I -- I don't know what she said.  I

4    didn't tell her --

5      Q.    Do you deny the statement in her email

6    when she said the Mayor wants him, Ron Cenicola, to

7    tag it?

8      A.    I -- I deny that, yes.

9      Q.    Okay.  So why do you deny it?

10   Because --

11     A.    Because I wouldn't --

12     Q.    -- of the term "tag it"?

13     A.    Yeah.  I won't understand it.  I

14   wouldn't use it.

15     Q.    Well -- okay.  Well, what -- what words

16   did you use when you spoke to them?

17     A.    I probably said that I'm getting

18   complaints about the deplorable condition that the

19   property is in and asking our property maintenance to

20   look at it.  I don't know how she synthesized those

21   words.

22     Q.    Well, apparently we know how she

23   synthesized it --

24     A.    Well --

25     Q.    -- because she said you said, Tell

Page 383

1  Cenicola to tag it.  That's -- that's what she said

2  you said.  Now you're denying that here under oath,

3  correct?

4       A.    I don't recall saying those words, no.

5       Q.    How about issue a summons?

6       A.    No.

7       Q.    Okay.  So it -- it appears then that at

8  some point your professionals issued -- withdraw the

9  question.

10            MR. KLEIN:  DD-40.

11       Q.    DD-40 is a July 12, 2019 letter from

12  Neglia.

13            MR. FIORENZO:  You can scroll down.

14       Q.    I think it's from Mr. Atkinson who

15  signed it.

16            MR. FIORENZO:  Scroll down, Steve, if

17  you would, please.  Just to the signature page.

18       Q.    David Atkinson.  Do you know who he is?

19       A.    Yes.

20       Q.    Who is he?

21       A.    He's our Borough engineer.

22       Q.    Okay.  And that's the individual I had

23  asked you about a moment ago and you -- I thought you

24  told me you had no recollection of ever having any

25  meetings or discussions with him.

Page 384

1      A.     I don't.

2      Q.     Is that right?

3      A.     I don't recall.

4      Q.     Okay.  So Neglia on July 12, 2019 wrote

5   a letter consisting of I think it's 32 pages.

6           MR. FIORENZO:  How many pages?

7           MR. KLEIN:  Twenty-two.

8      Q.     Twenty-two pages.  Did you see this

9   22-page letter written by Neglia?

10     A.     I don't recall.

11     Q.     Did you ever discuss DD-40, the Neglia

12  letter, with anyone?

13     A.     Could I see the full document?

14     Q.     Sure.

15          MR. FIORENZO:  Why don't you pull it

16  out.

17     A.     (Witness reviewing exhibit.)

18     Q.     The pending question is:  Did you

19  discuss the Neglia letter, DD-40, with anyone?

20     A.     I don't recall.

21     Q.     Did you ever -- with the benefit of

22  this, do you know what "resolution compliance" means?

23     A.     The engineer, after the -- something is

24  approved and the plans are submitted, they review it

25  for compliance.

Page 385

1        Q.      Compliance with what?

2        A.      The Borough code.

3        Q.      So you understand that engine- -- you

4    understand that resolution compliance means they

5    review it for compliance with Borough code?

6        A.      Yes.

7        Q.      Is that what they're asked to do here?

8        A.      I -- I don't think anyone was asked; I

9    think this is just something that happens after plans

10   are submitted.

11       Q.      So you don't think anyone asked Neglia

12   to do this?

13       A.      I -- I just think it's part of the

14   process.

15       Q.      Are you telling me that Neglia wasn't

16   requested to undertake this resolution compliance

17   review?

18       A.      I didn't ask them to.

19       Q.      Okay.

20       A.      It's part of the process.

21       Q.      Well, good.  Let's start with you.  So

22   you never asked Neglia, Mr. Atkinson to do this

23   resolution --

24       A.      I --

25       Q.      -- compliance analysis?

Page 386

1          A.      I don't believe so.

2          Q.      And you never suggested to them issues

3     that you wanted them to look at during the resolution

4     compliance phase?

5          A.      I -- I don't recall.

6          Q.      And so when you said to me a moment ago

7     that you understood resolution compliance to mean

8     that they were going to review any plans for the

9     determination of whether it complied with Borough

10    codes, how did you acquire that knowledge that that's

11    what they were supposed to do?

12         A.      I'm pretty sure there's a resolution of

13    compliance done for every project that goes before

14    the Land Use Department.

15         Q.      Okay.  But in terms of what they do to

16    determine resolution compliance, what's the basis of

17    your knowledge that they're supposed to look at the

18    ordinances of the Town to determine whether they have

19    been complied with?  What's the basis for that?

20         A.      The -- I don't understand your question.

21         Q.      The basis for that understanding.  How

22    did you acquire that understanding that that's what

23    they're supposed to do?

24         A.      I -- I guess from being on the Land Use

25    Board?

Page 387

1      Q.    Okay.  So you never reviewed the terms
2  and conditions of this letter?
3      A.    I probably did not read this whole
4  document.
5      Q.    I didn't ask that.  Did you review the
6  terms and the conditions of the letter?
7      A.    I don't understand what that means, the
8  terms and conditions.
9      Q.    Did you read the document?
10      A.    I just said I don't think I read the
11  whole document.
12      Q.    Well, did you read any of the document?
13      A.    I probably read what was checked off.
14      Q.    Okay.  Probably read what was checked
15  off.  When you say "checked off," let's just be clear
16  what that means.
17      A.    I don't know what it means.  Whether it
18  meant that it complied or it didn't comply --
19      Q.    Okay.
20      A.    -- because I don't recall.
21      Q.    You said a moment ago that you probably
22  read what was, quote, checked off.  Did you read --
23  do you know who made the checks?
24      A.    I'm gonna retract that 'cause I don't
25  know what I read of this document and what I didn't.

Page 388

1          Q.      Okay.

2          A.      I couldn't honestly answer.

3          Q.      Okay.  Do you -- can you honestly tell

4     me you read any parts of this document?

5          A.      I'm sure I read something, but I don't

6     recall what I did and didn't.

7          Q.      When you read it, did you discuss it

8     with anyone?

9          A.      I don't recall.

10         Q.      Did you understand what you were

11    reading?  Because it contains a number of items that

12    appear to be technical in nature.

13         A.      Correct.

14         Q.      Did you understand it?

15         A.      I don't recall.  Probably not.

16         Q.      Uh-huh.  And you never sought any

17    guidance from anyone as to what it meant?

18         A.      I -- I don't recall.

19         Q.      So turn to page 3.

20                 By the way, before I do that, you -- you

21    understood that prior to this -- we went over this

22    previously -- there was, in late December, a Land Use

23    Board hearing that you attended and there was

24    testimony from different experts, including

25    Mr. Ascolese, who had submitted a report on behalf of

Page 389

1    Boswell Engineering.  You understood that?

2         A.    Yes.

3         Q.    Okay.

4         A.    It was probably his review of the site

5    plan.

6         Q.    Right.  So Boswell had reviewed the site

7    plan and that informed the Board when they made their

8    decision, correct?

9         A.    Yes.

10        Q.    And so now with the appointment of

11   Neglia with him coming on, you then had someone take

12   another look at it, correct?

13        A.    I -- I don't recall the -- how this

14   went.

15        Q.    Well, Neglia appears to be looking new

16   at a number of issues that had been previously

17   addressed by Boswell.  Would you agree?

18        A.    I don't recall there ever being drawings

19   submitted to the Land Use Board.  I think they were

20   like rough sketches that were approved as I recall --

21        Q.    The site plan.

22        A.    -- and then -- no.

23        Q.    Well, the site plan --

24        A.    I don't --

25        Q.    -- was submitted, wasn't it?

Page 390

1              MR. BOTTA:  Let her finish.

2        A.    I -- I don't think it was a complete

3    site plan.

4        Q.    You don't?  Well, what was it?

5        A.    I -- I don't recall 'cause I wasn't on

6    the Land Use Bard.

7        Q.    Okay.  So then you don't know what was

8    submitted.

9        A.    But I do recall --

10        Q.    Do you know what -- hold on.  Do you

11    know what was submitted?  Did they submit a site plan

12    or not?

13        A.    I don't know.

14        Q.    Okay.

15        A.    There was a big picture of a building.

16        Q.    Okay.

17        A.    That's all I was able to review.

18        Q.    But you don't know what the actual plans

19    were that were submitted?

20        A.    I don't believe the full plans were

21    submitted.

22        Q.    Well, you said you didn't know a moment

23    ago what they submitted 'cause you never saw it.

24        A.    I think what I recall was the

25    agreement -- the Land Use Agreement said that the

Page 391

1  plans would comply with all Borough ordinances and

2  with the Redevelopment Plan, and I -- I don't believe

3  that a complete site plan was submitted.

4        Q.    Okay.  So did you -- when you appeared

5  before the Land Use Board, had you reviewed the plans

6  that were submitted:  Yes or no?

7        A.    Site plans for 419?

8        Q.    Yes.  Yes.  They approved the site plan

9  which was ultimately signed and filed.  Did you

10 review the site plan that was submitted --

11       A.    I don't --

12       Q.    -- to the Land Use Board that formed the

13 basis for their vote?

14       A.    I don't think that there were full site

15 plans.

16       Q.    I didn't ask that.  Did you review any

17 site plan whether you considered it full or not?

18       A.    I listened to the testimony and

19 commented.

20       Q.    Right.  So you didn't review any

21 plans --

22       A.    I --

23       Q.    -- at all?

24       A.    I don't think so, no.

25       Q.    Okay.  So you don't know what was

Page 392

1   submitted then, correct?

2        A.    I'm -- I'm pretty sure that the --

3   the -- if I recall correctly, they did not submit to

4   the Land Use Board complete site plans.

5        Q.    Yeah.  But you don't know --

6        A.    It was --

7        Q.    -- because you didn't look at them,

8   ma'am?

9        A.    It was a site plan that said that

10  everything was gonna be variance free, fit within the

11  redevelopment zone, and that is how they approved it

12  so quickly, because they did not review site plans.

13       Q.    Neither did you, right?

14       A.    I -- probably not --

15       Q.    Right.  Okay.

16       A.    -- no.  They didn't submit it.

17       Q.    So let's stop -- let's stop there.  To

18  the extent you never reviewed the site plans

19  submitted to the Zoning Board, can we --

20       A.    Land Use Board.

21       Q.    -- Land Use Board, can we agree then you

22  don't know what the plans were that they voted on,

23  correct?

24       A.    They were spoken about.

25       Q.    Yeah.

Page 393

1        A.      There was an hour, hour-and-a-half

2    meeting --

3        Q.      Sure.

4        A.      -- explaining it.

5        Q.      Okay.  Good.  And whatever the

6    explanation was, ultimately, those plans that were

7    explained and submitted to the Board formed the basis

8    for the vote of the Zoning Bard, correct?

9        A.      I guess, yes.

10        Q.      Okay.  And they approved it, correct?

11        A.      Uh-huh.

12        Q.      Yes?

13        A.      Uh-huh.

14        Q.      You have to answer --

15        A.      Yes.

16        Q.      -- yes or no.

17        A.      Yes.

18        Q.      Yes.  Okay.  And among -- among other

19    things at that hearing, there was testimony

20    regarding, for example, the height of the building,

21    correct?

22        A.      Yes.

23        Q.      In fact, you gave a statement in which

24    you raise questions about the height of the building,

25    correct?

Page 394

1         A.      What statement?

2         Q.      You -- you appeared before the Land Use

3    Board in December.

4         A.      Can you give me the statement?

5         Q.      Did -- did you appear before the Land

6    Use Board in December?

7         A.      I made comments on it, yes.

8         Q.      Right.  One of the comments you made was

9    the height, correct?

10        A.      Can you show me it?

11        Q.      No.  Do you remember?

12        A.      I don't recall.

13        Q.      You don't remember what you said?

14        A.      I don't.

15        Q.      Okay.  Do you remember whether anyone

16   raised issues about the height?

17        A.      I don't recall.

18        Q.      But clearly the height was one of the

19   things that had to be considered by the Board,

20   correct?

21        A.      The only thing I recall about the height

22   is that there were two different heights because

23   there was a dip by the railroad.

24        Q.      Whatever happened, all we know is that

25   height was discussed -- height was raised by people

Page 395

1    from the audience --

2          A.      That's --

3          Q.      -- and -- and -- let me finish.  -- and

4    ultimately the Board, after consideration of all

5    that, voted to approve the plan with the height as

6    contained in those plans, correct?

7          A.      I believe there was some kind of

8    discussion about where they were measuring from.

9          Q.      Okay.  But they approved the plans --

10   after that discussion, they approved the plans with

11   the height as reflected in those plans, correct?

12         A.      Yes.  But I believe --

13         Q.      Okay.  Thank you.

14         A.      -- that it was never documented where

15   the height was being measured from.

16         Q.      Right.  Which is why after you became

17   the mayor you then decided you wanted to focus on the

18   height, correct?

19         A.      I -- I don't recall any of this.  I

20   don't know.

21         Q.      You don't recall focusing on the height?

22         A.      Focusing?  No.

23         Q.      Yeah.  Didn't you ask to have the 2018

24   height ordinance reviewed because of your concern

25   about the Land Use Board approval of the height of

Page 396

1   this building?

2       A.    I believe what we wanted to do was

3   change the ordinance for the redevelopment zone and

4   lower it to three stories from four, and we were

5   advised by our attorney that we could do it because

6   Building 419 had the fourth story in it and that we

7   should not change any ordinances until this building

8   was completed.

9       Q.    Yeah.  But you wanted to change it

10  because it was -- you thought it was too high.  You

11  told us that repeatedly.

12      A.    Yes.

13      Q.    Okay.

14      A.    I've never liked the fourth story.

15      Q.    Of course you didn't.  Yeah.  You -- you

16  made that abundantly clear.

17            MR. FIORENZO:  Pull up E73, please.

18            MR. KLEIN:  DD-41.

19      Q.    So this appears on March 14, 2019,

20  which, by the way, I'll get to in a moment.  It was

21  right around the time you were meeting with the

22  redeveloper.  There's an email from Caroline to Jane

23  Dietsche, and it says, Hi Jane, the Mayor asked me --

24  so apparently you asked Caroline to do something, so

25  let's see what you asked her to do -- to -- quote, to

Page 397

1    review and adopt an ordinance that permitted a fourth

2    story in certain areas.  She indicated the ordinance

3    was probably adopted near the end of 2018 (i.e.

