Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF NEW JERSEY

3        CIVIL ACTION NO.:  20-cv-4728-MCA-MAH

4

5   EMERSON REDEVELOPERS URBAN

6   RENEWAL, LLC,

7              Plaintiff,

8

9      vs.

10

11  THE BOROUGH OF EMERSON, NEW

12  JERSEY and DANIELLE DIPAOLA,

13              Defendants.

14  ------------------------------------

15

16      DEPOSITION OF YAAKOVI "JACK" KLUGMANN

17            TUESDAY, APRIL 25, 2023

18

19           Deposition of YAAKOVI KLUGMANN in the

20  above-mentioned matter before Jomanna DeRosa, a

21  Certified Court Reporter (License No. 30XI00188500),

22  and Notary Public of the State of New Jersey, taken

23  at 250 Moonachie Road, Moonachie, New Jersey on

24  Tuesday, April 25, 2023, commencing at 10:06 a.m.

25  Job No. CS5877544

1   A P P E A R A N C E S

2

3   THE LAW OFFICES OF RICHARD MALAGIERE

4   A PROFESSIONAL CORPORATION

5   BY:   LEONARD E. SEAMAN, ESQ.

6   250 Moonachie Road, Suite 102

7   Moonachie, New Jersey 07074

8   (201)440-0675

9   les@malagierelaw.com

10

11

12   SILLS CUMMIS & GROSS P.C.

13   BY:   JOSEPH B. FIORENZO, ESQ.

14        STEPHEN KLEIN, ESQ.

15   The Legal Center

16   One Riverfront Plaza

17   Newark, New Jersey 07102

18   (973)643-5499 JF

19   (973)643-4775 SK

20   jfiorenzo@sillscummis.com

21   sklein@sillscummis.com

22

23

24

25

Page 3

1    A P P E A R A N C E S (CONT'D)

2

3    BOTTA ANGELI, LLC

4    BY:   CHRISTOPHER C. BOTTA, ESQ.

5    50 South Franklin Turnpike

6    Ramsey, New Jersey 07446

7    (201)818-6400

8    ccb@bottalaw.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                          I N D E X

2

3    WITNESS              EXAMINATION BY                    PAGE

4    Mr. Klugmann     Mr. Seaman                            9

5

6

7

8                        E X H I B I T S

9

10   NUMBER              DESCRIPTION                        PAGE

11   FD-1                First Amended Complaint            31

12

13   (All exhibits are attached hereto.)

14

15

16                        REQUESTS

17

18   PAGE   LINE

19   47      5

20   66      4

21

22

23

24

25

Page 5

1              YAAKOVI KLUGMANN, residing at 32 Cross

2    Street, Suite 301, Lakewood, New Jersey 08701, having

3    first been duly affirmed by the Notary, then

4    testified as follows:

5

6              MR. FIORENZO:  Before we begin, I just

7    want to place something on the record.  Who is going

8    to be examining Mr. Klugmann today?

9              MR. SEAMAN:  I'm going to be taking the

10   lead.

11             MR. FIORENZO:  Okay.  Because you both

12   represent the same parties.  We're not going to let

13   Mr. Klugmann be examined by two attorneys

14   representing the same party.  There should be one

15   person examining him.

16             MR. SEAMAN:  Well, we don't represent

17   the same parties.  I only represent Mayor DiPaola.

18             MR. FIORENZO:  As does Mr. Botta.

19             MR. SEAMAN:  With regard to any

20   uninsured claims.

21             MR. FIORENZO:  You both represent Mayor

22   DiPaola.

23             MR. SEAMAN:  On different issues.

24             MR. FIORENZO:  Okay.  My position is

25   that two attorneys representing the same client do

Page 6

1    not have a right to conduct an examination of a

2    deponent.

3                 MR. SEAMAN:  Do you have a rule to

4    support that position?

5                 MR. FIORENZO:  I'll get you some

6    authority for that.  But at the moment, I'm not going

7    to cite anything off the top of my head.  But you

8    don't have a right to question the witness twice.

9    You can't have two attorneys examine the same witness

10   at a deposition if they're representing the same

11   party.

12                MR. SEAMAN:  Well --

13                MR. FIORENZO:  That's duplicative.

14                MR. SEAMAN:  Well, there will not be a

15   duplicative question.  I can guarantee you that.

16   Mr. Botta and I will certainly work to not be

17   duplicative of the questioning.

18                MR. FIORENZO:  Just so we're clear on

19   the record.  My position is that only one counsel

20   representing the DiPaola party -- you represent Mayor

21   DiPaola.

22                MR. SEAMAN:  I do.

23                MR. FIORENZO:  Mr. Botta does as well.

24   Only one attorney representing Mayor DiPaola should

25   have the right to examine the witness.  Whoever that

1  is, I don't care.  But we're not going to have you

2  examine on behalf of Mayor DiPaola and Mr. Botta do

3  the same thing.  That's not appropriate.

4             MR. SEAMAN:  Well, Mr. Botta also

5  represents The Borough as an entity.

6             MR. FIORENZO:  Well, that's true.

7  That's true.  But, again, you're both representing

8  Mayor DiPaola.  So I'm not going to let two people

9  examine him.  So do you want Mr. Botta then, since he

10  represents both parties, you only represent one?  Let

11  him do the examination?

12             MR. BOTTA:  Well, you put it on the

13  record Mr. Fiorenzo, so very good.  Thank you.

14             MR. SEAMAN:  Okay.

15             MR. FIORENZO:  Okay.  Just so we're

16  clear, I'm not going to consent to a second attorney,

17  no offense to Mr. Botta.

18             MR. BOTTA:  Well, I would disagree with

19  that.

20             MR. FIORENZO:  Well, no, I mean, it's

21  nothing personal.  The position is two attorneys

22  representing the same party don't have the right to

23  examine the witness.  That's my position.  So, with

24  that said on the record --

25             MR. BOTTA:  So are you going to object

1    if I ask questions and direct him not to answer?

2              MR. FIORENZO:  Yes, I'm going to direct

3    him not to answer questions from you.  If you do that

4    at the conclusion of his examination, yes.

5              MR. BOTTA:  Well, then I guess we're

6    going to have to get Judge Hammer on the phone.

7              MR. FIORENZO:  We may have to do that.

8    We may have to do that because I don't think it's

9    appropriate having two attorneys examine on behalf of

10   the same client.

11             MR. BOTTA:  All right.

12             MR. FIORENZO:  So I don't know if you

13   want to do that now or you want to do it later.  It's

14   up to you guys.  I just want to, you know, state my

15   position clearly up front so you can handle it any

16   way you want.  You want to start your examination

17   now, get the Judge on the phone, whatever works.

18             MR. SEAMAN:  All right.  Well, let's

19   take a break.  Chris and I will discuss it and we'll

20   get back and tell you which way we're going to go.

21             MR. FIORENZO:  That's fine.

22

23             (Whereupon, a brief recess was taken off

24   the record.)

25

```
                                                    Page 9

1              MR. FIORENZO:  Just do me a favor when

2      we start the deposition, just note the timing because

3      there's a seven-hour limit.

4              MR. SEAMAN:  Mr. Botta and I have

5      discussed this.  While we appreciate you putting your

6      position on the record, we don't agree.  It's your

7      position.  I've asked you for some authority, other

8      than you giving your position.  You haven't given

9      that to me yet to even evaluate what we think or to

10     determine whether we -- there's authority for your

11     position.  We're going to proceed right now.  But

12     Mr. Botta may ask questions later and we'll deal with

13     that with Judge Hammer at that time.  Okay?

14              MR. FIORENZO:  Fair enough.  Let's do

15     it.

16

17     DIRECT EXAMINATION

18     BY MR. SEAMAN:

19          Q.    Good morning, Mr. Klugmann.

20          A.    How are you?

21          Q.    My name is Leonard Seaman and my firm

22     represents Danielle DiPaola in this lawsuit that is

23     pending by Accurate Builders against Mayor DiPaola

24     and The Borough of Emerson -- not Accurate Builders

25     -- Emerson Redevelopers.  Correct?  You've been
```

Page 10

1    produced today as a witness for deposition in this

2    case.  I know you were deposed previously last summer

3    in another suit related to the Emerson development.

4    Do you need me to go over any of the instructions

5    before we begin?

6                MR. FIORENZO:  If you could, for the

7    benefit of him.  I probably think it's a good idea.

8                THE WITNESS:  It's a good idea.

9

10   BY MR. SEAMAN:

11        Q.    Okay.  So everything being said in the

12   room today is being taken down by this lovely woman

13   here, the court reporter.  She takes down all the

14   words that are said in the deposition.  However, she

15   can't take down something like you nodding your head,

16   shrugging your shoulders, when people say "uh-huh"

17   for "yes" and "uh-uh" for "no"; it ends up looking

18   the same on paper.  People get confused.  It doesn't

19   make a clean record.  So please try to answer my

20   questions verbally with words, as appropriate, as

21   they come about.  It's also very difficult for her to

22   take down two people speaking at the same time.

23   Please wait for me to finish my question before you

24   provide an answer.  I will of course try and show you

25   the same courtesy in terms of making sure you

Page 11

1    finished your answer before I ask another question.

2    If Mr. Fiorenzo should raise any sort of objection,

3    please let him place that objection on the record.

4    We may have some discussion, we may not.  We may do

5    whatever.  You'll probably be given an instruction

6    once that's done and you can follow his instruction

7    at that point.

8              Do you understand that?

9         A.    Yes.

10        Q.    I also ask you to listen to my complete

11   question because lawyers have a habit of starting a

12   question, the witness anticipates what the question

13   is, the witness starts to answer the question they

14   think the lawyer is going to ask.  Then the lawyer

15   changes the question somehow at the last minute and

16   suddenly you're not answering the question that's

17   trying to be asked of you.  That just creates a

18   situation where you haven't answered the question

19   being asked and we have to go back and start all over

20   again to make the record clean.  So please wait for

21   me to finish my question before you provide any sort

22   of answer.  I also want to make sure that you've

23   heard my complete question so we're sure you

24   understand the question.  If I ask you a question

25   that's in any way confusing, I used a word you didn't

Page 12

1    understand, I mumbled, I went too fast, anything like

2    that, that is in any way confusing, you didn't hear

3    it, if you don't understand the question, stop and

4    let me know.  Tell me you're confused.  Explain to me

5    what the problem is.  I will repeat, rephrase or

6    change my question in whatever way so we're sure that

7    you're answering the question that I'm asking.

8                  Do you understand that?

9         A.     Yes.

10        Q.     Okay.  The converse to that rule is that

11   if you provide an answer to a question today, if this

12   deposition is used later in terms of the court

13   proceedings, Judge Cox Arleo, potentially the jury in

14   this matter when it goes to trial in Newark will

15   assume that you're answering the question as it's

16   being asked.

17                 Do you understand that?

18        A.     Yes.

19        Q.     Okay.  This is not a memory contest.

20   Don't feel compelled to answer questions just because

21   I'm asking them.  If you don't know or you don't

22   recall, that's perfectly acceptable.  Please tell me

23   that and we'll move on.  It's also not an endurance

24   contest.  As your attorney mentioned, there's a

25   seven-hour limit under the -- Rules of Civil

Page 13

1    Procedure and we already know from people here, we're

2    probably not going to go that long today.  That being

3    said, if you need to take a break at any time, please

4    let me know.  I'll be happy to accommodate you.  The

5    only condition I put on that is if there's a question

6    pending, I'm going to ask for your answer before we

7    take our break.

8              Do you understand that?

9        A.    Yes.

10       Q.    Lawyers often give witnesses instruction

11   at a deposition; don't guess, but you can estimate.

12   I find that to be a very confusing instruction and it

13   makes little sense, to me at least.  So I'm going to

14   tell you what I mean by it.  A guess is an

15   off-the-wall guess.  If I were to ask you what the

16   winning numbers in next Saturday's Mega Millions

17   lottery were, you could give me an answer.  It would

18   be a guess.  It would do us no good; maybe, maybe

19   not.  But it would be an off-the-wall guess.  An

20   estimate is something that, while you cannot be

21   absolutely precise, and this often comes up with

22   dates, times, in certain cases distances, things like

23   that; you can't be absolutely precise to your answer,

24   but you can give a reasonable estimate and it will be

25   one that you would feel comfortable sitting in the

Page 14

1    federal courthouse in Newark and telling Judge Cox

2    Arleo and the jury in this case that it was the

3    truth, albeit an estimate.

4                Do you understand the difference between

5    those two?

6        A.    Yes.

7        Q.    Okay.  So if you're presented with a

8    question that you can't be absolutely precise and you

9    can't give an absolute precise answer, but you can

10   give a reasonable estimate within those parameters,

11   please give a reasonable estimate and let me know

12   you're estimating.  If it's anything less than that

13   in terms of your confidence in giving the answer,

14   it's just a guess and you can tell me that you would

15   be guessing and we'll leave it at that.

16               Do you understand that?

17       A.    Yes.

18       Q.    Did you have an opportunity to meet with

19   your counsel prior to the deposition today?

20       A.    Yes.

21       Q.    Do you need to speak with Mr. Fiorenzo

22   or Mr. Klein any further before we begin?

23       A.    No, we're ready to go.

24       Q.    Okay.  Other than your counsel, did you

25   discuss your deposition today with any other person?

Page 15

1          A.     No.

2          Q.     Did you review any documents in

3   preparation for your deposition today?

4          A.     Yes.

5          Q.     What documents did you review in

6   preparation for your deposition today?

7          A.     Just a summary of notes that I have that

8   my attorney gave to me.

9          Q.     Are those notes that you have taken on

10  this case?

11         A.     No.

12         Q.     Are those notes that were prepared by

13  your counsel?

14         A.     Yes.

15         Q.     And when did you review those notes?

16         A.     About ten minutes ago.

17                MR. SEAMAN:  Off the record.

18

19                (Whereupon, a brief discussion took

20  place off the record.)

21

22  BY MR. SEAMAN:

23         Q.     The plaintiff in this case is Emerson

24  Redevelopers Urban Renewal.  Correct?

25         A.     Yes.

Page 16

1        Q.     How are you affiliated with Emerson

2    Redevelopers Urban Renewal?

3        A.     I'm the managing member.

4        Q.     And is Emerson Redevelopers Urban

5    Renewal a single purpose entity meant to develop the

6    property in Emerson that's the subject of this

7    litigation?

8        A.     Yeah.

9        Q.     Okay.  And what -- you're also

10   affiliated with a company called Accurate Builders.

11   Is that correct?

12       A.     Yes.

13       Q.     And can you describe the business of

14   Accurate Builders?

15       A.     Accurate Builders is a

16   development/building company GC.

17       Q.     And how long has Accurate Builders been

18   active as a developer/building company GC?

19       A.     Over ten years.

20       Q.     At the present time, is all of the work

21   of Accurate Builders related to development,

22   building, and general contracting services for single

23   purpose entities similar to Emerson Redevelopers

24   Urban Renewal?

25                    MR. FIORENZO:  Object to the form of the

Page 17

```
 1    question.  You may answer it.

 2              THE WITNESS:  I don't understand it.

 3

 4    BY MR. SEAMAN:

 5         Q.    Let me ask it this way:  Accurate

 6    Builders maintains a website?

 7         A.    Yes.

 8         Q.    Okay.  And what's the name of that

 9    website, if you know?  You seem to be struggling with

10    it.

11         A.    Yeah.  Honestly, I don't know.

12              MR. FIORENZO:  The name of the website?

13              MR. SEAMAN:  The URL for the website.

14              THE WITNESS:  AccurateofNJ.com, maybe.

15    I don't know.  I don't really know the website.

16

17    BY MR. SEAMAN:

18         Q.    You don't know?  Okay.  When was the

19    last time you reviewed the website for Accurate

20    Builders?

21         A.    I don't know that I ever have.

22         Q.    Are you aware that the Accurate Builders

23    website contains a web page that talks about a

24    portfolio of properties?

25         A.    Yes.
```

Page 18

1          Q.    Okay.  And that portfolio of properties

2     relates to various types of construction that

3     Accurate Builders has engaged in over it's existence.

4     Is that fair to say?

5          A.    Yes.

6          Q.    And that portfolio of properties

7     includes some single family homes.  Correct?

8          A.    Yes.

9          Q.    It includes some commercial development

10    buildings?

11         A.    Yes.

12         Q.    Okay.  And it involves some multi-family

13    mixed use properties?

14         A.    Yes.

15         Q.    Are there any other types of properties

16    that Accurate Builders was involved in the

17    construction and development of -- or has been

18    involved in since this lawsuit began?

19         A.    We do warehousing and office space and

20    just residential apartment buildings.

21         Q.    And within those different categories of

22    properties, where does the Emerson project fall?

23    What category would you put that in?

24              MR. FIORENZO:  Object to the form.  You

25    may answer.

Page 19

1              THE WITNESS:  Mixed use.

2

3    BY MR. SEAMAN:

4        Q.     And the Emerson property, when it is

5    completed, it is contemplated to provide commercial

6    rental space?

7        A.     There's about 14,000 square feet of

8    retail space.

9        Q.     And also residential apartments?

10       A.     Yes.

11       Q.     How many residential apartments are

12   contemplated for the Emerson project?

13       A.     So there's two properties.  One is

14   147 units and one is 7 units.

15       Q.     And where are the 147 units located?

16       A.     On Kinderkamack Road in Emerson.

17       Q.     And where are the seven units to be

18   located?

19       A.     Also -- 129 Kinderkamack Road.

20       Q.     And a portion of those residential units

21   are designated as low to moderate income housing?

22       A.     Yes.

23       Q.     And how many of those units are low

24   income housing?

25       A.     There's 22 on-site affordable units and

Page 20

1    there's 7 off-site affordable units.

2        Q.    And of the affordable units, on-site or

3    off-site, is there a distinction between them being

4    low income housing or moderate income housing?

5        A.    I don't know what it is.

6        Q.    I want to understand your answer.  Are

7    you saying you don't know what low or moderate income

8    housing is?  Let me withdraw the question.  I need to

9    ask a better question.

10            Do you have an understanding of what is

11   considered low income housing in New Jersey?

12            MR. FIORENZO:  Under the COAH

13   regulations, you're referring to?

14            MR. SEAMAN:  Yes.

15            MR. FIORENZO:  Okay.

16            THE WITNESS:  Yes.

17

18   BY MR. SEAMAN:

19       Q.    What is your understanding of low income

20   housing under COAH?

21       A.    Depends what people are -- depends on

22   how much the income is for the county versus what

23   they're making and stuff like that.

24       Q.    And what is your understanding of what

25   moderate income housing is in Bergen County?

Page 21

1        A.      I don't know the numbers.

2        Q.      Are you aware of how many units in the

3   Emerson project are designated as low income versus

4   moderate income in Bergen County?

5        A.      No.

6        Q.      Are you aware if any of the units in the

7   Emerson project are designated as low income?

8        A.      I don't know this offhand.

9        Q.      From the website, I'll just indicate to

10  you I found it as www.accurate-re.com.  Does that

11  sound about right?

12       A.      Yes.

13       Q.      Google is great.  The portfolio for

14  mixed use properties on that website, you list a

15  number of different properties and I will ask you

16  about some of them.  Citizen at Linden, are you

17  familiar with that property?

18       A.      Yes.

19       Q.      Is it in construction or complete?

20       A.      It's 100 percent complete.

21       Q.      And is it leased?

22       A.      Yes.

23       Q.      How many units of residential housing

24  are in that development?

25       A.      234.

Page 22

1          Q.     And are any of those 234 units

2    designated as low or moderate income housing?

3          A.     No.

4          Q.     City Square in Newark is that -- are you

5    familiar with that project?

6          A.     Yes.

7          Q.     And is that project complete or under

8    construction?

9          A.     No, we're starting the construction.

10         Q.     Crossings By Citizen in Raritan, in

11   Raritan, New Jersey?

12         A.     Yes.

13         Q.     Are you familiar with that project?

14         A.     I am.

15         Q.     Okay.  Is it complete?

16         A.     It is.

17         Q.     And are units being offered for rental

18   in that project?

19         A.     As opposed to?

20         Q.     I'm sorry.  I'm just trying to reference

21   being complete and being rented?

22         A.     Oh, yes.  Yeah.

23         Q.     Okay.  How many units are in Crossings

24   By Citizen?

25         A.     276.

Page 23

1      Q.      Are any of those units low or moderate

2  income housing?

3      A.      There are 20 affordable units.  It's a

4  pretty nice website.  I should go on it every so

5  often.

6      Q.      Just for the record, you made a comment

7  to Mr. Fiorenzo.  I'm assuming he has your website

8  open and you looked.  I'm asking you for the

9  information that you know.  Obviously, if you would

10  prefer that website, I just want to know.  I'm not --

11             MR. FIORENZO:  Yeah, I haven't showed it

12  to him.

13             MR. SEAMAN:  No, I understand.  Joe, I

14  understand.  And it's not -- I'm just making sure

15  that the record is clear with what the witness knows.

16  That's all.

17             THE WITNESS:  I don't have an issue with

18  your question.

19             MR. SEAMAN:  No, I know.  I'm protecting

20  the record, from my standpoint.  I know there was

21  nothing that was improper there.

22             Off the record.

23

24             (Whereupon, a discussion takes place off

25  the record.)

Page 24

1

2    BY MR. SEAMAN:

3        Q.    Mr. Klugmann, of the -- are you aware of

4    whether the 20 affordable units in Crossings By

5    Citizen are leased at this time?

6        A.    I don't know the state of all of them.

7        Q.    Are you aware of the racial background

8    of any of the tenants in the affordable units at

9    Crossings By Citizen at Raritan?

10       A.    No.

11       Q.    Are you aware of the racial background

12   of any of the tenants at Citizen by Raritan?

13       A.    No, it's not important to me.

14       Q.    And Citizen Bayonne, is that project

15   completed?

16       A.    Parts of it.

17       Q.    Are parts of it being leased to tenants?

18       A.    Yes.

19       Q.    And how many units is that?

20       A.    It's a total of 651 units.

21       Q.    And how many, approximately, are

22   available to lease?

23       A.    I don't know.

24       Q.    Of the 651 total units, are there any

25   affordable housing units?

Page 25

1          A.     No.

2          Q.     Citizens in Little Falls, is that

3     project complete and leasing?

4          A.     It is 95 percent complete.  It is being

5     leased.

6          Q.     Have any of the tenants taken occupancy?

7          A.     No.

8          Q.     Are any of the units in Citizen Little

9     Falls affordable housing units?

10          A.     Yes.

11          Q.     And how many units total at Citizen

12     Little Falls?

13          A.     45.

14          Q.     And how many are affordable?

15          A.     Oh, it's 185 units and 45 of them are

16     affordable.  I thought that was your question.

17          Q.     Okay.  Thank you for clarifying.  Are

18     you aware of the racial background of any of the 45

19     -- the tenants of any of the 45 affordable units?

20               MR. FIORENZO:  Objection.  Form.  He's

21     already said it hasn't been rented yet, so how would

22     he know?

23

24     BY MR. SEAMAN:

25          Q.     Are you aware -- I want to clarify.  I

Page 26

1    may have misunderstood.

2              Are leases signed with any tenants or

3    has it not been rented at all?

4         A.    I'm really not involved in this on a

5    day-to-day basis, so I don't know.

6         Q.    You don't know.  Okay.  All right.  As

7    you sit here today, you don't know if anyone is

8    occupying a unit at Citizen Little Falls?

9         A.    No, I told you, no one is in there.

10        Q.    Okay.  I apologize, then I

11   misunderstood.

12        A.    No problem.

13        Q.    Citizen Bound Brook, is that completed

14   or under construction?

15        A.    Yes.  It's also 95 percent complete.

16        Q.    Are any of the units in Citizen Bound

17   Brook leased to tenants who are occupying units?

18        A.    Yes.

19        Q.    How many units total is Citizen Bound

20   Brook?

21        A.    105.

22        Q.    And does that include any affordable

23   housing units?

24        A.    Does not.

25        Q.    There's a project identified in your

Page 27

1   website simply as Basking Ridge?

2        A.     Yes.

3        Q.     Does that have a name that it goes by as

4   well?

5        A.     Nope, not yet.

6        Q.     Okay.  Is it completed or under

7   construction?

8        A.     No, it's under construction.

9        Q.     There's also a project identified as

10  Parsippany.  Is that complete or under construction?

11       A.     Under construction.

12       Q.     There's a project identified as Citizen

13  Clifton on your website.  Is that complete or under

14  construction?

15       A.     Under construction.

16       Q.     There's a project identified in your

17  website as Montclair.  Is that complete or under

18  construction?

19       A.     Under construction.

20       Q.     There's a project identified on your

21  website as New Brunswick.  Is that complete or under

22  construction?

23       A.     They're doing demo.

24       Q.     So it's obviously not even started

25  construction of the actual unit yet?

Page 28

1          A.      Correct.

2          Q.      Okay.  A project on your website

3   identified as Cedar Grove.  Is that complete or under

4   construction?

5          A.      It's under construction.

6          Q.      There's a project on your website

7   identified as Citizen Guttenberg.  Is that complete

8   or under construction?

9          A.      It just got approvals.

10         Q.      Okay.  There's a project on your website

11  referred to as Perth Amboy.  Is that complete or

12  under construction?

13         A.      Neither.

14         Q.      Okay.  What does that mean, just so I

15  can clarify?

16         A.      It means we're going through the

17  approval process.

18         Q.      Other than the projects that we've just

19  discussed, are there any other projects that Accurate

20  Builders has been involved in the construction of

21  that are completed and renting units to tenants in

22  the State of New Jersey?

23         A.      Sure.  My website has a lot of it.

24         Q.      Okay.  Maybe I can clarify it.  Are

25  there any others that are identified as multi-family

Page 29

1   units as opposed to a single family or townhome

2   units?

3           MR. FIORENZO:  Is the question whether

4   there are any other multi-family units that Accurate

5   has been involved in construction of, other than what

6   you've discussed with him?  Is that --

7           MR. SEAMAN:  Yes.

8           THE WITNESS:  That we've built?

9           MR. SEAMAN:  Yes?

10          THE WITNESS:  Yes.

11

12  BY MR. SEAMAN:

13      Q.    Are there any that you're still involved

14  in, in terms of the ownership and management of?

15      A.    I'm a little confused.

16      Q.    Okay.  What's confusing you about my

17  question?

