Joseph B. Fiorenzo, Esq. (021421980)
David W. Phillips, Esq. (027141985)
**SILLS CUMMIS & GROSS P.C.**
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 643-7000
Attorneys for Plaintiff

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE BOROUGH OF EMERSON, NEW JERSEY, FOR A DECLARATORY JUDGMENT,<br><br>Petitioner. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: BERGEN COUNTY<br>Docket No.: BER-L-6300-15<br><br>Civil Action<br><br>**CERTIFICATION OF**<br>**YAAKOV KLUGMANN** |

I, Yaakov "Jack" Klugmann, of full age, certify as follows:

1. I am the managing member of Emerson Redevelopers Urban Renewal, LLC (the "Redeveloper"). I make this certification from personal knowledge, and from my review of the files and records of the Redeveloper.

2. The Redeveloper is the redeveloper of an area of Emerson Borough known generally as Block 419. The development will provide 29 low and moderate income housing units, assisting Emerson in meeting its Mt. Laurel housing requirements.

**Background**

3. In 2016, the Redeveloper entered into a Redevelopment Agreement with the Borough of Emerson ("Emerson"), to implement redevelopment of Block 419 on the tax map of Emerson. As set out in the Redevelopment Agreement, the Redeveloper competed with a number of other developers to become the developer of Block 419. Further, the process was driven in

large part by Emerson's need to provide low and moderate income housing which, I understand, had not been met.

    4.    The Redevelopment Agreement was amended three times, as follows:

        a.  First Amendment to Redevelopment Agreement, dated October 4, 2016, to add an additional Lot to the Project;

        b.  Second Amendment to Redevelopment Agreement, dated November 20, 2017, to amend the affordable housing requirements, permitting a portion of the affordable units to be built on another site, deleting one cost provision, and providing that Emerson would use eminent domain if necessary to acquire lots in the Project; and

        c.  Third Amendment to Redevelopment Agreement, dated December 31, 2018, memorializing Emerson's transfer of a lot to the Project, and the parties' rights and obligations thereto.

    5.    Thus, the Redevelopment Agreement as amended provides that the redevelopment of Block 419 (the "Project") would be four-story, 147-unit mixed-use inclusionary development for the property located at Kinderkamack Road in Emerson, between Linwood Avenue and Lincoln Boulevard, and designated as Block 419, Lots 1-4, 6.01, 6.02, 7-10 on Emerson's tax maps ("Property"). The Project will provide 29 units of low and moderate income housing that would go toward satisfying Emerson's fair share house obligations, of which 22 are on-site and 7 are to be off-site.

    6.    As of the time of the Redevelopment Agreement in 2016, Emerson was involved in *Mount Laurel* litigation. Like many other municipalities, it had filed a declaratory judgment action in 2015, and was seeking court approval of a fair share housing plan to avoid the specter of

developer's remedy lawsuit. The Redevelopment Agreement was intended to be part of Emerson's fair share housing plan, with 20% of the units to be set aside for fair share housing.

7. Pursuant to the Redevelopment Agreement, Emerson specifically agreed that it would cooperate with Redeveloper in moving the Project forward:

> The parties hereto agree to cooperate with each other and to provide all necessary and reasonable documentation, certificates, and consents in order to satisfy the terms and conditions hereof, and the Terms and conditions of the Plan.

8. This cooperation is always critical in developments, and was a necessary component of Redeveloper's agreement to enter the Redevelopment Agreement. Indeed, Redeveloper would not have entered the Redeveloper Agreement without such assurances from the Borough.

9. In November, 2017, Emerson reached a settlement of its fair share housing obligations with the Fair Share Housing Center. Of Emerson's realistic development potential of 53 units, fully 29 were to be built by the Redeveloper in the Project, with the option of 7 units being built off site. Thus, under the settlement, the Project was responsible for fulfilling 55% of Emerson's fair share housing obligation.

