UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHAMBERS OF<br>MADELINE COX ARLEO<br>UNITED STATES DISTRICT JUDGE | MARTIN LUTHER KING COURTHOUSE<br>50 WALNUT ST. ROOM 4066<br>NEWARK, NJ 07101<br>973-297-4903 |

April 22, 2025

VIA ECF
All Counsel of Record

**LETTER ORDER**

Re:  **Emerson Redevelopers Urban Renewal, LLC v. The Borough of Emerson, New Jersey et al.**
    **Civil Action No. 20-4728**

Dear Litigants:

Before the Court are Defendants Danielle DiPaola's ("DiPaola") and the Borough of Emerson's ("Emerson" or "the Borough") motions for summary judgment, ECF Nos. 82 and 83, respectively. Plaintiff Emerson Redevelopers Urban Renewal, LLC ("ERUR") opposes the motions. See ECF No. 84. For the following reasons, the Defendants' motions are **GRANTED**.

**I.    BACKGROUND**

This dispute centers around the redevelopment of Emerson's downtown, specifically the construction of a mixed-use apartment building with affordable units aimed to satisfy, in part, Emerson's obligations under New Jersey's Mount Laurel doctrine. Broadly speaking, the doctrine "prohibits municipalities from using their zoning laws to exclude lower income households and obligates them to affirmatively provide a realistic opportunity for construction of its fair share of l[o]w and moderate income housing." Mt. Holly Citizens in Action, Inc. v. Twp. of Mount Holly, No. 08-2584, 2009 WL 3584894, at *11 (D.N.J. Oct. 23, 2009) (summarizing Mount Laurel cases).

**A.   Emerson Works Toward Compliance with the Mount Laurel Doctrine.**

Over twenty years ago, pursuant to a builder's remedy lawsuit under the Mount Laurel doctrine, New Jersey state Judge Jonathan Harris, J.S.C., declared that Emerson "persists as a bastion of exclusionary zoning" and that the Borough "has steadfastly resisted taking affirmative steps to provide realistic opportunities for affordable housing within its borders." See ECF No. 82.3 ("Seaman Decl."), Ex. B at 1. While Judge Harris did not ultimately enter a builder's remedy, he directed Emerson "to adopt all affirmative measures . . . in order to fulfill its constitutional obligations to provide shelter opportunities for the beneficiary class of unhoused poor." Id. at 2.

In efforts to secure compliance with Judge Harris's ruling, Emerson took affirmative steps to provide additional affordable housing over the course of several years. In 2004, Emerson began to investigate property within the Borough, including Blocks 419 and 610, to determine whether

1

it "met the statutory criteria to be designated as an area in need of redevelopment," ECF No. 84.1 ("Fiorenzo Cert."), Ex. 14 at 1 (quotation marks omitted).  Finding redevelopment appropriate for those properties, the Borough fashioned a plan to there provide its fair share of affordable housing.  See generally id. (2016 ordinance describing redevelopment investigation, formation of redevelopment plan, and various subsequent amendments to said plan); see also Fiorenzo Cert., Ex. 5 (report detailing 2006 Redevelopment Plan).

In 2015, Emerson sought a declaratory judgment to "declare that its fair share plan is in compliance with the requirements of the Mt. Laurel Doctrine" and asked the New Jersey Superior Court to "issue of a judgment of repose insulating the Borough from exclusionary zoning lawsuits for a period of ten (10) years."  Fiorenzo Cert., Ex. 7 at 10.

During the pendency of that lawsuit, Emerson entered into a "Redevelopment Agreement" with ERUR, which provided for the construction of a mixed-use development on Block 419 of Emerson.  ECF No. 82.2, DiPaola Statement of Undisputed Material Facts ("DiPaola SUMF") ¶¶ 1, 6.  The development as planned contains 14,000 square feet of retail space and 147 living units.  See Seaman Decl., Ex. Q ("Klugmann Dep.") at 19:4–20:1.  Of those 147 units, 22 are earmarked as "affordable."  Id.; see also Fiorenzo Cert., Ex. 34 ¶ (g).  An additional seven affordable units were planned to be built off-site in Emerson, see Fiorenzo Cert., Ex. 34 ¶ (g), purportedly on Block 610, see Klugmann Dep. at 19:4–20:1.