4    November or December) however I can't find the

5    ordinance on the Borough's website where the 2018

6    ordinances are listed.  Perhaps I'm missing it.  If

7    you could provide any direction, I would -- I'd

8    appreciate it.

9              So this appears that in March you did,

10   in fact, speak to Caroline.  Not just at a lunch, but

11   apparently you spoke to her specifically about this

12   height ordinance that you weren't too happy about,

13   correct?

14             MR. SEAMAN:  Objection to form.

15        A.    Yes.  But you're taking it out of

16   context.

17        Q.    And it's that height ordinance that

18   allowed the redeveloper to come in with its plan to

19   build four stories instead of the three that you

20   thought was more appropriate, correct?

21        A.    The request to do this was for future

22   buildings, not for the one that was approved.

23        Q.    Could you now answer my question?

24        A.    I -- I....

25        Q.    Listen to the question.

Page 398

1          A.      You're taking everything out of context.

2          Q.      Listen to the question and just answer

3     my question.  That's how this works.  Listen and

4     answer.

5                  MR. FIORENZO:  Please.

6                  (Reporter read back.)

7                  "QUESTION:  And it's that height

8     ordinance that allowed the redeveloper to come in

9     with its plan to build four stories instead of the

10    three that you thought was more appropriate, correct?

11         A.      I -- I don't understand that question.

12    There's --

13         Q.      What don't you understand?  What don't

14    you understand about the question?

15         A.      I don't understand it.

16         Q.      It seemed pretty plain.  I'll try to

17    help you out.

18         A.      Okay.

19         Q.      What don't you understand about --

20         A.      I'd appreciate that.

21         Q.      Which of the words didn't you

22    understand?

23         A.      I didn't understand -- I don't

24    understand the question.  Yes, the building is -- was

25    approved at four stories.

Page 399

1          Q.     Yeah.

2          A.     Yes, I was against the fourth story

3   being approved in the whole redevelopment plan.

4          Q.     Right.

5          A.     And yes, I was trying to prevent any

6   future redevelopment in the redevelopment zone from

7   being four stories.

8          Q.     So you weren't looking at this

9   fourth-story issue in the context of the 419 project?

10         A.     Absolutely not.

11         Q.     Could you explain to me then why your

12  engineer was directed to do so?

13         A.     I have no idea.

14         Q.     No idea at all?  None?

15         A.     Who directed him?

16         Q.     You.  Didn't you?

17         A.     I -- I don't know.  Do you have a

18  document saying it?

19         Q.     Didn't you ask Neglia to look at the

20  fourth-story issue because that was the thing you

21  were most -- was most problematic about the project

22  to you --

23         A.     As it relates --

24         Q.     -- so you could try to -- so you could

25  try to scale it back?

Page 400

1          A.    No.  I -- I don't know what you're

2     talking about.

3          Q.    Didn't you ask Neglia to do that?

4          A.    I have no idea.

5          Q.    Didn't you Atkinson to do that?

6          A.    I have no idea.

7          Q.    Well, let's take a look at Atkinson's

8     report.

9               MR. FIORENZO:  Turn back to that,

10    please, Steve, DD-40.

11               Go to 4.1, Engineering Comments.  I'm

12    sorry.  Go to 4.6.  4.6.

13         Q.    There's a section in the Neglia report

14    in which he is now citing to the Emerson code, the

15    building height, and he's raising a variety of issues

16    about the building height.  Do you see that?

17         A.    Yeah.

18         Q.    Yeah.  Well, that ship had sailed.

19    The -- the Zoning Board heard and considered all that

20    and granted the approval.  Can you please explain to

21    me why then your engineer is attempting to again

22    revisit this issue decided by the Zoning Board?

23         A.    Because I --

24         Q.    Why?

25         A.    -- think it was never clear, just like

Page 401

1    this says, where the measurement began.

2            Q.      Uh-huh.  So you wanted him to go back --

3            A.      Whether it was a curb, whether it was on

4    the land, whether it was -- wherever it was.

5            Q.      Okay.

6            A.      I didn't want him to do anything.

7            Q.      Well, you know a lot about it.

8            A.      I --

9            Q.      Did you discuss it?

10           A.      That's all I remember is that there was

11   a lot of talk before I was mayor and after I was

12   mayor about where the height --

13           Q.      Yeah.

14           A.      Because the -- the parking garage is

15   actually five stories, not four.

16           Q.      Uh-huh.

17           A.      But because of this height, which is

18   above my pay grade to understand, that it's actually

19   supposedly the same height as the fourth story, and a

20   lot of people had difficulty wrapping their head

21   around, when it was only permitted to be four

22   stories, how the parking garage was gonna be five.

23           Q.      Yeah.  That was addressed at the

24   hearing, though, wasn't it?

25           A.      I -- I don't recall.

Page 402

1      Q.    That was addressed at the hearing,
2  wasn't it?
3      A.    I don't recall.
4      Q.    Okay.
5      A.    I really don't.
6      Q.    And -- so who told Neglia to kind of
7  jump back into the height issue?  Who asked him to do
8  that?
9      A.    I --
10     Q.    Did you ask him?
11     A.    -- don't think anyone asked him.
12     Q.    Did you ask him?
13     A.    I think when he read the plans --
14     Q.    Did you?
15     A.    No.
16     Q.    That's my question.  Did you ask him?
17     A.    No.
18           MR. BOTTA:  Now you're interrupting her,
19  Joe.  Let her finish.
20           MR. FIORENZO:  I -- I just want to know
21  if she asked him.  That was the only question.
22     Q.    Did you or did you not ask him:  Yes or
23  no?
24     A.    I don't believe I did, no.
25     Q.    Okay.  Do you know who in Town Hall

Page 403

1   asked him to look at that?

2        A.    There's a whole document here.  I don't

3   think everyone sat down and asked him to look --

4   review all of this.

5        Q.    Again, do you know who at Town Hall, if

6   it wasn't you --

7        A.    No.

8        Q.    -- who asked him --

9        A.    No.

10       Q.    -- to look at the height issue again?

11       A.    No.  No.

12       Q.    Did you ask any of your staff to convey

13   to Neglia after he said --

14       A.    No.

15       Q.    Let me finish.  -- that you wanted them

16   to again look at this height issue?

17       A.    No.  I already stated that I don't

18   believe that full site plans were ever submitted;

19   that they submitted them after I was mayor; and a

20   review needed to be done to make sure that the plans

21   fit into the Borough's plan because their site plan,

22   from what I recall, was only voted on based on the

23   fact that they would, in the future, submit plans

24   that fit within our ordinance and the redevelopment

25   zone.  That's what I recall.

Page 404

1          Q.      Uh-huh.

2          A.      So when the plans came in -- I do recall

3    the day they came in.  They were huge.

4          Q.      So you remember the plans coming in.

5          A.      I -- yes.  And I --

6          Q.      When was that?

7          A.      I don't recall when, but I remember that

8    they were big.  They were very, very round like this.

9          Q.      Were these construction plans?

10         A.      I -- I don't know.  They were just big

11   round plans.

12         Q.      Do -- do you know the difference between

13   a site plan and construction plans?

14         A.      No, I don't.

15         Q.      All right.  Do you understand that

16   before a construction permit can be issued that there

17   are construction plans that would be reviewed?

18         A.      I -- no.

19         Q.      You don't know.  So when you were

20   talking about the plans have to be revised --

21         A.      No.  I didn't say revised.  I said

22   reviewed.

23         Q.      Well, weren't the plans reviewed by

24   Boswell prior to the vote by the Zoning Board?

25                 MR. SEAMAN:  Objection to form.

Page 405

1      A.    I'm pretty sure that I just said a few

2  times that they didn't actually put in measured plans

3  for anything just that a plan would comply with our

4  Borough ordinance and redevelopment zone and would

5  need no variance.

6      Q.    Okay.

7      A.    The whole thing would be variance-free.

8      Q.    So the --

9      A.    So they changed all the variances

10  specifically for this project so it didn't have to

11  have any kind of approval.

12      Q.    Because it was a redevelopment zone and

13  because they -- because the Settlement Agreement with

14  counsel on affordable housing required higher density

15  to be affordable.  So the plan that was submitted was

16  the exact same plan that was the subject of the

17  Settlement Agreement, wasn't it?

18      A.    I don't know.

19      Q.    Okay.  Did you care?  Did you care if it

20  was the same?

21      A.    I didn't have a say.  I wasn't --

22      Q.    Did you care whether what they were

23  submitting to the Zoning Board was consistent with

24  the Settlement Agreement that had been reached or

25  not?

Page 406

1      A.     Did I care.

2      Q.     Did you care at all about that?

3      A.     I -- I --

4             MR. SEAMAN:  Objection to form.

5      A.     -- don't think that I was thinking about

6  it.

7      Q.     Okay.  So when this 22-page letter gets

8  issued by Neglia, the one you say you read parts of

9  it, did you read the part of this that relates to the

10 height?

11     A.     I -- I don't recall.

12     Q.     Uh-huh.  Can you recall any other -- any

13 of the sections of this letter with the benefit of

14 the letter in front of you that you actually read --

15     A.     I really --

16     Q.     -- and reviewed?

17     A.     -- don't remember.

18     Q.     So after this initial 22-page letter

19 from Neglia raising all of the issues that they

20 raise, is it your testimony that at no time after

21 that did you meet and have discussions with

22 Mr. Atkinson or Neglia regarding any of these issues?

23     A.     I don't believe so.  I believe this is a

24 list of either omitted or negligent issues having to

25 do with the plans, things that were not pointed out

Page 407

1   in the plans.

2        Q.    Well, how would you know if they were

3   omitted or negligent if you didn't even review the

4   entirety of the letter as you testified under oath

5   several times now?  How could you possibly know that?

6        A.    'Cause I'm reading it now.

7        Q.    So you're reading it now, and from

8   reading it now -- you're -- you're turning and

9   skimming pages -- you can now tell us that there are

10  items that were either omitted or negligent in that?

11  That's your opinion --

12              MR. SEAMAN:  Objection to form.

13       Q.    -- on this engineering letter, ma'am?

14  Is that your opinion here today?

15       A.    I'm -- I'm skimming this as you say.

16       Q.    You're saying it was -- there were

17  negligent -- there were --

18       A.    Or left out.

19       Q.    Boswell when they submitted it were

20  negligent or they were left out.  So show me where in

21  the -- in the letter that you're now reviewing for

22  the first time in its entirety, apparently, where it

23  refers to negligence or omissions.

24       A.    The parking spaces to the surface lot

25  and in the parking garage should be striped in a

Page 408

1    hairpin striping style to ensure the parked vehicles

2    are centered in the spaces.

3         Q.    Well, that was addressed at the hearing,

4    wasn't it?

5         A.    This comment has not been addressed.

6    The site plan set and architectural plan set shall be

7    revised to illustrate hairpin turns -- hairpin

8    striping within the parking lot.  That, to me, looks

9    like they didn't put that --

10        Q.    Right.

11        A.    -- depict it on the plan, and he was

12   telling them that it was lacking and that they needed

13   to redo it.

14        Q.    So this is something that he wanted to

15   have done that wasn't in the original resolution,

16   correct?

17        A.    I -- I don't know.

18        Q.    Okay.  Well, then, you don't know.

19              MR. SEAMAN:  Joe, your time is up.  It's

20   seven hours.

21              MR. FIORENZO:  It's not up.

22              MR. SEAMAN:  Yes, it is.

23              MR. KLEIN:  No, it's not.

24              MR. FIORENZO:  Okay.  We've been keeping

25   very close track.

Page 409

1           How much do we have left?

2           MR. SEAMAN:  You were at 5.3.  You went

3  1.7 today.

4           MR. KLEIN:  I'm keeping track of it.  We

5  have -- I have it calculated right now.  If you want

6  me to do that I will, because we have another hour

7  and 20 minutes.

8           MR. FIORENZO:  Do we disagree?

9           THE WITNESS:  Another hour?

10           MR. FIORENZO:  Yeah.

11           THE WITNESS:  Absolutely --

12           MR. SEAMAN:  Wait.

13           THE WITNESS:  I'll let you guys argue.

14           MR. BOTTA:  Can we go off the record?

15           MR. FIORENZO:  Yeah.

16           (Off-the-record discussion.)

17           (Break:  12:13 p.m.)

18           (Resume:  12:15 p.m.)

19           MR. FIORENZO:  All right.  So let's go

20  on the record.  We're gonna disagree on that, and

21  we'll seek to have the witness brought back.

22           Okay.  We're gonna go -- are we on?

23           THE COURT REPORTER:  Yes.

24           MR. FIORENZO:  Okay.  So we had a

25  discussion off the record about the length of time

Page 410

1    for this deposition, and the position of the

2    Defendants is that we've now reached seven hours.  We

3    have a different calculation of that, so I'll let

4    Mr. Klein basically state on the record our position

5    on the -- on the question of whether we used up seven

6    hours of deposition time first.  So why don't you

7    address that.

8                    MR. KLEIN:  Yeah.  So I have timing from

9    the first day of the deposition as 10:20 to 11:50,

10   12:01 to 12:45, 1:32 to 2:10, 2:20 to 3:15 and 3:30

11   to 4:36.  That gives us another thirty- -- 37

12   minutes.

13                   MR. FIORENZO:  With respect to the seven

14   hours.

15                   MR. KLEIN:  With respect to the seven

16   hours.

17                   MR. FIORENZO:  Okay.  So we have a

18   difference of agreement with you.  I understand your

19   position is you're looking at the transcripts.  We

20   tried to keep it -- I mean, starting, stopping.

21   Transcripts aren't always accurate.  I understand

22   your position, so we will make an application to the

23   Judge on that.  We also intend to continue the

24   deposition since I'm not completed, and we'll make an

25   application to continue the deposition further so I

Page 411

1    can finish my examination.