18      A.    I don't understand what you're asking

19  me.  Are there things that are not on the website

20  that I'm involved in?  Are there things that I'm an

21  investor in?  Are there -- like, I don't understand

22  your question.

23      Q.    Okay.  Are there -- let me ask it this

24  way then:  Are there other projects that you have an

25  interest in involving mixed use -- no, let me ask a

Page 30

1    better question.

2              MR. FIORENZO:  Is this Accurate when you

3    say "you" now?  Object to the form.  Are you asking

4    about Accurate's involvement in these projects?

5              MR. SEAMAN:  Okay.  Fair enough, Joe.

6    Fair enough, Joe.  Yeah.  Yeah.  I'm using "you" in

7    the vocative sense, not the nominative sense in terms

8    of "you" as Accurate Builders.  And I apologize if

9    that was in any way confusing.

10

11   BY MR. SEAMAN:

12        Q.    So are there any other projects that

13   Accurate Builders has been involved in the

14   development of that include affordable housing rental

15   units, besides the ones we've talked about?

16        A.    I don't recall right now.

17        Q.    Have you ever reviewed the First Amended

18   Complaint that was filed by your attorneys in this

19   action?

20        A.    Have I ever reviewed -- I didn't hear

21   you.

22        Q.    Have you ever reviewed -- I apologize.

23   I'll re-ask it.

24              Have you ever reviewed the First Amended

25   Complaint that was filed by your attorneys in the

Page 31

1    lawsuit in this action in federal court in Newark?

2          A.    Yes, I have.

3          Q.    When was the last time you reviewed it?

4          A.    I don't remember.

5          Q.    Do you know if you reviewed it before or

6    after it was filed?

7          A.    I don't remember either.

8

9                (Whereupon, Exhibit FD-1 was marked for

10    identification.)

11

12    BY MR. SEAMAN:

13          Q.    Mr. Klugmann, I've given you a document

14    that I've marked as FD-1 for identification.  It's

15    the filed First Amended Complaint in the federal

16    court action.  Please take as much time as you need

17    to review it and let me know when you're ready to

18    answer some questions.

19          A.    Let's go through it.

20                MR. FIORENZO:  Take a minute just to

21    skim through it.

22                THE WITNESS:  You sure?

23                MR. FIORENZO:  Yeah.

24                THE WITNESS:  It's a lot of papers.

25                MR. FIORENZO:  It's all right.

Page 32

1          Okay, he's reviewed it.

2

3   BY MR. SEAMAN:

4       Q.     Mr. Klugmann, before I start asking you

5   about the complaint, obviously, Danielle DiPaola is

6   one of the defendants in this case.  When did you

7   first meet Mayor DiPaola?

8       A.     The end of 2018.

9       Q.     And what was the -- what were the

10  circumstances of you meeting her at the end of 2018?

11      A.     I was coming in to be the redeveloper.

12      Q.     So where did you meet Mayor DiPaola?

13      A.     Emerson town hall.

14      Q.     And given the time frame, she was not

15  yet mayor.  Is that correct?

16             MR. FIORENZO:  You mean when he first

17  met her, you're talking about?

18             MR. SEAMAN:  Yes.

19             THE WITNESS:  She was mayor-elect.

20

21  BY MR. SEAMAN:

22      Q.     When you say you were coming in to be

23  the redeveloper, I imagine that you're speaking about

24  the entity Emerson Redevelopers Urban Renewal LLC.

25  Is that fair to say?

Page 33

1        A.      Yes.

2        Q.      Okay.  And where did you -- was this a

3   public meeting or something of that nature that you

4   met Mayor DiPaola for the first time?

5        A.      Yeah.

6        Q.      Do you know what public body was

7   meeting?

8        A.      I don't remember which one it was.

9        Q.      Did you have any one-on-one interaction

10  with Mayor DiPaola at that time?

11       A.      Not that I recall.

12       Q.      You indicated that when you met Mayor

13  DiPaola she was mayor-elect, so the election had

14  already taken place.  Is that fair to say?

15       A.      Yes.

16       Q.      Did you follow the municipal election in

17  Emerson in any way?

18       A.      Not even a little bit.

19       Q.      Did you receive any flyers?

20       A.      No.

21       Q.      Didn't see any campaign information

22  anywhere?

23       A.      That I have no idea if I saw.

24       Q.      You don't have any recollection of

25  seeing any campaign information.  Is that fair to

Page 34

1    say?

2        A.    That's fair to say.

3        Q.    Did you speak to any of the citizens of

4    Emerson about that election and what they were --

5    what the issues were?

6        A.    No.

7        Q.    Do you recall if there were any votes

8    taken after the public meeting when you first met

9    Mayor DiPaola?

10       A.    I don't recall.

11       Q.    Do you recall Mayor DiPaola making any

12   statements from the dais during that meeting?

13       A.    I don't remember.  I don't recall.

14       Q.    Have you, at any time, received any

15   e-mail communications from Mayor DiPaola?

16       A.    I don't recall.

17       Q.    Have you received any text

18   communications from Mayor DiPaola?

19       A.    I want to say yes, but it's been so long

20   that I don't remember.  So I don't remember.

21       Q.    Any of those text communications from

22   Mayor DiPaola, did she ever convey anything that you

23   took to be inappropriate comments of a -- about

24   anyone's racial background?

25                MR. FIORENZO:  Objection.  Form.  Lack

Page 35

1   of foundation.  He said "I'd like to think I did",

2   but he did not say he did receive a text message.

3   There's no foundation that there was such a text

4   message.  You can answer it subject to that

5   objection, if you're able to.

6               THE WITNESS:  Can you repeat the

7   question, again?

8               MR. SEAMAN:  Can you read the question

9   back?

10

11              (Whereupon, the requested portion of the

12   record was read by the reporter.)

13

14              THE WITNESS:  I don't remember the text

15   message from DiPaola, so I can't answer the question.

16   I don't remember if I got a text message, if I texted

17   her, so I can't answer the question if I have text

18   messages from her that she said something about

19   racial background.

20

21   BY MR. SEAMAN:

22       Q.    Have you ever heard Mayor DiPaola make a

23   comment that you interpreted as inappropriate in

24   terms of someone's racial background?

25       A.    Can I talk to counsel?

Page 36

1          MR. FIORENZO:  No, no, hold on.  Object

2     to the form.  Are you asking about verbal statements

3     now?

4          MR. SEAMAN:  Yes.

5          MR. FIORENZO:  Okay.  Go ahead.  You can

6     answer, if you're able to answer it.

7          THE WITNESS:  Can I talk to you?  Can we

8     go off the record for a minute?  May I talk with --

9          MR. SEAMAN:  No, I have a question

10    pending.  I asked you a question.

11         MR. FIORENZO:  We're not going to do it

12    unless you guys say it's in consent.

13         MR. SEAMAN:  Yeah.

14         MR. FIORENZO:  He's asked if he wants to

15    confer with me.

16         MR. SEAMAN:  Would it have anything to

17    do with -- you're allowed to confer with Mr. Fiorenzo

18    if it relates to some sort of privilege or things of

19    that nature.

20         THE WITNESS:  That's what it is.  It is

21    conversations that we've had and I need to clarify

22    it.

23         MR. SEAMAN:  I'll ask you a few

24    questions before I consent to you conferring.  Hold

25    on.

Page 37

1              THE WITNESS:  Okay.

2

3    BY MR. SEAMAN:

4         Q.    Let me get some foundation here first.

5    How many times have you had face-to-face verbal

6    communications with Mayor DiPaola since meeting her?

7         A.    I don't know.

8         Q.    Can you estimate?

9         A.    No.

10         Q.    I'm trying to understand what about my

11    question implicates any sort of privilege.  Let me

12    make it very clear to you.  I'm not asking you to

13    convey to me anything that was told to you by

14    Mr. Fiorenzo or any other attorney with his firm or

15    any information that he gave you.  I'm asking for

16    your personal observations of Mayor DiPaola's

17    conduct, so I don't understand how that would impact

18    a privilege.  So I don't understand why you would

19    need to confer with your attorney?

20              MR. FIORENZO:  Well, why don't you ask

21    the question again so we can better understand and

22    then we'll value whether it has any such implication.

23

24    BY MR. SEAMAN:

25         Q.    In any of your direct interaction with

Page 38

1    Mayor DiPaola, either in person or perhaps over a

2    telephone or anything of that nature, can you point

3    to any statements that she has made that you took to

4    be racially inappropriate?

5                    MR. FIORENZO:  I'm going to object to

6    the form of the question in that the use of the term

7    "racially inappropriate" is vague and ambiguous.  I

8    don't know what you mean by that.  If you're able to

9    answer it subject to the objection, you may.

10                    THE WITNESS:  I can't answer it because

11    of needing to talk to you.

12                    MR. FIORENZO:  The witness has indicated

13    he needed --

14                    THE WITNESS:  I'd be happy to talk to

15    him and come back with a decision on that.

16                    MR. SEAMAN:  Well, I'm going to ask you

17    a couple more questions.

18                    THE WITNESS:  I'll try to be helpful.

19                    MR. SEAMAN:  I'll ask you -- I'm going

20    to ask you a few more questions.

21

22    BY MR. SEAMAN:

23          Q.    During any of your interactions with

24    Mayor DiPaola, either face-to-face or over telephone

25    or anything of that nature, had she made any comments

Page 39

```
 1   to you that refer or relate to a person's racial

 2   background?

 3        A.    Yes.

 4        Q.    How many times did she make comments to

 5   you that refer or relate to a person's racial

 6   background?

 7        A.    I don't remember.

 8        Q.    And what do you recall her saying to you

 9   that related to a person's racial background?

10        A.    That comes back to me needing to talk to

11   Mr. Fiorenzo as well.

12        Q.    Is that because it is something that is

13   from a communication between you and Mr. Fiorenzo?

14        A.    Yes.

15        Q.    Well, I'm not asking for any

16   communications between you and Mr. Fiorenzo, I want

17   to make that clear.

18              So outside -- let me ask you this:  Was

19   anyone else present with you when Mayor DiPaola made

20   comments about someone's racial background?

21        A.    I'm sure, because I've never been there

22   alone.  I just don't remember who.

23        Q.    Okay.  Were any of your attorneys

24   present?

25        A.    That I don't -- I don't know.  I don't
```

Page 40

1    recall.

2          Q.      What person or group of people was Mayor

3    DiPaola referring to in her comments about any racial

4    background?

5          A.      Orthodox Jews.

6          Q.      And what do you recall Mayor DiPaola

7    saying about Orthodox Jews?

8          A.      A couple things; first one being that

9    we're -- that there's going to be a kosher breast

10   milk storage facility here.

11         Q.      I'm going to give you an instruction

12   that I neglected to give you when I began.  The court

13   reporter here may interrupt you from time-to-time and

14   ask you to repeat what you said.  She is literally

15   asking you to try and rewind and repeat what you

16   said.  She's not asking you to expand.  She's not

17   interested in asking you a better question than I

18   asked you, which she most likely could do.  But she

19   is interested in getting what you said clearly on the

20   record, which helps us all.  So if she does that,

21   just please try and repeat what you said the last

22   time.

23         A.      Understood.

24                 MR. FIORENZO:  Which I believe he just

25   did, at least on the one comment.

Page 41

1              MR. SEAMAN:  Yes.

2

3    BY MR. SEAMAN:

4         Q.    So I understand there was some comment

5    about a kosher breast milk facility in the Emerson

6    project.  Is that correct?

7         A.    Yeah.  Yes.

8         Q.    And can you -- when did this comment

9    take place?

10        A.    I don't remember.

11        Q.    Was it before or after the federal

12   lawsuit was filed?

13        A.    Definitely before.

14        Q.    Was it before or after Mayor DiPaola was

15   installed as the mayor of Emerson?

16        A.    After.

17        Q.    Where did that -- where was she when

18   that comment was made?

19        A.    The Borough Hall.

20        Q.    And do you recall anyone else being

21   present when that comment was made?

22        A.    I don't remember.

23        Q.    And do you recall precisely what Mayor

24   DiPaola said at that time?

25              MR. FIORENZO:  You mean other than what

Page 42

1    he's already testified to?

2                    MR. SEAMAN:  Yes.

3                    THE WITNESS:  No.

4

5    BY MR. SEAMAN:

6        Q.     Okay.  Was that comment made to you or

7    to someone else that was present at the time?

8        A.     Just to me.

9        Q.     Okay.  And was it a question to you

10   about whether the project would have a kosher breast

11   milk facility?

12       A.     They wanted to know who -- she wanted to

13   know who the tenants are going to be here in the

14   redevelopment.

15       Q.     So this comment related to the tenants

16   who would be occupying the retail commercial spaces

17   in the project.  Is that correct?

18       A.     Yes.

19       Q.     This comment did not have to do with the

20   tenants in any of the residential units?

21       A.     This particular comment, no.

22       Q.     Were you offended by her comment?

23       A.     Of course.

24       Q.     Did you express to Mayor DiPaola that

25   you were offended by her comment?

Page 43

1        A.     I don't remember what I did.

2        Q.     Okay.  Aside from that instance, are

3    there any other times that Mayor DiPaola made any

4    comments, in your presence, about any other person's

5    racial or ethnic background?

6        A.     In my presence?  I don't recall.

7        Q.     Did Mayor DiPaola ever make any

8    comments, in your presence, that related to the

9    racial or ethnic background of potential tenants in

10   the affordable housing units of the Emerson

11   development?

12       A.     I don't -- I don't remember.

13       Q.     Have you ever seen any written

14   communications of any sort, be it letters, texts,

15   e-mails, written statements attributed to the mayor

16   in the media, anything of that nature, that related

17   to the racial or ethnic background of the potential

18   tenants in the affordable units of the Emerson

19   development?

20              MR. FIORENZO:  I want an objection to

21   the form.  When you use the term "racial or ethnic

22   background", that is vague and ambiguous.  So I'll

23   note that objection.  You can answer if you're able,

24   subject to that objection.

25              THE WITNESS:  If you can -- if she can

Page 44

1    -- can you repeat the question?  Thank you.

2

3              (Whereupon, the requested portion of the

4    record was read by the reporter.)

5

6              THE WITNESS:  Yes.

7

8    BY MR. SEAMAN:

9         Q.    I just want to do this real quick.  What

10   have you seen?

11        A.    I've seen how her comments of "we don't

12   want the" -- I'm being clear I don't remember the

13   word she used.  I don't remember if it was Hasidics

14   or the Orthodox, which one it was, "to come in and

15   take over our town."

16        Q.    And, again, was this a verbal statement

17   from her or a written communication of some form?  Is

18   that what you're referring to?

19        A.    Yeah, I don't have any text messaging.

20   It was a verbal statement.

21        Q.    And do you recall where you saw that?

22        A.    No.

23        Q.    And whether it was Orthodox or Hasidic,

24   it related to people with a Jewish background taking

25   over the town, in terms -- that's a terrible

Page 45

1    question.  I'm going to ask a different one.

2              Did -- to your understanding, did that

3    comment have anything to do with the potential

4    tenants in affordable housing units in the Emerson

5    development?

6         A.    The answer is yes.  It's not just

7    affordable.  It's the entire project because she

8    knows that I'm an Orthodox Jew and that's what she's

9    trying to use as her propaganda.

10             MR. SEAMAN:  You want to take a break

11   now?

12             MR. FIORENZO:  Yeah, he's got to make

13   that call.  It's 11 o'clock.

14

15             (Whereupon, a brief recess was taken off

16   the record.)

17

18   BY MR. SEAMAN:

19        Q.    Mr. Klugmann, how is Mayor Dipaola using

20   your background as an Orthodox Jew as propaganda?

21        A.    So she ran on antidevelopment,

22   antidevelopment being specific to this site.

23        Q.    How do you know that she ran on

24   antidevelopment?

25        A.    A smart man told me the words "Google".

Page 46

1      Q.    So you Googled information on Mayor

2  Dipaola and looked at the results of the Google

3  search?

4      A.    Yeah.

5      Q.    What specific search terms did you put

6  into Google?

7      A.    I don't know.

8      Q.    When did you perform this Google search?

9      A.    2018, 2019.

10     Q.    Did you -- I'll ask that a little

11  different.

12           How many search results did you look at

13  from that Google search?

14     A.    I don't recall.

15     Q.    Did you keep copies of any of the web

16  pages that you were directed to as a result of that

17  Google search?

18     A.    Yes.

19     Q.    Which -- what pages did you keep copies

20  of as a result of that Google search?

21     A.    I don't remember right now while I'm

22  sitting here.

23     Q.    Do you still have those copies?

24     A.    That's a good question.  I don't know.

25  But I believe some of it is in my either affidavit or

Page 47

1  lawsuit.

2                  MR. FIORENZO:  Yeah, we produced --

3                  THE WITNESS:  I believe a lot of it is

4  in here.

5                  MR. SEAMAN:  Okay.  Well, my request is

6  going to be Joe, to the extent that any of those have

7  not been produced, I would like you to produce them.

8

9                  MR. FIORENZO:  Sure, if they haven't

10  been, but I believe they have.

11                  MR. SEAMAN:  Fair enough.

12                  MR. FIORENZO:  By the way, before we go

13  back, let's -- just to briefly address, you guys had

14  asked whether there was any authority for the

15  proposition that more than one attorney couldn't

16  examine on behalf of the same client.  So Steve, you

17  want to just give them.

18                  MR. KLEIN:  So generally, in courts in

19  the third circuit, there's a rule that, according

20  from this case which is a 1999 decision of the

21  Eastern District of Pennsylvania In Re Diet Drugs

22  Product Liability litigation; it's a February 10th,

23  1999 decision.  At Page 15, it talks about how:

24  "Generally, unless there is notice and prior

25  agreement, no more than one attorney for each

Page 48

1    defendant separately represented shall have the right

2    to pose questions to the witness and make objections

3    in connection with each such noticed deposition."

4              MR. BOTTA:  So you would agree that

5    there's no court rule about it.  Right?

6              MR. KLEIN:  The Federal Rules of Civil

7    Procedure do not expressly state that multiple

8    attorneys can or cannot take questions of a witness.

9    However, the practice in this jurisdiction, as

10   reflected in this court case, is that when there's

11   one deponent and multiple parties or multiple

12   attorneys are representing a single witness or a

13   single party in that litigation, they can't both

14   question the witness, as reflected in this case.

15             MR. FIORENZO:  That's our position.

16             MR. BOTTA:  That's your position.

17             MR. SEAMAN:  Well, first of all -- first

18   of all, do you have the full citation to that?

19             MR. KLEIN:  Sure.  1999 U.S. Dist LEXIS

20   1797.

21             MR. SEAMAN:  Okay.  And that's out of

22   the Eastern District of Pennsylvania?

23             MR. KLEIN:  Correct.

24             MR. SEAMAN:  Okay.  So you don't have

25   any cases from the District of New Jersey?

Page 49

```
 1              MR. KLEIN:  Those are the only ones that
 2    have addressed it.  And those courts that have
 3    addressed it had said if you have multiple attorneys
 4    representing a single party, one gets to question the
 5    witness.
 6              MR. SEAMAN:  Okay.  I'm just clarifying.
 7    You haven't cited a case yet from the District of New
 8    Jersey.
 9              MR. FIORENZO:  No, nor do we have to.
10    You can do your own research on it.  You asked for
11    some authority.  In the short period of time we've
12    been here, we've taken a quick look and given you
13    some.  There may be more.
14              MR. SEAMAN:  Okay.  Well -- okay.  I'm
15    just -- you found an unreported case from the Eastern
16    District of Pennsylvania.  Thank you.
17              MR. FIORENZO:  Yeah.  Yeah.  Yeah.
18              MR. SEAMAN:  Okay.  We'll take your
19    position under advisement.
20              MR. FIORENZO:  Okay.  And I want to
21    raise it early so you guys can plan accordingly.
22              MR. SEAMAN:  Okay.  Can you read the
23    last question and answer now?  I'm sorry.
24
25              (Whereupon, the requested portion of the
```

Page 50

1    record was read by the reporter.)

2

3    BY MR. SEAMAN:

4        Q.      In any of those Google search results,

5    did you find any specific comments by Mayor Dipaola

6    about Orthodox Jews or Hasidic Jews?

7        A.      I don't remember.

8        Q.      Do you have the FD-1 in front of you?

9        A.      Yeah.

10       Q.      Okay.  Looking at the Page 4,

11   Paragraph 10 of FD-1, that paragraph says:  "After

12   all these carefully -- agreements approved by the

13   Court and Special Master were swept away with the

14   November 28th Emerson elections that brought into

15   power defendant DiPaola and her slate of candidates,

16   who ran on a platform of stopping the project as

17   approved by the Court, Special Master plaintiff and

18   Emerson through the previous administration."

19               Did I read that correctly?

20       A.      Yeah.

21       Q.      What facts are you aware of that Mayor

22   Dipaola and her slate of candidates ran a platform of

23   stopping the project as approved by the Court?

24       A.      I think I answered that.  It's in --

25   it's in all of our documents and the affidavit, I

Page 51

1    think; in this lawsuit, it's in here.

2                MR. FIORENZO:  I'm sorry.  When you

3    refer to "an affidavit", what are you -- just so the

4    record's clear, what are you referring to?

5                MR. SEAMAN:  Yeah, I was going to get to

6    it.

7

8    BY MR. SEAMAN:

9        Q.    You mentioned an affidavit a couple of

10   times.  You haven't -- let's just --

11               MR. FIORENZO:  Do you mean your

12   certification?

13               THE WITNESS:  Yes, that's what I meant,

14   sorry.  Thank you.  I'm not so good at this.

15               MR. SEAMAN:  Okay.  I'm not -- Joe, you

16   can correct me if I'm wrong, but there are no

17   affidavits or certifications or declarations filed by

18   your client in this case in the federal action.

19               MR. FIORENZO:  No.  I could stand

20   corrected on that by Steve, but there are a number of

21   them in the state proceedings.  I think what he says

22   refers to his certification by reference; he's

23   referring to those, which, I think, detail in some

24   measure the extent of the communications on this

25   topic.

Page 52

```
 1              MR. KLEIN:  Just to be clear, it's in
 2    the underlying Mount Laurel action.  The 6300-15
 3    action.
 4              MR. FIORENZO:  Right.  Right.  Yeah, I
 5    should be clear.  There are two state court
 6    proceedings, as you know, the Mount Laurel action and
 7    then there's a separate action that's brought by
 8    Emerson against Accurate.  So in the Mount Laurel
 9    action, there are a number of certifications.  I
10    think that's what Mr. Klugmann was referring to.
11
12    BY MR. SEAMAN:
13         Q.    Mr. Klugmann, you've heard your counsel
14    kind of describe the different landscape of
15    litigation here and where you may or may not have
16    provided sworn statements to the court.  Is that your
17    understanding of what you were referring to as well
18    is certifications or affidavits that may have been
19    provided in the context of some of the state court
20    litigation related to this project?
21         A.    What do you mean?
22         Q.    I'm just trying to understand what you
23    were referring to --
24              MR. FIORENZO:  He's asking when you
25    talked about the affidavit, were you referring to the
```

Page 53

1    certifications that you signed in the state court

2    action?

3                   THE WITNESS:  Yes.  Yes.  Yes.

4                   MR. FIORENZO:  Okay.

5

6    BY MR. SEAMAN:

7         Q.     Well, as you sit here today, can you

8    describe for me what your understanding of Mayor

9    Dipaola and her slate of candidates' platform was to

10   stop the project as approved?

11        A.     She ran on antidevelopment; that's how

12   she won.  She brought in or she had other people run

13   to come and be on the counsel with her.  And her

14   antidevelopment, which is everywhere, and everything

15   she has to say about it was something that she's not

16   shy about.  She doesn't like this project.  She

17   didn't want this project and she wishes it was never

18   here, even until today.

19        Q.     All right.  I direct you to Paragraph 12

20   of the First Amended Complaint.  That paragraph

21   reads:  "The ultimate goal of this course of action

22   is to prevent racially diverse minorities from moving

23   into Emerson, which defendants connect to Mount

24   Laurel low income housing."

25                   Do you see that?

Page 54

1        A.      Yes.

2        Q.      Did I read that correctly?

3        A.      Yes, you did.

4        Q.      Okay.  So what facts are you aware of

5    that demonstrate that it was the ultimate goal of

6    Mayor Dipaola to prevent racially diverse minorities

7    from moving into Emerson?

8        A.      Yeah.  There's 29 affordable units here

9    on this project.  She wants to shut this project

10   down, which includes 29 affordable units.  We have

11   been able to move forward on 145 units, which has 22

12   affordable units -- move forward with the

13   construction of the 145 units in spite of her, due to

14   the good work of my attorneys and the court, who have

15   since put in place a court order monitor, Judge

16   Carroll, who, without him, we'd be nowhere; who The

17   Borough of Emerson is paying for, 100 percent of.  So

18   what she did is she tried to make the situation where

19   that will never happen.  Those affordable units will

20   never come into town, which is minorities and people

21   of lesser income.  And that's what she tried to stop.

22   That's what she's trying to stop still.

23       Q.      How do you know that minorities are

24   the -- well, before, I guess, you used the term

25   "minorities"; what does that mean to you?

Page 55

1          A.     She doesn't want the Jews there.

2          Q.     So when you used the phrase "minorities"

3     before, that was Jewish people?

4          A.     Part of it.

5          Q.     Any other groups fit within the

6     definition of minorities as you're using it?

7          A.     Anybody that's going to fit under the --

8     whoever is able to get affordable units.

9          Q.     Have you made any determination -- let

10    me ask it this way.

11               Are you aware of the racial background

12    of individuals who qualify for affordable units in

13    Bergen County?

14               MR. FIORENZO:  Generally, you're

15    referring to?

16               MR. SEAMAN:  Yes.

17               THE WITNESS:  No.

18

19    BY MR. SEAMAN:

20         Q.     Are you aware of the racial background

21    of any of the individuals who will potentially

22    qualify for affordable units in the Emerson project?

23               MR. FIORENZO:  You mean the project

24    that's not yet complete?

25               MR. SEAMAN:  Yes.

Page 56

1           THE WITNESS:  No.

2

3    BY MR. SEAMAN:

4       Q.    What facts are you aware of that

5    specifically connect Mayor DiPaola's proposition to

6    redevelopment?

7              MR. FIORENZO:  I'm going to object to

8    the form and that calls for a legal conclusion.  You

9    used the word "connect".  You're asking for him to

10   give opinions on causation.  I think that's improper.