10. In further implementation of the Settlement Agreement, and consistent with the Redevelopment Agreement, Emerson adopted, on December 6, 2018, the "Emerson Housing Element and Third Round Fair Share Plan (the "Third Round Plan"), which states in relevant part:

> The Block 419 Project is an integral component of the Borough's Fair Share Plan. This project is necessary and useful for the construction of 29 low and moderate income family rental housing units in a centrally located portion of town, with easy access to both bus and train lines for commuters. To accomplish this Project, the Borough of Emerson issued a Request for Proposals from redevelopers on January 8, 2016; publishing a ranking of Plaintiff respondents, and then executing a Redevelopment Agreement, First Amendment to Redevelopment Agreement and Second Amendment to Redevelopment Agreement (hereinafter collectively referred to as "Redevelopment Agreement" with Emerson Redevelopers Urban

Renewal, LLC (Redeveloper). The selected redeveloper ranked the highest in the review by the Governing Body

11. On December 10, 2018, Redeveloper appeared before the Emerson Land Use Board on an application for Site Plan approval for construction of the Project, as contemplated by the Settlement Agreement. Following a hearing before the Board, a vote was taken and the Project was approved (the "Site Plan Approval").

12. Thereafter, Redeveloper appeared before the Emerson Land Use Board on December 28, 2018, and the Board adopted a Resolution approving Redeveloper's Site Plan application for construction of Block 419, as required under the Settlement Agreement (the "Resolution").

13. In January, 2019, relying on the Redeveloper's Agreement, Emerson was able to obtain a "Conditional Final Judgement of Compliance and Repose" from the Superior Court in its Mt. Laurel Litigation, setting its fair share housing obligations, and approving the Project to supply 29 units of affordable housing, comprising 55% of the total affordable housing obligation of Defendant Emerson.

14. However, things dramatically changed in January, 2019, when the New Administration was sworn into office in Emerson, including a new mayor and several council people. The new mayor, Daniella DiPaola, and the new council people (the "New Administration"), had run for office on an anti-development platform, and expressed opposition to the scale of the Project which had been subject to the Settlement Agreement, and approved by the Court. Since then, we have encountered an incredible level of resistance, delay and obstruction from the Borough. The culmination of the constant issues, the constant delay, the constant obstruction of our legitimate efforts to advance the Project are unprecedented in my 11 years of

experience in development. Indeed, it took nearly a year to be in a position to begin demolition of the existing structures.

15. Since the change of administration in January 2019, Emerson has recklessly and aggressively fought to "scale back" the Project by seeking to "slow roll" the Project at every turn. Emerson has created new conditions to the commencement of construction; created unnecessary costs generating conditions such as requiring the Redeveloper to respond to repetitive and irrelevant requests from engineers and architects; has engaged in the newest technique used by recalcitrant municipalities to block progress on affordable housing – "the Resolution Compliance Process" as set forth below. Incredibly, as set forth below, this effort has continued, even in the face of the appointment of the Monitor to oversee the actions of the Borough on the Project.

16. As we demonstrated to Judge Padavano, Emerson held up the project for 18 months with its "resolution compliance" process, a never ending series of unnecessary and illegal demands for actions and information. These led in large part to the Redeveloper having no choice but to seek Judge Padavano's assistance.

17. For, we documented to Judge Padavano a series of other efforts by Emerson to slow or bury the project, including following:

   a. **Refusal to issue demolition permits.** Emerson arbitrarily refused to issue demolition permits, demanding that Emerson Redevelopers first show full Resolution Compliance as well as all outside agency approvals. Of course, Emerson was engaged in the Resolution Compliance Scam noted to Judge Padavano which would make it impossible to get a demolition permit under any circumstances. These demands were arbitrary, capriciously contrary to law. Ultimately, after many months of delay and the costs of additional time, effort and money, Emerson relented and issued a demolition permit. However, even after agreeing to issue