With a workable Redevelopment Agreement in place and a development partner selected, Emerson entered into a Settlement Agreement with respect to the declaratory judgment action in November 2017, see generally Fiorenzo Cert., Ex. 21, which the New Jersey Superior Court subsequently approved, see generally Fiorenzo Cert., Exs. 24, 38.  The Court entered a "Conditional Final Judgment of Compliance and Repose" on January 25, 2019.  See generally Fiorenzo Cert., Ex. 38.

The Redevelopment Agreement between ERUR and the Borough was amended three times: first on October 4, 2016, Seaman Decl., Ex. D, next on November 20, 2017, id., Ex. E, and finally on December 31, 2018, id., Ex. F.  The third amendment allowed Accurate Builders, which is owned by Jack Klugmann, "to join the project as the majority owner of ERUR," DiPaola SUMF ¶ 9; Seaman Decl., Ex. F at 2.

Just days after the third amendment was approved, Defendant Danielle DiPaola was sworn in as Emerson's new mayor.  DiPaola SUMF ¶ 8.

**B. DiPaola Publicly Opposes the Development.**

DiPaola, who served as a councilwoman before becoming mayor, see Seaman Decl., Ex. A ("DiPaola Dep.") at 7:19–8:1, had voted against several measures related to the project as a councilwoman.  DiPaola SUMF ¶ 16.  In her deposition, DiPaola testified that she was opposed to the development because the building, which would be four stories tall, was too dense and too big for Emerson's downtown.  DiPaola Dep. at 68:18–23, 84:9–85:22.  She further opposed the construction because it required the use of eminent domain.  Id. at 75:13–15, 77:2–24, 85:17–86:11.  At a town meeting, councilwoman DiPaola also questioned the financial viability of the project with respect to a "payment in lieu of taxes" agreement and asked what would happen if

funds from the Borough had to be given to the school system to support children from the development if the project turned out to be a "big white elephant." Fiorenzo Cert., Ex. 15 at 4, 6.

DiPaola carried these sentiments into her mayoral race, and publicly expressed her opposition to the development while campaigning and after her election.

A local newspaper reporting on DiPaola's electoral success indicated that DiPaola had referred to her win as "a referendum on overdevelopment." Fiorenzo Cert., Ex. 26 at 2. The paper explained that DiPaola had "opposed [B]orough tactics against holdout property owners, questioned where additional affordable housing is expected to go, and has called for greater transparency of the deal." Id. And, while campaigning, DiPaola allegedly expressed to the paper that "[m]y opponents have said I'm against progress, but this couldn't be further from the truth. I've always supported and voted yes on projects that actually improve the [B]orough while still being consistent with its small-town character."[1] Id.

The same newspaper reported mayor-elect DiPaola as critiquing the development's physical appearance during a town meeting, referring to the project's rendering as "too big and boxy," and asking whether the design was "really what you want to see in the downtown for the next 100 years." Fiorenzo Cert., Ex. 31 at 3. At that same meeting, DiPaola asked "[h]ow is this good planning for the [B]orough of Emerson? How does this benefit the [B]orough of Emerson in any way other than satisfying our affordable housing obligation? Because this, to me, does not look like it benefits Emerson." Fiorenzo Cert., Ex. 29 at 138:7–11.