2              MR. BOTTA:  All right.

3              MR. SEAMAN:  I just want to indicate as

4    well that I discussed with Mayor DiPaola before this

5    about what we anticipated the time would be, and she

6    does have a hard stop for a personal reason as well

7    going forward today, so....

8              MR. FIORENZO:  All right.

9              MR. BOTTA:  And just to put on the

10   record, as you summarized our position, Joe, is that

11   we're going on the transcript, and our opinion is

12   that the transcript should control the timing and

13   that is where we come up with the seven hours today.

14             MR. FIORENZO:  Okay.  We're gonna agree

15   to disagree and leave it at that.

16             MR. BOTTA:  Very good.

17             THE COURT REPORTER:  Counsel,

18   transcript?

19             MR. BOTTA:  Yes, please.  You can

20   expedite it.

21             (Proceedings concluded at 12:17 p.m.)

22                - - - - - - - - - - -

23

24

25

Page 412

1

2                    J U R A T

3

4              I DO HEREBY CERTIFY that I have read the

5      foregoing transcript of my deposition testimony.

6

7      _____

8      DANIELLE DiPAOLA

9

10

11

12     SWORN TO AND SUBSCRIBED

13     BEFORE ME THIS _____

14     DAY OF_____

15     2023

16

17     _____

18     Notary Public

19

20

21

22

23

24

25

Page 413

1                   C E R T I F I C A T E

2

3               I, LYDIA F. McDONNELL, a Certified

4    Shorthand Reporter and Notary Public of the State of

5    New Jersey, do hereby certify that prior to the

6    commencement of the examination, DANIELLE DiPAOLA was

7    duly sworn by me to testify the truth, the whole

8    truth and nothing but the truth.

9               I DO FURTHER CERTIFY that the foregoing

10   is a true and accurate transcript of the testimony as

11   taken stenographically by and before me at the time,

12   place, and on the date hereinbefore set forth.

13              I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any

15   of the parties to this action, and that I am neither

16   a relative nor employee of such attorney or counsel,

17   and that I am not financially interested in the

18   action.

19

20

21        Notary Public of the State of New Jersey

22        License No. 30XI00155900

23        My Commission expires June 30, 2024

24        Dated:  May 18, 2023

25

Page 414

1   ATTACH TO DEPOSITION OF:  MAYOR DANIELLE DiPAOLA
2
3   DATE TAKEN:  Monday, May 15, 2023
4
5                   E R R A T A   S H E E T
6
7               INSTRUCTIONS:   After reading the
    transcript of testimony, please note any change,
    addition or deletion on this sheet.  DO NOT make any
8   marks or notations on the transcript itself.
9               Please sign and date this errata sheet
    and return it to the court reporter whose name is
10  shown below.
11
    PAGE   LINE      CHANGE
12
    _____  _____     _____
13
    _____  _____     _____
14
    _____  _____     _____
15
    _____  _____     _____
16
    _____  _____     _____
17
    _____  _____     _____
18
    _____  _____     _____
19
    _____  _____     _____
20
    _____  _____     _____
21
    _____  _____     _____
22
    _____  _____     _____
23
    _____  _____     _____
24
    _____  _____     _____
25

| **&** | **13th** 304:4 | 358:4 367:2 | **300a** 304:14 |
|---|---|---|---|
| **&** 303:6 304:2 | **14** 396:19 | 369:3,9 370:9 | **307** 305:5,9 |
| 305:12 334:13 | **15** 303:8 | 373:4 377:8 | **308** 305:11 |
| **0** | 334:14 335:5 | 383:11 384:4 | **30xi00155900** |
| | 414:3 | 396:19 | 413:22 |
| **07074** 304:15 | **18** 413:24 | **2020** 370:9 | **31** 305:12 |
| **07102** 304:5 | **184** 380:24 | 373:4 | 334:12,13 |
| **07446** 304:10 | **19** 334:23 | **2021** 346:4 | **32** 305:13 |
| **1** | **19th** 347:12 | **2023** 303:9 | 338:9 384:5 |
| **1** 305:9 307:20 | **1:32** 410:10 | 412:15 413:24 | **33** 305:16 |
| 307:23 334:23 | **2** | 414:3 | 343:20 |
| 335:2 | | **2024** 413:23 | **334** 305:12 |
| **1.7** 409:3 | **2/11/15** 305:18 | **21** 308:25 | **338** 305:14 |
| **1/15/19** 305:12 | **2/25/19** 305:21 | 319:7 | **34** 305:18 |
| **1/19** 305:13 | **2/5/19** 305:16 | **22** 384:9 406:7 | 346:1,12 |
| **10** 311:2 | **20** 302:4 409:7 | 406:18 | **341** 305:15 |
| **10:14** 303:9 | **2001** 305:9 | **23rd** 339:18 | **343** 305:17 |
| **10:20** 410:9 | 307:24 312:13 | **24** 338:4 | **346** 305:18 |
| **11** 345:6,9 | 312:24 318:20 | **25** 305:15 | **35** 305:19 |
| 346:7,14 | **2002** 308:25 | 341:12,18 | 350:3,4 |
| **11:20** 365:6 | 313:2 319:7 | 358:4 | **350** 305:20 |
| **11:25** 365:7 | **2006** 367:15 | **250** 304:14 | **351** 305:21 |
| **11:50** 410:9 | **2008** 311:2 | **25th** 351:16 | **357** 305:23 |
| **11th** 343:22 | **201-440-0675** | **27** 327:3 | **36** 305:21 |
| 347:18 | 304:15 | **2:10** 410:10 | 351:17 |
| **12** 383:11 | **201-818-6400** | **2:20** 410:10 | **361** 305:24 |
| 384:4 | 304:10 | **3** | **37** 305:22 |
| **12:01** 410:10 | **2015** 346:14 | **3** 309:13 | 357:23 410:11 |
| **12:13** 409:17 | 368:12 | 388:19 | **372** 306:13 |
| **12:15** 409:18 | **2018** 395:23 | **3/14/19** 306:6 | **38** 305:24 |
| **12:17** 411:21 | 397:3,5 | **3/21/02** 305:11 | 361:2 |
| **12:45** 410:10 | **2019** 334:14 | **3/4/19** 305:22 | **380** 306:4 |
| **13** 303:8 | 337:13,17 | **30** 305:10 | **383** 306:5 |
| 305:15 306:13 | 338:4,7,13 | 308:23,24 | **39** 306:3 380:5 |
| 341:17 | 341:9 344:2 | 413:23 | 380:20,21 |
| | 351:16 357:25 | | |

[396 - agree]                                                                    Page 2

| | | | |
|---|---|---|---|
| **396** 306:7 | **5319** 335:16 | **accurate** | 402:1 408:3,5 |
| **3:15** 410:10 | **5th** 346:20 | 410:21 413:10 | **administration** |
| **4** | **6** | **achieve** 330:15 | 321:23 354:8 |
| | | 362:19,22 | **administrator** |
| **4** 306:13 350:9 | **6319** 336:14 | 363:4,7,12,15 | 346:14 361:6 |
| **4.1** 400:11 | **7** | 363:20 370:20 | 361:12,23 |
| **4.6.** 400:12,12 | | **achieved** 329:6 | **adopt** 397:1 |
| **40** 306:5 | **7/12/19** 306:5 | 329:24 | **adopted** 335:9 |
| 383:10,11 | **8** | **acquiescence** | 397:3 |
| 384:11,19 | **8th** 368:12 | 309:25 | **advice** 333:25 |
| 400:10 | **9** | **acquire** 386:10 | **advised** 396:5 |
| **41** 306:6 | | 386:22 | **advising** |
| 396:18 | **9** 311:2 | **acted** 323:14 | 345:14 |
| **419** 315:21,23 | **9441** 413:20 | **action** 302:4 | **affirmatively** |
| 316:3,4 338:20 | **973-643-7000** | 309:16 343:6 | 311:13 |
| 339:24 347:21 | 304:5 | 381:21 413:15 | **affordable** |
| 348:13,14 | **a** | 413:18 | 309:24 326:3 |
| 360:4,11,19,23 | | **actions** 310:4 | 327:3 331:15 |
| 363:7,9,12 | **a.m.** 303:9 | **actors** 312:15 | 331:20,24 |
| 369:19 370:10 | 365:6,7 | **actual** 320:3 | 332:7,9,13,18 |
| 370:16,22 | **able** 390:17 | 344:24 390:18 | 354:10 366:16 |
| 371:17,22 | **above** 303:3 | **actually** 313:11 | 367:24 405:14 |
| 373:7,11 | 381:5,5,5,6 | 327:15 335:9 | 405:15 |
| 378:23 379:9 | 401:18 | 343:15,22 | **agenda** 346:20 |
| 391:7 396:6 | **absolutely** | 401:15,18 | 363:11 |
| 399:9 | 399:10 409:11 | 405:2 406:14 | **ago** 323:6 |
| **4728** 302:4 | **abundantly** | **add** 346:19 | 328:6,22 |
| **4:36** 410:11 | 396:16 | **addition** 414:7 | 329:11 345:3 |
| **4th** 350:16 | **accommodate** | **additional** | 383:23 386:6 |
| 357:25 | 327:3 | 375:18 | 387:21 390:23 |
| **5** | **accomplish** | **address** 311:16 | **agree** 322:19 |
| | 360:22 | 316:16,24 | 322:23 323:6 |
| **5** 343:25 344:2 | **accumulative** | 339:19 410:7 | 323:21 381:8 |
| **5.3.** 409:2 | 319:9 | **addressed** | 389:17 392:21 |
| **50** 304:9 | **accuracy** | 389:17 401:23 | 411:14 |
| | 381:14 | | |

[agreed - atkinson]

Page 3

**agreed** 326:18
326:21 372:8
**agreement**
316:5 317:16
318:3 319:4,20
319:22 326:19
326:22 330:16
331:6 343:12
354:4,15,22
355:15 365:24
366:9,13,18,23
368:6,22 369:6
390:25,25
405:13,17,24
410:18
**ahead** 347:14
364:11 365:5
365:18,23
**allow** 307:12
**allowed** 326:25
397:18 398:8
**allows** 329:4,23
**alternative**
330:9,20 331:3
332:25 333:5
**alternatives**
327:15
**ambulance**
346:19 348:12
348:12
**amount** 332:6
**analysis** 375:14
385:25
**angeli** 304:8

**answer** 312:1
315:5 323:13
325:25 328:1
330:2 332:3
349:6 356:16
356:17,25
357:6 363:2
364:16 366:5
374:10,14
388:2 393:14
397:23 398:2,4
**answering**
311:8 328:12
332:3 357:7
**answers** 307:10
318:16
**anticipated**
411:5
**anybody** 318:8
322:16
**apc** 304:13
**apologize** 324:5
**apparently**
382:22 396:24
397:11 407:22
**appear** 388:12
394:5
**appeared**
309:19 391:4
394:2
**appears** 309:22
319:11 383:7
389:15 396:19
397:9

**application**
368:3 410:22
410:25
**applied** 376:25
**appointment**
389:10
**appointments**
321:20 334:9
335:7 336:21
**appreciate**
397:8 398:20
**appropriate**
325:4,10
397:20 398:10
**approval**
395:25 400:20
405:11
**approve** 319:19
319:20 395:5
**approved**
330:16 372:5
384:24 389:20
391:8 392:11
393:10 395:9
395:10 397:22
398:25 399:3
**architect** 321:6
334:3 336:14
**architects**
336:15
**architectural**
408:6
**area** 326:17
328:9,25
329:14

**areas** 309:24
397:2
**argue** 409:13
**arose** 318:19
**article** 337:24
**ascolese** 322:20
322:22 323:12
388:25
**asked** 314:16
315:6 318:13
329:18 331:3
338:25 344:23
345:16 349:25
353:7,7 363:22
364:13 381:24
382:2 383:23
385:7,8,11,22
396:23,24,25
402:7,11,21
403:1,3,8
**asking** 315:9
316:22 322:21
328:12 339:14
350:9 351:11
353:4,6,9,10,11
353:13,16,17
355:6,7 357:11
359:13 363:11
364:22 366:24
372:18 374:1
382:19
**assume** 362:3
**atkinson** 306:5
370:13 373:3
373:10 375:9

383:14,18
385:22 400:5
406:22
**atkinson's**
400:7
**attach** 414:1
**attached**
338:19
**attempted**
314:4
**attempting**
400:21
**attended**
319:11 388:23
**attention**
320:18
**attorney**
321:10 344:3
351:20,22
352:24 358:2
364:13 366:4
396:5 413:14
413:16
**attorneys** 304:7
304:11,16
318:13 341:25
342:7,16
351:17 364:2
**audience** 395:1
**availability**
345:15
**available**
361:25 362:18
**aware** 308:4,6
308:10 309:4

310:2,7,16,21
310:23 311:4
311:11 313:10
313:13 314:18
317:13,22
319:14 323:16
325:17,21
337:1 339:1
341:20 352:20
353:18,22
354:4,12,19
359:1 375:16
375:21,24

**b**

**b** 304:2 305:7
306:1
**back** 307:24
318:20 328:19
328:21 329:10
329:19 337:25
340:2 351:11
353:25 354:1
363:19 365:11
365:12,15,16
398:6 399:25
400:9 401:2
402:7 409:21
**background**
311:4 312:8
324:18
**bailiwick**
376:24
**bard** 390:6
393:8

**based** 324:22
324:23 332:9
403:22
**basically** 410:4
**basis** 386:16,19
386:21 391:13
393:7
**bastion** 307:25
313:17 316:11
**began** 401:1
**beginning**
325:11 328:17
**behalf** 358:10
388:25
**believe** 309:3
311:18 313:25
322:8 324:7
337:11 355:3,5
374:4 381:2
386:1 390:20
391:2 395:7,12
396:2 402:24
403:18 406:23
406:23
**believed** 369:12
369:16
**benefit** 384:21
406:13
**benefits** 316:6
**bergen** 323:15
368:4
**best** 362:5
379:19
**big** 326:24
327:1 390:15