11             MR. SEAMAN:  I'm not asking him for his

12   opinions on the causation.

13             MR. FIORENZO:  It sounded that way to

14   me.  I objected to form.  I didn't instruct him not

15   to answer.

16             MR. SEAMAN:  I didn't even finish my

17   question, Joe.

18             MR. FIORENZO:  Oh, I thought you did.

19             MR. SEAMAN:  No, I hadn't, so.

20             MR. FIORENZO:  Okay.  When you paused, I

21   thought you were done.

22             MR. SEAMAN:  I was not done.

23             MR. FIORENZO:  Okay.  Then why don't you

24   complete it and then I'll make my objection.

25

Page 57

 1    BY MR. SEAMAN:

 2        Q.    What facts are you aware of that support

 3    the statement that the ultimate goal of Mayor

 4    DiPaola's course of action is to prevent racially

 5    diverse minorities from moving into Emerson?

 6        A.    Her antidevelopment propaganda.

 7        Q.    And that antidevelopment propaganda, are

 8    there any instances you're aware of where any of that

 9    propaganda references racial diversity?

10            MR. FIORENZO:  Objection to the form.

11    You may answer.

12            THE WITNESS:  Well, it comes back to the

13    fact that I know that she doesn't want Orthodox Jews

14    coming into her town, so when you put that together.

15

16    BY MR. SEAMAN:

17        Q.    And please start at the beginning and go

18    to the end, and tell me everything that you're aware

19    of that Mayor Dipaola has done that shows that she

20    doesn't want Orthodox Jews coming into The Borough of

21    Emerson?

22        A.    The first thing is she fought the

23    development, which includes fighting off the Mount

24    Laurel lawsuit, which is in place, which is part of

25    the settlement which allows for different, diverse

Page 58

1    type of people to come in here.  That's the first

2    thing.

3              The second thing is, is the comments

4    that have been made, which I've expressed before, of

5    how she does not want this to become a town filled

6    with Orthodox Jews to come take over her town.

7         Q.    You've told me about the one comment

8    about a kosher breastfeeding facility.  What other

9    comments are you aware of that Mayor Dipaola has made

10   that she doesn't want Orthodox Jews taking over the

11   town?

12        A.    When she ran the second term, she went

13   around to people's houses telling them this.

14        Q.    How are you aware that Mayor Dipaola

15   went around campaigning for a second term and telling

16   people this?

17        A.    Some of it, I can't say.  And some of it

18   I can tell you that I got phone calls from local

19   people.

20        Q.    Why can't you say?  Is there some sort

21   of privilege attached to it?

22        A.    Yes.

23        Q.    Is that some -- are you -- would that

24   delve into communications with your lawyer?

25              MR. FIORENZO:  There are certain

Page 59

1    questions that we've had with him where we shared

2    information.  I think that's what he's referring to.

3                    THE WITNESS:  Yes.

4

5    BY MR. SEAMAN:

6        Q.    Okay.  All right.  Aside from anything

7    that you would have learned from your lawyer, can you

8    please identify for me the basis for your

9    understanding that Mayor Dipaola campaigned for a

10   second term -- let me finish the question --

11   campaigned for a second term with intentions to keep

12   Orthodox Jews from taking over the town?

13       A.    Yeah.  Yeah.  But if I can, I'd like to

14   back it up a second.  And that is that when she

15   became mayor, to me, I've done this in many

16   municipalities.  It was a normal course of action for

17   me to have communication with the attorney -- with

18   the town, borough, city mayor, which is why I told

19   you before it could be there's text messages.  I just

20   don't remember.

21                   We sat down a few months after she

22   became mayor to have a meeting.  She made it very

23   clear after she stopped picking up my phone calls or

24   text messages that nothing should be -- nothing

25   should come through -- I shouldn't call her anymore.

Page 60

```
1    Everything has to go through attorneys.  There's no
2    lawsuits.  There's no nothing.  Then she started
3    firing everybody that worked in The Borough.  And so
4    it took -- it didn't happen overnight, but one of
5    them was that they got rid of the existing borough
6    administrator or he left because he didn't like her.
7    I have no idea what it was, but either way, she then
8    brought in a new borough administrator who is a
9    notorious antisemitic.  He was the borough
10   administrator in, I believe, it's Ramapo.  His name
11   is Rob Hermansen.  He got fired from there because
12   Ramapo had a massive lawsuit about an eruv.  An eruv
13   is the string that allows --
14        Q.    I'm aware of what an eruv is.
15        A.    Yes.
16              MR. FIORENZO:  Well, you can finish your
17   answer.
18              THE WITNESS:  An eruv is basically
19   creating an area that allows us Orthodox Jews to
20   carry inside as opposed to walking on the streets on
21   the Sabbath and carrying stuff.  I'm sure you can
22   Google it and see the history of everything that he
23   has done over there.  So that was all part of the --
24   together with the history that she had of
25   antidevelopment and bringing in such type of people,
```

Page 61

1   together with the attorney that she brought in, John

2   McCann, who -- I'll put it as not a good person with

3   all of the stories and stuff online that get posted

4   by The Borough or by her on her Facebook page, and

5   then the comments that would be posted to her

6   Facebook page, to her post that she would put in

7   there about the development all led to the fact of

8   not only do we know that she doesn't want this

9   development, she doesn't want me, Jack Klugmann, in

10  her town.  And me, Jack Klugmann, being an Orthodox

11  Jew; and that's how she promoted her propaganda.  And

12  it continued.  It continued until she had to go redo

13  her -- to go where she ran for re-election.  I don't

14  know if I answered your question or not.

15          Q.    Well, I don't know -- do you feel you've

16  answered my question completely?

17          A.    I hope so.

18          Q.    Okay.

19                MR. SEAMAN:  I'm going to ask the

20  reporter just to read the question back and then I'm

21  going to ask you again to make sure that you've

22  answered the question completely.  Because I want

23  your complete answer.

24                THE WITNESS:  Yeah.

25

Page 62

1              (Whereupon, the requested portion of the

2     record was read by the reporter.)

3

4              THE WITNESS:  Yes, I answered it.

5

6     BY MR. SEAMAN:

7          Q.    Who is the previous borough

8     administrator?

9          A.    I forgot his name.

10         Q.    Do you know when he was fired?

11         A.    No.

12         Q.    Do you know when Mr. Hermansen was hired

13    as borough administrator?

14         A.    Estimate 2019.

15         Q.    Are there any other borough employees,

16    besides the previous borough administrator, that

17    you're aware of -- and you said she fired borough

18    employees.  You mentioned the borough administrator.

19    Any other borough employees that you indicate were

20    fired by Mayor Dipaola because of her opposition to

21    your project?

22         A.    The attorney, their redevelopment

23    attorney, and their engineer, and I think their

24    planner.

25         Q.    And when you say these individuals were

Page 63

1     fired, do you know if they were actually --

2     withdrawn.

3               Have you been involved in interactions

4     with municipal governments when they've had a change

5     in control based on a political party?

6          A.    That's vague.  I don't know -- I don't

7     know what you mean by that.

8          Q.    Okay.  Have you ever been working with

9     any of the towns in terms of redevelopments or

10    project that you are engaged in where the political

11    party in control of the local government changed?

12         A.    Yes.

13         Q.    And in the instances where those

14    political parties changed, did you ever observe a

15    change in terms of the professionals who served the

16    municipality?

17         A.    No.

18         Q.    Can you identify, other than Emerson,

19    municipalities where you've been present and you've

20    observed a change in the control of a governing body?

21         A.    Raritan.

22         Q.    When did there -- when was there a

23    change in control of Raritan?

24         A.    Shortly after we started construction.

25         Q.    And what was the makeup of the governing

Page 64

1    body before that shift?

2          A.    Which party were they part of?

3          Q.    Yes.

4          A.    I don't know.

5          Q.    Which party took control?

6          A.    I don't know.

7          Q.    And when one party took control of the

8    other, they retained the same borough attorney?

9          A.    They did, yes.

10         Q.    They retained the same municipal

11   engineer?

12         A.    Yes.

13         Q.    And they retained the same planner?

14         A.    They did.

15         Q.    Any other instances where you've

16   observed towns with a change in control?

17         A.    Yeah, in Parsippany.

18         Q.    And when did the change in control in

19   Parsippany take place?

20         A.    Before I started construction.

21         Q.    And what was the shift between the

22   parties?

23         A.    I don't know.

24         Q.    And you observed them retain the same

25   attorney with that new control of the government?

Page 65

1       A.      I don't know.

2       Q.      Do you know if they retained the same

3   engineer?

4       A.      I don't.

5       Q.      Do you know if they retained the same

6   planner?

7       A.      I don't.

8       Q.      Did Raritan have a redevelopment

9   attorney at the time that there was a shift in

10  government?

11      A.      I don't remember.  I don't remember.

12      Q.      Did Parsippany have a redevelopment

13  attorney?

14      A.      Yes.

15      Q.      Did they retain the same redevelopment

16  attorney?

17      A.      I don't remember because I got my

18  building permit.

19      Q.      You'd indicated previously that outside

20  of what you may have learned from your attorney, you

21  have heard that Mayor Dipaola made negative comments

22  about Orthodox or Hasidic Jewish people as part of

23  her re-election campaign.  Do you recall that?

24      A.      Yes.  Yes.

25      Q.      Who are the people who have told you

Page 66

1    that?

2         A.    I don't remember, but I could probably

3    find out.

4              MR. SEAMAN:  Well, I would ask you to

5    find out and we'll follow this up with a letter to

6    counsel, but I'm going to ask you to identify any

7    individuals who have provided that information to

8    you.

9              THE WITNESS:  Perfect.

10             MR. FIORENZO:  Send that and we'll

11   respond.

12             THE WITNESS:  Yes.

13

14   BY MR. SEAMAN:

15        Q.    And do you recall -- let me ask a little

16   bit about these people, if you know.  Are they

17   residents of Emerson?

18        A.    Yeah.

19        Q.    And do you generally recollect what they

20   told you they heard from Mayor Dipaola?

21        A.    The gist of it was how she doesn't want

22   it to turn into -- he's from Lakewood, he's an

23   Orthodox Jew, and she doesn't want it to turn into

24   Lakewood.

25             MR. FIORENZO:  Yeah, did you get that;

Page 67

1   he's from Lakewood, he's an Orthodox Jew, and we

2   don't want it to turn into Lakewood.

3               MR. BOTTA:  Make sure we get what he

4   said.

5               MR. SEAMAN:  We're going to get the

6   record.  That's all it is.

7

8               (Whereupon, the requested portion of the

9   record was read by the reporter.)

10

11              THE WITNESS:  No, let me add in the one

12  more thing.

13              MR. FIORENZO:  No, he also said he's an

14  Orthodox Jew.

15              THE WITNESS:  He's from Lakewood.  He's

16  an Orthodox Jew and we don't want it to turn into

17  that.

18

19  BY MR. SEAMAN:

20       Q.    Was it one person or more than one

21  person?

22       A.    More than one person.

23       Q.    Can you estimate the number of people

24  who told you words to that effect?

25       A.    I could.  I think it was three people,

Page 68

1    but I don't remember, because I don't remember which

2    ones told it to me offhand.

3         Q.    Did anyone, at any time, convey to you

4    statements by Mayor Dipaola about her opposition to

5    your project that referred or related to any minority

6    group other than Orthodox or Hasidic Jewish people?

7         A.    Well, I would include her negative

8    statements towards affordable housing.  I would

9    include that as a negative comment towards minorities

10   or -- yeah, so the answer is yes.

11        Q.    Okay.  So you equate any comments that

12   she made about affordable housing to minorities?

13        A.    Yes.

14        Q.    And why do you do that?

15        A.    Because that's what it is.

16        Q.    How do you -- what does the basis for

17   you saying that's what it is?

18        A.    It's people who are -- aren't making --

19   can you ask that question again?  Now I'm confused.

20             MR. SEAMAN:  Can you read the question

21   back please?

22

23             (Whereupon, the requested portion of the

24   record was read by the reporter.)

25

Page 69

1            THE WITNESS:  Oh, the one before that.

2

3            (Whereupon, the requested portion of the

4    record was read by the reporter.)

5

6            THE WITNESS:  Affordable housing is to

7    give housing to the people that can't afford the

8    regular -- the regular stuff, which is typically

9    people who make less money, people who just came into

10   the country and they just got work VISAs, and it's

11   all different types of people that come into the --

12   that can't get regular housing or can't afford

13   regular housing and that's what -- this is an

14   opportunity for them to have an affordable unit.

15        Q.    Have you seen any studies or empirical

16   data that indicate the percentage of minority groups

17   that occupy affordable housing in the State of New

18   Jersey?

19            MR. FIORENZO:  On a statewide basis?

20            MR. SEAMAN:  On a statewide basis for

21   now.

22            THE WITNESS:  No.

23

24   BY MR. SEAMAN:

25        Q.    Have you seen any data of that sort that

Page 70

1    identifies the makeup of affordable housing in Bergen

2    County?

3            A.      Yes.

4            Q.      And what empirical data have you seen on

5    that?

6            A.      I don't remember because it was back

7    when we were going for our approvals there, so I

8    don't remember.

9            Q.      In what context did you see that data?

10           A.      I wanted to understand what does it

11   meant to have 29 affordable units there and why was

12   the mayor so against it?

13           Q.      Can you describe for me what you -- what

14   you saw?

15           A.      I don't remember.  I just remember that

16   there's a conception, I don't know if conception is

17   the right word, but there's a view out there that

18   people think that affordable units is Section 8

19   homes; and it's not.  So I was reading up about

20   what's the difference, what does it mean there's

21   different levels of low or medium or different types

22   of income, and I was trying to understand what it is.

23           Q.      What is your understanding of Mayor

24   DiPaola's interpretation of affordable housing?

25                   MR. FIORENZO:  I'm going to object.  How

Page 71

1    could he possibly know what Mayor DiPaola's

2    interpretation is unless he can view her mind and

3    then state what's in her mind?  No one can do that.

4    It's not competent, I object to it.  It's an improper

5    form of the question.

6                    MR. SEAMAN:  You can answer the

7    question.

8                    THE WITNESS:  I don't know.  I know she

9    doesn't want affordable units.

10

11   BY MR. SEAMAN:

12        Q.    You know what?

13        A.    She doesn't want affordable units.

14        Q.    And how do you know she doesn't want

15   affordable units?

16        A.    Because she said it.

17        Q.    When did she say she didn't want

18   affordable units?

19        A.    When she said she doesn't want the

20   project.

21        Q.    When she said she doesn't want the

22   project, did she -- had she specifically mentioned

23   the affordable housing component of the project?

24        A.    Yeah, because there's another component

25   to this project of seven off-site units and she's

Page 72

1  fighting me about being able to build those without

2  trying to remedy the lawsuit which is in place, which

3  is actually a settlement, I should say, that's in

4  place for the Borough of Emerson.  And if she really

5  cared about the people having affordable housing,

6  which most people do, and if she really understands,

7  you realize that they're good people.  They just

8  can't afford certain units.  Then you would try to

9  make sure -- you would do whatever you can.  When

10  you're a leader of a municipality, you do whatever

11  you can to make sure that you can have affordable

12  units within reason.  She's doing the -- she's having

13  the adverse effect in the sense that she doesn't want

14  it.  She doesn't want affordable units here and the

15  history and the lawsuit and everything on Google

16  could back that up.

17        Q.    Are you aware of any other reason that

18  the Borough of Emerson objected to the seven off-site

19  units related to enforcement of the Borough zoning

20  laws or things of that nature?

21        A.    So I'm going to answer that question

22  with a little history here.  The history is that

23  Mayor Dipaola has never done anything to help

24  anything with this project.  Whenever she can find an

25  opportunity to do something to destroy it, she does

Page 73

1    it.  So if she decides -- back to your question, and

2    all that stuff is in this complaint, the First

3    Amended Complaint and there's a lot of it, at least.

4    So when it comes to including to not wanting to give

5    me a fence permit, which is done for safety reasons,

6    including not giving us demo permits, and then

7    complaining that there's people living in the houses

8    when we asked for a demo permit so we could make the

9    properties safe and put up fences, she wouldn't do

10   it.  And that's really her M-O because, instead of

11   just talking to me, she says everything had to go

12   through an attorney because she's just an

13   obstructionist.  So if she found something that can

14   obstruct me trying to keep my word to the Borough of

15   Emerson, which is to build 145 units on one property

16   with 22 affordable and 7 off-site affordable, she

17   will do whatever she can, whether she has the right

18   to or not, to obstruct it, because that's what she's

19   doing.

20         Q.    Turning to Page 16 of the First Amended

21   Complaint and Paragraph 55.  There are a number of

22   subparagraphs running across the following pages and

23   I want to direct your attention to those.

24         A.    Sure.

25         Q.    55A is captioned as "refusal to issue

Page 74

1    demolition permit".  Do you see that?

2         A.    Yes.

3         Q.    What are you aware of that Mayor Dipaola

4    specifically did to result in the refusal to issue a

5    demolition permit?

6         A.    Everything goes through her.  She runs

7    that Borough like a hawk, helicopter, whatever words

8    you want to use.  She runs with an iron -- whatever

9    the word is.

10              MR. FIORENZO:  Iron fist.

11              THE WITNESS:  Iron fist, there you go.

12   But the hawk also.  The hawk something --

13              MR. BOTTA:  You were a mayor.

14              THE WITNESS:  That's why I'm nervous

15   what I say in front of him about a mayor.

16              MR. SEAMAN:  He was a mayor too.

17              THE WITNESS:  Oh, really?

18              MR. FIORENZO:  It's true.

19              THE WITNESS:  Where was that?  Where

20   were you?  No pressure.

21              MR. BOTTA:  I'm not being deposed.

22              MR. SEAMAN:  Off the record.

23

24   BY MR. SEAMAN:

25        Q.    Are you aware of any -- let me ask you

Page 75

1    this way:  Can you identify any specific actions,

2    that you're aware of, that Mayor Dipaola took that

3    resulted in the refusal to issue the demolition

4    permit as alleged in Paragraph 55A?

5         A.    Yes.  We spoke to the building inspector

6    at the time and we asked him, "Where's our permits?"

7    And he told us, and I don't remember his name, and I

8    believe he's not there anymore, so if I find that

9    out -- he said that, "We were told to not issue you

10   permits here."  And I said, "By who?"  And he said,

11   "By the powers that be."

12        Q.    And did he tell you that he was told at

13   the time that Mayor Dipaola was the mayor?

14        A.    You want to know if he knew that Mayor

15   Dipaola?

16        Q.    I'm trying to set the time frame here.

17   I'm just trying to set the context here.

18        A.    She was definitely mayor then.

19        Q.    And you don't remember this individual's

20   name?

21        A.    No.

22        Q.    The next -- I'll just follow that up.

23   Other than that indication from the person whose name

24   you don't recall, are there any other specific acts

25   that you can point to that Mayor Dipaola was in with

Page 76

1    regard to refusal to issue a demolition permit as

2    alleged in Paragraph 55A?

3          A.    I don't remember offhand.

4          Q.    Looking at Paragraph 55B, the "refusal

5    to issue a fence permit".  Can you identify what

6    specific acts you're aware of that Mayor Dipaola

7    undertook with regard to the refusal to issue that

8    fence permit?

9          A.    Yeah.  We submitted to the -- we asked

10   for a -- if we could put up fences and we were told

11   no.  We had to submit a zoning permit, which we did,

12   outlining with a color coded map of where -- exactly

13   where the fence was going to go.  She said -- she

14   came out and said, I think even on record, but this

15   is a -- and I think that she's concerned about the

16   parking that's there for the existing stores or for

17   the commuters that are going to ride the trains and

18   which really was -- I'm going to jump to, if I may,

19   something which is not in here, but I'm going to talk

20   about how I know that she was involved with it.  When

21   we took over, there was a tenant here called Cork &

22   Keg Liquor Store.  She went ahead and -- we -- it was

23   -- they were a tenant on the property that we settled

24   with the owners to buy as part of us buying the

25   property.  She worked with the tenant to make sure

Page 77

1    that they wouldn't move and to prolong me from doing

2    this development in order to try to, in my opinion,

3    bankrupt the project.  And you may ask how do I know

4    this?  Because I drove by the property and I saw her

5    there one day talking to the owners.  We have e-mails

6    where the Borough is asking the state for questions

7    about how it works and what can be done.  So, again,

8    she wanted to make sure that the stores could be

9    operating and she didn't care about the safety of the

10   site and that's why she held up the issue, made sure

11   that the fence permit was not issued.  This is not a

12   counsel issue.  It's not a mayor conversation even.

13   It should never be a mayor conversation.  And I say

14   this in respect to the two mayors sitting here, this

15   is a zoning officer who goes by the law, the code,

16   and she got her nose -- and like everything else, she

17   stuck her nose into it.

18        Q.     All right.  You mentioned the Cork & Keg

19   there.  So when you observed Mayor Dipaola at the

20   Cork & Keg, were you able to hear what she was

21   saying?

22        A.     No.

23        Q.     Do you have any -- do you have any basis

24   to tell me what she was saying that time you observed

25   her at the Cork & Keg?

Page 78

1      A.      Yes.  Yes, because she said it on record

2    as well many times at the council meetings.  She

3    said, "These are my very good friends and I need to

4    make sure they're being taken care of."  And when it

5    came to another tenant that was there, which is in

6    here, which is K and L, she never -- when one tenant

7    we had that -- to try to -- when you read K and L, it

8    really describes it.

9              MR. FIORENZO:  You're referring to

10   letters K and L on Page 18 of FD-1?

11             THE WITNESS:  Yes, on Page 18, yes.

12

13   BY MR. SEAMAN:

14      Q.      So that's really into a failure to

15   respond to a cease and desist letter and a failure to

16   proceed with condemnation of Caiqui Zheng,

17   C-A-I-Q-U-I Z-H-E-N-G; that's what you're referring

18   to?

19      A.      Yes.

20      Q.      What specific acts did you observe Mayor

21   Dipaola undertake with regard to item K, the failure

22   to respond to the cease and desist letter?

23      A.      Exactly that.  She failed -- they didn't

24   do anything.  They didn't -- they have an obligation

25   under the Redeveloper's Agreement to make sure this

Page 79

1   project gets built and this would -- this would

2   destroy that because it would go straight to summary

3   judgment.  And they never responded.  I had to step

4   in, at the time, and have an attorney respond to

5   that.  And eventually we won it, but it had nothing

6   to do with the Borough.

7        Q.    Again, I asked you for specific acts

8   from the mayor that you're aware of.  Did you see her

9   say something?  Did you hear her say something?  Did

10  you see her do something?  Did you read something she

11  put in some sort of directive?

12            MR. FIORENZO:  I'm sorry, it's unclear

13  to me.  What are we specifically referring to now?

14  Which of these?

15            MR. SEAMAN:  Item K, the cease and

16  desist letter.

17            MR. FIORENZO:  K?  Okay.  Well, K --

18  okay, the cease and desist.

19            THE WITNESS:  No, I have nothing, not

20  that I can recall.

21

22  BY MR. SEAMAN:

23       Q.    Okay.  And as to Item L, the failure to

24  proceed with the condemnation of the person who is --

25  what specific acts did you observe Mayor Dipaola

Page 80

1    undertake to initiate that action?

2            A.    She took no action.

3            Q.    And did you personally observe any

4    directives that she gave or see anything in writing

5    of any sort of directive from her of that nature?

6            A.    No, I'm just a businessman.  I run a

7    business.  If somebody in my company does something

8    wrong, it's my fault.  So when you're the mayor, I

9    assume it's the same.

10           Q.    Are you familiar with the phrase "a fish

11   stinks from the head down"?

12           A.    No, but I like that.

13           Q.    Other than the mayor's position as the

14   chief executive officer or the governor or whoever it

15   may be, what other actions can you tell me that

16   involve her doing any act or making any direction

17   that relates to any of the items in Paragraph 55A

18   through L?

19                 MR. FIORENZO:  Okay.  I'm going to

20   object to that.  It's overly broad.  I thought we

21   were talking about the Zheng condemnation.  You're

22   asking about anything in the complaint?  I think

23   that's unduly broad.

24                 MR. SEAMAN:  No.  No, Joe, I wasn't

25   asking about anything from the complaint.  I was

Page 81

1   asking about Paragraph 55.

2           MR. FIORENZO:  Paragraph 55.  Yeah,

3   well, Paragraph 55 goes on for, I don't know, three

4   pages.

5           MR. SEAMAN:  Okay.  I'll withdraw --

6   Joe, Joe, I'll withdraw the question.

7           MR. FIORENZO:  It has A through L.

8           MR. SEAMAN:  Joe, I'll withdraw the

9   question.  Okay?

10          MR. FIORENZO:  Yeah.  Good.

11

12  BY MR. SEAMAN:

13      Q.    Again, so we're going to look at

14  Paragraph B, the fence permit.  What specific actions

15  or directives on the part of Mayor Dipaola are you

16  aware of that relate to the refusal to issue a fence

17  permit?

18          MR. FIORENZO:  Please take a look at it

19  before you answer.  Okay?

20          THE WITNESS:  Yeah.  We originally had

21  an agreement from the zoning officer about putting a

22  fence up.  Then we were told we're not going to get

23  it.  It has -- it's going to be discussed by council.

24  If you can look back at the YouTube, which I believe

25  they have all these council meetings, you'll find

Page 82

1    that it was then brought up as a public conversation,

2    which then the mayor said that, "We want to make sure

3    it doesn't hurt the parking of the tenants that are

4    there."

5

6    BY MR. SEAMAN:

7          Q.      Any other specific actions by the mayor?

8          A.      Not that I recall.

9          Q.      Okay.  Looking at Item C, "demand of

10   inappropriate information from asbestos contractor",

11   what specific actions are you aware of that Mayor

12   Dipaola undertook to relate to that item?

13                 MR. FIORENZO:  Again, please review and

14   give an answer.

15                 THE WITNESS:  Again, we were told by

16   that inspector that I was telling you about that we

17   were going to get our permits.  And then we were told

18   that he was -- that he was told to get all this

19   information, even though he's never had to request

20   this before.

21

22   BY MR. SEAMAN:

23         Q.      And did he tell you who told him to do

24   that?

25         A.      He referenced the mayor.

Page 83

1          Q.     And, again, this is the building

2     inspector whose name you don't recall?

3          A.     I don't, that's correct.

4          Q.     What specific actions are you aware of

5     that Mayor Dipaola was involved in with regard to

6     Item D, "denial of permits for utility

7     disconnections"?