8493686 v1

demolition permits, Emerson concocted a new way to delay. It frivolously insisted that all demolition permits, for every lot in the Project, had to be completed and submitted at once. Such a position had no basis in law or good construction practices and caused further costs, delay and effort.

        b.    **Refusal to issue fence permit.** An application for a fence permit was submitted in the form and manner sought by Emerson and in compliance with the site plan application. At the last minute Emerson demanded to conduct a new review of the area to be fenced and withheld approval of the permit. Incredibly, at the same time, Emerson asserted that the Redeveloper was not securing the Project sufficiently and that squatters were in the vacant building, it refused to issue the permit which again caused additional time, effort and money.

        c.    **Refusal to execute municipal consent for TWA.** This is required in order to undertake work on the sewer system which is part of the approved site plan. Emerson has frivolously refused to execute the TWA evidencing its required consent as a result of which there will be further delays in the Project. The Redeveloper is unable to submit its TWA Application to the DEP without Emerson's consent, which blocks Redeveloper's ability to construct the approved sewer system. This is consistent with Emerson's pattern of using every conceivable device in the development process to delay and cause cost generative expenses to the redeveloper.

        d.    **Denial of Permits for Demolition.** Application was made to the Borough for permits for demolition. Despite the redevelopment agreement requiring the Borough to "support any applications for Government Approvals" and to "execute any documents required to obtain such approvals and otherwise to cooperate with the Redeveloper with respect to same", Emerson refused to issue the permits, asserting the Project contained monitoring wells from prior environmental cleanup and demanding that the redeveloper obtain documentation from the NJDEP

concerning the monitoring wells. I am not aware of any basis under the law, the Settlement Agreement or the Redeveloper Agreement to condition the issuance of these permits on such action. As is or should be well known to Emerson, there were four monitoring wells on the site that were decommissioned years ago and are no longer in use. Nonetheless, they used this "frivolous excuse" to delay these permits in clear breach of the Redevelopment Agreement.

      e.    **Refusal to Issue Permits for Cutting and Capping Sewer and Water Lines.** Once again Emerson refused to allow cutting and capping of sewer and water lines until all demolition permits were complete for all lots. There is no basis for this denial and refusal which did nothing but cause additional delay and expense.

      h.    **Signoff by Fire and Police.** As the redeveloper sought the signature on the site plan so that construction permits could be obtained, Emerson continually attempted to condition the signature from Emerson on the police and fire departments "signing off" on the application. No such written comments or issues were ever presented by police and fire departments, over whom the redeveloper had no control. This represents yet another example of Emerson exploiting any conceivable baseless ground upon which to hold up or "scale back" (in the words of Mayor DiPaola) the Project.

      i.    **Demand for Improper Information from Asbestos Contractor.** When the Redeveloper was finally able to begin asbestos removal, Emerson demanded that the contractor provided the names of all workers. Such a request was without any legal basis and had the desired effect of causing additional time, effort and money on the part of the Redeveloper. Ultimately, Emerson was compelled to withdraw this frivolous request.

18.    In the spring of 2020, the Redeveloper submitted applications for permits to begin footer and foundation work. By email dated July 27, 2020, Richard Silvia, Borough Construction

Official, informed us that the application for the permits was complete, that his Technical Assistant was calculating the permit fees, that the permit fee amounts would be provided on July 28, 2020, and that upon payment of the permit fees the permits could be picked up from the Borough. On July 29, 2020, Mr. Silvia again emailed, indicating that the permit fees are $115,502.00, that the Borough would accept check or money order, and that the Redeveloper could have the permits upon payment of the permit fees.

19.     However, on August 5, 2020, in response to a question from the Redeveloper on the fees, Mr. Silvia stated that the Redeveloper has to pay a "cash performance bond" as well as one half of the COAH development fee prior to the footing and foundation permit being issued, and enclosed a homemade "checklist" of pre-permit requirements he was imposing. We responded to Mr. Silvia on August 10, 2020, with a request for additional information:

- How was the cost of the permit fee calculated?
- Why does the performance bond have to be in cash?
- What is the authority for a cash bond?
- How much is the performance bond?
- How is the performance bond calculated?
- How much is the COAH development fee?
- How is the COAH development fee calculated?
- Where does the checklist come from, and what is the authority for the checklist?