After assuming office, DiPaola continued to express concern about the development. At an annual meeting of local mayors, the paper reported DiPaola telling her audience that Emerson was "trying to scale [the development] back and make it more of a reasonable development that is friendlier to our small downtown."[2] Fiorenzo Cert., Ex. 37 at 5; see also DiPaola Dep. 220:6–222:15. And at a meeting of the Greater Pascack Valley Chamber of Commerce, DiPaola lamented that, because of the affordable housing project, Emerson had "lost seven businesses so far. Two others are still open and they're fighting for their lives." Fiorenzo Cert., Ex. 96 at 1; see also DiPaola Dep. at 242:1–22. DiPaola also apparently predicted that "traffic is going to be a very big issue" around the development. Fiorenzo Cert., Ex. 96 at 2.

According to ERUR, however, DiPaola's opposition to the development extended beyond public comment and into concrete action.

### C. DiPaola's Administration Allegedly Interferes with the Development.

ERUR claims that the Block 419 development had been proceeding as planned before DiPaola assumed office in January 2019, and ERUR had "obtained all required governmental

---

[1] In her deposition, DiPaola testified that she was against "any overdevelopment" but "guess[ed]" that the newspaper's discussion of redevelopment was in reference to the Block 419 project at issue here. See DiPaola Dep. 161:8–163:6.

[2] DiPaola admitted during her deposition that she "wasn't able to" scale the project back because it was already approved, "which is why it didn't happen." See DiPaola Dep. 222:16–223:15.

approvals." ECF No. 84 ("Opposition") at 1. After, DiPaola's administration allegedly "raised procedural hurdles at every turn . . . all as a pretext to raise the costs and delay affordable housing in the hope that [ERUR] would grow frustrated and abandon it entirely." Id. at 1–2; see also ECF No. 90 ("Klugmann Cert.") at ¶ 14.

In its submissions to the Court, ERUR details several discrete actions it argues the Borough has taken to "slow roll" the project, causing delay and increasing costs. See generally Klugmann Cert.; Opp'n at 10–12, 21–22; Fiorenzo Cert., Ex. 2. By way of example, Klugmann claims that Emerson has arbitrarily delayed or denied the issuance of demolition permits, Klugmann Cert. ¶¶ 17.a, d, refused to issue a fence permit, id. ¶ 17.b, refused to issue the required permits and consents for work on the sewer systems, id. ¶¶ 17.c, e, arbitrarily conditioned approval of construction permits on the police and fire department "signing off" on certain applications, id. ¶ 17.h, and demanded improper information from ERUR's asbestos removal contractor, id. ¶ 17.i.

### D. ERUR Takes Legal Action against Emerson.

To protect its interests, ERUR filed an application in aid of litigants' rights in New Jersey Superior Court in June 2020, arguing that Emerson's conduct violated the Court's Conditional Final Judgment. See In the Matter of the Application of the Borough of Emerson, New Jersey, for a Declaratory Judgment, No. BER-L-6300-15, Notice of Motion By Emerson Redevelopers Urban Renewal LLC, To Enforce Litigant's Rights Pursuant to R.1:10-3 (June 24, 2020).[3]

In March 2021, the Superior Court granted ERUR's application in part, appointing a "Mt. Laurel Implementation Monitor" and requiring, among other things, that "all applications for building permits, or for other governmental approvals, sought by [ERUR] from the Borough of Emerson shall be reviewed . . . on an expedited basis." Fiorenzo Cert., Ex. 105; see also Fiorenzo Cert., Ex. 106 (court order appointing Hon. Harry G. Carroll, JAD as the implementation monitor).

ERUR filed the instant suit in April 2020, a few months before it sought to enforce its rights in state court, asserting substantive due process and equal protection violations under 42 U.S.C. § 1983, along with pendent state law claims, against DiPaola and the Borough. ECF No. 3. This Court dismissed that complaint without prejudice. See ECF No. 24.

ERUR filed an Amended Complaint in March 2021, asserting the same counts against DiPaola and the Borough. See ECF No. 25. This Court permitted all counts to move forward except for the alleged equal protection violation. See generally ECF No. 36.