404:8,10
**bigger** 354:2
**bit** 313:21
**block** 316:4
338:20 339:24
363:7,8,12
371:17 373:7
373:11 378:23
379:9
**blunders**
319:13
**board** 336:16
337:10 372:6
386:25 388:23
389:7,19 391:5
391:12 392:4
392:19,20,21
393:7 394:3,6
394:19 395:4
395:25 400:19
400:22 404:24
405:23
**body** 311:13,16
315:1 316:16
316:24 317:15
318:4 330:3
367:16 368:13
**borough** 302:6
304:12 309:19
309:25 310:1
312:25 335:16
336:1,5 351:20
351:24,25
352:4 354:5,5
358:5,10

**[borough - clarification]**                                                      Page 5

362:19 366:8
366:10 368:4
376:21 379:4
383:21 385:2,5
386:9 391:1
405:4
**borough's**
312:16 354:9
354:14 358:7
397:5 403:21
**boswell** 335:25
336:1,5 389:1
389:6,17
404:24 407:19
**botta** 304:8,9
328:11 390:1
402:18 409:14
411:2,9,16,19
**bottalaw.com**
304:11
**bottom** 309:14
335:8 339:14
**break** 365:6
409:17
**bridgett** 323:10
**bridgette**
322:12,13
323:25 324:7
326:25
**brought** 320:18
320:24 321:24
334:4 335:19
336:15,18
350:14 351:12
409:21

**build** 326:4
372:9 397:19
398:9
**builder's**
309:16
**building** 325:4
325:9,10,12
326:11,18
327:1,1,2,10
331:11 332:12
333:14,18,19
348:12 349:2
349:12 371:19
372:7 373:1,18
379:13 381:10
390:15 393:20
393:24 396:1,6
396:7 398:24
400:15,16
**buildings**
397:22
**built** 325:16
326:3 372:7
**bullet** 336:13
**buy** 341:3

**c**

**c** 304:1,9 413:1
413:1
**calculated**
409:5
**calculation**
410:3
**call** 344:11,19
344:25 345:2

**calls** 366:4
**care** 314:21,25
315:10 405:19
405:19,22
406:1,2
**cared** 315:6,13
**caroline** 360:14
360:17,21
361:9 362:5
369:15 370:9
396:22,24
397:10
**caroline's**
361:8
**case** 330:14
341:14 380:25
381:1
**cataloged**
312:13
**cause** 312:2
374:7 387:24
390:5,23 407:6
**cc'ed** 344:6
**ccb** 304:11
**cenica** 381:1
**cenicola** 380:6
381:2 382:6
383:1
**center** 303:7
304:4
**centered** 408:2
**central** 316:4
**certain** 309:24
359:4 397:2

**certainly**
322:22 323:20
354:3
**certified** 303:4
413:3
**certify** 412:4
413:5,9,13
**cfo** 380:23
**chain** 347:5
**change** 396:3,7
396:9 414:7,11
**changed**
321:20 405:9
**characterized**
309:22
**che** 337:15,16
**checked** 387:13
387:14,15,22
**checks** 387:23
**chosen** 324:13
**chris** 361:3,9
361:10
**christopher**
304:9 336:19
**cigarettes**
341:3
**cite** 379:21,23
**cited** 313:23
**citing** 400:14
**civil** 302:4
343:6
**claims** 316:1
**clarification**
361:8

**clarify** 373:15
  374:2
**class** 309:18
  310:6 316:14
**clean** 320:21
  336:7 379:14
**cleaned** 336:10
**clear** 321:18
  344:22 387:15
  396:16 400:25
**clearly** 340:4
  394:18
**clerk** 337:12
**client** 351:24
  352:4 358:11
  358:14 364:13
  366:4
**client's** 380:11
**close** 408:25
**closing** 352:2
  358:6
**coah** 328:3
  329:21 332:5
**code** 377:8,10
  377:15 385:2,5
  400:14
**codes** 386:10
**cognizant**
  318:23
**color** 371:18,23
  373:1
**come** 313:4
  332:22 349:24
  375:13 379:5
  397:18 398:8

411:13
**comes** 321:23
**coming** 389:11
  404:4
**commencem...**
  413:6
**commencing**
  303:9
**comment** 408:5
**commented**
  391:19
**comments**
  320:14 394:7,8
  400:11
**commission**
  413:23
**common** 329:2
  329:4,16,22
  330:2,4
**communicating**
  349:24
**communication**
  338:5 339:2
  341:7 357:18
  360:16
**communicati...**
  314:3 341:8
  357:20 366:4
  373:10
**community**
  311:15 313:7
  342:25
**competence**
  324:12

**competent**
  324:15
**complain**
  355:14
**complaint**
  381:25 382:1
**complaints**
  379:13,24
  382:18
**complete**
  307:13 347:4
  366:8 390:2
  391:3 392:4
**completed**
  396:8 410:24
**completely**
  325:20 348:18
  366:9,10
**compliance**
  308:5 309:6
  315:2 326:9
  328:9,25 329:6
  329:14,24
  330:15 343:11
  384:22,25
  385:1,4,5,16,25
  386:4,7,13,16
**complied** 386:9
  386:19 387:18
**comply** 314:12
  365:23 366:9
  366:10,15,23
  367:2,5 369:5
  369:24 387:18
  391:1 405:3

**component**
  326:13
**compromise**
  326:5
**concentrated**
  309:23
**concept** 341:10
**concern** 352:21
  353:18 359:2
  359:20 395:24
**concerning**
  352:1 354:9
  362:22 369:19
  370:10 375:18
**conclude**
  324:24
**concluded**
  411:21
**conclusively**
  369:7
**condemnation**
  340:19
**condition**
  379:12 382:18
**conditional**
  341:13 343:5
  367:3 368:25
  369:6
**conditioned**
  343:8
**conditions**
  387:2,6,8
**conduct** 310:19
**confirm** 357:11
  362:6

consent  355:16
consideration
  395:4
considered
  391:17 394:19
  400:19
consigned
  319:12
consistent
  309:20 316:12
  405:23
consisting
  384:5
constitutional
  308:6,12,17
  315:2
construction
  376:23 377:1,7
  377:10,15,17
  378:16 380:7
  404:9,13,16,17
consultants
  352:5
contact  334:2
  338:5 347:20
  362:8
contacted
  333:24
contacts  341:8
contain  339:9
contained
  354:22 395:6
contains
  388:11

context  341:17
  347:13 348:5
  348:19 397:16
  398:1 399:9
continue
  410:23,25
continued
  307:4
contract
  363:14,25
control  411:12
conversation
  340:8,10
  344:24 345:1
  373:15
conversations
  360:9 372:19
  381:9
convey  403:12
cooperate
  354:6,14,19,21
  355:15
cooperated
  354:17
cooperation
  358:15
copied  344:9
  352:16 358:16
copy  358:19
corps  346:19
  348:12,12
correct  308:7
  312:2 313:7
  314:1,7,12,19
  317:22 320:7

320:24 321:21
321:24 323:16
323:22,23
326:13 327:3
332:25 333:5
334:16 335:3,4
335:12,17,20
335:21 336:3,4
336:6,7,16,19
336:20,23
337:2 340:8,23
341:2,4,21,22
343:2,12
344:14 346:15
350:11 355:4
358:2,16,21
361:6,13 362:3
367:8,11
368:19 371:8
373:21 375:25
377:8,11,16,20
383:3 388:13
389:8,12 392:1
392:23 393:8
393:10,21,25
394:9,20 395:6
395:11,18
397:13,20
398:10 408:16
correctly  392:3
correlation
  331:19
costly  319:13
council  305:12
  310:22 311:1

313:6 334:1,14
  368:19
councilperson
  315:8 317:5
counsel  357:19
  405:14 411:17
  413:14,16
counties  323:16
county  323:15
  368:4
couple  334:15
  334:17 337:18
course  308:3
  315:9 317:14
  336:25 341:20
  396:15
court  302:1
  308:4 319:14
  325:15 326:9
  330:16 341:12
  366:19,21
  409:23 411:17
  414:9
court's  369:6
courts  313:15
  316:10,17
created  316:25
criteria  377:24
  378:15
critical  308:5
  308:16 313:15
  320:14 351:23
criticized
  326:25

**criticizing**
  308:11,14
  310:3
**cross**  305:4
**cummis**  303:6
  304:2
**curb**  401:3
**customary**
  321:22
**cv**  302:4

**d**

**d**  305:1 307:1,1
**danielle**  302:7
  302:14 304:12
  304:17 305:3
  412:8 413:6
  414:1
**date**  368:8
  413:12 414:3,9
**dated**  305:21
  305:22 306:5
  357:24 413:24
**david**  383:18
**day**  335:11
  404:3 410:9
  412:14
**days**  335:5
  345:9
**dd**  305:9,10,12
  305:13,15,16
  305:18,19,21
  305:22,24
  306:3,5,6
  307:20,23
  308:23,24

  334:12,13
  338:9 341:17
  343:20 346:1
  346:12 350:3,4
  351:17 357:23
  361:2 380:5,20
  380:21 383:10
  383:11 384:11
  384:19 396:18
  400:10
**de**  337:15,16
**deal**  359:3
**dealt**  346:22,24
  347:24 348:3,7
  348:17 349:9
  349:18
**decades**  312:16
**december**
  388:22 394:3,6
  397:4
**decide**  336:9,11
  354:18
**decided**  395:17
  400:22
**decision**  305:9
  305:10 307:17
  307:23 308:9
  308:15,18,24
  309:5 319:17
  319:19,24
  320:4 323:21
  324:24 389:8
**decisions**
  313:10 322:23
  324:15,23

  325:1 330:3
**declaratory**
  368:4
**defendant**
  304:16
**defendants**
  302:8 304:11
  410:2
**deficiency**
  332:17
**delay**  359:2
**deletion**  414:7
**delve**  311:14
**demolition**
  376:2,8,19
**density**  331:25
  405:14
**deny**  316:2,2,7
  381:14,21
  382:2,5,8,9
**denying**  383:2
**department**
  376:23 377:1
  377:15,17
  378:16 380:7
  381:11 386:14
**depict**  408:11
**deplorable**
  379:12 382:18
**deposition**
  302:12 307:6
  410:1,6,9,24,25
  412:5 414:1
**describe**
  361:15

**description**
  305:8 306:2
**determination**
  377:19 386:9
**determine**
  386:16,18
**determined**
  309:17 330:8
**determining**
  377:15,24
  378:17
**developer**
  337:5,8 347:20
  352:20 357:19
  358:12 375:17
  375:18,22
**developer's**
  352:11
**developing**
  309:23
**development**
  315:21,23
  326:7 338:1
  339:6
**dietsche**  305:13
  306:7 337:14
  338:10 339:4
  396:23
**dietsche's**
  338:17
**difference**
  404:12 410:18
**different**
  309:12 313:23
  328:7,23

329:12 332:23
388:24 394:22
410:3
**difficult**  307:14
**difficulty**
401:20
**dip**  394:23
**dipaola**  302:7
302:14 304:12
304:17 305:3
305:17,18
335:10 339:21
411:4 412:8
413:6 414:1
**direct**  305:4
307:4 358:8
373:10,14
381:10
**directed**  399:12
399:15
**direction**  397:7
**directly**  381:9
**disagree**
330:20 409:8
409:20 411:15
**disagreed**
330:18 331:25
**disappointing**
358:9
**discretionary**
321:20,21
**discuss**  350:18
358:6 362:18
363:3 364:22
370:1,19 373:6

384:11,19
388:7 401:9
**discussed**
307:24 316:6
317:16 342:16
344:18 369:22
369:25 371:17
380:14 394:25
411:4
**discussing**
338:10
**discussion**
352:10 355:11
372:25 395:8
395:10 409:16
409:25
**discussions**
371:21 379:8
383:25 406:21
**displacing**
349:14
**disposal**  333:3
**district**  302:1,1
**doctrine**
327:25
**document**
310:9,14
312:23 313:8
313:11,14
320:1,2,3
339:9 346:7
347:8 353:12
384:13 387:4,9
387:11,12,25
388:4 399:18

403:2
**documented**
395:14
**doing**  314:11
322:20 369:12
370:10
**domain**  340:24
341:10
**dominick**
338:11,18
339:18
**downtown**
325:13 326:17
370:2 372:13
**drawings**
389:18
**duly**  307:2
413:7
**dumbfounded**
319:8
**duties**  343:1
**duty**  354:19,21

**e**

**e**  304:1,1,14
305:1,7 306:1
307:1,1 413:1
413:1 414:5,5
414:5
**e53d**  334:11
**e73**  396:17
**earlier**  343:25
**early**  344:2
**easy**  330:20
**economic**
309:18 310:6

316:14
**educate**  317:10
317:12
**effect**  316:13
380:16
**effective**
334:22
**effort**  337:5
**efforts**  309:22
310:20 316:13
337:9
**either**  313:5
319:15 320:2
357:5 370:15
374:9 381:9
406:24 407:10
**element**  354:11
**email**  305:13
305:16,18,24
306:3,6 338:17
339:19 343:24
344:2 346:13
346:18 347:5
347:12 348:4
361:8,9,11
362:2 373:16
380:21 381:22
382:5 396:22
**emails**  305:19
339:13 350:6
**emerson**  302:3
302:6 304:12
307:25 308:11
309:17 310:3
310:11,17

**[emerson - facts]**                                                    Page 10

311:7,10
313:15 314:5
314:11 315:1
316:5,11,15
318:20,25
319:3,11 325:4
325:23 326:4
352:11 366:21
367:7,11 368:2
368:4 400:14
**emerson's**
308:5,16 309:6
312:9 320:15
325:16 343:11
**eminent**  340:24
341:10
**emphatically**
363:23
**employee**
413:14,16
**employees**
321:14,21
**encountered**
358:14
**encountering**
358:15
**engage**  320:16
**engaged**  310:18
310:18 316:12
**engine**  385:3
**engineer**  321:4
323:3,14 334:4
335:16,19
336:2,6 370:12
375:14,17

383:21 384:23
399:12 400:21
**engineering**
335:17 389:1
400:11 407:13
**engineers**
330:24 333:2
**ensure**  408:1
**enter**  368:5
**entered**  305:15
341:13,18
367:6,10
368:24
**entering**  319:4
**entirety**  407:4
407:22
**entitled**  303:3
**errata**  414:9
**erur**  337:1,5
346:24 379:21
**esq**  304:2,3,9
304:14
**estate**  358:11
**evac**  349:1,11
**evaluated**
330:7,22
**everything's**
377:22
**exacerbated**
309:18 310:4,6
**exacerbating**
316:14
**exact**  405:16
**exactly**  333:11
347:21