8               MR. FIORENZO:  Again, please take a look

9     at it and then answer.

10              THE WITNESS:  Yeah.  I don't recall

11    anything like that one.

12

13    BY MR. SEAMAN:

14         Q.     Looking at the next page, Item E, "more

15    delay of demolition permits" is how it's captioned.

16    What specific actions are you aware of that Mayor

17    Dipaola undertook in connection with the purported

18    more delay of demolition permits?  And take your time

19    to look at the bullet point before you provide an

20    answer.

21              MR. FIORENZO:  Please.

22              THE WITNESS:  Same thing, the building

23    inspector referencing that he was told to cause us

24    these issues.

25

Page 84

1    BY MR. SEAMAN:

2        Q.    Same building inspector you referred to

3    previously?

4        A.    Yes.

5        Q.    Was this -- you've mentioned the

6    building inspector now with regard to a couple of

7    different ones.  Was this one interaction with the

8    building inspector or more than one interaction?

9        A.    Multiple.

10       Q.    With respect to each of these bullet

11   points you had a separate action; is that your

12   recollection?

13       A.    I don't remember.

14       Q.    "Refused to issue sewer and water

15   cutting and capping permits".  What information are

16   you aware of with regards to Mayor DiPaola's

17   directive or involvement in that point?

18       A.    I can't recall.

19       Q.    "Sign off by fire and police", under

20   Item G.  What specific action or involvement by Mayor

21   Dipaola are you aware of that relate to that bullet

22   point?

23       A.    That she wanted to make sure that fire

24   and police were satisfied with this project.

25       Q.    How do you know that she wanted to make

Page 85

1    sure the fire and police?

2         A.      Because she told us this.

3         Q.      She told you, personally?

4         A.      By one of our meetings that we had,

5    yeah.

6         Q.      What did she tell you?

7         A.      Exactly that.  That she wants to make

8    sure that fire and police sign off.  And we said, at

9    the time, "Never heard of something so -- there's no

10   code for this.  It's not necessary."  We even went to

11   the fire or police, I don't remember which one it

12   was, and they said, "What do you want from us?  Where

13   do we sign?  There's no signing here.  We don't

14   sign."

15        Q.      What's -- moving on to -- stop.

16               Other than that conversation with Mayor

17   Dipaola seeking the sign off by fire and police, are

18   there any other actions that you're aware of that she

19   undertook related to that bullet point?

20        A.      Not that I recall.

21        Q.      "Delay in issuance of resolution

22   compliance".  What actions of Mayor Dipaola are you

23   aware of that relate to that point?

24               MR. FIORENZO:  Take a look at the bullet

25   point, please.  Please read it.

Page 86

```
 1              THE WITNESS:  I read that, yeah.  So
 2      there's a history to that in the sense that we were
 3      pretty much through resolution compliance.  And I
 4      don't recall the dates.  And then she fired that
 5      engineer who reviewed the plans, and brought in a new
 6      engineer, who made up a bunch of stuff, like,
 7      basically started over again, which is part of our
 8      damages of what we're looking for of all the work we
 9      re-had to do because of all the, like I write in
10      here, previously imposed conditions which have no
11      basis and there was no reason for them, except for
12      doing what she does, which is to just delay this
13      project or try to make it not happen at all.
14           Q.    And who was the engineer who was
15      originally engaged?
16           A.    I don't remember.
17           Q.    And who is the new engineer?
18           A.    I think, this is a guess, (phonetic)
19      Neglia.
20           Q.    Again, I gave you an instruction before
21      about guesses and estimates and I just want to
22      understand.
23           A.    And I followed it.
24              MR. FIORENZO:  I mean, it's all in the
25      documents.  It's in the documents.  Show him.
```

Page 87

```
1              MR. SEAMAN:  I understand.

2              THE WITNESS:  But I followed the

3    instruction, also.

4              MR. FIORENZO:  No, I'm not, you know,

5    I'm just saying it's -- I can tell you who it is, if

6    you want.

7              MR. SEAMAN:  No.  I appreciate that.

8    I'm just trying to keep him with the guesses, is all.

9    It's not a consequential statement one way or the

10   other.

11             MR. FIORENZO:  Agreed.

12

13   BY MR. SEAMAN:

14        Q.    What is your understanding of Mayor

15   DiPaola's involvement in the replacement of that

16   borough engineer?

17        A.    I have no doubt it was all her.

18        Q.    Well, what things can you point to that

19   were done or said by her or others that leads you to

20   have no doubt it was her?

21        A.    She wanted to get rid of anybody that

22   had to do with Lou Lamatina and help building and who

23   was the prior mayor.  And she wanted to bring in the

24   people that she felt would make sure that everything

25   is done perfect, so that if it's not done perfect,
```

Page 88

1    she can stop the project.

2         Q.    With regard to bullet point I, "refusal

3    to execute municipal consent for TWA, temporary works

4    approval, what are you aware of that Mayor Dipaola

5    did in connection with refusing to execute the

6    municipal consent for the TWA?

7         A.    Just a refusal to act.

8         Q.    Has a temporary works approval ever been

9    signed by the -- on behalf of the Borough?

10        A.    Yes, recently.

11        Q.    When was it signed?

12        A.    In 2023.

13        Q.    Who signed it?

14        A.    I don't know.

15        Q.    Do you know if Mayor Dipaola was

16   involved in the signing of that, in any way?

17        A.    I don't know.

18        Q.    Item J, "the failure to contest the

19   written lawsuit", and I ask you to review that and it

20   specifically indicates within this that something was

21   done at the direction of defendant DiPaola, near the

22   bottom of that paragraph.  So please review that and

23   tell me everything that you're aware that was

24   directed by Mayor Dipaola to fail -- fail to answer

25   or otherwise respond to the product of written

Page 89

1    lawsuit?

2         A.    Before I get to that, I just want to

3    back up to I, just one last point.  In my opinion,

4    the only reason I have the TWA permit today and the

5    only reason why we have building permits and

6    inspections and there's construction going on on-site

7    is 100 percent due to Judge Carroll that's in place.

8    He's the court ordered monitor by Judge Padovano.

9    He's been excellent all the way around, and if wasn't

10   for him, we wouldn't have permits, inspections.  And

11   by the way, I want to put on the record that the

12   inspections that they're requesting are crazy.  I

13   don't have this, third-party inspections they're

14   mandating that I don't do in any other municipality

15   anywhere.  Not in any municipality, so I'm putting

16   that on the record that all the extra money they're

17   making me spend because that's what she wants me to

18   do.

19             Back to your question about J, I don't

20   remember that offhand.

21        Q.    Looking at Page 18 now of the First

22   Amended Complaint, Paragraph 57 that begins with a

23   sentence "Defendant DiPaola orchestrated the above

24   municipal actions."  Do you see that?

25        A.    Yes.

Page 90

1      Q.      Is there anything that you're aware of,

2  other than what you've told me previously related to

3  Paragraph 55, that Mayor Dipaola did to orchestrate

4  those actions?

5      A.      I don't recall it right now.

6

7  BY MR. SEAMAN:

8      Q.      Looking at Paragraph 58, it begins:

9  "After her election as mayor, DiPaola issued a

10  directive to municipal government to suspend all

11  actions on redevelopment and affordable housing under

12  the final judgment."

13          Do you see that?

14      A.      Yes.

15      Q.      Is there a written directive of some

16  nature?

17      A.      I don't remember offhand.  It's been a

18  while.

19      Q.      Have you ever seen a directive of that

20  sort?

21      A.      I don't remember.

22      Q.      Looking at Paragraph 59 on Pages 18 and

23  19, the final paragraph of that -- or the final

24  sentence of that paragraph begins:  "At her

25  direction," and then continues, "officials concocted

Page 91

1    new requirements for a demolition fence and utility

2    permits to obstruct delay and increase plaintiff's

3    project, consistent with the representations that she

4    would stop the project from being built."

5              Do you see that?

6         A.    Yes.

7         Q.    What, if anything -- what is there, if

8    anything, in addition to what you've already told me

9    that constitutes a direction by Mayor Dipaola to

10   officials to concoct new requirements for demolition,

11   fence, and utility permits?

12        A.    I have nothing new.  I told you what

13   they told me already.

14        Q.    Okay.  That's the conversations, I

15   apologize.  That's the conversations that you had

16   with the building official whose name you can't

17   recall?

18        A.    Yeah.  And I want to think back to the

19   conversation I had with Rob Hermansen.  Yeah.  After

20   I had an issue with one of the guys with the

21   demolition permit, I went to him, and I asked him for

22   his help.  And he told me, "I'm trying to do

23   everything I can to help you, but this is what the

24   mayor and our attorney are telling me they want."

25   Which I found out later was you can't trust a word

Page 92

1   that Mr. Hermansen says.

2           Q.    When did you find out that you couldn't

3   trust a word that Mr. Hermansen says?

4           A.    When he made a recording of me.

5           Q.    As you sit here today, do you believe

6   Mr. Hermansen was being truthful when he made the

7   statement to you that you mention about doing

8   everything he could to help you get the demolition

9   permit?

10              MR. FIORENZO:  Except for being told by

11  the mayor and the attorney, you've only characterized

12  part of it.  Is that the question?

13              MR. SEAMAN:  Yes.

14              MR. FIORENZO:  Okay.  He's asking you if

15  you think he was being truthful when he told you what

16  you just said.

17              THE WITNESS:  As I sit here today, I

18  would say, yeah.  He was new.

19

20  BY MR. SEAMAN:

21          Q.    What, if anything, did Mr. Hermansen

22  tell you, at that time, that Mayor Dipaola was doing

23  to prevent him from helping you to get the demolition

24  permit?

25          A.    It was just, "You have these new items.

Page 93

1    Let's see what we can do and I'll try to help you."

2         Q.    Did he indicate any specific action or

3    directive that Mayor Dipaola had given him with

4    regard to assisting you with the project?

5              MR. FIORENZO:  Object to the form.  You

6    can answer.

7              THE WITNESS:  I don't remember that.

8

9    BY MR. SEAMAN:

10         Q.    Looking at Paragraph 60 of the

11    complaint, it references an article in the Pascack

12    Press.  Do you see that?

13         A.    Yes.

14         Q.    Have you read that article?

15         A.    I have.

16         Q.    And it references a quote from Mayor

17    Dipaola that the Borough has lost "seven of its

18    thriving businesses due to redevelopment in the name

19    of affordable housing."

20              Do you see that?

21         A.    Yes.

22         Q.    Did you hear Mayor Dipaola make that

23    statement?

24         A.    I've heard her make that statement,

25    yeah.

Page 94

1      Q.      Did you hear her make the statement

2    that's attributed to her in the Pascack Press?

3      A.      Oh, no.  You want to know if I knew when

4    they got that quote from her?  I have no idea when

5    they got that quote.  Maybe I was there.  I don't

6    know.

7      Q.      Okay.  All right.  Is it correct that

8    seven businesses within Emerson are no longer doing

9    business because of the redevelopment?

10     A.      No.

11     Q.      What is incorrect about that factual

12   statement?

13     A.      Cork & Keg is still open down the block.

14   I have no idea about the other businesses.  We paid

15   some money to one of the businesses to relocate.  So

16   I don't know all the facts about each business, but I

17   can tell you that it's not true.

18     Q.      Do you know if it was factually accurate

19   at the time that the statement attributed to Mayor

20   Dipaola was purportedly made, that there were seven

21   businesses that were not currently operating because

22   of the redevelopment?

23     A.      That's also incorrect because there was

24   never a moment where Cork & Keg was out of business,

25   never.

Page 95

1          Q.     Looking at Paragraph 62 of the

2    complaint.  The final sentence in that paragraph

3    relates to "governing body members, including

4    Defendant DiPaola, are laughing, chortling, and

5    tripping over each other to be the first to 'so move'

6    and 'second' before enthusiastically adopting the

7    motion."

8               Do you see that?

9          A.     Yes.  And I remember it.

10         Q.     Do you remember one instance or more

11   than one instance?

12         A.     No.  It was March 3rd.

13              MR. FIORENZO:  He's referring to a

14   specific instance.  You were asking about this one?

15              THE WITNESS:  Yeah.

16              MR. SEAMAN:  Yes, I guess I am.

17              THE WITNESS:  Yeah, I remember it.

18

19   BY MR. SEAMAN:

20         Q.     Did you observe Mayor Dipaola laughing

21   at that time?

22         A.     Yeah.

23         Q.     Do you know what she was laughing about?

24         A.     I watched it on YouTube, like I do watch

25   most of their council meetings, and it was just like

Page 96

1    a funny matter about, you know, them convincing their

2    people that live in their Borough that they're going

3    to spend all this money now.  They're going to go

4    after the big bad -- I forget how Mr. McCann

5    describes it -- but the big bad developer I think is

6    how he does it, to bring down this project, which is

7    their goal.

8         Q.    So you heard a statement by Mr. McCann

9    during that meeting when you watched that YouTube.

10   Did you -- well, my question to you was:  Did you

11   observe Mayor Dipaola laughing?

12        A.    Yeah.

13        Q.    Do you know what she was laughing about?

14        A.    I don't remember.

15        Q.    Did you observe her chortling?

16        A.    Yes.

17        Q.    And do you know what she was chortling

18   about?

19        A.    She was laughing, chortling, and

20   whatever else we wrote in here over the fact that

21   they were coming to sue us.

22        Q.    How do you know that?

23        A.    It's on YouTube.  You can watch it.

24        Q.    Looking at Paragraph 67 of the

25   complaint, the First Amended Complaint, the final

Page 97

1    paragraph reads:  "DiPaola's obstruction of the

2    project is motivated by racial ends in that it seeks

3    to stop the relocation of minority residents."

4              Do you see that?

5        A.    Yeah.

6        Q.    Start at the beginning and go all the

7    way to the end and tell me all of the facts that

8    you're aware of that Mayor DiPaola's obstruction of

9    the project is motivated by racial animus?

10             MR. FIORENZO:  I'm going to object

11   because you've asked him about this previously today.

12   You want him to go back over his testimony?  Because

13   you examined him about, you know, what Mount Laurel

14   means and how he equates that to being discriminatory

15   and what facts he knew.  He's already testified at

16   some length about a lot of the facts he relies upon.

17   Do you want him to go back over all that again?

18             MR. SEAMAN:  Sure.

19             MR. FIORENZO:  Well, I don't think

20   that's appropriate, so if there's anything new, you

21   can -- I'm going to object because it's been asked

22   and answered in a variety of different ways.

23             MR. SEAMAN:  That's an objection, but

24   it's not an objection to a deposition question.

25             MR. FIORENZO:  No, it is in fact an

Page 98

1    objection to a deposition question.  I just made it.

2                   MR. SEAMAN:  I understand.  It's not an

3    objection to the form of the question.

4                   MR. FIORENZO:  It is.  All right.

5                   THE WITNESS:  I have nothing new to add.

6                   MR. FIORENZO:  I'm going to let you do

7    it again.

8                   MR. SEAMAN:  All right.  You know what?

9    I'll appease Mr. Fiorenzo.

10

11   BY MR. SEAMAN:

12        Q.    Other than what you have told me about

13   today, start at the beginning and go all the way to

14   the end and tell me every other fact that you're

15   aware of that Mayor DiPaola's obstruction of the

16   project is motivated by racial animus?

17        A.    I mentioned it already to you.

18        Q.    Looking at Paragraph 69 of the First

19   Amended Complaint, it says that Mayor Dipaola -- it

20   says:  "On information and belief DiPaola has used

21   her position as mayor to directly receive in the

22   approvals and permitting process with the project to

23   impede the project and slow the reaction of the

24   Borough to the project including through its

25   'resolution compliance' process."

Page 99

1              Do you see that?

2        A.    Yes.

3        Q.    Other than what you've told me about

4    already, are there any facts that you can identify

5    that support that position?

6        A.    No.

7              MR. FIORENZO:  Off the record.

8

9              (Luncheon recess:  1:05 p.m.)

10

11   BY MR. SEAMAN:

12       Q.    All right.  Mr. Klugmann, we're back on

13   the record.  You're ready to proceed now?

14       A.    I am.  Thank you.  I'm ready to finish.

15       Q.    Okay.  Again, by the way, I remarked

16   FD-1 for identification.

17       A.    So I'm going to give this to you and I'm

18   going to take this one.

19       Q.    So it has a proper marking on it.

20   Again, looking at Paragraph 67, which is on Page 20.

21       A.    20.

22       Q.    Again, other than what you've told me

23   about previously today, are there any facts that you

24   can identify to support the proposition that Mayor

25   Dipaola intended to convey that the potential of

Page 100

1   people with racial -- with diverse racial backgrounds

2   at the project have already destroyed existing

3   businesses or would cause some sort of harm?

4                   MR. FIORENZO:  Objection.  Asked and

5   answered.

6                   MR. SEAMAN:  I said other than what he

7   said here today.

8                   THE WITNESS:  No, not that I recall.

9

10  BY MR. SEAMAN:

11      Q.      Are you familiar with the rulings that

12  Judge Padovano has issued in the state court action?

13      A.      For the most part.

14      Q.      Are there any rulings, as you sit here

15  today, that you're aware of, that Judge Padovano made

16  that you disagree with in terms of any of his

17  findings?

18                  MR. FIORENZO:  I'm going to object in

19  that it calls for a legal analysis and a legal

20  conclusion.  He could only answer that if he

21  understood the legal analysis that was undertaken, so

22  I'm going to object to the form of the question.

23                  MR. SEAMAN:  Okay.  You can still answer

24  the question.

25                  THE WITNESS:  Well, I love that he made

Page 101

1    Emerson write me a check for my legal fees.  I love

2    the fact that Judge Carroll is in place.  Is there

3    anything that I'm not happy with, any decision that

4    he made?  No, not that I can think of.  Judge Carroll

5    was a great decision.

6

7    BY MR. SEAMAN:

8         Q.    Okay.  You're satisfied with Judge

9    Carroll as far as his services as well?

10        A.    Extremely.  He's a nice person.

11        Q.    Would you agree with me that there are

12   legitimate reasons why someone could object to a

13   development project that are not racially motivated?

14        A.    Do I agree with you that people can

15   object to a project that's not racially --

16             MR. BOTTA:  Why don't you have her read

17   back the question.

18             THE WITNESS:  Yeah.

19             MR. BOTTA:  Instead of you trying to

20   repeat it.

21             THE WITNESS:  Yeah.  I have to make sure

22   I understood that one.

23

24             (Whereupon, the requested portion of the

25   record was read by the reporter.)

Page 102

1

2                    THE WITNESS:  Hypothetically, sure.

3

4      BY MR. SEAMAN:

5           Q.    Is it fair to say that someone could

6      object to a redevelopment project because they

7      believed it was too big?

8                    MR. FIORENZO:  Objection.  Form.

9      Hypothetical.  You can answer.

10                   THE WITNESS:  Are you talking in any

11     case or are you talking specific to Emerson?

12

13     BY MR. SEAMAN:

14          Q.    Well, in any case, first of all?

15          A.    People can object to whatever they want.

16          Q.    Have you heard anyone object to the

17     project in Emerson, expressing their reason for their

18     objection because they believed it was too big?

19                   MR. FIORENZO:  Objection to form.  You

20     may answer the question.

21                   THE WITNESS:  Yes.

22

23     BY MR. SEAMAN:

24          Q.    Who are those people?

25          A.    Mayor Dipaola.

Page 103

1        Q.    Anyone aside from Mayor Dipaola who used

2    "too big" as a reason?

3        A.    I don't know.  I wasn't so involved

4    then, at that point, so I can't really speak to it.

5        Q.    Okay.  Have you heard anyone express an

6    objection to the project in Emerson on the basis that

7    it was too dense?

8              MR. FIORENZO:  Objection to the form.

9    You may answer.

10             THE WITNESS:  Not that I recall, other

11   than Mayor Dipaola.

12

13   BY MR. SEAMAN:

14       Q.    Have you heard anyone object to the

15   Emerson project on the grounds that it required too

16   much parking?

17       A.    I don't know that at all.

18       Q.    Have you heard anyone object to the

19   Emerson project on the grounds that it would generate

20   too much traffic?

21       A.    Yeah.

22       Q.    Who are those people?

23       A.    I don't remember.  This is going back

24   four years ago.

25       Q.    Do you recall Mayor Dipaola raising

Page 104

1    traffic as an issue?

2         A.    Yeah.

3         Q.    Do you recall anyone other than Mayor

4    Dipaola raising traffic as an issue?

5         A.    No.

6         Q.    With the other projects in your

7    portfolio that we discussed this morning --

8         A.    Yes.

9         Q.    -- have there been objections to those

10   projects for reasons such as being too big, too

11   dense, too much parking, too much traffic?

12              MR. FIORENZO:  I'm going to object.

13   Irrelevant.  Immaterial.  Beyond the scope of

14   discovery.  It has nothing to do with this case.

15   Subject to my objection, I'm going to let him answer

16   the question.

17              THE WITNESS:  Well, I think, really,

18   it's important to answer that question because I want

19   to clarify.  A lot of the stuff that I heard from

20   Mayor Dipaola, including the stuff that I said that

21   she spoke out against, was after she was mayor, was

22   after she looked at me in the face and including the

23   previous mayor, this was right before the end of the

24   year, and she told us how she wanted to create a

25   subcommittee to review the plans.  And I said, "If I

Page 105

1    do it, are you going to go ahead with it?  Are you

2    going to do whatever needed to be done?  Are we done?

3    Are we finished?  We know you don't like it.  At the

4    end of the day, this is approved.  The site is

5    approved and you have to approve it."  And she looked

6    at me and she said, "Yes."  And then, when it came

7    out to vote, she abstained.  And then, from there,

8    she never really -- which is what happened -- you're

9    asking me, do people come out and dislike or speak

10   out against projects?  It happens all the time.  We

11   all know that.

12            But, once it's approved, you don't have

13   people, unless it's a direct neighbor, 99 percent of

14   the time, who's affected by the project.  You don't

15   have people come out that keep on going on and on

16   about the project.  And that's what she has done.

17   She has gone on and on about how she wants to destroy

18   the project, even after it's approved.  The project

19   was approved.  It was done.  It's not her -- the bed

20   was made by someone else.  That's it.  She has to

21   deal with it and move on.  She wants to stop

22   development going forward, that's up to her and her

23   council and her planning board.  At the end of the

24   day, this was approved before she was mayor.  And she

25   has spoken out before, after, and everything in

Page 106

1    between to do whatever she can to stop it.

2

3    BY MR. SEAMAN:

4         Q.    All right.  I just want to clarify the

5    time frame.  You said "before the end of the year".

6    Can you testify to which year that was?

7         A.    To which point?

8         Q.    You spoke with her about a subcommittee,

9    it was near the end of the year?

10        A.    That was 2018, I think.  Yeah.

11        Q.    Okay.  So was that while she was still a

12   member of the council before she became mayor?

13        A.    Yes.

14        Q.    That's your reference?  And the

15   reference to a vote was when she was a member of the

16   council before she became mayor.  Is that correct?

17        A.    Correct.

18        Q.    Did she make any statements on the

19   record at the council as to the reason why she was

20   abstaining from her vote as opposed to voting for or

21   against the resolution?

22        A.    No.  But to me, it was cowardly because

23   you just made a deal with someone and looked at them

24   in the face and then the only answer she could have

25   come out to have given was yes.  She didn't give that

Page 107

1    answer.  So it was a coward move.  You shake

2    someone's hand, you follow through on what you say.

3    And she didn't do that, which is the story here.

4          Q.    Did her abstention from the vote on that

5    resolution prevent it from passing?

6          A.    No.

7          Q.    Who else was present during the pre-vote

8    conversation that you referred to?

9          A.    I had an attorney there and I had -- I

10   don't remember if the architect was there or the

11   engineer, but I had an attorney and I believe -- I

12   don't know, maybe my brother.  I don't remember.  I

13   don't remember everybody that was there.

14         Q.    Do you remember anyone that was there?

15         A.    Sure.  Lou Lamatina, who was the prior

16   mayor, the redevelopment attorney was there, Keith

17   Hoffman was there, I think that's his first name, he

18   was -- he went on with her to eventually join on the

19   council, so he was an elected official but wasn't in

20   yet.  She was there.  The room was packed.  It was a

21   back room and there was a bunch of people there, two

22   attorneys, town attorney, the redevelopment attorney,

23   I don't know.

24         Q.    I just want to understand the timeline

25   of this.

Page 108

1        A.      Yeah, that's fine.

2        Q.      No.  You had this meeting and these

3    statements you're attributing to Mayor Dipaola at the

4    time that she was still a council member were made.

5    Did the governing body then move directly to the dais

6    in open session or was there a closed session?

7        A.      This was closed session.  This was

8    closed session.  This wasn't done in open session.

9        Q.      And were you present for the entire

10   closed session meeting?

11       A.      No.

12       Q.      Okay.  So you were present for a portion

13   of the closed session meeting and there were

14   discussions taken during that closed session meeting

15   and then you and your colleagues were excused from

16   the closed session.  Is that fair to say?

17       A.      I don't remember how it ended.  But we

18   definitely stepped out to have our own private

19   conversation about what we wanted to do.

20       Q.      Is it your understanding that the

21   governing body continued to meet in closed session

22   for a period?

23       A.      I really don't remember.

24       Q.      And then subsequent to the closed

25   session, they returned to the dais?

Page 109

1          A.      To vote.

2          Q.      And they reopened the public meeting?

3          A.      Yes.

4          Q.      That was the time when the mayor cast

5     her vote as an abstention?

6          A.      Of the council, yeah.

7          Q.      Other than what you've told me

8     previously today, what facts can you point to that

9     show that the defendants' land use decisions in this

10    case were motivated by racial animus as opposed to a

11    mere reluctance to comply with state law?

12              MR. FIORENZO:  Objection to form.  You

13    may answer.

14              THE WITNESS:  I don't know if I have any

15    new fact -- any new thing that I haven't brought up.

16    No.  It's just, as the lawsuit says and as I've told

17    you, it's just her insistence of not having

18    affordable housing there.

19

20    MR. SEAMAN:

21         Q.      Okay.  Same question in terms of if

22    there are any facts other than what you've told me

23    about already today, that you're aware of that show

24    that the defendant's land use decisions were

25    motivated by racial animus as opposed to a general

Page 110

1    dislike of large residential buildings?