20.     On August 12, 2020, Mr. Silvia responded, indicating that the permit fee was calculated "as per the State Uniform Construction Code Chapter 132 Section 3 Fee's and by Borough Ordinance 1603-19. As you know, the calculation of construction permit fees under the Construction Code and the Borough Ordinance is a detailed undertaking, involving the aggregating of multiple fees for multiple items." Nevertheless, Mr. Silvia failed to provide the requested

breakdown as to how the Borough actually calculated the permit fee. Mr. Silvia further stated that the performance bond requirement is in the Redevelopment Agreement, and must be a certified check (not cash as he had previously represented). However, he did not disclose the amount of the performance bond, and admitted he does not know how much the bond is or how it is calculated. Mr. Silvia did not respond at all to the request for information on the COAH development fee, or the meaning of and authority for the checklist.

21. It was clear at that point that Emerson had decided to shut down the Project completely, notwithstanding the pendency of the motion in aid of litigant's rights. Emerson refused to provide the breakdown of how it has calculated the permit fee, and simply demanded that ERUR accept the amount of the fee on faith. Further, although the permit has been made contingent upon first posting a performance bond and paying half the COAH development fees, Emerson refused to disclose how much they were, or provide a breakdown of their calculations, or even when they will be calculated. Indeed, I understand that under New Jersey law, it is Emerson's obligation to provide an estimate of the performance bond, and an itemized cost estimate of the improvements, which itemized estimate must be appended to the performance bond.

22. Finally, Emerson could not lawfully demand **ANY** COAH fees, as the Project includes low and moderate income housing, and is therefore exempt from having to pay COAH fees of any kind.

23. The permits were not properly issued until after the Monitor was appointed, causing extensive additional delay.

24. Of course, the desired result of the delay, and the result we suffered, was to increase costs and expense dramatically and interfere with the construction of Affordable Housing required

under the Settlement Agreement. Unquestionably, Emerson hopes to drive the costs up to a level where the Project is no longer economically viable, and thereby derail the Project. Those actions and Emerson's efforts to derail the Project have continued despite the appointment of the Monitor in this case.

**Building Permits**

25. Richard Silvia has been the Construction Official of Emerson since August 2019, having been hired by the DiPaola administration. He has been at the center of our problems with Emerson, as applications for permits and all inspections go through him. Time after time he has delayed and denied lawful permits, and caused damage to the Project. Nearly all of the aforesaid issues that involve delayed permits, or excessive demands for issuance of permits, was at the behest of Mr. Silvia.

26. On November 5, 2021, applications were delivered to Emerson for building, fire and electrical permits for the Project. Pursuant to the Order appointing the Monitor, Emerson has 28 days to act on those applications, failing which they are to be approved by the Monitor.

27. Not one of the applications has been acted upon to date. Rather, Richard Silvia, the Emerson building code official, informed the Redeveloper he needs a minimum of 6 weeks to act on any permit applications.

28. With respect to the building permit, the building department has not responded to any of our follow-up emails -- no response at all. In fact, we have not seen the building inspector since November 5, 2021, when the drawings were submitted.

29. With respect to the plumbing permit, our on-site superintendent of construction spoke briefly to the plumbing inspector at approximately 3:30 p.m., on Thursday, December 2,

2021, when he was at the building department. The Superintendent asked for an update of the application, and was told "it's still under review."

30. As regards the application for electrical permits, our superintendent spoke briefly to the inspector on November 29, 2021, when the inspector asked if we could change quantities on tech sheet. On December 7, 2021, the inspector requested that we provide panel schedules, which were already attached to the tech sheet that are included on the plans.