Now, Defendants DiPaola and Emerson move for summary judgment on the remaining counts: (1) violation of substantive due process, contrary to the Fourteenth Amendment and § 1983; (2) breach of contract; (3) breach of the cooperation covenant; (4) breach of the implied covenant of good faith and fair dealing; and (5) violation of the New Jersey Civil Rights Act, N.J.S.A. §§ 10:6-1, et seq. ("NJCRA").

---

[3] The Court may take judicial notice of state court filings, including the record from previous court proceedings between the parties. See Roche v. Aetna, Inc., No. 22-607, 2023 WL 3173394, at *3 (D.N.J. May 1, 2023).

## II. DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56(a), the Court will grant a motion for summary judgment if the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. See Scanlan v. Am. Airlines Grp., 102 F.4th 164, 170 (3d Cir. 2024). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Physicians Healthsource, Inc. v. Cephalon, Inc., 954 F.3d 615, 618 (3d Cir. 2020) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The Court construes all facts and inferences in the light most favorable to the non-moving party. See id. At the summary judgment stage, the Court's role is not to weigh the evidence and determine the ultimate truth of the allegations. Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019). Keeping in mind these well-established standards, the Court addresses the Defendants' motions.

### A. Substantive Due Process

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." Shuman ex rel. Shertzer v. Penn Manor Sch. Dist., 422 F.3d 141, 146 (3d Cir. 2005). A substantive due process violation occurs if a government actor works "'an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement' that it is barred by the Fourteenth Amendment." Button v. Snelson, 679 F. App'x 150, 154 (3d Cir. 2017) (quoting City of Sacramento v. Lewis, 523 U.S. 833, 840 (1998)).

To state a prima facie case under § 1983, ERUR must establish, among other things, that "the particular interest at issue is protected by the substantive due process clause and the government's deprivation of that protected interest shocks the conscience." Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).

But not all wrongful executive behavior "shocks the conscience"—even when the behavior appears to be driven by "improper motive[s]" or taken in "bad faith." See 1201 W. Girard Ave., LLC v. Clarke, No. 23-3194, 2024 WL 4403866, at *2 (3d Cir. Oct. 4, 2024). Rather, "only the most egregious official conduct" satisfies that standard. See Button, 679 F. App'x at 154 (quotation marks omitted).

What conduct shocks the conscience varies based on the facts, but in the land-use context, Courts "look for evidence of corruption, self-dealing, intentional interference with constitutionally protected activity, virtual 'takings', or bias against an ethnic group on the part of local officials." Id. (citing Eichenlaub v. Township of Indiana, 385 F.3d 274, 286 (3d Cir. 2004)). Absent such evidence, a substantive due process claim fails: Courts will not be "cast in the role of a zoning board of appeals." United Artists Theatre Cir., Inc. v. Township of Warrington, 316 F.3d 392, 400 (3d Cir. 2003) (quotation marks omitted).

Here, the parties agree that ERUR has a property interest protected by the substantive due process clause. Compare ECF No. 82.1 at 15, with Opp'n at 14 n.1. Where they disagree is whether DiPaola's and the Borough's conduct "shocks the conscience."

To supports its claim that DiPaola's and the Borough's behavior shocks the conscience,

ERUR relies on two general theories: first, that Defendants' actions were motivated by race-based discriminatory animus, see Opp'n at 16–23, and, second, that Defendants' conduct is evidence of political corruption and self-dealing, see id. at 23–25.

### 1. Race-Based Discriminatory Animus

ERUR contends that Defendants' efforts to impede the redevelopment project are motivated by racial animus. In other words, Defendants are acting with the covert purpose of keeping minorities—who may choose to live in the affordable housing units—out of Emerson by delaying the construction of affordable housing. Indeed, "race-based discriminatory enforcement [concerning zoning and land-use decisions] would certainly constitute conscience shocking behavior," Thorpe v. Upper Makefield Township, 758 F. App'x 258, 261 (3d Cir. 2018), but the Court finds that the "evidence proffered by [ERUR] is insufficient proof" of such animus to survive summary judgment, id. at 262.