**examination**
307:4 373:17
411:1 413:6
**examine**  312:8
**example**
393:20
**except**  325:14
**exclusionary**
307:25 309:15
309:21,21
310:19,19
311:5,9 316:11
316:13 319:10
320:15 325:17
**excuse**  313:2
320:8 344:9
346:8
**exhibit**  309:9
309:12 334:11
347:9,15 350:5
384:17
**exhibits**  306:8
**expedite**
411:20
**experienced**
358:11
**expert**  327:12
**expertise**
378:19
**experts**  388:24
**expires**  413:23
**explain**  314:19
399:11 400:20
**explained**
317:23 330:23

341:25 342:6
342:15,19
393:7
**explaining**
393:4
**explanation**
314:4 359:10
393:6
**explore**  312:8
**explored**  333:2
**exposure**
325:22
**express**  329:5
329:23 359:20
360:21
**expressed**
353:18
**expressing**
352:21 359:2
**extent**  371:21
392:18
**extreme**  309:20
316:12
**extremely**
358:9

**f**

**f**  303:4 413:1,3
**faced**  330:3
**facing**  311:15
**fact**  325:3,9
327:18 362:5
379:16 393:23
397:10 403:23
**facts**  319:18

**[failure - full]**                                                     Page 11

| | | | |
|---|---|---|---|
| **failure** 312:14 | **fiorenzo** 304:2 | **floor** 303:8 | **formed** 391:12 |
| **fair** 325:22 | 305:5 307:4,19 | 304:4 | 393:7 |
| 326:2,2,9 | 307:21 308:21 | **flow** 354:10 | **former** 313:21 |
| 366:21 | 309:8 328:19 | **focus** 395:17 | **formulate** |
| **fairness** 368:23 | 329:17 334:10 | **focused** 360:4 | 330:11 |
| **fall** 375:5 | 335:23 336:12 | **focusing** | **forth** 413:12 |
| **familiarize** | 337:21 339:11 | 347:11 395:21 | **forward** 314:5 |
| 370:25 | 343:23 345:6 | 395:22 | 411:7 |
| **february** | 345:25 346:3,6 | **following** 345:9 | **found** 316:10 |
| 343:21,25 | 346:10 351:8 | 350:17 368:23 | **four** 345:3 |
| 344:1,2 345:6 | 353:25 358:18 | **follows** 307:3 | 378:6 396:4 |
| 345:9 346:7,13 | 360:6 361:1 | **footage** 339:20 | 397:19 398:9 |
| 347:18 351:16 | 364:23 365:1,5 | 339:24 | 398:25 399:7 |
| 358:4 | 365:8,10,15,19 | **forcibly** 340:23 | 401:15,21 |
| **feel** 307:7 | 365:21 377:4,6 | **foregoing** | **fourth** 396:6,14 |
| 346:20 349:7 | 383:13,16 | 412:5 413:9 | 397:1 399:2,9 |
| **feeling** 345:14 | 384:6,15 | **forget** 321:18 | 399:20 401:19 |
| **felt** 322:4 | 396:17 398:5 | 381:1 | **franklin** 304:9 |
| **fewer** 331:22 | 400:9 402:20 | **form** 310:12 | **frankly** 358:13 |
| 332:4 | 408:21,24 | 314:23 315:4 | **free** 392:10 |
| **field** 324:13 | 409:8,10,15,19 | 315:25 316:19 | 405:7 |
| **filed** 367:7,11 | 409:24 410:13 | 317:2 318:22 | **frequented** |
| 368:2 391:9 | 410:17 411:8 | 320:25 321:13 | 341:1 |
| **final** 341:13 | 411:14 | 321:25 326:14 | **friday** 351:10 |
| **finally** 345:21 | **firm** 305:21 | 326:20 327:20 | **front** 406:14 |
| **financially** | **first** 307:22 | 328:11 329:3 | **frustrating** |
| 413:17 | 309:1 317:5,6 | 331:16 354:16 | 358:9 |
| **find** 320:10 | 320:20 358:1 | 355:20 356:1 | **frustration** |
| 338:19 397:4 | 363:21 378:25 | 356:15 360:1 | 359:2 |
| **fine** 345:5 | 407:22 410:6,9 | 366:3 374:21 | **fulfill** 308:16 |
| **finish** 311:7,8 | **fit** 370:2 392:10 | 374:25 375:3 | 375:19 |
| 372:25 378:9 | 403:21,24 | 375:11 397:14 | **fulfilling** 314:5 |
| 390:1 395:3 | **five** 365:3 | 404:25 406:4 | **full** 333:19 |
| 402:19 403:15 | 401:15,22 | 407:12 | 361:21,22 |
| 411:1 | | | 384:13 390:20 |

391:14,17
403:18
**fully** 354:6
**function**
377:14
**further** 338:20
357:19 410:25
413:9,13
**furtherance**
354:6
**future** 397:21
399:6 403:23

**g**

**garage** 401:14
401:22 407:25
**gary** 322:20
**general** 352:1
**generally**
313:10
**getting** 320:9
349:11 379:13
379:24 382:17
**gilson** 352:23
352:25 353:3,5
353:13,16
**gist** 381:21
**give** 314:4
330:25 333:15
355:16 360:6
380:3 394:4
**given** 307:5
316:10 325:16
**gives** 377:17
410:11

**giving** 370:6
**go** 309:8
326:10 332:15
336:12 346:3
347:14 353:25
354:1 364:11
365:5,15,18,23
373:25 380:10
380:15 400:11
400:12 401:2
409:14,19,22
**goal** 363:6
**goals** 363:11
**goes** 312:12
347:22 354:3
362:16 386:13
**going** 307:6
308:1 317:25
318:19 338:2
347:21 360:2
386:8 411:7,11
**gonna** 332:17
334:11,12
339:19 372:11
375:4 387:24
392:10 401:22
409:20,22
411:14
**good** 307:5
338:18 349:15
378:14 385:21
393:5 411:16
**gotta** 311:7
**governing**
311:13,16

315:1 316:16
316:24 317:15
318:4 330:3
367:16 368:13
**governmental**
312:15
**grade** 401:18
**granted** 400:20
**great** 376:17
**gross** 303:7
304:2
**guess** 308:2
344:15 345:12
355:9,12
357:15 358:22
369:2,8 386:24
393:9
**guessing** 351:4
364:5
**guidance**
388:17
**guys** 409:13

**h**

**h** 305:7 306:1
414:5
**hairpin** 408:1,7
408:7
**half** 393:1
**halfway** 335:15
**hall** 371:13
379:4 402:25
403:5
**happen** 376:9
**happened**
356:8,14,18

357:13,17
374:5 394:24
**happens**
343:14 385:9
**happy** 397:12
**hard** 318:21
411:6
**harris** 305:9,11
307:18,23
308:10,11,25
309:5 310:2
315:3 316:25
319:7 320:11
**harris's** 313:16
**head** 307:11
366:12 368:10
401:20
**heard** 313:19
316:20 400:19
**hearing** 368:23
388:23 393:19
401:24 402:1
408:3
**height** 373:18
393:20,24
394:9,16,18,21
394:25,25
395:5,11,15,18
395:21,24,25
397:12,17
398:7 400:15
400:16 401:12
401:17,19
402:7 403:10
403:16 406:10

[heights - items]    Page 13

| | | | |
|---|---|---|---|
| **heights** 394:22 | **housing** 309:24 | **indicate** 411:3 | **interrupt** 378:9 |
| **held** 303:6 | 312:18 325:22 | **indicated** | **interrupting** |
| 322:9 | 326:2,2 354:10 | 340:12 397:2 | 402:18 |
| **help** 340:13,17 | 366:16,21 | **indicating** | **investigate** |
| 398:17 | 367:25 405:14 | 370:18 | 318:8 |
| **helpful** 370:19 | **huge** 404:3 | **individual** | **investigated** |
| **hereinbefore** | **huh** 320:19 | 383:22 | 327:15 |
| 413:12 | 322:14 351:13 | **info** 362:8 | **involved** |
| **hi** 339:18 | 361:24 369:21 | **information** | 312:25 313:3 |
| 344:10 361:4 | 380:10 381:3 | 318:8 338:19 | **involvement** |
| 362:3 380:25 | 388:16 393:11 | 338:23 339:5 | 358:8 |
| 396:23 | 393:13 401:2 | 339:14 370:6 | **issuance** |
| **high** 396:10 | 401:16 404:1 | **informed** | 375:22 |
| **higher** 332:6 | 406:12 | 319:19 389:7 | **issue** 317:22 |
| 405:14 | **i** | **initial** 308:17 | 377:13,22 |
| **highly** 320:14 | **i.e.** 397:3 | 313:16 406:18 | 378:17 380:15 |
| **hired** 360:10 | **idea** 338:24 | **input** 333:25 | 381:11,18 |
| **history** 313:22 | 399:13,14 | 334:5 | 383:5 399:9,20 |
| 314:18,21 | 400:4,6 | **inquiry** 338:11 | 400:22 402:7 |
| 318:2 319:9 | **ideas** 333:1 | **inside** 379:4 | 403:10,16 |
| 325:16 | **identified** | **instituted** | **issued** 375:19 |
| **hold** 322:8 | 315:3 | 367:13 368:17 | 377:16,20 |
| 390:10 | **identify** 333:9 | **instruct** 359:6 | 383:8 404:16 |
| **holding** 350:16 | **ii** 302:11 | 359:8 | 406:8 |
| **hone** 356:2 | 309:15 | **instruction** | **issues** 317:9 |
| **honestly** 388:2 | **illustrate** 408:7 | 307:12 | 318:19 346:21 |
| 388:3 | **important** | **instructions** | 349:8 352:3 |
| **hour** 393:1,1 | 315:16,18 | 307:6 414:6 | 358:7 359:4 |
| 409:6,9 | 316:23 317:4,6 | **intelligently** | 377:25 386:2 |
| **hours** 361:18 | 342:25 | 311:16 | 389:16 394:16 |
| 408:20 410:2,6 | **including** | **intend** 410:23 | 400:15 406:19 |
| 410:14,16 | 343:11 388:24 | **interest** 316:15 | 406:22,24 |
| 411:13 | **income** 312:17 | **interested** | **issuing** 376:18 |
| **house** 320:21 | **independent** | 413:17 | **items** 388:11 |
| 336:7,10 | 334:2 | | 407:10 |

[j - know]                                                              Page 14

| j | | | |
|---|---|---|---|
| **j** 335:17 412:2 | 342:2 343:2,5 | 345:8,14,16 | 341:15 342:4 |
| **jane** 337:14 | 367:3,10 368:5 | 350:1,7,10,13 | 342:10,11,14 |
| 339:18 396:22 | 368:6,25 369:7 | 350:25 357:20 | 344:11 345:10 |
| 396:23 | **july** 368:12 | 372:8 | 345:12 348:25 |
| **january** 305:15 | 383:11 384:4 | **klugmann's** | 349:6 350:25 |
| 334:14,23 | **jump** 402:7 | 351:17 | 351:3,4 353:2 |
| 335:2 337:17 | **june** 413:23 | **knew** 320:11 | 355:21,25 |
| 338:4,7,13 | **jury** 336:10 | 325:23 334:3 | 356:7,7 358:17 |
| 339:4,18 341:7 | | 336:25 338:14 | 359:14,16 |
| 341:9,12,15,18 | **k** | 341:4 | 360:3,14 |
| 367:2 369:3 | **keep** 362:9 | **know** 310:10 | 362:10 364:3,7 |
| **jersey** 302:1,7 | 410:20 | 310:13,15 | 364:7,9,15,24 |
| 303:6,8 304:5 | **keeping** 408:24 | 311:24 312:2,4 | 365:2,19 374:4 |
| 304:10,15 | 409:4 | 312:6,20 313:9 | 374:8,9,10,13 |
| 413:5,21 | **kevin** 336:14 | 313:20 314:2,6 | 374:14 375:7 |
| **jfiorenzo** 304:6 | **key** 354:11,11 | 314:10,20,24 | 375:12 376:13 |
| **joe** 402:19 | **kind** 318:20 | 315:5 316:8,22 | 376:15,15,20 |
| 408:19 411:10 | 395:7 402:6 | 317:1,3,6 | 376:23 377:23 |
| **joseph** 304:2 | 405:11 | 318:5,23,25 | 378:1,8,10,15 |
| 344:3 | **kinderkamack** | 319:2,6,24 | 380:2 382:3,20 |
| **judge** 305:9,11 | 380:25 | 320:5,6,16 | 382:22 383:18 |
| 305:15 307:17 | **klein** 304:3 | 321:1 322:1,18 | 384:22 387:17 |
| 307:23 308:10 | 306:8 307:20 | 322:18,24 | 387:23,25 |
| 308:11,25 | 308:23 338:9 | 323:3,13 | 390:7,10,11,13 |
| 309:5,14 310:2 | 343:20 346:1,5 | 324:20 325:25 | 390:18,22 |
| 310:16 312:12 | 346:12 347:6 | 326:1,6,7 | 391:25 392:5 |
| 312:21 313:16 | 350:3 357:23 | 327:14,18,23 | 392:22 394:24 |
| 315:3 319:7 | 361:2 377:5 | 328:1,5,7,9,13 | 395:20 399:17 |
| 320:11 341:18 | 380:5,20 | 328:23 329:1 | 400:1 401:7 |
| 367:2,5 368:5 | 383:10 384:7 | 329:12,15 | 402:20,25 |
| 368:24 410:23 | 396:18 408:23 | 330:1 331:13 | 403:5 404:10 |
| **judgment** | 409:4 410:4,8 | 331:17,18 | 404:12,19 |
| 305:15 341:13 | 410:15 | 332:2,7 338:16 | 405:18 407:2,5 |
| 341:19,24 | **klugmann** | 338:21,24 | 408:17,18 |
| | 305:16,20 | 339:25 340:2,7 | |
| | 343:16 344:4,9 | | |