2        A.    There was no land use decisions made

3    here.  I'm not sure I understand the question.

4        Q.    What facts, if any, other than what you

5    told me about today, are you aware of, that the

6    defendant's actions with regard to your development

7    were motivated by racial animus as opposed to a

8    general dislike of large residential buildings?

9            MR. FIORENZO:  Objection.  Asked and

10   answered now several times.  Do you have something

11   else to add to what you've already told him?

12           THE WITNESS:  No.

13

14   BY MR. SEAMAN:

15       Q.    Has Emerson Redevelopers Urban Renewal

16   been damaged as a result of the actions of the mayor

17   and the Borough that make up this action?

18       A.    I think significantly.

19       Q.    Can you start at the beginning and go

20   all the way to the end and tell me all the ways that

21   the plaintiff has been damaged by those actions?

22       A.    I can't tell you all --

23           MR. FIORENZO:  Let me just note, he's

24   going to answer the question, but there will be

25   expert reports that will be submitted that address

```
                                          Page 111

 1   the particulars and the numbers and damages.  He's

 2   here, and you're welcome to ask him generally,

 3   conceptually about it.  He'll answer it to the best

 4   of his abilities.

 5              MR. SEAMAN:  He's been doing a very good

 6   job of it so far, so I'm sure he'll continue.

 7              MR. FIORENZO:  Okay, yeah.  Thank you.

 8              THE WITNESS:  What was the question?

 9              MR. FIORENZO:  Have you suffered any

10   damages --

11              THE WITNESS:  No, he was asking about

12   the Borough, I think.

13              MR. SEAMAN:  I'll repeat the question,

14   just to be clear.  Let's start at the beginning --

15              MR. BOTTA:  You don't want to ask the

16   question, I think.

17              MR. FIORENZO:  You want me to ask?

18              MR. BOTTA:  No.  Let the reporter read

19   it.

20              THE WITNESS:  I'm happy to answer both

21   of them.  That's why.

22              MR. BOTTA:  That's how it should be

23   done.  We don't want Joe to rephrase it for you.

24   Just have the reporter ask it again.

25              MR. FIORENZO:  I'm just here to help.
```

Page 112

1    I'm just trying to help.  I'm here to help.  That's

2    all.

3                    MR. SEAMAN:  Oh, yeah.

4

5                    (Whereupon, the requested portion of the

6    record was read by the reporter.)

7

8                    MR. FIORENZO:  Yeah, I just want to

9    object to the form.  I don't know what start at the

10   beginning and going to the end means.  But subject to

11   my objection, you can describe it as best you can.

12                    THE WITNESS:  I'm actually happy that I

13   asked to repeat it because I didn't hear the Urban

14   Renewal part.  I only heard the Emerson part.  So I

15   thought you were talking about the Borough as opposed

16   to me, but you're talking about me.

17

18   BY MR. SEAMAN:

19        Q.    No, I'm asking how you've been damaged.

20        A.    Yeah.  So the first and foremost is the

21   delay in the project, the delay in the ability to

22   make money, to have an income from -- there's an

23   income producing property.  So the fact that we

24   should have started building this within a short time

25   frame after we closed on it being that it had all the

Page 113

1    government approvals, you have taxes, insurance,

2    carry.  It was so bad that when I finally got my demo

3    permits, the bank that I have in place says:  "You're

4    not going to finish in the time frame of when this

5    loan is maturing.  You have to redo the loan."

6    (Repeating for reporter)  "You're not going to finish

7    the project by the time that the loan is going to

8    mature, even with your extension that you have in

9    place.  You need to redo the loan.  We're not going

10   to advance you the draws and do it; especially since

11   we know that the municipality is slow playing

12   everything."  And then we also have the fact that the

13   cost of materials, construction, the higher interest

14   rates that are out there now, the lack of income that

15   was made for the management company that we have, and

16   the lack of just income that would have came in from

17   the property, the profits that could have been made

18   here are substantial.  On top of that, her onslaught

19   of media press releases, postings under -- whatever

20   they do, their consistent council meetings that they

21   like to make, their -- pardon my French -- their BS

22   conversations that they make up and try to have and

23   do things, is just -- there's nothing short of

24   trying -- their indirect way of trying to destroy my

25   reputation as a developer in this state.  It came up

Page 114

1    in other municipalities and you can do your homework

2    on it.  It happened in Clifton.  I still got my

3    approval there, but it's nothing short of stress,

4    anxiety, extra work, extra workers that have to do

5    stuff, starting over, starting again.  My lack of

6    ability, even on top of all this, to go -- I'm

7    sitting here today doing a deposition when I should

8    be going ahead and looking for new work and doing

9    more projects and going to other municipalities to

10   see how I can do new work.  So it's coming, the

11   hammer is coming.

12        Q.    What do you mean by "the hammer is

13   coming"?

14        A.    I want a lot of money; a lot of money.

15   Just on the record, we've offered her a million

16   times -- oh, I shouldn't say a million -- many times

17   to try to work out ways to settle this and her

18   misleading and misguiding attitude, I don't know if

19   that's the right way to put it, but I'll just say it

20   nicely, you know, she has no interest in settling.

21   She has no interest in doing what's right.  She has

22   no interest in doing anything.  And that's why we're

23   here for the -- until the finish line.  And our offer

24   to settle is not because we think we're wrong.  We

25   know we're 100 percent right.

Page 115

1          Q.      The management company that you

2    indicated is not earning the profits, is that

3    different in any way other than Emerson Redevelopers

4    Urban Renewal?

5          A.      It's called 21 Glen Management.

6          Q.      And do they serve as a management

7    company for your other projects in your portfolio?

8          A.      Yeah.   Yeah.

9          Q.      And it's your testimony that they've

10   lost money because they're not actively managing the

11   property at this point?

12         A.      1,000 percent.   Yes.

13         Q.      Are there any agreements in place from

14   Emerson Redevelopers Urban Renewal to pay 21 Glen

15   Management any amount of that loss?

16         A.      No.   They only make their money during

17   lease up and management.   They only make their money

18   when we're going through the lease up and management

19   process.

20         Q.      Would you agree with me that any of the

21   increased cost that you've described in terms of the

22   cost of developing this property will increase the

23   basis for the property for tax purposes?

24               MR. FIORENZO:   Object to the form.   I

25   don't know what you mean by "basis".   It has a legal

Page 116

1   tax term.  I don't know how you're using it.

2              THE WITNESS:  So I don't understand the

3   question.

4

5   BY MR. SEAMAN:

6        Q.   Are you familiar with the term "basis"

7   in terms of income tax implications?

8        A.   For income tax -- I'm confused by the

9   question.

10             MR. FIORENZO:  You're asking his opinion

11  as to whether something is going to increase the

12  basis?

13             MR. SEAMAN:  I'm asking him if he's

14  familiar with the term "basis".

15             MR. FIORENZO:  So you're asking him for

16  a legal conclusion.  How would he know?  He's not

17  here as an expert.

18             MR. SEAMAN:  I'm asking him a question.

19  Let him give an answer.  That's all.  It will be what

20  it is.

21

22  BY MR. SEAMAN:

23       Q.   Are you familiar with the term "basis"

24  in terms of use in taxation?

25             MR. FIORENZO:  Object to the form.

1    Under the federal tax code?  Is that the question?

2                MR. SEAMAN:  Generally, is he familiar

3    with the term?

4                THE WITNESS:  Vaguely.

5

6    BY MR. SEAMAN:

7        Q.    Okay.  On the other properties that

8    you've developed that are within your portfolio that

9    are actively leasing to tenants currently, are you

10   aware of the use of a depreciation deduction to

11   offset the income those properties generate?

12       A.    Of course.

13       Q.    And are you aware of the fact that the

14   more you spend to develop the property, the greater

15   that depreciation value becomes?

16               MR. FIORENZO:  Objection.  Calls for a

17   legal/tax accounting conclusion.  He's not here as an

18   expert.  He's not qualified to give such opinions, so

19   I object to the form.

20

21   BY MR. SEAMAN:

22       Q.    Generally, are you familiar with that

23   concept?

24       A.    No.

25       Q.    Are there any projects that Accurate

Page 118

1    Builders has lost as a result of any of the issues

2    that you're having with the Emerson project?

3                    MR. FIORENZO:  Object to the form.  What

4    do you mean by "lost"?

5                    MR. SEAMAN:  Do you understand the

6    question?

7                    MR. FIORENZO:  I don't.

8                    THE WITNESS:  I can guess.

9                    MR. SEAMAN:  Well, I don't want you to

10   guess.

11                   THE WITNESS:  Then, no.

12

13   BY MR. SEAMAN:

14        Q.    Okay.  Are there any projects that

15   Accurate Builders has applied for to develop property

16   that have been denied because of the issues that

17   you're having with Emerson in this case?

18        A.    No.  But I can tell you that in my

19   Clifton case, I had to have a non-Jew represent me

20   because of Emerson, because one of the people on the

21   council in Clifton, we knew that she was going to --

22   she was friends with Mayor Dipaola and she was going

23   to reference it.  And if I would be the face of it,

24   she would say, "Look what's going on in Emerson.  Do

25   you want to be a part of that?"

Page 119

1      Q.      So who is this member of the Clifton

2   council who's --

3      A.      I don't remember her name.

4      Q.      You don't recall the person?

5      A.      No.

6      Q.      And when you say you had to have a

7   non-Jew represent you, did you have someone appear as

8   a representative of Accurate Builders?  Or are you

9   saying you had a non-Jewish attorney represent you?

10  I just want to understand what you mean be "represent

11  you"?

12     A.      I had someone else under his own entity

13  go and get the approval with his own attorney.

14     Q.      And who was that?

15     A.      Kevin Codey, C-O-D-E-Y.

16     Q.      And who was the attorney that

17  represented Mr. Codey in that?

18     A.      Joe something, I forget his last name.

19     Q.      And did you have some sort of

20  discussions with Mr. Codey about him going in to get

21  that approval and then transferring the development

22  rights over to Accurate Builders?

23     A.      Of course.

24     Q.      And was there anything in writing to

25  memorialize that?

Page 120

1        A.      Yes.

2        Q.      And what was in writing to memorialize

3    that?

4        A.      A contract.

5        Q.      And does that contract specifically

6    reference a desire to avoid Clifton being aware of

7    the fact that it was going to be a Jewish business

8    that would be doing the development?

9        A.      No.

10               MR. SEAMAN:  Can I take five minutes

11   just quickly, Joe?

12               MR. FIORENZO:  Sure, sure.

13

14               (Whereupon, a brief recess was taken.)

15

16               MR. SEAMAN:  Mr. Klugmann, I don't have

17   any further questions of you.  I thank you for your

18   time.

19               THE WITNESS:  Really?

20               MR. SEAMAN:  Yeah, I really don't, but I

21   appreciate your time.  I appreciate your testimony.

22               THE WITNESS:  You've been very nice.

23               MR. FIORENZO:  Thank you, appreciate it.

24               (Whereupon, the deposition was concluded

25   at 1:49 p.m.)

Page 121

1                    CERTIFICATE

2

3

4              I, JOMANNA DEROSA, a Certified Court

5      Reporter and Notary Public of the State of New

6      Jersey, do hereby certify that the foregoing is a

7       true and accurate transcript of the testimony as

8       taken stenographically and digitally at the time,

9    place and on the date hereinbefore set forth, to the

10                    best of my ability.

11

12

13              I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of any

15    of the parties to this action, and that I am neither

16    a relative nor employee of such attorney or counsel,

17      and that I am not financially interested in the

18                       action.

19

20

21

22          JOMANNA DEROSA, C.C.R.

                 License No. 30XI00188500

23               Notary Public of the

                 State of New Jersey

24

25

[& - accounting]                                                          Page 1

| & | | | |
|---|---|---|---|
| **&**  2:12 76:21 77:18,20,25 94:13,24 | | | |

**0**

**07074**  2:7
**07102**  2:17
**07446**  3:6
**08701**  5:2

**1**

**1**  4:11 31:9,14 50:8,11 78:10 99:16
**1,000**  115:12
**10**  50:11
**100**  21:20 54:17 89:7 114:25
**102**  2:6
**105**  26:21
**10:06**  1:24
**10th**  47:22
**11**  45:13
**12**  53:19
**129**  19:19
**14,000**  19:7
**145**  54:11,13 73:15
**147**  19:14,15
**15**  47:23
**16**  73:20
**1797**  48:20
**18**  78:10,11 89:21 90:22

**185**  25:15
**19**  90:23
**1999**  47:20,23 48:19
**1:05**  99:9
**1:49**  120:25

**2**

**20**  1:3 23:3 24:4 99:20,21
**201**  2:8 3:7
**2018**  32:8,10 46:9 106:10
**2019**  46:9 62:14
**2023**  1:17,24 88:12
**21**  115:5,14
**22**  19:25 54:11 73:16
**234**  21:25 22:1
**25**  1:17,24
**250**  1:23 2:6
**276**  22:25
**28th**  50:14
**29**  54:8,10 70:11

**3**

**301**  5:2
**30xi00188500** 1:21 121:22
**31**  4:11
**32**  5:1
**3rd**  95:12

**4**

**4**  4:20 50:10
**440-0675**  2:8
**45**  25:13,15,18 25:19
**4656**  121:21
**47**  4:19
**4728**  1:3

**5**

**5**  4:19
**50**  3:5
**55**  73:21 81:1,2 81:3 90:3
**55a**  73:25 75:4 76:2 80:17
**55b**  76:4
**57**  89:22
**58**  90:8
**59**  90:22

**6**

**60**  93:10
**62**  95:1
**6300-15**  52:2
**643-4775**  2:19
**643-5499**  2:18
**651**  24:20,24
**66**  4:20
**67**  96:24 99:20
**69**  98:18

**7**

**7**  19:14 20:1 73:16

**8**

**8**  70:18
**818-6400**  3:7

**9**

**9**  4:4
**95**  25:4 26:15
**973**  2:18,19
**99**  105:13

**a**

**a.m.**  1:24
**abilities**  111:4
**ability**  112:21 114:6 121:10
**able**  35:5 36:6 38:8 43:23 54:11 55:8 72:1 77:20
**above**  1:20 89:23
**absolute**  14:9
**absolutely** 13:21,23 14:8
**abstained** 105:7
**abstaining** 106:20
**abstention** 107:4 109:5
**acceptable** 12:22
**accommodate** 13:4
**accounting** 117:17

**accurate** 9:23
9:24 16:10,14
16:15,17,21
17:5,19,22
18:3,16 28:19
29:4 30:2,8,13
52:8 94:18
117:25 118:15
119:8,22 121:7
**accurate's** 30:4
**accurateofnj....**
17:14
**act** 80:16 88:7
**action** 1:3
30:19 31:1,16
51:18 52:2,3,6
52:7,9 53:2,21
57:4 59:16
80:1,2 84:11
84:20 93:2
100:12 110:17
121:15,18
**actions** 75:1
80:15 81:14
82:7,11 83:4
83:16 85:18,22
89:24 90:4,11
110:6,16,21
**active** 16:18
**actively** 115:10
117:9
**acts** 75:24 76:6
78:20 79:7,25
**actual** 27:25

**actually** 63:1
72:3 112:12
**add** 67:11 98:5
110:11
**addition** 91:8
**address** 47:13
110:25
**addressed** 49:2
49:3
**administration**
50:18
**administrator**
60:6,8,10 62:8
62:13,16,18
**adopting** 95:6
**advance** 113:10
**adverse** 72:13
**advisement**
49:19
**affected** 105:14
**affidavit** 46:25
50:25 51:3,9
52:25
**affidavits** 51:17
52:18
**affiliated** 16:1
16:10
**affirmed** 5:3
**afford** 69:7,12
72:8
**affordable**
19:25 20:1,2
23:3 24:4,8,25
25:9,14,16,19
26:22 30:14

43:10,18 45:4
45:7 54:8,10
54:12,19 55:8
55:12,22 68:8
68:12 69:6,14
69:17 70:1,11
70:18,24 71:9
71:13,15,18,23
72:5,11,14
73:16,16 90:11
93:19 109:18
**ago** 15:16
103:24
**agree** 9:6 48:4
101:11,14
115:20
**agreed** 87:11
**agreement**
47:25 78:25
81:21
**agreements**
50:12 115:13
**ahead** 36:5
76:22 105:1
114:8
**albeit** 14:3
**alleged** 75:4
76:2
**allowed** 36:17
**allows** 57:25
60:13,19
**ambiguous**
38:7 43:22
**amboy** 28:11

**amended** 4:11
30:17,24 31:15
53:20 73:3,20
89:22 96:25
98:19
**amount** 115:15
**analysis** 100:19
100:21
**angeli** 3:3
**animus** 97:9
98:16 109:10
109:25 110:7
**answer** 8:1,3
10:19,24 11:1
11:13,22 12:11
12:20 13:6,17
13:23 14:9,13
17:1 18:25
20:6 31:18
35:4,15,17
36:6,6 38:9,10
43:23 45:6
49:23 56:15
57:11 60:17
61:23 68:10
71:6 72:21
81:19 82:14
83:9,20 88:24
93:6 100:20,23
102:9,20 103:9
104:15,18
106:24 107:1
109:13 110:24
111:3,20
116:19

**answered**
    11:18 50:24
    61:14,16,22
    62:4 97:22
    100:5 110:10
**answering**
    11:16 12:7,15
**anticipates**
    11:12
**antidevelopm...**
    45:21,22,24
    53:11,14 57:6
    57:7 60:25
**antisemitic**
    60:9
**anxiety**  114:4
**anybody**  55:7
    87:21
**anymore**  59:25
    75:8
**anyone's**  34:24
**apartment**
    18:20
**apartments**
    19:9,11
**apologize**  26:10
    30:8,22 91:15
**appear**  119:7
**appease**  98:9
**applied**  118:15
**appreciate**  9:5
    87:7 120:21,21
    120:23
**appropriate**
    7:3 8:9 10:20

97:20
**approval**  28:17
    88:4,8 114:3
    119:13,21
**approvals**  28:9
    70:7 98:22
    113:1
**approve**  105:5
**approved**
    50:12,17,23
    53:10 105:4,5
    105:12,18,19
    105:24
**approximately**
    24:21
**april**  1:17,24
**architect**
    107:10
**area**  60:19
**arleo**  12:13
    14:2
**article**  93:11,14
**asbestos**  82:10
**aside**  43:2 59:6
    103:1
**asked**  9:7 11:17
    11:19 12:16
    36:10,14 40:18
    47:14 49:10
    73:8 75:6 76:9
    79:7 91:21
    97:11,21 100:4
    110:9 112:13
**asking**  12:7,21
    23:8 29:18

30:3 32:4 36:2
    37:12,15 39:15
    40:15,16,17
    52:24 56:9,11
    77:6 80:22,25
    81:1 92:14
    95:14 105:9
    111:11 112:19
    116:10,13,15
    116:18
**assisting**  93:4
**assume**  12:15
    80:9
**assuming**  23:7
**attached**  4:13
    58:21
**attention**  73:23
**attitude**  114:18
**attorney**  6:24
    7:16 12:24
    15:8 37:14,19
    47:15,25 59:17
    61:1 62:22,23
    64:8,25 65:9
    65:13,16,20
    73:12 79:4
    91:24 92:11
    107:9,11,16,22
    107:22 119:9
    119:13,16
    121:14,16
**attorneys**  5:13
    5:25 6:9 7:21
    8:9 30:18,25
    39:23 48:8,12

49:3 54:14
    60:1 107:22
**attributed**
    43:15 94:2,19
**attributing**
    108:3
**authority**  6:6
    9:7,10 47:14
    49:11
**available**  24:22
**avoid**  120:6
**aware**  17:22
    21:2,6 24:3,7
    24:11 25:18,25
    50:21 54:4
    55:11,20 56:4
    57:2,8,18 58:9
    58:14 60:14
    62:17 72:17
    74:3,25 75:2
    76:6 79:8
    81:16 82:11
    83:4,16 84:16
    84:21 85:18,23
    88:4,23 90:1
    97:8 98:15
    100:15 109:23
    110:5 117:10
    117:13 120:6

|  b  |
| --- |

**b**  2:13 4:8
    81:14
**back**  8:20
    11:19 35:9
    38:15 39:10

[back - buildings]                                                    Page 4

47:13 57:12
59:14 61:20
68:21 70:6
72:16 73:1
81:24 89:3,19
91:18 97:12,17
99:12 101:17
103:23 107:21
**background**
24:7,11 25:18
34:24 35:19,24
39:2,6,9,20
40:4 43:5,9,17
43:22 44:24
45:20 55:11,20
**backgrounds**
100:1
**bad** 96:4,5
113:2
**bank** 113:3
**bankrupt** 77:3
**based** 63:5
**basically** 60:18
86:7
**basis** 26:5 59:8
68:16 69:19,20
77:23 86:11
103:6 115:23
115:25 116:6
116:12,14,23
**basking** 27:1
**bayonne** 24:14
**bed** 105:19
**began** 18:18
40:12

**beginning**
57:17 97:6
98:13 110:19
111:14 112:10
**begins** 89:22
90:8,24
**behalf** 7:2 8:9
47:16 88:9
**belief** 98:20
**believe** 40:24
46:25 47:3,10
60:10 75:8
81:24 92:5
107:11
**believed** 102:7
102:18
**benefit** 10:7
**bergen** 20:25
21:4 55:13
70:1
**best** 111:3
112:11 121:10
**better** 20:9
30:1 37:21
40:17
**beyond** 104:13
**big** 96:4,5
102:7,18 103:2
104:10
**bit** 33:18 66:16
**block** 94:13
**board** 105:23
**body** 33:6
63:20 64:1
95:3 108:5,21

**borough** 1:11
7:5 9:24 41:19
54:17 57:20
59:18 60:3,5,8
60:9 61:4 62:7
62:13,15,16,17
62:18,19 64:8
72:4,18,19
73:14 74:7
77:6 79:6
87:16 88:9
93:17 96:2
98:24 110:17
111:12 112:15
**botta** 3:3,4 5:18
6:16,23 7:2,4,9
7:12,17,18,25
8:5,11 9:4,12
48:4,16 67:3
74:13,21
101:16,19
111:15,18,22
**bottalaw.com**
3:8
**bottom** 88:22
**bound** 26:13,16
26:19
**break** 8:19 13:3
13:7 45:10
**breast** 40:9
41:5 42:10
**breastfeeding**
58:8
**brief** 8:23
15:19 45:15

120:14
**briefly** 47:13
**bring** 87:23
96:6
**bringing** 60:25
**broad** 80:20,23
**brook** 26:13,17
26:20
**brother** 107:12
**brought** 50:14
52:7 53:12
60:8 61:1 82:1
86:5 109:15
**brunswick**
27:21
**bs** 113:21
**build** 72:1
73:15
**builders** 9:23
9:24 16:10,14
16:15,17,21
17:6,20,22
18:3,16 28:20
30:8,13 118:1
118:15 119:8
119:22
**building** 16:16
16:18,22 65:18
75:5 83:1,22
84:2,6,8 87:22
89:5 91:16
112:24
**buildings** 18:10
18:20 110:1,8

**[built - clifton]**                                                    Page 5

**built**  29:8 79:1
  91:4
**bullet**  83:19
  84:10,21 85:19
  85:24 88:2
**bunch**  86:6
  107:21
**business**  16:13
  80:7 94:9,16
  94:24 120:7
**businesses**
  93:18 94:8,14
  94:15,21 100:3
**businessman**
  80:6
**buy**  76:24
**buying**  76:24

**c**

**c**  2:1 3:1,4
  78:17 82:9
  119:15
**c.c.r.**  121:22
**caiqui**  78:16
**call**  45:13
  59:25
**called**  16:10
  76:21 115:5
**calls**  56:8 58:18
  59:23 100:19
  117:16
**campaign**
  33:21,25 65:23
**campaigned**
  59:9,11

**campaigning**
  58:15
**candidates**
  50:15,22 53:9
**capping**  84:15
**captioned**
  73:25 83:15
**care**  7:1 77:9
  78:4
**cared**  72:5
**carefully**  50:12
**carroll**  54:16
  89:7 101:2,4,9
**carry**  60:20
  113:2
**carrying**  60:21
**case**  10:2 14:2
  15:10,23 32:6
  47:20 48:10,14
  49:7,15 51:18
  102:11,14
  104:14 109:10
  118:17,19
**cases**  13:22
  48:25
**cast**  109:4
**categories**
  18:21
**category**  18:23
**causation**
  56:10,12
**cause**  83:23
  100:3
**ccb**  3:8

**cease**  78:15,22
  79:15,18
**cedar**  28:3
**center**  2:15
**certain**  13:22
  58:25 72:8
**certainly**  6:16
**certificate**
  121:1
**certification**
  51:12,22
**certifications**
  51:17 52:9,18
  53:1
**certified**  1:21
  121:4
**certify**  121:6,13
**change**  12:6
  63:4,15,20,23
  64:16,18
**changed**  63:11
  63:14
**changes**  11:15
**characterized**
  92:11
**check**  101:1
**chief**  80:14
**chortling**  95:4
  96:15,17,19
**chris**  8:19
**christopher**  3:4
**circuit**  47:19
**circumstances**
  32:10

**citation**  48:18
**cite**  6:7
**cited**  49:7
**citizen**  21:16
  22:10,24 24:5
  24:9,12,14
  25:8,11 26:8
  26:13,16,19
  27:12 28:7
**citizens**  25:2
  34:3
**city**  22:4 59:18
**civil**  1:3 12:25
  48:6
**claims**  5:20
**clarify**  25:25
  28:15,24 36:21
  104:19 106:4
**clarifying**
  25:17 49:6
**clean**  10:19
  11:20
**clear**  6:18 7:16
  23:15 37:12
  39:17 44:12
  51:4 52:1,5
  59:23 111:14
**clearly**  8:15
  40:19
**client**  5:25 8:10
  47:16 51:18
**clifton**  27:13
  114:2 118:19
  118:21 119:1
  120:6