**Emerson's Latest Excuse:  It Claims It is not Appropriately Staffed to Inspect The Project**

31. Emerson's latest excuse for not complying with the 28 day review requirement in Judge Padavano's order is the claim of their inspector that cutbacks at Emerson have reduced the number of inspectors, and made it impossible for any approvals and inspections to take place in anything less than six weeks. The issue of expedited review of our permit applications was one of the key issues we presented to Judge Padavano which led him compel Emerson to stop their delaying tactics and issue permits within 28 days. It appears that the town may be denying resources to the building department (assuming what we were told is true) as their latest creative attempt to cause us harm and delay the project.

32. During a meeting of the Borough Council on October 19, 2021, Mr. Silvia informed the Board that he and his staff cannot inspect the Project. He stated that he has only part time inspectors available, who work for other towns as well, and who can spare only four hours a week for inspections in Emerson. The video of the meeting can be seen at https://youtu.be/ItUroAlESso, and Mr. Silvia's remarks on his lack of staffing begin at 17:55.

33. Although Mr. Silvia urged the Council to retain additional inspectors, there has been no mention of this request in subsequent meetings of the Council. Further, it is clear from

the video that Mr. Silvia is very intimidated by the Project, and that it is well beyond his experience and abilities. He repeatedly told the Borough Council that it is "mind boggling" how much inspection work there will be from the "massive" Project.

34. It appears that Mr. Silvia's first position in code inspection or enforcement was when he was hired by Emerson in August 2019. The Emerson website does not provide any information on Mr. Silvia's background. However, he maintains a Linked-in page at https://www.linkedin.com/in/richard-silvia-17b4251b/, that details significant experience in fire and ambulance services, and that he is currently a full time employee of the Bergen County arson squad. However, his code enforcement and or code inspection experience seems to be a side business he started in 2017 named RS Consultants, wherein he acts as a consultant for, among other things, code enforcement. Even so, the services he lists for RS Consulting are heavily weighted to fire and fire safety issues, and not building code enforcement or inspections. The company does not appear to have a website.

35. Mr. Silvia's Linked-in page also states that he is currently:

    a. An instructor at the Bergen County EMS training center; and

    b. President of the New Jersey Fire Prevention & Protection Association.

36. Mr. Silvia's experience on his Linked-in page does not list anything related to code inspection prior to become a code official at Emerson in August 2019.

37. Mr. Silvia's formal education as listed by him in his Linked-in page is as follows:

National Association of Fire Investigators
Degree Name: Certified Fire/Explosive Investigator, Certified Vehicle Fire Investigator
Field Of Study: Fire/Arson Investigation and Prevention
Dates attended or expected graduation: 2013 – 2014

National Association of Fire Investigator's
Degree Name: Certified Fire Explosive Investigator
Field Of Study: Fire/Arson Investigation

8493686 v1

> Dates attended or expected graduation: 2011 – 2012
>
> PCCC
> Degree Name: AAS
> Field Of Study: Fire Science
> Activities and Societies: NJFMBA, NJIAAI, IAAI, NFPA, BCFPPA, NJFPPA, AFAA, AFPE.
>
> Passaic County Community College, Federal Law Enforcement Training Center, National Fire Academy
> Degree Name: Fire Science, Fire Investigation
> Fire Technology, Fire Investigation/Evidence Collection

38. Tellingly, Mr. Silvia stated earlier in the Council meeting that all inspections must be approved be either he or his assistant Ron Cenicola, and he later states "My final say is what goes on down there."

**Other Issues Raised By Mr. Silvia On October 19, 2021**

39. During the October 19, 2021, Council meeting, Mr. Silvia was asked by Mayor DiPaola to "report" on the Project. His "report" was significantly erroneous, and was clearly designed to disparage the Project, and attempt to create a false record.