As evidence of racial animus, ERUR first points to Judge Harris's 2001 opinion lambasting Emerson's failure "to provide shelter opportunities for the beneficiary class of unhoused poor," see Fiorenzo Cert., Ex. 3 at 3, and to Emerson's failure to provide additional affordable housing in the years following Judge Harris's decision, see Opp'n at 19. While Judge Harris's decision appears to discuss only discrimination against the poor—not discrimination against racial minorities, see Fiorenzo Cert., Exs. 3, 4—ERUR provides an expert report explaining that Emerson's lack of affordable housing disproportionately impacts racial minorities, see generally Fiorenzo Cert., Ex. 1 (the "Bernard Report").

Accepting as true ERUR's arguments that Emerson's failure to provide affordable housing disproportionately impacts minority households, see generally Bernard Report; Opp'n at 19, 22–23, and that Emerson had yet to fully satisfy its affordable housing obligations as of the filing of this suit, see Fiorenzo Cert, Ex. 61; Opp'n at 23, the Court still cannot conclude that such downstream effects on minorities can alone demonstrate discriminatory intent sufficient to constitute conscience-shocking behavior. Cf. Commonwealth of Pennsylvania v. Flaherty, 983 F.2d 1267, 1273 (3d Cir. 1993) (in the constitutional context, "discriminatory intent may be proven indirectly . . . on the totality of the facts, including disparate impact[, but only] if coupled with some other indicia of purposeful discrimination." (quotation marks omitted)); Rittenhouse Ent., Inc. v. City of Wilkes-Barre, 782 F. App'x 148, 153–54 (3d Cir. 2019) ("[U]se of the police power to discriminate intentionally on the basis of race violates substantive due process." (emphasis added)).

Further, while ERUR accuses Emerson of maintaining the "status quo" regarding affordable housing, see Opp'n at 19, it overlooks the affirmative steps ERUR itself acknowledges Emerson took in the wake of Judge Harris's decision, see id. at 7–9. It also fails to address Emerson's rebuttal expert report which details increasing racial diversity within Emerson and discusses the existing affordable housing developments in Emerson, as well as the Borough's "implement[ation of] several affordable housing ordinances to implement inclusionary housing." See ECF No. 83.7 ("Preferred Planning Group Rebuttal Report") at 2.

In an effort to provide additional indicia of purposeful discrimination, ERUR next points to DiPaola, arguing that while "[DiPaola] never told [ERUR] directly or publicly stated that she

6

was acting to stop African-American or Hispanic communities from living in Emerson, she did employ coded language that relied upon prejudiced tropes." Opp'n at 19–21.

It is not lost on this Court that bad actors with discriminatory motives will "cover their tracks," Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 275 (3d Cir. 2014), and rely on "code words" or phrases to communicate animus, Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996). But the Court does not find that DiPaola's statements can be fairly characterized as "rely[ing] on prejudiced tropes," Opp'n at 19, such that a reasonable jury could find that any of DiPaola's statements belied discriminatory intent.[4]

For example, ERUR points to DiPaola's statement that, as a result of the redevelopment, Emerson "lost seven businesses so far. Two others are still open and they're fighting for their lives." See Fiorenzo Cert., Ex. 96. When asked about this statement during her deposition, DiPaola, a small business owner herself, see Fiorenzo Cert., Ex. 26 at 2, testified that she was "sad that businesses were being taken over" in furtherance of the development, even though "[t]here was no way to help them," DiPaola Dep. 242:1–25. The Court is hard pressed to understand how a factual statement regarding the closure of businesses in Emerson and an expression of concern regarding the remaining businesses can be fairly attributed to race.