[knowledge - lydia]                                    Page 15

**knowledge**
  386:10,17
**knowledgeable**
  318:1,6,10
  327:21,24
  328:3,8,24
  329:13,20
**knows** 376:21

**l**

**l** 307:1,1,1
**lack** 308:5,16
  309:6 312:15
  358:14
**lacking** 408:12
**ladies** 371:2,10
  372:19
**lamatina**
  313:22 315:20
  315:22
**land** 372:6
  386:14,24
  388:22 389:19
  390:6,25 391:5
  391:12 392:4
  392:20,21
  394:2,5 395:25
  401:4
**large** 325:12
  326:12,15,17
**larger** 326:11
**late** 388:22
**laurel** 309:6,15
  312:9 313:23
  314:6,12,22
  315:24 318:2

326:13 327:12
327:19,22,25
328:9,25 329:5
329:14,24
330:9,15 331:4
331:18
**lauren** 380:21
**law** 304:13
  305:21
**lawsuit** 366:20
  367:7,11,13,22
  367:23 368:1,7
  368:8,17,21
  369:7
**lawyers** 317:23
  327:23 328:5
  364:12,18
**learn** 313:4
  315:8
**learning** 317:7
**leave** 411:15
**led** 324:24
  368:5
**left** 407:18,20
  409:1
**legal** 303:7
  304:4 343:1
**legitimacy**
  353:9
**length** 409:25
**leonard** 304:14
**les** 304:16
**lessons** 319:12
**letter** 305:21,22
  306:5 351:16

351:22 352:7
352:15 353:17
354:1 357:24
358:4,16,24
383:11 384:5,9
384:12,19
387:2,6 406:7
406:13,14,18
407:4,13,21
**license** 413:22
**lie** 340:5
**liked** 396:14
**limiting** 325:22
**line** 306:13
  363:8 414:11
**lingo** 381:17
**list** 335:15
  406:24
**listed** 397:6
**listen** 372:18
  397:25 398:2,3
**listened** 333:8
  333:13 391:18
**litigation**
  315:24 319:10
  366:22 367:21
**little** 313:21
  347:19
**llc** 302:3 304:8
**loan** 330:25
**location** 340:23
**long** 317:18
  325:16 342:16
  376:16 378:5

**longer** 336:5
**look** 311:4,10
  311:14,23
  312:2 347:7
  369:24 372:6
  377:24 379:24
  381:25 382:20
  386:3,17
  389:12 392:7
  399:19 400:7
  403:1,3,10,16
**looked** 330:7
  370:1
**looking** 346:4
  381:5 389:15
  399:8 410:19
**looks** 343:21
  344:1 345:8
  408:8
**lot** 314:13
  318:13 321:14
  326:3 401:7,11
  401:20 407:24
  408:8
**love** 339:18
**low** 312:17
**lower** 332:6
  396:4
**lunch** 371:2,6
  371:10 372:20
  397:10
**lydia** 303:4
  413:3

[m - members]                                                                    Page 16

| m | | | |
|---|---|---|---|
| **m**  304:3 307:1 | **man**  323:19 | 367:14 369:10 | **measurement** |
| **ma'am**  327:8 | **march**  308:25 | 381:6,22 382:6 | 401:1 |
| 327:21 334:16 | 319:7 346:20 | 395:17 396:23 | **measuring** |
| 378:11 392:8 | 347:12 350:9 | 401:11,12 | 395:8 |
| 407:13 | 350:16 357:25 | 403:19 411:4 | **meet**  337:5,9,11 |
| **made**  308:11 | 396:19 397:9 | 414:1 | 343:17 344:12 |
| 309:4 310:3,7 | **mark**  334:11 | **mca**  302:4 | 344:13 345:18 |
| 310:10,17 | 334:12 346:10 | **mccann**  305:21 | 350:9 351:1 |
| 311:11 312:21 | **marked**  306:6 | 351:19 358:2 | 352:12 359:3,6 |
| 317:13,21 | 306:8 307:18 | 359:12 | 359:9 362:17 |
| 320:11,12 | 319:18 341:17 | **mcdonnell** | 362:20 363:3 |
| 323:21 324:16 | **market**  327:10 | 303:4 413:3 | 369:10 370:19 |
| 333:7,10,13 | 331:10,10,12 | **mean**  312:7 | 370:23 371:11 |
| 347:20 352:4 | 331:13,19,23 | 323:14 324:10 | 371:13,16 |
| 367:5 387:23 | 332:5,8,9,12 | 325:10 331:10 | 373:4,6 406:21 |
| 389:7 394:7,8 | **marks**  414:8 | 331:23 342:9 | **meeting**  305:12 |
| 396:16 | **matter**  303:3 | 344:24 350:20 | 334:14 335:6 |
| **mah**  302:4 | 325:21 326:1 | 355:22 356:13 | 345:22 349:25 |
| **maintenance** | 331:5 348:22 | 356:18 361:15 | 350:16,23 |
| 381:4 382:19 | 368:3 | 366:16 370:6 | 351:23 352:5 |
| **make**  318:1,6,9 | **matters**  348:24 | 374:6 375:4 | 352:21 353:20 |
| 330:2 332:15 | **matthew** | 386:7 410:20 | 357:21 358:5 |
| 334:9 337:25 | 352:23,25 | **means**  342:13 | 362:9,11,14 |
| 347:19 353:15 | 353:3,5,13,16 | 356:3,6,8,11 | 369:25 371:17 |
| 354:2 361:7 | **mayor**  302:14 | 357:12 371:7 | 372:6 393:2 |
| 362:13,17 | 304:12,17 | 373:23 374:5 | 396:21 |
| 377:21 403:20 | 305:3,12 313:6 | 375:8 380:2,3 | **meetings**  334:1 |
| 410:22,24 | 313:21 320:20 | 384:22 385:4 | 383:25 |
| 414:7 | 334:8,13,15,22 | 387:7,16,17 | **member**  311:13 |
| **makes**  307:24 | 335:10,14 | **meant**  341:24 | 311:16 313:5 |
| **malagiere** | 337:10 339:20 | 342:5,22 | 314:25 316:16 |
| 304:13 | 340:11,16 | 357:12 380:14 | 316:23 317:15 |
| **malagierelaw...** | 341:19 342:24 | 387:18 388:17 | 368:13 |
| 304:16 | 347:18 362:18 | **measured** | **members**  314:3 |
| | 363:21 367:12 | 395:15 405:2 | |

[met - number]                                                                    Page 17

met  369:19
  370:15,20,25
  371:5,7
michael  335:17
minute  364:21
minutes  305:12
  334:13 335:12
  365:3 409:7
  410:12
mis  344:7
missed  312:14
missing  397:6
misspoke  324:5
moderate
  312:17
moment  323:6
  328:6,22
  329:11 347:11
  383:23 386:6
  387:21 390:22
  396:20
monday  303:8
  351:11 414:3
money  378:7
  378:15
month  347:19
moonachie
  304:14,15
morning  307:5
  338:18
mount  309:6,15
  312:9 313:22
  314:6,12,22
  315:24 318:2
  326:12,12

327:12,19,22
327:24 328:9
328:25 329:5
329:14,23
330:9,15 331:4
331:18
mouth  357:8
move  306:12
  314:5 363:24
  372:11
movement
  345:10 348:11
moving  349:1
multiple
  346:21 347:24
  348:20 349:8
  352:4
municipalities
  323:15 358:12
municipality
  359:3

n

n  304:1 305:1
  307:1
name  325:2
  414:9
nature  388:12
near  397:3
necessarily
  327:7 380:13
necessary
  331:14
need  307:7
  338:20 346:21
  348:17 349:8

359:3 368:10
378:2 405:5
needed  327:2,4
  347:24 349:18
  351:3 403:20
  408:12
needs  347:20
negative
  309:23
neglia  335:17
  335:17 336:6
  370:12 383:12
  384:4,9,11,19
  385:11,15,22
  389:11,15
  399:19 400:3
  400:13 402:6
  403:13 406:8
  406:19,22
negligence
  407:23
negligent
  406:24 407:3
  407:10,17,20
neither  358:13
  392:13 413:13
  413:15
never  310:13
  313:8,24
  316:18 333:24
  369:14,19
  370:15,20
  372:22,24
  380:1 385:22
  386:2 387:1

388:16 390:23
392:18 395:14
396:14 400:25
new  302:1,6
  303:6,8 304:5
  304:10,15
  311:13 315:8
  320:24 321:22
  334:11 335:19
  336:21 354:8
  360:10 389:15
  413:5,21
newark  303:8
  304:5
newspaper
  337:24
nice  323:19
  372:9
nodded  307:11
nods  366:12
noncompliance
  308:12 312:9
  318:2 325:17
notary  303:5
  307:2 412:18
  413:4,21
notations  414:8
note  414:7
noted  336:3
notes  303:2
november
  397:4
number  305:8
  306:2 309:13
  331:14 332:8,8

332:15 334:12
343:8 346:17
388:11 389:16
**numbered**
309:10

**o**

**o** 307:1,1
**oath** 330:6
359:15 383:2
407:4
**objection**
310:12 314:23
315:4,25
316:19 317:2
318:22 320:25
321:13,25
326:14,20
327:20 328:11
329:3 331:16
354:16 355:20
356:1,15 360:1
366:3 374:21
374:25 375:3
375:11 397:14
404:25 406:4
407:12
**obligated**
355:15
**obligation**
308:6,17
312:16 314:6
314:22 326:8
330:10 331:4
354:14 369:5

**obligations**
308:13 315:2
343:1 354:9
**occasion**
371:11
**occur** 350:15
351:6
**occurred**
337:19
**october** 312:13
**office** 303:6
335:10,14
**officer** 381:4
**offices** 304:13
**official** 377:8
377:11
**officials** 309:17
310:1 352:5
**oh** 312:5 313:2
315:9 327:14
329:16 368:14
373:25
**okay** 307:10
308:9,20
310:22 311:3
312:1,12
313:20 314:2
315:15 316:9
317:21 318:12
318:15,18
321:3 323:18
323:20,24
324:6 325:5,7
327:6 329:4,22
331:22 332:11

332:16 333:4,9
333:17,20,24
334:8 335:5,15
336:9 337:4,12
337:17 338:4
339:22 341:6
341:23 342:4
342:24 343:4
343:14,19
344:1,21
345:13,24
346:2,5,9
347:16,17
349:6,13,21,23
351:7,19,21
352:17 353:24
354:25 355:6
355:10,13
357:16,24
358:23 359:19
360:16,25
361:11,15
362:2,4 364:25
365:10 367:18
368:9,11,12
369:3,9 370:12
371:1,3,7,20,25
372:17 373:3,9
373:20 374:17
374:24 375:8
375:13 376:7
376:11,17
377:10,13
378:14,22,25
379:5,8,15

382:9,15 383:7
383:22 384:4
385:19 386:15
387:1,14,19
388:1,3 389:3
390:7,14,16
391:4,25
392:15 393:5
393:10,18
394:15 395:9
395:13 396:13
398:18 401:5
402:4,25 405:6
405:19 406:7
408:18,24
409:22,24
410:17 411:14
**old** 320:23
**omissions**
407:23
**omitted** 406:24
407:3,10
**once** 337:10
369:23
**opinion** 312:13
313:16 322:17
323:10 324:21
329:5,23
330:17 407:11
407:14 411:11
**opinions**
330:13
**opportunities**
312:14

**opportunity**
312:17
**opposed** 340:22
**opposition**
309:24,25
310:1 330:25
**options** 319:1,3
**order** 326:8
327:2,13,13
367:5,6,10
376:8 377:22
**ordered** 325:15
**ordinance**
395:24 396:3
397:1,2,5,12,17
398:8 403:24
405:4
**ordinances**
386:18 391:1
396:7 397:6
**original** 408:15
**outside** 380:10
**overlooked**
319:12
**own** 333:25
**owner** 381:5,5

**p**

**p** 304:1,1 307:1
**p.c.** 303:7 304:2
**p.m.** 409:17,18
411:21
**padovano**
305:15 341:18
368:5

**padovano's**
367:2
**page** 305:8
306:2,13
307:22 309:8
309:11,11,13
335:6,23 347:2
352:14 383:17
384:9 388:19
406:7,18
414:11
**pages** 309:10
309:12 384:5,6
384:8 407:9
**paid** 378:2,3
**paparo** 305:23
344:3,5,10
351:22 354:13
357:25
**paragraph**
309:14 351:21
354:2 358:1
**parcels** 352:2
358:6
**parked** 408:1
**parking** 401:14
401:22 407:24
407:25 408:8
**part** 315:23
316:4,4 319:18
326:10 346:16
346:17 351:2
361:14,16,17
361:20,25
385:13,20

406:9
**participation**
358:8
**parties** 413:15
**parts** 388:4
406:8
**passing** 352:3
379:7
**past** 319:13
**path** 330:18
**pattern** 309:21
310:18,19
316:12
**pay** 376:10,15
379:16 401:18
**paying** 376:11
376:17 378:7
**payment**
378:14
**pending** 332:4
372:15 384:18
**pension** 362:1
**people** 314:13
321:24 322:1,2
322:4,7,10
323:7 335:11
394:25 401:20
**perils** 319:10
**period** 337:13
**permit** 376:3,8
376:19 377:16
377:20,22,25
378:3,17
404:16

**permits** 375:19
375:22,25
376:25 377:14
377:18 379:17
**permitted**
397:1 401:21
**permitting**
378:2
**personal** 411:6
**phase** 386:4
**phone** 344:19
344:25 345:2
**pick** 365:19
**picture** 390:15
**pigs** 375:4
**place** 318:21
413:12
**plain** 398:16
**plaintiff** 302:4
304:7
**plan** 330:11
332:1,16,23,25
333:5 389:5,7
389:21,23
390:3,11 391:2
391:3,8,10,17
392:9 395:5
397:18 398:9
399:3 403:21
403:21 404:13
405:3,15,16
408:6,6,11
**planner** 321:8
322:13 327:8
334:3 336:18