[closed - consistent]                                                    Page 6

| | | | |
|---|---|---|---|
| **closed** 108:6,7 | 58:7 68:9 | 96:25,25 98:19 | **condemnation** |
| 108:8,10,13,14 | **comments** | **complete** 11:10 | 78:16 79:24 |
| 108:16,21,24 | 34:23 38:25 | 11:23 21:19,20 | 80:21 |
| 112:25 | 39:4,20 40:3 | 22:7,15,21 | **condition** 13:5 |
| **coah** 20:12,20 | 43:4,8 44:11 | 25:3,4 26:15 | **conditions** |
| **code** 77:15 | 50:5 58:3,9 | 27:10,13,17,21 | 86:10 |
| 85:10 117:1 | 61:5 65:21 | 28:3,7,11 | **conduct** 6:1 |
| **coded** 76:12 | 68:11 | 55:24 56:24 | 37:17 |
| **codey** 119:15 | **commercial** | 61:23 | **confer** 36:15,17 |
| 119:17,20 | 18:9 19:5 | **completed** 19:5 | 37:19 |
| **colleagues** | 42:16 | 24:15 26:13 | **conferring** |
| 108:15 | **communication** | 27:6 28:21 | 36:24 |
| **color** 76:12 | 39:13 44:17 | **completely** | **confidence** |
| **come** 10:21 | 59:17 | 61:16,22 | 14:13 |
| 38:15 44:14 | **communicati...** | **compliance** | **confused** 10:18 |
| 53:13 54:20 | 34:15,18,21 | 85:22 86:3 | 12:4 29:15 |
| 58:1,6 59:25 | 37:6 39:16 | 98:25 | 68:19 116:8 |
| 69:11 105:9,15 | 43:14 51:24 | **comply** 109:11 | **confusing** |
| 106:25 | 58:24 | **component** | 11:25 12:2 |
| **comes** 13:21 | **commuters** | 71:23,24 | 13:12 29:16 |
| 39:10 57:12 | 76:17 | **concept** 117:23 | 30:9 |
| 73:4 | **company** 16:10 | **conception** | **connect** 53:23 |
| **comfortable** | 16:16,18 80:7 | 70:16,16 | 56:5,9 |
| 13:25 | 113:15 115:1,7 | **conceptually** | **connection** |
| **coming** 32:11 | **compelled** | 111:3 | 48:3 83:17 |
| 32:22 57:14,20 | 12:20 | **concerned** | 88:5 |
| 96:21 114:10 | **competent** 71:4 | 76:15 | **consent** 7:16 |
| 114:11,13 | **complaining** | **concluded** | 36:12,24 88:3 |
| **commencing** | 73:7 | 120:24 | 88:6 |
| 1:24 | **complaint** 4:11 | **conclusion** 8:4 | **consequential** |
| **comment** 23:6 | 30:18,25 31:15 | 56:8 100:20 | 87:9 |
| 35:23 40:25 | 32:5 53:20 | 116:16 117:17 | **considered** |
| 41:4,8,18,21 | 73:2,3,21 | **concoct** 91:10 | 20:11 |
| 42:6,15,19,21 | 80:22,25 89:22 | **concocted** | **consistent** 91:3 |
| 42:22,25 45:3 | 93:11 95:2 | 90:25 | 113:20 |

**[constitutes - day]**                                    Page 7

**constitutes**
91:9
**construction**
18:2,17 21:19
22:8,9 26:14
27:7,8,10,11,14
27:15,18,19,22
27:25 28:4,5,8
28:12,20 29:5
54:13 63:24
64:20 89:6
113:13
**cont'd** 3:1
**contains** 17:23
**contemplated**
19:5,12
**contest** 12:19
12:24 88:18
**context** 52:19
70:9 75:17
**continue** 111:6
**continued**
61:12,12
108:21
**continues**
90:25
**contract** 120:4
120:5
**contracting**
16:22
**contractor**
82:10
**control** 63:5,11
63:20,23 64:5
64:7,16,18,25

**conversation**
77:12,13 82:1
85:16 91:19
107:8 108:19
**conversations**
36:21 91:14,15
113:22
**converse** 12:10
**convey** 34:22
37:13 68:3
99:25
**convincing**
96:1
**copies** 46:15,19
46:23
**cork** 76:21
77:18,20,25
94:13,24
**corporation**
2:4
**correct** 9:25
15:24 16:11
18:7 28:1
32:15 41:6
42:17 48:23
51:16 83:3
94:7 106:16,17
**corrected** 51:20
**correctly** 50:19
54:2
**cost** 113:13
115:21,22
**council** 78:2
81:23,25 95:25
105:23 106:12

106:16,19
107:19 108:4
109:6 113:20
118:21 119:2
**counsel** 6:19
14:19,24 15:13
35:25 52:13
53:13 66:6
77:12 121:14
121:16
**country** 69:10
**county** 20:22
20:25 21:4
55:13 70:2
**couple** 38:17
40:8 51:9 84:6
**course** 10:24
42:23 53:21
57:4 59:16
117:12 119:23
**court** 1:1,21
10:13 12:12
31:1,16 40:12
48:5,10 50:13
50:17,23 52:5
52:16,19 53:1
54:14,15 89:8
100:12 121:4
**courtesy** 10:25
**courthouse**
14:1
**courts** 47:18
49:2
**coward** 107:1

**cowardly**
106:22
**cox** 12:13 14:1
**crazy** 89:12
**create** 104:24
**creates** 11:17
**creating** 60:19
**cross** 5:1
**crossings** 22:10
22:23 24:4,9
**cs5877544** 1:25
**cummis** 2:12
**currently** 94:21
117:9
**cutting** 84:15
**cv** 1:3

**d**

**d** 4:1 83:6
119:15
**dais** 34:12
108:5,25
**damaged**
110:16,21
112:19
**damages** 86:8
111:1,10
**danielle** 1:12
9:22 32:5
**data** 69:16,25
70:4,9
**date** 121:9
**dates** 13:22
86:4
**day** 26:5,5 77:5
105:4,24

**[deal - dipaola]**                                                    Page 8

| | | | |
|---|---|---|---|
| **deal** 9:12 | **demonstrate** | **desire** 120:6 | 45:1 46:11 |
| 105:21 106:23 | 54:5 | **desist** 78:15,22 | 52:14 57:25 |
| **decides** 73:1 | **denial** 83:6 | 79:16,18 | 69:11 70:21,21 |
| **decision** 38:15 | **denied** 118:16 | **destroy** 72:25 | 84:7 97:22 |
| 47:20,23 101:3 | **dense** 103:7 | 79:2 105:17 | 115:3 |
| 101:5 | 104:11 | 113:24 | **difficult** 10:21 |
| **decisions** 109:9 | **depends** 20:21 | **destroyed** | **digitally** 121:8 |
| 109:24 110:2 | 20:21 | 100:2 | **dipaola** 1:12 |
| **declarations** | **deponent** 6:2 | **detail** 51:23 | 5:17,22 6:20 |
| 51:17 | 48:11 | **determination** | 6:21,24 7:2,8 |
| **deduction** | **deposed** 10:2 | 55:9 | 9:22,23 32:5,7 |
| 117:10 | 74:21 | **determine** 9:10 | 32:12 33:4,10 |
| **defendant** 48:1 | **deposition** 1:16 | **develop** 16:5 | 33:13 34:9,11 |
| 50:15 88:21 | 1:19 6:10 9:2 | 117:14 118:15 | 34:15,18,22 |
| 89:23 95:4 | 10:1,14 12:12 | **developed** | 35:15,22 37:6 |
| **defendant's** | 13:11 14:19,25 | 117:8 | 38:1,24 39:19 |
| 109:24 110:6 | 15:3,6 48:3 | **developer** | 40:3,6 41:14 |
| **defendants** | 97:24 98:1 | 16:18 96:5 | 41:24 42:24 |
| 1:13 32:6 | 114:7 120:24 | 113:25 | 43:3,7 45:19 |
| 53:23 109:9 | **depreciation** | **developing** | 46:2 50:5,15 |
| **definitely** 41:13 | 117:10,15 | 115:22 | 50:22 53:9 |
| 75:18 108:18 | **derosa** 1:20 | **development** | 54:6 57:19 |
| **definition** 55:6 | 121:4,22 | 10:3 16:16,21 | 58:9,14 59:9 |
| **delay** 83:15,18 | **describe** 16:13 | 18:9,17 21:24 | 62:20 65:21 |
| 85:21 86:12 | 52:14 53:8 | 30:14 43:11,19 | 66:20 68:4 |
| 91:2 112:21,21 | 70:13 112:11 | 45:5 57:23 | 72:23 74:3 |
| **delve** 58:24 | **described** | 61:7,9 77:2 | 75:2,13,15,25 |
| **demand** 82:9 | 115:21 | 101:13 105:22 | 76:6 77:19 |
| **demo** 27:23 | **describes** 78:8 | 110:6 119:21 | 78:21 79:25 |
| 73:6,8 113:2 | 96:5 | 120:8 | 81:15 82:12 |
| **demolition** | **description** | **diet** 47:21 | 83:5,17 84:21 |
| 74:1,5 75:3 | 4:10 | **difference** 14:4 | 85:17,22 88:4 |
| 76:1 83:15,18 | **designated** | 70:20 | 88:15,21,24 |
| 91:1,10,21 | 19:21 21:3,7 | **different** 5:23 | 89:23 90:3,9 |
| 92:8,23 | 22:2 | 18:21 21:15 | 91:9 92:22 |

[dipaola - engineer]                                                   Page 9

93:3,17,22
94:20 95:4,20
96:11 98:19,20
99:25 102:25
103:1,11,25
104:4,20 108:3
118:22
**dipaola's** 37:16
56:5 57:4
70:24 71:1
84:16 87:15
97:1,8 98:15
**direct** 8:1,2
9:17 37:25
53:19 73:23
105:13
**directed** 46:16
88:24
**direction** 80:16
88:21 90:25
91:9
**directive** 79:11
80:5 84:17
90:10,15,19
93:3
**directives** 80:4
81:15
**directly** 98:21
108:5
**disagree** 7:18
100:16
**disconnections**
83:7
**discovery**
104:14

**discriminatory**
97:14
**discuss** 8:19
14:25
**discussed** 9:5
28:19 29:6
81:23 104:7
**discussion** 11:4
15:19 23:24
**discussions**
108:14 119:20
**dislike** 105:9
110:1,8
**dist** 48:19
**distances** 13:22
**distinction** 20:3
**district** 1:1,2
47:21 48:22,25
49:7,16
**diverse** 53:22
54:6 57:5,25
100:1
**diversity** 57:9
**document**
31:13
**documents**
15:2,5 50:25
86:25,25
**doing** 27:23
72:12 73:19
77:1 80:16
86:12 92:7,22
94:8 111:5
114:7,8,21,22
120:8

**doubt** 87:17,20
**draws** 113:10
**drove** 77:4
**drugs** 47:21
**due** 54:13 89:7
93:18
**duly** 5:3
**duplicative**
6:13,15,17

**e**

**e** 2:1,1,5 3:1,1
4:1,8 34:15
43:15 77:5
78:17 83:14
119:15
**early** 49:21
**earning** 115:2
**eastern** 47:21
48:22 49:15
**effect** 67:24
72:13
**either** 31:7 38:1
38:24 46:25
60:7
**elect** 32:19
33:13
**elected** 107:19
**election** 33:13
33:16 34:4
61:13 65:23
90:9
**elections** 50:14
**emerson** 1:5,11
9:24,25 10:3
15:23 16:1,4,6

16:23 18:22
19:4,12,16
21:3,7 32:13
32:24 33:17
34:4 41:5,15
43:10,18 45:4
50:14,18 52:8
53:23 54:7,17
55:22 57:5,21
63:18 66:17
72:4,18 73:15
94:8 101:1
102:11,17
103:6,15,19
110:15 112:14
115:3,14 118:2
118:17,20,24
**empirical** 69:15
70:4
**employee**
121:14,16
**employees**
62:15,18,19
**ended** 108:17
**ends** 10:17 97:2
**endurance**
12:23
**enforcement**
72:19
**engaged** 18:3
63:10 86:15
**engineer** 62:23
64:11 65:3
86:5,6,14,17
87:16 107:11

**[enthusiastically - fighting]**                                        Page 10

| | | f | |
|---|---|---|---|
| **enthusiastical...** 95:6 | **examine** 6:9,25 7:2,9,23 8:9 47:16 | **face** 37:5,5 38:24,24 104:22 106:24 118:23 | **falls** 25:2,9,12 26:8 |
| **entire** 45:7 108:9 | **examined** 5:13 97:13 | **facebook** 61:4 61:6 | **familiar** 21:17 22:5,13 80:10 100:11 116:6 116:14,23 117:2,22 |
| **entities** 16:23 | **examining** 5:8 5:15 | **facility** 40:10 41:5 42:11 58:8 | **family** 18:7,12 28:25 29:1,4 |
| **entity** 7:5 16:5 32:24 119:12 | **excellent** 89:9 | **fact** 57:13 61:7 96:20 97:25 98:14 101:2 109:15 112:23 113:12 117:13 120:7 | **far** 101:9 111:6 |
| **equate** 68:11 | **except** 86:11 92:10 | | **fast** 12:1 |
| **equates** 97:14 | **excused** 108:15 | | **fault** 80:8 |
| **eruv** 60:12,12 60:14,18 | **execute** 88:3,5 | | **favor** 9:1 |
| **especially** 113:10 | **executive** 80:14 | | **fd** 4:11 31:9,14 50:8,11 78:10 99:16 |
| **esq** 2:5,13,14 3:4 | **exhibit** 31:9 | **facts** 50:21 54:4 56:4 57:2 94:16 97:7,15 97:16 99:4,23 109:8,22 110:4 | **february** 47:22 |
| **estimate** 13:11 13:20,24 14:3 14:10,11 37:8 62:14 67:23 | **exhibits** 4:13 | | **federal** 14:1 31:1,15 41:11 48:6 51:18 117:1 |
| | **existence** 18:3 | **factual** 94:11 | |
| | **existing** 60:5 76:16 100:2 | **factually** 94:18 | **feel** 12:20 13:25 61:15 |
| **estimates** 86:21 | **expand** 40:16 | **fail** 88:24,24 | |
| **estimating** 14:12 | **expert** 110:25 116:17 117:18 | **failed** 78:23 | **fees** 101:1 |
| **ethnic** 43:5,9 43:17,21 | **explain** 12:4 | **failure** 78:14 78:15,21 79:23 88:18 | **feet** 19:7 |
| | | | **felt** 87:24 |
| **evaluate** 9:9 | **express** 42:24 103:5 | **fair** 9:14 18:4 30:5,6 32:25 33:14,25 34:2 47:11 102:5 108:16 | **fence** 73:5 76:5 76:8,13 77:11 81:14,16,22 91:1,11 |
| **eventually** 79:5 107:18 | **expressed** 58:4 | | |
| **everybody** 60:3 107:13 | **expressing** 102:17 | | |
| **exactly** 76:12 78:23 85:7 | **expressly** 48:7 | | **fences** 73:9 76:10 |
| **examination** 4:3 6:1 7:11 8:4,16 9:17 | **extension** 113:8 | | **fighting** 57:23 72:1 |
| | **extent** 47:6 51:24 | | |
| | **extra** 89:16 114:4,4 | **fall** 18:22 | |
| | **extremely** 101:10 | | |

[filed - funny]                                                        Page 11

| | | | |
|---|---|---|---|
| **filed**  30:18,25 | 32:16 34:25 | **fire**  84:19,23 | **forgot**  62:9 |
| 31:6,15 41:12 | 36:1,5,11,14,17 | 85:1,8,11,17 | **form**  16:25 |
| 51:17 | 37:14,20 38:5 | **fired**  60:11 | 18:24 25:20 |
| **filled**  58:5 | 38:12 39:11,13 | 62:10,17,20 | 30:3 34:25 |
| **final**  90:12,23 | 39:16 40:24 | 63:1 86:4 | 36:2 38:6 |
| 90:23 95:2 | 41:25 43:20 | **firing**  60:3 | 43:21 44:17 |
| 96:25 | 45:12 47:2,9 | **firm**  9:21 37:14 | 56:8,14 57:10 |
| **finally**  113:2 | 47:12 48:15 | **first**  4:11 5:3 | 71:5 93:5 98:3 |
| **financially** | 49:9,17,20 | 30:17,24 31:15 | 100:22 102:8 |
| 121:17 | 51:2,11,19 | 32:7,16 33:4 | 102:19 103:8 |
| **find**  13:12 50:5 | 52:4,24 53:4 | 34:8 37:4 40:8 | 109:12 112:9 |
| 66:3,5 72:24 | 55:14,23 56:7 | 48:17,17 53:20 | 115:24 116:25 |
| 75:8 81:25 | 56:13,18,20,23 | 57:22 58:1 | 117:19 118:3 |
| 92:2 | 57:10 58:25 | 73:2,20 89:21 | **forth**  121:9 |
| **findings**  100:17 | 60:16 66:10,25 | 95:5 96:25 | **forward**  54:11 |
| **fine**  8:21 108:1 | 67:13 69:19 | 98:18 102:14 | 54:12 105:22 |
| **finish**  10:23 | 70:25 74:10,18 | 107:17 112:20 | **fought**  57:22 |
| 11:21 56:16 | 78:9 79:12,17 | **fish**  80:10 | **found**  21:10 |
| 59:10 60:16 | 80:19 81:2,7 | **fist**  74:10,11 | 49:15 73:13 |
| 99:14 113:4,6 | 81:10,18 82:13 | **fit**  55:5,7 | 91:25 |
| 114:23 | 83:8,21 85:24 | **five**  120:10 | **foundation** |
| **finished**  11:1 | 86:24 87:4,11 | **flyers**  33:19 | 35:1,3 37:4 |
| 105:3 | 92:10,14 93:5 | **follow**  11:6 | **four**  103:24 |
| **fiorenzo**  2:13 | 95:13 97:10,19 | 33:16 66:5 | **frame**  32:14 |
| 5:6,11,18,21,24 | 97:25 98:4,6,9 | 75:22 107:2 | 75:16 106:5 |
| 6:5,13,18,23 | 99:7 100:4,18 | **followed**  86:23 | 112:25 113:4 |
| 7:6,13,15,20 | 102:8,19 103:8 | 87:2 | **franklin**  3:5 |
| 8:2,7,12,21 9:1 | 104:12 109:12 | **following**  73:22 | **french**  113:21 |
| 9:14 10:6 11:2 | 110:9,23 111:7 | **follows**  5:4 | **friends**  78:3 |
| 14:21 16:25 | 111:9,17,25 | **foregoing** | 118:22 |
| 17:12 18:24 | 112:8 115:24 | 121:6 | **front**  8:15 50:8 |
| 20:12,15 23:7 | 116:10,15,25 | **foremost** | 74:15 |
| 23:11 25:20 | 117:16 118:3,7 | 112:20 | **full**  48:18 |
| 29:3 30:2 | 120:12,23 | **forget**  96:4 | **funny**  96:1 |
| 31:20,23,25 | | 119:18 | |

[further - happy]                                                    Page 12

| | | | |
|---|---|---|---|
| **further** 14:22 120:17 121:13 | 60:1 61:12,13 73:11 74:11 76:13 79:2 96:3 97:6,12 97:17 98:13 105:1 110:19 114:6 119:13 | 113:4,6,7,9 114:8,9 115:18 116:11 118:21 118:22,24 119:20 120:7 | **groups** 55:5 69:16 |

**g**

**g** 78:17 84:20
**gc** 16:16,18
**general** 16:22
109:25 110:8
**generally** 47:18
47:24 55:14
66:19 111:2
117:2,22
**generate**
103:19 117:11
**getting** 40:19
**gist** 66:21
**give** 13:10,17
13:24 14:9,10
14:11 40:11,12
47:17 56:10
69:7 73:4
82:14 99:17
106:25 116:19
117:18
**given** 9:8 11:5
31:13 32:14
49:12 93:3
106:25
**giving** 9:8
14:13 73:6
**glen** 115:5,14
**go** 8:20 10:4
11:19 13:2
14:23 23:4
31:19 36:5,8
47:12 57:17

**goal** 53:21 54:5
57:3 96:7
**goes** 12:14 27:3
74:6 77:15
81:3
**going** 5:7,9,12
6:6 7:1,8,16,25
8:2,6,20 9:11
11:14 13:2,6
13:13 28:16
36:11 38:5,16
38:19 40:9,11
42:13 45:1
47:6 51:5 55:7
56:7 61:19,21
66:6 67:5 70:7
70:25 72:21
76:13,17,18,19
80:19 81:13,22
81:23 82:17
89:6 96:2,3
97:10,21 98:6
99:17,18
100:18,22
103:23 104:12
104:15 105:1,2
105:15,22
110:24 112:10

**good** 7:13 9:19
10:7,8 13:18
46:24 51:14
54:14 61:2
72:7 78:3
81:10 111:5
**google** 21:13
45:25 46:2,6,8
46:13,17,20
50:4 60:22
72:15
**googled** 46:1
**governing**
63:20,25 95:3
108:5,21
**government**
63:11 64:25
65:10 90:10
113:1
**governments**
63:4
**governor** 80:14
**great** 21:13
101:5
**greater** 117:14
**gross** 2:12
**grounds** 103:15
103:19
**group** 40:2
68:6

**grove** 28:3
**guarantee** 6:15
**guess** 8:5 13:11
13:14,15,18,19
14:14 54:24
86:18 95:16
118:8,10
**guesses** 86:21
87:8
**guessing** 14:15
**guttenberg**
28:7
**guys** 8:14 36:12
47:13 49:21
91:20

**h**

**h** 4:8 78:17
**habit** 11:11
**hall** 32:13
41:19
**hammer** 8:6
9:13 114:11,12
**hand** 107:2
**handle** 8:15
**happen** 54:19
60:4 86:13
**happened**
105:8 114:2
**happens**
105:10
**happy** 13:4
38:14 101:3
111:20 112:12

**harm** 100:3
**hasidic** 44:23
  50:6 65:22
  68:6
**hasidics** 44:13
**hawk** 74:7,12
  74:12
**he'll** 111:3,6
**head** 6:7 10:15
  80:11
**hear** 12:2 30:20
  77:20 79:9
  93:22 94:1
  112:13
**heard** 11:23
  35:22 52:13
  65:21 66:20
  85:9 93:24
  96:8 102:16
  103:5,14,18
  104:19 112:14
**held** 77:10
**helicopter** 74:7
**help** 72:23
  87:22 91:22,23
  92:8 93:1
  111:25 112:1,1
**helpful** 38:18
**helping** 92:23
**helps** 40:20
**hereinbefore**
  121:9
**hereto** 4:13
**hermansen**
  60:11 62:12

91:19 92:1,3,6
  92:21
**higher** 113:13
**hired** 62:12
**history** 60:22
  60:24 72:15,22
  72:22 86:2
**hoffman**
  107:17
**hold** 36:1,24
**homes** 18:7
  70:19
**homework**
  114:1
**honestly** 17:11
**hope** 61:17
**hour** 9:3 12:25
**houses** 58:13
  73:7
**housing** 19:21
  19:24 20:4,4,8
  20:11,20,25
  21:23 22:2
  23:2 24:25
  25:9 26:23
  30:14 43:10
  45:4 53:24
  68:8,12 69:6,7
  69:12,13,17
  70:1,24 71:23
  72:5 90:11
  93:19 109:18
**huh** 10:16
**hurt** 82:3

**hypothetical**
  102:9
**hypothetically**
  102:2

**i**

**idea** 10:7,8
  33:23 60:7
  94:4,14
**identification**
  31:10,14 99:16
**identified**
  26:25 27:9,12
  27:16,20 28:3
  28:7,25
**identifies** 70:1
**identify** 59:8
  63:18 66:6
  75:1 76:5 99:4
  99:24
**imagine** 32:23
**immaterial**
  104:13
**impact** 37:17
**impede** 98:23
**implicates**
  37:11
**implication**
  37:22
**implications**
  116:7
**important**
  24:13 104:18
**imposed** 86:10
**improper** 23:21
  56:10 71:4

**inappropriate**
  34:23 35:23
  38:4,7 82:10
**include** 26:22
  30:14 68:7,9
**includes** 18:7,9
  54:10 57:23
**including** 73:4
  73:6 95:3
  98:24 104:20
  104:22
**income** 19:21
  19:24 20:4,4,7
  20:11,19,22,25
  21:3,4,7 22:2
  23:2 53:24
  54:21 70:22
  112:22,23
  113:14,16
  116:7,8 117:11
**incorrect** 94:11
  94:23
**increase** 91:2
  115:22 116:11
**increased**
  115:21
**indicate** 21:9
  62:19 69:16
  93:2
**indicated** 33:12
  38:12 65:19
  115:2
**indicates** 88:20
**indication**
  75:23

**indirect** 113:24
**individual's**
    75:19
**individuals**
    55:12,21 62:25
    66:7
**information**
    23:9 33:21,25
    37:15 46:1
    59:2 66:7
    82:10,19 84:15
    98:20
**initiate** 80:1
**inside** 60:20
**insistence**
    109:17
**inspections**
    89:6,10,12,13
**inspector** 75:5
    82:16 83:2,23
    84:2,6,8
**installed** 41:15
**instance** 43:2
    95:10,11,14
**instances** 57:8
    63:13 64:15
**instruct** 56:14
**instruction**
    11:5,6 13:10
    13:12 40:11
    86:20 87:3
**instructions**
    10:4
**insurance**
    113:1

**intended** 99:25
**intentions**
    59:11
**interaction**
    33:9 37:25
    84:7,8
**interactions**
    38:23 63:3
**interest** 29:25
    113:13 114:20
    114:21,22
**interested**
    40:17,19
    121:17
**interpretation**
    70:24 71:2
**interpreted**
    35:23
**interrupt** 40:13
**investor** 29:21
**involve** 80:16
**involved** 18:16
    18:18 26:4
    28:20 29:5,13
    29:20 30:13
    63:3 76:20
    83:5 88:16
    103:3
**involvement**
    30:4 84:17,20
    87:15
**involves** 18:12
**involving** 29:25
**iron** 74:8,10,11

**irrelevant**
    104:13
**issuance** 85:21
**issue** 23:17
    73:25 74:4
    75:3,9 76:1,5,7
    77:10,12 81:16
    84:14 91:20
    104:1,4
**issued** 77:11
    90:9 100:12
**issues** 5:23 34:5
    83:24 118:1,16
**item** 78:21
    79:15,23 82:9
    82:12 83:6,14
    84:20 88:18
**items** 80:17
    92:25

**j**

**j** 88:18 89:19
**jack** 1:16 61:9
    61:10
**jersey** 1:2,12
    1:22,23 2:7,17
    3:6 5:2 20:11
    22:11 28:22
    48:25 49:8
    69:18 121:6,23
**jew** 45:8,20
    61:11 66:23
    67:1,14,16
    118:19 119:7
**jewish** 44:24
    55:3 65:22