> a. Mr. Silvia told the Council the Redeveloper had just applied for footing permits. The truth is the Redeveloper submitted applications for footer and foundation permits in the spring of 2020, and they were illegally declined by Mr. Silvia. In 2020, he demanded, among other things, that the Redeveloper pay COAH fees to the Borough, despite that legally they cannot be levied against developments containing Mt. Laurel housing. Our counsel wrote to Emerson's counsel on August 18, 2020, detailing the illegal delay and hindrance in issuance of the footer and foundation permits. Thus, there is simply no truth to Mr. Silvia's statement to the Council that we just applied for footer permits;

8493686 v1

    b. Mr. Silvia stated that we started doing excavations illegally without permits. This is simply inaccurate;

    c. Mr. Silvia made an issue about contamination of soil from a former dry cleaner at the Project, intimating that the Project had been delayed by our failure to timely begin the testing process. The issue of contamination is solely a State issue, and the Borough cannot get involved. We work closely with NJDEP, which tells us what to test, when to test, and approves the environmental contractors we hire. Further, NJDEP has the ultimate (and only) approval of any testing or remediation, not the Borough;

    d. Mr. Silvia repeatedly told the Council the Redeveloper has had three different contractors working on the Project. This is simply untrue, the Redeveloper is the only contractor on the Project.

40. The New Jersey Department of Community Affairs, in addition to licensing all municipal code officials, has its own group of code inspectors. Further, licensed inspectors from other municipalities can be hired to conduct inspections. Given Mr. Silvia's lack of experience and clear fear of the Project, and his demonstrated animosity to the Redeveloper and the Project, as well as that the clear animosity of the Borough to the Redeveloper and the Project, we should be permitted to hire inspectors from other municipalities to do the inspections, or that DCA inspectors be requested for the remainder of the Project.

**Current Status of Construction**

41. As of December 13, 2021, we pulled our people off the site. Due to the lack of permits, we cannot perform any further work until the permits are issued. The plumber and

electrician have been pulled off the site because there is no work they can perform in the absence of the permits. On December 14, 2021, one of my employees physically went to the Emerson Building Department to see if he could get a permit issued – the Borough was unresponsive, and there was no movement on the permits.

42. The Redeveloper will not be able to complete the Project if the current Building Department is permitted to review the permit applications. It is clear they are intent on continuing to delay even though Judge Padovano entered his Order.

43. I further note that under the Construction Code, the municipality has 20 days to approve a permit, failing which it is deemed denied, and the developer can appeal to the Construction Board of Appeals. Due to the severe problems we documented to the Court concerning trying to get prior permits from Emerson, we sought a modification of this procedure in our motion in aid of litigant's rights. Judge Padavano granted our request, and significantly altered the procedure, so that if a permit is not issue in 28 days, the Monitor can Order the Borough to issue the permit. This was a central issue in our application to Judge Padavano, and is clearly critical to completion of the Project.

44. If this Project continues along this path, with the continued and even heightened resistance from the Borough, the cost overruns will be so significant that it will no longer be economically viable.

**The Off-site Location**

45. The Redeveloper purchased the property at Block 610, Lot 10 for the 7 off-site units on March 19, 2019. I had many discussions with Borough officials prior to the property being purchased, and the Borough has always been aware that it was intended to be used for the 7 off-

8493686 v1

site units, and that we would not be able to comply with the commercial on the ground floor requirement, or the ban of multi-family housing on the ground floor. At no time did any Borough official ever suggest that we would not be able to have the 7 units at that property, without commercial space on the ground floor.

46. Further, despite extensive communications about the off-site location prior to the Redeveloper's selection of the off-site location, at no time has anyone in the Borough ever suggested or come forward with another location for the 7 off-site units. At the time we purchased the property, I was not aware of any other suitable and available property in the Borough. I am not aware today of any other suitable and available property in the Borough. Having to locate and purchase another property at this time will substantially increase the costs of the Project, and make it financially untenable.

I certify that the foregoing statements by me are true. I am aware that if any of the forgoing statements made by me are willfully false, I am subject to punishment.

_____
Yaakov "Jack" Klugmann

Dated: December 15, 2020