ERUR also points to DiPaola's alleged statement that Emerson would be "bleeding because funds had to be given to the school system to sustain the children" that move into the development. See Opp'n at 2, 10, 20. But this "statement" is divorced from crucial context: In a town meeting concerning a "payment in lieu of taxes" or "PILOT" agreement between the Borough and the developer, an attorney explained the agreement's financial details and how the tax proceeds would be distributed between the Borough, the school system, and the County. Fiorenzo Cert., Ex. 15 at 5. The meeting minutes summarize then-councilwoman DiPaola as remarking that the "numbers sounded great" but questioning "what would happen if the development turned into a big white elephant and they were not getting the anticipated revenue or could not sustain the rents they anticipated." Id. at 6. She further "asked what would happen if more affordable housing had to be made available just to make ends meet and then there were more children. She said that in that case, Emerson would be stuck in a 30 year agreement with a redeveloper and the Borough

---

[4] In his deposition, Jack Klugmann testified that DiPaola had made inappropriate statements about the Orthodox Jewish community. Klugmann Dep. 40:2–5. Klugmann, himself Orthodox, id. 45:8, said that DiPaola made a comment about a kosher breast milk facility potentially being a tenant in the redevelopment, id. at 41:4–43:1, though Klugmann did not specify what precisely DiPaola said. Klugmann also testified that DiPaola had "went around to people's houses" telling them she did not want Orthodox or Hasidic Jews "to come take over her town." See, e.g., id. at 44:9–45:9, 57:17–58:22. When pressed, Klugmann could not remember who told him that DiPaola had indicated she did not want those communities in Emerson, and DiPaola's counsel requested that Klugmann provide that information. Id. at 65:19–66:12. It appears that ERUR was unable to provide that evidence, see ECF No. 82 at 12, and, despite DiPaola's lengthy arguments in her briefing concerning these allegations, ERUR makes no mention of DiPaola's purported antisemitism in its Opposition. Further, these specific allegations are absent from ERUR's Amended Complaint, see ECF No. 25, and ERUR has not sought to further amend its contentions. As such, the Court assumes that ERUR has abandoned this theory and will not address it here.

would be bleeding because funds had to be given to the school system to sustain the children." Id. Again, in context, it is not apparent that DiPaola's questions regarding the PILOT agreement evidence any discriminatory intent, but rather genuine curiosity and concern about the development's financial sustainability.

In a final attempt to show purposeful discrimination, ERUR relies on an expert report from a consulting firm detailing additional conditions the Borough purportedly imposed on ERUR after the Borough's Land Use Board had "granted a Resolution of final, non-appealable development approvals to [ERUR] for the construction of the [p]roject." Opposition at 21 (citing Fiorenzo Cert., Ex. 2 ("Bowman Report")). These additional conditions included, for example, a soil evaluation report, a meter study for the existing sewage system, and a traffic study. Bowman Report at 6–9. The Borough also allegedly "conditioned the issuance of demolition permits" upon "ERUR obtaining a certification from [New Jersey Department of Environmental Protection] that there was no contamination on the [p]roject tract," id. at 10, failed to "promptly commence and prosecute" condemnation proceedings against a local business on Block 419, id. at 13–14, and imposed limitations on the project that the Land Use Board had previously rejected, id. at 6.

While the Borough may have ultimately acted ultra vires by imposing the aforementioned conditions, the Borough's actions still do not raise the "reasonable inference[]" of race-based discrimination, see Blunt, 767 F.3d at 275, when viewed alone or together with DiPaola's statements and ERUR's expert report describing discriminatory impact.

Accordingly, the Court cannot conclude that DiPaola's and Emerson's land-use decisions "shock[] the conscience because [they] were motivated by racial animus." Thorpe, 758 F. App'x at 261.