**[planners - protection]**                                    Page 20

**planners** 333:3
**planning**
  324:18 325:6
**plans** 384:24
  385:9 386:8
  390:18,20
  391:1,5,7,15,21
  392:4,12,18,22
  393:6 395:6,9
  395:10,11
  402:13 403:18
  403:20,23
  404:2,4,9,11,13
  404:17,20,23
  405:2 406:25
  407:1
**plaza** 303:7
  304:4
**please** 307:12
  309:9 328:18
  328:20 334:11
  335:24 338:18
  338:21 344:11
  345:7,10
  346:11 351:9
  358:18 362:8
  365:4,11,15
  372:17 378:9
  383:17 396:17
  398:5 400:10
  400:20 411:19
  414:7,9
**pleasure** 362:7
**point** 308:4
  317:15 330:22

336:13 342:15
349:24 375:17
375:21 377:11
377:12 383:8
**pointed** 406:25
**portion** 307:17
**porzio** 305:21
  351:17
**position** 352:11
  359:22 372:22
  373:1 410:1,4
  410:19,22
  411:10
**positions** 322:9
**possibility**
  363:23
**possible** 351:25
  355:18 373:20
  373:21 374:24
  375:2,4,9
**possibly** 350:17
  407:5
**post** 314:14
**posted** 314:14
  362:9,11
**present** 333:4
  335:9,13
  362:14 371:14
**preserved**
  309:18 310:5
**press** 363:18
**presumably**
  381:6
**pretty** 386:12
  392:2 398:16

405:1
**prevent** 399:5
**previously**
  307:5 368:18
  388:22 389:16
**prior** 316:25
  318:19 358:10
  388:21 404:24
  413:5
**privilege**
  364:14,22
**probably** 364:2
  364:3 379:6
  382:17 387:3
  387:13,14,21
  388:15 389:4
  392:14 397:3
**problem** 311:5
  311:5,9,15
**problematic**
  399:21
**problems**
  316:17,24
**proceedings**
  303:3 411:21
**process** 385:14
  385:20
**products**
  348:17
**professionals**
  320:23 332:20
  333:25 360:10
  369:11 383:8
**project** 325:15
  330:7 331:1

337:1,2 344:14
346:24 347:22
348:13,13,16
350:15 351:6
352:1 354:7,8
354:9,11
355:16 360:4
360:11,23
363:24 364:11
365:18 369:13
369:17,23,24
370:10,16
371:17,22
372:23 373:7
373:11 378:23
379:9 386:13
399:9,21
405:10
**projects** 336:2
  346:21,23
  347:24 348:2,7
  348:10,20,23
  349:5,8,16
  358:13
**pronounce**
  337:15
**property**
  339:20 380:11
  381:4,6,12
  382:19,19
**proposed** 318:3
  338:6
**protection**
  368:3

[provide - recall]                                                    Page 21

| | | | |
|---|---|---|---|
| **provide** 312:16 | **question** 309:1 | 387:22 396:25 | 387:10,12,13 |
| 318:15 351:25 | 314:8 328:2,16 | **quoted** 337:24 | 387:14,22,22 |
| 397:7 | 328:18,22 | **r** | 387:25 388:4,5 |
| **providing** | 329:9,11,18,20 | | 388:7 398:6 |
| 338:22 | 329:22 330:1 | **r** 304:1 307:1 | 402:13 406:8,9 |
| **provisions** | 332:3,4 347:17 | 412:2 413:1 | 406:14 412:4 |
| 355:14 | 347:23 349:7 | 414:5,5 | **reading** 348:4,6 |
| **public** 303:5 | 356:16,25 | **railroad** 394:23 | 348:8 351:14 |
| 307:2 314:4,10 | 357:6 363:2,22 | **raise** 393:24 | 353:4,14 |
| 412:18 413:4 | 365:11,13,17 | 406:20 | 388:11 407:6,7 |
| 413:21 | 365:20 366:5 | **raised** 394:16 | 407:8 414:6 |
| **pull** 307:21 | 369:4 370:4,8 | 394:25 | **real** 358:11 |
| 308:21 334:10 | 372:15,16,18 | **raising** 400:15 | **realistic** 312:17 |
| 337:21 341:16 | 374:2,11 | 406:19 | **really** 318:20 |
| 351:8 361:1 | 378:11 383:9 | **ramsey** 304:10 | 334:6 357:2 |
| 384:15 396:17 | 384:18 386:20 | **rate** 327:10 | 402:5 406:15 |
| **pursue** 367:21 | 397:23,25 | 331:10,12,13 | **reask** 365:20 |
| **push** 315:20,22 | 398:2,3,7,11,14 | 331:19,23 | **reason** 333:5 |
| 316:3,10 | 398:24 402:16 | 332:5,8,12 | 359:16 374:14 |
| **pushed** 340:23 | 402:21 410:5 | **rates** 332:10 | 411:6 |
| **put** 313:22 | **questions** | **reached** 326:5 | **reasonable** |
| 326:8 347:13 | 307:13 318:14 | 343:12 368:7 | 338:1 |
| 350:22 405:2 | 328:12 353:11 | 405:24 410:2 | **reasons** 314:17 |
| 408:9 411:9 | 357:11 393:24 | **reaching** | **recall** 308:3 |
| **putting** 357:8 | **quickly** 346:22 | 343:16 | 309:7 310:24 |
| **q** | 347:25 348:3,7 | **read** 307:17 | 311:22 312:11 |
| | 348:18 349:9,9 | 313:11,14,24 | 313:12 320:17 |
| **qualified** 322:5 | 349:11,19 | 314:9,14,16 | 320:17 327:17 |
| 322:8,11,11,16 | 355:1 392:12 | 316:21 318:7 | 333:11,23 |
| 322:19,22 | **quote** 309:15 | 328:19,21 | 336:25 338:8 |
| 323:1,4,7,11,12 | 310:5 312:13 | 329:10,19 | 338:10,12 |
| 323:20 324:6,8 | 319:8,13 343:5 | 342:2 346:25 | 339:3,7 340:1 |
| 324:9,20,25 | 351:23 358:1 | 347:10 358:23 | 340:9,14,18 |
| **quantify** 318:5 | 358:15 362:16 | 358:24 365:10 | 341:8,11 |
| 322:24 | 362:19 380:25 | 365:12,16 | 342:20,21,23 |
| | | 373:16 387:3,9 | |

343:18 344:20
344:22 345:20
348:1 349:17
349:20 350:2,8
350:19,21,24
351:15 352:9
352:14 353:23
355:17,19,23
356:3,4,6,7,10
356:12,17,20
356:23 357:4,9
357:17,22
358:25 359:5
359:25 360:5
360:12,12,18
360:20,24
362:15 363:5
364:6,19,20
365:13 366:7
368:25 369:20
370:11 371:12
371:24 373:5
373:19 374:3,5
374:7,18,23
375:1,20,23
377:9 379:2,11
379:20 380:18
381:13 383:4
384:3,10,20
386:5 387:20
388:6,9,15,18
389:13,18,20
390:5,9,24
392:3 394:12
394:17,21

395:19,21
401:25 402:3
403:22,25
404:2,7 406:11
406:12
**receive** 345:11
352:18 357:19
**received**
345:12 353:7
353:17 358:3
358:21,24
**recognize**
350:4
**recognized**
316:17
**recollection**
379:19 383:24
**recommended**
327:1
**record** 344:21
409:14,16,20
409:25 410:4
411:10
**recross** 305:4
**redeveloped**
338:7
**redeveloper**
337:9 353:19
354:5,6 355:2
355:16 359:1,7
359:11,20
362:9,11
396:22 397:18
398:8

**redevelopers**
302:3
**redevelopment**
354:4,15,22
355:14 358:13
363:1 365:24
366:9 369:5
391:2 392:11
396:3 399:3,6
399:6 403:24
405:4,12
**redirect** 305:4
**redo** 408:13
**reduce** 332:11
332:12
**refer** 348:14
**reference**
307:25 347:19
**referring**
347:25 348:11
348:21 349:1,4
368:7
**refers** 347:12
363:8 407:23
**reflected**
395:11
**refresh** 310:25
337:20
**regard** 360:23
381:12
**regarding**
309:5 312:16
338:20 339:5
341:9 352:11
360:10,19

370:16 371:22
373:10 378:23
379:9,12
393:20 406:22
**regardless**
354:7
**regulations**
328:4 329:21
332:6
**related** 320:3
352:3 358:7
371:18
**relates** 399:23
406:9
**relationships**
334:6
**relative** 413:14
413:16
**relentlessly**
309:17 310:5
**remain** 319:8
**remarkably**
309:20
**remedy** 309:16
**remember**
308:1 315:13
315:15 333:12
334:24 338:2
341:12 343:15
344:16,18,23
344:24 345:1,2
345:2,21 348:2
349:21 351:18
355:21,24
356:9,19,21,24

357:2,12,14
361:19 366:6
366:24 372:3
373:21,22
374:7,15,16
394:11,13,15
401:10 404:4,7
406:17
**remembering**
351:14
**remind** 307:12
**reminding**
354:13
**rendered** 308:9
309:5
**renewal** 302:3
**repeat** 307:7
312:20 319:12
329:8
**repeatedly**
396:11
**report** 388:25
400:8,13
**reporter** 303:5
307:14 328:21
329:10,19
365:12,16
398:6 409:23
411:17 413:4
414:9
**repose** 341:13
342:5,8,22
367:3 368:6,25
369:7

**representatives**
343:17
**request** 338:18
339:10 350:16
358:5 397:21
**requested**
385:16
**requests** 306:9
306:10 352:4
355:1 358:11
**require** 328:4
329:21 358:7
**required**
331:24 354:25
355:7 405:14
**requirements**
375:18 376:18
**requires** 354:5
**requisite**
324:12
**resignations**
335:7
**resolution**
335:9,16 336:3
336:14 384:22
385:4,16,23
386:3,7,12,16
408:15
**resolve** 312:15
**respect** 369:17
410:13,15
**respond** 345:13
355:1
**responded**
358:10

**responding**
350:12 359:11
359:21
**response**
328:14 339:17
358:3 374:2
**result** 318:19
**resume** 365:7
409:18
**retained** 306:8
**retired** 361:23
**retract** 387:24
**return** 414:9
**review** 384:24
385:5,17 386:8
387:5 389:4
390:17 391:10
391:16,20
392:12 397:1
403:4,20 407:3
**reviewed** 387:1
389:6 391:5
392:18 395:24
404:17,22,23
406:16
**reviewing**
347:9,15 350:5
384:17 407:21
**revised** 404:20
404:21 408:7
**revisit** 400:22
**rich** 361:3,4,5
362:3 380:24
380:25

**richard** 304:13
346:14
**rid** 320:23
321:1,3,12,15
322:11
**rider** 306:6
360:14,17,21
362:4,4,7
369:15 370:9
371:22 372:19
**right** 312:3,22
313:4,9,18,25
315:24 317:11
317:17,24
319:15,25
320:21 325:24
329:7,25 331:2
332:21 334:23
336:22 338:15
340:20,25,25
341:16 342:12
344:8,8 345:5
345:16,18
348:9 352:18
352:22 355:8
356:11,13,21
356:22,25
357:3 365:24
366:11 367:6
368:21 371:23
373:23,24
374:1,12,15,19
374:22 377:19
377:23 380:19
381:23 384:2

**[right - settlement]**                                                   Page 24

389:6 391:20
392:13,15
394:8 395:16
396:21 399:4
404:15 408:10
409:5,19 411:2
411:8
**riverfront**
303:7 304:4
**road** 304:14
**rock** 318:21
**roehrer** 306:3
380:22
**roehrer's**
381:22
**ron** 380:6
381:1 382:6
**rough** 389:20
**round** 404:8,11
**ruling** 310:3,7
310:11,17
316:25 320:12
**rulings** 308:11

**s**

**s** 304:1 305:7
306:1 414:5
**sailed** 400:18
**sat** 403:3
**satisfied** 377:22
**satisfy** 326:8
327:13 332:17
**satisfying**
330:9 331:4
**saw** 310:15
379:6 390:23

**saying** 319:24
337:25 370:20
383:4 399:18
407:16
**says** 309:14
312:12 335:13
335:16 338:18
339:18 343:5
344:6,10
345:17 348:6,8
350:13,14
351:5,23
352:19 358:1,3
358:20 361:4
362:5 380:25
381:23 396:23
401:1
**scala** 305:14
338:11,14,16
338:23 339:5
340:8,11 341:9
**scale** 337:25
363:19 399:25
**scheduled**
351:24 358:5
**scroll** 339:11
339:11 343:23
345:6 358:18
383:13,16
**seaman** 304:14
310:12 314:23
315:4,25
316:19 317:2
318:22 320:25
321:13,25

326:14,20
327:20 329:3
331:16 344:7
347:4,7 354:16
355:20 356:1
356:15 360:1
364:21,25
365:3,9 366:3
374:21,25
375:3,11
397:14 404:25
406:4 407:12
408:19,22
409:2,12 411:3
**second** 309:8
309:11,11
310:17 320:12
351:21 352:14
**section** 400:13
**sections** 406:13
**see** 339:15
350:8,10
351:18 352:7
379:5 384:8,13
396:25 400:16
**seek** 368:2
409:21
**seeking** 338:19
339:5 361:22
**seem** 340:6
**seemed** 398:16
**seen** 309:1
310:8,13 313:8
**segregate**
320:15

**segregation**
309:19 310:6
316:14 320:16
**sense** 322:2
329:2,4,16,22
330:2,4 353:15
362:17
**sent** 344:2
351:16 358:19
**sentence**
362:24
**separate**
362:24
**separated**
333:21
**series** 305:19
350:6
**set** 349:25
352:21 353:19
357:20 363:6
363:11 365:8
408:6,6 413:12
**settembrino**
336:15,15
**settled** 325:22
326:1 330:8,14
331:5 366:21
368:22
**settlement**
315:23 316:5
317:16 318:3
319:4,20,22
326:19,22
330:16 331:6
343:12 354:10

354:11 366:13
366:18,20,23
368:6,22
405:13,17,24
**settling** 369:7
**seven** 357:24
408:20 410:2,5
410:13,15
411:13
**several** 352:13
352:22 353:20
407:5
**share** 326:9
**she'd** 324:15
**sheet** 414:7,9
**sheola** 305:18
305:20,24
306:4 346:14
349:25 350:7
350:12,20,22
351:2 361:4,12
377:2,3 380:24
**ship** 400:18
**shorthand**
303:5 413:4
**shortly** 340:11
343:15 351:15
**show** 394:10
407:20
**shown** 307:16
414:10
**shows** 352:16
**sic** 348:17
**sign** 414:9