68:6 119:9
    120:7
**jews** 40:5,7
    50:6,6 55:1
    57:13,20 58:6
    58:10 59:12
    60:19
**jf** 2:18
**jfiorenzo** 2:20
**job** 1:25 111:6
**joe** 23:13 30:5
    30:6 47:6
    51:15 56:17
    80:24 81:6,6,8
    111:23 119:18
    120:11
**john** 61:1
**join** 107:18
**jomanna** 1:20
    121:4,22
**joseph** 2:13
**judge** 8:6,17
    9:13 12:13
    14:1 54:15
    89:7,8 100:12
    100:15 101:2,4
    101:8
**judgment** 79:3
    90:12
**jump** 76:18
**jurisdiction**
    48:9
**jury** 12:13 14:2

[k - letter]                                                                          Page 15

| k | 24:6,23 25:22 | l | lawyer 11:14 |
|---|---|---|---|
| **k** 78:6,7,10,21 | 26:5,6,7 31:5 | **l** 78:6,7,10 | 11:14 58:24 |
| 79:15,17,17 | 31:17 33:6 | 79:23 80:18 | 59:7 |
| **keep** 46:15,19 | 37:7 38:8 | 81:7 | **lawyers** 11:11 |
| 59:11 73:14 | 39:25 42:12,13 | **lack** 34:25 | 13:10 |
| 87:8 105:15 | 45:23 46:7,24 | 113:14,16 | **lead** 5:10 |
| **keg** 76:22 77:18 | 52:6 54:23 | 114:5 | **leader** 72:10 |
| 77:20,25 94:13 | 57:13 61:8,14 | **lakewood** 5:2 | **leads** 87:19 |
| 94:24 | 61:15 62:10,12 | 66:22,24 67:1 | **learned** 59:7 |
| **keith** 107:16 | 63:1,6,7 64:4,6 | 67:2,15 | 65:20 |
| **kevin** 119:15 | 64:23 65:1,2,5 | **lamatina** 87:22 | **lease** 24:22 |
| **kind** 52:14 | 66:16 70:16 | 107:15 | 115:17,18 |
| **kinderkamack** | 71:1,8,8,12,14 | **land** 109:9,24 | **leased** 21:21 |
| 19:16,19 | 75:14 76:20 | 110:2 | 24:5,17 25:5 |
| **klein** 2:14 | 77:3 81:3 | **landscape** | 26:17 |
| 14:22 47:18 | 84:25 87:4 | 52:14 | **leases** 26:2 |
| 48:6,19,23 | 88:14,15,17 | **large** 110:1,8 | **leasing** 25:3 |
| 49:1 52:1 | 94:3,6,16,18 | **laughing** 95:4 | 117:9 |
| **klugmann** 1:16 | 95:23 96:1,13 | 95:20,23 96:11 | **leave** 14:15 |
| 1:19 4:4 5:1,8 | 96:17,22 97:13 | 96:13,19 | **led** 61:7 |
| 5:13 9:19 24:3 | 98:8 103:3,17 | **laurel** 52:2,6,8 | **left** 60:6 |
| 31:13 32:4 | 105:3,11 | 53:24 57:24 | **legal** 2:15 56:8 |
| 45:19 52:10,13 | 107:12,23 | 97:13 | 100:19,19,21 |
| 61:9,10 99:12 | 109:14 112:9 | **law** 2:3 77:15 | 101:1 115:25 |
| 120:16 | 113:11 114:18 | 109:11 | 116:16 117:17 |
| **knew** 75:14 | 114:20,25 | **laws** 72:20 | **legitimate** |
| 94:3 97:15 | 115:25 116:1 | **lawsuit** 9:22 | 101:12 |
| 118:21 | 116:16 | 18:18 31:1 | **length** 97:16 |
| **know** 8:12,14 | **knows** 23:15 | 41:12 47:1 | **leonard** 2:5 |
| 10:2 12:4,21 | 45:8 | 51:1 57:24 | 9:21 |
| 13:1,4 14:11 | **kosher** 40:9 | 60:12 72:2,15 | **les** 2:9 |
| 17:9,11,15,15 | 41:5 42:10 | 88:19 89:1 | **lesser** 54:21 |
| 17:18,21 20:5 | 58:8 | 109:16 | **letter** 66:5 |
| 20:7 21:1,8 | | **lawsuits** 60:2 | 78:15,22 79:16 |
| 23:9,10,19,20 | | | |

[letters - matter]                                                    Page 16

letters  43:14
  78:10
levels  70:21
lexis  48:19
liability  47:22
license  1:21
  121:22
likely  40:18
limit  9:3 12:25
linden  21:16
line  4:18
  114:23
liquor  76:22
list  21:14
listen  11:10
literally  40:14
litigation  16:7
  47:22 48:13
  52:15,20
little  13:13 25:2
  25:8,12 26:8
  29:15 33:18
  46:10 66:15
  72:22
live  96:2
living  73:7
llc  1:6 3:3
  32:24
loan  113:5,5,7
  113:9
local  58:18
  63:11
located  19:15
  19:18

long  13:2 16:17
  34:19
longer  94:8
look  46:12
  49:12 81:13,18
  81:24 83:8,19
  85:24 118:24
looked  23:8
  46:2 104:22
  105:5 106:23
looking  10:17
  50:10 76:4
  82:9 83:14
  86:8 89:21
  90:8,22 93:10
  95:1 96:24
  98:18 99:20
  114:8
loss  115:15
lost  93:17
  115:10 118:1,4
lot  28:23 31:24
  47:3 73:3
  97:16 104:19
  114:14,14
lottery  13:17
lou  87:22
  107:15
love  100:25
  101:1
lovely  10:12
low  19:21,23
  20:4,7,11,19
  21:3,7 22:2
  23:1 53:24

70:21
luncheon  99:9

m

m  73:10
made  23:6 38:3
  38:25 39:19
  41:18,21 42:6
  43:3 55:9 58:4
  58:9 59:22
  65:21 68:12
  77:10 86:6
  92:4,6 94:20
  98:1 100:15,25
  101:4 105:20
  106:23 108:4
  110:2 113:15
  113:17
mah  1:3
mail  34:15
mails  43:15
  77:5
maintains  17:6
make  10:19
  11:20,22 35:22
  37:12 39:4,17
  43:7 45:12
  48:2 54:18
  56:24 61:21
  67:3 69:9 72:9
  72:11 73:8
  76:25 77:8
  78:4,25 82:2
  84:23,25 85:7
  86:13 87:24
  93:22,24 94:1

101:21 106:18
  110:17 112:22
  113:21,22
  115:16,17
makes  13:13
makeup  63:25
  70:1
making  10:25
  20:23 23:14
  34:11 68:18
  80:16 89:17
malagiere  2:3
malagierelaw...
  2:9
man  45:25
management
  29:14 113:15
  115:1,5,6,15,17
  115:18
managing  16:3
  115:10
mandating
  89:14
map  76:12
march  95:12
marked  31:9
  31:14
marking  99:19
massive  60:12
master  50:13
  50:17
materials
  113:13
matter  1:20
  12:14 96:1

| | | | |
|---|---|---|---|
| **mature**  113:8 | 92:11,22 93:3 | **meet**  14:18 | **milk**  40:10 41:5 |
| **maturing**  113:5 | 93:16,22 94:19 | 32:7,12 108:21 | 42:11 |
| **mayor**  5:17,21 | 95:20 96:11 | **meeting**  32:10 | **million**  114:15 |
| 6:20,24 7:2,8 | 97:8 98:15,19 | 33:3,7 34:8,12 | 114:16 |
| 9:23 32:7,12 | 98:21 99:24 | 37:6 59:22 | **millions**  13:16 |
| 32:15,19 33:4 | 102:25 103:1 | 96:9 108:2,10 | **mind**  71:2,3 |
| 33:10,12,13 | 103:11,25 | 108:13,14 | **minorities** |
| 34:9,11,15,18 | 104:3,20,21,23 | 109:2 | 53:22 54:6,20 |
| 34:22 35:22 | 105:24 106:12 | **meetings**  78:2 | 54:23,25 55:2 |
| 37:6,16 38:1 | 106:16 107:16 | 81:25 85:4 | 55:6 57:5 68:9 |
| 38:24 39:19 | 108:3 109:4 | 95:25 113:20 | 68:12 |
| 40:2,6 41:14 | 110:16 118:22 | **mega**  13:16 | **minority**  68:5 |
| 41:15,23 42:24 | **mayor's**  80:13 | **member**  16:3 | 69:16 97:3 |
| 43:3,7,15 | **mayors**  77:14 | 106:12,15 | **minute**  11:15 |
| 45:19 46:1 | **mca**  1:3 | 108:4 119:1 | 31:20 36:8 |
| 50:5,21 53:8 | **mccann**  61:2 | **members**  95:3 | **minutes**  15:16 |
| 54:6 56:5 57:3 | 96:4,8 | **memorialize** | 120:10 |
| 57:19 58:9,14 | **mean**  7:20 | 119:25 120:2 | **misguiding** |
| 59:9,15,18,22 | 13:14 28:14 | **memory**  12:19 | 114:18 |
| 62:20 65:21 | 32:16 38:8 | **mention**  92:7 | **misleading** |
| 66:20 68:4 | 41:25 51:11 | **mentioned**  1:20 | 114:18 |
| 70:12,23 71:1 | 52:21 54:25 | 12:24 51:9 | **misunderstood** |
| 72:23 74:3,13 | 55:23 63:7 | 62:18 71:22 | 26:1,11 |
| 74:15,16 75:2 | 70:20 86:24 | 77:18 84:5 | **mixed**  18:13 |
| 75:13,13,14,18 | 114:12 115:25 | 98:17 | 19:1 21:14 |
| 75:25 76:6 | 118:4 119:10 | **mere**  109:11 | 29:25 |
| 77:12,13,19 | **means**  28:16 | **message**  35:2,4 | **moderate**  19:21 |
| 78:20 79:8,25 | 97:14 112:10 | 35:15,16 | 20:4,7,25 21:4 |
| 80:8 81:15 | **meant**  16:5 | **messages**  35:18 | 22:2 23:1 |
| 82:2,7,11,25 | 51:13 70:11 | 59:19,24 | **moment**  6:6 |
| 83:5,16 84:16 | **measure**  51:24 | **messaging** | 94:24 |
| 84:20 85:16,22 | **media**  43:16 | 44:19 | **money**  69:9 |
| 87:14,23 88:4 | 113:19 | **met**  32:17 33:4 | 89:16 94:15 |
| 88:15,24 90:3 | **medium**  70:21 | 33:12 34:8 | 96:3 112:22 |
| 90:9 91:9,24 | | | 114:14,14 |

[money - object]                                            Page 18

| | | | |
|---|---|---|---|
| 115:10,16,17 | **municipalities** | **negative**  65:21 | **nodding**  10:15 |
| **monitor**  54:15 | 59:16 63:19 | 68:7,9 | **nominative** |
| 89:8 | 114:1,9 | **neglected**  40:12 | 30:7 |
| **montclair** | **municipality** | **neglia**  86:19 | **non**  118:19 |
| 27:17 | 63:16 72:10 | **neighbor** | 119:7,9 |
| **months**  59:21 | 89:14,15 | 105:13 | **nope**  27:5 |
| **moonachie** | 113:11 | **neither**  28:13 | **normal**  59:16 |
| 1:23,23 2:6,7 | | 121:13,15 | **nose**  77:16,17 |
| **morning**  9:19 | **n** | **nervous**  74:14 | **notary**  1:22 5:3 |
| 104:7 | | **never**  39:21 | 121:5,23 |
| **motion**  95:7 | **n**  2:1 3:1 4:1 | 53:17 54:19,20 | **note**  9:2 43:23 |
| **motivated**  97:2 | 78:17 | 72:23 77:13 | 110:23 |
| 97:9 98:16 | **name**  9:21 17:8 | 78:6 79:3 | **notes**  15:7,9,12 |
| 101:13 109:10 | 17:12 27:3 | 82:19 85:9 | 15:15 |
| 109:25 110:7 | 60:10 62:9 | 94:24,25 105:8 | **notice**  47:24 |
| **mount**  52:2,6,8 | 75:7,20,23 | **new**  1:2,11,22 | **noticed**  48:3 |
| 53:23 57:23 | 83:2 91:16 | 1:23 2:7,17 3:6 | **notorious**  60:9 |
| 97:13 | 93:18 107:17 | 5:2 20:11 | **november** |
| **move**  12:23 | 119:3,18 | 22:11 27:21 | 50:14 |
| 54:11,12 77:1 | **nature**  33:3 | 28:22 48:25 | **number**  4:10 |
| 95:5 105:21 | 36:19 38:2,25 | 49:7 60:8 | 21:15 51:20 |
| 107:1 108:5 | 43:16 72:20 | 64:25 69:17 | 52:9 67:23 |
| **moving**  53:22 | 80:5 90:16 | 86:5,17 91:1 | 73:21 |
| 54:7 57:5 | **near**  88:21 | 91:10,12 92:18 | **numbers**  13:16 |
| 85:15 | 106:9 | 92:25 97:20 | 21:1 111:1 |
| **multi**  18:12 | **necessary** | 98:5 109:15,15 | |
| 28:25 29:4 | 85:10 | 114:8,10 121:5 | **o** |
| **multiple**  48:7 | **need**  10:4 13:3 | 121:23 | |
| 48:11,11 49:3 | 14:21 20:8 | **newark**  2:17 | **o**  73:10 119:15 |
| 84:9 | 31:16 36:21 | 12:14 14:1 | **o'clock**  45:13 |
| **mumbled**  12:1 | 37:19 78:3 | 22:4 31:1 | **object**  7:25 |
| **municipal** | 113:9 | **nice**  23:4 | 16:25 18:24 |
| 33:16 63:4 | **needed**  38:13 | 101:10 120:22 | 30:3 36:1 38:5 |
| 64:10 88:3,6 | 105:2 | **nicely**  114:20 | 56:7 70:25 |
| 89:24 90:10 | **needing**  38:11 | | 71:4 80:20 |
| | 39:10 | | 93:5 97:10,21 |
| | | | 100:18,22 |

[object - orthodox]                                                    Page 19

| | | | |
|---|---|---|---|
| 101:12,15 | **obstruction** | 14:7,24 16:9 | **open** 23:8 |
| 102:6,15,16 | 97:1,8 98:15 | 17:8,18 18:1 | 94:13 108:6,8 |
| 103:14,18 | **obstructionist** | 18:12 20:15 | **operating** 77:9 |
| 104:12 112:9 | 73:13 | 22:15,23 25:17 | 94:21 |
| 115:24 116:25 | **obviously** 23:9 | 26:6,10 27:6 | **opinion** 77:2 |
| 117:19 118:3 | 27:24 32:5 | 28:2,10,14,24 | 89:3 116:10 |
| **objected** 56:14 | **occupancy** 25:6 | 29:16,23 30:5 | **opinions** 56:10 |
| 72:18 | **occupy** 69:17 | 32:1 33:2 36:5 | 56:12 117:18 |
| **objection** 11:2 | **occupying** 26:8 | 37:1 39:23 | **opportunity** |
| 11:3 25:20 | 26:17 42:16 | 42:6,9 43:2 | 14:18 69:14 |
| 34:25 35:5 | **offended** 42:22 | 47:5 48:21,24 | 72:25 |
| 38:9 43:20,23 | 42:25 | 49:6,14,14,18 | **opposed** 22:19 |
| 43:24 56:24 | **offense** 7:17 | 49:20,22 50:10 | 29:1 60:20 |
| 57:10 97:23,24 | **offer** 114:23 | 51:15 53:4 | 106:20 109:10 |
| 98:1,3 100:4 | **offered** 22:17 | 54:4 56:20,23 | 109:25 110:7 |
| 102:8,18,19 | 114:15 | 59:6 61:18 | 112:15 |
| 103:6,8 104:15 | **offhand** 21:8 | 63:8 68:11 | **opposition** |
| 109:12 110:9 | 68:2 76:3 | 79:17,18,23 | 62:20 68:4 |
| 112:11 117:16 | 89:20 90:17 | 80:19 81:5,9 | **orchestrate** |
| **objections** 48:2 | **office** 18:19 | 81:19 82:9 | 90:3 |
| 104:9 | **officer** 77:15 | 91:14 92:14 | **orchestrated** |
| **obligation** | 80:14 81:21 | 94:7 99:15 | 89:23 |
| 78:24 | **offices** 2:3 | 100:23 101:8 | **order** 54:15 |
| **observations** | **official** 91:16 | 103:5 106:11 | 77:2 |
| 37:16 | 107:19 | 108:12 109:21 | **ordered** 89:8 |
| **observe** 63:14 | **officials** 90:25 | 111:7 117:7 | **originally** |
| 78:20 79:25 | 91:10 | 118:14 | 81:20 86:15 |
| 80:3 95:20 | **offset** 117:11 | **once** 11:6 | **orthodox** 40:5 |
| 96:11,15 | **oh** 22:22 25:15 | 105:12 | 40:7 44:14,23 |
| **observed** 63:20 | 56:18 69:1 | **ones** 30:15 49:1 | 45:8,20 50:6 |
| 64:16,24 77:19 | 74:17 94:3 | 68:2 84:7 | 57:13,20 58:6 |
| 77:24 | 112:3 114:16 | **online** 61:3 | 58:10 59:12 |
| **obstruct** 73:14 | **okay** 5:11,24 | **onslaught** | 60:19 61:10 |
| 73:18 91:2 | 7:14,15 9:13 | 113:18 | 65:22 66:23 |
| | 10:11 12:10,19 | | 67:1,14,16 |

68:6

**outlining** 76:12

**outside** 39:18
65:19

**overly** 80:20

**overnight** 60:4

**own** 49:10
108:18 119:12
119:13

**owners** 76:24
77:5

**ownership**
29:14

**p**

**p** 2:1,1 3:1,1

**p.c.** 2:12

**p.m.** 99:9
120:25

**packed** 107:20

**padovano** 89:8
100:12,15

**page** 4:3,10,18
17:23 47:23
50:10 61:4,6
73:20 78:10,11
83:14 89:21
99:20

**pages** 46:16,19
73:22 81:4
90:22

**paid** 94:14

**paper** 10:18

**papers** 31:24

**paragraph**
50:11,11 53:19

53:20 73:21
75:4 76:2,4
80:17 81:1,2,3
81:14 88:22
89:22 90:3,8
90:22,23,24
93:10 95:1,2
96:24 97:1
98:18 99:20

**parameters**
14:10

**pardon** 113:21

**parking** 76:16
82:3 103:16
104:11

**parsippany**
27:10 64:17,19
65:12

**part** 55:4 57:24
60:23 64:2
65:22 76:24
81:15 86:7
92:12 100:13
112:14,14
118:25

**particular**
42:21

**particulars**
111:1

**parties** 5:12,17
7:10 48:11
63:14 64:22
121:15

**parts** 24:16,17

**party** 5:14 6:11
6:20 7:22
48:13 49:4
63:5,11 64:2,5
64:7 89:13

**pascack** 93:11
94:2

**passing** 107:5

**paused** 56:20

**pay** 115:14

**paying** 54:17

**pending** 9:23
13:6 36:10

**pennsylvania**
47:21 48:22
49:16

**people** 7:8
10:16,18,22
13:1 20:21
40:2 44:24
53:12 54:20
55:3 58:1,16
58:19 60:25
65:22,25 66:16
67:23,25 68:6
68:18 69:7,9,9
69:11 70:18
72:5,6,7 73:7
87:24 96:2
100:1 101:14
102:15,24
103:22 105:9
105:13,15
107:21 118:20

**people's** 58:13

**percent** 21:20
25:4 26:15
54:17 89:7
105:13 114:25
115:12

**percentage**
69:16

**perfect** 66:9
87:25,25

**perfectly** 12:22

**perform** 46:8

**period** 49:11
108:22

**permit** 65:18
73:5,8 74:1,5
75:4 76:1,5,8
76:11 77:11
81:14,17 89:4
91:21 92:9,24

**permits** 73:6
75:6,10 82:17
83:6,15,18
84:15 89:5,10
91:2,11 113:3

**permitting**
98:22

**person** 5:15
14:25 38:1
40:2 61:2
67:20,21,22
75:23 79:24
101:10 119:4

**person's** 39:1,5
39:9 43:4

**[personal - produced]**                                              Page 21

| | | | |
|---|---|---|---|
| **personal** 7:21 37:16 | **please** 10:19,23 11:3,20 12:22 | 80:13 98:21 99:5 | **prevent** 53:22 54:6 57:4 |
| **personally** 80:3 85:3 | 13:3 14:11 31:16 40:21 | **possibly** 71:1 | 92:23 107:5 |
| **perth** 28:11 | 57:17 59:8 | **post** 61:6 | **previous** 50:18 62:7,16 104:23 |
| **phone** 8:6,17 58:18 59:23 | 68:21 81:18 82:13 83:8,21 | **posted** 61:3,5 | **previously** 10:2 65:19 84:3 |
| **phonetic** 86:18 | 85:25,25 88:22 | **postings** 113:19 | 86:10 90:2 |
| **phrase** 55:2 80:10 | **point** 11:7 38:2 75:25 83:19 | **potential** 43:9 43:17 45:3 | 97:11 99:23 109:8 |
| **picking** 59:23 | 84:17,22 85:19 | 99:25 | **prior** 14:19 |
| **place** 5:7 11:3 15:20 23:24 | 85:23,25 87:18 88:2 89:3 | **potentially** 12:13 55:21 | 47:24 87:23 107:15 |
| 33:14 41:9 54:15 57:24 | 103:4 106:7 109:8 115:11 | **power** 50:15 | **private** 108:18 |
| 64:19 72:2,4 89:7 101:2 | **points** 84:11 | **powers** 75:11 | **privilege** 36:18 37:11,18 58:21 |
| 113:3,9 115:13 121:9 | **police** 84:19,24 85:1,8,11,17 | **practice** 48:9 **pre** 107:7 | **probably** 10:7 11:5 13:2 66:2 |
| **plaintiff** 1:7 15:23 50:17 | **political** 63:5 63:10,14 | **precise** 13:21 13:23 14:8,9 | **problem** 12:5 26:12 |
| 110:21 | **portfolio** 17:24 18:1,6 21:13 | **precisely** 41:23 | **procedure** 13:1 48:7 |
| **plaintiff's** 91:2 | 104:7 115:7 117:8 | **prefer** 23:10 **preparation** | **proceed** 9:11 78:16 79:24 |
| **plan** 49:21 **planner** 62:24 64:13 65:6 | **portion** 19:20 35:11 44:3 | 15:3,6 **prepared** 15:12 | 99:13 **proceedings** |
| **planning** 105:23 | 49:25 62:1 67:8 68:23 | **presence** 43:4,6 43:8 | 12:13 51:21 52:6 |
| **plans** 86:5 104:25 | 69:3 101:24 108:12 112:5 | **present** 16:20 39:19,24 41:21 | **process** 28:17 98:22,25 |
| **platform** 50:16 50:22 53:9 | **pose** 48:2 **position** 5:24 | 42:7 63:19 107:7 108:9,12 | 115:19 **produce** 47:7 |
| **playing** 113:11 | 6:4,19 7:21,23 8:15 9:6,7,8,11 | **presented** 14:7 **press** 93:12 | **produced** 10:1 47:2,7 |
| **plaza** 2:16 | 48:15,16 49:19 | 94:2 113:19 **pressure** 74:20 **pretty** 23:4 86:3 | |

**producing**
112:23
**product** 47:22
88:25
**professional**
2:4
**professionals**
63:15
**profits** 113:17
115:2
**project** 18:22
19:12 21:3,7
22:5,7,13,18
24:14 25:3
26:25 27:9,12
27:16,20 28:2
28:6,10 41:6
42:10,17 45:7
50:16,23 52:20
53:10,16,17
54:9,9 55:22
55:23 62:21
63:10 68:5
71:20,22,23,25
72:24 77:3
79:1 84:24
86:13 88:1
91:3,4 93:4
96:6 97:2,9
98:16,22,23,24
100:2 101:13
101:15 102:6
102:17 103:6
103:15,19
105:14,16,18

105:18 112:21
113:7 118:2
**projects** 28:18
28:19 29:24
30:4,12 104:6
104:10 105:10
114:9 115:7
117:25 118:14
**prolong** 77:1
**promoted**
61:11
**propaganda**
45:9,20 57:6,7
57:9 61:11
**proper** 99:19
**properties**
17:24 18:1,6
18:13,15,22
19:13 21:14,15
73:9 117:7,11
**property** 16:6
19:4 21:17
73:15 76:23,25
77:4 112:23
113:17 115:11
115:22,23
117:14 118:15
**proposition**
47:15 56:5
99:24
**protecting**
23:19
**provide** 10:24
11:21 12:11
19:5 83:19

**provided** 52:16
52:19 66:7
**public** 1:22
33:3,6 34:8
82:1 109:2
121:5,23
**purported**
83:17
**purportedly**
94:20
**purpose** 16:5
16:23
**purposes**
115:23
**put** 7:12 13:5
18:23 46:5
54:15 57:14
61:2,6 73:9
76:10 79:11
89:11 114:19
**putting** 9:5
81:21 89:15

**q**

**qualified**
117:18
**qualify** 55:12
55:22
**question** 6:8,15
10:23 11:1,11
11:12,12,13,15
11:16,18,21,23
11:24,24 12:3
12:6,7,11,15
13:5 14:8 17:1
20:8,9 23:18

25:16 29:3,17
29:22 30:1
35:7,8,15,17
36:9,10 37:11
37:21 38:6
40:17 42:9
44:1 45:1
46:24 48:14
49:4,23 56:17
59:10 61:14,16
61:20,22 68:19
68:20 71:5,7
72:21 73:1
81:6,9 89:19
92:12 96:10
97:24 98:1,3
100:22,24
101:17 102:20
104:16,18
109:21 110:3
110:24 111:8
111:13,16
116:3,9,18
117:1 118:6
**questioning**
6:17
**questions** 8:1,3
9:12 10:20
12:20 31:18
36:24 38:17,20
48:2,8 59:1
77:6 120:17
**quick** 44:9
49:12