### 2. Corruption and Self-Dealing

ERUR next contends that the Defendants' "purpose of obstructing [the development] and its affordable housing obligations was the Emerson officials' own political gain." Opp'n at 23–25. Here, ERUR has not identified any specific corrupt or self-interested conduct beyond DiPaola's commitment to her platform and desire to please her constituents. ERUR instead points to Defendants' violation of "their obligations pursuant to the New Jersey Supreme Court's Mount Laurel decision" and the New Jersey Superior Court's Conditional Final Judgment of Compliance and Repose in the declaratory judgment action "requiring that Emerson build [ERUR's] development," id. at 23–24, as conscience-shocking.

But "if pleasing voters were suspect, so would be the concept of representative democracy." Clarke, 2024 WL 4403866, at *2. And even "bad-faith violation[s] of state law remain[] only . . . violation[s] of state law." See, e.g., United Artists, 316 F.3d at 402 ("[E]very appeal by a disappointed developer from an adverse ruling of the local planning board involves some claim of abuse of legal authority, but it is not enough simply to give these state law claims constitutional labels such as due process or equal protection in order to raise a substantial federal question under section 1983." (quotation marks omitted)); Highway Materials, Inc. v. Whitemarsh Township, 386 F. App'x 251, 258 (3d Cir. 2010) ("If defendants intentionally misapplied [local] ordinances and disregarded their duty under Pennsylvania law to conduct a good-faith evaluation of [plaintiff's] proposal, that remains only a violation of state law." (quotation marks omitted)); Dotzel v.

8

Ashbridge, 306 F. App'x 798, 801 (3d Cir. 2009) (holding that failure to follow a township attorney's advice, making decisions based on impact to neighbors, road conditions, and reduced property values—even if improper criteria on which to base a zoning decision—did not shock the conscience); Clarke, 2024 WL 4403866, at *2 ("At most, [defendant's] call violates the state law against ex parte communications, but such a violation is not a basis for a claim for denial of substantive due process.").

The Court also observes that, even if the Borough's imposition of additional conditions on ERUR were questionable and ultimately impermissible, ERUR cannot demonstrate that the Borough's actions were taken without any legitimate governmental objective. See Button, 679 F. App'x at 153–54. In opposition to ERUR's motion in aid of litigants' rights, the Borough's attorney certified to the New Jersey Superior Court that the main obstacles to Emerson's compliance with that Court's judgment were the "actions and inactions of [ERUR]." See In the Matter of the Application of the Borough of Emerson, New Jersey, for a Declaratory Judgment, No. BER-L-6300-15, Certification of Brian T. Giblin, Sr., Esq., In Support of the Borough's Opposition to the Motion in Aid of Litigant's Rights (July 30, 2020). In other words, it appears the Borough did not act against the advice of counsel and perceived it had some rational basis for its actions. Further, the Borough's requests for traffic studies and environmental contamination reports, among other things, generally reflect "legitimate concerns of local governments." See Highway Materials, Inc., 386 F. App'x at 258.

In short, "a state official's failure to follow state law does not, by itself, shock the conscience in the absence of additional facts," and "no such additional facts" have been presented here that a reasonable juror could find "suggest[] conscience-shocking behavior." Whittaker v. Township of Neshannock, 437 F. App'x 105, 109 (3d Cir. 2011) (citation omitted). Accordingly, the Court concludes that ERUR's substantive due process claim fails.

### B. Remaining State Law Claims

In addition to its substantive due process claim, ERUR asserts several state law claims against Defendants, including breach of contract, breach of the cooperation covenant, breach of the implied covenant of good faith and fair dealing, and violation of the New Jersey Civil Rights Act. Having dismissed the only claim over which this Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over those remaining state claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").

### III. CONCLUSION

Based on the foregoing, Defendants' motions for summary judgment, ECF Nos. 82, 83, are **GRANTED**. This case is **CLOSED**.

SO ORDERED.

*s/ Madeline Cox Arleo*
**MADELINE COX ARLEO**

9

**UNITED STATES DISTRICT JUDGE**