**signature**
383:17 413:20
**signed** 363:14
383:15 391:9
**sills** 303:6
304:2
**sillscummis.c...**
304:6,6
**silva** 377:5,6,7
378:22 379:12
379:21 380:8
**silvio** 377:4
**similar** 358:13
**simple** 357:2
**sit** 330:11
344:13
**site** 338:6 389:4
389:6,21,23
390:3,11 391:3
391:7,8,10,14
391:17 392:4,9
392:12,18
403:18,21
404:13 408:6
**six** 345:9
**size** 325:10
326:18,21,23
327:2,7 331:1
332:12
**sketches**
389:20
**skill** 324:12
**skilled** 328:8,24
329:13

**skimming**
407:9,15
**sklein** 304:6
**sky** 375:5
**slow** 369:12
**small** 325:13
**smaller** 327:11
331:11 333:16
**solely** 332:22
**solution** 330:20
330:21
**somebody**
334:5 336:9
382:2
**soon** 351:24
**sorry** 321:18
324:3 400:12
**sought** 375:22
375:25 388:16
**source** 313:13
**south** 304:9
**spaces** 407:24
408:2
**spanning**
312:15
**speak** 307:13
369:11,15
370:8,13
374:20 378:22
397:10
**speaking**
307:15 344:16
360:13 362:7
379:11

**special** 306:9
306:10 336:2
**specifically**
323:8 344:20
344:23 345:23
348:14,15
352:1 364:6
366:24 381:9
397:11 405:10
**speed** 350:14
351:5,12
**spoke** 371:22
371:25 372:22
378:25 379:3
379:10 382:16
397:11
**spoken** 344:25
375:9 392:24
**square** 339:20
339:24
**staff** 359:6
377:14 381:10
403:12
**start** 322:12
376:5 385:21
**starting** 410:20
**state** 303:5
319:8 410:4
413:4,21
**state's** 319:10
**stated** 325:11
403:17
**statement**
316:20 356:3
381:15 382:5

**[statement - talking]**                                      Page 26

393:23 394:1,4
**statement's**
    325:19
**statements**
    312:21
**states** 302:1
**statile** 305:24
    336:19 360:9
    360:13 361:3
    361:10
**statile's** 361:9
**status** 352:2
    358:6
**stayed** 335:25
**stenographic**
    303:2
**stenographic...**
    413:11
**stephen** 304:3
**steve** 308:21
    337:21 343:24
    346:3 347:4
    383:16 400:10
**stop** 392:17,17
    411:6
**stopping**
    410:20
**store** 341:1
**stories** 396:4
    397:19 398:9
    398:25 399:7
    401:15,22
**story** 396:6,14
    397:2 399:2,9
    399:20 401:19

**strike** 306:12
    372:11
**string** 339:13
**striped** 407:25
**striping** 408:1
    408:8
**stuff** 317:12
**style** 408:1
**subcommittee**
    370:1
**subject** 346:18
    355:11 380:24
    405:16
**submit** 390:11
    392:3,16
    403:23
**submitted**
    384:24 385:10
    388:25 389:19
    389:25 390:8
    390:11,19,21
    390:23 391:3,6
    391:10 392:1
    392:19 393:7
    403:18,19
    405:15 407:19
**submitting**
    405:23
**subscribed**
    412:12
**subsequent**
    308:10 309:4
    310:3 320:4
    329:18

**substance**
    320:4 340:16
    344:25
**success** 352:6
    352:12
**suggested**
    310:17 386:2
**suggesting**
    310:4
**suggestion**
    333:10,12
**suggestions**
    333:7
**suit** 368:2
**suite** 304:14
**summarized**
    411:10
**summons**
    379:22 380:15
    381:11,19
    383:5
**supposed** 335:2
    381:2 386:11
    386:17,23
**supposedly**
    401:19
**sure** 322:6
    325:19 342:25
    362:13 375:6,6
    377:21 384:14
    386:12 388:5
    392:2 393:3
    403:20 405:1
**surface** 407:24

**surrounding**
    323:15
**swore** 335:11
**sworn** 302:12
    307:2 334:15
    334:20,24
    335:10,13
    337:4 412:12
    413:7
**sylvia** 377:7
**synthesized**
    382:20,23

**t**

**t** 305:7 306:1
    412:2 413:1,1
    414:5,5
**tag** 379:25
    380:2,4,11,12
    380:16 381:7
    381:11,17,18
    381:23 382:2,7
    382:12 383:1
**take** 332:24
    365:3 379:24
    381:21 389:11
    400:7
**taken** 303:4
    330:18 413:11
    414:3
**talk** 401:11
**talked** 313:21
    319:23 368:18
**talking** 321:19
    348:15 367:22
    367:24 368:1

| | | | |
|---|---|---|---|
| 400:2 404:20 | **thing**  369:22 | 400:25 402:11 | 361:17,20,21 |
| **team**  344:12 | 372:8 378:1 | 402:13 403:3 | 361:22,25 |
| **technical**  328:8 | 381:24 394:21 | 406:5 | 368:24 369:10 |
| 328:25 329:14 | 399:20 405:7 | **thinking**  406:5 | 373:9 375:13 |
| 388:12 | **things**  313:23 | **third**  335:6 | 375:17,21 |
| **tell**  339:4 | 314:11 320:20 | 354:1 | 376:16 378:5 |
| 342:12 382:4 | 322:19 337:18 | **thirty**  357:24 | 378:23,25 |
| 382:25 388:3 | 343:9 355:1 | 410:11 | 379:11,15 |
| 407:9 | 363:19 369:11 | **thought**  312:5 | 396:21 406:20 |
| **telling**  314:10 | 369:16 372:1 | 317:3 322:7 | 407:22 408:19 |
| 330:6 385:15 | 393:19 394:19 | 325:3,9,12 | 409:25 410:6 |
| 408:12 | 406:25 | 339:23 372:3,9 | 411:5 413:11 |
| **tenant**  352:3 | **think**  308:19 | 383:23 396:10 | **times**  378:6 |
| 358:7 | 310:8 314:13 | 397:20 398:10 | 405:2 407:5 |
| **tenants**  338:6 | 316:15,23 | **three**  336:2 | **timetable** |
| **term**  335:1 | 318:6 324:14 | 378:6 396:4 | 347:22 |
| 342:22 380:16 | 327:4 330:23 | 397:19 398:10 | **timing**  410:8 |
| 382:12 | 333:7 334:1 | **till**  378:11 | 411:12 |
| **terms**  325:6 | 340:14,15 | **time**  307:15 | **today**  330:6 |
| 386:15 387:1,6 | 342:6,12 344:7 | 308:1,4 312:22 | 362:8 407:14 |
| 387:8 | 346:4 348:4 | 313:1,3 315:13 | 409:3 411:7,13 |
| **testified**  307:3 | 352:23 359:19 | 315:16,19 | **together** |
| 407:4 | 359:21 362:25 | 316:6 317:16 | 346:17 371:4 |
| **testify**  413:7 | 363:8,21 | 317:18 318:3 | **told**  313:24 |
| **testimony** | 364:10 365:17 | 319:23 330:10 | 322:8 327:23 |
| 302:12 371:20 | 367:4,17,18 | 330:13 337:13 | 328:5 332:19 |
| 373:13 377:13 | 370:14,17 | 337:19,20,23 | 338:14 341:2 |
| 388:24 391:18 | 371:15 372:4,8 | 338:2,15,23 | 363:18,23 |
| 393:19 406:20 | 373:14 380:3 | 340:20 341:1,1 | 364:1,3,8,10,12 |
| 412:5 413:10 | 381:16 383:14 | 341:20 342:17 | 364:18,20,24 |
| 414:7 | 384:5 385:8,9 | 346:15,16,17 | 365:13,17,22 |
| **thank**  344:10 | 385:11,13 | 349:24 351:2,3 | 366:1 369:23 |
| 395:13 | 387:10 389:19 | 352:8 354:12 | 372:4 378:6 |
| **thereto**  319:11 | 390:2,24 | 360:2,8,17 | 381:16 383:24 |
| | 391:14,24 | 361:5,12,14,16 | 396:11 402:6 |

**tomorrow**
  381:1
**took**  336:24,25
**tool**  326:7
**top**  350:13
  368:9
**topic**  311:18,19
  311:25 312:3,7
  312:8 315:7,10
  315:12,16,18
**totally**  370:7
**town**  351:22
  355:1,15
  371:13 386:18
  402:25 403:5
**track**  408:25
  409:4
**transcript**
  303:2 305:10
  308:24 309:1
  309:13 411:11
  411:12,18
  412:5 413:10
  414:7,8
**transcripts**
  410:19,21
**tried**  314:18
  316:3 410:20
**true**  312:10
  325:20 331:24
  413:10
**truth**  413:7,8,8
**try**  307:13
  317:8,10 334:4
  337:9 340:12

340:17 363:18
378:11,13
398:16 399:24
399:25
**trying**  315:20
  315:22 316:9
  320:10,15
  337:25 347:13
  352:12,21
  353:19 356:2
  357:20 399:5
**turn**  335:6,23
  388:19 400:9
**turning**  407:8
**turnpike**  304:9
**turns**  408:7
**twenty**  384:7,8
**two**  309:12
  384:7,8 394:22

| u |
| --- |

**u**  412:2
**uh**  320:19
  322:14 351:13
  361:24 369:21
  380:10 381:3
  388:16 393:11
  393:13 401:2
  401:16 404:1
  406:12
**ultimately**
  325:15 368:5
  368:23 391:9
  393:6 395:4
**under**  330:6
  331:18 332:5

335:6 343:2,5
354:14 359:15
383:2 407:4
**understand**
  311:14 314:8
  318:18 320:8
  325:14 332:10
  342:8,18 343:1
  343:4 344:5
  347:21 369:4
  372:16 376:9
  382:13 385:3,4
  386:20 387:7
  388:10,14
  398:11,13,14
  398:15,19,22
  398:23,24
  401:18 404:15
  410:18,21
**understanding**
  314:17 341:23
  366:8,14,22
  367:1,4 386:21
  386:22
**understood**
  319:5 342:21
  355:7 376:7,12
  386:7 388:21
  389:1
**undertake**
  337:5,9 385:16
**undertook**
  375:14
**united**  302:1

**units**  326:3,4
  327:3,4,10
  331:10,10,12
  331:13,15,19
  331:20,23,24
  332:5,7,9,13,14
  332:18 366:17
**unpopular**
  354:7
**unqualified**
  323:24 324:1
**unreasonable**
  359:19,22
**unresponsive**
  370:7
**update**  351:25
**urban**  302:3
**use**  330:2 372:6
  378:16 380:13
  382:14,16
  386:14,24
  388:22 389:19
  390:6,25 391:5
  391:12 392:4
  392:20,21
  394:2,6 395:25
**used**  380:17
  410:5
**using**  324:4
  326:16

| v |
| --- |

**variance**
  392:10 405:5,7
**variances**
  405:9

**[variety - year]**                                                    Page 29

| | | | |
|---|---|---|---|
| **variety** 312:14 | **wants** 362:19 | **withdraw** | 362:4,7 |

variety 312:14
  400:15
various 334:9
vehicles 408:1
verbal 307:11
volume 302:11
vote 319:23
  330:24 367:20
  391:13 393:8
  404:24
voted 317:17
  320:10 368:18
  392:22 395:5
  403:22
vs 302:5

**w**

wait 378:11
  409:12
waiting 328:15
walked 339:21
want 312:19,20
  326:4 347:11
  348:25 401:6
  402:20 409:5
  411:3
wanted 337:18
  339:20,23
  344:13 350:25
  360:22 362:10
  362:22 363:4,6
  363:12,18,20
  370:19 381:22
  386:3 395:17
  396:2,9 401:2
  403:15 408:14

wants 362:19
  381:7 382:6
warning 380:4
way 318:20
  328:7,23 329:6
  329:12,25
  330:14 331:3
  340:3,6 344:25
  357:5 372:7
  373:7 374:9
  388:20 396:20
ways 330:5,9
we've 368:17
  408:24 410:2
website 313:22
  397:5
week 345:15,17
  345:18,19
  350:15,17
  351:6 361:18
weeks 334:15
  334:17 352:3
  352:13,22
  353:20
welcome
  347:10
went 319:7
  325:23 337:19
  337:23 340:19
  368:11,24,25
  388:21 389:14
  409:2
willingness
  308:16

withdraw
  383:8
withdrawn
  375:15
withstanding
  319:9
witness 305:3
  328:20 329:8
  346:8 347:9,15
  350:5 364:12
  364:16 366:12
  384:17 409:9
  409:11,13,21
word 313:17,25
  324:1,2,3
  326:16 342:4
  380:13
words 323:7
  340:15 344:24
  357:8 382:15
  382:21 383:4
  398:21
work 330:25
  351:11 361:25
  371:4
worked 336:2
  358:12 361:17
working
  332:20
works 344:11
  380:7,8 398:3
wrapping
  401:20
writes 345:8
  350:13 362:2,3

362:4,7
writing 351:22
  354:22 358:4
written 363:25
  384:9
wrong 324:2
  346:6
wrote 314:10
  314:13,17
  375:17 384:4

**x**

x 305:1,7 306:1

**y**

y 307:1
yeah 308:15,15
  319:22 322:25
  330:19 334:24
  337:8 339:12
  340:6 341:6
  346:1 347:1,3
  348:15 355:13
  355:13 358:21
  361:7 364:23
  372:11 375:8
  382:13 392:5
  392:25 395:23
  396:9,15 399:1
  400:17,18
  401:13,23
  409:10,15
  410:8
year 312:23
  360:22 362:19
  362:23 363:4,7

363:13 370:20
**years** 345:3
**yellow** 380:4
**yield** 332:6
**yielded** 331:14
**yup** 365:9

**z**

**zone** 392:11
396:3 399:6
403:25 405:4
405:12
**zoning** 308:1
309:15,21
311:5,9 316:11
319:10 320:15
325:17 392:19
393:8 400:19
400:22 404:24
405:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.