**quickly** 120:11
**quote** 93:16
94:4,5

**r**

**r** 2:1 3:1
**racial** 24:7,11
25:18 34:24
35:19,24 39:1
39:5,9,20 40:3
43:5,9,17,21
55:11,20 57:9
97:2,9 98:16
100:1,1 109:10
109:25 110:7
**racially** 38:4,7
53:22 54:6
57:4 101:13,15
**raise** 11:2
49:21
**raising** 103:25
104:4
**ramapo** 60:10
60:12
**ramsey** 3:6
**ran** 45:21,23
50:16,22 53:11
58:12 61:13
**raritan** 22:10
22:11 24:9,12
63:21,23 65:8
**rates** 113:14
**re.com.** 21:10
**reaction** 98:23
**read** 35:8,12
44:4 49:22

50:1,19 54:2
61:20 62:2
67:9 68:20,24
69:4 78:7
79:10 85:25
86:1 93:14
101:16,25
111:18 112:6
**reading** 70:19
**reads** 53:21
97:1
**ready** 14:23
31:17 99:13,14
**real** 44:9
**realize** 72:7
**really** 17:15
26:4 72:4,6
73:10 74:17
76:18 78:8,14
103:4 104:17
105:8 108:23
120:19,20
**reason** 72:12
72:17 86:11
89:4,5 102:17
103:2 106:19
**reasonable**
13:24 14:10,11
**reasons** 73:5
101:12 104:10
**recall** 12:22
30:16 33:11
34:7,10,11,13
34:16 39:8
40:1,6 41:20

41:23 43:6
44:21 46:14
65:23 66:15
75:24 79:20
82:8 83:2,10
84:18 85:20
86:4 90:5
91:17 100:8
103:10,25
104:3 119:4
**receive** 33:19
35:2 98:21
**received** 34:14
34:17
**recently** 88:10
**recess** 8:23
45:15 99:9
120:14
**recollect** 66:19
**recollection**
33:24 84:12
**record** 5:7 6:19
7:13,24 8:24
9:6 10:19 11:3
11:20 15:17,20
23:6,15,20,22
23:25 35:12
36:8 40:20
44:4 45:16
50:1 62:2 67:6
67:9 68:24
69:4 74:22
76:14 78:1
89:11,16 99:7
99:13 101:25

106:19 112:6
114:15
**record's** 51:4
**recording** 92:4
**redeveloper**
32:11,23
**redeveloper's**
78:25
**redevelopers**
1:5 9:25 15:24
16:2,4,23
32:24 110:15
115:3,14
**redevelopment**
42:14 56:6
62:22 65:8,12
65:15 90:11
93:18 94:9,22
102:6 107:16
107:22
**redevelopme...**
63:9
**redo** 61:12
113:5,9
**refer** 39:1,5
51:3
**reference** 22:20
51:22 106:14
106:15 118:23
120:6
**referenced**
82:25
**references** 57:9
93:11,16

**[referencing - requirements]** Page 24

**referencing**
83:23
**referred** 28:11
68:5 84:2
107:8
**referring** 20:13
40:3 44:18
51:4,23 52:10
52:17,23,25
55:15 59:2
78:9,17 79:13
95:13
**refers** 51:22
**reflected** 48:10
48:14
**refusal** 73:25
74:4 75:3 76:1
76:4,7 81:16
88:2,7
**refused** 84:14
**refusing** 88:5
**regard** 5:19
76:1,7 78:21
83:5 84:6 88:2
93:4 110:6
**regards** 84:16
**regular** 69:8,8
69:12,13
**regulations**
20:13
**relate** 39:1,5
81:16 82:12
84:21 85:23
**related** 10:3
16:21 39:9

42:15 43:8,16
44:24 52:20
68:5 72:19
85:19 90:2
**relates** 18:2
36:18 80:17
95:3
**relative** 121:14
121:16
**releases** 113:19
**relies** 97:16
**relocate** 94:15
**relocation** 97:3
**reluctance**
109:11
**remarked**
99:15
**remedy** 72:2
**remember** 31:4
31:7 33:8
34:13,20,20
35:14,16 39:7
39:22 41:10,22
43:1,12 44:12
44:13 46:21
50:7 59:20
65:11,11,17
66:2 68:1,1
70:6,8,15,15
75:7,19 76:3
84:13 85:11
86:16 89:20
90:17,21 93:7
95:9,10,17
96:14 103:23

107:10,12,13
107:14 108:17
108:23 119:3
**renewal** 1:6
15:24 16:2,5
16:24 32:24
110:15 112:14
115:4,14
**rental** 19:6
22:17 30:14
**rented** 22:21
25:21 26:3
**renting** 28:21
**reopened** 109:2
**repeat** 12:5
35:6 40:14,15
40:21 44:1
101:20 111:13
112:13
**repeating**
113:6
**rephrase** 12:5
111:23
**replacement**
87:15
**reporter** 1:21
10:13 35:12
40:13 44:4
50:1 61:20
62:2 67:9
68:24 69:4
101:25 111:18
111:24 112:6
113:6 121:5

**reports** 110:25
**represent** 5:12
5:16,17,21
6:20 7:10
118:19 119:7,9
119:10
**representations**
91:3
**representative**
119:8
**represented**
48:1 119:17
**representing**
5:14,25 6:10
6:20,24 7:7,22
48:12 49:4
**represents** 7:5
7:10 9:22
**reputation**
113:25
**request** 47:5
82:19
**requested**
35:11 44:3
49:25 62:1
67:8 68:23
69:3 101:24
112:5
**requesting**
89:12
**requests** 4:16
**required**
103:15
**requirements**
91:1,10

**research** 49:10
**residential**
18:20 19:9,11
19:20 21:23
42:20 110:1,8
**residents** 66:17
97:3
**residing** 5:1
**resolution**
85:21 86:3
98:25 106:21
107:5
**respect** 77:14
84:10
**respond** 66:11
78:15,22 79:4
88:25
**responded** 79:3
**result** 46:16,20
74:4 110:16
118:1
**resulted** 75:3
**results** 46:2,12
50:4
**retail** 19:8
42:16
**retain** 64:24
65:15
**retained** 64:8
64:10,13 65:2
65:5
**returned**
108:25
**review** 15:2,5
15:15 31:17

82:13 88:19,22
104:25
**reviewed** 17:19
30:17,20,22,24
31:3,5 32:1
86:5
**rewind** 40:15
**richard** 2:3
**rid** 60:5 87:21
**ride** 76:17
**ridge** 27:1
**right** 6:1,8,25
7:22 8:11,18
9:11 21:11
26:6 30:16
31:25 46:21
48:1,5 52:4,4
53:19 59:6
70:17 73:17
77:18 90:5
94:7 98:4,8
99:12 104:23
106:4 114:19
114:21,25
**rights** 119:22
**riverfront** 2:16
**road** 1:23 2:6
19:16,19
**rob** 60:11
91:19
**room** 10:12
107:20,21
**rule** 6:3 12:10
47:19 48:5

**rules** 12:25
48:6
**rulings** 100:11
100:14
**run** 53:12 80:6
**running** 73:22
**runs** 74:6,8

**s**

**s** 2:1 3:1 4:8
**sabbath** 60:21
**safe** 73:9
**safety** 73:5
77:9
**sat** 59:21
**satisfied** 84:24
101:8
**saturday's**
13:16
**saw** 33:23
44:21 70:14
77:4
**saying** 20:7
39:8 40:7
68:17 77:21,24
87:5 119:9
**says** 50:11
51:21 73:11
92:1,3 98:19
98:20 109:16
113:3
**scope** 104:13
**seaman** 2:5 4:4
5:9,16,19,23
6:3,12,14,22
7:4,14 8:18 9:4

9:18,21 10:10
15:17,22 17:4
17:13,17 19:3
20:14,18 23:13
23:19 24:2
25:24 29:7,9
29:12 30:5,11
31:12 32:3,18
32:21 35:8,21
36:4,9,13,16,23
37:3,24 38:16
38:19,22 41:1
41:3 42:2,5
44:8 45:10,18
47:5,11 48:17
48:21,24 49:6
49:14,18,22
50:3 51:5,8,15
52:12 53:6
55:16,19,25
56:3,11,16,19
56:22 57:1,16
59:5 61:19
62:6 66:4,14
67:5,19 68:20
69:20,24 71:6
71:11 74:16,22
74:24 78:13
79:15,22 80:24
81:5,8,12 82:6
82:22 83:13
84:1 87:1,7,13
90:7 92:13,20
93:9 95:16,19
97:18,23 98:2

98:8,11 99:11
100:6,10,23
101:7 102:4,13
102:23 103:13
106:3 109:20
110:14 111:5
111:13 112:3
112:18 116:5
116:13,18,22
117:2,6,21
118:5,9,13
120:10,16,20
**search** 46:3,5,8
46:12,13,17,20
50:4
**second** 7:16
58:3,12,15
59:10,11,14
95:6
**section** 70:18
**see** 33:21 53:25
60:22 70:9
74:1 79:8,10
80:4 89:24
90:13 91:5
93:1,12,20
95:8 97:4 99:1
114:10
**seeing** 33:25
**seeking** 85:17
**seeks** 97:2
**seem** 17:9
**seen** 43:13
44:10,11 69:15
69:25 70:4

90:19
**send** 66:10
**sense** 13:13
30:7,7 72:13
86:2
**sentence** 89:23
90:24 95:2
**separate** 52:7
84:11
**separately** 48:1
**serve** 115:6
**served** 63:15
**services** 16:22
101:9
**session** 108:6,6
108:7,8,8,10,13
108:14,16,21
108:25
**set** 75:16,17
121:9
**settle** 114:17,24
**settled** 76:23
**settlement**
57:25 72:3
**settling** 114:20
**seven** 9:3 12:25
19:17 71:25
72:18 93:17
94:8,20
**several** 110:10
**sewer** 84:14
**shake** 107:1
**shared** 59:1
**shift** 64:1,21
65:9

**short** 49:11
112:24 113:23
114:3
**shortly** 63:24
**shoulders**
10:16
**show** 10:24
86:25 109:9,23
**showed** 23:11
**shows** 57:19
**shrugging**
10:16
**shut** 54:9
**shy** 53:16
**sign** 84:19 85:8
85:13,14,17
**signature**
121:21
**signed** 26:2
53:1 88:9,11
88:13
**significantly**
110:18
**signing** 85:13
88:16
**sills** 2:12
**sillscummis.c...**
2:20,21
**similar** 16:23
**simply** 27:1
**single** 16:5,22
18:7 29:1
48:12,13 49:4
**sit** 26:7 53:7
92:5,17 100:14

**site** 19:25 20:1
20:2,3 45:22
71:25 72:18
73:16 77:10
89:6 105:4
**sitting** 13:25
46:22 77:14
114:7
**situation** 11:18
54:18
**sk** 2:19
**skim** 31:21
**sklein** 2:21
**slate** 50:15,22
53:9
**slow** 98:23
113:11
**smart** 45:25
**somebody** 80:7
**someone's**
35:24 39:20
107:2
**sorry** 22:20
49:23 51:2,14
79:12
**sort** 11:2,21
36:18 37:11
43:14 58:20
69:25 79:11
80:5 90:20
100:3 119:19
**sound** 21:11
**sounded** 56:13
**south** 3:5

| | | | |
|---|---|---|---|
| **space** 18:19 19:6,8 | 57:17 97:6 98:13 110:19 111:14 112:9 | **stephen** 2:14 | 43:24 104:15 112:10 |
| **spaces** 42:16 | | **stepped** 108:18 | **submit** 76:11 |
| **speak** 14:21 34:3 103:4 105:9 | **started** 27:24 60:2 63:24 64:20 86:7 112:24 | **steve** 47:16 51:20 | **submitted** 76:9 110:25 |
| **speaking** 10:22 32:23 | **starting** 11:11 22:9 114:5,5 | **stinks** 80:11 **stop** 12:3 53:10 54:21,22 85:15 88:1 91:4 97:3 105:21 106:1 | **subparagraphs** 73:22 **subsequent** 108:24 |
| **special** 50:13 50:17 | **starts** 11:13 | **stopped** 59:23 | **substantial** 113:18 |
| **specific** 45:22 46:5 50:5 75:1 75:24 76:6 78:20 79:7,25 81:14 82:7,11 83:4,16 84:20 93:2 95:14 102:11 | **state** 1:22 8:14 24:6 28:22 48:7 51:21 52:5,19 53:1 69:17 71:3 77:6 100:12 109:11 113:25 121:5,23 | **stopping** 50:16 50:23 **storage** 40:10 **store** 76:22 **stores** 76:16 77:8 **stories** 61:3 | **suddenly** 11:16 **sue** 96:21 **suffered** 111:9 **suit** 10:3 **suite** 2:6 5:2 **summary** 15:7 79:2 |
| **specifically** 56:5 71:22 74:4 79:13 88:20 120:5 | **statement** 44:16,20 57:3 87:9 92:7 93:23,24 94:1 94:12,19 96:8 | **story** 107:3 **straight** 79:2 **street** 5:2 **streets** 60:20 | **summer** 10:2 **support** 6:4 57:2 99:5,24 **sure** 10:25 11:22,23 12:6 |
| **spend** 89:17 96:3 117:14 | **statements** 34:12 36:2 | **stress** 114:3 **string** 60:13 **struggling** 17:9 | 23:14 28:23 31:22 39:21 |
| **spite** 54:13 **spoke** 75:5 104:21 106:8 | 38:3 43:15 52:16 68:4,8 106:18 108:3 | **stuck** 77:17 **studies** 69:15 **stuff** 20:23 | 47:9 48:19 60:21 61:21 67:3 72:9,11 |
| **spoken** 105:25 **square** 19:7 22:4 | **states** 1:1 **statewide** 69:19 69:20 | 60:21 61:3 69:8 73:2 86:6 104:19,20 114:5 | 73:24 76:25 77:8,10 78:4 78:25 82:2 |
| **stand** 51:19 **standpoint** 23:20 | **stenographic...** 121:8 | **subcommittee** 104:25 106:8 | 84:23 85:1,8 87:24 97:18 |
| **start** 8:16 9:2 11:19 32:4 | **step** 79:3 | **subject** 16:6 35:4 38:9 | 101:21 102:2 107:15 110:3 |

111:6 120:12
120:12
**suspend** 90:10
**swept** 50:13
**sworn** 52:16

**t**

**t** 4:8
**take** 8:19 10:15
10:22 13:3,7
31:16,20 41:9
44:15 45:10
48:8 49:18
58:6 64:19
81:18 83:8,18
85:24 99:18
120:10
**taken** 1:22 8:23
10:12 15:9
25:6 33:14
34:8 45:15
49:12 78:4
108:14 120:14
121:8
**takes** 10:13
23:24
**talk** 35:25 36:7
36:8 38:11,14
39:10 76:19
**talked** 30:15
52:25
**talking** 32:17
73:11 77:5
80:21 102:10
102:11 112:15
112:16

**talks** 17:23
47:23
**tax** 115:23
116:1,7,8
117:1,17
**taxation** 116:24
**taxes** 113:1
**telephone** 38:2
38:24
**tell** 8:20 12:4
12:22 13:14
14:14 57:18
58:18 75:12
77:24 80:15
82:23 85:6
87:5 88:23
92:22 94:17
97:7 98:14
110:20,22
118:18
**telling** 14:1
58:13,15 82:16
91:24
**temporary** 88:3
88:8
**ten** 15:16 16:19
**tenant** 76:21,23
76:25 78:5,6
**tenants** 24:8,12
24:17 25:6,19
26:2,17 28:21
42:13,15,20
43:9,18 45:4
82:3 117:9

**term** 38:6
43:21 54:24
58:12,15 59:10
59:11 116:1,6
116:14,23
117:3
**terms** 10:25
12:12 14:13
29:14 30:7
35:24 44:25
46:5 63:9,15
100:16 109:21
115:21 116:7
116:24
**terrible** 44:25
**testified** 5:4
42:1 97:15
**testify** 106:6
**testimony**
97:12 115:9
120:21 121:7
**text** 34:17,21
35:2,3,14,16,17
44:19 59:19,24
**texted** 35:16
**texts** 43:14
**thank** 7:13
25:17 44:1
49:16 51:14
99:14 111:7
120:17,23
**thing** 7:3 57:22
58:2,3 67:12
83:22 109:15

**things** 13:22
29:19,20 36:18
40:8 72:20
87:18 113:23
**think** 8:8 9:9
10:7 11:14
35:1 50:24
51:1,21,23
52:10 56:10
59:2 62:23
67:25 70:18
76:14,15 80:22
86:18 91:18
92:15 96:5
97:19 101:4
104:17 106:10
107:17 110:18
111:12,16
114:24
**third** 47:19
89:13
**thought** 25:16
56:18,21 80:20
112:15
**three** 67:25
81:3
**thriving** 93:18
**time** 9:13 10:22
13:3 16:20
17:19 24:5
31:3,16 32:14
33:4,10 34:14
40:13,13,22
41:24 42:7
49:11 65:9

68:3 75:6,13
75:16 77:24
79:4 83:18
85:9 92:22
94:19 95:21
105:10,14
106:5 108:4
109:4 112:24
113:4,7 120:18
120:21 121:8
**timeline** 107:24
**times** 13:22
37:5 39:4 43:3
51:10 78:2
110:10 114:16
114:16
**timing** 9:2
**today** 5:8 10:1
10:12 12:11
13:2 14:19,25
15:3,6 26:7
53:7,18 89:4
92:5,17 97:11
98:13 99:23
100:7,15 109:8
109:23 110:5
114:7
**together** 57:14
60:24 61:1
**told** 26:9 37:13
45:25 58:7
59:18 65:25
66:20 67:24
68:2 75:7,9,12
76:10 81:22

82:15,17,18,23
83:23 85:2,3
90:2 91:8,12
91:13,22 92:10
92:15 98:12
99:3,22 104:24
109:7,16,22
110:5,11
**took** 15:19
34:23 38:3
60:4 64:5,7
75:2 76:21
80:2
**top** 6:7 113:18
114:6
**topic** 51:25
**total** 24:20,24
25:11 26:19
**towards** 68:8,9
**town** 32:13
44:15,25 54:20
57:14 58:5,6
58:11 59:12,18
61:10 107:22
**townhome** 29:1
**towns** 63:9
64:16
**traffic** 103:20
104:1,4,11
**trains** 76:17
**transcript**
121:7
**transferring**
119:21

**trial** 12:14
**tried** 54:18,21
**tripping** 95:5
**true** 7:6,7
74:18 94:17
121:7
**trust** 91:25
92:3
**truth** 14:3
**truthful** 92:6
92:15
**try** 10:19,24
38:18 40:15,21
72:8 77:2 78:7
86:13 93:1
113:22 114:17
**trying** 11:17
22:20 37:10
45:9 52:22
54:22 70:22
72:2 73:14
75:16,17 87:8
91:22 101:19
112:1 113:24
113:24
**tuesday** 1:17
1:24
**turn** 66:22,23
67:2,16
**turning** 73:20
**turnpike** 3:5
**twa** 88:3,6 89:4
**twice** 6:8
**two** 5:13,25 6:9
7:8,21 8:9

10:22 14:5
19:13 52:5
77:14 107:21
**type** 58:1 60:25
**types** 18:2,15
69:11 70:21
**typically** 69:8

**u**

**u** 78:17
**u.s.** 48:19
**uh** 10:16,17,17
**ultimate** 53:21
54:5 57:3
**unclear** 79:12
**under** 12:25
20:12,20 22:7
26:14 27:6,8
27:10,11,13,15
27:17,19,21
28:3,5,8,12
49:19 55:7
78:25 84:19
90:11 113:19
117:1 119:12
**underlying**
52:2
**understand**
11:8,24 12:1,3
12:8,17 13:8
14:4,16 17:2
20:6 23:13,14
29:18,21 37:10
37:17,18,21
41:4 52:22
70:10,22 86:22

**[understand - watch]**                                   Page 30

| | | | |
|---|---|---|---|
| 87:1 98:2 | 26:16,17,19,23 | **v** | 47:17 49:20 |
| 107:24 110:3 | 28:21 29:1,2,4 | | 53:17 55:1 |
| 116:2 118:5 | 30:15 42:20 | **vague** 38:7 | 57:13,20 58:5 |
| 119:10 | 43:10,18 45:4 | 43:22 63:6 | 58:10 61:8,9 |
| **understanding** | 54:8,10,11,12 | **vaguely** 117:4 | 61:22 66:21,23 |
| 20:10,19,24 | 54:13,19 55:8 | **value** 37:22 | 67:2,16 71:9 |
| 45:2 52:17 | 55:12,22 70:11 | 117:15 | 71:13,14,17,19 |
| 53:8 59:9 | 70:18 71:9,13 | **variety** 97:22 | 71:21 72:13,14 |
| 70:23 87:14 | 71:15,18,25 | **various** 18:2 | 73:23 74:8 |
| 108:20 | 72:8,12,14,19 | **verbal** 36:2 | 75:14 82:2 |
| **understands** | 73:15 | 37:5 44:16,20 | 85:12 86:21 |
| 72:6 | **unreported** | **verbally** 10:20 | 87:6 89:2,11 |
| **understood** | 49:15 | **versus** 20:22 | 91:18,24 94:3 |
| 40:23 100:21 | **urban** 1:5 | 21:3 | 97:12,17 |
| 101:22 | 15:24 16:2,4 | **view** 70:17 71:2 | 102:15 104:18 |
| **undertake** | 16:24 32:24 | **visas** 69:10 | 106:4 107:24 |
| 78:21 80:1 | 110:15 112:13 | **vocative** 30:7 | 111:15,17,23 |
| **undertaken** | 115:4,14 | **vote** 105:7 | 112:8 114:14 |
| 100:21 | **url** 17:13 | 106:15,20 | 118:9,25 |
| **undertook** 76:7 | **use** 18:13 19:1 | 107:4,7 109:1 | 119:10 |
| 82:12 83:17 | 21:14 29:25 | 109:5 | **wanted** 42:12 |
| 85:19 | 38:6 43:21 | **votes** 34:7 | 42:12 70:10 |
| **unduly** 80:23 | 45:9 74:8 | **voting** 106:20 | 77:8 84:23,25 |
| **uninsured** 5:20 | 109:9,24 110:2 | **vs** 1:9 | 87:21,23 |
| **unit** 26:8 27:25 | 116:24 117:10 | | 104:24 108:19 |
| 69:14 | **used** 11:25 | **w** | **wanting** 73:4 |
| **united** 1:1 | 12:12 44:13 | | **wants** 36:14 |
| **units** 19:14,14 | 54:24 55:2 | **wait** 10:23 | 54:9 85:7 |
| 19:15,17,20,23 | 56:9 98:20 | 11:20 | 89:17 105:17 |
| 19:25 20:1,2 | 103:1 | **walking** 60:20 | 105:21 |
| 21:2,6,23 22:1 | **using** 30:6 | **wall** 13:15,19 | **warehousing** |
| 22:17,23 23:1 | 45:19 55:6 | **want** 5:7 7:9 | 18:19 |
| 23:3 24:4,8,19 | 116:1 | 8:13,13,14,16 | **watch** 95:24 |
| 24:20,24,25 | **utility** 83:6 | 8:16 11:22 | 96:23 |
| 25:8,9,11,15,19 | 91:1,11 | 20:6 23:10 | |
| | | 25:25 34:19 | |
| | | 39:16 43:20 | |
| | | 44:9,12 45:10 | |

**watched** 95:24
96:9
**water** 84:14
**way** 8:16,20
11:25 12:2,6
17:5 29:24
30:9 33:17
47:12 55:10
56:13 60:7
75:1 87:9
88:16 89:9,11
97:7 98:13
99:15 110:20
113:24 114:19
115:3
**ways** 97:22
110:20 114:17
**we've** 28:18
29:8 30:15
36:21 49:11,12
59:1 114:15
**web** 17:23
46:15
**website** 17:6,9
17:12,13,15,19
17:23 21:9,14
23:4,7,10 27:1
27:13,17,21
28:2,6,10,23
29:19
**welcome** 111:2
**went** 12:1
58:12,15 76:22
85:10 91:21
107:18

**winning** 13:16
**wishes** 53:17
**withdraw** 20:8
81:5,6,8
**withdrawn**
63:2
**witness** 4:3 6:8
6:9,25 7:23
10:1,8 11:12
11:13 17:2,14
19:1 20:16
23:15,17 29:8
29:10 31:22,24
32:19 35:6,14
36:7,20 37:1
38:10,12,14,18
42:3 43:25
44:6 47:3 48:2
48:8,12,14
49:5 51:13
53:3 55:17
56:1 57:12
59:3 60:18
61:24 62:4
66:9,12 67:11
67:15 69:1,6
69:22 71:8
74:11,14,17,19
78:11 79:19
81:20 82:15
83:10,22 86:1
87:2 92:17
93:7 95:15,17
98:5 100:8,25
101:18,21

102:2,10,21
103:10 104:17
109:14 110:12
111:8,11,20
112:12 116:2
117:4 118:8,11
120:19,22
**witnesses** 13:10
**woman** 10:12
**won** 53:12 79:5
**word** 11:25
44:13 56:9
70:17 73:14
74:9 91:25
92:3
**words** 10:14,20
45:25 67:24
74:7
**work** 6:16
16:20 54:14
69:10 86:8
114:4,8,10,17
**worked** 60:3
76:25
**workers** 114:4
**working** 63:8
**works** 8:17
77:7 88:3,8
**write** 86:9
101:1
**writing** 80:4
119:24 120:2
**written** 43:13
43:15 44:17
88:19,25 90:15

**wrong** 51:16
80:8 114:24
**wrote** 96:20
**www.accurate**
21:10

**x**

**x** 4:1,8

**y**

**y** 119:15
**yaakovi** 1:16
1:19 5:1
**yeah** 16:8
17:11 22:22
23:11 30:6,6
31:23 33:5
36:13 41:7
44:19 45:12
46:4 47:2
49:17,17,17
50:9,20 51:5
52:4 54:8
59:13,13 61:24
64:17 66:18,25
68:10 71:24
76:9 81:2,10
81:20 83:10
85:5 86:1
91:18,19 92:18
93:25 95:15,17
95:22 96:12
97:5 101:18,21
103:21 104:2
106:10 108:1
109:6 111:7

112:3,8,20
115:8,8 120:20
**year**   104:24
106:5,6,9
**years**   16:19
103:24
**youtube**   81:24
95:24 96:9,23

**z**

**z**   78:17
**zheng**   78:16
80:21
**zoning**   72:19
76:11 77:15
81:21

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.